## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano, | ) |
| **Plaintiff** | ) |
| | ) |
| v. | ) |
| | ) |
| **The City of Nashua, New Hampshire; James** | ) |
| **Donchess, Mayor of the City of Nashua, New** | ) |
| **Hampshire; Kimberly Kleiner, Administrative** | ) |
| **Services Director of the City of Nashua, New** | ) |
| **Hampshire; John Griffin, Chief Financial Officer** | ) |
| **of the City of Nashua, New Hampshire, Jonathan** | ) |
| **Duhamel, former Chief Assessor of the City of** | ) Civil Action No. |
| **Nashua, New Hampshire, Steven Bolton,** | ) |
| **Corporation Counsel of the City of Nashua, New** | ) |
| **Hampshire; Celia K. Leonard, Deputy Corporation** | ) |
| **Counsel of the City of Nashua, New Hampshire;** | ) |
| **Michael Carignan, former Chief of Police of the** | ) |
| **City of Nashua, New Hampshire; Frank Lombardi,** | ) |
| **current Sergeant of the Police Department of the** | ) |
| **City of Nashua, New Hampshire; Inception** | ) |
| **Technologies, Inc.; and Raymond Feoli, Inception** | ) |
| **Tech. President,** | ) |
| **Defendants** | ) |

## VERIFIED COMPLAINT
### (JURY TRIAL DEMANDED)

### I.    Preliminary Statement (No Response Expected).

This Verified Complaint of Laurie Ortolano sets forth ten causes of action, sounding in: 1. Violations of 42 U.S.C. § 1983 for suppressing her free speech rights and retaliation against her for her exercise of speech and expression protected under the First Amendment to the United States Constitution; 2. Violations of 42 U.S.C. § 1983 for suppressing her right to petition government and retaliation against her for attempting to do so, which rights are protected under the First Amendment to the United States Constitution; 3. Violations of 42 U.S.C. § 1983 for

suppressing her right to substantive due process, which rights are protected under the Fourteenth Amendment to the United States Constitution; 4. Violations of 42 U.S.C. § 1983 for suppressing her right to procedural due process, which right is protected under the Fourteenth Amendment to the United States Constitution; 5. Violations of her right to access governmental proceedings and records under Part 1, Article 8 of the New Hampshire Constitution; 6. Civil Conspiracy under the New Hampshire common law; 7. Violations of NH RSA 91-A:3, II(c), which prohibits public officials from conducting public municipal sessions in which a person's reputation is adversely affected; 8. Defamation under the New Hampshire common law; 9. Abuse of process under the New Hampshire common law; and 10. Intentional infliction of emotional distress under the New Hampshire common law.

After suffering an abrupt 150% reevaluation of her (and her husband's) home and concomitant 150% increase of her property taxes, Laurie Ortolano investigated, and became a public critic of, the Nashua, New Hampshire municipal government, particularly as it pertained to the Assessing Department, its practices, and its policies. Laurie Ortolano investigated Nashua's municipal government by reviewing documents and obtaining information from the public files of the various city departments and then employed these documents and this information in support of her public criticism of the operations and policies of the City of Nashua. Sometimes her criticism was harsh. Sometimes her criticism was sarcastic. Sometimes it was biting. Once, it was claimed by some Nashua officials that her criticism was profane. But Laurie Ortolano's criticism never physically threatened anyone, never probed into anyone's private matters, and never entered the ambit of unprotected speech. At all times, Laurie Ortolano's criticism constituted protected free speech – indeed, highly-protected political free speech – under the federal and state constitutions, as well as New Hampshire statutory law.

The federal Constitution, New Hampshire Constitution, state law of New Hampshire, and City Charter of Nashua provide all persons, including Laurie Ortolano, broad rights of citizen access to municipal documents and information. State law also protects the rights of citizens to ensure that their government

remains open and accessible, and that citizens retain the right to complain to public officials and to seek administrative and judicial relief from the actions their governments take. In these regards, the Bill of Rights of the New Hampshire Constitution provides:

- <u>Article 8</u>:    All power residing originally in, and being derived from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them. Government, therefore, should be open, accessible, accountable and responsive. To that end, the public's right of access to governmental proceedings and records shall not be unreasonably restricted. The public also has a right to an orderly, lawful, and accountable government.

- <u>Article 22</u>:   Free speech and Liberty of the press are essential to the security of Freedom in a State: They ought, therefore, to be inviolably preserved.

- <u>Article 32</u>:   The People have a right, in an orderly and peaceable manner, to assemble and consult upon the common good, give instructions to their Representatives, and to request of the legislative body, by way of petition or remonstrance, redress of the wrongs done them, and of the grievances they suffer.

Of course, the Free Speech and Right to Petition Clauses of the First Amendment of the United States Constitution, ratified seven years after implementation of New Hampshire's Bill of Rights, provide for these same constitutional protections. Section 71 of Nashua's City Charter provides the public with a broad right to inspect municipal documents and information: "The books and records of the assessors shall be the property of the city, and at all times be open to public inspection during office hours." And finally, New Hampshire's Right to Know Law, NH RSA 91-A protects citizens' rights of open government and free access to government documents and information.

But thin-skinned Nashua public officials denied these constitutional and statutory rights of access to documents and information, and its channels of public

3

speech, to Laurie Ortolano for the sole reason that her criticisms made them feel "uncomfortable;" they did not enjoy being "the focus of her negative attention." When their efforts to prevent Laurie Ortolano from speaking at public meetings, and from obtaining public documents and information through legally available channels, failed to silence her, these public officials launched a public smear campaign against her and even defamed her. And when even those tactics failed to stifle Laurie Ortolano's public efforts to seek good government, they found a way to cause the municipal police department first, to warn her that she could be arrested for engaging in undeniably protected free speech activities, and then, to actually arrest her. The efforts of Nashua's municipal government to quell Laurie Ortolano's free speech rights have been systematic and have reached the highest levels of city government. And those efforts continue to this day; Nashua public officials have limited Laurie Ortolano's ability to speak during the public comment portion of public hearings and meetings, have attempted several times to have her arrested for free speech rights she has attempted to exercise in City Hall, and have continued to look for ways to have her arrested every time she steps into the building. Just three weeks before the filing of this Verified Complaint, Nashua's Corporation Counsel attempted to have Laurie Ortolano *arrested for trespass because he saw her in a public hallway on the third floor of the Nashua City Hall*. He insisted that the police arrest Ortolano on his claim that he had the authority to issue an oral ban from a public space on the spot, which he appears to believe triggered an instant criminal trespass because he had not wanted her to be there at the moment he issued the ban.

This Verified Complaint particularizes more than three years of Laurie Ortolano's quest to employ her constitutionally and statutorily protected rights to investigate Nashua's government and focus sunlight on its dysfunctional workings. More pointedly, it particularizes the deprivation of civil rights – the punishment – that the City of Nashua, through and by its public officials, has foisted upon her because they judged her criticism to be brazen and inimical to their personal desire to maintain unchecked power.

## II.    The Parties.

1.      The plaintiff, Laurie Ortolano ("Ortolano"), is an individual currently residing in Nashua, New Hampshire.

2.      The defendant, City of Nashua, New Hampshire ("Nashua") is a chartered and duly established city within the State of New Hampshire and, like other New Hampshire municipalities, has the capacity to sue and be sued. The Mayor's Office (the "Mayor"), Administrative Services Department ("Administrative Services"), Legal Department, Board of Assessors, Assessing Department, Financial Services Department, and Nashua Police Department ("Nashua PD"), are each duly created and existing boards or departments of the City of Nashua.

3.      The defendant, James Donchess ("Donchess" or "the Mayor"), is an individual currently residing in Nashua, New Hampshire. At relevant times, he was the Mayor of the City of Nashua.

4.      The defendant, Kimberly Kleiner ("Kleiner"), is an individual who currently resides in Nashua, New Hampshire. She was first, the Mayor's Chief of Staff until on or about March 1, 2019, and then became the Administrative Services Director of the City of Nashua.

5.      The defendant, John Griffin ("Griffin"), is an individual who, on information and belief, currently resides in Tyngsboro, Massachusetts. At relevant times, he was the Chief Financial Officer ("CFO") of the City of Nashua.

6.      Jonathan Duhamel ("Duhamel") is an individual who, on information and belief, currently resides in Manchester, New Hampshire. At times relevant to this action, he was the Chief Assessor of the Assessing Department of the City of Nashua.

7.      The defendant, Steven A. Bolton ("Bolton"), is an individual currently residing in Nashua, New Hampshire. At relevant times, he was the Corporation Counsel of the City of Nashua Legal Department.

8.      The defendant, Celia K. Leonard ("Leonard"), is an individual who, on information and belief, currently resides in Bedford, New Hampshire. At relevant times, she was a Deputy Corporation Counsel of the City of Nashua Legal Department.

9.      The defendant, Michael Carignan ("Carignan"), is an individual who on information and belief currently resides in Litchfield, New Hampshire. Although he no longer serves, at relevant times, he was the Chief of Police of the City of Nashua Police Department.

10.     The defendant, Frank Lombardi ("Lombardi"), is an individual who, on information and belief, currently resides in Nashua, New Hampshire. At relevant times, he was a Patrolman/Officer, and later a Sergeant, of the City of Nashua Police Department.

11.     The defendant, Inception Technologies, Inc. ("Inception") is a New Hampshire business corporation with a usual place of business in Manchester, New Hampshire. Inception provides services to clients regarding the scanning, storage, and hosting of documents. At relevant times, Inception provided such services to the City of Nashua and, with authorization of Nashua, dealt with the plaintiff regarding information concerning stored documents.

12.     The defendant, Raymond Feoli ("Feoli"), is an individual who, on information and belief, resides in Derry, New Hampshire. At relevant times, he was the President of Inception and has personally dealt with the plaintiff.

6

### III.    Jurisdiction and Venue.

13.    This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because some of the causes of action arise under the First Amendment of the United States Constitution, as well as under 42 U.S.C. § 1983 and 42 U.S.C. § 1988. The Court has supplemental jurisdiction over the plaintiff's state and common law claims under 28 U.S.C. § 1367(a).

14.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1) because all defendants reside or do business in the State of New Hampshire, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events, circumstances, and/or omissions giving rise to the claims occurred within this judicial district.

### IV.    Facts Common to All Counts.

15.    In 2014, shortly after Ortolano and her husband, Michael,[1] purchased their home in Nashua, the Assessors increased its assessment from $469,800 to $706,300, an abrupt increase of more than 50%. At this time, the Ortolanos observed that Nashua had just conducted a reevaluation of property values in 2013 (which had established the $469,800 assessment) and neighbors'/area homes that were larger, nicer, and undeniably more valuable, enjoyed assessed values considerably lower than that of the Ortolanos' property. This caused the Ortolanos to believe that Nashua was not conducting a system of uniform real estate taxation, which would have been in violation of New Hampshire law.

16.    Ortolano called and arranged for a city appraiser, Gary Turgiss (not his brother, Greg Turgiss, who was also a city assessor), to come and inspect her property. At the inspection, Gary Turgiss noted that the City had made some mistakes because the 2014 reevaluation following sale had been accomplished

---

[1] Ortolano and her husband are sometimes hereafter collectively referred to as "the Ortolanos."

without an actual inspection of the property; he caused the assessment to be lowered by a little less than $7,000, from $706,700 to $699,400. Although this provided the Ortolanos with minor relief, their taxes nevertheless had jumped from the $11,040 disclosed to them as the purchasers of 41 Berkeley Street, Nashua, New Hampshire to $16,820 very shortly after the transfer of title was completed. This constituted an abrupt increase of about 49% and still was well above what the owners of many comparable or more valuable properties were paying.

17.     The Ortolanos' tax bill continued to climb, and by July 2017, a year prior to the 2018 City-wide scheduled reevaluation, had exceeded $18,000 a year. About a year later, Ortolano would learn that she was correct about how her assessment had been handled. On September 9, 2018, she would speak with Mr. Ken Rogers, an appraiser working for KRT Appraisal, the independent contractor conducting appraisals during Nashua's 2018 city-wide reevaluation. When she showed Mr. Rogers the records regarding her property, he exclaimed, "This is wrong. You were sales chased. That's illegal. It happened to me once."

18.     Continuing to observe that neighbors with bigger, nicer, and more valuable houses were paying significantly lower property taxes, in July 2017 Ortolano called Nashua's Chief Assessor, Duhamel, in search of an explanation. The phone call did not go well. Duhamel was defensive and ended the phone call by tersely stating: "You bought it; you own it; you pay for it."

