## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

_____

|  |  |
|---|---|
| Laurie Ortolano, | ) |
| Plaintiff | ) |
|  | ) |
| v. | )    Civil Action No. 22-cv-00326-LM |
|  | ) |
|  | ) |
| The City of Nashua, et al., | ) |
| Defendants | ) |

_____

### PLAINTIFF'S MEMORANDUM OF LAW OBJECTING TO THE MOTION OF DEFENDANTS, INCEPTION TECHNOLOGIES, INC. AND RAYMOND FEOLI, TO DISMISS COUNTS EIGHT AND TEN OF THE PLAINTIFF'S VERIFIED COMPLAINT

I.    INTRODUCTION AND PROCEDURAL POSTURE.

This is an action by the plaintiff, Laurie Ortolano ("Ortolano"), the Verified Complaint of Laurie Ortolano sets forth ten causes of action, sounding in: 1. Violations of 42 U.S.C. § 1983 for suppressing her free speech rights and retaliation against her for her exercise of speech and expression protected under the First Amendment to the United States Constitution; 2. Violations of 42 U.S.C. § 1983 for suppressing her right to petition government and retaliation against her for attempting to do so, which rights are protected under the First Amendment to the United States Constitution; 3. Violations of 42 U.S.C. § 1983 for suppressing her right to substantive due process, which rights are protected under the Fourteenth Amendment to the United States Constitution; 4. Violations of 42 U.S.C. § 1983 for suppressing her right to procedural due process, which rights is protected under the Fourteenth Amendment to the United States Constitution; 5. Violations of her right to access governmental proceedings and records under Part 1, Article 8 of the New Hampshire Constitution; 6. Civil Conspiracy under the New Hampshire common law; 7. Violations of NH RSA 91-A:3, II(c), which prohibits public officials from conducting public municipal sessions in which a person's reputation is adversely

1

affected; 8. Defamation under the New Hampshire common law; 9. Abuse of process under the New Hampshire common law; and 10. Intentional infliction of emotional distress under the New Hampshire common law. Two of these cases of action, defamation and intentional infliction of emotional distress, implicate the defendants Inception Technologies, Inc. ("Inception") and Raymond Feoli ("Feoli"), who are now moving to dismiss the claims against them for failure to state a claim upon which relief may be granted.

In their motion, Inception and Feoli attempt to trivialize Ortolano's claims as only being based on recent boldness because of winning some Right to Know cases in the New Hampshire Superior Court. They also go to lengths to assert that it is her own fault Inception and Feoli publicly accused her of a crime and caused her to be investigated by the Nashua Police Department: she was wrong for calling Feoli in the first place and asking questions about public records that Nashua residents are entitled to inspect. But Inception and Feoli got themselves in a long, complex, multipronged retaliation against attack on Ortolano's exercise of First Amendment rights because she was frequently critical of Nashua officials and their governmental practices. This retaliation was based on: (1) denying her the right to obtain documents to which she was entitled access under the law; (2) attempting to destroy her reputation by impugning her character at public hearings; and (3) conniving to have her arrested several times over a period of three years. Inception and Feoli would play an integral role in one of the attempts to get Ortolano arrested.

Early in the case, just as all the other defendants have answered the Complaint, Inception and Feoli are attempting to try the case. On an F.R. Civ. P. 12(b)(6) motion to dismiss, they have submitted an extraneous testimonial affidavit and an exhibit, while leaving other evidence that lies in wait for adequate discovery off the table. Their memorandum in support is almost entirely based on argument of the facts. Ortolano has submitted an affidavit contesting many of those facts. The Court should deny their motion, force them to answer, and submit to a serious discovery process before these factual questions are decided.

