## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano, | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 22-cv-00326-LM |
| | ) |
| | ) |
| The City of Nashua, et al., | ) |
| Defendants | ) |
| | ) |

### PLAINTIFF'S MEMORANDUM OF LAW OBJECTING TO DEFENDANT MICHAEL CARIGNAN'S MOTION FOR JUDGMENT ON THE PLEADINGS

I.    PROCEDURAL POSTURE.

This is an action by the plaintiff, Laurie Ortolano ("Ortolano"), that articulates

ten causes of action: 1. Violations of 42 U.S.C. § 1983 for suppressing her free

speech rights and retaliation against her for her exercise of speech and expression

protected under the First Amendment to the United States Constitution; 2.

Violations of 42 U.S.C. § 1983 for suppressing her right to petition government and

retaliation against her for attempting to do so, which rights are protected under the

First Amendment to the United States Constitution; 3. Violations of 42 U.S.C. §

1983 for suppressing her right to substantive due process, which rights are

protected under the Fourteenth Amendment to the United States Constitution; 4.

Violations of 42 U.S.C. § 1983 for suppressing her right to procedural due process,

which rights is protected under the Fourteenth Amendment to the United States

Constitution; 5. Violations of her right to access governmental proceedings and

records under Part 1, Article 8 of the New Hampshire Constitution; 6. Civil Conspiracy under the New Hampshire common law; 7. Violations of NH RSA 91-A:3, II(c), which prohibits public officials from conducting public municipal sessions in which a person's reputation is adversely affected; 8. Defamation under the New Hampshire common law; 9. Abuse of process under the New Hampshire common law; and 10.

## II.   THE RELEVANT FACTS.

As described in the Complaint, Ortolano took full advantage of the New Hampshire and Nashua laws allowing citizens sweeping access to public records, including the records kept at the Nashua Assessing Department, and also became a frequent attendee and speaker at the various Board and Department meetings conducted in the running of Nashua's municipal government. Complaint, ¶¶ 22, 23, 24-32. Nashua municipal officials (elected and appointed) took offense to Ortolano's constant presence at City Hall and particularly in regard to her criticisms of how municipal business was conducted. Complaint, ¶¶ 24-32, 39-45. These officials employed several strategies to prevent Ortolano from having access to public records and from speaking critically at public hearings/meetings. They attempted to restrict her access to public records by refusing to provide them although required to do so by law. Complaint, ¶¶ 33, 46-48, 123.

For the purpose of preventing or delaying Ortolano's ability to obtain public records, the City even violated the City Charter by altering the method by which citizens were allowed to gain access to such public records. Complaint, ¶¶ 51-59.

Frustrated that Nashua's departments started making her wait to get documents, and even refused to deliver many of her  requests for documents in violation of New Hampshire and Nashua law, Ortolano started requesting documents via Right to Know requests under NH RSA 91-A. Complaint, ¶ 65. The City responded by having the Legal Department handle all her RTK requests rather than the targeted departments, as had been past practice. The Legal Department delayed many of these requests by months, and often refused to produce any documents under the guise of technical objections. Complaint, ¶¶ 66-69. This forced Ortolano to sue the City under RSA 91-A; so far, she has essentially won all of her RTK lawsuits, and in at least one decision the Superior Court chastised and sanctioned the City for its dilatory practices in handling Ortolano's RTK requests. Complaint, ¶¶ 66-69.

When the City could not make Ortolano go away by these tactics, officials retaliated by starting a public campaign to destroy her reputation, even falsely accusing her of committing crimes during public meetings. For example, the Mayor publicly called her a liar, Complaint, ¶ 26; Corporation Counsel Bolton publicly called her a liar, Complaint, ¶ 113; and Director of Administrative Services Kleiner falsely accused her of impersonating a Nashua city official, causing the Nashua police to subject Ortolano to a criminal investigation.[1] Complaint, ¶ 122.

