## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **Laurie Ortolano,** | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **Civil Action No. 22-cv-00326-LM** |
| | ) |
| | ) |
| **The City of Nashua, et al.,** | ) |
| **Defendants** | ) |

## PLAINTIFF'S MEMORANDUM OF LAW OBJECTING TO MOTION FOR JUDGMENT ON THE PLEADINGS OF DEFENDANTSJAMES DONCHESS AND JOHN GRIFFIN

I.     ARGUMENT.

1.     <u>The Defendants Are Essentially Asking the Court to Decide Their Motion for Judgment on the Pleadings on the Motion for Summary Judgment Standard Just after the Issues Have Been Joined and Prior to Any Discovery</u>.

Donchess and Griffin have thrown over a dozen legal theories for dismissal of Ortolano's Complaint against the wall, hoping that some of them will defy gravity. The tone of their Memorandum suggests they seek to impose a greater evidentiary standard on Ortolano than is appropriate in this motion for judgment on the pleadings setting; much of their argument involves attempts to discredit and trivialize Ortolano's allegations. They have even attached unauthenticated transcripts of public meetings that wander far from addressing the factual allegations in Ortolano's Complaint.

A "close procedural cousin to a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)," a motion for judgment on the pleadings should be "treated in much the same way." *Hayes v. Mellon*, ___ F. Supp. 3d ___, ___, 2022 WL 3214957 (D. Mass. 2022)(citing *Kando v. R.I. State Bd. of Elections,* 880 F.3d 53, 58 (1st Cir. 2018); *see Sevelitte v. Guardian Life Ins. Co. of America*, 55 F.4th 71, 79 (1st Cir. 2022) (currently on appeal

to First Circuit Court of Appeals). Under this standard of review, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To demonstrate "plausibility," the "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . ." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate only if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Because of the difficulty of adhering to the page limitation requirement when dealing with shotgun blasts of legal theories – some marginal – Ortolano will set forth only discrete facts in relation to the arguments addressed hereafter rather than setting forth a separate statement of facts.

2. <u>Ortolano Has Stated a Plausible Claim Regarding Violation of Her First Amendment Rights</u>.

Ortolano's First Amendment claims proceed on two principal theories: (1) the defendants' retaliation against her because of her exercise of free speech that has been critical of the defendants and the defendants' methods, and (2) that the defendants' refusal to allow

Ortolano to examine public documents she was entitled to see under New Hampshire law constituted a violation of her right to petition government.

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003)). "A plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B., supra*, 675 F. 3d at 43 (citing *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011); *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010)). "This showing necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *González-Droz, supra*, 660 F.3d at 16. A pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Under the second step, a municipality may then avoid a finding of liability by showing that it would have reached the same decision even in the absence of the protected conduct. *González-Droz, supra*, 660 F.3d at 17.

The factual allegations of the Complaint go well beyond stating a plausible claim for relief. None of the defendants have ever suggested that Ortolano appearances at the Assessing Department and other City Hall Departments, and at public meetings, included anything other than protected speech and activity. Moreover, the Complaint documents a continuous trail of the defendants' – and specifically Donchess's and Griffin's – adverse actions against Ortolano.

Donchess had ample motivation to prevent Ortolano from maintaining access to public documents in City Hall: through public records reviews in October 2018, she had accidentally discovered the Mayor's nearly decade-long avoidance of real estate tax increases on his residence by leaving open a building permit for a six-figure renovation (thus preventing a reassessment on account of the substantial improvements). Complaint, ¶¶ 29-31. In fact, it is likely that he Mayor first learned of Ortolano's discovery through Griffin, who had already been surveilling Ortolano's activities at the Assessing Department; Griffin had been informed of Ortolano's discovery by email while Ortolano was likely still in the Assessing Department reviewing the Mayor's file. Complaint, ¶ 30.

In March 2019, just five months after Ortolano privately attempted to cause the Mayor to correct his personal real estate tax reassessment situation, and then went public when he refused to do so, Complaint, ¶ 31, the Mayor eliminated the Chief Assessor's position and put Kimberly Kleiner ("Kleiner"), his Chief of Staff, in charge of the Assessing Department.[1] Complaint, ¶¶ 49-50. Kleiner had neither the credentials nor the assessing experience to run the Assessing Department of any New Hampshire town or city, let alone that of the second most populous city in New Hampshire. Complaint, ¶ 50. Almost immediately upon taking charge of the Department, and still under the Mayor's supervision, Kleiner placed a gag order on all department assessors and clerks, preventing them from providing any written or oral public assessing information to

---

[1] Although Kleiner obtained the new title of "Director of Administrative Services," Complaint, ¶ 49, the City's Charter makes clear that her activities remained under control of the Mayor, and that the Mayor remained her direct supervisor. Section 49-a of the City Charter provides:

> The city shall have a department of administration headed by the mayor, and such other departments, divisions, and bureaus as the board of aldermen may establish by ordinance. . . .   Prior to adoption of the administrative code, the mayor shall have the power to establish temporary rules and regulations to insure economy and efficiency in the several divisions of the city government.

