## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Laurie Ortolano

     v.                                Case No. 22-cv-326-LM
                                               Opinion No. 2023 DNH 079 P

City of Nashua et al.

## O R D E R

Plaintiff Laurie Ortolano brought this suit against the City of Nashua, New Hampshire ("Nashua" or the "City"), its Mayor, several current and former Nashua employees and officials, and two private parties involved in providing certain services to the City. Ortolano brings claims under the state and federal constitutions, as well as under statutory and common law. Although not all ten counts in Ortolano's complaint (doc. no. 1) are leveled against every defendant, the gist of her claims is that the defendants, individually or collectively, improperly deprived Ortolano of various rights in retaliation for her criticism of City acts and officials, including wrongfully arresting her for trespassing. Ortolano alleges that, in connection with her arrest, defendant Michael Carignan, Nashua Police Chief until his retirement at the end of 2021, violated her rights under the state and federal constitutions and is also liable under state-law theories of civil conspiracy and intentional infliction of emotional distress ("IIED"). Before the court is Chief Carignan's motion for judgment on the pleadings (doc. no. 36). See Fed. R. Civ. P. 12(c).

Chief Carignan's motion for judgment on the pleadings is granted in part and denied in part.

## STANDARD OF REVIEW

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings, including the answer. See Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006)). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006) (citation omitted).

Ultimately, a Rule 12(c) motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres, 445 F.3d at 54 (citing cases). Accordingly, "[j]udgment on the pleadings is proper 'only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.'" Zipperer v. Raytheon Co., Inc., 493 F.3d 50, 53 (1st Cir. 2007) (quoting Aponte-Torres, 445 F.3d at 54). The court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014) (citation and internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678

(2009).

## BACKGROUND[1]

Ortolano asserts that in 2014, shortly after purchasing a home in Nashua,

the City's Assessing Department increased her home's assessment by more than

50%.  Complaint (doc. no. 1) ¶15.  Ortolano alleges that by July 2017 her tax bill

exceeded $18,000 a year.  Id. ¶17.  Ortolano alleges that she called the City's then-

Chief Assessor, defendant Jonathan Duhamel, for an explanation for her increasing

tax bills.  Id. ¶18.  She claims that Duhamel was defensive and ended the phone call

by tersely stating "you bought it; you own it; you pay for it."  Id.  She further claims

that after this exchange Duhamel actively sought to prevent her from obtaining

public documents and information from the Assessing Department.  Id. ¶20.

---

[1] Ortolano's complaint covers 67 pages and nearly 200 paragraphs.  The court
limits the factual background in this Order only to those allegations necessary to
resolve the instant motion.  Moreover, in ruling on this motion the court declines to
consider Ortolano's affidavit or its 78 pages of attachments.  (Doc. No. 39-2).  As
previously noted, Fed. R. Civ. P. 12(c) ordinarily constrains the court's analysis to the
pleadings.  Aponte-Torres, 445 F.3d at 54.  Although the First Circuit has recognized
a limited exception to this general rule for certain categories of documents, see GE
Mobile Water, Inc., 6 F. Supp. 3d at 199, there is no question here that Ortolano's
affidavit and attachments – which include the report of a private investigator she
hired to conduct surveillance of an Assessing Department employee – do not fall
within one or more of these categories.  See (noting that such documents include
records "the authenticity of which are not disputed by the parties; . . . official public
records; ... documents central to plaintiffs' claim; [and] . . . documents sufficiently
referred to in the complaint.").  714 F.3d 29, 36 (1st Cir. 2013) (noting that such
documents include records "the authenticity of which are not disputed by the parties;
. . . official public records; ... documents central to plaintiffs' claim; [and] . . .
documents sufficiently referred to in the complaint.").

Ortolano also asserts that Duhamel "would even launch a behind the scenes campaign to impugn [her] character and cause other City employees and officials to treat her unfavorably." Id.

This "campaign," Ortolano states, began after the July 2017 phone call and resulted in Duhamel and other employees exchanging emails disparaging her. Id. ¶¶ 22-23. She contends that by late 2018 "Duhamel, Kleiner, Bolton, Leonard, and the Mayor were taking her public criticisms personally and had started treating her differently than other citizens when she sought public documents and information from City Hall." Id. ¶ 39.

