## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Laurie Ortolano

v.

City of Nashua, et al.

Case No. 22-cv-326-LM
Opinion No. 2023 DNH 122 P

## O R D E R

Plaintiff Laurie Ortolano has sued the City of Nashua, New Hampshire ("Nashua" or "the City"), its Mayor, several current and former Nashua employees and officials, and two private parties involved in providing document scanning services to the City. Although not all 10 counts in Ortolano's complaint (doc. no. 1) are leveled against every defendant, the gist of her claims is that defendants, individually or collectively, improperly deprived Ortolano of various rights in retaliation for her criticism of city acts and officials, including wrongfully arresting her for trespassing. Ortolano alleges that, in connection with her arrest, defendants Steven Bolton and Celia K. Leonard, the City's Corporation Counsel and Deputy Corporation Counsel, respectively, violated her rights under the state and federal constitutions and are also liable under state-law theories of civil conspiracy, abuse of process, and intentional infliction of emotional distress. Before the court is Bolton's and Leonard's joint motion for judgment on the pleadings (doc. no. 52). See Fed. R. Civ. P. 12(c). As set forth more fully below, defendants' motion is granted in part and denied in part.

## STANDARD OF REVIEW

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). On a Rule 12(c) motion, unlike a Rule 12(b) motion, the court considers the pleadings, including the answer. See Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006) (citation omitted).

Ultimately, a Rule 12(c) motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres, 445 F.3d at 54 (citing cases). Accordingly, "[j]udgment on the pleadings is proper 'only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.'" Zipperer v. Raytheon Co., Inc., 493 F.3d 50, 53 (1st Cir. 2007) (quoting Aponte-Torres, 445 F.3d at 54). The court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014) (citation and internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## BACKGROUND[1]

The following facts, except as otherwise indicated, are drawn directly from the complaint (doc. no. 1).[2]  In 2014, shortly after Ortolano purchased a home in Nashua, the City's Assessing Department increased her home's assessment by more than 50 percent.  Id. ¶ 15.  By July 2017, Ortolano's tax bill exceeded $18,000 a year.  Id. ¶ 17.  Ortolano called the City's then Chief Assessor, defendant Jonathan Duhamel, for an explanation for her increasing tax bills.  Id. ¶ 18.  She claims that Duhamel was defensive and ended the phone call by tersely stating "you bought it; you own it; you pay for it."  Id.  Ortolano further claims that after this exchange Duhamel actively sought to prevent her from obtaining public documents and information from the Assessing Department.  Id. ¶ 20.

After the July 2017 phone call, Duhamel and other employees exchanged emails disparaging Ortolano.  Id. ¶¶ 22-23.  She contends that by late 2018 "Duhamel, Kleiner, Bolton, Leonard, and the Mayor were taking her public criticisms personally and had started treating her differently than other citizens when she sought public documents and information from City Hall."  Id. ¶ 39.

More specifically, after Ortolano "had challenged some statements Bolton made during [a public] hearing, Bolton aggressively approached [her] and barked angrily in her face that he did not appreciate her challenging him in public."  Id.

_____

[1] Ortolano's complaint covers 67 pages and nearly 200 paragraphs.  The court limits the factual background in this Order to those allegations necessary to resolve the instant motion.

[2] The court notes defendants' acceptance of the allegations in the complaint for purposes of this motion only.  Doc. no. 52-1 at 2 n.1.

¶ 40.  She responded by calling Bolton a "loser."  Id.  On another occasion while Ortolano was at Bolton's office, he stated to her that she "offended the Mayor, [she] offended [Bolton], and . . . now it's all personal."  Id.  Ortolano alleges that Bolton's "unchecked disdain" for her continued during two administrative abatement adjudications in the New Hampshire Board of Tax and Land Appeals and three Superior Court cases regarding New Hampshire's Right-to-Know Law, N.H. Rev. Stat. An. § 91-A.  Id. ¶ 41.  Additionally, Bolton "intervened on [her] abatements and met outside of public meetings to discuss her property assessment with the Board."  Id.

On multiple occasions during her abatement appeals and litigation pertaining to her right-to-know requests, "Bolton refused to communicate with [Ortolano] and directed his communications to an attorney representing her in different actions" even though Bolton knew she was "proceeding in the particular action pro se."  Id. ¶ 42.  She also argues that Bolton's "palpable disdain for [her] . . . seems to have clouded his professional judgment" with respect to her legal cases against the City.  Id. ¶ 44.  Ultimately, Ortolano claims, the "hatred for [her], based on her public criticisms of the workings of Nashua city government, would cause the defendants . . . to restrict her access to City Hall and prevent her from obtaining documents and information to which she was entitled under municipal and state law."  Id. ¶ 46.

