## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Laurie Ortolano

v.                                    Case No. 22-cv-326-LM
                                      Opinion No. 2023 DNH 124 P
City of Nashua, et al.

# O R D E R

Plaintiff Laurie Ortolano has sued the City of Nashua, New Hampshire ("Nashua" or "the City"), its Mayor, several current and former Nashua employees and officials, and two private parties involved in providing document scanning services to the City. Although not all 10 counts in Ortolano's complaint (doc. no. 1) are leveled against every defendant, the gist of her claims is that defendants, individually or collectively, improperly deprived Ortolano of various rights in retaliation for her criticism of city acts and officials, including wrongfully arresting her for trespassing. Ortolano alleges that Nashua Mayor James Donchess and the City's Chief Financial Officer John Griffin, violated her rights under the state and federal constitutions and are also liable under state-law theories of civil conspiracy and intentional infliction of emotional distress. Before the court is Donchess's and Griffin's joint motion for judgment on the pleadings (doc. no. 42). See Fed. R. Civ. P. 12(c). The defendants' motion is granted.

## STANDARD OF REVIEW

Rule 12(c) allows a party to move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). On a Rule 12(c) motion, unlike a Rule 12(b) motion, the Court considers the pleadings, including the answer. See Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006). In addition, "[t]he court may supplement the facts contained in the pleadings by considering documents fairly incorporated therein and facts susceptible to judicial notice." R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006) (citation omitted).

Ultimately, a Rule 12(c) motion for judgment on the pleadings is "ordinarily accorded much the same treatment" as a Rule 12(b)(6) motion. Aponte-Torres, 445 F.3d at 54 (citing cases). Accordingly, "[j]udgment on the pleadings is proper 'only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment.'" Zipperer v. Raytheon Co., Inc., 493 F.3d 50, 53 (1st Cir. 2007) (quoting Aponte-Torres, 445 F.3d at 54). The court must accept the factual allegations in the complaint as true, construe reasonable inferences in the plaintiff's favor, and "determine whether the factual allegations in the plaintiff's complaint set forth a plausible claim upon which relief may be granted." Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71, 75 (1st Cir. 2014) (citation and internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## BACKGROUND[1]

The following facts, except as otherwise indicated, are drawn directly from the complaint (doc. no. 1).[2]  In 2014, shortly after Ortolano purchased a home in Nashua, the City's Assessing Department increased her home's assessment by more than 50 percent. Id. ¶ 15.  By July 2017, Ortolano's tax bill exceeded $18,000 a year. Id. ¶ 17.  Ortolano called the City's then Chief Assessor, defendant Jonathan Duhamel, for an explanation for her increasing tax bills.  Id. ¶ 18.  She claims that Duhamel was defensive and ended the phone call by tersely stating "you bought it; you own it; you pay for it."  Id.  Upset by Duhamel's confrontational stance, in the days following their telephone call Ortolano placed three telephone calls to the Mayor's office to complain and left three messages requesting a return call.  The Mayor never responded to any of those calls.  Id. ¶ 19.  Although she was not aware of it at the time, Ortolano later learned that, after her July 2017 telephone exchange with him, Duhamel, some of the Assessing Department clerks, Griffin, and Kleiner, exchanged numerous emails demonstrating that they were monitoring Ortolano's activities in the Assessing Department and elsewhere at City Hall.

---

[1] Ortolano's complaint covers 67 pages and nearly 200 paragraphs.  The court limits the factual background  in this Order to those allegations necessary to resolve the instant motion.

[2] The court notes defendants' acceptance of the allegations in the complaint for purposes of this motion only.  Doc. no. 52-1 at 2 n.1.

Nashua city employees dealing with Ortolano monitored the activities of no other citizens in the same manner.  Id. ¶ 21.

Similarly, documents Ortolano received after successfully litigating claims under New Hampshire's Right-to-Know Law, N.H. Rev. Stat. Ann. § 91-A, demonstrated that other Nashua public officials, including Donchess, Kleiner, and the attorneys in the Legal Department, took offense to public comments critical of their job performance that Ortolano had made in municipal meetings and hearings. Id. ¶ 24.

In September 2018, Ortolano started to attend scheduled monthly "coffees with the Mayor," meetings held at a downtown café for the purpose of allowing citizens to speak directly to Donchess and to ask him questions.  When she raised her concerns with the Assessing Department in general and her own assessment in particular, Donchess replied, "That didn't happen. That wouldn't have been legal. We don't raise valuations by 50%!"  Some of the citizen attendees became upset and at the end of the meeting told Donchess that his reaction to Ortolano's statements had been inappropriate.  Id. ¶ 26.  Donchess also told Ortolano, "All you have done is waste the City's time."  He "asserted that she had wasted many hours of the time of the City's CFO, but at that time she had never even met [defendant] Griffin." Id. ¶ 27.

