# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **Laurie Ortolano,** | ) |
| **Plaintiff** | ) |
| | ) |
| **V.** | ) **Civil Action No. 22-cv-00326-LM** |
| | ) |
| | ) |
| **The City of Nashua, et al.,** | ) |
| **Defendants** | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO DEFENDANTS BOLTON AND LEONARD'S MOTION FOR SUMMARY JUDGMENT

**I.     PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS TO WHICH SHE CONTENDS A GENUINE DISPUTE EXISTS SO AS TO REQUIRE A TRIAL.**

In accordance with L.R. 56.1, § b, Ortolano hereby presents her Concise Statement of Material Facts to Which She Contends a Genuine Dispute Exists So as to Require a Trial, as follows:

1.  Attached as Exhibit "A" is Ortolano's Affidavit followed by its Exhibits A-1 through A-16. It admits those of the defendants' statements of fact that are uncontested and denies those that are protected, and provides facts and evidence in support of the denials. Exhibit "A" also provides additional facts and evidence that supports her objection to the defendants' Motion for Summary Judgment. Attached as Exhibit "B" is the Affidavit of Laura Colquhoun, a nonparty. It contains a response with an attached document to a Right-to-Know request she made to the Nashua Police Department. The attached document provides "objective evidence that "Ortolano" was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *See Nieves v. Barrett*, 587 U.S. ___, 139 S.Ct. 1715, 1727

1

(2019). Ortolano incorporates the two Affidavits and their attachments herein by reference and will refer to them throughout this Memorandum.

<u>Ortolano's Protected Speech</u>.

2.  The high administrators and officials of the City of Nashua government considered Ortolano to be a thorn in their side shortly after they first dealt with her. Ortolano investigated, and became a public critic of, the Nashua, New Hampshire municipal government, particularly as it pertained to the Assessing Department, its practices, and its policies. Exhibit A (Ortolano Affidavit) *passim*.

3.  Ortolano investigated Nashua's municipal government by reviewing documents and obtaining information from the public files of the various city departments; from the beginning she was far more active than the typical citizen in terms of requesting access to public documents. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 2, pp. 2-3; ¶¶ 37-47 on p. 21-22; Exhibit A-1 to Bolton Affidavit.

4.  Often, when Ortolano failed to receive documents she requested under N.H. RSA 91-A (the Right-to-Know Law), and which she believed she deserved to receive, she filed lawsuits against the City under the provisions of RSA 91-A. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 2, pp. 2-3; ¶¶ 37-47 on p. 21-22; Exhibit A-1 to Bolton Affidavit.

5.  Ortolano employed information garnered from these documents to support her public criticism of the operations and policies of the City of Nashua. She could be harsh, sarcastic biting, and, once, even profane, in her criticisms. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 2, pp. 2-3; ¶¶ 37-47 on p. 21-22; Exhibit A-1 to Bolton Affidavit.

6.   In her criticism, Ortolano never physically threatened anyone, never probed into anyone's private matters, and never otherwise engaged in speech that, in and of itself, could be civilly or criminally punished. Exhibit A (Ortolano Affidavit) *passim*.

7.   The Mayor, Administrative Services Director Kimberly Kleiner ("Kleiner"), Corporation Counsel Stephen Bolton ("Bolton"), Deputy Corporation Counsel Celia Leonard ("Leonard"), and Chief of Police Michael Carignan ("Carignan") all thought that Ortolano created excessive work for them and, with the possible exception of Carignan, were rankled by her criticism of them. Exhibit A (Ortolano Affidavit) *passim*.

8.   Bolton was particularly rankled by Ortolano's constant request for documents and criticism of him and others. During one of Ortolano's early right-to-know lawsuits against the City for the failure to produce requested documents, Bolton took Ortolano's deposition. He spent the end of that deposition engaged in an exchange with Ortolano about the derogatory language she used when dealing with City of Nashua Officials and employees, including the following snippet:

| Q (By Mr. Bolton) | Does it surprise you that people are reluctant to deal with someone who treats others in that way? |
|---|---|
| A. | Yes, it does surprise me. |
| Q. | So it's your position that people should continue to go out of their way to be helpful to you, even though, if you don't get everything you want, you call people names and use vulgar language? |

Exhibit A (Ortolano Deposition), p. 22-23; Exhibit A-15, at 110-117.

The Concerted Efforts and Official Policy of City Officials to Retaliate against Ortolano for Engaging in Protected Speech.

9. A number of officials from the various departments of Nashua government, from the Mayor on down engaged in a concerted effort that formed an official policy of retaliation against

Ortolano for criticizing Nashua City government and its employees, and for attempting to make the government transparent for filing RTK requests and then litigating them when the City failed to produce the records it was required to make public.

