## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Laurie Ortolano, | ) | |
| **Plaintiff** | ) | |
| | ) | |
| V. | ) | Civil Action No. 22-cv-00326-LM |
| | ) | |
| | ) | |
| The City of Nashua, et al., | ) | |
| **Defendants** | ) | |
| | ) | |

### AFFIDAVIT OF PLAINTIFF LAURIE ORTOLANO: (1) RESPONDING TO STATEMENT OF MATERIAL FACTS OF DEFENDANTS BOLTON AND LEONARD SET FORTH IN THEIR MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, AND (2) IN SUPPORT OF HER MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS BOLTON AND LEONARD'S MOTION FOR SUMMARY JUDGMENT

I, Laurie Ortolano, being under oath, do hereby depose and say as follows:

### A. **Plaintiff's Responses to Statement of Material Facts of Defendants Bolton and Leonard.**

Below are my responses to the alleged Statement of defendants Bolton and Leonard set forth in their Memorandum of Law in Support of Motion for Summary Judgment. I set forth each numbered statement from the Memorandum and below each one state whether I admit or deny each specific fact alleged therein, and provide evidentiary support for each response:

A. Background.

1. Steven A. Bolton and Celia K. Leonard are attorneys in the Office of Corporation Counsel for the City of Nashua.

Ortolano's Response: *Admitted.*

2. Their office has assisted its client, the City of Nashua, with responses to over 1,000 right-to-know ("RTK") requests from the Plaintiff over the last few years, producing over 40,000 pages of documents, and defended more than one dozen NH RSA 91-A claims in, to date, sixteen lawsuits filed by Plaintiff in superior court.

<u>Ortolano's Response</u>: *I first note that Bolton and Leonard did not attach any documents or other evidence to support the claims made in Statement # 2. The only support is to ¶ 2 of each of their Affidavits, both of which essentially just parrot the statement without providing any evidentiary support.*

*I admit that the Office of Corporation Counsel for the City of Nashua (hereinafter "Corporation Counsel's Office") appears to have begun handling <u>all</u> of my RTK requests sometime during the Summer of 2019. I deny that the City of Nashua "response[d] to over 1,000 right-to-know ("RTK") requests from the Plaintiff over the last few years." Attached to this Response is Exhibit A-1, which includes a more-than 300-page listing of what the City claimed in May 2022 (shortly prior to my filing of this action) to be RTK requests made by me and non-party, Laura Colquhoun. A review of this listing shows that it was clearly drafted to make it look like I had made many more formal RTK requests than I actually had. Through the time the Assessing Department stopped allowing me to review department documents onsite, with minimal work required by the Assessing Department clerks, the vast bulk of the requests I made for review of documents was for property cards, property files, etc., and most were one-page or a few pages of documents that I reviewed and handed back. The one document that stands out is my request for information on KRT, which no one informed me involved 31,000 pages of documents at the time of my request. Although that document has a lot of pages, it is a one-click document to produce in electronic format and should not have taken more than a few minutes for the information technology manager to produce. Please note that Corporation Counsel's Office began exclusively handling my RTK requests from page 51 forward on Exhibit A-1. Please also note that Exhibit A-1 lists "Questions" as formal RTK requests. Also, although the list purports to pertain to RTK requests made by Laura Colquhoun and me, Corporation Counsel's Office has listed multiple requests that clearly were made by other people, and unrelated to any requests Laura or I had made. Further, Corporation Counsel's Office has even listed my requests to see my own assessing documents as formal RTK requests.*

*After April 2019, nearly all employees in the Assessing Department were prohibited from speaking with or serving me at the counter in the Assessing Department. Exhibit A-2. Additionally, Cheryl Walley, an employee for the Assessing Department, told me that citizens could no longer do research at the Assessing Department Office because the City prohibited immediate access to citizen requests to review "multiple" documents; we now had to put requests for anything more than a single document in writing and wait for staff to make copies and provide them several days. In practice, the Assessing Department staff employed this directive to prevent me from accessing any of the public assessing files on the spot unless they pertained to my own property. I was required to put nearly every request to review Assessing Department documents in writing. I believe this policy and practice violated the New Hampshire RSA 91-A.IV(a) and (b), as well as Nashua's City Charter, § 71 ("The books and records of the assessors shall be the property of the city, and at all times be open to public inspection during office hours."), both of which require documents kept in the Assessing Department as public documents to be produced immediately for review, without the necessity of a formal RTK request.*

*Around the Summer of 2019, all of my written requests for documents that could and should have just been handed over at the counter in the Assessing Department (taking a minute or two for*

*each request) were forwarded to Defendant Kimberly Kleiner for review, and often forwarded to Corporation Counsel's Office for review. Frustrated that simple counter requests were going through this lengthy process of review, in an attempt to expedite the process, I just started to make my requests in the form of RTK requests, since they appeared to be treated as such anyway.*

*As to the lawsuits: at the time of the filing of this lawsuit, there were four lawsuits. One ended with a stipulation as to documents the City would produce and the other three went to trial. I won the three that went to trial. Because of Corporation Counsel's dilatory responses to subsequent RTK requests, as well as failure to adhere to the requirements of RSA 91-A when specifically responding to my requests for documents or information, I was forced to file more actions in the Superior Court. I have not ever counted them, but there may have been as many as 16. Among the remedies the Superior Court Judge has ordered was an award of attorneys' fees of more than $63,000 and an order that the City must participate in RTK remedial training.*

*A representative Order demonstrating the Judge's frustration is attached as Exhibit A-3. In that Order, the Superior Court Judge found that Tim Cummings, the City's Director of Economic Development and Administrative Services, directed the City's IT director not to communicate with me. (Later, Mr. Cummings would also refuse to communicate with me.) He notes that when I tried to contact another City employee to try to facilitate delivery of the information I sought, that employee informed me that the City Legal Department had ordered him not to speak to me because I was going to sue the City. In footnote 2 on page 5 of that Order, the Judge wrote:*

> *As the Court knows from this case and others involving these parties, the City and many of its high-ranking employees have: (1) effectively closed City Hall to Ms. Ortolano on a walk-in basis: (2) directed other employees not to interact with her on the phone or in person; (3) refused to answer Ms. Ortolano's basic questions; and (4) had Ms. Ortolano arrested for trespassing at City Hall. One alderman has even gone so far as to label Ms. Ortolano a "predator."*

3. Some of Plaintiff's many RTK requests were referred to the Legal Department.

<u>Ortolano's Response</u>: *Admitted with qualifications. By late 2019, it was my impression that all or virtually all of my questions and informal requests for information made to the Assessing Department (which I did not know the City was by then classifying as formal RTK requests), as well as my actual, formal RTK requests, were being referred to Corporation Counsel's Office. At first, Defendant Leonard responded to most of my formal RTK requests. In December 2020, Corporation Counsel's Office hired attorney Jesse Neumann to handle the City's RTK requests, and he responded directly to nearly all of my RTK requests until he left the employ of Corporation Counsel's Office in August 2021.*

4. In 2020, Plaintiff became "more publicly vocal" about her opinions regarding the City of Nashua employees and departments, she "frequently post[ed] on social media" about her views of the City and its administration, and she "launched a website entitled 'good-gov.org' on which she posted blogs" about her views of Nashua's city government.

