**LO**  **Exhibit A-15**

**STATE OF NEW HAMPSHIRE**

| | |
|---|---|
| **HILLSBOROUGH, SS.** | **SUPERIOR COURT** |
| **SOUTHERN DISTRICT** | **226-2020-CV-00133** |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
\*
LAURIE ORTOLANO                        \*
                                       \*
vs.                                    \*
                                       \*
CITY OF NASHUA                         \*
                                       \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**ZOOM DEPOSITION OF LAURIE A. ORTOLANO**

Zoom deposition taken, by agreement of counsel, on Tuesday, July 29, 2020, commencing at 1:00 P.M.

**Court Reporter:** (Via Zoom)
Tina L. Hayes, LCR, RPR
NH Licensed Court Reporter No. 80
(RSA 310-A:161-181)

```
 1        Q.   And when you read this the other day, you
 2   didn't notice that?
 3        A.   Didn't mark it.  I noticed it and didn't
 4   highlight it.
 5        Q.   And, apparently, you didn't remember it
 6   when I have now asked you twice about anything that
 7   needs to be corrected?
 8        A.   I actually spoke to my lawyer Monday about
 9   it but forgot.
10        Q.   Thirteen different taxpayers had their
11   values reduced by a total of 24 million.  Were some
12   of those properties exempt from taxation anyway?
13        A.   Yes.
14        Q.   Most of them; right?
15        A.   Yes.
16        Q.   Has any City official ever called you a
17   derogatory name?
18        A.   Not that I can recall.  I mean -- no.
19        Q.   Have you called any City official or
20   employee by a derogatory name?
21        A.   Yes.
22        Q.   How many?
23        A.   How many City officials?
```

```
 1         Q.   Yes.
 2         A.   I don't know what you define as a
 3   derogatory name.  I was thinking of one incident in
 4   a private phone conversation.  But I don't know what
 5   you consider derogatory; so that's a tough thing for
 6   me to answer.
 7         Q.   Well, tell me about the phone call.  Who
 8   were you talking to?
 9         A.   Ms. Kleiner.
10         Q.   And what did you call her?
11         A.   I didn't call her a personal name.  I told
12   her that she was a malevolent person, that her
13   actions were.
14         Q.   Have you ever called any City official
15   stupid?
16         A.   Not that I know of.
17         Q.   Do you recall, after a board of assessors
18   meeting, when the equalization ratio for 2018 came
19   down from the Department of Revenue Administration?
20         A.   Yes.
21         Q.   And I had told the board of assessors that
22   I was going to look into the possibility of mounting
23   a challenge and appealing that figure.  Do you
```

```
 1   recall that meeting?
 2        A.   Yes.
 3        Q.   And do you recall you approached me after
 4   the meeting?
 5        A.   No.  You approached me.
 6        Q.   Do you recall what you said to me?
 7        A.   I recall you being angry and saying that
 8   you didn't like me challenging you.  And I recall,
 9   as you walked out of the room, I called you a loser
10   as you were leaving the door.  I said, "Steve, you
11   are a loser."  That's what I recall.
12        Q.   Do you recall using the word "ridiculous"?
13        A.   Probably, but I don't remember.
14        Q.   And you don't recall calling me stupid?
15        A.   No.  I called you a loser, I remember.  I
16   wonder if you thought that was stupid, but I
17   definitely called you that.
18        Q.   Have I ever treated you other than with
19   respect?
20        A.   You have treated me with disrespect at
21   times.
22        Q.   What times?
23        A.   That specific incident.  You came up and
```

```
 1    barked very closely in my face.  I could feel you
 2    right against me, and you were angry.  And it ensued
 3    with me responding in an angry fashion as well.
 4    That was an emotional moment for both of us.
 5         Q.    Has any of -- has any City official or
 6    employee ever addressed you using vulgar and profane
 7    words and phrases?
 8         A.    No, not that I can recall.
 9         Q.    Have you used vulgar words and phrases in
10    addressing any City official or employee?
11         A.    I had a few private phone calls I can
12    think of to Alderman Tencza and another alderman
13    where I expressed my dissatisfaction with how the
14    City was handling the situation.  And in a private
15    phone call, I swore.  I did do that.
16         Q.    Do you recognize the room I am sitting in?
17         A.    Yes.
18         Q.    You have been in this room?
19         A.    Yes, for our mediation.
20         Q.    Other occasions?
21         A.    We had -- you and I had a meeting in here.
22    That -- I don't believe that was the room that we
23    met with Ms. Kleiner, you and I, was it?  I don't
```

```
 1   recall.
 2        Q.    I think it is.
 3        A.    Okay.
 4        Q.    Do you remember that meeting with
 5   Ms. Kleiner and I?
 6        A.    Yes.
 7        Q.    Do you remember getting angry?
