# Exhibit A-5

**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

## MICHAEL CARIGNAN

*April 19, 2024*



### Duffy & McKenna Court Reporters, LLC

P.O. Box 1658 Dover, NH 03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

Duffy & McKenna
Court Reporters, LLC

DEPOSPAN'S TRUSTED LOCAL CONNECTION

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
  LAURIE ORTOLANO,             *
                                * No.
                Plaintiff,      * 1:22-cv-00326-LM
                                *
      vs.                       *
                                *
  CITY OF NASHUA, et al.,       *
                                *
                Defendants.     *
                                *
* * * * * * * * * * * * * * * * *
```

VIDEOCONFERENCE DEPOSITION OF MICHAEL CARIGNAN,

Deposition taken with all parties appearing remotely,

on Friday, April 19, 2024, commencing at 3:11 p.m.

Court Reporter:
Pamela J. Carle, LCR, RPR, CRR

MICHAEL CARIGNAN                    2..5

## Page 2

APPEARANCES

For the Plaintiff:

        Peter Malaguti, Esq.
        500 Federal Street
        Andover, Massachusetts 01810
             978.681.0800
        malaguti@mslaw.edu

For the Defendant City of Nashua and the Witness:

        CULLEN COLLIMORE SHIRLEY PLLC
        37 Technology Way, Suite 3W2
        Nashua, New Hampshire 03060
        By:   Brian J.S. Cullen, Esq.
             603.881.5500
        bcullen@cullincollimore.com

For the Defendant Kimberly Kleiner:

        FRIEDMAN FEENEY
        95 North State Street
        Concord, New Hampshire 03301
        By:   David Betancourt, Esq.
             603.736.7683
        dbetancourt@friedmanfeeney.com

For the Defendants Steven Bolton and Celia Leonard:

        UPTON & HATFIELD
        10 Centre Street
        Concord, New Hampshire 03301
        By:   Madeline K. Osbon, Esq.
             603716.9777
        mosbon@uptonhatfield.com

## Page 3

                  I N D E X

WITNESS:       MICHAEL CARIGNAN

EXAMINATION:                              PAGE
By Mr. Malaguti                            4


EXHIBITS FOR IDENTIFICATION:
CARIGNAN     DESCRIPTION                   PAGE
1    6/26/19 Lehto supplemental report     13

     (Digital exhibit sent with transcripts.)

## Page 4

MR. MALAGUTI:  Shall we just say that we're using the same stipulations as last time, Counsel, or do you want me to read them into the record at?

MR. CULLEN:  Same is fine.

MR. MALAGUTI:  Okay, sounds good.

MICHAEL CARIGNAN,
having been duly sworn,
was deposed and testified
as follows:
EXAMINATION
BY MR. MALAGUTI:

Q.   Mr. Carignan, could you state your full name, please?

A.   Yes, my name is Michael Carignan, spelled C-A-R-I-G-N-A-N.

Q.   And former police chief of Nashua, I now understand that you're in private practice. Should I address you as Mr. Carignan, or is it Carignan, is that how you pronounced it?

A.   I do.  I pronounce it Carignan, yes.

Q.   Should I call you Mr., or Chief, or what would you prefer?

A.   Mr. is fine, thank you.

Q.   Okay.  I'll do that.  Have you been

## Page 5

deposed before, sir?

A.   I have, yes, sir.

Q.   So you know pretty much the rules, you keep your voice up, try to give affirmative answers rather than nods and shakes and the like.

We all have a tendency to do that.  I sometimes ask inartful questions.  If you don't understand my question, please say so and I will try to reframe it.

If you need a break, say so.  We may have a short one involving me trying to retrieve documents at some point.

Generally try not to answer until I'm done with my question and I will try not to ask a second question until you're done with your answer.

And you're here represented with counsel today, Mr. Carignan?

A.   Yes, I am.

Q.   And that's Brian Cullen who is sitting next to you?

A.   Yes, that's correct.  And just make sure, please, if you can't hear me, speak up.  This is my first deposition on Zoom, so.  If you can't hear me, just let me know.

MICHAEL CARIGNAN                                    6..9

1      Q.      Well, this will be my second, the first
2  one being this morning at 10:00, so.
3      A.      Fair enough.
4      Q.      That'll make two of us.
5              So where do you live, sir?
6      A.      I live in Litchfield, New Hampshire.
7  19 Bristol Way.
8      Q.      And you're not taking any medications
9  or have any impairments or medical issues that
10 might hinder your ability to answer these
11 questions and understand them?
12     A.      That's correct.
13     Q.      Who is your current employer?
14     A.      BAE Systems.
15     Q.      Is that in Nashua?
16     A.      Yes, sir.  Multiple locations.  I work
17 primarily in Nashua, sometimes Manchester.
18     Q.      And what's your position, what's your
19 title?
20     A.      My contract is program security
21 officer.
22     Q.      And what do you do in that job?
23     A.      Basically a compliance officer between
24 enforcing the rules and regulations for BAE policy
25 as well as the federal government's guidelines for

1  how to operate in a classified environment.
2      Q.      And how long have you been there, sir?
3      A.      Just over two years.
4      Q.      Did you graduate from high school?
5      A.      Yes, sir.  1990.
6      Q.      Where did you graduate?
7      A.      Nashua High School.
8      Q.      Is there a Nashua north or south, or
9  I'm not from here.  Or is it just one big one?
10     A.      So there's currently two, but at the
11 time I graduated there was only one.
12     Q.      There was one.  And did you go on to
13 higher education beyond high school?
14     A.      I did, I completed a bachelor's degree
15 and went on later in life for a master's degree.
16     Q.      Where did you go for your bachelor's
17 degree?
18     A.      I spent one year at the University of
19 Southern Maine, then I moved to the University of
20 Massachusetts, at the time it was ULowell, it is
21 now UMass at Lowell, where I got my bachelor's
22 degree in criminal justice around 1996 or '97.  I
23 took a year or two off to -- when I got hired by
24 the police department in 1993.  I went back and
25 completed the bachelor's degree.  And then I

1  believe in 2012 or '13 is when I went to Rivier
2  University for an MBA.
3      Q.      And was the MBA in criminal justice?
4      A.      No, it was just a --
5      Q.      I'm sorry, my bad.  I know what an MBA
6  is.  I'm sorry.  I should listen better.
7              Okay.  Have you served in the military,
8  sir?
9      A.      I have not.
10     Q.      Why don't you just run through very
11 quickly with me your job history once you were
12 done with school up until the Nashua Police
13 Department?
14     A.      So my jobs prior to the police
15 department, is that what you're asking?
16     Q.      Yeah, from college to police
17 department.
18     A.      So I was hired by the police department
19 while I was in college.  Prior to that --
20     Q.      That was '93, you said?
21     A.      Yes, September 7, 1993.
22     Q.      Go ahead.
23     A.      So prior to that I had worked odd jobs,
24 Sky Meadow Country Club.
25     Q.      I'm sorry.  I don't need the odd jobs.

1      A.      Okay.
2      Q.      Just -- let's say from, you know,
3  getting out of college forward to, you know,
4  becoming a full-time police officer.
5      A.      Sure.  I guess I can't answer that, I
6  had odd jobs in college and I was hired while I was
7  in college, so I started my police department
8  career in the middle of my college career, so I
9  never worked after that, if that's what you're
10 asking.
11             MR. CULLEN:  There were none is the
12 answer.
13 BY MR. MALAGUTI:
14     Q.      That's fine.  Good for you.  Let's
15 focus then on the Nashua Police Department.  You
16 started in 1993, was that full time or part time?
17     A.      That was full time.
18     Q.      And what was your position?
19     A.      I started as a first-year officer.  The
20 position is called the first-year special officer.
21     Q.      And then how long were you in that
22 position?
23     A.      That would be for one year, and then I
24 went to second-year special officer.
25     Q.      And another year or more?

MICHAEL CARIGNAN                                    10..13

1      A.      Yeah, so the third year is when you
2  become a patrolman.
3      Q.      Okay.
4      A.      It's all the same job, but it's a
5  different -- different rank based on knowledge.
6      Q.      Okay.  And then you became a patrolman,
7  and you were a patrolman for a number of years?
8      A.      Correct.
9      Q.      And then where did you go from being a
10 patrolman?
11     A.      So around 2000 I was transferred to the
12 detective bureau, into the narcotics investigation
13 division.  I spent four years in that position, two
14 at the Nashua Police Department, two assigned to a
15 DEA high-intensity drug trafficking area task
16 force.  And upon completion of that I was
17 transferred to the criminal investigation division
18 for several months before I was promoted and that
19 was in 2004, 2005 to the rank of sergeant.
20     Q.      And after you were a sergeant, where
21 did you go from there?
22     A.      So I spent a couple of years, two to
23 three years as a patrol sergeant, and then I was
24 transferred back into the narcotics investigation
25 division as a sergeant in there.

1      Q.      And how long did you stay as a sergeant
2  in any capacity in the Nashua Police Department?
3      A.      Roughly three years.
4      Q.      So until about 2007 or so?
5      A.      Yes.
6      Q.      And then where did you go from there?
7      A.      And then I was promoted to the rank of
8  lieutenant where I went back to patrol, spent
9  approximately a year in patrol, maybe a little
10 longer, and then I spent another year or two as a
11 narcotics investigation division lieutenant and a
12 criminal investigation bureau lieutenant.
13     Q.      And the difference between the first
14 patrol job that you had and the patrol job as
15 lieutenant was that you were a supervisor,
16 correct?
17     A.      Correct, yes.
18     Q.      And does that cover the entire thing?
19     A.      No, the sergeant is also a supervisor
20 position, but, no, after that I was promoted to the
21 rank of captain where I served in the patrol
22 division, and then I served as the captain of the
23 detective bureau.
24              After that I was promoted to the rank
25 of deputy chief where I spent time as a deputy

1  chief of operations, and then I was promoted to the
2  rank of chief.
3      Q.      And what year were you -- did you
4  become deputy chief?
5      A.      It was probably around 2017 or '18.
6  No, probably 2016.
7      Q.      And I assume you went directly from
8  there to chief?
9      A.      Yes, sir.
10     Q.      And what year did you become chief?
11     A.      It would have been 2019.  I believe it
12 was in August.
13     Q.      All right.  And I'm going to jump to
14 2019 and I'm going to focus in on this
15 investigation of the assessing department.
16              MR. MALAGUTI:  And the only document,
17 Brian, that I was going to introduce here was
18 Chief Lehto's (sic) very short, what we now
19 learned were called supplemental narratives of the
20 meeting over at the mayor's office.  Do you happen
21 to have that?
22              MR. CULLEN:  I do.  So I'm going to
23 show it to the chief.  It's NPD-LO-029, and my
24 version doesn't have any markings on it.
25 BY MR. MALAGUTI:

1      Q.      When you're ready, Mr. Carignan, do you
2  recognize that document?
3      A.      Yes, sir, I do.
4      Q.      You've seen it before?
5      A.      Yes, I have.
6      Q.      What is that, please?
7      A.      It is a supplemental report completed
8  by, at the time, Captain John Lehto, date
9  indicating it was completed on June 26, 2019.
10              MR. MALAGUTI:  Pam, can we mark that as
11 Carignan 1.
12 (Carignan Exhibit 1 was marked for identification.)
13              MR. MALAGUTI:  Brian, just to look
14 ahead a little bit, the only other documents that
15 you would have that I'm going to be looking to, to
16 do later on when we get onto the trespass thing,
17 are just the police records.
18              The original police -- there are sort
19 of two sets, the original one done by I think
20 Earnshaw, and then I think the follow-up ones done
21 by Roach.  So at some point we'll probably be
22 marking those.
23              I'm going to have to go from memory on
24 my end, but we'll be marking.  Just to give you a
25 head start on where we're going to be headed later

MICHAEL CARIGNAN                          14..17

Page 14

1   on, okay?
2           MR. CULLEN:  Sure.  I believe I have
3   those here.
4           MR. MALAGUTI:  I know you produced them
5   because I had pulled them down, and I just can't
6   get access to them, so.  Thank you.
7   BY MR. MALAGUTI:
8       Q.    Okay.  So, Mr. Carignan, I can't see
9   the document that you're looking at, but I believe
10  it's from -- is it from June of 2019, somewhere in
11  that area?
12      A.    Yes, June 26, 2019.
13      Q.    And could you describe that document to
14  us, please.
15      A.    Sure.  It's a -- as you stated, it's a
16  supplemental document, meaning a supplemental
17  report to a larger report that just indicates
18  something that happened within that case.  It was a
19  report written by Captain John Lehto, based on a
20  meeting that I had with him attending a meeting at
21  City Hall.
22      Q.    Now, this is in regard to an
23  investigation that would eventually be done by the
24  Nashua Police Department regarding the Nashua
25  Assessing Department, right?

Page 15

1       A.    Correct, yes, sir.
2       Q.    And it's fair to say if that was
3   brought to your attention by a woman named Laurie
4   Ortolano and perhaps another woman with her named
5   Laura -- I believe it's pronounced Colquhoun?
6       A.    Correct.
7           MR. MALAGUTI:  And if someone knows
8   better than me, I'm going to make an attempt at
9   spelling Colquhoun for the stenographer.  I
10  believe it's C-O-L-Q-U-H-O-U-N.  Does that sound
11  right, if you can find it somewhere?
12          MR. CULLEN:  That appears to be
13  correct.
14          MS. ORTOLANO:  It's C-A-L,
15  C-A-L-Q-U-H-U-O-N (sic).
16          MR. MALAGUTI:  C-A-L.  Okay.  Thank
17  you, Laurie.
18  BY MR. MALAGUTI:
19      Q.    You just came into a different view, so
20  you're still there.  My apologies.  You bounced
21  down on the screen.
22          Do you have a recollection,
23  Mr. Carignan, about your meeting with what I'll
24  call the two Laurie and Laura?
25      A.    The meeting with Laurie and Laura, I

Page 16

1   didn't have any specific memory of that meeting.  I
2   know I've spoken to Laurie several times.
3       Q.    When is the first time you ever spoke
4   with Laurie?
5       A.    I'll be honest, I'm not sure.  We've
6   had several conversations.  So -- go ahead.
7       Q.    Let me put them chronologically.  Did
8   you have conversations with her prior to
9   discussing the investigation into the Nashua
10  Assessing Department?
11      A.    Yes.
12      Q.    In what forum would these conversations
13  occur?
14      A.    Well, so, again, we had several
15  conversations, some we had seen each other at City
16  Hall a couple of times over some different issues,
17  but she came to me to the police department to
18  speak to me about her concerns with those
19  allegations.
20      Q.    So the meeting about the Nashua
21  Assessing Department was a face-to-face meeting at
22  the police department?
23      A.    I believe so, yes.
24      Q.    Was it just a conversation or did it
25  involve her showing you documents?

Page 17

1       A.    I believe she showed us some documents.
2   Again, we had several meetings, I apologize if the
3   chronology is not right, but Laurie had excellent
4   documentation as to her allegations and her
5   concerns.
6       Q.    At some point did she give police
7   officers some documentation that they retained?
8       A.    Yes.
9       Q.    And how soon after you first met with
10  Laurie at the police department to discuss these
11  allegations did you end up going over to the
12  mayor's office for the meeting that was documented
13  in Exhibit 1?
14      A.    I don't exactly remember the day she
15  came over, so I can't give you an exact time, but
16  it would be within a couple of days.  It was -- we
17  took it seriously, and we would have gone over
18  pretty quickly to start looking into it.
19      Q.    At that point when she contacted you,
20  would you say that you were in charge of the
21  matter?
22      A.    The allegations came to me and I
23  directed it to go towards the detective bureau, so,
24  yes.  In charge of assigning it, yes.  In charge of
25  handling it, no.

Page 18

1      Q.    Yeah, so, and in fact, you fairly
2  quickly assigned it to, I believe it was -- and
3  again, I don't have the docs, Captain Lehto and
4  Detective Mederos, is that right?
5      A.    Yes, as the chief, Captain Lehto was
6  the captain for the detective bureau, so I told
7  him, he was my immediate subordinate.  I told him I
8  wanted him and -- it was Lieutenant Mederos -- I
9  believe it was Lieutenant Mederos at the time, to
10 handle the investigation.
11     Q.    And do you know that at some point they
12 took possession of the documents that Laurie
13 Ortolano had shown you?
14     A.    Yes.
15     Q.    They were somewhat voluminous, weren't
16 they?
17     A.    Yes.
18     Q.    There was a private investigator's
19 report included, for example?
20     A.    I believe so.  I'm not sure which
21 packet of information it was, but I'm certainly
22 aware that there was the private investigator's
23 reports.
24     Q.    Now, do you know whether you appointed
25 Captain Lehto and Lieutenant Mederos before you

Page 19

1  went over to the meeting at the mayor's office or
2  afterwards?
3      A.    Well, so Captain Lehto went with me to
4  speak with the mayor about the allegations and the
5  fact that we would be conducting an investigation,
6  and the way the structure is at the police
7  department, I would assign John Lehto to handle it,
8  he would, through his lieutenant and sergeant, make
9  sure the detective -- the appropriate detective was
10 assigned to do the investigation.
11           So that's kind of how the flow --
12 it's -- it's a command structure, the flow, you
13 know, kind of went down through him.
14     Q.    So it sounds like you appointed Lehto,
15 Lehto appointed Mederos?
16     A.    Correct.
17     Q.    The chain of command, so to speak?
18     A.    Yes, sir.  Yup.
19     Q.    Now, when you met with Laurie Ortolano
20 and Laura Colquhoun, did you talk about the fact
21 that the police department and the City were sort
22 of all under one tent, the City of Nashua, and
23 that there might be conflicts involved?
24           MR. CULLEN:  Objection to form.  You
25 can answer.

Page 20

1      A.    So I don't remember that ever having
2  come up.  We're certainly a separate entity, we're
3  not -- we don't answer to the mayor, we answer to a
4  police commission, so we work for the City of
5  Nashua, but we're not under City Hall if that makes
6  sense.
7  BY MR. MALAGUTI:
8      Q.    No, that makes -- that makes -- well, I
9  never understand municipal government, but I sort
10 of understand it.
11           Describe for me this police commission.
12 How was it comprised?  For example, and I'm just
13 going to ask for a general narrative on this, is
14 it elected officials, is it appointed officials,
15 and what do they do is what I'm looking for.
16     A.    So there are currently three police
17 commissioners, and there have been traditionally,
18 those police commissioners are appointed by the
19 governor of the State of New Hampshire and approved
20 by the Executive Council.
21           Their role is to oversee the budget of
22 the Nashua Police Department, to oversee the
23 department as a whole, if I can compare it to a
24 board of directors where they're informed of all
25 that's going on in the PD, but the chief executive

Page 21

1  officer, which would be the chief of police,
2  manages the day-to-day and makes the strategic
3  decisions for the short and long-term for the
4  police department.
