UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

|                              |   |                                  |
|------------------------------|---|----------------------------------|
| Laurie Ortolano              | : |                                  |
|                              | : |                                  |
| v.                           | : | Civil Action No. 22-cv-00326-LM  |
|                              | : |                                  |
| The City of Nashua, et al.   | : |                                  |

### DEFENDANT FRANK LOMBARDI'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

By Verified Complaint dated August 23, 2022, Plaintiff initiated the instant matter against the City of Nashua, its Mayor, and several of its current and former employees, including Frank Lombardi, a Nashua Police Department detective assigned to investigate claims that Plaintiff made regarding alleged criminal activity at the City's Assessing Department. Although the Complaint originally included ten counts, including due process, state constitutional, and emotional distress claims, after this Court ruled on the various Defendants' Motions for Judgment on the Pleadings [Doc. Nos. 58, 60 & 61], Plaintiff reduced her claims to just four. *See* Stipulation of Dismissal [Doc. No. 63]. Of these, only two of the remaining counts ostensibly relate to this Defendant:

Count I: Claim pursuant to 42 U.S.C. § 1983, asserting that Defendants violated Plaintiff's First Amendment rights by "restricting, regulating, suppressing, or chilling" her speech and/or retaliating against her on account of her speech; and

Count II: Claim pursuant to 42 U.S.C. § 1983, asserting that Defendants violated Plaintiff's First Amendment right to petition by taking adverse action against her on the basis of her exercise of that right.

As set forth in more detail below, the undisputed facts establish that Plaintiff cannot succeed on either claim as to this Defendant. No act by Det. Lombardi violated Plaintiff's First Amendment

rights and, even were this Court to conclude otherwise, he would be immune from liability under federal law.  As such, Defendant Lombardi is entitled to judgment as a matter of law.

## STATEMENT OF FACTS[1]

*Background*

Plaintiff Laurie Ortolano moved to Nashua at the end of 2013.  Deposition of Laurie Ortolano ("Pl's Dep."), relevant portions of which are attached hereto as Exhibit 1, at p.16.  Shortly after, she claims, her property assessment increased dramatically, causing a corresponding increase in her taxes.  *Id*. p.19.  *See also* Verified Complaint (hereafter "Comp.") ¶15.  Plaintiff sought a reevaluation, which lowered the assessment slightly, but not to her satisfaction.  Comp. ¶16.  In 2017 and 2018 she contacted the Chief Assessor and the Mayor but did not get the responses she desired.  Comp. ¶¶18-19.  In September 2018 Plaintiff began attending monthly "Coffee with the Mayor" events and articulated her belief that the 2018 reevaluation was done improperly.  Comp. ¶26.  In October 2018 she and her husband wrote a letter to the Board of Aldermen (hereafter "BOA") criticizing the Assessing Department.  Comp. ¶25.  They then attended a BOA meeting where they expressed their concerns about the Department.  *Id*.  In fact, beginning in September 2018, Plaintiff became a regular participant in meetings of the BOA and the Board of Assessors, speaking at six such meetings during the last four months of that year and twenty more in the first six months of 2019.  *See* Affidavit of Megan Caron, attached hereto as Exhibit 2, at ¶4 and Ex. A thereto.

During this time, Plaintiff came to believe that one of the City's assessors, Greg Turgiss, was not performing his job duties.  Comp. ¶60; Pl. Dep. p. 34.  She hired a private investigator,

---

[1] The facts, of course, are presented in the light most favorable to Plaintiff, as they must pursuant to Fed R. Civ. P. 56.  Their recitation herein should not be construed as an admission and Defendant will likely challenge at least some such statements should the matter proceed to trial.

William Freyler, to follow Turgiss around the City during his workday, including during his lunch. Comp. ¶60; Pl's Dep. pp. 34-36.  Freyler ultimately produced a report for Plaintiff, which she shared with the City.  Comp. ¶60; Pl. Dep. p. 37; Caron Aff. Ex. B.  Per his report, Freyler set up at the parking garage next to City Hall to watch for Turgiss while Plaintiff was inside the Assessing Department reporting on his whereabouts. *See* Freyler Report p.2.  At times, Freyer noted, he used a drone to track Turgiss.  *Id*. pp. 4-5.  He took numerous photos of Turgiss in his vehicle and coming and going on foot from City Hall.  *Id*. pp. 13, 16-18.

