**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

**MICHAEL CARIGNAN**

*April 19, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH 03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION

Page 14

1   on, okay?
2           MR. CULLEN: Sure. I believe I have
3   those here.
4           MR. MALAGUTI: I know you produced them
5   because I had pulled them down, and I just can't
6   get access to them, so. Thank you.
7   BY MR. MALAGUTI:
8       Q.  Okay. So, Mr. Carignan, I can't see
9   the document that you're looking at, but I believe
10  it's from -- is it from June of 2019, somewhere in
11  that area?
12      A.  Yes, June 26, 2019.
13      Q.  And could you describe that document to
14  us, please.
15      A.  Sure. It's a -- as you stated, it's a
16  supplemental document, meaning a supplemental
17  report to a larger report that just indicates
18  something that happened within that case. It was a
19  report written by Captain John Lehto, based on a
20  meeting that I had with him attending a meeting at
21  City Hall.
22      Q.  Now, this is in regard to an
23  investigation that would eventually be done by the
24  Nashua Police Department regarding the Nashua
25  Assessing Department, right?

Page 15

1       A.  Correct, yes, sir.
2       Q.  And it's fair to say if that was
3   brought to your attention by a woman named Laurie
4   Ortolano and perhaps another woman with her named
5   Laura -- I believe it's pronounced Colquhoun?
6       A.  Correct.
7           MR. MALAGUTI: And if someone knows
8   better than me, I'm going to make an attempt at
9   spelling Colquhoun for the stenographer. I
10  believe it's C-O-L-Q-U-H-O-U-N. Does that sound
11  right, if you can find it somewhere?
12          MR. CULLEN: That appears to be
13  correct.
14          MS. ORTOLANO: It's C-A-L,
15  C-A-L-Q-U-H-U-O-N (sic).
16          MR. MALAGUTI: C-A-L. Okay. Thank
17  you, Laurie.
18  BY MR. MALAGUTI:
19      Q.  You just came into a different view, so
20  you're still there. My apologies. You bounced
21  down on the screen.
22          Do you have a recollection,
23  Mr. Carignan, about your meeting with what I'll
24  call the two Laurie and Laura?
25      A.  The meeting with Laurie and Laura, I

Page 16

1   didn't have any specific memory of that meeting. I
2   know I've spoken to Laurie several times.
3       Q.  When is the first time you ever spoke
4   with Laurie?
5       A.  I'll be honest, I'm not sure. We've
6   had several conversations. So -- go ahead.
7       Q.  Let me put them chronologically. Did
8   you have conversations with her prior to
9   discussing the investigation into the Nashua
10  Assessing Department?
11      A.  Yes.
12      Q.  In what forum would these conversations
13  occur?
14      A.  Well, so, again, we had several
15  conversations, some we had seen each other at City
16  Hall a couple of times over some different issues,
17  but she came to me to the police department to
18  speak to me about her concerns with those
19  allegations.
20      Q.  So the meeting about the Nashua
21  Assessing Department was a face-to-face meeting at
22  the police department?
23      A.  I believe so, yes.
24      Q.  Was it just a conversation or did it
25  involve her showing you documents?

Page 17

1       A.  I believe she showed us some documents.
2   Again, we had several meetings, I apologize if the
3   chronology is not right, but Laurie had excellent
4   documentation as to her allegations and her
5   concerns.
6       Q.  At some point did she give police
7   officers some documentation that they retained?
8       A.  Yes.
9       Q.  And how soon after you first met with
10  Laurie at the police department to discuss these
11  allegations did you end up going over to the
12  mayor's office for the meeting that was documented
13  in Exhibit 1?
14      A.  I don't exactly remember the day she
15  came over, so I can't give you an exact time, but
16  it would be within a couple of days. It was -- we
17  took it seriously, and we would have gone over
18  pretty quickly to start looking into it.
19      Q.  At that point when she contacted you,
20  would you say that you were in charge of the
21  matter?
22      A.  The allegations came to me and I
23  directed it to go towards the detective bureau, so,
24  yes. In charge of assigning it, yes. In charge of
25  handling it, no.

