```
         IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * *
                             *
LAURIE ORTOLANO              *    [COPY]
                             *
         Plaintiff,          *
                             *   Docket No.:
vs.                          *   1:22-cv-00326-LM
                             *
THE CITY OF NASHUA,          *
NEW HAMPSHIRE, ET AL.,       *
                             *
         Defendants.         *
                             *
* * * * * * * * * * * * * * *

         DEPOSITION OF RAYMOND E. FEOLI
    Deposition taken by agreement of counsel via
Zoom on Wednesday, April 10, 2024, commencing at
10:00 A.M.

Court Reporter:
Tina L. Hayes, RPR, NH LCR #80
(RSA 310-A:161-181)
```

Page 2

```
 1            A P P E A R A N C E S
 2   Representing the Plaintiff:
 3          OLSON LAWYERS
            31 Franklin Road
 4          Salisbury, NH  03268
            By:  Kurt S. Olson, Esquire
 5          (603)748-1960
            kolson@mslaw.edu
 6
 7   Representing the Defendants, The City of Nashua,
     Michael Carignan, and Frank Lombardi:
 8
            CULLEN COLLIMORE SHIRLEY, PLLC
 9          37 Technology Way, Suite 3W2
            Nashua, NH  03060
10          By:  Brian J.S. Cullen, Esquire
            (603)881-5500
11          bcullen@cullencollimore.com
12
     Representing the Defendant, Kimberly Kleiner:
13
            FRIEDMAN FEENEY, PLLC
14          95 North State Street, Suite 5
            Concord, NH  03301
15          By:  Dona Feeney, Esquire
            (603)783-5105
16          dfeeney@friedmanfeeney.com
17
     Representing the Defendants, Steven Bolton and Celia
18   Leonard:
19          UPTON & HATFIELD, LLP
            10 Centre Street
20          Concord, NH  03301
            By:  Madeline K. Osbon, Esquire
21          (603)224-7791
            mosbon@uptonhatfield.com
22
23
```

Page 3

```
 1            A P P E A R A N C E S
 2   Representing the Defendants, Raymond Feoli and
     Inception Technologies, Inc.:
 3
            CORRIGAN LAW OFFICES
 4          122 Chestnut Street
            Andover, MA  01810
 5          By:  Brian T. Corrigan, Esquire
            (978)988-1544
 6          corriganlaw@gmail.com
 7
            S T I P U L A T I O N S
 8
       It is agreed that the deposition shall be taken
 9   in the first instance in stenotype and when
     transcribed may be used for all purposes for which
10   depositions are competent under the Federal Rules of
     Civil Procedure.
11
       Notice, filing, caption and all other
12   formalities are waived.  All objections except as to
     form are reserved and may be taken in court at time
13   of trial.
14     It is further agreed that if the deposition is
     not signed within 30 days, the signature of the
15   deponent is waived.
16            I N D E X
     WITNESS:
17
       Raymond E. Feoli
18
     EXAMINATION:                                  PAGE
19
       By Mr. Olson                               5, 57
20
       By Mr. Cullen                                 55
21
     ERRATA SHEET                                    59
22
     CERTIFICATE OF REPORTER                         60
23
```

Page 4

```
 1   EXHIBITS FOR IDENTIFICATION:
 2   MARKED         DESCRIPTION                   PAGE
 3   Exhibit 1      Purchase Order No. 158909       15
 4   Exhibit 2      Defendant Raymond Feoli,        19
                    Inception Technologies
 5                  President's Objections and
                    Responses to Plaintiff Laurie
 6                  Ortolano's Requests for
                    Production of Documents
 7
     Exhibit 3      Defendant Raymond Feoli,        28
 8                  Inception Technologies
                    President's Objections and
 9                  Responses to Plaintiff's First
                    Set of Interrogatories
10
     Exhibit 4      Affidavit of Plaintiff Laurie   50
11                  Ortolano
12   (Electronic Exhibits were provided to all parties.)
13
```

