*COPY*

LAURIE ORTOLANO

V.

CITY OF NASHUA

Docket No. 1:22-CV-00236-LM

KIMBERLY KLEINER

May 09, 2024



**AVICORE REPORTING**

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

25

1    speak with residents with large multiple
2    requests on properties not owned by the
3    individual.  Please write down any questions and
4    they'll be answered in writing.
5  Q  That's enough.  I'm sorry.
6       So in the first document that we just
7    looked at in this packet, it specifically
8    mentions Ms. Ortolano, correct?
9       MS. FEENEY:  I just want a clear record.
10      MR. OLSON:  Sure.
11      MS. FEENEY:  This is the April 1, 2019,
12   first page of Exhibit 2?
13      MR. OLSON:  That's correct.  Yes.
14      MS. FEENEY:  Okay.  Because you've got
15   exhibit numbers on these other pages that --
16      MR. OLSON:  Yes.
17      MS. FEENEY:  Okay.  Sorry I probably mucked
18   up -- I'm sorry.
19 A   I don't remember the question now.
20 Q   No problem.  In the first document we looked at
21   in this packet that was labeled Monday, April
22   1st, 2019, it mentions Ms. Ortolano
23   specifically, correct?

26

1  A  Yes, it does.
2  Q  And the second document which is labeled Monday,
3    April 8th, 2019, basically the same message but
4    her name is not mentioned, correct?
5  A  No.  I don't agree it's the same message.
6  Q  Okay.  And why not?
7  A  The first is specifically any questions that
8    need to be answered by Assessors.  The second is
9    residents that have large multiple requests on
10   properties that are not their own.  So that
11   generally entails a lot more information to be
12   gathered.
13 Q  Okay.
14 A  So I don't consider that the same thing.
15 Q  Would you agree with me that the Monday, April
16   8th, agenda does not include Laurie Ortolano's
17   name?
18 A  It does not.
19 Q  Was Laurie Ortolano one of those people who
20   would typically appear with large multiple
21   requests on properties not owned by her?
22 A  Yes.
23 Q  So she could be identified as one of the people

27

1    that this is directed to.  The April 8th.
2  A  Yes, and there could be others.
3  Q  Okay.  Do you recall whether there were others?
4  A  Yes.  There were others.
5  Q  Okay.  Do you know how many?
6  A  No.
7  Q  Okay.  On to the third page of this packet
8    labeled Friday, July 19th, 2019, and this one is
9    number 2, and if you could just read the
10   beginning where it says send copies to Karina?
11 A  Send copies to Karina - sign-in sheets, property
12   cards requested, Assesshelp questions regarding
13   assessments will be forwarded to me.  If an
14   assessor needs to answer we will discuss on
15   Mondays and share with Legal.
16 Q  And correct me if I'm wrong, you had a chance to
17   read through all the pages, right?
18 A  Yes.
19 Q  Do any of the other, the first two documents,
20   mention sharing with Legal or is this the first
21   time?
22 A  This was the first.
23 Q  Do you know what would have spurred that change?

28

1  A  At some point, I do not know the exact date,
2    there was instructions that Right-to-Know
3    requests would be sent to the Legal office.
4  Q  And do you know from whom those instructions
5    came?
6  A  From the Legal office.  I don't know exactly
7    how.
8  Q  Okay.  Would you have a regular point of contact
9    within the Legal Department?
10 A  Yes.  I mean, about, depends about what.  I
11   mean --
12 Q  So I guess about Assessing.
13 A  Yes.  I would commonly speak with either
14   Attorney Bolton or Attorney Leonard.
15 Q  All right.  Anybody else in the Legal office or
16   just one of those two?
17 A  Pinpoint Assessing?
18 Q  Yes.
19 A  One of those two.
20 Q  Okay.  Thank you.  So back to the mandatory
21   audit.  I'm sorry I'm jumping around a little
22   bit.
23      Who was the Chief Assessor if you recall

