```
              UNITED STATES DISTRICT COURT
                        FOR THE
                DISTRICT OF NEW HAMPSHIRE


***********************************
LAURIE ORTOLANO
VS              NO:  22-CV-00326-LM
THE CITY OF NASHUA, Et Al.
***********************************


            DEPOSITION OF LAURIE ORTOLANO
      This deposition taken by agreement of counsel
at the Law Offices of Cullen, Collimore & Shirley,
37 Technology Way, Suite 3W2, Nashua, New
Hampshire, on May 8, 2024, commencing at 10:20 a.m.
```

Page 6

1  Q  So just a couple of things, I know you have
2     gone over this with Kurt, so I won't belabor
3     them but since Becky is here recording
4     everything, there are a couple of things we
5     have to do that are different than a normal
6     conversation.
7         Normally, you will be able to
8     anticipate how my -- even now, you will be
9     able to anticipate how my sentences are going
10    to end, but if you just let me finish them
11    before you give your answer, that would be
12    great. Okay?
13 A  Sure.
14 Q  I will try to do the same. I will let you
15    answer the question before I start my next
16    question. Okay?
17 A  Sure.
18 Q  As you are, keep your answers out loud. If
19    you start using hand signals, somebody will
20    just tell you what does that mean, and
21    likewise, if you nod or shake, somebody at the
22    table will ask, is that a yes. It's not meant
23    to be rude. It's just meant to get a clear

Page 7

1     record. Okay?
2  A  Understood.
3  Q  Have you been deposed before?
4  A  Once before in 2020 by Attorney Bolton.
5  Q  Okay. That was in relation to one of the
6     Right-To-Know suits?
7  A  Yes.
8  Q  The only other thing, a couple things, I
9     guess, counsel enter into usually what is
10    called the usual stipulations, which just
11    means your attorney doesn't have to object to
12    every single question even if it might not be
13    admissible at trial. Those objections are
14    preserved until trial.
15        MR. CULLEN:  Are we doing the usual
16    stipulations?
17        MR. OLSON:  Absolutely. Yes, what
18    we entered into at the previous depositions,
19    the Lombardi deposition, that will be fine.
20        MR. CULLEN:  Thank you.
21 Q  And then if you need to take a break at any
22    time, just tell me you need to take a break,
23    you don't have to tell me why, and we can do

Page 8

1     that. I don't have a sense how long it is
2     going to take, because as I said, I am not the
3     only one asking questions, but I do know it
4     will go much, much faster, if you can just
5     listen to my question and answer just the
6     question I ask. Some witnesses are more
7     garrulous than others, and that tends to make
8     these things run really long. I would just
9     encourage you to try and focus in on the
10    questions as best you can.
11        With respect to the prep for today,
12    other than meeting with your attorney or any
13    conversations you may or may not have had with
14    your husband, did you speak to anybody else
15    about your deposition, about the content of
16    it?
17 A  No, putting together the discovery is what my
18    review process was.
19 Q  Okay. So there weren't any particular
20    documents outside the discovery?
21 A  Well, there is probably some that you have. I
22    mean, I still have until Friday, right, the
23    15th, is that when discovery ends?

Page 9

1  Q  Well, I will let your lawyer talk to you about
2     your discovery process, but I am more
3     interested -- what specific documents did you
4     review to prepare for the deposition today?
5  A  Everything I sent over to you that I numbered,
6     the timeline, yes, those types of records.
7     That was my refresher course.
8  Q  And when you say the timeline, how about
9     e-mails and things like that between you and
10    members of the City?
11 A  There were so many, I couldn't review them
12    all.
13 Q  I just want to get a little of your
14    background, Ms. Ortolano.
15        Where did you grow up?
16 A  Somers, Connecticut.
17 Q  Somers?
18 A  Yes, S-O-M-E-R-S.
19 Q  Did you go to high school down there?
20 A  I did.
21 Q  When did you graduate?
22 A  1980.
23 Q  What did you do after high school graduation?

Page 18

1  -- maybe 2020, and the board itself has two or
2  three public people, and a gentleman who was
3  on it recommended that I take his seat. So he
4  wrote a referral to the governor, and the
5  governor made the recommendation to the
6  executive council, and I wasn't -- they didn't
7  do a vote because the governor knew before the
8  vote that I wasn't supported on a three-two
9  vote, so I didn't get that seat. And I ran
10 for public works in November of 2021, and I
11 lost that seat. That was an actual election.
12 Q  The assessing standards board, that was a
13    state board?
14 A  Yes.
15 Q  You said you started doing assessing work in
16    2018.
17    When you say you started doing
18    assessing work, what do you mean?
19 A  The new assessments had come out from KRT, the
20    company hired to do an update in late August,
21    and when I received our new number, I was
22    concerned, and I went to the assessing office
23    and had a conversation, and that started my

