UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LAURIE ORTOLANO

VS            NO:   22-CV-00326-LM

THE CITY OF NASHUA, Et Al.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LAURIE ORTOLANO

This deposition taken by agreement of counsel at the Law Offices of Cullen, Collimore & Shirley, 37 Technology Way, Suite 3W2, Nashua, New Hampshire, on May 8, 2024, commencing at 10:20 a.m.

Page 14

1  A  No, actually, I worked a couple years when he
2     was born. When he was an infant, I was still
3     working.
4  Q  I think I asked you this, but subsequent to
5     DARPA, you haven't had any other private
6     employment?
7  A  No.
8  Q  Or public employment?
9  A  I was an elected official in Litchfield, but
10    that was small pay.
11 Q  What was your position there in Litchfield?
12 A  I was elected to the school board and I served
13    about five years, and then I was elected to
14    the budget committee, and I served two to
15    three years.
16 Q  Other than your litigation with the City of
17    Nashua, have you been in litigation of any
18    type with any other entity?
19 A  No, I had this one issue with a gym in 2014
20    where they charged my credit card for a
21    membership. They continued to charge my card,
22    and I called the attorney general's office,
23    and they took the case, and that settled out.

Page 15

1     So that was like my one issue, my first time
2     having a litigation. I don't even know if I
3     would call it litigation. It was very
4     short-lived.
5  Q  Now, you have, obviously in addition to this
6     suit, you had some 91A lawsuits pending
7     against the City now?
8  A  Yes.
9  Q  How many are currently pending?
10 A  I think there are four or five. I just
11    dropped one to essentially -- there are two
12    cases that were very similar. So I am running
13    with a second case. I am going to say four or
14    five.
15 Q  When was the last time you filed a
16    Right-To-Know suit against the City?
17 A  Probably three months ago.
18 Q  And I think I read in one of your affidavits
19    that you may have filed about 16 in total
20    against the City, is that right?
21 A  That is what the City put up on the graph,
22    yes, about 16 files.
23 Q  When you say the City put up on the graph, was

Page 16

1     that a number you agree with, it is about 16?
2  A  Yes.
3  Q  When did the City put it up on a graph?
4  A  At the March 26 meeting, they held a public
5     meeting on outside legal costs, and they did a
6     presentation on how much money I have cost the
7     City.
8  Q  Was that a board of aldermen meeting?
9  A  Yes, a special board of aldermen meeting.
10 Q  When did you move to Nashua?
11 A  I'm not sure. It would have been --
12    essentially 2014. Last week of December '13,
13    I think we moved in. So winter of 2014, we
14    were firmly planted.
15 Q  Were either of your kids still in public
16    school at the time?
17 A  My oldest was in college, and my youngest was
18    a sophomore -- No, when I moved to Nashua, I
19    would say he was a junior. No, maybe a
20    sophomore, somewhere around there, sophomore
21    in high school. I think he was a freshman
22    actually. I am sorry, I think it was a
23    freshman in high school.

Page 17

1  Q  Your youngest son was in high school at the
2     time you moved here?
3  A  Yes.
4  Q  That is as specific as I need.
5  A  Okay.
6  Q  When you came here, did you join any or seek
7     to join any boards?
8  A  No.
9  Q  Have you since in Nashua?
10 A  Yes.
11 Q  Have you been on any boards here?
12 A  No, I didn't get appointed.
13 Q  Which boards did you seek to get appointments
14    to?
15 A  The board of assessor's had openings, when it
16    had an opening, two openings, when I started
17    doing assessing work in 2018, so I applied,
18    but I didn't receive a comment or response
19    back. I applied again in 2019, and I think I
20    received a response that I wasn't a candidate
21    they were looking for.
22       And then I applied to the assessing
23    standards board in -- I think that was 2019

Page 18

1   -- maybe 2020, and the board itself has two or
2   three public people, and a gentleman who was
3   on it recommended that I take his seat. So he
4   wrote a referral to the governor, and the
5   governor made the recommendation to the
6   executive council, and I wasn't -- they didn't
7   do a vote because the governor knew before the
8   vote that I wasn't supported on a three-two
9   vote, so I didn't get that seat. And I ran
10  for public works in November of 2021, and I
11  lost that seat. That was an actual election.
12  Q   The assessing standards board, that was a
13      state board?
14  A   Yes.
15  Q   You said you started doing assessing work in
16      2018.
17          When you say you started doing
18      assessing work, what do you mean?
19  A   The new assessments had come out from KRT, the
20      company hired to do an update in late August,
21      and when I received our new number, I was
22      concerned, and I went to the assessing office
23      and had a conversation, and that started my

