UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| Laurie Ortolano | : |
| v. | : Civil Action No. 22-cv-00326-LM |
| The City of Nashua, et al. | : |

**DEFENDANT CITY OF NASHUA'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

By Verified Complaint dated August 23, 2022, Plaintiff initiated the instant matter against the City of Nashua, its Mayor, and several of its current and former employees. Although the Complaint originally included ten counts, including due process, state constitutional, and emotional distress claims, after this Court ruled on the various Defendants' Motions for Judgment on the Pleadings [Doc. Nos. 58, 60 & 61], Plaintiff reduced her claims to just four. *See* Stipulation of Dismissal [Doc. No. 63]. Of these, only two relate to the City:

Count I: Claim pursuant to 42 U.S.C. § 1983, asserting that Defendants violated Plaintiff's First Amendment rights by "restricting, regulating, suppressing, or chilling" her speech and/or retaliating against her on account of her speech; and

Count II: Claim pursuant to 42 U.S.C. § 1983, asserting that Defendants violated Plaintiff's First Amendment right to petition by taking adverse action against her on the basis of her exercise of that right.

As set forth in more detail below, the undisputed facts establish that Plaintiff cannot succeed on either claim as to this Defendant. First, no City employee violated Plaintiff's First Amendment rights. Second, even were the Court to find such a violation, the City would not be liable for such violation in the absence of evidence that the violation was the result of a City policy or practice

adopted with "reckless disregard" of her rights. As such, the City is entitled to judgment as a matter of law.

## **STATEMENT OF FACTS**

The City incorporates herein the facts set forth in the various Motions for Summary Judgment filed by the individual City Defendants (Bolton, Leonard, Lombardi, Kleiner, and Carignan) and further states as follows:

*Background*

Plaintiff Laurie Ortolano moved to Nashua at the end of 2013. Deposition of Laurie Ortolano ("Pl's Dep."), relevant portions of which are attached hereto as Exhibit 1, at p.16. Shortly after, she claims, her property assessment increased dramatically, causing a corresponding increase in her taxes. *Id*. p.19. *See also* Verified Complaint (hereafter "Comp.") ¶15. Plaintiff sought a reevaluation, which lowered the assessment slightly, but not to her satisfaction. Comp. ¶16. In 2017 and 2018 she contacted the Chief Assessor and the Mayor but did not get the responses she desired. Comp. ¶¶18-19. She complains that City officials began to monitor her and disparage her in internal emails. Comp. ¶¶21-22.

In September 2018 Plaintiff began attending monthly "Coffee with the Mayor" events and articulated her belief that the 2018 reevaluation was done improperly. Comp. ¶26. In October 2018 she and her husband wrote a letter to the Board of Aldermen (hereafter "BOA") criticizing the Assessing Department. Comp. ¶25. They then attended a BOA meeting where they expressed their concerns about the Department. *Id*. In fact, beginning in September 2018, Plaintiff became a regular participant in meetings of the BOA and the Board of Assessors, speaking at six such meetings during the last four months of that year and twenty more in the first six months of 2019. *See* Affidavit of Megan Caron, attached hereto as Exhibit 2, at ¶4 and Ex. A thereto.

During this time, Plaintiff came to believe that one of the City's assessors, Greg Turgiss, was not performing his job duties. Comp. ¶60; Pl. Dep. p. 34. She hired a private investigator, William Freyler, to follow Turgiss around the City during his workday, including during his lunch. Comp. ¶60; Pl's Dep. pp. 34-36. Freyler ultimately produced a report for Plaintiff, which she shared with the City. Comp. ¶60; Pl. Dep. p. 37; Caron Aff. Ex. B.

Plaintiff states that based on Freyler's report the City hired Attorney Mark Broth to investigate the assessor. Comp. ¶60. Plaintiff, however, became concerned that officials – and Director of Administrative Services Kim Kleiner in particular - were interfering with Broth's investigation. Comp. ¶¶61-62. In particular, she had heard "second hand" that Kleiner had told staff about an incident that one member of the staff, Cheryl Walley, construed as a warning and admonition not to fully cooperate with Broth's investigation. Comp. ¶61. As a result, she and another resident went to the Nashua police to request that the police conduct a criminal investigation into both Turgiss and Kleiner. Comp. ¶62.

