UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LAURIE ORTOLANO

VS            NO:   22-CV-00326-LM

THE CITY OF NASHUA, Et Al.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF LAURIE ORTOLANO

This deposition taken by agreement of counsel at the Law Offices of Cullen, Collimore & Shirley, 37 Technology Way, Suite 3W2, Nashua, New Hampshire, on May 8, 2024, commencing at 10:20 a.m.

Page 14

1  A  No, actually, I worked a couple years when he
2     was born.  When he was an infant, I was still
3     working.
4  Q  I think I asked you this, but subsequent to
5     DARPA, you haven't had any other private
6     employment?
7  A  No.
8  Q  Or public employment?
9  A  I was an elected official in Litchfield, but
10    that was small pay.
11 Q  What was your position there in Litchfield?
12 A  I was elected to the school board and I served
13    about five years, and then I was elected to
14    the budget committee, and I served two to
15    three years.
16 Q  Other than your litigation with the City of
17    Nashua, have you been in litigation of any
18    type with any other entity?
19 A  No, I had this one issue with a gym in 2014
20    where they charged my credit card for a
21    membership.  They continued to charge my card,
22    and I called the attorney general's office,
23    and they took the case, and that settled out.

Page 15

1     So that was like my one issue, my first time
2     having a litigation.  I don't even know if I
3     would call it litigation.  It was very
4     short-lived.
5  Q  Now, you have, obviously in addition to this
6     suit, you had some 91A lawsuits pending
7     against the City now?
8  A  Yes.
9  Q  How many are currently pending?
10 A  I think there are four or five.  I just
11    dropped one to essentially -- there are two
12    cases that were very similar.  So I am running
13    with a second case.  I am going to say four or
14    five.
15 Q  When was the last time you filed a
16    Right-To-Know suit against the City?
17 A  Probably three months ago.
18 Q  And I think I read in one of your affidavits
19    that you may have filed about 16 in total
20    against the City, is that right?
21 A  That is what the City put up on the graph,
22    yes, about 16 files.
23 Q  When you say the City put up on the graph, was

Page 16

1     that a number you agree with, it is about 16?
2  A  Yes.
3  Q  When did the City put it up on a graph?
4  A  At the March 26 meeting, they held a public
5     meeting on outside legal costs, and they did a
6     presentation on how much money I have cost the
7     City.
8  Q  Was that a board of aldermen meeting?
9  A  Yes, a special board of aldermen meeting.
10 Q  When did you move to Nashua?
11 A  I'm not sure.  It would have been --
12    essentially 2014.  Last week of December '13,
13    I think we moved in.  So winter of 2014, we
14    were firmly planted.
15 Q  Were either of your kids still in public
16    school at the time?
17 A  My oldest was in college, and my youngest was
18    a sophomore -- No, when I moved to Nashua, I
19    would say he was a junior.  No, maybe a
20    sophomore, somewhere around there, sophomore
21    in high school.  I think he was a freshman
22    actually.  I am sorry, I think it was a
23    freshman in high school.

Page 17

1  Q  Your youngest son was in high school at the
2     time you moved here?
3  A  Yes.
4  Q  That is as specific as I need.
5  A  Okay.
6  Q  When you came here, did you join any or seek
7     to join any boards?
8  A  No.
9  Q  Have you since in Nashua?
10 A  Yes.
11 Q  Have you been on any boards here?
12 A  No, I didn't get appointed.
13 Q  Which boards did you seek to get appointments
14    to?
15 A  The board of assessor's had openings, when it
16    had an opening, two openings, when I started
17    doing assessing work in 2018, so I applied,
18    but I didn't receive a comment or response
19    back.  I applied again in 2019, and I think I
20    received a response that I wasn't a candidate
21    they were looking for.
22       And then I applied to the assessing
23    standards board in -- I think that was 2019

Page 18

1  -- maybe 2020, and the board itself has two or
2  three public people, and a gentleman who was
3  on it recommended that I take his seat. So he
4  wrote a referral to the governor, and the
5  governor made the recommendation to the
6  executive council, and I wasn't -- they didn't
7  do a vote because the governor knew before the
8  vote that I wasn't supported on a three-two
9  vote, so I didn't get that seat. And I ran
10 for public works in November of 2021, and I
11 lost that seat. That was an actual election.
12 Q  The assessing standards board, that was a
13    state board?
14 A  Yes.
15 Q  You said you started doing assessing work in
16    2018.
17    When you say you started doing
18    assessing work, what do you mean?
19 A  The new assessments had come out from KRT, the
20    company hired to do an update in late August,
21    and when I received our new number, I was
22    concerned, and I went to the assessing office
23    and had a conversation, and that started my

Page 19

1  work into trying to get our property
2  assessment corrected.
3  Q  So that is your first foray into what you call
4     assessing work?
5  A  I actually did call in 2014 when we moved in,
6     and I saw our assessment jump 5 grand. Our
7     tax bill went up $5,000. I made my first
8     contact with the tax assessor then.
9     And then I made contact again with
10    the assessing chief in 2017, very concerned
11    when my tax bill cost 18,000, and I thought it
12    was way too high.
13    I had minimal contact at those two
14    points.
15 Q  I understand you also assist other people with
16    their assessing challenges, should we say?
17 A  Not really. I would say the year after KRT
18    people did seek me out to help them with
19    their -- it wasn't KRT. It was when Vision
20    came out with the new numbers. They asked me
21    to help them out in 2021. I got calls from
22    neighborhoods, and letters saying, we seek
23    your assistance, come to our street, and so I

Page 20

1  did give assistance, and I published some
2  things on GoodGov, where I told people to look
3  up data. If you are concerned, go look this
4  up.
5  I made a series of videos on GoodGov
6  on how to file an abatement, how to do it
7  yourself, and frankly, the City, I don't
8  think, was very happy about it, and I was
9  pretty squashed in the whole thing, so I never
10 did it again. I had people seek me out last
11 year, and I just didn't do it anymore.
12 Q  When you say you think the City wasn't very
13    happy about it, what specifically made you
14    feel the City wasn't very happy about it?
15 A  When I tried to assist two senior citizens,
16    and sent the abatements in to be date/time
17    stamped, they sat on them for almost 20 days
18    which is unheard of. That neighborhood had a
19    street of 8 properties to be reevaluated and
20    the City policy, policy practice or guideline
21    was if there is a cluster of houses that are
22    incorrect, they correct those first because
23    they can deal with a pile of them.

