**Board of Aldermen Meeting, Wednesday September 12, 2018**

**https://www.youtube.com/watch?v=ohFdpx90Vm4**

**42:00**

Laurie Ortolano "41 Berkeley Street. Thank you for having community input. I wanted to talk a little bit to you about concerns I have with practices in the assessing office. I came to Nashua about 5 years ago and I became concerned after a few things with my tax bill about permits not being captured in the City. I came from a town that I served on as an elected official for about 8 years and where permits were always captured when work was done. I started to recognize that wasn't happening here, and started calling into the Assessor's Office and could not really get anywhere. I elevated my concerns to other offices and was unable to make a connection. When the appraisal data came out from KRT a few weeks ago, my husband and I are both engineers and I worked as an analysist for Westinghouse as an engineer for many years. We are both data driven people so we grabbed that KRT data base and we punched for about 30 hours on that data base and converted it from a PDF file into an excel file and captured a lot of records. We cross-checked a lot of data and started looking at some neighborhoods. I became very concerned and then came into City Hall a couple of weeks ago to the permitting department and did some investigating, went upstairs to the Assessor's Office, had a discussion with two of the assessors there, raised many red flags and started a bit of a stir. I know Counsel Steve Bolton has been very helpful since Monday, I have spoken to him and he has been wonderfully receptive and I am very appreciative and you should all be thankful you have such strong legal counsel and I am too that helps with the management of our City. Patricia Klee has been a wonderful Alderman for me because she is a smart lady who understands data and that has been super for me. But I think some people within your office are not as data oriented and I think your Assessor's Office, it's just critical that the integrity of that office be solid. They create the equalization within which we all pay and contribute to the budget or the money for this City. It has to be done fairly and equitably. So the permitting is a huge issue for me. I have certainly have uncovered I'm going to say 40 permits cases of significant amounts of money not captured that I questioned and the City is looking into it, the Mayor's Office and now the counsel are looking into this. The second thing and I am opposed to this is the use of MLS verifications on properties that change property assessments. I came from a town that did not do this practice, we do here in the City, the problem that I have is that these MLS verifications are being done randomly and not to all homes sold. So when you target certain homes and you don't do it to others, you create big discrepancies and this is where your disproportionate assessments occur. And I have had, I must tell you as Aldermen, some difficulty in communicating with City Hall- that we shouldn't be talking about our tax rate oh Mrs. Ortolano your taxes are going down. That is immaterial. What is so important to all of us is the assessment because it is that assessment data that sets the equity and determines what we all should fairly pay. The reason we have an appeal process in this City on appraisals and assessment data is because of that equity. I do not get to come over and complain once you set the tax rate. That's the end. You have good questions about KRT, I think it is a difficult process. My husband and I have talked to them, awesome, there were many people from my neighborhood that came in, but I don't think the City has done a good job or the letter is particularly helpful in knowing how to present data and I think Mr. Mayor has over-simplified what you need to do to go in there. We were certainly confused and we are two educated people and I don't know, I'm not even certain we presented ourselves correctly. That's that.

DRAFT

"My concerns with this Assessor's Office run deep and it has been four years of significant frustration from me of trying to get through to people and I am really thankful that this assessment data came out. I am completely opposed to accepting KRT's assessment in the City or appraisals, because you are creating significant disproportionate assessments because of the poor practices in your assessor's office. I have run a lot of data to get to try to get to this. So I am just sharing that with you and I want to put it on the record. It has been very challenging working with my City element and some people like I said Patricia Klee was wonderful, Steve Bolton understood the questions to ask. And I am appreciative of that but I think we have a ways to go. Thank you."

**Regular Board of Aldermen Meeting, Tuesday, October 23, 2018**

**https://www.youtube.com/watch?v=GWSl9VIA_PA**

**19:26**

Laurie Ortolano "41 Berkeley Street, Nashua, NH. Thank you for the input. I was here six weeks ago talking about the assessing office and some concerns I had. My concerns continue to grow a bit, I had an opportunity to look more deeply into sales verifications that we do in the City and it was Trish Klee who pointed out that I wasn't using a code correctly in the first round of data I generated. I did not go after 100 records on sales verification, but I just recently finished my 100 record gathering. The information is just very concerning, what I see. I'd like to think that the Assessing Office is working to create equity in these assessments for everybody. But what I am seeing and what I found most disturbing is that valuations or sales data that comes in at a sales price, if the assessment is higher than the price that the home sold for, I believe that in 100% of those cases, the Assessing Office will not reduce the assessment. It just stays high. If it is 25% out, it stays $50, $60, $70 grand above it; no adjustment. I printed every property card; I have all 100 trying to look at the notes to see what is the justification. I can't find it. On the flip side, if an evaluation is low and let's say it is at 60% of the sale value, the assessment or 70%, they are willing to move those up and many of them they only move up to 80/85. That seemed to be the general number. But if you are at 95, 100, 105, 110, 125, 130, those are staying. So what it tells me is that they are not looking to create equity in the data base for all of the tax payers. I don't understand why, because changing valuations that are simply too high, it is the same pot. You are just redistributing to get neighborhoods equitable. So that stood out glaring to me and that was really a disturbing piece of information on sales verifying. And also, I could not track a pattern like if you… 2013 was an assessment year, if you bought your house in 2013/2014 and everything had been equalized to 94% and did they take the home value if it sold that year and bring it to 94%, because that was the equalized ratio? No they didn't; they did some, they did us at 97 but they left other homes at 85, 82, you know, $100,000.00 differences. In neighborhoods that you know down in Tanglewood, nice neighborhoods, big variations. So I could not understand what was going on. I want you to know that I wrote a letter, I sent an e-mail into the Assessing Office more than a month ago, maybe 5 weeks ago, asking for what the MLS policy was and how are they using this sales information to adjust the data base. I was never able to get a response. I also asked them if they had policies in general that they could provide me in an e-mail; I was never able to get a response. Last week your CFO gave a response to a Union Leader article that we have policies in place for the capturing of permits and updating the cards using our mass appraisal system. That prompted a number of us in my neighborhood to go to the Assessor's Office and to call in and say, "We'd like copies of your policies". As it turned out, there are no policies. I was flat out told, we really





DRAFT

don't have them. What they have is a task list in everyone's computer that tells them what to do. I called the Chief Assessor out and asked if he was available and he came out. I said "Hey, I want your policies, your boss has said you have got policies, this is what I have been looking for, I want the policies". He really didn't know what I wanted, he said, "We really don't have policies". I think it was on a Saturday, this was a Friday I was in there, I got an e-mail back from him and he sent me two punch lists basically out of two of the ladies in the front office's computers that tell them what to do when they get a permit; go into WebPro, push this button, enter this data, look to see if it has value. If it has value, send it over to Gary. So it is a task list, that's not a policy. When I look at your Board of Assessor's web site, it says "The Board of Assessor's responsibilities include reviewing the Assessment Department's policies for compliance with statutes". I agree with that, I'd love to find the policies, because I really believe a big part of your problem in that office is not having any policies. It has made my life very difficult. I've had some people in City Hall be very critical of the data I produced telling me it wasn't truthful and, in fact, I have been very open with my data and if I have a mistake in my data, Trish called me up and said, "Oh you have got to look at the 8 in the verify column, that means MLS verified". I had to go to Alderman to figure that out. Nobody in the Assessing Department could tell me that for the time I'm there, when I send an e-mail so I could understand it? I care about my data, you really all have to stay to yourself, what would this lady's purpose be in producing a whole bunch of lies and throwing it out there, why would she do that? I wouldn't. I wouldn't do that to myself and I wouldn't waste your time either. One thing that really bothered me when I moved in here and my assessment got raised, I received a letter in January from the City letting me know it happened and it was going up $229,000.00 and I had until July to pay the bill. I discovered looking through all your cards that I was the only one that I can find given a letter. And, in fact, in the Assessing Office, they said "We don't tell people when we do this, we just send them their tax bill and if it goes up five grand, they get it and they've got a month to pay, come up with the money or else". I was shocked and I kind of resent living on Berkeley Street and being picked to be given a letter, if it was because I was special or in a high priced neighborhood, I deserved it. I'd like to be treated like everyone in this City and I think every person in this City deserves to receive a letter if their assessments are changing by massive valuations that really cause hardship when you get that information and you've got four weeks to come up with the money. I find that it has been very much an obstructionist process for me and City Hall. The ladies in the front office of the Assessor's Office are great. They really are, they are really great, but when you get to the Assessing point it really falls apart with finding anything that makes sense. We had a house on Berkeley Street that was kind of an interesting situation that had a fire and the assessment was very, very low. I knew that wouldn't be the only property I found; I managed to find several others that fit in that profile that speak to practices that I just feel have no place in an Assessing Office. So that deeply disturbs me and it is pretty disappointing. I have to tell you that there were days I came into City Hall and went down to permits and I was sick to my stomach, I was nauseous. And I've had nights where I got out of bed at 2:00 in the morning, put on coffee, looked at my data and said, "Is this even possible, am I even seeing it right". It was so mind-blowing to me. And the whole permit thing, I understand that permits have different values, I really do. I don't want you to trivialize that I don't understand that if $100,000.00 permit is pulled your assessment doesn't go up 100K. But let me tell you that when I see $100,000.00 permit and I see no change in the assessment, that's a red flag to me. I've been down in permits and I have pulled a lot of the records. I have photographed them all in my phone and I am telling you, I am seeing valuations that are so ridiculously big on permits, that don't show up in the assessment. I see one permit was for $100,000.00 in 2013, 2011/2012/13 assessed that shows no valuation and my neighbor next door gets

DRAFT

hit for a bathroom, kitchen and basement reno and his assessment goes up $200,000.00. I have never seen anything like that anywhere, ok? And the same $100,000.00 permit for bathrooms, kitchen, you know, cabinetry, extensive remodel generates nothing. I don't know what to say to that. I don't know how to make heads or tails out of that. It has just been really disappointing and I feel like we are not doing what we should be doing for the citizens in this City. I don't think we treat the young people who come in here well. I took two simple files for garages and pools. Let's look at 4 garages, let's look at 4 swimming pools, it is crazy. A double garage with an upstairs, huge build on attached to a house that had no garage, changed the assessment $7K. That's so ridiculously low it is mind-boggling. The young couple with a baby that moves in from Georgia tears down an existing garage, puts up a new one and pays $10K, but the garage was already there and it was detached, it is not an attached. So the assessment for the garage was in there, they had to pay for a grade change because it was new. That raised their assessment $10K. Then I go over to a wealthy neighborhood with 1,000 square foot garage put on that I can only see assessed for $3,000 bucks. I mean pools, in general pools run about $20 to $24K. Then you go to a wealthy neighborhood and a $95,000.00 pool isn't taxed. I don't know what to say to that except it is disturbing. I don't know what you can do about this though I don't know if a Board of Aldermen can participate in policy development. But for me, from what I've seen, for what is in my head, I would shut down all Assessing in that office, no assessing until we have policies. Keep them running, but there will be no assessing done until we have policies in place. Because I don't see how you work, I just can't for the life of me understand how you are establishing equity here in the City. And I wish I could. I am meeting with John Griffin on Thursday and I will have a chance to talk to him. I am really disappointed with the Mayor, I feel you have been extremely harsh with me about my data and not being truthful. I think what disappoints me most about the City is there has been such an effort to discredit the individual rather than address the issue and it is not a political issue. This has been going on for 10 years. I am looking at 10 years of data, this has been going on a long time. So it transcends any one Mayor, any group of Aldermen; it's just the way it has been. I think we should address it as an issue and not a political issue. It has been a little tiring to be discredited as an individual rather than be treated with somebody that you want to address the issue. Thank you.

**Regular Board of Aldermen Meeting, Tuesday, November 13, 2018**

**https://www.youtube.com/watch?v=t5Tv3PK-C78**

**53:00**

Lori Ortolano "41 Berkeley Street. Nice to see you all. I wanted to speak to the comments that the Mayor made regarding the report that John Griffin put together and I appreciate him providing this to all of us. I had the chance to talk to Chuck Reese up at DRA and the document here provided does show out of the properties looked at, all of the properties 3 were permitted. The one thing that Chuck made clear to me is their sample is not very statistically significant. They pool together a lot of qualities that they are looking at into a single pull on permits. When I asked "why" he said, "because are so short staffed, we just don't have the manpower to send around town to town to do samples that are more significant". So we can pat ourselves on the back because we have a great score, but when we are looking at permitted data like I am looking at, I see 3 permits here in the data pulled and that isn't very statistically significant for permit issues. I think if I had come to you and said I found 3 permits looking at 100 that weren't correct and I was concluding that we had a problem, you would all tell me to take a hike

DRAFT

because it just wasn't enough data. I looked at 100 and found many more issues and to let you know last week I pulled another 100 and I spent part of the weekend reviewing those and the data is equally concerning. So I am trying to make certain that I have a sample that is statistically significant and that is why in fact I went back and looked at sales data to the tune of 100 points. That is just a little food for thought there. When it comes to these assessments and the tax bills that just went out and the concerns that we have, one of the concerns that I carry is that the reaction of management within City Hall isn't what I expect for what we see with these new assessments. I think from the beginning when I saw KRT's data and I saw so many properties that went up 40%, 50%, 60% or 100%, I felt outraged. I mean my gut reaction was this is just not right. I've heard people speak, administrators, leaders with "you know the people who experienced these hikes they are just not going to be happy". I think we should all be unhappy with that data because that is part of the problem. Why has there been growth over the last 5 years on the order of 25%, we assessed in 2013 and now we have properties that are 100% out. What is creating these gaps and why do we have such wide variability and what are we going to do to try to prevent this from happening in the future. I know that part of the gap is caused by how we handle new sales, how we handle sales when we do an assessment, how we handle the capture of MLS data when we use those pictures to try and prove the property cards and bring them up to better valuation and how we are capturing these permits; where this data is coming from as far as the calculation of the permits to determine valuation when we change those cards. They all play a factor. What you find is that the sales data seems to be the strongest data to work with, it makes total sense, it is what our assessor KRT uses, it is what we try to use. The sales data is the hard data. But what happens is if you are one of those homes that has pulled permits, even had the permits captured, the valuation or not had permits captured, the valuation on the permits is so low that you end up sliding down and staying in the low level valuations for long periods of time and a house that sells gets corrected usually pretty well, certainly when it is used in the sales cycle, it is up there nice and high with the sales data where it sold at and all of these other homes tend to be sleepers. We are not closing the gap, we are not catching up on these homes that are under permit work and using the MLS verification data. They are just staying too low. We have had some exchanges, I have had with Steve and I know the City Counsel put a quote in the paper about the complexities of all this stuff. I think it is not as complicated for what is going on in the City as we may want to think it is. My observations in the Assessing Office is you have an attendance issue. You have to have a manager who is at work, it just has to happen. And that is a big issue, I'm aware of it and I am pretty certain that management is aware of it. Somebody has got to be at the helm. The other issue is not all assessors are experienced equally. We have some seasoned assessors and we have some assessors that are very new at this, I'm talking just a couple of years. My observation when I look at these property cards is a younger assessor is struggling to make the right decisions and there doesn't appear to be any oversight to assist in that. One case of that I can share with you happens to be a house in my neighborhood that has been under probably 6 or 7 permits in the last 8 years. The owner is very wise to never let the assessor in, to deny entry all the time. The house has slid under value tremendously. It is probably $150,000.00 under value; when the less experienced assessor goes to the home to try and get in and is denied, the homeowner simply says, "Just to let you know my kitchen now is average, no longer good and the bathroom I did 4 years ago is no longer good it is average, and everything should be changed to average". And the assessor changes all the data to average. Why are we doing that? The property owner should not be standing at the door telling the assessor what grade to put on their stuff, otherwise, we can all just send our card in with a mark up and say, "here is how we view it, here's what it is going to be". That is a problem and that is just an experience problem. The same

assessor visited an expensive property and the owner said, "I'm valued too high I just think I need to come down" and the assessor said, "Sure I agree" wrote in the notes, "I took him down", took him down pretty good. KRT rolls in the next year, this was 2017, takes them up a couple hundred thousand, I don't think down was the way it needed to go at all. But nobody is reviewing that either, that is a problem. That assessor is visiting homes where if they don't get in or get a response at all, they are closing the permit, walking away and assigning no value at all. That is what creates these issues with permits when it comes to equalizing out their valuations. We clearly are struggling with that. The other thing I did this weekend and what I hadn't thought about, all this MLS data that is on-line, I started realizing I can go and pull up pictures of houses and I can actually see what the kitchens and the bathrooms look like. I can lay out pictures and look at the property cards and say, "what did the assessor rate that as". And I can tell you I pulled up 3 kitchens in my neighborhood, one a 1970 linoleum Formica kitchen, pretty disastrous, really needed a lot of work, got an average rating. The house next to it was a 2005 kitchen, very open, nice countertop, white cabinetry, pretty nice-looking kitchen got an average rating. The third kitchen is a flipping, drop-dead gorgeous granite counter top, custom cabinet, double sink, double oven, it got an average rating too. It is all the same assessor. So I am now looking at pictures going, "What does it take, what are the guidelines in there". I did the same with bathrooms. I'd find a beautiful tiled bathroom, double sink, very lovely, gets an average rating. I find a bathroom that almost looks identical gets an excellent. Ok, that all goes on the card and it is supposed to make a difference in valuation but I'm finding in general that bathrooms and kitchens and basements can raise valuations when you are looking at permits by $3,000.00. Well on a $400,000.00 why are we even bothering to waste our time at that, you are talking about raising the assessment $60.00. Really when you got out and sell that house, you are finding the valuations are much higher. That is where the people who are actually involved in a sale are paying so much more and we are just missing it. My husband and I spent a lot of time two and a half weeks ago looking at property cards. There is something not right in the software in our opinion. It just, the yard items will be on the back of the card and when you flip it over many cards, the yard items are not getting into the assessment at the value that is on the back of the card by a lot. I don't know why. Some of them go on, a lot of them don't. I just don't understand it. Then the parameters within the database, I don't know if it is because we haven't calibrated that software in a long time. I don't know if it is because we haven't changed tables out in a long time. I still don't have answers and I don't understand how permits are captured. There is just no documentation on it and I'm learning today that it is something that I might have to access under Right to Know. I have to use an attorney to do that because I don't know how to ask the questions. But also it is quite possible that how permits are used, is not available for the public to know. It seems silly and it seems like we should be able to know that but it is possible it isn't. So all I can tell you is what we see and I printed $400.00 of permit cards, I've got 400 cards now. I'm looking at a good sample size and they just don't make a lot of sense. It is just you know disturbing and I think somehow we have to figure out what are the ways that we can do things better to treat these properties more equally. The lack of policy and procedure, in my opinion, is a huge problem. Not having a readable card for the public to understand their property card is very difficult. And not having anyone in the assessor's office who can explain it, they don't know what all those variables are. And somehow I think when you punch in the buttons those variables are playing part of the role. The rating of fixtures, you know I'd love to see the abating process in this city include not just sales data but comparable in your neighborhood. Because you are going to find when you use comparable in your neighborhood – my husband and I looked at comparable in our neighborhood that fly under the radar, very comparable to our house. But they have just never been brought up; well when we compare

DRAFT

ourselves we are, the price of our home would be around $500,000.00 to $510,000.00 on the rating with equal houses in our neighborhood. And I mean really good comparisons, if I use sales data I'm going to come in closer to $570 or $580. And probably with a dispute in abating trying to make it higher, that's a big difference, $70,000.00 at $21.00 is $1,400.00 a year plus the increase you get in your taxes over 5 years, I'm talking $8,000.00, $9,000.00 difference potentially that I'm going to be paying because I bought the house 5 years ago and was sales adjusted. And the house that is sitting there for 15 years our 20 years has pulled permits, stayed low, not captured, is down in the mud. They can't catch up to me and I can't down to them, I can't get there, that's the problem. And that is what frustrates the public, I think. We just really need to do a better job and I think there has been a real lack of transparency. It has been a really grueling process. The other thing I want to let you know, you shouldn't have to come forward with an issue and have your reputation suffer so much as much as my husband's and my reputation suffered. When we addressed these issues and put our package together for KRT we always took the position that we wanted our valuation lowered to meet the expectations of our neighbors. We used comparable in our neighborhood. We never requested that you raise people's assessments; we requested that we just be brought in line with our neighborhood. Unknown to me when KRT decided to do a second and a third view of Berkeley Street, Berkley Street got reviewed 3 times. We were not aware of that and it was only Berkeley Street that took this second and third view. A handful of homes, I'm going to say 10 properties were changed, 6 were raised again, some of them pretty high. Steve had mentioned to me when I spoke to him that he had fully expected people to be calling him pretty upset. One of the homes went up an additional $200,000.00. When the letter came out to the homeowners the second round, who none of them knew this was happening, there wasn't much of an explanation on why this happened. What do you mean. And they, of course, were no longer to meet with KRT the process was done. You are in abating now. Some of them never went forward because they didn't have a problem and then all of a sudden the second round, their assessments went up 15%. So that had no avenue and people were upset and I really believe that the City would hang that on me. I said to two of my friends, call into the assessor's office ask them what happened and they were going to call anyway. I said, "please find out what happened, ask them what happened". And the message that was given was someone on your street complained, and these assessments were raised. And I was in the house of one of the people when the call was made and I just think that it is really unacceptable for your assessing office to have that script for any of their staff to use. It shows me how unwilling they are to accept responsibility for what is going on in there. You hang it on the public instead of saying "Hey, we've got some issues over here, we've had some valuations get of whack, we've made some mistakes and we are trying to correct them". My husband and I took a blasting call at 10:00 at night from a neighbor over that phone call. And I just feel that that wasn't handled correct and I've seen that happen to us before. So I think we can work on how we treat people who come forward with a concern. It just shouldn't torch your reputation. Thank you.

**Board of Assessors November 15, 2018**

**8:30 – Ms. Laurie Ortolano – regarding procedures in Assessing – No VIDEO LINK**

Mr. Dominic D'Antoni began by introducing the board members to Ms. Ortolano and advised that each member of the board has received the material she submitted for their review. Ms. Ortolano began by saying that she and her husband have concerns there is a real lack of policy and procedure and that



DRAFT

really reflects what information the public is allowed to know on how this office operates. There was an article that ran in the Union Leader (October 10, 2018) which stated that Mr. John Griffin, the City of Nashua's Chief Financial Officer, made a statement that the City of Nashua has written policies in place for using the mass appraisal system. Since that article ran, she said she has been requesting Mr. Jon Duhamel, the Chief Assessor, give her a copy of these and has gotten no response to her request. She came into the office and asked staff for a copy and they looked at her like she has two heads and said we have no policies here. On a Friday evening Mr. Duhamel sent her two procedures that were the office ladies' procedures on entering permits into the system. She said her question is what is going on behind the front office when you get to management and assessors? How are they valuing these permits? She is seeing huge variations. She said she also has a big issue also with the printing costs of $1 per property card. She has spent over $500 and it tells a story of a not so controlled office. She advised she is now working with a lawyer. She received an email from (City Counsel) Steve Bolton that says they are not required to give me anything that is not in writing. She said she thought well, how convenient when you do not have anything in writing. She said she is 'coming out swinging' and will keep on going. It is not fair to the public. Taxpayers do not stand a chance going in there with an abatement. She said she read a set of minutes where a representative from KRT Appraisal said we have not been in some houses since 1991. She does not think there is an assessor in city hall who knows how to value the properties on Berkeley Street. She told the board she gave them a spreadsheet of forty properties out of 55 that have not been measured or data verified since 1991 and when someone new moves in like they did, you use MLS and take them to the moon. She said they had their assessment go up $230,000 and all of these other properties are not even looked at. She talked with a representative from KRT Appraisal and he said they were doing drive-bys only and he also said this is a case of sales chasing. We have a problem here. She asked the representative from KRT how he knows that and he said he has been a victim of this by his assessing department. He said his assessment was changed when he purchased his home and he felt it was sales chasing and brought this to their attention and his assessment was adjusted back to what it should have been. Ms. Ortolano said she did bring it to her assessing department's attention and they told her the assessment is correct and this is where you should be. She came in and printed the property record card and asked if they capture permits and they said 'oh yeah' we updated this year so she thought she was covered. She got a letter on 1/17/14 notifying her that her assessment again went up. She found out the assessing department does this to other people and no letter is sent to some. After receiving the letter she called the office and an assessor came out. While he was still in the house he just took his pen and crossed out $707,300 and hand wrote in $699,400. How did he know it was $699,400 to right there make the change. I thought there would be $80,000 in changes or maybe even $100,000 but $6,000? So KRT comes in and says some of these properties have not been inspected by the assessing department since 1991. They say is it because we are not getting permitted work. She says she does not think so because there have been so many permits pulled and they are getting closed without visits. They stay in the office and look at the drawings and do not visit the property. Ms. Ortolano then went through some permits comparing the amounts added to those assessments and said they are absurd. (As an attachment to these minutes is a chart provided by Ms. Ortolano entitled 'Berkeley Street Permit Capture 2010 forward'). Ms. Ortolano continued and mentioned a property where the owner let the assessor in and they still do not assess. The assessor went out in 2017 and $0 was added to the value. She talked to the owner and was told he came in and looked and said everything is already excellent on the card but after she looked at the property record card saw everything on the card actually says average. Everything that was built in 2000 or earlier has an



DRAFT

effective year built (EYB) of 1969! Her EYB got jacked up to 1995! Regarding Mr. Duhamel, she said she is 'gunning for his job'. His attendance is horrible! He is not at work enough to justify his position. She said another thing is the city does not value land like other communities do. She has a third of an acre and the difference in the land assessment between her lot and her neighbor with an acre of land is maybe $10,000. They cranked up the valuation of land in the Tanglewood area but land is undervalued in her area. It is almost a waste of time to have them type it in. She told the board that she and her husband have owned properties for 30 years and have always pulled a permit for all work done. They own a house up at the lake and the assessor was at their house within a month to six weeks after they pulled a permit. Her assumption here was that is what Nashua does too. She never expected they do not value. She said she does not understand why a house sells and it is $100,000 difference in the assessed value. How did it happen that the Ortolanos' property went up so much? They do not have any standard procedure on how to determine 'average' or 'fair', etc. This same assessor uses MLS verification tool to update data. This is a good tool if used correctly but in this case it is like giving a 14 year old the keys to the car. They are not looking for equity and she does not see why. It is the same pot of money when the tax rate is set. Ms. Ortolano mentioned a lot of examples where the disparity in how these are rated is obvious and said there have been times that the assessor has not even officially visited houses to make these changes.

Two assessors spoke to her and she asked how they got her at $699,400 when other properties are so low. Regarding the owner of one of these low properties, he said I am very good friends with that guy and he goes there all the time. She asked him 'so that is your friend's deal'? That property has had 6 office visits from the assessor's office. The most visits of any home on Berkeley St. Every time they went out there they did not make any change to the property.

The assessor knocks $100K off and sets the assessment at $243,000 because it is being rebuilt and the EYB is 1955. None of that was changed and the assessment is set at $434,000 in 2013. A month later they shave $103,000 off the property. What kills me is the assessor sets his friend's house low and then comes to her and says that her assessment is reasonable. Mr. Robert Earley asked why KRT went go out a second time to one property and Ms. Ortolano advised the city told them that someone on your street complained. She said 'what is that?'

Mr. D'Antoni asked what she paid for her house and Ms. Ortolano answered $725,000 and said they really overpaid. The assessing department took it to 98% but they paid cash. The assessment was $699,400 and then reduced $6K originally and again took it down another $18K. She told the board that the very experienced assessor should have seen that they had overpaid for that house. Properties in the Tanglewood area sold for $650,000 and they were not adjusted for sale price during a city-wide assessment update. She told the board that the State of New Hampshire Assessing Standards Board (ASB) manual for 2014 has a section on sales-chasing. Ms. Ortolano read the section from the ASB equalization manual adopted by ASB in 2013.

Mr. D'Antoni asked if she feels to some extent her concerns have been addressed because her assessment was reduced and she answered no and said she doesn't feel the city has been receptive to recognizing there are a lot of problems going on in there. She does not think the software is working correctly. Mr. D'Antoni said he thinks they can agree that a building permit doesn't reflect market value. Ms. Ortolano said she agrees but the assessment should reflect market value. The assessor should

DRAFT

figure out what the market value is with regard to that permit. The people who purchase a house are constantly being assessed higher than people that have been here a long time.

Mr. D'Antoni told Ms. Ortolano she has done a fantastic job. He asked her if she has thought of filing an abatement. She answered yes, we are going to file one now. He explained that by doing that she will have a concrete foundation. Ms. Ortolano told the board that her appraiser said it does look like she got sale chased. The appraiser told her this would be a silly case to take to court. She asked if the board of assessors has to see abatements. Mr. D'Antoni advised the process starts there with the assessor and his recommendation is presented to the board and after they give their decision then it is up to the home owner to go to the BTLA or Superior Court. Mr. D'Antoni said sales are concrete and anything short of that is just an opinion. She said that's the problem. If an abatement was filed four years ago she would have lost because the data is corrupt.

Mr. D'Antoni asked did she see any positive things in her discoveries and she answered yes, they keep pools high pretty effectively. They missed a $90,000 pool on Indian Rock Road.

They have pools so high and the garages are valued so low. When someone pulls a $25,000 permit for a garage and that adds only $3K to the assessment there is something wrong. She is finding some are assessed at $20K. How is that happening? What factors are being taken into consideration in the software.

Mr. Earley asked Ms. Ortolano what price was her property originally listed at and she replied $825,000. It sat for 6 months at $825,000 and it had no offers. In this north end of the city you have robberies, crime, homeless people and things that areas like Tanglewood do not have. She said she woke up one morning to a person sleeping under the bush. She said she has a lawyer and will also hire an appraiser if she has to. She and her husband asked for an appointment to speak to Mr. Duhamel and they did not get one. Her neighbor got one in three days. She told the board she would like them to do whatever they can do regarding policy. She has read this board is in charge of policy. Mr. D'Antoni told her that since 1986 all assessors in the State of NH are under the Commissioner of the Department of Revenue of the State of NH. It is that department who approves the tax rate, so they are pretty much in control of the assessments

Ms. Ortolano left the meeting at 10 AM.

**Regular Board of Aldermen Meeting, Tuesday, November 27, 2018**

**https://www.youtube.com/watch?v=k6GhyQM47bY**

**29:46**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Good evening, I wanted to share a little more information with you looking at some of the assessment data. We had the opportunity over the Holiday weekend to get ahold of KRT's data base in a form that we could actually look at and manipulate. It would be my request to the Aldermen that in the future if we do and when we do another assessment that we could look at the possibility of having that type of data that KRT provided in PDF form which was basic and did not include a lot of the fields, be provided to the public to in Excel or a readable form so that we can, as the public, work with that data to kind of see what went on in our neighborhoods and get what we need to get. It would be so easy to put it out that way and it does not have the level of data

that the Nashua system would have in case we are concerned about manipulations or privacy; but it would make it so much easier for us to look at our neighborhoods and to make comparisons to streets and properties around Nashua.

"In the process of really looking at the data we started wondering why we didn't get a report from KRT, we paid them what seemed to be almost half a million dollars to do an assessment for us. Next week I will be going into City Hall under the RSA request that my attorney wrote to look into some of the documents that the City is putting together and one of them was KRT correspondence. I don't know if there is a report from KRT that summarized what they saw when they did their assessment or what the distribution was. We hear the Mayor tell us tonight that the average increase was 23% or 24%, we came up with 26% in our data base, so you know, you always worry when you transfer data base that you didn't get it all as clean as you want or you know, it is a lot of work to bring one in. We had other residents in Nashua that worked on it and put it together, so it wasn't us doing it alone. It certainly would be nice if the professionals through KRT would give us that data clean and we would be able to know for certain if we are correct, but we are in the right ballpark. It just seems that we missed a great opportunity hiring a company and paying as much as we did if we did not get a report to look at what happened in our community when it came to assessing, where we hit these pitfalls and take this data and have our assessing office use it to make improvements in the process by which they are assessing. There clearly is room for improvements.

"I think when you look at the history of the last ten years, we came out of 2008 which was a nightmare, had to be a nightmare for all assessing offices. The crash of the real estate market was tremendously difficult; and in 2010 they did a reassessment that was not an easy task; 2013 they did a reassessment. My observation of that, because it is on the data cards is that we over-corrected, heavily. I know in my neighborhood, they cut houses $100,000.00 which was in some instances 25%, it was just so steep, when the equalized ratio in 2010 was 1.1.

"So I noticed we went up streets and gave $30,000.00 discounts to every home, whether it was worth $200,000.00 or it was worth $300,000.00, it wasn't percentage based. It was just a single swoop cut and I think that led to part of the problem in this assessment cycle. We found condo units that had been dropped from $120,000.00 to $70,000.00 in 2013 that are now up to $130,000.00 from KRT coming in 2018. So it was a total boomerang process for the people in those communities. I am disappointed that the assessing office and our chair or our manager didn't say, "Hey we need to get a report. Give us the distributions." That KRT data base is listed by Ward, every Alderman could have had a Ward report, really simple to run, to know what happened in my Ward? What was the increase, where are the problem areas? Who might I be hearing from? How simple would that be?

"And then we would get to work in the communities and neighborhoods that are messed up and we would be putting some extra focus time into those areas to correct it, because there is a lot corrective work that needs to be done. I was out in my neighborhood today walking a dog and got stopped from two people from the other end that had gotten their tax bills and one guy put the spread sheet together. He knew I was the person being public and he was like, "Oh my god, what happened to my house, how did this happen, how did I go from the 300's to the upper 500's, what happened in a week when all this changed over". It is hard for people to understand. And then they say, "Well I looked down the street and there are a whole bunch of houses in the 300's, we are all over the map over here, what happened". I know, yes I understand that, it is a problem. It all has to do, I did meet with the Board of Assessors, it





DRAFT

was a good meeting. It has to do with how we capture our permits and how we handle our MLS data in-between assessing cycles.

"It is abundantly clear to me that we do not value renovations and home improvements the way that the sales market tells you we should value it. We are undervaluing grossly, I mean it is ridiculous. All assessors, all good assessors will tell you, it is all about the sales data. This business is about the sales data and that is why when we abate, we only allow people to come in, working off of sales data. We don't allow them to use comps that are not sales based because the sales data is the hard data. It makes perfect sense, I understand that. But the assessors should be operating on that sales data too. Every time they look at a property they need to be asking themselves, what will this property bring in a market sale? What would it bring when they look at these improvements. I am finding lots of permits for home renovations, major home renovations, that bring $10, $15, $20, $30K to the property when they assess it.

"Then when I look at the sales data and I looked at substantial homes that sold – when you look at a house that undergoes a home renovation, you are getting between, in neighborhoods all over Nashua, especially for the homes in the high 200's or 300 range, when they completely renovate that house I could show you 10 sales that the house popped $180,000.00 to $200,000 to $225,000.00. They are hot and they go and there's a lot of data to support that. It is right in our neighborhood and that is one the reasons when I looked at your permit that I was concerned, Mr. Mayor, because it was so under- valued for the work done and any other house, there are three or four houses right around your neighborhood that when they did that level of work, their homes sold for $150, $200,000.00 more. They really get that pop.

"I feel that we are just not principled in the office down there, that we just don't have practices in place. I was very clear with the Board of Assessors that I felt policy needed to be created. I told them that it says in the mission statement that their role is to review and make certain that the Assessing Office is compliant with their policies. Well there appear to be none, so I encourage them to perhaps encourage the Assessing Office to create some. It just seems like there should be something down there. I know that legal counsel and members of City Hall, the Mayor, are very concerned about the time that I am wasting with staff, that I have overstayed my welcome. I have to tell you it is enormously difficult for me to access this data.

"The property cards you cannot get on your computer at home, the data base that is available in the house at your home is not a clean data base and it says right on the web site that there are errors in this data and basically you can't trust it. So I can't do it from home and when I go into the Assessing Office, I can use the computer but it will not bring up the format of a property card. I can't get the data that I need, unless I print the card out. So I have to use some staff time, and I do it all myself but then it goes to the printer and they have to charge me and I pay and sort them and count them and send me on my merry way. You know, I had asked the Assessing Office for help months ago in comping our house and it was Steve Hamilton up at the DRA I had three good conversations with him. And he gave me some questions that I would be able to ask my Assessing Office for help. They were not willing to answer those questions. Their immediate was no, they are not going to help me. He said one of the things you could ask about was comps. If you are looking at your property and you are confused about, he knew the effect of your build was an issue for me we talked about this. He said, "Ask for comps". I did, so did

my assessing chief at the Lakes Region, she said, "just ask for comps, ask for help and ask them to give you comps".

"I asked John Duhamel for comps, "Could you provide me with any comps or any policies to help me understand where my house EYB fell in my neighborhood". He never responded to the e-mail. So the only way for me to understand that was to go to City Hall and print the 55 cards and pay for it. And what I learned is we were the only property that was changed aggressively when we were assessed and that was great data for me to have. We were right at the top of the list. And I wouldn't have been looking so much and so deeply into the data, I look back at the way all of this has transpired, if somebody had shown me some professional courtesy in that office, and just helped me out, had a single meeting with me, got me some data, I wouldn't have been in there digging for every property card. If the guy had come back and said, "Oh you were the only house that was hit at this level, yes, ok, that may be a question, that's the data", I would have been at least happy to know that. And I wouldn't have had to spend time down there digging like I have dug. That's the level we are at.

"I cannot emphasize enough how strongly I feel about professional courtesy in an office. You have one assessor down there who is so professional, any time I am in that office and anyone walks in and he is around and he happens to have good visibility, he will say to anyone, "Is there anything I can help you with, do you need anything"?. The women in the office are A1 professional, the Chief, not cutting it. I have never seen a more unprofessional person in my life. I have had two conversations with him and in the second conversation a couple weeks ago, only twice, I've never had a meeting with this gentleman, the second conversation I had a couple weeks ago he actually had his head facing a wall while I was talking to him. Right in front of his staff I asked him if he could turn his head and look at me while I am speaking to him, to have to ask for that is absurd. It is absurd. And the issue of not really being at work really disturbs me. You have to take that job on full-time.

"It would take very little for this management team or the Mayor's Office or the CFO to go in there and do a quick audit on what is happening with attendance and get that information pretty quickly, somebody has to care and look into it. I think a lot of our problems occurred when I called him a year ago, he wasn't willing to meet, it was a very hostile conversation, I was wrong about everything, permits are captured, sales data is done, you are wrong, you are wrong, you are wrong. And that is what got me hopping because I didn't feel I was wrong.

"'It is just really disappointing and with regard to our property card, I had another neighbor go in last week, I've had two now, they go to the professional assessor, the one I would recommend to anyone, and there's only one that I will recommend that somebody go to in that office, only one. And they had a question on the land issue on the cards, there is a bunch of neighbors who are really concerned with land valuation and the factors on the property card and I think there is a legitimate issue there. One of my neighbors has been hot on it. He went in, he got the assessor to meet with him, the assessor could not answer his questions, the assessor said, "I'll get back to you", the assessor called back three days later, he gave him an answer on the phone, my neighbor wasn't really satisfied with it, but was super appreciative that at least he got a response. That is more than we ever got in four years and we happened to be with the assessor that doesn't do that, that didn't do it from the beginning.

"I think that difference in the assessors should not exist. Even three years that should not have existed, I shouldn't have felt like I needed to get a lawyer to get RSA information. I didn't know how to word my questions to this administration without having a lawyer do it for me. I didn't know how to ask for a





DRAFT

document, because I have asked, I've asked for the qualifications of our assessors because the CFO has said they are all certified. I don't know if they are, we all here have stuff on … people walking into a doctor who isn't a doctor, we all here are being duped because we are told what the right answer is but we don't really know. I said, "Well when were they certified and what are they certified in, who are they"? No answer nobody knows, but they are, just trust them, they are.

"I want to point out one thing when it comes to assessing and assessing fairly and I told this to the Board of Assessors, when I looked at our street, on Berkeley Street, there were a lot of permits that were missed. But when I finally laid out all the permit data and I looked at what it showed, KRT came in and met with the Board of Assessors and the Board said to him, Rob Tozier, "are all these problems caused by people not pulling permits and they are doing work to their homes and we don't know about it" and Rob said, "I don't know, I'm not certain it could be the problem", right? How would he actually know and in reality when I went into the Board of Assessors, I said "Let me tell you what I see. I see lots of permits being pulled but I see the assessing people not going out to check on the permits or to close them with a visit". Tons, they are assessing at the desk off a picture.

"On Berkeley Street there were 16 out of 35 permits pulled that were never visited or looked at. And I am talking significant valuations, they didn't go and in the process of not going they missed full home renovations, major changes, because we know we cannot just trust what is written on a piece of paper on what is happening with the permit. So 16 out of 35 were just never visited or seen and about 10 of them of those permits were simply not valued, forgotten to be valued for new kitchens and stuff. That is a lot, that is a lot of missed data that creates disproportionate assessments, it is very significant. You know, I was culling through the extra hundred permit cards I printed a week ago. I am going to tell you, I just scroll through them, scroll through them, I create a spread sheet and I take a look and I hit a property card where there were 1, 2, 3, 4, 5, 6, 7, 8 permits pulled, a lot done. Three big ones and the rest were mechanical, electrical and plumbing and I said, "Oh this is a house that has a lot of work it is in my neighborhood" and then I look at the activity section and there hasn't been a measuring list since 1994 and they hadn't done a data verification since 1998. There are absolutely no visits on this card, all of that work and there isn't a visit out there. The valuations are so flipping low it is crazy, a brand new kitchen in an old home, yielded $1,500.00 on the assessment.

"When I see a card like this and this is a card that they don't go back to all the time, three big permits, no visits, no visits, no visits, you know what I do? I look at the name, who is this? It is a Board of Assessor's member, you know, do they understand how hard it is for us? That to me is a conflict and I don't like seeing that. They don't understand on the outside what is like for us if you are not having anyone come to your property or that assessing office isn't going to these properties' to capture this stuff. They are missing it on a big level so it is really disappointing. I am going to continue to work at it. I don't really care if you stonewall and I am sure that the City is going to provide nothing and I am not going to get any answers and I am going to go back to the questions I've asked and I know I won't get answers. Over time I am going to try and verify the data by going back down there and obtaining information but the only reason that I am doing that is because the City won't give you any answers and I am not going to sit back and just accept that it got taken care of or somebody looked at it. I am going to verify it. And I am going to continue to verify it. And I do everything I can, I haven't spent much time in the assessing office this week, they have been mobbed with people coming in with issues, it is a zoo in there.



DRAFT

"I have stayed out of there because I know what is going on with the tax bills. But when things calm down a little bit, I will go back and do what I need to do. I hope that you folks as Aldermen can really get onboard, I would love to see you take a vote of no confidence in that office. At least as a minimum send a message that you've to clean it up. And you've got to care, it is really tough for us on the outside and I just don't see anyone on the inside doing and making the right decisions. And when you talk about exemptions, let's talk about Concord Street, let's talk about all the communities that give exemptions to historic homes. We never talk about that and they do and there is a street that is all over the map with properties that we largely know have so much trouble selling. And I feel very badly, I don't benefit with this tax, I don't live in the historic district, I am not pushing this for me, but these folks who try to maintain those little mini-museums down there have a brutal time trying to sell those houses and maintain them. When I see assessing done on those houses that jacks it $100 or $150 or $200,000.00 above sales prices, I cringe. We should be very careful in that neighborhood on how we assess those homes. Thank you."

**Regular Board of Aldermen Meeting, Tuesday, December 11, 2018**

**https://www.youtube.com/watch?v=nNOLxgC-6nw**

**3:23:15**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Mike just gave you a nice summary of some of the details of what happened with our property. I have kind of avoided the personal nature of it but the Mayor has pushed it in that direction, so I am offering a little bit more. Mike is correct that the data has been super helpful in giving us a perspective on what happened 5 years ago. I didn't have a way of looking at properties in the range of $675 to $725 where we fell out at $700; what those properties were because I don't have that access with the data base in the City. But with the KRT data base, we were able to pull that out and there were 15 homes including ours that fell in that price range.

"When you looked at the quality of those homes and where they were and the details of them, if left us scratching our head on how did this happen to us, how did such a gross error happen to us? I am looking at properties that first of all are built between 1988 and 2005, that's the quality of the other 14 homes. Ours was a 1925 home; our acreage was .34, I'm looking at homes that are sitting on lots 1.12, 1.34, 1 acre, .08, 1 acre, 1.6, 1.2, 1.0, 1.3, 2.3, 1.8. Big lots, and I am looking at homes with square footages 5,700, 4,086, 4,045, 4,200 4,200, 4,800, 4,300, 3,700, 4,800, we are 3,342. I am looking at bathroom fixtures, 24 fixtures, 23 fixtures, 16 fixtures, we came in at 15 which was the lower end of all the bathroom fixtures. And all of these properties 1988 and above, attached garages, air conditioning all the modern features. We don't have an attached garage, we don't have air conditioning and unlike the Mayor's property, our renovations done in 2008, no wall has ever been moved, we still have all the plaster, we have all the cast iron plumbing and lead, we still have part of the old wiring. So the level of renovation that was done on our property was far less than the level of renovation done on his property. And I don't understand how it happened to us, that this happened.

"One of the things that deeply concerns me when the Mayor brought up his card, he feels that he was slandered by me, and I don't feel that was done or that I am somehow implying that as a Mayor or elected official he affected this valuation. I am not implying that. I am going to tell you that every

DRAFT

property owner that is being assessed by that Assessor's Office, whatever that number is generated by those assessors, it is on those assessors, it is never on the property owner. It is on the assessors and what they are doing in the office. I am deeply concerned about ethics and conflict of interest issues and I think it has to be addressed.

"I am deeply concerned about people who are connected people who are well known in the City getting these sweetheart deals and we look at ourselves coming in as out of towners, outside people, new to the City, and we definitely got the shaft. The neighbor next to us that moved in 2010 because of our assessment being changed, they received a letter their assessment was jacked up $200,000. Outside of the Citywide assessment period. The reason? Because the renovated the old part of their home, they renovated 2.5 bathrooms, no new bathroom was put in, they dug out and did half of the basement, they knocked down walls and they put up new drywall like the Mayor did, they put in new plumbing, new wiring and part of the kitchen was redone in the old section of the house. When the Assessing Office calculated those improvements, it was a $200,000.00 increase on their tax bill; the same level of improvement on your home resulted in a $32,000.00 increase.

"When we go down the street on Berkeley Street we have another family that moved in from the mid West, they came in, a renovation $85,000.00 done by a prior home owner resulted in a $55,000.00 increase but then the Assessing Office wasn't happy with that and they kept running the numbers and they moved that house from $400,000.00 to $615,000.00 until the homeowners screamed uncle in 2011, filed for an abatement got a reduction in 2013 and the house came down $200,000.00. We are in that situation that the other house on Berkeley Street is in. We've been 5 years with it jammed down our throat way too high and this, we are trying to get to the other side of this. I wish the Mayor had given us a chance to talk to him about this, I expect my Mayor to understand the difference between a tax bill and an assessment.

"I was very concerned at the last meeting when you were positioning yourself to say that people with young families, or we don't want to charge more than $1,000.00 for a new kitchen or $1,500.00 because of their family situation. Our property cards don't come with family photos, we have to make assessment a fair issue for everyone. What the Mayor is talking about is a progressive form of tax, we feel that we paid with the progressive tax, somebody looked at our house, our income level, the fact that we bought the house for cash and decided these people can pay out the nose. We don't want that to happen. I want to make certain that the new people coming in are treated the same as the established people. And I agree the influence of a Mayor or Alderman although the billing cycle fell when you got elected for some reason in 2011, they were supposed to come back to your property in 2012, they never came back, I don't even know if they had finished their assessment cycle. We don't know. The notes are a little messy on that card. It's not that clean. But what is interesting too with your card, your permit was opened in 2007, nobody followed up until 2011. The property card is updated on a 2010 page, but it wasn't paid for in 2010, and in 2009 was a reassessment year and your assessment was dropped $45,000.00 despite the fact that you were into all these renovations. The property at Berkeley Street that I am referring to in 2009 was raised about

"$50,000.00, they didn't get a drop because they were doing, they had done renovations and the assessing office was looking to raise it more. You got the benefit of a reduction while doing improvements because nobody knocked on the door and came out and followed up on what has happened in 2 years. You didn't even get a knock on the door. That is the difference. And we just want

it to be fair Mr. Mayor. I am not accusing you of anything, I am not accusing the card I held up with the City, the appointed position to the Board of Assessors that hadn't had anyone come to it since 1994 despite 8 permits being pulled, 3 of monetary value. It is a connected person it is a well-known person. Nobody comes, that's not what happened to us. That's not what happened to the house on our street that is a connected well-known person that got a half value assessment for reasons I understand now, a lot of bad mistakes were made on that property. That was the most heavily visited property on Berkeley Street in 5 years with 6 official visits from the Assessing Office and in 6 official visits nobody did the property card correctly. And a house equivalent to mine was assessed at $343 and we were assessed at $700,000.00. So our tax bill was $18,000.00 and our equivalent home was $8 so please understand we are just trying to get where we want to feel like we are being treated equal, we want to pay our fair share, but we want a system that recognizes that new people need to be treated like the old guard and the system has to be equitable. Thank you."

**Regular Board of Aldermen Meeting, Tuesday, January 22, 2019**

**https://www.youtube.com/watch?v=LmVITX64xSM**

**12:35**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Happy New Year and thank you to the person who is doing the right on red at Costco. I'll feel good when that is in place.

"I wanted to share a couple thoughts with you on what is going on in the Assessing Office. I have continued to do some work looking at property cards and sales data. I attended in December a Board of Assessor's meeting where Kim Kleiner and John Griffin came in and presented to the Board their approach to what was going to happen with this audit and review of the Assessing Office. I am concerned about an internal review. I don't feel that it was the best way to go with the problems that are going on in there. If you are really going to look at what is happening in the Assessing Office it is not just limited to that office; there is a chain of command. It goes to the CFO, I think there has been a big breakdown in communication between whatever connection the Assessing Office has to the next level. I think there was a pretty non-existent amount of communication and that is part of the problem.

"I think that the problem goes up to the Mayor's Office in that when the public has a concern and you don't know where to go and you call them; they don't respond. That is what happened to me last year – in 2017 when my tax bill was super high and I still consider it super high and I was paying $18,000.00 and I am still trying to resolve that. I was calling the Mayor's office saying – I've had a blowout fight with your Assessor, they are not handling permits and sales data correctly, there is something wrong in that office and my assessment is out of control and I need to speak to somebody. And I get no response and I call a second time, a week later, and I get no response and it is just a dead end.

"This year, the KRT data comes out, that opens up a lot of avenues to understand what is going on. I call back to the Mayor's Office and I said – Look, I called twice last year and I'm calling again to say there is a definite problem in that office. Something is not right down there; no response. When I went in and met with Kim Kleiner, her comment to me was – I'm so sorry we never got your calls. You know, it just wasn't credible to me; that's just not credible that nobody received my calls. And, in fact, all of City Hall is just so non- responsive I feel to issues involving the Assessing Office. You have to work with the chief,





DRAFT

he's not there much, his attendance just isn't there much. There really is no oversight going on in the office so that's a problem for people. If the Mayor is saying – Oh you know the chief is so reliable and well-trained and great, go talk to him; that's not how it works down there. He's not a people person and he's not happy to come out of his office and speak with anyone. That was certainly the case for me.

"When I started calling the State, the first call I made to the State, I have to tell you, I was very cynical about calling the State. I called up there and I thought – I can't even get to anyone in City Hall, what is the State going to do for me, they are even bigger, nobody in City Hall can answer, I'm going to call up there and just be left hanging. I called, I ferreted around on who I had to talk to, it was Steve Hamilton, he called me back in a day. I've had 7 or 8 calls up there, I've never had anyone leave me hanging for more than 24 hours. Before Christmas I called the Commissioner Lindsey Stepp who heads the DRA to talk to her about what I could do. Actually to find out what I can do down here, I'm stuck, I don't have any avenue for communication within the City. She took my information, she ran it through her counsel group and her Deputy and she called me back and said – give me 2 days. She called me back in 15 hours – give me 2 days, I will call you back, I will get a response, we will have a conversation. She called me back promptly; had a full conversation with her, probably 20 minutes on the phone. She gave me so much information it was a lot and when the conversation ended she said – would you like me to type this up as an e-mail for you so you have something in writing. I said – Yeah that would be super. I got everything laid out, bullet by bullet, on how I could proceed with a PA75 formal complaint to the BLTA for a Hearing; everything else that I could fall in line with to try and deal with the problem.

"The reason that I ended up with the Commissioner is because it was going to be Board of Assessor's Meeting and meeting with them which was a couple months into this process that the Chair said to me – we don't handle issues with the Chief Assessor, that's handled by the Commissioner at the DRA. He works for her; I didn't know that, nobody down here told me that or passed me off or said – get up to the State, you're going to have to take this at a higher level. So I feel that there is a whole communication here that goes right to the Mayor's Office and Kim Kleiner explained when she talked to the Board of Assessors about this process they are going through. They are applying Lien 6 Sigma Study to the Assessing Office which is a TQM process used by a lot of industries. That whole TQM process, Lien 6 Sigma people, they are people who have black belts in that. They are trained for 30 years to do that; I really wonder how deep our training is to do a Lien 6 Sigma process here in City Hall. But she made it clear when she spoke to the Board of Assessors that we are looking at this with clear eyes, we are not going to consider any public concerns or questions raised after the assessment was finished. We are not addressing any of that. We are going to go through the process and if some of those things fall out, well great then they fall out; but if they don't, they don't.

"Well that begs the question, what does somebody do when they have a question? Okay, you are off doing your thing for 3 months, whatever it takes; what do you do when somebody has a question? It's great that you are not going to consider the public questions because you don't to be bothered with those, you don't want to be jaded. But what do you do when you have one? Nobody seems to have an answer to that. I really feel that you got the fox guarding the hen house here and that is not a really open audit the way it needs to be done. So I am kind of disappointed that that's the way it fell out, but that's the way it fell out so there we go.

"Regarding abating, you know, I've been looking a lot at the abating process because we have go through it and I didn't really know anything about filing an abatement or what it's like. Because the City has





DRAFT

been pretty deeply rooted against us, we were never really able to have a conversation with anyone in Assessing about what happened to our assessment. So we have no agreement that there was a problem and so for my husband and I, we felt that we were up against a wall and it is going to be one huge fight. So that is ultimately why we went and talked to a lawyer. Because we never had the luxury of sitting with anyone in Assessing and having anyone go – yeah this out of whack, abate it. I'm down in the Assessing Office a good bit and I hear people come in and they show stuff to the assessors and they go – Oh take this abating form and go abate it. We never had that.

"As a matter of fact, after one person left, I ran over to the assessor, one that I hadn't dealt with to try to pick his brain to get a little information on what I needed to do because I really wasn't certain what we were doing when we started off; because no one ever talked to us about that. That was just not going to be covered by them. So when you feel like it is them against you and you are battling something that they do not want to accept, you start dotting you I's and crossing your T's. One of the things I was going to do is start really looking in detail at these abating files. I want to see how they are done, I want to see how these assessors are appraising, I want to see how fair they are being, I want to see what they write up. Because what are they going to come after me with?

"One of the things that I discovered that I found really disturbing, every year the equalization ratio comes out by the State; it is a ratio that is supposed to take your municipality to 100%, equalize your municipality. When the median and the ratio letter comes down from the State, it is signed by a lady named Linda Kennedy and she writes that this ratio is to be applied and should be applied to all abatements for the purpose of equalizing within your municipality. What I discovered looking at some of these files is that the Assessor or Assessors, they have a form spread sheet where they negotiate with anyone who comes in; their opinion, the property owner's opinion, the agreed upon opinion and it is a spread sheet. Everything is negotiated on market value, sale price, because that is how it is done, sales is the hard data so you have got to go with sales. So they do that.

"But when they go to apply the equalization ratio they are only apply it, the ones that I've looked at right now, it has been commercial level and it is only because that was the vast majority of them, there weren't many.

"They are giving the equalization ratio to people who have a tax lawyer or are represented by a tax management company. They have representation, so they multiply through by the ratio and they do it all the way it is supposed to be done. But if you are a "Joe Schmoe" that has a little shop that is a house and you run a one-man business and you are doing it yourself like a resident is, they delete that line off the spread sheet and they don't apply the ratio. So what is being put in the data base is the sale price data and not an assessment level data. I really struggle with that because I feel it is deceptive. I mean it is willfully negligent to take a factor that is supposed to really go to everyone and delete it. And when I see the only cases I found are the people who don't have representation; they don't get the factor.

"So like last year it was 20% less, so if you were abating a house and you came to an agreement that it was a $400,000.00 property, the assessment should have been put into the system as $320,000.00 and your abatement should be based on the difference between what you paid in $320 but they are not doing that.

"They are calculating the return check for people at a much higher level and they are not returning the money that they should get back, in my opinion. And it concerns me for residents, because as a resident

I did not understand the equalization ratio and the form that you produce as a City which is similar to the State's but you do your own form here. And I believe your form has to have all the information that the State form has, it doesn't have a line for the equalization ratio. It just has the market value line so it has a resident working on the sales level which is fine. We are depending on the expertise and the professionalism of the office to apply the ratio. To not do it, the 4 I looked at, people were short-changed $1,500.00, $1,800.00, $1,600.00. Well you know what? If you could have gotten $1,600.00 more back you would have liked it, I'm sure; anyone would have.

"I feel that there should be a directive here given by the City, I am going to talk to the Board of Assessors about it, put down on the Assessing Office to say – the ratio will be applied to everybody; not just those with lawyers or tax management companies. Everyone gets the ratio because it is what keeps the data balanced. I called the State on that, I talked to Tom Hughes up there and I said – Am I thinking about this wrong, am I too Pollyanna, what's the deal? And his pitch was – no, the ratio is supposed to be applied for everyone abated, you don't pick and choose who gets the ratio. And yes, it is about equalizing the data base.

"When I went to John Duhamel with my concern, his pitch to me was – I'm here to save the City money and this is the way it's done all over the State. I was aghast. I said – that is so unethical and you are not here to save the City money, your mission is completely different. He turned around and walked away. I said that to the State; the first thing the guy said to me is – his job is to equalize the data base, his job is to create fair and equal assessments, number one priority, fair and equal assessments. The saving people money by ripping off little individuals, you know when they don't realize it is not fair. And I am really concerned for residents because if I wasn't deep into this like I am, I would never know. I would have no idea, I didn't understand that ratio the first person who told me about it was Steve and I remember when he said something to me on the phone I had no idea what he was talking about. I had no clue.

"So either take your form and put the equalization ratio below the market value price that is on that form so people know that it is going to be multiplied by a value. It is either like this year going to come in at 1, hopefully or a little bit lower, we don't have it yet, it comes out in February. Right now the abatements they are doing, a lot of them that I noticed are property card changes, there are small things – people go in and – oh I don't have that bathroom, that's not a closed porch. They are little changes that are being tweaked that are very easy for them to do that aren't sales data driven stuff. But you are about to get deep into the sales data driven stuff and ratios should be applied. I contacted the four property owners that didn't get the ratio to find out did they know. One of them said when I talked on the phone the guy told me – I got the ratio. I showed him the form, I said – you didn't. Another guy said – Wow I didn't get the ratio? I said – no. He knew about it and his property was dropped last June; he was concerned because he had deferred maintenance, there was a City-wide revaluation. The assessor told him – don't worry this information is going to be passed to KRT and your assessment is going to stay fixed as it is based on the deferred maintenance. Never got passed – guess what? He went up like $150,000.00 he's got to abate again, this year because the abatement information never got put into the file.

"So it just deeply concerns me that I see these things and there is nobody to have a discussion with about it to say – you know – let's try to fix this stuff and make it work. And I want to address one other thing, the Mayor has brought it up a good bit about the inaccuracies in my information that I gave out at the beginning when I came to you that the spreadsheet had errors. He was right about that; but obviously

there were more correct things or things going on that opened up the need to do an audit and deal with stuff than there were probably errors. But a lot of those errors came from the fact that I had nobody to talk to; I've never had a meeting with anyone in assessing, somebody who is making the decisions. For that matter anyone through City Hall that has said to me – let's sit down, let me show you how this data is put together, let me show you how these cards are marked. Let me show you, ok if you are upset and you are going to do a little review, here's the stuff you are going to look at. It has been running high the whole time. I go the permit department and I ask for help on how to read the permit files and gentleman comes out, shows me how the papers are all put together, shows me how the codes can be tracked, gives me a little primer, go at it. No problem. You think anyone does that in Assessing? The women in the front are phenomenal but I am talking the people that are making the real decisions on these numbers and how stuff is put together and how it recorded. Do you think they are coming out to show you anything? Nothing.

"And I really resent that Kim Kleiner had my data and there were problems with it and she didn't even reach out to say to me – you have a mistake in these 3 areas and I want to tell you why. This is why I don't trust her to do a review. Because somebody, perhaps the Mayor said – don't talk to that lady. You know? We'll just leave her alone and she'll go away because she's a little bit nutty and she's wrong. It didn't work. So nobody gave the time of day to try and fix the problems, that wasn't so good.

"The other issue that I talked to the State about a lot is sales chasing. I think you have a real significant sales chasing issue going on in here and it is not legal. I have been able to grab more data because I joined a real estate web site that allows you to print sales data from 1880 to current. So I was able to pull really relevant sales data over the last 5 years and I really wanted to focus on older properties that sold because I wanted to see what they were doing with the EYBs how they are changing Effective Year Build. I came to you in September and I said – Stop using MLS data to adjust property cards, you are not doing it right, don't do it.

"And I am coming back to you now and saying – Stop doing it. I explained to Tom Hughes at the State what was happening he said to me – they adjust the cards off the pictures but I said – they adjust the other factors really hard and they are changing these assessments dramatically. Well that is okay as long as they are changing every other property in that category, tell me they are doing all the other properties in that category; I said – no, they are only doing one. Then he made me repeat it again – Tell me again what they are doing and his response to me was – that is sales chasing. When they are hitting those factors, you've got to be careful.

"When our property EYB was changed in 1994 effective year build, I hadn't looked at this until just 2 weeks ago, that changed our assessment $160,000.00. The permitted work changed it $40. So when you mess around with that factor, you are adding huge valuation to property based on pictures you are seeing. The problem is you are not doing it to other older homes. What I have found is a group of older homes are being attacked, another group of older homes that are equally renovated are not being touched and then they are not even falling in line with the permitted work because the permits in general they are not applying the EYB factor, they forget to use it. And they just address the permit and then all of these permitted works – kitchens, baths and renovations stay at 1969 level. When you go down Berkeley Street and take a ride down there, 55 homes, I'm going to tell you 45 are 1969 or lower by build. You drive down that street and they don't look like 1969 houses, they really don't. You are way out of whack and then you sting specific properties with 1995.



DRAFT

"And then we are stuck in a neighborhood where we don't even fit. And there is nobody to have a discussion in this entire City about these issues. I am just so disappointed that we can't do better and we haven't done better. Thank you."

**Board of Aldermen Tuesday, February 26, 2019**

**https://www.youtube.com/watch?v=LmVITX64xSM**

**13:21**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to get back to you a little bit on some of the work that I've been doing and continue to do with the assessing issues; looking forward to seeing the report coming out on the first. I wasn't expecting it out so soon so that's great. I did file my PA71 with the State and I got my abatement in. I went to the Board of Assessors and they said – Well you know it would have been nice if you had waited until the City had filed their report. But I had a deadline both at the State level and with my abatement. So I had to have my report in to the State by the first of March and I had to have the abatement in by the 1st of March so I can't wait for a City report to come out. I want you all to know that, that wasn't an option at the State level for me either. So that is why I moved forward.

"I am looking forward to seeing the information with the changes to potentially the technology and how we can access information because I see that as obstacles. But I am not going to tell you that I don't see some really significant personnel issues as well and those aren't up for discussion; I understand that. But the technology isn't going to fix the issues alone because it is the people behind it that make all the difference in the world and I cannot overlook that given what we have gone through and given what I see in there.

"Regarding the technology and having finished out abatement process I really came to an understanding a lot about this abating process and I think it is so flawed for the homeowner or taxpayer to carry the burden of proof, you know? It's up to us to prove that our assessments are too high and to do that we need access to the data and for us, you know, a benchmark point was the effect of your build issue on our property card and that data isn't available publicly at all on the website, on the computers down inside the office, on your home computer. It required the printing of the property cards and I went after like 100 because I was trying to look at my neighborhood, first of all, all of Berkley Street to look at where I fell out, that is 55 cards right there. Then I didn't want to just say I am only looking at Berkley because people would think – I was afraid they would say – you are being too narrow. So I grabbed Chester, I grabbed Raymond, I grabbed a few on Concord and all of a sudden you are up to $200.00. I don't think that's right. I mean that information should be readily available and you can't tie the EYB to the grade either. The grade is not available on the web site down in the office for you to look at the cards as well.

"When I started this process, I did send an e-mail to Mr. Duhamel and I asked him if he would be willing to help me or give me the grade information for Berkeley Street and I did not receive a response back. It was really the State that said to me – Ask him to give you that data, that's a reasonable request so that you have access to it. And I never got it; so I ended up going in and printing it all. So I hope that we are able to create, you know, a system where the accessibility is better. I'd love to be able to print out a

property card without paying a dollar and really have the information on the property card. I really learned to read those and understand them much better than I did four months ago. You've got to have the card to really look at the houses and make the comparable.

"Also I think the search data base for abaters who go in and use the sales data is not very good because you can't narrow the search fields to the year the house was built or pick a range. So we live in an old neighborhood, I went in and helped a neighbor who had a colonial house, I wanted to grab colonial houses sold over the last two years; it came up with like 221. I can't narrow the field because there is no date range that you can put in. So that's a lot of data to cull through and it is pretty easy now to add a couple fields that narrow a search and give us a little more flexibility mostly so that when we are picking houses and people are that they are picking houses that are the age that their home is and a good comparable; that they are not looking at something that is 1995 when they are 1925. So it is just better for the assessors to get an abatement done to that level of quality and it is better for the property owner to be able to access data like that. So that's that.

"The last time I was here I talked to you about equalization ratios and I had done a little research down in the office and I had only looked at some commercial properties and I found a commercial property that or any of the commercial properties that had representation, namely CPTM up in Manchester or tax consultant. The equalization ratio was being applied but when the property owner did not have representation and was on their own, the assessors were not applying the ration. I actually spoke to somebody about that in the office and they had questioned it as well and the answer was, from the assessor was – the people don't know the difference so it doesn't matter. Well I beg to differ on that. That is a ratio produced by the State and I have had extensive conversations with the State and their position is the ratio is applied to everybody. It sets the equalization for the data base. The last couple of days I went in and started looking at residential properties and how we handle the equalization ratio for 2015 and 2016. I hadn't had time to do it before because I was so busy with my abatement and my paperwork for the State, I had to push that aside and I said – Ok when I get that done I am going to back and take a look at that.

"I pulled 10 abatements for 2015 from one assessor, 4 of them were fire issues, so there was a different proration form that is used for a fire, it is not the same as a typical abatement form so that knocked 4 data points out. The other 6 I grabbed, 3 of them received the ration, 3 of them did not. But the paperwork is all done, the math is all there where the assessor takes the homeowner's value, gives it the 88.5%, they put down their value of what they believe the property should be, they give it the 88.5% and then they do the abatement on 100%, they give that property owner 100%, they don't give the abatement amount, the don't give the equalization ratio and their refund is minimized. When I looked at these properties, you know, one homeowner is shortchanged $860.00. Another homeowner is shortchanged $1,994.00. Another homeowner is shortchanged $1,293.00. Another homeowner is shortchanged $1,969.00. I don't consider that token; I consider that significant. And if that's what the ratio said it should be then that is what we should be refunding.

"I have started to reach out to more industry people around the State because I've had time. When I started this some Alderwomen said to me – Have you looked at what other towns do. I don't have time for that, but now I do and I connected with an industry expert 27 years who served on the ASB up in Concord. I had a good 30 minute talk with him and I shared my concerns about this. He was so outraged

he said – I don't know why your lawyer hasn't filed a criminal lawsuit and I don't know why those people haven't been stripped of their certifications. He said – It is outrageous to me. It is not even an option.

"Now here is what I am going to tell you. This ratio is a relatively unknown entity to the homeowner or even a lot of small business people because it is not on the abatement form. The only thing you ask for on the abatement form is the market value. So everyone of us out there, us lay people who aren't wrapped in the law of property are being told – Give me the sales the data, tell us what you think the sales number is. That's fine, we depend on the expertise of those in the office who are certified by the State to apply the law the way the law is supposed to be applied. And when they are not doing it because we are too stupid to catch it, it just burns me. It just seems so wrong and it just – yeah. That's what I found in the last couple of days. I am going to go back in and look some more, but I don't like what I am seeing. I asked you the last time I came here to stop this practice and let these assessors know that the ratio should be applied to everyone. Right now we just went through equalization; we don't have a ratio produced by the State yet, the number isn't out. It is kind of late this year and I called them and it may not be out until the end of April. They haven't even started Nashua's data; normally we would have it in February.

"Because we just did equalization and we just did a full City-Wide reassessment they can use one. And that is going in as one, but in any other year, like last year, if the ratio wasn't out, then the law says you just apply the ratio from the year before. So you don't not apply anything; there is always a ratio to apply and until the new data comes out you use the old data. Right now we are allowed to use one because we did equalize and we don't know what the number is, we will know soon. But anyone who is putting in an abatement they have the right to say – Don't use my multipliers one, let's see what the number comes out as. If it comes out at 95% then they get on a $400,000.00 market value, they would be assessed at $380,000.00 – 20% less, 5% off every $100,000.00. They have the right to have that because that is the equalized number and I almost feel that some of the assessors feel like – I don't want to give them that number, I don't want them to be that low, I don't want to refund them that money. Last year it was 79.1%, you don't have a choice. It's not something you get to pick and choose that you don't want people to get that money. And Mr. Duhamel's position with me when I pointed it out was – Hey I'm here to save the City money, that's my job. I beg to differ; I've read your mission many times and those assessors aren't there to save the City money. They are there to create equity for all of those, horizontal equity for all of us.

"So that just really disappoints me that that is the case and we haven't fixed that – or that I had to go to the State to even have these discussions. I am going to continue to reach out. I stopped at several small towns around here, met with Chief Assessors and technicians today and I asked them – Do you use the ratio for everyone. They were like blown away – of course it is not an option, everyone gets a ration. It is not an option we do it. I talked about sales chasing, I talked about how they handle sales chasing, how they protect against it, how do they correct data with MLS information. That is another issue I have raised was the sales chasing issue, that is a complex issue. The State has been very helpful. KRT was helpful too, and they wrote some interesting e-mails to John Griffin about this issue. Several of the e-mails they wrote to John was – You should reach out to Chuck Reese up at the DRA and get his input on this issue.

"I called Chuck and he never had a reach out from John. Never had a conversation with him about this issue and I wonder who is the City talking to about this? They seem to be hunkered in going – we don't

"do it. But it is an interesting discussion point, there is a lot there to look at. And the basis of that issue for me was this whole EYB. I started looking at properties that for some reason the Assessing Office corrects them very hard on sales data. They take a property, they view it as renovated or restored and they drive the EYB up to 1995 or 2000. They pull all the depreciation out of the home or a vast amount of it and they can move an assessment $100,000.00 or $150,000.00. On our house it moved it $160,000.00, that's a lot of money. So out went the depreciation, in went that new EYB and our assessment went Poof – right through the roof.

"But then I started, I pulled all those property cards and I found 27 homes, I pulled 100. I found 25 that were corrected hard and graph out with EYB here and then a big gap in the EYB here after they sales adjust. Then I found 27 that I pulled up all the MLS pictures and they weren't corrected, but they were very well done homes, meaning they got to stay at 1965, 1969 and not adjusted. One of the homes I found, you will know Madam Chair, is 19 Monadnock. That was an interesting property because I pass it every day going to and from Amherst Street. That was a property that sold for $260,000.00. At the time it sold it was assessed for $147,000.00. The assessors look at the MLS data, they raise it $10K, they bring it to $157,000.00 a year and a half, two years ago. They don't touch the EYB, but the property was very nice, had leaded doors, side lights, newer windows, granite posts, granite steps; inside nicely done. It was not a 1965 or it might have even been 1959, it wasn't that old a house, it wasn't touched.

"So KRT comes around and does the reassessment, this house sold for $260,000.00. In their model it came out to $208,000.00 is the new value. It's quite a bit lower than what it sold for because none of that – all that interior work was grabbed by the assessors and raised in an EYB assessment. They got to go without any adjustment at all. What I took is I looked at all those 27 homes that didn't get adjusted, well KRT ends up rating them like 7% lower on overall pricing because the City doesn't use the data to correct those properties. That is where I question – are some of us being chased? Really I have said to you, don't use that EYB anymore, make your MLS adjustments on the quantitative data number of bathrooms, basement finished, the attic is finished; but when you go after the qualitative factors like grade and EYB you are really messing with assessments. You have to make certain you are doing it to everyone and they are not.

"That is my issue. One of the assessors was asked to present to the Board of Assessors, they were very smart about saying – Explain to us MLS. And I didn't go to that meeting I was traveling but I read the minutes after and I wrote a letter to the Board because I said – You were not given accurate information; your assessor is telling you we are changing the number of bathrooms or basements that are finished. They never mention that qualitative data and they are changing that too and that is what is driving a lot of these disproportion assessments when it is not done fairly.

"I have held steadfast that we should not do that and I am talking to other towns about that. And the State has been very open in addressing the fact that that is an issue. I don't know what to tell you except I, you know, regrettably there is no one here to talk to in the City. There is absolutely no one for a person like me to engage in a conversation with in this City; 5 months and I have never been invited into a meeting to sit with anyone to really come forward. I remember Brendan when Rob Tosier came in and some of you Aldermen got to sit in on that and you said to me – I really wished you had been there, I think you could have asked a lot of good questions and gotten answers. That option wasn't available to me. No one invited me there; it's never been an option. And that is a very big regret of mine and I hope someday the City figures out how to handle people like me and find a place for us to bring our questions

so that we can get some answers. I think I deserve that; I think anyone with the kind of questions I've had deserves that kind of information.

"I want to end this by talking about property card at 4 Rockland Street and I want to bring it up again because I really think – you came out with the papers and said there's no merit to favoritism and you know it is all unfounded. I didn't even know how you could make that statement and maybe the papers misquoted you, they don't do a – they don't always get it right. Because my issues of favoritism I wrote a pretty extensive letter to the Board of Assessors. They have not reviewed the letter. I didn't really take it anywhere else, I sent it to the Board. I'm sure it has made its way around City Hall. The Board of Assessors has not addressed it so when I went to the meeting on Thursday I was surprised in the paper earlier in the week that the Mayor had come out with the comments that Mrs. Ortolano's findings are unfounded or don't have merit. Because then I sit there and say – 1) Did my Board of Assessors meet in a non-public session to address this issue? Did they conclude it was unfounded and go to the Mayor and say – She's all wet none of this makes sense? Where are the conversations taking place and no one said anything to me.

"I approached the Board after the meeting, I said – Have you reviewed this? No. Have you spoken to the Mayor about this? No. They were adamant that they had had no conversations. I'm not certain if your role is really to not be involved in these assessing issues or to be involved, you certainly seemed very involved in ours publicly. And when you make statements to the paper that these issues I raise are baseless, I am trying to use a chain of command to take these issues to Board of Assessors because they are the group that, the State says they are the ones who are supposed to address it. I am trying to work through that avenue and you know it just seems like you are not making the right statements to the press that maybe - Hey we've got an internal report that is going to be released soon, Mrs. Ortolano is working through the proper channels with the Board of Assessors and they will make a determination on her issues; whatever. But it seems like it comes from you and as a citizen or a resident I never get the courtesy of somebody coming to me and telling me. I guess the newspaper has been a great avenue for me because I seem to get my questions answered through the newspaper when you speak. But I don't think that's the one we should count on.

"So regarding your property card and I know it brought a nice big smirk on your face but here is an issue when I look at that when it comes to favoritism, it is not about you personally, let it be known I don't think Jim Donchess had anything to do with the assessment of his property. This is all on the assessors and how they are looking at any individual; not on the property owner. Jim, Vicky, they weren't responsible for this. It is all on the assessors, they are certified, they are trained and they are supposed to be fair. But when I looked at your card, I went today and I printed two of them because the notes on the card said the EYB was 1970 but the card, when I printed it out, the EYB said 1979. And I didn't have time to research it weeks ago and I said – What did they type 0 and they meant a 9 I don't even understand this. But I noticed your depreciation just didn't change much, you didn't pay much for the change in the house because the depreciation didn't change, hardly at all.

"And so I went today and I said – Well print me the 2012 and the 2014 cards. Those were the cards, 2012 was when the file was officially closed, the EYB was done. And when I printed those cards, the EYB was 1970. And in 2014 it was 1970. Somehow in 2018 when I raised the question somebody changed it to 1979. And I am really curious who manipulated that data. And I am telling you that because there is no note in the comment section that an EYB change as made. How did that happen? There should be

documentation. That file should have a marked up card that says their rules are their rules, pencil marked up EYB was changed in 1979, the old card and the new card stapled and it is in the file. It's not there. There is nothing in the file. Who manipulated that card to change the EYB to 1979? And why was that done? It is so curious to me. And really why I believe there is favoritism is because I've compiled all this data and when I look at properties like yours, that went through a heavy demolition and renno, Jim up in the north end I can't find one that they kept at EYB at 1970 that was all done, where the walls were opened up and plaster was taken out and sheetrock was put up. I mean I can think of Hall Street went to 2000; Webster Street went to 1995 or 2000; Courtland went to 1999; Chester went to 1995; I went to 1994; neighbor went to 1994. You went to 1970. That's where it stands out. I think it is reasonable to point it out. It's not you, it's them. So think about that. Thank you."

**Board of Aldermen Thursday, March 7, 2019**

**https://www.youtube.com/watch?v=SSOz8P6FEtE**

**1:51:37**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Before I start, and maybe we can't do this, but there is a lady here and it is her first time at the meeting and she just whispered to me she'd like to talk but she didn't sign up on the sheet. So I don't know if you can accommodate her, but I just wanted to say that before I ended.

"I'd like to address the Mayor's comments first. I know you believe very strongly that the KRT numbers and this revaluation that we just did produced equitable assessments. I really am pretty opposite you on this issue. I feel that we have a lot of inequity in the City and that KRT's work fell very short, really because the data that they used was not that good. I can tell you from my perspective living in an old neighborhood, I think the old neighborhoods are particularly bad. And we have a lot of old neighborhoods around Nashua. And I think there is a lot of disparity in equity. I think there are a lot of people living in some of those homes that don't even understand the disparity that is there.

"So I don't like the idea of waiting 5 years, I think it is too long. I'm not even certain how well your ratio, your median ratio is going to hold over that time to give you the 5 years to take that time, especially if the real estate market keeps cruising along with some forward motion. So that is one thing.

"Secondly, I've been at the last two Board of Assessor's meetings and I have to be honest, they look pretty darn disappointing. It is really tough for me sitting there. The meeting I went to two weeks ago had a little bit of a show going on for me because at that point the number of abatements filed had been just over 100 so the Chair and the Ex-Chief were commenting on how satisfied the public is – we've only got about 100 abatements in and wow, you know, Lori that is a real good indicator that everyone is very happy, everything is good. You know people are not upset at all, what are you talking about? And I wasn't on the agenda so I couldn't speak to that, but I walked out really disappointed. I talked to some industry experts who said to me – that's not an indication of satisfaction at all and should not be used. A low number of abatements can actually mean that you are pretty undervalued in your City which I agreed with that.

DRAFT

"But now a week goes by and the abatements jump almost to 400. So this week we go into the Board of Assessors and they are no longer saying – Oh wow we hardly have any abatements everything is fine. But what they are saying – Well let's conduct a poll and the Chair is saying you know what? Kim and John asked about the community and has there been many complaints in their survey and their survey came up and people seem pretty happy overall people seem pretty happy with the office. I agree with that. I've been down there a lot. Your front end interface is outstanding. The three women at the front are outstanding, they do a wonderful job. Every one of them is professional, courteous, makes you feel welcome. But that is not an indication that the assessments are good and what is going on behind the wall. And so for the Chair to sit there today and say – Well you know what, we are not hearing any complaints, everyone is pretty happy, that's a pretty good indication we don't have a problem. You know, I have to sort of endure that for Round Two. And I think we are missing the point. So I know Mr. Bolton highlighted the experience of our Board of Assessors, I have some serious reservations about what is going on in there. I really do. I am so glad you brought up the Charter, the Board of Assessors does not seem to know where they fit in that Charter. One of their Mission Responsibilities in the web site it to review all policy and make certain all policy is implemented. When I saw them 3 months ago, I came with their Mission Statement and I read to them – your job is to implement policy, review policy, make certain it is happening. And at that point they looked at the Chief and said – Do we have any policies? And he kind of shrugged and went – I don't know we are looking into that. And then we started talking about the need for a policy on how to judge and grade fixtures. That was in November.

"I have been very patient, I have sat back very quietly for 4 months and said nothing about this because I have been watching, where is that policy. And that's a pretty simple policy to outline just to establish some standards among all the assessors. So November goes by and here we are March and I know our Chief left, but through this entire timeframe, no policy ever came forward, no first read to the Board of Assessors, no second read to the Board of Assessors, no asking by the Board of Assessors – Hey where is the policy on this? They don't seem to even understand that they need to be calling out for that. So I have some serious reservations and when I go to those meetings I usually come out of it with a pretty good headache. And there is a lot of work to do because I don't think they understand what their role is and the Chair, you know, he's the one who pushed me to the State to the Commissioner Lindsey Stepp.

"When I called the Commissioner and got her on the phone, she was like – Well wait a minute, you know, you have a problem with the Chief coming to work, that really doesn't fall on my plate, that's on your plate, you pay the guy. You know there is some stuff you are supposed to be doing. My Board of Assessor is like no, no, no, that is not on us. We are not covering that, go up to the State. So right now even between the State and the Board of Assessors, I am not certain what our role is. But I can tell you that our Board doesn't feel like they are tied to this position at all and I think they are missing something here.

"With regard to the position and the elimination of the Chief, I have a major concern. Mayor Donchess you mentioned that we have somebody within now in a supervisory capacity, I was more or less assured by you today Kim that we were not promoting anyone from within, nothing was being established that way. I hope that is true because I have serious reservations given the report about taking staff within and promoting anyone because there is a total lack of training. One of your commercial assessors has only been doing commercial for 2 years; one of your residential has only being doing residential for 2 years. For those people you've had a massive lack of oversight for the 3 ½ years that the Chief has been there, so they are not well-trained in my book at all with oversight and work. And then you've got the whole

communication problem internally and then you've got massive standards issues among the assessors that have experience in general.

"So I get pretty distraught to think that we have somebody capable within of promoting. I also share the same concerns Mr. O'Connor expressed. You know we haven't had the time, the CFO, even you Kim, have pretty busy jobs, all-encompassing jobs to now be down in that Assessing Office defining the direction and what needs to be done concerns me. I feel we need an Assessing Expert. Not for nothing but they are not assessing experts. And the fact that we are eliminating the Chief, Angelo Marino was a Chief, was a GIS Director and I think at one point a part-time IT guy and he sat in the Assessing Office and he wore all three hats. And when the IT piece kind of disappeared he wore two hats. So I don't know where this person is going to sit but I think and Angelo was here from 1996 until he left in 2016 and then you brought in John so you had the better of 23 years, you've had a Chief. It's a recognized position in the State.

"So the concept that Donnalee got rid of the Director position, we still had a Chief, we've had a Chief for a long time. So I really question, and the City has grown and the parcels of land have grown and the number of properties have grown. Can we really run without one, do we really not need one? So I hope you think a little bit about that because that is a reservation I have and I think you need to bring in help now to figure out how you are going to define how that group operates in a true assessing form.

"Now I don't think we are talking enough about some of the issues, the software stuff is great, you are nailing that, you are on the right page. I think we can't forget that all of this software stuff has to generate an interface for the public to be able to access what we would like to access. Please don't forget about us, property cards, MLS stuff, sales searches so we can do better abatements. But your assessors, when we talk about permits, you know the bottom line, I think we are missing a good number of permits, we are just missing them, we don't go. Ok? So that's a problem. MLS adjusting, you know, we are missing a bunch of homes on MLS adjusting, I don't care if you put a little 8 in the column the 8 is there and you flip the card over and nothing is written. And it may be that there was nothing to change, but there should be something there. I can tell you when I look at the MLS pictures, I go – Oh we should've changed stuff. It just looks like we threw an 8 in a column and never really looked at the pictures. And how we use those pictures, you know that I have a serious reservation about the sales chasing issue. And I think we have been doing that type of assessing strongly on sold properties that we have quantitative and we have qualitative data we can look at and we are being way too hard on the qualitative data. And we are changing those sold properties more aggressively than we are on permitted work and we are not even doing it to all sold properties, we are doing to select. That's not acceptable to me.

"Now right now my observation is they are not MLS correcting houses at all, there is quite a slew of them that have been sold since November that all have needs review in the column and they are not using the pictures they are not doing anything. I don't know if they gun-shy, I don't know if they are holding back but some of them; I'll give you an example are homes that in the past they would correct that, but I think they got to sit there and not correct. They have a home that is totally rebuilt, remodeled, permits pulled, addition put on, gutted, they go in in April and they go in with a clean card and they re-assess the whole property, it's all re-done which is what they had to do, it's like a new build. They reassess it, they do it just fine, they do their work the way they are supposed to, I go down, I can see it, it's perfect, it is stapled. They come up with an assessment for this property, $470,000.00. Then six weeks later it goes on the market, it has stayed one the market and it sold in December, ok? What does it sell for? $560. Alright?





DRAFT

The assessment and the price are off. Now it has a "needs review" stamp on it. It has a "needs review" for 3 months. In my opinion, you don't touch that. You're done. You looked at the property, you ran your model, your model produced evaluation, that's how your model works. What it tells me is that your model isn't very good because your permit tables haven't been updated, because your square footage build for new construction isn't that good or additions. But that's what your model is.

"So if you go to that house now based on the sale price and you say – Oh the year 2000 build I put on that old house, I'm going to make it 2010 now and I'm going to change the 3 bathrooms to excellent from good; and I'm going to change kitchen to excellent. And I can drive up another $40,000.00 or $50,000.00 grand out of that.

"You are only doing that because of the sales price. Stop. To me you did the best you could because that's what your model showed. Because if that house hadn't sold, and that house had somebody living in it and they had walked in and done that card, that would be the assessment, that would really be the assessment for the person living there. So you have to be careful how you use the sales data. And we need a lot of retraining on that. I think that is very, very important.

"I know there is more in my head and I am tired and I think you are too so I am going to stop here. I appreciate the work that's been done, I really do. But I don't want to lose sight of some of the important stuff going on there when we are creating valuation. Thank you.

**Board of Assessors March 7, 2019 – No VIDEO or AUDIO LINK**

Ms. Laurie Ortolano said she would like to comment about the benign neglect issue brought up by Mr. Hansberry previously in this meeting. She thinks they need to put that aside. The fact that people own a property which gets into disrepair she thinks is a very small % and he is basing his decision on financial and frankly mental health issues. She said there are other important issues happening here in this City that are the bigger fish to fry…sales chasing, MLS review, these are big. Mr. Hansberry said it is something he wants to have explored. He wants to see what other communities are doing because it detracts from other property values. A member of the public said there are some people positively impacted and some negatively impacted. I have dealt with data analysis and I can tell you, you can have that sort of effect just being arbitrary so the fact that you would use that can be insensitive.

A member of the public asked with this current change in the Chief Assessor being eliminated, if a private citizen has a company, to whom they would go in the Assessing Department if they wanted help to understand their assessment or how things are done. She was told she can begin with an administrative staff member and then, if necessary, the administrative staff member will direct the person to a commercial or residential assessor depending on the property.

Ms. Ortolano said she is not comfortable, based on this report and the lack of training, promoting from within. As a matter of fact one of the commercial assessors and one of the residential assessors are new to their job. Management has been lacking and everyone knows the issues have been going on for a long time, so to think our poorly trained assessing staff is now going to be promoted from within and not have a Chief Assessor, she does not think the office can operate like that on a daily basis. She asked 'Does anyone see that as an issue and how are we addressing that?' Ms.

DRAFT

Kleiner said she understands the concerns. The Assessing Department currently reports to the CFO, Mr. John Griffin. He has been down there much more than she has and the Mayor has asked she put some time in there also. In fact she is moving some of her duties so she can assist Mr. Griffin. She said she can tell Ms. Ortolano that there is no immediate desire or idea to promote from within. There is so much more that needs to be done and revisited that she totally agrees that would not be appropriate at this moment.

Ms. Laurie Ortolano regarding her communications to Board of

Assessors dated 1/9/2019 and 1/29/2019

Ms. Ortolano began by stating a lot has changed since she got on the agenda for this meeting two weeks ago. She had sent letters concerning the equalization ratio and a lot has to do with the practices within the office. To start off she is not certain the Assessing Office understands their mission and she is not sure the Mayor's Office understands equitable and fair. She did not think things were right when the Mayor's Office said there is no issue if your taxes have gone down. There is an issue. It is about the assessments. That is the fact that the public does not understand.

Regarding the last measure and list in 1991 she asked what percentage of homes the company that was hired got in. Mr. D'Antoni said he was project manager for that update and we got in 95% of homes. Ms. Ortolano said times have changed. Today we have a lot of households with two working people. Mr. D'Antoni said usually the wife was home back with the last reval. Ms. Ortolano said that has changed now. Mr. Hansberry noted since 9/11 there has been a dramatic shift and frequently the wife will say her husband is not home and she does not want to let the assessor onto her property. Ms. Ortolano agreed that is an issue.

She mentioned assessing models which put more weight on land valuation maybe should be looked at because it takes away problems involved with entering the properties and assessing permits or sales data. She said Henry George Institute in Maine is doing a lot of work on land valuation and a UNH professor is doing a lot of work on land valuation and she thinks we should look at that. I think the land is significantly undervalued in Nashua. She gave an example of her land being valued at $159,100 and her neighbor's $163,000 for a double lot. She says there are lots four times the size of her lot with a value difference of only $6,000. That is not right. So she doesn't know why this has not been looked at in a long time. Another problem she sees is that sales data is the only data allowed for abatements. You sort of flush away the measure and list and the State has flushed it away as well. At some point you have got to allow neighborhoods to look at other neighbor's assessments. 'So here's my neighbor's house - I am off $100,000 someone tell me why.' She said she has helped seven people do abatements and wishes she could have helped 200. Everyone she has helped with their abatement she has used sales data but also has used neighborhood data. She said she does not see why it is fair to say we met our mission.

She would like to build some public awareness in this to look at the neighborhood data. The concept of qualifying sales has to be looked at because sometimes you don't have the typical buyer. When you have one buyer in 2 ½ years of the property being on the market, that is not a flood of people. She continued saying at the time they bought that property, sales were so light for this type of property her appraiser had to go into Manchester for a comparable sale and she came back and told me we overpaid and she is a very good and very well-known appraiser. Mr. Hansberry noted the further away you go the

less reliable the sale data. Ms. Ortolano replied that the model would have never produced the assessment they gave me. The assessors worked very hard to take it right up to the sale price. There are a lot of instances where the assessment seems to be driven by the sale. Mr. Earley said the reasons for the issues were discussed in the audit, including lack of training and lack of policies. He said he read Ms. Ortolano's documents and his thought is we let the results of the audit take place.

Ms. Ortolano told Mr. Earley this is a policy board. When she came in December, Mr. Duhamel said there is no policy about grading, condition, etc. and there is no peer review. In December there was no policy and there still is no policy, 4 ½ months later. She said she is patient but there is a point where we should get working on this and get this done. She said she thinks this is just poor management. She asked if they received an email she had sent and the members said they did not. She said she wished this board had a real time way of getting emails but you do not. The Mayor said accountability and transparency that is what we are doing but there is not much we can do. The City should have planned, this being an update year, for the 376 number of abatements so that we could handle that many. She said she would like to make YouTube videos on how to abate. A big issue is the properties that the public is picking to use in their abatements are not the ones that should be used. They need the property record card to look at more details and be able to more fully understand. She said she would like people to understand how to abate and we do not help them. If the abate process is up to the taxpayers and they have all the data she can get 200-300 properties, lay it out for the assessor and do the work to get these properties fairly assessed. She said she looked at 19 Monadnock Street. It sold the end of 2016 for $260,000. It is assessed for $147,000 and the assessors go in and give it $155,000 but they don't adjust the EYB when the property has been changed a lot. It is a pretty heavily upgraded property that sold for $260,000 and the assessors put it at $155. KRT's assessment is $212,000 so that is 81% of value. So KRT model is saying that house was over bought. 9 Monadnock sold in 11/2017 for $355,000 and KRT puts it at $269.700 so that is at 76%. 17 Monadnock sold for $232,000 3/23/2018 and it is low balled at $200,900 and 15 Monadnock sells for $230,000 on 8/29/2018 and its assessment is $182,300. Attorney Bolton pointed out to Ms. Ortolano if these came out at 100% you would be using these as sales chasing examples. Ms. Ortolano replied KRT is used this sales data to create their model and that is legal during a citywide re- assessment but once the update is completed and closed we can no longer use sales to drive assessments. There are 5 houses on a street that are very undervalued. I just want you to think about that. Mr. D'Antoni said we are in the process of looking into this. Hopefully with the Administrative Services Director coming aboard those questions will be answered.

DRAFT

**Board of Aldermen Tuesday, March 12, 2019**

**https://www.youtube.com/watch?v=E7JZodx5ssU**

**1:40:20**

Laurie Ortolano "Good evening, Laurie Ortolano, 41 Berkeley Street. Just wanted to share my concerns again about this new director position. I hope that there is more discussion about the Assessing Office itself and getting some outside leadership in that office. I just cannot fathom or imagine promoting from within or not having a Chief down in that office given the amount of work that's there. I think that the Mayor's comment on the position, replacing the Chief with this Director position, I really believe there

are other positions down there you are missing. I'm not certain why in the 3 months they haven't been identified, but you are definitely short in a few areas and it doesn't seem like we would want to stay in that mode for another entire year but maybe we missed our window.

"Regarding the comments at the last week's meeting I really want to offer this challenge out to you and the Mayor. I become concerned when I hear the Mayor say that we are going to reevaluate in 5 years. 5 years is too long, and that what KRT did was sound, everything is equalized, it was a job well done. You know we need to recognize that KRT did the best they could but it was a garbage in, garbage out scenario. And if we can't get down to understanding that the data that they used wasn't necessarily good and resulted in not necessarily equalized evaluations, you know, I certainly won't be on any common ground with this Mayor any time soon. And the case in point for that is what happened on Berkeley Street. And I brought pictures to show you. Berkeley Street is the case street on why the KRT model really didn't work. So our street gets modeled, they come out with all the new assessments in August and then all of a sudden my husband and I go in and meet with KRT and we ask for our valuation to be lowered to $517,000.00 based on what was on our street; we didn't use sales data then because we didn't understand that. We just looked at all these very comparable homes and we went in and we had the meeting with Ken Rogers, the President. He offered to come to the house, he recognized the problem with our card, he was the one who identified the sales chasing issue, thought it was that case and off we went.

"The next thing you know we don't get Ken or anyone from KRT coming to our home, it is in October that I reach out to KRT and ask why they didn't come and I found out then that KRT was asked by the City to go down the street and reevaluate it again. And they picked 5 homes, so in this revaluation no one on the street knew this was happening. So they pick 5 properties, well they went down the whole street, what I was told after by CFO Griffin was that Rob Tozier came to my office, I gave him 55 property cards, told him drive down your street again, this time really look and fix some stuff.

"Now when the Mayor told us that KRT came in and looked at every property in this City because they gave a visual evaluation to everything and built the model, I don't really agree with that. It was a drive-by, it was really a feel of the neighborhood, the concept that they looked at every house was really not the case. And really when you think about it over maybe a four month period, I don't think they really had the time to look at every property, 28,000 parcels. It was really about creating a model and using the sales data to create a model. So they got a feel of neighborhoods I think by driving through, I saw them come through my street and they were going 10, 15 miles an hour, that's slow, but still not enough to really be looking at every house. So I take exception with that. I don't think they had a good visual on every home. But when they came down a second time, the goal of that, unknown to any of us on Berkeley Street was to get a good visual because things weren't right.

"And so they came down and they adjusted 5 properties. And in the process of doing that, they found another $300,000.00 of valuation that they could raise. And they gave a reason for it, they said, "The first property we are going to change it from a Grade C to a Grade B because most of the homes on Berkeley Street are Grade B". The problem was that there were another 7 homes that were still Grade C and they didn't touch those. So out of 55 homes, 48 are Grade B, 7 were Grade C, they change one to up the assessment $60,000.00 and they don't look at the others that are Grade C and clearly some of them are beautiful homes that the Grade had been done 40 years ago and no one changed. So why did they do that? Why did those homes stay Grade C.





DRAFT

"So I looked at that and I said "Well that's kind of crazy" and then on the other homes they went down 13 Berkeley, 17 Berkeley, 46 Berkeley, 50 Berkeley and they raised them anywhere from $46,000.00 to $90,000.00 a pretty good hit. And the reasons they noted on those was we've got to justify it, they are being depreciated for unknown renovations. I saw that and I said, "unknown renovations"? How do you create a valuation for something unknown. And these houses that they raised, these 5 houses, they never went to the door, they never knocked on the door and said, "Could we come in" or "We want to evaluate your house". Well none of these had unknown renovations, they had all had permits pulled that were improperly or not captured by the Assessing Department. So in my opinion they weren't unknown at all, you just go look at the permits, they were done.

"So here's a model that KRT made and they ran this model and they created valuation and then they come back and they take a really good look and they go, "Hmm, there's another $300,000.00 over here" and they change it. And that, to me, I was actually shocked that KRT did that because it put them, in my opinion, in a very bad position. They should have said to the City of Nashua, "Hey this is your dirty laundry, you didn't collect this stuff right, you go back in and knock on the door and get in the house and evaluate this stuff and fix it, because now we've got to throw our model to the wind and go back and do your work". And the thing that killed me about their evaluation, the very first home on Berkeley Street, I brought some pictures, it was where they started, is a very old colonial, that has fallen into disrepair, serious disrepair. So KRT starts there and sees a house like this, when you see a house that you know you think there are parts of it you could put your arm through, you say "well there's some deferred maintenance there". I wouldn't call that a B Grade anymore. KRT looked at this house and said, "Well that's a B". No. And that's worth $400,000.00. Ok, cool that's fine. But then you come right up from it, three houses up and you've got a beautiful, painted lady Victorian, a little bit larger, attached two car garage, beautifully done, 8 permits and very well rated and this is $13,000.00 grand more, with a B Grading? How can that be, how could you look at that house there and basically give it 3% more for this house here? Next to it is a beautifully restored conventional home wrapped in vinyl trim, new windows, very lovely done, this has a Grade C. Now what is it assessed at? $329,000.00. That's a really nice valuation. How can this be so low and this house that has fallen into such disrepair be so high graded above?

"All these homes are down in the block between Courtland and Laton. So land valuation is maybe 20% lower down there. And then you come up to the block where land valuation is higher and these two homes sit next to each other, this is a painted lady Victorian, very nicely done, a lot of exterior work, new kitchen put in, but older, older windows, you know certainly not all restored by any means, but very nicely maintained property and this is sitting at $410,000.00 virtually the same price as the house at 1 Berkeley Street. The building value on this house is $250,000.00 and the building value on the first house is $280,000.00. How can that be? This house next to it just sold. This house the exterior is definitely better than the first one I showed you but if you walk into this house you are in 1945 and it is really 1945. And it just sold to a young couple for $400,000.00 which was a high price and needs a lot of work but it's hard to believe that KRT would put this house above this house and they are right next to each other, they are right next to each other, they are neighbors.

"So I look at what KRT did on our street and I say, "that wasn't well done". And people have abated on some of these changes and I think very legitimately so, I think the second go-around on some of those houses was absolutely uncalled for. And people were irate, because once they put the change on, there was no hearing process anymore, because it was the second go-around. And all they had left was to

abate. And you know the Assessing Office is like, "Well what is the problem their taxes went down". The problem is that one of these houses took an $80,000.00 hit for honestly I even don't know why. You know? So the model shows you right there, there is a problem with the KRT model. Go over to Monadnock because I talked about Monadnock at the last meeting and if you just – that was an interesting street too. That's a street where the model fails and it's right in the old neighborhood because they had 1, 2, 3, 4, 5 sales and three of them were in the KRT window, where KRT took the data and used it to make their model, they captured the sales data and built their model. Cool. So a house sells for $355,000.00, it is used to build the model and KRT spits out a price on that of $269,000.00. That is pretty off from the sale price and that house ends up with a 76% valuation, that's what the model did. Another house sold within the window of their model for $232,000.00, it comes in at $200,000.00, it is at 86% valuation. Now their goal was to be between 90 and 110. They have another one that sells for $230,000.00; it comes in at $182,000.00 with their model, 79%. They have another one that sells outside of the window, it sells for $522,000.00; it comes in at $489,000.00, that one hit at 94%. Everything else hit at 81, 76, 86, 79.

"So what does that tell you? Well I don't know. I guess when I bought my house and I said, "Well we kind of overpaid for it" and they said, "No there's no such thing". KRT's model shows me all over the City there is overbought houses. They just, they are not worth what they paid for them and the model will show you, relative to other homes, that's not the valuation they should have. That's fine, I'll accept that, let's apply that to everyone now when we are abating and following our rules, let's apply it to everyone. So that is kind of an interesting thing and so I think we have to recognize that there are limitations in the KRT model and there are plenty of people who don't see equity in that model. And Berkeley Street is a picture street, Monadnock Street is another street that really puts it out there. I think we can say that they did the best they could, it was an inherently flawed system, we don't just want to focus on IT improvements, we want to focus on the actual development of the card and the modeling that we are using for that card and we want to get rid of practices that weren't good practices to be doing like the way we apply the median ratio and the possibility that we were chasing some of these sales. That is important stuff. And nobody wants to recognize it in the City but boy it is important to me.

"So I get worried that every time we talk about bringing in a consultant it is KRT, you know we are bedfellows now with them. Is there anyone else we can use? Should we look at somebody else when we do this big, multi – you know, $1.5 million dollar contract would we even bid it? Do they now a precedent and they are the ones that come all the time? You know I think we should expand our thinking and I think we should look at other experts too, I think that's a good idea. KRT, to my disappointment, when this happened and they went down the street the second time and I called them in October and I said, "Well you haven't come to my house" and they said, "Well Mr. Duhamel told us you wouldn't let us in so we never showed up". Of course I wanted them to come in I went to the meeting for that. So Mr. Duhamel had a bitterness to him and made certain that KRT didn't come to our house. So that's when KRT said to me, "Hey we went down your street, we took another drive by, the City asked us to do it, we drove down, we raised 5 homes". I said, "Well who did you lower?". "Nobody". How does that work, I said, "What other streets did you go down". "Only yours". I said, "They didn't ask you to go down any other streets I gave a package, I looked at my street behind me, I looked at Concord Street, you didn't look at any other street"? "Nope, just yours the City said just do yours again". That was very targeting; that was really very targeting, that was not a great model approach. And then when I wrote a letter to CFO Griffin and I said, "Who really authorized this? Why did we do this and who authorized KRT to do

this drive by and make these changes" and this appears outside the scope of work well KRT writes back, John Griffin sends them to KRT and KRT writes back to that request that the street was reviewed along with the rest of the City during the evaluation process, the initial process. It was reviewed a second time at the homeowner's request during the peering process, both reviews were part of our contract. So all of a sudden the second review was put on me. And that's why when people on my street called the Assessing Office and said, "Why were we evaluated again". They were told, "Your neighbor complained and she caused the houses to go up". That was not right. I never had a dialogue with KRT. I was never the one in charge of KRT. I didn't order a second go down on the street, it is absurd. And why would I do that and not have them come to my own home that I was trying to reduce? It was really disappointing for me to read that. And it made me think a lot differently about KRT when I did the Right To Know Law and pulled those minutes and saw that was how it was documented.

"I've been spending a lot of time reading the IAAO manual and there is a nice one on Standards on Mass Appraisal for Real Estate Property" and it talks about how important it is to value defend your numbers. And this is the guide that everyone here throws at me constantly, the Mayor, CFO Griffin, we follow the IAAO manual. Great; it says that the staff should also be prepared to support individual valuations as required preferably through comparable sales. At a minimum the staff should be able to produce a property record and explain the basic approach used to estimate the value of the property. The property owners should never be told simply that the computer or the system produced the appraisal. In general, the staff should tailor the explanation to the tax payer's knowledge and expertise, equations converted to tabular form can be used to explain the basis for valuation. We could never get anyone to explain our card or have any information brought to us on how it was built. We never got there, we are in abatement without an explanation. And as I read these things and these are the standards we use, I feel that we've got a lot of work to do on these standards.

"One last item, I didn't realize Mr. Teeboom was going to talk about the Board of Assessor's seat, the alternate. And I discovered that seat had expired essentially very oddly, I just happened to be going to Board of Assessor's Meetings and they kept cancelling meetings. And I finally went to the Assessing woman, clerk lady, and said, "Why are we canceling, why aren't we calling our alternate in to keep the meetings going" and she said "We don't have an alternate, her seat expired a year ago". I said, "are you kidding me, we are not running meetings because we don't have an alternate". You know, ok, I could do that job, I said "That is one I'd be interested in, I'd only have a few meetings a year, probably 2 or 3, it is an entry level position that would give me a voice and I already go to the meetings".

"So I typed an e-mail to the Mayor and I said, "This seat is open, no one is on it, I'd be interested in it". I ended up reaching out to Patricia, I was traveling she called me back on a Monday and she said, "Oh just to let you know, the person who had it prior wants to do it again, the seat is not available, she's going to receive the seat". I said, "Ok that's the way it is". And then I decided to go meet the individual who was supposed to have the seat and talk to her and I asked her if she knew what was going on in the Assessing Office and the answer was no, had she kept up, does she receive the packets, no, did she ever receive the packets, no. And she said to me, you know, "I made it clear that if the Mayor could find somebody else to do this job, I really am very busy with my downtown work and I really don't want to do it, I will only do it if he can't find somebody else". Well that was a little different from what I had heard.

"So I typed an e-mail and I went back to the Mayor and I said "Hey, I really would be interested in the seat, and just to let you know, to my disappointment, I am not upset that I didn't get the seat, it's



DRAFT

obviously not the place for me, that's fine, this is not my hill to die on, maybe my best work is done on the outside". It was just an entry level you know foot in the door, maybe go to three meetings, I'm there anyways, maybe have a voice on some things, but he gets to pick it, it's his to pick.

"I am disappointed that he did not have the courtesy to respond to my e-mail at all, nothing. It just went into vapor space. And I am disappointed that he doesn't take these seats seriously, these seats that he has to fill. We have a little bit of a crisis in that department and we have some weaknesses in that Board and we could really use a Mayor who is using his expertise and reaching out to try and fill these seats with the best people possible and that may not be me. He may have a better person in mind, that's fine, but at least show me you are working at it, you know? Not that it's just let's hurry up and quickly get someone in there and make this person take it if they really didn't want it because they are the best person. So that's a little disappointing, it just shows me how far we have to go to really you know fix things over there. And I would love to see some public positions available, maybe it doesn't have to be anything permanent, but some short term openings where the public could participate maybe in policy creation, a one year seat or panel, discussion group, work with consultants, try and look at better ways of doing what we do down there. I think there's an opportunity for that, that's not a long term position, it would just be a short term thing and that might be helpful, but not my hill to die on, it's ok that I didn't get it. Thank you."

**Board of Aldermen Tuesday, March 26, 2019**

**https://www.youtube.com/watch?v=9CSTXVyae_Q**

**22:52**

Laurie Ortolano, "41 Berkeley Street. I wanted to start off by extending an apology to the Board of Assessors. I went out to their meeting on Thursday and at the end of the meeting one of the members was pretty deeply offended by my comments at this meeting where I stated that meetings had been cancelled because there wasn't a quorum. And I believe I said that three meetings were canceled and it turns out that the two meetings that were cancelled in February were canceled, a meeting was cancelled on February 7th because they didn't have a quorum and I got an e-mail. Then a week later a meeting was cancelled on February 14th because they didn't have a quorum and I got an e-mail. But it wasn't a separate meeting, so that wasn't two meetings cancelled in their mind, it was one meeting cancelled twice. I was not really aware of that because I wasn't paying attention to the date; I was busy. And the meeting prior to that that was cancelled was cancelled due to a lack of work to do in their minds so they didn't hold the meeting.

"I told the Assessor member that I would come forward and clarify that; I think there is still some other issues with our Board that we can work on and deal with. I want to extend that to you, any misinformation I gave you. It was only the two meetings that were cancelled for a quorum and I don't know if we are still looking for somebody for that Board or not. So that is taken care of.

"I would like to talk to you about your nepotism policy. I was unaware and as you know my husband and I had our issues in the Assessing Department and one of our concerns is the fact that relatives work in the Assessing Department, we have two brothers. It really didn't work for us, the whole situation ended up being, I think, handled in a complete conflict of interest by the two brothers being involved in our

case. It has bothered me a lot when I came out to the meeting and the Mayor spoke about the changes at the management audit meeting and he mentioned that we have an assessor in the office who is a Certified Supervisor who could take over working for the office. I was really upset by that because it is one of the brothers and I just could not stand the thought of a relative taking over as an assessor, as a leader over a sibling, a relative. It just upset me enough that the next day I went to Kim Kleiner's office and said – You just can't do this. Then last Friday, out of the blue, I don't even know why, I never checked. I e-mailed your HR Director and I said – Do you have a nepotism policy. Well it came to me Friday afternoon. The policy very clearly states that "no relatives will work in the same office if it creates the appearance of a conflict of interest" that was number one. The second part of the policy was "no relative will work in a supervisory or managerial position above any other relative". No questions asked, it is just not happening; well in my opinion we violate that in both cases. We have brothers in there, not only were they working in the same office, they actually had the same role, they were both the residential assessors. You have four assessors, the two that served as the residential assessors were the relatives for 10 years.

"For our situation, you know, we had a dispute with how an assessment was created on a property by one individual. When we asked for a review of the property the individual that came to the door was the other brother. My husband was really upset about that, he came to the door, my husband took his business card, read it and said – Oh any relationship to the gentleman who created our assessment? And he chuckled and he went – Well yes, I know it doesn't look good but … Personally I don't think anyone should be at your door telling you it doesn't look good "but" if it doesn't look good it's not good and you shouldn't have been there. But he came in, I said to my husband – and my husband's next comment to him was – By chance is the supervisor or management, do they carry the last name as well. And he chuckled and said – Well no. We had him come in, he spent about 40 minutes there, I said to my husband privately – We are going to throw his brother under the bus, because we ain't holding back. It's not our fault he sent the brother. We've got a problem and we are going to put it all on the table. So we did; we went through everything. We showed him the property card at 17 Berkeley Street that his brother discounted deeply on a half-price home, how that happened. He kept circling our dining room table and flipping to that property card and pursing his lips and just looking at the data.

"We peppered him with a lot of questions, we walked him outside, down the street. We asked him to explain effective year build to us and he couldn't. He said – I just can't really explain that to you right now. And we said – OK but we are really trying to understand what happened to our property. He came back in the house and he said – You've asked a lot of good questions, you have a bigger issue here I can see. He said – Give me a week and I'll get back to you. He left and we never heard from him again. Now I held out, I know I am more naive than my husband, my husband said – This is over, you know, this brother ain't going to do anything for us. I held out hope and I said – Well give him a chance, give him a chance, give him a week. One week went by, two weeks went by, three weeks went by. I'm in and out of City Hall, the third week I saw him in the hallway, I said "Greg I am waiting for your response, have you looked into our situation and what did you determine? Oh, Oh, I'm talking to my boss, I'll follow up, I'll get back to you tomorrow. The next comes, nothing; the next day I send an e-mail. Oh, Oh, I still haven't followed up, sorry. And we just never heard and that was the issue with our abatement that set us off so much is that our issue was a fight that needed a legal entity we felt because we couldn't even get the City to agree that there was a legitimate dispute here.

"So we knew we were going to be locking horns. And when they Mayor was talking about our tax rate going down publicly we were so concerned that he was sending a message with his authority and his influence to the assessing office saying – these people really don't have a legitimate complaint. What are they talking about? Their tax bill is going down. So I have a Mayor who is making those public statements, I have a brother at my door who is backing his brother. And I am just going to tell you it was an awful experience. And this should not be happening, it is too small an office to have family in there. Now to extend it further, sometimes when family is in an office together things can get a little chatty about family stuff. Do we have that situation going on? Well maybe I won't answer that for you tonight. But I think and I spoke to Steve Bolton about it and he said he has heard that is an issue. Now that doesn't mean that Steve agrees it is or has looked into it; but he's heard that, ok? I've spent enough time down there where I have an opinion. But that happens because you put relatives together.

"I met with Kim Kleiner today and I said – Imagine what it is like for the other two assessors down there and imagine what it is like for the rest of the staff when you're working. I think that's a problem. I spoke to Larry the head of Human Resources yesterday after I got the policy on Friday and I said to him – Now that one of them is gone off and done a supervisor certification, was that individual told that you cannot serve in a management capacity in City Hall because you cannot manage your brother? You cannot serve in that capacity? Because I don't think that was told and it should be explained. It's great you're moving up, it's great you want a promotion but you are going to have to seek that outside of Nashua, or one of you has to go because we are not going to allow a supervisory role in our City Hall. And he couldn't answer me that was explained to the employee but it sure as heck should have been. The policy was last updated in 2014, I really think those policies should be given to every employee. And I asked Larry – What other relatives do we have in City Hall that are working together in the same Department? Are others working under managerial roles, because we should know that, just from a conflict of interest standpoint. I cannot tell you, I took this to Commissioner Stepp, how much and strongly I feel that in an Assessing Office, where they follow Code of Conduct and Ethics Rules from the IAAO, from the NHAAO, from the DRA itself there are 3 different conflict of interest in ethics policy from every organization that our folks belong to because assessing and the money are important issues. When you have that kind of regulation there at that level, I really believe that you should not set up that type of conflict.

"I was in Kim Kleiner's office today and I showed her a property card that was worked by the relatives and everything on it that was wrong and not owned by those individuals for what they did wrong, until a property owner in your neighborhood behind you bought it in 2017 and got completely screwed because permits weren't handled correctly. The MLS correction wasn't handled correctly and when they moved in, they didn't realize that a permit that was opened in 2010 and closed, was never valued. It didn't get closed until 2016, you've heard me argue that you can't leave permits open that long. When it got closed in 2016 the relative assessor, one of them, didn't value it. The house sells in the fall of 2017, the couple comes in, they think – OK. Then all of a sudden in December they get a call from the bank that their escrow account is empty and they owe $2,500.00. They were stunned and they didn't get a letter from the City, they didn't get the Assessors calling saying we are so sorry, we screwed this up, we own this. They got a hard EYB adjustment like I did so their assessment went up $100,000.00 more and you know with the tax rate at $25.00, they owed $2,500.00 bucks more, it wasn't in escrow.

"Of course as property owners they called the Assessing Office and said – What happened? And they got a story – Well you know you did pay more for the house and this was the type of adjustment we make and this is what we do. I went over to that property this weekend. I brought that card, I brought all the

information and I showed them what happened to them. It wasn't right and it's manipulated by two relatives I don't like it. It's not good business. So you know, I'm a little hell-bent about changing that, there's no question I am not going to put up with that right up to the State level. That is going to be something we work on and try to fix.

"The other thing I want to talk to you about, I think I could safely say Steve Bolton and I have pretty much locked horns on the issue regarding the equalization ratio. We had a good battle at the end of the Board of Assessor's meeting. So I think my job is to push and his job is to resist and so that's the way it is but I want to explain something to you. I'm really sensitive about the use of this ratio on these abatements. The use of a ratio is a complex issue and maybe most of you here don't know about it, I certainly didn't. I feel that our Assessing Office is not using this ratio uniformly the way the State has set it up to be used. I see assessors, namely the relatives, applying the ratio randomly. I started digging into this two or three months ago. The abatements for 2015, 2016 and 2017 were the ones that I looked at. It seemed like for every cluster of 6 that I would look at, 3 got the ratio, 3 did not. When I filled out my state complaint, I sent this data to the State on my PA71 saying –Why is this happening? Why do some get the ratio and some don't?

"When I talked to Steve about it back a little while ago, his position well abating is a negotiation and you find that in the negotiation process, the ratio, some people if they've negotiated, the ratio is just kind of taken away, it's all part of the negotiation. I agree with him on that for commercial properties. Commercial properties and the bigger properties where it is lawyer to lawyer, those are, they are negotiated. You've got two well-educated attorneys that are battling out what I see the big accounts; Pheasant Lane Mall, the utility companies, the big boys. They are working on striking an agreement and I agree that the ratio gets mixed in to that type of negotiation. But I will tell you for residential properties, really100%, I don't see negotiating going on. It is not happening. The residents don't know how to negotiate, they are pretty ignorant and they are not even doing a good job picking properties because the tools they have are pretty terrible. And the assessors are high school diploma people, certified. They are not appraisers, they are not lawyers and they are not negotiators. So you've got these certified assessors talking to the ignorant ratio people/property owner about what value their home should be. I see no evidence of negotiation. What I see over and over again is all the properties that the resident lists, the assessor says – Yeah your choices stink, I threw them all away; ok here's my 3 choices, here's the number I came up, here's your value. And they call the guy up on the phone or the lady and they say – This is the number I got. And I don't see any negotiation going on where the numbers are changed or are different, that's the number. And the people have to go – Yeah OK that's what you say. Because they don't really know how to argue. So now once you pick the market value then you multiply by the ratio.

"In the last 3 years the ratio has been below 1 so what it means to an assessor is that they are going to pick a market value like $300,000.00 and then they agree on it. The ratio is 80% so that means that the house is going to be actually assessed for at $300,000.00 it is going to be assessed for $240,000.00. It is going to be 20% lower of $300,000.00. So the assessment is going to be $240,000.00. So they look at what the people paid last year is what they are supposed to do, look at what the new assessment is and refund them the money. That is an equalized assessment; that's done to maintain equity within the data base of the assessing data Ok, now people don't know they are supposed to get that ratio. One of the reasons they don't know is that form that we give out to file an abatement that I used, doesn't have the ratio information on it. I kept saying to Commissioner Stepp up at the DRA, she said to me – The form has the ratio information on it. I said – We don't know about the ratio, we don't understand the ratio

down here. Well the abatement form has the ratio on it. There's a section that explains the ratio; so I kept going back to my form going – there's no section.

"Today she e-mailed me and she said – Here's the link, here's the RSA link in the form for abating printed out. Well sure enough the State form has a whole section that explains how you multiply out the ratio to calculate your new assessment to weigh it off against sales data, but we delete that on our form that we give to the public. So that's why I didn't know about it. That's why to me, it wasn't there. Now I personally don't think it should be deleted, I think the public should see this write up on our form. But I don't care if you delete it, I want you to apply it because it is still a confusing thing. I just want it to go with everyone. So to prove Steve wrong, I said – OK Steve is saying – Oh Laurie, half of those houses are in negotiation so they didn't get the ratio and the other half got it. For three years that's what you've seen in all that data. So I said – Alright, I'm going to go to 2012; the ratio in 2012 was 1.09 it was above 1 right? So I am going to pull out 50 abatements from this two people in the Assessing Office that are irritating me. I am going to take 50 abatements and I'm going to look 25 on each one and I am going to see how the ratio is applied when it is above 1 because that means that they are going to give, no matter if they multiply by it every time they are always going to give the property owner less money back.

"So what did I find? 100% of the time, except one abatement, they applied the ratio. The multiplied on all those abatements 1.09, 1.09, 1.09; so if what Steve is saying to me is true, that in some cases it is a negotiation so the value is just 1 then I would expect to see half of those negotiations happening and the value be just 1. But I don't; it is multiplied every dang time. The one that wasn't correct which I found very interesting, the assessor changed the ratio from 1.109 to 1.15. He multiplied by a different ratio. Why? Because he wanted the assessment price to be higher than what he had calculated, he wanted to make it even higher, by $4,000.00 grand even though his math showed that it should be $4,000.00 grand lower, in his mind, he said – Yeah I feel like adding $4,000.00 grand on this guy. I am going to multiply by 1.15 and he upped it $4,000.00 grand. That ratio should never change it is a constant calculated by the State.

"But if that was a negotiation, maybe the person called and said – I don't want your number of $216,000.00 I want you to make me $220,000.00, which I can't even imagine, but then the negotiation should have been on the price, the sale price; but there is no indication that a negotiation took place. That assessor, for some reason in his mind, decided to throw a little more value on that property. So that is a question I had to the State, you know, why should anyone change that ratio. I saw that with some of the ones in 2015, 2016, and 2017 that if the ratio was 88.5 they used 90.2 because they just felt like changing it a little bit. I don't know why. And to me, and it's not because it was last year's and it was the new ratio hadn't come out so they were using the old up until that time, nope it's not that. It's just that the ratio is being tweaked.

"We need to figure out how to use this ratio and treat people fairly. I am so staunchly opposed to letting people who aren't educated, like I have become, not receive what I am going to receive because I am going to fight for my ratio because I know how. And all my neighbors on Berkeley Street are going to get it because they are going to know how. And the people in the Assessing Office that have filed abatements they are going to get it, because they know how. But the rest of the public isn't going to get it because they don't know how. And that I don't like, I think everyone gets it or no one gets it. Ok? Tell the State and tell Lindsey Stepp, screw that equalization ratio, dump it and give it to no one, because I'd





DRAFT

rather see no one get it, than me get it and no one else because I know how to argue. It's not right for residential properties; everyone should be treated the same.

"So what happened is that the State came out with our ratio, it was .95. So that means if you are doing abatement you get 5% off your sale price. Steve informed the Board of Assessors that he thinks KRT feels that's wrong, it's too low KRT thinks it should be 97%. So Legal is considering filing an appeal; they have a month to decide. And they can file an appeal to see if they get it down to 97%. Why are they doing that? Well as I looked at the exposure report that I think you've got a copy of, we have some big accounts, big commercial properties that are going to abate, like Pheasant Lane Mall and some big dollar properties. So maybe saving the 2% is a good bit of money. So for those big commercial properties it makes sense and I get that. But what he told all the assessors in the meeting is – Don't give the ratio, keep the ratio 1 and basically don't give the ratio that the State has set to any of the residential properties. Anything you do from this point forward, just use 1.

"Well the meeting ended and my pitch was, why are you doing that? The ratio is set. Now I know you want to potentially appeal it, but I'm going to be smart enough to say – I'm not going to settle mine until I know what the number is. Because even if he announces in the meeting – I think it is going to be 97%, why should this City pocket my 3% in your pocket? Why don't I get the 3%? Why don't I have the option of having the 3% applied before I sign off on my paperwork? I don't want you taking the 3% from me. I want my 3%. What does 3% mean or 5%, if it ends up being 95% like the State said, on a $300,000.00 home, your assessment is now $285,000.00, you save $320 this year on your tax bill. Multiply that over 5 years with a rate increase; you are going to save $1,700.00. If you asked a residential property owner – Do you want to save the $1,700.00 and use the ratio or do you want to let us keep that? How many are going to say – Just keep it? I'm not going to let you keep it because quite frankly, I've overpaid you like $20,000.00 grand and I feel pretty damn screwed. I want all my money back and I want my ratio and I am going to fight for my ratio. I don't want to give it to you.

"So we locked horns at the end of the meeting and didn't come to an agreement. I immediately left that meeting and e-mailed Lindsey Stepp up in Concord, the Commissioner. Then I went up there yesterday and I had a talk with her assistant and I asked today if they could set up a meeting so I could go back up and talk to Chuck Reese or some of the people up there. I'm in the throes of drafting up another letter on what my position is just like I've kind of explained to you. I wish people in City Hall understood what equity means and that the appearance of fairness is really important to some of us. That's all I want to feel like we are being treated fairly. And I want us all to have a fair shot at that ratio. And I want these assessors to know that you just apply it. Negotiate on market value, I don't care but everything you do is on market value. When you are done with that, multiply by the number that the State says to multiply by.

"For some reason there is a power trip going on in there, there is a power trip with certain assessors who feel like they can put the screws to somebody by not giving it to them. I don't like that. It's random, it's targeting, it has all the elements in it of something not good. And part of that is happening because we put relatives in the same office.

President Wilshire "Ms. Ortolano if you have something new to add? We've given you a lot of latitude tonight."

Ms. Ortolano "Ok thank you."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE APRIL 1, 2019**

**https://www.youtube.com/watch?v=s1NeI2eBV7g**

**17:25**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I don't know if you are going to take up the position for the Director for the Assessing Office. I don't have an agenda so I don't even know if that's on there."

Chairman Caron "Yes it is."

Ms. Ortolano "It is on there, ok. So I just wanted to convey a few concerns I might have in that area. It is very difficult for me to think that we can run the Assessing Office without management down in the office and that is not the first area we are focusing on to stabilize what has been a difficult situation down there. I am a little bit concerned after the meeting a month ago that the Mayor talked to some of us and mentioned that hiring a Chief is very difficult, they are positions that are very hard to fill and get. If that's the case, it makes me wonder whether the whole focus of the technical part of assessing should be an outsource job for the City. I know most cities don't do that, I know many towns in New Hampshire do do that and I don't know if you will spend any time discussing the differences of the possibility of outsourcing the technical part; the running of the model, the creation of the cards, the inputting of the permits, the MLS verification. If that could be handled as an outsource piece, with the clerical work supported internally by staff in Nashua, but I've focused and moved towards that opinion in the last month because I see so many obstacles down there in staffing and getting the right resources to do the quality of work that we want to have with our cards and our data system. I don't know if the Mayor brought the directorship forward with possibly in mind the idea of outsourcing the work down in the Assessing Office and that just hasn't been shared publicly; maybe that is his intention, I don't know. But it just seems to me like that might be a direction we should look at. I just wanted to share that with you as a concern. Thank you."

**Board of Assessors April 4, 2019 – No VIDEO LINK**

Ms. Laurie Ortolano regarding assessing-related matters

Ms. Ortolano stated that as the members are aware her communication is regarding applying an EYB (effective year built) with a permitted property versus a sold property. She advised with their (Ortolano's) property the EYB got shifted heavily after they purchased it and the EYB on the current mayor's property after completing permitted work, did not. The use of EYB is important and it effects assessments a great deal. I talked with KRT and how they approach the modeling. EYB is what they look at to affect the model. If we are not treating these EYB's uniformly it is affecting equity when it is more randomly applied. She told the board that she hopes new policy is made that requires the EYB be applied more uniformly. Ms. Ortolano noted they have a brick home. Brick is porous and at some point it needs repointing. She is now fixed with a $75,000 job for this repointing and also with the cost of replacing an old roof, costs which she would not have if she had a 1994 home. She said she hopes policy in the future and guidelines, when established, will correct some of these differences.



DRAFT

Mr. Hansberry noted that Mr. Rob Tozier of KRT Appraisal has recommended we move away from EYB and administration has agreed. Ms. Ortolano said yes that is true but this will not be done for another five years. Mr. Hansberry noted it is something they were going to try to phase in but it may take some time. Ms. Ortolono pointed out EYB is driving the condition factor in the assessment data and that is what you are going to be using when you correct properties. Mr. Robert Earley asked if any other towns use EYB and Laurie replied she checked with the Town of Hudson's Chief Assessor and they also use Patriot Properties for their assessing software but use condition as the driving factor and not EYB, as the City of Nashua does. She said the Town of Hudson's

Chief Assessor told her that when they look at older homes they rarely change the EYB to anything over 1979. So the restored, nice older homes EYB are not being put over 1979. She thinks he is more correct than wrong and the EYB on an older home should never go above 1979. She said at the last meeting the board may recall she interrupted the meeting. This was because Ms. Kleiner had said she had a discussion with the DRA and Mr. Chuck Reese regarding what they consider best practice according to New Hampshire law. Ms. Ortolano was hoping a member of the board would ask Ms. Kleiner what the DRA believes is best practice. Ms. Ortolano said she was interested in that because she is a resident and would like to know this. Because that is super interesting to her, that is what generated the interruption but said she certainly will not ever do that again. Regarding the abatement on 1 Farmington Road that came before this board, Mr. Magovsky was told he was 'cherry picking' his sales and should have gotten comparable sales in the same neighborhood. She said she does understand about neighborhoods but when someone has a cape and a ranch in the same neighborhood as comparable sales, they will say go find a ranch. She asked if the board looked at what Residential Assessor Gary Turgiss produced for comparable sales and where they were. She said he was 'cherry picking'. She said our guys are assessors and they are not appraisers.

She told the board she had a meeting with Ms. Kleiner and discussed the software made available for taxpayers to use to pick comparable sales for their abatement and said it is very coarse. The assessors have a license for Co-Star which is a program allowing them to pick sales using other filters. She suggested this be put out on the city's website to make it an even playing field. She said she does not know what the cost is but if our residents can make better picks and create their abatements with greater data, it is her opinion the process improves. Mr. Hansberry said we have an expert software consultant looking at this and the goal is to make it more user-friendly. Ms. Ortolano said she would like to make one more comment regarding the concern Mr. Magovsky had on the 5% discount applied to his land due to the easement. She said Mr. Early was concerned that this board does not have the authority to apply a higher discounted rate on the assessment for this easement. She asked if this board does not have that authority then who does. KRT had a range on how the easements affect the value of the home. Ms. Ortolano told the board she wishes the board had not agreed to the proposed assessment until you had a chance to look at the easement issue. She said that is just a thought and since she knows the board has a lot to do in a nonpublic session, she will stop here.

**Board of Aldermen Tuesday, April 9, 2019**

**https://www.youtube.com/watch?v=dGpkYZfYGDo**

**2:02:42**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I was kind of glad tonight I was last and there were people before me, but here I am. So I wanted to share with you after the last meeting, I went home and did a Google search knowing very well that what has happened in our Assessing Office has happened in other communities, surely we are not the first one to go through a struggle where we are trying to rebuild. I came up with an interesting article and a transition that happened in Chicago with their Assessing Office. Chicago some has some areas that are notorious for their crime so they've had an assessing structure that has had a tough element to it because they Chief Assessor is an elected position. In the office over there, they were willing to accept gifts brought right to the office and donations brought right to the office which had just become a major issue among folks. So in comes February 21st or February 19th, a gentleman, highly educated, had never run for elected office, he had an MBA out of Stanford and worked 5 years in Russia as a financial analyst in a large mutual fund firm. He wins the election and he comes in and he has three principals that are going to guide his tenure as Assessor; ethics, fairness and transparency.

"He starts writing Executive Orders immediately and generates a 100 day plan which is moving along nicely, I get an e-mail every day from them and he sets up a visitor's log, which we have done, so the public so would be aware of any meetings with direct level employees or higher people in the office. He wanted to end so-called access to preferential outcomes. He described his work as complex and difficult and the referendum and reform of the Assessor's Office would be objective of taking a complicated system and making it better. Another policy he implemented on his first day in office was terminating any employee who had been hired or who had any form of nepotism, he implemented a strict anti-nepotism policy. He looked to eliminate many appeals and he introduced a number of new staff members, including outside experts he hired from the IAAO, data scientists and assessing officials from other states.

"He summarized it by saying the work isn't sexy but it is very important. And I thought it was interesting because I raised that issue regarding anti-nepotism in our policy and I know it struck a few notes but I think it's very important especially in an Assessing Office, because they operate with standards, ethic standards that are additional guidelines beyo nd an anti-nepotism policy that I think create a problem when there are relatives in an office at that level. I just want to let you know that I did reach out to Larry Budreau and he was the one who sent me the policy and I wanted to meet with him to talk about what was going on. I received a response back that he did not feel a meeting would be productive and he was respectfully declining any meeting. I do feel that you have some issues with your Human Resources Department that you should address and the one issue or the one item I raised with him is "do we know what other departments we have relatives working in or related people". The response that I got back is that we have documentation on that type of information and because there is documentation there is no right under RSA 91:A to answer the question because nothing is in writing. Really when you create an anti-nepotism policy or any policy and you are going to violate a policy, you should do a manual over-ride. I have a friend whose been a Human Resource Director at a company with 30,000 employees for 30 years. And they were the ones who said to me "you've got have an over-ride, you can't break a policy without an over-ride and the over-ride should be signed off by the management chain and it should be fully documented.

"I believe in that; I think that's good business and is good for the City and I am not certain we do have an over-ride policy. I am not sure all hires are going through Human Resources so that the screening for

these issues can take place. You know if I had the chance to meet with him I would have said that I think it is important to send a letter to all Department heads to understand who might be in your departments that are related or have a relationship and identify them, identify what their titles are and do we have a conflict here? And hiring that is handled that's handled in non-public session that's very typical for hiring to be handled in non-public session, I understand that if you are discussing personnel matters. But I know when I was on a Board once we discussed those matters and we knew the individual was going to accept the job, we came into public session and put the nomination into public session and did our vote in public session so that the public would know who we are hiring.

"My opinion is that if you are going to break an anti-nepotism policy in public session you should identify that and you should say "there is an issue here, we've over-ridden our policies, we have the proper sign-offs on this and we are moving forward this is our decision". My feeling is if you're not comfortable doing that, then you probably shouldn't be doing the hire because if you want to keep it a secret and not say it, then maybe it's not the right thing to do. And I bring it up because I happen to have some information come my way that other departments have had hires that are relatives or have relations that have made it into the system without an apparently screening process at all. So I don't think we are living up to our policy and I think it affects the quality of the work and the process and the product that we deliver here out of City Hall.

"So that's one thing. The other thing is I know that Ben wanted details, I needed to be more detail-oriented on what I saw was wrong and all I can tell you is when I filed my PA71 with the State this is the binder that I delivered. It contained many, many property cards, probably 300 pages. I put together a lot of detail because I was disturbed by what I saw here in the City. I can't come to a meeting like this and address that kind of detail here. It just won't work. Anyone can reach out to me and ask me if you want to be more educated about the things I am concerned about, that's fine.

"The other thing is the Board of Assessors, I would like to be able to take most of my issues to the Board of Assessors and have them addressed there. I don't think they belong here. But I can't make that avenue work and it's very frustrating. I delivered a letter on effective year build and concerns with an example on a property card to them three weeks ago. It was completely ignored, not even acknowledged for the record. They brought it back last week; they acknowledged it on the record but with no discussion. So if you can't get to a substantive discussion on issues that affect the quality of the assessing data base and a lot of home, then what good are they? I tried to track your meetings and one gentleman is very combative, so it is very difficult for me because I see an individual who I believe has a personal agenda. They are not willing to look at the big picture stuff that affects – you know – sales chasing, effective year build, these are all letters I kind of had sent to you, MLS Correcting, Permit Captures. We are dealing with valuations; favoritism and unethical conduct when it comes to assessing properties of potentially influential people. Those are important issues and if you can't have substantive discussions about those, I really don't know how you improve the quality of the data. All the software stuff you are doing is great but the software does not create the assessment on its own; the judgements are coming from the people and ultimately the management within the office.

"When I look at the Board of Assessors, last year they had 20 meetings, one cancelled, the average for those 20 meetings was under 30 minutes with almost half of them being under 20. They have meetings that are 6 minutes, 10 minutes, 10 minutes, 12 minutes, 13 minutes, 18 minutes, there are a lot of short meetings over there. I think there is room to up their meetings, take yours down by pushing these issues

to them and getting them to respond. So it is super frustrating because they just won't recognize anything.

"They won't sink their teeth into anything or even acknowledge the need for potentially creating policy. So I think policy is so important on a lot of these issues and they just won't address it. I felt like we took a huge step backwards last week with the use of the equalization ratio. One member doesn't really believe in it; I didn't even know that was the case So that was difficult. There was a resident that came in to represent an abatement and I thought it went really poorly for that individual and you really get this "us against them" adversarial feel. It's horrible, it's uncomfortable; it was so stressful for the gentleman who came; he was exhausted for two days after that whole event.

"So I hope that there is some way that someone can give some assistance to what is happening in those meetings so that they can become more substantive to work on what I think are the bigger issues. I know that the City's position, certainly with me, is "we've given you tons of time, you've talked to everyone, you're not happy, we're never making you happy". The reasons that I'm not happy is because the substantive issues aren't addressed. They are waived off and told they're nothing which is ultimately why I created a 3 inch binder that went to the State, because I couldn't get any of that really looked at here. And I'm really concerned about what is going on in that office. Management I think is very important; I'm super happy that a few of you spoke about potentially a Chief Assessor or some management in that office. I cannot tell you how important I think that is. I don't want to hear from anyone here how hard the staff is working; some work hard, some do not. We have some issues that have to be resolved; all is not equal. And that's just the way it is.

"When it comes to HR and our Chief Position, we don't even have a policy where upper management the higher level people check in. The biggest issues is he wasn't at work, he was at work 20, 25 hours a week, this went on for years. So we don't have a way that our people check in and get recorded to be paid, our top level people. I just find that odd. I asked myself what other departments do people not come to work and we don't know. To me if you're not going to come to work you should call Human Resources; say I have a sick or have a reason but not just your boss. This just totally feel through I don't know where and it went on for a long time. We really flushed half a million dollars down the drain in that position in 3 ½ years with benefits and everything else. That is expensive and it was very damaging. When I look back at – I'll end it with this comment and I thought about it last night. When I had my first interface with our ex-chief and I tried to address the valuation of my property which at the time was $700,000.00 a year and a half ago. I had a brutal conversation on the phone where he was unrelenting and punishing that it was fair, it was right, there were no issues in his office. I look back at that now and think "how screwed were we". Because this was a chief who knew what the equalization ratio was and I didn't, none of you probably did either. So when I'm on the phone going "$700,000.00 is outrageous for the value of my home", that was really the assessment, at the time the ratio was about 80%. So the sales value of my home was actually $840,000.00; I was upset at $700,000.00 but this guy knew, talking to me, and I've got a lady here who is upset whose home is, I know what the ratio is, her home is really got a value of $840,000.00 and I'm telling her, "you're fine, don't bother coming in, I'm not looking into, don't bother me, you bought it, you own, pay it, that's it". If that doesn't tell you how much it is us against them when that's going on, and we were totally taken because we didn't understand the ratio and I've done a lot to understand what that means when you are looking at your value. So thank you.





DRAFT

**Board of Assessors April 18, 2019 – No VIDEO LINK**

Ms. Laurie Ortolano regarding assessing-related matters: Ms. Ortolano told the board there are a couple of things she would like to mention. Firstly, she received the packet for this meeting but she did not receive any of the exemption material. She said she let that go at the last meeting and did not say anything but the last time this came up was when Mr. Hardy appeared before the board regarding his exemption. There was a memo included in the meeting material sent to the board regarding this. She had asked former Chief Assessor, Jon Duhamel and Ms. Brown for a copy of that memo and they told her she could not get it. She subsequently received the letter because it is a public issue. Ms. Ortolano asked Attorney Bolton if he had advised this material not be provided and Attorney Bolton said he does not talk about the advice he gives to his client. Ms. Ortolano said if it is a public meeting and the discussion is in a public meeting, if requested the material should be provided. She said she understands why the income and asset information of an elderly exemption applicant would be protected but she does not understand why the material being discussed in public session is not sent to her. She said she knows that Mr. Hardy's denial is heading to the BTLA on appeal. Ms. Ortolano asked that someone please follow up with her regarding this being public or nonpublic. Ms. Ortolano said Mr. Magovsky raised the question about having his property discounted further due to the land issues and he and I have since discussed this and she told the board she has encouraged him to accept the assessment that was approved by the board and not go to the BTLA because it will be 18 months to two years before that is handled. Speaking to Mr. Hansberry, Ms. Ortolano said you made an interesting comment about that street (Farmington Road) being thought of as a nice neighborhood. I did not know that because I have only been here five years. My first impression with the poles is it was not a nice neighborhood and then I saw pictures of what the neighborhood looked like before the trees were cut down. I am almost surprised there was not a push by the city to not allow that to happen. Ms. Ortolano pointed out that Ms. Kleiner said earlier in the meeting that she is speaking to people interested in the open board seat. She said she is going to challenge that. Ms. Ortolano said she does not know if there is an alternate member. Ms. Ortolano said her next matter is a private matter and she would like to request a nonpublic session because it effects the reputation of a worker. She said she is trying to be sensitive to matters which if discussed publicly would affect the reputation of an employee, but she is happy to speak in a public session, if not allowed to speak in non-public. Mr. Earley suggested we discuss this at the next meeting in a non-public session because the members do not have any information on the topic. Ms. Ortolano said she will not be submitting any information prior to the meeting. She will not be asking the board members to take any action. Ms. Ortolano said she just wants to give the members information and let the board members do the research. Mr. Hansberry said he would feel more comfortable scheduling this at the next meeting. He told her she would not have to share the material with the board secretary as it could just be submitted in an envelope marked 'confidential'. Ms. Ortolano said she would not know how to do it confidentially and she really worries about giving information on this topic ahead of time, so she asked that she be scheduled at the next meeting for a non-public session and we will have a discussion then. The board agreed.

**Board of Aldermen April 23, 2019**

**https://www.youtube.com/watch?v=jm9E_1hQH-A**

**48:54**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a couple of things. Laura spoke a little bit about the difficulty in getting answers. At that meeting that she went to with Kim and John Griffin, I attended with her back at the end of March. She asked a lot of good questions. A lot of questions I didn't know the answers to. The administration was pretty responsive to not knowing the answers either. But, I do think there's something to be said in getting a response or a timely response. If it doesn't come that somebody even lets us know that it's being worked on and it will be coming. I don't know what you consider reasonable, but I think a couple of weeks is reasonable. If it is going to be a month or two months, I think that people ought to know that because it's a long time. I can tell you right now there's been a change in practice down in the office set up by Ms. Kleiner to restrict information to the public. I'm not in favor of it. She isn't allowing people to speak directly to the assessors. You have to put it in writing, and it has to go to the assessor for an answer. That really is, I think, too restrictive and not appropriate. I know I raised a question about three weeks ago to an assessor. I went in to ask a question; I don't ask many. I really don't engage the assessors often, but I was asked to be a representative for somebody on an abatement, an individual, and I had a question about basement valuations. I was stopped at the counter and said: "Oh no, no. You have to put it in writing." So I put it in writing and sent the email to the assessor. It was two and a half week's ago. I haven't received a response. Honest to God, it's a question that would take 60 seconds to answer. I know it's that quick, and it is not responded to. I think the reason is she's trying to insulate the assessors from the public because they are concerned or nervous. I just don't think that's the right way to go. I don't think it's how an assessing office should work.

"Secondly, you can no longer access the data records, the public records in the Assessing Office directly. You have to fill out a form and submit it and wait for them to comply with those. I know Laura has been waiting for data. She may have started to get some, but it took a while. I feel I've never abused it, and I am always willing to work with them if they are busy and need a couple of days to do what. I've always done that in the past.

"When this rule came about, about three weeks ago, I didn't put any cards in because I'd been working on a huge swath of data – 800 data points that I'd be able to bring to the Board of Assessors to make a pretty compelling argument to look at outsourcing the technical aspects of the department. I need to prove my data a little bit by looking at files. I went in yesterday and dropped off a list of files I would like, and it was 50 which is a lot for me. But, I said I will take them in groups of ten, however you can do them. But it's different. I'm not certain restricting is really the way to go and that's what we were hoping to do. Remember, you folks in your management audit report set up the department this way. Kim will say: "Well, we are short staffed." Well that's because you chose not to hire a chief because you said you didn't need one. Any other staffing issues that were going on in that office, I don't think were addressed. If the administration had brought you the five-year staffing versus the current staffing you'd, I think, realize your short other positions. But that wasn't presented in the report. The short staffing can't be put on the public to say: "Hey, you know, enough. Back off. We're not going to give you information. We're busy. We're short" because it was your choice. There's nothing we can do about it. I think that's important.

"After the last meeting, I attended the coffee at JajaBelle's. I asked the Mayor a question about outsourcing; how he felt about it because several aldermen here spoke favorably about looking at that. I really do want to look at that for a number of reasons, but I didn't know what the Mayor's position was. He was kind enough to speak to it a bit. He did mention that when you do outsource, you lose control of



DRAFT

the situation. It was an interesting choice of words to me. It peaked my interest as to what he was thinking about, what control we had. I did send him an email to ask specifically what he was thinking about, and I wasn't able to get a response. I'd ask the aldermen or Trish, as my ward rep, find that out for me. That's really important to me. If you're going to have a discussion about this, I hope it's in the public eye so whatever your concerns are and anyone else's, I can hear so if I'm too short-sighted I understand because it's not something that I'm beating myself over saying this is what you've got to do. I don't know the right answer either. I just think it's something we seriously have to look at for a number of reasons.

"The Administrative Services Director position when that was created as a high level position, you all know I was concerned because the management in the office wasn't addressed. I was also concerned at the time when I took the microphone that it was such an elaborate position it would be hard to hire in from the outside. Who do you hire? Who do you pick? Listening to the Mayor describe that position tonight, it's very apparent that when you brought this report forward, you knew that this was going to be an internal position. Just based on the way you spoke tonight that you really can't go outside. The others were internal. It will take six months to look at applicants and another six months to screen. I feel like all along you were of the mindset that this was an internal position. I feel we should be more forthright with that information because that's not how I was looking at it. I have some real concerns with promoting from within. There was a dialogue on a Facebook page recently where people spoke. One of your aldermen, Jan, had posted the letter that the Mayor wrote and it got a number of different responses from people expressing concerns, myself included. I know Jan's position was: Ms. Kleiner, could we find anyone better? She's so qualified, outstanding. Well, my position was the only reason you say that is because you haven't looked at anyone else and you haven't screened any applicants. How do you know? You haven't looked anywhere. Now I realize we're really not going to look anywhere probably.

"I'm disappointed in that because I feel like it was a report done by the person doing the report who carves a position for themselves in this management chain, which I don't think that was what it was supposed to be. To tell you the truth, I think the Alderman's, Jan's position was well, Laurie, you've spoken favorably of Ms. Kleiner. I have. Just because I speak favorably and recognize that somebody works hard, doesn't mean that I would pick them for the management position to wear six hats. I've had some negative concerns too. Some I keep to myself, some I don't. But just because I didn't come to the microphone to share the negatives doesn't mean that I am all on board with the title that you are lining up. I get concerned when people want to put words in my mouth because I certainly think I'm a person who put my own words out there and don't need that help. The same was true at the coffee when the Mayor spoke about what was happening in the Assessing Office.

"He really felt that the software issues were going to take care of the problems in the office and that I would agree with that. I would not. Your budget in your Assessing Office is probably $600,000 in salaries. I'm very concerned about people issues, and the people are the ones who create the cards. We don't have magical buttons in the software that do it. But the integration of the software is very important. I recognize that, and there's value in that in and there's cost savings. The work that Ms. Kleiner is doing in there is great, but I think the personnel issues are missed. I think we have nobody down there who can answer the technical questions on assessing for when the public comes in. Nobody, because Kim doesn't know that information and the assessors are being isolated. Just a few concerns. Thank you.



DRAFT

**Board of Assessors May 2, 2019 – NO AUDIO OR VIDEO LINK AVAILABLE**

Mrs. Ortolano "I have an item that would be public so people don't have to leave. It's just based on what we have discussed here."

Mr. Hansberry "But you had said two weeks ago you wanted to address us in non-public. Do you still want to do that?"

Mrs. Ortolano "I do, I am just saying though I don't think every item I have is non-public so I didn't want to be in non-public if.. .you know I come and I get on the agenda so that if you talk about a bunch of stuff and I hear something I can ask a question so, you know, everyone doesn't have to leave because I just had a question on this piece of paper we just did. You know what I am saying? So this isn't necessarily non-public."

Mr. Hansberry "Alright, it's public."

Attorney Leonard "Well but the board does not have to entertain and answer questions should you not want to."

Mr. Hansberry "But she signed up, I mean she's on the agenda."

Attorney Leonard "Right but I'm just saying, that's...."

Mrs. Ortolano "You don't have to answer."

Attorney Leonard "You are correct, when you go into nonpublic it needs to be limited to the reason you went into nonpublic."

Mrs. Ortolano "Right. I don't want to use it the wrong way. That's all."

Attorney Leonard "Right. Well, more importantly the board, it's the board's prerogative to go into nonpublic."

Mrs. Ortolano "Yes."

Attorney Leonard "I just want to remind you there is still some advice of counsel we still need to address at some point."

Mr. Hansberrv "Right."

Attorney Leonard "I just wanted to make sure. I know you guys have gone through quite a bit."

Mrs. Ortolano "This religious exemption on Chandler Street that was just done, the only thing I noticed was the property at 43 Chandler was not viewed because they could not get in. So as a matter of procedure that we are all trying to follow, I wondered was a card left at the door and why didn't we not try to go back or why did we process this one so quickly because we did not gain entry. My reason to say that is because when I Looked at the property card we haven't been to that house since 2002 so we are almost 20 years since without looking at that property or having an opportunity to get in. And there were some permits pulled, that we don't know what in '18 and '19 what those permits were used for, because you know people can do stuff, that they only pull a mechanical or plumbing but there might be

something more happening inside. So I see permits, I see we haven't been in, I 500 n~ one was at the door, but the church was covered because somebody was there. I don't know if somebody at the church could have let him in the house but, you know, did we leave a tag and why did we not try to go back on this one before we just granted the exemption. You do not have to answer these questions but these are the questions I have on process."

Mr. Hansberry "I think historically it has been used as a rectory. It was a rectory for St. Francis Xavier, which was a Catholic church from back to the 1887 and then the Coptic church took it over and continued to use it as a rectory and then it is being transferred from one Coptic church to another Coptic church where it's continuing to be used as a rectory."

Mrs. Ortolano "That is fine. My issue is though you had the opportunity to see a place where permits were pulled and we do not know if the baseline value is correct to give the exemption. I don't know, is the exemption a full exemption? Is it 100% no taxes they pay?"

Mr. Hansberry "For the rectory, yeah."

Mr. Earley "Usually yes."

Mrs. Ortolano "OK, I just wanted to... ok that's fine. The other thing I just wanted to make clear, it came to my attention from the City that people are of the impression that I have always pushed to have all the assessors removed. I wanted them all fired and that was one of the reasons why being a part of this board was not a good idea because nobody wants somebody on the board who wants to fire all the assessors. I have never I believe pushed that position forward and I hope that's not the position that you have or the mindset you have, or the opinion. Yes, I have had issues with some specific work of some assessors but I have also recognized that we have some that are working very hard. I have never been of the opinion that a clean sweep is what I was going for. I didn't file my State complaint based on everyone; I filed charges that were very specific and this was my complaint and it took a lot of work and it was very databased. I didn't do this in haste. I tried very hard to work with the City presenting papers and technical data that I was never able to get anyone to respond to. And all Of my writings originally until I got to this were really based on data and not targeting an individual or naming individuals but just leaving it to the City or the board to look at the data and say why is this happening. But I was never able to get to that type of discussion or response or answer to any of the letters I put in. You as a board were willing to at least acknowledge that you received one, The Board of Aldermen wasn't even willing to acknowledge that. So and I want you to know something that I found very interesting, when I started all this and I called the State, specifically Chuck Reese, I was going to come to the Board of Assessors and Chuck said don't go there. You're going to find it very difficult. He said they are not going to help you. He said go to your Board of Aldermen and I did that for two months. I don't know why his opinion was that way. It might have been because we had some very senior members that were not, in his opinion, doing the job the way it needed to be done. All I know is I went to the State and that was the direction I was given. I went to the Board of Aldermen for a couple of months and then realized... I called him up and I said Chuck, I'm getting nowhere with the Board of Aldermen. They don't even recognize my letters and when I send them an email, I don't even get a response back that says thank you for your email. I get nothing. I mean you just don't even know where it went. As a protocol, the aldermen do not respond to anything in writing even to acknowledge receipt of it. So, and then no individual alderman, including my ward alderman would respond to anything. So I said to Chuck I got to go back to the Board of Assessors. I have no choice because the charter says they are the ones in charge and if they are not doing their job

then I have to push and push and push at this level because what else am I going to do. I did come back to you and I haven't found it to be great from a response standpoint with any specific letters I have given. None of them have been addressed but that's what ultimately led to this with the State, because I am hoping I can get more specific answers to the concerns because I could not get any in Nashua. I am actually going up there now and going to the ASB (State's Assessing Standards Board) meetings and I am starting to peel away at some of the answers I want, so that has been helpful. I just wanted to put that on the record publicly that my agenda wasn't to fire every assessor in Nashua. I do have specific concerns. So I asked for nonpublic because I was going to address some issues I see specifically with an abatement that was brought last meeting at 7 Auburn Street. I don't care. If you want to do it in public session, everyone's out of the room, I'll do it in public session. If you want to make a motion to go into nonpublic because it is assessor-specific, you can do that. I don't care how you want to do it."

Mr. Hansberry "Are you going to say something that could be potentially damaging to that person's reputation?"

Mrs. Ortolano "Well, if you want I think I can try to just not have that kind of dialogue and if you feel it is, stop me."

Attorney Leonard "So if I may, I have another question. So an abatement was granted or denied by this board two weeks ago?"

Mr. Hansberry "There was an abatement that was granted to 7 Auburn Street several months ago."

Attorney Leonard "OK."

Mr Hansberrv "And then with the equalization rate..."

Mrs. Ortolano "It was actually granted ten months ago."

Mr. Hansberry: "Ten months ago, yeah, so with the equalization rate the adjustment had to be made and brought up to date. So it was actually an abatement that was granted ten months ago."

Attorney Leonard "For which tax year?"

Ms. Walley "2017."

Attorney Leonard "OK so there was an abatement request for tax year 2017. It was processed? So either granted or denied."

Ms. Walley "Back in June and then another one for 2018."

Attorney Leonard "Ok so back in June 2018 and there was an appeal period where the abatement either granted or denied, if there had been some disagreement with the board's action, it could have been appealed."

Mrs. Ortolano "It wasn't."

Attorney Leonard "Ok, so is your intent to bring up a prior year?"

Mrs. Ortolano "My intent is to bring up that they filed another abatement for 2018."

Attorney Leonard "Has that been addressed by the board?"

DRAFT

Mrs. Ortolano "That was just addressed two weeks ago."

Attorney Leonard "OK, so a decision has come down as to being granted or denied right."

Mrs. Ortolano and Mr. Hansberry "Yes."

Attorney Leonard "OK, now these are properties you do not own?"

Mr. Hansberry "Correct."

Attorney Leonard "Are you the tax rep?"

Mrs. Ortolano "No. I have a process question. So how these are being processed."

Attorney Leonard "The abatements are being processed?"

Mrs. Ortolano "Yeah, how we're looking at the data. You know how I just brought up publicly that did we go to the property, did we leave a property card? These are my questions on these, on the process by which we generated this abatement. I want to address process issues because I think there's a problem with this and I went to the State with it when I had my meeting a month ago and I learned something from them that I think we should know."

Attorney Leonard "I think the State can talk for themselves. I just want to be a little careful that I know it can be very hard sometimes. Full meaning or detail is lost in translation. So where we don't have a representative from the State here I would just caution that I would like to just focus on your thoughts and not so much what was said to you by other people."

Mrs. Ortolano "OK."

Attorney Leonard "I am also just trying to get to the heart of what the board process-wise and statutorily..."

Mrs. Ortolano "I think you're just going to have to listen."

Attorney Leonard "I think I would ask the same respect. I was still speaking. So we have got in a case where there has been an abatement granted. There is an appeal process still open for 2018, it seems to me that if the taxpayer, and of course the board is free to do that, I think though that where, if you're certain that it wouldn't effect reputation… so it sounds like what you're saying is you want to ask specific questions."

Mrs. Ortolano "Yeah."

Attorney Leonard "This board as you know can't necessarily answer those. Certainly not right now."

Mrs. Ortolano "Well I realize that."

Attorney Leonard "OK, but I think the board can move forward how they feel. They can always stop and go into nonpublic."

Mrs. Ortolano "Yeah. You can if you think that you need to."

Attorney Leonard "Or we can go right there now."

Mrs. Ortolano "If you want I can work right around nonpublic and try to just present it as neutral as possible and if you feel you want to go into nonpublic, do that."

Mr. Hansberry "I always feel nonpublic should be used as limited as possible."

Mrs. Ortolano "I agree."

Attorney Leonard "I agree and I think there has already been some indication. It is my understanding that complaints to the State are confidential in nature and there has already been mention of those in public session so I do think there is basis for moving into nonpublic session."

Mr. Hansberry "You want us to go into nonpublic session? OK."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE MAY 6, 2019**

**https://www.youtube.com/watch?v=cHBz7AO8Cjg**

**10:06**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm doing a little topic change. I wanted to talk about the Administrative Services Director position. I'm not in favor of that position for two reasons. I'm not in favor because of the way it is being elected, nominated by or at the discretion of the Mayor to appoint. I feel a high level position like this should be a vetted position, should go out to candidates to screen and that we should be looking at a multitude of people that might be able to do that job. The second reason I am not in favor of it is all of this new management really spawned off of the issues in the Assessing Office and I think the position that we really need is a Chief Assessor down there. I can tell you as a member of the public, the public has nobody to go to down there with a technical issue. And that was the problem before when the prior chief was there because he wasn't really there. And we never, as a public, got an answer from the Administration on why he was allowed to not be present for 15 or 20 hours a week. We never got an answer to that. But we now have nobody down there to go to and this Administrative Services Director position is not going to cover it for the technical issues with regard to Assessing. If I have data questions, I cannot bring them to the Administrative Services Director. I can't have data appreciated by that person. And so it's to me the wrong position to fill. So I think you filled something that met the requirements for the Mayor but it didn't work for the public and so that I am disappointed in. Thank you."

**2:47:55**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'll be quick. I just wanted to point out a couple things when the Mayor spoke about the position for the Administrative Service Director. He talked about a learning curve that it could take a year to bring somebody up to speed. I just object with that viewpoint that it would take that long. All the other departments that this position is working with have a Director or a manager, with the exception of Assessing. And I got going looking at Assessing as a full-time mother with an engineering degree from years ago and I pretty much got ahold of it after the first month and understood what was going on at a pretty high level of detail. So I think somebody who is a lot smarter than me with a lot more education and more current work would be able to lock in and do something beneficial for the City pretty quickly.





DRAFT

"With regard to the Director making a recommendation for a Chief should there be a need that is something that I raised with the acting Director. And the reason the Chief isn't supported right now is because the Department is such a state of turmoil and it's such a mess that they want to fix it all before a Chief comes in. My feeling is a Chief should be an integral part of that rebuild. And there's a lot of benefit to having somebody in management who sees it for the big mess that it is and is part of the process to re-create it to a level that they want to work in it at because each Chief has a different style and would have a different perspective on how to set up an office. The State will tell you they have no standard guideline for how a Chief has to set up an office. So I see that position as something we should have right now so they are on the ground floor doing the re-build.

"And with regard to our past administrators, Russ Marcoux came to us with a Bachelors in Administration in Finance and an MBA in Public Administration and Finance and was the Chair of the NHMA. There was a lot of financing and public administration, education right up to a Masters. And Maureen Lemieux, she is now the CFO in Newton, MA through two different mayors. She had a BA in Financing and an MBA in Finance out of RPI. There was a high level of education there. And when they Mayor points out that our acting director has a finance background, they have an accounting background and that is substantially different than a finance background and they don't have an MBA.

"And I am just going to say at some level education does matter and it is something we can look at. Anyway, thank you for asking your question because I appreciate that and thank you for listening to me."

**Board of Aldermen Tuesday, May 14, 2019**

**https://www.youtube.com/watch?v=1XhBB-6LG4c**

**55:11**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street, I'm here to speak to the Administrative Services Position. I think I'd like to ask you to just put it on hold and consider bringing back the Chief position. I want you all to think about whether there is enough money in the budget right now to fund both positions. I would hope that as Aldermen and Alderwomen, you all recognize at this point the need for a Chief. And I am so compelled to tell you from the bottom of my heart I think we need that Chief. Assessing is a complex function and Ms. Kleiner just doesn't have that background. And when the Mayor points out that she's going to be a Director or a Manager, she's managing all other departments that have directors except for Assessing. And Paula Johnson was correct when she said the other Administrative Services Directors, we had a manager down there, we had a Chief. We don't anymore. And the day-to-day functions and the issues that Alderwoman Kelly asked are a serious issue.

"If you are going to just vote this position in tonight and say she is going to take over Assessing, as a bare minimum, please move her office down into Assessing, into John Duhamel's office. Let her work on the culture and the environment down there day-to-day right now. That's a 40 hour a week job.

"She's got the other 25 to do the other 5 or 6 functions and that's going to make up the 65 hours. But I really believe you need that. I've been taking the State's Statutes class this week with Ms. Kleiner up in Concord. It has been super interesting. But you meet people up there and speakers who are Chiefs and





DRAFT

Managers from other Towns that are so intelligent and passionate about their work. And it leaves me feeling a little broken that we can't find anyone like that for Nashua. Why can't we find anyone who is a numbers person who is passionate about equity. Why does that allude Nashua? You know what it is about the culture here that doesn't allow that to happen. And if what the Mayor keeps telling you, that we can't find candidates, then I beg you to please look at outsourcing, because it isn't fair to us as residents to have such a weak department where the bar is so low that you can't get answers to questions. Raising that bar is going to be enormously difficult; I think it will be more than 40 hours a week.

"And the last gentleman who spoke has had a wonderful experience getting questions answered. It is far more difficult for us with Assessing questions because we are dealing with somebody who has no background for something so technical. Those questions require her to call the State every time and she can't even rely on her people internally to go down there and get the answers and she told me she doesn't, which I am thankful for. We should not be taking any information from within at this point, not a good idea. So you know I think it is vitally important that we bring back that Chief position. And I don't want to wait until Ms. Kleiner says its important, we will just wait until she decides we need it. Or we wait until you decide we need it. How does that happen. What does it take to decide you need it? You know what do we have to do? I for myself can tell you there's no amount of data that I can put on the table that would convince there's a problem that hasn't worked.

"I will tell you Friday I had a meeting and Steve Bolton acknowledged that some of the numbers I was pointing out were too low. I honestly believe that in 8 ½ months that is the first time an administrator or somebody in City Hall said "yeah those numbers are too low". I've never had anyone confirm anything. I mean it has taken 8 1/ 2 months to get the confirmation on a number. And I think I've gone way too long waiting for answers, just way too long. You know the problems are deep and what you have happening now, I am sensing the complaints that you are getting hit with a lot of RTK letters, property files, you are. I'm generating a good bit of it. I'm going to dump another 1,000 pages on you pretty quickly here for RTK. You know why? Because I am conducting your external audit because none of you did it. It was your job to do an external audit and the internal one really didn't work. I prefer not to do that, I have to pay a lot of money for those copies – Ben I am hoping you write that letter and waive those for me. But that's what needs to be done.

"And I object to an Alderman like Ben Clemons sending out an e-mail telling me this weekend that I need to prove myself more, get all the reimbursements, get all the travel cards, get all of the information out of City Hall to prove that we have mismanagement. When do you step up and look at the data? When do you go get it? Because I have to RTK all that. I have to put staff through a lot of work to get that. I'd rather let you do your investigation and really get the information. Do it, get it, look at the reports, just let me know you're doing it. I won't ask for it. But I don't know how anyone thinks here that they can really run this place without having a Chief down there.

"You know I sat in a class yesterday and the Chief Assessor who taught for the afternoon ran a Tri-Town up by Lake Sunapee, Sunapee, New London and Newbury I think. He was so impressive. He was a man of numbers and you could tell he really loved his job. And the one comment he said is "I love a really intelligent property owner who comes in and challenges me with questions; it makes me a better assessor". We haven't had any one like that in our assessing office in a long time. You can't go in there with a question, there's nobody to answer. So please, I don't mind that you want to bring the position

back but boat them together and bring back your Chief Assessor. If you really don't think you can get one, get serious about out-sourcing that Department so we can get some equity in this town. Thank you."

**3:18:50**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street I followed all of this discussion on smoking and I think I've watched all of you debate it for probably 7, 8 hours. I wish you would spend a little more time all of you in debate on assessing. I think I've watched you really have discussions on it for just over an hour and 15 minutes. The presentation on the 30th generated about 25 minutes of comments but it was all compliments with the exception of Mr. Jette and I think Alderwoman Kelly asking some good questions and hard questions which were very appreciated. Everyone was just lock step in agreement and thought it was all wonderful.

"It was an extraordinarily difficult meeting for me to sit and watch and listen to an individual up here presenting about all the hard work when I knew what that individual was doing. And it was anything but hard work. So I'd love to see you spend more time as a group, all of you, engaged in the topic of assessing and give it a good 90 minutes in a Board Meeting for me. I'd love to hear that.

"Secondly when it comes to Mr. Lopez's comments about attaching e-mails to the minutes; every e-mail that I have sent to this Board is not attached. And I don't know that you have to request it but for me, e-mails that came to this Board were not acknowledged either, largely, fully. So you know I feel like anything I send to you just goes in the can. So I'd love to see these e-mails put with the record. And last week when I wrote an e-mail to the whole Board and I requested through Trish who was on the hiring committee, she said "Well it's not separate it's all the Board Members that you sent your letter to regarding your concerns about the Administrative Services Director". I went to that meeting and I watched whoever was chairing it acknowledge that several letters had been received and put them on the record, but mine was never acknowledge, because I probably didn't, I guess I had to ask for it. But it seems to me there are e-mails you are given and you should acknowledge them or they should go on the record somewhere. It wasn't as if I didn't give thoughtful attention to that.

"Thirdly Right to Know Law. I think we've done a really poor job in this City of addressing Right To Know. You know when I look back October/November and I wrote a request to John Griffin trying to access information, one of the things I asked for were the expense logs, the travel logs. I knew that there was a log system down there that was supposed to tie to the expense report. I didn't know the specific name but I asked for the log. What I received back is no such information existed; but in fact that wasn't true. Logs do exist and they tie. And Kim had pointed it out when at the last month she asked all of the assessors to start stapling the log to the expense report. Cool, good idea. And then I had the name of it, the full name, you know, expense mileage reimbursement log. But just because as a resident or a citizen on the outside you don't know the formal name and you are asking without saying RTK but asking. It should have been given to me and what came back was a letter that went to all of you at an Aldermen Meeting with the answer that "no such logs exist". They existed and I could have had that information a lot sooner and I could've been looking at this travel information because I went to Mr. Griffin and I said to him after collecting 3 years of data, "your travel logs look fraudulent, you've got a fraud issue in here".

"There's a problem especially with one that is grossly out of line. I was told they would get back to me, he would get back to me in a week and he did not. And then I asked for those logs and was told none exist.

"I am going to be RTK'ing for them again. Let's see what we come up with. But I feel like you are not fully honest about that type of information. And I am now going to also try and find out what is the name of every report you print in assessing. There are a lot of reports you can print. Just because I don't know the names shouldn't mean that I can't get them. I don't know how to request them because I don't know their titles. I sat in a meeting with Ms. Kleiner on Friday, she had a whole sales sheet done up of a bunch of data. I am going to RTK that but I don't know what it's called. What is that sales data? I know I've generated my own, but I have no idea what that report is. So somehow we've got to get a list of all the reports that are being generated so that the public can see all these reports as well. So somebody help me figure that out. Thanks."

**Board of Assessors May 16, 2019 – NO VIDIO OR AUDIO LINK**

Mr Earley "Next one is 10 Briarcliff Dr."

Mr. Turgiss "10 Briarcliff Dr. Staff recommendation is approval. Any questions on 10 Briarcliff Dr?"

Mr. Earley "No questions."

Mr Hansberry "I don't have any."

Ms. Ortolano "I'm the Tax Rep. I was supposed to be invited to the meeting."

Mr. Earley "Go ahead."

Ms. Ortolano "I just wanted to, just because I signed the paperwork. The parties here, the property owner is pleased with this reduction. The only thing they wanted noted on the record was that they had done an abatement in 2005, the fireplace had been removed and the condition of the pool was very poor and they were told it was going to be changed on the card and when they abated again and received the property card the fireplace had been left on. You saw the data. So, they asked me to represent that publicly that they had wanted a refund for that. I explained to them that counsel was not going to accept that because it sets a precedence to go back and ultimately it is their responsibility to make certain that their card is correct. I made a recommendation to the administration that I think the settlement pages should be emailed to people. Anyone that does an abatement and people I have talked to, I have said to them ask for your settlement papers and come get, when they mail out the approval or denial send out the property card, because you're mailing it and they can say check the card to make certain it's right. The people I have said get your settlement papers, I've received calls back saying I've asked for them, they don't know what I'm talking about because it's not a language we use so what I'm telling them is to ask for, the assessors are not used to being asked for that so I asked Kim to come up with a term. Now, it's funny as I go through this, we use the word settlement in here. Settlement values, settlement. So we do call it settlement I just picked settlement papers and maybe it's not the right word. You guys make up the word you want to call it and when people call in they'll know what their papers look like and you could email them to them. I think this is all part, and I represent the owner and this is all part of a public campaign to educate the public. I think it's really important that you



DRAFT

have the papers and have the property card. Just for clarification, this property did not receive the ratio and my assumption is because the changes made were based on changes to the property card and physical characteristics and not the sales data. Is that correct? When it is sales compared, we apply the ratio. When it is just physical changes to the card, we don't. Is that correct?"

Mr. Turgiss "That's correct."

Ms. Ortolano "Good, ok so that is why is wasn't, I just wasn't positive of that and I just wanted to make certain. Those are my only comments is let's see if we can get those settlement papers out to people and mail them their property card. I'm going to say to this couple check your card to make certain its right, because it's on them. I do want to agree this was well done by Mike. I thought this is another example to me of a card that was really looked at, fixed worked with and corrected at a full level. I thought the other one you pointed out was, I agree with you, was an excellent example of an abatement well done, thank you."

**Board of Aldermen Tuesday, May 28, 2019**

**https://www.youtube.com/watch?v=704J7-t9rOg**

**51:13**

Lori Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to address some of the comments raised at the Ward Meetings, at the Town Meetings, last week. The big issue that stuck on my mind was the Mayor spoke with some passion about the demoralizing nature of the investigative report that was done. He had heard from departments outside of assessing and received a number of comments from I think probably management that said it was very demoralizing and it was a real morale killer to the offices. I have a pretty different view of that and what is demoralizing really when you have a situation like what has happened in the assessing office. I will relate it to my very early career when I became an engineer 35 years ago in a field that was pretty much male dominated. I got a job in a company down south and I was very motivated, I had graduated from WPI and had done really well in my field and enjoyed it. I got assigned to a job with a project engineer that was 5 years older than me. Busy job, big deadlines and required some overtime and very early on it was very apparent that the older engineer was not a worker.

"He was a 20 hour a week guy and I was pretty motivated to do my job and he had a girlfriend in another state so Friday at lunch he split and took on a road trip to the other state and rolled in Monday after lunch when he left from that place and came back to work. Every week I would have to listen to the details of what was happening in the shower between him and his girlfriend before he left and when he came back. And then I had to carry the load, Thursday was 18 holes of golf in the afternoon and Tuesday and Wednesdays were work outs at the gym.

"I put up with it for about 8 months and then I was all set and I went in to management I said "I'm all set with this, here's what's going on". You know that was a very demoralizing situation for me in my career because I worked and I had to deal with somebody who didn't work. The gentleman left after a couple months and moved closer to his girlfriend which was a good thing. Fast forward 5 years and I moved my career into a new area, in a new department that had never had a woman in the department. I got put on a very busy, classified project that was over budget and behind schedule. Management made it very

DRAFT

clear that there was no money for overtime and we all had to work overtime. I again get assigned with an engineer who is probably 7 years or 8 years older than me and again wasn't an overly motivated person. Certainly not as bad as the first one, half-time work was pretty bad but could easily shave off 10 hours a week and never came in on a Saturday. Part-way into the project, the Project Manager, an older gentleman ready to retire, wanted me to learn Project Management and said, "I'm going to start sending you the budgets; I want you to look at the budgets and get familiar with them so you can step into Project Management someday".

"When I got my first budget and I looked at it, the engineer that I was working with was being paid 60 hours of overtime a month. I was shocked, I was told there was no overtime, I was working overtime, I never saw my constituents come in once on a Saturday and he was getting paid on a military contract. I was floored, marched into the manager's office and said "what's this" you know "how is this happening". And the answer I got was his wife was having a baby and he was under a lot of stress and he was trying to help him out by giving him a little extra pay. Needless to say, you know my personality now, it really wasn't different back then and it didn't fly with me at all. I went two layers up and I shut down that overtime. That was very demoralizing for me. That's what a demoralizing work circumstance sounds like to me and feels like to me.

"When I look in the Assessing Office and I look at the front end of the office with the four clerical staff women you have there; they work endlessly. They are tied to their computer screens pretty much all day. And I think if you look at any one of their desks you are going to see just piles of paper around them, they are just wrapped in paper. They have very set breaks; I've never seen an abuse of any break time with them. I think it is pretty demoralizing when you have a Senior Assessor who leaves like this Senior Assessor does and tells everyone "I'm heading out to the field" and signs out on the board, "I'm going to check properties" and then you find out he's in the park for 2 ½ hours or let me include that, driving and in the park or in the Holiday Inn lot for 2, 2 ½ or 3 hours at a time.

President Wilshire "Ms. Ortolano, this Board does not have anything to do with personnel matters, so I would respectfully ask that you keep your comments to what the Board has purview of. We don't have purview of personnel matters."

Ms. Ortolano "Well that's ok because what you do have purview of is performance issues? How do we address performance? And that to me is reasonable. And I am addressing something that was addressed by the Mayor at both Ward meeting; the demoralizing nature of this report. I am going to submit to you tonight for the record, which you all received e-mails, the four reports that I gave you. I'd like them to go in the minutes. They will be available for the public to see and read for themselves. I am also concerned by the minimizing I think of the issue by the Mayor. And what I mean by that is I listen to the comments at the Ward 7 Meeting where he mentioned that the investigation was only 2 weeks, that there were only 2 data points above an hour that he was out. I don't know the content of what he was referring to, but it was a month-long investigation and you know I don't want to debate what it was, I want the report to speak to itself. All I have done with this report is give 50 copies out to business leaders and members of the community and shared it through e-mail, without a cover letter. There is nothing to discuss on it. Read it for what it is and that's it. Let it stand on its own.

"Regarding your issue Ms. Wilshire on personnel, I received an e-mail from Ben Clemons that was very pointed that what I provided was very incomplete for the accusations I made. Please get the expense reports, please get the logs, please bring forward the data, show us that what you are talking about is

real. Ok? I didn't know what to make of that. I mean is that something I am supposed to prove? Because that's what I brought tonight; I brought the data that Ben Clemons said "show us, substantiate what you are doing". And I think if an Alderman is telling me I need to substantiate, I came here to substantiate. So I am not certain if you are telling me I can't, I shouldn't or I am out of line?

President Wilshire "What I am telling you Ms. Ortolano is this Board does not deal with personnel matters for City employees."

Ms. Ortolano Well I'm not asking you to deal with it and I am not asking you to reprimand, but I am asking you to listen.

President Wilshire "We have been listening week after week and we just keep hearing the same thing from you about this employee. We don't deal with employee issues in the City, we are not the employer board."

Ms. Ortolano "I don't think you've dealt with this week after week with me, the report came out 2 weeks ago. Really, I didn't say much about this particular employee. And I addressed any concerns I had with your administration and Ms. Kleiner. I didn't come here specifically, the only time I addressed this individual was on the anti-nepotism policy. Right? I challenge you to find the minutes where I've been in here talking endlessly about this individual. I don't believe I have.

"Ben, you raised the issue regarding Expense Reports. And the interesting issue on Expense Reports is back in October, I went to Finance and I pulled Expense Reports from 2014 up on Assessors. This is Assessor became a Commercial Assessor 3 years ago so he took on a different role. So the assessor he replaced, Commercial Assessor, I pulled his Expense Reports, and looked as his travel mileage which Commercial Assessors typically travel very low mileage relative to residential because permits, and properties …

Alderman Dowd "Can I have a ruling from the Corporation Counsel as to whether this is something the purview over or should it go to the HR Department and City Hall."

Attorney Bolton "This is General Public Comment, you've opened it up to speak on any topic."

Ms. Ortolano "I share all this information today, I had an hour long meeting with the Union Leader and an hour long meeting with the Telegraph. They were both interested in writing reports. And issuing a story on these issues. So I am sharing it with you because I shared it externally as well. And because I was asked by an Alderman about this. And I do think it's relevant and you'd want to hear. I want you to know I did do my homework. I went and gathered these reports that were commercial assessors. And when I looked at the Commercial Assessor who left, the mileage travel is very low, 20, 40, 50 miles a month. When I look at the Commercial Assessor who is in our Assessing Department his mileage is very low, 80, 20, 40, 30, low mileage. The Residential Assessors have much higher mileage going to individual properties, 175, 150, the month of April our Residential Assessors covered 226 miles because April was a busy month to gather data. So that's fine. When I look at this individual who moved into Commercial Assessing, his mileage is higher than anyone's, 220, 200, 210, 180. That's very unusual and when I saw that in October it was red flag for me. I went and called John Griffin and I said, "I think you have a fraud problem over here, there's an issue". OK? It's hard to prove, OK, other than giving it to him and I got the response, "I'll get back to you in a week". I never heard back from him again. But then I pushed that





DRAFT

aside, because I said, "that's too big an issue, it's too hard for me". Then I started looking at the property cards more and I started seeing property cards that were so off.

"For example, property cards that had visits to homes written in the activity section that were not visited. So those were potentially mileage charged for properties that were not visited and they could be easily sat down in a round table with anyone who would want to see them to know, to see how I know that and how I am able to ascertain that. But I am; there is a method. So that mileage was very concerning and it is very interesting to me that in April when Kim Kleiner asked for the field logs to be attached, the Residential Assessors attach a field log, they go out to 78 homes, they attach 226 miles. The Commercial Assessor now, who has been charging last month 220 miles, suddenly charges 45, 43; way down. Guess how many properties they visited in April? The very month that we are the busiest we could possibly be in Assessing, because we have so many permits to capture, A9's, exemptions, all this property work, it went to 7. Seven, that is startling. So the expense and the mileage logs from March would tell me that this individual had to be out at 100, 150 homes.

"But the data, the records don't support it. And I want you to understand that, that's the big red flag for me. How do you go from 200, 220, 280 down to 43? And a busy, busy month? The second thing is we could look at that and say you know what, there's a lot of work going on in assessing, this assessor didn't go to properties, what is the big thing happening in assessing? Abatements; abatements are huge right now. Everyone got those abatements divvied up, each assessor got about 90 files they had to work on. When you look at your Junior Assessor, your Junior Assessor in Assessing, who is not certified yet I don't believe, who is in training, since January he has done about 225 pages of abatements. And they are complete abatements, these are heavy duty sales intensive abatements where he had to do comps, go out to the homes, take measurements. So there is a lot of work here. I am going to venture to guess that this Assessor is going to get through 70, 75 abatements, challenging ones. When I look at our Senior Assessor who is supervisory level, look at the packet, 25 pages. And what are these abatements? Most of them, well there were 14, actually there are 8 abatements and 6 of them are fire probations or dilapidated mobile homes that had to be re-evaluated."

President Wilshire "Ms. Ortolano, there is one minute left to our public comment period so if you could start wrapping it up, I'd appreciate it. Thank you."

Ms. Ortolano "Sure, so there's a big issue and a disparity between why is a Senior Official, a Senior Supervisor unable to really put a bite into the abatements and take on the ones that are challenging and get any work done. There are actually no abatements here that required any work at all. Six of the abatements in here are people who filed after the March 1st deadline. So we had to tear the front sheet off, stamp a "D" on it and put it in the file and you get credit for work done. That is three minutes of work, 6 of them out of the 8; that leaves 2 in 5 months. That's pretty startling, so it is not abatements he is doing, it is not traveling to properties he is doing and it is not MLS adjusting because I checked that too. This is where the concern comes in. And as far as morality and demoralizing, I know what that's about. And it is demoralizing when you are a hard worker and you are doing your job and you see somebody who gets breaks like this who doesn't appear to be. Thank you."

**Board of Assessors June 6, 2019**





DRAFT

https://www.youtube.com/watch?v=jcmtmn25apY

**32:30**

Mr. Hansberry "We have appointments regarding the abatements that are being presented. The first one is Mr. and Mrs. Michael Ortolano regarding KRT's recommendation for their 2018 abatement. If you could just state your name and address for the record please?"

Ms. Ortolano "Laurie Ortolano, 41 Berkeley Street."

Mr. Ortolano "Michael Ortolano, 41 Berkeley Street."

Mr. Hansberry "Good Morning."

Ms. Ortolano "I think we'd just to just kind of cut to the chase and present what we think is reasonable and then give some back up and some communication on why we think it is reasonable. The abatement when we saw it last week was not in the format we were expecting the abatement to be in. We thought that the format would be a similar format used by the city and it was not. So Mr. Tozier did a sales grid but disqualified it because he had come to the property and made some data adjustments, and we would like to use the median in the sales grid which I believe was $622,000, apply the ratio, which is what you're doing for all the properties you are reviewing here. You're taking the median that are brought in by your assessors and applying the ratio to them. We would like the ratio applied to the median off the sales grid that he presented and have the abatement taken down to $590,000. That we consider more reasonable. What we know and what we have discussed with the board is that this process is not an exact science. The CAMA model is an average. It looks to mass everything together and create, you know, some average numbers for the city. I have pointed out to you folks some of the streets where the model seemed to fall apart. One of them was Monadnock right around the corner from me. Three data points were used by KRT in their model. One was a home sold in April of 2018, March of 2018 for $232,000 and the KRT model put it at $200,000. So there's a 14% difference on that home. In 11 of 2017 data used in the model, sales data, a house on that street sold for $355,000, the KRT model put it at $269,700. That's a 24% difference in the sale price and the assessed value and these are data points used by the model. I am pointing this out because it shows that the model isn't always right and when I took the States Statutes class with Kim, one of the chief assessors, I believe it was a gentleman from Durham, noted that all of this CAMA work is the work of averages. The work of creating a model. And that's where you can have some problems. That's why we allow the property owner as an individual to abate and to have an individual assessment done based on sales data and that didn't happen here. I think KRT is truly a mass modeler. That's their business and that's their business model and they're sticking to it for the abatement process but I don't think it's the right process to use for an abatement. It certainly is going to take the 25 or 30 abatements they have and produce very different results from what you're doing as a city. The other thing, you folks have looked at a lot of abatements up here and they're all over. I just listened to them. They treat deferred maintenance or a maintenance issue with a home as a reduction in an assessment. I have seen it over and over again. I have watched it for the last 30 minutes here. When Rob came to our house we have a leaky roof in two of the rooms. I didn't point it out to him because I turn around and count that as my maintenance issue. I have actually had a leak repaired twice on that slate roof that has not been corrected and because the ceilings are plaster, it blistered the plaster in our bedroom. Had it all re-plastered and the leak's back again, so we have got to work on that. We do have a slate roof and out of the three comps that he used we are the

only slate roof property. When he came we pointed out that we have water infiltration through the brick that was not seen by Greg when he came to the property in October. It's blistered the whole inside wall in the living room which is the plaster in lathing. The old wall. We had it sprayed with a water sealant but we have the water issue also upstairs in the main hallway of the home. Really the entire house needs repointing. That's a multi-year job and it is also a very expensive job. Somewhere in the order of $70,000 for a re-pointing. That's the maintenance associated with age. Now, I am not complaining that our assessment needs to be reduced on that but you are reducing everyone else's assessment for these types of issues. It seems to me that that plays into the age of the home and what we have to do because we live in an older home. While Rob was willing to take the EYB from 1994 and reduce it to 1989 which he said was relative to other homes in the neighborhood, it really isn't and I am going to show you some cards that show you why it isn't. The home that I asked about, my neighbor's home at 46 Berkeley Street, on my block across the street, had an EYB when I looked at it in the fall, of 1974 and that was a well-done property that I emailed him and said well that's 1974. I didn't realize in his or KRT's move to raise that property up a good bit they changed it to 1989. So that became the benchmark to say our house can come down to 1989 and be equivalent. You know I have a very big concern with having KRT do these abatements. I don't think they're the right outfit to do them, that this is not what they do. When I met with Kim in April the one thing I asked is that we be treated as everyone else on an abatement in the city and that they be given an example of how abatements are done so they know the model that's being used and that that was really important to us that we just have an opportunity to be treated the same as everyone else here and it just didn't happen. The other thing is KRT came down the street after the re-evaluation and did two more drive-downs. John Griffin gave, I believe Rob, 55 property cards and he said he gave him the whole stack of the street and had him come down and look at the street again in more detail and correct homes that were not correct. What they really did was corrected the homes that were called out in our package that we gave to KRT and the city saying that we wanted our assessment lowered because these other properties are very low. So they went to those other properties I called out and they raised them all up. It was almost as if they targeted the specific properties I listed which I didn't understand exactly why they did that, why they didn't do others that were on the street that were so far off, and they didn't. I didn't understand why they only did Berkeley Street because the package we gave to the city contained Concord Street and Chester. Our block behind us is Chester. We looked at our block. We had some nice comps right behind us, in our backyard. So we used those because we felt it was relative to our neighborhood. When I asked Rob why didn't you go look at Chester. Why didn't you look at Concord. The reason given was because the city hadn't instructed him to do that. So they said go in and do a bird's-eye view and target the homes that she looked at on Berkeley Street and the email will show from Rob that the properties were in fact changed…5A, 13, 17, 46 and 50 were all changed and they were changed based on a grade that wasn't correct on 5A right down by Laton St. It went from a C to a B. And then all the others were changed for unknown renovations or renovations due to a fire, which was 17 Berkeley Street and if you recall that was the "bee in our bonnet". The problem I have with 17 Berkeley Street which went to an assessment of $575,000. That's a hip roof brick home, very similar to ours, only all new construction built by the vice president of a construction company. It's a very nicely done home. So is ours. I accept that but the value of $575,000 was very generous for a new-construction home. The concern I have is when KRT took that property card and drove down the street, that card was completely wrong. The conditions of the kitchen and bathroom were average, the EYB was 1959. While they say it was due to a fire, that home had 6 visits by our assessors. Both Turgiss brothers between the two of them made six visits to that property.





DRAFT

So KRT is seeing a home that our guys went into six times. Did they recognize that the card was never fixed? That it was wrong and the condition of the home was completely wrong? I don't know but let's assume they did. They looked at a property like that 3400 square feet, hip roof, brick, added a third garage and a mud room, all brand new at $575,000 and somehow a brick hip roof home that's 1925 that's restored with all the old stuff in it on our end is $682,000. Actually the property was not reviewed correctly when Greg came to it and he missed the patio and the gas insert so the property really was around $687,000 when you looked at the addition of the patio and the gas-insert fireplace, which we knew it was going to go up a little. So I'm sitting at $687,000 and 17 Berkeley is at $575,000 with KRT's value. That was difficult. Now I just told you that KRT went down and did this review. The problem I have is when they started at 1 Berkeley Street, this is a 1901 colonial that has absolutely fallen apart. It is in serious dilapidation. There are squirrels going in and out of the home. You could probably stick your hand in it through the wall, it's bad. It has an EYB of 1959 which I agree but the grade on this property was left as a B and the valuation was $400,000. This is not a B property. This is a D property that probably should have been dropped down around $250,000. But this is what they looked at and they said it's a B. Meanwhile they took 5B, three homes up from it, and changed it to a B property as well because it was a C and that's a lovely property. So how can this be a B? If you go up the road to 32 you got this beautiful, very nicely maintained restored home. It's been in great shape since we moved in. This is an 1890 conventional home, 3,000 square feet. The EYB right now on this property is 1959. It's assessed at $406,000. It has a grade of a C. How can this be a C and this be a B and they're virtually the same price? When he drove up and looked at these homes how do these end up the same?"

Mr. Earley "Mrs. Ortolano was that second one upgraded to a B did you say?"

Ms. Ortolano No, this is a C. It never got changed. He only changed one property that was a C to a B but there were four properties that were C's that should have been changed. All of them and the EYB's don't make sense. I want to show you another. This is a lovely home. I am picking from very nice homes because we have a lovely home and we deserve to pay our fair share. This lovely home is in the same block where the neighborhood influence is 1.25. So we are all on the same land value here. 26 & 41 have the same land value. The land value changes at Courtland. When you go from Courtland down to Laton they drop the influence factor to 1.05 and the lands drop about $25-30,000 on land value from that point down. The buildings are all rated similar but that's where you lose some land value as you go towards Laton. This is in the block that's considered the upscale block. This is a really lovely property, 3800 square feet. It's 500 sf bigger than us. It's got an EYB of 1959 and the grade is a B-. We are a B+. It's assessed at $450,000. That's a really big nice home. OK and think we are at $587,000. The building value on this house is $282,000. Our building value is $500,000."

Mr. Earley "I think you said $687,000 correct?"

Ms. Ortolano "Yeah, but I'm talking building when I subtract the land. When I take the $169,000 off the land and we're at $582,000 we are about $512,000 on our building value. I say $500,000 but close enough. Just to give you an idea this property is a pretty run down property. It needs a lot of maintenance. It really does. The windows are very old, they're broken. It's a tired home. It's got an EYB of 1959. I think that's great but that's a grade B home too. I don't think that's a B grade. It's at $385,000. I don't mind the $385,000 but I'll tell you what when you go back and you look at this, these two are the same, that's pretty tough. This is in a better neighborhood. This has the lower neighborhood rating so the land on this one is $30,000 lower. The building here is just slightly more than the building here. That

just strikes me as odd, very odd. Just want to show you one other. This property is right down the street from us. This is a beautiful property really lovely maintained. Pristine. It's a 1920 colonial, like us 1925, similar. It is on 1.26 acres. This is a big lot over past Bellavance's property. It has an EYB of 1964. It's actually a slightly lower grade than that. It's just a B and not a B+. It's 3900 sf. It's almost 600 sf bigger than us. It's assessed at $532,000 and we are at $687,000, so when we ask you to consider accepting the $622,000 that KRT did, applying the ratio that would take it to $589,900, $589,500, do it $590,000 and accept that I don't feel we are being unreasonable. It kills me to be identical to 17 Berkeley Street or above it when that is a hip roof, brick home so similar to ours, neither has a pool, exact same lot, I know it's pushed down a little but it's all new construction. As a new construction home with a three-car garage and a mud room, we are above that. So when I show you these homes, there's no equity for us. There's a lot of us on Berkeley St that can't find equity. This process doesn't get me to equity. We are not being treated fairly right now when you put me at $590,000 it's not fair but I can't do anything about it. I have to take all these homes to the BTLA and fight to have them all raised. That's the only thing I can do. A lot of these homes ended up low because the city did not capture permits that were pulled. They left them. They left them. Our sister home that is used in the data at 45 Berkeley Street was bought for $550,000. Pulled a permit immediately, gutted the home, rebuilt the kitchen, rebuilt the bath. Did not occupy the home for 6 months. It was a dumpster out there that was filled and filled and filled. Your guy came by and saw it. Did not go into it. He might have been denied entry. Then when it came time to value the permit, he put $0 on it and the property was never valued for any of the renovations."

Mr. Hansberry "Mrs. Ortolano I am going to ask you to take a couple of minutes to summarize because it is supposed to be 15 minutes per party."

Ms. Ortolano "OK so our summary is we ask you to accept the sales grid that KRT provided at $622,000, apply the ratio to that and give us that as our assessment. We also ask that you consider not using KRT from this point forward because we were the only ones who had that grid put in. 47 didn't get a grid, nobody else did. I think you have got the wrong people doing the individual appraisals here. I'm going to tell you both, you need a chief because for us we had nobody to go to. We don't have a chief to call up on the phone and say look at this data-look at this process, it doesn't seem right, help us out. There is nobody to go to. It is very difficult for the homeowner in this city. Thank you."

**Board of Aldermen Tuesday, June 11, 2019**

https://www.youtube.com/watch?v=ptwF_Dayu1g

**1:52:10**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. I wanted to address the issue of uniformity and how important it is in the Assessing Office to have data capture be uniform. The office has some procedures in place. They are working on policies, but they have had some long-standing procedures that allow them to capture their data with uniformity. If a property card is being changed, an Assessor prints a card in its current form, takes it to the property, pencil marks or makes the appropriate changes on the card. It comes back to the office, is either changed in the data system, the Patriot System/Assess Pro by the Assessor or by a clerical staff member. The new card is printed, stapled to the old card, it is reviewed by

the Assessor to make certain all the data is correct and it is filed. It is a system that actually works well. And if it used by everyone, it is a great system. But what you find is there a lack of uniformity in there and not everyone is following the rules. If you don't have uniformity, you don't have equity and fairness in your assessments, it is that simple and it is that important. You received a letter that was read into the record by Ms. Kleiner regarding a clarification to a Memo I sent to the Board. I would like to make note of misinformation that she has provided you. She stated in this letter that AsessPro does not capture all of the work for all of the properties visited by an Assessor. It only indicates that during a certain time period the Assessor used AssessPro to make corrections with respect to the listed property. An Assessor typically performs a great deal more work and makes a great deal more property visits than are captured on this report. She gives the example that they might be investigating a charitable exemption where the Assessor needs to evaluate if the building is being used for a qualified charitable purpose. This would not warrant a change to the property card and is not captured in the report. In fact, that's not true. There are in this report that was given to me, three exemptions that were noted in April that this Assessor went to. All exemptions, whether they are religious or charitable exemptions come in in a form yearly, they have to be submitted to the Assessor's Office. And it is the clerical staff that handles those forms. They take those forms and they look at every charity or tax exempt business and they review them. A lot of them are repeats, they are just coming back and filling out their paperwork every year asking for their exemption, putting it on the record. There is no need for an Assessor to go visit. So it's the clerical staff that actually assigns the Assessor the responsibility to go check these properties.

"Many of them are not checked. But when the clerical person received an A9 or an Exemption Form for a new exemption that hasn't existed before, maybe an exemption that has had a Building Permit, they've got to get out there and check the permit for the exemption. Maybe a property that is no longer to be an exemption. They are going to go out to it and look at the property card and make certain that it's all up-to- date for tax purposes. Those get assigned, and, in fact, our assessor that we are looking at here under a little bit of scrutiny, was assigned three exemption properties to go to. The Y was one, that's an exemption property, he went out there because the new building opened, was asked by the clerical staff "Please go to the Y on Northeastern Boulevard and check out that new property". 25 Cornell Road, which is right up by me is a facility that was going to be used as a parsonage for Tabernacle Church over in Litchfield. It had not been a parsonage before so the clerical staff said to the assessor, "go out and check on that ranch-style home as a parsonage". The third one was 41 and 43 Chandler Street which had been bought out, that's the big beautiful church up on Chandler Street that was closed for a while; Catholic Church, transferred a couple times. It is now under new ownership, it has a big building permit. It has got a building next to it, a ranch that's used as a parsonage.

"Those properties needed to be checked because there are permits out on them. And, in fact, the clerical staff wrote a letter, religious exemptions that went to the Board of Assessors on the 29th of April explaining in this letter very clearly the property at 43 Chandler Street has been used on the A9 Form submitted as a rectory and is a ranch-style house assessed at 234. This has been exempt and an exemption is being requested for 2019, according to Commercial Assessor Greg Turgiss at the time of his inspection of the property last Friday, no one answered the door but he said that it appeared as if it was occupied. Then we went to the property at 41 Chandler Street, two structures; Mr. Turgiss inspected this property. He reported it. OK, these are exemption properties and they are, in fact, in the AssessPro report. She is not recognizing that these exemption properties are captured. And you have to ask yourselves when she makes note in her letter that there's a lot of other work that assessors do that may

be is not documented in AssessPro, we need to be very, very concerned. Because I will tell you, there is never a reason for an assessor to be out at someone's property, either on it, looking at it, inspecting externally or internally and not be documenting it on the property card. First of all, you shouldn't want your people on somebody's property where it's not documented.

"But that uniformity and documentation is what is so important on tracking where we are. Now if the assessor is going to go out to do drive-by, which really shouldn't happen at all and doesn't typically, the assessor is going to do drive-by's. That should be noted. KRT noted on almost all of the 1401 account, residential accounts, there's a note on almost everyone's property card that says field review. That was their drive-by. They didn't really come into your property and do an external inspection or list and measure. But AssessPro has a lot of codes, a lot of code names for you to go in and document exactly what you are doing when you look at a property. It is always documented. Now when I saw this letter which was just in the last day, I said, "Hmmm, am I wrong, did I really give the wrong information". Well let me look at the residential assessors that went out to 79 properties in April. Well when I look at that AssessPro report she gave me; excuse me it was 89 properties they went to. When I added up the properties, it came out to 92. That's pretty accurate, OK? They missed 3 that they should have expensed, but they didn't overcharge and pretty much it's a pretty accurate report.

"When I look at the other commercial assessor and the properties that he went to versus the expense report, it is off by a couple properties, pretty accurate. Some of them, because he was at a building that had 6 units that he was inspecting in the same building, it's not 6 trips, it appears 6 times because it's unit 12, unit 14, unit 16, unit 18. But you are literally going door-to-door looking at new properties. And that's how it is done; it is pretty darn accurate. But when I look at another assessor report and I am still trying to find 500 or 600 miles, that's when I see a red flag. And if Ms. Kleiner is saying that this assessor is driven around, he's just driving around, and you don't realize he's doing a lot of work but none of it is documented. Then I want to ask you to ask your administration, how do we monitor fraud, waste and mismanagement if we allow this to go on? How do you know you don't have a fraud, waste, and mismanagement process? If you are allowing this to happen and there's no documentation? That's never supposed to happen. And so the other thing she notes in here is that they are only doing a peer review process in there. Mr. Turgiss isn't operating as a supervisor at all; I disagree with that for a number of reasons. She's not down there daily; but they operate on peer review.

"Now the two residential assessors are doing peer review work. That is very apparent to me looking at the logs and the data and everything. But the commercial assessors are not. And I want to know why. The most experienced assessor in there is a Certified Appraiser and has done probably 20 years of Commercial Assessing, which is a different beast from residential. You have different income statements and different approaches to take to value commercial properties. They are trickier and more difficult to do because you don't have a lot of data in a single category sometimes to assess these properties. So they are unique creatures. So we have one commercial assessor that has 20 years of experience and is a licensed appraiser. Our other commercial assessor, in question here, has only been at it 3 years and does not have a lot of experience. Why is there no peer review going on here? Why isn't the experienced one doing the peer review, what is happening here? I think I have an answer to that, but I'm not going to share that right now. Let's see what the administration says. But that is not happening and that is a very good question why we don't do that monitoring.



DRAFT

"When I looked at again Ms. Kleiner's letter I thought to myself "well maybe I don't understand, maybe I missed what these assessors are doing". So I went back to the presentation that was given to you on the 30th. And there is what? Three pages in here on "What does an Assessor do". What is their primary work, what are they doing? And I went back and read this. And the primary work is permits, abatements, data capture from permits not collected and exemptions. The very things I am talking about right here that I am finding tracked in the data. So I am trying to say well did I miss something am I not seeing this clearly? But that report seems pretty detailed. Now I just received today from a Right to Know, the permit log, so I will be able to cross check all the open permits and who has gone to visit them and what has been closed. But to give you an idea on these exemptions that she's talking about that maybe they are going out to exemptions; remember exemption properties don't pay taxes so they are out of the tax base. It is important to keep up on your exemptions but from a priority standpoint, if you have a permit outstanding for a million dollars, that you need to go check or you have an exemption property that has been exempt for 10 years, the priority would be for them to go check the million dollar permit. Because that is the taxpaying property; you would worry a little bit less about the one that is consistently is not paying and hasn't made any changes. And that is to be expected. And that is what we should see going on. We don't see that all the time.

"Now I referenced in my report you know, big property variations. The data that I received from AssessPro from Ms. Kleiner showed that our assessor really hadn't gone to very many properties. I pulled all the property cards on; I said I want to see what the documentation is. Well lo and behold I found out, you know, the one at 41 Chandler Street, the exemption property that the letter was written to the Board of Assessors, there is no documentation on that property card that the assessor was there. Why? That should be an updated documented card. There were two mobile home properties visited, OK? And it was written up in the report that they had exterior inspections only. The assessor went there for exterior inspections only. Well when I looked at the property cards, they are blank, there's no building there because they are cleared lots and there was nothing on them. I drove out last week and there were mobile homes on each lot, on the trailer beds. When I called the mobile home company and I said, "Hey how long have these properties, have these mobile homes been here?" Well the lady said, "They are on the beds, they just got pulled in a week ago". I believe that.

"So when I read on the report that I did an exterior inspection, how do you do that? I don't think there was anything there. And you did it while it was up on the bed? And the one property that is going to be taken off the bed is actually having a garage added that hasn't been done yet. So I look at that documentation and I say that assessor is telling me they went and inspected a property that was physically there. And when I look at a property card, I should see a drawing of a building there. There is no drawing, just a blank piece of paper. What that tells me is that it is a new property that's being established that nothing is on it yet. And in fact that is what it was. So as I am cross-checking these cards, I'm seeing a fair number of errors. And that concerns me because I don't see that with other assessors."

President Wilshire "Mrs. Ortolano, we have one minute left for our Public Comment period, can you wrap it up?"

Ms. Ortolano "Sure."

President Wilshire "Thank you."

Ms. Ortolano "I gave you an example of a property card up in Kessler Farms that is an example of everything done wrong. The permit was left open for 6 years, this is current, the assessor goes out, he says, he writes on the form "Went to the property in April, captured the permit". This was a year ago. The property owner ends up very upset, calling saying "you never came out and you raised my taxed $900.00 for a basement refinish that I only finished a media room". So the assessor, after leaving a permit open for 6 years, never went and checked the permit file to see that the full basement wasn't finished. If they had checked the permit file they would have seen 1,500 feet wasn't finished, only 600 was. So they went and taxed them for the whole basement. The homeowner calls, fixed income retired people, outraged because their bill went up like $900.00. Nobody came to the house. The assessor says "Oh I'll come out, I'll come out". Comes out then he looks at the property, then he writes on the card "Went to visit". Then he changes the whole drawing on the basement, but guess what? It's too late and they have to file an abatement. That took, you know, 16 months to clear up and meanwhile they had to pay the full amount. When you are on fixed income, I can tell you, these people were not happy at all. And I look at a property card like that and I scratch my head and I say why does it say you went and visited? There is no indication that you ever went to that property and if you did, how could the drawing be so wrong, how could you not know if walked down the stairs that only a little portion of the basement was done."

President Wilshire "Ms. Ortolano, our Public Comment Period is over."

Ms. Ortolano "Thank you I waited very patiently to get here and I appreciate you giving me the time."

**Special Board of Public Works Meeting, June 27, 2019**

**https://www.youtube.com/watch?v=2BZAPX2wvpQ**

**6:16**

Laurie Ortolano "Ms. Laurie Ortolano, 41 Berkley Street I'll be brief. I attended the last meeting and I listened to some discussion about a new development going in on Temple Street and the development of that whole area and the Henry Hanger building which has been around forever. Just a couple of thoughts when it comes to roads and traffic. I don't know if there is a traffic study being done but Temple Street, when you go out onto Hollis Street is super busy to get out there and make a left or a right. It's really difficult and I avoid that area because of the traffic and I don't know what impact the new apartments have that are over by where the skatepark was in Hudson. I don't know if we have done traffic studies since that opened and I'm not certain if you are going to do traffic studies for when the units go in where the Corriveau-Routhier is and the Henry Hanger building but that's just a concern I have. When you spoke about those buildings at the last meeting, we talked about the revenue generated, the tax dollars you generate from adding new residential apartments or condo units and that's all well and good but I think there is a cost associated with it as well and I'd like to try and understand what those costs are, be it on the roads, emergency vehicles, public service or schools. There is some associated cost with taking in that revenue and I think it's nice to understand both sides of it because it all sounds sweet when you say we might get an extra "X" millions of dollars in tax dollars but it is at a cost.



DRAFT

"Alderman Jette brought up an interesting issue with the road being cut into before the five-year period and I had not even known about this issue but it was interesting to me because he brought up the fact that these Commissioners are in conflict with that ordinance or resolution, I'm not certain what it is and that we need to try and figure out what to do so they are not voting to support development and tearing up the roads. I don't know if any thought is given for a new construction or development even if they are going to cut in a side if it's before three years then they repave the whole road and if it's after three to five years then there's extra money put into a fund that's paid for by the developer to maintain the road. I just happen to feel that the cost of roads is a real issue on the taxpayers in the city and we are putting really good money into it and there's a lot of need. I think it's a really legitimate need but I don't think it's fair to shift any of the burden of the degradation onto the taxpayer and the only way you can do that is to set a point where if you've got a newly paved road and a developer is cutting into it then it's not just a patch that they are going to do but a section and restore it to full value so none of that risk comes back to the taxpayer. Those are my thoughts."

**Board of Assessors June 27, 2019**

**https://www.youtube.com/watch?v=do0DYyD-j6U**

**3:11:27**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street, thank you. Couple things, Mrs. Colquhoun came up and spoke to you about a concern she had with the property at 1 Bishop. I just wanted to add a little bit of information to that. I was not involved with her research but I do communicate with her and, you know she points out and to me represents an issue that I have brought forth repeatedly with the capture of permits and our struggle to do that. And you know it's very frustrating when you are a resident and you find something and I think you can see from her email she put a good bit of research into that work and looking at it and sent a nice you know paragraph of information to the director and the response that came back with was two sentences. And, I actually received a call at 7:30 in the morning from Mrs. Colquhoun frustrated because the email response wasn't correct, she didn't feel it was correct and I said well wait a minute, you know, her big concern was that the staff had a meeting on it, they had a lengthy discussion and in two sentences, one of them was, changes have been, hang on a second, changes were made to this account. This is what was written. 1 Bishop is being updated for the December tax bill; changes were made to the account, period. She says to me changes aren't made. I said well how do you know? She said I printed the card last week and it wasn't updated. I said well obviously when they met they must have updated it, they must have looked at it. So she got her computer, I got mine and we went on the OIS, because that's updated nightly, and it wasn't updated. I said well I'm going to the Assessing Office let me print a card and let me talk to staff. I'll figure out what is going on. I went to assessing, I printed a card, one of the staff members brought it up on GJS for me, reviewed the card with me and said well none of this is right, all of this is wrong, the data is wrong and I said I know. I didn't explain the email we had gotten from administration I just said it's not right. She said well let me get the assessor out here so you can talk to him. The assessor came out, in 90 seconds I had a full understanding of what had gone down and it was completely different from, to me, this response. This response was just a dismissal, in my opinion, of what somebody brought forward. I wrote about this letter to the state, I sent a letter up to the state just a few days ago, and this response is exactly where I feel we fall short on

transparency down here. I think it should have been written completely differently and with regard, and now you have a response that came to you today which maybe is more elaborate, I haven't even read it, but please understand what we're getting out there. I would have just written something completely different and the director just didn't seem to know that the card was not updated. What Mrs. Colquhoun pointed out is that there was a new picture on the card and a new drawing but none of the values were really correct. So when the director says, changes have been made to the card, you feel like is she twisting words or are we being misled. Yeah, there's a new picture and a new footprint but the data hasn't changed. That's the concern and when the value is $132,000, clearly it's an assessing office, for those of us on the outside we look at the numbers. But anyway, to point out the permit issue, cause you know this has been significant with me, I did a right to know for the permit report and what I got was a PDF file of 24 pages of permits. What I always been told is that the permit department and the assessing department work together and a report is run each year so that the permit information for the assessors to go value is transferred. I didn't know the exact mechanism of that, nor do I need to but I think it comes through a CityView process. So I did a right to know to get the permit data because I was concerned that we don't really look at it the way we should, or we're not really capturing it all. I've said this for 8 months. The report I got back from the administration was just a PDF file, 24 pages long, with all of the non-value permits in there, the electrical, the plumbing, the mechanical. Of course, I'm interested in the value permits and how we track those. And it was alarming to me because if that's the format the administration, I have to assume that what the administration sent me was the format they get. If they had an excel spreadsheet or a workable form, I would assume they would give me something workable. Obviously, I work with the data, but what they get is a PDF file that is totally nor-workable. That is concerning to me because I can't separate out the data to see what's going on so how are you separating out the data. So I'm not certain the whole permit issue is really being understood. We'll put that aside, there was a bunch of abatements here that were addressed. Preserve Drive piqued my interest and it shows you, I think, the errors that can be made in the KRT process. Preserve Drive was valued initially in the fall, in the reevaluation. Then when there was the hearing in my ward a gentleman came out who lives there, an attorney, and represented the street with a concern that it was just too high. And he was able to get KRT to come back and reevaluate that neighborhood and I think they took about $30,000 off of each home. They did a second look. So, I'm actually now in a right to know to try and get letters that were sent out to figure out what KRT did a second or third time because that data isn't trackable. We have a website that allows us to look at the initial data put up for commercial and residential but any secondary changes, which my understanding were they aren't many. I don't know how to track but in talking to the attorney and in looking at the data that I tracked on Preserve there was about a $30,000 reduction given to each home because KRT went down and reevaluated those properties and yet we gave an abatement to 6 Preserve, 22 Preserve, and 28 Preserve, significant abatements between 10 and 20% on properties that weren't right. Despite the fact that they had gone by and gone back on a second closer look. And I just think that's interesting. And with regard to Mrs. Corazzini's house selling in 2016, we get very hung up that the sale price is a hard value, a house can't be over bought. There's no such thing. I would say if can be under bought it can be over bought and when I met with Ken Rogers he said to me that he was in a situation like us that he over bought his house. And when he first got it, he was assessed too high and he called in the assessor and said take me down. You know you're chasing me he felt he was being chased, he's the one who identified sales chasing on our property card when we met with him

at the Amherst Street School. It was Mr. Rogers who said flip the card over and kept looking and said I think you were chased. He was the one who identified it. But he explained his own personal story. Now I know KRT is in Haverhill and I just happen to go on the Haverhill website searching for Ken Rogers to see if I could find a residence, to see if I could see, did he purchase the property was there an abatement, was there a reduction, what went on. Sure enough I find somebody, I don't know for sure if it was him but the whole story reads like what was told to me. It was a house purchased for $515,000 and yet the assessment, in 2016, like Mrs. Corazzini, and yet the assessment is $480,000 and when it was bought, I don't know when they reevaluated but when it was bought it was, you know, the assessment stayed down at like $430,000. And I look now and that house is quote, under assessed and just won and abatement in 2018. So I want you to understand that if that in fact represents the owner's house and it is what he kinda told me, just because you paid $515,000 doesn't mean it's the value. You know, there are circumstances and like Ken Rogers said to me, I over bought my house. I over bought it and if that's the case, and if it's just by luck I looked up a house and it happens to be the story and this is a lovely story to share because it fits the profile too. Whether it's his or not. House just pinged in my computer I just sat here in the back looking it up. So that's something important to bear in mind. I was truly disappointed to hear your analogy of my difficult request of the city and lack of cooperation to use assessors in the city and KRT. First of all, I was told by Steve Bolton that sometimes in these residential assessments negotiations take place. Sometimes you have a difficult situation and we negotiate with the homeowner. I tried to reach out to KRT to do that process and what I have found is that I feel what Steve had said to me is not accurate. You really can't negotiate with the city and you know your comments of what you put out here is something I couldn't comment to because you're not at' a table to negotiate and I feel you strongly misrepresented my concerns. First of all, I want to clear the record and say when I refer to one of our assessors as a junior assessor, it's not to be rude. You're right I've complimented his work many times and you're right I recognize how hard he works. It's because he is the younger one and I'm just using it as a term not as a rude term. So my apologizes if you interpret it that way but I wished you would had asked me. Secondly, the two brothers, and the issues with the two brothers on my property were a concern. My bigger concern is when the second one came out to look at my property, he did not answer our questions and did not get back to us with answers. That's an issue. I think we were worthy of a response and we were told I will get back to you in a week with answers. We did not get answers and I RTK'd the emails, I just got them from the city. I can see mine in there in the responses have you looked into this, have you followed up, no I haven't, no I haven't. So they're on the record and I requested the right to know emails from this assessor to be sure that these emails were there. That was my bigger concern. Thirdly, when it came to KRT doing our abatement it wasn't my suggestion. I was called into the office, I have the email by Ms. Kleiner to speak with her. Our abatement was given to Gary. The original individual who made the original valuation. I wasn't concerned, I did not raise an issue with that until a staff member had identified when the abatement was given to him, that he was not happy at all to have it and he didn't want it, that he had said that Jon Duhamel told him it would be outsourced. When the staff member told me that and I will send the letters to you from legal on this, I asked the staff member to speak to Steve Bolton because I was concerned that the staff member wasn't appropriate, they didn't want it. So, the staff member went to Steve Bolton, my lawyer wrote to Steve Bolton and said hey, if this isn't going to work don't put it there. Steve Bolton wrote a letter back saying nope, it's going to be fine, she is going to be treated just the way everyone else is. Her abatement won't be put at the bottom

of the pile. It's going to work its way up just like everyone else's don't worry it's going to be treated fine. We accepted that, there's no more communication. Ms. Kleiner then called me in, had a staff meeting, I believe one of her first staff meetings with the Mayor. Explained to me that her assessor was extremely emotional and distraught over taking our assessment and it was then she asked would I mind if it went out to KRT. How would I feel about that and I agreed with her. I said I'm not thrilled about KRT and I'm not thrilled about the response we got from KRT for our house but she explained that they had two days of service left on the contract for them to do abatements so there was money there and would I agree with it and then wanted me to agree that all the Berkeley Street properties would be given out there. I you know was interesting that I was the one who was giving approval for all of Berkeley Street to go out. I said yes in the spirit of moving things forward, in the spirit of compromise. What I did tell Ms. Kleiner in the meeting is I just wanted to be certain that we would be treated the same, with the same process that the city uses. That was of the utmost importance to me. My neighbors were never contacted that KRT was doing their abatement. They ended up asking me, one gentleman six weeks later said, where's my abatement? Do you know what happened? I said yeah, it went to KRT. They were not happy about that because of the original assessment but I said look we're giving it a shot and the city, you know, I don't feel like we had to give the other houses out to KRT. I don't know what the grudge was but it was Ms. Kleiner's position that this assessor couldn't handle any property on Berkeley Street, they really couldn't do it. It was her decision and I went along with it and I'm ok with that but I want you to have that information. I'm going to send you the letters from legal and I'm going to let you take a look at that. I wished you had talked to me before you spoke but you are entitled to your opinion. I love the fact that you went back to 2007 or 6 and used data. I am going to give you data Dan that is going to show you how many properties from that timeframe we have undervalued are completely undervalued. Ms. Colquhoun has been looking at that endlessly and is distraught by that data. We are so low and I showed you the property at 67 Berkeley Street that's a 4,000 square foot home on 1.2 acres that really did not go up at all. Stayed at $532,000 and 20 years ago that property, 20 almost 30 years ago that property was bought for around $450,000. That property has moved $80,000 in 30 years. That's low and you know what's happening right now when people tell me land isn't an issue. That property is being subdivided by the owner, because it's big, it's got a buildable lot and they are building their retirement home on it and selling the front end. Tell me there isn't value there. There is. They are going to make out well because they don't have to buy a parcel of land for $150,000 bucks and then sell the property. That's real, that's happening right now. Okay, I am truly disappointed because I came here with data to put up on the screen, I didn't know that the screen isn't going to be here for us to see. When you set up a room with this format, and I have data I'm no longer at a table to show data, I'm sitting here. So it makes it more difficult for me to communicate with you and I didn't know that the format of the meeting was going to change. I'm going to address just a brief concern. I think you do not know that I asked for an audit log from the city to look at property changes made in the calculative data on properties from, from October to the end of or the beginning of April. I want October 1st to the beginning of April and I got an audit log and it looks something like this. And what I noticed is on this log is that my house at 41 Berkeley Street is here on the 9th with a correction of $12,000 and that makes sense because the assessor came out on the 8th and did type us an email saying I'm making these brief corrections, simple corrections I'll get back to you on the big stuff and he did. He changed the yard items and he made a building changed for the basement having some water issues and made a change on the garage because it was falling down. What I was told at that

DRAFT

time, repeatedly, is and when we asked, do we have to file an abatement the answer was yes. At this point in time abatements have to be filed, I can't do any big changes to deal with something from 2018 it has to go into an abatement. The MS-1 was coming out that week, the MS- 1 was actually submitted to the state on October 1 so they were at the end of the road here to get the data secure but when I pulled this report I notice that 285 West Hollis was dropped $131,000. 713 West Hollis was dropped $121,000 and 69-79, 75 Main Street was dropped $92,000 and corrected. These were big corrections so it piqued my interest. How did these properties get an assessor to reduce them so aggressively without an abatement and I'm sitting before you trying to fight for an $80,000 correction. So, I pulled U1e records. What I found is 285 West Hollis Street was an abatement that you approved for 2017 and what is so interesting about this to me, for me is that it, it was approved by you for $175,000. The sales data used for that was 2017 sales data, property data. That's great. The email trail that I got from the city shows that the owner of the property is emailing the assessor saying do I really have to up for 2018, we just did an abatement and we did and appraisal and I think I should stay at $175,000. The $175,000 value that they were awarded for the 2017 abatement somehow did not get put into the computer and the computer had the house valued at $255,000. KRT moved this property to $306,000. So KRT put 20% on the property. The abated houses that were used on that 285 West Hollis Street, for sale data, went up between 20 and 30% in the KRT adjustment. So my question is why would an assessor agree to set it to $175,000, shave off $131,000 and not put it through an abatement? So now this property sits at the 2017 price, you're telling her her 2016 price needed to go up and all the other properties around them went up. I don't understand how that arrangement was made and in my opinion that should have been a secondary abatement but that property deserved an increase. That's what happened at 7 Auburn Street. The deal that that gentleman thought he had was I won an abatement was $240,000 in a 2017 review. I'm coming back in 2018, KRT's here no, I'm not going to be part of that, I'm saying at $240,000 and the assessor says, okay, you can stay at $240,000 and I'll give you the ratio and takes it down to $229,000. So that property got changed. If we did that to every assessor who brought you 2017 data, none of the 27 properties would increase. And there is no sales data to support dropping 285 West Hollis Street to $175,000. A matter of fact it switched from a business property to single family and the base rate for single family is higher than what it was when it was a business. You get a base rate increase on a single family so the next property at 713 West Hollis Street is a property that has three buildings on it. Our junior assessor had done a good amount of permit capture. The final building put up was a two car garage with a loft, bathroom, room upstairs, set of stairs to go up, it looks like it could be an apartment, whatever, it's a functional room but that garage got assessed in 20·17 and the property moved from $290,000 to $317,000. KRT comes along and sets it to $523,000 because it's three separate properties, three buildings and they are all a cape house, and older cape house a newer cape house and a new garage with a loft. So, I look at that valuation and yeah that's a big increase but there is a lot going on, on this property, square footage and buildings. Seems reasonable. Somehow, somehow they manage to come down $120,000, $21,000 and they get set to $406,000 by the assessor with no abatement. What's more interesting to me is I pulled every property file and there's no documentation. The old card stapled to the new card to say here's how we went from here to here. It's not there. That concerns me because I don't have an audit trail. I don't have a paper trail. The third property is 69-79, 75 Main Street. I see our assessor Doug in here looking at the shoe shop there on the corner with an abatement. This property is right next to it. Why last year were they able to shave off $92,000 without coming in here? I really feel that what

was, and there's a write up, the property owner came; you know when you're in the middle of a reevaluation and all that data is being captured, I don't know what your rule is but it would seem to me your assessors would be careful about going out making $90,000 adjustment when KRT is doing their data in 2018. You would be telling them to abate. The individual did write up a reason but you would say abate so I am deeply concerned because I spent a lot of time in the assessing office in September and October and I listened to the staff tell literally every resident coming in, honestly, you have to abate, you have to abate. I had the assessor at my home saying you have to abate and then I see $300,000 shaved off three properties without real specific documentation and no abatement process. I feel I'm being treated so unfairly and I'd like you to look into these properties, 69-75 Main Street, 713 West Hollis Street and 285 West Hollis Street and help me understand what happened here because this is data that is going right to the state. I don't understand it and I'm frustrated, I'm frustrated. Now for the record please I could not, the email I sent you regarding KRT's statement in the last set of minutes that said that I had formally written and email to them requesting they inspect the five other homes, I have no record. I wrote to Rob Tozier, I asked him to send me that email if he had it, I received nothing. I feel that was a misrepresentation by KRT, additionally in the record that I gave you from right to know minutes I received from John Griffin, Jon Duhamel and KRT. There was a second record in writing that says that we went to the KRT hearing on September 5th and requested through Ken Rogers that those properties be changed, there's two different stories out there, neither are true. We did not request any property be change, we focused on our property with a package and requested that it be lowered. You folks are really disappointing me. Thank you for your time."

**Board of Aldermen Tuesday, July 9, 2019**

**https://www.youtube.com/watch?v=X-uau-6eXt0**

**30:54**

Laurie Ortolano " Laurie Ortolano, 41 Berkeley Street. I wanted to talk to you a little bit tonight about the Right to Know Reports that I have been requesting. It is apparent that some of you in the Aldermen level are pretty upset that I have made the requests that I've made to the administration based on e-mails and text messages. And these reports really served a purpose. I have gleaned some pretty amazing stuff from the reports that I've been able to get from the administration. They were fairly extensive, I asked for an audit log, which I know the Director didn't really know that they could run it, but they did and that was enormously helpful. It is an accounting measure, an audit measure to look at how each individual is changing property valuations or working or going into the calculated data to make property evaluation changes; very interesting piece of information.

"I have requested the permit reports and the permit reports were a big disappointment and you know back from September I was all about permits not being captured and being concerned that we weren't getting permits captured and valuing them appropriately. Well the permit report really shows me that problem is still going on and is a problem. The report was wholly disappointing because I received 22 pages of 6.

"Print in a PDF file of every permit pulled that had to do with non-value items, including non-value items like mechanical, electrical and plumbing, which don't count in the assessments. It was a totally useless report for me, and I was frustrated by that. But then it made me realize that the Director must've sent me the data the way she gets it. If the data is in this form to her, it is as useless to her as it is to me. It would be very difficult to account for how your permits are being captured.

"Subsequent to getting this report another lady in the neighborhood has been active in this and went to the Building Permit area, Building Department and asked the gentleman there if they could create a permit report that would be more useful. He was super helpful, went to IT, knew exactly what we were looking for and is trying now to help us get a report that we can actually work with and get in a readable form. Just so we can understand what is happening with permits, but I also went down and spoke to a staff person in

"Assessing. I asked what do you run for permits reports that they said monthly we run a report that is given to the assessors each month. And yearly we run a single report; and one of them I can't remember which one is excel format. So then I scratch my head learning that last week and saying why don't I get an XL formatted report. I've sort of complained to you guys that these PDF files are brutal to work with and you can't do anything with the data. So if the administration has data in Excel form, send it to us that way. Don't lock us down with data that is useless.

"I received an AssessPro Activity report that was able to show me what was happening with visits to property, permits, abatements, all that kind of stuff, super helpful. I was able to get work logs and mileage reimbursement reports. Last week I had been trying to figure out what happened when KRT had the meeting and all these people came out in their Wards to say we want you to come see our house again. So we all got our letters at the end of August with the initial re-evaluation data. Then KRT set up these little meetings to allow people to come up to express concerns and you could ask for them to send somebody else out. I wanted to know how values were changed the second time around but with our contract with KRT we never asked for that data and we never captured what happened the second time around. I was interested in that and I was led to believe that there were really not many changes that there were you know 300 people who came to those meetings in total. There weren't that many changes. So I wrote a Right to Know to ask, what I figured is they must've sent a second letter out after the first letter when they did a final change, because I got one. I was one of those people who went and said look at my house again. In October I got a letter, so I said OH anyone who went out got a new letter in October. Well sure enough they did so I did a Right to Know request and I said send me all the letters you sent out in October for the second look. It was 1,252; that was a lot more than I thought, that's a lot of data in the second review.

"Now granted for all the parcels we have maybe that's only about 5% but it was a lot of data. I will tell you what concerns me about this data having gone through it is that KRT used 2017 values that must've been given to them by the City. When I take these 1,252 letters and put them into a spread sheet that is workable and I combined it with a data disc, data spread sheet data in City Hall, the 2017 values that we have on our records do not match the data that we gave KRT. And it really concerns me; something went awry for some of these properties. I don't know why. And out of the 1,252, 12% of the data was not correct, that's a lot. So now I am sitting here looking at data where the baseline given to KRT does not match our records. What I did observe for sure was that properties that were MLS corrected, let's say a property sold in 2017 and it was corrected by MLS data for the December tax bill of 2017. That was



DRAFT

never put into the KRT Assessment, re-evaluation, it didn't get in there. So properties that may have had, some of them had changes they had sold, they had been valued at $150 and they sold for $275. So when the Assessor corrected it, they made a more aggressive correction because the property had had a lot of upgrades. That's great; but that never got put into the KRT data and to me that is a significant issue. I have typed a question into assessing, the General Help Line to ask you know how did this happen and why is this so confusing where is the mix up? But to me there is a question there. That's pretty important. So the reports have all served a purpose and they served a purpose because some of you here really felt that this whole issue with a certain assessor was my responsibility to find the data, to establish proof, to look at work performance and to grab it all. I don't feel that was ever correct; I feel the City had a responsibility and I don't think the City followed its responsibility the way it should have. I think the investigation going on right now is far too narrow. But these requests gleaned a lot. And I came to you a few meetings ago and I spoke pretty directly about abatements not getting done; certain people not carrying their load. I can tell you after that meeting that individual did 20 abatements in a month. Imagine if they had done that for the five other months what we would have had. Hey that is impressive, light a fire, get a response. You shouldn't have to light a fire, but it got a response. The work logs, the reason I pulled work logs and I pulled the e-mails of this assessor, because the work logs which were not well documented relative to other assessors. The work logs were really incomplete; but the one thing noted in the work logs repeatedly was that they respond to taxpayer e-mails often. I thought how many taxpayer e-mails come in. I checked with the Assess Help E-mail and I was told hardly any. But then each assessor has their own personal business e-mail address that they can give out so they could have their own business e-mails. So what did I do? I did a Right to Know for the e-mails. Do you know what I found in 3 months? That assessor had to respond to 13 e-mails in 90 days. That is not that many. When I see it on a work log over and over again for half a day's work? That's not that many. I chuckled, I have to tell you, when I saw those e-mails. One of the e-mails was sent by a former chief and the question in the topic was "Ortolano" and the question was, "Does anyone know what she really wants, can anyone figure out what is going on". This was the beginning of November. This has gone on way too long. Can anyone figure out? And one of our assessors, the one I was looking at, these e-mails responded, "I think she's got an ax to grind and I can tell you even if she wins her abatement, she's not going away". I have to chuckle at that, what makes me chuckle at that is here is our chief sending an e-mail to his four assessors to say "Does anyone know what this lady wants? She's been done here for 2 months". But he never invited me into his office to speak to me nor would he even come out of his office to speak to me when I had a question, very hard to get him. Imagine how different this might have been had he tried to figure out himself, what does this lady want? What is the problem here and what is she looking at? Things might have been quite a lot different.

"So I asked for this data and I look at these reports very carefully and I do a lot with it and I work very hard with it because it tells a story. And I'm learning a lot about our permits, I'm learning a lot about missed data, you know? I'm learning a lot about these values that we gave KRT that are not correct. Something is wrong in our data capture and that's happening through the IT Department and those are big flags to me. I'm concerned, I am really concerned that there is an over-reach going on in the Board of Assessors that through the City, through our City Government and our leadership that does not allow our Board to operate independently. There are two things that bother me, back two or three months ago the Mayor had announced at this meeting that all Board of Assessors meetings would be verbatim minutes and televised.

DRAFT

"The Board of Assessors had no idea that was happening. They did not want verbatim minutes. When I looked at the Charter and I called a few other city officials, former people, I said, "Can the Mayor just vote and make a mandate that the minutes have to be changed or done a certain way" and the answer was "no". They said, "look in the Charter". I did look in the Charter and from my understanding it is up to each Board to determine how they are going to keep their public record; they have to keep a public record per the RSA no question. But it doesn't have to be verbatim. The reason that they didn't want it verbatim is that they don't have the staff. They have got 4 clerical people, one is a supervisor, you know, everyone has said they are up to their eyeballs in work and now you put verbatim minutes on top of them.

"So when the order was given, at that point, in the meeting on a Tuesday night the clerical person had already done the minutes not verbatim, had to go back and do them verbatim, they were 47 pages long. And they are not used to doing that. I couldn't understand when it was voted here why we weren't using another resource to outsource or have somebody else do them not within the office like we do with other city minutes. Why were we pushing this in on the staff? We pay $800.00 to $1,000.00 to have those minutes typed up verbatim down there. It's really not a good use of money or resources. I just came out of a meeting last Tuesday, it is 107 pages of minutes because it was the final go on the abatements, it was a 3-hour meeting, over 3 hours. That's ridiculous. And when I went after the first meeting, after the vote here, or after the Mayor said this is going to happen. I went to the Board of Assessors meeting and I talked to one of them before the meeting began, we don't want these. And another clerical staff said the Board Members don't want this, they don't want these verbatim minutes. It is an awful lot of work for them to have to read it and make certain 100 pages are correct as well. But that got forced into there without any vote of the Board.

"Recently in the last maybe I don't know 2 or 3 weeks we set up an e-mail address for our Board of Assessors, so we now have a way for the public to reach the Board. That has never happened before and it was something I complained about because other cities like Keene, Manchester, the Board of Assessors has addresses that you can e-mail them directly.

"We don't have phone numbers and we don't have addresses for ours. So all of a sudden on the web site an address appears, BOASSESS@NASHUANH.GOV. They got a web site, that's great. I send an e-mail in to address an issue and address a concern I have with what is going on in management in there and within 3 minutes I get an e-mail fired back at me, very angry, from the Director; she is bull at my e-mail. I wrote back "Well Hello, I didn't know you were on this address". The address is actually screened by the Director, the Board of Assessors is her boss. So then I called all the other cities and towns that have these addresses and I said, "Is your chief or your manager on those addresses or is solely your Board of Assessors". Every one of them it is solely their Board, not Nashua. It was inappropriate, it was inappropriate for me to have to take a blasting e-mail from somebody that I didn't even know was on the e-mail chain that was blindly copied or hidden, and the public doesn't know they are sending it to this individual."

President Wilshire "Ms. Ortolano time is running out. Wrap it up."

Ms. Ortolano "OK I'll just end it with this, it came to my attention just yesterday that there was a Facebook post put up by our new director that absolutely flabbergasted me on Facebook. It said by Kim Smith Kleiner "It is not my normal process to respond to Facebook posts, but I feel residents have the right to hear both sides and then I respect the conclusions they come to. The Assessing Department has

received multiple detailed requests and I am being continually insulted for not responding to two residents' numerous questions. When we did investigate, and I respond I am attacked that they were blindsided. Here's the truth, we had 90 remaining abatements to respond to.

"Residents who deserved to have their abatements heard from the deadline of July 1st I asked our assessors to work as hard as possible to process all these abatements. Everything else was secondary priority. If a resident feels my decision was wrong, I am happy to sit down and discuss it with you. My priority has always been to serve the people of the City always". This was a reply to an April 27th post that popped up over the weekend from 3 months ago. I am just flabbergasted we don't have a policy in here whereby our directors or to management don't respond on Facebook. You know if you folks all sit here and think it is a one way street, that I am the problem and you are all the right people it's more than that, so I would ask you to consider a policy to stop this. And there was one Alderman that gave a thumbs up to this. I didn't respond because I think it is inappropriate to use Facebook to air the dirty laundry like this."

**Board of Aldermen Monday, July 22, 2019**

**https://www.youtube.com/watch?v=lC7-adhuIXs**

**16:25**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. I have some concerns about the four-year time frame on this revaluation with a list and measure. I would love to see it done in 3 years and certainly not 5 so I was glad to hear tonight it was 4. A couple of my concerns are that the market is running high. We lost 5 points on the equalization ratio last year in a year that we were equalizing to one. We came down to 94.9%. It is very possible that this year we could lose 10 points on that ratio and we will be equalizing property at 85%, maybe 87 after that first year.

"You know you'd like to think that the market will correct itself, I hope it does. But if it doesn't and it runs hot, you are going to have properties that are pretty far off. When you couple it with the miscue and data that hasn't been captured over 30 years, I think you could have some pretty devastating increases. That concerns me a great deal. I would love to know if this State has any way to phase in high increases on properties.

"I know that other States do when they have done revaluations and they have seen somebody's property taxes go up a lot, they will phase it in over 2 or 3 years. I don't know if New Hampshire has ever done anything like that. But I am not a proponent of seeing property values increase 50 or 100% because of an adjustment. It sort of happened to us and it is a pretty unpleasant situation and I wouldn't wish it on anyone else. So that concerns me.

"Doing it sooner would help take the edge of the market run that we are seeing happening. And I also think that the Management Audit Report didn't do much at all to tell us about the need for a list and measure. What tells you the need for a list and measure would have been a technical audit report. It is the technical data that kind of speaks to that.

DRAFT

Alderman Dowd "Ms. Ortolano, could you address just the bond in front of us if you are in favor, stating that you are in favor and not what might come out of it or anything else, because we have no control over that at the public hearing."

Ms. Ortolano "OK I was only speaking to what was spoken to here, and I didn't know I couldn't speak to what was spoken to here. So I would like to see the bond carried sooner than 4 years. I would like to see the work done in 3 years. For myself it makes a big difference because I moved into a neighborhood where we have no equity and waiting 9 years to find it is just a long time to have to wait to get properties in line. You know it just doesn't seem reasonable for the properties that are completely out of line. So handling the list and measure quicker, I would be a big proponent of it."

**Board of Assessors August 1, 2019**

**https://www.youtube.com/watch?v=k9LqP68NxKs**

**36:45**

Mr. Hansberry "So now we move onto public comment. We have one person who has requested to speak. Mrs. Ortolano would you come forward?"

Ms. Ortolano "Good morning."

Mr. Hansberry "State your name and address for the record please?"

Ms. Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things I wanted to address this morning and I thought I would need the screen. I was going to print out some stuff but I ran out of time. I am working on the hearing for next Tuesday and I got way late on my paper for the State and I didn't print out papers but there is information here I could go over. The welcome statement that you folks read at the start of the meeting says please direct testimony to this board and not to anyone in the audience if you have any questions they are to be directed to the board and we will get them answered. I have been coming here for quite some time now, probably 7 or 8 months and it is my observation that you don't answer any questions and I am not talking just mine or submissions of letters, it is anyone else who has come here as well. I am not certain that I can think of an instance where you've provided answers or gone back and got answers for the public and it is for this reason that I look at this board as politically motivated and a rubber stamp. Because if you're not going to genuinely get us answers, take that out. I don't want to hear it every meeting I come to. It just isn't right. I sent you maybe 5 technical papers. I print, I copy, I make my 5 copies or whatever was required and they seem to go in the trash. Never get responded, in some instances never get acknowledged that they were received. I have stopped doing that because I have spent a lot of money printing to provide information to this city only to have it thrown away and not responded to. It's expensive for me, and it's ultimately why I have pursued other avenues through the state, so please consider getting rid of that line or acting on it honestly.

"I wrote you an email regarding policy and the creation of policy. We have a lot of policy questions here in our Assessing Office and we have basically a policy manual that is minimal and hasn't been looked at in a long time. I'd like to understand what the public's role is in policy development and that's something I'll take to the BTLA because I know you won't address it. I was on a school board and in an elected committee for 8 years. Policy was considered public business. It was the one place where the

public could come forward in a hearing and express their opinion on how operations were going to be run. The aldermen do it with their resolutions. They have hearings that allow people to step forward and give comment and even at a hearing ask questions and receive answers. I know that you are not a legislative board you are a governmental board. I haven't been able to explore yet within the charter whether that means policy creation is not the public's business but I am also concerned that it is not the board's business, because these policies are not coming to you and your mission says our role is to make certain that the policies are in line with the state's statutes with the office operations. How are you doing that if policy doesn't come to you for an open discussion in a public meeting? I am only aware of one policy that's been created and that was sending letters home when property assessments increase. I read it in a manual when I went a month ago. It was in there and I was surprised that it was actually being used. It is put together with a fixed number. For a $20,000 increase they are going to send a letter home. Every individual in the community that I showed that policy to commented that it shouldn't be a number, it should be a percent. Some of the people immediately said, some of the business leaders immediately said, it should be a percent. I agree with that. If you take a $150,000 home and you increase it $20,000 it is a 15% increase and that's your margin to notify the property owner. That's a hefty increase for somebody with an escrow that they have to pay. If you put a $20,000 increase on a $600,000 home that property owner is experiencing a 3% increase, that substantially different and may not be as significant to that owner. I would like to see a percentage picked whereby it triggers a letter based on percent increase. Decide what you want to use and send it, but I think to fix the number at $20,000 really isn't correct. I thought this policy was going to come forward so I'd be able to speak to it. I sort of hung back, waited 3 or 4 months and then I saw it in a book a month ago and it was acted on but I never saw it approved by you and I never saw it discussed in a public meeting by you. Secondly, there is an additional policy I would like you to consider because I have done a lot of work looking at property files. Unqualified sales, you know no market, family sales, tenant/lease sale, any of these things, foreclosures. I have not found good evidence that our assessors are qualifying these properties. A question would be how do you qualify an unqualified sale? My opinion would be it would be almost like doing an abatement. You'd take the house, you'd look at comps, you would see what comps look like and you would set the value for the home. I have never seen anything in a property file that tells me how an unqualified sale is qualified or any paperwork that does it. More often I see them ignored. Or the assessment level that they're at, let's say it was at $320,000 and the house sold for $280,000 and it was unqualified. The assessors are more apt to leave it at $320,000, which is not necessarily typical what they do with other qualified sales with MLS data. They tend to raise them or adjust them or look at the pictures. I mean there is a fair amount of data they miss but that's for all of the non-qualified sales, I am not seeing evidence of that. I would like any unqualified sale property to receive a letter from the assessing office saying we have qualified your property and this is your assessment level. Because it puts ownership on the assessors that this job is being done and they are seriously looking at this data. It is not a great deal of data. It is not a lot of extra letters, so I don't think it's a big cost issue but I think it would have a substantial benefit because a gentleman came in here last meeting, Mr. Durant, and his sale was looked at as unqualified. Looking at his property and speaking with him it was definitely more qualified than unqualified. Ours was a qualified sale in 2013 even though it was cash. Ours should have been looked at a little bit too, you know what was the arrangement with that when there was no bank financing. So you know I don't think anyone really qualified his sale. They just turned around you folks and said well it was $321,000 and now it's $398,000, that's good enough. That's good. In a year it increased $60 or $70,000. That's good. So that's the second issue with policy.

DRAFT

"I re-read the minutes from the last meeting and it was just a depressing sad experience for me. I was so disappointed Dan in how you spoke about me. I feel I am a better person and deserve better treatment. I feel that this board under the mission represents taxpayers and once again this political, rubber-stamping board represents the city and not the taxpayer. I feel you should have reached out to me to ask what my story was rather than script something that was inaccurate and wasn't my story. I have asked repeatedly for KRT to provide the emails where we asked that the neighborhood be changed and we have received no data. I know if I sat at this microphone and misrepresented you the way I have been misrepresented you would be furious. You would speak out strongly because you speak in a seat of leadership. I don't have that opportunity and I have to take it and it disheartened me so much to read those minutes. The justification of my abatement was based on sale data from 2007 by this board and I feel strongly that as a taxpayer I have to follow a strict set of rules to abate as anyone else does. I have to use sales data within the year window period of the tax year I am abating. I followed the rules and I did that. All of KRT's abatements, the 50 or so, they did not use that sales data. They said we don't need it, we got a CAMA model with 673 points. It was fair. I sat in a course with two of these people here and the chief from Durham and the chief from Goffstown both talked about how inaccurate the Marshall & Swift model is, which is what KRT used, and that when you do these general average uniform CAMA models, there is often some errors and you have to go back and correct them looking at sales data. They spoke to this and we used KRT and I didn't think they would be so married to their model but they are. I didn't. You know I spent 10 years modeling in engineering down in Westinghouse in Baltimore and I had to model telemetry data for space craft, and creating predictive models is very difficult, and very often you create the model, watch the space craft and find your data was good in some instances, your data was good in some environments. Your data was terrible in some other instances. That's the nature of a predictive model and I was never overly- married to my model. I understood that. I see a company who is overly-married to their model and didn't recognize the short-comings of their model. So when you pulled out 2007 data and said 41 Berkeley Street sold for $600,000 in 2007, so to move it to $651,000 in 2017, 8.5%, seems reasonable. Yup you guys, two of you agreed and said that's reasonable. You are on to something Dan when you sit here and you start questioning these assessors about these 2007 or 6 or 8 values before the crash and where we are now. I believe our 2013 re-evaluation, we went the wrong way on that in many instances. Berkeley Street was cut $100,000 in 2013 and four months later, when they complete their model, I buy high. I'm completely on the other side of what they modeled and the BTLA will see this information. This is the unsold versus sold homes issue. It's very apparent and you are on to something. Other communities might have corrected their data better. For some reason we didn't. So 11 Chester Street is a house very similar to mine that sold in 2007 as well and it was refurbished. It sold for $615,000. Mine sold for $600,000. It's on the lower part of Berkeley which is considered not as nice because it's between Laton and Courtland. It does receive more of a land discount. Back then it was only about $10,000, but that sold for $615,000 and didn't have another sales point after that. The market crashed in 2008. The assessment was cut $160,000 and cut in 2009 and then 2013 and in 2019 it sits at $434,000, fully renovated. That was my property under those renovations. Fully done by 2008 but I bought again in 2013 high and you had a point. So you used that point to slam me up to $700,000 and you recognized or the model recognized we were too high and they were willing to take it down minimally 2%. KRT was willing to come in and make another adjustment though very reluctantly. It was very clear that he didn't want to drop the EYB on that house. So I guess I should feel very special and I got a gift. 14 Chester Street sold in 2006 for $562,000 prior to peaking up in 2008. That was a rising home. They pulled $70,000 of permits since then and have done some really nice renovations that our

assessors have recognized as very good grade bathrooms and kitchens, closed in open porch. That house sits at $413,000. 38 Chester Street across from me to the left, sold in 2008 for $530,000. It had another sales point in 2017 for $570,000 but KRT assessed it at $508,000 and then there's us and we're at $651,000. 14 Chester and 30, I mean 14 Berkley and 38 Berkeley, these are Berkeley Street properties if I said Chester I am wrong. 11 Berkeley, 14 Berkeley, 38 Berkeley. All of these properties with the exception of 11, the two are larger than mine by 300 square feet and 11 is smaller by 200. Pretty comparable. We're talking differences of a couple hundred grand and I have to live with that kind of equity. There's a lot of data. I cut and sliced data from Berkeley Street to Raymond Street to Chester Street to up on Monadnock and you're going to see this kind of problem and the BTLA is going to see it I hope pretty darn clearly. We missed the broad side of our barn with this and there's an explanation for it. So…"

Mr. Hansberry "Mrs. Ortolano I'm going to ask you to wrap it up, a couple of more minutes please."

Ms. Ortolano "Sure, deferred maintenance that was addressed here, 2 Cardinal Circle. I am very concerned at how we are using deferred maintenance here. 21 Maurice Street was a property that got corrected when I was corrected in October by an assessor who went to the property noticed that there was deferred maintenance and dropped the assessment 7% Yet this house is owned by the same property owner for 20 years because they're not keeping up on it. This deferred maintenance issue you're bringing up should have been directed as a very specific discussion to be had inside the assessing office on how we are going to treat it because you're talking about an assessor who came here, KRT is an outside organization. What KRT does is very different and what they did to 50 abatements was very different than what this city did. You know, what we can all recognize is assessing is not a standard, calculated business. It's subjective. What's critically important is we have uniformity. I don't care if they gave 7% deferred maintenance to the property at 21 Maurice Street. You just got to do it to everyone uniformly and you're not. KRT looked at all the homes and said any deferred maintenance we don't count at all. You're counting it like crazy along with condition in Nashua and you're not treating everyone uniformly. Pools, last topic. Pools are a massive issue and that's going up to the BTLA. I owned a pool in my prior town, right here, 20' by 40' right now it's assessed for $10,000. All the pools around this, all the community pools are $8-10,000. We're $30-40,000 now.

"What happened in Nashua that drove yard items so high. This is why I wanted to have a meeting with KRT. One of the questions I had is why did all the yard items double or go up so substantially so if I go to put a pool into my property on Berkeley Street where I already feel I am high, I am going to be slammed with a new rate of $40,000 for a pool. Yet you put a garage on your home and it's $10,000. You put air conditioning in your home which is a pretty nice feature - $3,000. No matter what size house, $3,000. pool which is a liability, which absolutely shows, because I've studied the sales data that it hurts in the sale of a home. It's extremely seasonal, roughly 3 months of use time, and we're putting $30-40,000 on swimming pools. This shouldn't be corrected in the next re-evaluation it should be corrected now. I don't know if there's a law that says you can't fix that. I don't know. If you do it to all of them, I don't know how many pools you have in Nashua, probably 5, 6, 700. I don't know why you can't fix it for those people because something's not right here and it's not consistent with how appraisers look at pools. Anyway, thank you."

**https://www.youtube.com/watch?v=jAuBZGRhAb8**

**36:41**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to provide some clarification to a few of the Mayor's comments. He mentioned that there is no validity for the 15% or 10% entry rate. The Board of Assessor's meeting on March 7th of 2019, I would ask you to refer to those meeting minutes where the Chairman, Dave Hansberry, spoke that he had spoken to Rob Tozier who felt that we wouldn't get any more than 1/5th entry into our homes. Based on that, Dan did not, questioned whether a 20% entry and an 80% miss was worth us doing this List & Measure. So that is on the record. There is another set of minutes, that I think it is documented that KRT spoke of a 15% entry rate, I couldn't find them because I was short on time and I was scrolling through. But March 7th, 2019 is a good set for you to look at.

"Also, the documentation that the Mayor referred to from the BTLA and the DRA strongly suggesting that we move forward on a List & Measure, I'd like to see it. I hope that's not just verbal and I hope you all want to see it. I want to see what the DRA wrote, and I want to see what the BTLA has written; not implied but written because I have not seen that and I have been watching these correspondence closely. I have been in communication regularly.

"Regarding the Bob Gagne, I had a chance to talk to Bob Gagne, Bob Gagne used to be a Deputy in our Assessing Office. He is now the Chairman of the Board of Assessors up in Manchester; he's their head guy. I spoke to him last Tuesday. I asked Bob, "what do you think we will get for entry in Nashua". He said "10% no more". The Mayor pointed out in 2006 that they had gotten high level. That was before the laws were changed and it was after 2011; he also pointed out 2011 the law was changed after that. One, you don't have to allow entry and two, even without the allowing of entry, you can still appeal if you are contesting the valuation you have. It used to be that if you didn't allow entry, back about 6 years ago, you didn't allow entry, you lost your right to appeal to abate. You had to accept the number given; the Courts threw that out. So the data you are seeing that was higher in 2006 and 11 has changed dramatically. We should be checking these facts Mr. Mayor.

"Also, when you point out communities from Maine or Massachusetts, I do not know the laws in those States and you should cite those lows. Because if they are different from New Hampshire it will make a big impact on how doors are opened. So let's get our facts straight and let's all get on the same page. The validity of the $1.3 million dollars is in question and the Mayor seemed to indicate that KRT gave us that number. I am very concerned with that number. Let's investigate that. We had a quote years ago, Patriot was in here, it was over $2 million dollars OK? How is it only $1.3 now? Also, why haven't we checked with other cities that have done more of this work, bigger cities, to find out what their numbers are? So the $1.3 million, I am not comfortable with a KRT estimate. Entry rate we heard what I just said, Steve Bolton told the BTLA he hopes to get into 50% of the homes. Our own Board, Rob Tozier, Bob Gagne and today I called Scott Bartlett who is the head of the Goffstown Assessing Office and also the President of the NHAAO. I had a talk with him, they do a cyclical review. I said to him, "Scott, how many homes do you really get into"; "next to none" he said, "I'm looking at 800 homes this year and we will get entry into very, very few". And he said, "I'll tell you what, I'll never see a house with a new kitchen, or a basement finished, I'll never be invited into that kind of home, the only homes I ever get invited into





DRAFT

are the very old ones that are dated that the people are willing to show you hoping their assessment goes down". I just spoke to him this afternoon.

"I think these numbers that you are being sold on or told to vote on are not accurate, we are just not going to get that data. The law says we don't have to allow entry. I wrote a statement in here that List & Measure Initiatives are obsolete and should not be funded in Nashua any longer. Jan wanted to know why, because one – you are not required to give entry. And two – what we know right now definitively is that 100% of the people can say "no". That's for sure, we know they can."

President Wilshire "Ms. Ortolano, we have 6 other speakers and we have 6 minutes left to our Public Comment."

Ms. Ortolano "It is an important topic Chairwoman and it is really important so I'll be quick. The technical data capture is a big issue in the office. We are getting a review done, we don't have any of the information back. We have ongoing investigations, Drummond & Woodsum was hired to review mileage logs of Greg Turgiss. We don't have any data on that. The Board filed a motion, Steve Bolton filed a motion up at the BTLA expanding it appears the scope of work has been expanded into a management investigation. We don't have any information on that yet. The DRA is conducting an investigation based on the PA71's. We don't have information on that. The City is investigating the $24 million dollar assessment reduction made by an assessor on October 10th. We don't have any information on why $24 million was cut off the assessment records and we should. The BTLA just concluded a Hearing and will make a ruling in the near future.

"The final point is the breach of contract with KRT. There is and somebody else is going to speak to this, there is serious evidence that this contract was not followed and the data used to generate the model was not verified. That was a very big cost for our contract, six figures. This City should be going after KRT to get that money back. The entry into homes, there was no addendum signed by the Mayor or anyone else that authorized them not to gather the data. So that's a huge issue. Thank you."

**1:37:20**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. There were some things Ms. Kleiner said that were disappointing to hear. For me as a taxpayer, the quality of the Assessing staff is an issue and I don't understand why we haven't been able to conclude an investigation with an Assessor who did not do his job for the month of April, did not go out and inspect properties, is a confessed sex addict, has a number of issues and we accept that. And that's a problem for me."

President Wilshire "The problem here is I don't think we need to be saying that about people in the City."

Ms. Ortolano "I'm only saying what he said. Ok?"

President Wilshire "It is not acceptable in our Chamber, thank you."

Ms. Ortolano "Ok fine, that's fine for you but you're sitting up there and I am the taxpayer and this is the person you have working in the office. And I notice that he came out tonight to sit with the crew. I notice Ms. Walley isn't here. She wasn't invited. I'd like to know why somebody so valued isn't here? I'd like to understand that. But that's a disappointment. I'd like to share something with you that I shared up at



DRAFT

the BTLA and as you know I had a big concern with permit data and also EYB. Let's talk about EYB, Effective Year Build. This was a big issue from the very first day you came out in September and talked about the KRT meetings that were being set up. I think it was Mary Ann who talked about her District, having concerns with EYB, The Mayor spoke about it. I started focusing on Effective Year Build as a concern and I couldn't get anyone in the Assessing Office to validate it. They wouldn't speak with me, they wouldn't meet with me, they wouldn't talk to us, they rejected any attempt we had for a meeting even though we met with neighbors and we couldn't get any confirmation.

"Over the last couple of months investigating and digging deep and looking into records, I found a set of notes that was a meeting with KRT on 10/11/18. It was about five days after I had a phone call with Rob Tozier about my property and EYB and I was trying to figure out why they never came back and did an inspection. We went to the Hearing on September 6th and no one showed up. On August 5th I called KRT in Haverhill and I said, "Why didn't you come" and that's when I learned that they were told by John Duhamel we wouldn't let them in which was not true. But after that, he went and had a meeting with the Board of Assessors where only one Board Member was there and Ms. Walley was asked to take notes. At that meeting it said, in the record, KRT discovered that the Effective Year Build was being used to increase depreciation. This is an ineffective measure for anything that has maintenance issues or anything that is old. This issue really affects older homes. KRT found a lot of stuff that was old, 69, 84, 89, 94 inconsistent and they started to use the condition in conjunction with EYB.

"For example, a restored home is not in average condition; it is in better condition that average. About half the properties need to be reset. If one property has an Effective Year Build adjusted and the other property next door is identical and doesn't have that adjustment it will result in assessments that are not fair and equitable. EYB is a very subjective field. If an EYB was last updated in 1991 with the last full List & Measure, that would be skewing that assessments. Rob said there are really only 3 fields that are subjective: grade, condition and EYB, everything else is black and white. The neighborhood codes are somewhat objective but not tremendously. That is an interesting statement in set of minutes because I was struggling so much to understand why this EYB was throwing me off in my neighborhood to the point where I paid the $55.00 to get all the cards and put the data together to realize that most of the homes were 1955, 1960 and we were slammed up to 1995. No one, including Dan Hansberry, who is now the Chair of the Board who was sitting in this meeting would tell me that this discussion took place; that this was a legitimate issue, that I was seeing a problem. It affects about half the older homes, that's a big issue and I feel like the City withheld information from me.

"Also in the same meeting, Rob said that there was a serious problem with implementing the income approach. The income approach was all set up and then John recalculated wiping out all the income information, we lost it all. Rob said this happened "late in the game". So he called Patriot and they said it is probably because we were in the analysis database and that was not stable. Rob believes that explanation was just a cop out. Patriot was surprised that we did the entire update in the analysis data base but Rob said it should have been able to handle it. He was asked if there was going to be a problem when an abatement is filed and we need to defend the income approach. He said it would have to be set up again on that account. He said that Ken is really the person to explain how it was set up. At the meeting by the Board of Assessors on October 18th it was Dan Hansberry who said "I'm really concerned, we have to reinvent the wheel and create all this data all over again". And they never discussed it again. And the BTLA brought up the issue of this data. To me it is really questionable whether all this data got

recreated. Nobody ever really looked at that except to say "John said it was done". He lost it all and then it's all done. We should be looking at that. I really think Cornell, David Cornell should be looking at that income data to find out if the commercial properties were re-established correctly.

"But this is some of the public issues with perceptions and clarity and truthfulness and trust with this department, you know? I have opened my house for 35 years, we have always let assessors in. I will never open my door again in Nashua. That ship has sailed and I will tell anyone, don't open your door. Because I have looked at a lot of data and it pays not to open your door. And I hope all of you Aldermen here and the Mayor and the people sitting in this Chamber set the example and are the first ones to open your door and let these assessors in to re-evaluate your property and set the data straight. Thank you."

DRAFT

**Board of Assessors August 29, 2019**

**https://www.youtube.com/watch?v=ZK3joH1zEFk**

**20:18**

Ms. Ortolano "Laurie Ortolano, 41 Berkeley Street, thank you. I want to start off by thanking Ms. Kleiner for making the new manual available at the assessing desk. Hearing that it's going to be a fluid document will afford those of us in the public interest in following along with the process and the opportunity to do so, that's appreciated. I'd like to briefly speak to the abatement we just listened to that was approved. I think it was very well done. I think it really speaks to some of the issues with the KRT abatement. I'm very happy, Bob, that you asked what were the changes made that you identified and what value did it bring it to. It brought it to the $375,000 and yet they proceeded to use the sales grid which took it lower it with equalization and KRT was not willing to do that for us. They took it down through way of sales grid that took it to $622,000, questionably had a home on the sales grid at 4 Elliott because it wasn't a good comp. I asked them to use a better comp and they wouldn't. Then they proceeded to say that we weren't worthy of the equalized value of the $50,000 difference really didn't make a difference because it fell within the 10%. I think it was a really poor job and I wished we had the opportunity to negotiate with the city the way Mr. Duran had. I think he had that opportunity because he's a lawyer and it was easy to get it done but our garage was also in very poor shape. That's why Greg came out. He reduced our garage and that was a $5,000 change, as well as water in the basement was $7,000. That was an amazing discussion on what they found in that home and I don't know if any of you looked at 1 Massasoit that sold on that street at the same time that property sold. Had you looked at that the difference in the properties were startling and yet the assessments were too close and 1 Massasoit after purchase pulled a $90,000 permit for a significant increase in the square footage and home improvements. One house was virtually 400, the other was 500 and the difference was night and day. It concerns me that KRT didn't recognize that with a sales point right on the street."

Mr. Earley "Excuse me Laurie, do you know how much land 1 Massasoit has?"

Ms. Ortolano "I think it's a little bigger. That street up there is off Indian Rock all the parcels are all large. I think the one that was Mr. Duran's property was 1.1 or 1.2 acres and I believe the other one on Massasoit is almost identical."

Mr. Earley "This one is almost 2 acres."

Ms. Ortolano "Ok, then his was 1.6 but on the value, Bob, when you look at the land curve value, the difference in pricing makes no difference on that land curve value that KRT used in this statistical model. There's that original size difference that peaks a value and it takes off the curve in an expediential format and you don't see much difference. It levels off actually and you don't see much difference. The land value is not the issue. I did look at that. I want to talk to you just briefly about the contract we had with KRT on the statistical analysis because that issue came up at the State. I have looked very closely at that contract now. What came up at the state, it was questioned by, I believe by Ms. Walker was on the capturing of sold properties. Who did the inspections of the sold properties? I don't have the verbatim words, I don't know if there is a record being converted and I haven't listened to the tape again. It was indicated by KRT that the city primarily did that function, that they were instructed that they didn't have to do that. I don't know if KRT indicated that they did any, I'm not positive of that but I feel pretty strongly looking at this report that we did not get contract compliance here and we paid a lot for it. Specifically, their duties were to conduct sales surveys and establish base rates for buildings and land. I don't know if the sales surveys were done but that we could figure out when I get the KRT data. Prepare sales surveys so preparation of the sales surveys to bring out to homes commercial and residential was their job. If they are saying it was turned over to the city. I want you to know I went into the city to get the letters that were sent out to buyers, sellers and brokers and in the end there were none. We did not do that part. Laura and I have pulled up 500 of the roughly 1,200 homes to review each one individually. Cross reference them with MLS and look for letters. I know in the 150 I'm done with I believe I found one property that was given a letter by Mike Mandile. Letters in that process of trying to gather data on what went on with these sales properties was just not done. I'll check the property file on that one to see if a letter is in there and if letters make their way into the files. I think out of 500 properties, right now we are looking at maybe 5 that got letters. Assist the municipality to ensure that compliance with the contract is adhered to and submit assigned and date statement to the DRA attesting to the qualifications of all the levels all the certifications to be true accurate and correct. I don't see how they assisted us with compliance because a lot of parts of this are missed. For contract submittal they were supposed to give a list of the qualified DRA personnel to the State and to the City who are working on the job. One name that was appearing on the sales review listing on the property cards was the name K. Leen. That person is not on the list to be used by DRA to do the job. They are not on KRT's website as a staff member. I have an email up with the state to ask who they are, where they came from and what their certification is. I don't know who that is, we can't verify that. Then it says assessments of all properties the company shall list and verify all sales. We've already discussed that they have said that somebody told them they didn't have to do that but when you're in a contract and you're doing a half a million dollar contract, there should have been an addendum or sign off this was not being done by KRT. No doubt this was built into the cost of the project and there's no question in my mind that sales verification was a significant part of the cost because it takes a lot of time to go to 1,200 homes and verify the data. That's pretty significant. The completion of the work according to the contract says everything will be turned over to the city including the CAMA model on October 1st. There's been a question regarding the $24,000,000 that was adjusted on October 10th and who made these adjustments and was KRT involved. I'll discuss in a moment what was said at the August 13th meeting. It appears to me, unless it's written somewhere that the system was turned over and the city took control of the data by October 1st and changes made after that were city changes. My observation are

those properties that have identified as questions on the 8th, 9th & 10th were solely done by the city. That's all I know because that's all the documentation shows on some of the cards and once again the documentation was never complete. It makes it very hard to have an audit trail. It does say that KRT will provide the municipality, delivered at the end of the project with property cards and a hard copy of electronic or both, the data collection manual and all other products deemed necessary by the municipal assessing officials. This was the information I requested for, around the middle of August to look at that data that was returned. I might find some interesting information regarding properties of interest. I did not know until the Telegraph was called in to run an article, that, that request resulted in 31,000 pages of documentation. It's regrettable that the city did not let me know that before doing a photo op. Because I'm willing to meet with Celia, I have not had a response to being willing to meet with her and talk about what to take from there, what's in there. I've called the state and asked them for help on it. It looks to me like, if they returned a property card, if there was a property card printed for every property then roughly 29,000 pages of that are property cards that are returned. That gives you a little perspective of what I was asking for. I'm figuring it out by talking to KRT again personnel is highlighted again and that it's approved officials, certified DRA and we have somebody we don't know. I'm not certain they met the obligation to keep somebody on site in Nashua for 75% of the time. Again, it highlights the details that the company shall visit each commercial industrial and residential property sold between April 1, 2017 to March 31st to verify existing data and conditions of the sale. The company shall make an attempt to inspect the property. If unsuccessful, leave notification requesting that they call or deliver a letter. They are to arrange interior inspections to estimate the value of improvements using the best evidence available. It looks to me like the evidence, the best evidence that was used by the city was the MLS listings but I'm going to tell you when I complete that spreadsheet of 500, there was a lot of missed information when you cross reference. There's a lot of missed information. The other thing is that the company shall provide the city a complete copy of the field data collection cards worksheets and documents. This is noted repeatedly in the contract. The other thing is the city was, KRT was responsible for photographing all the principal buildings and photographing all the sales properties if they were significant changes in them. I can tell you looking at the 500 property cards, that probably 475 have no photo on the property card at all. I know the 150 I just completed, I think, only 3 had photographs. I can't speak for Laura's exactly but I know it's very low. They never took pictures. They never put them on the card and this was a question of mine. I kept looking at files, I've looked at a lot of them. Why don't we update photos when we go out, why don't we get the photos and update them? I can tell you has a resident who looks at them, it's really helpful to have the photo because you may have the idea in your mind of what the property is but not know the address. When you bring something up, you can say oh yeah, that's the property I'm looking for. They did not do that. It said the city will provide all the company a copy of all property transfers for a minimum of two years preceding the effective reevaluation date of April 1, 2018. That's really interesting to me because I wondered how they look at sales and transfers of properties that happened before the one year time frame that they used to create their model. I can tell you the sale of our home in 2013, in December, after reevaluation was done, it didn't have any impact on the neighborhood. It was never used in a model, it was never considered and it didn't affect the sale price because we bought it pretty substantially inflated value. What happens to these sold homes like the Corzini's in 2016. Their data should have been in here to say ok, they went up, and they went up again and we took them to the very top. What about the other properties next to them. They were never adjusted. I don't believe, I want to see the data that we provided for these property transfers and most likely that would be in the box."

Mr. Hansberry "Just a couple more minutes, okay."

Ms. Ortolano "Yes. A compilation of unqualified property transfers with the appropriate notation. I don't know if KRT produced that data. The market analysis used to indicate unit values with the documentation of the methods employed and any special adjustment factors, that was to be provided under the analysis section. The field review, the 100% property field review parcel by parcel we believe was the drive by. The company was supposed to ensure that all properties are valued at their highest and best use values. Any supporting documents provided or utilized by the company in the process, rental expense statements, questionnaires, company cost estimates, sales listing sheets, finally view notes, shall be relinquished to and become part of the municipality, that would be in the data. Here's where the company shall update the existing digital image files by taking new photos of each improved property. They should be at least 6 mega pixels and shot from the street. We didn't get that. The building cost tables were supposed to be adjusted by KRT and there's a long section on that but justified. So we have a building cost issue with building code. We have a base rate table issue with building code 72. That box should tell us the justification was for that data. Okay, this is a big one for me."

Mr. Hansberry "I'm going to ask you to wrap up Ms. Orotlano."

Ms. Ortolano "Sure, could I ask you if you would consider holding a workshop for the public so we could speak to you about some of these issues without having our 15-minute timeframe? You sat up at the DRA, or Bob did. There's a lot of issues on the table. I brought forth a lot of documentation that I wasn't able to get answered down here. We're putting together the whole sales report for the state because I can't give it to you. It would be helpful if you would consider having a hearing with the public and I know I could get about 10 or 12 people out here that would speak to you about some of these specific issues. I think it would be worthwhile. This is really important and I would like to request, this one I'll just speak to. The final values for the assessments for the reevaluation numbers were supposed to be posted on the company website. They never produced final values. That has bothered me tremendously. I am shocked that a appraisal company wouldn't want to control or know what their valuations were. The website posted the numbers at the beginning of September, on the first cut but then they held all those meetings where people could have second reviews and values were changed. I kept going back to that website to look at what changes were made and they weren't. I spoke to Kim Kleiner repeatedly about how can I figure out what the final numbers are because I was trying to understand what happened in May when I discovered the $24,000,000 reduction. What were KRT's final numbers and the only way that I could figure out how to do that was to put in a right-to-know for 1,252 mailings that went out after the second review and make an excel spreadsheet of all of those files, which Laura and I did, and marked put in all the data to see what the changes were. We had now, we feel we have a complete database. Those changes to the thirteen cards were not in there. That is a very big issue to me. The other one is the informal reviews."

Mr. Hansberry "Ms. Ortolano. Thank you very much."

Ms. Ortolano "Yes, I hope you will consider my request to set up a hearing for us. Thank you."

**Board of Assessors September 19, 2019**

**https://www.youtube.com/watch?v=EZzC4jyL9gU**

**8:27**

Mrs. Ortolano "Laurie Ortolano, 41 Berkeley St. I'm just going to read a write up I have on the procedure manual and I put it in writing to give it to you so you can have it verbatim for the minutes and I'll send you the file to copy and paste. This is written to Ms. Kleiner because she worked on this manual with her staff. I would like to read into the record my first thoughts regarding the Revised Manual presented to the Board at the prior meeting. I what to thank you and the staff and I appreciate all the hard work done by the staff and you to bring this manual to the Board and public. No doubt it involved much effort.

"In the article in the Telegraph, August 20, 2019 "City Completes New Assessing Manuals", you mentioned that input from the public had been incorporated into the policy manual. "Kleiner contends the public has already had a chance to give input into the manual, citing the manual addresses many of the concerns brought forth by Ortolano and others." That was encouraging.

"Unfortunately, when I reviewed the manual, it would appear my input was neither addressed and/or was disregarded, so it has left me a little confused. Here is what transparency means to me, in very simply terms; "Sharing" suggestions is great but only if your certain they are heard and acted upon (accepted or not). I want to know my suggestions are heard; however, I am equally interested in a dialog and listening to the Board and/or Administration discuss the recommendations brought forth by the public so we understand what the Departments rationale is in the adoption of these procedures and policies. A one way street with no communication fall short for transparency. When I ask questions, I may or may not receive acknowledge that the issues will be looked at but I will rarely get any information when that will take place and if it happened. If I check up 3 or 6 months later, I am scolded for "not letting you do your job." How does one follow up and why is it unreasonable to expect a response?

"Your Policy manual section, "Public Relations in the Assessor's Office", reads "Nothing is more frustrating to the taxpayer with a question than to be unable to reach the assessor. Good intentions, assessment knowledge and public relations techniques will be of little use if the public cannot reach the assessor. Substitute assessing manager for the assessor and the same can be said. As you all know, Ms. Kleiner, your shut down of communication from myself to the Assessors was quite frustrating for me, as you are well aware.

"The Disclaimer on the front of the Manual doesn't need to be there and is confusing to members of the public. Is it public information or is it not? I don't know understand what the commercial purpose of the disclaimer is. What would a violation of this disclaimer? How does restricting copying (or allowing all public members to copy) ensure that the manual is not misrepresented? I was hoping to see the new agenda for the Board of Assessors meeting would contain a line item for policy/procedure manual review. Given the mission statement of the Board, this document should be a regular topic of discussion over a period of time to work through the information in it. It would seem to me that at each meeting, the Chair would define the section to be review for discussion at the next meeting and take a systematic approach to the manual review. This manual is great learning tool for the Board. I communicated with you the need to put headers on these documents that would have titles, dates, revisions, signatures and page numbers. This is standard procedure for creating documents that will serve as policy, procedure, or regulations. It appears that was not done. Why? Additionally, I sent an email after the last Board meeting, August 29, asking if you would be willing to put any revisions to the manual in the Board packets. I did not receive an answer. Why? The public would otherwise have no idea when changes are

being made. Without headers, dates, revisions, signatures and page numbers, there is no way to track how modifications are being done and when. Is this an intentional decision? I asked about documenting abatements on property cards, in April, so residents would understand "larger" changes that can appear on some cards. I asked this because I was going into property card data on the computer and when I would see this big undocumented change, I would take staff time to have them pull the file. I would then realize that it was just an abatement. The response I received initially was – I'll look into this right away. This is not documented in the manual I'm not sure why. I followed up in June and received a poor response with the recommendation that "I let you do your jobs." It's been 6 months, and I am wondering if and how you plan on documenting abatements. I noticed in Haverhill MA where Patriot is used, they document abatements in the Notes section of the Previous Assessment area. I like this location a lot because it is right next to the assessment value and you don't have to search for it. It makes perfect sense. Abatements were documented in the past on property cards, but for some reasons, the Assessor's got away from it. I discussed with you the new policy written for notifying property owners if their assessment has increased due to a sale. The Department based the increase for notifying the property owner on a fixed number ($20,000 or higher). I was concerned that this was hard on the lower income people with lower property values and they would experience more hardship in making the increased tax payments. It would be more difficult on seniors on fixed income. Why did the department not change to a percent increase rather than a dollar amount? Where is the procedure for rating the condition of baths and kitchens? This has been a big issue that has been addressed repeatedly for months now. There is no consistency or understanding on how these ratings are being applied. I addressed this issue at a Board meeting in November of 2018. I would like to see the procedure so that when I am reviewing property cards, I understand the ratings given to kitchens & baths and other fixtures. If it is not part of this manual, why wouldn't you communicate with me a provide me with a separate copy? Additionally, the Telegraph article stated, "there are policies for updating a property card, how you look at grade and condition, what constitutes fair or poor, and that's very important that we get all our assessors looking at the properties the same way." None of that's in the manual. I addressed my concerns about the Nashua abatement form not containing the same information as the state form over the winter. I took this complaint to the state, the DRA and the BTLA. In the section on abatements, the abatement form in the book still does not have the information regarding the use of the ratio that is found on the State form. I feel strongly, that the Nashua form should have the same information on the state form. Why did we delete it and why does the City not support this? Section 2, Understanding Your Property Record Card – I have observed that the Residential Grid section of the property card does not appear to show the total bathroom count. I have noticed this on many property cards. It is labelled as section 41 on the sample property card in the manual. Why is this? Section 11 – Bathroom/Total Room/Kitchens is not on page 32 of the manual as indicated in the table of contents. I was interested in this section because I was looking for the rating system that you put on kitchens and baths for quality. Also, Appendix A-D listed in the table of contents are not in this section. Additionally, pages 27-28 appear to be missing for EYB, grade and condition and the depreciation section, page 33 is missing. Why? Section 15 – Procedure for MLS. There should be an explanation of how an MLS review is documented on the property card. I have found many cards that have inconsistent documentation for sales reviews. In my opinion, it should always be documented in the Activity Information section of the card. Assessors are not documenting it here consistently. So, when you check a card for MLS review, you must check the Comments section and see if there is an MLS write-up. If there isn't then you have to check if there is an "8" in the verify column of the Sales Information section on the card. Is there a table

that explains the numbers in the verify column and their meaning? Additionally, the comment section should contain a note that says "no changes made based on MLS review." Why? So we are certain that the Assessor didn't just skip it or not capture the information. The MLS review section should also have a tie to the notification to building permits for possible code violations. Section 17 – Review of Sales. In the Sales Qualification letter, questions 16 and 17 concern me because they are subjective. What is the purpose of these questions? Section 19 – Possible work done without Permits. This procedure was generated August 12, 2010 to formalize this issue. It states that there is an Assessing and Community Development folder on the S drive that contains a spreadsheet of potential permit violations. Have you looked at this? Could you provide me with a copy of this spreadsheet? I am concerned we are not communicating concerns with the other departments. In the next section, in the Administrative Staff Procedure Manual. This section of the manual concerns me. The Management Audit Report addresses significant deficiencies in the management of the Assessing office. Yet, this section of the manual, does not include any job functions and oversight descriptions for the Manager or Chief of Assessing. These procedures and regulation should be written. What are the oversight reports to be generated? What is the process for checking work product and quality? Do we have a job description for the Manager of Assessing? What role do they play in data management? There should be procedures that show what the manager is doing to ensure the required state forms and the paperwork are meeting regulations. I don't see anything in the manual that would quality check the sales and permit data. Who is overseeing the data and checking and verifying the changes? Do you recognize that the Assessing department is falling short in capturing sales and permit data and has struggled for years? If you believe that the capture of this data is problematic, why wasn't a procedure written to audit the capture rate of this data? I don't see any procedures whereby the Administration would be running audit reports to check the work product of each assessor. What reports will be run to ensure updating of the property cards is happening with quality and consistency? Who is checking the work of the Assessor's and what is the procedure for these checks? The department now schedules their field appointments. Who is ensuring that the data is being captured correctly on the cards?

"The Data Entry section of the Manual has Gary as the entry person for the data. I think it should be both Gary and Mike. Mike's name is on a lot of the work. For New Accounts being added to the system, is there a yearly report being produced for new accounts? Chapter 16, Printing Sales Reports. There is a sales report you can print that has year built. Would this be useful for the Assessor's to check EYB and Condition? Is there an incident reporting system for Patriot software problems when they arise? This incident report, hopefully would be become a discussion point at staff meetings. Technical software issues are real and are occurring with regularity. A documentation system for this technical problem is important especially since there is no Chief in the Department and a Manager is not located down there permanently. Do we maintain a support contract with Patriot so when technical problem arise the staff they can contact Patriot directly? Who is authorized to call Patriot with technical questions? Assessors send out letters to homeowner when their property values are changed that states, *based on our ongoing continued analysis*. What does a sales analysis involve? This is a question I've raised repeatedly and I was hoping that the manual would address the process for this analysis.

"I noticed a procedure in place for the Assessing office to work with Building permit office for notification when permits are not pulled. This is based on the Assessors performing MLS reviews. My observation is this is not happening. I think of the Corazzini property and the building department did not contact them when they moved in. I think of my property that might of fallen under this issue with

the kitchen renovations and the upstairs bath. No one contacted me from the building department. We both attended the NH State Statues I class. The instructors told us that a great deal of property corrections come from neighbors telling on other neighbors. What does Nashua do when a taxpayer identifies an issue with their property based on their neighbor's property? I know that when I reviewed Berkeley Street properties with an Assessor and saw that a permit was not captured for A/C, the assessor was willing to recognize that they missed it, but they never corrected it. Is there a procedure whereby a customer complaint regarding an inequitable neighborhood assessment is documented and responded to? How is EYB being addressed now and what is the standard for making corrections. As we all know, this is a huge issue. KRT wrote a document on how to handle data corrections going forward after the 2012 reevaluation. It was in the old manual. I have a copy of it from several months ago. It is not in this manual. Why was it removed and are we using this document? I absolutely expected a document in that manual addressing EYB, condition and grade. The Assessors were working on a view factor procedure. Did this take place and how is view factor rated for consistency on property cards?

"It is my hope that you are sincere in your statements to the Telegraph to accept public input and incorporate those suggestions into the document. If you require any clarification or need more information, please feel free to contact me.

"A Disclaimer I would like to read: I am well aware that questions raised in this review do not fall under a document request, and therefore the legal interpretation of RSA 91-A would leave all of these questions unanswered. If the Board and Administration are unable or unwilling to respond, a simple response informing me of that will do. Thank you."

Mr. Hansberry "Mrs. Ortolano?"

Ms. Ortolano "Yeah."

Mr. Hansberry "I have a question for you. So you're saying, if I heard you correctly, that there are references made in the manual and then when you look for certain items they're not there, is that correct?"

Ms. Ortolano "I gave Bob the pages, pages 27 & 28 are missing and I showed Amanda this morning. I've been in there 4 days Dan, and I was racking my brain out thinking this is the most important stuff to me, am I just losing it? So I scanned the entire document yesterday with my phone scanner and then last night I went through it and the pages aren't there and then I said ok did I just make a mistake, so I came in early and I went down; 27 & 28 on whatever I gave Bob. What was it?"

Mr. Earley "Pages 27 & 28 missing from the manual chapter 11; page 32 is missing kitchens and baths section."

Ms. Ortolano "It's in there but the topic isn't in there and page 33, 34 on depreciation so EYB is 27 to 28, EYB condition grade are missing, 33, 34 topic of depreciation missing, ratings for bathrooms and kitchens missing. Those are all really big things for me, and the telegraph was told it's all there. So I'm looking for that, so yes I'm telling you it's not in there. And I didn't ask the question down there because every time I ask a question, it becomes a right to know request so I kept my mouth shut. But if you can figure out how to get me that information, I'd love to see it."

Mr. Hansberry "Alright. Thank you very much."





DRAFT

Ms. Ortolano "And I'm just going to submit this so you have the write up because I read off of this and I'm going send you the file so you don't have to type it all."

**Board of Aldermen Tuesday, September 24, 2019**

**https://www.youtube.com/watch?v=6dgFjzHJR4Y**

**1:39:43**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just wanted to address a couple of things. The new Assessing Manual and procedures was released at the Board of Assessor's meeting on the 29th of August. That was of pretty big interest to me and a few other people based on a lot of the concerns that we had and what we were looking for. I was excited, the newspaper was there, they covered an article, they asked for comments and you know Ms. Kleiner had said that the concerns of the public were addressed. Any concerns brought forth citing the manual addresses many of the concerns brought forth by Ortolano and others. They are all addressing concerns that the public brought to us so it's not like they haven't had any input because they have. We listened to those concerns and we constructed the procedures. These are policies on updating a property record card, how you look at grade and condition, what constitutes fair and poor and that's very important that we get all our assessors looking at properties the same way.

"When she presented the Board with the book she said that they welcomed any questions and I want to make certain I have the words correct, that she was presenting them with the new procedural manual. And inside you would find it divided into two sections. I took the time, a week after it was released, it was put down in the Assessing Office to view and I took the time to go down there, I spent about 2, 2 ½ hours down there reviewing the manual and I typed up a paper on it, on what I thought was missing and what areas thought might have some weaknesses. But what shocked me is that any of the concerns I raised, and I mean I know I am not liked, but there was nothing in there, absolutely nothing for the concerns that I addressed. I mean I really think there was nothing.

"Policy hearings, one of the things I had asked about months ago, was well if you are going to write these policies the old manual had no headings, no revisions, no dates, no page numbers. If you are doing Policies & Procedures you want to have revisions and some way of tracking when they were activated and what their standing is. So this new manual comes out, there's none of that. The Condition and the Grade Issues were not in the book, I started getting very confused. The EYB was not in the book. The other one was the Ratings on Kitchens & Baths; when we had talked last November, how do we look at fixtures, how do we look at something that is good, average, fair, excellent. What are the qualities of a bathroom and kitchen that would give those ratings and that is independent of an upgrade for AssessPro5. That's just how the Assessor is looking at this stuff; that wasn't in there.

"Documenting abatements and how we would document abatements on property files; that wasn't in there. The percentage increase concern I had, the increase on properties when we would send a letter home, I did address that I was concerned about using a fixed number because lower income people are hit harder. A $200,000.00 home is experiencing a 10% increase to have a letter delivered and a $600,000.00 home is only experiencing a 3% increase and they get a letter. And for people at lower income notifying them earlier or based on a percentage might be better financially for them. And EYB

and Grade; so I was shocked and I was struggling down there. I was struggling with the manual because I couldn't find these things. I kept thinking I was missing them, so I went Friday, I went Tuesday, Wednesday, Thursday morning before the Board of Assessor's meeting I went in for 2 minutes and I asked for the manual. And I stood at the counter and I looked and I realized pages were missing, were missing little segments of pages are not in the book and they are not in the index; the EYB, the Grade & Condition, the Bathroom, Total Rooms & Kitchens. Those sections were all missing. I said to the woman at the counter, I said, "All these pages are missing". "What?" I said, "There are no pages so all the information I've been looking for isn't here". She was shocked and she looked at me and said, "I don't know why". She walked back to an assessor and she said, "All these pages aren't in the book" and the Assessor went "Hmmm".

"I come out tonight and I hear Ms. Kleiner mention you know EYB and Condition and stuff are going to be addressed with AssessPro5. I don't understand why the Board wasn't told that and the Board was presented with this manual as if it was a complete manual. I don't have any way as a citizen to go and ask them, "where's the stuff" because for me it becomes a Right To Know Request. It goes up to Legal, it could spend 4 weeks up there, it can get denied because it's not a document request. This one would be provide me with the documents. As a matter of fact I wrote 2 Right to Know's before coming out here; one to the Board of Assessors and one to Kim Kleiner for all of this missing documentation, because I have no way of getting it. I can't ask a question at the desk because they wouldn't tell me the answer anyway.

"But it is just disappointing that you do all of this work and you wait so long and somebody who in charge of the office goes to the press and says, "All of this is in there, we've looked at grade and condition and what constitutes fair and poor, it's all in there". And I'm digging around and I can't find any of it. I feel that's not transparency, that just isn't transparency for me; that's shutting the public out, making us run through hoops, making me work extra hard to try and figure it out. I know that she really dislikes the public, because in her thanks in the end, there was no recognition of the work that the public has done to try to help with what's gone on in Assessing.

"And that happened every presentation she has given. She has thanked the City but never the public and that just shows a very strong dislike and I'm not the only one. She mentioned she took input from other people, I don't know if she incorporated theirs, but she's not overly appreciative of any input.

"On a second note, at the prior meeting on August 13th, Ms. Kleiner got up and spoke about investigations that have been going on. She mentioned, because I submitted a letter, that there was concern on my part studying what happened in an audit report to $24 million dollars that was reduced from 12 properties. She said during the 2018 update it was determined that the base rate for school colleges, what we call Assessing Code 72 was incorrect. Correcting the table for Code 72 resulted in the bulk of a $24 million dollar adjustment that you keep hearing about. This has been verified by KRT. I am not certain how much you've all heard about the $24 million dollar adjustment. What happened, and this was the launching of Right to Know requests. I requested an audit report and in that audit report I discovered that one assessor, two days before the MS1 was going out, made a $24 million dollar adjustment to 12 properties. It was unprecedented; it was strange. I was really concerned because when I tried to look on the property cards to understand what happened there wasn't full documentation. I did find that a Code 72 change was done on a few of them. All of those properties that were changed

are not all tax paying properties, some were exempt, but some were tax paying properties and they got massive reductions, massive.

"When she said that this has been verified by KRT, I don't, now first of all, when this happened and was discovered in I'm trying to think when, May – I wrote a letter to her. I said, "Have you looked at that audit report you sent me, are you concerned by these reductions, do you understand why they are done, would it be helpful to meet, could you offer any explanation". I heard nothing. After 2 weeks I wrote back again. I got a letter from Legal saying this didn't meet the requirements of a document and therefore your concerns wouldn't be addressed. At that point I went to the Attorney General's office and several other citizens did and said, "We want to understand what happened with $24 million dollars". And we camped out with our concerns at the AG's office and they pushed it down to Nashua and they came to us and said, "You've got to bring it to your Nashua PD". So the Nashua PD opened an investigation into this $24 million dollars. When you hear that there is no investigation going on, there is no further investigation of the $24 million you keep hearing about, to my knowledge there is an open investigation about this. And it frustrates me that it had to go to that extreme, that we had to involve the Nashua Police and the AG's office.

"When I went and met with Mike Carignan, his comment to me was "Why didn't they just answer your questions, why didn't they just answer you". And I said, "Because they don't, they don't tell you why". It is even up at the DRA. You know, we as citizens should be able to question what happened to $24 million dollars and you know why did the reduction happen. This Code 72 change that she says was verified by KRT what does that mean? You're a lawyer, you're a lawyer, we've got some lawyers in here? Did they verify that the change was correct? Did they verify, yes a change was made? Did they verify yes it was done by that Assessor? It doesn't mean they approved it. I don't know what that means.

"So you know it is enormously disappointing because I hear a lot of concerns from this Chamber on the money I am wasting in this City looking at things like this. But I would waste so much less had there been some communication. Our PD wouldn't be involved with this; the AG wouldn't have been involved, the DRA wouldn't be looking at this. The Right To Know's wouldn't be happening."

President Wilshire "Ms. Ortolano, you have one minute left for our Public Comment Period, please."

Ms. Ortolano "Yes I just wanted to make you all aware of this because I think it's important. Thank you."

**Board of Assessors October 3, 2019**

**https://www.youtube.com/watch?v=YJHHiNo8TAU**

**4:25**

Mrs. Ortolano "Good morning, thank you for the opportunity to speak with you. Just in this newsletter that was just covered. It's honestly a little disappointing to see that the manuals are being turned back in so updated information can be provided. It would be helpful for the public to know what that information is. I had made that request in writing to the administration and I spoke to you about it. I don't know why they just don't give you the pages and say insert these in the book and replace these. But also that's the information I would like. I don't want to have to go down there and take a scanned

copy and match page for page to see what changed. It's not transparent. So, I guess under right to know, I'd like copies of all the changed documents, so that I'm aware of those.

"Secondly, we submitted a report, Laura Colquhoun and I, to the state regarding the verification of the sales data used by KRT. And this is an issue that came up, I think you are aware Bob, at the BTLA hearing, on what type of verification was done. Attorney Bolton explained to the BTLA that our staff handled the sales verification. But I've been doing a lot of consolidating of my paper work and organizing some things and I found an interesting set of minutes from January 3, 2019 where Mr. Hansberry is questioning Greg Turgiss on the sales data. And he says, Mr. Hansberry asked if KRT got out and looked at the properties and Mr. Turgiss stated that they may have gone out on some. Mr. Hansberry noted that KRT reviewed sales going back one year for residential properties and two years for industrial properties and asked how detailed was KRT's review of these sales and to what depth was the analysis done. Mr. Turgiss answered he was not directly involved with the analysis and he suggested that question be directed to KRT. What I find interesting about this is if in fact we were the ones that did all the detailed verification I would have expected Mr. Turgiss as the supervisor learning off this process to have said, heck I've verified 50% of them myself, of those commercial properties, we did the detailed analysis, that was on the city. But he was not aware of that and he was not aware of that because it was not done by the city. And I'm surprised up at the hearing that Attorney Bolton hadn't check with the assessors to say what type of detailed analysis did you do? We were questioning a great deal. The public was raising a lot of questions on the detail and the data. And what I keep finding in the city is no one is willing to verify. So when we came back we took that sales data out of the USPAP and we took 800 and roughly 40 properties and looked at those, there were about 1200. Ms. Colquhoun has just finished the remainder of the batch for the DRA. But what we found in here is verification simply, any detailed verification inspections of properties was not done. I'm going to say out of the 840 we looked at, I don't know, maybe 20, probably not even, there was an attempt to go out to the property or leave a card. The rest of them they worked off MLS data and very inconsistently. And I'm going to tell you a year ago I came to the Board of Aldermen and I said stop using MLS data to change properties and correct them, because you're not doing it equitably. You're making some pay so much more than others. And what I discovered in looking at 840 points is that's very true. The properties that are being hit the hardest with MLS corrections are the 1401, the single family homes. What you find is multi-unit properties 1402, 3, 4 and up, they don't even look at those. Those properties, duplexes, 3 family, 4 unit, flats, those properties are by in large not touched. If they are assessed at 240 and sell at 500, nobody does anything with them, until you do a statistical update. And that is grossly unfair to the residential properties. And so what we found is…here are our observations in a nut shell. The commercial properties were really not MLS reviewed. And even though we have the Co-Star program, it doesn't really look when we have a commercial property sale that we are using that or that there's evidence of that. The EYB and depreciation issue described in the October 11, 2018 workshop, shows that out of 230…so what I did out of those 840 properties is I took 230 of them and I went on the computer and I pulled up all the MLS data on them. And I printed the colored pictures of what they looked like and I wanted to see how much did those pictures match the property card. And there were a lot of errors; missed bathrooms, missed basements but EYB adjustments just were not done. And it really seems like as they were verifying data for 2017 and now I'm rolling into 2016, they almost didn't want to make EYB changes. They didn't mind doing it in 2014 when they could take a home and try to bring it up to 1. But they're really not using it. And so that came out very clearly. Multi-family units 2 to 10 were largely not MLS reviewed. I'm not going to say every one wasn't because all is very definitive, but I going to say maybe I found 2 out of, you





DRAFT

know, 50. Assessors are not sending letters and are ignoring this whole property group. They're only adjusted in the statistical review. Condos, detached, detached land, no land are not being reviewed and upgraded when significant improvements are made. So that's another whole segment of properties, condos; they just don't really look at them. They treat them as an insignificant group and they're ignored. Single family properties bore the brunt of the corrections and only a fraction of those were adjusted for depreciation. Adjustments made for kitchen and bath improvements are totally inaccurate and all over the map. The rating system remains a problem and was back then. Flooring improvements, this is widely seen, they'll write in the comment section that hardwood, you know first floor changed to hardwood, 100% hardwood, 100% laminate, but when you look at the property card it still shows the primary floor as carpet and when they will say we changed it to 50%, the percentage will be 5, 2, 5 is very common. I don't see on the property card where the date is getting changed. They're not putting it in and it's not reflecting in the section of the card where it should be. The bulk of the field reviews are done by Rob Tozier. One would expect that KRT would have been able to recognize the city did not do a complete sales inspection, as they reviewed the data from the field and sales reviews; but they didn't comment on that. They didn't push properties that were grossly off back to the city and say hey, you missed something significant here. They didn't leave, there was another very significant thing, KRT said, you know, we saw something that looked unusual; we got out of the car and put a tag. We did not find a single property that had a notation that KRT left a card at a door. Not one. Some sales didn't appear to be qualified; they snuck in there and shouldn't have been in the data. Overall contract compliance remains an issue. And then we gave a breakdown of what we saw. So our conclusion was how do you trust a model that didn't do a full analysis on the sales and what does that mean? That's the question we raised to the state. I know that they looked closely at this. I got a lot of communications with the DRA last week, diving into this data, but I'd like to show you a few cards up here to show you what I looked at. And this took a lot of time. I think I pulled 40 or 50 properties.

Ms. Cameron "Laurie, can you use the mic that's right on the podium there? There should be a mic… Thank you."

<u>Ms. Ortolano</u> "Ok. You can hear me better? Ok. I pulled 40 or 50 properties and printed the pictures and I stopped there because 1 it takes an enormous amount of time and 2 it's really expensive to do these. So if I look at a property like this, 101 Farley Rd. This was a very mismanaged property. They had a permit pulled for 75,000 in 11 of 15, right after the house sold for 287,000 but they never caught that permit. And then the house sold for 480,000, that's because that permit was a total redo. And when you look at the pictures, it was. So the house sold for 480 and KRT put it at 409. That's a pretty big discrepancy. For 2017 they left the EYB at 1983, which is way too low. KRT adjusted this one to 99 and I would love to see the EYB changes that KRT made if that could be obtained in RTK. I'd like to know what they switched for EYB's. I'm finding cards they changed but not a lot. And they had to do it. And it's interesting, that even doing a change like this, they could not make this house come anywhere near the sales value because the permit was never captured. New kitchen, granite, stainless steel appliances, LED lighting, hardwood flooring, reno'd bathrooms, 2 car garage, new roofing, Harvey windows, bulkhead, all new outside stairs, Trex decks, new landscaping and a redone barn. And the property looked like this with a write up and it gave a very, this comes right off the write up. And when you start looking at the pictures, you're going to see, is this the right way? Yup, you going to see this is a very renovated house. This kitchen is all brand new, marble or granite striped counter tops, redone bathrooms, hardwood flooring throughout the whole house. I mean this is a very renovated property, not caught.

"We go to the next card and I'll show you. This is 101 Celeste St, no 10 excuse me, 10 Celeste St. The EYB was supposed to change in 2006 to 1980 but the assessor marked it in the notes and never changed the EYB. So this property never got adjusted 15 years ago. The house just sold in 19 for 290 it has no new upgrades, it sits at 248. Because we never made the right correction in 2006.

"This is 5 Denton St. This is a fully renovated apartment building that they made a change to the EYB to 2010. That was a very aggressive change for a very old building. This building is a 1875. I actually look at 2010 as being very aggressive. And then you look at 17 Berkeley St that burnt to a shell in a fire and KRT puts that EYB at 1994. How do you make those determinations? And what's going on there?

"Look at this one. I tried to flag some cause I knew I wouldn't have time to go through them all. 47 Robin Hood Rd. This is a raised ranch and it's marked with a basement and not a lower level. Here's something I was seeing a good bit. There's a lot of basements on raised ranches that are marked basement and not LLV. What I discovered, talking to people around the state, is that the 2005 update of the software, AssessPro, of this city, 15 years ago, LLV was a newly added feature. And they never went back to all the raised ranches, splits or the moderns, and changed basements to LLVs. So what you have is, I see properties, right next to each other, 2 raised ranches that sold, I have them in here actually that I gave to the state. One of them is marked with an LLV and has a per square footage rate of about 68 bucks, one of them is paying for a basement with a per square footage rate of about 52. They're not paying the same rate because a basement is marked lower than an LLV. I don't know if it's because lower level living for a split, they actually have windows that can serve as a fire egress, they're more full windows that are in the lower level so the value of the square footage is higher. It makes sense to me. But we've never fixed out data in 15 years on these and that should be corrected before the new update comes in.

"This property 14 Dowd St. This is listed as a 1954 home. It's got vinyl sided, newer windows MLS says major upgrades over 15 years; roof, water heater, furnace, siding, electrical and updated baths. 1954 is ridiculous and in 2014 when it sold for 177, they did not pick up anything in the assessment. It was already above value but they never corrected the card. And that says it was qualified. And there's pictures on this one 14 Dowd St.

"7 Shingle Mill Dr. This one is an EYB of 1983. Has a new kitchen, granite, partially finished basement, that's not on the card, hardwood throughout the 1st floor, updated furnace, air conditioner, hot water heater, whole house fan. That sold for 295, it sits at 263.

"This one is 25 Mindy Place. I find a lot of the condos are not captured correctly. It's a detached condo, EYB 85 way to low. Fully upgraded, new kitchen, stainless steel, new bath, 1st floor all hardwood. September reviewed, 9/15, 9/5/18 with no change. So these… this is the data I sent up and in my opinion we are missing way too much.

"I just want to go back to the beginning for a quick second. Ok. When I looked at 11 Stark St, EYB 1964. Kitchen is newer than 1964, 2 baths were upgraded and should be marked very good. A very nice ¾ bath in the finished basement is not on the card.

"10 Fowl Ave. EYB 1959 completely remodeled ranch; newer kitchen, refinished hardwood, upgraded 1st floor bathroom, ¾ bath in the basement, average, vinyl sided. This was the ranch. This is a brand new looking, totally modernized ranch. And the card is just…what I did was put the cards into PDF and then was able to use a marker to kind of show the DRA where I was concerned. So, you know, and I will tell

DRAFT

you what I've done. So this was the 2nd report to the state, there's 2 more coming. I was so happy to see that the DRA wanted 2 years of sales data when they wrote the contract. That the city would provide property transfers for 2 years. But then I got a letter from Celia Leonard that said the city did not provide it that KRT had access to the database. Ok, I don't know if contractually if we don't provide it, they're supposed to use it. That's for lawyers. I don't know what that really means. But we did not provide it, but KRT would have that data, which was awesome. But I looked at the 2016 sales; that really intrigued me and I'm looking at all of them. I'm 600 data points into that. That sales data just wasn't even looked at, and there is some glaring interesting issues in that data and that really concerns me. That just to me is not an equalized assessment.

"So the other thing I want to address with you. Ms. Kleiner the policy manual is disappointing in how the communication is handled. I go to a board meeting of Aldermen and it appears that like some of the questions I've raised are being answered to the Aldermen in a way that we didn't put information in the manual because we're working on it. I'm tired of the misinformation and the games. It's not appropriate. We want clear communication, and when you go to the press and you tell the newspapers all of Laurie's concerns are in here. We've covered grade condition, when you are willing to tell the newspaper that and then I go in and I can't find what I'm looking for, it's misrepresentation. It does not represent transparency and we desperately need a chief who's qualified and competent because I'm tired of this political hacking I see going on in here. The other thing is Ms. Kleiner raised in the Aldermen meeting, that since Mr. Bergeron has come on, you folks are doing a review of your bylaws. I'm going to cite you for a right to know violation, because I have not heard any discussion at this table about your bylaws; and to me that's public business. So the whole board is working on rewriting the bylaws; where are you doing this? Did you discuss it in a non-public meeting? Are you exchanging emails? That's something I care about deeply. I'd like to see the old antiquated bylaws you have because I know they exist. But I was totally unaware that this was happening, because despite the fact that I come to every meeting, it's never been publicly discussed and that to me is a gross violation of right to know. Thank you."

**Board of Aldermen Tuesday, October 8, 2019**

**https://www.youtube.com/watch?v=J_N6nyXXhWw**

**18:15**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to talk to you for a few minutes about data management and you know, we all know I've put in a lot of Right To Know Requests and the City has made some pretty big claims and had a lot of words to state about these requests and what they are doing to the City. But I believe a lot of this is the result of the way we maintain out data and how we are maintaining our records. We are simply not doing it progressively at all. You know down in Assessing we have a vault that is full of property files. They are the equivalent of books on a shelf and there are 29,000 of them and growing. It doesn't make any sense to me that we are not looking at ways to scan these files.

"Why are we not taking an initiative to pay a single fee for a year and pay the $50,000.00 or $70,000.00 and create scanned records of all of these files? So that when the public, like me, wants to access a file,

we are not hearing that, “OH it is going to take us 5 days” and they’ve get to check it and inspect it and it is too much work and you are creating a big burden. Why aren’t we looking at ways to create records that are accessible, that are open access the way they should be? It is almost 2020.

“Right now I attended a class and the gentleman who is the Chief up in Goffstown, Scott Bartlett who heads the NHAAO, he was talking about his records. Up there they keep their property files and their income data separate. So if somebody wants to come in and get a property file, you can just get it, it doesn’t have to be checked. Down in Nashua, we combine the income data in the property file, which doesn’t affect all files, it only affects files, mostly commercial that have income data. But the staff has to quickly go through them to remove income data if that’s the type of file you have. Now it is not an overly, timely job; certainly for the files I’ve requested, they’ve really all been thinner files because I haven’t done a lot of work in commercial file access. Those files get very thick and take more time. But if you scanned and had a person come in and scan your records you would have, you could separate out the income data, you would have them all scanned. The public could come in like me, and go to the computer in the office and just pull up the files I’m interested in looking at. And if I wanted them from home, maybe you can’t make that accessible outside to the home, but then the office could easily send you the e-mail within 2 minutes with the files attached. It would be no work at all. And then as data gets added to files, they are not photocopying and running to a vault and stuffing pages into the files; they are just scanning and throwing the electronic record it which is frankly a lot easier.

“So when we hear from management that Assessing is a paper intensive job; it doesn’t have to be. I think if this City talks about wanting to have the best Assessing Office in the State, then make it so we can access the records, because we can’t really do it. Now I put in a request through Legal to access Buyer/Seller and Real Estate Agent letters, Broker letters that were sent out to verify the sales data from KRT. We were told by the Administration that our Assessors verified all the sales data for KRT, which turned out not to be true, we never did that job to the level we were supposed to. But that these letters were sent out to verify the sales; I wanted to see the letters to know if we did it. So I put in a Right To Know. The response back form Legal is, “Ok that’s over 1,000 files, really 1,200, it is going to take 4 years for us to get that to you”. Is that reasonable to tell the public you have to wait 4 years; that it is a 4-year process to access that data? Why aren’t they just scanned in a file. And that wasn’t a big request; that was just for a letter that would on the top of the file; that wasn’t for them to go through the whole file, take out income data or do something intensive. Four years to access a single letter. That is absurd that that was the type of response I got. I don’t think this Chamber in this horseshoe is doing enough to look at how we access data and how we want that office set up to access data.

“At the last meeting we heard management talk about, you know, putting together the binders. We do 7 binders now that we give out to the Board of Assessors and other people who come. And we heard management say, “It really doesn’t take much time, it’s not that intensive it doesn’t, it is very simple”. I disagree wholeheartedly and I’d wished you spoke to the person who did it for months. The time it takes is a function of what time of year it is. If it is March, April, May, June, July we are dealing with heavy abatement stuff, the paperwork for the Board of Assessor’s meeting is enormous, an enormous amount of paperwork. The binders going out were 200 to 250 pages a book. So you are doing 7 books, you are putting out 1,400 to 1,700 pages that you are photocopying downstairs to put these books together. That’s time intensive, I don’t know why management is telling you “that’s easy”. It isn’t, that took a lot of staff time. And you know what disturbs me more? They worked their butt off for a week to put the binder together, the meeting is on Thursday, all the books come back to Assessing Thursday after a

meeting and they throw it all in the trash and they start printing for the next meeting. You throw away 1,400 to 1,700 pages every other week. All that printing cost, that's enormous; you are the green people. You know, be green, don't allow us to do that kind of copying and create that kind of waste. Go electronic, have them bring in a notebook computer. I don't print mine, I bring my notebook in and I scroll through, you know, on my screen, download it because I don't want to carry 250 pages and flip through it. And I just put it there so I can have it to access. We are doing so much wrong with paperwork in my mind and we are doing it to prevent the public from having access. And I think we can do a much better job. And all these complaints that "Oh you know we have to spend $50,000.00 on a consultant because we are behind on permits". That permit stuff is malarkey. You are behind on permits because you are not staffed correctly and you are not looking at your permit data the way you should. But all of that is how you are managing your records. I just did a Right To Know to get the Mayor's letter that he sent out to the Board for this audit, I never had the letter. And I'm sure that cost me $500.00 to get that from the City; to go to Legal, to have a meeting, pull the document, look at it and send it to me. That's unfortunately but I don't know how else to get it. If it was in the record it would be awesome. If it had been part of the minutes it would be great, I could get it. But the letters aren't part of the record. So I get it and when I looked at that one of the things, the Mayor wrote a number of things that this report was going to do and one of them was cover staffing. They were going to address the staffing and the management of the Assessing Office. I have been a big critic that that audit report never addressed staffing. Why didn't we look at staffing in the office? That was so fundamentally important in my mind. We have a tremendous lack of staffing in there and qualified staffing; we are missing qualified people. And we never did that, we skipped that.

"And so you know, I think instead of shooting the messenger over and over and over again, I'd like to see the City take some responsibility to get on board to making access real for us. Don't make us have to jump through hoops, I'm with Celia Leonard, I'm writing 5, 6, 7 Right To Knows for the same data. And what I'm finding is Legal is sending me the wrong answers and I'm having to go back and pinpoint them to the e-mail I'm looking for in a server that I know is there that they are saying isn't. I'm doing 4, 5 and 6 requests for a single piece of information and I don't understand why it is so complicated. When I asked for the Buyer/Seller and Broker letters and I heard it was going to take 4 years I said, "Well let's make certain they are there". And I went back and forth with Legal and said, you know, "I don't think you have to look in the files, it should be recorded on the property cards, if they sent a letter, it should be documented". Legal says, "No, no, no it is never documented". I said, "It's always documented". I start looking at property cards with Laura Calhoun. There is no documentation in the cards that letters were sent. So I go back to Legal, the Clerk in there argues with me, "No we've got to look at every file, it's going to take 4 years to get through this, we've got to do this". I march down to Assessing and I happen to catch an Assessor at the printer and I said, "Excuse me, did you send any letters out to Buyers, Sellers and Real Estate Brokers when you reviewed the sales data". And his answer was "no".

President Wilshire "Ms. Ortolano, one minutes to wrap up, please?"

<u>Ms. Ortolano</u> "Sure. And I asked him to go ask the other three assessors and he literally marched through the office, I heard him, he asked every assessor, "Did you send them, did you send them, did you send them" every one of them said "No, we didn't do it". I marched up in Legal and I said, "Cancel the request, nobody sent any letters which is what I thought". They were going to embark on a four year event and I said, "I don't understand why you in Legal didn't march down to Assessing and say, did you guys do this". That was four or five e-mails that went back and forth on that and it never existed. So

please come on board and help make data something that is really accessible to the public. And please do not start this reevaluation until you hire a Chief. Don't vote to begin it until you bring in a Chief on who is going to follow this through for a couple of years. It doesn't have to be a three-year process, I talked to Bob Gagne, he wondered why we didn't do it as a 1-year. Just bid it out as a 1-year. So please, hold off until you bring somebody in who can run it the way it should be run. Thank you."

**Board of Assessors October 17, 2019**

**https://www.youtube.com/watch?v=nx1TsvIbJ8I**

**14:50**

Mr. Hansberry "There is no unfinished business. Ms. Ortolano. If you could state your name and address for the record please."

Ms. Ortolano "There is usually a little microphone there but I don't see it."

Ms Cameron "They didn't give us one today."

Ms. Ortolano "Oh they didn't, ok. Laurie Ortolano 41 Berkeley Street. I wanted to put up some of these cards. I just wanted you to take a look at 39 Stark Street. This was a property I emailed you about 6 months ago. There's another property on Amherst Street, it's 7 Amherst Street but the address has been changed to. Is that readable? No, why? It was originally, right? I don't know why it's not readable. Well, there is nothing I can do about it. I don't know how to focus it. Do I go out a little, maybe. Nope, it shut it off. Is that better? I think you're getting there Lynn. Is that better? That's as good as it gets so we'll just talk to the data. This is a property card I asked you to look at on valuation. It's one I asked Jon Duhamel to send his assessors out to create a valuation on a fully rebuilt property. There's another property over on Amherst Street, 7, which is renamed Abbott Street, that falls into this category as well. This property was fully rebuilt and the assessors valued it prior to the, no, yes, prior to the KRT evaluation. No, KRT valued it first. KRT took this property from, it was dropped in-between here and 2017 it was dropped to around 200,000 or 175,000 because it was being demoed and rebuilt, which I question the move to do that because it affects building up the value. KRT came along and set it at 284, because the property hadn't been completed. Once it was completed, very shortly after KRT did their review, the assessors went out and valued it at 509. They actually valued it twice. They valued it around, I believe, 560. Which, I looked at it and said I hope it would come in around 600. They put it at 560 then went back and they dropped it to 509 for reason I don't know because I can't find the paper trail. I have a card that shows it higher and I have a card that shows it lower. Then the house sold, the house sold for 732. They can't do anything with this house. They can't raise it, they had already maxed it out. They maxed out the condition, they maxed out the EYB, they put things in as excellent, very good, it had new construction. That card is done. And that valuation will never get to 737, even in the next evaluation and I could tell you more about that. This is happening with other properties as well, and it's because, I believe, how we're starting at the baseline to build our model and I think it's something you should look at. Because they're able to take other houses like ours that are sitting at 469 and put it to 707. But they can't move this house. Now, an assessment like this tells you, well the properties' overbought, it's 200,000 overbought. I'm ok with that, if that's what you say and I do think that went for a rich price. That went for a very rich price. But it's a half acer lot with a large barn attached to it that is pretty nice space if you

have a hobby or a craft business you want to run out of that barn. Who knows what the circumstances were for the buyer. But you have properties like this that you're not able to use sales pictures and adjust them to get them anywhere close to sales data and KRT couldn't do it either and I just want you to be aware of that. These would be good properties to get an answer to why this is happening. Next I wanted to talk to you a little bit about the adjustments that were made on properties during the second view by KRT. You know I raise certain properties, I brought you the information on the 24 million dollar adjustment to reduce property values on October 10th. I addressed three other properties that were changed when our property was changed on October 8th. We received a $12,000 reduction, a 2% reduction, and the houses that the assessor went out the same assessor went out that day and the next day received 30% reductions without filing abatements. What I didn't realize, when I went back to look at the audit report, that assessor made some other very large cuts on properties that didn't come in for an abatement, but they were recorded under Mike Mandile's account. So, when those audit reports are run, there should be a field that shows who did the correction. Who went and did the inspection and made the determination the value is coming down because they got credited to another assessor's account who didn't do the work. But there were some big adjustments and a lot of the reasons were deferred maintenance. What's interesting to me, there were another 8 or 10 properties, one of them was actually done by Mike and it applied the same technique the supervisory assessor used. Went out looked at a property, said oops there is a crack in the foundation and the brick veneer is peeling away. So this is a property at 38 Farmington Road, nice street. KRT put it at 493,100. They asked for a second review, it was inspected on 9/24, during the second review process by Mike and it was dropped 37,200 which is a big reduction. That was an 8% reduction to the property without an abatement and why was it dropped, because there was an observed crack in the foundation and the brick veneer was falling away. And because of that the property received a 10% depreciation discount on the total value of the property. I have a concern with this because, you know, this is very inconsistent practicing and just because you have a crack in the foundation, there's no noted water coming in. When we bought our house in Litchfield we had a crack in the foundation and water would flood in every rain storm. We never went to the assessing office and said give us a discount. We dug the foundation out about 5 feet, we bow-tied chiseled a grove out of that foundation by hand, we filled it with cement, we filled the inside with cement, we tarred it, we filled it in and we never had water in the basement again and that to me was called maintenance. And we took care of it. This is a 2000, 1998 home, newer home, a nice home 2,600 square feet, on Farmington Ave, and it received a very substantial reduction for maintenance issues. You know, I don't mind you telling the Ortolano's that any issues with your brick don't count but then issues with this brick don't count either. And that's not what's happening here. Also, this gentleman came in from 29 Monica and this one was adjusted by Gary, the rest of them were by Greg. This property received an 11% discount. It was valued by KRT at 387,600 and it was reduced 43,000. That's a big reduction, an 11% reduction. And the reasoning is, you know we change the influence factor from 5% to 50 and from, to -50. From 5% to - 50 to 25% and then we depreciated another 8% to 20% and we added the fact that the heat, the house is only heated by solar and wood. Which has been the case, the assessors been out there repeatedly. That's been the case on the property, this is a very unique property, for years. This property didn't have to abate. Came in got all of these depreciation factors, which weigh heavily in dropping the assessment. It's not just the characteristics issue, it's a depreciation factor. This one on Autumn Leaf was a condo, I believe. It was assessed by KRT at 115,800 and it was dropped 15% by Greg. Almost 17,000 with, it says observed deferred maintenance, and they gave a 15% discount in the depreciation column. Well that gave them





DRAFT

on 100 grand, the, on 115 grand that gave them the 16,900 with a few other factors. No abatement filed there. 1080 West Hollis Street received a 7% reduction. Went from 205,400 and was dropped 14,000, again by the same assessor and it was observed 60% due to overall poor condition ongoing repairs. They had ongoing repairs so they dropped and put a depreciation factor of 60% on this property. That's huge, that's absolutely huge. This one on Donna Street, same assessor again, dropped 4% and it's 12.2. It was 326,500 and it went down 12,200 and again the reasoning is they gave a noise correction because it's close to a highway. I could pick out a lot of homes that I've pointed out that have Daniel Webster Highway right behind them. We're not giving any noise correction to those properties. And maybe that needs to be discussed. What roads do you want to put 5% or 10% on. Because you're not doing it on some of the roads. Actually, if you're going to give it to this house the ones next to it ought to get it to. If that's what you're going to do. 6 Woodward was assessed for 297 by KRT, it received a 5.7% reduction, 17,000 again by the same assessor based on condition changes. Everything went from very good down to good. So they looked at the house and said we're going to drop the grading on everything. Very questionable to me, that's very questionable. This one is 70-72 Blossom, I believe it's a duplex, a two unit. It was assessed for 339, it received an 11% reduction of 36,000. And the reasoning on this one was observed deferred maintenance and they put a 20% factor into depreciation to drop the value. That's huge, at 20% on that generated 36,000 of valuation drop. That's awesome if it's being done for everyone. 22 Burnett Street had a KRT value of 267,200 it got a 16% reduction and was dropped 42,000. That's a big reduction without abating. What did they get if for, grade changes and physical condition, they dropped it on the property across the board. You look at 1 Berkeley Street, that I walked in here and showed you that you could stick your arm through the header board in that house. You got small animals running in the roofline. You have a house whose envelope was completely breached and KRT came down the street and said that's good, good condition. Assessed at 400,000. On the corner of Laton and Berkeley, the first one, didn't touch that. Wouldn't give any discount for the condition of that property. So those are concerns I have because…"

Mr. Hansberry "Ms. Ortolano can I ask you a question? Who's the owner on Farmington Road? It was back towards the very beginning."

Ms. Ortolano "I never put that out, because I'm not singling out just people. Just looking at properties but here is, Autumn Leaf, West Hollis, sorry getting there, here it is, Curran, Curran."

Mr. Hansberry "Okay, thank you."

Ms. Ortolano "C-u-r-r-a-n. The other thing I've noticed and I put in a right to know, I have a few responses, I don't know if the city denied it. This EYB issue is pretty huge and what I'm seeing in the data I'm looking at is there are properties that the EYB was changed, I believe by KRT. I'm starting to print the cards from 17 & 18, where, when our assessors change the EYB, I have found, it seems to be documented. Okay, in the comments section, EYB changed. Now what I've seen happen with our assessors is they write in the comments section I'm going to move the EYB from 70 to 80 or 92 and they don't change it. That I've seen. But I've seen it documented. What I'm seeing for 2018 are cards where the EYB is changed and there is no documentation, and it got me thinking about who made those changes. On sales data, used for the KRT model I had Louise print a 2017 card for Glasgow Road or Street that showed that in 17 the EYB was 74 and in 18, after KRT did the review on the sales data, it was changed to 1990. There's no documentation, the assessor who did the MLS sales review on the property and looked at the pictures to make changes to the property, appropriate. Never noted that he was

making a depreciation change or an EYB change. Wasn't on there. I don't think it was done, that was Mike that noted it and I do have to say that when I see his documentation, it's usually pretty thorough. I won't say that for everyone, but his is. So when I see the card in 2018 changed to 1990 somebody made the change. Now it concerns me if KRT made data changes and EYB and didn't tell us. I've got to call the state today and have a talk about this because I'm not certain they documented that is the USPAP. But the other thing is if they changed data, they didn't document it on our cards, which I have a huge problem with if they were making data changes other than to put in the activity section, we did a field review. If you're changing our sales data because you saw a problem, then why aren't you in the comments section writing what you saw and documenting our cards the way they should be. The only way I can tell what KRT did to these EYB's is to get a printout of the EYB, we save our database every night, get the printout before they ran the numbers and list the EYB before that date and list the EYB after. I will have a list generated of EYB changes. My guess is that it's not going to be extensive; it's not going to be a big list. And I could at least crosscheck it with the property cards to see who documented it. But actually, if the change, if they did 17 and 18 before KRT adjusted data and 18 after KRT adjusted the data, the data. I would very quickly be able to see if KRT made these changes. But I'm concerned because the paper trail is messy and these EYB changes have such a dramatic effect on the property values. Remember our property went up 160,000 when they adjusted the EYB. That was a major factor and it is, even in these changes that are being made. They're able to take 40, 30, 50 off when they change the EYB. So when they change depreciation or they put these influence factors on, those are the big movers. Changing the grade from fair to good and good to excellent, 1,000 bucks. This is where the movement is."

Mr. Hansberry "I'm going to give you a couple of minutes to finish up Mrs. Ortolano."

Ms. Ortolano "Okay, so that's really important to me. The other thing is I really hope, as the city is moving forward to do the measure and list, that you will not vote to support that until we have a Chief hired and we have competent staff brought in here. We have serious staffing issues that have not been addressed and I don't know if you listened at the last board meeting, but I received the Mayor's letter when asked for the audit to be done by Ms. Kleiner and Mr. Griffin. One of the parts of that audit was to do a staffing review, well that was never really done. I didn't understand why we never looked at staffing or addressed workload. So, the staffing review was never done and we haven't addressed staffing in a way I think it should be addressed, based on the workload. And just for the record I want to let you know when I listened to the Mayor and Ms. Kleiner at the budget review hearing on or about the end of September, commenting on the fact that they have to bring in consultants because of right to know requests, that's bologna. You know, to deal with permits, this permit data was known by the city for months and months. They had 400 abatements and this continuation of laying blame on citizens who are trying to understand what is going on with valuation and not taking responsibility for managing the office appropriately with these permits does not fall on the citizens. I pulled a mileage expense report and I wanted to see all of our assessors, where they were going and what they were doing. One of our assessors isn't even leaving the office to grab permits. So you got one assessor who is being warehoused in the basement, not going out to do any of the work the mayor says would create thousands, tens, millions of dollars of value. That's not a priority and my right to know requests that are taking two to four hours a week are knocking out the 36 hours to go grab permits. This is ridiculous; it's totally out of control. You have built a wall that is very tall between the public and yourselves and the continuation of laying blame of the people who come forward is the wrong solution to create trust. You know I will

actively campaign against any kind of measure and list in this city until you bring in the right people and the right management to do this. And the list and measure or measure and list, whatever you want to call it, is not going to fix our problems because our problem is how we're managing the data and the people in the office doing that. And we seem to not want to address that. I don't want to give the Mayor an out, which he is already using actively, to say a measure and list will solve all our problems. No it won't. Thank you."

**Board of Aldermen Tuesday, November 12, 2019**

**https://www.youtube.com/watch?v=AeL13uUhb40**

**34:47**

Laurie Ortolano "Good evening, Laurie Ortolano, 41 Berkeley Street, congratulations to those who got through their races and are back in the Chamber. I want to thank the Board for bringing forth the Resolution to look at funding a Chief for 2020. That makes me immensely happy and I am pleased that you are considering doing that. I will come out to the Budget Meeting and listen up when that takes place.

"I want to share a little bit of information with the Board. We know that the BTLA came down with a ruling at the end of the month, the 29th or something that they are going to keep the docket open and ask for quarterly reports from the Assessing Office to follow-up on what is going on with the List & Measure until we complete the update in 2022. I am very happy with that and I'm glad that's happening. That all came about because of the Hearing on August 6th where I presented data in a report that was fairly comprehensive with some members of the community. The City took the position to ask for a continuation to counter the data that was given by members of the public. I had a chance a couple weeks ago to get ahold of that rebuttal of sorts that Celia Leonard provided to the Board up at the BTLA.

"I have to tell you I was pretty underwhelmed and pretty disappointed in it because it just showed me that this Administration does not recognize any of its errors; does not recognize the things that the public has been addressing – permit capture, timeliness of permit valuation. You know the document harped on the fact that I'm not an Assessor, I'm not trained, I'm not certified, I can't make judgements on proprieties.

"What I want you all to know is while that is true it is funny to me that when I brought my assessment issue to KRT a year ago and had the chance to go through a Hearing and I brought comparable properties in my neighborhood that I used as examples, the City then told KRT, "Oh go down that street again and take a look at these properties that she's called out. I think there's some problems". They didn't tell me they were doing it, they didn't tell my neighbors they were doing it.

"They didn't knock on the door, they didn't ask to go in, they didn't ask to look at the properties. They took 5 properties that they said I identified and they raised them $350,000.00. They credit me with that maneuver, they said "Wow Laurie, you're so good at this, you nailed it, these houses aren't right". And while I may not be an assessor and I may not be qualified, it is amazing to me how they put that on me and said "you did the job that we needed to do, thank you". That has proceeded to happen.





DRAFT

"I think Ms. Leonard should be very careful about dissing the public and our qualifications because we have an acting manager right now that is no more qualified than I am. And that has been a great source of problem. Now one of the items that she highlighted to the BTLA was the fact that we were cherry picking. We were cherry picking data and making it look bad when really it just represents a little bit of data. Well I really didn't cherry pick, I lived in a north end neighborhood and I looked at every street up there and then branched out into other neighborhoods. What I find interesting is our past Chief two ago, Angelo Marino, is that this name, I can't remember, Angelo Marino. He was very much into neighborhood assessing. That was his technique was, I guess to cherry pick throughout the City. So I started off doing that myself because I was familiar with my neighborhood, but I looked at all the properties, I looked at 300 or 400 properties. I didn't look at just 5 or 6 on my street, I looked at the whole north end, that's how I ended up discovering the Mayor's property card.

"In this Hearing Document that went to the BTLA, my issue with the Mayor's property card had always been that the permit was never captured in a timely manner. It was opened in 2007, it was taxed in 2012. There was one visit in 2008 that didn't gain entry and the assessor put no value on the permit. And the assessor did not go to the property during the Annual List Timeframe, by April 1st. The assessor shows up a year later in September and misses the April 1st deadline to assess the permit; doesn't get in, doesn't go back, doesn't call, goes back 3 years later, again after the annual list of April 1st when we should be capturing permits, goes again in September. Then he captures the permit but it is too late to assess it in 2011 because the tax bill is closing within a month. He taxes that property in 2012. It took 5 years to put value on that property and that is a text book example of a property mismanaged. And when the assessor goes in he makes a determination on the card that he is going to change the EYB to 1985. But he gets back to the office and he only changes it to 1970, 15 years less. It was 1959, so he raises it 11 years. Ms. Leonard points out that EYB is subjective, it is. We have a huge problem with how subjective we have been using that.

"What makes one assessor determine that a house that has had the walls ripped down, the wiring and plumbing done, new sheetrock put up, new kitchens, baths, built-in cabinetry and basically a total remodel moved 11 years. Other houses that didn't even do that moved 30; what is the difference on your tax bill? On the Mayor's tax bill it would have been $50,000.00. On my tax bill it was $160,000.00. She blows all of that off and uses his property card in here to site as a job well done. That's when I lose faith. I lose faith that we don't take ownership for our mistakes; that we don't recognize that we have done some things wrong and we need to change the way we do those things. So reading that document that she sent to the BTLA was wholeheartedly disappointing a week ago.

"But a month ago, I started a data dig and it was interesting to me when she said I cherry pick; I don't look at enough data. I hadn't read this document. I decided that I am going to take all of the sales data from October of 2015 until KRT took the sales data of April 1st, 2017. I am taking 19 months of sales data, and I am running a sales report and I am going to make a spread sheet. I am going to go in and I am going to pull every property card up and I am going to pull every MLS up and I am going to look at all the qualified sales and I am going to look at every picture and I am going to see what our assessors saw.

"I created a spreadsheet of 10,000 data points, this was hand scraping, and this is why I tell you that I want data on-line. So I scraped this data, I put it together, and I find out exactly what is going on when they sales adjust property. Over that 19 month period, 27 homes were adjusted with their EYB. The

sales guys, the assessors looked at the data and they were very nicely done, they deserved to be adjusted. They had a total value of $8.7 million of property sales; 27 homes. The assessors increased the assessment value by $1.12 million. Those 27 homes saw, on average, a $2,000.00 increase in their tax bill for 2016 and 2017 until KRT came in and equalized.

"But I put together this book that I sent up to the DRA and I sent the report to the assessors today. This is all the data that they didn't capture, 272 qualified homes, that were very nicely done, pictures that are beautiful, updates, granite kitchens, new baths, tiled, stainless steel appliances, lovely, lovely homes. They didn't get touched. What was their value? So it was 272 properties that valued $80 million. 27 properties valued $8.7; a tenfold difference. These 272 homes saw a tax increase of $180.00 a year compared to the 27 that were totally screwed by the City and had to incur $2,000.00 a year. That's what happened to us; I can't help but tell you how strongly I feel that we don't have competent people down there.

"Now I am pulling all of the 2014 data for the year. I sent this all up to the State. I said, "This is all the data, this is everything, this is all the sales data on 1,023 properties; 821 were qualified sales". That's a good take of data. They are running an accuracy rate of about 60%; the Assessing Standard Board requires that their property data capture be at 90% or better. On this 19 month piece of data, it was about 60%; that is horrendous. It is so unfair, I've asked you at this Board 2 or 3 times, I've said to the Board of Assessors, "Shut down that MLS correcting, don't do it, because you are really screwing people and you are not doing it fairly". That is what has happened here. I am mortified by this, I really am. I think that we haven't addressed manpower, nice to see a Chief, but you have not addressed manpower issues. I am very disappointed in the Budget Hearing I watched in September where the Ms. Kleiner and the Mayor came out and asked for $50,000.00 because of Right to Know requests. Clemons, Tencza, Schmidt, who else is in there, a couple others, nobody asked meaningful questions. What is your manpower to cover 2,000 permits? I pulled the work log and data for the one assessor who has been in question because I wanted to see what is that assessor doing with permits? Not going out at all to capture permits. Why didn't somebody ask is everyone doing permit work? That answer would have been "no". Instead of blaming the public for putting forward Right to Know requests, why don't you address your manpower and look at what they are able to do; because you don't have the manpower to grab these permits. Once again, people are getting taxed on them and then there's a whole slew that don't get caught and they get a pass.

"All of this update that goes on, is dependent on the quality of the data and how you maintain it. Outside of an update, there's very few things you can do. You can use sales data to correct a property card, you can use permit data to adjust and abatements. You can occasionally go after a segment of properties that you want to adjust but that is almost never done and I don't know of a case where it has been done here. You have very limited means to make changes, but you have means and you are using them so ineffectively, inaccurately and non-uniformly that you have created a mess in your data. It is just unbelievable to me that it took 10,000 data points and data scraping at this level to be able to prove that Celia Leonard's position that we are cherry picking is really not the case at all. I do not know if the RSA's apply to the public, I need a lawyer to answer that, but the RSA through the ASB that puts 90% accuracy on the data. When I measure all of the sales data and I see 60%, can we do anything about that? Can the public complain and say we are not meeting our standards? I don't know, I don't know if I have any grounds. But I can tell you it is not good enough. In 2014 you only had 400 property sales. You are asking two assessors to each correct 1 home a day four times a week, not even all week. You're

not capturing that data, what is the excuse? It's not like they're bombed, it's not like they are busy with thousands of property sales; it was a slow economy and we didn't capture the data. I had to pay $5,000.00 more but a lot of houses didn't."

President Wilshire "Ms. Ortolano, one minute for public comment, thank you."

Ms. Ortolano I'm all set, thank you.

**Board of Assessors November 21, 2019**

**https://www.youtube.com/watch?v=MUld9L-6bV8**

**17:28**

Ms. Ortolano "Laurie Ortolano, 41 Berkeley St. Good morning.

"A couple things, let's see, I appreciate some of the responses I see in the update that's given to you on the questions I've asked of the board. That's sort of a first for me; I consider that a positive step forward but I am also going to offer some criticism to what I see here and some concerns.

"The letters that Ms. Kleiner produces tend not to be date driven or give both sides; for example: we're working on AssessPro 5, we'll keep you updated on what we are doing. I would like to know when is your anticipated date that AssessPro 5 will be up and running? Because, that will tell me on the outside when we might have different reporting capabilities. Now I've contacted Patriot and they've told me that there's a December date to have that up and running. But I shouldn't have to contact them and I'm trying to get my information from other areas and other states to figure out what we're doing because we don't use dates. And the other thing is the contract that's about to be signed or is being worked on with Vision Solutions, I put in a request for a signed copy, a right-to-know. I received a response from legal that it was…and I said if it's not available now I would like a copy of the signed contract, cause I didn't know a month ago. I knew they were hired. I didn't know where the contract was. I asked for a signed copy and I said if it's not available could you just send me a copy when it is available? I got a response back from legal that there is no signed contract and they couldn't hold my request open. I would just have to keep resubmitting it until it's available. So two weeks later I put it in again, and I received a response back from legal: this is your second request and it's not available. Okay so give me a clue when it is so I'm not sending a third request in that their writing. I did call the state and I said the City isn't being cooperative. I don't know when it's gonna come out and they're not telling me and they won't hold it open. So would you tell me when it comes up there and would you be willing to give me a copy? And they said absolutely, we will let you know. Why can I have a better relationship with the State than I can with my own City? That's just not right and I've been forced into a legal process where they're counting tickets on me and then writing changes to right-to-know because I'm running up the bills in City. That's just not right.

"The last report Ms. Kleiner put out she covered permits; permits that were reviewed, permits that were captured. What she's not telling you is what's not captured. I want to see both sides, because you know that's been a concern of mine. My husband kept putting in the paper, as letters to the editor, last abating season, the progress of what's going on; letter one: we've done 50, we have 350 left, we've done 120, we've got 150 left, we've got this many boom. And he kept giving a monthly update as letter to the

editor. I want to see the scale. I want to see where we are. Now these permits…the permit data on the end gives you a little more information on that, but it starts tell you and speaks to man power issue potentially. Do we have enough people to capture these permits? I also find it very interesting that out of 542 properties visited, they gained access to 38. I haven't done the math but that tells you what entry is like when you go and do a list and measure. And these are current sales with people who moved in new that might be the most receptive to allow entry. That tells me a lot. But I appreciate that. I appreciate the fact that the City assessors reviewed the report and I'm going to put up some information on that. It's interesting that my sales data is off by such a large number because when I met with Ms. Kleiner to review sales data last May, the sales data I had and the sales data she had were pretty accurate. They matched. I ended up doing a right-to-know to get her data and I had a good pull so I felt pretty good about it. The difficulty for me is, with the City, I can't get your sales data. I've asked for runs and to produce reports but I've been told they don't regularly produce them so I can't have them. Now as I look at this I think I realize that I can do a right-to-know for the information you send to the DRA to produce the ratio. But you know what's difficult for me? I don't know the name of it. I don't know the exactly what it's called. And when I write that right-to-know to legal, they bounce me back and say you didn't ask for specifically enough so you're denied. So, I have asked and one of the things I put in the letter to you, is create a part of the policy, a list of all the reports that are available. Stuff you submit to the State, stuff you can run through AssessPro. So, that when I ask, I'm not dipped around with in the legal office because I don't know enough of what the title is. I have written some pretty generic right-to-know's up to the State, ask for information on how I can look at what RSA's or assessing board standards exist to hold accountability for property card accuracy. And I didn't really know what I was asking for. But what I get is my statement quoted with okay we have a good idea of what you are interested in give us a chance to pull some records together and we'll send it to you. I don't get slapped in the face with Mrs. Ortolano you weren't specific enough, we have no idea what you were talking about and we're going to send you nothing. That's how I'm treated here in Nashua. So that has to change. And the other thing is, I have to send my data out publicly. I can't call and meet with an assessor. I've read the agenda's from Ms. Kleiner where no one is allowed to talk to me. I've never been able to go in, since she took over, and talk to an assessor. I've met up with you Dan and ask to speak to you and you said legal informed me not to communicate with you. I can't communicate with you. I tried to ask Mr. Bergeron if he would meet as one member to go over some information; he wasn't comfortable. That's not good. I don't have an avenue for personal communication that I can share information that I have concerns with so I have to put it out publicly. But I feel like you slap me in the face when you don't respond to me privately to give me a chance to correct my information. You have every avenue to reach me and address me privately, but you don't do it. I have no way to get to you and you pass nothing back directly to me.

"So I also feel this paragraph is weak, because while she says there are many inconsistencies in the sales, I only looked at residential. I don't know if her sales numbers are commercial too. I really don't know. So that's one difference. But more importantly, the details were…let's say I'm missing 500 sales, I still looked at homes that were corrected and found 27 in that sales group. That would then tell you that Mrs. Ortolano took a lot of sales. She took 1,023 sales points and hand cranked through them. If it's not complete data, it sure is a heck of a lot and it's way more than the State does. And then she gave you the pages to click on just to look at pictures that are available to correct cards. I can't tell if you're contending that the websites that I click on to look at conditions of the cards are not correct, but if that's my data sample and I can show you 27 homes were corrected hard and 272 weren't, then that's the big

area to address not that the number of the sales were incorrect, because that ratio is horrendous and it's poor. Even if I missed 500, it's way more than the State does. So that's one issue.

"The other area that I'm concerned about is I got a hold of the report that Celia Leonard and the Assessors sent up to the Board of Tax and Land Appeal to counter public data. You know, I feel it shows such a dark side of where we are at in our assessing office. I have a huge issue when you're using the assessors who created the problems to come in and sit with Ms. Leonard and justify why I'm wrong. We've got the fox guarding the hen house and we've been doing it for way too long. You need qualified assessors who are competent, ethical and want to work. That's not what we have entirely and that is a big problem. So one thing that was pointed out was, I'm sure you watched the Board of Aldermen meeting, the Mayor's property card as a justification by Celia, of a job well done. That's ridiculous. The permit wasn't taxed for 5 years. That doesn't meet the requirements of the annual list.

"And when I looked through all of the minutes or all of the emails that I asked for Jon Duhamel, I discovered one where Jon Duhamel asked Gary to produce a Donchess timeline on this assessing. I said well, that's interesting he had to produce something in writing that went to John Griffin and was looked at regarding the Mayor's property. I put in a right-to-know for that; exactly in language Jon Duhamel used, the time and date when the email was sent. It was denied for not being specific enough. I then emailed Gary Turgiss directly and re-emailed Celia and I said this is specific and I have to believe that when an assessor is asked to do work on the Mayor's property file or card it's a memorable experience. That would be something you'd remember. I'm verifying what we did and sure enough 2 days later I had the information. This is the runaround I keep getting that I have to push for. But when I got a response from Celia, the person who produced the report for Jon Duhamel was Greg. Well he was the one who handled the whole property to begin with that I didn't feel was handled well. Why are we using the person who made the mistakes, potentially, to verify that it was done correctly? I don't understand that. I don't feel confident in our process when that's what we do. Jon Duhamel himself or John Griffin should have been looking at that file to verify that it was handled correctly. And the last note on that file was that we need to go back in 2012, close the permit, and finish up, you know assess what was done. We closed the permit, but we never went back and we never got the assessment. So I have always said did we assess it fairly? I don't know. I can assure you that wasn't put in the report up to the State. Celia acknowledges that the permit was closed in 2012 but the note to say go back and visit and to make visit check on the property was never done.

"Now Celia Leonard pointed out a Berkeley Street property, and she went down Berkeley Street just frankly tearing me apart on my Berkeley Street data. The 5 homes that KRT came down and re-evaluated and raised 350,000, because of unpermitted…because of permitted work that the assessors didn't catch, which was documented by KRT. She sites all of those as assessing jobs well done. That Laurie Ortolano's complaints about these are invalid, invalid, invalid. If they were jobs well done, why did KRT go down and add 350,000 to 5 homes. And sight, never notified people, never knocked on the door, never tried to go in; stand at the road and go you, you, you, you, you. For me, I know the answer to that, it was retaliation. I've now been given very direct information that the assessors were looking to create a strained relationship on my street with some of my neighbors that were identified in my original data I took to KRT. You know, I have to present evidence of disproportionate assessment by using other properties. When you do that it can kinda screw you over by going after the other properties. I don't like that. That's been a technique used in here. I think it needs to be stopped and nipped right away. It's not a good practice and it happened to me and it's had its consequences. She cited..."

Mr. Hansberry "Ms. Ortolano you have a couple more minutes."

Ms. Ortolano

"Okay. 13 Berkeley Street was an example of a property that was not MLS reviewed and it sold for 510,000 in 2016. It was assessed for 321,500 at the time. The assessors never looked at the pictures. And there was a permit for $70,000 that was not valued. The house was sold. It was fully renovated and then the person who renovated it, who I happen to know, planned on living there. Actually, got a new girlfriend, they wanted to move and ended up selling the house and leaving. So it was beautifully done for them and then they decided to move out. So it sells for 510, very quick sale. But it's a fiduciary sale and Ms. Leonard points out to the BTLA that it's not qualified. The reason it wasn't looked at is it's not qualified. That's not true, that's not accurate information she's telling them. First of all, if you don't sales chase and if you're going to use argument, we don't sales chase, we don't use data, MLS data to look pictures with just homes that are qualified. There were pictures online of this property. Lots of MLS pictures. It wasn't a private sale that there were no pictures. Why aren't the assessors taking all the homes, all the pictures that are online, for every home whether it's qualified or not qualified and using it to check the property card for accuracy? They're there. You don't sales chase. You use it indiscriminately on everyone. So her argument to the BTLA that we didn't bother looking at this one because it's fiduciary. What does fiduciary mean? It means it's represented by somebody; the sale is represented by somebody else on your behalf. Trusts are often like this. Are all trust sales fiduciary? I don't know I have to ask my lawyer. But I will tell you when you look pull the deed on this there is nothing in this fiduciary sale that tells me it wasn't arm's length. I don't know if there's a means, I don't know what the means is to take some of these sales that are not listed as qualified and qualify them; that they're reasonable. That it was an arm's length transaction or the sales price was reasonable. But she's no because it was fiduciary, maybe she's saying because it was fiduciary for the State, just listed, we can't change it. But you had data to use and you never used the data. So if you are not sales chasing, tell me that every MLS, online posted photograph file is being used by the assessors to verify property cards, because what I'm finding is in a lot of the unqualified sales, they're not even looking at the pictures, they're not even looking it when there's pictures online.

Is this on?"

Ms. Cameron "Yes."

Mrs. Ortolano "Okay so this is the file for 13 Berkeley Street."

Mr. Hansberry "Mrs. Ortolano, this is going to be it though."

Mrs. Ortolano "Yes this is it. I just want you to see that 13 Berkeley Street. It is fiduciary, it did sell for 510, there's no MLS verification, and at the time it was assessed at 321,500 and there was no movement in it. And right now it's at 460. And Celia's saying fiduciary we don't do anything. Okay, so Celia Leonard is saying for fiduciary it's not qualified so we don't do anything. Here's a property at 17 Middle Dunstable Road. It's fiduciary. It sold for 540. Guess what it was at 375 and the assessors moved it to 503, because they MLS verified it. They used the data that was online and they said that value is way too l ow and we're taking it up. And when you flip it over, you're going to see they did an EYB change. They moved that house a lot because it was a big discrepancy. They moved it from 95 to 2000, and changed the grade, they went to excellent in the kitchen, they went to excellent on other fixtures. They pushed this

because they had room in the sales data to push this. And don't tell me they're not looking at the sales price because I'm going to tell you they are. But they used it and it was fiduciary. So the argument that she sent up to the BTLA is not valid. And that's a problem for me and I'm going to go after all that data that she put up there with you over the next 6 months because I found so obnoxious. I found it so disrespectful to myself and others that have been trying to find equity in our property assessments and this City isn't willing to say we made some mistakes you have some valid points and we are going to try and fix it. Thank you."

**Board of Aldermen Meeting, Tuesday, December 10, 2019**

**https://www.youtube.com/watch?v=pWuy5yzO5-E**

**23:38**

Laurie Ortolano "Good evening, Laurie Ortolano, 41 Berkeley Street. There's a couple things I wanted to address with the Board regarding some things that are happening in Assessing. The capturing of permits and sales data has been a really big issue that has been discussed for certainly more than a year within the Assessing Office. We don't have any mechanism to track open and closed permits and captured sales data. I don't understand why after all this time, that's not available in a reporting system. It absolutely floors me. We have Lynn Cameron down there, produces an open permit report every month. Building Department permits get captured, sent down, they load on to the property cards, she does the report to hand to the Assessors on all the open permits that can be captured by Assessing and the value permits.

"We have no way of tracking what the Assessors have done to close the permits which has been a huge issue for me. This Administration, you folks, the Mayor, the Board of Assessors, all say to me, "It is not a problem Lori" – Steve Bolton "We only miss a few, we've got 2,900 cards, sometimes we miss some". How do you know? You have no tracking system. Last year my husband wrote a letter to the editor every month on abatements and it really kind of ended up being a hit. He would say, "This many got done this month", he had like a meter going, 475 OK we are done to 400, OK we are down to 350, OK we are done to 275.

"People were waiting for it and watching, how are they going? And then they started calling their Wards and saying, "OH are they going to get to mine, we are running out of time and the abatements aren't done". People watched. I want to track these permits. Now the Mayor went to a Budget Meeting and he said at the Budget Meeting, when he said these right-to-knows were killing us and Mrs. Ortolano is causing a lot of problems and causing us to run up our bills and we have to hire outside people. We have several thousand building permits we have to capture in a month. So they open up $50,000.00 to hire outside people; they couldn't get anyone to come. So they had to hire KRT. The report that I saw that went to the Board of Assessors, I believe said, and don't hold me to it, KRT took care of 250 or 300 residential permits to close, ran around and took care of those. But there were, I thought, a couple thousand. So what happened to the others? Did they end up getting closed, how were they handled? Did we close out the tax bills, the property record cards without being able to capture those? How many were left open that weren't captured from last year? We don't know and nobody will speak to that.

"I've asked the Board of Assessors, "can you find that out". Ask that question; no interest. Sales Data for MLS correcting, great we have those tools, I am thrilled we have that technique to do that. But when they take the sales data and they are supposed to capture it, how do we know what they do? There's no report. We had an audit come out that showed that we had tremendous management weaknesses. We produced a new Policy Manual and the entire Manual is completely deficient on any management objectives. How could we be so critical of management and then create a new manual with no management objectives? You got rid of the Chief, you are bringing him back, that's fine. But the whole intention at the time was the Directorship was going to the management oversight, that's fine. Then write a manual that says what the reports are going to be that are going to be run quarterly, half-year, yearly that are going to show the accountability that we are expecting in an Assessing Office; no data.

"I have asked the Board of Assessors to please produce something in the Policy Manual that gives a list of the reports that are available to the public. They are not willing to do that. That leaves me in a bind because when I am looking for data and I write to Legal, I get bounced out of the City because I don't know the name of the reports, I am not specific enough and I don't know what they are called. I end up working with the State, the State is much more compliant. The Board of Assessors is a nightmare. They may all be nice men but the sum of the parts does not make a whole and their underperformance is overwhelming me. I learned that they take their model from the Zoning Board. I went to a Zoning Board meeting maybe a month ago. I realized that they are reading the script of the Zoning Board when they run the meeting now in Board of Assessors; and it changed since I've been going.

"My observation is the Zoning Board is a pretty together Board like the Assessing Board they have a Policy Manual or a Regulations Manual that I am sure is several thousand pages thick. A lot of regulations in Zoning, a lot of regulations in Assessing OK? They read the same words at the beginning of the meeting, "If you have questions direct them to us, we will answer your questions" you know "here's our format". They are very open. I go in I spend two hours in a meeting over there, they start it off introducing themselves, they ask the public "does anyone have any questions before we start". They bring each member up that is presenting a variance or a request. Those people dialogue with the Board, they answer their questions, the end the discussion. They have an open meeting where they dialogue very effectively on why they approve it or do not approve it. They allow more discussion, they ask the public for input and then the next person comes up, very efficient, very well done.

"Now I am not going to tell you that Board is perfect, because the mark of a really good Board for me is how they handle a problem. How do they handle dissention? How do they handle somebody who thinks something isn't done right? That to me is a real mark. I didn't see any of that that night but I did see a Board that worked very effectively with the public. That does not happen and has not happened once in a year at a Board of Assessor's meeting. They read every meeting "We will answer your questions, should you have them" and then they proceed to answer nothing. The last Board of Assessor's meeting I wrote them an e-mail; couple of basic questions. When is the List & Measure Starting? Has the contract been signed? Will the company vision have a form for people who do not allow them to enter their home? I noticed on line that some appraisal companies, knowing they can't get entry, have a pretty nice form that allows you to give details to the Assessors on your home should you not allow entry.

"I received no response. I am hoping they will discuss it when I go to the meeting, no response. Why is that a secret? Why is it a secret to know when the List & Measure is starting? Why is it a secret to know whether the contract has been signed? The City had said to me when I asked for the contract through

Legal, of course, it got forced up there, when I asked for it six weeks ago it wasn't signed. And they wouldn't leave it open for me, I think I told you this. They said, "Lori, you just have to keep submitting Right-To-Knows every couple of weeks until it is done". Well that seems like a waste of time, I'm using Legal's time, they are tallying up the numbers, I'm writing the same thing, because they won't tell me. So I called the State, and I said, "Will you tell me when it comes up there for your approval" and they said, "Definitely". Hasn't been sent up yet, I talked to them today, good. But I don't have to keep writing Right-To-Knows to the State to figure it out. I have to do that to my City. It is ridiculous and basic questions like this should be answered by the Board. I am so underwhelmed by this Board. And I don't see where there has been any development by the City, the NH Municipal Association, the State, to come in, do training and get this Board up to speed. We are spinning ourselves to nowhere.

"Accessing the property record cards; the 2018 cards are on-line and we all know that by June or so of this year we put property cards on-line. That was awesome, I'm super appreciative of that. I've been waiting for the 2019 property cards to come on-line. They were due on-line mid-November. And I asked the end of October when they were coming out, mid-November. Well it is December 10th and they are not out. I asked a couple days ago, e-mailed down to Assessing, "when are the 2019 property record cards going to be on-line". I got a response back, "We don't know". It is an unacceptable answer to me, OK. Somebody find out when or why, are we talking a month, are we talking three months. Here's the problem, abatements are coming in for 2019, I always follow that schedule, I go to all the meetings, I want the property record cards to track them but they are not on-line OK? Now I have got to go to City Hall and I start printing, I also want the permit and sales data for 2019. We are going into 2020 in two weeks. I have to get the data, you are behind, I'm OK with that but I want to be able to look at it. It is not available. So I either have to go into City Hall and the sales, the permit and the abatement data will cost me probably $2,500.00 by record card or try to get it on a thumb drive which they say in the manual they can do. But Kim Kleiner e-mailed me tonight and said she's not certain they can. It's unacceptable.

"And the e-mail really points out that they are busy, the property record cards are created through Archive Pro, a software purchased this past summer. Our IT Department is working with a vendor, we apologize for any inconvenience, with the AP5 upgrade sales inspection and the issuing of December tax bills, both Departments are working effectively and as efficiently as possible. I will inquire IT into the possibility of the 28,000 property record cards on a thumb drive. Your manpower and staffing issues are your issue and I have asked you to look into these. Nobody will do that. The property tax bills went out a month ago, I don't see how property tax bills are affecting the department to put on the new software or to put on the new property cards. We already purchased the software, I really don't know what the hang-up is, but what you are telling me is, the data is no longer available, go into City Hall and start printing again and pay out-of-pocket, because that's the best we can do. And it is not acceptable. You are very understaffed in Assessing, you lost your clerical coordinator, there's no sign or evidence that you are going to hire a new one, there is no job posting. What are we doing to fill that position? You don't have a Chief. You have one Commercial Assessor that seems to be ware housed in the basement, not going out. We lost a data collector years ago that we never put in there. We don't have a lot of manpower. And the Mayor's audit ordered that a manpower and staffing review be done and it was never done. Why aren't we looking at this? Because to me we have a staffing problem and you dangle these carrots to the public saying, "OH we have got this stuff on line, you can use it" "Oh sorry we are really busy, it's not there for you, you can't really have it, figure something else out". OK?



DRAFT

"Right-To-Know requests, this is hot topic, Ms. Schmidt has done some clever work to try to fix all the City's problems; awesome. I put in a Right-to-Know request to get John Duhamel's e-mails for September and October of last year. I was really interested in the two months when I was first entering the office and nobody would talk or work with me. Were they following me, were they tracking me, what was going on, what did they know about me? Well it turned out to be very interesting, there were well over 100 e-mails about me. They were very interesting, but when I asked for these e-mails 5 months ago I got a response back from IT that there were over 1,000 and it was going to take them a long time to go through them.

"It took 5 months OK? And they have to be redacted, but when I received the e-mails, they are all jumbled, so I don't understand when you ask for e-mails through IT and you ask for a consecutive time frame, they send them to you in all scrambled dates, no order to them. And the batches came out in six batches, ok, all scrambled. And there were a lot of August time frames in there, I didn't ask for August, I hadn't even been in Assessing in August, I started in Assessing in September.

"Out of those 5 batches a lot of duplicates, so they are redacting the same e-mails over and over again, in some cases four, four of the same e-mails batched out. The long and short when I compiled and put through a program that the "1,000 emails" it was really 1,200, it was really 700, there were 500 too many in there that were repeats or not in the timeframe.

President Wilshire "Ms. Ortolano, there is one minute left of public comment."

Ms. Ortolano "So my concern is this: Legislation like Jan Schmidt's that charges me for the hour to obtain data that I don't want, that I didn't ask for, the last batch, batch #6, that they sent me November 15th was 3,000 pages of August e-mails and data. I wrote to Celia Leonard and said, "I didn't ask for these dates, I didn't even ask for anything in August, you just spent a month redacting all of this stuff that I didn't even ask for". And I got a very curt response back, "We have satisfied your Right-to-Know Mrs. Ortolano". OK, I don't want to pay for that. And I wish Jan would write some legislation that would maybe have cities produce e-mails in sequential order that would help not only the citizen who is looking at the data but the Legal Office that has to go through it and is paying for redacting."

President Wilshire "Our public comment period is over."

Ms. Ortolano Thank you.

**SPECIAL BOARD OF ALDERMEN PUBLIC HEARINGS DECEMBER 16, 2019**

**https://www.youtube.com/watch?v=iJfXw4hxo0A**

**56:48**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I picked up this information pack on the back with these questions and like some of the questions raised here, the first question I had is what is the cost of this, where is the bond analysis. I built a school when I was over in Litchfield on the School Board and one of the things we looked at very closely was the bond and the cost. I think it is really unacceptable that you are asking us to get behind a $118 million dollars without being able to tell us what the impact on the tax rate is on some estimated level. I can't shop that way in my budget and I don't want my City

spending that way with my money, it's just not acceptable. I'm shocked. There are a lot of nice questions in here but I expected to see a bond estimate in here. I am also concerned about the enrollment study and whether we are overbuilding our space, you know? We have enrollments that have gone down and we need to be careful about how much additional space we are taking on.

"It is expensive, we have got to maintain it and there's a lot of parents that look for alternate options for education. We know some of that grant money got flushed away to take for charter schools but that's going to remain an issue. You are going to have parents looking for alternatives and that is going to move students out of the middle and high school and I think that matters.

"So the lack of a schedule and the enrollment study is that this City tends to shortcut on the studies that need to be done and the impact studies that need to be done when you are doing projects. And you and I all know that I have been very involved in assessing. I saw a lot of short cuts go on down there. One of my concerns is I really don't want to have to pay for something like this when I know I have an assessing department that doesn't know how to establish equity for our assessments. If you are an over-assessed property you are stuck and you are going to pay a bigger impact and a bigger cost tax rate for this type of bond than others. We haven't figured out how to equitably assess this City and we are going to have to eat this $118 million dollar bond. When would the first payment kick in for this bond, that was another thing I was curious about, there's a question – one."

Chairman Dowd "We don't know when the first payment would kick in because we don't know when we will be selling the bonds, when the first payments will be due. That's downstream."

Ms. Ortolano "So my vote is fix your assessing department, learn how to create equity for everyone and then sell your bonds, because I don't want to pay for them before that. Thank you."

**1:19:15**

Ms. Ortolano "The gentleman who came up and spoke about the system who worked at the school and the state of the schools for repair. I appreciate what he is saying, I'm not of the belief that you necessarily have to continue to put money into those schools. But I am just very concerned that we don't have a study that speaks to the bond cost and an analysis of what those bonds will look like for this building. I am also very concerned about the lack of an enrollment study and that we are potentially overbuilding.

"Also, it's almost a couple hours into this hearing and I know that putting these three bonds on the table for one single hearing I think was too much and I want to thank Mr. Teeboom for the analysis he provided and the detail that he brings to these meetings because as a tax payer and a resident I do appreciate that kind of discussion. I think in this horseshoe there is not enough of this going on. So when he overuses his one question, the one question is far too limiting when you are asking us to approve $118 million, for us to get behind that in a night. So I think you all get a little cranky with him but he's raising a lot of very good points. I want to tell you I really appreciate it. Thank you."

**Board of Aldermen Monday, December 23, 2019**

https://www.youtube.com/watch?v=b6FLPFpEm6s

**1:30:43**





DRAFT

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just wanted to talk to you for a couple minutes about some Right to Know issues. I had put in, and I am concerned about this because of the legislation that is being proposed to charge residents for time being used by administrators when you exceed a certain amount each month. You all know I put in plenty of Right to Know requests. One of the Right to Know requests I put in was on August 13th and I took this specific contract language from the KRT Contract and requested their returned documentation. The City took the position that all of that language, all of those requests were going to be denied with the exception of one piece on the basis that anything that KRT returned was considered "draft material". And as "draft material" it wasn't available for public viewing. That's going to be something we challenge in Court soon here I think. Because the way the City works right now an assessor will take a property card and go out to a home and mark it up "draft form" but that is stapled to the changed card and it is in the file and the public can review that. Basically KRT took all these forms and returned them. We didn't ask them to staple them to all of our property cards because it probably would have taken too much time.

"Anyway the City said what they said but they said that there was one thing they would deliver and it was the Hearing sheets. It kept getting stalled and the reason I found out about Hearing Sheets, I didn't know these Hearing Sheets existed and we met with the president of KRT; was because as I was gathering property files, record files over at City Hall I was finding Hearing Sheets in the files from people who went to the second hearing. So I requested my file and my sheet wasn't in there. It was interesting because through a series of Right to Knows, in those e-mail exchanges by the administration, they were talking about my Hearing Sheet. So I wanted to see it. So when I put that Right to Know out there and the City said, "We will let you see the Hearing Sheets, those we will make pubic". Great. I specifically asked, and they said, "It's going to take a little while, we need like 6 weeks". And I said, "Well could I see my own Hearing Sheet". And they said, "No we are not going to be able to find it, you're going to have to wait". Well it kept getting stalled and finally in the middle of December they delivered on the first batch. What was interesting was there was a resident who went and got their property file and found their Hearing Sheet and called me and said, "I found the Hearing Sheet". And I said, "Well send me a copy" and this was their Hearing Sheet when they went to talk to KRT and it said, the taxpayer is requesting a second review, blah, blah, blah. Well this individual, I said, "Well I put in a Right To Know for my Hearing Sheet because it wasn't in my file" and they said before they went and found theirs, they said, well can I put in a Right to Know for mine and I said, "yes, put one in and see what you get".

"Well the day they got the response back from the City they had gone to City Hall to check if there was a note in their file that they requested be in there. That's when they called me up and said, "Hey my Hearing Sheet is right in my file and here it is". And I said, "well that's cool yours happens to be there". But the City responded that day and delivered their Hearing Sheet and this is what they gave them, fully redacted, completely black claiming that all of this is confidential information and you can't see it. And the person was irate, like I already got a copy. So the next day I get the response from the City on the first batch. They send me 62 pages like this. So obviously the City after four months, decided that they weren't going to allow these Hearing Sheets to be Public Documents. Hey that's alright, the City gets to change their mind. But why would you have your staff and the Legal people in the Department go through and cull through pulling all of these sheets? They pulled them all and now they are just going to black out, I don't know how many there are, there could be 600, there could be 800, there could be

1,000, nobody knows. The whole interesting part of it is I received notification that they lost mine. So I don't even get mine.

"But this is what concerns me, why didn't the Legal Department say to me, "Mrs. Ortolano, we've changed our position and we are treating this as confidential information". I have about 10 of these that I happened to find in people's files that I printed to see how they were recorded and what was on them. They are public in the files down in Assessing that are there. Then somehow Legal said, "Nope it is not going to be information you can see". And instead of letting me know and saying, "Mrs. Ortolano we changed our position, if we give this to you it is going to be all black". I ended up after the first 62 sending an e-mail saying, "Please stop, you don't have to send me a whole bunch of black pages, you've obviously changed your mind". But I clarified and said, "Is my sheet available" and then I received a letter back that seems to indicate, couldn't fully understand it that there was not sheet for me. You know? This is what concerns me. I don't want to pay for this. I just feel like it's not right. And had there been open communication it wouldn't have happened.

"I didn't go to the last Board of Assessor's Meeting but I did read that the City has hired back David Cornell to work on a dashboard to do some development for reporting systems for the City. I think it is awesome, I think that's great. The one thing I would put out there is that there is still a huge resistance on the part of the City to allow any public input or any public discussion about what's going on. We saw what happened with KRT; Kim Kleiner and the Administration that you know we are going to let KRT come in and you folks in the public can talk to them and meet with them and it got cancelled and it got cancelled and the City decided they weren't going to allow that, never really telling us it didn't happen. Then there was the policy manual. I tried to give input to the policy manual and the manual comes out and everything that I had suggested was just thrown into the trash."

President Wilshire "Mrs. Ortolano there are other speakers signed up."

Ms. Ortolano "So this David Cornell coming is great, but I would like the City to think about letting the public have some input as to what this dashboard is going to look like and more importantly what the reports are going to look like because I can tell you that the compatibility of what I want to see in a report so it is useful to me as a member of the public may not be what the administration is looking for. I don't care if you say no I'll wait until it is all done and I'll give my whole list. It just seems inefficient to do it that way. I know you don't owe that to me, but I think there's a lot of lack of transparency that continues in this City and this experience was just dreadful. Thank you."

DRAFT

**Board of Assessors January 2, 2020**

**https://www.youtube.com/watch?v=CVx8PUfT2iE**

**21:55**

Laurie Ortolano, "Laurie Ortolano, 41 Berkeley Street. Will the reports that are being delivered to the DRA for status of what's happening in the Assessing office, these progress reports, be available to the public without having to request a right-to-know? And will the Board be receiving these reports to read and will they be included in your package? I'd like to get an answer to that question so I know whether or not right-to-knows are going to be needed for that information and if any reports have been

submitted yet to the, I think I said the DRA but it's the BTLA, with the order to reassess that was put out on October 29th of 2019.

"I'd like to just address quickly, Ms. Kleiner made a statement to thank her staff because it's been a very challenging year for members of the staff in the Assessing office. But I'd like to thank the public because it's been equally a challenging year for members of the public in dealing with this Assessing office and the changes that have been made in here. And I think as typical of Ms. Kleiner's actions, she constantly thanks her staff but she fails to recognize what we in the public have to endure as well.

"With regard to restricting access to data, I could not disagree with Ms. Kleiner anymore on what she said and the way she said it. When Jon Duhamel was here, you could go into the assessing office and access property record files as you walked in, as you can in any department in the state of NH. As soon as Ms. Kleiner took over, she became a paperwork flurry. She wanted everything in paper, lots of paper. She got her staff as busy bees doing a lot of paper. Then all of a sudden nobody is available to give you property record files anymore and you have to fill out a form. It was called a multi-request form because if you wanted more than one, you could use the form. But there's reasonableness in one going into the office and requesting a single file and being told to fill out the multi-form request when you only want one and being told to leave and come back 1-5 days later. In August, when that was in full swing, because Ms. Kleiner came back from a BTLA meeting with a bee in her bonnet, okay, requests for one were taking 3-5 days, that was irritating, unnecessary. I couldn't even get my own property record file, I was told to leave and come back and I put my foot down on that. I think access to data is immensely restricted. And also, for her to tell you that it's open for everyone and she's not restricting, you've reduce your staff in that office tremendously. She fired out the clerical coordinator reducing the staff load tremendously. That person has not been replaced. As uncomfortable as that is for you Mr. Hansberry, it's a public expression and it's my public input. You don't have somebody who's been in that position in what? 4 months? That person handled a lot of these requests. So for Ms. Kleiner to say that we haven't done anything to restrict access to information. By not staffing your office adequately you are in fact doing that.

"Now, with regard to the report that I submitted: 9/1/15 3/31/17 review a citizen's report of the sales data for residential 1 to 4 family units reviewed for MLS property corrections, changes in depreciation and KRT updates. On November 21st, Ms. Kleiner read a statement into the minutes which personally was attacking to my reputation and continues to be the mode of operation this City operates under. When you put out City Assessors and Members of the Board recently received a report via email analyzing a selection of residential sales from a member of the community. We were asked to review the material. We completed a review. The use of we, made me believe that you, because she said City Assessors and Members of the Board, I assumed that was you. We completed the review and found many inconsistencies, mistaken conclusions, and discrepancies. And then she targets the sales numbers off of use of the equalization ratio. I'm sitting here today to listen to Ms. Kleiner tell you that the review was very superficial, we checked a few. When you come out and read statements like this into the record, what you are doing is destroying my reputation by saying I produced a piece of crap.

"This was 35 pages of hard work that I put a lot of time into. And what I'm learning today is that the City really doesn't have the time or the man power to do the review. I gave you an opportunity to do the review because I didn't just want to send it to the State. I wanted to work with the City and see if they





DRAFT

would do due-diligence for efforts made. It's apparent in what Ms. Kleiner has read to you today that that will not happen and my avenue to send reports is in fact the State and not the City. It was a nice effort on my part. It was a failure. Now Ms. Kleiner sent me, through the legal office, the 2018 spreadsheet for sales data that is being worked on right now, the 2019, by the office. That spreadsheet was amazing to me; 25 columns of data and all the sales data. That was a great gold to me; to get real data in a format that was Excel that was workable. Okay, so but what I asked for, and Ms. Kleiner didn't know, I asked for only the 2018. My report was 15 through 17. I didn't ask for more data because I didn't know the format of it and I didn't want the City go through pulling out data and reports that wouldn't be useful to me. So I asked for 1. They sent me 2 reports; the spreadsheet is what I wanted, it was great, I go back on a right-to-know through Ms. Kleiner and say give me the 15, 16, and 17 spreadsheets and they don't send them. They send me this hacked up hard data that's revised. This spreadsheet has got a tone of columns on it, 25. This has got 3. And it's their effort to combine 15, 16 and 17 sales data into 1 sheet to say Laurie's numbers are wrong. How do I know their numbers aren't wrong? How do I know they didn't combine the data incorrect? Give me the raw data, so I can see it. They wouldn't provide it. Okay, I'm in a hold on that until January 22. The legal office says it's going to take that long. Supposedly you used it when she came here on the 21st to make her comments to say my data was wrong. She references the study. So what did they look at? But what I can tell you is; the State sent me the summary sheets. The State sent me everything I needed, but I still want it form the City for a very good reason and I'm waiting for that right-to-know to be filled. But you want to know something interesting, the City said no, wait 5 weeks. 23rd of December, I mailed a request up to the DRA to Linda Kennedy, who does the ratio, asked for the very same thing I asked from the City, and I asked for an electronic copy. All I wanted was it emailed. They mailed a CD to my home that arrived on December 26th, with Christmas being on the 25th. It took them a day and half to put the information into my hands. And it was enormously useful. This City is hiding data and screwing with everyone in the public and this Board in enabling it and I'm frustrated. So when I took the State data I can't come up with the 1652 that Kim references for sales, I'm going to be coming up with around 1200, I referenced 1223, their telling me it's 1652, that's why I wanted to all the data. My data appears more right than theirs. It's frustrating to see this be the case.

"You know what frustrated me the most about getting this data? I had been after the City for more than a year on all this EYB stuff. You know the first article ran in the Union Leader on October 10th, 2018 with EYB and me saying something's really wrong. On the 11th, you meet with KRT, you Dan do, and they spill the beans that we have EYB problems. You know it's not equalized, data's wrong and in older neighborhoods it's going to skew the assessments. Nobody gives me those notes, even in a right-to-know on November 14th from an attorney; those notes were hidden from me. Those notes became available in the summer, June, and got rolled up to the BTLA to show them; look at what I found; here's the problem. The City hid that. And in my request to get EYB data the City came back and said we do not have to construct reports for you that do not already exist; therefore all the depreciation changes, changes to effective year built or grade we don't have to tell you, which means 14,000 property record cards I have to search by hand. But when I got this spreadsheet from the City for 2018 and then the State, you put all the EYB changes in there, in a column. It's sortable. I could have this data for my abatement. I could have had this data for my arguments to you that something was wrong. You let me flounder without providing me with the information that was available and for that I am really frustrated.





DRAFT

I feel the City is holding back. When I sorted that data in 2014, the sales data, to look at how many properties had EYB changes? How actively are the assessors changing depreciation? And when do the change depreciation and grade? Because we got a double whammy, that raised our assessment 160,000. Do you know for 2014, when my card was corrected, only 2 properties were corrected for EYB and grade. I'm just going to tell you that is not, out of 1300 plus sold homes, that is not a great indicator to me of equity. EYB alone changes were 14 properties, okay. And I will tell you as I roll that data up through 15, 16, 17 and 18 it's pathetic, with 18 virtually no changes being made. No condition in EYB, in a market that's ripping hot, people selling homes and permits being pulled like mad. I'm so disappointed that I'm learning this now in December of 2019 and January of 2020. When I've been at this for 16 months and you were sitting on this goldmine that you kept from me. The battle continues.

"And as far as hiding data, here's a hearing sheet that a resident found in their property record file. KRT put together these hearing sheets, if you came in for second reviews. They filled them out and they were supposed to. I have requested mine for 4 months. I just learned that the City lost my hearing sheet and the package I gave to KRT when I asked for a second review, how convenient. But this resident said to me, I'm going to put in a right-to-know for my hearing sheet, I'd love to see it. I said go for it. She puts in a right-to-know and then goes to City Hall to check her property record file for another reason. She finds this hearing sheet, filled out by someone with the initials FR, 2013 it was 215K, had bought the house with many, many issues, gas leaks, plumbing issues, water leaks, wants an inspector, phone number on it, name, any money put in since 2013 was only to fix what was broken in the house. Okay, a sheet, it's in her file, public, anyone can see it. Here's the sheet the law office sends…"

Mr. Hansberry "Mrs. Ortolano, 2 more minutes okay?"

Ms. Ortolano "Yeah. Here's what legal sends. That day she gets that sheet, her right-to-know gets filled by the City. They take her sheet and blacken it out and inform her it's not public information; that this sheet has to be kept secret. She already picked it up that afternoon. I've got a handful of these that I've managed to find in property files that existed, but I couldn't find one in mine. Which is why I started asking where is mine? Where is my sheet? This is when Ken Rodgers told us were sales chased. What's written on my sheet? Conveniently lost…this to me looks like we have a lot to hide. And, oh by the way, with my right-to-know that was put in in August 13th, 2019, the City said we will give you those cheat sheets. That was one thing out of the KRT contract compliance that the City agreed to provide to me. I wait 4 months, they delay, they delay, they delay, they pull out, you know, 800 sheets, they send me the 1st batch, 62 pages of blacked out crap. Why did they send it? They obviously reconsidered and decided that all of this needed to be private. Why did they tell me they were going to send it and have me wait 4 months for this? I got 62 pages of this. I didn't need that. That's screwing around with residents and I'm tired of it. I'm tired of it. I'm disappointed. So 2019 was challenging for your staff, let me tell you it was challenging for your residents as well and I'll guarantee you 2020 will be equally challenging."

**Board of Aldermen Tuesday, January 28, 2020**

**https://www.youtube.com/watch?v=Ua5nl8EiJpM**

**20:29**

Lori Ortolano "Laurie Ortolano, 41 Berkeley Street. I just wanted to share a couple of comments with you. We saw the report had come out in the paper regarding the Police Investigation getting released. Part of that investigation had to do with this change that made on property record cards that amounted to a $24 million dollar reduction on a group of cards. That raised a number of issues because of how that communication was handled on those cards. The difficulty was the administration, Ms. Kleiner wasn't forthright on why those changes were made, which is what pushed it out into an outside investigation.

"But my concern is this, that change was done because we changed table data in the AssesPro System. Tabled data is what changes a group of properties that are coded as a group in that table. So essentially what you are doing is a mini-reassessment on a group of properties. That is allowed outside of a big update year, like KRT Appraisal coming in; we are allowed to do these mini-re-assessments. However, I am very concerned that these mini-reassessments are being done outside of the knowledge of the Board of Assessors. They don't approve these changes which is actually shocking to me because they are the oversight Board for approving changes in large scale assessments and the other area is in abatements, when abatements come forward.

"When we do a KRT or an update, we get all this data that pours out to the public. The public understands what went on and we can access a lot of information. When a property owner files an abatement, it is a very public document. Every property owner or every resident of this City can go down to Assessing, pull the abatement file, see who filed, see what sales comp they used or what data corrections they wanted, see what appraisal was put in. They can follow the whole process. The assessor who did the analysis, the analysis done by the assessor and then the action of the Board of Assessors on that property. So we have this huge public trail that is available that explains to us how a new assessment was arrived at; or perhaps it was denied and it stayed the same.

"When assessors in the office make a table data change and they change a large group of properties and there's no documentation done as was the case with this property, that becomes a major concern to me. And that was what raised the red flag. So you know, I would love to see a policy change in our Board of Assessors, where they are receiving this information when table data is changed in the model. And it comes down to the Board so that they are reviewing the group of properties that are receiving this reduction; in this case it was a $24 million dollar reduction. I think that's worthy of going to the Board.

"Just in the last few weeks, I stumbled on some properties by my house, because as all of you know I'm in an abatement issue and there was a change made to a group of properties. Each property was cut $100,000.00. One of them has already been abated by July 1st, it was abated. In October, an assessor down there, cut it another $100,000.00. I happened to catch it, just by luck. I wrote my questions, said "how did this happen". I'm in the same situation I was 16 months ago. I don't know, there's no documentation, I have to do research. Now the new director had said to us months ago, everything is going to be documented, we are going to document from now on. There's really no document trail.

"Also, there should be some policy in place whereby data changes being made to cards, data changes that are significant that are going to move a property 25%, $100,000.00, should be going before the Board. We are not talking about a ¾ bath is really a ½ and the assessment changed $2,000.00. We are talking about a $400,000.00 home coming down to $300,000.00; that's a massive adjustment. There should be a paper trail that's clear as can be to describe what went on with those properties and there

isn't. I am frustrated that I am back in the situation I was 16 months ago with an assessor who keeps saying, "I don't know, I will have to do research, I'll get back to you". It was the same assessor that treated my property that way and I never got answers and I know I am never going to get answers again on this one. The DRA asked me to put in a PA71, I have just completed it, I am filing it up there because I am frustrated. I really think we need to get some policies in place with our Board of Assessors, where they are doing more oversight than what I see going on down there.

"We have some gaps in our Assessing Office right now. And I am absolutely not in agreement with some of the assessors down there and the skill level they are showing for the work they do. Very concerned. And when I stumble on this and I see this again, my concerns remained heightened. So I hope that some of you will join me in encouraging the Board of Assessors to get on board with some policy to create better oversights for all of us. It upsets me when I hear the Mayor talking about the budget issues and the pending tax implications for what we have going on because I feel that this administration doesn't give a darn about the equity of these assessments.

"We have some assessors in there that are slashing numbers that make absolutely no sense and we let that happen. We burden those that are over-taxed with carrying the burden and then we complain that the tax rate is going to go up. You know I've not been an advocate of opening your door for this list and measure. It is for reasons like this, I will not tell anyone they should open their door for a list and measure. The only people who should open their door are people who have blighted properties or who haven't done upgrades in 25 years. If you do not have that property situation, keep your door closed and force the assessment from the street because it is the only way there is going to be equity. Because with a small pool that opened their door, the 15%, I was the person who opened my door and I got royally screwed and I am trying to get out of it now. I could not possibly tell anyone else in this City to open your door and do what I did. Close your door, let them work from the street for all of us. Thank you."

**Board of Assessors February 6, 2020**

**https://www.youtube.com/watch?v=gNXINGhIo-o**

**16:18**

Ms. Ortolano "Good morning, Laurie Ortolano 41 Berkeley Street. First off I'd like to thank you for having those changes to the policy manual, those pages as part of the packet cause it certainly makes it easier for me to follow what's going on with the board manual, the assessors manual, so I appreciate that.

"I wanted to talk to a little bit today about policy. I think there's an opportunity to do more in policy development to get a higher level of oversite from this Board on approvals on what is actually happening in the assessing office. We all know the police finished their investigation on that reduction for 24 million and they found no wrong-doing. That's all fine but the whole investigation came about because there was no open access to information and because a group of properties, a table was changed, the schools and college's table, building code 72, was changed in the software, in the table change rippled through and affected 13 properties at that point in time. There were some that were actually missed. Some of the code 72 properties were not caught but the ones that were caught, 13 of

them, were changed. What happened, as I digested it over time, is that the assessors did a mini-reevaluation on a group of properties. We couldn't figure out, the public, who had made that table change and right to knows and requests for emails we found out it was Jon Duhamel at the request of Greg, who changed the table, who did it for him. Because he thought there was a need. But the concern was, there was a real lack of documentation in those 13 files as to why it was done, or how it was justified to move this base rate from $174 per square foot down to 110, there simply was no paper trail.

"My feeling, and I'll do some more research on it, is when the assessors are going to conduct a mini-reevaluation on a group of properties, that should come before you. So that you and the public understand what is happening on that group. Their within their rights to make that type of correction, it's very rarely done outside of an update period. I don't have, I asked a couple staff people how often a table change is made, I asked a gentleman in another town how often you make a table change outside of a update period. Very rarely, so our changes that we make outside of update years are to capture permits and to adjust properties according to improvements based on permit work and to assess changes due to sales, MLS changes. I think in this instance, had there been a policy where those changes were brought forth to the Board, there would have been a public discussion and the justification for the base rate would have been out in the open, and who did it. I don't really understand why it was such a big secret.

"I also think there's an opportunity to handle a policy change on MLS correcting homes. We always do an MLS correction when a home has sold, why do we wait for it to sell?

"You know there's this issue of sales chasing that has been addressed where some properties seem to get adjusted off the pictures and they move very close to the sale price. If you did your MLS adjustment when the house lists, rather than sells, the issue of the sale price would never be an issue and I don't understand why we don't have the assessors contact the real estate agent. When a house is listed, make connections to the real estate agent. We're calling them out now on buyers and sellers to address the sales of properties. Have the assessor meet with the real estate agent and go through the house. At that point it's being sold by the owner, the new people buying it will know what the assessed value is based on this inspection. I think you have a higher probability of getting in and having it corrected right then and there and you know it's not going to be driven off a sale because they won't have the data.

"I actually think you're going to see substantially different values when you don't have a sale point. Because as you know, I produced some information and the assessing office does not have time look at it or consider it or review it, but my observation is sold homes are being treated much more harshly when it comes to corrections than permitted work done on homes. I think a policy where you go out when the house lists, get the data on the listing, get out there and correct the card before the sale occurs. You will be truly using those pictures for what they are to correct those properties.

"I also think we need to look at a policy that limits how long we allow deferred maintenance or problems with you know, discounts for painting or a brick problem to stay on a property card. I think it does affect value. I don't agree with KRT and their position they took last year with the 50 abatements that any deferred maintenance is deferred maintenance and we don't count it because our assessors did. I think if you bring an appraiser to a house and they see some of these things they're going to count it. It will affect the sale value, it's real. However, when you allow a property to get a 5 or 10% discount, because it's not painted, and the next year they paint. These discounts stay on those property cards for

10 years, or more. Laura and I have found them going back a long time or obsolescence that doesn't go away.

"I think its ok for our assessors to give the discount, but note on those cards, somehow flag them that after a year their going to be reevaluated. There was a property last year that came up here for an abatement that was discounted for painting issues, I can tell you that property has been completely redone and that 10% discount is going to stay on that property for a long, long time. It's not going to come off because we don't take it off and we have no way of going back and getting it. I think there is some good opportunity to work policy that come from the, that comes and starts at the Board. I would encourage you to look at that because I think it will make equity better and allow more transparency here in the city.

"Can you tell me if you finished your By-Laws, are your new By-laws completed?"

Mr. Earley "They're not."

Ms. Ortolano "Okay, that's ok, just curious, just following up. I wanted to show you a couple of things, just two things. This is a property that had sent an email in to the, to AssessHelp stating that the city was being sold, the property was being sold, on the backside. This is a property that the father had passed away on, and an assessment was done in 2018 but they understand if somebody is passed away the property needs to be reassessed. This family contacted the assessing office because the father passed away, that's good.

"The assessing office reviewed the property by doing just an Aerial V NC, I think that's and aerial view no correction in the activity information section. And so the property record card shows, so what I've noticed lately is that we're doing some of these aerial views, we are using GIS to confirm what the property looks like. We are not necessarily going into it and we didn't. We didn't go and take a look at the property, which I think would have been a good idea because the last time somebody was in it was 1991 and somebody was, here was an owner inviting you to come look at it again, and we didn't go. We just did the aerial view and when you look at the footprint on this property, here's a footprint. When we used the aerial view, when we used the GIS, which I believe is the GIS view, when you bring up the initial picture this is what you get. You get a heavy foliaged photograph that doesn't really allow you to see the footprint of the house. Unless you scroll through the layers, you cannot see what's around this house but when I scrolled through the layers and I got into no foliage on this property, there's a deck off the back, that's not picked up. When you go to the MLS, because they sold the home because the father passed away, there's a deck off the back and a landing.

"This would be something the DRA would flag. This is a process where using and I don't, I have found others like this, I pulled this one as an example where we are using aerial, but when you bring up the aerial you can't see because you can't see because of tree foliage is too heavy. I think you have to go through layers in order to get to a view that you can see to really look at the property or you're missing stuff and that might be a training issue. I think we should note that as a potential training issue and use it but I also think that maybe the person using it isn't working the layers correctly. I also think on properties like this, if you get a chance to go in you should go in.

"I came across some properties in my neighborhood that had an adjustment due to a jurisdiction code change. Totally by luck, I stumbled in to this property group. Again, this is an example of a property



DRAFT

group that I think would be a group of properties that should come to the Board as a matter of policy and procedure. This is a group of Concord Street properties and there were four properties, 67, 68, 72 and 74, that for some reason had a jurisdiction code, which is a land use factor that was not correct.

"When I first discovered it, and I discovered it on property 74, I didn't know what a jurisdiction code was. I started researching more, I found the J code. It's listed as a code in the land section. I got a past property record card and was able to realize that the land valuation on these properties somehow got skewed in the KRT update. Somehow the distribution between the land and the building got skewed. The total assessment seemed ok but the breakdown between the building and land was not.

"What concerned me about 74 is that property was abated last year by you, you approved an abatement. The owner of that property used CPTM, filed an abatement for 2018 based on the fact that they thought the assessment was too high and CPTM was coming in around 400. Our assessor did the abatement, came up with a market value of around 440 and when you applied the ratio the new assessment was 416 and change. Fine, they won the abatement. Now, this property is a highly redone property and I'll show you some photographs of it. This is a two-unit, it's a duplex, a two unit and it's fully redone. I walk my dog by this property, like every day for years, and I watched this undergo a transformation starting like three years ago. Matter of fact I stopped and talked to the contractors to potentially use them if I needed work because I liked what I saw going on. You can see the kitchen is a full granite kitchen, the floors and ceiling, this tin ceiling is actually new. It's not an old ceiling restored, it's actually a new ceiling.

"You can see the bathroom is a very nice high-end bathroom for this unit. Also, the appraisal that was submitted last year by CPTM could justify the reduction had a 2017 appraisal in it and when you look at the pictures of this appraisal it is remodeled. It shows you expanded bathroom number 2 is remodeled, they put in landscape with irrigation, it was professionally landscaped, professionally painted, it has a new bathroom, the bedroom up above the family room is refinished. It shows the bedrooms, the one-unit kitchen is a total remodel and well done and the second kitchen is, let me see if I can find it for you. Well, it's the one I showed you in the picture, the granite one, one is a wood cabinet and one is a white cabinet, it's also redone. This is a completely redone unit, house. Old home, 1890-1900, old home, but fully remodeled, four bathrooms in this property, air conditioned, new forced hot water heating system. This is a house that is done at a much higher level than my house on Berkeley Street. The thing that concerns me and this is where I look at permit work being captured. There was a permit pulled to do this work, it was listed primarily as electrical, and it was a $50,000 permit but when you look at it, it was removed bath tubs, toilet, entryway floor and the zoning was interior renovations. It also had electrical in there so they had done an electrical upgrade on the home but they had done renovations as well. And evident in this report of the appraisal renovations were done by 2017. This permit was pulled in 2012 and I think it was closed in 2017 so this one that was, had a long run, open. But, when the assessor closes this permit, he never goes to the property, he assesses from the desk, he says no changes. The assessment was 336,400 when it started and the assessment at the end was 336,400 as well. There's no change to this property, no value increase for all of that work done. That concerns me because I see a lack of equity there.

"The permit never gets captured. Okay, so now the house files for an abatement, it wins the abatement with CPTM. We give it a new value but then an assessor discovers that this land distribution isn't right and the land is off by a hundred-grand. We approve basically July 1st the new value for the property.

October, beginning of October the assessor makes the change on the jurisdiction code and drops that property 100,000. Now this property has a value, instead of 416 and change it's down to 320,100. At the click of a button it lost a hundred-grand. Because it happened to four properties, all four properties were adjusted about 100,000. What's amazing to me is if you look at these duplexes, these duplexes are pretty old. The only one that's really updated is 74 and it's a 3,100 square foot four bathroom, four bedroom, asphalt roof, the others have slate. These are asphalt so it's lower maintenance, forced hot water, the only one air conditioned and it sits at an assessment of 320 and the other assessments, the next lowest one is 352, 391 and 493. It is unbelievable to me that that house could lose 100,000 in three months on a push of a button and it upsets me because it is so grossly off. And when I went to the assessor to ask questions I got my typical answers that I got 16 months ago. I don't know, I'll have to look into it, I have to research, I'll get back to you and nobody ever gets back to you. This is where my trust is gone; I don't have trust or faith in an office that operates this way. It's just not equitable and you should be able to justify, and I don't think properties should be smashed down a hundred grand. When you're changing assessments 20 or 25%, I think those should come before you and a justification should be put on the table because I see this as a huge inequity. The house next to 74 is 72. If you look at that house on Concord Street, it's pretty run down its got a grade of a B+ and 74 is a B- good. I don't even understand how he could grade that other house that way when you look at it. I actually think 72 was the trigger that caught this. 72 called the owner, called the assessing office and said my assessment is too high and the assessor went out and did a full list and measure on the property, and that might be, I don't know because nobody will answer these types of questions. This is where the public is left in the dark. I think the assessor caught the error on that home and then made an adjustment and took it down a hundred grand. I don't agree with that because I think sales data should be used to set the assessment level. The individual was not required to abate. The rest of us are. If they call you out, and it's October and they have a concern with their value I don't know why they're not told, you need to file an abatement and we need to do a sales review. It didn't happen. I just want to make you aware of this because it's an issue that really leaves me befuddled on why this happens and why you can't get answers, it's disappointing. Thank you."

**Board of Aldermen Thursday, February 6, 2020**

**https://www.youtube.com/watch?v=mCs90x7Cy9E**

**1:39:25**

Laurie Ortolano "41 Berkeley Street. I think my issue here is similar to the gentleman who just spoke. I think it is about public trust and transparency. Mr. Clemons brought up the issue which is appreciated but he put it in terms of "people are curious". I can tell you my questions were not because I was curious, they were because I wanted to do a reality check and that's different. And I do respect that you want to maintain confidentiality, but I think that there's got to be a better balance between confidentiality and transparency and public trust. I wrote my initial question to Mr. Cummings just out of curiosity because I knew this was happening, where can I find out the money raised? I got the shortest answer, contact you, but by name, the Capital Campaign Person, I'm no longer involved. I didn't get a name of a phone number. I didn't even know who that was. Then there were other postings on social media on this page where another woman went out and she got a better response.

"I think you should have had a better response, the City knowing this was happening. People were going to ask, I asked. I sent an e-mail out to all of you because I figured you're coming in here, you guys must know. And I only got one response from an Alderwoman. So you know, I yeah, I think it is important that we have a different level of transparency and my concern here is just with the total package, not just this extension. But I happen to think the New Market Tax Credit, I studied that extensively, that's a longshot. And I am concerned that we can't pull the whole thing off. And I don't know that I believe that the total cost of $23.8 is fixed, the more time we take, the higher the costs go. I think when you get into dirt costs and you start digging, you can see some really big run ups and that's concerning to me.

"I believe your campaign is going well and you believe your campaign is going well, let's face it the market last year was hot, the investment market. Last year was a great year for people to come out and donate money. So you don't get a lot of years like we had last year; I'd love another one this year. I hope it is that was for us again, because it would be wonderful from a donating standpoint. But last year was the year to really rip down some private donations because the market was so good. I'm concerned that we still don't have enough. The $294,000.00 that come from the State Credit Program, do we know how many people bought into that $294,000.00? You know that was a fixed program that went out and people could buy into that, and it was all done; do we know how many bought into it?"

Chairman Dowd "Your time is up, but if you have a question?"

Ms. Ortolano "I just asked it."

Chairman Dowd "Mr. Cummings, do you have an answer."

Mr. Cummings "No."

Ms. Ortolano "Alright, thank you for my three minutes."

**2:21:25**

Laurie Ortolano "Laurie Ortolano, Berkeley Street, I'll be quick as well. A lot of interesting information came out here tonight, a lot of timelines and frames. I would request that in the future, you have a spec sheet or a document that's on the table for the public to show where we started and where we are now with a breakdown of the finances that have gone into this project. I mentioned that before when we did the school project and I think we are missing a lot of information as the public to be able to track what is going on. Some of us can't dig it all up ourselves, and we are busy and it would be super helpful if you would provide that tracking mechanism."

**Board of Assessors February 20, 2020**

**https://www.youtube.com/watch?v=_BbrTjTe-rY**

**11:10**

Ms. Ortolano "Good morning, Laurie Ortolano 41 Berkeley Street. A couple of items here; I was going to address the contract, I had some concerns but I'm going to wait till the meeting in March when you hold your special meeting which will be perfect to address some of those concerns.

"I talked a little bit at the last meeting about policy and the opportunity to develop policy, and I'd like to address another policy issue which is the handling of our records down in Assessing. It used to be, the practice in the office used to be that any assessing record, property record files were not allowed to leave the office. Angelo had a strict rule that all records stayed in the assessing office, and anyone who wanted a record in City Hall could obtain a copy but the original was always maintained in the office.

"When I started looking at records more than a year ago, I know I could not take anything out of the office, even if I wanted to go outside and sit at the table where there was a chair and a table to work on it, you couldn't do it. I was told no, the records have to stay here. My property file has been completely mishandled by the City because they do not protect the records here any longer.

"Jon Duhamel did not enforce the policy that records couldn't be removed and more than a year ago when my property was being reviewed by KRT, in October, I went to assessing to get my property record file and it had been taken by John Griffin up to the CFO's office. It stayed up there for quite a while. It's referenced in emails, and information in my report is, in my property record file, is referenced in some emails and I believe information that was in there, it's now lost. I've been told that information is now lost from my file. That they can't locate a hearing sheet, and they can't locate the packet that we provided to KRT and the City; we provided 2 that had comparables to address the concerns we had with our property assessment. So it ends up in John Griffins office for upwards of a month. I objected to that with Jon Duhamel. I said I didn't think it was right that a CFO should have my file, he's not an assessor. It makes its way back down to assessing. When Ms. Kleiner comes in, my abatement goes missing. It's not available, it's not downstairs. I then, interestingly enough during that time in December, the Mayor, had been concerned about his property record file being looked at by me, and he went and took his property record file and he carried it for 6 weeks. He announced at the Board of Aldermen meeting, I've been keeping my file on me for the last 6 weeks anticipating that a member of the public would address it. And I did address it, end of November, or beginning of December. When I went down to Assessing, a couple of days later to get his file, it wasn't available, it wasn't there. Okay, so nobody should have their file on them. I can't walk around and leave City Hall with my file.

"Then I went to Assessing in August to look at the KRT abatements and they were all on Cheryl Walley's desk and when I walked in I didn't expect to get them but they were all sitting there. I obtained all the KRT abatements. A few days later I came back because all the information that was there I hand wrote notes for tables I was trying to produce, to look at how abatements were handled, and one of my hand written notes I couldn't read, so I went back to get the KRT abatement file and I had been told by staff that Kim had taken them all up to her office and they were no longer in the assessing office, or available. That should not happen. And they weren't available. I couldn't get them.

"Now, and actually, I went to Assessing, within the last month, to get my abatement file for my attorney; he wanted a copy of everything in it. I went down to Assessing, I was told by Lynn, it's up in legal. And sure enough, Legal had the original file up in their office; not a copy but the original file. And when I when up there to look at it I was pretty directly scolded by Attorney Bolton for being up there. It's inappropriate for me to be up there, because I have counsel. But I was only up there to get the record, that's a public record that not just my public record, it's owned by everyone in the City. So we are no longer safe guarding records. We did a photo op where I think Greg took all these property files stored in Jon Duhamel's office, not even in the fire proof vault that were being collected, wheeled them up to the Mayor's conference area and took a picture. Did my stuff fall out when you took them out of

downstairs? Did we lose the papers there? We don't know. All I know is information is now missing from my file and my file has been out of the Assessing office repeatedly. I have called other assessing offices and talked with other chiefs. They treat those records sacred. They don't leave the office. I don't know if the DRA has regulations, I'm going to look in to that and the ASB on how property record files or data should be maintained in an office. Maybe they don't may be they do, I'll figure it out. But we should have a policy whereby nobody gets to walk around with the record files or take them; take a copy, copy is fine; but the originals? What you're doing is removing information that belongs to the public. Anyone can come in and look at my property record file. It's not just mine, it belongs to everyone in the City, and they have a right to access it; and when individuals remove it, that right is gone. So I would like you to consider some type of policy or practice where this does not happen any longer. The experience people in Assessing, who I look at, Louise and Greg, they're not speaking up to say, we don't take the records out of the Assessing office. Nobody's speaking up to stop it. Everyone's going along with it, and it's not a good practice. I'm not happy my information is missing and I will never know what happened to it.

"I want to address with you a property, a concern I have with the property. Okay let's see, it was on now it's not. Okay it's coming back on, can we make it larger? I don't know if that shows."

Ms. Cameron "It self-adjusts."

Ms. Ortolano "Okay it's losing its signal on and off so we'll just have to go with it... Okay it self-adjusts. Okay. This is a property at 500 Main Street and this property is particularly interesting to me because I went and pulled the permits on this. It had a permit in 2004. And the permit in 2004 was to replace a boiler. That's what's on the permit down in the office. The permit has remained open with a check back for 2018, so that's 14 years. Another permit was pulled down in the permit office in 2010, which was to rebuild, replace the garage and rebuild to a bigger foot print and add a half story with storage up above. That never even made it to the property record card. So I don't know what that's about. But this house is noted in the comments section, now you can see 11, 13, 14, 15, 16, 17 & 18 this property has been reviewed and in 15, 16, 17 & 18 it's only been an exterior review. When you look at GIS on the exterior in 17 a large deck was put off the back. It's not on the card. So I'm questioning if anyone really went and did an exterior review, because that deck and that landing should have been caught, it's big. I only suspected because it's a ranch house that on a fairly large lot, 1.3 acres, probably had a patio or a deck on the back, and it did. Brought up GIS, had a big deck, maybe 250-300 SF. I don't know how you miss that. But GIS pictures going back to 2017 show the footings going in, the sauno tubes. If you went in 17, you would expect it to be taxed in 18. It's not on the card. But the other interesting thing is there's a check back in 18, they went in 18 but in the notes section the last note says: added air conditioning, check back in 2018 under construction. This property has been listed as under construction for years with internal work going on but nobody is getting in. And there's no note in the comments section that they're actually talking to the owner. They seem to be getting information that it's 25% done, 50% done, whatever, but there's no indication that that's happening. This is a great property to ask your legal office when do you take action? They have liked to say, Attorney Bolten we'll do something about this. If you have a property owner that has a permit open for 14 years on construction and you're not getting in for 5-6 years, when do you stop believing that it's still under construction and assess it? The other thing is, it's getting, it was supposed to be check back in 18, it's check back with no note, it's 19 goes by they never go back, 20 is here now and it still got an under construction depreciation of 25%. This is really high; I don't understand why we keep that on the property record card. There's a story here, and I think we should understand what the story is, but I view this as a mishandled property.

"The other one is owned, is a property that is a duplex owned by the same family and it was a totally rebuilt duplex. They purchased the property, tore it down put in a new foundation, put up a brand new duplex. That's fine."

Mr. Earley "What's the address on that?"

Ms. Ortolano "2 Markar, M-A-R-K-A-R, 2 Markar Street. And a matter of fact, here's a picture of it, you can see. It's a newly built, newly constructed. This is 2017 GIS picture as of 4/15/2017, the month of annual inventory. Okay and when you go back and you look at 16 you see the foundation poured, a brand new foundation and then in 17 you got the whole house up. Okay it doesn't mean the interior is finished but the house is up. If you see, it says in the notes section, we removed under construction and we completed the project for 2019. But when you look in the depreciation section the under construction code is never removed. And it's still getting a 15% discount. That takes 30,000 off the value of the property. It concerns me when I see this because you're in AssessPro, you're putting a note in, why are we not taking the depreciation off and rerunning it? You know these are 2 examples and I could give you 20 more, but I'm not going to do that. And I'm going to continue to post things out on the web like this and bring these up as attention items, because they're concerning to me. I'm fighting for equity and this is what I'm seeing in my City, it's unacceptable.

"The other item I wanted to definitely talk to you about is swimming pools. I put a post up on pools. I asked Jon Duhamel a year ago in January, why the yard items, by KRT, were doubled; pools, tennis courts and other yard items were doubled. And Jon said to me you're going to have to wait for the USPAP comes out. I addressed yard items at this meeting and I met with Kim Kleiner and I talked to her about these yard items; why did they double? What was happening…there's minutes and notes that show KRT was going to be invited in to talk to the public. You folks were going to let the public talk to KRT, you cancelled that and we never had an opportunity to talk to KRT, so we could never figure out why this was done. So I believe somebody up here knows the answer to that question and I think you oughta answer it for the public.

"But what's happened with the pools, is you had a member of the community that filed an abatement on a pool. I didn't even know this member of the community had a pool, okay. When I talked to Jon Duhamel in January of 2019, I was just digging through data looking at these yard items saying wow these are so weird, these don't even make sense. I owned a pool in Litchfield and I went back over there and looked at my 1995 pool on my card and it's assessed for like 10 grand. Pools in Nashua have gone up 25 to 45,000 for assessments. It's absurd. This individual went to the 2nd informal hearing and had her informal hearing sheet, which I got a copy of, and they wrote pool's too high need to be changed. Cool, okay. My understanding and based on the emails I received from the City, the assessors thought the pools were too high. Gary and Mike thought these residential pools were ridiculous. And in fact, Gary had Mike change this property owner's pool, take it down. Okay. Then there was a series of emails where Louise Brown is saying, hey this assessor could get fired for doing that; we've fired people for that, taking down a single pool, and we can't do that. Then there's some redacted emails from Jon Duhamel to the assessor, and then all of a sudden the pool value is put back on the property card. The issue there…and the community member was called into Jon Duhamel's office and he said, hey, you can't change a single pool, you gotta change the pool tables and treat all the pools the same. Well that kinda makes sense, and he said I can't do that. I can't change the pool tables. At the time of that meeting I really questioned what was going on because he is the one who changed the building code 72

tables, right at that time. Greg is contacting Jon Duhamel saying I've run a back of the envelope kind of analysis, quick analysis; these building code 72's are too high can you take it down to 110? Jon says sure. He goes into the tables, he asks KRT do you mind if I drop these? KRT says go ahead; he drops them to 110. That's fine but then he tells the homeowner, a residential homeowner, I can't help you. I'm sorry. This can't be fixed. It's as if you're putting the screws to all the residential property owners. KRT has said pools are for rich people and the rich people with pools in Nashua are going to be slammed and that's what you did. Now when KRT came in and did abatements they used one pool property as an example. The pool is on the property record card for 40 grand, it's a gunite pool. When they applied it to a sales grid and looked at it they put at 15. That's the max they would give it. I happen to agree that that's the proper assessment number. I just had an appraisal done and I talked to a professional appraising company and they said to me we will never place a pool above 16 and the conditions have to be right for that; like what's the size of the lot? We have heard our assessors say, our residential assessors say, that pools affect the sale of a home in a negative manor. When the assessors said that I did some research, I found the assessor's statements were true. The time on the market extends when you have a swimming pool, because a lot of people don't want them. And if you have a pool in a yard with a very small foot print where you take out your green space or there's safety issues with children, they're even harder to sell. So this concept that pools add value between, you know 10 to 15 makes sense to me and it's what I see over in the town I left, 10 grand. Okay. Your pools now are in neighborhoods that are all ranch neighborhoods that have in-ground pools, and they're putting 30, 40, 42,000 on these pools. That's a massive adjustment on the assessment that's going on swimming pools. I'm upset because I feel like this City lied to the public. First of all they should have addressed it. The assessors should have stood up and said this absurd and they did in a way, but they backed off. And this individual who wanted the pool fixed is in an appeal process. I think the BTLA will grant it. I really do cause it's so ridiculous. But you should do the right thing and fix the pool tables for everyone. I gotta list of pools in the City but it involves businesses as well, residential I'm going to say, I don't know, maybe 6-7-800 swimming pools. If you could change building code 72 and knock assessed values down 24 million, you oughta be able to change swimming pools, which isn't going to be much more than that, and help the residential property owners that got slammed. They shouldn't have to wait 5 years. This was just handled wrong and makes me very distrustful of the office when I see what was done and no assessor stood up to take a corrective action. Thank you."

DRAFT

**Board of Aldermen Tuesday, February 25, 2020**

**https://www.youtube.com/watch?v=8StGSD29EV0**

**49:51**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I came out tonight because I knew you were going to approve the contract for Vision to start their Measure & List. I wasn't certain if they were going to be here because KRT had presented to you in 2018 before they started, and I actually thought Vision was going to be here tonight to talk to you. I know the Board of Assessors is holding a special meeting on Monday at 4:00 with the DRA to present the process and hopefully allow some public input.

"But I wanted to speak to you a little bit about a couple things with the contract. I know you are all aware that my belief was that the contract we had last time was not complied with well. There wasn't a

lot of oversight and I do believe this time around there will be more. But what I notice about the contracts when they are written, and I think they are largely developed by the DRA is they are very boiler plate contracts. The one that is presented now is very similar to the one that KRT used. That's fine but we still have to make certain that there's compliance within that contract. One of the specific areas I am concerned about and interested in is the informal second hearings that were held by KRT that are also going to be held by Vision, not only when they do the update but I believe as they go through and make changes to these properties each year at the third of the City. I would imagine there will be some process where people could question the changes they are making to the segmented properties they are looking at.

"When KRT came to the Board and talked to you about that, there were a couple Aldermen, Alderman O'Brien and Mary Ann asked good questions about that informal hearing process. Alderman O'Brien wanted to know specifically what that was and to go over so the public could know what the process is, what the hearing type is about and they can understand what is going to happen there.

"The President of the Company told the Board, "sure they come in, we go through their property record card to make sure that there is no discrepancy with the data. We can explain how the value is arrived. If they have comparable sales or what they feel are comparable, they can bring in and show them to us or comparable assessments. If there are neighbors that have very similar houses and their values are very different, it is those things that we can look at. So we do put together, for the tax payer, a little mini-manual and we explain the whole process on how we develop the values, how the neighborhoods were delineated". It gets into pretty good detail.

"Now anyone of you, if you went out and attended that informal Hearing, none of that happened. And that was a bone of contention with me. First of all, we didn't even know we were supposed to bring our property record cards. The letter that was mailed to the home owners about these hearings never said, "get your property record card". Property record cards weren't on-line so unless you called City Hall and said, and there were 2,050 people that went to these second hearings, most of them represented residential property owners in each Ward. So that was roughly 5% of the residential property owners that came out. So if each one of them didn't call the Assessing Office and say, "Print my card and leave it over at the meeting for me when I come out", you were really lead to believe, or you would have been led to believe as an Alderman seating here, that there would have been a computer there or the appraisers at the meeting would have had access to a computer screen to pull up your property record card to go over it with you.

"In fact, none of that was available. And this concept that they provided a little mini-manual or delineated how these assessments were done was absolutely false and that was a big issue for us. What they did is sit there and tells you, "we created a very sophisticated model, our model is very powerful". That's exactly what they told residents during the abatement process who came in to talk about the abatements last summer, June. We have a powerful model. That's not compliant with the State rules on addressing assessments and level of assessment.

"As a matter of fact, IAAO and the State calls it out specifically says, "Never say we have a powerful model", because the taxpayer doesn't understand that and they don't have access to the model. You have to go to a fee appraisal basis and you have to present properties within the neighborhood and show them that this really is in line with what they think it should be. That's what we know and that never happened. And no one called them on that. So I appreciated the Alderman who addressed it, but I





DRAFT

think this time around we have to hold them, Vision when they come in, accountable in these informal hearings to value, defend and justify the information that they are giving to us. And if they say they are going to provide us with mini-manuals and explain the assessments in our neighborhoods to justify our values, then by God do it. Because we walked away with nothing and we walked away from an abating process with nothing; two rounds of it. They proved nothing. "We have a powerful model".

"There was something else I wanted to raise and I didn't write it down. I can't recall. So we will end it on that. But I hope, I don't know if Vision is going to come to this Board; I hope when they do, you ask a lot of questions. Because of each one of you represents a Ward and I think that the property owners within that Ward will all be stepping through this process. Oh I know what I wanted to raise, I am concerned and I have written this in e-mails before to the City that in the next go-around, because our property cards have a lot of questionable data on them, especially with the depreciation code. You are going to see properties that get adjusted and changed significantly and I am really concerned and have been since the beginning of this process that we are going to slam property owners with very high increases, because their properties just weren't valued correctly, basically since the recession. We never quite got the right correction in after 2008 and we have moved this market up really heavily.

"I even have a girlfriend who lives in New Jersey and they did an assessment down in her town and the values came in very high; the City went nuts. They re-set everything back to the old value, they re-did it again and then they decided to do a Phase-In over 3 years. People who saw increases above a certain amount were given the increase incrementally placed in their property tax bill over a 3-year period to phase it in to get this correction made.

"I am very supportive of something like that and I have written this to the Administration; I have never received a response. I know that it would require some DRA effort, but I think it's worth talking about now before this happens in 2 or 3 years, to see if there's any way to reduce the burden of what might be coming down the road on some of these properties and especially where the market is so high. Our equalization ratio dropped to 88.8%, we are in the second year outside of a revaluation and we are already 12+% under market value, you know? We need a correction badly, actually. And if there were to continue to five years, the market itself will be pretty hard on these assessments and then you couple that with potential errors on the property record cards. It could be a real slam to a lot of people and I just don't want to see people hit like that. So I hope there's some creative thinking that happens in this horseshoe and in City Hall to address it. Thank you."

**Personnel/Administrative Affairs Committee Meeting, March 2, 2020**

**https://www.youtube.com/watch?v=Vy50Brwoz30**

**07:43**

Laurie Ortolano "Laurie Ortolano 41 Berkeley Street. I am here to speak to the change in the ordinance for community comment. I am concerned a little bit about it. What is written in here, first four items that are Part C, I fully understand. I raised a question in the e-mail about Item 5, the first five minutes and then the three minutes in the end on what that meant and I am hoping tonight I don't have to go over it again, but you could explain what the 5 minutes and the 3 minutes how they apply. And what happens at a Hearing when you have two comment sections for "for and against" just so that there is

clarification. I am concerned with Item 6, the presiding officer may allow questions at the presiding officer's discretion.

"I feel that I have been a controversial individual who has come to the microphone and if you are not liked, you are not treated as well as individuals that share complimentary comments to the Board. I just want to make certain that I am not treated differently from anyone else because my comments are dissatisfactory to you or anyone here as an entire Board. So I think that you need to institute a time clock procedure to treat us all fairly, so that's the way it is done. Because I notice when I go to the microphone I am warned before I am even out of my seat and I chuckle a little bit because I see other people go up and they are not warned at all.

"I also think that the e-mails are great and providing copies is great. I've had a lot of trouble getting responses from the Aldermanic Body to e-mails, that's where all this assessing stuff kicked off. I will say that the e-mail that I sent regarding this Ordinance, I got three responses back from the Aldermen on and I am very, very pleased and appreciative of that. It says, "excess repetition and irrelevant remarks are discouraged" – that is a little subjective. Item 10 says, "the speakers remarks have to adhere to this Ordinance or other applicable law". I don't know what other applicable laws are and that needs to be defined for me.

"One example I'd like to give you is that I spoke at the May 28th meeting last year. And I addressed a sore topic with the Aldermen which was about our senior assessor who goes out and writes on the board, "I'm heading out to the field and going to check properties" to find out that he was actually in parking lots for 2 ½ hours and driving around and going to the Holiday Inn. When I brought that topic up, the President Wilshire said to me, this Board has nothing to do with personnel matters so I respectfully ask that you keep your comments to the Board to what the Board has purview of; we don't have purview of personnel matters. And I said, "Well I think it's OK and who has purview of performance issues". "How do we address performance" and that's reasonable, I am addressing something that the Mayor addressed at the meetings, the public meetings that he holds.

"He brought up this demoralizing nature of the report. I was at your meeting addressing it. Then I was interrupted again, "what I am telling you Ms. Ortolano is the Board does not deal with personnel matters for City Employees". I said, "Well I am not asking you to deal with it or reprimand, but I am asking you to listen". Then I was interrupted again, "we've been listening for weeks of the same thing, over and over again about this employee". I said, "No you haven't, the report just came out, I have never addressed this employee at the microphone". And then Alderman Dowd said, asked for a ruling from Corporate Counsel.

"My concern is, would this be an example of what the President could turn around and just shut me down on right from her seat with this change of the Ordinance? Because if it is, I am not in favor of this at all, and I am really concerned by that. So I have something else I want to address with you but I will do it – oh the other thing is on this list, I think you should put that if there are more than 5 people at the end speaking they would obviously be using the 15 minutes and the Board should make every reasonable effort to hear the input of all those who sign up at the end. Let's say you have to go 20 because there's 2 more people, I would hope that you'd do that. And if there is only one person in, like I was there last week for community input and no one was there, would you extend it more than 3 minutes or is that not going to be allowed? Those are questions I have, thank you."

DRAFT

**2:32:20**

Laurie Ortolano "Laurie Ortolano 41 Berkeley Street. Quickly, I wish there has been copies of your amendments here for us that came along to follow this so that we'd have …"

Alderman Dowd "I had my own machine, so I only restrict them to the Committee and they change anyway."

Ms. Ortolano "OK but it's hard to follow along and you're here for a long night and it's nice to be able to follow along because these were extensive changes. Also, I'd like to ask the Committee to consider putting the public input, all of it, at the beginning. I lived in Litchfield, we moved all of our input to the beginning for the public. It's grueling to come out and sit for 2 ½ and 3 hours for your three minutes of speech, it really is. It is miserable, I think people don't come because they are too busy working and it is too late. Also I think that e-mail communications are like a flush down the toilet for me. I am writing e-mails to the Board and expecting a comment is really a dead end. I got into a heap of issues when I came to the Board of Aldermen with my concerns about Assessing; couldn't get anywhere. I switched over to the Board of Assessors, couldn't get anywhere; and after five months, I ended up at the State which opened up a whole can of worms because nobody would give you an answer. So when I hear that I can write an e-mail and send it in, to me, it's a flush down the toilet and I might as well talk to a door. So it is really discouraging to me. But I would like to address issue and I don't even know if I am at the right Committee. Personnel, there was an article in the paper about this whole Police investigation. One of the things that it said on a salary/personnel issue, is that a salaried employee, meaning he's entitled to a salary regardless of the actual hours he works, as long as he works at some point during a pay period. That's what our definition of a salaried personnel is."

Chairman Caron "I'm sorry, I hate to stop you, but that doesn't come under our jurisdiction."

Ms. Ortolano "Who does it come under?"

Chairman Caron "That should come under HR."

Ms. Ortolano "I called HR; it doesn't come under them. I got an e-mail from Larry Budreau and here's what I asked. I looked up the Union Contract for these salaried employees and the Union Contract defines a work day or the work week as five, 8-hour days. That's what they are supposed to work. But then the article in the paper in the paper comes out and says they don't actually have to follow any hours; that they work – a salaried works regardless of the actual hours he works, as long as he works at some point during a pay period. Who defined that. How do I figure that out."

Alderman Tencza "If I may just comment. I think that may be definition under State Law and not the City's definition of it. I don't know if Attorney Jette has any other …?"

Ms. Ortolano "Well then why do we have a Union Contract that calls out what a work week is?"

Chairman Caron "I'm just checking with the Budget Chair, would that come under Budget because that's finances, that's money? So I don't know if that would come under the Budget because they deal with contracts."

Alderman Dowd "Only when we deal through the Budget with certain positions. A union contract, it's one thing. If you are under the City Employee, like Sarah Marchant is the Director or Lisa Fauteux, who by the way work a lot more than 40 hours I can tell you that."

Ms. Ortolano "That's exactly what I thought, when you have a top manager, this really is what it falls under for salaried employees."

Chairman Caron "Ok it really doesn't come under us because we don't handle us, it is either the Finance Committee or the Budget Committee."

Ms. Ortolano "So if it is a Union question I have where do I take it, because this individual operates under a Union Contract and a Union Contract does not call for this language. So where's the enforcement?"

Alderman Dowd "The enforcement would be in the Union Contract, which is available to anybody it's on-line."

Ms. Ortolano "Well I know, I read it, and that was the language."

Chairman Caron "OK so if this is a Police Department person?"

Ms. Ortolano "No."

Chairman Caron "I thought that's what you said."

Ms. Ortolano "No, oh, no, no, no. This came out of the Police Investigation, this is our employee in Assessing, this is how Assessing works."

Chairman Caron "The Director of, or the person who oversees that Department, that's the way I would perceive it. If it were the Police Department I would send you to the Police Commission because they would give you that direction. But Alderman Tencza may be right too because of the wording and I know Alderman Clemons you had a …."

Ms. Ortolano "I mean I will check the State Law and see if this State Law if this is General State Law language. But I just don't understand how low level employees get to, if they work 2 hours a day and they did their job, whatever was defined by them, they are done. I don't even understand that."

Chairman Caron "I don't know but Alderman Clemons has a comment."

Alderman Clemons "Each individual Union Contract is unique to the Union. But in some areas of the City even the top employees are in the Union. Like for example we have a principal's union. So all of the principals of the school or most of them are in a union, they are in a collective bargaining unit. So just because a person is at the top of their Department if you will, doesn't necessarily mean they won't be covered under a Union Contract. So that's the only point I wanted to make. As far as your concern goes, are you getting that information from the Telegraph article."

Ms. Ortolano "The Police Department Inter-communication document cited this as the City's rule, not the State Law. And then I read the Union Contract and there's no parallel. And I went to Budreau and said, "how can this be, how can this be, who speaks to this because it is our money, we are paying employees if they work two hours and the boss says you're done, they're done".





DRAFT

Alderwoman Kelly "May I address, ok thank you. Can you read it again because I have a different interpretation of what you said?"

Ms. Ortolano "The employee, it says his name, Turgiss is a salaried employee, meaning he is entitled to a salary, regardless of the actual hours he works as long as he works at some point during the pay period. And what it says is investigators said that speaking with him they learned he often uses his lunch break to relax. In speaking with Turgiss' supervisors, the Human Resource Department, it appears that Turgiss was completing the work that was required and expected of him states the inter-departmental communication. So if he were given a task and it took two hours and he was done, sort of like mailmen, his day is over, it's over."

Alderwoman Kelly "Could I re-address please?"

Chairman Caron "OK alright, we don't want to get into a debate here, I understand your question."

Alderwoman Kelly "And that was from the investigation. So my only point was that it says "during the pay period" so I am interpreting that, if that is the language, of they have a week to get 40 hours done whether they do two hours one day and ten the next, they are still doing the hours."

Ms. Ortolano "No my clarification was 40 hours is immaterial. That's what bothers me because the Union Contract says, five 8-hour days, 40 hours. Like a postman doesn't have to work 40 hours, a postman has to deliver their route and when they fill their cart and deliver their route, if they get it done in 6 hours, postal workers are done. But it's a Saturday and they come in and they have a lot of mail to sort, they have to do a 10 hour day. And that's how it's done. They are not committed to a 40 hour work week."

Alderman Tencza "Ms. Ortolano, check RSA 275:43B on salaried employees."

Ms. Ortolano "Ok for the State?"

Alderman Tencza "Yes, for the State Law."

Ms. Ortolano "So I don't know if I just don't understand what a Union Contract does if that is a salaried employee contract, what's the difference. Why do we have one? Why do we call out what their hours are? I don't know, that's just an interesting thing."

Chairman Caron "Well I think a salaried employee has to work a minimum of 40 hours, most of them work more. But I think they are defining the other employees who are not salaried, that they work a five day week, eight hour day to make their 40 hours."

Ms. Ortolano "No because the contract is the professional contract is the salaried contract. They have different UAW Contracts, so I am looking at the professional one."

Chairman Caron "But that doesn't necessarily mean they are all salaried, that's what I am saying to you."

Ms. Ortolano "Well there's only one set of language in there. I was trying to figure it out myself."

Chairman Caron "OK but I apologize, we tried to help you but really this isn't the Committee."

Ms. Ortolano "Hard to know what Board, where to be. But I would appreciate considering moving public input to the front. It's grueling to have to sit here. Or call in, be progressive, I don't care what





DRAFT

Manchester does. We are talking about being progressive for bars and everything else, let us call in and we can give you our input from home."

**Board of Assessors Special Meeting of March 2, 2020**

**https://www.youtube.com/watch?v=VNPTKJbsQno**

**48:08**

Ms. Ortolano "I'm going to slide over here so I can see and not just behind everyone. Laurie Ortolano, 41 Berkeley Street. Couple things; when will the GIS update be done with the new pictures 16 of 22 without the foliage cause will you use GIS pictures to help confirm what you're looking at for properties?"

Mr. Hansberry "Mrs. Kleiner"

Ms. Kleiner "We will have a flight this coming spring that will replace the pictures that were done that had foliage."

Ms. Ortolano "Okay, and will Vision use GIS data, will you be using that for exterior work? I'm just curious."

Mr. Tarello "We'll be going right to the properties and taking photos, doing inspections there. But we do use GIS and Pictometry and so forth, when we do valuations."

Ms. Ortolano "Okay. The map you gave us is Ward 1 and I presume you're sort of marching through the City ward by ward to try to get through each one, whatever you get done is that correct?"

Ms. Perry "Yes."

Ms. Ortolano "You mentioned that you're going be doing the input as after the annual inventory, after the April 1st date or you're going to pick it up at that point. Let's say our inventory isn't finished by April 1st because in a big City it's very hard to do that so are you going to be picking up permits and sales data that is in this year 2020, that's occurring after April 1st or are our assessors going to be handling the input to the computer on that data?"

Ms. Perry "As of 4/1 this year, the assessors will be handling it. We'll be doing it after that."

Ms. Ortolano "So, from now to 4/1 the assessors are on, after 4/1 whatever's not picked up, you're on?"

Ms. Perry "Right, after this year has been closed out."

Ms. Ortolano "Okay perfect. Are you going to be resetting, I noticed that you mentioned that supervisors are the ones that determine the subjective criteria, the depreciation, the grade, the condition. Are you going to be making determinations on properties on those factors when you're out in the field for each group you look at now to try and address the depreciation issue we have in the City?"

Mr. Tarello "What we're going to do is, we'll make determinations on it but the team that's out there will gather information for us and put notes and comments and so forth, because they're there at the time. Statute we are required as supervisors to make the decisions and so forth in the value but we're doing it based on the information they provide."





DRAFT

Ms. Ortolano "So, what I'm wondering is will property owners…let me back track. What I understood is that as you go out and you look sample properties or you do Ward 1 and you get into homes and you see there's an extra bathroom or a finished basement, my understanding was that's going to be taxed as you find it. The card will be updated and the property owner will be assessed for those improvements. Will they be assessed for this subjective data as well or you going to handle that all at the end?"

Mr. Tarello "That'll be handled at the end; so this is just the physical data corrections."

Ms. Ortolano "You're going to do physical."

Mr. Tarello "Yeah."

Ms. Ortolano "Okay that's good. Cause I think it could be a real deterrent if some of that gets set."

Mr. Tarello "We've discussed that and talked it, it'd be better doing it at the end it'll be more consistent."

Ms. Ortolano "Yes, okay that's great. Will property owners be given letters if their assessments are changing? We have a policy within the district that if it's not more, if it's not more than $20,000 we don't send a letter out but if it's less than that and it's a change that's being captured by you will they be notified or are they going to not be notified?"

Ms. Kleiner "It has been our policy if our assessors are out and they pick up something and it's over $20,000 that we issue a letter. We haven't discussed this part of it and we may want to handle that differently, but I think that is something that we need to discuss."

Ms. Ortolano "Okay, that's fine."

Mr. Tarello "I'll note that and look into it."

Ms. Ortolano "Okay that's perfect. The data that you're going to be… changes to property record cards. Are you going to be going to the field with a physical property record cards or do you use a tablet?"

Mr. Tarello "We'll have physical property record cards."

Ms. Ortolano "Okay, so those will all be marked up and that data will all be returned back to the City?"

Mr. Tarello "Oh yeah."

Ms. Ortolano "Perfect. Great. My other questions have to do with modelling but I think that can wait a couple years because that's all going to come down the pike. Thank you very much."

**Board of Assessors March 5, 2020**

**https://www.youtube.com/watch?v=5kD4Xbs1_Lw**

**12:04**

Mr. Hansberry "Thank you Attorney Leonard. Ms. Ortolano?"

Ms. Ortolano "Do I have to push this to speak?"



DRAFT

Mr. Hansberry "Does she need to push…"

Ms. Ortolano "No, I don't think so, okay. Hopefully everyone can hear me. Laurie Ortolano, 41 Berkeley St. Just with what was said and Lynn presented, on the signed settlements, or coming into public and voting. I would encourage you to do that. I think she's absolutely right. It is much more transparent. And for myself, I have to go and request to get copies under right to knows to look at those settlements, correct? Where are they? Where are those settlements available to me Dan?"

Mr. Hansberry "It's a comment period, Mrs. Ortolano. Not a question or comment period. It's a comment period."

Ms. Ortolano "Actually, you do say you answer questions and you'll get answers so, and you have done it before so that's why I'm asking. But okay, so here's a question how do I get those settlement agreements and where are they available to me? Does it force me to have to go through a right to know to see how issues are settled? I would much rather be able to see it in the minutes and not have to put the administration through right to know requests. So please consider doing what Lynn said and making them transparent. Now I addressed at the last meeting pool tables; the data on swimming pools. Did you as a Board think about that or discuss whether you would be willing to make changes in the pools tables? I'm assuming you didn't because nobody's willing answer me. That's okay, but I just wanted to give you an opportunity to do it before I went public on some issues regarding this and I was hoping that you would do something so I wouldn't go public with issues like this; but you've answered my question with no answer, thank you.

"Another question is do we have anyone in the Assessing Department who can reevaluate a subset of properties? Angelo Marino was capable of looking at subsets of properties to do revaluations because assessors, in-between updates or revaluations, can re-assess groups of properties that have fallen far out from the ratio determined by the DRA. That's legal and it's allowed. And my understanding, in the past, is Angelo would do that. He would look at a property group that had fallen below the ratio and try to pull it back up. So that when you went that 5-year period that group of properties wasn't killed in the update by seeing assessments go up 50% or more or doubling. Now I happened to talk to a few ASB members up at the State, and they in fact, they do that. I had a detailed discussion. And when you do that re-evaluation of the subset it is turned into the DRA as part of your update material. They keep tract of it. What subsets are you looking at? So, when the DRA came in on Monday, they spoke about the fact that mobile homes have dropped to a ratio of 77% but the ratio is 88.8. That's a perfect set to go in and do a re-evaluation on. I'd take that subset of homes and reset them because they're really sliding. And if you wait 5 years, they're potentially going to be people to see the biggest impact, and they also tend to be the people who have the lowest incomes. So, one of the concerns I have is we have lost the ability to do these subset rests when the ratio is dropping. So, another question I have: has there been any discussion on outsourcing commercial appraisals and assessments in the City? I think that the commercial aspect of our assessing office is really hurting when it comes to manpower and work. And it's also a very difficult subset of properties to assess. And it seems to me we discussed outsourcing, the Board of Aldermen discussed it briefly too, Aldermen had asked the Mayor to come forward with a plan to look at outsourcing, and then it got dropped. Nobody followed up on it. I'm bringing it back because I see enough issues in this office that I'm concerned, but one area that I think is incredibly difficult for the City to manage is the commercial properties. They are a tricky set. I think that's a really tricky group of properties even to get through abating with those properties. My question

is, has there been any conversation about outsourcing that part of our assessing function? I know you don't answer right now.

"A few meetings ago, a month ago, I addressed policy and the potential to develop some policy on some issues that I thought could use some policy development. Has there been any movement or interest on the part of the Board to develop policy? Again, a non-answer is an answer. I'm disappointed that you don't value policy the way that policy should be valued as a board. I think policy serves a purpose; it's powerful. It gives the public an avenue to understand what's really happening; it gives us something we can voice on, and you're not doing it. That's really disappointing. So thanks, keep up the rubber stamp work. You're doing an awesome job."

**Budget Review Committee Meeting, April 29, 2020**

**Public comment submitted after the agenda was prepared.**

**Formal letter from L. Ortolano postdated April 29, 2020 (next page)**

**See pages 25 & 26 of the meeting minutes:**
**https://nashuanh.gov/AgendaCenter/ViewFile/Minutes/_04292020-4917**

**The communication was accepted by the Board of Aldermen and placed on file on Tuesday, April 28, 2020.**

DRAFT

Laurie Ortolano
41 Berkeley St.
Nashua, NH 03064

April 29, 2020
Aldermen Wilshire
President of the Board of Aldermen
Cc: Aldermen Clemons, Aldermen Jette, and Aldermen Lu

Re: Questions and communication for the Board of Aldermen meeting.

I took the opportunity to listen to last evenings Board of Aldermen Meeting. I was concerned about the communication that took place at the end of the meeting during "Comments by Aldermen."

**I wish to have this letter accepted as community comment at the next public Board of Aldermen meeting and the Budget Review Committee meeting.**

Aldermen Lu attempted to address a letter submitted by a resident, Laurie Ortolano.
Aldermen Clemons addressed Aldermen Lu and advised her to bring her issues to the Board that addresses financial issues, the Budget Review Committee. He indicated that she was not addressing her concerns at the proper meeting.

My communication was accepted last evening, April 28, 2020, during the public comment section on business to be acted on.

Clemon's comments to Aldermen Lu are out of line. The email communication was sent on April 20, 2020 titled Public Comment for the BOA and Budget Review Meetings. It was never accepted by the Budget Review Committee, Dowd never placed it on his agenda, and I am frustrated by this.

Here are the minutes from the 4/20/2020 budget review meeting:

> *Alderman Jette*
> *Mr. Chairman?*
>
> *Chairman Dowd*
> *Yes?*
>
> *Alderman Jette*
> *Alderman Jette here.*
> *So two things, number one – I received I think correspondence, I think it was addressed to all of us today from Lori Ortolano, and I would move that that be accepted and placed on file.*
>
> *Chairman Dowd*
> *I told Donna Graham to accept it and place it on file for the Board of Aldermen Meeting next Tuesday. It came in too late to be on the Agenda. We would have to vote to place it on the Agenda today, but it will be on the Agenda of the Full Board of Aldermen next Tuesday.*

The budget review committee is meeting frequently, so, if a public communication is submitted too late to make the current agenda, it should certainly be placed on the next agenda. The Budget committee

Laurie Ortolano
41 Berkeley St.
Nashua, NH 03064

has had 3 meeting, April 20, 27 & 29 to accept my communication and Dowd ignored it. Dowd essentially shut down discussion of the communication by his board and simply referred it to your board.

Also, Dowd tells Jette that a vote would have to take place to place it on the agenda today (April 20). Help me understand the Board's process here. Last evening, you suspended the rules, if there was no objection from the Board, to accepted communications from City officials who submitted information too late to make the agenda. There was no objection given and no vote taken.

Are you not allowed to accept communications from the public that are submitted too late using the same rules? It appears the concerns of the public are second rate to the concerns of City employees. We should at least be equal.

So, President Wilshire, was Aldermen Lu out of line to address the resident's concerns regarding a memo submitted to the Board of Aldermen and the Budget Review Committee that the Chair of the Budget Committee refused to accept and was accepted by your board last evening?

Aldermen Jette made a comment in the April 20, 2020 that I think applies here:

> *Alderman Jette*
> *Yes I agree with Alderman Kelly that, you know, we have talked about this before, that when something like this is coming up before us, **I know that when I've had the experience personally of trying to bring things up at the Full Board of Aldermen Meeting and to be told that I should have brought it up at the Committee level. The way we do business is we are supposed to be vetting these things in Committee and making the recommendation to the Full Board.***

Additionally, Aldermen Clemons spoke about the mentoring relationship he had with the Late Mr. McCarthy. It made me wonder, when newly elected Aldermen join the Board, is a mentor, or an experienced board member assigned to be the contact to assist the new member with questions?

I would imagine, that an orientation document is given to all new members that explains process and policies. I was given one 23 years ago when I joined a school Board. Please forward me any documentation given to a new board members to assist them in doing their job to the standards set forth by the Board.

As you know, I have been actively involved in observing and participating in government meetings. I don't understand your process; I am totally confused and frustrated and I would appreciate clarification. Kudos to Aldermen Lu for trying to address a resident's concerns.

Regards,

Laurie Ortolano
603-930-2853

**Public Hearing for FY21 Budget Review Held by the Board of Aldermen, Wednesday, May 20, 2020**

**https://www.youtube.com/watch?v=_dkoZP5eiNs**

**52:05,**

Chairman Dowd: "We are going to start with the Mayor's Office and if you want to be recognized please go video or state your name and I will call on you. Give your name and address for the record, please."

Laurie Ortolano "Hello?"

Chairman Dowd "Yes? Laurie Ortolano?"

Ms. Ortolano "41 Berkeley Street."

Chairman Dowd "You have 5 minutes."

Ms. Ortolano "The Mayor spoke about essential and non-essential positions and that we were holding off on non-essential positions in the Budget. Did I understand correctly that they are in the Budget and is there a list available of the essential and non-essential positions so that a resident can know how many positions are there and essentially what kind of growth that put (audio cuts out) into the budget?"

Chairman Dowd Mayor, do you want to address that?"

Mayor Donchess "Yes, let me unmute myself, I'm sorry. So I think I used essential and non-essential in two different ways. Certainly in terms of who is working remotely, we have developed a list of non-essential and essential positions that have been done by Emergency Management and a team of people, Justin Kates, and a team of people. And what we mean there is that non-essential positions don't have to be on the job, they can work remotely. For example, some IT functions can be performed, even though we need those functions, they can be performed remotely and therefore don't encounter any COVID-19 risk. On the other hand, we have First Responders, we have Public Works, other people who have to be on the job that cannot work remotely. Those are the essential positions that cannot work remotely. So that's the way those terms, at least I have used them and the City has used them in the context of redesigning City operations to (audio cuts out) safely with COVID-19.

"In terms of the open positions, open positions, the hiring freezes, there are some positions open and we really look at those on a case-by-case basis to ask the question, OK there's an open position, do we need to fill that right now? At some point we might need to but do we need to do it right now. If the answer is No, we can defer it, the hiring freeze would defer those positions, we save some money while we are waiting and in the delay that results from the hiring freeze. That does not mean that someday we won't fill those positions but right now we don't think they are necessary to today to fill the job."

Ms. Ortolano "So can a citizen get a list of what those positions are within the Budget that you looked at? I mean you explained essential and non-essential from Emergency Management and I understand that but I am really talking about the Budget. Is that something that is available or not, I just don't know."

Mayor Donchess "The ones we are looking at are the open positions, meaning people have resigned or retired or whatever. There would be a list of the open positions that currently exist, yes. That is somewhere."



DRAFT

Ms. Ortolano "OK."

Chairman Dowd "You have a couple minutes left."

Ms. Ortolano "Just one other quick one then. Healthcare – I was curious, I am glad you addressed the high deductible plan that you brought forward. It was my understanding and I might be wrong, that the sign-up period for that might have happened. And if it did, can you tell us how was the response for switching into that plan and what is the cost savings associated with that?"

Mayor Donchess "I think that we should turn the question over to the Administrative Services Director, Kim Kleiner, who can give more detail. But in general, the high deductible plan because it encourages, it incentives shopping and the determination – Well if I can get a service for $500.00 over here and it's the same qualify for $200.00 over here, I'll take the $200.00. They are incentives, but I'll let Director Kleiner, who I assume is on the call, talk about the details of how that plays out with respect to individual employees."

**1:01:40**

Chairman Dowd "…Hearing and seeing none we will move on to the City Clerk's Office."

Ms. Ortolano "Hello?"

Chairman Dowd "Yes?"

Ms. Ortolano "Can we just jump back to the Legal Department really quick."

Chairman Dowd "Ok can you say who you are?"

Laurie Ortolano "I'm sorry I hadn't turned my video on, I'm getting the buttons going. Laurie Ortolano, 41 Berkley Street."

Chairman Dowd "OK."

Ms. Ortolano "Does the Legal Department include all of the consultants that are used on various projects or litigation? For example, if they bring in a consultant to address abatements, is that in the Legal Budget or is that put somewhere else?"

Chairman Dowd "Attorney Bolton, you are on mute."

Steve Bolton, Corporation Counsel "It is not in the Legal Department's Budget."

Ms. Ortolano "Can you tell me where it is?"

Attorney Bolton "In the example that you offered, that would be in what we call the "overlay"."

Ms. Ortolano "OK I am familiar with that. And what about for consultants we hire, to do like Attorney Broth who came in and did his investigation. Where does he come out of?"

Attorney Bolton "I don't necessarily know, it would be whatever Department was using Attorney Broth or some other attorney, it would either be their budget or some appropriation from contingency or elsewhere to pay those expenses. But that would not be in my budget."





DRAFT

Ms. Ortolano "Ok, and then one last quick question. Are there are other legal services, I mean I'll just speak candidly, I was certainly somebody who the City viewed as having a big impact on the legal costs and raising the Budget $100,000.00. Where does that get logged?"

Attorney Bolton "I would say that's a complete exaggeration; we got an additional appropriation to provide for some overtime in order to respond to some of the Right to Know requests that you generated; others as well but yours were included. But that was much, much less than $100,000.00 in the Legal Department."

Ms. Ortolano "OK I think I am going off an article that possibly the Mayor had given a quote to the paper that I had run up the cost about $100,000.00 grand and I am only going off of that because that was a number thrown out. Now I don't care – I think, I recall at some point $50,000.00 was added but is that in your Budget or was that in somebody else's?"

Attorney Bolton "There was no $50,000.00 added to the Legal Department's Budget."

Ms. Ortolano "So it's just overtime that I would see in the Budget that would account for whatever Right to Know Requests were taken up."

Attorney Bolton "In the 2020 year, this doesn't even talk about the projected budget of 2021, but last year, in the Fiscal Year that we are currently in there was an addition made of $10,000.00 to pay for some overtime and that was mainly the increase of Right to Know Requests (inaudible)."

Ms. Ortolano "Thank you, I did not mean to misrepresent that, I was just going off what had been in the paper but thank you."

**1:08:00**

Chairman Dowd "…Any questions on Administrative Services."

Ms. Ortolano "Yes, I have a question."

Chairman Dowd "OK?"

Ms. Ortolano "Hang on I am turning on my video, so when you read a title, just so I know, I thought you were going to go through each one. When there's a big subtitle that's all lumped together and all of those topics can be addressed, is that correct?"

Chairman Dowd "No I go through every single Department within those major titles. So Administrative Services Division is the Division, then I go through each one of the Departments. So if you have a question on a particular Department, you should bring it up when I read that Department. If you have a general question on Administrative Services in general, you can ask it now."

Ms. Ortolano "Ok so I am just going to make a comment on this one and then I have one down in Assessing I will wait for, OK I understand. OK I am just going to say that from a position standpoint, I am a big believer that the position that was needed in the City was a Chief of Assessing and that I find this to be a nonessential position that got added to the Budget that we are paying a lot for when what we really needed was a Chief. And that's all I am going to say to that, I object to this position and the Department being funded and the way it was done last year and I think it put an awful lot of expense on the back of the taxpayer when what we needed was something else. But that's all I am going to say."



DRAFT

DRAFT

Chairman Dowd "Alright, thank you."

Ms. Ortolano "Yeah."

**1:11:38**

Chairman Dowd "Any questions on the IT Budget?"

Ms. Ortolano "Yes just a quick question. I had spoken to the Board about working and putting more information out digitally and I was pushed off on that months ago but was told it was something you were going to look into. And I want to know if anything has been put into the Budget to look at digitally scanning records and reducing the amount of people, we have in going to uploaded records that the public has access to?"

Ms. Kleiner "Alderman Dowd, so Director Codagnone and I, in fact, did meet with a firm today. We are gathering quotes for that very project. I am not going to say at this time that it would result in any reduction of personnel. I would think that it's too – it's not wise to say that at this point, we need to explore that more. But we are gathering quotes for digital records."

Chairman Dowd "Ok, follow up?"

Ms. Ortolano "Just a follow up quickly. You know I was a proponent for allowing citizens or members of the community to be involved with this and that was shot down and I want to voice my objection to that. I think that citizens should be a part of sharing information about what we are looking for, for digital records. And I think the City operates in a closed capacity and continues to look for ways to shut people out. And I am disappointed in them. It's nice to hear that they looked at it today but I've been waiting what? Three or four months? So terrific, but I don't know if they really know what I'm looking for Rick. And I have a funny feeling that Assessing Office doesn't. Thank you."

Director Kleiner "So Alderman Dowd, that building was moved to the City Buildings portion of the Budget for us to cover the utilities and the upkeep costs until the building is sold. So it is common that it would stay in the Budget until the building is taken off of the City book."

Chairman Dowd "OK."

Ms. Ortolano "Thank you."

**1:16:19**

Chairman Dowd "All set? Thank you. Alright, Purchasing, any questions or comments relative to the Purchasing Budget? Seeing and Hearing none – Assessing?"

Ms. Ortolano "Yes. Laurie Ortolano, 41 Berkeley Street."

Chairman Dowd "Mm-hmm?"

Ms. Ortolano "This is an area that I obviously have looked at closely and I believe that there are positions in here that unlike what the Mayor said that everyone is working 70 hours a week, that's not the case in this Department. I would challenge anyone who says it is also being handled at 40 hours a week. So number one, I don't understand why we didn't reduce hours or furlough in this Department. Number two, when we hired Vision Appraisal and I went to the March 2nd meeting with the DRA and

Vision, they explained that by April 1st, after the annual inventory date, that Vision would be taking over the MLS Sales Verification, the Sales Data and also capturing permits. A major part of our Assessors' job description is sales verification and permit capture. And when I heard this, I have wondered what are our Assessors going to do because their job descriptions involve a good bit of this work and why were we turning all of this over to Vision and then keeping our staff at the level we were? Frankly, I honestly thought that the City was making a move to outsource the Department and phase out the assessors, but they are not actually phasing them out. And I thought that because when you assign the work like they say they are assigning to an outside contractor that we are paying $1.3 million, then I wonder why we are paying all these assessors' salaries and their job descriptions don't match what they are doing any longer. I think the job description should match. And it's not something that I say to put a smile on your face Ms. Kleiner, I really say it because I don't understand it and I have wondered and nobody will answer this kind of question."

Chairman Dowd "Director Kleiner?"

Director Kleiner "Yes, so I'll start with the first. The staff who are in the Assessing Department they are all working 40 plus hours since we closed City Hall Building March 15. So that the public knows, they are working, we hold staff meetings virtually, they have worked extremely hard to pick up building permit information to look at new construction, to process exemptions and credits and to get everything ready for the July tax bills. That staff has continued to work very hard remotely. So I will start with that."

"The other, going into the full measure and list revaluation, it is very common when any municipality enters into a full measure and list, you would not lay off your staff. City Assessors will continue to work hard, they will evaluate property, they will inspect property and they will work with the staff from Vision day in and day out. They continue to do that now. So it is not when you enter into a full measure and list common to lay off all of your City Staff even though, yes, Ms. Ortolano is correct, the contract with Vision states Vision is required to inspect building permits after April 1st."

Chairman Dowd "OK thank you."

Ms. Ortolano "Chairman Dowd?"

Chairman Dowd "Yes."

Ms. Ortolano "Just one quick follow up. You know, I do take exception to the you know "how hard they work with exemptions and credits". That is a position that is assigned to one of the clerical members who primarily handles that. And this is a busy season because this is the exemption credit season. But I read the last Director's Report that was given at the Board of Assessor's Meeting and I talked about how the Assessors or the Assessing Staff had been very busy, they had 90 e-mails that month and responded to around 170 calls. I mean I do the math; 90 e-mails among 8 people for a month is an e-mail every other day. I don't consider that a heavy load."

Chairman Dowd "Ok less than one minute."

Ms. Ortolano "The phone calls I also – 170 among 8 people. I don't consider that a heavy load and I am just going to tell you I find some of this discussion simply not credible. And that's all I am going to say. Thank you."

**1:24:38**





DRAFT

Chairman Dowd "…Public Works Administration and Engineering, any questions or concerns about that portion of the budget?"

Ms. Ortolano "Yeah just a quick question and I don't know if it is in this line item or not. The work that is being done which will continue into this 2021 Budget for the building of the new facility. Is that part of Administration & Engineering, am I in the right line item area?"

Chairman Dowd "Director Fauteux, do you want to answer that question?"

Director Fauteux "No, that would not be in Administration & Engineering."

Ms. Ortolano "Ok where would that be?"

Director Fauteux "In fact you would not find that anywhere in our Operating Budget. That would be separate, that would be a bond that would eventually be sold, which it has not been at this point."

Ms. Ortolano "Ok so yes, the bond hasn't been sold yet, it's appropriated, you are working on it, but it just doesn't get carried any more is that correct, it's not carried any more at this point?"

Director Fauteux "You know I would let I think John Griffin speak to that. He's more of an expert on bonding than I am. I just know it is not in our Operating Budget."

Ms. Ortolano "Ok."

Chairman Dowd "Mr. Griffin?"

Mr. Griffin "Yes, the question, can you hear me?"

Chairman Dowd "Yes, I can hear you."

Mr. Griffin "The question was is any part of the construction of the DPW Building appear in the Operating Budget and the answer is "no". What we do is when Budgets are approved, we set up a project fund, so all the costs associated with the project fund would be captured in that area."

Ms. Ortolano "Ok thank you."

Mr. Griffin "You are welcome."

DRAFT

**Board of Aldermen Tuesday, July 14, 2020**

**https://www.youtube.com/watch?v=ZjP-76B8Rm8**

**2:04:19**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to thank the Board for allowing public comment to be available to us through the Zoom Meeting. It is very much appreciated. A couple of items. I listened to the communication or the meeting on the Assessing Update. Tomorrow night in the Finance Committee a consulting contract is going to be brought forth for Rex Norman to serve as a supervisor/consultant to the Assessing Department. I would like questions asked because this gentleman is the full-time Community Development Director for Windham and I would like to understand what that consulting contract is for; how much influence he will have on the work of the Assessors or doing

oversight during the day. If he, in fact, is still the full-time Community Director in Windham. And I just want to make you appraised of that, that is something I'm interested in understanding.

"With regard to transparency in the office and customer service, I'm really concerned about that. And I feel that there's a disconnect between the City Leadership and management and public perception and reality on what transparency is and what customer service is. First of all, the Board of Assessors has not allowed public input, either through e-mail or through any kind of verbal communication. And that has been a real concern of mine. There has been no communication submitted to the Board of Assessors as public comment. I tried to and they didn't accept them and I don't do that any longer. And when the day comes that they are willing to bring it back that would be great. But that's a transparency issue for me.

"I also find that access to records has just been so shut down to the public it is ridiculous. The redacting policy or the redacting practices that are happening for Assessing records make no sense to me. You know everything is shuttled up to Legal so that phone numbers and e-mails can be taken off because they are considered confidential information. But, in fact, when I go down to Building Permits or I ask for a file to be scanned out of Building Permits, they can the file, they send it to me, it has got e-mails, it has got private phone numbers and nothing is redacted. You know, your Board of Aldermen Meetings have only been accepting public comment when people e-mail them in. But none of the people's e-mail addresses are being redacted to preserve their confidentiality. They are all out for the public to have. And yet an application that's part of a public document in Assessing with an e-mail address is running up to Legal to be redacted. And the City is complaining and Ms. Leonard is writing letters on the extraordinary cost associated with them doing that. Why are we doing it then? If the Building Department doesn't do it, if the Board of Aldermen don't do it, and I can't find other Departments are doing it, my belief is it is happening in Legal because somebody said, "Slow the public down that's looking at information and we do not want them to get that information as quickly so let's ram everything up to Legal". And it's not just happening because I have litigation going. It is happening to other people that have no litigation going. I really don't understand that. And so that's not transparency. I should be able to get property record files when I walk into Assessing. And today when I called to get an appointment, I was told that it could only be 15 minutes and I asked if anyone had signed up on Thursday and the answer was "no". I said, "I'd like to do some research, I haven't been in the office in four months, could I have two slots?". "No". So you get one 15 minute slot and if you can't get it done oh well. And then I said, "Well can you schedule me an hour later, so I can come back"? "No, No, we do 15 minutes". You know, why? If nobody is coming into Assessing on Thursday and there were only three people who came in and somebody came in for half an hour, is that really a problem? I don't really understand that.

"Also these new property record cards that Ms. Kleiner identified that are being put together in a format that would be easier for the public to access. I'd love to know what that looks like from a transparency standpoint. They claim they are going to take off data that isn't used by the Assessors and are unnecessary for the public to see. I agree that some of that data exists on the card, but I can tell you I am also concerned that they are going to take off data that is valuable for the public to see."

President Wilshire "Mrs. Ortolano, you have one minute."

Ms. Ortolano "Why? What's the time limit?"



DRAFT

President Wilshire "Five minutes."

Ms. Ortolano "Ok it is supposed to be a period of 15 minutes for public comment and you haven't done it in a while. Are there other people in line?"

President Wilshire "I don't know."

Ms. Ortolano "Oh ok. So anyways this format for the property record card would be nice for the public to be able to see that and not just have it come out and if you don't' like it too bad. Your Public Comment Ordinance that you are working on and the one that the Board of Assessors is working on with the bylaws I believe is illegal. And I think you should be very careful about adopting that. I got a legal briefing that was generated by Steve Bennett where he was addressing the Board about a dozen years ago regarding closing the public down on speaking about personnel matters and about trying to define the tone of what they can say, repetition, redundancy and he wrote up a very detailed briefing with case studies on why that's illegal and should not be done.

"And I know your Board and the Board of Assessors have both come after me for addressing personnel matters and telling me I can't do it or I shouldn't do it or its offensive when, in fact, it is perfectly legally for the public to do that. And I think niceness Ordinances aren't good in public input. I think telling somebody not to repeat themselves is not right in public input and could be challenged. I think writing a public input policy that is as long as yours is, is ridiculous. You should look at the Assessing Standards Board Public Input Policy, it is basically one sentence and I think it would be good for you to do that. I want to thank Alderman Jette for making the motion to push an issue into the Finance Committee so that you're not just serving as a rubber stamp.

"I want to thank Alderman Lu for asking the question on complaints are being tracked and hearing that there is no system in line. That basically there are no complaints, I find that absurd and I find that just to be another example of where the voice, of even if it's a few, don't really matter when we have a complaint. Thank you very much."

**Board of Public Works Meeting, July 23, 2020**

**Audio Only: https://nashuanh.gov/DocumentCenter/View/19031/2020723-Board-of-Public-Works?bidId=**

Ms. Laurie Ortolano, 41 Berkeley Street "I just want to make you aware of something on this call because I am using my phone as I usually do. When I did the Alderman call it mutes you automatically and tells you to press *6 when you want to speak, when you are going to be recognized. So, I didn't even really know that I could be…that I was being heard. I rustled some dog food and some papers and you probably heard that. I just wanted to let you know that it is different and it's a little confusing. I didn't have to press *6 to get access to community input here.

"I wanted to address the new administrative facility that is being constructed. I've been following that and I am concerned that there isn't really any public information available on what's happening with that project. Commissioner Moriarty asked two or two and a half months ago for an update and I didn't see anything given on that. I feel as though when we bond a large project and the community gives us money that there isn't much public information that's available to see how that money is being spent

and I think it's too closed off. When I was on the School Board 25 years ago and we bonded $10 million for a facility we have a committee, it was public, we took notes, and we were very upfront about what we were doing, how the design was going, and we took input. Now, I'm not suggesting that you have to do that but, I don't even know if there are minutes available for the meetings you had. I spoke with the Commissioner and I was told that they don't even know when the meetings are being held and I am surprised that every Commissioner isn't aware of when the building committee or the construction committee is meeting on this. It makes me feel like the building itself, the construction, the planning, or the design and architect work that is being done by a few inside people in public works who are just creating the facility they want. I just feel like we should know about it and we have the right to know. I don't even know what happened to Burke Street, if it sold, if we have the $10 million or we only have the $6 million. I am going to put in a very detailed Right-to-Know request next week to get as much information as I can on the facility and not just the administrative facility but the facility needs for public works in general. I would like to request that there be more public information on these bonds and not just in the Division of Public Works but anywhere in the city when the public entrusts its government to take large sums of money and do projects with it."

**Board of Aldermen Tuesday, August 11, 2020**

**https://www.youtube.com/watch?v=LxSay0vUo5w**

**1:35:09**

Laurie Ortolano "41 Berkeley Street I'd like to address some of the comments made at the July 15th Finance Committee meeting. I was really disappointed in the conversation with the Mayor – the talk that the Mayor gave to the Committee and Ms. Kleiner regarding the cost of the assessing issues. I saw it as very heavy blame laid on me for costing the city so much. The Mayor made a comment that we couldn't find a Chief because of all the allegations – I believe he felt many unfounded – that were pointed at assessors in Nashua for failure to do their job. He said the assessment community consists of a very small group of people that all know each other and talk and they all believe that these actions by this individual are unfounded and they don't want to come here to work because they're going to be accused of the same thing Nashua assessors have been accused of.

"I want to share a little bit more truth on that issue and a story that I want you to understand. We had a Deputy Assessor named Andrew Lemay who worked in Nashua for a number of years. He left around 2012 and he has since retired and he's retired into a community up in Concord. He was talking to an individual that I happen to have an acquaintance with and they met up there because they had moved into the retirement community. Andrew had explained that he had been an assessor down in Nashua. The individual knew the issues going on in Nashua and they struck up a conversation. Andrew Lemay's statement to this man, which can be verified, was that you know the Mayor appointed a woman who is completely unqualified for the job and now it's all political and that there was a Coordinator in there, a woman, who had the best interest of the taxpayers at heart. She really watched out for the people and she was removed. He was referring to Cheryl Walley. That's a story with somebody who worked down here and he still has close relationships with Greg Turgiss, Louise Brown.

"Where does he get his information from? He's not the first one I have heard stories like that from. So when the Mayor tells you that it's a small community and they all talk and they don't want to come down here because Laurie Ortolano has just level charged – you know – and done things by going to the State that make it undesirable for them to work here. I think some of them didn't want to come here to work with somebody as unqualified as the Mayor picked. It was his choice to do that.

"I also felt Alderman Lu was not told the truth in that meeting when she raised some good questions. She asked how long the situation with not having somebody qualified in the office had gone on. The Administration or Ms. Kleiner and the Mayor explained the decertification of Greg Turgiss. That's not the case. This problem has existed for 15 months when the Mayor chose to put him as a Supervisor because he was automatically in there supervising his brother's work – Gary Turgiss. So Greg Turgiss was supervising Gary Turgiss's work because under the State Statutes, abatements cannot be brought to the Board of Assessors unless a certified supervisor is reviewing the work and verifying the work done. His brother Gary was bringing abatements forward last year in 2019 and again in 2020. So I have a huge issue with that.

"Also Mike Mandile who was not a certified supervisor until March of this year. He was a property assistant not a certified property assessor. He was a property assistant in training. The State law says he is not allowed to present abatements or opinions of value to a Board of Assessors. He's not qualified. Greg Turgiss assigned 65 abatements to him last year to present to the Board. Completely unqualified. That should have never happened. It happened again in March before he even had his certification. The story goes on.

"In my opinion, the Mayor is very excited about taking this gentleman back when his supervisory certification is restored. Ah you know, he has the right to do that and he hasn't recognized any of the problems that really have existed with the work of this individual and the work product. He can come back but rest assured Mr. Mayor, we have the right as the public to watchdog the work product of this individual especially given the history. I just stumbled on to something this weekend that is another eye opener on paperwork with this gentleman that is going up to the State. Tired of finding it and it never seems to end.

"I am so disappointed that our Mayor could not shoulder any of the responsibility for what went on here and that he put it all on me.

"That I created this burden. His closing line was just beautiful, "Have the taxpayers been forced to pay a lot of money because of what this woman has done? Yes they have." You know I expect more out of my leadership and not just from a Mayor but my Board of Aldermen as well. Too many of you went lockstep with him. There are a few of you who didn't. When you put that position in place, when you decided Ms. Kleiner would take over in April of 2019, Ernie Jette was the only one who spoke against it. Strongly concerned that we didn't have somebody qualified. Ms. Kleiner made it clear that she would let the Board know. She said, "I can promise you that if I feel if I ever feel that my effectiveness or that I'm hurting the city or the value to our residents in any way, I will let you know. I will let the Mayor know immediately." That never happened."

President Wilshire "Ms. Ortolano you're going to have to wrap up now please. "

DRAFT

Laurie Ortolano "Okay. Well all I'm going to tell you is she never did that. She brought forth in the September 24, 2019 meeting a one liner saying, "we're going to look at a Chief again" out of nowhere. No reason for it. Brought it forth in the November 12, 2019 meeting of the Board of Aldermen and no discussion on why she felt we needed it. Everyone just stamps the stamp and rubber stamps the money to get this position in without her ever explaining what the deficits were of not having the position."

President Wilshire "Okay you're going to have to wrap up now."

Laurie Ortolano "I am wrapping up. Thank you."

**Board of Public Works, August 27, 2020**

**https://www.youtube.com/watch?v=m0yrOopYjVw**

**11:05**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street "I know tonight there is an update regarding the new facility and I appreciate that. I would like to express that I had started off writing a Right-to-Know request to the Director to try to get documents and public information on this project and I was very unsuccessful. One of the things I did was try to reach out to the Board appointed members that sit on the Committee to get help on which documents were in fact, public documents. It's very hard for a citizen to know what to call out for and I went through the minutes extensively but there is not a lot of documentation in the record about the reports that had been produced or what was available. I'm disappointed that it's such a struggle because when I write a Right-to-Know request to a Director and it gets sent up to the Legal Department it becomes a total roadblock for me. One, it's written too generally, the Legal Department is backlogged and they have to sit on it for weeks, and I know when I wrote something generally there is a very high probability that the Legal Department is going to deny it based on unclear or unreasonably described which is very discouraging for me. I am not happy with the make-up of your Committee because some of the people that I reached out to help to find out just what I could request, I got no response from. I am a big fan of replacing those people who sit on the Committee with other people who are going to respond to the public.

"Also, I really like the idea of taking as much of this information that is public and putting it on the website. When my response came back from the Legal Department that they were backlogged and it would take three weeks just to read it, I canceled it and I decided to take a second approach which was just to call the Director to find out what reports were available. I was shut down on that phone call and received a call from the office woman named Diane saying that the Director wouldn't take my call and the Legal Department would call me and I shut that down because I felt that would be a confrontation communication with me and they didn't say that they wanted to work with me to help me understand what documents I wanted. I felt it was going to be more punitive and more destructive and I didn't want to take a call from the Legal Department. It disappoints me a lot that I go through this. I would like to be able to pick up the phone and go to the closest level where the work is being done where somebody can help me to find out what's available. I would ask you to put stuff on the website and I am most interested in the finances. Given the COVID situation, I am actually wondering if we should even be building an office facility now. I am sure that the whole project is a much larger budget than I even recognize, I don't know what the total cost is but I know that buildings that were unhealthy or sick…I am





DRAFT

not certain you are really getting at those right now and I don't know where this pandemic and the fallout from it; whether these projects are going to take form the way you had hoped they would. If that becomes an issue I hope you reconsider what you are going to do and what you are going to do with the possible shortfall on the $10 million project with the sale of Burke Street and the bond that was approved possibly not being quite enough money. Those are my concerns and that is my input."

**Board of Assessors August 27, 2020**

**https://www.youtube.com/watch?v=iiiELSAXP8s**

**28:32**

Ms. Ortolano "Can you hear me?"

Mr. Hansberry "Yes."

Ms. Ortolano "Okay, so I didn't sign up. I'm not certain how you sign up but I'm just here. My name is Laurie Ortolano, 41 Berkeley Street. I just want you to know I could not dial in on the phone. It would allow me to dial in and then it would put me on hold and say I have to wait until you allow me to enter. So, I just want to let you know that was a problem and I use my phone more than my computer. I'm on the computer now but there's a big internet problem over here with xfinity on Berkeley and Concord Street, and I've had a lot of trouble. Unfortunately I haven't been able to get in. I tried to send a text to Ms. Kleiner but her number wasn't valid anymore that I had either. Just a couple of things. The permit and sales data that was discussed in the report by the Director, I thought that Vision was handling permit and sales but it sounds like our assessors are doing some things as well with the questionnaires certainly going out, which is fine. I see the percentage of returns is fairly low. Sales, though we still have the advantage of still being able to use MLS data. I'm just wondering, are we still on the schedule where we're not, or are we following the plan where we're not doing any depreciation, condition or grade changes on these properties using MLS data, and we're only correcting based on physical items? That's a question I have because there's quite a lot of 2019 data that the adjustments to depreciation were not made, and I knew when Vision came on for the 2020 work, we were told they weren't going to make those adjustments until 2023, but that leaves some really big disparities on homes that have been completely redone. And that's going to create a very low ratio if there's no correcting going on in that. That's just a concern I have. Also, I would ask that the board revisit the policy on how we handle documenting property record cards in the file. There's a policy I have from Angleo Marino that was dated in 2012 that detailed out the process, and now the existing policy, I feel, is missing elements of what we do, which is, you know, when we update a property record card for a permit, we pencil-mark the old, we take it back to the office, a clerk or assessor inputs the changes, we check it, we staple the old to the new, it becomes a record in the file that's a public record. That process is not really outlined in policy, and I think it should be. And I'm concerned, you know, it seems to be we're still doing that, but it leaves the door open to say, did somebody change it and we're not? So I want to be very clear on what our practice is, and I think documenting our practice in very clear terms is important. And also, I feel strongly that the board of assessors should be reviewing the abatement applications. You know, the RSA states that abatements applications are to be reviewed by the board, and I feel that I have been told that way we process abatements is a first-come first-serve basis, but you have no idea that's happening





DRAFT

because you never see the applications of who came first, and what is first come first serve? I don't feel I was handled first come first serve in 2018; certainly wasn't handled at all in 2019. But when I went and looked at all the abatement applications, I don't really believe people whose applications stamped with dates are necessarily getting first come first serve. And I also think that if you're going to be an impartial board, you need to see both sides of the story, and that means people who've done appraisals, who've submitted sales data, take a look at what they put in. I understand that you fully trust our assessors to be the voice on what the value should be, but since the law states that it's incumbent on the property owner to present the… the burden of proof is on us, then I think our information should be reviewed by the board. And like I said, I'm particularly concerned that the first come first serve nature of what's supposed to be happening in there isn't really happening. Thank you."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE SEPTEMBER 10, 2020**

**Audio Only: https://www.nashuanh.gov/DocumentCenter/View/20146/2020910-Personnel-Admin-Affairs**

**36:35**

Laurie Ortolano "Sure Laurie Ortolano, 41 Berkeley Street. I just wanted to speak very briefly that I support the use of masks, but I don't feel like we need to change the Ordinance to put more restrictions on business owners to do more regulations. I think our numbers and our data have been very good and our compliance has been good and I just don't support more regulations to solve problems that potentially don't exist. I don't know if there's information out there now that shows an issue. I know some of the public has asked Bobbie Bagley to get information on where the cluster outbreaks were at restaurants, but the City isn't willing to disclose that. And since we don't have – as the public – first-hand information on this, I just don't feel that there's enough cases and problems to constitute a more stringent restriction placed on the masks. So that's all I had to say. Thank you."

**3:13:11**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. I just wanted to speak briefly and quickly to the new position being created to address Right To Know issues, that's going to be addressed up at the Legal Office. I have a couple concerns about this and I have been no stranger to the Right To Know issue. I really feel strongly that you have to do a great deal of training within your Department about Right To Know through the New Hampshire Municipal Association. I get the people who are closest to the information knowledgeable about what information is public and what information isn't. I am really leery and not happy about a position up in Legal to cover this because it has been a nightmare for me going through Legal, stepping two and three layers away from the Department that has the information, trying to get information requests satisfied. It's not working. Now in Assessing, you had one individual who's PDF Performance Description, Job Description basically put them in charge of handling information requests to the public and that woman was removed. And nobody else held that job. Then another individual came in and took the job and that woman has quit. Right now you have nobody in Assessing who is covering Job Description Forms by PDF who is knowledgeable on fulfilling Right To Know Requests or that I am aware who is trained through the NHMA.



DRAFT

"And that leaves a huge hole and that job isn't even posted. So that really concerns me, and I can tell you with my Right To Know, I had the ability at one point in time from when I started in September of 2018 until June 1st of 2019, I was getting information strictly working through the Assessing Office without incident. If you look through all the minutes and records there were no complaints from anyone publicly on record of all this chaos I was causing because the individual down there who was in charge of handling Right To Know Requests was doing her job and handling it. And if I had questions, she answered them, and if she didn't understand something I had, she called and asked for clarification and it worked really easy.

"But then once you changed and got rid of the Chief and put somebody in charge who wasn't as qualified, it became a nightmare. And the person who was able to handle the information was told they could no longer do that. They were not allowed to address Right To Know Issues with the public and there was nobody left down there. The other area for me, I was able to go over to the Finance Area, Rosemary Evans over there, there were probably only four times I interfaced with her. But if I went into Finance and asked Rosemary a quick question about an invoice paid, that woman could give me answer in five minutes. I was trying to get information through Legal on whether tablets had been purchased and paid for. I wrote 3 Right To Knows, they were all numbered different Right To Know to go in my pile of 300, they were not responded to. I was frustrated as heck, I wrote to Steve Bolton and said, "Why is this happening". Well it was because when I saw Rosemary in the hallway when City Hall was open, she said to me, "I can't talk to you anymore you have to go to Legal".

"And what happened is that any avenue that I had available to me to get the information from the source that had the information was slammed shut and it was thrown up in to Legal. I am really concerned that it is going to be a total roadblock for the public. I really feel strongly that you want your Departments to be able to handle Right To Know Requests and be trained. DPW, Lisa Fauteux, I viewed her as a very competent person, but the City doesn't believe she can handle a Right To Know Request and it got thrown to Legal and they are in charge.

"And I don't understand that. I just don't understand it, it's been a nightmare. I have to write Right To Knows three, four, five times. And I send Right To Knows to Legal that I get responses back from Celia Leonard that the information doesn't exist. I backdoor and have a number of them down to Assessing where I basically demand the information and I get it.

"But that shouldn't be happening. And there are e-mail chains for these Right To Knows that I can go 14, 15 letters deep between Legal and myself before I finally get the information; not because I wrote them in appropriately but because they kept saying it didn't exist when I knew it did. So I am really concerned about a legal position. And just to end it, I was offended by Ben's comment that when he said that I hope $99,000.00 is enough money for all the grief or what they are going to have to put up with. We have to change the culture in City Hall. You have to treat the public who comes out to get information not like we are barbarians at the gate and enemies of the City. It's public information, my Right to Know to access finance information is one of the most basic fundamental Right To Know that a citizen would request. And I had to work my butt off to get it. I mean I am so deeply offended by that comment. I appreciate what Attorney Bolton said, I think he understood that the public is asking for more information and you have an obligation to provide it. It's 2020 in a digital age and I feel strongly about open access.





DRAFT

"And I know most of you do not care for the work I did or the type of research I did or what my quest was or what I was believe in was wrong in the Assessing Office. I know I don't have the backing of this Board, but I fundamentally believe things were wrong. And the information I got gave me the information I needed. I know you don't recognize it, I know you feel there really was no problem. But it was what I requested. And regarding cost, I want to speak to Ben Clemons on this, he made a big deal about the $8,000.00 I spent hiring a PI to follow an Assessor; how horrible it is that a citizen would lay down money like that and attack an innocent City Worker and smear their reputation. I've had to work my tail off on these Right To Know Issues, I'm $100,000.00 into it and I know it's a $200,000.00 experience for me to legally challenge these Right To Knows. And I am so strongly opposed that the only people who can challenge their City for information are people who have some wealth and means. I have had more people come to me show me Right To Knows are not fulfilled and want help or wish they could so something legally and they don't have the means. Any information should not be for the wealthy."

Chairman Caron "Mrs. Ortolano, you've had 5 minutes."

Laurie Ortolano "I'm done."

Chairman Caron "Thank you."

Laurie Ortolano "Thank you."

**FINANCE COMMITTEE SEPTEMBER 16, 2020**

**https://www.youtube.com/watch?v=gSvRnu8W-7U**

**52:30**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street, Hello? Hello? Can you hear me?

Alderman Harriott-Gathright "Yes."

Mayor Donchess "Is this Public Comment?"

Laurie Ortolano "Yes, you move too quickly"

Mayor Donchess "Alright, I didn't know that there was anyone even on. Go ahead."

Laurie Ortolano "That's because I'm going through my phone. Lori Ortolano, 41 Berkeley Street and I am aware that it is a 5-minute public comment. Just quickly I tuned in a few minutes late, so I don't know if this was discussed. But, I am concerned at the amount of money being spent for the COVID renovations is really more about a City Hall renovation. I don't know if you talked about it, but I would be interested in knowing how many other City Halls are closing down for such an extended period of time to deal with COVID renovations, like Manchester. Some of these towns that have older City Halls. One of the concerns I have is I know and you all know that I have been actively involved in gathering information out of the Assessing Office, but also other offices as well. And I know that the Director told the Board of Assessors a couple of meetings ago that City Hall would be closing around September, I mean excuse me, the Assessing Office would be closing for renovations around September 10th. And that was the end of the discussion.





DRAFT

"You know, for people like me and other members of the public, we want to know when City Hall is going to be open and not just a little open, actually open like other towns around us. And I want to know when the Assessing Office is going to be open and more importantly, while it's closed, does that mean we don't have access to any records anymore at all? What is available to the Public while City Hall is closed? Are property record files available? I would like your Administrators to think about us when they speak about these issues. Because for somebody like me to have to write letters in and send e-mails asking what information is available now and when it will be open. For me, it is particularly painful because it becomes a numbered correspondence that goes up to the Legal Office, it's addressed by the Legal Office. It is put in a file and used in litigation against me. And I don't want to be in that situation. I want my City Officials to just give complete information when you are out there talking.

"Now for the last three weeks, I've had to drive to Hudson to get documents notarized because City Hall is so closed up in Nashua that we don't have a Notary or a place that I can walk in and use a Notary in City Hall. And I don't know why I can go to Londonderry, Litchfield and Hudson and walk in with a mask on and get my documents notarized but I can't do it in Nashua.

"I just went up north to north country and walked into a Town Hall to get a document addressed. I mean I really want to know when City Hall is going to be open and mostly I want to know that our ability to obtain information isn't shut down for the next three months because we are doing such an extensive renovation. Thank you."

**Board of Aldermen Tuesday, September 22, 2020**

**https://www.youtube.com/watch?v=kqlx6uRiMX8**

**35:42**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street President Wilshire, can you hear me?"

President Wilshire "Alderman Caron?"

Ms. Ortolano "Hello?"

President Wilshire "Alderman Caron, I can hear you."

Ms. Ortolano "This is actually Laurie Ortolano, you skipped Public Comment for items to be acted on, is that intentional?"

President Wilshire "Oh no I am sorry; I did not intentionally skip that."

Ms. Ortolano "Ok thank you."

President Wilshire "My apologies."

President Wilshire "Period for public comment relative to items expected to be acted upon this evening. Is there anyone that wishes to address the Board?"

Ms. Ortolano "I do, I thought somebody else might dive in but this is Laurie Ortolano at 41 Berkeley Street. I just want to speak briefly to the comments by the Mayor, pretty disappointing to hear his tone





DRAFT

and what he said to you folks. He said that, he used the word “deluge” of Right to Knows began about 2 years ago. Actually I believe there was a ramp up that started in June 2019 and that’s when the Legal Office started tracking these things. I know the other individual who was involved I believe put their first Right to Know in, in June or July. So I disagree with the 2-year time frame. I also think he said by that summer of last year, there were 34,000 document requests, or documents provided. That’s a gross misrepresentation. He’s talking about the request where I wanted to see the KRT Property Record Cards. Turns out those were 31,000 records which I didn’t know when I put the request in and the City denied them and didn’t produce them at all. So that’s a misrepresentation.

“Also, I am going to send to all of you the letter from Attorney Lehmann where he made the request for the audio/video files. We did not request the transcripts. We were fine with just getting the audio/video files and didn’t ask the City to do that. The City is the one that said without giving a reason, we will transcribe these and we will redact them. And we did not ask for that. And to give you a perspective on the amount of work, its 13 hours a tape. Now I’ve been involved in the Assessing Department and I’ve gone to many meetings during abatements, those meetings are 4 hours long. And they transcribe those down there in a matter of you know two days. So 13 hours which is working not full time, 13 hours of minutes for somebody who is skilled at that is not asking for a lot but we didn’t even ask for it. And I’m going to produce the letter from Attorney Lehmann that verifies. Because really when I see a Mayor put out wild accusations and really appear frightened by what’s happening here. I think his fear has gotten the best of him. I think he misrepresented what the position is about.”

President Wilshire “Mrs. Ortolano can you stick to the Legislation and not the Mayor please?”

<u>Ms. Ortolano</u> “Well the Mayor is the one who pitched it and he said he was going to provide some answers to good questions raised by the public. So I hope he’s able to do that and put his fear aside and get us to the answers. I would have liked to have heard that at the beginning instead of his frantic dialogue. I don’t like listening to people who I don’t think have integrity. I wish he had stuck to the issue and answered some of the questions the public brought forward so that when I gave my first input I would have something to say for you. So step it up Mr. Mayor. Thank you.”

**4:06:40**

<u>Laurie Ortolano</u> “Hi, I wanted to just provide a little clarification to some comments made regarding the Right to Know position. I think the City and the Legal Office in particular have created a very expensive process for what’s happened here. Any general request, certainly from me, that isn’t even a Right to Know was sent to Legal and for quite some time they were responding to general inquiries with denials because they didn’t constitute Right to Know questions, which I was aware of. I wrote a number of Memos, really frustrated to stop the lunacy, and asked them to stop doing that because I didn’t know. If I asked for a phone number and I gave you that example, it went up to Legal to be responded to. I just found that ludicrous. I can tell you I e-mailed the newspapers and I asked them what their process is. I got a response back from a reporter who told me in 10 years they’ve only had to file like 5 Right to Knows. They go right to the City Division and ask for anything they want and they use Carrie Miller if they need direction through the Mayor’s Office on where to go. And that is works beautifully, requires no written communications or instructions. And if the press can get information that easily, so should the public.

"I also think the City has practiced very aggressively, the Legal Office, malicious compliance. Unlike any other Government Group I've seen, they will not communicate with the public to clarify a request. So Ms. Colquhoun and got on and told you how she asked for open permits. Apparently, they couldn't search for just open that would have been like compiling but they didn't communicate that to her and they sent her 31,000 records, which she would not have taken. But there was no option to say no and somebody worked on that. Just to let you know, I've sent you all the letters from Attorney Lehmann regarding the transcript. We never asked for the transcript, he asked for the audio/video recordings, period. We got a response back within 6 days from Celia Leonard saying that they were going to transcribe them. And that was fine, that was on June 8th. We really believed that within a month we'd have those. It's almost four months now and we still don't have that information. If I knew it was going to take them that long or be too expensive, I would have paid for it and found the transcriber. It has taken the City almost 3 months to find a transcriber. I am not certain why it took so long. But I can tell you my husband through his business, accesses these people like nothing. And they are not expensive services anymore. So I would have moved that along to help but the option wasn't there for us.

"Also, I think the biggest problem happened when you promoted somebody into the Assessing Office as the Manager who had no understanding of Right to Know or what public information was down there. That is probably your biggest issue here and what caused all the problems.

"As far as all of the pages requested, I can tell you that the City produced for discovery, 15,000 documents that I have requested since they have been collecting them and they sent to my attorney and I. And I went through and cataloged them. At least 12,000 were not requested by me. So when I put in a Right to Know and ask for e-mails they sent me an extra 500 e-mails that weren't within the date range I wanted and redacted them. I didn't want them, I didn't ask for that range. They sent me 3,500 pages of the KRT new assessment data. I didn't ask for that, I just asked that it be put on-line and the City put it on-line, but they sent me the 3,500 pages. They sent me manuals I didn't want. You know it comes out to three-quarters of the information I didn't ask them for, they gave it to me. And when I Manuela say that she has spent 1,100 hours working or 1,000 hours, or two weeks a month, well you know, that's a lot of scanning and working and potentially redacting that I didn't ask for. So you know, I can go to the DRA put a request in have the attorney call me, have a worker call me and ask for clarification, handle it and be done. It's really simple. That process doesn't exist for some of us in the City. And if you start redacting documents like you are doing in Assessing, you're going to need more than one person because your Permit Department has a lot of data on it; phone numbers and e-mails. And everyone is down there accessing it publicly and they are not being slowed down from doing it. It's the assessing data that's being raced up to Legal."

President Wilshire "Ms. Ortolano, can you wrap it up please?"

Ms. Ortolano "Yes, I am extraordinarily disappointed in the Mayor. He does not take responsibility and he shifts the blame totally on the public. I've been wronged by this City, I think Attorney Bolton runs a pretty unethical office and I have certainly seen my costs run up legally because of what's gone on in there. Thank you."

DRAFT

**Board of Assessors October 1, 2020**

https://www.youtube.com/watch?v=aHLzvN4tYrw

**32:19**

Mr. Hansberry "Who's next, Director Kleiner? Do you—"

Ms. Ortolano "Laurie Ortolano, 41 Berkeley St."

Mr. Hansberry "Good morning. Go right ahead."

Ms. Ortolano "Good morning. You know, I do-- I'm glad we understand we can search those on the dashboard. I spent a little time working on the dashboard and I wasn't exactly certain of the layout. It would be nice to have a little tutorial on that, but I'm going to pursue some communication with the gentleman who set it up and see if I can get a handle on how it's used. I'm glad the sales are there because I'm starting to help some folks with abatements for next year and I'm going to need to access that sales data. Tax bills are going to be frozen. I sent you a letter, a correspondence regarding your handling of my 2019 abatement. So some concerns I had. I highlighted to you that in a March 2016 Board of Assessors meeting, Corporate Counsel Steve Bolton introduced himself and, you know, let you know that he works for you. And you know, I've had an impression since I've been involved with assessing and board meetings that you work for him, and that he acts more like the chair and the chief assessor. That's a little bit concerning to me. RSA 76:16 "by a selectman or assessor" states that selectmen or assessors for good cause shown may abate any tax, including prior year's tax, assessed by them or by their predecessor. And then it says number 2, upon receipt of an application under paragraph 1B, the selectmen or assessors shall review the application and shall grant for good cause shown or deny the application in writing by July 1after notice of the tax date of RSA 76:1-a. The failure to respond shall constitute denial. I'd like to know if the board is willing, for 2020 tax abatements that are coming in, to actually review applications. Can anyone answer that question? Because it's part of the RSA. I know your failure to review my application last year had an impact on fairness in how that was addressed. And I know you told Ms. Colquhoun that it's a comment period, but nothing excludes you from answering questions. And you open your meeting with "questions will be answered". I was at a board of alderman meeting last week online, and the board engaged extensively with a community member who had questions, so I would like an answer as to whether you are going to review abatement applications and follow the law under 76:l6. I understand the law allows you to fail to respond, but I'm trying to understand if you even knew about my abatement to fail to respond to it. I understand that the assessing supervisor is responsible for distributing the abatements to the assessors; at some point the assessing supervisor decided that he was going to pull mine out and not act on it. How does the board find out this is happening? Can the supervisor just hold it off on the side without the board's knowledge? How can the public find out what abatement the board chose to fail to respond on? I want to know if I was the only residential abatement that received this treatment. I've asked Louise Brown for help on this, but I would think the board would be interested in the answer. It doesn't seem correct that the legal office can just order it to be pulled out and ignore it without the board knowing, because the RSA puts the failure to respond on the shoulders of the selectmen or the assessors. When did the board decide not to act on my abatement, and why wasn't it part of the public record? I think the decision to let it expire because you accept the advice of legal to do so should have been on public record. I think the failure to act should be noted in the minutes. I called three well-respected chiefs last week, and one

member of the assessing standards board. I spoke to Dan Langille out of Keene, I spoke to Dave Michaud out of Hudson, and I spoke to Bob Gagne out of Manchester, who is also the vice chair of the Assessing Standards Board. Frankly, they were surprised that the board would not have acted on it. One chief stated that he never failed to respond to an abatement—he always acts on them. That was Keene. Another chief said he generally responds to all of them as well, but stated in that a few instances, commercial properties with tax representatives may not have received a letter, but he was in communication directly with them and it wasn't a problem. The other chief stated he acts on all abatements that do not have a tax representative. That was Bob Gagne. He knows that all residential properties get a response and some commercial properties with tax representatives don't get letters as well, but his office is generally in communication with them. He refers specifically to CTPM. Two of the chiefs stated the BTLA frowns upon bad-faith efforts to work with taxpayers to resolve the issue. I'm disappointed that Rex Norman didn't even look at my 2019 abatement when he approved a massive correction to 39 Berkeley St and 78 Concord St. I paid good money to put an appraisal in with my 2019 abatement, and it still wasn't worthy of a decision. When I spoke to one of the chiefs today—or last week—he stated that if the city tells you prior to July 1 that they're not going to act on your abatement, then you're free to file with the BTLA immediately. This would give me an opportunity to get into the system earlier. In speaking with the chief, he made it clear that the BTLA treats every abatement as a new entity.

"When I explained that Attorney Bolton believed that an appeal and subsequent abatement are inextricably linked, he said that was not the case. He assured me that the BTLA would act on it as a separate entity, and that is what I saw on BTLA online ruling. I think there's an opportunity here to create some guidelines that will better service the public and recognize that the courts are overburdened and want municipalities to engage in good faith efforts to resolve the matter. I think that the board should agree from this point forward to act on all abatements filed without tax representatives, and act on all residential abatements. I believe the board should also review all abatement applications to be sure they're being treated fairly. Be sure that property owners receive a letter from the city with approval or denial explaining each step. Make sure that abatements are expiring-- that are expiring without board action are clearly identified in an abatement report. Never deny a citizen placement on an agenda regarding their abatement. I looked back over my e-mails, and didn't realize that I tried four times to get on the agenda to replace—to address my 2019 abatement and did not get placement."

Mr. Hansberry "Ms. Ortolano—"

Ms. Ortolano "I'm almost done. I just realized that those requests were being sent right up to legal and being logged by Manuela and legal wasn't even responding. So they knew I was trying to address this abatement. I truly got the runaround by Attorney Bolton and Ms. Kleiner, and I just don't think it's equitable. And I'm waiting still to figure out—the abatement report that Ms. Kleiner sent me showed that my abatement was—was with a consultant labeled Q, and on the side it had a note "assessor reviewing"."

Mr. Hansberry "Ms. Ortolano, we've let you go way, way over. One thing I would say is—"

Ms. Ortolano "Well, don't you think this is an important issue, Dan? Don't you think making certain peoples' properties are treated fairly is important?"

Mr. Hansberry "Well, I think that Attorney—"

Ms. Ortolano "I know the answer to this; you don't. And the reason there's a police investigation into your actions as a board is because you don't take it seriously, and I do."

Mr. Hansberry "I think that Ms. Ortolano's question was answered by Attorney Bolton explaining how the subsequent abatement applications linked to the prior abatement application."

Ms. Ortolano "It was not."

**Board of Assessors October 6, 2020**

**https://www.youtube.com/watch?v=jwzoMoF8nuE**

**6:15**

Mr. Hansberry "Would you please identify yourself and state your address for the record?"

Ms. Ortolano "Laurie Ortolano."

Mr. Hansberry "And your address, please, Ms. Ortolano?"

Ms. Ortolano "41 Berkeley St."

Mr. Hansberry "Thank you. Go right ahead.

Ms. Ortolano "I think somebody else was waiting as well, because my phone was acting funny; so there might be somebody else there, Chairman Hansberry. Ah, yes, a couple questions on this exemption. Is there any documentation that the public can see that will show why it's getting the exemption at the hospital? I did put in a Right to Know for settlement agreements on this, there was I think back in 2009, and I believe it expired, the agreement on this property in 2018. It was extended last year, so and I think the buildings were probably getting exemptions, but now it's just the hospital. But I'd like to understand why it is receiving—I think this is an A9, a charitable exemption. And also does—I've put in a Right to Know, but I'd like to understand, does Saint Joseph's Hospital, as a Catholic hospital, receive the same exemption? And is there a way for the public to understand this, or was all of this done in non-public, as the reason for the exemption can't be understood by the public? I'm just trying to figure it out."

Mr. Hansberry "To answer that question, Saint Joseph's does receive the same exemption."

Ms. Ortolano "Okay, that's good to know. Great, so I've put my Right to Knows in, so I'll see what the City response is. Thank you."

**Board of Aldermen Tuesday, October 13, 2020**

**https://www.youtube.com/watch?v=drgbU2Oa9t8**

**1:19:26**



DRAFT

Laurie Ortolano "41 Berkeley Street. I'll move through it quickly. Resolution 20-077 Indigenous People Day I really believe that belongs on the ballot, that that should go out to the folks of the City to vote on. Parking I am in support of the reduction of the ticketing for parking. I think it's a great idea. I am sensitive to the Mayor's comments regarding the loss of revenue and the budget issues. It you are going to support this, I think you have to make the cuts in the positions, people, personnel to justify the reduction in the revenue. And I think that's fine but make certain you do both of those things if that's going to be the case and we just don't keep ourselves heavy on people when we don't have the work for them.

"I'd like to jump over to Ordinance O-20-009, Public Comment. I have some real concerns with the language of this and what the Legal Office brought forth. I agree with Ms. Pappas that I think the first Public Input should be open for anything on the Agenda. I really think there's a benefit to that to the community to allow those comments to be made on any item being discussed; not just final approval because it will make people more receptive to what is going to be voted on. And it will give more input to the Committee that's taking it off to review it.

"I also think these comments that were made in the Personnel meeting regarding public comments; they are not speeches, all discussion should be relevant to items that fall under the purview of the Board of Aldermen or the Committee conducting the Hearing. You know, that's very restrictive and it's not easy for a person coming in as a member of the public to even know that. So Alderman Dowd, I think you are way off base when you make a statement like that. There are people tonight who dialed in who had pre-written statements who essentially made speeches. And they were fine, you know, that should be ok and we shouldn't be putting restrictions on that.

"The other thing I am really concerned about is the use of a light is great I think that's awesome. I think Alderwoman Kelly raised the issue of what we think is civil and what rude or profane remarks would be prohibited. I have found President Wilshire very condemning on remarks that I have made that I feel were unworthy. And just at the last meeting on the 22nd, I addressed comments directly made by the Mayor in his opening statement and she shut me off, she said, please stop directing your comments to the Mayor. Well the Mayor opened up the discussion by speaking about two residents, one in particular, who had placed all this hardship on the City with Right to Know Requests and opened up a discussion on the law suit as a plaintiff that she had filed on the City. He made a lot of statements about these Right to Know Requests that I happen to think weren't right.

"I feel the door is open for the public to come back and comment on that. And to have Ms. Wilshire jump in and say, don't comment on the Mayor. That's democracy and that's a healthy debate that is happening there. And it has happened to me repeatedly with this Board. You know, also this concept that language on civil, rude, profane remarks was all put in by the Legal Office. I think that's a big mistake. The Legal Office is making Public Comment very restrictive in the City and this Ordinance is really tightening the screws down over a period of four or five years that Mayor Donchess has been in office and I think it's going completely in the wrong way. And this latitude that you give to the President of the Board to shut people down if she doesn't like the comments. God knows it is happening to me. I have to fight for my time. I don't want to have to challenge this in Court, really, I've got enough on my plate. I'd like you to just let these comments be opened up.

"The concept that we don't like – Alderman Lopez's comments were disturbing to me. He wants everything tucked in nice and neat and all pretty and everyone using good words and everything, you





DRAFT

know, a niceness policy works well for him. I think he's out of touch. This concept that you can't criticize individuals is unconstitutional. And this concept that we should only be the public coming to the Board to discuss matters that the Board covers, I don't know what you cover. I had personnel issues. I went to the Personnel Committee Meeting, they said, hey we don't cover that. I went to the Human Resource guy, he says, hey I don't cover that. I come to the Aldermen you are upset because you don't want it covered there. I don't know where you cover this stuff and I really don't give a crap. If I want to discuss it and I have something to say about a personnel matter, I am going to come most likely to the Board to say it. Because I am concerned; look at the stuff that I dug up. You've got 12 more sanctions that were brought down by the DRA last week. At some point you should stop saying, it's her; maybe there was something legitimate I was talking about.

"I also think Fred Teeboom made a very valid point. Start taking that light that's going to be on the wall and start using that on yourselves some of the time. Because there's a lot of extraneous communication going on at that table that could make these meetings a lot shorter. So I think you should bring this Ordinance back into the Committee and think long and hard about Legal's recommendation for some of the language in here. They are not doing this City a favor when it comes to transparency and openness of Government. Thank you."

**Board of Assessors November 5, 2020**

**https://www.youtube.com/watch?v=mledAKW76jA**

**31:49**

Ms. Ortolano "Yes, can you hear me?"

Mr. Hansberry "Yes."

Ms. Ortolano "It's Laurie Ortolano, 41 Berkeley St."

Mr. Hansberry "Alright, thank you, go right ahead."

Ms. Ortolano "I appreciate hearing that we're working on updating policies and procedures for running AP5 software; I think that's terrific. Of course you know I'm all about transparency, and I hope these new policies and procedures strongly consider the transparency issues and making records open access to the public and information easier to access. I've had some concerns that changes made in the department have actually closed down some of that transparency; I don't like our e-mail storage system at all that's been put in place, and I don't know when it happened, so that's a concern to me. I would like to ask that all reports—Ms. Kleiner mentioned that some new reporting might be available—that the reports that are available as public reports, that that sheet that I was sent privately through a Right to Know of all accessible public reports be put into the manual. You know, in the front section--here's what's available and here's what we produce, period. And anything in there that's being added, you update it. I think that's terrific. Ms. Colquhoun's issue with sales data was also mine. You know, Ms. Kleiner has mentioned that she's had some people who have been very successful with the dashboard; if they're members of the public, connect them to people like myself and Laura, because we're interested, and the city doesn't have time to provide a tutorial through its assessors to us. But if there are people who are wildly successful, give our name out and have them call us. I'm going to work with a former





DRAFT

clerk who's no longer—who's retired from the city, and sit down with her and go over this dashboard and see if she can help me figure it out, because I've struggled with it. And I don't mind confessing that I'm not a technology whiz; I'm an older woman, and I don't, you know, wrap myself in this stuff all the time. But I think I'm smart enough to work with it, and I'd like the respect that I think I deserve to be able to use the tool that we've spent so much money on with taxpayer dollars to create better quality control, and I'm not certain how to use it. I'm not certain how to read it. So I think that's terrific. You know I'm very concerned about RSA 76:16; you folks and myself got a letter from the BTLA. They failed to rule on my fundamental concern about RSA 76:16 stating that the Board of Assessors should review-- *shall*, the word is *shall*— review all abatement applications. Obviously this board has chosen, probably through the advice of legal, to delegate that. I'm going to—Attorney Lehman's going to appeal to, you know, the BTLA. We're going to pursue some communication; I am, with the DRA about this, because somebody should be responsible for this. I this year am going to get a copy of every abatement application submitted. I'll be going into the Assessing office weekly and collecting every application submitted. I'm going to encourage people who file to request that their application be put into the board packet and sent to the Board of Assessors. I think it's only fair-- we've lost a lot of applications that don't get recorded or handled correctly. Last year was the year that was really concerning to me. I put a letter out to all the chiefs in the state, and I got a terrific response within a matter of hours. And I was sent copies of abatement reports from two municipalities—large, like ours-- that were phenomenal, done by their software. I hope our software, for the money we've spent, can produce reports that are as phenomenal as those, because that's the kind of report this board should be seeing. It tracks everything. I had to put in 5 Right-to-Knows to get what they produce in a report and send to me in 15 minutes. That shouldn't be happening in Nashua. So I feel very strongly about the reporting, and I feel very strongly about the Board's responsibilities. Also, I really wondered what happened to 28-30 Berkeley Street's abatement for 2019 and '18. It was never on the list; I had to submit a Right-to-Know. I wanted to know, I submitted an appeal. I couldn't find it. I get a snarky response from Attorney Leonard that causes me to have to submit another Right-to-Know to try to find the exact records. And you should understand that I'm interested in a property like that because it's down the street from me and it affects my property value. I'm in an appeal process for two years, and I'm interested on what the City gave them. I'm interested on what you did. Of course I am. I know they wanted a ratio; I wanted it too. They got it, I didn't. Obviously I'm tracking that. When you don't make that a public record, or that abatement isn't put on the list, I'm concerned. I don't know what happened, except it looks like you're hiding information from me and the public, so that doesn't sit well with me. I'm going to try another abatement for 2020. I'm going to test the system out and see if it works. We have a new contractor who's a consultant. I want to see how this works, and this time, I'm going to track it like a dog. The other thing I wanted was the numbers the assessors use to deal with differentials in square footage and features when they do abatements on their sales grid sheets; You know, they were willing to give me that at the counter a year and a half ago; when I wrote the Right-to-Know, I got another snarky response from Attorney Leonard that they didn't have to answer the question and they wouldn't and I couldn't submit an abatement until the tax bills are mailed. Well, that's next week, so that's about ten days away. The tax bills are going out on the fifteenth; I contacted Dave Frechette—Fredette. So that's happening. So you know, if you can submit on the fifteenth, you're kind of working on it now. That's why I wanted to know. But what I didn't think about--and I contacted the old clerk who we had, the wonderful woman--and that is an Excel spreadsheet with the formulas in it. So I'm going to put in a Right-to-Know for the sheet with the formulas in a readable, writeable format so I can just follow it

myself. But I shouldn't have to do that. Celia Leonard and the legal office and the Assessing office should be willing to hand that to me without writing snarky letters back and drawing out a process. It's just become just so untenably hostile and difficult for no reason at all. I'm helping other people with abatements, and I can't even get the sales data they need to do it. And even though Ms. Kleiner says you have plenty of time, you don't really. It's a first- come first-serve basis, and let me tell you, I will be there first this year. I've never been first-come, first-serve. And if you don't want to service me, this year I'm going to say, then throw me out right away and let me go up to the state. I'm fine to do that. But I want that first-come, first-serve basis, and I'm also very concerned by what Ms. Colquhoun found in the records I looked at. EYBs being changed and undocumented are a stickler issue for me. It's deeply affected my assessment in my neighborhood. So please pay attention to documentation, and obviously there was some private discussion when a property is off by 50%, you are fixing some of those because they're so outrageously low you don't want to leave them that low. I understand that, but we should know what the threshold is and the cutoff for making these changes, because they're happening."

Mr. Hansberry Ms. "Ortolano—"

Ms. Ortolano

"…very low ratio. I'm all done. Thank you."

**Board of Assessors November 19, 2020**

**https://www.youtube.com/watch?v=7YdlfckOuxk**

**27:14**

Ms. Ortolano "Yes, Laurie Ortolano. Can you hear me?"

Mr. Hansberry "Yes. Yes. If you could state your address, please?"

Ms. Ortolano "Sure. 41 Berkeley Street, Nashua. Just quickly—Yes, did you say something?"

Mr. Hansberry "I just said go right ahead."

Ms. Ortolano "Okay. So on the abatement application, Ms. Kleiner made the statement that we ordinarily do not give a date stamped copy back. She's very wrong on that, and I think it might be written down somewhere, but as a matter of procedure, I know I saw many, many people come into the Assessing office and drop off their applications. Without even asking, the clerical staff makes a copy, date stamps it, makes a copy of the front page, and gives it to you. And they tell you it's very important to have that for your records, which I happen to believe it is. We've had a history of tracking these abatements that's been a little problematic, and that is basically their receipt, that it has been received and accepted. I put mine in last Friday, heard nothing back. I specifically asked about time stamping it, I heard nothing. Then I was worried that maybe I submitted it too early, that the tax bill didn't go out on the fifteenth, I found out today it went out on the twelfth. I resent it yesterday, saying "I want to make certain someone got this", so, you know, I think she is very wrong on that. We give out that front page, and the clerical staff does that as a matter of business without even being requested to, so that property owners have that for their records. And I think it's important with the assessing office closed that we continue somehow to do that—e-mail them a copy, or e-mail them and say it was date stamped this day

and this is your receipt so we know. The other thing is, I'm really concerned about is how we process applications this year because you know we lost our clerical coordinator and our board clerk who had a lot of experience; Ms. Cameron came in to fill it, take over the job, did it for about eight months, and then she left. Louise Brown is now on deck to do that position, the clerk to the board, and the supervisory position. And there's been no replacement for Ms. Cameron, and that's a lot of work. That's a lot of work for Louise. And, you know, that office is already short staffed, and that means there's potential for mistakes to be made with these applications. And the board doesn't receive them or review them. So, you know, I'm aware of that. I'm going to be putting in a request to get all of them submitted on a regular basis every two weeks. I'm going to work with legal on how to structure that. But I would like to track them. I understand how easy it is for information to get lost, and I'd like to understand what role Rex Norman will play in this abatement process. I CC'd it to him; I didn't hear anything back. I actually sent my abatement last night to his work address in Windham. It is so important for me to know that there is a certified supervisor who's going to look at these things, because for me, that process just hasn't worked. And I don't want this ball dropped on me again. It's just not right. And I'm going to do everything I can to make certain my abatement has eyes on it from certified, qualified people that are supposed to be looking at it based on state regulations. One other quick thing is…um… Rex Norman…. Oh, when we pay an appraisal, Attorney Bolton informed me on a Facebook post that we typically—that the legal office typically pays appraisals, for appraisers to perform appraisals on properties without going to them. I didn't know that. So the taxpayer pays for these appraisals not knowing that the appraisal's been done on their property. When they settle on a property, will that appraisal go back into the property owner's file as a public record? How do we see this work we paid for? Or is it still a legal document that is not public and stays in the legal office? I'm really curious because I think those appraisals should be part of the record once the settlement is done and whatever is public is public. The settlement is public; I don't know why the appraisal wouldn't be. Because I got ahold of the appraisal for 12 Beasom Street which was done without ever going to the property, and it piqued my interest because the appraisal value that their expert put on it would have given the Corazzini's an abatement level that I thought they deserved. It was right in line with what the Corazzini's wanted, but the legal office negotiated a pretty—significantly higher assessment level because the Corazzini's never knew that this assessment was done, because no one had ever come to the house. So the city gets to hold these cards, have this data, and then it gets released after, and you can see in their case, they were right on their assessment level. But they would never know. And I would never have known if I hadn't put a Right-to-Know in to get it. I think this documentation, for paid appraisals by taxpayer dollars should be part of the citizens' or the—the property file for all of us to be able to look at. And also, one last thing—EYB changes, Ms. Kleiner talked about property record cards with EYB changes, she doesn't say when they were done. We all know there's been an issue with that—a property that was changed from '59 to '79, I don't know when that change was made. When she looks at permits and she says we closed that permit, we all know that many permits have been closed without EYB changes made that should have been done, and that's been in inconsistent factor. And I recognize we're all trying to clean it up, but that's where the error in data occurs. Thank you."

DRAFT

**Board of Aldermen Tuesday, December 8, 2020**

**https://www.youtube.com/watch?v=2pIoqSLjWls**

**35:14**

Laurie Ortolano "Yes. 41 Berkeley Street. I just wanted to make a comment about the wastewater increase. I am just concerned that that type of increase really represents crisis management and not planning. And I don't know if there's any type of regulation or ordinance that governs the review of those fees with any regularity, I haven't researched it at all, but it would seem to me that there should be if they're not because anytime somebody steps in with a 35% increase across two years, I just feel like we missed the mark on planning for this. And in 2022 we have the reevaluation taking place, which I think is going to have a major impact on some of these property owners because there is a decent amount of disproportion that I certainly see and there's going to be a segment of owners that really get punched in the face. These fees and everything else that comes down is going to play a role, so I am just concerned that there's no review process of this on a more regular basis. Thank you."

**Budget Review Committee, December 17, 2020**

**Audio Only: https://nashuanh.gov/DocumentCenter/View/20666/20201217-Board-of-Public-Works?bidId=**

Laurie Ortolano "Laurie Ortolano - 41 Berkeley Street I just want to speak about the sewer potential fee increases, a couple of questions. I would like to try and understand the differences between usage and demand and whether a property owner can really do anything to try and minimize the cost impact of these increases that are being proposed by practicing a better means of conservation? And I don't really know or fully understand the differences between those fees, but I would like to try and understand that. And also, I know some municipalities allow a meter to be put in for sprinkler systems, so when you water I think the water usage that is just lawn watering counts as your sewer usage or into your bill. But it's really not used the same way as in house equipment or even gray water that is being generated, so the processing or treatment of it is completely different. Do we allow separate metering for sprinkler systems and charge a reduced rate for those? I don't even know what a meter costs so I am not certain how prohibitive it is, but I just happen to know that some municipalities, I believe, allow that. Thank you."

**Board of Assessors December 17, 2020**

**https://www.youtube.com/watch?v=WhBLnR1Zxas**

**53:20**

Ms. Ortolano "Laurie Ortolano."

Mr. Hansberry "Ms. Ortolano, if you could state your address please."

Ms. Ortolano "41 Berkeley Street. Chairman Hansberry I find your comments offensive and I read them in the last set of records and sent them to my attorney. I mean, here's a very specific issue I have. You

said the scope of our responsibilities are clearly defined under state law, the city charter and city ordinances. The state law says that the Board of Assessors will review all abatement applications. From what I can tell, you don't do that. And I put a right-to-know into the BTLA, paid $8 and got documents sent back to me and asked if they had any evidenced that the Board of Assessor's is reviewing abatement applications. They sent me back letters that were sent to commercial properties by our assessors that these properties were deemed denied, with a letter but it said the Board has reviewed your application and it has been deemed denied and they received the letter. However, you didn't review the application and when I've been in the meetings, the assessors come in with a long list of names. They read them all and say all of these are deemed denied. That doesn't mean you're reviewing the applications. So to me, you're not following the law and it would be super helpful if you explained how you are. We have a city charter that says our records will be open for inspection, immediate inspection when you go into the Assessing Department. That's not true. I couldn't walk in and get a property record file. Ms. Kleiner implemented a new rule that if you had multiple file requests, you had to fill out a form. But if I wanted one file, two files or three files and I was in there for an hour, I couldn't get them. They said no. They're not available for inspection and you cannot have them. Never defining what multiple requests meant. I couldn't even get my own property record file. That's the rule of the charter. So the charter has something in it that's written as an affirmation that's a nicety that's not legally binding and not followed. So how do I work with that. And as far as City Ordinances, it would be wonderful if you put out a list of ordinances that are there on the website because, God knows, I can't really find them, that you follow. You know, I have a major concern. I found, in the assessing manual, a document on the protocol that will be followed for tax abatement appeals out of the assessing office. This is assessing work. And what it says is, I came to you as a Board and complained that records are being removed from the assessing office and marched around City Hall and data is being lost out of these files. It happened to me. My file ended up in John Griffin's office for a month. My file ended up in the legal office for God knows how long. I got yelled at for going up there trying to get it. And here's the protocol. Assessing will provide legal with a PDF copy of the entire abatement file with our office including the denial letter sent property record card for the tax year filed and copy of the warrant screen to show the tax bill assessment issued for the abatement year filed. File will be put in the Assessing Legal folder in the S drive. No original record will leave the office. That's not being followed. Your mission statement says you're there to make sure they adhere to policy. What are you doing to adhere to policy? I never even got a response to these record issues and I just discovered this rereading the manual and going over the abatement section. I hadn't read it before carefully. And I told you when I spoke to you that I had, had a conversation with Cheryl Walley about this and she said it was never done that way when Angelo was there and she thought there was a policy and her name's in this policy. No wonder she was right. And where are our assessors, Greg Turgiss as a Supervisor, Louise Brown as a Supervisor of the clerical staff to put their foot down and not allow our records to disappear. That should be your oversight and if you view that as a criticism of a department that you have nothing to do with, none of you should be sitting at that table. Our records should be protected. You know, I also want you to know the data disk that was recently released. I sent an email to Ms. Kleiner a year ago and asked her if she would consider including the depreciation, condition and grade. The subjective factors because we all know in this update depreciation is what's being looked at. And you can't get a list of that. I was never able to get anyone in the assessing office to help me understand how my depreciation factor compared to other older homes. They would provide no information so if they would add that field to the data disk. Particularly when Vision is going to update these properties in 2022, we would

have a complete list of how these adjustments were made. I waited a year. I never bugged anyone. I know how to wait a long time. The data disc comes out and the information is never put on with no explanation. The property sales search, I'm disappointed in that because you can't, you can't click, you can't get a list of any properties. And I believe I wrote to the Board. The dashboard I like a lot. I figured out how to download but I asked Ms. Kleiner a very specific question a couple days ago. That there appear to be sales on the dashboard that are not qualified but they're listed under qualified. I did a qualified list of sales that came up with 657. I put it in the spreadsheet for the public to have but some of the sales have an N in the column not a Q. There's no list of abbreviations to explain what in the NLA field, that series of abbreviation means and Ms. Kleiner only said to me that the information on the dashboard as well as the property search is coming from the CAMA system. Fine. Well why, why are unqualified sales going into the qualified column? This makes it brutally hard for property owners to pick sales. I picked two and submitted mine that technically aren't qualified. I qualified them. I called the agent, I did the MLS review, I looked at them. I think they're pretty good. You can go and figure it out. But they're listed for me to use. And the biggest factor for the public has and the biggest criticism of all your assessors when they come in, and the work and the evidence that the public submits is that their selection of sold properties is poor. They don't pick the correct properties, and in particular, they bomb on grabbing on qualified sales because we've never had that…"

Mr. Hansberry "Ms. Ortolano. Ms. Ortolano, I'm going to ask you to take a minute and wrap things up. I've let you go well beyond the allotted time but I'll give you one more minute to wrap things up."

Ms. Ortolano "These are pretty serious issues Dan and I'm disgusted. I'm disgusted with the response I get from Ms. Kleiner. I'm disgusted with what's happened with my records. I'm disgusted that I can't understand the charter. That I don't understand how state law's followed and you do nothing to address that. Except slap our hands and pull the plug if you don't like what's being said. I am disgusted, every one of you should resign and I hope when Rick Vincent gets down here, he's got the stones to push back on the city. He better have a lot of energy, he's going to need it. I am thoroughly disgusted. I will send a blog out and you can read that."

DRAFT

**Board of Aldermen was held Tuesday, December 22, 2020**

**https://www.youtube.com/watch?v=Rpt3N9U2wF8**

**2:34:59**

President Wilshire "Again I am going to have to ask you to limit your comments to three minutes and raise your hand in your app or on your screen to let me know you want to speak. Ms. Ortolano, name and address for the record please?"

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street."

President Wilshire "Thank you."

Ms. Ortolano "Just quickly, I am just wondering why the Board didn't put the AFSME contract on for Public Works to vote on that. They changed the language in there to eliminate the additional pay that goes in with snowplowing and contracting and we've had a lot of plow days and we are piling a lot of

money out that we wouldn't have to if you did contract approval. So I think that's something to vote on or get a vote on that soon because we are in the winter.

"Another thing, I wanted to ask the Board to consider developing some Ordinances to help with the governance of the Board of Assessors. The Board voted for a public input policy like you folks did, but the policy included the language for uncivil and rude remarks that Shoshanna Kelly felt didn't belong in the policy because it would present a liability issue for the City. And Attorney Bolton agreed and the Board of Aldermen struck the language. But Attorney Leonard recommended that the Board of Assessors leave the language in. And when they rewrote their bylaws, they didn't cover policy. So the Board of Assessors on their web site had a mission statement that they did policy oversight and enforcement. And I did not realize until last week that they had removed their mission statement and they no longer do policy oversight and enforcement. And this is a big issue to me because bylaws and adopting new bylaws which they worked on in a workshop format but they brought it to a public meeting and approved it in a public meeting. They didn't tell the public that they eliminated their mission statement and policy oversight.

"They have very stricter rules over there, much stricter than the Board of Aldermen on what you can say and not say because they are enforcing this unconstitutional language. And I am no longer to address policy issues with the Board because it's not their responsibility anymore. And I really think policy has to be brought on the table and the Board of Aldermen have to be the ones to do that. You know you have Ordinances and Resolutions that define your work and allow the public to understand what you do. And I really thing policy and policy development should be what the next level down works on so the public understands what is going on. And yeah I am just really disturbed that this was taken off the table. I asked Chairman Hansberry today if in fact the mission statement had been removed and they are no longer doing policy oversight and he referred me and sent me an email ccing Celia Leonard and noted that Attorney Leonard is handling policy reviews. Well again this is confusing because Attorney Bolton will tell us that the Legal Office doesn't do anything without the permission of the Board. And when I asked the Board if you removed this stuff, they point to Celia Leonard who is responsible for the removal or the action. And I really think it's the Board's responsibility. But you have to develop Ordinances for that Board, because that's your job not theirs. They state that they are governed by State laws, they don't follow the State Laws. They state that they are governed by the Charter, the Charter actually has all the language that's been repealed and stricken for the Board of Assessors."

President Wilshire "Ms. Ortolano, time please?"

Ms. Ortolano "The only thing standing in there is the open records clause and that's not being followed and now I can't find any ordinances so I am hoping that the Board of Aldermen will help me with Ordinance development for the Board of Assessors. Thank you."

**Board of Aldermen Tuesday, January 12, 2021**

**https://www.youtube.com/watch?v=OLdOy0AOCsE**

**58:55**





DRAFT

Laurie Ortolano "41 Berkeley Street. Hi, I'd like to just speak briefly about the transparency chart. The Mayor's is correct, there are 19 boxes checked off in Nashua and the next community with the highest number of boxes is 8 and I think that's Hudson. But I can tell you, I would much rather work with Hudson, Manchester and Keene than I would with Manchester. Because what is on a website doesn't necessarily indicate the true transparency of a Department. And the Mayor underestimates what the people factor, the human factor of transparency and that's what we are missing in our Assessing Department as well as some serious staffing issues. You know and to be fair, 13 of those boxes were checked off when John Duhamel was there and probably when Angelo – John didn't add anything Angelo Marino was there. Angelo Marino was pretty progressive about open records getting GIS up and having those property search tools and those extra buttons on our website.

"So we still led the way with those two past chiefs and yet we got into all this trouble. So you know I can tell you Manchester only has 6 boxes, but I call up to the Chief there and I ask for an excel copy of their sales analysis spread sheet and I get it in like 30 minutes. In the City of Nashua, it took me 30 days and the Legal Office said they had to review trying to find an exemption to prevent me from having it. I mean that's what they were doing, were looking a way to keep it from me. I do the same thing in Keene, the same thing in minute talk with somebody and I can tell you what I learn in 30 minutes is probably equivalent to 25 Right-to-Knows that I have to do in this City.

"So it's really been unpleasant. And that's not transparency to me, those boxes. And Ms. Colquhoun is right, the 2020 cards aren't on-line and it's unprecedented that that data isn't available to the public now. It's never been this late, ever. And I actually asked Ms. Walley about that and she said she couldn't think of a time that that had happened. We are halfway through abatement season and we don't have access to the cards for your abatement. And I would have never done a software update. I think it was one of the biggest mistakes the Board of Aldermen made to approve that with no Chief on board, with a high turnover IT Department and we are short-staffed in the office. You took on one heck of a project that quite frankly whether you ran AP5 or AP4 I wouldn't have known the difference and I still don't know the difference except that I feel that some of the reporting in the new software is less transparent than the old software and I am kind of disappointed with that.

"So you know whatever the software problems are, Ms. Colquhoun is correct, 15 months has just been a long time. And these property record cards aren't correct as they stand printed and the proper data isn't even up yet. So let's not forget what people mean to transparency please and let's try to get City Hall opened."

**FINANCE COMMITTEE JANUARY 20, 2021**

**https://www.youtube.com/watch?v=4yGYJUhxztM**

**4:43**

Laurie Ortolano "Mayor Donchess?"

Mayor Donchess "Yes?"

Ms. Ortolano "Will there be another public input at the end? Is this the public input to speak to items that are being acted upon?"

Mayor Donchess “There is public comment at the end, yes.”

Ms. Ortolano “Ok that’s fine, I just wanted to make sure.”

**19:08**

Laurie Ortolano “Mayor Donchess?”

Mayor Donchess “Yes.”

Ms. Ortolano “This is Laurie Ortolano, 41 Berkeley Street.”

Mayor Donchess “Alright please proceed.”

Ms. Ortolano “Yes, I just wanted to make an appeal to the group to maybe try to gather some information about what is happening with property assessments and potentially the assessable tax base as we go through this year and into next year so that we are paying attention to what is going to happen to the tax rate. And I would like to appeal to the group to see if they would organize getting the new chief or the contracted chief to come in and do a talk about what they see potentially happening between commercial and residential properties and if we expect to see the shift that other communities are potentially looking at.

“I don’t know what the answer is to that and there hasn’t been kind of indication of what is going on through the Assessing Board, but I think it is important. I read an article in New Hampshire Business Review where a group of attorneys were encouraging the businesses to file under hardship due to act of nature, citing the pandemic would fall under there to get tax reductions on businesses for what happened 2020. So I would be interested in trying to understand it and I am hoping the Finance Committee, the Budget Committee and the Aldermen as a body would be interested in it, because that’s where the money talk happens. Thank you.”

**Board of Assessors March 4, 2021 – No VIDEO LINK**

**Audio: https://nashuanh.gov/DocumentCenter/View/21462/20210304-Board-of-Assessors**

Ms. Ortolano “Mr. Hansberry, this is Laurie Ortolano.”

Mr. Hansberry “Okay. There’s a couple things I just want to point out as far as the rules go; I’m reading right from the policies and procedures for the Board of Assessors. Each speaker is limited to speaking once per public comment period, and is limited to five minutes. And—sorry—and then remarks shall be civil; rude or profane remarks are prohibited. So at this time I will recognize Mrs. Ortolano. And if you could state your address, Mrs. Ortolano, please, for the record, we’d appreciate that.”

Ms. Ortolano “Laurie Ortolano, 41 Berkeley St. A couple of items. Has the Board received any updated changes for your policy manual? I know Ms. Kleiner said that the manuals were being updated, and I’m trying to find out if you have had updated pages come your way.”

Mr. Hansberry “Director Kleiner, do you want to address that?”

Ms. Ortolano "Actually, let me have my five minutes and then if she wants to address that after--I thought it would be just a yes/ no answer. And I have asked about this, and nobody followed up. Just for the sake of transparency, I think a quick answer could have been provided. I –you know, it's the only thing the public has access to to understand these policies. And following up on policy is important to me and it's important to several other people, I think, as well. Number two, when you redid your bylaws, someone—and I think it was Attorney Leonard—encouraged you to eliminate your mission statement and to remove policy oversight from the Board. I would like to request that Mr. Vincent, Chief Vincent, bring back a mission statement for the Assessing office. I think a mission is super important. I mean, I served on a school board, and we all know what a mission means to a school district. But an assessing office is also pretty important, and you should have a mission. And I think the removal of policy oversight was a mistake. And the Board should have policy oversight. You have very few functions you serve as a board; really, you have an inventory, annual inventory, you have to sign off on, review of abatement applications, and approval and denial of those applications. It's pretty minimal, and I think policy oversight is a very simple thing to have. I'd like to talk for a quick minute about the abatements. I think the abatement process this year was atrocious. I, you know—what was put out on the website… Ms. Kleiner did not write on the website that they would accept e-mail applications. And I did not understand this. And I learned that Attorney Bolton was attending her staff meetings in 2019, and they had a discussion about e-mail applications. And they sparred. Ms. Kleiner did not want to accept e-mail applications and e-mail information, and Attorney Bolton said, "I don't think we can deny them that." It turns out, I have an e-mail from a property owner who submitted a 2020 application through e-mail and he said to the clerical staff, "Will you accept an e-mail application?", and response back from Lynn Cameron was yes, we accept e-mail applications. I don't know why, on our website, during the pandemic, when it said how applications could be received, that you only gave a dropbox or US mail to get them in. I just thought it was very underhanded. And as I looked at other sites, and in particular where Chief Vincent came from—they accepted, their site accepted e-mail applications. They were very clear. The stamping of applications—I was super concerned when Ms. Kleiner stated that we don't date stamp applications ordinarily or give those receipts to property owners in December, I think—November or December minutes. I was shocked. That's a legal document, essentially, and we do stamp them. It happens all the time. So in this round of applications, you took the position to stall people, and I got quite a few e-mails from residents who were concerned that they weren't getting a response from the clerical staff. And I have an e-mail from a clerical staff—a text message from a clerical staff member where the citizen says, you know, I'm really frustrated you're not responding to my request for the date and time stamp, and the position of the staff member was, well, you think it's difficult for you, it's tough on us, too. That's not the appropriate response. So, you know, I've gotta thank Ms. Kleiner because she inspired me to go out there and do this work, because I thought that we were screwing over so many property owners who have legitimate issues. And I think it's essential. And I'm glad to see the number of abatements submitted, it is high. But I will tell you something, next year? I would hope you see 500 of them, because I already know the properties I really think should be filing. And these discrepancies really exist. And it's high time we clean it up and we create an assessing office that's strong, because we have an educated public that understands how to defend their assessment and present their information in a professional manner. Thank you."

Mr. Hansberry "Mrs. Ortolano, so – the update, are you asking if there were additional updates to the policies that were adopted last year?"

DRAFT

Ms. Ortolano “Ms. Kleiner told us, and Laura Calquhoun received e-mails from Jesse Neumann stating that the policy manual was being updated, which was months ago. And we wanted information and we were told it wasn’t available because the manual was being updated. And I’m just curious after months if Ms. Kleiner typically says to you guys, turn in your book, or we’ll give you the pages. I had a standing request that when you change the pages that you just e-mail me the pages changed because I have no way of knowing what’s being changed because the Board never discusses it. And we’ve been waiting months, and I just want to know what changes have been made to the manual, and if it fact you had those pages changed out like Ms. Kleiner had requested before.”

Mr. Hansberry “Are you talking about an employee policy manual, or are you talking about—"

Ms. Ortolano “No, I’m talking about the data collection manual. The city data collection manual that you all Board members got. That big, you know, 300 page, 350 page book that was put together in the fall of 2019.”

Mr. Hansberry “Okay. Director Kleiner—she’s going to respond, Mrs. Ortolano.”

Ms. Ortolano “Thank you.”

Mr. Hansberry “Go ahead, Director Kleiner.”

Ms. Kleiner “Good morning, Chair and Board. So in fact, you have not. You have not received any updates to the manual. The process is--when the city and the Assessing Department switched to the AP5 system, we realized that there are changes that need to be made to the manual in regards to the switch of the software. Right? There are important pages, there are tables, there is detailed information that is listed within that manual. Some of that will remain the same; some of that will have slight changes. With the onboarding of the new Chief, we wanted to respect—give him time to onboard and then have him address these issues going forward. So my apologies if we haven’t communicated that effectively, but there have been no changes and we have not updated any pages to the manual. We will certainly bring those to the Board once they are completed. In regards to the abatement process. So there were a number of pages of information about how to access the assessing department during the pandemic. Pages and pages of information on our city website. I have not heard from any resident, other that Ms. Ortolano, about concerns accessing the department or accessing the abatements.”

Mr. Hansberry “Thank you. Attorney Leonard, are you willing to respond to the removal of the mission statement from the Board’s policy? Are you willing to address that?”

Attorney Leonard “Good morning, Chairman Hansberry. I can address it only in the sense that I actually have no memory of that. We were looking at the rules of procedure; I don’t recall anything about policies being discussed. The Board of Assessors has its mission outlined in the City charter, but also follows RSAs. That’s something we can look at, but I have no memory of even looking at that.”

Mr. Hansberry “And Mrs. Ortolano, there was a third point you brought up earlier. It was the updates, the mission statement, and—"

Ms. Ortolano “Let’s see. There was the updates, the mission statements, and abatements. And just to clarify something—the mission statement I was talking about was actually on the assessing department website. It is gone. I know you have a charter, but I had a picture of that, and I have quoted it in letters years ago. I used it in documents, and it said that you were responsible for reviewing and overseeing

policy, and it's gone. I don't know who took it off. I assume you took it off. That's what I'm talking about. Ms. Leonard's correct, there is a charter, but I don't know what happened to that mission statement that was on the website. That's my question. And I don't recall the third item—there was abatements, it was policy, and it was mission, that's what I remember."

**Board of Aldermen was held Tuesday, March 9, 2021**

**https://www.youtube.com/watch?v=noB_2v6sevQ**

**2:35:10**

Laurie Ortolano "Hi, yes, 41 Berkeley Street. I wanted to just share a couple of thoughts with the Board, comments. I don't understand why the City did not make any effort to have a mechanism for the public to have their abatement applications stamped this year. I understand the Assessing Office was under renovations and closed. But no one anticipated that it would be closed for 95% of the time. All other cities seemed to have a mechanism available for the public to get assistance and get those applications stamped, and we did not. And that ultimately resulted in my arrest. I just recently got the Police Reports on that arrest. And I wrote a letter to the Board several weeks ago and told you I felt Attorney Leonard should be fired. I am on the phone tonight to tell you how strongly I feel that she should be fired because this was taken way out of line. When you go out publicly and you go to the press and you challenge someone's mental capabilities and you use language like "unstable" and "erratic", you really cross a line. And when you equate somebody to a DC rioter which I don't think I was anything like that. I watched the video yesterday of me going into City Hall and I looked as nonchalant and casual as you could come.

"I certainly didn't go there to go to Legal, I wanted to get my application stamped in the Assessing Office, not the office but the temporary office moved into Ms. Kleiner's office. But that just wasn't possible. I didn't need an appointment, I had gone in twice without an appointment; no issue. And it was just totally taken out of line. The berating Jessie Neumann described to the Police 11 days later that my actions in there was that I berated the people. The phone call by Mindy Lloyd to the Police is anything but a hostile scene. And to have Jessie Neumann and Cecilia Leonard describe the situation and their concerns as if it was a DC rioting situation. And then to listen to Mindy Lloyd on the phone with them there and the dispatcher saying, "are you concerned, is she threatening", "no", "do you want to stay on the phone until the Police get there?", "No, I'll hang up". And she just hangs up. It just doesn't match. It just doesn't match. And the bullies and the threatening and the erratic and the unstable people are right in that Legal office. When the Mayor has to call business leaders to apologize for the conduct of Attorney Bolton because he's so out of control on the phone screaming, that it requires the Mayor to make an apology, maybe he's the unstable one. Maybe we can talk about that in court."

President Wilshire "Ok you need to wrap up Ms. Ortolano, please."

Ms. Ortolano "I will."

President Wilshire "Thank you."

DRAFT

Ms. Ortolano "And I am going to play a tape of Celia Leonard's conduct; that's going to go out on the Internet. And we can evaluate that and decide whether she is stable too, I think what the City did was horrendous, just horrendous and I don't think it needed to go to that level."

**Board of Assessors March 18, 2021**

**https://www.youtube.com/watch?v=sJJ38M0sp3w**

**18:07**

Ms. Ortolano "Yes, I'm present. Laurie Ortolano."

Mr. Hansberry "Okay, and just to remind members of the public, it is a five-minute comment period. So if you could also state your address for the record, please, Ms. Ortolano."

Ms. Ortolano "Yes, it's 41 Berkeley Street, Nashua. Couple of things. I'm wondering if, when you open your meeting up, Chairman Hansberry, if you would be willing to announce who's present in your meeting from the city. I know the Mayor does that, and some of the other boards do that—they just run down who's in the meeting from the city, and it's just helpful for me to know that when I'm listening. Secondly—let's see. I would like to get an update on what's happening with the scanning of the property record files. I haven't asked for any file information, or very little, because I don't know the status, and when I did request information at one point, I was told those files weren't available because they were out being scanned.

"This was maybe four or five months ago, and I held back on asking for anything because I don't know the status, but I would like an update on the scanning of these files and what's happening with those. Also, I was—Ms. Perry gave a nice report today, and I would like to know if we're updating the property record cards with changes Vision is making when they go out and do an exterior visit. There are changes being made to the property record cards—I know for 2021, there's a lot of data. Ms. Calquhoun just got an audit report that I think showed Vision had made a lot of changes on a lot of cards, but from what I could tell it wasn't being documented on the card, and that's just an issue for me. Because property owners don't know what they did—you know, if it was a structure change, a shed, something on or off the property, and you can't tell. So initially, I was confused looking at these cards and seeing a difference between the GIS system and the actual card online being changed by 3, 4, 10 grand and not knowing why. So I really think we went into this update of the opinion that we were going to document, and we were going to document well, and cards weren't going to be changed unless there was documentation on it. And I'm not certain we're doing that, and I think we deserve that. I think we've paid for that. And we're not doing interior inspections, and probably won't be doing many at all; I think the least you can do is get these cards documented. Also, Mr. Vincent stated that he's going to be providing a permit report to Vision for them. I would like a copy of that. I have an issue with transparency on these reports now. I am not happy with how we have changed our software and what we've produced. And so when a report goes to June, I would like that report to go to me as well so I can see the formatting of that report. Also, qualifying sales.

"I would really appreciate it—and I'm going to go to the state on this to try and get a little more information on it. Qualified sales, there's some guidelines we use for market exposure. The market right





DRAFT

now is so hot that properties are selling before they're listed. Properties are selling in 48 hours. Do we qualify these sales, and what do you do in a circumstance when you have this runaway real estate market and you need to gather the sales data to qualify it? I just want to understand if there's a benchmark or a guideline that's being used within the assessing department to determine market exposure, because it's really a unique market. And I'm a little worried when it comes to gathering sales data. So those are all my questions for today, or comments, and thank you for the time."

Mr. Hansberry "Mrs. Ortolano, I have a question for you; I want to make sure I understand this right. Are you saying that there should be something more done for the public? Just for example, a number of years ago, I bought a gazebo, placed that on my property, and the value of my property was adjusted upward. Are you saying there should be something more than that being reflected on the property record card?"

Ms. Ortolano "So here's what I'm saying. The comments section of the property record card is the little comment block where, when the assessor comes out to your house and adds a gazebo, they put a note there. You will see that they made a visit or used GIS—they're noting to know whether Lindsay or Amanda did a GIS review. That's in the little verification section. But on the back on the comments section, it'll say "shed added" and it'll give the initials of the assessor like MM 2021. That's how they do it; everything they add or subtract is documented in the notes section of the card. The problem, for the public now--when I would get a card I was seeing, you know, $5000 differences or $3000 differences, or in some instances a $10,000 difference from what I could see on the computer, what was in GIS. And I can't tell-- when I collected some of the cards, when I actually printed the most current card, had the assessing office send me the 2021 card, there were no notes on it. So I couldn't tell why the assessment changed 10 grand. There's no documentation that said—maybe the house was vinyl sided, maybe…? You know what I would have to do, I'd have to get the old card, one year back, the one I can get on the computer, compare it to the 2021, and try to figure out among all the data fields what did change. But it becomes a hunt and peck--you know, there's 400 different fields on a card. There used to be 800. So the reason we document it in that section is so one, the property owner knows it changed; they may not know. And number two, they may not know they're being given an upcharge because their siding was changed to vinyl. I just found out one house was given an upcharge because the roof was slate. The property owner may not know that they're now being charged for their slate roof more. I wouldn't have known that. But we documented that ordinarily in the comments section. It just appears to me we're not doing that anymore.

"And I was not happy about when KRT did it, they changed a bunch of assessments and didn't document it on the card. I had to go back and cross reference two years of cards to figure it out. And you know, it ends up being a lot of digging, a lot of work, and the field is there to do exactly that. So if a property owner comes to a Nashua assessor and says, "Why did this change?", I don't know that the Nashua assessor is going to know. That was Vision's field. So what did they find? I don't know if they're going to know. And I think you should know. So that's been our more consistent process and I thought it was something we were trying to improve upon."

**Board of Aldermen Tuesday, March 23, 2021**

**https://www.youtube.com/watch?v=ql63S90Bq3Q**

**1:56:41**

Laurie Ortolano "Yes, Laurie Ortolano."

President Wilshire "OK, you have 3 minutes, name and address please for the record."

Ms. Ortolano "Sure, Laurie Ortolano, 41 Berkeley Street. I wanted to follow up and find out if the Purchase & Sales was signed or if we have closed on the property of Burke Street and that's gone and taken care of at this point. And I was wondering if the Aldermen, I can't recall if you have control of the building projects for DPW or DPW maintains control. But the quote on that project when we bonded it back in 2019 is almost 2 years old. And there's been a lot of changes in construction costs. And I am wondering if the Board, both your Board and DPW have made any movement to go back and re-cost that job because I am not certain it is going to be a $10 million job anymore. And if we have to cut it by a couple million dollars or we have to add to it, I think it is worth a review in looking at what you are actually buying for the money.

"Also, I raised an issue back a while ago, maybe at a Budget Committee Meeting about having an update on the impact and the shift in the tax rate that potentially could be caused by this pandemic and a shift of assessment values with residential versus commercial properties. And I know there's a fair number of commercial abatements this year, some big numbers and you would expect that. But I was wondering if there is any attempt to have Vision come in and talk to you, give us an idea of what they are seeing for vacancy rates and what that shift is going to be. I did an abatement for somebody up in Concord and helped them out and they had a condo that was worth $260. The tax bill in 2019 was $7500 and in 2020 it was $10.4 and their gross rate in their condos was like 14%, their houses were like 8 and commercial was down 2. I was stunned by the shift in the tax bill up in Concord. I am just curious if we are going to be faced with the same thing.

"And also, I was wondering if you could give us a rundown on the opening of City Hall. What is delaying that? Is it COVID? Is it construction? What is your estimated time frame to get Building Safety and the Clerk's Office open? Thank you."

**Board of Public Works Meeting, 03/25/2021**

**https://www.youtube.com/watch?v=hvUj3EbGQMo**

**11:35**

Mayor Donchess "We are now at Public Comment, is there any member of the public who would like to speak to the Committee?"

Laurie Ortolano "Yes, Laurie Ortolano."

Mayor Donchess "Could you please go ahead, just give your name and address."

Ms. Ortolano "Sure, Laurie Ortolano, 41 Berkeley Street. Two things – one I was just want to weigh in on the barriers and I know Director Cummings is going to give an update so I am going to pay attention and listen to that. I am just not certain that we should be (inaudible) into making those barriers a permanent thing in Nashua without maybe studying it a little more closely and looking at potential traffic impacts

particularly as we develop downtown with the Art Center and additional housing units. And there is a cost associated with putting them in and taking them down and I just think we should maybe do a little more investigating on that and studying to make certain it is the right decision.

"Secondly, I know that the Burke Street property sale is going to be discussed today. But I did bring up an issue at the Board of Aldermen meeting and I don't know who was control of the building project anymore. The bond was approved by the Board about 18 months ago but it is not the same project it was back then. And I think the quote for the project is now pretty dated. Construction costs have changed a lot, lumber costs, everything. And I don't know what Burke Street is going to sell for. And I think that project should be voted – pulled back and reviewed again. We should get a new cost estimate on building the DPW Office facility because it is a different time and place now and we shouldn't be purchasing something that we approved – by the time we get going on this, you know, a year and a half or two years ago, that isn't the same project any longer. So I think it would be good to take a second look at it again. Thank you."

**Board of Aldermen was held Tuesday, April 13, 2021**

**https://www.youtube.com/watch?v=7Uf6tNLsq8s**

**1:06:45**

Laurie Ortolano "My hand is up."

President Wilshire "I'm sorry I didn't see you, go ahead Ms. Ortolano."

Ms. Ortolano "Laurie Ortolano, 41 Berkeley Street. Just commenting on the Communications for the Assessing Office update. I am a proponent of allowing people access to the office with appointments the same day if information is available. It was a walk-in office and I think that's pretty helpful and I am also supportive of appointments longer than 15 minutes if that time is available and these slots aren't booked, there is openings for people to have more than 15 minutes. I am disappointed in the Customer Service area because you took away all the counter space for people to come in there to set up their notebooks or do some research. If they collected some property record files and they wanted to go through them there's so much less counters pace than there was in the old office that it is pretty disappointing that that's been eliminated. Other Assessing Offices I have been in maintain a lot of counter space for people to be able to spread out a little bit and do some research. So I wish we hadn't lost all that space. I am not certain where we are supposed to go if we did get a manual or files to look at, you know? What are we supposed to do? Can you not go in and do that anymore. Do you have to be booked into a conference room? It just seems really unfortunate that that was the layout and I really had no idea that was the way it was going to work. Thank you."

**1:06:43**

Laurie Ortolano "Yeah, Laurie Ortolano, 41 Berkeley Street. A couple of things quickly. A little while ago I talked to this Board and I think the Finance Committee about getting an update from Vision on the Commercial / Residential property assessment rate that we are potentially looking at for 2022 and the vacancy rate for these commercial properties, mostly to understand if there is going to be a burden shift from commercial properties onto residential. And I think there's been some recovery here but Vision has

collected one year of commercial sales data and would have some vacancy information. And I would like to have them talk to us and give us some input because I've received a number of calls from seniors who have asked me to ask this board to consider and take a look at the elderly tax exemption. You did this is 2018 and you ended up having to phase it in when there was an increase in the assessments because of the market. There was a pretty big outcry from seniors to get more assistance and I suspect in 2022 you are going to see the same thing. And I am not weighing in one way or another about what the right thing to do is here. But it would be good now to look at what other communities have done with these increases in the real estate market and how they are addressing their exemptions. We have a generous exemption but I think seniors have a good point who are saying, "address it now" so that we don't get stuck in this phase in plan that happened in 2022 and be a little proactive. But let's understand where we are going with this situation with the new update.

"I also would like and I think wrote a letter to the Board I can't recall if I did. I would really like to encourage the Mayor to set up a class with Vision to do a little camera review with us. It was something that was supposed to be done with KRT and it was cancelled, but some workshop where the public could learn more about modeling, how it is done, what data they use off your property record card and allows them questions or put out a video before the update is done.

"The last thing is I am not a proponent of maintaining that Right To Know position that was recently hired in the budget. I don't feel it has done what it should do to meet the needs of the public. I understand there is no legal obligation to be civil or polite or work with the public. But I do think that municipal government has an obligation to try to do that and I think that hasn't happened. I was very leery of having that position be part of the Legal Office because it intertwines with other legal issues and that's exactly what happened. And I don't think that that position should be maintained. I think it is really has been very poorly handled and I am really disappointed with it. Thank you."

**Board of Assessors April 15, 2021**

**https://www.youtube.com/watch?v=evab4GHvQfQ**

**16:40**

Ms. Ortolano "Yes. This is Laurie Ortolano"

Mr. Hansberry "And could you state your address, please?"

Ms. Ortolano "It's 41 Berkeley St. I'm looking at the clock; it's about 9:17. Just a couple of things I want to go through. At the meeting on March 18, Ms. Colquhoun read a statement into the record, and she made the comment that if the legal office was advising the Board not to comply with the law, as a matter of transparency please provide the public with information on this. She was referring to some issues regarding compliance with RSAs, and I wanted to say that Attorney Bolton was pretty set off by this and became pretty aggressive in commenting to this. And his response—his response to this was, "What you just heard in regards to my office and my personal activities—not a word of it was true. I've never advised this Board or the Assessing Department not to follow the law." First of all, attorney- client privilege doesn't even require him to say that. But he took this so personal—all she said was if the legal office. She didn't accuse anyone. And Attorney Bolton in my opinion embodies the absolute worst

DRAFT

character a citizen would want to see in a municipal lawyer. And most likely he would take this to be a compliment, but it shouldn't be about destroying the character of our citizens. Rather he should simply just address the misunderstanding and the issues itself. It's so personal for him; he's like a rabid dog, and all he wants to do is fight all the time. And I'd like to see that change. And Ms. Colquhoun deserves the same respect I do when it comes to getting answers. Everyone does. The other issue is nonpublic minutes. I can't find where you are releasing, when you do release non-public minutes, that they're put in the record. So I can't track hiring, I can't track settlements. I've brought this up before, I've asked Attorney Leonard to help me find settlement agreements, to direct me to the minutes. She refuses to do so. I'm going to make a suggestion and I'm going to talk to Rick Vincent about posting non-public minutes. But I don't think we're in compliance with the law, and it's too hard for the public to dig them out and find them. I just want to be able to track settlement issues and hiring, and I'm unable to do that. So the other thing is, at the March 18 meeting, I did ask the city to provide me with the permit data that was being given to Vision, a permit report. Mr. Vincent said that was going to Vision appraisal, I would imagine for the April 1 inventory date. I would like to see that report. That's something I've always been interested in, and I didn't want to make you run a separate one—you're already running it for them, so just provide it to me. The other thing is qualified sales. I had an issue come up at my abatement appeal, and it was regarding the qualification of the sale at 45 Berkeley Street. And my abatement and my appeal was- the appraiser didn't use 45 Berkeley St. because it was, in his opinion, not an arm's length transaction and not a qualified sale. And this concerned me a great deal, because Nashua has used it as a qualified sale through like six different levels of review. The DRA included it in the ratio study as qualified. The city submitted the data to the DRA as qualified. KRT used it in a sales grid—the only one they did—as qualified. Gary Turgiss used it as qualified on the abatement for my neighbor at 39 Berkeley St. And Rex Norman approved it, so. And I know the issue with that house and the sale, and I have talked to the selling agent, who said that she told the city-hired appraiser it was in fact an arms-length transaction. So, you know it affects my property assessment, the qualification of these sales and how they're used. If one appraiser hired on one side by the city says it's not qualified, and everyone else in the city calls it qualified to reduce the level of assessment of my neighbor's property, it affects me. And I want that addressed. I mean, I really want to understand what's happening here with qualified sales. And I did ask Gary Turgiss for a response on that, and I feel I'm entitled to that. I've asked twice about the abatement at 39 Berkeley St, particularly when I only had a 2019 appeal. It affects my level of assessment, and you know, it's important to me. I should be able to look at other assessments in comparison to mine and make the argument. The other thing is, Mr. Vincent in his town, Lebanon, allows a citizen to comment on any abatement that's being approved, sort of like what the Zoning Board does in the meetings. And I would like to ask MR. Vincent to change the bylaws and make the recommendation that you allow that to happen in Nashua. I think that's perfect. It's so open and transparent, and it treats the abatements with the respect and the understanding that we're all in this together, and we all get to comment on this information. So please consider making that change to the bylaws; I love what they do up in Lebanon. Yes, thank you very much. I'm all set."

**24:32**

Ms. Ortolano "Chairman? Chairman Hansberry?"

Mr. Hansberry "I'm sorry, no, the public question and comment period has ended. So, are there any comments by Board members?"

**BUDGET REVIEW COMMITTEE APRIL 26, 2021**

**https://www.youtube.com/watch?v=8Kkp4PtzkCY**

**1:23:43**

Laurie Ortolano "Laurie Ortolano,41 Berkeley Street. A couple of items here. What's the time for your nonpublic? I just want to make certain I don't blow it."

Chairman Dowd "Three minutes."

Laure Ortolano "Okay. Hang on a second. Let me start my time clock. Okay. Perfect. All right. A couple of things regarding the budget as you go into budget development. In the Assessing Department, they produce and exposure report and I would like to have somebody explain to me how the exposure report fits into the budget at some point and how you look at the years of return that you have to pay back on those and how it fits in.

"I'm also concerned when you do do the assessing budget that you recognize that next year is an update year and I think you could potentially have a lot more abatements than you had when KRT came through. I expect that that might be the case because I think you're going to have back to back years of significant increases and that usually fires people up to come in and abate. It would be unexpected to see 500 or 600 abatements come in instead of the 385 that came when KRT came through.

"Also I wanted to speak a little bit about the IT Department. I think we have some serious issues in our IT Department and our budget should be looked at very carefully. The termination of our IT Supervisor or Director is a big issue and I know Alderman O'Brien spoke to the newspapers about this little issue we had with money being scooped out. That calls to question some IT security issues. I'm old and I'm not IT knowledgeable but I can tell you I would not have said what he said to the papers. This is an IT issue. We've had some serious IT issues going on with the assessing software. It's been a big problem in getting it running. We have IT issues going on with getting property sales searches up. We have IT issues going on with reporting in assessing. My Right-to-Know court case just returned information after the city failed to comply with discovery."

Chairman Dowd "One minute."

Laurie Ortolano "They pulled something out and decided to tell us nine months into the process that the e-mails were corrupted on the city website and the backup was destroyed. Now that happened months again and they never disclosed it to us. We're going into court ex-parte on that to address that issue.

"Also the Legal Department I'm a big proponent of firing out Jesse Newman's position. That did not work out the way we had anticipated. When you read the job description, the city never wrote it up to be anything cooperative at all. I expect a Right-to-Know attorney to be willing to work with the public and that job description absolutely says he is not. He is there for the city only and its screw the public. We just don't need that. I filed another lawsuit today with Attorney Gagliuso who is representing me from Bernstein Shur on a Right-to-Know suit and they're more that are going to come in. That's as a

result of this new Right-to-Know Coordinator. So fire his buns out of there. We don't need this in our city budget."

**Board of Aldermen Tuesday, April 27, 2021**

**https://www.youtube.com/watch?v=BFb9mzZNq2E**

**58:00**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm addressing the whole Board because I know we're coming into budget season and I am not a proponent of maintaining the Right-to-Know Coordinator position in the Legal office. I really feel that position did not work out the way we had intended it to work out and I really believe that filling Right-to Knows for the public should be happening within the departments that carry the information not running amuck through Legal. It's been pretty much a disaster for a lot of people trying to do that interface through Legal. It's complicated. There's all these privilege information things. I know you had one lawsuit filed. I filed lawsuit through Attorney Gagliuso on Monday. There's two or three more in the cue that are coming in. It's all because of the way it's handled up in the Legal office. I just feel it's an expensive position and we shouldn't be funding that any more. Let the departments handle the public requests and when you need legal assistance, provide the assistance. You're abusing attorney/client privilege and hiding information from the public when you do it the way that it's being done right now. A lot of responses that are coming from the Legal office are just matters of business to type a letter that could be done in the department where there is no advisement being given by the attorney. They're writing it and then not technically owning it. The individual from the department is responsible for actually verifying that the data is done. I have hated the way that position worked. I think it's been a huge disservice and an obstacle to the public and certainly to me and I don't think we need that in our budget.

"Also I just need to put out to you folks that I am just appalled at the level of hatred that this City reigns down on members of the public that point out an issue. Never in my wildest dreams could I have believed that I would have encountered the level of hatred from the Mayor, Attorney Bolton, Attorney Leonard, and Kim Kleiner. It's unprecedented to address issues. What's happened with my property appeal is just unbelievable. They brought in a guy who committed perjury and we have a perjury charge that's really being looked at by the Board of Tax and Land Appeal. The level of the fight I just don't understand because I was never a person who carried that level of hatred. It was my Attorney Lehman who said to me you have to understand how much people hate you. It's been tough. It's not really funny Alderman O'Brien. It really isn't. It's been very costly. A huge cost to the City and it's just disgraceful. Just disgraceful. I think you have a lot to think about and a lot to change in how you address people."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE MAY 3, 2021**

**https://www.youtube.com/watch?v=BqcsuMYg3TQ**

**33:21**

Laurie Ortolano "Yes, Laurie Ortolano, can you hear me?"

Chairman Caron "Yes."

Laurie Ortolano "Yes, Laurie Ortolano, 41 Berkeley Street. I just wanted to address the group quickly and say that I do not support the appointment of Paul Shea to any Committee in the City. I feel that he does not represent diversity in the way that we would want the City represented. He is two pocketed with the Mayor. He runs a Civic Sounding Board Website that he frequently throws people off of and shuts them if their opinions differ from his opinion.

"And I think it is a poor representation of the City that he doesn't recognize that differing opinions hold a value. I have watched many people get tossed out of there and comment that they don't go over there because he is so unwelcoming.

"And I just don't see this guy as the right guy to sit on any Committee in the City and represent diversity. He gets his money from the Mayor and the City, he is beholding to him and when he thinks that someone expresses an opinion that is not behind the Mayor, he shuts them down and tosses them. And we don't need more of that in Nashua. I did enjoy listening to Justin Chapman, as a new appointment. I think he brings a lot to the table and he got involved and he's refreshing and that's what we need to see. But the same old, same old, guys lined up in the Mayor's pocket to do his bidding is not what I want to see. Thank you."

**Board of Aldermen Tuesday, May 11, 2021**

**https://www.youtube.com/watch?v=9WPcFGQIGgo**

**29:25**

Ms. Ortolano "Laurie Ortolano, 41 Berkeley Street. I was going to comment on the 144 and 143 but I will do that at the end of the meeting. But I would like to say with regard to the Mayor's comment that the study he did or the survey he took or the poll regarding the Police Department it would be nice if that was made public so we just know what the outcome of that is."

President Wilshire" But we are not taking action on that this evening."

Ms. Ortolano "Well I know, but he brought it up, that's all."

**1:36:15**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Quickly going through, I am not in favor of the dog park. I just think the money spent right now is not the thing to do. The Mayor spoke briefly about the secretive process of how these Commissioners are selected. I think we have our own secretive process going on down here where we have a Charter Change being proposed for the School, make-up of the elected members moving it toward a 15 member board with at-large seats. I really don't think that works and my idea of a transparent and open government. I know it doesn't violate an open meeting because it was handled by an Alderman making the change for the School Board, but I don't like that process at all.

"Your amendment for this Police thing is very confusing. Attorney Bolton wrote it up that the Board of Aldermen must hold an initial vote to determine if the amendment is necessary. And then it says, if it is





DRAFT

determined necessary the Board of Aldermen must order a notice be given for the public hearing. Well we started off this discussion with the Chairwoman saying that June 17, 2021 would be the hearing at Nashua North. It is as if you already determined it was necessary. And I am not certain if this vote tonight is why you determined it was necessary, but I found it totally lacking in understanding why you are doing this, why it came about and why need it. And I don't know when it goes to Committee, I can't tell if the Committee Meeting, Personnel Affairs is going to happen before the hearing or after the hearing and will it come back from Committee to the Board such that the Board will discuss it? I don't like the idea of a public hearing without being able to hear why you think it is necessary across the board. And if Alderman Lu hadn't opened the discussion up the way she had, by asking about the survey, I don't think there would have been any discussion at all.

"I think for something so significant there should be a lot more talk going on and a lot more solid reasoning behind why we think this will improve our Police Force. One other thing, your IT Office I think is in disarray. You've got some big problems in there with Cyber Security, there's hacking going on of emails; emails are lost, appointments are lost, citizens are being arrested when they go to City Hall for not having an appointment that they might in fact have because your email server is being hacked. You had on the table to establish an IT Study Committee; it has been tabled in Committee for months and months. You really should pull that Resolution 20-021 off the table, figure out what you need to do and get somebody in there highly qualified to deal with your IT issues. Serious problem and you've got a serious lack of clerical staffing in your Legal Office to provide assistance to those four attorneys and deal with Right-to-Knows. Thank you."

**BUDGET REVIEW COMMITTEE MAY 17, 2021**

**https://www.youtube.com/watch?v=h_WuaYP_mW4**

**20:17**

Laurie Ortolano "41 Berkeley Street."

Chairman Dowd "Yes, go ahead."

Ms. Ortolano "Hi. Just quickly, I noticed you are going to talk about the pilot program for the Bronstein Redevelopment. I am just wondering, when you talk about the pilot program there seems to be a lot more going on with pilots and if there is any information you can share about the City's expanded use of them and what you are trying to accomplish or the benefits you see for the City in using the pilots, it would be helpful. I think there are some good things there and I don't think that everyone understands what pilots are about. Thank you."

**Board of Assessors May 20, 2021**

**https://www.youtube.com/watch?v=5Wdc4LD0DSE**

**18:33**

Ms. Ortolano "Laurie Ortolano, 41 Berkeley St."



DRAFT

Mr. Hansberry "Go right ahead."

Laurie Ortolano "Laurie Ortolano, 41 Berkeley St. Just a couple of things. You know, your settlement agreement is interesting to me because when you sign it, you don't date it as board members. So, it's hard for me to track what meeting it was done in. Like, the property owner might sign it in March or February, you guys sign it in March- -I see a lot of them signed March 15th, but your board meeting was until the 18th, and I don't know that you have to sign them together. I don't know if there, I am not certain I just don't understand how there done, and whether you sign them in a meeting or you don't. But, you know when you have a legal document, it kind of surprises me that there is no date associated with your signatures. Like the property owner signs and dates the form, it would just be more clear. Also, is there any way to tell which ones of these settlements are settlements generated by the courts versus settlements that were done by the city? I'd like to know which settlements are BTLA or court driven, and what are city driven? And I can tell with a lot of the current ones because there's are a lot of 2020 settlements in there that those are obviously being driven by the city, because 2020 wouldn't even be filed, they are basically abatements right now, and you're settling on 2020, which is interesting to me, you're settling lawsuits on 2020 that are still abatements, and so I don't fully understand that, but I guess that's the way it's done. But my assumption was when I see 2020 settlements that are signed, that the city is doing those and not the BTLA. Now, I'm going to call the BTLA and see if I can get their help in finding out which ones of these are actually done by them or the courts, but I would be interested in understanding that. Also the next time Vision comes to address the board, I would like to get some information on the commercial properties, what they see for vacancies, what they've see in valuations, it's something I brought up at other meetings, and it will affect the shift in the burden between the residential property owners and commercial property owners. I'd also like to hear them speak about the older properties and what they're seeing with the assessments levels based on this depreciation factor and the use of affective year build. I can tell you over in my neighborhood it is very significant, and when you go to the west side of Concord St. there are so many low assessed properties. I pointed those out in 2018, where KRT left properties that it sold as part of a study at you know, 78 or 80 percent. When your ratio has dropped 20 percent already, these are homes that if they are corrected are going to see a 50 percent increase. These people don't even realize what's happening. I can tell you I get instant messages from some of the people that say to me can you check my property, do you think I'm over assessed? And they happen to be one of those that was, you know left at 78 percent in 2018. And I say you got one of the best kept secrets. You got a great deal going there, don't be surprised in 2022 if you feel a sharp sting. People don't even realize it. And it would be--I would really like to hear how Vision is doing and what they are seeing when it comes to looking at that factor and getting the decoupling done. You know they come in and give us very generic review. That's fine, but you know, let's put a little meat on the bone and get at what we are trying to get at here and understand where we stand. Thank you."

**BUDGET REVIEW COMMITTEE MAY 20, 2021**

**https://www.youtube.com/watch?v=OxIZilOS7AU**

**5:25**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street"

Chairman Dowd "Yes, go ahead."

Ms. Ortolano "I know we are going to review the Legal Budget and I am just putting it on the table that I don't support the position for the Right-to-Know Coordinator in that budget. I don't think we got the service as residents expected to get out of that position. They are not serving as the conduit that I thought they would to assist the public in gathering and obtaining information, particularly given this pandemic. And I know Alderman Dowd spoke about the other duties they do, but this individual was really hired to perform that Right-to-Know function and I think it's been a pretty miserable failure for the City and for the public, worse for the public. And I don't support spending the money on that position; I don't think it should have been something that was put into the Legal Department. Thank you."

**Board of Aldermen Tuesday, May 25, 2021**

**https://www.youtube.com/watch?v=QzRg3GJiISU**

**39:56**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street, I would like to support lifting the mandate, I have one quick question as I scroll through the end of the Board packet. The Ordinance is attached to this and it has written in there that it is in effect until 11:59 at night on June 8th. And I don't know if it was written that way or that's what you are hoping to enforce. I just didn't understand if that was pre-language that had already been put in. But I would like to see it lifted and I would like to see it lifted unconditionally. Those who are uncomfortable about removing their mask will certainly wear one and have the option to wear one. But I don't think anyplace else should require it. I know if there's a restaurant in Nashua that wants to keep it active, I wouldn't go to it. Today I had lunch with an individual up in Manchester, I picked Manchester because they lifted the mandate and it was really nice to walk into a restaurant and not have to worry about it. And I only saw one individual that was wearing a mask in there in a pretty active place with indoor and outdoor seating. So I would like to see it lifted unconditionally and those who certainly feel that they need the protection or feel more comfortable wearing a mask can certainly do so. Thank you."

**3:06:42**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I listened to the discussion about the mask ordinance started off ok the third motion was really disappointing. You know, it is like I am listening to people discuss everything you need to do micro manage and milk a mouse here. You are supposed to simplify this process and make it easy for people to come to City Hall and do their business. You are going to draft up a whole bunch of rules and regulations that people are going to have to follow again when they come in, even knowing what the hours are that are going to be for certain people. Whether they mask or don't mask and it puts people in this quandary of violating rules that they are not even familiar with exist anymore and they've got to be conscientious of it and it just sets up a lot of issues and problems. I don't think it was necessary. I think it is a control issue. I don't think you need to have that level of control. I don't think you have to put that on the Mayor or anyone else. You know, open the building. If you open the building and you see issues arise, or there is some outbreak, then you can readdress it, but that's the whole purpose of trusting what has gone on with the health program, where





DRAFT

we have taken this and moving forward. I think those City Hall and these Government Buildings are paid for by the people are really owned by the people and I understand compromised people, let them wear their masks, hopefully they have vaccinated, they have done what they need to do. If they need to have a mask on they do it. There's a lot of email and mail options to get information into City Hall and I don't think you need special hours and a special routine for a certain group. I think you just make it as easy as possible to open up your spaces and let people come use them."

**BUDGET REVIEW COMMITTEE MAY 26, 2021**

**https://www.youtube.com/watch?v=fnbSbK_OHMA**

**4:25**

Laurie Ortolano "Yes, Laurie Ortolano, 41 Berkeley Street. I want to speak to the Information Technology Budget. I have some really serious concerns that we do not have a Director in IT. I feel that there are a lot of issues going on in the IT Department. I got ahold of policies and procedures in the last few weeks, I find them woefully inadequate, particularly when it comes to backups and maintenance of the system. There's not real discussion, no real schedule for redundancies and process as to how it is done. I found the procedures very superficial.

"I think you should have an IT Director that is probably one of your highest paid positions in the City. You need a kick butt person in that seat. And you are having serious issues with emails that I was not aware of through Right-to-Know, I received information regarding corrupted emails that happened in February through the Assess Help Address. I know in January I sent in an Assess Help Email regarding two abatements and a Right-to-Know request is not recorded as being received in the Assess Help Account. And I don't know what that means. But I got an explanation from Legal on these corrupted emails and they said it has been a consistent problem that has gone on with Microsoft, prolonged. Well, you know what? That's unacceptable to me. And they also did not say whether those emails were recoverable. The Legal Office provided an unclear, unreasonably described an incomplete response using a lot of "ifs".

"I have written back for clarity on that. I don't know how you can run a City this size, be moving all your records in Assessing into digital form and not have a Director in IT who is extraordinarily talented, because there are real issues over here. And I think that we need to have those addressed and we need to understand what is going on in our IT Department. Also, maintenance of records, deletion of emails, 33A – what happens with records when you have a lawsuit? The Police did a major investigation just over a year ago. They said to me nothing will be deleted."

Chairman Dowd "One minute remaining."

Ms. Ortolano "I think you are going to find that a lot of stuff has been deleted. And I had a Right-to-Know lawsuit filed in February of 2020. We are not maintaining records the way we should and I am very concerned."

**1:08:18**

Laurie Ortolano "Sure, then I think Laura wants to be heard. Laurie Ortolano, 41 Berkeley Street. Just to let you know the Agenda that the public has access to does not list Public Comment. It didn't last

week and it confused me and it is not on there now and that's why I think Ms. Colquhoun is a little bit confused. She was trying to figure out if we had one.

"A couple quick things, I do think the email issue and the IT is real and I've heard it from other Aldermen and I'd like to say that I have written in to the administration regarding an email I sent on January 17th with two abatement applications that simply never showed up. And I haven't been able to get the City to acknowledge what happened to that email and I would like to send it in to have Nick try to figure out where did it go? Also the Legal Office sent an email to myself and my Attorney Lehman on March 17th of 2020 that we never received; neither one of us had it. And last Friday on May 21st I received an email, I wrote to the City to let them that they hadn't responded to a request that I was supposed to receive information on May 14th. I received an email from the City on the 21st and it was backdated to May 14th. I don't know if that's because they think they sent it, but once again I did not receive that email. And that is a big issue to me and I have a list of other citizens who have said that their emails were not responded to when it came to applications.

"I would like to understand what is going on there because it's, you know, ultimately it gave me a problem that ended with me getting arrested because I was trying to get those abatement applications stamped. The exposure report I have some concerns about. I have been getting copies of the exposure report, but it doesn't actually show the true exposure and I am wondering if the City does create a copy that shows the true exposure. It is a report that is showing the 2020 values but I have an abatement listed on there and it shows a value for a single year, but if it were to be awarded it would be paid out for '18, '19 and '20 and that exposure is not in the table and I'd like to find out where that is.

"The overlay account, my understanding is the General Revenue is paying for these abatements based on the checks we are getting. When it comes to Assessing, I want to put a bug in your ear that I think this Budget Committee should consider outsourcing commercial properties…"

Chairman Dowd "30 seconds."

Ms. Ortolano "Yeah … and get rid of the two commercial assessors we have. One of them is close to retiring, I think the other one is grossly unqualified and should have never been promoted to a supervisor level and get that as an outsourced function and I think you would save some money in this Budget and you would have a much better result with commercial properties. Thank you."

**Board of Aldermen Tuesday, June 1, 2021**

**https://www.youtube.com/watch?v=3jxTclV796A**

**26:32**

Laurie Ortolano "41 Berkeley Street. I am a dog lover too but I think the timing on this isn't right given the Budget increase and what we have going on in the City. I think we've asked taxpayers to incur a lot of increases in the last 2 years. And I think that this money as Ms. Colquhoun has said, could be used more wisely for reducing bonds or reducing costs for the City. It was a very expensive purchase for the

land. I am a little disappointed we were unable to find land we already owned to do this project versus having to purchase a piece. But I just feel like the timing isn't right and we have this budget increase that's probably going to push 4% this year and I think that we should have seen a Budget that was down, under, given where we have been with City Hall and our operations and our services to citizens. So I am not in favor of it at this time, but I am a great lover of dogs. Thank you."

**BUDGET REVIEW COMMITTEE JUNE 1, 2021**

**https://www.youtube.com/watch?v=3jxTclV796A**

**2:14:14**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'll be brief. Thank you for the more detailed explanation on the land being purchased to the entry to Mine Falls. It is a different perspective when you hear it explained rather than focusing on the dog park so that was good for me to listen to. Also, I want to ask you when you look at the Assessing Budget again to consider that next year we are doing the revaluation with Vision. And I think you are going to see additional money needing to be spent for abatements like when we contracted with KRT. I would actually expect quite a few more than what we gave to KRT; we gave 50 subcontracted out and we paid them additional money and I think you are going to find that you are going to see more than that this round and you could also have a problem with permits being captured again because the assessors are going to be working heavily on those abatements. You might need additional contracted support for permit work.

"Also I would like you to consider adding another computer down in the Assessing Office. And I want to let you know the redesign of that office for public service was done really poorly. In the old office you had about 45 square feet of countertop space for people to come in and spread out and use their documents and work. The new design you put up this what almost looks like bullet proof, thick, shielded glass or plexiglass and it such overkill. It confines the area, I actually think it is a health trap. But you now have roughly probably 8 square feet of countertop space for the public to work on. You can't even open a binder with documents. There's only two service counter areas with two computers, there's no open computer on a desk for anyone to come in and do research. I think you've made a total mess of customer service. And anyone who knows what goes on in a revaluation and the traffic in that area knows that this grossly inadequate. There should be another countertop placed outside with a computer on it behind the entry area some way to allow people to work. And I would encourage you as you redesign your Clerk's Office, I am hoping you do not do what you did in Assessing in creating these cubbies. Leave the space open and leave countertop space accessible."

Chairman Dowd "30 seconds."

Ms. Ortolano "Thank you."

**Board of Assessors June 3, 2021**

**https://www.youtube.com/watch?v=mSuitf6S5FM**

**46:40**

DRAFT

Ms. Ortolano “Yes, Laurie Ortolano.”

Mr. Hansberry “And could you state your address for the record please?”

Ms. Ortolano “Laurie Ortolano, 41 Berkely St. Thank you, Mr. Earley, for catching that. And I hope if I interrupted and I was going to, to remind you that I wouldn’t have been cut off. A couple of things, and let me start my timer on my phone so I am mindful of my time. Couple of things, the last meeting I talked about the sale, commercial sales data, that’s going to be used to build the model and I was unhappy with Dan’s response to that. And Mr. Tarello I was going to write a letter to Vision and cc the Board of Assessor’s on it. You know, I agree that Mr. Tarello believes that Nashua is going to recover well from this pandemic, particularly given the location of Nashua. However, this sales data is based on the 2020 and 2021 commercial property sales. And that is in the heart of the pandemic. And we have an overlay account this year that’s showing six million dollars in the overlay, largely because of abatements which is 3 times what we would typically carry, which I believe is a result of the pandemic situation. So, is Vision not going to use this sales data from 2020 to build the model for the revaluation? Or are they weighing it differently? Because I believe that will affect the assessment levels and the distribution of equity and proportionment between commercial properties and resident properties. Secondly, I want to thank the Assessors for granting the abatements that they did today, I very much appreciate their work. Third, I want the Board to know, third, Board, Mr. Hansberry mentioned and wanted to know how these abatements were filed and came about and Mr. Mandile said it was one person and he wanted to know if evidence submitted—you know what, to the entire Board, if you complied with the state law to review abatement applications like I believe it’s your duty, you would know that answer, and I think it’s important you know that answer on your own, and not leave it to the Assessors to do that. Three, the abatement, I have an abatement for 2020 for 41 Berkely St., I want to make you aware of that. Because I think the process that Nashua uses to let abatements expire without reviewing them is based on bad faith, ill will, and a dereliction of duty. I have written to our Senators to request a legislative change in the bill, and I’m hoping that will happen. And also, I am, I have written to all the Chiefs in the state on an email to get assistance on how to change this language. I think Nashua is doing a very poor job with these abatements. And when they have a war, personal vendetta, with a property owner, they are pushing every button in every limit to not perform their duties under what you know the responsibilities of what the ASB, the DRA and the state intended. Also, finally, the opening of City Hall on June 7th, I received a press release that showed that the only department maintaining closure was assessing, which shocked me actually. I got it yesterday. I had a conversation with Ms. Kleiner who informed me that there was an error in the press release. I asked if it was going to be corrected and I did not receive a response yet. But it’s almost startling to me because it’s her responsibility and Mr. Vincent’s to somebody had to give the information to the Mayor’s office on the opening of the assessing office. We’ve had criminal issues, I’ve been arrested. I do not want that to happen again. It’s really important that there be clarity on how the office is being opened and how the operation will run. And it’s just startling that a press release could go out that shows that the only office in City Hall not open to pre-pandemic position was Assessing. I’m glad to hear that it’s a mistake, but I think we should put something out in writing to fix that, thank you.”

**Board of Aldermen Monday, June 7, 2021**

**https://www.youtube.com/watch?v=13xVb9WLTOY**



DRAFT

DRAFT

**57:54**

Laurie Ortolano "Hi, Good Evening. Laurie Ortolano, 41 Berkeley Street. I want to address a couple of issues here. We have heard about the political influence on this change and I think the woman who just spoke nailed it. There's political influence either way. There is politics involved, you can't completely remove that. But I think you do take it a step further back when you leave this appointment at the State level. You know, at the State level the appointment of the 3, nobody has touched upon that they have to come from two different parties and right now we have 1 Republican and 2 Independents on our Police Commission. I haven't heard anyone here speak about how these appointments would be made by the Mayor and the Board, but my observation with this Administration is that we tend to promote and put all Democrats on Committees. And I would like to see, you know, the Committee be representative of the diversity of the voter population in Nashua. And right now your voter population, the heaviest party is your party of Independents.

"So I am concerned that we wouldn't see that. I don't support solving problems that don't really exist. And I can tell you that nobody probably right now understands what retaliation is about and like than myself and what I encountered and what I have come up against in trying to address issues in the Nashua Assessing Office. It far exceeded anything I ever thought would happen to me. My property was raised $150,000.00 above what KRT had placed it at, the Mayor was furious with me and came after me with everything he had. Attorney Bolton told me I had offended him, the Mayor, I offended Attorney Bolton, I offended Alderwoman Wilshire and offense caused a personal vendetta to be established. I would not want the local administration, local leadership to be appointing Commissioners on the Police force for the Police Department because I think it would result it in even greater conflicts and problems for somebody like me who opened the door and found a situation, walked into a real hornet's nest and got caught in a way that I have not yet been able to resolve.

"So you know, I will have the opportunity to speak to this again but I am concerned …."

Alderman O'Brien "30 seconds."

Ms. Ortolano "…that we will find that it will be seats filled with Democrats. The Board of Assessors is three older men, I believe all Democrats; two are cousins. You know, you want to talk about some conflict, you have some conflict there and you know, that's the way it is. And I know somebody like me who is an Independent, there is no place in the City for a seat for a person like me. Thank you."

**1:15:08**

Ms. Ortolano "41 Berkeley Street. Yes I would like to know if this Resolution should it or this Charter Change go through. Is the Board going to set it such that the five seats would be made up of different parties; that it would be Democrats, Republicans and Independents. I haven't seen the language where that has been drawn out but I think that would be very important. I am not in favor of doing that at all, I do think that the Boards that I see appointed right now by the Mayor and Aldermen tend to be single party focused and near and dear to the Board of Assessors. I go to the meetings all the time, it's 3 assessors, 3 Democrats. One of them doesn't even live in Nashua or own property in Nashua and two are related to each other so that concerns me. So I don't think that this will be an improvement to what we have going on and I think there are improvements to make in the Police Department, but I don't

think going to a 5 member Board that's really appointed by the Mayor and the elected people is really putting the power in the people's hands. If you want to do that, let us vote. Thanks."

**Board of Aldermen was held Tuesday, June 8, 2021**

**https://www.youtube.com/watch?v=uRQY18THfzw**

**1:00:27**

Laurie Ortolano "OK let me just set my timer so I know. Laurie Ortolano 41 Berkeley Street. I am speaking in opposition to R-21-145. I know it is bonded money but I think we could do something else with it. Nashua is going to see about a 7% budget increase between 2021 and 2022 and in 2022 property owners are going to see their assessments reset to market value. I don't think property owners have any idea what they are facing. Vision is collecting recent sales data to develop and model and they are gathering measure and list data to create a more accurate result. The measure and list we know depends on people opening their doors for an interior inspection. This is unlikely because the law doesn't require owners to do so.

"Updated homes with long-term owners and unpermitted work are not picked up. Sold homes that are updated are easy catches with MLS listings and photographs readily available, equalizing sold versus unsold homes is almost impossible without interior inspections. This creates real challenges when determining an equitable tax distribution. Additionally, Vision is planning on changing how the depreciation is set on properties. The past approach to setting depreciation created some serious assessment disproportion in older neighborhoods. Vision has not been forthright on how this correction is going to take place. Another challenge in creating accurate assessments is determining the tax distribution between commercial and residential properties. There have been times when residential owners cried foul when the tax burden shifted sharply, placing heavier duty on residential properties.

"In 2018 KRT applied an income approach to value commercial properties and balanced the tax burden between commercial and residential. For 2022, Vision is collecting 2 years of commercial data and 1 year of residential data. The pandemic negatively impacted many businesses. How will this impact the model and tax burden distribution between business and residential properties? In 2018, the commercial property vacancy rate was only 4% what about 2021? City leadership has not been willing to openly discuss or disclose Vision's observations with Nashua's businesses. Given the number of businesses that closed or saw lost income, it would be no surprise to see residential property owners bear a heavier burden as commercial assessments dropped. It is well known that many residential property owners' assessments will be increasing and they saw their personal incomes decline during the pandemic."

Donna Graham, Legislative Manager "30 seconds."

Ms. Ortolano "Their property will increase because it is based on (audio cuts out) sales and a short supply, high demand market, prices are soaring. Before the Mayor and Board of Aldermen vote on this park and budget increase, we should make certain we all understand what is going to happen when Vision presses the recalculate button. Let's have a candid discussion now about what the City expects it will be taking from the pockets of our citizens in 2022. Thank you."

**1:42:25**



DRAFT

Laurie Ortolano "41 Berkeley Street. I want to use this time to speak briefly about the Police Commission again and keeping the Commission the way it is, appointed through the State. As most of you know, over the last couple of years I've put in quite a few Right-to-Know requests. They have been the center of a good bit of controversy. I want to let you know that I've put requests at State Agencies, top government bureaus and other municipalities. And what I find is for all of those requests I put in, I received what I thought was a professional response. If my request wasn't clear, the agency or municipality would call, they would explain what information is available, allow me to express what I am interested in and provide the information.

"The Nashua Police Department has also operated that way and although I might not be in full agreement on how they have handled some situations involving me, when it has come to my Right-to-Know requests, they have practiced the utmost courtesy. They pick up the phone, they call and ask for clarification, they explain what they have for data. And when I have asked questions in writing, the Records Department comes back with pretty long, lengthy explanations of what I am looking for.

"City Hall, on the other hand, is the most oppressive, vindictive, and personal government I have ever worked with. They don't respond to Right-to-Knows in the way that any State agency or other municipality does. They will not pick up the phone, they will not explain what records are available. They will not work with you to let you know what is available. You are playing a guessing game in Nashua at City Hall and that's by design, through a Mayor and a Legal Office. It is obnoxious, it's crushing to citizens, it closes the door to transparency, it is oppressive. I am glad that the Police Department is operating like top governmental agencies in the State. And I don't want to see the appointments of these Commissioners come from a Mayor and a Board President because I don't want them taking on the oppressive form of government that City Hall is practicing right now in their citizens. I want that Police Department to continue with its professional response to citizen request. And the other issues that may exist that I may differ on can be worked on and improvements can come and will come with time. Thank you."

DRAFT

**FINANCE COMMITTEE JUNE 16, 2021**

**https://www.youtube.com/watch?v=HMomc3d1LPU**

**32:47**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. First of all I want to give you a heads up. You know Attorney Bolton did some nice soft shoe bull crap for you. The order did come down from the BTLA and when he said it's usually somewhere in between, he backed an appraiser who went up to the BTLA and set the market value for 2019 at $800,000. They wanted the assessment on my house at $710,000 when equalized. The Board of Tax and Land Appeals set it at 577. The city would have upped my tax bill a couple grand. The Board of Tax and Land Appeal basically dropped my tax bill a couple grand. So it was a very big difference. Not so much an in between and I'll tell you, it was a total waste of money and time with a vindictive legal office and Mayor that had to pick a fight. You probably spent $100,000 on that.

"As far as your overlay budget, it's secretive, sneaky and not transparent. Fix it and make it transparent because right now all of these settlements are handled in nonpublic session and not put out for the public to hear, or see, or get a copy of. We don't even know when to ask for them. I'm going to start

submitting a revolving every two week Right-to-Know to get those settlements and anyone who wants to complain that the 24 Right-to-Knows I file a year can stick it where the sun don't shine because this is the way you want it. Create some transparency for us.

"The other thing is that sheet is not updated and every one of you should be asking why are we doing 2018 appraisals in 2021. You are now hiring an appraisal guy who has to go back and try to create a market value from three years ago. Why doesn't that sheet show 2020 appraisals that need to be done for all these abatements that have been filed in 2020? I think Attorney Bolton is not laying out truthfully to you. I think there's going to be a lot more money to spend. I think you should know that right now. You know this is not really right and that list is not updated. Some of those have already settled. Give us updated material because it's the only way the public can follow. Thank you.

"Excuse me was I heard or was I off the air. I can't even tell?"

Chairman Harriott-Gathright "You were heard very clearly."

Laurie Ortolano "Thank you, okay."

**Board of Assessors June 17, 2021**

**https://www.youtube.com/watch?v=BwUFgt4gjRk**

**13:45**

Mr. Hansburry "Director Kleiner is there anyone who wants to address the Board remotely?"

Ms. Ortolano "Laurie Ortolano"

Mr. Hansberry "And if you could state your address please?"

Ms. Ortolano "Laurie Ortolano 41 Berkley St."

Mr. Hansberry "Go right ahead."

Ms. Ortolano "A couple of things. I'm still concerned about Vision's work and how they're handling the sales data for 2020, the vacancy rate, with commercial properties and what they're seeing and I think we owe the public a discussion about that and what's happening with these assessments. Secondly, you've seemed to infer, Dan, that somebody went around encouraging people to file abatements. That was me, and it wasn't encouraging people to file abatements, it was trying to correct what I viewed as disproportionate assessments. Largely driven off the sales data, I stayed focused on that. And I think what this city should start doing is appreciating that we need to get these assessments in line so everyone pays their fair share. And I happen to believe the abatement process is just how to do that. I wished a thousand people had filed and my encouragement would be for this year, to try to get a thousand of these things in, because I definitely see that many properties that need to be corrected. Before Vision hits the recalculate button. So, you know, that's my community service and that's my effort.

"I want to absolutely lambaste the assessors for the work that's been done on these abatements. I cannot believe that ten abatements are presented to you in the middle of June. It just shows me that





DRAFT

there is no serious effort by these assessors to address these abatements. There is a residential property, a 1402, that filed early December with my help that has been waiting for a call. This was always done first come first serve. This had to be one of the first three abatements filed and they have not received a response. Nothing. That should have been presented as one of the first ones and it's not here today. I don't understand that. Now, there's probably, I don't know, 60 residential abatements to handle before the end of June, before they go into the deemed denied pile, and maybe the city will act. There is no excuse why these will be all completed by the end of June. And what it shows me is that Chief Vincent does not give a priority to these. These assessors aren't doing sales reviews anymore, it's been assigned to Vision. These assessors are not having to do permit data, it's been assigned to Vision. I missed the very beginning of the meeting because the link to get on did not work on the website. So I dilly dallied trying to get connected instead of using the phone. I don't know if Chief Vincent explained why only ten are being presented and why it's been so slow at bringing these forward. But it just shows me that this assessing office does not look at equity as a priority matter when property owners file. And Greg Turgiss as far as his work to carry some of these residential abatements, have we seen any? I don't think I've seen one? I mean, you know, that office needs to be closed down. It just, for the million bucks you put into it, it just doesn't perform. And it is ridiculous. You know, it is absolutely ridiculous what we dump in there and what we get for services. Particularly to the public. Your customer service area is all but gone. You know, it's just, I can't believe it, I can't believe that 35 abatements have been presented by June 17th. And there's roughly 100 residential, probably 35 or so commercial, big ones, but there's a fair number. And you got through them when KRT came through. The city did 135, the residential assessor's did 135 of the residential abatements and farmed out 50 to KRT. So I don't really see why you can't get through a hundred before the deemed denied date. That's obnoxious. Really, really disappointing. Thank you."

**BUDGET REVIEW COMMITTEE JUNE 17, 2021**

**https://www.youtube.com/watch?v=M-s7OOtzTLw**

**1:31:29**

Ms. Ortolano "OK just a couple of things. When Chief Carignan spoke about the drug issue, the influx of drugs and the issues associated with them and the level of violence you see with these stimulant drugs, he did say that he wanted the Aldermen to keep in mind how we get ahead of this and how we deal with it. And I am wondering how we do that and what's in the budget to do that and what do they anticipate is actually coming to deal with that because I didn't really hear the details of how that is addressed. I do wish there was a Zoom capability for the Budget Hearing. I know you do it over at the School but it will really be interesting to see what the attendance is and the need to be in a place that large to address the Hearing.

"Also, I've heard a lot of complements tonight about the Police Department and they ranking it has nationally and at a State level and I want us to bear in mind that the way we select those Commissioners going through the Governor's Office is the way it should be maintained. I am very concerned that the closer you allow these appointments to take place, politics being what it is and it is political at every level but the more local you do it through an appointment process with the Mayor and the Aldermanic President, the more apt you are to have an influence there that I think would distort the objectivity of



DRAFT

the Department. And I think if you really want to have that type of structure with your Commissioners and people really believe that the Mayor nominated positions that would come to the Board is best on I think the next best thing, that is not a choice that I think is good; go to elected positions where the public is voting period. That's how they have real choice. So I am really a strong supporter of keeping the Commissioner seats and the appointments of those seats as they stand right now. Thank you."

**Board of Aldermen Monday, June 21, 2021**

**https://www.youtube.com/watch?v=EPIfkcYPsn0**

**40:16**

Laurie Ortolano "41 Berkeley Street. I am here and when I come to the microphone I am going to be addressing positions. I understand your budget increase is small but I really think you have positions in this budget that need to be removed. And in the Legal Department this Right-to-Know Coordinator has got to go. It is a $75,000.00 position that did not produce the results we had wanted. I really feel that there shouldn't of been a dedicated position for Right-to-Know and I don't think it is a viable position for you to fund. You are not going to get an attorney in there who is going to come in as a Right-to-Know Coordinator and stay. The Attorney you hired punched out after 6 months and it's going to be a roll out ground for anyone. It really is a mascaraed position if you just want to add an attorney. In the time that the attorney was here, we had 3 lawsuits on Right-to-Know largely because of his work. And I can tell you there are several more that are going to roll in. So I am not a fan of this Right-to-Know Coordinator Legal Position. I think what you want to fund is a taxpayer's attorney that is there to serve us. So that when our City wants to go after us with these frivolous lawsuits, we have some means of being funded so people who can't afford lawyers to come in on a Right-to-Know request issue which is standard Right-to-Know, basic Right-to-Know costs a citizen $5,000.00 to take into Court. That's not cheap. So instead of using the system to abuse your citizens, let's roll it the other way. And I think this Right-to-Know Coordinator should be taken out of the budget, there's $100,00.00 savings there, very misguided position. Thank you."

**57:50**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to address the Economic Development position in budget You know, I have a lot of concerns about this position. It seems to me City Hall is run by three individuals; Economic Development, Community Development, and Administrator / Director of Administrative Services. That's our trifecta, that's our brain trust and honestly I think it's missing a good bit of the brain side. It is a disappointment to me across the board and it's because these are appointed positions largely by the Mayor. And I am underwhelmed by these appointments because we seem to pick people who don't have qualifications and we promote them into positions that they are really overdone on. And the one thing I would say with the Economic Development position is my interface with this individual is they are very non-responsive to public issues. And as Ms. Colquhoun said, they produce reports that are just made up information that go out to Standard & Poors typed in, 7 years old telling us we don't do numbers to get vacancy rates. I have been after vacancy rates for well over a year because it is a legitimate concern for what is going to happen to the tax rate when we run the new assessment next year.



DRAFT

"What happened in 2020 to these commercial properties is relevant because the model run by Vision is being based on 2020 and 2021 sales on commercial properties – 2 years. And I am not certain that it is weighted and if it isn't then you have to look at what the distribution is going to be and the weight that residential properties are going to carry if there's a shift off of the commercial properties because of what happened in the pandemic. And I haven't been able to get anyone to answer that or speak to the vacancy numbers. I have been told you would, I have been told there would be a discussion and there was no discussion. And when I see the Economic Development Director producing reports that are largely false and when you send a Right-to-Know to him you get snubbed, treated rudely, doesn't e-mail it, sends it through snail mail and mails it back to you so you've got a 10 day waiting period. He's the only individual I ever knew to do that. I am not overly supportive of that and I am really tired of seeing positions promoted with people who are not qualified. I am underwhelmed by your picks Mr. Mayor. And you can bet your bibby I am not stoked about your picking Commissioners."

**1:13:18**

Chairman Dowd "We are still in General Government."

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Does General Government include the City Clerk's Office?"

Chairman Dowd "Yes."

Ms. Ortolano "OK. I guess I have a question then. I am wondering why were unable to hire a City Clerk that had experience being a Clerk. This is a big issue for me and it's not personal but I don't understand a City of 90,000 placing somebody in the Clerk's position that had no experience. And we are paying to certify this individual in their 60's so for the next 4 years they can work on certification to become a Clerk and then retire. It makes no sense at all and it is a huge deficit. I had problems at that office as well. And it just seems to me we could have recruited somebody and gone out and actually hired and not made this an appointment of yours, that is just picking from somebody within. It's not fair to the citizens when we don't look for the most experienced people to come in here and do the jobs that need to be done. Thank you."

**1:26:58**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Let's start with the Administrative Services position. I am all for removing that office. I've seen a lot of what it has done and it has run costs up very high on this City. I had the pleasure of spending 7 hours with the Director on Friday gathering information about how business is done in the City and I have to tell you I was disgusted and underwhelmed. If you all recall this picture that ran in the newspaper a while ago when I was working on Assessing issues, it is a picture of the Director and her staff with thousands of property record files out on the photo with the Mayor saying that I was retaliating against the City by doing my research. And that is was costing us $100,000.00. I then learned in a Budget Committee Meeting when Ms. Wilshire showed a great deal of sympathy to the Director because we had to hire a $50,000.00 contract to get permits addressed because this citizen was taking so much time of the Assessors.

"I learned on Friday that what happened here with the Director, Ms. Kleiner in these boxes, is she ordered anything that I requested to see by placed in a special office and ordered the assessors to research what I was looking at without ever knowing what I was looking at. In other words go figure out

what she thinks she's looking at and report back to me. And that was very difficult for them because they had no idea what I was looking for, the tune of probably spending well over half a million dollars. That's absurd that kind of tracking of a citizen. It's absolutely absurd. And that is what we call retaliation from a citizen? I call it retaliation of my government. She was completely unqualified for this position, another special assistant to the Mayor that got promoted to Department Head of 6 Departments, including becoming an acting chief essentially. This Department should be eliminated and we should go back to the individual departments we have. This is wrong. And I will be addressing Assessing, GIS and a couple of others. Thank you."

**1:41:39**

Laurie Ortolano "Laurie Ortolano 41 Berkeley Street. Onward to the Assessing Budget. Mr. Mayor, I think you really misrepresented the improvements that have gone in Assessing. It has been an enormously painful process. And you don't understand what citizens are trying to get at with information when you look at the improvements that were made by the Director. Property record cards that were ordinarily available to the public in November did not become available until the end of January. I had to send emails into a chief to request probably over 200 property record cards for him to email them to me because I had no access to help with abatements. It was absurd and frustrating. And any email to the Director to say when are these property record cards coming on line, we are 3 months late, there was no answer. Nobody could figure it out. The software update which was supposed to take a few months took 16 months and we had a lot of trouble with the software. There were a lot of errors and things that didn't work well. We instituted a new policy in there where records aren't open despite our Charter saying that we can come to City Hall and inspect records that are readily available. The Director put a 5 day Right-to-Know standing on open records so you couldn't go in and look at a property record file anymore and I believe that remains. I think that's actually illegal and that may be something I go to Court on. It's ridiculous, you took it away. So when you say there's tremendous improvements down there, I think it has been hair pulling. Have you looked at the new computer systems that are up down there, the two at the cubicles? The software is so complex that I don't think that any citizen is going to ever figure out how to print a property record card. I'm going to have to spend 5 or 6 hours figuring out the menus myself; it's not simple, no instructions at the counter. Have you looked at how the office space is set up for citizens? You took 45 square feet of countertop that the public could come in and use and reduced it to about 6. Where does the public put their papers, their notebooks, their drawings, their information they want to share with an assessor, you took it all away. You took away the research space so people like me could never go back in. You didn't leave a computer in an open area where a citizen like me could research away from the cubicles, you reduced the computers from 3 to 2. I am not happy with what you did in there and I don't think you made it better or easier or simpler for property owners."

Chairman Dowd "30 seconds."

Ms. Ortolano "I think it was a disaster and next I'll come back on IT."

**1:51:19**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to address a reduction in the Assessing Budget. I believe all of the commercial activities and business should be subcontracted out. We continue to have some really big issues in our commercial side and you know that there is an assessor over there

that under performs consistently. And I've grown really tired of it. We are in abatement season, we have abatements, we are going to hit the deem deny date on June 30th and this assessor once again has not delivered a single abatement to the table. I had two property owners email me this week that told me he was on vacation. It is absurd. Why are commercial assessors not able to handle the mom and pop businesses and get us through them in 4 months? We do not have the horsepower on the commercial side to handle this aspect of our City business. And we are probably paying $300,000.00 or $400,000.00 grand into that. I really think you should look at subcontracting out the commercial side and getting people who really know what they are doing with that part of the business.

"Secondly, that Assessing Office should have had a lot of furloughed workers during COVID. They could not do inspections, they were not doing permits and they were not doing their work. And we kept them on with full salaries despite that. That was not fair to the taxpayers. It's not like Public Works that had to go out there and do the job. Assessing did not and they did not do the job. And we paid full boat for that. If I have time – IT. You really need to restore your IT Director. I am very concerned that you fired the IT Director and you are leaving the position blank. The City is too large and has too much stuff going on in the digital world to not have a director. You are doing all these digital upgrades. You know, you have a big email problem. And I just filed a law suit yesterday pro se, over emails. I would way prefer not to do that. I would love to have a discussion with the City about what's going on with emails, but I can't. The only way you can do it is through a lawsuit. I asked for 2 months of emails, January and February, for Assess help. I didn't really get January's. I asked in March, it took 25 days for you to recognize the Right-to-Know and then you failed to deliver January's records. What are you doing with the emails? Why are they all missing?"

Chairman Dowd "30 seconds."

Ms. Ortolano "Those are official documents for the furtherance of City business. And in there were my emails with the abatement applications that I had done for senior citizens that I came to City Hall on the 22nd, on the 17th – the 22nd to get stamped and ended up 28 days later arrested. You didn't get my email on the 17th, you didn't get my email on the 20th, they weren't in there and apparently you didn't get my phone call. What is going on with our data."

Chairman Dowd "Time has expired."

Ms. Ortolano "Thank you."

**2:05:50**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. CFO Griffin, I think you have some terrific people in your office, I am particularly appreciative of Rose Mary. When I went to her, she was always very forthright in addressing my issues and getting me answers very quickly and it is very appreciated. And I look forward to having that opportunity to work with her again as soon as some of you other people lighten up and let us citizens have that access. Thank you."

**2:44:09**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I am going to be brief here but in looking at the staffing in Public Works my concern is you really don't have the Engineering staff that you should have. I think you are missing on people who are more qualified to address the road issues and design issues and





DRAFT

new projects. I look at the positions and it just looks like we are missing some positions. And I've watched, you know, projects get done where to me the analysis and the engineering work on the roads isn't there to support the project that's being done and I look over at the Henry Hangar Development. I think we had and have more road issues over there that got swept away and not addressed because we didn't either listen to our engineer or we didn't have the engineering support we needed. And I think it is a real weakness in this Public Works Budget and I think it ends up costing us a good bit. I would encourage you to strengthen your engineering personnel and improve those qualifications and the analysis that you are getting when you take on these projects. Thank you."

**Board of Assessors, June 30, 2021**

**https://www.youtube.com/watch?v=eEsNW8PcApw**

**41:38, 1:02:18**

Mr. Hansberry "Okay, Mrs. Ortolano?"

Ms. Ortolano "Yes, I just want to give you these packets because I'm going to reference a few documents and I don't want you to be in the dark. I appreciate the Board not pushing the matter to appeal, and it being over with, so that's nice to have that behind me. I am concerned about my ability to get information on neighborhood assessments and abatements that have been done within the neighborhood. One of the issues that I have is the property right next door to me at 39 Berkeley St. I feel that this Board and this city denied me the opportunity, and the assessing office, to understand how that abatement was produced, and what was done on that abatement. To justify the level of assessment, and the impact that had on my property assessment. I don't think it is right. I am going to file a complaint with the state about this. I do feel that every citizen should be able to look at other properties, especially in their neighborhood. And I wrote to Mr. Vincent on June 2nd and I said I wanted to speak to Mr. Turgiss about the abatement work he did on 39 Berkeley St. I wrote to him in 2019 and he would not respond. And nobody would respond down in assessing. So, per the DRA guidelines that questions should be responded to, it doesn't have to be by the person you wrote to, it could be somebody in assessing. Nobody responded it fell on deaf ears. My request to speak to the Board was denied. So I couldn't come to the Board last year. I think you should always be able to come to the Board on a property abatement issue before there is an appeal. And I did have an abatement, and I know the city took the position, Attorney Leonard and Attorney Bolton, that it was an inexplicably late abatement to an already existing appeal, but the BTLA did not rule on that, in favor of that. And kept them separate issues. So, I want you to understand something, 39 Berkeley St. had an abatement done by Gary. I'm not opposed to what was produced, but the sales data that he used on that abatement was Tanglewood. A house in Tanglewood and also my sister home at 45 Berkeley St. The last 4 pages of the document are some pictures off the listing sheet on that property. Now, 45 Berkeley St. was purchased in 2017. He took the data point a couple of years out, which is a little unusual for them to use sales data a couple of years old, but it was right on the street and he felt it was relevant. Here's what's unique about this property, so these photographs, there were very limited photographs on the MLS listing on this property, because the property was dated. And when you receive photographs and you see pictures like this, you can see it has this mauve carpeting, this wallpaper, it was dated. There were no pictures of bathrooms or kitchens. There was no write up on it, it was dated. When the property owners bought it,



DRAFT

they didn't move in for 6 months, put a dumpster out front and proceeded with a major overhaul. They pulled a 15,000 dollar permit. Now Mike Mandile followed up on that property, he went repeatedly, so I believe he had an idea given the dumpster out on the side of it, very visible, that the house was undergoing a pretty significant renovation. However, the property owner would not let him in. So, and it was a fully renovated house. In 2019 that house went on the Holiday House Tour, like mine did in eight, like '17, and the assessing staff came through. Because the property owner said to me, (inaudible), looking at the house, and the property owner said, oh the assessing staff came through the house and they said do you think they'll change the assessment and I said no. I think you'll get assessed the next round, but I don't think they're going to make a change. Because you had filed the permit, the assessor was by in 2017 and early '18, before KRT set the numbers to see that this work was going on. And the assessing office made no change to that property. They gave you a purchase price of $560,000 as being a reasonable market value for the house, and the fact that it was fully renovated, the assessing saw no reason to add value. In part I think they were right. Because diagonal to that property was a house at 38 Berkeley St. that sold to another young couple, these were two young couples that had moved on the street. It was a thousand square feet bigger and it sold for $540,000. It had a much newer kitchen and renovated bathrooms. And the two couples would talk, and the couple with the bigger house, always said to the other couple you really don't pay. I think in fact the assessor's looked at it and said okay, yeah it's all renovated, but they didn't want to change the EYB and make these conditional changes, because I had obviously have been making some waves about that. And really it shouldn't have been done, it needed to be addressed in the update. But, the card was never changed such that KRT saw any of that improvement. Now, in 2019 Gary uses that house at 45 Berkeley St. as a comp for 39 Berkeley St. It surprised me because the size difference between the two homes is almost about 800-750 square feet, there's a big size difference. The assessing office usually would not make those comparable. There were other larger homes on Concord St. in the neighborhood that could've been used as comps. The other issue is, if the assessing office believed that this was an un-renovated home, it did acknowledge that it was unrenovated, and there would've been no reason for them to compare that to 39 Berkeley St. If you looked at the property card which I have given you on 39 Berkeley St., it is a house that has put about 1.1 million into it. That's a lot of money. A $400,000 dollar permit, the pool, the upgrade, and the purchase price is about 1.1 million. It doesn't take a rocket scientist to appreciate that, that's probably a well done home. It is. The property owners don't deny that at all. But for the assessor to take 45 Berkeley St. make that a comp, to 39, tells me that the assessing office knew that 45 Berkeley St. was a very renovated home as well. The problem I have, is the property card, if you looked at 45 Berkeley St., the property record card that I had given you, the EYB in the documentation on that card, shows it as a, it's right before the pictures on the back, it's that one. It shows the EYB as 1964. It's not a 1964 home. How does Vision take a home like this and know that this home at 45 is very similar to renovation level at the home at 41. How does Vision know that? Well we don't mark the card when there is no note put by the assessor that this is an upgraded house. Now I believe—well, I know that the assessing staff went through this house. I believe it was communicated to the assessors the condition of the house. If it wasn't then all of you should've questioned why would you take this really dated old home and compare it to 39 Berkeley St., it makes no sense. But I believe they knew. And so, you know, I wanted to have this understanding to go into my BTLA hearing and I could not have that understanding because the city would not allow me to have that knowledge. They would not allow me to have that conversation. I was so irritated with the June 2nd email that I sent to Mr. Vincent where I discussed in the first paragraph wanting to address this abatement at 39 Berkeley St. and the response I got was the generic. You know,

response, "these are the documents developed by the assessing department to determine if an abatement was necessary; they speak for themselves. The documents are specific to each property. They do not necessarily reflect what would be considered for another property." Okay, that's a general statement. But I'm writing to you about my specific property. I have been hammered by this Nashua Legal office, in letters, in writing. You know, "AssessHelp, Mrs. Ortolano you can't you can't write a question into AssessHelp unless it's about your own property." That's what that's used for. That came from Celia. That was never really true. But when I write to my own property, when I speak to my own property, you ignore it and you come general. You go well, you know, they don't necessarily reflect what would be considered on another property. Did it for mine? Why would 45 Berkeley St. not be a reflection of 41? It is built by the same architect, okay designed by the same architect, and built by the same construction company and I put the pictures in there, those 4 pictures, because the stairway is identical, the front to back living room, the molding in the fireplace is literally identical to mine. I was shocked when I first walked in that house, because I said Oh my gosh, this is the same architect out of Boston. And they had some drawings marked with the same name. So technically their house has a completion date later than mine. I think that is an error. It's listed as a 1937 house, mine is a 1925. They actually think based on the drawings of the house that was not correct. But we don't know. But technically it would be a newer house. And the renovations done to the property done on 2017 and 2018, make all of the upgrades ten years newer than mine. So, you know, the BTLA has come out with a decision. I have addressed with Rick Vincent, I had him come to the house to look at my third floor living space in my attic. I feel my third floor living space should not be considered the same quality of space as my first and second floor. And I cite 45 Berkeley St. All of their living space is on the first and second floor. The four bedrooms and it's about hundred square feet bigger than mine. About, 3450 and I'm 3347. Okay, they're very, very, close. But all of the living space is first and second floor and it's an air conditioned house. My living space is first, second, and my fourth bedroom is an attic. It is not heated, it's not air conditioned and it's not insulated. We've never used it as a bedroom, it's not livable. It's oppressively hot in the summer. It only has gable windows on that third floor, its open wall and it's too cold in the winter. It's a 50 degree room and you'd have to run an electric heater and with all the old wiring in there we don't do it. We don't do it. So we don't use that space. I paid $90 dollars a square foot for that attic like I do for the second and first floor. I don't feel that is equitable. Now the BTLA comes down and gives a number of $625,000. They don't allow, they don't specify how the property card should be changed. My understanding is the BTLA number is an override that they are going to put on my property. When KRT came up with $652,000, KRT I think changed the data on the property record card, hit the calculate button, took the depreciation down 4-5 years, changed some features on the quality of bathrooms and the kitchens, and knocked that assessment down 30 grand. I think the math tells me that worked with a calculate button. The BTLA comes in and just gives a number. They don't care what the property card looks like. How is Vision going to rate my space and know that my card does not have the same living conditions as my neighbors' properties? And why can't the card be changed to reflect that the third floor should not be rated and paid at a $90 dollar a square foot level? It's a data correction. And I really think it affects my property. The reason I think it does, is because at 350 square feet, billed at $90 dollars is so different from the 450 extra square feet of the second floor of my neighbor, that my finished basement space would become a wash with their space. I do believe these two homes should be assessed fairly closely, their renovations are ten years newer. However, it won't come out that way because the data on the cards is not even accurate. So that's what concerns me about this whole Vision thing. When the assessors use a house, that the data is incorrect on the card,

DRAFT

don't bother correcting the card to any capacity, Vision's looking at that card and they see a 1964 house that fully isn't even renovated, whatever, $15,000 dollar renovation they did must have been so small wasn't really worth anything, when in fact it was probably a $200,000 dollar renovation, it was big, that's okay. But there is no knowledge for that, your assessors go in, your staff looks at it, nobody knows anything, they use it as a high end home to compare to the neighbors, and none of it is documented. So I've written to the BTLA--and I think I cc'd you on it--to say how do these data corrections get made? How does my card become reflective of the property it is? You gave me a nice number, it's an override, but it doesn't reflect the card at all. So, I really strongly object to the treatment I received last year from the legal office and from you as a Board, under the advisement of the legal office and I'm glad to see Attorney Leonard sitting in here, and I want to let you know I hope we never see Attorney Bolton sitting in here again. This was wrong to tell property owners you can't come in here and question your neighbor's property right next door, that frankly I wrote the abatement for and you granted. I think I know what I was talking about. I think I had a pretty good understanding on where that property should be as I had on mine. And if you recall in 2019, I asked you to accept $595,000 for my property, just give me $595,000 and I'll walk away. And you folks said no. And it turned into, what, $50,000 bucks of city spending to go battle that, on top of me? Total waste. So that's the end of that, but in public comment I want to address another issue."

**1:02:18**

Mr. Hansberry "Thank you. Ms. Ortolano?"

<u>Ms. Ortolano</u> "Yes, just starting my stopwatch here. Laurie Ortolano, 41 Berkeley St. A couple of things, I just want to talk about an abatement issue. You all know I did work on helping people file these abatements. And the first neighborhood I went into was over in Trestle Brook, because I saw a comment on social media from somebody saying I filed last year and the abatement was lost. That was fine. So I started looking at that property and these other raised ranches and there was a group that just didn't look right over there. And, a good group of them, 7 or 8, filed for an abatement. The abatements were processed. That was the whole issue that I ended up arrested for, because I came in with the 18 and 28 Baltimore Rd abatements to get them date/time stamped on the 22nd. I had emailed them to the city on the 17th and again on the 20th through AssessHelp and the city claims they never received them. I did a right to know for all the emails and they were not in there. By the 22nd Rick Vincent said to me we never got your applications. So when I came in to get them date and time stamped, I don't know what was going on with email. I did end up getting them date and timed stamped, eventually they came back to me stamped, and changed, penciled in as Jan 22nd. I really thought these abatements would be addressed first. Because we went first come first serve, and they weren't. Now, I told property owners who called me-- because they did, and they emailed me and followed up-- don't worry, they'll be taken in May and if not the first week in June. June 17th I started to get a little worried. I started making phone calls and wrote some emails, saying "what's the deal, who has these?" It irritates the crap out of me, when I write and I call and I say who's assigned the abatement, and I get put on hold and I get the run around and I'm told someone will call you back, and nobody does. Why is it I can't get the name of assessors assigned? Now ordinarily there would be an abatement list done by April or May, April really. I think this year with changes it wasn't done. It came to me Friday. And those abatements were never assigned to anyone, those eight, there was no name given to them. They have now been assigned to Mike Mandile. It's unacceptable. I mean, and I don't get an apology, that oh my gosh, we made a mistake, these will be done, these will be done. What I was told was that we had the ability to do more

abatements in July. Yes, but I would hope these are going to be the first and they are done. You make a commitment to these people that you will do the abatements, either deny them or grant them, but you will act on them. You will not leave them in a deemed denied pile to say to these people no. Here is an email I got from a gentleman at 25 Baltimore Road. “Just a quick update, no one came. I had exchanged emails with the city and was promised an evaluation would be done by the end of May. Nothing happened. On Friday this is the end of May, I received a tax bill for July and noticed that my bill was up from ’19. Very discouraging. Thinking about selling the house now just because I feel the city is overtaxing, especially when I don’t own the land. Have a great weekend.” I wrote back, “Don’t give up hope. The abatement will not show up, will show up on your next December tax bill. I’ve been virtually attending all Board of Assessor’s meetings, and they have not started really reviewing abatements. I would think by the first week of June they will start presenting. Email Rick Vincent tonight or tomorrow, and ask him who is assigned to your abatement. Ask Rick for his email address. It will either be Gary or Mike Mandile, Gary Turgiss or Mike Mandile. Send them an email and ask them if they have started your abatement. Your street was one of the first to submit applications and in the past it has been a first come first serve. Hang in there, I’m getting other emails from folks in your neighborhood who filed and haven’t heard a word yet. Keep me posted or give me a call.” He said, “Thank you, I’ll send the email tomorrow”. I reached out to him today to find out when he emailed and what he heard. But this is discouraging for people. For no explanation. And you know what, I’m not liked, I’m freaking despised. I don’t want call in and take Mr. Vincent’s time. I don’t want to send emails asking the same question over and over again. You know, I want to do it once and walk away. I really thought you would address these, and I almost feel like it was some kind of slamming punishment that goes with the arrest just to blow these people off and to blow me off. It’s obnoxious. And there should be a reason for it. I want to read one thing into the record. I did a lot of abatements, I did them for free. I did them because I wanted properties to be assessed fairly. “Dear Laurie, I would personally like to express our appreciation and commend you for your perseverance and hard work. In the spring of this year, you approached approximately 17 homes in the Thompson Preserve Development, location is Gilson Road. You presented the homeowners with the opportunity to have their assessment value reduced. You presented homeowners with nearly filled out forms. The outcome of this project is you have succeeded. Our units were recently reduced personally by $40,000 dollars. This resulted in a return of tax money from the City of Nashua. Our return check was over $900 dollars. May you continue to fight the good fight on behalf of homeowners. Thank you.” Signed by the homeowners. That’s why I do it. And I got into these developments, because I don’t think in developments we’re assessing them correctly. We’re jacking up developments and treating properties as if they’re full value, at market value, in the year they’re completed versus when they’re under construction. And this is what causes skews in these neighborhoods. People always say to me, how can I be like $60,000 off from this house, when an update is done when we’re the same house? It’s happening because of how the assessors are leveling these properties when they’re not completed. And I want to put an end to that. I think we need to be more conscious, which is why I did it. It’s just very upsetting to me and I really feel we need to make some personnel changes. This should not have happened and these people should not have been ignored. Unacceptable. Thank you.”

**Board of Aldermen Thursday, July 1, 2021**

**https://www.youtube.com/watch?v=Rsjcih1BYxs**





DRAFT

**8:30**

Alderman O'Brien "Thank you. I will now call any further testimony if anybody would like to come forward in opposition."

Laurie Ortolano "Laurie Ortolano."

Chairman O'Brien "Ms. Ortolano. Okay please state your name for the record and just to remind you, you do have a 3 minute window. Okay?"

Laurie Ortolano "Yes. Laurie Ortolano, 41 Berkeley Street. I don't know if at this hearing do you answer questions or is it not allowed?"

Chairman O'Brien "It's the tradition of the Board just to listen to your testimony."

Laurie Ortolano "Okay. So I guess I don't know where I fall out on this because I would have the question because I don't recall any school bond was voted on whether this was always included as part of the project. So if this road had always been put in as part of the project although it wouldn't have been in the bond because it's separate but if it was identified, it would be helpful for me to know that and it's not something that's being secondarily added to the budget.

"Also, I want to make you aware of the person doing the appraisal I believe is a gentleman named Vern Gardner who is the person responsible for the appraisal with the Board of Tax and Land Appeal on my property. I'm filing a formal complaint with the Office of License and Certification against this individual. I saw the appraisal he did on another parcel of parcel for Sarah Marchant over at the school – the last one that was bought. I e-mailed her and said I thought that appraisal was really poorly done because the parcels of land he used as a comp. to identify comparables they were parcels in Hollis and it actually didn't call out a land marking or ID that you could look up and actually see how the appraisal was built. I am in in favor of the city contracting any work to him and the Legal office also gave him two Teradyne pieces of property to work the appraisals on. So if you're working with him to do an estimate for eminent domain, or taking of the property, or coming up with an estimate, I want to see that appraisal and I wonder if you've seen that appraisal yet. I'm not in favor of using people who I think are corrupt, who I think should not be certified. I think the city and the Legal office should be able to do a better job of picking appraisals that have a better reputation. Thank you."

**14:41**

Laurie Ortolano "Alderman O'Brien, this is Laurie Ortolano."

Chairman O'Brien "Yes but you already spoke, correct?"

Laurie Ortolano "I did. There's a second round, correct?"

Chairman O'Brien "There is a second round, yes."

Laurie Ortolano "Okay thank you."

**16:00**

Laurie Ortolano "Laurie Ortolano."

Chairman O'Brien "Okay Ms. Ortolano you do know the same rules apply. State your name in the three minutes. Thank you. All right you may go."

Laurie Ortolano "Okay. Laurie Ortolano, 41 Berkeley Street. I think you're putting the cart before the horse on this one. You know I really think you need to get your appraisal hammered out a lot better and it concerns me, you know, Ms. Colquhoun put in a Right-to-Know to get a copy of that appraisal to review it and of course it didn't come to her because you used the five-day waiting period. I really think somebody should have had that appraisal in her hand immediately. That day somebody could have sent it so she could look at it because obviously you have it. I would have liked to have seen it too. I'm concerned with this gentleman you're using to do the appraisal. I don't trust his work and we're paying him $4,000 for it. He used Hollis parcels of property on the last appraisal he did over there at the school that were not well identified or trackable and did not seem to be good comparables. I'm now peaked. My interest is peaked after listening to Attorney Hollis to see if he used the same parcels to go and produce an appraisal for this piece of land.

"You know the property owner deserves a fair process and I'm not in favor of just taking the land by any means. If you don't have a viable layout and you don't have a good appraisal, you should put the brakes on this and get your homework done first before you come forward and ask for approval. Thank you."

DRAFT

**Board of Aldermen Thursday, July 1, 2021**

**https://www.youtube.com/watch?v=Rsjcih1BYxs**

**1:09:06**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. First of all I'd like to correct the attendance that was read into the record. It was stated that there were 11 in attendance and 2 via Zoom. There are actually 9 in attendance. Kelly, Clemons, Lu and Laws were not recorded as being on the record. I'm interested in seeing how the 2/3 votes go with regard to passing the increases that the Board proposed on Tuesday in their budget meeting. I'm opposed to the additional money being added per Police and Fire. I think they're funded adequately. I feel the response time issue from the Fire Department is you know difficult to quantify to a certain extent. When we put all the barriers up downtown, I didn't hear anyone from the Fire Department and couldn't really get any response on what happened to response times when we cut the road down to a single lane on each side? We did that without any problem or concerns that we were impacting our fire safety issues.

"So I feel like we need to be careful how often we point to those situations and use those to justify positions. I think we have a lot of positions that ought to be looked at closely and I'm going to go back and tell you. I'm sure you didn't your cut your Assessing office but I don't know why we're funding 2 commercial assessors in there because you all know how hot under the collar I am about what's happened with abatements and what's gone in there and what gets done in the commercial area. We pay for it endlessly.

"You know I just found out I didn't realize the Chief we hired is only here for a year on a 12-month contract. So basically he's almost a consultant. So you know we're going to be back in a Chief position. You have a new assessment level coming up next year. I'm concerned about the IT Department. I've

been calling around getting some good information. What are we doing about third party sourcing for our e-mails and what's going on in that area? I am not at all interested in seeing the Administrative Services Director run an IT Department. I'm not at all interested in seeing that position continue or a Right-to-Know Coordinator, or some of these upper management positions. They don't belong in the city budget and they're not doing what they should do."

Alderman O'Brien "30 seconds."

Laurie Ortolano "I object to Attorney Bolton sitting in this chamber. There should be somebody else sitting in this chamber representing the Legal office. Thank you."

**2:53:24**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a couple of things. You know I want to remind you that when Alderman Tencza talks about the impact of a 4% increase on property valuations, you are failing to recognize that next year is a reassessment year and we are going to get a new 2022 tax rate once Vision reassesses all the property. And we have not had really any information from the City that I know of that has talked about the impact and the balancing between the Commercial and Residential properties. I can tell you looking at the abatements right now, there's a lot of big commercial abatements, I think the valuation is for assessment reduction is somewhere around $68 million and I know the commercial properties during KRT's update were valued around $3.7 million and residential was around $6.3. We were able to balance that off 50/50 but you are seeing the commercial drops substantially more with potentially a higher vacancy rate.

"I know what the economy is doing when it comes to home prices and I will tell you something, you've got a big issue coming your way with senior citizens and I addressed this to you already but the Board ignored in this budget. Your exemption program for senior citizens based on hardship for 75 and older is $224,000.00 is your max exemption. Well when that was set, KRT in 2018 the average home price was $260,000.00 that means seniors could get a pretty good exemption at $224,000.00 and at 80 years or older it was $280,000.00. But look at what has happened now, the average home price in Nashua this year, it is not even finalized is probably closing in on $430,000.00 to $450,000.00. Your seniors are not going to get an exemption at all like they got. They are going to be paying $224,000.00 of taxable income. And you had, according to your MS1 you are giving $160 million dollars in tax exemptions to senior citizens on your MS1. That is primarily out of your residential total assessment of $6.3 billion. That's a substantial amount. So you have just swung a whole bunch of seniors out there and that 4% increase on top of a Vision reassessment update is going to be a pretty difficult pill to swallow and I wouldn't be surprised if you don't see …"

Alderman O'Brien "30 seconds."

Ms. Ortolano "… the need higher. So I think the tax impact assessment was too superficial and I think that the increase to this budget was unacceptable. Thank you."

**Board of Aldermen Tuesday, July 6, 2021**

**https://www.youtube.com/watch?v=1Ocn9ml9Ltc**





DRAFT

**24:38**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to let you know I'm really glad I was able to listen to the Board President on this. I do not support this on all. I've been on boards and when you have a board of three, it's a real pleasure. You can be three people who work together and respect each other can get so much done. I also think that filling board seats isn't easy. Filling these volunteer seats essentially is not easy and adding to them is not necessarily the right thing.

"When Alderman Lopez discussed this a week or two ago, I kept listening for him to see my full Board is backing me. I wanted to know the position of the three members of the Board of Health and there was nothing being said about that. I live very close to Dr. Stephanie and I walked down to the house today and knocked on the door and unfortunately she wasn't there so I couldn't talk to her. So I am very, very happy that I was able to listen to the Chairman talk.

"You know Dave Tencza mentioned at the last meeting that you know everything is boards of five, boards of five is the way we go and that's just not true. The Board of Assessors is a Board of three. Nobody has been working to beef that up because you'd all be terrified I'd get a seat for god's sakes. So you know we keep it as three. That's what you do. The Commissioners have been three and I don't even think the Police Commissioners as three are inappropriate. I think its fine and there are other boards in this City because I looked through them that are boards of three. I'll tell ya, you don't want to just flush these away and say we've got to add people in order for them to be productive. This pandemic was a very unusual situation and we should use it to make a precedent on how the board should operate. I think we won't see this continue, and we'll get behind this, and that board will be just fine doing what it does, and when there's time for replacement, I appreciate other people but we have a diverse board. I think we have dentist, a thoracic surgeon, and a pediatrician – something of that nature. As people move on, we can put a mental health person. You can put a holistic doctor. Imagine that. That would be pretty interesting. Do whatever you want to do but I do not support adding seats and I would ask that the Board not support this. Thank you."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE JULY 6, 2021**

**https://www.youtube.com/watch?v=1Ocn9ml9Ltc**

**1:25:32**

Laurie Ortolano Hi, Good evening. Laurie Ortolano, 41 Berkeley Street. I want to speak in opposition of this which has been consistent with how I have spoken. I think the very kick off to this with the survey that was put out by the Mayor was both leading and misleading and it raised a question immediately on what was going on here. I don't feel that the citizens in general have really been given the truth on why we were making this change and what it is that the City is trying to accomplish in doing this. It's just not clear enough to me. And because of that, I feel that we are being misguided on this. I have had a challenging relationship with the Police Department and I can say I don't think everything has been hunky dory over there from my perspective with my case and several cases that have been handled regarding issues that I brought to the Police. And I'd like to see some improvements on that and I'd like to see the commissioners a little more involved in what is going on within the department.



DRAFT

"That being said, I don't think you tip the apple cart over and you feel like you gotta start all over again. I think you let the system have an opportunity to correct mistakes if they exist or identify areas of improvement and you work through that. I recognize the reputation of the department and those that work in it want it the way it is. It is a three-member commission board and I think we should even think carefully about making it five. I feel as though the commissioners are just trying to be accommodating with the Mayor or some of the Aldermen to say "we would expand it". But you know don't dive into that too quickly because if you have a good working relationship and it is going OK accept that. I think that we know that the governor, both Maggie Hassan and Sununu picked these commissioners and they backed who is there right now a Democrat and a Republican. We have 2 Independents and 1 Republican on the commission because it has to be a Board of 2-1. I would ask this Board of Aldermen that if you are going to move forward on this and set a 5 member Board that you set it up as a 2-2-1 Board; Republic, Democrat, and Independent because we have a large independent population here in Nashua.

"And that would be, you know, my take on that. Also, I would like a public…"

Alderwoman Kelly "30 seconds"

Ms. Ortolano "… Elizabeth Lu or Attorney Bolton. One of the speakers mentioned a conflict of interest with Elizabeth Lu voting because her spouse is a commissioner, Commissioner Plante. When I heard this last meeting I contacted Alderwoman Lu and she said she had a discussion with Attorney Bolton on this quite a while ago and all of that was cleared. And I think it is very important to make a public statement on the record tonight regarding this issue so we don't let situations like that hang out there."

Alderwoman Kelly "Time is up."

Ms. Ortolano "And put a dark cloud on a situation where there should be no dark cloud. Thank you."

**4:02:49**

Chairman Caron "Thank you Commissioner. If there's no one else, general discussion?"

Laurie Ortolano "Wait a minute, Laurie Ortolano."

Chairman Caron "OH I am sorry I didn't see you. Yeah Public Comment, I didn't see you. Go ahead."

Ms. Ortolano "I couldn't find how to get my hand up on this screen. I want to talk to you."

Alderwoman Kelly "Laurie can you state your name and your address and you are a little bit soft."

Ms. Ortolano "OK Laurie Ortolano, that's because when it gets passed 11:00 my voice drops down. OK it's Laurie Ortolano 41 Berkeley Street. I want to talk to you about the kind of corruption I see in the City and I am going to call it information corruption. You know, you have the authority and the power to take advantage of information and use it in a way that's against us and doesn't allow us to have access to it. Your duty is to allow us to access information and you are not giving us that. While I was sitting in this meeting I had a Right to Know response Jessie Neumann. On May 18th I put in for some emails or communications to try to understand what is going on with our emails in the City with this corruption, these missing emails. And I wrote "all emails". I asked for all emails sent by the IT Department or any employee within the IT Department to Kim Kleiner for the time period of April 1st 2019 to May 1st 2021. Please use the following search words – "corrupt" "back up" "back-up" "Ortolano" "Laurie" "internal only address" "hacked" "RTK" "Right to Know" "deleted 45 day retention". The response I got from the



DRAFT

City said your request for emails between a group of largely unidentified persons who may or may not still be employed with the City of Nashua regarding all IT and Technical and hardware problems that have occurred over a period of 2 years starting 24 months ago. Under RSA 91A:IV A "The City is not required to make available governmental records that are not reasonably described. It is the City's position that this request does not describe governmental records sufficient for an employee familiar with the subject matter to locate the requested records with a reasonable amount of effort".

"OK so let me tell you the problem I have. You don't have a list of employees anywhere that I can get ahold of. I can't give the names of who is in the IT Department because I don't know who those people are. And up until 2015 the names of the employees were in the CAFR Reports that were published every year, but you stopped doing it. So tonight I wrote Right to Knows to get the pay stubs of every employee in the City and then also I tried that through Finance and then put one in through Human Resources to get a form that might be signed by an employee when they become an employee of the City. Go through the file and get me a public form that I can get the name of that employee off of so I can generate a list. It's obnoxious that I am denied information…"

Alderwoman Kelly "30 seconds."

Ms. Ortolano "… because you don't have a list and I have to write Right to Knows like that. So when Attorney Bolton says that you know we don't ever want to take away your rights, he certainly does. And I do find that ridiculous and it offends me and this is what he is doing in that Legal Office when I get Right to Knows written like this. Now an employee tonight gave me the list of people in the IT Department. I was lucky you won't do that for me and haven't for 2 years."

Ms. Ortolano And haven't for 2 years. This is obnoxious, this is information corruption and Attorney Bolton has to go.

Alderwoman Kelly "Time is up."

Ms. Ortolano "OK well you gave Tollner 4."

Chairman Caron "Your 3 minutes is done."

Ms. Ortolano "You certainly did, I ran my timer, you did. So I am just saying no Alderman has been willing to help me in 2 ½ years on this and anyone who is running, I am going to be staunchly opposed to you. I've had to climb a hill."

**Board of Aldermen Tuesday, July 13, 2021**

**https://www.youtube.com/watch?v=UBvS56wECMY**

**1:31:49**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to just state quickly that I did support the veto by the Mayor and I think that I get a little concerned when I hear a lot of emotional language used to describe the reasons why we have to keep the Fire and Police budgets where they are at. We elicit an emotional response in people when we look at these safety issues and time but I am not certain that is fully justified or we have seen enough numbers that do justify that and when we talked about the



DRAFT

personnel cuts that would have to be endured in the departments based on these budget cuts, the math just didn't really make sense. So your DPW Department also is a very large department, they negotiated a pretty reasonable contract, they didn't come in an ask for additional funding and the type of work that they do is really gives pleasure to people and makes the City life more appealing and satisfactory and because it doesn't elicit this negative, emotional response regarding safety and health we sort of overlook that. So I think the vetoed budget should have carried and I think it was reasonable.

"Also I want to speak at that last meeting last week, Attorney Bolton made some statements regarding a Right to Know request I read into the record. He said that I did not provide, I conveniently left things out. I did not. I also didn't read the full correspondence into the record. That's true because I am limited by a three-minute time period and I sent you all the email, the Right to Know request response so you could all read it in its fully glory. But I did read the sections that were important to me that I highlighted that I felt were not correct on the part of the City. I am also really concerned that he was able to tell all of you last week that I had received all the available emails that Ms. Kleiner had received from IT and I hope you read that request and saw that they were not provided to me. I am getting an update on July 30th which is not necessarily the response or that the records would be responded to, it would just be an update. And it really concerns me when he can identify that the Right to Know was given to me that night and then give information that is not correct. Because right after Beth Scaer spoke he said, I never say a single thing that is not true. And I am wondering why he responded and spoke to my Right to Know request and gave information out that was not true to the Board.

"I also don't think it is appropriate that when a citizen responds on a time limit that the Administration will come back and fire back at the citizen and there's not rebuttal time to correct the record. So I am doing it this week and I feel he was out of line, he was inappropriate and I don't think the Board should allow him to speak and say such things. We should be able to challenge those. Thank you."

**FINANCE COMMITTEE AUGUST 4, 2021**

**https://www.youtube.com/watch?v=_1TZ-K9u8mE**

**54:03**

Mayor Donchess "All right - Public comment. Does any member of the public wish to address the committee? Okay."

Laurie Ortolano **"**Yeah this is Laurie Ortolano."

Mayor Donchess "Please, please go ahead."

Laurie Ortolano "41 Berkeley Street. Just a couple quick things. The discussion about the lock doors is a concern to me and I will tell you I talked to Kim Kleiner about this last week. I don't agree with what you're saying here, Mr. Mayor. You brought up a safety issue that no one else brought up when I addressed it and I think it's not relevant to what's going on. The offices that were open were Finance. Don't describe it as down a hallway tucked in the back. The only reason it's located there is because we've got an old building built like a maze and that's where they are. Now you go down the hallway and it opens into a suite of offices. I used to be able to walk in there. Sometimes the door was propped open

and just ask Rose if she could check a bill for me. I didn't do it often, but I will tell you it was very convenient when I was in Assessing or over in permits and I wanted something checked. I could do it.

“The other thing is Human Resources. I think I've gone in there two or three times to request a resume or a piece of information I could walk in and ask. The third area is down next to Assessing are the ladies who process abatement checks. My check address was incorrect. I walked in and asked them to correct it. I consider that city business and these locked doors I was told by Ms. Kleiner it was the choice of the directors. I specifically asked her about Mr. Fredette’s and John Griffin's office and it was their choice to have those locks put on. She said she left it up to the directors to choose if they wanted them and they did. I feel we should find new directors who don't want locks. So I disagree with you completely.

“Also, I sent an email out regarding - and this is a finance, a money issue. I'm speaking to you about it because I don't know who else to speak to about it. I sent an e-mail out looking at risk exposure from the Legal Office. We run risk exposure reports for abatements and appeals. Risk Management runs a risk exposure report or a liability report based on workers' comp, and slip and falls, and employee issues but the third area that we have risk exposure is our lawsuits or pending lawsuits and I didn't realize that that was held separately by the Legal office. I have never seen any reporting on those risks and the number of suits we have running in Legal. Now I wrote a letter to the Budget Committee and you were cc'd on it Mr. Mayor today to ask a few questions about it and then request if there was a report that they provided to me. I got a response back from Rick Dowd telling me to this question is best answered by Legal and any Right-To-Know requests gets referred to Legal. I let him know that I was confused by that because I was told to go to departments. But that also I had questions in my e-mail and Legal isn't responsible for answering questions.

“Well, tonight, while you're sitting in this meeting, Attorney Bolton puts out one of his punch in the face e-mails that says, “the Legal Department represents the city and provides advice only to city officials and employees regarding the city matters. Please do not ever advise anyone other than a city official or employee to contact us with questions. Please know many, many Right-To-Know requests are not referred to the Legal Department.” Well, obviously he's giving a reprimand to Rick Dowd who clearly didn't know it wasn't supposed to be referred there and I think you're right to no training and understanding of what your departments are supposed to do is unclear. I spoke to a department this week that said to me, of course, you know I have to bring this through Legal. So I don't know what you're doing, but this e-mail - and I don't know if Attorney Bolton is there but I'm sure his ego is - it fills a room no matter where he is. I think it's obnoxious to write this. Handle that privately and train your people because they don't know. I forwarded it, the e-mail, to Attorney Bolton as a Right-To-Know but then told the committee I'm asking questions and I feel the questions are yours to answer.

“I wrote an e-mail to you maybe three weeks ago asking you to help me clarify what are the channels I'm supposed to use to get information? I received nothing. These types of scolding e-mails from your legal office are obnoxious. You really need a new Corporation Counsel. There's no - and I will tell you, I have called legal offices around the State. I have worked with legal offices to get Right-To-Know information and Attorneys…guess what you can call them and get…”

Mayor Donchess “Ms. Ortolano we limit these…Ms. Ortolano. Sorry but we limit the public comment to 3 minutes and we’re way over that right now. So could you just conclude, please?”

DRAFT

Laurie Ortolano “Give me 30 more seconds because you didn't give me a warning like you usually do. So yes I can limit my time and I will.”

Mayor Donchess “Thirty seconds. Go ahead, 30 seconds.”

Laurie Ortolano “Thank you. I will let you know that other legal offices around the State as well as the Attorney General's office, the Department of Revenue legal office will take my phone call, work with me, answer questions, and help me understand how data is stored and maintained in their facilities to fill a Right-To-Know request. Your Legal office refuses to do that thereby driving up the cost not only for all taxpayers. It's obnoxious. You need to dump Attorney Bolton and find somebody who wants to do that job as Corporation Counsel. Thank you.”

**Board of Aldermen Tuesday, August 10, 2021**

**https://www.youtube.com/watch?v=kJun5MSP6w0**

**1:14:50**

Laurie Ortolano “Yes good evening. Laurie Ortolano, 41 Berkeley Street. The reruns of a popular TV show Chicago PD still command a sizable audience. One ad frequently runs to attract viewers’ features the lead actor as a combative detective exchanging words with the city mayor. Obviously frustrated about some action the detective has taken, she exclaimed, “You work for me.” And responds the detective answers, “I work for the City of Chicago”. In many ways, this outburst captures the essence of an important public policy and Charter change issue facing the City of Nashua. To what extent should elected politicians exert control over the inner workings of their police department? We are all aware many police departments across the country have been the object of increased scrutiny, protest, and calls for change and reform. Some proposals are discouragingly extreme to their scope. To date, Nashua has been spared the agony of trying to respond to the kinds of issues that have generated these protests and proposals and hopefully will continue to do so.

“Our police department enjoys broad community support. Thankfully it ain’t broke but our Mayor still wants to fix it. I’m happy with the system of political oversight that currently exists. He is proposing changes that gives the Mayor direct political control. As it stands now, the Aldermen appoint one of their members and an alternate as a liaison to the Commission. It is important to bear in mind that two aldermen have regularly attended Commission meetings and have not raised red flags. Had there been cause for concern, those Aldermen were obliged to report misgivings back to the full Board. No records of misgivings or persistent or systemic deficiencies exist to justify the Mayor’s sudden action. The Mayor is proposing a Commission overhaul. He would like direct authority to nominate commission members with the aldermen appointed all members of a larger five-person commission. The Mayor would then be able to use the Commission to pressure the Chief on any number of internal matters.

“The Mayor is unwilling to subject his opinions to the full review process and vet this important change before the community and Board…”

Donna Graham, Legislative Affairs Manager “One minute”





DRAFT

DRAFT

Laurie Ortolano "…Instead he is jamming the petition through unwilling to allow the scrutiny of this Board and the community who may have different opinions. Read, fire aim is an added choice for a Charter change. Given at the present, the Mayor and Aldermen must approve the operating budget of the Police Department. Additional political leverage can only be aimed at personnel matters and day-to-day operations. Notwithstanding allowable objectives of local control, this for Nashua is a bad idea."

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "In summary, the proposed Charter change would 1) drastically alter the semi-autonomy of the Police Commissioner, would increase the risk of blatant political interference, and bias and operations would certainly disrupt department operations and have not demonstrated any potential increase in efficiency or effectiveness. The potential benefits of local control are undefined and outweighed by the risks of political damage to the operation. Therefore, the Charter change should be voted down. One last quick item. I don't support the…"

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "…increase in board members on the Board of Health. I wish we had more time to talk to both. I've spoken publicly about this. Please support our doctors on the Board of Health in maintaining that Board as a three-member body. Thank you."

**3:08:37**

Laurie Ortolano "Hi. Laurie Ortolano, 41 Berkeley Street. Just quickly. I sent you an e-mail tonight and I attached a spreadsheet looking at the top ten largest communities in New Hampshire relative to their police departments. What surprised me is – and it really surprised me. I called all the departments and talked to the police stations. Five out of those ten do not have commissioners. Three of the cities that the Mayor highlighted as cities that had changed their commissions – Portsmouth and Laconia – those two municipalities have three commissioners but they are elected by the general public. So five out of the ten don't have commissioners. Three out of the five left they're elected by their citizens at the ballot. Manchester has an appointed commission but it is only advisory. It doesn't have (inaudible) duties.

"So what's being proposed in Nashua is really unique to the other ten. I would like – I obviously think this is going to go on the ballot and the Mayor is going to get the signatures and the citizens behind providing the signatures to put it out there but I would like to understand how he determined that the best option was to have the Mayor and the President appoint and the Board vote versus having a citizen vote. Berlin and Somersworth were also used as examples of communities that change but you are looking at massive size variations – 10,000 people compared to Nashua with 90,000. The other thing you have to take into consideration here – Manchester is 113,000 people. Nashua is 90,000 and then the next biggest is Concord at 44 and it rolls down. So you know we have to be very careful with blanket comments and I looked back at the Mayor's original survey and he question he proposed is and it was just his blanket survey to his fixed number of constituents but it was 1) do you want the Mayor and the Board President to appoint the Commissioners, or 2) do you still want it with the Governor. I wish three had been on there which is do you want to elect them yourselves at the polls on a staggered time schedule. I would just like to understand how this happened and honestly I've been on an e-mail chain

that's you know 50, 100 comments deep. There's a lot of people that have asked some really good questions on that e-mail chain about what we're doing this…"

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "…and what it means. So huge opportunity to do some education over the next few months and I think there's a lot of work to do here to educate people. Thank you."

**Joint Meeting of the Board of Public Works and Committee on Infrastructure, August 10, 2021**

**https://www.youtube.com/watch?v=ChUB2ZHchrQ**

**6:06**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street Thank you very much. A couple things on your process for compliance with Right-to-Know. Just so you know, Chairman, this meeting was not posted on the website, and it needs to be. The 91-A meeting section 2 says if a body ordinarily maintains notice on an internet website then it should be reasonably accessible through that location. And I had an alderman recently email and said one of our posting locations is always the website and the second one is a notice on the door. If I had not been told by a Commissioner that this meeting was happening I would've never known. It was not put there. I also just asked you if the subcommittee had met and you said we met once. I can find no posting of it. Did not know it ever came and I have not seen minutes. Also your minutes need to be approved, they're only draft form and there are some inaccuracies in these records that need to be updated. So, I want to be able to participate and come to these meetings and listen but you have to make the postings such that I can find them and I know where they are. So, also, there are some general questions I have about reports that were going to be attached. Obviously, first of all, this meeting has 21 people in it and based on the Board of Health meeting last Monday that I attended this would not be considered a safe distancing room. I don't care where you fall with masks or no masks, but I would recommend, given what's going on with this Delta variant, and concerns that the City has, that you go to the Aldermanic Chamber, which is much larger."

Chairman O'Brien "Ms. Ortolano, items on the agenda, if you would please. The mask issue is a different matter that's not to be discussed."

Laurie Ortolano "Ok, well that's a safety concern. But I will address that with the Board of Health. I will write a letter and email to them and I will address my concerns in these minutes about obtaining some documents that are referenced here with Director Fauteux. Thank you very much."

**FINANCE COMMITTEE AUGUST 18, 2021**

**https://www.youtube.com/watch?v=mB1MlKH7qno**

**1:22**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just noticed the change order that's put in for the energy upgrade at Wastewater and I was wondering when you talk about it if you could tell me when





DRAFT

that project was started and the completion date. When I look at the contract, I can't quite tell when this project is expected to be done and that's my only comment. Thank you."

**18:02**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Hi. Good evening. I just wanted to talk to you a little bit about the use of subcommittees when we're making big changes on items like our Charter. You know our Charter is like our city constitution and it requires a lot of close and careful vetting before we make these changes. I really feel it was a mistake to push a petition through the way it's going through right now and not having this subcommittee meet.

"I wanted to let you all know that I'm on an Assessing Standards Boards subcommittee up in Concord. The committee was formed as a subcommittee to address releasing sanctions against assessors who are sanctioned by the DRA. This became a little bit of a hot issue when we had some of our assessors down here fall in the category of having some sanctions issued and the Assessing Standards Board realized that those sanctions were not being released publicly and they had anticipated when they set up the regulations that they would be released publicly. Now to address that, they didn't put it through and rush it through this year as a board change. They formed a subcommittee and I'm on that subcommittee. That subcommittee has been vetting the issued in meetings to allow open meetings all other chiefs and assessors from the State to come in and participate and it's been discussed at the full meetings of the board. The DRA and the DOJ have taken a neutral position, aren't going to block it. Basically the DRA is willing to give control over to the Assessing Standards Board who would like to put it under the Office of Professional Licensure and Certification. Now that's all done by committee and it may take about two years to get this change through as law. We're going to write the law this September. It's a process and we're doing the process.

"I think we're jipping ourselves down here in Nashua when we have a Mayor, some aldermen, and figureheads – leadership people pushing a petition. This is not really a citizen's petition and anyone who says everyone has the right to push a petition, that's true but when it's your Mayor who is doing it, you're a figurehead. You're a leader. When you're going door to door, people may be assuming that it had adequate vetting. There was adequate discussion. That the facts are being laid out the way they should be. I don't think that's really the case and you have a higher level of influence sitting as a figurehead than a general citizen who brings forth the petition. I came to this Board of Aldermen and asked if they would back a petition change for the Board of Assessors to require that all assessing board members living…"

Alderman Harriott-Gathright "Thirty seconds."

Laurie Ortolano "…in the City of Nashua. It received no attention at all or acknowledgement. Now that would be a case where as a citizen I could go out and ask for signatures and bring it forward because I tried to work with the Board. There was no acknowledgement and I could do it separately but you have not been willing to work with the Board Mr. Mayor. You were not willing to work on the subcommittee and you're jamming this through as a power grab over financial issues. That is really the wrong reason to do it and you're doing the wrong Charter change. The change should be for a city manager. You're in the right church but you're in the wrong pew here. When you compare us to Dover who has a City Manager…"

DRAFT

Alderman Harriott-Gathright "Your time is up Ms. Ortolano."

Laurie Ortolano "…and that with a $400 million budget has a mayor. Let's work on the correct Charter change. Thank you."

**Board of Aldermen Monday, August 23, 2021**

**https://www.youtube.com/watch?v=OuZzjz_C46I&list=PLqQByMyIJNHIpujxIgRbAZjX7e4VCTBXq&index=15&t=87s**

**32:16**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Thank you. I just want to piggyback off of what Fred Teeboom has said and there's not many public people out here. It's been something that has (no audio)…I'm just pointing out that Fred Teeboom made a comment about this money that surplus that seems to be divvied up and distributed among a lot of pretty high cost projects. I don't understand in this city why money isn't returned back to the taxpayers or put into a rainy day fund and looked at differently on distribution. You know we end up with – we have a tax increase. I think we understand what's coming next year with the reevaluation and redistribution between commercial and residential properties. I don't understand it. I know I came from a small town that was only 7 – 8,000 but there was so much attention put into returning money to the taxpayer and in the city it seems about we always have a new project we get to look at to go spend it. I don't understand it. I wish there were more people out here to talk to it frankly but there aren't. I think you as a group should be doing a better job about looking at how you distribute this money versus what you put back and give back to the taxpayers. Thank you."

**BUDGET REVIEW COMMITTEE AUGUST 23, 2021**

**https://www.youtube.com/watch?v=OuZzjz_C46I**

**44:40**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. As far as your agenda with the addition of the new holiday, I understand the importance of the holiday. I'm not belittling it whatsoever but it is a significant monetary cost to continue – to add the day. You know it seems like we should look at other ways to make reductions if we're going to fund this holiday and add it into a day off for everyone in the city. It's just a very expensive thing to ask the taxpayers to fund.

"The other issue is if this NRO that Fred points out which I was not familiar with 545 E if I have the number correct because I'm going to look it up requires us to maintain a list and under the spending cap I hope we have that list available and you're looking at it. I do think that a lot of this money that gets moved around should be returned to the taxpayers to keep the impact on the tax rate as low as possible. Like I said before I think at the other hearing, we just seem to be able to allocate all of this additional money to projects that you feel are important but I rarely hear the Budget Committee or the Aldermen as a group looking to say I don't know how often I've heard you say let's bring this money

back and put it in the taxpayers pocket. It's just something I don't hear spoken often and I think you need to do it a bit more. Thanks."

**1:40:09**

Laurie Ortolano "41 Berkeley Street. I'd like to talk to you about getting the support of the aldermen to encourage this city or request that the Municipal Records Committee convene to discuss how our city records are stored. This has been a big concern to me when it's come to access to information and there's been a lot of Right-to-Know stuff going on. This committee has not convened in over 10 years. I've had a good number of e-mails with Sue Lovering asking her to work with the Mayor, the Treasurer, and the Assessing Department because those are the individuals that are supposed to be on the committee called out by your statutes. She's not willing to do it. The way this city is set up is every department seems to be in charge of putting their own schedule and records together. It is a huge issue and Fred Teeboom mentioned IT. I think you've got a lot of work to do in your IT Department in upgrading it but also and having it be responsive to the issues we're seeing like with e-mails. You know the responses to these Right-to-Knows are ridiculous. I sent you all a letter and showed you that the city finally released the training material for Right-to-Know training that was done with city employees. It was only done optionally for those that waned to attend. The city fought us tooth and nail – the legal office – claiming it was attorney/client privileged information. When you see what was released after two months and thank you to Alderwoman Lu and Commissioner Pappas because if there hadn't been two people with some courage that could reach out and ask the Legal Department to provide the information so that they could look at it to make a determination, I don't' think we would have ever had this released. I was going into court with a lawsuit that was getting support from my NH Right to Know Coalition group to push it to try and see what this information was. The way the information is written if you look at it, it's really focused on not providing information to citizens. It's a focused paperwork that shows how to protect the city versus how to share information with citizens that are our public records. It's very frustrating to me that I still go through this. There's a lawsuit going in soon on failure to get minutes. It took two months…"

Alderman O'Brien "Thirty seconds"

Laurie Ortolano "We shouldn't have to fight like this and I would really like members of the Board to request the city convene the Municipal Records Committee so that we can access to our information and we don't have to keep going into court looking for help. The city legal office Attorney Bolton is dumping millions of city dollars on this stuff and there's no accountability from his office on this. It's a disgrace. Thank you."

**Board of Assessors Meeting of August 26, 2021**

**https://www.youtube.com/watch?v=MEvMnpqaLRg**

**37:45**

Resident Laurie Ortolano was given the floor and presented concerns with City Staff and Board of Assessors.



DRAFT

Talks about Attorney Bolton, Attorney Leonard, Rick Vincent, Ms Kleiner, Dan, Bob Early, Paul Bergeron, Ms Walley, and talks about her arrest. Lawsuits. Calls Cecilia Leonard "a despicable attorney" and "it was the cuntiest behavior".

**The following was transcribed by E. Vassar on Monday, March 18, 2024**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Can everyone hear me okay? It's a little hard when you're doing this with your facemask on. Okay. I gave you a letter because at one of the last meeting, Attorney Celia Leonard made a statement at the end that she had no recollection of ever saying that my emails into AssessHelp had to be questions for my own property. And she said, "It's my understanding that every document that Ms. Ortolano has ever requested has been sent to her if in fact it existed and was recently described. I don't think she can produce any evidence that I ever sent her anything saying anything like that." I provided you with the record from July 15th of 2019, and I sent a question into AssessHelp, and I sent another email in that had even more information on July 15th of 2019, and Ms. Leonard wrote back, "AssessHelp was created for residents to reach assessors for assessments on their property or to schedule an appointment." She did say – and she denied my information, my question request, because they weren't specifically for documents. You know, RSA 91-A is records request. And I understand that. But the DRA has regulations where citizens can go in and speak to assessors about property issues that are not necessarily in compliance with 91-A. That's why it's set up that way. I mean, there are properties – and I watched at that time, especially after the update, literally hundreds of people come in and have their questions answered. They weren't RSA 91-A document requests. I didn't even know the AssessHelp line existed until the summer of 2019, and it was Miss Colquhuen who said, "I send my questions in to AssessHelp. Doug Dane usually assists me." I said, "I'm gonna try that, why not?" And then when I did it, I was denied. And it wasn't an avenue for me. And this legal office has a short memory about how things operated in there and the walls they put up for when I wanted information. I do think – and, ya know, Attorney Bolton also said to me, in the early days of my abatement, when I was upset that I couldn't get a meeting with the assessors, and Greg Turgiss did not respond to my questions, he said, "We're under no obligation to respond to you." In fact, the DRA came back with a different answer, and said, 'Yes, they are. The assessors are supposed to respond to you. It doesn't have to be one assessor, it could be a chief, somebody. But under the DRA regulations, yes, they're supposed to respond to your requests.' But this city was able to effectively usurp that on an individual they didn't like because I was digging into information. And you know, to this day my husband and I scratch our head and think that it took seven years to get our property fixed, and it was absolutely absurd. It should've been recognized right away. The first year we came in, and I had the assessor come out to the house after it was jacked up two-hundred and forty-thousand. There should've been a "Oh, okay, wait a minute, let's get this right." And ya know, we went through *so much*.

"The other thing Miss Leonard spoke about was, and the letter was cut out, she spoke about my arrest at City Hall. And Rick Vincent said something to me recently when I was down in the Assessing office, regarding coming in with my abatement. Those two abatements to stamp. First of all, I responded, I followed the abatement process for three years. And for three years, in my opinion, it has not been followed per procedure, through policy in the book. We don't do what we say we're gonna do. First come first serve isn't really done. Responding to every citizen based on their evidence isn't really done. And stamping abatement applications, last year, you didn't set up a process for that at all. I don't know why. It wasn't a pandemic issue. I know you had renovations, but you had a person in the front. I believe that assessors were working in Kim Kleiner's office, her staff, and I had confirmation that that was the



DRAFT

fact. And Rick Vincent said to me, "You know, Laurie, when you came in to get those abatements stamped, and you went up to Legal, they could have never helped you, because they didn't have your paperwork." I said, "Rick, if you look at me on film, I'm carrying the abatements with me. I'm doing the process that was in the book: 'Come in with your abatements, get them reviewed and stamped.'" Now, I emailed them first, and no one responded to the emails. Twice. I sent it to the wrong address, to Rick Vincent in Lebanon, but I sent it into AssessHelp, where people would send them. And for *some* reason, the City has no record of those. I have *six* emails from different citizens that don't come up in the email search. So what I wanna tell *you* as Board of Assessor members: when people send email into AssessHelp, it doesn't always get received. And it literally goes *missing*. There's no accountability for it. I have six of them that are sitting in a lawsuit now to say, 'Where do they go? They're not there.'

"So, ya know, after sending the email in twice, on the 17th and the 20th, after phone calls, two phone calls, nobody responded. And my general sense of City Hall, unlike *other* agencies, City Hall is *very* non-responsive on the phone. I mean, I've heard *so* many people tell me, "Nobody picks up the *phone*." So I didn't get a phone response in five days. So I came in, following the procedure with my paperwork. And I was *admitted* without an appointment because website obviously didn't say I need an appointment. One, to go to Miss Kleiner's office, two, to go to the Legal office. There was no appointment posting on the website. So I can't – and the woman let me in. So when Celia Leonard says, "Mrs. Ortolano knows we don't stamp abatements in our office" – typically, that's true. But we don't have an Assessing Office under construction. We don't have a pandemic on top of it. And all of the communications about the abatement issues we going to *Legal*. Jesse Neuman and the Legal Office were handling them. Because that's the way they wanted it to operate for anything coming in from Miss Colquhuon or I. So they *knew* what the concern was on stamping the applications. Honestly, if somebody had been in Miss Kleiner's office – it was 9:30 in the morning. I really thought somebody would *be* here. Dark, lights off, door closed. Nobody was in. I went to the Mayor's office. Dark, lights off, nobody in. Door locked. The Legal office, the girl was there. I mean, it was a simple request for, ya know, citizen work. And it got blown into something that should've never happened. And really, it was Celia Leonard who took this up a notch very heavily, to do that. I think she's a despicable attorney. It was the *cuntiest* behavior I ever seen out of somebody. *Ridiculously* inappropriate. And we shouldn't be arresting our citizens in City Hall, *especially* over abatements. *Ridiculous*. So, ya know, her little story just did not fly with me at all. And *you* people should be concerned about it.

"Lastly, I asked the police to investigate this Board of Assessors for not complying with RSA 76:16. And Dan, *you* lawyered up and got the recommendation not to talk to the police about reviewing abatement applications. Personally, I think you should resign. To sit at this Board, to review people's abatements, and be comfortable taking yourself out of an investigation, because you know you had communications with Miss Walley, you know she talked to you, that the Board in the past reviewed all these applications, and that it's not happening now. And you were the one who had the most direct firsthand information on what was going on with them. And you lawyered up and told the police you wouldn't participate in the investigation. A chairman who won't participate in an investigation on how our records are being handled shouldn't be sitting in a Chair seat. And I've asked the police to reopen it, because they did not ask you folks if actually received the abatement applications. And I am *fully* of the impression that you do not! *You*, Bob Earley, told the police, "We receive the abatement requests." I don't know what you're talking about. Now, Paul Bergeron said they don't. He said, "We only get an analysis, the property record card, a picture…" Bob's, I mean, Paul Bergeron's information I thought was very accurate. But the





DRAFT

police failed to ask the basic question. And ya know what's even worse? Is that I have to go to the police and ask them to open a civil investigation on this, because the attorneys' office, Attorney Bolton and Celia Leonard, are so corrupted by their own beliefs, that they won't provide information to citizens that just should be given to us. Answer our question. If you don't wanna do it, say, "We don't wanna do it." But when I call other cities like Concord, Keene, and municipalities, they actually get copies of the citizen's abatement application put in with their backup information. Why? Because the burden of proof is 100% on us. And if we carry that burden, you should look at what we present. It was the biggest problem for me. I did an evidence-based, sales-based abatement, and you folks threw it in the trash. Threw out my sales data, and went with a data correction. Nothing is stronger than sales data, and I couldn't get you to even consider it. You didn't even have my application to see the work I put in. And if you did, shame on you.

"Now I asked for all these public packets so I can see what you look at. The whole intent was for me to be able to see what you at. And if you're going in to City Hall, in the back door, and reviewing all the abatements, then just *say so*. If that's what you were doing in '18 and '19, just say so. I don't understand why there's the secrecy. Not to answer that question. And Bob, I'm not certain you know what an abatement application *looks* like! Because when you tell the police, "I receive all the abatement requests", I said to them, "That's not abatement applications. Does he mean whatever the assessor put in the packet?" And if you're receiving them, then the public's not receiving them, and I've asked for them. As a matter of fact, it was a huge, big deal going through Legal during the pandemic to get copies of the abatement requests. There had to be ten communications. With Legal really resisting providing the information. Too busy. But if *you* were getting it, it would've been great, because it would've just come to me in the packet.

"I mean, really, Dan, I think you shouldn't be sitting here as a Chair when you lawyer up and you don't give direct information on issues that involve people's property assessments and their abatements. You just have no business sitting here. It's offensive to me.

"Lastly, I wanted to talk to you about your minutes. I put together a lawsuit against the City on how minutes and non-public minutes are handled. Right-to-know New Hampshire is helping me with it. And it's just an interesting case, because I happen to think you're not as forthright with your minutes, and you should be. Every time you approve a settlement agreement, I don't know why in the past you would put that out publicly. You would come out of non-public and announce a settlement agreement. That was super helpful to me, sitting here, because I could track it. But what I realized is you were never consistent. You would do some of them, and you didn't do others; at the time you were doing that, I believed you were doing it consistently for all settlements. Then, when I went to City Hall and reviewed the records, I realized there were a bunch missed. So it was sort of a haphazard approach. Now, I came into City Hall today, and went to the Clerk's office, and said, "I wanna see the folder for 2020. I was in in July to look at all the settlements. You've since done a bunch. I don't know which ones you've done." I've gotta go *back* in there and have the Clerk's office pull out the file so I can track which ones came through. And it's a lot of work for them, because every time I go in, they don't seem to know what I'm talking about. And they should be records for immediate inspection. They should be able to just hand me the folder. But I wouldn't go into the Clerk's office to get that information if the motions were just unsealed and it was put on the record. And to me, it's so simple. The Department of Public Works unseals their minutes."

Mr. Hansberry "One minute, Mrs. Ortolano."

Laurie Ortolano "They are the only department, is that because … what was my time limit?"

Mr. Hansberry "It was 15 minutes."

Laurie Ortolano "Yeah, okay. So the Department of (Public) Work(s) unseals them, makes them available to the public, and I think they're the only agency that follows the true intent and spirit of 91A to release information that should be publicly released. You manage, ya know, ten-billion dollars of valuation, abate *millions* of dollars, seal them off, and make it *very* difficult for the public to obtain that. Thank you."

**Board of Public Works, August 27, 2021**

**https://www.youtube.com/watch?v=Ic55vpYFHLM**

**6:37**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. Just a couple of things. I attended the budget hearing and the public hearings for allocating escrow money, and there are one, two, three, nine items that have to do with DPW where money was transferred and allocated. One of them this gentleman that just spoke was $56,000.00 to use to fund citywide playground improvements. I don't know if there's some money in there for him on that. I just don't know. But one of my concerns I have is I don't understand why all of this goes through the Budget Committee or a hearing through the Aldermen, and it really hasn't been presented to the DPW. Disc Golf is on the agenda today. That's great. I don't know if all the other things have been on the agenda, but it just appears like we operate backward. I mean, it just doesn't seem like DPW should be the last stop on hearing the plans that have already been approved, the money transfer, and the allocation by the Board of Alderman and the Budget Committee. It just doesn't make any sense to me. Also, I attended your hearing on or your meeting on August 10 regarding the joint committee of infrastructure and the DPW Board for the building of the new office facility, and frankly, I asked if there would be public input. I received an email from Tim Cummings saying there would be. I didn't demand it. I didn't argue for it. If you don't want to have it it's certainly your choice. These issues being decided on public comment seem to happen by an individual, I don't think the Board, the group as a whole decided on it. When I came to give public comment I felt I was very rudely interrupted by Chairman O'Brien at a minute and 55 seconds because I wasn't speaking to items on the agenda. You put it first, and he very harshly let me know that you had 3 minutes and that's it, and we're doing this as a favor to citizens. Don't do it as a favor if it's disingenuous. Don't give public comment if you really don't want it. I was cut off at a minute and 55 seconds, I was gipped my last minutes and 5 seconds because I was told I wasn't speaking to what's on the agenda. Do you remember what your agenda looked like? There was no board packet. How could I possibly speak to these things when I didn't even know what they were? CM contract. I didn't know what that was, and I don't understand. So, I can't speak to an agenda that has no material that I can prepare for, to come in. Put public comment at the end if that's the way you want it, so I can listen to what you're talking about. Secondly, I don't think that the subcommittee of this working group is appropriate or necessary. It seems like a way to splinter out the group to have decisions being made that are not brought to the full joint group because there were significant motions. There was a motion to spend $15M instead of $10M and it wasn't even on the agenda. So I could question that because I didn't know the motion existed. If the subcommittee meets, and you discussed a motion to spend $15M and your subcommittee is there

to recommend to the full joint committee what you're proposing, a $15M expenditure should have been on the agenda, and should have been written out completely so citizens know. So, I really feel that the way you operate is just so backward, and I can't track what's going on with money. It's very difficult. Thank you. And I overextended my stay. Thank you."

**Work Study Group Relative to the Police Commissioners**

**Human Affairs Committee September 2, 2021**

**https://www.youtube.com/watch?v=sl8hNt44XfI&list=PLqQByMyIJNHIpujxIgRbAZjX7e4VCTBXq&index=17**

**1:02:27**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Can you hear me okay? Okay. Just to move through some items quickly. I do think there was definite confusion by some people who signed that petition. I know I've been out talking to people and there are definitely people who regretted putting their name on it and not understanding what they were…"

Chairwoman Kelly "The mic is not working. Could you state your name and start over please."

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. People definitely were not aware of what they were signing. Some of these individuals didn't understand the ramifications of it and they definitely said to me that they're not voting for it and they regretted having their name on it. Really once you put your name on a petition, you can't really take it off. It's there.

"Also I think exit polling is very important. We have a great opportunity. In eight weeks we're going to be at the polls voting. No matter what happens with this vote if it passes or it doesn't, we have an opportunity to have information on the table and collect, question people coming out, and let's gather data coming out of the polling because no matter what the committee is going to still work and try to come up with a solution that we think is a united solution and that's an opportunity. There could be 10,000 people come out of those polls.

"I love the idea of the ward meetings grouped together – 3 at a time. You don't have time not to. I can tell you the public is hungry. Those people who are concerned about this want a unified message. They're out there now and they're not certain what exactly we should say and what we should put together. What kind of signage we should have for the police. It would be nice if someone on this board or a few people on this board could help direct that. There's two functions here as I see it. There's this longer term study committee absolutely necessary and then we have this short eight week need of trying to we're either going to take a position to try and stop that vote from happening, or make people more educated to make a more informed vote, or we're going to just let it fly and say whatever happens happens. I don't think there's enough people in the public that I think don't want to just let it fly and let's see what happens. They want to participate in trying to educate people - handing out literature, putting up signage, and trying to tell people what they think is important.

"As far as expanding – okay the Executive Council. I think it's great to invite somebody from the Executive Council but I can tell you the people that have been calling the Governor's office, one





DRAFT

individual in particular, talking to the assistant up there. You need somebody out of the Governor's office because the Governor's office is making the nomination for the Executive Council and they're actually doing the screening. There's a woman up there who has a lot of knowledge and I think the idea of getting an Executive Councilor in here is great but I think the past Councilor would be interesting. Deborah Pignatelli. Let's get her back in because she picked the last Executive Councilor. What types of concerns did she have? What was the vetting process like? She's right here from Nashua and let's pick her brain and find out what's going on and check with other Commissioners. It sounds like that's going to happen.

"As far as expanding the board goes, you know are the Commission. I'm not really in favor of that. Okay you can do it but you can find qualified women or minorities to come join a three person board I think without issue. There's plenty of opportunity. Thank you."

**Board of Aldermen Tuesday, September 14, 2021**

**https://www.youtube.com/watch?v=kL16DXkjvPw**

**52:49 & 59:39***

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a couple quick things. I know the Mayor had spoken with you maybe some of you about the changes in the assessments that will be coming next year in 2022. He indicated that he would have a meeting in September to brief the Board on what's happening with commercial properties and I think now is the time to do that. We've all been able to read in the newspaper what's happened up in Manchester with their new re-evaluation that came out – 5 year re-evaluation for 2021 and I think we're in for you know a significant issue here next year, and I think we should briefed on this and have a discussion, and the Board should be informed.

"I'd also like to talk to you about a situation that I feel needs to improve with our data handling and our records in City Hall. I think that the legal office is created the situation where they're showing some pretty bad faith in how they're handling Right-to-Know requests. Since they did a training seminar in June, they're no longer signing Right-to-Knows that are given back to citizens when they are complying with requests for information. So unless it's coming out of the legal office there's a signature but all of those Right-to-Knows that are coming out of administrative offices or departments are unsigned. That's creating some issues because in departments that have 6 agencies underneath them, you don't know who is actually responding. It's really a show of bad faith.

"I want to let you know that I worked with a citizen who wanted to get access to minutes that were not posted on line. Minutes June Caron spoke about this at a meeting. Minutes are your most basic record to obtain. It should be very simple to get minutes. It really shouldn't require five days. It took almost two months and eight back and forth e-mails to try and get the city to provide the minutes to an agency that weren't properly posted. It wasn't…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "… clear that all the minutes were there. It's ridiculous that citizens are fighting this hard for records that should be basic public records. Clearly there's a lot more training to do and we need to get rid of that bad faith that's being exhibited by this city. Thank you."





DRAFT

**59:39* (assumed user error related to Zoom connection in this portion)**

Alderman Jette: "…I'm not sure my analogy is correct but it's what I think of when I look at how when people say well the taxpayer have already paid this money so it's better for us to spend it rather than…"

***Laurie Ortolano** "Hi my name is Laurie Ortolano. I called earlier today to see if I could line up a reporter (to do a deposition…)"

Alderman Jette "I don't know if Ms. Ortolano was calling me or…so I'll end there. Thank you."

**Board of Aldermen Thursday, September 16, 2021**

**https://www.youtube.com/watch?v=hIDn1m8jt04**

**46:58**

Laurie Ortolano "Good evening. Laurie Ortolano, 41 Berkeley Street. A couple of things. The Police Commission size as a group of three I don't think should be changed. It's efficient. This Board heard the Board of Health talk about how important it was for them to stay as a unit of three because they were nimble, they worked well together, and they were efficient. A board of three as Police Commissioners is just fine and there is room on that board if there are other people who want to get involved. Diversity you want to include it, that's fine. It happens when it happens. You don't roll these seats over frequently. That's a given fact and three members on that commission I think the Police Commissioners should hold firm and the board members too to say that is a board that is sized appropriately to do the business for the city.

"Also, vetting this required so much more care. It wasn't an open process. It happened very quickly. It was one sided. There wasn't the debate that needed to be had. There were questions asked. The petitioners who wrote this said hey we're going to run around, gather all those signatures, and then we're going to allow the public to ask questions after. The debate starts after it gets on the ballot. I asked questions to Trish Klee and others why was it not considered to allow citizens to vote on this rather than having the Mayor appoint. I never received an answer. It just seems to be that well that's the only option that's exists. That's the one we brought forth and that's what you get to vote on. That's not open discussion and I don't think it needs to change at all. I think it's just fine the way it is. I think you're Charter change that needs to be look at is whether you need a city manager. Start looking there at a bigger picture on how you manage your money not how your Police Commission is set up.

"As far as putting women on a board because you need diversity, the kind of diversity you need in the city right now is the diversity of our minds. This is a very closed minded chamber typically and this Mayor is very narrow minded. He does not respect the broad opinions of other people and in many instance some of them are women."

Alderman O'Brien "Thirty seconds."

Laurie Ortolano "Now as far as open seats, I applied for a seat on the Board of Assessors. I was never considered. Not only was I not considered, I never even received a letter to let me know that I wasn't qualified. Is this how our Mayor is going to treat candidates who apply? Unacceptable to me. This

needed to be vetted. Everyone should vote no and let this be worked out the way it should be through open communication and dialog. Thank you."

**Board o Public Works, September 23, 2021**

**https://www.youtube.com/watch?v=n-iTQDFISi8**

**6:00**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. I think I can stick to my 3 minutes. A couple of things. At the last board meeting, it was mentioned by Director Fauteux at the end regarding costing, that there was some work done on a utility pole, a sidewalk, and tree removal, or tree replacement due to the Performing Arts Center. My question is does that come out of the Performing Arts Center budget, or does that come out of Public Works, and maybe it doesn't come out of Performing Arts because of the way Performing Arts is bonded with the facility? However, I'd like to know with the finances, is that cost tracked such that a citizen would be able to see that reflected in the total cost for the Performing Arts Center package? Secondly, your package today has a nice proposal done by a superintendent or a DPW staff member regarding resurfacing the Ledge Street courts to turn them into a street hockey facility, and it looks like there was a lot of detail put in there, and the gentleman made a recommendation not to proceed with that resurfacing and redesign because the cost came to $85,000.00. I'd like to point out that when the disc golf was presented a month ago, that type of analysis was never presented; and I have to tell you, I'm sorry that Ms. Pappas' motion, and I know that Ms. Schoneman wasn't here did not pass to go and walk the area. I for one can't see in the design how many acres that 18-hole golf course takes up.

"Also, if you need to create more parking space, parking can cost you $50,000.00 to $250,000.00. If you have tree work to do there's a cost associated with that. If you have to move a walking path, there's a cost associated with that. And none of that was costed out, and I think it's perfectly acceptable that citizens come forward and present their ideas to this Board on what they're interested in.

"You should always be opened minded, you should always welcome that kind of discussion, but I just don't' feel that the analysis and the plan put forth was complete enough to make a vote to say, let's spend $30,000.00 because it would easily look to me like it could be a project that cost $300,000.00. And also, we're very landlocked and real estate limited, Roby Park is a beautiful park. I'm just not certain if the disc golf space and real estate would constitute a usage that would be good for the City, in the long run when it came to activities for kids and families. It's just a thought. I don't know. But I don't think there was enough rich discussion on this to speak to it.

"Finally, I noticed there's a gentleman running for Public Works that's also a Greater American Downtown individual who made a request to the Department of Public Works regarding some street work that was done and received what looks like a pretty prompt response on what was going on. I'd just like to point out that you know I'm all about equal access to information and responses. Some of us have to fight through right-to-knows and long delays to get information, and others get stuff handed to them very rapidly, and you know my platform has always been equal access to information, and I hope this Board would embrace that, and I hope as a Board that you all want to see that happen for everything that goes on here at your board table. Thank you."

**Board of Aldermen Tuesday, September 28, 2021**

**https://www.youtube.com/watch?v=ZXuKsHcixQY**

**1:09:22**

Laurie Ortolano "There was no sign up sheet back there. Was there?"

President Wilshire "Yeah, there was."

Laurie Ortolano "Well I came in and there was no sheet. Nobody came and picked it up."

President Wilshire "Yeah they did"

Laurie Ortolano "Could I ask for public comment?"

President Wilshire "You'll get three minutes. Go ahead"

Laurie Ortolano "Thank you. I'm rather disappointed by the letter that was just…"

Alderman Caron "Name and address please."

Laurie Ortolano "Laurie Orlando – 41 Berkeley Street. I'm rather disappointed by the letter that was just read into the record by Ms. Kleiner and I feel the need to comment to it because I didn't know that this letter had been produced. It really shows a lack of sophistication on the part of some people in this administration, especially leadership people to summarize a public letter or a citizen's letter like that in that manner saving several untruths she said. This city isn't capable of recognizing that citizens carry different opinions. It's not that it's an untruth. It's a perspective. It's an opinion and when Ms. Kleiner talks about the changes in that office just so you know, I was unaware that those people had left. I've had difficulty recently just asking for an updated report that I waited three weeks for because I didn't know you only had one clerical staff member in there. Now, it would be nice if the administration would tell citizens that you're short staffed. Let us know.

"You had the same problem in the Clerk's Office. We don't know that the line is eight people long because you only had two clerks in the office. Tell us. So that's one issue. When your staffing is down and you don't have the citizens, you don't speak to it. The fourth paragraph of this, "the difficulty arose with the constant unsubstantiated criticisms raised by a select group". I think my criticisms were very substantiated. A court ruled in my favor on my property appeal and for the life of me I don't know why those assessors weren't sophisticated enough in this Legal office to recognize that that property was incorrectly assessed, grossly incorrectly assessed. Had this city addressed my concerns differently from the beginning, had somebody opened the door and said Mrs. Ortolano come on in, sit down, and we'll talk to you instead of slamming them in my face, pushing me away, and reading e-mails about how my brain doesn't work right because I'm an engineer and I can't understand assessing. It's insulting and that's the quality of the people you had in Assessing. I didn't enjoy that.

"With regard to articles or newspapers in social media…"

Donna Graham, Legislative Affairs Manager "30 seconds."





DRAFT

Laurie Ortolano "…you were the people who put me on the front page of the Telegraph for wasting money. Ridiculous. That was a poor move. With regard to following people outside of the workplace, well that obviously didn't bother the employee because that's the one who stayed who's here now. So you know, this is such an inaccurate - it just reflects perfectly on what is wrong with this city and I would ask citizens get out and vote and replace these Aldermen in this chamber."

Donna Graham, Legislative Affairs Manager "Time is up."

President Wilshire "Times up."

Laurie Ortolano "Time to move on. Thank you."

**Board of Assessors October 7, 2021**

**https://www.youtube.com/watch?v=pj88TiFxj-Y**

**8:35**

Mrs. Laurie Ortolano of 41 Berkeley Street spoke and expressed concerns regarding the ongoing revaluation and how it will impact residential vs. commercial taxpayers.

**The following was transcribed by E. Vassar on Monday, March 18, 2024, from video**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to get some more detailed information from Vision. The Mayor announced at the coffee in July that he was aware, had communications with Vision that there would be a shift onto residential properties with these assessments, and ultimately, the tax burden, because of the drop in commercial property values due to the pandemic. Vision has collected a year-and-a-half of commercial data and six months of the one-year data they're gonna use to create the model for next April 1st. So the Mayor had told me in the meeting when I addressed him privately that he would have an open discussion with the Board, both you and the Board of Aldermen, regarding this shift in the valuations in September. I didn't put in a Right-to-Know for the information regarding any communications because I said, "I'll give you till September", it was July at that point. In September's Board of Aldermen meeting last week, he announced – that… he did not, I believe the Board Chair did – announced that they would not discuss it till November 15th, after the political race and after the tax bills are mailed out. I don't agree with that type of transparency. It's politics. It's not transparent for the public. And I have some real concerns and issues. I have talked to a lot of senior citizens who are very, very concerned about what's coming down, and what they're paying right now for property taxes. And the one thing this city hasn't done is really control spending, they continue to spend, and if we have this shift onto residential properties, they're gonna get hit. And we also know that many of these assessments are wrong, because we didn't handle the depreciation right. I have a home in my neighborhood, walking-distance, that is assessed for three-sixty and sold for six-fifty. That's not because the market's running high. That's because the three-sixty assessment done by KRT was not the correct assessment in 2018. That house hasn't gone up sixty or seventy percent for an old home. It was one of those homes that was never done correctly. It had two additions, and depreciation was never handled correctly. So I would like to have a candid talk, and I would like it to start at the Board of Assessors' level, because I think it should happen here with you *with* Vision. I would like to know what they're seeing with these commercial properties.





DRAFT

"I'm also concerned that we're gonna continue to see a drop in commercial properties. There's some really big issues with shipping in this country right now. And anyone in commercial business or anyone that is involved in receiving inventory is in a lockout, really, because of the stack of cargo ships that are laying in ports because they don't have the workers to unload them. And I know it effects many, many businesses. So we're gonna continue to see commercial properties hit like this.

"I can see from the data that the entry rate is about 6% right now. When we first started this, the Mayor said it was gonna be forty: we could expect 40% to open their doors. I said it, Bob Gagne said, probably closer to five. We're at six. We got a little more time, let's see what happens. I have to go back and look at the data from Vision on how they've tracked their entry rate. Yes, the pandemic impacted it, but they opened up to do internal inspections four months ago. What's going on there? How many people are calling? How many people are lining up? I think they're really trying to get into the homes with the sales data, which is excellent, because they gotta build a model off of that.

"So I think there's a lot more we can do for transparency on this issue. I think the Board should be asking more questions of Vision, asking more about the skew that they're seeing between commercial and residential properties. This happened in Nashua where there was a shift in 1992, and it was a very, very difficult time for citizens. And I feel we're not being candid about this. I try to put the word out, but I think the elected body should be doing it. So it's disappointing that I have to wait six months, a mayor has had conversations with Vision, and is able to keep those confidential for six or eight months before he informs the public of what's going on – *after* an election and *after* a tax bill comes out. That just doesn't work for me. Our assessments are not a political game. And they shouldn't be to any of you sitting here. You don't serve the Mayor. Your serve us, and the interests of us. And I feel you're not doing that. Thank you."

**Board of Aldermen Tuesday, October 12, 2021**

**https://www.youtube.com/watch?v=lUYgCnIx0qo**

**17:53**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to address the minutes that you approved tonight and the statements made by Attorney Bolton at the end of the meeting on September 28. I take exception with his analysis or discussion regarding the abatement and the property appeal that was won up at the BTLA. He said the Legal Department, myself met with her and her attorney and she basically adopted the position that she would not compromise, and that she would not settle for the exact amount, and that she would only settle for the exact amount that she claimed her assessment should be. This is wholly untrue.

"Attorney Bolton knows that when we met that the city offered no value at all. They made no attempt to provide a number. On the record during the abatement with the Board of Assessors, I asked them if they would accept 592, take a KRT number for the sales value, and reduce it by the ratio of 94.8% and the Board said no. The Board of Tax and Land Appeals - Bolton says the Board of Tax and Land Appeals came in slightly less than the middle. This is a graph or diagram that shows the property assessment. The city asked for 2019 that the property of a market value of $800,000. I asked through my appraiser they came up with $598,000. The BTLA awarded $650,000 and when you apply the ratio, the city

wanted the assessment to be $710,400. My appraiser had it set for $531,000 and the BTLA gave $577,000. I asked for $592,000. When Attorney Bolton says as many as many times this is not a win for either side. This was a huge win for me. It was more than I really wanted. So I was very happy that I could get 2019 applied because if they had settled with me on the 2018 number, I would have never gotten the 2019 value. So to me this was a huge win and when Attorney Bolton says that the BTLA came in the middle, they were looking for a substantially higher number.

"I would like and I'm going to submit to the record the 18 page decision from the Board of Tax and Land Appeal. The city appraiser used two sales that will really illegal use…"

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "…and I knew it. Mr. Gardner - the Board found merit in the taxpayer's criticism of using her own property to create an assessment. Additionally, the BTLA said the use of 51 Berkeley Street was wrong. It was more than double the size. The lot was 2.14 acres compared to a third and that property had sold for $1.15 million. In light of these substantial differences, Mr. Gardner's testimony regarding the reasons why…"

Donna Graham, Legislative Affairs Manager "Your time is up."

Laurie Ortolano "…selected this property as the sale comparison was not credible. I want the facts on the record…"

President Wilshire "Your time is up."

Laurie Ortolano "Can I submit this?"

President Wilshire "You can submit it. Yes. You can hand it to Alderman Tencza and he'll make sure we get it. Thank you."

Laurie Ortolano "Thank you."

**1:07:26**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. The September 28 meeting was very disappointing for me because this Board does not follow Mason's Rules. Over and over again, I have watched Alderpeople – Aldermen and Alderwomen get interrupted and cut off by Attorney Bolton when he becomes inflamed by something that doesn't agree with him. In the 2016 letter that my neighbor just referenced, it said Bolton's tenure on the Board was marked by criticism for what some described as his autocratic leadership style. Further in the article, it says Donchess described declined to address the criticisms of Bolton's temperament while Aldermen but noted that the City Attorney would not be involved in any as an elected board member. It's a totally different role for him as City Attorney. He is not a legislator or an advocate for anything, but simply represents the city's interest.

"All too often, I think Attorney Bolton takes the floor away from the body that's here. I went out and I've done plenty of door knocking and not long ago, President Wilshire, you stated that the citizens deserve better. I can tell you this week door knocking I had people comment about that meeting on the 28th and said we deserve better, and this chamber needs to change. It's just not right what's going on here. Citizens are knocked down. Elected officials are knocked down by this unruly belligerence that's allowed to exist in this chamber. It needs to stop and I hope this election brings some of that about.





DRAFT

"I'm very concerned about the is representations Attorney Bolton stated about my legal case. He gets the floor for an extended period of time. I have a timer that runs for three minutes and cuts me off. I don't know why you don't ask him to submit on the record something in writing so we're all able to see it. I think he missed there's been 110 filings on my Right-to-Know case. Utterly absurd for him to characterize that every motion for summary judgment was I lost was actually wrong."

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "There were a number of summary judgments submitted that Judge Temple simply said take them into the trial to be decided. They weren't judged against or for. They were just requested to be brought into the court. So it's just very disappointing to see how the city operates against its citizens and this elected body is just not doing the job it should do for us. Thank you."

**Work Study Group Relative to the Police Commissioners**

**Human Affairs Committee, October 7, 2021**

**https://www.youtube.com/watch?v=sUD3cU0xYFo&list=PLqQByMyIJNHIpujxIgRbAZjX7e4VCTBXq&index=27**

**10:39**

Laurie Ortolano "Hi, Laurie Ortolano, 41 Berkeley Street. Now I know I rolled in five minutes late so I'm not certain if the discussion is done already on 1, 4, 5, and 6."

Chairwoman Kelly "Nope, that's what we're on right now and you may just want to make sure you're pointed at the mic."

Laurie Ortolano "Okay perfectly fine. So public comment was below it so I was confused. You know, I too, would like to make certain that the group stays focused on its mission and what was discussed in the first meeting regarding gathering information from other communities and, you know, looking at what would be the best option for Nashua. But I also have a recommendation because I've done a lot of footwork over the last couple of weeks out in the community. I think those Aldermen that voted to table this initiative for whatever reasons you had, it would be helpful if you group together and wrote a letter that could be publicized as a Letter to the Editor or posted on Facebook that explains your position for wishing to table it. Because I think there's a lot of people out there that do not know that the Aldermen voted to table it, or that this was a split decision. I can assure you, they absolutely do not know and the word is not out there.

"So I think it's very important to be clear and to be clear with the public what your position is. I mean I went to City Hall today to look at those petition verification sheets to see who verified those signatures and the Mayor personally verified 800 of those signatures out of the 2000. He's motivated. He's also still going door to door and today as I talked to residents on one street, a group of them had received a phone call from him on this issue just recently. So he's calling, he's going door to door still, and he, you know, gathered, witnessed 800 of these signatures. So there's a lot of motivation there on his part certainly to see this change happen. So I think I want to see the Aldermen who recommended tabling it





DRAFT

for study be as motivated to pull together information to sign a group letter and put it out there very publicly as to why you voted to table it. Thank you."

**Work Study Group Relative to the Police Commissioners**

**Human Affairs Committee, October 18, 2021**

**https://www.youtube.com/watch?v=ApkF1qLuMZo&list=PLqQByMyIJNHIpujxIgRbAZjX7e4VCTBXq&index=31**

**5:28**

Laurie Ortolano "Laurie Orlando – 41 Berkeley Street. I just have a quick question on format tonight. This is public comment and then there's a discussion involving all the wards. Is that where people can comment as well? I'm just confused on the format."

Chairwoman Kelly "So we're running this as public comment with three minutes each person. If you have questions, your Ward Aldermen can pull them up when we bring the rest of the people to the table to talk."

Laurie Ortolano "So there will be a question period?"

Chairwoman Kelly "There will be a question period within this horseshoe, yes."

Laurie Ortolano "Okay but right now this is just three minutes?"

Chairwoman Kelly "Yes please."

Laurie Ortolano "Okay, so…"

Chairwoman Kelly "Can you just speak right into the mic so we can hear you clearly? Thank you."

Laurie Ortolano "Sure. I don't have anything formally written but I've been out and I've not done a lot of doors. What I've learned from this experience is that the gut feel of this Board and those who voted against it to request that it be tabled or not brought to the ballot, I think was spot on. The voters out there have no clue what this is about. It's very hard to lead an education campaign when newspaper publications are so limited and the pandemic took its toll on linking people together and getting us out and we still live in this quasi pandemic mode. I think it was a big mistake to see this go on the ballot.

"I'm disappointed with the lack of leadership provided by those who voted against it in the chamber to step up and actively campaign and help educate those out in the public on this issue. There seems to be too small a group trying to do that and there's not enough time to do that. By the time this was put on the ballot, we only had months to work an education campaign and as you can see from the turnout at your last meeting for Wards 1, 4, 5, and 6, there weren't many people there. I've been a pretty big critic of city government and I've been accused of being the cause of people leaving the city workers. I don't really think that's the case and my criticisms have been very focused on the leadership of this city. I think we have major leadership issues. Our leaders aren't doing the right things to unite this community and for the greater good of this community and that needs to stop. So I'll have questions as we proceed. Thank you for the time."





DRAFT

**1:51:08**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to comment regarding the hurrying of the process. I think that was a real issue here and I think there was a lot of political motivation in bringing forth this Charter change the way it was brought forth. I don't think proper policy was followed or practice in the past. I don't know why Mayor Donchess and Attorney Bolton told the Board that this was the process that was followed and that deeply concerns me. Alderwoman Klee's comments about the political climate in Concord also really concerns me because I think we have quite a challenging political climate right here in Nashua and we should focus on it locally.

"You know one of the things and problems I do see is I don't like to see aldermen or alderwomen who serve in Concord sitting in this circle because their influence on what they see in Concord is driving too many decisions locally and I don't think they're balanced. So I think we have plenty of political problems right here in this city and I am less worried about Concord and more worried about Nashua.

"As far as committee appointments down here, our process for appointing to committees, and vetting it, and allowing the public to know how these citizens get appointed and what their backgrounds on is not existent. The case in point was the Board of Assessors. I applied. The Mayor never acknowledged my application. Truthfully looking back at it, I think I was qualified for that job. I was a woman. I could have done that job well with my engineering background, I was worthy of a response from the city and I got nothing. Not at all and with multiple phone calls and resends on the application, there was still no acknowledgement. So I know how this Mayor plays the game and he does play a game and I don't want that game played with commissioners.

"Regarding hiring practices that the former Chief just spoke about, I think he said that poor hiring practices was what results in lawsuits and litigation that he was party to when he was listening to other departments as he was traveling. I couldn't agree with him more and I think the hiring practices of the Nashua Police Department are standards that are hard to come by in any other department. There's a level and an excellence there that's unprecedented. When you look at the hiring practices in City Hall, I don't think you could go much lower. So there's a stark contrast there. Who you know matters and the less you know, the higher you go and that's why we have so many problems in City Hall. We promote Directors and Managers that have no resumes to support it, put them in charge of six or eight departments, say hey they can work 80 hours a week. They're awesome…"

Chairwoman Kelly "Your time is up."

Laurie Ortolano "…and they're not doing it. I don't want a Mayor who operates under those hiring practices to hire or be part of the hiring process for Commissioners. Thank you."

**Work Study Group Relative to the Police Commissioners**

**Human Affairs Committee, October 21, 2021**

**https://www.youtube.com/watch?v=9m1rbWiwYE4&list=PLqQByMyIJNHIpujxIgRbAZjX7e4VCTBXq&index=32**

**2:04**



DRAFT

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to address this Work Group on my concerns with the partisan nature of this issue. You know this was supposed to be a non-partisan issue and I've discovered it's very partisan and the individual making it partisan, in my opinion, is the Mayor in the way he's handled this. I feel the 8 Aldermen who voted against it haven't stepped up to participate in the process of educating the public on why you voted against it and why you said no. I'm tired of looking at an elected body that feels like they have to kiss the ring of this Mayor. It's not serving the city well. I'd like to show you a graph of our city. This is our representative city as of 2020 last year – 43% were registered or affiliated independent; 23% Republican; and 34 1/2 % Democratic but our aldermanic chamber consists of 9 wards and 6 at-large that are 100% Democratic. That process has failed us because it's not representative of the city. The School Board is a little better but not much. Twenty-one of the 24 elected seats are a single party and we are diverse.

"I am so disappointed with Shoshanna Kelly and the leadership role she has shown on this group. She won't step up and participate in speaking against this. You left it to citizens and other people running who hung their campaigns on this issue to represent it. You as elected officials didn't lift a finger and I expect much more. So I hope in another week when citizens come out to vote they change the colors of this chamber and the diversity we start to experience is the diversity of our affiliations and our thoughts because I think it's so important in our representation. As a woman who participates in government who held a technical background, I expect more from some of these leadership women because is a spine is a terrible thing to waste. Stand up and use your voice."

**1:55:23**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. You know we started this process off and when this Petition came forward, I was told as a citizen we'd be able to ask questions and get answers before we had to vote on it. I'm remiss to understand what questions and answers we've been able to ask. I came to two ward meetings and you didn't allow questions. I don't even understand that. It's nice that you get to ask questions but since the citizens have to vote on it, we should be able to ask questions. When I send e-mails, particularly to the Aldermen who made the vote, I don't even get a response back nor do other citizens. So everyone in my opinion has been irresponsible with this from the elected body. Miss Klee and Miss Newman really disturbed me in their comments about, you know, this should just go on the ballot and let the people vote. Miss Klee didn't have anything to do with it. She just kicked the process off. It was completely irresponsible. Once she kicked it off did she pull back and say, whoa wait a minute, this is way too involved? I shouldn't back this. Nope, she let it roll and got right on board and all of it seems to be based on fear of what's going on in Concord. This very political partisan environment up there. You know, she explained that as a Democrat, she hasn't been able to get through to the Governor's office.

"Well as a citizen in a nonpartisan city in three years, I've never gotten through the Mayor's office. That's interesting. Let's worry about the partisan politics we have going on down here and I'm not the only citizen. We have an autocratic, vindictive Mayor. I did not vote for him the last time and I would never vote for him again. He needs to move on and he has taken a position to do something with this Police Department. It's completely irresponsible. It's just ridiculous. I received the text today and there's a small group of us going out working very hard at getting information out. One of the people doing footwork today said lots of good conversations today with people doing yard work. They really don't know what's going on with the police. Kind of scary. Yup, that's what I had found.

"And what really disturbs me as well is when I see an e-mail in a very nonpartisan city that is a nice picture of the Mayor and the candidates on the steps. Let's keep working for a better city. Vote for your Democratic team on Tuesday, November 2."

Donna Graham, Clerk "Thirty seconds."

Laurie Ortolano "Jim and Vicki Donchess. Let's all of us get a black permanent marker out and put an X through every one of these faces and make certain we do not vote for these candidates on November 2 because this is far too partisan, and it needs to stop, and it starts with the Mayor. He takes your voices away and you as Aldermen are kissing his ring too much. Thank you."

**Board of Aldermen Tuesday, October 26, 2021**

**https://www.youtube.com/watch?v=pcVaDTRpFFo**

**30:49**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to thank the Board of Aldermen members who brought forth the Letter to the Editor or the OP ad that was published in The Telegraph and Union Leader for the no vote for the Charter change for the Police Commission. I think that was appreciated by many of us and it's helpful in providing further education to the community.

"Secondly, I'd like to address I'd like the Board of Aldermen to maybe take an interest in looking at employee turnover in the city. I find found out that there is no tracking of turnover for employees in any of the departments and I think it's important to know the health of your workforce and why they're going. We did have a letter read into the record a few meetings ago that attributed turnover in some areas to a group of citizens being too, you know, harsh or direct and trying to understand what was going on. I don't think that can really be validated and I think your process for exit interviewing needs to be reviewed because I don't think the department head who the employees work for should be conducting the exit interview. I think it should be done somewhere else. I can tell you, if you recall, when the Police Department investigated the Assessing office and they interviewed staff. If you look at those interviews, there were three or four staff members that said and expressed in those interviews that they didn't agree with the removal of a Chief and they felt that a Chief had to be brought back. But that had not been raised at that point by the administration because I don't think they felt comfortable telling the boss who made the decision to remove them to bring that individual back. So I'm not certain what free dialog you get and if people are leaving or moving on to jobs that are staying in the field within their field, they may not freely talk about why they exited from a city job. So I think it's important for us to understand that and to gather that information from all departments in the city and assess the health of our city government in our departments. I would encourage you to start asking for those types of reports and tracking what's happening within the city. Thank you."

**Board of Aldermen Tuesday, November 9, 2021**

**https://www.youtube.com/watch?v=xTomBHzm998**

**1:15:55**





DRAFT

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Good evening. A couple of things. I listened to the sick leave policy that you adopted tonight or as an incentive to get people vaccinated and I'm just curious to know if that's a violation of any of the union contracts to specify that they can't use their sick leave if they catch COVID and are not vaccinated. Also, I think it would have been good if the city had recognized another thing and that is if an employee has a letter from a doctor that says they've had COVID, that that would be recognized as well. So if they had natural immunity, it would be recognized and they would be able to use their sick leave if they caught it a second time. I think that's reasonable. I don't know why we don't give any credit to natural immunity because they do if you go into Europe now. You can get into a country with a vaccine card or a note from a doctor that you've had COVID.

"Also, I think the bonding for the DPW facility, I'd like you to pay attention to that because it looks like we're approving money that's going to the Budget Committee that now takes the project up over $17 million. I have followed along with that project and what I heard was approved was 15. There's another couple million that got slipped in there and I'd like to understand why that happened or what that money is used for and I'll pay attention to that when it goes to the budget meeting.

"Also, I believe the next meeting you're going to have a discussion about assessments. I think it was due on the agenda for the second meeting of November and to talk about the shift between commercial and residential properties to try and give us an idea of what's going to happen next year. I would also ask the Board to pay attention to looking at the elderly exemption ahead of time and not wait until next year like we did the last time. Our property increases on average were about 23% but this year coming up in the following year, I think you're going to see increases that are closer to 40 - 45% and that will be devastating for those folks who are receiving the exemption. They're not going to be able to hold on if you can only cover for 50% of it like you did the last time. So I think that's really important.

"Anyway, there was one other thing but I didn't write it down and it slipped my mind and there's still 30 seconds left so I'm yielding it back to you. Thank you."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE NOVEMBER 15, 2021**

**https://www.youtube.com/watch?v=RhUpMDWYQqc**

**2:18**

Laurie Ortolano, "Laurie Ortolano, 41 Berkeley Street. I'm only speaking first because I don't know what this discussion is going to be like. I would like to know how the hiring process worked for this position. The recruiting process - does the city use any type of outside recruiting agency to try and attract candidates to the job? And the reason I'm asking that is because I think CFO Griffin is highly qualified for what he does. He does a terrific job. I think he knows our budget inside and out every line item. But I do become concerned when we expand somebody's responsibilities and they have to wear more hats than they do. And I think we I think we all know what we saw when, CFO Griffin had to carry, you know, Assessing on top of Finance. It turned out to be a big task that was too difficult to cover and my only concern is when we take the CFO and we put them in the Treasurer or Tax Collectors role, that we're doing the same thing. We're splitting him and diluting him down where you can't be as successful as you should be.

"Our city is the fourth best city in the country, supposedly in this rating system and I'd like to try and understand why we have so much trouble recruiting. You know that I've talked to you all about people leaving and how important it is. I think to understand attrition and why people leave the city and I haven't had anyone respond to me that they're interested in looking into that or given any information from the administration that they're doing anything about it. But I feel strongly that the Board and the public should understand turnover and what's going on with turnover. But equally important is the recruitment of people to come into jobs for the city. If we're this terrific city, we should understand why it's difficult to recruit and find people. And I will tell you, I'm a big proponent of fresh eyes and feet coming into jobs here because you get the perspective of somebody new, looking at material, and potentially pointing out things that might need to change or need improvements that get overlooked by those who stay within the system and are trained within the system.

"And so right now, we have the Administrative Services Director who's an inside person who covers like eight departments. That's one set of eyes but that's also very much an appointment picked by the Mayor period. Not really outside recruited with any, you know, fresh perspective and now we're taking the Treasurer and Tax Collector's role and we're putting him in underneath the CFO and that becomes their role and, again, it's the same people. And I think we miss an opportunity to understand how our government works and improve it really openly by recruiting in…"

Alderman O'Brien "Thirty seconds."

Laurie Ortolano "…new people. Thank you."

**46:40**

Laurie Ortolano "Hi, Laurie Orlando, 41 Berkeley Street. Just a couple things. I do really appreciate what John Griffin does for us and Dave Fredette. Losing Dave Fredette is a big loss because you have somebody who comes in early in the morning, suit on, works his day, comes in Saturdays, and when you look at the customer service in his area, it's pretty outstanding. So we've been very fortunate. And as I said in my first public comment, I think John Griffin does an excellent job with our finances, our line items, and knowing exactly where we stand.

"But I do have reservations and I was disappointed in the Mayor's talk about this position because I think when he summarizes it that we really can't find anyone, we're much better working, you know, taking somebody from within because we haven't had any good luck hiring on the outside. I don't really know what he's referring to. I don't know that we've really tried to hire on the outside since he's been there. We hired John Griffin 10 years ago and we had a really good hire. It worked. Now the Mayor's been here six years, can't we hire from the outside and have it work?

"You know this is not an age discrimination thing but our workforce is getting older and, you know, I don't think John Griffin will be with us forever. And the one nice thing about hiring into the position is you might get somebody that can be trained with the knowledge that John Griffin had so that when he retires there's somebody there who has that. When you put the same hat or make him wear the same hats that have been worn by the people approaching retirement age, you lose the opportunity to spread the knowledge. And when the Mayor says we promote from within and it works great, in Assessing we had nobody to promote from within because we really didn't have staff assessors that really wanted to be certified as supervisors. So there was nobody to take over when Angelo Marino left. And the Clerk's





DRAFT

Office, we had nobody to promote from within. We took the clerk to the Board of Aldermen and made her the Clerk of the city. That's quite different. When we formed an Administrative Services Department, we didn't have a Maureen Lemieux with a Master's Degree and a finance background. We took the Chief of Staff to the Mayor. That's quite different.

"So you know, I think there is some benefit in hiring from outside. Your question was never really answered by the Mayor Alderman O'Brien on how many people and candidates they looked at. Elizabeth Lu had to pull that out but I think we should spread our training more and look for people to come into the city. Thank you."

**Board of Assessors November 18, 2021**

**https://www.youtube.com/watch?v=_JcZkqtE-Ws**

**10:20**

Ms. Laurie Ortolano, 41 Berkeley Street—Ms. Ortolano requested that the policy manual be updated to state that the Board of Assessors do not review abatement applications.

**The following was transcribed by E. Vassar on Monday, March 18, 2024 from video**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things. I'm requesting that the Board make a change to the policy manual regarding the handling of abatements, and place in there just an item that states that the Board of Assessors does *not* review abatement applications, but the Board, upon request, can receive applications to review if you so choose. And I'm asking you to do that because the police finally finished the investigation on this matter, and I think the entire thing was ridiculously handled. I was invited by the DRA up to a meeting by the ASB yesterday, a public meeting to talk about this, because they viewed it as so ridiculous. Ya know, I came to the Board eighteen months ago, and asked the basic question, 'Does the Board review abatement applications?' No one would answer me. I believe I went to the Legal office and got rejected because it was a question to be answered by – not requiring an answer under RSA 91-A, because questions don't have to be answered. I just wanted to understand if my interpretation of the State statute for boards to review abatement applications was clear. And I couldn't get an answer. So I then went to the BTLA, and they requested – they actually took the case – and requested that Attorney Bolton respond. Attorney Bolton's response never stated whether the Board reviewed the application. He danced around the issue completely, and he just ignored answering the question. The BTLA did not take I further, the DRA said to me, "We don't think the state – your city – is doing it correctly, that we would look into it – we might look into it…", they couldn't guarantee it. I had back-and-forth communications with Peter Rothe on this. He sent me emails, looked at my write-up, thought I did a good job: good on interpretation, reasonable issue, and then the DRA didn't take it, so I went to the police department and asked them to investigate a misdemeanor charge. You, Dan, withdrew yourself from that under legal advisement, which I personally think you should be removed from this Board for doing that; a simple statement like trying to find out whether abatement applications are reviewed. The police come out with a report eight months later, and never asked the question to the Board of Assessor members who *chose* to participate, Bob Earley and Paul Bergeron, if you actually review the abatement applications. Upon my request, they reopened it and asked the question directly, and called me about a month ago to tell me, "No, in fact, they don't."

I don't know why it took two years or eighteen months to get that answer. That's ridiculous, and that just shows the total lack of transparency.

"So my request is just put in the policy manual, as part of the abatement process, that in fact you don't do it. And then it's clear.

"Also, I'm very concerned about the sales review. Ya know, I didn't realize that none of the sales data, virtually none, only possibly two-hundred out of twenty-five-hundred, have been qualified to this point. Rick Vincent said it's due to a staffing shortage. But he is incorrect. Those sales, especially for abatements, cover October 1st of 2020 to September 30th of 2021. Our two residential assessors didn't leave until about September. Why did we not qualify data throughout the year? Especially when we were sitting home part of that with COVID. That's *perfect* home-based work. And now we're in an abatement season that, once again, we got *two-hundred properties* qualified for people to pick from.

"Secondly, we're having trouble printing cards again. We're having trouble switching over the software. We're having software problems with the tax bill. Nothing's been sent out. I asked Rick Vincent if he'd be willing to let a few volunteers go down, print the property record cards, put them in a book that… (audio cuts out) …so we don't have to pay a dollar each time we come in to buy them. He thought it was reasonable, he said he'd look into it, but, in fact, this is what other municipalities do. I've gone to them and I received the book of information. I guess it turned out he didn't deny it, but he basically said that they're not willing to do that. That we should wait, and by mid-December, something should be available. We have been given mis-information and lied to time and time again by this city on the availability of records. Last year, those cards didn't come out until January or February. I was sending emails to Rick Vincent to print me ten cards at a time, email them to me, so I didn't have to pay the dollar. Because they weren't available in November. And we go through the same thing time and time again since 2019. That's not transparency, and you're not working with the citizens. So I really think we can do a much better job. I did file a letter up with the BTLA today, and the state, a complaint on contract violation for this Vision update. I'm very concerned about what I heard. And I'm disappointed you didn't come to the meeting. I asked the Mayor to invite the Board of Assessors, to sit at the table, to ask questions. He told me he would do that. And you weren't even there. You should've been there for this update. You catching a part of it wasn't good enough. I would've liked for you three gentlemen, who are responsible for this Board, to ask questions. I've overused my time, thanks."

**Work Study Group Relative to the Police Commissioners**

**Human Affairs Committee, November 18, 2021**

**https://www.youtube.com/watch?v=hq6tpgzV8MU**

**1:46**

Laurie Ortolano "Hi, Laurie Ortolano, 41 Berkeley Street. I come here to tell you that I think this Work Study Group should be abolished. I think the one task you have in front of you is more clearly defining the process by which the Commissioners can go through to become selected by the Governor and participate in the commission board. I think that should be outlined on the city website and that process

should be more public for candidates. Once that's put on the city website, you've identified a good process that everyone understands.

"I'm opposed to this Committee meeting because I come to almost of them and you won't answer questions and you allow the public to speak but you don't allow us to have questions answered. I think at a committee level, that should be allowed and there is somebody who should be responsible for answering questions.

"Also, I think the Board of Aldermen as a whole should open the Ethics Committee and issue sanctions against the Mayor – hold hearings, address the ethics issues, and address how he operated during this Police Commission Charter changer because I think there were many ethics violations that he committed. You have a means of dealing with that. The reason you want to deal with that now is because his Commission change was beat down and won. If you did it and lost, you look like a poor loser but if you do it now after winning, you're making a solid statement on what you're going to tolerate for partisan politics in this city. You're not going to tolerate it so let's turn this around and send a strong message to the Mayor because anything else that comes up again, we're going to see the same antics. This is the cloth he's cut out. It's not public service. It's self-service with him. That's a dangerous game and I don't think we should put up with it.

"So, you know, using the cable TV station – the government channel – to hold a press conference less than a week before the vote to pitch a personal agenda item to change the Charter not the position of the governmental body which was a 8-6 vote not to bring it was simply out of line. Just because he wore the hat of the Mayor, he was able to take control of a TV station for personal agenda and this should never be allowed. He should not be allowed to exercise the type of partisan politics he exercised to move this thing forward, including shutting down government to virtually two months of not holding meetings. So please convene that ethics committee and take action on this, and be decisive, and let's break this Committee up. It's a waste of taxpayer dollars. We've got an answer. Let's move on. Thank you."

**BUDGET REVIEW COMMITTEE NOVEMBER 22, 2021**

**https://www.youtube.com/watch?v=k7IFvVfa-pg**

**22:25**

Laurie Ortolano "Hi. Good evening. Laurie Ortolano, 41 Berkeley Street. I know we have three different items here and they're all related. So I don't want to repeat myself too much but I also know I have a limited amount of time. So I'll be coming back up.

"A couple things regarding the facility. First of all on this one Resolution to use unanticipated revenue from 2022, I do support using that revenue to pay down the bond on Burke Street that was purchased years ago when it wasn't the correct building. I think you take out a bond on a facility, you don't end up being able to use the facility, you sell it, and then you maintain all the debt, and then apply more debt. Fundamentally, I don't agree with that. So that's one reason.

"Secondly, this facility has morphed into something different from where it began. It started off as an office facility and then it sort of became a facility that housed everyone except Wastewater, which is

fine but I do have a concern that there was never a traffic study done. All the equipment and heavy equipment is going to be in there and I see the city time and time again skirt these traffic studies and we don't do them. We really didn't do a good one down at Costco. We have the new buildings going in at the Henry Hanger Company and Corriveau Routhier where the road areas over there were a big concern. We did not look at the traffic impact over there and all of these vehicles - all of the heavy equipment going in and out in that residential neighborhood, I don't think we really did justice to a traffic study. I think traffic studies are important and I think it should have been - even if the public didn't come out and complain, I think we have an obligation to do the work and verify what's going on down there. It's a lot of heavy equipment. I don't even know how the timing works with making your schedules and your shifts work effectively pushing people out when they're all consolidated in a parking lot with 170 spaces plus the space for all of the heavy equipment trucks that will be rolling. So that's all I'm going to say on this part and then I'll talk about the other bonded pieces after. Thank you."

**27:33**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Quickly if I could have an understanding of the protocol for a hearing. Am I allowed to ask a question in a hearing?"

Chairman Dowd "You can ask your question and it can be answered now or somebody can get back to you later with the answer."

Laurie Ortolano "Okay, so my question is since I did address my concerns with the parking and my belief is that we didn't have a comprehensive parking study done. Was there a comprehensive parking study done? I mean a traffic study?"

Chairman Dowd "Director Fauteux do you want to address that?"

Lisa Fauteux, Public Works Director "Yes, we did do a comprehensive traffic study and it is posted on our website under the Division of Public Works website."

**29:58**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I could use some assistance. I have been looking at the boilerplate contract that was given to the board members and was on the finance page. It's the AIA Contract regarding this project. Section 5.2 guarantee maximum price states that price set forth in the guaranteed maximum price amendment, as it is amended from time to time. So it calls upon an amendment that's attached to the boilerplate and I haven't been able to find the amendment. I wrote today to CFO Griffin and asked him if he could help me with that. But that amendment is where there might be a force majeure clause called out and I want to understand a little more about what guaranteed maximum price really means in these contracts. Because ordinarily there would be a force majeure clause in there to allow that ceiling to go up in the event of unforeseen circumstances such as COVID and the situation that's occurred.

"I'm concerned that we put all our eggs in one basket. Harvey is a great company but they're doing the school. They're doing this office facility and they're doing the art center. Leadership here will tell you they're incurring all the risk. It's a maximum guaranteed price. So you know what if something goes wrong, they're gonna eat it. If there's a cost overrun, that's 15% deleted. Well when you look at roughly projects that are $150 million, are they going to eat $20 - 25 million? I tend to doubt that but I want to

DRAFT

understand where this amendment is and it's nowhere to be found. I think it's something we have to look at. Yeah I'm really concerned by that. Did board members receive the amendment to the document the boilerplate document so that you could see what the specific contract is regarding GMP?"

Chairman Dowd "I believe the committee's involved receive it. I know Infrastructure and then the construction committee received. I'm not sure about anyone else."

Laurie Ortolano "Well, it's not in the DPW package and it's not in the Finance package from Wednesday night. Not the amendment. The boilerplate document is there but I really can't find the amendment that would have the specific language. So I'm not certain what it means that the guaranteed maximum price as it is amended from time to time. That seems to me to open a door to say that these costs can be adjusted. And here's my concern. When Harvey came and gave a cost estimate in August to the DPW facility, they talked about how difficult a time it is right now. We all know that and they were hoping that things would settle out and calm down. I'm almost done, right?"

Chairman Dowd "Yes."

Laurie Ortolano "I'll sit down and continue with – go on."

**35:56**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just to continue where I left off. So do we have force majeure clauses in our contracts?"

Chairman Dowd "All of them."

Laurie Ortolano "All of them? Yeah, I thought so but I would love somebody to be able to point out where those are because I can't find it. So if somebody - that would be a request. It might be in these guaranteed maximum price amendments that I cannot find online in any of the attached documents. So. And again, my concern is you know right now Harvey bills in costs increases about 3 or 4% a year and the state of construction is seeing that type of increase in a month. In some instances, the fluctuation is 10, 12% a month. I mean, it's just real. It's really maddening and difficult to deal with. I mean my husband has a business and he's like pricing machinery weekly now. It's crazy. So I mean that concerns me quite a bit that, you know, we're going to have to work with our contractor. They're a great contractor but I don't think ultimately you can just stick it to them. That's not to our benefit or to theirs if these things become difficult to price and become difficult to maintain pricing. I think there's a reality that this could be the case. Of course, you know, I look at all aspects of what's going on in spending and I'm very cognizant of what's happening with property taxes next year, and these new assessments, and the sum total of it leaves me concerned that we should be more careful about what we bond and what we spend money on. So yeah if you could point me to those force majeure clauses and those amendments, I would surely appreciate it. Thank you."

**40:31**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. So we know why I'm in a position but I'm using my time wisely. So yeah I did look at the AIA Contract and put it in a word reader to try and find the force majeure clause and I just couldn't find it in there in. What I did print out here 5.2 was the language that I thought was closest – "price set forth in the guaranteed maximum price amendment as it is amended from time to time". I took that language because that's what I thought was closest but anyway. "To the

extent the cost of the work exceeds the guaranteed maximum price, the construction manager shall bear the cost in excess of the guaranteed maximum price without reimbursement or additional compensation from the owner". But it said, "insert specific provisions here, the construction manager is to participate in any savings" but that's a parentheses item that's in our contract. It was never filled in. So that's the only contract I have.

"I'll just, you know, reiterate my concern next year is that we have a lot of changes coming to our property assessments. I don't think the meeting on whatever night it was, was as pointed and direct as it should have been. First of all, I was disappointed there was no public comment. Second of all, the differential between the residential and commercial properties shown to be about 5% but I think that's low because we have a depreciation issue with our properties that's being corrected that wasn't addressed last week. That's going to grow that differential between commercial and residential properties. So I think property owners are in for a rude awakening next year and I think when you couple some of this debt on that'll be rolling thereafter it's problematic.

"Now when I look at this bond schedule that Dave so graciously provided us, it really looks like in 2023 the debt service is very low - $133,000. Is that what's correctly what's projected for 2023?"

David Fredette, Treasurer "Yes because we sell our bonds in the fall of each year. So the next year will be the fall of 2022, which is actually Fiscal Year 2023 and the payments don't start for the next fiscal."

Laurie Ortolano "Okay. The bigger hit comes in 2024?"

David Fredette, Treasurer "Yes 2024, yes."

Laurie Ortolano "Yeah and then upward there okay for a little bit. Okay."

David Fredette, Treasurer "But again, those numbers are very conservative."

Laurie Ortolano "Yes. Okay. So anyway, that's my feeling with the project. You don't have a lot of people participating. But, you know, I'd like to see a little more control on the spending and the bonding given what's coming down the road. Thank you."

**1:27:17**

**Minutes: https://nashuanh.gov/AgendaCenter/ViewFile/Minutes/_11222021-5757**

**Same Video Link**

Laurie Ortolano "Hi. Laurie Ortolano, 41. Berkeley Street. You missed the first public comment and maybe and I was going to just say a quick statement hoping you would address it. But you received and accepted the $30,000 from the Rotary for the disc golf course. I believe you allocated money prior to that $30,000 from another account, because I'm not certain that you knew if you were going to get this money. I might be wrong but I'm just going back in my mind to what I thought happened. If that money was allocated from another account, I'm just wondering if it can be returned to the taxpayers or to where it rightfully belongs.

"And also, there was a conversation or discussion, I think, where Director Fauteux mentioned that there would be a little bit of work done on clearing. And does anyone know how many trees are going to be cut down in that forested area in that park down there for that amount of land? I'm curious at how

DRAFT

much cutting we're going to do. We never did a real walk through. It's an 18 hole course and I'm just curious. There's probably a lot of old trees in there and I'm wondering how we're going to be handling that. Those are my only comments and thank you."

**Board of Aldermen Tuesday, November 23, 2021**

**https://www.youtube.com/watch?v=cpYgjz-8xzE**

**18:26**

Laurie Ortolano "41 Berkeley Street. First item is the Public Works bonds and appropriations that you're gonna approve tonight. Last night, Director Fauteux spoke to you about a parking study having been done. I was concerned about that. I don't know how many of you took a look at that parking study on the website but I'm going to tell you its very substandard. It did not look at truck traffic at all and I think it was done early when the building wasn't going to be all inclusive of all those different departments because that building started off as an office building and morphed into a more complete and full facility except for sewer and wastewater. So, again, I think it was a homespun parking study and I really think it is not complete and not the kind of parking study that would justify the size of that facility and the parking and the trucks that you have over there.

"Secondly, regarding CFO Griffin's position, you know, I, too, have some concerns. I think Elizabeth Lu made a very valid point about the Comptroller position. I don't think that position was covered enough and discussed enough and I think it's fair to say who do we have a get an answer in a public meeting on that and not be deflected and deferred and say wait, voted them in, wait, and then we'll tell you. I think that's not as open as it should be.

"Also, I would like to see you know if this is going to be a combined position that the office hours for this person be in City Hall from 8 to 5 Monday through Friday. That it not be a flex job, or a job that you can work from home, or not at the office. I think it makes a big difference to the people in the office. The people in Dave Fredette's area that come to him often and he's there during that entire time. I think you have to have coverage in the office with somebody there.

"Also, regarding your comments about the public saying things that don't make any sense. You know, there's a couple ways to handle that. When you say to the public, you know, do your homework or do a better job. I want you to know, I mean those weren't my comments but, however, doing that is difficult and City Hall. You don't come here and find many open doors. You don't pick up the phone and call and get people to return calls. You may have a meeting and its five days to get a response. So this City Hall operates differently let's say than Manchester. Go up there and you can get reports in an hour."

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "So I think it's better instead of dressing down citizens in a public meeting had you picked up the phone or somebody in your city pick up the phone and talk to that individual to clarify what was going on. That's not done as often and so I regret to see the approach taken here publicly against any citizen for failing to say the right thing. Thank you."

**1:41:16**

Laurie Ortolano "Could I please speak, Laurie Ortolano?"

President Wilshire "Yes."

Laurie Ortolano "Okay. Sorry, I couldn't find the button to put my hand up. Laurie Ortolano 41 Berkeley Street. I would just like to, you know, make the Board aware of a couple things regarding this development. We have to be cognizant of the fact that the property owner has the right to sell their property and enter into a contract to do what they're doing. I understand the homeowners on the west side of Concord Street not wanting this in their neighborhood but I think we have to recognize what control and what power we have and what we do. I think we have to be careful of setting a precedence here. I don't agree that we have to expand Greeley Park that there's a space limitation in there and that this parcel is a vital part of Greeley Park. I think that everyone should look at what the developer has proposed and anyone who says that, you know, we don't know what his work or what he's doing, you know, look on the contractor's site at the three developments that were done. You'll get a pretty good indication of his work and it seems to fit in line with what was presented to us on Wednesday night.

"So I think it's really important. I mean we have a development – the Camp Doucette was bought down at - purchase for $4million at 132 - oh the road in South Nashua. It escapes me now. That was 20 acres of a Boy Scout camp for years, and years, and years of old forest and that is all being cut down and turned into a, you know, 40 unit or more property development. We don't run in and scoop it up and save it. And you know, there's a reason we don't do that. So, and I think there's some misinformation given out here. I would like to ask if the Mayor plans to recuse himself because he's a voting member of the Planning Board and so is one of his or he can have a representative of his office and I think that since its development in his neighborhood, he should recuse himself from voting on this just to be aboveboard on all of this. But, you know, I want to caution you.

"I happened to live in Litchfield. There were three developments that went in a 55 and older, a bike path that cut right through my backyard with 20 feet of it taken, and a high school one street away, and I backed all of them. I know I was unusual to do that…"

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "I don't feel that my property lost value. That I made a bad decision. I wasn't popular at the time, I'll tell you that but it (inaudible). I view the high school as a plus. I viewed a bike path seven mile path off the back of my house as a as a good thing and the 55 and older was very cookie cutter not like this, and I didn't think it was going to harm the property and it didn't."

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "So I want us to be respectful of the process and make certain that we're allowing a fair and just process to take place here. Thank you."

**FINANCE COMMITTEE DECEMBER 1, 2021**

**https://www.youtube.com/watch?v=4xhUy1rcN0g**

**1:22:43**

Laurie Orlando "Laurie Ortolano, 41 Berkeley Street. This was a big agenda to follow and I don't know if it's normal but there were no motions attached to the packet. I thought usually you gave the motions like you would in any board packet. So it made it pretty challenging to follow and have to go through the data.

"I'm wondering, I noticed that I went back and looked at the budget for the CERF equipment for DPW and I noticed we purchased maybe five or six other pieces of equipment that were not in the budget for DPW under CERF. And I'm wondering if they weren't listed does that exceed the 10% rule and you have to bring that to the Board as well? Maybe I'm not reading it correctly but the first thing I did when I saw all of this equipment was to see what we budgeted? It seems to me we budgeted a lot more trucks and equipment and I I'd also like to know why if they weren't budgeted, why we didn't know we needed the equipment and why we need it now.

"Also, yeah, some of the accounts it didn't seem like the letters attached matched the motions on where the funding was coming from. But I couldn't verify that because I didn't have the actual motions being read.

"I was happy to hear Alderwoman Kelly, you know, ask about cost of the DPW facility with the increases in all of the material costs going on as a result of these shipping issues and COVID in general. But, you know, one of the things we think that would be good for the Board to do is to look at change orders and cost changes that have happened with the school and with the PAC. I've been asking for information about the Performing Arts Center. It's been several years, I think people since the Board has had an update on that. And I really feel before you approve this bond, we should be looking at the other two and how cost containment is going particularly on the purchase of items that are going to go into the building. I think that matters.

"And just one other thing relative to the brining. I know we all love the brining but I think one thing you forget about is that is its super corrosive on the equipment. So you get you get all this benefit of less salt, but you get an increase in wear and tear on your equipment and in corrosion. I'm wondering how we treat that. I know some businesses actually oil their trucks after they come back from brining to increase the life of the vehicle. And, you know, clean them very thoroughly. I think that's something we should look at because while we may save money on salt, the cost of these vehicles as you've just gone through quite an extensive list is obviously very expensive as well. So that's my input tonight. Thank you."

DRAFT

**Board of Assessors December 2, 2021**

**https://www.youtube.com/watch?v=cHv5O9qwW8k**

**5:43**

Ms. Laurie Ortolano, 41 Berkeley Street—Ms. Ortolano voiced concerns regarding the assessment of the future site of the Nashua Performing Arts Center and its condition as of April 1. She also raised the issue of the Board of Assessors reviewing abatement applications.

**The following was transcribed by E. Vassar on Monday, March 18, 2024 from video**

<u>Laurie Ortolano</u> "Laurie Ortolano, 41 Berkeley Street. I gave you folks a copy of the property record card for what's going to be the performing arts center. And the address for that is 78 – 84 West Pearl Street. One question that I have is the address, I think, used to be 201 Main Street and it was changed. However, I'm concerned about the assessment on this property, and what has happened to this property. There is a very difficult process, it is extraordinarily difficult to try and track the money for this performing arts center: who's responsible for bills. Because we did a new market tax credit that was a complicated investment vehicle; we set up a nonprofit called an "en-pack" (NPAC), and the City is funneling money to the NPAC to support it through certain lease or contract obligations, and then the NPAC nonprofit is paying the City back. I am very concerned by the property assessment and the tax bill that was paid on this property in August. If you look at the assessment from KRT, the total assessment when Alex Shoe Store was essentially there, was two-million, fifty-eight-thousand dollars. And if you look at the assessment today, it's the *same*. That assessment should've changed significantly. And as of April 1st, 2021, when you conduct the annual inventory to do the bill, I believe this building, or this property, should've been valued at *land-only*, which would've been two-hundred eighty-eight thousand, two. And the reason I say that is the building was actually demolished on April 6th. There was a newspaper article, the Telegraph ran a story, people standing outside, watching the demo. But as of April 1st, that building was reduced to a shell. The inside was demo-ed, and it's actually listed as a store with apartments, the shoe store – it was never changed!

So the City paid the NPAC approximately twenty-four thousand dollars in property taxes in August. It came out of an account called the "one-eighteen account." The NPAC paid the City back, almost twenty-four thousand dollars, and it went into the general fund. And I think it's a misappropriation of money. And I'm really watching this arts center closely. But also, it is *not* the correct assessment. This building is not even assessed correctly. It also has a sales price, that it sold in 2020, twelve eighteen, for a million dollars. I'd like to know where *that* came from. I can't track that. There must be a file down there I can look at and see where that sale is located. For the sale paperwork. It has not been qualified, from 2020, from December; there's no information on it. And I would like to know what the redress is for a citizen. It's a city property that went to a nonprofit. The citizens are paying the taxes. Do you have to file an abatement, can a citizen file an abatement, to have this property tax fixed? Because we're paying for it, and it's going into the general fund. And if not, do we have to file a lawsuit and take it to the BTLA to have it heard there? I mean, I'm trying to figure out what we can do. I realize I'm not entitled to answers. I'm gonna probably have to file a PA-71 with the DRA and speak to them about this. But this is not correct.

And also, when I go on the computer and I look at the GIS data, and I use pictometry, the 2021 pictometry data isn't there as of April 1st for 2021. The only data in there is 2020. Now, this property was inspected by one of our Assessing staff members in May 19th. If an aerial view was looked at, I'm wondering if the building was still there, what aerial view was used, I don't know if the office, the Assessing office, has access to 2021 data, and the citizens out, ya know, from home, don't, but I always thought GIS, my understanding was, was current. I mean, *totally* current.

One last thing: I believe that Mr. Earley's comments, regarding being able to review abatement applications, was unfortunate and incorrect. He is looking at this as if it's some daunting project. Other offices in other municipalities, their Boards of Assessors review them. And I will tell you, for properties that have data corrections, it's simple: for properties that use sales data, you might spend 15 minutes a property file. And with these things rolling in across four months or five months, I don't think spending



DRAFT

an hour a week is asking you to do too much homework, to understand what citizens have put into these abatements and these applications. Thank you."

**Board of Aldermen Tuesday, December 7, 2021**

**https://www.youtube.com/watch?v=vp5pxgyUEhI**

**57:04**

Laurie Ortolano "Hi. Yes, good evening. Laurie Orlando, 41 Berkeley Street. I do not think we should act on this bond. This is a private piece of property that a private owner is acting upon and people who believe that we are taking something away from Greeley Park I think are misguided. Nothing in Greeley Park is changing with respect to the approximately 100 acres that exists there now. We had a recent Master Plan completed and that Master Plan did not identify expanding Greeley Park at all. In fact, it identified setting up other parks in other parts of Nashua that don't have parks available.

"I walk Greeley Park a good bit and I'm very familiar with the fence area that is the Barker's property. I do not believe that a development in that area is going to diminish the park or that somehow we have an obligation to scoop up those 13 acres to make them a park more complete. It's almost 100 acre park right now and we have other parts of the city that don't have them. The housing study, which I read completely, did show approximately 5,000 houses that we are short and we continue to spend money. I don't know how many people are going to speak up against spending $21 million tonight but we are a spending city and we're doing a lot of spending and somebody's got to pay the bills and keep the lights on. When you think that the tax revenue raised by that property is insignificant, I think you're wrong. I also think there's an absolute market for those houses to sell at $700,000. I'm pretty certain a developer would not propose something that realistically would not sell. I think we have an obligation to let the process work the way the process should work and everyone's opinions about what is right and wrong should be vetted through the Planning Board and the Zoning Board if necessary. They're the entities that will be certain that the codes in the ordinances are followed and that the property is within the right to develop itself the way it can be developed. I think it's really important that we let that process go.

"So I am not in favor of bonding this money. We have a lot of other needs and that is important housing. The unit…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "The development down by Cherrywood was opposed by people and you're correct, the developer changed from 160 luxury units to 44 townhomes down there with a lot of asphalt space. I'm not certain the residents are going to be that happy with that either. But this development needs to happen because we continue to spend, and we have a need for the housing, and the housing report in the Master Plan full support development. Thank you for your time."

**1:25:52**

Laurie Ortolano "Hi, good evening. Laurie Orlando, 41. Berkeley Street. Just to clarify a few things. I think the concerns that the neighbors have with traffic are very valid but they're misplaced being addressed here with the Board of Aldermen or at a hearing. Those concerns have to be addressed with the

Planning Board using the process that's available for an existing developer to bring their plans and have them vetted. I think everyone does need to go forward to the Planning Board and participate in those meetings and express their concerns.

“I'm very concerned when I hear people talk about affordable housing because I attended the meeting at the church on a Sunday evening and it was pushed very heavily by Alderwoman Klee that we make this an affordable housing issue. I was very opposed to that because the developer never pitched this as an affordable housing development. It was very clear when he said these properties would sell between $650,000 and $750,000 that it was not affordable housing. The housing study does not talk about putting only affordable housing in. It talks about putting in housing across all sectors. So this is definitely high end housing more exclusive. Now if the gentlemen who just spoke really believes that if we went to affordable housing in your neighborhood and reduced it to 23 units of affordable housing, you'd accept that? Well, then maybe that's what you can get. But I think it's unrealistic to pitch that it should be divided up into 13 lots of 13 acres. That's not our call and the concept of one acre lots for homes in Nashua is really over based on the housing density we need to accommodate the growth of the city. I love my neighbor, Dan, and I think he's a terrific neighbor and he's on the other side of this issue from me. The one thing I agree wholeheartedly with Dan is that I think this Board of Aldermen has been very irresponsible with spending. I agree with him. A lot of bad spending decisions have been made. However, he sees, you know, this issue of preserving the space as the right thing to do. I don't think the spending decisions made by the city are going to change and as a hearing right after this for $21 million to be spent that actually hasn't even been discussed by the board in two years. I don't think we're going to stop spending. So we need to look at ways to have people who pay the bills and keep the lights on. That's the way it has to be and we need this housing according to the study. So it's not just affordable housing.”

Alderman O’Brien “30 seconds.”

Laurie Ortolano “(inaudible). So let's take this where it belongs and bring it to the Planning Board and not approve this bond tonight and let the Planning Board do its job and have faith that they're going to do their job and everyone get out there and watch and participate. That's a fair process.”

**1:39:15**

Laurie Ortolano “I have a couple of questions. If the excess money from the LED project that is bonded money is not spent on this, where does it go or what happens to that money?”

Chairman Dowd “Hello, Treasurer Fredette you want to answer that? If we don't spend the money. I think I know but I think I'd rather have the answer come from the Treasurer.”

Laurie Ortolano “Thank you.”

David Fredette, Treasurer/Tax Collector “We don't have this problem very often. I haven't seen it for quite a while but we may be able to use it to help make payments on bonds but okay the principal on bonds. But there's a lot of IRS rules on that because these are nontaxable bonds that we sell. So there's rules on that. That's possibly one area that it could be used for.”

Steve Bolton, Corporation Counsel “Mr. Chairman. We have to either use it to repay the principal on the bond or transfer it to another bondable expenditure.”

Chairman Dowd "I'm assuming testimony from Mr. Hudson that we have sidewalks in desperate need of repair and that's sort of a safety issue."

Laurie Ortolano "So just a point of clarification."

Chairman Dowd "Excuse me, who's speaking?"

Laurie Ortolano "It's Laurie Ortolano. You know I would like you to consider changing the rules when you have a hearing so that we can ask more than one question because clarification is important. If I want to back something, I want to understand it. I'm just trying to understand what attorney Bolton said. So if the money has to be used toward the principal or on the bond, you have this extra money from the LED projects. We are allowed to transfer it over to do sidewalks. Do we have any money currently earmarked to address sidewalk issues?"

Chairman Dowd "I think it was just pointed out that monies are collected when people do developments towards sidewalks and that money is already being used to repair some sidewalks. This would be the additional funds so we can fix more of the sidewalks that are in total disrepair."

Alderman O'Brien "30 seconds."

Laurie Ortolano "Okay. Well, we just finished redoing all the handicap ramps on sidewalks or I've been working on a big project on that now. Was that done by impact fees or was that a separately funded project?"

Dan Hudson, City Engineer "Sure. So the work we've been doing on the ramps is related to the paving program per federal regulations were required to replace the ramp access or actually to make it ADA compliant. I should be clear. The ADA access to the sidewalk system, so that work has been done and paid for as part of the paving program, although that is work that those funds could use for. As I said, I don't have the balances of those own accounts with me tonight. But it's not a significant amount of money and it is something that we will continue to use and could be used towards that type of work."

Laurie Ortolano "Thank you."

Chairman Dowd "Anyone else testimony in favor? Seeing none. Testimony in opposition. Seeing no one, other testimony in favor?"

Laurie Ortolano "Yes. Laurie Ortolano. How will it be determined what sidewalks are going to be addressed? Is there an existing sidewalk plan in place that you are working off of to do improvements throughout the city?"

Dan Hudson, City Engineer "So to my knowledge, no. I mean there are specific issues that the Attorney General's Office is asking us to address that have come to light relative to complaints we received. So Mr. Cummings will be up to speak about Riverwalk later and that will address some of those issues. But no this is something that we need to do. The city needs to develop a comprehensive plan and that's what part of this money will be used for but there are no shortage of areas needing repair. I can go out and find you a dozen in a few minutes. So this funding will be helpful. It's something that we certainly want and need to focus more on is going forward."

Chairman Dowd "Okay. All set?"



DRAFT

Laurie Ortolano "Yes."

**1:47:58**

Laurie Ortolano "Laurie Ortolano. Okay I'm now officially in opposition and I'll tell you why. I would like to see a comprehensive plan developed and I don't think developing a comprehensive plan will cost $400,000. I'd like to see that done so that we can get a picture of what the big, you know, the total cost of this project is and whether or not we can really begin funding it or start that work given where we're going particularly next year with the new property assessments and the amount of debt we've taken on. I don't want to authorize $400,000 to do not only the study, but potentially start something that we can't finish. I also feel we're halfway through the spending year. If we could fund just the study, you know, by the time you're ready to begin developing a new budget in April, you can look at funding this further if it's possible, but I think we're going to be up against a wall when it comes to spending and when we know what's coming down the pipe on these new properties which will be out next August. So I'm in opposition to this. Thank you."

**1:51:45**

Chairman Dowd "Any questions from the Aldermen? Thank you. Seeing none, I'll open the public testimony for testimony in favor."

Laurie Ortolano "Yes can you just tell me what the cost of the vehicle is relative to between the projects? I'm just wondering whether the split is."

Chairman Dowd "The class of vehicle?"

Laurie Ortolano "No the cost? This is a $1.8 million and it's for various projects with the landfill as well as a vehicle. What's the vehicle cost?"

Jeff Lafleur, Superintendent of Solid Waste "Jeff Lafleur, Superintendent of Solid Waste. The refuse truck that we're purchasing is $423,990."

Laurie Ortolano "And was that - so was that separate? That wasn't a CERF item? It's here being proposed because it wasn't proposed in the CERF budget?"

Jeff Lafleur, Superintendent of Solid Waste "No, it's proposed as part of our CERF but the city decides to bond some of our equipment since they're such highly priced."

Laurie Ortolano "Okay. Okay. I gotcha."

Jeff Lafleur, Superintendent of Solid Waste "And just to answer the first part of your question, I am getting a wheel loader - the large wheel loader and that's $495,450."

Laurie Ortolano "Okay."

Chairman Dowd "All set?"

Laurie Ortolano "Yeah, I just think that, you know, that might be something we should have budgeted in the regular budget. That's just my, you know, my feeling on them."

Chairman Dowd "So, the items are in CERF and some of the items especially larger items in CERF we have recently gone out and bonded with a low bonding rate. Also, all of these cost items are in the legislation."

Laurie Ortolano "Okay, well I'm not going to talk again because they'll stay in the I favorite column. I'm not changing my mind."

**2:31:14**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Mr. Cummings started this presentation off by saying he's had numerous presentations with the board and other committees. Can you tell me the last presentation you had with which board? What board was that?"

Tim Cummings, Economic Development Director "Sure, it was with the Board of Aldermen. It was the Infrastructure Committee and I'm gonna say it was in September off the top of my head, but I'm sure you could go back to the meeting minutes and look. I don't know."

Laurie Ortolano "Yes, the meeting was in March 24th of 2021 was your meeting on the Riverwalk project with the Infrastructure Committee. You are not on the agenda in September, October, or August. In that meeting, you said that you would like to come back to either this committee or the entire board and on the Board of Aldermen minutes, I have a specific search engine I can use. The last time Riverwalk was discussed was 2019. I feel it's inappropriate for you to do a presentation of this nature at 9:30 at night and then roll into a Budget Committee to approve a bond of this size. This should have been vetted before the full Board and the community should have an opportunity to discuss this. I have a lot of questions. I'm with Dan on this. I don't like the TIF funding on this and I don't like what I see going on with the TIF funding because it's not fair to the rest of the community.

"At the end of the meeting, Alderman O'Brien said that there would be future meetings that we would get together with the committee that Dave Tencza is on and we would be able to work more on ideas to move this project forward. That joint meeting I can't find either. So there is very little history on this. The community has had very little information and it almost seems like you and the Mayor have been working more quietly behind closed doors to push this forward. I don't see how TIF funding means it doesn't cost the taxpayers anything because we're bonding $21 million here. You're going to close Water and Factory Street for a period of time to do work. How exactly is that going to work when you put barriers up on Main Street for three years?"

Alderman O'Brien "30 seconds."

Laurie Ortolano "That's another issue that needs to be addressed. So this should be tabled. I hope the goal is not to get this approved before a new Board of Aldermen seats or spend this kind of money. I'm asking the Budget Committee to table this, take it to the full board, hold some more meetings, and I would like another public hearing on this when we have more information and can ask more questions. Thank you."

**2:36:13**

Laurie Ortolano "A question. Why did Director Cummings decide that now is the time to take on a $21 million project?"





DRAFT

Tim Cummings, Economic Development Director "Yeah, thank you. I actually would have liked to take it on a year or so ago. Unfortunately, it took us over a year to get through FEMA permitting so we could actually move this along. I would suggest a two year phase of being within preliminary design is much too long. However, that's what we had to go through to be able to get to the project to the point now that we're in and I'm trying to move this along as fast as possible."

Laurie Ortolano "Well I think you need to consider what we can afford and what's been proposed because while you were working hard to get that permitting, I understand, there were other bonds that came up and got approved like our DPW facility, as well as some other big projects. We just did a massive amount of (inaudible) and we're in a different time period now with some new assessment numbers coming out next year. So I think the timing of this is not correct and I think this has been done very underhanded and backdoor. There has not been enough open vetting of this and the discussions at the Board of Aldermen table have not taken place since 2019. This should not be voted on now. Thank you."

**BUDGET REVIEW COMMITTEE DECEMBER 7, 2021**

**https://www.youtube.com/watch?v=vp5pxgyUEhI**

**2:47:14**

Laurie Ortolano "Yes. Laurie Ortolano, 41 Berkeley Street. With regard to affordable housing, I just want to be clear that this was never presented as an affordable housing project and while the median income might be $78,000 that means 50 percent of the income levels are above that level. Yes, believe it or not, there is a market for higher end housing. It will do something to support it. I don't know what this concern is that it's – the Mayor said at the meeting at the church that perhaps 50 percent of the people who moved in there would move in from Massachusetts. But guess what, a lot of people move up here from Massachusetts and the other 50% would come from around this area or New Hampshire. I don't know why we feel so confident that we know who's going to buy these places because I don't think we do and I don't think it's our call. The call here is to let the Planning Board do their job and vet this development the way it should be vetted. Thank you."

**Board of Aldermen Tuesday, December 14, 2021**

**https://www.youtube.com/watch?v=b9Rqn_qZOZc**

**1:10:10**

Laurie Ortolano "Yes, Laurie Ortolano, 41. Berkeley Street. I'm asking you to table R-21-193. What Fred said resonated with me. I have a lot of concerns about these TIF issues, TIF funding. Let me tell you that two weeks ago, I attended the Board of Assessors meeting and I went after them with a lot of questions about the TIF funding on the performing arts center. You know we talk about incremental financing and it's based on valuations year to year and my understanding is if the valuation of the business changes from where it was established when the TIF was opened, that becomes the increment that feeds the fund.



DRAFT

"Well the performing arts center building, which was the former Alec Shoe Store was never assessed properly after Alec moved out. That building has been taxed at $2,058,000 since it was Alec Shoe Store and if you were to pull up the property record card right now, it's listed as a shoe store, a business with apartments operating. On April 6th, they put a wrecking ball to the place. You have to grab the valuations as of April 1st. On April 1st, it was a gutted building. It was not a $2,058,000 building. Now that taxpayers are essentially paying that tax. We paid a bill to the NPAC who in turn paid it back to us that I believe goes into a part of it into TIF financing. Well when you've done the wrong assessment on the property and they're not captured correctly, there's a whole mess there I can't even figure out. I don't want to submit a PA 71 to the State but I'm probably going to because two weeks ago I asked questions and nobody has even opened their mouth to speak or say what they're doing to give me answers. If you're going to put properties in TIF, you have an obligation to assess them fairly and accurately and you're not doing that.

"There are a ton of questions about this project on the riverfront. For Mayor Donchess to say it was discussed in 2020 the last time with the Board is an embarrassment to bring it back now for $21 million of funding. This is rushed. It's poorly thought of and it shouldn't be executed right now. Get your new Board in, slow your roll, and give it the time that it deserves.

"Also regarding masks, I don't care if you bring masks back up please for the love of God your restaurants have to go to take out only, you close your bars, you shut down your casinos, and you close your clubs. Enough. I don't want to hear Trish Klee talking about…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…how hard it is on staff and people at the hospital and then you leave the booze places, the restaurants, the clubs, and casinos open. But you tell everyone when they go to the supermarket to have your mask on. That's just stupid. Let's not go there. So make it a mandate and also put a restriction on businesses where people are not wearing a mask to be closed, period.

Also, please pay attention to RSA 162 k (9) which talks about TIF funding because I've (inaudible) digging into that. Thank you."

**2:30:06**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. You know I heard what Attorney Bolton said in his last comment there that he'd be happy to win again. I just spent two full days in court working on my Right to Know trial and I have one more day to go back. It is wholeheartedly disappointing to see what the city is doing with information. Maybe Attorney Bolton is very confident that he's gonna beat me hands down on everything and maybe I am going to lose everything. I don't know. We'll wait and see but I can tell you I feel you have a significant amount of information corruption going on in this city. I handled a pro se case on December 6th in court and what I heard from city employees really was disturbing to me that they're just deleting their emails. That they never heard of RSA 33A for record retention and they weren't even familiar with the email storage and retention policy and this was from Louise Brown who was a Supervisor in Assessing and been in City Hall for 20 years. You know you have some big problems in there when it comes to information. Attorney Bolton can chuckle at Fred Teeboom but I think Mr. Teeboom is raising a very valid point and I don't think you should be laughing about it. Your property for the art center, former Alec Shoe Store, was never valued correctly nor was

the assessment done and it was done again by Greg Turgiss who apparently never visited the property on April 1st when a wrecking ball was put to it. And I don't know why you think that's funny but I don't think it's funny. There's nothing funny about what's going on in here regarding these TIF properties and regarding Right to Know issues.

"Regarding the barriers. I think the Mayor did a real disservice to that conversation tonight. He wrote a terrible piece of legislation centered around pandemic politics and I believe that Tim Cummings should have nothing to do with that committee. Don't let him lead that committee. Let him sit back and be a spectator watching that. Assign one of the non-restaurant people who's in opposition to these barriers to head it. Let's put somebody who's on the other side of it in charge because we've heard what the cheerleaders say and all of the anecdotal information out there is just that. Where are these studies? Why is Paul Shea conducting data research on what downtown people want?"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "Why is this even happening? You know it's so disenfranchising and disingenuous when you hear Tim Cummings speak at a meeting and discount everyone who showed up to give comment. He's simply not a leader who can handle this and I find when it comes to Right to Know requests, his door is closed, the light isn't shining over there, and he wants nothing to do with citizens. Okay. He doesn't have to have anything to do with citizens because…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…he's the Mayor's right hand man but let's fix the problems in here."

**FINANCE COMMITTEE DECEMBER 15, 2021**

**https://www.youtube.com/watch?v=AfWv5m0t92Q**

**1:38**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to address this Committee regarding the performance of your legal office. I really feel that Corporation Counsel Attorney Bolton is a pretty compromised individual and Mr. Mayor you've left the situation over there to become very out of control."

Mayor Donchess "Ms. Ortolano wait. Can I just interrupt you for a second? First of all, you're in litigation with I realize but this Committee – I mean you're supposed to be talking about things that are on the agenda and certainly the legal office is not."

Laurie Ortolano "With all due respect, it's open public comment and you don't have that. I'm addressing a situation with your legal office and share my opinion on how they're performing, which quite frankly involves a lot of money that comes through this office. I can go to any meeting I want and share these comments. If you want to change your regulations to shut that down, you can do that but you have no business shutting me off. I would like to gain some time and just…"



DRAFT

Mayor Donchess "The normal way to proceed is we take comments regarding the agenda items at the beginning and there is public comment at the end which is more general. So would you mind complying with that normal procedure?"

Laurie Ortolano "I would. Thank you for asking."

Mayor Donchess "You would mind?"

Laurie Ortolano "So I believe that you have a very compromised legal office and that Attorney Bolton is seriously underperforming for this city. He clearly does not recognize his limitations and last night's meeting was a great indication. I really think that he needs to understand that his role isn't to take control of a meeting, interrupt, and speak out of turn, taunt citizens to pushing them into legal action. Basically, bringing the "bring it on" mentality. At the end, I'll continue my thoughts on that. Thank you."

**23:39**

Laurie Ortolano "Laurie Ortolano."

Mayor Donchess "(And) you understand you're limited to…I know you're upset but you're limited to 3 minutes."

Laurie Ortolano "I'm not upset. I'm more than happy to speak. Thank you. I'd like to address the conduct of Attorney Bolton and I really think Mr. Mayor you've let the situation get very out of hand and very expensive for the taxpayers. This man is clearly compromised and unable to perform his duties. He had a stroke a year ago and it has substantially slowed him down mentally. He should not be a trial lawyer anymore. He should not be representing the city in a courtroom. He really isn't suitable. It's all personal for him and I know a lot of it is personal for you as well. The level that he takes an issue to on a personal level is absolutely ridiculous. He cannot serve as a municipal lawyer and function in any reasonable capacity to serve this city any longer. It's just absurd.

"My Right to Know suits were totally out of hand with this city. I had a great hearing on December 6th pro se. I'm learning a lot in this one about the city's records and what's going on in there. I've got to tell you, you've got some serious information problems. There's no ownership. Attorney Bolton just is not able to perform his job anymore and he just doesn't have the awareness to continue. So I hope you're able to make a decision soon to bring in somebody who's able to perform that task within the level of work that has to be done. We just shouldn't be paying what we're paying for the services we're getting out of that office. I'm going to be putting a Right to Know for the bills and expenses that were incurred for this piece that I'm dealing with right now but it wasn't cheap for the city. It was entirely unnecessary. I've got three more suits in the cue. I'm lining them up. I'm coming in and we're going to keep going on this Right to Know stuff until we start to get some compliance here. I'll tell you as long as Attorney Bolton is in that legal office, there will be no compliance. He really is not capable of performing this job. Please don't leave us in a situation here where we're paying for a Legal Department that just can't perform…"

Alderman Harriott-Gathright "You have 30 seconds."

Laurie Ortolano "…that it should be able to. Thank you."

DRAFT

**Board of Aldermen Tuesday, December 21, 2021**

https://www.youtube.com/watch?v=ONTaKOFpwkI

**16:15**

Laurie Ortolano "Yes. Lori Ortolano, 41 Berkeley Street. I'm glad to see this coming forward and a first step to add, you know, affordable housing to the Nashua stock. I have a couple questions about the plan and I'm hoping I can get some answers.

"The inclusionary zoning policy matrix that was put up here on the screen is different than the one that's attached to the board agenda that I just pulled up off line and I believe that one from less than 10 and 10 to 49 was excluded and now you've added 10 to 49 is part of the program that requires affordable housing. I don't know if I saw that differently. Was there a point where the data was different?"

Matt Sullivan, Planning Manager "There are two matrices presented within the policy. The policy that was posted online actually should include both and I believe it does include both. The first matrix is related to the policy that will exist from January 1st of 2022 to June 30th of 2022."

Laurie Ortolano "Okay."

Matt Sullivan, Planning Manager "The second matrix that Director Cummings showed this evening is a policy that will exist I believe to be in perpetuity belongs to the updated from July 1, 2022 until a subsequent update happens."

Laurie Ortolano "Okay."

Matt Sullivan, Planning Manager "There are two independent matrices that are intended to be a ramp up of the policy and its implementation"

Laurie Ortolano "Okay, perfect. So I'm a little bit concerned about the group that falls in the 10 to 49 when you look at bonusing, you know, that they can get a density bonus. That's not a very high number of housing units. I went to a presentation down in South Nashua where there's those townhomes going in - 11 blocks, 44 houses. They would fall in this thing. They would end up with four that would be part of the inclusionary, you know, have to be affordable housing. They get a bonus, which would allow them to put another building up but I don't know that there's the space to actually do that and make the bonus work. So I think the bonus might work best for numbers above that. But that's just a thought and that doesn't mean I don't support this because I do. It's something you can check out.

"I was wondering if you have a mechanism in place on how you're going to monitor this and look at the success of the program. It would be really nice when the Board adopts these things that once a year you come back - the Planning Board or somebody with a table, a chart that shows how many affordable housing units were created, what we did within these neighborhoods, and the benefits we saw so we can actually have some tracking. I think that would be really helpful and that's not part of the ordinance, but I think it would be very helpful.

"And I'm also wondering in Section C under terms location and size of affordable…"

Alderman O'Brien "30 seconds."



DRAFT

Laurie Ortolano "…units. How did we pick 99 years as the timeframe for the affordability? Why did we go in such a long term?"

Matt Sullivan, Planning Manager "The initial intent was to provide a restriction in perpetuity, but obviously in the State of New Hampshire we cannot do that. So 99 years was viewed as the best effort in that regard. I will say the existing ordinance has a range of term within. It goes from 10 up to 30 years and how long that term actually lasts."

Laurie Ortolano "Okay."

Matt Sullivan, Planning Manager "Our intent here is to protect as long a term affordability as possible. So that's why we chose that 99 year period."

Laurie Ortolano "Thank you."

**PLANNING AND ECONOMIC DEVELOPMENT COMMITTEE DECEMBER 21, 2021**

**https://www.youtube.com/watch?v=ONTaKOFpwkI**

**2:18:30**

Laurie Ortolano "Hi. Yes - Laurie Ortolano, 41. Berkeley Street. I just want to say, you know, the scheduling of these meetings I just think wasn't done correctly. You know to schedule 15 minutes for the first meeting was absurd given the topic and that was without community input. It's over to two hours and 10 minutes later that we're sitting here in an economic development meeting.

"I take great offense to the comments made by Alderwoman Klee regarding public behavior. You know, I didn't participate in that behavior and it's not that I condone it but I feel like I've been in a lot of board meetings where I've seen similar behavior from the board members here. I have watched people get on their phone. I have watched President Wilshire wrinkle her face, make faces at me, cut me off. I've watched Attorney Bolton interject out of the rules of order of Robert's Rules. I have watched people use their cell phone. I have watched Alderwomen on Zoom go on social media - you Jan - type in social media comments while you're present as a board member. I've seen it all and I've had to put up with that. I think the call citizens out as children with poor behavior. It doesn't do any good and it's not to the benefit. I mean tonight you chose not to have public comment and I e-mailed President Wilshire to ask her if you were going to do a reading and place this as an item to be acted on would you allow comment. I didn't even get the courtesy of a response.

"You have the right to allow no comment and that's fine, but I participated in a Board of Health meeting two weeks ago and a lot has changed in two weeks. I would have challenged some things that these health people said. I've got a letter from the President of Southern New Hampshire who just put his letter out today saying we've come over the hump, we're coming down, and things are improving. I would have read that into the record. Hospitalizations that Dr. Wolf who is my neighbor said we're up 12%. Since December 3rd, they're down 5%. We're down around 437, which is what we were on December 3rd. The big surge came from November 15 to December 3rd. The way this is handled with a one sided view, I have supported the Board of Health. I really have. I've been a big fan of theirs and I understood the difficulty. They no longer have my support for what was said in here tonight. I do my



DRAFT

research. So it's just really very disappointing Alderwoman Klee to hear the scolding that goes on because you're the one who says, hey we're the Board. We have to take it anyway it comes, you know. You can do whatever you want to do, but you really don't take it. It offends you but I've been offended so many times in this chamber. I wish you'd consider that. Thank you."

**3:33:27**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just wanted to share a little bit of information from the mask mandate meeting that you had. I think one of the problems with how you conduct your business is that you're only willing to take your information from one source and even our Board of Health consists of healthcare providers and doctors that only look at medicine from one perspective. You could have doctors up there that would share a different opinion. You could have a nurse on that board that would share a different opinion and it's interesting because there seemed to be four or five people at the beginning of the meeting that were not keen on that mandate and by the end having listened to your "experts", they had all changed their mind. But they didn't allow the nurses that were, you know, in the crowd, or on Zoom, or any of the other people to share any perspective at all. It's been a while since people have been able to have a voice on this. It's two or three weeks since the Board of Health meeting allowed community input, then they shut it down, and then we come out here to an emergency hearing, and it shut down.

"I received the letter today from a friend written by the CEO of Southern and he wrote: "As we approach the end of 2021, I wish to give my most heartfelt thanks to all and each of you for all your hard work and dedication to our organization, blah, blah. He says we're anticipating COVID numbers are peaking now and will soon begin to decrease. We're also pleased to announce that we are having success and retention and recruitment of staff. It was a priority when I began at the end of September and we are now beginning to see positive results." This concept that you know this is going to blow up again isn't reflected in this letter at all. They're not seeing it. When I told you that I looked at the numbers on December 3rd, it was 433 hospitalizations. It went up to 462 on December 8th and right now as of December 21st, its 437 and we do seem to be riding a wave over it. I really would encourage everyone not to go downtown, don't go to restaurants, bars, clubs, and casinos. We shouldn't even be going into them and they should be closed. If what the Board of Health is telling us that the death of one child is significant and, you know, another hospitalization is a problem, then close those places where there's a lot of close contact. Instead of having the doctors sit at the table and say, well, it's their choice if they want to go and put themselves at that risk, I don't know how you can say that when in the second breath you're saying it's overtaxing the hospitals and they can't handle it. I'm a proponent of choice.

Chairman Tencza "30 seconds"

Laurie Ortolano "Like I said, I've been a proponent of the Board of Health but tonight was - I can't support that organization anymore. I think they're too one sided. They weren't objective. I was very disappointed in Stephanie Wolf and the pediatrician for sensationalizing the death of a child. He had no data on that and, you know, we know nothing about that to make a determination. I think the one member who stayed true to their position. Have a good night and have a good holiday."

**Board of Aldermen Tuesday, December 28, 2021**

https://www.youtube.com/watch?v=5Eafp24qhiQ

**58:31**

Laurie Ortolano "Hi. Good evening. Laurie Ortolano, 41 Berkeley Street. Happy almost New Year. I wanted to give my support to the affordable housing inclusionary zoning amendment. I believe the Board is going to back that tonight. I think that's a move in the right direction. I hope we do some good monitoring of that program and if adjustments need to be made to it that we move accordingly to make those adjustments.

"I'd also like to speak regarding the Bartlett Street property. I think there was some good points raised from individuals John Sullivan and another individual reading the housing issue and the housing shortage. I do think that, you know, you're looking at creating housing versus preservation of land and it's a competing issue here. I see a lot of spending going on in the city. I see a Mayor who's very liberal (inaudible) in spending and I don't see a lot of solutions in place as to how we're going to afford what is being spent. So that concerns me, it continues to concern me. So the Board is going to do what the Board is going to do but I'm, you know, I'm watching what's going on here.

"Also a third item you have a lot of letters in your packet regarding the mask mandate that was put in place. I asked Donna Graham to please provide me with any additional letters that didn't make it into the packet. Your packet had, I believe 29 letters, but there were additional 33 letters that didn't go in because they were not addressed properly with a full address to be counted. I think when you look at - I hope all Board members got all of those letters because when you look at those letters, I was pretty surprised to see the lack of support for the mask mandate on the level that I saw."

President Wilshire "We're not going to be acting upon that this evening Ms. Ortolano. Could you stick to items we're going to be acting upon?"

Laurie Ortolano "Well they are the items you read into the record and you allowed me to do this before. So they were acknowledged. So there were 42 people who were opposed to it and 21 people in support the mandate. So I hope that one individual or several individuals on the Board asked for a weekly update on the numbers and a weekly briefing be given to the Board. I don't see that that's on the agenda tonight but I would like you to pay attention to that because I think you don't have that support because people are not buying into what you're stating. I think your Board of Health was very misleading in what they gave to the Board."

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "We're all concerned about the load on the hospitals. However, these are regional hospitals that support patients from all over the area. Communities that are more population in the City of Nashua, we should assume that it's only Nashuans that are filling the hospital beds. It's a misrepresentation. I expect more from our Board of Health when it comes to data and I think they fell woefully short. Thank you."

**3:16:02**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to address the Board of Education meeting that took place on December 20th and the Mayor's involvement in that needing to speak regarding the impasse on the teacher's contract. I really feel that that crossed the line when it comes to

ethics and appropriate actions on the part of the Mayor to do what he did. I negotiated several teachers' contracts when I was on the School Board and that work was maintained, you know, very private, confidential work between the negotiating team which was made up of members of the Board, and of course, teachers from the union. My understanding is the Mayor reached out to Heather Raymond to talk to her about encouraging the School Board to accept the pay raises that the teachers' union wanted because there had been some concessions on health care. You know, he didn't have a negotiating position to do that kind of overreach but he said that he was going to go to the meeting on December 20th and speak as a citizen because as a citizen, he has a right to do that.

"Well when he went to the meeting on the 20th, first of all he was given five minutes to talk and he never identified as himself as a citizen at the microphone. He identified himself (lost audio) and he proceeded to, you know, certainly get the teachers fired up in support of what he was saying and clapping for him. But tonight, it was mentioned by a Board member, I think Ben Clemons, that he didn't suspect that the Mayor would bind the city into any kind of agreement if he were to negotiate the Bartlett Street property. In that meeting on December 20th, he made it clear that he thought that the Board of Education should make every effort to give the additional percentage point that the teachers wanted and we at City Hall will help you in terms of providing the funding to support the contract. You know, what right does the Mayor have to stand at a microphone and let the teachers know, when they're at an impasse heading into mediation that the City Hall is going to make up the difference or more of it? You know, he totally blew their mediation because now these teachers are going to want what a Mayor said he can deliver and frankly, I'd be furious if I were on that negotiating team that a Mayor could do that and hijack my meeting.

"Secondly, he talked about the fact that the concessions made…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…he realized that the city was that their agreement for healthcare reform was a significant savings realized to the city to offset a significant portion of the raises that are being discussed. What exactly is that portion? He didn't define it. We know that with the additional percentage put on it's probably $11.5 million dollars of raise increases is a significant portion with the healthcare adjustment of $7 - $8 million? Is it two or three…"

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "…he never disclosed that? So I hope you all realize that I think this is a very serious ethics violation for this Mayor to do what he did. Thank you."

**Board of Aldermen Tuesday, January 11, 2022**

**https://www.youtube.com/watch?v=5OiszWQgLJY**

**13:44**

Laurie Ortolano "President Wilshire are there any items that allow public comment to happen because there is nothing being acted on, is there?"

President Wilshire "No there isn't. That's true."

Laurie Ortolano "So I don't know why we put it in. Just checking to see if I'm missing something. Thank you. I'll lower my hand."

**17:11**

Laurie Ortolano "Hi. My name is Laurie Ortolano. I live at 41 Berkley Street. I finished a Right-to-Know lawsuit regarding Nashua's assessing records in December in Superior Court. One of the challenges involved the records return by the contracted appraisal company responsible for creating the 2018 assessments. The contract signed by the city and the company is a boilerplate document development by the DRA and widely used by municipalities around the State. The contract calls for all documents and property record cards used to create the new values be returned to the city when the contract ends. I filed a Right-to-Know to inspect these documents and was denied by the city under 91-A exemption for draft material and confidential information. I contacted many Chiefs throughout the State, the DRA, and attended Assessing Standards Board meeting in Concord. I questioned everyone on the confidentiality and draft nature of the information. Not one person backed Nashua's decision to make those records exempt from public disclosure. I wrote back to the city three times presenting a new argument each time on the importance of these materials being public. These records provided an audit trail for the work done by the hired company and allowed a property owner to verify that Nashua created equity in these new assessments.

"After three months of denials, I added this to my lawsuit. I then wrote formal Right-to-Know requests to four towns to request to inspect the records returned by their hired appraisal companies. Unlike Nashua, my requests were answered in a matter of hours. One request – this was the Town of Moultonborough where I own a home. Chief Hughes who served as the Director for the DRA invited me up to inspect these records expounding that they are your records. Chief Michaud from Hudson granted written access to the records and the Wolfeboro assessing clerk also welcomed me up to inspect the records. I finally contacted the assessor in Littleton, New Hampshire. Why did I pick Littleton? Because the Littleton assessing office is contracted to KRT. The same company we hired to do our 2018 assessment. The contract language for the return data was identical and KRT did the same type of 2018 update as was done in Nashua. When I called the Littleton assessing Chief Dorcette from KRT, I wondered how far my reputation reached. Mr. Dorcette immediately stated that these records if we still have them available are public records and affirmed his remarks in writing. Why did Nashua deny…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "When Ms. Kleiner was placed as Acting Chief of the Assessing office, I objected strongly. She did not have the skillset to be qualified for such a technical position. Ms. Kleiner assured the Board that she would consult with Chiefs around the State to verify that her work was compliant. In December under cross examination in court, Ms. Kleiner stated that she never spoke with any other State experts about the public nature of these records. Had I lived in any other place in New Hampshire, I would have had access to these records."

Donna Graham, Legislative Affairs Manager "Your time is up."

Laurie Ortolano "Ms. Kleiner deliberately acted to shut down – I'm on one sentence – the audit trail that allowed me to verify my property assessment and defend it in court as well as KRT's work. The matter is now in the hands of the Judge and should not be. This was a needless, costly legal challenge…"





DRAFT

President Wilshire "Okay, your time is up Ms. Ortolano."

Laurie Ortolano "Okay, I ran 15 seconds. Seriously? Nobody is here to talk. Seriously Ms. Wilshire? I wish somebody else had picked a new President. Fifteen seconds."

**BUDGET REVIEW COMMITTEE JANUARY 24, 2022**

**https://www.youtube.com/watch?v=g7LytDnM1N8**

**3:09**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I was wondering if the Budget Committee has any means or mechanisms to track the ordinance that was passed to allow folks who go out on sickness due to COVID to not to have to use their sick days. I was just at that the Police Commissioners meeting."

Chairman Dowd "We can't talk about that at this meeting. It's not on the agenda and you're breaking up so it's hard to hear what you're saying."

Laurie Ortolano "Yeah hard to hear what you're saying as well. I can't talk about it until the second public comment is that what you're telling me?"

Chairman Dowd "No. It's not on the agenda. It's not before the Budget Committee. You can talk about it tomorrow night."

Laurie Ortolano "Well wait a minute. Don't you have a second public comment at the end?"

Alderman O'Brien "Yes."

Chairman Dowd "Yes. That you could probably bring it up."

Laurie Ortolano "Well that would be exactly how it would be done there. I will do it at the end. Thank you."

**53:57**

Laurie Ortolano "Good evening. This is the worst (inaudible) audio/video meeting I've experienced. It's rough for all of us and I do… Chairman Dowd Yes. That you could probably bring it up."

Chairman Dowd "Did you identify yourself?"

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. I'm wondering if anyone is tracking the expenditures of sick time associated with the new (inaudible) I believe in December to allow those vaccinated to not have to use their sick time if they catch COVID. I'm interested in that because it turns out this next variant that we're dealing with ended up being very contagious whether you were vaccinated or not. The Board of Health had to hospital Executives on the meeting on Wednesday I believe it was and they both said that their hospitalizations are 50/50 vaccinated and unvaccinated that it really didn't make a difference and they weren't seeing any impact or significant difference in the health between those who were boosted and those that weren't. So this is an equal opportunity infector and I'm wondering what the financial impact is of that policy. I was not a strong (inaudible).

"Also I'm trying to get financial reports for the Board of Public Works. I think we are missing an opportunity to have the kind of oversight our elective body should be doing when it comes to finances. The Fire Department and the Police Department produce month financial reports that are very well done and excellent. The Police Department (inaudible) at their monthly meetings. I've been trying to get a hold of monthly or any kind of financial reporting for the Board of Public Works because the City Charter states the Board of Public Works will follow and track expenditures. That's part of I think Subsection 61. I think we have an obligation (inaudible) million organization to do that kind of tracking. I would like the Aldermen to support me on recommending (inaudible) financial reviews start happening and boards start becoming a little more educated about the money and the public be able to have access to these reports. The Board of Public Works meetings have changed to early afternoon and I haven't been able to go for three months and I won't be able to go any longer. That's fine. They're not geared toward the public to participate anyway and there is no interest to allow the public to participate. I would like the financial reports. I think its fair…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…to help me get those. I would really appreciate it. Thank you very much."

**Board of Aldermen Tuesday, January 25, 2022**

**https://www.youtube.com/watch?v=Cby5WMDpoEA**

**12:50**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Please end this mask mandate on January 31st. First of all, I'd like to know can you provide the legal authority the Board is relying on that permits New Hampshire cities and towns to require face coverings. Does the City of Nashua need to require or mandate face coverings because of grant money you're receiving by the federal government. Given the way these ordinance are written, they're call out as an emergency act. Can you identify the emergency you're relying on for these face covering ordinances and State law Chapter 31, Section 5, requires that cities and towns obtain permission from the courts to spend money in a city emergency and have we done that?

"I take objection to the Mayor's comments. His information to Alderman Comeau was not correct. The hospitals do not break out incidental cases. They're reporting incidental and COVID admissions and they are admitted. People go to the hospital to have their gall bladder out. They get there, they get COVID tested and their positive. They're admitted. They're counted as COVID but they're there to have their gall bladder removed. Two weeks ago I checked on those numbers. There were 30 something cases in the hospital. Twelve were incidental. Massachusetts has requested that hospitals break out all incidental cases. We're not doing that in New Hampshire. The doctors who came to the Board of Health meeting last week and spoke to the Board of Health, they were surprised visitors who were given public comment and the few members of the public were there were not given public comment. That is not correct. They were not on the agenda. It was a very disingenuous meeting for those of us in the public that wanted information. Those doctors came with one data point.



DRAFT

"I had written a letter to the Board of Health and asked them to gather data and show us the whole pictures and in come doctors with one day's data point. Southern had 46 patients. A record high on Wednesday. Sunday it was 14. They changed dramatically and we need running data. I'd like to know when the first ordinance where you came up with all the statistics that our local hospitals are reporting 60 to 80 percent of the patients are unvaccinated and ill. If you're following the data now, more of these patients going into the hospital are vaccinated. In fact, the Board of Heath doctors who came - the two hospital doctors said that Director Bagley asked them if more of the patients in the hospital are unvaccinated, she said no it's 50/50. They both said that."

Alderman O'Brien "30 seconds."

Laurie Ortolano "And they both said the booster makes no difference. So I do not think we need this legislation. The Mayor said a 14 day average data he gave me, that's bad data. Get the seven day data, that's what's posted on the New Hampshire dashboard. Look at the fall. It has come down dramatically and this is yesterday. Today it's down another – I just checked it. It just clicked in and it's down another five percent. Please go another week, lift the mask, peel them off everyone and be done (inaudible) this mask forever and it's time to take it off. Thank you."

**1:45:01**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a couple things. Thank you for your thoughtful discussion tonight on the mask mandate. I certainly was a proponent of lifting it and it doesn't really bother me because I know that our surrounding communities are available to go to to do your business. I choose to do that and then I don't have to use the mask. I have been a mask wearer very avidly and a big supporter of it but I changed my views about six weeks ago and I don't use it anymore because I did research on my own. I really feel that it's not the right thing. I appreciate the thoughtful discussion.

"I would like to address Alderman Moran. When you talk about the responsibilities we carry because of our hospitals, I think it's unfair to put that on Nashua people. These hospitals are supported by all these other communities. It's a regional hospital. I'm not responsible for what goes on in the hospital and I can't do anything about it. We as citizens don't get any data on the hospitals. Nothing comes to us with any consistency at all. Apparently it goes to the city but they don't put it out to us. All these surrounding towns don't have ordinances and they put their people there. So I don't understand why I'm responsible for the Nashua hospitals or I have to feel badly because I'm not doing enough. When you leave restaurants, bars, casinos, and clubs open, and those were where contract tracing showed when we did that that there was an issue. Then what's the point? I don't think kids doing sports doing sports should be in masks at all. I think it's more harmful to their health.

"This is a business owner – Buckley. We have SURF and MPs on the top – mask required. Three miles away, we got the two other restaurants in Hollis and in Merrimack. Come in without out. Is that a business owner that doesn't care and isn't responsible to his duties to protect everyone in the hospitals? Should this business owner be doing business here to do that? That's what you put the business owners in. Now there's a few stores I've gone in to Nashua, and I do mean very few, and they actually let me not wear a mask. I went into a pet store and I literally was putting my mask on and the ladies said you're the only one in here. You don't have to put it on. I don't feel like I'm breaking any big rules and I was literally the only one in there. I went to another business, small one, the owner doesn't wear a mask at all. He said you don't have to wear a mask. I don't wear a mask."



DRAFT

Alderman O'Brien "Thirty seconds."

Laurie Ortolano "I did it that way. Our data is coming down and the Mayor is not giving us the kind of information we deserve. You cancelled in the last five meetings on masks, you cancelled public input three times. Two Board of Health meetings cancelled and one Board of Aldermen meeting cancelled on masks. You want to know why people send e-mails that maybe are not so nice, because you cancel us out. I'm okay with this mandate. I'm not going to fight it."

Alderman O'Brien "Time."

Laurie Ortolano "I have other places to go. Thank you."

**FINANCE COMMITTEE FEBRUARY 2, 2022**

**https://www.youtube.com/watch?v=de6V1BR1VdE**

**2:26**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Is all the business I believe is new business, correct? There's no business, right?"

Mayor Donchess "Correct."

Laurie Ortolano "Okay so I'll wait til the end. Thank you."

**35:48**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just quickly. I would like to understand the TIF program that was just discussed. How do we justify what goes into the TIF program and why would like a road project go in there? I think we should understand how we grow that and what goes into that because I'd like to understand that.

"Also I think we should address eventually the policy on COVID sick leave. I did get some financial numbers that I couldn't fully understand that showed about $133,000 went into paying for employees that got ill and didn't have to use their sick time because they were vaccinated. As you know, I think I've expressed that I think that policy was a mistake and we should follow up on that and determine what impact that had on vaccination and what the overall costs are going to be because $133K for just over really a month of sick time I think is pretty enormous.

"I'd like to ask that Mr. Mayor you tighten the reins on City Hall and you try to get employees particularly managers back to work in the building. I think this COVID remote work has been going on too long and there is a lot of management that isn't here for like a year. Sue Lovering is rarely in. Lisa Fauteux is rarely in. The finance office is rarely in. Usually if you ask somebody if they're in, they'll tell you they don't even know. They don't know if they're in or out. They don't know if they're working at home or they're here. Go run around City Hall and see if you can find them. I mean to me it's like the love boat in here and I think we've got to tighten it up a lot. I think citizens deserve to have their employees working in the building and I think it's time to get back to that and not allowing very long work from home programs particularly for upper management.





DRAFT

"Also I'm concerned about the barrier issue. I think that that's been pushed away from the public view and eye that it was supposed to be set up. We had this crisis mode in December. I've been given some insight information that it's being developed and worked on internally but nobody on the outside knows anything about it. I got very incomplete barrier data in my Right to Know request. It looks like all of the surveys that were talked about for months really nobody actually saw them or knew what they looked like. It was just random information that was put out there. I still think there's a lot of frustration on that.

"Finally…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…I received an e-mail today from the Clerk's office that I think is very disturbing and you know Mr. Mayor I responded with an e-mail to a nonprofit organization over a very hostile response I had received from an Executive Director and the Executive Director is no longer working in that position. That was a month ago and I feel the e-mail I got today is equally as horrendous. It would be up to you to respond and I know that you're not going to do that. This is ridiculous was what written here and beyond out of line. Thank you."

Mayor Donchess "Well it is not accurate that these people aren't working or not in City Hall. Sue Lovering is here all the time. Lisa Fauteux does not work in City Hall. She works at Public Works."

Laurie Ortolano "She's never here."

Mayor Donchess "She's rarely in City Hall but she's at Public Works and I forget who else you mentioned. John Griffin – he was ill for a little while but he's always here."

Laurie Ortolano "You're very wrong on that. You don't know where your people are."

Mayor Donchess "And you do?"

Laurie Ortolano "I do. I come and I ask. Thank you."

**Board of Assessors Meeting of February 3, 2022**

**https://www.youtube.com/watch?v=PxJBoYq1Hww**

**5:01**

Laurie Ortolano, 41 Berkeley St. —Ms. Ortolano raised several concerns regarding the site of the proposed Nashua Performing Arts Center, particularly how it was valued for tax year 2021.

**The following was transcribed by E. Vassar on March 18, 2024 from video**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. You folks had a presentation regarding the new market tax credit, I think, here at the last meeting. And I wasn't able to be available. But I wanted to point out that, one, I appreciated the comment by Bob Earley in the confusion about how this really didn't make sense. What you indicated is exactly what Laura Colquhuen has been saying. Okay? And I hope you appreciate the complexity of what's been done here. It's really a sham for





DRAFT

taxpayers who funded that. And two of you sat pretty quiet. Bob, you raised some good *comments*, not necessarily questions, but comments that have been expressed by the public. Tim Cummings mentioned that we're going to – the company running the arts center is gonna pay the bills. We're paying *rent* for two-hundred and fifty thousand the first year, goes up to five-hundred thousand the second year, and it increments up. We bought the building, we funded it, we built it, and we're paying *rent*. It's kind of absurd. These new market tax credits are not known to be the most clear methods or considered the most *proper* methods to obtain funding. And I wish we hadn't, because our Aldermen couldn't explain it to citizens, ya know, what was done. I had an email from an Alderman who said, 'I don't understand it, I don't know how to explain it. My spouse and I are tying to figure it out.' Well, when you vote as an Alderman, vote 'no' if you don't know this stuff. Cuz it wasn't a good thing. I asked specific questions about the property for the arts center, and questioned whether the assessment was correct, because nobody did the April 1st assessment correctly. The building was a shell. It still taxed at over two-million dollars. Two-point-five million. I was told by Doug Dame in December when I checked in to the Assessing Office that my questions would be answered. The holiday was coming up, it would take a little bit of time. I never got an answer on why that assessment wasn't done correctly. That was *my* question. I came to a Board of Assessors to address an assessing issue. We got a new market tax credit overview. And I never got my questions answered. And I think my assessing questions were worthy of being answered.

"Let me switch over to legislation a little bit. I think there's a great opportunity to enact some legislation up at the state - and I hope Mr. Bergeron is listening – on these rental properties. We're about to reappraise these rental properties, and New Hampshire is the only New England state that doesn't allow, or doesn't mandate, that rental properties have to submit their financial statements as proof of income they're receiving. It's an honor system. With the high property taxes we're paying in New Hampshire, that should not be the case. And there have been articles after articles in the paper about how rental properties are being snatched up by income investors, ya know, big investing companies. And, in fact, at 30 Concord Street, there's an *old* apartment, five units, that is assessed around four-hundred-thousand dollars. It got purchased a couple months ago for one-point-four-million by an institutional investor out of New Jersey. They don't have to show any income statements on that to us. And I think that hurts us as residential property owners, and I think that's the kind of legislation that our Aldermen should be working on to see to it that those justifications have to be provided when updates are done.

"I'm also very interested in seeing legislation change such that you can abate your property every year, whenever you want, regardless of an update. Because cities like Nashua that push it off for five years, and don't equalize disparaging properties, stick people with bad assessments for five years because they don't handle their data correctly. Up at the Lakes Region, my property is reassessed every year. I do an update. Every year, I can contest my property value if I wanna do an abatement, because a new update is produced. We're not doing that down here, and we're not equalizing our data well.

"The next legislation issue I think needs to be addressed is the equalization ratio itself. That ratio is a combined commercial-residential ratio. And I think the time has come to split that. You're gonna have a ratio that's down around, ya know, 72% this year. Commercial properties didn't lose that kind of value. They get to apply those ratios to their abatements at the same level that residential properties do. And on the flip-side, when you average that ratio, you're taking residential properties, and you're preventing them from getting the correction they deserve, because you're using the commercial data that didn't

change much to set that ratio. And that is really a screw-over to taxpayers. It's really not good. I know this has been discussed up at the State before, and I think the time is good – I actually just heard that they're doing some work on this – and I hope we split that and change that so we can have a more-fair shake when we reset these assessments.

"So those are the things I'm working on. I would've liked my questions answered (inaudible)… I don't think that property at the arts center was ever assessed correctly."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE FEBRUARY 7, 2022**

**https://www.youtube.com/watch?v=4eJ4oKkKrSQ**

**2:35**

Laurie Orlando "41 Berkeley Street. I'd like to address Ordinance O-22-002 allowing Alderman to participate in meetings through video teleconferencing to the presiding officer and conduct the meeting. I'm opposed to this ordinance. I think it's really important, particularly the presiding officers, that you have a presence in the chamber. I've testified quite a bit up in Concord. There's a lot of different legislation up there this year on remote meetings. Right to Know New Hampshire has been opposed to those types of meetings and switching to that format. I think our elected people really need to be here. I know that we've been through a lot with the pandemic. I don't anticipate that we're going to stay in it forever and I don't think we can use the fear of COVID to keep us from coming out and participating. There's a lot of good things that happen when you're in a live meeting with people, and a lot of social cues, and body language that tells you what's going on in a meeting that you don't get when they're not here. I have not liked the video conferencing done, particularly where elected people keep the video off but they're on. I think we should be able to see our elected officers.

"I also think the video quality at times is intermittent. As far as the telecommunications, the verbal - the communication it's not great. The past two months have been a little spotty, a little tricky. I don't know why I'm not complaining about it. It's just the nature of the beast but I think it also makes recording minutes and having a record of the document that is so utterly important under RSA 91-A for the broadest access to public information and public meetings to be obtained. So I would ask all of you to not support that and really embrace being in this chamber, and being together, and being among your citizens who come out and want to converse with you. I think more of us will come out as things get better and that we conduct business the way we've always done business. Thank you."

**1:33:41**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just wanted to give you, you know, something that came across my phone right now that was from the Atlantic because I get the electronic subscription. New Jersey, Delaware, and Connecticut will end their mask mandates in schools next month. I'm particularly excited about that and would like to see the Nashua schools follow suit.

"I'd like to share with you - I liked the discussion on the meetings. I'm going to send some written testimony and I think Zoom should be maintained. I think my experience up at the State House for the last month plus five weeks has been awesome being able to go live without a mask and talk to people. I talked to people elected representatives before and after meetings and they have sought me out to





DRAFT

come participate in other bills and do a lot of work up there and that would never happen if it was Zoom. So I'm really appreciative of that.

"I wanted to let you know that I did file a pro se lawsuit regarding email and data storage. I want to share a little information about that. I've had a lot of concerns with data and records in the city and because I have a captive or audience of elected people here, I want to talk about it. I got the ruling from the court today and the Judge ruled in my favor. I tried to get two months of emails from an employee left at Christmas time last – November - December and the city denied them as not reasonably accessible. It didn't give any reason why and that's what concerns me is I got no reason. So the court said first to the extent the city contends that it need not search the backup tapes because that added time renders the search unduly burdensome, the court disagrees. As discussed above, the city has the technological capability to retrieve responsive documents from backup tapes and has already done so with respect to an unrelated record request. Mr. Miseirvitch also testified that the time it would take to restore a backup tape that would have located those responsive documents to the petitioner's request should only take a couple of hours. This additional time does not render the results search so time consuming as to obviate the city from having to perform the search. Then the court said there is nothing in the record to indicate that there are no practical obstacles to assessing the backup system in order to comply with the petitioner's request. For instance, the city is not alleging it would need to heavily redact the emails once located. It says finally the court disagrees with the city that is not required to search the backup tapes because such a search is incompatible with the old document retrieval system. The court did not find…"

Alderman Thibeault "30 seconds."

Laurie Ortolano "…searching the backup tapes would be incompatible with the city's retrieval system. Based on the foregoing, the court finds that the city has not met its burden to show that the search of the backup tape was not required. It did not perform an adequate search. Per 91-A and the court grants the petitioner's motion to compel the city to conduct a search. It then concluded that I could submit a record to ask the court ordered the city to undergo training and that I could submit a record within the next 30 days to do training and, you know, I think we have a lot to do with our record retention system here in the city. A lot of work to do. Thank you."

Chairwoman Kelly "I would appreciate if you would put that in written because I know you're trying to get it in your three minutes but there's a lot of information there. So make sure you submit that please."

Laurie Ortolano "Say that again?"

Chairwoman Kelly "I didn't hear everything because you said you were going to follow up with written testimony. So I was just hoping that you would do so."

Laurie Ortolano "Oh, yeah on the Zoom. I will. I'm going to do it and I'm going to do it to the Board meeting when you do it."

**Board of Aldermen Tuesday, February 8, 2022**

**https://www.youtube.com/watch?v=IRDQuy0bjpQ**

DRAFT

**34:48**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Madam President I'd like to ask for an extension of time given what happened here tonight."

President Wilshire "No. We have a three minute time period. That's the end."

Laurie Ortolano "I did not know Ms. Kleiner was going to be granted an exception to speak to an item that I could have spoken to as an item being acted on."

President Wilshire "You're wasting your time so just get on with it."

Laurie Ortolano "Please don't interrupt me. It's very concerning to me that she could come to the microphone and defame my reputation, and make the statement she made about requiring a police investigation, and me impostering a city official which is completely inaccurate, and not go into nonpublic session to allow my reputation to stay intact. I had to go into nonpublic session when I discussed an abatement regarding an assessor whose name was never used because the city wanted to protect the assessor. It was just about an abatement value. I come here and I hear the entire public just got a report that I'm under criminal investigation for impostering a city employee and it never happened. I wrote an e-mail. I absolutely did make those calls. I want you to all know as well that Tim Cummings has sent me responses to Right to Knows where he has told me to contact vendors myself. Call them. That's how the city is directing me to handle my comments, my concerns.

"I called Inception Technology two months ago. I never hid it. I called them again last week because of information from a Board of Assessor's meeting. I wrote an e-mail to the city to tell them I did it. Do you think I would be that forthcoming if I wanted to imposter somebody? If I was being sneaky? The guy's phone number is in my phone. I sent him an e-mail today and I didn't make four phone calls to speak to people. I couldn't reach anyone. They must have tagged it. I did send an e-mail which he didn't tell you to Ray the President to ask him to look for the property record file for the arts center that I'm trying to track. Here you've got Tim Cummings telling me to contact the company in Boston doing the parking surveys and get the data down there yourself. You're trying to figure out what regulations you're going to put in against citizens contacting vendors. Are you kidding me? I can't tell you how upset I am because I can't even defend myself."

Donna Graham, Legislative Affairs Manager "30 seconds"

Laurie Ortolano "There are two sides to a story and I had no idea. I've been nothing but forthright with this city and Ms. Kleiner to share these communications and once again, I come in and I am ambushed in this meeting. Completely ambushed. I didn't even have the courtesy of getting the documents you all have. I have no rights in this city. Where are the First Amendment rights for your citizens? Where's my side? Where's the nonpublic session to protect my reputation."

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "Please start thinking about that."

**FINANCE COMMITTEE FEBRUARY 16, 2022**





DRAFT

https://www.youtube.com/watch?v=VdXs72LtIWI

**20:53**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to talk to you a little bit tonight about the barriers and the barrier issue. I'm really disappointed to learn and today I learned there was a public meeting of the Downtown Improvement Committee January 14th that was never posted. I would say legally such that the public knew the meeting took place. It was a 90 minute meeting. The bulk of the discussion was about the placement of the barriers. On January 12th, I sent an e-mail to Alderman O'Brien and Tim Cummings requesting any information on this committee, any committee meetings that were going to happen. The Right to Know was actually ignored. I never got a response on the 12th.

"This is my file that I put together today that has about six e-mails that were sent to Alderman O'Brien and Cummings trying to find out when meetings were going to happen, how the committee was being set up, and how I could participate or know about it. I got stonewalled for two months. I learned through a back door that there was never going to be a committee picked as said in the public meeting on December 8th that the stakeholders – and I have confirmation of this through e-mails – was going to be just a downtown committee of stakeholders. Well I realize now that that committee is the Downtown Improvement Committee. It was never directly said. Tim Cummings was meeting with them for two months to go over developing the plan and getting input from them. I can tell you if the public had known, there would have been 25 people out there. I know there would have been. The best place for the public to have their input is in these smaller subcommittee meetings. They're much more productive that coming to a board meeting.

"I received the most offensive e-mail last night from Tim Cummings telling me that I didn't miss anything. I shouldn't be concerned that those two meeting weren't really posted because you'll have all the opportunity you need when it goes to the board. You know what, that's the normal process. The normal process is that I'm allowed to attend all public meetings that are public meetings. You don't get to pick what meetings I get to go to. At any time the Board of Aldermen can cancel public comment. They've done it before. The Board of Aldermen doesn't answer questions.

"I've got a drawing in front of me now that I actually have questions about. If I had gone to those two committee meetings, I could have asked questions. When this come up…"

Alderman Gouveia "30 seconds."

Laurie Ortolano "…I can't ask questions. Today I went over to City Hall to try and get the records for the minutes for the Downtown Improvement. I was treated so hostile by Tim Cummings I was floored. I waited 45 minutes outside this office at that table just left a message when he was done his meeting that I wanted to talk to him. He literally ran down the stairs, yelled at me that I didn't have an appointment and refused to answer if the minutes were in his office."

Alderman Gouveia "That's time"

Laurie Ortolano "Thank you."

**Board of Aldermen Tuesday, February 22, 2022**





DRAFT

**https://www.youtube.com/watch?v=tpENCdsPXGw**

**15:59**

Laurie Orlando "Laurie Ortolano, 41 Berkeley Street. Just a couple things. I want to thank Alderman Moran for bringing forth this motion to consider lifting it tonight. I know that citizens appreciate it no matter what happens. It's very representative, I think, of where the public stands and how they feel about you know moving this on. So I appreciate what you did.

"Mayor Donchess I did send you an e-mail and I asked if you would address what you're doing with City Hall if this mandate is lifted, I think it's important that we know that. I talked to Alderwoman Timmons today and she was going to address it here at the meeting for me. I didn't know masks would be allowed to be discussed so I'm bringing it up. But I would like it to be clearly understood by us that you're on board in lifting this in City Hall. I think it's been pretty ridiculous that all your staff is behind this thick glass not really wearing masks and moving around and the citizens come in pretty light flow, pretty light group of people coming in and we're all forced to wear masks and no matter what amount of time we spend in the building. I don't think its representative of what's going on anymore, and I think it needs to be lifted, and I'm concerned that you stuck in solidarity with what the schools were doing when you flip this mask thing back into City Hall in September and not out in the public. So please support your community fully and make certain you make it clear tonight what you're doing with the masks.

"I do disagree with Dr. Storace. I don't know that he's correct that the masks worked. Yippee, we know it. I don't think we really know that with the data. I think masks work too. They do work but I think the amount in what you get from a mask based on what I've read doesn't benefit or way out with what's really going on. I don't know how Dr. Storace can say that Nashua having a mask ordinance with a dozen towns surround us that service the hospitals not having an ordinance really made the difference of keeping the hospital load low. I just don't know how you can say that. I mean I really want something more definitive than the number went down. What would Dr. Storace say if we didn't have the mask mandate, and the numbers went down that way? Oh, the masks weren't needed. But we don't know. It's not the experiment we're running. I don't like data used this way and I don't think we're being consistent and reasonable with how we review our data. I was a big advocate last night and I spoke at my first Board of Education meeting to get these masks off the kids. I think the Nashua School Board…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…made some really bad mistakes and parents who want choice in education have to leave this district. This is not the place to educate your kids. Thank you."

**2:00:46**

Laurie Orlando "Laurie Ortolano, 41 Berkeley Street. I want to address the barriers. On December 8th when we had an Infrastructure Committee meeting, Director Cummings said that he was happy to facilitate a working group and it would be a public meeting where it would be publicly noticed. Alderman O'Brien stated, "It's my intention probably, maybe to have it as a full committee but I'm willing to appoint committee members. I would encourage that it's open to members of the public, the stakeholders. We've got to have the stakeholders. We got to have you people at the meeting to really tell us. To come to the Aldermen meeting like this is really not the kind of place it's putting the horse - the horse got out of the barn a bit. So off we go on the ninth with we're going to get this committee





DRAFT

done and it's an urgent thing on the eighth. On the ninth, I wrote a question. I asked O'Brien you know, what's going on? How does this committee really get appointed? I was told after January 9th when the board is sworn in will do with it. And then he said, "As stated earlier, it's a work in progress with a keen eye on the calendar for a solution that stated with an eye on the calendar. I assure you it is a project of high priority and it will be done." I looked on the calendar. It was never posted.

"On January 12th, I wrote an e-mail to Alderman O'Brien and Cummings requesting an update and had a committee been selected, and general questions on the format, and I worded as a Right to Know. I never got a response but I did learn last week that on the 11th Cummings received an e-mail from Marylou Blaisdell that informed him of an upcoming meeting on the 14th - two days later with the DIC to discuss the barrier issue. Nobody was told. I was never told through that Right to Know. This meeting was never posted on the digital city calendar.

"On January 26, we had an Infrastructure meeting. Barriers went out on the agenda. It was very strange, weird. I spoke at the end. I was the only member of the public there. At the end, I said I'm confused with this is an emergency. What's going on? Alderman O'Brien waited till the very last comments and said there's an organization that's been around probably since the inception of Main Street and we're relying on them for citizen input. He went on to say we need stakeholders and I might have a few names I can give you. I feel it was very deceptive not to state who that group was. You didn't even say it was a public group. I didn't know who you were talking about. I've never been to a DIC meeting. The last set of minutes online are from April of 2021 and there has never been a committee report…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…submitted to the Board of Aldermen since last year. This goes on and on with deception and Right to Knows. I was tasked by people in this city to try and tell them when something was happening. I did everything I could to do that and I got duped because nothing was posted. I'm very disappointed at the underhanded nature. We gave you about $50 million to improve the downtown with an art center, with a walkway, with School Street project, and now we're hearing…"

Donna Graham, Legislative Affairs Manager "Your time is up."

Laurie Ortolano "…if we don't give you the sidewalks, it's not good enough. I think we gave you enough. Thank you."

**BUDGET REVIEW COMMITTEE FEBRUARY 28, 2022**

**https://www.youtube.com/watch?v=Eo_jAV0OFOw**

**1:02:53**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to talk to you for a few minutes as you go into budget season about a couple things. 1) I'm hoping that you reach out to the Board of Assessors Rick Vincent and talk to them about what needs to be changed for the elderly exemptions to get that funded in this year's budget because there is going to be big changes in these properties, really big changes, and I don't think we want to phase it in and there is no reason why we have to. It can be a break even item and I think that's worthwhile getting ahead of.





DRAFT

"2) I want to talk to you a little bit about the Inception Technology standing project. I did not agree with the presentation that was given. Not on the personal nature of it, let's push that aside, but on the technical nature of the information that was provided to the Board regarding the status of that project. I would like the board to go back to the July 20, 2020 - no it was July. I think 20 or 15 of 2020 when it was presented to the Finance Committee. I think it's really important that you take a look at that information and what was presented because it was a $60,000 project and what was disclosed a few weeks ago in the Board of Alderman meeting and the depth of what had to be done and changed was not presented 20 months ago. You know the software side of it or the scanning side of it looks like it's going to be around $120,000. My concern is the redacting piece. When Miss Kleiner said there is 1.3 million documents when you look back in 2020 when she told you how many documents there were, she said 100,000 that's in the record. I knew that didn't make any sense for 29,000 property record files, but I didn't dispute it because what am I gonna do? I don't really have a voice in that. I didn't think it was accurate and now he's coming in and say, "hey it's 1.3 million". Well I'm encouraging you to do the math and calculate out if you have a base line employee who could redact 800 pages a day which is a lot of sitting their redacting work. It would take them about 5.5 years to do 1.3 million documents and it's unacceptable to me that getting these records on line is gonna take like 7-8 years. That's never what we were told. Just for the record, I'd like you to know that I went over to the Building Department. I didn't realize they were doing scanning records over there or they scanned some of the files. When I went to get some permit information on a building, the gentlemen Mark said "oh let me go to the computer I have to pull that stuff down digitally it's not on the computers yet for the public to access…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…they had a station set up in the office. He pulled it down and gave it to me and no one in Assessing can do that for you and it's been years. I have filed a PA71 with the Sate on this. They were happy to accept it because they found it unacceptable as well. So I want you to look at it in the budget. You're gonna have to budget a few people full time to try and get these records up and running. I had no idea. This is a $300,000 -$350,000 project and I don't think it was presented."

**FINANCE COMMITTEE MARCH 2, 2022**

**https://www.youtube.com/watch?v=pVyZXeefP_w**

**1:02**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I see tonight you have the Inception Technology quote before you to continue the scanning records project and I would just like to state that I think we get into projects of this magnitude that the city owes us a little more information about the big total picture cost on a project like this. You know it came up 2 years ago almost or about 22 months ago and we funded it in July as about a $60,000 project and it needs another $50,000 to take to completion plus a little more for software. But the redaction piece of $1.3 million that is going to cost a lot of money when it comes to personnel time. I wish we had not done it because it was sent to us to allow assessors to be able to work from home during COVID to access this information.

"Well that's over and 2 years that never really happened with the records and the excuse that the Administration is giving now you know this is taking a lot of time is because we had COVID, we have a

measure list, and we had staffing issues. We that is exactly what was going on when we voted the project in. We were four months into COVID. We had no Chief at all and no prospects of finding one. People were not knocking down to come to Nashua and we had the State mandated and ordered measure list with State oversight on it from the BTLA and the DRA and we took it on and now we're saying hey, you know what, we don't know when these files are going to be available because we're burdened.

"I went to Assessing Department a few weeks ago and I left an Assessing meeting to get records on the Art Center. I didn't realize that they had entered into a scanning project, but they were actually able to download the documents I was looking for and give me the scanned copies as I waited there. They worked with me. You can't get that kind of service in the Assessing office and this is where the project started. So this is going to be a $300,000 or more project and it was spoken to us as a pitch to us as a $60,000 deal. I think some of the redacting you should look at for necessity because it's costing a ton of money - totally agree with e-mail…"

Alderman Comeau "30 seconds."

Laurie Ortolano "… but now they're redacting the addresses of the private property owner. I look at some of that. (inaudible) the taxpayers are going to pay and the time it takes to get the records. Thank you."

**PERSONNEL/ADMINISTRATIVE AFFAIRS COMMITTEE MARCH 7, 2022**

**https://www.youtube.com/watch?v=kPeg9HuqfGw**

**1:28:31**

Laurie Ortolano "Thank you. Hi. Good evening. Laurie Ortolano, 41 Berkeley Street. I wanted to address with you a couple issues I have and concerns with a personnel matter involving our Administrative Services Director. We've been through a lot of Right to Know lawsuits involving e-mails. This city is being very non-compliant with e-mails, and making them accessible, and available to the public. There's been four lawsuits and I think the city has lost all of them. The one that was in there Monday, they offered to settle – agree and admitted to wrongdoing but I took it into trial because I wanted the Judge to weigh in on some issues in what's going on in here. I think we've got to do a much better job with our electronic records and the obstacle to this is Ms. Kleiner. She's just not willing to make records available ever since she came on in 2019. The records have been scrambled essentially and getting a hold of them something simple like e-mails is enormously difficult.

"Also, the Assessing records are just a mess. I've put up with it for three years and I've finally hit my wall. I filed another PA71 with the State. It's been two years – 2 ½ years since I filed but I did. I'm going up this week to management. I'm meeting with the senior leadership at the DRA to talk to them about my concerns. You know we can't get records in our Assessing office and nobody is trained in there. Rick Vincent is a total wall. He's an obstacle going right along with Kim Kleiner. You know at least when Jon Duhamel was there, and he wasn't really in the office, you could go in there and ask for any property record file and it would be given to you. You can't do that. They're not even willing to look for it. They

just send you away with no real reason why and where it is. Frankly the DRA found that totally unacceptable.

“The scanning project that you were given information on by Director Kleiner I think is highly errant. Totally change in demeanor at her at the Finance Committee but once again, the information on redacting I think is completely bogus. I have a set of minutes from her where she told the Budget Committee that it takes the Legal office four hours to redact 100 pages. I think in the Finance Committee meeting she dropped a number of redacted pages from 1.3 million to 300,000. Well if you get 200 done a day and you’ve got…”

Alderman Thibeault “30 seconds.”

Laurie Ortolano “…(inaudible) to go through, it’s going to take you six years to do that work. Again, we’re not getting the straight answers on that. I’m a big proponent of cutting the Administrative Services Director position because I see her as somebody who has destroyed the credibility of the city. Thank you.”

**Board of Aldermen was held Tuesday, March 8, 2022**

**https://www.youtube.com/watch?v=C4oCczX7y-o**

**15:18**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. I am here to speak about R-22-008 the Expendable Trust Fund for 14 Court Street. I am not in support of this and feel that we should be looking at another way to address Court Street and I would hope that the Board would think a little about this. There is an existing resolution that was passed in 2011 - R-11-160 which is sent up to establish an Expendable Trust Fund and has been funded for renovations, repairs, and maintenance for various city buildings. So I’m wonder why R-11-160 is not being utilized.

“The other thing is that Laura Colquhoun is going to dial in and talk to you about the special revenue fund that’s used by the Hunt Building. I think you have a lot more transparency when you put a building like 14 Court Street into that special revenue fund. Now personally 14 Court Street is a white elephant. It’s a money pit and I think the only reason why we maintain that old building is that the central fire station emergency call lines come in from the north and south into that building and I don’t know if that can be moved. That’s the significance of that building. There are call lines there and so if that’s not the case, Alderman O’Brien can clear that up but there is some significance with the Fire Department in that building and the rest of the building is so expensive to maintain. You know the communication by the Administration when they spoke to the Board last week when they said they hoped this would become self-sufficient. I think what should have been said is “most likely it will never be”. That hasn’t been a self sufficient facility probably in 50 years and I don’t think you’re gonna get it there. I think Peacock Players and other places that are utilizing those theaters you should look for spaces downtown that you can move those places to and not operate that building anymore.

“We were not told accurate information last year about the roof cost. It was budgeted for $750,000 and ended up being $250,000. Money ended up being shifted over there. I think there was a total lack of transparency in what went on with that building and I don’t want to create an avenue that allows that to

exist so use the existing resolution if you want or pay attention to Miss Colquhoun because I think she's going to make more sense on greater transparency and accountability. Thank you."

**1:38:40**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street, Nashua. I'd like to thank the Board for sending 14 Court Street back to the Budget Committee for review.

"I'd also like to ask the Mayor – you gave a nice presentation on our COVID numbers, but I'm wondering what level we're at. Usually you say if we're at still at substantial and the website still has us at a substantial rate of transmission and I'd like to know when that's going to change.

"I'd like to address the removal of the press table at the back of the room. So this is your Chamber collectively and I was told that now Attorney Bolton is looking at putting a law library back there with some books. I'd kind of like to know. I got my press pass, and I'm ready to report, and the table has been removed. So I think we should bring our press table back and if you are going to have a law library back there, I think that's terrific. I think you should dedicate a shelf to Right-to-Know Law because I think we could use some polishing up on that.

"As far as barriers go, that's coming up tomorrow and I'd like to say I've done quite a bit of work looking at the data and a friend of mine compiled all the surveys and information from February 22 and March 8 as of today. I think there is a lot of data in there that shows there is not a lot of support for these barriers. I'm disappointed in the letter that went out from the Mayor because I think that it was not clear, and it was convoluted, and it had a twisted view on what should be said. I know Derek you're shaking your head "no", but really you should allow me to speak and give me the courtesy to do that and then you can state your position on what you see. Some of it's debatable because its data on the way it's written and I really understand that. I'm looking at overall the response from the newspaper, the petitions that were signed, and the letters that in both sets of information.

"Finally I'd like to speak on safety. I really think that the two new Chiefs had a private meeting with Alderman O'Brien and Tim Cummings to address the safety issues. I think these safety issues have been raised repeatedly by the public and I think our safety officials should put in writing their concerns. No short, small meetings with pro-barrier people on how we're making accommodations. I think it's reasonable that that be put in writing. Those are safety issues for our citizens so please ask your Fire and Police Department to put in writing the safety issues.

"Finally, I'd like to let you know that I was up at the State House today giving testimony on the (inaudible) Bill for the Right-to-Know office."

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "I think that was very promising. It looks like it's going to pass. That will allow citizens to file a Right-to-Know challenge for $25 with an office, the (inaudible) office for Right-to-Know who will make the case and assist you with the challenge. I think it will offer some nice benefits to controlling costs, getting answers, and creating better transparency for New Hampshire. Thank you."

DRAFT

**FINANCE COMMITTEE MARCH 16, 2022**

https://www.youtube.com/watch?v=ilEgDaZNsaE

**1:14**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I saw on the agenda was Court Street and I just wanted to give a few thought on that building. I know there is a special meeting at the end of the month to gather ideas on how to proceed with the Elm Street Junior High School building to do something with that and I would like to see a lot of those arts programs that are over at 14 Court Street moved over to Elm Street. It just seems like 14 Court Street is just such an expensive building to maintain. I sort of addressed at the last Board of Aldermen meeting my thoughts that there was a fire issue, communications issue in that building, communication lines, but Alderman O'Brien seemed to be shaking his head "no" that I was wrong on that. I'm sort of wondering why we haven't pursued selling that building and letting that go given the extremely high cost associated with trying to operate it and fund it with tax dollars. See if a developer can do something better with it and move our arts programs over to the big auditorium theater over at Elm Street. That is all I have for input. Thank you."

**16:11**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a couple of things. The riverfront project that you spoke about, and these are questions which I know I'm not going to get answers to but maybe an Alderman later can answer me. Is this our first time doing the maintenance work or the development down there? Does Department of Public Works carry any responsibilities or any costs associated with doing the cleanup down there? I'm just curious about that.

"Also, I'd like to talk about the scanning project that you approved. Maybe that was the last meeting. It didn't seem to me that we really got an indication on the timeframe it's going to take to get the records up and you know it's not clear to me that as records have been returned and put on the DocuWare system digitally that any redacting has started at this point. So I'd like to know what amount of redacting work has started. I don't mean just in the last month. I'm talking the last year if we've done any of that. How many people are you going to hire to do this redacting work so we can get through it? I said before I don't agree with redactions that take off the address of the prior owner because that's information on the deed and I recently got cards that had redactions on them on the property record card itself, which is very unusual unless a note is added that there would be anything redactable there and it was the address. It just makes no sense to go and do potentially 250,000 property record cards and redact that field. I would challenge that. I told the Legal office I would challenge that in court before I'd spend the money paying for that. Other redactions you want to do I get. That's fine but I feel that we haven't even addressed the cost of that making it happen.

"Miss Kleiner had told the Finance Committee back when this was getting going that the Legal office was spending up to four hours to redact 100 pages. Well if you're still talking now about 300,000 pages, you're still talking a tremendous amount of redaction time before the records are available. It just seems like we can never really get a straight answer or input on that and it always comes after there is some fight or kind of blowout that happens when the community asks and the administration…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…because the question was raised. So I hope we can get some straight answers on that and know what's happening with those records and what is actually really publicly available on a digital basis. Thank you."

**Budget Review Committee, Joint Infrastructure & PEDC**

**https://www.youtube.com/watch?v=qZqv5_DcJKk**

**5:06**

Alderman Thibeault "So I mean the two or three people that I see online spoke last week in length about this. So what difference are they going to say? It would be really be nice if we could work on the issues and talk to the people that have come here to be part of the Committee so we're not here until 11:00. That's how I view it. I mean we've heard from Mr. Wingate. We've heard from Miss Ortolano. We know where they stand. We haven't done anything since they spoke...*Laurie Ortolano interrupts Alderman Thibeault.* You cannot speak right now Miss Ortolano."

Laurie Ortolano Well don't speak about me. You don't know. Alderman Thibeault Well you can speak about me and if they allow you to speak. I'm not going to allow you to interrupt me when I'm trying to talk. We had a meeting last week where we asked everybody that wanted to come out and speak, speak. If we told the same people that they could speak again this week, they would be here. I know they would be here."

**8:22**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. To those folks from Derek's Ward, shut your TV off, hop on your computer, and join the Zoom meeting and you can give public comment. That's a solution. Also, I do have different input. A week has gone by and a week gives you enough time to reflect on things. One of my issues is the garbled language that Alderman O'Brien gave at the beginning of this meeting. The personal privilege. The situation at hand. He never actually told us what he was talking about, but I do have a comment on the last meeting I went to.

"I felt the motion made was extremely confusing. I asked the city Legal office to put Mason's Manual of administrative privileges or Legislative Rules into the Clerk's office so I can look it up. It was structured like a hearing, but you didn't allow any questions and that's what a hearing would allow. You know it was just really difficult to figure out what was going on in there. Whatever your personal apology was tonight Alderman O'Brien, you didn't say what it was to the public so we have no idea what you're talking about but I don't think that meeting was run correctly.

"Also with regard to not allowing public input at these workgroups, I think it's a big mistake. When the first two meetings were not publicly put out there, I got an e-mail from Tim Cummings saying you will have ample opportunity to give public input as more meetings are held. Then you set up workshops and cut public input out. I would have liked to have been at the two Downtown Improvement Committee meetings and given input down there. I spent time after those meetings ended speaking to the business owners and had an opportunity to chat. That's helpful. That doesn't happen unless you allow input and you're not allowing that.





DRAFT

"Also with regard to surveys, we fight a lot about surveys. Some board members say "you know 3,000 surveys in the Telegraph what does that mean?" The parking guy that came and talked said he got about 1,000 responses. He considered that excellent. Is 1,000 excellent? Do you people think 1,000 is enough and if 1,000 is excellent in his mind are 3,000 from the Telegraph unique surveys good enough? I don't know, but we seem to fight a lot about the quality of surveys. I do think the parking guy made a mistake because he said 1,000 was like 10% of our 90,000, but it's really 1%. But he still considered that plenty statistically significant. I also feel that we need to do…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…a cost analysis of what we should charge for a space should they proceed, but I'm still not a proponent of doing these barriers. I really think it's an issue that should be brought before the public, and voted on, and taken care of in that space and time. Thank you."

**1:39:36**

Laurie Ortolano "Thank you. Laurie Ortolano, 41 Berkeley Street. I got to go quick through this. I want to thank Alderman Moran. He is 100% correct. I think transparency has been missing and the idea that this was a democratic process was missing and I think a lot happened tonight that made that seem a lot better. I can tell you that I started putting in questions to Alderman O'Brien on December 9th about the construction of this committee and the process by what it was picked. I was never able to get an answer. Even asking general questions and then formalizing them is Right-to-Know and it was so frustrating to me that there was no process that was publicized that a citizen could learn about or understand how this was happening. You know I really have a big issue with how Alderman O'Brien has handled this Committee. I don't think he speaks clearly. I don't think he represents the Committee adequately. I would have liked to see a change there.

"I also think that Derek is too closeminded. He does not recognize the ability of people to shift and come together. I have been not for the barriers, but I'll tell you it's not my hill to die on and my issues have been life safety, cost to the taxpayers, and the fact that we charge nothing, traffic, and the lack of a democratic process. Now I feel like the democratic process came in. I feel like these other towns that have costs they are implementing and were able to do, we should be able to do that. I agree with Kathy Cardin that we need more lanes of moving traffic and I agree that we could use the full sidewalk and out to the parking spots on restaurants that want that space to have expanded space. I'm not 100% opposed. I can come together and negotiate, but you don't even allow your citizens to have that view point and frankly Mr. Thibeault, when you turn around and start a meeting calling my name out personally and saying we already say what Laurie Ortolano wants and she's against it, so we don't want to hear from her again. I think that's a violation of Mason's Rules. I can't get a hold of a manual yet, hopefully it will be in the office tomorrow but frankly it's inappropriate. Citizens - and you weren't going to have public comment. I have to hear myself called out and put out there in a way that I'm categorized that may not be true, you know? So it's really disappointing.

"I started my quest on December 9th for information on this Committee…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…and on it's now March 16. I disagree with Marylou that you have to have it done in one meeting. You are the guys who let this thing run by. It's not your public. I know Rick Dowd

mentioned "hey I called out Dan Hudson. Oh he probably doesn't appreciate that I called him out by name. Well you know Derek. You call your citizens out by name. You need another one. Gary Wingate - oh we're the ones with the problem. It's very disrespectful and I think it's out of line with Mason's Rules. Thank you."

**Board of Assessors Meeting of March 17, 2022**

**https://www.youtube.com/watch?v=-8ylr7wAcD0**

**15:08**

Laurie Ortolano, 41 Berkeley St. expressed concerns about the senior exemption process and public access to records in the Assessing Office.

**The following was transcribed by E. Vassar on March 12, 2024 from video**

"Laurie Ortolano, 41 Berkeley Street. Ya know, I do think your public comments statement on rude and profane messages is unconstitutional. The Board of Aldermen does not restrict that, because it's unconstitutional, and you should consider doing the same. I don't care because I don't think it's been a problem here, but it's really not right.

"I have addressed several times my concerns about the senior exemption. We're getting into budget season in like four weeks, and I don't know who's responsible for looking at the elderly exemption for properties, but I feel that that should be evaluated carefully and thoroughly this year. In 2018, it was not evaluated, and when they needed to make adjustments for the exemptions, there wasn't enough money to do it in one year, so they split it. That created a lot of hardship for seniors, that they couldn't fully fund it. And I think that this year it would be a shame not to calculate that and analyze it, because there is a big, big shift going on now, and there were a lot of properties that were sort of out of whack.

"I've had a lot of call, I think you're going to see with this new data coming out, that you're gonna see a number of people lose their homes, not be able to afford them any longer. I would like to not see that hardship go down any harder than it has to. I don't know who's responsible for getting numbers to the Budget Committee. Ya know, I've asked repeatedly, no one has been willing to provide an answer. But I am just relaying what I think, obviously you would think, is of interest to people, older people, and that is those exemptions.

"I'm also really discouraged by public access to records down in the Assessing Office. This scanning project, I think, got way out of hand, was under-funded and under-manpowered. The last time I came to a board meeting, and you went into non-public, I went downstairs to try to get the property record file for the Arts Center, and Dan, you were incorrect in stating that somebody from the city went and viewed that property in March or April of 2021. Because if they did, it's not documented on the card. And we would have no way of being able to tell if it's not on the card and we can't access the file.

"So, when I went down there, the entire office was in the back room, apparently on the non-public session. And we never allowed this in the past. You know, if the office isn't open to service customers, there should be a sign put up, that it's closed to customer service. So I rang the bell, and the assistant Jen came to the window, and I asked her if she could show me how to print a property record car, and

she said, “I don’t know how” on the computer, and then I asked for the Arts Center File. She disappeared in the back, came back, and said that Rick Vincent was in a meeting. I said, “Well, I know he is, he’s upstairs in non-public. But I just want the file.” (quoting staff member) “Well I don’t know if it’s on a shelf, it could be in a box.” I said, “You just look for it. They’re in order. Just get the file.” She didn’t like my tone. She did not like my tone. And so she said, “I’m in a meeting.” I said, “Okay, is there another clerk who can help me?” (quoting staff member) “No, they’re in a meeting, too.” I said, “Is there an assessor available?” (quoting) “Nope, we’re *all* in a meeting.” And she walked away. I stood there at the counter and figured out how to print the card. And I printed it, and then I realized I didn’t have a buck in my pocket to pay for it, and I came up here and borrowed a dollar from somebody, and ran back downstairs. It was actually a twenty, rang the bell again, and two women came out. And I told them, “I figured out how to print”, and I wanted to pay for the card, I only had a twenty. They couldn’t make change. They gave it to me. And off I went.

“Ya know, I used to go down to board meetings, and when the board was in non-public session, I’d go do research. Ya know? I’d go all the time. I’d go downstairs, and I’d pull files, I’d stay an extra hour, cuz I was at a meeting, and I’d do research. And there were people down there who could go get me files. It was no big deal. The office was *staffed*. And I don’t think anyone’s trained down there. One, how to print a card, two, to know how to retrieve a file. And when I put a question in to Mr. Vincent, “Who’s trained? Who are our clerical staff members and what is their training level?” I got a response back that no records exist. So they weren’t willing to answer that question. I would love to know who’s trained. I’d love to know who to go to at the window by name and say, “Hey Lisa, could you help me?” just like I used to do in the days when Cheryl Walley was there. Ya know, I called upon Cheryl because the other clerk said she was the most trained, use her, she could help you. I’d walk in and say, “Is Cheryl available?” And she was. And that’ how I go help.

“Ya know, customer service and access to records has never been the same since that office got tipped out, over, on its ear. And 2019 was the end of open records down there, and I think it’s really inappropriate that we haven’t funded the redacting phase of the work Inception is doing.

“When Ms. Kleiner did her, I’ll say, “show” at the February 8th Board meeting on me impostering a city official and talking to a vendor … I called that vendor because I couldn’t get any updates from the city. Nobody’s ever willing to give you an update. They never come to this board with an update. All I know is you can’t access records. And when the guy told me that the boxes of data were sitting in his office, and they had been sent back digitally to the cloud, but the hard records were sitting there, I said, “Do you realize, as customers, as citizens, we need those hard records? We don’t have access to the digital. You gotta bring the boxes back. They can’t just sit in your warehouse for two weeks or a month. We’re waiting!”

(time warning)

Laurie Ortolano “Okay. He didn’t know that. And I’ve begun filing PA-71’s again. It’s been almost two years. I didn’t file. I wanted to move past that. But I’m back to the frustration level of not having questions answered and access to data, and I just think it’s wrong. Thank you.”

**Board of Aldermen Monday, March 21, 2022**

https://www.youtube.com/watch?v=WC1SItX44Cs

**45:58**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just have a question and I understand the project here. Was this bid out separately or was this project piggybacked with the middle school renovation? Did you go for competitive bids on this $5 million or was it folded in to what was going on with the middle school? I'm just curious. I don't even know."

Chairman Dowd "It's separate funding but – do you want to address the - we selected the firms that we are currently using and had familiarity with the building because of the preliminary studies. Therefore it made more sense to use people we know and to do the job at a reasonable price because cost is an effort so they were selected by the Joint Special School Building Committee."

Laurie Ortolano "Okay. Thank you. And one other question. I notice that the contingency costs 10%, 5% they seem high but this is a really volatile market for construction and does that in part drive it because it's such a hard market to cost out your materials. I don't know when the $5 million was costed when we came up with that quote but certainly we're back into high material costs, and inflation, and all that stuff. So do they bill that on the contingency amount? I remembered when I did school projects, it seemed to me that contingencies were like 2% and 3% now they're 15. I think they need it because of the volatility. Is that correct?"

Chairman Dowd "Yes. Typically they are higher and in this particular project, they bid it conservatively. Again if we don't spend any of the $5 million, it doesn't get bonded or it can be used for something else. The Board of Alderman would determine. So we feel comfortable with the costs that have been programmed for steel and all that other thing. They took into account what's going on with the current market."

Laurie Ortolano "Okay. One last comment, not a question. I understand the selection and working with people we know but I also think it's important to just remember that, you know, we expand our projects to people who have good reputations that we might not know as well. If we are always tied to the same firm, it has a limitation and I just want you to bear that in mind. That's my only comment and other than that, I support what you're doing."

Chairman Dowd "All of the costs for materials and things are all bid out competitively."

Laurie Ortolano "Okay. Thank you."

**50:10**

Laurie Ortolano "Do you have a bond schedule for this or a cost payout for this done up that we can actually have a copy?"

Chairman Dowd "That would fall to the City Treasurer."

John Griffin, CFO/City Treasurer/Tax Collector "Good evening. John Griffin CFO/Treasurer/Tax Collector. As the resolution was put together, we costed out a level principal payment and on the second page of the Resolution, the 20-year bond payment would be $315,625 annually. The total $5 million plus the interest is $6,312,500. Just to put this project in perspective, the general fund debt service adopted by the Board of Alderman in Fiscal 22 is $16.8 million. So $315,000 is less than 2% of that number. As far as

we move into Fiscal 23 budget, I'm in the process of working with my team to create what's called "a bond sale", which we notify the Aldermen these are all the projects, some approved, some not approved yet. We put together the schedules of payments, General Fund, Enterprise Fund, and other funds - Highway in particular with the paving program. We will have all those schedules and as this becomes a sale and I'm learning as we go as well too, that we don't need the $5 million this summer. Following Treasurer Fredette's footsteps to avoid arbitrage and other problems, we'll probably sell this in two chunks but it will be part of a comprehensive bond sale plan. We've been very successful over the last few years taking advantage of the available rates, timing of the projects, and the bonding. So we will be presenting. I will be presenting more of a comprehensive plan through a memo at the beginning schedules and then a discussion. The thing about bonding and we have a fair amount of high school bonds coming off, so paying those down and we try to manage the increase in any given year to a reasonable level in the general fund. So we replace things as they need to be replaced. We rapidly pay off our debt. That's one of - for those of you that maybe attended the 2012-2013 presentation by a financial advisor. We're looked upon favorably the rating agencies. That's a sign of strength. So all of that – I mean thank you for asking the question but that's a kind of preview of the coming attraction that Alderman Dowd and I have talked about with making sure we all understand the magnitude of the debt, that it's manageable, it's paid off rapidly, and it funds the necessary programs and initiatives that we need in the City. That's a long-winded answer but that's the answer."

Laurie Ortolano "Thank you very much. I like to have this educational piece brought forward when we can see or talk about what's coming off and what stays on because I think the public has to understand that as we bond things. Even in the future if we can have a table or something, it's just really helpful to know that we're not just keeping it on. We're eliminating it as well, so thank you very much."

**MARCH 21, 2022**

**https://www.youtube.com/watch?v=WC1SItX44Cs**

**1:19:46**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. As we go into budget season, I've seen, you know, what the Mayor has put out for a request from departments as far as capping it. I really think that this season you should be looking at a 10% reduction across the board. That isn't really being taken seriously. You've got new assessment numbers coming out in six months. I don't think the public has been told what's really going on there. I don't think the last update you had from the administration clarified what was going on with the depreciation factor. Vision gave an update last Thursday stated that you would have properties moving between 45 and 60% higher. The median is going to be a set number and condos and ranches are going to take a big hit again. Those that didn't have the depreciation set correctly could see increases between 80 and 100%. They're gonna see a big change in their tax bill and I don't think Aldermen are prepared to deal with that within your Wards the way you should when people start calling. They're going to be very upset. So I really feel this budget season needs to be very aggressive at cutting the budget.

"I also want to make the request that the Legal budget be substantially cut and you start looking at some level of outsourcing because I look at the millions of dollars spent to lay out battle with me on





DRAFT

issues and I think it was ridiculous. They should have been willing to negotiate. They should have been willing to address these issues. My last trip to court on the 28th, they did offer to settle 10 minutes before and I said no because I wanted the Judge to hear what was going on. Two days before my trial, they discovered 500 pages of records I had been asking for 11 ½ months ago. It's just absurd the withholding of information that's going on here. I'm opposed to funding a Legal office that is doing this.

“I've also become aware that the Legal office is representing some city employees who are not being truthful to them. I am completely opposed to that. No lawyer would give representation to somebody who's not being truthful. They tell you to take a hike. But we're using tax dollars to represent individuals who are not being truthful to City Counsel. Make them go find and hire their own attorneys to represent them in court. Don't make taxpayers pay for that. So I'm, you know, and I really believe you got to look at - I would had a meeting with the DRA. They asked me specific questions…”

Alderman O’Brien “30 seconds.”

Laurie Ortolano “…about what was going on with the property record card scanning and bringing that online. I don't have any answers. I specifically asked when that was going to be addressed and done as Jonathan Cathey asked. The answer I got from the Legal office, not the Chief, was to go back and look at the February 8th meeting. Miss Kleiner provided no answer. It was -oh, we're super busy. We don't know. So I would like to get answers to that because records are a big problem and they're causing a lot of issues and you're gonna get new bills out soon. Thank you.”

**Board of Aldermen Tuesday, March 22, 2022**

**https://www.youtube.com/watch?v=ja5bfU3tSnU**

**13:44**

President Wilshire “Thank you. I have someone on Zoom but right to something. I'm not sure - Right to Know. That's not a name. So in the future if you could put your name that would be more helpful.”

Laurie Ortolano “Okay. I don't know if I can because I don't even know why that appears. But anyway, it's Laurie Ortolano, 41 Berkeley Street. I would like to speak to a couple things. The first one was the Franklin Street School. The bond for $5 million. I was there last night. I gave some comments on that. I would like to ask the Board to do more to get information to the public on the bonding schedules, the cost of bonds, bonds that are coming off payment plans so we have a better understanding on what's going on with the bond schedules and we're able to educate Board members more fully. We did that when I lived in Litchfield. I think it's really important because I don't have a good sense of it and I can't believe Board members really have a good sense of it.

“I also think it's really important to competitively build these things. We seem to give our contract to the same person or the same company over and over again because we have great results. I just think that that's not a good plan long term. We should mix it up a little bit. A 15% contingency is very high. I know it's because of material fluctuations but I think normal contingencies are like 3% or 4%.

“14 Court Street - you've heard my comments on that. I'm concerned about extending a lease to Liquid Therapy because I really think we should be getting rid of the building. If there is no fire issue in there to





DRAFT

maintain the building, then we are just holding on to a facility that we will never make money in and it costs us, you know, millions of dollars to maintain. So maybe we should sell that building to somebody who has a better plan and can turn that into something more profitable.

"I support the gaming change in schedule to some extent. But in general, I sort of feel like nothing good happens with alcohol after midnight. The woman who just spoke and said that you should limit it to the patrons that are already on the establishment, I think had a really valid point. I'd also like to know what the Police Department position is on this as far as what it may potentially do for police calls involving issues at these establishments and if they raise the concern that was just raised by this woman who spoke previously. I'd also like to know that there's a monitoring program that we can see if there's any impact with our Police Department and extending this to 2 am.

"Raising the landfill fees I think is terrific. We need to do that. It is hard on the people dropping off stuff that are local people but it's a necessary change. We have to preserve the landfill."

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "Okay. That's everything. I'm good. Thank you."

**50:04**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. And what's really interesting is the name is now Laurie Ortolano and I did not do that. So I guess your request was magically filled out. So I want to talk about our e-mail storage and retention policy. I want to talk about anything the Aldermen can do to assist me in this policy we have going on in the city regarding e-mails. There's been a number of lawsuits filed over e-mail records and for the most part, citizens have done well winning those lawsuits on records. One thing that has occurred over the last year is that each time records were being requested for e-mails, the city was providing us with a written policy - a 45 day e-mail storage and retention policy that was updated by the Mayor on the May 3rd of 2021. But it turns out that policy was not what was being used by the city. The city had changed their storage retention policy to 90 days in March of 2020 and then in the summer of 2020 changed it to 120 days - four months but never disclosed to the public that that change was made. And while I was submitting Right to Knows to understand what the retention policy was, because I felt it wasn't being handled right, the city just kept unloading a 45 day policy on me.

"After going through a series of trials in court and through questioning Nick Miseirvitch, I learned that that was not the policy. That was not what was being used. He testified that Ms. Kleiner had authorized a change to 120 days and so when Laura Colquhoun asked for e-mails between Rick Vincent and Miss Kleiner in 2021 - January and February - the city initially would not provide any records and then came back and said, we can't guarantee we can give you two months of records because we had a 45 day retention policy. The fact it was 120 days and there was no issue on providing the records.

"The same thing happened to me with these assess help e-mails that I am in court on back in court on Thursday. Turns out on those e-mails, it was a 60 day policy unwritten. So I can't file a Right-to-Know to get what the policy is because it's not in writing. The city refused to tell me what it was because it wasn't in writing and they would only give me a defunct nonworking 45 day policy that wasn't used and then stood behind it to deny me records. Now I know I'm going to win this lawsuit, but I am so frustrated by…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…the lying done by this city and in particularly what Miss Kleiner is doing. It is beyond distressing what I have gone through. We should not be representing people in the city with our Legal counsel who are lying to the citizens and lying to the courts. It's coming out. I'm confident I can get it out. I'm gonna have to file a few more lawsuits but I am so tired of this and I am adamant that we should not keep people like this in City Hall."

Donna Graham, Legislative Affairs Manager "Your time is up."

Laurie Ortolano "Thank you."

**Board of Aldermen Monday, March 28, 2022**

**https://www.youtube.com/watch?v=5Cw5A1lkvoE**

**7:15**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. So I have a couple of questions and I might have missed this because I was trying to get my computer uploaded here. What areas of the city does this cover? I know that they are going to repave our street. I believe they were doing site work to repave it and do gas lines, but I believe there is a fair number of sewer pipe problems over their neighborhoods? And how are we addressing that, I'm just curious?"

Chairman Dowd "Mr. Hudson?"

Dan Hudson, City Engineer "So yes the funding covers all areas of the City, but we are focusing our inspection efforts on the oldest parts of the City. The sewer system was built out over time in the downtown to the outskirts. So the downtown has most of the older pipes. As I said, there are pipes that are like unreinforced concrete pipes that are problematic in the past, so we'll look at those. Right now we are looking at pipes typically older than the 1940's. As we progress the system, we'll start looking at newer and newer pipes until we get to pipes that meet current standards and are in good condition.

"We do this work hand-in-hand with the paving program. So whenever we are going to pave a street, we reach out to all the utility companies - gas, water to screen the streets but we do the same thing internally. We video the pipes on that street if there are pipes as noted in that condition that is potentially something that would be concerned about. Certainly if there is any sewer issues, please forward those to the DPW. If there any sewer issues that anyone is aware of, let us know and we'll take those very seriously."

Laurie Ortolano "Okay could I just follow on it for a quick second? So yes I will send an e-mail over to DPW because if they're going to pave the street and gas company came around and knocked on all the doors and said they were going to do the gas pipes and then repave. It's a neighborhood where the piping would be around 160 years old from the 1870's homes up to 1900-1925. There's definitely some interesting smells when you walk your dog through the neighborhood. So I think there is some need, but it ought to be looked at. I just don't want them to pave the road and then find out there were piping problems. That's all. It just came to mind when I saw this but I'm in favor of it and obviously we've got a lot of work to do and you guys are doing good work. Thank you."





DRAFT

Chairman Dowd "I'm sure DPW and the rest of the City would not want the streets dug up after we paved it. Any other testimony in favor?"

**BUDGET REVIEW COMMITTEE MARCH 28, 2022**

**https://www.youtube.com/watch?v=5Cw5A1lkvoE**

**38:11**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Couple of things with the Budget Committee. I have been pretty outspoken about my concerns with the funding and what's going on with the Legal office – the Right to Know Coordinator and in general city responses with Right to Know issues. I'm really concerned when the city offers legal representation to any employee who is not truthful under oath, or in court, or in general to its citizens. I feel very strongly that we should not be paying for that. We should not be paying for that representation out of our tax dollars. I think under New Hampshire Bar rules and to some extent ABA rules, there are pretty strict guidelines on ethics on representing somebody who isn't truthful.

"I finished a trial on Thursday. That was very taxing and challenging and there were discoveries of information that wasn't provided that was very frustrating given a year. The cities have all the power to really abuse the law. The courts are backlogged. 91-A is priority law, which means you're supposed to get into court quickly but because they're so backlogged, it's almost impossible to do so. This records request was done a year ago. You're in court, you know, figuring out how to fix the problem twelve months later. At that point, a lot of times the records are far less relevant. In this case, they weren't but the city discovered more records – 11 ½ months later because the lawsuit was in place. There was an e-mail not provided that was very informative about e-mails I had sent into the city that didn't appear in the record search.

"The 45 day retention policy for e-mail storage and retention is a major issue for me that I think I'm going to back into court on. I really think it's illegal. I think it's not being done correctly. I think that police should be thrown out and we should call it something else and we should write it differently. Enough people have been under oath to say that they aren't even aware of it in this city – or workers. I don't think we're…"

Alderman Klee "30 seconds"

Laurie Ortolano "…living up to the law when it comes to e-mail record retention and doing the right thing. Just because the city lawyers can go in there and tell a judge, "oh we throw our e-mails in different files and they're not searchable. We get rid of our transitory e-mails. I'm just finding what they say isn't really the case and the training in there doesn't match that. You saw today I sent you the lawsuit that the Judge ruled on in favor to hold the ruling on for a win. Thank you."

**FINANCE COMMITTEE APRIL 6, 2022**

**https://www.youtube.com/watch?v=0EiXeqBCY34**

**0:49**

Laurie Ortolano "41 Berkley Street, Nashua.

"I'm not certain I understand the format of the agenda so. These communications it's not clear to me. Are you actually like voting on these tonight or like approving them because they are not listed as like business? Okay so you'll be voting on these. I just wanted to understand this Rescue Plan Act money for the $200,000 what we get for that, are we trying to go after grant money, and what kind of strings get attached with that grant money, how much is available? It looks like it's all COVID related and I'm always concerned about what the hooks are in that.

"I'd like to know for the road projects being done or we would interested in hearing for 14 miles of paving we're doing. Is this typical for what we do for paving each year and is that money - I think its bonded money and we're feeding out of the bond. I'm not even certain how it goes, but if we are taking money that's already been bonded and spending it, I was just trying to understand that.

"And I want to just lay some caution on the assessing dashboard consulting services. I'm not certain what this is about or what it's going to give us, but I'm more concerned with getting the records online and getting the redactions done and the digital component of the property record files brought up. I think that is going to cost a good bit of money, and people, and services to do that, and I would like to see the priority go there rather than to this dashboard because I think it's more valuable to everyone especially with new numbers coming out. Thank you."

**16:11**

Laurie Ortolano "Yes. Laurie Ortolano, 41 Berkeley Street, Nashua. I have a lot of questions on what I just heard with this $82,000 being spent and I'm so tired of "improvements being made for transparency" that we either don't need or don't make sense. Is this supposed to bring the property record files online because Miss Kleiner does not speak clearly? Is this an interface that brings these files on line that are being done by Inception Technology? I'd like an answer to that. We were told that's $7,500. Is that $7,500 we're going to spend still to do this or is ArcGIS providing this? And where is the transparency now? We have all the cards online. You can check your neighborhood. You can access them from home. You can run the taxes. You can look at all comparable properties. Why would be doing this unless this is the interface for Inception Technologies scanned work? I'm so tired of the wasted money for transparency that isn't transparent or necessary.

"We bought all those tablets for the assessors to take out in the field. We never really use them. You know why, our assessors since 2019 when we purchased them aren't doing permits or sales data anymore because when we signed the contract with Vision they took over and did all that work. So the handy tool of buying digital equipment wasn't really necessary at all. We spend the money, we don't really use it. We upgraded for thousands of dollars, tens of thousands of dollars. Patriot Properties tool three years ago. We have the latest and greatest software down there. She did not say "is this system going to be accessible from home?" or "is this only going to be accessible if you go into the assessing office?" because I don't want. I want the same accessibility from home that I have now but I don't see a need for this at all. Somebody tell me what this is going to do other than muddle it for people who have to try and understand this stuff. The new version of Patriot is complicated enough down there and the Clerks that work in the office don't know how to help you on that computer screen because they don't

understand the WebPro that's been updated. You have to fish through it yourself. I went down there and a person couldn't show me how to print a card off the computer. I had to stand there and do it myself.

"So is this part of the Inception deal? Are we trying to couple the property record files and this is being developed by a consultant to allow…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…property record files to be accessed? I'd like clarity. I'm going to cut this discussion out and send it to the DRA and say "help me understand my records" because I don't understand what was just said to you and I wish you hadn't approved this. This requires more discussion. Thank you."

**Board of Public Works Budget Workshop, 4/19/2022**

**https://www.youtube.com/watch?v=dQZthHCdIR0**

**2:11**

Laurie Ortolano, 41 Berkeley Street: Ms. Ortolano spoke to her concerns about property assessment values. She praised DPW for the work we did this winter with snow and ice clearing. She spoke about the City's nonpublic minutes and the fact that the BOA, BPW and Assessing are all out of compliance with the new law put in place January 1st. The best and most complete set she reviewed was from DPW but said she is concerned that our nonpublic minutes should be listed separately.

**The following was transcribed by E. Vassar on March 19, 2024**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I know this, I think it's the first budget planning meeting, I'm not positive. So I just want to emphasize mindfulness in spending. I think there's a lot going on when these new assessment numbers come out in July that have some hidden secrets for property owners. I think the lowest level property owners will see the highest increase, which is always problematic. But I do appreciate the work you do with the roads and plowing. I didn't have any complaints this winter, and I know some people did, but I think it was particularly challenging with the amount of rain and ice. And I think you did pretty good, really. And I think it was expensive for you to try to stay on top of all of that. So I'm gonna give you kudos for what went on with the roads. I think you di da great job. And I know my road is being dug up right now, and I don't even care if you repave it. I didn't think it was so bad. But the process is underway.

I would like to talk to you about how you handle your non-public meeting minutes. I picked up a list that was done, cuz the law changed on January first, and I don't think you're really on compliance with those. And no board was. I picked up the minutes from the Assessing Office, DPW and from the Board of Aldermen; none of the lists were even close to matching each other, because each one is applying a different process. The best and most complete set was Public Works. Yours were the best set. But I am concerned that separate minutes are not listed for non-public meetings. And they really should be. And I cited a NH Municipal Association document from Cordell Johnston in 2016 where he advises and says non-public meeting minutes must be separate. And that was my training as an elected official, and I could just tell you from a transparency standpoint, as a member of the public, it hugely helps when you



DRAFT

put ‘non-public meeting minutes’ listed under your meeting minutes so that the public knows that something was released. Otherwise, we have to go searching through every set of records, that could be 83 pages long, to try and find where they are. And quite frankly, I haven’t been able to find the ones from February and March. I don’t know where they are. But I really believe it’s not in compliance, otherwise, your list was quite good. Your listing method. It’s just how they’re posted. Thank you.”

**Board of Assessors Meeting of April 21, 2022**

**https://www.youtube.com/watch?v=LbSjiZa5Bh0**

**12:48**

Laurie Ortolano, 41 Berkeley St. asked questions about the BOA packets with regard to nonpublic minutes and expressed concerns about the process regarding sealed minutes. Following public comment, board members attempted to answer Ms. Ortolano’s questions and clarify the steps the board takes regarding accepting, approving and unsealing BOA minutes.

**The following was transcribed by E. Vassar on March 13, 2024**

“Laurie Ortolano, 41 Berkeley Street. A couple of things. I did just ask Jen if, in the packets that you receive, the board packets you receive, if the non-public meeting minutes are part of that packet. So you get a set of public meeting minutes and a set of non-public meeting minutes. Do you get your non-public meeting minutes for every meeting? Marked non-public?”

“This is a public comment period, it’s not a question and answer period.”

Laurie Ortolano “Well I know, but behind me is Rick Vincent to answer it, and he couldn’t do that, so I’m here because the meeting was starting. And it’s a very simple question on a packet thing. But let me go on and explain what my concerns are. The state changed the law in January regarding documented sealed minutes. And the Assessing Department is not handling the documentation for those sealed minutes correctly. I went down there to get the list, and I actually got it from the Board of Aldermen, the DPW and the Board of Assessors, because they have non-public meetings that have happened since January 1st that have to be documented in a list. Before I requested those, I wrote five weeks ago to the Legal office, and I said I’m going to request a quarterly report of sealed minutes. The law changed. Every quarter. And I want you to know, by the end of March 31st, I’m going to request the list for January, February, March. And I gave them a heads-up because I wanted everyone to know this was coming. Now, my presumption was the Legal office and the Clerk’s office would be responsible for alerting all the different departments or divisions in City Hall of this law change. So it seemed to me the reasonable place to go. Just a guess. So I collect all three sets, and all three groups are doing it differently. The on that is most accurate is DPW. They’re doing pretty well. *Your* group is terrible, and the Board of Aldermen is incorrect as well. Okay? So the law specifically lists six items that have to be in the table for sealed minutes. The list I got had four columns, not six. And it’s all scrambled for when you’re unsealing.

“The other thing that seems to escape this city is that non-public meeting minutes are always supposed to be separate. Meaning they get reviewed separately, they get approved separately, and they get posted separately. Coming from Litchfield, this is the way we always did it, and when I was a school board member and a budget committee member, this is how we did it. For eight years. And I went on

the Litchfield site, and I can click on non-public meeting minutes. The problem I have with the way you're doing it is that, what Jen explained to me, was that you're folding, when you decide, you started unsealing minutes, which is a good thing. This law change was in part because of how Nashua was operating. I went up and testified that the Board of Assessors spends three quarters of its time in non-public session. And you never unseal anything. And it never used to be like that until I started coming. You would put out and disclose the settlement agreements that were public record when you agreed to them in your meeting. You'd come out and disclose, here the settlements we took care of. And then all of a sudden it became totally private material that was sealed. Even though they'd go to the Clerk's office, but again, you weren't *dating* your settlements, so I couldn't tell which ones were handled in which meetings. They go to the Clerk's office into a pile of a hundred, they'd be scrambled in there, so as a citizen, I'd have to go through all hundred. So I decided I'd start writing Right-To-Knows to Rik Vincent after each meeting to try and get what you cover. *Total pain in the rear end*. And ridiculous. Okay? And Celia Leonard was the big obstructionist to this. My repeated communications to her as an attorney to unseal these things and to handle it correctly was met with a "screw you." And I'm tired of that.

"Now, Jen Zin(s) really upset me a couple days ago. Because she tried to tell me, "We're doing it right. And if you have a problem, Laurie, go to Legal." Where do you get off telling me to go to Legal? When Legal said every department is responsible for their records. You go to the department. And you *know* I can't go to Legal. I can't knock on the door. I can't get an appointment. And I rarely get a response. Despite the fact that they're losing on most of their litigation with me. They treat me like trash. I shouldn't have to go to Legal to get the lists done correctly. I should be able to work with someone down in Assessing to form your lists correctly. I'm bringing all this data to a state meeting on Saturday to look at all these people (who) are combining Right-To-Know what their municipalities are doing so we can start to track how this is working, and whether it is meeting its purpose of getting minutes unsealed. But the other reason, what you're doing here, is when you unseal minutes, she showed me that on February 17th, you had a meeting. You approved settlements. And on March 17th, you unsealed those minutes. And I said, "Well, where is the record? You said it was put into the February 17th meeting minutes." Well we looked, and they weren't there. But more importantly, those meeting minutes were approved by you in the meeting, the next meeting in early March, they were approved by you. You can't, you shouldn't go back and add whatever you want to a set of minutes that's already been approved. That's why most cities or most municipalities treat their non-public separate. Because if you unseal, you've taken an action at a different date and time that were not part of the original minutes.

"The other thing is the NH Municipal Association, and I will send the documents to you, produces good technical and legal papers on non-public meeting minutes, and their recommendation, and thy said this in a paragraph, (inaudible) non-public meeting minutes should always be separate. And their comment was, "It goes without saying." Well, it doesn't go without saying, because we're combining them. And when you fold them into records that already exist, the public has no idea when you're unsealing. We have no idea what's really happening. It's so much easier if the agenda, if the city website is set up with Board of Assessor regular meeting minutes, non-public meeting minutes, just like they do in Litchfield. Do it that way, because actually, that's what the law is telling you to do. But also, meet the requirements about what the law says about the table. That whole process is set up for sealed minutes. Just sealed minutes. Non-public. If you run a non-public session and they're not sealed, they come out in

72 hours anyway. We don't wanna track what's not sealed. We wanna track what's *sealed*. *You* guys have historically sealed everything. Just do the table correctly.

(inaudible time warning)

Laurie Ortolano "Okay. Please follow the law. I really don't feel like filing another lawsuit."

**Board of Aldermen Tuesday, April 26, 2022**

**https://www.youtube.com/watch?v=1U7V-G7iSAQ**

**12:47**

Laurie Ortolano "Good evening. Laurie Ortolano, 41 Berkeley Street. I'm here to address the unfinished business item that you'll be voting on tonight for the Expendable Trust Fund for 14 Court Street. I'm not in favor of this fund because I think that building it was pitched to the Board that the goal is that building will become self-sustaining or profitable and not require this, you know, constant use of taxpayer money. I happen to believe that that's not the case with 14 Court Street. We're doing a lot for the arts downtown and the art center that's being built was obviously funded by taxpayer dollars. But on top of that, there's a lease arrangement whereby I believe for 15 years taxpayers will be paying a fee to the operation of that building that will go anywhere from a half a million dollars to three quarters of a million dollars. So taxpayers will be supporting that art center regardless of whether it's profitable or not for a very long period of time. I think we have to look at what facilities we keep going like 14 Court Street that struggles so much as that requires a lot of costs. That building it was always very, very expensive.

"I agree that the Keefe Auditorium should be maintained at Elm Street and obviously, there's a lot of interest in that and I'm not certain why we can't transition. The few arts programs that are over they're using the theater over to Elm Street to use the auditorium over there. It's a much nicer facility. It'll obviously be renovated and it just seems to me that it would be a much better use of taxpayer dollars. If in fact 14 Court Street does not contain the fire station lines north and south lines that I had addressed at one of the board meetings that was rather scoffed at by a few people as not an issue, if those lines are not in there and there's no fire issue with that station associated with 14 Court Street, I don't know why we wouldn't look at letting that go to someone else for development of some kind to turn that into something that wouldn't be such a burden for taxpayers because that becomes a third arts potential place that we just continue to dump money into that I think is a bottomless pit. That will never be a self-sustaining facility. So I'm not in favor of this expendable trust fund because I just see it as a money pit and I think what we're doing with the new end pack and what we're doing with Elm Street with taxpayer dollars is the direction to go in and cut your losses on the white elephants that don't work. Thank you."

**1:01:06**

President Wilshire "Thank you. Seeing no one else. I'm sorry Ms. Ortolano."

Laurie Ortolano "No problem. Laurie Ortolano, 41 Berkeley Street. A couple things. The road project that you looked at yesterday and bonded, I think, to do the next five years. Terrific. The road project I think is a very nonpartisan issue but I would ask you to be mindful of the patching and the cutting into roads



DRAFT

that's going on in this project. There's been a lot of questions raised about proper cuttings and patching done on roads when we're spending this amount of money and we're not doing the proper patching. Hall Street's got some beautifully well done patching done when they've had to open a road that has been paved or even due to paving and there's been plenty of studies by the DPW Department regarding the consequences of cutting into freshly paved roads and then having to patch them. If the patches aren't done well, that you affect the life of that road by 30%. It's really significant. Go out on Broad Street - you see five or six patches between Coliseum Ave. and Broad Street School that are really exceptionally poorly done on a newly paved road. We spent millions on that. Go down Hall Street and you see beautifully done patches. They're done by two different vendors. If let's say Pennichuck does some of the cuts, their work might be of a different quality for patching than let's say Liberty. We need to get consistency and compliance with the patching process because we're spending an awful lot of money on these roads.

"Another thing – Assessing. We know our Assessing Chief has moved on. I want to make certain that that has no impact on the release of the numbers in July. I am very concerned by the no bid process done for the $82,000 contract awarded to EZRI to create an interface between the Arc GIS system and the assessing software. That was a sole source bid and I would like to recommend that when the administration brings forth projects that are not bid, that it be marked in the proposal when it's given to you that this is sole sourced. I don't believe that should have been sole sourced. I don't think - you had other options and I had to do a lot of research but there is a community in Nashua not far from here, half the size with 40,000 plus people that put that interface in place. When I called them and told them we paid $82,000 for a consultant, they were blown away. They said we paid nothing. We did it ourselves in the IT Department and I'd strongly recommend you just take your time and do it. We're rushing this for some kind of transparency plan…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…in Assessing that is not necessary. If you want us to have transparency, just give us the sales data in a spreadsheet and we'll be good to go. I would like you all to be able to confirm that we're on target for July for those numbers. I have to turn in a memorandum to the courts Friday for training for the city regarding Right to Know. I have a lot of reservations that the city will not be compliant with any type of training because the legal office has given me so much trouble. So thank you very much."

**Board of Public Works, April 28, 2022**

**https://www.youtube.com/watch?v=G804Ug9_H7M**

**1:53**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. I know your agenda has (inaudible), and I just wanted to address the patching and cutting on roads and whether that could be revisited. I'm trying to get enforcement when a road has to be cut into that has been freshly paved. I went down Hall Street and I took photographs that I'll send to you of cuttings that were done on Hall Street, that the density of the patch is …"





DRAFT

[Mic turned on]

"--okay, that the density of the patch is very well done. Extremely well compacted, and then after they put the patch in they did that black seal, crack sealing all the way around the patch sort of putting that shiny band around it. Very level with the road. Very well done. If you go down Broad Street and you see that street was pretty newly paved and then they must have had maybe gas or water problems, I don't know which one. There was some problem on that road that resulted in the need to cut-in, there's maybe 5 or 6 patches between Coliseum Ave., and the Broad Street School. Those patches are a lot rougher. They're not as compacted, they're not dense, they're not level with the pavement, they're not crack sealed or banded; and I think we should to develop more consistent protocols on that, particularly when we spend so much money doing the roads; and I know there are certain regulations that if you are going to do a patch you got to go curb to curb or whatever, and we've probably never done that enforcement, but I think the consistency of the patch quality should be looked at and some level of oversight, particularly on high traffic roads like Broad Street, which gets a lot of traffic should be looked at.

"The second issue, is disc golf, and I would like to ask this Board to consider since there appears to be more public interest holding another walkthrough with potentially some of the neighbors or people who have raised some concerns. I saw the walkthrough for the winter time and I was going to go but it was cancelled because of icy conditions. You then did a walkthrough on the 15th, but I was on vacation and didn't get back into town until the 16th, so I missed it. I went over yesterday and walk around, and frankly, I'm really surprised by the amount of cutting—"

[30 seconds]

"--and removal of trees to the land. When I was here and listened to that pitch in September 2021, it was minimal tree cutting, high branches. I really thought it was going to be very non-invasive. I was shocked when I walked in there yesterday. Absolutely shocked! There was no permit pole for intent to cut. Not certain what the intent to cut law are, but I've checked with assessing on that, and they're looking into it."

[Time]

"Okay-- (inaudible) to invite your neighbors."

DRAFT

**FINANCE COMMITTEE MAY 4, 2022**

**https://www.youtube.com/watch?v=iS69kfFRndc**

**1:17**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to speak in support of the funding for the software maintenance from Mimecast for $41,000. This I discovered is being purchased and it allows cloud based storage for our e-mail system. I have a couple of questions that I would be interested in understanding and is the space and is the purchase of this cloud system only for e-mails or folders too exactly what digital data is being stored? My understanding is that the storage is being purchased so that e-mails are stored for 366 days, one year plus one day. What happens after 366 days? Are they

automatically deleted permanently? I understand we're still maintaining a tape system to do back-ups, but I don't know if that is going to be a permanent thing because that is an older archival system and I don't know if we're trying to transition out of there.

"And the other thing is, do we have the ability with this contract if we want to hold e-mails in certain departments for a longer period of time that may be subject to litigation, more frequent litigation, and I'm thinking of Assessing because I have addressed this with the City. Abatements and abatement appeals can last for two years or three years. I know talking to a couple of Assessing Departments, they hold electronic data for three years. If we wanted to hold it longer, would we have the ability to do so within a department or extend those e-mails (just roll them for another year)?

"Those are my few questions, but I would encourage the Finance Committee to support this. I think it helps us align us with e-mail storage and retention policies under RSA 33:A for correspondence in the furtherance of official duties of a city. Thank you."

**1:07:08**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Thank you very much for addressing some of the questions I raised tonight. I really appreciate it. Nick was wonderful. Just one thing that was a sole-source contract and it's the first time that we're seeing it as a sole-source contract and I didn't think to ask, but one interesting question would be why was Mimecast picked? It's not that I think they did anything wrong but it would just be interesting to know. There's a lot of cloud based software programs out there. How did the hone in on Mimecast? I know they did last year with like a $10,000 amount of money that didn't have to go through Finance. So they probably did some research but we don't know what it is. That would be a good question.

"Secondly, I had addressed that I would love to see these finance letters coming to you marked off if they're sole-sourced. Well it turns out doing research sole-source is identified through NRO 5-84 and its number 4. A4 is sole-source procurement and it's supposed to be marked when you have something coming to the Finance Committee that is sole sourced but they're not doing it consistently. So like when the package for the software to do the interface for Assessing, it wasn't marked as sole-source. It was a sole-source program and A4 I think should have been called out.

"The billboard that I think got tabled it sounded like was sole-sourced, but it called out A7 "purchased under the extensions of a contract" but not A4. I think it should call out both because that is a great label and then you all know that there was no competitive bidding done. So I'd like to see a little more consistency there.

"One last thing just in sitting in this meeting and researching looking up these NRO's so I can understand them, I ran into a Parks and Rec NRO regulation – NRO 215, Chapter 215, Article One, and it has a whole list of regulations for Park and Rec. One of the regulations is that no golf shall be played by any person in a park or on a playground. I'm going to tell you you're going to have to address that with the disc golf course because when I looked up accidents and liability issues that language is what got municipalities in trouble and lawsuits that had an accident occur. I happened to read the highlighted language that they had Parks and Recs rules that state "no golf will be played in a park or a recreation area". Well it just happen to stumble in, ours is the same thing and I think you're going to want to address that at some table…"





DRAFT

Alderman Comeau "30 seconds."

Laurie Ortolano "…to change that language to protect the City. Thank you."

**Board of Assessors Meeting of May 5, 2022**

**https://www.youtube.com/watch?v=o2aJSgs1TUU**

**17:07**

**From the Minutes:**

Laurie Ortolano, 41 Berkeley St. appreciates the following:

The BOA unsealing non-public minutes

Easier access to unsealed non-public minutes on the website

The BOA discussion and action items regarding charitable applications

She informed the board about the following:

The favorable rulings that have come in for her cases

She would like to know the court date for Pheasant Lane mall so she can attend

She expressed concerns about the following:

Access to assessing information

Her frustrations with the legal team and previous assessing staff/ procedures/ emails

**The following was transcribed from video by E. Vassar on March 14, 2024**

(No mic being used)

"Laurie Ortolano, 41 Berkeley St. A couple things. I appreciate the thought you gave to the exemption being late. I can tell you, I was up at the ASB meeting. The assessors up there are very frustrated by that, and (inaudible) …feel that it's been abused for too long. And it was an interesting discussion. They're sending out letters, ya know, firm letters saying, ya know, no more repeat violators, this was a done deal. So I think you're on the right track of tolerance, and I think you're generously tolerant when non-profit organization (does) management change and somebody didn't know, maybe, that year, I would be tolerant of that. But beyond that, this consistent pattern I think should be addressed. So I appreciate you doing that.

"I sent you a letter that I sent to the BTLA requesting that they keep the docket open regarding the…"

(Ms. Ortolano was handed a mic)

"…thank you very much. That they keep the docket open regarding the update that will be completed. I don't know when they'll close it, but I would anticipate the city would ask soon. I didn't send it to you, but I got a ruling on my big six charge lawsuit that was before the court in a three-day trial in December.





DRAFT

And I feel I did very well, and I got a favorable ruling on five of the six claims, and the judge did order legal fees could be paid in this. And, ya know, it's a nice win for me, but I know it's not over, because they'll probably go for reconsideration, I'm not going to, and I anticipate the city will go to the Supreme Court and I won't get access to the data for probably another year or longer. And it leaves a lot of questions on the process that's used. But I feel the city has been particularly punishing with Right-to-Know and access to information in Assessing, and that very little has changed. This started in 2018 with a property issue that I really thought, as a pretty innocent person down there researching, they would work with me and fix. A year later, when I got the emails from John Duhamel and I saw the way I was being referred to in September and October, I understood at that point how disliked I was, and they weren't going to work with me. It took a year. And, ya know, I'm coming forward with more litigation, and I think often of my neighbor saying to me, "For an entire year, you would sit there in my house and say, 'They'll work with me, they'll fix this. It's reasonable.'" And she said, "I kept saying to you, 'They won't. They hate you. They won't work with you. They're vindictive.'" And it took me almost eighteen months to finally conclude that that is who they were. I held out hope. And the way I fought for that property reduction was ridiculous. And then 2019, the door started slamming closed, and it was Celia Leonard writing all the rejections, which were taken into court and this. It's her name all over, I think every one of these. And she wouldn't even work with me. I couldn't get anywhere. She was a nightmare for me. And, ya know, information: closed, closed, closed. And the city of Nashua just wasn't referring to other assessing officers or chiefs to find out how they were handling open access. And they were clearly handling it much different. 2020, we filed a lawsuit, and we again experienced trouble with records requests. We filed sanctions because of the sneakiness and deception of the city. We win those sanctions for a city learning that a backup tape was corrupted early on, and stringing me along for ten months, telling me they're gonna give me the information when it didn't exist. And I got those sanctions. And in 2021, I'm experiencing the same thing when it came to email usage. And '18, '19, '20 and '21: what's changed? And I have a civil case I gotta bring forward, and I'm going back in with one more into local court, Superior, on RSA 33-A, retention records, a violation. My Right-to-Know group has been after me to get a ruling on that, and I have to treat that separately. And I've tried to work with city on that to acknowledge that there's a problem, and they won't work with me. And I hate to have to go into court. I'm gonna write an apology when I submit the lawsuit because I don't wanna keep doing it. But I want an answer, and I wanna know why we're operating this way. And I feel it never ends here. And it's wrong. And it all stems around assessing information. And it filters into other areas with just the Clerk's office and access to information. I find it ridiculous. Just maddening.

"I also noticed… so I'm going to send you the lawsuit to read. I'm gonna modify my request to the BTLA to include this, and write about this litigation process and what's happened – and the *cost* of it! It's *absurd* what citizens have to do. I think some of our state legislators should be working on laws with citizens to change this.

"And I also noticed, I don't know if this is a change you've made, but usually the Board packets, the agenda's online and the Board packet material is online as well; and it hasn't been online the last few meetings. Like, I scrolled in last night, and the packet isn't there. Now, it was there like three meeting ago. It's usually there. So I don't know if they changed it so they're not putting the packet online anymore, but if you could just, I think, it's helpful to *me*, because I download the packet, I come in to the meeting, and I look at, ya know, the timber and the A-9's and what's changing, and I can follow along. So I don't know why that's not there anymore.



DRAFT

"But I do appreciate you unsealing minutes. I do see that they're now posting them separately, which is very helpful. And I would like to know when the Pheasant Lane Mall lawsuit is going into court. I wanted to listen to that, it's a huge, huge issue for the city when it comes to commercial tax payments, because Pheasant Lane is a huge taxpayer. And I believe that it's not in the hands of the BTLA, that it's going into maybe Superior Court, and I haven't been able to find it. And if somebody can tell me when there's a court date for that. I'd like to know because I'd like to go on that one. Thank you."

**Board of Aldermen Tuesday, May 10, 2022**

**https://www.youtube.com/watch?v=djb4CukxgnQ**

**1:18:14**

Laurie Ortolano "Hi. I'm Laurie Ortolano, 41 Berkeley Street. Just a couple of things. The Greeley Park Advisory Committee - I understand what you're trying to do here, but I think you should broaden that because I think that that kind of got going when the purchase of the land was happening up on Bartlett Street and the interest to make certain the park is what the citizens want it to be. But I think you have it as an important issue going on in Roby Park right now and you could certainly have a Roby Park Advisory Committee. But more importantly, I think you should just an overall Park Advisory Committee. I would really like to see that as an oversight committee to DPW. I think the Conservation Commission should be involved. It's just apparent to me given the way decisions are made and actions are taken that they're too singular, too outside of the public's participation and eye, and when things don't go well, we are not a very kind City. Our leadership, I think, is not overly kind to citizens that take different positions than them. So I could like to see that expanded into just a Park Advisory Committee for the City of Nashua.

"The animals in the park ordinance that's going to be referred to committee, I would like you to consider a language change on that in that the Superintendent of Parks and Recs is assigned the responsibility to notice the parks for pet accessibility. Really we've had a lot of issues with that Superintendent position. Very heavy turnover, very short term. I really think that anything written in the name of the Superintendent should now be changed over to the Board of Public Works. I think it was at one point and I think you should consider that now in the language.

"Also, I was very disappointed to see the City put up such a fight on the Right-to-Know training that was remanded by the Court for the City to participate in given what's gone on. It's just rather amazing to me that the Mayor would petition that to the Supreme Court rather than do the training. We've had 7, 8, 9, 10 Right-to-Know violations that have been found. I know there are more and it just seems to me when the City has had that many problems with the Right-to-Know Law that it would be reasonable that training is done. I wrote a training memorandum…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…that I gave to you all and I think that you have to remember that all these violations were the responses that came directly from the Nashua Legal office and it's very concerning to me that we can sit here as a Board and as a community and say we don't need any training. I think the Board could have done a lot more to assist in these matters and they're much more proactive. Thank you."





DRAFT

**BUDGET REVIEW COMMITTEE MAY 16, 2022**

**https://www.youtube.com/watch?v=Ilflg3wTm9Q**

**4:05**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I won't have time to go through all of these, but I'm going to start right away with the Legal office. I'd like some real scrutiny done there. I don't think the Right-to-Know Coordinator position should be in there any longer for almost $90,000. That did its stint. It cost us a lot of money because it created a lot of litigation that came right from the responses from that Right-to-Know Coordinator. It almost appeared as if no one in the Legal office was supervising the position and the work that was coming out.

"I also have some real questions regarding the expenses. I don't see where there is any consultation fees in here if other attorneys are consulted and office supplies. I know what it costs for me to print and go in with books. My Right-to-Know lawsuit in December supposedly the City had run off 50,000 pages of documents they wanted to present at court making numerous copies. I don't believe that supply budget of $3,000 is accurate. There must be money coming out of someplace else because I understand litigation now and I understand the paperwork involved and that cannot be all inclusive and the same with litigation related expenses. So I'd like to know if there is some other part of the budget where consultation with other law firms is being posted and I'd like to get that position out of there for Right-to-Know Coordinator.

"Back to the Mayor's Budget. I'd like to see a position cut from that budget. The services – it says "communicates and engages with the public". This Mayor only communicates and engages with likeminded people who are similar to him. I want to see an office that engages all of us and that's not happening. "Creates a welcoming atmosphere within city government". This is not welcoming. You come into City Hall and there's locked doors with buttons and no doorbells and plaques up saying "by appointment only". This is the only City Hall I've been in the State that is like that. You know what, its okay. That's the way he wants his City Hall run that's fine. I don't want to fund all the positions. "Whoever the PR person is in there and I don't understand all those strategic positions, I'd like you to ask each one as a name, no job description. I can certainly Right-to-Know to get all that. However, I'd like this Board to ask let's get rid of the PR person because I don't think they're PRing the way they should.

"Board of Alderman not too many issues there, but I will say the transcriptionist is still in the budget for $44,000. We haven't had that position filled since September. Why are we still funding it? We're obviously not doing minutes the way we used. We're abbreviating them…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…we're not using outside services to do this. So I would like to see that $44,000 removed from the budget and trim it down and just go with our Legislative Assistant, abbreviated minutes, and we're done, YouTube postings and we're good. Thank you."

**1:43:22**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I take exception to what I heard tonight coming out of the Mayor. I have a real concern with this position that he said for the Right-to-Know Paralegal. I

am equally concerned that Attorney Bolton would say that I knew nothing about this position. Why would we have a Right-to-Know Coordinator in the Legal Office and a Right-to-Know Paralegal under Administrative Services to handle Right-to-Knows when you've got Right-to-Knows in DPW? When you have Right-to-Knows in the Building Department. When you've got all these other Divisions that have them - Finance. John Griffin gets a bunch of them from a citizen. Why would you put that under Miss Kleiner? I am deeply concerned that Miss Kleiner would have any responsibility for anyone legal. I don't think she's qualified to do that. I see that as an enormous risk. I came out of court with her and I found her to be the most non-credible person in that court room. Please do not make this mistake again. Do not do that.

"Also the Mayor said we've had 1,200 Right-to-Knows since 2018, 2019, 2020, 2021, and 2022. Let's look at look at 2022 and let me dispel the lies that this Mayor put out. One of the reasons the Right-to-Knows have to be filed is when I come into City Hall and ask for information that I could always get, they say "oh Laurie go home and write a Right-to-Know". Well guess what, I've put my foot down on that and I'm not doing it anymore. I'm coming in and getting the information that is available right away and taking it. I'm not writing a Right-to-Know so they can write back to me. It's absurd. When the Mayor says they have people who don't want to be here because they don't want to be dealing with Right-to-Knows, they don't want to deal with Miss Kleiner's crap on how to handle them and they're walking out because of her. Are you looking into that? Is anyone researching what she's doing? And let me say this, when the Mayor says the Chief didn't want to do it. Amanda Mazerole testified on the stand that my Right-to-Know request to assess help to get printed property record cards were ignored and when I said to her "did you answer my request just to send me a printed card" she said "no". I said why? Miss Kleiner told me not to. What did you do with them? I had to send them to Miss Kleiner and Rick Vincent. Then Rick Vincent was told to go do the clerical work and get the card printed and send it to me, which he didn't following up on because he's a Chief making $125,000 who couldn't do that work. I wrote an e-mail to him and said "why are you doing this…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "Its clerk work. Its settlements. I had to go to Mr. Vincent to get settlement agreements. They were always in the minutes. They sealed them. I couldn't get them any longer. This is crap. This is ridiculous. This Mayor needs to go. He's fabricating stories and building it into the budget. Get rid of him and don't do this with our budget. There is nothing comical about it Mr. O'Brien. It's a sad story. You're birds of a feather."

Alderman O'Brien "Excuse me Miss!"

Laurie Ortolano "I'm done!"

**FINANCE COMMITTEE MAY 18, 2022**

**https://www.youtube.com/watch?v=5Is6h4n8kf0**

**9:18**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. Just with regard to the contract if channel growth was in there, and modernization, and upgrading hopefully the big contract specified what you're looking

for so that both parties or all parties submitted what you were looking for and that they didn't believe that the same was what you were looking for because the low bid would be the winner. I mean I didn't see the contract and read it, but I do think that's important. I do think if modernization and upgrading was what you are looking for and you picked who you picked for that, fine, but as long as the contract specified that for all parties what the criteria was that's very important. So if channel growth, and upgrading, and modernization was part of the contract so be it.

"I am concerned and I just want to state there was a bunch of information in the packet regarding how we're going to rebrand and legitimize the station, develop, diverse bilingual shows, weekly interview shows with Department of Health, DPW, NPD, NFD, BOA, Mayor, and City departments. I want to make certain that we are allowing programming that speaks to the diversity of thought in the City. That it doesn't become a single party television station. I want to make certain when boards go on, first of all if you have enough members of the Board you have a meeting. When Boards go on that they don't become a political platform. I want rules written like what happens during candidate season when we register new people to run for office in September? Do those Board members that are maybe coming back get greater access time because they're already on the Board to pitch what they've done and newer candidates aren't going to have a voice who are there? I want to make certain that we represent all the views of the City and that Republican views, Democratic views, and Independent views are accessed. If the Department of Health comes on, terrific but get some people on who speak about not wanting to vaccinate children or not believing masks are effective. Let those voices be heard. Would you entertain a program on Right-to-Know? What is open access information? What is the public need to know about that information? I just want to make certain that it doesn't become a political station for a single party. That we have plenty of City diversity in the programming that we do. Thank you."

**1:20:17**

Laurie Ortolano "Hi. Laurie Ortolano, 41 Berkeley Street. I just want to point out when you were doing the contract talk for CTV over the public broadcast, it was about BRB TV did get a unanimous vote from the Cable Advisory Board for that contract. I think there was a lot of discussion on it. I know Ernie Jette originally was concerned. He wasn't voting yes and then he switched upon getting questions answered. So I think as a Board you can at least look that there was a lot of discussion about it. I know that transition for change is hard on everyone and hopefully we'll see some of our common programming and expansions to other programming as well.

"I would like to say that I am a little bit concerned about constitutional and viewpoint issues. The use of television and the broadcasting of government business on a public broadcast station. I think we need to be careful about that and I believe this City is more restrictive on First Amendment Rights on viewpoint issues because I watched that whole flag issue unfold. I supported the Save Women's Sports Flag not because I'm strongly in the person's camp who presented it because I have plenty of friends who are Democrats, Republicans, and Independents who supported the message of that flag. When I hear Board members say that it's a transphobic haters flag, it concerns me. I have a friend who is a really awesome Democratic Constitutional Attorney. I had a really lengthy discussion with them about this and they said that flag is absolutely not a transphobic hater flag…totally misinterpreted. But it concerns me because the City's interpretation is horrible and it's personalized on the person. When I heard a Board member say that this individual wanted to fly the flag had locked arms with the Satan and (inaudible) with a satanic flag, it really concerned me. I think that's very, very harsh. I think our ability to recognize





DRAFT

viewpoints in this City has been closed way down. I don't want to see the public access station utilized with that same closure or abused to not present viewpoints that I think are representative of the community…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…so I'd like you to bear that in mind. I think I'd like to see policy developed on that – a pretty clear policy on where the lines are because the people who run the TV station know those rights well but the oversight group may cut it right off and do what we're doing with that flag and I don't support that. Thank you."

**Board of Assessors Meeting of May 19, 2022**

**https://www.youtube.com/watch?v=YpKpQBPnzz4**

**4:37**

**From the Minutes:**

PUBLIC COMMENT: Laurie Ortolano – 41 Berkeley St

Ms. Ortolano expressed concerns about the Reval:

Vision Government Solution's end-of-service date

When the final numbers would be released

Depreciation issue had been resolved

How depreciation would impact older homes

Shift of value for commercial and residential properties.

Update of % increase

Abatements – why it takes so long to settle with a 6% interest return, now 4%

Dates of sales data used

Hard numbers – when are they coming out for informal hearings

Doug Dame – why is the City trying to force him into retirement, etc.

**The following was transcribed by E. Vassar on March 14, 2024:**

"Laurie Ortolano, 41 Berkeley Street. I don't know when Vision is coming back to do an update, but I had some questions that I want to relay to you to see if you can help me get some answers. I wanted to know what the cut-off date is for the sales data that is being used for this update. The contract doesn't specify that. April 1st is a typical date and I wanna know if they're ending the sales data as of April 1st, taking it through to the end of April. I'd just like to get that date. And I also wanted to know if there's a hard date coming out for the numbers coming out. The contract specifies they have to release the numbers on or before September 1st. There' been a lot of talk that the numbers will come out in July.





DRAFT

But I'm trying to understand how real that is. Is that just being said and the contract affords them September one. But they have to do all the informal hearings from this update – it's a big job, potentially, particularly given the way these are changing; you could have a lot of people coming out who don't understand the process wanting to have that informal review, I wouldn't be surprised by that. And that'll take a lot of time.

"I would like to know if the depreciation issue has been corrected and if Vision can tell us what that impact is on older homes. So they were trying to de-couple the depreciation factor from the effective year built to the condition of the home. And I believe it's probably been reset and I believe they can probably run a report to look at that. That's going to affect homes probably 1960 and older.

"Residential and commercial properties: I'd like to try and understand the shift on that. I think based on their last visit here, they're probably winding down or done with the commercial property overview. The last time Rick Vincent and Kim Kleiner did an update to the Board of Aldermen, which was probably last September – no, November! I think Rick Vincent was indicating there was roughly a 10% shift potentially, but I'm concerned that it's actually larger given where the ratio fell this year. The ratio dropped almost ten points in a single year. It went from like 86 or 87 down to 82, and from 82 down to 72. This was a big slide-year, because property values *really* went up. But it's the residential that carried that. So I'd like to get an idea, and I think Vision could tell us what that shift is now between commercial and residential Properties.

"Also, with regard to abatements, I'm concerned about our response time. I don't understand why this city carries so many abatements that go back twenty-eighteen, nineteen, twenty, twenty-one. We pay interest on those: 6%. It's been changed this year to 4% as of 2022 it'll be a 4% return. *However*, I've talked to other municipalities, and especially the big ones, they deal with their abatements very efficiently. Commercial: they want them cleared, and they don't wanna pay the fees. And we have so many that aren't cleared. And I'm trying to figure out why. I was trying to figure out what was going on with the Pheasant Lane Mall, the abatement file wasn't down in the office, I don't know what the carry-over years are on that, I can't track it, I would have to write a series of Right-to-Knows. It's really frustrating. And I don't know if that goes back to '18, '19, '20, I have no idea, I just have no way of knowing.

"One other thing: ya know, I've heard rumbling that there's an effort underway by management to try to have Mr. Dane leave the City, retire. And that may not be true, but I just wanna say that I'm concerned about that. Because for me as a citizen who's gone to Assessing, the one person I felt was the most knowledgeable and helpful when it comes to answering a question about assessing is Doug Dane. And I was always cut off by this city from interfacing with him. They did everything they could to prevent me from having conversations. I found him to be honest, direct. He's an older guy, they probably wanna get rid of him, he doesn't get enough done, whatever the reason is. But there's a lot of issues with age discrimination and that stuff. I've heard the union is working with him, to back him. I don't *like* it, because we have the other assessor, who I don't feel is productive at all, who we've had issues with, that this Board said, "we don't deal with personnel, we look the other way." I don't think he was truthful on his white board. I don't think his past transgressions should've been forgiven. And if he can hold a job here – and if I ever go to *that* assessor and ask for help, it's, "well, Laurie, we've got twenty-nine-thousand parcels, and I'll get back to you." If you talk to Doug Dane…" (she snaps her fingers) "…he's got

an answer like this. So for me, driving him out of the city and trying to fire him isn't helpful. And I just want you to be aware of that. Thank you."

**BUDGET REVIEW COMMITTEE MAY 19, 2022**

**https://www.youtube.com/watch?v=ntESPmlHuuc**

**1:03:37**

Laurie Ortolano "Yes. Hi. Good evening. Laurie Ortolano, 41 Berkeley Street. I know the next meeting - I don't know if it's Monday or Tuesday I didn't check the calendar - but there's a lot budgets coming in for that meeting under Administrative Services Director and I want to share with you my concerns at little bit and hope that there are some questions asked about the Right-to-Know Paralegal. You know that Right-to-Know Coordinator position when it was hired in December of 2020 was pretty distressing to me. I did not want to see that come in because I felt that position would present hurdles and obstacles to the public getting information as we wanted it and it did. It resulted in four lawsuits over an eight month period. One was the sanctions that were won - one other citizen one, a Right-to-Know and two pro se put in by me. The final judgment isn't in, but the City did acknowledge there was wrongdoing there in Court. So that presented for legal actions and I wasn't a fan of that.

"Now I see this Right-to-Know Paralegal coming in. There was no job description. Some of you might have seen that I tried to put it out to the Budget Committee that I have asked for the job description for that. When I look up what a paralegal does, I don't think it belongs under Administrative Services Director. I'm very concerned by the tracking that continues to go on for me. These are the assess help e-mails that were sent to me from my last lawsuit that were only sent to me two days before the trial, which was records I was supposed to receive a year earlier. This is one of three batches of records the City had that they didn't provide me. These are all e-mails sent to assess help for help. I had nine e-mails I sent in. I was trying to find mine. I didn't know what other people sent in, but I have nine pages of this were all three batches. Look at all of these in here. This is one abatement the way they're clipped. So it's clearly citizens were sending in a lot of information to that line because the Assessing office was closed. When I see my questions pulled out and shipped up to Miss Kleiner and then sent to a Chief who has to respond to them, frankly it just infuriates me and I hear the Mayor say "Chief Vincent left because he had to deal with Laurie's Right-to-Knows".

"My questions were sent into assess help and I call them Right-to-Knows because they were just questions. They were acknowledged…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…as 91A issues at all. They were just questions like these citizens and what they sent in but mine got pulled out and flagged. Chief Vincent always said he was going to be here a year. I was aware of that. He stayed 14 months. I'm not certain I want to play the blame game on what citizens did, but I'm really opposed to what I see going on with positions and that position in there. It will be another battle and I don't want to go through it. Thank you."





DRAFT

**BUDGET REVIEW COMMITTEE MAY 25, 2022**

**https://www.youtube.com/watch?v=x3poGsPCf-U**

**1:49**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I noticed in this budget there's two new departments - Payroll and PEG access channel that I'd be interested to know how payroll got moved over into this area. I know the Mayor appointed cable TV to Miss Kleiner.

"When we go through the budget within the Assessing Department, I'd like that somebody to pay attention to who is going to be doing all the redacting on the property record files to get them up online, what positions are allocated to this. Have we looked at outsourcing the entire Assessing office given the decline in employees within that office?

"How is Right to Know training done within your department since you want to hire a Right to Know paralegal? I did receive documents back from various departments on Right to Knows as of January 1st. I don't think the paralegal is justified based on the quantity of questions being asked and how they're processed. But we need to understand what the city and what specifically the Administrative Services Office considers the Right to Know request.

"What are we doing about the appeal costs - abatement appeal costs when it comes to settling in house? We seem to be drawing those out for years and years and we're spending 6% interest on those when other municipalities are settling those rapidly and not paying the literally hundreds of thousands in interest expenses. I think we should look at that. And what are we doing about the position that we need to collect the $10 million of unpaid taxes that haven't been collected on over a large number of years? I think we should be working on that. Do we need a paralegal or somebody to collect $10 million of unpaid taxes for people who have let property taxes slide 5, 6, 7, 10 years?

"IT department. How are we moving to move away from backup tapes? When are we planning to get away from backup tapes as opposed to cloud based storage? We got emails on cloud based storage. How many other municipalities are using backup?"

Alderman O'Brien "One minute."

Laurie Ortolano "And what have we done to look at the 366 data storage policy based on litigation issues? What are we doing? Is there any cost increase to extend past one year to three years? What is happening with the Arc GIS project as far as linking the database to GIS? How many people in it are involved on this? Who will be responsible for updating all of the GIS data? And what are the difficulties in hiring right now?"

Alderman O'Brien "30 seconds."

Laurie Ortolano "I'm really interested in. I think there's costs there that needs to be looked at. What are our biggest risks? What are our concerns? What are we doing to minimize liability? How is the department capturing and tracking risks exposure. Purchasing. What changes have been made to the department? Payroll - where did it come from? GIS updating data. I know my time's up. Thank you."

**3:21:02**





DRAFT

DRAFT

Laurie Ortolano "Laurie Ortolano, 41, Berkeley Street. You know I'd like to ask this Board to think a little bit about this some of what's going on in Assessing. You're gonna have a really hard time finding people to come here because of how you've set up that office. This whole redacting, and records issue, and Right to Know documentation isn't happening anywhere else in the State. No other municipality is doing this. No other municipality redacts their records. No Assessing Chief has to deal with that at all. I just got records from - I put in to see how many Right to Knows have been filed since January. The Mayor's office had five. They were from me. They came back to me fully redacted with my name and email and address off of it and black to me. The DPW had six or seven records. Donna Graham had eight. That's in about five months. That is not excessive. Kim Kleiner sent me a spreadsheet or Administrative Services. There's 55 on there.

"There is so much ridiculousness going on in there and when she says to you I would hope general questions are being answered. They're not. Nobody's coming to Nashua to work in an office like this. When you can be a chief or a leader in any other municipality and not have to worry about redacting all your records, or getting in trouble because you left an address on, I have to come up here and state my name and address - 41 Berkeley Street for the whole public to know. I don't have to do that at the State House and yet the email that comes back to me, 41 Berkeley Street is redacted because that's confidential private information. Okay.

"Also, property record cards came out of the legal office to me with all the addresses redacted off the card. I had never seen such a thing. I thought we were going to be in redaction heck in the deep darkness of that. We have hundreds of 1000s of property records cards."

Alderman O'Brien "One minute."

Laurie Ortolano "That the Legal office came back and said that was a mistake. They're not going to do that. And you don't need to hire a Right to Know Paralegal or somebody who understands redacting to do this. And you're not going to educate them on how to read a property record card with 800 fields. You can do that to anyone. They're going to make mistakes and things are going to be missed. It's okay. There won't be many. The Legal office makes mistakes and sends me stuff unredacted in error."

Alderman O'Brien "30 seconds."

Laurie Ortolano "Mistakes happen but what you've done is create a total mess out of a situation that there's no getting out of. Nobody should ever come to Nashua to work in Assessing with an office setup like this. It's absurd. Thank you."

**FINANCE COMMITTEE JUNE 1, 2022**

**https://www.youtube.com/watch?v=YmaKIw_PC-o**

**28:19**

Laurie Ortolano "Good evening. Laurie Orlando, 41 Berkeley Street. I just have a question that's finance related but not to what you cover tonight. At one point in one of your Aldermen meetings Ernie Jette asked about having a review regarding the tax, the spending cap because the State law had changed. The ruling from the court was Nashua was fine, then the legislature overturn that and created their own

version right or wrong. I mean I do think local control is what it was about but the State did what they did. That's fine. Now we had the changes made at the State and Ernie asked in the meeting if somebody could give an overview on what's covered in that cap and Rick Dowd said that he would provide that during the budget meetings. He would provide an overview of that.

"I've written several emails to him and have asked when if he's going to do that and when he's going to do it. I'm primarily interested because I don't fully understand that cap. I know the city says one thing and I know there's another side that says something else. I'm trying to figure out what it really is and what it really means, particularly when it comes to grant money. I heard that challenge before and I don't know why no one's responding to me. I don't know if I asked some hot potato question that legal has said you know what, we're not going to talk about it publicly. We're going to do whatever we want to do and the public doesn't get to know. I object to that. On the record, I object to that. I think the public has a right to understand it. I want to understand it and I want to be able to formulate an opinion if I think that that cap is being used correctly. So I'm hoping somebody can find out from Mr. Dowd or the Administration if they plan to allow that discussion to take place because I want it to happen. I want to hear it and I want to understand it. So that's my input for tonight. Thank you."

**BUDGET REVIEW COMMITTEE JUNE 2, 2022**

**https://www.youtube.com/watch?v=1jA1KF2hd0E**

**4:54**

Laurie Orlando, 41 Berkeley Street. In looking at the Finance Department budget, there's a couple things I want to note. I got those Right to Know requests that were filed to different departments and the Finance office had about 37 Right to Knows submitted to it since January. I noticed this department isn't requesting a Right to Know paralegal. Ms. Kleiner's ten departments had 55 and we're funding a Right to Know paralegal for an office. It looks to me like his office needs it a heck of a lot more than hers but he had the common sense not to ask for that position because it's ridiculous.

"Secondly, I'd like to talk about the promotion of internal people. Miss Lindner moved into the Treasurer Management position this office. We are constantly promoting from within and we are constantly promoting from within people who are not necessarily competent or the right people. We did it with Ms. Kleiner out of Assessing Chief of Staff. We did it with Sue Lovering. I objected last year. Sue Lovering is leaving. I said we're going to do all this training for four years to certify her and she's going to retire. In fact, she's retiring after three years. Why because her salary went up to about $110,000 for three years and now she can draw a big retirement. We just moved another lady out as Chief of Staff - $70,000 - $72,000 position to $110,000 position. Why because the Mayor can call in all his favors, can set all his conformists up to hack the budget. We don't look for qualified people and we have to do a better job at that. This promoting from within is killing the city and the same thing happened with Miss Kleiner.

"Chairman Dowd I have a question for you. When will you be discussing the cap? Ernie Jette asked for that. You said it will be put on the agenda at one of the budget meetings. When will that be discussed?"

Chairman Dowd "I was advised the cap determination is in the legislation. It's not under the control of this Committee. It's determined by Administration."





DRAFT

Alderman O'Brien "One minute."

Laurie Ortolano "The fact that you were advised and didn't share it with your board."

Chairman Dowd "If you want to bring it up at the public hearing on the budget, you may."

Laurie Ortolano "So Mr. Dowd, Alderman Dowd, you were asked about presenting this to the Committee by a standing Alderman. You said you would address it in a budget meeting. So is your answer today that is not going to happen because it doesn't belong in a budget meeting? Is that your answer?"

Chairman Dowd "I just told you what my answer was."

Laurie Ortolano "Well you didn't convey that to the people who asked in a public meeting. You did not convey that to Attorney Jette in the public meeting."

Chairman Dowd "This is public comment not debate, so please (inaudible) 20 seconds left."

Laurie Ortolano "It's not debate. Your policy says that questions can be asked and you can answer those questions if you so choose. You can also refuse but I'm asking because I've sent you emails repeatedly and you've blown me off and I don't appreciate it. I want to understand it and if it's in the special revenue fund, I want to understand it. How can you vote on it?"

Alderman O'Brien "Madam, time, please."

Laurie Ortolano "Thank you."

**2:29:55**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just to let you know it was at the March 21st meeting that Alderman Jette said, "So I don't know where we stand on spending or the cap. I know there's been a provision in the spending cap for accepting certain things. So I was wondering if it would be possible for you to arrange for Corporation Counsel and maybe CFO to kind of give us a little lesson on what we're dealing with. Are we constrained by the spending cap and if so, what is it?" Your response was, "I will talk - Chairman Dowd - to Mr. Griffin about it when we know that and it would be the Mayor, Mr. Griffin, and Legal. I wouldn't touch it myself. Okay, no problem." Then you went on, on the 28th and you addressed it again when Alderman Jette said, "So I know at the last meeting, I expressed my confusion. You said we have a special meeting on that and it hasn't been set up yet." Alderman Jette said, "Okay. We're getting our budgets around May 10th so sometime in April we'll discuss it." You said, "That's the plan."

"Now the fact - don't interrupt my time - the fact that that was what you were doing and then you come here today when I tried to ask and I email you about this and say you had a private meeting with somebody and determined that there's nothing to discuss is just wrong. I think we're entitled to have that discussion. CFO Griffin touched on that. Fred Teeboom mentioned that we haven't done that with the money for 25 years. I don't know if that's true or not. I honestly don't know. I haven't been here but I want to hear that debate. I think he's right when he says grants are not under the control of the local departments. They're under the control of the federal government or the State agency that gave you the grant. That is not local controlled money. I think there's a point to be made there. So I'd like to understand why we switched that. Other people have spending tax caps and do they fold their grant money in? That might be interesting to know. I don't know the answer to that.

"The other thing I want to tell you is winter is coming people in these tax assessments that are coming out. I went to the Board of Assessment meeting…"

Alderman O'Brien "One minute."

Laurie Ortolano "…and I was disgusted by the presentation from Vision today. They had clearly been told by the Mayor to not provide information and clamp down. Two months ago, they gave a very detailed presentation on where they stood with increases. Today, they come in pretty much say nothing. Miss Kleiner says we don't want to say the wrong thing. We don't want to give out information that's overly broad. Well, the Mayor spoke freely about it on May 15th. He dropped all kinds of bread crumbs so I expected to get information."

Alderman O'Brien "30 seconds."

Laurie Ortolano "You people have no idea what is coming down here. You better get serious about cutting this budget. You have no idea. It's entirely wrong. Did anyone know we have no certified assessing supervisor in Assessing? Were you told that? I just learned that today. That's a huge problem. They can't do abatements down there. Did she and anyone disclose to you that that is the condition of the office?"

**Board of Assessors Meeting of June 2, 2022**

**https://www.youtube.com/watch?v=ZnhMWRTJLuM**

DRAFT

**MOTION BY** Robert Earley to amend the main motion to delete the following properties from the approved list.

2

**SECONDED BY** Paul Bergeron

- **32476 230 Amherst St Wina Realty LLC**
- **43800 310 DW Hwy Dayton Hudson Corp**
- **7202 600 Amherst St Target Corp**
- **43797 310 DW Hwy CTL Propco I LLC**
- **43802 310 DW Hwy Pheasant Lane Mall FB LLC**

**VOTE:** All in favor

Comment by Laurie Ortolano – 41 Berkeley: Why are they being removed?

Mr. Hansberry: They are in litigation.

**34:38**

**From the minutes:**

Laurie Ortolano – 41 Berkeley St

Asked about legislation for New Hampshire to require the Income & Expense report to be filled out – right now it's optional

How many Income & Expense reports have been returned to Vision

Opposed to extension sent to DRA for possible approval

Will the preliminary database be available when the letters are sent out for the informal hearings

Feels public should be able to ask questions to Vision's update on the reval

Feels she is not getting answers to her questions

Feels abatements cannot be discussed in non-public session – they are not legal matters per RSA 91:A

Suspect of the City's legal team

**The following public comment during the June 2, 2022 Board of Assessors meeting was transcribed by E. Vassar on March 14, 2024:**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things on the Vision update. I had asked about legislation regarding income and expenses for businesses. To mandate that. Because I think most other New England - *all* other New England states – *require* that form to be done. New Hampshire, it's *optional*. And Mr. Turello stated that they're entering the data from the business and expense forms. I'd like to know how many gave data. Usually it's low, like 10%. So could we find out how many of these businesses provided data to the appraisal company? That would be interesting to know. Because it's information that can be fed for legislative change.

"The other thing is, my general sense is I am opposed to the extension by the DRA. But I'm not hardly opposed. But I do want to understand something. Letters are being mailed out around August 17. Which is what KRT did. It was a little bit later. Everyone got a letter, "we're doing an assessment." But at the same time, the preliminary database was posted on the website to show all the property data. Am I correct that the preliminary database will be posted as well? And I just wanna make certain that happens. I don't mind if the – obviously, when I wrote, "final numbers", that is going to be reflective of any changes made from the 10% or so of people who come out to contest their valuation, or say something wasn't right on their card. I would anticipate that will happen. So we know there'll be some changes. But *also*, the general opinion of the city was any major changes was supposed to be handled through an abatement. And we know that wasn't complied with in 2018, so I don't know what's going to be done *this* round. But am I correct that the preliminary database will be posted like it was for KRT at the end of August? And if the letters go out on August 17th, the database will be posted preliminarily with the residential and the commercial assessment, so we have the big swath of data to look at to get an idea.

"I also very strongly disagree with the fact that we can't make any statements about how these assessments with Mr. Turello. I think they did a really poor job to day presenting. They provided less information with detail than they did two months ago. He had charts that showed the various property groups and the movements, and when Miss Kleiner says, "We can't make blanket statements and we have to be careful," that's exactly what the Mayor did in the May 15th Budget meeting. He spoke about the shift between commercial and residential properties being, ya know, existing somewhere on the order of 5%, but he couldn't say what. He made the statement that residential property taxes *will go up*. He didn't say all of them, but he clearly had information from communication with Vision on this shift in values due to residential and commercial properties, and I sit here today wit an update, and they say *nothing*. If the Mayor can put out blanket statements, then we're entitled to have some detail. Just some detail. So if there isn't going to be the preliminary database put out, I'm going to write to the DRA and say, "please don't approve this extension if they're gonna give us nothing." At least KRT gave us something. And hold them to the deadline of releasing numbers.

"Ya know, and I'm just opposed to seeing the administration, ya know, answer my, first of all, I ask questions, and I ask them to the Board. I wrote you an email, and I asked two months ago if I could speak to you about an issue. I received no response back as the Chair. I asked two weeks ago or last week if I could get the address of an abatement you discussed in non-public session; I received no response. I come to these meetings, and so often you read into the record that you expect common





DRAFT

courtesy, decency, common sense, to be employed by the citizens who take the microphone. And yet when citizens reach out to *you*, to me there's no common courtesy, decency, or common sense to respond. Just respond: "information received… somebody will get back to you." I waited two weeks to get these questions answered, and I have to say, I'm not fully satisfied with the answers. But I only got them *today*. And I sent my questions to you. And then I spoke them in the meeting. And I wish there had been an opportunity to ask a few questions of Vision, because I think the incumbent statements are worth asking, I think making very certain we understand what we're getting delivered on August 17th is worth asking. And I am very concerned when I read the non-public minutes that you went into non-public session to discuss an abatement. RSA-91:A, for reasons for non-public sessions, specifically states that abatements cannot be discussed in non-public session. *Property tax abatements* are not considered litigation or negotiations and *cannot be* discussed in non-public session. They are public matters. That is actually *tagged on* to, I think, "item E" under ninety-one-A-colon-three exemptions, non-public sessions. Meetings. And I'm very sensitive to that, because you discussed *my* abatement in non-public session. You had a meeting with Legal about it. Then you denied me the opportunity to speak to you. You came in here, Dan Hansberry, in 2019, seemed to read a statement about my conduct, my behavior, my difficult personality, and why the abatement should be based on what KRT said and nothing that Mr. and Mrs. Ortolano said. And you guys voted not to reduce the abatement. To a level… that I ultimately received a *lower* level from the BTLA and won that appeal. And all of that was done because you were able to meet in non-public session. And I'm very suspect of this legal team because they're very retaliatory. Whose abatement are you talking about in non-public session? Who don't they like that they wanna screw over like they screwed over me? Why are you unable to sit in a public meeting and address an abatement? If you need legal counsel, just like the Board of Aldermen does, have legal counsel here and say, "Hey, we're concerned, this abatement's been filed multiple times, we're not certain it's right, what's your take on this?" That's public information. And I really oppose *abatements*. Appeals are different: they're legal matters. Abatements are not.

"So I hope I get an answer to that, but again, I emailed you and didn't even get a response that it's being looked into. Don't make demands on the public to practice courtesy and decency when you yourself do not do that. Thank you."

**BUDGET REVIEW COMMITTEE JUNE 7, 2022**

**https://www.youtube.com/watch?v=kvR0NgtKI2Y**

**5:53**

Laurie Ortolano "Are you doing first public comment?"

Chairman Dowd "We've already gone by public comment."

Laurie Ortolano "Well the audio wasn't working. I guess I missed that."

Alderman O'Brien "No, I looked at that screen. I didn't know who you are? I know your name is not "Right to Know NH" but that's the title you use. The computer showed you were lacking bandwidth and there was no hand up."

Chairman Dowd "We'll have another one at the end."

**1:05:01**

Laurie Ortolano "Yes, Laurie Orlando, 41 Berkeley Street. Okay. I just wanted to state that I thought the Public Works budget was pretty well done. I would like to ask that there be some efficiency studies done on, you know, how scheduling is being handled, rolling out trucks, setting schedules for different departments, as well as inventory on equipment. I know that was asked at the last meeting and I don't know if any Alderman got a report from John Griffin on that.

"I'd also like to share a few comments about the spending cap that's going to be discussed next Monday. You know I know some of the Aldermen at the table expressed concerns that the local courts ruled against the spending cap and then the State legislative passed legislation thereby, you know, stepping on local, the authority of local control. I gave some thought to that because I, you know, filed a big Right to Know lawsuit on assessing records. And really, that was a very high risk lawsuit to take through the courts. My preference was to have legislative changes done but I couldn't get anyone in Nashua to support me because there's such a strong democratic contingency. They weren't interested in working with somebody who they viewed either as Republican or an Independent. For 2019 and 2020, I wanted to try and get legislation passed on those issues with property record cards and assessor records and I couldn't do it. So I ended up in a lawsuit. Frankly if I had lost my suit, I would be going forward to have legislative changes done and I still am going to go forward for some legislative changes because I think I'd like to see some of this broadened a little more than I got on the court ruling. So you know, you shouldn't be so harsh and discriminatory about people using the legislative process to try and make changes because the courts don't always get it right. Complicated issues, you're at the mercy of…"

Alderman O'Brien "One minute."

Laurie Ortolano "…getting the right judge, having the right circumstances. I brought a very technical case into the courts. It was enormously expensive, very difficult, and very high risk. My choice would be not to have done that but I didn't have a legislative option. I think the spending cap brought into court is, again, a very technical and heavy topic and it's easy to have, you know, a decision made that isn't exactly where you thought it should be or where it should be. So please bear that in mind. Thank you."

**Board of Aldermen Monday, June 13, 2022**

**https://www.youtube.com/watch?v=n_KCI0G28A8**

**1:45:31**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to thank the Board for holding this meeting. It was very informative, interesting to hear the perspective, and I appreciate the questions everyone brought to the table. I would have liked to have heard some of the people who worked on the spending cap speak and have an opportunity to have a little bit of time to present their positions because I think interpretation is always a little complicated and it's not a black and white issue. I hate to see things come down to arguments that are we're going to court on it, we're going to sue on it, we're force it through that hole. I'd like to see more consensus building done so that is not the case. It's not often productive and these are complex issues.





DRAFT

"I tend to agree that I do not think the grant money belongs in the calculation. I think grants are different. They really are different. There's the money you're appropriating for departments to run and operate and then grants come in and it's not money that you are necessarily in need of appropriating. When I looked up "expenditure", the term "total expenditure", and "municipal expenditure", GAL, or any type of organization, accounting organization, it really talks about the monies required by schools, police, fire, all your departments. No language that I reviewed it for definitions on my phone came up with grant money included. So I do think that's separate and I think that's a legitimate point.

"I'm not certain we're at that $113 million under the cap. I think there is some skew there that I don't fully understand and I'd like to understand that a little bit more. Yeah I'd like to see us work together more with the public and gather the views of those that have been around longer…"

Alderman O'Brien "One minute."

Laurie Ortolano "…and value the input that they have because there is perspective there. For whatever reason in 2017, 2018, 2019, we went along with the calculation done this way. We had virtually the same management leadership team here that applied it that way and then it changed in 2023 and for somebody looking in from outside, it's a red flag. It's a little bit of a hey what's going on here? Why the need for the switch?"

Alderman O'Brien "30 seconds."

Laurie Ortolano "So again, thank you very much for holding this. I think it was informative for everyone. Appreciate the time you all gave this. Thank you."

**Board of Aldermen Tuesday, June 14, 2022**

**https://www.youtube.com/watch?v=fUnqt6h4uuI**

**15:42**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to speak about the Housing Trust Fund Committee that's being established. I feel this item should be tabled and explored further. I am a little bit concerned that there was no discussion on how this Housing Fund Committee or Trust Committee operates differently from the Nashua Housing Authority. You know when I look on the City website for descriptive information on the Nashua Housing Authority and their mission, it really does give one. Manchester has a very extensive website on their Manchester Housing Authority. But that organization covers low income housing, affordable housing, Section 8 housing, Meals on Wheels, and all kinds of programs.

"So what is the purpose of this new Housing Board with seven members versus the Nashua Housing Authority with their five Commissioners and their host of people that provide services for assistance? I feel we do a lot of overlap in this City and I'd like to see a list given to the Board and to the public that shows all the services or organizations in the City that provide housing resources for people, what amount they provide, what sources of funding they have before we essentially establish another Expendable Trust Fund to do just that. I understand the need for housing and I understand the issue but it's almost like the Nashua Housing Authority isn't doing the job adequately so we've started another

housing group of internal people to do it. I do not support having the two City people - Tim Cummings and Matt Sullivan be the Chair and Vice Chair of that Committee and be voting members. I think it should not be structured that way. It's too much of an inside City Hall group and I think if you want the perspective of what's going on…"

Alderman O'Brien "One minute."

Laurie Ortolano "…then you should definitely set that up differently. Your Nashua Housing Authority your voting members are five Commissioners. Your group calls for a lawyer. You have Helen Honorow on the Nashua Housing Authority. It calls for a building expert. You have Mr. Moynihan on the Nashua Housing Authority. You have the other Attorney Eric Wilson on the Nashua Housing Authority. You have an insurance executive on the Nashua Housing Authority and another gentlemen."

Alderman O'Brien "30 seconds."

Laurie Ortolano "So I really feel like we need more information and somebody I'd like to tell me why that isn't an overlapping committee and function. Thank you."

**2:15:16**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things about the development of the Housing Trust Committee. I sort of disagree with what President Wilshire stated that the Nashua Housing Authority is independent of the City. They might be independent but when you look under volunteer boards and committees, they are listed as a committee of the City and are governed by RSA 91-A and must post their agendas and meeting minutes. The authorities that are responsible for doing that do so because they perform or to be a business that is linked to the City and often financially linked to the City that requires them to comply with 91-A. That Committee has two liaisons, board members who are appointed to serve on our Nashua Housing Authority, and our attendance isn't good on that Committee. In the last 6 months, we've only had an Alderman attend one meeting. I would recommend that the Planning Board - and what I noticed is most other municipalities the appointment of a member to their Housing Authority is through their Planning Board. Their Planning Board attends the Housing Authority meetings. Our Planning Board does not. Don't have a Planning Member that goes there and I think if Matthew Sullivan is going to be on this Committee, he should be assigned to be on that Committee as well because there is overlap and some parallel. I think we should try to understand that a little bit more.

"With regard to the parks, I really like what John Sullivan recommended. I think there should be an oversight group. I don't know why the Board is opposed to allowing volunteer committees that work outside of being a government agent or government recognized groups. I think that's a better choice."

Alderman O'Brien "One minute."

Laurie Ortolano "Let them be a group of volunteers that do what they do and let them make recommendations to their Ward Alderman to carry them forward. You have committees that are so large they're unruly - Cultural Connections Committee 20-21 people on there. It's huge. They struggle to hold meetings because they can't get a quorum. I'm not recommending you do that for a committee that is made up of parks, but you could have a person from every Ward.

"I'm also concerned that the DPW group would be in opposition to that or have concerns about a citizen group providing some direction, or guidance, or thoughts, or improvements for any of our parks. I see park areas that I think are under maintained and I think there is a resource issue there and how we stage our parks people to get out and do the work and I think we have to look more closely at that. So that's my two cents on that. Everyone have a great evening and Happy Father's Day to everyone on the Board. Thank you."

**Board of Aldermen Tuesday, June 21, 2022**

**https://www.youtube.com/watch?v=dwPkzXlYRH4**

**7:35**

Laurie Ortolano "When we did a hearing on the teacher's contract, Miss Wilshire said there was no time limit. It's a hearing and you can ask questions and you'd have unlimited time. The teachers had unlimited time. Why are the citizens restricted and why are we restricted to one question? I object to that."

Chairman Dowd "You can ask multiple questions. You just have to give other people the courtesy of being able to get up and ask a question. So you're not limited that much. Your first question and statement is five minutes. You can come up again and ask another question for three minutes and you could ask other questions for three minutes."

Laurie Ortolano That's inappropriate and that is a big deal. If I don't want to talk for five minutes but I want to ask questions for three minutes, I should be allowed to do so. I can tell you I'm going to start with questions."

Chairman Dowd "Excuse me. That's the way we've been holding these public hearings for at least the 40 some odd years I've been involved. So we're not changing tonight. With that, we're going to have an opening from the Mayor. He's going to give a presentation."

**33:04**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to go through these departments. I'll have some questions and I'll come back through. Regarding the statement made by the Mayor for the opening statement, I'd like to offer a little perspective on this measure and list that he spoke about. He made certain to let the public know that this was State mandated and if he had had his choice, he wouldn't be doing it. I'm very concerned about that because when the State did mandate this in 2019, okay after the 2018 reevaluation, they gave us four years to fix our numbers. We are obligated to do it at a maximum of every five. So we had to do it within five years. Now there were a number of different assessing offices from around the State that said why doesn't Nashua just get it done in one or two? Just screen this thing through and be done? The city certainly had the right to go to the BTLA and say hey we'll get it done in two years. We'll have it done it by 2020. We'll have it done in 2021. But the BTLA said we'll give you four years. The only amount of time they could have given you is 2023.

"It sounds very whiny to me. When I hear a Mayor say the State made us do it. It's whiny and our valuations are off by 40 to 50%. The State and the Assessing Standards Boards the DRA recommend that





DRAFT

if your valuations fall below 90%, that you do a revaluation. We're at 60% on average and your condos and starter homes are at 50%. They're definitely going to see a tax hike. We have a lot of condos in this city. So to turn around and say that, you know, I wouldn't be doing that now. I hope you would. At 40% at 60% valuation, this is the problem with our Assessing Department in the city. We don't know what to do and we're not doing it well. I think the State better stay on us and keep mandating when it should be done because it appears you don't know when it needs to be done. So that's my comment on the Mayor's office. The only thing we might potentially need to add to the budget is a chauffeur for the Mayor because I think your driving is very questionable getting here.

"Board of Aldermen. I'm concerned by the budget and the suggestion of an increase to add another full time person for the clerk. I think the Board of Aldermen has to cut their committees and cut the board itself. I've been going to Aldermen meetings for three years and I find a 15 member board not to be effective. My biggest concern are the at-large Aldermen. Those are the people who I see do so little. The Ward Aldermen have obligations to their Wards. The city should be set up with nine wards, that's it. That would control the costs in your Board of Aldermen office and then get the rid of some of these committees. All these Aldermen are assigned to go sit on these committees. Many of these committees don't get covered by Aldermen because they can't possibly do all the work. You've got too many committees and you can't have successful Aldermen when they're assigned to do work they cannot get done. So I do not support creating another full time position so that the administrative services person who's handling the minutes the clerk can get the job done because you know she can't do it with the number of committees you have in a board this size. Let's fix that problem by not adding more clerks to handle all the committees that we can't keep up with.

"I want to ask some questions and talk about the Legal Department. We should not be adding another attorney to the Legal Department and leaving the fourth attorney in there. A Right to Know Attorney is an absolute waste. We've had plenty of lawsuits and you all saw that I got a ruling today from the court and one another pro se suit on emails, which probably the city will appeal that as well to the Supreme Court. But exactly what are we getting for from this office? I can't see minute what's happening there."

Chairman Dowd "One minute."

Laurie Ortolano "When the budget was presented by Attorney Bolton to your Budget Committee, he never said that that Right to Know Attorney is going to be doing other things. So my question is what is the Right to Know Attorney in the budget book going to be doing? And do we have a policy written or unwritten from this Right to Know Attorney on how right to knows are processed, whether a taxpayer is in litigation or not. I want to know what that policy is and I would like somebody to explain it here tonight. I'll yield my time and let the next person speak. Thank you."

**42:41**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. So I asked a question at my last five minutes but didn't get an answer. What's the policy for answering it?"

Chairman Dowd "You have three minutes to ask a question. The time doesn't count when the answer is being given. So if you have a question, ask a question and I'll pause the clock."

Laurie Ortolano "Were the rules such that you could ask one question in the five minute discussion?"

Chairman Dowd "You could have asked one in the five minutes that you…"

Laurie Ortolano "I did."

Chairman Dowd "What was the question?"

Laurie Ortolano "I asked two. What's the Right to Know Coordinator going to be doing for the city? I mean the Right to Know lawyer. What role are they going to be performing for the city within that budget?"

Chairman Dowd "Who wants to address that? I think the City Attorney is going to address that."

Laurie Ortolano "Thank you."

Steve Bolton, Corporation Counsel "We are not proposing adding any positions in the Legal Department. So that was a misstatement made earlier. The Right to Know Coordinator is an Attorney. She mostly provides guidance to city managers and officials on compliance with Right to Know provisions of the law - essentially Chapter 91A of the Revised Statutes Annotated. She does some amount of training of city personnel. She also does what other legal work gets assigned to her. She, for example, sits on the Taxi Cab Commission which licenses the cab and cab drivers and handles appeals from decisions of the City Clerk's office on those licensing. She also may work on other cases. My plan is to have her do more of the code enforcement type work but whatever else is needed. She is part of a team that addresses all legal issues along with me and the other two lawyers in the office and the two paralegals that work with us."

Chairman Dowd "Do you have another question to ask?"

Laurie Ortolano **"**I do. So that question didn't - I'm going to make a statement that my assumption is this Right to Know Attorney is spending more there than half their time on Right to Know work otherwise I would hope they wouldn't have the title Right to Know Attorney and I'm opposed to that position because I think it's a waste of taxpayer money and it has not been effective.

"Did this Right to Know Attorney who provides counsel to departments and all establish any type of written or unwritten policy on how Right to Knows are handled throughout the entire city and in particular, handled for those who have pending litigation against the city regarding a Right to Know issue within a specific department? Is there such does such policy exist either written or unwritten for the entire city? I don't want to know of a division policy. I want to know of a city wide policy."

Steve Bolton, Corporation Counsel "No."

Laurie Ortolano "Then we should definitely cut that position. Please dump that Right to Know Attorney because if you can establish the basic policies for how Right to Know is going to be handled for your citizens, then that's been a big fail.

"I also feel we need a new Corporation Counsel for the city. I feel this Counsel has been a big disappointment and it's simply not fit for duty."

Chairman Dowd "You're starting to pick on people and I told you to refrain from doing that."

Laurie Ortolano "I don't think I'm picking on them at all. I can speak to specifics. Would you like that?"

Chairman Dowd “And your time is up.”

Laurie Ortolano “Okay. I'll be back.”

**1:13:43**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. So given the history of what happened with our Right to Know Coordinator for last year where we hired an inexperienced person who had just received their law degree within weeks of coming into the city, it appears that no one supervised that individual or that individual decided it was open season on citizens.”

Chairman Dowd “Is there a question?”

Laurie Ortolano “Why are we still funding a position that resulted in so much litigation that was lost by the city? That's a question. And, you know, so I think my statement to that was I don't think we should be funding this.

“I'll just move on to the City Clerk's Office. The City Clerk's Office has a mission statement. The legal office does not have a mission statement and I think one of the issues with the legal office is what is our mission statement for our legal office? But the City Clerk's office has a mission statement and I'd like to know why we don't have a centralized location for Right to Knows or information requests to be handled through this city like all other municipalities appear to have to address our records issues and also the preservation and maintenance of our records. So right now if I don't know how to get information and I write to the City Clerk, the response I'll receive is well it's not my office. Write to the other 10 departments or divisions and go figure out where it is. That's not how it works in Manchester, Concord. Keene. When I have to do that, the inefficiency to the city and forcing citizens to operate that is tremendous. We waste a lot of money.”

Chairman Dowd “So what is your question and to whom?”

Laurie Ortolano “Why do we not have a centralized location, which I believe should be through the Clerk's office, to address Right to Know issues coming into the city for a response?”

Mayor Donchess “Well, we've struggled with the amount of time that city employees take in responding to Right to Know requests. For years now, we've had at least four employees who spend half their time responding to Right to Know requests from one or two individuals. So the city taxpayers are spending - when we calculate that, that's about $250,000 a year just as you know, a single taxpayer had submitted 1,200 Right to know requests over the last several years. Each one of those can take hours to respond to. A person has to read sometimes a very, very - I mean as you know hundreds and hundreds of emails come in from a single one or two people. There can be a Right to Know request within a very long email. So all the emails have to be read then and determined is there a request for documents in there. If there is, then they have to go look for the documents. Sometimes that's quite time consuming. Could be hours, could be 10 minutes, could be hours, could be days. As you know, we have produced tens of thousands of documents. We've had…”

Laurie Ortolano “Chairman Dowd, point of order. I asked a question and the Mayor is whining again.”

Chairman Dowd “He’s trying to answer the question.”

Laurie Ortolano “He did not answer my question. He is whining and what I would like to say is, I…”

Chairman Dowd "Excuse me. Let the Mayor finish his answer or you're done. Let him finish."

Laurie Ortolano "I would like an answer. Why don't we have a central location so Right to Knows can be processed and what you're speaking about to these 1,200 Right to Knows, you know, that I put in a request for all the Right to Knows from January through June? We all know that the number has dropped dramatically. The storm is over. So this is not an issue anymore. So why don't we have a central location to handle our requests like all the other cities have done? And frankly if we had had it, this problem of all the employees, which frankly you created this problem Mr. Mayor. You are in part part of the problem. Why didn't we have this type of system set up to make it easier? Sometimes a citizen had to send ten Right to Knows in to try and figure out what department head…"

Mayor Donchess "I'm still trying to answer the question."

Laurie Ortolano "Well, I'd love an answer. Move it along."

Mayor Donchess "I will answer if you please don't interrupt me. Can I ask that courtesy?"

Laurie Ortolano "No, continue."

Mayor Donchess "So you insist - you're going to insist on interrupting then why bother answering,"

Laurie Ortolano "You almost hit me with your car getting over here. Just hurry up."

Mayor Donchess "So you've met mentioned the other cities. Now I meet with the Mayors periodically and we talk about Right to Know requests. I can guarantee you no other city has been hit with anything close - nothing close to 1,200 Right to Know requests from a single individual. In order to avoid even more, we've had to do a scanning project of 700,000 pages, which is costing us $90,000 so that we can put those things online so that Right to Know request can be answered simply by referring to one of 700,000 documents. But in talking to the other Mayors, I disagree with your characterization of the way they handle them. I can tell you none of them have anything close to this. I can tell you we're spending hundreds of thousands of dollars a year and staff time responding to Right to Know requests from a single individual. And yeah I think that they've slowed down. We've only had 50 or 60. In other words, only about one every two days this year rather than sometimes ten over a weekend. So the burden is significant. People are burned out. They say to us, we're supposed to be working for the citizens. We don't want to just be searching for documents all the time, and answering these requests and, you know, getting sued all the time. If we make a tiny mistake, then we get sued. People are, you know, they're tired. So I think we do have a central location. It tends to be the legal office but we're trying to burn up - you know, it tends to be the legal office but if it seems like it'll burn - we're already burning so much time on this that if it seems more efficient for someone just to answer it directly, that's what we do. But it's a problem because they get so stacked up that a person could spend the next month just working for a single citizen on all these Right to Know requests. So we have to try to meter them. We have to try to handle them. It is really, really difficult. People are burned out. They're tired. So we need additional help. As you know, we put a Right to Know Assistant in here so that that person can help people get documents because as I've said for some people, they're spending half their time. Rick Vincent he told the DRA he spent half his time. This is the Chief Assessor. Half his time. We're paying this guy $130,000. He spends half his time responding to a single individual."

Laurie Ortolano "I know that's not true and the statement…"

Chairman Dowd “Okay, your time is up.”

Laurie Ortolano “I'm going to…”

Chairman Dowd “Your time is up.”

Mayor Donchess “That's what he told the DRA.”

Laurie Ortolano “Well, that's not true.”

Mayor Donchess “In response to a complaint you filed, he was called up there. They asked him what's going on. He said I spend nearly…”

Laurie Ortolano “He was forced.”

Mayor Donchess “…half my responding to a single individual.”

Laurie Ortolano “Mr. Mayor, you're a liar. You are not telling the truth.”

Chairman Dowd “Time’s up and we're moving on to the next part of the budget. We're done with this portion.”

**1:28:22**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. I don't know if this goes in this area or where it goes so you can direct me. But did we cease our policy for covering sick leave for those who were vaccinated or do we still give free sick time if a vaccinated person gets COVID? Is that still in place?”

Kim Kleiner, Administrative Services Director “The policy is in place if an employee is vaccinated, shows proof of vaccination, and they show proof that they have COVID, they do get the five days of sick time.”

Laurie Ortolano “That is outrageous and that policy should be dropped given what we know with COVID and how many people have been vaccinated who have caught it again. That is costing us a ton of money and that's just not right. Thank you.”

Chairman Dowd “Any other questions on Public Health and Community Services?”

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. So for clarification if somebody is vaccinated and three months ago they caught COVID and they have proof of vaccination, they get the wave on the sick days or the sick time used. I think Miss Kleiner mentioned five days but are days specifically called out? I think it's not called out and if they get sick again two months later, because I have friends that that's happened to, do they continue to get another five days or is it one sick, you know, ticket you get or does this keep revolving as COVID becomes more like a cold. Are we going to just keep paying on this in somebody now gets 10 days of free sick time or 15? Is it really limited to five?”

Kim Kleiner, Administrative Services Director “It is limited to five because the regulations changed and the employees are required to be out of work for the five days. I would like to stress that many of our city employees whether they have COVID and they are home or not continue to work and perform their functions from their homes. Many.”

Laurie Ortolano “That's really immaterial. But now if they get sick again two months’ later, do they get another five days?”





DRAFT

Kim Kleiner, Administrative Services Director “The policy does not address whether there are multiple cases. There have not been that many instances of multiple cases but we would address it at the time.”

Laurie Ortolano “So there have been instances, and we pay for that, and I do think it's discriminatory, and I do think it's just a matter of time. I don't know if you all saw the article on the AGs office in Arizona, Scottsdale suing the School Board for their mask policy and not allowing public comments on their mask policy from their parents.”

Chairman Dowd “I think you're getting off subject from…”

Laurie Ortolano “I'm just pointing out that that is a suit that the AGs took up took on from 14 months earlier and these things are starting to roll out. I think the point made that this is potentially future litigation is true. Thank you.”

**1:39:49**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. You know this format you're using is very unfair because departments like this that have 13 divisions that have 13 different departments apply the same rules. You get five minutes and one question, then you come back for three minutes and a question, and then you can only ask questions. That's the same rule for whether I'm doing other public safety department with two different divisions in it or two different departments in it or 13. It's really tremendously unfair this process and I'm going to guess if I add up the money in the budget of Administrative Services it's enormous and we can't question it the way we should be allowed to do in a public hearing. So I very much object to your format.

“That being the case, I'd like to start by talking about the Arlington Street Community Center. Do we have a Director for that center currently? I know the Director moved over to the Mayor's office Ms. Caron but has that position been filled for an Arlington Street Community Center Director?”

Mayor Donchess “Yes.”

Laurie Ortolano “Okay. The one thing I would like to make note of is when that department was formed or group was formed from My Brother's Keeper some years ago, 2016/2017, it was pitched in the record as being a self-sufficient. The goal was to make it an independently self-supporting group and of course it isn't. We're funding it out of the budget. For that purpose, I'd like I like to hold people accountable when they say it's going to be self-sufficient. And unless you can really come up with a strong reasons why that that program has to be maintained, you have not been able to make it self-sufficient in five years. I don't think that the taxpayers should continue to fund these services.

“Human Resources we've undergone quite a change in the department and how that's set up because we have a Director and it's incumbent on you all to make certain that the reallocation of resources and titles is working efficiently for the city and I'm not certain that it is.

“Benefits I have concerns about. I would like to see when the budget is put up for citizens. I really like to see the budget with the 2016 to current all the years that you have been Mayor, Mr. Mayor, what the accomplishments are through the budget? What's happened with benefits across those five years, six years? What's happened with the number of employees that we have? Have we grown, have we shrunk, what's happened to these benefits costs? We keep hearing from Ms. Kleiner that she's done some great

things helping to reduce benefits for certain types of employees. What is the impact on the total budget with those benefits?

"We also know that the State just recently announced that they're going to take some of that $400 million of surplus money and apportion it to cities in a one-time payment to offset I think the pension plan. If the city has any information on that pension plan, I would like to hear that discussed tonight on what the mumblings are at the State level as to how that's going to be apportioned and what impact that might have on the tax rate.

"Information Technology run has undergone quite a few changes and we don't have a Director over there. I asked a question months ago about the new email retention policy, which we went to a Mimecast cloud based storage email system which is terrific, but we're only retaining them for one year, which is the bare minimum of RSA 33 A and if there's litigation, it's not adequate. Nick Miseirvitch told me that he would provide me with an answer on how we're dealing with litigation issues and I never received that answer. So my question is did we extend the time on the cloud? Other municipalities keep their emails up for three years so it covers them for those types of issues. Have we extended our…"

Chairman Dowd "One minute."

Laurie Ortolano "…policy such that we're covered in our cloud based storage?" Assessing - I, you know, you all know how I feel about what's going on in Assessing and I'm going to take that up in my next comments sections to comment.

"GIS - I'd like to know if we are on target with the ArcGIS integrated system that's being done between the IT Department and GIS to move records, integrate records into the GIS platform. We haven't had an update on that and it's going to impact the citizens ability to research data once the numbers come out at the end of August. Those are questions and I know I'm only allowed to ask one but when you throw 13 departments at us, tell us you got five minutes and one question, it's completely unfair and I think it does not live up to the spirit of the law on public hearings. Thank you."

Chairman Dowd "Any other questions on Administrative Services? If nobody else is asking a question, you'll get three minutes."

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to address some of the comments made by the Mayor regarding Right to Knows in the Assessing office. He stated that Rick Vincent told the DRA that he spent half his time dealing with Right to Know requests. I feel that that is grossly inaccurate and he was only here a year and I certainly have the records. But at that point, Right to Know requests were being handled through the Legal office and Rick Vincent testified in a court case that he was not involved in those Right to Know requests. He didn't review the records, he didn't compile the records, and he didn't have anything to do with them, and he couldn't speak to the responses that were provided by Legal. Responses were coming out from Legal from the time Rick Vincent joined Assessing in December through August of 2019 until Nicole Clay joined and they started doing some retooling. So I'm really remissed to understand.

"Also, and you know I complained about this, when I requested property record cards from the Assessor's office to work on abatements because your office was closed. Nobody could go in. It was renovated. The cards weren't online. You had to email assess help. Everyone had to do that. I did get in a court case a stack of emails that went into assess help. There were thousands of them. They weren't

mine. I had about eight in there. Turns out there were thousands of pages. Other citizens were accessing it heavily. So when you say I'm the only one writing Right to Knows, I know there's no truth in that because my dining room table right now has three feet of paper on it on those assess help emails that came in with abatements and they're not mine. Rick Vincent was told that he had to process my request to ask for property record cards when the clerk of the city, you know, making $20 an hour…"

Chairman Dowd "One minute."

Laurie Ortolano "…was handling that work. Rick Vincent making $125,000 was required to print my property record cards and send them back to me. I appear to be the only individual he was required to do that for and very often he didn't respond and get them back. Why did the city use a Chief like that? Why were the rules set up that he had to require that? I think it's a gross misrepresentation when you get to do your table dance on a citizen and then comment is shut down because I ran out of time and I can't defend myself. I really think there's a lot of free speech violations going on in this room tonight. Thank you."

**1:51:38**

Chairman Dowd "We have about 40 senior people here from city government that are just sitting here. I'm going to insist that you ask a question and not give a speech. If you don't have a question, then I'm going to ask you to sit down."

Laurie Ortolano "I asked several questions in the first round but you can only handle one."

Chairman Dowd "Then ask a specific question."

Laurie Ortolano "Has Information Technology expanded the time that emails are retained in the cloud beyond one year?"

Kim Kleiner, Administrative Services Director "The policy has not been amended since you received a copy."

Laurie Ortolano "Thank you. I think the policy should be amended because I think from a budgetary standpoint, I was told that the difference in whether you maintain them on the cloud for an extended period of time was minimal and I'd like to see us do what other administrations or cities do for the sake of preservation of records.

"In the Assessing Department I have another question. You budgeted for a full time Chief and you budgeted for a full time consultant. Unsure of what position might be filled. Why are we budgeting for both positions and not budgeting just for one? If we have a consultant for a while and then we get a full time Chief, we'll just transfer those funds over to the salary for the Chief. We do these fund transfers often. So why are we funding two of the same positions under two different categories of either a consultant or a full time employee?"

Kim Kleiner, Administrative Services Director "They are not the same exact position. So we are currently looking for a Chief Assessor. We are also currently looking at the city's option for consultant services."

Laurie Ortolano "So will the Chief - will a consultant who's coming in to fill in as a Chief be paid out of the consulting budget or be paid out of the salary for the Chief?"





DRAFT

Kim Kleiner, Administrative Services Director “The Chief Assessor who works for the city would be paid out of the salary line. A consultant who would be hired to represent us on many different things would be paid out of the consultant line.”

Laurie Ortolano “Okay. So I think that's redundant. I think we don't have to fund both positions. They’re high level positions and they’re high cost positions.

“What are we doing to address the closure of our abatements that seemed to stay open for a much longer time than other municipalities because we pay a 6% penalty? I know it was changed this year to four but there's a 6% interest penalty to abatements not closed and we have abatements going back years that sit on the table and aren't addressed yet we hire a consultant to address these. Why is that happening in Nashua?”

Kim Kleiner, Administrative Services Director “We are currently looking at the process of abatements. As Ms. Ortolano knows, that's extremely difficult to do without a Chief Assessor. So once the city has hired a Chief Assessor, we should be back on track with that. But that is part of the consultant money that is put into the budget just to address that area.”

Chairman Dowd “Your time's up.”

Laurie Ortolano “I'll come back.”

**2:03:58**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. Where does the money or the funding for the Performing Arts Center fall and who has oversight of that? I was thinking Economic Development has oversight but where does we start paying the rent on that building when it opens I think to the tune of a half a million dollars something like that. Is that in the budget and where does that fall?”

Mayor Donchess “There's a bit of a misunderstanding regarding this. Yes, I mean, the financing arrangements are somewhat complicated because we qualified the building for new market tax credits. Therefore generating $2.5 million in cash in these tax credits - ballpark. So in order to maintain the qualification for that, you have to give kind of a complicated ownership structure. But in the end, the quote “rent” being paid by the city equals the property taxes being paid. So it's a wash. The money going in and the money going out for rent and property taxes equal each other so in the end, it's a net zero as far as rent and property taxes go.”

Laurie Ortolano “So I don't see it as a net zero and because the why bother paying rent if the NPAC is paying property tax to us because they owe us property tax because they're a for profit business that's running the center under this seven year commitment with the new market tax credit. Then why aren't they just paying us the taxes and why are we paying them a rent back to make it a wash? Why should we do that?”

Mayor Donchess “Well, it is a wash.”

John Griffin, CFO/Treasurer/Tax Collector “Yeah, it's pretty complicated. I actually sent some communication after my presentation before the Budget Review Committee to those members and the members of the Board of Aldermen. A very complicated deal, but very well described. So if you did have the time, I think it was about an hour and a half, all of the folks that worked on that project. But getting





DRAFT

back to the budget if we look at page 107, not really knowing where to place it, the Comptroller and I decided other general government. At this point, we're contemplating two lines. One is the rent that we're talking about are the performing arts center. So NPAC doesn't have any money. So the appropriation to get the $2.5 million that the Mayor described, we have to pay what could be $500,000 in rent, base rent, because you need an arm's length for profit calculation in the new market tax credit mix.

“We also pay what's called in the contract “additional rent”, which is the property taxes. So as I mentioned, NPAC doesn't have any money so we need to through appropriation have to pay whatever that property tax amount is for them, NPAC to pay the city. So that is a wash. There's another line item called once it gets open and operational is “an equipment lease” for the equipment to properly equip the Performing Arts Center to work. So we've entered into a lease agreement. Once again, we pay the appropriation lease and then they pay us back through what's called a “distribution”. So you're going to have the expenses appropriations on page 107 and then elsewhere in the revenue side of the budget, you have those payments coming back to us.”

Laurie Ortolano “And what does the…”

Chairman Dowd “You have one minute.”

Laurie Ortolano “Okay, I'll definitely come back on this. 107 puts it in - is it other general government or general government is that the - I'm not gonna open my book because I don't have the time.”

John Griffin, CFO/Treasurer/Tax Collector “118 is the appropriation. You're looking for the revenue?”

Laurie Ortolano “Yeah for the appropriation, where does it fall under like what group?”

John Griffin, CFO/Treasurer/Tax Collector “Oh Financial Services and that's why I (inaudible) my budget is going up 17% is because this is in here.”

Laurie Ortolano “And is the for profit NPAC a public entity? You know we had to do this complex deal in order to get this $2.5 million through the new market tax credit but in the process of doing it, it seems to me we gave up our right as citizens to understand what our government is doing with our money and that art center was…”

Chairman Dowd “Time is up.”

Laurie Ortolano “I’ll come back.”

**2:12:35**

Chairman Dowd “All right. I’d like to move on to Public Library. We've had enough questions. You've asked a bazillion questions tonight. You're tying up the entire city government. You know a lot of these questions that you're asking you've asked on Right to Know requests.”

Laurie Ortolano “I have not.”

Chairman Dowd “You’ve asked them at other meetings and had answers.”

Laurie Ortolano “I have not.”

DRAFT

Chairman Dowd “Do you have a question that you're going to ask that hasn't been asked before?”

Laurie Ortolano “Yes.”

Chairman Dowd “All right. Go ahead.”

Laurie Ortolano “And you need to go home and go to bed because you're very grumpy.”

Chairman Dowd “No, you haven't seen me when I'm grumpy.”

Laurie Ortolano “I have. Is the NPAC a public entity? Because of the way the city structured this deal to get the new market tax credit, how does citizens have oversight of a very large amount of money that is involved in the construction project as well as funding or moving money into this non-funded entity that needs money? How are citizens able to track that if it is not a public entity governed under 91? So my question is, is the NPAC a public entity covered under 91-A?”

John Griffin, CFO/Treasurer/Tax Collector “It was done by the Legal Department contributed heavily. I'm not sure if it…”

Laurie Ortolano “Do we know what the NPAC is? Like what kind of business - I mean I know it's a for profit but what is it exactly? It's a for profit what? Is it governed? For example, I was told the Main Street Realty, which was that intermediary that the money moved through which was the nonprofit portion before it was picked up by the NPAC was a 162G – RSA 162G entity is what Tim Cummings said. That is a public entity subject to public knowledge so you can ask questions about it.

“Now, the reason I haven't asked these questions is because I've never been able to understand if the NPAC is in fact is it a 162G? What RSA governs the type of business this for profit is and does the public have any ability to understand? For example, there’s a huge construction project going on. We get no updates.”

Chairman Dowd “One minute.”

Laurie Ortolano “Do we have the ability to understand that?”

John Griffin, CFO/Treasurer/Tax Collector “It's part of the budget to the extent that there's appropriations and revenue.”

Chairman Dowd “Okay.”

Laurie Ortolano “Okay, thank you.”

John Griffin, CFO/Treasurer/Tax Collector “The question I believe is you're trying to find out is what if any rules govern the NPAC organization that's been incorporated?”

Laurie Ortolano “Exactly.”

John Griffin, CFO/Treasurer/Tax Collector “Right and I don't have that answer.”

Laurie Ortolano “I've been trying to get that answer for a long time. Thank you.”

**2:19:30**

Chairman Dowd "You can't speak from that far away. Nobody's gonna hear you. So Public Library. Any questions on the Public Library? Seeing none. Financial Services Division - 118 other General Government, 126 Financial Services."

Laurie Ortolano "Laurie Ortolano, 41. Berkeley Street. Since the money that Mr. Griffin discussed with the NPAC are part of the budgetary items are covered under Financial Services, I guess I'd just like to make a statement on this. That is when you set up an entity like NPAC and it's such a complicated process and the understanding of how that entity exists, who controls it, who's on the board isn't available, isn't readily available at all. You've got to file a Right to Know, right? That's what you got to do. I know I've tried to speak to Tim Cummings about it and he refuses to answer the questions. So I'd have to submit something in writing and I haven't done that.

"But I'm also very concerned that something so complex that the Aldermen had a difficult time understanding it does not have citizen oversight, wasn't set up such that we could monitor what's going on, or have accountability to the public. That deeply disturbs me given the complexity of this center and you know $30 - $40 million of expenditures that are going to go into it. I just don't think that was right. Thank you."

**2:30:23**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I have a question on the interfund transfers out on page 215 and I was there when the Finance office was covering this in the Budget meeting. There are two ETFs that were set up - the transfer to Eastside Recreation Facility ETF and the BIDA ETF that through 2022 as of April 30th carried a certain sum of money - three quarters of a million dollars and a quarter of a million dollars and each one respectively. Then in 2023, they're blank. Has that money been removed, or was it spent, or are those carrying over into 2023? What happened to that money? It's on page 250."

John Griffin, CFO/Treasurer/Tax Collector "I can answer that. So we only transfer at one time so we're not going to do it again. But what I want to get for you is the page number of the trust fund that will show the 750 and the 250 in it, which is on page 307."

Laurie Ortolano "Okay."

John Griffin, CFO/Treasurer/Tax Collector "So if you looked at 307, you're going to see the BIDA line 38 that now because it has a little bit of interest $250,061, I believe, and then there's one here for the 750."

Laurie Ortolano "Okay So I'm just confused by the fact that the 2023 proposed department budget shows nothing. It's not a zero, it's just a dash. So I guess in a nutshell, does BIDA have $250,000 in the ETF?"

John Griffin, CFO/Treasurer/Tax Collector "It has $250,081."

Laurie Ortolano "And that is continuing? They're continuing to have that amount of money?"

John Griffin, CFO/Treasurer/Tax Collector "They have that money and they haven't spent anything yet."

Chairman Dowd "One minute."

John Griffin, CFO/Treasurer/Tax Collector "But one final point on a dash means a zero."

Laurie Ortolano "Okay."

Mayor Donchess "So where that came from is when the - pursuant to a development agreement, I don't know a dozen years ago, a parcel of land formerly John Mansville was sold by the city to the to a developer for $750,000. That money was allocated, $250,000 remained with BIDA so that they could maybe generate another project and additional tax money, and $500,000 I think went to a fund dedicated to recreation in the neighborhood where the land was sold. So that was you know, money that came in from outside of the city dedicated to those two purposes."

Chairman Dowd "Half a minute."

Laurie Ortolano "Okay. My only concern is, you know, I'm sensitive to these ETFs. If you have committees and organizations that don't meet and aren't like BIDA is not an actively meeting group. I'm opposed to funding them with ETFs if there are no projects. This money can be used to reduce the tax rate and I think we should be looking at No ETFs in determining if the money is being spent and if it isn't and projects aren't on the horizon, why we just are putting the money there? Thank you."

**2:36:57**

Chairman Dowd "Any other questions on debt service, contingent, and interfund transfers?"

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just want to address here because I don't know where else to address it – the spending cap because this debt service and these grants are part of that issue, especially with bonding. I don't understand why the grant money's in there and I listened to this discussion from the Mayor where he seemed to concur that he doesn't think the grant money should be there. However, the legislator the language in the bill is forcing him to do that. I would disagree on that from a number a couple of positions here."

Chairman Dowd "Do you have a question?"

Laurie Ortolano "Where can I have a discussion about the spending cap?"

Chairman Dowd "You know this is not on this particular part of the budget"

Laurie Ortolano "Where is it?"

Chairman Dowd "We addressed spending cap earlier in the evening."

Laurie Ortolano "No Fred just came up and started with it because he chose to. It really wasn't - he opened it and he was given the floor to do so. You didn't have a special spot for it so where am I supposed to address it?"

Chairman Dowd "So the spending cap is determined by the city. It's not part of the budget in that what we are going to budget and spend either, you know, falls within or doesn't fall within the spending cap. The definitions that we've had on the spending cap is we're way under. So if there were any concerns about the spending cap, I don't know where you'd address them but I don't think you're gonna have any answers here."

Laurie Ortolano "Well, you know, with all due respect Alderman Dowd you're the one who said that your questions on the spending cap could be answered at the hearing. And you told us to take our questions to the hearing."





DRAFT

Chairman Dowd And you had questions at the beginning and they were answered"

Laurie Ortolano "That was one individual. Because I didn't come up, I lost my chance? It wasn't in the budget. It's not part of your sheet. Just because Mr. Teeboom chose to address it as the first line item, I forfeited my chance to address it because he addressed it in the Mayor's office? That's not right."

Chairman Dowd "Do you have a specific answerable question on the spending cap?"

Laurie Ortolano "Yes, I do."

Chairman Dowd "Then ask the question."

Laurie Ortolano "Why are we duplicating debt service? Debt service is accounted for in our budget on a regular basis but then we turn around in the spending cap and we list all the bond debt as part of the spending cap to account for. How is that not an act of double accounting? I'm particularly concerned with the list you gave the Board at the meeting when the spending cap discussion was done looking at money that was being reallocated from the Bradstreet Parkway, I believe, to do some lighting initiatives - LED lighting initiatives. We had a bond for the Broad Street Parkway. We paid debt service on that bond. We've had extra money so now we've reallocated it to a project and now we're putting all of that bond money down."

**2:48:13**

Chairman Dowd Okay. "Questions for the Public Works and Engineering?"

Laurie Ortolano "Are we allowed to make a statement? What's the rule again? It starts off with a new department…"

Chairman Dowd "We're trying to move things along so I'd prefer that you ask a question involving that department. No statements."

Laurie Ortolano "Well, I'm gonna have a few statements. You can't change the rule in the middle of game. Now I spent years in Litchfield doing public hearings and actually having special meetings, right, ward meetings on Saturday mornings. A town with a $13 million budget assemble…"

Chairman Dowd "Please ask a question"

Laurie Ortolano "And you spend six, seven, eight hours of your Saturday, all day, having public discussions about your budget. We come here at seven o'clock and you're ready to throw the towel in by nine and you're ticked off that we're not moving along. This is an abomination.

"Now regarding Public Works. I have concerns with the public relations position in that department. I think it's falling short and I think this Roby Park issue is a great example of where it fell short. I think it's an unnecessary position and we should be funding that because I don't think the public relations is happening the way it should with the outreach to the community when things are going on that affect the community. Roby Park was a perfect example. I was there for all of those Public Works meetings where the discussion took place, the vote went down, it was very quick. There was almost no discussion, real discussion by the board. I do feel we're falling short on green space. When the Mayor mentions that we have 17 people to maintain 900 acres of park and that's very difficult, I recall Alderman Jette asking if they felt to Public Works if they were able to do that and do that maintenance and the answer was yes.





DRAFT

Now one of the concerns I have is that I'm not certain we're deploying those Park people efficiently or correctly. It is very important…"

Chairman Dowd "One minute."

Laurie Ortolano "…that their work schedules get done the day before so that when they come to work at seven in the morning, they're ready to roll out and do parks work. I think we're not handling that staff correctly and those inefficiencies we are paying a lot of money for. So I'm not in tune to keep the budget as it is and fund this because I don't think we're doing the right thing here. Thank you."

**2:52:33**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Based on information and belief, there was a scanning project going on in the Building Permit Department to scan records like Assessing. I didn't realize that was happening but it was underway. Can anyone tell me what the scope of that scanning project is? When those records will be available to the public? There are computers set up but they're not working. What the cost was for that project and if we've completed it?"

Matt Sullivan, Community Development Division Director "The scanning process that's underway currently within the Building Department is what I would refer to as an incremental scanning process. It's something that we are undertaking with our existing staff to digitize records as they come in, particularly for new permit applications. As we actually go through that process and speaking specifically to the question and our use of Civicgov, which is the customer portal for permits and inspections, we're focusing our effort right now again on process moving forward and new applications. Currently there's no funding available to actually resource it historical scanning process for existing records that exists within the Building Safety Department and so we have not funded that as of today.

"Speaking to that same effort in the Planning and Zoning Department, we actually do have a current part time staff person who is digitizing old site plan and subdivision records as well as incrementally moving through all of our minutes and applications as well. But currently, there's no dedicated funding within the Building Safety Department for that scanning project. It's something that current staff are undertaking as we go."

Laurie Ortolano "Okay. It's not a separate outsourced item?"

Matt Sullivan, Community Development Division Director "Correct."

Laurie Ortolano "And the newer records and applications that are being scanned or digitized eventually they will move to that citizen portal but that's not available yet?"

Chairman Dowd "One minute."

Matt Sullivan, Community Development Division Director "That's correct. We're working with Information Technology and Administrative Services but unfortunately, that citizen portal is not yet available. We hope to roll it out sometime over the next year working cooperatively with IT."

Laurie Ortolano "And are you redacting your records as your person - are you under reduction requirements to redact your records?"



DRAFT

Matt Sullivan, Community Development Division Director “We are not currently redacting records. The reason for that is that currently the files are not redacted in any way and so we're providing them in the same manner that we have historically.”

Laurie Ortolano “Okay so phone numbers or email addresses remain on those documents?”

Matt Sullivan, Community Development Division Director “We are not currently redacted.”

Laurie Ortolano “Okay. Also…”

Chairman Dowd “30 seconds.”

Laurie Ortolano “Okay. Also one last question. What do you see for code enforcement violations and how do you track that?”

Matt Sullivan, Community Development Division Director “Mr. Chair we track code enforcement violations using the same process and software that we use for building permits - that being Civicgov. We track it on an address by address basis. Our code enforcement process operates on a complaint basis, unless it's something that's easily seen by a member of city staff out in the field. Therefore when we field a complaint or receive a complaint, we respond, we conduct an investigation, and respond appropriately under the legal process defined in Statute. But again, that system lives within the Civicgov software that we're using for all of our other permanent processes currently.”

Chairman Dowd “Times up.”

Laurie Ortolano “Thank you.”

**2:56:12**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. I have just a quick question. I'm wondering how many DARE officers or how many officer we have that cover our public schools in Nashua. I'm wondering how we handle how we document fights or issues in the schools. I'm concerned about the high schools because they have to cancel the F Block. And how is that documented either by the School District or the Police Department? And then I have a couple other questions.”

Kevin Rourke, Police Chief “We currently have two school resource officers - one at North one at South. If there is an incident at the high school, the school resource officers are responsible for documenting.”

Laurie Ortolano “And I'm wondering - I know at one point we had a fully staffed Police Department. We had all the positions filled and I know that sort of a rarity. Where do we stand now with staffing and filling positions for the department?”

Kevin Rourke, Police Chief “Last July we were at full staff at 179. Right now we're between - short 10 or 12 officers. We have a couple of pending retirements.”

Laurie Ortolano “And I know last year a lady addressed the overtime budget and the amount of money that's put in overtime versus regular staffing. I'm wondering if we could get a little bit of information on what's going on with that overtime budget where we stand on it, what is using that overtime budget, where does money come from if you're investigating a homicide. Have you seen more incidents of that kind of thing?”



DRAFT

**3:10:56**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I too am very concerned about where our schools are moving and how our children are being educated. I think we're really in a crisis not just in Nashua but in this country and we're failing these kids. We're charging an awful lot of money to do that. This contract that was voted in, you know, we look at the performance of our students and it's very average out of 150 districts we're down in in mid to lower range 100th level. Nothing to write home about but we turn around and say that our raises to our staff have to be, you know, much better because they deserve more and this is what kills us all. I want to fund success. I don't want to find failure and Mr. Mayor you wrote in your record in your mission and goals statement that you support strategies to ensure that all of Nashua's children reach their full potential. This falls right in line with Christina's question about what we're doing to get kids to their full potential. Exactly what strategies do you support?"

Chairman Dowd "Is that a question for the Mayor?"

Mayor Donchess "Well, again, I don't run the School Department but what I support is an excellent education for every student in every school every day. Now I think our teachers do a very good job. I mean the scores across the country are down. I don't think - I think our schools are doing a good job by and large in educating Nashua children."

Laurie Ortolano "I'm also very concerned that we were a district that was closed longer than most any district in the State when it came to COVID. The consequences of that was perilous send our kids. The catch up and the loss in education is enormous and Nashua is affected by that more than other communities."

Chairman Dowd "One minute."

Laurie Ortolano "There was another question I had regarding education. The School District had to cancel the F block in high school. The F block is the block where students can go and rotate through the building to speak with teachers, students who need and want support in tutoring to assist in any subject matter that they're having difficulty with. They had to cancel F block in the high schools because the fights were so severe they couldn't let the kids go through the hallways. That's a real loss to public education and our teachers are being paid for these tutoring services that can't be delivered under an entire 90 minute block because we have safety issues in the hallway and we can't let our students move through the building."

Chairman Dowd "Time."

Laurie Ortolano "I think that really affects the quality of our education and I think we're missing something here."

**3:30:38**

Laurie Ortolano "It's unclear to me how these funds ended up in the spending cap calculation and it just seems to me that there's really no purpose in a spending cap right now because when you can run a calculation and show taxpayers that your 130 million under it, you know, that we could have spent $113 million more and been within our financial responsibilities of what a spending cap is all about, it's absolutely absurd. The spending cap has been blown away because the feelings of the administration is

the legislation isn't written clear enough to delineate what can and can't be in it. I think one of the big concerns I have is the word "total expenditures". I contacted the DRA to ask if there is a DRA definition of expenditure and there is not. That is a very undefined term and it leaves a door wide open as to how you interpret what expenditure means and total expenditure. The city has chosen to interpret it to mean all of these grants, all of these bonds, all of this money that wasn't considered that type of expenditure in the past.

"So, you know, I really hate to hear the discussion of the need for litigation and going to court. I'd like to think there's compromise and when I hear the Mayor say he agrees it doesn't belong in there but the law is allowing you to do it. Well the law is not preventing you from not doing it and you have a choice. If it doesn't make sense to you or it doesn't seem reasonable as a method to handle taxpayer money, then you shouldn't do it. Your hands aren't being tied by this.

"I did ask can anyone tell me how other cities with spending caps or tax caps are - I did ask to set another meeting - are handling these types of special accounts? Does anyone have any information on that?"

Chairman Dowd "One minute."

Laurie Ortolano "No?"

Chairman Dowd "It doesn't appear so."

Laurie Ortolano "Okay. Well I think that information would be good to understand and maybe other, you know, communities are thinking exactly the way the Mayor is that this doesn't belong here and they're not applying it. But you're recognizing it doesn't belong here and saying I'm gonna stick it in there anyway and essentially stick it to the taxpayers. I think it's wrong."

**BUDGET REVIEW COMMITTEE JUNE 22, 2022**

**https://www.youtube.com/watch?v=ZQbtBDVJmU8**

**2:48:19**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. I shared a little bit of a story last night living over in Litchfield and attending deliberative sessions and how the sessions worked in a small town of 7,000 with a budget of about $13 million. The public would get together. There was usually quite a lot of interest. Fill a school auditorium and the process of deliberating, discussing, and asking questions about a budget went from 9:00 in the morning until 3, 4, sometimes 5:00 in the afternoon. You had wide variety of people at the microphone - long lines in fact. It wasn't the same people talking and very often if you had a list of questions, somebody else was asking your question, or getting an answer which helped you in understanding in getting the information you were looking for.

"When you go to a Nashua budget hearing and there's only really 4 or 5 people that are participating in it, I thought that the Chairman showed an extreme amount of frustration and disrespect to the citizens who showed up because we kept coming to the mic and he didn't appreciate it. He changed the rules repeatedly, which I think was in violation of how a public hearing is to be done and I drafted a letter to

DRAFT

the Attorney General's Office today to have a discussion with the State about what's happening down here and our hearings.

"It was just so disrespectful and attacking to have a Chair say, "You've come to other meetings. We're sick of you. We're tired of you being around. You've already asked questions. We don't want to hear from you anymore." Most of the public comments at the meetings are just only public comment and not questions to be answered. The hearing was the one place I could come and to be shut down for addressing the spending cap when in fact Alderman Dowd…"

Alderman O'Brien "One minute."

Laurie Ortolano "…at a public meeting stated the spending cap could be discussed at the hearing was just really discouraging. So this City and the leadership of this City – the old guard - needs to go. It certainly doesn't respect (inaudible) government. The document that Jonathan Cathey referenced a large stack of Right-to-Knows tabulated with a cover sheet that explained how the City treats Right-to-Knows…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…I would like to a copy of that document as a formal Right-to-Know request publically. I want that because I think that's what the Mayor was referring to and that person that seems to take a lot of criticisms, I actually don't have that record. I'd like to see it. I'd like to study it and I agree with Jonathan Cathey that we're abusing what a Right-to-Know request is. Thank you and thank for the work done by the Committee tonight."

**Board of Aldermen Tuesday, June 28, 2022**

**https://www.youtube.com/watch?v=rM0G-vjVK5Y**

**12:27**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm on the phone so I can't raise my hand. I wanted to call in to put in my lack of support for the budget for this year. I'd like to see that budget trimmed down some more. I think the Board needs to be mindful of what's going in the economy and I think the lack of information regarding the assessments has made it difficult. I'd like to point out that the City has been very secretive and non-disclosing regarding the depreciation factor issue that was called out a few years ago and they were working on decoupling depreciation from affected year bills to addition. I have asked for some reports on the effects on that because it's going to affect older homes. In four years, there's been no report given and I think that when the Mayor talked about the potential shift of 2.5%, or 5%, whatever it's going to be onto residential properties because of the deduction and lack of growth in commercial properties, you've a shift associated with the depreciation factor as well that has not been discussed. I think we should have full disclosure on that.

"I'd like to talk to you for a brief moment about downtown. I saw there's an intern being hired through Downtown Improvement Committee. I don't know if that intern is going to gather data but there's been a group gathering data for two months on the restaurants. I think that it's pretty clear that the use of the expanded outdoor dining does not justify…"





DRAFT

Alderman O'Brien "One minute."

Laurie Ortolano "…(inaudible) for setting it up. It's been very light down there. Your Saturday night is your busiest night. There are primarily three or four restaurants that I think have benefitted from it but you've got these barriers up to service 25 restaurants and there are just no people there even on a beautiful night. It's extremely light and I really don't…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…understand why the barriers are down there. Anyway thank you for your time."

**Board of Assessors June 30, 2022**

**https://www.youtube.com/watch?v=ZpCtATZhmy0**

**11:18**

Laurie Ortolano – 41 Berkeley St. – She was inquiring as to the % of Income & Expense statements that were returned. Ms. Ortolano was looking for information on the depreciation of effective year built on older homes, as well as, looking for answers to the email she sent the evening of 6/30/22.

**The following was transcribed from video by E. Vassar on March 15, 2024**

"Laurie Ortolano, 41 Berkeley Street. I sent an email back to you last night with some questions that I was hoping to have answered when/if Vision comes and does another update. I wanna know what the entry rate was in the end for commercial and residential property. And whether the entry rate changed after 2021 when (inaudible) …after the COVID issue. Laura? Laura, can you mute yourself? Thank you. I'm getting a ton of feedback. Okay, so I wanted also to know how many income statements they received back and if they sent those to all commercial, industrial, rental properties to collect income data. What was the return percentage on those? Because I talked to Nashua reps about working legislation on that issue, and I'd like to get the data to understand what exists.

"The measure list was spoken about in the 2019 Board of Aldermen meeting in August, and there were a lot of questions raised, a lot of points raised by the Mayor during the discussion, and he was unsure that there was anything wrong with the data. He knew it had been, ya know, 27 or 28 years since the last update, and that it seemed like it was time, but he didn't really believe that there was necessarily anything that needed to be corrected. And I think at this point, now that we've finished a four-year process, it's important that we look at what we found or didn't find, because in that meeting in August 2019, my husband and I spoke against the measure list, primarily because we wanted to see the office stabilized, and we believe the problems with consistency and data was happening because of deficiencies in the office. And since that time, I would say the office has deteriorated more. So we don't have the stability in the office, which I think compromises the data.

"We went through a million-dollar project, which was expensive for the taxpayers, and I think we should be able to sit back now and come to some conclusions about whether it was a reasonable thing to do or an unreasonable thing to do. And I'm all for pushing on the State, the DRA particular, to abolish these measures and lists if they really don't yield any results, because either, one, you don't have entry, or there's largely nothing found because there isn't entry.





DRAFT

"A big issue for me is the depreciation of, the decoupling of depreciation from effective-year building, coupling it to condition. There was a lot of talk about that. And in four years there hasn't been a single update on what has happened with that. And I would like to get data on what that showed, because the Mayor has spoken about the shift to residential properties, on the tax burden, because of the differences in value increases on those two types of properties, with residential growing at a more rapid rate than commercial - substantially more rapid – and that that's gonna shift the tax burden to the residential properties, and I understand that, but he has not addressed the depreciation issue on older homes. And I believe Nashua has a significant group of – number of properties that are certainly 1960 or earlier. And I think we have a responsibility to understand if there was a problem there. And I will certainly do the data dive, but I would like to think that Vision has the capability of reporting to us on what they found, what the impact is on some of these homes when depreciation is set to condition and what the shift is on properties for that.

"I was also, I think I emailed you, I was completely disgusted by the comments in the Budget Hearing by the Mayor, that he would never had done a measure list this year, now, if it hadn't been for the State forcing us. Ya know, I hate political football games, and I see this mayor running for office again, announcing his candidacy, fundraising for 2023. And now that the economy has been… taken a skid, inflation's running high, costs are pressuring all citizens, he's suddenly not on board with this anymore, and he never wanted to do it. And yet, I think I sent you the link to the 2019 minutes, uh meeting, where Attorney Bolton, speaking for the Mayor, stated that the City's intentions were always to do a measure list for 2022. Suddenly now it's not right. We could only have gone until 2023. And I was always under the impression that the State, the DRA and the BTLA granted the 2022 date because it was the request of the City. They did not issue an order in August. The order didn't come out until, I believe, October. I always thought the State worked cooperatively with the City to pick that date and grant four years of time to rework the revaluation. And I thought I was very reasonable. I see this mayor lining up to blame the state, blame the citizen, and walk away trying to be squeaky clean, that he had nothing to do with this. And that is just such poor leadership. This man has no business serving as our mayor, and quite frankly, I find him a boldfaced liar. And I'm tired of it. So…"

(time warning)

Laurie Ortolano "…So I hope you're able to get me some answers. Dan, when you talk, you gotta go into the microphone. Because you cannot be heard with your mask on."

Mr. Hansberry "Mrs. Ortolano, your time is up."

Laurie Ortolano "Okay, thank you."

**FINANCE COMMITTEE JULY 6, 2022**

**https://www.youtube.com/watch?v=yVNm_jW2a9M**

**0:07**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street I have one quick comment about the first couple of items that are being presented on the Riverwalk Project that's being done. I know that's a TIF project and I'd like to know what the plans are for the City or what your plans are Mayor Donchess to allocate



DRAFT

funding for TIF? Have you set any boundaries or limits on how much money you want to see scooped up downtown that's put into tax incremental financing initiatives? My question is, I think my understanding is, that money that's allocated specifically for downtown is not in the used to calculate rate for the public. So it does raise the tax rate for the general public when that money is pushed off. Concord has a very heavy number of TIF districts but they also have a very high tax rate. I want to know what your limit is or what your boundaries are for creating TIF districts and rolling properties into it. Thank you."

**44:24**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to talk to you tonight and get some help from the seated Aldermen regarding the Performing Arts Center. This organization was set up when the new market tax credit money was received with two entities that are managing that art center - 201 Main Street Realty and the NPAC. NPAC is I believe for-profit and 201 Main Street Realty is non-profit. What happened when we did that is that was a very complex financial deal to try and obtain this $2.5 million that we were looking for that we were unable to obtain through fund raising in the early phases when we were building the art center. The early commitment was it was a $15 million bond and we would obtain $2.5 million of money or donations from the public and that didn't come to fruition. The bond amount went up to $25 million and the City started exploring other options to get money.

"My recollection is they found this finance vehicle through the federal government called the "New Market Tax Credit" which could be used for banks to buy these - to receive deep tax discounts to invest in this facility and we would receive $2.5 million from it. So we set this up and in order to do this very complicated deal, we had to set up two companies. These companies I have been trying to find out if they are subject to RSA 91A open records laws. I believe they should be. I believe they should be because they have at least 80% of our taxpayer dollars were given to that facility. Ordinarily the RSA 91A would specify that entities that receive substantial amounts of taxpayer monies must be subject to the open records law. Now RSA and State Statutes define that for BIDA - business industrial development authorities. They're called out as 91A compliant businesses even though they are not operating within the City itself because they co-mingle with the City and they co-mingle with projects. The Nashua Housing Authority is another organization, the Airport Authority is another organization, and we all know public utility companies are public entities and we can obtain those records. Bills on our neighbors' accounts we can get, building costs, housing costs on any house you're going to buy, open public records. So I really believe the City should have set up these two entities as public RSA 91A open entities but I'm not certain they did. They're not willing to answer me."

Alderman Comeau "30 seconds."

Laurie Ortolano "All the leadership has shunned me but Rich Lannon who is the President of both entities wrote to me a week ago and said our meetings are public and said there were three meetings held between December and May that were public meetings. The problem is they weren't properly posted, noticed, and the minutes were never generated. So they were in violation of the law and we are still struggling with Tim Cummings putting records out inappropriately and not following 91A. So I'd like one of you to find out…"

Alderman Comeau "Time."

Laurie Ortolano "…if this is in fact a public entity and help me figure this out. Thank you."

**Board of Aldermen Monday, July 18, 2022**

**https://www.youtube.com/watch?v=GEGf3GS5RDg**

**34:37**

Laurie Ortolano "Laurie Ortolano, 41 Berkley Street. I just wanted to make a comment. I think that (inaudible) that ordinarily would be addressed (inaudible) is a detriment to (inaudible). The special meeting I think (inaudible) City Clerk position I'm not certain. (Inaudible) I've noticed this individual is a fairly young person and he's coming to a City that I think is very corrupted and working for a Mayor that I think is really unethical, unscrupulous, a liar and I've had to put in a lot of law suits involving records and the lack of openness for records. Some of the issues have stemmed around the Clerk's Office, so I'm very concerned about this because I think there needs to be a lot of changes made in that Clerk's Office and I think not having somebody certified for three years was a problem. I think a good number of our policies are outdated. When a citizen comes to the Clerk Office and asks to inspect records and is told they're not there and then asks well do you where they are? The answer is under RSA 91-A, I don't have to answer questions. It ensues into an argument at which point it then is revealed that the records are in another part of City Hall and you're told where they. I don't think those fights are necessary to have. I don't think that's compliant with the law. This is a City that violates open records frequently. I spent the weekend working on a pro se lawsuit. That's the biggest one I've filed so far. All on record issues. I'm disgusted. I'm just disgusted that this is what it goes to and it never stops. So I hope this new Clerk has the gumption to make change but I have seen this Mayor ruin many careers on good people. When I see somebody young stepping into the seat, I'm thrilled but I'm also concerned because this City is a career buster. So best wishes to you, I hope you're dynamic and manage our records like they haven't been managed for quite some time."

**FINANCE COMMITTEE JULY 20, 2022**

**https://www.youtube.com/watch?v=OvwbDCBwcEA**

**0:55**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Good evening. I saw some communications in the packet that Mr. Cummings is bringing forth information on the Riverfront Project and a few other things. I want to express my concerns with him as an employee of the City and maintaining and performing any work on any of these projects. He is unfit to do that kind of work. He is over assigned. He is deeply in violation of the law when it comes to Right-to-Know and open access to meetings and information. He shares an office adjoining to the Mayor and the door is always locked and closed. He does not consider himself a public servant and he will not make himself accessible to citizens at all. I've been to City Hall for three years and I have never seen that door unlocked and opened. I've never been able to knock on the door and get anyone to open the door. My access to Tim Cummings is always through the Mayor's Office and the staff there has been hesitant to be of assistance as well. Recently you just had a new hired person Jen come in and her customer service and friendliness has been greatly improved in one week. I'm talking about one week. But really for two years it's been horrendous. I think Mr. Cummings is just a completely obnoxious, arrogant man and he doesn't…"





DRAFT

Mayor Donchess "Miss Ortolano this is not the purpose of the Public Comment. You're address issues before the Finance Committee. You've still got a few minutes. You cannot come on - it is not proper for you to come on here night after night and just lambast all the employees with all the scurrilous comments. It is just not appropriate. It's not appropriate."

Laurie Ortolano "You need to shut your mouth. Shut your pie hole Mr. Mayor. This is my public comment and I'm addressing not every employee. I'm addressing Director Cummings and I have been in a very difficult situation trying to get information from him. I sat in a December 15th meeting with him."

Mayor Donchess "You know I think we're going to have to propose some kind of rules for Public Comment."

Laurie Ortolano "I think you're going to have to."

Mayor Donchess "The swearing, the profanity, the name calling. It is not appropriate. Pie hole, criminal, all this kind of stuff is not appropriate."

Laurie Ortolano "I would agree with you. Shut your pie hole. Shut your pie hole."

Mayor Donchess "It degrades the Board of Aldermen, the City, and the public discourse."

Alderman Comeau "30 seconds."

Laurie Ortolano "Shut your pie hole. Shut your pie hole."

Mayor Donchess "And you're certainly proving it now."

Laurie Ortolano "And it's not profanity. You keep talking about profanity, and swearing, and all the things. I don't see your public coming out and doing that."

Mayor Donchess "Madam you call a woman lawyer in the City with the "c" word in a public meeting. So you need…"

Laurie Ortolano "I described her behavior…"

Mayor Donchess "…to become more appropriate."

Laurie Ortolano "I said you're – Attorney Donchess. I referred to…"

Alderman Comeau "Time."

Mayor Donchess "Your time is up Ms. Ortolano."

Laurie Ortolano "…of having…"

Mayor Donchess "All right."

**17:47**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Mr. Mayor you made mention in the first Public Comment that you though perhaps a new public policy should be adopted because of all the swearing and cussing going on during Public Comment and I found that not to be truthful or really what I see going on in Public Comment. But then you brought up the fact that I referred to Attorney Leonard with

the "c" word. So you opened the door for that discussion. That happened about a year ago and I really think that if you, or the City, or the Aldermen, or the Board of Assessors had been really bothered, you would have changed the policy and you should have if you felt that way. But what I think is fair to say is it wasn't a continued behavior and I think today is the day for me to speak to why I said that and what the meaning of it was. I never bothered addressing it because it just wasn't worth it. I didn't refer to Miss Leonard as a "cunt". I referred to her, her behavior as having the cuntiest behavior I'd ever seen. That is a little bit different."

Mayor Donchess "Miss Ortolano we don't want to use profanity and these words that are so degrading to females. It's just not appropriate. We've got people walking out of the meeting right now because your discussion is so offensive."

Laurie Ortolano "I asked to speak to that. I think you don't understand the meaning of that word. That is a very common expression in British television and it's used to describe men more than women. I watched a show and it struck a note with me. I've heard before used and in British language in television it refers to something distasteful or you're really irritated by it - bad behavior - and most of the time it's men they talk about. You can look it up in the dictionary and you can find that reference. That's why I threw it out there. I was talking about my arrest at City Hall, which was a very personal and emotional issue to me.

"Now I don't care if people here that word and want to walk out because it's a degrading body part because there have been a lot of woman movements that have taken it away but I didn't say that to refer to her genitalia. I'd say the same expression to describe you and Attorney Bolton. It fits perfectly but nobody would have understood that. I actually thought Dan Hansbury might because I thought he was a bit on the English side…"

Alderman Comeau "30 Second."

Laurie Ortolano "…but he did not. But when you open the door to bring that up in a public meeting and bring up all the swearing and cussing going on, I don't see that that's been the case and it's another lie by you and misrepresentation and it's exactly what I expect from you. Thank you."

**Board of Public Works, July 28, 2022**

**https://www.youtube.com/watch?v=qtZ0k-fRBsQ**

**7:15**

Laurie Ortolano "Yes. Laurie Ortolano, 41 Berkeley Street. I didn't know disc golf was on the agenda. I looked at the agenda and I didn't think this was a topic being covered today. Is it being covered?"

Mayor Donchess "No, it's not."

Laurie Ortolano "Well, I don't know why everyone got to talk about it, but since they are, I'll join in, because I intended to cover it at the end. But it became an issue at the beginning. So, I think the people who are for it, I understand why. I think the process though that the city used to vet this was not correct. And we need to do a better job when we're going to change our parks, and particularly a park such as that, that has such high utilization and 50 acres of beautiful area, including wetlands. That

before we make a major change, that there is plenty of dialogue that goes on with the citizens of that neighborhood and the community. And I just don't think it happened here.

“I was one of those people that filed a report with the DES. And I didn't think it was right walking it. My husband and I walked it and didn't think it was right. We met people who were shocked at what was going on. Hearing some of the expert Board members say, I have a master gardener degree and I can tell you what this and that are all about. Well, not really. The DES did have a little different perspective. And there was no erosion mitigation going on when I was down there until I told them. I filed a report. Days later the erosion mitigation went up. I just think we don't do the best job when it comes to public relations to building consensus and we don't recognize the value of functional conflict.

“We don't all have to conform to the same idea. We can disagree and we can vet things to come up with solutions that hopefully give some satisfaction to both sides. It can't always be done that way, but it certainly, there's no chance of it being done that way when you don't reach out to both sides. And I think this happened too quickly and was unvetted. I'm a big supporter of an overall Parks Group through the Board. I don't like the fact that a Greeley Park Advisory Committee was formed for Greeley Park. I think there should have been an overall Parks Advisory Committee formed that encircles all of our parks and allows the Conservation Commission to have a bigger voice, embedding what is going…”

Mayor Donchess “30 seconds remaining.”

Laurie Ortolano “-with Parks and Rec. That's all I have to say. Thank you.”

**Board of Aldermen Tuesday, August 9, 2022**

**https://www.youtube.com/watch?v=DkE_6mlpBUI**

**21:24**

Laurie Ortolano “HI. Laurie Ortolano, 41. Berkeley Street. I'd like to speak in favor of maintaining Zoom as a platform and interface for public to participate in all of your meetings. Right to Know New Hampshire is a big supporter of this interface and most of the legislation we backed last year contained language to maintain or expand Zoom as an interface for communities to grow their participation. Mr. Gouthro was correct in the legislation that was enacted in Massachusetts to expand it and I know the New England First Amendment Coalition is strongly behind using this platform to increase community participation.

“I think when I read the letter on the costs, I think it's pretty nominal given all of the items in the budget and the type of programming we're doing in this city to allow that interface to, you know, improve and be maintained. I would certainly like to see that Zoom interface brought over to the schools side. Frankly, their meetings don't have it and that is rather shocking. I don't think their participation is as good as it would it be if they had Zoom because they run their meetings at 6 o'clock, which is a very difficult family time if you're doing dinner. I know many people who haven't come out to school meetings because of their family commitments to have a meal on the table and that's the population that does have kids. If they want to have a family meal, it's right at dinner time.





DRAFT

"So I'd like to see Zoom expanded. I'd like to see the investment made into it and I'd like to see the Board understand the benefits you've gotten from it because I think we've had quite a few older citizens dial in…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…to participate because, you know, it was a lot easier than them coming out and particularly in a New England climate in the winter and the cold. Zoom affords everyone a really awesome avenue to be part of a meeting. So I hope that you would support continuing the use of it and embrace the broader involvement you get in your public meetings through that interface. Thank you."

**1:56:28**

Laurie Ortolano "Hi. Laurie Ortolano, 41 Berkeley Street. I would like to ask the Board to consider when you have legislation being brought forth by the Legal office, because often it's drafted by them, and that legislation is relevant to forming a new committee, or a board, or advisory group for the city I think it's very important to have that analysis section defined whether that board is a public body under RSA 91. A. I've been able to see that other municipalities do that and I've learned that we, in fact, have done that. My concern stems from the fact that you formed two RSA 162-g nonprofit organizations to handle and address the New Market Tax Credit for the Performing Arts Center and it was coupled with the NPAC Corporation which is a for profit. Collectively, it formed a joint committee. The analysis provided by Attorney Leonard said that those two nonprofits under RSA 162-g and RSA 292:1 constituted a public body - a public corporation. But it seems that no one in the city, the agencies of the city, the divisions and departments, know what that means. The Legal office doesn't provide advice to citizens, I get that. But when a citizen goes to the division or organization, they should know that otherwise how are you distributing records for this Performing Arts Center which is controlling probably upwards of $30 million of city funding from taxpayer dollars? How is that being brought to the forefront for citizens to have access to information regarding that money?"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "You know I'm really disappointed that these kinds of things you have to put into a lawsuit. I'm almost done with that lawsuit and I'm going to ask the Judge to rule on the public nature of the joint PAC committee, the public nature of the Capital Campaign Committee, the public nature of the Nashua Community Arts nonprofit, as well as a lot of violations that have happened with meeting minutes not being posted, meetings not being noticed…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…and not being responded to. In the future, I think it would be enormously helpful when legislation comes forward for a committee, or an agency, or a board, or subcommittee that you have Legal define how that committee operates. Thank you."

**Board of Public Works, August 16, 2022**

**https://www.youtube.com/watch?v=ZBtaAtwzu8I**

**1:01**



DRAFT

Laurie Ortolano" I just have a couple of things. I saw on the agenda –"

Vice Chair Moriarty "—okay."

[Instruction by CCTV-You're going to need to sit at the table.]

Lisa Fauteux, Director, Division of Public Works "Do you want to come sit here?"

Vice Chair Moriarty "Again, we'll need your name and residence."

Laurie Ortolano "Sure. Laurie Ortolano, 41 Berkeley Street. Just on the agenda, what do we have? We have downtown, West Pearl, School Street. Is School Street the TIF district? Are we going over that or? Okay, so—"

Ms. Fauteux "--correct—"

Ms. Ortolano "--Well, if we're going over the School Street TIF, I would like to understand a little bit about how that TIF is set up. It's set up under R.S.A. 162 K, and I feel we're not overly compliant with that when we do the setups for these TIFs.

"I'm also concerned with School Street that that group has not been formed or met yet and the TIFs been in place for over a year, maybe 18 months, and I think that a meeting of that group of interested stakeholders ought to take place. I think the stakeholder group on that TIF is in question as well, because you're supposed to pick people from the neighborhood who either reside in those buildings or are abutters and the way we organized that TIF Advisory Board was that we picked three people out of City Hall who are not really residents. They're just employees and Director Cummings also serves on it, but he also serves as the administrator to the advisory board and I think that's a conflict.

"So, I'd like to understand a little more about what is going on with that TIF and that School area. Yeah, and the rest of it I'm just hoping to get a rundown on what's happening, that's why I came. Thank you."

**Planning & Economic Development Committee, August 16, 2022**

**https://www.youtube.com/watch?v=zAsyXpxkn5Q**

**1:51:45**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to talk a little bit about public information and access to public information. I filed a pretty big lawsuit last night against the City on economic development issues and one of them is the NPAC. I think when you develop those two non-profit corporations under RSA162-g, you had an obligation to disclose what that meant. So Attorney Leonard drew up that Resolution. In the analysis section, she copied the language right out of RSA162-g and she said these non-profits are body politic, public corporations.

"The Attorney General's memo on Right-To-Know states that for 162-g and a host of other RSA's, that it's up to the municipality to decide how the State Statute RSA 91-a applies to that. Now 162-g is what describes Business and Industrial Development Authorities of which we have one which is a fully public entity. Dover's Business and Industrial Development Authorities, their bylaws and regulations they call

out 91-a. So does their website page. I fully believe that these two non-profits are 91-a companies because they're profit companies. They're public companies rather - non-profit public companies.

"Attorney Leonard would not define that. She didn't carry her duty to disclose far enough to say what those entities were and then they played the game the Legal office we're going to hide behind attorney/client privilege. We can't tell the public. I'm okay with that to a certain extent as long as they told you and you can tell us but they didn't tell you. Nobody here seemed to know and couldn't define it. For eight months I asked the same questions over and over again - Is this an RSA 91-a compliant entity and what information is available? I got the runaround. That's how lawsuits get filed. I don't think that we should have to do that and I think the way you operate in the dark on this art center makes it look very shady. Really inappropriate. I think those records should have been open. Now I've got to start a flood of Right-To-Knows that are part of discovery for this lawsuit which I haven't done a lot. It's not my choice to do that. It will take me a couple hundred right-To-Knows to peel this open and figure out what's going on because I don't have somebody to talk to. I don't have anyone I can communicate with. I have to write Right-To-Knows now. It's really unfortunate."

Alderman Thibeault "30 seconds."

Laurie Ortolano "You couldn't understand my frustration weeks ago when Director Cummings and what's going on here. Nobody could understand it. If you took a look at that lawsuit, you don't have the 334 pages of exhibits that went with it but I put an enormous amount of time into that and I've got several more to file. It's a lot of work. It's not my preference but I don't like the way you're operating and I wish you'd do something about it. You all have a responsibility to do that. Thank you."

**FINANCE COMMITTEE AUGUST 17, 2022**

**https://www.youtube.com/watch?v=c3eQh1YKa5M**

**51:31**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'd like to talk to the Committee about as projects roll into the table to you. I think that bonding of large projects should go on hold at this point. I'd like to see the brakes put on a little bit on the spending, and get the new tax bills out, and look at the tax rate, and let's see where we're at and how are senior citizens are doing with their money when things change.

"I'd like to talk to you a little bit about information flow in the City. I would like the Mayor to be more proactive in trying to open up avenues and set up methods whereby questions raised to the City are being handled through a central location. I tried to address this in the budget hearing and I pretty much got run over by you Mr. Mayor. You did a pretty good job demolishing me up there for my Right-to-Knows but I really feel that there should be a central location where Right-to-Knows are handled. I just submitted a lawsuit where I'm showing a judge that I am sending up to 6 and 7 people at a time and some of them are violating the law because they're not responding. I'm sending it to all of them because I'm trying to figure out who has the information. I'm telling other people now when they send them in to do the same thing. You don't have that problem when you go to Manchester and other cities because it goes through the Clerk's Office and it's disseminated. It makes it very difficult for us to track and it





DRAFT

produces a lot of paperwork for the City as well. So it's a very frustrating process for me and I don't appreciate it.

"Then the City is very active in throwing my reputation down to the ground because I've done this work and I've done it in this manner and it's been bothersome to you when you haven't done anything to make it efficient. I am very concerned with your Legal Office. I feel two of the attorneys should be disbarred. I've filed complaints with the Professional Conduct Committee at the Supreme Court and I'm going to continue filing up there. Attorney Bolton tried to have me arrest on the 22nd of July wrongfully, I believe, and the City isn't going to stop until they arrest me in City Hall and you're going to succeed at it because all it takes is one Officer who is not well-trained who turns around. One of your people dog whistles the Police for handcuffs on me, it's going to happen. I'm not looking forward to that and I try to not make that happen but when I see and I get the police logs of the calls that are coming in…"

Alderman Comeau "30 seconds."

Laurie Ortolano "…it's a problem. Attorney Leonard I feel really violated her oath and her duties to disclose what was going on with the Art's Center. I also feel that when she lied to the Courts about the emails of Miss Kleiner's emails in July of 2020 that was sanctioned and paid to me in January of this year. That quite frankly Judge Temple should have reported her to the Professional Conduct Committee and my Attorney Rick Lehmann should have. They didn't do it so I'm doing it but it's frustrating."

Alderman Comeau "Time."

Laurie Ortolano "Thank you."

**Personnel/Administrative Affairs Committee, September 6, 2022**

**https://www.youtube.com/watch?v=po27qBt2av4**

**1:24**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I know tonight you have a couple ordinances that you're looking at to change the way public comment is handled for the City and I'd like to address that. First of all, I'd like to make you aware that there have been six changes to public comment or accepting public documents by this Administration since 2015 and I think that is a lot of change. In 2015, it was changed that citizens couldn't speak at the first comment regarding items not on the agenda. It used to be open for that. That was eliminated. Then public comment was allowed for 15 minutes. If no one showed up and somebody spoke 15 minutes, they could use the 15 minutes. That was changed and no longer allowed. If only one person shows up, they get 3 even though the time is 15.

"We currently have legislation in place here tonight to limit what people can say and allows the Chair to interrupt them if they're not happy, which is already happening by the chairs of committees. The Mayor has proposed legislation that both public comment periods can only be relative to items on the agenda and I don't think that's listening to your public. Miss Wilshire and the rest of the Board cut Zoom out for citizens but is paying for the committee members and elected a people to have access to Zoom. The cost of that was portrayed as $11,000 which is minimal given what's going on here. President Wilshire

appears to have stopped allowing public communications in Board packets. That's no longer accepted and I'm unaware that was a Board vote. It's just been eliminated from the agenda.

"I think this is a lot of changes that are really showing that this Board doesn't want to hear from the public and I really believe that these changes to public comment are happening because of me. I think I'm the one driving those changes and I think it's unfortunate. I think I had a bad run in the last June at the Public Hearing and in July when at the Human Affairs meeting I was cut off by Mr. Lopez. Then in the Finance Committee meeting, I was cut off by the Mayor. The Mayor unfortunately decided to bring up a word he found distasteful that hadn't been uttered or discussed in 12 months and nobody here on the Board bothered to ask why he did that. I now fully believe that he did that so he could introduce this legislation that would now cut public comment because we can't allow these things to be said. I don't know why it wasn't a problem a year ago and why you didn't address it then but we have had citizens…"

Alderman Thibeault "30 seconds."

Laurie Ortolano "…we've had board members say things that are very unsavory. Vice-Chair talked about screwing the pooch in a meeting. Nobody flinched. Patricia Klee talked about throwing the finger to the Court. Nobody flinched. Alderman over here talked about whiny white bitches when she was on the School Board. Nobody flinched. Nothing was done. I don't know why the public is penalized when the conduct of the Board should be in question as well. Thank you."

**1:08:28**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple of things. I'm really concerned what I heard Alderman Moran say tonight. He mentioned and I wish the Mayor hadn't walked out because I looked right at him and asked him questions. That if you have a concern, take it up with the Mayor. The Mayor has never been willing to address me since 2018 when I tried to reach out to him with my property assessment issues. He wouldn't meet with me. He has never accepted any level of communication from the very beginning. I know the Nashua Police Department always said to me we don't understand why he didn't do that why he just didn't try to address you.

"In 2021, I had an Alderman ask me to come to a meeting at the Mayor's office to discuss TIFs and the art center. I was really interested in it and they said come along, I'm having a meeting with the Mayor. When I got to the door, I was told I couldn't enter. I was told by the Alderman that the Mayor viewed me as a liar and I wouldn't be given entry to his office. I've never been in the Mayor's Office so that doesn't exist for some of us.

"I also found your remarks saying that this was a very well run City since the Mayor has taken over it's very well run. You get to have that opinion but then you said and you referred to the public as the public spewing alternate facts. What a disrespectful way to speak to the public. We don't necessarily spew alternate facts. We have an opinion that's different than yours. It's really my opinion is based on some level of experience or participation. I've never gotten to talk to the Mayor. I bet you have quite a bit more than I have.

"I'd like to know from the Mayor in the Finance meeting why he brought up the "c" word. Why did he even go there? I'd like to know from the Mayor why he said that "pie hole" is a swear word? I didn't even know it was. Is that one of the vulgar terms that can't be said?





DRAFT

"I'd like to know in the Finance Committee meeting when I went through a significant number of issues that I was concerned about with Tim Cummings - his door never being open, him being overscheduled, him not having records available, finding him to be very arrogant. He was at a meeting presenting information on Finance. This guy manages $100 million of money. I was cut off sharply and told we're not going to listen to these scrofulous remarks out of you. Well why not? Then the Mayor took over my public comment for two minutes. He would not give me the floor back until Alex Comeau said times up. I had to sit down. Why did I lose that?"

Alderman Thibeault "30 seconds."

Laurie Ortolano "It's not right and so I think a lot of what's gone on here today has been targeted to me. I have asked this Board to go into non-public session and the Chairwoman to go into non-public session when you discuss issues about me. In four years, you've never been able to do it not once. I've listened to myself spoken about – bankrupting the City, costing hundreds of thousands of dollars, being vindictive and retaliated, impersonating a City employee. All this has been done in public eye."

Alderman Thibeault "Time."

Laurie Ortolano "I don't think I get the courtesy that I think I deserve."

**CABLE TELEVISION ADVISORY BOARD 09/09/2022**

**https://www.youtube.com/watch?v=qKpiAKcwGjs**

**1:31**

Lori Ortolano "Laurie Ortolano, 41 Berkley Street, just a couple of things, I know this is all getting started, I just want to give my two cents on how important I think balance is in broadcasting. I think when we have a two-party system in this country, we need to listen to both sides and have representation from both sides. So, I really think we all benefit by that. I would like to request, more televising of our public meetings. We have a lot of different meetings that are not regularly scheduled, like our tax incremental finance district, our performing arts center, our downtown improvement committee, and those are... Downtown improvement is more of a regular meeting, but the other two are more periodic.

"I think those are high public interest, activities in this events in this city, and I think it would be nice to see those meetings televised. A number of them are meeting in the Auditorium upstairs in a room that has the television capability, but they're not being televised. Part of it is the time, they're at noon or in the morning. So, I think televising those meetings would be great if we could expand that.

"And I think for our senior citizens, I know I've heard a number of people say that there isn't enough programming during the day. I noticed last week when I turned on cable, it was a message board that said "no programming available at this time or something." That has been running a fair amount, where there is just no programming. And I think it's important to even recycle these meetings, and I think seniors like that. Especially during the day, they're up. It's when they want to see what's going on, and I've heard them say it, that some of the programming has stopped, and also if there could be a, TV guide, some sort of guide that would show them where the programming is going to be run that would



DRAFT

be super helpful for everyone. Cause it could be a lot of repeats, which is fine, but you may want to just find the program you're interested in, and having some guide service for that would be awesome. Thank you."

**Board of Assessors September 15, 2022**

**https://www.youtube.com/watch?v=Q13i6btVuHA**

**27:47**

Laurie Ortolano – 41 Berkeley St. Ms. Ortolano commented that there should be a place residents can address general concerns about valuations of properties they do not own. Vision won't speak to non-property owners about specific property valuations. This board should hear those concerns and look into/address them. Other topics she inquired about include:

How many corrections to properties have there been through the hearing process?

Will there be a reset of the exemption level and when?

What is the residential property shift?

Specific property valuation questions regarding specific parking lots

**The following was transcribed from video by E. Vassar on March 15, 2024**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Laura talked about land. I'm concerned about a comment made by Miss Kleiner. The issue of standing and who can speak to Vision about property is such that you can only address your own property. So I feel it's incorrect to say to Laura, "If you've got questions on properties, you need to go to Vision. Oh, but if it's not yours, they won't talk to you and you have no standing. There has to be a place where you can address general concerns about assessments, or groups of properties, or values. And I think that concern *does* fall on this table. I think *you* are the body that has to address that. *You* have the broad authority to do that. And I think you have to address those land issues. I agree with Miss Calquhoun. Ya know, Vision came in and gave some presentation, and I think they said land, on average, went up about 40%. What we didn't hear from them was what the standard deviation is. And I believe there's a very high standard deviation on that land. It's all over the map. You can have one house, I have a house in my neighborhood, two houses away, one piece of land is a hundred-thousand, the next one's fifty. That's a big difference, ya know, on a street. Why that happened? It's because they had to shift the value on the house? I don't know. But the land thing got, to me, a little screwed up, and I don't fully understand it. I can't address it with Vision, either. But it's a good question for *you* guys to address. *You're* the people with the standing.

"I'd like to know why the property record cards are down. So we can only get these basic, unofficial sheets, which were never formatted correctly and have been prone to errors. When the new preliminary numbers came up, the property record cards went down. That never happened during KRT. So, it's like, a problem because you can't get past data off the card, it's just a real pain in the butt.

"We heard about the hearings and that there were roughly seventeen-hundred hearings done. So in 2018, there were twelve-hundred and fifty. So we are running maybe 50% higher. That's good, that's



DRAFT

what I'd expect. It means people are asking questions. What I would like to know is how many corrections have been made off of those. How many – am I correct that Vision is the one doing all the inspections? Who's doing the inspections? Are Nashua assessors doing the inspections and how many corrections have they found and made? Now, I'll be able to pull the sheets out for September and October, the data from the AssessPro and see what corrections were put in, but it would be nice if I didn't have to do that, and you could tell me that. Cuz that's what I'm interested in: what kind of mistakes are they finding? I definitely believe there's some, cuz I've definitely looked at some and talked to people and said, "yeah, there's a lot of inconsistency here, you should look at this." And I was able to talk to Vision when I went over to talk about a piece of property, but I wasn't the owner, and they did say to me they were looking into it, and they did say that, ya know, the model's not perfect and mistakes happen. It's a model. That's why they have the hearings, so you can go over and address them. And so there are gonna be mistakes. And what are they seeing.

"I'm very concerned about the new exemption level that has to be addressed. And it's not being addressed. For hardship and disability. So we have an exemption level that is set. Has a new exemption level been reset? And who does that? We freeze property record cards in a month. Are we just gonna put the screws to senior citizens when exemption levels are like two-hunded and fifty-thousand but their ranches just went up to four-hundred? They're gonna eat that? That's a lot of money for people on hardship. And I don't k now what the timing is to address that, but the fact that I've raised it repeatedly and no one has said a word is what concerns me. It gives me pause and it raises concern. So I'd like to know when you address that. I've had seniors ask me about it. I don't have any information.

"Additionally, I'm concerned about residential property shift. The big issue here was the shift in tax burden between the commercial and residential properties, because residential took off and soared, and commercial properties had segments that actually lost value. Some went up a lot, like apartment complexes. But the net increase was substantially lower than the net increase on residential properties. There was no data provided for us for that. And I've asked Miss Kleiner to provide data or parse out what the commercial and industrial land use codes are so that we can create it ourselves. But when we create it ourselves, it can be prone to errors, and I would rather have the company speak to that. And I think it's something they should've disclosed, so we have idea: what's the burden, what's the shift.

"I sent you a piece of paper on the property at – what was my address – at 249-251 Main Street. And the sale that you could see on March 31st, the day before you had to cut the sales off, is not a qualified sale. For five twenty-five. But what concerns me on this property is it sold in 2011 for three-thirty as a qualified sale - I have a hard time believing that it's lost a lot of value -what surprises me in 2011 when it sold, it was assessed, so – and Angelo was here – he took that property and he raised it from like two-hundred to two-seventy-five. It sold for three-thirty. Eh. That's a good assessment, I feel it's a value increase. But then when KRT came in, they dropped it to two-oh-three. It lost a lot of value. And now it hasn't come up at all. And I don't know if it's because of – ya know, there's been a big investment in Downtown. There's been a lot of stuff going on to pull values up, to create the TIF districts, to put in, ya know, businesses and entities that boost it. So I'm not certain why there isn't that boost seen there, and why it still doesn't come to the level of what it was purchased at in 2011. And there may be a perfectly good reason, but I don't know why. And that's the kind of vairiability (sic) that I see on some of this commercial-industrial, and these lots or areas.

"The other parking lot areas I wanna point out are two that are separated by only a quarter of a mile. And it's one on 50 High St. And I do not know if that's the High Street Flat property. I cannot tell. Because I cannot read the card to see the data. And I'll go down to see if I can grab the file today. But it's 50 High Street. And that parking lot is .37 acres, and the assessment moved from a hundred and three-thousand to two-hundred and thirty-thousand. It's just a parking lot. Then you go a quarter of a mile away, you have the parking lot at 11-13 Park Street. So that is right behind like where the little bank is. It's a block up from Jean Shaheen's office. You go on Court Street and you circle around Court Street, and when Court Street comes down, that's Park Street, that little piece that goes out to Main. There's a parking lot, a good-sized parking lot to the left. That parking lot is .33 acres; the other one was .37. That parking lot assessment moved from a hundred and nineteen to one-twenty-three. Hardly moved at all. So it's flat. There's no value increase. But a quarter of a mile away, the parking lot doubled. And I'm curious as to why – how that gets determined. Ya know, it just strikes me as interesting.

"So I see that kind of variability and there's no building, that's just a land thing. And then you go down to that parking lot on 249-251 Main Street, and that still hasn't hit a value that it was purchased at in 2011. It's not even close to it.

"The only thing I wish had happened is that Vision had put out more of an explanation sheet to the public. I mean, I did get a lot of comments, and that, "Why don't we have something to look at that gives us a feel for where our homes are relative to others. Mobile homes got smashed. I didn't realize how smashed mobile homes were. Because I did not hear in these presentations where Vision really expressed that fully. But you have a lot of mobile homes that have gone up a hundred-twenty-five, a hundred-fifty percent. Ya know, homes assess at fourty-three that are now a hundred and fourty. These are *major* changes. And we did not prepare the public for that. I didn't even know it was happening. So I wish there had been something put out to assist people, and I wish there had been more information even put out with the tax bill in June. You mail a tax bill, you're putting a letter out, you're paying te postage, put *one* page in there that says, "Here's what's going on," and, ya know, "these are the properties that are gonna get hit, up your escrow, save some money… and people don't understand sales data. They really don't, I've talked to many. They don't understand market value well. So they sit there, and so many of them say to me, "My property went up, ya know, two-hundred-thousand, that can't be right." And I said, "It is, it's right, look at the sales data. Start there." "But I didn't do anything to my house!" "No one else did, either." But people came and bought it, just like it was, for two-hundred-thousand more! And you have to say that over and over again, it's a message that has to have a cadence that's repeated over and over again. And people just don't understand that.

"Ya know, I think overall it went pretty well, and I'm glad to hear the hearings are going well. I'm curious to how much change is being – what changes they're finding in there to correct. Cuz I tell you, some of these are wrong. I *know* some of these properties are wrong. It hit me right in the face. Just cuz the model made a mistake. Anyway, thank you very much."

**Planning and Economic Development Committee, September 20, 2022**

**https://www.youtube.com/watch?v=6lvD3Eoe4OE**

**1:16**



DRAFT

Laurie Ortolano "Laurie Ortolano 41, Berkeley Street. A couple of items. You're going to talk about the Riverfront oh no the TIF project. I had an opportunity to attend that meeting on August 31st with the advisory board. John Vancour from Hayner/Swanson came in and gave a presentation. I thought he was excellent. The guy was very knowledge based. He was a very quick speaker so it was hard to capture everything. He brought up some interesting points I thought. They called in the DES immediately when they began their project because they wanted to make certain that they were doing it correct because they were dealing with a body of water. The DES ended up having concerns about the Renaissance Park that Park de la Renaissance as well as the screening that was going in at the Eversource facility. I think that's an interesting thing to note because we know we didn't involve the DES in some of our other projects to look at things before we got going and it ended up being a problem.

"The other thing he mentioned is that the contracting company hired to provide overall contract management services has backed out of the deal and they can't do it. I didn't get the initials. It was BHB or VHB. He spoke so fast I couldn't understand it. So they're going to stay on and continue to do the permitting process and the structural design elements because those two tasks were too hard to complete and change with a new individual.

"I want to address the minutes for that meeting really were done. Nobody took minutes in the meeting when it was happening. There was no recorder of any sort happening. It wasn't tape recorded and it wasn't being written down. I happened to type this in my computer because I just was sitting there and I wanted to try and understand what was going on. I think that's a compliance issue when we don't do that. When the meeting minutes were finally released, I really do have issue with them because it didn't note that we didn't have - that the contract manager was backing out or that the DES had come in and had concerns and what they specifically were.

"I attended the special meeting of Public Works on August 13 or 16 where a presentation on this Riverfront Project was given. So what they've decided to do is remove the park from the project. John Vancor requested it be removed so it wouldn't hold back on the permitting process. But that really wasn't conveyed to the Public Works. I think those are important issues to convey to the Public Works because when you go to them and you share a project, their goal is to think about what they need to support that project be it manpower, resources, taking care of a park. If it's not going to be there anymore, I think we should tell them. So tonight I'm hoping to find out when we were aware that DES had issues and the park needed to come out of the plans and the plans needed to be reworked. Also after this meeting on the 31st, Eversource and DES were going to get together within a couple of weeks and discuss the screening issue and I'm wondering if tonight there's any kind of update on that. So I think that would be good. Do I have to I have a little bit of time left?"

Chairman Moran "43 seconds."

Laurie Ortolano "Okay. So regarding - and the other thing you have going on here is fees for outdoor dining. I don't know how many of you looked at outdoor dining this year how actively utilized it was. We had a group that went and collected data for May and June. I would say May was a complete bust. June it picked up a little more. We're in the end of it. I don't remember the close date. Is it after Columbus Day? I'm thinking it's after Columbus Day so we probably got another three and a half weeks and it closes is what I'm thinking but we're into fall for sure and shorter days. I feel as though those outdoor barriers…"

Alderman Thibeault "Time."

**1:14:35**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. The red line document that you requested a copy of for this Board, could I also get a copy of that as well which looks at what was came out of the project? I want to tell you that I'm not really supportive of the Riverfront Project anymore at this time because when we costed that and had the public hearing, you passed the $20 million bond to do a certain amount of work. Now you've got to remove maybe 40% of the work because the cost of everything has gone up. Nobody has addressed the fact that that's not what the taxpayers were sold. I go to buy a house that's 2,000 square feet and I think I'm going to pay $400,000 and then all of a sudden, you know, 3 or 4 months later, I go to look at the same house and for $400,000 I gotta get 1,000 square feet. I may rethink and say you know what I'm not doing that. I'm not doing it. I'm not making that investment to spend that money. But the City never thinks that way and I think it's not appropriate. I think those red line changes should be out in the public and seen. What are we getting for our money now? And I think that with the bonding rates, I don't know if the bonds have been sold for this project. There's been no bond update but if they haven't, your interest rates are pushing up a good bit and that's a question.

"I'm also very concerned when I heard John speak to the fact that the City will serve as the coordinator between HL Turner and the other company because the project manager backed out. Who will that person be? Because you know I have major concerns with the Economic Development office taking on more projects. It's just not right. They're overworked to begin with and a staff of two people. They have 20-25 projects to manage now and the records aren't being maintained properly. So for that reason, I don't support this anymore. That's a different beast now completely and it's going to cost the taxpayers a lot more money not only on the bond for what we get but for the work we have to do internally.

"The survey that we hired an intern that I believe worked with the Economic Development office that was collecting information this summer on the barriers as part of like an internship. Could we get that data? Let's see what that data shows.

"I really think you do have to come up with a fee schedule. I don't support the idea that we charge nothing. I think when we sold this last year, I think Ben expressed it well. We sort of sold it to the public that we weren't…"

Alderman Thibeault "30 seconds."

Laurie Ortolano "…going to give it away for free. I think we have to commit to that, and I think you have to work with the people, and I think some of these smaller businesses won't go for it because their tables really aren't being used. Remember, we're not saying you get no outdoor dining. They still have outdoor dining but just less tables. I think the smaller places will use those. We know there's five or six bigger places that really use the space. The rest of them from my standpoint dinner or lunch, don't and I go down there every day."

Alderman Thibeault "Time."

Laurie Ortolano "Thank you."

DRAFT

**Budget Review Committee, September 26, 2022**

https://www.youtube.com/watch?v=Y4Qoti4ye1E

**1:39**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I just wanted to address the use of the surplus money for the fund balance to reduce the tax rate. I wanted to know if somebody tonight could go over what that savings means. I'm trying to look at it as a citizen, so my thinking was a million dollars constitutes about a third of a percent of the appropriations budget because the appropriations budget was I think $303 million. So a million dollars is a third of a percent. If I apply that third of a percent to the tax rate, I can't apply it to the 2320. I think I have to look at it at the reduced rate which I'm thinking would come around $18.00. That would amount to $.6 per million. So I'm trying to see is it correct for a million would drop the tax rate about $.24 or what would that number be and can someone help me with the math just to understand what the change is for a million dollars? Thank you."

**1:02:58**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to thank the Board, Mr. Griffin, and the Mayor for explaining a little more about what that $1 million means per tax rate, the portends. That's great. I had a pretty good understanding of it.

"I want to make you aware of something though and I think it's really important. When we dropped the tax rate in 2018 and KRT came in, we saw properties grow about 20 - 23% and our tax rate came down about 20% which means the average growth on a home saw essentially, if you fall into that average, no increase on your tax rate. However, now this year the average home has grown 40% or just over. The tax rate is coming down 21 so we're asking property owners to eat the other 20%. So a ranch when KRT came in in 2013 it was about 225. In 2018, it was 265. This year in 2022, it's 380. So a ranch last year had a tax bill if you did the 23 - 22 at the start of the tax bill, 6150 was the tax bill. This year when they up with the 18.30, it's going to be $7000. It's going up $850. That is significant.

"I don't think you realize that the number of people that fall at a 20% or lower increase on their property is a small number, and that the vast majority of property owners are going to see an increase, and the vast majority are going to see a big one like the condos, the mobile homes, the small capes, and ranches. Mobile homes some of them tripled. So a mobile home bill that was a $50,000 mobile home last year was $1,044 or this year right now is $1,044. It's going to get recalculated to $2,760. That's enormous. So I appreciate you looking for the other $2.5 million but we know that that was worth about…"

Chairman O'Brien "One minute."

Laurie Ortolano "...18 cents. The tax rate to cover the 40% increase that we saw in properties would have to go down to about 13.95. We're at 18.30. We're not even close. So we're asking citizens to soak up an awful lot when gas, when heat, when food, and all this went up. I think it's going to be brutal. So I think you have to be careful at your board table on what you're voting for. That's why I'm very careful about this bonding on new projects and the spending. I've been very, very concerned about that because now that I see these numbers, this is a lot of money. Thank you."

DRAFT

**Board of Aldermen Tuesday, September 27, 2022**

**https://www.youtube.com/watch?v=R4DScBcP_tc**

**18:01**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to address R-22-062 Establishing the Fund Balance for Reducing the Tax Rate. I went to the Budget meeting last night and had a chance to hear about this. I would hope that this receives full support from the Board. It will help lower the tax rate about .29 cents and I want to talk to you about how high our tax rate is and how important it is to take this reduction and consider trying to do more this year as you build your budget and you look at your spending. Our tax rate is a good bit higher than I thought it would be. Our homes went up about 40% maybe a little bit higher on average. Our tax rate is coming down about 20 - 21% so we're asking many property owners, residential property owners to pick up the tab with property tax increases. It's going to be pretty significant. I looked last night and the average ranch in 2018 was $265,000 when KRT came through and at this rate currently $23.22 that's about a $6,100 tax bill. If you look at the average ranch now, that same ranch is $380,000 and you multiple it by a tax rate of $18.30, the Mayor thought it would fall between $18.30 and $18.50, you're at about $7,000. You're going up $850-$900. That's a lot of money on a 900 square foot ranch and I can tell you I look at my neighborhood where they had to address the depreciation issue in the older neighborhoods that wasn't quite right and there are some small homes going up almost $2,000. There's a street with 8 houses on it that's all over the map. So we're going to see a lot of hardship. I think this .29 cents is far too little. I think that you're going to be addressing a new business, a whole lot of bonding…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…for $32 or $34 million and I think this Board ought to think long and hard about how much money you're going to continue to spend on this City.

"I'd like to address Alderman O'Brien because I know you've done a lot of work up at the State with the pension fund but I think you're not doing enough work down here to vote no on things because you can't change what's up there at the State with 500 people and you can't count on it. So I think your fiscal conservative is missing down here in Nashua. Thank you."

**43:23**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Alderman Lopez you made some comment tonight about this unfortunate reevaluation that we had to do that had unintended consequences. I don't know what you were referring to because it was rather coded but I think it had to do with the fact that some people addressed issues in the Assessing Office, namely me in 2018, and it opened up this view to get a measure and list done. This was something that Attorney Bolton and Mayor Donchess got behind because we hadn't done a measure and list in 30 years. If you recall when the measure and list came forward, I actually said don't do it. I was opposed to that in spending that amount of money on a measure and list not believing that we'd get into that many homes and not believing we would resolve the issues which were really more interoffice regarding staffing and process. I wanted to see that improved before we went on the outside.

DRAFT

"We got our new numbers from Vision. They did not provide any type of report for citizens like KRT did to inform us on what the general overall increase was, where the categories fell, we got nothing. We were then told that there was a shift between commercial and residential. There was no report done on that. I'd like to know what that shift is because right now the average home went up about 40%. Tax rate is coming down about 20%. That wasn't a 20% differential. There is other stuff going on there. We also had a concern with how depreciation was being applied and we were going to rework that and how we built condition on the home. We undertook that process. What was the result of that? We don't know. Was it effective? Was paying the $1.3 million effective in fixing that problem? We have no idea. I'd be the first one to advocate not to do it again if it didn't work. I don't want to see money wasted like that. Just go back to an update for half a million dollars. So I think you're being very narrow-minded and you're uninformed about what we were really looking to do here and the fact that you as a Board don't have…"

Donna Graham, Legislative Affairs Manager "1 minute."

Laurie Ortolano "…answers on what the outcome really is. You don't know.

"So I also think that I'm very concerned when I hear Director Cummings is taking over for Miss Kleiner. I have a major concern with that because I view him as a major violator of open records laws. This guy is not good at that and he runs wild. He does it his own way. Beg for forgiveness afterwards I suppose but this guy isn't a people person and I don't think he's a people person for inside here."

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "I think you've got to start looking for people who are more aligned with what needs to be done for this City and have more skill-level. You didn't address what's going to happen to Economic Development when he moves over? Is he wearing all the hats? Maybe thirteen departments for one person isn't the right thing but I think that's a disaster pick and I know that is going to be a nightmare for people like me and other citizens but I think it's going to be a nightmare for people inside this City Hall. Thank you."

DRAFT

**Board of Aldermen Tuesday, October 4, 2022**

**https://www.youtube.com/watch?v=ZG2GmlI1kXo**

**1:26:08**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I have some questions about this - a few. The escrow money that's being transferred or be appropriated is that all 2022 money or some of that from the first quarter of 2023? Does anyone know?"

Chairman Dowd "Mayor do you want to address that or?"

Mayor Donchess "It's all '22."

Laurie Ortolano "It's all 22. And so do we know how the first quarter has shaken out for spending or expenditures and what we're running on there because a large part of this escrow money that builds up is positions that go unfilled. So if I listened to correctly, it's, you know, revenues that exceed

expectations or anticipation and appropriations that remain unspent. We have, you know, a good number of appropriations that have remained unspent for the first quarter of 2023. So there's quite a bit of money there as well.

“Regarding the Emergency Management position and establishing that. When we lost our Emergency Management person, it seemed like there was some controversy about that position or some difficulties when that person went out, concerns about how the office was being run. Did we resolve those issues to establish this position and bring somebody in who's going to be successful? Or has the position been redefined? Okay, maybe that's for a later day. What about - I'm concerned about pre loading the CERF fund? We plan for capital equipment reserve fund. We have money in there. We're spending it down as Mr. Griffin told us but this $3 million that you're transferring over is allowing you to preload for next year for 2024. Not interested in pre-loading given where the tax rate is. I think you just ride that through, do your deal in 2024, and shift some of this money back to the taxpayers. You know, Miss Colquhoun mentioned that the average home is going up $910. That was 1,750 residential properties that are essentially the single families up to four families. Only 478 of those saw a return…”

Alderman O’Brien “30 seconds.”

Laurie Ortolano “...I didn't think timing worked because you could ask questions. Is that true or can I come back up for questions?”

Chairman Dowd “It's not the three minutes for a public hearing. No.”

Alderman O’Brien “Oh, excuse me. That saves me with a timer.”

Laurie Ortolano “Thank you. And so only 478 went down or see a flat rate and 3500 of those are going to see an increase of over $1,200. The manufactured homes, of which we have 870 units, their average increase is $700 bucks and 230 of those homes are going up almost a grand. That's a big, big shift. The increase alone isn't the problem. The problem is for people who carry escrow accounts on their mortgages because what happens is the bank anticipates that that $1,000 increase is really going to happen next year. They forced the property owner to pay an estimated $2,000, $1,000 increase divided over 12 months. So all of a sudden you get your bill in December and it says your escrow short $1,000 and oh by the way as you pay your mortgage this month, your escrow has been recalculated and you owe an extra $175 bucks per month starting now. So they get a double hit. Unless you're able to PMI or buy out of that program where you put enough money down, you get hit it that and it’s expensive. I'll tell you it's very hard to negotiate with the mortgage companies to say no, no, no, this is a one-time thing don't double me up. They won't listen to that. They make you pay.

“I'm a little bit concerned about - I'm very supportive of the air quality issues but if there is ARPA funds available for that, I'd look at shifting some of the money for what's going on with improvements and do that air filtration system that they have very high regard for. I think you could make a big difference in just the health of the students and that's important. I think the Your Voice, Your Choice program the way it was pitched has a big benefit for a relatively low cost to the community.

“I'm really concerned about all of this. I want to speak to the Police Department. You know, I'm very supportive of the Police Department but I'm not certain I support these two positions and I'll tell you why. Simply because they're down 13 positions and the reality of the department is they struggle to fill their positions. They don't reach that 179 officers often and it's a fleeting moment. They're struggling to



DRAFT

fill the positions. So if they're down 13 and they're struggling to fill the positions but they want to add two more, I'm just not certain it makes sense. I really did listen to the Chief and the concerns about the growth of the city with all of the high rise units going up - Bronstein apartments, High Street flats, your new shelters opening, your development over at Henry Hanger. All of those things have an impact on the police. Even establishing the riverfront walkway. I understand that but I think part of our responsibility and the responsibility of this Board is to make certain you're doing your growth such that your Police Department can keep up with it. I don't think we've done that. I don't think they're going to be able to keep up with what you've done here. It's not just the numbers game of Manchester having 267 officers and Nashua having 179. If you just look at the math of it based on size, Manchester is about 20% bigger. That would say, you know equality being that it is, we should have Manchester would have 232 to our 179 but they have 267. They're another 30 officers higher. But a lot of that depends on the type of events, the city, the density downtown, the number of large gatherings they hold, their high rises, their apartments, their buildings of need, their income levels, all of that plays a role in those officers, and that officer count. I think we have to look at that a little more carefully.

"I do support the equipment requests. I understand the needs for those but I am concerned about positions and I'm concerned about these decisions that the city makes to grow, go, go, go, bond, bond, bond, and police and fire good luck chasing and keeping up with us. Because when places aren't safe, people change their tune about coming downtown and walking the riverfront and other areas. Thank you."

**BUDGET REVIEW COMMITTEE OCTOBER 4, 2022**

**https://www.youtube.com/watch?v=CVrVXkR9prg**

**2:28**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm not certain how if I'm looking at this correctly the $4 million of surplus that's used to take the tax rate down. On top of that, we have this $7.5 million that's being spent and of course, some of its apportioned and saved to meet our obligation under our legislation to maintain 10% and a balance. I think the shift here - the money that's being allocated for the tax rate reduction is simply too small. 7.5 going to projects and $4 million to reduce the tax rate is just a wrong way. Perhaps it should have been $9 million to reduce the tax rate and a small amount left to do some of these projects because I think there's a real need to do that here and now. I don't know if we've ever done a tax rate, you know, reduction on that magnitude but these are extraordinary times where we're seeing quite a shift and largely produced by the fact or the result of not having done a measuring listed many years, having depreciation not calculated correctly within the properties, having commercial properties not rise at the same rate as residential, and having a high inflationary rate. There's a lot of factors here that lead to this as well as a lot of spending.

"I'm also a proponent of not worrying about the AAA bonds from the two companies. I think we're weighing that too heavily and nobody's been able to provide a specific data on what happens when you go to a AA bond that the other municipalities have. I for one think that if your bond weight rating came down with an A, that maybe that would keep you from bending so much money bonding if you had to pay a little more for it because we bond like the dickens. There's $35 million of bonds on the next





DRAFT

October 13th public hearings for us to vote on and those are all higher level bonds. So, you know, I'd like to get specific information without having to Right-to-Know on what happens when the bond rate changes to AA. I know that in the meetings that wasn't answered by leadership and I think it's worth having answers on that. Thank you."

**1:12:43**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things. I think this administration owe this Board some better numbers on what averages were. Alderman Jette asked some good questions and, you know, it was said by the administration we don't really look at averages. We look at individual ones. Vision runs all these numbers based on means and medians. It's all averages or midpoints separated by top and bottom. That's how the numbers are run.

"Now I look at a little street next to Manchester Street over in the north end that has 11 homes on it mixed with some 60s, 80s, and a couple conventionals. Their assessments before Vision came in 266, 233, 182,000, 199,000, 211,000, 383,000, 270,000. That's the range. Now Vision's come in and set the numbers. These 11 properties have gone up or down by this amount - $1,000, $860, $430. One home is down 111. Only one dropped. $1,150, $800, $1,800, $1,500, $1,700, $1,300, and $700 for an average for those 11 homes of $1,012. That's a big increase and you should be able to know that right now because your administration gave you enough information to know that. To have you sit in this meeting and say, I don't know if this is really true, is what they're saying true, somebody should be able to confirm that. I don't come up here to paint lies but it's so simple. This is simple math.

"Regarding the barriers and the $75,000, I'm glad it was asked. I am deeply disturbed that Director Cummings has now taken the position that he didn't get any data this year. They didn't do it. The answer to him and your question on are we gonna come back with a report? There is no report because he took that ordinance that was approved for three years and his statements last year that he do the data, he threw it in the trash and didn't do it. Michael Buckley said I want you to get data. Enough citizens came out and wanted data. Go gather it. They didn't do it. So I gathered data. They don't have any and the belief that we've approved it for three years and therefore it can't change, you can resend it. I think it should be revisited and you got no data. You got Alderman Dowd saying, oh is wildly popular. Yes certain days it was busy. He was very underutilized. People actually don't have money to go out."

Alderman O'Brien "30 seconds."

Laurie Ortolano "I don't know if you've noticed that. People don't have $100, $150 to spend on a night out for dinner anymore right now. They just don't have it. So, you know, I think that this Board was not given the information it should have been given and I think you are missing what's going on here. This spending - your Assessing office the budget in there, what a ridiculous budget. Makes no sense at all. It wasn't frugal. It doesn't even make sense."

**Board of Aldermen was held Tuesday, October 11, 2022**

**https://www.youtube.com/watch?v=EL-lvGKCqdI**

**23:23**

DRAFT

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I am speaking in opposition to spending the $7.5 million of escrow for unlike requests. I have handed out a graph that takes a look at our spending over 5 years with regard to escrow and I'm going just hold this up for everyone. It shows from 2018 to 2022, which of course the Resolution applies a year after for the escrow money. In '18, '19, and '20, we put $4.5 million back to the tax payers to reduce the tax rate. In '21 and '22, we reduced that to $4 million. On the flip side, the escrow money that's being returned for unlike requests has gone up substantially - more than doubling. We were at $2.5 million for 2019 escrows and now we're at $7.5 million. You can see the total money that is not being spent is up to $11.3 million in 2018. When we were looking at 2019 escrows, it was $6.5 million. This to me does not show good budgeting or good accounting. This is a trend that shows that we are really growing the amount of the extra money that we have and we are willing to take more of the taxpayer dollars and spend it down on items we want rather than return it to the taxpayers and I think that's wrong.

"I also have a big concern with positions being included in this escrow money because positions are recurring matters. Year over year, we have to pay for them. They're not single expenses. We have an E-Code Section 5130 appropriation accounts and loans to cities. This is page 2 of the document I gave you and there are three sections - d, f, and g."

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "I'm particularly concerned with g - municipal agencies in accordance with policies and procedures which may be established by the Financial Services Division may escrow unexpended appropriations only to provide for payment of charges which will come due following the end of the fiscal year for goods, equipment, or services contemplated by the original appropriation in which do not constitute general ongoing ordinary expenditures of the agency. To me, salaried positions are general, ongoing…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…expenditures and my question is are we violating this E-Code Section 5130 in doing this with positions? Strongly opposed to positions. I think they need to be vetted differently. I don't think this Emergency Management person has been out for a long time and in the budget process, we did not discuss the need for this. Thank you very much."

**1:27:47**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to thank the Board for taking the time to think a little more about the appropriations that are going to be spent. I want to thank Alderman Sullivan for putting in the time to try to come up with a plan to offer more relief to the taxpayers. It's easy to be critical of what you offered but you were the one who brought forth the plan and that's appreciated I think by many of us.

"I would like to address Ernie Jette because I feel - I'm very appreciative that you asked Attorney Bolton for an explanation regarding that Ordinance on appropriation accounts and loans to the City. When I bring this forward to you and I ask this, it's not to present terrible information as Alderman Moran indicated. You know we have to get rid of this terrible misinformation out there. I'm really trying to understand it. I do this kind of research to understand it. As a citizen, I don't have the right to ask questions to anyone to get an answer within the City because it's not a Right-to-Know request. So if I

don't come through you and somebody here doesn't ask it, I don't know and the citizens don't know. So kudos to you for at least allowing it to be clarified and for me to have the opportunity to learn.

"I would like to ask Alderman Moran to be a little more patient with those of us who don't know and we simply want to learn by what these codes say and to understand what can be done and what is supposed to be done. I still am not in favor of positions, ongoing payable positions being part of an escrow account. That's one-half percent of your budget next year is now being appropriated this year. The $7.5 million represents an additional two and a half percent of your spending which setting a budget by the Mayor to say this is what we're going to keep it at a percent and a half or two and now you roll it and you put two and a half percent more in. That's a different budget now and we're paying for that by not giving back…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…on the tax rate. So I'm not trying to be difficult but I hear plenty about what people are spending too. I do a lot with assessments and get a lot of calls for help. So I appreciate what's going on out there and I think citizens are looking for relief. So I'll be at the hearing on Thursday night and I hope you have a bond table available for the public. We get a review of all our bonds that are coming due, what's coming off the table…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…since we're about to add another $32 million or so in bond debt to the City. I'd like to understand that in some detail and I'm hoping at this hearing when I ask questions that I'll get the courtesy of some answers. Thank you."

**PLANNING AND ECONOMIC DEVELOPMENT COMMITTEE OCTOBER 12, 2022**

**https://www.youtube.com/watch?v=MrY1KqzNlOM**

**1:56:49**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. The presentations tonight were excellent, really well done. I enjoyed listening to them.

"I'd like to address Alderman Moran. Your comments at last evening's meeting and your leadership what you showed in that Chamber in responding to the public. I think I presented an email that much upset you and it caused a very strong reaction that I was doing something that was very misleading to the public. When I presented this email, I specifically stated as I watched the video today that I wanted your comments on is this true? Alderman Jette was very helpful in that he asked our Attorney what his professional opinion was and he provided that opinion without any negativity from me on that opinion being provided. It's exactly what I wanted. When the comments came at the end, you made it very clear that I presented a lie. Really I presented information from a former Alderman whose name I actually x-off because I didn't want to put their name out there. It had my name on it so it came to me. I passed it to you folks to say is this true? It was a lie and you said, "I'm going to push back on this information every time. It always gets me right in the funny bone about silver spoon millionaires coming in here and acting like they are the crown jewel of the working class pushing off information we don't to be true

until we ask legal counsel." Then you went on a diatribe about Governor Sununu. Then you said, "This chamber is represented by the middle class. We represent the City. Everyone knows that. You can go to my Facebook page. Millionaires who were born with silver spoons in their mouths who don't earn crap have no respect from me." Very harsh.

"Now honestly you made yourself out to be the champion of the…"

Alderman Thibeault "One minute."

Laurie Ortolano "…proletarian class but I don't think you really are because you can afford my much than I could at your age. Your children go to private Catholic School at St. Chris. You signed and auctioned off and paid $3,400 for your kid to be Principal for the day. I couldn't afford that in my 30's. I didn't have that money. Now my husband and I give a great deal of money to that Church because we can afford it. But we did not have those opportunities."

Alderman Thibeault "30 seconds."

"You sent a very strong message last night about who can come to this Chamber and speak and I heard some comments today. If you're poor, you don't belong in here. If Melbourne Moran thinks you're a millionaire or whatever definition he has, don't come (inaudible) to share input. You're not welcome. You made a judgement that was horrendous and you are a very poor example to your own children. Thank you."

Chairman Moran "I have no idea if that member of the public is a millionaire or not. I was very upset about millionaires who make poor decisions who are policymakers in this State that shift down to cost."

Laurie Ortolano "That's not what you said."

Chairman Moran "I will say that let the record show that a member of the public who refused to apologize to children for the use of the "c" word on public television is upset with me because I don't like millionaires too much. And by the well, I'm doing well for myself. I have an issue with silver spoon millionaires, not millionaires who work their way up."

Laurie Ortolano "That's what you referred to me as and I tried to…"

Chairman Moran "I have no idea what your income is. You're not a policy maker. Why do I care?"

Alderman O'Brien "Mr. Chairman point of order. I offer this point of order for advice. I think the public had their opportunity to speak. Short of that with your rebuttal and the public's rebuttal, then it gets into a debate. I would recommend, personally recommend that this is a meeting not so much as debate format."

Chairman Moran "It is true Alderman O'Brien. You are correct."

Alderman O'Brien "So I would just say as a point within the traditions of our chamber, best to leave it at this particular time and let's carry on."

Chairman Moran "Yes. Comments by Alderman. Alderman Thibeault?"

DRAFT

**2:04:46**

Alderman Thibeault (from Remarks by the Aldermen) "One thing I didn't see coming up last night was no one on any of their bingo cards said can we take away the $300,000 for lawsuits in the City. If we stopped having frivolous lawsuits, we would not have to add $300,000 to the escrow but nobody had that. Nobody put that down last night."

Laurie Ortolano (From her seat) "Because they're not frivolous."

Alderman Thibeault "Call me what you want. The City will know. So nobody put that out there. Alderman Sullivan didn't. None of us did. I was thinking it. Why do we need to spend so much money on legal fees for no reason?"

Chairman Moran "Can we have it quiet please in the Chamber? Thank you."

Alderman Thibeault "We talked about decorum, we talked about respect. She comes here. There's never any respect for us but we have to be respectful to her and I have been. I haven't said any names tonight. Alderman Moran hasn't said any names tonight."

Laurie Ortolano "Unusual night."

Chairman Moran "Please quiet in the chamber Miss."

**Board of Aldermen Special Meeting was held Thursday, October 13, 2022**

**https://www.youtube.com/watch?v=w8_C42tJWJY**

**5:29**

Laurie Ortolano "Laurie Ortolano, 41Berkeley Street. I just have a question about this. It is on the CERF account which was one question I had. So it was budgeted in CERF. It's a 12 year schedule to replace the pumper truck. So we're doing it on the 12 years. I'm just wondering if the life of the equipment has truly expired the truck at 12 years. Is there any opportunity to get 13 or 14 years? I'm only asking that because it's a tough time right now. We all heard the economic news that came out today and everything being what it is, equipment doesn't necessarily just completely fall apart on 12 years but of course you'd have to look at what investment you're putting into that equipment for repair. So I guess I'd like to understand if there's a possibility to keep it going, has it been through a lot of maintenance such that it's not worth it given what we've done, or could we extract a little more life out of it because of what's happening here? Thank you."

Chairman Dowd "Anyone else Testimony in Favor?"

Laurie Ortolano "Well is somebody going to actually answer that?"

**19:51**

Laurie Ortolano "I just have a quick question because I was listening. This was not in the CERF fund account was it or was it? Because it's GPS equipment, and the type of equipment, it was it wasn't put in

CERF. So it's going to be a bond for this year. When would something like this be bonded? When can you use it?"

Jeff LaFleur, Superintendent Solid Waste "I would anticipate buying it immediately as soon as I get the money available. I'd be buying it and putting it on our equipment immediately."

Laurie Ortolano "Okay so you would want to get this equipment. When would the bond be sold and what would the impact on the budget be this year bonding this right now? I'm just curious, what's the payment?"

(Laurie Ortolano "Just wondering. The handouts that you have, are there any extra copies for the public?")

**38:21**

Laurie Ortolano "Laurie Ortolano, 41Berkeley Street. I'm speaking in opposition but I have some questions. I'm speaking in opposition largely off of the comment in favor - the comments by the prior public speaker so with a little different slant.

"What portion $16 million or so of ESSER money is coming our way? An additional $16 million to bond. If I heard correctly, we're doing these HVAC upgrades but the HVAC upgrades which can be covered by ESSER are only part of what's needed because we've got to do some building modifications with doors, and closing off spaces which would affect your HVAC system as well. Is that true?"

Shawn Smith, Plant Operations Director, Nashua School District "That's true."

Laurie Ortolano "Okay. You've got to balance your HVAC system so to do the balancing, you have to have your spaces defined as open or closed to balance the system. I get that.

"Now what percentage of the money - how much does the HVAC cost and how much do the other renovations that sort of go hand-in-hand with the actual HVAC work cost? Is it 16 and 16 is it pretty even?"

Shawn Smith, Plant Operations Director, Nashua School District "I didn't bring that information with me. I can get that to you at a later date. I would say that we, again, we just got the schematic drawings. The energy efficient (inaudible) who is our engineering company is working on the HVAC system. They're hoping to wrap that up in the next week or so. There's two different processes. They have to go to the State for approval and then we have this bonded approach. Between the two of them once their process is done, then I can give you an answer of how much goes to HVAC, how much goes toward walls, how much is going to electrical. If you're familiar with construction, there are things called "divisions" so all those things I can get those answers probably hopefully in a few weeks."

Laurie Ortolano "Okay so um are we required to spend all of the ESSER money given for 2023 in 2023 or can some of it be carried over to next year?"

Shawn Smith, Plant Operations Director, Nashua School District "It has to be spent by September of 2024."

Laurie Ortolano "Okay and did I read correctly that there is a little more ESSER money coming in 2024 - $3 million or something?"





DRAFT

Chairman Dowd "I'm seeing a "no" from Mr. Donovan."

Laurie Ortolano "No. Okay so this is the end of it. Is there any future ESSER - this is all COVID related, so is this the end of ESSER money? This is like the end of it. Okay which I'm okay with just because I'm okay with being done with that phase of life.

"You know I think that I'd like to see personally one school done instead of two because we have a lot of expenditures going on here. We're asking citizens to cover a lot of costs and was this bond something we anticipated in our budget spending this year? Was this built into our 2023 budget?"

Chairman Dowd "Mr. Griffin?"

John Griffin, CFO/Treasurer/Tax Collector "This actually was not in our bond plan. This was a situation where the ESSER funds materialized and Alderman Dowd talked to the Mayor and I and we decided if they had been on the CIC for a while, it probably made sense to do them both with the ESSER funds and do it well. So as part of my discussion after this, I want to answer that immediate question but I want to go through the process of bond sale planning, and bonding, and approvals by the Aldermen, and how they happen, tie in with the CIC all of that stuff. So if you give me a little bit of time, I will do that but I wanted to answer that instant question. As Treasurer Fredette always told us, the bond plan is a living document. It's not as what we're going to do today, damn the torpedo's full speed ahead. It's literally moving, priority changing, etc. and this is a classic case. Thank you."

Chairman Dowd "So the other thing is we're doing two schools at the same time, same companies, and if we only did one school, we'd be spending less money now but we'd be more than doubling and maybe tripling the cost of doing the other school later."

Laurie Ortolano "You can say that about everything Alderman Dowd. The truth of the matter is we have limited amounts of money. We just heard that it really wasn't planned. An opportunity came up with this ESSER money – terrific but the rest of it, the $16 million, wasn't planned. Yesterday I attended a meeting and we're saying these schools are 30 years old and really need renovating. Yesterday I attended a meeting, we talked about our 45 year old fire station and the immediate need to address that and I agree. Some of you were very passionate that that needs to be a priority. Forty-five years and it's a public safety issue. I agree but you've got to start carving out some of this money that you're just laying down as opportunity at the door to make taxpayers pay and then roll in with the fire station got to be done too.

"All I'm saying is I don't envy your job. I really don't because I think everything that gets presented to you gets presented as a legitimate need. It's true. People aren't coming up here asking City workers just to waste money willy nilly and they do have to think about it but a lot gets thrown on you. You have to have a plan that thinks I think you have to think a little more broadly. I'm really concerned about the fact that the RFP just went out and we really don't have pricing. These are tough times when it comes to costing projects given the inflation rate and what's going on. I know in the past, I just found a set of minutes from 2019 where you said historically you're on the record, we never spend our contingency money. We just roll it back in. I think we're starting to spend our contingency money now on projects because of this inflationary rate. Thank God we have it. We're using it. That's a sign of the times. So I'm just concerned because today's numbers that came out on the news regarding inflation and what's happening with citizens and taxpayers buying food and stuff is bleak. I got a call from my son who's a 20

something year old kid who has to eat a gluten-free diet. He said mom I went to the market and just got a basket of food. Now he makes a decent income but not - he has a house and a mortgage. I bought eleven items of my gluten-free food and it was $104.00. He said Molly and I aren't going out to eat anymore at all. We cannot afford it. That's real. So I'm just trying to think about that. I know you say it's a good deal, it's a good deal. I agree. I love a good deal too but I'm just asking for some balance and prudence."

Chairman Dowd "Yeah the more important question would be which school would you select and which students would be left with less security and less good air including staff?"

Laurie Ortolano "That's your decision and that's not the way…"

Chairman Dowd "Our decision is to do both schools and get it at 50% of the cost."

Laurie Ortolano "It's really a very…let me bring this on too. You're talking about facilities - the needs of facilities and I get it - the buildings but I also have concerns in the schools about program and there's no money."

Chairman Dowd "You're outside the bounds of this public hearing."

Laurie Ortolano "I'm talking about the money that's being spent here that should be spent here because…"

Chairman Dowd "That's not bonding money. You're talking about programs in the schools. Go to the Board of Education if you want to talk about the educational part of it."

Laurie Ortolano "Well that's money that needs to be spent too whether it's bonded or not."

Chairman Dowd "Well it's not part of this bond."

Laurie Ortolano "And I think that the money you're bonding here to pay for building stuff ought to be used toward programming instead within the school as well. Thank you."

**51:52**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I guess I'd like to address the programming issue or statements that were made by Mr. Donovan and how ESSER funds can be used. I'd like to address it in terms of this bond because it sounds like a good portion of that $16 million - if that was the right number of ESSER money - is going toward 40 or so toward educational programs. So I happen to be of the belief that there should be more put into educational programs, which would reduce this bond. The reason I say that is at the High School, they have a block. E block that is supposed to be dedicated for students to go receive tutoring, counseling, go to the library. It's their free block to go get help for their classes. They haven't been able to use the E block in almost a year because they can't move the students through the hallways because of fights that break out. They don't have the staffing or security to move the students through safely. So the tutoring, counseling, library program has been cancelled and that's an education loss of an entire block forever now. If we don't produce a solution where we can have people in the hallways so that the kids can move through that block and that has gone on. I've heard that repeatedly. I checked on that with the school. They do have a problem with that block. I think we have to do a solution and I think if ESSER funds could be used to get that worked out so even our teachers with their contract, that's sort of a working block for them to be able to do tutoring and

counseling and it's not being used by them because everyone is sort of hostage in their place because the kids can't move through the hallway safely. I just think that's a problem we ought to be able to solve. It's a whole block of educational time. It's gone on for a long time. Thank you."

**1:09:12**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Just a quick question. I'm presuming based on the discussion that this was a budgeted item within your Public Works budget. Is that correct?"

Dan Hudson, City Engineer "Yes. My understanding is this was included in the budget. It shows up like as a revenue item and it's paid for through sewer rates. So it was an anticipated budgeted item."

Laurie Ortolano "It was participated. Thank you very much."

**Special Board of Aldermen, 5/24/23**

**https://www.youtube.com/watch?v=7yMJKbN1yTA&t=1586s**

**10:10**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm not speaking in favor or opposition. I just have a couple of questions. Is the Veteran's Bridge the big bridge that runs over connecting Nashua to Hudson where the condos are built? Are we talking about that bridge, the main bridge? Is that the Veteran's Bridge?"

Chairman Dowd "We're talking about the only two bridges we have that run over to Hudson."

Laurie Ortolano "Well there's also and it doesn't cross to Hudson. Okay, so that's our Veteran's Bridge. What about the bridge on Canal Street that's been rated very poorly for over ten years for renovations?"

Chairman Dowd "That's not part of this legislation."

Laurie Ortolano "Are we doing anything with that bridge with federal funds?"

Chairman Dowd "Mr. Hudson would you like to come up and answer?"

**19:14**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm not speaking in favor or against but I have a couple of questions. This is the cybersecurity issue Director Cummings referenced information you have in your packet regarding the breakdown in costs. Is that stamped confidential or is that a public document that shows the breakdown of the costs?"

Chairman Dowd "The legislation is public."

Laurie Ortolano "That gives a breakdown of costs?"

Chairman Dowd "It is posted. It's not going to give - I don't believe the delineation of the actual expenses because that's confidential."

Laurie Ortolano "Well I'm asking you he referenced a document that you have. Is that document in your possession stamped confidential or is it a public document? It's a simple question I'm asking. Not the legislation, he didn't reference that. He gave you a document with the breakdown. Is that document stamped confidential or not?"

Chairman Dowd "Director Cummings is that the one you handed out?"

Tim Cummings, Administrative Services Director "Mr. Chairman it is a public document."

Laurie Ortolano "Could I ask you he outlined four costs and security. Phase one is already done. He said phase two is $335,000, phase three which would require an amendment but we couldn't do it tonight was $60,000. We had legal expenses at $65,000 and correcting security issues at $100,000. How much was phase one? Is that included in here as part of the money that is being transferred and do you know how much that was?"

Chairman Dowd "I don't see the delineation by phase in the legislation."

Laurie Ortolano "Okay. Does this take care of all the money that will need to be allocated to address it because it was a ransomware attack so there's a ransom to pay eventually which I would think eventually becomes public information if we're paying it just like this information? You're having a public hearing about these expenses. So is all of that separate?"

Chairman Dowd "Director Cummings?"

Tim Cummings, Administrative Services Director "Thank you, Mr. Chairman. At this time I would not advise answering any of these questions due to the event that's still unfolding."

Laurie Ortolano "Can you tell me he did reference when it started but he didn't give a date. When did this event occur?"

Chairman Dowd "Director Cummings?"

Tim Cummings, Administrative Services Director "I'll give you approximately. The last week in April I believe in and around April 30th."

Chairman Dowd "Thank you."

Laurie Ortolano "And could someone please tell me what account 89650 is? Is that a special account set up for this cyber issue or what other money is in that account? When I went on expenditures and tried to look up that account, that number wasn't there. So what exactly is that account?"

Chairman Dowd "Mr. Griffin?"

John Griffin, CFO/Treasurer/Tax Collector "That's a rather unique account where we put it. That's a transfer into the property and casualty internal service fund. So we need to position it there so we can physically transfer it into that property and casualty internal service fund."

Laurie Ortolano "There's a lot of fund numbers in there so how do you know where to put it after that?"

John Griffin, CFO/Treasurer/Tax Collector "Good question. By way of explanation, that particular fund that internal service fund only has the account numbers for the benefit of the people trying to

DRAFT

understand the monies in it. That's why that 89650 is literally the authorization from the Board of Aldermen to transfer into it. What line they end up putting it in not sure yet but we know we need half a million to go in there. Thank you."

Laurie Ortolano "And just one last item. I want to express some concerns with the property casualty risk management account and this references property casualty self-insurance fund. There is a 6500 account in the expenditure reports that comes up every two weeks that's called "property and casualty" and I don't know if that's this title property casualty self insurance fund. It seems to me that property casualty has become a catch all for a lot of money that is sitting over there I think is not properly placed. It used to be 2015, 14, 15, 16 property casualty or that fund had about a half a million dollars in it which I believe was covering liability issues - things that really happened. That account has pushed up to almost $6 million. There's a lot of line items in there that I think don't belong in there. They below in departments and they're being loaded into that account. It really concerns me because I think it's not transparent and it needs to be much more transparent. How did we allow 2% of our budget to fall into that? You know we're showing departments that are flatlined like legal and there's a ton of fees and attorneys that are being pushed into property casualty even if they're being used just to cover simple litigation matters that ordinarily our legal team would have covered. I can tell, I haven't talked to them up in Manchester, they put that within their budgets. They don't stuff it into that area. So bear in mind that this account has moved from like $500,000 to upwards of $6 million since Mayor Donchess has taken over and I'd like to understand that. It's pretty significant. Thank you."

**Personnel/Administrative Affairs, June 5, 2023**

**https://www.youtube.com/watch?v=TINrT5p8WwI**

**1:02**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I know that on the agenda tonight is a discussion about public comment. I want to thank the ACLU and the New England First Amendment Coalition for getting involved in encouraging the city to change their comment. I want to thank the Board members that sponsored it and those that signed on a couple of weeks ago to participate in making that change.

"I'd like to make you aware that the Board of Assessors changed their language in 2020 - three years ago, long before Laurie Ortolano was the problem and their clause actually says that uncivil remarks will not be tolerated. They address it just that way. It's not a matter of vulgar or inappropriate. Its uncivil remarks and I objected to that from the beginning. It was Attorney Leonard who wrote that public comment policy, pitched it to the Board, and got them to agree to it. You know I watched people come in there on abatement issues. Those can be heated issues and make a comment. One lady, you know, what the hell's going on? Shut down, inappropriate. A very senior citizen with a walker who was a military guy used a swear word when they wouldn't give him his exemption and they thanked him for his service. He said I don't give a blank about my service. I want my exemption. Boom, slapped on the wrist. I mean I think that's ridiculous and that policy over at the Board of Assessors should be changed.

"I never agreed with what you did here. I thought it was very reactive for the Mayor to come out swinging from the Finance Committee meeting when he was upset because I was addressing deficiencies I saw in Director Cummings. He brought up the whole issue of the word "used" from a year

earlier. There was no need to do that except he was inflamed and the Board jumped on that, reacted, wrote a policy that I think it was wrong a year ago.

“I don't know if you also saw the video of the gentleman who came into City Hall a week ago Friday and made a video for about 15 minutes about free press and City Hall being able to film audio and video film City Hall and the objections he was met with that. I, too, bought a body cam because of all the arrest attempts on me when I came into City Hall. I wrote to Police Chief Rourke and got an email response back today as well as the Chief Prosecutor for the Police Department and both of them said – Chief Rourke said there’s no issue at all. We were called to City Hall. We were contacted by somebody in City Hall. We showed up that day but there was no action taken because a citizen can audio/video/record in a public place. I will tell you the city gave me a really hard time about that and it was never right. From a year ago…”

Alderman Thibeault “30 seconds.”

Laurie Ortolano “…I didn't like having a body cam but I felt I needed it for my protection. So I hope that you all vote to change that public comment policy, and strike that language, and just, you know, let citizens have the rights that they're entitled to. Thank you.”

**1:28:04**

**From Remarks by the Aldermen**

Alderman Thibeault “Okay. Follow up?

“So a couple of things on this. I mean we all work. Nothing's changed other than the ACLU letter since we originally went over this. We debated it and there was a debate. I remember having to try to explain to one Alderman what crude and vulgar means or what we think it means.

“So we got an email today and I want to read part of it because it goes against what we're really even trying to do with this ordinance. I’m not going to read it all but – “I want to give a big thank you to Alderman John Sullivan, Alderman Alex Comeau, and Alderman Tyler Gouveia for sponsoring O-23-054 in order to give Nashua residents back their freedom of speech. As Nashua residents have seen in the past, some Board of Aldermen do not want to hear from any residents that do not agree with them. However, this is not a perfect world and residents are allowed to disagree with what our Aldermen are doing for their constituents.” I can't remember one time that we've told other than hearing the word that we don't want to hear over the airwaves told somebody to stop speaking.”

Laurie Ortolano (From her seat) “I did.”

Alderman Thibeault “You're not talking.”

Laurie Ortolano “I did.”

Alderman Thibeault “I don't care.”

Chairwoman Kelly “Ms. Ortolano.”

Alderman Thibeault “Then you're going against this ordinance right now by speaking out.”

Laurie Ortolano I'm going to share it with you.

**1:46:57**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. When you bring legal in, would you please have them address the public comment policy for the Board of Assessors? I know the ACLU didn't cover that in their letter and they didn't have to but that is just basic blanket language that says uncivil remarks will not be tolerated and I think that should be struck. That is what the Attorney Bolton told you to strike at the same time and Attorney Leonard put it in over there.

"Your discussion about a compromise is encouraging. I want you didn't know Alderman Thibeault when you said I don't know anyone who's ever been interrupted or cut off, I have been and it was at that Finance meeting that the Mayor if you watch that tape in 60 seconds he shut me down. He was angry because I was upset about not being able to get records through Economic Development and he started going right at me. He took my three minutes right away. I lost the other two minutes and no one objected. When the Mayor goes off track, nobody stands up and says Mr. Mayor give her the floor. She has her three minutes. I told him to shut his pie hole several times and his remark was pie hole is a swear word. It's in a Lizzie McGuire movie and I don't think it's a swear word. It was an emotional thing. It was an emotional moment and sometimes that happens and no one stepped in. The same action happened to me in the public hearing in June with the Mayor. He ran right over me, interrupted my comments, took the floor for over five minutes, and when I wanted to respond, Alderman Dowd said time's up and I had to sit down. This has happened to me repeatedly which is why you have a federal suit by me on these constitutional issues. Not on swearing, just not allowing me to have my speech.

"So secondly, I want to address public information. I don't understand why the Board of Aldermen hasn't been a lot more active in enacting legislation to deal with open records issues. Why is it impossible in the City of Nashua, a city of this size, that a citizen has no place to go to say what records are available, where are they stored, and how can I get them? I can do that in virtually every other municipality I go to. We are supposed to by Charter and NRO have a Municipal Records Committee that addresses these issues. You have not had that committee formed in 20 years. Their job is to look at record availability, record retention, and record archival, and record disposal as required by the State Statute. Why is it there no place to go?"

Alderman Thibeault "30 seconds."

Laurie Ortolano "If you go to an office and you say are these records located here? The responses is under 91-A, I don't have to answer you. You're being challenged in numerous lawsuits on this that the Right to Know law doesn't allow you to say I'm not going to tell you where your records are. The Town of Hudson the Board of Selectmen just wrote legislation for a Right to Know policy to deal with all of their issues because of the big construction project with Amazon putting in a facility which was withdrawn."

Alderman Thibeault "Time."

Laurie Ortolano "You should be doing the same."

**Regular Board of Aldermen Meeting, 6/13/23**

**https://www.youtube.com/watch?v=XlZnYtIWA7g**

DRAFT

**10:17**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Madam Chair could I speak at this input? I wasn't able to get here for 7:30."

President Wilshire "You can but you know you're supposed to sign up and be ready before."

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I was at a church service and I got here 5 minutes late. I just wanted to address the supplemental appropriation of the $500,000 into the Risk Management account. I know that was addressed in a hearing and I came out and spoke to that and there was a breakdown given by Director Cummings regarding that matter which had to do with the IT issues involving the school. I'd like to, you know, I know what the accounting was given but I'm also aware of other appropriations in Risk Management that have to do with this. There was a contract to Charles River to do $100,000 worth of work that happened in early May that I believe is relative to this software issue and this IT matter with the school hacker ransomware. It would be nice to have a total appropriation of how much money was moved into Risk Management beyond the $500,000 because I don't feel like the $5,000 was the full appropriation. I think we ought to understand how much money is being moved over there for that and I also think that at some point parents ought to be told what records were compromised just like a bank would do or a company. They have to report if your information has been compromised but parents still don't know what was taken on their students. I think it's reasonable for them to know that. Thank you."

**48:41**

Laurie Ortolano "Once again, I was late and I'm requesting an opportunity to speak."

President Wilshire "Okay."

Laurie Ortolano "Thank you. I'll start my clock. Laurie Orlando, 41 Berkeley Street. I have a handout here I just wanted to give the Board. I'll just put one here and one on this side. I wanted to address - you know, I know you're all aware of the different Right-to-Know actions I've had going with the City and my concerns about open records. I think we haven't moved in the direction that I've hoped we'd move in the last three years.

"One of the recent lawsuits I had had to do with New Market Tax Credits and records involving New Market Tax Credits. I put in a Right-to-Know to Director Cummings' office to get information on whether we were pursuing New Market Tax Credits for future work. I didn't get the response I felt was right so I filed the lawsuit. The paper I gave you happens to be a contract that we just undertook in December, January, and February with Neil Cannon. Neil Cannon was the specialist hired to assist us with the New Market Tax Credit in 2018 through the very beginning of 2021 when we signed our contracts. He was considered the tax credit specialists New Market Tax Credit sole proprietor specialist and he did the work. Unknown to me, we hired him. Director Cummings hired him in December, January, and February without the use of a PO, a requisition, or going through the proper purchasing channels to make such a purchase. We paid him $5,000 a month at a fixed rate with no definition. If you look at page one, you can see the invoice for February 1st which had to do with the December billing period for $5,000. Page two is the check paid to him. There is no definition of what he did for $5,000. If you look at page three, it's the approval of a non-PO invoice which according to the procedures of the 65-page purchasing manual, a non-PO cannot be used for a service like this."

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "It's not considered proper. Then if you look at pages four and five, you'll see the invoices he gave us when he did the work in 2018 for $5,000 and the attached invoice with all the detail of what he did hours and time. I feel it was unlawful and illegal for a contract to be given to Neil Cannon without the public having any knowledge of that contract and knowing what was going on."

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "And you know who do you take it to? This language in here says it's unethical, it's unlawful. Who do you take it to? Director Cummings controls the HR Department. Director Cummings controls Purchasing, although this manual says Purchasing is under Finance. It isn't any more. You know its wrong and the citizens, I can't track what was done. I don't know what we paid the man $15,000 for and I haven't been able to get those records yet."

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "This is an ethics violation. It's an unlawful issue and it should be addressed by the Board. Thank you."

**Special Meeting of the Board of Aldermen, 6/20/23**

**https://www.youtube.com/watch?v=xdhiO6Gi4Q4**

**22:37**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I appreciate the overview. It would be helpful in the overview if there was information that covered new positions. You know as we look at the budget, I think the big thing is that costs us a lot are positions, and benefits, health care and when we do an overview, I don't have a sense of how many new positions have been added to the budget. I did my own math and it's about 28 but I think we should be talking about those positions and covering that information. That's my one comment. I'd like to see more specifics go into the surface - the information that's most relevant. Thank you."

**43:49**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. First of all, I'm concerned that the education budget continues to grow every year despite the fact that enrollments have gone down. I'm particularly concerned about our buildings and our infrastructure maintenance in education and our needs. I think there is a pattern to ignore data to not look closely at what the numbers tell us and numbers don't tell the whole picture but they give you information and work with that data. I think the consultant that was hired to come in and look at the school usage and the needs of the school for redistricting dropped a report that surprised a lot of people. Not just at the Board of Education table but at the Board of Aldermen table."

Chairman Dowd "Okay. I'll let you go. You're okay about it so far but I don't want to address any redistricting questions to the Board because that's not part of the FY24 budget. It's part of what the Board of Education is doing and it has nothing to do with our budget."



DRAFT

Laurie Ortolano "I'm not going to ask questions on redistricting. I'm just saying that out of that..."

Chairman Dowd "That's fine, you're alright."

Laurie Ortolano "…plan came a result that said we have far too many schools. We have too many buildings. I think there needs to be a consolidation on that and part of the reason is because you can deliver services better if they are consolidated, particularly in the special education area. You have specialists that run from school to school to perform services where the kids are very spread out. They're hard to find. They're tough positions to fill. It's not very efficient and you would definitely pick up better efficiency in delivering those services and those services are very expensive. I'm concerned that construction - you have a $90 - $100 million middle school might not have been fully necessary at the capacity that it was built. I really feel that we kind of missed the mark and we're carrying a lot of bond debt associated with education. To put that together with performance, student performance in this district, I think, is too low. When an administrator says that district wide 20% of our students are reading proficient, I think that's very low and that's not to blame a party or make it a partisan issue. I think if we're going to address the needs of education in the City, it has to be a non-partisan discussion where we're all vested in improving what needs to be improved because I really think parents don't care about your party affiliation. They want their children well educated. They want them to know certainly basic skills and I feel we've missed the mark on that. Because of that, I am resistant and not willing as a taxpayer to continue to fund increases in this system. A lot of it has to do with a lack of transparency that exists right here at this, you know, Board of Aldermen table and how these meetings are run. You know the budget book changed a lot, the format changed a lot. It's hard to come in here and ask questions. Then you learn that you can only say one thing, and you're cut out after that, and you got to wait till the end to come up. It's a hearing on a $300 almost $20 million budget and to be prepared - I'm not even certain if your rules apply when Administrative Service Division is done and it covers 13 departments. Can we ask on each department or are you allowed one question and then you go to the back of the line and wait till the end? I don't even know what the format really is."

Chairman Dowd "Just a couple of things. You can ask more than one question but you can only come up once but you can ask multiple questions. But do you have any specific questions for education?"

Laurie Ortolano "What is the cost per pupil this year?"

Chairman Dowd "Somebody from the Board of Ed want to cover that or from the School Department? Please identify yourself."

Dan Donovan, Chief Operating Officer "The cost per pupil on the DOE 25 that we did last year is about $16,000 total."

Laurie Ortolano "What is the cost including debt service to the school per pupil?"

Dan Donovan, Chief Operating Officer "That cost includes debt. It includes everything but transportation. That's a cost based on a formula designed by the State so that all districts put the same components into the cost structure."

Laurie Ortolano "So does it include the bonding of our new middle school that's $16 million?"

Dan Donovan, Chief Operating Officer "If incurred, yes. It wouldn't be the full amount."

Laurie Ortolano "Okay. So I come up with a different number but that's a discussion for another day and I can share that with you separately because there's no need in debating that. The other thing I'm concerned about is enrollment projections which look like they're rolling down which is another issue to really look at facility consolidation. I heard some members of the Board of Aldermen say that, you know, we don't have the single-family homes for young people to get into it. It's definitely an issue and that they're going to go to these vertical buildings, apartments and that's where families will be raised. I'm not certain I really believe that in Nashua. But also I'm a little bit concerned on how that works with all of these Tax Incremental Financing Districts being done because a large part of the vertical construction is being done under TIFs. If you do have a bunch of school children that are coming into those living arrangements, they don't belong in TIFs. But overall, I'm really disappointed with our performance and it just seems like administrators and leaders in this City just want to say a lot of fluffy words about how excellent it is, how successful their child or grandchild might have been but we're not looking at the big picture of all the kids. I think that this City could do great things. We have a lot of upward potential and we could do great things if we really work together in a non-partisan way. Thank you.

**01:03:33**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Could somebody - I noticed that there's position increases for Public Works Admin 2023. It was 13 positions and now it's gone to 21. Is that correct and could somebody speak to the Admin position increases in Public Works?"

Chairman Dowd "Can someone from Public Works cover that?"

Laurie Ortolano "Can somebody tell me if my math is correct and that is correct? Have we gone from 13 to 21?"

Chairman Dowd "Do you want to come down to the microphone because."

Lisa Fauteux "Lisa Fauteux, Director of Public Works We have not increased the number of Administrative Assistants in Public Works this year."

Laurie Ortolano "So is there something in the book then that makes that look that way?"

Chairman Dowd "John go ahead."

John Griffin, CFO/Treasurer/Tax Collector "In discussions with Chairman Dowd, he wanted us to take a little bit different approach and what we tried to do is indicate in each division/department the number of employees and their salaries. So in this particular budget, we didn't do what's called "the allocation of split funded positions". We have it but not in the end of the book. So what happens when you do a split funded positions, you might have a point five FTE that's now showing here as a single FTE if their - it gets a little bit complicated - but if their HR 11 record is in DPW, that's where the position stands. So what I would suggest is a follow up to this particular discussion, get you the information."

Laurie Ortolano "Okay, I would appreciate that. Just a comment when we do present the budget so and we're in this department because now my positions might not be summarized correctly because of how we looked at this. When I see 28 new positions, that might not be correct but there's no apples to apples comparison for us this year going off of last year's book which made it all the more critical when you present it in the beginning to kind of highlight this for us so that we would know. This budget book doesn't have an index in it and so I would recommend next year putting an index back in the budget

book because it's hard to, you know, find - it's a big book and all of a sudden you're looking for departments and you don't know where they are. Flipping through the whole thing to find them is difficult and maybe look at the print size on some of these pages too because we're getting older and they're pretty small."

John Griffin, CFO/Treasurer/Tax Collector "Mr. Chairman if I may?"

Chairman Dowd "That comment has been made by some of the Aldermen as well."

John Griffin, CFO/Treasurer/Tax Collector "Mr. Chairman if I may? This is a book, it's an evolving book. Any concerns that you have, any suggestions they're welcome."

Laurie Ortolano "Okay, perfect. Thank you."

**01:15:08**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Where are we right now when it comes to filled or unfilled positions?"

Kevin Rourke, Chief of Police "Right now we're down 11 officers and we're about to hire three within the next three weeks."

Laurie Ortolano "Were we ever fully staffed this year?"

Kevin Rourke, Chief of Police "Unfortunately, no. At one point, we were down 17 was our most."

Laurie Ortolano "So I just want to point out with surplus money because - escrow money rather. When we do our escrow deal which I'm hoping we won't do this year because we present a budget that's 4.4% but when you go and vote in June, or July, or August to shift over 3% more out of escrow, your budget increase is really like 7% or more. I think it's very misleading when we're all here in a budget hearing on increases and then we shift escrow money in. I was not a fan of putting positions using escrow money to create positions and put them in the book. I know we asked and approved two officers and I think they were specialty but I'm only going to point out that I think that shift could have happened within the budget and should have. I hope this year we won't use escrow to create new positions. It's not that I don't support new positions in the Police Department but I'm conscientious about how escrow money is used. Thank you."

**01:28:12**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Can somebody tell me what the endowment is for the Public Library and how that's managed?"

Chairman Dowd "Librarian is here?"

Jennifer McCormack, Library Director "The library has approximately 20 different trust funds. The total investment amount, I don't have an exact figure at the moment. I think it's in the vicinity of $4 million."

Laurie Ortolano "And what do you use it for?"

Jennifer McCormack, Library Director "It depends. So every fund has different restrictions. The biggest fund we have - the Stern's Fund - we spend that on content, eBook content. We've spent that on

digitizing historical newspapers. We spend that on a particular database we use. So for that individual fund, the restriction is it needs to be spent on reading materials not normally purchased by the City of Nashua."

Laurie Ortolano "Okay and then do you regularly use your endowment fund to spend?"

Jennifer McCormack, Library Director "We use - so there are some that rarely get used. So for instance, there's one that's solely for the purpose of buying books about the Constitution."

Laurie Ortolano "Okay."

Jennifer McCormack, Library Director "So some years we use that. There's one solely used for the purpose of programs and events dedicated to Lithuanian culture. So we'll spend from that when a particular request comes in. There's another one dedicated to purchasing works of art by living artists and that has been used right now the most current use is we're funding a call for artists to design a special edition library card so that'll be a couple $1,000 that hopefully will get spent this year. So it's really individualized. There are a number of funds that are unrestricted. I can't tell you exactly how many but I can tell you the expendable balance in those. The total amount that's available to be spent in those is in the vicinity of $100,000 to $150,000. So the amount that's expendable that's unrestricted on an annual basis is fairly small."

Laurie Ortolano "Okay. And just one last quick question. You got rid of your fines didn't you your book fines last year?"

Jennifer McCormack, Library Director "That is correct."

Laurie Ortolano "Okay. That was awesome and have you found that that has worked out okay?"

Jennifer McCormack, Library Director "That has worked out fine."

Laurie Ortolano "Good."

Jennifer McCormack, Library Director "We've had more positive feedback than negative."

Laurie Ortolano "Good. Great. Thank you."

**01:36:43**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. We were doing a conversion to digital records over in permits and last year I came to this microphone at this meeting to see how we were proceeding and completing that and we weren't done. Where do we stand on making those records available to the public and will they be available from their home, or are they online, and what records are going to be there for us?"

Chairman Dowd "Director Sullivan?"

Matt Sullivan, Community Development Director "For the record, Matt Sullivan, Community Development Director. Miss Ortolano I do remember this conversation from last year's budget meeting. The effort is ongoing and just to reiterate a few comments that I made last year, there are really two independent components to the record digitization process. One that we have completed successfully is the incoming permit process. When it comes to an applicant coming in for a building permit, all of those



DRAFT

permit applications and the routing associated therewith including all of the repository of that information is now exclusively digital. So we've now successfully completed that task of incoming permits. The task that's not yet complete is if you were to go into the Community Development offices, we have a huge file room that contains all of the history of building permitting for the City of Nashua for all of the property cards across the City. What hasn't been completed is actually taking those records, digitizing them, and then attaching those records on a permit by permit basis back to the property cards. That will be a substantial effort that we have not yet completed that will take some level of outside consultant or firm simply because records are so voluminous in nature and that tie-in exercise is so time sensitive or so time intensive. So again, the incoming permitting process is something we've already fully digitized. The one part I should address that you raised is the idea of a permit, a permitee, or a homeowner actually submitting an application through the online permit portal. That's something we're still working actively with IT to roll out. We have not released it as of this date and time and I think my update may have been somewhat similar last year but we we're really working on finalizing that sort of internal review process digitally and we've done that."

Laurie Ortolano "Okay. So none of these records or the permits that are now digitized and that part is done are really available to the public are they? Are those are just internal or are they available?"

Matt Sullivan, Community Development Director "Great question. So the digitization I'm referring to you're correct is available only from an internal review perspective. So right now in order to pull a full building permit record, you still need to contact the Building Safety Office and either we can send it to you - we are doing a lot of our work that way these days - or certainly you could come in to review the record. What I can say though is because we've recognized this delay in that process, we've been trying to be proactive and accommodating when it comes to sending digital records out by email or some other method because we know that online portals not available just yet."

Laurie Ortolano "Okay. And is it actually in your budget to do this digitizing of existing permits and records that are in storage? Is that a budget line item or how was that budgeted because part of me thinks that it's not a realistic task?"

Matt Sullivan, Community Development Director "I would say it is a realistic task assuming that in the future we budget some monies to it. We have not included that specific task within the Fiscal '24 budget as it exists now. To your question and your line of questioning, our first priority was the internal process. Our second priority was actually rolling out that public facing portal for applying for permits online. The third task is taking those historic records and digitizing them. We're very aware of the labor intensity associated with that. It's something that will have to be done at some point in time but we simply are not there yet. So you're correct, it's not in the budget but I would disagree that I do think it's realistic to provide that we dedicate some resources to it albeit not within this budget."

Laurie Ortolano "Okay. It turned out to be such an expensive undertaking in Assessing. You know it started off as like $60,000 and all in, it ended up being maybe $300,000 or $400,000 when you look at the staff time needed to do it. It was an expensive project and I don't even know where that stands so I just see it as pretty significant. Thank you."

**02:04:10**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. So does this include Health and Human Services? I think it does. Am I correct? Okay good. Couple of questions for you. Is there revenue in there for the new position that was just voted by the Board for the Chief of Health - Nashua's new Chief of Health? Is that part of this budget or has that not been put in?"

Mayor Donchess "I could answer. That's not a new position. So the Ordinances had previously designated the Environmental Health Officer as the Chief Health Officer of the City but that was done when the Director of Public Health and Community Services did not have a medical background or scientific background. We encountered problems when Director Bagley applies for grants and stuff and they expect - hey, outside parties, expect that the Director of Public Health and Community Services would be the Chief Public Health Officer. In addition, Director Bagley I think has earned the designation. So the ordinance what it did is simply said instead of the Environmental Health Officer being labeled the "Chief Public Health Officer of the City", it's now going to be the Director of Public Health and Community Services."

Laurie Ortolano "Okay. So it's not really a new position, is that correct?"

Mayor Donchess "Correct."

Laurie Ortolano "Okay and she'll still serve as the Director of Nashua Health and Human Services. We're not creating a new position."

Mayor Donchess "Correct."

Laurie Ortolano "Okay. And then do we have additional new grant funded positions in that department coming in this year or have we grown that at all? I can't tell with the numbers because…"

Mayor Donchess "Well Director Begley is going to have to answer that but we hope so. We hope so and I think we expect that or the grants are in progress but not yet expended. Director Bagley can answer that."

Bobbie Bagley, Director of Division of Public Health and Community Services "Yeah so we do have a number of grants that we have received from the Center of Disease Control and the Bureau of Drug and Alcohol as a pass-through to the State Health Department. Those grants will fund and do fund existing positions as well as several new positions starting in Fiscal Year '24."

Laurie Ortolano "Okay. Is it your anticipation that those positions will continue to be funded - I mean I'm always concerned when we start with grant funding that we end up growing with permanent positions but would these be temporary positions that are just based on grant funding or do you anticipate them becoming permanent positions?"

Bobbie Bagley, Director of Division of Public Health and Community Services "So there's two parts to that question. There are several grants that we receive that we receive for decades that fund our emergency preparedness, one of our public health nurses, our staff that do the behavioral health. That's continual funding that comes in. Some of the new funding that has come in as a result of the COVID Response Funds or ARPA funds from the CDC, those funds will end at the end of Fiscal Year '24 and so those positions that will be brought on in July will be temporary positions."

Laurie Ortolano "Okay. All right. Thank you."

**02:13:54**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Within your organization, what departments report to you? What other departments report to Financial Services? It used to be Purchasing, Payroll, Risk Management. Do you still have those? You don't have purchasing anymore, correct?"

John Griffin, CFO/Treasurer/Tax Collector "That's correct. The individuals that report to me are Financial Reporting, Accounts Payable, Treasury Tax, Treasury Management, Motor Vehicle. Those are consolidated. With the reconstitution of the Administrative Services Division several years ago, there was a replication of those departments that you just mentioned back in under the Administrative Services Director."

Laurie Ortolano "Were they under it before?"

John Griffin, CFO/Treasurer/Tax Collector "They were back in Mayor's Streeter's tenure and prior to that."

Laurie Ortolano "Okay. I really think they belong in Financial Services - Purchasing and Risk Management. Have we addressed all of the various escrow accounts that have grown over the last four or five years under this administration to consolidate those and clean them out or are we still holding all of the different escrow accounts for various departments?"

John Griffin, CFO/Treasurer/Tax Collector "Mr. Chairman, if I may. As Director Sullivan indicated and the other Directors, we made a concerted effort in this budget to put in the budgets ongoing operational costs. So the hope, the objective is to not have operational escrows unless absolutely needed and certainly not payroll escrows. So what will happen is we, you know, hopefully we're fortunate enough to have appropriations not spent which is surplus. Hopefully, we will be moving those dollars into either capital projects, CERF, other items that need some help from a funding perspective."

Laurie Ortolano "Plus I think if there is a lot of escrow money, it ought to be returned to the taxpayer if it's not budgeted. That's part of the game and instead of just as escrowing it and keeping it to move around, it ought to come back and not be carried year to year. So I'm glad to hear that that is underway and that effort is being made. Thank you."

**02:21:57**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm not a fan of this position and I've watched it operate for three years. I think it's been a really destructive position for the City when it comes to citizens and access to City Hall and information. The prior Director was pretty restrictive and now we have a new Director who has taken City Hall in closed most of the doors down. They're closed. They have phone numbers you have to call. They're by appointment only. It's swept through almost every door. I received an email through a Right-to-Know where Director Cummings tried to get the keypads and the scanners on every door but it was like $8,000 a door and Risk Management said hey we didn't budget for that so we can't do it. He wanted 15 doors done. That's not a public building anymore. Our City Hall is not a public building and it's different from Hudson, and Manchester, and Keene, or Salem. Go into those city buildings because I've been in them. They're all open. Getting people to answer the phone if you're standing there and you knock and no one answers and you call and you can hear the

DRAFT

phone ringing in there, no one picks up. I don't believe it's because no one's there. Okay. I think what has happened is a travesty and I think Director Cummings has been really destructive to how a public operation and a municipal government should operate. Now I also don't understand his job title change. What is his job title? Is he the Administrative Services Director or the Chief Operating Officer because both are listed in the book? What is he?"

Mayor Donchess "His job title was expanded and changed."

Laurie Ortolano "Okay. I have a big issue with a Chief Operating Officer being added to a job description of an Administrative Services Director. A Director is very different from a COO and if you operated within the guidelines of the Charter that would be a new position you brought forward for vetting and I think that should have been brought forward. You know we talked about this Chief Public Health Officer which is a separate position that's assigned to somebody and it just got assigned to Director Bagley but she's still a Director. It was a separate, defined position. It was discussed in the Board meeting. It was voted on as an ordinance by the Board. Now we look at COO tacked on to a Director's label and we throw it there and it looks to me like he got a pretty good pay raise increase which I don't think is justified. I think you really subverted the intent of the law when you created a Chief Operating Officer which really in truth a COO would, you know, the Chief Financial Officer would work for the COO. This would take on everything and what you're really doing with that COO is creating a City Manager position and I think that needed to be vetted as well."

Mayor Donchess "He did not get a pay raise because of that."

Laurie Ortolano "Okay. Well okay maybe because of that but he is still overpaid in my book for what's going on in City Hall. He's creating an awful lot of liability. Now let's look at his department and let's look at the Right-to-Know Administrator. I think that position should be eliminated. That has created more lawsuits in the last three months because of what's going on with that position than I could have ever imagined. This individual is not skilled, does not understand the law, writes letters with the wrong dates, puts the wrong names on them, attaches the wrong documents, tells you when you write general correspondence that they're not required to answer questions when there isn't a question in the letter. It's frustrating. So if your intent was to frustrate us and create more lawsuits, bravo you've done a great job but I'll tell you, you have not made this any easier and that position should be cut. It is not helpful. Using him as the middleman to departments that have the knowledge where the workers are very knowledgeable. They know their stuff but they can't impart it because it's got to go to the guy who isn't knowledgeable, who isn't writing very well, and isn't doing a very good job. So I'm totally opposed to what we've done with money there because it created a liability. Now let's look at Purchasing. I think we're not following our purchasing policies and I addressed this a little bit two weeks ago or 10 days ago at a board meeting but I also feel that our contracts when we sign contracts, my observation is when I read contracts that have parts in it, that involve citizen awareness, or doing something for public promotion, or PR, we fall short on that a lot and nobody in contracts management or departments are pushing to make certain that that part of the contract is complied with. What I think of is in our first assessing contracts when we said, oh we're going to hold meetings, and you're going to get a mini analysis on your property, and you're going to have all the comparable data so you can see all your property change that never happened. That was part of the contract. It did not happen. Now I look at when we hired Neil Cannon and we have his contract and proposal. The very first thing front and center was a public relations campaign to educate the public, and the stakeholders, and the shareholders on



DRAFT

DRAFT

what a New Market Tax Credit is and how it works because it's so complicated. His whole push was public awareness and he would attend public hearings. Did he attend any public hearings where the public could ask questions because I actually think the answer is no. He did come to a hearing that was set up a year after we did the closing deal in December of 2021 to take questions from the public twelve months after it was done. When I look at how that Art Center was done, we had a performing - we had a PAC - a Performing Arts Center Steering Committee that allowed no public input. We had special meetings of the Aldermen when Brian McCarthy was alive and there were special meetings of the Aldermen, public comment was on the agenda. Special meetings of the Aldermen after he died, no public comment. If it had to do with the art center, public comment was shut down. Downtown Improvement Committee did a lot of discussion and input for the art center. Go to a Downtown Improvement Committee meeting, no public comment allowed. Now you have a Trust Committee for the Performing Arts Center that meets and does oversight. No public input allowed. Okay. Then you formed and used this New Market Tax Credit funding that created very unique entities that were very confusing one of them being a private corporation where all the records were locked down essentially and the project even though it was funded with bond money became a private project. So I will tell you, I'm very concerned when that kind of funding is being done to grow this City and those kinds of contracts that are running through Purchasing that involve public education are not being paid attention to and a lot more work has to be done. Switching to Assessing. Where do we stand on bringing the records online for the property files? We still had years to go. Where do we stand on completing that task and did we budget for it this year?"

Chairman Dowd "Who's gonna address that question?"

Tim Cummings, Administrative Services Director "We have budgeted for it in the past. I believe we've continued to budget for it. It's an ongoing project to get the files up. It's my understanding that we have completed a major tranche of it and we're going through a vetting exercise to make sure that the records are redacted appropriately."

Laurie Ortolano "Okay. That really doesn't tell me what percentage is done and where we really stand on. Are they up and running on the computer for us to access? They were in very limited form. I mean you had like three pages in your property record file. As they're being redacted, are they being loaded live so that are coming right in so that you can look at files that are complete and when will we know if the file is complete? You know you'd never know if you're looking at a complete file."

Tim Cummings, Administrative Services Director "It's my understanding that all the prior property cards have been uploaded. However, they've been locked down and secured until the redacting process has taken place."

Laurie Ortolano "I'm unaware that a property record card gets redacted. It doesn't. I mean I've never seen that."

Tim Cummings, Administrative Services Director "Sorry, just to clarify. I said property record card because I meant all the additional paperwork that would be included in that file. As I understand it, there's additional miscellaneous assessing paperwork that would go along with that property card or that file and those individual documents need to be reviewed and redacted."

Laurie Ortolano "Let's talk about redacting. We've complained a lot as a City about redacting. It's expensive. It's difficult to do. It's costly."

Chairman Dowd If it's not in the '24 budget, I'd rather the questions be specific to FY24 budget."

Laurie Ortolano "It's in this budget. I want to know if anyone looked into purchasing redacting software that is widely available to minimize the staff time used for redacting. Did we investigate that, or budget for that, or attempted to get it? We complain a lot."

Chairman Dowd "Do we have redacting software?"

Tim Cummings, Administrative Services Director "I'm not aware of any redacting software. We certainly haven't looked into it but I would happy to do so."

Laurie Ortolano "I think it's something you should look into. Also Risk Management. I'm really concerned about what's over there under Risk Management. We are putting all of the legal office stuff, the consultants, additional services, fixing elevators in a parking garage $100,000-$125,000, all of that is falling under Risk Management. I think that has become a massive slush fund. It is not just litigation stuff. It's grown. It's $6 million and it's not just Risk Management. I think the Board should be looking closely at that Risk Management account and looking at what's sliding in there. Because when we do get to Legal, we're going to see Legal hasn't grown at all. That's ridiculous given what's going on in this City because it's all in Risk Management. I also have a really big concern when we're paying for the attorneys that are being, you know, that a citizen, an elected Board member who gets sued not in his capacity as a Board member is now being paid for by City funds to be represented to the tune of $20,000 or $25,000 so far. I'm sorry, we should not be – taxpayers..."

Mayor Donchess "Which Board member are we talking about?"

Laurie Ortolano "Mr. Moran."

Mayor Donchess "Oh and who brought that lawsuit?"

Laurie Ortolano "I did. But so what? So if he wasn't acting, he went on a radio show and decided to make defaming statements outside his capacity as an Alderman. Why should the taxpayers pay his legal bill? You know what it shows me, birds of a dark feather flock together. You take care of your people and the taxpayers are going to pay for it when their conduct is poor. I think that is not appropriate. That's actually shocking to me that we cover the cost of those types of lawsuits. I think that's just wrong. Back to Purchasing. What do we do? Where are the safeguards in purchasing to address when contracts are or we don't comply with the rules because the NRO's the purchasing manual's state it's unlawful, it's unethical. They don't cite the RSA although there is an RSA for purchasing that does give you some language but what happens when we don't comply? When somebody turns around and just cuts a PO, or pays for something with no instructions like I saw happen with Neil Cannon coming back to the City. What do you do with that? When I addressed the Board, it was rather shocking to me that no one on the Board said this is very concerning. You know how did this happen? We didn't have a requisition. We didn't have three bids for something between, you know, $10,000 and $25,000. We didn't have a proposal. We didn't have a contract. We had a non-PO signed invoice which it didn't fall under the qualifications to be a non-PO service. Here I've been talking about transparency. I've had litigation in the courts that stands there on this art center New Market Tax Credit funding program because I don't want

to see it used again because all the records were locked up. If you're gonna build downtown out using those types of special financing mechanisms, you're denying citizens the right to have any construction records, any costs, all of that stuff is gone and so I think it's wrong. I think it's just wrong and I think the City should have defined that originally when you took that on but, you know…"

Mayor Donchess "My understanding was that 6,000 pages virtually every piece of paper generated by the Performing Arts Center has been produced - checks, bank records, change orders, 6,000 pages isn't it?"

Laurie Ortolano "No. You're thinking of the closing binder. That's 6,000 pages. You know what, that was a public document that was never made public. I got that within…"

Chairman Dowd "Again, I think we're going astray from the FY24 budget because that's certainly not part of the FY24 budget. Do you have specific questions for this area of the FY24 budget?"

Laurie Ortolano "I'm expressing, you know, a lack of performance in our Purchasing Department, a lack of performance with our COO, a lack of performance with our Right-to-Know Coordinator, a lack of performance in our Risk Management Department. I'm concerned with all of those and I think the lockdown of City Hall is exactly where we shouldn't be. That is not a public building anymore."

Chairman Dowd "All right, so you've expressed your opinions. Thank you."

Laurie Ortolano "Thank you."

**02:21:57**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. With regard to the Legal office, I think we're not carrying the accounting the way it should be carried. First of all, the overlay account for abatements contains all the consulting fees that are used by legal to help settle the appeals and work on the cases. In Manchester and other cities, those are part of the legal budget. I think it should be part of the legal budget so we see what we're paying consultants to assist us on appeals. I also think that the Board should push much more to try and get these appeals settled quickly. Other communities tried to settle those appeal issues or abatements that go to appeal out within 12 months because we have to pay interest on those. If you lose, there's a penalty. It was 6%. It went down to four. We are letting our appeals run out three and four years and we're paying the penalty on that and we pay the consultants in a budget we never see. Secondly, I think all of the various consultants that are being or additional legal services that are being hired to assist the Legal Department ought to be within the legal budget. It shouldn't show that there's no increase at all. I generally feel that that legal office is a mess. I think there's been a total lack of policy and procedure in the codifying on how things should be done with those records are available to the public and they help safeguard the City. I feel that not enough has been done in that area to address that. The legal office has been a major part of the problem in creating a lot of this litigation because they like litigation. I guess they're not so into mediating or trying to address situations and resolve them in a more peaceable manner. That was never more true to me than my property appeal. It's still a stunning thing to me to look at a property assessment that was as off as far as mine was and we couldn't come to a resolution that had to go all the way to the BTLA. Could not mediate that. So I am not happy with your legal office. I think your Corporation Counsel needs to be replaced. I think you need to do a much better job in creating policy and procedure up there. I think you got to get your accounting in order and put your consultants where they belong in that office. Moving





DRAFT

on. Let's go to Economic Development. When did the Economic Development Office move to the Hunt Building?"

Mayor Donchess "It didn't."

Laurie Ortolano "So I was told by your office that Economic Development was no longer next door. That I had to go to the Hunt Building. That's not the case?"

Mayor Donchess "I mean I'd have to check that but I mean I don't know what you were actually told but no they did not move."

Laurie Ortolano "So okay. I think your Economic Development office should be an open public office. I know in other cities it is. I've talked to the Economic Development Directors, I've been able to go into an Economic Development office. Your Economic Development office here at City Hall, I've never seen the door open. I've been in City Hall numerous times where people have come up to me saying gee I'm trying to get into the Economic Development office. I knock. No one answers. How do I get to them? I say you gotta go through the Mayor's office. Nobody answers. I don't understand that. I really don't. I've been to City Hall a good bit. I've never seen the door open. I personally have never knocked on the door where anyone has ever answered and they're not a phone call kind of group either. They don't answer. So I think that's a real problem when it comes to customer service and public business. If you want to run your office that way, go work someplace else because that's not an open public government. I do not support Economic Development taking on the role that it does in this City. It's quite different from other cities in that there are a lot of big projects going through Economic Development and I don't think its right. I think there's too many irons in the fire. I think there is not a lot of transparency. The records are not available to the public and it's done under a lot of secrecy. I don't think that's been to the benefit of the public. That department passes a lot of money through it and they may say they're advisory but based on minutes I was looking at of the art center construction meetings, your Economic Development Director was a lot more than advisory taking on tasks. Also City Clerk's Office. I want to say that I've been really happy with the change in your City Clerk's Office and I feel like the records are becoming more available. Customer service is very good over there. The shades are up most of the time. They have quite a few people at the window. I think it's been a real shift, and I think it's been really positive, and I hope they continue to work in that direction. I do think you need to get your Municipal Records Committee reformed and meeting again because I think a lot of the problems with the litigation on Right-to-Know has come from the fact that we don't have a Municipal Records Committee within the City. I don't know and a lot of people don't know what records are public. The City has always taken a position we're not going to tell you. Well your Municipal Records Committee would be the perfect place to go to which Sue Lovering held one meeting. It was great. It was a good meeting. They were going to meet again within after the election in 2021 and they never met again. I kept going over to the Clerk's Office trying to meet with her on that Municipal Records Committee and she would not speak to me. The reason I wanted to meet with her was to try and find out what art center records are public. Help me figure out what's public over there. Instead of trying to work with me, I received an email that I'd be under arrest if I came back into the office again. They'd call the police and have me arrested. Now I've never had a letter like that come from our new Clerk and I'm really appreciative of that and I hope that continues but I think if you got your Municipal Records Committee together, we'd start to understand what's available to us. TIFs. Do we still have the same number of TIFs? We have the School Street TIF, the Riverfront TIF. Have we added any more TIFs?"

Mayor Donchess "No."

Laurie Ortolano "Okay. Were we able to pay out the bond? The bond costs, the principle and interest on the $5.5 million out of the School Street TIF account? Do we have enough money in it?"

John Griffin, CFO/Treasurer/Tax Collector "Mr. Chairman, we have the School Street. Principle and interest is in the School Street TIF accounting.

Laurie Ortolano "And so we just paying that fully out of there?"

John Griffin, CFO/Treasurer/Tax Collector "Correct."

Laurie Ortolano "Awesome. Thank you."

**Regular Meeting of the Board of Aldermen, Tuesday, 6/27/23**

**https://www.youtube.com/watch?v=hqtZmPGAkNU**

**21:15**

Laurie Ortolano "Laurie Ortolano - 41 Berkeley Street. I'm here to speak in opposition to the budget. You know the 4.4% increase doesn't seem like much but it's every year we are taking this budget up when the biggest issue is our student enrollments are going down. What we're not being told is that once you apply additional escrow money that usually roll in in September, that budget goes up a couple more percent and it's easy to become a 7% budget which is what happened last year. I'm not a proponent of using significant amounts of escrow money to fund the budget. I think that should go back to the taxpayers. I'm very concerned about what's happening and Risk Management being used like a slush fund to roll expenses over there that really are not property casualty expenses. I think the report that the consultant provided on the school was very eye opening and while it helped me put us as number three but the devils in the detail and you really have to look at the comparable cities that are used in that WalletHub analysis to determine if it makes much sense that Nashua is in it. I think we all know what these studies and reports can say and your ability to sort of throw yourself in those lists. I think that we have a lot of work to do in the public education system here in Nashua and I think we have a lot of nonpartisan work to do. I don't think parents care what party affiliation you are when they're trying to educate their children. They just want their children to have a good education and I don't think we're delivering that through the Nashua Public School system. Our reading proficiency level throughout the District is about 20% and that is simply far too low for budgets of 59 million that keep going up every year. I hope that this Board takes seriously the consolidation of the building plans. Consolidating buildings will do a lot for a specific group of students, especially special needs students who require services…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…that are being split up between facilities taking specialized people making them travel building to building to deliver those services where the buildings are substantially underutilized. So I hope we give some serious thought to our property management for our school buildings and our performance in a very nonpartisan manner. When it comes to the legal office, no one is surprised when I tell you I think you need an overhaul."

Donna Graham, Legislative Affairs Manager “30 seconds.”

Laurie Ortolano “There's been a big liability issue that I think is caused by the legal office itself and the competency of that office. I'm going to be addressing that at the next public input and I think that it's unfortunate it's been allowed to go there but I think our lawyers need to understand what municipal law is about and how to serve a community as municipal lawyers. This sue us, see us one, raise us one mentality has to change. Thank you.”

**01:08:52**

Laurie Ortolano “Laurie Orlando - 41, Berkeley Street. I've started my stopwatch here. Wanted to ask if the Board will be doing a final review on the art center - the close out or the cost for the project and whether there would be any kind of public comment allowed to that? I think it's important. That was a very closed book project compared to other construction projects that the city has taken on. There wasn't a lot of public involvement because of the nature of accepting the New Market Tax Credit money. I have pretty much strongly disagreed with that type of funding being used in a municipal project. I'm very concerned with Director Cummings initiating more of these types of projects with New Market Tax Credit money in Nashua as he indicated he might do for the Elm Street Middle School. I want to let you know that the corporations that were formed there were three. The 201 corporations were supposed to be nonprofit public corporations. I challenged Attorney Leonard on this when the By-Laws were written and I read them but they were written as private corporations. Their meetings were essentially being done private and all of their records were being maintained private. I could not get Attorney Leonard to address why the By-Laws were done this way. We hired a consultant out of Drummond Woodson and paid him $65,000 to do the work on the paperwork for that New Market Tax Credit and he did the By-Laws wrong. Because I couldn't get Attorney Leonard to work with me, I filed the 201 corporations into the lawsuit in Superior Court challenging those records and essentially I won. I've been in settlement with, which was announced in court. This is not revealing anything that is private. McLean Middleton joined representation for the 201 corporations which we are paying - the taxpayers are paying the legal bill for McLean Middleton.”

Donna Graham, Legislative Affairs Manager “One minute.”

Laurie Ortolano “And they immediately when they joined on, they contacted me and said we don't know why these By-Laws are done this way. They don't make any sense. So they wanted to settle out quickly. I said no. I want to do discovery. They stayed on but essentially, they've completely written the By-Laws, have made them a public corporation, they're going to be adopted by the Board in August. My question to you is why did you allow me to have to waste my money and time to go to court - not my money…”

Donna Graham, Legislative Affairs Manager “30 seconds.”

Laurie Ortolano …but we're going to pay McLean Middleton out of the taxpayer dollars, probably 60 grand, to represent this issue that Attorney Leonard would not correct when I tried to speak to her. I think that's ridiculous. I mean there's a lot of questions of fraud in that Art Center project and why it was done the way it was done and that's going to be taken through the court. But honestly, I think she was a terrible municipal attorney in doing what she did to hide the misrepresentation of those corporations and forced me into court. Thank you.”

**Special Board of Aldermen, Tuesday, 6/28/24**

**https://www.youtube.com/watch?v=CrVz84ALDko**

**6:26**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things. This is going to be money coming in from Spectacle based on sales of items and other type things. Did we determine a contract or make an arrangement on getting a dollar off of ticket sales which is one of the items that's part of this? What is the deal for getting that arrangement done? Does anyone know because that's a big one? That's where you're going to get some money. That was, I believe, presented when Director Cummings presented it to us that that was something that could happen. As I read through this, I'll find the part that will tell you that it's something that has to be negotiated and I'm wondering if it has been negotiated. It probably has not yet been negotiated. Okay. The Spectacle agreement that I'm looking at has a term of seven years from the occupancy date. Do you know why we expired after seven years? Will this fund disappear after seven years? What's the purpose of having this term with Spectacle? Do we intend on no longer having Spectacle manager it after seven years? Why did we pick seven years?"

Chairman Dowd "I don't think there's anyone here that can answer that question other than maybe Director Cummings but it's not part of this legislation."

Laurie Ortolano "Well it is because the expendable trust fund is set up under this Spectacle contract. So I'm looking at the fact that this contract expires in seven years and I'm wondering why."

Chairman Dowd "Unless somebody on the Board knows."

Alderman Klee "I do not know why the seven years were chosen but I think the intent has always been that the city would never run this. So whether it's Spectacle, or ABC management, or something I think Director Cummings probably can answer it better. I think the intent has always been to have someone else run this not the city. I think that was almost kind of a promise to the people that the city is not in the business of necessarily running this. So whether it be Spectacle, or ABC management, or whoever it to be I believe that's what it is. Why seven years? I believe they negotiated that seven years per what Spectacle wanted and so on. I don't think any of the residents in the City of Nashua would have been really thrilled if we did this in perpetuity. I think we had to have and seven years is a really good timeframe for them to get started, understand, and I believe that there is if I'm not mistaken, there's somewhere in the contract that kind of gives them the ability to continue with this and so on. I think that's just part of the negotiations."

Tim Cummings, Administrative Services Director "Thank you Mr. Chairman. The seven year question is one relative to actually falling into compliance with the New Market Tax Credits. So that seven years goes with the New Market Tax Credit compliance period. Honestly, I wanted it to be the shortest period of time. I wanted something like three to five years. We're creating a new market and so we essentially wanted to make sure we knew what the market was doing. We wanted to see it stabilize. Spectacle would obviously like a longer contract. They wanted something more than seven years. We ultimately agreed to have seven years. I thought that would be a reasonable amount of time to have enough data and then we could reassess and renegotiate the contract with Spectacle or any other operator or management group that we may entertain at that point in time."



DRAFT

Laurie Ortolano "Okay. Thank you. I thought it might be New Market Tax Credit. Another part of this – let's see – have we had expenditures above the $1,500 that have required us to draw on the money that has been raised so far do you know?"

Chairman Dowd "I don't believe that has anything to do with this particular resolution. We're just establishing a capital reserve fund with no funding being talked about at this meeting. It's coming from Spectacle in accordance with the contract. Anything beyond that is not specifically related to this resolution."

Laurie Ortolano "Okay. I want to know there's another part in here that I think is relative and that is "Spectacle shall make its books, records, and files relative to the facility available for inspection and copying by the city upon written request within five business days of the request and maintain the records and the term of the agreement plus three years." How are those – this would be records that you could obtain relative to this contract or this money going in there. Who is the city to make that request? When it says the city can make the request who is that? It's not really a citizen is it?"

Chairman Dowd "I would assume it's the Board of Directors."

Alderman Klee "Board of Trustees."

Laurie Ortolano "It's the Board of Trustees?"

Alderman Klee "To be honest with you, I'm not sure whether the contract says that. I'm going to assume that it's the Board of Trustees. You were at the last meeting. They report to us everything that they have that is costed as well as the funds that have been received."

Laurie Ortolano "Okay so I would like an answer to that just to be certain what that is under 91-A. I did attend the Trustees meeting and I was happy to do so but I was disappointed there was no public comment allowed. Okay the advanced reserve fund. Let's see. This is where there's a ticket thing in here. Merchandising. One quick question just so I understand this. The contract that we have for the operating manual which gives us all the pieces of the utilities. I notice that's not done yet and that kind of feeds into this fund. Do we know when the operating manual is going to be completed? It was supposed to be completed three months before the opening. It's now five months past so we're eight months out. I'm just wondering where we stand on that operating manual."

Alderman Klee "Again, that's not part of what this resolution is but I'll do my best to answer it. We had discussed this at the Board of Trustees and it was even discussed, I believe, at the last Board of Trustees. The outline of it will be coming. They ran into some issues with the – just as we were doing the opening including finishing that night before. They were kind of given a - we know that it's coming and we will get it done. They are working on the manual so that the reason for the operational manual is if someone isn't there or doesn't have to they can just pick up this manual and continue to make sure that everything is running. It was discussed at the Board of Trustees meeting that you were at. So it's not something that's being ignored. While yes we did discuss the fact that it was supposed to be done prior to that, there were circumstances beyond their control."

Laurie Ortolano "Okay the utilities that the city is paying, those will not be paid out of this fund correct? That's a whole separate area? Okay. They did provide in the meeting a first quarter report and honestly it was good. Concession sales raised $5,000. Sponsorship sales raised almost $5,000. So for the quarter,



DRAFT

they raised about $10,000. It doesn't include any ticket money so that comes in that would be great. I would love to see where it said the ticket thing."

Chairman Dowd "The first thing we have to do by this resolution is give it some place to put it."

Laurie Ortolano "Okay. I can't find my little spot that I had it in here. That's okay. I would like to get an answer though to find out what we're doing with coming up with an arrangement where we do collect the dollar on the ticket sales because that would make a big difference I think in this fund if there are even some. Whatever they want to negotiate but if we could get something out of some of those events it would be a lot of money I think to help. Thank you."

**Finance Committee, July 19, 2023**

**https://www.youtube.com/watch?v=obwKOP4YnsQ**

**2:04**

Laurie Ortolano "Laurie Ortolano, 41, Berkeley Street. I happen to notice that we have a purchase order for the hiring of a it looks like one employee from Vision who's going to be here each year. Maybe it was a five year contract I noticed to do assistance with the assessors downstairs. My question is the contract called out a certain number of building permits they were going to cover maybe it was 7,500. Do we know what capacity that is that they're going to cover for the total number?"

Chairman Donchess "I think we will learn more about the contract when that item comes up on the agenda."

Laurie Ortolano "Okay. Well I'm glad to see that position being done. I think that maintaining our data quality is a good thing. It was always difficult even particularly for residential properties with just two assessors. They just didn't have the time to get out and cover all of the sales and permit work that was done in the city and that this service would be pretty helpful in maintaining our data integrity. So thank you."

**38:14**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm hoping I might be able to get some answers tonight. I'm trying to understand when a contract is necessary when we hire somebody, particularly the hiring of Neil Cannon to do some professional contract work for economic development. I addressed this with the Board of Aldermen and I showed you that invoices were submitted for three months - December, January and February with no detail provided and these were given out as non PO invoices I discovered. I don't think it's correct or proper that a citizen can't tell what a contractor is doing because there's no proposal, nothing in writing, or no information of what they're up to. I had to file a Right to Know to get the emails to try and find out what they were doing because the city wouldn't answer basic questions to allow me to have it. When I got the response, there were I'm guessing 150 emails. They batched out one batch of them. Mr. Cannon is doing primarily work for the Performing Arts Center. I don't know why that's not billed to the Performing Arts Center and why it's coming through economic development contracts.



DRAFT

"But I'm also extremely concerned about the records provided. It took a month to get them and the records were heavily redacted. 78 pages with probably 500 redactions. We have battled this redaction issue citizens against the city for three years and in particular, against this new Right to Know Administrator. Every one of these redactions was wrong. It went back into legal and they unredacted these documents completely. These documents are now - they took Mr. Cannon's name off and they required no redactions. So I hear leaders in the city like you Mr. Mayor complaining to the public that citizens are wasting so much money when we ask for emails and redactions take so much time. You're breaking the law when you redact and one classic example is this one. Here's a page of redactions heavily redacted. What's redacted is the address of a for profit sign company - business address. What the Right to Know Administrator put on that was that the address of the company at 125 Front Street, Bridgeport, Connecticut, was redacted as confidential commercial or financial information pursuant to RSA 91:A IV. That is 100% incorrect."

Alderman Klee "One minute."

Laurie Ortolano "And after the court order from the court on July 7th after the court order issued by Judge Temple, I wrote to Russ Hilliard that you've hired to represent these cases and said I've had it. I've had it with what you're doing wasting our money and running us around. He contacted the legal office to take a look and all of these redactions were wrong. Every one of them and we waited a month for those records. Didn't even need it. So, you know, I want to know why we hired Mr. Cannon. I think citizens ought to know how our money is being spent and I'd like answers on why these non PO contracts are being awarded. $15,000 has been paid. It's like he's getting a backdoor payment of $5,000 a month and these emails show that he continues to do work in March, April and May. I couldn't even ask the city when his contract ends. They wouldn't answer that. They said we're not going to answer that. Is that more Right to Knows I have to file?"

Alderman Klee "Time is up."

Laurie Ortolano "So I think I'm owed some answers instead of filing Right to Knows."

**Finance Committee, August 2, 2023**

**https://www.youtube.com/watch?v=-u--MI-91eQ&t=573s**

**4:13**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to address with the Committee the fees associated with the New Market Tax Credit that we took on for the art center. As you know, I've been involved with litigation on that building over records issues. Recently there was a filing that noted that the reason we did the New Market Tax Credit was because it was so cost effective. It was a way of saving money. I feel that that could not be more opposite to what had occurred. That New Market Tax Credit to get $2.4 million of financing cost us almost $2 million in fees. Had we bonded that money $2.5 million back in 2020 at a 2 percent interest rate across 25 years, a bond calculator would put the interest payment at somewhere around $650,000 to $700,000. That bond schedule would most likely yield a premium back. If I recall correctly when John Griffin has come to the meetings, he points out when



DRAFT

bonds are sold the city typically receives a premium back because people look to buy our bonds and we pay up on our debt. So we get some money back on that to offset it.

"The fees for the New Market Tax Credit when we started off, the investment fee was $146,000. The investment fund fee was $97,000. Baker Tilly which was a consulting firm tied to this was $97,000. The ongoing CDE fee was $339,000. There was $102,000 loan servicing fee. Compliance fee was $68,000. Neil Cannon that we hired initially was $68k by the city but we're probably adding another 30 to it because he's doing work right now on FF&E. That will push $110k. John Kaminski was hired by us for $55k in writing but I think he came in around $65k. The city time for two years for our city staff members officials like Celia Leonard, Attorney Bolton, Tim Cummings, the Mayor, John Griffin, Dave Fredette would have certainly come up with salary and benefits around $150k. We had to ensure all of these businesses paid for out of the city insurance. Jen Deshaies had to get a quote to get all the insurance costs for all of these businesses set up. When we went and did closing to resell the business to the NPAC Corporation, it was $55,000 in closing costs. The structuring and closing costs were $199,000. The estimated New Market Tax Credit legal fees which were billed by Lanthram GMP was $212,000. The fee list – this was a feeding at the troth and everyone came for the fee grab. This was a horrible program for such an small amount of money particularly when the city was outlaying all the money for it. This should have been bonded. It is why I am very opposed to these types of intricate and sophisticated financing schemes to roll into municipal projects. We're going to end up with over $2 million of costs to get $2.4 million.

"If my kid came to me and said Mom I'm buying a car for $35,000. I'm taking a 7 year loan and I'm going pay 60. I'd say don't do it. Don't do it. Go look at that again. You can do way better than that. That's what we did here. That was the biggest ripoff…"

Alderman Klee "30 seconds."

Laurie Ortolano "…you could have done to us. I think the city has to be much more mindful and it starts here with the Finance Committee to make certain that these sophisticated programs do not come into this city anymore. That New Market Tax Credit was not made from municipal businesses. It's really a private entity. It was a mistake to employ it and we paid dearly for it. Thank you."

**Budget Public Hearing, August 28, 2023**

**https://www.youtube.com/watch?v=CrVz84ALDko**

**6:23**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. A couple things. This is going to be money coming in from Spectacle based on sales of items and other type things. Did we determine a contract or make an arrangement on getting a dollar off of ticket sales which is one of the items that's part of this? What is the deal for getting that arrangement done? Does anyone know because that's a big one? That's where you're going to get some money. That was, I believe, presented when Director Cummings presented it to us that that was something that could happen. As I read through this, I'll find the part that will tell you that it's something that has to be negotiated and I'm wondering if it has been negotiated. It probably has not yet been negotiated. Okay.

"The Spectacle agreement that I'm looking at has a term of seven years from the occupancy date. Do you know why we expired after seven years? Will this fund disappear after seven years? What's the purpose of having this term with Spectacle? Do we intend on no longer having Spectacle manager it after seven years? Why did we pick seven years?"

Chairman Dowd "I don't think there's anyone here that can answer that question other than maybe Director Cummings but it's not part of this legislation."

Laurie Ortolano "Well it is because the expendable trust fund is set up under this Spectacle contract. So I'm looking at the fact that this contract expires in seven years and I'm wondering why."

Chairman Dowd "Unless somebody on the Board knows."

Alderman Klee "I do not know why the seven years were chosen but I think the intent has always been that the city would never run this. So whether it's Spectacle, or ABC management, or something I think Director Cummings probably can answer it better. I think the intent has always been to have someone else run this not the city. I think that was almost kind of a promise to the people that the city is not in the business of necessarily running this. So whether it be Spectacle, or ABC management, or whoever it to be I believe that's what it is. Why seven years? I believe they negotiated that seven years per what Spectacle wanted and so on. I don't think any of the residents in the City of Nashua would have been really thrilled if we did this in perpetuity. I think we had to have and seven years is a really good timeframe for them to get started, understand, and I believe that there is if I'm not mistaken, there's somewhere in the contract that kind of gives them the ability to continue with this and so on. I think that's just part of the negotiations."

Tim Cummings, Administrative Services Director "Thank you Mr. Chairman. The seven year question is one relative to actually falling into compliance with the New Market Tax Credits. So that seven years goes with the New Market Tax Credit compliance period. Honestly, I wanted it to be the shortest period of time. I wanted something like three to five years. We're creating a new market and so we essentially wanted to make sure we knew what the market was doing. We wanted to see it stabilize. Spectacle would obviously like a longer contract. They wanted something more than seven years. We ultimately agreed to have seven years. I thought that would be a reasonable amount of time to have enough data and then we could reassess and renegotiate the contract with Spectacle or any other operator or management group that we may entertain at that point in time."

Laurie Ortolano "Okay. Thank you. I thought it might be New Market Tax Credit.

"Another part of this – let's see – have we had expenditures above the $1,500 that have required us to draw on the money that has been raised so far do you know?"

Chairman Dowd "I don't believe that has anything to do with this particular resolution. We're just establishing a capital reserve fund with no funding being talked about at this meeting. It's coming from Spectacle in accordance with the contract. Anything beyond that is not specifically related to this resolution."

Laurie Ortolano "Okay. I want to know there's another part in here that I think is relative and that is "Spectacle shall make its books, records, and files relative to the facility available for inspection and copying by the city upon written request within five business days of the request and maintain the

records and the term of the agreement plus three years." How are those – this would be records that you could obtain relative to this contract or this money going in there. Who is the city to make that request? When it says the city can make the request who is that? It's not really a citizen is it?"

Chairman Dowd "I would assume it's the Board of Directors."

Alderman Klee "Board of Trustees."

Laurie Ortolano "It's the Board of Trustees?"

Alderman Klee "To be honest with you, I'm not sure whether the contract says that. I'm going to assume that it's the Board of Trustees. You were at the last meeting. They report to us everything that they have that is costed as well as the funds that have been received."

Laurie Ortolano "Okay so I would like an answer to that just to be certain what that is under 91-A. I did attend the Trustees meeting and I was happy to do so but I was disappointed there was no public comment allowed.

"Okay the advanced reserve fund. Let's see. This is where there's a ticket thing in here. Merchandising. One quick question just so I understand this. The contract that we have for the operating manual which gives us all the pieces of the utilities. I notice that's not done yet and that kind of feeds into this fund. Do we know when the operating manual is going to be completed? It was supposed to be completed three months before the opening. It's now five months past so we're eight months out. I'm just wondering where we stand on that operating manual."

Alderman Klee "Again, that's not part of what this resolution is but I'll do my best to answer it. We had discussed this at the Board of Trustees and it was even discussed, I believe, at the last Board of Trustees. The outline of it will be coming. They ran into some issues with the – just as we were doing the opening including finishing that night before. They were kind of given a - we know that it's coming and we will get it done. They are working on the manual so that the reason for the operational manual is if someone isn't there or doesn't have to they can just pick up this manual and continue to make sure that everything is running. It was discussed at the Board of Trustees meeting that you were at. So it's not something that's being ignored. While yes we did discuss the fact that it was supposed to be done prior to that, there were circumstances beyond their control."

Laurie Ortolano "Okay the utilities that the city is paying, those will not be paid out of this fund correct? That's a whole separate area? Okay.

"They did provide in the meeting a first quarter report and honestly it was good. Concession sales raised $5,000. Sponsorship sales raised almost $5,000. So for the quarter, they raised about $10,000. It doesn't include any ticket money so that comes in that would be great. I would love to see where it said the ticket thing."

Chairman Dowd "The first thing we have to do by this resolution is give it some place to put it."

Laurie Ortolano "Okay. I can't find my little spot that I had it in here. That's okay. I would like to get an answer though to find out what we're doing with coming up with an arrangement where we do collect the dollar on the ticket sales because that would make a big difference I think in this fund if there are

even some. Whatever they want to negotiate but if we could get something out of some of those events it would be a lot of money I think to help. Thank you."

**Finance Committee, September 6, 2023**

**https://www.youtube.com/watch?v=BPpH-j8dvdQ&t=2378s**

**33:43**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I was over at the debate today and had an opportunity to listen to the candidates speak. There were some interesting comments that came up on the Performing Arts Center, and the cost of that, and the commitment of that, and I wanted to clarify some of the information stated. The reason I'm addressing this is because that Center is done, it's our building, it's not our building we don't own it but we rent it, and it's here to stay, and we should all make the most of what we have. But I think there were mistakes made in that project and I want to make certain we never go back and do that again and I'm concerned that we will do that again if we don't acknowledge what we did.

"I'm concerned with some of the downtown projects right now, particularly the Mohawk Tannery and the Riverwalk Project because of cost overruns. The uniqueness in the Mohawk Tannery of that project and the complexity of the Nashua public city/public money piece and with the Riverwalk Project just general cost overruns. It was stated today by a candidate that we had given a $7.1 million loan, the City of Nashua to 201 Main Street financing to build that Art Center. Mr. Mayor you stated that there was no loan given. I'm here to tell you that there was a loan given and here's the loan agreement, here's the security pledge agreement dated December 17, 2020, ad here's the promissory note for $7.1 million given from the City of Nashua to 201 Main Street Financing Corp. with a 1% interest rate to be paid on an interest only basis which was $71,089 per year for seven years and it has a maturity date of 2050 with interest and principle starting thereafter. You signed this loan. It's your name on it with Mr. Lannan. So to state that there was no loan given was absurd to me and the mystery of that loan is very concerning to some of us who've tried to follow what's going on because this loan was never put on the City books. It was never accounted for. We don't even know how a public accounting firm would that does an audit of the books would not recognize that a $7.1 million loan wasn't recorded when interest payments were coming in to the City and those were on the books. So and the reason…"

Alderman Comeau "30 seconds."

Laurie Ortolano "The reason we're paying that rent for this art center is to cover the cost of these loans not just the City loan but Mascoma's $9.55 million loan has an interest only payment of $130,000 a year. Our rental money of $500,000 a year up to $670,000 a year for 25 years is picking up the cost of all the fees associated with that New Market Tax Credit and the loans. This was a very complex…"

Alderman Comeau "Time."

Laurie Ortolano "…project that we should not have undertaken and I'm going to be in here talking about this a good bit more because I think there was mismanagement of public funds here. Thank you."

DRAFT

Mayor Donchess So what I explained, again, about all of these inaccuracies and false statements that are being made repeatedly what I disagreed with was the accusation that we spent $7 million and loaned $7 million more than we were authorized by the Board of Aldermen. Board of Aldermen authorized $21 million. That's what we spent, period. That's it. No extra $7 million, no extra $9 million, no extra $16 million. All of these, and I explained, that all of these expenditures checks get written by the Finance Department and that they would never sign a check for $7 million, or $9 million, or $16 million more than authorized by the Board of Aldermen. That would never survive an audit. We would never have a AAA bond rating if they were doing things like that. So it is these accusations that have been made for a long time now are just totally inaccurate. The other inaccurate observation that's been made many times is that somehow the City is paying $500,000 annually. No, this is a breakeven transaction. There is a "so called" rent in the amount of approximately $500,000 but there's a distribution back to the City in approximately the same amount. So this is a net zero situation which is what I said today, and what I've said many times, and I wish the people who keep making these statements would listen to the Finance Committee, to the CFO, and to common sense, and stop making these false accusations."

Laurie Ortolano (From her seat) "You don't allow us to meet with you."

Mayor Donchess "Remarks by Aldermen."

Laurie Ortolano "You don't allow us to have those comments. Your doors are locked so we can't speak to anyone. That's the problem with your administration. There's no transparency here. You want this communication to stop, open the doors at City Hall."

**Regular Meeting of the Board of Aldermen, Wednesday, September 13, 2023**

**https://www.youtube.com/watch?v=swR-pn-NV2Q**

**03:06:18**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I noticed on August 8th that you folks approved the provision to change the bylaws for the 201 corporations to make them RSA 91-A compliant. I'm a little bit concerned that what you approved is not RSA 91-A complaint and that the posting of the minutes doesn't have to be done for two weeks. I really don't understand why that is because I've worked hard to try and make them compliant. When I read Attorney Bolton's statements that the whole reason this is being done is just because it's easy enough to do. We'll just take care of what she wants. I have to wonder why I had to file a lawsuit to do this because for ten months before filing the lawsuit, I was asking the city and the Board of Directors why the bylaws were wrong, why the 201 corps. weren't public, and no one would respond to me. So you forced my hand to provide a lawsuit then the 201 corps. have to lawyer up. You're going to pay McLane Middleton a couple hundred grand to represent this and you gave me a win right off the back because they called right away and said hey we agree with you. They're wrong. So I'm really concerned with how Attorney Bolton portrayed this to the Board. It's easy to do. Why didn't you take care of it when it wouldn't cost the taxpayers a couple hundred grand? Of course the whole purpose of this was for me to get access to information that is from the inception of those companies. Attorney Bolton mentioned that that's not the deal. That's not the deal I had with McLane Middleton. I was unaware that he believes Attorney Bolton that this is all going to come after. So it really surprises me. I'm disappointed you approved those. As you all know, I have filed a disciplinary

complaint against Attorney Bolton with the Attorney Discipline office and it's now up before the disciplinary council. I am very proud of my work to get those complaints there – those two complaints – because citizens have such a difficult time moving them. Attorney Bolton seems to think…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…he's entitled to some form of confidentiality. I think he waived that when my treatment in this chamber was anything but protected of my rights. I heard Attorney Bolton call me out as somebody who doesn't tell the truth, a liar, somebody who omits information. I've been called out as a child predator. Somebody who does oppositional research. Ms. Klee is somebody who insights violence. I've heard it all. Ms. Kleiner coming in and saying I was a criminal. I've had my…

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…reputation trampled on here and the last thing I'm going to afford Attorney Bolton is confidentiality on an attorney discipline complaint. That can result in a six-month license suspension. I think it should hit him hard. I think he's been a terrible municipal attorney for the city. The property casualty account has gone up from a half a million dollars when he started here to upwards of $7 million and that's where we're tucking all of his…"

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "…lawsuits because this guy likes a fight and he doesn't settle. Thank you."

**Regular Board of Aldermen Meeting, Tuesday, September 26, 2023**

**https://www.youtube.com/watch?v=OK3cvdh1qsQ**

**10:31**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to talk a little bit about the use of escrow money to offset the tax rate. I expressed some concerns last year with this and I think my issue is, you know, I just heard Derek say we do such a terrific job with the budget and it's also low but what we're doing is creating a lot of escrow accounts in this City. We have many, many of them and we're talking money in these escrow accounts and we're leaving it in there unspent - millions of dollars. There's another account that we just looked at, Miss Colquhoun and I that has $12 million sitting in it. So I don't think we should be patting ourselves on the back because we have strong fiscal management and tight budget controls that are keeping our tax rate low. I think we're misusing public funds by allowing these escrow accounts to exist and all of that money to stay stuffed in there. If you look at that last year, we gave - this is the graph for six years of our escrows and money back. We gave $4,000 back and kept over $7,000 in there to use for some pet projects and have you vote on things you wanted to do. Last year was the tough year when we should have given the $8,000 or $9,000 back but we didn't do that and I think we didn't do it because it wasn't an election year. So I think what we see going on here is partisan politics at its best. The Mayor is going to do what he needs to do to look good to keep that tax rate low."

President Wilshire "That's not part of our discussion what the Mayor's doing."





DRAFT

Laurie Ortolano "Excuse me. This is open public comment for me to speak. You are violating my constitutional rights. I want my time back. Do not interrupt me if I offer a criticism to this Mayor. It is wrong. Now what the Mayor is doing is partisan politics here and you can see that all of a sudden the blue line of what we're giving back is huge this year."

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "In 2019 when he was running, we didn't give that much back because there was no one running against him. There was no incentive to do it. So I think we need to manage our escrow accounts much better and I think we have to stop having 11, 12, 15, $20 million in these accounts that we can play with to give little tidbits back at the end of the budget season to make ourselves look good. Other seasons are doing this. Other towns are not doing this because they don't hold that kind of money. So I think it's really important that we manage our finances better because what I think it represents is a real misuse of public funds and I hope this Board starts addressing those escrow accounts, and what's in them, and how we're moving the money through them. Thank you very much for your time."

**27:35**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. You know I've raised some concerns with Aldermen about our accounting systems and how we handle our money in our escrow accounts but I want to raise another concern tonight regarding a $7.1 million loan that we gave from the City of Nashua to one of the 201 Corps that we formed to do the art center. It was the Financing Corp. and it was a very secretive kind of loan. The documentation on it was not well noted on the drawings and what was done with this money and it took some of us a long time to figure out what was going on but it turned out it was a loan with loan documents that was kept outside of the closing binder when we did the art center project and it was given from the City to 201 Main Street Financing I think on a 30-year term, maturity 2050, with a 1% interest rate, so interest only payment for 70 years of $71,000. The loan for unknown reasons was never recorded in the City books and that is a case of financial fraud and mismanagement. Where it really glares out is that the comprehensive annual financial report which is done yearly except we have not done the report for 2022 and there is no reasons given why we haven't done that audit but if you look at the report for year '19, '20 and '21, there is on page 51 a section that said loans. "The Economic Development Office administers loan programs that provide working capital and capital asset financing for startup and existing businesses in the Nashua area. The City records a receivable for the principal amount of the loan issued." We did not do that and that loan was passed right through the Economic Development Project page. It was in the Economic Development account when it was moved out. So the question is why didn't we do it?"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "Well Mr. Griffin was sending emails right after the December closing and in March asking Celia Leonard and Director Cummings do we have any loans that need to be recorded on the City financials and it doesn't appear that they provided him with the loan documents. There is no record of it. They did a Zoom meeting instead and after a lot of investigation primarily with Miss Colquhoun because she has an extensive finance background, she determined that the…"

Donna Graham, Legislative Affairs Manager "Thirty seconds."

Laurie Ortolano "…loan wasn't there and after 29 months in August, they recorded the loan on the books in the May trial balance which is on the sheets that we have here. I'm going to encourage this Board to really pay attention to our documentation in our finance office and I'd like somebody to find out for me why we haven't done the annual audit for 2022. We're going on six quarters behind with no audit of our books. Thank you."

**Regular Meeting of the Board of Aldermen, Tuesday, October 10, 2023**

**https://www.youtube.com/watch?v=jSWF-e2mRco**

**13:56**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I'm just here to do a quick comment on our R-23-154 which is the transfer of money from the assigned fund balance for $425,000 over to property casualty self-insured and this, I believe, had to do with the public hearing you had for the ransomware issue. I would like to ask if the Board would be or the administration would be so kind is when you list these appropriations if you would tell us what account they're coming out of. The assigned fund balance account is not something I was familiar with on where you'd find that and I did have to write an e-mail to CFO Griffin and he did answer me but that's not always the case. I know that the City would prefer I ask fewer questions than more. I will ask fewer questions if you would put the accounts on it where it's coming from because the assigned fund balance is technically it's an account called "assigned for future liabilities" and it has $11,455,000. Actually Miss Colquhoun and I were looking at that account trying to figure out what that was. We didn't realize that was the assigned fund balance because it's not actually called that. So you know I'd ask when you do these large movements of money that you actually specify the amount and the account it came from if possible because then it prevents me from having to ask questions. Also, I listened to the budget hearing where there was some discussion from Aldermen wanting to get more details on the spending on this ransomware attack. I think to me there was a legitimate question in there from a citizen standpoint and I would be interested in tracking how much money we've spent. We have Charles River Consulting services which we've given I don't know maybe close to half a million dollars to no more probably three quarters of a million dollars to. We have these large transfers that we've done and I think the money transfers ought to be public. I would agree that your discussions in non-public about the strategies…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…and how you're addressing that are closed issues, and confidential, and can maintain that way but I actually think the spending, and the authorization of that spending, and since that spending is in the expenditure report, I think we ought to be able to get an accounting of that so that if I put in a request and said how much money has been spent so far on this ransomware attack, you could give me the data on just the spending. So I'd like you to consider that and maybe somebody will let me know why that's not possible. Thank you."

**44:30**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I wanted to address the audit report that was given out and I have some real concerns with it and I hope the auditor will come back and present it

again to the Budget Committee once it's a final report. It was really never announced in the Budget Committee that that was a draft copy. It's not marked draft anywhere. It's not online because it's not done and at the very end Mr. McIntyre said when we submit the final copy and it's formatted correctly, you'll see a lot of this fixed. When is the final copy coming out because people have asked me that and it isn't online? I think it's reasonable for us to have that answer. Also, I think that it was a shame that all of you were given a 200+ page book that night and you were asked to speak on it when it was placed in your hand two minutes before the discussion happened. Nobody even cracked the binder and there wasn't a single intelligent question from any of these Budget Committee, excuse me, Finance Committee members to speak on it because no one knew what they were even looking at. I would encourage you to take a really close look at the letters submitted by Melanson this year or Marcum, LLC. It's a different letter than what's been in your book in the past. It is not the same letter. Very much they use a form letter three pages long. This letter is four pages. I am particularly concerned about a statement in here that says that's changed now. We are required to communicate with those charged with governance regarding among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal controlled related matters that we have identified during the audit. Well there's been a lot of public interest about the $7.1 million loan how the Art Center is actually accounted for in the budget because it was a complex transaction. Is it a public/private partnership? Is it on books? Is it off books? No one will answer those questions. That's not transparency. But when they say we are required to communicate with those charged, I have a big problem with that. What does that mean? They can have a private meeting with the CFO Griffin and the Mayor and share the communications on what they think might be wrong with our internal controls because I think it ought to be disclosed and documented and part of the governing body would be the Board of Aldermen. I think it should be disclosed. An auditor should disclose that as the public record. This is municipal government. These aren't private meetings to have."

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "So I would encourage you to look very closely at these letters and also the Gasby 87 issue for causing lateness and this is really bogus. Manchester had the same thing they had to institute and their audit was out by April. What caused us to not have an audit out even now? It's not done. There was another story here and I believe Miss Colquhoun's digging into that loan as part of that story and there's been a lot of communications between the Finance Office…"

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "… and the accounting office on that loan and I think it should be made public. Thank you."

**Special Board of Aldermen, Thursday, October 19, 2023**

**https://www.youtube.com/watch?v=W2RLBuENhCU&t=2s**

**12:18**



DRAFT

Laurie Ortolano "Good evening. Laurie Ortolano, 41 Berkeley Street. I have a couple questions. How many different escrow accounts do we have within our city budget that require us to move money and track? Does anyone know how many we have?"

Chairman Dowd "It's not relevant to this."

Laurie Ortolano "Yes because this is about the movement of escrow money. It's being moved because we have these escrow accounts. What I'm wondering is how many different escrow accounts do we have? Do we know? Is it trackable? Is there a place in the budget or a financial place I can go and find these escrow accounts, specifically escrow accounts?"

John Griffin, CFO/Treasurer/Tax Collector "These are brand new escrows. Essentially what this is taking monies that were previously appropriated and move it into a new escrow for these purposes. We can only spend on these purposes. With regard to prior escrows that are carried over, those are on the monthly financial statements."

Laurie Ortolano "They're on the monthly. Have we done anything to reduce the number of those escrow funds or do we escrow accounts separate accounts? Do we change them or do we still maintain quite a few of those escrow accounts?"

John Griffin, CFO/Treasurer/Tax Collector "Generally speaking, anything that is capital related, project related where the project hasn't been completed those are carried forward. With regard to coming out of the COVID pandemic where we tried to provide funding on a continuing basis for the different operating divisions, we're going to eliminate several of those."

Laurie Ortolano "Okay. I'm opposed to spending this money and not returning it to the taxpayers for a number of reasons. I feel that the city has not been transparent with myself when I requested information regarding finances. The first one was the audit. I feel that the Mayor lied to me. He did not respond to my Right to Know request and he got to do that. That audit was not done."

Chairman Dowd "Again, this is getting off track from this public hearing."

Laurie Ortolano "I'm here to speak on why I don't support anyone against it is supposed to come up. Now you're telling me I can't speak why I'm against it. All I can say is I'm against it…"

Chairman Dowd "I'm just saying you need to be more specific relative to the item on the agenda."

Laurie Ortolano "Okay. So I'm telling you why. I don't support any of these nine items because I feel there's been no transparency in the city when it has come to spending money and accountability. I am still waiting for the final finances for the arts center. We have been strung along for ten months and we don't have the accounting on that. We keep being told they're waiting for another bill. We had the financial report from December of 2022 and it is now October of 2023 and we don't have accounting. I'm opposed to this spending because as a citizen I can't track the money at all. It's not trackable. It's not right. The audit – we violated RSA 21J:19 and that we didn't get it done for 12 months. Instead of just acknowledging we didn't get our work done to assure that our finances are managed correctly, we beat up on the citizen who points out that why did it take so long. I don't feel we have the access to our financial office that citizens should have. You have to write and write, and write to try to get information. Laura Colquhoun wrote at least 15 emails to try and understand the loan. Why not have her come in and talk to her? This is why I'm opposed to you taking our money in escrow and using it for

anything else except to give it back to us. You haven't shown me your responsible with our money. You love to kick me constantly for questioning it and calling me out as a liar but you do not put the facts on the table, or open the doors, or give the information which is why you do have a whistleblower. People get frustrated."

Chairman Dowd "Again you're drifting of course here so. Mr. Griffin did you want to address any of that or just let it go? All right. You're entitled to your opinion."

Laurie Ortolano "Of course."

Chairman Dowd "But let's stick to the item that's on the agenda."

Laurie Ortolano "I'm concerned about the creation of new escrows in the existing escrows. A year ago, Rosemary Evans called me very upset about these escrow accounts. I am concerned…"

Chairman Dowd "Now you're bringing personal names into this discussion."

Laurie Ortolano "I have every right. It's a city employee who called me."

Chairman Dowd "You have every right to follow the rules of a public hearing which is to talk on the subject at hand…"

Laurie Ortolano "I am speaking."

Chairman Dowd "…not bringing up other people's names on other matters that aren't directly addressed by this escrow account."

Laurie Ortolano "I think you're completely insane."

Chairman Dowd "Well."

Laurie Ortolano "I have a right to address what – Rosemary Evans is the Comptroller and she's got 23 years of finance experience. When Ms. Evans calls me and spends an hour on the phone talking about these accounts and expresses the concerns and her inability to do her job, I feel like I have the right to address it in a meeting about escrow accounts."

Chairman Dowd "You have the right to state your opinion. This Board will determine whether or not we pass this legislation."

Laurie Ortolano "Of course. I'm only giving my opinion."

Chairman Dowd "All right."

Laurie Ortolano "You're going to go make your vote."

Chairman Dowd "Giving your opinion."

Laurie Ortolano "So I don't want to see more escrow accounts added that become the burden in the finance office that have to be tracked when you haven't closed down and really cleaned up the escrow accounts that are running over there. According to her, they're out of control."





DRAFT

Chairman Dowd "So at the Budget hearing, we're going to be talking about each one of these and I think that we'll see which ones if not all of them are critical to the running of the City of Nashua and aren't just a frill of spending money."

Laurie Ortolano "It's not that I'm saying they're a frill of spending money, it's that nothing ever comes off the table. Nothing ever gets cleaned up in these escrow accounts on the other ones. That was my concern. So I'm just expressing that you seem to create a lot of accounts, tuck a lot of money into it instead of emptying the accounts yearly and coming in with a supplemental appropriation when you need extra money. You hold it and squirrel it away. I'm opposed to the squirreling away of money because the Mayor lies to us about audits. Because the financial office…"

Chairman Dowd "Now you're drifting off."

Laurie Ortolano "…lies to us about our loans and because the NPAC company has lied to us about our art center. I'm tired of that. Thank you."

**Regular Meeting of the Board of Aldermen, Tuesday, October 24, 2023**

**https://www.youtube.com/watch?v=xUj-JrO9mAs**

**12:16**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. First I'd like to address the escrow money. I came out for the hearing and I talked about the large number of escrow accounts we have in this City. I think it would be prudent for the Board when you look at creating these escrow accounts with extra money that you're doing yearly to get a report from the City on all of the escrow accounts and take a look at them. I think there's a lot of overlap. There's a lot of overlap in Building, Parks & Rec., and I think that it should be consolidated, and I think it should be cleaned up because those escrow accounts do put a burden on the Finance office to maintain all of them. So I think it would be good for everyone to just know that when it comes. Let's see. The other thing I wanted to address was the cyber security money and the transfer of money. I'm hoping and wondering if there's a way that a citizen can track the spending that's been done on that. Like if I put an information request in or didn't have to for change if I could say what was spent so far and I could get an answer for that. I'd like to think that we have that ability with our projects and I'm concerned with some of them that we don't and things that happen. The third item is going to be the ordinance that has to do with amending the Land Use Code notice provision table. I don't know exactly what this applies to but I'm hoping at some point the Board will address some of these noticing provision Land Use Code for parcels that have maintained a code that allow them not to require noticing but they're in very residential areas. Like what happened to that condo development over by an NHTI where the crematorium is going in right next to it."

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "So it's a whole lot of people and families tightly packed, very middle income. They're not going to be able to move and a ranch sold right on the end and the ranch was zoned for the type of zoning that didn't require a public hearing. It was bought by a funeral home to do a crematorium. So you know 50 feet out people's doors will be this crematorium because it was allowed to go in and by the time that people knew it…"

Donna Graham, Legislative Affairs Manager “30 seconds.”

Laurie Ortolano “…it was too late. I think we should look at some of those areas and carefully consider whether we need to change them and we should do it also with our Downtown Improvement Plan in some of the areas as well because there's a lot of residential now going in. That’s what we're building. Thanks.”

**1:01:44**

Laurie Ortolano “Laurie Ortolano, 41 Berkeley Street. I've come out tonight to address the remarks of the Aldermen at the last meeting on October 10th and I'm particularly concerned about the comments made by Mr. Thibeault. You know he brought up the fact that a citizen put in a Right-To-Know request looking at the costs associated with alcohol purchase on a grant. He said it turned out it was - he said this citizen has been taking all these Right-To-Knows was actually wound up about some alcohol that was purchased that had to do with the Right-To-Know on it. It turned out to be Black Heritage Trail with Mrs. Newman at Holman Stadium. Nothing nefarious, nothing fraudulent nobody's drinking upstairs. The Mayor doesn't have a case of champagne under his desk. No one's drunk right now I think you know. Just because someone says it in public it's not true. I wrote a Right-To-Know very respectful, very respectfully. It had nothing to do with people drinking under their desk or being drunk Derek. What you do is dress the public down who comes out here to speak by insulting them over and over again and why this Board doesn't say no to that is beyond me. You have a code of conduct. My Right-To-Know said that there was an expenditure for five - please provide me with the grant fund document used to credit the $514 expenditure for the New Hampshire Liquor Store purchase in the expenditure report up to 6-29-23. Please provide me with any records that will show what this purchase was used for and who authorized the purchase and what department it came from. Do you know I put that in? Because Rosemary Evans who had been calling me at home in September contacted me and told me about that alcohol purchase. She also told me about the City using a limousine to take Mr. Cummings on a travel thing. She was very concerned about how…”

Donna Graham, Legislative Affairs Manager “One minute.”

Laurie Ortolano “…the Citizen Bank credit cards are being used by the City. She had seen the charges go way up. She thought it was out of control. The Mayor was being irresponsible and Donnalee Lozeau would have never done that. She recommended that Laura Colquhoun put in for those expenditures and try to get as much as she could on them and I know my documentation to the authorities and the date on that combined with when we did this would probably match up pretty well. We had never ever myself or Laura put in for a request on those cards.”

Donna Graham, Legislative Affairs Manager “30 seconds.”

Laurie Ortolano “When you diminish us and you speak like we wrote something about people being drunks, you are a disgrace. We are citizens that does - and you're laughing the whole time. You think it's hilarious.”

Alderman Thibeault “I do.”





DRAFT

Laurie Ortolano "Yeah it's pretty - and somebody here ought to call that out because we have a right to make those requests respectfully. The City's response to me was very respectful. They offered an explanation."

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "They made no assumptions like Mr. Thibeault. They didn't say how dare you infer we're drunk in our offices. They treated it respectfully and I expect you Aldermen to do the same."

President Wilshire "Time."

Laurie Ortolano "A pox on you Mr. Thibeault."

REMARKS BY THE MEMBERS OF THE BOARD OF ALDERMEN

Alderman Thibeault "Yeah well I got extra stuff to talk about I guess. You know for her to come in here and bring up City Hall employees and drag them through the mud and bring up their names. That's disgraceful. To constantly attack everyone here or almost everyone - I should say everybody but three is disgraceful and to not listen to us speak back to you is disgraceful."

Laurie Ortolano "I only got 3 minutes."

Alderman Thibeault "The people have to know out there what she is doing to this City."

President Wilshire "All right."

Laurie Ortolano "I get 3 minutes Mr. Thibeault. You get 10 minutes."

President Wilshire "Enough."

**Regular Meeting of the Board of Aldermen, Tuesday, December 12, 2023**

**https://www.youtube.com/watch?v=obdNYHYbrtQ**

**1:14:15**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I want to talk a little bit about transparency. As some of you know I'm going into a Right-to-Know trial Monday, Tuesday and Wednesday with some challenges to the city on how records have been handled primarily through the Economic Development office. One of the big challenges I have is how the Capital Campaign Committee handled fundraising for this Art Center Project. It was a subcommittee, the Performing Arts Center Steering Committee formed three subcommittees. None of the subcommittee's complied with RSA 91-A. Subcommittees of a committee are supposed to be public and do notices and minutes, they did not. They all waived that and for various reasons that I think are worth a court challenge, I thought it was wrong and I feel a lot of information given from Director Cummings and the Legal office to push this into the darkness was not correct. The city pointed out what went on in Keene to us with their new market tax credit program repeatedly. So I reached out to Keene really by looking on their website because they used the new market tax credit to do a library annex expansion that completed in 2019 and part of their expansion was a $5 million capital campaign drive. We did the $1.5 million drive. Well their drive was all public.

You know their records and what I've given you here is their accounting. Every dollar raised was sent to their Corporation Counsel Tim Mullen. He approved it and reviewed it. They opened a bank account. The bank statements were sent to the Finance Committee and every donation from a nickel too you know $100,000 or $250,000 were documented with the donors and all $5 million is accountable for after 4.5 years - a little over 4.5 years. We had no accountability in our project at all."

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "Citizens were told we couldn't get the numbers. That February 6, 2020 meeting where so many people came out and Corporation Counsel wasn't there. Ben Clemons raised a good question about transparency. Ernie Jette raised a good question about transparency and no one had answers. I'd like to know why Keene could make their project 100% transparent in their New Market Tax Credit Program for capital campaign and we did nothing. You know just yesterday a friend called me and said…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…she was having a conversation with somebody who said they don't believe that the money was ever raised. That the city never raised $1.5 million or more for the Art Center. Well the truth of the matter is you can't say anything to counter that because we have no proof or records. We were never allowed to have any records. So the people who sit out there and believe money wasn't raised, there's nothing you can show them but in Keene, I wanted you to see these records. I pulled them right offline myself. I spoke to a number of different people but they're all publicly available and I think you should look at how we handled ours. This is a big claim for the court. Thank you."

**Finance Committee, Wednesday, January 17, 2024**

**https://www.youtube.com/watch?v=nB7KTVittmg**

**20:58**

Laurie Ortolano "Good evening. Laurie Ortolano, 41 Berkeley Street. I wanted to talk to you folks on the Finance Committee about doing more in the city to address what's happening with changes in our Right-to-Know process in this city. You know there's been a lot of issues regarding litigation on Right-to-Knows since 2020 and the city has gone very quiet on addressing what's being done for improvements. When Kim Kleiner was here and we had issues with the Assessing Office, she came forward to the Board of Aldermen which is the governing body and she did four or five presentations to address what was being changed in the Assessing Office. What that afforded the public was the opportunity to hear publicly what was going on and to respond to it if we didn't agree because it was out there. After she left and these issues have evolved regarding other projects within the city and what's going on with Right-to-Know, there has not been a single public discussion about changes being made to improve the process, be more transparent, nothing.

"In order for me to find out what's changed in the Right-to-Know process in Nashua, I have to file a Right-to-Know and most likely it's going to be determined to be attorney-client privilege which is what they did in 2021 when we tried to find out what changes were going on. The Town of Hudson and the Town of Milford have redone their Right-to-Know policies in their towns. They were sued by citizens

over issues that had to do with record compliance. In those towns, the citizens lost across the board pretty much. Ruled as mute in Milford and in Hudson it was the big Amazon logistics facility being built that stirred up a neighborhood to get active. They pretty much lost in court rulings with Judge Colburn on trying to go after the developer to shut that down. Even though they lost, both municipalities and towns formed Right-to-Know Committees with their citizens and their Selectmen and worked on policies…"

Alderman Gouveia "One minute."

Laurie Ortolano "…and came up with new policies and procedures to address those issues. What they tried to do was open communication, and prove transparency, and just create a calmness when it came to addressing matters. What I liked about the Selectmen is they recognized the publics frustration but they also recognized their city employee or their town employee frustrations. We have not done that. We refuse to do that. We put a veil up and say we don't have any problems here because our citizens don't win. Well citizens in Nashua have won more than any of those other towns. Hands down we've done better and yet we can't get a single change made in this town to improve that process. I was up giving testimony today on Right-to-Know legislation that I don't think is good for this city and testified why and one reason specifically because this city will not address a process change. You know if you want to improve transparency, you have to talk about it, and you have to talk about it through the…"

Alderman Gouveia "That's time."

Laurie Ortolano "…governing body, the Board of Aldermen. I would encourage you to think about that because a lot of money is being spent on this. Thank you."

DRAFT

**Board of Aldermen Regular Meeting, Tuesday, February 13, 2024**

**https://www.youtube.com/watch?v=Wtichbw-BUI**

**19:24**

Laurie Ortolano **"**Laurie Ortolano, 41 Berkeley Street. Thank you for the Mayor producing a memo to send this back to committee or do whatever you need to do to engage in a little more discussion on that. I think it's the right thing to do and I'm glad to see that happening. I came here in October of '22 and spoke against that money to bond to do the two schools and match it with the ESSER funds. I was pretty harshly treated by Chairman Dowd and criticized for my lack of support of the schools and one of my criticisms was we don't have good accounting and we don't have good control of the money. He put it on me to say how do you suggest we do it, which a citizen coming here to participate and give a viewpoint shouldn't be the one in the hot seat to tell you how to do your job. I was treated very poorly. Now I'm back to see that we have this $4.5 million of money that wasn't there and was used for something else. I think that there's – I want to know when it became known that this shortage of money existed because the project was done over the summer. I think that's a reasonable question for all you Board members to know. I did not appreciate how Alderman Dowd conducted himself at that meeting and I wish he was here tonight. I feel the Board should have called a point of order and admonished him for his conduct because he made a demand that you all have to deal with this right now. We have bills to pay. We have to deal with this right now. It was an ambush on a very serious issue involving $4.5 million

of accounting. Clearly as soon as he found out from the School District that $4.5 million wasn't accounted for as soon as he knew, come to the Board to disclose it and certainly not make a demand on Thursday night that you all had to give a vote of support on this right now because we got bills to pay. You know Laura's right. I think if that extra money sits in the bottom line with $5.1 million use some of it. Regarding the roof…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…you know a good contractor knows if there's two membranes down and you're going to have to peel them off. I'm sorry, that is just unacceptable and I'm an engineer. There is just no reasonable way that they didn't understand the work that was going to be done on the roof. We've had a long-term relationship with Harvey and that's fine but I'm encouraging you to start thinking about developing a new relationship with a contractor or introducing other people. Maybe it shouldn't be 100 percent Harvey…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…maybe we should look to expand and not put all our eggs in one basket so heavily on $100, $150, $200 million of projects. I think that's the proper thing to do. I'm anxious. I put in a Right-to-Know to get the accounting because of course I have to. I want to know what's going on with the money and I will pay attention. Thank you for taking this back and engaging in discussion to figure out what the right thing to do is."

**01:40:26**

Laurie Ortolano "Laurie Orlando, 41 Berkeley Street. I wanted to talk to you. I sent an email to the Board about putting Right-to-Knows on the city website that are being done by the Right-to-Know Administrator. I think that would be helpful. I'd appreciate that. I'm not embarrassed by my work at all, and the others that are coming in, and I hope you'd make that available so other people don't have to file Right-to-Knows to see what Right-to-Knows have been filed and other towns do that. So I kind of thought it was interesting and it would be worthwhile. I spoke to the Finance Committee a couple months ago about engaging the Board of Aldermen in having a discussion about our Right-to-Know policies and processes and I was hit with a bucket of cold water on that. You know when Kim Kleiner was here, she came to the Board and addressed what was going on in the Assessing office three or four times and had these quarterly meetings and updates which her presentation of the problems in the Assessing office allowed the public to use the governing body to put something out publicly that we could listen to and gather information. All of the Right-to-Know issues that have gone on since she left have never been addressed by the Board of Aldermen, there was no discussion up here by the governing body, and I think there should be. I pointed out that the towns of Hudson and Milford had their citizens sue them on Right-to-Know issues. Their citizens didn't do well at all but even though they did do well, both towns formed committees, worked with the public to try and create a uniform process within their town governments to handle it. Now Melbourne Moran pointed out that I had done a disservice by using the Town of Hudson as an example and he discussed this issue that had happened in the Police Department and honestly it was so garbled, I really couldn't understand it. So I took the video and I sent it to the Hudson Board of Selectmen and they forwarded to the Police Department who called me and explained what had gone on in this situation. It was really interesting because I wondered how



DRAFT

Alderman Moran knew about that and it turns out William Dolan our representative from Nashua, I think Ward Five…"

Donna Graham, Legislative Affairs Manager "One minute."

Laurie Ortolano "…was involved in a dispute with Hudson and on a Right-to-Know request through the Police Department and the Hudson Police Department gave me all those records and I don't think Alderman Dolan's Right-to-Know was handled correctly. He had to go to the ombudsman. It wasn't handled correctly. He did get his records. He had to fight for them. It took two or three months. It was resolved but Alderman Dolan or House Rep. Dolan now has become a supporter of not charging fees because of his experience in what happened in Hudson and I think you should know…"

Donna Graham, Legislative Affairs Manager "30 seconds."

Laurie Ortolano "…that police departments function with their Right-to-Knows completely different from City Hall. I don't think we should dis Hudson's process on how they are handling Right-to-Knows through their Selectmen office and with their citizens. I think we shouldn't dis any other town around us who's tried to make an effort. I think it was an honest effort and it's good. The person who rejected House Rep. Dolan's Right to Know was Nicole Clay who came from here and was trained here. So you know…"

Donna Graham, Legislative Affairs Manager "Time."

Laurie Ortolano "Let's consider it and I would like the Board to consider trying to do something to offer Right-to-Know information to the public. I had to file a Right to Know request after two months to find out what's going on with Right to Know policy and procedure last week which is really frustrating to me because I wanted to get it without having to file a Right to Know and I've been looking for it for months. Thank you."

**Budget Review Committee Meeting, Febraury 26, 2024**

**https://www.youtube.com/watch?v=erMVFlHks24**

**02:30**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. I think I'm going to focus on the process on how this all went down. You know it wasn't long ago at a budget meeting or a special hearing that you came out Alderman Dowd running it saying, hey board members you got to vote for this tonight. We have a shortfall $4.5 million. We need to pay the bills and we need your approval right now. This city has perfected the art of the ambush and surprise tactics. You do it beautifully and it's done and played out over and over again. I see it with Director Cummings frequently coming in here the night of something and saying here we are, I need you guys to vote tonight, we've got to make a decision right now. It's not fair. It's not reasonable particularly when there was a major mismanagement or miscue of the money. I would like to know and hope that I'm here tonight to find out when you or anyone became aware of this because the school renovations I believe were done over the summer. So when were the renovations done? When did we figure out we had this shortfall of money? Who was contacted in City Hall about this shortfall and when? Why did we wait until three weeks ago or a month ago to hold the hearing to

say, oh, oh you know four-alarm fire? Four-alarm fire we need to bond some money, serious money and carry this debt. I mean an Alderman described this as a bail-out bond and I agree. It is a bailout bond but we should have some answers and we should have some accountability on what happened. I'm not a big believer on taking on more debt and I'm happy to see that there's a committee an Ad Hoc Committee being formed to address projects and planning over the long-term. I think that's a good thing. I'm not certain I approve the makeup of the committee. I don't know if we have enough voices of opposition or voices that will challenge what's going on there so and I can't remember who all is on the committee but when that happens, we'll see how that plays out. I think you owe us a lot of answers. I think you owe us some accountability of the numbers. I don't know if this actually is going to get voted on tonight. I couldn't really tell. It's just a one thing. So I look forward to hearing the discussion and understanding what went on here. Thank you."

**01:41:32**

Laurie Ortolano "Laurie Ortolano, 41 Berkeley Street. Laura takes no prisoners. I think everyone in this room does have the best interest of the students at heart - everyone behind me and in front of me and the debate is about funding. For me, the important thing was about process. I heard some things here that really piqued my interest. You know when the Board of Aldermen discussed this, there was a lot of beat down on the School District for not handling things right and they showed up here tonight to put themselves in the hot seat and answer the questions which is great. But Alderman Jette pointed out that it's not just the School District, it's the JSSBC and in-part the Aldermen who have played a role. I did hear Mr. Donovan say that May/June timeframe there were a group of small group of people, four people including he believed Alderman Dowd that became aware of this. Now it doesn't appear between that summer timeframe it took until the last meeting of the JSSBC December for this to come out. Mr. Donovan mentioned that he wasn't certain there was anything ever put in writing it was just done verbally. Why wasn't there something put in writing when they figured this out in the early summer? This should have been a memorandum that said priority high, documented, and sent to everybody. This wasn't a quiet phone call that shouldn't be documented anywhere, and given to everybody, and given to the JSSBC immediately and I am very interested Aldermen Dowd on when you exactly did know and why it took that gap because you're the leader. I have a very specific interest based on some questions I was asking about spending in the fall that were not answered I don't think properly now. But I know the answer to my question. It was political year. It was political season. Would it have been appropriate? Would the parties in power have wanted a letter coming out saying $4.5 million was not accounted for properly, and we need to bond another, and the roofs aren't right, and we need to bond another $8.5 million in August or September as people are filing for seats? I don't think so. I think this waited until December to come out until after the election and then it was safe. I didn't fall off the turnip truck yesterday and I don't think any of you did either. This was a political issue which prevented the documentation from being done and the letter from being written that should have gone to all of you and the JSSBC in writing with priority high, here's what's going on…"

Alderman O'Brien "30 seconds."

Laurie Ortolano "…with the money. So I would encourage all of you to point a finger at yourselves and your process in this chamber because you definitely pointed a finger at the school leaders behind me and they stood in the hot seat and took it."

Alderman O'Brien "Time."





DRAFT

Laurie Ortolano "Now it's time for you to stand in the hot seat and take it too. Thank you."

**Board of Aldermen, February 27, 2024**

**https://www.youtube.com/watch?v=EBLT1f77oJ8**

**1:34:44**

Laurie Ortolano "Laurie Orlando, 41, Berkeley Street. I'd like to address a little bit on the Mohawk property development. I would like to see this Board embrace an understanding of what information on that project will be public. It is my opinion that this is going to be a public/private partnership similar to what happened with the Art Center Project and we never had records to find on that project. However this develops, I would like to see those records to find or an understanding of what we have access to so that we don't engage in these fights and arguments between citizens and government on what's really public and what isn't. I want to highlight to you on the Art Center project, that was a public/private partnership but really not called out by the Board of Aldermen and not really told to the public that that's what it was. Black's Law Dictionary describes a public private partnership where the public and the private entity both have a controlling interest. We were told as the Art Center was being developed that we had no controlling interest in the city. The two nonprofit corporations formed were not under the city's control, or management, or representation and then there was never a public hearing where the formation of the private company NPAC was disclosed.

"All of a sudden in an omnibus resolution three weeks before the closing documents were signed, the city comes in with a 25 pieces of legislation that you approve in an hour which never specifies that NPAC Corp. is a private corporation is taking over, and that all the records are going to go dark, and that the money is going to be managed by a private company, and you won't be able to see or get anything. You won't even see construction reports. You know this is before the courts and there's a lot of interesting stuff going on regarding the constitutionality of what was done in that Art Center and I don't want to see this repeated again. I want to see transparency on these records. Tim Cummings mentioned that hey for the public's perspective, things change. He's right. As you develop this project, things are going to change…"

Dan Healey, City Clerk "One minute."

Laurie Ortolano "…but let's make certain that the change isn't like the change for the Performing Arts Center where a private company comes in and scoops up all the public money and goes dark. You know Director Cummings called that "a little nuance of the deal". That wasn't a nuance, that was like a fart in church. That was massive. That was a big deal and we none of us in the public, and I don't think the Board understood what you were doing and what are you giving away."

Dan Healey, City Clerk "30 seconds."

Laurie Ortolano "…so please, let's not do that again. As we engage in these partnerships with projects, let's make certain the public understands what's available to us. It's okay that some of it isn't available to us. It's fine but let's not have citizens digging around fishing trying to figure out what it is. Thank you."





DRAFT

**Board of Aldermen, March 12, 2024**

https://www.youtube.com/watch?v=7NXlstZKgiQ

**19:36**

**2:06:25**

