In the Matter Of:

LAURIE ORTOLANO vs

CITY OF NASHUA

---

MICHAEL CARIGNAN

*April 19, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH 03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
Court Reporters, LLC

DEPOSPAN'S TRUSTED LOCAL CONNECTION

Page 14

1  on, okay?
2       MR. CULLEN: Sure. I believe I have
3  those here.
4       MR. MALAGUTI: I know you produced them
5  because I had pulled them down, and I just can't
6  get access to them, so. Thank you.
7  BY MR. MALAGUTI:
8       Q.   Okay. So, Mr. Carignan, I can't see
9  the document that you're looking at, but I believe
10 it's from -- is it from June of 2019, somewhere in
11 that area?
12      A.   Yes, June 26, 2019.
13      Q.   And could you describe that document to
14 us, please.
15      A.   Sure. It's a -- as you stated, it's a
16 supplemental document, meaning a supplemental
17 report to a larger report that just indicates
18 something that happened within that case. It was a
19 report written by Captain John Lehto, based on a
20 meeting that I had with him attending a meeting at
21 City Hall.
22      Q.   Now, this is in regard to an
23 investigation that would eventually be done by the
24 Nashua Police Department regarding the Nashua
25 Assessing Department, right?

Page 15

1       A.   Correct, yes, sir.
2       Q.   And it's fair to say if that was
3  brought to your attention by a woman named Laurie
4  Ortolano and perhaps another woman with her named
5  Laura -- I believe it's pronounced Colquhoun?
6       A.   Correct.
7       MR. MALAGUTI: And if someone knows
8  better than me, I'm going to make an attempt at
9  spelling Colquhoun for the stenographer. I
10 believe it's C-O-L-Q-U-H-O-U-N. Does that sound
11 right, if you can find it somewhere?
12      MR. CULLEN: That appears to be
13 correct.
14      MS. ORTOLANO: It's C-A-L,
15 C-A-L-Q-U-H-U-O-N (sic).
16      MR. MALAGUTI: C-A-L. Okay. Thank
17 you, Laurie.
18 BY MR. MALAGUTI:
19      Q.   You just came into a different view, so
20 you're still there. My apologies. You bounced
21 down on the screen.
22      Do you have a recollection,
23 Mr. Carignan, about your meeting with what I'll
24 call the two Laurie and Laura?
25      A.   The meeting with Laurie and Laura, I

Page 16

1  didn't have any specific memory of that meeting. I
2  know I've spoken to Laurie several times.
3       Q.   When is the first time you ever spoke
4  with Laurie?
5       A.   I'll be honest, I'm not sure. We've
6  had several conversations. So -- go ahead.
7       Q.   Let me put them chronologically. Did
8  you have conversations with her prior to
9  discussing the investigation into the Nashua
10 Assessing Department?
11      A.   Yes.
12      Q.   In what forum would these conversations
13 occur?
14      A.   Well, so, again, we had several
15 conversations, some we had seen each other at City
16 Hall a couple of times over some different issues,
17 but she came to me to the police department to
18 speak to me about her concerns with those
19 allegations.
20      Q.   So the meeting about the Nashua
21 Assessing Department was a face-to-face meeting at
22 the police department?
23      A.   I believe so, yes.
24      Q.   Was it just a conversation or did it
25 involve her showing you documents?

Page 17

1       A.   I believe she showed us some documents.
2  Again, we had several meetings, I apologize if the
3  chronology is not right, but Laurie had excellent
4  documentation as to her allegations and her
5  concerns.
6       Q.   At some point did she give police
7  officers some documentation that they retained?
8       A.   Yes.
9       Q.   And how soon after you first met with
10 Laurie at the police department to discuss these
11 allegations did you end up going over to the
12 mayor's office for the meeting that was documented
13 in Exhibit 1?
14      A.   I don't exactly remember the day she
15 came over, so I can't give you an exact time, but
16 it would be within a couple of days. It was -- we
17 took it seriously, and we would have gone over
18 pretty quickly to start looking into it.
19      Q.   At that point when she contacted you,
20 would you say that you were in charge of the
21 matter?
22      A.   The allegations came to me and I
23 directed it to go towards the detective bureau, so,
24 yes. In charge of assigning it, yes. In charge of
25 handling it, no.

