UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano,<br>      Plaintiff,<br>v.<br><br>The City of Nashua, New Hampshire, et al.,<br>      Defendants. | No. 22-cv-00326-LM |

**DEFENDANTS INCEPTION TECHNOLOGIES, INC. AND RAYMOND FEOLI'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants Inception Technologies, Inc. and Raymond Feoli (collectively, "Defendants") submit this Memorandum of Law in support of their Motion for Summary Judgment as to Count Eight (Defamation) of the Verified Complaint asserted by Plaintiff Laurie Ortolano ("Ms. Ortolano").

**INTRODUCTION**

Admittedly frustrated with the City of Nashua's ("City") lack of response to her numerous right-to-know ("RTK") requests for Assessing Department records, and conscious of the time and expense associated with petitioning the Court pursuant to RSA 91-A to compel the City's response, Ms. Ortolano chose to circumvent statutory procedures and seek information and documents directly from the outside vendor with whom the City had contracted to scan the subject records. Thus, Defendants became unwitting participants in the ongoing legal war between Ms. Ortolano and the City.

When Ms. Ortolano contacted Mr. Feoli seeking information about the status of the Inception scanning project, she quoted the Purchase Order number for the job and stated the amounts that had been paid by the City and balance remaining. She inquired about Inception's

1

contract performance dates.  Ms. Ortolano inquired about public access to the scanned documents, stating: "**We** don't have access to those files.  When can **we** get those files back." She never disclosed that she was a citizen and not a City official.  She assured Mr. Feoli that she would speak to City Director about expediting payment of Inception's invoice.  In his 28 years as Inception's President, Mr. Feoli had never received such a call from a citizen of a municipal customer.  Given these facts, any reasonable person would have deduced that Ms. Ortolano was a City official.  Mr. Feoli reasonably believed he was talking to a City official.  Accordingly, he divulged proprietary information to Ms. Ortolano.

Upon learning that Ms. Ortolano was not a City official, Mr. Feoli was obligated to notify the City about his communications and what he determined to be a breach of his company's data security policies.  In his email to the Board of Alderman, he stated that he had been "deceived" by Ms. Ortolano, who "portrayed herself as a city employee."  Mr. Feoli had never met Ms. Ortolano.  He was not aware of her longstanding battles with the City.  He harbored no animus toward Ms. Ortolano.  He simply felt compelled to disclose the data breach.

Ms. Ortolano never should have contacted Mr. Feoli directly.  She knew that Mr. Feoli had no right to share proprietary information directly with City constituents.  But, in her mind, obtaining the information by any means was the only goal.  What Ms. Ortolano did was wrong.

## **STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Inception is a privately owned New Hampshire corporation with an office in Manchester.  Affidavit of Raymond Feoli ("Feoli Aff.") [Doc. No. 31-2], at ¶2.

2. Inception provides document scanning and data storage solutions to private companies and public agencies. *Id.* at ¶3.

3. Among its current and former customers are the New Hampshire municipalities of Nashua, Salem, Moultonborough, and Hollis. *Id.* at ¶3.

4. Inception routinely handles sensitive, confidential customer information and documents and therefore must maintain strict data security protocols. *Id.* at ¶4.

5. In or about August of 2019, Inception contracted with the City to undertake the scanning of Assessor records. *Id.* at ¶5.

6. Since the start of the project Inception has scanned approximately 500,000 documents for the City. *Id.*

7. Mr. Feoli is Inception's President. *Id.* at ¶1.

8. In late 2021 or early 2022, frustrated by the City's failure to respond timely to her Right to Know Law requests for Assessor records, Ms. Ortolano called Inception and left a voicemail message for Mr. Feoli, identifying herself as Laurie Ortolano of Nashua. Complaint at ¶121; Feoli Aff. at ¶7.

