## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano,<br>　　　　　　　Plaintiff,<br>v.<br><br>The City of Nashua, New Hampshire, et al.,<br>　　　　　　　Defendants. | No. 22-cv-00326-LM |

### DECLARATION OF BRIAN T. CORRIGAN, ESQUIRE

I, Brian T. Corrigan, Esquire, make this declaration under the authority of 28 U.S.C. 1746 and state as follows:

1.    I am counsel to Defendants Inception Technologies, Inc. and Raymond Feoli.

2.    I make this Declaration based on my own personal knowledge.

3.    The documents attached hereto are true and accurate copies of documents relating to this matter:

- Excerpts of the Deposition of Defendant Raymond Feoli, taken 4/10/24

- Excerpts of the Deposition of Plaintiff Laurie Ortolano, taken 5/8/24

I declare under the pains and penalties of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.

Dated May 31, 2024

　　　　　　　　　　　　　　　　　　　　　/s/ Brian T. Corrigan
　　　　　　　　　　　　　　　　　　　　　Brian T. Corrigan

### CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

　　　　　　　　　　　　　　　　　　　　　/s/ Brian T. Corrigan
　　　　　　　　　　　　　　　　　　　　　Brian T. Corrigan

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * *

                                    *

LAURIE ORTOLANO                     *    COPY

                                    *

          Plaintiff,                *

                                    *   Docket No.:

vs.                                 *   1:22-cv-00326-LM

                                    *

THE CITY OF NASHUA,                 *

NEW HAMPSHIRE, ET AL.,              *

                                    *

          Defendants.               *

                                    *

* * * * * * * * * * * * * * * *

          DEPOSITION OF RAYMOND E. FEOLI

          Deposition taken by agreement of counsel via
Zoom on Wednesday, April 10, 2024, commencing at
10:00 A.M.

Court Reporter:
Tina L. Hayes, RPR, NH LCR #80
(RSA 310-A:161-181)

---

**Page 2**

1        A P P E A R A N C E S
2  Representing the Plaintiff:
3        OLSON LAWYERS
         31 Franklin Road
4        Salisbury, NH  03268
         By:  Kurt S. Olson, Esquire
5        (603)748-1960
         kolson@mslaw.edu
6
7  Representing the Defendants, The City of Nashua,
   Michael Carignan, and Frank Lombardi:
8
         CULLEN COLLIMORE SHIRLEY, PLLC
9        37 Technology Way, Suite 3W2
         Nashua, NH  03060
10       By:  Brian J.S. Cullen, Esquire
         (603)881-5500
11       bcullen@cullencollimore.com
12
   Representing the Defendant, Kimberly Kleiner:
13
         FRIEDMAN FEENEY, PLLC
14       95 North State Street, Suite 5
         Concord, NH  03301
15       By:  Dona Feeney, Esquire
         (603)783-5105
16       dfeeney@friedmanfeeney.com
17
   Representing the Defendants, Steven Bolton and Celia
18 Leonard:
19       UPTON & HATFIELD, LLP
         10 Centre Street
20       Concord, NH  03301
         By:  Madeline K. Osbon, Esquire
21       (603)224-7791
         mosbon@uptonhatfield.com
22
23

---

**Page 3**

1        A P P E A R A N C E S
2  Representing the Defendants, Raymond Feoli and
   Inception Technologies, Inc.:
3
         CORRIGAN LAW OFFICES
4        122 Chestnut Street
         Andover, MA  01810
5        By:  Brian T. Corrigan, Esquire
         (978)988-1544
6        corriganlaw@gmail.com
7
          S T I P U L A T I O N S
8
     It is agreed that the deposition shall be taken
9  in the first instance in stenotype and when
   transcribed may be used for all purposes for which
10 depositions are competent under the Federal Rules of
   Civil Procedure.
11
     Notice, filing, caption and all other
12 formalities are waived.  All objections except as to
   form are reserved and may be taken in court at time
13 of trial.
14   It is further agreed that if the deposition is
   not signed within 30 days, the signature of the
15 deponent is waived.
16          I N D E X
   WITNESS:
17
     Raymond E. Feoli
18
   EXAMINATION:                                PAGE
19
     By Mr. Olson                            5, 57
20
     By Mr. Cullen                              55
21
   ERRATA SHEET                                 59
22
   CERTIFICATE OF REPORTER                      60
23

---

**Page 4**

1  EXHIBITS FOR IDENTIFICATION:
2  MARKED          DESCRIPTION                 PAGE
3  Exhibit 1       Purchase Order No. 158909     15
4  Exhibit 2       Defendant Raymond Feoli,      19
                   Inception Technologies
5                  President's Objections and
                   Responses to Plaintiff Laurie
6                  Ortolano's Requests for
                   Production of Documents
7
   Exhibit 3       Defendant Raymond Feoli,      28
8                  Inception Technologies
                   President's Objections and
9                  Responses to Plaintiff's First
                   Set of Interrogatories
10
   Exhibit 4       Affidavit of Plaintiff Laurie 50
11                 Ortolano
12 (Electronic Exhibits were provided to all parties.)
13
14
15
16
17
18
19
20
21
22
23

**33**

1    Q.   Thank you.

2    A.   -- "believed her to be a City official

3  based on her intimate knowledge of the City's

4  business, the terms of Inception's contract, and the

5  status of PO, billing and payments, as well as her

6  statements."

