**EXHIBIT A**

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **Laurie Ortolano,** | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) **Civil Action No. 22-cv-00326-LM** |
| | ) |
| | ) |
| **The City of Nashua, et al.,** | ) |
| **Defendants** | ) |
| | ) |

<u>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS OBJECTION TO DEFENDANTS BOLTON AND LEONARD'S MOTION FOR SUMMARY JUDGMENT**</u>

**I.**     **PLAINTIFF'S CONCISE STATEMENT OF MATERIAL FACTS TO WHICH SHE CONTENDS A GENUINE DISPUTE EXISTS SO AS TO REQUIRE A TRIAL.**

<u>Response of Plaintiff Laurie Ortolano ("Ortolano") to Defendants' Material Facts</u>

1. Steven A. Bolton and Celia K. Leonard are attorneys in the Office of Corporation Counsel for the City of Nashua. ***Admitted.***

2. Their office has assisted its client, the City of Nashua, with responses to over 1,000 right-to-know ("RTK") requests from the Plaintiff over the last few years, producing over 40,000 pages of documents, and defended more than one dozen NH RSA 91-A claims in, to date, sixteen lawsuits filed by Plaintiff in superior court. ***Defendants Bolton and Leonard provide no documentary or other evidence to support this claim. Their affidavits essentially merely parrot the statements made here. Ortolano admits that Nashua Corporation Counsel's office handled her RTK requests, denies that she has filed over 1,000 RTK requests, and denies that the City has produced over 40,000 pages pertaining to her RSA 91-A requests. See Exhibit A, Ortolano Affidavit, ¶ 2 at pp. 1-3.***

3. Some of Plaintiff's many RTK requests were referred to the Legal Department. ***Admitted. See***

***Exhibit A, Ortolano Affidavit, ¶ 3, at p.3***

4. In 2020, Plaintiff became "more publicly vocal" about her opinions regarding the City of Nashua employees and departments, she "frequently post[ed] on social media" about her views of the City and its administration, and she "launched a website entitled 'good-gov.org' on which she posted blogs" about her views of Nashua's city government. ***Admitted. By way of further answer, Ortolano was forced to post on private websites and create her own blogsite because Nashua officials had interfered with her ability to speak publicly at City hearings. See Exhibit A, Ortolano Affidavit, ¶ 4, at p.4.***

5. Plaintiff "achieved" a "public profile" through social media and her "good- gov.org" blog site. ***Admitted with the same further answer as provided as to No. 3 above. See Exhibit A, Ortolano Affidavit, ¶ 5, at p.4.***

6. On January 22, 2021, the Plaintiff went to City Hall. Plaintiff alleges she was there to have abatement applications date stamped. ***Admitted.***

7. The Legal Department is not open to the public, has locked entry doors, and does not date stamp abatement applications.[1] Additionally, at the time of this incident, City Hall still had a few Covid-19 restrictions in place. ***Denied. The Mayor had opened City Hall on June 7, 2021; the City website did not list the Legal Department as one that required an appointment; there was no notice on the door of the Legal Department saying it was not open to the public or that an appointment was required; the statement in footnote 1 was issued a year and one-half earlier, prior to the pandemic and prior to the total shutdown of***

---

[1] The role of the Legal Department had been explained to Plaintiff on or before September 11, 2019, and Plaintiff stated that "You made very clear that legal is only there to address specific document requests and I should not bring any other information of concerns regarding the City to the attention of the legal office." On Wednesday, January 20, 2021, the City's then Chief Assessor, Mr. Vincent, emailed Plaintiff to tell her that he would get the abatement applications date-stamped for her.

*the Assessing Department; the Assessing Department was involved with abatement*

*applications at least to the extent it handled appeals; Mr. Vincent said he would "look into*

*the date-stamp and did not say when that might be; it would actually take 17 days for the*

*time stamps to be issued. See Exhibit A, Ortolano Affidavit, ¶ 7, at pp. 4-6.*

8. Plaintiff did not have an appointment with anyone in the Legal Department. ***Admitted with***

   ***the qualifications provided above in response to No. 7. See Exhibit A, Ortolano Affidavit, ¶***

   ***8, at p.6.***

9. Legal Assistant Mindy Lloyd told Plaintiff she could not enter the office without an

   appointment. ***Denied. Ms. Lloyd opened the door and Ortolano walked in. As she was doing***

   ***so, Ms. Lloyd asked (not "told") if she had an appointment. See Exhibit A, Ortolano***

   ***Affidavit, ¶ 9, at p. 6.***

10. Instead of leaving, Plaintiff forcibly entered the locked Legal Department, and forced her way

    past Ms. Lloyd into the locked office area. ***Denied. Ms. Lloyd opened the door and Ortolano***

    ***came in without using any force, asking to Attorney Neumann. See Exhibit A, Ortolano***

    ***Affidavit, ¶ 10, at pp. 6-7.***

11. Attorney Neumann came out of the conference room to assist Ms. Lloyd. ***Admit that***

    ***Attorney Neumann came into the lobby area, but not to "assist" Ms. Lloyd. He came out***

    ***because Ortolano had called his name. See Exhibit A, Ortolano Affidavit, ¶ 11, at p. 7.***

12. Attorney Neumann told Plaintiff repeatedly that she needed to leave immediately and that she

    was trespassing. ***Admitted with the qualification that Ortolano was not trespassing. She***

