## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

_____

|  |  |
|---|---|
| Laurie Ortolano, | ) |
|                          Plaintiff | ) |
|  | ) |
| V. | )  Civil Action No. 22-cv-00326-LM |
|  | ) |
|  | ) |
| The City of Nashua, et al., | ) |
|                          Defendants | ) |

_____

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OBJECTION TO DEFENDANT FRANK LOMBARDI'S MOTION FOR SUMMARY JUDGMENT

**I.    CONCISE STATEMENT OF FACTS.**

    A.   Material Facts Demonstrating that Judgment Should Not Enter against the Plaintiff as a Matter of Law.

As relevant First Amendment jurisprudence provided in the Argument below demonstrates, determining whether unlawful deprivations of free speech rights by way of government retaliation and harassment requires careful attention to the facts, in their proper context, and in full consideration of the totality of the circumstances. *Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir. 1980); *Grossman v. Martin*, 566 F. Supp.3d 136, 145 (D. R.I. 2021). While most of Lombardi's stated facts are technically correct – although some are not – he has mostly stripped them of context and background circumstances, and often strategically articulated them in the passive voice to soften or massage their true import. Detective Frank Lombardi ("Lombardi") would have this Court believe that he, as he had done with others many times before, merely advised Laurie Ortolano ("Ortolano") not to speak with Nashua Assessing Department employees in an attempt to proactively prevent a crime from occurring. But the facts presented immediately below in full detail and context support Ortolano's claim that Lombardi either

intentionally or recklessly participated in a shakedown of Ortolano by Kimberly Kleiner ("Kleiner"), who was then the subject of a criminal investigation that Lombardi was conducting, and that was initiated by Ortolano.

In 2018, Ortolano sought appointment to the Nashua Board of Assessors, but was not appointed. Exh. A, Ortolano Deposition, at 17. She applied again in 2019, but again was not appointed. *Id.* She had become interested in Nashua assessing in 2018 because she believed that the City had over-assessed her residence. *Id.* at 19. At that time, she "started doing assessing work. Id. at 17-18." She would go on to post a series of "how to do it yourself" tax abatement videos on a public website called "GoodGov," and help some senior citizens file applications for abatements. *Id.* at 20. Kleiner, who was then running the Assessing Office, was not happy with Ortolano's efforts regarding abatements. *Id.* at 21.

As Lombardi concedes in his Memorandum, in 2018 Ortolano started regularly attending Board of Assessors and Board of Aldermen meetings. Lombardi Memorandum of Law, at 2, Caron Affidavit attached thereto as Exhibit 2, ¶ 4. At those meetings, Ortolano was often critical of the way the Assessing Department operated and sometimes of particular Nashua officials, including Kleiner and Mayor Donchess ("Donchess"). Ortolano Affidavit, Exh. B, ¶ 1. In September 2018, Ortolano started to attend scheduled monthly "coffees with the Mayor," meetings held at a downtown café for the purpose of allowing citizens to speak directly to Donchess and to ask him questions. Donchess appears not to have appreciated Ortolano's comments at those coffees, and voiced criticism of her at the meetings. Ortolano Affidavit, Exh. B, ¶¶ 3-6.

On October 16, 2018, while working at an Assessing Department computer to research properties in proximity to her home, Ortolano learned that Donchess had obtained a building

permit for his nearby home in 2009 to complete a total renovation (down to the studs) at a then estimated cost of $100,000. Ortolano Affidavit, Exh. B, ¶ 8. Although nine years had passed and the work had presumably been completed, the building permit had never been properly closed out. *Id.* Ortolano wrote Donchess a letter that asked him to "do the right thing" and fix the assessment. But, when Donchess's wife responded to the letter, rebuking the offer to allow the Donchesses to privately correct this issue, Ortolano publicly reported what had occurred at a late November 2018 Board of Aldermen meeting. Ortolano Affidavit, Exh. B, ¶ 10.

In early March 2019, Ortolano attended a Board of Aldermen meeting at which Donchess and Kleiner announced that Kleiner would become the Director of Administrative Services overseeing all City administrative departments. They also announced that the position of Chief Assessor of the Assessing Department had been eliminated and that Kleiner would be directly in charge of that Department. Ortolano Affidavit, Exh. B, ¶ 11. At one of her first Assessing Department staff meetings on April 1, 2019, Kleiner ordered that, "if a member of the public has a question – John [Griffin, the Nashua CFO,] or I will answer." Neither Kleiner nor John Griffin were assessors or had any type of training in real property assessment. At the same staff meeting on April 1, 2019, Kleiner ordered that: "going forward Mike, Gary and Greg will not speak with Ms. Ortolano. Please write down any questions and they will be answered in writing." Ortolano Affidavit, Exh. B, ¶ 12.

