# EXHIBIT B

### UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano,<br>　　　　　　　Plaintiff<br><br>V.<br><br>The City of Nashua, et al.,<br>　　　　　　　Defendants | )<br>)<br>)<br>)<br>) Civil Action No. 22-cv-00326-LM<br>)<br>)<br>)<br>)<br>) |

**AFFIDAVIT OF LAURIE ORTOLANO IN SUPPORT OF HER OBJECTION TO DEFENDANT FRANK LOMBARDI'S MOTION FOR SUMMARY JUDGMENT**

I, Laurie Ortolano, being under oath, do hereby depose and say as follows:

1. I am the plaintiff in the above-captioned action. The facts stated herein are based on my personal knowledge.

2. After I became a regular attendee of Board of Assessing and Board of Aldermen meetings starting in 2018, I was often critical of the way the Assessing Department operated and sometimes of particular Nashua officials including Kleiner and Mayor Donchess.

3. In September 2018, Ortolano started to attend scheduled monthly "coffees with the Mayor," meetings held at a downtown café for the purpose of allowing citizens to speak directly to Donchess and to ask him questions.

4. At the first such coffee, I explained how my residence had been "sales chased" and stated my belief there were problems with the data collection and handling of KRT Appraisal's 2018 city-wide reevaluation.

5. Donchess responded in a defensive and confrontational manner, saying: "That didn't happen. That wouldn't have been legal. We don't raise valuations by 50%!" I heard some of the citizen attendees became upset and at the end of the meeting told Donchess that his reaction to my statements had been inappropriate.

6. At the October 2018 coffee, I invited the Mayor to walk with me down Berkeley Street (my street) so I could show him the homes that were assessed at lower values than mine. The

1

Mayor retorted: "All you have done is waste the City's time." Beginning with the November 2018 coffee, Donchess stopped fielding questions from citizens altogether at these coffees.

7. Beginning in 2018, I began to visit the Nashua Assessing Office frequently to review public documents pertaining to both my own property and the property of others, with whom I was comparing my property assessments. I eventually came to learn that the entire office was run poorly, and that KRT, an outside independent contractor assessing company, was doing poor work.

8. On October 16, 2018, while working at an Assessing Department computer to research properties in proximity to her home, I came upon a file for 4 Rockland Street, a property less than a half mile from my house. The data revealed that the owner had obtained a building permit in 2009 to complete a total renovation (down to the studs) of the home at a then estimated cost of $100,000. Although nine years had passed and the work had presumably been completed, the building permit had not been properly closed out. I believed that the failure to properly close out the building permit caused the assessed value of that property to be substantially lower than it would have been if the building permit had been properly closed.

9. As with all other files in the Assessing Department, the name of the property owner of 4 Rockland Street was not apparent on the computer screen, so I asked clerk Cheryl Walley to retrieve the file. I scanned the file and saw that it was Donchess who owned 4 Rockland Street.

10. I decided to give Donchess chance to cure the problem privately, so I wrote him a letter that asked him to "do the right thing" and fix the assessment. Donchess's wife responded to the letter, saying that she and the Mayor believed their assessment was fair and they were not going to do anything about it. After I received this letter of rebuke, I publicly reported what had occurred at a late November 2018 Board of Aldermen meeting.

11. In early March 2019, I attended a Board of Aldermen meeting at which Donchess and Kleiner announced that Kleiner, would become the acting Chief of the Assessing Office and by June 2019 would be promoted to Director of Administrative Services overseeing all City administrative departments. They also announced that the position of Chief Assessor of the Assessing Department had been eliminated and Kleiner would be directly in charge of that Department.

12. At one of her first Assessing Department staff meetings on April 1, 2019, Kleiner ordered that, "if a member of the public has a question – John [Griffin, the Nashua CFO,] or I will

Mayor retorted: "All you have done is waste the City's time." Beginning with the November 2018 coffee, Donchess stopped fielding questions from citizens altogether at these coffees.

7. Beginning in 2018, I began to visit the Nashua Assessing Office frequently to review public documents pertaining to both my own property and the property of others, with whom I was comparing my property assessments. I eventually came to learn that the entire office was run poorly, and that KRT, an outside independent contractor assessing company, was doing poor work.

8. On October 16, 2018, while working at an Assessing Department computer to research properties in proximity to her home, I came upon a file for 4 Rockland Street, a property less than a half mile from my house. The data revealed that the owner had obtained a building permit in 2009 to complete a total renovation (down to the studs) of the home at a then estimated cost of $100,000. Although nine years had passed and the work had presumably been completed, the building permit had not been properly closed out. I believed that the failure to properly close out the building permit caused the assessed value of that property to be substantially lower than it would have been if the building permit had been properly closed.

9. As with all other files in the Assessing Department, the name of the property owner of 4 Rockland Street was not apparent on the computer screen, so I asked clerk Cheryl Walley to retrieve the file. I scanned the file and saw that it was Donchess who owned 4 Rockland Street.

10. I decided to give Donchess chance to cure the problem privately, so I wrote him a letter that asked him to "do the right thing" and fix the assessment. Donchess's wife responded to the letter, saying that she and the Mayor believed their assessment was fair and they were not going to do anything about it. After I received this letter of rebuke, I publicly reported what had occurred at a late November 2018 Board of Aldermen meeting.

