**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

# FRANK LOMBARDI

*April 19, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION!

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                *
  LAURIE ORTOLANO,             *
                                * No.
                Plaintiff,      * 1:22-cv-00326-LM
                                *
      vs.                       *
                                *
  CITY OF NASHUA, et al.,       *
                                *
                Defendants.     *
                                *
* * * * * * * * * * * * * * * * *
```

VIDEOCONFERENCE DEPOSITION OF FRANK LOMBARDI,

Deposition taken with all parties appearing remotely,

on Friday, April 19, 2024, commencing at 10:03 a.m.

Court Reporter:
Pamela J. Carle, LCR, RPR, CRR

1                    APPEARANCES

2
    For the Plaintiff:

3

4          Peter Malaguti, Esq.
           500 Federal Street
5          Andover, Massachusetts 01810
               978.681.0800
6              malaguti@mslaw.edu

7
    For the Defendant City of Nashua and the Witness:

8
           CULLEN COLLIMORE SHIRLEY PLLC
9          37 Technology Way, Suite 3W2
           Nashua, New Hampshire  03060
10         By:  Brian J.S. Cullen, Esq.
               603.881.5500
11             bcullen@cullencollimore.com

12
    For the Defendant Kimberly Kleiner:

13
           FRIEDMAN FEENEY
14         95 North State Street
           Concord, New Hampshire 03301
15         By:  David Betancourt, Esq.
               603.736.7683
16             dbetancourt@friedmanfeeney.com

17
    For the Defendants Steven Bolton and Celia Leonard:

18
           UPTON & HATFIELD
19         10 Centre Street
           Concord, New Hampshire 03301
20         By:  Madeline K. Osbon, Esq.
               603716.9777
21             mosbon@uptonhatfield.com

22
    Also Present:

23
           Laurie Ortolano

24

25

```
 1    now.  And please excuse me, because I'm not good
 2    at this.
 3              Can you see that document, Sergeant?
 4         A.    Yes.
 5         Q.    Does the form of it look familiar to
 6    you?  Not the document itself, but the form of it.
 7         A.    Yes.
 8         Q.    The problem with the share screen is
 9    that multiple page documents we have to scroll
10    through.  So what I'm going to ask you to do is as
11    we're looking at these documents, I'm in control
12    of the screen here, so if you need me to scroll
13    down or to flip to another page, just let me know
14    as we're going through this.
15         A.    Okay.
16         Q.    Could you look at this document,
17    please, and tell me if you recognize it.
18         A.    Yes, I recognize it.
19         Q.    What is it?
20         A.    It looks like one of the pages from the
21    report I completed during an investigation into the
22    Nashua Assessing Department.
23         Q.    This, would it be fair to say, is your
24    first entry into an investigation of the assessing
25    department, to the best of your recollection?
```

1        A.      I believe so.

2        Q.      And some names are mentioned in here,

3   Captain Lehto, Detective Lieutenant Mederos.

4   Those were obviously two employees of the Nashua

5   Police Department at the time?

6        A.      Yes.

7        Q.      Would it be fair to classify them as

8   your superiors at that time?

9        A.      Yes.

10        Q.      And how about Sergeant MacLeod is

11   mentioned down here as well.  Is Sergeant MacLeod

12   someone who was employed at the time?

13        A.      Yes.

14        Q.      And to be more precise, by the Nashua

15   Police Department.  Would he have been a superior

16   at the time as well?

17        A.      Yes.

18        Q.      How did you come to learn that you

19   would be involved in an investigation of the

20   assessing department of Nashua?

21        A.      I was told by my supervisors, those

22   three individuals specifically.

23        Q.      And would it be fair to say that this

24   document was essentially the beginning of your

25   investigation?

