UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

_____
                                        )
Laurie Ortolano,                        )
                        Plaintiff       )
                                        )
V.                                      )   Civil Action No. 22-cv-00326-LM
                                        )
                                        )
The City of Nashua, et al.,             )
                        Defendants      )
_____)


PLAINTIFF'S MEMORANDUM OF LAW AND AFFIDAVIT IN SUPPORT OF HER
OBJECTION TO DEFENDANTS' FEOLI AND INCEPTION'S MOTION FOR
SUMMARY JUDGEMENT


NOW COMES, the Plaintiff, Laurie Ortolano, and objects to Defendants' Feoli and

Inception's Motion for Summary Judgement, and in support sets forth her Memorandum and

Affidavit, and says as follows:


I. INTRODUCTION

The defendant, Inception Technologies, Inc. ("Inception") is a New Hampshire business

corporation with a usual place of business in Manchester, New Hampshire. Inception provides

services to clients regarding the scanning, storage, and hosting of documents. At relevant times,

Inception provided such services to the City of Nashua and, with authorization from Nashua,

dealt with the plaintiff regarding information concerning stored documents, pursuant to a written

Contract for Professional Services, dated 8/6/ 2020  ("contract"). *A-2.*

The defendant, Raymond Feoli ("Feoli"), is an individual who, on information and belief, resides in Derry, New Hampshire. At relevant times, he was the President of Inception and has personally dealt with the plaintiff.

In January 2022 Ortolano called Feoli, the President of Inception, which had been working as an independent contractor to upload many of Nashua's public records into electronic format. Ortolano was seeking information on the progress his firm was making in uploading City of Nashua Assessing records to the cloud or at least into electronic format since she had made several requests outside of public meetings to the City on the progress of the scanning project and specifically for the property record file for 78-84 West Pearl Street. At all times, Feoli was acting on behalf of Inception. *A-2 pg 3*

In **A**ugust 2020, the City had contracted with Inception Technologies to scan Assessing Department files to make available publicly-accessible digital property record files. *A-2* In late 2021, because defendant Kleiner had not provided any public updates about the project, Ortolano contacted Inception's President, Feoli, to ask him questions about how the scanning and storage were handled. Ortolano was instructed by Director Cummings by email, dated January 21, 2022 to contact city vendors if she had questions. *A-5* She contacted Feoli again in early February 2022 for an update. After that second phone call, despite the fact that Ortolano never stated that she was employed by the City of Nashua or was an independent contractor for the City of Nashua, or in any way represented the City of Nashua, Feoli later informed Kleiner about the phone call and referred to Ortolano as a city employee. *A- 8 and A-9* Feoli would later admit when giving a statement about the incident to the Nashua Police Department that Ortolano had never stated or purported that she was a City employee; he assumed she was because she was so knowledgeable about city government. *A-11* Ortolano knew the specifics of the Inception

Technologies, Inc. contract because it was a matter of public record. The contract was part of the public records for the agenda of the July 15, 2020, Finance Committee Meeting. *See A-3* The information concerning the Inception Technologies contract can be found at *A-2.*

Ortolano never stated or implied that she was employed by the City of Nashua. *See A, Affidavit Ortolano* At the time of the communication between Feoli and Ortolano, Feoli knew or should have known that Ortolano was not an employee of the City of Nashua. Nevertheless, Feoli informed Kleiner that Ortolano had represented that she was an employee of the City of Nashua and Kleiner announced at the February 8, 2022, public meeting that the matter had been reported to the Nashua Police for criminal investigation. *A-10* Kleiner requested that Feoli provide an email detailing the events. The Feoli email and Kleiner presentation was not on the Board of Aldermen public agenda, nor was the email included in the Board information package given to Board members before the meeting. *A- 9*

Based on the false information provided by Feoli, defendant Kleiner, who either purposely or negligently chose not to inquire why Feoli might think that Ortolano was a city employee, on February 8, 2022, in a public meeting of the Nashua Board of Aldermen, Kleiner called out Ortolano by name and accused Ortolano of committing the crime of impersonating a city official. *A-10 pg 14* Ortolano was investigated by the Nashua Police and, based upon their investigation, determined Ortolano did not commit a crime. *A-11* The basis of the Kleiner underline referral to the Police and her public presentation at the February 8, 2022 Aldermanic Meeting was predicated on the Feoli email. Ortolano did nothing wrong by contacting Feoli because that is what she was instructed to do by Director Cummings if she had a question for a city vendor, *A-5 & A-6.* Yet, she was defamed by pursuing a process that was recommended to her by the City.

