# EXHIBIT "A"

### UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano,      Plaintiff | ) ) ) ) |
| V. | ) Civil Action No. 22-cv-00326-LM ) |
| The City of Nashua, et al.,      Defendants | ) ) ) ) ) |

### AFFIDAVIT OF PLAINTIFF LAURIE ORTOLANO: IN OPPOSITION TO DEFENDANT FEOLI'S MOTION FOR SUMMARY JUDGMENT

I, Laurie Ortolano, being under oath, do hereby depose and say as follows:

1. I am a resident of Nashua, New Hampshire, residing at 41 Berkeley St.

2. On July 14, 2020, the Board of Aldermen held a Special Meeting for an update on the assessing office. Ms. Kleiner presented at this meeting and discussed the scanning project she would be proposing to the finance committee on the following evening. *A-1*

3. Ms. Kleiner stated, "this is for scanning all of our property record files. One thing that we found during COVID working remote experience was that our Assessors really needed access to these files. So we are looking at using Docuware Software to make these records easily accessible to our staff remotely. So while they are on those tablets and they are working directly on the CAMA System, they can also pull up a full property record file and have that information in front of them." *A-1, pg 9.*

4. On July 15, 2020, the Inception Technologies Inc. scanning project contract for professional services was presented at the Nashua Finance Committee Meeting as a public record and discussion. *A- 2*

1

5. Ms. Kleiner stated in the finance meeting of 7/15/2020 that the scanned files would be beneficial to the Assessing staff working remotely who need access to property record files during COVID. She also states, "we felt it was a product that meets our needs not only in Assessing but also in other City Departments." *A-3 pg 5.*

6. At the July 15, 2020 Finance Committee Meeting, Ms. Kleiner stated, "this quote, we did go through the vault, that's where our records are kept and they estimated that we have around 100,000 documents that need to be scanned and that's what this quote is based off of. " *A-3 pg. 6*

7. On August 6, 2020, The City of Nashua contracted with Inception Technologies to complete a scanning project for the contract price of $59,638. *A-2*

8. On November 13, 2021, I emailed my friend, Laura Colquhoun, and asked if she would track down the spending on the Inception contract because I could not find any information on when the contract would be completed. Ms. Colquhoun received records from the City and provided me with a financial accounting. Ms. Kleiner had not provided any financial update that I was aware of since the project's start date in August 2020. *A-4*

9. On January 1, 2022, I sent a Right-to-Know request for information regarding the placement of barriers, including a parking study, in downtown Nashua.

10. On January 21, 2022, Economic Development Director Tim Cummings responded and provided me with the name of the Boston company DESMAN, which was contracted to perform a downtown parking study. Director Cummings wrote that my "request should be directed to Desman Design Management. *A-5, pg.* 2 Additionally, Director Cummings directed me to a Nashua non-profit organization, Great American Downtown, independent of the City, to obtain downtown barrier survey data. *A-5 pg. 1*

11. On January 31, 2022, Director Cummings emailed me complete contact information for me to call Desman directly to request the parking survey. *A-6*

12. I called Mr. Feoli in late 2021 to speak with him about the scanning project. I did not generate a written record of this call. As I recall, Mr. Feoli explained the procedures and how property record files would be searchable on a City computer and at home.

13. In early February, I called Mr. Feoli numerous times and left messages trying to speak with him about the project completion date. Ms. Kleiner had not given a public update to City leaders, and I did not know when the property files would be back in City Hall, either digitally or in paper form.

14. I spoke with Mr. Feoli on February 4, 2020. I identified myself by name and from Nashua. In my deposition, I stated, "that I started talking to him about needing access to the files that we don't have access to these files, and unless they are brought back to the City, none of us can go in there and get property record files that we want to see if they are sitting in his warehouse." *See B, Ortolano Deposition pg. 150 L8-14*

15. I spoke with Feoli on February 4, 2022 and I again questioned him about public access to the scanned document stations, "at one point stating/inquiring that Nashua citizens had been waiting for the project to be completed for many months and Kleiner had not provided any public updates".

16. According to Feoli, only certain employees had access to the scanned files. The public did not.

17. Ortolano identified herself as Laurie from Nashua, *See C, 16 Feoli Deposition pg. 13. L20-21.*

18. Feoli concluded that Ortolano was representing the City because "she was calling me from Nashua." *See C, Feoli Deposition, Pg. 14 L1-10.*

19. Based on my deposition, I stated that, "Mr. Feoli explained to me his process, that they do this for citizens all over the state. They scan these files, and bring them back in. He explained how they set up a computer at City Hall that we would be able to access, that I would able to go to this computer in the hallway at the citizen computer and open to the public to use." *See B Ortolano Deposition, pg. 150-151, L19-23; L1-3.*

20. I did not state that I would "expedite" payment, but I do recall stating that I would inquire about the contract funding because Mr. Feoli stated that the contract was close to running out of money. He stated that he did not have enough money to finish the more than 80 boxes of records to be scanned.

