**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **Laurie Ortolano,** | ) |
| **Plaintiff** | ) |
| | ) |
| **V.** | ) **Civil Action No. 22-cv-00326-LM** |
| | ) |
| **The City of Nashua, et al.,** | ) |
| **Defendants** | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW AND AFFIDAVIT IN SUPPORT OF HER**
**OBJECTION TO DEFENDANT KLEINER'S MOTION FOR SUMMARY JUDGEMENT**

NOW COMES, the Plaintiff, Laurie Ortolano, and objects to Defendant's motion for

Summary Judgement, and says as follows:

**STATEMENT OF MATERIAL FACTS**

After purchasing a home in Nashua, New Hampshire, the plaintiff, Laurie Ortolano

("Ortolano"), and her husband, Michael Ortolano (collectively, "the Ortolanos"), endured what

they believed to be an unfair and sudden increase in their real estate taxes; the City's Assessing

Department (the "Assessing Department") increased the valuation of their home by more than

50% in one fell swoop. *A-1* Frustrated that the City would provide no more than token relief, ,

Ortolano started examining the Assessing Department's public records and became an active

attendee and speaker at public meetings of the various City boards and committees, where she

sometimes spoke critically of Nashua officials and practices. When Nashua officials took notice

of Ortolano's frequent appearances at City Hall, they started to actively monitor her activities

and communicate with each other about her whereabouts and actions in City Hall. *A-31* Duhamel emails.

Ortolano would not discover until years later that she had been deemed persona non grata at City Hall. Realizing that Ortolano's interest in City government would not wane, Nashua officials began searching for methods to deny her access to public information and stifle her at public meetings and hearings. The Chief Assessor for the City, Jon Duhamel ("Duhamel"), took charge of the initial effort to prevent Ortolano from viewing public documents; in fact, he would come to suffer public discipline from the New Hampshire Department of Revenue ("DRA") and the New Hampshire Association of Assessing Officials ("NHAAO") for having denied public documents to Ortolano on at least four occasions. *A-3* In March 2019, Nashua eliminated the position of Chief Assessor, thus terminating Duhamel, and placed defendant Kimberly Kleiner ("Kleiner"), Director of Administrative Services, in charge of the nine-person Assessing Department. *A-4* This reorganization left the Assessing Department without a certified supervisor subject to the Assessing Standards Board ("ASB") certification requirements and the NHAAO professional rules of ethics. *A-5* Kleiner, a nonprofessional, was able to deprive Ortolano of the right to access public assessing documents without any fear of professional discipline. This is exactly what Kleiner did.

Within the first month of assuming leadership of the Assessing Department, Kleiner: (1) ordered the clerks not to answer questions from members of the public *(A-6, April 8, 2019);* ordered the clerks to refer all public assessing questions to Nashua CFO John Griffin ("Griffin") or her rather than to the professional assessors in the office *(A-6, April 1, 2019 Staff mtg)* ; (3) specifically ordered the department assessors "not speak with Ms. Ortolano" about assessment matters *(A-6, April 1, 2019 Staff mtg)*; and (4) ordered that, rather than being able to inspect

public documents immediately upon request during normal business hours, Nashua residents

would be required to complete a written request and wait for five days to have any access to

public documents, in contravention of Section 71 of the Nashua City Charter and the state statute

*(A-6, April 8, 2019).* Although, some of the changed policies were directed to the public, they

were implemented to handle Ortolano. Those were all new policies after Ortolano began looking

into the assessing office records.

By mid-summer 2019, Kleiner was even personally surveilling every citizen's request to

look at Assessing Department documents; she now required document requesters to identify

themselves in writing and specify the files they wanted to inspect so Kleiner would know who

was requesting public records. She also ordered that all email requests for information be

forwarded to her prior to providing an answer or information. *(A-6, July 19, 2019)* This new

procedure was implemented after Ortolano disclosed serious issues about the Mayor's Rockland

Street property assessment. In fact, while testifying at trial under oath in an RTK action Ortolano

had been forced to bring, a clerk in the Assessor's Department, Amanda Mazerolle,  testified

that, although it was her duty to respond to citizen requests for information, she did not process

Ortolano's requests for records and information that had been received through the "assesshelp"

portal because Kleiner had specifically told her that she was not allowed to respond to Ortolano's

requests. (*A-8)* Ortolano was ignored when seeking help while the Assessing staff helped other

residents *See F (thumbdrive) A-32 email narrative)*

When the City prevented Ortolano from obtaining access to public documents at City

Hall, Ortolano started requesting them under RSA 91-A, New Hampshire's Right to Know

("RTK") Law. But the City would not give in. It responded by referring all of Ortolano's RTK

requests to the Legal Department, which could take months to respond (sometimes as much as

eight months), and at the end of the long wait would usually deny her requests on specious grounds, such as your request is unreasonably described or no records exist. This forced Ortolano to sue the City multiple times in the State Superior Court under the remedy provisions of the RTK Law. *See B, C, D.* To date, the Superior Court has ruled in favor of Ortolano on numerous issues she has raised, despite the Defendant pointing out a recent decision that will be appealed when it is ripe. Indeed, the City has also suffered some embarrassing defeats in these cases: it has been chastised for its lack of "candor" and failure to act in "good faith;" it was admonished for the "trouble[ing length of time] it took to deny {Ortolano's] request, especially in light of the multiple extensions of response time . . . ."; it has been ordered to pay Ortolano's attorney's fees; it has been ordered to participate in "remedial training regarding the City's compliance with Right-to-Know Law records requests;" it has been sanctioned for discovery abuse; and Nashua Corporation Counsel has been chastised for advancing arguments that were "[more than] a little over the top." (*See B)* On October 26, 2023, the Court ordered that Attorney Leonard, Deputy counsel for the City of Nashua, testify as a witness, as opposed to serving as counsel of records. The Superior Court summed up: "Going forward, the Court admonishes the City to adopt a more cooperative perspective and endeavor to respond to RTK requests more promptly." *(See C & D)* Nevertheless, the City appealed every one of these decisions to the New Hampshire Supreme Court. *(A-10)* Having failed to silence Ortolano by denying her access to public documents both in practice and in the courts, the City launched a sinister two-pronged stratagem: (1) Nashua officials would impugn Ortolano's character in public hearings and meetings, which made her participation in those forums quite unpleasant, (*A-11, pg 26-28 A12, pg 9-10)* and (2) starting in September 2019, two City officials, defendants Kleiner and Bolton, would launch a three-year campaign of attempting to get the Nashua Police Department ("Nashua PD") to have her arrested

or threaten to have her arrested. *See A-20, A-21, A-22, A-23, A-25, and A-30*  In terms of public disparagement, on numerous occasions, the Mayor and other officials used public meetings to accuse Ortolano of being a liar and of constantly making "scurrilous" statements in public hearings, obtained bail conditions to prevent Ortolano from attending BOA Meetings or committee meetings without an appointment and threatened to have Ortolano arrested while in public places in City Hall.

