## EXHIBIT "A"

### UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| **Laurie Ortolano,** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **V.** | ) | **Civil Action No. 22-cv-00326-LM** |
| | ) | |
| | ) | |
| **The City of Nashua, et al.,** | ) | |
| **Defendants** | ) | |
| | ) | |

### AFFIDAVIT OF PLAINTIFF LAURIE ORTOLANO IN OPPOSITION TO
### DEFENDANT KLEINER'S MOTION FOR SUMMARY JUDGMENT

I, Laurie Ortolano, being under oath, do hereby depose and say as follows:

1.  After purchasing a home in Nashua, New Hampshire, the plaintiff, Laurie Ortolano ("Ortolano"), and her husband, Michael Ortolano (collectively, "the Ortolanos"), received a sudden increase in their real estate taxes.

2.  The City's Assessing Department (the "Assessing Department") increased the valuation of their home from $469,800 to $706,300 an increase of just over 50% within weeks of purchasing the home. Complaint, ¶ 15. *A-1*

3.  In September 2018, the City released new updated assessment values for all city properties. Upon reviewing the neighborhood data, my husband and I believed our property was significantly over-assessed.

4.  Neighborhood Ward meetings were scheduled with the KRT Appraisal, the contractor hired to perform the assessing update. My husband and I met with KRT President Ken Rodgers, who identified that he believed the property had been sales chased. I alleged this publicly.

5. Sales chasing is a Department of Revenue Administration ("DRA") sanctionable violation. Sales chasing is the practice of adjusting property values based on the recent sale of the property rather than adjusting assessments based on all property's true market values. When a single property assessment is changed in the direction of the sale price and that same change is not made to other similar unsold properties, the results can lead to unfair assessments. I believed our assessment was unfair.

6. The DRA form (PA-71) to report DRA Certified Assessor misconduct, lists "sales chasing" as one of the misconduct charges that can be reported. In 2019 I submitted numerous PA-71 to bring misconduct complaints against Nashua Assessors alleging sales chasing.

7. I informed the DRA that the Assessing Office was determining property valuations based on sales chasing. As a result of my sales chasing claim and reports of improper data controls, the New Hampshire Board of Tax and Land Appeals ordered the City to perform a full measure and list of all Nashua properties. *A-2* The City was ordered to complete this in three years (2022). The DRA uses standards established by the International Association of Assessing Officials which recommends that a full measure and lists be done every 7 years. It was 30 years since Nashua had done a measure and list.

8. In September 2018, I started examining the Assessing Department's public records in an effort to understand my property assessment.

9. In September 2018, I began attending and speaking at public meetings, primarily the Board of Aldermen and Board of Assessor Meetings.

10. Sometimes, I spoke critically of Nashua officials and their practices.

11. Unknown to me until the Fall of 2019, Nashua officials actively monitored my activities and communicated with each other about my whereabouts and actions in City Hall. *A-31, Duhamel emails*

12. The Chief Assessor, Jon Duhamel ("Duhamel"), took charge of the initial effort to prevent me from viewing public documents.

13. In June and the Fall of 2020, The DRA and the New Hampshire Association of Appraising Officials ("NHAAO") sanctioned Duhamel for denying public documents to me on at least four occasions. Complaint, ¶ 47. *A-3*

14. In March 2019, Kim Kleiner and City CFO John Griffin completed a Management Audit Report that recommended that Nashua eliminate the position of Chief Assessor, thus terminating Duhamel and placing defendant Kimberly Kleiner ("Kleiner"), who was later promoted to Director of Administrative Services, in charge of the nine-person Assessing Department. *A-4*. Management Audit Report

15. This reorganization left the Assessing Department without a certified assessing supervisor, who was required by state DRA/ASB regulations to review and approve Nashua's assessing documents. *A-5*

16. Kleiner, an uncertified nonprofessional Assessor, was able to deprive Ortolano of the right to access public assessing documents without any fear of professional discipline as she was not subject to the oversight of the DRA or the NHAAO.

