**Nashua Police Department**
Page: 1
2019-08-22 1445HRS INTERVIEW W/ RONALD "JON" DUHAMEL
Ref: 19-46336-OF

**Redactions of DOB pursuant to 91-A:5,IV, confidential information and disclosure would constitute invasion of privacy**

On August 22, 2019 at approximately 1445 hours Detective Sergeant MacLeod and I responded to the Concord, New Hampshire Police Department, located at 35 Green Street in Concord, New Hampshire. We responded to that location to meet with the former Chief Assessor of the Nashua Assessing Department, Ronald Jonathan Duhamel (DOB: ). I had previously made contact with Duhamel on the phone and he had agreed to meet with us at the Concord Police Department to provide a statement in reference to this investigation.

At approximately 1505 hours while in one of the interview rooms within the Concord Police Department Duhamel began providing Detective Sergeant MacLeod and I with an audio recorded statement. As I began recording our conversation I confirmed that Duhamel was aware our conversation was being audio recorded and that he was fine with that. I also confirmed that Duhamel was providing his statement voluntarily and that he was currently not under the influence of any drugs or alcohol.

In speaking with Duhamel he explained that he had been the Chief Assessor in Nashua from May of 2016 until March of 2019. Duhamel said that previous to this he had been working in the assessing field since 2001. Duhamel said that as the Chief Assessor it was his job to oversee the entire Nashua Assessing Department. Duhamel explained that the Assessing Department consisted of two commercial assessors, Doug Dame (DOB: ) and Greg Turgiss (DOB: ). Two residential assessors, Gary Turgiss (DOB: ) and Michael Mandile (DOB: ). And several administrative staff members.

Duhamel was asked if anyone else within the Assessing Department held a supervisor title. Duhamel explained that Louise Brown (DOB: ) was the head of the administrative staff. This meant that Brown supervised the administrative staff and she reported to Duhamel. Duhamel was asked about the assessor side of the department. Duhamel explained that the four assessors reported to him and that none of them supervised each other. Duhamel explained that there could be some confusion with the levels of certifications they are given from the state. Duhamel said that the highest certification level an assessor could receive from the State of New Hampshire was Assessor Supervisor. Duhamel stated that Greg and possibly Doug and Gary had received this level of certification through the state however they did not supervise anyone within the Nashua Assessing Department.

In speaking with Duhamel about what the Assessing Department does for the city of Nashua, Duhamel explained that it is the responsibility of the Assessing Department to assess the value of properties in Nashua. Duhamel explained that the goal is to have properties in Nashua assessed as close to fair market value as possible. Duhamel explained that this is done by conducting sales analysis, comparing similar type properties, and inspecting properties when possible. Duhamel said that they do not just set the assessed value to the most recent sales price. Duhamel said that would be considered sales chasing, which is a practice the Nashua Assessing Department does not participate in.

Duhamel explained that after analysis is completed a base value is determined for a specific type of property. An example of this would be a ranch style residence would be given a base value. This base value is the same for every ranch style residence in Nashua regardless of any other variable. Duhamel said that part of his job as Chief Assessor was to set these base values and he was the only one within the office that had the ability to set the base values within the office. Duhamel did however explain that when the city enlisted the services of the private company KRT to assist them with a reevaluation update in 2018 KRT had the abilities to adjust the base values of properties as well as him.

Duhamel explained that once the base rate was in place that number was added to other factors such as location, condition, additions, deprecation, etc. and that would be how they would determine the value of a property. Duhamel explained that some of the factors that are taken into consideration when determining the value of a property such as condition could vary and thus make this job an imperfect science. Duhamel said that the goal when assessing properties is to try and get them as close to fair market value as possible.

Duhamel explained that if a residence was unhappy with their assessment or felt it was incorrect they could file for an abatement. This is basically when a residence request for their property to be reassessed. This includes the Assessing Department attempting to inspect the property, reviewing the property information, and make adjustments if needed. These adjustments could result in the assessed value being raised, lowered, or remaining the same.

