## THE STATE OF NEW HAMPSHIRE

**HILLSBOROUGH, SS.**
**SOUTHERN DISTRICT**

**SUPERIOR COURT**
**No. 2020-CV-00133**

Laurie Ortolano

v.

City of Nashua

### ORDER

The plaintiff, Laurie Ortolano, has brought a petition under New Hampshire's Right-to-Know Law ("RTK" law), RSA 91-A, seeking access to records from the City of Nashua's (the "City") Assessing Department (the "Department"). After an extensive period of pretrial litigation, the Court held a bench trial on the petition on December 13, 14, and 16, 2021. At the trial, the Court heard testimony from the plaintiff, former Department Coordinator Cheryl Walley, KRT Appraisal ("KRT") Project Manager Robert Tozier, City Risk Manager Jennifer Deshaies, Nashua Police Department ("Nashua PD") Communications Manager David Lavoie, City Director of Administrative Services Kimberly Kleiner, and City legal department Assistant Manuela Perry. Additionally, exhibits were submitted at the bench trial for the Court's consideration. After consideration of the evidence, the arguments, and the applicable law, the Court finds and rules as follows.

### Background[1]

---

[1] In light of this narrative order, the Court declines to rule on the plaintiff's proposed findings of fact and rulings of law. See Magrauth v. Magrauth, 136 N.H. 757, 760 (1993) (stating superior court not required to rule on parties' requests for findings and rulings as long as decision sufficiently recites bases for decision).

By way of brief background, this action arose from the plaintiff's concerns regarding the Department.  In 2018, the City hired KRT to conduct its semi-annual, mandated reevaluation of property values.  Such work involves assessing properties within the City and providing an assessment value for each.  This value is used to determine the property tax owed on each property.  As the 2018 assessment work was concluding, the plaintiff became concerned about how KRT and the Department performed the work.  As a result, she sought numerous documents from the Department under RSA 91-A about this work and property owners' concerns with their reevaluations.

In 2019, the plaintiff became concerned about the conduct of two Department employees.  Her concerns helped instigate a Nashua PD investigation into the Department.  Several Department employees were interviewed.  The investigation concluded without any charges being filed against the employees.  However, during the course of the investigation, the plaintiff was warned by Nashua PD not to contact Department employees outside of City Hall.  No charges were brought against the plaintiff.  The plaintiff sought documents and interview footage from these investigations.

<u>Analysis</u>

"The purpose of the Right-to-Know Law is to ensure both the greatest possible public access to the actions, discussions and records of all public bodies, and their accountability to the people."  <u>N.H. Right to Life v. Dir., N.H. Charitable Trs. Unit</u>, 169 N.H. 95, 103 (2016) (quoting RSA 91-A:1).  "Thus, the Right-to-Know Law furthers our state constitutional requirement that the public's right of access to governmental

proceedings and records shall not be unreasonably restricted." Id. (quotation omitted);
see also N.H. CONST. pt. 1, art. 8 ("Government . . . should be open, accessible,
accountable and responsive. To that end, the public's right of access to governmental
proceedings and records shall not be unreasonably restricted.").  "Although the statute
does not provide for unrestricted access to public records, [the Court] resolve[s]
questions regarding the Right-to-Know Law with a view to providing the utmost
information in order to best effectuate these statutory and constitutional objectives." Id.
(quotation omitted).  Consistent with this statutory purpose, the Court may "look to other
jurisdictions construing similar statutes for guidance, including federal interpretations of
the federal Freedom of Information Act (FOIA)." Censabella v. Hillsborough Cty.
Attorney, 171 N.H. 424, 426 (2018).

The plaintiff now seeks to be provided with certain records she argues should
have been made available to her pursuant to her requests under RSA 91-A.
Specifically, she seeks the following records, brought as individual counts in her
amended complaint: (A) security camera footage from the Assessing Department office
(the "Office"); (B) Nashua PD investigation reports of Greg Turgiss and the threat of an
arrest made to the plaintiff; (D) unredacted KRT informal hearing review sheets; (G1)
KRT field data collection cards; (G2) the Department's policy and procedure manual;
and (I) audio and video recordings of interviews from the aforementioned Nashua PD
investigations.[2]  Finally, the plaintiff seeks attorney's fees based on the City's alleged
violations of the RTK law.  The Court will address each request in turn.

(A)    Office Security Camera Footage

---

[2] The petitioner brought additional claims that have since been withdrawn.

Sometime in the spring or summer of 2019, the City installed a security camera in the Office. The City did so in order to monitor the areas within City Hall with cash flow, of which the Office is one. The camera is installed on the employee-side of the room, facing the counter. The camera is not monitored in real time. The City shares the footage, upon request, with the Nashua PD. The City routinely denies citizen requests to view footage. (See Trial, Day 2 at 2:49.)

On August 7, 2019, the plaintiff visited the Office to request to view property owner abatement files. Ms. Walley, who was working in the Office at the time, received permission from her supervisor, Louise Brown, to let the plaintiff look at the files. Subsequently however, Ms. Walley was placed on disciplinary leave. The plaintiff learned that Ms. Walley had been reprimanded for having spent one hour assisting the plaintiff with the files, a timeframe the plaintiff disputes.

On September 9, 2019, the plaintiff emailed City attorney Celia Leonard, requesting access to the camera footage from "around the second week of August" in order "to determine if Ms. Kleiner is accurate in her disciplinary action against a City employee and her video of myself." (Pl. Ex. 1.) On September 13, Attorney Leonard replied, denying her request under RSA 91-A:IV because the plaintiff did not specify a date or date range. Attorney Leonard said the request was thus not reasonably described. She also stated that "personnel matters are confidential," but that she would reevaluate the plaintiff's request if the plaintiff provided more detail. (Pl.'s Ex. 2.) On September 16, 2019, the plaintiff emailed Attorney Leonard and Ms. Perry asking to "review the video data for August 7 for footage of myself and Cheryl Walley review[ing] KRT abatements." (Pl.'s Ex. 3.) On September 20, 2019, Attorney Leonard wrote the

plaintiff informing her that "[t]he time reasonably necessary to determine whether the request shall be granted or denied is by October 11, 2019." (Pl.'s Ex. 5.)[3]

On October 10, 2019, however, Attorney Leonard wrote the plaintiff to inform her the review was taking longer than expected and that the plaintiff could expect completion of the review by October 25, 2019. (See Def.'s Ex. A.) On October 24, 2019, Attorney Leonard again extended the review time completion date to November 8, 2019, without providing an explanation as to why. (See Def.'s Ex. D.) On November 8, 2019, Attorney Leonard emailed the plaintiff and several other people who had made RTK requests for Office camera footage. In this correspondence, Attorney Leonard stated that reviewing all of the requested footage was taking longer than expected, and that all reviews should be completed by November 15, 2019. (See Def.'s Ex. E.)

