*ORIGINAL*

LAURIE ORTOLANO

V.

CITY OF NASHUA

Docket No. 1:22-CV-00236-LM

KIMBERLY KLEINER

May 09, 2024



AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

**Page 61**

1  Q   Okay. At some point did the attitude of the
2      people in assessing both administrative staff
3      and Assessors change with respect to Ms.
4      Ortolano?
5          MS. FEENEY: I'll object to your form. You
6      may answer.
7  A   I'm not sure I understand the question.
8  Q   Okay. I'll rephrase.
9          Originally, admin staff in Assessing and
10     the Assessors would have outreach to Ms.
11     Ortolano. They respond to her questions. At
12     some point did that relationship sour because of
13     the excessive requests by Ms. Ortolano as
14     reflected in that newspaper article?
15         MS. FEENEY: I'm going to object to your
16     form, and tell the witness she may answer.
17 A   So I don't think I can certainly speak for the
18     individuals themselves, but there was a
19     significant amount of frustration on staff being
20     overwhelmed with the amount of work in front of
21     them, and that was apparent to me.
22 Q   What was your attitude?
23 A   I think we were all significantly trying to help

**Page 62**

1      the best we could, but we were under a
2      significant amount of pressure to complete the
3      work, including the Right-to-Know requests.
4  Q   Did you feel that Ms. Ortolano had ill feelings
5      toward you or anyone in the Assessing Office?
6  A   Yes. I did. I think they were publicly said at
7      Board of Aldermen meetings. Yes.
8          (Exhibit 7 marked for identification)
9  Q   You recognize this document?
10 A   Yes.
11 Q   Can you just read it for me, please?
12 A   The email is from Laurie Ortolano to me. Kim,
13     thanks so much for some of your time. I dropped
14     in unscheduled and really appreciate you taking
15     the time to speak with me. Your efforts have
16     not gone unnoticed. This was and is a big task
17     and I know you're working to move the city in
18     the right direction. The Mayor is lucky to have
19     you. Laurie.
20 Q   Do you recall seeing that?
21 A   I do.
22 Q   In '19. Thank you. So at some point, I believe
23     this was early in 2020 you announced that the

**Page 63**

1      Assessors did not want to have contact with you
2      anymore. Can you recall that?
3          MR. CULLEN: Objection to form.
4          MS. FEENEY: Object to form.
5  A   With me?
6  Q   Yes.
7          MS. FEENEY: Your question was that the
8      Assessors didn't want to have contact with my
9      client?
10 Q   No. I'm sorry, the Assessors did not want to
11     have contact with Laurie Ortolano.
12         MS. FEENEY: That's not what your question
13     was. Let's just do it over and get it right.
14 Q   Do you recall at some point that the Assessors
15     came to you and told you that they did not want
16     to have contact with Laurie Ortolano anymore?
17 A   Yes.
18 Q   Thank you. Do you remember what spurred that?
19 A   Yes.
20 Q   What was it?
21 A   There had been a number of ethics violations
22     filed with the Department of Revenue on various
23     Assessors by Ms. Ortolano.

**Page 64**

1  Q   Do you recall specifically which members of the
2      Assessing Department were involved?
3  A   Had violations?
4  Q   Yes.
5  A   So Greg Turgiss and Gary Turgiss. I'm not sure
6      on Mike Mandile. Both the Turgisses.
7  Q   So Ms. Ortolano filed ethics violations or filed
8      something with the State or the Department of
9      Revenue about both Turgisses?
10 A   Yes.
11 Q   Okay. Anybody else that you recall?
12 A   I believe there was another resident who did
13     file complaints as well.
14 Q   Okay. And do you recall who that was?
15 A   Ms. Laura Colquhoun.
16         MS. FEENEY: Kurt, just before you get into
17     the questions, Exhibit 8, does the enclosure
18     letter which cites a list of things enclosed,
19     are all of those attached to this exhibit?
20         MR. OLSON: They are not.
21         MS. FEENEY: So Exhibit 8 is a January 23,
22     2020, letter to Attorney Lehmann, but all the
23     itemized enclosures are not attached to Exhibit

**Page 77**

1  A  I decided that my career choice was to work for
2     a smaller town with significant work challenges
3     in different areas, yes.
4  Q  Okay. Thank you.
5     (Recess taken 12:36 - 12:47 p.m.)
6  Q  Sorry to take you back in time, but I'd like to
7     return to October of 2019. Recall an incident
8     involving a person who was allegedly
9     impersonating a assessor from Nashua? I'll help
10    you a little bit. Gary Turgiss supposedly
11    reported this based on some information he had
12    received from a homeowner as he was doing
13    Assessments or driving around town to assess
14    properties.
15 A  Very roughly.
16 Q  Sure. Okay. We'll mark the next one.
17    (Exhibit 12 marked for identification)
18 Q  For the benefit of the people Zooming in, this
19    is a four-page exhibit consisting of Nashua
20    Police Department report from October 31st,
21    2019.
22    MS. FEENEY: Is Page 241 supposed to be
23    missing?

