# *ORIGINAL*

## LAURIE ORTOLANO

vs

## CITY OF NASHUA

Docket No. 1:22-cv-00326-LM

## RAYMOND FEOLI

April 10, 2024



# AVICORE REPORTING

15 Constitution Drive, Suite 1A · Bedford, NH 03110 · (603) 666-4100
info@avicorereporting.com · www.avicorereporting.com

9

1   A.  We don't host data for any other
2   customers.
3   Q.  You don't?  Okay.
4   A.  No.
5   Q.  And does your company have the ability to
6   store incoming calls?
7   A.  No.
8   Q.  Okay.  And are you aware -- I saw that, as
9   part of your production, you have something called
10  the official board policy on corporate information
11  security.  Is that to comply with any law in
12  New Hampshire?
13  A.  No.  It's more a general guideline for us.
14  And we're a small company.  But we need to protect
15  our customers' data as best we can.  Otherwise we
16  probably wouldn't have customers, because they are
17  entrusting us with their information.  So we use it
18  to sort of, you know, breed our culture of
19  protecting our customers' data.
20  Q.  Okay.  I understand.  And I was almost
21  going to interrupt you in the middle of that answer,
22  but that's something I forgot to tell you.  Please
23  wait for me to finish a question.

10

1   A.  Oh, okay.
2   Q.  And I will wait for you to finish an
3   answer.  That makes it a whole lot easier on Tina,
4   our stenographer today.
5   A.  My apologies.
6   Q.  No worries.  I think I did it first.
7       So are you aware of the New Hampshire data
8   privacy protection law?
9   A.  Yeah.  Yes.
10  Q.  Okay.  And do you know whether or not your
11  board policy complies with that?
12  A.  I believe it does.
13  Q.  Okay.  Have you had any lawyers check that
14  out at all?
15  A.  No.
16  Q.  Okay.  And switching gears -- just to let
17  you know, as I go through this, I will give you a
18  little bit of a warning so that you know that we're
19  now onto a different topic -- when did Nashua first
20  contact you regarding their scanning and storage
21  needs?
22  A.  I believe it was in the summer of 2019.
23  Q.  Okay.  And if you are not sure, please

11

1   just say you are not sure.  That's perfectly fine.
2   A.  Yeah.  It's about that time frame, right
3   before COVID.
4   Q.  Okay.  And who was it that contacted you
5   out of Nashua?
6   A.  Bruce Codagnone or -- I can't pronounce
7   his name.  My apologies.
8   Q.  Okay.  No worries.  Tina had asked me
9   about that because I believe it's spelled two
10  different ways within your documents.
11  A.  Yes.
12  Q.  So I guess we'll have to get some
13  clarification from somebody who knows at some point,
14  but -- because I saw Cogagone (phonetic) and also
15  Codagone (phonetic), I think.  So --
16  A.  Yeah.
17  Q.  -- anyways.  And at some point, did your
18  primary point of contact with Nashua switch?
19  A.  Yes.
20  Q.  Okay.  And to whom did it switch?
21  A.  Kimberly Kleiner.
22  Q.  Okay.  And what sort of information did
23  you provide Ms. Kleiner?

12

1   A.  There wasn't a lot to provide, because she
2   was involved in the process already.  But she wasn't
3   my main point of contact until that time that Bruce
4   left.
5   Q.  Okay.  So did Mr. Codagnone -- let's just
6   call him Bruce.  Did Bruce perform the same kind of,
7   I guess, services or -- in relationship to your
8   contact with him, as Ms. Kleiner did?
9   A.  I will say yes.  I mean, it's kind of a
10  hard question.  I am not sure what you are asking.
11  Could you maybe be a little more specific?
12  Q.  I will rephrase.
13  A.  Thank you.
14  Q.  So when you contacted either Bruce or
15  Ms. Kleiner, what was their role in responding?  In
16  other words, what communications did you have with
17  them?
18  A.  Typically, just pickups and drop-off
19  scheduling.
20  Q.  Okay.  So they would have another batch of
21  documents, and you would then be called to come and
22  get them and scan and store them?
23  A.  Correct.

