## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Laurie Ortolano, | ) |
|           Plaintiff | ) |
| | ) |
| V. | )   Civil Action No. 22-cv-00326-LM |
| | ) |
| | ) |
| The City of Nashua, et al., | ) |
|           Defendants | ) |
| | ) |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OBJECTION TO DEFENDANT MICHAEL CARIGNAN'S MOTION FOR SUMMARY JUDGMENT

I.    **CONCISE STATEMENT OF FACTS.**

    A.  Material Facts Demonstrating that Judgment Should Not Enter against the Plaintiff as a Matter of Law.

        1.  Authority of Chief Carignan to Set the Policy Regarding Arrests at City Hall, and How the Nashua Police Department Dealt with Trespass Complaints at City Hall Prior to Ortolano's Arrest.

At his deposition, former Chief Michael Carignan ("Carignan") testified that, although Nashua has a three-person Police Commission that oversees budgets and approves personnel decisions, ultimately the Chief of Police is in charge of the Nashua Police Department's ("NPD") day-to-day and long-term policing policy and law enforcement matters:

> *The chief executive officer, which would be the chief of police, manages the day-to-day and makes the strategic decisions for the short and long-term for the police department. . . . [The Police Commission] approve[s] our budgets, they approve our promotions, they approve our terminations, or deny them, but they don't deal with the day-to-day operations of the police department.  They're noy sworn officers, they're not -- they have no legal authority to enforce the laws.*

Exh. A, Carignan Deposition, pp. 20-21. Indeed, the Nashua City Charter supports Carignan's assertion about the Nashua Police Commission, Subpt. B, Subch. 1, ¶¶ A-101, A-103, and New

Hampshire RSA 105:2-a supports Carignan's claim that he has the authority to make the "short and long-term" day-to-day "strategic decisions" about police department business: "each chief of police    . . . shall have authority to direct and control all employees of his or her department in their normal course of duty and shall be responsible for the efficient and economical use of all department equipment." Accordingly, Carignan had the authority to set overall policy regarding the conditions and circumstances by which decisions to arrest for trespass complaints should be made, as well as the authority to "direct and control" the decision whether Laurie Ortolano ("Ortolano") should be arrested for trespass.

And, while he was Chief, Carignan testified that he implemented and followed a general policy regarding the handling of  police calls for trespass incidents:

> if we're called to a location where somebody's there, and a person who has control over that space doesn't want them there for a specific reason and asks them to leave, the expectation is that they leave. If they don't leave, we get called, and we go, and we will tell them to leave.· We'll talk to the victim, we'll find out what the victim says happened, or the controller of the property.· And then if the person still refused to leave, we'll arrest them.· If they leave, we will generally give them the warning to go, because they -- they're not refusing in our presence. And if you're asking for the philosophy, it's people -- it's very difficult in the courts, particularly in Nashua, to get a conviction because the victim or the controller of the properties generally won't show up to for a number of reasons. So that's generally how they go.

Exh. B, Carignan Deposition, at 64-65. Carignan further agreed that, "as a general rule, when the police show up, order the perpetrator to leave, and the perpetrator cooperates and leaves, the perpetrator will not be arrested." *Id.* at 65-66. And he agreed that this description was not just a philosophy, but also "a practice  . . . while [he was] deputy chief and chief, and [a] patrolman." *Id.* at 67.

Prior to the arrest of Laurie Ortolano ("Ortolano") on February 18, 2021, objective data show that both Carignan and those who preceded him as Chief were true to this policy when dealing

