# Exhibit A

**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

## MICHAEL CARIGNAN

*April 19, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION!

```
                UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF NEW HAMPSHIRE




*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                    *
   LAURIE ORTOLANO,                 *
                                    *  No.
                 Plaintiff,         *  1:22-cv-00326-LM
                                    *
        vs.                         *
                                    *
   CITY OF NASHUA, et al.,          *
                                    *
                 Defendants.        *
                                    *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

VIDEOCONFERENCE DEPOSITION OF MICHAEL CARIGNAN,

Deposition taken with all parties appearing remotely,

on Friday, April 19, 2024, commencing at 3:11 p.m.




Court Reporter:
Pamela J. Carle, LCR, RPR, CRR

```
 1                        APPEARANCES

 2
    For the Plaintiff:
 3

 4          Peter Malaguti, Esq.
            500 Federal Street
 5          Andover, Massachusetts 01810
                978.681.0800
 6              malaguti@mslaw.edu

 7
    For the Defendant City of Nashua and the Witness:
 8
            CULLEN COLLIMORE SHIRLEY PLLC
 9          37 Technology Way, Suite 3W2
            Nashua, New Hampshire  03060
10          By:  Brian J.S. Cullen, Esq.
                603.881.5500
11              bcullen@cullincollimore.com

12
    For the Defendant Kimberly Kleiner:
13
            FRIEDMAN FEENEY
14          95 North State Street
            Concord, New Hampshire 03301
15          By:  David Betancourt, Esq.
                603.736.7683
16              dbetancourt@friedmanfeeney.com

17
    For the Defendants Steven Bolton and Celia Leonard:
18
            UPTON & HATFIELD
19          10 Centre Street
            Concord, New Hampshire 03301
20          By:  Madeline K. Osbon, Esq.
                603716.9777
21              mosbon@uptonhatfield.com

22

23

24

25
```

Duffy & McKenna Court Reporters, LLC
1-800-600-1000

```
 1                      I N D E X
        WITNESS:          MICHAEL CARIGNAN
 2
        EXAMINATION:                          PAGE
 3      By Mr. Malaguti                       4

 4

 5

 6

 7      EXHIBITS FOR IDENTIFICATION:

 8      CARIGNAN          DESCRIPTION                 PAGE

 9       1        6/26/19 Lehto supplemental report      13

10
                (Digital exhibit sent with transcripts.)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           Q.     When you're ready, Mr. Carignan, do you

2      recognize that document?

3           A.     Yes, sir, I do.

4           Q.     You've seen it before?

5           A.     Yes, I have.

6           Q.     What is that, please?

7           A.     It is a supplemental report completed

8      by, at the time, Captain John Lehto, date

9      indicating it was completed on June 26, 2019.

10                 MR. MALAGUTI:  Pam, can we mark that as

11     Carignan 1.

12    (Carignan Exhibit 1 was marked for identification.)

13                 MR. MALAGUTI:  Brian, just to look

14     ahead a little bit, the only other documents that

15     you would have that I'm going to be looking to, to

16     do later on when we get onto the trespass thing,

17     are just the police records.

18                 The original police -- there are sort

19     of two sets, the original one done by I think

20     Earnshaw, and then I think the follow-up ones done

21     by Roach.  So at some point we'll probably be

22     marking those.

