**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

**STEVEN BOLTON**

*May 13, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

**VOLUME:  I**
**PAGES:  1 - 310**
**EXHIBITS:  1 - 9**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


**CIVIL ACTION NO. 22-cv-000326-LM**


------------------------------------x
**LAURIE ORTOLANO,**

　　　**Plaintiff**

**v.**

**THE CITY OF NASHUA, ET AL.,**

　　　**Defendants**
------------------------------------x




　　　　**DEPOSITION OF STEVEN BOLTON** taken on
behalf of the Plaintiff, pursuant to the applicable
provisions of the Federal Rules of Civil Procedure,
before Lauren M. Buzzerio, a Registered Professional
Reporter, and Licensed Shorthand Reporter, in and
for the State of New Hampshire, at the offices of
Cullen Collimore Shirley PLLC, 37 Technology Way,
Nashua, New Hampshire, on Monday, May 13, 2024.

---------------------------------------

```
 1                    A P P E A R A N C E S
 2
        William Aivalikles, Esq.
 3      LAW OFFICE OF WILLIAM AIVALIKLES, P.A.
        253 Main Street
 4      Nashua, New Hampshire 03060
        (603) 880-0303/william@nhtriallaw.com
 5      Attorney for the Plaintiff
 6
        Kurt S. Olson, Esq.
 7      OLSON LAWYERS
        31 Franklin Road
 8      Salisbury, New Hampshire 03268
        (603) 748-1960/kolson54@gmail.com
 9      Attorney for the Plaintiff
10
        Russell F. Hilliard, Esq.
11      BROOKE LOVETT SHILO
        159 Middle Street
12      Portsmouth, New Hampshire 03801
        (603) 436-7046/rhilliard@upton-hatfield.com
13      Attorney for the Defendants,
        Steven Bolton and Celia Leonard
14
15      Brian J.S. Cullen, Esq.
        Cullen Collimore Shirley, PLLC
16      37 Technology Way
        Nashua, New Hampshire 03060
17      (603) 881-5500/bcullen@cullencollimore.com
        Attorney for the Defendants,
18      City of Nashua, Michael Carignan, and Frank Lombardi

19
        Dona Feeney, Esq. (via Zoom)
20      FRIEDMAN FEENEY, PLLC
        95 North Street, Suite 5
21      Concord, New Hampshire 03301
        (603) 783-5105/dfeeney@friedmanfeeney.com
22      Attorney for the Defendant,
        Kimberly Kleiner
23
```

```
 1              A P P E A R A N C E S
 2
        Michael A. Pignatelli, Esq.
 3      RATH YOUNG AND PIGNATELLI, P.C.
        20 Trafalgar Square
 4      Nashua, New Hampshire 03063
        (603) 889-9952/map@rathlaw.com
 5      Attorney for James Donchess
 6
 7      ALSO PRESENT:
 8      Laurie Ortolano
        Christine Becotte
 9      Celia Leonard
10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

```
 1        vociferous.  And he can express his displeasure
 2        towards specific individuals.
 3             Q.  Was he ever barred from City Hall on a
 4        no trespass?
 5             A.  Not to my knowledge.
 6             Q.  During your tenure, your most recent
 7        tenure as corporate counsel, do you recall any
 8        citizen being disruptive, unruly, antagonistic,
 9        or anything like that?
10                 MR. HILLIARD:  Is that it?
11                 MR. AIVALIKLES:  Yeah.
12             A.  I do.
13             Q.  Okay.  You do.  And what were those
14        circumstances?
15             A.  Well, Ms. Ortolano.
16             Q.  And what meeting did she attend?  What
17        committee meeting did she attend?
18             A.  You didn't ask about committee
19        meetings.  You asked about City Hall.
20             Q.  I apologize.  Let me go back then.  Do
21        you recall any citizen -- let me strike that.
22        Let's talk about Laurie.  What was the first
23        meeting, either aldermanic or committee
```

```
 1        meeting, that you recall where you were not
 2        happy with her conduct?
 3                MR. HILLIARD:  Object to form.
 4                Go ahead.
 5           A.   I wouldn't say unhappy would capture
 6        at any time any of my feelings towards
 7        Ms. Ortolano.
 8           Q.   Well, what conduct did she exhibit at
 9        the committee meetings that you felt weren't
10        appropriate?
11           A.   She would use rough language.  She
12        would be accusatory toward people.  She may or
13        may not have had the right to do all of that.
14        I still had my own opinions as to the
15        appropriateness of it.
16           Q.   Okay.  What was the first meeting that
17        you recall either aldermanic or committee
18        meeting in which she used rough language?
19           A.   I can't -- I can't give you a specific
20        incident at a committee meeting.
21           Q.   Well, how about the aldermanic --
22           A.   Or the full board meetings?
23           Q.   Yes.
```

STEVEN BOLTON 28

