# Exhibit A

**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

## JAMES W. DONCHESS

*May 15, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH  03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com  (Billing/Production)

1              UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF NEW HAMPSHIRE
2

3

4    ----------------------
     LAURIE ORTOLANO,        )
5         Plaintiff          )
     v.                      )   CIVIL ACTION
6                            )   NO. 22-cv-000326-LM
     THE CITY OF NASHUA,     )
7    ET AL.,                 )
          Defendants         )
8    ----------------------

9

10   DEPOSITION OF JAMES W. DONCHESS, a witness in the

11   above-mentioned matter, taken remotely from Rath

12   Young Pignatelli, 20 Trafalgar Square, Nashua,

13   New Hampshire, pursuant to the applicable provisions

14   of the Federal Rules of Civil Procedure before Susan

15   Lozzi, Registered Professional Reporter, License No.

16   140, in the State of New Hampshire, on Wednesday,

17   May 15, 2024, commencing at 9:06 a.m.

18

19

20

21

22

23

```
 1      APPEARANCES:

 2

 3      THE LAW OFFICE OF WILLIAM AIVALIKLES, P.A.
             253 Main Street
 4           Nashua, New Hampshire 03060
             (603) 880-0303
 5           For the Plaintiff.
             BY:  WILLIAM AIVALIKLES, ESQ.
 6                (via Zoom from
                     Rath Young Pignatelli.)
 7

 8      OLSON LAWYERS
             31 Franklin Road
 9           Salisbury, New Hampshire 03268
             (603) 748-1960
10           For the Plaintiff.
             BY:  KURT S. OLSON, ESQ.
11                (via Zoom.)

12

13      RATH YOUNG PIGNATELLI
             20 Trafalgar Square
             Nashua, New Hampshire 03063
14           (603) 889-9952
             For the Witness, John Donchess.
15           BY:  MICHAEL A. PIGNATELLI, ESQ.
                  (via Zoom.)
16

17      BROOKE LOVETT SHILO
             159 Middle Street
18           Portsmouth, New Hampshire 03801
             (603) 436-7046
19           For the Defendants,
             Steven Bolton and Celia Leonard.
20           BY:  RUSSELL F. HILLIARD, ESQ.
                  (via Zoom.)
21

22

23
```

```
 1    APPEARANCES CONTINUED:

 2

 3    CULLEN COLLIMORE SHIRLEY, PLLC
           37 Technology Way
 4         Nashua, New Hampshire 03060
           (603) 881-5500
 5         For the Defendants, City of Nashua,
           Michael Carignan and Frank Lombardi.
 6         BY:   JONATHAN SHIRLEY, ESQ.
                 (via Zoom.)
 7

 8    FRIEDMAN FEENEY, PLLC
           95 North Street - Suite 5
 9         Concord, New Hampshire 03301
           (603) 783-5105
10         For the Defendant, Kimberly Kleiner.
           BY:   DONA FEENEY, ESQ.
11               (via Zoom.)

12

13

14    ALSO PRESENT (via Zoom):
      Laurie Ortolano, Plaintiff.
15    Robin Partello, Paralegal,
      The Law Office of William Aivalikles, P.A.
16    Christine Becotte.

17

18

19

20

21

22

23
```

1                              INDEX

2

   **JAMES W. DONCHESS**                                **Page**

3
   **Direct Examination by Mr. Aivalikles**              **5**

4

5                            **EXHIBITS**

6                    **(No exhibits were marked.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2                    JAMES W. DONCHESS, having been sworn
 3    to tell the truth, testified as follows:
 4    DIRECT EXAMINATION BY MR. AIVALIKLES:
 5        Q.   Good morning, Mr. Mayor.  Can you state
 6    your full name, for the record.
 7        A.   James W. Donchess.
 8        Q.   And your address?
 9        A.   4 Rockland Street, Nashua, New Hampshire.
10        Q.   And you're the mayor of the City of
11    Nashua?
12        A.   Correct.
13        Q.   And can you tell us what other political
14    positions you've held?
15        A.   I have -- going back how far?  All the
16    way?
17        Q.   Well, --
18        A.   I was in the Constitutional Convention
19    of 1974 as a representative in Concord, actually.
20    In 1977 I was elected to the Board of Alderman in
21    Nashua.  In -- for a four-year term.  In 1984 I was
22    elected mayor of Nashua; reelected in 1987.  In --
23    also there was another Constitutional Convention in
```

```
 1      '84.  I was -- I was elected to that, from Nashua.
 2      And then was elected as an alderman at large again
 3      in Nashua in 2011, the election of 2011.  I was
 4      elected as mayor in 2015 and then I've been in that
 5      office ever since.
 6           Q.   You've had your deposition taken before,
 7      so --
 8           A.   No, I have not.
 9           Q.   You have not?
10           A.   No.
11           Q.   This is your first deposition?
12           A.   Yes.
13           Q.   I'm going to be asking the questions and
14      you're going to be sworn and we can't be talking at
15      the same time.
16           A.   Correct.
17           Q.   If you don't understand the question,
18      please ask me and I'll rephrase it.  Even though
19      you're a lawyer, us lawyers do have our -- have our
20      own language and sometimes we're not as clear as we
21      should be.
22           A.   Okay.
23           Q.   If you want to change your answer at any
```

1    time during the deposition, please feel free to do

2    so.  Okay?

3        A.   Okay.

4        Q.   I'm going to be reading from the "Public

5    Relations in the Assessor's Office" for the City of

6    Nashua.  It is a document we have obtained.

7             And it says, "The basis for good public

8    relations is the 'golden rule.'  Treat the public as

9    you would like to be treated.  Always try to look at

10   a situation from the taxpayer's point of view and

11   respond accordingly."  Do you agree with that?

12       A.   Well, now, if you want me to answer

13   questions about the document, I think you're going

14   to have to show it to me.

15       Q.   I have it highlighted.

16             COURT REPORTER:  Excuse me.  Is this a

17   previous exhibit?

18             MR. AIVALIKLES:  No.

19             (Reviewing document.)

20       A.   I agree with it, but I think the

21   obligation is a two-way street.  I think the

22   employee should treat the public as they like to be

23   treated, but I think the resident also needs to

```
 1    treat city employees with respect and with civility.
 2         Q.   So is it fair to say then that if a
 3    citizen doesn't treat a City employee with civility,
 4    that the City employee has the right to respond
 5    accordingly and maybe not in a civil way?
 6         A.   No, but I think the employee can make a
 7    decision that they don't want -- let's say an
 8    employee were being abused by a citizen and had a
 9    history of that, I think the employee is reasonable
10    to say I don't want to -- I don't want to deal with
11    that person anymore.
12         Q.   Well, we're not talking about that
13    situation.
14         A.   Well, --
15         Q.   We're talking about a conversation between
16    a city employee and a citizen.  Should the City
17    employee follow the "golden rule" as set forth in
18    this assessor's statement?
19         A.   Well, I answered that question already.
20         Q.   Well, yeah, you did, but you sort of
21    qualified it.
22         A.   That was my answer.
23         Q.   Well, let me ask it to you this way:  Do
```

1    you believe in the statement that "the customer is

2    always right"?

3         A.    Not really.

4         Q.    No?  Okay.

5         A.    Because sometimes the customer is wrong.

6         Q.    Okay.  So just so I understand, you don't

7    have any issue with a City employee being uncivil to

8    a Nashua taxpayer at -- at City Hall, for example?

9         A.    I never said that.

10        Q.    Okay.  Well, let me ask you, do you have

11   any issue with a City employee being uncivil to a

12   Nashua taxpayer in dealing with them at City Hall?

13        A.    Yes, but I also expect, as I already said,

14   the resident or the customer to be civil to the

15   employee as well.

16        Q.    Okay.  Do you agree with this statement?

17   And I'll let you look at it.  "Nothing is more

18   frustrating to the taxpayer with a question than to

19   be unable to reach the assessor.  Good intentions,

20   assessment knowledge and public relations techniques

21   will be of little use if the public cannot reach the

22   assessor."  This is directed to the -- let me ask

23   you, do you feel that that applies to all city

1    employees?

2         A.    I'd have to look at it.

3                    (Reviewing document.)

4         A.    I find it a little confusing, actually.

5         Q.    Okay.  So are you able to answer the

6    question after reviewing it?  This -- this came from

7    one of your department -- departments.

8         A.    What is the question?

9         Q.    Do you agree with that that statement I

10   just read?

11        A.    My qualification is that it may not be

12   possible for an assessor or any other city

13   employee to immediately respond to a question or any

14   employee from -- from a resident.

15              They may be doing other jobs.  They may be

16   doing -- that's important.  They may be in the field

17   in the case of an assessor, so it might not be

18   possible for an assessor or employee to talk

19   immediately with a resident when the resident wishes

20   that to occur.

21        Q.    Well, do you think that the employee

22   should at least respond to the citizen within a

23   reasonable time?

1    A.    Yes, with the qualifications that I've

2    already expressed, that if the resident has

3    previously been abusive towards the employee, maybe

4    their obligation to respond is not the same.

5        Q.    Okay.  Do you agree with this statement?

6    The image of the assessing office is determined by

7    the impression the public gets from the employees.

8    Whether in the office or in the field the assessor

9    must be courteous and responsive to the needs of the

10   public [as read].

11            Again, implying that the City employees as

12   a whole as opposed to just the Assessor's Office.

13   Do you agree with that statement?

14                (Reviewing document.)

15       A.    In general, yes, with the qualification

16   that if a particular resident has been abusive or

17   really rude to -- to an employee, I think that

18   changes the relationship between that employee and

19   the -- and the resident.

20       Q.    I -- I take it as a politician, you want

21   citizens to be politically active in the community?

22       A.    Correct.

23       Q.    Do you encourage their involvement?

1      A.    Correct.

2      Q.    You would agree that, you know, hearing

3  from members of the public really helps the City

4  because you're getting input from how the citizens

5  feel about how things are being run?

6      A.    Often but not always.

7      Q.    Okay.  Politically active people, you

8  know, provide a service to the government by, you

9  know, voicing their opinions in public sessions,

10  giving the members of the City or the politicians

11  an opportunity to respond.  That is -- you would

12  agree that's a -- a positive environment to have in

13  the City?

14      A.    Often that is the case but not always.

15      Q.    In fact, you started Coffee with the Mayor

16  in the Mornings, correct?

17      A.    I did.

18      Q.    When did you start that?

19      A.    I think in 2017.

20      Q.    And was that a once-a-month event?

21      A.    Generally, yes, although, you know, I'm

22  sure we missed some and then when COVID came, that

23  interrupted everything.

1          Q.   So how many of those events did you host?

2     Do you know roughly?

3          A.   Quite a few.  I mean, I'd have to think

4     back.  I'd say 50.

5          Q.   Okay.

6          A.   Maybe.  You know, it's just a total guess.

7          Q.   Yeah.  No, I understand.

8          A.   More than 25.  It's less than a hundred.

9          Q.   And so during those sessions, you would

10    take questions from citizens at Morning -- Morning

11    Coffee with the Mayor, correct?

12         A.   Correct.

13         Q.   And at those sessions, there was some

14    citizens that may have been critical of you or

15    the City members?

16         A.   Yes.

17         Q.   And you withstood the slings and arrows

18    that were being thrown your way, correct?

19         A.   Yes.  But it was generally very positive

20    and, you know, polite.

21         Q.   You agree that the citizens of Nashua have

22    a right to criticize government?

23         A.   Of course.

JAMES W. DONCHESS                                14

```
 1          Q.   The right to criticize the Board of
 2     Alderman?
 3          A.   Correct.
 4          Q.   The right to criticize the mayor?
 5          A.   Yes.
 6          Q.   Right to criticize city employees?
 7          A.   Correct.
 8          Q.   You, yourself, would not want your
 9     employees to in any way restrict the right of the
10     citizen to criticize the government, correct?
11          A.   Correct.
12          Q.   You have attended two Constitutional
13     Conventions, so you appreciate the constitutional
14     rights that are set forth in the U.S. Constitution,
15     especially Amendment 1:  The right to free speech?
16          A.   That's right.
17          Q.   You fully support that, don't you?
18          A.   Of course.
19          Q.   And you certainly want members of
20     the City of Nashua employees to also support that?
21          A.   Yes, but -- and I would point out that the
22     City employees also have a First Amendment right to
23     express their views which may agree or not agree
```

1    with some of the criticism.

2         Q.    Of course.  It goes -- it goes both ways.

3         A.    Correct.

4         Q.    If a -- if a citizen comments or

5    criticizes a city official but their criticism is

6    not based on fact, they still have a First Amendment

7    right to make that statement, correct?

8         A.    Yes.

9         Q.    And you would never permit your department

10   heads to in any way chill free speech?

11        A.    No, but I would certainly agree that they

12   would -- if they think something is not factual,

13   that they have a right to respond and give their own

14   point of view.

15        Q.    Absolutely.  And, in fact, if the -- the

16   remedy for a person that is subject to statements

17   that are false is defamation and liable?

18        A.    Well, yes, but when it comes to public

19   officials, the statements -- you know, it's very

20   difficult to lodge, you know, a defamation or liable

21   case against -- you know, for a public official to

22   bring a -- a liable case because there's a much

23   higher standard.

1    Q.   No, I understand that, but you would never

2    tolerate your City employees from punishing a

3    taxpayer for statements that they made that were

4    critical of the department or the individual, would

5    you?

6    A.   I wouldn't, and I don't believe that's

7    ever occurred.

8    Q.   Okay.  And if that was happening and

9    brought to your attention, you'd put an end to it,

10   wouldn't you?

11   A.   If I thought that they were actually,

12   quote, "punishing" someone, yes.

13   Q.   You would agree that citizens of Nashua

14   have a right to the records that are maintained in

15   City Hall that are for public inspection such as

16   assessing records and things of that nature,

17   correct?

18   A.   Consistent with the right-to-know law, but

19   that is the -- that is the governing authority

20   regarding the City's obligation to provide

21   documents.

22   Q.   Do you recall a coffee morning in

23   October 2018 where Laurie Ortolano attended?  Do you

1    recall her attending that coffee session and asking

2    you to take a walk with her on Berkeley Street to

3    look at the houses on Berkeley Street?

4         A.   I recall the request.  I don't know when

5    that came.

6         Q.   Okay.

7         A.   But I recall the request, yes.

8         Q.   Do you recall telling her all you have

9    done is waste the City's time?

10        A.   No.  What I said was I'm the mayor and I

11   do not get involved in individual assessments of

12   properties and I never have.

13             And the reason is that we cannot create

14   the impression that assessment is a political thing;

15   that we cannot ever -- that if you go to the mayor

16   and you get them to walk on your street or if you go

17   to an alderman, you can get your assessment changed

18   by doing that.

19             So I declined the invitation because I'm

20   not going to get involved in comparing someone's

21   assessment to someone else's.  I -- I think that

22   injects the political process into something where

23   the political process does not belong.

1        Q.   At that coffee session, did you also say

2    to Laurie -- when I say "Laurie," I'm talking about

3    Ortolano, you've wasted many hours of the City's

4    CFO.  Do you recall making that statement?

5        A.   No.

6        Q.   At a November 2018 --

7        A.   No, I don't -- I don't recall specifically

8    any particular coffee, so when you put it to

9    October 2018, I don't have a specific memory that

10   any of this occurred on -- at that particular time.

11            But I -- but I do recall, as I said, the

12   request that I walk Berkeley Street and try to

13   determine whether the assessments are correct.  I

14   mean, I have no expertise in assessing, so I don't

15   inject myself in assessments.

16       Q.   Do you recall having a coffee session with

17   the citizens the next month in which Laurie raised

18   the issue of your property assessment?

19       A.   I don't recall that happening at a coffee,

20   but I recall that Ms. Ortolano did raise the issue

21   of my assessment, yes.

22       Q.   And did she --

23       A.   I recall it happening at a meeting of the

1    Board of Alderman.

2         Q.   Okay.  And I -- I guess her issue was that

3    you had taken out a building permit to renovate your

4    house in early 2008 or '9, is that correct?

5         A.   I think that was around that time.

6         Q.   And it was for $100,000, the -- the cost

7    of the project?

8         A.   I mean, I had nothing to do with filling

9    out the building permits, so this was done by a

10   contractor and I'm sure we -- you know, he gave us

11   an estimate as to what it would cost.

12        Q.   Right.  And was -- was the renovations

13   that you had done came out to roughly $100,000?

14                  MR. PIGNATELLI:  Hold on a second.

15   I'm going to object.  I need to know how this is

16   likely to lead to admissible evidence in the

17   First Amendment claims that are pending.

18                  MR. AIVALIKLES:  It -- it goes to

19   retaliation.  It goes to animus.  It's all relevant

20   in terms of his relationship with Laurie, his

21   feelings about Laurie and what we may have done to

22   irritate him, be a persistent pest as she's been

23   called, so I think it does have relevancy.

1           MR. PIGNATELLI:  Well, we hope we

2      don't have to go into great detail about it.  I -- I

3      fail to see the relevance, but I don't know -- if

4      the mayor feels otherwise, if you want to give

5      answers to these questions, go ahead.

6           MR. AIVALIKLES:  Well, don't coach the

7      mayor.  He's a lawyer.  I'm sure he knows how to

8      handle questions.

9           MR. PIGNATELLI:  I just told him to

10     answer the question if he wants to.

11     A.   All right.  Well, let's make it clear.

12     I'm not a practicing lawyer at this time and I have

13     not been for ten years or so, so I am -- I do not

14     represent the City as a lawyer in any respect.

15     Q.   Okay.  So the work that was done, did it

16     total roughly $100,000?

17     A.   I'm sure it meets that level, yes.

18     Q.   Okay.  And were you aware that your

19     building permit was never closed for nine years?

20     A.   No.

21     Q.   No.

22     A.   Was I aware of it then?  No.  Now, when

23     Ms. Ortolano -- I don't really -- I'm not sure that

1      nine years is correct, but, I mean, it was closed --

2      it wasn't -- it took -- the project took a long

3      time.

4          Q.   Right.

5          A.   At the -- at the -- back when the project

6      was going on, I was not paying any attention to the

7      building permit or the assessment or anything else.

8               I was not in public office.  I was

9      working.  I was not involved or even thinking about

10     it, so -- nor did I really understand the process of

11     the building permit, open, closed, so at the time, I

12     had no knowledge or understanding of it.

13              When Ms. Ortolano raised this, I became

14     aware that the building permit had been open for,

15     you know, some period of years.  I'm not sure it was

16     nine, but I had -- I had the impression it was three

17     or four but maybe that's wrong.  I don't know.

18         Q.   So can you explain what it means to have

19     the building permit open in terms of assessing the

20     property value?

21         A.   No.

22         Q.   You understand if it's open, there's no

23     assessment done for the improvement until the

