UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Laurie Ortolano

    v.                                      Civil No. 22-cv-326-LM
                                            Opinion No. 2025 DNH 022 P

City of Nashua, et al.

**O R D E R**

Plaintiff Laurie Ortolano brings this suit against the City of Nashua ("Nashua" or "the City"), several Nashua officials and employees, and two private parties. The gist of Ortolano's complaint is that the defendants, individually or collectively, improperly deprived her of various rights in retaliation for her criticism of City acts and officials, for seeking access to public records, and for bringing lawsuits against the City. One of the defendants is Detective Frank Lombardi of the Nashua Police Department ("Nashua PD"). Presently before the court is Detective Lombardi's motion for summary judgment. Doc. no. 84. Ortolano objects. Doc. no. 99. For the following reasons, Detective Lombardi's motion (doc. no. 84) is granted.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment where she "shows that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the lights most favorable to the nonmovant. Kelley v. Corr. Med. Servs. Inc., 707 F.3d 108, 115 (1st Cir. 2013).

## BACKGROUND

The following facts are not in genuine dispute except where otherwise indicated. Ortolano has submitted several hundred written and verbal "Right-to-Know" requests with the City, see RSA ch. 91-A, primarily seeking to obtain documents pertaining to the City's Assessing Department and its policies and processes for assessing property taxes. Ortolano has also filed multiple lawsuits against the City in New Hampshire state court alleging violations of the Right-to-Know law. See, e.g., Ortolano v. City of Nashua, 176 N.H. 175 (2023). In addition, Ortolano is a vocal public critic of the City and many of its departments, officials, and employees. She frequently expresses her criticism in public meetings, on social media, and on her blog.

Ortolano moved to Nashua in late 2013. Shortly after she moved into her home, the City reassessed her property value, which increased her property tax liability. Ortolano believed the new assessment was inaccurate and that her new property tax obligation was too high. Ortolano thereafter engaged in various efforts to lower her property tax bill, including by seeking a reevaluation of her assessment and by attending and speaking at various public meetings.

Eventually, Ortolano began reviewing the Assessing Department's records and observing the Department's operation. As a result, she came to believe that one of the City's assessors, Greg Turgiss, was not fulfilling his job duties. So Ortolano hired a private investigator to follow Turgiss around during the workday. The investigator would park on the lower level of a parking garage adjacent to Nashua City Hall, where he could see people entering and exiting the building. At times, he

tailed Turgiss's car. At other times, he used a drone to track his whereabouts. The investigator took many photographs of Turgiss in his car and walking to and from City Hall. This went on for three weeks.

Ultimately, the investigator produced a report. According to the report, Turgiss frequently drove to a parking lot behind a hotel during the workday, where he would take naps. The investigator also claimed that Turgiss falsified his mileage logs to indicate he had been driving around the City inspecting properties during times he was not working.

Ortolano provided the investigator's report to the Mayor of Nashua. The Mayor thereafter engaged a private attorney to conduct an independent investigation. However, Ortolano became concerned that Kim Kleiner, who was the Director of Administrative Services for the City and who oversaw the Assessing Department, was tampering with witnesses and interfering with the attorney's investigation.[1] On June 25, 2019, Ortolano went to Nashua PD to request that the police conduct a criminal investigation into both Turgiss and Kleiner. Nashua PD opened an investigation and assigned it to Detective Lombardi. Detective Lombardi had never interacted with Ortolano before this assignment.

Detective Lombardi began reviewing materials provided by Ortolano, including the private investigator's report, and interviewing various people who worked at the Assessing Department. On August 23, 2019, he interviewed Lynn

---

[1] Kleiner is also a defendant in the instant action, and she has also moved for summary judgment. The court will address her motion separately.

3

Cameron, an administration specialist at the Department. Cameron said that Assessing Department employees were "on eggshells" when speaking with Ortolano because Ortolano would "twist[ ]" their words or take what they say out of context in order to get what she wanted. Doc. no. 84-7 at 2. Cameron knew that Ortolano had caused the ongoing criminal investigation into the Assessing Department.

Ortolano continued to visit the Assessing Department during Detective Lombardi's investigation. Ortolano testified at her deposition that, on one occasion, she went to the Assessing Department to attempt to retrieve a note on an employee's wall. According to Ortolano, the note explained how Assessing Department employees were "supposed to treat" Ortolano when she visited the Department. Doc. no. 84-2 at 7. Ortolano went to retrieve the note on a day she knew the employee would not be there. She hoped Cameron would be there because she thought Cameron would help her get the note. However, Cameron was not there when Ortolano arrived. Another Assessing Department employee told Ortolano to speak to the Legal Department if she wished to obtain a copy of the note. Ortolano then spoke with the Legal Department, who told her she could not have the note.

