UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>Laurie Ortolano</u>

     v.                                                Civil No. 22-cv-326-LM
                                                 Opinion No. 2025 DNH 033 P

<u>City of Nashua, et al.</u>

**O R D E R**

Plaintiff Laurie Ortolano brings this suit against the City of Nashua ("Nashua" or "the City"), several Nashua officials and employees, and two private parties. The private parties are Inception Technologies, Inc. ("Inception") and its president, Raymond Feoli. The gist of Ortolano's complaint is that the City and its officials improperly deprived her of various rights in retaliation for her criticism of City acts and officials, for seeking access to public records, and for bringing lawsuits against the City. She also brings a defamation claim against Inception and Feoli (who had a contract with the City) alleging that Feoli defamed her when he represented to the Nashua Board of Aldermen that Ortolano deceived him into believing she was a City employee. Presently before the court is Inception and Feoli's motion for summary judgment. Doc. no. 91. Ortolano objects. Doc. no. 101. For the following reasons, Inception and Feoli's motion (doc. no. 91) is granted.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment where he "shows that there is no genuine dispute as to any material fact and [that he] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all

facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013).

## BACKGROUND[1]

I.   Background on Ortolano's Dispute with the City

Ortolano moved to Nashua in late 2013. Shortly after she moved into her home, the City reassessed her property value, which increased her property tax liability. Ortolano believed the new assessment was inaccurate and that her new property tax obligation was too high. She thereafter engaged in various efforts to lower her property tax bill, including by seeking a reevaluation of her assessment. Ultimately, the City did not lower its assessment of Ortolano's property value to her satisfaction.

Ortolano's experience seeking to lower her property tax assessment led her to become a vocal public critic of the City and many of its departments, officials, and employees, including the Assessing Department. Since 2018, she has attended and spoken at over 200 public meetings. See doc. no. 84-4 (424-page document outlining Ortolano's statements since 2018). She frequently criticizes the City and the Assessing Department for a perceived lack of accessibility to property records. See, e.g., id. at 228.

Ortolano also makes public statements online. She posts her critiques on social media and even launched a website where she has posted blogs about perceived problems with Nashua city government. Some of those blogs were entitled

---

[1] The following facts are not in dispute unless otherwise indicated.

"An Overview of Nashua Assessing," "What is Sales Chasing?" and "Will the 2019 Abatement Process in Nashua be Fair?" Doc. no. 1 ¶ 97. According to Ortolano, her statements online and at public meetings gave her a "public profile" such that many members of the public began asking her to assist them with property tax abatement applications. Id. ¶ 98.

In addition to expressing public criticism of the City and its departments and employees, Ortolano has submitted several hundred written and verbal "Right-to-Know" requests with the City. See RSA ch. 91-A. The requests primarily seek to obtain documents pertaining to the City's Assessing Department and its policies and processes for assessing property taxes. Ortolano has also filed multiple lawsuits against the City in New Hampshire state court alleging violations of the Right-to-Know law. See, e.g., Ortolano v. City of Nashua, 176 N.H. 175 (2023). Ortolano characterizes her public criticism, Right-to-Know requests, and lawsuits against the City as "a public crusade to pressure Nashua officials to clean up the Assessing Department." Doc. no. 1 ¶ 33. Ortolano's disputes with the City have received substantial media coverage. See, e.g., Dean Shalhoup, Property Owner Alleges Wrongdoing by City, Nashua Telegraph (Feb. 20, 2019).[2]

II.   The Alleged Defamation

Inception provides document scanning and data storage solutions to private companies and public entities in New Hampshire, including municipalities. In or

---

[2] Available at: https://www.nashuatelegraph.com/news/2019/02/20/property-owner-alleges-wrongdoing-by-city/.

around 2020, Inception entered into a contract with the City to digitize Assessing Department records. The digitization project continued through 2022.

In late 2021 or early 2022, Ortolano called Feoli. She was unable to access the Assessing Department records that were with Inception for scanning, and was frustrated with how long the project was taking. Feoli had never communicated with Ortolano before, and he was unaware of her disputes with the City. Ortolano told Feoli that she was "of Nashua," doc. no. 31-2 at 2, and that she was "trying to find out when we are going to have the scanning job done" because "we don't have access to those files" that were with Inception to be scanned, doc. no. 91-2 at 7-8. Ortolano recited information from a pending purchase order as well as amounts Inception had billed to the City for the project. She told Feoli that she would contact Kim Kleiner, who oversaw the Assessing Department, about when the City would be making additional payments to Inception in order to complete the project.

Inception routinely handles customers' confidential data and is therefore required to adhere to strict confidentiality and security protocols. Feoli states that he thought Ortolano was a City employee during their conversation given her statement that she was "of Nashua" and her detailed knowledge of the project.[3] He therefore disclosed information to her about the status of the project.

