**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

---

# MICHAEL CARIGNAN

*April 19, 2024*

---



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH 03821

**1-800-600-1000**

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION!

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW HAMPSHIRE**

```
* * * * * * * * * * * * * * * * *
                            *
  LAURIE ORTOLANO,          *
                            * No.
              Plaintiff,    * 1:22-cv-00326-LM
                            *
      vs.                   *
                            *
  CITY OF NASHUA, et al.,   *
                            *
              Defendants.   *
                            *
* * * * * * * * * * * * * * * * *
```

**VIDEOCONFERENCE DEPOSITION OF MICHAEL CARIGNAN,**

**Deposition taken with all parties appearing remotely,**

**on Friday, April 19, 2024, commencing at 3:11 p.m.**

**Court Reporter:**
**Pamela J. Carle, LCR, RPR, CRR**

Page 82

1   posture was in -- Ms. Ortolano was in when she was
2   in the legal office?
3       A.    I believe she was sitting down in front
4   of the door.  If I remember right, that's what --
5   that's what's coming to mind.
6       Q.    She was sitting on the floor.
7       A.    Correct.
8       Q.    Did Mr. Bolton tell you that she had
9   made threats?
10      A.    I don't believe so.  I don't recall him
11  saying she had made threats.
12      Q.    No one else in the meeting said that
13  she had made threats?
14      A.    Not that I remember.
15      Q.    Was it your position at the time that
16  you were going to stick with what the officers had
17  found and put in their papers that they had
18  created for the incident?
19      A.    Yes.
20      Q.    Do you have any reason to doubt that
21  what they said in that original incident report
22  and the supplemental narrative were anything other
23  than true and accurate?
24      A.    No, I -- I believe that they were
25  absolutely true and accurate.

Page 83

1       Q.    How long did the meeting with the legal
2   department last?
3       A.    Approximately a half an hour, maybe a
4   little less.
5       Q.    Now, you said that you were not going
6   to immediately arrest Ms. Ortolano.  Did you say
7   anything else in terms of an investigation that
8   might follow?
9       MR. CULLEN:  Objection to form.  You
10  can answer.
11      A.    I don't know the specific word, so did
12  I say the immediate -- to answer your question, I
13  don't know.  My belief was that this matter was
14  closed, and we were not going to pursue further
15  charges.
16  BY MR. MALAGUTI:
17      Q.    So I wrote down that Steve Bolton said
18  he was not satisfied, is that accurate?
19      A.    Yes.
20      Q.    And then he demanded -- I believe you
21  used the word he told you to arrest her
22  immediately?
23      A.    That's correct.
24      Q.    Go ahead.
25      A.    He didn't say immediately -- paraphrase

Page 84

1   the conversation, he said that we should arrest
2   her, or you should be able to arrest her.
3       Q.    Would you consider what he said to have
4   been a demand that you arrest her?
5       A.    He was trying to present it as a
6   demand.
7       Q.    Okay, what else did he say, if
8   anything, during that up to a half an hour
9   meeting?
10      A.    That's pretty much -- the conversation
11  was about his position of us arresting her and us
12  not going to do what he said.  And there was back
13  and forth, and I don't remember specific
14  conversations or specific words that were used, but
15  he wanted us to have her arrested, and at that time
16  I was not of the opinion that we would be
17  arresting her.
18      Q.    And did you say anything else that you
19  haven't already told us?
20      A.    Not that I know of, no.
21      Q.    Now, was the meeting being audio or
22  video recorded, to your knowledge?
23      A.    To my knowledge, no.
24      Q.    Did you notice whether anyone was
25  taking notes of the meeting?

Page 85

1       A.    I don't notice -- I did not notice.
2       Q.    Now, you're the -- you were then the
3   chief, so you're not the kind of person who would
4   rush back and file an incident report, I would
5   imagine, would that be correct?
6       A.    That's correct.
7       Q.    Did you, upon returning to your office,
8   create any written documents in regard to the
9   meeting?
10      A.    I don't believe I did.  I generally as
11  the chief didn't do documents based on meetings.
12      Q.    And did you discuss the meeting with
13  any of your command staff or anyone else in the
14  police department?
15      A.    Sure.  I don't remember specifically
16  who was present, but it's something I would have --
17  it's a conversation I would have had with -- if
18  Kevin Rourke was with me at the meeting, we would
19  have talked about, again, I don't remember if he
20  was there or not, but if not, we would have talked
21  about it back in my office.
22      Q.    Do you remember if the meeting came up
23  at one of the morning meetings?
24      A.    At the meeting, no.  That's generally
25  not something I would discuss.

