**In the Matter Of:**

LAURIE ORTOLANO vs

CITY OF NASHUA

# MICHAEL CARIGNAN

*April 19, 2024*



**Duffy & McKenna Court Reporters, LLC**

P.O. Box 1658 Dover, NH  03821

1-800-600-1000

603-743-4949 | 603-743-4952 (fax)

www.dmreporting.com

dmreporting@stenosearch.com (Scheduling)
camille@stenosearch.com (Billing/Production)

OUT-OF-TOWN DEPOSITIONS?



WWW.DEPOSPAN.COM

*Duffy & McKenna*
*Court Reporters, LLC*

DEPOSPAN'S TRUSTED LOCAL CONNECTION!

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * *
                                 *
  LAURIE ORTOLANO,               *
                                 * No.
               Plaintiff,        * 1:22-cv-00326-LM
                                 *
       vs.                       *
                                 *
  CITY OF NASHUA, et al.,        *
                                 *
               Defendants.       *
                                 *
* * * * * * * * * * * * * * * * *
```

VIDEOCONFERENCE DEPOSITION OF MICHAEL CARIGNAN,

Deposition taken with all parties appearing remotely,

on Friday, April 19, 2024, commencing at 3:11 p.m.

Court Reporter:
Pamela J. Carle, LCR, RPR, CRR

Page 74

1  Q.  But in your words, you know that
2  Ms. Ortolano was cleared?
3  A.  Correct.
4  Q.  Meaning she was not arrested at that
5  time?
6  A.  That's correct.
7  Q.  And I'm sorry if I'm repeating.  Did
8  you know whether the officers no trespassed her at
9  the time?
10 A.  I don't.  I don't remember them -- I
11 don't remember knowing that at all.
12 Q.  And do you remember reading about the
13 incident in the newspaper or from some other news
14 medium?
15 A.  I don't remember specifically, but I
16 was kept pretty well informed on news outlets,
17 so whether, you know, I'm not sure if it made
18 Channel 9 news, I'm not sure if it was the Patch or
19 the Telegraph or -- I remember being informed, and
20 generally when it became -- with the Nashua
21 situation it was more about what I was told from my
22 two deputies.
23 Q.  Or at the morning meetings,
24 potentially?
25 A.  Correct.

Page 75

1  Q.  Do you recall whether this ever came up
2  at one of the morning meetings?
3  A.  It's something that would have come up,
4  but I don't know if -- it's also possible that the
5  same officers would have come in or the captains or
6  deputies would have come in and told me that day.
7  It's something that would have generated somebody
8  mentioning it to me.
9  Q.  It would have generated some buzz
10 throughout the department?
11 A.  Yes.
12 Q.  Ms. Ortolano was fairly well known in
13 the department, is that sort of the thought?
14 A.  I can't answer that.  Amongst the
15 command staff she was.
16 Q.  Now, do you remember seeing in the news
17 that a police spokesman had said that the matter
18 is over, and that nothing further would be
19 happening?
20 A.  I don't.
21 Q.  Do you remember -- do you know Celia
22 Leonard?
23 A.  Professionally we've met a few times,
24 yes.
25 Q.  And you know she is an attorney in the

Page 76

1  city legal department?
2  A.  At the time she was, yes.
3  Q.  And you know that she also was one of
4  the people who were present while Laurie Ortolano
5  was in the legal office on the day in question?
6  A.  Yes.  From what I was told, yes.
7  Q.  And did you ever hear that Celia
8  Leonard, when she heard that the police department
9  would be -- the incident would require no further
10 action, do you recall her saying these words, or
11 something to this effect:  I find it troublesome,
12 to say the least.  My office will be speaking with
13 the police further.
14 A.  No, I don't remember her saying that
15 prior to my meeting.  I didn't have any
16 conversations with her prior to my meeting with
17 Steven Bolton and several members of the legal
18 department.
19 Q.  Okay.  So -- but it's fair to say that
20 you thought at one point the matter was cleared,
21 meaning the matter was over, right?
22 A.  Correct.
23 Q.  And then a communication occurred from
24 the city legal department to the police
25 department?

Page 77

1  A.  Correct.
2  Q.  And the communication was that they
3  wanted a further investigation done into the
4  matter, right?
5  A.  I'm not sure how that -- I'm not sure
6  that's -- if it was them asking for more
7  information.  I'm aware that I got -- I was
8  contacted and requested a meeting with the legal
9  department and Mr. Bolton.
10 Q.  So you got a call directly from the
11 legal department requesting a meeting?
12 A.  I don't know if it was a call or an
