UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
        LAURIE ORTOLANO             *
                                    *   22-cv-326-LM
               v.                   *   April 3, 2025
                                    *
STEVEN BOLTON AND CELIA LEONARD     *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF FINAL PRETRIAL CONFERENCE
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:

For the Plaintiff:          William E. Aivalikles, Esq.
                            Aivalikles Law Office


For the Defendant:          Russell F. Hilliard, Esq.
 (Steven Bolton)            Brooke Shilo, Esq.
                            Upton & Hatfield, LLP



For the Defendant:          Brian J.S. Cullen, Esq.
 (City of Nashua)           Cullen Collimore Shirley, PLLC
 (Celia Leonard)



Court Reporter:             Susan M. Bateman, RPR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1453

P R O C E E D I N G S

THE CLERK:  The Court has before it for consideration today a final pretrial conference in Laurie Ortolano versus Bolton, et al.  It is 22-cv-326-LM.

If counsel could please identify themselves for the record, starting with the plaintiff, please.

MR. AIVALIKLES:  Good afternoon, your Honor.

I am William Aivalikles from Nashua, and I represent Laurie Ortolano, the plaintiff.

THE COURT:  Good afternoon, sir.

Good afternoon, Ms. Ortolano.

MR. HILLIARD:  Your Honor, Russ Hilliard from Upton & Hatfield.  I represent Attorney Bolton.

THE COURT:  Good afternoon.

MS. SHILO:  Your Honor, Brooke Shilo from Upton & Hatfield, and I also represent Attorney Bolton.

THE COURT:  All right.

MR. CULLEN:  Good afternoon, your Honor.

Brian Cullen here at least for now on behalf of the City of Nashua.

THE COURT:  All right.  We'll get to that.

Okay.  Let me just lay out some papers so I've got everything in order.

I think what I want to do is start by just sort of going over nuts and bolts the final pretrial typical matters,

and then we'll go through some of the motions, if not all of them, depending on the time.

And we'll start with your motion with respect to Attorney Cullen when we get there.

Okay. All right. One second.

All right. Let's just start with some nuts and bolts. I will start the trial at 8:30 every morning, go till 4:30 every day.

And as I will explain to you, I have counsel meet me an hour before the start of trial. So we'll start early, meet here at 7:30.

Now, the jury selection will be in the ceremonial courtroom. So just prepare for that selection day to be in the ceremonial courtroom number 3, and then we'll move -- after we get our jury, we'll move back into here for the actual trial to begin, all right, in courtroom 1. I'm pointing there. I hope that's where the ceremonial -- it's over there, but it's courtroom number 3 and that's where we'll pick the jury.

Okay. We will start on April 15. That's Tuesday. We always start jury trials on Tuesdays, and let me -- the length of the trial. I know that this is essentially one claim basically, and so I am not clear on the discrepancy between the estimated time and the number of witnesses that plaintiffs have on the witness list. So ultimately I would

like to hear about the length of trial.

Are you still thinking, Attorney Aivalikles, that you think it would be eight days?

MR. AIVALIKLES:  I think so, your Honor, because we have a lot of exhibits and there appears to be objections to those exhibits so that we would have to have the person testify to lay the proper foundation for the admission of the exhibit.

For example, there's a court, not a court, a newspaper reporter who wrote a number of articles about the arrest and we have marked those articles as part of our exhibits, but there's an objection because it's hearsay so we would need to bring that person here.  And we have that issue with a number of other exhibits also, your Honor.

In addition to that, your Honor, there are a number of police officers that were involved with the investigation of both the January 2021 arrest and the incident that happened on July of 2022.  So there's a total of six police officers that were involved with those particular incidences.

And we have also claimed, your Honor, that there's been a pattern of harassment of my client depriving her of her First Amendment rights and retaliation.  So there's going to be a number of witnesses that we would have to call to testify to those elements.

So the harassment as well as authenticating the

exhibits.  So I do think it's going to be a lengthy trial.

And in addition, we have added another attorney.
So he's going to be taking up some time also, your Honor.

THE COURT:  Okay.  Well, let's start at the point
which was I think your argument about harassment and an
incident that postdates the arrest.  Because the claim is
retaliatory arrest.  That is the claim.  And harassment is
another way to show an adverse action, but this is a
retaliatory arrest.  The arrest is the claim, and that's been
clear since my order early in the case.

So that is the remaining claim, it's a retaliatory
arrest claim, and that's why I think there's a big difference
between the way I'm viewing the length of the case and the
claim that's at issue -- that will be at issue before the
jury.  So that's number one.

And number two, exhibits.  Obviously there can be
disputes about exhibits, but the exhibits, you know, have to
be relevant.  They have to be admissible.  I'm certainly not
going to allow us to take up a lot of time on exhibits that
ultimately I would say are not relevant.

So I saw a lot of witness names on the list, and
maybe this can be pared down in light of the fact that I think
your understanding of your theory of the case is not my
understanding of the claim.  The claim and the theory has been
the retaliatory arrest of your client.  That's the theory of

the retaliation.  Yes, you could bring a harassment
retaliation claim, but this is a retaliatory arrest claim and
that's -- there are two different ways to go about it.  And
that is the claim that's going to be in front of the jury, and
so perhaps that is an area where you could pare down the
number of witnesses, number of exhibits, because a history of
harassment is not the theory of the claim.  The claim is
retaliatory arrest.

          MR. AIVALIKLES:  I understand what the Court is
saying, your Honor.  However, I think it's important for the
jury to understand how we got to the point of the arrest.
There's got to be context to the action that happened during
the arrest.  And also as part of the harassment as an adverse
consequence, they would involve the defendant's conduct.

          THE COURT:  And I agree there would be some element
of context, I agree with that, but it's not going to be an
eight-day-long trial.  There's just no way this is an eight
day trial based on my understanding of this.

          I could see if you thought you were going to bring
in a whole history of harassment, but this is a retaliatory
arrest in January 2021.  That's ultimately the claim that the
jury is going to have to deliberate on.  And one of my roles
here as gatekeeper with respect to evidence is to make sure
that the jury is hearing evidence about that claim and
evidence relevant to that claim.

So ultimately that may be an area where I think we can discuss paring this down and reducing the number of witnesses and exhibits that you're anticipating using but -- so the length of the trial, and I want to be straight with the jury because obviously they're coming in here and it helps for their planning purposes to know how long the trial is, but depending upon how fruitful discussions are I think today and my sense of the ability to pare this down to relevant evidence and exhibits and witnesses, you know, I might consider time limitations with respect to the trial. I haven't -- I will contemplate that depending upon what happens here, but just to keep this as efficient as possible and focused on the one claim at issue in the case.

There are two counts, obviously, but it's retaliatory arrest based on violations of her First Amendment rights, right to petition and right to speak, but it's a theory of retaliatory arrest. That's what we're here on.

So harassment again, and that was -- I know that was I believe the sentence that was disputed in the statement of the case. That sentence is not something I'm reading to the jury because that is not relevant.

MR. AIVALIKLES: Your Honor, there was another event which was in July of 2022.

THE COURT: I understand, and you'll have to tell me about that. And in the context of the trial that could be

potentially relevant.  It occurs after, however, the relevant
events that the jury has to decide.  I can envision an event
that occurs after the relevant event being relevant in some
way to the credibility of somebody testifying, things that you
might use to impeach the credibility of a witness, but
ultimately the question is going to be very limited to what
the defendants were aware of with respect to your client's
First Amendment history.  So there is obviously a context that
will be laid, but I'm not seeing how anything that happened
subsequent to that is relevant to the event -- the critical
event in the case that preceded it.

         MR. AIVALIKLES:  It's my understanding, your Honor,
that even threatening to arrest a person is an adverse
consequence.  So I think in that regard it is relevant.  It's
also relevant to the hostility and the bias that existed
between the plaintiff and the defendants.  So I think it's
also relevant for that purpose also.

         THE COURT:  It could, as you say, be relevant to
bias as they testify.  I will not close the door to questions
about bias and how that might be implicated, and I obviously
don't know the facts, but with respect to the case-in-chief
and proving that, the decision to pursue the arrest, your
theory of the case, that the defendants pursued the arrest and
they did so to retaliate for First Amendment reasons, that's
going to be a January -- was it January --

MR. AIVALIKLES:  '21.

THE COURT:  2021, but it was January --

MR. HILLIARD:  January 2022, your Honor.

THE COURT:  Okay.  So it was January 22 in 2021?

MR. AIVALIKLES:  Correct.

THE COURT:  Okay.  That's going to be the relevant incident.

And then obviously the conversations that occurred with and among the police, the defendants, that led to the arrest, obviously all of that is relevant, but I would be inclined not to admit things that happened after that arrest unless they somehow implicate bias, credibility, and obviously we will cross those bridges when we get there.

So I'm viewing this as a four day maximum trial.  I don't see how this goes longer than four days.

