*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 3, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * * *
                                    *
LAURIE ORTOLANO,                    *
                                    *
            Plaintiff,              *
                                    *   1:22-cv-326-LM
            v.                      *   April 15, 2025
                                    *   10:14 a.m.
STEVEN BOLTON and CELIA LEONARD,    *
                                    *
            Defendants.             *
                                    *
                                    *
* * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


Appearances:


For the Plaintiff:          William E. Aivalikles, Esq.
                            Aivalikles Law Office


For the Defendant,          Russell F. Hilliard, Esq.
Steven Bolton:              Madeline Kate Matulis, Esq.
                            Upton & Hatfield LLP


For the Defendant,          Brian J.S. Cullen, Esq.
Celia Leonard:              Cullen Collimore Shirley PLLC


Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            U.S. District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603) 225-1442

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3   consideration today a motion hearing in Laurie Ortolano vs.
 4   Bolton, et al.  It is 22-cv-326-LM.
 5              If counsel could please identify themselves for the
 6   record, starting with the plaintiff, please.
 7              MR. AIVALIKLES:  Good morning, your Honor.  William
 8   Aivalikles for the plaintiff.  Laurie Ortolano is sitting next
 9   to me.
10              THE COURT:  Good morning.
11              MR. HILLIARD:  Good morning, your Honor.  Russ
12   Hilliard for Attorney Bolton and with me is Maddie Matulis from
13   our office.  I think it's her first time appearing before you.
14              THE COURT:  Well, welcome.
15              MS. MATULIS:  Thank you.
16              THE COURT:  Good morning.
17              MR. CULLEN:  Good morning, your Honor.  Brian Cullen
18   here on behalf of defendant Leonard.
19              THE COURT:  All right.  Good.  My understanding is
20   that today we're going to try to deal with those -- I think
21   there are maybe three pending motions, and one is just a motion
22   to clarify.  And then we're going to talk somewhat about
23   exhibits and witnesses, perhaps, in terms of buckets of
24   objections, so that you can simplify it for me.
25              I am just going to give you a sense of how I might
```

 1    rule with respect to those buckets.  We're talking -- obviously

 2    we're using casual terminology, but I think you understand what

 3    I mean.  If there are a collection of exhibits and you have

 4    essentially the same objection to those exhibits and -- and

 5    same for you, Attorney Aivalikles, if you can put them into a

 6    unit, if you will, then I can help guide you, I think, in terms

 7    of perhaps slimming down some of your witness and exhibit

 8    lists.

 9            Is there anything else today that we need to do or

10    am I right, that pretty much covers it?

11            MR. AIVALIKLES:  I think so, your Honor.

12            THE COURT:  Okay.  All right.  Good.  Let's do this

13    then.  Let me start with, okay, the motion to clarify.  And

14    that is document number 172.

15            And I know, Attorney Aivalikles, you had filed this

16    and I will hopefully answer your question -- answer your motion

17    for you and just clarify that the July 2022 incident postdates

18    the relevant incident.  And I ruled -- I granted the motion,

19    provisionally granted the motion, assuming the evidence comes

20    out a certain way, because that incident is not relevant to the

21    questions before the jury.

22            However, I did say that there are ways in which

23    potentially testimony could come in that might open the door to

24    that evidence, but as I sit here, it's hard for me to envision

25    a way in which that incident comes in.  Perhaps if one witness,

1    Attorney Bolton, is testifying and testifies -- characterizes

2    his own conduct toward Ms. Ortolano as always civil, always

3    polite, always -- we always were courteous to one other and

4    perhaps the incident would contradict that, then I -- I would

5    think that that opens the door to it.  But, otherwise, it is --

6    it is not coming in for all the reasons under 403 that I

7    articulated in my ruling.

8              Is that clear to defendants in terms of granting

9    your motion?  But, obviously, it depends on how the evidence

10   comes out at trial.

11             MR. HILLIARD:  It is, your Honor.

12             THE COURT:  Okay.  And, Attorney Aivalikles, is

13   that --

14             MR. AIVALIKLES:  Yes, your Honor.  When I saw your

15   order saying it was granted, I took the position that anything

16   to do with that was -- was out and it wasn't my understanding

17   when you were talking about the motion.

18             But I think also, your Honor, I think it's relevant

19   for more than just impeachment because it does show retaliatory

20   motive.  I mean, my -- my client's standing in a public hallway

21   and Attorney Bolton is demanding that the police arrest her.

22   And this is similar to what happened in the -- the 2021 case,

23   except she wasn't in a public place.

24             So I think it's relevant for motive, for intent, and

25   the other grounds that I have in my motion, your Honor.

1          THE COURT:  Okay.  And I just want to make sure you

2     understand that I do not agree with that interpretation because

3     the motive at issue is the motive in January 2021.

4          MR. AIVALIKLES:  '21.

5          THE COURT:  2021.  And so it isn't relevant to the

6     motive at that time.  It could be relevant to something that I

7     cannot foresee as I sit here, but I would not admit it as to

8     motive because it happens -- it couldn't have -- it couldn't

9     have caused -- that event that happened a year and a half later

10    could not have caused the event in January of 2021.

11         So that -- that I would disagree with.  I just want

12    to make sure you understand --

13         MR. AIVALIKLES:  Sure.

14         THE COURT:  -- that I would not be allowing it under

15    that theory, but it could come in, perhaps, if something

16    happened at trial that I cannot predict.  Okay?

17         All right.  So that takes care of document 172.

18         Okay.  Let's -- we've got document 169, this issue

19    of victims and victimization.  There are citations, I think,

20    Attorney Aivalikles, to statutes that deal with victims' rights

21    and need definitions in order for judges to interpret those

22    statutes.  But, this, you're asking for a far broader

23    exclusion, excluding them from in any way describing themselves

24    as victims of this criminal trespass.

25         And my inclination on that is that I am inclined to

 1    deny this, but, again, there are ways in which, you know, I may

 2    exclude it, depending upon how -- how it's being used.  It's

 3    hard for me to -- to predict.  You know the cases better than I

 4    do, but I don't -- I'm not going to stop them from using the

 5    word victim.  I mean, if someone burglarized my home, you're

 6    telling me I'm not a victim of the burglary?  Or somebody --

 7    Josh Shapiro is not a victim of the arson that occurred a

 8    couple days ago at his mansion?

 9            MR. AIVALIKLES:  That's totally different, your

10    Honor, than criminal trespass because with an arson or a

11    burglary, there's going to be property damage.  Criminal

12    trespass, there is -- there is no victim, possibly the city of

13    Nashua, but certainly Attorney Bolton wasn't even there for him

14    to -- you know, to claim that status and I think it's just

15    designed to bring sympathy to the defendant.

16            THE COURT:  Can I just point out, and as I hear this

17    evidence -- and, again, I will hear the context and I'll be

18    able to make a ruling.  So you can certainly renew a motion in

19    the moment and make an argument to me, Judge, this is my

20    argument, put it on the record, and let me hear it in the

21    context of the testimony.  But what I'm trying to do now is to

22    give you a real strong sense of where -- where I'm likely to

23    head so that you know and understand how the evidence is likely

24    to -- how I am likely to act in my role as gatekeeper based on

25    my understanding of the facts.

1          But what I was going to say was I -- you're talking

2    about the prejudice to your case, but, in essence, the fact

3    that they think of themselves as victims, doesn't that build in

4    some way to your theory of the case, that you're arguing to the

5    jury, these -- they thought they were victims, they thought

6    that this conjured up -- I think one of them described it as

7    January 6th or thought of January 6th, but isn't that part of

8    your theory of the case?

9          So I'm not -- I'm not seeing a lot of prejudice from

10   this and I think this -- if -- if it cuts in one way, it might

11   cut in your favor.

12          But, in any event, I want to hear it in context and

13   I -- I am denying 169 because at this point, I -- I am not

14   going to preclude them from using the word victim to describe

15   themselves.  I do think Attorney Bolton, if he was not

16   present -- again, though, that to me fits in with your theory

17   of the case.  If he's going to describe himself as a victim,

18   well, you get to cross-examine him.

19          MR. AIVALIKLES:  I understand the Court's ruling,

20   your Honor.

21          THE COURT:  Okay.  All right.  So that's document

22   number 169.

23          And then there is the issue of the C word and

24   keeping that out.  And that one is document number -- is it

25   170?

1          MR. CULLEN:  It is, your Honor.

2          THE COURT:  Yeah.  Okay.  All right.

3          And, ultimately, as I understand it, it would not

4   be introduced to show subjected to adverse action; it would

5   instead be introduced only on the question of damages.  Is that

6   correct?

7          MR. CULLEN:  Yes, your Honor.  We'd be looking to

8   put it in to show that the plaintiff, who claims that her

9   speech was chilled, was not actually chilled, and this is a

10  very direct and rather stark example of that.

11         THE COURT:  Okay.  And isn't that an objective

12  standard, ultimately?  Give me the --

13         MR. CULLEN:  The standard on chilling?

14         THE COURT:  Yes.

15         MR. CULLEN:  I would say that's subjective, but I

16  would say that the -- yeah, I would say that --

17         THE COURT:  It is subjective?

18         MR. CULLEN:  No, whether her speech was chilled, I

19  think it's whether it would chill a reasonable person.

20         THE COURT:  So it's objective.

21         MR. CULLEN:  I think it's objective, yes --

22         THE COURT:  Okay.

23         MR. CULLEN:  -- but --

24         THE COURT:  And so her subjective -- her,

25  essentially, personal approach to subjective chilling seems to

1    be different than what you would consider the average person.

2    She's able to actually --

3              MR. CULLEN:  But --

4              THE COURT:  And so I can see it going to damages,

5    but, ultimately, the question is would a person -- an

6    objective, reasonable person standard as opposed to somebody

7    well-schooled in --

8              MR. CULLEN:  I --

9              THE COURT:  -- going to public meetings, et cetera.

10             MR. CULLEN:  I understand that, your Honor, from the

11   standpoint of do they achieve that element of their claim, but

12   then there's the damages.  And as it's pointed out --

13             THE COURT:  Okay.

14             MR. CULLEN:  -- in the pretrial papers, there's a --

15   there's a $995,000 demand in this case.  That's based on the

16   premise that her speech was actually restricted and chilled in

17   some way.  And I think it's very relevant to that to be able to

18   show that, in fact, she continued to speak regularly, that she

19   was so unbowed by this arrest that -- you know, that she was

20   willing to use these sort of extreme terms, specifically

21   towards my client who she claims has caused her a million --

22   nearly a million dollars worth of damages.

23             THE COURT:  Okay.

24             MR. CULLEN:  I think its starkness is important.

25             THE COURT:  Let me ask you this.  Are there a bunch

1    of other examples of --

2                    MR. CULLEN:  There's --

3                    THE COURT:  -- behavior?

4                    MR. CULLEN:  -- nothing like this, your Honor.

5    There are other --

6                    THE COURT:  This is the singular example of the C

7    word being used?

8                    MR. CULLEN:  Yeah, the singular example of the C

9    word being used.  There are other examples of her speaking, but

10   to take the most stark one, the most obvious or extreme one,

11   out would -- would really weaken our presentation.  It's not as

12   though, you know, this is just sort of a matter of being

13   cumulative.  This isn't cumulative because it's -- it's

14   different than the other -- it's different than just getting up

15   and speaking or getting up and, you know, making other comments

16   at a public meeting.  This is --

17                   THE COURT:  What was the exact quote?

18                   MR. CULLEN:  Russ -- I might defer to Russ, if he

19   remembers it.  It was, I think -- I think it was a combination

20   of using it, specifically calling Ms. Leonard a C word, and --

21                   THE COURT:  Do you know the exact quote?

22                   MR. CULLEN:  And I think there's also a -- it was

23   also used somehow as an adjective, I believe, which I'm not

24   sure exactly how that worked.

25                   I have the --