19.     Upset by Duhamel's confrontational stance, in the days following their telephone call Ortolano placed three telephone calls to the Mayor's office to complain and left three messages requesting a return call. The Mayor never responded to even one of those calls.

20.     Years later, when she would finally receive responses to "Right to Know Law" ("RTK") requests made under NH RSA 91-A, and having been forced to sue Nashua

for failing comply with the RTK statute, Ortolano would learn that her early exchanges with Duhamel had caused him to despise her. Indeed, Duhamel had become obsessed with her efforts to obtain public documents and he actively sought to prevent her from obtaining public documents and information from the Assessing Department. Duhamel would even launch a behind-the-scenes campaign to impugn Ortolano's character and cause other City employees and officials to treat her unfavorably.

21.     Ortolano now knows that, after the unpleasant telephone exchange with Duhamel in July 2017, Duhamel, some of the Assessing Department clerks, Griffin, and Kleiner, exchanged numerous emails demonstrating that they were monitoring Ortolano's activities in the Assessing Department and elsewhere at City Hall. Neither Duhamel nor the other Nashua city employees dealing with Ortolano monitored the activities of other citizens in the same manner.

22.     Thereafter, Duhamel and other Nashua city employees freely exchanged emails that were disparaging of Ortolano and attempted to create an unflattering picture of her. Email participants in this behind-the-scenes character assassination were Griffin, Kleiner, Louise Brown (the Head Clerk of the Assessing Department), other licensed assessors employed by the Assessing Department, and the individual members of the Board of Assessors. These emails complained of Ortolano's presence in City Hall, her requests for documents or information, and/or her temperament. Examples include: "Was just in here ranting again …….."; "just in here again, got about 30 more cards including the Mayor's"; "I'm sorry? She's complaining about not getting to permits fast enough? But? She's taking one of our staff out of field? To respond to her nonsense? What am I missing?"; "What does she want now?"

23.     A September 12, 2018 email to all the Department's assessors stated: "She was at Aldermen meeting last night, please take the time to torture yourselves and watch it, if you like to do it as a group? We can set up my tv? Lmk?" And his

November 8, 2018 email to the same Department assessors stated: "Now that this has been going on way too long. Can anyone even tell me what she wants at this point??"

24.     Emails and other documents that Ortolano would receive years later, after being forced to litigate her requests under New Hampshire's "Right to Know Law" ("RTK"), demonstrated that other Nashua public officials, including the Mayor, Kleiner, and the attorneys in the Legal Department, took offense to public comments critical of their job performance that Ortolano had made in municipal meetings and hearings.

25.     Ortolano had indeed been publicly critical of Assessing Department practices. On October 2, 2018, the Ortolanos sent a letter to the Board of Aldermen asking it to review the practices of the Assessing Department to ensure compliance with both New Hampshire law and generally accepted assessment practices employed by assessment professionals. The letter listed the problems they had found following a public records search and included appendices that listed "uncaptured permits," inconsistent use of "Home Sales and MLS Data," "undervalued permits and assessments," "Inconsistent Use of Effective Year Build (EYB)," and "Supplemental Information." After sending the letter, the Ortolanos voiced their concerns publicly at the October 2018 meeting. The Mayor, Kleiner, and other city officials were in attendance.

26.     Nor did the Mayor appreciate Ortolano's public statements and efforts to improve the operations of the Assessing Department. In September 2018, Ortolano started to attend scheduled monthly "coffees with the Mayor," meetings held at a downtown café for the purpose of allowing citizens to speak directly to Donchess and to ask him questions. She explained her sales chasing issue and articulated her belief there were problems with the data collection and handling of KRT Appraisal's 2018 city-wide reevaluation. Like Duhamel before him, the Mayor responded in a

defensive and confrontational manner, essentially calling Ortolano a liar in regard to her own assessment: "That didn't happen. That wouldn't have been legal. We don't raise valuations by 50%!" Some of the citizen attendees became upset and at the end of the meeting told Donchess that his reaction to Ortolano's statements had been inappropriate.

27.     At the October 2018 coffee, Ortolano invited the Mayor to walk with her down Berkeley Street (her street) so she could show him the homes that were assessed at lower values than hers. The Mayor retorted: "All you have done is waste the City's time." He asserted that she had wasted many hours of the time of the City's CFO, but at that time she had never even met CFO John Griffin. Beginning with the November 2018 coffee, the Mayor stopped fielding questions from citizens altogether at these coffees.

28.     By pure happenstance, Ortolano would come across embarrassing information about Donchess that would stoke his personal dislike of her. On October 16, 2018, while working at an Assessing Department computer to research properties in proximity to her home, Ortolano came upon a file for 4 Rockland Street, a property less than a half mile from her house. The data revealed that the owner had obtained a building permit in 2009 to complete a total renovation (down to the studs) of the home at a then estimated cost of $100,000. Although nine years had passed and the work had presumably been completed, the building permit had never been closed out. The failure to close out the building permit caused the assessed value of the mayor's residence to be substantially lower than it would have been if the building permit had been properly closed. Because none of the city-wide reevaluations between 2009 and 2018 considered the enhanced value of the Mayor's residence due to his six-figure renovation, the Mayor's real estate taxes were significantly and improperly low during that period. Building permits are supposed to be closed out and followed up with reassessments, just as sales of properties are supposed to trigger reassessments (as happened to the Ortolanos).

11

29.     As with all other files in the Assessing Department, the name of the property owner of 4 Rockland Street was not apparent on the computer screen, so Ortolano asked clerk Cheryl Walley to retrieve the file. As Ortolano scanned the file and saw that it was Donchess who owned 4 Rockland Street, Ortolano rolled her eyes to Assessing Department clerk Cheryl Walley, and stated, "It's the Mayor."

30.     Years later, Ortolano would learn that, within minutes after Ms. Walley had announced that Ortolano was reviewing the assessing file pertaining to the Mayor's residence, Duhamel emailed Griffin stating, "Just in here again, got about 30 more cards including the mayor's." Shortly after Ortolano had unwittingly pulled the Mayor's property file, someone removed it from the Assessment Department and it remained unavailable to the public for more than a month.

31.     After discovering the Mayor's assessment discrepancy, Ortolano decided to give him the chance to cure the problem privately. She wrote him a letter that asked him to "do the right thing" and fix the assessment. Donchess's wife (not the Mayor) responded to the letter, saying that she and the Mayor believed their assessment was fair and they were not going to do anything about it. Because the Mayor had demurred when given the chance to privately correct his improperly low assessment, Ortolano publicly reported what had occurred at a late November 2018 Board of Aldermen meeting.

32.     The following email strings, again obtained years after the fact, now make clear that Duhamel, Kleiner, Griffin, and Brown, and perhaps other City officials, were colluding to prevent Ortolano from obtaining taxpayer relief to which she was entitled under New Hampshire law because of their personal distaste for her, her continuing quest for information, and her public criticism of Nashua public officials:

| Date | Time | From | To | Message |
|---|---|---|---|---|
| 9/10/18 | 4:00 p.m. | Duhamel | Kleiner | Mike going tomorrow at 10am, |

| | | | (then the Mayor's Chief of Staff) | another problem she is having, is that she doesn't understand the 4/1 date and how to read the notes on the cards. |
|---|---|---|---|---|
| 9/10/18 | 6:57 p.m. | Duhamel | Assessor Mike Mandile | I need you to be on your game today for 41 Berkeley [(Ortolano's residence)]; I believe the card is accurate, get in and out as soon as possible, text me when you leave, this hit the Mayor's office, it's on me." |
| 9/11/18 41 | 3:24 a.m. | Duhamel | Brown | [Mike Mandile] [i]s inspecting Berkeley this morning; blow up his phone and get him out of there. |
| 9/11/18 | 3:26 a.m. | Duhamel | Mandile | Have your cell phone on you during your inspection, please and thank you. |
| 10/4/18 | 7:11 p.m. | Duhamel | Head Clerk Louise Brown | (Subject: "Thought – Ortolano") Message: "Lets (sic) turn her to our advantage? Require an inspection if you appear?? 74:17-d as was previously written" |

33.    It is also now clear that Duhamel, Griffin, Kleiner and other Nashua officials attempted to silence Ortolano by restricting, and sometimes preventing, her access to public documents and other information that Ortolano could use in what had become a public crusade to pressure Nashua officials to clean up the Assessing Department. On October 2, 2018, in responding to a Duhamel query about how he should respond to a specific Ortolano request for public information, Griffin wrote: "At this time, let's hold off responding to the taxpayer. It has come to my attention that an email was sent to several members of the Board of Aldermen, essentially restating her public remarks several weeks ago. No need to provide any additional

information." Duhamel and Griffin would exchange numerous emails about Ortolano's requests for documents and information, and Griffin would become a key figure in limiting Ortolano's access to public documents.

34.     On October 10, 2018, the *Union Leader* published an article in which Griffin, apparently responding to the Ortolanos' letter to the Board of Aldermen of October 2, 2018, stated that the Assessing Department conducted its practices in accordance with a "book of policies." Still believing that the assessing department was taking short cuts and rendering arbitrary assessments, Ortolano immediately went to the Assessing Department and requested that she be allowed to inspect the book of policies to which Griffin had referred. The Assessing Department clerk at the counter said she was unaware of any such manual and brought Duhamel to the counter. Duhamel told Ortolano that no such manual existed.

35.     Two days later, however, Duhamel emailed to Ortolano scanned copies of two short documents that contained scant information purporting to be about how the Assessing Department conducted its assessment practices. Unsatisfied with what Duhamel attempted to pass off as the "book of policies," she emailed back a further description: "the policies or procedure that the residential appraisers use for setting the permits, inputting and all other duties."

36.     On October 24, 2018, about two weeks after Ortolano's request for the book, CFO Griffin emailed her, claiming that the City's "general Policies and Procedures for our appraisers can be found in the Uniform Standards of Professional Appraisal Practice (USPAP)," and provided a link to the State's (not Nashua's) assessing reference manual. Because it was obvious that the professional standards and state manual Griffin had proffered was not Nashua's assessment policies and procedures that Griffin had referenced in the October 10, 2018 *Union Leader* article, Ortolano continued to demand the ability to view the referenced "book."

14

37.     At an April 30, 2019 meeting of the Board of Alderman, when a participant again made reference to the book of policies, Kleiner held up a thick binder of documents so as to indicate that it constituted the policy and procedures manual of the Assessing Department. But the City still refused Ortolano the ability to review the book of Assessing Department policies it claimed to exist as far back as early October 2018.

38.     Finally, on June 26, 2019, some eight and one-half months after Griffin had publicly proclaimed that an Assessing Department book of policies existed and Ortolano had asked to review it, Ortolano was allowed to review a book of policies and procedures pertaining to the Assessing Department. Some of these policy items appear to have existed on October 10, 2018 when Griffin referred to them in the *Union Leader* article, but others appear to have been created thereafter.

39.     By late 2018, Ortolano had developed an awareness that Duhamel, Kleiner, Bolton, Leonard, and the Mayor were taking her public criticisms personally and had started treating her differently than other citizens when she sought public documents and information from City Hall. After later obtaining documents and information from RTK requests that Nashua would fight for months, and even years, Ortolano would eventually learn that Duhamel and Corporate Counsel Bolton were particularly offended by Ortolano's criticisms and quest for information.

40.     On one occasion, after a public meeting in City Hall during which Ortolano had challenged some statements Bolton made during the hearing, Bolton aggressively approached Ortolano and barked angrily in her face that he did not appreciate her challenging him in public. Ortolano responded in anger, calling him a "loser." On another occasion, while Ortolano was at Bolton's office and mentioned that Board of Alderman Chair Wilshire had exhibited hostility toward her, Bolton

15

interjected, "You offended the Mayor, you offended me, and you offended Lori
Wilshire; now it's all personal."

41.     Bolton's unchecked disdain for Ortolano continued throughout two
administrative abatement adjudications in the New Hampshire Board of Tax and
Land Appeals ("BTLA") and three Superior Court litigations to obtain documents
Ortolano had requested under New Hampshire's RTK law. For example, Ortolano
filed a tax abatement for the years 2018 and 2019. The Board of Assessors' rules on
abatement applications required that the Board seek to enforce equitable, fair and
defensible assessments. The rules sets forth a process that requires the Board to
gather information from the taxpayer and City assessors to determine the proper
assessment. The Board made no attempt to speak to, or seek information from,
Ortolano at all. But it did hear from Attorney Bolton on her abatement applications;
he intervened on Ortolano's abatements and met outside of public meetings to
discuss her property assessment with the Board. In June 2019, after receiving
counsel from Bolton on Ortolano's assessment, the Board ruled against Ortolano's
abatement applications. During the process, likely based on Bolton's intervention,
Board Chairman Hansberry characterized Ortolano as difficult and unreasonable to
work with, and inaccurately summarized the dispute.