II.    THE RELEVANT FACTS.

A.  Facts Alleged in the Plaintiff's Complaint.

After purchasing a home in Nashua, New Hampshire, the plaintiff, Laurie
Ortolano ("Ortolano"), and her husband, Michael Ortolano (collectively, "the
Ortolanos"), endured what they believed to be an unfair and sudden increase in
their real estate taxes; the City's Assessing Department (the "Assessing
Department") increased the valuation of their home by more than 50% in one fell
swoop. Complaint, ¶ 15. Frustrated that the City would provide no more than token
relief, Complaint, ¶¶ 16-19, Ortolano started examining the Assessing Department's
public records and became an active attendee and speaker at public meetings of the
various City boards and committees, where she sometimes spoke critically of
Nashua officials and practices. Complaint, ¶¶ 17-20; 25-29. When Nashua officials
took notice of Ortolano's frequent appearances at City Hall, they started to actively
monitor her activities and communicate with each other about her whereabouts and
actions in City Hall. Complaint, ¶¶ 20-25; 30; 32. Ortolano would not discover until
years later that she had been deemed persona non grata at City Hall. Complaint, ¶¶
20-25; 30; 32.

Realizing that Ortolano's interest in City government would not wane,
Nashua officials began searching for methods to deny her access to public
information and stifle her at public meetings and hearings. Complaint, ¶¶ 32-33.
The Chief Appraiser for the City, Jon Duhamel ("Duhamel"), took charge of the
initial effort to prevent Ortolano from viewing public documents; in fact, he would

come to suffer public discipline from the New Hampshire Association of Appraising Officials ("NHAAO") for having denied public documents to Ortolano on at least four occasions. Complaint, ¶ 47. In March 2019, Nashua eliminated the position of Chief Assessor, thus terminating Duhamel, and placed defendant Kimberly Kleiner ("Kleiner"), Director of Administrative Services, in charge of the nine-person Assessing Department. Complaint, ¶ 49. This reorganization left the Assessing Department without a professional supervisor subject to the NHAAO professional rules of ethics, and Kleiner, a nonprofessional, able to deprive Nashua residents of the right to access public assessing documents without any fear of professional discipline. Complaint, ¶ 50. And that is exactly what Kleiner did.

Within the first month of assuming leadership of the Assessing Department, Kleiner: (1) ordered the clerks not to answer questions from members of the public; (2) ordered the clerks to refer all public assessing questions to Nashua CFO John Griffin ("Griffin") or her rather than to the professional assessors in the office; (3) specifically ordered the department assessors "not speak with Ms. Ortolano" about assessment matters; and (4) ordered that, rather than being able to inspect public documents immediately upon request during normal business hours, as required by New Hampshire RSA 91-A:4 and Section 71 of the Nashua City Charter, Nashua residents would be required to complete a written request and wait for five days to have any access to public documents. Complaint, ¶¶ 51-58. By mid-summer 2019, Kleiner even was personally surveilling every citizen request to look at Assessing Department documents; she now required document requesters to identify

4

themselves in writing and specify the files they wanted to inspect so Kleiner would know who was requesting public records. She also ordered that all email requests for information be forwarded to her prior to the provision of an answer or information. Complaint, ¶ 59. In fact, while testifying at trial under oath in an RTK action Ortolano had been forced to bring, a clerk in the Assessor's Department testified that, although it was her duty to respond to citizen requests for information, she did not process Ortolano's requests for records and information that had been received through the "assesshelp" portal because Kleiner had specifically told her that she was not allowed to respond to Ortolano's requests. Complaint, ¶ 123. Other times, when Ortolano made her written requests as required, the officials of the various departments played stall games to prevent her from obtaining the documents. For example, on several occasions when Ortolano requested documents from a particular City department she thought would logically possess them, the department allowed a substantial amount of time to pass and then informed her that she had made the request to the wrong department. When Ortolano followed up by asking which department she should contact, the standard answer was "I don't know, but it's not this one." When she brought the same request to another department, once again, after another considerable delay, the next department told her the same thing. Complaint, ¶ 101.

When the City prevented Ortolano from obtaining access to public documents at City Hall, Ortolano started demanding them under RSA 91-A, New Hampshire's Right to Know ("RTK") Law. Complaint, ¶ 65. But the City would not give in. It