_____

[1] The City's efforts to destroy Ortolano's reputation because of her criticisms of Nashua's government continued even after Ortolano initiated this lawsuit. In a public hearing October 13, 2022 that was televised live throughout greater-Nashua and preserved thereafter for the world to view on YouTube, Alderman Melbourne Moran falsely accused Ortolano of being a liar and child predator who had done "opposition research" on his children. He "doubled down" by telling the Principal of the Catholic School his children attended that Ortolano, a known parishioner at the

At some point, City officials came to view the Nashua Police Department, and its ability to initiate criminal charges against citizens, as a weapon to employ against Ortolano. This is how Chief Carignan became involved. From reviewing records and observing the operations of the Assessing Department in 2018 and the first half of 2019, Ortolano observed that one of the assessors, Greg Turgiss ("Turgiss"), was not performing a substantial portion of his job duties. Complaint, ¶ 60. Ortolano orally raised this issue with Administrative Services Director Kleiner, who refused to speak about it. Complaint, ¶ 60. So Ortolano hired private investigator William Freyler ("Freyler") to determine whether her suspicions were correct. In April 2019, with Ortolano's assistance, Freyler surveilled Turgiss's activities when he left the Assessing Department offices. Complaint, ¶ 60. Freyler produced a detailed written report demonstrating that on a daily basis Turgiss would usually leave the Assessing Department offices between 11:00 a.m. and noon, and marked the "OUT" part of the white board in the public research area of the

---

Catholic Church associated with the school, was a child predator and asked for assurances that his children would be safe from her at school. Moran then "tripled down" by going on a local radio program and announcing to greater-Nashua listeners that he had to call his wife and tell her to lock the doors of the family home because he feared for his children's safety. He added that, as a licensed social worker and "child protective worker," his expertise qualified him to identify Ortolano as a child predator.

Additionally, knowing that it could interfere with Ortolano's attempt to attain permanent residence status in a European country where she and her husband intend to spend a good portion of their retirement years, the City has attempted to intervene in her District Court petition for annulment of her trespass "violation" for the obvious reason of attempting to pay her back for criticizing City officials in public hearings.

Assessing Department offices either "FIELD" or "OTL/FIELD"[2] and the "IN" part of the white board, "PM."A true and accurate copy of Freyler's report is authenticated in Ortolano's Affidavit (¶ 4) as Exhibit "A." A true and accurate copy of Ortolano's surveillance notes supporting the Freyler report is authenticated in Ortolano's Affidavit (¶5) as Exhibit "B."

The reports indicate that Turgiss was surveilled on 16 different work days – April 1, 2, 3, 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, and 23 – and was usually out of the office for between 2 and one-half or 3 hours. *See* Exhibits "A" and "B." Only once was Turgiss observed doing any field work, and that was for only about 10 minutes. *See* Exhibit "B" (April 10th entry). All other surveilled time out of the office involved Turgiss either driving around town in an apparent attempt to run up miles on his odometer, or mostly time spent parked either behind a Holiday Inn hotel or in a Rail Trail parking lot where he either slept in his car or looked at personal laptop computer. *See* Exhibits "A" and "B." Turgiss was never observed eating lunch during the typical 2 and one-half or 3 hours that he had marked either "OTL/FIELD" or "FIELD" as he left the office. *See* Exhibits "A" and "B." Because City officials who Ortolano had informed of her suspicions actually praised Turgiss's work in public, and caused him to be promoted, Ortolano's attorney sent all this information to Mayor Donchess by a letter dated May 8, 2019. A true and accurate copy of that letter is authenticated in Ortolano's Affidavit (¶ 6) as Exhibit "C."

---

[2] "OTL" appears to have meant "Out to Lunch."

The Mayor appointed Attorney Mark Broth to conduct an investigation of Turgiss's activities, but on May 21, 2019, Mr. Broth revealed by letter that his investigation was a limited one. In a July 3, 2019 meeting between Mr. Broth and Ortolano's attorney, Mr. Broth confirmed that he was only reviewing whether Turgiss had engaged in misconduct under the union's collective bargaining agreement, which did not include a review of any of Turgiss's assessing work. A true and accurate copy of a July 8, 2019 letter from Ortolano's attorney to the Mayor confirming this and asking him to widen the scope of the investigation is authenticated in Ortolano's Affidavit (¶ 7) as Exhibit "D."

Accordingly, on June 20, 2019 Ortolano wrote a letter to then Deputy Police Chief, Michael Carignan,[3] providing the details of what Freyler and she had found, and asking that the Police Department conduct a criminal investigation. A true and accurate copy of that letter to Deputy Chief Carignan is authenticated in Ortolano's Affidavit (¶ 8) as Exhibit "E." In that letter, Ortolano specifically asserted that the Mayor was "downplay[ing] the significance of the Investigation" and that Kleiner "appears to be interfering with independent investigation." *See* Exhibit "E." Ortolano also noted that Turgiss "is logging roughly 10 times more mileage than the other commercial assessor for very few properties visited." *See* Exhibit "E."