Ortolano. Complaint, ¶¶ 51-53. At the same time, Kleiner ordered that no Nashua taxpayer could come to the Assessing Department and obtain immediate access to any of the public assessing files with the exception of the file pertaining to his/her/their own real estate; now, all requests had to be made in writing and requestors had to wait for five days to receive documents sitting in the files of the Assessing Department. Complaint, ¶¶ 54-56. It is at least plausible that Donchess was actively attempting to prevent Ortolano from continuing her research at City Hall and speaking critically of Nashua officials at public hearings because: (1) she had learned of the Mayor's real estate tax issue by examining public documents and (2) he was thin-skinned about her public criticisms. Kleiner's actions regarding Ortolano, almost certainly undertaken in accordance with the guiding hand of Donchess, were in open and flagrant violation of NH RSA 91-A.IV.(a), Part 1, Article 8 of New Hampshire's Bill of Rights, and Section 71 of Nashua's City Charter.

Griffin began monitoring (essentially surveilling) Ortolano's activities in the Nashua Assessing Department in City Hall, and in other parts of City Hall, as early as July 2017. Complaint, ¶¶ 21-22, 27. 30. On October 18, 2018, after Ortolano had requested documents and information from the Assessing Department, and which New Hampshire and Nashua law provided she was entitled to immediately, Griffin emailed to the Chief Assessor: "At this time, let's hold off responding to the taxpayer. It has come to my attention that an email was sent to several members of the Board of Aldermen, essentially restating her public remarks several weeks ago. No need to provide any additional information." Complaint, ¶ 33. Griffin's order to deny Ortolano this information violated Section 71 of the Nashua City Charter: "The books and records of the assessors shall be open to public inspection during office hours." It also violated NH RSA 91-A.IV.(a), which states: "Each public body or agency shall, upon request for any

governmental record reasonably described, make available for inspection and copying any such governmental record within its files when such records are immediately available for such release." And finally, it violated New Hampshire's Bill of Rights, Part 1, Article 8, which guarantees that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted." Griffin, as supervisor of the Assessing Department, gave Ortolano the runaround when she requested a copy of the Assessing Department's "book of policies" he had mentioned to a reporter from the *Union Leader*. It took approximately eight months and multiple story changes for Griffin to finally produce this public document that Ortolano had requested. Complaint, ¶ 34-38. These ample adverse actions easily satisfy the plausibility requirement for the second prong of the test for First Amendment retaliation.

Finally, the protected conduct was a substantial or motivating factor in the adverse actions taken by Donchess and Griffin against Ortolano. Given the limited space available to relay facts, Ortolano will point to one telling admission by Corporation Counsel Steven Bolton that goes straight to the issue of causation. On an occasion when Ortolano asked Bolton why the Chair of the Board of Alderman had exhibited hostility toward her, Bolton retorted: "You offended the Mayor, you offended me, and you offended Lori Wilshire; now it's all personal." Complaint, ¶ 40. Additionally, it is clear that the defendants specifically targeted Ortolano in terms of preventing her from examining public documents and discouraging her from speaking at public meetings; indeed, Kleiner's mentioned Ortolano by name when issuing a gag order that Assessing Department personnel were not to speak with her. Complaint, ¶¶ 51-53. There is at least plausible factual support that Ortolano's free speech activities were the motivating factor for the defendants' adverse actions taken against her.

The right to complain to public officials and to seek administrative and judicial relief from their actions are protected by the First Amendment. *United Mine Workers v. Illinois State Bar Ass'n.,* 389 U.S. 217, 222 (1967) (right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights" and is "intimately connected. . . with the other First Amendment rights of free speech and free press"); *see Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

> "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." This "right of public access" dates back several centuries, with roots in both the common law and the First Amendment. . . . The right to public access extends far beyond the proprietary or strategic interests of the parties. Instead, there is an overriding interest in ensuring that the "workings" of the government, including the courts, are subject to the "watchful eye" of the public.

*John Doe Co. No. 1 v. Consumer Fin. Protection Bur.,* 195 F. Supp. 3d 9, 17 (D. D.C. 2016)(citations omitted). The factual allegations demonstrating the efforts of Donchess, Griffin, and the other defendants to deprive Ortolano of her right to inspect public documents at Nashua City Hall provide more than plausible evidence of right to petition violations. Ortolano has clearly stated a claim.

The remainder of Donchess's and Griffin's assertions that Ortolano has failed to allege sufficient facts to support her First Amendment claims primarily consist of attempts to recast the actual facts and are largely distortions of what actually occurred. For example, the defendants dilate on a public meeting at which Donchess interrupted Ortolano and prevented her from speaking while her time to speak ran out. Donchess's and Griffin's Memorandum of Law in Support of their Motion for Judgment on the Pleadings, at 8-9. The defendants' contention that the Mayor was merely attempting to enforce content-neutral time, place, and manner rules designed to maintain order is not accurate. At a July 20, 2022 Finance Committee meeting at

which Donchess presided, Ortolano was allowed to comment over a Zoom link for up to a period

of three minutes. Complaint, ¶ 127. Donchess allowed Ortolano to speak until she started to

complain that Economic Development Director Tim Cummings refused to make himself

available to the public and displayed an "obnoxious attitude. Complaint, ¶ 127. At that point,

Donchess interrupted Ortolano, and continued to talk over her as her time ran. Complaint, ¶ 128.