Ortolano alleges that in late June 2019 she and another Nashua resident requested that the Nashua Police Department ("NPD") conduct a criminal investigation into the Assessing Department, its supervisor, Kim Kleiner, who had been the head of the department for several months, and department employee Greg Turgiss. Id. ¶¶ 49, 62.[2] "[W]ithin 24 hours" of that request, Chief Carignan and Captain Lehto met with the Mayor and Kleiner "to discuss how to handle Ortolano's claims." Id. ¶ 63. The result of the meeting was that Ortolano's request was granted – it was decided that the NPD would investigate Turgiss and Kleiner. Id.

As part of the investigation, defendant Frank Lombardi, – then an NPD detective and now a sergeant – interviewed members of the Assessing Department as well as an employee from KRT Appraisal that was working with the City on the

---

[2]Kleiner is a defendant in this case.  Turgiss is not.

2018 property reevaluation.   ¶ 76.  While the investigation was ongoing, Ortolano approached one Assessing Department employee in the City Hall parking lot.  Id. ¶ 70.  Detective Lombardi subsequently told Ortolano that the Assessing Department staff had requested that she not contact them outside of work.  Id. ¶ 82.  As a result, Ortolano "came to believe that she could be arrested merely be attempting to speak to one of the Assessing Department staff members outside the Assessing Department office."  Id. ¶ 83.  She says that this belief "chill[ed] her ability to engage in First Amendment rights while interacting with City employees."  Id. ¶ 84. Id. ¶ 76.  While the investigation was ongoing, Ortolano approached one Assessing Department employee in the City Hall parking lot.  Id. ¶ 70.  Detective Lombardi subsequently told Ortolano that the Assessing Department staff had requested that she not contact them outside of work.  Id. ¶ 82.  As a result, Ortolano "came to believe that she could be arrested merely be attempting to speak to one of the Assessing Department staff members outside the Assessing Department office."  Id. ¶ 83.  She says that this belief "chill[ed] her ability to engage in First Amendment rights while interacting with City employees."  Id. ¶ 84.

In January 2020, the NPD issued a written exoneration of Turgiss.  Id. ¶ 90. Ortolano claims that the investigation of Kleiner and Turgiss that she requested "had actually been manipulated to focus on" herself, as police reports she obtained demonstrated that investigating officers did not ask Assessing Department employees about any of the concerns Ortolano had expressed about Kleiner.  Id. ¶ 91.

In January 2021, Ortolano attempted to go to the Assessing Department to file real estate tax abatement applications on behalf of senior citizens she was assisting.  Id. ¶ 105.  That office was closed, however, due to construction.  Id. ¶ 106. Although she eventually mailed the applications, Ortolano received no response to her request for confirmation of her filings.  Id.  Ortolano went to Nashua City Hall seeking date-stamps for the applications on January 22, 2021.  Id. ¶ 107.  When the office to which she was directed was closed, Ortolano sought another office to obtain her proof of abatement filings.  Id.

The only open City Hall office at this time was the Legal Department.  Id. ¶ 108.  Ortolano describes the events that culminated in her arrest as follows:

> Ortolano knocked on the door to the Legal Department and employee Mindy Lloyd opened it and asked if Ortolano had an appointment. Ortolano answered in the negative, saying she needed a date stamp, and asking if Attorney Neumann (the attorney handling RTK requests) was available to provide one. Ortolano walked past Ms. Lloyd and called out for Attorney Neumann who eventually came out of the conference room, said he would not date stamp her abatement applications, and told her she would have to leave. Ortolano said she was going to wait in the lobby area for someone to assist her and sat down in the lobby area on the floor.
>
> A short time later, Attorney Leonard arrived at the Legal Department, walked up to Ortolano who was sitting on the floor and began berating her. Ms. Lloyd called the Nashua PD, who arrived and escorted Ortolano out of the building. At that time, the Nashua PD told Ortolano that she would be given a no trespass order and would be unable to visit City Hall for a year. A day or so later, however, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order.

But Leonard had other ideas. When a <u>Union Leader</u> reporter informed Leonard of the Nashua PD's statement quoted directly above, Leonard responded, "I find it troublesome, to say the least. My office will be speaking with the police further."