In April 2019, defendants Kleiner and Leonard "caused the Nashua Assessing Department to implement a policy preventing [her] . . . from orally

obtaining any . . . assessing information during business hours" from any department employee, effectively preventing her from obtaining information from the assessors who had done the property appraisal she was contesting.  Id. ¶ 53. In addition, defendant Kleiner instituted a policy that staff were no longer authorized to immediately fulfill requests to review multiple documents from any member of the public who was conducting research while physically present in the Assessing Department.  As a result, "rather than being able to conduct research comparing property assessments in the public research area of the Assessing Department" Ortolano was required "to fill out and submit a form listing the particular files/documents [she] wanted to review."  Id. ¶ 55.  Ortolano claims that this "Kleiner/Leonard created policy" violated the Nashua City Charter.  Id. ¶ 56. Ortolano asserts that this policy "allows for unlawful censorship of the documents and information the public is allowed to inspect."  Id.  She accuses Kleiner and the City's Legal Department of being "censors of which public Assessing Department documents and information the public was allowed to inspect or receive."  Id. ¶ 59.

In the late spring and early summer of 2019, Ortolano started requesting public documents through the formal right-to-know process.  Kleiner "caused all of [her right-to-know] requests pertaining to the Assessing Department to be referred to the Legal Department."  Id. ¶ 66.  In addition, the Legal Department often objected to her requests based on "some picayune defect, which it also often expressed in legal jargon that non-lawyers would not easily understand," and often delayed production for many months, before informing Ortolano that it would not

produce any documents because of exemptions under the Right-to-Know Law or a technical issue in her request.  These strategies were part of the Legal Department's "bad faith and lack of candor" to "prevent [her] from obtaining documents she was entitled to under the law."  Id. ¶¶ 66-67.

In 2020, Ortolano "started to become more publicly vocal" about her alleged claims of the "dysfunctional operations of the Assessing Department and other Nashua departments".  Id. ¶ 97.  In response to her "growing public profile," defendants and other Nashua officials "commenced a campaign of announcing publicly that [Ortolano's] requests for information were overburdensome and had prevented city employees from accomplishing the City's work."  Id. ¶ 99.  In addition, "[t]hese public officials have suggested in public that [she] in effect was a right-wing lunatic waging a war against government itself" and that "[o]ne attorney in the Legal Department would compare [her] actions to those who attacked the Capitol Building in Washington, D.C. on January 6, 2021."  Id.

In January 2021, Ortolano visited the Assessing Department to file real estate tax abatement applications on behalf of senior citizens she was assisting.  Id. ¶ 105.  That office was closed, however, due to construction.  Id. ¶ 106.  Although she eventually mailed the applications, Ortolano received no response to her request for confirmation of her filings.  Id.  Ortolano went to Nashua City Hall seeking date-stamps for the applications on January 22, 2021.  Id. ¶ 107.  When the office to which she was directed was closed, Ortolano sought another office to obtain her proof of abatement filings.  Id.

The only open City Hall office at this time was the Legal Department.  Id.

¶ 108.  Ortolano describes the events that culminated in her arrest as follows:

> Ortolano knocked on the door to the Legal Department and employee Mindy Lloyd opened it and asked if Ortolano had an appointment. Ortolano answered in the negative, saying she needed a date stamp, and asking if Attorney Neumann (the attorney handling RTK requests) was available to provide one. Ortolano walked past Ms. Lloyd and called out for Attorney Neumann who eventually came out of the conference room, said he would not date stamp her abatement applications, and told her she would have to leave. Ortolano said she was going to wait in the lobby area for someone to assist her and sat down in the lobby area on the floor.

> A short time later, Attorney Leonard arrived at the Legal Department, walked up to Ortolano who was sitting on the floor and began berating her. Ms. Lloyd called the Nashua PD, who arrived and escorted Ortolano out of the building. At that time, the Nashua PD told Ortolano that she would be given a no trespass order and would be unable to visit City Hall for a year. A day or so later, however, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order.

> But Leonard had other ideas. When a Union Leader reporter informed Leonard of the Nashua PD's statement quoted directly above, Leonard responded, "I find it troublesome, to say the least. My office will be speaking with the police further."