On October 2, 2018, Ortolano asked the Board of Aldermen, in writing, to review the practices of the Assessing Department to ensure compliance with both New Hampshire law and generally accepted assessment practices employed by

assessment professionals.  Ortolano then voiced the same concerns publicly at the
October 2018 Board meeting.  The Mayor, Kleiner, and other city officials were in
attendance.  Id. ¶ 25.  The same day, in responding to Duhamel's query about how
he should respond to a specific request Ortolano made for public information,
Griffin wrote: "At this time, let's hold off responding to the taxpayer.  It has come to
my attention that an email was sent to several members of the Board of Aldermen,
essentially restating her public remarks several weeks ago. No need to provide any
additional information." Id. ¶ 33.

On October 10, 2018, a local newspaper published an article in which Griffin,
apparently responding to the October 2, 2018 letter to the Board of Aldermen,
stated that the Assessing Department conducted its practices in accordance with a
"book of policies."  Ortolano immediately went to the Assessing Department and
requested that she be allowed to inspect the book of policies to which Griffin had
referred.  The Assessing Department clerk at the counter said she was unaware of
any such manual and brought Duhamel to the counter.  Duhamel told Ortolano that
no such manual existed.  Id. ¶ 34.  About two weeks after Ortolano's request for the
policy book, Griffin emailed her, claiming that the City's "general Policies and
Procedures for [their] appraisers can be found in the Uniform Standards of
Professional Appraisal Practice (USPAP)," and provided a link to the State's
assessing reference manual.  Because she believed that the materials Griffin had
cited were not the assessment policies and procedures referenced in the October 10,
2018 newspaper article, Ortolano continued to demand to view the referenced

"book." Id. ¶ 36.  On June 26, 2019, Ortolano was allowed to review a book of policies and procedures pertaining to the Assessing Department.  Some of these policy items appear to have existed on October 10, 2018, when Griffin referred to them in the article, but others appear to have been created after that time.  Id. ¶ 38.

Later in October 2018, Ortolano, while researching properties comparable to her own for assessment information, determined that Donchess's home was undervalued.  Id. ¶ 28.  "Years later," Ortolano learned that, soon after she reviewed Donchess's property information, Duhamel emailed Griffin, stating that, "Just in here again, got about 30 more [property] cards including the mayor's." Shortly thereafter, Donchess's property card was removed from the Assessing Department and was unavailable to the public for more than a month.  Id. ¶30.[3] After Donchess and his wife responded to Ortolano's request that they change the assessment by asserting that it was fair, Ortolano publicly reported her findings at a November 2018 Board of Alderman meeting.  Id. ¶ 31.

In June 2019, Ortolano and another Nashua resident asked the Nashua Police Department to commence a criminal investigation into the Assessing Department, defendant Kleiner, and another individual.  Id. ¶ 62.  Within 24 hours, Donchess, Nashua Police Chief Carignan (also a defendant in this case), Nashua Police Captain Lehto, and Kleiner met in the Mayor's conference room to discuss

---

[3] Ortolano alleges that Duhamel's email to Griffin came "within minutes" after an assessing department employee "announced" that Ortolano was reviewing Donchess' property records.  Id. ¶30.  Nowhere in the complaint, however, is there an allegation that the employee made such an "announcement."  Instead, the preceding paragraph indicates that Ortolano stated "It's the Mayor."  Id. ¶29.

how to handle Ortolano's claims.  The group determined that the police would

investigate a department employee for alleged mileage fraud and Kleiner for alleged

witness tampering.  Id. ¶ 63.

In 2020, Ortolano started to become more publicly vocal about the

dysfunctional operations of the Assessing Department and other Nashua

departments.  She began to post on social media about Nashua's maladministration

issues.  In early February 2020, she launched a website entitled "good-gov.org," on

which she posted blogs about the problems with Nashua's city government. The

site's first month of posted blogs included "An Overview of Nashua Assessing,"

"What is Sales Chasing?" and "Will the 2019 Abatement Process in Nashua be

Fair?"  Id. ¶ 97.  Because of Ortolano's growing experience with abatement matters,

and the public profile she had achieved through social media and her "good-gov.org"

blog site, numerous people, many of whom were on fixed income and/or elderly,

started asking Ortolano to assist them in handling their abatement applications.

She obliged and provided what she considered to be public service assistance.  Id.

¶ 98.

In response to Ortolano's growing public profile, Donchess, Kleiner, Bolton,

Leonard, and other Nashua public officials commenced a campaign of sharing

publicly that Ortolano's requests for information were overburdensome and had

prevented City employees from accomplishing the City's work.  They repeatedly

proclaimed publicly that she had made an unreasonable number of requests for

public documents.  They routinely "engaged in gross exaggerations when describing

how many requests Ortolano had made." They publicly complained that, rather than being a concerned citizen who was attempting to ensure that the Assessing Department accomplished its work properly and fairly, her only goal was to overburden the department and prevent real work from being accomplished. Id.