10. Defendant Kleiner and Louise Brown, head clerk of the Assessing Department, organizing the employees of the Nashua Assessing Department to request that the Nashua Police warn me that I could get arrested for speaking to them anywhere outside of their offices at the Assessing Department. Exhibit A (Ortolano Deposition), ¶ p. 49.a at p. 23; Exhibit A-12.

11. At the request of defendant Kleiner, Detective Frank Lombardi of the Nashua Police Department issued a warning to Ortolano that she could get arrested for speaking to any Assessing Department employees outside the Assessing Department offices although Ortolano had never threatened anyone or engaged in anything but protected speech. Exhibit A (Ortolano Deposition), ¶ p. 49.b at p. 23;  Exhibit A-12.

12. Defendant Kleiner contacted Detective Lombardi and caused a criminal police investigation of Ortolano to occur by telling Lombardi that one of the assessors spoke with a homeowner who claimed that someone fitting Ortolano's description had been impersonating a Nashua assessor. The homeowner reported to the police that this person was blonde, drove a white sedan, and told the police that she had said she was a real estate agent. Although Kleiner knew that Ortolano is not blond, she contacted the police, who opened a criminal investigation. Soon became clear to the police that the person in question told the homeowner she was a real estate agent and not an appraiser, that Ortolano did not fit the description of the person who the homeowner says he encountered, and that neither Ortolano nor her husband owned a white sedan. The criminal investigation that Kleiner started was then dropped. Exhibit A (Ortolano Deposition), ¶ p. 49.c at p. 23-24;  Exhibit A-16.

13. After Ortolano was arrested for trespass, and entered into an agreement with the Nashua Police Legal Department allowing her to visit government offices in City Hall as long as she had a prearranged appointment for the legal office, defendant Bolton appeared in court to answer why the City Legal Department was not honoring Ortolano's requests for an appointment. Although Chief Carignan confirmed on deposition that defendant Bolton had been communicating with the Nashua Police Legal Department about Ortolano's prosecution, Exhibit A (Ortolano Deposition) Exhibit A-5, at 87, and must have been aware of the terms of the plea agreement, defendant Bolton told the Judge that he had never intended to honor the plea agreement, saying: "She can continue to try and make appointments with my department . . . and she will not be granted any appointments by my department." Exhibit A (Ortolano Deposition) ¶ p. 49.d at p. 24; Exhibit A-7 (at page 10).

14. When Ortolano petitioned the Hillsborough County District Court to annul her trespass "violation" based upon a plea, a procedure that is routinely allowed, defendant Bolton appeared in court to oppose any annulment. Exhibit A (Ortolano Deposition) ¶ p. 49.e at p. 24;

15. Defendant Kleiner prohibited all Assessors in the Nashua Assessing Department from answering any of my questions or speaking to me and forbade other employees in the Assessing Department from serving me or speaking to me. Defendant Bolton gave similar instructions to at least one City employee. Exhibit A (Ortolano Deposition) ¶ p. 49.f at p. 24; Exhibit A-2.

The January 2021 Incident.

16. According to Chief Carignan, the Nashua Police Department followed a customary practice of how they handled calls regarding alleged trespassers on private and public property. At his deposition in this action, he described it as follows:

> if we're called to a location where somebody's there, and a person who has control over that space doesn't want them there for a specific reason and asks them to

leave, the expectation is that they leave. If they don't leave, we get called, and we go, and we will tell them to leave.· We'll talk to the victim, we'll find out what the victim says happened, or the controller of the property.· And then if the person still refused to leave, we'll arrest them.· If they leave, we will generally give them the warning to go, because they -- they're not refusing in our presence. And if you're asking for the philosophy, it's people -- it's very difficult in the courts, particularly in Nashua, to get a conviction because the victim or the controller of the properties generally won't show up to testify for a number of reasons.· So that's generally how they go.

Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-5, at 64-65.

17. When asked at his deposition, "Okay. Now, when it comes to – so would I be correct then in sort of encapsulating what you said, which is that as a general rule -- I understand there are exceptions -- as a general rule, when the police show up, order the perpetrator to leave, and the perpetrator cooperates and leaves, the perpetrator will not be arrested?" Chief Carignan answered, "That's correct." Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-5, at 64-65.

18. Between January 1, 2014 and January 21, 2021, the Nashua Police Department was called to 10 trespass situations at City Hall. Exhibit B (Colquhoun Affidavit, with attachment).

19. Of those 10 trespass situations, the Nashua Police Department made not a single arrest. Exhibit B (Colquhoun Affidavit, with attachment).