<u>Ortolano's Response</u>: *Admitted with qualifications. I admit that I frequently posted on nongovernment social media sites about my frustrations with administrators, officials, and employees of the City of Nashua government, and that I created a blog website entitled good-gov.org. By way of further response, I was forced to post on private websites and had to create my own blog site because I could not prevent City of Nashua high officials, both elected and appointed, from quelling my time-limited comments by constantly interrupting my criticisms of City government during Nashua public meetings so I would not have my full time to speak, and by sometimes accusing me of crimes I had not committed, e.g., impersonating Nashua City employees, being a child predator. My ability to speak on social media sites – which were not broadcast live to thousands of people on cable television as were Nashua's public meetings, nor memorialized on YouTube for the entire world to see as were Nashua's public meetings – was no substitute for the City's denial of my right to petition government by gaining access to public documents, speak with informed government officials, and speak at public meetings without being interrupted so that I would lose my full time and being slandered by officials who appear to have believed they were operating under the shield of legislative immunity. Additionally, for the most part, City personnel would not answer basic questions for me as they would for other citizens who walk into City Hall for assistance. I was treated differently and my access to responses and information was restricted.*

5.    Plaintiff "achieved" a "public profile" through social media and her "good-gov.org" blog site.

<u>Ortolano's Response</u>: *I hereby restate my response to Statement # 4, directly above.*

B. <u>January 2021 Incident.</u>

6.    On January 22, 2021, the Plaintiff went to City Hall. Plaintiff alleges she was there to have abatement applications date stamped.

<u>Ortolano's Response</u>: *Admitted.*

7.    The Legal Department is not open to the public, has locked entry doors, and does not date stamp abatement applications. Additionally, at the time of this incident, City Hall still had a few Covid-19 restrictions in place.

<u>Ortolano's Response</u>: *If the Legal Department was not open to the public, it had not made the public, or me specifically, aware of that fact. Prior to the pandemic, I had entered the legal office numerous times without an appointment or being told of any requirement to do so. On May 29, 2021, the Mayor had sent a letter stating that City hall was reopening on June 7, 2021; nothing in that letter stated that any particular departments, including the Legal Department, was not open to the public, so I just assumed that the Legal Department was open to the public like the other departments in City Hall. During the pandemic, the City website did list specific department that required an appointment or were closed, but the City Legal Department was not one of those so identified.*

*I had filed two abatement applications online on January 17, 2021 for two elderly women who did not have very much money and needed the abatement refunds badly. I wanted to get the applications filed early, so they would be up near the front of the line for processing and refunds. I explained this in my email to Rick Vincent, the Chief Assessor, when I filed the abatement applications on January 17th. See Exhibit B-2 to Celia Leonard Affidavit. When I did not receive confirmation of filing from the Assessing Department by January 20, 2021, I emailed Mr. Vincent again. He responded that he would "look into the date stamps and get those to you." But he also repeated that he would have to "look into" the applications after "verify[ing] ownership at the Registry of Deeds." Five days had passed without any recognition that the applications were going to move forward, so I decided to go to City Hall and get physical date stamps to document that the applications were filed early.*

*When I arrived at City Hall on January 22, 2021, I informed the receptionist/check-in person that I wanted to get the two applications stamped at the Administrative Services Office. She did not ask me if I had an appointment, and waived me right in. Unfortunately, the Administration Services Office was closed and no onewas  present. I could not find any other offices opened and remembered that I had previously emailed defendant Kleiner and Attorney Neumann when looking for help on abatement applications. Given that the Administrative Services Department was closed (which Ms. Kleiner headed), and that I had prior dealings with Attorney Neumann about abatement applications, I thought the Legal Department was the logical place to try to get a date stamp, finding no other offices open.*

*When I arrived at the door of the Legal Department, there was no notice on or near the door saying that the office was not open to the public, or that one had to make an appointment to come in. The only sign on or near the door was a piece of paper warning that the door opened outward.*

7
(FN 1).    The role of the Legal Department had been explained to Plaintiff on or before September 11, 2019, and Plaintiff stated that "You made very clear that legal is only there to address specific document requests and I should not bring any other information of concerns regarding the City to the attention of the legal office." On Wednesday, January 20, 2021, the City's then Chief Assessor, Mr. Vincent, emailed Plaintiff to tell her that he would get the abatement applications date-stamped for her.

Ortolano's Response: *I admit that I sent that email to defendant Leonard on September 11, 2019, some year and one-half prior to the January 22, 2021 incident, but further respond that everything changed during the pandemic, when the Assessing Department had been closed for renovations and the public could not conduct assessing transactions at the Assessing Department. With no Assessing Department open, and the staff not very attentive to my emails while the office was closed, I tried to deal with defendant Kleiner and Attorney Neumann of the Legal Department when looking for help on abatement applications. Further, I knew that all appeals of abatement decisions were handled by the Legal Department, so I thought it was logical to get the date stamps that I could not seem to get anywhere else from the Legal*

*Department. Also, given that the Administrative Services Department was closed (which Ms. Kleiner headed), and that I had prior dealings with Attorney Neumann about abatement applications, I thought the Legal Department was the logical place to try to get a date stamp when I could find no other offices open.*

*I deny that Mr. Vincent had definitively emailed me that he would get the abatement applications date-stamped for me any time soon. As can be seen by reading his email attached to the Celia Leonard Affidavit in Exhibit B-2, he said he would "look into" it, and first had to "verify ownership at the Registry of Deeds," but did not say when that would be. In fact, when I finally received the date-stamped applications, the date stamp was for February 3, 2021, seventeen days after I had filed them. Moreover, perhaps because of who I was, the elderly women I was helping had their applications for abatements delayed and were among the last considered.*

8. Plaintiff did not have an appointment with anyone in the Legal Department.

Ortolano's Response: *Admitted with the qualification that there had been no public notification that I or other members of the public could only gain admission to the Legal Department with an appointment had been made in any place that I had noticed. Further, there was no sign on the door at the time that appointments were necessary to gain entry to the Legal Department. Prior to the pandemic, I had been able to gain entry to the Legal Department without an appointment, so I assumed this continued to be the case after the Mayor reopened City Hall to the public. And I believed in good faith that the Legal Department would be able to place a time stamp on my applications or provide some other form of receipt showing that they had been filed.*

*Interestingly, not until after my January 22, 2021 incident did a notice appear outside the Legal department reading: "313, Legal Department, By Appointment Only, 589-3250." I do not know whether this was done for others who might come to the Legal Department or to try to establish a false claim that it was up on January 22, 2021, which it was not.*

9. Legal Assistant Mindy Lloyd told Plaintiff she could not enter the office without an appointment.

Ortolano's Response: *Denied. After I knocked on the door of the Legal Department and Ms. Lloyd opened it, she asked if I had an appointment as I walked into the office saying that I did not have an appointment, but telling her that I needed a date stamp on some abatement applications and asking if Attorney Neumann was available to provide one.*

10. Instead of leaving, Plaintiff forcibly entered the locked Legal Department, and forced her way past Ms. Lloyd into the locked office area.

Ortolano's Response: *Denied. I did not forcibly enter the Legal Department, which was not locked because Ms. Lloyd opened the door for me. I did not force my way past Ms. Lloyd or anyone else. After Ms. Lloyd opened the door and I walked into the office, I walked past Ms. Lloyd and called out for Attorney Neumann, who eventually came out of the conference room, said he would not date stamp her abatement applications, and told me I would have to leave. I responded that I was going to wait in the lobby area for someone to assist me and sat down on*

*the floor in the Legal Department lobby area to wait for someone to provide a receipt for the abatement applications.*

11. Attorney Neumann came out of the conference room to assist Ms. Lloyd.

Ortolano's Response: *Admitted that Attorney Neumann came into the lobby area where I was sitting but I deny he came out to assist Ms. Lloyd. As described above, I called out to him as I came into the lobby area and I believe it was my call that caused him to come out. As I recall, Mr. Neumann came to the conference room door where his office was located. He spoke to me in the office area while standing in his doorway. When he refused to assist me, I moved into the lobby entry area and sat there. He really did not come out of his office. When I went into the lobby area, he stayed in his office.*

12. Attorney Neumann told Plaintiff repeatedly that she needed to leave immediately and that she was trespassing.

Ortolano's Response: *Admitted, but I deny that I was trespassing because I entered a public office to seek to perform a public function. I had received no notice that the office was not open to the public – indeed, I was allowed in – and I was only asking that someone in the office provide a date stamp on abatement applications, as had always occurred when the Assessing Department was open.*

13. Plaintiff sat down on the floor, first in the doorway of Attorney Leonard's office, and then moved to sit on the floor near the main entrance door.