 8        A.    Yes.
 9        Q.    Do you remember standing up from your
10   chair, pacing around the room, and ranting at us?
11        A.    No.  I feel that's very --
12        Q.    Do you remember you used vulgar terms?
13        A.    I was very direct.  It had been when the
14   police report had -- my private investigation report
15   had just come out.  It was the meeting where
16   Ms. Kleiner was so disrespectful to my data and
17   didn't even look at it.  It was a meeting to go over
18   sales data, where I brought the three copies in to
19   share and discuss it.  And she sat in front of her
20   with a list and said -- put her hands down -- "I
21   have already got all this.  I have all this
22   information."
23              And you are right.
```

```
 1                (Simultaneous crosstalk.)
 2                (Reporter admonition.)
 3                MR. LEHMANN:  Let her finish her answer.
 4        A.    She smacked her hands down and said, "I
 5   have already got all of this, Laurie.  I know" -- "I
 6   have already checked all this data."
 7                And then you said to me, "Well,
 8   Mrs. Ortolano, what do you see and what problems do
 9   you see?"
10                And I slid you a spreadsheet, and we
11   opened it up.  And I said, "Here are some properties
12   specifically that I think are wrong."
13                And you said, "Those are too low.  I
14   understand what you are saying."
15                And I was infuriated with Ms. Kleiner at
16   that meeting.  I called a meeting to meet with her
17   to go over sales data, and she agreed to have the
18   meeting.  And she was disrespectful and
19   disinterested; I wondered why I was there, why I
20   even bothered.
21                And the secondary issue of the report
22   being released, the meeting was set up before I knew
23   the Freyler report was coming out.  And the Freyler
```

```
 1   report had come out the day before.  So we
 2   subsequently got into a discussion about the Freyler
 3   report.  And I can tell you I was disgusted with
 4   what that report produced.
 5             So you are accurate to say I was angry.
 6   If you say I swore or used vulgar language in that
 7   exchange between the three of us, it's possible.  I
 8   won't deny that.  I know I was angry.  I was
 9   thoroughly disgusted with the City at that point.
10   But if you press me for the exact language, I simply
11   won't remember.  I will take responsibility for what
12   it was.
13       Q    (By Mr. Bolton) Does it surprise you that
14   people are reluctant to deal with someone who treats
15   others in that way?
16       A.   Yes, it does surprise me.
17       Q.   So it's your position that people should
18   continue to go out of their way to be helpful to
19   you, even though, if you don't get everything you
20   want, you call people names and use vulgar language?
21            MR. LEHMANN:  I object to the form of the
22       question.
23            Answer to the best of your ability.
```

```
 1        A.   I am not going answer to that.  I object
 2   to the question too.
 3             I have had my name put in the newspaper by
 4   the City.  I have had Ms. Kleiner stand at a
 5   microphone and describe my husband and I in pretty
 6   unflattering terms.  I have had assessors not
 7   respond to my questions and walk away, leaving me
 8   hanging.  Should I feel that I have been treated
 9   well?  This cuts both ways.
10        Q    (By Mr. Bolton) You have never heard me
11   use vulgar language towards you, have you?
12        A.   No.
13             MR. BOLTON:  That's all I have.
14             MR. LEHMANN:  Okay.  I just have a couple
15        of quick questions, Laurie.
16                         EXAMINATION
17   BY MR. LEHMANN:
18        Q.   During this deposition, you were asked a
19   number of questions about how you know things that
20   are alleged in the complaint; right?
21        A.   Yes.
22        Q.   And you were asked a number of questions
23   about who in the city took specific kinds of actions
```

```
 1   that are set forth in the complaint; right?
 2        A.   Yes.
 3        Q.   And you have been asked to identify
 4   specific facts that make you believe other facts to
 5   be true; right?
 6        A.   Correct.
 7        Q.   Have you reviewed a letter from Attorney
 8   Leonard asserting that the City would be producing
 9   it's Rule 22 disclosures by July 24?
10        A.   It was in my calendar.  Yes.
11        Q.   Are you aware of whether or not those have
12   been produced at this point?
13        A.   I have not seen them.
14        Q.   So in answering the questions that you
15   were asked today, have you had an opportunity to
16   review the evidence that's in possession of the City
17   of Nashua that might answer some of those questions?
18        A.   No, I have not.
19             MR. LEHMANN:  That's all I have.
20             MR. BOLTON:  Nothing further.
21             (The deposition concluded at 4:10 P.M.)
22
23
```