5           So the commission, is -- what we do,
6  they approve our budgets, they approve our
7  promotions, they approve our terminations, or deny
8  them, but they don't deal with the day-to-day
9  operations of the police department.  They're not
10 sworn officers, they're not -- they have no legal
11 authority to enforce the laws.
12     Q.    And does each commissioner have a
13 full-time job as commissioner?
14     A.    Yes.  Yes, they -- I believe one of the
15 commissioners now is retired -- I'm sorry, so, no,
16 the police commission part, I believe they get $100
17 a year to serve in that role.  But each of them
18 have outside jobs, outside careers, or they're
19 retired, so they don't -- their job is not a police
20 commissioner.
21     Q.    And does every municipality have a
22 New Hampshire have a police -- I'm an outsider, so
23 I apologize.  Does every municipality have a
24 police commission or is that something that only,
25 for example, happens with cities?

Page 22

1     A.     This is -- this is something that
2  happens more with cities. Nashua is a unique
3  environment, it is unique in that it's appointed.
4  Its members of the commission are appointed by the
5  governor, it was set up that way over a hundred
6  years ago to basically keep the corruption -- to
7  keep local politics out of a police department.
8          So the thought process was if the mayor
9  at City Hall doesn't like or wants somebody
10 particular promoted or hired, they can influence
11 the police commission by holding their position
12 over their head.  So the governor now does it with
13 the Executive Council approval from the state level
14 with the intention of keeping the politics out of
15 that.
16    Q.     Would it be an apt analogy to say that
17 the police commission is like the board of
18 directors and the police chief is like the chief
19 executive officer of the police department?
20    A.     Yes.
21    Q.     So in a way the police commission was
22 your boss when you were the chief of police?
23    A.     Yeah, not in a way, they are definitely
24 my boss.  That is 100 percent accurate.
25    Q.     In terms of policies and goals and big

Page 23

1  decisions, but not in terms of everyday policing?
2     A.     Correct.
3     Q.     Okay.
4     A.     So, for example, the police commission
5  will not dictate who handles an investigation, they
6  would not dictate how an investigation is handled,
7  but they would dictate our annual budget, they
8  would dictate the raises, they'd dictate anything
9  like that.
10    Q.     And back to -- did Laurie Ortolano or
11 Laura Colquhoun raise any concerns about the
12 independence of the investigation that was about
13 to occur with the Nashua Assessing Department?
14    A.     I don't know if it was at that specific
15 meeting, but she certainly raised those concerns at
16 some point with me.  And I don't remember
17 conversations with Laurie Colquhoun, I remember
18 more having engagements with Laurie Ortolano.
19    Q.     Laurie Ortolano was the talker of the
20 two?
21    A.     No, that's just the person I had the
22 communications with.
23    Q.     Now, when you say you remember that
24 Laurie had expressed that concern, can you -- can
25 we at least guesstimate, was it early in the

Page 24

1  process, was it later in the process?  Do you have
2  a recollection in that regard?
3     A.     Again, I can't be beholden to anything
4  specific, but it was multiple times throughout, so
5  it's fairly accurate to say right around that time
6  before we started and several times afterwards.
7     Q.     And at any point did she outright tell
8  you that she thought that the police investigation
9  of the Nashua Assessing Department was not being
10 conducted independently?
11    A.     No.  I think her wording was
12 independently.  I know she was not satisfied with
13 the investigation or the outcome, and she had some
14 issues with several points of some of the
15 detectives.  I'm not sure exactly what those were,
16 but I don't know that it was necessarily -- I don't
17 remember it necessarily being a biased
18 investigation, more just an incomplete one.
19    Q.     And how did she communicate those
20 concerns?  Through which medium is what I'm
21 asking.
22    A.     She would -- well, she would try to
23 contact me.  She would contact I believe
24 Captain Lehto, she would contact pretty much the
25 detectives.  She contacted many of us often to

Page 25

1  express those.  You know, I didn't -- I wasn't
2  involved with the case, so I didn't really have
3  involvement in the day-to-day communications with
4  her, or it really wasn't my place to have
5  conversations with her.  If we saw each other, we
6  would talk about it, sometimes we would meet, but
7  it's pretty accurate to say she contacted many
8  people.  And regarding the means of the
9  communication, she would use the telephone.
10         I don't believe she e-mailed me, but
11 it's possible, but I don't remember any e-mails,
12 because most -- mostly it was through face-to-face
13 or phone calls.  She used social media a lot to
14 express her concerns on many different topics for
15 us, so those are the meetings I -- you know,
16 recollect.
17    Q.     Now, while the investigation was going
18 on, did you keep yourself apprised of what was
19 going on in a general way?
20    A.     In a general way, yes, sir.
21    Q.     How so?
22    A.     So every morning at the police
23 department we had -- I don't know the time now, at
24 the time it was 9:00, we would have a morning staff
25 meeting where each of the bureau's captains would

Page 26

1   report over the events of the last 24 hours,
2   anything significant happens or any long-term
3   projects they've been working, just an opportunity
4   for us all to touch base to kind of stay connected.
5          So most of the conversations and the
6   updates would occur at that morning meeting.  If
7   something significant happens, it's quite common
8   for the deputy -- the captain to come in and say,
9   hey, I just need to run something by you or tell
10  you, something happened.
11         So it's an informal process, it wasn't
12  part of the decision-making for it, but that's how
13  it usually happens, so, yes, updated on a regular
14  basis would answer your question.
15      Q.    And how long would those meetings
16  typically last?
17      A.    They'd last anywhere from ten minutes
18  to a half an hour, depending on the topics you had
19  to talk about.
20      Q.    And how broad were they, were they
21  entire -- entire police department or just the
22  command staff?
23      A.    So the command staff each represents
24  their bureaus.  So, for example, the detectives,
25  would inform about major cases that happened for

Page 27

1   the night, patrol would do the same, services
2   bureau may talk about maintenance issues for the
3   building, legal may talk about upcoming cases or
4   anything significant.
5          So each of the six bureaus within the
6   police department report on major things so the
7   chief can be made aware and not -- and kept up to
8   speed.
9       Q.    And I don't remember if I asked.  How
10  long -- was there a set time for these meetings?
11  In other words, I know you said they began at
12  9:00, but were they for just a half an hour, or
13  was there an actual set time of how long they
14  lasted?
15      A.    No, there was no set time.  They would
16  just run until everybody reported what they need
17  to, and if we had other side discussions after,
18  some of those may happen.  So there was no set
19  time.
20      Q.    Now, you said they're informal.  So am
21  I to understand that they were, for example, not
22  recorded?
23      A.    That's correct.
24      Q.    Did anyone take notes or minutes of the
25  meetings?

Page 28

1       A.    Our -- my administrative assistant at
2   the time, Kathy Breslin, was in the meetings, and I
3   believe she takes notes, but I don't believe she --
4   she doesn't record them or enter them into
5   anything.  It's just a reminder for me to address
6   certain issues that come up in the meeting.  That's
7   how it was for me.
8       Q.    Would she have given you those notes to
9   take possession of, or did she keep possession of
10  them herself?
11      A.    No, she would have kept possession of
12  them if -- I don't even know that she maintained
13  it, she basically would walk into the office and
14  say, hey, chief, you have a meeting here, or don't
15  forget you have to address this issue or don't
16  forget this is coming up.
17      Q.    Did she take notes on the computer or
18  did she write out the notes by hand?
19      A.    No, she handwrote her notes.
20      Q.    Did she ever transcribe those notes and
21  put them into electronic format, Word or whatever?
22      A.    Not that I know of.  Not for the
23  morning meetings.
24      Q.    Let's talk about this meeting on --
25  when did we say it was, June 26, 2019?  Do I have

Page 29

1   the date right?
2       A.    Yes, sir.
3       Q.    Who called that meeting?  Was it the
4   police department or was it someone else?
5       A.    No, that was me.  That was the police
6   department.
7       Q.    And who did you call to say that there
8   was going to be a meeting?
9       A.    I don't remember exactly who I called,
10  but it would have either been Kim Kleiner to set
11  the meeting up or I would have called the mayor
12  directly.  Most likely in this case it was the
13  mayor directly, yeah, at the time.
14      Q.    And at the time what was Kim Kleiner's
15  position in the city government?
16      A.    She was the -- at the time I thought
17  she was the chief of staff for the mayor, but this
18  has her as director of administrative services.
19      Q.    And you understand that she was the
20  chief of staff at one point and then became the
21  director of administrative services.  Somewhere --
22      A.    Correct.
23      Q.    -- through all of this, right?
24      A.    Correct.  And throughout that portion,
25  our relationship did not change as far as the

MICHAEL CARIGNAN                    30..33

Page 30

1  topics we would talk about.
2       Q.   And when you say the relationship,
3  you're referring, of course, to your city business
4  relationship?
5       A.   Correct.
6       Q.   Okay.
7       A.   Correct.
8       Q.   How long had you known Kim Kleiner
9  before June 26, 2019?
10      A.   I can't remember if I met her as a
11 captain or a deputy chief.  I was pretty active in
12 community activities, I felt that was important, so
13 it was -- we did a lot of work with the Arlington
14 Street Community Center, and that's when I really
15 got to know her well, which would have been as a
16 deputy chief, so 2016 to 2019, roughly.
17      Q.   And the Arlington Street Community
18 Center is some type of charitable organization, I
19 gather?
20      A.   Well, it's a city-owned property that
21 we opened -- we opened a community center out of.
22      Q.   Okay.  And how long have you known the
23 mayor, James Donchess?
24      A.   I've known him since he was sworn in as
25 mayor, so --

Page 31

1       Q.   The first time or the second time?
2       A.   No.  No, the second time.  Well, the
3  second set of times.  I don't -- we may have had
4  some interactions when he was a union
5  representative, but I don't -- I don't remember
6  having enough interaction to say I knew him,
7  because I was never the union steward.
8       Q.   Now, Mayor Donchess was at one point a
9  union representative?
10      A.   Yes, he was, he represented the
11 Patrolmen's Union.
12      Q.   He represented the Patrolmen's Union as
13 an attorney, am I --
14      A.   Correct.  For the collective
15 bargaining, yes.
16      Q.   So he was not a patrolman or an
17 employee at any time of the Nashua --
18      A.   No, no, no.
19      Q.   Okay.
20      A.   He was not.
21      Q.   And when would this have been, the
22 early aughts, the early 2000s, or before then?
23      A.   No, it might have been right around
24 those times.  I don't remember when he started as
25 the union representative, as the attorney

Page 32

1  representing the union.  It was a good chunk of his
2  non-political time, if that answers your question.
3            So he's been consistently a part of
4  collective bargaining for the police department for
5  a majority of the time that I've been there, I was
6  there.
7       Q.   And did you ever have a social
8  relationship with the mayor, a non-business
9  relationship?
10      A.   No, I did not.
11      Q.   Never went out to dinner with him and
12 his wife or anything of the like?
13      A.   No.
14      Q.   And Ms. Kleiner, did you ever have a
15 social relationship with Ms. Kleiner?
16      A.   No.
17      Q.   Okay.  So what time was the meeting
18 convened on June 26th, 2019?
19      A.   According to the report, it's 9:00 in
20 the morning.
21      Q.   And who was present?
22      A.   Myself, Captain John Lehto, Mayor
23 Donchess, and Kim Kleiner.
24      Q.   And did this take place in the mayor's
25 conference room?

Page 33

1       A.   Yes.
2       Q.   And I'm going to ask you to remember
3  what was said during that meeting, and I'll
4  probably just go person by person as to, you know,
5  who said what.  What did you say at the meeting?
6       A.   So the purpose of the meeting and what
7  I said was informing the mayor that there was a
8  criminal complaint alleged against employees at
9  City Hall, and that we would be investigating the
10 case, and we would be conducting an investigation,
11 or detectives from the Nashua Police Department
12 would be conducting an investigation into those
13 allegations and we would be speaking with multiple
14 employees at City Hall.
15      Q.   Did you say anything else that you
16 remember?
17      A.   No.
18      Q.   And when you said -- when you described
19 the criminal investigation, did you describe the
20 types of allegations that had been made?
21      A.   No, we tried to keep all -- all those
22 facts to really a minimum.  It wasn't his business
23 what we were investigating.  Him and Kim were both
24 well aware of what they were, they had been told of
25 the allegations that were made or they had found

Page 34

1    out about it, and I'm not sure how.
2        So they were aware of what we were
3    looking into, but we didn't give them any
4    information as to the nature of the complaints or
5    how we were going to conduct our investigation.
6    Q.    Now, prior to going into this meeting,
7    did you know the names of the people who were
8    going to be -- let me strike that.
9        Prior to going into this meeting, did
10   you know the names of the subjects of the
11   investigation?
12   A.    I believe so.
13   Q.    Does the name Greg Turgiss sound
14   familiar to you?
15   A.    Yes.
16   Q.    Gary Turgiss?
17   A.    Yes.
18   Q.    And, obviously, Kim Kleiner?
19   A.    Correct.
20   Q.    And you knew prior to going into that
21   meeting that all three of them were subjects of
22   the investigation?
23   A.    Yes.
24   Q.    You knew that Kim Kleiner was a subject
25   of the investigation?

Page 35

1    A.    Correct.
2    Q.    So you were meeting and discussing
3    strategy with one of the subjects of the
4    investigation?
5    A.    No, sir, as I just said, we were just
6    there to tell them that there was an investigation,
7    there was criminal complaints being alleged, and we
8    were going to be conducting an investigation.
9    Q.    Okay.  What did Captain Lehto say, if
10   you recall?
11   A.    Based on -- based on the report, it
12   doesn't really indicate that he said anything, nor
13   would it be common for him to say much, other than
14   pleasantries.
15   Q.    Okay.  A man of few words, fair to say?
16   A.    Yes, he was.
17   Q.    And is that your recollection, that he
18   didn't say anything?
19   A.    Yeah, I don't -- I don't remember
20   him -- like I said, the purpose was pretty quick,
21   it was to be there to let them know that there were
22   going to be detectives walking around City Hall
23   trying to talk to people.  Basically we expected
24   cooperation and just letting the mayor know that we
25   were going to be at City Hall doing that.

Page 36

1        So we didn't go off topic and we didn't
2    discuss a bunch of other things, and we certainly
3    didn't go into the nature of the allegations or the
4    strategy behind the investigation.
5    Q.    And what did Kim Kleiner say at that
6    meeting, if you recall?
7    A.    I'm not sure if it was her or the
8    mayor, but through -- through that conversation the
9    discussion was that they were aware of the
10   allegations, and they had -- I believe they talked
11   about already hiring an investigator to conduct it
12   as an internal interview.
13   Q.    Why don't you tell me about that.  Tell
14   me everything you know about the hiring of the
15   investigator.
16   A.    So they had just said they were aware
17   of the complaints made and because it was an
18   internal matter for them that they had decided to
19   hire an investigator to look into the allegations.
20   Q.    Did they tell you --
21   A.    Those allegations -- I'm sorry, go
22   ahead.
23   Q.    My apologies, I cut you off.  Finish,
24   please.
25   A.    No.  No, you go ahead.

Page 37

1    Q.    Did they tell you who the investigator
2    was?
3    A.    I'm sure they did, John noted it in the
4    report, so.
5    Q.    Was his name Attorney Mark Broth?
6    A.    Yes.
7    Q.    Did you know Mark Broth from any
8    encounters prior to this?
9    A.    No.
10   Q.    Did they say anything else about the
11   investigation -- the external investigation that
12   you just described?
13   A.    No.
14   Q.    Do you recall that anyone said that the
15   human resources director, I believe his name was
16   Mr. Budreau, am I correct, did they say anything
17   about him having already done some work on it?
18   A.    According -- I don't recall that part
19   of the conversation, but according to the report
20   there's an indication that that was true.
21   Q.    Do you know Mr. Budreau?
22   A.    Yes.
23   Q.    I don't remember his first name, what's
24   his first name?
25   A.    His first name is Larry.

MICHAEL CARIGNAN                                     38..41

Page 38

1      Q.      Larry.  Am I pronouncing his last name
2   correctly?
3      A.      Yes.
4      Q.      Did anyone tell you that Mr. Budreau
5   had already interviewed some of the assessors?
6      A.      I don't remember that, but according to
7   the report, he had already interviewed several
8   employees.
9      I don't have the report in front of me.
10  Does the report name the people who were
11  interviewed?
12     A.      According to the report it said Greg
13  Turgiss had already been interviewed by director of
14  human resources, Larry Budreau.
15     Q.      Did you know Greg Turgiss from before
16  this?
17     A.      I did not.
18     Q.      Did you know Gary Turgiss from before
19  this?
20     A.      I did not.
21     Q.      And we've already talked about Kim
22  Kleiner.  Okay.  Do you remember Ms. Kleiner
23  saying anything about the city providing full
24  support as needed, or anything to that effect?
25     A.      No.  I mean, my recollection is that

Page 39

1   both she and the mayor said they understood.  They
2   said they welcomed an investigation and we would
3   get cooperation.
4      Q.      Okay.  And do you remember anything
5   that the mayor said?  I know you relayed a couple
6   of instances where you couldn't remember if it was
7   the mayor or Kleiner, so I'm asking for additional
8   statements that you can remember above and beyond
9   those.
10     A.      No, that's it.
11     Q.      And how did the meeting end?  Did
12  someone give instructions, or did someone say
13  time's up?  Or if you recall, how did it end?
14     A.      No, it just -- it was pretty obvious
15  that the topic of discussion was over, so we just
16  said goodbyes.
17     Q.      And do you remember how long the
18  meeting lasted for?  I think you said it began at
19  9:00.  Do you remember what time you got out?
20     A.      I don't.  It was a fairly short
21  meeting.  Our purpose was not to talk about
22  anything other than this.
23     Q.      Short as in less than a half an hour,
24  short as in less than 15 minutes, can you
25  estimate?  If you have no memory, that's fine.

Page 40

1      A.      No, if I had to estimate, I'd say
2   between 15 minutes and a half an hour.
3      Q.      And when you left the meeting, did you
4   and Captain Lehto continue to talk about what
5   transpired in the meeting?
6      A.      No.  If I remember the conversation was
7   more who it was going to be assigned to, and just
8   to make sure they did a thorough job.
9      Q.      And when you talked about who it was
10  going to be assigned to, did you know at that
11  point that Lieutenant Mederos was going to be
12  assigned, or is that one of the people who -- that
13  Lehto mentioned to you?
14     A.      So Lieutenant Mederos would be assigned
15  in the manner that it's an investigation being done
16  by the criminal investigation bureau.  He was the
17  CID -- CIB lieutenant so it would flow to him to
18  pass down to the sergeant and the detectives.
19     Q.      And at some point you came to
20  understand that Mederos and Lehto didn't do the
21  whole investigation themselves, they assigned it
22  downward?