Plaintiff states that based on Freyler's report the City hired Attorney Mark Broth to investigate the assessor.  Comp. ¶60.  Plaintiff, however, became concerned that officials – and Director of Administrative Services Kim Kleiner in particular - were interfering with Broth's investigation.  Comp. ¶¶61-62.  In particular, she had heard "second hand" that Kleiner had told staff about an incident that one member of the staff, Cheryl Walley, construed as warning and admonition not to fully cooperate with Broth's investigation.  Comp. ¶61.  As a result, she and another resident went to the Nashua police to request that the police conduct a criminal investigation into both Turgiss and Kleiner.  Comp. ¶62.

*Investigation*

Plaintiff initially met with then-Chief Michael Carignan.  Deposition of Michael Carignan ("Carignan Dep."), relevant portions of which are attached hereto as Exhibit 3, pp. 16-17.  The Chief assigned the investigation to the detective bureau.  Carignan Dep. p. 17.  In addition, Chief Carignan and Captain Jon Lehto met with the Mayor and Kleiner to inform the Mayor that a criminal complaint had been made against employees at City Hall and that the police would be conducting an investigation into the allegations.  Carignan Dep. pp. 32-33.  The Mayor and Kleiner stated that they understood and assured the police that they would receive cooperation from the

3

City.  Carignan Dep. pp. 38-39.

The bureau assigned the investigation to Detective Frank Lombardi and Sgt. Robert MacLeod, with Lombardi serving as the lead detective.  Affidavit of Frank Lombardi ("Lombardi Aff."), attached hereto as Exhibit 4, ¶3.  Lombardi is – and at all relevant times was – a police officer employed by the City of Nashua.  Lombardi Aff. ¶2.  He joined the police department in 2008 as a patrol officer, at which time he attended the New Hampshire Police Academy, a 16 week program in which officers are trained law enforcement techniques, criminal law, and citizen's rights, including under the United States Constitution.  Lombardi Aff. ¶2.  In 2105 he became a Detective, a position in which he regularly was assigned to investigate alleged criminal activity.  Lombardi Aff. ¶2.  Prior to this assignment he had no professional or personal conflicts with Plaintiff.  Lombardi Aff. ¶3.

Lombardi received and reviewed extensive materials delivered to the police department by Plaintiff.  Lombardi Aff. ¶4.  These included the investigation report prepared by Freyler.  Lombardi Aff. ¶4.  After reviewing the materials from Plaintiff, Lombardi began interviewing various members of the Assessing Department.  Lombardi Aff. ¶5.  These included Lynn Cameron, an administration specialist, whom he interviewed on August 23, 2019.  Lombardi Aff. ¶5.  At that time, Cameron informed him that while she formerly had good interactions with the Plaintiff, now the staff were "on eggshells because I think we've all been in the position where she's taken what we've said and twisted it to use it against somebody else."  Lombardi Aff. ¶5.  She added that Plaintiff had taken things she had said out of context.  Lombardi Aff. ¶5.

*The "Warning"*

Plaintiff continued to visit the Assessing Department as the police investigation continued.  On one of those occasions, she states, she went to the office around lunchtime to "get a piece of

4

paper on Cheryl Walley's wall." Pl. Dep. p. 47.  Specifically, Plaintiff sought a note that Walley wrote that Walley said explained how the department staff was supposed to treat Plaintiff. Pl. Dep. p. 47.  Walley was out on leave at the time Plaintiff went to the office and Plaintiff hoped that Cameron would get the note for her.  Pl. Dep. pp. 47-48.  Cameron, however, was out.  Pl. Dep. pp. 48-49.  Another employee would not give Plaintiff the note, advising her to ask the Legal Department.  Pl. Dep. 48-49.  Plaintiff then proceeded to the Legal Department and requested the note but was told she could not have it.  Pl. Dep. pp. 49-50.  Plaintiff went back to her car, which she states was parked on the Elm Street side of City Hall.  Pl. Dep. pp. 51-52.  While there, she spotted Cameron walking towards the side door of the building.  Pl. Dep. p. 51.[2]