Page 30

1  topics we would talk about.
2      Q.   And when you say the relationship,
3  you're referring, of course, to your city business
4  relationship?
5      A.   Correct.
6      Q.   Okay.
7      A.   Correct.
8      Q.   How long had you known Kim Kleiner
9  before June 26, 2019?
10     A.   I can't remember if I met her as a
11 captain or a deputy chief.  I was pretty active in
12 community activities, I felt that was important, so
13 it was -- we did a lot of work with the Arlington
14 Street Community Center, and that's when I really
15 got to know her well, which would have been as a
16 deputy chief, so 2016 to 2019, roughly.
17     Q.   And the Arlington Street Community
18 Center is some type of charitable organization, I
19 gather?
20     A.   Well, it's a city-owned property that
21 we opened -- we opened a community center out of.
22     Q.   Okay.  And how long have you known the
23 mayor, James Donchess?
24     A.   I've known him since he was sworn in as
25 mayor, so --

Page 31

1      Q.   The first time or the second time?
2      A.   No.  No, the second time.  Well, the
3  second set of times.  I don't -- we may have had
4  some interactions when he was a union
5  representative, but I don't -- I don't remember
6  having enough interaction to say I knew him,
7  because I was never the union steward.
8      Q.   Now, Mayor Donchess was at one point a
9  union representative?
10     A.   Yes, he was, he represented the
11 Patrolmen's Union.
12     Q.   He represented the Patrolmen's Union as
13 an attorney, am I --
14     A.   Correct.  For the collective
15 bargaining, yes.
16     Q.   So he was not a patrolman or an
17 employee at any time of the Nashua --
18     A.   No, no, no.
19     Q.   Okay.
20     A.   He was not.
21     Q.   And when would this have been, the
22 early aughts, the early 2000s, or before then?
23     A.   No, it might have been right around
24 those times.  I don't remember when he started as
25 the union representative, as the attorney

Page 32

1  representing the union.  It was a good chunk of his
2  non-political time, if that answers your question.
3           So he's been consistently a part of
4  collective bargaining for the police department for
5  a majority of the time that I've been there, I was
6  there.
7      Q.   And did you ever have a social
8  relationship with the mayor, a non-business
9  relationship?
10     A.   No, I did not.
11     Q.   Never went out to dinner with him and
12 his wife or anything of the like?
13     A.   No.
14     Q.   And Ms. Kleiner, did you ever have a
15 social relationship with Ms. Kleiner?
16     A.   No.
17     Q.   Okay.  So what time was the meeting
18 convened on June 26th, 2019?
19     A.   According to the report, it's 9:00 in
20 the morning.
21     Q.   And who was present?
22     A.   Myself, Captain John Lehto, Mayor
23 Donchess, and Kim Kleiner.
24     Q.   And did this take place in the mayor's
25 conference room?

Page 33

1      A.   Yes.
2      Q.   And I'm going to ask you to remember
3  what was said during that meeting, and I'll
4  probably just go person by person as to, you know,
5  who said what.  What did you say at the meeting?
6      A.   So the purpose of the meeting and what
7  I said was informing the mayor that there was a
8  criminal complaint alleged against employees at
9  City Hall, and that we would be investigating the
10 case, and we would be conducting an investigation,
11 or detectives from the Nashua Police Department
12 would be conducting an investigation into those
13 allegations and we would be speaking with multiple
14 employees at City Hall.
15     Q.   Did you say anything else that you
16 remember?
17     A.   No.
18     Q.   And when you said -- when you described
19 the criminal investigation, did you describe the
20 types of allegations that had been made?
21     A.   No, we tried to keep all -- all those
22 facts to really a minimum.  It wasn't his business
23 what we were investigating.  Him and Kim were both
24 well aware of what they were, they had been told of
25 the allegations that were made or they had found