### Page 33

1  Q.  Thank you.
2  A.  -- "believed her to be a City official
3  based on her intimate knowledge of the City's
4  business, the terms of Inception's contract, and the
5  status of PO, billing and payments, as well as her
6  statements."
7  Q.  Do you recall if that's what you told the
8  detective at the time?
9  A.  I don't recall exactly, no.
10  Q.  Okay.  I believe, in answer to an earlier
11  question, you didn't mention all of those things.
12  But we can look at the detective's report in a
13  minute.
14  A.  Sure.
15  Q.  And skip ahead to No. 12.  Tell me when
16  you are ready, Ray, please.
17  A.  Yeah.  (Perusing document.)  Okay.
18     (Perusing document.)  Okay.
19     (Perusing document.)  Okay.
20  Q.  So in the middle of, actually, that begins
21  with "Thinking Ms. Ortolano," would you read that.
22  A.  "Thinking Ms. Ortolano was a City
23  official, I promptly returned the call."

### Page 34

1  Q.  Okay.  And just to clarify, when you
2  received that voicemail message, was there anything
3  in it that led you to believe that Ms. Ortolano was
4  a City employee?
5  A.  Just like I said, she -- I have never had
6  this situation come up where I have had a client of
7  a customer call me looking for information.  She
8  mentioned Nashua.  She mentioned the PO.  I just
9  concluded she was with the City.
10  Q.  Okay.  So you are really sort of
11  reinforcing your previous answer that, because it
12  was so rare or maybe had never happened before, that
13  you were assuming that she was a City employee;
14  correct?
15  A.  In 28 years, it's never happened.
16  Q.  Okay.  And if you go down to the bottom of
17  your answer, beginning with "On or about February 4,
18  2022," please read that.
19  A.  (As read) "On or about February 4, 2022,
20  Ms. Ortolano called me again and left a voicemail.
21  Once again, I promptly returned the call.
22  Ms. Ortolano questioned me about public access to
23  the documents, at one point stating/inquiring:  'We

### Page 35

1  don't have access to those files.  When can we get
2  those files back?'  I did not provide Ms. Ortolano
3  access to the scanned documents."
4  Q.  Thank you.
5     So I don't believe that you mentioned the
6  quoted language here when you described that second
7  phone call.  Do you recall that?
8  A.  I am not sure what you are referring to.
9  Q.  So where you have in quotes down at the
10  line -- first line from the bottom --
11  A.  Yeah.
12  Q.  -- "We don't have access to those files.
13  When can we get those files back."
14     As you sit here today, do you recall her
15  saying that or asking those questions?
16  A.  Yeah.  That -- she was concerned about
17  documents that were being requested.  And she made
18  comment that, while we have those files in our --
19  Inception's possession, that she didn't have access
20  to those files.
21     And I said to her that, you know, "You do.
22  Because when we scan them and upload them into
23  DocuWare, you can search and retrieve those files."

### Page 36

1  And that's, again, under the thought that she was
2  with the company [sic].  And I mentioned that she
3  could, you know, have Kim provide her log-in
4  credentials to get access to those files if she were
5  a City employee.  She didn't say she wasn't.  And
6  she let it go, and that was it.
7  Q.  Okay.  And the last line in your answer
8  here where you say "I did not provide Ms. Ortolano
9  access to the scanned documents," did she ever ask
10  you for the scanned documents?
11  A.  She wanted to know when they could have
12  access to them.  She didn't specifically say
13  "scanned documents."  I said to her that, you know,
14  "You could have access to those scanned documents if
15  you got log-in credentials from Kim."
16     As a company, we don't give out log-in
17  credentials from -- we pick a point of contact
18  within the organization who tells us, "Yes, this
19  person can have access to those files."  So I kind
20  of was referring to the fact that, if she wanted to
21  get access to those scanned documents, as an
22  employee of the City, she could have requested
23  log-in credentials.