Case 1:22-cv-00326-LM   Document 86-4   Filed 05/30/24   Page 3 of 8

53..56

53

1   MS. FEENEY: You mean summarize Exhibit 5?
2 Q Summarize the first paragraph.
3   MS. FEENEY: I'm going to object to the
4   form.
5 Q Okay, sure. That's fine.
6   MS. FEENEY: Having her summarize something
7   that's written by her doesn't seem to make
8   sense, but it's your deposition.
9 Q Can you give me a brief summary of what the
10   first paragraph says?
11   MS. FEENEY: Again, I'll object to your
12   form. You may answer.
13 A Okay. In the first paragraph, I am speaking to
14   the fact that Ms. Ortolano had come to my office
15   looking for information that was on Cheryl
16   Walley's desk, and I, she claims were violating
17   her rights, not giving her the document, and I
18   informed her that Legal was on the third floor.
19 Q And at that time, was everything referred to
20   Legal on the third floor regarding Ms.
21   Ortolano's request?
22 A Regarding Right-to-Know requests, everything was
23   being directed through us, we would take the

54

1   request, and everything was being directed to
2   the legal department. In this particular, the
3   last sentence explains, she was asking for
4   information that I considered a personnel matter
5   which would not be discussed with a resident
6   which is why I asked her to go to Legal. I was
7   not going to give her the information.
8 Q Okay. Would it be fair to say that in that
9   first paragraph Ms. Ortolano is looking for a
10   document?
11   MS. FEENEY: I'm going to again object to
12   your form.
13 Q Okay. I'll ask the witness to read the 1, 2, 3,
14   fourth line down beginning with the sentence on
15   the right-hand side that says she then. Do you
16   see that? Fourth line down?
17 A She then claims we are violating her rights.
18 Q I believe you might have skipped over a line.
19   She then informs?
20 A Oh. She then informs me she needs a document
21   off Cheryl Walley's desk in a stack on the
22   right-hand side of the desk. She claims Ms.
23   Brown had a meeting with administrative staff in

55

1   May informing them to direct Ms. Ortolano's
2   questions to her.
3 Q So at that point, was Louise Brown instructed
4   not to turn over documents to Ms. Ortolano?
5   MR. CULLEN: Objection to form.
6   MS. FEENEY: I'm going to give you a
7   continuing objection to form on this exhibit.
8 A So at this point, this is September of 2019.
9   Prior would stand. So the July, the April and
10   July direction had not changed in that point.
11   So if Ms. Brown informed administrative staff to
12   direct Ms. Ortolano's questions to her, that
13   would be in form with the previous directions
14   that had been given.
15 Q Okay. So not just to Louise Brown, but I
16   believe those documents that you're referring to
17   from April and July --
18 A Correct.
19 Q -- said that the requests would then go to
20   legal, correct?
21 A Correct. So to be clear, Ms. Brown is the
22   Administrative Services Supervisor so she's
23   directing her two clerks to give the questions

56

1   to her. Okay?
2 Q Okay. But then eventually they go to Legal,
3   correct?
4 A Yes. I mean, depending on if it's a
5   Right-to-Know request, depending on what it's
6   for, I mean if it's -- it depends, it depends on
7   what it is.
8 Q So just to be clear, would Ms. Ortolano be able
9   to obtain access to any records in assessing
10   without it going through Louise Brown?
11   MS. FEENEY: At what point in time?
12 Q In 2019. Starting in May of 2019.
13 A Yes. I believe she did. I believe she looked
14   up property record files. I believe she looked
15   at many things if they were readily available.
16 Q But certain requests were to be referred first
17   to Louise Brown and then to you or Mr. Griffin,
18   correct?
19 A Yes. If there were multiple requests or if they
20   were requests for things that needed to be
21   investigated and researched and found.
22 Q Okay. Thank you. So at some point again, this
23   would be around the same time that you wrote

AVICORE Reporting & Video
15 Constitution Drive, Suite 1A, Bedford, NH  03110 * (603) 666-4100

61

1 Q Okay. At some point did the attitude of the
2   people in assessing both administrative staff
3   and Assessors change with respect to Ms.
4   Ortolano?
5       MS. FEENEY: I'll object to your form. You
6   may answer.
7 A I'm not sure I understand the question.
8 Q Okay. I'll rephrase.
9     Originally, admin staff in Assessing and
10  the Assessors would have outreach to Ms.
11  Ortolano. They respond to her questions. At
12  some point did that relationship sour because of
13  the excessive requests by Ms. Ortolano as
14  reflected in that newspaper article?
15      MS. FEENEY: I'm going to object to your
16  form, and tell the witness she may answer.
17 A So I don't think I can certainly speak for the
18  individuals themselves, but there was a
19  significant amount of frustration on staff being
20  overwhelmed with the amount of work in front of
21  them, and that was apparent to me.
22 Q What was your attitude?
23 A I think we were all significantly trying to help