Page 19

1  work into trying to get our property
2  assessment corrected.
3  Q  So that is your first foray into what you call
4     assessing work?
5  A  I actually did call in 2014 when we moved in,
6     and I saw our assessment jump 5 grand. Our
7     tax bill went up $5,000. I made my first
8     contact with the tax assessor then.
9         And then I made contact again with
10    the assessing chief in 2017, very concerned
11    when my tax bill cost 18,000, and I thought it
12    was way too high.
13        I had minimal contact at those two
14    points.
15 Q  I understand you also assist other people with
16    their assessing challenges, should we say?
17 A  Not really. I would say the year after KRT
18    people did seek me out to help them with
19    their -- it wasn't KRT. It was when Vision
20    came out with the new numbers. They asked me
21    to help them out in 2021. I got calls from
22    neighborhoods, and letters saying, we seek
23    your assistance, come to our street, and so I

Page 20

1  did give assistance, and I published some
2  things on GoodGov, where I told people to look
3  up data. If you are concerned, go look this
4  up.
5      I made a series of videos on GoodGov
6  on how to file an abatement, how to do it
7  yourself, and frankly, the City, I don't
8  think, was very happy about it, and I was
9  pretty squashed in the whole thing, so I never
10 did it again. I had people seek me out last
11 year, and I just didn't do it anymore.
12 Q  When you say you think the City wasn't very
13    happy about it, what specifically made you
14    feel the City wasn't very happy about it?
15 A  When I tried to assist two senior citizens,
16    and sent the abatements in to be date/time
17    stamped, they sat on them for almost 20 days
18    which is unheard of. That neighborhood had a
19    street of 8 properties to be reevaluated and
20    the City policy, policy practice or guideline
21    was if there is a cluster of houses that are
22    incorrect, they correct those first because
23    they can deal with a pile of them.

Page 21

1      There was a cluster of houses in
2  that neighborhood at that time in 2021, they
3  ended up dealing with them last. They went to
4  the bottom of the pile.
5      People who went before the board who
6  carried their own assessments in, asked me for
7  help. There were only two I represented.
8  Everyone else went on their own, said to me
9  when they went before the board of assessor's,
10 they were questioned, oh, did somebody help
11 you, don't even say her name, we know who she
12 is. They seemed to be just not happy with the
13 work of what was submitted.
14 Q  Sorry. To pin this down a little more, when
15    you say they, who didn't seem happy?
16    Specifically, who are you talking about?
17 A  Kim Kleiner, I will say Ms. Kleiner. She was
18    running the assessing office at that time, and
19    I don't believe there was a chief at that
20    time.
21 Q  Was it your impression that Ms. Kleiner had
22    direct contact with these applicants?
23 A  I think a lot of them screened through the

Page 54

1  A   Right, I believed it was into the work of Greg
2      Turgiss and Kim Kleiner, but it seemed to
3      expand into the assessing department.  It took
4      on a different dimension.
5  Q   In any case, the conversation that you had
6      with Lynn Cameron outside city hall took place
7      while this investigation was ongoing?
8  A   Yes.
9  Q   The investigation that you had triggered,
10     right?
11 A   Yes.
12 Q   You don't have any reason to think it wasn't
13     known that you triggered this investigation,
14     right?
15 A   I think they all knew that.
16 Q   You would agree Cameron could have chosen at
17     that time not to talk to you outside, right?
18 A   Yes.
19 Q   And if she had said to you, Ms. Ortolano, I
20     would really rather not talk about this
21     outside of city hall, you would have honored
22     that, right?
23 A   Yes.

Page 55

1  Q   And that really goes for anyone at the
2      assessing department, right?  If Louise Brown
3      or anyone else had said to you face-to-face,
4      Ms. Ortolano, I really only want to talk to
5      you in city hall, in the department, I don't
6      want to talk to you at Target or any other
7      places, you would have honored that too,
8      right?
9  A   That never happened.  The only individual that
10     seemed to trigger this was Lynn Brown behind
11     Sy Mahfuz' business.
12 Q   Lynn Cameron?
13 A   I mean, Lynn Cameron behind Sy Mahfuz'
14     business.
15         It is funny you word it that way, at
16     Target and stuff.  I thought it was outside of
17     city hall.  When I got the warning, they said,
18     you can't talk to any assessor outside of
19     their office, the assessing office.  I didn't
20     even know that was the warning.  I didn't
21     realize that until I got it.
22 Q   My question was if any of the other members of
23     the assessing department had asked you,

Page 56

1      Ms. Ortolano, I would rather not talk to you
2      outside of city hall or outside the assessing
3      office, you would have honored that, right?
4  A   I believe so, yes.
5  Q   Did you ever speak with Lynn Cameron about her
6      discussions with Frank Lombardi about this
7      incident?
8  A   No.
9  Q   Do you know if Cheryl Walley ever did?
10 A   I don't know.  It is possible.
11 Q   But Cheryl hasn't come to you and said, hey, I
12     just spoke to Lynn and here is what she said?
13 A   No.
14 Q   No one else has either, right?
15 A   No.
16 Q   The only information you have heard about Lynn
17     Cameron's report of that incident comes from
18     Frank Lombardi's interview of her?
19 A   Correct.
20 Q   Or his report?
21 A   What is written, and she was never a witness
22     in any of my cases.
23 Q   And when you did eventually get a warning from