Page 19

1   work into trying to get our property
2   assessment corrected.
3   Q   So that is your first foray into what you call
4       assessing work?
5   A   I actually did call in 2014 when we moved in,
6       and I saw our assessment jump 5 grand. Our
7       tax bill went up $5,000. I made my first
8       contact with the tax assessor then.
9           And then I made contact again with
10      the assessing chief in 2017, very concerned
11      when my tax bill cost 18,000, and I thought it
12      was way too high.
13          I had minimal contact at those two
14      points.
15  Q   I understand you also assist other people with
16      their assessing challenges, should we say?
17  A   Not really. I would say the year after KRT
18      people did seek me out to help them with
19      their -- it wasn't KRT. It was when Vision
20      came out with the new numbers. They asked me
21      to help them out in 2021. I got calls from
22      neighborhoods, and letters saying, we seek
23      your assistance, come to our street, and so I

Page 20

1   did give assistance, and I published some
2   things on GoodGov, where I told people to look
3   up data. If you are concerned, go look this
4   up.
5       I made a series of videos on GoodGov
6   on how to file an abatement, how to do it
7   yourself, and frankly, the City, I don't
8   think, was very happy about it, and I was
9   pretty squashed in the whole thing, so I never
10  did it again. I had people seek me out last
11  year, and I just didn't do it anymore.
12  Q   When you say you think the City wasn't very
13      happy about it, what specifically made you
14      feel the City wasn't very happy about it?
15  A   When I tried to assist two senior citizens,
16      and sent the abatements in to be date/time
17      stamped, they sat on them for almost 20 days
18      which is unheard of. That neighborhood had a
19      street of 8 properties to be reevaluated and
20      the City policy, policy practice or guideline
21      was if there is a cluster of houses that are
22      incorrect, they correct those first because
23      they can deal with a pile of them.

Page 21

1       There was a cluster of houses in
2   that neighborhood at that time in 2021, they
3   ended up dealing with them last. They went to
4   the bottom of the pile.
5       People who went before the board who
6   carried their own assessments in, asked me for
7   help. There were only two I represented.
8   Everyone else went on their own, said to me
9   when they went before the board of assessor's,
10  they were questioned, oh, did somebody help
11  you, don't even say her name, we know who she
12  is. They seemed to be just not happy with the
13  work of what was submitted.
14  Q   Sorry. To pin this down a little more, when
15      you say they, who didn't seem happy?
16      Specifically, who are you talking about?
17  A   Kim Kleiner, I will say Ms. Kleiner. She was
18      running the assessing office at that time, and
19      I don't believe there was a chief at that
20      time.
21  Q   Was it your impression that Ms. Kleiner had
22      direct contact with these applicants?
23  A   I think a lot of them screened through the

Page 34

1  Q  With respect to the concern that she expressed
2     to you about Ms. Kleiner conveying the story
3     that made her feel like it was some sort of a
4     threat to her, would you agree that is not the
5     way she conveyed it to Detective Lombardi?
6  A  I would agree with you on that.
7  Q  One of the documents in the list here, number
8     5 is a Freyler investigative report.
9        Mr. Freyler was a private
10    investigator you had hired?
11 A  Yes.
12 Q  What was the purpose of hiring him?
13 A  I was concerned that Mr. Turgiss was not
14    maintaining the property files properly and
15    leaving the office for roughly four hours a
16    day, signing on a white board saying he was
17    going to inspect properties but then really
18    wasn't doing that work.
19 Q  And as part of his work for you, is it fair to
20    say Mr. Freyler followed Mr. Turgiss around?
21 A  Yes.
22 Q  Was that something -- was that your idea or
23    was that Mr. Freyler's idea?