*Assessing Department Investigation and "No Contact" Warning*

Plaintiff initially met with then-Chief Michael Carignan. Deposition of Michael Carignan ("Carignan Dep."), relevant portions of which are attached hereto as Exhibit 3, pp. 16-17. The Chief assigned the investigation to the detective bureau. Carignan Dep. p.17. In addition, Chief Carignan and Captain Jon Lehto met with the Mayor and Kleiner to inform the Mayor that a criminal complaint had been made against employees at City Hall and that the police would be conducting an investigation into the allegations. Carignan Dep. pp. 32-33. The Mayor and Kleiner stated that they understood and assured the police they would receive cooperation from the City. Carignan Dep. pp. 38-39.

The department assigned the investigation to Detective Frank Lombardi and Sgt. Robert

MacLeod, with Lombardi serving as the lead detective. Carignan Dep. pp. 40-41; *see also* Affidavit of Frank Lombardi [Doc No. 84-7] at ¶3. During the investigation, Plaintiff approached Lynn Cameron, one of the Assessing Department clerks, outside of City Hall as she returned from lunch. *See* Pl. Dep. pp. 47-48, 53-54. Plaintiff's intention was to ask Cameron to retrieve for her a document from Cheryl Walley's work station that the Legal Department had just told Plaintiff she could not have. Pl. Dep. pp. 47-52. Cameron reported the incident to Lombardi, with her supervisor, Louise Brown, present. Lombardi Aff. ¶7. Cameron stated that she was very uncomfortable with her interaction with Plaintiff and felt that Plaintiff had been waiting outside for her. Lombardi Aff. ¶7. Cameron was emotional and crying as she conveyed this to the detective. Lombardi Aff. ¶7.

At Cameron's request, Lombardi advised Plaintiff that Cameron (and the rest of the Assessing Department staff, except for Cheryl Walley) did not wish to speak with her outside of their duties within the Assessing Department. Lombardi Aff. ¶¶8-11. Plaintiff asked Lombardi whether the warning was lawful, and he responded that such warnings were lawful and were done proactively to prevent crimes from occurring. Lombardi Aff. ¶12. He further stated that if she did contact the employees outside of work, depending on the circumstances, she could face criminal charges. Lombardi Aff. ¶12. *See also* Comp. ¶¶82-83. As Lombardi would later explain, it is not uncommon for police to issue such "warnings" in citizen disputes in an effort to secure the peace between feuding parties. *See* Deposition of Frank Lombardi, relevant excerpts of which are attached hereto as <u>Exhibit 4</u>, at pp. 42-45.

> Almost every domestic violence call we go to where an arrest isn't made, we're typically giving some sort of warning or advice and telling people to, you know, stop whatever behavior they're doing to prevent any future issues.

Lombardi Dep. p. 42. He added that in addition to domestic incidents such warnings are given in neighbor disputes, road rage incidents, and juvenile issues. Lombardi Dep. p. 43. '[O]ur school

4

resource officers probably do it multiple times a day, every day." *Id.* An arrest, of course, would only occur if some crime was committed in some subsequent interaction, such as assault or criminal threatening. Lombardi Aff. [Doc. No. 84-7] ¶12.

Plaintiff says that when Lombardi gave her the warning he asked whether she had any questions. Pl. Dep. p. 58. Plaintiff responded that she had "a shit-ton of questions, but I think I have to talk to my lawyer…." Pl. Dep. pp.58-59. As it happens, Plaintiff was represented by at least one and possibly two different counsel at this time to whom she could address her questions. She had engaged Attorney Robert Fojo in late 2018 to assist her with 91-A requests. Pl. Dep. pp. 24-25. He remained her counsel until approximately October 2019. Pl. Dep. p. 25. Plaintiff had also engaged Attorney Rick Lehman to represent her. Pl. Dep. p. 26. At this time, she concedes, she may have spoken with both counsel: "I probably talked to both Fojo and Lehmann. I know I talked to Lehman." Pl. Dep. 59. Plaintiff concedes that had any of the assessing staff asked her themselves not to talk to her outside of work she would have honored that request. Pl. Dep. pp. 54, 55-56.