Page 21

1  There was a cluster of houses in
2  that neighborhood at that time in 2021, they
3  ended up dealing with them last. They went to
4  the bottom of the pile.
5  People who went before the board who
6  carried their own assessments in, asked me for
7  help. There were only two I represented.
8  Everyone else went on their own, said to me
9  when they went before the board of assessor's,
10 they were questioned, oh, did somebody help
11 you, don't even say her name, we know who she
12 is. They seemed to be just not happy with the
13 work of what was submitted.
14 Q  Sorry. To pin this down a little more, when
15    you say they, who didn't seem happy?
16    Specifically, who are you talking about?
17 A  Kim Kleiner, I will say Ms. Kleiner. She was
18    running the assessing office at that time, and
19    I don't believe there was a chief at that
20    time.
21 Q  Was it your impression that Ms. Kleiner had
22    direct contact with these applicants?
23 A  I think a lot of them screened through the

Page 22

1   office and in fact --
2   Q   Is that a no, I am not sure I understand.
3   A   I am going to say yes, she probably did,
4       because the assessing office was closed that
5       year for construction, and all the
6       applications were going through her office
7       because several of the assessing staff members
8       moved into her office to do work.  There was
9       no assessing office open at that time.
10  Q   So based on -- it is based on the overall
11      geography of the department that you believe
12      Kim Kleiner was directly involved?
13  A   Yes, and you know what, I am going to take
14      back that an assessor wasn't assigned.  That
15      month, December, they brought in Rick Vincent
16      as a consultant, so he came on board.  So Rick
17      Vincent was also involved.  He was a chief in
18      Lebanon, and he retired and came to Nashua.
19  Q   To give me a time frame again, you said
20      December.
21          December, what month?
22  A   2020.
23  Q   I want to go back now, because I did take this

Page 23

1   in sequence and talked a little bit about the
2   investigation that was done by the Nashua
3   Police Department into the assessing
4   department.
5       When this, I am going to show you a
6   document, and we will mark it as Exhibit 1.
7   Mike, for your sake, I am looking at the
8   police report of John Lehto, dated June 25th,
9   2019.
10          (Whereupon, the court reporter
11  marked Exhibit Number 1, Police Report
12  6-25-2019, for Identification.)
13  Q   Ms. Ortolano, with respect to this document
14      and anything else that I give you, take as
15      much as time as you want to look at it, but I
16      will have some specific questions that I will
17      want to highlight for you.
18  A   Good.  Thank you.
19  Q   With respect to this first one, my first
20      question is fairly simple, this is a report by
21      Captain Lehto at the time, and it references a
22      meeting with Lieutenant Mederos, and you and
23      Laura, and I am going to butcher her name,

Page 24

1       Colquhoun?
2   A   Colquhoun, yes.
3   Q   It indicates they met you on June 25th, 2019.
4           Is that about the recollection you
5       have of when you guys met?
6   A   Yes.
7   Q   In the middle of the first page, it references
8       18 different documents that it references.
9       These references come from binders, black and
10      a blue binder of information you had compiled.
11          Where did you compile that
12      information?
13  A   From city hall.  Those were city hall records.
14  Q   And were they records that you got through the
15      Right-To-Know requests?
16  A   Yes.
17  Q   There is a document 2 here, Attorney Robert
18      Fojo's letter to Mayor Donchess, dated 8th of
19      May, 2019.
20          Was that a letter that he wrote on
21      your behalf?
22  A   Yes.
23  Q   When did you first hire Attorney Fojo to

Page 25

1   represent you?
2   A   It was in 2018, late, maybe November of 2018.
3   Q   And without going into detail what you said to
4       each other, what was the purpose of you hiring
5       him?
6   A   To help me write a Right-To-Know.  It was the
7       first time I was writing an official
8       Right-To-Know, and I couldn't remember how to
9       do it properly.  So I asked him to help me.
10  Q   And then there is a second letter reference
11      from the same attorney on item 4, his letter
12      to Attorney Broth dated 7 June, 2019.
13          Do you see that?
14  A   Yes.
15  Q   And was he still representing you then in June
16      of 2019?
17  A   Yes.
18  Q   And for how long did Attorney Fojo to
19      represent you?
20  A   I think until maybe October of 2019.
21  Q   And was there any particular reason that
22      relationship ended?
23  A   I wasn't getting where I thought I should be

Page 26

1  on my abatement, which was now an appeal.
2  Q  I know you also were represented by Rick
3     Lehmann at some point?
4  A  Yes.
5  Q  Did you go directly from Attorney Fojo to
6     Attorney Lehmann?
7  A  More or less. He first assisted Cheryl
8     Walley, a lady in the assessing office on a
9     settlement agreement. He worked with her, and
10    then I would say in January of 2020, he began
11    working on my issues.
12 Q  Back in 2019, were you friendly with Cheryl
13    Walley?
14 A  Yes.
15 Q  And I take it, it was her recommendation that
16    led you to Attorney Lehmann?
17 A  No. No.
18 Q  How did that come about?
19 A  It was an article in The Telegraph about him
20    helping a school board member in Nashua,
21    George Farrington, and so I called him cold.
22 Q  And again, without going into details of your
23    conversations with him, what was the topic