Page 30

1  topics we would talk about.
2     Q.    And when you say the relationship,
3  you're referring, of course, to your city business
4  relationship?
5     A.    Correct.
6     Q.    Okay.
7     A.    Correct.
8     Q.    How long had you known Kim Kleiner
9  before June 26, 2019?
10    A.    I can't remember if I met her as a
11 captain or a deputy chief. I was pretty active in
12 community activities, I felt that was important, so
13 it was -- we did a lot of work with the Arlington
14 Street Community Center, and that's when I really
15 got to know her well, which would have been as a
16 deputy chief, so 2016 to 2019, roughly.
17    Q.    And the Arlington Street Community
18 Center is some type of charitable organization, I
19 gather?
20    A.    Well, it's a city-owned property that
21 we opened -- we opened a community center out of.
22    Q.    Okay. And how long have you known the
23 mayor, James Donchess?
24    A.    I've known him since he was sworn in as
25 mayor, so --

Page 31

1     Q.    The first time or the second time?
2     A.    No. No, the second time. Well, the
3  second set of times. I don't -- we may have had
4  some interactions when he was a union
5  representative, but I don't -- I don't remember
6  having enough interaction to say I knew him,
7  because I was never the union steward.
8     Q.    Now, Mayor Donchess was at one point a
9  union representative?
10    A.    Yes, he was, he represented the
11 Patrolmen's Union.
12    Q.    He represented the Patrolmen's Union as
13 an attorney, am I --
14    A.    Correct. For the collective
15 bargaining, yes.
16    Q.    So he was not a patrolman or an
17 employee at any time of the Nashua --
18    A.    No, no, no.
19    Q.    Okay.
20    A.    He was not.
21    Q.    And when would this have been, the
22 early aughts, the early 2000s, or before then?
23    A.    No, it might have been right around
24 those times. I don't remember when he started as
25 the union representative, as the attorney

Page 32

1  representing the union. It was a good chunk of his
2  non-political time, if that answers your question.
3           So he's been consistently a part of
4  collective bargaining for the police department for
5  a majority of the time that I've been there, I was
6  there.
7     Q.    And did you ever have a social
8  relationship with the mayor, a non-business
9  relationship?
10    A.    No, I did not.
11    Q.    Never went out to dinner with him and
12 his wife or anything of the like?
13    A.    No.
14    Q.    And Ms. Kleiner, did you ever have a
15 social relationship with Ms. Kleiner?
16    A.    No.
17    Q.    Okay. So what time was the meeting
18 convened on June 26th, 2019?
19    A.    According to the report, it's 9:00 in
20 the morning.
21    Q.    And who was present?
22    A.    Myself, Captain John Lehto, Mayor
23 Donchess, and Kim Kleiner.
24    Q.    And did this take place in the mayor's
25 conference room?

Page 33

1     A.    Yes.
2     Q.    And I'm going to ask you to remember
3  what was said during that meeting, and I'll
4  probably just go person by person as to, you know,
5  who said what. What did you say at the meeting?
6     A.    So the purpose of the meeting and what
7  I said was informing the mayor that there was a
8  criminal complaint alleged against employees at
9  City Hall, and that we would be investigating the
10 case, and we would be conducting an investigation,
11 or detectives from the Nashua Police Department
12 would be conducting an investigation into those
13 allegations and we would be speaking with multiple
14 employees at City Hall.
15    Q.    Did you say anything else that you
16 remember?
17    A.    No.
18    Q.    And when you said -- when you described
19 the criminal investigation, did you describe the
20 types of allegations that had been made?
21    A.    No, we tried to keep all -- all those
22 facts to really a minimum. It wasn't his business
23 what we were investigating. Him and Kim were both
24 well aware of what they were, they had been told of
25 the allegations that were made or they had found