9. Believing Ms. Ortolano to be a City official, Mr. Feoli promptly returned the call. Feoli Aff. at ¶7.

10. Prior to this call, Mr. Feoli had never met, communicated with, or heard of Ms. Ortolano. *Id.* at ¶8.

11. Mr. Feoli knew nothing of Ms. Ortolano's legal battles with the City. *Id.*

12. In his 28 years as Inception's President, Mr. Feoli had never received a telephone call from a citizen of a municipality or a customer of a customer seeking information about a pending work order. Deposition of Raymond E. Feoli ("Feoli Dep.") at 33:20 to 34:15 and 42:21 to 43:16.

13. Ms. Ortolano was, at the time of her first call to Inception, well aware of New Hampshire's Right-to-Know Law and the procedures for compelling a municipality to produce requested public records via petition to the Court. Deposition of Laurie Ortolano ("Ortolano Dep.") at 156:14 to 158:15.

14. Ms. Ortolano did not want to follow what she deemed to be a "nightmare" process of petitioning the Court and paying "$400 to file and get a summons served." Ortolano Dep. at 157:7-20.

15. When asked to recall how she introduced herself to Mr. Feoli, Ms. Ortolano stated: "Laurie Ortolano, I am trying to find out when **we** are going to have the scanning job done on all of these property cards." Ortolano Dep. at 89:6-10 (emphasis supplied).

16. Ms. Ortolano did not identify herself as a citizen of Nashua during the first call to Inception or during any subsequent call. In fact, she did not identify herself as a citizen of Nashua until she sent an email to Mr. Feoli after Mr. Feoli emailed the Board of Alderman. Ortolano Dep. at 149:22 to 151:8.

17. Ms. Ortolano asked Mr. Feoli questions about the scanning project and Inception's production schedule and recited facts about a pending Purchase Order as well as the amounts Inception had billed to, and was paid by, the City. *Id.*

18. Ms. Ortolano stated that she would contact City Director Kimberly Kleiner ("Ms. Kleiner") make sure payment from the City was expedited. *Id.*; Affidavit of Laurie Ortolano [Doc. No. 33-2] at ¶9.

19. Believing Ms. Ortolano was a City official, Mr. Feoli gave Ms. Ortolano a status report on the scanning project. *Id.*

4

20. On or about February 4, 2022, Ms. Ortolano called Mr. Feoli again and left another voicemail message and, once again, Mr. Feoli promptly returned the call. *Id.* at ¶10.

21. During this second call, Ms. Ortolano questioned Mr. Feoli about public access to the scanned documents, at one point stating/inquiring: "**We** don't have access to those files.  When can **we** get those files back?" *Id.* (emphasis added).

22. Mr. Feoli did not provide Ms. Ortolano access to the scanned documents but instead advised Ms. Ortolano to confer with then City Director Kimberly Kleiner ("Ms. Kleiner") to obtain access to the scanned data. *Id.*; Ortolano Dep. at 151:16 to 152:3.

23. Following this second call with Ms. Ortolano, Mr. Feoli received a call from Ms. Kleiner who asked Mr. Feoli to identify all City officials with whom he had communicated about the City's scanning project. *Id.* at ¶10.

24. Mr. Feoli identified the City officials with whom he had communicated, including Ms. Ortolano, who he believed to be a City official. *Id.* at ¶12.

25. Ms. Kleiner then informed Mr. Feoli that Ms. Ortolano was not a City official and proceeded to inform Mr. Feoli about the lawsuit(s) Ms. Ortolano had brought against the City. *Id.* at 13.

26. Prior to this conversation with Ms. Kleiner, Mr. Feoli had never heard of Ms. Ortolano or her lawsuit(s) against the City. *Id.*

27. Upon learning that Ms. Ortolano was not a City official, Mr. Feoli concluded that his communications with Ms. Ortolano amounted to a breach of Inception's data security obligations to the City. *Id.* at ¶14.