7    Q.   Do you recall if that's what you told the

8  detective at the time?

9    A.   I don't recall exactly, no.

10    Q.   Okay.  I believe, in answer to an earlier

11  question, you didn't mention all of those things.

12  But we can look at the detective's report in a

13  minute.

14    A.   Sure.

15    Q.   And skip ahead to No. 12.  Tell me when

16  you are ready, Ray, please.

17    A.   Yeah.  (Perusing document.)  Okay.

18        (Perusing document.)  Okay.

19        (Perusing document.)  Okay.

20    Q.   So in the middle of, actually, that begins

21  with "Thinking Ms. Ortolano," would you read that.

22    A.   "Thinking Ms. Ortolano was a City

23  official, I promptly returned the call."

**34**

1    Q.   Okay.  And just to clarify, when you

2  received that voicemail message, was there anything

3  in it that led you to believe that Ms. Ortolano was

4  a City employee?

5    A.   Just like I said, she -- I have never had

6  this situation come up where I have had a client of

7  a customer call me looking for information.  She

8  mentioned Nashua.  She mentioned the PO.  I just

9  concluded she was with the City.

10    Q.   Okay.  So you are really sort of

11  reinforcing your previous answer that, because it

12  was so rare or maybe had never happened before, that

13  you were assuming that she was a City employee;

14  correct?

15    A.   In 28 years, it's never happened.

16    Q.   Okay.  And if you go down to the bottom of

17  your answer, beginning with "On or about February 4,

18  2022," please read that.

19    A.   (As read) "On or about February 4, 2022,

20  Ms. Ortolano called me again and left a voicemail.

21  Once again, I promptly returned the call.

22  Ms. Ortolano questioned me about public access to

23  the documents, at one point stating/inquiring:  'We

**35**

1  don't have access to those files.  When can we get

2  those files back?'  I did not provide Ms. Ortolano

3  access to the scanned documents."

4    Q.   Thank you.

5        So I don't believe that you mentioned the

6  quoted language here when you described that second

7  phone call.  Do you recall that?

8    A.   I am not sure what you are referring to.

9    Q.   So where you have in quotes down at the

10  line -- first line from the bottom --

11    A.   Yeah.

12    Q.   -- "We don't have access to those files.

13  When can we get those files back."

14        As you sit here today, do you recall her

15  saying that or asking those questions?

16    A.   Yeah.  That -- she was concerned about

17  documents that were being requested.  And she made

18  comment that, while we have those files in our --

19  Inception's possession, that she didn't have access

20  to those files.

21        And I said to her that, you know, "You do.

22  Because when we scan them and upload them into

23  DocuWare, you can search and retrieve those files."

**36**

1  And that's, again, under the thought that she was

2  with the company [sic].  And I mentioned that she

3  could, you know, have Kim provide her log-in

4  credentials to get access to those files if she were

5  a City employee.  She didn't say she wasn't.  And

6  she let it go, and that was it.

7    Q.   Okay.  And the last line in your answer

8  here where you say "I did not provide Ms. Ortolano

9  access to the scanned documents," did she ever ask

10  you for the scanned documents?

11    A.   She wanted to know when they could have

12  access to them.  She didn't specifically say

13  "scanned documents."  I said to her that, you know,

14  "You could have access to those scanned documents if

15  you got log-in credentials from Kim."

16        As a company, we don't give out log-in

17  credentials from -- we pick a point of contact

18  within the organization who tells us, "Yes, this

19  person can have access to those files."  So I kind

20  of was referring to the fact that, if she wanted to

21  get access to those scanned documents, as an

22  employee of the City, she could have requested

23  log-in credentials.