    ***entered a public office to perform a public function. See Exhibit A, Ortolano Affidavit, ¶ 12,***

    ***at p. 7.***

13. Plaintiff sat down on the floor, first in the doorway of Attorney Leonard's office, and then

moved to sit on the floor near the main entrance door. ***Admitted that Ortolano sat on the floor in the lobby area, but deny that it was in the doorway of Attorney Office. Attorney was not in when Ortolano first sat on the lobby floor. See Exhibit A, Ortolano Affidavit, ¶ 13, at p. 7.***

14. Attorney Leonard arrived at the Legal Department on January 22, 2021 and was confronted by Ortolano sitting on the floor in front of her office. ***Denied that Ortolano confronted anyone; it was Attorney Leonard who confronted and berated Ortolano while Ortolano sat on the floor. See Exhibit A, Ortolano Affidavit, ¶ 14, at p. 7.***

15. Attorney Leonard told Plaintiff she was trespassing and needed to leave. ***Admitted that Attorney Leonard told Ortolano that she needed to leave. Ortolano does not recall whether Attorney Leonard told her she was trespassing; at the time, Attorney Leonard was yelling at her and berating her. See Exhibit A, Ortolano Affidavit, ¶ 15, at p. 7.***

16. Ms. Lloyd called the Risk Assessment office, who advised Ms. Lloyd and Attorney Neumann to call the Nashua Police Department. ***Admitted that the police were called. Ortolano believed Ms. Lloyd called them directly. See Exhibit A, Ortolano Affidavit, ¶ 16, at p. 8.***

17. The police arrived at the Legal Department, and escorted Plaintiff out of the Legal Department. ***Admitted that the police arrived but denied that Ortolano was "escorted" out. The police report says that Ortolano was calm and willingly left when asked to do so. See Exhibit A, Ortolano Affidavit, ¶ 17, at p. 8; Exhibit A-4.***

18. The Nashua Police Department informed Plaintiff that "she [was] being trespassed from City Hall and only allowed in the building with an approved appointment." She was advised that she could face arrest from Criminal Trespass if she attends City Hall without an appointment. This was confirmed with Attorney Leonard. ***Admitted in essence with the proviso that the***

*police report at Exhibit A-4 of the Ortolano Affidavit describes what happened more accurately and comprehensively. See Exhibit A, Ortolano Affidavit, ¶ 85, at p. 8.*

19. Plaintiff commented that "she would probably be arrested as she would be back." ***Ortolano does not recall saying that but does concede that Officer Timothy Roach wrote than in one of the police documents pertaining to the incident. See Exhibit A, Ortolano Affidavit, ¶ 19, at p. 9.***

20. After learning what occurred and believing a criminal trespass charge would be appropriate for anyone so conducting themselves in such a manner, Attorney Bolton expressed an opinion that the Nashua Police Department should interview witnesses before it made a charging decision. ***Denied. Chief Carignan testified on deposition that Attorney Bolton, with raised voice and anger, demanded that Ortolano be arrested, and that he thought Ortolano had been "cleared," i.e., no arrest would occur. See Exhibit A, Ortolano Affidavit, ¶ 29, at p. 9; Exhibit A-5 at pp. 76-84.***

21. Defendants Bolton and Leonard have no authority over the Nashua Police Department, as it is controlled by an independent police commission. ***Denied. Chief Carignan testified that the Police Commission "do[es not] deal with the day-to-day operations of the police department. They're not sworn officers, they're not – they have no legal authority to enforce the laws. . . . [T]hey would not dictate how an investigation is handled . . . ." See Exhibit A, Ortolano Affidavit, ¶ 21, at p. 9-10.***

22. After an investigation into the incident, the Nashua Police Department arrested the Plaintiff for criminal trespass. ***Admitted. By way of further answer, after defendant Bolton insinuated himself into the matter, the Nashua Police departed from its normal protocol of not arresting trespass suspects if the suspect cooperates when the police arrive and agree to***

*leave the premises immediately. See Exhibit A, Ortolano Affidavit, ¶ 22, at p. 10-11; Exhibit*
*A-5, at 63-64; 67. Of the twelve incidents involving possible trespasses requiring police*
*presence at Nashua City Hall between January 1, 2014 and January 31, 2022 (more than*
*eight years), defendants Bolton and Leonard succeeded in causing Ortolano to be the only*
*one to arrested. See Exhibit B, Affidavit of Laura Colquhoun with attachment produced by*
*Nashua Police Department showing all trespass incidents at City Hall between January 1,*
*2014 and January 31, 2022.*

23. Attorneys Leonard and Neumann, and Ms. Lloyd, were the victims of Ortolano's criminal

    trespass. ***This self-serving legal conclusion is denied.***

24. Although Plaintiff later sought to have the charge annulled, she pled guilty on July 12, 2021

    to committing trespass on January 22, 2021. This conviction had not yet been annulled at the

    time Plaintiff filed her Complaint in this matter. ***Denied. The charged Class A misdemeanor***