From reviewing records and observing the operation of the Assessing Department in 2018 and the first half of 2019, it became apparent to Ortolano that one of the assessors, Greg Turgis, was not performing a substantial portion of his job duties. Ortolano orally raised this issue with Kleiner, but Kleiner refused to speak about it. So Ortolano hired a private investigator to determine whether her suspicions were correct. Ortolano Affidavit, Exh. B, ¶ 13. Ortolano's

private investigator produced a written report demonstrating that, rather spending the bulk of his work time in the field inspecting homes and businesses for the purpose of appraising real estate, Greg Turgis frequently drove to a parking lot behind a hotel, took long naps, apparently faked the mileage logs he was required to submit to show that he had been driving around the City inspecting properties, and had frequently spent parts of the work day viewing nonwork matters on a personal computer in his car. In May 2019, Ortolano provided a copy of that report to the Mayor, who then engaged private attorney Mark Broth to conduct an investigation and issue a written report on the Greg Turgis situation. Ortolano Affidavit, Exh. B, ¶ 14.

In June 2019, while the Broth investigation of Greg Turgis was ongoing, Ortolano heard from an Assessing Department employee that Kleiner had assembled staff members and told an anecdote about being careful when reporting wrongdoing about another employee because she had done so and it hurt her career. She told her staff that the moral of the story was that they should not jump to conclusions about what they have seen and should be careful about what they report. The Assessing Department employee construed the anecdote to be a warning about what happens to ""snitches" and an admonition not to fully cooperate with the Broth investigation. Ortolano Affidavit, Exh. B, ¶ 15.

On June 25, 2019, having observed what they believed to be Kleiner's attempt to cover for Greg Turgis's demonstrably poor job performance, and now believing that Kleiner might be attempting to engage in witness tampering to prevent Assessing Department staff cooperation with Attorney Broth's investigation, Ortolano and Laura Colquhoun, another Nashua resident, went to the Nashua Police Department (NPD) and requested that it conduct a criminal investigation of the Assessing Department, Greg Turgis, and Kim Kleiner. Ortolano Affidavit,

Exh. B, ¶ 16; Exh. C, NPD-LO-001 to NPD-LO-013.[1] The next morning at 9 a.m., Chief Carignan and Captain Lehto "responded to City Hall" and "met with Mayor Jim Donchess and Director of Administrative Services Kim Kleiner" to "inform [them] that the Nashua Police Department had received a complaint from Laurie Ortolano regarding possible illegal activity. . . . Mayor Donchess and Ms. Kleiner were familiar with Ms. Ortolano and her allegations." Exh. C, NPE-LO-029. On July 17, 2019, Lombardi was assigned to the investigation and appears to have been the detective primarily responsible for its completion. Exh. C, NPD-LO-039; Exh. D, Lombardi Deposition, pp. 14-15.

On September 16, 2019, at 8:56 a.m., Lombardi called Robert Tozier, the head of a company called KRT, which the City had hired to help with assessing tasks. Exh. C, NPE-LO-200. Lombardi's official document he refers to as a "Supplemental Narrative" shows that Lombardi questioned Tozier about the relationship between KRT and the Assessing Department, and "whether he or anyone in his company had observed or was aware of any issues of criminal activity within the Nashua Assessing Department." *Id.* "Before ending [his] contact with Tozier," Lombardi "asked if there were any issues or information [Tozier] that the Nashua Police Department . . . should be aware of involving this investigation" and "Tozier said that there was not." *Id.* Although the Supplemental Narrative makes no mention of Lombardi asking any questions about Ortolano, who was not a suspect or even a witness who was interviewed for the investigation, oddly and without prompt,

> Tozier did however express some concern in regards to Ortolano. Tozier explained that because of Ortolano's claims, accusations, and fixations on issues that she perceives exist, he and members of his office have been concerned that they could be the focus of her negative attention.

---

[1] Exhibit C is a compilation of relevant documents, with Bates stamp numbers, the defendants produced in discovery.

As KRT is located in Haverhill, Massachusetts Tozier was instructed to contact the local Police if any issues were to rise at that location. Tozier was also given information on how to apply for a restraining order if he or other employees felt that their concerns arose to that level.