11. In early March 2019, I attended a Board of Aldermen meeting at which Donchess and Kleiner announced that Kleiner, would become the acting Chief of the Assessing Office and by June 2019 would be promoted to Director of Administrative Services overseeing all City administrative departments. They also announced that the position of Chief Assessor of the Assessing Department had been eliminated and Kleiner would be directly in charge of that Department.

12. At one of her first Assessing Department staff meetings on April 1, 2019, Kleiner ordered that, "if a member of the public has a question – John [Griffin, the Nashua CFO,] or I will

answer." Neither Kleiner nor John Griffin were assessors or had any type of training in real property assessment. At the same staff meeting on April 1, 2019, Kleiner ordered that: "going forward Mike, Gary and Greg will not speak with Ms. Ortolano. Please write down any questions and they will be answered in writing." Attached as Exhibit B-1 are agendas of that meeting I obtained through a right-to-know request.

13. From reviewing records and observing the operation of the Assessing Department in 2018 and the first half of 2019, I reached the conclusion that one of the assessors, Greg Turgis, was not performing a substantial portion of his job duties. I orally raised this issue with Kleiner, but Kleiner refused to speak about it. So I hired a private investigator to determine whether my suspicions were correct.

14. My private investigator produced a written report demonstrating that, rather spending the bulk of his work time in the field inspecting homes and businesses for the purpose of appraising real estate, Greg Turgis frequently drove to a parking lot behind a hotel, took long naps, apparently faked the mileage logs he was required to submit to show that he had been driving around the City inspecting properties, and had frequently spent parts of the work day viewing nonwork matters on a personal computer in his car. In May 2019, I provided a copy of that report to the Mayor, who then engaged private attorney Mark Broth to conduct an investigation and issue a written report on the Greg Turgis situation.

15. In June 2019, while the Broth investigation of Greg Turgis was ongoing, I heard from Assessing Department clerk, Cheryl Walley, that Kleiner told assembled staff members about an incident she had encountered in a prior job. The story she told was that in a prior job she had reported to superiors what she believed to be wrongdoing by another employee, and that doing what she had thought was the right thing ended up hurting her career. She told her staff that the moral of the story was that they should not jump to conclusions about what they have seen and should be careful about what they report. Walley construed the anecdote to be a warning about what happens to ""snitches" and an admonition not to fully cooperate with the Broth investigation. I reached the conclusion that Kleiner was attempting to cover for Greg Turgis's demonstrably poor job performance and was attempting to influence Assessing Department employees not to cooperated with the Broth investigation.

16. On June 25, 2019, Laura Colquhoun, another Nashua resident, and I went to the Nashua Police Department and requested that it conduct a criminal investigation of the Assessing

3

Department, specifically of Greg Turgis for wage theft and possible bribery, and Kleiner for possible witness tampering. I provided the police with a thick binder of documents we had compiled, including the report of my private investigator. I later learned that the investigation was assigned to Detective Frank Lombardi.

17. On September 22, 2019, a Sunday afternoon, I learned that two police cruisers, one with Detective Lombardi and the other with Sergeant DiTullio, arrived at my home at 41 Berkley Street in Nashua. Although I was not at home, my husband called me on my cellphone saying they were looking for me. I immediately called the Nashua police headquarters and left a message, offering to come to the station to speak with Detective Lombardi. I later came down to the headquarters, where he issued the stay-away warning at issue in this action.

18. I know that some of my neighbors saw the NPD show of force at my home on a pleasant Sunday afternoon because some of them told me so. Some also continued to bring it to my attention whenever they saw a police cruiser in the neighborhood, apparently assuming it had something to do with me.

19. After the police warning in the fall of 2019, I began worrying that I could be arrested for accidentally running into an Assessing Department employee outside the Assessing Office. I requested the police documents pertaining to my warning for greater clarity about my rights, only to be told that the police would not provide those documents until the criminal investigation into Kim Kleiner and Greg Turgiss had been terminated. It was not until several months later, when the police documents were finally released, that I realized that Kim Kleiner, not an employee of the Assessing Department, was one of the persons I was not to contact outside the Assessing Office.

20. I reduced my visits to City Hall to avoid potential arrest; my husband did not want me to go to City Hall at all. When I did go to City Hall and saw a police car in the parking lot, I would lie down across the seat to hide until the police left, in case they were looking for me. I continued to wait in my car if the police were at City Hall until I told them to leave. If I waited for more than 20 minutes, I would leave and go back later.

21. On or about February 3, 2022, Kim Kleiner approached me in a hallway of City Hall and screamed at me for yelling at an employee in the City Clerk's office. I had not yelled at her and thought she was attempting to set me up to get arrested. She was able to get me banned from City

4

Hall for a day. I bought my body cam and started wearing it to City Hall to document that I had done nothing in violation of the stay-away warning.

22. The February 3, 2022 incident caused me to contact Detective James Testaverde to inquire whether it was right for Ms. Kleiner to approach me and attempt to create a confrontation outside of the Assessing Department Office when I had been warned not to approach her.

23. I know that the records pertaining to my stay-away warning is a public document and available for anyone to access either internally by police personnel or externally by persons making a right-to-know request under New Hampshire law. I have obtained police records through right-to-know requests myself.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 28TH DAY OF JUNE, 2024.

_____
LAURIE ORTOLANO