```
 1    do you have anything to report to us, so if they
 2    bring it up on their own it doesn't appear that I'm
 3    trying to put words in their mouth or anything like
 4    that.
 5              And then later on in the investigation
 6    if we were able to establish more evidence or
 7    things of that nature, then where I had left these
 8    interviews kind of cordial and not -- just kind of
 9    open-ended, I'd be able to reapproach them and ask
10    them more pointed questions, if need be.
11        Q.    Do you remember interviewing
12    Ms. Cameron a second time or a third time?
13        A.    Not -- I don't believe so, no.
14        Q.    So is it your testimony that this was,
15    to your recollection, the only time you
16    interviewed Ms. Cameron?
17        A.    From what I can recall, this was the
18    only formal interview of her, yes.
19        Q.    So it would be fair to say that you
20    never asked Ms. Cameron about her input as to the
21    witness tampering charges?
22        A.    I don't know if I ever did directly,
23    no.
24        Q.    Okay.
25              MR. MALAGUTI:  Bear with me for a
```

1    warnings that you give?

2         A.     I guess I just try to use common sense,

3    and I guess every situation is kind of different,

4    you know, it depends on the situation.

5         Q.     Can you estimate how many no-contact

6    warnings you've given over the course of your

7    career?

8         A.     Well, when you say no-contact warnings,

9    are you talking about like protection orders that I

10   served to people over the years, or just more of a

11   vague, like in this case, like no contact --

12        Q.     Yeah, we'll ratchet down from the

13   protection orders.  Obviously, am I correct that a

14   protection order would have to be issued by a

15   court?

16        A.     Yes.  Yeah.

17        Q.     So we're talking about just police

18   warnings, something that might be proactive.

19        A.     As far as putting a number on that,

20   that would be hard to do.  I mean, almost every

21   domestic violence call we go to where an arrest

22   isn't made, we're typically giving some sort of

23   warning or advice and telling people to, you know,

24   stop whatever behavior they're doing to prevent any

25   future issues, so it could be multiple times a day.

FRANK LOMBARDI                                    43

1          Q.     It happens a lot in the domestic
2     situations?
3          A.     Yeah, domestic situations, neighbor
4     disputes, road rage incidences, juvenile matters at
5     the schools, I believe -- I mean, our school
6     resource officers probably do it multiple times a
7     day, every day.
8          Q.     And obviously less so in those
9     instances that you just didn't describe, less more
10    common -- less common in the instances that you --
11    other than what you described?
12         A.     I guess I --
13                MR. CULLEN:  Objection to form.  You
14    can answer, if you can.
15         A.     I guess I'm not understanding it, less
16    than -- less than what?
17  BY MR. MALAGUTI:
18         Q.     Well, you suggested that they happen
19    quite frequently in domestic situations,
20    neighborhood situations, juvenile situations, road
21    rage situations.  Are there other situations where
22    you've given no-contact orders?  And I'm obviously
23    talking about other than this case.
24         A.     Yeah, I -- I'm sure they have.  I mean,
25    I don't remember all specifically every instance of

FRANK LOMBARDI                                    44

 1    that.
 2         Q.    Okay.  And, generally, what is the
 3    purpose of giving a -- and, again, we're talking
 4    less than a protection order, just a warning not
 5    to have contact?
 6         A.    Generally speaking, it's to prevent any
 7    future issues or need for police involvement.
 8         Q.    Would it be fair to say then that you
 9    give them only when you anticipate that the
10    situation may escalate to a crime?
11         A.    I don't know if that would be true in
12    all cases.  I don't know if that would be true in
13    all cases.
14         Q.    Can you give me an example of a case
15    where you don't have a fear that the matter may
16    escalate to a crime, but you've nonetheless given
17    a verbal warning to have no contact?
18         A.    Oh, I guess an instance of that would
19    be issues involving juveniles.  If they're
20    bothering somebody or fighting with each other or
21    whatever it may be, that may be an instance where
22    we would intervene and say, hey, you know, whatever
23    behavior they're doing, knock it off, stop it, and
24    in those cases if they're juveniles, knowing full
25    well that we can't arrest a specific juvenile, we

1    would warn them against whatever behavior they're
2    doing.
3         Q.    But it sounds like you've just
4    described matters where you are worried about a
5    crime happening, even -- regardless of whether you
6    can arrest or not.
7         A.    Okay.
8         Q.    Well, assault is a crime, right?
9         A.    Well, I'm not saying that they would be
10   assaulting somebody, if they were just making bad
11   decisions or maybe, I don't know, climbing on a
12   stone wall, you're afraid that they were going to
13   get hurt, hey, knock it off, that kind of thing.  I
14   mean, I guess that would be an instance where a
15   police officer could intervene.
16              We're kind of going down a deep
17   hypothetical road here.
18        Q.    Sure, it is.  I understand that.
19              What about with adults, an instance
20   where you don't anticipate -- an example of when
21   you don't anticipate a crime occurring in the
22   future, but you still feel it's appropriate to
23   give a verbal warning of no contact?
24        A.    An instance where I would warn an adult
25   not to have contact with another adult when I don't