## PROCEDURAL HISTORY

1. This matter was filed on August 23, 2022.

2. The Defendants, Feoli and Inception Technologies, Inc. were served by Waiver of Service on September 27, 2022 and filed with the Court.

3. On September 27, 2022, the defendant waived service of the summons and was required to file and serve an answer or motion under Fed. R. Civ. P. Rule 12 (a)(1)(A)(ii) within 60 days of 8/29/2022.

4. Feoli filed a Motion to Dismiss on November 18, 2022, which was not timely.

5. On June 12, 2023, the Court granted in part/ denying in part Defendant Feoli and Inception's Motion and dismissed Count 10, Infliction of Intentional Emotional Distress, but did not dismiss the defamation count.

6. There is only one remaining count relating to Defendant Feoli: Count Eight-- Defamation.

7. On May 31, 2024, Feoli and Inception filed a Motion for Summary Judgment (Document 91).

8. Since the Court denied in part the motion to dismiss, Feoli and Inception were required to file an answer concerning the surviving count on or before June 26, 2023. See Fed. R.Civ. P. 12(a)(4)(A), which states in relevant part (A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or (B) if the court grants a motion for a more definite statement. The responsive pleading must be served within 14 days after the more definite statement is served. Fed. R. Civ. P. 12(a)(4)(A).

9. On June 7, 2024, the Plaintiff filed a Motion for Default for failure to comply with Fed. R. Civ. P. 12(a)(4)(A) and requested that default should be entered against Feoli and Inception pursuant to Fed. R. Civ. P. 55(b)(2).

10. The Plaintiff also requested for the Court to strike their summary judgment motion and schedule a hearing by jury on assessment of damages.

11. Feoli and Inception filed an untimely and without Court permission answer to the Complaint on June 11, 2024.

12. On June 25, 2024, the Plaintiff filed a Motion to Strike the Defendant's answer.

## STATEMENT OF MATERIAL FACTS

1. Raymond Feoli is the President of Inception Technologies. (undisputed)

2. Inception Technologies is a duly incorporated corporation doing business within the State of New Hampshire. (undisputed)

3. The City of Nashua contracted with Inception Technologies to complete a scanning project on August 6, 2020 for the contract price of $59,638. *A-2*

4. Mr. Feoli, President of Inception Technologies stated in his Motion for Summary Judgment that he received a voicemail message from the Plaintiff identifying herself as Laurie Ortolano <u>of Nashua</u> in late 2021 or early 2022. *See* Feoli Motion for Summary Judgment Document 91-1 ¶8. Additionally, Ortolano talked with Feoli in late 2021. Ortolano left numerous voice messages for Feoli in early 2022.

5. Ortolano identified herself by name and stated of Nashua. Ortolano never stated she was a City of Nashua employee, nor did she intimate that she was an employee. *See C, Feoli Deposition, pg. 14*

6. When Feoli called Ortolano back, she asked him questions about the scanning project Inception was handling for the City of Nashua. *Id.* at ¶17. Ortolano had knowledge of the contract and Inception's scope of work scanning the property record files since it was a matter of public knowledge. *See A-2, A-3 A-4*

7. Feoli claims that he spoke by phone again with Ortolano on February 4, 2022 and that Ortolano again questioned him about public access to the scanned document stations, "at one point stating/inquiring that Nashua citizens had been waiting for the project to be completed for many months and Kleiner had not provided any public updates". Affidavit of Laurie Ortolano, ¶ 15

8. Ortolano did nothing wrong by contacting Feoli because that is what she was instructed to do by Director Cummings. *A-5 and A-6* Yet, she was defamed for pursuing a process that was recommended to her by the City.

9. On February 4, 2020, after Ortolano's phone call with Feoli, she emailed Rick Vincent, the Nashua Chief of Assessing, copying Kleiner, the Mayor and DRA, and asked questions about why citizens do not have access to the property record files that were scanned and uploaded to the cloud, and why Inception Technologies is not told to return the scanned files immediately as this is the only way to access property data. Ortolano made reference to specific issues discussed with Feoli – "last week 28 boxes were scanned an uploaded, Inception is out of money or almost out of money, 86 boxes were shipped to the company." *A-7*

10. It was this email from Ortolano to City Officials that prompted Kleiner to contact Feoli and ask him about the City employee he talked to. *A-7*

11. The contract was for the "Property Card Scanning Proposal". According to the contract, Section 6, Kim Kleiner is named the City Representative. According to Section 4, General Terms and Conditions of the contract, all communications about the contract shall be addressed by the City of Nashua representative. *A-2*. Even if Ortolano was a city employee, Feoli should not be talking to her according to the contract.