21. On February 4, 2020, after my phone call with Feoli, I emailed Rick Vincent, the Nashua Chief of Assessing, copying Kleiner, the Mayor and the Department of Revenue Administration ("DRA"), and asked questions about why citizens do not have access to the property record files that were scanned and uploaded to the cloud, and why Inception Technologies is not told to return the scanned files immediately as this is the only way to access property data. Ortolano made reference to specific issues discussed with Feoli – "last week 28 boxes were scanned and uploaded, Inception is out of money or almost out of money, 86 boxes were shipped to the company." *A-7*

22. It was my intention in sending this email to get the City to tell Feoli to ship records back to Nashua that were already scanned and let the City know that it appeared as though the project would stall if more money was not approved.

4

23. The contract was for the "Property Card Scanning Proposal." According to Section 6 of the contract, Kim Kleiner is named the City Representative. According to Section 4, General Terms and Conditions of the contract, all communications about the contract shall be addressed by the City of Nashua representative. *A-2*. I did not represent myself as a city employee. I did not believe that I was doing anything wrong.

24. In his Deposition, Feoli testified that the primary point of contact was Kim Kleiner, *See C, Feoli Deposition Pg.11 L17-21*

25. *In his Deposition, Feoli stated that if an employee wants access to the scanned documents, the Nashua Representative, Kim Kleiner would tell the company agent that the person can have access. See C, Feoli Deposition, pg. 36 L16-19*

26. On Sunday, February 6, 2022, Mr. Feoli wrote a letter to Ms. Kleiner and sent it via email. The letter stated he had spoken with me a month earlier. Mr. Feoli claimed that I had portrayed myself as a city employee on thre [sic] different occasions. I did not do this. *A- 8*

27. Mr. Feoli wrote that he spoke with Ortolano "this past Friday." He thought that Ortolano was just "syncing up with my company to make sure we were on track with the PO and boxes. Ortolano explained that while Feoli's company has the boxes, "we don't have access to those files? When can we get them back?" *A-8*

28. According to Feoli, certain city employees could access the scanned records that Inception transferred to the cloud if they had the password. I advised Feoli that I had no means to access the scanned property files.

29. I called Mr. Feoli back shortly after the first call to get more details on the boxes to complete. *A-8 pg. 2*

30. Feoli stated that there was nothing in the Ortolano voicemail that indicated she was a city employee or agent. *See C, Feoli Deposition, pg. 14 L11-14.*

31. Ortolano did not request access to the scanned documents only when they could have access to them. *See C, Feoli Deposition, pg. 36 L7-15*

32. On February 8, 2022, I attended the Board of Aldermen meeting as a member of the public.

33. The agenda produced for the Board meeting did not have any information or items that showed the Inception Scanning project would be discussed, nor was the email from Feoli to Kleiner included in the online agenda. *A-9*

34. Ms. Kleiner states, "This is a project of huge magnitude. So, 29,000 property record files were estimated right now over 1.3 million documents. So you can imagine what the review of those documents is going to put and roughly to be totally honest, our staff has to work on the revaluation. That is our priority. We are mandated to do it by the BTLA. We would like to see if it's possible to get some assistance from other staff. There is an employee in my office who's familiar with the Right to Know and with public documents and she could assist. These employees need to be trained on the system, and then they need to redact and review the files, and then we need to install the interface. I would not want to put any type of time limit on it and be unable to meet that deadline." *A-10 pg. 5*

35. At the February 8, 2022 Board of Aldermen meeting, Kleiner stated, "[Feoli] informed me that a city employee named Ms. Ortolano had also reached out to him regarding the project and indicated that she could expedite payment on the remaining project. I informed Mr. Feoli she was not employed by the city and for many reasons which was concerning to him." *A-10 pg. 4*

6

36. After Kleiner shared this information with the Board of Aldermen, Vice Chair Aldermen O'Brien stated and questioned, "This is very concerning. Is this being referred to any other agency for further investigation?" Kleiner answered, "Yes, it has been reported to the Nashua Police Department." *A- 10, pg. 6*