Although they had forced Ortolano to file many duplicative requests to obtain public documents that were supposed to be available for immediate inspection and applied far more stringent standards of permitting review to her than to other citizens, they employed false numbers to publicly claim that Ortolano had purposely overburdened the Nashua government with document requests and had cost the Nashua taxpayers huge sums of money in administrative and litigation fees, thereby depriving the citizens' services. Kleiner was on the front page of the Nashua Telegraph detailing how much of a burden Ortolano was. *A-15*

Under DRA and ASB requirements, the Assessing office is required to have an assessing manual available in the office for public inspection. *A-5*  In the fall of 2019, Ms. Kleiner provided the Board of Assessors with a newly compiled public policy manual, which was absent from the City's assessing office. Kleiner went to the local newspaper, which ran an article on August 20, 2019, "City Completes New Assessing Manuals", where Kleiner contends the public has already had a chance to give input into the manual, citing the manual addresses many of the concerns brought forth by Ortolano and others." (*A-16*) Ortolano reviewed the manual and could not find any of her concerns addressed in the newly released policy manual. Ortolano read a letter into the public record at the September 19, 2019, Board of Assessor's meeting, citing her concerns with important missing residential information critical to this policy manual. *A-17*

*pgs.5-9*  In August 2019, the Board of Tax and Land Appeals ("BTLA") called the City to a

hearing to address their assessing practices. City of Nashua and DRA officials along with

Ortolano presented their concerns to the BTLA. (*A-32*) In October 2019, the BTLA issued an

"Order for Reassessment" writing:

> As noted at fn.1, the board asked the City to provide a copy of its data collection manual.
> The Assessor Manual and Procedures document submitted by the City, however, is
> deficient in several respects. First, this document only contains one "Data Collection"
> section (Section 5) that only addresses "Commercial" property and not residential
> property. Second, this document does not fulfill the requirements stated in Section 3.3.2,
> including subsection 3, of the Standard on Mass Appraisal of Real Property (referenced
> in the Cornell Report and fn. 2). This section details many "essential" elements to make
> data collection "accurate and consistent." An important, preliminary step in the
> reassessment process si development of a data collection manual that complies with these
> standards and the City should complete this step, updating the board as prescribed below.
> *A-2*

On multiple occasions, Nashua officials made public comments to the effect that

Ortolano was a right-wing lunatic waging a war against the government itself. *A-18 pg. 20-22,*

An attorney in the Nashua Legal Department publicly compared Ortolano's actions to those who

attacked the Capitol Building in Washington, D.C., on January 6, 2021. *A-19*. But none of the

defendants' conduct was as egregious as their multiple attempts to commandeer the Nashua PD

to investigate Ortolano for alleged criminal conduct and even cause her to be arrested. *A-33*

In mid-September 2019, the Nashua PD was investigating Kleiner for possible witness

tampering and Greg Turgiss, an Assessing Department professional assessor, for possibly

falsifying work records as a result of Ortolano's complaint to the police. Kleiner was able to

divert the inquiry away and toward Ortolano by claiming that all the employees in the Assessing

Department but one would prefer not to deal with Ortolano because she was critical of their work

and sometimes made them feel uncomfortable. *(A-20)* The investigating police officer told

Kleiner that this was not a crime that warranted an investigation, but Kleiner insisted that he

warn Ortolano not to communicate with any of the employees outside the City Assessing Department. The result was that, despite the First Amendment's protection of Ortolano's non-threatening speech, Kleiner caused two police cruisers to arrive at Ortolano's home on Sunday afternoon to warn her that "there was the potential that, if [Ortolano] did have contact with the [Assessing Department Staff], . . . she could face criminal charges depending on the circumstances of this contact." (*A-20*) More than a year and a half later, the City's Legal Department succeeded in dragooning the Nashua PD into arresting Ortolano for insisting on obtaining City Hall date stamps on several real estate tax abatement applications she was filing on behalf of elderly friends. *A-33*

Kleiner did not stop there. On October 31, 2019, Kleiner called the Nashua Police and reported that Ortolano was impersonating a City Hall Assessing employee by driving around and taking pictures of homes. This resulted in a criminal police investigation against Ortolano which was ultimately determined that the claim was false. (*A-21*) Kleiner knew that the description of the impersonator as a blond did not fit Ortolano. *See E, pg.80 L2-3  Kleiner deposition*. Despite this material discrepancy in the physical description of the alleged impersonator, Kleiner referred the matter to the Nashua Police for a criminal investigation. Kleiner knew based upon the description of the individual, this individual could not be Ortolano. The individual was described as a blonde woman claiming to be a real estate agent.

Kleiner clearly remained steadfast in attempting to destroy Ortolano due to her public criticisms of her and her coworkers. On the morning of July 22, 2022, Kleiner called the Nashua PD, asking for a police presence at City Hall because Ortolano had a scheduled appointment at City Hall at about 10:00 a.m. and "prior incidents between the members of City Hall and Ortolano" required police presence to "ensure that the interactions were orderly and incident

free." *A-23* Ortolano had no meeting scheduled but Kleiner was advised that Ortolano told the

Mayor at a Board of Aldermen meeting to "shut his pie hole." *A-24* The presence of the police at

City Hall was requested due to Ortolano's exercise of her free speech. The police presence at

City Hall was done for the sole purpose of intimidating Ortolano and to chill her right to speak

regarding the Mayor. The "prior incident" was a public hearing at which Ortolano had criticized

the City's Director of Economic Development. Ortolano had no such meeting, and the police

eventually left City Hall. Later on, however, Ortolano did come to City Hall and was spotted by

defendant Bolton in a public hallway near the Legal Department speaking on her cellphone. The

police were called and Bolton, clearly neither rational nor in control of his emotions, insisted that

the Nashua PD immediately arrest Ortolano for trespassing in a public hallway in City Hall. *A-25*

In early 2022, Defendants Inception and Feoli would willingly become active participants

in the City's efforts to destroy Ortolano's reputation and silence her. Feoli told Kleiner that

Ortolano had called him and represented to him that she was a Nashua City Hall employee when

she told him she was from "Nashua" and knew a lot about the contract. That information was in

the public domain *A-2* This was false; as Feoli would later admit when pressed by the Nashua

PD, Ortolano never stated or purported to be a City of Nashua employee. *Affidavit, See A,*

*Ortolano ¶ 64* Kleiner then took this false information and announced at a public Board of

Aldermen ("BOA") meeting on February 8, 2022, that Ortolano had been impersonating a City

employee, which both publicly disparaged Ortolano's reputation by asserting she was a criminal

and a fraud and Kleiner contacted the police to criminally investigate Ortolano. *A-30* Rather than

addressing the issue in a private session as some aldermen believed should have occurred,

Kleiner addressed it in a public session watched by thousands of residents on Channel 98 of local

programming and broadcast live on Youtube. *A-29* This was done to embarrass Ortolano and

have a chilling effect on her right to free speech and was retaliatory. Ortolano reduced the number of meetings she attended after that publicly false and unwarranted announcement.

Mr. Feoli, President of Inception Technologies stated in his Motion for Summary Judgment that he (1) received a voicemail message from the Plaintiff identifying herself as Laurie Ortolano of Nashua in late 2021 or early 2022. *See* Feoli Motion for Summary Judgment Document 91-1 ¶8; (2) she sent an email to Mr. Feoli after Mr. Feoli emailed the Board of Alderman. *A-28* (3) When Feoli called Ortolano back, she asked him questions about the scanning project Inception was handling for the City of Nashua, Feoli claims that he spoke by phone again with Ortolano on February 4, 2022 and that Ortolano again questioned him about public access to the scanned documents. At one point stating/inquiring, Nashua citizens had been waiting for the project to be completed for many months and Kleiner had not provided any public updates. *See A Affidavit of Laurie Ortolano, ¶72* Feoli provided those answers. Prior to contacting Feoli, Ortolano was told by Cummings in an email that if she had an issue with the vendor, to contact the vendor directly. *A-26* She followed his instructions when she called Feoli.

On February 4, 2022, Ortolano sent an email to Richard Vincent and cc'd Defendant Kleiner with questions regarding the Inception data scan project. *A-27* Based on the email, Kleiner knew Ortolano got that information for Inception and called Feoli. Feoli claims that Kleiner called and asked him to "identify all City officials with whom [he] had communicated about the City's scanning project." (Feoli Motion for Summary Judgment).