17. In early 2019, Kleiner ordered the Assessors and clerks not to answer questions from members of the public. *Exh.6 Staffing Meetings April 8, 2019.* This policy order was directed at me, although it used the term "members of the public". The City had no such policy until my involvement with my tax abatement.

3

18. Kleiner ordered the clerks to refer all public assessing questions to Nashua CFO John Griffin ("Griffin") or her rather than to the professional assessors in the office A-6. *Staff Meeting April 1, 2019*

19. Kleiner specifically ordered the department assessors "not speak with Ms. Ortolano" about assessment matters. *A-6, Staff Meeting April 1, 2019.*

20. Kleiner ordered that, rather than being able to inspect public documents immediately upon request during normal business hours, as required by New Hampshire RSA 91-A:4 and Section 71 of the Nashua City Charter, Nashua residents would be required to complete a written request and wait for five days to have any access to public documents, in contravention of Section 71 of the Nashua City Charter. *A-6 Staff Meeting April 1, 2019. and A-7* I believe this new policy was directed at me.

21. By mid-summer 2019, Kleiner was even personally surveilling every citizen's request to look at Assessing Department documents; she now required document requesters to identify themselves in writing and specify the files they wanted to inspect so Kleiner would know who was requesting public records. *A-6, Staffing Meeting July 19, 2019* This was a new policy directed at me.

22. Kleiner also ordered that all email requests for information be forwarded to her prior to providing an answer or information. *Exh.6 Staff Meeting, July 19, 2019.* This was a new policy directed at me.

23. While testifying at trial under oath in a Right-to-Know ("RTK") action I filed, Amanda Mazerolle, a clerk in the Assessor's Department, testified that, although it was her duty to respond to citizen requests for information, she did not process my requests for records and information that had been received through the "assesshelp" portal because Kleiner

had specifically told her that she was not allowed to respond to Ortolano's requests. *A-8*

Trial Transcript, pg 33- 34. L16-25 L1-8

24. I started requesting public records under RSA 91-A, New Hampshire's Right to Know ("RTK") Law.

25.  Kleiner started referring all of my RTK requests to the Legal Department, which could take months to respond (sometimes as much as eight months), and at the end of the long wait would deny my requests on specious grounds. This forced Ortolano to sue the City multiple times in the State Superior Court under the remedy provisions of the RTK Law.

26. In May 2020, when I received the Police records from a Police investigation of the Assessing Office, I realized City leadership was hindering my efforts to correct my unfair property assessment.

27. In his police interview, Chief of Assessing Duhamel explained, "that he had become frustrated with Ortolano because she was in the assessing office everyday wasting their time with questions" Duhamel said that "Ortolano was an engineer and that engineer's brain work differently than other people and she was unable to understand how the process of assessing worked." *A-9*

28. To date, the Superior Court has ruled in favor of me on numerous issues I have raised, despite the Defendant pointing out a recent decision. Indeed, the City has also suffered some embarrassing defeats in these cases:

- 226-2020-cv-00133 – July 14, 2021 – Discovery sanctions - it has been sanctioned for discovery abuse and order to pay over $8,000; and Nashua Corporation Counsel has been chastised for advancing arguments that were "[more than] a little over the top." *See B – July 14, 2021 Court Order in 00133*

- 226-2020-cv-00133 – May 3, 2022 Court Order - it has been chastised for its lack of "candor" and failure to act in "good faith;" it was admonished for the "trouble[ing length of time] it took to deny {Ortolano's] request, especially in light of the multiple extensions of response time . . . ."; The Superior Court summed up: "Going forward, the Court admonishes the City to adopt a more cooperative perspective and endeavor to respond to RTK requests more promptly." it has been ordered to pay Ortolano's attorney's fees (just over $63,000) *See C – May 3, 2022 Court Order in 00133*

- 226-2021-cv-00354 – February 7, 2022, Court Order it has been ordered to produce records stored on back-up tape and participate in "remedial training regarding the City's compliance with Right-to-Know Law records requests;" *See D – Court Order*

- 226-2021-cv-00354 – March 8, 2024 Notice of Decision – The court granted a motion for contempt and protective order for City failing to operate in good faith in delivering the emails won by me on appeal at the Supreme Court.