Duhamel explained that changes could be made to a property without the property owner going through the abatement process if there is an error in the information the Assessing Department had for a specific property. For example if a property was being assessed as having a deck and the property owner informs the Assessing Department that the deck had been removed years ago. The Assessing Department would be able to confirm that there is no longer a deck and adjust the property value accordingly from that point going further. This change would however not be

**Redactions of DOB pursuant to 91-A:5,IV, confidential information and disclosure would constitute invasion of privacy**

retroactive for when the deck was originally removed just from when the Assessing Department was made aware of the change.

Duhamel explained that in addition to residents bring in requests for abatements or issues with their properties data other instances that would trigger an assessment would be by request, sales, building permits, and verifying exemptions. An example of a property that would receive an exemption would be a school or an elderly resident that owns property. An exemption is basically when certain properties are not required to pay as much or any taxes based on what they are used for or who owns them.

Duhamel explained that when he took over as the Chief Assessor in Nashua's Assessing Department he felt that everything within the department was running smoothly. Duhamel said that the assessors all did a good job and he never had any issues with any of them. Duhamel stated that there were times when he felt like he did not have anything to do because everyone was working and doing their jobs and there were no issues for him to address.

Duhamel did say that while he was the Chief Assessor he had been attempting to get the city to update the software that the Assessing Department used. Duhamel said that this was because the software they had been using was old and there were much better versions available. Duhamel said that he had also been pushing to update the property data for the entire city. Duhamel however stated that he was unable to do either of these things due to a lack of funds.

Duhamel did state one project that he was asked to address while he was the Chief Assessor was to update a policy manual for the Assessing Department. Duhamel said that he did not think this was needed because the office was running smoothly and everyone already knew how to do their job and was doing them correctly.

When Duhamel was questioned about the assessors' wages he explained that the assessors were salaried employees. Duhamel explained this meant that the assessors were not eligible for overtime regardless of the hours they worked. Duhamel said that the hours the Assessing Department was open was Monday through Friday from 0800 hours to 1700 hours. Duhamel said that the assessors were given an hour each day for lunch. Duhamel said the assessors were not required to take their lunch break at a specific time however he preferred if they staggered them between 1200 hours and 1400 hours to insure that they had at least one assessor available at all times in case something came up that needed to be addressed.

Duhamel said that because the assessors were not entitled to overtime he tried to be flexible with them. For example if an assessor got stuck late working on something he allowed them to come in late or leave early on another day. Duhamel said there was no written or documented policy for this it was just something he did for them.

Duhamel was then asked about mileage and how it was documented by assessors. Duhamel explained that the assessors submitted their mileage monthly on mileage reimbursement forms. Duhamel said that this form just listed their daily mileage for the month. Duhamel said that he trusted each of his assessors and that the forms were filled out correctly. Duhamel said he never saw any reason to not trust them so he never questioned the mileage they submitted for reimbursement.

Duhamel said that the Chief Assessor previous to him, Angelo Marino had required the assessors to keep a separate work log that documented properties they had visited. Duhamel said that he had told the assessors not to worry about these work logs because he felt they were a waste of time. Duhamel said that once the Assessing Department started receiving complaints they were instructed to start doing the work logs again. Duhamel said that even after they were told to do the logs again he still did not keep tabs on them because he felt the assessors were all adults that knew how to do their jobs and they were getting their work done.

When asked about mileage the commercial assessors traveled for work Duhamel explained that Dame did not leave the office much. Duhamel said that Dame did more research so his mileage would typically be much lower than the other assessors. Duhamel said that Greg had transitioned for residential assessor to commercial assessor in August of 2016. Duhamel said that during Greg's transition period he was doing both commercial and residential assessments. Duhamel said he expected Greg's mileage to be higher than Dame's mileage based on the type of work they were doing.

Duhamel was asked about complaints against the Assessing Department that he was aware of. Duhamel explained that Nashua property owner, Laurie Ortolano (DOB:          ) had made complaints that Duhamel was rude to her. Duhamel said that he probably was rude to Ortolano. Duhamel explained that he became frustrated with Ortolano because she was in the assessing office everyday wasting their time with questions. Duhamel said that Ortolano was an engineer and that engineer's brains work differently than other people and she was unable to understand how the process of assessing worked.