On November 13, 2019, the City denied each request under the following RSA 91-A:5, IV exemptions: internal personnel practices; confidential information; "personnel and other files whose disclosure would constitute invasion of privacy;" and records relating to emergency functions. (Pl.'s Ex. 6.) The City also denied the request under the Murray exemption, see Murray v. N.H. Div. of State Police, 154 N.H. 579 (2006), "for records or information complied [sic] for law enforcement purposes, which purposes include both civil and criminal matters." (Pl.'s Ex. 6.)[4]

The plaintiff now argues the City unreasonably delayed its response, and violated the RTK law by denying her access to the footage. The City replies that it did not

---

[3] On October 11, 2019, the plaintiff emailed Attorney Leonard asking for footage for the entire day of August 7, 2019. (See Def.'s Ex. B.) On October 15, 2019, Attorney Leonard responded, notifying her that the City had learned that it was more difficult to respond to requests for an entire day's footage rather than for shorter, discrete time periods. (See Def.'s' Ex. C.)
[4] The Court rejected the City's arguments that the footage was exempt under the emergency function and Murray exemptions in its November 23, 2020 order on the plaintiff's motion for summary judgment. (See Court Index #62.)

unreasonably delay, and that it properly exempted the footage under RSA 91-A:5, IV.

This subsection of the statute exempts from disclosure "[r]ecords pertaining to internal

personnel practices; confidential, commercial, or financial information; . . . and other

files whose disclosure would constitute invasion of privacy."  Interpreting this exemption

requires "analysis of both whether the information sought is confidential, commercial, or

financial information, and whether disclosure would constitute an invasion of privacy."

Union Leader Corp. v. New Hampshire Hous. Fin. Auth., 142 N.H. 540, 552 (1997)

(quotation and citation omitted).

While the footage may show City employees working, the plaintiff argues the

footage does not show internal personnel practices, nor disclose confidential

information or constitute an invasion of privacy.  Alternatively, the plaintiff contends the

public interest in access to the sought footage outweighs any privacy interest.  The City

replies that any public interest in the footage is minimal and outweighed by privacy

interests.

In deciding this question, the Court performs a three-part test that weighs the

benefits of disclosure of the footage to the public against the benefits of non-disclosure

to the City.[5]  See Goode v. N.H. Office of Legislative Budget Assistant, 148 N.H. 551,

554 (2002) (citation omitted).

> First, [the Court] evaluate[s] whether there is a privacy interest at stake that
> would be invaded by the disclosure . . . If no privacy interest is at stake, the
> Right-to-Know Law mandates disclosure.

---

[5] To the extent the City argues the footage is part of personnel files, (See Def.'s Memo. at 4), the Court disagrees.  Ms. Deshaies testified that the security camera was installed for the sole purpose of monitoring the cash box in the Office.  While the footage may have incidentally been viewed when determining whether Ms. Walley should be disciplined, there was no evidence presented to the Court that the footage is actually part of any City employee's personnel file.  See Reid v. N.H. Attorney Gen., 169 N.H. 509, 528 (2016) (citation omitted).

> Second, [the Court] assess[es] the public's interest in disclosure.
> Disclosure of the requested information should inform the public about the
> conduct and activities of their government. . . .
> Finally, [the Court] balance[s] the public interest in disclosure against the
> government's interest in nondisclosure and the individual's privacy interest
> in nondisclosure.

Lambert v. Belknap County Convention, 157 N.H. 375, 382–83 (2008).

Whether or not there is a privacy interest at stake is an objective inquiry. Id. The

City cites N.H. Right to Life v. Dir., N.H. Charitable Trusts Unit, 169 N.H. 95, 114 (2016)

in support of its assertion that citizens and Department employees captured by the

security camera have a privacy interest in the footage. That case addressed whether

people or their vehicles caught on security camera in the midst of a protest at a health

clinic—but whose relationships to the clinic and protest could not be determined from

the footage—had a privacy interest in the footage. The New Hampshire Supreme Court

found that the non-protesting individuals visible in the footage had "at least some

privacy interest in controlling the dissemination of the DVD footage." Id. at 113.

Nevertheless, the supreme court held that, without being provided with more information

about the non-protesting individuals, "we cannot assess whether, in fact, the DVDs

implicate heightened privacy concerns. Nor can we determine the weight to be given to

the privacy interests at stake." Id.

Based on the Court's review of the security camera footage, it shows little more

than what a customer would be able to see if physically present in the office. At most,

the footage reveals who was in the Office at what times. Accordingly, while employees

and customers have a privacy interest in the footage, such interest "is minimal because

the [footage] [does] not reveal intimate details of an individual's life." N.H. Civil Liberties

Union v. City of Manchester, 149 N.H. 437, 441 (2003).

Having determined there is a privacy interest at stake, however minimal, the Court next analyzes the public interest in disclosure of the footage.  The plaintiff argues the footage is necessary for "the public interest in gauging the actions of the City" because it is the only evidence that "would shed light" on the interaction in question between the plaintiff and Ms. Walley.  (Pl.'s Memo. at 3.)  She also asserts the footage would show how she was disparately treated by Department employees.  The City maintains that any public interest is minimal because the footage merely shows Department employees' day-to-day work activities.

> Disclosure of the requested information should inform the public about the conduct and activities of their government.  If disclosing the information does not serve this purpose, disclosure will not be warranted even though the public may nonetheless prefer, albeit for other reasons, that the information be released.

Lambert, 157 N.H. 375 at 383.

Although the footage may not provide groundbreaking revelations about the Department's functioning, it still provides some information about a governmental entity's conduct and activities.  See Union Leader Corp. v. Nashua, 141 N.H. 473, 476–77 (1996) ("If the general public has a legitimate, albeit abstract, interest in the requested information such that disclosure is warranted, disclosure must be made despite the fact that the party actually requesting and receiving the information may use it for less-than-lofty purposes." (quotation omitted)).  Specifically, and relevant here, the footage provides direct information about whether the Department accurately characterized the interaction between the plaintiff and Ms. Walley on August 7, 2019.  Cf. Lamy v. N.H. Pub. Util. Comm'n, 152 N.H. 106, 111 (2005) (holding little public interest in disclosure of names and addresses of utility customers where the

disclosure's sole public purpose would be to discover potential derivative information and was only tangentially related to the RTK law); see also Fed. Labor Relations Auth. v. U.S Dep't of Def., Army & Air Force Exch. Serv., Dallas, Tex., 984 F.2d 370, 375 (10th Cir. 1993) (finding no public interest in federal employee names and home addresses because such information "has nothing to do with public scrutiny of government activities").

While the footage's value to the public may not be enormous, the City's interest in its nondisclosure is miniscule.  In performing this analysis, the Court looks at factors such as "whether disclosing the information is likely to impair the [City's] ability to obtain necessary information in the future and whether disclosure is likely to cause substantial harm to the person from whom the information was obtained. Towle v. Commissioner, N.H. Dep't of Corr., No. 2020-0221, 2021 WL 861731, at *1 (N.H. Feb. 26, 2021) (non-precedential) (citation omitted).  No such risks are present in this case.  The footage would cause no substantial harm where, as the Court determined from its viewing thereof, the footage does not reveal what is on employee or customer computers.  The footage reveals that there are stacks of paper around the Office but not what is on the pieces of paper.  Indeed, the footage reveals only one view that is not accessible to the public in the office: the cleaning supplies and additional unidentifiable stacks of paper behind the counters.