**Page 78**

1     MR. OLSON: Yes.
2     MS. FEENEY: Okay.
3  A  Yeah.
4  Q  I kept trying to reduce the number of pages so I
5     wouldn't have to carry two copy boxes.
6  A  Okay.
7  Q  All set?
8  A  Yes.
9  Q  Okay. So does this refresh your recollection
10    about that incident?
11 A  Yes.
12 Q  Okay. So at the beginning it says on October
13    31st, 2019, at approximately 0916 hours,
14    Detective Lieutenant Mederos informed me that
15    the Nashua Assessing Department had received
16    information of someone possibly impersonating a
17    Nashua Assessing Department Assessor.
18    Do you remember if that was you who reached
19    out to Lieutenant Mederos or possibly Detective
20    Lombardi since he's the one that did the report?
21 A  I don't recall if I was. I do recall him
22    contacting me, but I don't recall.
23 Q  Would someone else associated with Assessing be

**Page 79**

1     responsible for reaching out to the police?
2  A  No. No. I mean, normal protocol would be for
3     the Assessors or the Assessor employees to come
4     to me.
5  Q  Okay.
6  A  And normally I would contact the Chief.
7  Q  So at this point -- I'm sorry.
8  A  I don't know.
9  Q  Okay. So in the middle of the second paragraph
10    that begins with in speaking with Kleiner. Do
11    you see that one?
12 A  Yes.
13 Q  At the end of that same paragraph it says that
14    Kleiner said that the description the resident
15    provided Gary of this female matched that of
16    Nashua resident Laurie Ortolano. Did I read
17    that accurately?
18 A  That's what it says.
19 Q  Okay. And do you have any recollection of
20    saying that the description provided by Gary --
21 A  I don't.
22 Q  You were aware of Ms. Ortolano's appearance at
23    that time, right?

**Page 80**

1  A  Yes.
2  Q  And you knew that she wasn't blond, correct?
3  A  Yes.
4  Q  So the description of this blond woman in a
5     white sedan would probably not have been Ms.
6     Ortolano?
7     MS. FEENEY: I'm going to object to your
8     form.
9  Q  Thank you.
10 A  What's the question?
11 Q  So the question is --
12    MS. FEENEY: Everybody stop talking.
13    Question, answer, please.
14 Q  Sure. So the question is you would have been
15    aware at that time that a woman with short blond
16    hair driving a white seDan was likely not Mrs.
17    Ortolano.
18 A  I'm not sure that I was aware that it was blond
19    hair.
20 Q  Okay. I think earlier in the very first page it
21    says that you said to Detective Lombardi the
22    description of the resident provided Gary of
23    this female matched that of Nashua resident

**Page 97**

1  A   Because Mr. Feoli sent me an email that is
2      addressed to the Board of Aldermen, and I felt
3      obligated to deliver.
4  Q   Okay. Thank you.
5      So the last series of questions for you
6      concern these last two documents.
7      (Exhibit 18 marked for identification)
8      (Laurie Ortolano enters deposition by Zoom)
9  Q   All set?
10 A   Yes. I mean I haven't read it word for word.
11     MS. FEENEY: Let's wait for the question,
12     and then if you need more time to read it we can
13     take a moment.
14 Q   I actually am just going to be referring you to
15     one small section so it's probably best you
16     don't read the whole thing. If you would turn
17     to page 2 of the document?
18 A   Okay.
19 Q   So we referenced this particular provision of
20     the Canon of Ethics earlier. ER 1-4. That's in
21     the middle of the page there. And could you
22     read that for us, please? Just that paragraph?
23 A   ER 1-4, Members must make available all public

**Page 98**

1   records in their custody for public review,
2   unless access to such records is specifically
3   limited or prohibited by law, or the information
4   has been obtained on a confidential basis and
5   the law permits such information to be treated
6   confidentially.
7  Q   Okay. And if we go back to Exhibit 2, the one
8      that had the agendas, beginning on April 1st,
9      2019? And then there's another one from April
10     8. Looks like that.
11     MS. FEENEY: Exhibit 2?
12 Q   Yes. That's it.
13     MS. FEENEY: And what was the other one
14     you'd like?
15 Q   That's it.
16     MS. FEENEY: I'm sorry. I missed the
17     question in all of that.
18     MR. OLSON: I didn't actually ask one yet.
19     MS. FEENEY: Good.
20 Q   If you look at ER 1-4, talks about the
21     obligation of Assessors to make documents,
22     public documents available to citizens,
23     taxpayers, correct?

**Page 99**

1  A   Yes.
2  Q   And in Exhibit 2, your decision. I believe you
3      wrote those agendas, right?
4  A   Yes. I did.
5  Q   So in Exhibit 2, what you do is direct the
6      Assessors not to even speak with Ms. Ortolano,
7      correct?
8      MR. CULLEN: Objection to form.
9      MS. FEENEY: I'll join that objection. You
10     can answer.
11 A   So I do acknowledge that they would not like to
12     speak with her and to write down the questions
13     and they will be answered. Yes. So I believe
14     the resident is getting the information although
15     it may not directly be coming out verbally from
16     those Assessors' mouths at that precise moment.
17 Q   So I guess I'd just like to clarify because I
18     believe you said that the Assessors going
19     forward, Mike, Gary, and Greg, three Assessors,
20     right? I think you said would not like to speak
21     with Ms. Ortolano. This is actually a directive
22     from you, right?
23 A   Yes.

**Page 100**

1  Q   And those three will not speak to Ms. Ortolano.
2      MS. FEENEY: I don't understand your
3      question. If you could try again.
4      MR. OLSON: I just wanted to clarify
5      because --
6      MS. FEENEY: I understand. Go ahead.
7  Q   What you said was that going forward Mike, Gary
8      and Greg would not like to speak to Ms.
9      Ortolano. Correct?
10     MS. FEENEY: I'm going to object to your
11     form. Testimony will speak for itself.
12 Q   Okay. But what the document actually says is
13     going forward Mike, Gary, and Greg will not
14     speak with Ms. Ortolano?
15 A   That is what the document says.
16 Q   And that was a directive from you, correct?
17 A   Yes.
18 Q   Okay. So under those circumstances, are you
19     telling the Assessors, Mike, Greg, and Gary, to
20     violate that ethical provision, ER 1-4?
21 A   No. I don't believe I am.
22 Q   Okay.
23 A   I believe I'm protecting my employees.