**13**

1  Q. Okay. And switching again now, when did
2  you first hear from Laurie Ortolano?
3  A. I believe it was -- gosh, I am trying to
4  remember the date. But anyway, I heard from her, I
5  think it was, in January. And she had left me a
6  voicemail, and I called her back.
7  Q. Okay. And just to be specific, January of
8  which year?
9  A. Gosh, I am sorry. I don't recall the
10 exact year. I -- I think it was last year.
11 Q. Okay. To refresh, would it make sense
12 that it might be 2022?
13 A. Let me look.
14 Q. Go take your time.
15 A. Yes, it was 2022. My apologies.
16 Q. No worries.
17    To the extent that you can recall, do you
18 remember what she said to you in that first
19 voicemail message that you got from her?
20 A. She just said she's "Laurie Ortolano from
21 Nashua. And I am calling in regards to the PO
22 number that, you know, was issued." And I believe
23 that was it.

**14**

1  Q. Okay. And when did you conclude that she
2  was a representative or agent of the City?
3  A. Basically, during the conversation with
4  her, I -- well, let me -- no. Because I called her
5  back. So I assumed that, based on the fact that she
6  was calling me from Nashua, that she was my
7  customer. Because I have never had somebody call me
8  that is, essentially, a customer of my customer.
9  It's just never happened before. So my assumption
10 was she was with the City at that point, I guess.
11 Q. Okay. Did she say anything in the
12 voicemail that would indicate that she was an agent
13 or employee of Nashua?
14 A. I don't recall that, no.
15 Q. Okay. And when you called her back, can
16 you recall the substance of that first conversation
17 with her?
18 A. Yeah. She was asking a lot about the PO
19 and the amounts and, you know, so what was, you
20 know, outstanding on it, et cetera. I gave her all
21 the information. So that was pretty much it. I
22 mean, you know...
23    MR. OLSON: Okay. Tina, would you mind

**15**

1  bringing up what Mr. Feoli has referred to as
2  the "PO"? It should be one of the exhibits,
3  please.
4     (R. Feoli Deposition Exhibit No. 1 was
5  marked for identification and shared via Zoom.)
6  Q. (By Mr. Olson) I am just going to scroll.
7  Do you recognize this document, Mr. Feoli?
8  A. Yes, sir.
9  Q. Okay. And what is this?
10 A. This is a PO from the City of Nashua to
11 Inception Technologies.
12 Q. Okay. And you said that this was the PO
13 that Ms. Ortolano referenced during the phone call
14 with you; correct?
15 A. I don't recall exactly. But based on
16 timing and everything, yes, because I don't think
17 there was any other PO at that time.
18 Q. Okay. So if you would look up in the
19 upper left-hand corner next to the City of Nashua
20 seal, do you see the date there?
21 A. Yes.
22 Q. Okay. And am I correct in stating that
23 it's 9/15 -- September 15, 2020?

**16**

1  A. That would be -- yes.
2  Q. Okay. And at that time, was that the only
3  PO that was issued by the City of Nashua?
4  A. To my knowledge, yes.
5  Q. Okay. And I am just trying to clarify
6  because the conversation that you had with
7  Ms. Ortolano you said was in January of 2022. So
8  did --
9  A. Yeah. This project wasn't a quick
10 project. Scanning process takes time.
11 Q. Okay.
12    MR. OLSON: All right. Thank you. You
13    can unshare that one, Tina. I appreciate it.
14 Q. (By Mr. Olson) So other than the talk
15 about the PO, was there anything else that
16 Ms. Ortolano said during that first phone
17 conversation that you recall?
18 A. I had mentioned to her that -- because she
19 was asking about amounts due and so forth. And I
20 had mentioned to her that I agreed with what she had
21 said was the stated balance; however, we had an
22 invoice that was sort of in the process of being
23 generated. And at that time, she said, "Well, I