with trespass incidents at City Hall. Between January 1, 2014 and January 31, 2021 (18 days before Ortolano's arrest), the NPD responded to 10 complaints of trespass at City Hall, including that of Ortolano, and chose to arrest *none* (0) of the persons allegedly trespassing. Exhibit B, Colquhoun Affidavit, at 06-10.[1] Three of those are of particular interest. On July 23, 2019, the NPD responded to a man in City hall who was yelling at employees. Although he had previously been trespassed from the transit center, the man left when the NPD requested him to do so and was not arrested. *Id.* at 07-08. On August 29, 2019, the Community Development Office called the NPD because a person was within the offices and refusing to leave. For reasons not stated, the Community Development Office cancelled the request before the NPD arrived. *Id.* at 08. On December 28, 2020, NPD was called to City Hall when a man "snuck into the building acting disorderly right now." He refused to leave until he could speak to the Mayor and claimed to be unaware that City Hall had been closed to the public at that time. Although he "refused to listen" to the advice the NPD attempted to give him regarding his conduct, he was only warned not to come to City Hall without an appointment and was not arrested. *Id.* at 08-09. And finally, police records show the Ortolano incident on January 22, 2021. Noting that she "was not causing a scene on arrival and appeared calm," and "left willingly" after the NPD arrived, the records noted at the time that she was not arrested because there were "[n]o offences alleged or apparent." *Id.* at 09-10.

2. <u>Ortolano's Constitutionally Protected Conduct</u>.

Shortly prior to June 25, 2019, Ortolano and taxpayer Laura Colquhoun ("Colquhoun") communicated to Carignan that they suspected an employee of the Nashua Assessing

---

[1] The Colquhoun Affidavit was previously submitted in opposition to the Bolton/Leonard motions for summary judgment. For convenience, Ortolano submits that Affidavit again as Exhibit B.

Department ("Assessing Department") was filing fraudulent mileage reports and was sleeping or otherwise disengaged when he was being paid to do work, and that Kim Kleiner ("Kleiner"), his Chief of Staff as well as Director of Administrative Services, might have engaged in witness tampering. Exh. A, Carignan Deposition, at 13-17; Exh. C, Documents Production, at NPD-LO-01. Carignan had already known Ortolano from speaking with her at City Hall several times previously; he agreed that Ortolano "was fairly well known . . . [a]mongst the command staff" of the NPD. Exh. A, Carignan Deposition, at 16, 75. Carignan assigned the investigation of the matter to Captain Lehto and Detective Medeiros ("Medeiros"), and they would further assign Detective Frank Lombardi ("Lombardi") to work on the case. Id. at 18; Exhibit C, at 11. Lehto and Medeiros met with Ortolano and Colquhoun on June 25, 2019. Exhibit C, at 11. The next day, June 25, 2019, Carignan and Lehto went to the Mayor's office to apprise Mayor Donchess ("Donchess") and Kim Kleiner ("Kleiner"), his Chief of Staff as well as Director of Administrative Services, of the investigation. Exh. A, Carignan Deposition, at 14, 28-29, 32; Exh. C, at NPD-LO-029. Although he did not know how they had received the information, Donchess and Kleiner were already aware of the charges. Exh. A, Carignan Deposition, at 33-34.

Carignan kept himself apprised about what was happening during the investigation through morning staff meetings. Exh. A, Carignan Deposition, at 25, 45. "[M]ultiple times" during the investigation, Ortolano complained to Carignan that the detectives were not conducting an adequate investigation in terms of completeness. Exh. A, Carignan Deposition, at 23-25. He knew that Ortolano was unhappy with the outcome of the investigation. Exh. A, Carignan Deposition, at 24. On September 23, 2019, Ortolano sent Lombardi an email asserting complaining that he had issued her a warning not to speak with employees of the Assessing Department outside the department offices, and questioning whether the NPD will be able to

complete "an informed, objective report." Exh. C., at NPD-LO-212. Lombardi's official police write-up questioned Ortolano's veracity; he forwarded the complaint to the "Chief's Office." *Id*.

      3.  <u>Carignan's Adverse Action against Ortolano</u>.

          i.  <u>The Version of the Arrest As Reflected in Official Nashua Police Documents.</u>

*The Original Decision Not to Charge Ortolano with Trespass.*

The adverse action Carignan inflicted on Ortolano primarily involves Ortolano's arrest on February 18, 2021. The basics of these facts and evidence have been restated and the Court will know them well upon reading the several memoranda. Ortolano will only present what is necessary about her arrest here.