23                 I'm going to have to go from memory on

24     my end, but we'll be marking.  Just to give you a

25     head start on where we're going to be headed later

1     on, okay?
2                   MR. CULLEN:  Sure.  I believe I have
3     those here.
4                   MR. MALAGUTI:  I know you produced them
5     because I had pulled them down, and I just can't
6     get access to them, so.  Thank you.
7     BY MR. MALAGUTI:
8          Q.    Okay.  So, Mr. Carignan, I can't see
9     the document that you're looking at, but I believe
10    it's from -- is it from June of 2019, somewhere in
11    that area?
12         A.    Yes, June 26, 2019.
13         Q.    And could you describe that document to
14    us, please.
15         A.    Sure.  It's a -- as you stated, it's a
16    supplemental document, meaning a supplemental
17    report to a larger report that just indicates
18    something that happened within that case.  It was a
19    report written by Captain John Lehto, based on a
20    meeting that I had with him attending a meeting at
21    City Hall.
22         Q.    Now, this is in regard to an
23    investigation that would eventually be done by the
24    Nashua Police Department regarding the Nashua
25    Assessing Department, right?

```
 1          A.      Correct, yes, sir.
 2          Q.      And it's fair to say if that was
 3     brought to your attention by a woman named Laurie
 4     Ortolano and perhaps another woman with her named
 5     Laura -- I believe it's pronounced Colquhoun?
 6          A.      Correct.
 7                  MR. MALAGUTI:  And if someone knows
 8     better than me, I'm going to make an attempt at
 9     spelling Colquhoun for the stenographer.  I
10     believe it's C-O-L-Q-U-H-O-U-N.  Does that sound
11     right, if you can find it somewhere?
12                  MR. CULLEN:  That appears to be
13     correct.
14                  MS. ORTOLANO:  It's C-A-L,
15     C-A-L-Q-U-H-U-O-N (sic).
16                  MR. MALAGUTI:  C-A-L.  Okay.  Thank
17     you, Laurie.
18   BY MR. MALAGUTI:
19          Q.      You just came into a different view, so
20     you're still there.  My apologies.  You bounced
21     down on the screen.
22                  Do you have a recollection,
23     Mr. Carignan, about your meeting with what I'll
24     call the two Laurie and Laura?
25          A.      The meeting with Laurie and Laura, I
```

1   didn't have any specific memory of that meeting.  I

2   know I've spoken to Laurie several times.

3          Q.     When is the first time you ever spoke

4   with Laurie?

5          A.     I'll be honest, I'm not sure.  We've

6   had several conversations.  So -- go ahead.

7          Q.     Let me put them chronologically.  Did

8   you have conversations with her prior to

9   discussing the investigation into the Nashua

10  Assessing Department?

11         A.     Yes.

12         Q.     In what forum would these conversations

13  occur?

14         A.     Well, so, again, we had several

15  conversations, some we had seen each other at City

16  Hall a couple of times over some different issues,

17  but she came to me to the police department to

18  speak to me about her concerns with those

19  allegations.

20         Q.     So the meeting about the Nashua

21  Assessing Department was a face-to-face meeting at

22  the police department?

23         A.     I believe so, yes.

24         Q.     Was it just a conversation or did it

25  involve her showing you documents?

1      A.      I believe she showed us some documents.

2  Again, we had several meetings, I apologize if the

3  chronology is not right, but Laurie had excellent

4  documentation as to her allegations and her

5  concerns.

6      Q.      At some point did she give police

7  officers some documentation that they retained?

8      A.      Yes.

9      Q.      And how soon after you first met with

10  Laurie at the police department to discuss these

11  allegations did you end up going over to the

12  mayor's office for the meeting that was documented

13  in Exhibit 1?

14      A.      I don't exactly remember the day she

15  came over, so I can't give you an exact time, but

16  it would be within a couple of days.  It was -- we

17  took it seriously, and we would have gone over

18  pretty quickly to start looking into it.

19      Q.      At that point when she contacted you,

20  would you say that you were in charge of the

21  matter?

22      A.      The allegations came to me and I

23  directed it to go towards the detective bureau, so,

24  yes.  In charge of assigning it, yes.  In charge of

25  handling it, no.

1      Q.     Yeah, so, and in fact, you fairly

2   quickly assigned it to, I believe it was -- and

3   again, I don't have the docs, Captain Lehto and

4   Detective Mederos, is that right?

5      A.     Yes, as the chief, Captain Lehto was

6   the captain for the detective bureau, so I told

7   him, he was my immediate subordinate.  I told him I

8   wanted him and -- it was Lieutenant Mederos -- I

9   believe it was Lieutenant Mederos at the time, to

10   handle the investigation.

11      Q.     And do you know that at some point they

12   took possession of the documents that Laurie

13   Ortolano had shown you?

14      A.     Yes.

15      Q.     They were somewhat voluminous, weren't

16   they?

17      A.     Yes.

18      Q.     There was a private investigator's

19   report included, for example?

20      A.     I believe so.  I'm not sure which

21   packet of information it was, but I'm certainly

22   aware that there was the private investigator's

23   reports.

24      Q.     Now, do you know whether you appointed

25   Captain Lehto and Lieutenant Mederos before you

1      A.      So I don't remember that ever having

2   come up.  We're certainly a separate entity, we're

3   not -- we don't answer to the mayor, we answer to a

4   police commission, so we work for the City of

5   Nashua, but we're not under City Hall if that makes

6   sense.