```
1        she use?
2              A.  She has used many vulgar expressions.
3              Q.  Can you for the record tell us what
4        those are.
5              A.  Shit.  Fuck.  Cunt.  Asshole.
6              Q.  Is that it?
7              A.  That's all I can say at this time.
8              Q.  Well, is that all you recall or all
9        you can say?  You can say more if you recall
10       more?
11             A.  That's what I recall at this time.
12             Q.  And who was the statement "shit"
13       directed to?
14             A.  It was directed generally toward the
15       City and its employees and officials.
16             Q.  Okay.  Did that include you?
17             A.  Probably.
18             Q.  Okay.  And how about the use of the
19       word "cunt"?  Who was that directed to?
20             A.  The first time I was aware of that, it
21       was directed toward deputy corporation counsel
22       Celia Leonard.
23             Q.  And that was at an aldermanic or
```

STEVEN BOLTON                                32

```
1              A.  I believe that's correct.
2              Q.  And that was at the finance committee
3      meeting?
4              A.  That's my recollection.
5              Q.  Okay.  But you don't remember who told
6      you that she used that language at the finance
7      committee?
8              A.  I think someone told me I might want
9      to view the video.
10             Q.  Well, who would that someone be?
11             A.  I don't remember.
12             Q.  Well, would it be someone from your
13     legal department?
14             A.  I don't think so.
15             Q.  Would it been an alderman?
16             A.  It's possible.  But I don't remember.
17             Q.  Who did she call an asshole?
18             A.  She called me that.
19             Q.  And when was that?
20             A.  Various occasions.
21             Q.  How many?  Do you recall?
22             A.  Well, more than a couple; less than a
23     dozen.
```