```
 1    building permit is actually closed.  Do you
 2    understand that now?
 3        A.   Yes, but I understand that is typically
 4    the way the assessing department has handled
 5    residential building permits.
 6              They don't go in every year and try to
 7    determine the value of the improvements until the
 8    work is done.  That's my understanding now.
 9              Now, when it comes to a commercial --
10    because there's not -- you know, we don't want
11    to -- when it's residential, I mean, I think the
12    assessors don't want to bother the residents with
13    that.
14              We're not really dealing with a lot of
15    value.  You know, someone's house might be increased
16    by 5,000 -- worth the trouble is what I gather and,
17    you know, if we're dealing with a big commercial
18    property, you know, things where -- where the value
19    could increase by a million dollars, still
20    uncompleted, but it was worth, you know,
21    hypothetically a half a million and now it's worth a
22    million and a half, that's worth -- that's worth
23    doing and they do that.
```

JAMES W. DONCHESS                          23

1              (Internet connection interruption.)

2         A.    That's worth going in and reassessing.

3         Q.    You got a tax bill twice a year?

4         A.    Correct.

5         Q.    And when you got the tax bill, did you

6    look at it?

7         A.    Of course.  I mean, I -- we wrote a check,

8    so we must have looked at it to pay it.

9         Q.    Okay.  Did you look at the assessed value

10   of your house?

11        A.    I don't think I did.

12        Q.    Okay.  Did you have any kind of

13   emotional --

14        A.    When are we talking about?

15        Q.    We're talking about the period where

16   your -- your permit was still open.

17        A.    No.  That wasn't -- I mean, I think -- I

18   mean, I generally believe the municipal -- the

19   government is doing a good job, so I -- at that

20   point, I -- you know, working, the bill comes in, we

21   paid it.  We're not focused on what the assessment

22   is or anything really other than just let's pay the

23   bill on time.

1          Q.   Did you have an emotional reaction to
2     Laurie's bringing that issue in a public setting?
3          A.   The only thing I reacted to was as
4     presented, Ms. Ortolano did not say that this
5     occurred in -- what -- what did you say?  2006?
6     2008?
7          Q.   I think it was 2009.
8                    MS. ORTOLANO:   2007.
9          Q.   I'm sorry.  2007.
10         A.   When she presented it, my recollection is
11    she did not tell people that this occurred years
12    before.  And leaving the impression, at least one
13    could -- you know, leaving the impression that
14    potentially this occurred when I was mayor and
15    somehow I used my position to make this occur, which
16    of course was not at all the case.
17              So that's where I took exception
18    particularly; that, you know, one could have
19    inferred from the -- the statement that somehow I
20    had just done this when, in fact, it was year -- I
21    mean, I was in no public office.  I was -- you know,
22    I -- I didn't even know the assessors.  I don't know
23    who came out and assessed the property.  I have no

1    idea, you know, what -- what was happening at the

2    time.

3         Q.    Were you embarrassed by it?

4         A.    No.

5         Q.    Did you make a public statement about it?

6         A.    I -- yes.  I think I tried to point out

7    that this was when I wasn't in office.

8         Q.    In -- in what setting was that done?

9         A.    I think I responded in the Board of

10   Alderman meeting.  That's -- that's my -- but this

11   goes back, what?  Six years.

12        Q.    Were you aware that in the Assessor's

13   Office, the record for your home -- is it 4 Rockland

14   Drive?

15        A.    Street.

16        Q.    4 Rockland Street did not have the name of

17   the owner?

18        A.    No.  I don't think that's correct, but

19   I've never observed that.

20        Q.    Were you advised by any City employees

21   that Laurie was looking at your property assessment?

22        A.    I don't know.  I looked at it when

23   Ms. Ortolano raised it because I -- you know,

1    Ms. Ortolano was focused on property cards.  I --

2    I'd never looked at my own property card.  I'm

3    not -- I was never really interested.

4            And as I said, I just get the bill and pay

5    it.  When this came up, I actually got the property

6    card and looked.  What is on the property card?

7        Q.    Did anyone from the Assessor's Office or

8    any of the employees tell you that Laurie was

9    looking at your property cards at the Assessor's

10   Office?  Did anyone tell you that?

11       A.    I don't recall that happening, but it was

12   obvious that she was because she had made public

13   statements about it, about -- about the whole

14   building permit and, you know, the whole file,

15   whatever was there.

16           So, I mean, just from her statements, it

17   was obvious that she was looking at this, so I don't

18   think a City employee needed to tell me that.

19       Q.    Were you aware that your property file was

20   unavailable for public inspection for about a month

21   during that time period?

22       A.    I -- you know, when Ms. Ortolano raised

23   this, you know, I said what's she taking about?  You

```
1    know, I have no idea what this is all about, so I
2    got the file.  Now, maybe they gave me the original
3    file; maybe they gave me a copy.  I don't really
4    remember.
5            But, you know, she made some public
6    accusations that imply that somehow I had used my
7    official position to bring this about, so -- so I
8    wanted to look.
9            And I had the file for a little while, and
10   I -- you know, I looked at the property card and,
11   you, know there were other things in there, and I
12   looked at them.
13           And it's possible they brought me the
14   original one, but it's also -- it's also possible
15   that they brought me a copy.  I don't really -- I
16   didn't really care one way or the other which they
17   brought.  I just wanted see it, so I don't know
18   whether my file was unavailable or not.
19       Q.   Well, even if you were given the original
20   file, would it be reasonable for it to be
21   unavailable for, like, 30 days?
22       A.   You know, I had other things to do.  This
23   wasn't my only focus, so I might have taken time to
```

1    look at it.  You know, to, oh, gosh, I've got to get
2    back to that.  I wanted see what was there.  I think
3    there was -- it's -- it's not only -- as I recall
4    it, and I haven't looked at my property file since
5    that, but as I recall it, you know, it's got -- I
6    don't.  You know, multiple pages in there, various
7    things that go back in history, so it might have
8    taken me a while and then maybe I wasn't very
9    diligent about returning it if I had the original.
10        Q.   Were you informed of the incident that
11   happened on January 22nd, 2021, in which Laurie was
12   accused of criminal trespass?
13        A.   I certainly became aware of that, yes.
14        Q.   When did you become aware of it?
15        A.   I don't know.
16        Q.   If the event happened on January 22nd,
17   2021, would it be that day?  A week?  A month?
18        A.   I don't know.
19        Q.   But you did become aware of it?
20        A.   Correct.
21        Q.   Who made you aware of it?
22        A.   I'm not sure.
23        Q.   Do you have any records or any notes that

JAMES W. DONCHESS                    29

1    would help you refresh your memory on that issue?

2         A.   No.  I think I saw it in the newspaper,

3    but I knew about it already.  I believe there was

4    some kind of posting by Ms. Ortolano or a newspaper

5    story maybe in the -- in the Leader.

6              But I -- I knew about it already, but

7    there was a -- a story, so I -- I must have learned

8    about it sometime between when it occurred and when

9    this -- these public, you know, notices were

10   published.

11        Q.   So you were aware that -- that she

12   criminal trespassed?

13        A.   Yes.

14        Q.   And who made you aware of that?

15        A.   I don't know.

16        Q.   Were you consulted concerning the

17   disposition of her case?

18        A.   In terms of the original prosecution?

19        Q.   Yes.

20        A.   No.

21        Q.   How about the ultimate sentence?  Were you

22   consulted with that?

23        A.   No.

1        Q.   Were you aware that she was not allowed to
2    enter City Hall for one year without an appointment
3    as one of the conditions of her sentence?
4        A.   I think I heard she agreed to that, yes.
5        Q.   And were you also aware as part --
6        A.   Without an appointment, I think it was.
7        Q.   Yeah, without an appointment.  Were you
8    aware that she could not enter City Hall because of
9    her bail conditions when the case was opened?
10        A.   I don't remember that, but I'm not
11    involved in negotiating or considering bail
12    conditions.  I have no idea.  That's the police
13    department that does that.
14        Q.   So Laurie's attorney filed a motion with
15    the Court in the criminal case because the City
16    refused to schedule any appointments with her and
17    without any appointments, she couldn't go to
18    City Hall.
19             So there was a hearing before Judge Leary
20    on December 15th, 2021, in which that issue was
21    addressed.  And Attorney Bolton, representing the
22    City, was there, and he told Judge Leary, reading on
23    Page 2, "I represent the victim.  The victim is the

| | |
|---|---|
| 1 | City of Nashua."  You agree with that? |
| 2 |     A.   I agree with what? |
| 3 |     Q.   That the City of Nashua was the victim of |
| 4 | that criminal trespass. |
| 5 |     A.   I don't know.  I would say it was more |
| 6 | personal.  I'd say it was more, you know, personal. |
| 7 | Maybe -- maybe Celia Leonard or Steve Bolton.  I |
| 8 | mean, I suppose technically the City is, but I |
| 9 | didn't -- I didn't feel victimized by it. |
| 10 |     Q.   Okay.  Were you aware that the police |
| 11 | department, Captain Kenney, spoke to Attorney Bolton |
| 12 | to see if the issue could be resolved where they |
| 13 | would schedule appointments so that she could go to |
| 14 | City Hall?  Were you aware of that? |
| 15 |     A.   I don't remember being aware of it. |
| 16 |     Q.   Okay.  And Captain Kenney had no luck in |
| 17 | getting an agreement with Steve Bolton that |
| 18 | appointments should be scheduled so that she could |
| 19 | go to City Hall and she could express her views. |
| 20 |                MR. HILLIARD:  Objection to form. |
| 21 |     Q.   Do you think that's -- do you think that |
| 22 | that is appropriate for Attorney Bolton to deprive |
| 23 | her of an appointment? |

JAMES W. DONCHESS                                    32

1          MR. HILLIARD:  Objection to the form.

2     Did you get both of my objections, Susan?

3               COURT REPORTER:  I did.  Thank you.

4               MR. HILLIARD:  Thank you.

5     A.    Well, I think during this time -- I would

6     have to go back and try to review the records, but I

7     believe that during this time, Ms. Ortolano was

8     making public statements at the Board of Alderman,

9     so she wasn't -- I -- but I'm not sure of that.

10    Q.    So you don't know if she went to the

11    Board of Alderman meetings or -- or the committee

12    meetings during that time frame?

13    A.    I'm not sure.

14    Q.    Okay.

15    A.    But certainly since that time,

16    Ms. Ortolano has, you know, appeared frequently.

17    Q.    Correct.  But do you think it was

18    appropriate for Attorney Bolton to refuse to even

19    schedule an appointment with her so that she could

20    discuss a matter with him involving the City?

21              MR. HILLIARD:  Objection to the form.

22    Q.    I should say with the legal department.

23              MR. HILLIARD:  Same objection.

1           MR. PIGNATELLI:  I'm going to object
2    to the form.  If you want to put it in a
3    hypothetical, I won't object.
4        A.    I don't know.
5        Q.    You don't know?  Okay.
6        A.    I mean, he has no obligation to.  I mean,
7    we're -- we're in litigation, I presume.  You know,
8    I don't know.  Does he have an obligation to meet
9    with someone who's trespassed and there's a criminal
10   case?  I mean, I -- you know, I don't know.
11       Q.    Even if the person that wanted to schedule
12   the appointment had a legitimate reason to meet with
13   him?  It was not related to any litigation she had
14   against the City?
15       A.    I don't think --
16           MR. HILLIARD:  Objection to form.
17       A.    -- he has any obligation to meet -- I
18   don't think he has an obligation to meet with
19   someone who has an active criminal case pending,
20   and I'm not sure he has an obligation to meet with
21   anyone, you know, who is in litigation against the
22   City.
23       Q.    But as part of her sentence, --

```
1         A.    I mean, if you came in to me and say
2    you -- you're a lawyer representing, you think I
3    have an obligation to meet with you?  I -- I don't
4    think so.
5         Q.   If I was to meet with -- if I was to meet
6    with you for something that was not related to the
7    litigation, you would consider that to be a problem
8    in not meeting with you?
9         A.    In all due respect, I don't think -- I
10   might meet with you, but I don't have an obligation
11   to do so.
12        Q.   As a -- as a -- as the mayor or as
13   corporate counsel, if a citizen has a legitimate
14   reason to want to discuss something, do you need to
15   meet with them?
16        A.    Well, certainly when there's a long
17   history of problems with a -- as I said, there had
18   been -- as I've said, this obligation to treat the
19   resident and the employee with respect is a two-way
20   street, and there had been a long history, a history
21   of Ms. Ortolano not treating employees with respect,
22   including Mr. Bolton and Celia Leonard as evidenced
23   by -- by what happened.  Under those circumstances,
```

1    I'm not sure they really have the obligation to
2    continue to meet with that resident.
3         Q.    Even though there was an agreement that --
4    as part of the sentencing, that she could come to
5    City Hall if she had an appointment?
6         A.    There was a time when -- I recall a time
7    when Ms. Ortolano was praising Attorney Bolton to
8    the skies --
9         Q.    Well, that --
10        A.    -- saying how great he was.
11        Q.    That was before all of this.
12        A.    Before all of this.
13        Q.    Right.
14        A.    But that arose out of I believe
15   discussions and maybe meetings which occurred
16   between Mr. Bolton and Ms. Ortolano.
17            So, clearly, at some point he had been
18   willing to engage with her fully, but I believe that
19   Ms. Ortolano kind of abused the privilege.
20            I mean, she's been -- has said a lot of
21   things about these lawyers in private and in public
22   meetings that are not in the content but, like, the
23   tone and the profanity and other words that are used

```
 1   that show a lack of respect towards the employees in
 2   which I consider to be abusive towards the
 3   employees.
 4        Q.   Who advised you that she was abusive?
 5        A.   I heard her call Celia Leonard the C word,
 6   because I listened to it, in an assessor's meeting.
 7        Q.   Didn't she say -- didn't she use the word
 8   "cunty"?
 9        A.   Well, what word do you think -- that's the
10   C word, isn't it?
11        Q.   Well, it could.  I've never heard that
12   word around here, but --
13        A.   That's not what I recall.
14                  MR. HILLIARD:  I object to the
15   characterization of the word.  Go ahead.
16        A.   What they do in England has no bearing on
17   what's appropriate in Nashua City Hall.
18        Q.   In the transcript --
19        A.   They call the bathroom the loo.  You know,
20   we don't do that, so there's a totally different
21   vocabulary and even though within -- you know,
22   within the same English language, so the fact that a
23   word is -- might be acceptable, I mean, I have no
```

1    idea, it's in England, has no bearing on whether

2    that's acceptable in Nashua City Hall.

3        Q.   The prosecutor at the hearing before

4    Judge Leary stated, we've been trying to reach out

5    to City Hall to see if maybe we could -- Captain

6    Kenney tried to reach out to see if maybe we could

7    mediate the situation.  That's why we asked Attorney

8    Bolton to be here [as read].

9             Again, it goes on.  That's consistent with

10   Laurie's attorney's statement that the police

11   department tried to speak to Attorney Bolton to see

12   if he would schedule meetings and --

13       A.   You're going to have to show me the

14   transcript.  I've -- I've lost what you're reading.

15            MR. PIGNATELLI:  Hold on a second, if

16   I can.  Is somebody else speaking there?

17            (Discussion off the record.)

18       A.   Well, first, I think your questions imply

19   that Bolton was denying Ms. Ortolano the right to

20   meet with anybody in City Hall.  And as I read the

21   transcript, that is not the case at all.  He just

22   was personally declining to meet with her.

23       Q.   Do you recall or are you aware that there

1    was a city directive that indicated that -- by the

2    legal department that if any department was going to

3    be meeting with Laurie, legal had to be there?

4                    MR. HILLIARD:  Objection to the form.

5         A.   I'm not sure that -- I'm not sure that

6    that's correct.

7         Q.   Okay.  But if that is correct, then the

8    failure to schedule a meeting with Laurie through

9    legal would prevent her from meeting with the City

10   departments because they -- because legal needed to

11   be there?

12                   MR. HILLIARD:  Objection to the form.

13        A.   I don't -- I don't -- I don't follow it

14   and I don't agree with your assumption.

15        Q.   Okay.  Attorney Bolton told Judge Leary,

16   referring to Laurie, she can continue and try to

17   make appointments with my department and she will

18   not be granted any appointments by my department.

19                   She may well be granted appointments by

20   other departments she has made herself -- it says

21   that she has made herself at home going to public

22   meetings [as read].  Do you think that was a good

23   policy, that the legal department had established

JAMES W. DONCHESS                                    39

```
 1    that they were not going to give Laurie an
 2    appointment ever?
 3                 MR. HILLIARD:  Objection to the form.
 4         A.   Could I -- could I please --
 5         Q.   Sure.
 6         A.   -- read the transcript?
 7                 (Reviewing document.)
 8         A.   Now, previously you asked me who told me
 9    that Ms. Ortolano -- I believe you asked me who told
10    me that Ms. Ortolano had abused the lawyers, people
11    in the legal department?
12         Q.   No.  I think City -- I think it was City
13    employees, but...
14         A.   All right.  Well, if we speak -- if we
15    talk about the legal department now, I'm a little
16    reluctant to get into it in the sense that there's
17    an attorney/client privilege, so I don't want to
18    waive an attorney/client privilege by talking about
19    what someone in the legal department has said to me.
20         Q.   Well, that -- that's fine, but --
21         A.   I -- my understanding is that -- from more
22    than one person that Ms. Ortolano has screamed at
23    these lawyers obscenities in meetings in a
```

1   conference room, so I think that's a reason for them

2   not to meet with in addition to all the litigation,

3   and the standard legal advice is you don't talk to

4   people who -- you know, you have litigation with.

5           But beyond all that, I think it's

6   reasonable for them once they -- they hold meetings

7   with someone and they're screaming obscenities at

8   them, I think it's reasonable for them to just say,

9   you know, we're going to have to deal in writing.

10      Q.   So you concur with Attorney Bolton's

11  position that he set forth in Judge Leary as the

12  mayor?

13      A.   I'd have to read it.

14      Q.   Read it, please.

15           (Reviewing document.)

16      A.   I agree that they having been abused by

17  Ms. Ortolano in the past with a long history, with

18  litigation pending could decline to meet with

19  Ms. Ortolano or any other resident who had conducted

20  themselves in that manner.

21      Q.   So this was in December of 2021.  Are you

22  aware whether legal has scheduled an appointment

23  with Laurie from the date of this hearing,