As she was leaving City Hall, however, she encountered Cameron, who was returning from lunch. Although the parties dispute precisely what Ortolano said to Cameron, it is undisputed that Ortolano asked Cameron for the note and for information about how Assessing Department employees had been instructed to interact with her, and that Cameron did not obtain the note for her.

4

On September 16, 2019, Detective Lombardi visited City Hall to continue his investigation. While there, Cameron's supervisor, Louise Brown, notified him that Cameron wanted to speak with him about her interaction with Ortolano the week prior. Detective Lombardi then met with Brown and Cameron. Cameron explained that Ortolano had confronted her outside City Hall as she was returning from lunch. She further relayed that, while Ortolano had not assaulted or threatened her, the incident made her feel very uncomfortable, as it seemed Ortolano may have been waiting to confront her outside the office. As she was explaining what had happened, Cameron began to cry. Cameron said that, given Ortolano's accusations against Assessing Department employees and how Ortolano twists everything employees tell her, the interaction made her uncomfortable and scared.

Although it was clear to Detective Lombardi that Ortolano's conduct towards Cameron was not criminal, he told Cameron of steps she could take to reduce the chance of it occurring again. He explained the process for seeking a restraining order. He also told Cameron he could speak to Ortolano on her behalf and explain that she did not wish to have contact with her outside of the Assessing Department. Detective Lombardi testified at his deposition that it is common for police officers to convey one private party's desire not to have contact with another private party in order to keep the peace and prevent crimes before they occur.

Cameron told Detective Lombardi that she would like to take some time to think about what to do. In addition, both she and Brown wanted to speak with other members of the Assessing Department, as they believed other employees might

5

wish to avoid contact with Ortolano outside the office as well. Kleiner later spoke with Detective Lombardi and informed him that all but one of the Assessing Department employees did not wish to have contact with Ortolano outside the Department, and that they would like Detective Lombardi to convey their wishes to Ortolano. Detective Lombardi agreed to do so. He and another officer traveled to Ortolano's home to speak with her, but she was not there, so they left a message with her husband asking her to contact them.

Ortolano called Detective Lombardi back. Detective Lombardi explained that he would like to speak with her in person for a few minutes. Ortolano agreed and said she was near the police station and would be there in a few minutes. Detective Lombardi and another officer spoke with Ortolano in the lobby of the station. He explained his conversation with Cameron and that, while Cameron was not accusing Ortolano of committing a crime, the incident made her uncomfortable given Ortolano's accusations against the Assessing Department and the resulting investigations. He further explained that all of the current members of the Assessing Department (with one exception) did not wish to have contact with her outside the Assessing Department.

Ortolano asked Detective Lombardi if what he was doing was legal. Detective Lombardi explained that it is both legal and common for a police officer to convey one private party's wish not to have contact with another private party. Detective Lombardi also explained that, if Ortolano were to have contact with these persons outside the Assessing Department, she could face criminal charges depending on

6

the circumstances of the contact. At his deposition, Detective Lombardi testified that it is common for police officers to issue these sorts of warnings in citizen disputes, but that an arrest would only occur if a crime occurred during a subsequent interaction, such as assault or criminal threatening.

Following her interaction with Detective Lombardi, Ortolano spoke with her lawyer about the legal effect of Detective Lombardi's warning. She continued visiting the Assessing Department. She also continued to make Right-to-Know requests, enforce her requests by filing lawsuits against the City, attend public meetings, and vocally criticize city employees and officials. Meanwhile, Detective Lombardi continued his investigation into Turgiss and Kleiner. The investigation concluded in early 2020 and no charges were brought. Detective Lombardi has had no further involvement with Ortolano since that time.

## DISCUSSION

Following the court's orders on the parties' Rule 12 motions and Ortolano's stipulation of dismissal as to many of the claims in the complaint (doc. no. 63), the only claim she brings against Detective Lombardi is for retaliation in violation of her First Amendment rights. See doc. no. 99 at 11-21. Ortolano claims that Detective Lombardi warned her of Assessing Department employees' desire to have no contact with her outside of work in retaliation for her outspoken criticism of City officials and her numerous lawsuits against the City.