On or about February 4, 2022, Ortolano called Feoli again, identifying herself as "from Nashua." Doc. no. 101-1 at 3. Ortolano asked Feoli about public access to

---

[3] Feoli also states that, in his nearly three decades in this field, he had never been contacted by a citizen of a municipality seeking information about work that Inception was performing for the municipality.

scanned documents, stating: "We don't have access to those files. When can we get those files back?" Doc. no. 31-2 at 2. Believing Ortolano to be a City employee, Feoli told Ortolano that Kleiner could provide City employees with log-in credentials to access the electronic copies of documents that Inception had already scanned. In response, Ortolano did not make explicit that she was a Nashua citizen rather than a Nashua employee.

Following Feoli's second phone call with Ortolano, Kleiner called him and asked him to identify all City officials he had communicated with about the digitization project. Feoli said that Ortolano was one of the City officials he had spoken with about the project. Kleiner told Feoli that Ortolano was not a City employee and that she had brought several lawsuits against the City. She told Feoli that she would update the Board of Aldermen on the status of the digitization project at their next session.

Upon learning that Ortolano was not a City employee, Feoli concluded that his conversations with Ortolano breached Inception's data security obligations to the City. On February 6, 2022, he wrote a letter to the Board of Aldermen and emailed it to Kleiner. In the letter, he stated that he had "been deceived" by Ortolano, "who portrayed herself as [a] city employee to me." Doc. no. 31-2 at 5. He then detailed what he and Ortolano said to each other during their conversations.

On February 8, 2022, the Board of Aldermen held a public meeting, at which Kleiner spoke.[4] After detailing Inception's progress on the project and its cost, she

---

[4] Feoli did not attend this meeting.

5

recounted her conversation with Feoli. She said that Feoli told her "that a city employee named Ms. Ortolano had . . . reached out to him regarding the project." Doc. no. 86-6 at 14. She also provided the Board with Feoli's letter, which was accepted into the Board's public file.

Later that evening, Ortolano emailed Feoli and informed him she was a Nashua resident, not an employee. This was the first time Ortolano expressly told Feoli she was a member of the public and was not a Nashua official or employee.

On February 11, 2022, a Nashua Alderman contacted Feoli for clarification about his letter to the Board. Feoli clarified that Ortolano never explicitly stated she worked for the City but that he believed she was a City official based on her statements to him and her intimate knowledge of the City's affairs, the terms of the digitization contract, and the status of purchase orders. Around that same time, a detective with the Nashua Police Department came to Inception's office to speak with Feoli about his conversations with Ortolano. He told the detective the same thing he told the Alderman—that Ortolano never affirmatively claimed to be a City official but that he believed she was based on her statements and intimate knowledge of the digitization project and City business.

Feoli and Inception have had no further contact with Ortolano.

## DISCUSSION

Ortolano alleges that Inception and Feoli defamed her when Feoli told the Board of Aldermen in his letter that Ortolano "deceived" him when she "portrayed herself" as a City employee during their conversations. Inception and Feoli move for

6

summary judgment on Ortolano's defamation claim. They contend that they are entitled to judgment as a matter of law because Ortolano was a limited-purpose public figure and there is no evidence Feoli acted with actual malice.

The Constitution imposes a more stringent standard for public figures to succeed on a defamation claim than it does for private individuals. Pendleton v. City of Haverhill, 156 F.3d 57, 66 (1st Cir. 1998). This is so because "public figures have voluntarily exposed themselves to increased risk of injury from defamatory falsehood" in exchange for "an influential role in ordering society," whereas private individuals have "relinquished no part of [their] interest in the protection of [their] own good name." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974) (quotation omitted). To succeed on a defamation claim, public figures must show that the defendant acted with "actual malice," while private individuals usually only need to prove that the defendant acted negligently. Pendleton, 156 F.3d at 66. A defendant acts with "actual malice" when she makes a statement with "knowledge that it was false or with reckless disregard of whether it was false or not." Lluberes v. Uncommon Prods., LLC, 663 F.3d 6, 12 (1st Cir. 2011) (quoting N.Y. Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)).

There are two categories of public figures: "(1) persons who are public figures for all purposes; and (2) so-called limited-purpose public figures who are public figures for particular controversies." Thomas v. Tel. Publ'g Co., 155 N.H. 314, 340 (2007). A person falls into the first category when they achieve "general fame or notoriety in the community, and pervasive involvement in the affairs of society."

Gertz, 418 U.S. at 352. Few persons achieve such heights. Id. (cautioning that courts should "not lightly assume that a citizen's participation in community and professional affairs render[s] him a public figure for all purposes"). A person is a limited-purpose public figure when they "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 345. When this occurs, courts deem the person a public figure only for the range of public controversies they have put themselves at the forefront of. See Lassonde v. Stanton, 157 N.H. 582, 590 (2008). Whether a person is a public figure or a private individual presents a question of law. Pendleton, 156 F.3d at 68.