MICHAEL CARIGNAN                              86..89

Page 86

1      Q.      Were there further conversations with
2  Steve Bolton or anyone on his staff between the
3  time you left that meeting and when Ms. Ortolano
4  was actually arrested?
5      A.      No.
6      Q.      Now, when you were dealing with
7  Mr. Bolton and the tall red-headed attorney and
8  others, is it fair to say that there was no
9  attorney-client relationship because they -- you
10 considered them to be the victims rather than
11 attorneys?
12             MR. CULLEN:  Objection to form.  You
13 can answer.
14             MR. MALAGUTI:  No, that's a bad
15 question, so let me reform it.
16 BY MR. MALAGUTI:
17     Q.      Is it fair to say that you did not
18 consider there to be an attorney-client
19 relationship with anyone in the legal department
20 regarding the January 22nd incident?
21     A.      Yes.
22     Q.      In fact, you told us early on that
23 there are very limited circumstances by which
24 there's an attorney-client relationship with the
25 city legal department and the police department?

Page 87

1      A.      Correct.
2      Q.      You got further communications from the
3  legal department -- and let me reframe that.
4              To your knowledge, did you or anyone at
5  the police department get further communications
6  from the legal department between the time that
7  the meeting occurred and Ms. Ortolano was
8  arrested?
9      A.      I don't -- I don't recall specifically
10 getting any myself.  I know that there were several
11 conversations back throughout this entire ordeal,
12 not just this arrest, where Bolton would contact
13 the legal department, and I believe it was Captain
14 Brian Kinney at the time, or Lieutenant Kinney.
15 There was some -- I think some conversations there
16 that he let me know about.
17     Q.      Captain or Lieutenant Brian Kinney, was
18 he in the police legal department or was he in
19 some other department?
20     A.      He was part of the Nashua police legal
21 department.
22     Q.      Was he an attorney?
23     A.      No.
24     Q.      Did -- it sounds like he got promoted
25 to captain, he might have been a lieutenant at the

Page 88

1  time, so I'll just call him Brian Kinney.
2              Did Brian Kinney tell you the content
3  of those conversations between himself and
4  Steve Bolton?
5      A.      The conversation, I don't recall him
6  telling me specifically, but it would have gone to
7  his captain up to the deputy to me.
8      Q.      And you don't remember anything that
9  was said?
10     A.      No.
11     Q.      Admittedly, by the time it reached you
12 second or third-hand?
13     A.      Correct.
14     Q.      Do you remember the nature of what was
15 said?
16     A.      I don't.  I -- no, I remember the
17 conversation with Bolton, and we held firm that we
18 weren't going to pursue charges, and that's -- I
19 knew there was back and forth, but I don't remember
20 what they specifically were.
21     Q.      Did you understand that Steve Bolton
22 was advocating for the arrest of Laurie Ortolano
23 when he spoke with Brian Kinney?
24     A.      I believe so.  I know for a fact he was
25 advocating for it when we had our meeting.

Page 89

1      Q.      At some point did the police department
2  open an investigation into whether Laurie Ortolano
3  should get arrested?
4      A.      Yes.
5      Q.      How soon was that after the meeting at
6  Bolton's office?
7      A.      I don't know specifically.  If I had to
8  guess, it was within a week.
9      Q.      Do you know why the investigation was
10 opened?
11     A.      I do.
12     Q.      Why?
13     A.      I was advised by my deputies that they
14 wanted to open an investigation to re -- to relook
15 at the case because of a social media post that
16 Ms. Ortolano had posted, but if I remember right,
17 she was bragging about refusing to leave, and
18 not -- not obeying the commands of what the person
19 who had control of the property did, meaning the
20 legal department.
21     Q.      You understand that Ms. Ortolano has a
22 First Amendment right to post on social media?
23     A.      I do.
24     Q.      You understand that Ms. Ortolano has a
25 right to post even offensive material under the

MICHAEL CARIGNAN                                                98

Page 98

```
 1                    CERTIFICATE
 2              I, Pamela J. Carle, Registered
 3    Professional Reporter, do hereby certify that the
 4    foregoing is a true and accurate transcript of my
 5    stenographic notes of the deposition of MICHAEL
 6    CARIGNAN, who was first duly sworn, taken at the
 7    place and on the date hereinbefore set forth, and
 8    that reading and signing of the transcript was not
 9    discussed.
10              I further certify that I am neither
11    attorney nor counsel for, nor related to or
12    employed by any of the parties to the action in
13    which this deposition was taken, and further that
14    I am not a relative or employee of any attorney or
15    counsel employed in this case nor am I financially
16    interested in this action.
17
18              THE FOREGOING CERTIFICATION OF THIS
19    TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
      THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
      CONTROL AND/OR DIRECTION OF THE CERTIFYING
20    REPORTER.
21
22
23
24    _____
              Pamela J. Carle, LCR, RPR, CRR
25
```