13 e-mail.  I was contacted then.
14 Q.  And when was that meeting held, to the
15 best of your recollection?
16 A.  It had to be within -- I would say
17 within a week of the incident.  Please don't hold
18 me to a hard date, but within about a week.
19 Q.  Where was the meeting held?
20 A.  It was held in the legal department --
21 City Hall legal department conference room.
22 Q.  Who was present from the Nashua Police
23 Department at that meeting?
24 A.  I was present.  I don't honestly
25 remember who else was present.  I don't, yeah.

Page 78

1    Q.   Do you remember if Patrolman Earnshaw
2  was present?
3    A.   He was not.
4    Q.   Sergeant Gilbert?
5    A.   He was not.
6    Q.   Is it Lieutenant Rourke?
7    A.   That was Deputy Chief Rourke at the
8  time. He could have been because he was the
9  uniformed deputy, but I don't remember if anybody
10 was there.
11   Q.   Is there a police officer named Roach?
12   A.   Tim Roach, yes.
13   Q.   Tim Roach. Do you remember if he was
14 there?
15   A.   He would not have been at that meeting.
16   Q.   So you remember that you were there,
17 but you don't remember whether anyone else was
18 there, but it's possible that Deputy Chief Rourke
19 might have been there?
20   A.   Correct.
21   Q.   Who was present from the legal
22 department?
23   A.   Steve Bolton was present.
24        THE WITNESS: Is Celia the red-headed
25 one? Taller, the red-headed one?

Page 79

1        MR. CULLEN: I wouldn't be able to
2  answer you even if I could answer, but truthfully,
3  I don't know exactly what Celia looks like.
4    A.   Sorry, I didn't have much interaction
5  with the other attorneys.
6  BY MR. MALAGUTI:
7    Q.   You would say a tall red-headed
8  attorney?
9    A.   Yeah, she was there, as well as there
10 might have been a younger lady there that was part
11 of the legal department's administrative staff.
12   Q.   A paralegal, potentially?
13   A.   Correct.
14   Q.   Would the name Manuela Perry sound
15 familiar?
16   A.   I'm not sure. I never worked with her.
17   Q.   Manuela, I think. Okay. Anyone else
18 from the legal department?
19   A.   Not that I recall.
20   Q.   Who did most of the speaking from the
21 legal department?
22   A.   Attorney Bolton.
23   Q.   Now, the tall red-headed attorney, did
24 she do any speaking?
25   A.   No, not that I remember. It was

Page 80

1  Attorney Bolton.
2    Q.   He did all the speaking, as far as you
3  remember, on behalf of the legal department?
4    A.   Correct.
5    Q.   And you did all the speaking on behalf
6  of the police department?
7    A.   Correct.
8    Q.   So what did Steve Bolton say?
9    A.   Paraphrasing the conversation, he was
10 not satisfied with the outcome of the
11 investigation. He felt that she should have been
12 placed under arrest immediately. He expressed
13 concern for his staff, meaning the other attorneys
14 and the paralegals in the department, and he had
15 asked me to -- I guess he told me to arrest her,
16 and I told him I would not arrest her.
17   Q.   Was Attorney Bolton angry?
18   A.   Yes.
19   Q.   Did he shout?
20   A.   Raised voice.
21   Q.   Did he bang anything?
22   A.   Not that I remember.
23   Q.   Did he explain what his concern for his
24 staff was?
25   A.   Yes, he expressed concern for their

Page 81

1  safety, based on what he felt was unpredictable
2  behavior from Ms. Ortolano.
3    Q.   You know Ms. Ortolano, I think you've
4  said.
5    A.   I do. Yes.
6    Q.   From her physical makeup, do you think
7  she could hurt somebody physically?
8    A.   Based on my experience, sir, it really
9  doesn't matter, physical appearance. We've
10 scrapped with some pretty small, slight people, so
11 that's not really a good question. I'm sorry.
12   Q.   As one of those small, slight people,
13 I'll take note. Did you consider Ms. Ortolano to
14 be a physical threat?
15   A.   I did not.
16   Q.   Do you know if any of the officers who
17 were responding to the incident did?
18   A.   I'm not sure how they felt, but I don't
19 believe they did.
20   Q.   Do you know whether the incident
21 report, whether the -- whether the papers
22 surrounding the incident said that Ms. Ortolano
23 made any threats?
24   A.   I don't believe so.
25   Q.   Do you know what physical position or

Page 82

1   posture was in -- Ms. Ortolano was in when she was
2   in the legal office?
3       A.   I believe she was sitting down in front
4   of the door.  If I remember right, that's what --
5   that's what's coming to mind.