Now, I'm not saying right now that I'm going to limit time.  I would rather use counsel's good judgment.  I would rather use Rule 403 if I have to.  Rule 403 being cumulative, confusing.  I don't want the jury to be confused about incidences.  The charged incident is the January 22, 2021 incident that therein led to her arrest, and so I will entertain certainly 403 objections if witnesses get to be cumulative, repetitive, or irrelevant.

So if I were to do time limits, let me give you a sense of what I would envision.  I think I would envision a

two day case for you to put on.  I would envision a day per

defendant.  That's what I'm thinking.  Again, I am open to

your thoughts.  I'm hopeful that ultimately we can do this by

paring down obviously the witnesses and exhibits.  But if I

give you two days or a certain number of hours to try your

case, you'll decide which are the witnesses you absolutely

need to prove your case, and then -- I would leave that

obviously to your discretion and we would begin moving through

the trial, but I have not decided on that yet.  I will

certainly let you know if that's what I decide.

          Go ahead, sir.

          MR. AIVALIKLES:  I'm sorry.  I didn't mean to

interrupt, but one of the other time issues is that the

defendants have requested a view down in Nashua.

          THE COURT:  That's not going to happen.  I don't

understand why that can't come in through testimony.  I would

allow photographs, I would allow diagrams, but I don't think a

view is necessary.  I'm obviously aware of the request and

thought about that request, I can understand the request, but

that's not going to happen.

          MR. AIVALIKLES:  The other issue, your Honor, that

may help move things along is we had a conference about

exhibits and I went through my issues with their exhibits, and

we've agreed to a lot of my -- I'm sorry.  They've agreed

to -- I've agreed to a lot of their exhibits.

We didn't have that opportunity.  The defendant took the position that, well, I've objected and that's what I'm standing on.  There was no dialogue going back and forth how something could be relevant or something may not be hearsay.  So, I mean, if we had the opportunity to meet and really focus on plaintiff's exhibits, that may eliminate a lot of time.

THE COURT:  Okay.  I'm going to be all in favor for that.  So I'm going to try to end this to give you time to perhaps meet and allow Attorney Aivalikles -- am I saying your name right?

MR. AIVALIKLES:  Yes.  That's fine, your Honor.

THE COURT:  Okay.  To pare them down based on what I'm saying now.  Obviously, I'm telling you how I see this case and how -- you can obviously persuade me with respect to each exhibit, each witness, but I'm hoping that this conference will help you both pare down agreements, disagreements.  And where you can stipulate to foundation, great.  I would be very pleased to give you that time, and I think it's only fair if you've obviously gone through their exhibits and agreed to certain things, that counsel can do the same for you when we conclude this.

So let me see.  I -- exhibits.  I want to make sure that you know Attorney Esposito and you're familiar with her because she will show you how to use the technology in here.

If you're not familiar with it, you may be, same for you as well, and she's very, very patient and is willing to spend time with you also showing you how to mark those exhibits and make sure they're marked appropriately for ID.

We'll get to the trial -- and I'm not sure how much you know about trials, Ms. Ortolano.  Okay.  During the trial with exhibits what happens is the jury doesn't see an exhibit unless both parties agree it's a full exhibit.  So if you agree ahead of time, then that would be marked as a full exhibit.  That way Attorney Esposito, Donna, knows, okay, this is something the jury can see.

If there's a dispute about an exhibit and you can't reach some sort of agreement, which I'm hoping you can on most of these, you mark it for ID.  So what will happen is it will be referred to as Exhibit 11 marked for ID, your Honor, and here's what we would like to tell you.  And then I might be looking at that exhibit on a screen here and the lawyers can see it, but the jury does not see it.  They do not see that exhibit until I rule on any objection or until there's some foundation that is laid with respect to that exhibit.  So that's how that works.

And there's technology involved with pushing buttons so that the jury -- they have a screen that you cannot see, but it's -- there are two very large screens that are on the other side of the jury box, and you're welcome to go back

there at the end of this and look around and get familiar with that, but there are screens that the jury will then be looking at while a witness is testifying.  The witness will have it on a screen right there.  The witness gets to see that exhibit marked for ID.  The jury can't yet until it's admitted as a full exhibit.

So as soon as Donna hears those magic words, then she's marking it as a full exhibit and it's going to be something the jury sees, and then the witnesses carry on and you carry on asking questions about the exhibit while the jury has it in front of them and is looking at them.

MR. AIVALIKLES:  Your Honor, Attorney Esposito has been terrific in terms of answering questions and getting back on phone calls, but I'm not going to be handling any of the electronic stuff because I'm a dinosaur.

THE COURT:  Okay.

MR. AIVALIKLES:  So do we need to disclose -- do we need to get permission for the person that will be handling my exhibits?

THE COURT:  You'll have somebody who will have a computer and will be working with it?

MR. AIVALIKLES:  Yes.

THE COURT:  I would think it would be good if you could bring that person as well to work with the technology. Is that something you can do?

MR. AIVALIKLES:  Yes.  That's our intent, your
Honor.  I've spoken with Attorney Esposito.

THE COURT:  Okay.  That's actually very good that
she comes in ahead of time and knows how it works and knows
Attorney Esposito.

MR. AIVALIKLES:  Do we need to do anything in terms
of name disclosure or anything like that?

THE COURT:  No.  Just let me know when she's here,
and then our court reporter will just make a record of her
presence, and you can introduce her to the jury and explain
her role.

MR. AIVALIKLES:  Great.  Thank you, your Honor.

THE COURT:  Okay.  So the case summary, I will read
that.  I did take out the pattern of harassment, but otherwise
I think both of you were in agreement on the description of
the case.  I think all I would do is at most edit it just to
make it even more readable, but it will -- you'll hear
something similar to what you both agreed on.

MR. AIVALIKLES:  Okay.  One of the issues I had,
and I'm trying to recall what it was, but I think in the
defendant's analysis or statement they indicated that she pled
guilty to a crime.  What she pled guilty to was not a crime.
It was a violation.  So to the extent that the word crime is
in there --

THE COURT:  In the statement?

MR. AIVALIKLES:  In the statement.  I'm not sure if they said crime or criminal trespass.

THE COURT:  I don't think it's in here.

MR. HILLIARD:  I'm sorry, your Honor.  We said she pled guilty to a violation level offense of trespass.

MR. AIVALIKLES:  All right.  Fine.

THE COURT:  I do see Class A misdemeanor, but was that in -- I'll fix that.  I'll fix that.  I will make sure that gets edited out, put it that way.  I do have Class A misdemeanor in my draft so that must have been edited since I --

MR. HILLIARD:  No, it was in mine, your Honor, because that's what the original complaint was.

THE COURT:  Okay.

MR. HILLIARD:  That she pled guilty to a violation.

THE COURT:  By causing her arrest for criminal trespass.  It was an arrest for a misdemeanor, but you're fine just describing it --

MR. HILLIARD:  I am, your Honor.  Thank you.

THE COURT:  Okay.  All right.

Okay.  In retaliation for her criticism of city acts and officials.  All right.

And to the extent you have stipulations you can reach with respect to any issues, obviously let me know what those are and we will, you know, obviously put those in front

of the jury to the extent you're able to agree on anything, and obviously you can stipulate throughout the trial.  You can tell me the morning of that you've stipulated to something.  So I'm not going to really attach a deadline to a stipulation, but I do encourage them.

MR. AIVALIKLES:  Do you want those in writing, your Honor, or just oral?

THE COURT:  Well, we'll cross that bridge, but I would think it would be best if it is in writing if there's a stipulation you both can give me, yeah.

MR. HILLIARD:  I just have two quick comments before you get too much further down the line.

THE COURT:  Sure.

MR. HILLIARD:  One in terms of the time limits.

I do -- it's my anticipation that the plaintiff will be calling the defendants as witnesses in their case-in-chief, and I assume the Court would prefer that we then examine our clients as opposed to recalling them so that their testimony is sort of complete in one fell swoop.

THE COURT:  I will leave that to your discretion I think, but I'll have to wait and see how it comes in.  They'll come in as witnesses and ultimately you'll agree then they can cross, right?

MR. HILLIARD:  Yes.

THE COURT:  And that's what ends up being awkward.

They get cross-examination.  There may be some amount of
direct before the cross happens.

        MR. HILLIARD:  I just wanted to raise that to you
in terms of the timing.

        THE COURT:  Right.  I appreciate that.  And I think
in terms of timing it would work best, but I'll let you make
that strategic call at the time.  There may be some reason
that you decide you needed to call your own client.  I'll let
you make that call.

        MR. HILLIARD:  The second thing, your Honor,
unrelated to that is -- and I appreciate what the Court has
said, but as you probably know from my filings, there are some
broad categories of exhibits on the plaintiff's list that we
view as irrelevant.