```
 1              THE COURT:  Do you have transcripts of that --
 2              MR. CULLEN:  Defendant's trial Exhibit F, your
 3   Honor, has the actual -- and thank you, Russ -- has the actual
 4   language.
 5              THE COURT:  Was it once?  So once we find it, that's
 6   it, the one singular occasion?
 7              MR. CULLEN:  I believe it's the singular occasion --
 8              THE COURT:  Okay.
 9              MR. CULLEN:  -- at one meeting.
10              MR. HILLIARD:  Yes, although it's referred to later
11   by other speakers in her presentation.
12              THE COURT:  You mean her use of that --
13              MR. HILLIARD:  Yes.
14              THE COURT:  -- was referred to later?
15              MR. HILLIARD:  Yeah.
16              THE COURT:  Okay.  Well, I'm not --
17              MR. HILLIARD:  And she then responded to it.
18              So it's not -- I just want to say it's not just a
19   single word at a single time.
20              THE COURT:  Right.  But, ultimately, the objection
21   is not I didn't say it; the objection is this is prejudicial.
22   Right?
23              And so the question becomes once that's admitted, if
24   I admit it --
25              MR. CULLEN:  Uh-huh.
```

1          THE COURT:  -- is it so prejudicial to her case that

2     the jury won't be able to really get past that.  And I'm not

3     sure.  I need to wait and hear the evidence.  But if there is a

4     lot of evidence that she was not chilled --

5          MR. CULLEN:  Your Honor, I'd really feel like you

6     were kneecapping us if you told us we can't use the strongest

7     evidence that we have and that we have to fall back on

8     cumulative evidence that's not as strong.  I mean, that would

9     be prejudicial to our case.

10          THE COURT:  Give me some ideas -- give me some

11     examples of the other evidence.

12          MR. CULLEN:  I think what we have and what we were

13     actually not going to present as exhibits anymore, we've marked

14     them just for ID and we'll go over that in a little bit, we

15     have lots of other examples of her speaking at various -- you

16     know, she asked for us to be fired; she -- you know, one of our

17     exhibits, Exhibit B, is entitled The Colossal Stupidity of the

18     Legal Office, in which she -- you know, she attacks both Bolton

19     and Leonard for their -- you know, for their conduct within the

20     office:  The colossal -- these colossally stupid practices

21     created by Attorney Bolton with or without Donchess's blessing

22     set the stage for costly litigation.

23          There are other things, but there's not something

24     that's as stark, in my view, as -- as this.

25          And, you know, certainly we could, you know, alert

1   the Court to when we were going to address it, if the Court

2   were inclined to address it on the fly, but I think to rule at

3   this stage that it's -- it's more prejudicial than probative, I

4   think, would -- would really hamstring us.

5           I'm looking at another one, defendant's trial

6   Exhibit VV, Update on Right-to-Know Lawsuit Against the Nashua

7   City Hall, Crooks and Liars, published by Laurie Ortolano, 26th

8   of April 2021.  So just two months after her arrest.

9           So there -- there are other examples.  I just don't

10  think --

11          THE COURT:  Okay.

12          MR. CULLEN:  -- they're as stark as this one.

13          THE COURT:  All right.  Well, at this stage, I am --

14  it's document number 170.  I'm denying it without prejudice to

15  renewing it at trial.  I need to hear the evidence.

16          MR. AIVALIKLES:  Yeah.  And the term, your Honor --

17  I know the Court wanted to know --

18          THE COURT:  Yeah.

19          MR. AIVALIKLES:  -- what was said.  It said that she

20  engaged in the cuntiest behavior I ever saw.

21          And that was six months after the arrest.

22          THE COURT:  Okay.

23          MR. AIVALIKLES:  And she heard that on British TV.

24          MR. HILLIARD:  Just for the record, what exhibit is

25  that, please?

 1                THE COURT:  What exhibit?  He's wondering where that

 2      comes from.

 3                MR. AIVALIKLES:  I wasn't referring to the exhibit,

 4      your Honor, but that's the recollection is of what she said.

 5                THE COURT:  You think it's different than that?

 6                MR. HILLIARD:  No, no, I don't.  I just wanted --

 7      just for the record, I wanted to have the exhibit.

 8                THE COURT:  Okay.  All right.

 9                MR. HILLIARD:  I do -- I agree with that.

10                THE COURT:  Okay.  So that, I think, takes care of

11      the pending issues.  All right.

12                Now, let's talk about witnesses and exhibits and

13      units that we can deal with in terms of objections and the

14      like.

15                Attorney Hilliard or Attorney Cullen, Attorney

16      Aivalikles.  I'm happy --

17                MR. HILLIARD:  I think Attorney Cullen is probably

18      the right person to start with witnesses.

19                THE COURT:  Okay.

20                MR. CULLEN:  If you want to address the witnesses

21      first, your Honor, I'm happy to do that.  I think the two

22      things do kind of tie together, but I did file an objection or

23      a -- regarding the witnesses.  It was document number 160.  176

24      was the plaintiff's revised witness list and 179 was our

25      response to that witness list.

1       And, essentially, the concern here that we have is

2   that although the witness list is substantially culled from the

3   original one that was in the pretrial conference, there's still

4   several people on both of the witness will call list and the

5   may call list that don't appear to have any relation to the

6   remaining claims.

7       The first, really, is the mayor himself, who's

8   listed on plaintiff's will call list as, I think, the second

9   person on their -- on their will call list.  The mayor was not

10  present at the -- during the January 2021 incident; he was not

11  alleged to be present or -- and was not present at any of the

12  meeting -- at the meeting or meetings between the legal team

13  and the police; he wasn't involved in the investigation or

14  prosecution of Ms. Ortolano.  He really doesn't have anything

15  to say about the issues that are here today.

16      The plaintiff has a long history with the mayor.

17  She -- mostly to do with the abatement process, but other

18  things as well.  I noted that her exhibits include exhibits

19  that relate to her challenges to the abatement process and

20  claims about his own tax assessments.

21      And so my concern is that the mayor is being put on

22  for purposes that would be unrelated to the specifics of this

23  case and more an opportunity to simply examine him in a

24  courtroom about topics that are unrelated.  That seems to be

25  borne out by the -- by the exhibit list.

1              THE COURT:  And are there other witnesses who fall

2      into sort of that category?

3              MR. CULLEN:  I think -- I think Kim Kleiner is in a

4      very similar situation.  She's on the may call list.

5              THE COURT:  Kleiner?

6              MR. CULLEN:  Yes, Kim -- Kimberly Kleiner was the --

7      was eventually -- she ran the assessing department and she's

8      the first person on the plaintiff's will call list.  I think

9      both of them have a very similar lack of relationship to the

10     issues that remain before the Court.

11             THE COURT:  Okay.  All right.  Let me ask you, what

12     would you be introducing the witnesses for?  What would you be

13     trying to show with them?

14             MR. AIVALIKLES:  Yeah, with regard to the mayor,

15     your Honor, this whole effort to harm my client, retaliate

16     against my client, started with the mayor and it started in

17     2018 when Ms. Ortolano discovered that the mayor's $100,000

18     building permit was never closed, which meant that the city was

19     never taxing his property for the hundred thousand dollar

20     improvements.  And that went on for like six years until they

21     eventually closed it because of Ms. Ortolano.

22             And she disclosed this at a public meeting that the

23     mayor was present at and he accused her of slandering her

24     (sic).  And this is the beginning of the problems that she

25     began to experience with the city.  Keeping in mind that the

1    mayor appointed Attorney Bolton and Attorney Leonard, he is

2    their boss, and it's our position that they were greatly

3    influenced by Ms. Ortolano's revelation about the city's taxing

4    of the mayor's property.

5              THE COURT:  Okay.  So, essentially, it's part of

6    your context evidence --

7              MR. AIVALIKLES:  Yes.

8              THE COURT:  -- to show your client's history of I'm

9    going to say gadfly -- can I use that --

10             MR. AIVALIKLES:  Sure.

11             THE COURT:  -- as a -- gadfly history.  And I'm

12   wondering why she can't just testify about that in terms of her

13   history with the city.  I'm not sure that the defendants are

14   going to dispute that she was a gadfly going back to early

15   years.

16             Now, were both defendants employed at that time?

17             MR. AIVALIKLES:  Yes.

18             THE COURT:  Were both defendants aware?  Okay.

19             MR. AIVALIKLES:  It's my understanding they were

20   aware, your Honor.

21             THE COURT:  And so general context evidence, I

22   think, could be -- could be relevant, but there -- I

23   wouldn't -- I wouldn't think a lot of evidence on that, enough

24   to establish it from your client's perspective, but we

25   certainly don't need the mayor to come in and testify about

1    it unless -- unless there's some way in which that becomes

2    relevant during the trial and you need to call the mayor to

3    rebut something.

4              But I -- I can't even imagine how the mayor himself,

5    who was not present for the actual incident and then wasn't

6    present for any of the meetings with the police, how he figures

7    in.

8              MR. AIVALIKLES:  Well, again, your Honor, it's a

9    question of introducing evidence.  If she testifies to what the

10   mayor said at that meeting, that's objectionable, hearsay --

11             THE COURT:  Right.  But what the mayor said at a

12   meeting in years before is just not -- not relevant.

13             MR. AIVALIKLES:  But, again, it adds context to what