42.     On multiple occasions during Ortolano's abatement appeals and RTK
litigations, despite knowing that Ortolano was proceeding in the particular action
pro se, Bolton refused to communicate with her and directed his communications to
an attorney representing her in different actions.

43.     In the 2019 BLTA appeal in which Ortolano was not represented by counsel,
Ortolano wrote to Bolton, offering suggested dates on which she was available for a
required mediation of the matter. Bolton never responded to Ortolano's entreaty.
Instead, without consulting Ortolano beforehand or providing her with concurrent

notice, Bolton filed a motion to compel mediation, notifying an attorney who was not representing her in the action.

44.     Bolton's palpable disdain for Ortolano even seems to have clouded his professional judgment in the City's judicial actions involving Ortolano. For example, he took a deposition of Ortolano in one of Ortolano's Superior Court RTK litigations. Although the simple question in that action was whether the City was justified in refusing to turn over, and/or delaying in turning over, certain documents to Ortolano after an RTK request, Bolton spent a significant part of the deposition confronting her about what he considered to be her disrespect of him and others. For example, he asked her the following questions in the deposition:

-       "Do you recall using the word 'ridiculous'?"

-        "And you don't recall calling me stupid?"

-       "Does it surprise you that people are reluctant to deal with someone who treats others in that way?"

As Corporation Counsel of the second largest city in New Hampshire, Bolton could not have legitimately believed that Ortolano's attitude excused the City of Nashua from complying with NH RSA 91-A.

45.     Even worse, because the City had failed to produce documents in discovery and had forced Ortolano to file a motion to compel, the Hillsborough County Superior Court Judge issued a July 14, 2021 order sanctioning the City for its apparent lack of candor and good faith in dealing with Ortolano. It also chastised Bolton for the inappropriate tone of his opposition to Ortolano's motion to compel production of documents:

> Here, it is undisputed that the City first informed the plaintiff
> that the requested files were unavailable due to the corruption of
> the tape backups nine months after her initial request. During
> this time the plaintiff relied on the City's statements that it was

17

"still searching" and would produce responsive documents. Moreover, the City's lack of candor, or lack of action to discover the corruption of the files, led the plaintiff to file a motion to compel the documents at issue. The Court was required to hold a hearing to determine the discoverability of the documents. The City's actions, or inaction, shows that it was disregarding the plaintiff's discovery request, or misleading the plaintiff about the availability of responsive documents.

Additionally, the Court finds that the City has not demonstrated substantial justification for the conduct at issue that would make the imposition of sanctions unfair. Indeed, the Court notes and admonishes the City for its objection to the plaintiff's request for sanctions. The Court finds the City's objection to go against the underlying facts, which the City admitted were uncontested at the hearing. The Court also finds the tone of the City's objection concerning. ("The plaintiff's motion is rife with unsupported and inflammatory allegations, conjecture, and hyperbole unworthy of a motion before this Court.") ("The plaintiff's behavior in filing this frivolous motion arguably meets the definition of obdurate and obstinate.") The Court is concerned about the City's candor and if the City attempted in good faith to resolve the discovery dispute over the documents at issue. The stark contrast between the objection and the City's position at the hearing is striking. (Attorney Bolton characterizing the objection at the hearing as follows: "It was a little over the top. Maybe more than a little, in response.")

46.    This hatred for Ortolano, based on her public criticisms of the workings of Nashua city government, would cause the defendants named in this complaint to restrict her access to City Hall and prevent her from obtaining documents and information to which she was entitled under municipal and state law. For example, Duhamel, the Chief Assessor who supervised the other three assessors in the Assessing Department, admitted to Nashua Police Officer Frank Lombardi that he saw Ortolano as "an annoyance" and "an inconvenience." He "didn't really want to give her the time of day" and "didn't feel like he should have to deal with her."

47.    Duhamel's attitude, implemented through his refusal to provide to Ortolano Assessing Department documents to which she was legally entitled; caused the New

Hampshire Association of Appraising Officials ("NHAAO") to issue him a public reprimand for violating Canon 1-4 of the IAAO Code of Ethics and Standards of Professional Conduct:

> It is unethical for members to refuse (by intent or omission) to make available all public records in their custody for public review . . . . Assessing officers must make every reasonable effort to inform the public about their rights and responsibilities under the law and the property tax system.

In addition, in June 2020 Duhamel would agree to accept sanctions from the New Hampshire Department of Revenue Administration ("DRA") for, among other things, refusing to process four (4) of Ortolano's RTK requests for documents and information.

48.     While Duhamel was denying Ortolano access to public records in fall 2018, emails and other documents later produced documents as a result of an order of the Hillsborough County Superior Court show that Duhamel was privately coordinating with, and accepting instructions from, CFO Griffin about whether and how to respond to each documents/information request that Ortolano made.

49.     Eventually, the performance of the Assessing Department and Duhamel as the Department's Chief Assessor became the subject of an investigation conducted by CFO Griffin and Kleiner (who was then Donchess's Chief of Staff). Following the investigation, the Mayor and Kleiner presented a written report at an early March 2019 Aldermen meeting and announced that Duhamel's position – Chief Assessor – had been eliminated and that they had reorganized the Assessing Department. Rather than have any professional Chief Assessor, the Mayor and Kleiner announced that they had created the new position of Director of Administrative Services, had placed Kleiner into that new position, and had put Kleiner in charge of the nine-person Assessing Department, as well as of six other City departments (the number would later grow to twelve).

50.     The remaining professional assessors were now answerable to Kleiner, who had no background, education, or training in real estate appraisal or assessing. This reorganization left an Assessing Department without a professional mass appraisal supervisor who was subject to rules of professional ethics of the New Hampshire Real Estate Appraisers Board and the rules and regulations promulgated to govern assessment practices by the New Hampshire DRA.

51.     In terms of providing access to the Assessing Department's public documents to Ortolano and other property owners, Kleiner would be even more miserly than Duhamel. Almost immediately upon assuming leadership of the Assessing Department, Kleiner implemented a policy that prohibited Assessing Department clerks from answering property owners' questions about assessing matters. She later claimed that "she wanted assessors [rather than Assessing Department clerks] answering assessing questions to insure they were answered correctly." But Kleiner's claimed goal was not truthful. At one of her first Assessing Department staff meetings on April 1, 2019, Kleiner ordered that, "if a member of the public has a question – John [Griffin, the Nashua CFO,] or I will answer." Neither Kleiner nor John Griffin were assessors or had any type of training in real property assessment.

52.     At the same staff meeting on April 1, 2019, Kleiner ordered that: "going forward Mike, Gary and Greg will not speak with Ms. Ortolano. Please write down any questions and they will be answered in writing." "Mike, Gary and Greg" were the only three assessors in the Assessing Department who performed residential assessments. A fourth assessor, Doug Dame, exclusively performed commercial assessments. But when Ortolano later inquired whether she may at least speak to Mr. Dame about Nashua's general processes for capturing permits, Kleiner referred the matter to the Legal Department. Attorney Leonard refused to allow Ortolano to speak to Mr. Dame on the ground that he was not a residential assessor and could not provide her with relevant information.

53.    On and after April 1, 2019, therefore, Kleiner and Leonard caused the Nashua Assessing Department to implement a policy preventing Ortolano, a Nashua citizen and property owner, from orally obtaining any oral assessing information during business hours from *any of the nine employees of the Assessing Department, including the four assessors*. This policy prevented Ortolano from obtaining information from the assessors who had done the actual appraisal work pertaining to her home. This policy imposed the additional burden on Ortolano that she would get no answers to any of her assessment questions unless they were reduced to writing and submitted to the Nashua CFO or Director of Administrative Services, neither of whom worked in the Assessing Department, and neither of whom possessed any education, training, or background in professional assessing.

54.    But Kleiner did not stop there. At the same April 1, 2019 staff meeting, she also directed that the staff was no longer authorized to immediately fulfill requests to review "multiple documents" from any member of the public who was conducting research while physically present in the Assessing Department. In practice, the Assessing Department staff employed this directive to prevent any citizen/property owner from accessing any of the public assessing files on the spot unless it was his or her own property. This was in undeniable contravention of New Hampshire's RTK law and § 71 of the Nashua City Charter, which treat *all* Assessing Department documents as public records subject to immediate citizen inspection rather than just the records pertaining to property that a requesting citizen owns.

55.    Since April 1, 2019, rather than being able to conduct research comparing property assessments in the public research area of the Assessing Department by accessing multiple assessing files in a single research session, as always had been allowed prior to April 1, 2019, a requestor thereafter had to fill out and submit a form listing the particular files/documents s/he wanted to review. After April 1, 2019, a requesting citizen was told that his or her requests will be "answered in 5 days." Kleiner's new policy of making requestors wait five days for immediately

available public documents clearly violated NH RSA 91-A.IV.(a), which states: "Each public body or agency shall, upon request for any governmental record reasonably described, make available for inspection and copying any such governmental record within its files when such records are immediately available for such release." Additionally, Kleiner's new policy made the ability to obtain public documents from the Assessing Department less efficient and more costly for requesting citizens, who were now unable to verify that requested documents were relevant until after they were copied and the requester was presented with a fee for copying.

56.    Kleiner's new policy has chilled the ability of Ortolano and other Nashua property owners to research properties similar to their own in order to satisfy themselves that the Assessing Department was fairly appraising their real estate. Moreover, this Kleiner/Leonard created policy violates § 71 of the Nashua City Charter, which states: "The books and records of the assessors shall be open to public inspection during office hours." The unlawful five-day waiting period, which (on information and belief) is employed to allow both Kleiner and the Legal Department to review the particular requests, also allows for unlawful censorship of the documents and information the public is allowed to inspect. This unlawful policy remains in effect as of the filing of this Complaint.

57.    Head clerk Louise Brown used this new policy specifically to punish Ortolano on one occasion. Ortolano had become interested in the assessment of a particular daycare center. Not realizing that the daycare center had been converted to a multiple-unit condominium and that the file now had substantially more pages of documents in the file (no record that she could have examined had disclosed the conversion to a condominium) Ortolano filed a written request for the documents pertaining to what she believed was still a daycare center. When Louise Brown started copying the massive file, clerk Cheryl Walley told her that Ortolano likely did not realize the daycare center had been converted to a condominium and that

Brown should question Ortolano about it rather than continuing to copy the documents. Despite now knowing that Ortolano would likely not want the documents she was copying, Brown said in effect that she was just going to keep copying and present all the documents to Ortolano. Brown's clear purpose was to run up the costs that Ortolano would have to pay to inspect the documents. When Ortolano arrived at the Assessing Department five days after making the request, Brown presented her with a copying bill of more than $90 for documents that she knew Ortolano did not want.

58.     Also at the April 1, 2019 Assessing Department staff meeting, Kleiner announced that the Assessing Department's physical space would be redesigned in order to achieve "no more citizens in the hall." Kleiner eventually did redesign the physical space but, instead of keeping citizens out of the hall, the redesign essentially eliminated the Assessing Department's public research area, removed public research computers from the tiny public space that remained, and had the effect of making it nearly impossible for Nashua citizens to research public assessment records during business hours at the Assessing Department. Along with the other restrictive policies created at the April 1, 2019 Assessing Department staff meeting, the office redesign has prevented citizens from being able to inspect public documents during normal business hours in violation of § 71 of the Nashua City Charter.

59.     At the July 19, 2019 Assessing Department staff meeting, Kleiner instructed the staff that citizens seeking to review records now had to put their names on "sign in sheets" and that the sign in sheets and all "property cards requested" must be sent to Karina Ochoa, Kleiner's assistant, for Kleiner's review. Kleiner was now surveilling all citizen requests to review the Assessing Department's public records. At this meeting Kleiner also ordered that "Assesshelp questions regarding assessments will be forwarded to me, (sic) if an assessor needs to answer we will discuss on Mondays and share with Legal." "Assesshelp" was the email platform by

which the public could submit assessment questions to the Assessing Department. Kleiner's new policy now required legal review of every question regardless of whether such questions presented any legal issues. This slowed down the process of information dissemination and chilled the ability of citizens to obtain the public information to which they were legally entitled. These policies also established Kleiner and the Legal Department as censors of which public Assessing Department documents and information the public was allowed to inspect or receive.