responded by referring all of Ortolano's RTK requests to the Legal Department, which generally took months to respond (sometimes as much as eight months), and at the end of the long wait would usually deny her requests on specious grounds. Complaint, ¶ 66. This forced Ortolano to sue the City multiple times in the State Superior Court under the remedy provisions of the RTK Law. Complaint, ¶ 67. To date, the Superior Court has ruled in favor of Ortolano on nearly every issue she has raised. Indeed, the City has suffered some embarrassing defeats in these cases: it has been chastised for its lack of "candor" and failure to act in "good faith;" it was admonished for the "trouble[ing length of time] it took to deny {Ortolano's] request, especially in light of the multiple extensions of response time  . . . ."; it has been ordered to pay Ortolano's attorney's fees; it has been ordered to participate in "remedial training regarding the City's compliance with Right-to-Know Law records requests;" it has been sanctioned for discovery abuse; and Nashua Corporation Counsel has been chastised for advancing arguments that were "[more than] a little over the top." Complaint, The Superior Court summed up: "Going forward, the Court admonishes the City to adopt a more cooperative perspective and endeavor to respond to RTK requests more promptly." ¶¶ 45; 67-69. Nevertheless, the City appealed every one of these decisions to the New Hampshire Supreme Court. Complaint, ¶ 69.

Having failed to silence Ortolano by denying her access to public documents both in practice and in the courts, the City launched a sinister two-pronged stratagem: (1) Nashua officials would impugn Ortolano's character in public

hearings and meetings, which made her participation in those forums quite
unpleasant, and (2) starting in September 2019, two City officials, defendants
Kleiner and Bolton, would launch a three-year campaign of attempting to get the
Nashua Police Department ("Nashua PD") to have her arrested for anything they
could think of. In terms of public disparagement, on numerous occasions the Mayor
and other officials used public meetings to accuse Ortolano of being a liar and of
constantly making "scurrilous" statements in public hearings. Complaint, ¶¶ 26,
113, 139. Although they had employed trickery to force Ortolano to file many
duplicative requests to obtain public documents that were supposed to be available
for immediate inspection and applied far more stringent standards of permitting
review to her than to other citizens, Complaint, ¶¶ 101-102, they employed false
numbers to publicly claim that Ortolano had purposely overburdened the Nashua
government with document requests and had cost the Nashua taxpayers huge sums
of money in administrative and litigation fees. Complaint, ¶¶ 102-103. On multiple
occasions, Nashua officials made public comments to the effect that Ortolano was a
right-wing lunatic waging a war against government itself. Complaint, ¶ 99. An
attorney in the Nashua Legal Department publicly compared Ortolano's actions to
those who attacked the Capitol Building in Washington, D.C. on January 6, 2021.
Complaint, ¶ 99.

But none of the defendants' conduct was as egregious as their multiple
attempts to commandeer the Nashua PD to investigate Ortolano for alleged
criminal conduct and even cause her to be arrested. In mid-September 2019, while

the Nashua PD was investigating Kleiner for possible witness tampering and Greg Turgiss, an Assessing Department professional assessor, for possibly falsifying work records, Kleiner was able to divert the inquiry away them and toward Ortolano by claiming that all the employees in the Assessing Department but one would prefer not to deal with Ortolano because she was critical of their work and sometimes made them feel uncomfortable. The investigating police officer told Kleiner that this was not a crime that warranted an investigation, but Kleiner insisted that he warn Ortolano not to communicate with any of the employees outside the City Assessing Department. Complaint, ¶¶ 70-81. The result was that, despite the First Amendment's protection of Ortolano's non-threatening speech, Kleiner caused two police cruisers to arrive at Ortolano's home to warn her that "there was the potential that, if [Ortolano] did have contact with the [Assessing Department Staff], . . . she could face criminal charges depending on the circumstances of this contact." Complaint, ¶ 83.

A bit more than a year and a half later, the City's Legal Department succeeded in dragooning the Nashua PD into arresting Ortolano for insisting on obtaining City Hall date stamps on several real estate tax abatement applications she was filing on behalf of elderly friends. Complaint, ¶¶ 105-112. Because the Assessing Department had (unsurprisingly) refused to confirm to her by email the date and time it had received the electronic filings of those applications, on January 22, 2021, Ortolano went to City Hall to obtain date stamps on copies of the applications but found every office except the Legal Department shuttered.