Carignan arranged for Ortolano and her friend, Laura Colquhoun ("Colquhoun"), to meet with Police Captain Jon Lehto and Lieutenant Daniel Mederos on June 25, 2019. A true and accurate copy of Captain Lehto's Report on the June 25, 2019

---

[3] A short time later, Carignan would be named the Chief of Police.

meeting is authenticated in Ortolano's Affidavit (¶ 9) as Exhibit "F." At the meeting, Ortolano and Colquhoun provided all the documentation they had collected about Turgiss's fraudulent work conduct and described what they believed to be Defendant Kleiner's witness tampering with Assessing Department employees. *See* Exhibit "F." Lehto and Mederos explained that "the Police Department would investigate the matter and . . . draw our own independent conclusions" but that it considered that "the City would be the 'victim' and would be consulted regarding resolution of the matter." *See* Exhibit "F."

There is little doubt that Captain Lehto would have remembered, and should have taken into account, that Turgiss had a documented history of abusing his job duties. Then Detective Lehto served as one of the primary detectives in an October 2006 investigation of charges that Turgiss has spent hundreds of hours viewing pornographic material on his workstation computer in the Assessing Department during the workday hours. A true and accurate copy of the police reports and records from that investigation is authenticated in Ortolano's Affidavit (¶ 10) as Exhibit "G." The City IT department took more than 8,000 pornographic images from Turgiss's work computer; Turgis admitted to viewing pornography for several hours at a time while he was supposed to be working. *See* Exhibit "G." At least one of the images taken from the Turgiss computer was clearly of a "young girl." *See* Exhibit "G." Turgiss admitted that he was addict[ed] to viewing pornography and also engaged in "chatting" in regard to pornography during work hours. *See* Exhibit "G." Turgiss voluntarily allowed the Nashua Police Department to take control of

his home computer, on which there was no pornography. *See* Exhibit "G." Turgiss received "administrative" discipline by the City but was not charged with a crime. *See* Exhibit "G." Accordingly, in addition to the criminal records available to the public, there would certainly have been a City Human Resources Department file on the matter demonstrating Turgiss's propensity to spend work time on "recreation" rather than work. It is also quite likely that word of this type of investigation of a City employee would have spread through the police department ranks rather quickly.

Rather than "draw[ing their] own independent conclusions" first and waiting to "consult[ ]" the "victim regarding resolution of the matter" after a determination of whether charges were appropriate, Captain Lehto and Deputy Chief Carignan "consult[ed]" the "victim" prior to even starting an investigation. Lehto and Carignan went straight to the Mayor and Kleiner withing 24 hours after meeting with Ortolano and Colquhoun. A true and accurate copy of Captain Lehto's police report memorializing the June 26, 2019 meeting between Carignan, Lehto, Donchess, and Kleiner is authenticated in Ortolano's Affidavit (¶ 11) as Exhibit "H." This report indicates that Donchess and Kleiner already knew about the Ortolano/Colquhoun meeting with Carignan and Lehto because it indicates that Donchess and/or Kleiner summoned them to meet at the Mayor's office at 9 a.m.: "Deputy Chief Carignan and I *responded* to Nashua City Hall . . . and met with Mayor Jim Donchess and Director of Administration Services Kim Kleiner in the Mayor's Conference Room." *See* Exhibit "H" (emphasis added.) Although Lehto

clearly knew about Turgiss's prior workplace misbehavior, and Carignan presumably did as well (it would be shocking if Lehto had not told him or if Carignan did not already know from inter-department scuttlebutt), the Report does not state whether they relayed this information to Donchess and Kleiner. *See* Exhibit "H." When Donchess and Kleiner were informed that the police would be interviewing the Director of Human Resources and members of the Assessing Department, Kleiner, who was supposed to be a target of the investigation, told Carignan and Lehto that that the Director of Human Resources and independent counsel Mark Broth had already interviewed Turgiss and that Broth had already interviewed "several members of the Assessing Department." *See* Exhibit "H." In fact, Kleiner, the City's Director of Administrative Services as well as an investigation target, was technically in charge of both the Human Resources and Assessing Departments. A true and accurate copy of the final police report on the Turgiss and Kleiner investigations is authenticated in Ortolano's Affidavit (¶ 12) as Exhibit "I."