He started a speech, saying that it was not proper for Ortolano to "night after night just lambast

all the employees with all these scurrilous comments. It's just not appropriate. It's not

appropriate." Complaint, ¶ 128. Ortolano was able to regain the floor again for a moment, but

again, the Mayor cut her short: "You know, I think we're going to have to propose some kind of

rules for public comment. The swearing, the profanity, the name calling; it is not appropriate!"

He continued as Ortolano attempted to speak and say that she had not spoken any profanity, and

as an official next to him announced, "30 seconds." Referring to an incident that had occurred

about a year earlier, the Mayor proclaimed that she had "called a woman lawyer in the City with

(sic) the c-word in a public meeting." As Ortolano attempted to respond, the Mayor announced,

"Your time is up!" and her Zoom feed was cut. Complaint, ¶ 128.

This was hardly a content-neutral enforcement of time, place, and manner rules.

Donchess's refusal to allow Ortolano to speak did not come until Ortolano attempted to criticize

Director Cummings, clearly a restriction on protected speech based on the content of the speech.

Moreover, the fact that Donchess proclaimed, "I think we're going to have to propose some kind

of rules for public comment," belies the claim that Donchess was merely enforcing previously

established content-neutral time, place, and manner restrictions.   Ortolano has asserted a

plausible claim for violation of her First Amendment rights.

3. Ortolano's Claims against Mayor Donchess Are Not Barred under the Legislative
   Immunity Doctrine.

The flaw with Donchess's legislative immunity argument is that he asks the Court to apply the doctrine to the purely non-legislative events alleged in Ortolano's Complaint. *See* Donchess's and Griffin's Memorandum of Law in Support of their Motion for Judgment on the Pleadings, at 16 *et seq*. ('Ms. Ortolano's allegations related to Mayor Donchess's work as chair of [all] public meetings [identified in the Complaint] fail under legislative immunity."). His argument fails to appreciate that, when acting as the Mayor of the City of Nashua, Donchess exercised purely administrative power, not legislative power.[2] And he further fails to appreciate that the statements and actions he claims to be protected by legislative immunity, all made before lesser board meetings, committee meetings, or at public events when he spoke exclusively as the Mayor, involved purely *non*-legislative functions under New Hampshire law and Nashua's form of government. They merit no protection under the legislative immunity doctrine.

New Hampshire case law is clear that it is only the Board of Aldermen that exercises legislative power in Nashua.[3] When "statements [of non-legislative officials are] not made at a

---

[2] Section 45 of the Nashua City Charter makes clear that the Mayor's power is administrative rather than legislative:

> The mayor shall be the chief administrative officer and the head of the administrative branch of the city government. He shall supervise the administrative affairs of the city and shall carry out the policies enacted by the board of aldermen. He shall enforce the ordinances of the city, this charter, and all general laws applicable to the city. He shall keep the board of aldermen informed of the condition and needs of the city and shall make such reports and recommendations as he may deem advisable, and perform such other duties as may be prescribed by this charter or required of him by ordinance or resolution of the board of aldermen, not inconsistent with this charter. . . .

[3] Section 48 of the Nashua City Charter dictates that the Board of Aldermen "shall have all the powers and discharge all the duties conferred or imposed upon city councils. . . ." The New Hampshire Supreme Court has pronounced that it is the town meeting activities in towns and city council activities in cities that comprise the legislative function of New Hampshire municipal governments. *Pierson v. Hubbard*, 147 N.H. 760, 765 (2002); *Voelbel v. Town of Bridgewater,* 144 N.H. 599, 600 (1999). Boards and committees

meeting of the legislative body in the performance of a legislative function, they are not absolutely privileged." *Pierson v. Hubbard*, 147 N.H. 760, 765 (2002).

> [U]nlike city councils, for example, boards of selectmen do not exercise any legislative power while conducting their meetings because they are simply carrying out the mandates of the legislative body. *Cf. Sherburne v. Portsmouth,* 72 N.H. 539, 540–41 (1904) (noting that while duties of city councils are both legislative and administrative, the duties of the selectmen are administrative and judicial).

*Id*. Thus, under New Hampshire law, although a municipal board of selectmen member earns legislative immunity regarding statements of public interest properly made at a town meeting. *Voelbel v. Town of Bridgewater,* 144 N.H. 599, 600 (1999), the town clerk in *Pierson*, whose comments were made at a board of selectmen meeting, enjoyed no legislative immunity. *Pierson, supra*, 147 N.H. 765; *see also Bourne v. Arruda*, 2011 WL 2357504, *20 (D. N.H. 2011)(not reported in F. Supp. 2d). None of the statements or actions that Donchess claims to be privileged occurred at a Board of Aldermen meeting or event; all occurred either at Mayor *qua* mayor events (the "Mayor's Coffees") or at Nashua's lesser boards and agencies that do not exercise legislative power (the Budget Review and Finance Committees). *See* Verified Complaint, ¶¶ 26-27; 103; 127; Donchess's and Griffin's Memorandum of Law in Support of their Motion for Judgment on the Pleadings, at 8, 12, 13, 27.