On information and belief, Bolton, Leonard, and other city officials cajoled, pushed, and pressured Chief Carignan to order that Ortolano be arrested for <u>felony trespass</u> until he finally caved and did so on February 17, 2021.

<u>Id.</u> ¶¶ 109-12 (emphasis in original).[3]

---

[3]The criminal complaint lodged against Ortolano shows that the original charge was a misdemeanor. (Doc. No. 42-2). Ortolano eventually pleaded guilty to a violation-level offense. <u>Id.</u>; Pltf. Mem. (doc. no. 33-1) at 9 n.1. The relevant statute, N.H. Rev. Stat. Ann. § 635:2, describes the various permutations of criminal trespass as follows:

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:
    (a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or
    (b) The person knowingly enters or remains:
        (1) In any secured premises;
        (2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;
        (3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or
        (4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the

# DISCUSSION

Among the 10 counts in the complaint, 7 include claims against Chief Carignan: (1) suppression and chilling of Ortolano's First Amendment right to free speech; (2) violation of Ortolano's First Amendment right to petition the government; (3) violation of Ortolano's substantive due process rights; (4) violation of Ortolano's procedural due process rights; (5) violation of the New Hampshire Constitution's right of access to governmental proceedings and records; (6) civil conspiracy; (7) intentional infliction of emotional distress. The first four claims are brought under 42 U.S.C. § 1983[4]; the remainder under New Hampshire constitutional and common law.  The court addresses these claims seriatim.

---

department of corrections without prior authorization or without a legitimate purpose associated with department of corrections operations.
IV. All other criminal trespass is a violation.

[4] 42 U.S.C. § 1983, "supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."  Mead v. Indep. Ass'n, 684 F.3d 226, 231 (1st Cir. 2012) (internal quotation marks omitted).  "In order to make out a viable claim under § 1983, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued."  Id. (internal quotation marks omitted).  There appears to be no dispute here that Chief Carignan acted under color of state law.  The court therefore focuses on whether Ortolano has adequately alleged a deprivation of a federally secured right.

I.      Suppression of First Amendment Rights (Counts 1 and 2)

In Counts 1 and 2 of her complaint, Ortolano alleges that the defendants[5]: chilled her right to free speech (Count 1) and violated her right to petition the government (Count 2).  To prevail, Ortolano must demonstrate that "(1) she engaged in constitutionally protected conduct, (2) was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action.  Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 258 (D.N.H. 2022) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012)).

Chief Carignan does not dispute that Ortolano was engaged in protected speech or that she was arrested.  Instead, Chief Carignan focuses on the paucity of factual allegations concerning his actions, as well as the legitimacy of her arrest.  Chief Carignan is correct that the complaint contains few allegations specific to him.  First, Ortolano asserts that the investigation he instigated at her request did not result in any action against Kleiner or Turgiss, but instead turned into an investigation of Ortolano herself, which resulted in Detective Lombardi warning her against visiting the Assessing Department.  These allegations are insufficient to

---

[5]The court's task is complicated because the complaint and much of Ortolano's objection to Chief Carignan's motion lump all the defendants together as transgressors of her rights.  But, in a multiple defendant case such as this, each defendant's acts must be isolated and analyzed separately under Rule 12(b)(6).  See, e.g., Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009); Rivera-Torres v. Ruiz-Vale, Civil No. 13-1684 (SEC), 2016 WL 3962904, at *2 (D.P.R. July 21, 2016).

state a First Amendment claim against Chief Carignan based on the investigation. Although Ortolano asserts that "Chief Carignan's thumbprints" are all over the investigation, Pltf. Mem. (doc. no. 39-1) at 19, there are no factual allegations in the complaint to support this conclusory assertion. Similarly, her argument that "it is likely that Chief Carignan assigned Detective Lombardi and Sergeant McCloud to the investigation" and "signed off on" the warning to Ortolano is without factual support. Finally, with respect to the results of the investigation that Chief Carignan began at her request, Ortolano has no constitutional right to direct the course of the investigation or have someone else arrested. Town of Castle Rock v. Gonzales, 545 U.S. 748, 768 (2005); see Gini v. Las Vegas Metro. Police Dep't, 40 F.3d 1041, 1045 (9th Cir. 1994) ("The police have no affirmative obligation to investigate a crime in a particular way or to protect one citizen from another even when one citizen deprives the other of liberty or property."); Thibeault v. Brown, No. 12-cv-10333-PBS, 2012 WL 1865834, at *4 (D. Mass. May 21, 2012) ("There is no constitutional right to a police investigation, adequate or otherwise."). Accordingly, to the extent that Ortolano's First Amendment claims are premised on the conduct related to the investigation of Assessing Department personnel, the motion for judgment on the pleadings is granted.