> On information and belief, Bolton, Leonard, and other city officials cajoled, pushed, and pressured Chief Carignan to order that Ortolano be arrested for felony trespass until he finally caved and did so on February 17, 2021.

Id. ¶¶ 109-12[3] (emphasis in original).

---

[3]The criminal complaint lodged against Ortolano shows that the original charge was a misdemeanor.  Doc. no. 42-2.  Ortolano eventually pleaded guilty to a violation-level offense.  Id.; doc. no. 33-1 at 9 n.1.  The relevant statute, N.H. Rev. Stat. Ann. § 635:2, describes the various permutations of criminal trespass as follows:

Ortolano's interactions with Bolton and Leonard continued after her arrest. At a February 8, 2022 Board of Aldermen meeting, Bolton "sat mute" as defendant Kleiner "publicly accused [Ortolano] of impersonating a city official" and "defamed [Ortolano] and simultaneously violated the [right-to-know] law." Id. ¶ 122.  Next,

---

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:

> (a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or

> (b) The person knowingly enters or remains:

>> (1) In any secured premises;

>> (2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;

>> (3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or

>> (4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the department of corrections without prior authorization or without a legitimate purpose associated with department of corrections operations.

IV. All other criminal trespass is a violation.

N.H. Rev. Stat. Ann. § 635:2.

on July 22, 2022, Bolton encountered her in Nashua City Hall and attempted to have her arrested. Id. ¶ 130. Ortolano claims that she was at City Hall because the Legal Department, in response to one of her right-to-know requests, had transmitted documents to her via a secure email portal, and she was unable to open them. Id. She went to the IT Department at City Hall to get help opening the documents, but it appeared that no one was there. Id. She chose to call the Legal Department to ask for hard copies of the documents "[b]ecause Bolton had ordered that [she] would never be granted an appointment with any Legal Department employee, and that he would have [her] arrested if she attempted to enter the Legal Department." Id.

Ortolano approached the Legal Department's main entrance door to get the phone number on the wall and dialed the phone number. Id. ¶ 131. "Within seconds" of a department employee answering the phone, the door to the department "opened abruptly about half-way" and Bolton was in the doorway. Id. Bolton yelled at her, accused her of trespassing and threatened to have her arrested. Id. Bolton also told her she was not permitted to call into the Legal Department, nor speak with anyone in the department by phone. Id. As a result, Ortolano was "[f]earful that Bolton would have her arrested" and wanted to have "her side of the incident recorded," so she called back to the Legal Department and when no one answered, she left a message. Id. "Certain that Bolton would indeed attempt to cause her to be arrested for trespass, Ortolano called 911" and asked the Nashua Police Department dispatch an officer to City Hall. Id. ¶ 132. After police

officers arrived and took her statement, they spoke with Bolton who "insisted that [she] be arrested for trespassing" and allegedly "became extremely upset when [one of the officers] did not immediately" do so.  Id. ¶ 133.  Bolton claimed she was trespassing because there was no public area accessible by the hallway, and that, she "should be arrested merely for placing a phone call to the Legal Department." Id. ¶ 134.  When one of the officers asked Bolton why there was a video doorbell outside of the Legal Department despite the public not being allowed there, Bolton responded, "[f]or people other than her."  Id.  Bolton insisted that he could "prevent a single member of the public from being in an area of City Hall open for public access."  Id.

Ortolano assumed that Bolton's "banishment of her from the hallway" would lead to her arrest if she returned there, and that because of this, she would not be able to access either the City's IT Department or the public auditorium that hosted many of the City's public meetings.  Id. ¶ 135.  In response to an email Ortolano sent to defendant Kleiner regarding Ortolano's ability to attend meetings via Zoom due to Bolton's warning, Bolton "issued an untruthful response," stating that he did not issue the warning, and he had only directed her "to leave the narrow corridor providing access to the entrance to and egress from the Legal Department as [he] was attempting to leave and she was interfering with [his] passage."  Id. ¶ 136.

## DISCUSSION

Of the 10 counts in the complaint, 8 include claims against defendants Bolton and Leonard: (1) suppression and chilling of Ortolano's First Amendment right to

free speech; (2) violation of Ortolano's First Amendment right to petition the government; (3) violation of Ortolano's substantive due process rights; (4) violation of Ortolano's procedural due process rights; (5) violation of the New Hampshire Constitution's right of access to governmental proceedings and records; (6) civil conspiracy; (7) abuse of process; and (8) intentional infliction of emotional distress. The first four claims are brought under 42 U.S.C. § 1983;[4] the remainder under New Hampshire constitutional and common law.  The court first addresses the defendants' litigation privilege defense before turning to Ortolano's individual claims.