When Ortolano sued the City because her right-to-know requests were not honored, the officials publicly proclaimed that her lawsuits were frivolous. Nashua public officials have suggested in public that Ortolano was a right-wing lunatic waging a war against government itself. Specifically, "[t]heir public disparagement of her has caused people to call her what they believe to be unflattering names on social media, such as that she was a 'Trumper.'" Id. ¶ 99. One attorney in the Legal Department would compare Ortolano's actions to those who attacked the Capitol Building in Washington, D.C. on January 6, 2021. Id. In addition, Donchess provided to the Budget Review Committee a 300-plus page list of citizen requests for information made since 2018. He stated that "one citizen" has generated over 1,200 requests since 2018. Given the public propaganda campaign he had been waging against Ortolano by name, and the manner of his statement, it was clear to all at the meeting or observing on Zoom that Donchess was referring to Ortolano. Yet, the very document Donchess handed the Committee revealed that she had requested far fewer than the 1,200 figure he asserted and that other, unnamed citizens presented more requests during that period. Id. ¶ 103.

In January 2021, Ortolano visited the Assessing Department to file real estate tax abatement applications on behalf of senior citizens she was assisting. Id.

¶105.  That office was closed, however, due to construction.  Id. ¶ 106.  Although she eventually emailed the applications, Ortolano received no response to her request for confirmation of her filings.  Id.  Ortolano went to Nashua City Hall seeking date-stamps for the applications on January 22, 2021.  Id. ¶ 107.  When the office to which she was directed was closed, Ortolano sought another office to obtain her proof of abatement filings.  Id.

The only open City Hall office at this time was the Legal Department.  Id. ¶ 108.  Ortolano describes the events that culminated in her arrest as follows:

> Ortolano knocked on the door to the Legal Department and employee Mindy Lloyd opened it and asked if Ortolano had an appointment. Ortolano answered in the negative, saying she needed a date stamp, and asking if Attorney Neumann (the attorney handling RTK requests) was available to provide one. Ortolano walked past Ms. Lloyd and called out for Attorney Neumann who eventually came out of the conference room, said he would not date stamp her abatement applications, and told her she would have to leave. Ortolano said she was going to wait in the lobby area for someone to assist her and sat down in the lobby area on the floor.

> A short time later, Attorney Leonard arrived at the Legal Department, walked up to Ortolano who was sitting on the floor and began berating her. Ms. Lloyd called the Nashua PD, who arrived and escorted Ortolano out of the building. At that time, the Nashua PD told Ortolano that she would be given a no trespass order and would be unable to visit City Hall for a year. A day or so later, however, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order.

> But Leonard had other ideas. When a *Union Leader* reporter informed Leonard of the Nashua PD's statement quoted directly above, Leonard responded, "I find it troublesome, to say the least. My office will be speaking with the police further."

On information and belief, Bolton, Leonard, and other city officials cajoled, pushed, and pressured Chief Carignan to order that Ortolano be arrested for *felony trespass* until he finally caved and did so on February 17, 2021.

Id. ¶¶109-12[4] (emphasis in original).

––––––––––––––––––––

[4] The criminal complaint lodged against Ortolano shows that the original charge was a misdemeanor. Doc. no. 42-2. Ortolano eventually pleaded guilty to a violation-level offense. Id.; Doc. no. 33-1 at 9 n.1. The relevant statute, N.H. Rev. Stat. Ann. § 635:2, describes the various permutations of criminal trespass as follows:

I. A person is guilty of criminal trespass if, knowing that he is not licensed or privileged to do so, he enters or remains in any place.

II. Criminal trespass is a misdemeanor for the first offense and a class B felony for any subsequent offense if the person knowingly or recklessly causes damage in excess of $1,500 to the value of the property of another.

III. Criminal trespass is a misdemeanor if:

(a) The trespass takes place in an occupied structure as defined in RSA 635:1, III; or

(b) The person knowingly enters or remains:

(1) In any secured premises;

(2) In any place in defiance of an order to leave or not to enter which was personally communicated to him by the owner or other authorized person;

(3) In any place in defiance of any court order restraining him from entering such place so long as he has been properly notified of such order; or

(4) On any grounds, lands, or parking areas of any state correctional facility or transitional housing unit operated by the department of corrections without prior authorization or without a legitimate

In July 2022, during a "public comment" portion of a Finance Committee meeting Ortolano leveled several criticisms of Nashua's Economic Development Director. The criticism ranged from performance issues – being over-assigned and in violation of laws – to the personal – being "unfit" for the job, "obnoxious, [and] arrogant." Id. ¶ 127. During this meeting, Donchess interrupted Ortolano, who describes the interaction as follows:

> At that point the Mayor interrupted and spoke over Ortolano while her three-minute speaking slot continued to run, saying that this was not the purpose of public comment; you're to address issues before the Finance Committee. As Ortolano objected and attempted to regain the floor as her time ran, the Mayor held up his hands and said, "Wait. Wait. You've still got a few minutes," but continued to berate Ortolano, saying, that it was not proper for Ortolano to "night after night just lambast all the employees with all these scurrilous comments. It's just not appropriate. It's not appropriate."