13. Ortolano had filed two abatement applications online on January 17, 2021 for two elderly women who did not have very much money and needed the abatement refunds badly. She wanted to get the applications filed early, so applications would be processed early. Ortolano explained this in my email to the Chief Assessor when filing the applications on January 17, 2021[h]. Exhibit B-2 to Celia Leonard Affidavit. When Ortolano did not receive confirmation of filing, she made phone calls and emailed the Chief Assessor but could not get a confirmation that the applications had been processed. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 7, pp. 3-4; Exhibit B-2 to Celia Leonard Affidavit.

14. When five days had passed without any recognition that the applications were going to move forward, Ortolano decided to go to City Hall and get physical date stamps to document that the applications were filed early. When Ortolano arrived at City Hall on January 22, 2021, she informed the receptionist/check-in person that she wanted to get the two applications stamped at the Administrative Services Office. She did not ask if Ortolano had an appointment, and waived her right in. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 7, pp. 3-4.

15. The Administration Services Office was closed and no one was present. When Ortolano could not find any other offices opened headed to the Legal Department, which she though was a logical place to try to get a date stamp, finding no other offices open. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 7, p. 4. When Ortolano arrived at the door of the Legal Department, there was no notice on or near the door saying that the office was not open to the public, or that one had to make an appointment to come in. The only sign on or near the door was a piece of paper warning that the door opened outward. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 7, p. 4.

16. Ms. Lloyd, a Legal Department employee opened the door when Ortolano knocked. I did not force my way past Ms. Lloyd or anyone else. Ortolano walked into the office, past Ms. Lloyd and called out for Attorney Neumann, who eventually came out of the conference room, said he would not date stamp her abatement applications, and told me Ortolano that she would have to leave. Ortolano responded that she would wait in the lobby area for someone to assist her and sat down on the floor. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 10, pp. 6-7.

17. Soon, defendant Leonard came into the Legal Department lobby, stood above Ortolano, and berated Ortolano for coming into the Legal Department Offices, which Ortolano had believed to be a public department of the Nashua City government, and to which she had been to before without an appointment. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 15, pp. 7-8.

18. Ms. Lloyd called the Nashua Police Department, and officers arrived at the scene a short time later. The Police Department Call Report stated what happened after they arrived:

> Laurie was sat down in an upstairs corridor area of City Hall. Was not causing a scene on arrival and appeared calm. She was upset as reported she has been trying to get appointment and paperwork stamped by city hall and they continue to not assist her. Reports this has been going on for months. She apparently assists people in property tax abatement/reductions and needed papers stamped.

> Spoke with Celia from City Hall who is Deputy Corporation Counsel for city? She said this is ongoing issue with Laurie and that personnel from NPD are aware. No allegations of any threats made but stated that Celia needed to leave now. Wanted her trespassed but allowed at City Hall if she has an approved appointment. Reported the City have had a lot of contact with Laurie via email and that there are pending lawsuits with the City.

> Lauries was asked to leave. She left willingly but stressed her frustration indicating that the City do not communicate with her or assist her. She was informed she is being trespassed for one year and is not allowed at City Hall unless with an appointment. She was advised that she could face arrest from Criminal Trespass if she attends City Hall without an appointment. She understood.

> No offences alleged or apparent

Exhibit A (Ortolano Affidavit); Exhibit A-4.

19. A day or so later, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order. But when a Union Leader reporter informed defendant Leonard of what the Nashua Police Department had said, Leonard responded, "I find it troublesome, to say the least.

My office will be speaking with the police further." Exhibit A (Ortolano Affidavit),
Response to Defendant's Statement of Material Facts, # 20, p. 8.

20. Within about a week after the January 22, 2021 incident, defendant Bolton
requested a meeting with Chief Carignan in the conference room of the City Legal
Department's conference room. Exhibit A (Ortolano Affidavit); Exhibit A-5 (Carignan
Deposition, at 77). During the meeting, defendant Bolton said he was not satisfied with
the outcome; he pronounced that Ortolano should have been arrested. Exhibit A
(Ortolano Affidavit); Exhibit A-5 (Carignan Deposition, at 80). Defendant Bolton was
angry, spoke in a raised voice, and demanded that Ortolano be arrested; according to
Chief Carignan, "I guess he told me to arrest her and I told him I would not." Bolton
was" trying to present it as a demand." Exhibit A (Ortolano Affidavit); Exhibit A-5
(Carignan Deposition, at 84).

21. Having failed to succeed in getting Chief Carignan to capitulate and cause
Ortolano to be arrested, Chief Carignan learned that defendant Bolton went down the
chain of command and began advocating my arrest to Captain Brian Kenney of the
Nashua Police Legal Department. Exhibit A (Ortolano Affidavit); Exhibit A-5 (Carignan
Deposition, at 87-88). Suddenly, the Nashua Police opened an investigation of the
incident. Exhibit A (Ortolano Affidavit); Exhibit A-5 (Carignan Deposition, at 89).