Ortolano's Response: *Admitted that I sat on the floor in the lobby area of the Legal Department and deny that I sat in the doorway of Attorney Leonard's office. Attorney Leonard was not in the office when I arrived and I would not go to her office because, not having been there, she could not have date stamped the applications.*

14. Attorney Leonard arrived at the Legal Department on January 22, 2021 and was confronted by Ortolano sitting on the floor in front of her office.

Ortolano's Response: *Denied that I confronted anyone. I was sitting on the floor the entire time as Attorney Leonard stood above me and berated me for coming into the Legal Department Offices, which I had believed to be a public department of the Nashua City government and had been to before without an appointment.*

15. Attorney Leonard told Plaintiff she was trespassing and needed to leave.

Ortolano's Response: *Attorney Leonard was yelling at me and berating me. I do not recall that she told me I was trespassing. I do not specifically recall that she told me that I needed to leave, but she might have. At that point, I did not know where else to go to get the City to acknowledge the filing of the two abatement applications I needed to get moving forward.*

16. Ms. Lloyd called the Risk Assessment office, who advised Ms. Lloyd and Attorney Neumann to call the Nashua Police Department.

Ortolano's Response: *Admitted that the police were called. I had thought that Ms. Lloyd had called them directly, but the call could have passed through the Risk Assessment Office.*

17. The police arrived at the Legal Department, and escorted Plaintiff out of the Legal Department.

Ortolano's Response: *Admitted that the police arrived but denied that the police "escorted" her out. I believe the Nashua Police Call Report accurately describes what occurred:*

> *Laurie was sat down in an upstairs corridor area of City Hall. Was not causing a scene on arrival and appeared calm. She was upset as reported she has been trying to get appointment and paperwork stamped by city hall and they continue to not assist her. Reports this has been going on for months. She apparently assists people in property tax abatement/reductions and needed papers stamped.*

> *Spoke with Celia from City Hall who is Deputy Corporation Counsel for city? She said this is ongoing issue with Laurie and that personnel from NPD are aware. No allegations of any threats made but stated that Celia needed to leave now. Wanted her trespassed but allowed at City Hall if she has an approved appointment. Reported the City have had a lot of contact with Laurie via email and that there are pending lawsuits with the City.*

> *Lauries was asked to leave. She left willingly but stressed her frustration indicating that the City do not communicate with her or assist her. She was informed she is being trespassed for one year and is not allowed at City Hall unless with an appointment. She was advised that she could face arrest from Criminal Trespass if she attends City Hall without an appointment. She understood.*

> *No offences alleged or apparent*

*Exhibit A-4.*

18. The Nashua Police Department informed Plaintiff that "she [was] being trespassed from City Hall and only allowed in the building with an approved appointment." She was advised that she could face arrest for Criminal Trespass if she attended City Hall without an appointment. This was confirmed with Attorney Leonard.

Ortolano's Response: *Admitted in its essence, but the Nashua Police Call Report quoted above states what occurred more comprehensively and accurately.*

19. Plaintiff commented that "she would probably be arrested as she would be back."

*Ortolano's Response:* *I do not recall saying that, but I do understand that Officer Timothy Roach wrote in a police document that I said something to that effect. For the record, I did not come back to the City Hall until the trespass matter was resolved in the courts and I was permitted to come back to City Hall.*

20. After learning what occurred and believing a criminal trespass charge would be appropriate for anyone so conducting themselves in such a manner, Attorney Bolton expressed an opinion that the Nashua Police Department should interview witnesses before it made a charging decision.

   *Ortolano's Response:* *Denied. After the Nashua Police Officers wrote police reports quoted above in response to Statement of Fact no. 17, and found "No offences alleged or apparent," Chief of Police Michael Carignan believed that the matter was "cleared" (meaning that Ortolano would not be arrested for trespass). Carignan Deposition, at 76. A day or so later, however, the police informed Ortolano's attorney and the press that "the incident required no further action" and they were not going to issue a no trespass order. But when a Union Leader reporter informed defendant Leonard of what the Nashua Police Department had said, Leonard responded, "I find it troublesome, to say the least. My office will be speaking with the police further."*

   *Within about a week after the January 22, 2021 incident, defendant Bolton requested a meeting with Chief Carignan in the conference room of the City Legal Department's conference room. Carignan Deposition, at 77. Carignan, Bolton, Leonard, and a young woman (likely Mindy Lloyd) met with Chief Carignan in the conference room. Carignan Deposition, at 78. During the meeting, defendant Bolton said he was not satisfied with the outcome; he was concerned for the safety of his staff and Ortolano should have been arrested. Carignan Deposition, at 80. Defendant was angry, spoke in a raised voice, and demanded that Ortolano be arrested for the January 22, 2021 incident: according to Chief Carignan, "I guess he told me to arrest her and I told him I would not," Carignan Deposition, at 8. Bolton was" trying to present it as a demand." Carignan Deposition, at 84.*

   *Michael Carignan's Deposition are attached hereto as Exhibit A-5.*

21. Defendants Bolton and Leonard have no authority over the Nashua Police Department, as it is controlled by an independent police commission.

*Ortolano's Response:* *Denied. As to the authority of the Police Commission over the Nashua Police Department, Chief Carignan testified that:*

   *they approve our budgets, they approve our promotions, they approve our terminations, or deny them, <u>but they don't deal with the day-to-day operations of the police department.· They're not sworn officers, they're not -- they have no legal authority to enforce the laws.</u>*

*Exhibit A-5, at 21 (emphasis added). He continued:*

> *So, for example, the police commission will not dictate who handles an investigation, <u>they would not dictate how an investigation is handled</u>, but they would dictate our annual budget, they would dictate the raises, they'd dictate anything like that.*

*Exhibit A-5, at 23 (emphasis added). Having failed to succeed in getting Chief Carignan to capitulate and cause me to be arrested, Chief Carignan learned that defendant Bolton went down the chain of command and began advocating my arrest to Captain Brian Kenney of the Nashua Police Legal Department. Exhibit A-5, at 87-88. Suddenly, the Nashua Police opened an investigation of the incident. Exhibit A-5, at 89. And although the police had a week prior reported that defendant Leonard had not informed them that I had threatened anyone and should not be arrested (only to be "trespassed" and ordered not to come to the Legal Department without an appointment), she changed her story in a police statement to claim I had been "hostile and threatening," and requested that I be arrested for trespass. Exhibit A-4 (Statement of Celia Leonard at 9th page). Although Chief Carignan made clear that he did not think I should be arrested for trespassing, in the end he "supported that decision." Exhibit A-5, at 90.*

*I believe that these facts demonstrate that defendants Bolton and Leonard exercised brawny control over the Nashua Police Department.*