23     A.      Correct.
24     Q.      Do you know who got the assignments?
25     A.      Ultimately Frank Lombardi got it.  I'm

Page 41

1   sure he was assisted by other detectives, other --
2   his supervisors, his sergeants would have been
3   involved as well, but he was the lead detective.
4      Q.      And at the time his position was
5   detective?
6      A.      Correct.
7      Q.      And do you know how long after the
8   meeting the assignment to Detective Lombardi
9   occurred?
10     A.      I don't.
11     Q.      And you knew Detective Lombardi
12  previously of course from being in the same
13  department together?
14     A.      Correct.
15     Q.      And by the way, when the meeting
16  occurred, you were not yet chief, right?  You were
17  deputy chief, is that right?
18     A.      Correct.  At the time the current
19  chief, Andrew Lavoie, was on what we call terminal
20  leave.  He was on time off between the time of his
21  vacation time, unused vacation and sick time, and
22  the time of his retirement, so I was acting in the
23  role of -- still a deputy chief, but I was
24  acting -- I guess you call it acting chief.  It
25  wasn't an official title.

MICHAEL CARIGNAN                                    42..45

Page 42

1    Q.    Had you yet been appointed to become
2  the chief?
3    A.    Yes, in June I would have, because I
4  believe I was promoted August 1st, I believe.  So,
5  yes.
6    Q.    And that appointment was by the police
7  commission, I believe; is that right?
8    A.    Correct.
9    Q.    Did the police commission also appoint
10 you as deputy chief or was that a role that the
11 chief had?
12   A.    That was a role that the chief had and
13 he would have informed the police commission, they
14 would have had to approve the promotion, but that
15 is based solely on the chief's recommendation.
16   Q.    Okay.  How did you come to learn that
17 Detective Lombardi had been appointed to lead the
18 investigation?
19   A.    The process would have -- I'm assuming
20 the way the process would normally go is
21 Captain Lehto would have informed me, whether at
22 the morning meeting or at any other point.
23   Q.    Okay.  And as the investigation went
24 on, whether it was through these meetings or
25 otherwise, you were generally kept apprised of

Page 43

1  what was happening in the investigation, right?
2    A.    From an overall perspective, yes.
3    Q.    Now, did you have to approve any parts
4  of the investigation?
5    A.    No.  So those approvals go through the
6  chain of command, and ultimately when the case is
7  done, the bureau captain would review it and sign
8  off on it.  And the chief would be informed.
9    Q.    So what's the bureau captain?  What's
10 that role?
11   A.    So at the time it was a he, John Lehto,
12 was -- he oversaw all felony investigations within
13 the city of Nashua.
14   Q.    And this was a -- it was identified
15 early on as a felony investigation?
16   A.    Based on the allegations -- based on
17 the allegations and the -- what we had initially
18 been told of the amount of fraud or loss, it was --
19 appeared to fall under the felony category, yes.
20   Q.    When did -- you might have mentioned
21 it, but when exactly did you become the chief?
22   A.    It was August 1st of 2019.
23   Q.    That's the kind of date we all
24 remember, right?
25   A.    So you remember your initial hire date

Page 44

1  and you remember your retirement date.  Those are
2  the two most significant dates in a police
3  officer's current history.
4    Q.    Do you happen to own a boat?
5    A.    I do.  Do I own a boat?  No, but I know
6  where you're going.
7    Q.    Yeah, what are the two happiest days of
8  a boat owner, the day you buy it and the day you
9  sell it.  So.
10   A.    Yep.  Very similar.
11   Q.    All right.  I happen to have the
12 misfortune of owning a boat, so that's why I
13 raised that.
14         So -- and you didn't stay as captain
15 for a decade.  You were there for a couple of
16 years, is my understanding?
17   A.    Correct.
18   Q.    What was the date that you left, that
19 you retired or resigned?
20   A.    I retired officially March 1st, 2022.
21   Q.    And did you go straight into public
22 work -- I'm sorry, private work at that point?
23   A.    I did.  I was on terminal leave for
24 approximately two months, and I started -- I'm
25 sorry, approximately three months I had terminal

Page 45

1  leave time built up, so I started BAE Systems on
2  January 2nd of 2022.
3    Q.    Now, eventually the report -- I'm
4  sorry, eventually the investigation was completed.
5  Do you understand some of the events that happened
6  or the investigative -- let me rephrase that.
7         Do you have any recollection of any of
8  the investigative steps that Detective Lombardi
9  and others took during the investigation?
10   A.    Not specifically.  I know the
11 investigation was progressing along quite a bit.
12 It seemed to blossom out -- if I remember
13 correctly, it seemed to blossom into bigger things
14 at times.  So nothing specifically other than it
15 was being done in a timely and a thorough manner.
16   Q.    Did you receive any reports of who was
17 interviewed at any point, that you can recall?
18   A.    I did not review any written reports,
19 but through the daily meetings and through
20 interactions with Captain Lehto I would have been
21 informed, hey, we're doing this this time or this
22 is roughly what we're doing.
23         So, again, it was an informal process
24 to be kept up to speed on.
25   Q.    And did you -- in your position as

Page 46

1    chief, did you have occasion to work with the
2    legal department of the City of Nashua?
3        A.    Yes.
4        Q.    Did the legal department of the City of
5    Nashua represent the police department, or is that
6    something different under the way New Hampshire
7    law works, or Nashua law works?
8        A.    So the legal department would advise me
9    on matters of negotiations with some of the
10   collective bargaining units that we had, they would
11   have one of their attorneys present with me to make
12   sure that I wasn't trying to promise anything or
13   negotiate down the road that the City wouldn't be
14   willing to approve.  Because ultimately the budget
15   comes from the City.
16           So they would do that.  If we had a
17   question on legislation, we would talk to them
18   about the impact to the City, but they did not
19   represent our criminal cases in any manner, we had
20   a separate bureau for that.
21           They did not represent us in civil
22   litigation, we had -- obviously we had --
23       Q.    Attorney Cullen?
24       A.    Yes, yeah, no, risk department would
25   mitigate that, and I don't ever recall a time them

Page 47

1    representing us.  And the only other time I believe
2    they represented us was maybe in 94 -- some 94-A
3    requests.
4            So for the most part, no, but there was
5    occasions that they did in some instances, if that
6    makes sense.
7        Q.    Pardon my ignorance, but what's a 94-A
8    request?
9        A.    It's just a request for freedom of
10   information to get the reports and --
11           MR. CULLEN:  I think the chief means
12   91-A.
13           MR. MALAGUTI:  Believe it or not, I
14   actually know what a 91-A is.
15       A.    My apologies, I should remember.
16   BY MR. MALAGUTI:
17       Q.    No, that's fine.  Thank you.  Was
18   Attorney Bolton the -- I forget his title, is he
19   city solicitor, the chief legal counsel during the
20   entire time that you were the chief of police?
21       A.    Steve Bennett was there for a period of
22   time, but I don't remember when that transition
23   happened, so I don't believe Steve Bolton was in
24   there the entire time, I believe Bennett was for a
25   portion of my time.

Page 48

1        Q.    So let's just put it in reference to
2    June 26th of 2019, since that's the date we've
3    thrown out.  Was Bolton already the city solicitor
4    at that point?
5        A.    Yes.
6        Q.    Did you speak with Bolton at all about
7    the meeting that you had at City Hall on
8    June 26th?
9        A.    No.
10       Q.    Did you speak with Celia Leonard or any
11   other attorney in the legal department about that
12   meeting?
13       A.    No.
14       Q.    Did you speak with anyone from the
15   Nashua legal department about the investigation at
16   any time during the investigation, from the time
17   it was open until the time it was closed?
18       A.    Legal department would have been
19   represented in the morning meetings, so they were
20   present -- they were present, and they would have
21   been aware.
22           So, yes, they would have participated
23   in some general conversations, but I didn't seek
24   out the legal bureau for anything specifically.
25           MR. CULLEN:  Can I just ask a

Page 49

1    clarifying question here, Peter?
2            MR. MALAGUTI:  Sure, go ahead.
3            MR. CULLEN:  When you say legal bureau,
4    legal department, I think, Peter, plaintiff's
5    counsel is asking about the city legal department.
6            THE WITNESS:  No, I'm sorry.
7            MR. MALAGUTI:  Thank you.
8        A.    Are you talking about the legal
9    department --
10           MR. MALAGUTI:  Thank you.  I would have
11   gone down this rabbit hole.  Thank you, Brian.
12           MR. CULLEN:  That's what I was
13   afraid of.
14       A.    So you're referring to the city legal
15   department?
16   BY MR. MALAGUTI:
17       Q.    I'm referring to the department
18   currently headed by Steven Bolton.
19       A.    My apologies, we have a legal
20   department at the police department, so it's one of
21   our several bureaus.
22           So, no, to answer your question, I did
23   not have any conversations with the City of
24   Nashua's legal department regarding this.
25       Q.    And just to clarify, when you say that

Page 50

1  the legal department is present in the morning
2  meetings, you're referring to the legal bureau
3  within the police department, is that right?
4      A.    Yes, sir.  That's correct.
5      Q.    Steve Bolton's city solicitor's office
6  does not attend the morning briefings that you
7  conduct?
8      A.    That is correct.
9      Q.    Okay.  Good, thank you.
10          Okay.  As you sit here today, do you
11  have a recollection of the way that the
12  investigation went?  Do you remember events from
13  it, is what I'm asking, and if you could relate
14  them, please.
15      A.    I remember the -- I remember the
16  investigation was, in my opinion, very, very
17  thorough.  I remember it was pretty clear that they
18  were trying to cover every base.
19          Ms. Ortolano, as a victim, asked many
20  questions, and we -- and I recall it being
21  important to follow up with all of those, and I
22  believe that was being done.  Again, those would
23  have been through the detective bureau,
24  Captain Lehto down to Lieutenant Mederos.  But,
25  yes, those are my recollections of the case.

Page 51

1      Q.    Do you remember when the case
2  concluded?
3      A.    I do.
4      Q.    Do you remember reading the report?
5      A.    I did not read the entire report.
6      Q.    Do you remember who authored the report
7  closing the case?
8      A.    No.  I don't know.  No, I don't know
9  who authored the last report.
10      Q.    Might it have been Lieutenant Mederos?
11      A.    It could have been.
12      Q.    But you don't recall?
13      A.    That's correct.  I did not read the
14  entire case.
15      Q.    Of course there's a document to jog
16  both of our memories on this, and it's not
17  important for us today, but -- so okay.
18          Did you have any input into the final
19  decision?
20      A.    No.
21      Q.    Did you make any recommendations
22  leading up to the final decision?
23      A.    No.
24          MR. CULLEN:  If you're about to shift
25  gears here, Peter, can we just take just about a

Page 52

1  five-minute break?
2          MR. MALAGUTI:  I would love a
3  five-minute break.
4          MR. CULLEN:  Okay.  Thanks.
5          MR. MALGUTI:  It might give me a chance
6  to look for documents to put up, too, but.
7          MR. CULLEN:  Oh, then I take it back,
8  let's just keep going.
9          MR. MALGUTI:  Well you've already
10  pulled those two police reports for me, right?
11          MR. CULLEN:  I haven't had time to pull
12  them, but I think I know the ones you have.  I
13  don't have the entire file in front of me, but I
14  have the documents that I would expect you to be
15  looking at.  So, yeah, I think I've got it here.
16          MR. MALGUTI:  Let's take five and I'll
17  see if I have them, too.  Thank you.
18          (Recess taken.)
19  BY MR. MALAGUTI:
20      Q.    Okay, Mr. Carignan, before I get
21  into -- and I really only have one more incident
22  to talk about, we'll talk about for a little
23  while, but before I get into that, just a couple
24  of general questions.
25          Have you ever had occasion to call over

Page 53

1  to various departments in City Hall by telephone
2  over the years you were chief?
3      A.    Sure.
4      Q.    Have you called the mayor's office
5  directly at any point?
6      A.    I don't remember a specific time
7  calling his direct number or if he had one, but,
8  sure, I would have certainly called over to the
9  mayor's office many times.
10      Q.    Did you ever talk to the mayor about
11  cases you were working on or was it policy
12  matters, or what kind of things did you discuss
13  with him?
14      A.    For the most part my contact with the
15  mayor was over two major issues, if there was a
16  significant incident in the city, a homicide, a
17  bomb threat at the school, something that rose to
18  that level, I would call him out of courtesy, or
19  there was a lot of community work being done with
20  the police department in the city of Nashua, so
21  certainly phone calls could have been done over
22  that.
23      Q.    In terms of the major issues, the
24  homicides and the bomb threats and the like, did
25  the mayor have any input at all into the police

1    procedures that were followed?
2         A.    Absolutely none.
3         Q.    Did the mayor ever try to give advice
4    on any of those matters?
5         A.    No.
6         Q.    Major issues, homicide, murder, bomb
7    threats.  Laurie Ortolano was not a major issue,
8    was she?
9         A.    No.  Not something that I would call
10   him about.
11        Q.    Do you ever recall discussing Laurie
12   Ortolano with the mayor's office?  When I say the
13   mayor's office, I'm talking about the mayor, the
14   chief of staff or any of the staff who you would
15   deal with directly in the mayor's office?
16        A.    There were -- there were times that I
17   remember -- again, the time span between deputy
18   chief and chief is where I would have occasions to
19   have those conversations.
20              We dealt with Laurie Ortolano a lot
21   over a lot of issues, and my recollection is that
22   the relationship between Laurie and the City of
23   Nashua was much more involved, so there were
24   probably conversations, and I don't recall anything
25   specific, but there were probably conversations

1    about, you know, do you guys have these reports or
2    this is coming up, so I don't recall anything
3    specific, but conversations, I'm sure, would have
4    happened about Laurie, about different items.
5         Q.    And specifically, if you recall, who
6    would those conversations have been with?  The
7    name of the person they would have been with.
8         A.    It could have been with Mayor Donchess,
9    it could have been with Kim Kleiner.  Those are the
10   two I would have had occasion to have conversations
11   about.
12        Q.    And you don't recall whether it was
13   when you were the deputy mayor or the -- I'm
14   sorry -- the deputy mayor -- the deputy chief or
15   the chief?
16        A.    I'm sure those conversations happened
17   during both periods of my career.
18        Q.    Any other offices in City Hall that you
19   would have called over to?
20        A.    No.  The only other people I had
21   occasion to speak to was really the risk
22   department, but that wasn't about Laurie Ortolano.
23        Q.    And is the risk department, do they
24   maintain an office in the City Hall?
25        A.    They do.

1         Q.    City Hall an easy place to hail by
2    telephone, or do they answer their phones over
3    there?
4         A.    I never recall having a problem getting
5    in touch with whomever.
6         Q.    Do you ever recall speaking with anyone
7    over at City Hall in regard to Laurie Ortolano's
8    Right-to-Know request specifically?
9         A.    So I remember having a conversation
10   with a new attorney that was hired.  I was told
11   that the -- and when I say I was told, I believe it
12   was Steve Bolton, but she was hired -- I'm sorry,
13   the new attorney was hired specifically to deal
14   with cases of 91-A requests.
15        Q.    Would that be Attorney Neumann,
16   N-E-U-M-A-N, or something like that?
17        A.    If that's the attorney that was a
18   veteran from the military, then that's correct.  I
19   don't remember, it was a gentleman and I don't
20   remember his name, but I remember he was a military
21   veteran.
22        Q.    And did you talk with Steve Bolton
23   regarding RTK requests?
24        A.    Yeah, I'm sure we had conversations
25   about it, you know, we -- I was responsible for the

1    Nashua Police Department's and I think we had asked
2    his advice or legal department's advice on certain
3    matters.  There was one point that he sent a
4    directive out that all 91-A requests had to go
5    through the City of Nashua's legal department, not
6    the Nashua Police Department, but legal department,
7    but that's all I remember about it.
8              We were pretty responsive to the 91-A
9    requests for our own reasons, so I don't think
10   that, you know, anything more than informing us of
11   what they were doing in that directive.
12             I don't remember when that directive
13   was, but I remember he was telling us for legal
14   purposes any 91-A requests had to go through them.
15        Q.    Isn't it the case that the police
16   department deals with their own 91-A requests
17   rather than going through City Hall?
18        A.    We do.
19        Q.    I think you have a department, or at
20   least a person who deals with that, is that right?
21        A.    Yeah, I'm assuming it's still the same
22   person.  David Lavoie was the records manager, and
23   he dealt with all the 91-A requests.
24        Q.    And was it your understanding that at
25   some point the Nashua city legal department headed

MICHAEL CARIGNAN                                     58..61

1   by Steve Bolton handled the rest of the 91-A
2   requests for the city?
3        A.   I don't -- I can't answer that because
4   I don't know if he did the school department.  I
5   don't know, the health department.  I'm not sure
6   what level he went out to, so.  I know we handled
7   ours.
8        Q.   Reframe the question.  Is it fair to
9   say that at some point the legal department -- let
10  me start again.
11            At some point did you become aware that
12  the legal department was handling the bulk of 91-A
13  requests for the city?
14       A.   Yes.
15       Q.   So when you talked to Steve Bolton
16  about 91-A requests, were you talking to him about
17  police department 91-A requests or other 91-A
18  requests?
19       A.   I don't remember specifically.  There
20  were probably some that were both -- that involved
21  both.  So I don't remember any specific
22  conversations about it, because David Lavoie had a
23  handle on it, the services bureau captain would
24  have informed me of anything that needed to be --
25  to be dealt with or what they were handling.

1        Q.   Do you feel generally you were kept in
2   the loop pretty well over all matters?
3        A.   Yeah --
4        Q.   Let me narrow the question.  That was
5   too broad a question.  While you were chief, do
6   you feel that you were generally kept in the loop
7   regarding, you know, most of the cases that were
8   being handled in the police department?
9        A.   Regarding most of the cases, no.  There
10  are a lot of cases, roughly a hundred thousand a
11  year, so certainly not at that level.
12       Q.   How many patrolmen and officers and
13  police staff do you have?  That's a big
14  department.
15       A.   There were -- at the time I left we
16  were authorized for 179 sworn police officers and
17  an additional 60-something civilian staff.
18       Q.   Do you recall speaking with
19  Steve Bolton about Laurie Ortolano's RTK requests?
20       A.   Not specifically about hers, other than
21  what I stated earlier.
22       Q.   It sounds like Laurie Ortolano was
23  obviously at front of mind for a lot of people.
24  Were you generally aware of her situation with the
25  Right-to-Know requests that she made?

1        A.   Yes.
2        Q.   How so?  How did you keep aware of
3   those?
4        A.   Well, just there was a large number,
5   and what would cause it to come to my attention is
6   if they involved a lengthy amount of time to
7   respond to, if it would go over a certain time and
8   it was going to cost a lot of money through hours
9   worked to get the information needed, that's
10  generally when I would be given a heads-up.  And
11  I'm speaking only to the police department
12  Right-to-Know requests.
13       Q.   Did you feel that Ms. Ortolano made a
14  larger number of police department requests than
15  other citizens?