Even though the Legal Department had just told Plaintiff she could not have the document attached to Walley's wall, Plaintiff approached Cameron and asked for exactly that.  Pl. Dep. pp. 51-52.  She also asked Cameron about "what Kleiner had told the clerks about on how to deal with me."  Pl. Dep. p. 52.  Plaintiff concedes that she knew the investigation was ongoing and that the assessing personnel were aware that she had triggered the investigation.  Pl. Dep. p. 54.

Cameron reported this incident to Lombardi, with her supervisor, Louise Brown, present. Lombardi Aff. ¶7.  Cameron stated that she was very uncomfortable with her interaction with Plaintiff and felt that Plaintiff had been waiting outside for her.  Lombardi Aff. ¶7.  Cameron was emotional and crying as she conveyed this to the detective.  Lombardi Aff. ¶7.

Lombardi advised Cameron that there were steps that might reduce the chances of such confrontations happening again.  Lombardi Aff. ¶8.  These included seeking an order of protection. Lombardi Aff. ¶8.  Lombardi also offered that he could speak with Plaintiff on Cameron's behalf

---

[2]   Perhaps not coincidentally, this is the same location Freyler had staked out to spy on Turgiss.  *See* Freyler Report (Caron Ex. B) at p. 2.  Indeed, Freyler photographed Turgiss in that very place.  *Id*. at p. 3.

5

and advise her that Cameron did not wish to speak with her outside of her duties within the Assessing Department.  Lombardi Aff. ¶8.  Shortly thereafter Lombardi was informed that Cameron and indeed all of the employees of the Department, save Walley, wanted him to express to Plaintiff that they did not want to speak with her outside of work. Lombardi Aff. ¶9.

Lombardi and another officer then went to Plaintiff's home to inform her of this request. Lombardi Aff. ¶10.  As she was not home, they left a message with her husband asking Plaintiff to contact them.  Lombardi Aff. ¶10.  Plaintiff subsequently called Lombardi and arranged to meet him at the police station.  Lombardi Aff. ¶11.  Soon thereafter, she met with Lombardi and Sgt. Scott Hudon in the lobby of the police station.  Lombardi Aff. ¶11.  Lombardi explained the purpose of the meeting and Plaintiff acknowledged that she had spoken with Cameron by City Hall but denied that she had been waiting for her.  Lombardi Aff. ¶11.  Lombardi explained that Cameron was not suggesting any crime had occurred but that she and the other members of the department (bar Walley) did not want to have contact with her outside of City Hall.  Lombardi Aff. ¶11.  Plaintiff asked Lombardi whether the warning was lawful, and he responded that such warnings were lawful and were done proactively to prevent crimes from occurring. Lombardi Aff. ¶12.  He further stated that if she did contact the employees outside of work, depending on the circumstances, she could face criminal charges.  Lombardi Aff. ¶12.  *See also* Comp. ¶¶82-83.

Lombardi would explain at deposition that it is not uncommon for police to issue such "warnings" in citizen disputes in an effort to secure the peace between feuding parties.  *See* Deposition of Frank Lombardi, relevant excerpts of which are attached hereto as Exhibit 5, at pp. 42-45.

> Almost every domestic violence call we go to where an arrest isn't made, we're typically giving some sort of warning or advice and telling people to, you know, stop whatever behavior they're doing to prevent any future issues.

Lombardi Dep. p. 42.  He added that in addition to domestic incidents such warnings are given in

neighbor disputes, road rage incidents, and juvenile issues.  Lombardi Dep. p. 43.  '[O]our school resource officers probably do it multiple times a day, every day." *Id.*  An arrest, of course, would only occur if some crime was committed in some subsequent interaction, such as assault or criminal threatening.  Lombardi Aff. ¶12.