MICHAEL CARIGNAN                                                38..41

Page 38

1   Q.   Larry.  Am I pronouncing his last name
2   correctly?
3   A.   Yes.
4   Q.   Did anyone tell you that Mr. Budreau
5   had already interviewed some of the assessors?
6   A.   I don't remember that, but according to
7   the report, he had already interviewed several
8   employees.
9   Q.   I don't have the report in front of me.
10  Does the report name the people who were
11  interviewed?
12  A.   According to the report it said Greg
13  Turgiss had already been interviewed by director of
14  human resources, Larry Budreau.
15  Q.   Did you know Greg Turgiss from before
16  this?
17  A.   I did not.
18  Q.   Did you know Gary Turgiss from before
19  this?
20  A.   I did not.
21  Q.   And we've already talked about Kim
22  Kleiner.  Okay.  Do you remember Ms. Kleiner
23  saying anything about the city providing full
24  support as needed, or anything to that effect?
25  A.   No.  I mean, my recollection is that

Page 39

1   both she and the mayor said they understood.  They
2   said they welcomed an investigation and we would
3   get cooperation.
4   Q.   Okay.  And do you remember anything
5   that the mayor said?  I know you relayed a couple
6   of instances where you couldn't remember if it was
7   the mayor or Kleiner, so I'm asking for additional
8   statements that you can remember above and beyond
9   those.
10  A.   No, that's it.
11  Q.   And how did the meeting end?  Did
12  someone give instructions, or did someone say
13  time's up?  Or if you recall, how did it end?
14  A.   No, it just -- it was pretty obvious
15  that the topic of discussion was over, so we just
16  said goodbyes.
17  Q.   And do you remember how long the
18  meeting lasted for?  I think you said it began at
19  9:00.  Do you remember what time you got out?
20  A.   I don't.  It was a fairly short
21  meeting.  Our purpose was not to talk about
22  anything other than this.
23  Q.   Short as in less than a half an hour,
24  short as in less than 15 minutes, can you
25  estimate?  If you have no memory, that's fine.

Page 40

1   A.   No, if I had to estimate, I'd say
2   between 15 minutes and a half an hour.
3   Q.   And when you left the meeting, did you
4   and Captain Lehto continue to talk about what
5   transpired in the meeting?
6   A.   No.  If I remember the conversation was
7   more who it was going to be assigned to, and just
8   to make sure they did a thorough job.
9   Q.   And when you talked about who it was
10  going to be assigned to, did you know at that
11  point that Lieutenant Mederos was going to be
12  assigned, or is that one of the people who -- that
13  Lehto mentioned to you?
14  A.   So Lieutenant Mederos would be assigned
15  in the manner that it's an investigation being done
16  by the criminal investigation bureau.  He was the
17  CID -- CIB lieutenant so it would flow to him to
18  pass down to the sergeant and the detectives.
19  Q.   And at some point you came to
20  understand that Mederos and Lehto didn't do the
21  whole investigation themselves, they assigned it
22  downward?
23  A.   Correct.
24  Q.   Do you know who got the assignments?
25  A.   Ultimately Frank Lombardi got it.  I'm

Page 41

1   sure he was assisted by other detectives, other --
2   his supervisors, his sergeants would have been
3   involved as well, but he was the lead detective.
4   Q.   And at the time his position was
5   detective?
6   A.   Correct.
7   Q.   And do you know how long after the
8   meeting the assignment to Detective Lombardi
9   occurred?
10  A.   I don't.
11  Q.   And you knew Detective Lombardi
12  previously of course from being in the same
13  department together?
14  A.   Correct.
15  Q.   And by the way, when the meeting
16  occurred, you were not yet chief, right?  You were
17  deputy chief, is that right?
18  A.   Correct.  At the time the current
19  chief, Andrew Lavoie, was on what we call terminal
20  leave.  He was on time off between the time of his
21  vacation time, unused vacation and sick time, and
22  the time of his retirement, so I was acting in the
23  role of -- still a deputy chief, but I was
24  acting -- I guess you call it acting chief.  It
25  wasn't an official title.