37

1  Q.  Thank you.
2      One more from this document and that's
3  Interrogatory No. 14 starting here.
4  A.  (Perusing document.)  Okay.
5      (Perusing document.)  Okay.
6  Q.  So before we scroll on through this one,
7  Ray, at the bottom of the first paragraph here,
8  would you read the sentence beginning with "She
9  stated that she would."
10 A.  "She stated that she would make sure
11 payment from the City would be expedited."
12 Q.  Okay.  And I believe this is all
13 repetitive of something you wrote before?
14 A.  Uh-huh.
15 Q.  But we now get to an email.  Do you
16 recognize this email?
17 A.  Yes.
18 Q.  Okay.  And what is it?
19 A.  It's an email that I sent to my customer
20 that was essentially summarizing what I determined
21 to be a breach of my customer's information.  My
22 responsibility is to my customer and to keep their
23 information confidential, regardless of the nature

38

1  of the information.  So I felt that it had been
2  breached and I needed to notify my customer the
3  circumstances around that.
4  Q.  Do you recall whether you ever
5  mentioned -- excuse me -- anything about a security
6  breach in this email?  I will let you read the whole
7  thing before you answer, if you want to take a --
8  A.  No, I don't specifically recall saying
9  "data breach" in there.  But, essentially, for me,
10 that's what it came down to.
11 Q.  Okay.  And do you know whether notice of a
12 security breach is required by the New Hampshire
13 statute?
14 A.  I don't know that it's required.  So I
15 don't know if it's required by New Hampshire
16 statute.
17 Q.  Okay.  Would you like to read through this
18 just to find out whether or not you did mention
19 anything about a security breach, or are you
20 confident that you didn't?
21 A.  No, I am not confident that I did or
22 didn't.
23 Q.  Okay.

39

1  A.  So I know what my thought process was
2  around writing it, which was that I felt that I had
3  violated our security protocols by disclosing
4  customer information about -- you know, to somebody
5  who wasn't with my customer.
6  Q.  Okay.  Thank you.
7      And the paragraph that begins on this page
8  with "This past Friday," would you read that first
9  sentence, please.
10 A.  "This past Friday I received a voicemail
11 from Ms. Ortolano which I forwarded to Kim Kleiner
12 after speaking with Ms. Ortolano and finding about
13 this person from Kim."
14 Q.  Thank you.
15     So you described that before, I believe;
16 right?  So after the second phone call with
17 Ms. Ortolano, you communicated with Ms. Kleiner;
18 correct?
19 A.  No.  I believe that it was the third, not
20 the second, because I didn't notify Kim about a
21 voicemail from Ms. Ortolano.  Now, I still had a
22 copy of the voicemail in my email box and forwarded
23 it to her after I found out that she wasn't with the

40

1  City.
2  Q.  Okay.  But will you agree with me that
3  that first sentence indicates that you spoke --
4  sorry -- you forwarded the voicemail to Kim Kleiner.
5  And then it says that "finding out about this person
6  from Kim."  Does that mean that you found out from
7  Kim that Ms. Ortolano was not a City employee?
8  A.  Yes.  As I stated before, until that phone
9  call with Kim identifying the employees that I
10 thought were with the City -- or that I had
11 communicated with the City, until that point in
12 time, I that had no reason to believe that Laurie
13 wasn't with the City.
14 Q.  Okay.  And then if you don't mind reading
15 that second sentence beginning with "I called her
16 back"?
17 A.  "I called her back thinking she was with
18 the City and we had just invoiced another batch."
19 Q.  So based on the first sentence, do you
20 think that you already knew at that point that
21 Ms. Ortolano was not with the City?
22 A.  No.  I didn't know that she was not with
23 the City until Kim said she wasn't with the City.