62

1   the best we could, but we were under a
2   significant amount of pressure to complete the
3   work, including the Right-to-Know requests.
4 Q Did you feel that Ms. Ortolano had ill feelings
5   toward you or anyone in the Assessing Office?
6 A Yes. I did. I think they were publicly said at
7   Board of Aldermen meetings. Yes.
8      (Exhibit 7 marked for identification)
9 Q You recognize this document?
10 A Yes.
11 Q Can you just read it for me, please?
12 A The email is from Laurie Ortolano to me. Kim,
13  thanks so much for some of your time. I dropped
14  in unscheduled and really appreciate you taking
15  the time to speak with me. Your efforts have
16  not gone unnoticed. This was and is a big task
17  and I know you're working to move the city in
18  the right direction. The Mayor is lucky to have
19  you. Laurie.
20 Q Do you recall seeing that?
21 A I do.
22 Q In '19. Thank you. So at some point, I believe
23  this was early in 2020 you announced that the

63

1   Assessors did not want to have contact with you
2   anymore. Can you recall that?
3       MR. CULLEN: Objection to form.
4       MS. FEENEY: Object to form.
5 A With me?
6 Q Yes.
7       MS. FEENEY: Your question was that the
8   Assessors didn't want to have contact with my
9   client?
10 Q No. I'm sorry, the Assessors did not want to
11  have contact with Laurie Ortolano.
12      MS. FEENEY: That's not what your question
13  was. Let's just do it over and get it right.
14 Q Do you recall at some point that the Assessors
15  came to you and told you that they did not want
16  to have contact with Laurie Ortolano anymore?
17 A Yes.
18 Q Thank you. Do you remember what spurred that?
19 A Yes.
20 Q What was it?
21 A There had been a number of ethics violations
22  filed with the Department of Revenue on various
23  Assessors by Ms. Ortolano.

64

1 Q Do you recall specifically which members of the
2   Assessing Department were involved?
3 A Had violations?
4 Q Yes.
5 A So Greg Turgiss and Gary Turgiss. I'm not sure
6   on Mike Mandile. Both the Turgisses.
7 Q So Ms. Ortolano filed ethics violations or filed
8   something with the State or the Department of
9   Revenue about both Turgisses?
10 A Yes.
11 Q Okay. Anybody else that you recall?
12 A I believe there was another resident who did
13  file complaints as well.
14 Q Okay. And do you recall who that was?
15 A Ms. Laura Colquhoun.
16      MS. FEENEY: Kurt, just before you get into
17  the questions, Exhibit 8, does the enclosure
18  letter which cites a list of things enclosed,
19  are all of those attached to this exhibit?
20      MR. OLSON: They are not.
21      MS. FEENEY: So Exhibit 8 is a January 23,
22  2020, letter to Attorney Lehmann, but all the
23  itemized enclosures are not attached to Exhibit

65

```
 1      8.
 2           MR. OLSON:  That's correct.
 3           MS. FEENEY:  Okay.  Thanks.
 4   Q   You can certainly continue reading to reach the
 5       end, but I just have a question about one
 6       paragraph in the document.
 7           MS. FEENEY:  Finish.
 8   Q   Actually, it's that page that I'm interested in
 9       so in the middle of the page do you see where it
10       says I informed Ortolano as a result of this
11       incident?
12   A   Yes.
13   Q   And it goes on to say that after, I believe this
14       was Detective Lombardi, after Detective Lombardi
15       finished speaking with the members of the
16       Assessing Department, none of them wanted to
17       have contact with Ms. Ortolano; is that correct?
18   A   Yes.
19   Q   And did each of the people who are listed here,
20       Michael Mandile, Kimberly Kleiner, yourself,
21       Louise Brown, Greg Turgiss, Gary Turgiss,
22       Douglas Dane, Lynn Cameron, Amanda Mazerolle,
23       did they come to you individually before they
```