Page 57

1      Detective Lombardi, it ran to all persons in
2      assessing except for Cheryl Walley, correct?
3  A   It wasn't presented to me that way at the time
4      the warning was given to me, but when I
5      received the written warning four months
6      later, that is what was in there.
7  Q   And have you spoken to any of the members of
8      the assessing department, the members at that
9      time, have you spoken to them at any time
10     since about that warning?
11 A   No, only Cheryl Walley, and she was never
12     notified by the police.  They didn't include
13     her.  She didn't get asked one way or another.
14     So she was the only one I talked to.  No one
15     else.  I never spoke to anyone about it.
16 Q   You don't have any evidence one way or the
17     other as to whether the other assessing
18     department members actually asked that they be
19     lumped into this warning?
20 A   Correct.
21 Q   We went over this before, so I will just be
22     brief, but to keep it in order, you learned
23     that the police came to your house?

Page 58

1  A   Yes.
2  Q   And then after you learned that, you went to
3      the police station to meet with Detective
4      Lombardi?
5  A   And the other officer.
6  Q   And where did that meeting take place?
7  A   Right in the lobby.
8  Q   They didn't take you into the back area at
9      all?
10 A   No.
11 Q   And what specifically, I am guessing here,
12     Detective Lombardi did the talking?
13 A   Correct.
14 Q   The other officer didn't speak at all?
15 A   He did.
16 Q   Did he just introduce you, or did he say
17     anything else?
18 A   He introduced, and then at the end, he made a
19     comment, because I said something that made
20     him laugh, and he said that is really funny.
21 Q   What was it that made him laugh?
22 A   Detective Lombardi said to me, do you have any
23     questions, and I said I have a shit ton of

Page 59

1      questions, but I think I have to talk to my
2      lawyer, and this younger police officer burst
3      out laughing, and he said, that is really
4      funny, to get written up that way, but that is
5      what happened.
6  Q   That is what happened?
7  A   Yes.  God's honest truth.
8  Q   And the lawyer you would have talked to, was
9      that Fojo, or were you on to Lehmann?
10 A   I was transitioning.  I probably talked to
11     Fojo and Lehmann.  I know I talked to Lehmann,
12     because he followed up on the Right-To-Know
13     for me to get the report.  I am sure Lehmann.
14 Q   And maybe Fojo also?
15 A   Maybe.
16 Q   Because you did have a lot of questions?
17 A   Oh, I did.
18 Q   You had a shit ton of questions, didn't you,
19     right?
20 A   I didn't expect what came my way, that is what
21     it really came down to.  I didn't expect it.
22 Q   Once you got that news from Lombardi, you were
23     going to ask those questions of somebody.  If

Page 60

1      it wasn't him, it was going to be Fojo or
2      Lehmann or another counsel?
3  A   He did accurately record, is this even legal?
4      What is going on here?  I just couldn't
5      imagine -- for over a year, I called it a
6      restraining order, a warning for a restraining
7      order.  That is how I referred to it all the
8      time.
9          There is no such thing I found out
10     later.  There really isn't.  That is what it
11     felt like to me.  I couldn't tell what it was.
12 Q   At some point, you discussed this warning with
13     maybe it's Deputy Chief Testeverde?
14 A   Yes.
15 Q   Was he deputy chief then?
16 A   He was a deputy, yes.
17 Q   And you and he talked about this warning that
18     Lombardi had given you, right?
19 A   Yes, it was awhile after, too, I believe.
20 Q   And you actually asked for a similar warning
21     was to be given to Ms. Kleiner, right?
22 A   Yes.
23 Q   And do you know if that warning was given to

Page 61

1      Ms. Kleiner?
2  A   I believe he talked to her, but it wasn't like
3      my warning.  It had a whole different feel.
4  Q   You weren't there when he talked to her?
5  A   He wrote something up, and he sent it to me, I
6      think.  And it was so carefully danced around,
7      actually, kind of felt like -- yes, it was
8      interesting.
9  Q   What exactly did Lombardi say to you when he
10     gave you the no contact warning?
11 A   Okay.  It is hard for me to be exact, but I
12     will give you the points that you remember.
13         Just that he had in the course of
14     doing his investigation been given information
15     that employees of the assessing office did not
16     want to have contact with me.  I thought he
17     said outside of city hall, and he said, you
18     recently had a conversation with Lynn Cameron
19     that she wasn't comfortable with, and
20     speaking, he didn't say he didn't speak, but
21     he said in speaking with all the staff, none
22     of them want you to have contact with them
23     outside of city hall, and I was shocked, and I