Page 35

1  A  He was an investigator. That was really his
2     idea as to how he conducts and investigation.
3  Q  I take it he billed you by the hour?
4  A  I believe so.
5  Q  And so did he submit to you reports that
6     indicated which hours he worked on different
7     days?
8  A  Yes.
9  Q  How many hours a day was he following
10    Mr. Turgiss around?
11 A  He would focus on coming when we knew he was
12    signing out. So he had a pattern, this
13    assessor. So he would work according to that
14    pattern, and he would come, you know, three or
15    four days a week, if he had another
16    commitment, because he had other jobs.
17 Q  He being -- I am sorry to interrupt,
18    Mr. Freyler?
19 A  Will Freyler would say I can't be there on
20    Tuesday or can't be there on Friday. I have a
21    commitment, but I will come down and do
22    Monday, Wednesday and Thursday and monitor.
23    He picked it on his schedule.

Page 36

1  Q  Sure, and on the days when it fit his
2     schedule, did he watch Mr. Turgiss for the
3     whole day, basically start to finish?
4  A  He would watch him until -- he initially would
5     watch him leaving city hall, and then attempt
6     to follow him, and then going back to city
7     hall, but he had difficulty following him. He
8     would lose him, Mr. Turgiss would lose him
9     frequently. He was an investigator. He was
10    having trouble.
11 Q  His intent, anyway, was to essentially follow
12    him for all the time he was outside of the
13    office?
14 A  Yes.
15 Q  Obviously, on the days that he was working?
16 A  Yes.
17 Q  And that would include checking out what he
18    was doing at lunchtime?
19 A  Yes, but it seems to me he didn't do a lot of
20    lunchtime. He just went to a place and stayed
21    at a place.
22 Q  Did Mr. Freyler videotape Mr. Turgiss?
23 A  I don't know if he videotaped. He took

Page 37

1     photos.
2  Q  Kind of classic PI work, sitting in his car
3     taking pictures out the window of Mr. Turgiss?
4  A  Yes.
5  Q  Did Mr. Turgiss, to your knowledge, did
6     Mr. Turgiss learn about Mr. Freyler's
7     activities?
8  A  No, I don't believe so.
9  Q  Other than the police, who else was the
10    Freyler investigation report turned over to?
11 A  The City.
12 Q  And who at the City?
13 A  It went to the Mayor, and I believe Attorney
14    Bolton, and it was a letter to from Attorney
15    Fojo, item 2, from Fojo's letter to Mayor
16    Donchess was that investigative report.
17 Q  Thank you. So Attorney Fojo provided the
18    report on your behalf to the Mayor?
19 A  Yes.
20 Q  Did you ever meet with Attorney Broth?
21 A  Yes. That resulted in number 4. I believe
22    that came after a meeting with myself and
23    Attorney Fojo.

Page 62

1  said, even Cheryl Walley? I mean, Cheryl
2  Walley told you that? I think I talked to her
3  almost every day, almost every other day, and
4  he said, oh, no, not her, we didn't even ask
5  her. But everyone else? And he said, yes.
6      I said, what does that mean? Did I
7  do something harassing or threatening or was
8  I -- did I sound dangerous, what has happened
9  here? He said, no, no, not at all, you were
10 not. I said, is this even legal? He said,
11 yes, this is something we do all the time.
12 This is what we do. I said, it doesn't seem
13 right. What am I supposed to do with this?
14      I later learned talking to him, how
15 does this go away? Does this ever stop? He
16 said, no, it stays a warning forever. Now, I
17 kind of think it is gone because everybody has
18 left the office. I am going to call it over.
19      This is like a restraining order
20 that stays with me forever? He said, it just
21 stays on your record, and I was just stunned
22 by the whole thing. I really was. I couldn't
23 even wrap my head around. I had never been

Page 63

1  police involved. I didn't know what to make
2  of it.
3      That is why he said, do you
4  understand everything here? I have a shit
5  load of questions. I need to talk to my
6  lawyer, and a young cop burst out laughing,
7  and he said that is really funny, I really
8  like that. And off I went, and I called my
9  husband right away.
10 Q  I am going to move on now to the city hall
11    trespass. You want to take a couple minutes?
12 A  Let me just take five minutes.
13     (Short recess.)
14 Q  (By MR. CULLEN:) Coming back, I want to talk
15    to you a little bit about the city hall
16    incident of January 22nd, 2022?
17 A  '21.
18 Q  '21. I read somewhere, I think you have a
19    whole affidavit on this. I don't want to
20    belabor it too much.
21     When you went upstairs that day, it
22    was Mindy Lloyd who answered the door?
23 A  Yes.