*2021 Trespass Charges*

Over a year later, Plaintiff was charged with criminal trespass after she refused to leave the City's Legal Department despite repeated requests to do so. Specifically, on January 22, 2021, Plaintiff went to the Legal Department at City Hall, ostensibly to obtain date stamps on abatement appeals she was filing. Complaint ¶¶107-08; Pl's Affidavit in Opposition to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p. 5. She knew – as she acknowledged in an email to Deputy City Attorney Celia Leonard in 2019 - that the Legal Department was not the proper place that purpose, writing then: "you made it very clear that legal is only there to address specific documents requests and I should not bring any other information [or] concerns regard the

5

City to the attention the legal office." Affidavit of Celia Leonard in Support of Bolton/Leonard Motion for Summary Judgment [Doc. No. 71-13] p.1 ¶3. She was told by Attorney Jesse Neuman – who she knew to be an employee of the City – to leave. *See* Complaint ¶109; Pl. Dep. p. 64. Indeed, Plaintiff admits that Neumann <u>repeatedly</u> told he that she was trespassing and needed to leave. *See* Pl's Affidavit in Opposition to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p.7 ¶12 (Statement of Fact and Response). Instead, she "sat down in the lobby area on the floor." Complaint ¶109; Pl's Affidavit in Opposition to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p.7 ¶13. She remained there until another attorney – Defendant Leonard – approached her. Complaint ¶110. Plaintiff continued to refuse to leave even after Attorney Leonard called the police, who had to escort her out of the building. *Id*.

Although the responding officers did not charge her at the time, the police reopened the investigation after learning that Plaintiff had written about refusing to leave and not obeying the commands of the people at the Legal Department on social media. Carignan Dep. p. 89. While Plaintiff will try to spin her eventual arrest as retaliation for her post, Carignan explained it differently:

> The decision, from what I understand, to arrest was her admission of committing the crime. She went on her social media post and admitted to refusing to obey those commands, and for us the discussion, if I remember correctly, was, well, she's admitting to a crime, we don't need a witness to necessarily come forward, she's making her own self-admissions, so we will charge her.[1]

Carignan Dep. p.90.

The Chief's recollection of Plaintiff's actions is entirely accurate. Plaintiff admits that she posted her version of events in a Facebook Forum called "The Nashua Scoop." Pl. Dep. pp. 72-

---

[1] The Chief explained that the police are generally reluctant to charge trespass based solely on the property owner's testimony as they are then dependent on that witness appearing at court, which often doesn't happen. Carignan Dep. pp. 64-65.

6

73 and Ex. 3 thereto.  Therein, she admitted that Attorney Neumann told her to leave and advised her that she was trespassing "repeatedly" but that she refused to leave.  *Id*. at p.2.  She even stayed after the Legal Department staff called Risk Management: "I would not go with them.  I sat down on the floor against a wall by a door.  I said that I was just going to sit there until someone provided me with information." *Id*.  She made similar statements to a reporter for the Union Leader, admitting again that Attorney Neumann asked her to leave and that he would have her removed if she refused.  Pl. Dep. p. 70 (conceding she informed the reporter that she was told to leave but refused).

Plaintiff was arrested on February 18, 2021.  Although Plaintiff claims – even emphasizes - in her Complaint that she was charged with a felony, the actual charge was a misdemeanor.  *See State v. Ortolano*, Doc. No 459-2021-CR-00606 (9th Cir. Court – District Division – Nashua) (reciting proper charges and plea).  Plaintiff ultimately pled guilty to a violation offence.  *Id.  See also* Sept 26, 2023 Order on Bolton/Leonard Motion for Judgment on the Pleadings [Doc. No. 60] at p.7 n. 3.

*Kleiner Public Comments re: Plaintiff*

Plaintiff asserts that Kleiner defamed her on February 8, 2022, when she (accurately) reported to the BOA that a vendor for the City, Raymond Feoli, had been led to believe, by Plaintiff, that Plaintiff was City employee.  As set forth in Kleiner's Motion for Summary Judgment [Doc. No. 86], Kleiner merely conveyed to the Board the content of an email Feoli had addressed to the Board but sent to Kleiner.  *See* Doc. No. 86-1 at pp.5-7. Plaintiff addressed the Board that very same evening, presenting what she represented as her side of the story.  *See* Caron Ex. A p. 281.