Page 27

1  that you were asking Attorney Lehmann to
2  assist you with?
3  A  Right-To-Know issues.
4  Q  And for approximately how long did Attorney
5     Lehmann represent you?
6  A  He was on, let's see -- he was on until I am
7     going to say October of 2021.
8  Q  So from approximately January 2020 to 2021, he
9     was engaged with you in some manner?
10 A  Yes.
11 Q  And when you reached out to him originally
12    after reading the George Farrington article,
13    do you remember when that was?
14 A  You know what, it was September of 2019
15    because I reached out to him because of the
16    police coming to my door in 2019 and issuing
17    me a warning. I was scared.
18 Q  Let's go to that then.
19       The police came to your door --
20 A  September 22nd of 2019? It was A Sunday
21    afternoon.
22 Q  Were you home at the time?
23 A  I was at Laura Colquhoun's home. My husband

Page 28

1  was home.
2  Q  I take it your husband notified you that they
3     had been there?
4  A  Yes.
5  Q  And is that when you reached out to Attorney
6     Lehmann then?
7  A  Yes.
8  Q  Did you reach out to him before you went down
9     to the station?
10 A  No.
11 Q  How soon after you went to the station did you
12    reach out to Attorney Lehmann?
13 A  I am going to say two or three weeks?
14 Q  When did you first learn that Detective
15    Lombardi had been assigned to investigate the
16    allegations that you made about the assessing
17    department?
18 A  I don't recall, because he wasn't in the
19    interview in June, involved initially, and I
20    wasn't getting reports. So I don't really
21    know when he -- my recollection would be in
22    September when he was there with his other
23    police officer, Heron, Haran (phonetic) or

Page 29

1  whatever his name was. I might have said
2  something to him, but I just don't recall when
3  I knew he was involved.
4  Q  Had you had any prior contact with Lombardi
5     before the assessing department case?
6  A  Not that I know of.
7  Q  Any since that case was over?
8  A  No.
9  Q  Just to close the loop on that then, other
10    than your interaction with Detective Lombardi
11    with respect to the assessing department
12    investigation and this warning to you, did you
13    have any other interaction with him at all?
14 A  I can't recall him being involved. I don't
15    believe he was involved in the arrest. If I
16    did Right-To-Knows, it went through David
17    Lavoie, through the police department, and
18    what I found is the officers move around a
19    lot. They get promotions and their titles
20    change, and they seem not to be in the same
21    place for very long. So I don't know where he
22    went.
23 Q  When you talk about the graphs, you mean the

Page 34

1  Q  With respect to the concern that she expressed
2     to you about Ms. Kleiner conveying the story
3     that made her feel like it was some sort of a
4     threat to her, would you agree that is not the
5     way she conveyed it to Detective Lombardi?
6  A  I would agree with you on that.
7  Q  One of the documents in the list here, number
8     5 is a Freyler investigative report.
9        Mr. Freyler was a private
10    investigator you had hired?
11 A  Yes.
12 Q  What was the purpose of hiring him?
13 A  I was concerned that Mr. Turgiss was not
14    maintaining the property files properly and
15    leaving the office for roughly four hours a
16    day, signing on a white board saying he was
17    going to inspect properties but then really
18    wasn't doing that work.
19 Q  And as part of his work for you, is it fair to
20    say Mr. Freyler followed Mr. Turgiss around?
21 A  Yes.
22 Q  Was that something -- was that your idea or
23    was that Mr. Freyler's idea?

Page 35

1  A  He was an investigator. That was really his
2     idea as to how he conducts and investigation.
3  Q  I take it he billed you by the hour?
4  A  I believe so.
5  Q  And so did he submit to you reports that
6     indicated which hours he worked on different
7     days?
8  A  Yes.
9  Q  How many hours a day was he following
10    Mr. Turgiss around?
11 A  He would focus on coming when we knew he was
12    signing out. So he had a pattern, this
13    assessor. So he would work according to that
14    pattern, and he would come, you know, three or
15    four days a week, if he had another
16    commitment, because he had other jobs.
17 Q  He being -- I am sorry to interrupt,
18    Mr. Freyler?
19 A  Will Freyler would say I can't be there on
20    Tuesday or can't be there on Friday. I have a
21    commitment, but I will come down and do
22    Monday, Wednesday and Thursday and monitor.
23    He picked it on his schedule.

Page 36

1  Q  Sure, and on the days when it fit his
2     schedule, did he watch Mr. Turgiss for the
3     whole day, basically start to finish?
4  A  He would watch him until -- he initially would
5     watch him leaving city hall, and then attempt
6     to follow him, and then going back to city
7     hall, but he had difficulty following him. He
8     would lose him, Mr. Turgiss would lose him
9     frequently. He was an investigator. He was
10    having trouble.
11 Q  His intent, anyway, was to essentially follow
12    him for all the time he was outside of the
13    office?
14 A  Yes.
15 Q  Obviously, on the days that he was working?
16 A  Yes.
17 Q  And that would include checking out what he
18    was doing at lunchtime?
19 A  Yes, but it seems to me he didn't do a lot of
20    lunchtime. He just went to a place and stayed
21    at a place.
22 Q  Did Mr. Freyler videotape Mr. Turgiss?
23 A  I don't know if he videotaped. He took

Page 37

1     photos.
2  Q  Kind of classic PI work, sitting in his car
3     taking pictures out the window of Mr. Turgiss?
4  A  Yes.
5  Q  Did Mr. Turgiss, to your knowledge, did
6     Mr. Turgiss learn about Mr. Freyler's
7     activities?
8  A  No, I don't believe so.
9  Q  Other than the police, who else was the
10    Freyler investigation report turned over to?
11 A  The City.
12 Q  And who at the City?
13 A  It went to the Mayor, and I believe Attorney
14    Bolton, and it was a letter to from Attorney
15    Fojo, item 2, from Fojo's letter to Mayor
16    Donchess was that investigative report.
17 Q  Thank you. So Attorney Fojo provided the
18    report on your behalf to the Mayor?
19 A  Yes.
20 Q  Did you ever meet with Attorney Broth?
21 A  Yes. That resulted in number 4. I believe
22    that came after a meeting with myself and
23    Attorney Fojo.