Page 38

1  Q.  Larry. Am I pronouncing his last name
2  correctly?
3  A.  Yes.
4  Q.  Did anyone tell you that Mr. Budreau
5  had already interviewed some of the assessors?
6  A.  I don't remember that, but according to
7  the report, he had already interviewed several
8  employees.
9  Q.  I don't have the report in front of me.
10 Does the report name the people who were
11 interviewed?
12 A.  According to the report it said Greg
13 Turgiss had already been interviewed by director of
14 human resources, Larry Budreau.
15 Q.  Did you know Greg Turgiss from before
16 this?
17 A.  I did not.
18 Q.  Did you know Gary Turgiss from before
19 this?
20 A.  I did not.
21 Q.  And we've already talked about Kim
22 Kleiner. Okay. Do you remember Ms. Kleiner
23 saying anything about the city providing full
24 support as needed, or anything to that effect?
25 A.  No. I mean, my recollection is that

Page 39

1  both she and the mayor said they understood. They
2  said they welcomed an investigation and we would
3  get cooperation.
4  Q.  Okay. And do you remember anything
5  that the mayor said? I know you relayed a couple
6  of instances where you couldn't remember if it was
7  the mayor or Kleiner, so I'm asking for additional
8  statements that you can remember above and beyond
9  those.
10 A.  No, that's it.
11 Q.  And how did the meeting end? Did
12 someone give instructions, or did someone say
13 time's up? Or if you recall, how did it end?
14 A.  No, it just -- it was pretty obvious
15 that the topic of discussion was over, so we just
16 said goodbyes.
17 Q.  And do you remember how long the
18 meeting lasted for? I think you said it began at
19 9:00. Do you remember what time you got out?
20 A.  I don't. It was a fairly short
21 meeting. Our purpose was not to talk about
22 anything other than this.
23 Q.  Short as in less than a half an hour,
24 short as in less than 15 minutes, can you
25 estimate? If you have no memory, that's fine.

Page 40

1  A.  No, if I had to estimate, I'd say
2  between 15 minutes and a half an hour.
3  Q.  And when you left the meeting, did you
4  and Captain Lehto continue to talk about what
5  transpired in the meeting?
6  A.  No. If I remember the conversation was
7  more who it was going to be assigned to, and just
8  to make sure they did a thorough job.
9  Q.  And when you talked about who it was
10 going to be assigned to, did you know at that
11 point that Lieutenant Mederos was going to be
12 assigned, or is that one of the people who -- that
13 Lehto mentioned to you?
14 A.  So Lieutenant Mederos would be assigned
15 in the manner that it's an investigation being done
16 by the criminal investigation bureau. He was the
17 CID -- CIB lieutenant so it would flow to him to
18 pass down to the sergeant and the detectives.
19 Q.  And at some point you came to
20 understand that Mederos and Lehto didn't do the
21 whole investigation themselves, they assigned it
22 downward?
23 A.  Correct.
24 Q.  Do you know who got the assignments?
25 A.  Ultimately Frank Lombardi got it. I'm

Page 41

1  sure he was assisted by other detectives, other --
2  his supervisors, his sergeants would have been
3  involved as well, but he was the lead detective.
4  Q.  And at the time his position was
5  detective?
6  A.  Correct.
7  Q.  And do you know how long after the
8  meeting the assignment to Detective Lombardi
9  occurred?
10 A.  I don't.
11 Q.  And you knew Detective Lombardi
12 previously of course from being in the same
13 department together?
14 A.  Correct.
15 Q.  And by the way, when the meeting
16 occurred, you were not yet chief, right? You were
17 deputy chief, is that right?
18 A.  Correct. At the time the current
19 chief, Andrew Lavoie, was on what we call terminal
20 leave. He was on time off between the time of his
21 vacation time, unused vacation and sick time, and
22 the time of his retirement, so I was acting in the
23 role of -- still a deputy chief, but I was
24 acting -- I guess you call it acting chief. It
25 wasn't an official title.