28. On February 6, 2022, Mr. Feoli wrote an email to the Board of Alderman and forwarded it to Ms. Kleiner to memorialize his communications with Ms. Ortolano. *Id.* at ¶15. The email reads as follows, verbatim:

> **From:** Raymond Feoli
> **Sent:** Sunday, February 6, 2022 9:36 AM
> **To:** Kleiner, Kimberly <kleinerk@nashuanh.gov>
> **Subject:** Laura Ortolano
> **Importance:** High
>
> To the Board of Alderman,
>
> My name is Raymond Feoli, President of Inception Technologies. My company has provided the City with document scanning services for the Assessors records. I am writing to the Board after having conversation with Kim Kleiner today. It has come to my attention that I have been deceived by individual, Laura Ortolano, who portrayed herself as city employee to me on thre different occasions.
>
> My first conversation was approximately a month ago. Ms. Ortolano called my company and had left a voicemail asking for an update on the project regarding the PO Number 158909. I promptly returned her phone call thinking she was a city employee. She explained that based on the invoices the City had there was approximately $22K left on the existing PO. I had explained to her that had just finished a batch and was billing another $12K against the PO. She had also asked about when documents were going to be returned and I told her that we were scheduled to drop off a batch and pick up another batch. During that conversation, she had mentioned that she would make sure payment was expedited on any open invoices. I told her we just sent the invoice so it was no hurry on that.
>
> This past Friday I received a voicemail from Ms. Ortolano which I forwarded to Kim Kleiner after speaking with Ms. Ortolano and finding out about this person from Kim. I called her back thinking she was with the city and we had just invoiced another batch. Getting close to the original PO amount, I thought she was just syncing up with my company to make sure we were on track with the PO and boxes. She asked several questions about accessing the documents and the public having access to those records. She explained that while my company had the documents, she stated "**we** don't have access to those files. When can we get those files back?" I corrected her and said well you may not have access to the physical records, what we have scanned was searchable and could be emailed or printed by finding the records in the DocuWare system. I said to her thinking she was an employee "I don't know if a login has been created for you or if you are able to have access to those records in the assessors database, but if you don't,

then someone in the assessors department could provide those files." I went on to explain that we had picked up a batch of approximately 80 boxes and due to the remainder on the PO, we had broken that big batch into smaller batches to avoid exceeding the original PO amount. I did mention that I had just quoted the City on the remainder of the boxes. She thanked me ended the conversation.

She called back a little while later on my cell phone. During this conversation she asked me about the files left to scan. I had explained that I did 2 quotes for the Assessors department. One quote was for the boxes we had sitting in our warehouse that would most likely not fit under the existing PO. That was approximately 55 boxes. I then mentioned that I had done a separate quote for 98 boxes that the department has ready to go once the approval or PO was cut. She passed a comment implying that she was going to help push that along and would let me know when she sees it. I said thank you and we hung up the phone.

Its important to note that any document scanning project is an estimate on the volumes of paper. When we originally did the inspection with Bruce Codagone, we estimated that the City had approximately 1.2 million pages which we felt was a conservative estimate. The thought was to scan the entire set of records over a couple of budget years and show the value the city was going to get from the system. So when we quoted it both Bruce and Inception was aware that we had not accounted for the entire set of records in the initial proposal.

I would be happy to meet with the Board and answer any questions you may have regarding my conversations with Ms. Ortolano or the project itself. Please let me know if there is anything else I can do to assist you further. Thank you.

Sincerely,

Raymond Feoli
President
Inception Technologies Inc.
www.inceptiontech.com
603-703-223  direct
508-801-3279   cell

*Id.* at Exhibit A.

    29.    Mr. Feoli's email was read at the February 8, 2022 Board of Aldermen meeting.

*Id.* at ¶16.

    30.    Mr. Feoli did not attend or participate in this meeting. *Id.*

    31.    On February 11, 2022, Mr. Feoli received an email from Alderman Alex Comeau who wanted to clarify the statements made in Mr. Feoli's February 6, 2022 email. *Id.* at ¶17.