37

1   Q.   Thank you.
2       One more from this document and that's
3   Interrogatory No. 14 starting here.
4   A.   (Perusing document.)  Okay.
5       (Perusing document.)  Okay.
6   Q.   So before we scroll on through this one,
7   Ray, at the bottom of the first paragraph here,
8   would you read the sentence beginning with "She
9   stated that she would."
10  A.   "She stated that she would make sure
11  payment from the City would be expedited."
12  Q.   Okay.  And I believe this is all
13  repetitive of something you wrote before?
14  A.   Uh-huh.
15  Q.   But we now get to an email.  Do you
16  recognize this email?
17  A.   Yes.
18  Q.   Okay.  And what is it?
19  A.   It's an email that I sent to my customer
20  that was essentially summarizing what I determined
21  to be a breach of my customer's information.  My
22  responsibility is to my customer and to keep their
23  information confidential, regardless of the nature

38

1   of the information.  So I felt that it had been
2   breached and I needed to notify my customer the
3   circumstances around that.
4   Q.   Do you recall whether you ever
5   mentioned -- excuse me -- anything about a security
6   breach in this email?  I will let you read the whole
7   thing before you answer, if you want to take a --
8   A.   No, I don't specifically recall saying
9   "data breach" in there.  But, essentially, for me,
10  that's what it came down to.
11  Q.   Okay.  And do you know whether notice of a
12  security breach is required by the New Hampshire
13  statute?
14  A.   I don't know that it's required.  So I
15  don't know if it's required by New Hampshire
16  statute.
17  Q.   Okay.  Would you like to read through this
18  just to find out whether or not you did mention
19  anything about a security breach, or are you
20  confident that you didn't?
21  A.   No, I am not confident that I did or
22  didn't.
23  Q.   Okay.

39

1   A.   So I know what my thought process was
2   around writing it, which was that I felt that I had
3   violated our security protocols by disclosing
4   customer information about -- you know, to somebody
5   who wasn't with my customer.
6   Q.   Okay.  Thank you.
7       And the paragraph that begins on this page
8   with "This past Friday," would you read that first
9   sentence, please.
10  A.   "This past Friday I received a voicemail
11  from Ms. Ortolano which I forwarded to Kim Kleiner
12  after speaking with Ms. Ortolano and finding about
13  this person from Kim."
14  Q.   Thank you.
15      So you described that before, I believe;
16  right?  So after the second phone call with
17  Ms. Ortolano, you communicated with Ms. Kleiner;
18  correct?
19  A.   No.  I believe that it was the third, not
20  the second, because I didn't notify Kim about a
21  voicemail from Ms. Ortolano.  Now, I still had a
22  copy of the voicemail in my email box and forwarded
23  it to her after I found out that she wasn't with the

40

1   City.
2   Q.   Okay.  But will you agree with me that
3   that first sentence indicates that you spoke --
4   sorry -- you forwarded the voicemail to Kim Kleiner.
5   And then it says that "finding out about this person
6   from Kim."  Does that mean that you found out from
7   Kim that Ms. Ortolano was not a City employee?
8   A.   Yes.  As I stated before, until that phone
9   call with Kim identifying the employees that I
10  thought were with the City -- or that I had
11  communicated with the City, until that point in
12  time, I that had no reason to believe that Laurie
13  wasn't with the City.
14  Q.   Okay.  And then if you don't mind reading
15  that second sentence beginning with "I called her
16  back"?
17  A.   "I called her back thinking she was with
18  the City and we had just invoiced another batch."
19  Q.   So based on the first sentence, do you
20  think that you already knew at that point that
21  Ms. Ortolano was not with the City?
22  A.   No.  I didn't know that she was not with
23  the City until Kim said she wasn't with the City.

41

1    Q.   Okay.  But I am just trying to get clear
2  here, because the first sentence shows that you
3  forwarded Kim Kleiner the voicemail; and then it
4  says "finding out about this person from Kim."  Will
5  you agree that that suggests that Kim informed you
6  that Ms. Ortolano was not with the City?
7    A.   I thought I already stated that.
8    Q.   Right.  But then your next sentence says
9  that you called her back thinking she was with the
10  City.
11    A.   Yeah, I did.  I called Kim -- not --
12  the times she had called me -- those three times
13  she called me and left voicemails, I called her
14  back.
15    Q.   Okay.
16    A.   Maybe I didn't word it properly and
17  clearly, but that's essentially what happened.
18    Q.   Okay.  So it's your testimony today that
19  you called Ms. Ortolano back prior to the call with
20  Kim Kleiner; is that correct?
21    A.   Correct.  I did not -- I called
22  Ms. Ortolano back each time she left a message,
23  which was three times.  After the third one, I got a

42

1  call back, I think it was, within a couple of days
2  of speaking with Laurie Ortolano.  And Kim asked me
3  those questions about who I had been talking to.  I
4  identified the people I thought were with the City
5  that I had spoken to.  And then that's the point
6  where Kim said, "Oh, no, she is not with the City,"
7  and I said, "Oh, okay."  So...
8    Q.   Okay.  Then at some point, I believe it
9  was, on February 11th -- but correct me if I am
10  wrong -- you received an email from Mr. Comeau from
11  the board of aldermen in Nashua?
12    A.   I don't think I got an email.  I think I
13  got a voicemail.
14    Q.   Okay.
15    A.   I could be wrong on that one, but --
16    Q.   Okay.  So we can check if we need to.  But
17  leaving that aside, you did receive some form of
18  communication from Mr. Comeau of the board of
19  aldermen; correct?
20    A.   Yes.
21    Q.   Okay.  And do you recall the substance of
22  that conversation?
23    A.   Yes.  He wanted to clarify my email in