    ***was reduced to a "violation." See Exhibit A, Ortolano Affidavit, ¶ 24, at p. 11; Exhibit A-6***

    ***(plea papers). The only reasons Ortolano agreed to a plea were: (1) because of the***

    ***attendant stress she and her family had suffered as they endured the criminal process, and***

    ***(2) the the Nashua Police Legal Department agreed in the plea that Ortolano could***

    ***continue to visit all Nashua City departments with the single exception that she could not***

    ***enter "into the legal bureau at City Hall without an appointment for one year." See Exhibit***

    ***A, Ortolano Affidavit, ¶ 24, at p. 11.***

25. On July 22, 2022, Attorney Bolton and Plaintiff encountered one another in City Hall, around

    noon (Attorney Leonard was not present during this incident, and the Plaintiff does not allege

    any involvement of Attorney Leonard in this incident). ***Admitted.***

26. The Legal Department had transmitted responsive documents to one of Plaintiff's RTK

requests via email, through Citrix, a secure email portal for document transfers.  Plaintiff was unable to open the documents. ***Admitted.***

27. Attorney Bolton opened the Legal Department door and saw Plaintiff in the hallway.  He directed Plaintiff to leave the narrow corridor providing access to the entrance to and egress from the Legal Department as he was attempting to leave, and Plaintiff was interfering with his passage and refusing to move. ***Denied. Defendant Bolton's description of the incident is contradicted by the Nashua Police Department reports, written after police officers interviewed Bolton and Ortolano, examined the area, and reviewed the camera footage that recorded the incident in the hallway. See Exhibit A, Ortolano Affidavit, ¶ 27, at p. 12; Exhibit A-8 (police reports). Ortolano was in the hallway outside the Legal Department with her back to the Legal Department door. Defendant Bolton opened the Legal Department door abruptly about half-way. Ortolano turned around and saw Bolton standing in the doorway. Without coming out of the doorway, Bolton immediately started hollering at Ortolano: "You cannot be here!" "Go!" "Leave! You are trespassing!" "I can have you arrested."Ortolano tried to explain that she had only taken the Legal Department's phone number off the wall and was speaking with Manuela (who was in the Legal Department) on the phone. Again shouting, defendant Bolton retorted: "You aren't allowed to call into my office! You aren't allowed to speak with anyone in this office, even by phone!" Fearful that Bolton would have her arrested, and wanting her side of the incident recorded, Ortolano attempted to call back to the Legal Department; when no one answered, she left a message saying that she was merely attempting to obtain some help in opening the electronic documents the Legal Department had sent. Ortolano was only within the hallway that leads to the Legal Department for approximately two minutes. See***

*Exhibit A, Ortolano Affidavit, ¶ 27, at p. 12; Exhibit A-8 (police reports).*

28. Attorney Bolton did not call the police department in connection with this incident. ***Admitted. Afraid that defendant Bolton would call the police and attempt to have her arrested again, Ortolano called the police department. Exhibit A, Ortolano Affidavit, ¶ 28, at p. 12.***

29. Rather, Plaintiff called the Nashua Police Department, saying Attorney Bolton was assaulting her. ***Denied. Ortolano told the police that defendant Bolton have "verbally assaulted" her. Exhibit A, Ortolano Affidavit, ¶ 29, at p. 13.***

30. Plaintiff was not present when Attorney Bolton spoke with the Nashua Police Department, and alleged in Paragraph 135 of the Complaint that she did not know "what had transpired when Nashua PD personnel interviewed Attorney Bolton." ***Admitted.***

31. Attorney Bolton answered the Nashua Police Department's questions, telling them he had asked and then directed Plaintiff to leave the hallway so he could pass. ***Denied. The police reports demonstrate that defendant Bolton demanded that Ortolano be immediately arrested and became angry when they refused to do so. After conducting interviews, watching the video, noting that the hallway was wide enough that Ortolano could not have been blocking the hallway, and noting that they had "tried to reason" with Attorney Bolton, they did not buy his story. Additionally, the police report states that defendant Bolton insisted to the police officers that he had the power to prevent a citizen from being in the public hallways of City Hall. Exhibit A, Ortolano Affidavit, ¶ 31, at p. 13-14; Exhibit A-8.***

32. No arrest was made as a result of this incident. ***Admitted. See also explanation and support provided in answer to No. 31.***

33. Plaintiff cannot show that her speech has been chilled, as she continued (and continues) to

exercise her First Amendment rights. ***Denied. Although Ortolano continued to state her views in private forums such as blogs and social media, she has been prevented from fully exercising her rights to petition government and speak at public hearings without being interrupted, derided, and even slandered by public officials, including defendants Bolton and Leonard. Exhibit A, Ortolano Affidavit, ¶ 33, at p. 14.***

34. On August 17, 2022, Plaintiff sent an email stating that she filed another NH RSA 91-A lawsuit against the City, calling Attorney Bolton a "moron" and Attorney Leonard a "nitwit," and discussing how, on numerous occasions, she publicly criticized City officials, even after her arrest in 2021. ***Admitted. The email was made through a private medium that the defendants cannot regulate or censor as they have done in regard to public forums. Exhibit A, Ortolano Affidavit, ¶ 34, at p. 14.***

35. Plaintiff also stated that Attorney Leonard had the "cuntiest behavior" Plaintiff had ever seen. ***Admitted, although Ortolano regrets having said this <u>years prior</u>, and has endured the defendants continuously bring it up in public to disparage her and retaliate for her criticisms of them. Exhibit A, Ortolano Affidavit, ¶ 35, at p. 14.***

36. On numerous occasions after her arrest in January 2021, as well as after the July 2022 incident, Plaintiff was publicly critical about City Officials at public meetings, through her blog posts, and in emails to City Officials, including, but not nearly limited to, the following statements:

    a) In her August 27, 2022 blog post, titled "*The Colossal Stupidity of the Nashua Legal Office*," Plaintiff wrote: "Like the Assessing Office, the Mayor has promoted incompetent leadership and lawyers who ignore their professional conduct codes and disregard citizen's rights. Who are the major offenders?