*Id.* [2]  A short time later on the same morning, Lombardi found himself at the Nashua Assessing Office to interview Gary Turgiss for the investigation. At 11:45 a.m., after he finished the Turgiss interview (and less than three hours after Lombardi had advised Turgiss about how to seek a restraining order against Ortolano) head clerk Louise Brown came forward and "notified [Lombardi] of an incident that had occurred the previous week involving Nashua Assessing Department employee, Lynn Cameron. . . and resident Laurie Ortolano." Exh. C, NPE-LO-202. According to the Supplemental Narrative about the discussion:

> Cameron informed me that the previous week, possibly on Wednesday, September 11, 2019 she had just left the office and was walking down Elm Street to where her vehicle was parked to get something for lunch. Cameron said that while walking she was approached by Ortolano who confronted her about memos and a meeting both related to the Nashua Assessing Department.

> Cameron said that during this contact Ortolano had not assaulted her or threatened her at all. However Cameron explained that the entire interaction with Ortolano made her feel very uncomfortable. Cameron explained that she felt that Ortolano had been waiting outside and had intentionally been attempting to confront her outside of the office.

> As Cameron was explaining what had occurred she began to cry. Cameron explained that based on the accusations Ortolano had previously made about the assessing department and how Ortolano twists everything they tell her or

---

[2] At his deposition, Lombardi admitted that what Tozier was saying was not relevant to his investigation. Exhibit D, Lombardi Deposition, p. 85. He also admitted that Tozier made no allegations that could be considered criminal conduct. Exh. D, Lombardi Deposition, pp. 87-88. When asked why he even told him that he had the option to apply for a restraining order when no evidence of criminal conduct had been reported, Lombardi responded:

I don't have to make that decision ever. My job is just simply to enforce them if one is already in place. I don't decide if they're issued or not. . . . [H]e had the option to go and get one if he wanted to. . . . [W]e don't ever guarantee or make any promises and say that they're every going to be granted. We just remind them that that's an option and it's up to them if they want to do that or not. Exh. D, Lombardi Deposition, pp. 89-90.

> attempt to explain to her this interaction made her very uncomfortable and also
> scared her because she felt that Ortolano had specifically been waiting for her to
> confront her.

Exh. C, NPE-LO-202. At his deposition, Lombardi admitted that Cameron's belief that Ortolano

had been based on feelings rather than facts:

> Q:    Did you ask her what facts she relied on when she said that Ortolano had
>       been waiting?
>
> A:    Yeah, I don't think she had any specific facts, that was just how she felt or
>       interpreted the – or the contact.
>
> Q:    So your impression is she didn't know for a fact that Ortolano was waiting
>       outside?
>
> A:    Yeah, I don't – I don't – I don't recall her giving me any hard evidence or
>       proof, that was just her feelings.

Exh. D, Lombardi Deposition, 98-99. And when asked, "Did you ask her what she meant by the

words that Ortolano had . . . 'intentionally been attempting to confront her outside of the office.'

Did you ask for more specific facts about that?," Lombardi responded: "Again, I don't recall if I

did, but I don't – from what I can remember she didn't have any, again, evidence or facts to

really substantiate that claim." *Id*. Yet, although Ortolano's words delivered to Ms. Cameron

were undeniably protected speech spoken on what in First Amendment parlance appears to have

been a "traditional public forum," but not reported to Lombardi until almost a week later and just

three hours after an independent contractor with no reason to be discussing Ortolano within the

context of a criminal investigation into Kleiner and Greg Turgiss had made a nearly identical

complaint about Ortolano, and without a scintilla of evidence that Ortolano had engaged in or

might engage in criminal conduct, Lombardi again took it upon himself to "explain[ ] the

protection order process to her and what options she had involving attempting to obtain a

protection order." He also volunteered to "speak with Ortolano on her behalf and inform

Ortolano that Cameron no longer wanted to have any contact with her outside of her duties within the Assessing Department Office." Exh. C, NPE-LO-202.