```
 1      feel like a crime is going to be committed?
 2            Q.     Yes.
 3            A.     Is that the question?
 4            Q.     Yes.
 5            A.     I guess I can't think of any off the
 6      top of my head why I would do that.
 7            Q.     Okay, thank you.  Let's take a look at
 8      another document.
 9                   MR. MALAGUTI:  Bear with me just for a
10      minute, I apologize.
11    BY MR. MALAGUTI:
12            Q.     Can you see that document, Sergeant?
13            A.     Yes.
14            Q.     And let's just focus on the first page.
15      Do you recognize it or can you identify it?
16            A.     It looks like the narrative I completed
17      for my interview with Ms. Brown.
18                   MR. MALAGUTI:  Pam, can we enter that
19      as Lombardi 8?
20    (Lombardi Exhibit 8 was marked for identification.)
21    BY MR. MALAGUTI:
22            Q.     Sergeant, did you do an interview with
23      Louise Brown?
24            A.     Yes.
25            Q.     And it was done at the police
```

1     say it?

2         A.     So two-part question.  Were you asking

3     me if I mentioned --

4         Q.     Yeah, let me rephrase it.  Why is there

5     no mention -- why is there no questioning about

6     the witness tampering charges regarding Kimberly

7     Kleiner?

8         A.     Again, it was just to -- it was an

9     initial interview to see what she was wanting to

10    report to us, what she had to report without me

11    putting any words in her mouth or anything like

12    that.

13        Q.     Do you remember interviewing Ms. Brown

14    again while she was being videotaped or

15    audiotaped?

16        A.     You said Ms. Brown, are you talking

17    about Ms. Brown or Amanda Mazerolle?

18        Q.     I'm sorry, thank you.  Let me reframe

19    the question.

20               Do you remember interviewing Amanda

21    Mazerolle again being videotaped or audiotaped?

22        A.     I don't believe I did.

23        Q.     Do you remember having an informal

24    interview with her again?

25        A.     I don't -- I don't believe I did.  I

```
 1     during that interview?
 2          A.     Yes.
 3          Q.     And there's a lot of discussion here
 4     about the relationships -- I'll just represent to
 5     you -- I'm not going to ask you a question on
 6     this -- there's a lot of discussion about the
 7     relationships between the various members of the
 8     assessing department.  But, once again, I don't
 9     see that there's any questions about the witness
10     tampering charges with Ms. Kleiner.
11          A.     I think this is Dame -- I apologize,
12     never mind.  I misunderstood your question.
13                 MR. MALAGUTI:  Because it was rather
14     obfuscated, Brian, why don't I try it again.
15     BY MR. MALAGUTI:
16          Q.     While Mr. Dame talks about a lot of
17     different things, I don't see that he is
18     questioned or provides any information on the
19     witness tampering charge with Ms. Kleiner.
20          A.     I think that would be accurate.
21          Q.     And once again, just very quickly, I
22     think I know the answer.  What's the reason for
23     that?
24          A.     Again, this was early in the
25     investigation, and I just wanted to see what people
```

```
 1      Lombardi 12.
 2   (Lombardi Exhibit 12 was marked for identification.)
 3   BY MR. MALAGUTI:
 4        Q.    Is this supplemental narrative a fair
 5     and accurate representation of what was said
 6     during the Mandile interview?
 7        A.    Yes.
 8              MR. MALAGUTI:  And for the record, this
 9     is NPD-LO-137 and 138.
10   BY MR. MALAGUTI:
11        Q.    You don't recall asking Mr. Mandile
12     about witness tampering and Kim Kleiner?
13        A.    I don't recall if I did or not.
14        Q.    Was this one of the early interviews
15     like the others, where you just tended to let the
16     people talk on their own?
17        A.    I believe so.
18        Q.    Do you recall interviewing Mr. Mandile
19     again after this interview?
20        A.    I don't think I did another formal
21     interview, no.
22              MR. MALAGUTI:  Pam, did I enter the
23     last one as 12?
24              COURT REPORTER:  Yes, you did.
25              MR. MALAGUTI:  Thank you.
```

FRANK LOMBARDI                          65

```
 1                Was Gary also a suspect in the
 2       investigation you were doing?
 3            A.    Yes.
 4            Q.    And this supplemental narrative is a
 5       fair and accurate representation of what was said
 6       during his interview?
 7            A.    Yes.
 8            Q.    Do you recall interviewing him again?
 9            A.    I don't believe I conducted a formal
10       interview with him again, no.
11            Q.    And if I represented that you didn't
12       ask him any questions about Ms. Kleiner and
13       witness tampering, would you dispute that?
14            A.    No.
15            Q.    Is that your recollection, that you did
16       not ask him about witness tampering?
17            A.    I don't specifically recall.
18            Q.    And you considered this to be one of
19       the early interviews where you just let people
20       talk like the others?
21            A.    Yes.
22            Q.    To your knowledge, was there an issue
23       here about Greg Turgiss and Gary Turgiss assessing
24       the same property?
25            A.    Well, I guess that's a matter of
```

```
 1              A.      Again, this is a summary.  I don't
 2      remember exactly the words that he used when he was
 3      talking to me.
 4              Q.      Do you remember accusations, that word?
 5              A.      Again, I don't remember the exact words
 6      he used, if those were them or -- I didn't -- I
 7      didn't put any of these words in quotes, so I don't
 8      remember exactly what he said.
 9              Q.      Okay.  Did you know what he meant by
10      negative attention, the words negative attention?
11              A.      I guess I -- I don't really recall
12      exactly what he said at the time.
13              Q.      Did you ask him to be more detailed
14      about what he meant?
15              A.      Again, I may have.  I -- I don't know.
16              Q.      Would you agree that he was not
17      reporting that Ms. Ortolano had physically
18      threatened him?
19              A.      He didn't allege any criminal offenses
20      to me, no.
21              Q.      And those criminal offenses would have
22      been what, criminal threatening, stalking,
23      criminal harassment, those types of things?
24              A.      Again, he didn't allege any criminal
25      offenses to me at that time, so that could have
```