12. On Sunday, February 6, 2022, Mr. Feoli wrote a letter to Ms. Kleiner and sent it via email. The letter stated he had spoken with Ortolano a month earlier. Ortolano identified that $22K was left on the existing PO. She inquired about when the documents would be returned to the City. Mr. Feoli wrote that Ortolano stated she would make sure that payment was expedited on any open invoices. *A-8* Ortolano never told Feoli that she would expedite payment on the open invoices, Ortolano's remarks regarding funding payment was handled in her February 4, 2022 email to Chief Vincent, where she informs him that Inception is out of money or almost out of money. *Affidavit Ortolano ¶ 20; A-.7*

13. Ortolano told Feoli that she would inquire from the City about when more money would be coming because she and other Nashua citizens wanted the job done. This was Ortolano's only reference to payment.

14. Mr. Feoli wrote that he spoke with Ortolano "this past Friday." He thought that Ortolano was just "syncing up with my company to make sure we were on track with the PO and boxes.  Ortolano explained that while Feoli's company has the boxes, "we don't have access to those files? When can we get them back?" *A-8*

15. On February 9, 2022, the Nashua Police Department went to Inception Technology and spoke with Feoli in person. The Sergeant specifically asked Feoli if, at any point, Ortolano stated she was a city employee or purported to be an employee of the City of Nashua or anything similar and he said "no". *A-11*

16. Feoli advised the Sergeant that because Ortolano had so much information on this subject, he assumed she was an employee, but she never stated that she was.  *A-11*

17. The Nashua Police Sergeant asked Feoli if Ortolano was asking about any type of private or secure information and he stated "no". *A-11*

18. Ortolano, using the term "we," was clearly talking about the citizens, and Feoli should not have assumed the "we" was the City because of the contract terms. Ortolano Affidavit ¶ 14 and *A-2, Inception Contract*

19. According to Feoli, certain city employees could access the scanned records that Inception transferred to the cloud so long as they had the password. Ortolano advised Feoli that she has no means to access the scanned property files. *Affidavit Ortolano* ¶ 14, *A- 8*

20. Ortolano followed up with another call and to ask about the files left to scan. Feoli provided details on the box covered by the existing PO and boxes to be scanned under a new PO. *A-8*

21. At the February 8, 2022 Board of Aldermen meeting, Kleiner stated, "[Feoli] informed me that a city employee named Ms. Ortolano had also reached out to him regarding the project and indicated that she could expedite payment on the remaining project. I informed Mr. Feoli she was not employed by the city and for many reasons which was concerning to him." *A-10 pg. 4*

22. After Kleiner shared this information with the Board of Aldermen, Vice Chair Aldermen O'Brien stated and questioned, "This is very concerning. Is this being referred to any other agency for further investigation?" Kleiner answered, "Yes it has been reported to the Nashua Police Department." *A-10 pg. 6*

23. During the presentation by Kleiner at the February 8, 2022 Board of Alderman Meeting, Aldermen Sullivan spoke up regarding the Feoli letter and the information presented by Ms. Kleiner about Ortolano.  He stated, "

> With regard to the letter, I just skimmed it seeing it just got it this evening and as far as it's been sent to the Nashua Police Department, at what point do we get

involved here and understanding either both sides of the story or see what's going on. I underlined the word "thinking" a few times in the letter which maybe that is not clear by the person that wrote it or maybe misunderstanding. I don't know. So I am just bringing that up as this is a communication from one side. I don't know what happens from here but I would like to hear both sides of the story if possible. Aldermanic President Wilshire responded to Sullivan, "Alderman Sullivan when something is being investigated by the police, we have no role there. Okay. So at this point we have no role in that." *A-10, pg. 6-7.* February 8, 2022,, minutes of the Board of Aldermen Meeting

24. At the end of the February 8, 2022, Board meeting during "Aldermen Comments", three aldermen shared their opinions about Kleiner's statement about Ortolano.