37. During the presentation by Kleiner at the February 8, 2022 Board of Alderman Meeting, Aldermen Sullivan spoke up regarding the Feoli letter and the information presented by Ms. Kleiner about Ortolano. He stated, "

> With regard to the letter, I just skimmed it seeing it just got it this evening and as far as it's been sent to the Nashua Police Department, at what point do we get involved here and understanding either both sides of the story or see what's going on. I underlined the word "thinking" a few times in the letter which maybe that is not clear by the person that wrote it or maybe misunderstanding. I don't know. So I am just bringing that up as this is a communication from one side. I don't know what happens from here but I would like to hear both sides of the story if possible. Aldermanic President Wilshire responded to Sullivan, "Alderman Sullivan when something is being investigated by the police, we have no role there. Okay. So at this point we have no role in that." *A-10, pg.6-7*

38. At the end of the February 8, 2022, Board meeting during "Aldermen Comments", three aldermen shared their opinions about Kleiner's statement about Ortolano.

39. Alderman Cathey stated:

> Lastly, I think that I would agree with Alderman Sullivan earlier. I think in the future maybe, I don't really know how this would work. I would appreciate both sides of the story of a situation. I don't know how that would work but I think it's fair because I don't have all the facts. I have this letter. I'm a data guy. I want to hear all the information first. I think that would be more helpful. I don't know how we move forward in the future how that gets handled. I think that would be best for all sides involved that both sides are given ample sort of time to express themselves or talk about their grievance as it were and then we can move on from there. I understand that now the situation is with NPD. So that might not be appropriate but certainly in the future I think that would be maybe best. I don't know. Something that we can discuss as Aldermen. I think that's it for me. Thank you. *A-10 pg.13*

40. Alderman Comeau stated:

7

    Lastly, I would like to see in the future – I don't know procedurally whether it would be proper or not – but if we're going to discuss a member of the public, I think we should probably move to a nonpublic session just to respect people's privacy. We've done it before for other people. I would think that that should be something that we consider especially if we're going to be discussing a member of the public in a negative light. I'd like to see that done in nonpublic next time. That's all I have. Thank you. *A-10 pg.14*

41. Alderman Sullivan stated:

    Thank you Madam President. I wanted to speak about just the form and the flow of the meeting tonight. Being new and I still understand that I'm learning a lot and I still consider myself very much an outsider to the rules in how we do things and how we build agendas. I think a common misconception in life is that people like surprise parties. Personally, I don't like surprise parties, especially how they happen sometimes. Being an outsider as I still feel as though I am, there seems to be an us versus them to tone to what happened. I understand that there are rules and procedures that I will learn about but I was just wondering and I would like to request that should we be faced with something like that again that we handle it differently. That's all my ask. I appreciate it. Thank you. *A-10 pg. 17*

42. I was stunned listening to Kleiner at the February 8, 2022 meeting. I pulled myself together during public comment. *See D – Thumbdrive of Ortolano public comment.*

43. The discussion with Ortolano as represented by Feoli did not result in the disclosure of any proprietary or confidential material. See §21 of General Terms and Conditions of the Contract, *A-2*

44. As a result of Kleiner's presentation and accusations, social media posts and tweets became public about Ortolano's alleged criminal activity. *A-12*

45. On February 9, 2022, the Nashua Police Department went to Inception Technology and spoke with Feoli in person. The Sergeant specifically asked Feoli if, at any point, Ortolano purported to be an employee of the City of Nashua or anything similar and he said "no". *A-11*

46. Feoli advised the Sergeant that because I had so much information on this subject, he assumed I was an employee, but I never said I was. *A-11*

47. The Nashua Police Sergeant asked Feoli if I was asking about any type of private or secure information, and he stated "no". *A-11*

48. Ms. Kleiner's number of documents to be reviewed, 1.3 million, was not the same as the number she presented to the Finance Committee on July 15, 2020, for 100,000 pages to scan. *A-3, pg. 6*

49. I was speaking as a citizen looking for public records.

50. During the meeting, Alderman Sullivan commented, "With regard to the letter, I just skimmed it seeing it [sic] just got it this evening…" *A- 10 pg. 6*

51. Prior to Kleiner reporting the matter to the Nashua Police, she did not communicate with me to get her side of the events.

52. I am not aware that subsequent to Kleiner's presentation and email that any City official discussed in a public meeting that the police found no criminal act occurred.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 1st DAY OF JULY 2024.

_____
LAURIE ORTOLANO

Personally appeared, Laurie Ortolano, on July 1, 2024, and swore under oath that the facts asserted herein are true to the best of my knowledge and belief.



NOTARY PUBLIC