On Sunday, February 6, 2022, after speaking with Kleiner, he sent an email to the BOA and Kleiner, attempting to explain what had occurred with Ortolano. (*A-28*) Feoli stated that "It has come to my attention that I have been deceived by individual (sic), Laura (sic) Ortolano, who portrayed herself as a city employee to me on thre (sic) different occasions." Kleiner did not

request to talk to the BOA in a private setting about her claims against Ortolano. *A-29* Three

Aldermen at the end of the February 8, 2022 meeting expressed concerns about how this matter

was handled:

Alderman Cathey stated:

> Lastly, I think that I would agree with Alderman Sullivan earlier. I think in the future
> maybe, I don't really know how this would work. I would appreciate both sides of the
> story of a situation. I don't know how that would work but I think it's fair because I don't
> have all the facts. I have this letter. I'm a data guy. I want to hear all the information first.
> I think that would be more helpful. I don't know how we move forward in the future how
> that gets handled. I think that would be best for all sides involved that both sides are
> given ample sort of time to express themselves or talk about their grievance as it were
> and then we can move on from there. I understand that now the situation is with NPD. So
> that might not be appropriate but certainly in the future I think that would be maybe best.
> I don't know. Something that we can discuss as Aldermen. I think that's it for me. Thank
> you. A-29 pg 13

Alderman Comeau stated:

> Lastly, I would like to see in the future – I don't know procedurally whether it would be
> proper or not – but if we're going to discuss a member of the public, I think we should
> probably move to a nonpublic session just to respect people's privacy. We've done it
> before for other people. I would think that that should be something that we consider
> especially if we're going to be discussing a member of the public in a negative light. I'd
> like to see that done in nonpublic next time. That's all I have. Thank you. A-29 pg. 14

Alderman Sullivan stated,

> Thank you Madam President. I wanted to speak about just the form and the flow of the
> meeting tonight. Being new and I still understand that I'm learning a lot and I still
> consider myself very much an outsider to the rules in how we do things and how we build
> agendas. I think a common misconception in life is that people like surprise parties.
> Personally I don't like surprise parties, especially how they happen sometimes. Being an
> outsider as I still feel as though I am, there seems to be an us versus them to tone to what
> happened. I understand that there are rules and procedures that I will learn about but I
> was just wondering and I would like to request that should we be faced with something
> like that again that we handle it differently. That's all my ask. I appreciate it. Thank you.
> A-29, pg. 17

Ortolano was present at the meeting and responded to the Kleiner presentation. (See G *thumbdrive Ortolano public comment*) Ortolano had no idea this issue would be addressed at the meeting. This issue was not on the posted Board of Aldermen agenda.

Feoli's discussion with Ortolano as represented by Feoli did not result in the disclosure of any proprietary or confidential material.  See §21 of General Terms and Conditions of the Contract, *A-34*

The evidence Feoli cited in the email was scant: - Feoli claimed he "thought" Ortolano was a City employee because she was knowledgeable about the contract despite the fact it was public knowledge. *(A-28)* Regardless of how Feoli reached his conclusion that Ortolano had deceitfully portrayed herself as a City employee, her reputation was damaged when his claim of deception was read into the public record by defendant Kleiner, shown on live television throughout Nashua, and preserved for the world to see on YouTube (where all BOA hearings are placed). *A-29* Kleiner stated in the public alderman meeting that "Feoli informed her that a city employee named Ms. Ortolano had reached out to him and indicated that she could expedite payment on the remaining project". *A-28*  Ortolano made no such statement. Kleiner knew that the statements she was publicly making about Ortolano were false. Unlike Feoli, Kleiner stated at the public hearing that Ortolano committed a crime. Kleiner's referral to the police led to an immediate police investigation into whether Ortolano had committed a crime. The Nashua Police Department investigated and found no crime had been committed by Ortolano. *(A-30)* Due in large part to Kleiner's conduct, Ortolano was afraid to enter City Hall if she saw a police cruiser in the parking lot or afraid to enter her neighborhood if a police cruiser was in her neighborhood. Incorporated by reference herein is the Affidavit of Laurie Ortolano dated, May 1, 2024, filed in the Bolton/Leonard Objection to Summary Judgement. The Ortolano affidavit in the Objection to

Lomardi's Motion for Summary Judgement, the Ortolano affidavit in the Objection to Carrigan

Motion for Summary Judgement, and the Ortolano affidavit in the objection to the City's Motion

for Summary Judgement are incorporated herein.

## STANDARD OF REVIEW

Summary judgment is appropriate in the absence of a genuine issue of material fact,

when the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Neither

party may rely on conclusory allegations or unsubstantiated denials, but must identify specific

facts deriving from the pleadings, depositions, answers to interrogatories, admissions and

affidavits to demonstrate either the existence or absence of an issue of fact. *See* Fed.R.Civ.P.

56(c) and (e).


## ARGUMENT

At all relevant times, the defendant, Kleiner, was a state actor and subject to suit for

violating Ortolano's rights under the United States Constitution, and at all times, Kleiner acted

under color of state law. The actions and conduct by defendant Kleiner, as applied to plaintiff

Laurie Ortolano, are in violation of the Fourteenth Amendment, as it incorporates the right to

Petition and free speech.

The actions and conduct described herein by defendant Kleiner, singled Ortolano out for

disparate and unfair treatment. Those actions were arbitrary and were not pursued in

advancement of any legitimate governmental interest.

## VIOLATION OF CONSTITUTIONAL RIGHTS

The actions, or participation in events that constituted actions, by defendant Kleiner, that

had the effect of restricting, regulating, suppressing, or chilling the speech or expressions of

Ortolano, concerning government conduct, were done in violation of the Fourteenth Amendment,

as it incorporates the Free Speech Clause of the United States Constitution.

The speech and/or expression that Ortolano engaged in constituted constitutionally protected conduct. Ortolano was subjected to one or more adverse action(s) by defendant Kleiner. Ortolano's protected conduct was a substantial or motivating factor in the adverse action(s) taken by Kleiner, have thus unlawfully retaliated against Ortolano on account of her protected constitutional conduct and activities.

In regard to defendant Kleiner, the procedures, policies, rules, regulations, and/or laws promulgated were official policies created, altered, modified, or amended by city officials, including Kleiner who had the final authority to establish governmental policy in the particular areas. Kleiner explained all the policies and procedures she enacted at the July 14, 2020 Special Board of Aldermen Meeting where Kleiner provided an Assessing update. Exercising such final authority, Kleiner made deliberate choices to follow particular courses of action from among a variety of alternatives. Because the deliberate choices made by Kleiner in creating, altering, modifying, or amending the official procedures, policies, rules, regulations, and/or laws described herein had the effect of constituting unlawful restriction, suppression, or chilling of Ortolano's free speech rights in violation of the Fourteenth Amendment, as it incorporates the Free Speech Clause of the First Amendment of the United States Constitution, Kleiner is liable under 42 U.S.C. § 1983. (42 U.S.C. § 1983 – First Amendment -- The Government Actors' Violations of Ortolano's Right to Petition Government for Redress of Grievances) Count 1.

The actions of Defendant Kleiner in (1) instructing all City employees to not speak with Ortolano; (2) reporting Ortolano to the police and requesting her prosecution falsely claiming she was impersonating a city assessor, (3) falsely claiming she was a City of Nashua employee, (4) falsely claiming she was disorderly at the assessing office and demanded the police order her not to return to City Hall for a day. (5) providing false and misleading information to the Nashua

Police that Ortolano had committed multiple crimes; (6) repeatedly threatening to have Ortolano arrested, announcing at a televised Board of Alderman meeting that Ortolano had committed a crime; (7) depriving Ortolano with proper notice that such an allegation would be made, depriving her of a right to defend herself and her reputation, violating her rights under the New Hampshire Constitution and the United States Constitution. Kleiner was the ringleader in demonizing Ortolano and punishing her for exercising her free speech and acted with retaliatory conduct to chill her free speech.