29. Nevertheless, the City appealed all three assessing records decisions to the New Hampshire Supreme Court.

30. I have prevailed at the Supreme Court on two of these decisions, presenting as a pro se litigant. *A-10*

31. On October 26, 2023, the Court ordered that Attorney Leonard, Deputy counsel for the City of Nashua, testify as a witness, as opposed to serving as counsel of records.

32. Nashua officials would falsely impugn my character in public hearings and meetings, which made my participation in those forums quite unpleasant. *A-11 – September 28 2021 Board of Aldermen Meeting pg.26-28*

33. At an August 13, 2019 Board of Alderman meeting Kleiner read a disparaging letter regarding my husband's and my opinions on an assessing matter. *A-12, pg 9-10*

34. Starting in September 2019, two City officials, defendants Kleiner and Bolton, would launch a three-year campaign to get the Nashua Police Department ("Nashua PD") to arrest me on false claims.

35. In terms of public disparagement, on numerous occasions, the Mayor and other officials used public meetings to accuse Ortolano of being a liar and of constantly making "scurrilous" statements in public hearings, obtained bail conditions to prevent Ortolano from attending BOA Meetings or committee meetings without an appointment and threatened to have Ortolano arrested while in public places in City Hall.

36. Ortolano was forced to file many duplicative requests to obtain public documents that were supposed to be available for immediate inspection, and the review standards applied to her were far more stringent than to other citizens.

37. The city website has an information request policy stating that Citizen requests would be ticketed within 24 hours of submission and "Our City Staff has been trained to make sure that all requests are sent to the proper department. Even if you do not know where to send the request or inquiry, you can rest assured that we know." *A-13*

38. City Officials demanded I find the correct department myself and send the same request to multiple departments, inflating the number of requests I was submitting. If the City

required additional information from me and I responded, the tracking number would be changed to a new number.

39. City officials employed false numbers to publicly claim that I had purposely overburdened the Nashua government with document requests and had cost the Nashua taxpayers huge sums of money in administrative and litigation fees, thereby depriving the citizens services. *A-14*

40. In August 2019, Kleiner was on the front page of the Nashua Telegraph detailing how much of a burden I was. *A-15*

41. Under DRA and ASB requirements, the Assessing office is required to have a Data Collection manual, required under Assessing Board Standards 3.3.2.3, available in the office for public inspection. In the fall of 2019, Ms. Kleiner provided the Board of Assessors with a newly compiled Data Collection Manual, which was absent from the City's assessing office preventing public inspection. *A-2*

42. Kleiner went to the local newspaper, which ran an article on August 20, 2019, "City Completes New Assessing Manuals." *A-16.* In the article, Kleiner contends the public has already had a chance to give input into the manual, citing that it addresses many of the concerns brought forth by me and others. I reviewed the manual and could not find any of my concerns addressed in the newly released policy manual.

43. In August 2019, the Board of Tax and Land Appeals called the City to a hearing to address their assessing practices. City of Nashua and DRA officials, along with myself, presented their concerns to the BTLA. In October 2019, the BTLA issued an "Order for Reassessment" writing:

> As noted at fn.1, the board asked the City to provide a copy of its data collection manual. The Assessor Manual and Procedures document submitted by the City,

however, is deficient in several respects. First, this document only contains one "Data Collection" section (Section 5) that only addresses "Commercial" property and not residential property. Second, this document does not fulfill the requirements stated in Section 3.3.2, including subsection 3, of the Standard on Mass Appraisal of Real Property (referenced in the Cornell Report and fn. 2). This section details many "essential" elements to make data collection "accurate and consistent." An important, preliminary step in the reassessment process in development of a data collection manual that complies with these standards and the City should complete this step, updating the board as prescribed below.