Case 1:22-cv-00326-LM Document 102-12 Filed 07/01/24 Page 3 of 3 Page: 3

Nashua Police Department
2019-08-22 1445HRS INTERVIEW W/ RONALD "JON" DUHAMEL
Ref: 19-46336-OF  Redactions of DOB pursuant to 91-A:5,IV, confidential information and disclosure would constitute invasion of privacy

Duhamel estimated that his first interaction with Ortolano occurred approximately one year prior. Duhamel however stated that the Assessing Department had been dealing with Ortolano prior to that. Duhamel admitted that during his initial interactions with Ortolano she was pushed aside because he did not want the Assessing Department wasting their time dealing with her.

Duhamel estimated that in 2014 Gary had gone out to assess Ortolano's property of 41 Berkley Street after she had purchased it for approximately $750,000.00. Duhamel said from what he could remember the house had be remodeled since a previous assessment so the assessed value increased from around $500,000.00 to around $680,000.00, which seemed more reasonable based on the recent sale price of the residence.

Duhamel said that Ortolano complained about her assessed value increasing so he sent Greg out to her property to conduct another assessment. Duhamel said that he sent Greg because Mandile was new at that time and Dame only did commercial assessments so Greg was his only option. Duhamel said that Greg made a few changes which ended up lowering Ortolano's assessment a little bit but not much. Duhamel stated that he felt Greg's assessment was fair and he in no way felt like Greg had covered for Gary.

Duhamel said that he also recalled Ortolano making an accusation that Gary was friends with the property owner of 17 Berkley Street and had been using his position as an assessor to do favors for this property owner. Duhamel stated that he did not think there was any truth to these accusations at all. Duhamel explained he felt this way because he had not seen anything to corroborate the accusation and he did not feel like Gary would do something like that.

Duhamel was asked if there were issues in the Assessing Department when he was there. Duhamel said the only issue in the Assessing Department when he was there was with administrative staff member, Cheryl Walley (DOB: ). Duhamel said that Walley had previously sued the city of Nashua and received money. Duhamel said that this in addition to Walley having some sort of personal relationship with the city of Nashua's attorney Steve Bolton made employees of city hall uneasy around Walley.

Duhamel described Walley as the type of person that felt she should be the boss. Duhamel said Walley would always push back on everything she was told to do. Duhamel added that he felt that Walley would feed residents information when they were making appeals to the Assessing Department. Duhamel said that Walley also had issues with Brown, who was Walley's direct supervisor. Duhamel suspected that Walley did not like Brown because Brown had been promoted to her position as office manager over Walley and he felt that Walley resented Brown for this. Duhamel said that if he could have fired Walley the Assessing Office would have operated much smoother.

Duhamel was then asked about the results from the audit that was conducted on the Assessing Department. Duhamel said that they found that the software needed to be updated, they needed to conduct a full measure and list, there were ineffective policies and procedures, and they eliminated the Chief Assessor position.

With the majority of Duhamel's assessing career occurring in places other than Nashua he was asked for his opinion of Nashua compared to other places he has worked. Duhamel described Nashua as "top notch". Duhamel said that Nashua was great compared to the other places he has worked. Duhamel said that Nashua follows all the state standards and has access to better resources then most communities. These resources include flyover photography and access to MLS data. Duhamel further stated that in his opinion the assessors in Nashua were some of the best in the state. Duhamel said that he was upset that his position was eliminated because he liked his job and the assessors that he worked with.

With no further questions for Duhamel at that time and with Duhamel not having any further information or concerns to inform the Nashua Police of the interview was ended at approximately 1625 hours. After the interview was complete Duhamel was escorted back to the front lobby of the Concord Police Department where he was thanked for his time and I ended my contact with him.

An audio copy of this interview was later tagged as evidence per departmental procedure under Nashua Police Department property number 19-5754-PR.

DETECTIVE LOMBARDI 16