The Court "construe[s] provisions of the Right-To-Know law favoring disclosure broadly and exemptions from disclosure narrowly, mindful that the purpose of the statute is to ensure the greatest possible public access to the actions, discussions, and records of public entities and the accountability of such public entities to the people."

Towle, 2021 WL 861731, at *1 (citation omitted).  Further, "[t]he party resisting

disclosure bears a heavy burden to shift the balance toward nondisclosure." N.H. Civil

Liberties Union, 149 N.H. at 440; see also Provenza v. Town of Canaan, ___ N.H. ___,

___ (April 22, 2022) (slip op. at 3).  In light of this standard and the facts at issue

analyzed under the balancing test, the Court finds the balance favors the plaintiff.  The

footage is not exempt from disclosure under RSA 91-A:5.

   The Court lastly addresses the burden on the City of producing the footage.

While the Court is not unsympathetic as to the amount of time that may be required to

comply with the City's obligations under the RTK law, the City is still obligated to

comply.  In this case, the search was not overly-burdensome such that the Department

should be exempt from having to perform it.  Courts "have held that agencies are

excused from complying with FOIA requests where review[ing], redact[ing], and

arrang[ing] for inspection [of] a vast quantity of material presents an unreasonable

burden." Long v. U.S. Immigration & Customs Enforcement, 149 F. Supp. 3d 39, 55-56

(D.D.C. 2015) (quotation omitted).  That said, "when an agency claims that complying

with a request is unreasonable, it bears the burden to provide [a] sufficient explanation

as to why such a search would be unreasonably burdensome." Ayuda, Inc. v. U.S. Fed.

Trade Comm'n, 70 F. Supp. 3d 247, 275 (D.D.C. 2014) (quotation omitted).  "Among the

factors that a court may consider in assessing the claimed burden are the amount of

time, expense, and personnel that would be required to complete document searches

and production, as well as whether the agency has the existing technology or would

have to purchase new technology to perform those tasks." Long, 149 F. Supp. 3d at 55.

Ms. Deshaies testified that it would take approximately an hour to prepare video footage

responsive to a request for two minutes of footage.  (See Trial, Day 2 at 3:03.)  It is

unclear to the Court why preparing footage that shows only the day-to-day operations of

the Office would require much review or redaction.  It took the Court approximately eight

hours to review the footage at issue.

Nevertheless, and assuming Ms. Deshaies accurately represented the amount of

time required, the Court still finds that the search is not overly-burdensome.  Assuming

an eight-hour day, by Ms. Deshaies' estimation that two minutes of footage would take

an hour to review, eight hours of footage would take 240 hours to review, which is far

less than the thousands of hours or years of processing time identified by other courts

as being overly-burdensome.  See e.g., Nat'l Day Laborer Organizing Network v. U.S.

Immigration and Customs Enforcement, No. 16-CV-387, 2017 WL 1494513, at *12

(S.D.N.Y. Ap. 19, 2017) (finding response to a FOIA request would be unreasonably

burdensome where defendant showed it would take up to 58 work years to comply).

Moreover, the plaintiff provided a shorter, more specific footage timeframe that would

have taken the City even less time to review.  The Court declines to hold that *any*

request for Office security camera footage would be reasonable, but has no difficulty

doing so in this particular case, based on the limited nature of the request.  Accordingly,

the Court orders the City to provide the requested footage to the plaintiff.[6]

---

[6] To the extent the City wishes to relitigate the Court's holding with respect to the Murray exemption or exemption for emergency functions, the Court declines to reconsider its ruling in its November 23, 2020 order.  The Court also declines to find the months-long delay between the plaintiff's request for the footage and the City's final denial was unreasonable such that it constituted a separate RTK law violation. The Court is somewhat troubled by how long it took to deny the request, especially in light of the multiple extensions of the response time.  However, the Court is also mindful of the challenges that arose from dealing with multiple, voluminous RTK requests.  Going forward, the Court admonishes the City to adopt a more cooperative perspective and endeavor to respond to RTK requests more promptly.

(B)    Nashua PD Investigation Reports[7] and (I) Recordings of Witness Interviews

In June of 2019, the plaintiff reported concerns she had about potential fraudulent activities on the part of Greg Turgiss, an assessor for the Department.  She was also concerned about potential witness tampering on the part of Ms. Kleiner.  (See Pl.'s Ex. 12.)  Nashua PD opened an investigation, during which, it interviewed a number of Department employees.[8]  On September 22, 2019, amidst the ongoing investigation into Mr. Turgiss, the plaintiff was given a verbal warning by Nashua PD to not contact any Department employees outside of City Hall, except for Ms. Walley.[9]

On September 23, 2019, the plaintiff requested a copy of the police reports concerning Nashua PD interviews with Department staff.  She also asked for the day on which "the complaint" was filed.  (Pl.'s Ex. 9.)  On the same date, Detective Frank Lombardi of the Nashua PD replied that the investigation into the Department was ongoing and so he could not then provide the information she requested.  He also indicated he did not know when the records might become available.  (Id.)  On December 24, 2019, the plaintiff's then-attorney Richard Lehmann wrote to Detective Lombardi, subject line "Right to Know Request – Investigation of Laurie Ortolano," confirming that the plaintiff's September 23, 2019 request for police reports had been made pursuant to the RTK law.  (Pl.'s Ex. 10.)  He also asked to be provided with the "complete investigative file," including police reports written by the officers who went to the plaintiff's residence to issue the warning, and any statements made by Department

---

[7] The petitioner moved for summary judgment on this claim, which the Court denied.  (See Court Index #88.)

[8] The investigation closed because there was insufficient probable cause for any criminal offenses having occurred arising from the concerns raised by the plaintiff.  (See Pl.'s Ex. 12.)

[9] At some point, the plaintiff came to believe that the investigation of her had been rolled into a broader investigation involving Mr. Turgiss and Ms. Kleiner.  (Trial, Day 1 at 11:06.)

employees about the plaintiff.  (Id.)  Detective Lombardi responded to Attorney

Lehmann on December 26, 2019, stating that the investigation was still ongoing and

thus none of the reports could be released at that time.  He wrote that once the

investigation was complete, the plaintiff "will be notified and able to obtain copies of the

report from our Records Department."  (Pl.'s Ex. 11.)

On January 15, 2020, Attorney Lehmann wrote to Detective Lombardi, reporting

that the plaintiff had been notified that the investigation had been closed.[10]  Attorney

Lehmann specifically requested "[a] copy of any reports or communications concerning

the September 22, 2019 meeting between [the plaintiff] and members of the Nashua

Police Department;" and "[a] complete copy of the investigative file of any Nashua

Police Department activity concerning assessing department employees."  (Pl.'s Ex.