**33**

1  Q.  Thank you.
2  A.  -- "believed her to be a City official
3  based on her intimate knowledge of the City's
4  business, the terms of Inception's contract, and the
5  status of PO, billing and payments, as well as her
6  statements."
7  Q.  Do you recall if that's what you told the
8  detective at the time?
9  A.  I don't recall exactly, no.
10  Q.  Okay.  I believe, in answer to an earlier
11  question, you didn't mention all of those things.
12  But we can look at the detective's report in a
13  minute.
14  A.  Sure.
15  Q.  And skip ahead to No. 12.  Tell me when
16  you are ready, Ray, please.
17  A.  Yeah.  (Perusing document.)  Okay.
18      (Perusing document.)  Okay.
19      (Perusing document.)  Okay.
20  Q.  So in the middle of, actually, that begins
21  with "Thinking Ms. Ortolano," would you read that.
22  A.  "Thinking Ms. Ortolano was a City
23  official, I promptly returned the call."

**34**

1  Q.  Okay.  And just to clarify, when you
2  received that voicemail message, was there anything
3  in it that led you to believe that Ms. Ortolano was
4  a City employee?
5  A.  Just like I said, she -- I have never had
6  this situation come up where I have had a client of
7  a customer call me looking for information.  She
8  mentioned Nashua.  She mentioned the PO.  I just
9  concluded she was with the City.
10  Q.  Okay.  So you are really sort of
11  reinforcing your previous answer that, because it
12  was so rare or maybe had never happened before, that
13  you were assuming that she was a City employee;
14  correct?
15  A.  In 28 years, it's never happened.
16  Q.  Okay.  And if you go down to the bottom of
17  your answer, beginning with "On or about February 4,
18  2022," please read that.
19  A.  (As read) "On or about February 4, 2022,
20  Ms. Ortolano called me again and left a voicemail.
21  Once again, I promptly returned the call.
22  Ms. Ortolano questioned me about public access to
23  the documents, at one point stating/inquiring:  'We

**35**

1  don't have access to those files.  When can we get
2  those files back?'  I did not provide Ms. Ortolano
3  access to the scanned documents."
4  Q.  Thank you.
5      So I don't believe that you mentioned the
6  quoted language here when you described that second
7  phone call.  Do you recall that?
8  A.  I am not sure what you are referring to.
9  Q.  So where you have in quotes down at the
10  line -- first line from the bottom --
11  A.  Yeah.
12  Q.  -- "We don't have access to those files.
13  When can we get those files back."
14      As you sit here today, do you recall her
15  saying that or asking those questions?
16  A.  Yeah.  That -- she was concerned about
17  documents that were being requested.  And she made
18  comment that, while we have those files in our --
19  Inception's possession, that she didn't have access
20  to those files.
21      And I said to her that, you know, "You do.
22  Because when we scan them and upload them into
23  DocuWare, you can search and retrieve those files."

**36**

1  And that's, again, under the thought that she was
2  with the company [sic].  And I mentioned that she
3  could, you know, have Kim provide her log-in
4  credentials to get access to those files if she were
5  a City employee.  She didn't say she wasn't.  And
6  she let it go, and that was it.
7  Q.  Okay.  And the last line in your answer
8  here where you say "I did not provide Ms. Ortolano
9  access to the scanned documents," did she ever ask
10  you for the scanned documents?
11  A.  She wanted to know when they could have
12  access to them.  She didn't specifically say
13  "scanned documents."  I said to her that, you know,
14  "You could have access to those scanned documents if
15  you got log-in credentials from Kim."
16      As a company, we don't give out log-in
17  credentials from -- we pick a point of contact
18  within the organization who tells us, "Yes, this
19  person can have access to those files."  So I kind
20  of was referring to the fact that, if she wanted to
21  get access to those scanned documents, as an
22  employee of the City, she could have requested
23  log-in credentials.