On January 22, 2021, Nashua police officers were summoned to the Legal Department on the third floor of City Hall to deal with a woman who "was attempting to have documents reviewed" and "was refusing to leave." Exh. C, NPD-LO-3656. One of the responding officers, Timothy Roach, presented the follow written narrative for the police record:

> Laurie was sat down in an upstairs corridor area of City Hall. Was not causing a scene on arrival and appeared calm. *She was upset as reported she has been trying to get appointment and paperwork stamped by city hall and they continue to not assist her.* Reports this has been going on for months. She apparently assists people in property tax abatement/reductions and needed papers stamped.
>
> Spoke with Celia from City Hall who is Deputy Corporation Counsel for city? She said this is ongoing issue with Laurie and that personnel from NPD are aware. *No allegations of any threats made but stated that Celia needed to leave now. Wanted her trespassed but allowed at City Hall if she has an approved appointment. Reported the City have had a lot of contact with Laurie via email and that there are pending lawsuits with the City*.
>
> Lauries (sic) was asked to leave. She left willingly but stressed her frustration indicating that the City do not communicate with her or assist her. *She was informed she is being trespassed for one year and is not allowed at City Hall unless with an appointment. She was advised that she could face arrest from Criminal Trespass if she attends City Hall without an appointment. She understood.*

*No offences alleged or apparent*

Exh. A-1, NPD 1/22/21 Call. According to Carignan, "the officers responded and handled it, and it was -- and it was cleared." Exh. A, Carignan Deposition, at 72. When asked what "cleared" meant, Carignan explained: "Cleared without arrest, meaning they left the property and they did not arrest her. She left when they told her to." Id. He did not think there would be an arrest and initially believed that there should not be an arrest: "the matter was over, . . . this matter was closed, and we were not going to pursue further charges." Id. at 76, 83. Deputy Corporation Counsel Celia Leonard, who had told Officer Roach that Ortolano had not made any threats and that she wanted her "trespassed but allowed at City Hall if she has an approved appointment," also understood that the NPD had determined that no crime had been committed. Exhibit E, Leonard Deposition, at 48.

*The NPD's Change of Mind and Charge of Trespass.*

On February 1, 2021, ten days after the January 22, 2021 incident, NPD police officer Timothy Roach reported, "I was made aware by supervisors that City Hall through Attorney Celia Leonard had contacted the Nashua Police Department and wished to open an investigation into the incident that occurred on January 22nd, 2021 involving Laurie ORTOLANO for her actions that day. I will attend City Hall to arrange to speak with witnesses to this incident." Exh. C, NPD-LO-3665. Officer Roach then took interviews and completed an investigation. Exh. C, NPD-LO-3665 – NPD-LO-3677. In her second interview, Leonard changed her story. Instead of saying that Ortolano had made no threats and Leonard only wanted her "trespassed" but allowed at City Hall with an appointment, according to Officer Roach she now said that Ortolano's behavior was "threatening and hostile." Exh. C, NPD-LO-3670. She now described Ortolano's

behavior as "erratic. *Id*. She claimed that Ortolano's "refusal to leave despite multiple requests . . . [in]conjunction with recent violent actions against government employees and ORTOLANOs vocal criticism of City Staff and herself at public meetings and emails was concerning." *Id.* On deposition, she admitted she was referring to the January incidents in D.C. Exh. D, at 58-59.

Carignan would claim on deposition that the reason Ortolano was arrested despite a policy of not arresting others in similar circumstances was that Ortolano had made a social media posting admitting to the crime. Yet, Officer Roach's Affidavit supporting the Arrest Warrant said nothing about a social media post and failed to mention that Leonard had changed her position about what happened and on whether she wanted Ortolano arrested. Exh. C., NPD-LO-3654 - NPD-LO-3658.