7   BY MR. MALAGUTI:

8      Q.      No, that makes -- that makes -- well, I

9   never understand municipal government, but I sort

10   of understand it.

11           Describe for me this police commission.

12   How was it comprised?  For example, and I'm just

13   going to ask for a general narrative on this, is

14   it elected officials, is it appointed officials,

15   and what do they do is what I'm looking for.

16      A.      So there are currently three police

17   commissioners, and there have been traditionally,

18   those police commissioners are appointed by the

19   governor of the State of New Hampshire and approved

20   by the Executive Council.

21           Their role is to oversee the budget of

22   the Nashua Police Department, to oversee the

23   department as a whole, if I can compare it to a

24   board of directors where they're informed of all

25   that's going on in the PD, but the chief executive

1     officer, which would be the chief of police,

2     manages the day-to-day and makes the strategic

3     decisions for the short and long-term for the

4     police department.

5               So the commission, is -- what we do,

6     they approve our budgets, they approve our

7     promotions, they approve our terminations, or deny

8     them, but they don't deal with the day-to-day

9     operations of the police department.  They're not

10    sworn officers, they're not -- they have no legal

11    authority to enforce the laws.

12        Q.    And does each commissioner have a

13    full-time job as commissioner?

14        A.    Yes.  Yes, they -- I believe one of the

15    commissioners now is retired -- I'm sorry, so, no,

16    the police commission part, I believe they get $100

17    a year to serve in that role.  But each of them

18    have outside jobs, outside careers, or they're

19    retired, so they don't -- their job is not a police

20    commissioner.

21        Q.    And does every municipality in

22    New Hampshire have a police -- I'm an outsider, so

23    I apologize.  Does every municipality have a

24    police commission or is that something that only,

25    for example, happens with cities?

1    decisions, but not in terms of everyday policing?

2         A.    Correct.

3         Q.    Okay.

4         A.    So, for example, the police commission

5    will not dictate who handles an investigation, they

6    would not dictate how an investigation is handled,

7    but they would dictate our annual budget, they

8    would dictate the raises, they'd dictate anything

9    like that.

10        Q.    And back to -- did Laurie Ortolano or

11   Laura Colquhoun raise any concerns about the

12   independence of the investigation that was about

13   to occur with the Nashua Assessing Department?

14        A.    I don't know if it was at that specific

15   meeting, but she certainly raised those concerns at

16   some point with me.  And I don't remember

17   conversations with Laurie Colquhoun, I remember

18   more having engagements with Laurie Ortolano.

19        Q.    Laurie Ortolano was the talker of the

20   two?

21        A.    No, that's just the person I had the

22   communications with.

23        Q.    Now, when you say you remember that

24   Laurie had expressed that concern, can you -- can

25   we at least guesstimate, was it early in the

1    process, was it later in the process?  Do you have

2    a recollection in that regard?

3         A.     Again, I can't be beholden to anything

4    specific, but it was multiple times throughout, so

5    it's fairly accurate to say right around that time

6    before we started and several times afterwards.

7         Q.     And at any point did she outright tell

8    you that she thought that the police investigation

9    of the Nashua Assessing Department was not being

10   conducted independently?

11        A.     No.  I think her wording was

12   independently.  I know she was not satisfied with

13   the investigation or the outcome, and she had some

14   issues with several points of some of the

15   detectives.  I'm not sure exactly what those were,

16   but I don't know that it was necessarily -- I don't

17   remember it necessarily being a biased

18   investigation, more just an incomplete one.

19        Q.     And how did she communicate those

20   concerns?  Through which medium is what I'm

21   asking.