```
 1        thank Alderman Timmons for making such a
 2        pointed statement?
 3             A.   Again, I don't think I would use the
 4        word "deviant."  But it was not a nice thing
 5        for the person to say.
 6             Q.   Well, there's a lot of nice things
 7        that people -- there's a lot of not nice things
 8        that people say at aldermanic meetings,
 9        correct?
10             A.   Yes.
11             Q.   Yeah.  And you've heard them directed
12        to you, correct?
13             A.   Yes.
14             Q.   And as an alderman, don't you have to
15        sort of accept that as part of the territory?
16                  MR. HILLIARD:  Object to the form.
17                  Go ahead.
18             A.   My general understanding is aldermen
19        and city officials of every nature do not give
20        up their own First Amendment rights.  So they
21        have a right to respond and say what they
22        think.  If people don't like that, they can be
23        voted out of office.
```

1          A.   Last week.

2          Q.   Okay.  When you were reading it, was

3     there anything there that you disagreed with?

4          A.   Yes.

5          Q.   What was that?

6          A.   He seems to believe that sometime

7     after the January incident, after I spoke with

8     him, that I had some conversations with Captain

9     Kenney and advocated with Captain Kenney that

10    Ms. Ortolano should be criminally charged.  I

11    don't think that's accurate.

12         Q.   Did you speak with Captain Kenney?

13         A.   During that time frame, no.

14         Q.   So between January 22, 2021, and when

15    she was arrested, you had no conversations with

16    Captain Kenney?

17         A.   He might have been present on a Zoom

18    conference where Chief Carignan and many of his

19    high-ranking officers were also in the room

20    where they were gathered.  And so I don't know

21    one way or another whether Captain Kenney was

22    there.  But the conversation chiefly was

23    between myself and Chief Carignan.  Other than

1       that, I had no interaction with Captain Kenney

2       during that time frame.

3              Q.  Did you have interaction with any

4       other police officials between January 22,

5       2021, and when Laurie was arrested in February

6       of 2021?

7              A.  With Chief Carignan and to the extent

8       others were present in the conference room

9       where Carignan was where we had that Zoom

10      conference.  Other than that, no.

11             Q.  Well, excluding that conference, did

12      you have any contact or did anyone in your

13      department have any contact with the police

14      between January 22, 2021, and when Laurie was

15      arrested in February of 2021?

16             A.  I believe the three persons in the

17      office who were present for the incident were

18      all interviewed by a police officer.

19             Q.  Okay.  And who contacted the police to

20      ask that they be interviewed?

21             A.  I did.

22             Q.  You did.  So you had had contact with

23      the police?

STEVEN BOLTON                                          84

1           A.   Only with Chief Carignan.

2           Q.   Okay.  So you called Chief Carignan

3      and asked him to interview these three people

4      as part of the investigation?

5           A.   Essentially, yes.  I said I thought

6      the witnesses should be interviewed before a

7      decision was made as to whether there should be

8      charges or not.

9           Q.   And you were not happy when the police

10     concluded on January 22, 2021, that there was

11     no offense alleged or apparent?  You were not

12     happy with that finding, were you?

13          A.   I didn't know that there had been a

14     particular finding of that nature.

15          Q.   So you never saw the police report

16     indicating that?

17          A.   Not at the time frame we're talking

18     about.

19          Q.   You were told, were you not, that the

20     police did not find any criminal offense or

21     apparent criminal offense, correct?

22          A.   No.

23          Q.   You never knew that?

1          A.   I knew that it was printed in the

2     paper that nothing more was going to be done.

3          Q.   Right.

4          A.   That's all I knew.

5          Q.   And when you read that in the paper,

6     did you contact Chief Carignan -- Carignan, I'm

7     sorry -- to find out if they were going to do

8     any further investigation?

9          A.   I called him and advocated that I

10    thought that witnesses should be interviewed

11    before a decision was made on whether to charge

12    or not charge.

13         Q.   You also advocated to him that Laurie

14    should be charged and prosecuted for criminal

15    trespass, didn't you?

16         A.   I was advocating that an

17    investigation -- witnesses should be

18    interviewed before that decision was made.

19         Q.   Did you tell any police officer that

20    Laurie should be arrested for criminal

21    trespass?

22         A.   I don't believe I did.

23         Q.   Did you tell any police officer that

1    Laurie should be charged with criminal

2    trespass?

3            A.   Concerning this incident?

4            Q.   Yes.

5            A.   No.

6            Q.   We're talking about January 22, 2021.

7    Is your testimony under oath that you never

8    told a police officer that Laurie should be

9    charged with a criminal offense of criminal

10   trespass?

11           A.   I never said that.

12           Q.   Okay.

13               MR. HILLIARD:   Let's take a

14   five-minute break when you're at a good

15   stopping point.

16               MR. AIVALIKLES:   This is probably a

17   good point.

18               (Recess taken.)

19               MR. AIVALIKLES:   Back on the record.

20           Q.   So who were the participants in that

21   Zoom meeting with the police other than

22   yourself, former chief, possibly Captain

23   Kenney?   Was there anyone else?