```
 1    December 15th, 2021, through to today, --
 2         A.   I'm not aware --
 3         Q.   -- May 15th?
 4         A.   -- one way or the other.
 5         Q.   Let me show you what's been marked as
 6    Exhibit 83.  This is an order by Judge Temple in
 7    the case of Laurie Ortolano vs. City of Nashua,
 8    2023-CV-00165.  Have you seen this before?
 9                   (Reviewing document.)
10         A.   I don't know.  You'd have to give me time
11    to read this.
12         Q.   Well, we won't be out of here by 12:00
13    just so you know.
14         A.   How can you ask me about a document that's
15    how many pages long --
16         Q.   I'm just asking.  I'm not asking --
17         A.   -- without letting me read it?
18         Q.   No.  No.  I'm asking you -- if you need to
19    read it to determine if it was provided to you,
20    that's fine.
21                   MR. PIGNATELLI:  Let me just tell you
22    something.  We've got three hours today, and I
23    brought this up with Attorney Olson.  He had assured
```

1      me he would provide me with all documents that you
2      wanted to discuss with the mayor in advance of the
3      deposition.
4                   Had you or he produced those to me, I
5      would have had the mayor review them in advance, so
6      if you want to spring a multipage document on him in
7      the middle of the deposition, you're using up time
8      in your three hours.
9                   MR. AIVALIKLES:  Well, I disagree with
10     that.  First of all, I wasn't even aware of that.
11                  MR. PIGNATELLI:  I don't care.  You
12     were here, co-counsel.
13                  MR. AIVALIKLES:  Excuse me.
14                  COURT REPORTER:  I'm sorry.  I can
15     only take one person at a time, please.
16                  MR. AIVALIKLES:  Please let me talk,
17     Mich.  I'd appreciate that.  I wasn't aware of that,
18     but I'm only asking him if it was -- was ever
19     submitted to him.  I don't think he needs to read
20     the whole document to answer the question.
21         A.   I -- I don't know.  I've seen -- there
22     have been a lot of orders.  There are a lot of
23     pleadings in all of the many litigations between

JAMES W. DONCHESS                                  43

1      Ms. Ortolano and the City.  There may be a dozen
2      cases that Ms. Ortolano has brought against the
3      City.  I'm just guessing.  It's hard to count them.
4          Q.   Okay.
5          A.   I'm still answering.
6          Q.   Oh, go ahead.
7          A.   And so -- and I've seen a lot of
8      pleadings.  I don't know if this is one of them.  I
9      have definitely seen pleadings where Judge Temple
10     has been -- and other judges in the Superior Court
11     have been very critical of Ms. Ortolano and the kind
12     of things she says about them and about the City,
13     but I'm not sure without completely reading this
14     order whether I've seen this one or not.
15         Q.   Well, you're aware that there are a number
16     of court orders that are critical of the City's
17     handling of cases against her and including Attorney
18     Bolton.  Are you aware of that?
19              MR. HILLIARD:  Objection to the form.
20         A.   Judge Temple has tried to I think improve
21     the relationship between the City and Ms. Ortolano
22     by maybe criticizing both sides, but I don't agree
23     with your characterization of what he said about the

1    City.

2         Q.   Well, I'm going to read some language from

3    the court order.  This is a footnote, if you want to

4    read along with me.

5              In his order he says -- he says As the

6    Court knows from this case and others involving

7    these parties, the City and many of its high-ranking

8    employees have:  (1), effectively closed City Hall

9    to Ms. Ortolano on a walk-in basis; directed other

10   employees not to interact with her on -- on the

11   phone or in person; refused to answer Ms. Ortolano's

12   basic questions; and, (4), had Ms. Ortolano arrested

13   for trespassing at City Hall.  One alderman has

14   even gone so far as to label her -- label Ortolano a

15   "predator" [as read].  Did I read that correctly?

16        A.   You read it correctly, but I don't think

17   these statements are accurate.

18        Q.   Well, --

19        A.   For example, the last one.  I don't think

20   that happened.

21        Q.   You don't recall one of the alderman

22   calling her a predator?  Maybe you weren't at the

23   meeting.

1        A.    I think he said when Ms. Ortolano -- my

2    recollection is that when Ms. Ortolano, you know,

3    went after his children in a public meeting, that he

4    said it had a predatory vibe.

5        Q.    You would agree that this footnote is

6    critical of the City, --

7        A.    Yes.

8        Q.    -- would you not?

9        A.    Yes.  But I don't think it is based upon

10   evidence that was submitted in the -- in the

11   hearing.  I don't think it's -- but I don't know

12   what happened at the hearing.

13       Q.    Exactly.

14       A.    But I don't think it's accurate.  I don't

15   think the statements are accurate.

16       Q.    Let me read the next statement in the

17   order.  "Although the Court does not always agree

18   with Ms. Ortolano or rule in her favor, the Court

19   cannot help but join in Ms. Ortolano's frustration

20   in this particular case.  Ms. Ortolano sought basic

21   information from her local government officials

22   about the potential use of a complicated tax credit

23   scheme."  Did I read that correctly?

JAMES W. DONCHESS                                    46

1          A.    I think you read it correctly.

2          Q.    Okay.

3          A.    But I don't know what this case is about

4     here.  I don't even know what this is -- is

5     referring to, "complicated tax credit scheme"?  Is

6     this the Newmarket tax credits?

7          Q.    Yes.

8          A.    Well, my understanding is that the City

9     has produced, what?  Hundreds, thousands of

10    documents to Ms. Ortolano regard this transaction,

11    so to say the basic questions aren't being answered

12    is, I mean, wrong.

13         Q.    Well, according to the Court, the Court

14    was even frustrated with the City's responses to her

15    right-to-know request in this particular case.  Do

16    you think that's appropriate?

17               MR. HILLIARD:  Objection to the form.

18         A.    I don't read it that way at all.  He's --

19    he's not saying that the documents weren't produced.

20    He's saying that some kind of questions weren't

21    answered, but I think in terms of -- first of all,

22    the right-to-know law does not require that

23    questions be answered.  It requires that documents

JAMES W. DONCHESS                                    47

```
 1    be produced and that -- and the City complies with
 2    the right-to-know law.
 3              And so my understanding is that hundreds
 4    or thousands of documents have been produced to
 5    Ms. Ortolano regarding the right-to-know -- or
 6    excuse me -- regarding the Newmarket tax credit
 7    transaction, which the Court calls a scheme.  It is
 8    not a scheme.
 9              This is -- this is a way that we brought
10    in $2.4 million for the City of Nashua using legal,
11    federal procedures and tax credit -- tax credits
12    which has been used by cities across the country, so
13    it's not a scheme.  It was a way to help the
14    taxpayers of the City of Nashua.
15        Q.   No -- no one in this order labeled it a
16    scheme, but I'll go back to my --
17        A.   I thought -- didn't the Court label it a
18    scheme?  Didn't he use the word "scheme"?
19        Q.   Tax credit scheme.
20        A.   Yeah, well, it's not a scheme.
21        Q.   Okay.
22        A.   So I'm not sure that Judge Temple really
23    got into the details of the Newmarket tax credit.
```

1    Anyone who says it's a scheme has not really
2    reviewed what happened.
3         Q.   Again, I'll go back to the original
4    purpose of reading that, and this decision indicates
5    that the Court is equally frustrated with the City,
6    as was Ms. Ortolano [as read].  Isn't that what
7    Judge Temple stated on Page 5 and 6?
8                    MR. PIGNATELLI:  Bill, could you just
9    give us the time -- date of that court order?
10                    MR. AIVALIKLES:  Yeah.
11                    MR. PIGNATELLI:  You might have said
12   it before.
13                    MR. AIVALIKLES:  It's June 30, 2023.
14                    MR. PIGNATELLI:  Thank you.
15        Q.   And in it he says, "Although the Court
16   does not always agree with Ms. Ortolano or rule in
17   her favor, the Court cannot help but join in
18   Ms. Ortolano's frustration in this particular case."
19        She sought basic information from the
20   local government about potential tax credit issues,
21   and the question could have been boiled down to,
22   "Is the City actively exploring the use of NMTCs for
23   any other municipal projects?"  So the Court was

JAMES W. DONCHESS                                49

1    also frustrated with the City according to what this
2    order says, correct?
3                    MR. HILLIARD:  Objection.
4                    MR. PIGNATELLI:  Objection to form.
5        Q.   Was the Court sharing its frustration with
6    the City in terms of the right-to-knows?
7                    MR. HILLIARD:  Objection.
8        A.   If -- if that is the case, it's
9    ill-founded because -- is the answer to that
10   question because we don't know -- you know, this
11   goes back, what?  To 2023, right?
12             At that point we have no idea whether
13   we're going to use and still don't have any idea
14   whether we're going to use Newmarket tax credits
15   again, so there is no answer to the question.  Well,
16   are we going to use them?  No one knows.
17       Q.   Well, according to the records, --
18       A.   I think I said -- I believe I've said that
19   publicly.
20       Q.   I'll continue to read what Judge Temple
21   said.
22       A.   And I think you've mischaracterized it so
23   far, but...

1          Q.    Mr. Cummings, the City's Director of
2     Economic Development, could have just answered
3     that -- that question with a simple "no" based on
4     his personal knowledge, as his May 5th, 2023, letter
5     seems to suggest is the answer [as read].  So the
6     City --
7          A.    I don't think "no" would be necessarily a
8     correct answer.
9          Q.    But that's what your director said.
10         A.    No.  He is saying that Cummings -- the
11    Court is saying that Cummings did not say "no" and
12    is criticizing -- as I read this, criticizing
13    Cummings for not answering with the word "no," but I
14    don't think "no" would be an active -- would be an
15    accurate answer.
16         Q.    Judge Temple goes on to say --
17         A.    Because we are -- it's possible.  You
18    know, there's the library.  It's possible.  There's
19    the Keefe.  It's possible.  So we're always thinking
20    about it.  We might; we might not.  You know, so,
21    no, we're not considering would not be truthful.
22         Q.    So Judge Temple goes on to say, But that
23    would have been too easy.  That would have allowed

```
 1    Ms. Ortolano to get what she wanted, and the City
 2    surely could not -- I'm sorry -- and the City surely
 3    could not have that, at least not without stringing
 4    her along for a while [as read].  Do you think
 5    that's appropriate comment by your employees?
 6         A.    I don't think it's an accurate --
 7                    MR. HILLIARD:  Objection to form.
 8         A.    I don't think it's an accurate
 9    characterization of what the employees did.
10         Q.    But --
11         A.    And I think the statements reflect a
12    misunderstanding of what has occurred and -- of the
13    Newmarket tax credit in general, and I'm not sure
14    this has anything to do with whatever issues were
15    pending before the Court at that time.
16         Q.    So assuming that Judge Temple's
17    understanding what's implied is correct that she was
18    being stringing along, do you think that's
19    appropriate for City employees to engage in that
20    type of stonewalling conduct?
21                    MR. PIGNATELLI:  Objection to form.
22                    MR. HILLIARD:  Objection to form.
23         A.    First of all, I don't think the City was
```

JAMES W. DONCHESS                                    52

1    stringing anyone along.  The answer which Judge

2    Temple -- you know, I -- I respect Judge Temple, but

3    I don't -- with all due respect, I don't think he

4    understands the Newmarket tax credit transaction.

5           The suggestion that the City should have

6    said, no, we're not considering, Judge Temple has

7    suggested that the City should have answered

8    Ms. Ortolano by saying, no, we're not considering

9    any Newmarket tax credits.

10          That would not -- the answer that Judge

11   Temple is suggesting that Tim Cummings should have

12   given would have not been truthful because we are --

13   we're always considering using them again.

14          They brought in a lot of money for the

15   City.  It's possible we would use them again.  We do

16   not have any definite plans, but right now use them

17   for the library?  We could; maybe we will.

18       Q.   Mr. Mayor, I feel that you're

19   filibustering with your answers because you didn't

20   answer the simple question.  So if we have to go

21   beyond 12:00, we have to go -- the question I asked

22   you was, if Judge Temple was correct in his opinion,

23   is that the type of conduct you find acceptable, the

JAMES W. DONCHESS                              53

1    City stonewalling a citizen's request?

2                    MR. PIGNATELLI:  Objection.  Asked and

3    answered.

4                    MR. HILLIARD:  Objection to form.

5    Asked and answered.

6        A.    I feel that you have mischaracterized his

7    testimony.  For example -- for example, I know for a

8    fact that the Newmarket tax credit transaction was

9    not a scheme and, yet, Judge Temple uses that word.

10            And then when you reread some of this

11   language, you left out the word "scheme," so you're

12   not totally being accurate in terms of what's

13   being -- what Judge Temple.

14       Q.   Let me ask you the question again because

15   we spent a lot of time on this.  Assume that Judge

16   Temple is correct when he says but that would have

17   been easy concerning a simple answer.

18            Assume that he's correct, "That would have

19   allowed Ms. Ortolano to get what she wanted, and the

20   City surely could not have that, at least not

21   without stringing her along for a while."  Assuming

22   he's correct, is that appropriate for a City

23   employee to be engaged in stonewalling over a

1      citizen's request?

2                    MR. SHIRLEY:  Object to the form.

3      Object asked and answered.

4         A.   First of all, I know he's not correct.

5         Q.   But I'm asking you to assume he's correct.

6         A.   How can I --

7                    MR. SHIRLEY:  Objection to the form.

8         Q.   I'm asking you to assume.

9         A.   But I -- I can't.

10                    MR. AIVALIKLES:  So for the record,

11     the mayor refuses to answer the hypothetical.  We

12     may have to file a motion with the Court.  This

13     deposition will remain open pending what the Court

14     decides.

15                    MR. SHIRLEY:  Objection.  The City

16     does not agree to extending the timeline of this

17     deposition.

18                    MR. AIVALIKLES:  Well, it's not up to

19     you.  It's up to the Court.

20                    MR. SHIRLEY:  We can make a record

21     when we get closer to noon, Bill, on this issue.

22        Q.   Then he goes on to say, "Thus, here" we

23     are -- "here we all are again.  Another

JAMES W. DONCHESS                                55

```
1    Right-To-Know action involving Ms. Ortolano and
2    the City.  Another lengthy petition drafted by
3    Ms. Ortolano citing troubling behavior of City
4    employees."
5              Does that concern you that a judge is
6    finding that City employees are engaging in
7    troubling behavior?
8        A.   I don't know what behavior he's talking
9    about.
10       Q.   He calls it "troubling."
11       A.   But I don't know what he's talking about.
12       Q.   So --
13       A.   It depends what he's talking about.  You
14   know, maybe; maybe not.  You know, if, for example,
15   Judge Temple has suggested that Tim Cummings should
16   have said, no, we're not considering Newmarket tax
17   credits for any other transaction, that would not
18   have been a truthful answer.
19             So I would not have wanted Tim Cummings to
20   say, no, we're not considering it because we are,
21   but we don't know, so, you know, is it troubling
22   that Tim Cummings wouldn't say no?  No, it's not
23   because that would have required that he say
```

1    something that's not true.

2        Q.   Okay.  He goes on to say, Another filing

3    fee.  Another sheriff's deputy needing to serve the

4    petition.  Another attorney hired by the City and

5    paid for by the taxpayers.  Another belated

6    response by the City after the initiation of the

7    case.  Another merits hearing.  Another audit

8    issued by this Court.  All of this just to learn

9    that there was -- that there were no responsive

10   records [as read].

11            The City told the judge that they had no

12   responsive records to her request, but they didn't

13   tell her that initially and which necessitated the

14   filing of this petition.

15       A.   Well, you're telling me that, but I'm not

16   sure that --

17       Q.   Okay.  So now can you understand why

18   the -- the judge is also frustrated with the City

19   along with my client?

20                MR. HILLIARD:  Objection to the form.

21       A.   Well, I don't understand what he's saying

22   because I don't know what he's talking about.  He's

23   saying that the City never told Ms. Ortolano that

```
1    there were no responsive records.  I'm not sure that
2    that's -- I mean, if that's what's implied there,
3    I'm not sure that's accurate.
4         Q.   If that's what he said, do you agree that
5    the City should have told her when she filed the
6    request early on there are no responsive documents?
7                   MR. HILLIARD:  Objection to the form.
8         A.   How could they not have told her?
9         Q.   That's --
10        A.   What was the answer?  What are you -- what
11   are you saying?  I guess are you testifying?  I
12   don't really know, but what are you saying the
13   City's response was?  Simply no response at all?
14        Q.   I think the judge is saying that when they
15   got the request from Ms. Ortolano, that their
16   response should have been there are no records
17   responsive to your --
18        A.   What was it?
19        Q.   They dragged it out.  They stonewalled it.
20        A.   How?
21        Q.   That's what the judge is saying.
22        A.   How?
23                   MR. HILLIARD:  Objection to the form.
```

JAMES W. DONCHESS                                58

1           A.    They have to respond within five days.

2           Q.    And they -- yeah.  The -- the transcript

3      will show that the City kept asking you to provide

4      further clarification for information when they

5      could have simply said no in the beginning.

6           A.    Well, oftentimes the -- the requests are

7      unclear and for the City to decide that there are no

8      responsive records, they have to get clear requests

9      as to what records are being asked because this is a

10     very hair-triggered litigation situation so that if

11     they in any way misstate anything, there's going to

12     be another lawsuit.

13               So they need to be very careful about

14     trying to define what is being requested because if

15     they misinterpret or arguably allegedly misinterpret

16     a request and they say there are no documents

17     available and then it turns out that there's a

18     misunderstanding and there are some documents, then

19     there's another lawsuit, so they need to be very

20     careful in terms of precisely figuring out what is

21     being requested to try to prevent further

22     litigation.

23          Q.    So reading on with Judge Temple's decision

```
 1    he goes on to say, So the Court asks Mr. Cummings -
 2    was all of this worth whatever utility you derive
 3    from stonewalling Ms. Ortolano?  Was it a good use
 4    of taxpayer funds to pay an attorney in this case
 5    because you could not bring yourself to answer a
 6    yes/no question?  Wouldn't it have been easier to
 7    just answer the question?  The Court reminds the
 8    City and its employees "that it is their function to
 9    provide assistance to all their citizens," including
10    Ms. Ortolano [as read].  Did I read that correctly?
11         A.    You did.
12         Q.    Are you troubled by what the judge is
13    saying in that order?  In that -- kin that paragraph
14    that I just read?  Does that trouble you as the
15    mayor?
16              MR. HILLIARD:  Objection to form.
17         A.    So where I disagreed with you,
18    Mr. Aivalikles, is that I don't really think a
19    yes-or-no answer is possible in that situation
20    because whether there has been a decision to -- or
21    whether we are considering and have decided to use
22    Newmarket tax credits, and the answer which I think
23    we've discussed publicly is, you know, maybe but
```

```
 1    neither yes or no.  We haven't decided to go ahead,
 2    but we haven't decided not to go ahead, so I'm not
 3    sure that a yes-or-no answer is really possible.
 4         Q.    Doesn't it at least bother you one percent
 5    that the judge is making these comments about how
 6    the City conducts its business in this particular
 7    case?
 8         A.    We're listening --
 9                   MR. HILLIARD:  Objection.
10         A.    We're certainly -- "we" as, you know, the
11    City is certainly reading these decisions and are
12    trying to adjust to the comments that are made by
13    Judge Temple and the other judges.  For example, we
14    have to try to streamline the process to try to make
15    it so there are less glitches.
16               We have attempted to -- to focus the
17    requests upon a particular individual, funnel them
18    through a particular individual, a single person to
19    kind of create a process.
20               Ms. Ortolano is critical of that, but
21    Judge -- one of the judges in Superior Court called
22    that a best practice.  So the -- the judges and
23    Ms. Ortolano may disagree about, you know, we are
```

```
 1    listening to this and we're trying to respond to
 2    judges that are deciding these decisions and
 3    certainly one of them is Judge Temple.
 4            So we are seeking to comply not only
 5    with -- with the letter but the spirit of the law as
 6    Judge Temple is trying to articulate.
 7       Q.   I'll ask the question again.  Does it
 8    bother you a little that you have a Superior Court
 9    judge accusing the City of stonewalling?  Does it
10    even bother you a little as the mayor?
11                MR. HILLIARD:  Objection to form.
12       A.   I don't know if the word "bother."  We are
13    trying to adjust and -- and improve the way that
14    these requests are handled and part of that is based
15    upon what Judge Temple and what the other judges
16    have said.
17            Remember that we're getting on average
18    over a period of years like a communication a day on
19    average.  We're spending hundreds and hundreds and
20    hundreds of hours responding to requests from a
21    single individual, so the fact that, you know, one
22    time out of a thousand there's some kind of glitch,
23    you know, we're not perfect.
```

JAMES W. DONCHESS                                    62