To succeed on a retaliation claim, the plaintiff must show that "(1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an

adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action." D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012). It is undisputed that plaintiff's public criticism of municipal employees and officials, as well as her Right-to-Know requests and related lawsuits, is constitutionally protected conduct. The court's analysis therefore begins with whether Detective Lombardi subjected Ortolano to an adverse action.

I.  No Reasonable Trier of Fact Would Conclude that Detective Lombardi Subjected Ortolano to an Adverse Action

"[A]n adverse action in a First Amendment case is one that 'viewed objectively . . . would have a chilling effect on the plaintiff's exercise of First Amendment rights,' or that 'would deter a reasonably hardy person from exercising his or her constitutional rights.'" Pollack v. Reg. Sch. Unit 75, 12 F. Supp. 3d 173, 188 (D. Me. 2014) (brackets and citation omitted) (quoting Barton v. Clancy, 632 F.3d 9, 29 & n.19 (1st Cir. 2011) and Elizabeth B., 675 F.3d at 43 n.11). While "the injury suffered need not be great," Bourne v. Arruda, Civ. No. 10-cv-393-LM, 2011 WL 2357504, at *15 (D.N.H. June 10, 2011) (quoting Mattox v. City of Forest Park, 183 F.3d 515, 519 (6th Cir. 1999)), the official action cannot be "so trivial that it would not deter an ordinary [person] in the exercise of his or her First Amendment rights," Barton, 632 F.3d at 29.

Here, Ortolano claims that Detective Lombardi subjected her to an adverse action when he warned her that certain Assessing Department employees did not wish to have contact with her outside of work and that, depending on the

8

circumstances of any future encounter, she could face criminal charges. However, no reasonable jury would conclude that Detective Lombardi's warning would deter a plaintiff of ordinary firmness from exercising her First Amendment rights. Given the record at this time, it is not subject to genuine dispute that police officers such as Detective Lombardi routinely give these sorts of proactive warnings to private citizens in order to prevent their animosity from escalating to criminal conduct. Moreover, Detective Lombardi did not communicate that Ortolano could face criminal charges simply for interacting with an Assessing Department employee, but only that she could face charges depending on the circumstances of the encounter. That statement is objectively true and noncontroversial. See, e.g., RSA 644:4, I(b) (providing that a person is guilty of harassment if the person "[m]akes repeated communications at extremely inconvenient hours or in offensively coarse language with a purpose to annoy or alarm another"); RSA 644:2, II(a) (providing that a person is guilty of disorderly conduct if the person "[e]ngages in fighting or violent, tumultuous or threatening behavior in a public place"); RSA 631:4, I(a) (providing that a person is guilty of criminal threatening if, "[b]y physical conduct, the person purposely places or attempts to place another in fear of imminent . . . physical contact").

     In the face of a routine police admonishment that certain government employees did not wish to speak outside of work, a reasonably hardy individual who wished to express public criticism, obtain public records, or initiate litigation would not be deterred from doing so. See Artus v. Town of Atkinson, No. 09-cv-87-PB, 2009

WL 3336013, at *3 (D.N.H. Oct. 14, 2009) (concluding as a matter of law that a reasonably hardy advocate of a local ballot initiative would continue to advocate for the initiative even after the town's police chief angrily demanded an explanation from another advocate as to why he supported the initiative). Were it otherwise, this sort of run-of-the-mill, proactive policework would give rise to federal civil rights actions. But "allowing constitutional redress" for such conduct would "serve to trivialize the First Amendment." Bourne, 2011 WL 2357504, at *15 (quoting Mattox, 183 F.3d at 519).

For these reasons, no reasonable jury would conclude that Detective Lombardi's communication constituted an adverse action. Detective Lombardi is therefore entitled to summary judgment on Ortolano's retaliation claim.

II. <u>No Reasonable Jury Would Conclude that Detective Lombardi's Intent Was to Retaliate Against Ortolano for Engaging in Protected Conduct</u>

Ortolano's claim against Detective Lombardi fails as a matter of law for the additional and independent reason that no reasonable jury would find that Ortolano's constitutionally protected conduct was a substantial or motivating factor in Detective Lombardi's decision to convey Assessing Department employees' wishes not to speak with Ortolano outside work.