      The first step of the limited-purpose public figure analysis is to isolate the public controversy. Lassonde, 157 N.H. at 590. Not all matters of interest to the public are public controversies for purposes of this analysis. Id. Rather, for a public controversy to exist, there "must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way." Id. (quoting Waldbaum v. Fairchild Publ'ns, Inc., 627 F.2d 1287, 1296 (D.C. Cir. 1980)). In other words, "a public controversy is a dispute that . . . has received public attention because its ramifications will be felt by persons who are not direct participants." Id. at 591 (quoting Waldbaum, 627 F.2d at 1296).

      Here, the relevant public controversy is Ortolano's self-proclaimed "public crusade" against the City to reform the Assessing Department. Doc. no. 1 ¶ 33. This dispute qualifies as a public controversy because Ortolano, by her own admission, sought to increase transparency within the department and improve its operation

for the benefit of the public. Indeed, Ortolano's dispute led other members of the Nashua community to seek their own property value reassessments, and Ortolano assisted them as an act of "public service." Id. ¶ 98. Feoli's statement to the Board in February of 2022 was within the context of this controversy because his statement concerned Ortolano's efforts to obtain information about the Assessing Department.

Ortolano thrust herself to the forefront of this public controversy. She has spoken at over 200 public meetings since 2018, often criticizing the Assessing Department and its operation. She has also posted her critiques on social media, and even started a website dedicated to publicizing problems she perceives with Nashua city government and the Assessing Department specifically. This has led to notable recognition for Ortolano, as demonstrated by, among other things, press coverage of her disputes with the City and by members of the public seeking her out for assistance with their own property tax issues.

For these reasons, Ortolano is a limited-purpose public figure with respect to her "public crusade" against the Assessing Department. Therefore, to prevail on her defamation claim, she must show that Feoli acted with actual malice. This she cannot do.

As noted above, to show actual malice, Ortolano must show that Feoli made the challenged statement with "knowledge that it was false or with reckless disregard of whether it was false or not." Lluberes, 663 F.3d at 12 (quoting N.Y. Times, 376 U.S. at 280). To overcome summary judgment, "there must be sufficient

9

evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of" his statement. Hi-Tech Pharms., Inc. v. Cohen, 277 F. Supp. 3d 236, 248 (D. Mass. 2016) (brackets omitted) (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)). For example, actual malice may be found "where a publisher fabricates an account, makes inherently improbable allegations, relies on a source where there is an obvious reason to doubt its veracity, or deliberately ignores evidence that calls into question his published statements." Levesque v. Doocy, 560 F.3d 82, 90 (1st Cir. 2009).

      No reasonable trier of fact would conclude that Feoli acted with actual malice. Feoli had not heard of Ortolano before she contacted him and knew nothing of her legal battle with the City. In their first conversation, Ortolano told Feoli she was "of Nashua," doc. no. 31-2 at 2, and that she was "trying to find out when we are going to have the scanning job done" because "we don't have access" to files that were with Inception, doc. no. 91-2 at 7-8.  Ortolano demonstrated intimate knowledge of Inception's work for Nashua and even discussed details from specific purchase orders. She also told Feoli she would speak with Kleiner, a high-ranking City official overseeing Inception's work, about when the City would be making further payments to Inception under the contract. At no point did Ortolano affirmatively state that she was calling as an interested citizen of Nashua, not as an employee of the City, and in his nearly three decades in this line of work, a municipal citizen had never contacted Feoli to discuss work Inception was performing pursuant to a municipal contract.

In their second conversation, Ortolano reminded Feoli that she was "from Nashua," doc. no. 101-1 at 3, once again told him that "[w]e don't have access" to the files that were with Inception, and asked "[w]hen can we get those files back?" Doc. no. 31-2 at 2. In response, Feoli told her that city employees could ask Kleiner for log-in credentials to access the electronic versions of records Inception had already scanned. Again, Ortolano did not affirmatively state that she was a Nashua resident, not a Nashua employee.

In all the foregoing, there is no evidence Feoli "deliberately ignore[d]" evidence that undermined his claim. Levesque, 560 F.3d at 90. Nor is there evidence he relied on a source with obvious credibility issues—indeed, it cannot be disputed that the basis for his belief was Ortolano's own statements. And Feoli's claim is not "inherently improbable." Id. To the contrary, Ortolano's statements provided Feoli with a reasonable basis to conclude he was speaking with a City employee. At most, a reasonable jury could find that Feoli should have asked Ortolano directly whether she was a City employee during their conversations in order to confirm or dispel his belief. But "mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." Gertz, 418 U.S. at 332. In short, no reasonable jury would find that Feoli knew his statement was false, or that he entertained serious doubts as to the truth of his statement, when he wrote in his letter to the Board that Ortolano deceived him into believing she was a City employee. Feoli and Inception are therefore entitled to summary judgment on Ortolano's defamation claim.

## CONCLUSION

Inception and Feoli's motion for summary judgment (doc. no. 91) is granted.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 10, 2025

cc:     Counsel of Record