6       Q.   She was sitting on the floor.
7       A.   Correct.
8       Q.   Did Mr. Bolton tell you that she had
9   made threats?
10      A.   I don't believe so.  I don't recall him
11  saying that she had made threats.
12      Q.   No one else in the meeting said that
13  she had made threats?
14      A.   Not that I remember.
15      Q.   Was it your position at the time that
16  you were going to stick with what the officers had
17  found and put in their papers that they had
18  created for the incident?
19      A.   Yes.
20      Q.   Do you have any reason to doubt that
21  what they said in that original incident report
22  and the supplemental narrative were anything other
23  than true and accurate?
24      A.   No, I -- I believe that they were
25  absolutely true and accurate.

Page 83

1       Q.   How long did the meeting with the legal
2   department last?
3       A.   Approximately a half an hour, maybe a
4   little less.
5       Q.   Now, you said that you were not going
6   to immediately arrest Ms. Ortolano.  Did you say
7   anything else in terms of an investigation that
8   might follow?
9            MR. CULLEN:  Objection to form.  You
10  can answer.
11      A.   I don't know the specific word, so did
12  I say the immediate -- to answer your question, I
13  don't know.  My belief was that this matter was
14  closed, and we were not going to pursue further
15  charges.
16  BY MR. MALAGUTI:
17      Q.   So I wrote down that Steve Bolton said
18  he was not satisfied, is that accurate?
19      A.   Yes.
20      Q.   And then he demanded -- I believe you
21  used the word he told you to arrest her
22  immediately?
23      A.   That's correct.
24      Q.   Go ahead.
25      A.   He didn't say immediately -- paraphrase

Page 84

1   the conversation, he said that we should arrest
2   her, or you should be able to arrest her.
3       Q.   Would you consider what he said to have
4   been a demand that you arrest her?
5       A.   He was trying to present it as a
6   demand.
7       Q.   Okay, what else did he say, if
8   anything, during that up to a half an hour
9   meeting?
10      A.   That's pretty much -- the conversation
11  was about his position of us arresting her and us
12  not going to do what he said.  And there was back
13  and forth, and I don't remember specific
14  conversations or specific words that were used, but
15  he wanted us to have her arrested, and at that time
16  I was not of the opinion that we would be
17  arresting her.
18      Q.   And did you say anything else that you
19  haven't already told us?
20      A.   Not that I know of, no.
21      Q.   Now, was the meeting being audio or
22  video recorded, to your knowledge?
23      A.   To my knowledge, no.
24      Q.   Did you notice whether anyone was
25  taking notes of the meeting?

Page 85

1       A.   I don't notice -- I did not notice.
2       Q.   Now, you're the -- you were then the
3   chief, so you're not the kind of person who would
4   rush back and file an incident report, I would
5   imagine, would that be correct?
6       A.   That's correct.
7       Q.   Did you, upon returning to your office,
8   create any written documents in regard to the
9   meeting?
10      A.   I don't believe I did.  I generally as
11  the chief didn't do documents based on meetings.
12      Q.   And did you discuss the meeting with
13  any of your command staff or anyone else in the
14  police department?
15      A.   Sure.  I don't remember specifically
16  who was present, but it's something I would have --
17  it's a conversation I would have had with -- if
18  Kevin Rourke was with me at the meeting, we would
19  have talked about, again, I don't remember if he
20  was there or not, but if not, we would have talked
21  about it back in my office.
22      Q.   Do you remember if the meeting came up
23  at one of the morning meetings?
24      A.   At the meeting, no.  That's generally
25  not something I would discuss.

Page 86

1   Q.   Were there further conversations with
2   Steve Bolton or anyone on his staff between the
3   time you left that meeting and when Ms. Ortolano
4   was actually arrested?
5   A.   No.
6   Q.   Now, when you were dealing with
7   Mr. Bolton and the tall red-headed attorney and
8   others, is it fair to say that there was no
9   attorney-client relationship because they -- you
10  considered them to be the victims rather than
11  attorneys?
12           MR. CULLEN:  Objection to form.  You
13  can answer.
14           MR. MALAGUTI:  No, that's a bad
15  question, so let me reform it.