        THE COURT:  Okay.  Let's go through those.  I would
love to go through those.  My guess is that some of what we've
already said is going to narrow the category, but I'm happy to
hear about a category of exhibits and give you my thoughts on
those to see if that helps counsel limit the scope of
reviewing of exhibits.  The last thing I want to be doing with
this jury is deciding those kinds of questions in the middle
of the trial.  I would rather you have a sense ahead of time
about what exhibits you're going to be able to get in so that
you are aware in time for your opening.  So let's talk about
those after motions in limine.

Does that make sense?

MR. HILLIARD:  Yes, your Honor.

THE COURT:  Okay.  Now, JERS, J-E-R-S.  JERS is the system that the jury uses.  It is the way the jury is going to look at the evidence inside the jury deliberation room.  It really has nothing else to do with the trial.  It's a system whereby they can look at a big screen and all of them talk about an exhibit.  They can zoom in, talk about language.  They can highlight an exhibit, I believe.  They can -- but it's on a big screen, and that's the JERS system.  So I just am confirming that that's how the exhibits will be presented to the jury.  And so that's what Attorney Esposito will be chasing down will be those properly marked final full exhibits in the format that she's going to need them to upload them into that deliberation room software, okay?

Now, exhibits and exhibit lists.  We do an original set of exhibits and two sets of copies that are premarked and submitted.  All of this will be in an order that I will issue, and we will attach to this order -- we will attach the documents that explain the process of marking exhibits and the JERS system.

But if you have questions, this is a person that will take your phone call, will call you back and will talk to you about exactly how to go about doing this.  And to the extent you have any questions, feel free to call her ahead of

time.

Okay.  You've got your will-call witnesses.

Witness lists.  Have you exchanged those?  You
have.  Those were in the pretrial statements.

Okay.  One thing that I do that is probably unique,
and it's worked for me for every jury trial that I've done as
a judge, I am very, very careful with the jury's time.  I give
counsel -- I'm really user friendly I think with counsel
during a trial if counsel is respectful of the jury's time.
And what I'm about to tell you is that to the extent you can
alert me to legal disputes, legal issues, ahead of time so
that I can do my legal research, if I need to, that night so
that I am not keeping this jury twiddling their thumbs while
I'm up in my chambers frantically looking up legal research or
having my law clerks do legal research that really we could do
while they're home eating dinner and getting ready for bed.  I
don't need necessarily to go home and have dinner.  If I need
to do some legal research, I'm here in the evening and I'm
going to do it so that the jury is not twiddling their thumbs
at any time during the trial.

Now, I was a trial lawyer myself so I know there
are things that happen during a trial, but what I'm asking
from you is at breaks and at the end of the day and at the
beginning of the day I want you to come prepared to explain to
me, Judge, I'm going to put on this witness I anticipate there

will be objections about.  And I don't mean that you have to
tell me your entire theory of your case, I don't mean that,
but I do want to know -- as best as you can do and predict,
let me know what the legal issues are, the disputes, so that I
can resolve those for you.

         I have found that lawyers appreciate that because
they know what is coming up.  They know what they can ask with
regard to a particular witness.  They know what they can say
in their opening statements.

         So ultimately I will ask you at every break, is
there anything you need to tell me now that I can accomplish
during my lunch break in terms of research or thinking and
deciding questions, and then I'll come right back out, I'll
meet with counsel, and I'll give you a ruling, and in that way
you know what the ruling is.  You can say, Judge, just note my
objection, earlier objection, and I'll say objection noted,
exhibit is a full exhibit, or the witness can so testify, and
then we keep everything moving and the jury doesn't even know
that we've had these legal disputes.

         So that's how I would like to keep the case moving,
and I'm very careful and respectful of the jury's time.  So
that's the only thing that I will really treat as, you know,
my red line, if you will.  I will not have them twiddling
their thumbs at any point.

         All right.  Now, the other thing that I do that I

find very helpful, I think counsel does as well -- last minute
disputes come up, they just do, and rather than have deadlines
and not learn of a dispute simply because a deadline has
passed to alert me to a motion in limine or something, I
prefer to have a status conference.  And I have this as close
to the jury trial as I can so that you can tell me about any
last minute disputed evidentiary or legal questions that come
up right on the eve of trial.  Oftentimes we'll have a jury
instruction issue that might be difficult.  If there's
something that I can iron out for you, I would like to do it
at a status conference.

          And I have picked April 10, and I believe in the
afternoon because I have a bail hearing that's going to go
through the morning.  So 2:00 p.m. April 10th for that.

          Now, to the extent you want to file something in
writing, you feel like there's some legal issue that you want
to preserve, then -- I'm going to give you these deadlines in
a written order but I'm going to give you April 7th by 5:00
p.m., and then you can reply or object if you want by April
9th by 5:00 p.m.  Then that gives me your objections or
responses the night before our status conference and I can
ponder those objections and then actually give you some sort
of answer on April 10th, which is before the jury starts
obviously, the jury trial, so you will have a sense again of
where you can expect the trial to go.  So April 10, 2:00 p.m.

here.

Now, if you --

MR. HILLIARD:  Your Honor --

THE COURT:  No problem.  I'll let you speak.  I promise.

If you decide that there aren't any disputes, that you have been able to iron out everything, nothing has come up last minute, then just let Attorney Esposito know and we will cancel that.  So it's a placeholder really, but it might be a place where ultimately if you're not able to agree on some exhibits, we can make some -- I can make some final decisions for you there.

Okay.  Attorney Hilliard.

MR. HILLIARD:  I'm sorry, your Honor.

THE COURT:  That's all right.

MR. HILLIARD:  I made a commitment a long time ago to attend a meeting in Saint Paul, Minnesota, on the 11th of the organization that I do my work with in Tanzania.  Of course Attorney Shilo or someone will be here, but if we have that in the afternoon of the 10th, I'll --

THE COURT:  Can you appear via Zoom?

MR. HILLIARD:  Excuse me?

THE COURT:  Could you appear remotely or by telephone on that day?

MR. HILLIARD:  Oh, yes, I could.

THE COURT:  You are going to be flying to Minnesota probably on the 10th?

MR. HILLIARD:  I'll be flying to Minneapolis that afternoon.  The meeting is an all-day retreat on Friday, but I'll be flying -- if it's -- you said 2 o'clock, your Honor, on the 10th?

THE COURT:  Yes.  We couldn't do the bail hearing in the afternoon or we could switch it to the morning.

MR. HILLIARD:  I would be landing in Minneapolis at 2:00 Central, 3:00 Eastern.  I'm sorry for this complication.

THE COURT:  That's okay.  That's all right.

MR. HILLIARD:  I arranged this long ago, but we'll find a way to work it out.

We'll work it out.  Thank you.

THE COURT:  All right.  Would it be helpful if we did it at 3:00 instead of 2:00?  Would that be helpful?

MR. HILLIARD:  Do what, your Honor?

THE COURT:  Do it at 3 o'clock on the 10th instead of 2:00?

MR. HILLIARD:  That's when I'm supposed to land, but yes, because of the time difference, Central Time.

THE COURT:  Would that time work for you, Attorney Aivalikles?

MR. AIVALIKLES:  We'll make it work, your Honor, somehow.

THE COURT:  All right.  So 3:00 p.m. then on the 10th.

MR. HILLIARD:  Thank you very much.

THE COURT:  And then if you end up coming late via telephone, that's going to be fine with the Court.

MR. HILLIARD:  Thank you very much, your Honor.

THE COURT:  Okay.  All right.

THE CLERK:  Your Honor, are we going to do a hybrid hearing or all on Zoom for that?

THE COURT:  I would think we could do it via -- we could do the whole thing via Zoom, but I think we're here so I would prefer to do it in person if that's okay.

THE CLERK:  Okay.

THE COURT:  And then, Attorney Hilliard, whatever you prefer in terms of being here.  It can be via phone or --

MR. HILLIARD:  Much appreciated.

THE COURT:  Okay.  All right.  I think that takes care of nuts and bolts.

Deposition testimony.  Are there going to be any disputes about deposition testimony?

MR. HILLIARD:  I don't think either side anticipates reading any depositions.

THE COURT:  Maybe impeachment?

MR. HILLIARD:  Maybe impeachment.

MR. AIVALIKLES:  Correct.

THE COURT:  All right.  Well, good.  I'll put something in my final pretrial order just so it's clear.

And I've looked at voir dire.  I'm going to ask questions to address most of the questions.  Many of the questions you gave me, both sides actually, were not yes or no questions.  They were how do you feel about type questions.  And, again, I can't ask the jury open-ended questions like that.  I need to ask them to answer yes or no.  If you answer yes, come up and talk to the judge and the attorneys.  And so I will try to address most of the issues you raised.

I don't think anybody actually raised, maybe you did, press coverage and whether people have read newspaper articles, but it seems to me something I should ask them.

MR. AIVALIKLES:  Yeah.  I agree, your Honor.

MR. HILLIARD:  Yes.  We agree with that, your Honor.

THE COURT:  Okay.  So I'll try to remember to add that specifically.