14   she has gone through, your Honor.  He accused her of slandering

15   him by disclosing a truthful fact, and that is that his -- his

16   building permit for a hundred thousand dollars had not been

17   closed and the city was not taxing it.

18             THE COURT:  Right.  I don't want the jury to -- I

19   want the jury to focus on the issues that are relevant and it

20   would be very easy for them to get distracted by other

21   episodes, other incidents.

22             I think generally the history, the -- let's call it

23   gadfly history, that sets a context and I think it is relevant

24   to your case, but there would be a definite line I would draw.

25   The mayor, unless something comes up that makes him relevant,

1    I -- unless we hear something about his role in the actual

2    retaliatory incident itself, I -- I can't imagine that I would

3    find that he would be necessary as a witness.  And so I haven't

4    heard anything at this point that would persuade me otherwise.

5           Same thing with abatement exhibits.  I guess you

6    could -- you could have a load of abatement exhibits and

7    introduce them all in one -- one exhibit with your client on

8    the stand to talk about, did you file these, you know, and you

9    filed them for years, and this has gone on for a long time.  I

10   could see that, perhaps.  But I wouldn't necessarily -- and

11   obviously the defendants would have to have an opportunity to

12   look at those.  And then I do -- there would have to be some

13   tie to the defendants and their awareness of the particular

14   context evidence.

15          Now, do they have to be aware of every single

16   incident?  I don't -- I would not be so strict as that.  But I

17   would allow context evidence in that showed -- was evidence

18   that the defendants were aware, generally aware of.

19          MR. AIVALIKLES:  We only had two abatements, your

20   Honor, and those were the elderly people that she went to the

21   city hall to have date-stamped that resulted in her arrest.

22          THE COURT:  Okay.  That sounds -- two -- two

23   abatement documents?  I thought you said there were numerous

24   abatement exhibits.

25          MR. HILLIARD:  I think he's referring to something

1    different, your Honor.

2        THE COURT:  Okay.  All right.

3        MR. HILLIARD:  The two abatement requests that were

4    said to be date-stamping were two other people's --

5        THE COURT:  Okay.  So you're still talking about a

6    stack of abatement exhibits --

7        MR. CULLEN:  There were -- there were at least a

8    half dozen exhibits that had to do with the mayor's own

9    assessment.

10       MR. AIVALIKLES:  Well --

11       THE COURT:  I don't see that coming in.  I just --

12   this could -- this trial could take two weeks if we --

13       MR. AIVALIKLES:  Well --

14       THE COURT:  -- if it's opened up to the mayor's --

15       MR. AIVALIKLES:  Well, I only see the mayor being on

16   the witness stand for a half-hour, your Honor, just to lay some

17   of the groundwork that led up to the problems that she had with

18   the city and their -- and their motivation.

19       And so I -- I think it's critical for the jury to

20   understand the context, what started this, and I think that's

21   the starting point of the problems that Ms. Ortolano

22   experienced.  And the two abatements were the -- the basis of

23   her being the -- at the town attorney's office and her arrest.

24       THE COURT:  Those two abatements, those do sound

25   relevant.  They're part of her story.  You would admit those as

1    she's telling the story.  That -- I don't see any problem with

2    those.  But a history of the mayor's abatement documents and

3    other documents related to the mayor's --

4              MR. AIVALIKLES:  Well --

5              THE COURT:  -- home or property, no, I'm not seeing

6    that as relevant.

7              MR. AIVALIKLES:  There's no issue about the mayor's

8    abatement, your Honor.  That -- that's not the issue.

9              THE COURT:  Well, there were documents that you

10   described, Attorney Cullen, that -- of course, this is a little

11   hard for me because I am -- I'm speaking in the abstract and

12   I'm not actually seeing the particular exhibits as I sit here.

13   But in the abstract, this is not sounding relevant.

14             I can see you putting your client on the stand to

15   tell stories.  And to the extent the -- to the extent the

16   defendants are suggesting that there wasn't a history with the

17   mayor as far back as, you know, 2019, did you say --

18             MR. AIVALIKLES:  '18.

19             THE COURT:  -- 2018, I -- ultimately, it's really

20   hard for me to see how that comes in, but we can wait for trial

21   and see if there's any way in which this becomes relevant

22   somehow.  But I'm not seeing it as I sit here.

23             So let me help parties out here by saying that the

24   mayor as a witness on your will call list, I -- I would

25   certainly move him to the bottom of your may call list, at

1    most, and you would have to, you know, make the case for me to

2    find him -- his testimony to be relevant in the moment at

3    trial.  Okay?  But I'm not seeing case in chief.

4              Any other -- there's Kim Kleiner.  Same kind of

5    thing, it's background context evidence?

6              MR. AIVALIKLES:  Well, that's a little bit more

7    involved, your Honor.  And, again, it depends upon the

8    testimony of Attorney Bolton and Attorney Leonard, because they

9    had a lot of contact with her.  So that's why I have her as a

10   potential.  I don't know what they're going to say.  And

11   Ms. Kleiner could be contradicting them or rebuttal and that's

12   why I did not list her as a will call but only as a potential,

13   depending upon the testimony of Attorney Leonard and Attorney

14   Bolton.

15             THE COURT:  Okay.  We can keep her on the may call

16   and then if you need to admit her and you object, I'll hear it

17   out.

18             All right.

19             MR. CULLEN:  Just a couple other things on the will

20   call list then, your Honor.

21             There are two officers, Patrolman Earnshaw and

22   Sergeant Gilbert.  Those are officers who responded to the July

23   2022 incident.  They were not involved in the January 2021

24   incident.  So I think based on your prior ruling on defendant's

25   motion in limine regarding that July 2022 incident, they would

1    not have any relevant testimony to the facts that are -- remain

2    in issue.

3            THE COURT:  Do they have any testimony that -- other

4    than July 2022, any testimony they would offer?

5            MR. AIVALIKLES:  Officer Gilbert has had a prior

6    encounter with Attorney Bolton in which Attorney Bolton did the

7    same pattern and that is that he claimed that this driver

8    assaulted him.  The police were called.  He told the driver --

9    I mean, he told the police that the driver assaulted him.  He

10   was very angry.  And there was a third-party independent

11   witness that said it never happened and so there were no

12   charges.  So it's somewhat similar to what happened on January

13   21st.

14           THE COURT:  Bolton was not present for January 20 --

15           MR. AIVALIKLES:  No.

16           THE COURT:  -- 21, right?

17           MR. AIVALIKLES:  But --

18           THE COURT:  That is -- that is --

19           MR. AIVALIKLES:  -- your Honor --

20           THE COURT:  That is definitely at the bottom with

21   the mayor, at the bottom of your may call list, and that is --

22   I'm inclined to agree with the argument being made that this

23   is -- this is not going to be admitted and -- for the same

24   reasons that I am not admitting evidence in the case in chief

25   of the July 2022 episode.

 1                MR. AIVALIKLES:  Just for clarification, Attorney

 2    Bolton was very instrumental in having the police prosecute and

 3    arrest Mr. Bolton for the January 2021 incident.  He, according

 4    to Chief Carignan, demanded that she be arrested.  So he is

 5    tied in to 2021 although he wasn't --

 6                THE COURT:  I understand that.  He's a defendant

 7    who's remained in the case --

 8                MR. AIVALIKLES:  Right.

 9                THE COURT:  -- but, ultimately --

10                MR. AIVALIKLES:  I just wanted the Court to -- the

11    Court to --

12                THE COURT:  Okay.  I understand that.  Okay.

13                So, yeah, those two witnesses I would suggest should

14    be on, at most, a may call list, I agree.

15                Go ahead.

16                MR. CULLEN:  As you know, this witness list came to

17    us -- the amended witness list came to us a little late, it

18    came in on the 8th and I appreciate it being culled.

19                It has a couple other people on it.  Dr. Laura Chan,

20    addressed in the paper --

21                MR. AIVALIKLES:  We're not calling her, your Honor.

22                MR. CULLEN:  Okay.

23                THE COURT:  Laura Chan?  Okay.

24                MR. CULLEN:  Not calling.

25                And the last two on the will call list are a Karen

1    Bill and an Eliese Moore.  And I think they may have been

2    people that Ms. Ortolano advocated on behalf of for their

3    abatements.  So I just wasn't sure what their relevance was,

4    but if -- certainly I'm happy to hear what alternative

5    reasoning to have them on.

6              THE COURT:  Go ahead.

7              MR. CULLEN:  I'm not overly worried about them.  I

8    just --

9              THE COURT:  You don't know --

10             MR. CULLEN:  I don't want the jury to hear a list of

11   25 names of potential witnesses if these people really aren't

12   going to get called.

13             MR. AIVALIKLES:  Your Honor, Eliese Moore is the

14   elderly person who filed her abatement through my client.  So

15   she would just testify that she hired her, she didn't pay her,

16   and she handled the abatement for her.

17             THE COURT:  Okay.  And how is that relevant?

18             MR. AIVALIKLES:  Well, that precipitated the arrest

19   on January 21st.  That's why she was there, to get her -- her

20   abatement date-stamped.

21             THE COURT:  Okay.  But that issue may not be even

22   disputed.  And so if your client is describing the abatement

23   and describing this individual, I'm not seeing how that

24   individual herself would need to testify as to this retaliatory

25   arrest.  Tell me -- tell me why.