60.     From reviewing records and observing the operation of the Assessing Department in 2018 and the first half of 2019, it became apparent to Ortolano that one of the assessors, Greg Turgiss (not Gary Turgiss, who was Greg's brother), was not performing a substantial portion of his job duties. Ortolano orally raised this issue with Kleiner, but Kleiner refused to speak about it. So Ortolano hired a private investigator to determine whether her suspicions were correct. Ortolano's private investigator produced a written report demonstrating that, rather than spending the bulk of his work time in the field inspecting homes and businesses for the purpose of appraising real estate, Greg Turgiss frequently drove to a parking lot behind a hotel, took long naps, apparently faked the mileage logs he was required to submit to show that he had been driving around the City inspecting properties, and had frequently spent parts of the work day viewing nonwork matters on a personal computer in his car. In May 2019, Ortolano provided a copy of that report to the Mayor, who then engaged private attorney Mark Broth to conduct an investigation and issue a written report on the Greg Turgiss situation.

61.     In June 2019, while the Broth investigation of Greg Turgiss was ongoing, Ortolano had heard second hand that Kleiner told assembled staff members about an incident she had encountered in a prior job. The story she told was that in a prior job she had reported to superiors what she believed to be wrongdoing by another employee, and that doing what she had thought was the right thing ended up hurting her career. She told her staff that the moral of the story was that they

24

should not jump to conclusions about what they have seen and should be careful about what they report. Staff member Cheryl Walley construed the anecdote to be a warning about what happens to ""snitches" and an admonition not to fully cooperate with the Broth investigation.

62.     In late June 2019, having observed what they believed to be Kleiner's attempt to cover for Greg Turgiss's demonstrably poor job performance, and now believing that Kleiner might be attempting to engage in witness tampering to prevent Assessing Department staff cooperation with Attorney Broth's investigation, Ortolano and another Nashua resident went to the Nashua PD and requested that it conduct a criminal investigation of the Assessing Department, Greg Turgiss, and Kim Kleiner.

63.     A years later, after obtaining documents following litigation against the City for failure to comply with the RTK law, Ortolano would learn that, within 24 hours after she initiated her citizen complaint about potential criminal activity, Mayor Donchess, Nashua PD Chief Carignan, Nashua PD Captain Lehto, and Kleiner met in the Mayor's conference room to discuss how to handle Ortolano's claims. The other participants permitted Kleiner to be present at that meeting despite the fact that she was one of the subjects of the criminal complaint the group was discussing. Still, the Mayor's group determined that the Nashua PD would conduct an investigation of Greg Turgiss for alleged mileage fraud and Kleiner for alleged witness tampering.

64.     Although the Mayor's group had immediately decided, at a meeting with chief Carignan and Captain Lehto present, that the Nashua PD would commence an investigation of Greg Turgiss and Kleiner, the Nashua PD personnel told Ortolano that her complaint was too vague and misrepresented to her that she would have to provide more specific information before the Department could decide whether to proceed. Ortolano continued to provide specific information to the Nashua PD, but

the Nashua PD would not tell her that the investigation was moving forward until about two weeks after the investigation had already begun.

65.     Frustrated that she was no longer able to review Assessing Department documents she previously had been able to inspect merely by going to the Assessing Department during business hours and receiving them on the spot, and being shunned by Assessing Department staff every time she appeared in the Assessing Department, who clearly had been instructed to do so, in the late spring and early summer of 2019 Ortolano started requesting public documents through the formal RTK process provided in NH RSA 91-A.

66.     Kleiner caused all of Ortolano's RTK requests pertaining to the Assessing Department to be referred to the Legal Department, which treated her citizen requests much like document requests proffered by attorneys in high-stakes litigation looking to justify as little production as possible. The Legal Department often interjected objections on account of some picayune defect, which it also often expressed in legal jargon that non-lawyers would not easily understand.

67.     Additionally, the Legal Department often delayed production and consumed many months, only to inform Ortolano in the end that it would not produce any documents because of some claimed but legally inappropriate exemption under NH RSA 91-A, or some technical issue it raised to her request. The following facts, quoted from a Hillsborough Superior Court's May 2, 2022 order requiring the City to produce documents under NH RSA 91-A, is emblematic of the bad faith and lack of candor the Legal Department repeatedly employed to prevent Ortolano from obtaining documents she was entitled to under the law. This instance involves Ortolano's request for video footage from a security camera pointed at the public counter area of the Assessing Department:

> On September 16, 2019, the plaintiff emailed Attorney Leonard and
> Ms. Perry asking to "review the video data for August 7 for footage of
> myself and Cheryl Walley review[ing] KRT abatements." On
> September 20, 2019, Attorney Leonard wrote the plaintiff informing
> her that "[t]he time reasonably necessary to determine whether the
> request shall be granted or denied is by October 11, 2019."
>
> On October 10, 2019, however, Attorney Leonard wrote the plaintiff to
> inform her the review was taking longer than expected and that the
> plaintiff could expect completion of the review by October 25, 2019. On
> October 24, 2019, Attorney Leonard again extended the review time
> completion date to November 8, 2019, without providing an
> explanation as to why. On November 8, 2019, Attorney Leonard
> emailed the plaintiff and several other people who had made RTK
> requests for Office camera footage. In this correspondence, Attorney
> Leonard stated that reviewing all of the requested footage was taking
> longer than expected, and that all reviews should be completed by
> November 15, 2019.
>
> On November 13, 2019, the City denied each request under the
> following RSA 91-A:5, IV exemptions: internal personnel practices;
> confidential information; "personnel and other files whose disclosure
> would constitute invasion of privacy;" and records relating to
> emergency functions. The City also denied the request under the
> *Murray* exemption "for records or information complied (sic) for law
> enforcement purposes, which purposes include both civil and criminal
> matters."

(Citations and footnotes omitted.) The Court rejected the City's use of the stated
exemptions applied and ruled in favor of Ortolano in this instance, stating that "the
City's interest in [the video's] nondisclosure is miniscule." The 33-page order
described several other of the City's violations of NH RSA 91-A, some employing the
same tactics described above.

68.    Even on a different issue addressed by the Court in that order, one of the
very few on which it actually found in favor of the City in the three RTK lawsuits
Ortolano would be forced to commence, the Court still announced that it was

> somewhat troubled by how long it took to deny the request, especially
> in light of the multiple extensions of response time. . . .  Going forward,

27

> the Court admonishes the City to adopt a more cooperative perspective
> and endeavor to respond to RTK requests more promptly.

Some of Ortolano's requests for documents under the RTK law would not be
produced until more than eight months had passed after request.

69.    In its three comprehensive and well-reasoned decisions issued since February
7, 2022 on RTK actions that Ortolano was forced to file to obtain documents to
which she was entitled under NH RSA 91-A, the Court has resolved nearly every
one of the numerous document disputes in favor of Ortolano, has required the City
to pay Ortolano's attorney's fees in one of the actions, and has ordered the City to
participate in "in remedial training regarding the City's compliance with Right-to-
Know Law records requests." The common theme adopted by the Hillsborough
County Superior Court in these decisions was that courts should "construe
provisions of the Right-To-Know law favoring disclosure broadly and exemptions
from disclosure narrowly, mindful that the purpose of the statute is to ensure the
greatest possible public access to the actions, discussions, and records of public
entities and the accountability of such public entities to the people." Choosing to
continue to exhibit its disdain for Ortolano rather than capitulate, the City has
appealed these decisions to the New Hampshire Supreme Court. Contrary to
established New Hampshire law, when it came to satisfying Ortolano's requests for
public records, the facts demonstrate that the City has systematically acted to
construe provisions of the Right-To-Know law as favoring disclosure *narrowly* and
exemptions from disclosure *broadly*.

70.    In mid-September 2019, while the Nashua PD and Broth were conducting
their investigations of Kleiner and Greg Turgiss, Detective Frank Lombardi visited
the Assessing Department for the purpose of seeking information in pursuance of
those investigations. While he was there, Louise Brown, the head clerk at the
Assessing Department, told him that Lynn Cameron, one of the Assessing
Department clerks, was upset because Ortolano had approached her in the City

28

Hall parking lot and had queried Ms. Cameron about Kleiner's instructions on how clerks should deal with Ortolano when she visits the Assessing Department. Lombardi quickly determined that no criminal conduct had occurred. He then went over the options he believed were available to Ms. Cameron: he told her that she could let it go, she could seek a protective order from a court (although he would later admit that there were no grounds for the issuance of a protective order), or she could ask the Nashua PD to warn Ortolano not to contact Cameron outside the confines of the Assessing Department.

71.    When Lombardi mentioned the possibility of warning Ortolano to stay away from Cameron outside of the Assessing Department, Ms. Brown "brought up the possibility" that other members of the Assessing Department might also be interested in the issuance of such a warning on their behalf. Lombardi gave his contact information and left the Assessing Department to deal with other matters.

72.    A short time later, Kleiner, who Lombardi was then supposed to be investigating for witness tampering, called Lombardi and told him that "everyone in the assessing department[, with the exception of Cheryl Walley,] had basically come together and were on the same page, that they didn't want to have contact with Ms. Ortolano outside of the assessing department." Kleiner asked Lombardi to "relay that information to Ms. Ortolano for them."

73.    On information and belief, Lombardi did not ask each member of the Assessing Department individually (other than Ms. Brown and Ms. Cameron) whether s/he wanted him to issue a warning to Ortolano on their behalf. He just took Kleiner's word for it despite the fact that he was then supposed to be investigating her for witness tampering based on a complaint that Ortolano had made, and despite the fact that Kleiner had clearly organized and implemented this concerted effort to cause the Nashua PD to become involved in the concerted effort to stifle Ortolano's rights of free speech and petitioning of government.

74.    No Assessment Department employee, or anyone else for that matter, told Lombardi or anyone else that Ortolano had ever physically threatened them. No one ever complained to Lombardi or anyone else that Ortolano had made inquiries about the employees' private lives. "[N]obody expressed [to Lombardi] a concern to that [Ortolano] was mischaracterizing their private lives."

75.    The most the Assessing Department employees or agents could say in support of their request for the Nashua PD to issue a verbal warning to Ortolano was that Ortolano sometimes made them feel "uncomfortable." In fact, Lombardi would testify under oath later in a deposition in another action that the Assessing Department employees "were more concerned with that -- like the words getting twisted [by Ortolano] rather than like a physical assault [by Ortolano] or anything like that." Lombardi further stated under oath that their request to involve the Nashua PD was because they "were uncomfortable with the way she was characterizing the operations of the [assessing] department."

765.    On the same day that Lombardi interviewed Ms. Brown and Ms. Cameron about the Greg Turgiss and Kleiner investigation, Lombardi also interviewed Robert Tozier as a part of that investigation. Tozier was an employee of KRT Appraisal, which had been providing mass appraisal services for Nashua during the 2018 reevaluation. In concluding the interview, Lombardi asked Tozier "if there were any issues or information he felt that the Nashua Police Department should be aware of involving this investigation."

77.    Tozier said that he had no further information about the investigation but, almost certainly without coincidence, "he did express some concern in regards (sic) to Ortolano," who was not even a subject of the investigation that had caused Lombardi to interview him. Echoing the same type of insubstantial concerns as those of the Assessing Department employees, Tozier asserted that: "because of Ortolano's claims, accusations, and fixations on issues that she perceives exist, he

and members of his office have been concerned that they could be the focus of her negative attention." Although he again recognized that Tozier was complaining of no conduct that was criminal or unlawful, Lombardi instructed him about how he could try to obtain a restraining order against Ortolano if he felt he needed to.

78.     Tozier either did not disclose to Lombardi – or if he did, Lombardi failed to take account of it – that Ortolano had previously told Tozier she believed that KRT had failed to perform all duties it was contractually bound to perform while conducting the 2018 reevaluation and that she believed that Tozier had misrepresented the work KRT had performed in signed documents he had submitted. Although Lombardi relied on Tozier's complaints about Ortolano in issuing the warning that she should stay away from Assessing Department employees outside of the Assessing Department, Tozier would later agree to discipline from the DRA based on Ortolano's complaint that he had made misrepresentations in official documents he submitted about the assessing work that KRT had provided to the City of Nashua. The DRA decertified him as a supervising appraiser for a year, which prevented him from overseeing any instate revaluations.

79.     To Ortolano's knowledge and belief, as of the commencement of this action, Nashua has failed to bring an action against KRT for reimbursement of fees paid for assessing services that KRT represented it had performed but had not. Public officials named in this complaint instead remain more focused on their efforts to stifle Ortolano's First Amendment rights.