Complaint, ¶ 105-108. When she went into the Legal Department and asked that the applications be date stamped, one of the department attorneys came out of his office, refused to permit the time stamping, and told her she would have to leave. Complaint, ¶ 109. Realizing that the filing period was running, and afraid that the City would claim that her filings were untimely, Ortolano said she would wait for someone to date stamp the applications and sat down in the lobby area on the floor. Complaint, ¶ 109. After defendant Leonard arrived a short time later, the Nashua PD was summoned and Ortolano was escorted out of City Hall. Complaint, ¶ 110. A day or so later, the Nashua PD informed Ortolano's attorney and the press that "the incident required no further action;" they would not be arresting Ortolano or issuing her a "no trespass order." Complaint, ¶ 111. When so informed, however, defendant Leonard responded to a *Union Leader* reporter: "I find it troublesome, to say the least. My office will be speaking with the police further." Complaint, ¶ 111. Just shy of a month later, the Nashua PD arrested Ortolano for criminal trespass, charging a Class A criminal trespass.[1] Complaint, ¶ 112.

---

[1] The public record discloses that Ortolano would eventually plead down to a non-criminal "violation" for the event. Nashua District Court, Docket No. 459-2021-CR-00606. The public record shows that Ortolano sought an annulment of the violation by petition dated July 12, 2022. Nashua District Court, Docket No. 459-2021-CR-00606. The public record also shows that after this action was filed, the City of Nashua attempted to intervene and oppose the annulment, claiming that the City is a crime victim and, despite Ortolano's clear assertion in filings that a failure to achieve the annulment could negatively affect the applications of her husband and her for permanent residence status in a country they are considering for retirement life, that Ortolano's annulment petition was made for the purpose of achieving a tactical advantage in this case. Nashua District Court, Docket No. 459-2021-CR-00606. The thin-skinned City officials named as defendants in this action quite clearly remain steadfast in attempting to destroy Ortolano for her public criticisms of them.

The most recent attempt of the City to have Ortolano arrested occurred shortly after the City had suffered a spate of losses in the Superior Court on Ortolano's RTK cases, and just a few weeks prior to her filing of the Complaint in this action. On the morning of July 22, 2022, Kleiner called the Nashua PD, asking for a police presence at City Hall because Ortolano had a scheduled appointment at City Hall at about 10:00 a.m. and "prior incidents between the members of City Hall and Ortolano" required police presence to "ensure that the interactions were orderly and incident free." Complaint, ¶ 126. The "prior incident" was a public hearing at which Ortolano had criticized the City's Director of Economic Development. Complaint, ¶ 127. Ortolano had no such meeting, and the police eventually left City Hall. Complaint, ¶ 126. Later on, however, Ortolano did come to City Hall and was spotted by defendant Bolton in a public hallway near the Legal Department speaking on her cellphone. Complaint, ¶ 130. The police were called and Bolton, clearly neither rational nor in control of his emotions, insisted that the Nashua PD immediately arrest Ortolano for trespassing in a public hallway in City Hall. Complaint, ¶ 130-137.

In early 2022, Defendants Inception and Feoli would willingly become active participants in the City's efforts to destroy Ortolano's reputation and attempted to have her arrested. Feoli told Kleiner that Ortolano had called him and represented to him that she was a Nashua employee. Complaint, ¶¶ 121-122; 182-188. This was false; as Feoli would later admit when pressed by the Nashua PD, Ortolano never stated or implied to Feoli that she was a City of Nashua employee. Complaint, ¶¶

121-122; 182-188. Kleiner then took this false information and announced at a public Board of Aldermen ("BOA") hearing that Ortolano had been impersonating a City employee, which both publicly disparaged Ortolano's reputation and caused Ortolano to be investigated by the Nashua PD yet again. Complaint, ¶¶ 121-122; 182-188.

B. Facts Alleged in the Defendants' Extraneous Factual Submissions.

Although the purpose of a Rule 12(b)(6) motion to dismiss is limited to testing the legal adequacy of the plaintiff's complaint rather than whether the plaintiff will ultimately prevail, *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1997); *see Conley v. Gibson*, 335 U.S. 41, 45-46 (1957), Inception and Feoli have attached to their motion a testimonial affidavit and copy of an email they sent to the Nashua Board of Aldermen accusing Ortolano of impersonating a Nashua public employee; the email is neither attached to Ortolano's Complaint nor referred to in her Complaint. This bit of early and free discovery reveals a serious factual discrepancy between what Feoli told Kleiner and the BOA about his conversations with Ortolano, and what he told the Nashua PD when forced to be truthful. Feoli's Affidavit is also vague about conversations he had with Kleiner and the Chairperson of the BOA, and suggests on its face that there is a lot more to the story that needs to be plumbed in discovery. Instead of supporting their claim that Ortolano's Complaint is legally inadequate under Fed. R. Civ. P. 12(b)(6), the extraneous submissions of Inception and Feoli actually provide further evidence of their culpability.