The police did not surveil Turgiss's activities as had Ortolano's private investigator. *See* Exhibit "I." Nor did the police even consider whether Turgiss truly did complete any field work while he was out of the office; the Freyler Report convincingly demonstrates that with few exceptions he did not. Instead, Detective Lombardi and Sergeant Macloud appear to have merely been tasked to match "daily work and activity logs that had been generated . . . to the mileage reimbursement forms that Turgiss had submitted" and "us[e] Google maps [to] map[ ]out the

shortest possible distances it would have taken Turgiss to visit the properties he had on specific days." *See* Exhibit "I."

Despite Freyler's finding that Turgiss had clearly driven around to run up his odometer before landing in parking lots for naps and computer time, the final police report declared that "Turgiss had not over reported any of his mileage and actually under recorded the mileage on some days." *See* Exhibit "I." As to Kleiner, the report concluded that only one employee had interpreted Kleiner's anecdote about how one can actually lose one's job by initiating or cooperating with investigations and that the one employee must have misconstrued the incident. *See* Exhibit "I."

What the final police report on the Turgiss/Kleiner investigation that Carignan and Lehto oversaw failed to reveal was that, before the investigation concluded, the Nashua Police Department shifted the investigation from targets Kleiner and Turgiss to complainant Ortolano. At a time when police personnel were interviewing Assessing Department employees, Kleiner called Detective Lombardi, who was then investigating her for witness tampering at Carrigan and Lehto's behest, and asked him to issue a warning to Ortolano that "everyone in the assessing department[, with the exception of Cheryl Walley, the employee who complained of Kleiner's witness tampering] had basically come together and were on the same page, that they didn't want to have contact with Ms. Ortolano outside of the assessing department." Complaint, ¶¶ 70-72. Lombardi made clear in a deposition taken in another civil action that no one had complained that Ortolano had ever physically threatened them or that "[Ortolano had been] mischaracterizing

their private lives." Complaint, ¶ 74. To the contrary, the Kleiner, supposedly speaking for the Assessing Department employees, claimed to be merely "uncomfortable with the way [Ortolano] was characterizing the operations of the [assessing] department." Complaint, ¶ 75. Despite knowing and later admitting on deposition that Ortolano had not done anything remotely criminal, Lombardi caused two police cruisers to go to Ortolano's residence for the purpose of delivering the message that if Ortolano had any further "contact with the [Assessing Department Staff outside the Assessing Department], . . . she could face criminal charges depending on the circumstances of this contact." Complaint, ¶ 83. He did not describe or give examples of the types of "circumstances" that could lead to criminal charges against Ortolano. As a result of Lombardi's admonition, Ortolano came to believe that she could actually be arrested merely by attempting to speak to one of the Assessing Department staff members in a City Hall common area or some other place outside the Assessing Department office. Complaint, ¶ 83.

Later, when Carignan was the Chief of Police, the Nashua Legal Department succeeded in having Ortolano arrested at City Hall. On January 17, 2021, Ortolano emailed two real estate tax abatement applications she sought to file on behalf of senior citizens to the Assessing Department through its Assesshelp email portal. Complaint, ¶¶ 105-106. Because abatement applications face hard filing deadlines and prior to the pandemic were normally filed in person so the filer could obtain confirmation through a date stamped copy, Ortolano requested an emailed confirmation of the filing. Complaint, ¶¶ 105-106. But as was by then *de rigueur*

regarding all of Ortolano's attempted communications with City employees, she received no response. Complaint, ¶ 106. Ortolano followed up with a phone call and another email on January 20, 2022, but still received no response. Complaint, ¶ 106. Given the City's history of gamesmanship when dealing with her, Ortolano feared that the Assessing Department would claim that she had failed to file the abatement applications timely unless she possessed date-stamped receipt showing that she had. Complaint, ¶ 106.