The cases Donchess has cited in support of his claim of legislative immunity are inapposite. In *Bogan v. Scott-Harris*, 523 U.S. 44, 47 (1998), the Mayor of the City of Fall River, Massachusetts advocated before the *Fall River City Council* for the elimination of a one-

---

that report at town meeting or answer to city councils are not legislative municipal agencies. *Pierson, supra*, 147 N.H. at 765; *Voelbel, supra,* 144 N.H. at 600.  Moreover, Section 50 of the Nashua City Charter makes clear that the Finance Committee performs purely administrative work, and Section 56 of the City Charter dictates that the Budget Review Committee cannot exercise legislative power regarding the enactment of budgets because that Section sets forth a process by which proposed budgets must flow through the Mayor before coming up for final approval by the Board of Aldermen.

employee city department for allegedly unlawful purposes. In *Tenney v. Brandhove*, 341 U.S. 367, 370-71 (1951), the plaintiff claimed that defendant United States Senators violated his civil rights during *Senate investigation hearings*. *National Soc'ty of Soc. Wkrs. V. Harwood* involved a rule prohibiting lobbying on the floor of the State of *Rhode Island's House of Representatives.* 69 F. 3d 622, 632 (1ˢᵗ Cir. 1995). And Donchess's most cited case, *Artus v. Town of Atkinson*, involved the actions and words of the *moderator presiding at a New Hampshire town meeting*. 2009 WL 3336013, at *4-5 (D. N.H. 2009)(not reported in F. Supp. 2d). Unlike Donchess's words and actions alleged in this case, in each of these cases legislative immunity applied only because the speech and actions involved occurred withing the scope of legislative activity. The Court should deny Donchess's assertion of legislative immunity.

     4.   <u>Ortolano's Claims Are Not Barred under the Discretionary Function or Official Immunity Doctrines.</u>

        a.   <u>Neither Official Immunity Nor Discretionary Function Immunity Apply To the Federal Question Causes of Action Raised in this Action.</u>

"The doctrine of official immunity protects public officials and employees from personal liability *for alleged common law torts* committed within the scope of their government employment." *Farrelly v. City of Concord*, 168 N.H. 430, 439 (2015) (citing *Everitt v. General Elec. Corp.*, 156 N.H. 202, 209 (2007))(emphasis added). Official immunity "shields against lawsuits alleging *common law torts, such as negligence*." *Conrad v. New Hampshire Dpt. of Pub. Safety*, 167 N.H. 59, 70 (2014)(quoting *Everitt, supra*, 156 N.H. at 210)(emphasis added). Moreover, a listing of cases considering discretionary function immunity in *Everitt* demonstrates that it too applies only to the immunization of state officials from state law and state constitutional law causes of action. *Everitt, supra*, 156 N.H. at 211-12. But even if these New Hampshire state law doctrines of official immunity and discretionary function immunity are not

intended to apply solely to state law causes of action, Ortolano's causes of action under § 1983 and the federal Constitution undeniably preempt Donchess's and Griffin's assertions of immunization under New Hampshire law:

> Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law. A construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced.

*Martinez v. California,* 444 U.S. 277, 284 n. 8 (1980)(citations omitted); *see Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 377 (1990). Accordingly, these immunity defenses cannot apply to Counts One through Four, which state purely federal question causes of action.

    b. <u>As to the State Law Causes of Action, The Court Should Not Immunize Griffin and Donchess under the Official Immunity Doctrine Because Ortolano Has Alleged Plausible Facts Demonstrating That They Denied Ortolano Access to Public Documents and Chilled Her Speech In Terms of Speaking at Public Meetings in Violation of Clear New Hampshire and Nashua Law.</u>

Ortolano has asserted a plausible case that Griffin and Donchess do not merit official immunity or discretionary function immunity. They have not satisfied the good faith requirements of official immunity because their refusal to provide documents and information to Ortolano openly violated New Hampshire and Nashua law. As to discretionary function immunity, there is no risk that Court intervention would "permit judicial second-guessing of the governing functions of another branch of government" because, to the extent Donchess and Griffin had engaged in discretionary acts requiring consideration of public policy considerations or planning, such considerations or plans openly flouted the law that the Courts are required to apply and enforce. *See Everitt, supra*, 156 N.H. at 211 (citing *Mahan v. N.H. Dep't of Admin. Services,* 141 N.H. 747, 749-50 (1997). Discovery of their emails and text messages could well

provide additional evidence of their egregious breaches of New Hampshire law in suppressing

Ortolano's attempt to obtain public information and question public officials in public meetings.

  Ortolano has already reported Donchess's and Griffin's actions in violation of New

Hampshire law in Section I.2 *infra*, and will not repeat them here. These open violations law was

at least lacking in "'honesty in belief or purpose' and 'faithfulness to one's duty or obligation,'"

*Crosby v. Stafford Cty. Dpt. of Corrections*, 2015 WL 3484912 (D. N.H. 2015)(not reported in F.