Ortolano's claim based on her arrest fares differently, however. In her complaint, she alleges that Chief Carignan "ordered" her arrest, overruling the judgment of other officers who believed her conduct was not arrest-worthy. Complaint (doc. no. 1) ¶¶ 110-12. Given the apparent enmity between Ortolano and

the City, this allegation is sufficient to allow this particular claim against Chief Carignan to proceed at this time.  Although Chief Carignan relies on Ortolano's eventual guilty plea and her seeming admission to facts that would support a trespassing arrest to negate her arrest-based claim, neither side has addressed the legal implication of her plea or the status of her conviction – which she sought to annul.  If the effect and status of her criminal case, and the extent, if any, that Chief Carignan was involved in the decision to arrest Ortolano are to be resolved before trial, such resolution will take place in the context of a motion for summary judgment under Fed. R. Civ. P. 56, rather than a Rule 12 motion.

II.     Due Process (Counts 3 and 4)

        A.      Substantive Due Process (Count 3)

        In Count 3, Ortolano asserts that Chief Carignan's actions violated her right to substantive due process.  The Fourteenth Amendment to the United States Constitution prohibits a state from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.  "The touchstone of this due process guarantee is the protection of the individual against arbitrary action of government."  DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (internal quotation marks omitted).  The substantive due process guarantee "safeguards individuals against certain offensive government action, notwithstanding that facially fair procedures are used to implement them."  Id.

        To set out a substantive due process claim, a plaintiff challenging specific acts of government officials must sufficiently allege that: (1) the officials' "acts were

so egregious as to shock the conscience"; and (2) that the acts "deprived [her] of a protected interest in life, liberty, or property." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006); see also DePoutot, 424 F.3d at 118.  A plaintiff must provide evidence of a defendant's acts that are "so extreme and egregious as to shock the contemporary conscience." Abdisamad v. City of Lewiston, 960 F.3d 56, 59–60 (1st Cir. 2020).  The question whether "the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized." DePoutot, 424 F.3d at 118.  To meet that standard, the officers' conduct must be "truly outrageous, uncivilized, and intolerable." Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011).

The First Circuit has depicted certain guideposts to direct the analysis.  See Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880-81 (2010).  On one hand, "negligence, without more, is simply insufficient to meet the conscience-shocking standard." Id. at 881 (internal quotation marks omitted).  On the other, allegations that state officials had "an intent to injure in some way unjustifiable by any government interest is likely sufficient" to meet the conscience-shocking threshold. Id. (internal quotation marks and brackets omitted).  Between these two poles are cases that present "closer calls." Id. (internal quotation marks omitted). Ultimately, though, the shocks-the-conscience threshold is necessarily a "high one," to prevent the Constitution from being demoted to a "font of tort law." Drake v. Town of New Bos., No. 16-CV-470-SM, 2017 WL 2455045, at *13 (D.N.H. June 6, 2017) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

As this court recently recognized, the First Circuit has collected representative cases in which plaintiffs established a viable substantive due process claim:

> Among the cases in which plaintiffs have prevailed are those involving a student blinded in one eye when a coach intentionally struck him in the head with a metal weight; a teacher's fabrication of sexual abuse charges against a father, resulting in loss of contact with his child for three years; rape by a police officer in connection with a car stop; a 57–day unlawful detention in the face of repeated requests for release, police officers aiding a third-party in shooting the plaintiff; an intentional assault by a police officer who struck a pretrial detainee twice in the head and threatened to kill him; and a principal forcing his way into a room where a student was hiding, grabbing her from the floor, throwing her against the wall, and slapping her.