I.    Litigation Privilege

It is well-settled in New Hampshire that "certain communications are absolutely privileged and therefore immune from civil suit."  Pickering v. Frink, 461 A.2d 117, 119 (N.H. 1983).  Statements made in the course of judicial proceedings constitute one class of communications that is privileged from liability in civil actions if the statements are pertinent or relevant to the proceedings.  See id.  "The purpose of this privilege is to encourage witnesses to testify and to ensure that their testimony is not altered or distorted by the fear of potential liability."  Provencher v. Buzzell-Plourde Assocs., 711 A.2d 251, 255 (N.H. 1998); see also Briscoe v. LaHue,

---

[4] 42 U.S.C. § 1983, "supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."  Mead v. Indep. Ass'n, 684 F.3d 226, 231 (1st Cir. 2012) (internal quotation marks omitted).  "In order to make out a viable claim under § 1983, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued."  Id. (internal quotation marks omitted).  In their motion, defendants question only whether Ortolano has adequately alleged a deprivation of a federally secured right.

460 U.S. 325, 333 (1983) (noting that absolute immunity allows a witness to give candid and objective testimony without fear of a subsequent lawsuit).  "[T]he policy of granting absolute immunity for such statements 'reflects a determination that the potential harm to an individual is far outweighed by the need to encourage participants in litigation, parties, attorneys, and witnesses, to speak freely in the course of judicial proceedings.'"  Pickering, 461 A.2d at 119 (quoting McGranahan v. Dahar, 408 A.2d 121, 125 (N.H. 1979)).  The First Circuit Court of Appeals has concluded that the New Hampshire Supreme Court would view the privilege as "extend[ing] to any civil claim arising from statements made in the course of a judicial proceeding."  Hugel v. Milberg, Weiss, Bershad, Hynes & Lerach, LLP, 175 F.3d 14, 17 (1st Cir. 1999).

Defendants, attorneys for the City, argue that Ortolano's several tax abatement and right-to-know lawsuits against the City – first filed in August 2019 – place all of their comments within the realm of "in the course of judicial proceedings."  Given the necessarily sparse record, the court is unpersuaded by the defendants' broad invocation of immunity.  For example, the defendants, without further elaboration, cite as examples of protected statements Bolton "berating [Ortolano] and having her escorted out of the legal office" and his threat to have Ortolano arrested because she was preventing him from leaving that office.  Doc. no. 52-1 at 13.

Defendants offer no support for their implicit position that the very existence of litigation between the parties immunizes all of their temporally proximate

statements.  Cases applying the privilege demand more.  See, e.g., Provencher, 11 A.2d at 253 (the defendant offered a property appraisal in connection with eminent domain proceedings); Lath v. City of Manchester, Civ. No. 16-cv-534-LM, 2018 WL 1718291 at *2 (D.N.H. Apr. 9, 2018) (statements made in a pleading).  By contrast, in Carney v. Weare, Civ. No. 15-cv-291-LM, 2017 WL 680384 at *14 (D.N.H. Feb. 21, 2017), this court denied a defendant-attorney's motion to dismiss on the basis of the litigation privilege because it was "unable to conclude that the entirety" of the attorney's conduct occurred during the course of judicial proceedings "at [that] stage of the litigation.  Whether the privilege bars any of [plaintiff's] claims is best addressed in the context of a properly-supported motion for summary judgment."  So it is here.  Without more detail concerning the timing, scope, and context of the statements and acts at issue, the court cannot grant defendants' motion on the basis of litigation privilege.

II.    Suppression of First Amendment Rights (Counts 1 and 2)

In Counts 1 and 2 of her complaint, Ortolano alleges that defendants Bolton and Leonard chilled her right to free speech (Count 1) and violated her right to petition the government (Count 2).  In order to prevail on these claims, Ortolano must demonstrate that "(1) she engaged in constitutionally protected conduct, (2) was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action."  Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 258 (D.N.H. 2022) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012)).