> Finally, Ortolano was able to regain the floor for a moment by saying: "You need to shut your mouth. Shut your pie hole Mr. Mayor. This is my public comment and I'm addressing not every employee; I'm addressing Director Cummings and I have been in a very difficult situation trying to get information from him." But once again the Mayor cut her short: "You know, I think we're going to have to propose some kind of rules for public comment. The swearing, the profanity, the name calling; it is not appropriate!" He continued as Ortolano attempted to speak and say that she had not spoken any profanity, and as an official next to him announced, "30 seconds." Referring to an incident that had occurred about a year earlier, the Mayor proclaimed that she had "called a woman lawyer in the City with (sic) the c-word in a public meeting." As Ortolano

---

purpose associated with department of corrections operations.

IV. All other criminal trespass is a violation.

N.H. Rev. Stat. Ann. § 635:2.

attempted to respond, the Mayor announced, "Your time is up!" and her Zoom feed was cut.

Id. ¶¶128-29.

## DISCUSSION

Of the 10 counts in the complaint, 7 include claims against defendants Donchess and Griffin: (1) suppression and chilling of Ortolano's First Amendment right to free speech; (2) violation of Ortolano's First Amendment right to petition the government; (3) violation of Ortolano's substantive due process rights; 4) violation of Ortolano's procedural due process rights; (5) violation of the New Hampshire Constitution's right of access to governmental proceedings and records; (6) civil conspiracy; and (7) intentional infliction of emotional distress.  The first four counts are brought under 42 U.S.C. § 1983;[5] the remainder under New Hampshire constitutional and common law.  The court now turns to Ortolano's specific claims.

I.    Suppression of First Amendment Rights (Counts 1 and 2)

In Counts 1 and 2 of her complaint, Ortolano alleges that Donchess and Griffin: chilled her right to free speech (Count 1) and violated her right to petition

---

[5] 42 U.S.C. § 1983, "supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law."  Mead v. Indep. Ass'n, 684 F.3d 226, 231 (1st Cir. 2012) (internal quotation marks omitted).  "In order to make out a viable claim under § 1983, a plaintiff must show both that the conduct complained of transpired under color of state law and that a deprivation of federally secured rights ensued." Id. (internal quotation marks omitted).  In their motion, defendants question only whether Ortolano has adequately alleged a deprivation of a federally secured right.

the government (Count 2).  As more specifically delineated in her objection to the instant motion, Ortolano asserts that defendants retaliated against her because she criticized them and their refusal to allow her to see documents she was entitled to see under New Hampshire law violated her right to petition government.  Doc. no. 48-1 at 2-3.

In order to prevail on these claims, Ortolano must demonstrate that "(1) she engaged in constitutionally protected conduct, (2) was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action."  Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 258 (D.N.H. 2022) (quoting D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012)).  The third element requires a causal connection between the protected speech and the allegedly retaliatory response.  Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 16 (1st Cir. 2011).  A pattern of informal harassment may establish a retaliation claim if the harassment has a chilling effect on a plaintiff's exercise of First Amendment rights.  Id. at 17.

Turning first to defendant Griffin, the court finds that the complaint insufficiently alleges any specific actions Griffin took which chilled Ortolano's First Amendment rights.  To be sure, Ortolano accuses Griffin of, for example, "monitoring" her activities, doc. no. 1 ¶ 21, but there no facts alleged to support this claim.  Ortolano refers to an "email string" which "make[s] clear" that Griffin was colluding with other City officials.  Id. ¶ 32.  The listed emails, however, do not involve Griffin.  Id.  Similarly, Ortolano alleges that "Griffin would become a key

figure in limiting [her] access to public documents." <u>Id.</u> ¶ 33.  But other than a delay in providing the Assessing Department's policy book which Griffin described in a newspaper article – a delay which is not attributed to Griffin – Ortolano cites no actions taken by Griffin to support Counts 1 and 2.[6]

The First Amendment claims against Mayor Donchess fare no better.  To the extent that Ortolano claims that her discovery of Donchess's allegedly improper property assessment led to Donchess retaliating against her, the court notes that she first claims to have learned about the assessment in October 2018 and reported her finding publicly the following month.  Her first claim of retaliation is that Donchess placed defendant Kleiner, his chief of staff, "in charge of" the Assessing Department in March 2019, and that Kleiner soon restricted public access to department records.  Doc. no. 48-1 at 4-5.  Contrary to Ortolano's argument that "it is 'at least plausible'" that Kleiner's installation was Donchess's retaliation for Ortolano's public revelation of his tax records, the court finds that this is little more than impermissible speculation that cannot defeat defendants' motion.  See Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (noting that "a complaint must contain factual allegations that 'raise a right to relief above the speculative