22. Although the police had a week prior reported that defendant Leonard had not
informed them that I had threatened anyone and should not be arrested (only to be
"trespassed" and ordered not to come to the Legal Department without an appointment),
she changed her story in a new police statement to claim Ortolano had been "hostile and
threatening," and requested that I be arrested for trespass. Exhibit A (Ortolano Affidavit);

Exhibit A-4 (Statement of Celia Leonard at 9th page). Although Chief Carignan made clear that he did not think I should be arrested for trespassing, in the end he "supported that decision." Exhibit A (Ortolano Affidavit); Exhibit A-5, at 90.

23. But for the insistence of defendants Bolton and Leonard that the Nashua Police depart from what Chief Carignan described to be its normal protocol of not arresting trespass suspects if the suspect cooperates when the police arrive and agree to leave the premises immediately. Exhibit A (Ortolano Affidavit); Exhibit A-5, at 63-64; 67, Ortolano would not have been arrested.

The July 22, 2022 Incident.

24. On July 22, 2022, Ortolano was outside the Legal Department in the hallway trying to call into the office on my cellphone. All of a sudden, the door burst open and defendant Bolton came to the doorway and started yelling at her, saying she could not be there and he could have her arrested. Afraid that Bolton would call the police and seek to have Ortolano arrested she called 911. Soon the police arrived and interviewed her. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 27, pp. 12.

25. Then the police interviewed Bolton. The police reports say that Officers Earnshaw and Abrams met Sergeant Gilbert on the way in to interview witnesses, and they met with Bolton on the first floor of City Hall. Bolton was angry and agitated. He insisted that Ortolano be arrested for trespassing and "became extremely upset when [Sergeant Gilbert] did not immediately move to respond outside to arrest Ortolano." Bolton insisted that he had told Ortolano to leave the hallway several times and that she had refused. He insisted that he wanted to leave the Legal Department offices, but that Ortolano was blocking the hallway. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 31, pp. 13; Exhibit A-8.

26. The officers walked to the third floor with Bolton to observe the hallway in question. They noted that there were no signs, keypads, closed or locked doors, or other indicia communicating that the public should not be in the third-floor hallway near the Legal Department. They noted that people were walking in the hallway around them, which also indicated that Ortolano was permitted to be in the third-floor hallway. They also noted that the hallway was wide enough for two people to pass each other without touching, so it was unlikely that Ortolano could have been blocking Bolton from exiting his office. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 31, pp. 13; Exhibit A-8.

27. The reports say that defendant Bolton was not making sense to the officers. He insisted that because "there was no public area accessible by the hallway," Ortolano was trespassing. At thesame time, he insisted that Ortolano should be arrested merely for placing a phone call to the Legal Department. Sergeant Gilbert asked if Ortolano had been served any sort of legal process stating that she could not call the Legal Department. Defendant Bolton conceded that she had not. Sergeant Gilbert asked Bolton why there was a video doorbell outside the Legal Department door if the public was not supposed to be in the hallway. Bolton responded, "For people other than her." Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 31, pp. 13; Exhibit A-8.

28. When Sergeant Gilbert "tried to reason" with Bolton by explaining that the police cannot prevent a single member of the public from being in an area of City Hall open for public access, Bolton insisted, "I can do that." Officer Earnshaw then attempted to positively identify Bolton by asking his name and date of birth. Bolton refused to answer either question; he did no more that hand Officer Earnshaw his business card. Exhibit A (Ortolano Affidavit), Response to Defendant's Statement of Material Facts, # 31, pp. 13; Exhibit A-8.

How Defendants Bolton and Leonard Conduct Chilled Ortolano's Speech.

29. Various members of the Board of Aldermen and other City Committees, as well as defendant Kleiner, Mayor Donchess, defendant Bolton, and others regularly attack Ortolano personally at City meetings, regularly attempt to make her as uncomfortable as possible while she attends meetings, and attempts to turn others in attendance against me. The Aldermen generally attack her at the end of their session when the public comment period has ended and she has no ability to respond. Alderman Klee and defendant Bolton have compared my incident at the Legal Department on January 22, 2021 as commensurate with the actions of the January 6th insurrectionists at the Nation's Capitol. This has caused people on social media to deride Ortolano as a "Trumpist," although she is not. Exhibit A (Ortolano Affidavit), ¶ 50, at 24-25.