22. After an investigation into the incident, the Nashua Police Department arrested the Plaintiff for criminal trespass.

<u>Ortolano's Response</u>: *Admitted. By way of further answer, the facts make clear that the Nashua Police Department would not have arrested me for criminal trespass but for the insistence of defendants Bolton and Leonard that the Nashua Police depart from what Chief Carignan described to be its normal protocol of not arresting trespass suspects if the suspect cooperates when the police arrive and agree to leave the premises immediately. Exhibit A-5, at 63-64; 67. In fact, out of the twelve incidents involving possible trespasses requiring police presence at Nashua City Hall between January 1, 2014 and January 31, 2022 (more than eight years), defendants Bolton and Leonard succeeded in causing me to be the only one to be arrested. See Affidavit of Laura Colquhoun with attachment produced by Nashua Police Department showing all trespassing incidents at City Hall between January 1, 2014 and January 31, 2022.*

*I also have taken note that every time I called the Nashua Police Department regarding the Kleiner/Turgiss investigation or any other matter in which the police were involved, the Nashua Police Department memorialized every single telephone call or other communication by a call report and/or supplemental narrative. Yet, despite the fact that Chief Carignan testified on deposition that defendant Bolton communicated with Captain Brian Kenney in the Nashua Police Legal Department for the purpose of advocating for my arrest, Exhibit A-5, at 87, not a single call report, supplemental narrative, or telephone record memorializing their communications was produced in discovery by the City of Nashua, Bolton, or Leonard. I am told that Bolton and Leonard initially claimed that their communications with Nashua Police personnel was subject to the work product and attorney-client privileges, but that the claimed privilege was withdrawn*

when counsel conferenced this issue in contemplation of a motion to compel production of documents. I believe that the fact that the Nashua Police Department did not memorialize defendant Bolton's advocacy for my arrest to Captain Kenney suggests an attempt among different branches of Nashua government to keep secret their concerted efforts of retaliation against me for exercising my free speech rights.

23. Attorneys Leonard and Neumann, and Ms. Lloyd, were the victims of Ortolano's criminal trespass.

Ortolano's Response: *Denied. By way of further answer, this is not a "statement of fact;" it is a self-serving legal conclusion.*

24. Although Plaintiff later sought to have the charge annulled, she pled guilty on July 12, 2021 to committing trespass on January 22, 2021. This conviction had not yet been annulled at the time Plaintiff filed her Complaint in this matter.

Ortolano's Response: *Denied. In my plea, the charged Class A misdemeanor was reduced to a "violation." Attached as Exhibit A-6 is a true and accurate copy of my plea papers. And the only reasons I agreed to a plea were: (1) because of the attendant stress suffered by my family and me as we endured the criminal process, and (2) the the Nashua Police Legal Department agreed in the plea that I could continue to visit all Nashua City departments with the single exception that I could not enter "into the legal bureau at City Hall without an appointment for one year."*

*My violation was annulled despite the fact that defendant Bolton appeared in court to oppose my petition for an annulment.*

*Furthermore, despite the plea agreement the Nashua Police Legal Department had negotiated with my attorney, Corporation Counsel's Office refused to honor it by repeatedly denying all my requests for an appointment to meet in order to deal with issues involving RTK requests. Defendant Bolton appeared in Court for a hearing precipitated by the breach of my plea agreement. At that hearing, defendant Bolton said: "She can continue to try and make appointments with my department . . . and she will not be granted any appointments by my department." Attached as Exhibit A-7 (at page 10) is a true and accurate copy of the transcript of a December 15, 2021 hearing in the 9th Circuit Court – District Division – Nashua (Leary, J.).*

C. July 2022 Incident.

25. On July 22, 2022, Attorney Bolton and Plaintiff encountered one another in City Hall, around noon (Attorney Leonard was not present during this incident, and the Plaintiff does not allege any involvement of Attorney Leonard in this incident).

Ortolano's Response: *Admitted.*

26. The Legal Department had transmitted responsive documents to one of Plaintiff's RTK requests via email, through Citrix, a secure email portal for document transfers. Plaintiff was unable to open the documents.

Ortolano's Response: *Admitted.*

27. Attorney Bolton opened the Legal Department door and saw Plaintiff in the hallway. He directed Plaintiff to leave the narrow corridor providing access to the entrance to and egress from the Legal Department as he was attempting to leave, and Plaintiff was interfering with his passage and refusing to move.

Ortolano's Response: *Denied, with the exception of Defendant Bolton's claim that he opened one of the Legal Department doors and saw me in the hallway. Defendant Bolton's description of the incident is contradicted by the Nashua Police Department reports, written after police officers interviewed Bolton and me, examined the area, and reviewed the camera footage that recorded the incident in the hallway. A true and accurate copy of the police reports is attached as Exhibit A-8.*

*I was in the hallway outside the Legal Department with my back to the Legal Department door. Defendant Bolton opened the Legal Department door abruptly about half-way I turned around and saw Bolton standing in the doorway. Without coming out of the doorway, Bolton immediately started hollering at me, saying: "You cannot be here!" "Go!" "Leave! You are trespassing!" "I can have you arrested." I tried to explain that I had only taken the Legal Department's phone number off the wall and was speaking with Manuela (who was in the Legal Department) on the phone. Again shouting, defendant Bolton retorted: "You aren't allowed to call into my office! You aren't allowed to speak with anyone in this office, even by phone!" Hearing this, Manuela terminated the phone call, which had lasted only 20 seconds.*

*The call now terminated, defendant Bolton turned and went back into his office, closing the door behind him. Fearful that Bolton would have me arrested, and wanting myr side of the incident recorded, I attempted to call back to the Legal Department; when no one answered, I left a message saying that I was merely attempting to obtain some help to her open the electronic documents the Legal Department had sent. As stated in the police report, through observing video security footage in City Hall, the Nashua PD would later determine that I was only within the hallway that leads to the Legal Department for approximately two minutes.*

28. Attorney Bolton did not call the police department in connection with this incident.

Ortolano's Response: *Admitted. Certain that defendant Bolton would indeed attempt to cause me to be arrested for trespass, I called 911, said that Attorney Bolton was verbally assaulting me in the hallway outside the Legal Department, and requested that the Nashua PD dispatch an officer to the back side of City Hall. Two officers, Officers Earnshaw and Abrams, arrived within minutes and met me outside City Hall. I gave them my statement about what happened, recounting the facts I stated just above. Then the officers went into the building to speak with people in the Legal Department.*

29. Rather, Plaintiff called the Nashua Police Department, saying Attorney Bolton was assaulting her.

Ortolano's Response: *Denied. I called 911, which relayed me through the state police, and told the dispatcher that I was being verbally assaulted by Attorney Bolton in the hallway outside the Nashua Legal Department on the third floor of City Hall.*

30. Plaintiff was not present when Attorney Bolton spoke with the Nashua Police Department, and alleged in Paragraph 135 of the Complaint that she did not know "what had transpired when Nashua PD personnel interviewed Attorney Bolton."

Ortolano's Response: *Admitted.*

31. Attorney Bolton answered the Nashua Police Department's questions, telling them he had asked and then directed Plaintiff to leave the hallway so he could pass.