16       A.   I do.
17       Q.   Okay.  Let's talk January 22nd, 2021.
18  And I would be putting documents in front of you
19  if I could.
20            Do you -- at that time I believe you
21  were the full chief.  You were appointed in 2020,
22  if I remember correctly, right?
23       A.   Yes, that's correct.
24       Q.   So on January 22nd, 2021 you would have
25  been the police chief at that time.  Did you

1   become aware around that time that there was an
2   incident at City Hall involving Ms. Ortolano?
3        A.   Yes.
4        Q.   How did you come to hear of that for
5   the first time?
6        A.   I was informed, and I don't recall
7   which, again, we had meetings that had multiple
8   captains and staff in it, so I was apprised by
9   either the patrol captain or the patrol deputy
10  chief that there was an incident at City Hall
11  involving Ms. Ortolano.
12       Q.   And who would have been the patrol --
13  what did you say, patrol captain or patrol chief?
14       A.   Patrol deputy chief.
15       Q.   Who would have been those two people,
16  if you remember?
17       A.   So Deputy Chief Kevin Rourke at the
18  time, who is now Chief Rourke, and I believe it was
19  Captain Bolton, but it could have been a second
20  shift captain, may have been Faye.  I'm not sure
21  which captain.
22       Q.   Are you familiar with -- and, again,
23  I'm going off of memory here, a Patrolman
24  Earnshaw?
25       A.   Yes.

MICHAEL CARIGNAN                    62..65

1      Q.      Would he have been -- I think it was a
2    he.  Would he have been a patrolman in January of
3    2021?
4      A.      Yes.
5      Q.      And are you familiar with, I believe, a
6    Sergeant Gilbert, if I remember correctly, is it
7    Caleb Gilbert?
8      A.      Yes, I'm familiar with him.
9      Q.      Do you have knowledge that they were --
10   and there's a third person who I can't remember,
11   but do you have knowledge that they were present
12   to handle the incident with Laurie Ortolano in
13   January of 20 -- I've lost the date, too -- 2021.
14     A.      I'm not sure which -- I don't remember
15   which officers responded.  I know I would have been
16   told, but I don't remember who they were.
17     Q.      And you wouldn't have heard from them
18   directly anyways, right?
19     A.      That's correct.
20     Q.      You would have heard through Rourke or
21   Bolton, or would that have even gone to another
22   step before it came to you?
23          MR. CULLEN:  Just to be clear, you mean
24   Captain Bolton, right?
25          MR. MALAGUTI:  Yeah, not -- thank you.

1    BY MR. MALAGUTI:
2      Q.      Any relation, to your knowledge,
3    between Captain Bolton and Steve Bolton of the
4    legal department?
5      A.      They are not -- they are of no
6    relations.
7      Q.      I assumed so.  Bolton is not a name
8    like Malaguti, it's somewhat common.
9          Okay.  So do you remember what you
10   heard about the incident the first time you heard?
11     A.      Sure.  I remember that officers were
12   called to City Hall for a criminal trespass
13   situation.  They got there, Laurie Ortolano was --
14   up until our arrival had refused to leave an area
15   around the legal department of City Hall, and when
16   officers -- when our officers arrived and asked her
17   to leave, she left.
18     Q.      Do you recall whether she was detained
19   or arrested before she left?
20     A.      She was not.  She complied with the
21   officers' commands.
22     Q.      Now, in general, when there is a
23   trespass situation, a potential trespass
24   situation -- let's back up.  I'm going to move
25   away from Laurie Ortolano for a quick minute and

1    talk generally if that's okay.  And I'm going to
2    ask you questions about your philosophy as to how
3    trespass situations should be handled.
4          Do you have a general philosophy about
5    how criminal trespass situations should be handled
6    by Nashua's police officers?
7      A.      Sure.
8      Q.      Could you say it for us?
9      A.      Yeah, if we're -- you know, if we're
10   called to a location where somebody's there, and a
11   person who has control over that space doesn't want
12   them there for a specific reason and asks them to
13   leave, the expectation is that they leave.
14          If they don't leave, we get called, and
15   we go, and we will tell them to leave.  We'll talk
16   to the victim, we'll find out what the victim says
17   happened, or the controller of the property.  And
18   then if the person still refused to leave, we'll
19   arrest them.  If they leave, we will generally give
20   them the warning to go, because they -- they're not
21   refusing in our presence.
22          And if you're asking for the
23   philosophy, it's people -- it's very difficult in
24   the courts, particularly in Nashua, to get a
25   conviction because the victim or the controller of

1    the properties generally won't show up to testify
2    for a number of reasons.  So that's generally how
3    they go.
4      Q.      And when you say that typically the
5    victim will not show up to testify, are you
6    primarily referring to incidents on private
7    property, or is it both private and public
8    property?
9      A.      Both public and private property.  It's
10   a fairly common call for service at the Nashua
11   Police Department.
12     Q.      And so sometimes when there's someone
13   who's asked to leave public property and doesn't
14   leave, you find it difficult to get cooperation
15   from the city employees who control that property?
16     A.      No, our general philosophy is that's
17   not specifically toward City Hall, because city
18   property doesn't really happen as much, unless, you
19   know, say it's city parks or anything like that,
20   they generally won't show up to testify.
21     Q.      Okay.  Now, when it comes to -- so
22   would I be correct then in sort of encapsulating
23   what you said, which is that as a general rule --
24   I understand there are exceptions -- as a general
25   rule, when the police show up, order the

Page 66

1  perpetrator to leave, and the perpetrator
2  cooperates and leaves, the perpetrator will not be
3  arrested?
4      A.    That's correct.
5      Q.    Now, you mentioned that City Hall is a
6  little bit different.  Are there trespass --
7  obviously we're going to talk about Ms. Ortolano
8  in a minute.
9           Do you know of trespass incidents at
10  City Hall in the past?
11      A.    I don't have a specific case.  I
12  believe with dealing with the homeless population
13  there were criminal trespass arrests at City Hall,
14  but those are really the two that would stand out
15  in my head.
16      Q.    Could you describe what typically
17  happens with a homeless situation?
18      A.    Sure.  I mean, every situation is
19  different, but typically you'd show up, there'd be
20  a homeless person either sleeping in a bathroom,
21  or -- not just say a homeless person, a particular
22  person in the bathroom, in the stairwell, and they
23  will ask them to move along, and if they don't,
24  they'll get arrested for criminal trespass.
25      Q.    But even homeless people, if they do

Page 67

1  move along, they will not get arrested for
2  criminal trespass?
3      A.    Well, not necessarily.  Again, the
4  philosophy and the decision is people from City
5  Hall are not going to go to the district court
6  every day to testify about this person or that
7  person in City Hall, so the desire is just to get
8  them to move along, to comply with the commands to
9  move along.
10      Q.    And you would agree that the philosophy
11  we're talking about is also a practice that while
12  you were deputy chief and chief, and patrolman,
13  for that matter, was practiced in Nashua as well?
14      A.    Yes.  Most of the time, yes.
15      Q.    The homeless people who typically are
16  asked to leave, do they force their way into the
17  building at night, or do they come in while the
18  building is open, generally?
19      A.    No, for the criminal trespass it would
20  generally be that the building is open.
21      Q.    And when police admonish someone to
22  leave, do they sometimes issue a trespass warning?
23  I think you folks call it, you trespass them, is
24  that right?  Is that something that the police do?
25      A.    Yes.

Page 68

1      Q.    Could you describe what that is and how
2  that works?
3      A.    Well, it depends on the situation.
4  I'll give you an example of the Pheasant Lane Mall.
5  If somebody is doing something that is not welcomed
6  by the mall or the particular store, maybe
7  threatening to shoplift or possibly shoplifting or
8  doing returns, they may say we don't want this
9  person in our store, he's not welcome, we would
10  like them trespassed for a year.
11           It's changed a lot since I was working
12  the street, but I believe that they would document
13  on our calls for service that this trespass was
14  requested by a particular employee, and we would
15  get that person's information, and that they would
16  prosecute, and then it would be kept on record for
17  a year, or the date stamp that would happen would
18  happen for however long it did.  I don't remember
19  if it was a year, six months, whatever.
20      Q.    So would I be correct in saying that
21  when you trespass someone, it's essentially a
22  warning, but it has teeth?
23      A.    Right.
24      Q.    That if it's violated within a year,
25  they'll automatically be arrested?

Page 69

1      A.    Correct.
2      Q.    Do you think that's a good solution?
3  Is that part of the philosophy of trespass that
4  you've formed?
5           MR. CULLEN:  Objection to form.  You
6  can answer.
7      A.    Yeah, I think it's --
8  BY MR. MALAGUTI:
9      Q.    It's a compound question.  So let me
10  just ask.  Is trespass a tool in the belt that
11  works its way into the philosophy that you hold?
12      A.    It is a tool, yes.
13      Q.    And do you think it's a successful
14  tool?
15      A.    Sure.
16      Q.    And to your knowledge -- well, let me
17  ask you this.  When you were a patrolman, did you
18  use that as a tool?
19      A.    When I was -- I'll be honest, I was a
20  police officer for 28 years and policing changed
21  significantly, to the point of our -- how we
22  recorded calls, right, we didn't have computers
23  back when I started, believe it or not, so when
24  I -- through my patrol career that was not an
25  option to us.

MICHAEL CARIGNAN                                    70..73

Page 70

1    Q.    Now, am I correct that the property
2  owner or the person who controls the property
3  requests the no trespass order, but the decision
4  is up to the police officer on the scene?
5    A.    Correct.
6    Q.    And it's also fair to say that police
7  officers who are responding to trespass incidents
8  are given a great amount of discretion to deal
9  with how they'll handle them?
10   A.    Correct.
11   Q.    And we're talking not 28 years ago when
12 you were a patrolman, or more than that probably
13 now, because you've been up in the higher ranks,
14 we're talking currently since, say, 2015 forward,
15 that's the way that it's generally done?
16   A.    Yes.  That's accurate.
17   Q.    And when a no trespass is given,
18 something is written by the police department and
19 a record is kept of that, right?
20   A.    Yes, it's part of the call notes for a
21 call for service.
22   Q.    And that would probably be reflected in
23 a supplemental narrative, do I have that phrase
24 right?
25   A.    I don't believe it would be a

Page 71

1  supplemental narrative any longer.  I think for the
2  last several years officers were entering it in as
3  call notes as a call for service, and that served
4  as the report.
5    Q.    Okay.  And those determinations are
6  generally made on the spot, the no trespass; is
7  that fair to say?
8    A.    Correct.
9    Q.    Do you know of any times they're ever
10 made later on, upon reflection?
11   A.    Sure.  Well, I know one in particular.
12 We'll talk about it shortly, I would imagine.
13   Q.    Well, I'm talking about a no trespass
14 order, I'm not talking about an actual arrest.
15   A.    I'm sorry, I thought you were still
16 talking about the arrest.  You know, unfortunately,
17 my career wasn't in patrol for the most part, so,
18 no, I don't -- I don't really have any recollection
19 of that.
20   Q.    Okay.  All right.  Let's talk about
21 January 22nd, 2021.  Do you feel like you have a
22 pretty good recollection of the details of what
23 happened with Laurie Ortolano in January of 2021?
24   A.    Regarding what, I'm sorry.  Are you
25 talking about her arrest or her --

Page 72

1    Q.    Well, first we'll call it the incident
2  at the legal department in City Hall.
3    A.    Okay.  Yes, I was aware that it
4  happened.  I definitely don't have details about it
5  other than I know that the officers responded and
6  handled it, and it was -- and it was cleared.
7    Q.    What does that mean, it was cleared?
8    A.    Cleared without arrest, meaning they
9  left the property and they did not arrest her.  She
10 left when they told her to.
11   Q.    Okay.  Do you know whether there was an
12 initial conversation with Attorney Celia Leonard,
13 and that she told the officers on the scene that
14 she wanted Ms. Ortolano to be no trespassed for a
15 year?
16   A.    I'm not sure.  I was not made aware of
17 that.
18   Q.    Do you remember ever reading the
19 supplemental narrative or incident reports or
20 anything regarding that day?
21   A.    I'm sorry, I don't.
22   Q.    Do you know whether you did or not, or
23 you just don't remember whether you did or not?
24   A.    I don't remember if I did or not.  It's
25 generally not something I would do.

Page 73

1    Q.    Okay.  And you get information by
2  reading the newspapers and watching the news as
3  well?
4    A.    Yes.
5    Q.    Are you a voracious newspaper reader?
6    A.    No.
7    Q.    Do you keep up with the Nashua news in
8  the newspaper?
9    A.    Any longer?  No.
10   Q.    When you were chief?
11   A.    Yes.
12   Q.    It's funny, I teach, and one of the
13 things I always ask my students is whether they
14 know what it's like to get newsprint on their
15 fingers.  They don't read newspapers on hard copy
16 anymore.
17        All right.  And so you wouldn't be
18 aware that Patrolman Earnshaw, in either an
19 incident report, and I must apologize because I've
20 had that snafu with the documents, I don't have it
21 before me, but Patrolman Earnshaw concluded his
22 report saying no offenses alleged or apparent.
23        Did you know that until I just told you
24 that?
25   A.    No, I did not.

Page 74

1      Q.      But in your words, you know that
2  Ms. Ortolano was cleared?
3      A.      Correct.
4      Q.      Meaning she was not arrested at that
5  time?
6      A.      That's correct.
7      Q.      And I'm sorry if I'm repeating.  Did
8  you know whether the officers no trespassed her at
9  the time?
10     A.      I don't.  I don't remember them -- I
11 don't remember knowing that at all.
12     Q.      And do you remember reading about the
13 incident in the newspaper or from some other news
14 medium?
15     A.      I don't remember specifically, but I
16 was kept pretty well informed on news outlets,
17 so whether, you know, I'm not sure if it made
18 Channel 9 news, I'm not sure if it was the Patch or
19 the Telegraph or -- I remember being informed, and
20 generally when it became -- with the Nashua
21 situation it was more about what I was told from my
22 two deputies.
23     Q.      Or at the morning meetings,
24 potentially?
25     A.      Correct.

Page 75

1      Q.      Do you recall whether this ever came up
2  at one of the morning meetings?
3      A.      It's something that would have come up,
4  but I don't know if -- it's also possible that the
5  same officers would have come in or the captains or
6  deputies would have come in and told me that day.
7  It's something that would have generated somebody
8  mentioning it to me.
9      Q.      It would have generated some buzz
10 throughout the department?
11     A.      Yes.
12     Q.      Ms. Ortolano was fairly well known in
13 the department, is that sort of the thought?
14     A.      I can't answer that.  Amongst the
15 command staff she was.
16     Q.      Now, do you remember seeing in the news
17 that a police spokesman had said that the matter
18 is over, and that nothing further would be
19 happening?
20     A.      I don't.
21     Q.      Do you remember -- do you know Celia
22 Leonard?
23     A.      Professionally we've met a few times,
24 yes.
25     Q.      And you know she is an attorney in the

Page 76

1  city legal department?
2      A.      At the time she was, yes.
3      Q.      And you know that she also was one of
4  the people who were present while Laurie Ortolano
5  was in the legal office on the day in question?
6      A.      Yes.  From what I was told, yes.
7      Q.      And did you ever hear that Celia
8  Leonard, when she heard that the police department
9  would be -- the incident would require no further
10 action, do you recall her saying these words, or
11 something to this effect:  I find it troublesome,
12 to say the least.  My office will be speaking with
13 the police further.
14     A.      No, I don't remember her saying that
15 prior to my meeting.  I didn't have any
16 conversations with her prior to my meeting with
17 Steven Bolton and several members of the legal
18 department.
19     Q.      Okay.  So -- but it's fair to say that
20 you thought at one point the matter was cleared,
21 meaning the matter was over, right?
22     A.      Correct.
23     Q.      And then a communication occurred from
24 the city legal department to the police
25 department?

Page 77

1      A.      Correct.
2      Q.      And the communication was that they
3  wanted a further investigation done into the
4  matter, right?
5      A.      I'm not sure how that -- I'm not sure
6  that's -- if it was them asking for more
7  information.  I'm aware that I got -- I was
8  contacted and requested a meeting with the legal
9  department and Mr. Bolton.
10     Q.      So you got a call directly from the
11 legal department requesting a meeting?
12     A.      I don't know if it was a call or an
13 e-mail.  I was contacted then.
14     Q.      And when was that meeting held, to the
15 best of your recollection?
16     A.      It had to be within -- I would say
17 within a week of the incident.  Please don't hold
18 me to a hard date, but within about a week.
19     Q.      Where was the meeting held?
20     A.      It was held in the legal department --
21 City Hall legal department conference room.
22     Q.      Who was present from the Nashua Police
23 Department at that meeting?
24     A.      I was present.  I don't honestly
25 remember who else was present.  I don't, yeah.

Page 78

```
1      Q.      Do you remember if Patrolman Earnshaw
2  was present?
3      A.      He was not.
4      Q.      Sergeant Gilbert?
5      A.      He was not.
6      Q.      Is it Lieutenant Rourke?
7      A.      That was Deputy Chief Rourke at the
8  time.  He could have been because he was the
9  uniformed deputy, but I don't remember if anybody
10 was there.
11     Q.      Is there a police officer named Roach?
12     A.      Tim Roach, yes.
13     Q.      Tim Roach.  Do you remember if he was
14 there?
15     A.      He would not have been at that meeting.
16     Q.      So you remember that you were there,
17 but you don't remember whether anyone else was
18 there, but it's possible that Deputy Chief Rourke
19 might have been there?
20     A.      Correct.
21     Q.      Who was present from the legal
22 department?
23     A.      Steve Bolton was present.
24         THE WITNESS:  Is Celia the red-headed
25 one?  Taller, the red-headed one?
```

Page 79

```
1          MR. CULLEN:  I wouldn't be able to
2  answer you even if I could answer, but truthfully,
3  I don't know exactly what Celia looks like.
4      A.      Sorry, I didn't have much interaction
5  with the other attorneys.
6  BY MR. MALAGUTI:
7      Q.      You would say a tall red-headed
8  attorney?
9      A.      Yeah, she was there, as well as there
10 might have been a younger lady there that was part
11 of the legal department's administrative staff.
12     Q.      A paralegal, potentially?
13     A.      Correct.
14     Q.      Would the name Manuela Perry sound
15 familiar?
16     A.      I'm not sure.  I never worked with her.
17     Q.      Manuela, I think.  Okay.  Anyone else
18 from the legal department?
19     A.      Not that I recall.
20     Q.      Who did most of the speaking from the
21 legal department?
22     A.      Attorney Bolton.
23     Q.      Now, the tall red-headed attorney, did
24 she do any speaking?
25     A.      No, not that I remember.  It was
```

Page 80

```
1  Attorney Bolton.
2      Q.      He did all the speaking, as far as you
3  remember, on behalf of the legal department?
4      A.      Correct.
5      Q.      And you did all the speaking on behalf
6  of the police department?