Plaintiff says that when Lombardi gave her the warning he asked whether she had any questions. Pl. Dep. p. 58.  Plaintiff responded that she had "a shit-ton of questions, but I think I have to talk to my lawyer…."  Pl. Dep. pp.58-59.  As it happens, Plaintiff was represented by at least one and possibly two different counsel at this time to whom she could address her questions.  She had engaged Attorney Robert Fojo in late 2018 to assist her with 91-A requests.  Pl. Dep. pp. 24-25.  He remained her counsel until approximately October 2019.  Pl. Dep. p. 25.  Plaintiff had also engaged Attorney Rick Lehman to represent her.  Pl. Dep. p. 26.  At this time, she concedes, she may have spoken with both counsel: "I probably talked to both Fojo and Lehmann.  I know I talked to Lehman."  Pl. Dep. 59.  Plaintiff concedes that had any of the assessing staff asked her themselves not to talk to her outside of work she would have honored that request.  Pl. Dep. pp. 54, 55-56.

*Conduct After Warning*

Plaintiff later discussed the warning with Deputy Chief Testaverde.  Pl. Dep. p.60.  Incredibly, while Plaintiff now contends that this warning violated her First Amendment rights, after her discussion with the Deputy Chief she asked him to issue the same warning to Kleiner, instructing Kleiner that Plaintiff did not want contact with her.  *Id*.

In addition, despite the warning, Plaintiff remained a regular attendee of public meetings where she frequently criticized City officials.  Indeed, just two days later she appeared and spoke at some length at a Board of Aldermen meeting, criticizing Kleiner and the recently released

7

Assessing Department procedures. Caron Aff. ¶7 and Ex. A pp. 97-99. The following week she attended (and spoke at) a Board of Assessors meeting. *Id*. pp. 99-103. That would be one of just nine meetings of those two Boards that she would speak at after the warning through the end of 2019. Caron Ex. A pp. 99-123. Plaintiff spoke during at least 25 public meetings in 2020. Caron Aff. ¶8. She also attended additional meetings at which she did not speak. Pl. Dep. pp. 83-84. This continued apace through 2021. *See* Plaintiff's Affidavit in Response to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p.24, ¶50 (noting attendance at 45 BOA meetings from January 2021 through October 2022). In fact, Plaintiff concedes that she regularly attended meeting of all manner of City boards until October 2022, when she claims that unrelated comments from an individual alderman caused her to stop attending for several months. Pl. Dep. at pp. 83-84.[3]

Plaintiff also continued filing Right-to-Know requests and enforcing them through litigation. *See* Affidavit of Steven Bolton ("Bolton Aff."), appended to Bolton's Motion for Summary Judgment [Doc. No. 71-2] at ¶2. Plaintiff has not been shy therein about criticizing the City or its officials. Indeed, just last week the Hillsborough Superior Court documented her increasingly hostile pleadings, baseless accusations, and crude language. *See* Order of May 23, 2024, *Ortolano v. City of Nashua*, 2021-cv-00354 (Hillsborough County Superior Court – Southern Dist.) attached hereto as Exhibit 6.

In the meantime, Lombardi concluded his investigation in early 2020 and no charges were brought against either Turgiss or Kleiner. Lombardi Aff. ¶13. He had no further involvement with Plaintiff and played no role in subsequent investigations of Plaintiff for trespass or any other

---

[3]   Plaintiff has filed a separate suit based on that issue. *See Ortolano v. Moran*, 226-2022-cv-00466 (Hillsborough County Superior Court – Southern Dist.).

8

matter. Lombardi Aff. ¶13.

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment motions provide courts the opportunity to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Acosta v. Ames Dept. Stores, Inc.*, 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)).  Thus, although the initial burden is upon the moving party to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), if a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists. *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir. 1983).  Failing that showing, summary judgment must be granted.