## 41

1  Q. Okay. But I am just trying to get clear
2  here, because the first sentence shows that you
3  forwarded Kim Kleiner the voicemail; and then it
4  says "finding out about this person from Kim." Will
5  you agree that that suggests that Kim informed you
6  that Ms. Ortolano was not with the City?
7  A. I thought I already stated that.
8  Q. Right. But then your next sentence says
9  that you called her back thinking she was with the
10 City.
11 A. Yeah, I did. I called Kim -- not --
12 the times she had called me -- those three times
13 she called me and left voicemails, I called her
14 back.
15 Q. Okay.
16 A. Maybe I didn't word it properly and
17 clearly, but that's essentially what happened.
18 Q. Okay. So it's your testimony today that
19 you called Ms. Ortolano back prior to the call with
20 Kim Kleiner; is that correct?
21 A. Correct. I did not -- I called
22 Ms. Ortolano back each time she left a message,
23 which was three times. After the third one, I got a

## 42

1  call back, I think it was, within a couple of days
2  of speaking with Laurie Ortolano. And Kim asked me
3  those questions about who I had been talking to. I
4  identified the people I thought were with the City
5  that I had spoken to. And then that's the point
6  where Kim said, "Oh, no, she is not with the City,"
7  and I said, "Oh, okay." So...
8  Q. Okay. Then at some point, I believe it
9  was, on February 11th -- but correct me if I am
10 wrong -- you received an email from Mr. Comeau from
11 the board of aldermen in Nashua?
12 A. I don't think I got an email. I think I
13 got a voicemail.
14 Q. Okay.
15 A. I could be wrong on that one, but --
16 Q. Okay. So we can check if we need to. But
17 leaving that aside, you did receive some form of
18 communication from Mr. Comeau of the board of
19 aldermen; correct?
20 A. Yes.
21 Q. Okay. And do you recall the substance of
22 that conversation?
23 A. Yes. He wanted to clarify my email in

## 43

1  regards to Laurie's statements about being with the
2  City, et cetera.
3  Q. And what sort of clarification did you
4  give him?
5  A. Same thing I told you, is that it wasn't
6  anything that she said. Like, she never came out
7  and said, "I am not" -- "I am with the City." It
8  was more that she had intimate knowledge about
9  things that, you know, in my experience, only
10 customers would have. I never had this happen in
11 28 years. And she never came out and said, "I am
12 not with the City," or, "I am" -- you know, "I need
13 this information for, you know, litigation
14 purposes," or whatever. She just asked questions
15 about specific, you know, POs and, you know, status
16 of the project, et cetera.
17 Q. Okay. So based on that answer, in your
18 conversation with Mr. Comeau, you gave him details
19 about your thoughts regarding Ms. Ortolano; correct?
20 A. I don't recall giving her [sic] any
21 thoughts other than that, you know, I didn't -- I
22 felt like she could have been more forthright about
23 who she was and -- and, you know, sort of what she

## 44

1  was asking for. Because, you know, to my knowledge,
2  she was with the City and I was giving information
3  about that. So...
4  Q. Okay. But you didn't inform Mr. Comeau
5  that there may have been a data breach; right?
6  A. Yeah. Actually -- well, I had already
7  sent the -- the email, which, like I said, I
8  didn't -- I don't know if I specifically used the
9  term "data breach," but I did disclose customer
10 information.
11     So, you know, I may not have used the
12 proper term, "data breach," in there. But when I
13 let go private information to somebody who is not
14 authorized to have it, I feel an obligation to let
15 my customer know that I have done that. And that's
16 essentially what this email is.
17 Q. Okay.
18 A. And --
19 Q. So -- go ahead. Sorry.
20 A. The email was purely a notification to my
21 customer. I had no understanding that it was going
22 to be read into public forum. It was something that
23 I was just sending to let them know this is what