66

```
 1       spoke with Detective Lombardi?
 2   A   So at different times.  At different times the
 3       individuals came to me.  This was a result of
 4       the Lynn Cameron meeting in the parking lot.
 5       One of the exhibits you gave me just a few
 6       minutes ago where Lynn came to my office visibly
 7       shaken.  So Lynn and Louise came to me right
 8       before they contacted the police department.
 9   Q   I think what you're recounting is, and Detective
10       Lombardi says the same thing, that these members
11       of the Assessing Department came to you as a
12       result of the incident with Lynn Cameron,
13       correct?
14   A   Correct.
15   Q   But you said earlier that they came to you at
16       different times.  So you didn't hear from all of
17       them in the same day that the Lynn Cameron
18       incident happened?
19   A   Not within the same meeting.  They all came to
20       me at different times that day, several days
21       before that.  So this was not, this was not the
22       first time that they had approached me asking me
23       if something could be done about them limiting
```

67

```
 1       their contact with Laurie Ortolano.
 2   Q   And after the Lynn Cameron incident happened,
 3       did you have discussion with all of them about
 4       how that's what they wanted, not to have contact
 5       with Laurie Ortolano?
 6   A   I'm not sure that I had a conversation with
 7       Mr. Dane, but I believe he was present when they
 8       spoke with Detective Lombardi.  I was not.
 9   Q   You weren't.  Okay.
10   A   I was not.
11   Q   But you had previously told, because your name
12       is one of the ones listed here, you had
13       previously told Detective Lombardi that that was
14       your desire as well?
15   A   I must have.  I mean, I don't remember
16       specifically saying I didn't want to have
17       contact.  I commonly would have contact as the
18       Director of the department.
19   Q   Okay.  Thank you.
20           MS. FEENEY:  Can you just give me a second?
21              (Discussion off the record)
22              (Exhibit 9 marked for identification)
23           MS. FEENEY:  This whole exhibit or is this
```

68

```
 1       one of those blendos?
 2   Q   This one is, the first probably 7 or 8 pages are
 3       the letters to the individuals, Duhamel,
 4       Turgiss, and Tozer and then about midway through
 5       is the letter from the State Department of
 6       Revenue which includes their discipline.  That's
 7       where the DRA starts.
 8           MS. FEENEY:  Yes.
 9   Q   I think we've talked, Ms. Kleiner, about a
10       couple of different members of the Assessing
11       Department getting sanctioned, correct?
12   A   Yes.
13   Q   And do you remember based on looking at this
14       document who was sanctioned by both New
15       Hampshire Association of Assessing Officials and
16       by the New Hampshire Department of Revenue
17       Administration?
18   A   I think there's a mixture in here.
19           MS. FEENEY:  That's what I just saying to
20       him before.  There's a whole bunch of stuff in
21       Exhibit 9.
22   A   Right and there's --
23           MS. FEENEY:  So just listen to the question
```

## 93

1  Laurie Wilshire, the President of the Board of
2  Aldermen, copying the Mayor, and second and
3  third page are an email that was written by
4  Raymond Feoli, President of Inception to the
5  Board of Aldermen.
6  Q  And can you briefly describe what this was
7     about?
8  A  Briefly, Inception Technologies was working with
9     us on a scanning project scanning all of the
10    records in Assessing, primarily property
11    records. This was a project that had occurred,
12    started during COVID. It was taking a long
13    time. I was going to provide the Board of
14    Aldermen with an update on the project that had
15    been impacted by COVID and answer their
16    questions as to why Mr. Feoli the need to send
17    this email.
18 Q  How would you describe the email that Mr. Feoli
19    sent to you? In other words, what was it about?
20    What was the content?
21 A  I think Mr. Feoli is simply letting his client
22    know, the City, that he was concerned, he had a
23    conversation with someone whom he thought was a

## 94

1     City employee and later found out it was not,
2     and he was concerned that he may have given more
3     information than was their standard procedure to
4     do.
5  Q  Okay. Is it your understanding that Mr. Feoli
6     was referring to Laurie Ortolano?
7  A  Yes.
8  Q  Okay. And at some point did you inform
9     Mr. Feoli that Ms. Ortolano was not a City
10    employee?
11 A  Yes. In a phone call.
12 Q  And I'll show your the next exhibit.
13    (Exhibit 17 marked for identification)
14 Q  You don't have to read the entire document if
15    you don't want to. What I'm interested in is on
16    page 3 in this document which actually if you
17    could identify it for us that would be great.
18    Do you know what this document is?
19 A  These are, yes, these are minutes from the Board
20    of Aldermen meeting held Tuesday, February 8th,
21    2022.
22 Q  So on to the page, page 3, it's actually
23    identified that way in the upper right-hand