Page 62

1  said, even Cheryl Walley?  I mean, Cheryl
2  Walley told you that?  I think I talked to her
3  almost every day, almost every other day, and
4  he said, oh, no, not her, we didn't even ask
5  her.  But everyone else?  And he said, yes.
6       I said, what does that mean?  Did I
7  do something harassing or threatening or was
8  I -- did I sound dangerous, what has happened
9  here?  He said, no, no, not at all, you were
10  not.  I said, is this even legal?  He said,
11  yes, this is something we do all the time.
12  This is what we do.  I said, it doesn't seem
13  right.  What am I supposed to do with this?
14       I later learned talking to him, how
15  does this go away?  Does this ever stop?  He
16  said, no, it stays a warning forever.  Now, I
17  kind of think it is gone because everybody has
18  left the office.  I am going to call it over.
19       This is like a restraining order
20  that stays with me forever?  He said, it just
21  stays on your record, and I was just stunned
22  by the whole thing.  I really was.  I couldn't
23  even wrap my head around.  I had never been

Page 63

1  police involved.  I didn't know what to make
2  of it.
3       That is why he said, do you
4  understand everything here?  I have a shit
5  load of questions.  I need to talk to my
6  lawyer, and a young cop burst out laughing,
7  and he said that is really funny, I really
8  like that.  And off I went, and I called my
9  husband right away.
10  Q  I am going to move on now to the city hall
11     trespass.  You want to take a couple minutes?
12  A  Let me just take five minutes.
13       (Short recess.)
14  Q  (By MR. CULLEN:)  Coming back, I want to talk
15     to you a little bit about the city hall
16     incident of January 22nd, 2022?
17  A  '21.
18  Q  '21.  I read somewhere, I think you have a
19     whole affidavit on this.  I don't want to
20     belabor it too much.
21       When you went upstairs that day, it
22     was Mindy Lloyd who answered the door?
23  A  Yes.

Page 64

1  Q  Was Mindy somebody who you had known who she
2     was?
3  A  Yes.
4  Q  And you knew she was an employee of the legal
5     department?
6  A  Yes.
7  Q  And with respect to Attorney Neumann, again,
8     that was somebody you knew at the time?
9  A  He had just started in December.
10  Q  And but you, had you interacted with him
11     in-between December and that time?
12  A  Yes.
13  Q  So you knew that Attorney Neumann was in the
14     legal department also?
15  A  Yes.
16  Q  And obviously, and you knew Attorney Leonard?
17  A  Yes.
18  Q  And she wasn't there when you first arrived,
19     correct?
20  A  Correct.
21  Q  With respect to, how long were you in the
22     legal department area itself before you
23     decided to sit down and stay?

Page 65

1  A  Probably two minutes, and then there is that
2     entry hallway area, so I would say maybe not
3     even two minutes.  It was very short, and I
4     went to that hallway.
5  Q  Is that -- there is a photo.  Let me show you
6     a picture here.  We can mark this as Exhibit
7     2.
8       (Whereupon, the court reporter
9     marked Exhibit Number 2, Union Leader article,
10     for Identification.)
11  Q  The photo is you, I take it?
12  A  Yes.
13  Q  You look like you are maybe waving?
14  A  When I realized she was taking the picture, I
15     put my hand up.  It was a reflex.
16  Q  To stop the photo?
17  A  Just what are you doing, but she took the
18     photo.  She took two photos.
19  Q  And so where you are sitting now, is that
20     where you sat for the duration you sat in the
21     legal department area, this is where you sat?
22  A  No.
23  Q  Where did you first sit?

Page 82

1    you own the property for ten years, and then
2    you can get citizenship or residency or
3    something like that?
4  A  It moved much quicker.  You can get it in two
5    or three years.
6  Q  Have you obtained yours now?
7  A  We have our residency visa right now.  So we
8    have to go through that two or three years,
9    pass a language exam and a history exam to
10   become a citizen.  My Portuguese isn't what it
11   needs to be yet.
12 Q  Is that the only thing holding you back now
13   Portuguese language skills?
14 A  Yes, and my son who speaks seven languages is
15   learning it now to teach his mother.
16        (Whereupon, the court reporter
17   marked Exhibit Number 8, Affidavit of
18   Plaintiff to Inception Technologies, for
19   Identification.)
20 Q  Exhibit 8 is an affidavit, Ms. Ortolano, from
21   you that was filed in response to the
22   Inception/Feoli motion to dismiss back in
23   December of 2022.