Page 64

1  Q  Was Mindy somebody who you had known who she
2     was?
3  A  Yes.
4  Q  And you knew she was an employee of the legal
5     department?
6  A  Yes.
7  Q  And with respect to Attorney Neumann, again,
8     that was somebody you knew at the time?
9  A  He had just started in December.
10 Q  And but you, had you interacted with him
11    in-between December and that time?
12 A  Yes.
13 Q  So you knew that Attorney Neumann was in the
14    legal department also?
15 A  Yes.
16 Q  And obviously, and you knew Attorney Leonard?
17 A  Yes.
18 Q  And she wasn't there when you first arrived,
19    correct?
20 A  Correct.
21 Q  With respect to, how long were you in the
22    legal department area itself before you
23    decided to sit down and stay?

Page 65

1  A  Probably two minutes, and then there is that
2     entry hallway area, so I would say maybe not
3     even two minutes. It was very short, and I
4     went to that hallway.
5  Q  Is that -- there is a photo. Let me show you
6     a picture here. We can mark this as Exhibit
7     2.
8      (Whereupon, the court reporter
9     marked Exhibit Number 2, Union Leader article,
10    for Identification.)
11 Q  The photo is you, I take it?
12 A  Yes.
13 Q  You look like you are maybe waving?
14 A  When I realized she was taking the picture, I
15    put my hand up. It was a reflex.
16 Q  To stop the photo?
17 A  Just what are you doing, but she took the
18    photo. She took two photos.
19 Q  And so where you are sitting now, is that
20    where you sat for the duration you sat in the
21    legal department area, this is where you sat?
22 A  No.
23 Q  Where did you first sit?

Page 70

1     this is all you.
2         First comments from Ms. Leonard.
3  A  No, I can't say. I don't believe I said that,
4     and I think that -- I don't recall him saying
5     he would have me removed. Other than to say
6     you have to leave, and he directed Ms. Lloyd
7     to call management.
8  Q  The next paragraph does have a quote that
9     appears to be attributed to you.
10        It reads, "I am going to be treated
11    with the dignity that I deserve," she said, "I
12    told them I was going to sit here until
13    someone gave me the time of day."
14       Is that something you told
15    Ms. Houghton?
16  A  I would say yes.
17  Q  Does that accurately reflect what you told the
18    legal department, that you were going to sit
19    there until someone gave you the time of day?
20  A  I don't know if I told the legal department
21    that.
22  Q  Have you told Ms. Houghton you told the legal
23    department that?

Page 71

1  A  If that is what it says, I don't know did I
2    say that, or did I just give her that quote?
3    I am not certain it says I told the legal
4    department that. I told them I am going to
5    sit there until somebody gives me the time of
6    day. I am going to be treated with dignity.
7    I don't know if I did the dignity line. If I
8    told them I am going to sit here until someone
9    gives me the time of day, that sounds very
10    possible.
11  Q  Back in January of 2021, that is what you told
12    Ms. Houghton, correct?
13  A  Yes.
14  Q  Your memory then is pretty fresh?
15  A  It was right after it happened.
16  Q  So if it reads here, I told him I was going to
17    sit here until someone gave me the time of
18    day, it is fair to say that is what you
19    actually did tell them, right?
20  A  Correct. I recall telling Attorney Neumann, I
21    just need these date/time stamped. Could you
22    just please give me the date/time stamp.
23  Q  When he wouldn't do that, that is what

Page 72

1    prompted you to decide to sit there until
2    someone took care of you?
3  A  Yes.
4  Q  And the date/time stamps were abatement
5    notices regarding those two senior citizens?
6  A  Applications.
7  Q  The next document we are going to mark as an
8    exhibit is an article in the Nashua Scoop.
9        (Whereupon, the court reporter
10    marked Exhibit Number 3, Nashua Scoop, for
11    Identification.)
12  Q  Do you recognize this document?
13  A  Yes.
14  Q  What is the Nashua Scoop?
15  A  It is a Facebook social media page.
16  Q  It says private group at the top with 12.9
17    thousand members?
18  A  Yes.
19  Q  Do you know who monitors it?
20  A  I don't. It changes, the people who do it.
21    At the time, I don't know who was the monitor.
22  Q  This one is a post that purports to be by you
23    dated January 22nd.