7

*Bolton Encounter July 2022*

According to Plaintiff, on July 22, 2022, City Attorney Steve Bolton "attempted to have her arrested." Comp. ¶130. She admits that it was she – not Attorney Bolton – who called the police to report their encounter. Comp. ¶132. Plaintiff concedes that she was not arrested and that the police closed the matter. Comp. ¶138.

*Plaintiff's Ongoing Conduct*

Plaintiff remained a regular attendee of public meetings long after all of the events recited above. For example, just two days after Lombardi warned her not to contact assessing staff outside of work, Plaintiff appeared and spoke at some length at a Board of Aldermen meeting, criticizing Kleiner and the recently released Assessing Department procedures. Caron Aff. ¶7 and Ex. A pp. 97-99. The following week she attended (and spoke at) a Board of Assessors meeting. *Id*. pp. 99-103. Those would be among nine meetings of those two Boards that she would speak at after the warning through the end of 2019. Caron Ex. A pp. 99-123. Plaintiff spoke during at least 25 public meetings in 2020. Caron Aff. ¶8. She also attended additional meetings at which she did not speak. Pl. Dep. pp. 83-84.

This continued throughout 2021 (after her arrest) and much of 2022 (after she claims that Kleiner defamed her and Bolton tried to get her arrested a second time). *See* Plaintiff's Affidavit in Response to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p.24, ¶50 (noting attendance at 45 BOA meetings from January 2021 through October 2022). Plaintiff attended and spoke at a Board of Assessors meeting on March 4, 2021, and at a BOA meeting on March 9, 2021. Caron Aff. Ex. B pp. 181-85. In the latter she reminded the Board that she felt Attorney Leonard should be fired, a belief she reiterated then. Caron Ex. B at p. 184. She continued to participate in public meetings throughout the year. *See* Plaintiff's Affidavit in

Response to Bolton/Leonard Motion for Summary Judgment [Doc. No. 75-2] at p.24, ¶50 (noting attendance at 45 BOA meetings from January 2021 through October 2022). As noted, this included speaking at the BOA meeting where Kleiner addressed the Feoli report, Caron Ex. A at p. 281, and less than a week after the Bolton incident in July 2022 speaking at the Board of Public Works, where she criticized the manner by which the City decided to allow "disc golf" in a City park. Caron Ex. A. pp. 353-54. In fact, Plaintiff concedes that she regularly attended meeting of all manner of City boards until October 2022, when she claims that unrelated comments from an individual alderman caused her to stop attending for several months. Pl. Dep. pp. 83-84.[2]

Plaintiff also continued filing Right-to-Know requests and enforcing them through litigation. *See* Affidavit of Steven Bolton ("Bolton Aff."), appended to Bolton's Motion for Summary Judgment as Doc. No. 71-2, at ¶2. Plaintiff has not been shy therein about criticizing the City or its officials. Indeed, just last week the Hillsborough Superior Court documented her increasingly hostile pleadings, baseless accusations, and crude language. *See* Order of May 23, 2024, *Ortolano v. City of Nashua*, 2021-cv-00354 (Hillsborough County Superior Court – Southern Dist.) attached hereto as Exhibit 5.

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment motions provide courts the opportunity to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether

---

[2]   Plaintiff has filed a separate suit based on that issue. *See Ortolano v. Moran*, 226-2022-cv-00466 (Hillsborough County Superior Court – Southern Dist.).

trial is actually required." *Acosta v. Ames Dept. Stores, Inc.*, 386 F.3d 5, 7 (1st Cir. 2004) (quoting *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir. 1992)).  Thus, although the initial burden is upon the moving party to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir. 1988), if a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists.  *Donovan v. Agnew*, 712 F.2d 1509, 1516 (1st Cir. 1983).  Failing that showing, summary judgment must be granted.