Page 46

1  Q  Where did that take place?
2  A  It took place in the area between the parking
3     garage on Elm Street that a lot of city
4     employees park in and city hall behind it.
5     There is a walking path that goes into a back
6     entrance to city hall, and the employees would
7     use that a lot, and she was in that back area
8     in I think a public street area, not on city
9     hall grounds and not on anyone's property. It
10    is right behind the Sy Mahfuz' Persian Rug
11    Gallery. That is where we were.
12 Q  The one with the nice big mural?
13 A  Nice big --
14 Q  -- mural on the side?
15 A  Yes.
16 Q  That side entrance to city hall, you said the
17    employees use it, that is not a public
18    entrance, right?
19 A  It is. I actually started using it when the
20    assessing ladies told me go out that way, it
21    is quicker. It is public.
22 Q  So you can go in and out that door?
23 A  It is. I never really used it.

Page 47

1  Q  Had you been at the assessing office earlier
2     that day?
3  A  I did.
4  Q  Do you remember what you were there to do?
5  A  I was. I was there to get a piece of paper on
6     Cheryl Walley's wall. She had been suspended
7     from her job and was home, and she said to me,
8     I have a note on my partition wall that
9     explains how we are supposed to treat you.
10    She said they change the rules so often on
11    you, I can't keep it straight, and we are all
12    getting in trouble because we are not dealing
13    with you correctly. So I wrote a note to
14    myself how to deal with you.
15       I went there that day to see if I
16    could get a copy of that note, and I was
17    looking for Lynn Cameron to help me.
18 Q  And so hang on for a second there.
19       Stepping back to your conversation
20    with Walley about the note, when did that
21    conversation take place?
22 A  Right probably within days of me going to city
23    hall.

Page 48

1  Q  And then you went to city hall, went to the
2     assessing department to ask for a copy of that
3     note?
4  A  Yes.
5  Q  Did Cheryl Walley ask you to get it for her?
6  A  She definitely wanted it. She thought when
7     they packed her office up, they wouldn't give
8     it to her.
9  Q  My question was, did she actually ask you to
10    get it for her?
11 A  No.
12 Q  You also wanted it, right?
13 A  Yes.
14 Q  You went in that morning to pick it up?
15 A  Yes, I think it was lunchtime, whatever break
16    time, I knew it was lunchtime because it
17    turned out Lynn Cameron wasn't in.
18 Q  Why did you want to ask Lynn Cameron for it as
19    opposed to Louise Brown or someone else?
20 A  Louise Brown was not helpful to me. She was
21    not somebody who wanted to assist me. Lynn
22    Cameron was very helpful and friendly to me,
23    and she was a good friend of Cheryl Walley,

Page 49

1     and she was upset about Cheryl being removed,
2     gone, suspended, and so -- I believed she
3     would give me a copy of the letter.
4  Q  When you came in to get a copy of the letter,
5     did you ask for a Right-To-Know request or did
6     you just go to the desk and ask?
7  A  No, I just asked.
8  Q  When you got to the assessing department, you
9     said Lynn was not there, who was there?
10 A  Amanda Mazerolle.
11 Q  Did you ask Ms. Mazerolle for a copy?
12 A  Yes.
13 Q  What did Amanda Mazerolle say to you?
14 A  Go to legal.
15 Q  Did you go to legal?
16 A  Yes.
17 Q  Who did you speak to?
18 A  I think it was Manuela Perry, and I don't know
19    if that was a conversation that Celia Leonard
20    came out of her office. I just don't
21    remember. I was told -- you know what, it was
22    probably Celia Leonard, in that letter, she
23    had as her evidence, I think I know now,

Page 50

1  September of 2019, I wrote back to her, there
2  might be a link there, but I can't quite get
3  there.
4  Q  Let's take on the steps you took.
5     You went to the assessing office
6  looking for Lynn?
7  A  Yes.
8  Q  You spoke to Amanda Mazerolle who would not
9  give you a copy --
10 A  She told me to go to legal.
11 Q  You went to legal, you spoke to Manuela?
12 A  Manuela and/or Celia Leonard and asked for a
13 copy, and they said, no.
14 Q  But you are not sure exactly which one of
15 those it was?
16 A  Exactly.
17 Q  And then after they said, no, where did you
18 go?
19 A  I left.
20 Q  And legal is up on the third floor.  By which
21 door of the city hall did you leave?
22 A  The Elm Street door, the usual typical door, I
23 came out the back door.