Page 62

1  Q.   Would he have been -- I think it was a
2  he.  Would he have been a patrolman in January of
3  2021?
4  A.   Yes.
5  Q.   And are you familiar with, I believe, a
6  Sergeant Gilbert, if I remember correctly, is it
7  Caleb Gilbert?
8  A.   Yes, I'm familiar with him.
9  Q.   Do you have knowledge that they were --
10 and there's a third person who I can't remember,
11 but do you have knowledge that they were present
12 to handle the incident with Laurie Ortolano in
13 January of 20 -- I've lost the date, too -- 2021.
14 A.   I'm not sure which -- I don't remember
15 which officers responded.  I know I would have been
16 told, but I don't remember who they were.
17 Q.   And you wouldn't have heard from them
18 directly anyways, right?
19 A.   That's correct.
20 Q.   You would have heard through Rourke or
21 Bolton, or would that have even gone to another
22 step before it came to you?
23      MR. CULLEN:  Just to be clear, you mean
24 Captain Bolton, right?
25      MR. MALAGUTI:  Yeah, not -- thank you.

Page 63

1  BY MR. MALAGUTI:
2  Q.   Any relation, to your knowledge,
3  between Captain Bolton and Steve Bolton of the
4  legal department?
5  A.   They are not -- they are of no
6  relations.
7  Q.   I assumed so.  Bolton is not a name
8  like Malaguti, it's somewhat common.
9       Okay.  So do you remember what you
10 heard about the incident the first time you heard?
11 A.   Sure.  I remember that officers were
12 called to City Hall for a criminal trespass
13 situation.  They got there, Laurie Ortolano was --
14 up until our arrival had refused to leave an area
15 around the legal department of City Hall, and when
16 officers -- when our officers arrived and asked her
17 to leave, she left.
18 Q.   Do you recall whether she was detained
19 or arrested before she left?
20 A.   She was not.  She complied with the
21 officers' commands.
22 Q.   Now, in general, when there is a
23 trespass situation, a potential trespass
24 situation -- let's back up.  I'm going to move
25 away from Laurie Ortolano for a quick minute and

Page 64

1  talk generally if that's okay.  And I'm going to
2  ask you questions about your philosophy as to how
3  trespass situations should be handled.
4       Do you have a general philosophy about
5  how criminal trespass situations should be handled
6  by Nashua's police officers?
7  A.   Sure.
8  Q.   Could you say it for us?
9  A.   Yeah, if we're -- you know, if we're
10 called to a location where somebody's there, and a
11 person who has control over that space doesn't want
12 them there for a specific reason and asks them to
13 leave, the expectation is that they leave.
14      If they don't leave, we get called, and
15 we go, and we will tell them to leave.  We'll talk
16 to the victim, we'll find out what the victim says
17 happened, or the controller of the property.  And
18 then if the person still refused to leave, we'll
19 arrest them.  If they leave, we will generally give
20 them the warning to go, because they -- they're not
21 refusing in our presence.
22      And if you're asking for the
23 philosophy, it's people -- it's very difficult in
24 the courts, particularly in Nashua, to get a
25 conviction because the victim or the controller of

Page 65

1  the properties generally won't show up to testify
2  for a number of reasons.  So that's generally how
3  they go.
4  Q.   And when you say that typically the
5  victim will not show up to testify, are you
6  primarily referring to incidents on private
7  property, or is it both private and public
8  property?
9  A.   Both public and private property.  It's
10 a fairly common call for service at the Nashua
11 Police Department.
12 Q.   And so sometimes when there's someone
13 who's asked to leave public property and doesn't
14 leave, you find it difficult to get cooperation
15 from the city employees who control that property?
16 A.   No, our general philosophy is that's
17 not specifically toward City Hall, because city
18 property doesn't really happen as much, unless, you
19 know, say it's city parks or anything like that,
20 they generally won't show up to testify.
21 Q.   Okay.  Now, when it comes to -- so
22 would I be correct then in sort of encapsulating
23 what you said, which is that as a general rule --
24 I understand there are exceptions -- as a general
25 rule, when the police show up, order the