32. Mr. Feoli promptly called Alderman Comeau and discussed the email, clarifying that Ms. Ortolano never explicitly stated she worked for the City but that he believed she was a City official based on her intimate knowledge of City business, the terms of Inception's contract and the status of Purchase Orders, billing and payments, as well as her statements. *Id.*

33. Shortly after the February 8, 2022 Board of Aldermen meeting, a detective from the Nashua Police Department visited Mr. Feoli at his Manchester office and asked questions about his communications with Ms. Ortolano. *Id.* at ¶18.

34. Mr. Feoli informed the detective that Ms. Ortolano never stated that she was a City official but that he believed her to be a City official based on her intimate knowledge of City business, the terms of Inception's contract and the status of Purchase Orders, billing and payments, as well as her statements. *Id.*

35. Ms. Ortolano has thrust herself into the public forum with various conduct which includes vigorous participation in multiple City meetings and affairs. Complaint, p. 4 (discussing "Ortolano's quest to employ her constitutionally and statutorily protected rights to investigate Nashua's government…"), ¶ 25 (she "has been publicly critical of Assessing Department…"), ¶ 26 (attending monthly coffees with the Mayor), filing multiple RTK actions, *see* Complaint generally, ¶ 97 (Ortolano started to become more publicly vocal about the City in 2020, began to frequently post on social media about the City's administration and launched a website named "good-gov.org."), ¶¶ 128-129 (telling the Mayor to shut up and to shut his pie hole – always good for notoriety).

36. Ms. Ortolano has also sought and received ample media coverage. *See, e.g.*, "Laurie Ortolano, Should you open your doors to revaluation?" Union Leader, Op-Ed, May 25, 2020 (https://www.unionleader.com/opinion/op-eds/laurie-ortolano-should-youopen-your-doors-

8

to-evaluation/article_ee856739-8938-528b-80cadf84bde92f47.html); Property owner alleges wrongdoing by city, Nashua Telegraph, February 20, 2019 (www.nashuatelegraph.com/news/2019/02/20/property-owner-alleges-wrongdoingby-city/).

37. A Memorandum of Law filed by Mayor Donchess and CFO Griffin in support of their Motion for Judgment on the Pleadings, [Doc 42-1], which motion was granted by the Court, [Doc 61], points out many other public activities by Plaintiff. *See* [Doc. 42-1], pp. 7-9.

### SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)); Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). Once the burden of has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the

[unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009); Anderson, 477 U.S. at 255. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. Anderson, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." Id. The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Id. "A district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). A complete failure of proof regarding an essential element of a nonmoving party's claim renders all other facts immaterial. Celotex Corp., 477 U.S. at 323.

## ARGUMENT

### I.     Ms. Ortolano's Defamation Claim Fails as a Matter of Law

To establish defamation under New Hampshire law, a plaintiff must prove that a defendant "publish[ed]... a false and defamatory statement of fact about the plaintiff to a third party." *Moss v. Camp Pemigewassett Inc.*, 312 F.3d 503, 508 (1st Cir. 2002), quoting *Independent Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc.,* 138 N.H. 110, 635 A.2d 487, 492 (N.H.1993) (citing Restatement (Second) of Torts § 558 (1977)). A statement is defamatory if it "tends to lower the plaintiff in the esteem of any substantial and respectable group of people." *Nash v. Keene Publ'g Corp.,* 127 N.H. 214, 498 A.2d 348, 351 (1985). *Moss*, 312 F.3d at 508. Alleged

10

defamatory statements must be read in the context of the entire publication. *Moss*, 312 F.3d at 509, citing *Duchesnaye v. Munro Enters., Inc.,* 125 N.H. 244, 480 A.2d 123, 125 (1984). "A statement is not actionable [defamation] if it is substantially true." *Moss*, 312 F.3d at 509, citing *Simpkins v. Snow,* 139 N.H. 735, 661 A.2d 772, 776 (1995).