43

1  regards to Laurie's statements about being with the
2  City, et cetera.
3    Q.   And what sort of clarification did you
4  give him?
5    A.   Same thing I told you, is that it wasn't
6  anything that she said.  Like, she never came out
7  and said, "I am not" -- "I am with the City."  It
8  was more that she had intimate knowledge about
9  things that, you know, in my experience, only
10  customers would have.  I never had this happen in
11  28 years.  And she never came out and said, "I am
12  not with the City," or, "I am" -- you know, "I need
13  this information for, you know, litigation
14  purposes," or whatever.  She just asked questions
15  about specific, you know, POs and, you know, status
16  of the project, et cetera.
17    Q.   Okay.  So based on that answer, in your
18  conversation with Mr. Comeau, you gave him details
19  about your thoughts regarding Ms. Ortolano; correct?
20    A.   I don't recall giving her [sic] any
21  thoughts other than that, you know, I didn't -- I
22  felt like she could have been more forthright about
23  who she was and -- and, you know, sort of what she

44

1  was asking for.  Because, you know, to my knowledge,
2  she was with the City and I was giving information
3  about that.  So...
4    Q.   Okay.  But you didn't inform Mr. Comeau
5  that there may have been a data breach; right?
6    A.   Yeah.  Actually -- well, I had already
7  sent the -- the email, which, like I said, I
8  didn't -- I don't know if I specifically used the
9  term "data breach," but I did disclose customer
10  information.
11       So, you know, I may not have used the
12  proper term, "data breach," in there.  But when I
13  let go private information to somebody who is not
14  authorized to have it, I feel an obligation to let
15  my customer know that I have done that.  And that's
16  essentially what this email is.
17    Q.   Okay.
18    A.   And --
19    Q.   So -- go ahead.  Sorry.
20    A.   The email was purely a notification to my
21  customer.  I had no understanding that it was going
22  to be read into public forum.  It was something that
23  I was just sending to let them know this is what

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

************************************

LAURIE ORTOLANO
VS                 NO:  22-CV-00326-LM
THE CITY OF NASHUA, Et Al.

************************************

DEPOSITION OF LAURIE ORTOLANO

This deposition taken by agreement of counsel
at the Law Offices of Cullen, Collimore & Shirley,
37 Technology Way, Suite 3W2, Nashua, New
Hampshire, on May 8, 2024, commencing at 10:20 a.m.

Laurie Ortolano                                                    May 08, 2024

---

Page 86

1  Q   But short -- within 2020 most likely?
2  A   Yes, I don't think it started in '19.  I think
3      it started in '20, and COVID was running, it
4      was tricky.  I remember COVID being a factor.
5  Q   I guess, if you say here the budget -- "The
6      City chose to undertake the project in 2020,"
7      I am just trying to get a sense how soon after
8      that, after it started, did you learn about
9      it?
10 A   Oh, I would have learned about it -- I went to
11     a lot of budget review committee meetings.  I
12     would have learned about it right then.  It
13     would have been something that piqued my
14     interest.  It was a big deal.
15 Q   That was going to make your assessment work
16     easier, if it is digitized, theoretically?
17 A   Theoretically.  I had some doubts.
18 Q   Theoretically, this was going to be
19     potentially a boon for you?
20 A   A help, to have home records to review
21     property files, not just a card, but files.
22 Q   Paragraph 5, you write, "Unfortunately that
23     project started to linger, which restricted

---

Page 87

1      access to these public records, and resulted
2      in great frustration."
3          Do you mean great frustration to
4      you?
5  A   Yes.
6  Q   When was it that the project started to
7      linger?
8  A   Well, I believe it was presented to the budget
9      committee as being something that could be
10     done in like four to six months, and this
11     was -- I am not certain it is done now.  So
12     this had a lot of, it took a lot more time.
13     Yes, it took years.  Like I said, I don't know
14     if it is done.
15 Q   So the project started, according to paragraph
16     4, in 2020.
17         About when was it that you
18     decided -- that you determined it started to
19     linger?
20 A   When we cleared like six months, when we
21     cleared that time, and what happened is I
22     would contact assessing to get a file, and
23     they would say, oh, it is boxed, it is out for