Attorney Bolton and Attorney Leonard." ***Admitted. This blog was made through a private medium that the defendants cannot regulate or censor. Exhibit A, Ortolano Affidavit, ¶ 36(a), at p. 15.***

b) In her December 18, 2022 blog post titled "The Police Records of Attorney Bolton," Plaintiff wrote: "[The records] depict a very angry, hostile, out-of-control man who lacks self-awareness and self-control," and "But of course, with the Mayor not staffing an ethics committee for four years, the county attorney's office being incompetent, no municipal division of the AG's office, and a PCC (which stands for Protect Corrupt Counselors), all dodging the problem, how is justice delivered?" ***Admitted. This blog was made through a private medium that the defendants cannot regulate or censor. Exhibit A, Ortolano Affidavit, ¶ 36(b), at p. 15.***

c) In a November 28, 2022 email to City Officials, Plaintiff wrote, among many other things: "I found the Mayor's remarks to lack credibility and take ownership for the budget and tax increase, and the need for the assessment revaluation" and "[The Mayor] is the master of blame and always the virtuous victim. These are serious character flaws that do not exemplify leadership." ***Admitted. By way of further answer, Ortolano sends this type of email to public officials far less often than she used to before she was arrested because they are almost always followed by a public slandering, interruption of her public statements, and other forms of derision. Exhibit A, Ortolano Affidavit, ¶ 36(c), at p. 15.***

d) At a July 18, 2022 Board of Alderman meeting, the Plaintiff stated: "I've noticed this individual is a fairly young person and he's coming to a City that I think is

very corrupted and working for a Mayor that I think is really unethical, unscrupulous, a liar and I've had to put in a lot of law suits involving records and the lack of openness for records." ***Admitted. This is one of the few instances in recent years when Ortolano was allowed to complete her statement without interruption or some form of public derision. Exhibit A, Ortolano Affidavit, ¶ 36(d), at p. 16.***

e) At a July 20, 2022 Finance Committee meeting, the Plaintiff stated:

> I want to express my concerns with [Cummings] as an employee of the City and maintaining and performing any work on any of these projects. He is unfit to do that kind of work. He is over assigned. He is deeply in violation of the law when it comes to Right-to-Know and open access to meetings and information. He shares an office adjoining to the Mayor and the door is always locked and closed. He does not consider himself a public servant and he will not make himself accessible to citizens at all.

***Admitted, but noting that the Mayor interrupted her and berated her multiple times when she spoke to prevent her from having her full time to speak, and calling time so Ortolano to finish her public statements. Exhibit A, Ortolano Affidavit, ¶ 36(e), at p. 16.***

f) At the same meeting, Plaintiff said to the Mayor: "You need to shut your mouth. Shut your pie hole Mr. Mayor.  This is my public comment and I'm addressing not every employee." ***Admitted. But see response to No. 35(3) above.***

g) At an August 16, 2022 Planning and Economic Development meeting, Plaintiff stated: "Attorney Leonard would not define that.  She didn't carry her duty to disclose far enough to say what those entities were and then they played the game the Legal office we're going to hide behind attorney/client privilege.  We can't tell the public." ***Admitted. Exhibit A, Ortolano Affidavit, ¶ 36(g), at p. 17.***

h)  At an August 17, 2022 Finance Committee meeting, Plaintiff said the following:

"I tried to address this in the budget hearing and I pretty much got run over by

you Mr. Mayor.  You did a pretty good job demolishing me up there for my

Right-to-Knows but I really feel that there should be a central location where

Right-to-Knows are handled." As the same meeting, Plaintiff said:

> I am very concerned with your Legal Office. I feel two of the
> attorneys should be disbarred. I've filed complaints with the
> Professional Conduct Committee at the Supreme Court and I'm
> going to continue filing up there. Attorney Bolton tried to have
> me arrest on the 22nd of July wrongfully, I believe, and the City
> isn't going to stop until they arrest me in City Hall and you're
> going to succeed at it because all it takes is one Officer who is not
> well- trained who turns around.