It seems that Brown and Cameron must have discussed this result with others beforehand because as the encounter was ending they "expressed an interest in sharing these options with other members of the assessing department as *they were under the impression that they would also possibly not want Ortolano to have any contact with them either outside of the Nashua Assessing Department Office.*" *Id.* (emphasis added). Lombardi responded, "that would not be an issue." *Id.*

But things would get curiouser. Neither Cameron nor Brown or any other employee of the Assessing Department ever contacted Lombardi to ask him to warn Ortolano not to speak to them outside of the Assessing Office. Exh. D, Lombardi Deposition, pp. 116-117. It was Kleiner, who had not been in the Assessing Office when Brown and Cameron spoke with Lombardi about Ortolano, Exh. D, Lombardi Deposition, p. 95, and who Lombardi was then investigating for witness tampering, who directed Lombardi to issue stay-away warnings to Ortolano on behalf of every single employee of the Assessing Department but Cheryl Walley. Exh. D, Lombardi Deposition, p. 116-118. Despite the fact that Ortolano did nothing other than engage in protected speech on a traditional public forum, and not a single one of the victims had personally directed him to do so, Lombardi set out to issue Ortolano a stay-away warning on the word of person he was investigating on felony charges that she allegedly had admonished Assessing Department employees not to cooperate with a City investigation of Greg Turgiss. Exh. C, NPE-LO-002.

Lombardi testified that he typically gave stay-away warnings for domestic violence incidents, neighbor disputes, road rage incidents, juvenile matters in school. Exh. D, Lombardi Deposition, pp. 42-45. Of course, Ortolano's situation did not approach those situations. When asked if he

had ever issued a stay-away warning "where you don't have a fear that the matter may escalate to a crime," he referred to situations with juveniles "knowing full well that we can't arrest a specific juvenile." Exh. D, Lombardi Deposition, pp. 44-45. But when pressed about an example of "when you don't anticipate a crime occurring in the future, but you still feel it's appropriate to give a verbal warning" to an adult, he responded, "I guess I can't think of any off the top of my head why I would do that." Exh. D, Lombardi Deposition, pp. 45-46. Yet, that is just what Lombardi did with Ortolano, and he attempted to do it big. He did not call Ortolano on the phone or ask her to come to police headquarters to speak with him. Exh. D, Lombardi Deposition, pp. 120-131. Instead, on a Sunday afternoon on September 22, 2019 at 4:34 p.m. Lombardi and Sergeant DiTullo each drove a police cruiser to Ortolano's residential neighborhood, parked in front of her home, and both walked to her front door to deliver the message. Sergeant DiTullio was in uniform and carrying a firearm. Although Lombardi, a detective, was not in uniform, he was carrying a firearm. Exh. D, Lombardi Deposition, pp. 120-123. Ortolano's husband answered the door and told them that Ortolano was not home. The officers left. Hearing that the police was looking for her, Ortolano immediately went to the police station. Exh. B, Ortolano Affidavit, ¶ 17. Ortolano's neighbors clearly witnessed the show of force; some of them inquired about it and continued to notify her every time they saw a police cruiser in the neighborhood thereafter. Exh. B, Ortolano Affidavit, ¶¶ 17, 18.

When Ortolano arrived at NPD headquarters, Lombardi and the accompanying officer gave Ortolano the verbal admonition "that all the people in the assessor's office at that time. . .  asked that [Ortolano] have no contact with them outside of the assessing department." Exh. C, NPD—LO-209-210. Aware that she had not engaged in any criminal activity, Ortolano asked Lombardi if his warning was even "legal." Lombardi said it "is legal and was also something that was

commonly done by the Nashua Police Department in an attempt to proactively prevent crimes from occurring." He told Ortolano that "there was the potential that, if she did have contact with the [Assessing Department Staff], that she could face criminal charges depending on the circumstances of this contact." He did not describe or give examples of the types of "circumstances" that could lead to criminal charges against Ortolano. Exh. C, NPD—LO-209-210.

As a result of Lombardi's admonition, Ortolano came to believe that she could actually be arrested merely by attempting to speak to one of the Assessing Department staff members outside the Assessing Department office; she came to believe that Kleiner was looking to have a confrontation outside of the Assessing Department so Ortolano would be arrested. Exh. B, Ortolano Affidavit, ¶¶ 19-22.

The police records pertaining to Ortolano's stay-away warning became a part of the NPD's permanent police files. They are considered public documents that can be used by NPD officers going forward. Exh. D, Lombardi Deposition, pp.132-133. Additionally, anyone has the right to access police records under NH RSA 91-A, the Right-to-Know law.  Exh. B, Ortolano Affidavit, ¶ 23.