```
 1     included those ones as well.
 2          Q.     Did you take notice at the time that he
 3     didn't allege any criminal offenses?
 4          A.     Yes.
 5          Q.     Did you tell him that he did not allege
 6     any criminal offenses?
 7          A.     I don't remember specifically what I
 8     told him about that or not.
 9          Q.     Did you advise him that because there
10     were no criminal offenses, there was no legal
11     remedy that the police could implement to stop
12     someone like Ms. Ortolano from engaging in
13     negative attention?
14          A.     Again, I don't specifically remember
15     what I said to him.
16          Q.     Now, you did advise him, as we're
17     looking here, and I'll read this with you.
18                 "As KRT is located in Haverhill, Tozier
19     was instructed to contact local police if any
20     issues were to arise at that location.  Tozier was
21     also given information on how to apply for a
22     restraining order if he and other employees felt
23     that their concerns rose to that level?"
24                 Would a restraining order in
25     New Hampshire have been issued for something that
```

1    didn't involve criminal behavior?

2         A.    I'm not the one that issues restraining

3    orders, that would be a question for a judge.

4         Q.    So that would be -- you were advising

5    him on how to go to court to get a restraining

6    order?

7         A.    No, I was advising him that restraining

8    orders are an option, and if they want to explore

9    that option they would have to go to the court and

10   talk to a judge about that.

11        Q.    Are restraining orders an option in

12   your mind?  You have to make these calls on a

13   daily basis.  Are restraining orders an option in

14   your mind when no crime has been committed?

15        A.    I don't have to make that decision

16   ever.  My job is just simply to enforce them if one

17   is already in place.  I don't decide if they're

18   issued or not.

19        Q.    Then why did you even tell him that he

20   had the option of applying for a restraining

21   order?

22        A.    Because he had the option to go and

23   attempt to get one if he wanted to.

24        Q.    Do you generally tell people that they

25   have rights for restraining orders when they find

1    other people to be annoying or to engage in

2    negative attention?

3        A.    If they -- depending on the

4    circumstances, in this case, if he's bringing up

5    these concerns we say that that's an option, but we

6    don't ever guarantee or make any promises and say

7    that they're going to be granted.  We just remind

8    them that that's an option and it's up to them if

9    they want to go attempt to do that or not.

10       Q.    Did you advise him at this time that

11   the police might consider issuing a no-contact

12   warning to Laurie Ortolano?

13       A.    If it's not documented in here, then I

14   don't know or remember if I did or not.

15       Q.    Is that because you didn't think it was

16   appropriate to give him that advice?

17            MR. CULLEN:  Objection to form.  You

18   can answer.

19       A.    I don't know if I considered that at

20   that time or not.  I don't remember what I was

21   thinking at that time.

22   BY MR. MALAGUTI:

23       Q.    I've just pulled another document up on

24   the screen.  Could you take a look at that,

25   please.  And when you're ready, could you tell me

1     room separate from everyone else.

2          Q.     So it was a private room where no

3     one --

4          A.     Yeah.

5          Q.     Okay.  And there was no one else in the

6     room besides the three of you?

7          A.     No, I believe it was just us three.

8          Q.     So was Kimberly Kleiner in the office

9     at the time, do you know?

10         A.     I don't remember seeing her down there.

11         Q.     Now, we'll take a look and spend a

12    little bit of time on this, but do you have a

13    recollection apart from this supplemental

14    narrative of what Lynn Cameron told you once you

15    started to talk in the conference room?

16         A.     Yes.

17         Q.     What did she tell you?

18         A.     She told me that when she was -- I

19    don't know if it was leaving work for the day or

20    during a lunch break on a previous day that she was

21    confronted by Laurie Ortolano, I think it was

22    somewhere between City Hall and the Elm Street

23    parking garage, I don't know if was on the sidewalk

24    or where, but confronted by her and asked questions

25    about the assessing department.