Alderman Cathey stated:

Lastly, I think that I would agree with Alderman Sullivan earlier. I think in the future maybe, I don't really know how this would work. I would appreciate both sides of the story of a situation. I don't know how that would work but I think it's fair because I don't have all the facts. I have this letter. I'm a data guy. I want to hear all the information first. I think that would be more helpful. I don't know how we move forward in the future how that gets handled. I think that would be best for all sides involved that both sides are given ample sort of time to express themselves or talk about their grievance as it were and then we can move on from there. I understand that now the situation is with NPD. So that might not be appropriate but certainly in the future I think that would be maybe best. I don't know. Something that we can discuss as Aldermen. I think that's it for me. Thank you. *A-10 pg.13*

Alderman Comeau stated:

Lastly, I would like to see in the future – I don't know procedurally whether it would be proper or not – but if we're going to discuss a member of the public, I think we should probably move to a nonpublic session just to respect people's privacy. We've done it before for other people. I would think that that should be something that we consider especially if we're going to be discussing a member of the public in a negative light. I'd like to see that done in nonpublic next time. That's all I have. Thank you. *A-10 pg.14*

Alderman Sullivan stated,

Thank you Madam President. I wanted to speak about just the form and the flow of the meeting tonight. Being new and I still understand that I'm learning a lot and I still consider myself very much an outsider to the rules in how we do things and how we build agendas. I think a common misconception in life is that people like surprise parties. Personally I don't like surprise parties, especially how they happen sometimes. Being an outsider as I still feel as though I am, there seems to be an us versus them to tone to what happened. I understand that there are rules and procedures that I will learn about but I

was just wondering and I would like to request that should we be faced with something like that again that we handle it differently. That's all my ask. I appreciate it. Thank you. *A-10 pg. 17*

25. The discussion with Ortolano as represented by Feoli did not result in the disclosure of any proprietary or confidential material.  See §21 of General Terms and Conditions of the Contract, *A-2*

26. Prior to Kleiner reporting the matter to the Nashua Police, she did not communicate with Ortolano to get her side of the events. *Affidavit*

27. After the February 8, 2020 Meeting, social media posts and tweets went up about Ortolano being under criminal investigation. *A-12.*

*28.* In his Deposition, Feoli testified that the primary point of contact was Kim Kleiner. *See C, Feoli Deposition Pg.11 L17-21.*

29. Ortolano identified herself as Laurie from Nashua. *See C, Feoli Deposition pg. 13. L20-21.*

30. Feoli concluded that Ortolano was representing the City because "she was calling me from Nashua." *See C, Feoli Deposition, Pg. 14 L1-10.*

31. Feoli stated that there was nothing in the Ortolano voicemail that indicated she was a city employee or agent. *See C, Feoli Deposition, pg. 14 L11-14.*

32. Ortolano did not request access to the scanned documents only when they could have access to them. *See C, Feoli Deposition,* pg. 36 L7-15

33. In his Deposition, Feoli stated that if an employee wants access to the scanned documents, the Nashua Representative, Kim Kleiner, would tell the company agent that the person can have access. *See C, Feoli Deposition, pg. 36 L16-19*

## **STANDARD OF REVIEW**

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 68 (1st Cir.1992). "We take the well-pleaded facts and the reasonable inferences therefrom in the light most favorable to the nonmovant," *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53 (1st Cir. 2018).

## **ARGUMENT**

According to the Restatement (Second) of Torts § 558 (1977) ), liability for the tort of "defamation" — which includes libel and slander — exists if there is "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." The actions of defendants Feoli and Inception constituted defamation. As a result of Feoli's, and Inception's unlawful actions and conduct, Ortolano has suffered substantial damages. According to the Feoli email, he accused Ortolano of impersonating a city official, fraud, and deceptive conduct. His email was the basis of the criminal referral to the Nashua Police by Kleiner. The First Amendment does not inoculate all opinions against the ravages of defamation suits. A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 127 (1st Cir.1997).

In the case at bar, the defendant made a false and defamatory statement that Ortolano was committing the crime of impersonating a City Hall Official, which was wrongfully published to

the high-level officials at Nashua City Hall and the public that was listening to Kleiner during the Aldermanic Meeting on February 8, 2022. Kleiner republished the defaming statements of Feoli. Kleiner referred the matter to the Nashua Police Department, thereby causing Ortolano injury to her personal life and reputation when it was publicly announced at a Nashua Board of Alderman meeting that Ortolano was a criminal. Ortolano was defamed by Feoli's email that caused Nashua Police to investigate. The Police found no crime was committed. The police investigation absolved Ortolano of any crime; however, the leveling of Ortolano as a criminal was clearly out in the public domain.  Social media posts and tweets went up immediately after the criminal claims were leveled by Kleiner in the public meeting. Aldermen Comeau stated that the information placed Ortolano in a "negative light".