## <u>CONSEQUENCES DUE TO THE CONDUCT OF KLEINER THAT PLAINTIFF'S RIGHTS WERE CHILLED AND ADVERSE</u>

The crux of Defendant Kleiner's argument is that Ortolano's actions were the catalyst that opened the door for Kleiner to stomp on Ms. Ortolano's constitutional rights.  A litany of Supreme Court cases pronounces that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989); see also, e.g., *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); R.A.V. v. St. Paul, 505 U.S. 377, 392 (1992).

Kleiner, without an investigation, provided this false claim that Ortolano had committed a crime to the entire Board of Alderman and admits to publicly stating in a televised Board of Alderman meeting that Ortolano had falsely impersonated a City Hall employee. She broadcasted that Ortolano was under Police investigation for her impersonating a city employee. Kleiner claims she was not obliged to investigate statements told to her because she had no reason to not believe Feoli. Yet, Feoli had a motive to lie because he should not be talking to Ortolano as this jeopardized his contract with the city. Kleiner, without an investigation provided this false claim to the entire Board of Alderman.

Kleiner told the Nashua Police that all employees of assessing did not want to speak with Ortolano, despite the employees never informing the police of this. Kleiner requested the police issue a no-contact order against Ortolano, which was issued. (*A-20*) This false claim resulted in the Nashua Police Department issuing a no-contact order. *(A-20)* Kleiner's activity prevented Ortolano from going to City Hall for 24 hours and prevented her from talking to the assessing staff.

Defendant Kleiner requested that the Nashua Police warn Ortolano that she would be arrested for speaking to any assessing employee anywhere outside of their offices at the Assessing Department. Kleiner admits to filing a police report against Ortolano, alleging she impersonated a Nashua City Hall assessing department. *(A-21)* Kleiner also admits to filing a police report against Ortolano for allegedly driving around taking photos of houses- alleging she was impersonating a Nashua City Hall assessor knowing that the physical description did not fit Ortolano.

At the request of defendant Kleiner, Detective Frank Lombardi of the Nashua Police Department issued a warning to Ortolano that she could get arrested for speaking to any Assessing Department employees outside the Assessing Department offices although Ortolano had never threatened anyone or engaged in anything but protected speech. *A-20*

Defendant Kleiner contacted Detective Lombardi and caused a criminal police investigation of Ortolano to occur by telling Lombardi that one of the assessors spoke with a homeowner who claimed that someone fitting Ortolano's description had been impersonating a Nashua assessor. The homeowner reported to the police that this person was blonde, drove a white sedan, and told the police that she had said she was a real estate agent. Although Kleiner knew that Ortolano was not blonde and the person did not claim to be an employee of the

assessing office but a real estate agent, Kleiner contacted the police, who opened a criminal investigation. *A-21*

It soon became clear to the police that the person in question told the homeowner she was a real estate agent and not an appraiser, that Ortolano did not fit the description of the person who the homeowner says he encountered, and that neither Ortolano nor her husband owned a white sedan. The police determined that Ortolano was not the person who was impersonating a City assessor. This false claim, which resulted in a police investigation, caused Ortolano to fear the next retaliatory strike from Kleiner. This would occur on January 21, 2021 and then on February 3 and 8, 2022.

Defendant Kleiner prohibited all Assessors in the Nashua Assessing Department from answering any of Ortolano's questions or speaking to her and forbade other employees in the Assessing Department from serving her or speaking to her. *A-6* This edict prevented Ortolano from speaking to the civil servants that worked for Ortolano and citizens of Nashua. This edict, issued by Kleiner, was done to silence Ortolano from speaking to the civil servants that worked for Ortolano and Citizens of Nashua. This unconstitutional edict was issued by Kleiner to silence Ortolano, hindering her ability to obtain city records and violated Section 71 of the City Charter that mandates that assessment records be made available immediately.

The staff in the assessor's office refused to help Ortolano with her requests to access and examine public records available to citizens immediately upon request, City Charter Section 71, (*A-7)*Ortolano documented a September 19, 2019, situation in the Assessing Office where she tried to access files, and the staff would only assist others who walked in after her. Ortolano obtained the security video from the City, which showed exactly what Ortolano documented in writing that day. *A-32*

## ADVERSE ACTION/ SPEECH CHILLED

A credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement. *Bray v. City of New York,* 346 F. Supp. 2d 480 (S.D.N.Y. 2004). In this case, not only were there threats of prosecution but arrest and prosecution resulted. The police issued a notice of trespass to Ortolano at the request of Kleiner. (*A-22*) Kleiner threatened to have her arrested. Kleiner referred at least two criminal referrals to the Nashua Police Department that resulted in finding of no crime committed. *Exh.* *(A-21 & A30)* Kleiner independently disclosed in a public session defamatory information about Ortolano that was false and violated RSA 91-A:3, II(c),.

As the Supreme Court has explained, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Sindicato* *Puertorriqueño v. Fortuño*, 699 F.3d 1 (1st Cir. 2012). In this case the Defendant's conduct resulted in the following adverse actions: [1] Instructing Assessor not to speak with Ortolano; [2] creating multidocument request forms for records to be answered within 5 days, [3] ordered assessing questions requests to be sent to Kleiner; legal will review answers assessors are providing, [4] referred Ortolano for criminal prosecution to the Nashua Police for impostering a City Assessor, knowing the description did not fit Ortolano, [5] Ordered warning from Police for Ortolano not to speak with Assessor staff outside of the office, [6] ordered police to issue a one day nontrespass order to keep Ortolano out of City Hall, [7] referred for criminal prosecution to Nashua Police Department for impersonating a City employee when she called Inception Technologies, [8] In a public meeting, without notice, addressed the Feoli email and announced the criminal referral, [9] requested the police patrol city Hall on the morning of July 22, 2022 claiming Ortolano had an appointment scheduled and maintaining order was necessary.

A litany of Supreme Court cases pronounces that, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989); *see also, e.g., Snyder v. Phelps,* 562 U.S. 443, 458 (2011); *R.A.V. v. St. Paul,* 505 U.S. 377, 392  (1992).

> In our own time and place, criminal laws have grown so exuberantly and come to cover so much previously innocent conduct that almost anyone can be arrested for something. If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age. The freedom to speak without risking arrest is "one of the principal characteristics by which we distinguish a free nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987).

*Nieves, v. Bartlett*, 587 U.S. ___, 139 S.Ct. 1715, 1730 (2019)(Gorsuch, J., concurring in part and dissenting in part). Tying these tenets of free speech jurisprudence to the maintenance of a functioning form of democratic government, the high court has recognized that the First Amendment provides elevated protection of free speech rights pertaining to governmental petitioning activities; the "right to petition [is] one of the most precious of the liberties safeguarded by the Bill of Rights." *Lozman v. City of Riviera Beach, FL*, 585 U.S. 87, 101 (2018)(quoting *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524 (2002)) Kleiner's conduct as set forth herein smashed the bedrock principles underlying the First Amendment. These were no de minimus consequences. No citizen in America should ever fear going to City Hall to obtain public records, speak with city employees and elected officials and voice their opinions at public hearings because of the threat of arrest and prosecution. What Ortolano had to endure was un-American, unconstitutional and an anathema to our democracy. The City of Nashua believes you can't fight city hall and deters any such attempt by using unconstitutional means to silence the citizens who try.