*Exh. 2 pg. 4 of 5*

44. I read a letter into the public record at the September 19, 2019, Board of Assessor's meeting, citing my concerns with important missing residential information critical to this policy manual. *A-17*

45. On multiple occasions, Nashua officials and the Defendants made public comments to the effect that Ortolano was a right-wing lunatic waging a war against the government itself.. Attorneys in the Nashua Legal Department publicly compared Ortolano's actions to those who attacked the Capitol Building in Washington, D.C. on January 6, 2021. *A-18 pg 20-22 and A-19*

46. In July 2019, the Police opened an investigation into the Nashua Assessing Office based, in part, on information I provided the police regarding the potential criminal activity of an assessor by falsely charging mileage for work not performed and against Kleiner for witness tampering.

47. The defendants repeatedly called upon the Nashua PD to investigate me for alleged criminal conduct.

48. During this investigation, Kleiner contacted the police and reported that all the employees in the Assessing Department but one would prefer not to deal with me because I was critical of their work and sometimes made them feel uncomfortable. *A-20*

49. The investigating police officer told Kleiner that this was not a crime that warranted an
    investigation, but Kleiner insisted that he warn me not to communicate with any of the
    employees outside the City Assessing Department. *A-20*

50. Two police cruisers arrived at my home, with armed officers coming to my door to warn
    me that "there was the potential that, if [Ortolano] did have contact with the [Assessing
    Department Staff], . . . I could face criminal charges depending on the circumstances of
    this contact". I was not home at the time and drove to the Police station to meet two
    officers who issued a verbal warning. *A-20*

51. Confused by the police warning, I requested the information in writing but could not
    obtain the information for four months. Police claimed that the warning was part of the
    police investigation into Turgiss' and Kleiner's potential criminal actions.

52. On October 31, 2019, Kleiner called the Nashua Police and reported that I was
    impersonating a City Hall Assessing employee by driving around and taking pictures of
    homes. This resulted in a police investigation against me, ultimately determining that the
    claim was false. *See E Kleiner Deposition Testimony and A-21*

53. Kleiner knew the description given to the City by the homeowner, did not fit my
    description. Despite the erroneous description, Kleiner called the Police and indicated
    that it was me. *See E Kleiner Deposition Testimony, pg 80, L2-3*

54. On February 3, 2022, Ms. Kleiner had the police trespass me from City Hall for one day
    because she claimed I yelled at an assessing staff person. This was untrue. Ms. Kleiner
    argued with me and said she could have me arrested for yelling at an employee. I called
    the police, concerned that Kleiner would have me arrested again. After the police spoke
    with Kleiner, they ordered me to stay off of City property for 24 hours.  I called the Chief

of Police, and about 1 month later, a new report was issued that simply stated that "it was best if she come back to City Hall on another day". *See A-22*

55. On the morning of July 22, 2022, Kleiner called the Nashua PD, asking for a police presence at City Hall as I had a scheduled appointment at City Hall at about 10:00 a.m. Kleiner claimed because of "prior incidents between the members of City Hall and Ortolano" police presence was required to "ensure that the interactions were orderly and incident free." *A-23*

56. The "prior incident" was a July 20, 2022 Finance Committee Meeting at which I had criticized the City's Director of Economic Development. Mayor Donchess interrupted my three minutes public comment because he believed I was not permitted to criticize employees. Frustrated, I told the Mayor to "shut his pie hole." *See A-24*

57. I had no such meeting scheduled, and the police eventually left City Hall.

58. Later on, however, Ortolano did come to City Hall and was spotted by defendant Bolton in a public hallway near the Legal Department speaking on her cellphone. Complaint, ¶ 130.

59. The police were called and Bolton insisted that the Nashua PD immediately arrest Ortolano for trespassing in a public hallway in City Hall. Complaint, ¶ 130-137 and *A-25*

60. The Police investigated and found no cause for arrest. *See A-25*

61. In August 2020, Inception Technologies was contracted to scan the City's property records files to create a digital system for record access.

62. On January 21, 2022, Ortolano was told by Director Cummings in an email that if she had an issue with the vendor, to contact the vendor directly *See A-26*

63. In late 2021 or early 2022, Ortolano left voicemail messages for Mr. Feoli, President of Inception Technologies, identifying herself as Laurie Ortolano of Nashua. *See* Feoli Motion for Summary Judgment Document 91-1 ¶8; (2)

64. I did identify myself from Nashua during the first call to Inception.

65. Feoli called me back, and she asked him questions about the scanning project Inception was handling for the City of Nashua.