13.)  On January 16, 2020, Lieutenant Mederos replied that he had forwarded the

plaintiff's RTK requests to their records department for processing, and that the records

department would "be in touch" once the processing was completed.  (Def.'s Ex. G.)

On January 23, 2020, Nashua PD sent Attorney Lehmann a letter along with a

number of responsive documents pertaining to the investigation of the plaintiff.  Among

these were report narratives of contacts between the plaintiff and the Nashua PD.  (See

Pl.'s Ex. 14.)  The responsive records did not contain footage or transcripts of police

interviews with Department staff.  With respect to the requested records concerning the

investigation into the Department, the letter stated that the records department would

---

[10] Sometime in January of 2020, Lieutenant Daniel Mederos sent an intradepartmental communication
about the investigation into the Department to Captain Kerry Baxter.  This communication reflected
Nashua PD's conclusion that there was insufficient probable cause to believe there were any criminal
offenses that arose from the employees' activities about which the plaintiff was concerned.  The Nashua
PD thereafter closed the investigation.  (See Pl.'s Ex. 12.)

need to review and redact them.  Attorney Lehmann was advised that this process should be completed by March 31, 2020.  (Id.)  However, on March 30, 2020, Attorney Leonard extended the time of completion of the process to May 29, 2020, which she attributed to the COVID-19 pandemic.  (Pl.'s Ex. 15.)  On May 29, 2020, Attorney Leonard wrote to Attorney Lehmann and informed him the City was providing ten tranches of approximately 200 pages each of responsive records in electronic form.[11]

On June 1, 2020, Attorney Lehmann wrote to Attorney Leonard specifically requesting footage of the interviews of employees made as part of the investigation into the Department.  (See Pl.'s Ex. 18.)  Attorney Leonard responded on June 8, 2020 that she had forwarded the request to Nashua PD, which sent her multiple CDs of witness recordings.  Attorney Leonard told Attorney Lehmann that the City would need to review the recordings, which would require that the recordings first be transcribed.  She stated she would follow up by June 29, 2020, or when a date of completion of the transcripts was provided to the City, whichever was earlier.  (See Pl.'s Ex. 19.)

In response, on June 9, 2020, Attorney Lehmann wrote Attorney Leonard that the request for recordings of the interviews was not a new request but rather stemmed from the September 23, 2019 request for the complete investigative file.  He told her that "[c]learly my request for a 'complete copy of the investigative file' includes audio and / or videotaped interview[s] with assessing department[ ] employees."  (Pl.'s Ex. 20.) Attorney Leonard failed to abide by the June 29, 2020 timeline.  (See Def.'s Ex. I.)

---

[11] Among the responsive documents provided was a summary of a Nashua PD interview with Ms. Walley in which she stated she did not think a police investigation was necessary.  (See Pl.'s Ex. 16.)  Also among the responsive documents was the Nashua PD interview with Ms. Kleiner.  (See Pl.'s Ex. 17.)  The City also sent Mr. Turgiss's work logs.  (See Def.'s Ex. H.)  No interview footage was sent.  At the trial, Mr. Lavoie testified that the footage was considered physical evidence, not considered part of the investigative file.  He also testified he did not have access to the footage.  (See Trial, Day 2 at 3:56–59.)

On July 10, 2020, Attorney Leonard told Attorney Lehmann that investigative files do not contain audio or video recordings of witness interviews because those are considered evidence by Nashua PD. Accordingly, she stated that Attorney Lehmann had already been provided with the complete investigative file as requested. Thus, according to Attorney Leonard, the request for the footage constituted a separate request. She said she did not have a timeline for the transcript review process, but said she would follow up on August 15, 2020. (See Pl.'s Ex. 21.)

On August 6, 2020, Attorney Lehmann wrote Attorney Leonard requesting she provide him with the interview transcripts. (See Pl.'s Ex. 22.) On August 14, 2020, Attorney Leonard wrote Attorney Lehmann to inform him that the City had received the transcripts on July 28, 2020. She also wrote that the time reasonably necessary to determine if the City would grant or deny the request was August 31, 2020. She said she would follow up as to whether the actual recordings could be provided by September 30, 2020. (See Pl.'s Ex. 23.) On September 30, 2020, Attorney Leonard wrote Attorney Lehmann interpreting his August 6, 2020 request for transcripts as being a separate request from his request for audio and video records. Attorney Leonard also stated that, as a result of COVID-19, the review and redaction process would take longer, and that the City would follow up by October 30, 2020. (See Pl.'s Ex. 24.) However, on October 30, 2020, Attorney Leonard wrote Attorney Lehmann to inform him that the City was declining to produce the transcripts and footage, citing the Murray exemption. (See Pl.'s Ex. 25.)

The plaintiff now argues she should have been provided with the transcript and footage of the interviews conducted as part of the Nashua PD investigation into Mr.

Turgiss. As an initial matter, the Court need not address the City's argument that the plaintiff's September 23, 2019 email did not constitute a RTK request or, even if it did, the request was not reasonably described. It is undisputed that Attorney Lehmann's December 24, 2019 email was a RTK request. The first question before the Court is instead whether the December 24, 2019 email reasonably described the footage and transcripts, or whether the June and August, 2020 requests for these records constituted separate RTK requests. The Court is not convinced that the December 24, 2019 request reasonably described the interview recordings or transcript thereof. The plaintiff cites no authority indicating that witness interview footage or transcripts are automatically considered to be part of a police investigative file. The plaintiff also did not show that the City typically views interview footage or transcripts as such. To the contrary, as Mr. Lavoie testified, interview footage has been considered evidence, separate from the investigative file, for as long as he has worked for the Nashua PD. He does not even have access to such footage because it is kept at a separate location. In addition, the fact that the RTK requests and City responses thereto concerned two initially separate investigations—one into the Department and the other of the plaintiff— further confuses the issue of what requested records pertained to which investigation. In short, the Court cannot find the City acted unreasonably in considering the requests for recordings and transcripts of the witness interviews separate from the original request for the complete investigative file. See Goode v. N.H. Office of Legislative Budget Assistant, 145 N.H. 451, 455 (2000) (finding agency did not violate RTK law where "it was reasonable for the State to conclude that all of the requested materials were exempt from the [RTK] [l]aw").

The plaintiff now makes two arguments as to why the City erred in its response to her requests related to the Nashua PD investigations: that the City unreasonably delayed in responding to the requests, and that the City improperly failed to provide her with access to the witness interview transcripts and footage.

As was the case with its analysis of the Office security camera footage, the Court must interpret whether the City is exempted from providing the interview recordings or transcripts under RSA 91-A:5, IV, which exempts confidential information and other records whose disclosure would be an invasion of privacy. In deciding the applicability of this exemption, the Court again performs the three-part test balancing the benefits of disclosure to the public against the benefits of non-disclosure to the City. See Goode, 148 N.H. at 554. The plaintiff asserts there is no privacy interest sufficient to overcome the public's right to these records because the interviews pertained to Department employees performing their official functions. The City replies that the plaintiff was provided with narrative summaries of the interviews, which "adequately serve the public interest." (Def.'s Memo. at 16.) The City also argues that the plaintiff's speculation that Nashua PD may not have properly performed its job does not establish a public interest in disclosure.