    4. <u>Facts Bearing on Whether Ortolano's Protected Conduct was a Substantial or Motivating Factor in Carignan's Adverse Actions against Her</u>.

       i. <u>Chief Carignan's Version of How the Original Decision Not to Charge Ortolano Changed and Led to Her Arrest.</u>

Within a week of the incident, Carignan "was contacted [either by phone or email] and requested [to attend] a meeting with the legal department and Mr. Bolton" at the City Hall Legal Department conference room. Exh. A, Carignan Deposition, at 77. Carignan says that at least Bolton and Leonard were present for the Legal Department, but cannot remember if anyone else was. *Id.* at 77-79. At the meeting, Carignan said that Bolton did all the talking for the Legal Department. Bolton expressed that he

> was not satisfied with the outcome of the investigation. *He felt that she should have been placed under arrest immediately*. He expressed concern for his staff, meaning the other attorneys and the paralegals in the department, and *he had asked me to -- I guess he told me to arrest her, and I told him I would not arrest her.*

*Id.* at 80. He said that the NPD should arrest Ortolano, which Carignan interpreted as a demand

that she should be arrested; Bolton "was trying to present it as a demand." *Id.* at 83-84. Carignan

testified that Bolton was angry and spoke with a raised voice. *Id.* It was Carignan's position

during the meeting that he was going "to stick with what the officers had found and put in their

papers created for the incident, . . . which he believed were absolutely true and accurate." *Id*. at

82.

Carignan said that, between the time of the meeting and Ortolano's arrest,

> there were several conversations back throughout this entire ordeal . . . where
> Bolton would contact the [NPD] legal department [, the NPD's prosecuting arm],
> and I believe it was Captain Brian Kinney (sic)[2] at the time, or Lieutenant Kinney.
> There was some -- I think some conversations there that he let me know about.

*Id.* at 87. Carignan said that, at first "we held firm that we weren't going to pursue charges." *Id.*

at 87. Within about a week, however, the NPD opened an investigation into whether Ortolano

should be arrested. *Id.* at 89. According to Carignan,

> I was advised by my deputies that they wanted to open an investigation to re -- to
> relook at the case because of a social media post that Ms. Ortolano had posted,
> but if I remember right, she was bragging about refusing to leave, and. not -- not
> obeying the commands of what the person who had control of the property did,
> meaning the legal department.

*Id.* at 89. Further elaborating, Carignan said:

> She went on her social media post and admitted to refusing to obey those
> commands, and for us the discussion, if I remember correctly, was, well, she's
> admitting to a crime, we don't need a witness to necessarily come forward, she's
> making her own self-admissions, so we will charge her. . . .

*Id.* at 90. Although Carignan voiced his disagreement with his deputies, and had the authority to

override the decision to arrest Ortolano (see above), in the end he "supported that decision." *Id.*

Ortolano was thus arrested.

---

[2] This is a transcribing error throughout the deposition; it is "Brian Kenney."

      ii.   <u>Corporation Counsel Bolton's Version of How the Original Decision Not to
Charge Ortolano Changed and Led to Her Arrest.</u>

On deposition, Bolton's version of events surrounding the change of decision regarding the
Ortolano arrest was so different from that of Carignan that the only conclusion one could reach
was that one of them listened to nothing the other said, or one of them is not being truthful. This
alone supports Ortolano's assertion that there are genuine issues of material fact in dispute and
the claims need to be tried.[3]

<u>Bolton's Animus Toward Ortolano</u>

First, Bolton's animus for Ortolano virtually drips from the pages of his deposition.[4] He
considers Ortolano to be "disruptive, unruly, [and] antagonistic." Exh. E, Bolton Deposition, at
25. Specifically, he said: "She would use rough language. She would be accusatory toward
people.· She may or may not have had the right to do all of that. I still had my own opinions as to
the appropriateness of it." *Id.* at 26. He said she says she uses the words, "Shit. Fuck. Cunt.
Asshole." Id. at 28. He claims that Ortolano called him an "asshole" on various occasions. Id. at
32. Yet, while he would not have called Ortolano a "predator" or said her behavior was
"deviant," as Alderman Moran had called Ortolano, Bolton asserted that Alderman "do not give
up their own First Amendment rights . . . [and]· have a right to respond and say what they think."
*Id.* at 46. He admitted that his relationship with Ortolano had deteriorated at some point. *Id.* at
74.

---

[3] Ortolano points out that, because they filed well before the end of the discovery period, neither Bolton
nor Leonard had been deposed when her responses for summary judgment were due. Their depositions
contain substantial evidence demonstrating disputes as to material facts. Ortolano respectfully requests
that this Court consider the Bolton/Leonard motions (relatively) contemporaneously with the other five
motions for summary judgment, which were all filed at about the same time, and employ the facts
available from all six motions in deciding the Bolton/Leonard motions.