22        A.     She would -- well, she would try to

23   contact me.  She would contact I believe

24   Captain Lehto, she would contact pretty much the

25   detectives.  She contacted many of us often to

1   express those.  You know, I didn't -- I wasn't
2   involved with the case, so I didn't really have
3   involvement in the day-to-day communications with
4   her, or it really wasn't my place to have
5   conversations with her.  If we saw each other, we
6   would talk about it, sometimes we would meet, but
7   it's pretty accurate to say she contacted many
8   people.  And regarding the means of the
9   communication, she would use the telephone.
10           I don't believe she e-mailed me, but
11   it's possible, but I don't remember any e-mails,
12   because most -- mostly it was through face-to-face
13   or phone calls.  She used social media a lot to
14   express her concerns on many different topics for
15   us, so those are the meetings I -- you know,
16   recollect.
17       Q.    Now, while the investigation was going
18   on, did you keep yourself apprised of what was
19   going on in a general way?
20       A.    In a general way, yes, sir.
21       Q.    How so?
22       A.    So every morning at the police
23   department we had -- I don't know the time now, at
24   the time it was 9:00, we would have a morning staff
25   meeting where each of the bureau's captains would

```
 1            A.      Our -- my administrative assistant at
 2      the time, Kathy Breslin, was in the meetings, and I
 3      believe she takes notes, but I don't believe she --
 4      she doesn't record them or enter them into
 5      anything.  It's just a reminder for me to address
 6      certain issues that come up in the meeting.  That's
 7      how it was for me.
 8            Q.      Would she have given you those notes to
 9      take possession of, or did she keep possession of
10      them herself?
11            A.      No, she would have kept possession of
12      them if -- I don't even know that she maintained
13      it, she basically would walk into the office and
14      say, hey, chief, you have a meeting here, or don't
15      forget you have to address this issue or don't
16      forget this is coming up.
17            Q.      Did she take notes on the computer or
18      did she write out the notes by hand?
19            A.      No, she handwrote her notes.
20            Q.      Did she ever transcribe those notes and
21      put them into electronic format, Word or whatever?
22            A.      Not that I know of.  Not for the
23      morning meetings.
24            Q.      Let's talk about this meeting on --
25      when did we say it was, June 26, 2019?  Do I have
```

1    the date right?

2         A.    Yes, sir.

3         Q.    Who called that meeting?  Was it the

4    police department or was it someone else?

5         A.    No, that was me.  That was the police

6    department.

7         Q.    And who did you call to say that there

8    was going to be a meeting?

9         A.    I don't remember exactly who I called,

10   but it would have either been Kim Kleiner to set

11   the meeting up or I would have called the mayor

12   directly.  Most likely in this case it was the

13   mayor directly, yeah, at the time.

14        Q.    And at the time what was Kim Kleiner's

15   position in the city government?

16        A.    She was the -- at the time I thought

17   she was the chief of staff for the mayor, but this

18   has her as director of administrative services.

19        Q.    And you understand that she was the

20   chief of staff at one point and then became the

21   director of administrative services.  Somewhere --

22        A.    Correct.

23        Q.    -- through all of this, right?

24        A.    Correct.  And throughout that portion,

25   our relationship did not change as far as the

1    representing the union.  It was a good chunk of his

2    non-political time, if that answers your question.

3              So he's been consistently a part of

4    collective bargaining for the police department for

5    a majority of the time that I've been there, I was

6    there.

7         Q.    And did you ever have a social

8    relationship with the mayor, a non-business

9    relationship?

10        A.    No, I did not.

11        Q.    Never went out to dinner with him and

12   his wife or anything of the like?

13        A.    No.

14        Q.    And Ms. Kleiner, did you ever have a

15   social relationship with Ms. Kleiner?

16        A.    No.

17        Q.    Okay.  So what time was the meeting

18   convened on June 26th, 2019?

19        A.    According to the report, it's 9:00 in

20   the morning.

21        Q.    And who was present?

22        A.    Myself, Captain John Lehto, Mayor

23   Donchess, and Kim Kleiner.

24        Q.    And did this take place in the mayor's

25   conference room?

1          A.      Yes.

2          Q.      And I'm going to ask you to remember

3     what was said during that meeting, and I'll

4     probably just go person by person as to, you know,

5     who said what.  What did you say at the meeting?

6          A.      So the purpose of the meeting and what

7     I said was informing the mayor that there was a

8     criminal complaint alleged against employees at

9     City Hall, and that we would be investigating the

10    case, and we would be conducting an investigation,

11    or detectives from the Nashua Police Department

12    would be conducting an investigation into those

13    allegations and we would be speaking with multiple

14    employees at City Hall.

15         Q.      Did you say anything else that you

16    remember?

17         A.      No.

18         Q.      And when you said -- when you described

19    the criminal investigation, did you describe the

20    types of allegations that had been made?