```
 1          A.   Well, in the conference room in the
 2     legal department at City Hall there would've
 3     been me, Attorney Celia Leonard, Attorney Jesse
 4     Neumann, and legal assistant Mindy Lloyd.  In
 5     the conference room at the police station,
 6     there would've been Chief Carignan and a number
 7     of other people, all of whom, I believe, were
 8     high-ranking police officers.  My -- without
 9     having specific recollection, I think the two
10     deputy chiefs were likely present.  That would
11     be Jim Testaverde and Kevin Rourke.  There were
12     probably a number of captains present, one of
13     which may or may not have been Brian Kenney.
14     There are seven captains.  All seven may have
15     been there.  There may have only been four or
16     five.
17          Q.   Do you know if that Zoom meeting was
18     recorded?
19          A.   I don't know.
20          Q.   Who would have the transcript of the
21     recording of that Zoom meeting?  Would that be
22     the police department or the City of Nashua?
23               MR. CULLEN:  Objection.
```

1        happened with Laurie --

2              A.  Yes.

3              Q.  -- on January 22, 2021, correct?

4              A.  That's why I refer to them as

5        witnesses.  Yes.

6              Q.  Right.  And none of those witnesses

7        came forward at that time to give the police

8        any information that they had concerning the

9        incident of January 22, 2021?

10             A.  I don't think that's true.

11             Q.  Who did?

12             A.  All of them.

13             Q.  They all spoke to the police?

14             A.  Yes.

15             Q.  Okay.  And was there written

16       statements done contemporaneously with them

17       meeting with the police of after they met with

18       the police?

19             A.  I believe a police officer interviewed

20       them each later on.

21             Q.  Right.  But did they interview them on

22       January 22, 2021?

23             A.  I believe the police officers who

1    responded asked brief questions.  And that may

2    or may not have been fully captured in any of

3    their reports.  But I would not have called

4    that an interview.

5         Q.  So according to you, the police did

6    speak with Mindy Lloyd on January 22, 2021?

7         A.  I believe so.

8         Q.  They spoke with Attorney Leonard on

9    January 22, 2021?

10        A.  I believe so.

11        Q.  And they spoke with Attorney Neumann

12   on January 22, 2021?

13        A.  I believe so.

14        Q.  And after speaking with them and

15   speaking with Laurie, they determined that

16   there was no crime or no appearance of a crime?

17        A.  I don't know that.

18        Q.  Well, I believe that we've talked

19   about the report.  So you never read any police

20   report that indicates that at least on

21   January 22, 2021, they do not feel that a crime

22   had been committed?

23        A.  Never is a long time.  Are you talking

 1            A.   I think he told me they were
 2      contemplating something like filed without a
 3      finding on condition that Ms. Ortolano stay
 4      away from the legal department.
 5            Q.   Did you agree with that?
 6            A.   No, I did not.
 7            Q.   Why not?
 8            A.   I didn't think that exhibited any
 9      remorse for what had gone on.  I didn't think
10      she had exhibited any remorse.  And I thought
11      if there was going to be that level of
12      leniency, then some remorse was in order.
13            Q.   So a finding without a finding is not
14      a conviction, correct?
15            A.   Correct.
16            Q.   And what was it about her conduct that
17      you felt she didn't exhibit remorse?
18            A.   She was -- she was unremorseful in her
19      comments either on the internet or in comments
20      she made at various public meetings and in
21      communications she sent to various people.
22            Q.   So what -- by the way, how did you
23      know about these incident comments?

```
 1        members of aldermen, the newspaper, or the

 2        internet that she did nothing wrong, you felt

 3        that you needed to have a conviction?

 4                MR. HILLIARD:  Object to the form.

 5                MR. CULLEN:  Objection to form.

 6            A.  I never said that I needed to have a

 7        conviction.

 8            Q.  But you wanted a conviction?

 9                MR. CULLEN:  Object to the form.

10                MR. HILLIARD:  Same objection.

11            A.  If -- I did not think placing it on

12        file without a finding was an appropriate

13        disposition.  If there were other dispositions

14        short of a conviction that indicated that it

15        was unlikely to happen again, I might have been

16        more satisfied with that.