```
1              So there could be a problem, but Judge
2      Temple seems to be ignoring that, you know, in the
3      99 -- 9989 other occasions there has been no
4      complaints, so, you know, we're -- we're certainly
5      reading this and attempting to adjust.
6          Q.   Do you agree with Judge Temple's
7      statement, The Court reminds the City and its
8      employees "that" -- and this is in quote, "that it
9      is their function to provide assistance to all their
10     citizens," including Ms. Ortolano, citing Carbonneau
11     V. Rye, 126 N.H. 96.  Do you agree with that
12     statement?
13         A.   I'd have to read --
14              MR. HILLIARD:  Objection to the form.
15         A.   -- Carbonneau vs. Rye.
16         Q.   Assuming that that's an accurate quote
17     that the judge is taking from that case, do you
18     agree with that statement?
19         A.   Generally, but it -- it qualifies -- it's
20     depend -- it depends.  I mean, if the -- if the
21     resident is demanding attention every day, day after
22     day after day, if the resident is filing hundreds
23     and hundreds of right-to-know requests, I think at
```

1    some point the City can say, look, we're going to

2    comply with the law but beyond that we just don't

3    have the time to spend on a single resident.

4           You know, at one point I had four

5    employees saying they were spending half of their

6    time, four employees responding to Ms. Ortolano's

7    various requests in writing and verbal.

8           That is a big commitment for her when

9    you've got a city of 91,000 people.  If you've got

10   four employees working for a single person, you

11   know, at some point there are going to be, you know,

12   mistakes made.

13          So, you know, Judge Temple is trying to

14   improve the communications and I think at other

15   times has suggested that Ms. Ortolano should be

16   behaving differently as well.

17      Q.   And reading excerpts of this decision,

18   does that refresh your memory whether they were

19   provided to you?

20      A.   No.

21      Q.   Would you expect this decision to have

22   been provided to you?

23      A.   Not necessarily because I know from

JAMES W. DONCHESS                                    64

1    talking -- I know -- I know that there are many
2    cases pending.  I'm saying ten or 12.  Many of them
3    have been decided in the City's favor but at least
4    there have been ten or 12 cases brought, including
5    this one, and I know that they are very motion
6    heavy.
7           I believe that Ms. Ortolano files a lot of
8    motions, a lot of, you know, different motions, and
9    there are a lot of decisions regarding all these
10   motions, and I'm not sure -- and the cases in
11   general, so I'm not sure I see every order that is
12   issued by the Superior Court.
13      Q.   Judge Temple goes on to say, Indeed, the
14   New Hampshire Constitution dictates that government
15   "should be open, accessible, accountable and
16   responsive," citing the New Hampshire Constitution
17   Part 1, Article 8 [as read].  In your opinion, has
18   the City been open, accessible, accounting and
19   responsive to Laurie?
20           MR. HILLIARD:  Objection to the form.
21      A.   Within the bounds that I've discussed
22   already, yes.
23      Q.   "The bounds" being?

JAMES W. DONCHESS                           65

```
1         A.   If an employee is -- that the obligation
2     to treat each other with respect and with courtesy
3     is a two-way street and that if a resident through
4     their behavior using screaming, yelling, profanity,
5     demands, shows a lack of respect and civility
6     towards City employees, then that -- that qualifies
7     their obligation to try meet the demands of that
8     particular resident.
9         Q.   The judge goes on to say, "Thus, the Court
10    'strongly suggest[s] that the [City] quickly get
11    'in the business' of responding to Ms. Ortolano's
12    basic questions and requests for information,"
13    citing the Carbonneau case.  Did the Court qualify
14    what the City should be doing in terms of dealing
15    with Ms. Ortolano?
16                 MR. HILLIARD:  Objection to the form.
17        A.   I don't know.
18        Q.   You don't know?
19        A.   I -- I -- I do know that, for example, in
20    response to comments like that, we have -- we have
21    revised procedures and required -- and tried to
22    follow right-to-know requests through a single
23    individual.  Responses can be -- can comply with the
```

1    right-to-know law and so that there is a record kept
2    of all of these requests and all of the, you know,
3    hundreds of requests and hundreds of responses and
4    that we've done that in part based upon comments
5    made by the various judges in the Superior Court.
6            And Judge -- one of the judges suggested
7    that that was a best practice, something that
8    Ms. Ortolano I understand disagrees with, but so no
9    matter what we do, you know, there's usually an
10   objection.
11       Q.   Are these revised procedures in writing?
12       A.   I don't know.
13       Q.   Well, have you -- have you reviewed the
14   revised procedures?
15       A.   Did they have to be?
16       Q.   I ask the questions, --
17       A.   I don't know.
18       Q.   -- Mr. Mayor.
19       A.   I don't know, but I don't consider that --
20   I don't consider it important.  We do many things
21   according to the procedures that are not written
22   down.  I mean, there are, what?  Thousands of
23   actions that the City takes, hundreds of actions

1    that the City takes probably on a daily basis and

2    there aren't written procedures to cover what

3    happens if someone calls and asks about a pothole.

4    There's probably no written procedure that says you

5    call public works and ask them to fix it but that's

6    the procedure.

7        Q.   The question is, are these revised

8    procedures in writing?

9        A.   I don't know.

10        Q.   Well, wouldn't that be something that

11    would be brought to your attention considering you

12    stated that the City spends hundreds of thousands of

13    dollars for right-to-know requests?

14            Wouldn't you be concerned about what the

15    policies are with the City with regard to those

16    right-to-know requests in light of the tremendous

17    amount of money the City is spending?

18        A.   I don't consider it important as to

19    whether the procedures are written or verbal as long

20    as we try to follow them.

21        Q.   Well, do you recall any discussions with

22    any department heads or -- about what revised

23    procedures should be?

1        A.    Yes.

2        Q.    And who is that?

3        A.    You know, I can't talk about conversations

4    with the legal department but certainly with

5    Mr. Cummings, with everybody.  I mean, a lot of

6    people.

7        Q.    Did you have a special meeting set up to

8    discuss that?

9        A.    I don't know.

10        Q.    The judge goes on to say --

11        A.    But remember, we hired a particular

12    individual.  We created a new position to handle

13    right-to-know requests and so certainly -- it's

14    certainly understood that we were hoping to -- this

15    is the person that you've referred to, Gary.

16             This is a person who has the sole

17    responsibility of responding to right-to-know

18    requests, and we're trying to regularize that

19    procedure by directing all right-to-know requests to

20    his attention and allowing him to respond according

21    to the law.  So is that all written down?  I don't

22    know, but it's very obvious because we've -- we've

23    hired him to do this job.

JAMES W. DONCHESS                    69

1          Q.   Continuing on with Judge Temple's order.
2     He says, "The answer is also not for the City to
3     stonewall, delay, or ignore her requests when they
4     seem complicated, unclear, or perhaps even outside
5     the letter, if not the spirit, of the Right-To-Know
6     law."
7              The solution is for Ms. Ortolano and the
8     City to work together in a collaborative manner to
9     identify the records and the information sought
10    [as read].  Do you agree with that?
11                   MR. HILLIARD:  Objection to form.
12         A.   I agree that I believe that the City
13    at various times has tried to collaborate with
14    Ms. Ortolano and has found that impossible.
15         Q.   Can you give me an instance please?
16         A.   The meeting with her -- a meeting between
17    her and the legal department in the legal conference
18    room in which she is screaming obscenities at the
19    lawyers.
20         Q.   Did that occur before June 30th, 2023?
21         A.   My answer is, yeah, it occurred before
22    that date.
23         Q.   But on June 30th, 2023, the Court is

```
 1    telling the City to work with her in a collaborative
 2    manner.  Have there been any meetings between the
 3    City and Laurie since June 30th, 2023, so as to work
 4    in a collaborative manner in addressing the
 5    right-to-know?
 6         A.   I think there have been.
 7              MR. HILLIARD:  Objection to form.
 8         A.   Yes.  Ms. Ortolano has refused to
 9    cooperate on at least one effort that I'm aware of.
10         Q.   Well, what effort is that?
11         A.   In one of these litigations, the court
12    ordered a conference where documents would be
13    marked.  Very routine.
14              The parties would get together and they
15    would go through the documents that were going to be
16    admitted and agree to which documents would be
17    admitted into evidence or what would be identified,
18    et cetera.
19              My understanding Ms. Ortolano showed up
20    and said I'm not going to do that and refused to
21    participate and stormed out of the meeting.
22         Q.   Who told you that?
23         A.   Various people.
```

JAMES W. DONCHESS                                    71

```
 1          Q.   I'd like to know the names of the people
 2     that told you that.
 3          A.   I'm not sure.
 4          Q.   This is a discovery deposition.
 5          A.   I'm not sure.
 6          Q.   You're not sure?
 7          A.   I'm not sure.
 8          Q.   Could it have been Steve Bolton?
 9               MR. PIGNATELLI:  Objection.  As you
10     know, we've got the attorney/client privilege.
11               MR. AIVALIKLES:  Well, if Attorney --
12     it's already been disclosed what was told to him,
13     but if it's Attorney Bolton, there's no
14     attorney/client privilege.
15               MR. PIGNATELLI:  Well, you asked him
16     if he were aware of incidents and he told you of an
17     incident.
18               MR. AIVALIKLES:  Right.
19               MR. PIGNATELLI:  But he -- he doesn't
20     have to divulge any communications with the City.
21          A.   I'm not sure who told me.  I'm not sure
22     who told me.
23          Q.   For the record, he just -- he did disclose
```

1    the nature of the communication.

2         A.    But I think it's accurate because I heard

3    from people who attended the trial that they had to

4    spend the first day going through the documents one

5    by one to admit them.

6              These were e-mails between the City and

7    Ms. Ortolano and they were all admitted, the same

8    documents that Ms. Ortolano refused to review, and

9    did the Court even know about these things?  I'm not

10   sure that the Court does.

11        Q.    I think the Court saw the documents that

12   the City was submitting in presenting it to Laurie

13   and how hers were disorganized but everyone else's

14   exhibits were in perfect order, so I think the Court

15   had a view of that issue.

16        A.    Does that Court know the situation where

17   Ms. Ortolano is yelling obscenities at the lawyers

18   in a meeting between them?  I don't -- I doubt the

19   Court knows about that.  I don't know.

20        Q.    Well, the transcripts speak for themselves

21   and we will address those issues with the Court.

22              THE WITNESS:  Can I ask your

23   indulgence?  Would you mind if I took a bathroom

JAMES W. DONCHESS                    73

```
1     break?
2               MR. AIVALIKLES:  Oh, no, please.
3               MR. PIGNATELLI:  Ten-minute break.
4               (A break was taken from
5               10:32 a.m. to 10:39 a.m.)
6        Q.   Let me read you Judge Temple's footnote on
7     Page 8, Footnote 3.  "With that said, the Court
8     recognizes the City has, on many occasions, left
9     Ms. Ortolano with no choice but to file
10    Right-to-Know petitions, as the City does not always
11    engage in any dialog."
12              Of particular note, the Court was dismayed
13    to learn that Mr. Perrin, the City's
14    Right-to-Know/Records Administrator, included his
15    phone number in his -- I'm sorry -- included his
16    phone number in his correspondence with Ms. Ortolano
17    and told her to "feel free" to contact him at the
18    phone number for "additional assistance" [as read].
19              Yet, when she did just what he told her
20    that he was directed -- I'm sorry -- Yet, when he
21    did just that, he told her that he was directed not
22    to speak with her.  This type of behavior does not
23    meet the "responsive" and "accessible" standards of
```

1    Part 1, Article 8 of the New Hampshire Constitution
2    [as read].  If that finding by the Court is
3    accurate, does that bother you?
4                    MR. HILLIARD:  Objection to the form.
5        A.    It depends on the history.
6        Q.    So the City employee did the right thing,
7    gave Ms. Ortolano his card and said call me if I can
8    be of assistance to you, and this was the person
9    handling the right-to-know.  Yet, he then is
10   directed not to speak to Ms. Ortolano and you think
11   that's appropriate?
12                   MR. SHIRLEY:  Objection.
13                   MR. HILLIARD:  Objection to the form.
14       A.    I think there is a history.  There was
15   another part of the history that we haven't talked
16   about which is that on many, many occasions
17   employees have talked with Ms. Ortolano.
18             Then later Ms. Ortolano makes a public
19   statement or a statement in a pleading as to
20   employee X told me this and the employee says I
21   never said that.  That has happened over and over
22   and over.  So that is another problem with having a
23   lot of dialogue with Ms. Ortolano.  You are likely

1    to be misquoted in a public statement or in a

2    lawsuit.

3         Q.   Who told you that -- who told you that

4    incident happened?

5         A.   Every -- practically everyone.  Everyone.

6         Q.   Well, can I have some names?

7         A.   Cummings, Kleiner.  I don't know if I can

8    talk about what the lawyers say.  People in my

9    office.  Just people in the assessing office.  Just

10   all over the place.  It's almost a constant.

11        Q.   Did Mr. Perrin ever tell you that?

12        A.   No.

13        Q.   Because Mr. Perrin was the one that gave

14   Laurie his card and phone number and said call me if

15   you need assistance.

16        A.   But it's possible that in trying to avoid

17   litigation, you know, the City doesn't -- if every

18   time you make a statement it's misquoted and becomes

19   part of a lawsuit, you know, a technique or a method

20   to try to avoid litigation is not to give a lot of

21   public -- a lot of statements so that they can't be

22   misquoted.

23        Q.   Finally, on Page 9 it goes on to say,

1    "The undersigned and Judge Colburn," that's the
2    other judge that heard the right-to-know cases,
3    "have both asked the City about the process for
4    making a Right-to-Know request for City records in
5    other cases involving these parties.  To date, even
6    us judges have not received a clear answer."  Is
7    that appropriate for the City not to respond to a
8    judge's request?
9         A.   We have responded.
10                  MR. HILLIARD:  Objection to form.
11        Q.   Well, when did they respond?
12        A.   We created the -- the Perrin position some
13   years ago.  A couple years ago.
14        Q.   Well, --
15        A.   And Judge Colburn has called that a best
16   practice, so partially in response to what the
17   judges have said and Judge Colburn has appraised
18   that approach so we have developed a uniform policy
19   as the Courts have asked.
20        Q.   So as of June 30th, 2023, Judge Temple had
21   not been informed by the City of the -- the
22   policies, according to what he is saying, correct?
23        A.    I guess but within the same order he's

JAMES W. DONCHESS                          77

```
1    talking about Perrin being the right-to-know
2    administrator, so it seems to contradict itself.
3        Q.   It goes on to say, "The Court therefore
4    strongly encourages the City to develop a uniform
5    policy outlining the process for making a
6    right-to-know request for City records and to make
7    that policy publicly available on its website."  Has
8    the City made that policy available on its website?
9        A.   I don't know.
10                 (Pause.)
11       A.   Well, we have developed a policy.
12       Q.   I understand that, but the Court is
13   suggesting that it be done on the website so that
14   all citizens of Nashua know exactly what the policy
15   is.
16                 (Pause.)
17       Q.   So you don't know whether or not it's on
18   the City website?
19       A.   I don't.
20       Q.   Should it be on the City website?
21       A.   As I've said, you know, something being in
22   writing is not the most important thing.  The most
23   important thing is that we try to develop a uniform
```

```
 1     approach and we follow it.
 2          Q.   Now, Attorney Bolton at a September 28,
 3     2021, alderman meeting stated, Fact is I've never
 4     acted vindictively toward her.  I never insulted her
 5     [as read].  Yet, when Attorney Bolton spoke to the
 6     press, --
 7          A.   Can I see that, please?
 8          Q.   Sure.
 9                    (Reviewing document.)
10          A.   He goes on to say She has misstated my
11     age.  She has ridiculed the fact that I have had
12     some medical issues in the past [as read].  She's
13     referring to a stroke.
14               She has spread rumors that I'm about to
15     retire.  None of that is true.  She has -- she has
16     insisted that I've doubled the size of the legal
17     staff in the five years that I have been there.
18     None of that is true [as read].  So, you know, you
19     read part of the statement but not --
20          Q.   Well, --
21          A.   And then he goes on beyond that.
22          Q.   The -- the part that I read has to do with
23     the question I'm going to ask you.  The question I'm
```

```
 1    going to ask you has nothing to do with the other
 2    stuff that you wasted our time reading.  So he says
 3    he has -- he has never insulted her.  That's what he
 4    says, correct?
 5         A.   He does say that, yes.
 6         Q.   Okay.  And that was on September 28, 2021,
 7    at a meeting, and he spoke to the press.  It says
 8    the fact is we know she doesn't tell the truth
 9    [as read].  Would you consider that to be an insult?
10              MR. PIGNATELLI:  What's the date of
11    that?
12              MR. AIVALIKLES:  Unfortunately it's --
13    it's -- it's --
14              MS. ORTOLANO:  It's January --
15              COURT REPORTER:  I can't hear who's
16    speaking.
17              MS. ORTOLANO:  That's the article.
18              MR. HILLIARD:  Objection.
19         A.   As I've said, a City employee has a
20    [inaudible] to write also.  And if a City employee
21    feels that -- that a citizen who's criticized them
22    is not being truthful, what?  They're not allowed to
23    say that?
```

1    Q.   No, but he told the board that he's never
2    insulted her.
3    A.   But it's not an insult if it is -- if it
4    is accurate.  If it is accurate.
5    Q.   So you don't have any concerns about the
6    attorney for the City making that statement at the
7    aldermanic meeting that -- I'll withdraw the
8    question.  There is another court case pending.
9    This is Ortolano vs. City of Nashua, 2020-CV-00133.
10                   MS. ORTOLANO:  It's in the Supreme
11   Court, right?
12   Q.   It's labeled "ORDER ON PLAINTIFF'S MOTION
13   FOR DISCOVERY SANCTIONS" and it was issued by Judge
14   Temple.  And Judge Temple states the Court also
15   finds the tone of City's objection concerning See
16   City's hearing.
17                   The Court also finds -- I'm sorry.
18   "'The plaintiff's motion is rife with unsupported
19   and inflammatory allegations, conjecture, and
20   hyperbole unworthy of a motion before this Court.'"
21   "'The plaintiff's behavior in filing this frivolous
22   motion arguably meets the definition of obdurate and
23   obstinate.'"  Did I read that correctly?

1      A.    Yes.

2      Q.    And that was the City's position as

3   honored by Judge Temple, correct?

4      A.    He's quoting.  I think he's quoting

5   something.

6      Q.    But he was concerned about the tone of the

7   City's objection.

8      A.    Correct.

9      Q.    Does that concern you?

10               MR. HILLIARD:  Object to the form.

11     A.    Yes, because I didn't like the tone,

12   either.

13     Q.    "The Court is concerned about the City's

14   candor and if the City attempted in good faith to

15   resolve the discovery dispute over the documents at

16   issue."  See N.H. Superior Court Rule 21(f)

17   "(requiring the parties to make 'a good faith effort

18   to resolve informally a dispute concerning

19   discovery.')"  Does that statement by the Court

20   concern you?

21     A.    I'd have to know more about it.

22               MR. HILLIARD:  Objection to form.

23     A.    I'd have to know what the dispute, what it

JAMES W. DONCHESS                                    82

1    is.

2         Q.   It goes on to say, "The stark contrast

3    between the objection and the City's position at the

4    hearing is striking."  And he references the

5    transcript.

6              "(Attorney Bolton characterizing the

7    objection at the hearing as follows:  'It was a

8    little over the top.  Maybe more tan a little, in

9    response.')"

10        A.   So Bolton agrees that it was

11   inappropriate.

12        Q.   And then the Court goes on to award Laurie

13   attorney's fees.

14        A.   Yes.

15        Q.   And those fees were $8,000?

16        A.   I don't know the number.

17        Q.   Does that bother you that the City

18   attorneys are not cooperating with discovery and

19   causing the City to incur legal fees?

20                   MR. HILLIARD:  Objection to the form.

21        A.   I'm not sure that's what happened.  What

22   I -- what you just read me suggests that this was a

23   guy who no longer works for the City, but he

JAMES W. DONCHESS                                    83