Ortolano claims that a reasonable jury could find that Detective Lombardi's actions were motivated by retaliatory intent because (1) he conveyed the employees' wishes within a few months of Ortolano's request that the police investigate Turgiss and Kleiner, and (2) there is "circumstantial evidence" that people other than Detective Lombardi bore animus toward Ortolano. Doc. no. 99 at 20. It is true that

temporal proximity between protected conduct and an alleged adverse action can constitute evidence of retaliatory intent. Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011). But temporal proximity alone is usually insufficient to overcome summary judgment, "especially if the reality of the situation undercuts any claim of causation." Gavlin-Assanti v. Atl. Props. Mgmt. Corp., 483 F. Supp. 3d 125, 138 (D.R.I. 2020); see, e.g., Pagán-Colón v. Walgreens of San Patricio, Inc., 697 F.3d 1, 10 (1st Cir. 2012) (explaining that "temporal proximity on its own is insufficient to establish" a causal connection between protected conduct and adverse action but "it is relevant evidence that, combined with other facts, may support such a finding"); Acevedo-Diaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993) ("Mere temporal proximity between a change of administration and a public employee's dismissal is insufficient to establish discriminatory animus.").

    Here, it is undisputed that Cameron tearfully recounted her unexpected encounter with Ortolano to Detective Lombardi describing how Ortolano approached her outside of the city offices to request a note from another employee's possessions. This encounter occurred after Ortolano (1) caused the initiation of a criminal investigation into two Assessing Department employees, (2) caused an internal investigation into an Assessing Department employee, and (3) hired a private investigator to surreptitiously follow and photograph an Assessing Department employee. In response to Cameron's visible distress, Detective Lombardi offered to perform routine policework that would minimize the possibility of additional distressing interactions and prevent the situation from escalating.

Given these realities, no reasonable jury would conclude from the fact that Detective Lombardi conveyed the employees' wishes to Ortolano three months after she caused the initiation of the criminal investigation that Detective Lombardi did so in order to retaliate against Ortolano for engaging in protected conduct.

To withstand summary judgment, Ortolano must offer "more than a mere scintilla of evidence" that Detective Lombardi was motivated by animus toward her protected conduct. Williams v. Kawasaki Motors Corp. U.S.A., 30 F.4th 66, 70 (1st Cir. 2022) (quoting Hochen v. Bobst Grp., Inc., 290 F.3d 446, 453 (1st Cir. 2002)). Because she has not done so, Detective Lombardi is entitled to summary judgment.

III. Even if Ortolano Had Produced Sufficient Evidence on her Retaliation Claim Against Detective Lombardi, He Would Be Entitled to Qualified Immunity

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protecting all but the plainly incompetent or those who knowingly violate the law.'" City of San Francisco v. Sheehan, 575 U.S. 600, 611 (2015) (brackets omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)) "The plaintiff bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed." Mitchell v. Miller, 790 F.3d 73, 77 (1st Cir. 2015). To carry this burden, the plaintiff must "identify controlling authority or

12

a robust consensus of persuasive authority such that any reasonable official in the defendant's position would have known that the challenged conduct is illegal in the particular circumstances that he or she faced—then-existing precedent, in other words, must have placed the statutory or constitutional question beyond debate." Rivera-Corraliza v. Morales, 794 F.3d 208, 214-15 (1st Cir. 2015) (quotations and ellipsis omitted).

      Here, even if Ortolano had produced evidence from which a reasonable jury could find that Detective Lombardi subjected her to an adverse action in retaliation for engaging in protected conduct, she has not carried her burden to show that Detective Lombardi's conduct violated clearly established law of which a reasonable officer would have known. In an attempt to carry her burden, she points to a single out-of-circuit district court case with much stronger evidence of retaliatory intent. See DeJong v. Pembrook, 662 F. Supp. 3d 896, 903-04, 913-14 (S.D. Ill. 2023) (holding at the motion to dismiss stage that school administrators were not entitled to qualified immunity where school administrators ordered plaintiff to have no contact with certain other students or else face disciplinary consequences and plaintiff plausibly alleged that the no-contact order was issued to silence the expression of political views). Ortolano identifies neither binding authority nor "a robust consensus of persuasive authority" that Detective Lombardi's conduct violated clearly established law. Rivera-Corraliza, 794 F.3d at 214 (quotations omitted). As such, he is entitled to qualified immunity, and therefore to summary judgment.

## CONCLUSION

Detective Lombardi's motion for summary judgment (doc. no. 84) is granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 25, 2025

cc:     Counsel of Record