16  BY MR. MALAGUTI:
17  Q.   Is it fair to say that you did not
18  consider there to be an attorney-client
19  relationship with anyone in the legal department
20  regarding the January 22nd incident?
21  A.   Yes.
22  Q.   In fact, you told us early on that
23  there are very limited circumstances by which
24  there's an attorney-client relationship with the
25  city legal department and the police department?

Page 87

1   A.   Correct.
2   Q.   You got further communications from the
3   legal department -- and let me reframe that.
4        To your knowledge, did you or anyone at
5   the police department get further communications
6   from the legal department between the time that
7   the meeting occurred and Ms. Ortolano was
8   arrested?
9   A.   I don't -- I don't recall specifically
10  getting any myself.  I know that there were several
11  conversations back throughout this entire ordeal,
12  not just this arrest, where Bolton would contact
13  the legal department, and I believe it was Captain
14  Brian Kinney at the time, or Lieutenant Kinney.
15  There was some -- I think some conversations there
16  that he let me know about.
17  Q.   Captain or Lieutenant Brian Kinney, was
18  he in the police legal department or was he in
19  some other department?
20  A.   He was part of the Nashua police legal
21  department.
22  Q.   Was he an attorney?
23  A.   No.
24  Q.   Did -- it sounds like he got promoted
25  to captain, he might have been a lieutenant at the

Page 88

1   time, so I'll just call him Brian Kinney.
2        Did Brian Kinney tell you the content
3   of those conversations between himself and
4   Steve Bolton?
5   A.   The conversation, I don't recall him
6   telling me specifically, but it would have gone to
7   his captain up to the deputy to me.
8   Q.   And you don't remember anything that
9   was said?
10  A.   No.
11  Q.   Admittedly, by the time it reached you
12  second or third-hand?
13  A.   Correct.
14  Q.   Do you remember the nature of what was
15  said?
16  A.   I don't.  I -- no, I remember the
17  conversation with Bolton, and we held firm that we
18  weren't going to pursue charges, and that's -- I
19  knew there was back and forth, but I don't remember
20  what they specifically were.
21  Q.   Did you understand that Steve Bolton
22  was advocating for the arrest of Laurie Ortolano
23  when he spoke with Brian Kinney?
24  A.   I believe so.  I know for a fact he was
25  advocating for it when we had our meeting.

Page 89

1   Q.   At some point did the police department
2   open an investigation into whether Laurie Ortolano
3   should get arrested?
4   A.   Yes.
5   Q.   How soon was that after the meeting at
6   Bolton's office?
7   A.   I don't know specifically.  If I had to
8   guess, it was within a week.
9   Q.   Do you know why the investigation was
10  opened?
11  A.   I do.
12  Q.   Why?
13  A.   I was advised by my deputies that they
14  wanted to open an investigation to re -- to relook
15  at the case because of a social media post that
16  Ms. Ortolano had posted, but if I remember right,
17  she was bragging about refusing to leave, and
18  not -- not obeying the commands of what the person
19  who had control of the property did, meaning the
20  legal department.
21  Q.   You understand that Ms. Ortolano has a
22  First Amendment right to post on social media?
23  A.   I do.
24  Q.   You understand that Ms. Ortolano has a
25  right to post even offensive material under the

Page 98

1      CERTIFICATE
2           I, Pamela J. Carle, Registered
3    Professional Reporter, do hereby certify that the
4    foregoing is a true and accurate transcript of my
5    stenographic notes of the deposition of MICHAEL
6    CARIGNAN, who was first duly sworn, taken at the
7    place and on the date hereinbefore set forth, and
8    that reading and signing of the transcript was not
9    discussed.
10          I further certify that I am neither
11   attorney nor counsel for, nor related to or
12   employed by any of the parties to the action in
13   which this deposition was taken, and further that
14   I am not a relative or employee of any attorney or
15   counsel employed in this case nor am I financially
16   interested in this action.
17
18          THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
19   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
     CONTROL AND/OR DIRECTION OF THE CERTIFYING
20   REPORTER.
21
22
23                      *Pamela J. Carle*
24   _____
            Pamela J. Carle, LCR, RPR, CRR
25