So I will give them just a brief, you know, lecture about jury duty, explaining how it works, and I'll let you introduce yourselves, your client, to the jury.  It will be in the big ceremonial courtroom.

And then we will call them up one by one.  It will be Juror No. 1, Juror No. 2, Juror No. 3, and these will be assigned and you'll get this ahead of time.  And they'll come

up to a microphone, they'll put on headphones, and then --
it's a little bit odd.  Again, I would ask you to practice
doing this perhaps with Attorney Esposito, but the juror and I
and the attorneys will all be listening and you will be
listening and your clients will be listening while I'm
whispering to the juror.  That way no one else can hear what
we're talking about.  Classical music is playing in the
background to try to block out anything, any noise, and then I
will ask some questions to that witness.  For instance, if
they've seen some press, I'll ask what have you read, what
have you heard, what do you remember, that kind of thing, and
then I'll say, would you step back for just one moment, and
then I'll ask the juror to take off the headphones and then
I'll say, Attorney Aivalikles, do you have any objection to
this juror.  You might say, no, I don't, Judge, or you might
say, Judge, I would like you to ask this question.  I'll
consider that.  And then I'll ask Attorney Hilliard or Shilo,
whoever is going to do jury selection, and then Attorney
Cullen, what's your position and are there questions that you
would like me to ask.

        Assuming that you're asking me to ask reasonable
questions, which I always benefit from what the attorneys
suggest to me by way of follow up, then I'll ask them your
follow-up questions and then I'll ask for your position, and
I'll make a ruling as to whether they're qualified or excused.

It will go back and forth like that.  We'll end up -- we want
to end up with eight jurors and three peremptories per side,
but there are two defendants so I think that would be six
total.

Is that right, six total for the defense, or is it
three total for both?  I need to figure that out ultimately,
but if it's just one defendant and one plaintiff, it's three
and three.  So we end up with 14.

Attorney Cullen.

MR. CULLEN:  Yeah, I have seen you do it, not you
particularly, but this court do that different ways depending
on how aligned the defendants were.  I would be happy to speak
with the defense.  Four I think would be sufficient.

THE COURT:  Sufficient?

MR. CULLEN:  Yeah.

THE COURT:  Okay.  And three for plaintiff?

MR. CULLEN:  I think so.

THE COURT:  Yeah.

MR. CULLEN:  If we still had somebody like Mr.
Feoli here who has a totally different idea of what jurors he
might want, his situation might be different, but the
defendants are relatively close to aligning.

MR. AIVALIKLES:  In the interest of fairness,
wouldn't it be appropriate for the plaintiff to also have
four?

THE COURT:  Let me look at that.  Let me look at that because ultimately plaintiff is getting three and each defendant is getting two each.  So let me study that.  That will be made clear to you in my jury order which will be attached to my final pretrial order.

Okay.  All right.  Now, you let me know if you need to take a break, Susan.

And she will also let us know when she needs a break during the trial, and it's usually an hour and a half.  Sometimes you can go for two but usually an hour and a half, and we'll take breaks, okay?

MR. AIVALIKLES:  What about lunch, your Honor?

THE COURT:  Yeah, we'll play that by ear.  I would say it would be good probably to know where you might grab something for yourself quickly or bring a lunch with you in case you are doing prep at lunchtime, but there are places to go nearby that you could grab something.  There's something right across the street in fact.

MR. AIVALIKLES:  Are you anticipating like a half hour for lunch?

THE COURT:  We'll play that by ear, but I think probably 45 minutes.  The jury is probably going to need an hour the first day, their first day here, so I'll probably give them one hour once we select if we get to lunch.  We'll start the trial right after we select our jury.  So depending

upon how long it takes to select them, I'm thinking I'll give them an hour the first day and probably 45 minutes after that. I'll let you know if that changes.

MR. AIVALIKLES:  Thank you, your Honor.

THE COURT:  Okay.  All right.  Now let's go through first your arguments with respect to Attorney Cullen, and I am -- I've read your motion to vacate and I have read your arguments, and I'm happy to hear from you with respect to the motion if you would like to be heard on that, and I'm thinking maybe five minutes per argument, but go ahead, sir.

MR. AIVALIKLES:  For two and half years Attorney Hilliard represented the defendant Leonard, and then three weeks before trial there's a new attorney appointed.  Now, I'm not saying we're entitled to know the reason why because it's attorney-client, but generally when an attorney withdraws, there's usually a general statement, a breakdown in the attorney-client privilege or financial or whatever.  We have no idea.

And the concern is that -- well, there's two concerns.  One, was it done for strategic reasons to be able to have two cross-examinations, two openings, two closings, along that line of strategy, but also, your Honor, the Court I'm sure is well aware of Rule 1.7, and I think that that is implicated by Attorney Cullen's representation, because there is a dispute between Chief Carignan and Attorney Leonard in

terms of the number of meetings that they attended together to talk about arresting Laurie Ortolano. We don't know if there's going to be any other discrepancies or different statements until they testify, but that could arise.

And the question is how does Attorney Cullen handle that in terms of cross-examining or examining his client Chief Carignan and still advocating and protecting his client Attorney Leonard. So that's an issue that we have a concern about. Attorney Cullen has had the opportunity to learn confidential information from Chief Carignan and also from Attorney Leonard. So I think that that poses a problem in terms of Rule 1.7.

Right now the discrepancy is not significant, but we don't know other discrepancies that are going to come about based upon Chief Carignan's testimony and how that may implicate the duty of loyalty that Attorney Cullen would owe to his client. So that is the reason why we oppose his involvement in the case, your Honor.

THE COURT: All right. I read everything that you submitted as well, Attorney Cullen, and I've given this thought, and ultimately -- I'm going to explain the reasons right now why I'm going to deny document number 160 which seeks to disqualify Attorney Cullen from representing Attorney Leonard and seeks to vacate my order that I issued last night, I believe it was last night, granting Attorneys Hilliard and

Shilo's motion to withdraw from representing Attorney Leonard.
So I'm going to deny that request.  Here's why.

You've moved based on Rules of Professional Conduct
1.7 and 1.8, and neither rule suggests that Attorney Cullen's
representation of Attorney Leonard poses an issue.

First, 1.7.  A concurrent conflict of interest
exists under Rule 1.7 when, and I'm quoting here, "the
representation of one client will be directly adverse to
another client; or when there's a significant risk that the
representation of the client will be materially limited by the
lawyer's responsibilities to another client or a former
client."  That's 1.7(a)(1) through (2).

Now, the rule goes on:  "A conflict may exist by
reason of substantial discrepancy in the parties' testimony,"
and that's ABA Model Rule of Professional Conduct Rule 1.7 and
it's comment 23, and I emphasize the word substantial.

Now, Ms. Ortolano contends that a conflict of
interest exists because Chief Carignan may testify at trial
that he met with Attorney Leonard one time; whereas Attorney
Leonard may testify he met with her twice.  This is in my view
an insubstantial discrepancy that fails to create a conflict
of interest.  Moreover, it would likely not be in Attorney
Leonard's interest for Attorney Cullen to cross-examine Chief
Carignan to highlight the possibility that he may have met
with Attorney Leonard more than once to discuss resuming the

investigation into Ms. Ortolano.  So I see little reason for Attorney Cullen to impeach Chief Carignan on this subject.

In addition, Ms. Ortolano fails to show that the asserted conflict, even if it existed, could not be waived.

Now, you've contended that Attorney Cullen's joint representation violates 1.7(b)(3) which prohibits waiver of a conflict if the representation involves the assertion of a claim by one client against another client represented by the lawyer in the same litigation, but neither Attorney Leonard nor Chief Carignan have brought any claims against each other. So paragraph (b)(3) prohibits representation of opposing parties in the same litigation.  That's ABA Model Rule of Professional Conduct Rule 1.7, comment 23.  And again I'm emphasizing opposing parties in that language in that rule.

It does not prohibit, however, simultaneous representation of parties whose interest in litigation may conflict, such as co-plaintiffs or co-defendants.

For these reasons I am ruling that you failed to show that Attorney Cullen must be disqualified pursuant to Rule 1.7.

Now, 1.8.  I feel that, likewise, you have not shown that Attorney Cullen must be disqualified pursuant to this rule.  This rule provides:  "A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed

consent, except as permitted or required by these rules."
1.8(b).

And it goes on.  The model rule to 1.8, comment 5
says, "The rule does not prohibit uses that do not
disadvantage the client."

Now, Ms. Ortolano contends that Attorney Cullen has
likely received confidential information from Chief Carignan
which, and I'm quoting, "he cannot now ethically use to the
benefit of Leonard in the same litigation."  That's document
160 at page 4, and I'm going to reject that argument for at
least two reasons.

First, 1.8(b) only prohibits the use of
confidential information to the disadvantage of the client,
1.8(b) again, and the motion fails to show that confidential
information from Chief Carignan would be used to Chief
Carignan's disadvantage.

Second, even if Ms. Ortolano had made that showing,
the argument ignores that Chief Carignan could give informed
consent to use the confidential information.