```
 1              MR. AIVALIKLES:  I mean, I think it's important for
 2    the jury to see faces.  And, you know, my client can testify,
 3    you know, to names, but I -- I also think it's important for
 4    the jury to understand the good work that my client was doing
 5    at no -- at no cost, no payment, that got her arrested.
 6              THE COURT:  And -- and she's going to be describing
 7    that, your client, right?
 8              MR. AIVALIKLES:  She is, your Honor, but then again,
 9    you know -- again, this witness would be no more than a
10    half-hour on the witness stand.  It certainly isn't going to
11    prolong the trial.
12              THE COURT:  Right.  But it's not going to be
13    disputed that she's there to get abatement applications
14    time-stamped; is that right?
15              MR. HILLIARD:  That's not conceded, your Honor, but
16    there's emailing between the plaintiff and somebody in the
17    assessing department in the days before January 22 in which the
18    two abatement applications she has are identified and that
19    person is one of the two.  So the fact that that person is one
20    of the two applications is not disputed.
21              THE COURT:  Okay.  Yeah.  All right.  She might be
22    somebody you would like to bring in and show to the jury, but
23    ultimately, the jury has to decide about the motivations of
24    Mr. Bolton and Leonard and what happened with respect to that
25    arrest, why the arrest happened, what the motive for the arrest
```

1    was.  And so I -- I am -- based on everything that I've heard

2    today, that person sounds like somebody better suited for the

3    bottom of the may call list as -- as well.

4          Bringing in witnesses on matters that are not in

5    dispute and matters that, ultimately, the jury doesn't need to

6    decide, those types of witnesses, if they had knowledge that

7    was relevant, that would -- that would be obviously somebody

8    for your witness list, for your case in chief, but based on

9    what I'm hearing, I would grant the motion to exclude that

10   witness based -- in your case in chief.

11         So -- so that's Karen Bill, Eliese Moore.  It sounds

12   like Karen Bill, you weren't planning on -- or were you

13   planning on bringing her in for the same reason?

14         MR. AIVALIKLES:  She's different, your Honor.  She

15   stood up before I believe it was the Board of Aldermen and

16   testified how cruel and how badly treated they dealt with

17   Ms. Ortolano.  And she's not a friend, but she was at a meeting

18   and she was very critical about how they handled her, how they

19   had her arrested.  And so to that extent, she can testify to

20   the impact that the community sensed or at least that she

21   sensed by the way that Ms. Ortolano was treated and it goes

22   directly to the January 21 arrest.

23         THE COURT:  You mean to her damages; is that what

24   you're --

25         MR. AIVALIKLES:  Yes.

1            THE COURT:  -- you're arguing?

2            MR. AIVALIKLES:  (Nods head.)

3            THE COURT:  Tell me how that would not be relevant

4   to her damages.

5            MR. CULLEN:  Well, it sounds like what he wants is

6   somebody to come in and attest that it's her opinion.  I mean,

7   the jury ultimately would be making that -- that -- that it's

8   Ms. Bill's opinion that she was mistreated.  I don't -- I don't

9   see how that is different from what we're asking the jury to

10  decide.

11           THE COURT:  Uh-huh.  And Ms. Bill was part of some

12  sort of public meeting --

13           MR. AIVALIKLES:  Yes, that's correct.

14           THE COURT:  -- involving the arrest?

15           MR. CULLEN:  I think she spoke up defending

16  Ms. Ortolano at a Board of Aldermen hearing, essentially saying

17  that, you know, you put her through the wringer, or words to

18  that effect.

19           THE COURT:  Okay.  And then there could be another

20  list of witnesses perhaps who maybe saw it a different way that

21  you might want to bring in or no?

22           MR. CULLEN:  We certainly don't have anybody like

23  that on our list right now.  I suppose if Ms. Bill was coming

24  in to testify as essentially some sort of a character witness

25  or to provide opinion testimony as to what she perceived, then

1    perhaps we'd have to revisit our will call list --

2              THE COURT:  Yeah.

3              MR. CULLEN:  -- for rebuttal witnesses, but I'd

4    prefer not to.

5              THE COURT:  I think I'll wait until I hear this in

6    context, but to the extent I'm trying to help you get a sense

7    of where my head is regarding whether this would come in, it

8    does not sound as though this person has relevant testimony

9    with respect to what the jury has to decide.  I can understand

10   why you want both witnesses in, but, ultimately, I'm not

11   seeing -- I'm not seeing the -- the relevance.  So -- and it

12   could confuse the jury to introduce people who are essentially

13   giving their own opinion as to what happened to your client,

14   which is really what the jury has to decide.

15             So for all those 403-type reasons, I would likely

16   grant a motion to exclude her from testifying unless I hear

17   something at trial that would make it relevant.  Right now, as

18   I sit here, I'm not hearing any -- anything that would compel

19   me to allow you to introduce her testimony.

20             So are there others?  Are there others?

21             MR. CULLEN:  No, your Honor, nothing --

22             THE COURT:  So that takes care of, essentially,

23   witnesses.

24             MR. CULLEN:  Yes.

25             THE COURT:  Does it also take care of some exhibits

1   or --

2           MR. CULLEN:  Not really.  I think --

3           THE COURT:  Okay.

4           MR. CULLEN:  Attorney Hilliard will address the

5   exhibits, but I think there are a few larger buckets that he'll

6   be able to address with you, your Honor.

7           THE COURT:  Okay.  All right.

8           Attorney Aivalikles, did you want to say something?

9           MR. AIVALIKLES:  Yeah.  I mean, I'm getting the

10  sense that we're going to have like a sanitized version of this

11  trial, your Honor, and that all of this evidence is going to

12  come through my client without the jury knowing that it had a

13  wide-ranging effect.  And that's my concern.  Again, I -- I

14  think that we're being really bootstrapped in terms of the

15  context and what led up to the January 21st arrest, your Honor.

16          THE COURT:  I understand.  Okay.  You can make those

17  arguments, renew them at -- at trial and I will be hearing the

18  evidence at that time and be able to have a sense of exactly

19  where the lines are.  But as I see it now, I'm not hearing

20  anything that makes the mayor, Kim Kleiner, Earnshaw --

21  Officers Earnshaw, Gilbert, or Ms. Bill or Ms. Moore admissible

22  in this -- in this case.

23          I understand they're part of the history.  They play

24  some role in a long span of time.  But we're just talking about

25  one incident.  And to the extent witnesses have relevant

1   testimony about the incident and can help the jury decide these

2   questions, then they would be relevant.

3          But right now, there's -- any relevance at all,

4   which is minimal, is substantially outweighed by, essentially,

5   confusion of the issues for the jury, cumulative testimony on

6   top of what your client is going to testify to, and in some

7   instances, with respect to the officers or with respect to,

8   actually, the mayor, specifically, they're not going to be

9   disputing certain aspects of her difficulties or interactions

10  with the mayor.  Does that make sense?

11         MR. AIVALIKLES:  I understand -- no, I understand

12  what the Court's ruling is, your Honor.

13         THE COURT:  Okay.  I just don't think it requires

14  the mayor's testimony.

15         All right.  Let's go to exhibits.

16         Go ahead, Attorney Hilliard.

17         MR. HILLIARD:  Thank you, your Honor.

18         And just by way of context, what I'm holding is a

19  revised objection with the buckets that I filed on April 8.

20  It's document number 174.

21         THE COURT:  Okay.  Let me see if I can find that.

22  Is that going to help me or can you just tell me --

23         MR. HILLIARD:  Well, I hope it will.  It was

24  intended to.

25         THE COURT:  Document 174.  Let me see if I have