80.     None of these complaints made against Ortolano included a single shred of evidence suggesting that Ortolano had done anything other than engage in free speech activities fully protected by the First Amendment of the United States Constitution and Articles 22 and 32 of the Bill of Rights of the New Hampshire Constitution. As Lombardi knew, the substance of the concerted complaint Kleiner,

some Assessing Department employees, and an employee of an independent contractor working for the Assessing Department, made against Ortolano was merely that they did not like Ortolano's criticism of their assessing work.

81.    Nevertheless, based on Kleiner's request (who, once again, Lombardi was then supposed to be investigating for witness tampering) and the obviously insubstantial and self-serving statements given to the Nashua PD, on September 22, 2019, Lombardi and an accompanying officer obtrusively arrived at Ortolano's home in two separate police cruisers. Ortolano's husband answered the door and told them that Ortolano was not home. The officers left. Hearing that the police were looking for her, Ortolano immediately went to the police station and waited in the lobby for Lombardi and the other officer to arrive.

82.    After arriving, Lombardi and the accompanying officer gave Ortolano the verbal admonition "that all the people in the assessor's office at that time. . .  asked that [Ortolano] have no contact with them outside of the assessing department."

83.    Aware that she had not engaged in any criminal activity, Ortolano asked Lombardi if his warning was even "legal." Despite knowing, and later admitting at a deposition, that Ortolano had not done anything remotely criminal, Lombardi would also admit that he told her the warning "is legal and was also something that was commonly done by the Nashua Police Department in an attempt to proactively prevent crimes from occurring." He further admitted telling Ortolano that "there was the potential that, if she did have contact with the [Assessing Department Staff], that she could face criminal charges depending on the circumstances of this contact." He did not describe or give examples of the types of "circumstances" that could lead to criminal charges against Ortolano. As a result of Lombardi's admonition, Ortolano came to believe that she could actually be arrested merely by attempting to speak to one of the Assessing Department staff members outside the Assessing Department office.

84.     This admonition from a Nashua PD detective, which included warnings that criminal charges could follow, had the effect of frightening Ortolano and chilling her ability to engage in First Amendment rights while interacting with City employees. For example, on more than one occasion while Ortolano was present in City Hall, Kleiner aggressively approached her outside of the Assessing Department and chastised her for wasting staff time on requests for public documents. Rather than engage with Kleiner, Ortolano had to withdraw, fearing that Lombardi's warning exposed her to the risk of arrest.

85.     What Lombardi did not tell Ortolano at the police station on September 22, 2019, but which he would later admit under oath during a deposition in a different action, was that his warning did not "really carry any specific legal consequence." In fact, Lombardi would later admit that, despite the ominous sound of his words that "[Ortolano] could face criminal charges depending on the circumstances of this contact," legally Ortolano was no more susceptible to arrest than any other person who had never received such a warning from a New Hampshire police detective or officer. Knowing this, he still gave the warning and, by his own admission, used the word "crime" or its derivation "criminal" at least twice when explaining to Ortolano the consequences of the warning he gave her.

86.     Lombardi admits that, shortly after issuing the warning to Ortolano on September 22, 2019, he reported back to Kleiner – the person he was then supposed to be investigating for witness tampering – that he had accomplished the warning she had requested. At this point, Kleiner had succeeded in refocusing the Nashua PD's attention from Greg Turgiss and herself to Ortolano. Additionally, Kleiner had essentially effectively enlisted the Nashua PD as another Nashua department operative in the concerted effort to deprive Ortolano of her First Amendment rights.

87.     Lombardi later would even tell Ortolano that the Assessing Department employees were working hard and doing a good job, and that Ortolano should be

"more grateful" about what they had done for the City. Further displaying the bias that Lombardi brought to his investigation of Turgiss and Kleiner, he emailed other city officials, agreeing with them "[b]asically that Ortolano makes speculations and insinuates things based on limited information and presents these speculations and insinuations as facts." As previously demonstrated above, in issuing formal discipline to Greg Turgiss and Tozier on account of Ortolano's allegations, the New Hampshire DRA and New Hampshire Association of Assessing Officials ("NHAAO"), which had conducted real investigations, clearly would disagree with Lombardi's assessment of Ortolano's claims.

88.     Nashua PD's stonewalling of Ortolano's requests for records would become as profound as that of the Assessing Department. On September 23, 2019, feeling stung that she had received a police department warning after initiating a complaint of potential criminal activity against two city employees, Ortolano requested copies of all police reports and interviews of Assessing Department staff related to the investigation of her complaint. Lombardi immediately responded that he could not provide any documents because the investigation was ongoing and could not say when it would end.

89.     On December 24, 2019, Ortolano's attorney Richard Lehmann, made an RTK request in writing of Lombardi for the "complete investigative file," including police reports written by the officers who went to Ortolano's residence to issue the warning to her, and all statements made by Assessing Department employees about Ortolano. Lombardi again responded that the investigation was ongoing and the Department could not release any documents at that time. He wrote that once the investigation was complete, Ortolano "will be notified and able to obtain copies of the report from our Records Department."

90.     On information and belief, Attorney Broth issued a report addressing the allegations against Greg Turgiss in early January 2020, but the City has refused to

make it or its contents public. On January 8, 2020, the Nashua PD issued a written exoneration of Greg Turgiss, explaining that the department had used a Google Maps app to estimate that he actually had underrepresented his mileage in reimbursement reports. The Nashua PD also accepted Turgiss's explanation – and apparently ignored the documented findings set forth in the report of Ortolano's private investigator – that he only slept in his automobile during lunch breaks. The Nashua PD's exoneration does not comport with the New Hampshire DRA's public discipline of Greg Turgiss issued a few months later, under which Greg Turgiss agreed to accept discipline on the grounds he: (1) created a conflict of interest by reviewing the work of his brother, Gary Turgiss, in assessing Ortolano's property, and (2) "*neglect[ed] work and misrepresent[ed his] whereabouts while resting in [his] car . . . .* (Emphasis added.) In this regard, the DRA specifically found that:

> Your field logs are incomplete and thus for any dates that you were observed by the private investigator in the parking areas and lacking a field report showing you were actually doing something work-related, any uncertainties should be weighed against you. This behavior constitutes misconduct under Ash 301.36 as dereliction of duty, or malfeasance, misfeasance or nonfeasance because during the hours you were in your car napping or relaxing you should have been performing the assessing duties outlined in Asb 304.04. Not doing so and instead misrepresenting to your employer what you were actually doing constitutes dereliction of duty, and malfeasance, misfeasance, or nonfeasance.

91.     Shortly after the January 8, 2020 Nashua PD exoneration of Greg Turgiss was released, Kleiner's husband chided Ortolano on social media in early January 2020 that his wife had been completely exonerated by both Attorney Broth and the Nashua PD. As said, the City refuses to release the Broth report. Further evidencing that the Nashua PD's supposed investigation of targets Greg Turgiss and Kleiner had actually been manipulated to focus on Ortolano, who was the complainant rather than a target, the police reports about the investigation that Ortolano obtained through RTK requests more than a year later show that investigating officers appear to have not once specifically questioned any Assessing

Department employee about the Kleiner witness tampering concerns or the previously described anecdote that Kleiner had told them.

92.     On January 15, 2020, Attorney Lehmann again wrote Lombardi, this time noting that the investigation had been closed and the RTK document request should be fulfilled. Lehmann also renewed his December 24, 2019 RTK request for documents and specifically requested "[a] copy of any reports or communications concerning the September 22, 2019 meeting between [Ortolano] and members of the Nashua Police Department;" and "[a] complete copy of the investigative file of any Nashua Police Department activity concerning assessing department employees."

93.     On January 16, 2020, Nashua PD Lieutenant Medeiros replied that he had forwarded Ms. Ortolano's RTK requests to the Police Records Department for processing and that the Records Department would "be in touch" once the processing was completed."

94      On January 23, 2020, the Nashua PD sent some responsive documents pertaining to the investigation, including police narratives of communications with Ortolano, but did not provide any videos or transcripts of witness interviews. The Nashua PD wrote that it was still redacting private information from the videos and documents, which would be completed by March 31, 2020. Despite continuing requests, to this day Ortolano has not received these remaining transcripts and videos from the Nashua PD because the Legal Department got involved and started employing its old bag of tricks to impede the RTK requests for documents from the Nashua PD.

95.     On July 10, 2020, some seven months after he first requested them, Leonard told Attorney Lehmann that he really had not requested videos and transcripts of witness interviews because technically they were considered to be "evidence" and thus not a part of the "complete copy of the investigative file" that Lehmann had

36

requested. No employee of the Nashua PD had ever articulated such a position during the prior six months that the request was pending. Leonard told Attorney Lehmann that she would now consider this to be a separate request but did not know how long it would take to produce the videos and transcripts. She promised to be back in touch by August 15, 2020.

96.     On August 14, 2020, Leonard wrote Attorney Lehmann, informing him that the City needed more time to determine whether it would produce the videos and transcripts of witness interviews. She promised to follow up by September 30, 2020. On September 30, 2020, however, Leonard wrote again to Attorney Lehmann stating that as a result of the pandemic the City would not be responding to the request until October 30, 2020. On October 30, 2020, Leonard once again wrote to Attorney Lehmann, this time informing him that the City would not produce the requested transcripts and footage, citing the so-called *Murray* exemption, which exempted from RTK production requests that "could reasonably be expected to interfere with enforcement proceedings." Leonard raised this exemption despite knowing that the investigation of Greg Turgiss and Kleiner had terminated in early January 2020.

97.     In 2020, Ortolano started to become more publicly vocal about the dysfunctional operations of the Assessing Department and other Nashua departments. She began to frequently post on social media about Nashua's maladministration issues. In early February 2020, she launched a website entitled "good-gov.org," on which she posted blogs about the problems with Nashua's city government. The site's first month of posted blogs included "An Overview of Nashua Assessing," "What is Sales Chasing?" and "Will the 2019 Abatement Process in Nashua be Fair?" As Ortolano increased her public criticisms about Nashua's government, Nashua city officials bristled even more.

98.     Because of Ortolano's growing experience with abatement matters, and the public profile she had achieved through social media and her "good-gov.org" blog site, numerous people, many of whom were on fixed income and/or elderly, started asking Ortolano to assist them in handling their abatement applications. She obliged and provided what she considered to be public service assistance.

99.     In response to Ortolano's growing public profile, Donchess, Kleiner, Bolton, Leonard, and other Nashua public officials commenced a campaign of announcing publicly that Ortolano's requests for information were overburdensome and had prevented City employees from accomplishing the City's work. They repeatedly proclaimed publicly that she had made an unreasonable number of requests for public documents. They routinely engaged in gross exaggerations when describing how many requests Ortolano had made. They publicly complained that, rather than being a concerned citizen who was attempting to ensure that the Assessing Department accomplished its work properly and fairly, her only goal was to overburden the department and prevent real work from being accomplished. When Ortolano was forced to sue the City because her RTK requests were not honored, they publicly proclaimed that her lawsuits were frivolous. These public officials have suggested in public that Ortolano in effect was a right-wing lunatic waging a war against government itself. Their public disparagement of her has caused people to call her what they believe to be unflattering names on social media such as that she was a "Trumper." One attorney in the Legal Department would compare Ortolano's actions to those who attacked the Capitol Building in Washington, D.C. on January 6, 2021.

100.    An early example of this propaganda campaign involves Nashua officials' scurrilous attacks on Ortolano for merely maneuvering around the City's dilatory tactics it employed in dealing with RTK requests. Because the City website provided the City Clerk's address for RTK requests, Ortolano initially believed that the City Clerk's office was where all RTK requests must be made. But the Clerk

informed her that the Clerk's office only dealt with RTK requests for records physically kept within that office and Ortolano would have to herself determine which City department physically kept the records she wished to inspect.

101.    On multiple occasions, when Ortolano made RTK requests for documents from a particular city department she thought would logically possess them, the department allowed a substantial amount of time to pass and then informed Ortolano that she had made the request to the wrong department. When she followed up by asking which department she should contact, she was consistently refused an answer; usually an "I don't know, but it's not this one." She then followed up by filing her request with another department that she believed controlled the documents she sought. Once again, after another considerable delay, the next department told her the same thing. Several times, these delays snowballed as each successive department claimed it had no such documents.

102.    To alleviate this delay tactic and prevent many months from passing before simple document requests were satisfied, Ortolano began presenting the same request for documents to as many city departments as she believed might possibly control them, say 7 departments. Not to be outfoxed, however, when the Mayor, Kleiner, or some other City official decided it was time to wail in a public meeting that Laurie Ortolano was again overburdening the City with document requests and preventing it from doing real work, they pointed to the duplicative requests that they caused themselves to complain that she had once again burdened many City departments and had even caused some City employees to quit their jobs.