Feoli says he received a voicemail message from Ortolano in late 2021 or early 2022. Feoli Affidavit, ¶ 7. When Feoli called Ortolano back, she asked him questions about the scanning project Inception was handling for the City of Nashua. Feoli Affidavit, ¶ 8. Feoli claims that, although Ortolano never said she worked for the City, her detailed questioning and knowledge of facts about his contract with the City of Nashua caused him to believe that she was a City employee, Feoli Affidavit, ¶¶ 9-10. Feoli claims that Ortolano recited facts about the amounts that Inception had billed and how much the City had paid on the contract and promised to expedite payment from the City.[2] Feoli Affidavit, ¶ 9. Feoli claims that he spoke by phone again with Ortolano on February 4, 2022 and that Ortolano again questioned him about public access to the scanned documents, "at one point stating/inquiring: 'We don't have access to those files. When can we get those files back?'"[3] Feoli Affidavit, ¶ 10. Coincidently or not, Feoli asserts that, shortly after

---

[2] Feoli is incorrect. Nashua citizens had been waiting for the project to be completed for many months and Kleiner had not provided any public updates. Affidavit of Laurie Ortolano, ¶ 5. When Ortolano called and asked Feoli when the project would be completed, Feoli told her that Inception had just about used up the funds appropriated for by the City and would need another City appropriation to complete the project. Ortolano Affidavit, ¶ 8. Upset to learn that the project was now hanging in limbo, Ortolano questioned Feoli about how much money had already been appropriated and how much more he would need. Ortolano Affidavit, ¶ 9. Feoli provided those answers. Ortolano Affidavit, ¶ 9. Ortolano told Feoli that she would inquire from the City about when more money would be coming because she and other Nashua citizens wanted the job done. Ortolano Affidavit, ¶ 9. Ortolano never told Feoli that she would "make sure payment from the City was expedited." Ortolano Affidavit, ¶ 9. That Feoli has misstated these facts is either a product of faulty memory or an effort to justify an improper assumption about Ortolano's status because he believed it might jeopardize his contract with the City of Nashua.

[3] Once again, Ortolano was expressing her frustration that the City had promised online access to the scanned documents Inception was working on and was inquiring when they might be made available to Nashua citizens – she was one – for online inspection. Ortolano Affidavit, ¶ 9.

12

his second call with Ortolano, defendant Kleiner called and asked him to "identify all City officials with whom [he] had communicated about the City's scanning project." Feoli Affidavit, ¶ 11. At that point, Feoli claims he first learned that Ortolano was not a City employee and "concluded that [his] conversations with her amounted to a breach of Inception's data security obligations to the City." Feoli Affidavit, ¶¶ 12-14.

At this point, Feoli appears to have started to scramble to deal with contract performance issues of his improper assumption about Ortolano. On February 6, 2022, after speaking with Kleiner, he sent an email to the BOA and Kleiner, attempting to explain what had occurred with Ortolano. Feoli Affidavit, ¶ 15. Right at the top – the last sentence of the short first paragraph – Feoli accused Ortolano of committing a crime: "It has come to my attention that I have been deceived by individual (sic), Laura (sic) Ortolano, who portrayed herself as city employee to me on thre (sic) different occasions." Feoli Affidavit, Exhibit "A." The evidence Feoli cited in the email was scant:

- Feoli claimed that Ortolano referred to a purchase order number and cited specific purchase order amounts.[4]

- Feoli claimed that Ortolano promised that she "would make sure payment was expedited on any open invoices."[5]

---

[4] Ortolano disagrees; it was Feoli, not her, who was throwing around specific dollar values and the like in answer to her questioning about when the project would be completed. Ortolano Affidavit, ¶ 9.

[5] Ortolano never said that. When Feoli told her that the City had not appropriated money to complete the project, an upset Ortolano told him that she would pressure Kleiner to make more payments because Nashua residents were eager for the project to be completed. Ortolano Affidavit, ¶¶ 8-9.