On January 22, 2021, Ortolano went to City Hall to get the abatement applications date stamped. Complaint, ¶ 107. Finding that the only City Hall office that was not shuttered was the Legal Department and, knowing that the Legal Department had been handling assessment questions from the public since the Assessing Department had been closed for construction, Ortolano knocked on the door to the Legal Department and employee Mindy Lloyd opened it and asked if Ortolano had an appointment. Complaint, ¶ 107-108. Ortolano said "no" but that she only needed a date stamp on the abatement applications; she asked if Attorney Neumann (the attorney handling RTK requests) was available to provide one. Complaint, ¶ 109. When Attorney Neumann said he would not date stamp her abatement applications and told her she would have to leave, Ortolano, running out of options, said she was going to wait in the lobby area for someone to assist her; she sat down in the lobby area on the floor. Complaint, ¶ 109. A short time later, Defendant Celia Leonard arrived at the Legal Department and started to scream at Ortolano, who remained sitting on the floor while the Nashua Police Department

12

was summoned. Complaint, ¶ 110. A true and accurate compilation of all police reports regarding every potential criminal trespass event resulting in a verbal or written warning or arrest, and which occurred at Nashua City Hall between January 1, 2014 and January 31, 2021, was obtained through a Right to Know request and is authenticated in Ortolano's Affidavit (¶ 13) as Exhibit "J." The letterhead on the response shows the Chief of Police to be defendant Michael Carignan. *See* Exhibit "J." The police writeup regarding the Ortolano incident at City Hall on January 22, 2021 is on pages 7 and 8 (the last pages) of that document. As shown in that document, five (5) Nashua Police Department personnel were involved in the incident: Master Patrolmen Roark, Lee, and Yeomelakis, and Sergeants Karlis and Caron. *See* Exhibit "J." The end of the incident report indicates what conclusion these five police personnel reached in determining how to resolve the matter:

> Laurie was sat down in an upstairs corridor area of City Hall. Was not causing a scene on arrival and appeared calm. She was upset as reported she has been trying to get appointment and paperwork stamped by city hall and they continue to not assist her. Reports this has been going on for months. She apparently assists people in property tax Nashua Police Department abatement/reductions and needed papers stamped.

> Spoke with Celia from City Hall who is Deputy Corporation Counsel for city? She said this is ongoing issue with Laurie and that personnel from NPD are aware. No allegations of any threats made but stated that Celia needed to leave now. Wanted her trespassed but allowed at City Hall if she has an approved appointment. Reported the City have had a lot of contact with Laurie via email and that there are pending lawsuits with the City.

> Lauries (sic) was asked to leave. She left willingly but stressed her
> frustration indicating that the City do (sic) not communicate with her
> or assist her. She was informed she is being trespassed for one year
> and is not allowed at City Hall unless with an appointment. She was
> advised that she could face arrest from Criminal Trespass if she
> attends City Hall without an appointment. She understood.

> *No offences alleged or apparent*

*See* Exhibit "J," at 7-8 (emphasis added). In fact, the response attached as Exhibit

"J" demonstrates that, even in regard to the listed incidents that were potentially

more violent or intrusive than Ortolano's January 22, 2021 incident, the Nashua

Police Department charged not a single person with criminal trespass between 2014

and January 2021. Nor did the five police personnel involved in Ortolano's incident

conclude that Ortolano should be arrested. Consistent with their finding, a day or so

later the police informed Ortolano's attorney and the press that "the incident

required no further action" and they were not even going to issue a no trespass

order. Complaint, ¶ 110. But, when a *Union Leader* reporter informed defendant

Leonard of the Nashua Police Department's statement that there would be neither

an arrest nor a no trespass order, Leonard responded, "I find it troublesome, to say

the least. My office will be speaking with the police further." Complaint, ¶ 111.

Obviously, someone higher than the rank of sergeant or master patrolman

overruled the five police personnel who handled the Ortolano incident after

Leonard's office spoke with him/her/them. On February 17, 2021, the Nashua Police

Department arrested Laurie Ortolano. Complaint, ¶ 112. Given Carignan's prior

involvement in matters involving Ortolano, it is likely – certainly at least plausible

– that Carignan was involved in the decision to overrule the police personnel

14

involved. The result was that, for the time in seven years, a person was arrested at City Hall. And the reason for the arrest was that a 60-year old woman insisted on sitting on the floor of the lobby while waiting for someone to date stamp two real estate tax abatements.