Supp. 2d), if not intentionally unlawful, and no proper planning or public policy consideration

could be advanced by a purposeful evasion of state and municipal law, as well as the New

Hampshire Bill of Rights. *See Everitt*, 156 N.H. at 211-14. The Court should deny Donchess's

and Griffin's assertion of discretionary function immunity and official immunity.

  5. <u>Ortolano's Claims Are Not Barred by Qualified Immunity</u>.

  The First Circuit employs a two-part test to determine whether government officials are

entitled to dismissal of free speech claims against them under the doctrine of qualified

immunity.[4] Public officials are *not* entitled to immunity if (1) the facts alleged or shown by the

plaintiff make out a violation of a constitutional right; and (2) the right was "clearly established"

at the time of the defendant's alleged violation. *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st

Cir.2009). Not quite as straightforward as it may appear, the *Maldonado* Court has added

refinements to the second prong of the test.

> the second, "clearly established" step of the qualified immunity analysis . . . in
> turn, has two aspects. One aspect of the analysis focuses on the clarity of the law
> at the time of the alleged civil rights violation. To overcome qualified immunity,
> "[t]he contours of the right must be sufficiently clear that a reasonable official
> would understand that what he is doing violates that right." The other aspect
> focuses more concretely on the facts of the particular case and whether a

---

[4] In response to *Pearson v. Callahan,* 555 U.S. 223, (2009), the First Circuit abandoned its
former three-part test in favor of a new two-pronged analysis. *Maldonado v. Fontanes,* 568 F.3d
263, 269 (1st Cir.2009).

reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Indeed, "[i]t is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Cognizant of both the contours of the allegedly infringed right and the particular facts of the case, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. That is, the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional.

*Id.*

Despite Donchess's and Griffin's untenable claims to the contrary, the first prong of the qualified immunity analysis has been satisfied because above Ortolano has already demonstrated plausible claims of First Amendment violations by way of the Mayor's and Griffin's participation in specific retaliation against her for her free speech expressions (denying her access to publicly available documents for exposing the Mayor's decade-long real estate tax avoidance, publicly criticizing Nashua public officials for their actions, and exposing the inefficiency and arbitrary practices of the Assessing Department through the examination of public records) and the general denial of her right to petition government (specifically preventing her from obtaining public documents she was entitled to examine under New Hampshire and Nashua law).

The second prong of the analysis requires examination of whether Ortolano's rights were "clearly established" at the time of Donchess's and Griffin's alleged violations; the "salient question is whether the state of the law at the time of the alleged violation gave [Donchess and Griffin] fair warning that his particular conduct was unconstitutional." *See Maldonado, supra,* 568 F.3d at 269. It cannot be disputed that NH RSA 91-A.IV.(a), Part 1, Article 8 of New Hampshire's Bill of Rights, and Section 71 of Nashua's City Charter were all in effect and clearly applicable to Donchess and Griffin throughout the relevant time periods leading up to the

filing of this action. Moreover, it had to be obvious to Donchess and Griffin, both of whom had been a Nashua public official for a considerable period of time, that Ortolano and other members of the public had a right to timely examination of Nashua's public documents under New Hampshire and Nashua law. *Cf. Fletcher v. Szostkiewicz*, 190 F. Supp. 2d 217, 224-25 (D. Mass. 2002); *McCarthy v. Szostkiewicz*, 188 F. Supp. 2d 64, 69 (D. Mass. 2002). Moreover, as previously addressed in Section I.2 *infra*, the federal courts have long considered the right to be free from retaliation for exercising free speech rights a protected right under the free speech clause of the First Amendment, and right of access to public documents kept by governments to be a protected right under the First Amendment's right to petition government.

Donchess and Griffin had more than fair warning that their orders not to give Ortolano documents to which she was entitled under New Hampshire law, and the gag orders given to the Assessing Department's public servants that they were not to serve Ortolano when it came to access to the Assessing Department, were clear violations of Ortolano's First Amendment rights. Indeed, Donchess and Griffin must agree that Ortolano has satisfied the second prong of the qualified immunity test; their *entire argument* is that the first prong – Ortolano has failed to establish a plausible claim of their violation of a constitutional right – has not been met. Donchess's and Griffin's Memorandum of Law in Support of their Motion for Judgment on the Pleadings, at 21-22.

6. Ortolano Has Stated Sufficient Facts in Her Complaint to Support a Claim of Supervisory Liability at the Judgment on the Pleadings Stage of this Litigation.

The flaw with Donchess's and Griffin's assertion that Ortolano has failed to state a plausible claim of supervisor liability is that it plainly fails to consider the facts asserted in the Complaint.