Spencer v. Doran, No. 18-CV-1191-LM, 2020 WL 4904826, at *5 (D.N.H. Aug. 20, 2020) (quoting Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir. 2001) (citations omitted)).  In Spencer, following the Court of Appeals's guidance, the court found that allegations of deliberate misuse of official authority targeting the plaintiff and allegations of false testimony aimed at causing the plaintiff economic and reputational harm were insufficient to state a substantive due process claim.  The allegations in this case call for the same result.

None of the allegations against Chief Carignan comes remotely close to establishing a claim for a violation of Ortolano's substantive due process rights. Indeed, her objection to the instant motion pays scant notice to the guideposts outlined by the First Circuit.  Nor does her reliance on some unspecified future discovery, Pltf. Mem. (doc. no. 39-1) at 21, save this claim.  The allegations in

Ortolano's complaint are insufficient to state a claim for relief under a theory of substantive due process.  The motion for judgment on the pleadings is granted as to Count 3.

      B.    <u>Procedural Due Process (Count 4)</u>

Ortolano claims in Count 4 that Chief Carignan violated her rights under the procedural component of the Fourteenth Amendment's Due Process Clause.  The requirements of procedural due process mandates that "certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures." Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014) (internal quotation marks omitted).  To properly plead a procedural due process violation, a plaintiff must allege: (1) a protected liberty or property interest; and (2) that the defendants, while acting under color of state law, deprived him of that interest without constitutionally adequate process.  Id.; see also Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 11 (1st Cir. 2013).

Ortolano's objection does not address Chief Carignan's motion with respect to this claim.  That alone would be sufficient to grant the motion.  See LR 7.2 (Waiver); ITI Holdings, Inc. v. Odom, 468 F.3d 17 (1st Cir. 2006) (affirming dismissal based on waiver pursuant to local rule).  Even ignoring waiver, however, her claim fails.  Assuming that Ortolano's arrest satisfies the first prong of the analysis – deprivation of a right – the second prong of a procedural due process claim (that the deprivation occurred without constitutionally adequate process), requires a description of the process afforded to the plaintiff in relation to the alleged

deprivation, see Aponte-Torres, 445 F.3d 50, 56, and requires her to identify the failings of that process or describe the process that was due to them, see Doe by Fein v. D.C., 93 F.3d 861, 870 (D.C. Cir. 1996), so that the court can assess whether the process given accords with the due process guarantee.

"The basic guarantee of procedural due process is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted).  Here, to the extent there is any description of the process that was afforded to Ortolano, it is in her concession that she was charged, went to court, pleaded guilty to a lesser included of the original offense, and sought annulment of the conviction.  Ortolano has provided no authority for the proposition that this is insufficient process, nor is the court aware of any.  Accordingly, Chief Carignan's motion is granted as to Count 4.

III.     New Hampshire Constitution (Count 5)

In Count 5, Ortolano alleges that Chief Carignan violated her rights under Part I, Art. 8 of the New Hampshire Constitution, which guarantees access to government proceedings and records.  Once again, Ortolano's failure to interpose an objection to the motion with respect to this claim warrants waiver.  But even if argument on this issue were not waived, it does not appear that such a constitutional tort exists under New Hampshire law.  The New Hampshire

Supreme Court has rejected the creation of constitutional torts where adequate statutory relief exists.  See Khater v. Sullivan, 999 A.2d 377, 379 (N.H. 2010).  Such relief exists here, as Ortolano has explained in detail her use of New Hampshire's Right-to-Know Law, N.H. Rev. Stat. Ann. § 91-A, to gain access to records. Accordingly, Chief Carignan's motion for judgment on the pleadings is granted as to Count 5.

IV.   Civil Conspiracy (Count 6)

In Count 6, Ortolano alleges that Chief Carignan was part of a civil conspiracy in connection with her arrest for trespassing.  Under New Hampshire law, a viable claim for civil conspiracy requires at least "two or more persons" conspiring to achieve an unlawful objective.  In re Appeal of Armaganian, 147 N.H. 158, 163 (2001).  As she explains in her objection, Ortolano's conspiracy claim is that "someone in the Police Department – likely Chief Carignan – agreed with one or more people from the Legal Department – likely Bolton and/or Leonard to overrule a supported finding of five Police Department investigators that there was no probable cause to charge Ortolano with a crime."  Pltf. Mem. (doc. no. 39-1)) at 22.