Although defendants do not contest whether Ortolano was engaging in constitutionally protected conduct, the court's ability to assess the defendants' motion with respect to Counts 1 and 2 is nevertheless hindered by the fact that they rely, in large part, on memoranda filed by other defendants. See doc. no. 52-1 at 10. In the context of resolving the instant motion, however, the court must assess the sufficiency of the allegations against each defendant individually, diminishing the utility of relying on other defendants' arguments. Similarly, the court's task is complicated because much of Ortolano's complaint frequently aggregates several defendants together as transgressors of her rights. But, in a multiple defendant case such as this, each defendant's acts must be isolated and analyzed separately under Rule 12(b)(6). See, e.g., Sanchez v. Pereira-Castillo, 590 F.3d 31, 48 (1st Cir. 2009); Rivera-Torres v. Ruiz-Vale, Civil No. 13-1684 (SEC), 2016 WL 3962904, at *2 (D.P.R. July 21, 2016).

Many of the allegations against the defendants relate to the dispute over the City's compliance with Ortolano's right-to-know requests and the resulting litigation. See, e.g., Ortolano v. City of Nashua, No 2022-0237, 2023 WL 5313167 (N.H. Aug. 18 2023). Ortolano has not provided any authority suggesting that the right-to-know dispute itself is an "adverse action." Nor, given her continued litigation and pursuit of Assessing Department records, does the complaint plausibly suggest that her pursuit of City records was actually "chilled." See Sullivan v. Carrick, 888 F.2d 1, 4 (1st Cir. 1989) (holding that a plaintiff must show that her speech was "actually chilled" to state a First Amendment violation);

Hurwitz v. Newton Pub. Sch., No. CV 17-10231-LTS, 2017 WL 3008886, at *3 (D. Mass. July 14, 2017) ("To show a deprivation of their First Amendment rights, Plaintiffs 'must allege that [their] speech was in fact chilled or intimidated by' Defendants' actions."), aff'd, No. 17-1829, 2018 WL 11442304 (1st Cir. Dec. 20, 2018)).  Therefore, to the extent that Ortolano's First Amendment claims are based on her dispute over the Nashua Legal Department's responses to her record requests, defendants' motion is granted.

But that is not the end of the court's inquiry.  Ortolano's arrest is indisputably an adverse action.  To be sure, her allegations against these defendants are somewhat sparse.  Ortolano alleges that, after she was escorted from City Hall without being arrested, Leonard said that her office "would be speaking with the police further."  Doc. no. 1 ¶ 111.  In addition, she alleges that defendants Bolton and Leonard "pressured" police to arrest her.  Id. ¶ 112.  Although this allegation was made on "information and belief," such a caveat is not fatal to her claim at this stage of the litigation.  See Menard v. CSX Transp., Inc., 698 F.3d 40, 44 (1st Cir. 2012) ("'Information and belief' does not mean pure speculation.").  In light of the indisputably contentious relationship between Ortolano and the City's Legal Department, the court finds that Ortolano's claim that her arrest resulted from Bolton and Leonard's retaliation for her protected activity survives defendants' motion.[5]

_____

[5] Defendant Michael Carignan, one of the defendants whose arguments Bolton and Leonard incorporates by reference, argued that Ortolano's guilty plea to

III.   <u>Due Process (Counts 3 and 4)</u>

    A.   <u>Substantive Due Process (Count 3)</u>

In Count 3, Ortolano asserts that Bolton and Leonard violated her right to substantive due process.  The facts alleged in the complaint, however, do not support this claim.

The Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1. "The touchstone of this due process guarantee is the protection of the individual against arbitrary action of government."  <u>DePoutot v. Raffaelly</u>, 424 F.3d 112, 117 (1st Cir. 2005) (internal quotation marks omitted).  The substantive due process guarantee "safeguards individuals against certain offensive government action, notwithstanding that facially fair procedures are used to implement them."  <u>Id.</u>

To establish a substantive due process claim, a plaintiff challenging specific acts of government officials must sufficiently allege that: (1) the officials' "acts were so egregious as to shock the conscience"; and (2) that the acts "deprived [her] of a

---

trespassing negated her arrest-based claim.  However, as the court noted in allowing such a claim to proceed against Carignan:

> [N]either side has addressed the legal implication of her plea or the status of her conviction – which she sought to annul. If the effect and status of her criminal case, and the extent, if any, that Chief Carignan was involved in the decision to arrest Ortolano are to be resolved before trial, such resolution will take place in the context of a motion for summary judgment under Fed. R. Civ. P. 56, rather than a Rule 12 motion.