---

[6] Ortolano asserts that Griffin told Chief Assessor Duhamel to "hold off" on responding to Ortolano's "request for public information."  Doc. no. 1 ¶ 33.  This allegation is insufficient to defeat the instant motion for two reasons.  First, the reference to "public information" is vague and conclusory.  Second, the reference to an October 2, 2018 email and letters sent to Board of Alderman members suggest that Ortolano was restating findings she had reported to the Board, based on records she had reviewed, rather than making a right-to-know request.  Ultimately, this allegation is too unclear to support an inference that Griffin acted unconstitutionally.

level" to defeat a Rule 12(c) motion.).[7]  Also, the fact that Kleiner's installation took place several months after Ortolano reported her discovery to Donchess fails to support her claim of retaliation.  See Calero–Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 25 (1st Cir.2004) (noting that periods of three or four months have been held insufficient to establish the necessary causal connection in cases alleging retaliation); see also Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (noting that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close") (internal quotation marks omitted).

The court also finds that any claim that Donchess was involved in Ortolano's arrest is without appropriate factual support.  In her objection, Ortolano argues that Donchess's alleged interference in the police investigation of Kleiner in 2019 "suggests the possibility" that Donchess was involved in the criminal trespass charges police lodged against Ortolano in 2021.  Doc. no. 48-1 at 19.  Her claim of interference in the Kleiner matter not only lacks support, but is belied by the allegations in her complaint.  The complaint alleges that Donchess convened a meeting almost immediately after Ortolano complained about Kleiner, and that the result of the meeting was that the Nashua Police Department undertook the investigation that Ortolano sought.  Doc. no. 1 at 63.  Having asserted no other facts

---

[7]Ortolano's objection asserts that Donchess had "ample motivation" to retaliate against her.  Doc. no. 48-1 at 4.  Donchess' motivation to retaliate cannot be dispositive in the absence of any facts to support a claim that he did retaliate.

in support of her claim that Donchess was involved, Ortolano's retaliation claim based on her arrest must be dismissed.

Ortolano's remaining allegation of a First Amendment violation relates to the contentious exchanges with Donchess during a Board of Finance meeting in July 2022.  Doc. no. 1 ¶¶ 128-29.  Donchess argues he was enforcing Nashua ordinances regarding public comments at meetings.  The court need not address this argument, as the allegation itself is insufficient to support a claim for a constitutional violation.  In her complaint, Ortolano states that Donchess's interruptions and eventual termination of her Zoom feed deprived her of her "full three minutes of public comments."  The court here agrees with Donchess that this was, at most, a de minimis reaction that cannot support her First Amendment claim.

With regard to the "adverse action" prong of a First Amendment claim, adverse action need be more than "de minimis," which the First Circuit has defined simply as sufficient to chill a "reasonably hardy" person, or "a person of ordinary firmness," from continuing to exercise their constitutional rights.  Barton v. Clancy, 632 F.3d 9, 29 (1st Cir. 2011); Starr v. Dube, 334 Fed. Appx. 341, 342 (1st Cir. 2009).  Here, Donchess's allegedly unconstitutional act was limited to shortening Ortolano's time to comment. The record establishes that Donchess's actions did not deter Ortolano from continuing to engage publicly on matters concerning Nashua government.  See, e.g., Doc. no. 42-1 at 10(documenting Ortolano's continued participation in Nashua government affairs on numerous occasions).

16

Judge Barbadoro's decision in Artus v. Town of Atkinson, No. 09-cv-87-PB, 2009 WL 3336013 (D.N.H. Oct. 14, 2009) is instructive.  In that case, the plaintiff sued various town officials over incidents related to warrant article petitions the plaintiffs circulated to voters.  Id. at *1.  The "harshest specific allegation" against one defendant – who served as both the Chief of Police and the director of the local Elderly Affairs office – was that he called one petition signer "angrily demand[ing] . . . an explanation as to why his family 'signed this shit.'"  Id. at *3 (citation omitted). The court found that a "'reasonably hardy' person, however, would not remove his name from a petition whose goals he supported because of such demands even if the alleged speaker is both the chief of police and director of the local Elderly Affairs Office."  Id.  The court specifically noted the lack of any threats against the signers. Id.  The same reasoning leads to the same result here.  Donchess's reaction to the Board of Finance meeting was far less problematic than the call to individuals' homes in Artus.  Unlike the defendant in Artus, Mayor Donchess was responding in real time to what could arguably be perceived as comments violative of local ordinances.  In Artus, the defendant took it upon himself to harass a local voter.

Similarly, given that Ortolano was undeterred in her pursuit of relief from the City, whatever injury she suffered was also de minimis and therefore not actionable.  See Bourne v. Arruda, No. 10-cv-393-LM, 2011 WL 2357504, at *16 (D.N.H. June 10, 2011) (dismissing First Amendment claim after finding that plaintiff failed to allege more than de minimis injury from public official's allegedly defamatory remark at public hearing).