30. It has been hard for Ortolano to take the abuse, so she often stay away from such meetings. Since October 25, 2022, she have attended only 11 Board of Aldermen meetings. Prior to that, between January 2021 to October 2022, she had attended over 45 Board of Aldermen meetings and in addition had also regularly attended finance, budget, and infrastructure meetings . She stopped attending virtually all standing committee meetings after October 2022. Exhibit A (Ortolano Affidavit), ¶ 51, at 25.

31. Not only has the retaliatory conduct of City officials tamped Ortolano's attendance at meetings; it has also reduced her standing in the community. She is often recognized in markets and places of public accommodation around the City of Nashua as the person who is regularly attacked and derided in public meetings. Some people have told her that they know she is the person who has been accused of being a child predator. Exhibit A (Ortolano Affidavit), ¶ 52, at 25.

III. ARGUMENT.

  A.  The Summary Judgment Standard.

A federal court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party must "assert the absence of a genuine issue of material fact and

then support that assertion by affidavits, admissions, or other materials of evidentiary

quality." *Mulvihill v. Top–Flite Golf Co*., 335 F.3d 15, 19 (1st Cir. 2003). "A genuine issue is

one that could be resolved in favor of either party, and a material fact is one that has the potential

of affecting the outcome of the case." *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010). Once

the movant has made the requisite showing, "the burden shifts to the summary judgment target to

demonstrate that a trialworthy issue exists." *Id*. The nonmoving party " 'may not rest upon the

mere allegations or denials of [the] pleading, but must set forth specific facts showing that there

is a genuine issue' of material fact as to each issue upon which he or she would bear the ultimate

burden of proof at trial."  *Santiago–Ramos v. Centennial P.R. Wireless Corp*., 217 F.3d 46, 52–

53 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A

reviewing court is obligated to view the facts "in the light most favorable to the nonmoving party

(here, the plaintiff), consistent with record support," and gives him "the benefit of all reasonable

inferences that those facts will bear." *Noviello v. City of Boston*, 398 F.3d 76, 82 (1st Cir.

2005) (internal citation omitted).[1]

---

[1] Under Rule 56(f)(1) of the Federal Rules of Civil Procedure, the Court may "grant summary
judgment for a nonmovant" if it first gives notice and a reasonable time to respond. Indeed, it is "well
established that a party that moves for summary judgment runs the risk that the court may grant
summary judgment sua sponte against the movant." *Banco do Brasil, S.A. v. 275 Washington St.
Corp*., 889 F.Supp.2d 178, 187 (D.Mass. 2012) (quotation marks and citation omitted); *see Jarvis v.
Village Gun Shop*, 805 F. 3d 1, 6-7 (2015);  *Forrester Environmental Services, Inc. v. Wheelabrator
Techs, Inc.*, 2012 WL 3420487, *1 (D. N.H. 2012)(not reported in F.Supp), *rev'd on other grounds*, 715
F.3d 1329  (1st Cir. 2013).

Because genuine disputes as to material facts continue to exist regarding the conduct of Bolton and Leonard as such applies to Ortolano's claims of retaliation on account of her exercise of free speech and petitioning rights, the Court should deny Bolton's and Leonard's motion for summary judgment.

B. <u>Genuine Issues of Material Fact Continue to Exist on Counts One and Two of Ortolano's Complaint against Bolton and Leonard, and the Court Should Allow the Case to Proceed to Trial the Causes of Action Alleging That They Retaliated Against Her for Her Free Speech and Petitioning of Government Activities.</u>

A litany of Supreme Court cases pronounces that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989); *see also, e.g., Snyder v. Phelps,* 562 U.S. 443, 458 (2011); *R.A.V. v. St. Paul,* 505 U.S. 377, 392  (1992).

> In our own time and place, criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something. If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age. The freedom to speak without risking arrest is "one of the principal characteristics by which we distinguish a free nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987).

*Nieves, v. Bartlett*, 587 U.S. ___, 139 S.Ct. 1715, 1730 (2019)(Gorsuch, J., concurring in part and dissenting in part). Tying these tenets of free speech jurisprudence to the maintenance of a functioning form of democratic government, the high court has recognized that the First Amendment provides elevated protection of free speech rights pertaining to governmental petitioning activities; the "right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach, FL*, 585 U.S. 87, 101 (2018)(quoting *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524 (2002)).