Ortolano's Response: *Denied. I read the police reports and they refute that Defendant Bolton merely "asked that then directed [me] to leave the hallway so he could pass." The reports say that Officers Earnshaw and Abrams met Sergeant Gilbert on the way in to interview witnesses, and they met with Bolton on the first floor of City Hall. Bolton was angry and agitated. He insisted that Ortolano be arrested for trespassing and "became extremely upset when [Sergeant Gilbert] did not immediately move to respond outside to arrest Ortolano." Bolton insisted that he had told Ortolano to leave the hallway several times and that she had refused. He insisted that he wanted to leave the Legal Department offices, but that Ortolano was blocking the hallway.*

*The officers walked to the third floor with Bolton to observe the hallway in question. They noted that there were no signs, keypads, closed or locked doors, or other indicia communicating that the public should not be in the third-floor hallway near the Legal Department. They noted that people were walking in the hallway around them, which also indicated that Ortolano was permitted to be in the third-floor hallway. They also noted that the hallway was wide enough for two people to pass each other without touching, so it was unlikely that Ortolano could have been blocking Bolton from exiting his office.*

*The reports say that defendant Bolton was not making sense to the officers. He insisted that because "there was no public area accessible by the hallway," Ortolano was trespassing. At the same time, he insisted that Ortolano should be arrested merely for placing a phone call to the Legal Department. Sergeant Gilbert asked if Ortolano had been served any sort of legal process stating that she could not call the Legal Department. Defendant Bolton conceded that she had not. Sergeant Gilbert asked Bolton why there was a video doorbell outside the Legal Department door if the public was not supposed to be in the hallway. Bolton responded, "For people other than her."*

*When Sergeant Gilbert "tried to reason" with Bolton by explaining that the police cannot prevent a single member of the public from being in an area of City Hall open for public access, Bolton insisted, "I can do that." Officer Earnshaw then attempted to positively identify Bolton by asking his name and date of birth. Bolton refused to answer either question; he did no more that hand Officer Earnshaw his business card.*

*See Exhibit A-8.*

32. No arrest was made as a result of this incident.

Ortolano's Response: *Admitted because, despite defendant Bolton's insistence that I be arrested, the police determined that his account did not add up and there was not credible evidence supporting his demand that I be arrested.*

D. Plaintiff's Speech Has Not Been Chilled.

33. Plaintiff cannot show that her speech has been chilled, as she continued (and continues) to exercise her First Amendment rights.

Ortolano's Response: *I admit that I continue to exercise my First Amendment rights to some degree in nongovernment forums but deny that I have not suffered injury to such rights, especially regarding my ability to exercise fully my right to petition government and speak without interruption of being slandered by Nashua officials at public City government meetings.*

*By way of further answer, Paragraph 33 of this alleged Statement of Facts is not really a "statement of fact;" it is a self-serving legal conclusion.*

34. On August 17, 2022, Plaintiff sent an email stating that she filed another NH RSA 91-A lawsuit against the City, calling Attorney Bolton a "moron" and Attorney Leonard a "nitwit," and discussing how, on numerous occasions, she publicly criticized City officials, even after her arrest in 2021.

Ortolano's Response: *I admit that I sent the email attached to the Bolton Affidavit as Exhibit A-1 and that the document speaks for itself. By way of further answer, this email represents speech made through a private medium that the defendants in this action can neither regulate nor censor. They have succeeded in chilling much of the speech I used to engage in at City government meetings, and by limiting and frustrate my attempts to receive public information from public documents.*

35. Plaintiff also stated that Attorney Leonard had the "cuntiest behavior" Plaintiff had ever seen.

Ortolano's Response: *I admit that I sent the email attached to the Bolton Affidavit as Exhibit A-1 and that the document speaks for itself. I used that word in public once, years ago when I was enduring the stress of being prosecuted by the City in retaliation for my public criticisms of public officials, and I regret that I said it. But it is the City that keeps bringing it up, often one and two years later, in an attempt to continue to disparage me in public and in retaliation for my public criticisms of the City and its officials.*

36. On numerous occasions after her arrest in January 2021, as well as after the July 2022 incident, Plaintiff was publicly critical about City Officials at public meetings, through her

blog posts, and in emails to City Officials, including, but not nearly limited to, the following statements:

    a) In her August 27, 2022 blog post, titled "*The Colossal Stupidity of the Nashua Legal Office*," Plaintiff wrote: "Like the Assessing Office, the Mayor has promoted incompetent leadership and lawyers who ignore their professional conduct codes and disregard citizen's rights. Who are the major offenders? Attorney Bolton and Attorney Leonard."

Ortolano's Response: *I admit that I posted the blog attached to the Bolton Affidavit as Exhibit A-2 and that the document speaks for itself. By way of further answer, this blog represents speech made through a private medium that the defendants in this action can neither regulate nor censor. They have succeeded in chilling much of the speech I used to engage in at City government meetings, and by limiting and frustrating my attempts to receive public information from public documents.*

    b) In her December 18, 2022 blog post titled "The Police Records of Attorney Bolton," Plaintiff wrote: "[The records] depict a very angry, hostile, out-of- control man who lacks self-awareness and self-control," and "But of course, with the Mayor not staffing an ethics committee for four years, the county attorney's office being incompetent, no municipal division of the AG's office, and a PCC (which stands for Protect Corrupt Counselors), all dodging the problem, how is justice delivered?"

Ortolano's Response: *Once again, I admit that I posted the blog attached to the Bolton Affidavit as Exhibit A-3 and that the document speaks for itself. By way of further answer, this blog represents speech made through a private medium that the defendants in this action can neither regulate nor censor. They have succeeded in chilling much of the speech I used to engage in at City government meetings, and by limiting and frustrating my attempts to receive public information from public documents.*

    c) In a November 28, 2022 email to City Officials, Plaintiff wrote, among many other things: "I found the Mayor's remarks to lack credibility and take ownership for the budget and tax increase, and the need for the assessment revaluation" and "[The Mayor] is the master of blame and always the virtuous victim. These are serious character flaws that do not exemplify leadership."

Ortolano's Response: *I admit that I sent the email attached the Bolton Affidavit as Exhibit A-4 to City Officials, among others, and that the document speaks for itself. By way of further answer, I send emails to public officials much less frequently than I did before I was arrested because they are almost always followed by one of the public officials falsely alleging that I have committed one crime or another, or decrying in a public meeting that I used the "C-word" (which they keep bringing up when interrupting my comments at public meetings, although I regrettably used the word publicly once, years ago when I was enduring the stress of the City's criminal prosecution of me in retaliation for my public criticisms), or accuse me of being a child predator, or frequently interrupt my three minutes of speaking time with scurrilous accusations for the purpose of preventing the public from hearing what I have to say.*

d) At a July 18, 2022 Board of Alderman meeting, the Plaintiff stated: "I've noticed this individual is a fairly young person and he's coming to a City that I think is very corrupted and working for a Mayor that I think is really unethical, unscrupulous, a liar and I've had to put in a lot of law suits involving records and the lack of openness for records."

Ortolano's Response: *I admit that the write-up of my comments made at an Aldermen meeting on page 8 of the minutes attached to the Bolton Affidavit as Exhibit A-5 more or less accurately reflect what I said at that meeting and that my comments as recorded speak for themselves. I also take note that the minutes reflect that this was one of the few times in recent years that a public official did not interrupt me before I could finish, or did not accuse me of some crime or immoral act.*

e) At a July 20, 2022 Finance Committee meeting, the Plaintiff stated:

I want to express my concerns with [Cummings] as an employee of the City and maintaining and performing any work on any of these projects. He is unfit to do that kind of work. He is over assigned. He is deeply in violation of the law when it comes to Right-to-Know and open access to meetings and information. He shares an office adjoining to the Mayor and the door is always locked and closed. He does not consider himself a public servant and he will not make himself accessible to citizens at all.