7      A.      Correct.
8      Q.      So what did Steve Bolton say?
9      A.      Paraphrasing the conversation, he was
10 not satisfied with the outcome of the
11 investigation.  He felt that she should have been
12 placed under arrest immediately.  He expressed
13 concern for his staff, meaning the other attorneys
14 and the paralegals in the department, and he had
15 asked me to -- I guess he told me to arrest her,
16 and I told him I would not arrest her.
17     Q.      Was Attorney Bolton angry?
18     A.      Yes.
19     Q.      Did he shout?
20     A.      Raised voice.
21     Q.      Did he bang anything?
22     A.      Not that I remember.
23     Q.      Did he explain what his concern for his
24 staff was?
25     A.      Yes, he expressed concern for their
```

Page 81

```
1  safety, based on what he felt was unpredictable
2  behavior from Ms. Ortolano.
3      Q.      You know Ms. Ortolano, I think you've
4  said.
5      A.      I do.  Yes.
6      Q.      From her physical makeup, do you think
7  she could hurt somebody physically?
8      A.      Based on my experience, sir, it really
9  doesn't matter, physical appearance.  We've
10 scrapped with some pretty small, slight people, so
11 that's not really a good question.  I'm sorry.
12     Q.      As one of those small, slight people,
13 I'll take note.  Did you consider Ms. Ortolano to
14 be a physical threat?
15     A.      I did not.
16     Q.      Do you know if any of the officers who
17 were responding to the incident did?
18     A.      I'm not sure how they felt, but I don't
19 believe they did.
20     Q.      Do you know whether the incident
21 report, whether the -- whether the papers
22 surrounding the incident said that Ms. Ortolano
23 made any threats?
24     A.      I don't believe so.
25     Q.      Do you know what physical position or
```

MICHAEL CARIGNAN                                82..85

Page 82

1    posture was in -- Ms. Ortolano was in when she was
2    in the legal office?
3         A.    I believe she was sitting down in front
4    of the door.  If I remember right, that's what --
5    that's what's coming to mind.
6         Q.    She was sitting on the floor.
7         A.    Correct.
8         Q.    Did Mr. Bolton tell you that she had
9    made threats?
10        A.    I don't believe so.  I don't recall him
11   saying that she had made threats.
12        Q.    No one else in the meeting said that
13   she had made threats?
14        A.    Not that I remember.
15        Q.    Was it your position at the time that
16   you were going to stick with what the officers had
17   found and put in their papers that they had
18   created for the incident?
19        A.    Yes.
20        Q.    Do you have any reason to doubt that
21   what they said in that original incident report
22   and the supplemental narrative were anything other
23   than true and accurate?
24        A.    No, I -- I believe that they were
25   absolutely true and accurate.

Page 83

1         Q.    How long did the meeting with the legal
2    department last?
3         A.    Approximately a half an hour, maybe a
4    little less.
5         Q.    Now, you said that you were not going
6    to immediately arrest Ms. Ortolano.  Did you say
7    anything else in terms of an investigation that
8    might follow?
9              MR. CULLEN:  Objection to form.  You
10   can answer.
11        A.    I don't know the specific word, so did
12   I say the immediate -- to answer your question, I
13   don't know.  My belief was that this matter was
14   closed, and we were not going to pursue further
15   charges.
16   BY MR. MALAGUTI:
17        Q.    So I wrote down that Steve Bolton said
18   he was not satisfied, is that accurate?
19        A.    Yes.
20        Q.    And then he demanded -- I believe you
21   used the word he told you to arrest her
22   immediately?
23        A.    That's correct.
24        Q.    Go ahead.
25        A.    He didn't say immediately -- paraphrase

Page 84

1    the conversation, he said that we should arrest
2    her, or you should be able to arrest her.
3         Q.    Would you consider what he said to have
4    been a demand that you arrest her?
5         A.    He was trying to present it as a
6    demand.
7         Q.    Okay, what else did he say, if
8    anything, during that up to a half an hour
9    meeting?
10        A.    That's pretty much -- the conversation
11   was about his position of us arresting her and us
12   not going to do what he said.  And there was back
13   and forth, and I don't remember specific
14   conversations or specific words that were used, but
15   he wanted us to have her arrested, and at that time
16   I was not of the opinion that we would be
17   arresting her.
18        Q.    And did you say anything else that you
19   haven't already told us?
20        A.    Not that I know of, no.
21        Q.    Now, was the meeting being audio or
22   video recorded, to your knowledge?
23        A.    To my knowledge, no.
24        Q.    Did you notice whether anyone was
25   taking notes of the meeting?

Page 85

1         A.    I don't notice -- I did not notice.
2         Q.    Now, you're the -- you were then the
3    chief, so you're not the kind of person who would
4    rush back and file an incident report, I would
5    imagine, would that be correct?
6         A.    That's correct.
7         Q.    Did you, upon returning to your office,
8    create any written documents in regard to the
9    meeting?
10        A.    I don't believe I did.  I generally as
11   the chief didn't do documents based on meetings.
12        Q.    And did you discuss the meeting with
13   any of your command staff or anyone else in the
14   police department?
15        A.    Sure.  I don't remember specifically
16   who was present, but it's something I would have --
17   it's a conversation I would have had with -- if
18   Kevin Rourke was with me at the meeting, we would
19   have talked about, again, I don't remember if he
20   was there or not, but if not, we would have talked
21   about it back in my office.
22        Q.    Do you remember if the meeting came up
23   at one of the morning meetings?
24        A.    At the meeting, no.  That's generally
25   not something I would discuss.

Page 86

1      Q.      Were there further conversations with
2  Steve Bolton or anyone on his staff between the
3  time you left that meeting and when Ms. Ortolano
4  was actually arrested?
5      A.      No.
6      Q.      Now, when you were dealing with
7  Mr. Bolton and the tall red-headed attorney and
8  others, is it fair to say that there was no
9  attorney-client relationship because they -- you
10 considered them to be the victims rather than
11 attorneys?
12         MR. CULLEN:  Objection to form.  You
13 can answer.
14         MR. MALAGUTI:  No, that's a bad
15 question, so let me reform it.
16 BY MR. MALAGUTI:
17     Q.      Is it fair to say that you did not
18 consider there to be an attorney-client
19 relationship with anyone in the legal department
20 regarding the January 22nd incident?
21     A.      Yes.
22     Q.      In fact, you told us early on that
23 there are very limited circumstances by which
24 there's an attorney-client relationship with the
25 city legal department and the police department?

Page 87

1      A.      Correct.
2      Q.      You got further communications from the
3  legal department -- and let me reframe that.
4          To your knowledge, did you or anyone at
5  the police department get further communications
6  from the legal department between the time that
7  the meeting occurred and Ms. Ortolano was
8  arrested?
9      A.      I don't -- I don't recall specifically
10 getting any myself.  I know that there were several
11 conversations back throughout this entire ordeal,
12 not just this arrest, where Bolton would contact
13 the legal department, and I believe it was Captain
14 Brian Kinney at the time, or Lieutenant Kinney.
15 There was some -- I think some conversations there
16 that he let me know about.
17     Q.      Captain or Lieutenant Brian Kinney, was
18 he in the police legal department or was he in
19 some other department?
20     A.      He was part of the Nashua police legal
21 department.
22     Q.      Was he an attorney?
23     A.      No.
24     Q.      Did -- it sounds like he got promoted
25 to captain, he might have been a lieutenant at the

Page 88

1  time, so I'll just call him Brian Kinney.
2          Did Brian Kinney tell you the content
3  of those conversations between himself and
4  Steve Bolton?
5      A.      The conversation, I don't recall him
6  telling me specifically, but it would have gone to
7  his captain up to the deputy to me.
8      Q.      And you don't remember anything that
9  was said?
10     A.      No.
11     Q.      Admittedly, by the time it reached you
12 second or third-hand?
13     A.      Correct.
14     Q.      Do you remember the nature of what was
15 said?
16     A.      I don't.  I -- no, I remember the
17 conversation with Bolton, and we held firm that we
18 weren't going to pursue charges, and that's -- I
19 knew there was back and forth, but I don't remember
20 what they specifically were.
21     Q.      Did you understand that Steve Bolton
22 was advocating for the arrest of Laurie Ortolano
23 when he spoke with Brian Kinney?
24     A.      I believe so.  I know for a fact he was
25 advocating for it when we had our meeting.

Page 89

1      Q.      At some point did the police department
2  open an investigation into whether Laurie Ortolano
3  should get arrested?
4      A.      Yes.
5      Q.      How soon was that after the meeting at
6  Bolton's office?
7      A.      I don't know specifically.  If I had to
8  guess, it was within a week.
9      Q.      Do you know why the investigation was
10 opened?
11     A.      I do.
12     Q.      Why?
13     A.      I was advised by my deputies that they
14 wanted to open an investigation to re -- to relook
15 at the case because of a social media post that
16 Ms. Ortolano had posted, but if I remember right,
17 she was bragging about refusing to leave, and
18 not -- not obeying the commands of what the person
19 who had control of the property did, meaning the
20 legal department.
21     Q.      You understand that Ms. Ortolano has a
22 First Amendment right to post on social media?
23     A.      I do.
24     Q.      You understand that Ms. Ortolano has a
25 right to post even offensive material under the

1   First Amendment on social media?
2       A.      Yes, sir, I do.
3       Q.      You understand that unless
4   Ms. Ortolano's postings constitute some form of
5   unprotected speech that she cannot be regulated in
6   that speech, as a general matter?
7       A.      Yes, sir.
8       Q.      Do you believe it would be wrong for
9   the Nashua Police Department to arrest Laurie
10  Ortolano because of social media posts they made?
11      A.      I can't answer that question because
12  the answer is it's possible.  If she's -- we're not
13  arresting her based on anything she's just saying
14  in there.
15      Q.      Can you elaborate on that?
16      A.      The decision, from what I understand,
17  to arrest was her admission of committing the
18  crime.  She went on her social media post and
19  admitted to refusing to obey those commands, and
20  for us the discussion, if I remember correctly,
21  was, well, she's admitting to a crime, we don't
22  need a witness to necessarily come forward, she's
23  making her own self-admissions, so we will charge
24  her, and I supported that decision.
25      Q.      Now, when you say that she wasn't

1   obeying, are you talking about the command to
2   leave given by people in the legal department, or
3   by the police officers at the scene?
4       A.      People in the legal department.
5       Q.      Didn't we discuss a short while ago
6   that as a general proposition if the people
7   cooperate with the police officers when they
8   arrive, even though they had refused to leave
9   until then, that the police may not arrest them
10  but will not generally arrest them for trespass?
11      A.      Yes, we did.
12      Q.      Why didn't that happen here?
13      A.      So if I -- if I understand their
14  thought process correctly, she was admitting to
15  committing the crime, bragging about committing the
16  crime, and the concern was that the bragging and
17  the admissions occurred after the warning and the
18  no trespass, and the thought was that she was
19  pretty vocal about it, and there was a concern that
20  it would be a repeat offense, and the decision was
21  made to arrest her for it.
22      Q.      And you said your deputies advocated
23  for the arrest?
24      A.      Well, it wasn't -- it was not their
25  decision to make.  I don't -- it would have been

1   made at a lower level.
2           So I'm not sure who made the decision
3   to arrest, whether it was the patrol sergeant or
4   the supervisors or whom it was, but typically that
5   would not be a decision made by the deputies.
6       Q.      So did I misunderstand you when you
7   said that your deputies were advocating to have
8   her arrested?
9       A.      No, they were telling me about what the
10  social media posts, and part of the discussion
11  involved, well, they wanted to arrest her, is it
12  legal, can we do it, should we do it.  Those are
13  the processes that came up, the discussion that
14  we had.
15      Q.      So they were not taking a position
16  on it?
17      A.      Correct.
18      Q.      They were reporting what their
19  subordinates were advocating?
20      A.      Correct.
21      Q.      And it's obviously in the police
22  papers, but do you remember who the advocates were
23  for her arrest?
24      A.      I don't, but if it's in the police
25  report, I would verify it.

1       Q.      And you eventually -- well, let me ask
2   you this.  Was it your decision to be made?
3       A.      No.
4       Q.      Did you check off on the decision, in
5   your mind?
6       A.      I had my opinion, but it wasn't a
7   direction I told anybody, it was not an order to
8   give anybody.
9       Q.      And you voiced that opinion?
10      A.      I voiced it with my two deputies,
11  correct.
12      Q.      And you assume that they sent it down
13  the chain of command?
14      A.      No.  The discussion that you -- please
15  don't misunderstand me.  The discussion with my two
16  deputies involves the facts that the officers were
17  given and us exchanging back and forth what that
18  looked like, what that meant, what the options
19  were, what the outcomes were, just a general
20  discussion about that incident and their decision.
21      Q.      And who were your deputies again at
22  that time?
23      A.      I think it was Kevin Rourke and Jim
24  Testaverde.
25      Q.      Again, I'm sorry, what was Mr. Rourke's

Page 94

1  title?
2       A.     He's now chief.  At the time he was
3  deputy chief.
4       Q.     Deputy, right.  And Jim Testaverde?
5       A.     Deputy chief.
6       Q.     Is he deputy chief now, or was he then?
7       A.     He was then.
8       Q.     To your knowledge, did Steven Bolton
9  ever discuss this with Deputy Rourke?
10      A.     I don't believe.
11      Q.     With Jim Testaverde?
12      A.     I don't believe he did.
13      Q.     Do you know anyone in the police
14  department other than Brian Kinney that Attorney
15  Bolton communicated to to advocate for the arrest
16  of Laurie Ortolano?
17      A.     It would have been myself at the
18  meeting.  Brian Kinney I believe was about that
19  time, I know they had communications, and if
20  Deputy Rourke was with me at the meeting, it would
21  have been him.  I don't know who else he spoke to.
22      Q.     So you didn't hear anything about him
23  speaking to anyone else?
24      A.     Not that I remember.  I don't believe
25  he did.

Page 95

1       Q.     Has any official at City Hall ever
2  asked you to start an investigation or take some
3  other police action regarding a person who has
4  been critical of the Nashua city government?
5       A.     No.
6       Q.     You're sure about that?
7       A.     Yes.
8       Q.     Did you ever say anything of that
9  effect to any other person that you can remember?
10      A.     No.
11      Q.     You don't remember saying anything to
12  that effect to another law enforcement officer
13  outside of the Nashua Police Department?
14      A.     No.
15             MR. MALAGUTI:  Okay.  I have no further
16  questions.
17             MR. CULLEN:  So technically the other
18  people can ask you questions if they want to.  Not
19  just technically, they can.  So just let me ask
20  Maddie or David, do either of you have questions
21  for the chief?
22             MR. BETANCOURT:  I have no questions,
23  thank you.
24             MS. OSBON:  I have no questions.
25             MR. CULLEN:  I have no questions

Page 96

1  either, Chief.  I appreciate your time today.
2             MR. MALAGUTI:  I appreciate your time
3  too.  Thank you.
4             COURT REPORTER:  And before people hop
5  off, can I just get transcript orders, please?
6             MR. CULLEN:  A mini PDF would be great.
7             MR. MALAGUTI:  That sounds good to me,
8  too.
9             COURT REPORTER:  David?
10             MR. BETANCOURT:  Could we have a PTX,
11  please?
12             MS. OSBON:  I'll do the same as Brian.
13             COURT REPORTER:  All right, thank you.
14  (The deposition was concluded at 5:40 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 97

1  DEPOSITION ERRATA SHEET
2  Page___Line___Change_____
3  Page___Line___Change_____
4  Page___Line___Change_____
5  Page___Line___Change_____
6  Page___Line___Change_____
7  Page___Line___Change_____
8  Page___Line___Change_____
9  Page___Line___Change_____
10  Page___Line___Change_____
11  Page___Line___Change_____
12  Page___Line___Change_____
13  Page___Line___Change_____
14  Page___Line___Change_____
15  Page___Line___Change_____
16  Page___Line___Change_____
17  Page___Line___Change_____
18  Page___Line___Change_____
19  Page___Line___Change_____
20  Page___Line___Change_____
21  Page___Line___Change_____
22  Page___Line___Change_____
23  Page___Line___Change_____
24  Page___Line___Change_____
25  SIGNATURE:_____  DATE:_____

MICHAEL CARIGNAN                                    98

1              CERTIFICATE

2          I, Pamela J. Carle, Registered

3  Professional Reporter, do hereby certify that the

4  foregoing is a true and accurate transcript of my

5  stenographic notes of the deposition of MICHAEL

6  CARIGNAN, who was first duly sworn, taken at the

7  place and on the date hereinbefore set forth, and

8  that reading and signing of the transcript was not

9  discussed.

10         I further certify that I am neither

11  attorney nor counsel for, nor related to or

12  employed by any of the parties to the action in

13  which this deposition was taken, and further that

14  I am not a relative or employee of any attorney or

15  counsel employed in this case nor am I financially

16  interested in this action.