**ARGUMENT**

Following the first round of dispositive motions in this case, there are only two counts on which Lombardi remains a defendant: Count I (First Amendment Retaliation) and Count II (Violation of Right to Petition).  Lombardi is entitled to summary judgment on both claims.

**I.   LOMBARDI DID NOT VIOLATE PLAINTIFF'S FIRST AMENDMENT RIGHTS.**

By Counts I and II of the Complaint, Plaintiff alleges that the various Defendants "chilled" her right to free speech and "violated" her right to petition, respectively, in violation of the First Amendment.  As set forth previously by this Court, to prevail on either claim, Plaintiff must establish that:

9

> (1) she engaged in constitutionally protected conduct, (2) was subject to an adverse action by the defendants, and (3) the protected conduct was a substantial or motivating factor in the adverse action.

Order on Carignan Motion to Dismiss [Doc. No. 58] at 9 (quoting *Currier v. Town of Gilmanton*, 621 F.Supp.3d 233, 258 (D.N.H. 2022)) (further citations omitted).

In addition, Plaintiff must demonstrate that the defendant acted with <u>intent</u> to retaliate against her and that the retaliatory action actually caused the injury for which she seeks compensation. *Reid v. Brodeur*, 2001 DNH 032 (Feb. 15, 2001) at 16-17 (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). When such claims arise from criticism of public officials by private citizens, courts must examine whether a defendant's alleged wrongful conduct was "motivated or substantially caused by the plaintiff's exercise of free speech." *Gill v. Pidlypchak*, 732 F.3d 157, 159 (2d Cir. 2004). As for the injury element, a plaintiff must show that the defendant's alleged retaliation chilled the plaintiff's free speech or caused some other concrete harm to the plaintiff. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). As this Court previously observed, "adverse action must be more than 'de mininus,' which the First Circuit has defined simply as sufficient to chill a 'reasonably hardy' person, or 'a person of ordinary firmness,' from continuing to exercise their constitutional rights." Order on Donchess's Motion to Dismiss [Doc. No. 61] at 16 (quoting *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011); *Starr v. Dube*, 334 Fed. Appx. 341, 342 (1st Cir. 2009)). In addition, the claimed *injury* must be more than de minimus. *See* Order on Donchess's Motion to Dismiss [Doc. No. 61] at 17 (observing with respect to Plaintiff that "whatever injury she suffered was also de minimus and therefore not actionable) (citing *Bourne v. Arruda*, 10-cv-393-LM, 2011 WL 2357504 at 16 (D.N.H. June 10, 2011)).

Plaintiff cannot satisfy this burden as to this (or any) Defendant. At the outset, Plaintiff does not have an unfettered First Amendment right to speak with line governmental employees

10

outside of their work against their wishes.  She was not seeking to engage in some protest or criticize them in some public forum.  Rather, she sought to obtain information from them outside the confines of their workspace.  As to Ms. Cameron, this effort focused on a rather dubious attempt to have her remove and supply to Plaintiff a copy of a document apparently pinned to a cork board by a fellow employee's desk after the City's legal counsel had expressly told her she was not entitled to the document.

Det. Lombardi was well within constitutional norms to advise Plaintiff that Cameron and other staff did not want to talk with her outside of work, the equivalent of instructing neighbors to keep civil or school children to leave each other alone.  Moreover, it is patently true that, depending on the manner in which she might subsequently contact them despite their request, she could be found to be committing a crime.  For example, RSA 644:4 prohibits repeated communications using "offensively coarse language with a purpose to annoy or alarm another."  RSA 644:2 prohibits threatening behavior in a public place, obscene, derisive or offensive words in a public place that are likely to provoke a violent reaction, and the obstruction of pedestrian traffic or the entrance to a public building.  Given Plaintiff's conduct in public forums and even before state courts, *see* Ex. 6, such events are not beyond imagination.

In addition, Lombardi's verbal warning would not chill a reasonable person and certainly did not chill Plaintiff's speech.  Anyone could simply Google the enforceability of verbal no contact orders and quickly learn that, while there are many good reasons to follow them, they carry no independent authority.  Plaintiff, however, had the additional option of asking either of her two attorneys whether the warning exposed her to any criminal liability and, indeed, admits that she spoke to at least one of them.