Case 1:22-cv-00326-LM   Document 86-3   Filed 05/30/24   Page 5 of 5

53..56

**53**

1  Q.  Okay.  So you didn't think it was
2  advisable to let him know that there may have been a
3  data breach?
4  A.  I thought I already notified my customer.
5  Q.  Okay.
6  A.  So, to me, the issue was dead.  It's not
7  like anything I gave was PII.  But as I stated
8  earlier, my obligation is to my customer and keeping
9  their information, without written permission from
10 them, private.  So it may not have been a crime by
11 any means because, you know, it's not personal
12 information.  But it's out of my relationship with
13 my customers to protect their data.  And that is why
14 I say I feel like it was a breach and that I let
15 that information out to somebody who I thought was
16 one of my customers.
17 Q.  Okay.  So you would agree, at least in
18 terms of your policy and the procedures of companies
19 like yours that do document storage, it's your
20 obligation to maintain the confidentiality of all of
21 their documents, not just PII; correct?
22 A.  Correct.  Yeah.
23 Q.  Okay.  And yet, just to repeat, you didn't

**54**

1  mention that there may have been a data breach to
2  either Mr. Comeau; the aldermen, in general; or
3  Sergeant Goodwin?
4  A.  I don't know that I used the term "data
5  breach" in any of those conversations specifically.
6  Like I said, I sent the email because I felt it was
7  a data breach, you know, and I needed to report it
8  to my customer.
9      MR. OLSON:  Okay.  Thank you, Mr. Feoli.
10    That is all I have for you.  I don't know if
11    anybody has any questions.
12     MR. CORRIGAN:  No.  I am good.
13    (Reporter clarification.)
14     MR. CORRIGAN:  That's me, Attorney
15    Corrigan, Mr. Feoli's counsel.
16     MR. CULLEN:  I would like just to take
17    maybe five minutes, Kurt, to go over my notes.
18    And if that's okay, Mr. Feoli, I am sorry
19    to put you on pause for a second, but I would
20    just like to take five minutes to check to see
21    if there's anything I want to follow up on
22    before we let you go.
23     THE WITNESS:  Absolutely.

**55**

1      MR. CULLEN:  You can get up and refill
2    your drink or hit the boys room or whatever you
3    need.
4      If that's okay with everyone, we'll just
5    reconvene in five minutes?
6      MR. OLSON:  Sure.
7      THE WITNESS:  Sounds good.
8      (A break was taken.)
9          EXAMINATION
10 BY MR. CULLEN:
11 Q.  Mr. Feoli, I just want to really wrap up a
12 couple of things.  My name is Brian Cullen.  I am
13 here on behalf of the City of Nashua and the two
14 police officers who are named in the suit.
15     I just wanted to confirm or go over it.
16 There were a number of things that Ms. Ortolano said
17 to you that led you to conclude that she was an
18 employee of the City of Nashua; correct?
19 A.  Yes.
20 Q.  Okay.  And that included, first and
21 foremost, that the first thing she said on the
22 voicemail was, "This is Laurie Ortolano from
23 Nashua"; right?

**56**

1  A.  Yeah.  She didn't say "City of Nashua,"
2  but yes.
3  Q.  And then, in addition, she told you that
4  she could expedite the payment on your invoice;
5  correct?
6  A.  Yes.
7  Q.  And that was one of the things you relied
8  on in concluding that she was an employee of the
9  City?
10 A.  Yeah.  It was a summation of everything,
11 the knowledge of all of the orders, the invoices,
12 the amounts, and what was left on the PO.  And
13 that's at the point where I corrected her and said,
14 well, that accurate -- that would be accurate, with
15 the exception of that we were in the process of
16 billing the next batch.  And then that's where she
17 interjected that, well, she would expedite payment.
18 Q.  And has any noncustomer ever conveyed to
19 you previously that they could assist with getting a
20 payment to you by your customer expedited?
21 A.  No.  I have never had -- I call her a
22 customer of the City.  I have never had a customer
23 of a customer call me ever.

*AVICORE Reporting & Video*
*15 Constitution Drive, Suite 1A, Bedford, NH  03110 * (603) 666-4100*