## 95

1     corner, and at the bottom of the page it's your,
2     I guess you call it testimony to the members of
3     the Board; is that accurate?
4     MS. FEENEY: I'm going to object to your
5     form as to testimony.
6  Q  Do you know what you were addressing the Board
7     on that day?
8  A  So I'm giving the Board an update on the project
9     and so I go on to explain the project, where it
10    currently is, and that I end with the document
11    that is addressed to them from Mr. Feoli.
12    That's it.
13 Q  The paragraph that begins, this is on page 4,
14    upper right-hand corner, and you are speaking,
15    sorry, let me know if you are speaking where you
16    say last week Chief Vincent. Is that still your
17    words to the Board?
18 A  Yes.
19 Q  Okay. Can you just read that for us?
20 A  Sure. Last week Chief Vincent and I received
21    several emails on the project from a resident
22    who also --
23 Q  Probably copied?

## 96

1  A  -- supposed to be copied the State DRA,
2     Department of Revenue Administration, and the
3     Nashua Police Department. Information and
4     misinformation in those emails caused me to
5     reach out to the vendor. During our
6     conversation with Ray Feoli, President of
7     Inception Technologies, informed me that a city
8     employee named Ms. Ortolano had also reached out
9     to him regarding the project and indicated that
10    she could expedite payment on the remaining
11    project. I informed Mr. Feoli that she was not
12    employed by the city and for many reasons which
13    was concerning to him. I informed him that I
14    would update the Board of the project,
15    especially with a quote going to Finance. He
16    indicated that he would be happy to speak with
17    you should you request he do so.
18 Q  So in the conversation that you reference here
19    with Mr. Feoli, had you already told him that
20    Ms. Ortolano was not a City employee?
21 A  Yes.
22 Q  Okay. And why did you decide to report this to
23    the Board of Aldermen?

97
1  A   Because Mr. Feoli sent me an email that is
2      addressed to the Board of Aldermen, and I felt
3      obligated to deliver.
4  Q   Okay. Thank you.
5      So the last series of questions for you
6      concern these last two documents.
7          (Exhibit 18 marked for identification)
8          (Laurie Ortolano enters deposition by Zoom)
9  Q   All set?
10 A   Yes. I mean I haven't read it word for word.
11     MS. FEENEY: Let's wait for the question,
12     and then if you need more time to read it we can
13     take a moment.
14 Q   I actually am just going to be referring you to
15     one small section so it's probably best you
16     don't read the whole thing. If you would turn
17     to page 2 of the document?
18 A   Okay.
19 Q   So we referenced this particular provision of
20     the Canon of Ethics earlier. ER 1-4. That's in
21     the middle of the page there. And could you
22     read that for us, please? Just that paragraph?
23 A   ER 1-4, Members must make available all public

98
1      records in their custody for public review,
2      unless access to such records is specifically
3      limited or prohibited by law, or the information
4      has been obtained on a confidential basis and
5      the law permits such information to be treated
6      confidentially.
7  Q   Okay. And if we go back to Exhibit 2, the one
8      that had the agendas, beginning on April 1st,
9      2019? And then there's another one from April
10     8. Looks like that.
11     MS. FEENEY: Exhibit 2?
12 Q   Yes. That's it.
13     MS. FEENEY: And what was the other one
14     you'd like?
15 Q   That's it.
16     MS. FEENEY: I'm sorry. I missed the
17     question in all of that.
18     MR. OLSON: I didn't actually ask one yet.
19     MS. FEENEY: Good.
20 Q   If you look at ER 1-4, talks about the
21     obligation of Assessors to make documents,
22     public documents available to citizens,
23     taxpayers, correct?