Page 83

1  A  Yes.
2  Q  The last page has a /s/ electronic signature?
3  A  Yes.
4  Q  This is, in fact, your affidavit, correct?
5  A  Yes.
6  Q  Somewhere in the ether, there is an actual one
7    signed by you?
8  A  I would assume so, but I just can't remember.
9  Q  In any event, this was something you reviewed
10   and signed under the pains and penalties of
11   perjury?
12 A  When you ask me that way, it looks like you
13   found something.
14 Q  No, I am not actually trying to trick you.  I
15   am just trying to confirm it is your
16   affidavit?
17 A  Yes, to the absolute best of my ability.  I
18   was absolutely trying to be truthful.
19 Q  In paragraph 3, you say, "By regularly
20   attending public hearings and meetings
21   conducted by the City of Nashua Government and
22   keeping up with the bulk of pending issues
23   affecting the citizens of Nashua, I have a

Page 84

1    good grasp on the workings of the Nashua City
2    Government."
3         That statement was still true as of
4    December of 2022 when you signed the
5    affidavit, right?
6  A  When was it signed?
7  Q  The 5th of December 2022?
8  A  Yes, I stopped going in October of 2022, but I
9    still could watch them on TV, yes.
10 Q  Why did you stop going in October of 2022?
11 A  Because there was an incident with an alderman
12   who referred to me as giving off predatory
13   vibes like crazy, and he was a social worker,
14   a licensed social worker, and based on his
15   background, he felt that I did oppositional
16   research on children and I had predatory
17   qualities, and I didn't want be -- I didn't
18   want them bringing it up and over and over
19   again.
20        The board has a tendency to use
21   their public comment at the end, their time to
22   speak when the public can't speak to raise
23   issues about me, and I felt that it would come

Page 85

1    up over and over again, so I removed myself
2    from board meetings.  From that time, really,
3    forward until now, I have attended very few.
4  Q  That was Alderman Moran?
5  A  Yes.
6  Q  On paragraph 4, "In 2020, the City chose to
7    undertake a project to outsource all property
8    record files in order to create digitally
9    scanned files."
10        How did you first learn about that
11   project?
12 A  I believe Ms. Kleiner went to the budget
13   committee to get approval of a dollar amount
14   that was in excess of 25 grand and required
15   approval.  I believe the first round of money
16   was under 25 grand, but then she needed more.
17   I can't recall the date exactly.  It did
18   require budget committee approval.
19 Q  And do you remember when it was that you first
20   learned about that project?
21 A  It says, "In 2020, the City chose to undertake
22   a project."  It must have been -- like the
23   month, I don't remember.

Page 86

1  Q  But short -- within 2020 most likely?
2  A  Yes, I don't think it started in '19. I think
3     it started in '20, and COVID was running, it
4     was tricky. I remember COVID being a factor.
5  Q  I guess, if you say here the budget -- "The
6     City chose to undertake the project in 2020,"
7     I am just trying to get a sense how soon after
8     that, after it started, did you learn about
9     it?
10 A  Oh, I would have learned about it -- I went to
11    a lot of budget review committee meetings. I
12    would have learned about it right then. It
13    would have been something that piqued my
14    interest. It was a big deal.
15 Q  That was going to make your assessment work
16    easier, if it is digitized, theoretically?
17 A  Theoretically. I had some doubts.
18 Q  Theoretically, this was going to be
19    potentially a boon for you?
20 A  A help, to have home resources to review
21    property files, not just a card, but files.
22 Q  Paragraph 5, you write, "Unfortunately that
23    project started to linger, which restricted

Page 87

1     access to these public records, and resulted
2     in great frustration."
3         Do you mean great frustration to
4     you?
5  A  Yes.
6  Q  When was it that the project started to
7     linger?
8  A  Well, I believe it was presented to the budget
9     committee as being something that could be
10    done in like four to six months, and this
11    was -- I am not certain it is done now. So
12    this had a lot of, it took a lot more time.
13    Yes, it took years. Like I said, I don't know
14    if it is done.
15 Q  So the project started, according to paragraph
16    4, in 2020.
17        About when was it that you
18    decided -- that you determined it started to
19    linger?
20 A  When we cleared like six months, when we
21    cleared that time, and what happened is I
22    would contact assessing to get a file, and
23    they would say, oh, it is boxed, it is out for

Page 88

1     scanning, and when is it coming back, and
2     there was a system set up in assessing that
3     when they boxed them, there was supposed to be
4     an indexing system, so if a citizen wanted a
5     record, and they were still in city hall, you
6     could retrieve it from the box, but they were
7     not retrieving them.
8         Then when they went out to
9     Inception, they were taking a very long time
10    to get the boxes back. The records were just
11    not available. It went on for years.
12 Q  So the short answer is within about six months
13    of when the project started, Inception was
14    lingering?
15 A  Yes, I will bear that in mind.
16 Q  At some stage, you spoke with Raymond Feoli
17    about the project, right?
18 A  Yes.
19 Q  And did you reach him the first time you
20    called him, or was it a voicemail the first
21    time?
22 A  I don't think I reached him at all. I mean, I
23    remember having a very hard time finding his

Page 89

1     number. Whenever I called, I don't think it
2     even worked.
3         At some point, I reached him. Would
4     it have been a voicemail at the beginning, I
5     don't recall.
6  Q  When you first spoke to him, how did you
7     introduce yourself?
8  A  Laurie Ortolano, I am trying to find out when
9     we are going to have the scanning job done on
10    all of these property cards.
11 Q  Did you tell him that it was Laurie Ortolano
12    from Nashua?
13 A  Well, I think -- I don't necessarily think I
14    even said from Nashua, because I was
15    discussing the Nashua project, so I am not
16    certain I announced it that way.
17        I explained to him why I was
18    frustrated, which I believe he would have
19    understood, I am a citizen. I am trying to
20    retrieve files, and I said, you have had a
21    batch of files in your office for an extended
22    period of time. And he explained to me, yes,
23    they are sitting right in my warehouse.