Page 73

1       Is this, in fact, your post?
2  A  Yes.
3  Q  And again, this is on the very day of the
4    incident at the city hall?
5  A  Yes.
6  Q  So when it says at the top of page 2 with
7    reference to Attorney Neumann, "He said I was
8    trespassing and had to leave the office," that
9    is an accurate statement as to what Attorney
10    Neumann said to you, right?
11  A  Yes.
12  Q  And when it says at the top of page 2, "he,"
13    being Attorney Neumann "repeatedly said I was
14    breaking the law and trespassing," that is an
15    accurate statement of what he said to you?
16  A  Yes.
17  Q  When you write after that, "I said, I would
18    not leave until I had some answers," that is
19    an accurate statement of what you said?
20  A  Yes.
21  Q  And again going down to the next paragraph, it
22    says, "I sat on the floor against the wall by
23    a door. I said that I was just going to sit

 



# The Nashua Scoop

Private group · 12.9K members

Joined   Invite

About   Discussion   Announcements   Topics   Members   Events   Media   Files

 **Laurie Ortolano**
January 22 ·

I had a depressing experience today. I went to City Hall to try to see if I could get some abatement applications stamped for receipt or record. I know the assessing office is still under construction, but Ms. Kleiner's office has been open and assessing staff have been working in there. There is a young woman stationed in the hallway who asks where you are going and what you need. I told her I wanted to see if I could get abatement applications stamped at Ms. Kleiner's office. She welcomed me along. Did not ask if I has an appointment. It was 9:20 am and Ms. Kleiner's office was locked and closed. I headed to the Mayor's office to see if someone could tell me where some assessing people have been moved to. The Mayor's office was locked and all lights were off. I headed to the third floor to the legal office to see if the new RTK coordinator could help me with the abatement issue. I have been trying to communicate with him by email and calling to see if he would meet with me to discuss abatement applications and the process. In three weeks, he had not responded to emails or phone calls.

I knocked on the door and a young woman answered and I asked if Attorney Neumann was in. She would not answer and said I needed an appointment. I told her I have tried to get one, but he will not

**EXHIBIT 3 ORTOLANO** RLM 5/8/24

NPD_LO_001538

 

conference room. He said I was trespassing and had to leave the office. I explained that I was just looking for help on filing abatements and reviewing applications. He repeatedly said I was breaking the law and trespassing. I said I would no leave until I had some answers.

They called Risk Management to have me removed, but I would not go with them. I sat down on the floor against a wall by a door. I said that I was just going to sit there until someone provided me with information. Five armed police officers showed up to ask me to leave the office. Of course, I said yes, I wasn't looking for a hostile exchange, just a peaceful protest.

Attorney Leonard showed up as I was sitting on the floor and escalated the situation. She claimed that I was looking in her office. Her office door was open and I was just sitting on the floor against the only wall away from the clerk and Attorney Neumann. I was not spying by looking in her office, she left door open. She then claimed that i was hostile and that she felt threatened and intimidated. I am an almost 60 year old woman sitting on the floor looking up at her and she found that to be a threatening, hostile posture. She kept repeating how threatened she felt. She then opened the window because she did not know my covid exposure. I was wearing a mask and would never come to City Hall if I thought I had any exposure risk.

Interestingly enough, two weeks ago the legal office invited me to city hall to review documents for many hours at time with a legal assistant present. They didn't ask me to take a COVID test for that event. Now, suddenly, Attorney Leonard is frantic about COVID cooties.

The police explained that I had trespassed and ban me from City Hall for 1 year. If I enter City Hall I MAY be arrested. They did not say I would be arrested. They told me that I need to schedule an appointment; I explained how frustrating and futile this is as the city will not respond to my questions or my requests to meet to discuss matters. By the way, the City website does not say that you need an appointment to go into the legal office.

I refuse to be thrown out of a public building. This is wrong. The way our government is treating its Citizen is a travesty. I am not some barbarian at the gate. I am a citizen requesting help. I am almost 60 years old and I have never had a speeding ticket, and it was never on my bucket list to be arrested, but I refuse to allow the City to tell me I am trespassing when I enter City Hall. A pox to Attorney Neumann and Attorney Celia Leonard and all those city leaders who violate our rights.

 124                                      336 Comments

                                               Like

                                                                Top Comments

An admin turned off commenting for this post.

NPD_LO_001539