## ARGUMENT

Following the first round of dispositive motions in this case, there are only two counts on which City remains a defendant: Count I (First Amendment Retaliation) and Count II (Violation of Right to Petition).  To establish liability for either claim, Plaintiff must first demonstrate an underlying violation of her rights by some City employee.  She must then link that violation to some City policy or procedure.  As set forth below, Plaintiff can do neither.

### I.   NO CITY EMPLOYEE VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHTS.

If Plaintiff cannot prove an underlying violation of her rights, the City is entitled to summary judgment as a matter of law on the derivative claims under 42 U.S.C. § 1983.  *See Wilson v. Town of Mendon*, 294 F.3d 1, 7 (1st Cir. 2002) ("Without a finding of a constitutional violation on the part of a municipal employee, there cannot be a finding of section 1983 damages liability on the part of the municipality."). *Accord, City of Los Angeles v. Heller*, 475 U.S. 796 (1986). Here, Plaintiff alleges that the various Defendants "chilled" her right to free speech and "violated" her right to petition, respectively, in violation of the First Amendment.  The undisputed facts show otherwise.

10

As set forth previously by this Court, to prevail on either claim against one of the individual Defendants, Plaintiff must establish that:

> (1) she engaged in constitutionally protected conduct, (2) was subject to an adverse action by the defendants, and (3) the protected conduct was a substantial or motivating factor in the adverse action.

Order on Carignan Motion to Dismiss [Doc. No. 58] at 9 (quoting *Currier v. Town of Gilmanton*, 621 F.Supp.3d 233, 258 (D.N.H. 2022)) (further citations omitted).

In addition, Plaintiff must demonstrate that the employee acted with <u>intent</u> to retaliate against her and that the retaliatory action actually caused the injury for which she seeks compensation. *Reid v. Brodeur*, 2001 DNH 032 (Feb. 15, 2001) at 16-17 (citing *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998)). As for the injury element, a plaintiff must show that the defendant's alleged retaliation chilled the plaintiff's free speech or caused some other concrete harm to the plaintiff. *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2nd Cir. 2013). As this Court previously observed, "adverse action must be more than 'de mininus,' which the First Circuit has defined simply as sufficient to chill a 'reasonably hardy' person, or 'a person of ordinary firmness,' from continuing to exercise their constitutional rights." Order on Donchess's Motion to Dismiss [Doc. No. 61] at 16 (quoting *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011); *Starr v. Dube*, 334 Fed. Appx. 341, 342 (1st Cir. 2009)). In addition, the claimed *injury* must be more than de minimus. *See* Order on Donchess's Motion to Dismiss [Doc. No. 61] at 17 (observing with respect to Plaintiff that "whatever injury she suffered was also de minimus and therefore not actionable") (citing *Bourne v. Arruda*, 10-cv-393-LM, 2011 WL 2357504 at 16 (D.N.H. June 10, 2011)). Here, Plaintiff cannot satisfy this burden.

As set forth in detail in each employee's Motions for Summary Judgment, incorporated herein by reference, none of the individual defendants violated Plaintiff's First Amendment rights. Det. Lombardi did nothing more than advise her (correctly) that the assessing staff did not want to

have contact with her outside of work.  To the extent that she argues that was some sort of adverse action, it was de minimus.  Plaintiff had legal counsel with whom she consulted as to whether the warning had any teeth.  Presumably they accurately told her that she could only be arrested if her conduct violated a statutory crime.  In any event, she agrees that she would not have approached them if they had made the same request directly to her.  It is difficult to discern any injury under such circumstances.

Likewise, Plaintiff's arrest for trespass was both lawful and constitutional.  *See Del Gallo v. Parent*, 557 F.3d 58, 68 (1st Cir. 2009) (quoting *Greer v. Spock*, 424 U.S. 828, 836 (1976)) ("The government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'") (further citations omitted); *Berner v. Delahunty*, F.3d 20, 26 (1st Cir. 1997 (noting that courtrooms are nonpublic forums to which access can be restricted as long as restrictions are reasonable and not solely content based) (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).  Plaintiff properly pleaded guilty to a violation level offense having admitted in her blog post all of the requisite elements of the crime.  While Plaintiff claims she was treated differently than other trespassers at City Hall, she can present no evidence that any other person camped out in a private office at City Hall, refused to leave when directed to, and then published her confession on social media.