Page 51

1  Q  The one that goes out to the little parking
2  lot?
3  A  Exactly.
4  Q  Had you parked there?
5  A  I parked in the last spot, not a lot of
6  parking, on the left side.  So when I am
7  coming out, it is the far right side.  I was
8  in that spot.
9  Q  Close to the building, or close to the street?
10 A  Building.  Pulled in facing the building.
11 Q  So you go back out that door, and you get in
12 your car?
13 A  I go to get in my car, and Lynn Cameron is
14 coming through the back way.
15 Q  In which direction?
16 A  Heading to city hall to go in the side door
17 right behind Sy Mahfuz' building.
18 Q  What do you do then?
19 A  I approached her.
20 Q  What did you say to her?
21 A  I said, I am trying to figure out what rules
22 Kim Kleiner has established for working with
23 me.  I was just downstairs trying to get a

Page 52

1  letter, you know, that Cheryl Walley has up on
2  her wall.  I wanted to see if you would give
3  me a copy, and can you tell me what Kleiner
4  has told the clerks on how to deal with me,
5  and she said, well, she gave us the option if
6  we found you difficult, we didn't have to work
7  with you, Louise Brown would handle you, and
8  it was our choice, but then she sort of
9  switched it up and said Louise Brown is going
10 to handle her, no matter what.
11    She said there were some rules
12 changes, and I said, I don't think Cheryl
13 Walley is coming back, and I would really love
14 to see a copy of that note on her wall, on how
15 to handle Laurie Ortolano.
16 Q  And what did Lynn say to that?
17 A  She didn't really respond.  She had given me
18 information on how I was to be handled, and it
19 seems to me, it was later down the road, in
20 terms and transcripts that that was going on.
21 Q  How long did that discussion take place?
22 A  Three minutes, short.
23 Q  Is there anything else you recall from the

Page 53

1  actual conversation itself about who said what
2  to whom?
3  A  No, because I was asking questions to her, I
4  really didn't.  I don't know, and she answered
5  them.
6  Q  And in addition to questions, you gave her
7  statements, I really want to see that
8  document, right?
9  A  I want to see that note.
10 Q  And what, if anything, did Lynn say in
11 response to that statement?
12 A  I don't recall.  I really believe at that
13 point, they were all very frightened in the
14 office, especially the clerks, because Cheryl
15 was suspended now, and Lynn Cameron was good
16 friends with her, go to her home, swim in her
17 pool.  I think Ms. Walley would babysit her
18 kid, her granddaughter.  They had an
19 association, so I think her absence was
20 impactful.  That was my feeling.
21 Q  And this was during the investigation, the
22 Nashua Police investigation into the assessing
23 department, right?

Page 54

1    A   Right, I believed it was into the work of Greg
2        Turgiss and Kim Kleiner, but it seemed to
3        expand into the assessing department. It took
4        on a different dimension.
5    Q   In any case, the conversation that you had
6        with Lynn Cameron outside city hall took place
7        while this investigation was ongoing?
8    A   Yes.
9    Q   The investigation that you had triggered,
10       right?
11   A   Yes.
12   Q   You don't have any reason to think it wasn't
13       known that you triggered this investigation,
14       right?
15   A   I think they all knew that.
16   Q   You would agree Cameron could have chosen at
17       that time not to talk to you outside, right?
18   A   Yes.
19   Q   And if she had said to you, Ms. Ortolano, I
20       would really rather not talk about this
21       outside of city hall, you would have honored
22       that, right?
23   A   Yes.

Page 55

1    Q   And that really goes for anyone at the
2        assessing department, right? If Louise Brown
3        or anyone else had said to you face-to-face,
4        Ms. Ortolano, I really only want to talk to
5        you in city hall, in the department, I don't
6        want to talk to you at Target or any other
7        places, you would have honored that too,
8        right?
9    A   That never happened. The only individual that
10       seemed to trigger this was Lynn Brown behind
11       Sy Mahfuz' business.
12   Q   Lynn Cameron?
13   A   I mean, Lynn Cameron behind Sy Mahfuz'
14       business.
15           It is funny you word it that way, at
16       Target and stuff. I thought it was outside of
17       city hall. When I got the warning, they said,
18       you can't talk to any assessor outside of
19       their office, the assessing office. I didn't
20       even know that was the warning. I didn't
21       realize that until I got it.
22   Q   My question was if any of the other members of
23       the assessing department had asked you,

Page 56

1        Ms. Ortolano, I would rather not talk to you
2        outside of city hall or outside the assessing
3        office, you would have honored that, right?
4    A   I believe so, yes.
5    Q   Did you ever speak with Lynn Cameron about her
6        discussions with Frank Lombardi about this
7        incident?
8    A   No.
9    Q   Do you know if Cheryl Walley ever did?
10   A   I don't know. It is possible.
11   Q   But Cheryl hasn't come to you and said, hey, I
12       just spoke to Lynn and here is what she said?
13   A   No.
14   Q   No one else has either, right?
15   A   No.
16   Q   The only information you have heard about Lynn
17       Cameron's report of that incident comes from
18       Frank Lombardi's interview of her?
19   A   Correct.
20   Q   Or his report?
21   A   What is written, and she was never a witness
22       in any of my cases.
23   Q   And when you did eventually get a warning from

Page 57

1        Detective Lombardi, it ran to all persons in
2        assessing except for Cheryl Walley, correct?
3    A   It wasn't presented to me that way at the time
4        the warning was given to me, but when I
5        received the written warning four months
6        later, that is what was in there.
7    Q   And have you spoken to any of the members of
8        the assessing department, the members at that
9        time, have you spoken to them at any time
10       since about that warning?
11   A   No, only Cheryl Walley, and she was never
12       notified by the police. They didn't include
13       her. She didn't get asked one way or another.
14       So she was the only one I talked to. No one
15       else. I never spoke to anyone about it.
16   Q   You don't have any evidence one way or the
17       other as to whether the other assessing
18       department members actually asked that they be
19       lumped into this warning?
20   A   Correct.
21   Q   We went over this before, so I will just be
22       brief, but to keep it in order, you learned
23       that the police came to your house?