Page 86

1  Q.  Were there further conversations with
2  Steve Bolton or anyone on his staff between the
3  time you left that meeting and when Ms. Ortolano
4  was actually arrested?
5  A.  No.
6  Q.  Now, when you were dealing with
7  Mr. Bolton and the tall red-headed attorney and
8  others, is it fair to say that there was no
9  attorney-client relationship because they -- you
10 considered them to be the victims rather than
11 attorneys?
12     MR. CULLEN:  Objection to form.  You
13 can answer.
14     MR. MALAGUTI:  No, that's a bad
15 question, so let me reform it.
16 BY MR. MALAGUTI:
17 Q.  Is it fair to say that you did not
18 consider there to be an attorney-client
19 relationship with anyone in the legal department
20 regarding the January 22nd incident?
21 A.  Yes.
22 Q.  In fact, you told us early on that
23 there are very limited circumstances by which
24 there's an attorney-client relationship with the
25 city legal department and the police department?

Page 87

1  A.  Correct.
2  Q.  You got further communications from the
3  legal department -- and let me reframe that.
4      To your knowledge, did you or anyone at
5  the police department get further communications
6  from the legal department between the time that
7  the meeting occurred and Ms. Ortolano was
8  arrested?
9  A.  I don't -- I don't recall specifically
10 getting any myself.  I know that there were several
11 conversations back throughout this entire ordeal,
12 not just this arrest, where Bolton would contact
13 the legal department, and I believe it was Captain
14 Brian Kinney at the time, or Lieutenant Kinney.
15 There was some -- I think some conversations there
16 that he let me know about.
17 Q.  Captain or Lieutenant Brian Kinney, was
18 he in the police legal department or was he in
19 some other department?
20 A.  He was part of the Nashua police legal
21 department.
22 Q.  Was he an attorney?
23 A.  No.
24 Q.  Did -- it sounds like he got promoted
25 to captain, he might have been a lieutenant at the

Page 88

1  time, so I'll just call him Brian Kinney.
2      Did Brian Kinney tell you the content
3  of those conversations between himself and
4  Steve Bolton?
5  A.  The conversation, I don't recall him
6  telling me specifically, but it would have gone to
7  his captain up to the deputy to me.
8  Q.  And you don't remember anything that
9  was said?
10 A.  No.
11 Q.  Admittedly, by the time it reached you
12 second or third-hand?
13 A.  Correct.
14 Q.  Do you remember the nature of what was
15 said?
16 A.  I don't.  I -- no, I remember the
17 conversation with Bolton, and we held firm that we
18 weren't going to pursue charges, and that's -- I
19 knew there was back and forth, but I don't remember
20 what they specifically were.
21 Q.  Did you understand that Steve Bolton
22 was advocating for the arrest of Laurie Ortolano
23 when he spoke with Brian Kinney?
24 A.  I believe so.  I know for a fact he was
25 advocating for it when we had our meeting.

Page 89

1  Q.  At some point did the police department
2  open an investigation into whether Laurie Ortolano
3  should get arrested?
4  A.  Yes.
5  Q.  How soon was that after the meeting at
6  Bolton's office?
7  A.  I don't know specifically.  If I had to
8  guess, it was within a week.
9  Q.  Do you know why the investigation was
10 opened?
11 A.  I do.
12 Q.  Why?
13 A.  I was advised by my deputies that they
14 wanted to open an investigation to re -- to relook
15 at the case because of a social media post that
16 Ms. Ortolano had posted, but if I remember right,
17 she was bragging about refusing to leave, and
18 not -- not obeying the commands of what the person
19 who had control of the property did, meaning the
20 legal department.
21 Q.  You understand that Ms. Ortolano has a
22 First Amendment right to post on social media?
23 A.  I do.
24 Q.  You understand that Ms. Ortolano has a
25 right to post even offensive material under the