Ms. Ortolano's defamation claim against Defendants is based on the following factual allegation:

> 121. In fall 2020, the City had contracted with Inception Technologies to scan Assessing Department files to make available publicly-accessible digital records. In late 2021, because Kleiner had not provided any public updates about the project, Ortolano contacted Inception's President, Feoli, to ask him questions about how the scanning and storage was handled. She contacted him again in early-February 2022 for an update. After that second phone call, despite the fact that Ortolano never stated that she was employed by the City of Nashua, was an independent contractor for the City of Nashua, or in any way represented the City of Nashua, Feoli later told Kleiner about the phone call and referred to Ortolano as a city employee. Feoli would later admit when giving a statement about the incident to the Nashua PD that Ortolano had never stated or suggested that she was a City employee; he assumed she was because she was so knowledgeable about city government.

Complaint ¶ 121.

Ms. Ortolano cannot dispute that she contacted Mr. Feoli to obtain information and documents. Nor can she dispute that she expressed an intimate knowledge of City business, the Inception-City Contract, the pending Purchase Order, status of billing and payments, and the scanning production schedule. She admits these facts in her Verified Complaint. Mr. Feoli's recounting of his communications with Ms. Ortolano are undisputedly true and therefore nonactionable.

## II.    Feoli's Statement to the Board of Alderman Was a Nonactionable Statement of Opinion

It is axiomatic that statements of opinion cannot give rise to a defamation claim. Gray v. St. Martin's Press, Inc., 221 F.3d 243, 248 (1st Cir. 2000). A statement is not actionable if it is

11

plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts. Id. The law protects opinions that involve "expressions of personal judgment, especially as the judgments become more vague and subjective in character." Id. "Whether a statement is a verifiable fact or an opinion can be decided by the court as a matter of law." Piccone v. Bartels, 785 F.3d 766, 771 (1st Cir. 2015). "This task requires an examination of the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation and any cautionary terms used by the person publishing the statement." *Id.*

Defendants recognize that the Court initially rejected this argument at the Rule 12 stage, noting that Mr. Feoli's statement that Ms. Ortolano portrayed herself as a City employee "is capable of being proven true or false." Levinsky v. Walmart Stores, Inc., 127 F.3d 122, 129 (1st Cir. 1997). With the benefit of a fully developed record, it is now much clearer why Mr. Feoli believed Ms. Ortolano to be a City official, and why this belief was reasonable.

The crux of Ms. Ortolano's defamation claim against Defendants is the following statement in Mr. Feoli's email to the Board of Aldermen: "It has come to my attention that I have been deceived by individual, Laura [sic] Ortolano, who portrayed herself as city employee to me on thre[sic] different occasions." This is a clear statement of Mr. Feoli's opinion, deduced from his prior communications with Ms. Ortolano in which she exhibited intimate knowledge of City business, recited facts concerning the Nashua-Inception Contract and pending Purchase Order, assured Mr. Feoli that **she** would expedite payment by the City, and then requested access to the scanned documents, stating: "**We** don't have access to those files. When can **we** get those files back?" This statement of opinion is not defamatory.

12

### III.     Ms. Ortolano Is A Limited Purpose Public Figure And Cannot Prove Malice

Ms. Ortolano was a limited purpose public figure for issues relating to the City's public records. These issues she discussed with Mr. Feoli included the City's document storage, retention and production as well as Inception's contract with the City to convert records to an electronic database. The Inception contract/project was tied to Ms. Ortolano's ongoing RTK requests, as indicated by her various efforts to obtain documents and her deep interest in Inception's project. *See, e.g.* Complaint, ¶ 168 ("[F]or more than three years, the City of Nashua has caused its governmental proceedings and records to fail to be open, accessible, accountable, or responsive…."), ¶ 182 (Plaintiff called Mr. Feoli to inquire about the Inception project regarding Assessing Department records) and Feoli Aff. [Doc 31-2], ¶¶ 9- 10.