---

Page 88

1      scanning, and when is it coming back, and
2      there was a system set up in assessing that
3      when they boxed them, there was supposed to be
4      an indexing system, so if a citizen wanted a
5      record, and they were still in city hall, you
6      could retrieve it from the box, but they were
7      not retrieving them.
8          Then when they went out to
9      Inception, they were taking a very long time
10     to get the boxes back.  The records were just
11     not available.  It went on for years.
12 Q   So the short answer is within about six months
13     of when the project started, Inception was
14     lingering?
15 A   Yes, I will bear that in mind.
16 Q   At some stage, you spoke with Raymond Feoli
17     about the project, right?
18 A   Yes.
19 Q   And did you reach him the first time you
20     called him, or was it a voicemail the first
21     time?
22 A   I don't think I reached him at all.  I mean, I
23     remember having a very hard time finding his

---

Page 89

1      number.  Whenever I called, I don't think it
2      even worked.
3          At some point, I reached him.  Would
4      it have been a voicemail at the beginning, I
5      don't recall.
6  Q   When you first spoke to him, how did you
7      introduce yourself?
8  A   Laurie Ortolano, I am trying to find out when
9      we are going to have the scanning job done on
10     all of these property cards.
11 Q   Did you tell him that it was Laurie Ortolano
12     from Nashua?
13 A   Well, I think -- I don't necessarily think I
14     even said from Nashua, because I was
15     discussing the Nashua project, so I am not
16     certain I announced it that way.
17         I explained to him why I was
18     frustrated, which I believe he would have
19     understood, I am a citizen.  I am trying to
20     retrieve files, and I said, you have had a
21     batch of files in your office for an extended
22     period of time.  And he explained to me, yes,
23     they are sitting right in my warehouse.

---

Page 90

```
1          I said if you don't ship them back,
2     then people like me, a citizen, cannot get
3     those files, because they are not back in the
4     office.  So I thought he understood that I was
5     clearly speaking as a frustrated person trying
6     to find the files.
7  Q   Are you telling me now you said me as a
8     citizen?
9  A   Well, I definitely said I can't get these
10    files to look through them.
11  Q   Because you say in the affidavit, we don't
12    have access to those files.  You put it in
13    quotes.
14          Is that what you said?
15  A   Sure.
16  Q   I want to make sure.  Sometimes we have a
17    tendency to talk about what I would have said,
18    what I could have said, what I should have
19    said.
20  A   Absolutely.
21  Q   What you actually said.  What you quoted in
22    the affidavit, we don't have access to those
23    files?
```

Page 91

```
1  A   Right.
2  Q   Have you spoken to Mr. Feoli prior to this
3     exchange you had about the frustration in the
4     files?
5  A   I don't know that I did.  I think I had one
6     conversation, for sure.  There might have been
7     a second short one.  I don't recall.  I know
8     left a message, for sure.  I definitely left a
9     message at one point, but it was over pretty
10    quickly because it became a public incident.
11  Q   Let me show you this one.
12          (Whereupon, the court reporter
13    marked Exhibit Number 9, E-mail 2-9-22
14    Feoli/Goodwin/Ortolano, for Identification.)
15  Q   This is an exhibit to your affidavit.  It is
16    marked 33-2 at the top.  The first page
17    appears to be an e-mail from you to Mr. Feoli
18    with copies to Ms. Kleiner, the Mayor and the
19    board?
20  A   Yes.
21  Q   In the third paragraph of the e-mail you
22    write, "I spoke with you a couple months ago,
23    and you provided a helpful explanation where
```

Page 92

```
1     you were in the process of scanning records."
2          Do you recall that conversation?
3  A   I think I do, and I think I did speak to him
4     very generally on what was going on.  I don't
5     recall it being specific at all, just where
6     we were going, did he know when it was going
7     to get done.  The date of this e-mail is what,
8     February 8th of 2022.  I was definitely trying
9     to get some files I couldn't get.
10  Q   Do you remember anything specific about that
11    earlier conversation, would have taken place
12    two months earlier?
13  A   No, because I viewed it as pretty friendly and
14    helpful.  Nothing stood out in my mind.
15  Q   And even as we sit here today, you don't
16    remember anything specific that you said to
17    Mr. Feoli or he said to you back two months
18    before February 8, 2022, correct?
19  A   I don't.
20  Q   Back to your affidavit, Exhibit 8, in
21    paragraph 9, you write towards the bottom, "I
22    told Feoli that I would inquire from Kleiner
23    about when more money would be paid to get the
```