***Admitted. Ortolano was responding to defendant Bolton's most recent attempt***

***to have her arrested for being in a public hallway of City Hall. Exhibit A,***

***Ortolano Affidavit, ¶ 36(h), at p. 17.***

i)  Plaintiff also claimed: "Attorney Leonard I feel really violated her oath and her

duties to disclose what was going on with the Art's Center." ***Admitted. See***

***Ortolano's response to No. 35(h) above..***

j)  At an October 12, 2022 Planning and Economic Development meeting,

Plaintiff said to Chairman Moran: "You made a judgment that was horrendous

and you are a very poor example to your own children." ***Admitted. As***

***explained in her affidavit, Ortolano was responding to Alderman Moran's***

***calling her, among other things,  a "silver spoon millionaire[ ]," and***

***"coming in here acting like they're the crown jewel of the working class,***

***[and] pushing off information that we don't know to be true until we ask***

*legal counsel." The next evening, Alderman Moran would tout his credential as a "child protective worker" and accuse Ortolano of being a child predator. He then repeated the child predator charge about a week later on the Nashua radio program, Nashua This Morning." Exhibit A, Ortolano Affidavit, ¶ 36(j), at p. 18-20.*

    k)   In a March 4, 2024 email to Nashua City Officials titled "The Notable Moronic Response from the Nashua's Premier Attorney – Leonard," Plaintiff stated: "It is time the Nashua attorneys stop blowing sunshine up the asses of the Judges and get real in producing a viable and cost effective system for public records and requests." *Ortolano cannot adequately respond to this Statement. Bolton Exhibit A-10 is not an email from Ortolano to Nashua City Officials; it is a letter from defendant defendant Leonard to Ortolano responding to an RTK request, and says nothing like the statement quoted above*. **Exhibit A, Ortolano Affidavit, ¶ 36(k), at p. 20.**

<u>Ortolano's Additional Concise Statement of Facts</u>

1.  Defendant Bolton questioned Ortolano during a deposition in an unrelated case involving the City's response to a right-to-know request and inquired:

    Q     (By Mr. Bolton) Does it surprise you that people are reluctant to deal with someone who treats others in that way?

    A.     Yes, it does surprise me.

    Q.    So it's your position that people should continue to go out of their way to be helpful to you, even though, if you don't get everything you want, you call people names and use vulgar language?

Exhibit A, Ortolano Affidavit, ¶ 48, at p. 23; Exhibit A-15.

2.  When the Nashua police arrived at the Legal Department on January 22, 2021, defendant Leonard reported to them that Ortolano had not threatened anyone and should not be arrested (only to be "trespassed" and ordered not to come without an appointment), but after Attorney Bolton ordered Chief Carignan to arrest her and she provided another statement to the police, she changed her story: this time she asserted that Ortolano had been "hostile and threatening," compared her conduct to that of those who stormed the Capitol on January 6, 2021, and requested that Ortolano be arrested for trespass. Exhibit A, Ortolano Affidavit, ¶ 21, at p. 10; Exhibit A-4 (Statement of Celia Leonard at 9th page).

3.  After Ortolano was arrested for trespass, and entered into an agreement with the Nashua Police Legal Department allowing her to visit government offices in City Hall as long as she had a prearranged appointment for the legal office, defendant Bolton appeared in court to answer why the City Legal Department was not honoring her requests for an appointment. Although Chief Carignan confirmed on deposition that defendant Bolton had been communicating with the Nashua Police Legal Department about Ortolano's prosecution, Exhibit A, Ortolano Affidavit, ¶ 49(d), at p. 24; Exhibit A-7 (at page 10). Exhibit A-5, at 87, defendant Bolton told the Judge that he had never intended to honor the plea agreement: "She can continue to try and make appointments with my department . . . and she will not be granted any appointments by my department." Exhibit A, Ortolano Affidavit, ¶ 49(d), at p. 24; Exhibit A-7 (at page 10).

4.  When Ortolano petitioned the Hillsborough County District Court to annul her trespass conviction, a procedure that is routinely allowed, defendant Bolton appeared in court to oppose any annulment. Exhibit A, Ortolano Affidavit, ¶ 49(e), at p. 24.

**III. ARGUMENT.**

A. <u>The Summary Judgment Standard</u>.

A federal court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case." *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010). Once the movant has made the requisite showing, "the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists." *Id*. The nonmoving party " 'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A reviewing court is obligated to view the facts "in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support," and gives him "the benefit of all reasonable inferences that those facts will bear." *Noviello v. City of Boston*, 398 F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).[2]

---

[2] Under Rule 56(f)(1) of the Federal Rules of Civil Procedure, the Court may "grant summary judgment for a nonmovant" if it first gives notice and a reasonable time to respond. Indeed, it is "well established that a party that moves for summary judgment runs the risk that the court may grant summary judgment sua sponte against the movant." *Banco do Brasil, S.A. v. 275 Washington St. Corp.*, 889 F.Supp.2d 178, 187 (D.Mass. 2012) (quotation marks and citation omitted); *see Jarvis v. Village Gun Shop*, 805 F. 3d 1, 6-7 (2015); *Forrester Environmental Services, Inc. v. Wheelabrator Techs, Inc.*, 2012 WL 3420487, *1 (D. N.H. 2012)(not reported in F.Supp), *rev'd on other grounds*, 715 F.3d 1329  (1st Cir. 2013).

Because genuine disputes as to material facts continue to exist regarding the conduct of

Bolton and Leonard as such applies to Ortolano's claims of retaliation on account of her exercise

of free speech and petitioning rights, the Court should deny Bolton's and Leonard's motion for

summary judgment.

B.  Genuine Issues of Material Fact Continue to Exist on Counts One and Two of Ortolano's
Complaint against Bolton and Leonard, and the Court Should Allow the Case to Proceed
to Trial the Causes of Action Alleging That They Retaliated Against Her for Her Free
Speech and Petitioning of Government Activities.