But Kleiner and Lombardi were not done with trying to get Ortolano arrested. On October 31, 2019, just about a month after Lombardi had given Ortolano the stay-away warning, Kleiner contacted him and reported that a woman fitting Ortolano's description and driving a white sedan had appeared at a resident's home and identified herself as an assessor in the Nashua Assessor's office. Exh. C, NPD-LO-240. Lombardi started an investigation, but it got nowhere when the homeowner told him the woman said she was a real estate agent, not an assessor, had blond hair,

which Ortolano does not, and photos revealed that the car was not of a type or color owned by Ortolano or her husband. Exh. C, NPD-LO-240, 242-243, 245.

On July 14, 2020, a little more than a year after the investigation had been opened, Lombardi created an official NPD document called a "Supplemental Narrative" in which he claimed to have spoken "with all of the other Assessing Department employees and people present at the staff meeting in question, [and] none of them reported being threatened or coerced [by Kleiner] into not participating with any investigations involving the Nashua Assessing Department." Exh. C, NPD-LO-263. But at his deposition, Lombardi admitted that the only persons he spoke to about possible witness tampering were: Kleiner, the suspect, Cheryl Walley, the accuser, and John Griffin, Kleiner's superior. Exh. D, Lombardi Deposition, p. 139. When confronted with the Supplemental Narratives created for each employee interview, Lombardi specifically admitted that he did not ask any questions about the Kleiner witness tampering accusation to the following Assessing Department employees: Lynn Cameron, Exh. D, p. 40. Amanda Mazerolle, Exh. D, p. 53, Douglas Dame, Exh. D, p. 55, Michael Mandile, Exh. D, p. 63, and Gary Turgiss, Exh. D, p. 65. At the end of the Supplemental Narrative, Lombardi stated that there was no probable cause to charge Kleiner and requested that the investigation be closed.  Exh. C, NPD-LO-263.

## II.   ARGUMENT.

### A.   The Summary Judgment Standard.

A federal court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must "assert the absence of a genuine issue of material fact and then support that assertion by affidavits, admissions, or other materials of evidentiary

quality." *Mulvihill v. Top–Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). "A genuine issue is one that could be resolved in favor of either party, and a material fact is one that has the potential of affecting the outcome of the case." *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010). Once the movant has made the requisite showing, "the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists." *Id.* The nonmoving party "'may not rest upon the mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). The trial court is obligated to view the facts "in the light most favorable to the nonmoving party (here, the plaintiff), consistent with record support," and gives him or her "the benefit of all reasonable inferences that those facts will bear." *Noviello v. City of Boston*, 398 F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).

    B.  <u>Defendant Lombardi Unlawfully Retaliated against Ortolano in Violation of the First Amendment's Free Speech Clause.</u>

    1.  The Legal Standard for Free Speech Retaliation Claims.

Government actors "offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *Pollack v. Regional School Unit No. 75*, 12 F.Supp.3d 173, 188  (D. Me. 2014)(citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280–81 (1977) and *González–Droz v. González–Colón,* 660 F.3d 1, 16 (1st Cir. 2011)). The rationale for the First Amendment retaliation doctrine is that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct

prohibition against the exercise of First Amendment rights." *Board of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996).

A First Amendment "retaliation claim[ ] proceed[s] in two stages." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003)). First, a plaintiff must establish a prima facie case by demonstrating three elements: "that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B., supra,* 675 F.3d at 43 (citing *González-Droz, supra,* 660 F.3d at 16, *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010), and *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 10 (1st Cir.2005)). Once a plaintiff has established a prima facie case, the second stage of analysis shifts the burden to the defendant to prove that the same decision(s) would have been reached even in the absence of the plaintiff's prior or ongoing protected conduct. *González-Droz, supra,* 660 F.3d at 17. As she will demonstrate below, Ortolano has satisfied her burden of presenting a prima facie case.

2.  Ortolano Engaged in Constitutionally Protected Conduct.

a.  The Legal Standard for Constitutionally Protected Conduct.

Because the "right to petition [government is] one of the most precious of the liberties safeguarded by the Bill of Rights," *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524 (2002), speech that is "critic[al] of public officials . . . is high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach, FL*, 585 U.S. 87, 101 (2018); see *Connick v. Myers,* 461 U.S. 138, 145 (1983). Filing grievances and lawsuits are protected activity. *Hannon v. Beard,* 645 F.3d 45, 48 (1st Cir.2011); *Roy v. Wrenn*, 2013 WL 4541389 at *4  (D. N.H.