```
 1    or did tears come somewhere in the middle or
 2    during the conversation?
 3         A.    I don't remember specifically.  I don't
 4    believe she was crying when she first walked in the
 5    room.  I think it was as she began to tell me about
 6    the situation is when she started crying, but I
 7    don't recall specifically when she started crying.
 8         Q.    And, again, you don't recall anything
 9    more specific about how she felt uncomfortable?
10         A.    No, other than just the overall, I
11    guess, stress that her and the rest of the
12    assessment department had been in since I guess
13    this whole thing began.
14         Q.    Now, again, if you'd take a look at my
15    cursor, I'm going to read that sentence that
16    follows.  Do you see that?
17         A.    Yes.
18         Q.    "Cameron explained that she felt that
19    Ortolano had been waiting outside and had
20    intentionally been attempting to confront her
21    outside the office."
22               Did you ask her what facts she relied
23    on when she said that Ortolano had been waiting?
24         A.    Yeah, I don't think she had any
25    specific facts, that was just how she felt or
```

FRANK LOMBARDI                                    99

```
1    interpreted the -- or the contact.  Yeah.
2         Q.    So your impression is she didn't know
3    for a fact that Ortolano was waiting outside?
4         A.    Yeah, I don't -- I don't -- I don't
5    recall her giving me any hard evidence or proof,
6    that was just her feelings.
7         Q.    And I'm going to just jump ahead for a
8    minute, and you may or may not recall.  You did
9    speak with Laurie Ortolano about this incident,
10   right?
11        A.    Yes.
12        Q.    And Laurie Ortolano told you that she
13   had not been waiting, didn't she?
14        A.    Yes.
15        Q.    Did you ask her what she meant by the
16   words that Ortolano had -- and, again, if you look
17   at my cursor, "intentionally been attempting to
18   confront her outside of the office."
19             Did you ask for more specific facts
20   about that?
21        A.    Again, I don't recall if I did, but I
22   don't -- from what I can remember, she didn't have
23   any, again, evidence or facts to really
24   substantiate that claim.
25        Q.    And did you even know what she meant
```

FRANK LOMBARDI                        116

1    quotes, but I'm sure it was something to that
2    effect.
3         Q.    Okay.  Now, did Ms. Cameron ever
4    directly ask you to issue a no-contact order in
5    regard to Laurie Ortolano?
6         A.    No.
7         Q.    Let me rephrase that.  I used the word
8    order improperly.  It was a warning, right, not an
9    order?
10        A.    Yeah, it had no -- there was no order,
11   it was just a verbal warning.
12        Q.    Somebody did contact you and tell you
13   that Lynn Cameron did not want contact with
14   Ms. Ortolano outside of the assessing department
15   office, correct?
16        A.    Yes.
17        Q.    It wasn't Ms. Brown, was it?
18        A.    No.
19        Q.    It was Kim Kleiner, right?
20        A.    Yes.
21        Q.    Now, you've already testified that Kim
22   Kleiner was not in the office when you were there
23   that day and was not in the conference room when
24   you spoke with Ms. Brown and Ms. Cameron, right?
25        A.    Yes.

1        Q.    What did Kim Kleiner tell you?

2        A.    She told me that the assessing

3  department had spoken amongst themselves and they

4  all, except for Ms. Walley, had decided that they

5  wanted me to relay to Ms. Ortolano that they didn't

6  want to have any contact with her unless they were

7  in the assessing department.

8        Q.    Did you speak with any other members of

9  the assessing department besides Lynn Cameron to

10  confirm whether they wanted contact with Laurie

11  Ortolano?

12        A.    Nope.

13        Q.    The only two people you talked about

14  this with directly were Louise Brown and Lynn

15  Cameron, right?

16        A.    Well, and then Kim Kleiner when she

17  told me what they had all decided upon.

18        Q.    Okay.  So you didn't ask the Turgisses

19  if they wanted a no-contact order?

20        A.    No.

21        Q.    So you took Ms. Kleiner's word for it

22  that these people wanted a no-contact warning?

23        A.    Yes.

24        Q.    And Ms. Kleiner was then and there

25  under investigation for witness tampering, right?

FRANK LOMBARDI                          118