The Kleiner presentation of the incident and Feoli's email was not on the Board of Aldermen agenda. At the February 8, 2022 meeting, neither Ortolano nor the Board members were informed that these issues would be discussed at the February 8, 2022 meeting. *A- 9.* The issues concerning the Feoli matter should have been addressed in a nonpublic session. *A- 10, and D thumbdrive of Ortolano's public comment*

Whether Feoli willingly or unwillingly became ensnared in Kleiner's vendetta, he is liable for the consequences of his defamatory email. Kleiner's animus and her intent to punish Ortolano is alluded to by the Aldermen's comments. Alderman Comeau's statement is telling. He realized the disparate treatment of Ortolano by Kleiner, questioning why this was not in a private session. He stated, "we've done it for other people". It's done to respect their privacy, especially when put in a negative light, stating, "I'd like to see that done in private next time". Alderman Sullivan recognized it was not fiat what had occurred  by stating, "I don't like surprise parties". Aldermen Sullivan recognized the unfairness of the meeting because it was one-sided,

and there was insufficient time to read the email. This was a hatchet job by Kleiner recognized by three Aldermen. Alderman Comeau recognized Feoli's email portrayed Ortolano in a negative light, and was a part of Kleiner's scheme to harm Ortolano by publicly impugning her reputation.

## I. Feoli and Inception Defamed Ortolano

A plaintiff in New Hampshire proves defamation by showing that defendants failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party. See *Pierson v. Hubbard*, 147 N.H. 760, 763, 802 A.2d 1162, 1165 (2002). Publication means communication of the statement to a third party. See *Duchesnaye v. Munro Enters., Inc.,* 125 N.H. 244, 253, 480 A.2d 123, 127 (1984). A statement is defamatory if it tends to lower plaintiff in the esteem of any substantial and respectable group of people. *Moss v. Camp Pemigewassett, Inc*., 312 F.3d 503, 507 (1st Cir. 2002) (citing Nash v. Keene Publ'g Corp., 127 N.H. 214, 219, 498 A.2d 348, 351 (1985)). Statements accusing the Plaintiff of impersonating a City employee and committing fraud undisputedly lowered the plaintiff's standing in Nashua. The Feoli email and Kleiner presentation were broadcast by local cable TV 16 to significant members of the public since this was a public meeting. There is no question the email was defamatory. A member of the Board of Aldermen, Comeau, recognized it as such by his comment, "negative light." Kleiner referred Ortolano's conduct set forth in the email to the police for investigation.

Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, ridicule or tend to impair his standing in the community. Imputations of criminality generally fits the bill. *Thomas*, 155 N.H. at 338, 929 A.2d at 1015 (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 94-95 (1st Cir. 2005)).

In the *Bourne* case, this court found that the Plaintiff stated a viable defamation claim based on the comment that the Plaintiff had altered a Town document. *Bourne v. Arruda*, Civil No. 10-cv-393-LM (D.N.H. Jan. 8, 2013).

Words susceptible of being construed to imply fraud or wrongdoing used in the defamatory sense are a question of fact for the jury. The context further indicates that Arruda, the selectmen, and Town counsel considered Bourne's conduct actionable, which further shows that the quoted language could be construed to imply Bourne's misconduct in altering a document. *Thomson v. Cash*, 119 N.H. 371, 374, 402 A.2d 651, 653 (1979) In this case, Kleiner found Ortolano's conduct criminal based upon the Feoli's email since she referred the matter to the Nashua Police for criminal investigation. The fact of a criminal investigation was disclosed to the public at large that attended the meeting and those residents that watched the Kleiner presentation on cable TV 16 and Youtube. Kleiner believed Ortolano's conduct was actionable because she referred it to the police.

To be defamatory, the statement must " `hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair h[er] standing in the community, at least to h [er] discredit in the minds of a considerable and respectable class in the community." Thomas 1st N.H. at 338 The Feoli email and the Kleiner presentation to the Board of Aldermen was stated in the presence of many citizens at the meetings and on live television broadcasted to a significant number of subscribers. Kleiner's presentation discussing the Feoli email was unquestionably understood to claim Ortolano committed a criminal act. It was understood she committed fraud by deception. The re-publication of the Feoli email and Kleiner's presentation were false and defamatory. The Nashua Police investigated and determined no crime was committed. It was easy for Feoli to lie to Kleiner in order to keep his company's continued contractual relationship with the City.