As in *Lozman*, Ortolano "alleges the City deprived [her] of this liberty by retaliating against [her] for . . . [her prior] lawsuit[s] against the City and her criticisms of public officials." *Lozman*, 585 U.S., at 101. Accordingly, *Lozman* dictates that Ortolano's "speech [at issue in this action] is high in the hierarchy of First Amendment values." *Id.* (citing *Connick v. Myers,* 461 U.S. 138, 145 (1983)). This case does not involve the implementation of reasonable time, place, or manner restrictions that apply generally to persons attempting to participate in the democratic processes of Nashua's City government; to the contrary, it involves the attempts of Nashua City officials, including Kleiner, to prevent Ortolano from speaking with personnel in the Assessor's Office after February 8, 2022, when Kleiner stated at the Board of Aldermen meeting that Ortolano impersonated a city employee and the matter is now in the hands of the police. This was another looming criminal investigation of Ortolano, causing fear, trepidation, and chilling effect of her entering City Hall.

Ortolano knew that the claim was false but the publication of the crime and the police investigation in a publicly broadcasted session was frightening. Ortolano did not know if she would be arrested at City Hall and therefore minimized her visits to City Hall and Board meetings to avoid being arrested and handcuffed in a public place. Unlike Kleiner, Ortolano did not disclose in a public meeting that the Nashua Police were investigating Kleiner for witness tampering. Kleiner violated RSA 91-A:3 II (C) by disclosing at a public meeting the crime of impersonating a city official and fraud and the Police investigation, thereby damaging her reputation. After his acquittal, Raymond Donovan, U.S. Secretary of Labor stated "which office do I go to to get my reputation back?" This is Ortolano's conundrum.

Ortolano's concern for her safety and liberty began to intensify when the police came to her door to issue a warning for no contact with Assessing Employees outside of their City Hall

Office. The threat of arrest frightened her. The City's mounting of a camera in the assessing office concerned Ortolano that she was now being watched. The camera was used to discipline an assessing clerk who was assisting Ortolano with records requests. Eventually, this 20-year employee was fired and compensated under a settlement agreement. Ortolano's concerns were shared by her family members. Ortolano was subjected to many negative attacks in Board meetings and newspaper articles with hostile quotes from City leaders, including the Mayor. Once the Police Department opened the Assessing Office investigation in June 2019, Ortolano spoke with Chief Carignan and he warned her to back off, stating "you need to pick your battles." Ortolano explained it wasn't her intention to cause trouble, but she just wanted an equitable and fair assessing office. Once the Assessing office investigation was closed, Ortolano learned that Kleiner and an assessor accused her of imposing a City Assessor. The Police determined there was no cause for a charge. When Ortolano went to City Hall, she would not enter the building if the police were parked in the lot. When Ortolano left with the police after trying to get abatement applications stamped, she read a newspaper article that there was no police investigation and no charges were being filed. Three weeks later, she was arrested for trespassing. Corporation Counsel's attempt to have Ortolano arrested in a public hallway outside his office was a coincidental encounter that resulted in the attorney ordering an immediate arrest. Ortolano became very fearful that arrest was imminent. Ortolano avoided and, at times, did not share these incidents with her husband for fear of causing him great stress. Kleiner's statements and conduct was a significant factor in her heightened fear of minimizing her presence at city hall.

### The Elements of a Free Speech Retaliation Cause of Action

"Under the First Amendment, retaliation claims proceed in two stages." *D.B. ex rel.*

*Elizabeth B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd.
Of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56
(1st Cir. 2003)). "A plaintiff must first prove that (1) he or she engaged in constitutionally
protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the
protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel.
Elizabeth B.,* 675 F.3d at 43 (citing *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir.
2011) See also *Bourne v Arruda*, Civil No. 10-CV-393-LM C.D. N.H. Jan. 8, 2013 and *Gorelik
v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010)). "This showing necessitates proof of a causal
connection between the allegedly protected speech and the allegedly retaliatory response."
*González-Droz*, 660 F.3d at 16. A pattern of informal harassment may establish a First
Amendment retaliation claim if the alleged harassment has a chilling effect on the plaintiff's
exercise of his or her First Amendment rights. *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011).
Under the second step, a defendant may then avoid a finding of liability by showing that it
would have reached the same decision even in the absence of the protected conduct. *González-
Droz*, 660 F.3d at 17.

**<u>Retaliation</u>**

     In our own time and place, criminal laws have grown so exuberantly and come to cover
so much previously innocent conduct that almost anyone can be arrested for something. If the
state could use these laws not for their intended purposes but to silence those who voice
unpopular ideas, little would be left of our First Amendment liberties, and little would separate
us from the tyrannies of the past or the malignant fiefdoms of our own age. The freedom to speak
without risking arrest is "one of the principal characteristics by which we distinguish a free

nation." *Houston v. Hill*, 482 U.S. 451, 463 (1987). *Nieves, v. Bartlett*, 587 U.S. ___, 139 S.Ct.

1715, 1730 (2019) (Gorsuch, J., concurring in part and dissenting in part).

The undisputed facts document the retaliatory action of Kleiner in either punishing

Ortolano for her words/acts or chilling her words and conduct are as follows:

- April 1, 2019 - Instructing Assessor not to speak with Ortolano; created a multidocument request form to be answered within 5 days.

- July 19, 2019 – ordered assessors to send property card requests and assesshelp questions to Kleiner; legal will review answers assessors are providing.

- September 19, 2019 – referred for criminal prosecution to the Nashua Police for impostering a City Assessor, knowing the description did not fit Ortolano.

- September 22, 2019 – Ordered warning from Police for Ortolano not to speak with Assessor staff outside of the office

- February 3, 2022 – ordered police to issue a one day non trespass order to keep Ortolano out of City Hall

- February 7, 2022 – referred for criminal prosecution to Nashua Police Department for impersonating a City employee when she called Inception Technologies.

- February 8, 2022 – In a public meeting, without notice, addressed the Feoli email and announced the criminal referral in direct contravention of the RTK Statute.

- July 21, 2022 – requested the police patrol city Hall on the morning of July 22, 2022 claiming Ortolano had an appointment scheduled and maintaining order was necessary.

**RTK does qualify as adverse action**

The preamble to the right-to-know law which states that its purpose "is to ensure ... the

greatest possible public access to the actions ... and records of all public bodies...." RSA 91-A:1

(Supp. 1977) (emphasis added) has a constitutional dimension in the Bill of Rights because of the addition to pt. I, art. 8, in 1976, providing that "the public's right of access to governmental proceedings and records shall not be unreasonably restricted. In the New Hampshire Constitution, the last two sentences of the article became part of the article in 1976, and added a constitutional dimension to New Hampshire's Right-to-Know Law, RSA 91-A. *Lodge v. Knowlton*, 118 N.H. 574, 391 A.2d 893 (1978).

"Openness in the conduct of public business is essential to a democratic society. The purpose of this chapter is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people." RSA 91-A:1.

Under RSA 91-A:3, II(c), Public agencies are authorized to hold a non-public hearing, Matters which, if discussed in public, likely would adversely affect the reputation of any person, other than a member of the body or agency itself, unless such person requests an open meeting.13  This exception shall extend to any application for assistance or tax abatement or waiver of a fee, fine, or other levy, if based on inability to pay or poverty of the applicant. RSA 91-A:3, II(c). This statutory provision was violated by Kleiner discussing the Feoli email and the criminal referral. Kleiner did not publicly comment on the scanning contract for well over a year, yet when she received the Feoli email, she showed up at the next public BOA meeting to update the Board of the scanning project. Then she goes on to discuss the Feoli email. The discussion of the scanning project was a pretext to defame Ortolano. Even the Aldermen understood it for what is was – an ambush.