66. I spoke with Feoli on February 4, 2022 and that Ortolano again questioned him about public access to the scanned documents. Affidavit of Laurie Ortolano, ¶ 5. Feoli provided those answers.

67. On February 4, 2022, I sent an email to Richard Vincent and cc'ed Defendant Kleiner about questions regarding the Inception data scan project. *See A-27*

68. Feoli concluded that Ortolano was representing the City because "she was calling me from Nashua." See F Feoli Deposition, Pg. 14 L1-10.

69. Feoli would later admit when pressed by the Nashua PD, I never stated to Feoli that I was a City of Nashua employee. *See F Feoli Deposition*

70. Feoli stated that there was nothing in the Ortolano voicemail that indicated she was a city employee or it agent. *See F Feoli Deposition, pg. 14 L11-14.*

71. In his Deposition, Feoli stated that if an employee wants access to the scanned documents, the Nashua Representative, Kim Kleiner, would tell the company agent that the person can have access. *See F Feoli Deposition, pg. 36 L16-19*

72. Feoli claims that he spoke by phone again with Ortolano on February 4, 2022 and that Ortolano again questioned him about public access to the scanned documents, "at one point stating/inquiring that Nashua citizens had been waiting for the project to be

completed for many months and Kleiner had not provided any public updates". *See A Affidavit of Laurie Ortolano response to Feoli Memo MSJ, ¶14 & 15.*

73. On February 6, 2022, after speaking with Kleiner, Feoli addressed an email the BOA and sent it to Kleiner, attempting to explain what had occurred with Ortolano. *A-28*

74. Right at the top – the last sentence of the short first paragraph – Feoli accused Ortolano of committing a crime: "It has come to my attention that I have been deceived by individual (sic), Laura (sic) Ortolano, who portrayed herself as city employee to me on thre (sic) different occasions." *See A-28*

75. Kleiner deliberately attended the February 8, 2022 BOA meeting to publicly defame me by making false accusations that I had been impersonating a city employee. *See A-29 pg.3-6*

76. Prior to Kleiner reporting the matter to the Nashua Police, she did not communicate with me to get her side of the events.

77. Three Aldermen voiced their concerns about the surprise issue, the public airing of it, and the unfairness of the process. *See A-29 pg 6-7, pgs. 13, 14, 17*

78. Feoli stated that there was nothing in the Ortolano voicemail that indicated she was a city employee or it agent. *See F Feoli Deposition, pg. 14 L11-14.*

79. In his Deposition, Feoli testified that his primary point of contact was Kim Kleiner, *See F Feoli Deposition Pg.11 L17-21.*

80. Ortolano did not request access to the scanned documents only when they could have access to them. *See F Feoli Deposition, pg. 36 L7-10*

81. Kleiner had not publicly discussed the inception contract completion in over a year. Yet, without the Inception contract being on the Board of Aldermen agenda, she presented an

update at the public BOA meeting as a pretext to disclose Feoli's false claims set forth in his email.

82. Rather than addressing the issue in a private session as some aldermen believed should have occurred, Kleiner addressed it in a public session watched by residents on Local Access Cable TV16 and broadcast on YouTube.

83. Discussing this in public session impugned my reputation as a private citizen and violated the Right-to-Know law.

84. The Nashua Police Department found no crime had been committed. *A-30*

85. I incorporate herein my Affidavit filed in my objection to the Lombardi Motion for Summary Judgement.

86. I incorporate herein my Affidavit filed in my objection to the Bolton and Leonard Motion for Summary Judgement.

87. I incorporate herein my Affidavit filed in my objection to the Carignan Motion for Summary Judgement.

88. I incorporate herein my Affidavit filed in my objection to the City of Nashua Motion for Summary Judgement.

        SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 1st DAY OF
JULY 2024.

                                                LAURIE ORTOLANO

Personally appeared, Laurie Ortolano, on July 1, 2024, and swore under oath that the facts asserted herein are true to the best of my knowledge and belief.

NOTARY PUBLIC

15