Here, some of the records sought concern an investigation into potentially illegal conduct on the part of Department employees. See Reid, 169 N.H. at 529 (noting that "federal courts applying the FOIA have recognized that witnesses who cooperate with internal investigations concerning alleged employee violations do have privacy interests at stake." (brackets and quotation omitted)). The interviews were conducted with specific individuals. The footage and transcripts would reveal at least some "personal

or identifying information such as name, address or date of birth." <u>N.H. Civil Liberties</u> <u>Union</u>, 149 N.H. at 441. Accordingly, the Department employees have a privacy interest in the sought records.

Next, determining the public's interest in disclosure requires the Court to analyze whether the sought information would "inform the public about the conduct and activities of their government." <u>Lambert</u>, 157 N.H. 375 at 383. As just discussed, the interviews were conducted pursuant to an investigation into Department employee conduct related to their jobs. <u>See</u> <u>Union Leader Corp. v. N.H. Retirement Sys.</u>, 162 N.H. 673, 684 (2011) (requiring disclosure of records under the RTK law because "[t]he public has an interest both in knowing how public funds are spent and in uncovering corruption and error in the administration" of a public entity administering public funds); <u>see also</u> <u>Reid</u>, 169 N.H. at 532 ("We recognize that the public has a significant interest in knowing that a government investigation is comprehensive and accurate." (brackets and quotation omitted)). The second investigation was into a City resident that arose in conjunction with the investigation into potential City employee misconduct. The records could provide additional information about the first investigation as well as give insight into the City's treatment of a resident. <u>See</u> <u>Nation Magazine, Washington Bureau v. U.S.</u> <u>Customs Serv.</u>, 71 F.3d 885, 895 (D.C. Cir. 1995) (holding that records pertaining to an individual's activities "may still be cloaked with the public interest if the information would shed light on agency action."). In short, there is a public interest in the disclosure of the footage and transcripts.

The Court finds the City has little interest in the nondisclosure of the footage and transcripts. Both investigations are closed. Disclosure would not impede any ongoing

investigations or enforcement proceedings.[12]  <u>Judicial Watch, Inc. v. U.S. Dep't of Just.</u>,
No. 17-5283, 2018 WL 10758508, at *1 (D.C. Cir. June 22, 2018) (vacating district
court's granting of summary judgment in favor of agency because the ongoing law
enforcement proceeding that served as the basis for denial of the FOIA request was no
longer pending).  Additionally, the matters at issue in both investigations are not
especially sensitive nor likely to arouse public offense.  Even if they did, the public
interest in disclosure would likely outweigh the interest in nondisclosure given the fact
that the investigations pertained to governmental activities.  <u>See</u> <u>Linzmeyer v. Forcey</u>,
646 N.W.2d 306, 325–26 (Wis. 2002) (holding that public interest in preventing release
of report of closed police investigation of potential teacher abuse of students did not
outweigh public interest in the release in order to inform the public about the workings of
the government).  The Court also finds that any risk the employees would be less
candid if they knew their interviews could be released to the public does not "outweigh[]
the public's interest in disclosure."  <u>Goode</u>, 148 N.H. at 556 (finding the public interest in
disclosure of interview records pertaining to agency audit process outweighed concerns
about interviewee openness).

　　　In light of the standard construing the RTK law in favor of disclosure and the facts
at issue analyzed under the balancing test, the Court finds the balance favors the
plaintiff.  Neither the footage nor the transcript are exempt from disclosure under RSA
91-A:5, IV, nor for any other reason.  The City must provide the footage.  If the footage

---

[12] Accordingly, and where the investigations were closed by the time the plaintiff sought the footage, the <u>Murray</u> exemption is inapplicable.  There is no indication any further proceeding in either case is forthcoming.  <u>See</u> <u>Murray</u>, 154 N.H. at 583 (noting that "an agency must show that enforcement proceedings are pending or reasonably anticipated" for the exemption for records investigatory and compiled for law enforcement purposes (citations omitted)).

is not reasonably available, the City must provide the transcripts.  It is not clear to the

Court if there are any records pertaining to the investigative reports from either

investigation—besides the footage and transcripts—that the City has not yet provided to

the plaintiff.  To the extent there are, the City must provide those records.[13]

(D)    Unredacted KRT Informal Review Sheets

        As discussed earlier, the City did a reassessment of property values in 2018.  As

part of the process, the City contracted with KRT.  KRT calculated preliminary

assessment values.  After property owners were provided with their assessed property

values, concerned property owners were given the opportunity to have an informal

review with KRT representatives.  At these hearings, property owners could discuss

their assessments with the representatives, who filled out informal hearing sheets.[14]

(See Pl.'s Ex. 29.)  The completed sheets were delivered to the City.

        On August 13, 2019, pursuant to RSA 91-A, the plaintiff wrote Ms. Kleiner asking

for the opportunity to "inspect," among other records, "all documentation utilized or

obtained during the information review process that was to be relinquished to the

municipal assessing officials."  (Pl.'s Ex. 26.)  On August 20, 2019, Attorney Leonard

replied, informing her that the time reasonably needed to respond to the request was

August 27, 2019.  (See Pl.'s Ex. 27.)  On August 27, 2019, Attorney Leonard wrote to

the plaintiff and extended the time for response to September 10, 2019.  (See Pl.'s Ex.

28.)  On September 10, 2019, Attorney Leonard again wrote the plaintiff, informing her

---

[13] As was the case with respect to the Office security footage, the Court declines to find a separate RTK law violation as a result of the City's delay in responding to the plaintiff's requests.  The Court is mindful of the additional challenges that arose from the COVID-19 pandemic.  However, the Court again reminds the City of the importance of promptly and judiciously responding to RTK law requests.

[14] Mr. Tozier testified that these meetings were held in public spaces such as school cafeterias in which property owners could have individual conversations with KRT employees that others could overhear.  (See Trial, Day 2 at 1:35.)

that, due to the fact that there were "hundreds of documents," and that the City was then "working on redactions to documents responsive to some of your prior [RTK] requests," the review and redaction process of the hearing sheets would not be completed until November 15, 2019. (Pl.'s Ex. 29.)  Later on September 10, 2019, the plaintiff emailed Attorney Leonard.  In this email, she requested access to the hearing sheet for 41 Berkeley Street. (See Pl.'s Ex. 30.)  On September 17, 2019, Attorney Leonard replied, stating she could not confirm if there was a hearing sheet for that property until they had completed processing the request. (See Def.'s Ex. P.)