[4] Ortolano articulates just a few examples here.

Although he was not present for the incident on January 22, 2021, that would lead to Ortolano's arrest, Bolton rejected Ortolano's claim that she was at the Legal Department to obtain date stamps on abatement applications she was helping senior citizens file, proclaiming, "I don't think that was motivated at all by any assistance she was giving to any senior citizen." *Id.* at 147. He refused to admit that the process of being arrested was humiliating or embarrassing for Ortolano; specifically, he denied that being fingerprinted, having a mugshot taken, and waiting in a jail cell for bail were humiliating. *Id.* at 159-162.

Bolton did not agree with the plea agreement that the NPD Legal Department negotiated: that Ortolano's charges should be filed without a finding on condition that she stay away from the Legal Department without an appointment because he did not believe she was remorseful. *Id.* at 95. Yet, when pressed whether he wanted her to endure a conviction, he responded that he did not know what would have satisfied him. *Id.* at 99-100. Perhaps because he did not like the terms of Ortolano's plea agreement, he prevented the legal department from scheduling an appointment with the Legal Department at all despite the fact that the terms of the plea agreement suggested that she could visit with an appointment. *Id.* at 131-134. During his deposition, when questioned about a newspaper report that Bolton claimed Ortolano's presence in the Legal Department was an "'out and out invasion' and intended to disrupt government operations seemingly inspired by events in Washington," Bolton claimed that that reporter had misquoted him." *Id.* at 113-118.

<u>Bolton's Completely Different Story about How the Decision to Charge Ortolano Changed</u>.

Bolton read Carignan's deposition prior to his deposition and asserted that he disagreed with much of Carignan's testimony:

> He seems to believe that sometime after the January incident, after I spoke with
> him, that I had some conversations with Captain Kenney and advocated with

Captain Kenney that Ms. Ortolano should be criminally charged. I don't think
that's accurate.

*Id.* at 82. He denies speaking with Captain Kenney at all between January 22, 2021 and the time

of Ortolano's arrest. *Id.* at 82-83. He claims that he had one interaction with Carignan by

telephone during which he did not advocate for Ortolano's arrest, but only stated that Leonard,

Mindy Lloyd, and Jesse Neumann, all of whom were present in the City Legal Department when

Ortolano entered, should be interviewed before a decision on charging was made. *Id.* at 83-84.

His says his other interaction with Carignan was by a Zoom call rather than in person, and that

Carignan and a number of his high officials "were likely present" during the Zoom call. *Id.* at 83,

86-87. He was adamant that he had never advocated for or demanded Ortolano's arrest; he only

advocated that the witnesses should be interviewed before a final decision was made. *Id.* at 85-

86. He insisted that Leonard, Neumann, and Lloyd had not been "interviewed" on the scene on

January 22, 2021; they had only responded to "brief questions" that "may or may not have been

fully captured in any of [the police] reports." *Id.* at 89-90.

## II.    ARGUMENT.[5]

### A.   The Summary Judgment Standard.

A federal court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The moving party must "assert the absence of a genuine issue of material fact and

then support that assertion by affidavits, admissions, or other materials of evidentiary

quality." *Mulvihill v. Top–Flite Golf Co*., 335 F.3d 15, 19 (1st Cir. 2003). Once the movant has

made the requisite showing, "the burden shifts to the summary judgment target to demonstrate

---

[5] The legal standard are fairly consistent throughout the prior memoranda opposing summary judgment
that Ortolano has filed, so she provides pared-down legal standards here.

that a trialworthy issue exists." *Id*. The nonmoving party "'. . . must set forth specific facts

showing that there is a genuine issue' of material fact as to each issue upon which he or she

would bear the ultimate burden of proof at trial." *Santiago–Ramos v. Centennial P.R. Wireless

Corp.*, 217 F.3d 46, 52–53 (1st Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986)). The trial court is obligated to view the facts "in the light most favorable to the

nonmoving party (here, the plaintiff), consistent with record support," and gives him or her "the

benefit of all reasonable inferences that those facts will bear." *Noviello v. City of Boston*, 398

F.3d 76, 82 (1st Cir. 2005) (internal citation omitted).