21         A.      No, we tried to keep all -- all those

22    facts to really a minimum.  It wasn't his business

23    what we were investigating.  Him and Kim were both

24    well aware of what they were, they had been told of

25    the allegations that were made or they had found

```
 1    out about it, and I'm not sure how.
 2              So they were aware of what we were
 3    looking into, but we didn't give them any
 4    information as to the nature of the complaints or
 5    how we were going to conduct our investigation.
 6         Q.    Now, prior to going into this meeting,
 7    did you know the names of the people who were
 8    going to be -- let me strike that.
 9              Prior to going into this meeting, did
10    you know the names of the subjects of the
11    investigation?
12         A.    I believe so.
13         Q.    Does the name Greg Turgiss sound
14    familiar to you?
15         A.    Yes.
16         Q.    Gary Turgiss?
17         A.    Yes.
18         Q.    And, obviously, Kim Kleiner?
19         A.    Correct.
20         Q.    And you knew prior to going into that
21    meeting that all three of them were subjects of
22    the investigation?
23         A.    Yes.
24         Q.    You knew that Kim Kleiner was a subject
25    of the investigation?
```

```
 1    leave time built up, so I started BAE Systems on
 2    January 2nd of 2022.
 3         Q.    Now, eventually the report -- I'm
 4    sorry, eventually the investigation was completed.
 5    Do you understand some of the events that happened
 6    or the investigative -- let me rephrase that.
 7               Do you have any recollection of any of
 8    the investigative steps that Detective Lombardi
 9    and others took during the investigation?
10         A.    Not specifically.  I know the
11    investigation was progressing along quite a bit.
12    It seemed to blossom out -- if I remember
13    correctly, it seemed to blossom into bigger things
14    at times.  So nothing specifically other than it
15    was being done in a timely and a thorough manner.
16         Q.    Did you receive any reports of who was
17    interviewed at any point, that you can recall?
18         A.    I did not review any written reports,
19    but through the daily meetings and through
20    interactions with Captain Lehto I would have been
21    informed, hey, we're doing this this time or this
22    is roughly what we're doing.
23               So, again, it was an informal process
24    to be kept up to speed on.
25         Q.    And did you -- in your position as
```

1      Q.    Well, first we'll call it the incident

2    at the legal department in City Hall.

3      A.    Okay.  Yes, I was aware that it

4    happened.  I definitely don't have details about it

5    other than I know that the officers responded and

6    handled it, and it was -- and it was cleared.

7      Q.    What does that mean, it was cleared?

8      A.    Cleared without arrest, meaning they

9    left the property and they did not arrest her.  She

10   left when they told her to.

11     Q.    Okay.  Do you know whether there was an

12   initial conversation with Attorney Celia Leonard,

13   and that she told the officers on the scene that

14   she wanted Ms. Ortolano to be no trespassed for a

15   year?

16     A.    I'm not sure.  I was not made aware of

17   that.

18     Q.    Do you remember ever reading the

19   supplemental narrative or incident reports or

20   anything regarding that day?

21     A.    I'm sorry, I don't.

22     Q.    Do you know whether you did or not, or

23   you just don't remember whether you did or not?

24     A.    I don't remember if I did or not.  It's

25   generally not something I would do.

1      city legal department?

2           A.      At the time she was, yes.

3           Q.      And you know that she also was one of

4      the people who were present while Laurie Ortolano

5      was in the legal office on the day in question?

6           A.      Yes.  From what I was told, yes.

7           Q.      And did you ever hear that Celia

8      Leonard, when she heard that the police department

9      would be -- the incident would require no further

10     action, do you recall her saying these words, or

11     something to this effect:  I find it troublesome,

12     to say the least.  My office will be speaking with

13     the police further.

14          A.      No, I don't remember her saying that

15     prior to my meeting.  I didn't have any

16     conversations with her prior to my meeting with

17     Steven Bolton and several members of the legal

18     department.

19          Q.      Okay.  So -- but it's fair to say that

20     you thought at one point the matter was cleared,

21     meaning the matter was over, right?