17            Q.  Well, did you suggest that to the

18        police officer that, hey, you know, I don't

19        have a problem with maybe a disposition that

20        doesn't involve a conviction, but I want some

21        kind of assurances that it's not going to

22        happen again.  Did you ever tell that to the

23        prosecutor that that's what you were looking
```

1    for?

2         A.  I very specifically said I was looking

3    for it never to happen again.

4         Q.  Right.  I understand that's what your

5    stating.  And if there was a disposition placed

6    on file without a finding and a statement from

7    Laurie that she would not do that again, would

8    that have satisfied you?

9              MR. HILLIARD:  Object to the form.

10             Go ahead.

11        A.  That wasn't what we were discussing.

12        Q.  Would that have satisfied you?

13             MR. HILLIARD:  Objection.

14        A.  I don't know.

15        Q.  You don't know.  Okay.  That's fair

16   enough.  So you were insistent that there be a

17   conviction because you wanted to make sure --

18        A.  You're putting words in my mouth.

19             MR. HILLIARD:  Let him finish the

20   question and then you give your answer.

21        Q.  You wanted to have a criminal

22   conviction so that she would be humiliated,

23   correct?

1    no reason.

2         Q.  Well, it doesn't say that Ms. Ortolano

3    used the word "hauled out."  That's a word you

4    used.  And what do you mean by that word

5    "hauled out"?

6         A.  I was responding to a question I was

7    asked.  My recollection is that that word was

8    used by someone else before I repeated it.

9         Q.  Did you tell the reporter that there

10   was a sign outside of the office indicating

11   that appointments are required and that

12   Ortolano's actions were "out and out invasion"

13   and intended to disrupt government operations

14   seemingly inspired by events in Washington.

15   Did you tell that to the reporter?

16        A.  I can't remember precisely.  I

17   probably said something along the lines of

18   there was a sign informing about appointments

19   were required.  I believe my reference to the

20   January 6th events in Washington was a response

21   to a question about isn't it a public building?

22   Doesn't the public have every right to be in

23   any portion of it?  And I said something to the

1      effect of just like what happened in
2      Washington, members of the public cannot
3      interrupt the business of government, do not
4      have free access behind closed and locked
5      doors.  I don't think I said, even though the
6      reporter puts it that way in the story, I don't
7      think I said that I thought Ms. Ortolano was
8      inspired by that.  Because I don't think that.
9          Q.  Well, but you equated what she did to
10     the events on January 6th?
11             MR. HILLIARD:  Object to the form.
12         A.  I'm not sure I even equated it.
13     Because obviously that was much more serious.
14     People died.
15         Q.  Right.
16         A.  But I used that as a comparison when
17     asked to address isn't it a public building?
18     Doesn't the public have access to all parts of
19     a public building?  And I said similar to that,
20     you don't have the right to go into spaces that
21     are designed for a certain purpose and disrupt
22     that purpose, disrupt the operation of
23     government.

1         Q.  So are you equating the sitting down

2     in your office by Ms. Ortolano to disrupting

3     the certification of the President of the

4     United States?

5              MR. HILLIARD:  Object to the form.

6         Q.  Is that your equivalency?

7              MR. HILLIARD:  Asked and answered.

8              MR. AIVALIKLES:  I didn't ask him

9     that.

10             MR. HILLIARD:  No.  You used the same

11    phraseology.  One more time.

12        A.  I don't think they were equivalent.  I

13    didn't think they were equivalent then.  I used

14    a recent event as an example of the fact that

15    just because some building or some space is

16    publicly funded does not mean that at all times

17    it is open to the public.

18        Q.  Is it your testimony that that hallway

19    that people access to get into the legal

20    department is not available to the public?

21        A.  It's available to the public for the

22    purpose of accessing the spaces for the

23    business that are conducted in those spaces.

```
 1        It's not available to the public for the
 2     purpose of standing there to get in out of the
 3     rain and disrupt the flow of people who have
 4     legitimate business.
 5          Q.  So did Laurie break any windows trying
 6     to get into your office?
 7          A.  Not to my knowledge.
 8          Q.  Did she strike or assault any of your
 9     employees?
10          A.  She pulled the door out of Mindy's
11     hand.
12          Q.  Was that an assault?
13          A.  I wouldn't have characterized it that
14     way.
15          Q.  Did you hear her say where's Bolton?
16     Where's Bolton?  Where's Bolton?
17          A.  I wasn't there.
18          Q.  Did anyone tell you she was saying
19     where's Bolton?  Where's Bolton?  Where's
20     Bolton?
21          A.  I was told she was demanding to see
22     one of the attorneys.  She may well have asked
23     for me by name.
```

1          Q.  Did she say hang Mayor Donchess?  Hang

2     Mayor Donchess?  He's a traitor?

3          A.  No one reported that to me.

4          Q.  You went on to say in this case,

5     happily, no one was injured or worse, but her

6     example does not make us any more comfortable

7     here.  Did you make that statement?

8          A.  I don't remember whether I made it or

9     not.

10         Q.  Well, did you read this article?

11         A.  I may have.

12         Q.  Did you contact the reporter to say

13    that you misquoted me?

14         A.  I don't even remember if I read it.

15         Q.  Do you recall contacting the reporter

16    and saying you misquoted me in a newspaper

17    article?

18         A.  I know I've done similar things in the

19    past.  I don't know if I did it in this case.

20         Q.  So you have done it in the past.  But

21    you don't recall doing it in this case?

22         A.  Correct.

23         Q.  Okay.  All right.

```
 1              MR. HILLIARD:  He doesn't recall if he
 2    did it in this case.  But go ahead.
 3         Q.  Now, you're aware that Laurie failed a
 4    request to discharge -- a condition to
 5    discharge the conviction of violation of
 6    criminal trespass, correct?
 7         A.  To annul it.
 8         Q.  Right.  To annul it.
 9              MR. HILLIARD:  Well, wait a minute.
10    Let's --
11         Q.  This says discharge.  But --
12              MR. HILLIARD:  Let's use the word in
13    the document, please, instead of guessing what
14    it is.
15         Q.  Was there a motion filed by an
16    attorney representing the City opposing that
17    annulment?
18         A.  I think there was.
19         Q.  And prior to it being filed, did you
20    read it?
21         A.  I don't know.
22         Q.  How did you find out that there was a
23    petition to annul her record?
```