```
 1    responded with an inappropriate tone and the City --
 2    I mean, I guess you read from what --
 3          Q.    The order.
 4          A.    -- Mr. Bolton says.  He agreed with that
 5    and the City ordered -- you know, the court ordered
 6    attorney's fees.  Yeah, of course it was concerning
 7    because we didn't think the tone of the response was
 8    appropriate.  It was Jesse Neumann who did that.
 9          Q.    Now, are you aware that in that -- the
10    same captioned case ordered the City to pay
11    $63,341.47 in attorney's fees and costs for the
12    reasons stated in this order?  Are you aware of
13    that?
14          A.    Yes.
15          Q.    And was that Attorney Neumann's fault
16    also?
17                     MR. HILLIARD:  Object to the form.
18          A.    I don't think it was.  That's not my
19    understanding -- I mean, I'd have to go back, but my
20    understanding was that -- and I could be wrong.  I
21    mean, I could tell you what I understood about this.
22    I don't know if you want to hear that.
23          Q.    That's fine.  Yes, I do.
```

1          A.    My understanding was that there were two

2     issues in this case.  Now, I could be wrong about

3     this.  There are a lot of cases and a lot of orders.

4               One had to do with whether the police had

5     to produce transcripts and tapes of interviews they

6     had done in the course of a criminal investigation,

7     and there had never been such a requirement in New

8     Hampshire before.  People were concerned that this

9     could compromise law enforcement efforts.

10              So the City declined -- the City, the

11    police department really and the City declined to

12    produce those transcripts and tapes.

13              And Judge Temple found that the City

14    should have known that those would be subject to

15    right-to-know -- a right-to-know request even -- and

16    would have to be produced even though there was no

17    law on that in New Hampshire already and in other

18    jurisdictions it would have gone the other way.  So

19    that's on appeal because -- because the whole issue

20    of attorney's fees has to do with Judge Temple's

21    opinion that the City should have known how he would

22    decide that case under the circumstances I just

23    described.  That was one -- as I recall, that's one

JAMES W. DONCHESS                                                85

1      of the issues in that case and that's why attorney's

2      fees were ordered.

3                  So it all has to do with should the City

4      have known that we would be required to produce,

5      "we" the police department and the City would be

6      required to produce the tapes and transcripts of

7      criminal interviews for the first time.

8      Q.    Were you aware that the City in the case

9      of Laurie Ortolano vs. City of Nashua,

10     226-2022-cv-00309 filed a request for a protective

11     order seeking to prevent further disruption?

12                 The Court should order the Plaintiff to

13     refrain from any -- I'm sorry -- from contact with

14     any city officials and employees in connection with

15     the pending litigation [as read].  Did I read that

16     correctly?

17                 (Reviewing document.)

18     A.    Yes.  I mean -- yes, you did read it

19     correctly.

20     Q.    And were you aware that the City was

21     taking that position?

22     A.    I'm not sure I was -- I'm not sure.

23     Q.    Now, were you aware that the City was

1    taking the position that Laurie's conviction for

2    violation criminal trespass not be annulled?  Were

3    awe aware of that?

4        A.   Yes.

5        Q.   Did you agree with that?

6        A.   Yes.

7        Q.   And why did you agree with that?

8        A.   Because she pled guilty and I think there

9    was a concern that an annulment -- there would be an

10   argument that the annulment meant the fact that she

11   had pled guilty to this trespass couldn't be

12   admitted in all this litigation that exists

13   including this case.

14          So I think it really had to do with a

15   concern that all of the evidence be allowed to be

16   presented to the Court in all these cases

17   regarding -- in this case and others, but

18   particularly I suppose this one because it has --

19   because it has to do with the -- you know, the

20   charge and the guilty plea regarding the

21   trespassing.  Regarding this trespassing violation.

22       Q.   Wasn't -- let me just show you the City of

23   Nashua's motion to intervene and be heard on

JAMES W. DONCHESS                                  87

```
1      Defendant's petition for annulment [as read] that
2      was filed September 12, 2022, by Attorney Cullen.
3          A.    Okay.
4          Q.    And one of the grounds here also asserts
5      that Laurie has not rehabilitated herself.
6          A.    Okay.
7          Q.    It says the annulment -- it says the
8      annulment will not assist in the Defendant's
9      rehabilitation nor will it be consistent with the
10     public welfare [as read].  Do you agree with that?
11         A.    I don't know.
12         Q.    Well, he goes on to state --
13         A.    I'd have to read it.  I don't know.
14         Q.    Okay.
15         A.    I don't know.  I mean, he's -- he's
16     representing the City, but he's not consulting me
17     about everything he says in a pleading.
18         Q.    Well, I'm asking if you agree --
19         A.    I don't know.
20         Q.    -- with his position.  Why don't you read
21     it.
22               (Reviewing document.)
23         Q.    So this is what he asserts.  We're looking
```

```
 1        at Paragraph B. on Page 5 of the motion.
 2             A.   Well, he says that the Defendant posted
 3        about the incident in the Nashua Scoop [as read].  I
 4        assume that's accurate.
 5             Q.   Yeah.
 6             A.   I assume that's accurate.
 7             Q.   Well, that's fine.  That's not the
 8        question.  The question is --
 9             A.   I believe that was posted.
10             Q.   Why don't you read it and then I'm going
11        to question you about it.  I'm not talking about
12        whether it's accurate or inaccurate at this point.
13        I want you to read it and then I'm going to question
14        you about it.
15                  (Reviewing document.)
16             A.   Okay.  I've read this part.
17             Q.   It goes on.
18             A.   But I haven't read this first paragraph.
19             Q.   Okay.  Why don't you read it.
20                  (Reviewing document.)
21             A.   Okay.  I've read it, at least what's on
22        this page.
23             Q.   Do you agree with the position that she
```

JAMES W. DONCHESS                          89

1    has not rehabilitated herself based upon her conduct

2    set forth in that paragraph?

3                   MR. SHIRLEY:  I need to object to the

4    form of the question.

5         A.   I can't say that I agree or disagree.  I'm

6    not sure.

7         Q.   You're not sure?

8         A.   I think that these things are accurate.

9    The -- the statements supporting that conclusion are

10   accurate.

11        Q.   So you don't take a position one way or

12   another whether your attorney was accurate in

13   opposing the motion to annul based upon her lack of

14   rehabilitation using those -- those articles?

15                  MR. SHIRLEY:  Object to the form of

16   the question.  Somebody's phone's ringing.

17        A.   I didn't -- I didn't follow the question.

18        Q.   Do you agree that what's contained in his

19   objection on Page 5 was a valid basis to claim that

20   she has not been rehabilitated?

21                  MR. SHIRLEY:  Object to the form of

22   the question.  In part, I can't even see the

23   documents that the attorney is presenting the

1    witness, but objection to the form of the question.
2    Thank you.
3        A.    I don't really know.
4        Q.    Were you aware that they were going to
5    oppose the annulment?
6        A.    Yes, because of the concern that a lawyer
7    representing Ms. Ortolano would try to argue that
8    we -- that the fact that she pled guilty to this
9    couldn't be admitted in -- in a -- in this
10   litigation and other litigation.
11       Q.    I'm going to show you what's going to be a
12   response to the City's material facts and motion for
13   summary judgment.
14             And No. 36.  The City says On numerous
15   occasions after her arrest in January 2021, as well
16   as after July -- publicly critical about City
17   Officials at public meetings, through her blog
18   posts, and in e-mails to City Officials, including,
19   but not limited to the following [as read].  Did I
20   read that correctly?
21       A.    Yes.
22       Q.    And what the City is relying upon in
23   support of that material fact is --

JAMES W. DONCHESS                                91

```
1         A.    What are we looking at?
2         Q.    This is the City's motion for summary
3    judgment and those are material statements of fact
4    by the City.
5         A.    But you're showing me Laurie Ortolano's
6    affidavit, are you not?  Isn't this Laurie
7    Ortolano's affidavit?
8         Q.    That's the way it came through.
9         A.    "That's the way it came through."  I don't
10   know what that means.
11        Q.    These were material facts that the City
12   asserted in moving for summary judgment against
13   Laurie.
14        A.    Okay.  But you're showing me an affidavit
15   filed by Ms. Ortolano.  You're not showing me the
16   City's pleading, so wouldn't it be better to show me
17   the City's pleading?  I mean, I don't know.  Is this
18   accurate or not?  I have no idea.
19        Q.    You are seeing the City's pleading.  This
20   is the response to the City's pleading, but the new
21   rules in Superior Court is you have to respond
22   within the asserted material fact.  And so in
23   support of the material -- the material fact in 36
```

```
1     first has the City's representation and then it's
2     followed by the Plaintiff's statement.  What I'm
3     reading to you now is what the City requested as set
4     forth as a material fact for 36.
5                    MR. HILLIARD:  Can you just stop for
6     one second, please?  I think that the witness is
7     being shown Bolton and Leonard's motion for summary
8     judgment; not the City's.
9                    MR. AIVALIKLES:  I don't know what you
10    said, Russ.  You're going in and out.
11                   MR. HILLIARD:  What I said -- can you
12    hear me now?
13                   COURT REPORTER:  I can hear you.
14                   MR. HILLIARD:  Jonathan, can you hear?
15                   MR. SHIRLEY:  I hear you very well.
16    Thank you.  I realize there seems to be an issue.
17                   MR. HILLIARD:  What I'm saying is that
18    the document you're showing the witness is part of
19    Bolton and Leonard's motion for summary judgment;
20    not a motion filed by the City.  I just want the
21    record to be clear what is being shown.
22                   MR. AIVALIKLES:  I appreciate the
23    clarification.
```

1                    MR. SHIRLEY:  Well, I just -- I need

2        to weigh in here.  Part of the problem we are

3        experiencing is the documents are being shown to the

4        witness that have not been furnished to other

5        counsel and are not available to be seen on this

6        Zoom deposition.  I just -- I think I need to just

7        object on that basis.

8                    MR. AIVALIKLES:  Well, these are

9        records that the attorneys have.

10                   MR. SHIRLEY:  Still as a courtesy.  I

11       just want to note that I object to having a witness

12       be presented documents that they are not available

13       on Zoom to the other counsel.  Thank you.

14       Q.   So No. 36 is the City's -- not the City's.

15       I'm sorry.  It's Bolton and Leonard's statement.

16       I stand corrected.

17                   It says On numerous occasions after her

18       arrest in January 2021, as well as after July '22

19       incident, Plaintiff was publicly critical about City

20       Officials at public meetings, through her blog post

21       and e-mails to City officials, including, but not

22       limited to the following statements [as read] and

23       then they go on to list statements that supposedly

1    Laurie made.

2          A.    Okay.

3          Q.    Do you -- do you agree that Laurie had the

4    right to criticize the City?

5          A.    Yes.  But the City has a right to disagree

6    and say that those aren't accurate criticisms

7    which -- and I don't -- I don't know about these

8    dates.

9                I don't know what Ms. Ortolano said

10   between these various dates, but she's never been

11   reluctant to criticize the City, which is her right.

12         Q.    This is Attorney Bolton's affidavit dated

13   March 28, 2024.  Paragraph 14 says Additionally, on

14   numerous occasions after her arrest in January 2021,

15   as well as after the July '22 incident, Plaintiff

16   was publicly critical of City Officials at public

17   meetings, through her blogs and in e-mails to City

18   Officials, including but not limited to, the

19   following statements [as read] and then he goes on

20   to state the following blogs that he's referencing.

21   Again, did Ms. Ortolano have a First Amendment right

22   to issue these statements that he's citing in

23   Paragraph 14?  It would be a. through h.

```
1            A.   Well, I haven't read a. through .h, but in
2       general, yes, Ms. Ortolano has a right to criticize
3       the City or city officials and they have, in turn, a
4       right to respond and give their point of view.
5            Q.   Now, you said that you were aware of the
6       January 21st, 2022, incident, correct, of trespass?
7            A.   Yes.
8            Q.   Okay.  Were you aware that the police were
9       called?
10           A.   Yes.
11           Q.   And the police interviewed Ms. Ortolano
12      and they interviewed Attorney Leonard?
13           A.   Yes.
14           Q.   Okay.  And the police, according to the
15      police report, and this is Exhibit A-4 in the
16      summary judgment, found -- found that "No offenses
17      alleged or apparent."  Did I read that correctly?
18                     (Reviewing document.)
19           A.   Correct.
20           Q.   So when the police left after their
21      interviewing of Ms. Ortolano, Attorney Leonard and
22      some people, they determined there was no crime,
23      correct, according to this police report?
```

JAMES W. DONCHESS                    96

```
 1        A.   I don't know.
 2             MR. HILLIARD:  Object to the form.
 3        A.   I've never seen this or -- I don't know
 4    who wrote it, but I didn't know about this at the
 5    time and I think more information about this has
 6    come out recently, but -- in depositions.
 7        Q.   Am I reading it correctly?
 8        A.   You read correctly.
 9        Q.   Okay.  And this is the police report?
10        A.   Yes, I guess.  I mean...
11        Q.   Take a look at it.  This was an exhibit in
12    this case.
13             (Reviewing document.)
14        A.   Okay.
15             MR. PIGNATELLI:  You're representing
16    it's a police report, right, Bill?
17             MR. AIVALIKLES:  Well, it's a police
18    report, call log, whatever, but it's not the only
19    police report.
20             (Reviewing document.)
21        A.   Anyway, yes, you've read it correctly,
22    and it appears to be something prepared by the
23    police department, yes.
```

JAMES W. DONCHESS                          97

```
1        Q.   And you would agree that Steve Bolton
2   cannot demand that the police arrest a citizen or
3   cause to be arrested?  In this case, Laurie.
4        A.   Yes.  He cannot demand that, nor would I
5   believe the police department comply with such a
6   demand if he did.
7        Q.   You would find that to be inappropriate if
8   Steve Bolton demanded that the police arrest Laurie?
9                 MR. HILLIARD:  Objection to the form.
10       A.   I think it's just -- I don't think it
11   would mean anything because the police department
12   doesn't work for me.  They conduct their own affairs
13   in the way they feel is best.
14       Q.   But you -- as the mayor, do you have a
15   concern that the corporate counsel would demand the
16   arrest of a citizen such as Laurie?
17                 MR. HILLIARD:  Objection to the form.
18       A.   He could suggest that he thought an arrest
19   was warranted.
20       Q.   I'm talking about demanding that an arrest
21   issue.
22                 MR. HILLIARD:  Objection to form.
23       A.   He -- I'm not sure that that happened, and
```

1      I don't believe that it -- that the police

2      department would comply with a demand such as that.

3      They make their own judgments and they don't answer

4      to Attorney Bolton.

5          Q.    But that wasn't my question.  My question

6      was, do you have a concern, and I'm using the word

7      "demand" deliberately, that Attorney Bolton demand

8      that the police department arrest Laurie?

9                     MR. HILLIARD:   Objection to the form.

10         A.    I'm not sure that it would have much

11     effect, but if he said I demand that you arrest her,

12     you know, obviously he's exceeding his authority,

13     but -- meaning that he doesn't have the right to

14     demand that they do anything.

15               On the other hand, if he -- if he said I

16     think you should arrest her based on the facts, then

17     certainly that would be appropriate.

18               So it depends exact -- I guess you're

19     quibbling or arguing over the words that were used

20     at the time, and I -- I think that in a way Bolton's

21     wording doesn't really matter because the police

22     department is not going to comply with demands made

23     by people in City Hall.

1        Q.   So I'm going to reference former Chief

2    Carnigan's deposition --

3        A.   Okay.

4        Q.   -- that was taken on April 19th, 2024, in

5    the case of Laurie Ortolano vs. The City of Nashua.

6    So looking at the deposition on Page 80.

7             Question:  He did all the speaking,

8    referring to Bolton, as far as you remember, on

9    behalf of the legal department?  Answer:  Correct.

10            Question:  And you did all speaking on

11   behalf of the police department?  Answer:  Correct.

12            Question:  So what did Steve Bolton say?

13   Answer:  Paraphrasing -- paraphrasing the

14   conversation, he was not satisfied with the outcome

15   of the investigation.  He felt that he -- that she

16   should have been placed under arrest immediately.

17   He expressed concern for his staff, meaning the

18   other attorneys and the paralegals in the

19   department, and he had asked me to -- I guess he

20   told me to arrest her, and I told him I would not

21   arrest her [as read].  Question:  Was Attorney

22   Bolton angry?  Answer:  Yes.  Did he shout?  He

23   raised his voice [as read].  Did I read that

1    correctly?

2         A.   You did.

3         Q.   Would you consider that dialogue to be a

4    demand that she be arrested?

5         A.   No.

6                   MR. HILLIARD:  Objection to the form.

7         Q.   Does it concern you of the conversation

8    that the former chief was relating in his answer --

9                   MR. HILLIARD:  Objection to form.

10        Q.   -- about Attorney Bolton?

11        A.   Well, first of all, he does not use the

12   word "demand" which your questions have suggested.

13        Q.   Okay.  Well, let me -- let me --

14        A.   It suggests that Bolton told him to arrest

15   her.  I mean, that's probably not the best choice of

16   words, but if that was the actual quote and the

17   chief says he's paraphrasing, so it's not clear from

18   that what words Bolton used and if he said I think

19   you should arrest her, you know, he's got that right

20   to ask for that.

21        Q.   Let me go to Page 83.

22        A.   But they don't have to comply, you know.

23        Q.   Well, they ultimately complied because

```
1     they arrested her on February 18th and charged her
2     with --
3          A.    Not because of what Bolton --
4                    MR. HILLIARD:  Objection to the form.
5          Q.    That's a matter of argument.
6          A.    Yeah.
7          Q.    So on Page 83, the former chief goes on to
8     say, I don't know the specific words, so did I --
9     did I say the immediate -- to answer your question,
10    I don't know.  My belief was this matter was closed,
11    and we were not going to pursue it -- further
12    charges [as read].
13               Question:  So I wrote down that Steve
14    Bolton said he was not satisfied, is that accurate?
15    Yes.  And then he demanded -- I believe you used the
16    word he told you to arrest her immediately?  Answer:
17    That's correct [as read].
18         A.    All right.  And you used two words,
19    "demand" and "told" --
20         Q.    Right.
21         A.    -- and he -- he agreed with generally that
22    statement, so what -- what's the question?
23         Q.    Well, at least in this dialogue, the chief
```

1    is using the word Bolton demanded.

2                    MR. HILLIARD:  Objection to form.

3         A.   Wait.  Wait.  Show it to me again.  I

4    think you used the word "demand."  He didn't --

5         Q.   No.  And then he demand -- Question:  And

6    then he demanded -- I believe you used the word he

7    told you to arrest her immediately?  That's correct

8    [as read].  That was his answer.

9         A.    And I interpret that to mean that he

10   agrees with your statement that Bolton told her,

11   told him to arrest Ms. Ortolano and that might have

12   been Bolton's words but -- and if he -- if he said

13   I'm telling you to arrest her, that's not the best

14   choice of words.

15        Q.   Let me go to Page 84.  Question:  Would

16   you consider that (sic) he said to have been a

17   demand that you arrest her?  Answer:  He was trying

18   to present it as a demand [as read].  Did I read

19   that correctly?

20        A.   You did.

21        Q.   Do you have a concern that your corporate

22   counsel is demanding that the police arrest a

23   citizen for a criminal trespass when -- after the

```
 1    police went to City Hall, interviewed people and

 2    decided no crime was committed?

 3                    MR. HILLIARD:  Object to the form of

 4    the question.

 5        A.   I don't think you're telling -- I don't

 6    think you're giving us all the facts.  Ultimately,

 7    other things happened which resulted in her arrest

 8    as I understand it.

 9        Q.   The situation --

10        A.   It wasn't --

11        Q.   The situation --

12        A.   They based -- they based the arrest, as I

13    understand it, based on stuff that Ms. Ortolano did

14    after this, after -- after the -- after the

15    incident.

16        Q.   The chief is talking about shortly after

17    the incident or a week after the incident.

18        A.   Yes.

19        Q.   This is when -- Bolton communication with

20    the chief, and he demanded that she be arrested and

21    it was before any of the post date that resulted in

22    her arrest.