So for all these reasons I deny document number
160.  So Attorney Cullen, you may remain.

Let's move now to, if we could, the motions in
limine and see if we can get somewhere on those so that you
have an idea of what is going to happen in your case, what's
likely going to happen with respect to how I'm viewing some of

these exhibits and arguments.

So let's start with the -- we talked a little bit about this so I think you have a sense.  Let's start with the July 20, 2022, encounter that we talked about briefly.  This is an encounter between Attorney Bolton and Ms. Ortolano at City Hall.  This motion is document 136, and it is defendant's motion.

You're going to argue it, Attorney Shilo?

MS. SHILO:  Yes.

THE COURT:  And you're seeking to exclude evidence of that.  I'm going to say at the outset, just to save time, that I think -- having read through the motion, I think I agree with your position as its put forth in writing.  I'm concerned about relevance, but I want to hear from Attorney Aivalikles on it and then let you respond to the extent you would like to, but I think I would rather cut to the chase and not hide the ball at all and let you know what it is I'm thinking so that you can persuade me that I'm wrong.

So tell me why this encounter should come in.  And I assume you're wanting to introduce it in your case-in-chief and so tell me how that would come in, and then maybe you would concede that perhaps, Judge, it doesn't come in in the case-in-chief but there may be ways it could come in by way of impeaching a witness who says something and ultimately something that happened in July would be relevant.

So go ahead.  Go ahead, sir.

MR. AIVALIKLES:  So, the incident, your Honor, took place in a public hallway.  It wasn't in the attorney's office.

Attorney Bolton opened the door, saw my client there, and started screaming at her, you can't be here, I'm going to have you arrested, and she really got frightened and left.

And she was so concerned with the threat of arrest because it had already happened a year earlier that she called the police department and said this is what happened.

And so the police arrive and they spoke to my client, and they determined she was in a public hallway, she had a right to be there, and she didn't in any way threaten Mr. Bolton or anything along those lines.

And they talked to Mr. Bolton about what happened, and he was very angry and he kept demanding that they arrest her.  It got to the point where he wasn't even cooperating with the police, he refused to give them some background information, and they determined that because she was in a public place she had done nothing wrong.

So I think the incident itself of threatening to arrest is an adverse consequence.  I think it also goes to Attorney Bolton's hostility and animus at the policemen wanting to know if this hallway is not for the public, then

why do you have a bell there, it's a video bell, to gain entrance upon identifying yourself, and Attorney Bolton said: For everyone but her.

So, again, that's evidence of his animus, his hostility, his -- maybe his knowledge of, you know, her rights of speech, not being able to even ring the bell to identify herself in wanting to speak to someone in that office.

He also told the district court judge when there was an issue about whether she was going to get appointments or not, because that was one of the prohibitions, she couldn't go to City Hall unless she had an appointment, and so Attorney Bolton stated in the transcript that she'll never get an appointment ever.

And this all goes back to this pattern of harassment, this incident that happened in July of 2022, and his efforts to really stifle her by depriving her of an appointment at the legal department -- of her at least having to gain access to the legal department by the use of this video camera.

So I think for all of those reasons, your Honor, it is relevant. It shows his selectivity. Everyone but Mrs. Ortolano could schedule an appointment and one would be scheduled if it was necessary or that everyone but Ms. Ortolano could gain access to the legal department.

So I think it has a lot of relevancy for a lot of

different issues in this case.

THE COURT:  Okay.  All right.

Now, again, at trial things may come in differently.  I can't predict how they're going to come in.  I'm relying on what you've put in your motions, what I've read about the case, but what happened after the incident on January 22 of 2021, as you're describing it, is not relevant to the retaliatory arrest in 2021 in January.

It could be relevant.  What you're describing could be relevant somehow, there could be some way in which the door is opened to it, but it's something I can't envision at this point.  I would have to hear it in the moment, and I would give you a ruling in the moment.  You would need to explain to me why you think you get to bring in that testimony, but ultimately any probative value of that incident is substantially outweighed by the dangers of jury confusion because the jury is going to have two incidents in front of them.  It could create a trial within a trial because my guess is that Attorney Bolton might have a different view of what occurred.  And then in terms of the jury hearing that evidence it could be -- it could be unfairly prejudicial.  So all of those things I weigh, and I agree with Attorney Shilo's motion that the evidence has limited relevance to the issues before the jury because it occurred more than a year after the alleged retaliatory arrest.

Now, introducing evidence regarding a July 2022 encounter in which Attorney Bolton allegedly accused Ms. Ortolano of trespassing and threatened to have her arrested could confuse the jury as to whether Ms. Ortolano's retaliatory arrest claim stems from the July 2022 encounter or the January 2021 incident, and this is all the more true given that Attorney Bolton, as I understand from the summary judgment record, was not present for the actual January 2021 incident.

So in addition, as I said, I believe there will be a dispute regarding the circumstances of that encounter which presents a danger of a trial within a trial on a subject matter that bears little relevance to Ms. Ortolano's retaliatory arrest claim.

Finally, introduction of the evidence runs a risk of unfair prejudice as it could depict Attorney Bolton as angry or combative after the alleged retaliatory arrest. I'm not saying it wouldn't come in somehow, that it might not -- something could open the door to it, but ultimately it is not coming in.

So I am granting document number 136.

137.

MR. AIVALIKLES: Your Honor, could I just address two things just for the record?

THE COURT: Sure. Go ahead.

MR. AIVALIKLES:  This is not a he said/she said situation.  You have three investigating police officers that have extensive notes on what happened.  So I don't think that there should be much confusion in terms of conflicting statements by the plaintiff or the defendant Bolton.  You have three independent police officers investigate this, and what they had to say was very relevant.  Especially as it goes to his animus.

Secondly, I don't think the jury is going to be confused by the two incidents because the January 2021 incident there was an arrest.  The July 2022 incident there was no arrest.  So I don't think there's any danger that the jury is going to be confused by those two different events, your Honor.

THE COURT:  Okay.  Thank you, sir.

Document number 137.  This is a motion to exclude evidence that Attorney Bolton spoke with Captain Kenny prior to Ms. Ortolano's arrest in 2021, and let me just give you where my thoughts are on this and let you respond.

I -- let's see.  This is the conversation between Attorney Bolton and Captain Kenny.  The alleged conversation.

Yeah, I'm inclined to deny this one because Attorney Aivalikles has a good faith basis to cross-examine Attorney Bolton or Captain Kenny regarding the conversations she alleges they had in advance of her arrest.

Now, it may be that Attorney Bolton and Officer Kenny would deny that such conversations occurred, but Chief Carignan certainly testified that to the best of his memory they did.

And so I'm inclined to deny this one, but I want to hear from you, Attorney Hilliard, as to why I'm wrong about that.

MR. HILLIARD:  I appreciate your comments, your Honor.  The purpose of the motion was to say that the plaintiff ought not to be allowed to state this in the opening statement or refer to it unless and until there is some competent evidence presented that such a conversation occurred.

THE COURT:  Well, why couldn't they say to the jury, you'll hear that Chief Carignan remembers -- to the best of his memory he remembers that it was Captain Kenny with whom Attorney Bolton spoke?

MR. HILLIARD:  That's hearsay with respect to then Chief Carignan, your Honor.  He didn't hear it from Kenny.  If you remember from the deposition excerpt, it was either second or thirdhand hearsay.  He wouldn't be able -- he's not saying Kenny told me that.  He's saying somebody, somebody, somebody came to me.  That's why we filed the motion, your Honor, because with respect to --

THE COURT:  You're talking primarily about the

opening.  You don't dispute that he can ask Chief Carignan if this happened?

   MR. HILLIARD:  No.  From former Chief Carignan, your Honor, it's hearsay.  Carignan didn't hear it from Bolton or Kenny.  Carignan's deposition transcript said somebody told him that somebody else told him that somebody told them, and he thought it was Kenny.  That's why -- that's really why we filed the motion, your Honor, because Carignan cannot competently supply that testimony.  He didn't hear it.  Even if he heard it from Kenny, it would be hearsay, but he didn't even hear it from Kenny, your Honor.

   THE COURT:  Okay.  I thought his deposition he remembered it himself, but you're saying he remembered other people telling him that?

   MR. HILLIARD:  Right.  That's exactly what it -- those excerpts were attached to the plaintiff's objection, your Honor.

   THE COURT:  Okay.  So you're saying essentially not in the opening but he could theoretically impeach with it?

   MR. HILLIARD:  Well, I don't anticipate that if he testifies that former Chief Carignan is going to be able to be asked that question by either side because with respect to him it's hearsay.  The only two people that would be able to testify competently would be Bolton and Kenny.

   THE COURT:  Okay.  I'm not going to rule on this in

the abstract, I would have to hear it, but my instinct tells me that they would be able to at least ask, didn't you think -- or at one point didn't you think you had spoken to Captain Kenny or that Captain Kenny had spoken to Attorney Bolton or impeach him with statements to that effect if he's going to remember something else when he testifies.  Because when he was deposed, he remembered that it was Kenny he thought Attorney Bolton had spoken with.