```
 1    that.  Hold on.
 2                I have a limited number of documents and I don't
 3    have that one and I don't have my computer down, which gives me
 4    access to the entirety of the docket.  But maybe --
 5                THE CLERK:  Would you like me to print it?
 6                THE COURT:  Could you?  That'd be excellent.  Thank
 7    you.
 8                THE CLERK:  174.
 9                MR. HILLIARD:  And while it's being retrieved, your
10    Honor, the reason I filed a revised one is that I filed our
11    initial objections to plaintiff's exhibits back on March 27,
12    but then on April 7 we got a revised list that substantially
13    changed the order of the exhibits and, therefore, the
14    numbering, and eliminated quite a few.
15                I guess at the end of the day I might propose to the
16    Court to just give me a day or two to update this one because
17    it'll become much clearer to all of us, better organized.
18    Because what I did in this amended one, your Honor, is I -- I
19    took my original filing from March 27 and I entered
20    parenthetically the new number of the exhibit from the revised
21    exhibit list.  So, frankly, it got fairly cumbersome.  But I
22    thought if today I could just talk about buckets --
23                THE COURT:  And these are the headnotes that
24    you've --
25                MR. HILLIARD:  Yes.
```

1          THE COURT:  -- you've got in here?  Okay.

2          MR. HILLIARD:  These are the buckets.  And within

3     those buckets, as you'll see, I list exhibits that fall in the

4     bucket and then, parenthetically, the new exhibit number on the

5     revised exhibit list.  So it's a document that deserves some

6     cleaning up, your Honor, but that's where it stands at the

7     moment.

8          But the first -- the first bucket is a number of

9     meeting minutes of the Board of Aldermen and a number of those

10    go back to 2018 and the plaintiff's remarks about the assessing

11    department.

12         There were a number of aldermanic meetings in 2019

13    with her remarks about the Board of Tax and Land Appeals and a

14    reassessment of the property in Nashua.  And this is all

15    outlined.  I don't mean to read my exhibits, your Honor, but

16    it's all outlined there on the page 2 under category 1.

17         These are her concerns being expressed years before

18    the incident in question.  And although I appreciate the

19    Court's comments about some general context, there's a lot of

20    exhibits here.  And not only do we have the minutes, but you'll

21    see later on we've got video recordings of all these meetings

22    as well of the plaintiff testifying at various board meetings.

23    It's cumulative.  It's just not a good use of the Court's time

24    to go through all of these.

25         So that's bucket number 1.

 1              THE COURT:  Okay.  Let's do it bucket by bucket.

 2              MR. HILLIARD:  Okay.

 3              THE COURT:  How about that?  And we'll try to move

 4   pretty quickly.

 5              Attorney Aivalikles --

 6              MR. AIVALIKLES:  Oh, yes, your Honor.

 7              THE COURT:  -- how about bucket number one, the

 8   Board of Aldermen meetings, minutes, and video recordings.

 9              MR. AIVALIKLES:  First of all, we've reduced our

10   exhibit list by 50, your Honor, you know, so we did make a

11   meaningful effort after we had that April 3rd hearing.

12              But, again, the minutes of the meeting provide

13   context and provide further evidence of what Ms. Ortolano had

14   to deal with going before the Board of Aldermen, going before

15   the Board of Assessors, going before the -- like the finance

16   committee where Attorney Bolton was present for some of these,

17   Attorney Leonard was present for some of these.

18              So they -- they do have proper context because

19   Attorney Bolton and Attorney Leonard were at a significant

20   number of these particular meetings, your Honor.

21              THE COURT:  Okay.  And they occurred as far back as

22   2018?  Okay.  2019.

23              MR. AIVALIKLES:  And the other issue, your Honor, is

24   that we -- I'm not attempting to introduce videos of all of

25   these meetings.  I think there's just five, and they're

1    snippets.  They're not the whole meeting.

2                 THE COURT:  Okay.  What kind of snippets and what's

3    the --

4                 MR. AIVALIKLES:  Again, it's Ms. Ortolano talking.

5    It shows how calm she was, how measured she was, and yet, you

6    know, despite that, there's, you know, remarks that had been

7    made to her that were critical of her.

8                 So I think it's important for the jury to think

9    that -- or to know that Ms. Ortolano was just not showing up at

10   these meetings and making wild claims, but rather it shows how

11   measured she was, how -- her tone of speech and those things,

12   your Honor.  And I think that's important --

13                THE COURT:  Well, this is your case in chief --

14                MR. AIVALIKLES:  Yes.

15                THE COURT:  -- so her -- as you put on this evidence

16   and your client is testifying about it, unless it goes to the

17   January 2021 episode, I can only see that kind of evidence

18   coming in in rebuttal or if -- if she's impeached in some way,

19   it might become relevant.  But it -- it does not seem to me to

20   be a case in chief bucket.

21                However, introducing, you know, just various

22   documents to essentially corroborate very quickly, yes, is this

23   the -- is this the document that describes what you just told

24   the jury; does it generally describe that meeting.

25                But, again, giving the jury meeting minutes that

1  describe a meeting that happened years before or even months

2  before, unless it really is relevant to your case in chief, I

3  am not inclined to admit that.

4         And so I'm just telling you for the sake of -- you

5  know, of your understanding in terms of what I'm likely to do.

6  And, again, this is -- this is going to depend on how the

7  testimony comes in and what the defendants' arguments are, but

8  as I sit here now, this seems to be something that you would

9  use, perhaps, in rebuttal of some sort of suggestion being made

10  about your client's behavior with respect to this 20 -- January

11  2021 incident.

12         MR. AIVALIKLES:  So the --

13         THE COURT:  So --

14         MR. AIVALIKLES:  I'm sorry.  I didn't mean to

15  interrupt, your Honor.

16         THE COURT:  Yeah, go ahead.

17         MR. AIVALIKLES:  I would just say, for the Court's

18  edification, the minutes are not of the entire meeting.  It's

19  been redacted.  So it just shows Mrs. Ortolano's statements and

20  comments that were made to her.  I think one of them involved a

21  meeting in which Attorney Bolton made comments about her.

22         So they're not entire minutes of meetings, your

23  Honor.  They're just her statements and, in one case, Attorney

24  Bolton's statement, your Honor.

25         THE COURT:  Okay.  Can you give me an example?

1           MR. AIVALIKLES:  I'm sorry, your Honor.  I didn't --

2    I didn't bring my entire file with me.

3           THE COURT:  Well, just give me an example of a

4    statement that you claim is going to help the jury decide the

5    disputed issues in the case.

6           MR. AIVALIKLES:  I mean, in -- in one of the

7    minutes, your Honor, and it had to do with my client winning

8    her abatement before the land and tax appeal.  I think Attorney

9    Bolton references she wasn't being truthful, for example.  I

10   mean, this is what I can think of offhand, your Honor.  I

11   didn't bring my entire exhibit book and I apologize to the

12   Court because I didn't realize we were going to be doing this.

13          THE COURT:  Right.  But do you see how that could

14   open the door to a trial within a trial?  Because then it opens

15   the door to a dispute about the context in which Mr. Bolton

16   said that, they would then want to respond to that to,

17   essentially, defend, perhaps, his -- whatever the implication

18   is.  And it's -- it sounds to me, again, the same issue is

19   coming up.  I'm hearing evidence that really is evidence that

20   is not relevant to the case in chief.

21          And I know it's frustrating you.  I can see it on

22   your face.  But I have to keep the jury focused on the issue in

23   the case and the issue they have to decide and I am not going

24   to have the jury confused with other episodes and other

25   incidents.

1          I'm not saying I'm going to block you from

2   cross-examining Mr. Bolton on something that you believe to be

3   his -- representative of his bias or that kind of thing, but

4   I -- as your -- in your case in chief, this does not seem to me

5   to cross the Rubicon of relevance.

6          So I'm going to -- I'm going to tell you that that

7   is my strong inclination with respect to bucket 1.  You're --

8   the jury's going to be able to see your client testifying and

9   describing the context and the history.  And to the extent you

10  need some video to rebut some inference that's been made, make

11  the argument to me.  But I'm not inclined to have the jury hear

12  all kinds of background evidence about statements that were

13  made years and months before the episode.

14          MR. AIVALIKLES:  But, your Honor --

15          THE COURT:  So those exhibits, that pile of

16  exhibits, is -- I'm -- I'm agreeing with the argument being

17  made by Attorney Hilliard with respect to category 1, Board of

18  Aldermen meetings minutes and video recordings.  To the extent

19  they do not deal with the January 2021 incident --

20          MR. AIVALIKLES:  Your Honor --

21          THE COURT:  -- I would likely exclude those.

22          MR. AIVALIKLES:  Your Honor, can I just be heard

23  real quick on -- I'm not trying to beat a dead horse.

24          THE COURT:  Tell me one thing about this bucket --

25          MR. AIVALIKLES:  Sure.

1          THE COURT:  -- that makes it relevant in your case

2    in chief and I'll -- I'll hear you out.

3          MR. AIVALIKLES:  Okay.  We have a claim for punitive

4    damages.  We have to establish malice.  And I think some of

5    these statements by Attorney Bolton are indicia of malice.  And

6    it's going to be very difficult for us to prove ill will,

7    malice, and those issues without being able to introduce some

8    of these particular documents that pertain directly to Attorney

9    Leonard and Attorney Bolton.

10          THE COURT:  Okay.  Assert that argument at the time,

11   but at this point, that is my -- my view of this category of

12   documents.

13          Attorney Hilliard.

14          MR. HILLIARD:  Bucket 2, your Honor, is exhibits

15   relating to plaintiff's various right-to-know requests.

16          I will tell the Court that the plaintiff has

17   withdrawn a number of these, but there's still many there and

18   they have to do with, the Court will hear in the trial, a great

19   number of right-to-know requests filed by the plaintiff and the

20   city's response, the city's response made by -- initially in

21   responding to the request and then litigation by the city

22   attorneys.  And that's what all of these exhibits I've

23   designated here are about.  Some of those have been withdrawn.

24   There was -- it was 99 and 100 had to do with a protective

25   order motion I filed on behalf of the city in a pending case in

1    the superior court.  That's now been withdrawn.

2           But the remaining ones, one by one, number one,

3    relevance to the issue before the Court and the jury; number

4    two, individual things that the lawyers file in responding to a

5    right-to-know request or to an email from plaintiff or her

6    counsel about right-to-know requests, those are primarily going

7    to fall within that litigation privilege that I talked about

8    earlier in the case.  They're acting as lawyers there,