103.    The public propaganda campaign against Ortolano continues to this day. For example, recently the Mayor provided to the Budget Review Committee a 300-plus page list of citizen requests for information made since 2018. He proclaimed that "one citizen" has generated over 1,200 requests since 2018. Given the public propaganda campaign he had been waging against Ortolano by name, and the

manner of his statement, it was clear to all at the meeting or observing on Zoom that Donchess's "one citizen" reference was to Ortolano. Yet, the very document Donchess handed the Committee revealed that she had requested far fewer than the 1,200 figure he asserted and that other, unnamed citizens had actually presented more requests during that time period.

104.    Although another Nashua citizen has requested as many or more documents and information as Ortolano, her requests have been mostly satisfied quickly and without fuss or fanfare because, unlike Ortolano's requests, each of her requests was not purposely tracked and scrutinized. Also unlike Ortolano's requests, her requests were handled by the City Financial Services Department without additional screening by Nashua's Legal Department. Ortolano's requests, on the other hand, have been targeted for delay and denial because the public official defendants named in this action have formed a personal dislike for her on account of her criticism of Nashua government and Nashua government officials.

105.    In January 2021, Ortolano had two abatement applications to file on behalf of senior citizens she was assisting. Abatement applications face a hard deadline; late filing constitutes an automatic and unwaivable ground for denial. As a result, it had always been Assessing Department policy that citizens could file their abatement applications in the Assessing Department office in person and that they would be provided a date-stamped copy to prove that the application had been timely filed.

106.    Ortolano would have gone to the Assessing Department to file the two applications for abatement and receive a date-stamped copy, but the office was closed because it was undergoing the construction Kleiner had ordered for the purpose of eliminating the public research area and upgrading the interior space. On January 17, 2021, Ortolano emailed the applications to the Assessing Department through its Assesshelp email portal and requested a confirmation of filing but, as was by then customary regarding all her attempted communications

with City employees, she received no response. Ortolano followed up with a phone call and email on January 20, 2021 but received no response. Because of all the gamesmanship she had endured over the prior several years when dealing with the City, she feared that the Assessing Department would claim that she had failed to file the abatement applications timely unless she possessed date-stamped receipt showing that she had.

107.    On January 22, 2021, Ortolano went to City Hall to file the applications and get them date stamped. She first went to the check-in person monitoring entry to City Hall and explained her intent to go to the Administrative Services Department to obtain a date stamp because she knew it had been open throughout the pandemic. The check-in employee welcomed Ortolano and directed her to the Administrative Services office. When Ortolano got there the door was locked and no one was present.  Because the Assessing Department was closed on account of renovations, she looked for some other department that might be able to provide filing receipts.

108.    The only City Hall office that was not shuttered was the Legal Department. This seemed like a logical place for Ortolano to obtain her date stamps because she knew that the Legal Department had been handling assessment questions from the public since the Assessing Department had been closed for construction.

109.    Ortolano knocked on the door to the Legal Department and employee Mindy Lloyd opened it and asked if Ortolano had an appointment. Ortolano answered in the negative, saying she needed a date stamp, and asking if Attorney Neumann (the attorney handling RTK requests) was available to provide one. Ortolano walked past Ms. Lloyd and called out for Attorney Neumann who eventually came out of the conference room, said he would not date stamp her abatement applications, and told her she would have to leave. Ortolano said she was going to wait in the lobby area for someone to assist her and sat down in the lobby area on the floor.

41

110.    A short time later, Attorney Leonard arrived at the Legal Department, walked up to Ortolano who was sitting on the floor and began berating her. Ms. Lloyd called the Nashua PD, who arrived and escorted Ortolano out of the building. At that time, the Nashua PD told Ortolano that she would be given a no trespass order and would be unable to visit City Hall for a year. A day or so later, however, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order.

111.    But Leonard had other ideas. When a *Union Leader* reporter informed Leonard of the Nashua PD's statement quoted directly above, Leonard responded, "I find it troublesome, to say the least. My office will be speaking with the police further."

112.    On information and belief, Bolton, Leonard, and other city officials cajoled, pushed, and pressured Chief Carignan to order that Ortolano be arrested for *felony trespass* until he finally caved and did so on February 17, 2021.

113.    Of course, Nashua public officials continued their anti-Ortolano propaganda campaign. Leonard falsely stated that Ortolano had "forced her way into the locked legal office'" although she was not even present when Ortolano entered the Legal Department. Bolton, who would soon be chastised by the Hillsborough Superior Court for using "over-the-top" language in court filings, and had not been present for any part of the January 22, 2021 incident, tried to convey the impression that he was a witness to it in calling Ortolano a liar: "The fact is, we know [Ortolano] doesn't tell the truth . . . [T]he impression that she was mistreated because she was hauled out [of City Hall] for no good reason is completely false. She was asked many times to leave and refused, and had no right at all to be here and interfere with the operations of this office." Bolton even compared Ortolano's actions to those of the January 6th insurrectionists.

42

114.    Having been unsuccessful in stifling Ortolano's criticisms through unlawful policies limiting her access to public documents, the defendants focused on the tactic of trying to get her arrested to silence her. The defendants' efforts to have Ortolano arrested when she is present at City Hall have continued through the date of filing of this Complaint.

115.    On April 15, 2021, following an order by the Hillsborough Superior Court, the City finally produced some documents that Ortolano had requested of the City some nine months earlier. However, Nashua did not produce many of the documents requested in discovery and, for the first time during the nine-month fight over whether they should be produced, introduced a new excuse for its failure to produce requested documents: "the City's backups are corrupt between April 2019 through October 2019." Ortolano had to wait nine months for the City to raise a production excuse it could have issued at the outset, and then only following an order of the Hillsborough Superior Court.

116.    On July 14, 2021, the Hillsborough County Superior Court sanctioned the City of Nashua for discovery abuse in an RTK legal action Ortolano had filed against it.

117.    By 2022, the defendants and their agents were fully engaged in trying to get Ortolano arrested. On January 31, 2022, Ortolano went to the City Clerk's office to ask for documents pertaining to Nashua's record storage and retention practices. Ortolano had previously gone to the office numerous times and had sent several emails over several weeks in search of this information, but had received no response. Upon arrival, an employee told Ortolano that the City Clerk and Deputy Clerk were in a meeting and granted Ortolano permission to wait for them in the customer service area. After about 20 minutes, the Deputy Clerk came to the window and told Ortolano that the Clerk's office would answer none of her questions orally. Despite the refusal of the Clerk's office to answer any of Ortolano's

previous written emails asking for this information, the Deputy Clerk told Ortolano that she would have to reduce all her requests to writing. Ortolano left without documents, without answers, and without incident.

118. On February 2, 2022, however, the Nashua City Clerk wrote an email to Ortolano regarding her January 31, 2022 visit to the City Clerk's office, stating: "Appropriate steps may be taken by employees to disengage from abusive behavior. If you are not present in the City Clerk's Office to conduct any legitimate business, and you refuse to leave, your conduct will be immediately reported to law enforcement." Knowing that she had not engaged in any abusive behavior in the City Clerk's office, and knowing that she was not present in the City Clerk's office for anything other than "legitimate business," Ortolano wrote back, making an RTK request for "the video surveillance footage of the customer service area of the clerk's office for January 31, 2022 for the time period of 3:00 p.m. to 5:00 p.m." as well as "any city policies regarding acceptable or unacceptable citizen behavior in city hall." There were no such City policies.

119. On February 3, 2022, Kleiner saw Ortolano in the third-floor auditorium of City Hall, speaking with the Chairperson of the Board of Assessors. Kleiner aggressively approached Ortolano and, in front of the Chairperson, said that she could call the police and have her arrested for yelling at "Jen" that morning. Jen was a clerk in the Assessing Department, which Ortolano had visited that morning to request a property file. Fearing that Kleiner would indeed try to have her arrested, Ortolano immediately left City Hall and preemptively called the police to report what had happened.

120. On February 7, 2022, the Hillsborough Superior Court issued a judgment in favor of Ortolano in one of her RTK actions and ordered that the City provide properly requested documents and undergo training regarding the proper handling

of RTK requests. The city filed a motion for reconsideration, which the Court denied, and then appealed to the New Hampshire Supreme Court.

121.    In fall 2020, the City had contracted with Inception Technologies to scan Assessing Department files to make available publicly-accessible digital records. In late 2021, because Kleiner had not provided any public updates about the project, Ortolano contacted Inception's President, Feoli, to ask him questions about how the scanning and storage was handled. She contacted him again in early-February 2022 for an update. After that second phone call, despite the fact that Ortolano never stated that she was employed by the City of Nashua, was an independent contractor for the City of Nashua, or in any way represented the City of Nashua, Feoli later told Kleiner about the phone call and referred to Ortolano as a city employee. Feoli would later admit when giving a statement about the incident to the Nashua PD that Ortolano had never stated or suggested that she was a City employee; he assumed she was because she was so knowledgeable about city government.

122.    But Kleiner saw another opportunity to tarnish Ortolano's reputation in public. At an Aldermen meeting on February 8, 2022, just one day after the Hillsborough Superior Court had ruled in favor of Ortolano and against the City in an Ortolano RTK case, Kleiner, an administrative employee of the City of Nashua who performed no legislative functions, publicly accused Ms. Ortolano of impersonating a city official. Not only was Kleiner's public statement about Ortolano false; it also violated NH RSA 91-A:3, II(c), which prohibits public discussion of "[m]atters that, if discussed in public, would adversely affect the reputation of someone other than a member of the public body." Corporation Counsel Bolton sat mute in the chamber as Kleiner defamed Ortolano and simultaneously violated the quoted RTK law.

123.    On March 24, 2022, while testifying at trial under oath in the case of *Ortolano v. City of Nashua*, Hillsborough County Docket No. 226-2020-CV-00133,

45

Amanda Mazerrolle, a clerk in the Assessor's Office, admitted that, although it was
her duty to respond to such citizen requests, she did not process Ortolano's requests
for records and information that had been received through the "assesshelp" portal
because Kleiner had specifically told her that she was not allowed to respond to
Ortolano's requests. Instead, she was told to send all of Ortolano's assesshelp emails
to Kleiner or the new Chief Assessor, Rick Vincent, for special treatment. Few of
Ortolano's so-forwarded requests received timely responses and many received no
responses at all. At the same time, Ms. Mazerrolle was permitted to respond timely
to all other requests from all other Nashua residents.

124.    On May 3, 2022, the Hillsborough South Superior Court issued a methodical
33-page order rebuking the City for violating NH RSA 91-A in multiple ways by
once again impeding Ortolano's RTK requests. This was the City's second straight
loss on Ortolano's RTK lawsuits and in this case, the Superior Court ordered the
City to pay Ortolano's attorney's fees. The City again appealed the decision to the
New Hampshire Supreme Court.

125.    On June 20, 2022, the Hillsborough South Superior Court issued yet another
order rebuking the City for violating NH RSA 91-A by failing to timely produce
documents required under the RTK law. This was the City's third straight loss on
Ortolano's RTK lawsuits. Once again, the City appealed.

126.    On the morning of July 22, 2022, Kleiner called Nashua PD Deputy Chief
Joseph Fay, asking for a police presence at City Hall. Kleiner told Fay that Ortolano
had a scheduled appointment at City Hall at about 10:00 a.m. and "prior incidents
between the members of City Hall and Ortolano" required police presence to "ensure
that the interactions were orderly and incident free." (Ortolano had scheduled no
such appointment at City Hall.) Fay assigned the matter to Sergeant Caleb Gilbert,
who checked and saw that Ortolano had no active trespass orders that prevented
her from being in City Hall. But he arranged for two other Nashua PD officers to

46

meet him there at about 10:00 a.m. Sergeant Gilbert and officers Earnshaw and Abrams arrived at about 10:00 a.m. but, when Ortolano had failed to arrive by 10:51 a.m., they left City Hall.

127.   The "prior incidents" Kleiner referred to were nothing more than Nashua Director of Economic Development Tim Cummings becoming upset that Ortolano had criticized him during the public comment period at a Finance Committee two days earlier and in an email she sent to him the next day. Moreover, Ortolano was not even physically present at the "incident;" she spoke through a Zoom feed. Ortolano's criticism of Cummings was harsh, but in no way did she threaten physical violence, raise private matters that might be embarrassing, or otherwise engage in any form of expression other than fully protected speech. Specifically, Ortolano's criticisms were:

- He is unfit to do that kind of work

- He is over assigned

- He is deeply in violation of the law when it comes to Right to Know and access to meetings and information

- His office door is always closed and locked. Ortolano has been going to City Hall for three years and has never seen his door open or unlocked. She has never been able to get anyone to open the door when she has knocked on it

- He does not consider himself to be a public servant and he will not make himself accessible to citizens at all

- Mr. Cummings is a completely obnoxious, arrogant man.