- Ortolano called a second time and inquired about when "we" can get access to documents. Feoli apparently believed that "we" was the City of Nashua rather than the residents of Nashua who had no access to the documents while they sat in Inception's warehouse.[6]

Regardless of how Feoli reached his conclusion that Ortolano had deceitfully portrayed herself as a City employee, her reputation was damaged when his claim of deception was read into the public record, shown on live television throughout Nashua, and preserved for the world to see on YouTube (where all BOA hearings are placed). His misstatements led to an immediate police investigation into whether Ortolano had committed a crime.

C. <u>The Police Report and Affidavit Submitted by the Plaintiff in Response to Defendants' Extraneous Factual Submissions</u>.

To correct the misstatements of fact in Feoli's Affidavit and supplement the record to show that Feoli has neither told the whole story nor not being truthful in his letter to the BOA, Ortolano has submitted a short fact Affidavit and a copy of the police report created as a result of the criminal investigation of Ortolano that Feoli caused. The factual discrepancies highlighted in Ortolano's Affidavit are set forth in footnotes to each of Feoli's misstatements in Subsection B above.

The police report and its attachments paint a far different picture than Feoli presented in his letter to the BOA, Affidavit in Support of his motion to dismiss and memorandum in support of the motion to dismiss. Nashua PD Sergeant Goodwin, who wrote the police report, stated:

---

[6] Ortolano contends that she was clear in expressing her frustration that it was the residents of Nashua who had been deprived of the ability to access public records. She cannot understand how Feoli could have interpreted the word "we" as an affirmation that she was a city employee. Ortolano Affidavit, ¶¶ 10-11.

I called Feoli at ████████████ and asked if he was free to talk in person about this incident and he agreed. Detective Sgt. Nicole Hannigan and I then responded to Inception Technologies, ████████████ ████████████, and spoke with Feoli in person. I showed Feoli a copy of the email from him to the Board of Aderman and he confirmed that was from him. *I specifically asked Feoli if at any point Ortolano purported to be an employee of the City of Nashua or anything similar and he stated no.* Feoli advised that because Ortolano had so much information on this subject he assumed she was an employee *but she never stated that she was. I asked Feoli if Ortolano was asking about any type of private or secure information and he stated no. Feoli explained Ortolano was asking about the progress of the job and when it would be ready.* Feoli advised that he received another email from Ortolano late last evening which was originally sent earlier in the morning but he did not receive the first one. Feoli sent me the email and also printed me out a copy which was attached to the case. This ended my contact with Feoli.

After speaking with Feoli, no crimes have been committed and this report is being completed for informational purposes.

Ortolano Affidavit, Exhibit "B," at p. 4. (Emphasis added.)(Private

information redacted.). The email Sergeant Goodwin referred to was

Ortolano's email to Feoli the night his letter to the BOA was read into the

public record. It recounted what actually was said in their February 4, 2022

phone conversation. Ortolano Affidavit, Exhibit "B," at pp. 10-11.


III.  ARGUMENT.

A.  The Rule 12(b)(6) Standard.

To survive a Rule 12(b)(6) motion to dismiss, the complaint must state a

claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007). To demonstrate plausibility, the "[f]actual allegations must be enough to

raise a right to relief above the speculative level. . . ." *Id.* at 555 (internal citations

omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate only if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Ordinarily, the court's review is limited to the complaint and documents attached or expressly incorporated, unless the court converts the proceeding to one for summary judgment under Fed. R. Civ. P. 56. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). There are, however, "narrow exceptions" to this limitation for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claims; or for documents sufficiently referred to in the complaint." *Id.* If other matters outside the pleadings are presented to the court, the court may exclude such matters or may treat the motion as one for summary judgment, with all parties given a reasonable opportunity to present all the material that is pertinent to the motion. Fed. R. Civ.

16

P. 12(d); *see also Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 317, 321 (2008)(if materials outside the complaint are considered, the motion ordinarily "must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment").

Inception's and Feoli's testimonial Affidavit and exhibit clearly appear to be extrinsic and not within one of the exceptions to the rule that extrinsic matters should not be considered at the 12(b)(6) stage.