III.   ARGUMENT.

A.   The Rule 12(c) Standard of Review.

Under Rule 12(c), "after the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A "close procedural cousin to a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)," a motion for judgment on the pleadings should be "treated in much the same way." *Hayes v. Mellon*, ___ F.Supp. 3d ___, ___, 2022 WL 3214957 (D. Mass. 2022)(citing *Kando v. R.I. State Bd. of Elections,* 880 F.3d 53, 58 (1st Cir. 2018); *see Sevelitte v. Guardian Life Ins. Co. of America*, 55 F.4th 71, 79 (1st Cir. 2022) (currently on appeal to First Circuit Court of Appeals). Under this standard of review, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To demonstrate "plausibility," the "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining

whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate only if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Although the court's review is ordinarily limited to the complaint and documents attached or expressly incorporated, there are "narrow exceptions" for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claims; or for documents sufficiently referred to in the complaint." *Ironshore Specialty Ins. Co. v. United States*, 871 F. 3d 131, 135 (1st Cir. 2017); *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). Ortolano is attaching some documents through an authentication affidavit to dispel Carignan's attempt in his Memorandum in Support of Motion for Judgment on the Pleadings to portray himself, the Chief of Police of the Nashua Police Department, merely as an uninvolved bystander while the department he directed: (1) converted an open criminal investigation of two Nashua public officials that Ortolano instigated into an investigation of Ortolano herself; (2) after whitewashing the charges against these two Nashua public officials, bringing it to a close by

warning Ortolano that she could be arrested for continuing to exercise her free speech and government petitioning rights protected by the First Amendment; and (3) at the insistence of the Legal Department, overruled the determination made by three Master Patrolmen and two Sergeants that Ortolano should not be arrested for criminal trespass due to her attempt to obtain date stamps on abatement applications at Nashua's Corporation Counsel City Hall Office on January 22, 2021 January 22, 2021 because the patrolmen and sergeants found that "[no] offenses [were] alleged or found." All of the attached documents are public documents obtained through Right to Know requests and which clearly formed the backbone of the claims made in Ortolano's Complaint.

B. Ortolano's First Amendment Claims.

Ortolano's First Amendment claims, contained in Counts One and Two of her Complaint principally complain of the City's actions in chilling her ability to engage in free speech, retaliating against her for engaging in free speech activities while seeking documents and attempting to speak at public hearings and meetings, and denying her the right to petition government by denying her access to publicly available documents and failing to give her complaints against Turgiss and Kleiner a fair review.

1. Ortolano's First Amendment Retaliation Claim.

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v.*

*Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003)). "A plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B., supra,* 675 F. 3d at 43 (citing *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011); *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010)). "This showing necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *González-Droz, supra*, 660 F.3d at 16. A pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Under the second step, a municipality may then avoid a finding of liability by showing that it would have reached the same decision even in the absence of the protected conduct. *González-Droz, supra*, 660 F.3d at 17.

There can be no legitimate dispute that Ortolano engaged in Constitutionally protected speech. The juvenile record developed at this point reveals defendants admitting that Ortolano made no threats, sought no information that would constitute an invasion of privacy or did anything more than attempt to retrieve public documents and speak at public hearings and meetings (albeit sometimes critically and even harshly). Complaint, ¶¶ 15-139. Nor can it be seriously contended that the Nashua Police Department's role in (1) refusing to seriously investigate her serious claims of workplace fraud and witness tampering, and (2)

overruling the determination of five police department personnel that Ortolano had committed no crimes at City Hall on January 22, 2021 and should not be arrested were anything but adverse actions against Ortolano. More pointedly, defendant Carignan's thumbprints were all over the whitewashed Turgiss/Kleiner investigations that ended with an investigation of Ortolano, the complainant herself. Carignan was the ranking Department official throughout the matter. Carignan handled the intake and assigned the original interview to Lehto and Mederos. Carignan consulted with the so-called 'victim" before even starting the investigation, and allowed Kleiner, one of the targets of the investigation, to participate in a discussion of how the investigation was to proceed. It is likely that Carignan assigned Detective Lombardi and Sargent Macloud to handle the investigation. And it was likely – at least plausible – the Carignan the ranking department member involved in the investigation signed off on the final report and decision that police department would warn Ortolano not to engage in protected speech with Assessing Department employees. It is also highly likely – again, at least plausible – that Chief of Police Carignan was the one accepted the pleas of defendants Leonard, and possibly Bolton, that Ortolano should be the first person in over seven years to be arrested for criminal trespass at City Hall, and especially egregious that she was arrested for merely seeking a date stamp on two documents (without being threatening or otherwise dangerous). Finally, Ortolano has exceed the standard of plausibility in demonstrating that her protected free speech was a substantial or motivating factor in the adverse action, and that, whether Carignan

himself sought to retaliate against Ortolano, or he was merely assisting Donchess, Bolton and Leonard in their attempts to retaliate, Carignan's thumbprints were all over the two incidents in which he was involved.