Prior to March 2019, when Kleiner became the director of the Assessing Department, Griffin was the direct supervisor of all Assessing Department employees, including Chief Assessor Jon Duhamel. Complaint, ¶¶ 27, 30, 32, 33, 34, 36, 38. Griffin was in on Duhamel's surveillance of Ortolano while she was in City Hall; Duhamel appears to have reported directly to Griffin in that regard. Complaint, ¶¶ 21, 22, 32, 33. Within minutes of Ortolano unwittingly pulling the Assessing Department file for the Mayor's residence, Duhamel emailed Griffin to tell him that Ortolano had pulled the Mayor's file. Complaint, ¶ 30. It was Griffin, as supervisor of the Assessing Department, who gave Ortolano the runaround when she requested a copy of the Assessing Department's "book of policies" he had mentioned to a reporter from the *Union Leader*. Complaint, ¶ 34-38. In responding to a Duhamel query about how he should respond to a specific Ortolano request for public information, in clear violation of Section 71 of the Nashua City Charter and NH RSA 91-A.IV.(a), Griffin ordered Duhamel not to give the documents to Ortolano. Complaint, ¶ 33. Griffin was indeed intimately involved with Duhamel's plot to deprive Ortolano of access to the public documents she had a right to examine. In fact, Duhamel would be sanctioned by the Hampshire Association of Appraising Officials for failing to allow Ortolano to examine public documents she had a right to review; Griffin would escape such sanctions because he was not a licensed appraiser subject to ethical discipline for his conduct. Complaint, ¶ 47. Ortolano has stated a more-than-sufficiently plausible claim of supervisor liability against Griffin, whose conduct was intentional.

Ortolano has already described how Donchess tasked Kleiner, his Chief of Staff, to take control of the Assessing Department and prevent Ortolano from accessing public documents kept there. In March 2019, just five months after Ortolano exposed the Mayor's avoidance of real estate taxes, Complaint, ¶ 31, Kleiner ordered department assessors and clerks not to provide

written or oral public assessing information to Ortolano. Complaint, ¶¶ 51-53, and prevented

citizens from obtaining immediate access to any of the public assessing files in violation of New

Hampshire and Nashua law. Complaint, ¶¶ 54-56. Again, Ortolano has stated a more-than-

sufficiently plausible claim of supervisor liability against Donchess, whose conduct appears to

have been intentional and purposeful.

      7.   <u>Ortolano's Demand for Punitive Damages Should Not Be Dismissed on a Motion for
Judgment on the Pleadings</u>.

     Donchess and Griffin are mistaken in describing the law regarding the award of punitive

damages in § 1983 cases. They say:

> If any of Plaintiff's claims survive this Motion, the Court should grant judgment
> for the defense on the punitive damages claim. Such damages are not allowed
> against defendants acting in their official capacities or against local governments.
> *City of Newport v. Fact Concerts*, 453 U.S. 247 (1981); *Chestnut v. City of
> Lowell*, 305 F.3d 18, 21, 22 (1st Cir. 2002) (en banc) (vacating award of punitive
> damages).

Donchess's and Griffin's Memorandum of Law in Support of their Motion for Judgment on the

Pleadings, at 23-24. Neither *City of Newport* nor *Chestnut* hold that "defendants acting in their

official capacities" are to be relieved of punitive damages awards. Both only held that the

municipality itself is not subject to a punitive damages award in a § 1983 action. *City of Newport

v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981)("we hold that a municipality is immune from

punitive damages under 42 U.S.C. § 1983"); *Chestnut v. City of Lowell*, 305 F. 3d 18, 21 (1st Cir.

2002)("The judgment insofar as it awards punitive damages against the City is vacated and the

matter is remanded for further proceedings not inconsistent with this opinion"). In fact, two years

after the Supreme Court issued *City of Newport*, it decided *Smith v. Wade*, 453 U.S. 247, 271

(1983), holding "that a jury may be permitted to assess punitive damages in an action under §

1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it

involves reckless or callous indifference to the federally protected rights of others."  The

defendant in Smith was a "defendant acting in [his] official capacity[y]": a prison guard. *Id.* at

32.

Donchess and Griffin are correct that NH RSA 507:16 does prohibit punitive damages

under state law causes of action, and Ortolano admittedly should have been more precise in

describing the enhanced damages she seeks on state law grounds. New Hampshire law does

recognize "enhanced compensatory damages."

> "When an act is wanton, malicious, or oppressive, the aggravating circumstances
> may be reflected in an award of enhanced compensatory damages.'" "Wanton
> conduct means that the actor is aware that his actions are causing a great risk of
> harm to others." Malicious or oppressive actions are those done with "ill will,
> hatred, hostility, or evil motive."

*Jenks v. Texron, Inc*., 2012 WL 2871686, at *1 (D. N.H. 2012)(no reported in

F.Supp.2d); *see Figioli v. R.J. Moreau Companies, Inc.*, 151 N.H. 618, 621 (2005).

Ortolano has alleged a plausible scheme by the municipality, municipal individual

defendants, and non-municipal defendants and actors to frustrate her, defame her, and

eventually to employ the strong arm of the Nashua police department to repeatedly

attempt to have her arrested in order to drive her from participating in public municipal

meetings and intimidate her into ceasing to review public records. Complaint, ¶¶ 20-139.

It is plausible that a jury could find these actions to be malicious or oppressive.

Accordingly, the Court should not prohibit Ortolano from seeking enhanced

compensatory damages at trial.