In his motion, Chief Carignan invokes the "intracorporate conspiracy doctrine," pursuant to which "the agents and employees of a corporate entity acting within the scope of their employment or authority are legally incapable of conspiring together." Def. Mem. (doc. no. 36-1) at 11 (citing Carney v. Town of Weare, No. 15-CV-291-LM, 2017 WL 680384, at *15 (D.N.H. Feb. 21, 2017)).

Ortolano did not respond to this legal argument in her objection.  In Carney, this court applied the doctrine and dismissed a conspiracy claim brought against town employees and an attorney representing the town because all were agents of the town.  2017 WL 680384, at *16. [6]  The same reasoning applies here.  Chief Carignan cannot form a conspiracy with other Nashua government officials.  The motion for judgment on the pleadings is therefore granted as to Count 6.

V.      Intentional Infliction of Emotional Distress (Count 10)

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ."  Mikell v. School Adm. Unit No. 33, 972 A.2d 1050, 1055 (N.H. 2009) (citing Morancy v. Morancy, 593 A.2d 1158, 1159 (N.H. 1991)).  "In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice."  Mikell, 972 A.2d at 1055 (citation and quotations omitted).  Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so

_____

[6]In Carney, the court noted that New Hampshire had not adopted the doctrine, but it concluded that, if confronted with the issue, New Hampshire would adopt it based on traditional principles of agency.  Carney, 2017 WL 680384, at *16.  Although the New Hampshire Supreme Court has not weighed in, at least two Superior Court decisions followed Carney's reasoning.  See Legacy Global Sports, LP v. St. Pierre, 218-2019-CV-198, 2020 WL 2027401, at *3 (N.H. Super. Apr. 27, 2020); D.G. Whitefield, LLC v. Cate St. Capital, Inc., 218–2015–CV–1406, 2017 N.H. Super. LEXIS 16, at *28-29 (N.H. Super. July 10, 2017).

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation omitted).

As previously noted, the allegations against Chief Carignan in the complaint are limited.  Ortolano's objection states only that he began the investigation she requested and cooperated with others to cause Ortolano to be wrongfully arrested. Pltf. Mem. (doc. no. 39-1) at 22.  This is plainly insufficient to state a viable claim for intentional infliction of emotional distress.

A comparison with the New Hampshire Supreme Court's decision in Mikell is instructive.  There, the Court upheld the trial court's dismissal of an IIED claim in a case involving a student who committed suicide.  His estate alleged that a schoolteacher falsely reported a disciplinary infraction against the student, causing emotional distress that resulted in the student's suicide.  Id. at 1055.  The plaintiff claimed that the teacher's motive was to cause the student's expulsion.  Id.  The Court held that while a "teacher falsely reporting misconduct by a student is a reprehensible act, the circumstances of this case are simply not beyond all possible bounds of decency."  Id. at 1056.  Even as alleged by Ortolano, nothing about Chief Carignan's conduct could be characterized as "reprehensible," a characterization which itself fell short of the mark in Mikell.  972 A.2d at 1056.

A decision by this court also provides guidance.  In Banks v. Hall, No. 10–cv–269–JL, 2012 WL 3263607 (D.N.H. Aug. 9, 2012), the plaintiff sued several state troopers who allegedly kicked, tasered, and sicced their police dog on him.  Id. at *1.

Although the court found the allegations sufficient to deny the officers summary judgment on plaintiff's excessive force claim, the court granted summary judgment for the troopers on plaintiff's emotional distress claim "because, even if the defendants' conduct amounted to excessive force, no rational factfinder could deem it 'atrocious, and utterly intolerable in a civilized society.'" Id. at *2 (quoting Mikell, 972 A.2d at 1056). Similarly, here, the allegations that Ortolano lodges against Chief Carignan fall well short of "extreme and outrageous conduct" as those terms have been used in this court and the courts of New Hampshire. Accordingly, Chief Carignan's motion for judgment on the pleadings in granted as to Count 10, intentional infliction of emotional distress.

## CONCLUSION

Chief Carignan's motion for judgment on the pleadings (doc. no. 36) is granted in part and denied in part as follows:

- the motion is denied as to Counts 1 and 2 (First Amendment), but only insofar as those counts relate to Ortolano's claim of retaliatory arrest.

- the motion is otherwise granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 28, 2023

cc: Counsel of Record.