Doc. no. 58 at 11.  The same rationale applies to the instant motion.

protected interest in life, liberty, or property."  Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006); see also DePoutot, 424 F.3d at 118.  The defendant's acts must be "so extreme and egregious as to shock the contemporary conscience."  Abdisamad v. City of Lewiston, 960 F.3d 56, 59–60 (1st Cir. 2020).  The question whether "the challenged conduct shocks the contemporary conscience is a threshold matter that must be resolved before a constitutional right to be free from such conduct can be recognized."  DePoutot, 424 F.3d at 118.  To meet that standard, the conduct must be "truly outrageous, uncivilized, and intolerable."  Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011).

 The First Circuit has enumerated certain guideposts to direct the analysis. See Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880-81 (1st Cir. 2010)  On one hand, "negligence, without more, is simply insufficient to meet the conscience-shocking standard."  Id. at 881 (internal quotation marks omitted).  On the other, allegations that state officials had "an intent to injure in some way unjustifiable by any government interest is likely sufficient" to meet the conscience-shocking threshold. Id. (internal quotation marks and brackets omitted).  Between these two poles are cases that present "closer calls."  Id. (internal quotation marks omitted). Ultimately, though, the shocks-the-conscience threshold is necessarily a "high one," to prevent the Constitution from being demoted to a "font of tort law."  Drake v. Town of New Boston, No. 16-CV-470-SM, 2017 WL 2455045, at *13 (D.N.H. June 6, 2017) (quoting City of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

As this court recently recognized, the First Circuit has collected representative cases in which plaintiffs established a viable substantive due process claim:

> Among the cases in which plaintiffs have prevailed are those involving a student blinded in one eye when a coach intentionally struck him in the head with a metal weight; a teacher's fabrication of sexual abuse charges against a father, resulting in loss of contact with his child for three years; rape by a police officer in connection with a car stop; a 57–day unlawful detention in the face of repeated requests for release; police officers aiding a third-party in shooting the plaintiff; an intentional assault by a police officer who struck a pretrial detainee twice in the head and threatened to kill him; and a principal forcing his way into a room where a student was hiding, grabbing her from the floor, throwing her against the wall, and slapping her.

Spencer v. Doran, No. 18-CV-1191-LM, 2020 WL 4904826, at *5 (D.N.H. Aug. 20, 2020) (quoting Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir 2001) (citations omitted)).  In Spencer, the court found that allegations of deliberate misuse of official authority targeting the plaintiff and allegations of false testimony aimed at causing the plaintiff economic and reputational harm were insufficient to state a substantive due process claim.  The allegations in this case call for the same result.

None of the allegations against Bolton or Leonard establishes a claim for a violation of Ortolano's substantive due process rights.  Indeed, her objection to the instant motion, relying on her objection to other defendants' motions, does not meaningfully address the First Circuit's guideposts described above.  The court need not go any further.  The motion for judgment on the pleadings is granted as to Count 3.

B.    Procedural Due Process (Count 4)

Ortolano claims in Count 4 that Bolton and Leonard violated her rights under the procedural component of the Fourteenth Amendment's Due Process Clause.  The requirements of procedural due process mandates that "certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures."  Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014) (internal quotation marks omitted).  In order to properly plead a procedural due process violation, a plaintiff must allege: (1) a protected liberty or property interest; and (2) that the defendants, while acting under color of state law, deprived him of that interest without constitutionally adequate process.  Id.; see also Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 11 (1st Cir. 2013).

Ortolano's objection does not address defendants' motion with respect to this claim.  That alone would be sufficient to grant the motion. See LR 7.2 (Waiver); ITI Holdings, Inc. v. Odom, 468 F.3d 17 (1st Cir. 2006) (affirming dismissal based on waiver pursuant to local rule).  Even ignoring waiver, however, her claim fails. Assuming that Ortolano's abatement contest, arrest or denial of right-to-know requests satisfies the first prong of the analysis (deprivation of a right), her allegations do not satisfy the second prong of a procedural due process claim (that the deprivation occurred without constitutionally adequate process).  The second prong requires a description of the process afforded to the plaintiff in relation to the alleged deprivation, see Aponte-Torres, 445 F.3d at 56, and requires Ortolano to

19

identify the failings of that process or describe the process that was due, see Doe by Fein v. D.C., 93 F.3d 861, 870 (D.C. Cir. 1996), so that the court can assess whether the process given accords with the due process guarantee.  While she describes the contours of the process she received, Ortolano has failed to identify those processes' shortcomings.