Based on the foregoing, defendants' motion for judgment on the pleadings is granted as to Counts 1 and 2.

II.   Due Process (Counts 3 and 4)

    A.   Substantive Due Process (Count 3)

In Count 3, Ortolano asserts that Donchess and Griffin violated her right to substantive due process. The facts alleged in the complaint, however, do not support this claim.

The Fourteenth Amendment prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The touchstone of this due process guarantee is the protection of the individual against arbitrary action of government." DePoutot v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (internal quotation marks omitted). The substantive due process guarantee "safeguards individuals against certain offensive government action, notwithstanding that facially fair procedures are used to implement them." Id.

To establish a substantive due process claim, a plaintiff challenging specific acts of government officials must sufficiently allege that: (1) the officials' "acts were so egregious as to shock the conscience"; and (2) that the acts "deprived [her] of a protected interest in life, liberty, or property." Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006); see also DePoutot, 424 F.3d at 118. The defendant's acts must be "so extreme and egregious as to shock the contemporary conscience." Abdisamad v. City of Lewiston, 960 F.3d 56, 59–60 (1st Cir. 2020). The question of whether "the challenged conduct shocks the contemporary conscience is a threshold matter that

must be resolved before a constitutional right to be free from such conduct can be recognized." DePoutot, 424 F.3d at 118.  To meet that standard, the conduct must be "truly outrageous, uncivilized, and intolerable."  Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011).

The First Circuit has enumerated certain guideposts to direct the analysis. See Gonzalez-Fuentes v. Molina, 607 F.3d 864, 880-81 (1st Cir. 2010)  On one hand, "negligence, without more, is simply insufficient to meet the conscience-shocking standard."  Id. at 881 (internal quotation marks omitted).  On the other, allegations that state officials had "an intent to injure in some way unjustifiable by any government interest is likely sufficient" to meet the conscience-shocking threshold. Id. (internal quotation marks and brackets omitted).  Between these two poles are cases that present "closer calls."  Id. (internal quotation marks omitted). Ultimately, though, the shocks-the-conscience threshold is necessarily a "high one," to prevent the Constitution from being demoted to a "font of tort law."  Drake v. Town of New Boston, No. 16-CV-470-SM, 2017 WL 2455045, at *13 (D.N.H. June 6, 2017) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).

As this court recently recognized, the First Circuit has collected representative cases in which plaintiffs established a viable substantive due process claim:

> Among the cases in which plaintiffs have prevailed are those involving a student blinded in one eye when a coach intentionally struck him in the head with a metal weight; a teacher's fabrication of sexual abuse charges against a father, resulting in loss of contact with his child for three years; rape by a police officer in connection with a car stop; a 57– day unlawful detention in the face of repeated requests for release,

19

police officers aiding a third-party in shooting the plaintiff; an intentional assault by a police officer who struck a pretrial detainee twice in the head and threatened to kill him; and a principal forcing his way into a room where a student was hiding, grabbing her from the floor, throwing her against the wall, and slapping her.

Spencer v. Doran, No. 18-CV-1191-LM, 2020 WL 4904826, at *5 (D.N.H. Aug. 20, 2020) (quoting Cummings v. McIntire, 271 F.3d 341, 346 (1st Cir 2001) (citations omitted)).  In Spencer, following the Court of Appeals' guidance, the court found that allegations of deliberate misuse of official authority targeting the plaintiff and allegations of false testimony aimed at causing the plaintiff economic and reputational harm were insufficient to state a substantive due process claim.  The allegations in this case call for the same result.

As the court noted in its discussion of Ortolano's First Amendment claims, the complaint contains few allegations of Griffin's conduct.  That is reason enough to dismiss Count 3 as to him.  Regardless, none of the allegations against Griffin or Donchess establishes a claim for a violation of Ortolano's substantive due process rights.  Her claim that "the wide-ranging forces of municipal government, including . . . the police . . . to strike out at her when she would not capitulate," (doc. no. 48-1 at 19) is rhetoric that exceeds the allegations in her complaint.  In addition, the nature of the specific allegations falls short of the acts that have been determined to be "conscience shocking."  See Spencer, 2020 WL 4904826, at *5.  The motion for judgment on the pleadings is therefore granted as to Count 3.

20

B.      Procedural Due Process (Count 4)

Ortolano claims in Count 4 that Donchess and Griffin violated her rights under the procedural component of the Fourteenth Amendment's Due Process Clause.  The requirements of procedural due process mandates that "certain substantive rights — life, liberty, and property — cannot be deprived except pursuant to constitutionally adequate procedures."  Garcia-Gonzalez v. Puig-Morales, 761 F.3d 81, 88 (1st Cir. 2014) (internal quotation marks omitted).  In order to properly plead a procedural due process violation, a plaintiff must allege: (1) a protected liberty or property interest; and (2) that the defendants, while acting under color of state law, deprived him of that interest without constitutionally adequate process.  Id.; see also Rocket Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 11 (1st Cir. 2013).