As in *Lozman*, Ortolano "alleges the City deprived [her] of this liberty by retaliating against [her] for . . . [her prior] lawsuit[s] against the City and her criticisms of public officials." *Lozman*, 585 U.S., at 101. Accordingly, *Lozman* dictates that Ortolano's "speech [at issue in this action] is high in the hierarchy of First Amendment values." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 145 (1983)). This case does not involve the implementation of reasonable time, place, or manner restrictions that apply generally to persons attempting to participate in the democratic processes of Nashua's City government; to the contrary, it involves the attempts of Nashua City officials, including Bolton and Leonard, to prevent Ortolano from obtaining public documents via New Hampshire's Right-to-Know Law because they did not like her attitude and criticism of them and their colleagues. Upon realizing that Ortolano would not be deterred from exercising her right to petition government, Bolton and Leonard (in concert with a number of other Nashua officials, and in pursuance of an official policy motivated by retaliation), eventually caused her to be arrested for trespass at City Hall when *none* of the dozen or so trespass incidents occurring at City Hall over the prior seven years had resulted in an arrest. Deposition testimony and government documents provide a compelling case that, but for Bolton's and Leonard's retaliatory intervention, Ortolano would not have been arrested. And Bolton would not stop there. About a year after he dragooned the Nashua Police Department into arresting Ortolano in contravention of standard police practice, he demanded that the Nashua Police arrest Ortolano merely for being present in a corridor of the Nashua City Hall. In this action, Ortolano states a classic free speech retaliation case that should proceed to trial.

1.   The Elements of a Free Speech Retaliation Cause of Action.

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of*

*Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st

Cir. 2003)). "A plaintiff must first prove that (1) he or she engaged in constitutionally protected

conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected

conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B.,*

675 F.3d at 43 (citing *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011)

and *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010)). "This showing necessitates proof of a

causal connection between the allegedly protected speech and the allegedly retaliatory

response." *González-Droz*, 660 F.3d at 16. A pattern of informal harassment may establish a

First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's

exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

Under the second step, a defendant may then avoid a finding of liability by showing that it would

have reached the same decision even in the absence of the protected conduct. *González-Droz*,

660 F.3d at 17.

    2.  The January 2021 Incident.

        a.  Bolton's and Leonard's Argument that Ortolano's Conduct on January 22, 2021 Was Not Protected Speech.

The defendants' monistic focus on Ortolano's conduct on January 22, 2021, the day of her

arrest, suggests that they believe either that Ortolano did not allege protected speech predating

January 22, 2021, or that the law does not permit the Court to consider speech prior to that

occurring on the day of her arrest to be protected for the purposes of a First Amendment

retaliation claim.[2] Ortolano's Complaint could not be clearer that Bolton, Leonard, and other city

officials engaged in a years-long concerted effort to intimidate her in retaliation for her multiple

---

[2] In claiming that "Plaintiff's Conduct Was Not Protected," the defendants point to no conduct other than that occurring "during the January 2021 incident." Defendants' Memorandum of Law, at 10-12.

right-to-know requests, criticisms of Bolton, Leonard, and other city officials at public meetings, and lawsuits that Ortolano brough against the City to enforce New Hampshire's Right-to-Know law. And she asserts that the City, through Bolton, Leonard and other city officers, executed a part of their plan of intimidation by causing her arrest on January 22, 2021. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Some free speech retaliation cases based on an arrest only involve claims of protected conduct occurring immediately prior to the arrest, *see e.g., Nieves*, 587 U.S. ___, 139 S.Ct. at 1720; *Ward v. Petow*,  2020 WL 1929125, *1-*2 (D. R.I. 2020)(not reported in Fed.Supp.), while others involve protected conduct occurring over a long span of time preceding the arrest, *see e.g., Lozman*, 585 U.S. at 91-92; *Exline v. Joseph*, 2020 WL 3643044, *1-*2 (D. N.H. 2020) (not reported in Fed.Supp.).

    With the possible exception of her attempt to file abatement applications at City Hall (petitioning activity), Ortolano's Complaint does not even contend that the events occurring at the Legal Department on January 22, 2021 constituted protected speech. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Instead, it was her RTK filings, criticisms of public officials, and filing of RTK lawsuits, all occurring over the span of the prior three-plus years, that she claims to have been protected speech. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Since the defendants have failed to even contend that *any* of the events occurring prior to January 22, 2021 did not constitute protected speech – they did not present any facts or evidence with their motion regarding those events –  they have not met their burden under Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure requiring that they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show a lack of a "genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." F.R. Civ. P. 56(a). Accordingly, the Court

should not make any finding for the purposes of ruling on this motion that Ortolano did not

engage in protected speech.

      **b.** **Bolton's and Leonard's Argument That There was Probable Cause to Arrest Ortolano.**

The First Amendment prohibits government officials from retaliating against individuals on

account of their words or actions protected by the Free Speech Clause. *Nieves*, 587 U.S. ___, 139

S.Ct., at 1722.

> If an official takes adverse action against someone based on that forbidden
> motive, and "non-retaliatory grounds are in fact insufficient to provoke the
> adverse consequences," the injured person may generally seek relief by
> bringing a First Amendment claim.