Ortolano's Response: *I admit that the write-up of my comments and those of the Mayor made at a Finance Committee meeting on pages 1-2 of the minutes attached the Bolton Affidavit as Exhibit A-6 more or less accurately reflect what was said at that meeting and that my comments as recorded speak for themselves. This was another meeting where I was supposed to have been given three minutes to speak but could not even get a minute and a half into my statements without the Mayor interrupting and preventing me from making any more substantive comments. I was not even physically present at this meeting but was speaking through a Zoom feed. The Committee kept the clock running while the Mayor interrupted and spoke over me. I recognized what was happening; the Mayor was attempting to prevent me from using my entire time to speak. Taking my time, he said it was not proper for me to "night after night just lambast all the employees with all these scurrilous comments. It's just not appropriate. It's not appropriate." Finally, I was able to regain the floor for a moment by saying: "You need to shut your mouth. Shut your pie hole Mr. Mayor. This is my public comment and I'm addressing not every employee; I'm addressing Director Cummings and I have been in a very difficult situation trying to get information from him."*

*But once again the Mayor cut me short: "You know, I think we're going to have to propose some kind of rules for public comment. The swearing, the profanity, the name calling; it is not appropriate!" He continued as I attempted to speak and say that I had not spoken any profanity, and as an official next to him announced, "30 seconds." Referring to an incident that had occurred the private email sent about a year earlier and addressed above, the Mayor proclaimed that she I "called a woman lawyer in the City with (sic) the c-word in a public meeting."(Once again, the regrettable incident involving the C-word happened a year early and was never*

16

*repeated. The Mayor raised the issue again to interrupt my public criticisms of a public official, and to attempt to impugn my character to deflect attention from my criticisms. As defendant Bolton's Exhibit A-1 shows, I did not use that word at that public meeting; it was the Mayor who mentioned it. As I attempted to respond, the Mayor announced, "Your time is up!" and the Committee cut my Zoom feed was cut.*

f) At the same meeting, Plaintiff said to the Mayor: "You need to shut your mouth. Shut your pie hole Mr. Mayor. This is my public comment and I'm addressing not every employee."

Ortolano's Response: *I restate my answer to Statement # 35(e) directly above.*

g) At an August 16, 2022 Planning and Economic Development meeting, Plaintiff stated: "Attorney Leonard would not define that. She didn't carry her duty to disclose far enough to say what those entities were and then they played the game the Legal office we're going to hide behind attorney/client privilege. We can't tell the public."

Ortolano's Response: *Admitted. Attorney Leonard was the attorney from the City Legal Department who was primarily responsible for dealing with the bonding for the Arts Center. My research suggests that many of the details have been kept from the public, and I was expressing that belief and asking for accountability.*

h) At an August 17, 2022 Finance Committee meeting, Plaintiff said the following: "I tried to address this in the budget hearing and I pretty much got run over by you Mr. Mayor. You did a pretty good job demolishing me up there for my Right-to-Knows but I really feel that there should be a central location where Right-to-Knows are handled." As the same meeting, Plaintiff said:

I am very concerned with your Legal Office. I feel two of the attorneys should be disbarred. I've filed complaints with the Professional Conduct Committee at the Supreme Court and I'm going to continue filing up there. Attorney Bolton tried to have me arrest on the 22nd of July wrongfully, I believe, and the City isn't going to stop until they arrest me in City Hall and you're going to succeed at it because all it takes is one Officer who is not well- trained who turns around.

Ortolano's Response: *Admitted. I was responding to the fact that Attorney Bolton had just tried to get me arrested again for being present in a public corridor in City Hall.*

i) Plaintiff also claimed: "Attorney Leonard I feel really violated her oath and her duties to disclose what was going on with the Art's Center." Ex. A, Bolton Aff. ¶ 14(i); Ex. A-8.

Ortolano's Response: *I restate my answer to Statement # 35(g) above.*

j) At an October 12, 2022 Planning and Economic Development meeting, Plaintiff said to Chairman Moran: "You made a judgment that was horrendous and you are a very poor example to your own children." Ex. A, Bolton Aff. ¶ 14(j); Ex. A-9.

<u>Ortolano's Response</u>: *I admit that I made this statement at the October 12, 2022 meeting, but it is a mere snippet of what Chairman Moran said and leaves out the context of the fact that I was responding to Chairman Moran's personal attack of me. At a different hearing the previous evening, Chairman Moran attacked me by saying:*

> *So, yes, I'm gonna push back on this information. It always gets me right in the funny bone about, you know, silver spoon millionaires coming in here acting like they're the crown jewel of the working class, pushing off information that we don't know to be true until we ask legal counsel. If maybe he's wrong, then you can go to a court, which you can do . . . there's three systems of government. Final resolution, and they had the final say.*

> *Just like what I said about Eversource. Sununu cut their taxes, and how did we get thanked? We get price increases . . . and then you're going to be up with these millionaires at his ski resort that they heat at 90 degrees up there. . . .*

> *It's fantastic that we are representative of the City. Everyone knows, you can go to my Facebook, you can go back to when I spoke as a kid in college, millionaires who are born with silver spoons in their mouths who didn't earn crap have no, no respect from me, and I just want that to be perfectly clear.*

*The next evening, October 12, 2022, at the end of a Planning and Economic Development Committee ("PEDC") meeting (which was also broadcast on television and is still available on YouTube), I responded to Moran's "silver spoon millionaires" charge from the previous evening, saying in full:*

> *I think I presented an email that very much upset you, and it caused a very strong reaction that I was doing something that was very misleading to the public. When I presented this email, I specifically stated, as I watched the video today, that I wanted your comments on "is this true"? . . . When the comments came at the end, you made it very clear that I presented a lie. Really, I presented information from a former alderman, whose name I actually x'd off because I didn't want to put their name out there. It had my name on it, so it came from me. I passed it to you folks so you could say, "Is this true"? . . .*

*After restating the "silver spoon millionaire" comment Moran had made about me the previous evening, I continued:*

> *Now honestly, you made yourself out to be the champion of the proletariat class. But I don't think you really are because you can afford much more than I could at your age. Your children go to private Catholic school at St. Chris. You signed and auctioned off and paid thirty-four hundred dollars for your kid to be principal for the day. I couldn't afford that in my thirties. I didn't have that money.*

18

> *Now, my husband and I give a great deal of money to that church because we can afford it. But we didn't have those opportunities – you sent a very strong message last night about who can come to this chamber and speak, and I heard some comments today. If you're poor, you don't belong in here. And if Melbourne Moran thinks you're a millionaire or whatever definition he has, you don't come and share input. You're not welcome. You made a judgment that was horrendous, and you're a very poor example to your own children.*

The next evening, October 13, 2022, Nashua held a public hearing of the Board of Aldermen, followed by a meeting of the Nashua Budget Review Committee ("BRC"). Although Moran was not a member of the BRC, and normally did not attend BRC meetings, he came and sat at the front of the room with the actual members of the Committee. During the BRC hearing, Ortolano offered comments regarding four different bond proposals on the agenda. After receiving public comments, Moran was allowed to speak, and used his time to deliver a brutal diatribe aimed straight at me:

> *I do want to apologize for yesterday; I was the chairman of the PEDC. And instead of acting as chairman, I acted more as a dad which I didn't really have to experience much until yesterday. Alderman Timmons mentioned that, you know, attacking children – yesterday my children were attacked by a member of the public. And there have been two emails regarding them as well. And it was the first time I've really been angry since probably I was a teenager.*

> *And I realize that, you know, as an alderman, I should not have behaved in that way with a member of the public who was attacking my children live in front of me. However, I will say it's very concerning that, you know, people come in here and dish it out all the time, but someone was offended that I made some comments about millionaires. You know, attack me, I'm the politician, I'm the one that's getting paid to do this, volunteering my time really to do this. I have no qualms about people coming in here attacking me.*