17

18         THE FOREGOING CERTIFICATION OF THIS

   TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF

19  THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT

   CONTROL AND/OR DIRECTION OF THE CERTIFYING

20  REPORTER.

21

22

23

24      _____

        Pamela J. Carle, LCR, RPR, CRR

25

MICHAEL CARIGNAN                    1

**Exhibits**

**Exhibit 1** 13:12 17:13

**$**

**$100** 21:16

**1**

**1** 13:11,12 17:13
**100** 22:24
**10:00** 6:2
**13** 8:1
**15** 39:24 40:2
**179** 59:16
**18** 12:5
**19** 6:7
**1990** 7:5
**1993** 7:24 8:21 9:16
**1996** 7:22
**1st** 42:4 43:22 44:20

**2**

**20** 62:13
**2000** 10:11
**2000s** 31:22
**2004** 10:19
**2005** 10:19
**2007** 11:4
**2012** 8:1
**2015** 70:14
**2016** 12:6 30:16
**2017** 12:5
**2019** 12:11,14 13:9 14:10,12 28:25
30:9,16 32:18 43:22 48:2
**2020** 60:21
**2021** 60:17,24 62:3,13 71:21,23

**2022** 44:20 45:2
**22nd** 60:17,24 71:21 86:20
**24** 26:1
**26** 13:9 14:12 28:25 30:9
**26th** 32:18 48:2,8
**28** 69:20 70:11
**2nd** 45:2

**5**

**5:40** 96:14

**6**

**60-something** 59:17

**7**

**7** 8:21

**9**

**9** 74:18
**91-A** 47:12,14 56:14 57:4,8,14,16,23
58:1,12,16,17
**93** 8:20
**94** 47:2
**94-A** 47:2,7
**97** 7:22
**9:00** 25:24 27:12 32:19 39:19

**A**

**ability** 6:10
**absolutely** 54:2 82:25
**access** 14:6
**accurate** 22:24 24:5 25:7 70:16
82:23,25 83:18
**acting** 41:22,24
**action** 76:10 95:3
**active** 30:11

**activities** 30:12
**actual** 27:13 71:14
**additional** 39:7 59:17
**address** 4:19 28:5,15
**administrative** 28:1 29:18,21 79:11
**admission** 90:17
**admissions** 91:17
**admitted** 90:19
**Admittedly** 88:11
**admitting** 90:21 91:14
**admonish** 67:21
**advice** 54:3 57:2
**advise** 46:8
**advised** 89:13
**advocate** 94:15
**advocated** 91:22
**advocates** 92:22
**advocating** 88:22,25 92:7,19
**affirmative** 5:4
**afraid** 49:13
**agree** 67:10
**ahead** 8:22 13:14 16:6 36:22,25 49:2
83:24
**allegations** 16:19 17:4,11,22 19:4
33:13,20,25 36:3,10,19,21 43:16,17
**alleged** 33:8 35:7 73:22
**Amendment** 89:22 90:1
**amount** 43:18 60:6 70:8
**analogy** 22:16
**Andrew** 41:19
**angry** 80:17
**annual** 23:7
**answers** 5:5 32:2
**anymore** 73:16
**apologies** 15:20 36:23 47:15 49:19
**apologize** 17:2 21:23 73:19

MICHAEL CARIGNAN                                                    2

apparent 73:22

appearance 81:9

appeared 43:19

appears 15:12

appoint 42:9

appointed 18:24 19:14,15 20:14,18
22:3,4 42:1,17 60:21

appointment 42:6

apprised 25:18 42:25 61:8

approval 22:13

approvals 43:5

approve 21:6,7 42:14 43:3 46:14

approved 20:19

approximately 11:9 44:24,25 83:3

apt 22:16

area 10:15 14:11 63:14

Arlington 30:13,17

arrest 64:19 71:14,16,25 72:8,9
80:12,15,16 83:6,21 84:1,2,4 87:12
88:22 90:9,17 91:10,21,23 92:3,11,23
94:15

arrested 63:19 66:3,24 67:1 68:25
74:4 84:15 86:4 87:8 89:3 92:8

arresting 84:11,17 90:13

arrests 66:13

arrival 63:14

arrive 91:8

arrived 63:16

asks 64:12

assessing 12:15 14:25 16:10,21
23:13 24:9

assessors 38:5

assign 19:7

assigned 10:14 18:2 19:10 40:7,10,
12,14,21

assigning 17:24

assignment 41:8

assignments 40:24

assistant 28:1

assisted 41:1

assume 12:7 93:12

assumed 63:7

assuming 42:19 57:21

attempt 15:8

attend 50:6

attending 14:20

attention 15:3 60:5

attorney 31:13,25 37:5 46:23 47:18
48:11 56:10,13,15,17 72:12 75:25
79:8,22,23 80:1,17 86:7 87:22 94:14

attorney-client 86:9,18,24

attorneys 46:11 79:5 80:13 86:11

audio 84:21

aughts 31:22

August 12:12 42:4 43:22

authored 51:6,9

authority 21:11

authorized 59:16

automatically 68:25

aware 18:22 27:7 33:24 34:2 36:9,16
48:21 58:11 59:24 60:2 61:1 72:3,16
73:18 77:7

---

**B**

---

bachelor's 7:14,16,21,25

back 7:24 10:24 11:8 23:10 52:7
63:24 69:23 84:12 85:4,21 87:11
88:19 93:17

bad 8:5 86:14

BAE 6:14,24 45:1

bang 80:21

bargaining 31:15 32:4 46:10

base 26:4 50:18

based 10:5 14:19 35:11 42:15 43:16
81:1,8 85:11 90:13

basically 6:23 22:6 28:13 35:23

basis 26:14

bathroom 66:20,22

began 27:11 39:18

behalf 80:3,5

behavior 81:2

beholden 24:3

belief 83:13

belt 69:10

Bennett 47:21,24

BETANCOURT 95:22 96:10

biased 24:17

big 7:9 22:25 59:13

bigger 45:13

bit 13:14 45:11 66:6

blossom 45:12,13

board 20:24 22:17

boat 44:4,5,8,12

Bolton 47:18,23 48:3,6 49:18 56:12,
22 58:1,15 59:19 61:19 62:21,24 63:3,
7 76:17 77:9 78:23 79:22 80:1,8,17
82:8 83:17 86:2,7 87:12 88:4,17,21
94:8,15

Bolton's 50:5 89:6

bomb 53:17,24 54:6

boss 22:22,24

bounced 15:20

bragging 89:17 91:15,16

break 5:10 52:1,3

Breslin 28:2

Brian 5:20 12:17 13:13 49:11 87:14,
17 88:1,2,23 94:14,18 96:12

briefings 50:6

Bristol 6:7

broad 26:20 59:5

Broth 37:5,7

brought 15:3

budget 20:21 23:7 46:14

MICHAEL CARIGNAN

3

**budgets** 21:6

**Budreau** 37:16,21 38:4,14

**building** 27:3 67:17,18,20

**built** 45:1

**bulk** 58:12

**bunch** 36:2

**bureau** 10:12 11:12,23 17:23 18:6 27:2 40:16 43:7,9 46:20 48:24 49:3 50:2,23 58:23

**bureau's** 25:25

**bureaus** 26:24 27:5 49:21

**business** 30:3 33:22

**buy** 44:8

**buzz** 75:9

**C**

**C-A-L** 15:14,16

**C-A-L-Q-U-H-U-O-N** 15:15

**C-A-R-I-G-N-A-N** 4:16

**C-O-L-Q-U-H-O-U-N** 15:10

**Caleb** 62:7

**call** 4:22 15:24 29:7 41:19,24 52:25 53:18 54:9 65:10 67:23 70:20,21 71:3 72:1 77:10,12 88:1

**called** 9:20 12:19 29:3,9,11 53:4,8 55:19 63:12 64:10,14

**calling** 53:7

**calls** 25:13 53:21 68:13 69:22

**capacity** 11:2

**captain** 11:21,22 13:8 14:19 18:3,5,6, 25 19:3 24:24 26:8 30:11 32:22 35:9 40:4 42:21 43:7,9 44:14 45:20 50:24 58:23 61:9,13,19,20,21 62:24 63:3 87:13,17,25 88:7

**captains** 25:25 61:8 75:5

**career** 9:8 55:17 69:24 71:17

**careers** 21:18

**carignan** 4:7,13,15,19,20,21 5:18 13:1,11,12 14:8 15:23 52:20

**case** 14:18 25:2 29:12 33:10 43:6 50:25 51:1,7,14 57:15 66:11 89:15

**cases** 26:25 27:3 46:19 53:11 56:14 59:7,9,10

**category** 43:19

**Celia** 48:10 72:12 75:21 76:7 78:24 79:3

**center** 30:14,18,21

**chain** 19:17 43:6 93:13

**chance** 52:5

**change** 29:25

**changed** 68:11 69:20

**Channel** 74:18

**charge** 17:20,24 90:23

**charges** 83:15 88:18

**charitable** 30:18

**check** 93:4

**chief** 4:17,22 11:25 12:1,2,4,8,10,18, 23 18:5 20:25 21:1 22:18,22 27:7 28:14 29:17,20 30:11,16 41:16,17,19, 23,24 42:2,10,11,12 43:8,21 46:1 47:11,19,20 53:2 54:14,18 55:14,15 59:5 60:21,25 61:10,13,14,17,18 67:12 73:10 78:7,18 85:3,11 94:2,3,5, 6 95:21 96:1

**chief's** 42:15

**chronologically** 16:7

**chronology** 17:3

**chunk** 32:1

**CIB** 40:17

**CID** 40:17

**circumstances** 86:23

**cities** 21:25 22:2

**citizens** 60:15

**city** 14:21 16:15 19:21,22 20:4,5 22:9 29:15 30:3 33:9,14 35:22,25 38:23 43:13 46:2,4,13,15,18 47:19 48:3,7 49:5,14,23 50:5 53:1,16,20 54:22 55:18,24 56:1,7 57:5,17,25 58:2,13 61:2,10 63:12,15 65:15,17,19 66:5,10, 13 67:4,7 72:2 76:1,24 77:21 86:25 95:1,4

**city-owned** 30:20

**civil** 46:21

**civilian** 59:17

**clarify** 49:25

**clarifying** 49:1

**classified** 7:1

**clear** 50:17 62:23

**cleared** 72:6,7,8 74:2 76:20

**closed** 48:17 83:14

**closing** 51:7

**Club** 8:24

**collective** 31:14 32:4 46:10

**college** 8:16,19 9:3,6,7,8

**Colquhoun** 15:5,9 19:20 23:11,17

**command** 19:12,17 26:22,23 43:6 75:15 85:13 91:1 93:13

**commands** 63:21 67:8 89:18 90:19

**commission** 20:4,11 21:5,16,24 22:4,11,17,21 23:4 42:7,9,13

**commissioner** 21:12,13,20

**commissioners** 20:17,18 21:15

**committing** 90:17 91:15

**common** 26:7 35:13 63:8 65:10

**communicate** 24:19

**communicated** 94:15

**communication** 25:9 76:23 77:2

**communications** 23:22 25:3 87:2,5 94:19

**community** 30:12,14,17,21 53:19

**compare** 20:23

**complaint** 33:8

**complaints** 34:4 35:7 36:17

**completed** 7:14,25 13:7,9 45:4

**completion** 10:16

**compliance** 6:23

**complied** 63:20

**comply** 67:8

MICHAEL CARIGNAN                                    4

**compound** 69:9

**comprised** 20:12

**computer** 28:17

**computers** 69:22

**concern** 23:24 80:13,23,25 91:16,19

**concerns** 16:18 17:5 23:11,15 24:20
  25:14

**concluded** 51:2 73:21 96:14

**conduct** 34:5 36:11 50:7

**conducted** 24:10

**conducting** 19:5 33:10,12 35:8

**conference** 32:25 77:21

**conflicts** 19:23

**connected** 26:4

**considered** 86:10

**consistently** 32:3

**constitute** 90:4

**contact** 24:23,24 53:14 87:12

**contacted** 17:19 24:25 25:7 77:8,13

**content** 88:2

**continue** 40:4

**contract** 6:20

**control** 64:11 65:15 89:19

**controller** 64:17,25

**controls** 70:2

**convened** 32:18

**conversation** 16:24 36:8 37:19 40:6
  56:9 72:12 80:9 84:1,10 85:17 88:5,17

**conversations** 16:6,8,12,15 23:17
  25:5 26:5 48:23 49:23 54:19,24,25
  55:3,6,10,16 56:24 58:22 76:16 84:14
  86:1 87:11,15 88:3

**conviction** 64:25

**cooperate** 91:7

**cooperates** 66:2

**cooperation** 35:24 39:3 65:14

**copy** 73:15

**correct** 5:22 6:12 10:8 11:16,17 15:1,
  6,13 19:16 23:2 27:23 29:22,24 30:5,7
  31:14 34:19 35:1 37:16 40:23 41:6,14,
  18 42:8 44:17 50:4,8 51:13 56:18
  60:23 62:19 65:22 66:4 68:20 69:1
  70:1,5,10 71:8 74:3,6,25 76:22 77:1
  78:20 79:13 80:4,7 82:7 83:23 85:5,6
  87:1 88:13 92:17,20 93:11

**correctly** 38:2 45:13 60:22 62:6
  90:20 91:14

**corruption** 22:6

**cost** 60:8

**Council** 20:20 22:13

**counsel** 4:3 5:18 47:19 49:5

**Country** 8:24

**couple** 10:22 16:16 17:16 39:5 44:15
  52:23

**court** 67:5 96:4,9,13

**courtesy** 53:18

**courts** 64:24

**cover** 11:18 50:18

**create** 85:8

**created** 82:18

**crime** 90:18,21 91:15,16

**criminal** 7:22 8:3 10:17 11:12 33:8,19
  35:7 40:16 46:19 63:12 64:5 66:13,24
  67:2,19

**critical** 95:4

**Cullen** 4:5 5:20 9:11 12:22 14:2 15:12
  19:24 46:23 47:11 48:25 49:3,12
  51:24 52:4,7,11 62:23 69:5 79:1 83:9
  86:12 95:17,25 96:6

**current** 6:13 41:18 44:3

**cut** 36:23

---

**D**

**daily** 45:19

**date** 13:8 29:1 43:23,25 44:1,18 48:2
  62:13 68:17 77:18

**dates** 44:2

**David** 57:22 58:22 95:20 96:9

**day** 17:14 44:8 67:6 72:20 75:6 76:5

**day-to-day** 21:2,8 25:3

**days** 17:16 44:7

**DEA** 10:15

**deal** 21:8 54:15 56:13 70:8

**dealing** 66:12 86:6

**deals** 57:16,20

**dealt** 54:20 57:23 58:25

**decade** 44:15

**decided** 36:18

**decision** 51:19,22 67:4 70:3 90:16,24
  91:20,25 92:2,5 93:2,4,20

**decision-making** 26:12

**decisions** 21:3 23:1

**degree** 7:14,15,17,22,25

**demand** 84:4,6

**demanded** 83:20

**deny** 21:7

**department** 7:24 8:13,15,17,18 9:7,
  15 10:14 11:2 12:15 14:24,25 16:10,
  17,21,22 17:10 19:7,21 20:22,23 21:4,
  9 22:7,19 23:13 24:9 25:23 26:21 27:6
  29:4,6 32:4 33:11 41:13 46:2,4,5,8,24
  48:11,15,18 49:4,5,9,15,17,20,24
  50:1,3 53:20 55:22,23 57:5,6,16,19,25
  58:4,5,9,12,17 59:8,14 60:11,14 63:4,
  15 65:11 70:18 72:2 75:10,13 76:1,8,
  18,24,25 77:9,11,20,21,23 78:22
  79:18,21 80:3,6,14 83:2 85:14 86:19,
  25 87:3,5,6,13,18,19,21 89:1,20 90:9
  91:2,4 94:14 95:13

**department's** 57:1,2 79:11

**departments** 53:1

**depending** 26:18

**depends** 68:3

**deposed** 4:9 5:1

**deposition** 5:24 96:14

**deputies** 74:22 75:6 89:13 91:22
  92:5,7 93:10,16,21

**deputy** 11:25 12:4 26:8 30:11,16
  41:17,23 42:10 54:17 55:13,14 61:9,
  14,17 67:12 78:7,9,18 88:7 94:3,4,5,6,

MICHAEL CARIGNAN                                                          5

9,20

describe  14:13 20:11 33:19 66:16
  68:1

desire  67:7

details  71:22 72:4

detained  63:18

detective  10:12 11:23 17:23 18:4,6
  19:9 41:3,5,8,11 42:17 45:8 50:23

detectives  24:15,25 26:24 33:11
  35:22 40:18 41:1

determinations  71:5

dictate  23:5,6,7,8

difference  11:13

difficult  64:23 65:14

dinner  32:11

direct  53:7

directed  17:23

direction  93:7

directive  57:4,11,12

directly  12:7 29:12,13 53:5 54:15
  62:18 77:10

director  29:18,21 37:15 38:13

directors  20:24 22:18

discretion  70:8

discuss  17:10 36:2 53:12 85:12,25
  91:5 94:9

discussing  16:9 35:2 54:11

discussion  36:9 39:15 90:20 92:10,
  13 93:14,15,20

discussions  27:17

district  67:5

division  10:13,17,25 11:11,22

docs  18:3

document  12:16 13:2 14:9,13,16
  51:15 68:12

documentation  17:4,7

documented  17:12

documents  5:12 13:14 16:25 17:1
  18:12 52:6,14 60:18 73:20 85:8,11

Donchess  30:23 31:8 32:23 55:8

door  82:4

doubt  82:20

downward  40:22

drug  10:15

duly  4:8

### E

e-mail  77:13

e-mailed  25:10

e-mails  25:11

earlier  59:21

early  23:25 31:22 43:15 86:22

Earnshaw  13:20 61:24 73:18,21 78:1

easy  56:1

education  7:13

effect  38:24 76:11 95:9,12

elaborate  90:15

elected  20:14

electronic  28:21

employee  31:17 68:14

employees  33:8,14 38:8 65:15

employer  6:13

encapsulating  65:22

encounters  37:8

end  13:24 17:11 39:11,13

enforce  21:11

enforcement  95:12

enforcing  6:24

engagements  23:18

enter  28:4

entering  71:2

entire  11:18 26:21 47:20,24 51:5,14
  52:13 87:11

entity  20:2

environment  7:1 22:3

essentially  68:21

estimate  39:25 40:1

events  26:1 45:5 50:12

eventually  14:23 45:3,4 93:1

everyday  23:1

exact  17:15

EXAMINATION  4:11