Lombardi also had good reason to believe that the members of the Assessing Department were genuinely concerned about Plaintiff contacting them outside of work. Plaintiff had already documented how her private investigator would wait, hidden in the nearby parking garage, for their colleague (Turgiss) to emerge from the back door, assisted by Plaintiff herself reporting from inside the department. Even if Plaintiff considered their concern unwarranted, there was no basis for Lombardi to disbelieve it: Ms. Cameron emotionally recounted her encounter with Plaintiff as she returned from lunch, crying as she related the incident to the Detective. Lombardi – who had no prior history with Plaintiff – merely conveyed to Plaintiff (truthfully) that Cameron and others did not want to have contact with her outside of work and cautioned her that under certain circumstances such contact could lead to her arrest. That was an accurate statement insofar as, depending on Plaintiff's actual behavior, such contact could violate laws prohibiting harassment.

Finally, there is no evidence that the verbal warning caused more than de minimis damage to Plaintiff. At worst she felt she could not speak with employees who did not want to speak with her anyway. Plaintiff claims that she would have honored those wishes had she received them directly from the staff themselves. She did not otherwise stop attending public meetings or criticizing City officials or staff. To the contrary, Plaintiff appeared at a Board of Aldermen meeting just two days after receiving the warning and spoke at length, continued to attend public meetings over the next three years, and has filed numerous suits against the City.

## II.   LOMBARDI IS IMMUNE FROM LIABILITY.

Even were this Court to conclude that Lombardi violated Plaintiff's rights – effectively barring police from taking simple proactive steps to avert conflicts between private persons – Lombardi could not be held liable as there is no clear precedent prohibiting such verbal warnings. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Importantly, "[t]he plaintiff bears the burden of demonstrating that the law [the defendant purportedly violated] was clearly established at the time of the alleged violation." *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015). This burden is not satisfied simply by establishing that a person has a right – for example, the right not to be retaliated against based on her speech – but requires that the officer charged should have known that his or her specific conduct would violate that right. *See Fernandez-Salicrup v. Figueroa-Sancha*, 790 F.3d 312, 325 (1st Cir. 2015) (determining whether a right was clearly established involves a two-part inquiry into: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable officer would have understood that what he [or she] was doing violated the right, and (b) whether in the particular factual context of the case, a reasonable officer would have understood that his [or her] conduct violated the right") (quoting *Mlodzinski v. Lewis*, 648 F.3d 24, 32–33 (1st Cir. 2011)). To meet this burden, the plaintiff must "identify controlling authority or a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced — then existing precedent, in other words, must have placed the statutory or constitutional question . . . beyond debate." *Rivera-Corraliza v. Puig-Morales*, 794 F.3d 208, 214-15 (1st Cir. 2015) (emphasis added) (citation omitted).

Defendant has located no case in this Circuit – or indeed anywhere – holding that verbal no contact orders violate the First Amendment, much less a "robust consensus of pervasive authority" to that effect. Barring some extraordinary discovery by Plaintiff, Lombardi is therefore immune from liability for his issuance of the warning. As Lombardi's warning is the sole conduct

13

by Lombardi in support of Plaintiff's claims, summary judgment must enter.

## CONCLUSION

The undisputed facts fall far short of those required to sustain any claim against this Defendant. As such, he is entitled to Summary Judgment on both remaining Counts of the Complaint.

Respectfully submitted,

**FRANK LOMBARDI**

By his attorneys

CULLEN COLLIMORE SHIRLEY PLLC

Dated: May 29, 2024     By: /s/ Brian J.S. Cullen
Brian J. S. Cullen (Bar No. 11265)
37 Technology Way, Suite 3W2
Nashua, NH  03060
(603) 881-5500
bcullen@cullencollimore.com

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: May 29, 2024     By: /s/ Brian J.S. Cullen
Brian J.S. Cullen