99
1  A   Yes.
2  Q   And in Exhibit 2, your decision. I believe you
3      wrote those agendas, right?
4  A   Yes. I did.
5  Q   So in Exhibit 2, what you do is direct the
6      Assessors not to even speak with Ms. Ortolano,
7      correct?
8      MR. CULLEN: Objection to form.
9      MS. FEENEY: I'll join that objection. You
10     can answer.
11 A   So I do acknowledge that they would not like to
12     speak with her and to write down the questions
13     and they will be answered. Yes. So I believe
14     the resident is getting the information although
15     it may not directly be coming out verbally from
16     those Assessors' mouths at that precise moment.
17 Q   So I guess I'd just like to clarify because I
18     believe you said that the Assessors going
19     forward, Mike, Gary, and Greg, three Assessors,
20     right? I think you said would not like to speak
21     with Ms. Ortolano. This is actually a directive
22     from you, right?
23 A   Yes.

100
1  Q   And those three will not speak to Ms. Ortolano.
2      MS. FEENEY: I don't understand your
3      question. If you could try again.
4      MR. OLSON: I just wanted to clarify
5      because --
6      MS. FEENEY: I understand. Go ahead.
7  Q   What you said was that going forward Mike, Gary
8      and Greg would not like to speak to Ms.
9      Ortolano. Correct?
10     MS. FEENEY: I'm going to object to your
11     form. Testimony will speak for itself.
12 Q   Okay. But what the document actually says is
13     going forward Mike, Gary, and Greg will not
14     speak with Ms. Ortolano?
15 A   That is what the document says.
16 Q   And that was a directive from you, correct?
17 A   Yes.
18 Q   Okay. So under those circumstances, are you
19     telling the Assessors, Mike, Greg, and Gary, to
20     violate that ethical provision, ER 1-4?
21 A   No. I don't believe I am.
22 Q   Okay.
23 A   I believe I'm protecting my employees.

101
1  Q   Okay. But the ethical rule basically sets forth
2      the duty of Assessors to turn over public
3      documents to taxpayers, correct?
4          MR. CULLEN: Objection to form.
5          MS. FEENEY: Same objection to form. You
6      may answer.
7  A   This is speaking to, this is providing public
8      records. I do not believe that ER 1-4 requires
9      them to answer verbally every question that is
10     raised. I believe the residents, yes, deserve
11     an answer. That doesn't necessarily mean that
12     it needs to be stated verbally right at that
13     moment. It does require them to make sure that
14     the residents get the information and public
15     records in accordance with RSA 91-A.
16 Q   So 91-A basically says that if there is a
17     document that's a public document that's
18     available in the Assessors Office, it must be
19     turned over at that time. Correct?
20         MR. CULLEN: Objection to form.
21         MS. FEENEY: Object to the form. If you
22     want to show her the statute, I'm happy to have
23     her look at the statute.

102
1  Q   Let me go back to ER 1-4. You'll agree with me
2      that it says members must make available all
3      public records in their custody for public
4      review, correct?
5  A   That is what is stated there.
6  Q   Okay. So when you instructed the Assessors in
7      the Assessing Department not to respond to
8      Laurie Ortolano, weren't you telling them they
9      need not make public documents available?
10 A   No, I was not.
11         MS. FEENEY: Object to form. You've
12     already answered it, but I object to form.
13 Q   Okay.
14 A   No, I was not.
15 Q   Okay. Thank you. That's all I have.
16         MS. FEENEY: Anybody on the Hollywood
17     Squares lineup want to ask my questions? Going
18     once?
19         MS. OSBON: No.
20         MS. FEENEY: Going twice?
21         MR. CULLEN: Brian Corrigan? (No
22     response.)
23         MS. FEENEY: Assuming the witness will be

103
1      available for trial, I'll have no questions.
2          MR. CULLEN: I have one quick question. I
3      apologize.
4                  EXAMINATION
5  BY MR. CULLEN:
6  Q   At the beginning of your deposition,
7      Ms. Kleiner, you were asked some questions about
8      the concerns the staff had raised regarding Ms.
9      Ortolano misconstruing things that they said.
10     Was there also a concern expressed to you that
11     Ms. Ortolano might be mischaracterizing things
12     that they had said to her?
13 A   Yes.
14 Q   That's all I have.
15         (Deposition ended at 1:30 p.m.)

104
1          I have carefully read the foregoing
2      deposition, and the answers made by me are true.

                    _____
5                   KIMBERLY KLEINER

8  STATE OF _____
9  _____, SS.

11         At_____on the
12     _____ day of _____ A.D.
13 2024, personally appeared the above-named KIMBERLY
14 KLEINER and made oath that the foregoing answers
15 subscribed by her are true.
16                 Before me,

                    _____
20                  Notary Public