Page 90

1      I said if you don't ship them back,
2  then people like me, a citizen, cannot get
3  those files, because they are not back in the
4  office.  So I thought he understood that I was
5  clearly speaking as a frustrated person trying
6  to find the files.
7  Q  Are you telling me now you said me as a
8     citizen?
9  A  Well, I definitely said I can't get these
10    files to look through them.
11 Q  Because you say in the affidavit, we don't
12    have access to those files.  You put it in
13    quotes.
14         Is that what you said?
15 A  Sure.
16 Q  I want to make sure.  Sometimes we have a
17    tendency to talk about what I would have said,
18    what I could have said, what I should have
19    said.
20 A  Absolutely.
21 Q  What you actually said.  What you quoted in
22    the affidavit, we don't have access to those
23    files?

Page 91

1  A  Right.
2  Q  Have you spoken to Mr. Feoli prior to this
3     exchange you had about the frustration in the
4     files?
5  A  I don't know that I did.  I think I had one
6     conversation, for sure.  There might have been
7     a second short one.  I don't recall.  I know
8     left a message, for sure.  I definitely left a
9     message at one point, but it was over pretty
10    quickly because it became a public incident.
11 Q  Let me show you this one.
12        (Whereupon, the court reporter
13    marked Exhibit Number 9, E-mail 2-9-22
14    Feoli/Goodwin/Ortolano, for Identification.)
15 Q  This is an exhibit to your affidavit.  It is
16    marked 33-2 at the top.  The first page
17    appears to be an e-mail from you to Mr. Feoli
18    with copies to Ms. Kleiner, the Mayor and the
19    board?
20 A  Yes.
21 Q  In the third paragraph of the e-mail you
22    write, "I spoke with you a couple months ago,
23    and you provided a helpful explanation where

Page 92

1     you were in the process of scanning records."
2         Do you recall that conversation?
3  A  I think I do, and I think I did speak to him
4     very generally on what was going on.  I don't
5     recall it being specific at all, just where
6     were we going, did he know when it was going
7     to get done.  The date of this e-mail is what,
8     February 8th of 2022.  I was definitely trying
9     to get some files I couldn't get.
10 Q  Do you remember anything specific about that
11    earlier conversation, would have taken place
12    two months earlier?
13 A  No, because I viewed it as pretty friendly and
14    helpful.  Nothing stood out in my mind.
15 Q  And even as we sit here today, you don't
16    remember anything specific that you said to
17    Mr. Feoli or he said to you back two months
18    before February 8, 2022, correct?
19 A  I don't.
20 Q  Back to your affidavit, Exhibit 8, in
21    paragraph 9, you write towards the bottom, "I
22    told Feoli that I would inquire from Kleiner
23    about when more money would be paid to get the

Page 93

1     job done."
2         Do you see that?
3  A  Yes.
4  Q  That is something you told Feoli you would do?
5  A  Yes.
6  Q  Do you speak at every meeting at which you
7     attend, every public meeting?
8  A  No.
9  Q  Obviously, you attend a fair number, because
10    we have a stack of them here.
11 A  I did up until 2022.
12 Q  Of the meetings that you attend, what is your
13    best estimate of how frequently you would
14    speak versus not speak?
15 A  Frequently, I would say 80 percent of the
16    time, 85 percent of the time.
17 Q  So if we have, and we do, if we have 65
18    meetings that you attended and spoke at
19    between March 2021 and the end of 2021, you
20    would have probably attended 80 meetings and
21    spoke at about 65?
22 A  I would say yes, and giving me a time frame, I
23    haven't looked at my records, so I would say

Page 134

```
 1   six-year period.  They don't process them
 2   quickly like other municipalities do.  In the
 3   process of doing that, you are holding lawyers
 4   who are representing private businesses' or
 5   owners' properties for years.  They are tied
 6   up in litigation with the City because they
 7   don't close those cases down.
 8 Q But don't you have to appeal a denied
 9   abatement by the next September to either the
10   Court or the Board of Land and Tax Appeals?
11 A Sure.  You can.  You can settle them out,
12   appeal them, yes.
13 Q But once they are appealed, either to the
14   Court or the board, then the case has to be
15   heard there, in accordance with the scheduling
16   with the board or the Court, right?
17 A Yes.
18 Q Last page of Exhibit 15, paragraph number 14?
19 A Yes.
20 Q You talk about seeking assistance to do a
21   declaratory judgment on the constitutional
22   violation of forming of shell corporations.
23   You said that "no attorney would assist as
```