To the extent Plaintiff claims that Attorney Bolton sought her arrest on a second occasion, Plaintiff was not actually arrested, and it was Plaintiff – not Attorney Bolton – who called the police.  This does not constitute adverse action.  As to Kleiner, Plaintiff's First Amendment claims are unclear.  However, as Kleiner asserts in her summary judgment motion, she did nothing more then relay the information that Feoli had directed to the BOA via an email sent to her.  Plaintiff –

perpetually undaunted – immediately addressed the issue to the Board, presenting her side of the story. Kleiner neither took "adverse action" nor caused the well-known gadfly any harm.

Finally, no action by the City has ever actually chilled Plaintiff's speech, as the Court has previously observed. *See* Order on Donchess Motion to Dismiss [Doc. No. 61] at 17 (noting that Plaintiff was "undeterred" in her pursuit of relief against the City). She did not stop attending public meetings or criticizing City officials or staff. To the contrary, Plaintiff appeared at public meetings at or immediately following each of the actions she complains of and continues to do so until this day. Her criticism of the City and its officials is unabated and she has filed numerous suits against the City which continue to this day. *See* Ex. 5.

## II. THE CITY DID NOT CAUSE ANY VIOLATION OF PLAINTIFF'S RIGHTS.

Even if Plaintiff could identify some First Amendment violation by City employees, that would not be enough to circumvent summary judgment for the City. "It is by now axiomatic that the doctrine of *respondeat superior* does not apply to claims under section 1983." *Gaudreault v Salem, Mass.*, 923 F.2d 203, 209 (1st Cir. 1990) (citing *Voutour v. Vitale*, 761 F.2d 812, 819 (1st Cir. 1985)). Rather, Plaintiff must establish that:

> (1) a municipal policymaker intentionally adopted a policy, implemented a training protocol, or allowed a custom to develop; (2) the challenged policy, training protocol, or custom caused a violation of federally protected rights; and (3) the policymaker acted with at **least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the policy, training, protocol, or custom**.

*Penney v. Town of Middleton*, 888 F. Supp. 332, 340 (D.N.H. 1994) (emphasis added). *Accord City of Canton v. Harris*, 489 U.S. 378, 385-92 (1989). "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

This is true even if a plaintiff establishes that an underlying violation of her rights. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (proof of a single incident of unconstitutional activity insufficient to impose liability on town without proof that it was caused by municipal policy).

Here, Plaintiff cannot satisfy her burden.  While the police do have a practice of giving verbal "no contact" orders in a variety of cases, this practice is not so clearly unconstitutional (if at all) to be "deliberately indifferent" to her rights.  With respect to her arrest, Plaintiff cannot show a "policy" of unconstitutional or retaliatory arrests where Plaintiff's circumstances appear to be unique. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1988) (for custom or practice to be attributable to municipality "it must be so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.").

To the extent that Plaintiff has personal conflicts with individual City employees, whether it be the Mayor, legal counsel, or the Director of Administrative Services, she has not shown that the City has adopted a policy or practice of violating First Amendment rights.  City employees are entitled to respond to her attacks.  *See* Order on Donchess Motion to Dismiss [Doc. No. 61] at p.17.  They are permitted to arrest those who refuse to leave private areas of City Hall after repeated requests to do so.  Even if the Court determines that some individual's actions strayed over the constitutional line, Plaintiff cannot show that it was the result of a policy created in "deliberate indifference" to her rights.

## CONCLUSION

The undisputed facts fall far short of those required to sustain any claim against the City. As such, the City is entitled to Summary Judgment on both remaining Counts of the Complaint.

Respectfully submitted,

**CITY OF NASHUA**

By its attorneys

CULLEN COLLIMORE SHIRLEY PLLC

Dated: May 31, 2024  By: /s/ Brian J.S. Cullen
Brian J. S. Cullen (Bar No. 11265)
37 Technology Way, Suite 3W2
Nashua, NH  03060
(603) 881-5500
bcullen@cullencollimore.com

**CERTIFICATE OF SERVICE**

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: May 31, 2024  By: /s/ Brian J.S. Cullen
Brian J.S. Cullen

15