Page 58

```
 1   A   Yes.
 2   Q   And then after you learned that, you went to
 3       the police station to meet with Detective
 4       Lombardi?
 5   A   And the other officer.
 6   Q   And where did that meeting take place?
 7   A   Right in the lobby.
 8   Q   They didn't take you into the back area at
 9       all?
10   A   No.
11   Q   And what specifically, I am guessing here,
12       Detective Lombardi did the talking?
13   A   Correct.
14   Q   The other officer didn't speak at all?
15   A   He did.
16   Q   Did he just introduce you, or did he say
17       anything else?
18   A   He introduced, and then at the end, he made a
19       comment, because I said something that made
20       him laugh, and he said that is really funny.
21   Q   What was it that made him laugh?
22   A   Detective Lombardi said to me, do you have any
23       questions, and I said I have a shit ton of
```

Page 59

```
 1       questions, but I think I have to talk to my
 2       lawyer, and this younger police officer burst
 3       out laughing, and he said, that is really
 4       funny, to get written up that way, but that is
 5       what happened.
 6   Q   That is what happened?
 7   A   Yes.  God's honest truth.
 8   Q   And the lawyer you would have talked to, was
 9       that Fojo, or were you on to Lehmann?
10   A   I was transitioning.  I probably talked to
11       Fojo and Lehmann.  I know I talked to Lehmann,
12       because he followed up on the Right-To-Know
13       for me to get the report.  I am sure Lehmann.
14   Q   And maybe Fojo also?
15   A   Maybe.
16   Q   Because you did have a lot of questions?
17   A   Oh, I did.
18   Q   You had a shit ton of questions, didn't you,
19       right?
20   A   I didn't expect what came my way, that is what
21       it really came down to.  I didn't expect it.
22   Q   Once you got that news from Lombardi, you were
23       going to ask those questions of somebody.  If
```

Page 60

```
 1       it wasn't him, it was going to be Fojo or
 2       Lehmann or another counsel?
 3   A   He did accurately record, is this even legal?
 4       What is going on here?  I just couldn't
 5       imagine -- for over a year, I called it a
 6       restraining order, a warning for a restraining
 7       order.  That is how I referred to it all the
 8       time.
 9           There is no such thing I found out
10       later.  There really isn't.  That is what it
11       felt like to me.  I couldn't tell what it was.
12   Q   At some point, you discussed this warning with
13       maybe it's Deputy Chief Testeverde?
14   A   Yes.
15   Q   Was he deputy chief then?
16   A   He was a deputy, yes.
17   Q   And you and he talked about this warning that
18       Lombardi had given you, right?
19   A   Yes, it was awhile after, too, I believe.
20   Q   And you actually asked for a similar warning
21       was to be given to Ms. Kleiner, right?
22   A   Yes.
23   Q   And do you know if that warning was given to
```

Page 61

```
 1       Ms. Kleiner?
 2   A   I believe he talked to her, but it wasn't like
 3       my warning.  It had a whole different feel.
 4   Q   You weren't there when he talked to her?
 5   A   He wrote something up, and he sent it to me, I
 6       think.  And it was so carefully danced around,
 7       actually, kind of felt like -- yes, it was
 8       interesting.
 9   Q   What exactly did Lombardi say to you when he
10       gave you the no contact warning?
11   A   Okay.  It is hard for me to be exact, but I
12       will give you the points that you remember.
13           Just that he had in the course of
14       doing his investigation been given information
15       that employees of the assessing office did not
16       want to have contact with me.  I thought he
17       said outside of city hall, and he said, you
18       recently had a conversation with Lynn Cameron
19       that she wasn't comfortable with, and
20       speaking, he didn't say he didn't speak, but
21       he said in speaking with all the staff, none
22       of them want you to have contact with them
23       outside of city hall, and I was shocked, and I
```

Page 62

1  said, even Cheryl Walley? I mean, Cheryl
2  Walley told you that? I think I talked to her
3  almost every day, almost every other day, and
4  he said, oh, no, not her, we didn't even ask
5  her. But everyone else? And he said, yes.
6      I said, what does that mean? Did I
7  do something harassing or threatening or was
8  I -- did I sound dangerous, what has happened
9  here? He said, no, no, not at all, you were
10 not. I said, is this even legal? He said,
11 yes, this is something we do all the time.
12 This is what we do. I said, it doesn't seem
13 right. What am I supposed to do with this?
14      I later learned talking to him, how
15 does this go away? Does this ever stop? He
16 said, no, it stays a warning forever. Now, I
17 kind of think it is gone because everybody has
18 left the office. I am going to call it over.
19      This is like a restraining order
20 that stays with me forever? He said, it just
21 stays on your record, and I was just stunned
22 by the whole thing. I really was. I couldn't
23 even wrap my head around. I had never been

Page 63

1  police involved. I didn't know what to make
2  of it.
3      That is why he said, do you
4  understand everything here? I have a shit
5  load of questions. I need to talk to my
6  lawyer, and a young cop burst out laughing,
7  and he said that is really funny, I really
8  like that. And off I went, and I called my
9  husband right away.
10 Q  I am going to move on now to the city hall
11    trespass. You want to take a couple minutes?
12 A  Let me just take five minutes.
13      (Short recess.)
14 Q  (By MR. CULLEN:) Coming back, I want to talk
15    to you a little bit about the city hall
16    incident of January 22nd, 2022?
17 A  '21.
18 Q  '21. I read somewhere, I think you have a
19    whole affidavit on this. I don't want to
20    belabor it too much.
21      When you went upstairs that day, it
22    was Mindy Lloyd who answered the door?
23 A  Yes.

Page 64

1  Q  Was Mindy somebody who you had known who she
2     was?
3  A  Yes.
4  Q  And you knew she was an employee of the legal
5     department?
6  A  Yes.
7  Q  And with respect to Attorney Neumann, again,
8     that was somebody you knew at the time?
9  A  He had just started in December.
10 Q  And but you, had you interacted with him
11    in-between December and that time?
12 A  Yes.
13 Q  So you knew that Attorney Neumann was in the
14    legal department also?
15 A  Yes.
16 Q  And obviously, and you knew Attorney Leonard?
17 A  Yes.
18 Q  And she wasn't there when you first arrived,
19    correct?
20 A  Correct.
21 Q  With respect to, how long were you in the
22    legal department area itself before you
23    decided to sit down and stay?