**Page 90**

1  First Amendment on social media?
2     A.   Yes, sir, I do.
3     Q.   You understand that unless
4  Ms. Ortolano's postings constitute some form of
5  unprotected speech that she cannot be regulated in
6  that speech, as a general matter?
7     A.   Yes, sir.
8     Q.   Do you believe it would be wrong for
9  the Nashua Police Department to arrest Laurie
10 Ortolano because of social media posts they made?
11    A.   I can't answer that question because
12 the answer is it's possible.  If she's -- we're not
13 arresting her based on anything she's just saying
14 in there.
15    Q.   Can you elaborate on that?
16    A.   The decision, from what I understand,
17 to arrest was her admission of committing the
18 crime.  She went on her social media post and
19 admitted to refusing to obey those commands, and
20 for us the discussion, if I remember correctly,
21 was, well, she's admitting to a crime, we don't
22 need a witness to necessarily come forward, she's
23 making her own self-admissions, so we will charge
24 her, and I supported that decision.
25    Q.   Now, when you say that she wasn't

**Page 91**

1  obeying, are you talking about the command to
2  leave given by people in the legal department, or
3  by the police officers at the scene?
4     A.   People in the legal department.
5     Q.   Didn't we discuss a short while ago
6  that as a general proposition if the people
7  cooperate with the police officers when they
8  arrive, even though they had refused to leave
9  until then, that the police may no trespass them,
10 but will not generally arrest them for trespass?
11    A.   Yes, we did.
12    Q.   Why didn't that happen here?
13    A.   So if I -- if I understand their
14 thought process correctly, she was admitting to
15 committing the crime, bragging about committing the
16 crime, and the concern was that the bragging and
17 the admissions occurred after the warning and the
18 no trespass, and the thought was that she was
19 pretty vocal about it, and there was a concern that
20 it would be a repeat offense, and the decision was
21 made to arrest her for it.
22    Q.   And you said your deputies advocated
23 for the arrest?
24    A.   Well, it wasn't -- it was not their
25 decision to make.  I don't -- it would have been

**Page 92**

1  made at a lower level.
2          So I'm not sure who made the decision
3  to arrest, whether it was the patrol sergeant or
4  the supervisors or whom it was, but typically that
5  would not be a decision made by the deputies.
6     Q.   So did I misunderstand you when you
7  said that your deputies were advocating to have
8  her arrested?
9     A.   No, they were telling me about what the
10 social media posts, and part of the discussion
11 involved, well, they wanted to arrest her, is it
12 legal, can we do it, should we do it.  Those are
13 the processes that came up, the discussion that
14 we had.
15    Q.   So they were not taking a position
16 on it?
17    A.   Correct.
18    Q.   They were reporting what their
19 subordinates were advocating?
20    A.   Correct.
21    Q.   And it's obviously in the police
22 papers, but do you remember who the advocates were
23 for her arrest?
24    A.   I don't, but if it's in the police
25 report, I would verify it.

**Page 93**

1     Q.   And you eventually -- well, let me ask
2  you this.  Was it your decision to be made?
3     A.   No.
4     Q.   Did you check off on the decision, in
5  your mind?
6     A.   I had my opinion, but it wasn't a
7  direction I told anybody, it was not an order to
8  give anybody.
9     Q.   And you voiced that opinion?
10    A.   I voiced it with my two deputies,
11 correct.
12    Q.   And you assume that they sent it down
13 the chain of command?
14    A.   No.  The discussion that you -- please
15 don't misunderstand me.  The discussion with my two
16 deputies involves the facts that the officers were
17 given and us exchanging back and forth what that
18 looked like, what that meant, what the options
19 were, what the outcomes were, just a general
20 discussion about that incident and their decision.
21    Q.   And who were your deputies again at
22 that time?
23    A.   I think it was Kevin Rourke and Jim
24 Testaverde.
25    Q.   Again, I'm sorry, what was Mr. Rourke's