Ms. Ortolano's status as a limited purpose public figure determines the standard to be applied in a defamation case such as this one. The U.S. Supreme Court "has created two subclassifications of public figures: (1) persons who are public figures for all purposes; and (2) so-called limited-purpose public figures who are public figures for particular public controversies." Thomas v. Telegraph Publ'g, Co., 155 N.H. 314, 340 (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 351 (1974). "As to the second group, individuals may become limited purpose public figures when they 'have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" Id. at 341 (quoting Gertz, 418 U.S. at 345). "Courts make the limited purpose public figure determination 'by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'" Id. (quoting Gertz, 418 U.S. at 352).

Determining whether an individual is a public or private figure is a question of law. Id.; Currier v. Town of Gilmanton, 621 F. Supp. 3d 233, 252 (D.N.H. 2022). Here, as in Currier, "the

13

undisputed facts show that the [Ms. Ortolano] 'thrust [herself] to the forefront of particular public controversies in order to influence the resolution of the issues involved….'" Id., quoting Thomas, 155 N.H. at 341. Like the Curriers, Ortolano spoke at multiple town/city meetings (Complaint, ¶ 25), has been publicly critical of the City's Assessing Department, *id*., made public statements at "coffee with the Mayor" meetings, *id*. ¶ 26, publicly reported the valuation of the Mayor's residence at a Board meeting in November 2018, *id*., ¶31, sought "public documents and other information that Ortolano could use in what had become a public crusade to pressure Nashua officials to clean up the Assessing Department, *id*., ¶ 33. Ms. Ortolano's public thrust continued over a course of years. *See* Complaint, ¶ 97 (in 2020, "Ortolano started to become more publicly vocal;" in early February 2020 "she launched a website entitled 'good-gov.org6' on which she posted blogs" about the City government, and as "Ortolano increased her public criticisms about Nashua's government…."); *id*., ¶ 98 (Ortolano started assisting others with assessment issues because of her experience "and the public profile she had achieved through social media…."); *id*. ¶ 99 (in response "to Ortolano's growing public profile…."). Ms. Ortolano has also sought and received ample media coverage. *See, e.g*., "Laurie Ortolano, Should you open your doors to revaluation?" Union Leader, Op-Ed, May 25, 2020 and Property owner alleges wrongdoing by city, Nashua Telegraph, February 20, 2019. There can be no doubt that Ms. Ortolano is a limited purpose public figure on issues relating to her dealings with the City and issues or documents relating to property assessment.

      As a limited purpose public figure, Ms. Ortolano must show the same level of culpability, malice, as all public figures for liability to pertain. Pendleton v. City of Haverhill, 156 F.3d 57, 70 (1st Cir. 1998), see also Currier, 621 F.Supp. 3d at 253. Malice, for liability in defamation cases "requires proof that the speaker published the statement with knowledge of its falsity or

14

with reckless disregard as to whether it was false." Pendleton, 156 F.3d at 65; Currier, 621 F. Supp. 3d at 253.  There is no evidence that Mr. Feoli knew he was making a false statement or made a statement with reckless disregard to its truth.  There is no evidence of malice.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and dismiss Count Eight (Defamation) of Plaintiffs' Verified Complaint, with prejudice, award Defendants attorney's fees and costs, and grant any other relief it deems just.

| | |
|---|---|
| Respectfully submitted,<br>Dated: May 31, 2024 | Defendants Inception Technologies, Inc.<br>and Raymond Feoli,<br>By their attorneys,<br><br>*/s/ Brian T. Corrigan*<br>Brian T. Corrigan (*pro hac vice*)<br>122 Chestnut Street<br>Andover, MA 01810<br>(978) 988-1544<br>CorriganLaw@gmail.com<br><br>Emmanuel Gonzalez (Bar No. 275359)<br>Gonzalez Legal, PC<br>PO Box 221<br>Lynn, MA 01903<br>e@gonzalezlegaloffice.com<br>T. (781) 346-4874<br>F. (781) 318-5999 |

## **CERTIFICATE OF SERVICE**

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

>   */s/ Brian T. Corrigan*
>   Brian T. Corrigan