Page 93

```
1     job done."
2          Do you see that?
3  A   Yes.
4  Q   That is something you told Feoli you would do?
5  A   Yes.
6  Q   Do you speak at every meeting at which you
7     attend, every public meeting?
8  A   No.
9  Q   Obviously, you attend a fair number, because
10    we have a stack of them here.
11  A   I did up until 2022.
12  Q   Of the meetings that you attend, what is your
13    best estimate of how frequently you would
14    speak versus not speak?
15  A   Frequently, I would say 80 percent of the
16    time, 85 percent of the time.
17  Q   So if we have, and we do, if we have 65
18    meetings that you attended and spoke at
19    between March 2021 and the end of 2021, you
20    would have probably attended 80 meetings and
21    spoke at about 65?
22  A   I would say yes, and giving me a time frame, I
23    haven't looked at my records, so I would say
```

Laurie Ortolano
May 08, 2024

Page 146

1  Q   So you asked Ms. Kleiner about the status of
2      the scanning, and you didn't get a response
3      back, is that accurate?
4  A   I don't recall any response back, and I went
5      --
6  Q   Am I correct there was no response you can
7      recall, is that correct?
8  A   I don't recall, yes.
9  Q   Fair enough.  You don't recall whether there
10     was or wasn't, as you sit here today?
11 A   Correct.
12 Q   Very good.
13         Did you speak with any of the
14     aldermen about the status of the scanning
15     project at any time?
16 A   I am sure I tried, but the aldermen wouldn't
17     respond to me.
18 Q   Not my question.  So let's try it one more
19     time so we can get out of here.
20         Did you speak to any of the aldermen
21     about the status of the scanning project at
22     any time?
23 A   Yes.

Page 147

1  Q   Who and when?
2  A   I can't recall, but I know I did.
3  Q   How is it that you know you did?
4  A   Because it was being discussed.  She was going
5      in to do a presentation and it was on the
6      agenda, I know when I saw it on the agenda,
7      and I followed up.  I wanted to know from the
8      aldermen and tell them to ask, when is it
9      going to be done?  This has gone on well over
10     a year.  It was supposed to be quick.  I know
11     I reached out to an alderman to try and get
12     them to ask questions.
13 Q   Was it Alderman Comeau?
14 A   It was probably Comeau, Sullivan or Gouveia.
15 Q   Did you call them, e-mail them, see them
16     face-to-face?
17 A   It was probably a phone call or an e-mail.
18 Q   When you say probably, do I take that to mean
19     you don't know one way or the other?
20 A   I don't.
21 Q   And did either of those three aldermen respond
22     to you?
23 A   All I know is I remember -- no, you know who

Page 148

1      it was?  Jonathan Cathey.  He was short-lived,
2      six months.  He was one.  He was the one in
3      the meeting who started to ask questions when
4      this project began, what the anticipation was
5      to complete it.  Those questions came up in
6      the meeting.
7  Q   I'm not asking what happened in the meeting.
8      Again, you keep getting my question confused
9      with the one you would like me to ask you.
10         The question is who did you talk to
11     among the aldermen whether they were
12     short-term aldermen or long-term aldermen
13     about the status of the scanning project?
14         You gave me three names?
15 A   And Cathey, four.  Cathey, Sullivan --
16 Q   Comeau.
17 A   -- Comeau and Gouveia, and I don't know -- all
18     four of them were on at the same time.  So I
19     don't know if one of them wasn't there.
20 Q   All right.  And do you have a specific
21     recollection as you sit here today of speaking
22     to them verbally?
23 A   It is possible.

Page 149

1  Q   You don't know?
2  A   I don't.
3  Q   Do you have a specific recollection as you sit
4      here today of e-mailing one or more of them?
5  A   I don't know.
6  Q   And do you have a specific recollection as you
7      sit here today of seeing them face-to-face and
8      asking a question?
9  A   I don't know.
10 Q   Fair enough.  Give me one moment.
11         MS. FEENEY:  That is all I have
12     right now.  Thank you.
13 INTERROGATORIES BY MR. CORRIGAN:
14 Q   A couple of questions.  Ms. Ortolano, I am
15     Brian Corrigan.  I represent Inception
16     Technologies, Incorporated and Raymond Feoli.
17     I am going to refer to Exhibits 8 and 9, if
18     you wouldn't mind pulling those out again.
19 A   Okay.
20 Q   Why don't we start with Exhibit 9?
21 A   Okay.
22 Q   And the first page, third paragraph of your
23     e-mail to Feoli, you state, "Just to be clear,

Laurie Ortolano                                                    May 08, 2024

---

Page 150

1    I am a citizen"?
2  A   Yes.
3  Q   Was that the first time you had notified Mr.
4     Feoli, you were a citizen of Nashua?
5  A   Probably.
6  Q   Why didn't you tell him that the first time
7     you communicated with him?
8  A   I thought he knew when I started talking to
9     him about needing access to the files that we
10    don't have access to these files, and unless
11    they are brought back to the City, none of us
12    can go in there and get property record files
13    that we want to see if they are sitting in his
14    warehouse.
15 Q   How would Mr. Feoli have known you were a
16    citizen of Nashua with some right to those
17    documents if you didn't identify yourself as
18    such?
19 A   He explained to me his process, that they do
20    this for citizens all over the state.  They
21    scan these files, bring them back in.  He
22    explained how they set up a computer at city
23    hall that we would be able to access, that I