A litany of Supreme Court cases pronounces that, "[i]f there is a bedrock principle

underlying the First Amendment, it is that the government may not prohibit the expression of an

idea simply because society finds the idea itself offensive or disagreeable." *Texas v.*

*Johnson,* 491 U.S. 397, 414 (1989); *see also, e.g., Snyder v. Phelps,* 562 U.S. 443, 458 (2011);

*R.A.V. v. St. Paul,* 505 U.S. 377, 392  (1992).

> In our own time and place, criminal laws have grown so exuberantly and come to
> cover so much previously innocent conduct that almost anyone can be arrested for
> something. If the state could use these laws not for their intended purposes but to
> silence those who voice unpopular ideas, little would be left of our First
> Amendment liberties, and little would separate us from the tyrannies of the past or
> the malignant fiefdoms of our own age. The freedom to speak without risking
> arrest is "one of the principal characteristics by which we distinguish a free
> nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987).

*Nieves, v. Bartlett*, 587 U.S. ___, 139 S.Ct. 1715, 1730 (2019)(Gorsuch, J., concurring in part

and dissenting in part). Tying these tenets of free speech jurisprudence to the maintenance of a

functioning form of democratic government, the high court has recognized that the First

Amendment provides elevated protection of free speech rights pertaining to governmental

petitioning activities; the "right to petition [is] one of the most precious of the liberties

safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach, FL*, 585 U.S. 87, 101

(2018)(quoting *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524 (2002)).

As in *Lozman*, Ortolano "alleges the City deprived [her] of this liberty by retaliating against

[her] for . . . [her prior] lawsuit[s] against the City and her criticisms of public officials."
*Lozman*, 585 U.S., at 101. Accordingly, *Lozman* dictates that Ortolano's "speech [at issue in this action] is high in the hierarchy of First Amendment values." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 145 (1983)). This case does not involve the implementation of reasonable time, place, or manner restrictions that apply generally to persons attempting to participate in the democratic processes of Nashua's City government; to the contrary, it involves the attempts of Nashua City officials, including Bolton and Leonard, to prevent Ortolano from obtaining public documents via New Hampshire's Right-to-Know Law because they did not like her attitude and criticism of them and their colleagues. Upon realizing that Ortolano would not be deterred from exercising her right to petition government, Bolton and Leonard (in concert with a number of other Nashua officials, and in pursuance of an official policy motivated by retaliation), eventually caused her to be arrested for trespass at City Hall when *none* of the dozen or so trespass incidents occurring at City Hall over the prior seven years had resulted in an arrest. Deposition testimony and government documents provide a compelling case that, but for Bolton's and Leonard's retaliatory intervention, Ortolano would not have been arrested. And Bolton would not stop there. About a year after he dragooned the Nashua Police Department into arresting Ortolano in contravention of standard police practice, he demanded that the Nashua Police arrest Ortolano merely for being present in a corridor of the Nashua City Hall. In this action, Ortolano states a classic free speech retaliation case that should proceed to trial.

    1.   The Elements of a Free Speech Retaliation Cause of Action.

    "Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st

Cir. 2003)). "A plaintiff must first prove that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B.,* 675 F.3d at 43 (citing *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011) and *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010)). "This showing necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *González-Droz*, 660 F.3d at 16. A pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Under the second step, a defendant may then avoid a finding of liability by showing that it would have reached the same decision even in the absence of the protected conduct. *González-Droz*, 660 F.3d at 17.

   2. The January 2021 Incident.

      a. Bolton's and Leonard's Argument that Ortolano's Conduct on January 22, 2021 Was Not Protected Speech.

The defendants' monistic focus on Ortolano's conduct on January 22, 2021, the day of her arrest, suggests that they believe either that Ortolano did not allege protected speech predating January 22, 2021, or that the law does not permit the Court to consider speech prior to that occurring on the day of her arrest to be protected for the purposes of a First Amendment retaliation claim.[3] Ortolano's Complaint could not be clearer that Bolton, Leonard, and other city officials engaged in a years-long concerted effort to intimidate her in retaliation for her multiple right-to-know requests, criticisms of Bolton, Leonard, and other city officials at public meetings,

---

[3] In claiming that "Plaintiff's Conduct Was Not Protected," the defendants point to no conduct other than that occurring "during the January 2021 incident." Defendants' Memorandum of Law, at 10-12.

and lawsuits that Ortolano brough against the City to enforce New Hampshire's Right-to-Know law. And she asserts that the City, through Bolton, Leonard and other city officers, executed a part of their plan of intimidation by causing her arrest on January 22, 2021. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Some free speech retaliation cases based on an arrest only involve claims of protected conduct occurring immediately prior to the arrest, *see e.g., Nieves*, 587 U.S. ___, 139 S.Ct. at 1720; *Ward v. Petow*, 2020 WL 1929125, *1-*2 (D. R.I. 2020)(not reported in Fed.Supp.), while others involve protected conduct occurring over a long span of time preceding the arrest, *see e.g., Lozman*, 585 U.S. at 91-92; *Exline v. Joseph*, 2020 WL 3643044, *1-*2 (D. N.H. 2020) (not reported in Fed.Supp.).