2013)(not reported in F. Supp.); *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983) )("the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"); *Boudreau v. Petit*, 2024 WL 665546 *12 (D. R.I. 2024)(not reported in F. Supp.)(it is long settled that filing a lawsuit constitutes protected conduct). Speech less formal than the filing of written grievances will also suffice; specifically, oral criticism of municipal officials and/or municipal government is protected speech. *Connick, supra,* 461 U.S. at 145 (speech concerning public affairs the essence of self-government); *Currier v. Town of Gilmanton*, 621 F.Supp.3d 233, 258-59 (D. N.H. 2022)(voicing of dissatisfaction with town government and related issues is speech protected by the First Amendment).

      b.  The Evidence Demonstrating that Ortolano Engaged in Constitutionally Protected Conduct.

Lombardi seems to concede that Ortolano engaged in constitutionally protected conduct; indeed, in his Statement of Facts swell with references to Ortolano's free speech activities predating Lombardi's stay-away warning. Lombardi's Memorandum of Law, at 2-7. But, since Ortolano carries the burden of demonstrating that she engaged in constitutionally protected conduct, she hereby references the following acts set forth in her statement of facts:

-   Ortolano regularly attended Board of Aldermen, Board of Assessors, and other public meetings, at which she criticized the Assessing Department, Assessing Department employees, and other City of Nashua employees and officers. Material Statement of Facts, at 2.

- Ortolano attended coffees with the Mayor and engaged in confrontational exchanges with him. Material Statement of Facts, at 2.

- Ortolano publicly criticized the Mayor for failing to properly close out a building permit and thereby paying lower taxes. Material Statement of Facts, at 3.

- After the Mayor and Kleiner refused to take action on her claim that Greg Turgiss, one of the assessors, was sleeping on the job and fudging his mileage, Ortolano went to the NPD and caused a criminal investigation to be launched. She also asked that the NPD investigate Kleiner for felony witness tampering charges. Material Statement of Facts, at 3-5.

3. Lombardi Subjected Ortolano To the Kind of Adverse Action Proscribed under First Amendment Retaliation Law.

a. The Legal Standard for Retaliatory Adverse Actions.

To succeed on a First Amendment retaliation claim, a plaintiff "must establish, among other things, 'a retaliatory adverse act' that is more than *de minimis. Pope v. Bernard,* 2011 WL 478055, at * 2 (1st Cir.2011) (per curiam)(not reported in F. Supp.)(citing *Morris v. Powell,* 449 F.3d 682, 684 (5th Cir.2006)). "[M]ore than *de minimus* means the action must be sufficient to chill a person of ordinary firmness in the performance of future first Amendment First Amendment activities." *Pope,* 2011 WL 478055, at * 2 (citing *Morris,* 449 F.3d at 685-86); *see Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011)("the pertinent question . . . is whether the defendant's actions would deter 'a reasonably hardy individual[ ]' from exercising his constitutional rights")( (citing *Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1218 (1st Cir.1989) (en banc)); *Starr v. Dube*, 334 F. App'x 341, 342-43 (1st Cir. 2009)(per curiam).

> "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a *de minimus* injury." "*Actual* deterrence need not be shown. Even the threat of an adverse can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct."

*Grossman, supra,* 566 F. Supp.3d at 145 (emphasis in original)(quoting *Bell v. Johnson*, 308

F.3d 594, 606 (6th Cir. 2002) and *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *see Huffman*

*v. City of Boston*, 2022 WL 2308937, at *4 (D. Mass. 2022)(not reported in F. Supp.).

"The definition of adverse action is not static across contexts." *Grossman*, 566 F.  Supp. at

145 (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999). "Indeed, a court should

consider the totality of the circumstances to evaluate whether an inference of retaliation is

permissible." *Id*.; *see Ferranti v. Moran*, 618 F.2d 888, 892 (1st Cir. 1980) (although two

separate incidents each considered alone were insufficient to serve as cognizable retaliation,

"[v]iewing these separate allegations of retaliation and interference together . . . suffice[s] to

state a claim of constitutional deprivation under section 1983."); *see also Peixoto v. Russo*, 2016

WL 7410774, at *4 (D. Mass. 2016)(not reported in F. Supp.)(where a plaintiff alleges multiple

adverse actions, courts consider the cumulative effect of such actions in determining whether

they are more than *de minimus).* And, in considering the totality of the circumstances,

"[p]risoners may be required to tolerate more than public employees, who may be required to

tolerate more than average citizens, before an action taken against them is considered adverse."[3]

*Blackmer v. Vinson*, 2010 WL 4174585, at  *2 (D. N.H. 2010)(quoting *Thaddeus–X, supra,* 175

F.3d at 398). Moreover, the inquiry into whether an action is sufficiently adverse to support a

claim is based on an objective standard rather than a subjective one, such that it is "capable of

screening the most trivial of actions from constitutional cognizance." *Grossman*, *supra,* 566 F.