```
 1              A.      Yes.
 2                      MR. MALAGUTI:  Okay, let's try to get
 3        through a couple more of these.  Hit a slow point,
 4        we'll then speed this up.
 5    BY MR. MALAGUTI:
 6              Q.      Can you see this document here that's
 7        up on the screen?
 8              A.      Yes.
 9              Q.      Do you recognize it?
10              A.      Yes.
11              Q.      What is it?
12              A.      It is call notes for a call that was
13        generated in reference to this incident.
14              Q.      Tell me about the call, who
15        participated in that call?
16              A.      In this specific call it was myself,
17        and then Scott Hudon and Laurie Ortolano.
18              Q.      And this call, when you used the word
19        call, you're not talking about a telephone call,
20        are you, necessarily?
21              A.      No.  No, it's basically a -- call for
22        service, but it's basically just a number that's
23        generated for reference, and something that we did
24        just to document it.
25                      MR. MALAGUTI:  And let's enter this as
```

1        Q.    And, again, the only ones that you
2   spoke to personally either by phone or by
3   telephone were Kimberly Kleiner, Lynn Cameron and
4   Louise Brown?
5        A.    Yes.
6        Q.    Again, another document up on the share
7   screen.  Do you recognize?
8        A.    Yes.
9        Q.    What is it, please?
10        A.    It looks like the supplemental
11   narrative that I completed when I attempted to make
12   contact with Laurie Ortolano at her residence.
13        Q.    And do you recall the details of what
14   happened outside of this memo, outside of reading
15   this supplemental narrative?
16        A.    Yes.
17        Q.    So you came to Laurie Ortolano's house?
18        A.    Yes.
19        Q.    On September 22nd, 2019.  That was a
20   Sunday, wasn't it?  Do you remember?
21        A.    That I -- I don't remember.
22        Q.    Could it possibly have been a Sunday,
23   if I represented to you that it was Sunday?
24        A.    It could very well have been a Sunday,
25   yeah.

FRANK LOMBARDI                                    121

1        Q.     A nonworking day, right?

2        A.     If it was a Sunday, then I guess.  I

3    was working, so it was a working day for me.

4        Q.     Now, you came to Ortolano's house with

5    Sergeant DiTullio, is that how you pronounce it?

6        A.     Yes, DiTullio.

7        Q.     You both arrived in separate police

8    cruisers?

9        A.     Yes.

10       Q.     Your lights weren't on, were they?

11       A.     No.

12       Q.     Parked both cruisers in front of the

13   house?

14       A.     Yes.

15       Q.     Were you in uniform that day?

16       A.     No.

17       Q.     Was Sergeant DiTullio in uniform?

18       A.     Yes.

19       Q.     You walked up to the front door of

20   Ms. Ortolano's home and rang the bell?

21       A.     Yeah, I don't remember if I rang the

22   bell or knocked on the door, but one of -- one of

23   those things.

24       Q.     Why did you bring a second person with

25   you?  Was that for -- to have a witness?

1      A.      Yes.

2      Q.      Is that a standard practice when a

3   no-contact warning is made?

4      A.      It's just standard practice in general

5   to have two people there when you're making contact

6   with someone.

7      Q.      And Ms. Ortolano wasn't home, right?

8      A.      No, she wasn't.

9      Q.      You were greeted at the door by her

10   husband who told you as much?

11      A.      Yup.

12      Q.      And he said that he would have her

13   contact you when she returned?

14      A.      Yes.

15      Q.      Could you have delivered this warning

16   by telephone instead of bringing two cruisers into

17   her neighborhood and parking in front of her

18   house?

19      A.      I like to talk to people in person,

20   that way they can confirm who I am and that I'm not

21   just a random person on the phone telling them I'm

22   a police officer.

23      Q.      Would it have been easier for you to

24   call her and ask her to come to the Nashua Police

25   Department?

1        A.      Could have been, I guess.

2        Q.      Did you consider doing that instead of

3    bringing two police cruisers to her home?

4        A.      I don't remember, but at the time I

5    assumed this would be a fairly brief conversation,

6    instead of forcing her to leave her house and drive

7    down to the police department, that I would be more

8    inconveniencing her by doing that than if I just

9    showed up to her house and had a quick conversation

10   with her and left.

11       Q.      Was Sergeant DiTullio carrying a

12   firearm when you walked up to the front door?

13       A.      Yes.

14       Q.      Were you carrying a firearm?

15       A.      Yes.

16       Q.      Let's take a look at the next document.

17               Can you see the document up on the

18   share screen, Sergeant?

19       A.      Yes.

20       Q.      Now, Ms. Ortolano called you a short

21   time after you had visited her home, right?

22       A.      Yes.

23       Q.      And what was said in the telephone

24   conversation?  I imagine it was brief.

25       A.      Yeah, just that I was just looking to

FRANK LOMBARDI                    124

```
 1    make contact with her in person for a few minutes.
 2    And she told me she was near the police department,
 3    so she was just going to stop by there.
 4          Q.    Okay.
 5                MR. MALAGUTI:  By the way, I'm sorry,
 6    Pam, did we enter the last exhibit, Exhibit
 7    Lombardi 19?
 8                COURT REPORTER:  I believe 18 was the
 9    last one.  Let me just check.
10                MR. MALAGUTI:  Quickly, and I will just
11    flash up 19 again.  None of it is quick.
12                MR. CULLEN:  I think we can agree that
13    19 was NPD-LO-208.
14                MR. MALAGUTI:  There we go.  So, Pam,
15    could you mark that as 19.
16                COURT REPORTER:  Yes.
17                MR. MALAGUTI:  My apologies.
18    (Lombardi Exhibit 19 was marked for identification.)
19    BY MR. MALAGUTI:
20          Q.    All right, Sergeant, so the upshot
21    is -- and, once again, can you see this document
22    that I have up now?
23          A.    Yes.
24          Q.    I'm sorry, did I already ask you to
25    identify it?  I don't believe I did.
```

FRANK LOMBARDI                    125

1        A.      I don't remember.

2        Q.      So why don't we do that now.  Do you

3   recognize this document that's up?

4        A.      Yes.

5        Q.      What is it, please?

6        A.      It is a supplemental narrative for my

7   contact with Ms. Ortolano.

8        Q.      And this is the contact you had at the

9   Nashua Police Department a short time after you

10  had gone to her house, right?

11       A.      Yes.

12               MR. MALAGUTI:  And before I forget,

13  let's mark this as Lombardi 20, please.

14  (Lombardi Exhibit 20 was marked for identification.)

15  BY MR. MALAGUTI:

16       Q.      Now, this time you had a second -- a

17  different -- a different person with you from the

18  department.  This time it was Sergeant, am I

19  pronouncing it correctly, Hudon or Hudon?

20       A.      Hudon, yes.

21       Q.      And at this point you gave Ms. Ortolano

22  her verbal warning of not contacting the people in

23  the assessing department, right?

24       A.      Yes.

25       Q.      And just for the record, the people in