14

However, when confronted with a police investigation and the consequences of lying to the police, he had no alternative but to tell the truth. Ortolano never stated she was a city employee, nor purported to be. *See A-11*

Under New Hampshire law, a plaintiff proves defamation by showing that the defendants failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party. *Pierson v. Hubbard*, 147 N.H. 760, 763, 802 A.2d 1162 (2002). Publication means communication of the statement to a third party. *Duchesnaye v. Munro Enters., Inc.,* 125 N.H. 244, 253, 480 A.2d 123 (1984). There is no dispute that the Feoli email was published when sent to Kleiner, presented to the Board of Aldermen and its contents aired by Channel 16, local access cable. Despite his assumption, he knew or should have known that Ortolano was not a city employee because he could only communicate with Kleiner according to the contract.

There are limits imposed by the First Amendment on the type of speech that can be the subject of a defamation action. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 & 20 (1990). "[L]oose, figurative" language, "lusty and imaginative expression[s] of contempt," "rhetorical hyperbole," "vigorous epithet," and statements that "cannot `reasonably [be] interpreted as stating actual facts' about an individual" are not actionable. *Id.*

A statement alleged to be defamatory is not actionable if it is substantially true. *Thomas v. Tel. Publ'g Co.,* 155 N.H. 314, 335, 929 A.2d 993, 1013 (2007). The "literal truth of a statement is not required so long as the imputation is substantially true so as to justify the gist or sting of the remark." *Faigin*, 978 F. Supp. at 425 (internal quotation marks and citations omitted). In this case, the claim that Ortolano committed a criminal act was proven false by the police investigation and the changed testimony of Feoli when questioned by the police. *A-11*

There was no basis for Feoli to assume he was talking to a city employee because that would be contrary to the terms of his company's contract that he signed.

Only statements that present or imply the existence of facts that can be proven true or false are actionable.... *Fiacco v. Sigma Alpha Epsilon Fraternity*, 484 F. Supp. 2d 158 (D. Me. 2007). In *Milkovich*, the Supreme Court held that there is no wholesale defamation exemption for anything that might be labeled `opinion.' *Knapp v. Adams*, No. 1523 WDA 2014 (Pa. Super. Ct. Oct. 2, 2015). "[T]he relevant question is not whether challenged language may be described as an opinion, but whether it reasonably would be understood to declare or imply provable assertions of fact." *Saad v. American Diabetes Association*, Civil Action No. 15-10267-TSH (D. Mass. Feb. 23, 2015).

The First Amendment does not inoculate all opinions against the ravages of defamation suits. A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable." *Levinsky's, Inc. v. Wal-Mart Stores, Inc.,* 127 F.3d 122, 127 (1st Cir.1997); see also Restatement (Second) of Torts § 566 (1977) ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."). "The determination whether a ... statement is protected opinion or an unprotected factual assertion is a matter of law for the court." *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1016 (1st Cir.1988). In making this determination, the Court must examine the statement itself and the broadcast as a whole. *Id.*

More importantly, neither Feoli or Kleiner qualified their statements with the words, "in my opinion". The email makes clear that Ortolano held herself out as a city employee and

perpetuated a fraud. One does not refer criminal investigations based upon opinion. Police do not investigate crimes based upon opinion.

Statements that charge the plaintiff with a crime are one of four types of statements that are actionable as defamation without proof of economic loss. It is well established in New Hampshire that no proof of specific damages is required "[w]hen ... the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel per se." *Chagnon v. Union Leader Co*., 103 N.H. 426, 441, 174 A.2d 825 (1961); see Restatement (Second) of Torts § 570 (1977) (stating that "[o]ne who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other ... a criminal offense ..., or ... matter incompatible with his business, trade, profession, or office"); see also *Lassonde v. Stanton*, 157 N.H. 582, 592-93, 956 A.2d 332 (2008). Instead, the plaintiff "can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation." *Chagnon*, 103 N.H. at 441, 174 A.2d 825.

The statement that Laurie Ortolano held herself out as an employee of the City of Nashua was false. According to the police interview of Feoli, his statement to the Nashua Police contradicted his email that was the basis of the Kleiner re-publication to the Board of Aldermen on February 8, 2022 and the City of Nashua. *A-10*

**<u>Classifications of Public Figures</u>**

The Supreme Court has identified three different types of public figures: (1) all-purpose public figures, who "assume roles of especial prominence in the affairs of society," such as those who occupy positions of "persuasive power and influence;" (2) limited-purpose public figures,

17

who "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved;" and (3), involuntary public figures, who may "hypothetically" arise in "exceedingly rare" instances where, "someone ... become[s] a public figure through no purposeful action of his own." *Gertz v. Welch*, 418 U.S. 323, 345, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

### Ortolano is not a public figure

Typically, courts approach the public-official analysis as if it were a three-legged stool, taking into account (i) the extent to which the inherent attributes of a position define it as one of influence over issues of public importance, (ii) the position's special access to the media as a means of self-help; and (iii) the risk of diminished privacy assumed upon taking the position. See *Kassel*, 875 F.2d at 939-40.