Although this court has ruled that there are no damages for an RTK violation, in this case, the defendant Kleiner, in pursuing a pattern of retaliation against Ortolano, violated Ortolano's

RTK protection by her public disclosure. She interfered with Ortolano's right to obtain public records so she could not obtain evidence for her property appeal before the Board of Tax and Land Appeals. Kleiner instructed [1] assessing office personnel not to talk to Ortolano, [2] obtained a police order that prevented Ortolano from talking to Assessing employees (including Kleiner) outside of her office, [3] made it difficult for Ortolano to schedule an appointment to obtain public records, [4] Threatened to have Ortolano arrested and then had the police prevent her from entering City Hall for one day for allegedly yelling at an employee. All of this conduct by Kleiner was retaliatory since Ortolano was very critical of her job performance and did contact the police to investigate Kleiner.

### IV. Defamation

It is well established in New Hampshire that no proof of specific damages is required "[w]hen ... the jury could find that the defamatory publication charged the plaintiff with a crime or with activities which would tend to injure him in his trade or business, commonly called libel per se." *Chagnon v. Union Leader Co*., 103 N.H. 426, 441, 174 A.2d 825 (1961); see Restatement (Second) of Torts § 570 (1977) (stating that "[o]ne who publishes matter defamatory to another in such a manner as to make the publication a slander is subject to liability to the other although no special harm results if the publication imputes to the other ... a criminal offense ..., or ... matter incompatible with his business, trade, profession, or office"); see also *Lassonde v. Stanton*, 157 N.H. 582, 592-93, 956 A.2d 332 (2008). Instead, the plaintiff "can recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation." *Chagnon*, 103 N.H. at 441, 174 A.2d 825.

### Kleiner is not Immune under RSA 507-B:4

RSA 507-B:4, IV states: If any claim is made or any civil action is commenced against a present or former employee, trustee, or official of a governmental unit seeking equitable relief or claiming damages, the liability of said employee or official shall be governed by the same principles and provisions of law and shall be subject to the same limits as those which govern governmental unit liability, so long as said employee or official was acting within the scope of his or her office and reasonably believed in the legality of his or her actions.

Kleiner, in asserting her defense of qualified immunity, must prove that the conduct complained of "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). This court must look to the "`objective reasonableness of [the defendant's] conduct, as measured by reference to clearly established law,' to determine whether the doctrine of qualified immunity applies." *Unwin v. Campbell*, 863 F.2d 124, 128 (1st Cir.1988) (citing Harlow, supra).

The qualifying test for qualified immunity is in two parts: whether (1) Ortolano's constitutional or statutory rights were violated; and (2) whether those rights were clearly established such that Kleiner would have known that her conduct violated those rights. *Emery v. Holmes*, 824 F.2d 143, 147 (1st Cir.1987). Kleiner charged Ortolano with the crime of identity fraud in a public meeting of the BOA by stating Ortolano's conduct is under police investigation. This was done to damage Ortolano's reputation in retailiation for Ortolano's speech criticizing Kleiner and her associates. These defamatory statements were made in a public session, violating Ortolano's RTK protections set forth in RSA 91-A:3 II.

RSA 638:26, I(a) provides: "A person is guilty of identity fraud when the person ... [p]oses as another person with the purpose to defraud in order to obtain money, credit, goods,

services, or anything else of value." "'Pose' means to falsely represent oneself, directly or

indirectly, as another person or persons." RSA 638:25, II (2007). As the court previously stated,

RSA 625:11, II provides:" 'Person', 'he', and 'actor' include any natural person and, a corporation

or an unincorporated association. *State v. Washington*, 136 A.3d 916, 168 N.H. 689 (2016).

The New Hampshire Supreme Court has construed RSA 507-B:5 as providing immunity

for municipal employees only where the official "acted within the scope of his official duties and

... `reasonably believe[d], at the time of the acts or omissions complained of, that his conduct

was lawful.'" *Farrelly v. City of Concord*, 168 N.H. 430, 448, 130 A.3d 548 (2015).

There is significant evidence that Kleiner did not reasonably believe that her conduct was lawful.

See *Farrelly*, 168 N.H. at 448, 130 A.3d 548; *Huckins v. McSweeney*, 166 N.H. 176, 182, 90

A.3d 1236 (2014), since Kleiner was fully aware of the RTK statute. Kleiner stated that she had

been thoroughly trained on the RTK law. Exh. _____ She therefore knew the RTK law required

her presentation to be in nonpublic session. Even Aldermen Comeau stated that Kleiner's

comments should have been in a nonpublic session. This information placed Ortolano in a

"negative light".          After Kleiner shared this information with the Board of Aldermen, Vice

Chair Aldermen O'Brien stated and questioned, "This is very concerning. Is this being referred

to any other agency for further investigation?" Kleiner answered, "Yes it has been reported to the

Nashua Police Department." *A-29 February 8, 2022, minutes of the Board of Aldermen Meeting*.

Kleiner, in broadcasting in a public meeting that Ortolano was impersonating a city hall

employee was done outside of the scope of her office. Kleiner, referring Ortolano's conduct to

the police was done outside of the scope of her employment. Kleiner had full acess to the legal

department at the city of Nashua. Given that this was a purely legal issue, this was not within her

scope of employment to determine if Ortolano had committed a crime. Further, the call Kleiner

placed to Feoli was done on a Saturday and communication with Feoli was done entirely on a weekend. Even if Kleiner believed that her statements were true, she was acting outside of the scope of her employment by announcing during a public meeting that Ortolano had committed a crime of allegedly impersonating a City Hall employee.

Kleiner was fully knowledgeable about the Right to Know law. Pursuant to RSA 91-A: NONPUBLIC SESSIONS: Meetings or portions of meetings that the public may not attend. Begin in a properly noticed public meeting. A motion for nonpublic session is made and seconded, citing the statutory reason, and a majority roll call vote is taken. Once in the nonpublic session, only the reason(s) cited in the motion may be discussed. Minutes must be kept and (unless the board votes to seal them) made available to the public upon request within 72 hours after the meeting, whether or not approved yet. RSA 91-A:3. Nonpublic sessions are allowed only for reasons listed in RSA 91-A:3, II, including… Matters which would likely adversely affect the reputation of any non-board member… Lawsuits filed or threatened in writing against the municipality, until fully adjudicated or settled… Kleiner exceeded the scope of her employment when she violated RSA 91-A:3 II by stating in a public Board of Alderman meeting that Ortolano impersonated a city employee, perpetuated a fraud and was referred to the police for criminal investigation. Kleiner's statements were broadcasted by local television and YouTube. The violation of RSA 91-A:3 II, removes the shield of qualified immunity in RSA 507-B IV that Kleiner is asserting.

Kleiner acted beyond the scope of her employment by violating Ortolano's Constitutional rights. Kleiner used the opportunity of a public session to defame Ortolano, claiming she committed a crime. Her issue was not on the meeting agenda. She had not commented on the

completion of the scanning project in well over a year. The purpose of this public disclosure was to harm Ortolano for exercising her rights of of free speech and redress.