On November 13, 2019, Attorney Leonard emailed the plaintiff to inform her that the research into her request was ongoing, and that an update would be provided by December 13, 2019. (See Pl.'s Ex. 31.)  On December 13, 2019, Attorney Leonard wrote the plaintiff to inform her that the City had gathered the potentially responsive documents and was redacting them.  She noted that some of the records had been completely reviewed and redacted, and that the first batch of such records was attached to the correspondence.  Attorney Leonard further noted that as more records were completed they would be forwarded to the plaintiff. (See Def.'s Ex. S.)

While the plaintiff was provided with a number of the requested hearing sheets, at least some were heavily redacted, providing only the date, account number, and address, along with a citation to the RSA 91-A:5 exemptions the City claimed justified the redactions.  These included exemptions for confidential information, invasion of privacy, and that the documents were preliminary drafts. (See Pl.'s Ex. 32.)[15]  The

---

[15] The plaintiff provided two unredacted hearing sheets which showed the notes taken during the hearing. For example, the notes section of the second of the unredacted sheets states "pool value very high!" and "City Hall worker table is high." (Pl.'s Ex. 33.)  The bottom of the sheet states that "pool changed," and has "NC" circled, indicating no change was ultimately made. (Id.)

plaintiff now argues the City violated the RTK law by unreasonably delaying in its response, and by improperly redacting the hearing review sheets.

The plaintiff argues that the City violated the RTK law by "excessively redacting the informal hearing notes and failing to provide access to them in unredacted form." (Pl.'s Memo. at 16.)  The City replies that the redactions were proper because the review sheets constitute preliminary drafts, which are exempt from disclosure.  RSA 91-A:5, IX exempts from disclosure "[p]reliminary drafts, notes, and memoranda and other documents not in their final form and not disclosed, circulated, or available to a quorum or a majority of the members of a public body."  This exemption is meant to "protect pre-decisional, deliberative communications that are part of an agency's decision-making process."  ATV Watch v. N.H. Dep't of Transp., 161 N.H. 746, 758 (2011) (quotation omitted).

On the other hand, "[d]ocuments reflecting data . . . are not subject to exemption under the deliberative process exemption because they are not part of the predecisional, deliberative process."  Chicago Tribune Co. v. Cook County Assessor's Office, 109 N.E.3d 872, 880 (Ill. App. Ct. 2018).  Moreover, "purely factual material must be disclosed . . . once a final decision has been made, unless the factual material is inextricably linked with predecisional and deliberative discussions."  Id.  Information "such as location, square footage, the number of bedrooms, the number of bathrooms" which leads the Department "to produce another piece of factual data: the property's taxable market value" is discoverable.  Id.  However, opinions or deliberations of Department employees, including internal debates or discussions, as opposed to data, may be protected under the deliberative process exemption.  See id. at 881; see also

Hearst Corp. v. Hoppe, 580 P.2d 246, 252 (Wash. 1978) ("Unless disclosure reveals and exposes the deliberative process, as opposed to the facts upon which a decision is based, the exemption cannot apply."); but see ATV Watch, 161 N.H. at 759 ("the deliberative-factual distinction has given way to more process-oriented considerations, i.e., the nature of the process is more significant than the nature of the materials").

The Court must determine whether the informal hearing review sheets merely contained data or constituted preliminary drafts.[16] The next issue then is whether the City properly redacted as much as it did. At trial, the Court was presented with evidence showing that, at the informal review hearings, KRT representatives and property owners discussed the review process and why their property values may have changed. The owners would tell the KRT representatives what aspects of their properties may have been incorrectly assessed. Property owners' telephone numbers and email addresses were shared. (See Trial, Day 2 at 1:37.) The KRT representatives filled out the hearing sheets, which then went to the Department, not to be again seen by the representatives.[17] (See id. at 1:42.)

At the trial, the plaintiff submitted a heavily redacted sheet and indicated many she received were similarly redacted. Even the initials of the KRT employee were redacted. It is clear to the Court, based on its in camera review of unredacted hearing review sheets and unredacted sheets presented as evidence at trial, that much of what was likely redacted constituted mere data. However, it is also clear that at least some

---

[16] The Court denied the plaintiff's motion for summary judgment on this issue, finding that a genuine issue of material fact existed as to whether the redacted data in the hearing sheets were merely data collected by KRT employees or reflected KRT employees' thoughts and reflections whose disclosure would "expose the deliberative process of the Department." (November 23, 2020 Court Order at 18.)
[17] Under the terms of the reevaluation contract between KRT and the City, "[a]ll documentation utilized or obtained during the informal review process shall be relinquished to the municipal assessing officials." (Pl.'s Ex. 38 at 15.)

of the sheets also contain what could reasonably be described as constituting aspects of preliminary drafts such as KRT employee opinions. Thus, when the City redacted data (such as the number of bedrooms or when a property was sold) it violated the RTK law. However, the City did not violate the RTK law by redacting KRT employees' impressions or opinions. Accordingly, the Court orders the City to provide the sought informal hearing sheets to the plaintiff, this time redacting only what constitutes KRT employee opinions, deliberations, debates, or discussions, planned actions or next steps, or is data inextricably intertwined with the deliberative process. See Chicago Tribune Co., 109 N.E.3d at 880.

As to the City's argument that provision of the unredacted hearing review sheets would constitute an invasion of privacy, the Court generally disagrees. There may be some confidential information such as a property owner's contact information, which should be redacted. However, as the evidence showed at trial, the discussions between the owners and KRT employees could be overheard by others nearby. Further, much of the information discussed (e.g., number of bedrooms) is otherwise accessible to the public through, for example, an online real estate database search. In short, there is no confidential information or other information implicating privacy concerns that could not be redacted while still complying with the RTK law.[18]

(G1)   KRT Field Data Collection Cards

As part of KRT's property reevaluation process, KRT printed field data collection cards from an assessing database to perform a field review of each property. Field review involved KRT appraisers verifying or noting corrections to the data contained on

_____

[18] The Court again declines to find the City's delay in response constituted a separate RTK law violation and reminds the City to respond to RTK requests more promptly.

the cards.  KRT used the notations to develop preliminary assessments for the properties.  From there, KRT senior appraisers used the preliminary assessments and information contained on the cards to determine final assessments for each of the properties.  The cards were never circulated and were only used by KRT staff.[19]  Once the final assessment was made, the final data elements used to develop the final assessments were then transferred to the official property record card for each property in the City's assessing database.  Once the data on the cards was entered into the CAMA system,[20] the cards themselves were not altered by KRT.

In her August 13, 2019 email to Ms. Kleiner, the plaintiff requested to be provided with the opportunity to review the field data collection cards.  (See Pl.'s Ex. 26.) Attorney Leonard replied on August 20, 2019, notifying the plaintiff that the time reasonably needed for a response was August 27, 2019, (see Pl.'s Ex. 27), later extended to September 10, 2019.  (See Pl.'s Ex. 28.)  On September 10, 2019, Attorney Leonard wrote the plaintiff to inform her that, relevant here:

> [t]here are approximately 31,000 individual printed property record cards . . . and over 1000 printed property record cards for properties sold within the reevaluation timeframe which are responsive to this request.   These property record cards are exempt from disclosure under RSA 91-A:5, IX as preliminary drafts, notes, and other documents not in their final form and not disclosed, circulated, or available to a quorum or a majority of the members of a public body.