B.  Defendant Carignan Unlawfully Retaliated against Ortolano in Violation of the First
    Amendment's Free Speech Clause.

      i.  The Legal Standard for Free Speech Retaliation Claims.

A First Amendment "retaliation claim[ ] proceed[s] in two stages." *D.B. ex rel. Elizabeth B.

v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v.

Doyle*, 429 U.S. 274, 287 (1977) and *Guilloty Perez v. Pierluisi*, 339 F.3d 43, 56 (1st Cir. 2003)).

First, a plaintiff must establish a prima facie case by demonstrating three elements: "that (1) he

or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse

action by the defendant, and (3) the protected conduct was a substantial or motivating factor in

the adverse action." *D.B. ex rel. Elizabeth B., supra,* 675 F.3d at 43 (citing *González-Droz,

supra,* 660 F.3d at 16, *Gorelik v. Costin*, 605 F.3d 118, 123 (1st Cir. 2010), and *Centro Medico

del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 10 (1st Cir.2005)). Once a plaintiff has

established a prima facie case, the second stage of analysis shifts the burden to the defendant to

prove that the same decision(s) would have been reached even in the absence of the plaintiff's

prior or ongoing protected conduct. *González-Droz, supra,* 660 F.3d at 17. As she will demonstrate below, Ortolano has satisfied her burden of presenting a prima facie case.

ii.   Ortolano Engaged in Constitutionally Protected Conduct.

a.   The Legal Standard for Constitutionally Protected Conduct.

Because the "right to petition [government is] one of the most precious of the liberties safeguarded by the Bill of Rights," *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 524 (2002), speech that is "critic[al] of public officials . . . is high in the hierarchy of First Amendment values." *Lozman v. City of Riviera Beach, FL*, 585 U.S. 87, 101 (2018); see *Connick v. Myers,* 461 U.S. 138, 145 (1983). Filing grievances and lawsuits are protected activity. *Hannon v. Beard,* 645 F.3d 45, 48 (1st Cir.2011); *Roy v. Wrenn*, 2013 WL 4541389 at *4  (D. N.H. 2013)(not reported in F. Supp.); *see Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983) )("the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances"); *Boudreau v. Petit*, 2024 WL 665546 *12 (D. R.I. 2024)(not reported in F. Supp.)(it is long settled that filing a lawsuit constitutes protected conduct). Speech less formal than the filing of written grievances will also suffice; specifically, oral criticism of municipal officials and/or municipal government is protected speech. *Connick, supra,* 461 U.S. at 145 (speech concerning public affairs the essence of self-government); *Currier v. Town of Gilmanton*, 621 F.Supp.3d 233, 258-59 (D. N.H. 2022)(voicing of dissatisfaction with town government and related issues is speech protected by the First Amendment).

b.   The Evidence Demonstrating that Ortolano Engaged in Constitutionally Protected Conduct.

Once again, with the exception of claiming that a trespass is not protected speech,[6] Carignan (like Lombardi) does not seem to contend that Ortolano has failed to engage in protected speech. As recounted in the facts above, Ortolano's filing of the grievance against Turgiss and Kleiner, as well as her lawsuits and criticisms of Nashua City government and its officials is vibrant evidence of free speech activities.

      iii.    Carignan Subjected Ortolano To the Kind of Adverse Action Proscribed under First Amendment Retaliation Law.

      a.  The Legal Standard for Retaliatory Adverse Actions.

To succeed on a First Amendment retaliation claim, a plaintiff "must establish, among other things, 'a retaliatory adverse act' that is more than *de minimis. Pope v. Bernard,* 2011 WL 478055, at * 2 (1st Cir.2011) (per curiam)(not reported in F. Supp.)(citing *Morris v. Powell,* 449 F.3d 682, 684 (5th Cir.2006)). "[M]ore than *de minimus* means the action must be sufficient to chill a person of ordinary firmness in the performance of future first Amendment First Amendment activities." *Pope,* 2011 WL 478055, at * 2 (citing *Morris*, 449 F.3d at 685-86); *see Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011)("the pertinent question . . . is whether the defendant's actions would deter 'a reasonably hardy individual[ ]' from exercising his constitutional rights")( (citing *Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1218 (1st Cir.1989) (en banc)); *Starr v. Dube*, 334 F. App'x 341, 342-43 (1st Cir. 2009)(per curiam).