22          A.      Correct.

23          Q.      And then a communication occurred from

24     the city legal department to the police

25     department?

```
1          A.     Correct.
2          Q.     And the communication was that they
3    wanted a further investigation done into the
4    matter, right?
5          A.     I'm not sure how that -- I'm not sure
6    that's -- if it was them asking for more
7    information.  I'm aware that I got -- I was
8    contacted and requested a meeting with the legal
9    department and Mr. Bolton.
10         Q.     So you got a call directly from the
11   legal department requesting a meeting?
12         A.     I don't know if it was a call or an
13   e-mail.  I was contacted then.
14         Q.     And when was that meeting held, to the
15   best of your recollection?
16         A.     It had to be within -- I would say
17   within a week of the incident.  Please don't hold
18   me to a hard date, but within about a week.
19         Q.     Where was the meeting held?
20         A.     It was held in the legal department --
21   City Hall legal department conference room.
22         Q.     Who was present from the Nashua Police
23   Department at that meeting?
24         A.     I was present.  I don't honestly
25   remember who else was present.  I don't, yeah.
```

```
 1          Q.     Do you remember if Patrolman Earnshaw
 2   was present?
 3          A.     He was not.
 4          Q.     Sergeant Gilbert?
 5          A.     He was not.
 6          Q.     Is it Lieutenant Rourke?
 7          A.     That was Deputy Chief Rourke at the
 8   time.  He could have been because he was the
 9   uniformed deputy, but I don't remember if anybody
10   was there.
11          Q.     Is there a police officer named Roach?
12          A.     Tim Roach, yes.
13          Q.     Tim Roach.  Do you remember if he was
14   there?
15          A.     He would not have been at that meeting.
16          Q.     So you remember that you were there,
17   but you don't remember whether anyone else was
18   there, but it's possible that Deputy Chief Rourke
19   might have been there?
20          A.     Correct.
21          Q.     Who was present from the legal
22   department?
23          A.     Steve Bolton was present.
24                 THE WITNESS:  Is Celia the red-headed
25   one?  Taller, the red-headed one?
```

```
 1              MR. CULLEN:  I wouldn't be able to
 2     answer you even if I could answer, but truthfully,
 3     I don't know exactly what Celia looks like.
 4         A.     Sorry, I didn't have much interaction
 5     with the other attorneys.
 6   BY MR. MALAGUTI:
 7         Q.     You would say a tall red-headed
 8     attorney?
 9         A.     Yeah, she was there, as well as there
10     might have been a younger lady there that was part
11     of the legal department's administrative staff.
12         Q.     A paralegal, potentially?
13         A.     Correct.
14         Q.     Would the name Manuela Perry sound
15     familiar?
16         A.     I'm not sure.  I never worked with her.
17         Q.     Manuela, I think.  Okay.  Anyone else
18     from the legal department?
19         A.     Not that I recall.
20         Q.     Who did most of the speaking from the
21     legal department?
22         A.     Attorney Bolton.
23         Q.     Now, the tall red-headed attorney, did
24     she do any speaking?
25         A.     No, not that I remember.  It was
```

1    Attorney Bolton.

2         Q.    He did all the speaking, as far as you

3    remember, on behalf of the legal department?

4         A.    Correct.

5         Q.    And you did all the speaking on behalf

6    of the police department?

7         A.    Correct.

8         Q.    So what did Steve Bolton say?

9         A.    Paraphrasing the conversation, he was

10   not satisfied with the outcome of the

11   investigation.  He felt that she should have been

12   placed under arrest immediately.  He expressed

13   concern for his staff, meaning the other attorneys

14   and the paralegals in the department, and he had

15   asked me to -- I guess he told me to arrest her,

16   and I told him I would not arrest her.

17        Q.    Was Attorney Bolton angry?

18        A.    Yes.

19        Q.    Did he shout?

20        A.    Raised voice.

21        Q.    Did he bang anything?

22        A.    Not that I remember.

23        Q.    Did he explain what his concern for his

24   staff was?

25        A.    Yes, he expressed concern for their

```
 1    posture was in -- Ms. Ortolano was in when she was
 2    in the legal office?
 3         A.    I believe she was sitting down in front
 4    of the door.  If I remember right, that's what --
 5    that's what's coming to mind.
 6         Q.    She was sitting on the floor.
 7         A.    Correct.
 8         Q.    Did Mr. Bolton tell you that she had
 9    made threats?
10         A.    I don't believe so.  I don't recall him
11    saying that she had made threats.
12         Q.    No one else in the meeting said that
13    she had made threats?
14         A.    Not that I remember.
15         Q.    Was it your position at the time that
16    you were going to stick with what the officers had
17    found and put in their papers that they had
18    created for the incident?
19         A.    Yes.
20         Q.    Do you have any reason to doubt that
21    what they said in that original incident report
22    and the supplemental narrative were anything other
23    than true and accurate?
24         A.    No, I -- I believe that they were
25    absolutely true and accurate.
```

1    the conversation, he said that we should arrest

2    her, or you should be able to arrest her.