```
 1        department, I don't think that was motivated at
 2        all by any assistance she was giving to any
 3        senior citizen.
 4             Q.  So it's your testimony that untruthful
 5        statements are not protected by the First
 6        Amendment of the U.S. Constitution?
 7                  MR. HILLIARD:  Objection.  Calls for
 8        conclusion of law.
 9             A.  I don't think I'm here as a
10        constitution law expert.  I would say when you
11        asked me if there is anything wrong with that
12        statement, that is inaccurate.
13             Q.  You testified earlier that making
14        false statements is not protected by the First
15        Amendment, did you not?
16             A.  I think I said I wasn't sure whether
17        it was.
18             Q.  And the remedy for making a false
19        statement is a libel action or a slander
20        action, isn't it?
21                  MR. HILLIARD:  Objection to the form.
22             A.  In certain cases those remedies are
23        available and all of the elements are met.
```

```
 1      conviction was annulled or the record of arrest
 2      was annulled?
 3           A.   I know.
 4           Q.   Well, would you tell us?
 5           A.   I don't have to tell you.
 6                MR. HILLIARD:  But I think under the
 7      statute the entirety is annulled.  Arrest.
 8      Conviction.  Everything.
 9           Q.   Are you aware that when people are
10      arrested they are fingerprinted?
11           A.   Generally speaking, I am aware of
12      that.
13           Q.   You would agree that's humiliating?
14           A.   Not especially.  No.
15           Q.   You wouldn't be humiliated by having
16      your fingerprints taken for a criminal arrest?
17           A.   I don't know that it necessarily
18      follows that the act of being fingerprinted is
19      itself humiliating.
20           Q.   I'm asking you.  Would you --
21           A.   And I'm telling you.
22           Q.   No.  Would you be humiliated if you
23      were fingerprinted pursuant to an arrest?
```

1              A.   Depends on the totality of the

2       circumstances.

3              Q.   So you're not going to answer the

4       question either yes or no?

5              A.   I gave you an answer.

6              Q.   Again, we'll see what the judge thinks

7       about that.  Do you think it's humiliating to

8       have your -- being handcuffed with your hands

9       behind your back?

10             A.   I assume many people would find it so.

11             Q.   Right.  Would you find it so?

12             A.   I don't know.

13             Q.   Would you find doing the perp walk to

14      be humiliating?

15             A.   I don't know what you mean by that

16      term.

17             Q.   You've never heard the term "perp

18      walk"?

19             A.   I've heard of it.

20             Q.   When you're handcuffed behind your

21      back and you're being led to a certain area,

22      either a jail cell or whatever.  You've never

23      heard the term "perp walk"?

1        A.  I didn't say that.  I said I didn't

2   understand what you meant by it.

3        Q.  Well, the questions are directed to

4   you and what your understanding is, not what my

5   -- my understanding is irrelevant.  Okay.

6        A.  Well, then I don't understand the

7   question.  So my understanding of a perp walk

8   is when an arrested person is marched before

9   members of the media.

10       Q.  Okay.  That's your understanding.

11   Okay.  That's fine.  Do you think it's

12   humiliating to have your mugshot?

13       A.  No.

14       Q.  No?  Do you think it's humiliating to

15   be placed in a jail cell while you're awaiting

16   bail?

17       A.  I don't imagine it's pleasant.  I

18   don't know if I've described it as humiliating.

19       Q.  And if Laurie was charged with a

20   violation of criminal trespass, she would not

21   have been fingerprinted, she would not have

22   been arrested, she would not have been

23   handcuffed, she would not have had a mugshot,

STEVEN BOLTON                                   162

```
 1     and she wouldn't have spent any time in a jail
 2     cell pending bail; isn't that correct?
 3            A.   I don't know if that's correct or not.
 4            Q.   Well, you did criminal work.  Have you
 5     ever known anyone to be arrested for a
 6     violation?
 7            A.   Yes.
 8            Q.   What were the circumstances?
 9            A.   Many people are arrested for DUI,
10     which is a violation on a first offense.  And
11     they go through all of that.
12            Q.   Okay.  Other than DWI?
13            A.   I don't know if reckless driving would
14     be handled similarly.
15            Q.   Are people generally arrested for a
16     violation of criminal trespass?
17                 MR. HILLIARD:  Object to the form.
18            A.   I think people have been.  I don't
19     know generally.
20            Q.   And do you know the consequences of
21     having a conviction on your record in terms of,
22     say, employment?
23            A.   I don't imagine it helps.
```