23        A.   Yeah.
```

1          Q.    Do you have concern based on --

2          A.    I don't --

3          Q.    Excuse me.  Based upon that point of the

4     investigation where the police had determined

5     already that there was no crime committed, that your

6     corporate counsel is demanding of the chief of

7     police that they arrest Laurie?

8                    MR. HILLIARD:  Objection to form of

9     the question.

10                    MR. SHIRLEY:  Objection.

11         A.    I know that the people up there were very

12    upset by the incident and they were concerned about

13    what Ms. Ortolano might do at the time.

14              So they were upset and if Bolton used a

15    poor choice of words, you know, yeah, that's not the

16    greatest, but the police department I -- I don't

17    believe made the arrest based upon what Bolton --

18    the way Bolton phrased the suggestion that

19    Ms. Ortolano should be arrested and ultimately

20    concluded that an arrest was justified and

21    ultimately Ms. Ortolano pled guilty.

22         Q.    Do you think it was appropriate for

23    Attorney Leonard and Attorney Bolton to compare what

```
 1    happened on January 21st to the insurrection at
 2    Capital Hill?
 3        A.   I -- I don't know.  I don't know that they
 4    did that.
 5               COURT REPORTER:  Excuse me.  Someone
 6    is joining and I think it's interfering with the
 7    audio.
 8               (Discussion off the record.)
 9               MR. HILLIARD:  I'm going to continue
10    to participate, but I need to leave to pick up my
11    wife.  She's just had surgery completed, but I'm
12    going to close out my computer laptop and move to my
13    iPhone.
14               MR. SHIRLEY:  Understood.  Russ, good
15    luck.
16               MR. HILLIARD:  Thank you.
17        Q.   Let me give you a hypothetical.  You
18    know -- you have the facts of the incident of
19    January 22nd, 2021, correct?
20        A.   In general.
21        Q.   In general.  Hypothetically, do you think
22    that incident equates with what happened on Capital
23    Hill on January 6th, 2021?
```

1           MR. SHIRLEY:  Objection to the form of

2    the question.

3       A.   I think the insurrection was a more

4    serious challenge to the U.S. Government.  This is

5    not a challenge to the federal capital -- to the

6    decisions as to who was elected president.

7       Q.   Now, we know that Laurie had raised issues

8    about the assessing department.  Were you aware that

9    the State of New Hampshire Department of Revenue had

10   issued citations against Greg Turgiss and John

11   Duhamel?  Are you aware of that?

12      A.   Yes.

13      Q.   And they're still employed -- strike that.

14   Is Greg Turgiss still with the City?

15      A.   No.

16      Q.   And John Duhamel?

17      A.   No.

18      Q.   Is he still with the City?

19      A.   No.

20      Q.   And then Rob Tozier of a firm that the

21   City was using to do appraisals.

22      A.   Yes.

23      Q.   And I guess the -- you're aware of the

1    reason that Department of Revenue Administration

2    sanctioned Mr. Tozier?

3         A.    Vaguely.

4         Q.    Does the City still use the firm that he

5    worked for?

6         A.    No.

7         Q.    When were they -- when -- did the contract

8    end?

9         A.    Yes.

10        Q.    And is the City using another private

11   firm?

12        A.    Yes.

13        Q.    Did that have anything to do with

14   Mr. Tozier's sanction with the Department of Revenue

15   Administration?

16        A.    Probably.  I mean, but I think he was

17   prohibited from pursuing this work anymore.

18        Q.    Right.

19        A.    So it wouldn't have been possible to hire

20   him, but certainly given, you know, I think we would

21   have made the decision to go elsewhere anyway.

22        Q.    Did the City seek to recover the money

23   they paid this firm?

JAMES W. DONCHESS                    108

1      **A.**    No.

2      **Q.**    Laurie also -- strike that.  Were you

3   aware that the City was claiming that Laurie was

4   impersonating an assessor?  Did that come to your

5   attention?

6      **A.**    I don't know.

7      **Q.**    So no one told you that there was a woman

8   who drove by a city street and was taking pictures

9   of a house and the individual called the assessing

10  department and the assessing department said that it

11  wasn't any of the employees and the police were

12  contacted and were told that they believed that

13  Laurie was impersonating a city official?  You don't

14  recall that incident?

15     **A.**    I remember other situations where people

16  stopped and Ms. Ortolano was impersonating people,

17  but I don't specifically remember that.

18     **Q.**    The police wasted their time with the

19  investigation and determined that the woman that was

20  driving by was a blond and drove a white car and

21  that ruled out Laurie.

22     **A.**    Okay.

23     **Q.**    So do you think it was appropriate for the

1    City to get the police involved as opposed to maybe

2    doing their own investigation?

3                   MR. SHIRLEY:  Object to the form of

4    the question.

5         A.    It is -- it is illegal for someone to

6    impersonate a City employee.

7         Q.    Of course it is, but --

8         A.    So if someone thinks that might have

9    happened, the contact to the police is not -- is

10   kind of routine.

11        Q.    But according to the -- the facts of the

12   case, there is no representation made by this person

13   that was driving by that she was a City employee?

14        A.    I don't know.

15        Q.    The second incident involving Mr. Feoli,

16   are you aware of that?

17        A.    Yes.

18        Q.    His company does scanning for the City

19   and, again, a person called and I believe Laurie

20   identified herself as a citizen and sent him some

21   e-mails and she was asking questions about a

22   project, when it was going to be complete presumably

23   for the right-to-know stuff, and the individual, I

1    think his name was Bergeron -- or Feoli.  Sorry.

2            And so the City was thinking that Laurie

3    was impersonating herself as a City employee and

4    they contacted the police again on Laurie, and the

5    police investigated it and they interviewed

6    Mr. Feoli and they asked did she ever say she was an

7    employee of the City?  And he said no.  That was the

8    end of the investigation.

9            Wouldn't it have been easy for the City

10   employee to ask Mr. Feoli if she identified herself

11   as a City employee rather than getting the police

12   involved in a criminal investigation and having

13   Laurie investigated by the police?

14                   MR. SHIRLEY:  Object to the form of

15   the question.

16                   MS. FEENEY:  I also object to the form

17   of the question.

18        A.   I don't think that's what happened.

19        Q.   You're aware that Laurie questioned

20   whether Greg Turgiss was working for the City during

21   his -- his working hours?

22        A.   Yes.

23        Q.   And she hired an investigator?

1        A.    Correct.

2        Q.    And the private investigator determined

3   that Mr. Turgiss was not working.  When he said he

4   was working, he was sleeping by a hotel and he was

5   smoking and he was reading and working on his

6   computer.  Are you aware of that?

7        A.    I think you've mischaracterized it.

8        Q.    In what way?

9        A.    The investigator found that around the

10  lunchtime Ms. -- Mr. Turgiss was in his car and

11  sleeping.

12       Q.    So you think that the time that he was

13  observed was during his lunchtime, but let me back

14  up.  How long do employees get for lunch?

15       A.    With someone like that there's no --

16  there's no particular, you know, you've got to take

17  lunch at 12:00 and stop at 1:00 or anything like

18  that.

19            So this is a -- this is an employee who

20  has a lot of discretion regarding time; an employee

21  who -- you know, an employee who the records

22  indicated often came to work early before the

23  starting time of 8 o'clock.  And so if an employee

```
 1    took more than an hour at lunch but worked extra
 2    some other time, it's very hard, I mean, really to
 3    try to discipline the employee because of that.
 4         Q.   Well, were you involved in the
 5    investigation for this particular incident?
 6         A.   I thought it was -- it was the -- it was
 7    the private investigator.
 8         Q.   No.  No.  I'm not talking about that.
 9    Once it became known to the City, was there any
10    investigation of Mr. Turgiss?
11         A.   Yeah, I mean, we looked into the
12    circumstances.
13         Q.   And was he interviewed?
14         A.   Probably.
15         Q.   And --
16         A.   I did not interview him.
17         Q.   Right.  So you felt that he basically was
18    a good employee and, you know, he may have taken a
19    little bit long for lunch but it was okay.  Is that
20    a fair characterization?
21                   MR. SHIRLEY:  Object to the form of
22    the question.
23         A.   An incomplete.  Keep in mind also that
```

1       this is a union position.  You've got to be able to

2       prove cause.  You've got to prove.  You've got to

3       prove good cause to discipline an employee if

4       there's an appeal with an arbitrator, so you need

5       strong evidence.

6               And certainly this was gray.  He did work

7       extra hours.  There was no question about that

8       because, you know, he would clock in before the

9       8 o'clock start time and so we didn't -- so it

10      didn't seem -- it seemed like he was providing a

11      reasonable number of hours for the City and under

12      those circumstances, the fact that he had taken

13      extra time at lunch wouldn't justify any kind of

14      discipline.

15          Q.   Were you aware that his field notes were

16      false?

17          A.   You'd have to tell me how.  You know, show

18      me the field notes.

19          Q.   I don't have them with me right now but

20      claiming he was doing his assessing work out in the

21      field when, in fact, he was sleeping at the hotel.

22          A.   But he had been out in the field, hadn't

23      he?

1          Q.    He was at the hotel for two -- two hours

2     at least on one occasion.

3          A.    Didn't he do fieldwork before and after

4     that?

5          Q.    I don't know.

6          A.    Well, that's relevant.

7          Q.    Were you aware that the same person had

8     been sanctioned for viewing pornography on the

9     City's computers?

10         A.    Yes.  In -- you know, some years before.

11         Q.    Does it really matter how long ago it was?

12    The fact is he's working on city time viewing

13    pornography.

14         A.    It does matter because we could never win

15    a discipline case against someone that did something

16    ten years earlier.  We can't come back ten years

17    after the fact and discipline them.

18              The matter was dealt with by, what?  The

19    Streeter Administration, so we're talking about ten

20    or more years.  There's no way we could win a case

21    where we disciplined something for ten years early.

22    And -- and the City didn't -- you know, took

23    whatever action they took.  They -- they wrote him

1    up or something at the time, but ten years later we

2    can't get away with -- with disciplining an employee

3    for something that they did ten years before.

4         Q.   And I understand that, but what

5    investigation did the City do to either confirm or

6    refute what the private investigator that Laurie

7    hired recorded?  What did the City do to

8    investigate?

9              MR. SHIRLEY:  I need to object to the

10   form of the question and to the extent we're into an

11   attorney/client privileged communication, I just --

12   it needs to be acknowledged that that's not the

13   scope of the question.

14             MR. AIVALIKLES:  We're talking about

15   whether the City conducted an investigation.

16        A.   There was an investigation, but this is

17   years and -- you know, this is, what?  Six, eight

18   years ago.  I don't remember exactly everything that

19   was done.

20        Q.   Who did the investigation?

21        A.   I don't -- I don't really recall.

22        Q.   Was there a report issued?

23        A.   I mean, Broth, Attorney Broth did a report

```
 1    regarding the assessing office in general, and he
 2    may have looked into this as well, but I don't
 3    remember and that is an attorney/client protected
 4    document anyway.  He did issue a report.
 5         Q.   Right.  And did the City pay for that
 6    report?
 7         A.   Yes.
 8         Q.   And the City refuses to disclose that
 9    report to the taxpayers of Nashua, correct?
10         A.   We haven't released it.
11         Q.   Right.  And why haven't you released it?
12         A.   I assume because it's an attorney/client
13    protected document.
14         Q.   You're the mayor.  You can tell whoever
15    prepared it to release it to the public so the
16    citizens of Nashua can see what their -- what their
17    money went for.
18                   MR. SHIRLEY:  Objection.
19                   MR. HILLIARD:  Objection to the form
20    of the question.
21         A.   I don't know.
22         Q.   You don't think you can do that as the
23    mayor?
```

```
1              MR. PIGNATELLI:  Confidential
2    personnel files?  He can do that?  Putting them out
3    into the public?
4              MR. AIVALIKLES:  I'm not talking
5    personnel files.  I'm talking about what their
6    investigation disclosed.
7         A.   It's a personnel matter and, therefore,
8    we're on thin ice in discussing any of this stuff
9    publicly.
10        Q.   Now, I believe that you -- sorry --
11   a statement at the November 27, 2018, aldermanic
12   meeting that -- you were talking about your
13   assessment, and it says -- this is you talking now.
14             We took out a building permit in maybe
15   2007, 2008.  I was neither an alderman nor an office
16   nor mayor in the permit, $100,000.  Of course I
17   never even saw the paperwork at the time because I
18   wasn't that interested in how this would have
19   affected my assessment, and the project took a few
20   years [as read].  But during the time that the
21   permit was open, you were an alderman?
22        A.   No, I wasn't.
23        Q.   Weren't you an alderman in 2011?
```

| | |
|---|---|
| 1 | A.    Yeah, but this is 2007, 2008. |
| 2 | Q.    Right.  Right.  It was closed in 2012. |
| 3 | A.    I don't know. |
| 4 | Q.    Well, -- |
| 5 | A.    I was not aware that there was -- I was |
| 6 | not aware at the time.  It never even occurred to |
| 7 | me.  I didn't -- you know, that there was an open |
| 8 | building permit.  It never even occurred to me. |
| 9 | I didn't have any understanding of how |
| 10 | this would be at all significant.  All I -- you |
| 11 | know, the contractor guy, you know, who does a good |
| 12 | job, but I don't know.  Maybe he doesn't keep |
| 13 | records very well.  He was in charge of the whole |
| 14 | building permit process. |
| 15 | I was not asking -- it never even -- I was |
| 16 | not asking about this and, in fact, I don't know |
| 17 | that I've ever thought about the idea that a |
| 18 | building permit would be open and then later closed. |
| 19 | I'm not -- I'm not sure that I was even aware that |
| 20 | that was something that happened. |
| 21 | Q.    But you would agree during the period of |
| 22 | time that the building permit was open you were a |
| 23 | Nashua alderman if you were an alderman in 2011? |

1        A.    Until 2012, yes, for a period of a few

2    months.

3                 MR. SHIRLEY:  Russ, is it possible you

4    can mute yourself?

5                 MR. HILLIARD:  Yes.  I'm sorry.  I can

6    do that.

7        Q.    Mr. Bolton testified in a deposition on

8    Monday that he had been interviewed by the FBI about

9    your campaign, financing on your campaign.  Are you

10   aware of that?

11       A.    Yeah, I was interviewed by the FBI.  It

12   wasn't about our campaign.

13       Q.    Well, that's what Attorney Bolton said and

14   I was going to ask you.  What -- what did they

15   interview you?  What was the subject matter?

16       A.    They were -- there was something going on

17   at the time.  This was an odd -- you know, an odd

18   interview.  They were interviewing me about

19   whether -- about the appointment of Kim Kleiner to

20   the position of administrative services director and

21   the appointment of Sue Lovering to the

22   appointment -- to the position of city clerk.

23       Q.    That was -- that was their whole focus?

 1          A.    Yeah.  And the agents I don't think even
 2     realized when they got here that I nominate.  I
 3     don't appoint.  These things have to be approved by
 4     the aldermen.
 5               So my impression was that they didn't --
 6     weren't even aware of that and when they became
 7     aware of it, you know, what is there?
 8               How -- how is the appointment of Sue
 9     Lovering who worked for the City for 30 years as a
10     city clerk, how is that -- anything wrong with that.
11          Q.    I don't know.  Did they have an
12     appointment to talk to you?
13          A.    Yeah.
14          Q.    Oh, that's good.  So Kim Kleiner was your
15     chief of staff for a period of time, correct?
16          A.    Correct.
17          Q.    And then you appointed her to a position.
18     What was the title of her position?
19          A.    Administrative services director.
20          Q.    And she was overseeing as part of her
21     duties the assessment department, correct?
22          A.    Correct.
23          Q.    And what qualifications did she have to

1    oversee the assessment department?

2         A.   Well, the position of administrative

3    services director supervises, you know, a whole

4    bunch of departments and she had a lot of expertise

5    regarding many of the functions that she was

6    supervising.

7              Now, she'd never been an assessor, I'm

8    sure, and wasn't a certified assessor but neither

9    had anyone else that had held that job.

10        Q.   Yeah, but at the time wasn't there a chief

11   assessor before she was appointed that left the City

12   or was no longer there?

13        A.   Correct.

14        Q.   So in essence she was the chief?

15        A.   No, she wasn't.

16        Q.   Who was?

17        A.   We didn't -- we didn't have that position.

18        Q.   Okay.

19        A.   I mean, what was required was that there

20   be a supervisor to -- and we had that, a certified

21   supervisor.

22        Q.   Were you aware that Ms. Kleiner changed

23   procedures in the assessing office so that if anyone

JAMES W. DONCHESS                                   122

```
 1    was requesting more than one file, they were going
 2    to get back to them in five days as opposed to
 3    immediately making them available?
 4         A.   I'm not sure.
 5         Q.   It doesn't ring a bell with you?
 6         A.   I don't know.  This was -- this was some
 7    years ago.
 8         Q.   Are you aware that that violated the City
 9    ordinances that City records are to be made
10    immediately available to the public?
11                   MS. FEENEY:  Objection to the form.
12                   MR. SHIRLEY:  Objection.
13         Q.   And the delay of five days was contrary to
14    that ordinance?
15                   MR. SHIRLEY:  Object to the form of
16    the question.
17         A.   Well, the governing laws, the state
18    right-to-know law which overrides anything the City
19    has to say, so the -- you know, the City's objective
20    is to comply with the state right-to-know law.
21         Q.   And doesn't our RSA -- I'm sorry.
22         A.   Go ahead.  Sorry.
23         Q.   No.  Please finish up.
```

1        A.    I did.

2        Q.    Doesn't RSA 91-A Roman numeral IV (a)

3    state each public body or agency shall upon request

4    for any governmental record reasonably describe,

5    make available for inspection and copying any

6    such governmental record within its files when

7    such records are immediately available for such

8    [as read].  Now, the records at the Assessor's

9    Office are available for public inspection, are they

10   not?

11       A.    Not necessarily.  I mean, they've got to

12   go look for these documents.

13       Q.    Right.  They have to look for them.

14       A.    Yes.

15       Q.    And if --

16       A.    What if that takes an hour?  What if it

17   takes 15 minutes?  I mean, this is -- this is the

18   subject of right-to-know litigation and I defer to

19   the courts regarding what the City's required to do,

20   and --

21       Q.    Not to be critical of assessing

22   department, but is the assessing department so

23   disorganized that it would take that long to come up