I don't know the facts as well as you.  I want to keep an open mind on it.  I think he makes a point though about opening statement.  Do you agree with that then?

MR. AIVALIKLES:  Yes.  That's why I stood up, your Honor.  I don't intend to make that part of my opening because if I can't prove it, it's not going to look good to the jury.

THE COURT:  Right.

MR. AIVALIKLES:  So I had no intention of using it as part of my opening.

THE COURT:  Okay.  All right.

So with regard to opening statement, thank you for making that clear, he's not even going to go there.

MR. HILLIARD:  Thank you.

THE COURT:  So I'll grant it to the extent of opening statement, and then I'll reserve ruling on it in the context of trial with respect to any impeachment that he might want to use it for, okay?

MR. HILLIARD:  Currently in the record it's attached to the plaintiff's objection, but it's the Carignan deposition transcript at page 88 and 89.

Thank you, your Honor.

THE COURT:  Okay.  All right.  Thank you.

All right.  Now we've got, okay, number 138.

This is a motion to exclude evidence of other trespass incidents at City Hall, and I am inclined to deny this one.

Tell me why I shouldn't, Attorney Shilo.  This is critical of some decisive importance to her case.  Given the undisputed, really the undisputed existence of probable cause for her arrest, her claim really rests frankly on this type of evidence.  So make your argument.  Tell me why I'm wrong.

MS. SHILO:  Thank you, your Honor.

Our first argument is that there's no evidence in the record that either of the defendant attorneys were involved in any of these incidents or were aware of them, and we think that's important because in order to treat someone differently they need to have context and so that makes these incidents irrelevant.

The other is that the description of these incidents that we believe would be coming into evidence is incomplete.  They're very, very brief descriptions, they're located in document No. 75-18, and they are several line

descriptions of the incidents that were in the police reports.

Further, we don't think that any of the plaintiff's witnesses listed in their exhibit list (sic) will be able to testify to them aside from the incident involving Ms. Ortolano herself and one other incident that occurred on May 2nd.

So there's no -- we don't believe there's any further evidence coming in about these incidents that would allow the jury to have a more complete understanding of them, but on their face on the limited evidence they are incomplete and confusing at best.

THE COURT:  Okay.  What exhibit is it?  Do I have an advanced copy of that?  What exhibit is it?

MR. HILLIARD:  67, your Honor.

THE COURT:  67.  Okay.  So this would be Exhibit 67 marked for ID because I haven't ruled on it, and so this is an example of one of those exhibits where I would have to rule on it in the middle of the trial.  I can't rule on it in the abstract, but I can give you a sense that I would lean toward allowing these because -- to the extent they are unhelpful or incomplete, you can cross on that and you can cross-examine the proponent of these call logs.

Who's going to introduce them?

MR. AIVALIKLES:  I have Mr. Lavoie who is the keeper of the records for the Nashua Police Department, your Honor.  So I was going to get it in through the keeper of the

records.

THE COURT:  Okay.  And if those call logs, if I decide they come in, do you disagree that they came from the Nashua PD?  Do you need to fight about foundation or -- if I go ahead and rule they're admissible in general, would you stipulate so that he doesn't have to call a witness?

MR. HILLIARD:  Yes.

THE COURT:  Okay.  And I'll hear that argument in the context of the case, but I lean toward allowing it.  I'm going to deny it for now.

These are things to please raise in the context of the trial, but my instinct is that I would admit this and you then can do with them what you intend.  And then you would be able to cross-examine on how the jury -- whatever argument you're making about the jury relying on this to make a finding of similarity.

Do you have an officer who can testify that the policy is that generally --

MR. AIVALIKLES:  Yes.  Chief Carignan said this. He said it's a policy that we don't arrest people for trespass.  If we show up and the police tell them to leave, then they leave.  We do not arrest people.

THE COURT:  Okay.  Well, why do you need much more than that?  That's kind of a strong argument.  That's strong evidence right there.

MR. AIVALIKLES:  I agree, your Honor, but it also shows the implementation of that policy.

THE COURT:  Right.  You do have to show similarly situated comparative type evidence.  So you'll have to establish that in some way.  And maybe the similarity is narrow such that all it takes is, from your perspective, that these involved people who trespass.  They were asked to leave, they did not leave, but then when the police showed up, they left, and in that way they were similar.

And ultimately if you can get that from Chief Carignan or whoever, whatever officer, yes, that is our policy and that has happened many times in the past, that seems to me to be enough.

So I don't think these call logs are necessarily going to make or break it.  It sounds like you've got evidence.  But my instinct is that I would probably allow these call logs.

So I would deny document number 138.  And, again, I'm denying all of these without prejudice for you to renew these arguments at trial.

MS. SHILO:  Thank you, your Honor.

THE COURT:  All right.  Okay.

Now we're looking at 139.  Okay.  Yeah, this one just seeks to exclude evidence of claims or defenses that a party is no longer pursuing.

This one is yours, Attorney Shilo?

MS. SHILO:  Yes, your Honor.

THE COURT:  That one makes sense to me.  So let me hear from Attorney Aivalikles, and hopefully you're going to say, Judge, we don't intend to put evidence of abandoned claims or claims that are not before the jury.

Go ahead.

MR. AIVALIKLES:  The problem, your Honor, is that the motion doesn't have any specificity.  So we have really no idea what claims they're talking about.  Because there are potentially some claims that occurred as part of the harassment that Attorney Bolton and Attorney Leonard were present during these events.

So without having the ability to identify specifically what claims they're talking about, I don't think the Court can make that ruling until we actually have the trial and questions are raised about that.

THE COURT:  Well, I can tell you that unless I hear something very persuasive, it seems to me that unless a piece of evidence has some relevance to the only claim before the jury, the retaliatory arrest claim, it will be excluded.  So it's got to have some relevance to that claim, so I can certainly grant it to that extent, because I'm not going to allow evidence of claims or defenses that are not in front of the jury.  That seems a rather uneventful ruling on my part.

MR. AIVALIKLES:  I mean, we're talking about events that happened, your Honor.

THE COURT:  Can you give me an example of a claim or a dismissed claim or defense no longer being pursued that I would let in front of the jury?

MR. AIVALIKLES:  Well, again, your Honor, these go to -- well, yes, I can actually.

THE COURT:  Okay.

MR. AIVALIKLES:  The Court ruled that the right to know issue was not part of this case or there was no claim, okay?

THE COURT:  Okay.

MR. AIVALIKLES:  If you look at Exhibits 4, 5 and 6, your Honor, for identification.

THE COURT:  Yep.

MR. AIVALIKLES:  Okay.  So Exhibit 4 is an e-mail my client sent to Celia Leonard in which she says:  Under the right-to-know would you please provide me with the document for "Donchess timeline" that Jon Duhamel had Gary Turgiss put together.

And then if you go to Exhibit No. 5, the response is by Attorney Leonard:  The city is in receipt of your October 12, 2019, right-to-know.  The request is to provide me with documents for the Donchess time period that Jon Dunhamel and Gary Turgiss put together.

But the next paragraph says:  The law requires a reasonable description of the document sought, RSA 91-A:4. The request was not reasonably described because after due inquiry the city could not determine what governmental record is being sought.

If you go to Exhibit 3, your Honor, the last document, there is an e-mail a year earlier from Jon Duhamel to Louise Brown and the subject is Donchess timeline.

I think it's quite clear that that's what the request was directed towards, and I think the statement that it's ambiguous or unclear I think is just another effort to arrest my client, your Honor.

She specifically says I want the document Donchess timeline.  There is a city exhibit that references in an e-mail Ray Donchess timeline.

That position by Attorney Leonard claiming that it's ambiguous or they can't make that determination, that was part of the harassment.

THE COURT:  Okay, but that's not -- you haven't tied that to the retaliatory arrest.

If it's part of the story, part of the story that led to the visit to City Hall by your client, then I can see giving the jury a sense of why did she go to City Hall, why did -- and I think it was she was dealing with getting date stamps on text documents I think, but I'm not sure how an

e-mail between your client and Ms. Leonard that doesn't deal with the retaliatory arrest or the incident in January '22, how that has anything to do with --

MR. AIVALIKLES: The reason why they wanted her arrested, your Honor, is because they didn't like her, they had this animus to her, and they were going to make her life miserable. And the way they did that was little things like this that finally led to her arrest on January 2021, your Honor.

I mean, I think this is clear that the whole statement by Attorney Leonard with regard to this one right-to-know request, and there's others that are similar to this, clearly shows a pattern of harassment.