9    representing the city.  They've got to be able to file things

10   in court, respond to emails from the plaintiff or her counsel,

11   and have that be protected by attorney-client privilege, the --

12   excuse me, the litigation privilege.

13          The last one in that bucket, we already talked about

14   it, those 2012 -- that was a right-to-know request for some

15   2012 police records involving Attorney Bolton.  We talked about

16   that earlier, your Honor.  But that's -- that's the bucket that

17   I'm concerned about there in general.

18          THE COURT:  2012?

19          MR. HILLIARD:  That was in 2012.  What we were

20   talking about earlier was 2012.

21          THE COURT:  Okay.  Yeah.

22          MR. HILLIARD:  And you've already --

23          THE COURT:  Yeah, I think this falls into this same

24   category.  Relevance is the hurdle.  I'm not getting to the

25   litigation privilege.  I haven't looked at these documents.

 1  But just in terms of the relevance hurdle, that's going to be

 2  your biggest -- biggest hill to climb.

 3            MR. AIVALIKLES:  Okay.  Your Honor, what's confusing

 4  is that the defendants have listed that same exhibit for ID,

 5  Exhibit C, which is Attorney Bolton's arrest record.  The same

 6  exhibits that we have that they're objecting to, they have

 7  listed as potential exhibits.  So it's -- it's hard to --

 8            THE COURT:  Okay.  Well, I can't deal with that

 9  issue.  I'm -- I'm just dealing with a slew of right-to-know

10  requests --

11            MR. AIVALIKLES:  Yes.

12            THE COURT:  -- and documents related to that.  So

13  that has the same relevance hurdle that you'll need to get over

14  at trial.

15            So let's move on to Donchess property record card.

16  I think we've dealt with that.

17            MR. HILLIARD:  Nothing to add.

18            THE COURT:  That is not relevant.  That does not

19  meet the relevance standard for the reasons we've already

20  talked about.

21            Okay.  Newspaper articles.

22            MR. HILLIARD:  Yes, about the plaintiff and the

23  arrest.  And my objection is that it may contain statements by

24  the plaintiff that --

25            THE COURT:  What's that again?

1              MR. HILLIARD:  I said they may contain statements by

2     the plaintiff that I might cross-examine them about, but

3     they're not properly part of the plaintiff's case in chief.

4     And to the extent they might contain statements alleged to have

5     come from one of the defendants, they can be cross-examined

6     about them.  But newspaper articles --

7              THE COURT:  Right.  Wouldn't they show your -- tend

8     to show, perhaps, your -- your client's awareness of certain

9     context evidence?  No?

10              MR. HILLIARD:  Because -- you mean because they saw

11     the newspaper articles or because they were called by the

12     newspaper to make a comment?

13              THE COURT:  In whatever way that they would hear

14     about it, through hearsay, but they would --

15              MR. HILLIARD:  I don't think it -- I'm not sure how

16     that -- these are all post the arrest, your Honor.  I'm not

17     sure how that --

18              THE COURT:  These newspaper articles are articles

19     that happened after the arrest.

20              MR. HILLIARD:  They -- let me check a date, your

21     Honor.

22              THE COURT:  Let me ask Attorney Aivalikles.

23              What are these articles being introduced -- what's

24     your purpose to introduce them?

25              MR. AIVALIKLES:  Well, they have quotes from both

43

1    Leonard and Attorney Bolton in the articles and, in fact, one

2    of the quotes in the article --

3                THE COURT:  I'm not going to rule on this right now.

4    This seems like it might be admissible.  If they're quotes,

5    statements, being made and you're going to cross-examine on

6    them, then at this point I don't want to exclude them.  But,

7    again, you'll be able to impeach him with statements, but it's

8    not necessarily going to mean that that article is a full

9    exhibit.

10                MR. HILLIARD:  That's fine, your Honor.

11                THE COURT:  And you can argue that at the time.

12    Okay?

13                MR. HILLIARD:  Bucket number 5 is the plaintiff's

14    investigation well before the incident in January of '21 of the

15    assessing department.  It involved interaction with the DRA,

16    BTLA hearings and orders.

17                THE COURT:  Are your clients disputing they were

18    aware, generally, of that history?

19                MR. HILLIARD:  No, we're not --

20                THE COURT:  Okay.  So why do you need the exhibits

21    themselves to come in with respect to an investigation that

22    predated -- predated the incident?

23                MR. AIVALIKLES:  Yeah, I -- I think, again, your

24    Honor, what's important to some of these documents is it

25    demonstrates that my client wasn't a disrupter.  She brought

1    about good changes to the assessing department.  She informed

2    the state of deficiencies in the Nashua assessing department

3    that resulted --

4          THE COURT:  Okay.  She can testify about her history

5    of taking on the assessing department.  But, ultimately,

6    exhibits, the jury needs to see those in your case in chief?

7          MR. AIVALIKLES:  Well, I mean, I would confront them

8    with the issue of what she has to say about the outcome being

9    hearsay because these documents clearly address an exception to

10    the hearsay rule.  They're the state's business records.

11    They're certified records.

12          THE COURT:  Right.  The hurdle is relevance.  How

13    are they relevant?  That's going to be the hurdle.  I think

14    that you're going to see for most of these exhibits just how

15    are they relevant to what the jury has to decide.  I -- and I'm

16    talking about the documents now.  I'm saying she's going to be

17    testifying about this history of her taking on the assessing

18    department and that -- that history with respect to her

19    investigation, et cetera.

20          MR. AIVALIKLES:  But I think that --

21          THE COURT:  You may need an exhibit to substantiate

22    something after cross-examination, but --

23          MR. AIVALIKLES:  But --

24          THE COURT:  -- I'm not seeing them getting over the

25    relevance hurdle.

1        MR. AIVALIKLES:  I mean, from our perspective, your

2   Honor, I mean, I think it creates a greater credibility for the

3   jury to see an actual document rather than my client making

4   that statement.  I mean, I think it makes a big difference in

5   terms of how jurors respond to evidence, your Honor.  And I

6   think having the -- that particular evidence in front of the

7   jury, which did predate the arrest, was upsetting to Attorney

8   Bolton, it was addressed at the various meetings, I think does

9   have relevancy.

10        THE COURT:  Okay.  And you're talking about one

11   document --

12        MR. AIVALIKLES:  Yes.

13        THE COURT:  -- right now.  There might be one

14   document that you want to introduce as opposed to paragraph 5

15   of Attorney Hilliard's document -- motion is document 174.

16   Paragraph 5 has a lot of documents with respect to this

17   investigation.  And what I'm saying is there is just -- I'm not

18   hearing any evidence that would suggest all of these documents

19   are necessary --

20        MR. AIVALIKLES:  I understand.

21        THE COURT:   -- and pass the relevance hurdle for

22   introduction to the jury.  But I can see what you're saying

23   with respect to maybe one document, you want the jury to see

24   something.  Try to introduce it, they'll make an objection, and

25   I might allow it.  If you've -- you're limiting it to one

1  document, you want the jury to see it, I might allow that.  But

2  a slew of documents related to something that does not -- it's

3  not necessarily in dispute that she was investigating the

4  assessing department, but there may be a lot of disputes as to

5  how to interpret these documents and that's going to distract

6  and confuse the jury, but her testimony about that history

7  provides context.

8            So that's what I would say about paragraph 5 or

9  category 5.

10           Let's do 6, which seems kind of similar.

11           MR. HILLIARD:  It --

12           THE COURT:  Tax --

13           MR. HILLIARD:  Very similar.  We've discussed it,

14  the principle, to some extent.  The plaintiff had her own tax

15  abatement cases at the BTLA and these exhibits are about that,

16  cases that were handled by the defendants here as counsel for

17  the city.

18           THE COURT:  Okay.  Well, again --

19           MR. AIVALIKLES:  And, again, Attorney Bolton was

20  involved with that.  He made representations to the Board of

21  Aldermen about the outcome of that that were not truthful.  He

22  basically said -- he basically told the Board of Aldermen that

23  no one won, they sort of came down in the middle, when, in

24  fact, they ruled clearly in favor of my client in terms of the

25  valuation.

1          So there's a history here of friction and antagonism

2    between my client and Attorney Bolton and these documents

3    establish that friction that existed, the dislike that he had

4    for my client, your Honor.

5          THE COURT:  There are documents that will

6    actually -- where he is expressing --

7          MR. AIVALIKLES:  Yeah.  At one point --

8          THE COURT:  -- dislike?

9          MR. AIVALIKLES:  Yes.

10         THE COURT:  Can you give me an example?

11         MR. AIVALIKLES:  I mean, at one of the Board of

12   Aldermen meetings, your Honor, where he literally told the

13   Board of Aldermen that no one really won; the BTLA came down

14   sort of in the middle.  And that's not true.

15         THE COURT:  But, ultimately, saying something about

16   the merits of a tax abatement case is not -- that's not

17   relevant to -- it might be relevant somehow to his credibility.

18         MR. AIVALIKLES:  Exactly.

19         THE COURT:  Okay.  But it's not -- in a pile of

20   exhibits that you are going to introduce in your case in chief,

21   again, it -- it goes to relevance to the January 2021 episode.

22   And the history and the context, I've made clear I'm going to

23   allow your client to talk -- to testify about that.

24         And -- but giving the jury a number of different

25   documents regarding the merits of tax abatement cases, that is

48

 1    not -- that is not relevant.

 2              And you can make the case at the time with respect

 3    to a document that you want to admit.  Mark it for ID and I'll

 4    give you a ruling at that time once I hear their objection and

 5    then I'll -- you know, if it's -- I can tell you if it's really

 6    limited and you want to make the jury see something to

 7    substantiate one thing and it does that, I'll probably say I'm

 8    going to allow this.  But a stack of tax abatement documents,

 9    no, I would not allow that.  That is not going to be -- that is

10    not going to be coming in in your case in chief.

11              So paragraph 6.  Let's move to 7 and is this -- this

12    looks like the same kind of thing.

13              MR. HILLIARD:  It is, your Honor.

14              THE COURT:  So relevance of assessor meeting

15    minutes.  I don't think I need to say anything more than what

16    I've already said.

17              MR. AIVALIKLES:  Right.  I understand the Court's --

18              THE COURT:  Okay.

19              MR. AIVALIKLES:  -- direction.

20              THE COURT:  Okay.  Thank you.

21              And then plaintiff's publications on various social

22    media, it looks like there's only three, 52, 33, and 54.

23              MR. HILLIARD:  Well, actually, there's two, because

24    52 was renumbered to 33, your Honor.

25              THE COURT:  Okay.  So it's only two?  I -- is there