128.   At that point the Mayor interrupted and spoke over Ortolano while her three-minute speaking slot continued to run, saying that this was not the purpose of public comment; you're to address issues before the Finance Committee. As Ortolano objected and attempted to regain the floor as her time ran, the Mayor held up his hands and said, "Wait. Wait. You've still got a few minutes," but continued to

berate Ortolano, saying, that it was not proper for Ortolano to "night after night just lambast all the employees with all these scurrilous comments. It's just not appropriate. It's not appropriate."

129.    Finally, Ortolano was able to regain the floor for a moment by saying: "You need to shut your mouth. Shut your pie hole Mr. Mayor. This is my public comment and I'm addressing not every employee; I'm addressing Director Cummings and I have been in a very difficult situation trying to get information from him." But once again the Mayor cut her short: "You know, I think we're going to have to propose some kind of rules for public comment. The swearing, the profanity, the name calling; it is not appropriate!" He continued as Ortolano attempted to speak and say that she had not spoken any profanity, and as an official next to him announced, "30 seconds." Referring to an incident that had occurred about a year earlier, the Mayor proclaimed that she had "called a woman lawyer in the City with (sic) the c-word in a public meeting." As Ortolano attempted to respond, the Mayor announced, "Your time is up!" and her Zoom feed was cut. Ortolano's criticism of Director Cummings and her attempt to get her full three minutes of public comment were the actual cause of Kleiner's haling the police to City Hall the morning of July 22, 2022.

130.    On July 22, 2022, around noon, Bolton did encounter Ortolano in City Hall and once again attempted to have her arrested. Ortolano had received a tranche of documents from several City departments that were responsive to one of her RTK requests. The Legal Department had transmitted them via email, through Citrix, a secure email portal for document transfers. Unable to open the documents because of a portal problem, Ortolano went to City Hall to request that someone in the City's IT Department assist her in gaining access to the documents. The IT Department is located on the third floor of City Hall, down the hall from the Legal Department. Ortolano arrived on the third floor around noon but the door to the IT Department was closed and locked; it appeared that no one was there. Because Bolton had ordered that Ortolano would never be granted an appointment with any Legal

Department employee, and that he would have Ortolano arrested if she attempted to enter the Legal Department, Ortolano decided to call the Legal Department to ask whether it could provide hard copies instead of the electronic copies she could not open.

131.   But Ortolano did not have the Legal Department's phone number, so she walked down the hall to the Legal Department's main entrance door and read the phone number from a placard on the wall near the door. As Ortolano dialed the Legal Department phone number with her mobile phone, she started to walk away from the Legal Department entrance, attempting to move down the hall to handle the phone call. Manuela Perry, an office employee, answered the call and Ortolano started to explain that she was having trouble getting into the Citrix portal. Within seconds, however, the Legal Department door opened abruptly about half-way and Ortolano, whose back was to the Legal Department door, turned around and saw Bolton standing in the doorway. Without coming out of the doorway, Bolton immediately started hollering at Ortolano, saying: "You cannot be here!" "Go!" "Leave!  You are trespassing!" "I can have you arrested." Ortolano tried to explain that she had only taken the Legal Department's phone number off the wall and was speaking with Manuela. Again shouting, Bolton retorted: "You aren't allowed to call into my office! You aren't allowed to speak with anyone in this office, even by phone!" Hearing this, Manuela terminated the phone call with Ortolano, which had lasted only 20 seconds. The call now terminated, Bolton turned and went back into his office, closing the door behind him. Fearful that Bolton would have her arrested, and wanting her side of the incident recorded, Ortolano attempted to call back to the Legal Department; when no one answered, Ortolano left a message saying that she was merely attempting to obtain some help to her open the electronic documents the Legal Department had sent. Through observing video security footage in City Hall, the Nashua PD would later determine that Ortolano was only within the hallway that leads to the Legal Department for approximately two minutes.

132.    Certain that Bolton would indeed attempt to cause her to be arrested for trespass, Ortolano called 911 and requested that the Nashua PD dispatch an officer to the back side of City Hall. Two officers, Officers Earnshaw and Abrams, who had been present earlier in the day on account of Kleiner's call, arrived within minutes and met Ortolano outside City Hall. She gave them her statement. Then the officers went into the building to speak with people in the Legal Department.

133.    Officers Earnshaw and Abrams met Sergeant Gilbert on the way in to interview witnesses, and they met with Bolton on the first floor of City Hall. Bolton was angry and agitated. He insisted that Ortolano be arrested for trespassing and "became extremely upset when [Sergeant Gilbert] did not immediately move to respond outside to arrest Ortolano." Bolton insisted that he had told Ortolano to leave the hallway several times and that she had refused. He insisted that he wanted to leave the Legal Department offices, but that Ortolano was blocking the hallway. The officers walked to the third floor with Bolton to observe the hallway in question. They noted that there were no signs, keypads, closed or locked doors, or other indicia communicating that the public should not be in the third-floor hallway near the Legal Department. They noted that people were walking in the hallway around them, which also indicated that Ortolano was permitted to be in the third-floor hallway. They also noted that the hallway was wide enough for two people to pass each other without touching, so it was unlikely that Ortolano could have been blocking Bolton from exiting his office.

134.    Bolton was not making sense to the officers. He insisted that because "there was no public area accessible by the hallway" Ortolano was trespassing. At the same time, he insisted that Ortolano should be arrested merely for placing a phone call to the Legal Department. Sergeant Gilbert asked if Ortolano had been served any sort of legal process stating that she could not call the Legal Department. Bolton conceded that she had not. Sergeant Gilbert asked Bolton why there was a video doorbell outside the Legal Department door if the public was not supposed to

be in the hallway. Bolton responded, "For people other than her." When Sergeant Gilbert "tried to reason" with Bolton by explaining that the police cannot prevent a single member of the public from being in an area of City Hall open for public access, Bolton insisted, "I can do that." Officer Earnshaw then attempted to positively identify Bolton by asking his name and date of birth. Bolton refused to answer either question; he did no more that hand Officer Earnshaw his business card.

135.   Not knowing what had transpired when Nashua PD personnel interviewed Bolton, and awaiting a conclusion of the Nashua PD's investigation that would determine whether she would be again prosecuted for criminal trespass, Ortolano assumed that Bolton's banishment of her from the hallway on the third floor stood and that she would be arrested if she went up to the third floor of City Hall. This posed the problem that the both the public auditorium hosting many of the City's public meetings and the City's IT Department were also on the third floor and that Ortolano would not be able to access either venue without passing through the third-floor hallway where Bolton accused her of trespass and told her he could have her arrested for being there. Desiring to continue to participate in public meetings, as well as obtain technical assistance from the IT and A/V offices to which she was entitled as a resident of Nashua, Ortolano sent an email to Kleiner:

> Ms. Kleiner,
>
> The meeting zoom link, once again, does not work for today's meeting. The link is also not on the calendar. I wanted to attend the meeting but cannot access it through zoom.
>
> I cannot attend meetings in person because I was issued a warning by Attorney Bolont (sic) last Friday, July 22, 2022, that I am subject to arrest if I am in the Hallway of the third floor. This shuts down my ability to attend BOA meetings, the A/V Access TV recording room and the IT office. I am awaiting a police report to be issued on this warning as under the RSA trespass statute, attorney Bolton has the authority to issue such a warning.

> If the BOAssessors is no longer doing zoom, please let me know, but please provide a valid link so the public can attend if this is permitted.
>
> Laurie

136.   Bolton received Ortolano's email to Kleiner and issued an untruthful response (with copies to Ortolano, the Mayor, the Board of Assessors, and the Legal Department):

> I issued no such warning. I did direct her to leave the narrow corridor providing access to the entrance to and egress from the Legal Department as I was attempting to leave and she was interfering with my passage[.]

As the Nashua PD investigation would show, Bolton did in fact tell Ortolano that she had no right to be in the hallway near the Legal Department; indeed, he insisted to the police officers interviewing him that Ortolano had no right to be there. In fact, he even insisted that the Nashua PD arrest her on the spot for criminal trespass because she had been in the hallway near the Legal Department.

137.   After conducting a full investigation, including interviewing witnesses, doing background checks, viewing the footage from City Hall surveillance cameras, and reviewing the applicable trespass statutes that might apply, Sergeant Gilbert reported that:

> Based on this [statutory] definition [of criminal trespass], Ortolano was not in a place that she was not allowed to be, nor did she remain there after being asked to leave. Video surveillance recording shows her within the Legal Department public hallway for approximately two (2) minutes and based on the statement provided by all involved, it appears she left soon after contact was made with Bolton.
>
> At this time I have deemed this case unfounded and it will be closed.

138.   On multiple occasions, Nashua public officials have limited Ortolano's ability to speak during the public comment portions of public hearings and meetings. For example, depending on the particular public hearing, citizens

are usually given either three or five minutes to speak. On multiple occasions, Ortolano was allowed to start speaking but was interrupted as soon she began to criticize the way a particular public official performed his or her job by the person chairing the meeting, often Donchess. The claimed grounds for interrupting her, while her time was running, has been either that her comments are not relevant to that meeting or that she will not be permitted to make "scurrilous" comments about Nashua's public officials. On these occasions, as the interrupter and Ortolano argued about whether Ortolano should be allowed to continue to talk about the subject she had been addressing, another public official at the front of the room then announced that Ortolano's time was up. This has chilled Ortolano's First Amendment rights to criticize aspects of her municipal government.

139.   Top officials of the Nashua city government have systematically attempted to prevent Ortolano from criticizing them in public meetings, have attempted to prevent her from obtaining public documents and information to support her criticisms, have caused her to be arrested to silence her, and are continuing to attempt to coerce her to prevent her from speaking publicly about Nashua officials and municipal policies and practices, all in violation of the law.

### IV.    Causes of Action.

## Count One

**(42 U.S.C. § 1983 – First Amendment -- The Government Actors' Restrictions, Suppression, and Chilling of Ortolano's Right to Free Speech)**

*Laurie Ortolano*
*v.*
*The City of Nashua, James Donchess, Kimberly Kleiner, John Griffin, Jonathan Duhamel, Steven A. Bolton, Celia K. Leonard, Michael Carignan, & Frank Lombardi*

140.    The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 139 of the foregoing Complaint.

141.    Ortolano is a resident of Nashua, New Hampshire who is entitled to all the rights, benefits, and privileges that municipal residents have in Nashua, the State of New Hampshire, and the United States of America, including the right to participate in government activities, attend municipal public meetings and hearings, obtain public documents kept by government, file applications for benefits provided by government, and petition government to obtain all deserved benefits, to redress all wrongs done her and of the grievances she may suffer.

142.    At all relevant times, the defendants, City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi were state actors subject to suit for violating Ortolano's rights under the United States Constitution. At all times, the defendants, City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi acted under color of state law.

143.    All of Ortolano's speech and expressions described herein, including by not limited to her speaking at City of Nashua public meetings and/or hearings, her speaking at informal city gatherings such as the Mayor's coffees, her speaking to individual city employees whether within or outside of the scope of the employees' city job duties, her speaking to non-government individuals at times relevant to this action, her exchange of emails with individual city employees whether within or outside of the scope of the employees' city job duties, her exchange of emails with non-government individuals at times relevant to this action, her emails to government portals, and any and all other of her speech, expressions, complaints, grievances, opinions, data, facts, etc., was speech that is protected by the Free Speech Clause of the United States Constitution.

144.    The actions, or participation in events that constituted actions, by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, that had the effect of restricting, regulating, suppressing, or chilling the speech or expressions of Ortolano, as described herein, were done in violation of the Fourteenth Amendment, as it incorporates the Free Speech Clause of the United States Constitution.

145.    The speech and/or expression that Ortolano engaged in, which is described herein, constituted constitutionally protected conduct. Ortolano was subjected to one or more adverse action(s) by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi. Ortolano's protected conduct was a substantial or motivating factor in the adverse action(s) taken by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi. Defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi have thus unlawfully retaliated against Ortolano on account of her protected constitutional conduct and activities.

146.    In regard to defendant City of Nashua, the procedures, policies, rules, regulations, and/or laws described herein were official policies created, altered, modified, or amended by city officials who had the final authority to establish governmental policy in the particular areas described herein. Exercising such final authority, those officials made deliberate choices to follow particular courses of action from among a variety of alternatives. Because the deliberate choices made by Nashua officials in creating, altering, modifying, or amending the official procedures, policies, rules, regulations, and/or laws described herein had the effect of constituting unlawful restriction, suppression, or chilling of Ortolano's free speech rights in violation of the Fourteenth Amendment, as it incorporates the Free Speech Clause of the First Amendment of the United States Constitution, the City of Nashua is liable under 42 U.S.C. § 1983.