B. <u>The Court Should Not Convert Inception's and Feoli's Motion to Dismiss to One for Summary Judgment.</u>

Respectfully, the Court should not exclude Feoli's Affidavit and Exhibits, as well as Ortolano's counter-Affidavit and Exhibits and decide the motion as one to dismiss rather than as one for summary judgment at this stage of the litigation. First, there are apparent discrepancies in the stories Feoli has told to different people and these should be flushed out on deposition. Second, Feoli's Affidavit and letter to the Nashua BOA have clear factual gaps, indicating that justice would best be served if the parties were able to fill in those gaps with discovery. For example, Feoli claimed that, after his second telephone conversation with Ortolano, Kleiner called him and told him that Ortolano did not work for the City; Feoli then immediately decided to write the February 6th email to the BOA. Feoli Affidavit, ¶¶ 11-15; Exhibit A. Questions abound from this claim: What caused Kleiner to call? Did Feoli and Kleiner discuss whether Feoli should write to the BOA? Did Kleiner suggest to Feoli that Ortolano had committed a crime? Did Kleiner offer suggestions

about what Feoli should write in his email? Given the different incantations of fact, and apparent gaps in information, disposition of this case prior to trial, if at all, makes more sense after the opportunity for the parties to have discovery.

### C.   Inception's and Feoli's Charge that Ortolano Deceitfully Impersonated a City Employee Did Not Constitute Non-Actionable Opinion.

The defamation claim against Kleiner and Feoli is a state law cause of action to be decided under New Hampshire law, subject to "constitutional concerns" requiring that the challenged statement be one of fact rather than opinion. *Automated Trans., LLC. v. American Bankers Ass'n*, 172 N.H.528, 532 n.2 (2019). Inception and Feoli claim that Feoli's words, "It has come to my attention that I have been deceived by individual (sic), Laura (sic) Ortolano, who portrayed herself as city employee to me on thre (sic) different occasions," constitute "a clear statement of Mr. Feoli's opinion, deduced from his prior communications with Ms. Ortolano." They cite little law supporting their claim and they are incorrect.

> An important criterion for distinguishing statements of opinion from statements of fact is verifiability, *i.e.,* whether the statement is capable of being proven true or false.  Where an expressive phrase, though pejorative and unflattering, cannot be objectively verified, it belongs squarely in the category of protected opinion." "The vaguer a term, or the more meanings it reasonably can convey, the less likely it is to be" verifiable and hence actionable.

*Automated Trans.*, 172 N.H. at 532 (citations omitted). The fact that Kleiner and/or the BOA actually referred the matter to the Nashua PD for criminal investigation demonstrates that Feoli's charge was objectively verifiable. Inception and Feoli will

18

assert that, because Feoli stated the facts upon which his charge of a crime was based, there is no defamation. This assertion has initial appeal:

> When the speaker discloses the facts upon which he bases his statement, "no reasonable reader would consider the term anything but the opinion of the [speaker] drawn from the circumstances related."

*Id*. at 527 (citations omitted). But this cannot lead to dismissal for failure to state a claim at this stage because Ortolano has asserted that the underlying facts upon which Feoli based his claim were false. *See* Ortolano Affidavit, ¶¶ 7-11. The falsity of the underlying information formed the basis of Kleiner's and/or the BOA's referral for a criminal investigation of Ortolano.

Ortolano deserves an ability to conduct discovery and obtain all the facts surrounding Inceptions's and Feoli's claim of criminal behavior and the truthfulness of underlying facts on which they were based. The defendants have relied on extraneous documents that should not be considered at this stage, and Ortolano has challenged the truth of those statements.

IV.   CONCLUSION.

For the foregoing reasons, the plaintiff, Laurie Ortolano respectfully submits that the motion of defendants Inception and Feoli should be denied.

Respectfully submitted,

Laurie Ortolano, Plaintiff
By her Attorneys,

Olson & Olson, P.A.
*/s/* Kurt S. Olson
Kurt S. Olson
Bar ID No. 12518

19

31 Franklin Rd.
Salisbury, NH 03268
603-748-1960
kolson@mslaw.edu

## <u>CERTIFICATE OF SERVICE</u>

**I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be sent electronically forthwith to the registered participants as identified on the Notice of Electronic Filing (NEF).**

*/s/* Kurt S. Olson
Kurt S. Olson