       2.  <u>Ortolano's Right to Petition Claim</u>.

The rights to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment. *United Mine Workers v. Illinois State Bar Ass'n.,* 389 U.S. 217, 222 (1967) (right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected. . . with the other First Amendment rights of free speech and free press"); *see Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). The whitewashing of Ortolano's complaints against Turgiss and Kleiner and her arrest for criminal trespass for merely attempting to obtain date stamps on real estate tax abatements constitutes violations of her right to petition government. She has already described in detail how Carignan participated in those constitutional violations.

    C.  <u>Ortolano's Due Process Claims</u>.

"The touchstone of due process is protection of the individual against arbitrary action of government," *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974), whether the fault lies in a denial of fundamental procedural fairness, *see Fuentes v. Shevin,* 407 U.S. 67, 82  (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, *see Daniels v.*

<div align="center">20</div>

*Williams,* 474 U.S., 327,331 (1986)(the substantive due process guarantee protects against government power arbitrarily and oppressively exercised). The standard is high. Federal cases emphasize that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." *Collins v. Harker Heights,* 503 U.S. 115, 129 (1992). At this juncture, prior to the completion of discovery, Ortolano has made out at least a plausible claim of highly egregious conduct related to her January 22, 2021 arrest for criminal trespass. The five police officers who were involved in investigating the incident pronounced "No offences alleged or apparent." But three weeks later, after extensive pressure from City officials who changed their minds and decided to allege grounds for arrest because Ortolano had bruised while engaging in protected speech, a high Nashua Police Department official – likely Carignan, who had previously done the bidding of City officials – arbitrarily decided that Ortolano should be charged and arrested. Such is highly arbitrary and egregious activity that, at least at this stage, should support Ortolano's due process claims.

     D.  <u>Ortolano's Claims for Civil Conspiracy</u>.

     Under New Hampshire law, the elements of civil conspiracy are: (1) two or more persons; (2) an object to accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means, or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47 (1987). In regard to the January 22, 2021 incident at City Hall, the

Complaint clearly alleges that someone in the Police Department – likely Carignan – agreed with one or more people from the Legal Department – likely Bolton and/or Leonard to overrule a supported finding of five Police Department investigators that there was no probable cause to charge Ortolano with a crime. The complete is replete with evidence that Bolton and Leonard were among those thin-skinned City officials who despised Ortolano because of her criticisms of them. At least at this stage, Ortolano has alleged sufficient facts to sustain the cause of action.

     E.  <u>Ortolano's Claims for Intentional Infliction of Emotional Distress</u>.

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. *Mickell v. School Adm. Unit No. 33*, 158 N.H.723, 729 (2009); *Morancy v. Morancy,* 134 N.H. 493, 496, 593 A.2d 1158 (1991).

> We recognize that false accusations may be grounds for liability under an intentional infliction of emotional distress claim. *See McLaughlin v. Sullivan,* 123 N.H. 335, 338 (1983). We also acknowledge that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other, or power to affect his interests." *Restatement (Second) of Torts* § 46 comment *e* at 74.

 *Mickell, supra,* 158 N.H. at 729. As described above, Ortolano has made a plausible case against Carignan for highly egregious conduct. He is alleged to have cooperated with Bolton and/or Leonard to use their position to cause Ortolano to be wrongfully arrested and subject to the criminal justice process.

    IV.   CONCLUSION.

For the foregoing reasons, the plaintiff, Laurie Ortolano respectfully submits that the Motion of Defendant Michael Carignan for Judgment on the Pleadings should be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

Laurie Ortolano, Plaintiff
By her Attorneys,

Olson & Olson, P.A.

/s/ Kurt S. Olson
Kurt S. Olson
Bar ID No. 12518
31 Franklin Rd.
Salisbury, NH 03268
603-748-1960
kolson@mslaw.edu

</div>

## CERTIFICATE OF SERVICE

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be sent electronically forthwith to the registered participants as identified on the Notice of Electronic Filing (NEF).

<div style="margin-left: 40%;">

/s/ Kurt S. Olson
Kurt S. Olson
31 Franklin Rd.
Salisbury, NH 03268
603-748-1960
kolson54@gmail.com

</div>