8.  <u>Ortolano Has Stated a Plausible Claim Regarding Violation of Her Due Process
Rights</u>.

"The touchstone of due process is protection of the individual against arbitrary action of

government," *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974), whether the fault lies in a denial of

fundamental procedural fairness, *see Fuentes v. Shevin,* 407 U.S. 67, 82  (1972) (the procedural

due process guarantee protects against "arbitrary takings"), or in the exercise of power without

any reasonable justification in the service of a legitimate governmental objective, *see Daniels v.*

*Williams,* 474 U.S., 327,331 (1986)(the substantive due process guarantee protects against

government power arbitrarily and oppressively exercised). Admittedly, the standard is high.

Federal cases emphasize that only the most egregious official conduct can be said to be

"arbitrary in the constitutional sense." *Collins v. Harker Heights,* 503 U.S. 115, 129 (1992).

But Ortolano has plausibly alleged a years-long pattern of purposeful flouting of state law

to deny her access to the information kept by her own local government, all of which was readily

available to other Nashua citizens, and then the mustering of the wide-ranging forces of the

entire municipal government, including the heavy hand of the investigation and arrest power

exerted by the Nashua Police Department, to strike out at Ortolano when she would not

capitulate. Complaint, ¶¶ 20-139. Ortolano's Complaint presents hard evidence of Griffin's and

Donchess's violations of New Hampshire law by denying Ortolano access to public documents

she was entitled to inspect. Complaint, ¶¶ 21-22, 27, 29-31, 33, 49-56. She has presented

evidence suggesting that Donchess interfered with a police investigation into the conduct of

Kleiner, his former Chief of Staff, that Ortolano and another citizen had initiated. Complaint ¶

63-64. This, of course, suggests the possibility that Donchess interfered with the Police

Department's investigation and criminal charges against Ortolano initiated in February 2021.

Complaint, ¶¶ 105-112. The Nashua Police Department's police reports of the January 21, 2021

incident at City Hall found: "No offences alleged or apparent," and the Police reported to the

press and Ortolano's attorney that no trespass against Ortolano would be forthcoming. *See*

Plaintiff's Memorandum of Law Objecting to Defendant Michael Carignan's Motion for

Judgment on the Pleadings, at 12-13. The Court should not dismiss Ortolano's substantive due process cause of action as it pertains to Donchess and Griffin.

9.  <u>The Court Should Not Dismiss Ortolano's Causes of Action for Violations of the Bill of Rights in New Hampshire's State Constitution.</u>

Donchess and Griffin incorporate by reference defendant Carignan's argument that, because New Hampshire does not have a statutory equivalent to §1983 under which a plaintiff may seek "a damages remedy modeled on tort law, for violation of state constitutional rights, *Rockhouse Mt. Prop. Owners Ass'n v. Town of Conway*, 127 N.H. 593, 598 (1986), and First Circuit courts have refused to imply a constitutional damages remedy in federal actions, *Bourne v. Town of Madison*, 494 F. Supp.2d 80, 94 (D.N.H. 2007), this Court should dismiss Ortolano's state constitutional law claims. *See* Defendant Carignan's Memorandum of Law in Support of Motion for Judgment on the Pleadings, at 10-11. Ortolano concedes that her claims for monetary damages on the state constitutional causes of action should not proceed. But the precedent advanced by Carignan, Donchess, and Griffin only applies to "constitutional torts," i.e., actions that seek monetary damages for violations of state constitutional provisions. Ortolano also seeks injunctive relief for the defendants' violations her constitutional and common law rights. Complaint, V.E. (Demand for Relief). The New Hampshire Supreme Court has held that, although not every plaintiff is entitled to a remedy that provides compensation for injuries, the State Constitution does provide a constitutional right to a remedy, which ensures that civil remedies are "available . . . to guard against arbitrary and discriminatory infringements upon access to courts." *Huckins v. McSweeney*, 166 N.H. 176, 180 (2014); *see Ocasio v. Fed. Express Corp.,* 162 N.H. 436, 448 (2011). Ortolano submits that the Court should not dismiss the State Constitution claims to the extent that they seek injunctive relief for violations of the New Hampshire Constitution.

10. <u>Ortolano Has Stated a Plausible Claim for Intentional Infliction of Emotional Distress</u>.

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. *Mickell v. School Adm. Unit No. 33*, 158 N.H.723, 729 (2009); *Morancy v. Morancy,* 134 N.H. 493, 496, 593 A.2d 1158 (1991).

> We recognize that false accusations may be grounds for liability under an intentional infliction of emotional distress claim. *See McLaughlin v. Sullivan,* 123 N.H. 335, 338 (1983). We also acknowledge that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other, or power to affect his interests." *Restatement (Second) of Torts* § 46 comment *e* at 74.

 *Mickell, supra,* 158 N.H. at 729. As much as Donchess and Griffin attempt to trivialize what they, the City, and the other defendants have put Ortolano through because she dared criticize Nashua officials. Ortolano has made a plausible factual case against them for the type of egregious conduct that supports an action for intentional infliction of emotional distress. Without repeating these facts, Ortolano incorporates the summary of them with citations as stated in Section I.8, *infra*.