"The basic guarantee of procedural due process is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted).  Here, in connection with her arrest, Ortolano essentially concedes that she was charged, went to court, pleaded guilty to a lesser included of the original offense, and sought annulment of the conviction.  With respect to her right-to-know requests, Ortolano does not deny the trail of state-court litigation that followed the City's assessment and subsequent denial of her requests for information.  See doc. no. 52-1 at 12 n.4.

Ortolano has provided no authority suggesting that she has received insufficient process either with respect to her arrest or her right-to-know litigation, nor is the court aware of any.  Accordingly, defendants' motion is granted as to Count 4.

IV.    New Hampshire Constitution (Count 5)

In Count 5, Ortolano alleges that Bolton and Leonard violated her rights under Part I, Art. 8 of the New Hampshire Constitution, which guarantees access to

government proceedings and records.  Once again, Ortolano's failure to interpose an objection to the motion with respect to this claim warrants waiver.  But even if argument on this issue was not waived, it does not appear that such a constitutional tort exists under New Hampshire law.  The New Hampshire Supreme Court has rejected the creation of constitutional torts where adequate statutory relief exists.  See Khater v. Sullivan, 999 A.2d 377, 379 (N.H. 2010).  Such relief exists here, as Ortolano has explained in detail her use of New Hampshire's Right-to-Know Law, to gain access to records.  Accordingly, the defendants' motion for judgment on the pleadings is granted as to Count 5.

V.      Civil Conspiracy (Count 6)

In Count 6, Ortolano alleges that Bolton and Leonard were part of a civil conspiracy in connection with her arrest for trespassing.  Under New Hampshire law, a viable claim for civil conspiracy requires at least "two or more persons" conspiring to achieve an unlawful objective.  In re Appeal of Armaganian, 784 A.2d 1185, 1189 (N.H. 2001).  As explained in her objection to defendant Carignan's motion for judgment on the pleadings (doc. no. 39), Ortolano asserts that Bolton and/or Leonard conspired to overrule a supported finding of five police department investigators that there was no probable cause to charge Ortolano with a crime," (doc. no. 39-1 at 22) and, as alleged in her complaint, to deny her legitimate records requests.  Doc. no. 1 ¶ 173.

The defendants invoke the "intracorporate conspiracy doctrine," pursuant to which "the agents and employees of a corporate entity acting within the scope of

their employment or authority are legally incapable of conspiring together." Doc. no. 52-1 at 15 (citing Carney 2017 WL 680384, at *15). In Carney, this court applied the doctrine and dismissed a conspiracy claim brought against town employees and an attorney representing the town because all were agents of the town. Id. at 16.[6] Ortolano's only substantive response is that defendants included two non-City employees in their conspiracy, and thereby forfeit the defense. The complaint, however, names only City employees in this count as conspirators. Doc. no. 1 ¶¶173-75.

Defendants Bolton and Leonard cannot, as a matter of law, form a conspiracy with other Nashua government officials, as the complaint alleges. Their motion for judgment on the pleadings is therefore granted as to Count 6.

## VI. Abuse of Process (Count 9)

To prove a claim of abuse of process, Ortolano must prove that: (1) a person used (2) legal process, whether criminal or civil, (3) against the party, (4) primarily to accomplish a purpose for which it is not designed, and (5) caused harm to the party (6) by the abuse of process. Tessier v. Rockefeller, 33 A.3d 1118 (N.H. 2011). "An action for abuse of process is concerned with the improper use of process after it has been issued." Id. "The gravamen of the misconduct for which liability for abuse

---

[6]In Carney, the court noted that New Hampshire had not adopted the doctrine, but it concluded that, if confronted with the issue, New Hampshire would adopt it based on traditional principles of agency. Carney, 2017 WL 680384, at *16. Although the New Hampshire Supreme Court has not weighed in, at least two Superior Court decisions followed Carney's reasoning. See Legacy Global Sports, LP v. St. Pierre, 218-2019-CV-198, 2020 WL 2027401, at *3 (N.H. Super. Apr. 27, 2020); D.G. Whitefield, LLC v. Cate St. Capital, Inc., 218–2015–CV–1406, 2017 N.H. Super. LEXIS 16, at *28-29 (N.H. Super. July 10, 2017).

of process is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings.  The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed."  Id. (alterations and citation omitted).  It is not enough merely to allege that a lawsuit was initiated to retaliate against or Harass an adversary, and "[t]here is no liability [for abuse of process] where a party has done nothing more than carry out the process to its authorized conclusion, even though with ulterior intentions."  Clipper Affiliates v. Checovich, 638 A.2d 791, 795 (N.H. 1994) (quoting Restatement (Second) of Torts § 682, at 474 (1977)).