Ortolano's objection does not address the defendants' motion with respect to this claim.  That alone would be sufficient to grant the motion. See LR 7.2 (Waiver); ITI Holdings, Inc. v. Odom, 468 F.3d 17 (1st Cir. 2006) (affirming dismissal based on waiver pursuant to local rule).  Even ignoring waiver, however, her claim fails. Assuming that Ortolano's abatement contest, arrest or denial of right-to-know requests satisfies the first prong of the analysis (deprivation of a right), her allegations do not satisfy the second prong of a procedural due process claim (that the deprivation occurred without constitutionally adequate process).  The second prong requires a description of the process afforded to the plaintiff in relation to the alleged deprivation, see Aponte-Torres, 445 F.3d at 56, and requires Ortolano to

21

identify the failings of that process or describe the process that was due, <u>see</u> Doe by Fein v. D.C., 93 F.3d 861, 870 (D.C. Cir. 1996), so that the court can assess whether the process given accords with the due process guarantee.  While she describes the contours of the process she received, Ortolano has failed to identify those processes' shortcomings.

"The basic guarantee of procedural due process is that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted).  Here, in connection with her arrest, Ortolano essentially concedes that she was charged, went to court, pleaded guilty to a lesser-included of the original offense, and sought annulment of the conviction.  With respect to her right-to-know requests, Ortolano does not deny the trail of state-court litigation that followed the City's assessment and subsequent denial of her requests for information.  See Doc. no. 52-1 at 12 n.4.

Ortolano has provided no authority suggesting that she has received insufficient process either with respect to her arrest or her right-to-know litigation, nor is the court aware of any.  Accordingly, defendants' motion is granted as to Count 4.

III.    New Hampshire Constitution (Count 5)

In Count 5, Ortolano alleges that Griffin and Donchess violated her rights under Part I, Art. 8 of the New Hampshire Constitution, which guarantees access to

government proceedings and records.  The New Hampshire Supreme Court has rejected the creation of constitutional torts where adequate statutory relief exists. See Khater v. Sullivan, 999 A.2d 377, 379 (N.H. 2010).  Such relief exists here, as Ortolano has explained in detail her use of New Hampshire's Right-to-Know Law, to gain access to records.  Ortolano argues that the Court's reference to "constitutional torts" precludes only a damages remedy and not the injunctive relief she also seeks. But she provides no authority to suggest that the New Hampshire Supreme Court would allow a direct action under the state constitution where identical statutory relief is available.  Given that that Court has rejected a remedy under the State Constitution that is broader than the relevant statutory remedy, this court is unwilling to create a remedy that is identical to the statutory relief available under state law.  See Khater, 999 A.2d at 379 (rejecting permit applicant's claim under state constitution's equal protection provisions where statutory relief existed, even though "statutory remedy may not be as 'complete' as an additional constitutional tort would provide"); see also Farwell v. Town of Brookline, No. CIV. 00-89-M, 2000 WL 1745137, at *4 (D.N.H. Oct. 20, 2000) ("Expansive reading of New Hampshire's constitutional provisions is a realm best occupied by the New Hampshire Supreme Court.").

Accordingly, the defendants' motion for judgment on the pleadings is granted as to Count 5.

IV.   Civil Conspiracy

In Count 6, Ortolano alleges that Donchess and Griffin were part of a civil conspiracy to deprive her of her constitutional rights.  Under New Hampshire law, a viable claim for civil conspiracy requires at least "two or more persons" conspiring to achieve an unlawful objective.  In re Appeal of Armaganian, 784 A.2d 1185, 1189 (N.H. 2001).  Ortolano argues that Griffin and Donchess conspired to stifle her criticism of Nashua government officials.  Doc. no. 48-1 at 21-22.

The defendants invoke the "intracorporate conspiracy doctrine," pursuant to which "the agents and employees of a corporate entity acting within the scope of their employment or authority are legally incapable of conspiring together."  Doc. no. 52-1 at 15 (citing Carney, 2017 WL 680384, at *15).  In Carney, this court applied the doctrine and dismissed a conspiracy claim brought against town employees and an attorney representing the town because all were agents of the town.  Carney, 2017 WL 680384, at 16.[8]  Ortolano argues in response the defendants enlisted two non-City employees in their conspiracy, and thereby forfeit

_____

[8]In Carney, the court noted that New Hampshire had not adopted the doctrine, but it concluded that, if confronted with the issue, New Hampshire would adopt it based on traditional principles of agency.  Carney, 2017 WL 680384, at *16.  Although the New Hampshire Supreme Court has not weighed in, at least two Superior Court decisions followed Carney's reasoning.  See Legacy Global Sports, LP v. St. Pierre, 218-2019-CV-198, 2020 WL 2027401, at *3 (N.H. Super. Apr. 27, 2020); D.G. Whitefield, LLC v. Cate St. Capital, Inc., 218–2015–CV–1406, 2017 N.H. Super. LEXIS 16, at *28-29 (N.H. Super. July 10, 2017).

the defense.  Doc. no. 48-1 at 22-23.  The complaint, however, names only City

employees in this count as conspirators.  Doc. no. 1 ¶¶ 173-75.