*Id.* (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998) and *Mt. Healthy City Bd. of Ed. v.

Doyle*, 429 U.S. 274, 283–284 (1977)). To prevail on a free speech retaliation claim, a plaintiff

must establish a "causal connection" between the government defendant's "retaliatory animus"

and the plaintiff's "subsequent injury." *Id.* And as a general matter, when a claim of retaliation

based on an arrest is made, the plaintiff must demonstrate that there was no probable cause for

the underlying arrest in order to satisfy the causation requirement. *Id.* "[B]ecause probable cause

speaks to the objective reasonableness of an arrest, its absence will . . . generally provide weighty

evidence that the officer's animus caused the arrest, whereas the presence of probable cause will

suggest the opposite."[3] *Id.,* 139 S.Ct., at 1724.

---

[3] Concurring in part and dissenting in part in the *Nieves* case, Justice Gorsuch suggested that probable
cause should play no role in First Amendment retaliation cases because "the *First* Amendment operates
independently of the Fourth and provides different protections. It seeks not to ensure lawful authority to
arrest but to protect the freedom of speech." 587 U.S. ___, 139 S.Ct., at 1731. Analogizing to retaliatory
arrest cases brought under the Equal Protection Clause of the Fourteenth Amendment, he stated:

> Following our lead, the courts of appeals have recognized that § 1983 plaintiffs alleging
> racially selective arrests in violation of the Fourteenth Amendment don't have to show a

As with all general rules, however, there are exceptions, and the recent *Lozman* and *Nieves* cases provide two different exceptions that are relevant here. *Nieves* holds that the probable cause requirement does not apply in "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. ___, 139 S.Ct., at 1727. And *Lozman* dispenses with the normal probable cause requirement when a plaintiff has asserted a so-called *Monel* claim: the government as an entity is responsible under § 1983 when "execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978); *see Baron v. Suffolk Cty. Sherrifs Dept.*, 402 F. 3d 225, 236 (1st Cir. 2005). Both exceptions apply here.

> i.  The *Nieves* Exception.

The *Nieves* Court recognized that the probable cause requirement should not apply to cases where officers "have probable cause to make arrests, but typically exercise their discretion not to do so" because, "[i] n such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" 587 U.S. ___, 139 S.Ct., at 1727 (quoting *Lozman*, 585 U.S., at 99.

---

> lack of probable cause, even though they might have to show a lack of probable cause to establish a violation of the Fourth Amendment: "[S]imply because a practice passes muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with equal protection."

*Id.* He continued:

> I can think of no sound reason why the same shouldn't hold true here. Like a Fourteenth Amendment selective arrest claim, a First Amendment retaliatory arrest claim serves a different purpose than a Fourth Amendment unreasonable arrest claim, and that purpose does not depend on the presence or absence of probable cause. We thus have no legitimate basis for engrafting a no-probable-cause requirement onto a First Amendment retaliatory arrest claim.

*Id.,* 139 S.Ct., at 1732.

> For example, at many intersections, jaywalking is endemic but rarely results in
> arrest. If an individual who has been vocally complaining about police conduct is
> arrested for jaywalking at such an intersection, it would seem insufficiently
> protective of First Amendment rights to dismiss the individual's retaliatory arrest
> claim on the ground that there was undoubted probable cause for the arrest. In
> such a case, because probable cause does little to prove or disprove the causal
> connection between animus and injury, applying *Hartman*'s rule would come at
> the expense of *Hartman*'s logic.

*Id.* The *Nieves* Court continued:

> Because this inquiry is objective, the statements and motivations of the particular
> arresting officer are "irrelevant" at this stage. After making the required showing,
> the plaintiff's claim may proceed in the same manner as claims where the plaintiff
> has met the threshold showing of the absence of probable cause.

*Id.*

The *Nieves* exception clearly applies here. Chief Carignan testified that the customary

practice of the Nashua Police Department was to not arrest a trespasser suspect if, once the

police arrived the person cooperates and leaves. Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-

5, at 64-65. And the objective evidence garnered from the Nashua Police document attached to

the Colquhoun Affidavit bear this out; prior to the Ortolano case, the Nashua Police Department

just did not arrest people at City Hall who cooperated and left once the police arrived. Of the 10

incidents at City Hall between January 1, 2014 and January 21, 2021, the Nashua Police

Department arrest on one until Laurie Ortolano came along. Exhibit B (Colquhoun Affidavit,

with attachment).