> *But you took my kids into it, and as a child protective worker, when someone does oppositional research on a child, that sends out predatory vibes like crazy. The person also mentioned that she was a donor to my kids' school, not just once here in public but followed up in an email to tell me that. Was that a veiled threat? Is she going to have some influence over my children's' school? Is she going to want a special tour while my kids are in class? Is she going to give them a "what-for" because of what their dad does? That's the predatory behavior that I'm concerned about. It's very deviant to go down that road. . . . and it was frustrating when someone continuously comes in here with misinformation and proposes it in ways as if she's always right without asking a simple question: "Where'd you get the money from?" Not once . . . no emails about that – just a straight attack. It's further concerning that a member of my kids' school gave that information out to this person. That's messed up.*

19

*Not satisfied to slander me in Nashua public meetings, about a week later, on October 21, 2022, Moran decided to do it on the Nashua radio program, "Nashua This Morning":*

> *. . . this one particular person did opposition research on my children and brought it up at a PEDC meeting which I chair and brought my kids' school into it, St. Christopher's. I talk about my kids' school all the time in public. But they did opposition research and found information that's not publicly available and shared that at the PEDC meeting as an attack on me, but it was also an attack on my kids.*

*He further claimed during the radio show that I had "found information that's not publicly available and shared that at the PEDC." But he knew that the auction at which he donated the $3,400 was a highly publicized fundraising event attended by hundreds of people and followed by publication of Moran's purchase on the publicly visible school announcement board facing a highly traveled public street. Moran then falsely announced to greater Nashua listeners that I was a physical threat to his children: "So, it got me worried. And this person also has had criminal charges against them, (sic) which I understand that they (sic) plead guilty to. So, you start thinking as a dad in that moment, not as a politician, how to protect your kids."*

*Then, Moran could not help but call Ortolano a child predator yet again. And, to convince those listening to the radio broadcast that Ortolano was indeed a child predator, Moran placed his professional imprimatur on the claim: "she was upset because I called the behavior predatory, because it is. You know she was upset because as a social worker, you say something like that, it carries more weight."*

*Moran finished by claiming on air that he had informed the Principal of the St. Christopher Academy that Ortolano had threatened his children. He claimed that she "assured me that my kids are safe" and said that "she denounced that type of attack." He continued, "I should be having conversations with her about my kids' learning, not about their safety."*

    k) In a March 4, 2024 email to Nashua City Officials titled "The Notable Moronic Response from the Nashua's Premier Attorney – Leonard," Plaintiff stated: "It is time the Nashua attorneys stop blowing sunshine up the asses of the Judges and get real in producing a viable and cost effective system for public records and requests."

<u>Ortolano's Response:</u> *I cannot adequately respond to this Statement. Bolton Exhibit A-10 is not an email from me to Nashua City Officials; it is a letter from defendant Leonard to me responding to an RTK request, and says nothing like the statement quoted above.*

## B. Plaintiff's Additional Evidence in Support of Her Concise Statement of Material Facts to Which She Contends a Genuine Dispute Exists So as to Require a Trial.

Below is additional evidence submitted to support the Concise Statement of Material Facts set forth in my Memorandum of Law in Opposition to Defendant Bolton's and Leonard's Motion for Summary Judgment. I will continue the numbering from the previous section by starting my paragraphs with number 37.

A. <u>My Protected Speech</u>.

37. Prior to my arrest for trespassing in January 2021 and defendant Bolton's subsequent attempt to have me arrested again, I engaged in many forms of protected speech directed at criticizing the City of Nashua government and seeking more transparency from the City.

38. Prior to my arrest, I posted many online criticisms of Nashua officials and created a website entitled "good-gov.org," on which I posted blogs about the problems with Nashua's city government. I could fill up hundreds of pages with these postings; indeed, the Nashua Police Department has produced scores of pages of them in its production of documents, which makes me believe that the postings caused Nashua public officials to take them personally and want to retaliate against me for my free speech activities. I will describe just three that the Nashua police Department has produced.

39. Attached as Exhibit A-9 is a social media post I made describing defendant Bolton's "blustery and annoyed" response to a New Hampshire Board of Tax and Land Appeals action I filed. See NPD LO 00169 – NPD LO 001684.

40. Attached as Exhibit A-10 is a social media post I made describing my request to Mayor Donchess to release his online survey results of citizens' opinions of an issue of City government. See NPD LO 001673 – NPD LO 001677.

41. Attached as Exhibit A-11 is a social media post I made describing my victory at the New Hampshire Board of Tax and Land Appeals and how the "entire issue was personal and vindictive for Bolton, Leonard, Kleiner and Donchess." See NPD LO 001685 – NPD LO 001690.

42. Another form of protected speech I engaged in was my multiple filings of RTK petitions, a form of petitioning of government protected by the Free Speech Clause of the First Amendment. See Exhibit A-1, which demonstrates that the City was keeping track of my RTK filings and was clearly rankled by them.

43. Yet another form of protected speech I engaged in was the many comments I made at public meetings, and in letters to public officials, that were critical of City of Nashua employees and officials. Defendants Bolton and Leonard made note of some of my public meeting criticisms in their Memorandum of Law in Support of their Motion for Summary Judgment. See Bolton Exhibits A-4, A-5, A-6, A-7, A-8, and A-9 of the Defendants' submission.

44. But I engaged in even more criticism of public officials and employees in public meetings and letters to public officials before defendants Bolton and Leonard caused me to be arrested. Below are just a few examples.

45. Attached as Exhibit A-12 is "Exhibit Lombardi 1," taken from the deposition in this action of Detective Frank Lombardi. It describes how I made complaints of potential criminal action by Nashua officials/employees Kimberly Kleiner and Greg Turgiss, and provided a binder

of documents that I believe to support my concerns. Please note that the only action to come from the Nashua Police investigation of Ms. Kleiner and Mr. Turgiss, was that Detective Lombardi warned me that I could be arrested for speaking with any member of the Nashua Assessing Department and Ms. Kleiner for trying to speak to any of them outside their offices at City Hall. See Exhibit A-13, which is "Exhibit Lombardi 20," taken from the deposition in this action of Detective Frank Lombardi. It describes how Detective Lombardi warned me not to speak with any employees of the Assessing Department and defendant Kleiner despite the fact none of them complained that I had threatened them or engaged in any unprotected speech or conduct. Their only complaint about me was that I had questioned them about the workings of the Assessing Department and they were annoyed by it.

46. In September 2018, I started to attend scheduled monthly "coffees with the Mayor," meetings held at a downtown café for the purpose of allowing citizens to speak directly to Donchess and to ask him questions. I explained to him that I believed the Assessing Department was engaging in improper "sales chasing," specifying that there were problems with the data collection and handling of KRT Appraisal's 2018 city-wide reevaluation. The Mayor responded in a defensive and confrontational manner, essentially calling me a liar: "That didn't happen. That wouldn't have been legal. We don't raise valuations by 50%!" Some of the citizen attendees became upset and at the end of the meeting told Mayor Donchess that his reaction to my statements had been inappropriate. At the October 2018 coffee, I invited the Mayor to walk with her down Berkeley Street (my street) so I could show him the homes that were assessed at lower values than mine. The Mayor retorted: "All you have done is waste the City's time." He asserted that I had wasted many hours of the time of the City's CFO, John Griffin, although at that time I had never even met CFO John Griffin. Beginning with the November 2018 coffee, the Mayor stopped fielding questions from citizens altogether at these coffees.