excellent  17:3

exceptions  65:24

exchanging  93:17

executive  20:20,25 22:13,19

Exhibit  13:12 17:13

expect  52:14

expectation  64:13

expected  35:23

experience  81:8

explain  80:23

express  25:1,14

expressed  23:24 80:12,25

external  37:11

### F

face-to-face  16:21 25:12

fact  18:1 19:5,20 86:22 88:24

facts  33:22 93:16

fair  6:3 15:2 35:15 58:8 70:6 71:7
  76:19 86:8,17

fairly  18:1 24:5 39:20 65:10 75:12

fall  43:19

familiar  34:14 61:22 62:5,8 79:15

Faye  61:20

federal  6:25

feel  59:1,6 60:13 71:21

felony  43:12,15,19

felt  30:12 80:11 81:1,18

file  52:13 85:4

MICHAEL CARIGNAN 6

**final** 51:18,22

**find** 15:11 64:16 65:14 76:11

**fine** 4:5,24 9:14 39:25 47:17

**fingers** 73:15

**Finish** 36:23

**firm** 88:17

**first-year** 9:19,20

**five-minute** 52:1,3

**floor** 82:6

**flow** 19:11,12 40:17

**focus** 9:15 12:14

**folks** 67:23

**follow** 50:21 83:8

**follow-up** 13:20

**force** 10:16 67:16

**forget** 28:15,16 47:18

**form** 19:24 69:5 83:9 86:12 90:4

**format** 28:21

**formed** 69:4

**forum** 16:12

**forward** 9:3 70:14 90:22

**found** 33:25 82:17

**Frank** 40:25

**fraud** 43:18

**freedom** 47:9

**front** 38:9 52:13 59:23 60:18 82:3

**full** 4:13 9:16,17 38:23 60:21

**full-time** 9:4 21:13

**funny** 73:12

---

**G**

**Gary** 34:16 38:18

**gather** 30:19

**gears** 51:25

**general** 20:13 25:19,20 48:23 52:24 63:22 64:4 65:16,23,24 90:6 91:6 93:19

**generally** 5:13 42:25 59:1,6,24 60:10 64:1,19 65:1,2,20 67:18,20 70:15 71:6 72:25 74:20 85:10,24 91:10

**generated** 75:7,9

**gentleman** 56:19

**Gilbert** 62:6,7 78:4

**give** 5:4 13:24 17:6,15 34:3 39:12 52:5 54:3 64:19 68:4 93:8

**goals** 22:25

**good** 4:6 9:14 32:1 50:9 69:2 71:22 81:11 96:7

**goodbyes** 39:16

**government** 20:9 29:15 95:4

**government's** 6:25

**governor** 20:19 22:5,12

**graduate** 7:4,6

**graduated** 7:11

**great** 70:8 96:6

**Greg** 34:13 38:12,15

**guess** 9:5 41:24 80:15 89:8

**guesstimate** 23:25

**guidelines** 6:25

**guys** 55:1

---

**H**

**hail** 56:1

**half** 26:18 27:12 39:23 40:2 83:3 84:8

**Hall** 14:21 16:16 20:5 22:9 33:9,14 35:22,25 48:7 53:1 55:18,24 56:1,7 57:17 61:2,10 63:12,15 65:17 66:5,10, 13 67:5,7 72:2 77:21 95:1

**Hampshire** 6:6 20:19 21:22 46:6

**hand** 28:18

**handle** 18:10 19:7 58:23 62:12 70:9

**handled** 23:6 58:1,6 59:8 64:3,5 72:6

**handles** 23:5

**handling** 17:25 58:12,25

**handwrote** 28:19

**happen** 12:20 27:18 44:4,11 65:18 68:17,18 91:12

**happened** 14:18 26:10,25 45:5 47:23 55:4,16 64:17 71:23 72:4

**happening** 43:1 75:19

**happiest** 44:7

**hard** 73:15 77:18

**head** 13:25 22:12 66:15

**headed** 13:25 49:18 57:25

**heads-up** 60:10

**health** 58:5

**hear** 5:23,25 61:4 76:7 94:22

**heard** 62:17,20 63:10 76:8

**held** 77:14,19,20 88:17

**hey** 26:9 28:14 45:21

**high** 7:4,7,13

**high-intensity** 10:15

**higher** 7:13 70:13

**hinder** 6:10

**hire** 36:19 43:25

**hired** 7:23 8:18 9:6 22:10 56:10,12,13

**hiring** 36:11,14

**history** 8:11 44:3

**hold** 69:11 77:17

**holding** 22:11

**hole** 49:11

**homeless** 66:12,17,20,21,25 67:15

**homicide** 53:16 54:6

**homicides** 53:24

**honest** 16:5 69:19

**honestly** 77:24

**hop** 96:4

**hour** 26:18 27:12 39:23 40:2 83:3 84:8

**hours** 26:1 60:8

**human** 37:15 38:14

**hundred** 22:5 59:10

MICHAEL CARIGNAN

7

hurt 81:7

**I**

identification 13:12

identified 43:14

ignorance 47:7

imagine 71:12 85:5

immediately 80:12 83:6,22,25

impact 46:18

impairments 6:9

important 30:12 50:21 51:17

inartful 5:7

incident 52:21 53:16 61:2,10 62:12
  63:10 72:1,19 73:19 74:13 76:9 77:17
  81:17,20,22 82:18,21 85:4 86:20
  93:20

incidents 65:6 66:9 70:7

included 18:19

incomplete 24:18

independence 23:12

independently 24:10,12

indicating 13:9

indication 37:20

influence 22:10

inform 26:25

informal 26:11 27:20 45:23

information 18:21 34:4 47:10 60:9
  68:15 73:1 77:7

informed 20:24 42:13,21 43:8 45:21
  58:24 61:6 74:16,19

informing 33:7 57:10

initial 43:25 72:12

initially 43:17

input 51:18 53:25

instances 39:6 47:5

instructions 39:12

intention 22:14

interaction 31:6 79:4

interactions 31:4 45:20

internal 36:12,18

interview 36:12

interviewed 38:5,7,11,13 45:17

introduce 12:17

investigating 33:9,23

investigation 10:12,17,24 11:11,12
  12:15 14:23 16:9 18:10 19:5,10 23:5,
  6,12 24:8,13,18 25:17 33:10,12,19
  34:5,11,22,25 35:4,6,8 36:4 37:11
  39:2 40:15,16,21 42:18,23 43:1,4,15
  45:4,9,11 48:15,16 50:12,16 77:3
  80:11 83:7 89:2,9,14 95:2

investigations 43:12

investigative 45:6,8

investigator 36:11,15,19 37:1

investigator's 18:18,22

involve 16:25

involved 19:23 25:2 41:3 54:23 58:20
  60:6 92:11

involvement 25:3

involves 93:16

involving 5:11 61:2,11

issue 28:15 54:7 67:22

issues 6:9 16:16 24:14 27:2 28:6
  53:15,23 54:6,21

items 55:4

**J**

James 30:23

January 45:2 60:17,24 62:2,13 71:21,
  23 86:20

Jim 93:23 94:4,11

job 6:22 8:11 10:4 11:14 21:13,19
  40:8

jobs 8:14,23,25 9:6 21:18

jog 51:15

John 13:8 14:19 19:7 32:22 37:3
  43:11

jump 12:13

June 13:9 14:10,12 28:25 30:9 32:18
  42:3 48:2,8

justice 7:22 8:3

**K**

Kathy 28:2

keeping 22:14

Kevin 61:17 85:18 93:23

Kim 29:10,14 30:8 32:23 33:23 34:18,
  24 36:5 38:21 55:9

kind 19:11,13 26:4 43:23 53:12 85:3

Kinney 87:14,17 88:1,2,23 94:14,18

Kleiner 29:10 30:8 32:14,15,23 34:18,
  24 36:5 38:22 39:7 55:9

Kleiner's 29:14

knew 31:6 34:20,24 41:11 88:19

knowing 74:11

knowledge 10:5 62:9,11 63:2 69:16
  84:22,23 87:4 94:8

**L**

lady 79:10

Lane 68:4

large 60:4

larger 14:17 60:14

Larry 37:25 38:1,14

lasted 27:14 39:18

Laura 15:5,24,25 19:20 23:11

Laurie 15:3,17,24,25 16:2,4 17:3,10
  18:12 19:19 23:10,17,18,19,24 54:7,
  11,20,22 55:4,22 56:7 59:19,22 62:12
  63:13,25 71:23 76:4 88:22 89:2 90:9
  94:16

Lavoie 41:19 57:22 58:22

law 46:7 95:12

laws 21:11

lead 41:3 42:17

MICHAEL CARIGNAN                                              8

**leading** 51:22

**learn** 42:16

**learned** 12:19

**leave** 41:20 44:23 45:1 63:14,17 64:13,14,15,18,19 65:13,14 66:1 67:16,22 89:17 91:2,8

**leaves** 66:2

**left** 40:3 44:18 59:15 63:17,19 72:9,10 86:3

**legal** 21:10 27:3 46:2,4,8 47:19 48:11, 15,18,24 49:3,4,5,8,14,19,24 50:1,2 57:2,5,6,13,25 58:9,12 63:4,15 72:2 76:1,5,17,24 77:8,11,20,21 78:21 79:11,18,21 80:3 82:2 83:1 86:19,25 87:3,6,13,18,20 89:20 91:2,4 92:12

**legislation** 46:17

**Lehto** 13:8 14:19 18:3,5,25 19:3,7,14, 15 24:24 32:22 35:9 40:4,13,20 42:21 43:11 45:20 50:24

**Lehto's** 12:18

**lengthy** 60:6

**Leonard** 48:10 72:12 75:22 76:8

**letting** 35:24

**level** 22:13 53:18 58:6 59:11 92:1

**lieutenant** 11:8,11,12,15 18:8,9,25 19:8 40:11,14,17 50:24 51:10 78:6 87:14,17,25

**life** 7:15

**limited** 86:23

**listen** 8:6

**Litchfield** 6:6

**litigation** 46:22

**live** 6:5,6

**local** 22:7

**location** 64:10

**locations** 6:16

**Lombardi** 40:25 41:8,11 42:17 45:8

**long** 7:2 9:21 11:1 26:15 27:10,13 30:8,22 39:17 41:7 68:18 83:1

**long-term** 21:3 26:2

**longer** 11:10 71:1 73:9

**looked** 93:18

**loop** 59:2,6

**loss** 43:18

**lost** 62:13

**lot** 25:13 30:13 53:19 54:20,21 59:10, 23 60:8 68:11

**love** 52:2

**Lowell** 7:21

**lower** 92:1

---

**M**

**Maddie** 95:20

**made** 27:7 33:20,25 36:17 59:25 60:13 71:6,10 72:16 74:17 81:23 82:9, 11,13 90:10 91:21 92:1,2,5 93:2

**Maine** 7:19

**maintain** 55:24

**maintained** 28:12

**maintenance** 27:2

**major** 26:25 27:6 53:15,23 54:6,7

**majority** 32:5

**make** 5:22 6:4 15:8 19:8 40:8 46:11 51:21 91:25

**makes** 20:5,8 21:2 47:6

**makeup** 81:6

**making** 90:23

**Malaguti** 4:1,6,12 9:13 12:16,25 13:10,13 14:4,7 15:7,16,18 20:7 47:13,16 49:2,7,10,16 52:2,19 62:25 63:1,8 69:8 79:6 83:16 86:14,16 95:15 96:2,7

**MALGUTI** 52:5,9,16

**mall** 68:4,6

**man** 35:15

**manager** 57:22

**manages** 21:2

**Manchester** 6:17

**manner** 40:15 45:15 46:19

**Manuela** 79:14,17

**March** 44:20

**mark** 13:10 37:5,7

**marked** 13:12

**marking** 13:22,24

**markings** 12:24

**Massachusetts** 7:20

**master's** 7:15

**material** 89:25

**matter** 17:21 36:18 67:13 75:17 76:20,21 77:4 81:9 83:13 90:6

**matters** 46:9 53:12 54:4 57:3 59:2

**mayor** 19:4 20:3 22:8 29:11,13,17 30:23,25 31:8 32:8,22 33:7 35:24 36:8 39:1,5,7 53:10,15,25 54:3,13 55:8,13, 14

**mayor's** 12:20 17:12 19:1 32:24 53:4, 9 54:12,13,15

**MBA** 8:2,3,5

**Meadow** 8:24

**meaning** 14:16 72:8 74:4 76:21 80:13 89:19

**means** 25:8 47:11

**meant** 93:18

**Mederos** 18:4,8,9,25 19:15 40:11,14, 20 50:24 51:10

**media** 25:13 89:15,22 90:1,10,18 92:10

**medical** 6:9

**medications** 6:8

**medium** 24:20 74:14

**meet** 25:6

**meeting** 12:20 14:20 15:23,25 16:1, 20,21 17:12 19:1 23:15 25:25 26:6 28:6,14,24 29:3,8,11 32:17 33:3,5,6 34:6,9,21 35:2 36:6 39:11,18,21 40:3, 5 41:8,15 42:22 48:7,12 76:15,16 77:8,11,14,19,23 78:15 82:12 83:1 84:9,21,25 85:9,12,18,22,24 86:3 87:7 88:25 89:5 94:18,20

MICHAEL CARIGNAN                                          9

**meetings** 17:2 25:15 26:15 27:10,25 28:2,23 42:24 45:19 48:19 50:2 61:7 74:23 75:2 85:11,23

**members** 22:4 76:17

**memories** 51:16

**memory** 13:23 16:1 39:25 61:23

**mentioned** 40:13 43:20 66:5

**mentioning** 75:8

**met** 17:9 19:19 30:10 75:23

**Michael** 4:7,15

**middle** 9:8

**military** 8:7 56:18,20

**mind** 59:23 82:5 93:5

**mini** 96:6

**minimum** 33:22

**minute** 63:25 66:8

**minutes** 26:17 27:24 39:24 40:2

**misfortune** 44:12

**misunderstand** 92:6 93:15

**mitigate** 46:25

**money** 60:8

**months** 10:18 44:24,25 68:19

**morning** 6:2 25:22,24 26:6 28:23 32:20 42:22 48:19 50:1,6 74:23 75:2 85:23

**move** 63:24 66:23 67:1,8,9

**moved** 7:19

**multiple** 6:16 24:4 33:13 61:7

**municipal** 20:9

**municipality** 21:21,23

**murder** 54:6

---

### N

**N-E-U-M-A-N** 56:16

**named** 15:3,4 78:11

**names** 34:7,10

**narcotics** 10:12,24 11:11

**narrative** 20:13 70:23 71:1 72:19 82:22

**narratives** 12:19

**narrow** 59:4

**Nashua** 4:17 6:15,17 7:7,8 8:12 9:15 10:14 11:2 14:24 16:9,20 19:22 20:5, 22 22:2 23:13 24:9 31:17 33:11 43:13 46:2,5,7 48:15 53:20 54:23 57:1,6,25 64:24 65:10 67:13 73:7 74:20 77:22 87:20 90:9 95:4,13

**Nashua's** 49:24 57:5 64:6

**nature** 34:4 36:3 88:14

**necessarily** 24:16,17 67:3 90:22

**needed** 38:24 58:24 60:9

**negotiate** 46:13

**negotiations** 46:9

**Neumann** 56:15

**news** 73:2,7 74:13,16,18 75:16

**newspaper** 73:5,8 74:13

**newspapers** 73:2,15

**newsprint** 73:14

**night** 27:1 67:17

**nods** 5:5

**non-business** 32:8

**non-political** 32:2

**north** 7:8

**note** 81:13

**noted** 37:3

**notes** 27:24 28:3,8,17,18,19,20 70:20 71:3 84:25

**notice** 84:24 85:1

**NPD-LO-029** 12:23

**number** 10:7 53:7 60:4,14 65:2

---

### O

**obey** 90:19

**obeying** 89:18 91:1

**Objection** 19:24 69:5 83:9 86:12

**obvious** 39:14

**occasion** 46:1 52:25 55:10,21

**occasions** 47:5 54:18

**occur** 16:13 23:13 26:6

**occurred** 41:9,16 76:23 87:7 91:17

**odd** 8:23,25 9:6

**offense** 91:20

**offenses** 73:22

**offensive** 89:25

**office** 12:20 17:12 19:1 28:13 50:5 53:4,9 54:12,13,15 55:24 76:5,12 82:2 85:7,21 89:6

**officer** 6:21,23 9:4,19,20,24 21:1 22:19 69:20 70:4 78:11 95:12

**officer's** 44:3

**officers** 17:7 21:10 59:12,16 62:15 63:11,16 64:6 70:7 71:2 72:5,13 74:8 75:5 81:16 82:16 91:3,7 93:16

**officers'** 63:21

**offices** 55:18

**official** 41:25 95:1

**officially** 44:20

**officials** 20:14

**open** 48:17 67:18,20 89:2,14

**opened** 30:21 89:10

**operate** 7:1

**operations** 12:1 21:9

**opinion** 50:16 84:16 93:6,9

**opportunity** 26:3

**option** 69:25

**options** 93:18

**ordeal** 87:11

**order** 65:25 70:3 71:14 93:7

**orders** 96:5

**organization** 30:18

**original** 13:18,19 82:21

**Ortolano** 15:4,14 18:13 19:19 23:10, 18,19 50:19 54:7,12,20 55:22 59:22

---

60:13 61:2,11 62:12 63:13,25 66:7 71:23 72:14 74:2 75:12 76:4 81:2,3, 13,22 82:1 83:6 86:3 87:7 88:22 89:2, 16,21,24 90:10 94:16

**Ortolano's** 56:7 59:19 90:4

**OSBON** 95:24 96:12

**outcome** 24:13 80:10

**outcomes** 93:19

**outlets** 74:16

**outright** 24:7

**outsider** 21:22

**oversaw** 43:12

**oversee** 20:21,22

**owner** 44:8 70:2

**owning** 44:12

---

**P**

**p.m.** 96:14

**packet** 18:21

**Pam** 13:10

**papers** 81:21 82:17 92:22

**paralegal** 79:12

**paralegals** 80:14

**paraphrase** 83:25

**Paraphrasing** 80:9

**Pardon** 47:7

**parks** 65:19

**part** 9:16 21:16 26:12 32:3 37:18 47:4 53:14 69:3 70:20 71:17 79:10 87:20 92:10

**participated** 48:22

**parts** 43:3

**pass** 40:18

**past** 66:10

**Patch** 74:18

**patrol** 10:23 11:8,9,14,21 27:1 61:9, 12,13,14 69:24 71:17 92:3

**patrolman** 10:2,6,7,10 31:16 61:23

62:2 67:12 69:17 70:12 73:18,21 78:1

**patrolmen** 59:12

**Patrolmen's** 31:11,12

**PD** 20:25

**PDF** 96:6

**people** 25:8 34:7 35:23 38:10 40:12 55:20 59:23 61:15 64:23 66:25 67:4, 15 76:4 81:10,12 91:2,4,6 95:18 96:4

**percent** 22:24

**period** 47:21

**periods** 55:17

**perpetrator** 66:1,2

**Perry** 79:14

**person** 23:21 33:4 55:7 57:20,22 62:10 64:11,18 66:20,21,22 67:6,7 68:9 70:2 85:3 89:18 95:3,9

**person's** 68:15

**perspective** 43:2

**Peter** 49:1,4 51:25

**Pheasant** 68:4

**philosophy** 64:2,4,23 65:16 67:4,10 69:3,11

**phone** 25:13 53:21

**phones** 56:2

**phrase** 70:23

**physical** 81:6,9,14,25

**physically** 81:7

**place** 25:4 32:24 56:1

**plaintiff's** 49:4

**pleasantries** 35:14

**point** 5:12 13:21 17:6,19 18:11 23:16 24:7 29:20 31:8 40:11,19 42:22 44:22 45:17 48:4 53:5 57:3,25 58:9,11 69:21 76:20 89:1

**points** 24:14

**police** 4:17 7:24 8:12,14,16,18 9:4,7, 15 10:14 11:2 13:17,18 14:24 16:17, 22 17:6,10 19:6,21 20:4,11,16,18,22 21:1,4,9,16,19,22,24 22:7,11,17,18, 19,21,22 23:4 24:8 25:22 26:21 27:6 29:4,5 32:4 33:11 42:6,9,13 44:2 46:5

47:20 49:20 50:3 52:10 53:20,25 57:1, 6,15 58:17 59:8,13,16 60:11,14,25 64:6 65:11,25 67:21,24 69:20 70:4,6, 18 75:17 76:8,13,24 77:22 78:11 80:6 85:14 86:25 87:5,18,20 89:1 90:9 91:3,7,9 92:21,24 94:13 95:3,13

**policies** 22:25

**policing** 23:1 69:20

**policy** 6:24 53:11

**politics** 22:7,14

**population** 66:12

**portion** 29:24 47:25

**position** 6:18 9:18,20,22 10:13 11:20 22:11 29:15 41:4 45:25 81:25 82:15 84:11 92:15

**possession** 18:12 28:9,11

**possibly** 68:7

**post** 89:15,22,25 90:18

**posted** 89:16

**postings** 90:4

**posts** 90:10 92:10

**posture** 82:1

**potential** 63:23

**potentially** 74:24 79:12

**practice** 4:18 67:11

**practiced** 67:13

**prefer** 4:23

**presence** 64:21

**present** 32:21 46:11 48:20 50:1 62:11 76:4 77:22,24,25 78:2,21,23 84:5 85:16

**pretty** 5:3 17:18 24:24 25:7 30:11 35:20 39:14 50:17 57:8 59:2 71:22 74:16 81:10 84:10 91:19

**previously** 41:12

**primarily** 6:17 65:6

**prior** 8:14,19,23 16:8 34:6,9,20 37:8 76:15,16

**private** 4:18 18:18,22 44:22 65:6,7,9

**problem** 56:4

**procedures** 54:1

**process** 22:8 24:1 26:11 42:19,20 45:23 91:14

**processes** 92:13

**produced** 14:4

**Professionally** 75:23

**program** 6:20

**progressing** 45:11

**projects** 26:3

**promise** 46:12

**promoted** 10:18 11:7,20,24 12:1 22:10 42:4 87:24

**promotion** 42:14

**promotions** 21:7

**pronounce** 4:21

**pronounced** 4:20 15:5

**pronouncing** 38:1

**properties** 65:1

**property** 30:20 64:17 65:7,8,9,13,15, 18 70:1,2 72:9 89:19

**proposition** 91:6

**prosecute** 68:16

**providing** 38:23

**PTX** 96:10

**public** 44:21 65:7,9,13

**pull** 52:11

**pulled** 14:5 52:10

**purpose** 33:6 35:20 39:21

**purposes** 57:14

**pursue** 83:14 88:18

**put** 16:7 28:21 48:1 52:6 82:17

**putting** 60:18

---

**Q**

**question** 5:8,14,15 26:14 32:2 46:17 49:1,22 58:8 59:4,5 69:9 76:5 81:11 83:12 86:15 90:11

**questions** 5:7 6:11 50:20 52:24 64:2 95:16,18,20,22,24,25

**quick** 35:20 63:25

**quickly** 8:11 17:18 18:2

---

**R**

**rabbit** 49:11

**raise** 23:11

**raised** 23:15 44:13 80:20

**raises** 23:8

**rank** 10:5,19 11:7,21,24 12:2

**ranks** 70:13

**reached** 88:11

**read** 4:3 51:5,13 73:15

**reader** 73:5

**reading** 51:4 72:18 73:2 74:12

**ready** 13:1

**reason** 64:12 82:20

**reasons** 57:9 65:2

**recall** 35:10 36:6 37:14,18 39:13 45:17 46:25 50:20 51:12 54:11,24 55:2,5,12 56:4,6 59:18 61:6 63:18 75:1 76:10 79:19 82:10 87:9 88:5

**receive** 45:16

**recess** 52:18

**recognize** 13:2

**recollect** 25:16

**recollection** 15:22 24:2 35:17 38:25 45:7 50:11 54:21 71:18,22 77:15

**recollections** 50:25

**recommendation** 42:15

**recommendations** 51:21

**record** 4:4 28:4 68:16 70:19

**recorded** 27:22 69:22 84:22

**records** 13:17 57:22

**red-headed** 78:24,25 79:7,23 86:7

**reference** 48:1

**referring** 30:3 49:14,17 50:2 65:6

**reflected** 70:22

**reflection** 71:10

**reform** 86:15

**reframe** 5:9 58:8 87:3

**refused** 63:14 64:18 91:8

**refusing** 64:21 89:17 90:19

**regard** 14:22 24:2 56:7 85:8

**regular** 26:13

**regulated** 90:5

**regulations** 6:24

**relate** 50:13

**relation** 63:2

**relations** 63:6

**relationship** 29:25 30:2,4 32:8,9,15 54:22 86:9,19,24

**relayed** 39:5

**relook** 89:14

**remember** 17:14 20:1 23:16,17,23 24:17 25:11 27:9 29:9 30:10 31:5,24 33:2,16 35:19 37:23 38:6,22 39:4,6,8, 17,19 40:6 43:24,25 44:1 45:12 47:15, 22 50:12,15,17 51:1,4,6 53:6 54:17 56:9,19,20 57:7,12,13 58:19,21 60:22 61:16 62:6,10,14,16 63:9,11 68:18 72:18,23,24 74:10,11,12,15,19 75:16, 21 76:14 77:25 78:1,9,13,16,17 79:25 80:3,22 82:4,14 84:13 85:15,19,22 88:8,14,16,19 89:16 90:20 92:22 94:24 95:9,11

**reminder** 28:5

**repeat** 91:20

**repeating** 74:7

**rephrase** 45:6

**report** 13:7 14:17,19 18:19 26:1 27:6 32:19 35:11 37:4,19 38:7,9,10,12 45:3 51:4,5,6,9 71:4 73:19,22 81:21 82:21 85:4 92:25

**reported** 27:16

**REPORTER** 96:4,9,13

**reporting** 92:18

---

**reports** 18:23 45:16,18 47:10 52:10 55:1 72:19

**represent** 46:5,19,21

**representative** 31:5,9,25

**represented** 5:17 31:10,12 47:2 48:19

**representing** 32:1 47:1

**represents** 26:23

**request** 47:8,9 56:8

**requested** 68:14 77:8

**requesting** 77:11

**requests** 47:3 56:14,23 57:4,9,14,16, 23 58:2,13,16,17,18 59:19,25 60:12, 14 70:3

**require** 76:9

**resigned** 44:19

**resources** 37:15 38:14

**respond** 60:7

**responded** 62:15 72:5

**responding** 70:7 81:17

**responsible** 56:25

**responsive** 57:8

**rest** 58:1

**retained** 17:7

**retired** 21:15,19 44:19,20

**retirement** 41:22 44:1

**retrieve** 5:11

**returning** 85:7

**returns** 68:8

**review** 43:7 45:18

**Right-to-know** 56:8 59:25 60:12

**risk** 46:24 55:21,23

**Rivier** 8:1

**Roach** 13:21 78:11,12,13

**road** 46:13

**role** 20:21 21:17 41:23 42:10,12 43:10

**room** 32:25 77:21

**rose** 53:17

**roughly** 11:3 30:16 45:22 59:10

**Rourke** 61:17,18 62:20 78:6,7,18 85:18 93:23 94:9,20

**Rourke's** 93:25

**RTK** 56:23 59:19

**rule** 65:23,25

**rules** 5:3 6:24

**run** 8:10 26:9 27:16

**rush** 85:4

**S**

**safety** 81:1

**satisfied** 24:12 80:10 83:18

**scene** 70:4 72:13 91:3

**school** 7:4,7,13 8:12 53:17 58:4

**scrapped** 81:10

**screen** 15:21

**second-year** 9:24

**security** 6:20

**seek** 48:23

**self-admissions** 90:23

**sell** 44:9

**sense** 20:6 47:6

**separate** 20:2 46:20

**September** 8:21

**sergeant** 10:19,20,23,25 11:1,19 19:8 40:18 62:6 78:4 92:3

**sergeants** 41:2

**serve** 21:17

**served** 8:7 11:21,22 71:3

**service** 65:10 68:13 70:21 71:3

**services** 27:1 29:18,21 58:23

**set** 22:5 27:10,13,15,18 29:10 31:3

**sets** 13:19

**shakes** 5:5

**shift** 51:24 61:20

**shoplift** 68:7

**shoplifting** 68:7

**short** 5:11 12:18 21:3 39:20,23,24 91:5

**shortly** 71:12

**shout** 80:19

**show** 12:23 65:1,5,20,25 66:19

**showed** 17:1

**showing** 16:25

**shown** 18:13

**sic** 12:18 15:15

**sick** 41:21

**side** 27:17

**sign** 43:7

**significant** 26:2,7 27:4 44:2 53:16

**significantly** 69:21

**similar** 44:10

**sir** 5:1,2 6:5,16 7:2,5 8:8 12:9 13:3 15:1 19:18 25:20 29:2 35:5 50:4 81:8 90:2,7

**sit** 50:10

**sitting** 5:20 82:3,6

**situation** 59:24 63:13,23,24 66:17,18 68:3 74:21

**situations** 64:3,5

**Sky** 8:24

**sleeping** 66:20

**slight** 81:10,12

**small** 81:10,12

**snafu** 73:20

**social** 25:13 32:7,15 89:15,22 90:1, 10,18 92:10

**solely** 42:15

**solicitor** 47:19 48:3

**solicitor's** 50:5

**solution** 69:2

MICHAEL CARIGNAN                                    13

**somebody's** 64:10

**sort** 13:18 19:21 20:9 65:22 75:13

**sound** 15:10 34:13 79:14

**sounds** 4:6 19:14 59:22 87:24 96:7

**south** 7:8

**Southern** 7:19

**space** 64:11

**span** 54:17

**speak** 5:23 16:18 19:4,17 48:6,10,14 55:21

**speaking** 33:13 56:6 59:18 60:11 76:12 79:20,24 80:2,5 94:23

**special** 9:20,24

**specific** 16:1 23:14 24:4 53:6 54:25 55:3 58:21 64:12 66:11 83:11 84:13, 14

**specifically** 45:10,14 48:24 55:5 56:8,13 58:19 59:20 65:17 74:15 85:15 87:9 88:6,20 89:7

**speech** 90:5,6

**speed** 27:8 45:24

**spelled** 4:16

**spelling** 15:9

**spent** 7:18 10:13,22 11:8,10,25

**spoke** 16:3 88:23 94:21

**spoken** 16:2

**spokesman** 75:17

**spot** 71:6

**staff** 25:24 26:22,23 29:17,20 54:14 59:13,17 61:8 75:15 79:11 80:13,24 85:13 86:2

**stairwell** 66:22

**stamp** 68:17

**stand** 66:14

**start** 13:25 17:18 58:10 95:2

**started** 9:7,16,19 24:6 31:24 44:24 45:1 69:23

**state** 4:13 20:19 22:13

**stated** 14:15 59:21

**statements** 39:8

**stay** 11:1 26:4 44:14

**stenographer** 15:9

**step** 62:22

**steps** 45:8

**Steve** 47:21,23 50:5 56:12,22 58:1,15 59:19 63:3 78:23 80:8 83:17 86:2 88:4,21

**Steven** 49:18 76:17 94:8

**steward** 31:7

**stick** 82:16

**stipulations** 4:2

**store** 68:6,9

**straight** 44:21

**strategic** 21:2

**strategy** 35:3 36:4

**street** 30:14,17 68:12

**strike** 34:8

**structure** 19:6,12

**students** 73:13

**subject** 34:24

**subjects** 34:10,21 35:3

**subordinate** 18:7

**subordinates** 92:19

**successful** 69:13

**supervisor** 11:15,19

**supervisors** 41:2 92:4

**supplemental** 12:19 13:7 14:16 70:23 71:1 72:19 82:22

**support** 38:24

**supported** 90:24

**surrounding** 81:22

**sworn** 4:8 21:10 30:24 59:16

**Systems** 6:14 45:1

---

**T**

**takes** 28:3

**taking** 6:8 84:25 92:15

**talk** 19:20 25:6 26:19 27:2,3 28:24 30:1 35:23 39:21 40:4 46:17 52:22 53:10 56:22 60:17 64:1,15 66:7 71:12, 20

**talked** 36:10 38:21 40:9 58:15 85:19, 20

**talker** 23:19

**talking** 49:8 54:13 58:16 67:11 70:11, 14 71:13,14,16,25 91:1

**tall** 79:7,23 86:7

**Taller** 78:25

**task** 10:15

**teach** 73:12

**technically** 95:17,19

**teeth** 68:22

**Telegraph** 74:19

**telephone** 25:9 53:1 56:2

**telling** 57:13 88:6 92:9

**ten** 26:17

**tendency** 5:6

**tent** 19:22

**terminal** 41:19 44:23,25

**terminations** 21:7

**terms** 22:25 23:1 53:23 83:7

**Testaverde** 93:24 94:4,11

**testified** 4:9

**testify** 65:1,5,20 67:6

**That'll** 6:4

**there'd** 66:19

**thing** 11:18 13:16

**things** 27:6 36:2 45:13 53:12 73:13

**third-hand** 88:12

**thought** 22:8 24:8 29:16 71:15 75:13 76:20 91:14,18

**thousand** 59:10

**threat** 53:17 81:14

**threatening** 68:7

MICHAEL CARIGNAN                                14

**threats** 53:24 54:7 81:23 82:9,11,13

**thrown** 48:3

**Tim** 78:12,13

**time** 4:2 7:11,20 9:16,17 11:25 13:8
16:3 17:15 18:9 24:5 25:23,24 27:10,
13,15,19 28:2 29:13,14,16 31:1,2,17
32:2,5,17 39:19 41:4,18,20,21,22
43:11 45:1,21 46:25 47:1,20,22,24,25
48:16,17 52:11 53:6 54:17 59:15 60:6,
7,20,25 61:1,5,18 63:10 67:14 74:5,9
76:2 78:8 82:15 84:15 86:3 87:6,14
88:1,11 93:22 94:2,19 96:1,2

**time's** 39:13

**timely** 45:15

**times** 16:2,16 24:4,6 31:3,24 45:14
53:9 54:16 71:9 75:23

**title** 6:19 41:25 47:18 94:1

**today** 5:18 50:10 51:17 96:1

**told** 18:6,7 33:24 43:18 56:10,11
62:16 72:10,13 73:23 74:21 75:6 76:6
80:15,16 83:21 84:19 86:22 93:7

**tool** 69:10,12,14,18

**topic** 36:1 39:15

**topics** 25:14 26:18 30:1

**touch** 26:4 56:5

**traditionally** 20:17

**trafficking** 10:15

**transcribe** 28:20

**transcript** 96:5

**transferred** 10:11,17,24

**transition** 47:22

**transpired** 40:5

**trespass** 13:16 63:12,23 64:3,5 66:6,
9,13,24 67:2,19,22,23 68:13,21 69:3,
10 70:3,7,17 71:6,13 91:9,10,18

**trespassed** 68:10 72:14 74:8

**troublesome** 76:11

**true** 37:20 82:23,25

**truthfully** 79:2

**Turgiss** 34:13,16 38:13,15,18

**type** 30:18

**types** 33:20

**typically** 26:16 65:4 66:16,19 67:15
92:4

---

## U

**ULOWELL** 7:20

**ultimately** 40:25 43:6 46:14

**UMASS** 7:21

**understand** 4:18 5:8 6:11 20:9,10
27:21 29:19 40:20 45:5 65:24 88:21
89:21,24 90:3,16 91:13

**understanding** 44:16 57:24

**understood** 39:1

**uniformed** 78:9

**union** 31:4,7,9,11,12,25 32:1

**unique** 22:2,3

**units** 46:10

**University** 7:18,19 8:2

**unpredictable** 81:1

**unprotected** 90:5

**unused** 41:21

**upcoming** 27:3

**updated** 26:13

**updates** 26:6

---

## V

**vacation** 41:21

**verify** 92:25

**version** 12:24

**veteran** 56:18,21

**victim** 50:19 64:16,25 65:5

**victims** 86:10

**video** 84:22

**view** 15:19

**violated** 68:24

**vocal** 91:19

**voice** 5:4 80:20

**voiced** 93:9,10

**voluminous** 18:15

**voracious** 73:5

---

## W

**walk** 28:13

**walking** 35:22

**wanted** 18:8 72:14 77:3 84:15 89:14
92:11

**warning** 64:20 67:22 68:22 91:17

**watching** 73:2

**week** 77:17,18 89:8

**welcomed** 39:2 68:5

**whomever** 56:5

**wife** 32:12

**woman** 15:3,4

**word** 28:21 83:11,21

**wording** 24:11

**words** 27:11 35:15 74:1 76:10 84:14

**work** 6:16 20:4 30:13 37:17 44:22
46:1 53:19

**worked** 8:23 9:9 60:9 79:16

**working** 26:3 53:11 68:11

**works** 46:7 68:2 69:11

**write** 28:18

**written** 14:19 45:18 70:18 85:8

**wrong** 90:8

**wrote** 83:17

---

## Y

**year** 7:18,23 9:23,25 10:1 11:9,10
12:3,10 21:17 59:11 68:10,17,19,24
72:15

**years** 7:3 10:7,13,22,23 11:3 22:6
44:16 53:2 69:20 70:11 71:2

**younger** 79:10

**Yup** 19:18

---
                              **Z**
---

**Zoom** 5:24