Page 135

```
 1   they viewed the entire project as corrupt and
 2   felt it should be before the Attorney General,
 3   Jane Young's office" -- that would be the
 4   United States attorney?
 5 A Yes.
 6 Q "The FBI or other federal agencies."
 7   Who are you referring to there?
 8 A I am referring to the paper we wrote -- I am
 9   referring to Judge Temple's court order of the
10   footnote.
11 Q It was a poorly worded question.
12   You said, "No attorney would assist
13   as they viewed the entire project as corrupt."
14   What attorneys are you speaking of there?
15 A Different attorneys I tried to contact for
16   assistance.
17 Q Who?
18 A Attorney Aivalikles, Attorney Lehmann,
19   Attorney -- I don't remember his name, but I
20   met him at a social function, and he said he
21   would help.  And then when I called him, he
22   said, yes, I don't want to help.  Those three
23   come to mind.
```

Page 136

```
 1 Q Aivalikles, Lehmann, and whoever the third one
 2   was?
 3 A And I also contacted the New Hampshire Bar
 4   Association to see if I could try and find
 5   somebody.  No response, no attorneys
 6   available, and no answer to my phone call.
 7      MR. HILLIARD:  I don't have any
 8   other questions.  Thank you.
 9 INTERROGATORIES BY MS. FEENEY:
10 Q I just have a few questions for you.  My name
11   is Dona Feeney, and I represent Kim Kleiner.
12   I have a very, very bad habit of talking very
13   rapidly.  I make no apologias for it.  I just
14   tell witnesses if I am going too fast, hold up
15   your hand, tell me.  I may be skipping around,
16   I am not doing that intentionally to try and
17   confuse you.  I am just trying to backfill
18   some of my notes based on what I have written
19   down.
20      Are you able to tell me, please,
21   what specifically Kim Kleiner did that
22   restricted your ability to speak freely, in
23   other words your First Amendment rights that
```

Page 137

```
 1   you pled in count one?
 2 A Well, there is a lot in my affidavit about
 3   things that went on, and her restricting the
 4   assessors in the assessing office from having
 5   any communication with me was a big shift and
 6   a change when she came on in April, March 1,
 7   April 1 when she took over the assessing
 8   office, and she developed agendas that
 9   specifically called out that no assessor is to
10   communicate directly with Laurie Ortolano, and
11   she proceeded on a series of changes that went
12   on from, I think April 1st to September, and
13   then they stopped because I put in a
14   Right-To-Know, outlining the tracking and what
15   had to be done when she was requesting
16   information, and who she could speak to.
17 Q Would it be fair to say it was primarily part
18   and parcel of the Right-To-Know request you
19   were endeavoring to make as a result of the
20   assessing information you wanted?
21 A Well, I was really trying to understand my
22   assessment.  Assessors are there in any
23   property assessment to speak to those issues
```

Page 138

1   in general to any member of the public.
2 Q  I appreciate that. That wasn't exactly my
3   question. Perhaps it was a bad one. So let
4   me try and ask it again.
5       In count 1 of your complaint, you
6   claiming all of the defendants affected your
7   right to free speech, and what I am asking is,
8   you have not separately said what Kim Kleiner
9   did, and what I want to understand today,
10  under oath, what is it that you contend Kim
11  Kleiner did that restricted your free speech
12  rights under the First Amendment?
13 A  Okay. So I think the example I gave just
14  right now is a valid example of restricting my
15  ability to access the people in the office,
16  her decision to lay out agendas the way she
17  did and to issue orders as a director to
18  assessors and clerical members to stop me from
19  accessing information, and it wasn't just the
20  assessors.
21      When she told the front staff that
22  they could no longer service me when I come
23  in, and that everything would be directed to

Page 139

1   Louise Brown, which again was a progression.
2   Initially, it was one person that was handling
3   me, or you were writing it down, and then it
4   ended up switching to Louise Brown was the
5   only one who could assist me, and Louise Brown
6   was rarely in the office when I went in. She
7   was not there.
8       So I would walk into an office, and
9   three women whose job descriptions said 50
10  percent of their time would be spent assisting
11  customers who walked in would be sitting at
12  their desks with their heads down not willing
13  to get up or even look at me, and feeling
14  uncomfortable because the rules had changed.
15  That is one example.
16      Another thing that restricted my
17  speech, and in defense of myself, was her
18  announcement that was I was under criminal
19  investigation for the Ray Feoli issue in a
20  board of aldermen meeting. I think that
21  portrayed me in a way that was very negative.
22  I went to the microphone to try and defend
23  myself at the end and asked for more than

Page 140

1   three minutes to do that because it was --
2   there were so many things leveled in that
3   20-minute conversation that happened with her
4   in the board of aldermen and Lori Wilshire
5   denied me the opportunity to speak to it.
6 Q  But Kim Kleiner didn't deny you the
7   opportunity to speak --
8 A  Kim Kleiner chose to address that issue as a
9   public matter, putting me out there in a
10  criminal forum--
11 Q  I appreciate that is your perspective.
12      I am asking you specifically, Kim
13  Kleiner didn't restrict your opportunity to
14  speak at that meeting, am I correct?
15 A  That is true.
16 Q  Other than those two examples, anything else
17  you can tell me specifically that Kim Kleiner
18  did to restrict your speech?
19 A  I am sure I could, but --
20 Q  Why don't you take a moment and think about
21  it? This is the only time I have an
22  opportunity to examine you under oath before
23  trial, and I would like to know specifically

Page 141

1   what it is you contend Kim Kleiner did to
2   restrict your speech?
3 A  I know there is more. I just can't think of
4   them right now. I am just going to let them
5   go. If you could walk me through a timeline
6   that helped me, I would do that.
7 Q  I don't have the burden of proof. If you
8   can't remember anything else, I will move on
9   to the next question.
10      My next question is, what is it that
11  Kim Kleiner specifically did that affected
12  your rights to petition the government or the
13  City of Nashua for redress, that is count 2 of
14  your complaint in this case?
15      MR. OLSON: Objection. Asked and
16  answered.
17      MS. FEENEY: Well, two different
18  counts, and so it is a form objection here in
19  federal court.
20 Q  You can answer the question.
21 A  Say it again.
22      MS. FEENEY: Sure. May I have it
23  read back?

Page 142

1  (The record was read.)
2  A  Setting up the agendas and taking over the
3  assessment office to set up the agendas where
4  the entire staff down there was restricted in
5  speaking to me and answering my questions was
6  huge. There were hundreds of people walking
7  in at the time I was there, and they were all
8  being serviced freely, and I was not.
9        I would watch people walk right in
10  front of me go to a counter, ask the clerk or
11  ask to speak to an assessor, and they would go
12  get them and bring them out. I would walk up
13  next, and say, could I, please, speak to an
14  assessor, and they would not come out. I
15  would be told, no, you can't. Write it down.
16  Maybe we will get back to you. Could I come
17  back later? No, you can't.
18        That, all my work in the assessing
19  office from, you know, April 1st of 2019 until
20  my appeal was done in 2021 was completely
21  restricted on a set of rules that I didn't
22  have equal footing with everyone else who went
23  in there.

Page 143

1  Q  I appreciate your perspective on that, ma'am.
2     Thank you.
3        How many times did Kim Kleiner speak
4     to you directly and say, you couldn't get or
5     do something or have something?
6  A  By way -- well, there is a lot of
7     Right-To-Knows. There is a lot of --
8  Q  My question is -- I would be happy to have it
9     read back. We are at the end of a long day.
10       I want to know on how many occasions
11    Kim Kleiner spoke to you directly and said,
12    you can't have, you can't do, you can't
13    petition for this?
14 A  I can't recall. I don't have the count
15    number. I can't give you a count number.
16 Q  More than one time?
17 A  Yes.
18 Q  That Kim Kleiner spoke to you directly?
19 A  Yes.
20 Q  More than five times?
21 A  Probably, yes.
22 Q  But probably, so sometime between one and five
23    times, is that your best estimate?

Page 144

1  A  I can't say for sure.
2  Q  Okay. So you don't know?
3  A  I don't.
4  Q  You know it is more than one, but probably not
5     more than five?
6  A  That may not be true.
7  Q  Okay. So under oath today, what is true?
8        How many times did Kim Kleiner speak
9     to you directly and tell you you couldn't have
10    something, you couldn't look for something,
11    she wasn't going to get something for you?
12 A  Well, she wouldn't allow me to talk to her
13    about the assessor whose files were not
14    properly handled, and I ended up hiring an
15    investigator.
16 Q  That is not quite the answer to my question.
17       Did Kim Kleiner tell you that?
18 A  Yes.
19 Q  And that is one occasion?
20 A  Sure.
21 Q  How many other occasions?
22 A  I am trying to think back. I had a meeting
23    with her on that.

Page 145

1        She gave me a phone call right away
2     when I was looking at my property and said
3     that she would look into the assessment in
4     September of 2018 and get back to me on why my
5     assessment appeared so incorrect, and she
6     never got back to me.
7  Q  That was a second time she spoke to you, and
8     what you are objecting to is the fact that she
9     didn't follow up with you, is that accurate?
10 A  There was no follow-up to try and fix the
11    problem.
12 Q  So that's accurate. She didn't get back to
13    you, am I right?
14 A  Correct.
15 Q  That's two times.
16 A  Okay. Let's see, so I went with her.
17       The property record cards. Trying
18    to work with her to find out when the property
19    record files were going to be fully scanned
20    and online, asking her to do a review so we
21    could get those records, no responses, no
22    information back. I can't recall -- which is
23    why I reached out to Mr. Feoli directly.