Page 65

1  A  Probably two minutes, and then there is that
2     entry hallway area, so I would say maybe not
3     even two minutes. It was very short, and I
4     went to that hallway.
5  Q  Is that -- there is a photo. Let me show you
6     a picture here. We can mark this as Exhibit
7     2.
8         (Whereupon, the court reporter
9     marked Exhibit Number 2, Union Leader article,
10    for Identification.)
11 Q  The photo is you, I take it?
12 A  Yes.
13 Q  You look like you are maybe waving?
14 A  When I realized she was taking the picture, I
15    put my hand up. It was a reflex.
16 Q  To stop the photo?
17 A  Just what are you doing, but she took the
18    photo. She took two photos.
19 Q  And so where you are sitting now, is that
20    where you sat for the duration you sat in the
21    legal department area, this is where you sat?
22 A  No.
23 Q  Where did you first sit?

Page 70

```
 1     this is all you.
 2            First comments from Ms. Leonard.
 3   A  No, I can't say.  I don't believe I said that,
 4     and I think that -- I don't recall him saying
 5     he would have me removed.  Other than to say
 6     you have to leave, and he directed Ms. Lloyd
 7     to call management.
 8   Q  The next paragraph does have a quote that
 9     appears to be attributed to you.
10            It reads, "I am going to be treated
11     with the dignity that I deserve," she said, "I
12     told them I was going to sit here until
13     someone gave me the time of day."
14            Is that something you told
15     Ms. Houghton?
16   A  I would say yes.
17   Q  Does that accurately reflect what you told the
18     legal department, that you were going to sit
19     there until someone gave you the time of day?
20   A  I don't know if I told the legal department
21     that.
22   Q  Have you told Ms. Houghton you told the legal
23     department that?
```

Page 71

```
 1   A  If that is what it says, I don't know did I
 2     say that, or did I just give her that quote?
 3     I am not certain it says I told the legal
 4     department that.  I told them I am going to
 5     sit there until somebody gives me the time of
 6     day.  I am going to be treated with dignity.
 7     I don't know if I did the dignity line.  If I
 8     told them I am going to sit here until someone
 9     gives me the time of day, that sounds very
10     possible.
11   Q  Back in January of 2021, that is what you told
12     Ms. Houghton, correct?
13   A  Yes.
14   Q  Your memory then is pretty fresh?
15   A  It was right after it happened.
16   Q  So if it reads here, I told him I was going to
17     sit here until someone gave me the time of
18     day, it is fair to say that is what you
19     actually did tell them, right?
20   A  Correct.  I recall telling Attorney Neumann, I
21     just need these date/time stamped.  Could you
22     just please give me the date/time stamp.
23   Q  When he wouldn't do that, that is what
```

Page 72

```
 1     prompted you to decide to sit there until
 2     someone took care of you?
 3   A  Yes.
 4   Q  And the date/time stamps were abatement
 5     notices regarding those two senior citizens?
 6   A  Applications.
 7   Q  The next document we are going to mark as an
 8     exhibit is an article in the Nashua Scoop.
 9            (Whereupon, the court reporter
10     marked Exhibit Number 3, Nashua Scoop, for
11     Identification.)
12   Q  Do you recognize this document?
13   A  Yes.
14   Q  What is the Nashua Scoop?
15   A  It is a Facebook social media page.
16   Q  It says private group at the top with 12.9
17     thousand members?
18   A  Yes.
19   Q  Do you know who monitors it?
20   A  I don't.  It changes, the people who do it.
21     At the time, I don't know who was the monitor.
22   Q  This one is a post that purports to be by you
23     dated January 22nd.
```

Page 73

```
 1            Is this, in fact, your post?
 2   A  Yes.
 3   Q  And again, this is on the very day of the
 4     incident at the city hall?
 5   A  Yes.
 6   Q  So when it says at the top of page 2 with
 7     reference to Attorney Neumann, "He said I was
 8     trespassing and had to leave the office," that
 9     is an accurate statement as to what Attorney
10     Neumann said to you, right?
11   A  Yes.
12   Q  And when it says at the top of page 2, "he,"
13     being Attorney Neumann "repeatedly said I was
14     breaking the law and trespassing," that is an
15     accurate statement of what he said to you?
16   A  Yes.
17   Q  When you write after that, "I said, I would
18     not leave until I had some answers," that is
19     an accurate statement of what you said?
20   A  Yes.
21   Q  And again going down to the next paragraph, it
22     says, "I sat on the floor against the wall by
23     a door.  I said that I was just going to sit
```

Page 82

```
1       you own the property for ten years, and then
2       you can get citizenship or residency or
3       something like that?
4   A   It moved much quicker.  You can get it in two
5       or three years.
6   Q   Have you obtained yours now?
7   A   We have our residency visa right now.  So we
8       have to go through that two or three years,
9       pass a language exam and a history exam to
10      become a citizen.  My Portuguese isn't what it
11      needs to be yet.
12  Q   Is that the only thing holding you back now
13      Portuguese language skills?
14  A   Yes, and my son who speaks seven languages is
15      learning it now to teach his mother.
16          (Whereupon, the court reporter
17      marked Exhibit Number 8, Affidavit of
18      Plaintiff to Inception Technologies, for
19      Identification.)
20  Q   Exhibit 8 is an affidavit, Ms. Ortolano, from
21      you that was filed in response to the
22      Inception/Feoli motion to dismiss back in
23      December of 2022.
```

Page 83

```
1   A   Yes.
2   Q   The last page has a /s/ electronic signature?
3   A   Yes.
4   Q   This is, in fact, your affidavit, correct?
5   A   Yes.
6   Q   Somewhere in the ether, there is an actual one
7       signed by you?
8   A   I would assume so, but I just can't remember.
9   Q   In any event, this was something you reviewed
10      and signed under the pains and penalties of
11      perjury?
12  A   When you ask me that way, it looks like you
13      found something.
14  Q   No, I am not actually trying to trick you.  I
15      am just trying to confirm it is your
16      affidavit?
17  A   Yes, to the absolute best of my ability.  I
18      was absolutely trying to be truthful.
19  Q   In paragraph 3, you say, "By regularly
20      attending public hearings and meetings
21      conducted by the City of Nashua Government and
22      keeping up with the bulk of pending issues
23      affecting the citizens of Nashua, I have a
```

Page 84

```
1       good grasp on the workings of the Nashua City
2       Government."
3           That statement was still true as of
4       December of 2022 when you signed the
5       affidavit, right?
6   A   When was it signed?
7   Q   The 5th of December 2022?
8   A   Yes, I stopped going in October of 2022, but I
9       still could watch them on TV, yes.
10  Q   Why did you stop going in October of 2022?
11  A   Because there was an incident with an alderman
12      who referred to me as giving off predatory
13      vibes like crazy, and he was a social worker,
14      a licensed social worker, and based on his
15      background, he felt that I did oppositional
16      research on children and I had predatory
17      qualities, and I didn't want be -- I didn't
18      want them bringing it up and over and over
19      again.
20          The board has a tendency to use
21      their public comment at the end, their time to
22      speak when the public can't speak to raise
23      issues about me, and I felt that it would come
```

Page 85

```
1       up over and over again, so I removed myself
2       from board meetings.  From that time, really,
3       forward until now, I have attended very few.
4   Q   That was Alderman Moran?
5   A   Yes.
6   Q   On paragraph 4, "In 2020, the City chose to
7       undertake a project to outsource all property
8       record files in order to create digitally
9       scanned files."
10          How did you first learn about that
11      project?
12  A   I believe Ms. Kleiner went to the budget
13      committee to get approval of a dollar amount
14      that was in excess of 25 grand and required
15      approval.  I believe the first round of money
16      was under 25 grand, but then she needed more.
17      I can't recall the date exactly.  It did
18      require budget committee approval.
19  Q   And do you remember when it was that you first
20      learned about that project?
21  A   It says, "In 2020, the City chose to undertake
22      a project."  It must have been -- like the
23      month, I don't remember.
```

   



# The Nashua Scoop

Private group · 12.9K members

Joined    Invite

About    Discussion    Announcements    Topics    Members    Events    Media    Files

 **Laurie Ortolano**
January 22 ·

I had a depressing experience today. I went to City Hall to try to see if I could get some abatement applications stamped for receipt or record. I know the assessing office is still under construction, but Ms. Kleiner's office has been open and assessing staff have been working in there. There is a young woman stationed in the hallway who asks where you are going and what you need. I told her I wanted to see if I could get abatement applications stamped at Ms. Kleiner's office. She welcomed me along. Did not ask if I has an appointment. It was 9:20 am and Ms. Kleiner's office was locked and closed. I headed to the Mayor's office to see if someone could tell me where some assessing people have been moved to. The Mayor's office was locked and all lights were off. I headed to the third floor to the legal office to see if the new RTK coordinator could help me with the abatement issue. I have been trying to communicate with him by email and calling to see if he would meet with me to discuss abatement applications and the process. In three weeks, he had not responded to emails or phone calls.

I knocked on the door and a young woman answered and I asked if Attorney Neumann was in. She would not answer and said I needed an appointment. I told her I have tried to get one, but he will not

**EXHIBIT 3 ORTOLANO**
RLM———5/8/24

NPD_LO_001538



conference room. He said I was trespassing and had to leave the office. I explained that I was just looking for help on filing abatements and reviewing applications. He repeatedly said I was breaking the law and trespassing. I said I would no leave until I had some answers.

They called Risk Management to have me removed, but I would not go with them. I sat down on the floor against a wall by a door. I said that I was just going to sit there until someone provided me with information. Five armed police officers showed up to ask me to leave the office. Of course, I said yes, I wasn't looking for a hostile exchange, just a peaceful protest.

Attorney Leonard showed up as I was sitting on the floor and escalated the situation. She claimed that I was looking in her office. Her office door was open and I was just sitting on the floor against the only wall away from the clerk and Attorney Neumann. I was not spying by looking in her office, she left door open. She then claimed that i was hostile and that she felt threatened and intimidated. I am an almost 60 year old woman sitting on the floor looking up at her and she found that to be a threatening, hostile posture. She kept repeating how threatened she felt. She then opened the window because she did not know my covid exposure. I was wearing a mask and would never come to City Hall if I thought I had any exposure risk.

Interestingly enough, two weeks ago the legal office invited me to city hall to review documents for many hours at time with a legal assistant present. They didn't ask me to take a COVID test for that event. Now, suddenly, Attorney Leonard is frantic about COVID cooties.

The police explained that I had trespassed and ban me from City Hall for 1 year. If I enter City Hall I MAY be arrested. They did not say I would be arrested. They told me that I need to schedule an appointment; I explained how frustrating and futile this is as the city will not respond to my questions or my requests to meet to discuss matters. By the way, the City website does not say that you need an appointment to go into the legal office.

I refuse to be thrown out of a public building. This is wrong. The way our government is treating its Citizen is a travesty. I am not some barbarian at the gate. I am a citizen requesting help.I am almost 60 years old and I have never had a speeding ticket, and it was never on my bucket list to be arrested, but I refuse to allow the City to tell me I am trespassing when I enter City Hall. A pox to Attorney Neumann and Attorney Celia Leonard and all those city leaders who violate our rights.

 124                                                                                  336 Comments

Like

Top Comments 

An admin turned off commenting for this post.

NPD_LO_001539