---

Page 151

1     would be able to go to this computer in the
2     hallway as a citizen computer and open to the
3     public to use.
4         So he gave me this whole process of
5     how this information is downloaded for
6     citizens.  So I believed he really knew it was
7     me, that I was not misrepresenting myself.  I
8     thought I had a very good call with him.
9  Q   And you indicated Mr. Feoli was very friendly
10    on your call with him?
11 A   Yes.
12 Q   And helpful?
13 A   And explaining what he does to bring these
14    records back in and set up a computer that
15    citizens can go and research all of this data.
16 Q   Now, did Mr. Feoli during one of your calls
17    recommend to you, you should contact Kimberly
18    to get access to the online database?
19 A   I don't recall if he did.  Oh, to get
20    access -- yes, I think he did do that.  I do
21    think he did.
22 Q   Did you ever speak to Ms. Kleiner about
23    getting that access?

---

Page 152

1  A   Yes.  Ms. Kleiner was not responsive, and it
2     didn't get done.  I don't think the computer
3     is set up now.
4  Q   The City of Nashua doesn't have digital access
5     to the files that Mr. Feoli's company has
6     scanned in for them?
7  A   Only partial the last time I looked.
8  Q   When you say "partial," you mean only a few
9     files or partial records of actual files?
10 A   Only -- not the full 25,000 properties, the
11    last time I looked, and I was told that a lot
12    of data had not been scanned and was missing,
13    and my own 41 Berkeley file was very absent of
14    records.  It was very short and not what I
15    expected.  I was told they are still working
16    to scan and put them in.
17        Now, it has been a year since I
18    looked, but still, that is 2023 from a project
19    that started in 2020, so I really believed
20    based on the presentation of Ms. Kleiner that
21    this was a six-month project, and we were
22    going to have our files.
23 Q   Now, Ms. Ortolano, in your e-mail to Mr. Feoli

---

Page 153

1     referenced in Exhibit 9, you made specific
2     reference to a particular file related to
3     78-84 West Pearl Street?
4  A   Yes.
5  Q   That was, I believe on the e-mail you sent out
6     erroneously to a bad e-mail address.
7         Is that how it worked?
8  A   Oh, maybe it did.  I see it right down at the
9     bottom.
10 Q   You attempted to send Mr. Feoli an e-mail that
11    went to the wrong e-mail address?
12 A   I think some of the e-mail addresses that were
13    online didn't work.
14 Q   Did it bounce back to you?
15 A   I don't know.
16 Q   How did you know that the e-mail, original
17    e-mail didn't go to Mr. Feoli?
18 A   I think I asked him when I spoke to him, what
19    address should I use.
20 Q   Okay.  What is this particular file that you
21    are referencing here in your e-mail to Mr.
22    Feoli?
23 A   It's the Performing Arts Center.

---

Page 154

1  Q  So that is a property in Nashua?
2  A  Yes.
3  Q  And why were you seeking the property records
4     file for that property?
5  A  Because we were, Ms. Colquhoun and myself were
6     doing a lot of research on the Performing Arts
7     Center, and it was newly constructed and
8     permits have to be captured in order to
9     produce an assessment that was fair, year over
10    year, as the building was being built.  We
11    wanted to see what assessments were being
12    placed on this property as construction was
13    going on.
14 Q  Did you ultimately receive the file that you
15    were seeking here?
16 A  Yes.
17 Q  Who gave it to you?
18 A  The City of Nashua.
19 Q  Does that indicate they got the file back from
20    Mr. Feoli's company?
21 A  Yes.
22 Q  Now, I take it that you regularly request
23    property record files from the City of Nashua,

Page 155

1     is that safe to say?
2  A  No.
3  Q  Have you ever?
4  A  Yes.
5  Q  Now, when you get those files back, are they
6     ever redacted?
7  A  Originally, no, not at all, and I really
8     stopped obtaining files -- like this was a
9     file I asked for in 2022, but I would say in
10    2022, that might be the only file I asked for.
11       I stopped asking for files in 2021,
12    probably early on, and in 2018 and '19, they
13    were not redacted.  They were fully unredacted
14    and available at the counter, and then in 2019
15    when Ms. Kleiner took over, the files were
16    going up to legal, they were scanning them and
17    redacted.  My files were redacted.  They were
18    in the assessing office unredacted.  But then
19    they were coming to me redacted.
20 Q  So you received files from the City of Nashua
21    that contained taxpayers' personally
22    identifiable information?
23 A  There really wasn't any in a file.  They were

Page 156

1     redacting things like -- there is no personal
2     identifiable information that the former chief
3     ever considered was part of an assessing file
4     except for business income forms which are
5     always removed from a file for commercial
6     files so we can't get them.  They would not in
7     the past redact an e-mail, but they adopted a
8     policy in 2019, later in 2019, to take an
9     e-mail off.
10 Q  When you received the 78-84 West Pearl Street
11    file from the City of Nashua, was it redacted
12    at all?
13 A  I don't recall.
14 Q  Now, you are probably much more familiar with
15    the process than I am since I am not a New
16    Hampshire resident, but I assume there is a
17    procedure for petitioning the state when a
18    municipality does not respond properly to your
19    request for a public record, is that true?
20 A  Yes.
21 Q  What is that procedure?
22 A  It is RSA 91A.  It is the Right-To-Know law in
23    New Hampshire.  It is an RSA state statute.

Page 157

1     It is 91A and it gives you the right to
2     petition the Court for records not received
3     and gives you a remedy for that petition.
4  Q  Now, why didn't you follow that procedure in
5     the case of 78-84 West Pearl Street?
6  A  Why didn't I?
7  Q  Why did you go to Mr. Feoli instead of
8     petitioning the Court when the City did not
9     give the file to you?
10 A  Oh, my gosh, the process of petitioning the
11    Court is a nightmare.  I would not want to go
12    in and petition the Court on one property
13    records file I didn't receive.  That is 12
14    months to wait.  That is the problem.  These
15    things take forever to run through a court.
16       Pick up the phone and ask the person
17    who has it.  When is it coming back, way
18    easier than filing a lawsuit.  It is $400 to
19    file and get a summons served.  I definitely
20    didn't want to file a lawsuit.
21 Q  Ms. Ortolano, is a private company providing
22    services to a municipality subject to the
23    Right-To-Know law?

Laurie Ortolano

Page 158

1  A   I didn't call him thinking about the
2      Right-To-Know law.
3  Q   You were requesting a document that was a
4      public record?
5  A   Well, that is not how I looked at it.  I
6      requested a document that he was scanning that
7      is our public record.  See the difficulty here
8      was his company did have all of our public
9      records.  We didn't have them, and we have to
10     get them back.  When he told me they were
11     sitting in a warehouse in boxes for like two
12     months done and nobody had picked them up and
13     they weren't shipped back, I was surprised.
14     You have to get these back, because we are
15     waiting for them.  That is all.
16         MR. CORRIGAN:  That is all I have.
17     Thank you.
18         MR. CULLEN:  I don't have any
19     follow-up.
20         MS. FEENEY:  I don't have any
21     follow-up.
22         MR. HILLIARD:  Nor do I.
23         MR. OLSON:  I have two corrections.

Page 159

1      INTERROGATORIES BY MR. OLSON:
2  Q   Laurie, can you refer to Exhibit 1, please?
3  A   Okay.
4  Q   Can you read the first sentence?
5  A   "On 25, June '19 at approximately 0930 hours,
6      Detective Lieutenant D. Mederos and I met with
7      Laurie Ortolano and Laura Colquhoun."
8  Q   Thank you.  So earlier in questioning by
9      Attorney Cullen, I believe he asked you
10     whether or not you had triggered the
11     investigation into the assessing office.
12         Do you remember that?
13 A   Yes.
14 Q   And is that accurate?
15 A   Well, it was two of us.  It was Laura
16     Colquhoun and myself.
17 Q   Thank you.  That was the first point.
18         The other one, Exhibit 8, which I
19     believe is your affidavit?
20 A   Got it.
21 Q   So if you read with me, paragraph 3 on page 1,
22     and again, in questioning by Attorney Cullen,
23     I believe he read the sentence for you.  If

Page 160

1      you can just read actually after "the citizens
2      of Nashua," can you read that?
3  A   Which one is it?
4  Q   The very bottom of the first page?
5  A   "Affecting the citizens of Nashua, I have had
6      a good grasp on the workings of the Nashua
7      City Government."
8  Q   I believe when Attorney Cullen read this for
9      you into the record, he said, "I have a good
10     grasp of the workings of Nashua."
11         You would agree it says "have had"?
12 A   Yes.
13         MR. OLSON:  Thank you.  That is all
14     I have.
15     INTERROGATORIES BY MR. CULLEN:
16 Q   As of the 5th day of December 2022, would you
17     agree you still had a good grasp on the
18     workings of the Nashua City Government?
19 A   The 5th of December of 2022?
20 Q   Yes.
21 A   I am going to say I had a good grasp of the
22     workings of the board of aldermen as a
23     governing body of the City.

Page 161

1          MR. CULLEN:  Okay.
2          THE WITNESS:  There was so much
3      change.
4          (TIME NOTED:  2:37 p.m.)