With the possible exception of her attempt to file abatement applications at City Hall (petitioning activity), Ortolano's Complaint does not even contend that the events occurring at the Legal Department on January 22, 2021 constituted protected speech. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Instead, it was her RTK filings, criticisms of public officials, and filing of RTK lawsuits, all occurring over the span of the prior three-plus years, that she claims to have been protected speech. *See* Complaint, at ¶¶ 15-139; 143-146; 153-155. Since the defendants have failed to even contend that *any* of the events occurring prior to January 22, 2021 did not constitute protected speech – they did not present any facts or evidence with their motion regarding those events – they have not met their burden under Rule 56(c)(1)(A) of the Federal Rules of Civil Procedure requiring that they "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" to show a lack of a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R. Civ. P. 56(a). Accordingly, the Court

19

should not make any finding for the purposes of ruling on this motion that Ortolano did not

engage in protected speech.

        b.   Bolton's and Leonard's Argument That There was Probable Cause to Arrest
            Ortolano.

      The First Amendment prohibits government officials from retaliating against individuals on

account of their words or actions protected by the Free Speech Clause. *Nieves*, 587 U.S. ___, 139

S.Ct., at 1722.

> If an official takes adverse action against someone based on that forbidden
> motive, and "non-retaliatory grounds are in fact insufficient to provoke the
> adverse consequences," the injured person may generally seek relief by
> bringing a First Amendment claim.

*Id.* (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998) and *Mt. Healthy City Bd. of Ed. v.*

*Doyle*, 429 U.S. 274, 283–284 (1977)). To prevail on a free speech retaliation claim, a plaintiff

must establish a "causal connection" between the government defendant's "retaliatory animus"

and the plaintiff's "subsequent injury." *Id.* And as a general matter, when a claim of retaliation

based on an arrest is made, the plaintiff must demonstrate that there was no probable cause for

the underlying arrest in order to satisfy the causation requirement. *Id.* "[B]ecause probable cause

speaks to the objective reasonableness of an arrest, its absence will . . . generally provide weighty

evidence that the officer's animus caused the arrest, whereas the presence of probable cause will

suggest the opposite."[4] *Id.,* 139 S.Ct., at 1724.

---

[4] Concurring in part and dissenting in part in the *Nieves* case, Justice Gorsuch suggested that probable
cause should play no role in First Amendment retaliation cases because "the *First* Amendment operates
independently of the Fourth and provides different protections. It seeks not to ensure lawful authority to
arrest but to protect the freedom of speech." 587 U.S. ___, 139 S.Ct., at 1731. Analogizing to retaliatory
arrest cases brought under the Equal Protection Clause of the Fourteenth Amendment, he stated:

> Following our lead, the courts of appeals have recognized that § 1983 plaintiffs alleging
> racially selective arrests in violation of the Fourteenth Amendment don't have to show a
> lack of probable cause, even though they might have to show a lack of probable cause to
> establish a violation of the Fourth Amendment: "[S]imply because a practice passes

As with all general rules, however, there are exceptions, and the recent *Lozman* and *Nieves* cases provide two different exceptions that are relevant here. *Nieves* holds that the probable cause requirement does not apply in "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. ___, 139 S.Ct., at 1727. And *Lozman* dispenses with the normal probable cause requirement when a plaintiff has asserted a so-called *Monel* claim: the government as an entity is responsible under § 1983 when "execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978); *see Baron v. Suffolk Cty. Sherrifs Dept.*, 402 F. 3d 225, 236 (1st Cir. 2005). Both exceptions apply here.

i. The *Nieves* Exception.

The *Nieves* Court recognized that the probable cause requirement should not apply to cases where officers "have probable cause to make arrests, but typically exercise their discretion not to do so" because, "[i] n such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" 587 U.S. ___, 139 S.Ct., at 1727 (quoting *Lozman*, 585 U.S., at 99).

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is

---

> muster under the Fourth Amendment (arrest based on probable cause) does not mean that unequal treatment with respect to that practice is consistent with equal protection."

*Id.* He continued:

> I can think of no sound reason why the same shouldn't hold true here. Like a Fourteenth Amendment selective arrest claim, a First Amendment retaliatory arrest claim serves a different purpose than a Fourth Amendment unreasonable arrest claim, and that purpose does not depend on the presence or absence of probable cause. We thus have no legitimate basis for engrafting a no-probable-cause requirement onto a First Amendment retaliatory arrest claim.

*Id.,* 139 S.Ct., at 1732.

arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest. In such a case, because probable cause does little to prove or disprove the causal connection between animus and injury, applying *Hartman*'s rule would come at the expense of *Hartman*'s logic.

*Id.* The *Nieves* Court continued:

Because this inquiry is objective, the statements and motivations of the particular arresting officer are "irrelevant" at this stage. After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause.

*Id.*

The *Nieves* exception clearly applies here. Chief Carignan testified that the customary practice of the Nashua Police Department was to not arrest a trespasser suspect if, once the police arrive, the person cooperates and leaves. Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-5, at 64-65. And the objective evidence garnered from the Nashua Police document attached to the Colquhoun Affidavit bears this out; prior to the Ortolano case, the Nashua Police Department just did not arrest people at City Hall who cooperated and left once the police arrived. Of the 10 incidents at City Hall between January 1, 2014 and January 21, 2021, the Nashua Police Department arrest on one until Laurie Ortolano came along. Exhibit B (Colquhoun Affidavit, with attachment).

The defendants may claim that Ortolano's situation was different because she made a social media post after the incident bragging about refusing to leave after being told to do so by Celia Leonard. Exhibit A (Ortolano Affidavit), p. 25; Exhibit A-5, at 89. But any claim that she was arrested for exercising the protected First Amendment right by posting on social media only enhances her claim. Moreover, the police had a big evidentiary problem with changing its mind: Celia Leonard's story changed; when she was initially interviewed she conceded that Ortolano was not threatening anyone, and that she did not want her arrested. But after defendant Bolton

dragooned Captain Kenney of the Nashua Police Legal Department into opening the investigation, Leonard gave a statement saying that Ortolano was threatening and that she wanted her arrested. Exhibit A (Ortolano Affidavit) Exhibit A-4. At the very least, this is a question of fact for the trier of fact.

ii.   The *Lozman* Exception

As said, *Lozman* expounds that the probable cause requirement should not apply when a plaintiff includes a municipality as a defendant upon a claim that s/he suffered free speech retaliation injury based on an "execution of a government's policy or custom . . . by those whose edicts or acts may fairly be said to represent official policy."

> In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established. But "[u]nlike a 'policy,' which comes into existence because of the top-down affirmative decision of a policymaker, a custom develops from the bottom-up." In a § 1983 suit premised on custom, then, we must first determine whether the custom is fairly attributable to the municipality. This standard is met when a custom is "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." If a custom is attributable to the municipality, we must also inquire whether it was "the cause of and the moving force behind the deprivation of constitutional rights."

*Baron*, 402 F. 3d at 236-37 (citations omitted).

Ortolano's Complaint makes clear that she is pursuing her claims against the City on a *Monel* claim. Moreover, she has presented ample facts demonstrating concerted efforts by high officials of the Nashua City government to punish Ortolano for making multiple right to know requests, publicly criticizing the high officials and other City officials, and suing the City for not complying with RSA 91-A. See Ortolano's Concise Statement of Facts, ¶¶ 9-15 above. Defendant Bolton has stated that Ortolano should not expect Nashua officials to serve her as they would other citizens because of the derogatory terms she uses when criticizing them. Kleiner, the Director of Administrative Services Director, ordered employees not to communicate with her or

serve her. Leonard, the Deputy Corporation Counsel, changed her story to police to achieve Ortolano's arrest. At minimum, there is a genuine issue of material fact about whether the "custom" of high officials of the City of Nashua is to retaliate against citizens like Ortolano for engaging in protected speech.

iii.  A Retaliatory Investigation Exception.

Other federal courts have begun to recognize a cause of action for "retaliatory investigation," which does not require a plaintiff to establish a lack of probable cause. *See e.g., Lacey v. Maricopa Cty.,* 693 F.3d 896, 917 (9th Cir. 2012) (Sheriff's improper conduct during a years-long intrusive investigation was not absolutely immune and subjected him to first amendment retaliation claim); *Denney v. Drug Enf't Admin.,* 508 F. Supp. 2d 815, 830 (E.D. Cal. 2007) (recognizing cause of action for retaliatory investigation in the case of physician who alleged he was investigated in retaliation for speech concerning medical marijuana); *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 487 (W.D. Pa. 2007) (*Hartman* does not foreclose plaintiff's retaliatory investigation claim notwithstanding the court's determination that the ensuing investigation, search, arrest and prosecution were supported by probable cause). These cases find liability without probable cause when a defendant has induced a prosecutor to bring charges that would not have been initiated without his urging. Bolton and Leonard improperly wrapped themselves into the investigation of Ortolano, which Chief Carignan confirmed should never have occurred. Even more compelling in this case is that the prosecutor, Alyssa Kuehne, was not an independent prosecutor; she was a police prosecutor employed by the Nashua Police Legal Department, which (through Captain Kenney) had been communicating with defendant Bolton about the arrest. Exhibit A (Ortolano Affidavit); Exhibit A-7.

3.  <u>July 2022 Incident</u>.

The only claim different about the July 22, 2022 incident that has not been addressed above is that, although Bolton tried hard to get Ortolano arrested, he did not succeed. The incident still cause harm to Ortolano; one more incident of harassment did chill her ability to engage in public meetings and the like. This was one more incident in the pattern of harassment. First Circuit case law is clear that a pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).

III.     CONCLUSION.

For the foregoing reasons, this Court should deny defendant Bolton and Leonard's Motion for Summary Judgment.

Dated: June 5, 2024                              Respectfully submitted,

                                                 Laurie Ortolano, Plaintiff
                                                 By her Attorneys,

                                                 Olson & Olson, P.A.

                                                 */s/ Kurt S. Olson*
                                                 Kurt S. Olson
                                                 Bar ID No. 12518
                                                 31 Franklin Rd.
                                                 Salisbury, NH 03268
                                                 603-748-1960
                                                 kolson@mslaw.edu

<u>CERTIFICATE OF SERVICE</u>

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be sent electronically forthwith to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 5, 2024                              */s/ Kurt S. Olson*
                                                 Kurt S. Olson
                                                 31 Franklin Rd.
                                                 Salisbury, NH 03268
                                                 603-748-1960
                                                 kolson@mslaw.edu