Supp. at 145 (quoting *Thaddeus–X, supra,* 175 F.3d at 398). For this reason, it should not be

relevant whether, after enduring retaliatory adverse actions, an ultra-hardy plaintiff continues to

engage in constitutionally-protected speech, for a court choosing to employ the plaintiff's

---

[3] Ortolano, an average citizen, is thus objectively deemed capable of tolerating less than public employees and prisoners.

reaction to an adverse action as a yardstick to measure the severity of a defendant's conduct would improperly apply a subjective standard rather than an objective one. A case from the United States District Court for the District of Maine provides an example of how this objective standard should be applied:

> [t]he fact that [the plaintiff] continued to press his grievances after the incident is *irrelevant* at this point because I conclude that the retaliatory acts as alleged, viewed objectively, "would chill or silence a person of ordinary firmness from future First Amendment activities."

*Ayotte v. Barnhart*, 973 F.Supp.2d 70,  95 (D. Me. 2013)(emphasis added)(quoting *Pope, supra,* 2011 WL 478055, at *2).

Finally, although "courts are not typically receptive to retaliation claims arising out of government speech," *Currier, supra,* 621 F.Supp.3d at 259 (quoting *Najas Realty, LLC v. Seekonk Water Dist*., 821 F.3d 134, 143 (1st Cir. 2016), retaliation in the form of government speech is nevertheless actionable if it "concerns 'private information about an individual' or . . . it was 'threatening, coercive, or intimidating so as to intimate that punishment, sanction, or adverse regulatory action will imminently follow.'" *Goldstein v. Galvin,* 719 F.3d 16, 30 (1st Cir. 2013)(quoting *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 689 (4th Cir.2000) and *Benningfield v. City of Houston,* 157 F.3d 369, 376–77 (5th Cir.1998)). Accordingly, government speech that threatens or intimates a criminal investigation or arrest thus can serve as a cognizable adverse action.

     b.  The Evidence Demonstrating that Defendant Lombardi Engaged in Retaliatory Adverse Actions.

Lombardi's warning to Ortolano was reached far beyond a de minimus retaliatory act. It was a shakedown at the behest of Kleiner. Indeed, Lombardi proceeded with the warning despite the fact not a single employee of the Assessing Department personally asked him to do it; he relied

on the word of the person he was investigating for witness tampering. The actual warning was a show of force at her home: two cruisers, a uniformed officer with a gun, and a detective with a gun on a Sunday afternoon when all the neighbors were at home and watching. Lombardi claims that he was merely doing what he always did: proactively talk with a citizen to prevent a future conflict. But there was no conflict of the type he typically attempted to quell; Ortolano engaged in protected speech on property recognized under the law as a traditional public forum. It was not a domestic violence call or a road rage incident.

Moreover, the effects were severe. The show of force embarrassed Ortolano as to her neighbors. She believed that the warning left her susceptible to a Kleiner setup for arrest. Indeed, Kleiner seemed to be finding a way to get her arrested. She gave the directive to Lombardi to issue the stay-away order. Lombardi should have known better. She appears to have fabricated a bogus claim that Ortolano was attempting to impersonate a Nashua assessor. And she confronted Ortolano in City Hall outside the Assessing Department, knowing that Ortolano was under a stay-away warning. The investigation records created were permanent are pen to the public.

Viewed objectively, Lombardi's acts "would chill or silence a person of ordinary firmness from future First Amendment activities."

      4.   Ortolano's Protected Conduct was a Substantial or Motivating Factor in the Adverse Actions Undertaken by Lombardi.

          a.   The Legal Standard for Showing that Conduct Was a Substantial or Motivating Factor in the Adverse Actions.

The third element of a plaintiff's prima facie case "necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response." *González-Droz*, 660 F.3d at 16. A pattern of informal harassment may establish a First Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First Amendment rights. *Alston v. Town of Brookline*, 997 F.3d 23, 42 (1st Cir. 2021); *D.B. ex rel* 675 F. 3d at 43; *Barton v. Clancy*, 632 F. 3d 9, 29 (1st Cir. 2011). Moreover, because "a retaliatory state of mind typically is not susceptible to proof by direct evidence that can be averred in a complaint," *Ferranti, supra*, 618 F.2d at 892 (citing *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir. 1979)),

> direct proof of a retaliatory motive is not essential to make out a prima facie case. In some instances, circumstantial evidence (say, temporal proximity between a protected act and an adverse action, falsification of institutional records, or deviation from standard operating procedures) may suffice.

*Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011); *see Mattei v. Dunbar*, 217 F. Supp. 3d 367, 377 (D. Mass. 2016). Other federal circuits agree: a plaintiff may "survive summary judgment . . . [by] . . . present[ing] circumstantial evidence of motive, which usually includes: '(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual.' " *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011); *see Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564-65  (11th Cir. 1995)(purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive); *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)(courts may look to proximity in time, actual antagonistic conduct or animus, or other types of circumstantial

evidence, such as inconsistent reasons given for the treatment of the defendant that give rise to an inference of causation when considered as a whole).

      b.   The Evidence Demonstrating that Lombardi's Conduct Was a Substantial or Motivating Factor in the Adverse Actions.

Ortolano launched the Kleiner/Turgiss investigation on June 25, 2019. The investigation remained open through January 2021. All of the informal harassment of Ortolano occurred within that period. September 16, 2019 was a telling date, for the various complaints about Ortolano magically appeared on that day withing hours. Ortolano, who had no witness role in the investigation, suddenly was stunted in her ability to deal with anyone from the Assessing Department on the word of the person who was supposed to be undergoing an investigation. Additionally, the animus against Ortolano by various employees of the Assessing Department and Kleiner presents additional circumstantial evidence. There is ample circumstantial evidence, temporal and otherwise, that Lombardi and his confederates were substantially motivated to take adverse action against Ortolano on account of her constitutionally protected speech.

      5.   Defendant Lombardi Is Not Entitled to Qualified Immunity for His Acts of First Amendment Retaliation.

Qualified immunity shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In determining whether a government official is entitled to qualified immunity, the Court must determine: (1) "whether the plaintiff's version of the facts makes out a violation of a protected right" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Alston v.*

*Town of Brookline*, 997 F.3d 23, 50 (1st Cir. 2021) (internal citation omitted). As to the second determination, "[t]he question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted." *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017).

The recent case of *DeJong v. Pembroke*, 662 F.Supp.3d 896, 914 (S.D. Ill. 2023), presenting similar facts to this one explains why Lombardi does not deserve qualified immunity.

> because [the plaintiff] has properly pleaded a constitutional violation, [the police officer] can receive qualified immunity only if their conduct was not clearly established as unlawful. In other words, there must be settled authority that would cause [the police] to understand the illegality of their actions. As explained above . . ., an individual's right against retaliation for protected speech under the First Amendment is not a new constitutional principle. While [the plaintiff] does not raise any cases clearly establishing that the no-contact orders are unlawful, she provides analysis [that defendant police officers cannot retaliate for the exercise of constitutionally protected speech]. Moreover, government "officials can still be on notice that their conduct violates established law even in novel factual circumstances," if the state of the law at the time provided fair warning that their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). As described above . . . if [the police] issued the NCOs motivated by and as retaliation for [the plaintiff's] statements and social media posts, they would have known that their actions infringed on [her] First Amendment rights. Thus, [the police] are not entitled to qualified immunity at this stage as to Count One."

Lombardi is not entitled to qualified immunity.

## III.   CONCLUSION.

For the foregoing reasons, this Court should deny defendant Bolton and Leonard's Motion for Summary Judgment.

Dated: June 28, 2024                    Respectfully submitted,

                                        Laurie Ortolano, Plaintiff
                                        By her Attorneys,

                                        Olson & Olson, P.A.

                                        */s/* Kurt S. Olson
                                        Kurt S. Olson
                                        Bar ID No. 12518
                                        31 Franklin Rd.
                                        Salisbury, NH 03268
                                        603-748-1960
                                        kolson@mslaw.edu

### CERTIFICATE OF SERVICE

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be sent electronically forthwith to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: June 28, 2024                    */s/* Kurt S. Olson
                                        Kurt S. Olson
                                        31 Franklin Rd.
                                        Salisbury, NH 03268
                                        603-748-1960
                                        kolson@mslaw.edu