```
 1    the assessing department were all members of the
 2    assessing department with the exception of Cheryl
 3    Walley?
 4         A.    Correct.
 5         Q.    And you didn't speak directly with
 6    Ms. Walley about her desire not to be part of that
 7    no-contact warning?
 8         A.    No.
 9         Q.    That was relayed by Kim Kleiner?
10         A.    Yes.
11         Q.    So I'm just going to refer you to the
12    paragraph where I'm focusing the cursor here.
13               So when you issued the warning, and I
14    think the words that you used -- let's go up to
15    the paragraph above.
16               You informed Ortolano that after
17    speaking with Kleiner and members of the assessing
18    department, they decided they wanted me to inform
19    Ortolano that all members -- all of the current
20    members of the assessing department did not want
21    to have any contact with Ortolano anywhere other
22    than within the Nashua Assessing Department for
23    matters involving assessing.
24               Now I'm dropping down to this
25    paragraph.  She asked you if what you were doing
```

FRANK LOMBARDI                    127

1    was legal.  Do you remember that happening?
2         A.    Yes.
3         Q.    When you issue these warnings, do
4    people often say that?
5         A.    Typically not, no.
6         Q.    Do you ever remember anyone else asking
7    if it was legal to give such a warning?
8         A.    No.  I don't think so.
9         Q.    Okay.  And you said that it is commonly
10   done in an attempt to proactively prevent crimes
11   from occurring.  Is that an accurate reflection of
12   what you said?
13        A.    Yes.
14        Q.    Did Mrs. Ortolano do anything to make
15   you think that she might engage in a crime
16   regarding the members of the Nashua Assessing
17   Department?
18        A.    At that time --
19        Q.    Yeah.
20        A.    -- did I think she was a suspect in
21   anything?  No, nothing had been alleged.
22        Q.    Well, I'll broaden the question a bit.
23   Not only was she a suspect, was there anything
24   that she did to make you think that she might
25   engage in some type of a crime when dealing with

FRANK LOMBARDI                                  128

1      members of the Nashua Assessing Department?
2                  MR. CULLEN:  Objection to form.  You
3      can answer.
4           A.     Well, I mean, we're kind of going down
5      a hypothetical road here.  I mean, is it possible
6      that she could have eventually committed a crime
7      against one of the members of the assessing
8      department?  Yes, it's possible.
9    BY MR. MALAGUTI:
10          Q.     Well, it's a hypothetical warning,
11     isn't it?  Because you said it's commonly done by
12     the Nashua Police Department to attempt to
13     proactively prevent crimes from occurring.  You
14     didn't have any crimes in mind, did you?
15          A.     No.
16          Q.     And there's nothing that you had seen
17     that would suggest that Ms. Ortolano would be
18     committing a crime any time soon, correct?
19          A.     I -- again, I don't know if things were
20     to escalate, and if she were to keep having contact
21     with people outside of the assessing department,
22     there is the potential that that could have
23     escalated to becoming a crime.
24          Q.     Do you think it was possible then it
25     could have escalated to being a crime perpetrated

```
 1      by one of the assessors on Mrs. Ortolano?
 2          A.      I mean, anything's possible.
 3          Q.      So then you explained to Ortolano, and
 4      I'm going to take this portion of the sentence
 5      from right here, "that if she did have contact
 6      with previously listed individuals, that she could
 7      face criminal charges" --
 8              MR. CULLEN:  No, no, no, Peter, you
 9      can't start there.
10              MR. MALAGUTI:  All right.  I'll read
11      the whole thing.  I -- well taken.
12              MR. CULLEN:  You're leaving out the --
13      there was the potential, which is a pretty
14      important aspect of that sentence.
15              MR. MALAGUTI:  So let's start right
16      here, Brian.  We'll start at the beginning of the
17      sentence.
18              MR. CULLEN:  Sure.
19              MR. MALAGUTI:  I explained to Ortolano.
20  BY MR. MALAGUTI:
21          Q.      "I explained to Ortolano now that she
22      had been warned that these specific people did not
23      want to have any contact with her outside of the
24      assessing department, there was the potential that
25      if she did have contact with previously listed
```

```
 1      individuals that she could face criminal charges,
 2      depending on the circumstances of the contact."
 3                 Is that an accurate representation of
 4      what you told her?
 5          A.    Yes.
 6          Q.    Did you explain to her what the
 7      circumstances might be?
 8          A.    No, I didn't get into every
 9      hypothetical situation that could exist that could
10      lead to her arrest, no.
11          Q.    Well, did you tell her that just a
12      normal conversation was not engaged in -- was not
13      encapsulated in that statement, "the circumstances
14      of this contact"?
15          A.    Again, I don't specifically think I
16      said that, no.
17          Q.    Without some type of a limitation, did
18      you think that she might draw the impression that
19      merely talking to one of the assessors or one of
20      the clerks outside of the office might constitute
21      a crime?
22          A.    I guess that's a question for her.  I
23      felt like I was very clear when I told her that
24      depending on circumstances, just merely her having
25      contact with them would not be cause to arrest her.
```

```
 1            Q.      Well, Sergeant, you say it's a question
 2      for her, but you're the one who told her that she
 3      could face criminal charges if she had contact.
 4                    MR. CULLEN:  Objection to form.
 5   BY MR. MALAGUTI:
 6            Q.      And you didn't feel the need to limit
 7      what you were saying?
 8            A.      I told her that depending on the facts
 9      and circumstances of that contact it could
10      potentially lead to criminal charges.
11            Q.      Did you consider that this might put
12      her in a bit of a spot if a member of the
13      assessing department approached her outside of the
14      assessing department offices?
15            A.      No, I don't see why that would put her
16      in a spot.
17            Q.      So you don't see whether, for example,
18      if Kimberly Kleiner were to approach her and
19      chastise her for something, that that would
20      not put her -- let me start again.
21                    If Kimberly Kleiner were to approach
22      her and chastise her for something she had done,
23      that would not put her in apprehension of being
24      arrested for responding in kind?
25            A.      No, I don't see how she would interpret
```

1     that that way.
2          Q.     Now, this warning ends up becoming a
3     part of the police files kept at the police
4     department, doesn't it?
5          A.     Yes.
6          Q.     And this warning is a public document,
7     isn't it?
8          A.     I believe so, yes.
9          Q.     This warning can, in fact, be relied
10    upon by Nashua police officers dealing with her in
11    the future, correct?
12         A.     Correct.
13         Q.     This document can be obtained by any
14    member of the public making a 91-A request as
15    well, right?
16         A.     I'm not intimately familiar with the
17    91-A requests, I don't handle those, so I don't
18    know what, if any, parts of this would be redacted
19    or not.
20         Q.     Well, do you know that, in fact, this
21    warning was relied upon by an officer when he
22    dealt with Ms. Ortolano some three years later?
23         A.     No.
24         Q.     Do you know who Officer James
25    Testaverde is?

FRANK LOMBARDI                    133

1          A.     Yes.

2          Q.     Who is James Testaverde, please?

3          A.     Currently right now he is a part-time

4     detective assigned to register sex offenders for

5     the Nashua Police Department.

6          Q.     So I'm going to have you take a look at

7     this letter and ask you if you recognize it.  I'm

8     going to guess that you don't, but just take a

9     minute to look at it, and tell me if you recognize

10    it, please.

11         A.     I don't believe I've seen this before.

12         Q.     But you recognize the form.  And I

13    mistakenly called it a letter, it's not a letter.

14    Would it be the form of a supplemental narrative?

15         A.     Yes.

16         Q.     And do you recognize that it is signed

17    by James Testaverde?

18         A.     Yes.

19         Q.     And you see that the date is June 15 --

20                MR. MALAGUTI:  By the way, let's enter

21    this as an exhibit.  What is this one, 21?

22    Lombardi 21.

23                COURT REPORTER:  Correct.

24    (Lombardi Exhibit 21 was marked for identification.)

25                MR. MALAGUTI:  NPD-LO-4125 through

```
 1      into not participating with any investigations
 2      involving the Nashua Assessing Department."
 3                  Do you see that?
 4           A.     Yeah.
 5           Q.     That's not accurate, is it?
 6           A.     I don't understand why that's not
 7      accurate.
 8           Q.     So did you ask every single member of
 9      the assessing department whether they were
10      threatened or coerced by Kim Kleiner into not
11      participating in the investigation of the Nashua
12      Assessing Department?
13           A.     No.
14           Q.     In fact, the only ones that you asked
15      questions of as to this witness tampering question
16      was Kim Kleiner herself, Cheryl Walley, and John
17      Griffin, correct?
18           A.     I would agree with that if that's what
19      it says in the reports, yes.
20           Q.     John Griffin was Ms. Kleiner's boss,
21      right?
22           A.     I don't remember how they were
23      structured at that time, but that's very possible
24      he was.
25           Q.     All right.  I'm just going to ask you a
```