Due to the First Amendment's "protection of true speech on matters of public concern," a private figure plaintiff suing a media defendant regarding speech on such matters bears the burden of proving that the speech is false. *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986).

The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures). *Ravnikar*, 782 352, 352 N.E.2d at 511.

The fault standard takes into account Supreme Court doctrine developed under the First Amendment, which "sets clear limits on the application of defamation law with respect to any factual statement published in the news media about a public official or public figure, even when that statement is shown to be false and defamatory." *Murphy v. Boston Herald, Inc*., 449 Mass. 42, 865 N.E.2d 746, 752 (2007). If a plaintiff is a public official or public figure, he "must prove,

by clear and convincing evidence, that the defendant published the false and defamatory material with `actual malice,' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Id. (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Assuming arguendo that Ortolano is a public figure, Feoli knew she did not hold herself out as a City employee, yet published that fact in his email. He knew, according to the contract, that the only person he could communicate with was Kim Kleiner. He should have immediately ended the conversation with Ortolano and called Kim Kleiner. His actual knowledge of the falsity of his assertion is confirmed by his statements to the police in which he walked back his statement that Ortolano held herself out as a City employee. Feoli did not act in a reasonable manner in arriving at his erroneous assumption that Ortolano was a city employee, which could have been answered by a phone call to Kleiner. Feoli recklessly asserted different from the truth that Ortolano holds herself out as a city employee.

"The Supreme Court has roughly bisected the sphere of social commentary between matters of public concern, which are those that can be `fairly considered as relating to any matter of political, social, or other concern to the community, and matters of private concern, which are those that address `matters only of personal interest.'" *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 999 F. Supp. 137 (D. Me. 1998). In this case the return of the property record files was a personal issue and not a public issue. The existence of the contract was disclosed at the July 15, 2020, Finance Committee meeting, but there was no public comment or controversy until the February 8, 2022 Alderman Board meeting. In fact, Mayor Donchess on June 17, 2024 stated it was only one person requesting this scanning project be done, "in the end there was only one person asking for this information so I think we didn't allocate any additional money to it so the the project was never completed."

**Limited-Purpose Public Figure**

        A person becomes a limited-purpose public figure when he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Lluberes*, 663 F.3d at 13 (quoting *Gertz*, 418 U.S. at 351, 94 S.Ct. 2997). To determine whether a defamation plaintiff is a limited-purpose public figure, the First Circuit employs a two-pronged test: the defendants must prove (1) that a public controversy existed prior to the alleged defamation, and (2) that "the plaintiff has attempted to influence the resolution of that controversy." *Id*. at 13-14 (internal quotation marks omitted). A public controversy existed, "whether it is framed narrowly as a debate over who was responsible for the Marathon bombings, or more broadly as part of an ongoing discussion about public safety, national security, and terrorism." *Alharbi v. Beck*, 62 F.Supp.3d 202, 208 (D.Mass.2014). The defendants now argue that *Alharbi* voluntarily injected himself into this debate by granting five interviews to the press between April 16 and May 21, 2013. In this case, Ortolano was trying to determine when the remaining public documents would be available for immediate inspection pursuant to Section 71 of the Nashua City Charter. *A-13*. Ortolano's involvement in determining when the public property record files would be returned to the City was not a public controversy. The completion of the scanning of documents had not been publicly discussed by Kleiner between the signing of the Inception contract and the February 8, 2022 public session. Ortolano did not thrust herself to the forefront of a particular public controversy in order to influence the resolution of the issue. Ortolano's contact with Feoli was predicated on the return of the documents which is the genesis of the defamatory email and Kleiner's presentation. *A-10 pg. 4* Here the issue was the return of the property record files. Even the Mayor stated that it was one person that was requesting this information. Ortolano is not a limited purpose public figure since

her effort to determine when the public records would be returned to the City did not thrust her into the public domain. The issue was not a public controversy. It was Feoli and Kleiner that made her efforts to determine when the records would be returned a public and criminal issue. This was not a public controversy until Feoli and Kleiner made it so. Ortolano bears no responsibility for making the return of the property record files a public issue. In the First Circuit, the question of whether a defamation plaintiff is a public figure is properly resolved by the court, not by the jury, regardless of the contestability of the predicate facts. *Pendleton v. City of Haverhill*, 156 F.3d 57, 68 (1st Cir.1998). Given the significance of status determinations in libel-law litigation, it is often perfectly reasonable to attempt to decide whether a plaintiff is a public official or public figure during pretrial proceedings. *Mandel v. Boston Phoenix, Inc.,* 456 F.3d 198, 204 (1st Cir.2006). The Court recognizes that "there are cases in which it may not be possible to resolve the public-figure issue until trial." *Id.*

**Involuntary Public Figure**

In *Wells v. Liddy*, the Fourth Circuit held an individual must have "assumed the risk of publicity" to be assigned involuntary public figure status, meaning that he "has taken some action, or failed to act when action was required, in circumstances in which a reasonable person would understand that publicity would likely inhere." 186 F.3d 505, 540 (4th Cir.1999). Once again, Ortolano did not cause the determination of the date the records would be returned to the city as a public issue.

**Negligence**

As a private figure, Ortolano is only required to prove negligence as opposed to malice. Since the Plaintiff is a private citizen and not a limited public figure, the Plaintiff needs to prove the defamatory statement was made negligently. *Gertz v. Robert Welch, Inc*., 418 U.S.

323, 344-45, 348-49, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).  It is, however, axiomatic that, if the

plaintiff is a private person, he or she "may recover compensatory damages upon a showing that

the defendant was negligent in publishing a defamatory falsehood." *McCusker v. Valley News,*

121 N.H. 258, 260, 428 A.2d 493 (1981); see *Duchesnaye v. Munro Enterprises, Inc.,* 125 N.H.

244, 251, 480 A.2d 123 (1984); *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344-45, 348-49, 94

S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Under the negligence standard, "the defendants are required to act reasonably in

checking on the truth or falsity of the communication before publishing it." A plaintiff in New

Hampshire proves defamation by showing that defendants failed to exercise reasonable care in

publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff

to a third party. See *Pierson v. Hubbard*, 147 N.H. 760, 763, 802 A.2d 1162, 1165 (2002).

In this case, Feoli knew, according to the contract terms, that Kim Kleiner was the only

Nashua representative who could discuss the scanning project. His knowledge of that fact and his

failure to contact Kleiner is unreasonable conduct amounting to negligence. Feoli's assumptions

based upon his communication with Ortolano were wrong. Even Alderman Sullivan stated this

may be a misunderstanding. Feoli had a duty to contact the City to determine whether Ortolano

was an employee. Prior to any conversation with Ortolano about the project, a less burdensome

step was to simply ask Ortolano what department do you work for, what is your title, what is

your city email address. These basic questions would have eliminated these erroneous

assumptions. There are other factors that raise questions about the reasonableness of Feoli's

conduct as set forth herein, but the failure to contact Kleiner, initially, in and of itself is sufficient

to establish negligence. According to the contract, Feoli could only deal with Kleiner. Ortolano

never stated she was a city employee. Feoli never asked Ortolano about her position with the

City of Nashua. Feoli should have immediately contacted Kleiner to determine if Ortolano was an employee of the City. When Ortolano stated we have no access to the documents, Feoli should have realized that city employees, via the password, could have access to the documents electronically. Feoli did not act reasonably in assuming Ortolano was a city employee. The Plaintiff's evidence raises disputed material facts together with all reasonable inferences on this issue for Jury determination. *Alharbi v. Theblaze, Inc.,* 199 F. Supp. 3d 334 (D. Mass. 2016).

**The Plaintiff incorporates by references her arguments and legal citations in the Kleiner objection in support of her objection herein.**


# VI. <u>CONCLUSION</u>

For all of the grounds stated in the Plaintiff's Memorandum of Law, Exhibits, and Affidavits, the Defendants' Motion for Summary Judgement should be denied. Summary judgment requires that the moving party establish an entitlement to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). That requirement is not a hollow one. Summary judgment should be granted only where . . . [further] inquiry into the facts is not desirable to clarify the application of the law." *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The defendants' Motion for Summary Judgement must be denied.

Dated: July 1, 2024                                    Respectfully Submitted by,


                                                                   */s/William Aivalikles*
                                                                   William Aivalikles, Esq.
                                                                   253 Main Street
                                                                   Nashua, NH 03060
                                                                   (603)880-0303

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.


Dated: July 1, 2024

/s/William Aivalikles
William Aivalikles, Esq.