<u>Malice</u>

The First Amendment is not so fragile that it requires us to immunize this kind of reckless, destructive invasion of the life, even of public officials, heedless of their interests and sensitivities. The First Amendment is not a shelter for the character assassinator whether her action is heedless and reckless or deliberate. *St. Amant v. Thompson*, 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). (Dissent of Justice Fortas)

The Trial Court properly defined malice in its charge to the jury as "ill will, evil motive, intention to injure or a wanton or reckless disregard of the rights of others. Malice . . . may consist of the intentional publication of defamatory matters with a reckless disregard of the rights of others, and it may consist of willfully doing an act or a willful neglect of an obligation which the writer knows is liable to injure another, regardless of the consequences, even though there is no actual intention to hurt or harm an individual." *Chagnon* v. *Union-Leader Co., supra*; *New York Times Company* v. *Sullivan,* 84 S. Ct. 710, 726 (1964). Kleiner admitted that she believed Ortolano felt ill will towards her. Exh. E Kleiner deposition P. 62 L. 4-6 Kleiner had previously contacted the police to investigate Ortolano's alleged criminal conduct. KIeiner had requested police inform Ortoalno not to talk to the Assessing Staff outside of their office. Kleiner told Amanda Mazerolle not to assist Ortolano. Kleiner requested the police issue a 24 hour no trespass preventing Ortolano from going to city hall.

Defendant Kleiner falsely reported to the NPD that every assessing employee wanted no contact with Ortolano. However, the police reports do not reflect the same. Next, Defendant

Kleiner accused Ortolano of impersonating an assessing office employee and driving around the City photographing people's homes. *A-21*

Kleiner did not stop there. Kleiner accused Ortolano of impersonating a city official and stating Ortolano had committed a crime prior to the Nashua Police Department initiating their investigation. Despite Kleiner's statement that Feoli did not have reason to lie, Kleiner could have terminated the contract because Feoli violated it by talking to Ortolano. Once Kleiner received the February 4, 2022, email from Ortolano, she should have questioned why Ortolano would provide this information to Kleiner if she was committing the crime of impersonating a city worker.

These facts raise substantial issues as to whether Kleiner acted reasonably in publishing the defamatory statements.

Ortolano had been very critical of Kleiner and her job performance and referred her suspected witness intimidation conduct to the police. Kleiner's acts of malice and ill will are evidenced by her disclosing the Feoli emails in a public Board of Aldermen meeting on an issue not on the agenda and in violation of RSA 91-A:3, II(c). Even three Aldermen questioned the fairness of the process of impugning the reputation of a private citizen in public session. Kleiner had a history of reporting Ortolano's alleged conduct to the police, seeking no trespass orders and preventing her from going to City Hall.

<u>Kleiner's defense that Feoli's statements were substantially true is not available to her</u>

Under New Hampshire law even if there is a libel *per se* defendant need not prove the truth of the stated facts to escape liability. She may escape liability if she proves a privilege by showing that the facts (although untrue) were published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds, of their

truth. *Chagnon* v. *Union-Leader Co.,* 103 N. H. 426, 438. "This is a very different thing from showing the actual truth." *Carpenter* v. *Bailey,* 53 N. H. 590, 594. It has long been our law that good motives and belief in truth are strong circumstances to rebut any inference of malice. *State* v. *Burnham,* 9 N. H. 34, 44. *Baer v. Rosenblatt,* 106 N.H. 26, 203 A.2d 773 (1964). There is substantial evidence for the jury to consider and find that Kleiner by her conduct and words acted with malice. In New Hampshire, this is a jury question based on an evaluation of the facts.

"`Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his standing in the community. Imputations of criminality generally fit the bill.'" *Thomas*, 155 N.H. at 338, 929 A.2d at 1015 (quoting *Burke v. Town of Walpole*, 405 F.3d 66, 94-95 (1st Cir. 2005)).

This court found that the Plaintiff stated a viable defamation claim based on the comment that the Plaintiff had altered a Town document. Accordingly, the motion to dismiss is denied as to this statement. *Bourne v. Arruda*, Civil No. 10-cv-393-LM (D.N.H. Jan. 8, 2013). See *Thomson v. Cash*, 119 N.H. 371, 374, 402 A.2d 651, 653 (1979) (whether words susceptible of being construed to imply fraud or wrongdoing were used in "the defamatory sense is a question of fact for the jury").

The context further indicates that Arruda, the selectmen, and Town counsel considered Bourne's conduct actionable, which further shows that the quoted language could be construed to imply Bourne's misconduct in altering a document.

Justification is established if the facts stated are true and are published with a justifiable motive. *Hutchins v. Page*, 75 N. H. 215; *Chagnon v. Union-Leader Co.,* 103 N. H. 426, 437.

There was ample evidence to warrant a finding by the jury that the defamatory statements were

not substantially true and that the comments made thereon were unjustified. Restatement, Torts,

.s 582, comment e; Prosser, Torts (2d ed.) .s 96, p. 632. "Even though a defendant cannot justify

the publication because it can be found to be untrue he may excuse it by showing it was

privileged. A conditional privilege, which is what is claimed here, is established if the facts,

although untrue, were published on a lawful occasion, in good faith, for a justifiable purpose, and

with a belief, founded on reasonable grounds of its truth." *Chagnon v. Union-Leader Co.,* supra,

438. *Baer v. Rosenblatt*, 106 N. H. 26, 203 A.2d 773 (1964).

Statements of facts and comments based thereon made by the defendant about the

management of the Belknap Recreational Area could be found to constitute a lawful occasion

and the basis of a privilege. However, they would constitute a lawful occasion and a privilege

only if they were published in good faith and with a belief, founded on reasonable grounds, of

their truth. *State v. Burnham*, 9 N. H. 34; *Lafferty v. Houlihan*, 81 N. H. 67, 71. A court,

therefore, cannot rule that a communication is privileged in the public interest without assuming

the conditions on which it is held to be privileged, namely, that it was made with good motives

and upon probable grounds of its truth. *Lafferty v. Houlihan*, supra, 72. Where, as in this case,

the motives of the defendant and her basis for believing his statements to be true were both in

controversy, the Trial Court properly denied defendant's motion that it rule before trial that his

article, in the absence of malice or bad faith, was privileged in the public interest. *Baer .v*

*Rosenblatt*, 106 N.H. 26, 203 A.2d 773 (1964).

The law is well established that a defamatory statement made with malice cannot be

excused as privileged. *Chagnon v. Union-Leader Co.,* 103 N. H. 426, 438. The burden of

proving malice to defeat the defense of privilege and invoke the more liberal rule of damages is

on the plaintiff. *Hutchins v. Page*, 75 N. H. 215; *Saladino v. Gurdy*, 80 N. H. 211; 1 Harper & James, Law of Torts, .s 5.27.

Any or all of the statements could be considered by the jury in their determination of whether the defendant was actuated by malice in publishing the email. *Saladino* v. *Gurdy,* 80 N. H. 211, 213; 2 Wigmore, Evidence, *ss.* 403, 404. The jury could find on the evidence that the defendant lacked reasonable grounds to believe in the truth of the statements she published, that by her prior utterances, she demonstrated animosity toward the plaintiff; and that the defamatory statements, which are the basis of this action, were published with actual malice and consequently not privileged. *Chagnon* v. *Union-Leader Co.* 103 N. H. 426, 440. These two individuals had a long-standing contentious relationship. Kleiner stated in her deposition at pg 62 L 4-7, (See E) she believed that Ortolano had ill feelings towards her.

Any or all of Kleiner's statements and conduct could be considered by the jury in their determination of whether the defendant was actuated by malice in publishing the email and statements at the BOA session. *See Saladino v. Gurdy,* 80 N. H. 21, 213; 2 Wigmore, Evidence, s. 403, 404. A jury could find on the evidence that the defendant lacked reasonable grounds to believe in the truth of the statements she published; that by her prior utterances she demonstrated animosity toward the plaintiff; and that the defamatory statements, which are the basis of this action, were published with actual malice and consequently not privileged. *Chagnon .v Union-Leader Co.* 103 N. H. 426, 440. *Baer v. Rosenblatt,* 106 N.H. 26, 203 A.2d 773 (1964).

### Defamation Per Se

Under New Hampshire common law, a statement accusing a person of committing a crime, or engaging in activities that would tend to injure him in his trade or business, is defamatory per se. See, e.g., *MacDonald v. Jacobs,* 171 N.H. 668, 674, 201 A.3d 1253, cert. denied, ___ U.S.

___, 139 S. Ct. 2754, 204 L.Ed.2d 1143 (2019); *Chagnon v. Union Leader Corp.*, 103 N.H. 426, 441, 174 A.2d 825 (1961); *Jones v. Walsh*, 107 N.H. 379, 380, 222 A.2d 830 (1966); see also Restatement (Second) of Torts § 570 (1977). A statement that is defamatory per se is defamatory on its face; therefore, a plaintiff can "recover as general damages all damages which would normally result from such a defamation, such as harm to his reputation," without needing to "prove these damages specifically." *Lassonde v. Stanton*, 157 N.H. 582, 593, 956 A.2d 332 (2008) (quotation omitted). *Martin v. Mooney*, 448 F. Supp. 3d 72, 2020 D.N.H. 28 (D.N.H. 2020).

Typically, courts approach the public-official analysis as if it were a three-legged stool, taking into account (i) the extent to which the inherent attributes of a position define it as one of influence over issues of public importance, (ii) the position's special access to the media as a means of self-help; and (iii) the risk of diminished privacy assumed upon taking the position. *Kassel v. Gannett Co., Inc.,* 875 F.2d 935 (1st Cir. 1989).

"The Supreme Court has roughly bisected the sphere of social commentary between matters of public concern, which are those that can be `fairly considered as relating to any matter of political, social, or other concern to the community, and matters of private concern, which are those that address `matters only of personal interest.'" *Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 999 F. Supp. 137 (D. Me. 1998). In this case the return of the property record files was a personal issue and not a public issue. The existence of the contract was disclosed at the July 15, 2020, Finance Committee meeting, but there was no public comment or controversy until the February 8, 2022 Alderman Board meeting. In fact, Mayor Donchess on June 17, 2024 stated "in the end there was only one person asking for this information so I think we didn't allocate any additional money to it so the the project was never completed.

**Limited-Purpose Public Figure**

A person becomes a limited-purpose public figure when he "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Lluberes*, 663 F.3d at 13 (quoting *Gertz*, 418 U.S. at 351, 94 S.Ct. 2997). To determine whether a defamation plaintiff is a limited-purpose public figure, the First Circuit employs a two-pronged test: the defendants must prove (1) that a public controversy existed prior to the alleged defamation, and (2) that "the plaintiff has attempted to influence the resolution of that controversy." *Id*. at 13-14 (internal quotation marks omitted). A public controversy existed, "whether it is framed narrowly as a debate over who was responsible for the Marathon bombings, or more broadly as part of an ongoing discussion about public safety, national security, and terrorism." *Alharbi v. Beck*, 62 F.Supp.3d 202, 208 (D.Mass.2014). In this case, Ortolano was trying to determine when the remaining public documents would be available for immediate inspection pursuant to Section 71 of the Nashua City Charter. *A-13.* Ortolano's involvement in determining when the public property record files would be returned to the City was not a public controversy. Ortolano did not thrust herself to the forefront of a particular public controversy in order to influence the resolution of the issue. Ortolano's contact with Feoli was predicated on the return of the documents which is the genesis of the defamatory email and Kleiner's presentation. *A-10 pg. 4* Here the issue was the return of the property record files. Even the Mayor stated that it was one person that was requesting this information. Ortolano is not a limited purpose public figure since her effort to determine when the public records would be returned to the City did not thrust her into the public domain. There was no public controversy. It was Feoli and Kleiner that made her efforts to determine when the records would be returned a public and criminal issue. This was not a public controversy until Feoli and Kleiner made it so.

Ortolano bears no responsibility for making the return of the property record files a public issue. Given the significance of status determinations in libel-law litigation, it is often perfectly reasonable to attempt to decide whether a plaintiff is a public official or public figure during pretrial proceedings. *Mandel v. Boston Phoenix, Inc.,* 456 F.3d 198, 204 (1st Cir.2006). The Court recognizes that "there are cases in which it may not be possible to resolve the public-figure issue until trial." *Id.*

## Malice

The Trial Court properly defined malice in its charge to the jury as "ill will, evil motive, intention to injure or a wanton or reckless disregard of the rights of others. Malice . . . may consist of the intentional publication of defamatory matters with a reckless disregard of the rights of others, and it may consist of willfully doing an act or a willful neglect of an obligation which the writer knows is liable to injure another, regardless of the consequences, even though there is no actual intention to hurt or harm an individual." *Chagnon v. Union-Leader Co.,* supra; New York Times Company v. Sullivan, 84 S. Ct. 710, 726 (1964). *Baer v. Rosenblatt*, 106 N.H. 26, 203 A.2d 773 (1964).There is overwhelming evidence that establishes malice.

As one court explained, actual malice is concerned with the publisher's attitude toward the truth while common law malice is concerned with its attitude toward the plaintiff. Geyer v. Steinbronn, 351 Pa.Super. 536, 506 A.2d 901, 915 (1986). *Thomas v. Telegraph Pub. Co,*. 929 A.2d 993, 155 N.H. 314 (2007). There is overwhelming facts based upon Kleiner's statements and conduct that she harbored ill will in her feelings about Ortolano. *Munson*, 118 N.H. at 478, 387 A.2d 1174.

## Negligence

A plaintiff in New Hampshire proves defamation by showing that defendants failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party. See *Pierson v. Hubbard*, 147 N.H. 760, 763, 802 A.2d 1162, 1165 (2002).

Since the Plaintiff is a private citizen and not a limited public figure, the Plaintiff needs to prove the defamatory statement was made negligently. *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344-45, 348-49, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).  It is, however, axiomatic that, if the plaintiff is a private person, he or she "may recover compensatory damages upon a showing that the defendant was negligent in publishing a defamatory falsehood." *McCusker v. Valley News,* 121 N.H. 258, 260, 428 A.2d 493 (1981); see *Duchesnaye v. Munro Enterprises, Inc.,* 125 N.H. 244, 251, 480 A.2d 123 (1984); *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 344-45, 348-49, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Kleiner knew that her Feoli disclosures at the public meeting were untruthful. Kleiner solely relied upon her conversation with Feoli and his statement and did not further investigate prior to disclosing to the public the false and damaging reputational statements. She never tried to talk to Ortolano about her version. With her receipt of the February 4, 2022 email from Ortolano. *(A-27)* Kleiner knew she had to be talking to Feoli. Kleiner should have asked herself why Ortolano would let her know that she was talking to Feoli if she was impersonating a city employee. This dynamic should have caused Kleiner to question Feoli's statement and, without any further inquiry, should not have rebroadcasted his defamatory statement and additionally claimed that Ortolano had committed a crime. The language in the Feoli email and telephone conversations raised questions that Kleiner should have pursued prior to her public disclosure.

Kleiner did not ask Feoli, as the police did, whether Ortolano stated she was a city employee. This fact alone caused the police to absolve Ortolano of any criminal acts. *A- 30*

# VI. <u>CONCLUSION</u>

For all of the grounds stated in the Plaintiff's Memorandum of Law, Exhibits and Affidavits, the Defendant's Motion for Summary Judgement should be denied.

Dated: July 1, 2024                    Respectfully Submitted by,


                                       *<u>/s/William Aivalikles</u>*
                                       William Aivalikles, Esq.


## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: July 1, 2024                    *<u>/s/William Aivalikles</u>*
                                       William Aivalikles, Esq