---

[19] Mr. Tozier testified that, while the majority of information contained in the field review card returned to the City would also be reflected in the final property record card, some notes entered into a field review card might not have been entered into the final property review card if the data enterer did not find it important.  (Trial, Day 2 at 2:29.)  Mr. Tozier testified that he considered the cards to be part of the public record.  (Id. at 2:18.)

[20] CAMA, or computer assisted mass appraisal system, used by KRT, is "a system of appraising property that incorporates computer-supported tables, automated valuation models and statistical analysis to assist the appraiser in estimating value for a reevaluation, assessment data maintenance and valuation update."  (Pl.'s Ex. 39 at 2.)

(Pl.'s Ex. 29.)  The plaintiff argues that the exemption does not apply to the cards because it is "uncontroverted that KRT Appraisal did not make further changes or alterations to [ ] the field data collection cards."  (Pl.'s Memo at 14.)  Accordingly, she contends they are not preliminary nor are they drafts.  The plaintiff alleges the City in fact knows the cards are public records and that the City violated the RTK law by failing to provide her access to them.  For its part, the City maintains the data collection cards were properly exempted as preliminary drafts.[21]

The field data collection cards at issue contain information about physical features of the property such as size, layout, type of flooring, type of heating system, numbers of bedrooms and bathrooms, and whether there is a garage or chimney.  The cards also contain prior tax assessments, note whether building permits were issued, and contain some hand-written notes about the properties.[22]  The cards list the names and addresses of the property owners, and indicate who performed the assessments. (See Pl.'s Ex. 34.)  Once the cards were filled out, some or all of the information was entered into the CAMA system.

While the supreme court has not addressed the exact issue of whether such data collection cards are exempt under the RTK law as preliminary drafts, other jurisdictions have, and have found the records are not exempt.  The Chicago Tribune Co. court found that assessing department spreadsheets and property valuation reports used in assessment were not exempt as preliminary drafts.  While adjustments to property

---

[21] The plaintiff moved for summary judgment on the issue of whether the field data cards were properly withheld under RSA 91-A:5, IX.  The Court denied summary judgment, finding there was "a significant factual dispute as to the substance, character and purpose of these cards."  (January 12, 2021 Court Order at 7.)

[22] For example, in the data collection card submitted by the plaintiff, some of the hand-written notes say "new furnace," "1/2 bath remodeled," and "added master bath."  (Pl.'s Ex. 34.)

values could later be made, "[e]ven if analysts make adjustments as the process continues, the data is the data.  There is nothing in the record here that discloses the Assessor's Office's internal evaluations."  109 N.E.3d at 880.  The Court finds this reasoning persuasive and consistent with the purpose of RSA 91-A.  Additionally, the cards are not exempt for confidentiality or privacy reasons because the information contained on the cards is not confidential or private.  See Menge v. City of Manchester, 113 N.H. 533, 537–38 (1973) (noting that the information on the cards "could be acquired for the most part by a 'windshield' or visual inspection of the property.  We find nothing in the information here that would qualify as an invasion of privacy.").

As with the informal hearing review sheets, the Court orders the City to comply with the plaintiff's request for the field data collection cards.  The City may simply redact information that is confidential (such as contact information) and any notes that express opinions or formulations of policies or actions, rather than data.  See Gordon v. Sandoval Cnty. Assessor, 28 P.3d 1114, 1118 (N.M. Ct. App. 2001) (holding that information contained on property cards records are public, except with respect to confidential information such as about income, and diagrams of the interior, which could be redacted).

(G2)  Policy and Procedure Documents

The plaintiff lastly seeks access to the Department's policies and procedures manual.  Sometime in early October 2018, the plaintiff went to the Office and asked to see the policies and procedures.  On October 12, 2018, the City's then-chief assessor,

Jon Duhamel sent the plaintiff two PDFs of procedures.  (See Pl.'s Ex. 41.)[23]  On

October 19, 2018, the plaintiff emailed a reply, asking him to send her "the policies or

procedure that the residential appraisers use for setting the permits, inputting and all

other duties."  (Pl.'s Ex. 42.)  On October 24, 2018, John Griffin, the City's Chief

Financial Officer, emailed the plaintiff that the City's "general Policies and Procedures

for our appraisers can be found in the Uniform Standards of Professional Appraisal

Practice (USPAP)."[24]  (Pl.'s Ex. 43.)  He attached State appraiser certification

requirements, and provided a link to the State's assessing reference manual.[25]

On April 30, 2019, the City's Board of Aldermen held a meeting to discuss the

Department.  (See Pl.'s Ex. 44.)  At this meeting, one of the speakers referred to the

"book of policies that have already existed in some form down in the Assessing

Department."  (Id.)  Ms. Kleiner held up a binder containing these policies.[26]  (See Pl.'s

Ex. 45.)  On June 25, 2019, the plaintiff sent an email to Ms. Brown requesting the

opportunity to "review the policy and procedure manual that was shown at the April 30,

2019 meeting to the Board of Aldermen."  (Pl.'s Ex. 46.)  On June 26, 2019, she was

able to view the documents in-person and scan pages.  (See Def.'s Ex. T.)

---

[23] According to the plaintiff, the PDFs described data entry and were not what she had in mind because they were more clerical in nature while she wanted a more specific manual for Nashua assessors.  (See Trial, Day 2, at 2:23.)

[24] USPAP is the generally recognized and accepted appraisals standards by the Appraisal Foundation as authorized by Congress as the source of relevant standards and appraiser qualifications.  (See Pl.'s Ex. 38 at 5.)

[25] The plaintiff testified that these documents and links were not what she sought because they were general policies while she sought Nashua-specific policies.  (Trial, Day 1 at 2:26.)

[26] The plaintiff believes this binder, in the context of the board's discussion, indicates the Department had policies and procedures.  (See Trial, Day 1, at 2:31.)  However, Ms. Kleiner testified that there was no comprehensive manual at that time.  Rather, she testified there were merely lists, instructions, and tasks.  According to Ms. Kleiner, the binder did not represent a comprehensive manual but a mere compilation of the aforementioned lists, instructions, and tasks.  (See Trial, Day 3, at 10:07.)

The plaintiff requested an additional opportunity to view the documents but was told by Ms. Brown on August 8, 2019 that Ms. Brown "believed [the plaintiff] [had] already seen everything from the prior administration at this point. The current drafts are only a working draft and are still under review." (Pl.'s Ex. 47.) On the same date, the plaintiff emailed Ms. Kleiner to report that the previous day, she had stopped by the Office in order to view the manual again but was rebuffed. (See Pl.'s Ex. 48.) On August 9, 2019, Attorney Leonard provided the plaintiff with a PDF of the "requested Assessing Policy Manual." (See Pl.'s Ex. 49.) On the same date, the plaintiff emailed Attorney Leonard to express her frustrations at being told she could not again view the documents and at being given the PDF when she only wished to view the manual in the Office. She also expressed frustration that she did not know when the manual was going to be updated. (See Def.'s Ex. T.) The plaintiff, in her August 13, 2019 email to Ms. Kleiner in which she asked to view the property record cards, again requested to view the "Data collection manual which was to be given [by KRT] to the City and included with the USPAP document." (Pl.'s Ex. 26.)

The plaintiff claims the City has violated RSA 91-A by failing to do provide her with prompt access to the policies and procedures in response to her October 2018 request. She claims that these records were immediately available at the time of her request, and that the City "play[ed] games" and "pretend[ed] otherwise." (Pl.'s Memo. at 17.) The City replies that it did not unreasonably delay because the manual was not available in October of 2018. Once the manual was complete, it was provided to the plaintiff. Accordingly, "[c]learly the City conducted a search reasonably calculated to

discover responsive records as it was able to determine that no such policy or procedure manual existed." (Def.'s Memo. at 21.)

As an initial matter, the Court is sympathetic to any frustrations caused by the delay between the plaintiff's initial October 2018 request and the provision of the PDF nearly a year later. However, at the time of the request, the City was in the process of compiling the manual. The Court cannot find the City erred by not providing the plaintiff with the manual prior to its completion.[27]

The Court next must address whether providing the manual in PDF form was doing so in a manner "reasonably calculated to comply with the request in light of the purpose" of the RTK law. RSA 91-A:4, V. The City's records must be "maintained in a manner that makes them available to the public." Hawkins v. N.H. Dep't of Health & Human Services, 147 N.H. 376, 379 (2001). However, "any public body or agency which maintains governmental records in electronic format may, in lieu of providing original records, copy governmental records requested to electronic media using standard or common file formats in a manner that does not reveal [confidential] information . . ." RSA 91-A:4, V. The Court finds that the City's provision of a PDF version of the manual was responsive to the plaintiff's request. This response in electronic form also complied with the RTK law.

### Request for Attorney's Fees

The plaintiff contends that the City owes her reasonable attorney's fees based on the City's "persistent bad faith" and "pattern of ignoring its responsibilities." (Pl.'s Memo.

---

[27] To the extent the plaintiff argues that, in between her initial request and the provision of the PDF a year later, the City violated the RTK law by only providing her with certain parts of what would ultimately comprise the manual, the Court was presented with insufficient evidence to decide this question.

at 18.)  She claims that, as a result, she "was required to retain counsel to secure access to public records."  (Id.)  She contends the City knew or should have known that it was not in compliance with the RTK law.  The City replies that it has not violated the RTK law.  Even if the City did violate the statute, the City contends that "it has not been shown that the City knew or should have known that the conduct engaged in was a violation."  (Def.'s Memo. at 25.)

"[A]bsent statutorily or judicially created exceptions, parties pay their own attorney's fees."  Choquette v. Roy, 167 N.H. 507, 517 (2015).  "A prevailing party may be awarded attorney's fees when that recovery is authorized by statute, an agreement between the parties, or an established judicial exception to the general rule that precludes recovery of such fees."  George v. Al Hoyt & Sons, Inc., 162 N.H. 123, 139 (2011).  The RTK law is one such authorizing statute.  The applicable portion of the statute provides:

> If any public body or public agency or officer, employee, or other official thereof, violates any provisions of this chapter, such public body or public agency shall be liable for reasonable attorney's fees and costs incurred in a lawsuit under this chapter, provided that the court finds that such lawsuit was necessary in order to enforce compliance with the provisions of this chapter or to address a purposeful violation of this chapter.  Fees shall not be awarded unless the court finds that the public body, public agency, or person knew or should have known that the conduct engaged in was in violation of this chapter or if the parties, by agreement, provide that no such fees shall be paid.

RSA 91-A:8, I.  In other words, "an agency shall be liable for reasonable attorney's fees and costs incurred if the trial court finds that: (1) the agency violated any provision of RSA chapter 91-A; (2) the lawsuit was necessary in order to make the information available; and (3) the agency knew or should have known that the conduct engaged in

was a violation of RSA chapter 91-A." 38 Endicott St. North, LLC v. State Fire Marshal, N.H. Div. of Fire Safety, 163 N.H. 656, 669 (2012) (quotations omitted).

With respect to (1), as discussed above, the City violated the RTK law in the following ways: by not providing the plaintiff with the Office security camera footage; for denying her request for the footage and transcripts; for improperly redacting the informal hearing sheets; and for failing to provide the field data collection cards.

The Court also finds that (2) this lawsuit was required in order for the plaintiff to be provided with the sought records. While the City provided some of the responsive records, the plaintiff still has not been provided with the Office security camera footage, the Nashua PD footage or transcripts from their interviews with Department employees, the unredacted informal hearing review sheets, or the field data collection cards. This case has been pending for approximately two years, during which time the City could have provided the requested records. However, the City did not do so. As a result of this Order, the City is required to provide these records to the plaintiff. The Court finds that this suit was necessary for the plaintiff to be provided with the requested records. Cf. 38 Endicott St. North, LLC, 163 N.H. at 669 (finding attorney's fees not warranted because lawsuit was unnecessary where agency demonstrated records properly withheld under Murray.)

Lastly, the Court finds that (3) the City knew or should have known its actions with respect to the office security footage, police investigative footage and transcripts, and field data collection cards violated RSA 91-A. The determinations the City did not have to provide these records were unreasonable for the reasons stated in this Order. See N.H. Challenge, Inc. v. Comm'r, N.H. Dep't of Educ., 142 N.H. 246, 249 (1997).

However, given the complexity in determining what exact information should be redacted from the informal hearing review sheets, the Court cannot say the City either knew or reasonably should have known the specific kinds of redactions necessary to fully comply with the RTK law. Accordingly, the City does not owe the plaintiff attorney's fees or costs with respect to this exact issue. <u>See</u> <u>Goode</u>, 145 N.H. at 455 (upholding trial court's determination plaintiff was not entitled to attorney's fees, despite finding lawsuit was necessary, because "it was reasonable for the State to conclude that all of the requested materials were exempt from the [RTK] [l]aw").

Conclusion

In conclusion, the Court finds the City violated RSA 91-A by not providing certain requested records. The Court also finds the plaintiff's lawsuit was necessary for her to be provided with the requested records, and that the City knew or should have known it violated the RTK law. Thus, the plaintiff is entitled to reasonable attorney's fees and costs. However, in order to obtain an award of attorney's fees and costs, the plaintiff must file an itemization of such fees and a taxation of costs within 20 days of the clerk's notice of decision. The City will then have 20 days to object. The Court will thereafter award reasonable attorney's fees and costs in compliance with RSA 91-A:8. Any requests for costs shall be made in accordance with Superior Court Rule 45(a)(1).

So ordered.

Date: May 2, 2022

Hon. Charles S. Temple,
Presiding Justice

Clerk's Notice of Decision
Document Sent to Parties
on  05/03/2022

Ortolano v. City of Nashua
2020-CV-00133
33