    "The plaintiff's evidentiary burden is merely to establish the factual basis for his claim that the retaliatory acts amounted to more than a *de minimus* injury." "*Actual* deterrence need not be shown. Even the threat of an adverse can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct."

---

[6] As said in Ortolano's Memorandum Objecting to the Bolton/Leonard Motion for Summary Judgment, and incorporated here, Ortolano has never argued that trespass constitutes protected speech. Memorandum, at 17-18.

*Grossman, supra,* 566 F. Supp.3d at 145 (emphasis in original)(quoting *Bell v. Johnson*, 308

F.3d 594, 606 (6th Cir. 2002) and *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010); *see Huffman*

*v. City of Boston*, 2022 WL 2308937, at *4 (D. Mass. 2022)*(not reported in F. Supp)*.

> b.  The Evidence Demonstrating that Defendant Carignan Engaged in
>      Retaliatory Adverse Actions.

At first, Carignan adhered to NPD policy not to arrest persons who voluntarily left property

after the police arrived; according to him, he stood to Bolton's demand that Ortolano be arrested.

Exh. A, Carignan Deposition, at 80, 87. But he eventually capitulated, either to Bolton or other

colleagues in the department, supporting Ortolano's arrest. Carignan originally exercised the

authority he derived from the Nashua City Charter and New Hampshire law to refuse to treat

Ortolano disparately from others who had been accused of trespassing at City Hall. But he did

not in this case. Because of his refusal to adhere to police policy, Ortolano was arrested. Any

claim that arrest is *de minimus* retaliatory conduct is absurd. The consequences are severe and

well within the legal requirements for retaliatory adverse actions.


Ortolano's Protected Conduct was a Substantial or Motivating Factor in the Adverse Actions
Undertaken by Lombardi.

> c.  The Legal Standard for Showing that Conduct Was a Substantial or
>      Motivating Factor in the Adverse Actions.

The third element of a plaintiff's prima facie case "necessitates proof of a causal connection

between the allegedly protected speech and the allegedly retaliatory response." *González-Droz*,

660 F.3d at 16. A pattern of informal harassment may establish a First Amendment retaliation

claim if the alleged harassment has a chilling effect on the plaintiff's exercise of his or her First

Amendment rights. *Alston v. Town of Brookline*, 997 F.3d 23, 42 (1st Cir. 2021);  *D.B. ex rel* 675

F. 3d at 43; *Barton v. Clancy*, 632 F. 3d 9, 29 (1st Cir. 2011). Moreover,

> direct proof of a retaliatory motive is not essential to make out a prima facie case.  In some instances, circumstantial evidence (say, temporal proximity between a protected act and an adverse action, falsification of institutional records, or deviation from standard operating procedures) may suffice.

*Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011); *see Mattei v. Dunbar*, 217 F. Supp. 3d 367, 377 (D. Mass. 2016). A plaintiff may "survive summary judgment    . . . [by] . . . present[ing] circumstantial evidence of motive, which usually includes: '(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual.' " *McCollum v. Cal. Dep't of Corr. & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011); *see Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564-65  (11th Cir. 1995)(purely circumstantial evidence, taken in the light most favorable to the plaintiff, can create a jury question on the issue of the government's motive); *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)(courts may look to proximity in time, actual antagonistic conduct or animus, or other types of circumstantial evidence, such as inconsistent reasons given for the treatment of the defendant that give rise to an inference of causation when considered as a whole).

> d.   The Evidence Demonstrating that Ortolano's Protected Conduct Was a Substantial or Motivating Factor in the Adverse Actions.

Carignan exercised his authority in the first instance in refusing to arrest Ortolano on account of NPD policy. He claims to have only capitulated after the intervention of Bolton and Leonard, who demanded Ortolano's arrest, as well as the urgings of his subordinates that Ortolano should be prosecuted because of a social media post admitting guilt. As a result, Ortolano has been treated differently than other trespassers at City Hall, none of whom were arrested.

The social media post excuse is pretext. First, the assertion is preposterous that Ortolano's admissions on a social media post meant there would be no need for witnesses, when all the testimony was that there were three members of the Legal Department hostile toward Ortolano and willing to testify. Second, if the social media post containing an admission was the vital piece of evidence that distinguished Ortolano's case from all others, why was it not even mentioned in Officer Roach's Affidavit supporting the Arrest Warrant? Finally, the antagonism of Bolton toward Ortolano, but for whom there would have been on charge against Ortolano, is rife. There is plenty of circumstantial evidence demonstrating that Ortolano's protected conduct was a substantial or motivating factor in the arrest.

C.  Carignan's Probable Cause Argument.

As a general matter, when a claim of retaliation based on an arrest is made, the plaintiff must demonstrate that there was no probable cause for the underlying arrest in order to satisfy the causation requirement. *Id.* As with all general rules, however, there are exceptions, and the recent *Nieves* exception is relevant here. *Nieves* holds that the probable cause requirement does not apply in "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. ___, 139 S. Ct., at 1727.

The *Nieves* Court recognized that the probable cause requirement should not apply to cases where officers "have probable cause to make arrests, but typically exercise their discretion not to do so" because, "[i] n such cases, an unyielding requirement to show the absence of probable cause could pose 'a risk that some police officers may exploit the arrest power as a means of suppressing speech.'" 587 U.S. ___, 139 S. Ct., at 1727 (quoting *Lozman*, 585 U.S., at 99).

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest

> claim on the ground that there was undoubted probable cause for the arrest. In
> such a case, because probable cause does little to prove or disprove the causal
> connection between animus and injury, applying *Hartman*'s rule would come at
> the expense of *Hartman*'s logic.

*Id.*

The *Nieves* exception clearly applies here. Carignan testified that the customary practice of the Nashua Police Department was to not arrest a trespasser suspect if, once the police arrive, the person cooperates and leaves. And the objective evidence garnered from the Nashua Police document attached to the Colquhoun Affidavit bears this out; prior to the Ortolano case, the Nashua Police Department just did not arrest people at City Hall who cooperated and left once the police arrived. Of the 10 incidents at City Hall between January 1, 2014 and January 21, 2021, the Nashua Police Department arrested no one until Laurie Ortolano came along. Exhibit B (Colquhoun Affidavit, with attachment). Ortolano was treated disparately from others who were alleged to be trespassing at City Hall.

Carignan argues that the *Nieves* exception does not apply because "[n]one of those calls appear to involve persons refusing to leave a private workspace in City Hall, much less persons who provided a written admission that they had refused to leave upon request." *Nieves* does not require the type of exactitude that Carignan seeks, especially as made even more clear by the very recent case of *Gonzalez v. Trevino*, 602 U.S. ___ (2024)(the only placed on the sort of evidence a plaintiff may present for that purpose was that it must be objective). As in *Gonzalez*, Ortolano has provided objective evidence. The *Nieves* exception applies here. Probable cause is not required.

18

### III.   CONCLUSION.

For the foregoing reasons, this Court should deny defendant Carignan's Motion for Summary

Judgment.

Dated: July 1, 2024                    Respectfully submitted,

                                       Laurie Ortolano, Plaintiff
                                       By her Attorneys,

                                       Olson Lawyers

                                       /s/ Kurt S. Olson
                                       Kurt S. Olson
                                       Bar ID No. 12518
                                       31 Franklin Rd.
                                       Salisbury, NH 03268
                                       603-748-1960
                                       kolson@mslaw.edu

### CERTIFICATE OF SERVICE

I, Kurt S. Olson, hereby certify that this document, filed through the ECF system, will be
sent electronically forthwith to the registered participants as identified on the Notice of
Electronic Filing (NEF).


Dated: July 1, 2024                    /s/ Kurt S. Olson
                                       Kurt S. Olson
                                       31 Franklin Rd.
                                       Salisbury, NH 03268
                                       603-748-1960
                                       kolson@mslaw.edu