3         Q.    Would you consider what he said to have

4    been a demand that you arrest her?

5         A.    He was trying to present it as a

6    demand.

7         Q.    Okay, what else did he say, if

8    anything, during that up to a half an hour

9    meeting?

10        A.    That's pretty much -- the conversation

11   was about his position of us arresting her and us

12   not going to do what he said.  And there was back

13   and forth, and I don't remember specific

14   conversations or specific words that were used, but

15   he wanted us to have her arrested, and at that time

16   I was not of the opinion that we would be

17   arresting her.

18        Q.    And did you say anything else that you

19   haven't already told us?

20        A.    Not that I know of, no.

21        Q.    Now, was the meeting being audio or

22   video recorded, to your knowledge?

23        A.    To my knowledge, no.

24        Q.    Did you notice whether anyone was

25   taking notes of the meeting?

1          A.      Correct.

2          Q.      You got further communications from the

3    legal department -- and let me reframe that.

4                  To your knowledge, did you or anyone at

5    the police department get further communications

6    from the legal department between the time that

7    the meeting occurred and Ms. Ortolano was

8    arrested?

9          A.      I don't -- I don't recall specifically

10   getting any myself.  I know that there were several

11   conversations back throughout this entire ordeal,

12   not just this arrest, where Bolton would contact

13   the legal department, and I believe it was Captain

14   Brian Kinney at the time, or Lieutenant Kinney.

15   There was some -- I think some conversations there

16   that he let me know about.

17         Q.      Captain or Lieutenant Brian Kinney, was

18   he in the police legal department or was he in

19   some other department?

20         A.      He was part of the Nashua police legal

21   department.

22         Q.      Was he an attorney?

23         A.      No.

24         Q.      Did -- it sounds like he got promoted

25   to captain, he might have been a lieutenant at the

MICHAEL CARIGNAN                                    89

1          Q.     At some point did the police department
2    open an investigation into whether Laurie Ortolano
3    should get arrested?
4          A.     Yes.
5          Q.     How soon was that after the meeting at
6    Bolton's office?
7          A.     I don't know specifically.  If I had to
8    guess, it was within a week.
9          Q.     Do you know why the investigation was
10   opened?
11         A.     I do.
12         Q.     Why?
13         A.     I was advised by my deputies that they
14   wanted to open an investigation to re -- to relook
15   at the case because of a social media post that
16   Ms. Ortolano had posted, but if I remember right,
17   she was bragging about refusing to leave, and
18   not -- not obeying the commands of what the person
19   who had control of the property did, meaning the
20   legal department.
21         Q.     You understand that Ms. Ortolano has a
22   First Amendment right to post on social media?
23         A.     I do.
24         Q.     You understand that Ms. Ortolano has a
25   right to post even offensive material under the

1    First Amendment on social media?

2        A.      Yes, sir, I do.

3        Q.      You understand that unless

4    Ms. Ortolano's postings constitute some form of

5    unprotected speech that she cannot be regulated in

6    that speech, as a general matter?

7        A.      Yes, sir.

8        Q.      Do you believe it would be wrong for

9    the Nashua Police Department to arrest Laurie

10   Ortolano because of social media posts they made?

11       A.      I can't answer that question because

12   the answer is it's possible.  If she's -- we're not

13   arresting her based on anything she's just saying

14   in there.

15       Q.      Can you elaborate on that?

16       A.      The decision, from what I understand,

17   to arrest was her admission of committing the

18   crime.  She went on her social media post and

19   admitted to refusing to obey those commands, and

20   for us the discussion, if I remember correctly,

21   was, well, she's admitting to a crime, we don't

22   need a witness to necessarily come forward, she's

23   making her own self-admissions, so we will charge

24   her, and I supported that decision.

25       Q.      Now, when you say that she wasn't