```
 1    with five files?
 2         A.    It could take a while.
 3         Q.    And do you think --
 4         A.    What if the requests were, you know, over
 5    a hundred?
 6         Q.    But we're not talking about a hundred.
 7         A.    Well, I'm not so sure of that.
 8         Q.    We're talking -- according to the
 9    directive of Tim Kleiner, if you request two files,
10    just two or more, let's say two, that you'll get
11    those in five days.  We'll let you know when we have
12    them.  Does that -- does that satisfy New Hampshire
13    law if the law says immediately?
14         A.    I don't know.  That's up to the Courts,
15    and --
16         Q.    Well, does that concern you that the
17    assessing department was taking that position in
18    addressing a citizen's request for some tax
19    assessing records?
20         A.    I don't know.  You'd have to talk to
21    Ms. Kleiner about that.
22         Q.    You're the mayor.
23         A.    I don't get involved in those things.
```

1      Q.   I understand that.

2      A.   I don't know how long it takes to get a

3    record.  I have no idea.  So really you have to ask

4    someone else.

5      Q.   But as Harry Truman says, the buck stops

6    here.  The buck stops with you, Mr. Mayor.

7                MR. SHIRLEY:  Objection.

8      Q.   And I'm asking you if you think it's

9    appropriate that a citizen has to wait five days to

10   look at two property files at the Assessor's Office?

11               MR. SHIRLEY:  Objection to the form of

12   the question.

13     A.   It depends on the circumstances.

14               (Pause.)

15     Q.   So you don't, in your opinion, feel that

16   that kind of procedure of having to wait five days

17   in any way restricted a citizen's right to obtain

18   city records immediately?

19     A.   I don't know.  I mean, that's up to a

20   judge, and there's been so much litigation over

21   this, I assume the judge has been asked to look at

22   that if there's a problem, there's an alleged

23   problem with it.

1        Q.   Do you recall, and maybe this is where

2    Attorney Broth was brought in, that there was a

3    complaint or there was information brought into the

4    police that were investigating the Turgiss matter

5    that Kim Kleiner suggested in the meeting of the

6    assessing department that basically gave an antidote

7    of where she worked before where this person

8    basically told her supervisors what another employee

9    did and the employee that made the statement career

10   advancement was impacted.  Do you recall something

11   like that --

12       A.   Yes.

13       Q.   -- being investigated?  Okay.

14            MS. FEENEY:  Let me put a belated

15   objection to form on the record, please, Susan.

16   Thank you.

17       Q.   So that was I believe reported to the

18   police on June 26th, but there was also a meeting

19   between you, Kim Kleiner and I think the police

20   officers that discussed that, correct?

21       A.   There was a meeting.

22       Q.   Right.

23       A.   I don't think the purpose was to discuss

1    the specifics of the allegations.

2         Q.   Well, why were the police at the meeting?

3         A.   They requested the meeting and they came

4    and they said that whenever we conduct an

5    investigation within an organization, it is routine

6    for us to just tell the organization that we're

7    doing that.  Okay.  That's what I recall.

8         Q.   But did you know that Kim Kleiner was the

9    subject of the investigation?

10        A.   Maybe.

11        Q.   Did you think it was appropriate for

12   Kim Kleiner to be there when the police were talking

13   about their investigation in which she was a target?

14        A.   Well, of course I didn't know what the

15   investigation was about before the meeting started.

16   So they asked for a meeting.  I got to the meeting

17   and they told us.  I think if they thought it was

18   inappropriate, they would have raised it as an

19   issue.

20        Q.   Was Mr. Duhamel's position as chief

21   assessor eliminated?

22        A.   Yes.

23        Q.   And that's when Kim Kleiner was overseeing

1     the department, correct?

2         A.    It was before that.

3         Q.    Was it before that?

4         A.    Yes.

5         Q.    Now, the position of director of

6     administrative services, that was a new position,

7     correct?

8         A.    Yes and no in this regard.  It had been

9     a position that was originally created under the

10    Arel Administration in the 1970's I think and had

11    last -- had been in existence when I was mayor the

12    first time and continued until about 2008, '9, '10,

13    something like that, so, you know, 30, 40 years.

14            Mayor Lozeau created a different job and

15    kind of substituted one for another, so during a

16    portion of Mayor Lozeau's Administration there was

17    no such position and that's why I say yes and no

18    because when we recreated the job, it wasn't

19    existing but it had in the past for decades been a

20    position within city government.

21        Q.    And the first person to take that position

22    was Kim Kleiner?

23        A.    Correct.

```
1        Q.   Were you aware that Kim Kleiner
2    implemented a policy prohibiting the clerks from
3    answering any questions of Laurie?
4              MS. FEENEY:  I'll object to your form.
5        A.   I'm not sure that's accurate.
6        Q.   Did she prohibit clerks from talking to
7    any persons that came to the counter looking for
8    property information?
9        A.   No.  I mean, what I got back was what do
10   we do if an employee has been abused by a citizen
11   and that employee doesn't want to deal further in a
12   face-to-face manner with that citizen.  What do we
13   do with that?
14             And my position was, well, if an employee
15   has been abused by a citizen, I mean, we're not
16   going to force them, especially these are, you know,
17   clerk level -- these are lower-level positions.
18             We're not going to force them to deal with
19   someone who treats them in that manner, so that I
20   think is a fair approach towards the situation.
21       Q.   Were you aware of the state's actions and
22   findings against Gary (sic) Turgiss?
23       A.   Yes.
```

1          Q.    And I'll -- I'll read it.   They

2     specifically found your field logs are incomplete

3     and thus for any dates that you were observed by the

4     primary investigator in the parking area, you're

5     lacking a field report showing that you were

6     actually doing something work related [as read].

7               Any uncertainty should be weighed against

8     you.   This behavior constitutes misconduct under

9     ASH 301.36 as dereliction of duty or malfeasance,

10    misfeasance or nonfeasance because during the hours

11    you were in your car napping or relaxing, you should

12    have been performing the assessing duties outlined

13    in AS -- ASB 304.04.   Not doing so and instead

14    misrepresenting to your employer what you were

15    actually doing constitutes dereliction of duty and

16    malfeasance, misfeasance or nonfeasance [as read].

17    Did I read that correctly?

18         A.    What are you reading from?

19         Q.    This is a complaint that was filed in this

20    case, but it's a quote from the findings of the --

21         A.    I've never --

22         Q.    -- State.

23         A.    I've never read that paragraph.

JAMES W. DONCHESS                    131

1          Q.   Okay.  If what I'm reading is correct, do
2     you think that that would be sufficient to overcome
3     any union objection to the dismissal of Mr. Turgiss?
4          A.   Probably not.
5                    MR. SHIRLEY:  Objection to form.
6          A.   And they did discipline him, so probably
7     not because you had to have progressive discipline,
8     so you have to kind of -- you know, to -- you need
9     progressive discipline.
10         Q.   So even if someone is dereliction of their
11    duty with malfeasance and misfeasance, that wouldn't
12    be grounds to terminate them?
13         A.   No.
14         Q.   No?
15         A.   No, not -- not on the first instance.  I
16    mean, you know, it's always kind of guesswork going
17    into an arbitration regarding employee discipline,
18    but typically you've got to have a very good record
19    of progressive discipline over time.
20         Q.   Did you ever see the police report in
21    which Mr. Turgiss was exonerated?
22         A.   I don't think so.
23         Q.   Were you informed of the status of the

```
 1      investigation that the police were conducting
 2      concerning Mr. Turgiss and Kim Kleiner?
 3          A.   I believe I was informed at the end that
 4      they had concluded, you know, no -- they didn't want
 5      to take action.  They didn't think there was
 6      justification for that.
 7          Q.   Were you aware that Mr. Cummings
 8      instructed Kim Kleiner to call the police on
 9      July 21st, 2022, because he was concerned that
10      Laurie was going to show up at City Hall on
11      July 22nd, 2022, based on an aldermanic meeting on
12      July 20th in which you -- I'll repeat it.
13               Were you aware -- strike that.  Do you
14      recall attending an aldermanic meeting on July 20th,
15      2022, in which Laurie told you to shut your piehole?
16                    MS. ORTOLANO:  That was the Finance
17      Committee.
18                    MR. AIVALIKLES:  I'm sorry.  Finance
19      Committee.  Thank you.
20          A.   Yes, that was the Finance Committee.  I do
21      remember that.
22          Q.   And were you aware that on July 21st
23      Mr. Cummings instructed Kleiner to call the police
```

```
 1    because he thought that Laurie was going to be at
 2    City Hall on the 22nd?  Were you aware of that?
 3         A.    I don't know.  I don't recall.
 4         Q.    And I'll represent to you that the police
 5    were at City Hall on the 22nd for about an hour
 6    waiting for Laurie to come in.  Do you think that's
 7    a proper use of police time?
 8         A.    I don't know that they were there waiting
 9    for Laurie to come in.  I -- I don't know.
10         Q.    I'll show you the police report.  You can
11    take a look at it.  See if what I represented to you
12    is correct.
13                   (Reviewing document.)
14         A.    You know, people in City Hall are afraid
15    of Ms. Ortolano.  They are.  Physically.  They don't
16    know what she's going to do.  People don't scream --
17    you know, it's just the reality.  A lot of abuse of
18    employees, screaming during public meetings.
19              You know, they're -- you -- you make light
20    of security issues.  Well, I can tell you that
21    cities across the country are becoming far more
22    concerned about security because of really bad
23    things that have happened.
```

1        So I don't know.  I -- I think that these

2   people are worried about what someone that is that

3   volatile might do.

4        I mean, I've been to, what?  Hundreds of

5   meetings and I've never seen anything like that

6   where a member of the public is screaming at the

7   chair of the meeting to shut their piehole.  I --

8   you know, and other things that have been done, so

9   it's sort of unpredictable.  Now, I don't feel that

10   fear but other people do.

11       Q.   Well, shutting the piehole was directed to

12   you; --

13       A.   Yes, but --

14       Q.   -- not to Mr. Cummings or to Kim Kleiner.

15       A.   But a lot of the other obscenities and

16   conduct has been conducted -- has been directed at

17   other people.

18       Q.   And do you think that's a good use of the

19   police time to wait at City Hall for about an hour

20   for Laurie to show up?  You can take a look at it.

21       A.   I don't know.  That's up to the police to

22   decide.  I mean, they don't have to comply with

23   requests like this.  They don't have -- you know,

1    they don't work for us.

2         Q.   I'm asking --

3         A.   They can do what they want.

4         Q.   I'm asking your personal opinion.  Do you

5    feel that that's a good use of police time, they're

6    busy enough, to have to go and wait at City Hall

7    because someone at City Hall felt threatened because

8    Laurie used the word shut your piehole?

9         A.   I think it's much broader than that.  I

10   think it's much broader than that, the concern about

11   the conduct.

12        Q.   Now, were you aware that there was an

13   incident on I believe July 22nd, '22, at City Hall

14   around noontime where Mrs. Ortolano went to the

15   legal department office and was in the hallway?

16   Were you aware of that incident?

17        A.   I'm not aware of specifically the date,

18   but, yes, I'm aware that there was a meeting or a

19   confrontation, I don't know what you want to call

20   it, between Ms. Ortolano and Mr. Bolton in the

21   hallway.

22        Q.   And that hallway that leads to the legal

23   department and the ATV, whatever it is.

1              MS. ORTOLANO:  AV -- AV studio.

2        Q.   AV studio.  That's a public hallway, isn't

3    it?

4        A.   Correct.

5        Q.   So the public has a right to be there?

6        A.   Correct.

7        Q.   Are you aware that there was a roping that

8    now prohibits the public from going into that

9    hallway that I'll call the Laurie [inaudible]?  Are

10   you aware of that?

11             MR. HILLIARD:  Objection to the form.

12             COURT REPORTER:  Can you repeat that

13   question?

14       Q.   Do you think it's appropriate to put up a

15   roping barrier preventing people from -- citizens of

16   Nashua from accessing a public space?

17       A.   It's a hallway that's, what?  20-feet long

18   and leads basically to the legal office only, so I

19   can just tell you that Nashua City Hall is

20   relatively open.  I mean, I go to Portland, Maine.

21   They don't even let you in the building.  I mean,

22   these cities are concerned about security issues,

23   and I can give you some examples if you want of

1    serious situations that have occurred, so closing

2    off a hallway that leads to one office I don't think

3    is a big -- a big issue.

4         Q.   Well, I can tell you I was in City Hall

5    very recently and it seemed like every single door

6    was locked and really restricting public access, but

7    that's not for this deposition.

8              So the incident that happened on July 22,

9    2022, involved Laurie going into the public hall

10   leading to the legal department and Steve Bolton

11   happened to be coming out the door and he saw Laurie

12   and Steve Bolton told the police that she should not

13   be within City Hall, do you think that was

14   appropriate?

15              MR. HILLIARD:  Objection to the form.

16   Are you hearing my objections, Susan?

17        A.   I'm reading the police report.

18              MR. SHIRLEY:  Yes, we are, Russ.

19              MR. HILLIARD:  Thank you.

20        A.   Show me where you're...

21              (Reviewing document.)

22        A.   Well, at that point Ms. Ortolano had a

23   right to be at City Hall.  Let's put it that way.

1      Q.   He told the police that he had just had a

2   incident with Laurie Ortolano and that she -- wrong

3   place.  Sorry.  Attorney Steve Bolton stated that

4   she should not be within City Hall [as read].  Did I

5   read that correctly in the police report?

6      A.   Let me look at it.

7               (Reviewing document.)

8      A.   I mean, I think what he's referring to is

9   this incident where if someone blocks, you know,

10   someone else's ability to leave the hallway, I mean,

11   that could be a problem.  It is a problem, so

12   there's a disagreement about what happened.  I mean

13   obviously.

14      Q.   Well, do you -- do you trust that the

15   police would be objective in drawing their own

16   conclusions as opposed to --

17               MR. HILLIARD:  Objection.

18      Q.   -- he said/she said?

19      A.   I think in a he said/she said situation

20   you can't possibly bring a criminal complaint

21   because you just -- you can't prove it, --

22      Q.   According to the police, --

23      A.   -- you know, to -- to a criminal standard.

JAMES W. DONCHESS                                          139

1          Q.   According to the police, Laurie did not

2     interfere with his right to leave.  According to the

3     police.

4          A.   How do they know?  They weren't there.

5          Q.   Well, there was --

6          A.   The only two people were present.

7          Q.   I understand that, but they measured the

8     hallway and they did an investigation and they

9     concluded that she was not blocking his -- his --

10         A.   I would have to measure it myself.

11              MR. HILLIARD:  I'm going to object to

12    the form of the question, if there's a question

13    pending.

14         A.   I think that were there physical contact

15    between these two individuals, if someone had to

16    bump someone else to get by, that could be a legal

17    problem, so -- given the history.  So -- so, you

18    know, you -- you have to talk to those two

19    individuals as to what happened.

20         Q.   But that didn't happen.  There was no

21    contact.  I think Attorney Bolton acknowledged that.

22         A.   Yes, but to avoid it -- but to -- what --

23    what's -- what's the situation if to get by you need

```
 1     to make physical contact?  That hallway is narrow,
 2     so if someone were standing in the middle and
 3     were --
 4         Q.   I don't know if she was standing in the
 5     middle or up against the wall.
 6         A.   No, I don't --
 7         Q.   Okay.
 8         A.   -- and neither do you, and I'm saying that
 9     the only people who really can describe it are
10     Bolton and Ortolano.
11         Q.   Or the police --
12         A.   But they weren't there either.
13         Q.   -- had to do an investigation, interviewed
14     people and draw their own conclusions, but...
15                   COURT REPORTER:  Excuse me.  Can I
16     request a break?
17                   (Discussion off the record.)
18                   (A break was taken from
19                    12:07 a.m. to 12:14 p.m.)
20         Q.   While waiting for Officer Earnshaw and
21     Abrams, I -- I was approached by a male who asked me
22     if I was looking for him.  I told him I was not and
23     then asked him why I might be looking for him.  At
```

1    this time he identified himself as Attorney Steven

2    Bolton.  The City attorney, Bolton, stated that

3    he just had an incident with Laurie Ortolano in

4    that she had trespassed and wanted her arrested

5    [as read].  Did I read that correctly?

6        A.    Yes.

7        Q.    Do you think it was appropriate for the

8    City counsel to ask the police to arrest her based

9    upon the fact that she was standing in a public

10   hallway?

11                MR. HILLIARD:  Objection to the form.

12       A.    I believe it depends on the circumstances.

13   If -- if Ms. Ortolano was -- was blocking Mr. Bolton

14   from getting out of his office following a previous

15   trespassing conviction, you know, it's appropriate

16   to suggest, I believe, to the police department

17   that, again, she be charged with trespassing.

18                On the other hand, if she did not block

19   him, then I don't think it is appropriate, so it

20   depends on what happened.

21       Q.    But she was in a public place and there's

22   no information that she did anything improper,

23   correct?  I mean, according to the police report.

1          A.    But they weren't there, so it all depends

2     on whether -- as I -- as I understand the situation,

3     it all depends on whether she was blocking him or

4     not.

5               And that as you've pointed out, it is a

6     he said/she said situation that none of us really

7     can resolve that as a matter of fact.  I don't think

8     there are any witnesses to this.

9          Q.    The police examined the video of the area

10    and the police indicate when I viewed the video, I

11    observed Laurie walking up the stairs at

12    approximately 11:49.  She had went to the IT

13    department and stood outside their door [as read].

14              At approximately 11:50 hours, Laurie

15    walked out of the camera's view and I believe back

16    downstairs.  At the end of the -- I'm sorry.

17    At approximately 11:58 hours, I observed Laurie

18    return from the third floor using the same stairs.

19              She then walked to the end of the hallway

20    at the auditorium and turned left towards the legal

21    department.  There were no cameras in the hallway.

22    Laurie remained in the hallway until 12:00 when I

23    was able to see her on the phone in front of the

1      auditorium.  She stayed on the phone and paced the

2      hallway until approximately 12:06 hours when I saw

3      her remove the phone from her ear and walk out of

4      the camera's view again to where I believe is

5      downstairs.  This video was tagged at -- as evidence

6      [as read].

7              Based on my observations, it appears

8      Laurie was within the hallway at the legal

9      department for approximately two minutes [as read].

10     Did I read that correctly?

11         A.   Yes, you did.

12         Q.   Going back to the police report with the

13     encounter with Bolton, he goes on to ask, talked

14     with Bolton for a very short time attempting to get

15     a synopsis of what had occurred [as read].

16              Bolton stated that Ortolano was

17     trespassing from his portion of City Hall and that

18     she had blocked his ability to egress from his

19     office.  Bolton started to become extremely upset

20     when I did not immediately move to respond outside

21     to arrest Ortolano [as read].  So do you think that

22     was appropriate for --

23                   MR. HILLIARD:  Objection to form.

1          Q.    -- Attorney Bolton again demanding that

2     the police immediately arrest Laurie?

3                     MR. SHIRLEY:  Object to the form of

4     the question.

5                     MR. HILLIARD:  Objection to the form.

6          A.    It doesn't say that he demanded that she

7     immediately be arrested, but it depends on the

8     circumstances.

9                If there was a history, Ms. Ortolano had

10    pled guilty and convicted of trespass within the

11    legal office.  This is a hallway that leads

12    basically to the legal office.  I mean, that's it.

13    There is this other thing there, but no one really

14    goes to that during the daytime.

15               And so if she blocked him, you know, it's

16    reasonable for him to request or ask or whatever it

17    is that she be held accountable for that.

18               On the other hand, if she did not block

19    him, then of course the suggestion that she be

20    arrested for just being there is inappropriate, so

21    it depends what happened.  And what you've already

22    read to me says that there's no camera in that

23    hallway so there's no way we can know what actually

1    happened.

2         Q.   Do you think it's appropriate, though, for

3    city counsel to become extremely upset when I, the

4    police officer, did not immediately move to respond

5    outside to arrest Laurie Ortolano [as read]?

6              Do you think that's appropriate for him to

7    get angry at the police officer because they didn't

8    go outside to arrest her?  I mean, that's what it

9    says.

10                   MR. HILLIARD:  Objection to the form.

11                   MR. SHIRLEY:  Objection to the form.

12                   COURT REPORTER:  I didn't get the

13   answer.

14                   MR. PIGNATELLI:  "I don't think that's

15   what it says."

16        A.   My answer was yes.  I don't think that's

17   what it says.

18        Q.   Okay.  The police officer goes on to say

19   I was able to explain the need for a criminal

20   investigation which is standard procedure to bring

21   forward criminal charges [as read].  Did I read that

22   correctly.

23        A.   Yes.

1          Q.   At this time Officers Earnshaw and Abrams

2     had arrived, and I requested Bolton show us the area

3     in which the offense occurred.  Bolton led us to the

4     main staircase to the third floor [as read].

5               Once on the third floor we took a right

6     turn and then a left turn down the small corridor.

7     At that time Bolton stopped in front of the closed

8     and locked door marked legal department, by

9     appointment only and the phone number [as read].

10               And the police say it should be noted that

11     while traveling to this office door, there are no

12     closed doors, keypads or reception desk preventing a

13     member of the public from entering [as read].  Did I

14     read that correctly?

15          A.   Yes.

16          Q.   Additionally, next to the sign with the

17     phone number for the legal department there's a

18     videocamera and doorbell which is presume --

19     presumable for a member of the public to ring to

20     speak with someone within the legal department.

21     There were several such call boxes within City Hall

22     as -- all used for the same purpose [as read].  Is

23     that correct?

1         A.    Yes.

2         Q.    Okay.

3         A.    You read it correctly, yes.

4         Q.    Well, is that correct that there's a bell

5    there --

6         A.    Yeah, I think --

7         Q.    -- for the public?

8         A.    Yeah.

9         Q.    Then he goes on to say at this time I

10   informed Bolton that we would -- we would be audio

11   and visually recording his explanation of the

12   incident.  Bolton nodded his assent and I began

13   recording [as read].

14              At this time Bolton stated Ortolano had

15   been standing where I was standing while speaking

16   with him [as read].  So the police officer knew the

17   location where Bolton was.

18              The location was -- the location was

19   approximately 4 feet from the front of the legal

20   department door.  Bolton stated he asked Ortolano to

21   leave so he could leave at which time Ortolano

22   refused to move [as read].  I then asked Bolton if

23   Ortolano was attempting to access the blocked door

1    or attempting to enter the office and he confirmed

2    that she was not but that she was calling to gain

3    access

4    [as read].  Nothing wrong with her calling to gain

5    access, is there?  Using the -- the bell that's for

6    public?

7         A.   I suppose not, no.

8                   MR. SHIRLEY:  Object to the form of

9    the question.

10        Q.   Bolton stated that Ortolano had been

11   told that she was to make contact only through

12   mail or written communication based on past events

13   [as read].

14             I then asked Bolton if Ortolano was served

15   any sort of legal process which prevented her from

16   calling the office.  Bolton stated no.  I'm in

17   charge.  I can direct her to leave [as read].  Do

18   you think that was an appropriate response to a

19   police officer?

20                   MR. HILLIARD:  Objection to the form.

21        A.   Leave what?  You know, --

22        Q.   It's Bolton's words.

23        A.   What's he talking about?  I mean, we

```
 1    already had a situation where Ms. Ortolano entered
 2    the legal office, was arrested and convicted, pled
 3    guilty of trespassing, so maybe he's talking
 4    about -- I don't know what he's talking about.  You
 5    have to get this from him.
 6         Q.    Okay.
 7         A.    As I've said, it depends on what happened
 8    in the hallway.
 9         Q.    It appears they are 4 feet apart.  She was
10    4 feet from the door according to the --
11         A.    But that doesn't mean she wasn't
12    blocking --
13                   MR. HILLIARD:  Objection to the form.
14         A.    It doesn't mean she wasn't blocking
15    Bolton.  Maybe she was.  I -- you know, again, it
16    depends on what happened in the hallway.
17         Q.    He goes on to say and then -- I then
18    informed Bolton we would conduct an investigation
19    and attempt to confirm that the hallway in question
20    was public.  Bolton stated he disputed this and
21    stated there was no public area accessible by the
22    hallway and that Ortolano had been told she could
23    not call Bolton [as read].  But you've told me that
```

```
 1      that's a public hallway?
 2                  MR. SHIRLEY:  Object to the form of
 3      the question.
 4           A.   Yes.  It's --
 5                  MR. HILLIARD:  Objection to form.
 6           A.   -- called a semipublic hallway, but I --
 7      I -- you know, I've been there.  I'm not frequently
 8      in the hallway, but if someone stood in the middle
 9      of the hallway and kind of wanted to block someone
10      else's way, it's narrow enough so that that could
11      happen.
12           Q.   But you don't know if that was the
13      situation.
14           A.   I don't.
15           Q.   According to the police, based on their
16      investigation it was not the situation.
17           A.   How can they know?  You know, Bolton --
18      I -- I infer from this Bolton is saying that
19      Ms. Ortolano was blocking him.  Ms. Ortolano says
20      she wasn't.  I think -- I also infer that Bolton
21      would be concerned about brushing against or
22      touching Ms. Ortolano because of the history between
23      them that there could be complaints related to that
```

```
 1    and so we don't know what happened.
 2         Q.   Bolton also confirmed that she had not
 3    been served any sort of legal process detailing her
 4    prohibition from calling [as read].
 5         A.   Right.  But that doesn't mean she could
 6    block him from getting out of the -- getting out of
 7    the office.
 8         Q.   I haven't even asked the question yet,
 9    Mr. Mayor.  You seem to be very defensive of -- of
10    Steve Bolton and his conduct.
11                   MR. SHIRLEY:  Objection to this --
12         A.   I'm not defensive at all.  I mean, I've --
13    I think we've gone over this and over this and over
14    this.  It depends what happened.
15         Q.   I then asked Bolton why there was a video
16    doorbell if the public was not supposed to be down
17    the hallway.  At this time Bolton stated for people
18    other than her [as read].  Do you think that was
19    appropriate?
20                   MR. HILLIARD:  Objection to the form.
21         Q.   "for people other than her."
22                   MR. SHIRLEY:  Objection to the form.
23                   MR. HILLIARD:  Objection to the form.
```

JAMES W. DONCHESS                    152

1          A.   I do -- I do know this.  I -- there is a

2     lot of litigation between the City and Ms. Ortolano.

3     There have been a lot of allegations that

4     Ms. Ortolano makes, untrue statements regarding, you

5     know, interactions with City employees.

6               Bolton is apparently making the decision

7     that it is too risky to meet with Ms. Ortolano for

8     fear that there could be what he considers to be a

9     misrepresentation about the meeting.

10              And there's litigation, which I understand

11    a lawyer doesn't want to meet with someone who's got

12    a lot of lawsuits against the City for -- the

13    standard advice is don't talk to someone that's

14    suing you, so he's following through on that.

15              And so he doesn't care to talk to

16    Ms. Ortolano personally for all those reasons and

17    what happened in the hallway is a separate issue.

18         Q.   He goes on to state I -- I tried to reason

19    with Bolton and explain that we can't prevent a

20    single member of the public from an area of a public

21    building in which she has not been trespassed to

22    which he responded I can do that [as read].  Can

23    Bolton do that?

1    A.    Do what?

2              MR. HILLIARD:   Objection to the form.

3    Q.    Prevent a person from going into a public

4    area.

5              MR. HILLIARD:   Objection to form.

6    A.    I don't think so.  He can complain that

7    his access to it from his office is blocked.

8    Q.    That's not -- that's not what -- what was

9    stated.  The police explained to Bolton that we,

10   "we," the police, can't prevent a single member of

11   the public from an area of the public building in

12   which she has not been trespassed in which he

13   responded I can do that [as read].  So he can do

14   what the police said they couldn't do?

15   A.    Well, he -- I think he's saying there --

16             MR. HILLIARD:   Objection to the form.

17   A.    He -- he may have been suggesting that he

18   could trespass Ms. Ortolano and to that, I don't

19   know.  There had been a history and they were

20   concerned about further similar incidents.  I mean,

21   I'm sure that's the case.

22   Q.    As a lawyer I can appreciate your skills

23   here.  Officer Earnshaw then attempted to positively

```
 1     identify Bolton with his name and date of birth.
 2     However, Bolton refused to provide anything except
 3     his business card.  At this time we ended our
 4     contact with Bolton [as read].
 5          Do you think it was appropriate for -- for
 6     him to refuse to comply with the police officer's
 7     request for identity?  I mean, these people work
 8     hard enough.
 9          A.   I don't know.  I don't.
10               MR. HILLIARD:  Objection.
11               MR. SHIRLEY:  We had agreed to a
12     12:00 p.m. stop.  We've extended it to 12:30 on the
13     representation that we would be done by then.  It's
14     now 12:32.  I do have other commitments today.
15               MR. AIVALIKLES:  Well, I understand
16     that, but there was a number of problems.  One is
17     that the Zoom has been a problem.  Two, the mayor is
18     very longwinded and that's taken up a lot of time.
19               And I know he wants to get his
20     position on the record and that's fine.  I mean, I
21     appreciate that, but, I mean, these are all part of
22     problems that I have no control over.
23               MR. SHIRLEY:  I don't agree with that,
```

```
 1     Bill.
 2                    MR. AIVALIKLES:  Well, that's fine.
 3     You don't have to.
 4                    MR. SHIRLEY:  Yeah, so I don't -- I
 5     object to extending, you know, just on your own
 6     merit.  You're unilaterally extending this
 7     deposition beyond anybody else's agreement when, you
 8     know, you set this up as a Zoom.  Your -- your team
 9     set this up as a Zoom deposition and at the very
10     last minute you changed to an in-person deposition
11     where everyone else is attending by Zoom.
12                    I give great credit to your steno,
13     Susan, trying to keep up with this situation, but it
14     is a really, really hard challenge for her and for
15     everyone else as part of this deposition.  How much
16     more questions do you have?  Like, how many more are
17     we talking about?
18                    MR. AIVALIKLES:  I can get through it
19     quickly if we have short answers and no video
20     problems.
21                    MR. SHIRLEY:  Ten questions?  Are you
22     talking about ten questions?
23                    MR. AIVALIKLES:  No.  I have more
```

1    questions.

2                   MR. SHIRLEY:  You don't know?

3                   MR. AIVALIKLES:  It could be 20 more

4    minutes; it could be less.  I don't know.

5                   MR. SHIRLEY:  Should we take a break,

6    Mike?  You want to talk for a minute about this?

7                   (Discussion off the record.)

8        Q.   Are you aware of Section 71 of the Nashua

9    city charter dealing with assessment records?

10       A.   I can't say I've ever read it.

11       Q.   Okay.  Do you recall getting a letter from

12   an Attorney Robert Fojo dated May 8th, 2008?

13                  (Reviewing document.)

14       A.   Not really.  I mean, this goes back five

15   years.

16       Q.   Okay.  But it's addressed to you.  Do you

17   have any reason to believe that you didn't get it?

18   Or we can go through some of the contents of it.

19   Maybe it would refresh your memory.

20       A.   I have no reason to believe I didn't get

21   it.  I'm not sure I read it at the time.  I might

22   have, but I might not have.

23       Q.   It's about the cost of -- the City's cost

JAMES W. DONCHESS                                   157

```
 1    dealing with right-to-know cases, correct?  I -- I
 2    think there's an aldermanic meeting on June 21st,
 3    2022, which you indicated that you've had at least
 4    four employees who spent half the time responding to
 5    right-to-know requests from one or two individuals,
 6    so the City taxpayers are spending when we calculate
 7    that to be about 250,000 a year [as read].  Do you
 8    remember making that statement?  You can take a
 9    look.
10                (Reviewing document.)
11         A.    Yes.  I don't remember the date, but I --
12    I recall making a statement like that.
13         Q.    The one or two individuals that you
14    referenced in that public session, was one of those
15    individuals Laurie?
16         A.    Yes.
17         Q.    Who was the other individual?
18         A.    There's someone that Laurie Ortolano often
19    works with, Laura Colquhoun, who, you know, has
20    provided nothing close to what Ms. Ortolano has
21    done, but, you know, they seem to be working
22    together on this in many instances.
23         Q.    When you came up with the 250,000, were
```

1     you talking about man-hours or actual legal fees

2     paid or what does this 250,000 represent?

3         A.   You know, an estimate of if we've got four

4     employees, this is what that staff time would

5     actually cost.

6         Q.   And you would agree that, for example, the

7     court case involving the 2023 order that had -- I

8     think it was Mr. --

9                 MS. ORTOLANO:  Cummings.

10        Q.   -- Cummings just stated when he got the

11    request there are no records, that would have saved

12    a lot of man-hours?

13        A.   I don't really agree that that -- I

14    don't -- I don't understand that it happened the way

15    you described it.

16        Q.   There was also an article in the Nashua

17    Telegraph on September 25th, 2019, about the cost

18    that the City is facing I believe with the

19    right-to-know.  Do you recall being interviewed with

20    the Nashua Telegraph?

21        A.   I recall the article.  I don't

22    specifically remember talking to a reporter, but...

23        Q.   You stated --

1          A.    I'm not claiming that I was misquoted.

2          Q.    As the City gears up to complete a full

3     measure for the first time since 1991, Donchess said

4     many contractors who are well aware of issues of

5     dealing with Ortolano want to charge the City more

6     money to take the job [as read].  What did you mean

7     by that?

8          A.    Just what I said.

9          Q.    Well, explain it.  I -- I don't understand

10    the context.  If you could explain the context, that

11    be would great.

12         A.    The situation in the assessing department

13    in Nashua, you know, became as I understand it --

14    and Ms. Ortolano was known to the assessing

15    community and, you know, we had trouble, various

16    problems because of it.  You know, people didn't

17    want to work in Nashua, things like that.

18              But we were concerned that assessing firms

19    who would also be aware of likely attacks on them

20    would want to build in extra time and trouble into

21    bids to account for the possibility that they also

22    could come under attack.

23         Q.    Well, what firm told you that?

1    A.   No one told us.  We were just -- I'm not

2    sure if anyone told us.  I mean, no one said that to

3    me directly, but it is I think a natural concern for

4    anyone working for the City who's trying to spend,

5    you know, the reasonable -- the minimum, the

6    reasonable minimum to be do any kind --

7        Q.   So no one -- according to you, no one

8    actually told you that; you were just assuming that

9    that may occur?

10       A.   Correct.

11       Q.   Okay.  You go on to state that now we're

12   hearing that the bids for the major project are

13   going to be significantly higher because the

14   assessing firms realize that they're going to have

15   to put up with a lot of this themselves, Donchess

16   said.  It's going to be large and we're not talking

17   hundred thousand.  We're talking a lot more than

18   that [as read].  Does that refresh your memory about

19   the conversation about that?

20       A.   Well, I don't recall, you know, hearing

21   this, but maybe I did.  I mean, that quote -- and

22   this goes back how many years?

23       Q.   This was in 2019.

1      A.   All right.  So we're talking five years

2   ago.  I may have.  I mean, I don't recall someone

3   telling me that directly, but the statement I made

4   there implies that maybe someone did.

5           It was not just me thinking about the

6   problems that could result but that we were hearing

7   from actual potential bidders that this could be the

8   case.

9      Q.   But you don't have knowledge as to who it

10   may have been?

11      A.   No, I don't -- I might have had knowledge

12   then but I don't now.

13      Q.   The City signed that contract with a firm

14   to do the assessing work?

15      A.   Yes.

16      Q.   And what was the amount the contract was

17   for?

18      A.   I don't remember the specific number.

19      Q.   And how many years was that for?

20      A.   I think it took a couple years --

21      Q.   Two years?

22      A.   -- again --

23      Q.   And what was the -- what was the prior

1    firm that did that?

2        A.    I don't know.  There was no prior firm.

3        Q.    Was there --

4        A.    This kind of thing had not been done --

5    and you read it somewhere out loud in a question.

6    This has not been since 1991.

7        Q.    So you don't know if this 1.5 figure had

8    any kind of premium in it based upon their fear of

9    having to deal with this Ms. Ortolano, do you?

10       A.    I suspect it did.

11       Q.    What proof do you have?

12       A.    What you just read me.  My own suggestion

13   that we had been informed that -- from bidders that

14   this is likely to occur.

15       Q.    Okay.  So you said "we had been informed."

16   What bidders informed you?

17       A.    I don't remember, but you just read me a

18   statement from five years ago that I made, and I

19   would not have made that statement without some

20   basis, so I don't remember what motive -- you know,

21   what I was talking about at the time but just

22   reading that, it implies that we got some feedback

23   on the issue.

JAMES W. DONCHESS                    163

1          Q.    So the City hired a firm, correct?

2          A.    Yes.

3          Q.    And they did the assessments?

4          A.    Yes.

5          Q.    Do you have any information that Laurie

6     interfered in any way with that firm performing

7     their assessing duties?

8          A.    She filed complaints against them, but I

9     don't know if that's regarded as interfering.

10         Q.    Well, are you sure she filed complaints

11    against them?  Because Laurie is shaking her head.

12         A.    Well, isn't that how they were

13    disciplining?  It was based upon I believe Ortolano.

14               COURT REPORTER:  I'm sorry.  Excuse

15    me.  I'm not hearing what Ms. Ortolano is saying.

16         A.    What are we talking about?

17         Q.    We're talking about the firm that the City

18    hired that paid $1.5 million.

19         A.    Well, I'm talking about JRT.

20         Q.    What firm did the City hire?

21         A.    JRT.

22         Q.    They did the evaluation?

23         A.    I believe so, yes.  And both of them were

1    complaints.  Maybe they were valid complaints, but

2    there were complaints.

3         Q.   In fact, one of the people that was

4    doing the assessing was sanctioned by the State of

5    New Hampshire and was banned from doing assessments.

6         A.   Right.

7              MR. AIVALIKLES:  Okay.  Okay.  All

8    right.  Why don't we take a break.  Let me talk to

9    Laurie and maybe we can wrap this thing up.

10              (A break was taken from

11               12:44 p.m. to 12:46 p.m.)

12         Q.   Maybe this will refresh your memory, but

13    the firm that took over to do the assessment was

14    Vision.

15         A.   That was -- that was the one that was

16    completed in 2022.  This is one that was done before

17    that.

18         Q.   Okay.  One last area.  I may have asked

19    you this but I don't recall.  Did you have

20    conversations with Kim Kleiner about the policies

21    and procedures that she would be implementing

22    concerning Laurie?

23         A.   Repeat the question.

1      Q.   Did you have any meetings or

2  communications with Kim Kleiner that dealt with how

3  Laurie Ortolano should be handled?

4      A.   We certainly had discussions about the

5  burden that, you know, hundreds and hundreds of

6  right-to-know communications were created and how we

7  could possibly satisfy the requests for tens of

8  thousands of pages of documents and perform duties

9  that people were supposed to, so we certainly had

10  those discussions as to how to grapple with this

11  issue.

12      Q.   And what was decided in terms of how

13  Laurie was going to be handled when she either came

14  to the City Hall or made a request of City Hall?

15      A.   We would comply with the right-to-know

16  request but that, you know, we couldn't necessarily

17  respond immediately.

18      Q.   Well, how about non right-to-know

19  requests?

20      A.   Well, I'm not aware that there were non

21  right-to-know requests.

22      Q.   Well, when Laurie went into the Assessor's

23  Office to look for -- look at a file and she is

1  being told that we can't talk to you.

2      A.   That is a right-to-know request.  Any --

3  any time a document's requested, that's a

4  right-to-know request.

5      Q.   So it's your position that at any time a

6  document is requested, it's a right-to-know request,

7  but the City charter has a civil provision, does it

8  not?

9      A.   It's not my position.  I think it's the

10  position of the Courts and whoever decides these

11  things.  Look, the right-to-know -- you know, the

12  City charter does not override the state law, so we

13  are governed by state law and we try to comply with

14  it.

15              MR. AIVALIKLES:  Nothing further.

16              COURT REPORTER:  Would each of the

17  attorneys please tell me if you are ordering a

18  transcript?

19              MR. AIVALIKLES:  I'm ordering.

20              MR. PIGNATELLI:  I am not.

21              MR. SHIRLEY:  And the City is

22  ordering.

23              MS. FEENEY:  I'm ordering just an

JAMES W. DONCHESS                    167

1        e-tran, please.

2                    MR. SHIRLEY:  I'll take an e-tran.

3                    MR. HILLIARD:  Same with me.

4                    (Whereupon, the deposition concluded

5                     at 12:49 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23