THE COURT: Okay. But pattern of harassment is not the adverse action at issue in the case. The adverse action is the arrest. And ultimately -- if it's part of the story of that arrest decision, then ultimately it would be relevant. I can see maybe questioning Attorney Leonard and if Attorney Leonard suggests that, oh, I was always agreeable and I tended to answer her requests, her right-to-know requests, and I was always forthcoming or whatever, I mean I'm just making this up, but then I could see, wait a minute, wait a minute, Attorney Leonard, I need to ask you about a couple of communications you've had with my client.

But in terms of the -- and that would go maybe to

her credibility, but in terms of the retaliatory arrest and
the motivation to have her arrested, I don't -- I'm not seeing
that level of minutia in detail as something that I'm going to
allow in.

Again, in the context of the trial -- and you will,
by the way, have headphones at your table.  You won't even
have to come up to the bench.  Our court reporter stays there.
It's much faster.  You just put those on.  You explain to me
why it is you think you want to introduce something.  I'll
hear from the defense as to why they don't think or why they
agree, go ahead, Judge, we'll allow it, and then we'll go
forward from there, but I don't -- I want to be clear with you
so you know where my head is what I'm likely to rule so that
you can prepare your trial but that is the level of -- I
understand the frustration, the history, and you want to tell
the whole story to the jury, but ultimately the issue in front
of the jury is limited to that retaliatory arrest, and I know
there's a context around that that is absolutely relevant in
terms of the motivation, but I'm not going to allow a lot of
that kind of evidence because ultimately it's limited to what
Attorney Bolton and what Attorney Leonard were aware of in
terms of your client's activities with respect to City Hall,
city government.

She's going to be testifying I presume about
activities, speech, her petitioning the government, her upset

over taxes, and the way the government in her view was

handling things, communicating with her.  So she's, you know,

a gad fly at this point and she's going to testify about that.

        And then Attorney Leonard and Attorney Bolton will

be talking about what they understood, and you'll be able to

cross-examine them about their treatment of her.  And if they

try to suggest that they were always oh so happy to see her or

deal with her, then, yeah, then that might open up some

different avenues, but it's totally going to depend on what

the evidence is.

        But as you stand there right now and I sit here

right now, I do not see the Donchess timeline coming in.  I

don't see those e-mails coming in unless you persuade me in

the moment that they are relevant to the claim.

        MR. AIVALIKLES:  I think they are, your Honor,

because I think the arrest on January of '21 that Attorney

Leonard demanded and that Attorney Bolton demanded is a

product of their harassment.  Get her arrested.  Have her

handcuffed.  It's all part of that pattern, your Honor, that

existed for the three years leading up to that arrest.

        THE COURT:  Three years before leading up?

        MR. AIVALIKLES:  Well, two years.  This is 2019,

the right-to-know.

        THE COURT:  Well, if I'm not mistaken, I thought --

I know I read some excerpts from deposition transcripts and I

thought, if I'm not mistaken, Attorney Leonard admits that
there were all kinds of lengthy interactions and a history
with Ms. Ortolano.  So I don't think that's going to be a
contested issue.  So I'm not sure we're going to need to get
into e-mails and Donchess timelines.

          I can tell you sitting here I'm going to be
sustaining an objection to that.  Unless the evidence comes in
differently than I'm understanding it now, I'm going to be
sustaining it, okay?  All right.

          So 139 then, I see that as a grant, and I don't
anticipate hearing about claims that are not in front of the
jury any longer.

          All right.  140.

          And we're powering through, we've gone for about an
hour and a half.

          Are you okay, still, Susan?

          MR. AIVALIKLES:  Ms. Ortolano needs --

          THE COURT:  Sorry.  Do you need a moment?

          MS. ORTOLANO:  Can I use the restroom?  You can
continue and I'll be right back.

          THE COURT:  Well, we could take a break very
briefly.  We only have 140 and -- is that the last one?

          MR. AIVALIKLES:  There's two more I think.

          THE COURT:  There's 140 and 141, you say?

          Yes, I see 141.

Why don't we all take a five minute break, and then that way you don't miss anything and it gives our court reporter five minutes. How does that sound?

MS. ORTOLANO: Great, your Honor. Thank you.

(RECESS)

THE COURT: All right. Let's do 140, and let me tell you what I'm thinking on 140.

I can see a point where this evidence might become cumulative, but excluding all of the evidence of her prior expressive conduct, it seems that I'm not inclined to do that.

So I do think that it would need to be tied to Attorney Bolton and Attorney Leonard's awareness of it, but it paints the context, the backdrop of the case.

So go ahead.

MS. SHILO: Understood, your Honor. And that's just what our motion is about. It is precluding prior protected conduct unless it's clear that the defendant attorneys were aware of the conduct. And there's certain conduct that I think there's no dispute that the attorneys were aware of, the 91-A requests, the lawsuits, Ms. Ortolano's testimony and comments at meetings that they were in attendance at. And we know that they were there because they're listed as attendees in the meeting minutes. But there's a lot of other material that we think may be presented, criticisms at meetings where they were not present.

THE COURT:  But would they hear about it later?  In
other words, Ms. Ortolano is making a lot of noise and
disputing this and that.  If they've heard about it later,
even though technically it would be hearsay, it would be
introduced not for the truth.

MS. SHILO:  And if there's evidence that they knew
about it or they heard about it, we're not moving to preclude
Ms. Ortolano from presenting evidence of that.  It's about
events that they didn't know about, you know, blog posts,
newspaper articles, those things.  There's no evidence that
the defendant attorneys were reading those and viewed those or
were even aware of them.  We would ask that the Court exclude
them based on this motion in limine.

THE COURT:  I think it's fair though for Attorney
Aivalikles to say, did you see this article, were you aware
that she came to the meeting and made these accusations about
city government and, you know, that kind of thing.  And
clearly if Attorney Bolton or Attorney Leonard says, no, I did
not know about that, then it's over.

MS. SHILO:  And that's exactly what we would
propose, your Honor.

THE COURT:  Okay.  I think that makes sense to me
then.  So to that extent I think I would -- you know, to the
extent it's trying to seek to exclude all evidence, then I,
you know, would be denying it, but I think you're conceding

that's not the point.  It needs to be tied to your clients'
awareness.

        MS. SHILO:  That's right, your Honor.

        THE COURT:  Whether awareness by hearsay or not, it
would be just general awareness.

        MS. SHILO:  That's correct.

        THE COURT:  Okay.  All right.

        And so in terms of your case-in-chief then too, it
may be something that you would get out through, you know,
Attorneys Bolton and Leonard as opposed to your own client
because she may not know what they know in terms of, you know,
things that happened, you know, well before or outside the
time frame.  Unless they knew and you have a good faith basis
to suggest they did know, then I wouldn't be prepared to ask
your client about that.  You can ask Attorneys Bolton and
Leonard, were you aware of the, you know, whatever the
incident is or whatever the debate or dispute was.

        MR. AIVALIKLES:  Right.  So I think my client can
testify that at the specific meeting she stated Attorney
Bolton should be fired.  I think she can testify to that.
Then the question is did Attorney Bolton know of that
particular statement.

        THE COURT:  Yeah, I mean -- I think if that's
something -- is that in a newspaper article as well?

        MR. AIVALIKLES:  Yes, yes.

THE COURT:  Okay.  That seems to be something I would probably allow.  So, yeah, I mean you're definitely hitting in the ballpark.  So that sounds admissible.

And you're not even disagreeing with that?

MS. SHILO:  No, your Honor.

THE COURT:  Okay.  All right.  So let's move on to 141 which is punitive damages.  This is just one that I don't think I can decide on until I've heard evidence, but I understand the argument and ultimately I think you can renew this argument by way of, you know, a motion for judgment as a matter of law at the appropriate time during trial.

I don't think the dismissal of the IIED claim, intentional infliction of emotional distress claim, makes the punitive damages under 1983 unavailable as a matter of law.  So I would not agree with that aspect of the argument, but ultimately it's going to depend on how the evidence comes in.

MS. SHILO:  Thank you, your Honor.

THE COURT:  So that one is denied but without prejudice to you to renew it.

MS. SHILO:  Thank you.

THE COURT:  Because I just can't rule on it right now.

Okay.  I think that takes care of the motions then.

And now we've got some categories of exhibits, and I'll let you negotiate on those now that I think you know

ultimately where I'm headed with some of these motions in limine.  And you can obviously -- I think the courthouse -- I think the courthouse actually closes at 5:30 if I'm not mistaken, but you're welcome to stay here if you would like to use this as a meeting place.

And I will get an order out probably Monday.  I might -- I'll try to get it out, if I can, tomorrow for you, the final pretrial order, so it lays out my rulings that I just made so it's clear to you where those are, and a lot of the other issues that we've already talked about will be laid out for you.  I will try to get that out tomorrow.  I'm gone so I'll try to do it if I can tonight, tomorrow morning.

So let me -- go ahead, Attorney Aivalikles.

MR. AIVALIKLES:  I'm sorry, I didn't mean to interrupt you, but just thinking of the logistics with that status conference.

THE COURT:  Yes.

MR. AIVALIKLES:  So we would have to file something on Monday because I think you gave us till April 7th if we want to file a pleading, and then the other side has until April 9th.  It's really close because today is Thursday.

THE COURT:  I know.

MR. AIVALIKLES:  In light of his schedule, maybe if we did it on the 11th, the status conference, is that within the Court's schedule, and then push those dates out for filing

pleadings to the 8th?

THE COURT:  I think I can do the 11th if we did it via Zoom.  I don't have my calendar.

Would that work for you?

MR. HILLIARD:  I'm in an all-day retreat on the 11th, but if you say on the 11th at this hour we're going to do it, I can step out and do a Zoom.

THE COURT:  Does it work for everybody?

MR. CULLEN:  I can't do the 11th, your Honor.

THE COURT:  Oh, right.  I know.  I know the 11th was out.  I knew there was a reason.  I apologize.

So we'll keep it at the 10th, and we'll hopefully get you involved.

What you said makes sense, but you don't have to file anything in writing.  You don't have to.

And you don't have to respond to it.  I certainly don't want replies and surreplies.  I'm just thinking, Judge, here's a stack of exhibits and we can have a dispute about them.  We want you to address this at the status conference.

If you can get me a brief summary of it ahead of time by way of a really short pleading that you file, a brief to raise the issue and give me an opportunity to think about it, I will get through those so that you know what the exhibits are that are likely to come in.

MR. AIVALIKLES:  One other idea, your Honor.

I think you gave us until 5 o'clock on the 7th. Can we push that out later than 5:00 to file?

THE COURT:  Oh, you mean maybe midnight?  Is that what you're thinking?

MR. AIVALIKLES:  Well, as much time as you can give us, your Honor.

THE COURT:  Well, let's do that.  Let's make it midnight, and then you can do it after 5:00.  That's fine by me.

MR. HILLIARD:  It's still 5:00 for me?

THE COURT:  It's still 5:00 for you, yeah.

MR. AIVALIKLES:  Thank you, your Honor.

THE COURT:  Yeah.  They say 60 is the new 40, I'm 62, but I do think that 9:00 p.m. is the new midnight for me.

MR. HILLIARD:  I was a lone voice in the wilderness when the e-filing was adopted here many years ago, and I said it still should be 4:30 to file.

THE COURT:  Well, I will allow it at midnight, and I probably would even allow it if you filed it the next day. I'm pretty user friendly.  Especially if you guys are.

You've tried cases with me, Attorney Cullen.

So have you, Attorney Shilo.

I've certainly tried cases against you, Attorney Hilliard.

It's a pleasure to meet you, Attorney Aivalikles.

MR. AIVALIKLES:  I go back to Judge Bownes.  That was my first special case.

THE COURT:  Okay.

Attorney Cullen, go ahead.

MR. CULLEN:  Thank you.

Just very briefly, your Honor, because I sensed that you were wrapping up.  I didn't want to see you shuffle your papers and run.

THE COURT:  Yes.

MR. CULLEN:  I just have two quick things.

One was -- and this is a bit related to the question about prior acts.  The witness list I think I would put in the category of the exhibits or would ask the Court to put in the category of exhibits as something that could be --

Sorry.  I'll be much slower.

-- pared down.  For instance, my client Frank Lombardi is on their will-call list.  He did the investigation into the assessing department.  The motion for summary judgment was granted.  He had nothing to do with the arrest.

THE COURT:  I think Attorney Aivalikles can probably -- based on this hearing can probably go back and figure out that his witness list and exhibit list is going to be a lot smaller.

MR. AIVALIKLES:  Yeah.  Especially if we have the opportunity to meet, your Honor.

THE COURT:  Yeah.  But go ahead.  I don't want to cut you off.

MR. CULLEN:  So ideally we could perhaps meet either tomorrow or Monday and at least go over that, but I would ask that we have some timeline by which we have a more realistic witness list so that we could raise that at the status conference if necessary.

Likewise, I know your practice typically is to allow some -- we would want some sense of which witnesses are being called when once we know what that witness list is.  Our clients are likely to be called in this case as we've pointed out, I'm sure other witnesses would be, too, but it would be helpful for us, and again, not today, not Monday, but by the end of next week to know what that order is going to look like.

And then the last thing, your Honor, is you indicated we're going to start on the 15th and presumably just go through until it ends.

My client, Attorney Leonard, has a surgical procedure on the 18th, which is the Friday.  I said that I would at least ask if there's a possibility that we could take that day off so she could get the surgery.  She says if she has to, she'll reschedule, but it won't get rescheduled until November.  It's a long wait.  So I said I would raise it.

THE COURT:  Yeah, I appreciate that.

MR. CULLEN:  So we could do trial, and then take a day off and come back Monday.

THE COURT:  I'm going to have to hold that, we'll see how the trial is going, because I have tickets that I've got to use for a long-planned vacation the next week, and I would be leaving Wednesday of the next week.  So if I cut out one day of the trial, that would be tough.

MR. CULLEN:  Wednesday, the 23rd, your Honor, you leave?

THE COURT:  Yes.  I'm very much hoping, obviously, that the jury verdict is in before that time, and so -- and again, I don't see the case as being as long as the following week.  I'm not even going to tell the jury that because I just don't see it, and I don't like telling the jury something that's inaccurate in terms of the days of trial.  That concerns me.

But I think the sense that I'm getting from Attorney Aivalikles is that he's going to cut down witness list and exhibit list, and I think by the end of next week at the latest would make sense.  You can work it out.  And to the extent there are disputes, bring in the categories.  Because I would rather hear about categories of exhibits than each one individually if you can do that for me.

The same thing with witnesses.  They fall under this category, Judge.  Are these witnesses coming in?  Because

we can't agree.  And I will give you my take on it.  That's exactly what that status conference is for.

I also am happy to get on a Zoom conference with you if something comes up in the meantime.  I want this trial to keep moving for that jury.  That is really my top priority.  Obviously I want a fair trial, but I want them to hear the trial, hear the case, and have us move it through and not have them wasting their time.

They will appreciate it ultimately, and I think you will enjoy the experience more as well.  So I am very happy to cut through some of it and give you a sense of what categories of exhibits and evidence are going to come in, and I think that's the purpose of the status conference.  But if you need that -- if you need something before the status conference, contact Attorney Esposito and I will get on a Zoom with you.  You present me what it is you're having trouble with, and I'll help -- I'll give you a sense of why that is or is not coming in at least in my best guess based on my understanding of the case, and then we can still have the status conference to go over, you know, other minor issues if you still need it.

But if something happens and you need me before the trial, in my view it's going to keep the trial moving, it's going to keep you working together to pare down the evidence, and I will make it happen and so will Attorney Esposito.

MR. AIVALIKLES:  I have one quick question, your

Honor.

        THE COURT:  Sure.

        MR. AIVALIKLES:  You said you start the trial at
8:30 but you wanted to meet with the lawyers an hour
beforehand?

        THE COURT:  Yes.

        MR. AIVALIKLES:  So does that mean 7:30?

        THE COURT:  That's right.

        MR. AIVALIKLES:  Okay.

        THE COURT:  That's right.  It will be early.  I'll
be in a hotel the whole time.  I live on the seacoast so I
don't want to get up at 4:00 in the morning and drive over.
So I'll be actually in a hotel during the trial just so that
I'm here and it's much easier for me.

        But 7:30, that gives you an opportunity to tell me
the evidentiary issues that are going to happen and I can give
you a sense of here's how I'm likely to rule on that, and then
we keep everything moving.

        If it's pretty clear the night before that you
don't have anything, again you let her know and we'll show up
at 8:30.

        MR. AIVALIKLES:  Okay.

        THE COURT:  All right?  That's how it works.

        So you'll be in touch with her via e-mail I think
or telephone.

THE CLERK:  E-mail or I can give them my cell phone number.

THE COURT:  All right.  Excellent.

Very nice to meet everybody.

Anything else?

MR. HILLIARD:  Just what time is jury selection, your Honor?

THE COURT:  That starts in the morning.

Usually we actually address the perspective jurors around 9:30, 9:40, something like that?

THE CLERK:  Yes.

THE COURT:  I'll come out -- now, if you need to see me before jury selection, then I'll come down or you can come upstairs to a conference room if there's some reason you need to see me, but be prepared to move everything back to here after we pick the jury because if you have big briefcases and such, it's important you know this is where we're going to do the trial.  We'll start it right after we pick the jury.

MR. HILLIARD:  So report to courtroom 3 at 9:30, 9:15?

THE CLERK:  I would say be there more like 9:15 if you don't need to see her.

MR. HILLIARD:  Thank you.

THE COURT:  And if you do, just let her know ahead of time and we'll meet, okay?

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  Excellent.

Good to see everybody.

Thank you.

Court is adjourned.

(Conclusion of hearing at 5:05 p.m.)

C E R T I F I C A T E

     I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.

Submitted:  11-14-25    /s/   Susan M. Bateman _____
                             SUSAN M. BATEMAN, RPR, CRR