```
 1    a reason I need to rule on that now out of context?

 2              MR. HILLIARD:  They're just statements by the

 3    plaintiff out of court that -- classic hearsay.  But you don't

 4    need to rule now, your Honor.

 5              THE COURT:  Okay.  But do they go in some way to the

 6    case?  Do they -- I mean, I --

 7              MR. AIVALIKLES:  Yes.

 8              THE COURT:  I don't know what they are, so help me

 9    out.

10              MR. AIVALIKLES:  They do, your Honor.  They're posts

11    that my client made being critical of Bolton and Leonard and

12    one of them is a comment by Attorney Bolton.  He actually read

13    the article and he commented on it.

14              THE COURT:  And this is before the January 2021

15    incident?

16              MR. AIVALIKLES:  It was right after, your Honor.

17              MR. HILLIARD:  Afterwards.

18              MR. AIVALIKLES:  I'm sorry.  She tells me it's

19    before, your Honor.

20              THE COURT:  These -- both of these were before,

21    right before the incident?

22              MR. AIVALIKLES:  Just --

23              THE COURT:  I'm not going to rule on this, because

24    no one seems to know exactly what they are.  And to the extent

25    they're statements that your client wants to introduce that
```

 1    somehow are relevant, then I would allow them.  I'm not going

 2    to rule on them in a vacuum here.

 3              So number 8, I will rule at trial.

 4              Pile 9, let's see, Nashua Police Department response

 5    to right-to-know for trespass incident.

 6              MR. HILLIARD:  You've already ruled on this, your

 7    Honor.

 8              THE COURT:  Oh, okay.

 9              MR. HILLIARD:  I had noted that; I added a sentence

10    to note that you've already ruled on that one.

11              THE COURT:  Okay.  We can move on then.  I think I

12    ruled those were relevant; is that right?

13              MR. HILLIARD:  That they might be.

14              THE COURT:  Yeah.

15              All right.  Paragraph 10.

16              MR. HILLIARD:  Budget committee meeting, same --

17    that's really the same as the other committees and boards we've

18    been talking about, your Honor.

19              THE COURT:  Okay.  Attorney Aivalikles, I'll let you

20    lead me on this.

21              Do you agree that this is essentially falling in

22    that same category --

23              MR. AIVALIKLES:  Same bucket, yes.

24              THE COURT:  -- context evidence?

25              MR. AIVALIKLES:  (Nods head.)

1          THE COURT:  Okay.

2          MR. HILLIARD:  Your Honor, it may well be -- and I'm

3  sorry.  It may well be the plaintiff has withdrawn those two

4  exhibits, but I'm not positive.

5          THE COURT:  Okay.

6          MR. AIVALIKLES:  What exhibit numbers?

7          MR. HILLIARD:  Well --

8          THE COURT:  31 and 135.

9          MR. HILLIARD:  In the original list.

10          THE COURT:  I'm using document 174 to go through

11  these different buckets.  They all seem like one big bucket to

12  me.  I -- but let's move to number 11, audio and visual --

13          MR. HILLIARD:  Those are the audio and visual

14  recordings, your Honor, of --

15          THE COURT:  Okay.  We've talked about --

16          MR. HILLIARD:  -- meetings of minutes we've already

17  talked about.

18          THE COURT:  Okay.  Anything you can tell me

19  that's --

20          MR. AIVALIKLES:  Well, again, I think I've

21  already -- we've already addressed that.

22          THE COURT:  Same sort of thing?

23          MR. AIVALIKLES:  Right.  Exactly.

24          THE COURT:  Okay.  And, again, if there's some need

25  for some audiovisual proof of something that's relevant, ask --

1    bring it up, you can tell me why it's not admissible, and I'll

2    give you a ruling.  But it seems to me that a number of

3    exhibits -- and it looks like there are a number here of

4    audiovisual exhibits -- would not pass that test, that

5    relevance test.  But I could see, perhaps, a need for one or

6    two of these, depending upon how the evidence comes in.  Just

7    make the argument in the context of the case.

8              Okay.  Arrest records.  These seem different, arrest

9    records.  Tell me about these.

10             MR. HILLIARD:  These relate to property taken from

11   her at the arrest and bail conditions, your Honor.  And then --

12             THE COURT:  Say that again.  I'm --

13             MR. HILLIARD:  I'm sorry, your Honor.

14             Property taken from her upon her arrest is 65, now

15   52, and 66 was bail conditions set by the bail commissioner.

16   It's now 53.

17             THE COURT:  Okay.  Why isn't that coming in?  What's

18   the --

19             MR. HILLIARD:  Relevance, your Honor.

20             THE COURT:  This is the incident she was arrested

21   for.  Yeah, I'm not going to exclude that right now.  Those

22   are -- they deal, actually, with the -- her arrest, right?  And

23   she's --

24             MR. HILLIARD:  Well --

25             THE COURT:  Part of what she's doing is showing the

1    jury what happened to her when she was arrested.  And that goes

2    to the incident itself.  It goes to her damages potentially.

3    So --

4                MR. HILLIARD:  Okay.  All right.

5                THE COURT:  All right?

6                MR. HILLIARD:  Okay.  Thank you.

7                THE COURT:  Uh-huh.

8                MR. HILLIARD:  74 through 80 as originally marked

9    have to do with postconviction proceedings, your Honor.

10                THE COURT:  I'm not going to rule on that right now

11    either.  I'd like to hear -- that seems, again, postconviction

12    for this criminal trespass that was annulled.

13                MR. HILLIARD:  Yeah.

14                THE COURT:  Yeah.  I think those potentially pass

15    that relevance hurdle and so I'll wait and rule on those in

16    the --

17                MR. HILLIARD:  Okay.

18                THE COURT:  -- context.

19                So paragraph 13 --

20                MR. HILLIARD:  Thank you, your Honor.

21                THE COURT:  -- I've ruled on that.

22                MR. HILLIARD:  We've already talked about.

23                THE COURT:  Great.

24                MR. HILLIARD:  And 14 was just a miscellaneous

25    bucket, your Honor.  There were two exhibits that were related

1     to HR in the city clerk's office.  Number 68, now 56, is a

2     letter from some other citizen in Nashua writing in about this

3     incident.

4              88 and 89 are a visit to the assessing office a year

5     after the incident.

6              97 and 98 relate to a -- an award that plaintiff

7     received in 2023 from the Nackey Loeb First Amendment -- I may

8     not be saying it entirely correctly -- organization.  And

9     that's objected to on relevance.

10             THE COURT:  Well, that one -- that one, I'll wait

11    and hear --

12             MR. AIVALIKLES:  Yeah.  It's background.

13             THE COURT:  -- at trial, but the others that you

14    represented, as you described the miscellaneous exhibits, do

15    you agree that those also pose a problem with respect to

16    relevance or are there certain exhibits you want to point me to

17    in that paragraph that you think should come in in your case in

18    chief?

19             MR. AIVALIKLES:  Again, your Honor, I'd like to

20    specifically look at the exhibit list again in light of what

21    the Court has indicated the direction of the Court is, but I

22    think that some of those definitely do have some relevancy,

23    your Honor.

24             THE COURT:  Okay.  To the incident itself.

25             MR. AIVALIKLES:  Yes --

 1            THE COURT:  Yeah.

 2            MR. AIVALIKLES:  -- the incident itself.

 3            THE COURT:  Okay.  Well, then, I'll let you do that.

 4    I'll leave that paragraph to counsel.

 5            And so hopefully that helps you pare that down

 6    significantly and will just make it easier when we get to

 7    exhibits.  If you have your exhibits that you agree on ahead of

 8    time, obviously those can be marked for Attorney Esposito and

 9    my benefit and the jury's benefit.  Full exhibits, as I think I

10    described, would be exhibits that we can just turn the exhibit

11    on, let the jury see it, while testimony is occurring.  So to

12    the extent you can agree on those ahead of time, that makes it

13    very easy for us.

14            To the extent there are disagreements, mark it for

15    ID and then we'll -- we'll deal with it at trial or, perhaps,

16    if you need to get me on a Zoom with respect to remaining

17    disputes, I certainly -- I would like to help counsel pare this

18    down before the trial.

19            As you know, I won't repeat myself, I really don't

20    want to be doing this and using the jury's time to do it.  So

21    to the extent I can help you pare it down further, I'll give

22    you my -- I'll give you my sense of how I'm likely to rule,

23    assuming the evidence comes in as I'm understanding it.  Okay?

24            MR. AIVALIKLES:  Your Honor, with regard to the

25    defendant's exhibit list, I did file a response to that, but

1    there's about, I don't know, 125, 150 exhibits.  And most of

2    them are marked for ID, but they're the same exhibits, your

3    Honor, that they objected -- that we had that they objected to.

4            So it would be helpful to know if the city can pare

5    down that list to really reflect the exhibits they intend to

6    introduce that are marked for identification as opposed to this

7    list that has the same -- basically a lot of our own exhibits

8    that they objected to, your Honor.

9            THE COURT:  Uh-huh.

10           MR. AIVALIKLES:  I think it makes it very difficult

11   for us.

12           THE COURT:  Okay.  Attorney Hilliard, go ahead.

13           MR. HILLIARD:  A couple things, your Honor.

14           We're happy to do that and it would be very

15   efficient to do it because through this process we have, among

16   ourselves on the defense team, culled out about 70 of them so

17   that we've only got examples of publications after the arrest

18   by the plaintiff as opposed to.

19           Now, we may move them down to may use if something

20   happens --

21           THE COURT:  Okay.

22           MR. HILLIARD:  -- at trial that we want to --

23           THE COURT:  Sure.

24           MR. HILLIARD:  -- emphasize a particular point.

25           There -- Attorney Aivalikles is correct.  There's a

1    couple, ironically, that we objected to him using and we have

2    them because we have them in there for damages.  He was

3    offering them for a different purpose.  But we'll identify

4    those --

5              THE COURT:  Okay.

6              MR. HILLIARD:  -- so it's clear.

7              THE COURT:  All right.

8              MR. HILLIARD:  And by doing that, as the Court has

9    seen, I'm sure, we went all the way out to quintuple L.  As,

10   double As, triple As, quadruple As, and then five digits, five

11   letters.  With what we've culled out, I think we can get it

12   down to no more than double --

13             THE COURT:  The alphabet.

14             MR. HILLIARD:  -- double letters.

15             THE COURT:  Okay.  Great.

16             MR. HILLIARD:  A through Z and double A through Z.

17             THE COURT:  Well, that's good.

18             MR. AIVALIKLES:  That would help.

19             THE COURT:  This is helpful.  All right.  That's

20   probably what you were hoping to hear.  Certainly music to my

21   ears in terms of culling.

22             Anything else you want to say about that,

23   Attorney Aivalikles?

24             MR. AIVALIKLES:  No.  I mean --

25             THE COURT:  Okay.

 1          MR. AIVALIKLES:  -- culling it down like that would

 2   be very helpful, your Honor.

 3          THE COURT:  Okay.  All right.  Now, in terms of --

 4   let me just ask you.  Is there going to be -- are there areas

 5   where I can instruct the jury they can already -- they can find

 6   certain things?  Are there going to be agreements with respect

 7   to -- for instance, PC, probable cause for the arrest.  The

 8   issue in the case comes down to, really, the exception --

 9          MR. AIVALIKLES:  Right.

10          THE COURT:  -- and whether or not --

11          MR. AIVALIKLES:  Right.

12          THE COURT:  Is there going to be any dispute that I

13   would essentially tell the jury, you are instructed to find

14   probable cause for the arrest or explain it in some -- I

15   haven't written the jury instructions yet, but I'm trying to

16   think through that issue ahead of time.  I know I think you

17   proposed something similar to that in your instruction.

18          MR. CULLEN:  I think we did, and I've seen Attorney

19   Aivalikles' responses to ours and I thought it might make sense

20   for us to talk through whether there are some -- we can come up

21   with some agreed-upon language for some jury instructions and

22   maybe revisit that issue.  I would certainly love to do that in

23   advance of our next pretrial, which I think is June 7th, with

24   the idea that we, perhaps, present the Court with a more clean

25   version of where we agree and where we disagree.

1          THE COURT:  That would be excellent.  And can you do
2    that without me?
3          MR. CULLEN:  Yes, that would be the plan.
4          MR. AIVALIKLES:  That would be the first --
5          MR. CULLEN:  I think it would be ideal to, you know,
6    have a conversation with plaintiff's counsel about that issue
7    and also, obviously, to the extent that we can both extend --
8    exchange our revised proposed exhibits --
9          MR. HILLIARD:  I'm sorry.
10          MR. CULLEN:  Sorry.
11          MR. HILLIARD:  Sorry.
12          THE COURT:  Okay.
13          MR. CULLEN:  No exhibits as far as I was thinking,
14    you know, in advance so that when we come to the 7th, you know,
15    I --
16          MR. HILLIARD:  Yeah, sorry.
17          MR. CULLEN:  So I guess I was thinking --
18          THE COURT:  Okay.
19          MR. CULLEN:  -- that we could try to do that within
20    the next -- we've got a little extra time now but, certainly,
21    you know, two weeks in advance or ten days in advance of the
22    next pretrial --
23          THE COURT:  Okay.
24          MR. CULLEN:  -- so that we have a chance to put
25    things before the Court in a timely manner.

60

1              THE COURT:  Okay.

2              MR. CULLEN:  I think all parties would like to know

3    the jury instructions before the openings, which I know it

4    doesn't always happen, but it would be --

5              THE COURT:  Yeah.  No, I do like to get the jury

6    instructions done earlier rather than later and I will

7    obviously have ongoing input with counsel before I actually

8    give them the instructions.  But I actually do like to

9    understand what it is the jury needs to know as I head into a

10   trial so my clerks are well-schooled in getting me the jury

11   instructions, the first draft, early in the case.

12             And, as you know if you've tried a case with me, I

13   will generally give you a draft copy with draft written on it

14   so you understand it's not final and then we will meet and

15   discuss ways in which you object.  And then I'll go back and

16   try to address objections or I might just decide I'm going to

17   overrule that objection and here's what I'm deciding.  We do

18   that -- we'll do that throughout the trial.  But I'd like to

19   get you a draft in advance -- in advance to the extent I can.

20             MR. CULLEN:  Okay.

21             THE COURT:  So --

22             MR. AIVALIKLES:  No, that would be great, your

23   Honor, and I think if we can get -- counsel can get together

24   maybe we can sort of help that process along.

25             THE COURT:  Okay.  And there would be -- if there's

1    stipulations on your side with respect to, you know, probable

2    cause for the arrest, perhaps slimming it down for the jury in

3    terms of color of state law and some other issues so they are

4    focused on, really, the heart of the matter, that would be

5    helpful.  I will leave that in your hands.

6              And -- oh, I want to tell you where that quote comes

7    from that we were talking about at the beginning and I withheld

8    ruling on the use of the C word.

9              It is found in the record.  It was with the motion

10   for summary judgment and it was document number 71-3 and I

11   think at page 2.

12             MR. CULLEN:  Thank you, your Honor.

13             MR. HILLIARD:  It's Exhibit A --

14             THE COURT:  Okay.

15             MR. HILLIARD:  -- on our list, your Honor.

16             THE COURT:  All right.  Good.

17             All right.  Good.  Good to see everybody and -- and

18   thank you very much for your understanding with respect to my

19   schedule and I will see you in a bit.  Thank you.

20             MR. HILLIARD:  Thank you.

21             MR. CULLEN:  Thank you, your Honor.

22             THE COURT:  Court's adjourned.

23             THE CLERK:  All rise.

24             (Proceedings concluded at 11:39 a.m.)

25

C E R T I F I C A T E


        I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 12/3/25            */s/  Liza W. Dubois*
                             LIZA W. DUBOIS, RMR, CRR