147.    The City of Nashua's procedures, policies, rules, regulations, and/or laws described herein constitute facial violations of the Fourteenth Amendment, as it incorporates the Free Speech Clause of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

148.    The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, as applied to plaintiff Laurie Ortolano, are otherwise in violation of the Fourteenth Amendment, as it incorporates the Free Speech Clause of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

149.    As a result of these unlawful actions and conduct, Ortolano has suffered substantial damages.

## Count Two

**(42 U.S.C. § 1983 – First Amendment -- The Government Actors' Violations of Ortolano's Right to Petition Government for Redress of Grievances)**

*Laurie Ortolano*
*v.*
*The City of Nashua, James Donchess, Kimberly Kleiner, John Griffin, Jonathan Duhamel, Steven A. Bolton, Celia K. Leonard, Michael Carignan, & Frank Lombardi*

150.    The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 149 of the foregoing Complaint.

151.    The right to petition government for redress of grievances is among the liberties safeguarded by the Bill of Rights and is intimately connected with the other First Amendment rights of free speech and free press.

152.   The right to complain to public officials and to seek administrative and judicial relief from their actions are within the ambit of the right to petition government for redress of grievances and is protected by the First Amendment.

153.   The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi were in violation of Ortolano's right to petition government for redress of grievances.

154.   Ortolano was subjected to one or more adverse action(s) by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi. Ortolano's exercise of her right to petition government for redress of grievances was a substantial or motivating factor in the adverse action(s) taken by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi. Defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi have thus unlawfully retaliated against Ortolano on account of her protected constitutional conduct and activities.

155.   The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, as applied to plaintiff Laurie Ortolano, are otherwise in violation of the Fourteenth Amendment, as it incorporates the right to Petition Clause of the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

156.   As a result of these unlawful actions and conduct, Ortolano has suffered substantial damages.

### Count Three

### (42 U.S.C. § 1983 – Fourteenth Amendment – The Government Actors' Violations of Ortolano's Rights to Substantive Due Process)

*Laurie Ortolano*
*v.*
***The City of Nashua, James Donchess, Kimberly Kleiner, John Griffin, Jonathan Duhamel, Steven A. Bolton, Celia K. Leonard, Michael Carignan, & Frank Lombardi***

157.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 156 of the foregoing Complaint.

158.   The Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property, without due process of law," and protects individuals from arbitrary actions and conduct of the government.

159.   The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi singled Ortolano out for disparate and unfair treatment. Those actions were arbitrary and were not pursued in advancement of any legitimate governmental interest.

160.   The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, as applied to plaintiff Laurie Ortolano, were otherwise in violation of the Substantive Due Process Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

161.   As a result of these unlawful actions and conduct, Ortolano has suffered substantial damages.

## Count Four

**(42 U.S.C. § 1983 – Fourteenth Amendment – The Government Actors' Violations of Ortolano's Rights to Procedural Due Process)**

***Laurie Ortolano***
***v.***
***The City of Nashua, James Donchess, Kimberly Kleiner, John
Griffin, Jonathan Duhamel, Steven A. Bolton, Celia K.
Leonard, Michael Carignan, & Frank Lombardi***

162.    The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1
through 161 of the foregoing Complaint.

163.    The actions and conduct described herein by defendants City of Nashua,
Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi,
which deprived Ortolano of rights to which she was entitled under federal, New
Hampshire, and Nashua law, denied her of her liberty or property interests without
due process of law.

164.    The actions and conduct described herein by defendants City of Nashua,
Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, as
applied to plaintiff Laurie Ortolano, were otherwise in violation of the Procedural
Due Process Clause of the Fourteenth Amendment of the United States
Constitution and 42 U.S.C. § 1983.

165.    As a result of these unlawful actions and conduct, Ortolano has suffered
substantial damages.

## Count Five

### (Part 1, Article 8 of the New Hampshire Constitution – Right
to Access Governmental Proceedings and Records)

***Laurie Ortolano***
***v.***
***The City of Nashua, James Donchess, Kimberly Kleiner, John
Griffin, Jonathan Duhamel, Steven A. Bolton, Celia K.
Leonard, Michael Carignan, & Frank Lombardi***

166.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 165 of the foregoing Complaint.

167.   New Hampshire's Bill of Rights, Part 1, Article 8, guarantees that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted."

168.   For more than three years, the City of Nashua has caused its governmental proceedings and records to fail to be open, accessible, accountable, or responsive, at least as to Ortolano.

169.   Ortolano has endured numerous recriminations, insults, and other indignities on account of her attempt to obtain the access to governmental proceedings and records that she deserves. At other times, she has been prevented from obtaining the access to governmental proceedings and records that she deserves.

170.   The actions and conduct described herein by defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, as applied to plaintiff Laurie Ortolano, were otherwise in violation of New Hampshire's Bill of Rights, Part 1, Article 8.

171.   As a result of these unlawful actions and conduct, Ortolano has suffered substantial damages.

## Count Six

**(Civil Conspiracy)**

***Laurie Ortolano***
***v.***
***James Donchess, Kimberly Kleiner, John Griffin,***

*Jonathan Duhamel, Steven A. Bolton, Celia K.*
*Leonard, Michael Carignan, & Frank Lombardi*

172.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1
through 171 of the foregoing Complaint.

173.   Defendants Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan,
and/or Lombardi agreed with each other that they would work together to deprive
Ortolano of her lawfully provided rights to obtain access to public records and
government proceedings because they were offended by her criticism of some of
them.

174.   Together, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan,
and/or Lombardi accomplished one or more unlawful overt acts for the purpose of so
depriving Ortolano of her rights, and as a proximate result thereof caused Ortolano
to suffer substantial damages.

175.   Defendants Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan,
and/or Lombardi have engaged in a civil conspiracy to harm Ortolano and are
accordingly liable to her for damages.

## Count Seven

**Violation of NH RSA 91-A:3, II(c), which Prohibits the Conduct
of Public Municipal Sessions in which a Person's
Reputation Is Adversely Affected**

*Ortolano*
*v.*
*Kleiner*

176.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1
through 175 of the foregoing Complaint.

177.   NH RSA 91-A:3, II(c) prohibits public discussion of "[m]atters that, if discussed in public, would adversely affect the reputation of someone other than a member of the public body."

178.   On February 8, 2022, in a public meeting of the Nashua Board of Aldermen, Kleiner called out Ortolano by name and accused Ortolano of impersonating a city official.

179.   Even if Kleiner had been correct, her actions constituted a violation of NH RSA 91-A:3, II(c). But Kleiner was incorrect; Ortolano never told anyone that she was a city employee or took any action that would lead someone to believe that she was a city employee. Kleiner misrepresented this fact in a public session, and in undeniable violation of NH RSA 91-A:3, II(c), either knowingly or recklessly.

180.   As a result of Kleiner's unlawful actions and conduct, Ortolano has suffered substantial damages.

## **Count Eight**

### **(Defamation)**

### *Ortolano*
### *v.*
### *Kleiner, Inception, & Feoli*

181.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 180 of the foregoing Complaint.

182.   In January 2022 Ortolano called Feoli, the President of Inception, which had been working as an independent contractor to upload many of Nashua's public records into electronic format. Ortolano was seeking information on the progress his

firm was making in uploading City of Nashua Assessing records to the cloud or at least into electronic format.

183.    At all times, Feoli was acting on behalf of Inception.

184.    Ortolano never stated or implied that she was employed by the City of Nashua.

185.    At the time of the communication between Feoli and Ortolano, both Feoli and Kleiner knew or should have known that Ortolano was not an employee of the City of Nashua. Nevertheless, Feoli told Kleiner that Ortolano had represented that she was an employee of the City of Nashua.

186.    Knowing that Ortolano was not an employee of the City of Nashua, and either purposely or recklessly choosing not to inquire why Feoli might think that Ortolano was a city employee, on February 8, in a public meeting of the Nashua Board of Aldermen, Kleiner called out Ortolano by name and accused Ortolano of impersonating a city official.

187.    Based on these facts, Ms. Ortolano has set forth a cause of action for written defamation or libel.

188.    The actions of defendants Kleiner, Feoli, and Inception constituted defamation a civil conspiracy to harm Ortolano and are accordingly liable to her for damages.

189.    As a result of Kleiner's, Feoli's, and Inception's unlawful actions and conduct, Ortolano has suffered substantial damages.

## Count Nine

### (Abuse of Process)

### *Ortolano*
### *v.*
### *City of Nashua, Bolton, & Leonard*

190.    The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 189 of the foregoing Complaint.

191.    The City of Nashua, by and through its Legal Department (specifically Bolton and Leonard), systematically acted to refuse to permit Ortolano to enjoy the rights to which she was entitled as a resident of Nashua including but not limited to the right to inspect public documents and obtain public information, and the right to fair real estate tax assessments. One of the methods the City of Nashua, Bolton, and Leonard employed to deprive Ortolano of her rights was to force Ortolano to endure the expense, inconvenience, and emotional trauma by forcing her to bring legal actions in New Hampshire Courts or appeal abatement applications to the BTLA. And, once Ortolano was forced to file such legal or adjudicative actions, they employed every tactic they could to delay, run up Ortolano's cost, and deprive Ortolano of the benefits of litigation. These tactics included but were not limited to abusing the discovery process in litigation to the point of being sanctioned by the Court, refusing to mediate in good faith with Ortolano, refusing to communicate with Ortolano when she was a pro se plaintiff, and appealing every adverse decision on frivolous grounds.

192.    These actions of the City of Nashua, Bolton, and Leonard were taken with the ulterior purpose of depriving Ortolano the rights she deserved as a resident of Nashua and the acts they took, which are described above, were willful and not proper in the regular conduct of the proceedings.

193.   As a result of the City of Nashua's, Bolton's, and Leonard's abuse of process, Ortolano has suffered substantial damages.

## Count Ten

### (Intentional Infliction of Emotional Distress)

*Ortolano*
*v.*
*All Defendants*

194.   The plaintiff, Laurie Ortolano, hereby restates and realleges Paragraphs 1 through 193 of the foregoing Complaint.

195.   The actions of the defendants as described herein, including but not limited to, causing Ortolano to be arrested, and continuing to attempt to cause her to be arrested every time she stepped into City Hall to engage in constitutionally protected conduct, were extreme and outrageous.

196.   The defendants engaged in these actions intentionally and/or recklessly.

197.   As a result of the defendants' actions, Ortolano suffered severe emotional distress.

198.   As a result of the defendants' actions, Ortolano has suffered substantial damages.

## V.   Demand for Relief.

WHEREFORE, the plaintiff, Laurie Ortolano, demands the following relief:

A.    That she be awarded her compensatory damages in such amount as will make her whole for her reputational, physical and emotional injury, and her pain and suffering;

B.    That she be awarded exemplary and punitive damages;

C.    That she be awarded pre- and post-judgment interest;

D.    That she be awarded her costs and reasonable attorney's fees;

E.    That, after trial and the entry of judgment, the Court enter a permanent injunction against defendants City of Nashua, Donchess, Kleiner, Griffin, Duhamel, Bolton, Leonard, Carignan, and Lombardi, restraining and prohibiting them from denying Laurie Ortolano full and proper access to all public documents, public information, access to public hearings and meetings, and that they refrain from continuing to attempt to have her arrested for criminal trespass when she is properly exercising her First Amendment rights anywhere in the City of Nashua; and

F.    That she be awarded such other relief as the Court deems just and proper.

## VI.    Jury Demand.

In accordance with Rule 38 of the Federal Rules of Civil Procedure, the plaintiff, Laurie Ortolano, hereby demands a trial by jury as to all causes of action so triable.

Respectfully submitted,
Plaintiff, Laurie Ortolano
By her Attorneys,
Olson & Olson, P.A.

August 23, 2022                                    /s/ Kurt S. Olson
                                                   Kurt S. Olson
                                                   Olson & Olson, P.A.
                                                   31 Franklin Rd.
                                                   Salisbury, NH 03268
                                                   603-748-1960
                                                   kolson54@gmail.com

## VERIFICATION

I, Laurie Ortolano hereby verify, under the pains and penalties of perjury, that I have read the foregoing Verified Complaint, and that to the best of my knowledge and belief, the facts stated therein are true and accurate.


<u>/s/ Laurie Ortolano</u>
Laurie Ortolano

67