11. <u>Ortolano Has Stated a Plausible Claim for Civil Conspiracy</u>.

Under New Hampshire law, the elements of civil conspiracy are: (1) two or more persons; (2) an object to accomplished (i.e., an unlawful object to be achieved by lawful or unlawful means, or a lawful object to be achieved by unlawful means); (3) an agreement on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof. *Jay Edwards, Inc. v. Baker*, 130 N.H. 41, 47 (1987). Without repeating the allegations stated throughout this Memorandum, Ortolano alleges that more than two defendants worked together by agreement, express or tacit, to accomplish the object of preventing Ortolano

from continuing to criticize Nashua officials and obtain information to fuel the criticisms by reviewing public documents. Complaint, ¶¶ 20-139. She alleges several violations of New Hampshire and Nashua law, as well as violations of the federal Constitution, in the accomplishment of an arrangement to stifle her and that she has suffered damages caused by the damage to her reputation, frequent criminal investigations of her for the purpose of intimidation, and her arrest and resultant emotional distress. Complaint, ¶¶ 139, 149, 159, 161, 165, 169, 171, 175, 180, 189, 193, and 198.

Donchess's and Griffin primary ground for dismissal of the civil conspiracy ground is the intra-corporate conspiracy doctrine: "the agents and employees of a corporate entity acting within the scope of their employment or authority are legally incapable of conspiring together." *Carney v. Town of Weare*, 2017 WL 680384, at *15 (D. N.H. 2017). What Donchess and Griffin do not report is that the New Hampshire Supreme Court has never itself accepted the intra-corporate conspiracy doctrine; the Federal District Court has predicted that the New Hampshire Supreme Court would employ the doctrine. *Id*. at *15-16. Ortolano submits that the intra-corporate conspiracy does not apply, at least upon the undeveloped facts at the judgment on the pleadings stage, because the Complaint is clear that the municipal defendants, working together to suppress Ortolano's ability to criticize Nashua employees, drew at least two nonmunicipal individuals into their conspiracy to intimidate and silence her. In an effort to have the Nashua Police Department issue a warning to Ortolano that she could be arrested for exercising her free speech rights, one of the participants in the conspiracy – likely Kleiner – induced an independent contractor providing services to the City, Robert Tozier, to complain to Officer Lombardi that Ortolano's "negative attention" had made him uncomfortable and that she should be warned to stop. Complaint, ¶¶ 75-87. Later, Kleiner would drag independent contractor, Raymond Feoli,

into an attempt to ruin Ortolano's reputation at a public meeting. Kleiner appears to have cajoled Feoli into writing a letter to the Board of Aldermen wrongfully accusing Ortolano of pretending she was a Nashua employee, and which case another improper Police criminal investigation of Ortolano. Complaint, ¶¶ 121-122. The defendants' intra-corporate conspiracy doctrine defense to civil conspiracy lacks merit because the municipal conspirators were not content to work together; they saw it necessary to draw noncorporate participants into the scheme.

### 12. The Continuing Tort Doctrine Prevents Dismissal at This Stage on Allegations That the Applicable Statutes of Limitations Have Passed.

Donchess's and Griffin's statute of limitations defense must fail under the continuing violation doctrine, which is well established in New Hampshire law. Under the "continuing wrong" or "continuing violation" doctrine, "[w]hen a tort is of a continuing nature, although the initial tortious act may have occurred longer than the statutory period prior to the filing of an action, an action will not be barred if it can be based upon the continuance of that tort within that period." Singer Asset Fin. Co., LLC v. Wyner, 159 N.H. 468, 478 (2007); see *Eldridge v. Rolling Green at Whip-Poor-Will Condo. Owners' Ass'n*, 168 N.H. 87, 92 (2015). The continuing wrong doctrine "simply allows suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." Eldridge, supra. 168 N.H. at 92. Ortolano has comprehensively articulated a scheme of repetitive and continuous tactics employed in an ongoing attempt to stifle her free speech activities from about July 2017 through the filing of the Complaint in this action. Complaint, ¶¶ 21-139. In fact, discovery will demonstrate that the defendants have continued their unconstitutional activities even after the filing of the Complaint in this action. Ortolano has alleged a continuing tort that brings her causes of action well within the applicable statutes of limitation.

### II.   CONCLUSION.

For the foregoing reasons, the plaintiff, Laurie Ortolano, respectfully submits that the Motion

for Judgment on the Pleadings of Defendants Donchess and Griffin should be denied.

Respectfully submitted,

Laurie Ortolano, Plaintiff
By her Attorneys,

Olson & Olson, P.A.
*/s/* Kurt S. Olson
Kurt S. Olson
Bar ID No. 12518
31 Franklin Rd.
Salisbury, NH 03268
603-748-1960
kolson@mslaw.edu

## CERTIFICATE OF SERVICE

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be
sent electronically forthwith to the registered participants as identified on the Notice of
Electronic Filing (NEF).

*/s/* Kurt S. Olson
Kurt S. Olson