The defendants argue that Ortolano's claim must fail because they used the processes at issue – defending their client (the City) in various lawsuits and calling the police when Ortolano was trespassing – for their intended purposes.  Doc. no. 52-1 at 17-18; Doc. no. 56at 2-4.  Ortolano argues in response that defendants were acting in retaliation for her legitimate document requests and complaints about City government.  But, as the New Hampshire Supreme Court held in Checovich, defendants' "ulterior motives" are not relevant.  A recent New Hampshire Supreme Court case is instructive.  In New England Backflow, Inc. v. Gagne, 233 A.3d 31, 327 (N.H. 2019), the Court affirmed the dismissal of an abuse of process claim where defendant's complaint led to the arrest of plaintiff's employee.  The Court concluded that the complaint fail[ed] to sufficiently allege that "the defendants, after procuring the arrest warrant, used it for something other than its authorized purpose — to arrest the employee."  Id. (emphasis added).  As especially relevant

here, the Court observed that allegations of ulterior motives were insufficient to sustain the cause of action where "the complaint fails to allege that the defendants used the warrant for an improper purpose to gain "'a collateral advantage, not properly involved in the proceeding itself . . . .'" Id. (quoting Checovich, 638 A.2d at 795).

Here, stripping defendants' alleged motivation from this court's analysis, none of their alleged actions with respect to Ortolano's arrest or her right-to-know requests was "used for something other than [their] authorized purpose[s]." Gagne, 233 A.3d at 327. Accordingly, defendants' motion is granted as to Count 9.

VII.   Intentional Infliction of Emotional Distress (Count 10)

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." Mikell v. School Adm. Unit No. 33, 972 A.2d 1050, 1055 (N.H. 2009) (citing Morancy v. Morancy, 593 A.2d 1158, 1159 (N.H. 1991)). "In determining whether conduct is extreme and outrageous, it is not enough that a person has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice." Mikell, 972 A.2d at 1055 (citation and quotations omitted). Rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citation omitted).

As previously noted, Bolton and Leonard are accused of ostensibly instigating Ortolano's arrest and generally thwarting her right-to-know requests, in retaliation for her criticism of City government. These allegations are insufficient to state a viable claim for intentional infliction of emotional distress ("IIED").

A comparison with the New Hampshire Supreme Court's decision in Mikell is instructive. There, the Court upheld the trial court's dismissal of an IIED claim in a case involving a student who committed suicide. His estate alleged that a schoolteacher falsely reported a disciplinary infraction against the student, causing emotional distress that resulted in the student's suicide. Id. at 1055. The plaintiff claimed that the teacher's motive was to cause the student's expulsion. Id. The Court held that while a "teacher falsely reporting misconduct by a student is a reprehensible act, the circumstances of this case are simply not beyond all possible bounds of decency." Id. at 1056. Even as alleged by Ortolano, nothing about the defendants' conduct could be characterized as "reprehensible," a characterization which itself fell short of the mark in Mikell.

A decision by this court also provides guidance. In Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277 (D.N.H. 2016), the plaintiff sued her supervisor, alleging that he yelled at her, was physically aggressive, and retaliated against her complaints of discrimination and harassment, causing the plaintiff "anxiety and stress issues," on top of her pre-existing PTSD. Id. at 284. The court granted summary judgment in favor of the supervisor on the IIED claim, finding that the behavior likely did not rise to the level of "extreme and outrageous conduct." Id. at

25

293.  "At best, [the supervisor] was ineffective in putting an end to sexual banter in the office and lost his temper on a few occasions."  <u>Id.</u>  His worst conduct "was rare and sporadic."  <u>Id.</u>  Although the alleged behavior arguably went "beyond the merely unprofessional to the deplorable, . . . New Hampshire law requires more."  <u>Id.</u>  The allegations that Ortolano lodges against Bolton and Leonard, while certainly reflective of serious disputes, fall well short of "extreme and outrageous conduct" as those terms have been used in this court and the courts of New Hampshire.  Accordingly, their motion for judgment on the pleadings is granted as to Count 10, the IIED claim.

## CONCLUSION

Based on the foregoing, Bolton and Leonard's motion for judgment on the pleadings (doc. no. 52) is granted in part and denied in part as follows: the motion is denied as to Counts 1 and 2 (First Amendment), insofar as those counts relate to Ortolano's claim of retaliation; the motion is otherwise granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 26, 2023

cc:  Counsel of Record.