Defendants Donchess and Griffin cannot, as a matter of law, form a

conspiracy with other Nashua government officials, as the complaint alleges.  Their

motion for judgment on the pleadings is therefore granted as to Count 6.

V.      <u>Intentional Infliction of Emotional Distress (Count 10)</u>

"One who by extreme and outrageous conduct intentionally or recklessly

causes severe emotional distress to another is subject to liability for such emotional

distress . . . ."  Mikell v. School Adm. Unit No. 33, 972 A.2d 1050, 1055 (N.H. 2009)

(citing Morancy v. Morancy, 593 A.2d 1158, 1159 (N.H. 1991)).  "In determining

whether conduct is extreme and outrageous, it is not enough that a person has acted

with an intent which is tortious or even criminal, or that he has intended to inflict

emotional distress, or even that his conduct has been characterized by malice."  <u>Id.</u>

at 1055 (citation and quotations omitted).  Rather, "[l]iability has been found only

where the conduct has been so outrageous in character, and so extreme in degree, as

to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community."  <u>Id.</u> (citation omitted).

As previously noted, Donchess and Griffin are accused of thwarting

Ortolano's right-to-know requests and playing a role in instigating her arrest, all in

retaliation for her criticism of City government.  These allegations are insufficient

to state a viable claim for intentional infliction of emotional distress.

A comparison with the New Hampshire Supreme Court's decision in Mikell is instructive.  There, the Court upheld the trial court's dismissal of an IIED claim in a case involving a student who committed suicide.  His estate alleged that a schoolteacher falsely reported a disciplinary infraction against the student, causing emotional distress that resulted in the student's suicide.  Id. at 1055.  The plaintiff claimed that the teacher's motive was to cause the student's expulsion.  Id.  The Court held that while a "teacher falsely reporting misconduct by a student is a reprehensible act, the circumstances of this case are simply not beyond all possible bounds of decency."  Id. at 1056.  Even as alleged by Ortolano, nothing about the defendants' conduct could be characterized as "reprehensible," a characterization which itself fell short of the mark in Mikell.

A decision by this court also provides guidance.  In Posteraro v. RBS Citizens, N.A., 159 F. Supp. 3d 277 (D.N.H. 2016), the plaintiff sued her supervisor, alleging that he yelled at her, was physically aggressive, and retaliated against her complaints of discrimination and harassment, causing the plaintiff "anxiety and stress issues," on top of her pre-existing PTSD.  Id. at 284.  The court granted summary judgment in favor of the supervisor on the IIED claim, finding that the behavior likely did not rise to the level of "extreme and outrageous conduct."  Id. at 293.  "At best, [the supervisor] was ineffective in putting an end to sexual banter in the office and lost his temper on a few occasions."  Id.  His worst conduct "was rare and sporadic."  Id.  Although the alleged behavior arguably went "beyond the merely unprofessional to the deplorable, . . . New Hampshire law requires more."

Id.  The allegations that Ortolano lodges against Donchess and Griffin while not trivial, fall well short of "extreme and outrageous conduct" as those terms have been used in this court and the courts of New Hampshire.  Accordingly, their motion for judgment on the pleadings is granted as to Count 10, intentional infliction of emotional distress.

## CONCLUSION

Based on the foregoing, defendants Donchess and Griffin's motion for judgment on the pleadings (doc. no. 42) is granted.[9]  Donchess and Griffin are dismissed as party defendants.

Having resolved all of the pending Rule 12 motions, the court understands that the claims that remain against the moving defendants are as follows:

- Raymond Feoli and Inception Technologies: Count 8 (defamation);

- Michael Carignan: Counts 1 and 2 (insofar as those counts relate to Ortolano's claim of retaliatory arrest);

- Steven Bolton and Celia Leonard: Counts 1 and 2 (insofar as those counts relate to Ortolano's claim of retaliation);

As to the defendants who did not move to dismiss – Kimberly Kleiner, Frank Lombardi, and the City of Nashua – the claims against them remain as pleaded in the complaint.  Lastly, in light of these rulings, the parties' assented-to motion to

---

[9] Given its reasoning for granting defendants' motion, the court does not reach defendants' immunity and statute of limitations arguments.

27

suspend case deadlines (doc. no. 59) is denied without prejudice.  The parties may

file a renewed motion to continue with a proposed schedule.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 28, 2023

cc:  Counsel of Record.

28