The defendants may claim that Ortolano's situation was different because she made a social

media post after the incident bragging about refusing to leave after being told to do so by Celia

Leonard. Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-5, at 89. But any claim that she was

arrested for exercising the protected First Amendment right by posting on social media only

enhances her claim. Moreover, the police had a big evidentiary problem with changing its mind:

Celia Leonard's story changed; when she was initially interviewed she conceded that Ortolano was not threatening anyone, and that she did not want her arrested. But after defendant Bolton dragooned Captain Kenney of the Nashua Police Legal Department into opening the investigation, Leonard gave a statement saying that Ortolano was threatening and that she wanted her arrested. Exhibit A (Ortolano Affidavit) Exhibit A-4. At the very least, this is a question of fact for the trier of fact.

> ii.  The *Lozman* Exception

As said, *Lozman* expounds that the probable cause requirement should not apply when a plaintiff includes a municipality as a defendant upon a claim that s/he suffered free speech retaliation injury based on an "execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy."

> In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established. But "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." In a § 1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." If a custom is attributable to the municipality, we must also inquire whether it was "the cause of and the moving force behind the deprivation of constitutional rights."

*Baron*, 402 F. 3d at 236-37 (citations omitted).

Ortolano's Complaint makes clear that she is pursuing her claims against the City on a *Monel* claim. Moreover, she has presented ample facts demonstrating concerted efforts by high officials of the Nashua City government to punish Ortolano for making multiple right to know requests, publicly criticizing the high officials and other City officials, and suing the City for not complying with RSA 91-A. See Ortolano's Concise Statement of Facts, ¶¶ 9-15 above.

Defendant Bolton has stated that Ortolano should not expect Nashua officials to serve her as they would other citizens because of the derogatory terms she uses when criticizing them. Kleiner, the Director of Administrative Services Director, ordered employees not to communicate with her or serve her. Leonard, the Deputy Corporation Counsel, changed her story to police to achieve Ortolano's arrest. At minimum, there is a genuine issue of material fact about whether the "custom" of high officials of the City of Nashua is to retaliate against citizens like Ortolano for engaging in protected speech.

### iii. A Retaliatory Investigation Exception.

Other federal courts have begun to several courts have recognized a cause of action for "retaliatory investigation," which does not require a plaintiff to establish a lack of probable cause. *See e.g., Lacey v. Maricopa Cty.,* 693 F.3d 896, 917 (9th Cir. 2012) (Sheriff's improper conduct during a years-long intrusive investigation was not absolutely immune and subjected him to first amendment retaliation claim); *Denney v. Drug Enf't Admin.,* 508 F. Supp. 2d 815, 830 (E.D. Cal. 2007) (recognizing cause of action for retaliatory investigation in the case of physician who alleged he was investigated in retaliation for speech concerning medical marijuana; *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 487 (W.D. Pa. 2007) (*Hartman* does not foreclose plaintiff's retaliatory investigation claim notwithstanding the court's determination that the ensuing investigation, search, arrest and prosecution were supported by probable cause). These cases find liability without probable cause when a defendant has induced a prosecutor to bring charges that would not have been initiated without his urging. Bolton and Leonard improperly wrapped themselves into the investigation of Ortolano, which Chief Carignan confirmed should never have occurred. Even more compelling in this case is that the prosecutor, Alyssa Kuehne, was not an independent prosecutor; she was a police prosecutor employed by the

Nashua Police Legal Department, which (through Captain Kenney) had been communicating with defendant Bolton about the arrest. Exhibit A (Ortolano Affidavit); Exhibit A-7.

3.  July 2022 Incident.

The only claim different about the July 22, 2022 incident that has not been addressed above is that, although Bolton tried hard to get Ortolano arrested, he did not succeed. The incident still cause harm to Ortolano; one more incident of harassment did chill her ability to engage in public meetings and the like. This was one more incident in the pattern of harassment. First Circuit case law is clear that a pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

III.   CONCLUSION.

For the foregoing reasons, this Court should deny defendant Bolton and Leonard's Motion for Summary Judgment.

Dated: May 1, 2024                          Respectfully submitted,

                                            Laurie Ortolano, Plaintiff
                                            By her Attorneys,

                                            Olson & Olson, P.A.

                                            */s/* Kurt S. Olson
                                            Kurt S. Olson
                                            Bar ID No. 12518
                                            31 Franklin Rd.
                                            Salisbury, NH 03268
                                            603-748-1960
                                            kolson@mslaw.edu

CERTIFICATE OF SERVICE

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be sent electronically forthwith to the registered participants as identified on the Notice of Electronic Filing (NEF).

23

Dated: May 1, 2024

<u>/s/ Kurt S. Olson</u>
Kurt S. Olson
31 Franklin Rd.
Salisbury, NH 03268
603-748-1960
kolson@mslaw.edu