47. On October 2, 2018, my husband and I sent a letter to the Board of Aldermen asking it to review the practices of the Assessing Department to ensure compliance with both New Hampshire law and generally accepted assessment practices employed by assessment professionals. The letter listed the problems they had found following a public records search and included appendices that listed "uncaptured permits," inconsistent use of "Home Sales and MLS Data," "undervalued permits and assessments," "Inconsistent Use of Effective Year Build (EYB)," and "Supplemental Information." After sending the letter, the Ortolanos voiced their concerns publicly at the October 2018 meeting. The Mayor, Kleiner, and other city officials were in attendance. Attached as Exhibit A-14 is the letter my husband and I sent to the Board of Alderman.

48. Attached as Exhibit A-15 is a true and accurate copy of pages 110-118 of a deposition taken on July 29, 2020 in one of the early cases the City forced me to bring because it had not properly produced documents and information I had requested under New Hampshire's Right-to-Know law. Defendant Bolton spent the last seven pages of his questioning of me about whether I had ever used derogatory terms aimed at him and other City officials. At the end of his questioning, I believe questioning early on displays defendant Bolton's belief, followed by action, that he and the City had the right to retaliate against me by denying my RTK requests and otherwise refusing to serve a citizen, because they viewed me as vulgar and undeserving. He questioned as follows:

| Q (By Mr. Bolton) | Does it surprise you that people are reluctant to deal with someone who treats others in that way? |
| --- | --- |
| A. | Yes, it does surprise me. |
| Q. | So it's your position that people should continue to go out of their way to be helpful to you, even though, if you don't get everything you want, you call people names and use vulgar language? |

Exhibit A-15, at 110-117.

### B. The Concerted Efforts and Official Policy of City Officials to Retaliate against Me for Engaging in Protected Speech.

48. I believe that a number of officials from the various departments of Nashua government, from the Mayor on down engaged in a concerted effort that formed an official policy of retaliation against me for criticizing Nashua City government and its employees, and for attempting to make the government transparent for filing RTK requests and then litigating them (almost always successfully) when the City failed to produce the records it was required to make public.

49. These efforts include but were not limited to:

   a. Kimberly Kleiner and head clerk Louise Brown organizing the employees of the Nashua Assessing Department to request that the Nashua Police warn me that I could get arrested for speaking to them anywhere outside of their offices at the Assessing Department. See Exhibit A-12.

   b. Detective Frank Lombardi's decision to warn me that I might get arrested although all agree that I had never threatened anyone or engaged in anything but protected speech. See Exhibit A-12.

   c. Kimberly Kleiner causing a criminal police investigation of me to occur when she told Detective Lombardi that one of the assessors spoke with a homeowner who said that someone fitting my description had been impersonating a Nashua assessor. The homeowner reported to the police that this person was blonde, drove a white sedan, and told the police that she had said she was a real estate agent. Although Kleiner knew that I am not blond, she contacted the police, who opened a criminal investigation on me. Attached as Exhibit A-16 are supplemental narratives describing Kleiner's complaint and the criminal police investigation that followed. They were produced in a production of documents in this action as NPD LO 240, 242, 243, and 252. After it was determined that the person in question told the homeowner she was a real estate agent and not an appraiser, that I did not fit the description of the person

who the homeowner says he encountered, and that neither my husband nor I owned a white sedan, the criminal investigation of me was dropped.

d.  After I was arrested for trespass, and entered into an agreement with the Nashua Police Legal Department allowing me to visit government offices in City Hall as long as I had a prearranged appointment for the legal office, defendant Bolton appeared in court to answer why the City Legal Department was not honoring my requests for an appointment. Although Chief Carignan confirmed on deposition that defendant Bolton had been communicating with the Nashua Police Legal Department about my prosecution, Exhibit A-5, at 87, and must have been aware of the terms of the plea agreement, defendant Bolton made it clear at the court hearing that he had never intended to honor the plea agreement by telling the Judge: "She can continue to try and make appointments with my department . . . and she will not be granted any appointments by my department." Exhibit A-7 (at page 10).

e.  When I petitioned the Hillsborough County District Court to annul my trespass conviction based upon a plea, a procedure that is routinely allowed, defendant Bolton appeared in court to oppose any annulment.

f.  Defendant Kleiner prohibited all Assessors in the Nashua Assessing Department from answering any of my questions or speaking to me and forbade other employees in the Assessing Department from serving me or speaking to me. Defendant Bolton gave similar instructions to at least one City employee.

C.  How the Defendants' Conduct Chilled My Speech.

50. As I have already described, various members of the Board of Aldermen and other City Committees, as well as defendant Kleiner, Mayor Donchess, defendant Bolton, and others regularly attack me personally at City meetings, regularly attempt to make me as uncomfortable as possible while I am attending, and attempt to turn others in attendance against me. The Aldermen generally attack me at the end of their session when the public comment period has ended and I have no ability to respond. Alderman Klee and defendant Bolton have compared my incident at the Legal Department on January 22, 2021 as commensurate with the actions of the January 6th insurrectionists at the Nation's Capitol. This has caused people on social media to deride me as a "Trumpist," although I am not and have not voted for the man.

It is hard to take the abuse, so I often stay away from such meetings. Since October 25, 2022, I have attended only 11 Board of Aldermen meetings. Prior to that, between January 2021 to October 2022, I had attended over 45 Board of Aldermen meetings and in addition had also regularly attended finance, budget, and infrastructure meetings regularly. I stopped attending virtually all standing committee meetings after October 2022.

Not only has the retaliatory conduct of City officials tamped my attendance at meetings; it has also reduced my standing in the community. I am often recognized in markets and places of public accommodation around the City of Nashua as the person who is regularly attacked and

derided in public meetings. Some people have told me that they know I am the person who has been accused of being a child predator.

D. The Disparate Treatment I Received When I was Arrested for Trespass at City Hall.

51. At his deposition in this action, Chief Carignan described the normal or typical way that police calls for trespass incidents are handled:

> if we're called to a location where somebody's there, and a person who has control over that space doesn't want them there for a specific reason and asks them to leave, the expectation is that they leave. If they don't leave, we get called, and we go, and we will tell them to leave.· We'll talk to the victim, we'll find out what the victim says happened, or the controller of the property.· And then if the person still refused to leave, we'll arrest them.· If they leave, we will generally give them the warning to go, because they -- they're not refusing in our presence. And if you're asking for the philosophy, it's people -- it's very difficult in the courts, particularly in Nashua, to get a conviction because the victim or the controller of the properties generally won't show up to testify for a number of reasons.· So that's generally how they go.

Exhibit A-5, at 64-65. When asked, "Okay. Now, when it comes to – so would I be correct then in sort of encapsulating what you said, which is that as a general rule – I understand there are exceptions -- as a general rule, when the police show up, order the perpetrator to leave, and the perpetrator cooperates and leaves, the perpetrator will not be arrested?" Chief Carignan answered, "That's correct." Exhibit A-5, at 65-66.

52. The Affidavit of Laura Colquhoun submitted in opposition to the Bolton/Leonard motions for summary judgment attaches a Nashua Police Department response to her RTK request for information surrounding all trespass incidents at City Hall between January 1, 2014 and January 31, 2021. The information provided is objective evidence that, in arresting me for trespass although I voluntarily left after the police arrived, I was treated disparately than everyone else for whom police were called at City Hall since 2014. Out of the twelve incidents involving possible trespasses requiring police presence at Nashua City Hall between January 1, 2014 and January 31, 2022 (more than eight years), defendants Bolton and Leonard succeeded in causing me to be the only one to be arrested.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 1st DAY OF MAY 2024.

_____
LAURIE ORTOLANO

STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY                    DATED: MAY 1, 2024

Then appeared before me the above-named Laurie Ortolano who, after being sworn, affirmed and attested that her statements in the foregoing Affidavit are true and accurate to the best of her knowledge and belief.

NOTARY PUBLIC

MY COMMISSION EXPIRES: