** NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-19-2026 **

UNITED STATES DISTRICT COURT
CONCORD, NEW HAMPSHIRE
CASE NO. **22-CV-00326-LM**

_____

**LAURIE ORTOLANO**,
                    Plaintiff
            vs.                              **February 6, 2026**

**STEVEN BOLTON AND CELIA LEONARD**
                    Defendants.

_____

**TRIAL DAY 4 - MORNING SESSION**

BEFORE THE HONORABLE **LANDYA B. McCAFFERTY**,

UNITED STATES DISTRICT COURT JUDGE

_____

**A P P E A R A N C E S**

FOR THE PLAINTIFF:        **WILLIAM E. AIVALIKLES**, ESQ
LAURIE ORTOLANO           Aivalikles Law Office

FOR THE DEFENDANT:        **RUSSELL F. HILLIARD**, ESQ
STEVEN BOLTON             **MADELINE K. MATULIS, ESQ**
                          Upton & Hatfield LLP

FOR THE DEFENDANT:        **BRIAN J.S. CULLEN**, ESQ
CELIA LEONARD             Cullen Collimore Shirley PLLC


REPORTED BY:              **GIZELLA BAAN-PROULX**, FCRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1454
                          Trialreporters@hush.com

**I N D E X**

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CELIA LEONARD | 13 | 36 | | |
| STEVEN BOLTON | 95 | | | |

**P L A I N T I F F   E X H I B I T S**

(None)

**D E F E N S E   E X H I B I T S**

(None)

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

**THE COURTROOM CLERK:**  The court is in session and has for its consideration a charging conference in 22-CV-326-LM, Ortolano versus Bolton, et al.

**THE COURT:**  I think what I'll do is just start by drawing your attention to the specific additions that I made since our last discussion with respect to jury instructions.

We have got more witnesses, so there may be a stipulation.  There haven't been some factual stips yet, have there?

**MR. AIVALIKLES:**  No, Your Honor.

**THE COURT:**  I'll just keep it bold for now.  I'll remove that if there are no stipulations entered.  I'm just going page by page.

All right.  Go to page 8, lines 16 through the end. And you can see the additions are underlined, and there's a line through what I have removed.

**MR. CULLEN:**  I'm sorry, Your Honor, I'm not sure --

**MS. LEONARD:**  Here.

**MR. CULLEN:**  Sorry.  My client stole my copy.

**THE COURT:**  I should have given enough copies.

**MR. CULLEN:**  She didn't steal my copy.  Sorry.

**THE COURT:**  This is just the reciprocity that Attorney Avilikles asked for, so just read that over quitely, and let me

know if you have any objections.

MR. CULLEN:  Just one thing, Your Honor, if you're looking for comments, on line 16 where it says by contrast, maybe just similarly, which I apparently have a hard time pronouncing.

THE COURT:  Likewise?

MR. CULLEN:  Either one of those, I think, would be better than by contrast.

MR. AIVALIKLES:  Likewise is fine, Your Honor.

THE COURT:  Likewise is easier to say.  Similarly.  Likewise, that will be changed.

MR. CULLEN:  Thank you, Your Honor.

THE COURT:  All right.  I have kept punitive damages, obviously, in bold.  Did I skip anything?

MR. AIVALIKLES:  Page 11, Your Honor, you made a change at line 14.

THE COURT:  I'm sorry.  Which page?

MR. AIVALIKLES:  Page 11, line 14.

THE COURT:  Wait a second.  Let me just go back.  I see page 9 through 10 here, so let's start with that one and then go to the next one.

The defendants do not dispute that Ms. Ortolano engaged in these activities?

MR. CULLEN:  That's consistent with what we suggested yesterday, Your Honor.

MR. AIVALIKLES:  Yes.

THE COURT:  All right.

MR. CULLEN:  Your Honor, just before we move off page 10, if you don't mind.

THE COURT:  Sure.

MR. CULLEN:  I just want to continue my concern about the first component of causation.  I'm still concerned that the but-for language is, you know, along the lines of but-for the fact that I got up this morning, I wouldn't have gotten shot.  It still seems very attenuated to me.  I know I raised that concern; I'm not sure that I have a great solution to it.

But I'm also, on the second sentence, where it says the other way to show by a preponderance of the evidence -- where we have the and on line 16, I'd suggest that maybe we add and also just to make to a little more clear.  It looks as though this is along the lines of sort of a joint feasor type of thing.  And I just want to make it crystal clear to the jury that, you know, the and doesn't -- it's not an and/or.  And I think the also maybe would just help emphasize that.

THE COURT:  All right.  I'll add also.  Do you see any reason to object?

MR. AIVALIKLES:  No, I don't have an objection to that.  I think the Court should keep the but-for.  That's an easy concept for a lay person to understand, as opposed to proximate cause, you know, those tort principles.

THE COURT:  All right.  What do you suggest instead of but-for?

MR. CULLEN:  I don't.  I haven't preserved any objection that would be sufficient.  It's just a concern of mine.

THE COURT:  All right.

MR. CULLEN:  But I'm satisfied that the Court has done what they can with this instruction.

THE COURT:  Okay.  And you're okay with dividing the first component, the second component?  And the only reason I'm doing it is because there really is an either or in that first component, and I think separating them makes it analytically easier, but it could be just all one section, obviously, under causation.

MR. AIVALIKLES:  I'm happy with the way the Court has it, Your Honor.

THE COURT:  Are you okay with the way it is now?

MR. CULLEN:  That's fine, Your Honor.  It seems to be consistent with prior instructions.

THE COURT:  Okay.  What is our next edit or issue?  Anything else?

THE LAW CLERK:  Page 11, line 14.

THE COURT:  I did overlook that.  Yes, I made substantial consistent as requested, I think, by Attorney Cullen.

**MR. CULLEN:**  Thank you, Your Honor.  And with respect to element 4 that's on 11, we don't need to argue it, but we just want to preserve our objection as to the issue of that our clients had any idea that these events were happening.

**THE COURT:**  Yes.  Understood.  Okay.  I think I covered a fair number of your requests that came in this morning, Attorney Avilikles.

We know you want me to do an offensive-speech instruction.  What's evidence of offensive speech before the arrest?  The C word comes up after.

**MR. AIVALIKLES:**  Yes.

**THE COURT:**  And that wasn't what caused the arrest because it happened after.

**MR. AIVALIKLES:**  Your Honor, it did happen after, but I think it would be important for the jury to know how that's treated and viewed as opposed to maybe they're viewing it as something much more significant that they would hold against my client, Your Honor.

**THE COURT:**  Yeah.  I think it would confuse them. We'd be talking about offensive speech, and you can't essentially be arrested for offensive speech when, in fact, the arrest preceded the use of the C word, so I'm inclined not to give that.

**MR. AIVALIKLES:**  Okay.

**THE COURT:**  I think it's -- I think it's fair for you

to argue in closing that the police can't arrest people because they curse at them.

**MR. AIVALIKLES:**  Very well, Your Honor.

**THE COURT:**  Okay.  And then -- I think -- did I cover everything in your document -- my docket number is not on mine.

**MR. AIVALIKLES:**  Yeah.  I believe we had two.

**THE COURT:**  When did you file this?

**MR. AIVALIKLES:**  Last night.

**THE COURT:**  Proposed revisions to Court's model jury instructions -- yeah, my instructions were not model instructions; they were just my instructions.

**MR. AIVALIKLES:**  Okay, Your Honor.  Well, maybe they are a model, Your Honor.  No.  I think we addressed the reciprocity issue that the Court included, and the other was the offensive language that we just addressed.  So I think that's it.  We did submit a jury verdict form.

**THE COURT:**  All right.  So I'm going to look at your verdict form, and I am inclined to give a general verdict form, and I am not inclined to break this down into elements.  That's the whole purpose of jury instructions.  So I'm going to keep the verdict form.  Did you have a chance to look at the verdict form?

**MR. AIVALIKLES:**  No, I haven't, Your Honor.  I guess I missed it.

**THE COURT:**  We'll go over that.  I'm going to go ahead

and convert the jury instructions as we go.  Obviously, we have more evidence today, and I'll have time this weekend to finalize them.  But you're going to have to bring to my attention anything that you want with respect to jury instructions, you know, before -- we'll try to do that before we leave for the weekend.

MR. HILLIARD:  I'm sorry.

MR. AIVALIKLES:  No.  I think I'm hearing good news that we may be arguing on Monday as opposed to today.

THE COURT:  That's what I would guess based on what I've seen.  I don't envision things ending by 2:00 o'clock.  I see more like 3:00 or 4:00, and then I would send them home.  Openings Monday.  Jury instructions.

MR. AIVALIKLES:  Great.

THE COURT:  That's what I'm anticipating.  If you get done by 2:00, we'll talk.

MR. HILLIARD:  Two quick things.  I believe my assumption is correct, but ultimately the jury receives your instructions in hard copy and has them?

THE COURT:  That is correct.

MR. HILLIARD:  And well, nothing, but if we're going to do it that way, maybe we have the jury come in at 9:30 rather than 9:00 in light of the probable late night Sunday that most of them will experience.

THE COURT:  Any objection to starting at 9:30 Monday?

MR. AIVALIKLES: No. That's fine, Your Honor. It's Super Bowl Sunday.

MR. CULLEN: I think that's fine.

THE COURT: We'll have a light moment with the jury when we send them home.

MR. CULLEN: I think that's a good idea, Your Honor, but I think it would be good just to make sure that we get our closings done and the charge done.

So I can't imagine that won't happen, but I don't know if we're doing half hour for closings, then 9:30 would be 11:00, break, charge, lunch.

I just want to be cautious of extending the charge past the lunch break. I think it would be important to get them both done in the morning.

THE COURT: We may be able to do closings today.

MR. CULLEN: I definitely would not like to do that.

I have one question on the jury --

THE COURT: I'll hold that issue of 9:00, 9:30 rather than -- go ahead.

MR. CULLEN: One thing on the verdict form, Your Honor, I do think that the damages, especially on the punitives probably have to be split up by defendant -- just a thought to maybe all of us to think about.

THE COURT: All right. Anything else?

MR. AIVALIKLES: I don't think so, Your Honor. Oh,

yes.  Your Honor, I think counsel is okay if we put on the screen the depositions of either Attorney Bolton or Attorney Leonard for ID only, so only the witness will see it; the jury won't.  And then if they're questioned about their deposition testimony, they have it in front of them.

THE COURT:  Why not make sure each witness has their full hard copy of the depositions with them on the stand?  And then that way you tell them to go to what page you need them to go to, they turn to it, they can see it.  The jury is not going to be looking at it.

MR. AIVALIKLES:  No.  We understand.  We don't have an extra -- unless counsel does.

THE COURT:  Does counsel have an extra copy, just to make it easy?

MR. CULLEN:  Attorney Leonard has her deposition with her, so she can bring it up.

THE COURT:  And we'll just identify that when she comes up.  Attorney Bolton, do you have yours as well?

MR. CULLEN:  I have a spare of Attorney Bolton's.

MR. AIVALIKLES:  Thank you, guys.  That will work better.  Okay.  We still have 10 minutes.  So I will see you in 10.

(Thereupon, a brief recess was taken.)

THE COURTROOM CLERK:  All rise for the Court.  Please remain standing for the jury.

(Thereupon, the jury entered the courtroom.)

THE COURTROOM CLERK:  Please be seated.  This court is in session and has for consideration jury trial day 4 in the matter of Ortolano vs. Bolton, et al., case number 22-CV-326-LM.

THE COURT:  All right.  Good morning, members of the jury.  I'm just checking in with you about whether or not you've been able to comply with all of my orders as you returned home last night.

THE JURY:  (Nodding.)

THE COURT:  This morning, everybody, again, affirmatively answering that question, so I will not ask you individually.

We will get started, and I believe Attorney Leonard was on the stand.  We can swear Attorney Leonard in again.

Thereupon,

CELIA LEONARD,

having been duly sworn by the courtroom clerk, testified as follows:

THE WITNESS:  I do.

THE COURTROOM CLERK:  Please be seated and please state your full name for the record and spell your last name.

A.   Celia Kathleen Leonard, L-E-O-N-A-R-D.

***DIRECT EXAMINATION***   (continued)

BY MR. CULLEN:

Q.   Good morning, Celia.

A.   **Good morning.**

Q.   I believe yesterday when we left off, we had been talking about exhibit 17, 18, and 19 which were exhibits to do with a couple of 91-A requests in July of 2019.

Do you recall that?

A.   **I do, yes.**

Q.   When did you first become involved with responding to 91-A requests on behalf of the City as a whole, its departments and things like that, as opposed just 91-A requests that were directed to the legal department itself?

A.   **Well, I think it was always part of the job duties of the office of corporation counsel to assist our clients when they had questions about complex or unusual right-to-know requests.**

**However, I think more germane here would be -- again, I think it was fall of 2018, going into '19, the City, my client, was receiving a large volume of complex right-to-know requests from the plaintiff, both just in -- they were lengthy, they were also unusual, things that maybe my clients hadn't seen before requested.**

**So my client reached out to our office to help, to make sure that they were meeting their requirements under the law.**

Q.    And we looked yesterday at exhibit 18, which was an e-mail from the plaintiff to Kim Kleiner.

Is that the example, when you say a complex 91-A request?

A.    **I would say so, yes.**

Q.    What would you do when you got a request like that forwarded to you from one of your clients, in this case Ms. Kleiner?

What was your job to do then?

A.    **So we pretty much put it in the process.  So, again, as I discussed yesterday, there's a statutory time limit, so we needed to know when did the City receive it.  You've got to look at was it received on a Saturday, a Sunday, 5:00 p.m., was it a weekend?**

**So we'd log in when it was received to then count the statutorily-required days out that we needed to advise our client that a response was due.**

**Then look through the requests, I would go through and -- with the assistance of one of the legal assistants, to see if we could discern, if it wasn't very clear, if it was -- when I say hidden, I don't mean purposely hidden, but just within the body of the texts, was there a request that, you know, I want to know all -- this is just an example -- all meetings that had the color yellow agendas.  I don't even know if that's something that could happen; I'm just saying, well, is that**

really a request?  Well, guess what?  We have a document.  So anyway, going through delineating what we thought were document requests.

Then, of course, I had to work with my client.  You've seen the office of corporation counsel.  It is a law office. We do not house all of the documents in the City by any means. We do not have access, even, on the computer drive to other -- unless we're given special permission, we cannot look at other people's e-mails, we cannot look at the community division directors or community division files.

So we have to work with our client, of course, to then say, okay, this is the ones we have identified the requests, what do you have, subject matter expert?  What documents?  Or do you have questions?  And then my job would be to organize that, and then you saw an example where we listed out, and then working with my client, come up with answers.

If there wasn't a document, it would be, of course, my client who was telling me there is no document because I wouldn't know if there was a document in the assessing or not.

Q.   And also, I think we both need to make sure we keep our cadence down just a little bit for the stenographer as well.  I think we both speak very quickly.

With respect to Ms. Ortolano, of course, is it fair to say she filed a lot of these 91-A requests?

A.   Yes.

Q.   Did that bother you?

A.   **No.**

Q.   You had a conversation with Ms. Ortolano in September of 2019, and we discussed this, I think, a little with the plaintiff on her examination but could you please bring up A, which is a full exhibit?

Are you able to see that okay?

A.   **I am.   Thank you.**

Q.   I'm not going to try to blow it up or anything.  I think the jury has seen it also.  Just -- how did the conversation with you and Ms. Ortolano come about and -- well, I'll start with that.

A.   **My recollection is Ms. Ortolano came into the legal office for some reason; I don't know.  I was in my office working, and she was speaking with one of the legal assistants, and I could sort of overhear that it wasn't -- because it's a small office, you can hear pretty much everything.  It wasn't something that our office did; you know, we don't oversee the assessing firm. And to my recollection, it had something to do with assessing policies or what not.**

**So it sort of became clear that one of the legal assistants was trying to politely say she couldn't help her, and so I stepped in to see what was happening and explained that we don't oversee the assessing department, we don't oversee their policies, we've been assisting our client as she**

was aware, because she was receiving many, many responses from my office, meaning for my signature.

But so if there's a specific question she had about a letter that we'd sent, we'll try to address it, but we don't oversee the whole city; we don't direct the City. And so that was my recollection.

Q. Ms. Ortolano writes in here on the second line that you made very clear that legal is only there to address specific document requests and essentially not to take generalized requests. Did you also feel that you had made it very clear to her?

A. I believe I made that clear, and I believe I also made clear that, again, that our client is the City; that we're not there for general legal questions, either, of the public.

Q. At some stage, Ms. Ortolano brought a lawsuit under RSA 91-A which allows citizens to sue if they feel they didn't get the documents they wanted?

A. Correct.

Q. And Attorney Lehman, who testified yesterday, was her attorney in that?

A. He ended up being one of the attorneys throughout the course of the litigation for the plaintiff, yes.

Q. And did you hear Attorney Lehman mention yesterday that there are ethics reasons that delineate when you can and can't speak to someone who is represented by counsel?

A.   **I did.**

Q.   And you're familiar with those rules as well?

A.   **I am.**

Q.   Can you be reported to the bar association or the professional conduct committee if you violate those rules?

A.   **Yes, absolutely.**

Q.   And as of January 22nd, 2021, the date of this incident, were you aware that the plaintiff had filed just such a complaint against your colleague Attorney Bolton?

A.   **I was, yes.**

Q.   Was that a factor in how you approached communications with Ms. Ortolano in January of 2021?

A.   **Yes.**

Q.   Jesse Neumann arrived at the legal department as an employee, I think we decided -- is it late December of 2020?

A.   **It was the last week of 2020.  I recall it almost better than my start date just because it had do with when you get a raise at the City, and we wanted a colleague, an employee of the City to take advantage of the fiscal year-end raises on July 1, but you had to be employed as of January 1.  So, yeah. I just happened to remember it was the last week of December.**

Q.   So as of July 22nd, 2021, Jesse had only been there four weeks at most?

A.   **January 22nd, yes.**

          MR. HILLIARD:  You said July.

MR. CULLEN: I apologize, I said July. January. You corrected me, I think.

BY MR. CULLEN:

Q. And do you know if Attorney Neumann was also familiar with the ethics complaint brought against Mr. Bolton?

A. I believe he would have been, yeah.

Q. And when Jesse was brought in, what was his role? What were the things he was supposed to do in the legal department?

A. So we brought in a fourth attorney given -- the overall legal work of our office was increasing but, in large part, due to our client's needs around right-to-knows and the litigation, so his job was to assist me. I was doing the bulk of it, but, obviously, the office and our client was responding lawfully to right-to-know requests.

Q. Did he have anything to do with overseeing assessing?

A. No.

Q. Did he have any role in abatement applications?

A. No. Not only did he have no role with the municipal level abatement applications, which is purely assessing level and handle the board of assessors, at that point being only a few weeks in, and given why he was fired, he didn't even handle -- or he was not even going to handle in our office any of the abatement appeals to the Superior Court for the BTLA. So he had nothing to do with assessing.

Q. Obviously you had some history with Ms. Ortolano by January

of 2021, as we have just gone over, in the sense that you had worked on her 91-A requests to have been involved with her lawsuits.

As of the morning of January 22, 2021, what were your general feelings with respect to Ms. Ortolano?

A.   **She was part of my job.  She made a lawful requests.  There was a lawful lawsuit.  It created work within the office that we dealt with the way offices deal with things.**

**When the continued need was seen, we sought appropriation and a new position and handled it professionally and got a new lawyer.  So it was just part of my job.**

Q.   I mean, did you hate her?

A.   **No.  I just dealt with her professionally.  I didn't really know her.**

Q.   Did you resent her?

A.   **No.**

Q.   Did you ever tell people not to speak her name?

A.   **Not that I recall, no.**

Q.   How did you start your day on January 22nd?

A.   **Well, in the barn.  I've got three horses and goats at home, so that's where I started my day.**

Q.   At that stage, I think we discussed you had -- your son was five?

A.   **Yes.  Yeah.  So...**

Q.   Was he in school?

A.    He was in preschool, yeah.

Q.    So did you have to drop him off also?

A.    Yeah.  So get everything fed, a lot of things to feed, and clean up, and get packed up, and then get my son to preschool, and then, you know, Covid brought a lot of changes, some good. I was able to just get him to daycare on time, and then get to a place where I could get reception to do a Zoom meeting.

Q.    And is that what you did that day?

A.    Yes.

Q.    Was the Zoom call interrupted?

A.    It was, yes.

Q.    And how was that?

A.    I received a message, probably a text message, from risk management that --

Q.    And as a result of that text, what did you do?

A.    I got off the Zoom call and proceeded to then drive to City Hall.

Q.    And why did you do that?

A.    Well, it just seemed that I knew that we had one legal assistant there and a brand-new employee, and it seemed like something that I should be there to support my colleagues for.

Q.    And I think we heard testimony earlier that Attorney Bolton was out at an appointment or something that morning?

A.    Correct.  Attorney Bolton was going to be out of the office that day.  I knew that.  Also we were coming back from Covid,

so I was on my way to work because, as I discussed yesterday, I was one of two deputy corporation counsels, and it was my turn to be in office that day.

So I was basically the manager, since I was the highest-ranking lawyer or employee that would be there that day, and I thought I should be there.

Q.   When you arrived, was the plaintiff still there?

A.   Yes.

Q.   And you recognized her, I assume?

A.   I did, yes.

Q.   Were the police there when you arrived?

A.   No.

Q.   Where was the plaintiff?

A.   She was sitting on the floor in front of my office, like in the doorway.

Q.   And your office doesn't have your name on the door, does it?

A.   No.  No.  It's a small private office.  Everyone knows it's mine who goes in there.

Q.   Does it have the usual accoutrements of a lawyer's office, diplomas, et cetera?

A.   At that time, it did.  In my new office, I have yet to hang anything, but at that time, yes.  My diploma was on the wall. I think my bar admission to the State of New Hampshire and Mass, I think, were on the wall.

Q.   There's been discussion about a sign on the door outside that says something along the lines of by appointment only.

Was that -- where was that sign at this time?

A.   **In January of 2021, it would have been right on the left of the door that we consider our main entrance into our offices.**

Q.   When you saw Laurie Ortolano there, do you recall -- did you speak to her first or did she speak to you?

A.   **You know, I don't recall.**

Q.   What did you say to Ms. Ortolano?

A.   **That she had to go.**

Q.   Did she at any time tell you she was just there to get something stamped?

A.   **No.**

Q.   Why did you ask her to leave, as opposed to ask her what she wanted or ask her for help or something like that?

A.   **There's a lot of reasons.  First and foremost, my colleagues had already expressed that they wanted her out of there, and my job is to support the office.**

**Second, I knew she had no appointment to be there that day.  There was no legitimate purpose for her to be there that day in our locked area.**

**And the behavior of sitting on the floor was a departure from the few times she had been in there before, you know, either to drop something off, as she had testified, or there had been a meeting; even if it got heated with Attorney**

Bolton.  When the time came to leave or she was asked to leave, she left.

And this time, I knew that she had been asked to leave, and she hadn't.  And beyond that, she was physically blocking the entrance to my office, and it just -- it needed to end.  She needed to leave.  We needed to get back to the business of what we were there to do.

Q.   You took a couple of photographs of her that day?

A.   I did.

Q.   And why did you do that?

A.   Because it was one of the most extraordinary, outrageous things I had ever seen, and I honestly just didn't think anyone would believe us.  It was crazy.

Q.   Did you walk up to her in black boots and sort of stand -- maybe not pressed up against her thigh, but up over her?

A.   Absolutely not.

Q.   Were you still there when the police arrived?

A.   I was, yes.

Q.   And could you hear what they said to her and what she said to them?

A.   No.

Q.   Did the officer speak with you also?

A.   Yes.

Q.   And was that Officer Roach or Sergeant Roach, who we saw the other day?

A.   I believe it was.  I remember the accent.

Q.   Did you tell the officer that you wanted her to leave?

A.   I did, yes.

Q.   Officer Roach testified that you never told him you felt threatened while he was there.

     Did he ever ask you if you felt threatened?

A.   No.

Q.   Did he ask you if you wanted her arrested?

A.   No.

Q.   Did you feel threatened?

A.   I did.  It was very threatening.

Q.   Can you tell the jury why you felt that way?

A.   Well, I mean, as you've heard the testimony, there had been lawful vocal criticism of the government and myself included. That's fine.

     But that day, it clearly had gone into unlawful physical intrusion into our private space, and she had been asked to leave and literally refused to go until police came. I think that's designed to be threatening.  Why else would you just sit there?

     MR. AIVALIKLES:  Your Honor, can we have a side bar?

     (Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

     MR. AIVALIKLES:  Your Honor, if you recall, Attorney Cullen was concerned about my client answering in a narrative

fashion, and I think that's what's happening here.

This last question, I don't think, required the extensive testimony. Certainly there could be follow-up questions, and that's fine, but it's hard for me to then object when she's going through this narrative form.

THE COURT: Overruled.

(Thereupon, the side-bar conference was concluded.)

BY MR. CULLEN:

Q. With respect to the trespass order, we have heard a fair amount about that from, I think, the attorneys and also from Ms. Ortolano.

Do you recall who raised with you the idea of her being trespassed?

A. **Well, I think we were using the term, You're trespassing; you need to go. And then the officer asked, do you want her trespassed? And you said yes.**

Q. What was your understanding at that time of what that meant?

A. **At that time, I thought that meant kind of everything. She would have to go. She couldn't come back. And -- because in my view, it had been illegal, that there would be natural consequences, investigation, et cetera, arrest was warranted; it would happen.**

Q. When the police left that day, what did you believe the next steps were going to be with respect to Ms. Ortolano's

intrusion into your legal department or the legal department?

A.   **I thought that she would be trespassed because that was confirmed with me with the officer before he left; that she couldn't come back to legal office without an appointment for a year.**

**And then, like I said, I also thought that meant that there would be an investigation, and then if warranted, consequences.**

Q.   You prepared a written statement that was eventually submitted to the police, and it's part of exhibit 47.

Maddie, could we bring that up?  It's pages 24 and 25. This is a full exhibit.

Do you recognize this as your statement?

A.   **I do, yes.**

Q.   Why did you prepare this?

A.   **I think there was a couple of reasons.  I think, one, again it was extraordinary event and a lot happened very quickly.  I wanted to make sure that I was documenting, from my own memory, what happened.**

**And it could have been -- I'm pretty sure, even though Attorney Bolton wasn't in the office that day, would have absolutely reached out to him, and he may have requested that we document the file.  Attorneys often do memos to file.**

Q.   I believe you came in for some criticism from Ms. Ortolano, subsequently, for including in your statement some actions that

took place before you were there, for instance, you write the legal assistant asked if you had an appointment and Ms. Ortolano said no.

Where did you get that information?

A. **From the legal assistant, Ms. Lloyd.**

**I mean, these were typewritten --**

MR. AIVALIKLES: Objection.

THE COURT: Sustained. Go ahead. You can ask her another question.

BY MR. CULLEN:

Q. Did you need to clarify your answer in some way?

I think the question was just where you got the information.

A. **No. It's fine. No.**

Q. When did you prepare this statement?

A. **On -- I think I put a date on it. I'm pretty sure it was the day of, January 21st, 2022.**

MR. HILLIARD: (Inaud.)

BY MR. CULLEN:

Q. January 22, 2021?

A. **Yes. Sorry.**

Q. Done that myself a dozen times.

A. **That's why I hoped there's a date on it.**

Q. Well, we can go to the next page, actually. I don't think there's any real question but -- sorry.

I think that would be page 25, Maddie.

A.   **Yeah.**

Q.   Now, you also had a conversation with a reporter from the Union Leader, a woman named Kimberly Houghton.  Do you remember that?

A.   **I do, yes.**

Q.   Do you remember how that came about?

A.   **Ms. Houghton either contacted the mayor's office and they requested I call her back, or she called the legal office directly.  That I don't recall exactly, but somehow she contacted City Hall, and I called her back.**

Q.   I'm going to turn your attention to that article but not quite yet.  If we could go back one page again to the first page of the statement.

In this statement, you specifically write at the bottom -- sorry about that -- that Ms. Ortelano's erratic and unusual actions coupled with her refusal to leave despite multiple requests to do so were hostile and threatening.

Do you see that?

A.   **I do, yes.**

Q.   And you referenced actions that took place back on January 6th, in the next line?

A.   **I do.**

Q.   Can we turn to exhibit F, please.  This is a full exhibit. If we could turn to the second page.

Looking at this line here that I've -- it states in a statement Leonard said, Ms. Ortolano stood up from the floor and then sat down again, and continues, Ms. Ortolano's erratic and unusual actions coupled with her refusal to leave despite multiple requests to do so were hostile and threatening.

Is it just me, or is that awfully close to what you wrote in your statement?

A.   **Yes.**

Q.   Had you sent, in fact, Ms. Houghton a copy of your statement?

A.   **I had, yes.**

Q.   So no question in your mind that your statement was written prior to your call with Ms. Houghton?

A.   **It was, yes.**

Q.   When did you speak with Ms. Houghton?

A.   **Sometime around noon on Friday, the same day, maybe one.**

Q.   And after speaking to her, you sent her the statement?

A.   **I did, yeah.**

Q.   And did you also send her the photos?

A.   **I did -- or at least one of the photos.**

Q.   Maddie, would you go back one page for me, please.  And in fact, the photo caption, you got a photo credit, didn't you?

A.   **I did.  My first and only, I think, yes.**

Q.   So this was something, again, you sent sometime that afternoon?

A.   Correct.   On that same day I sent it to Ms. Houghton.   Like early afternoon.

Q.   With respect to -- we've seen a lot about this e-mail that was sent to the legal department.   This is exhibit 1.

     Do you recall that one that says, Celia Leonard should be fired?

A.   From this trial, I do recall it, yes.

Q.   Maddie, do you mind bringing up exhibit 1.   It's a full exhibit.   Thank you.

     Are you able to see the time stamp on that at the top?

A.   I am, yes.

Q.   And what's the time stamp?

A.   3:57 p.m.

Q.   And do you remember when you first saw this?

A.   Not specifically, no.

Q.   Did you see it before you wrote your written statement?

A.   No.

Q.   Did you see it before you spoke with Ms. Houghton?

A.   No.

Q.   Did this bother you?

A.   No.

Q.   Well, why not?   She specifically says Attorney Leonard should be fired.

A.   You know, in our line of work as attorneys, particularly for a city, and we deal with pro se litigants, it's not unusual

in an adversarial system that another party could not be happy with your performance or finding fault in your work regarding them.

I knew I had the full confidence of my employer. The mayor had already reached out that day to make sure we were okay.

Q. You used the term pro se, and I think a lot of people know what that is, but what is that generally?

A. Pro se is someone who represents themselves, and although Ms. Ortolano did have counsel, as you've heard, she also advocated for other people and herself and her right to know. So I sort of lumped it in.

Q. Ms. Houghton had indicated in her article that she had spoken with the police officer and reported that the officer had stated that there was not going to be a trespass order or an investigation. Do you recall that?

A. I do. Yes.

Q. Is that something she shared with you?

A. She did, yes.

Q. You made the comment that's quoted -- I should ask you, I guess, there's a comment attributed to you saying that you find it troublesome, to say the least, and that my office will be speaking with police further. Is that something you said?

A. Yes.

Q. And why did you say that?

A.   Because I was confused when -- excuse me.

When the police had left that morning, they had said -- and I believe it's also in the report -- that they confirmed that the plaintiff was going to be trespassed.

So to hear that she wasn't was troublesome because they had just told me that morning that she was, and I also had believed that that meant that there would be follow-up and further investigation.

So I didn't understand why the police would say one thing in the morning and then tell the press something different later in the day.

Q.   We have, still, in front of us, the exhibit 1, the full exhibit.  In paragraph 2, the plaintiff writes I headed to the third floor to the legal office to see if the new RTA coordinator -- is it fair to say RTK is right to know?

A.   That's as I understand it, yes.

Q.   To help me with the abatement issue.  I had been trying to communicate with them by e-mail and calling to see if he would meet with me to discuss abatement applications and to discuss the process.

Was it Jesse Neumann's job to handle abatement applications and the general process around it?

A.   No.

Q.   Was it his job to answer questions from Ms. Ortolano or anyone in the general public about how that process works?

A.    No.

Q.    Could he have done so even if he wanted?

A.    **Probably not without disparaging his intelligence, but he had only been there a few weeks, and he had nothing to do with that; he had no idea.**

Q.    And then further down, sorry, on page 2, also paragraph 2, Ms. Ortolano writes that you photographed her and then claimed she was hostile and felt threatened.  Do you see that?

A.    **I do.**

Q.    So is that something you told Ms. Ortolano herself while she was there, that you thought she was hostile and you felt threatened?

A.    **I did say that.**

Q.    So it's not something you made up after the fact?

A.    **No.**

Q.    And, in fact, on the next paragraph she writes she wanted me arrested.  Do you see that?

A.    **I do.**

Q.    So, again, I assume since this was in her 357 e-mail, it's not something you only decided after getting this e-mail?

A.    **That's correct.**

Q.    Did this e-mail have any impact, one way or the other, on your opinion as to whether Ms. Ortolano should be prosecuted for a criminal trespass for her actions that day?

A.    **None.**

Q.   You were present in at least one meeting with Chief Carignan?

A.   **Yes.**

Q.   Prior to that meeting, did you reach out to the chief or any other officer of Nashua Police Department?

A.   **No.**

Q.   Regarding this incident?

A.   **No.**

Q.   Did you have any speaking role at the meeting with the chief?

A.   **No.**

Q.   After meeting with the chief or any time between the date of the incident and the date you were interviewed by Sergeant Roach, did you have any other conversations with Sergeant Roach?

A.   **No.**

Q.   Did you have any conversations with anyone at the -- associated with the Nashua Police Department where you were advocating or making any -- taking any position on the investigation and which direction it should go?

A.   **I did not.**

Q.   When you spoke with the police on the day of the incident, did you handle that any differently than you would have if you had still been working at the bank?

A.   **No.**

Q.   At any other time in your interactions with the police, whether on the initial day or during your interview with Sergeant Roach, did you consider yourself to be there boss in any way?

A.   **Absolutely not**.

Q.   Did you consider yourself to be acting in the course and scope of your duties as deputy legal counsel?

A.   **No**.

     **MR. CULLEN**:  Thank you.  I don't have any other questions for the witness.

     **MR. HILLIARD**:  I don't anticipate any questions, Your Honor.  Thank you.

     **THE COURT**:  Attorney Avilikles?

     **MR. AIVALIKLES**:  Yes.  Thank you.


                    *CROSS EXAMINATION*

**BY MR. AIVALIKLES**:

Q.   Good morning, Attorney Leonard.  How are you this morning?

A.   **I'm well.  Good morning**.

Q.   That's good.  So when you were dealing with Laurie Ortolano concerning her right-to-know requests, you were playing games, weren't you?

A.   **No**.

Q.   Well, let me direct your attention to the Donchess timeline.

You did get a request from her about the Donchess timeline, correct?

A.   **Either through my client or directly, yes.**

Q.   And when she sent you the request for the Donchess timeline, she was quite specific in terms of what she was asking for because she noted the Donchess timeline, and she gave you some more information that would help you in terms of your searching for the records, did she not?

A.   **I didn't search for the records.**

Q.   Oh, so what did you do, then, when you got the right to know?

A.   **Well, again, I can't remember since it's not up, but when -- if it was sent to me directly, but when I received it, I would have -- as I testified earlier -- consulted with what I call the subject matter expert, whoever the person was that would perhaps know what it was, which I think was -- this was a John Duhamel.  He was the assessor at the time.**

**So I would have talked to my client, the assessing office, probably Mr. Duhamel or anyone else there, to see if they knew was it was.  And if they did, to please produce it so we could produce it in a timely manner.**

Q.   And you were aware this Mr. Duhamel wrote an e-mail to Louise Brown in the assessing office and the subject matter was the Donchess timeline.

Are you aware of that?

A.    **Was I aware of it then**, or through this trial?

Q.    Well, were you aware of it then?

A.    **I don't believe so, no.**

Q.    In fact, didn't my client clarify the issue that you -- what she was looking for and told you to contact Mr. Turgiss about that so that you could locate the document?

A.    **If I'm remembering the exhibit at trial, there was the initial request that didn't mention that, and then there was, after the denial, because my client didn't understand, there was a clarification.  So then I did think it did say that, and then my memory is -- and I think the exhibit's in -- was then found and sent.**

Q.    Well, do you know who in the assessing office was looking for the document the Donchess timeline?

A.    **Specifically?  I don't know who was assigned that task, no.**

Q.    So when you got something back from the assessing office saying we don't know what she's talking about, did you follow up with that with them?

A.    **I may have or I would have assumed that my client did their job and we asked -- said it was not reasonably described.  We got a clarification.  Clarification was made.  The document was sent.**

Q.    You said that you didn't become aware of that until this litigation.  So you did see the e-mails earlier on between Mr. Duhamel, who was the chief assessor and the other

individual in the office, Mrs. Brown, that talked about the Donchess timeline, did you not?

A. **Are those exhibits here?  Then I've seen them.**

Q. Well, you said that you found out about it during this litigation, I believe?

A. **That's what I meant, if they were exhibits.**

Q. Right.  So you did follow up then?

A. **I'm sorry.  What was the question?**

Q. You did follow up after you got the initial response?

A. **Of course, yes.**

Q. And then they found the Donchess timeline documents, correct?

A. **Correct.**

Q. And you produced them, right?

A. **Yes.**

Q. And the Donchess timeline had to do with the mayor's property; isn't that correct?

A. **I believe so, given the name.**

Q. And what that timeline was for was to determine when certain things were done in the assessing office concerning the mayor's property?

          **MR. HILLIARD:**  Your Honor, objection.

          **THE COURT:**  Sustained.

          **MR. HILLIARD:**  Thank you.

**BY MR. AIVALIKLES:**

Q.   And then exhibit 38, which you were required -- or the City was required to produce by the New Hampshire Supreme Court. Can you bring that up so Attorney Leonard can see that?

Do you see that?

A.   **I do, yes**.

Q.   If you want, we can scroll through it so you can see all the documents that I'll be asking questions about.

Do you need to look at it any further?

A.   **I'm sorry.  What did you ask?**

Q.   Do you need to look at it any further?

A.   **I don't think so, but I don't know what your question is going to be, so maybe.**

Q.   So Mrs. Ortolano sent the right-to-know request asking for the e-mails and the abatements that she had filed.  Do you recall that?

A.   **I don't recall her specific right-to-know request, no**.

Q.   Well, do you recall responding to her request saying that the documents were put on a backup tape.  Do you recall that?

A.   **There was one request where Ms. Ortolano had requested e-mails for an employee who no longer worked at the City and to -- I was told by IT that to get those e-mails would have required to go to backup tapes.**

**So I do remember generally and that it ended in litigation, so I remember that, yeah.**

Q.   Do you see this letter that you wrote on November 16th,

2023?

A.   **I do.**

Q.   And it has -- it says HCSC-226-2021-CV-00306.  What is that?

A.   **That's a docket number for a Hillsborough County South civil action which, I'm presuming -- I don't know -- 0306 I recognize was a lawsuit that Ms. Ortolano has against the City.**

Q.   And did that have to do with her request to get the abatement that she filed for those elderly people?

A.   **I don't know.  There's -- she filed to date about 20 lawsuits against the City.  I don't know specifically which one 306 was about.**

Q.   Well, you know that she filed a lawsuit for those documents from the City to get the abatements that she filed for those elderly people?  You do know that?

A.   **No.  She asked for e-mails.  Her reason for asking the e-mails, I don't know.  You don't have to disclose a reason when you make a right-to-know request.**

Q.   There's also a Supreme Court order; is that correct?

A.   **It looks like a Supreme Court case is referenced as well, so perhaps that was the appeal for the 306.**

Q.   So after you got that Supreme Court order, you sent her -- can you bring those up?

        This is what you sent her?

        **MR. HILLIARD:**  Your Honor, just from the Supreme Court

docket number you can tell that that's activity after to answer the question, Your Honor.

THE COURT:  You're going to withdraw the question?

MR. AIVALIKLES:  No, Your Honor.  It shows how her right-to-know request were handled by the City.  It's a full exhibit in this case.

THE COURT:  All right.  Side bar.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

THE COURT:  I have note -- can you hear me?  I'm confused.  I can only imagine the jury's confused.  But with respect to objections, you're going to have to help me out.  You know what you're talking about.  This is an exhibit that he's got up.  I've got to tell you:  I have no idea what this exhibit purports to be.  And you're just flying through it again and asking her questions about specific things without any real context, but I don't understand your objection.  What is it, Attorney Hilliard?

MR. HILLIARD:  I will tell you, Your Honor, and I accept responsibility for this.  Exhibit 38 is agreed upon.  I did not realize when I redid that exhibit that it had that 2023 letter, the back of it, and that's my fault.

But at this point, I don't think it's appropriate to spend a lot of time discussing something that was not in response to a Supreme Court decision that came two years --

THE COURT:  I'm sorry.  But she ended up taking litigation against the City all the way to the Supreme Court, and she won.  She prevailed.

Why isn't it as simple as that?

Why do they have to fly through pages of an exhibit?

Why can't there be a big picture described to the jury and then perhaps get into some details?

Because I don't know what's going on.

MR. AIVALIKLES:  Your Honor, I haven't had the chance to do that.  That's my expectation.  I was going to follow up in trying to clarify because she's sort of -- she doesn't really know what the issue is I'm talking about, and I'm trying to clarify that by showing her this exhibit.  It took two and a half years --

THE COURT:  I understand.  I understand.  The jury doesn't know.  And ultimately, the jury is the audience.  It's between the two of you at this point.

But the jury is here, and the jury is audience.  They need to understand what the point is as opposed to just bickering about particular pages in exhibit so give the big picture and then get into details.  All right?  Just so that we understand what it is.  And with respect to objections, just make clear exactly what you're objecting to.

MR. CULLEN:  I would like to join the objection and add relevance.  This line of questioning was introduced with

the first question.  You played the games with my client.  This is -- that took place entirely after the arrest.  We know that not just from the docket numbers but because the production is the abatement records from that week.

So I don't believe my client played any games with the 91-A requests, but this does not -- even if you established that they didn't properly comply with a 2021 request after her arrest, that wouldn't be relevant to this case.

THE COURT:  I agree.  I agree.  It's a full exhibit, so he can ask some questions about it, but to spend this amount of time on it, it does -- it's marginally relevant.  So hurry along.  All right?

MR. AIVALIKLES:  I'll try.

(Thereupon, the side-bar conference was concluded.)

BY MR. AIVALIKLES:

Q.  So directing your attention to, again -- can you bring up the letter that Attorney Leonard wrote on January 16th, 2023?

Do you see your introduction?  You indicate that you're responding, and the request was for all AssessHelp e-mails from January 1st, 2021, to March 5th, 2021.  Do you see that?

A.  **I do, yes**.

Q.  And what my client ended up getting was the documentation -- can you go back?  I'm sorry.

The abatements that she filed for the elderly people

that the City received on January 17th, 2021, that's what you produced, correct?

A.   **It looks like it was attached, yes.**

Q.   And you produced both of those?  So it took approximately two and a half years from her request to get those documents?

A.   **Yes.**

Q.   And you represented the City at the Superior Court level, correct?

A.   **I believe I did, yes.**

Q.   And the judge ordered you to produce those?

A.   **At the Superior Court level?  No, it went to the Supreme Court, and the Supreme Court ordered us to do it.  They overturned the Superior Court is my memory.**

Q.   That's your memory?

A.   **Yeah.**

Q.   Did you -- strike that.

     Did the Supreme Court order you to produce those documents?

A.   **I think so, yes.  That's why we were sending the letter.**

Q.   So you had a chance to review the abatements that you filed for those two ugly people at some point, I take it, during the litigation?

A.   **Reviewed them?  How?**

Q.   Well, you were handling the litigation involving these issues?

A.   **I was handling litigation regarding right to know for e-mails.  The e-mails hadn't been produced yet because we had been ordered to, so I didn't know what was in the e-mails.**

Q.   Now, the legal department had those abatement applications by the -- that were filed for these elderly people, didn't they, on January 22nd?

A.   **Not that I'm aware of, no.**

Q.   Weren't all legal documents that concerned Ms. Ortolano sent to the legal department?

A.   **No.**

Q.   You're aware that it took approximately two weeks for Mrs. Ortolano to get -- strike that.

You're aware that it took some time for her to get verification of the filing of those abatements for the elderly people based upon the e-mails in exhibit 40, 40-A through M?

A.   **I've seen those exhibits, yes.**

Q.   And it took her a lot of time to get verification, correct?

A.   **I would not classify it as a lot of time, no.**

Q.   No?

A.   **No.**

Q.   But according to exhibit 38, the City had those appeals on January 17th, 2021, before the 22nd event?

MR. HILLIARD:  Objection, Your Honor.  That's mischaracterization of the exhibit.

THE COURT:  Rephrase the question.  All right?

**BY MR. AIVALIKLES:**

Q.  Can you go to the first abatement?

Does that indicate when it was received by the City?

A.  **This does not.  I don't see an assessing date stamp on it.**

Q.  Do you see it was signed on the 17th of January, 2021?

A.  **I do.  That's what the exhibit shows.**

Q.  And do you see that it was sent on January 17th, 2021, at 7:21 p.m. through AssessHelp?

A.  **I do, yes.**

Q.  Is there any reason to believe that the City did not receive it on the 17th, if it was filed through AssessHelp?

A.  **I'm not in IT, but probably not, no.**

MR. HILLIARD:  Your Honor, side bar, please.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

MR. HILLIARD:  The question I objected to said doesn't it show these abatement applications were in the legal department on January 17th?  And that's why I said it mischaracterized the exhibit.  Yes.  They were e-mailed to the assessing office that day, but I'm just so concerned that the question left some suggestion that the legal department had them.

THE COURT:  Okay.  Well, that wasn't clear to this person, the judge, trying to rule on these.  I don't know these exhibits.  And I'm going to need a little bit more help slowing

down and pinpointing specific dates is much better than just throwing an exhibit at her and asking her a question also.  To the extent you're going to describe an exhibit, do it at accurately from the start.

This point that he's making about legal department versus assessor's office, just be more precise in terms of the description you're using for the exhibits.  That's been a problem throughout.  So...

MR. AIVALIKLES:  Your Honor, she answered no to my question, whether the legal office had these abatements.  She answered it in a no fashion.

MR. HILLIARD:  Exactly.

THE COURT:  Right, but you had asked the question as though it had an answer which was, yes, doesn't this document ultimately -- that's why I'm saying you can rephrase the questions.

You know these exhibits, and ultimately, Attorney Hilliard, you're going to have to be very clear with me as to what the objection is.

MR. AIVALIKLES:  Thank you, Your Honor.

MR. HILLIARD:  Thank you, Your Honor.

THE COURT:  Move along.

(Thereupon, the side-bar conference was concluded.)

BY MR. AIVALIKLES:

Q.  Did you feel that Mrs. Ortolano was an irritant in dealing

with her?

A.    What time frame?

Q.    Well, let's talk about the time frame of January 9th, 2019, January 20, 2021?

A.    No.

Q.    I believe you testified you didn't recall if you had made that statement, Don't mention her name?  I think that was your testimony; you don't recall that?

A.    That's correct.

Q.    Would you say that you had a contentious relationship with Ms. Ortolano in 2020, 2021?

A.    No.

Q.    Did you view her numerous right-to-know requests as contentious?

A.    No.

Q.    Did you stonewall her requests at all?

A.    No.

Q.    Mrs. Ortolano was successful in her claims to the New Hampshire Bank and taxing and land appeal, was she not?

A.    Which one?

Q.    Well, when she filed her abatement request for her property?

A.    She received an abatement, yes.

Q.    Did you -- were you involved in that?

A.    I was.  I was defending the City's assessment.

Q.   And she also won before the Department of Revenue Administration concerning her claims that two of the assessors were not doing their job; is that correct?

A.   **I think so.  I assisted one assessor briefly on that, but I'm not familiar with all the details.**

Q.   Would that be Mr. Duhamel?

A.   **No.**

Q.   So it would be Greg Turgiss?

A.   **Correct.  He was one of my clients, yes.**

Q.   And he was the one that was sleeping on the job?

A.   **I think that was the allegation, yes.**

Q.   And didn't they ultimately sanction him for that?

A.   **I believe they did, yes.**

Q.   Now, on January 22nd, 2021, you were advised that Laurie was in the office; is that correct?

A.   **Correct.**

Q.   And who advised you?

A.   **It was someone from the risk management department of the City.**

Q.   And did they tell you to go back to your office, or what did they tell you specifically?

A.   **No.  I think that Ms. Ortolano was there and refusing to leave, but no, they didn't direct me to come back to the office.**

Q.   How long did it take you to get there?

A.   **I was at Captain's Corners.  I drove to City Hall.  It was kind of Covid-ish, whatever, less than ten minutes.  Not long.**

Q.   And you were angry that you had to cancel or interrupt your Zoom conference to get to City Hall to deal with this issue involving Laurie Ortolano, weren't you?

A.   **No.**

Q.   Well, the first thing you did when you walked in, you didn't say hello to her, did you?

A.   **No.**

Q.   You didn't say, Can I help you?

A.   **Nope.**

Q.   What assistance would you like from this office?  Did you ask her that?

A.   **I did not know.**

Q.   First thing you said is you have to leave; you're trespassing.  Is that correct?

A.   **Yes.**

Q.   And you instructed her -- or you told her that she was sitting in front of your office; is that correct?

A.   **I did inform her where she was sitting, yes.**

Q.   So she didn't know where she was sitting in terms of your office, did she?

A.   **I'm not sure.**

Q.   Right.  And when you told her that, she got up and moved to near the front door, didn't she?

A.   **I think she did.**

Q.   And that was the conduct that you told the police that you felt was erratic because she stood up and then she sat down?

That's the conduct that you were referring to, correct, that event?

A.   **No.**

Q.   No?  You said that you didn't know that -- why she was there that day?

A.   **That's correct.**

Q.   Well, you saw, did you not, Attorney Neumann's statement in which he indicates she was there to get abatement stamps?  You saw the statement.  I can bring it up.  Can you bring that up?

Do you see where he says -- he said that he repeated these forms at least three times before told she had to leave, that she was trespassing, and had no intention of discussing it with her.  Mrs. Ortolano refused to leave and continued to talk about abatement stamp dates while berating both he and Ms. Lloyd.  Do you see that?

A.   **I do.**

Q.   So when you get to the office, did you ask Mr. Neumann do you know why she's here?

A.   **No.**

Q.   And you never asked her, did you?

A.   **I did not, no.**

Q.   And then when the police arrived, did they talk to you

first, or did they talk to Mrs. Ortolano?

A.    **I don't exactly remember.  There was a few of them is my recollection, maybe they split up maybe at one point.  I don't really remember who they spoke to first.**

Q.    Did you notice in Officer Roach's incident report that he observed that Mrs. Ortolano was calm?

A.    **Yes.  That's in his report.**

Q.    And that was true, wasn't it?

A.    **I don't believe so, no.**

Q.    So do you think this competent police officer was wrong when he concluded that she was calm?

A.    **I think we have different perspectives.**

Q.    In your perspective -- strike that.

If she had told you that she was looking for a stamp for the elderly tax abatement applications, would you have been able to help her?

A.    **No.**

Q.    Well, you could have maybe called down to the assessing department to find out if they had received them, couldn't you?

A.    **I believe she testified the office was closed, so no.**

Q.    Well, do you have a way to reach Mr. Vincent at that time?

A.    **During Covid, I would have e-mailed him.  I don't know if he would have been onsite or not.**

Q.    So you could have e-mailed him.  So did you consider -- would you have considered doing that as you'd been told that

she was there for an abatement stamp?

A.   **So if I had known she was there for an abatement stamp, I probably would have sent her down to talk to somebody probably where she had already been who had an abatement stamp, and they weren't there, so I would have thought it would be handled later.  He didn't need to file until March 1st of any given year for an abatement.  I don't think there's any hurry, so I I'm not sure I would have hypothetically, in the situation, seen any urgency to it, no.**

Q.   Did you see in the e-mail when they she filed it that she was concerned that an abatement from one of the mobile park owners last year had been lost.  Did you see that in her e-mail statements?

A.   **I've seen that through this trial.  Not that day, no, I didn't -- haven't seen that.  I did not know that, no.**

Q.   I understand that, but could that have been the reason why she was trying to be really on top of getting proof that she had filed it?

MR. CULLEN:  Objection.

THE COURT:  Sustained.

BY MR. AIVALIKLES:

Q.   Do you know if Mr. Neumann offered to assist her when she told him that she want these abatement applications stamped?

MR. CULLEN:  Objection.  If I may be heard?

(Thereupon, there was a side-bar conference outside

the presence and hearing of the jury.)

**MR. CULLEN:** Your Honor, there's a consistent characterization of this Jesse Neumann's statement as saying she came to him and asked him to be stamped.

The statement just says she continued to talk about abatement stamp dates, and given that she had sent some thing of a diatribe the night before, there's really no evidence to suggest that she had actually asked him for this or that this witness would know that she asked him for anything like that.

**THE COURT:** She can testify to that and you can get up on redirect and ask her and then argue in your closings. So I'll let you go ahead.

**MR. CULLEN:** Thank you.

(Thereupon, the side-bar conference was concluded.)

BY MR. AIVALIKLES:

Q. Do you remember the question?

A. **No. Could you --**

Q. Is it possible you can read it back?

(Thereupon, the court reporter read back the requested portion.)

A. **I don't know what either of them said. I wasn't there, meaning at that time when they were speaking. I didn't hear them speak to each other. I came after -- or later.**

BY MR. AIVALIKLES:

Q. Would you agree that your conduct when you first entered

the office was confrontational?

A.   **No.**

Q.   Would you characterize your conduct when you came into the office as hostile?

A.   **No.**

Q.   Would you characterize your conduct as threatening?

A.   **No.**

Q.   Now, you did have the opportunity to speak with the police officers, correct -- or the police officer, I should say?

A.   **When?**

Q.   Officer Roach, the first time?

A.   **Yes, I did.  Briefly, yes.**

Q.   And you wanted to tell him your side of the story?

A.   **That day, no.  I simply wanted the plaintiff out of our offices, so we could get back to normal and start business with the government.**

Q.   But you told him part of the story, did you not, that you felt she was threatening?

A.   **I told him what I told him, yes.**

Q.   And according to his statement -- can you bring that up? That's exhibit 47, page 1 and 2.

          **THE COURT:**  What is this?  If you could just describe it or orient the witness and the jury.

          **MR. AIVALIKLES:**  Sure, Your Honor.  Thank you for reminding me.  This is the notes from the dispatcher, the

telephone calls with Mindy Lloyd, and it contains his interview notes with you and with Ms. Ortolano. So in that portion that -- can you scroll down?

THE COURT: This is what? This is the collection of police reports?

MR. AIVALIKLES: Yeah. 47 is. I'm sorry, Your Honor.

THE COURT: All the statements, all the call logs.

MR. AIVALIKLES: Yes.

THE COURT: Okay. And just ask if she's familiar with it and recognizes it, has seen it before.

MR. AIVALIKLES: Thank you, Your Honor.

THE COURT: Go ahead.

BY MR. AIVALIKLES:

Q.   So you have seen this police report; is that correct?

A.   **Through this trial, yes**.

Q.   Yes. Okay. And can you look at the portion that talks about his conversation with you, which is the --

A.   **I'm sorry. Can you speak up? The whole trial I've had a hard time hearing you**.

MR. AIVALIKLES: Your Honor, can we take a break because my voice is really --

THE COURT: Certainly. Certainly.

MR. AIVALIKLES: Thank you.

THE COURT: Let's take our morning recess.

(Thereupon, a brief recess was taken.)

THE COURTROOM CLERK:  Court is back in session.  All stand for the jury.

(Thereupon, the jury entered the courtroom.)

MR. AIVALIKLES:  May I proceed, Your Honor?

THE COURT:  Oh, I'm sorry.  Yes.  I'm waiting for you. Go ahead.

BY MR. AIVALIKLES:

Q.   If my voice gets lower and you're having trouble, please let me know.  Okay?

A.   **I will.  Thank you.**

Q.   Just going back to when you first came out -- when you first came into the office, while you were talking to Mrs. Ortolano, did you suggest that she schedule an appointment with the legal office to discuss the issue that she was there for?

A.   **No.**

Q.   Did you suggest to the police officer, hey, why don't you tell her to schedule an appointment, and then we can discuss this issue?

A.   **No.**

Q.   Now, going back to the police call log, which is exhibit 47, page 1 and 2, do you have that in front of you?

A.   **I do, yes.**

Q.   And I think you've testified before the break that you had read these documents in the course of the litigation?

A.   Correct, yes.

Q.   Is there any notation by the police officer that Laurie was making threats?

A.   No.

Q.   Is there any notation in the police officer's note that Laurie was hostile?

A.   Not that I see, no.

Q.   Was there any statement in the police officer's report that you told him that her client was unstable?

A.   Unstable?  I don't think that's in this report, no, or this portion of the report.  No.

Q.   Is there anything in the incident report under the conversations that the officer had with you that you were concerned about her behavior?

A.   No.  It doesn't look like he put that in.

Q.   Are you saying that you told that to the police officer, but he did not include that in his report?

A.   I'm saying it's not in the report.  I don't recall what I said exactly that day, but it's not in the report.

Q.   Is there anything in the police report that her behavior was erratic?

A.   I don't believe that's in the incident report.

Q.   And did you tell the police officer that you wanted her arrested?

A.   I don't recall I did.  I don't recall he asked that, and I

don't know if I said it, no.

Q. And when you spoke to the police officer at the location, the e-mail you should be fired, which is exhibit 1, had not hit the legal department; is that correct?

A. That's correct. I think the time stamp was 3:57 that day, so that was later.

Q. And you told -- according to the police officers, you told Officer Roach and Officer Caron that you wanted her trespassed?

A. I did, yes.

Q. And you know what it means to be trespassed, don't you?

A. I thought I did.

Q. Well, did you understand that when a person was trespassed, they can't return to City Hall?

A. I did understand that, yes.

Q. And they told her she was trespassed, but she needed an appointment to return to City Hall, correct?

A. Yes.

Q. Then after the police left, you prepared your own report to document what had happened; is that correct?

A. Correct.

Q. And you don't remember if Attorney Bolton asked you to do that; is that correct?

A. Yeah. I don't remember if he did or not, but obviously I did it.

Q. Can we pull up her January 22nd, 2021 report?

THE COURT:  What exhibit?

MR. AIVALIKLES:  Yes.  It's part of exhibit 47, Your Honor.

THE COURT:  It's part of 47?

MR. AIVALIKLES:  The police report.

BY MR. AIVALIKLES:

Q.   No.  Keep going.  There it is.

So directing your attention to exhibit 47 and the number on the bottom, page 24, is that the statement you prepared for yourself on January 22nd, 2021?

A.   **Yes.**

Q.   And that was prepared shortly after the police officer left City Hall?

A.   **Within a few hours probably, yeah.**

Q.   And in that report you included all relevant information that would document what happened that particular day?

A.   **I tried to.  It was an internal memo, really.**

Q.   Well, that internal memo ended up getting to the police department, didn't it?

A.   **It did, and the press.**

Q.   Now, I think you indicated in your statement -- let me see if I can find it.  I believe you indicated in the statement that there is a sign by the door that indicates visits are by appointment only.  Do you see that?

A.   **I think it's in there, but I want to make sure.**

THE COURT:  Can you just point to where it is on the statement, please.

A.    **I see it, yep, third line.**

BY MR. AIVALIKLES:

Q.    Small point.  But that's not what the sign says; is that correct?

A.    **What does the sign say exactly?  What is the discrepancy? It says by appointment only.**

Q.    The sign says by appointment only.  It doesn't say visits by appointment only, does it?

A.    **Oh, okay.  I guess not, no.**

Q.    You had a chance to review the statements by Mr. Neumann and Mindy Lloyd; is that correct?  During this litigation, the statement you gave to the police, January 23rd?

A.    **Yes.  I've seen them.**

Q.    Do you know what's in them?

A.    **Not specifically, no.**

        MR. CULLEN:  Your Honor, I just want to object to crossing on someone else's statements.

        THE COURT:  I'm sorry?

        MR. CULLEN:  I would object to crossing someone on someone else's statements.

        THE COURT:  He did didn't have a question.  He just asked her if she knew about the statements.

        MR. CULLEN:  I'm anticipating a question.

BY MR. AIVALIKLES:

Q.   And it's agreed that Laurie was not there pursuant to an appointment?

A.   **Correct.**

Q.   And that's what you stated, correct?

A.   **Yes.**

Q.   Now, in the statement, you had indicated that she pulled the door open and stormed past Mindy Lloyd.  Can we find that?

A.   **I see it.  It's about halfway down, yeah.**

Q.   You weren't there, were you?

A.   **No.**

Q.   Did Mindy Lloyd ever tell you that Laurie Ortolano stormed past her?

A.   **I don't think she used the word stormed, but she said pushed by her.**

Q.   Did Mr. Neumann tell you that Laurie Ortolano stormed past Mindy Lloyd?

A.   **He may have, yeah.**

Q.   So that would be in his report, I presume?

        MR. CULLEN:  Objection.

        THE COURT:  Sustained.

BY MR. AIVALIKLES:

Q.   When did he tell you that?

A.   **We talked about the incident after the plaintiff was escorted out; he probably told me then.**

Q.   Before you prepared your own statement of January 22nd; is that correct?

A.   **Yeah.  Yep.**

Q.   Did you ever ask Attorney Neumann whether he advised Ms. Ortolano that the legal department does not date stamp assessor's documents?

A.   **I never asked him that, no.**

Q.   And other than repeatedly telling her to leave and that she was trespassing, did you offer her any type of assistance?

A.   **No.**

Q.   I think on direct examination you were asked if you were in the bank when you worked at Citizen's and this happened, would you have called the police?

A.   **I was.**

Q.   But customers aren't treated like that when they enter a bank because it's a public institution, correct?

A.   **My legal office at the bank was on the fourth floor on Elm Street.  It was a locked office suite.**

Q.   No.  I'm talking about if they came into the bank themselves.  They would be asked, Can I help you?  What can I do for you?  Good morning.  Right?

A.   **The tellers?**

Q.   Well, the people, right.

A.   **At the bank, sure, yeah.  I did not understand the question to be what the tellers would have done.  I understood the**

**question what I would have done for my office.**

Q.    Could any bank customer get to your fourth floor office at Citizens Bank?

A.    **If they were allowed into the locked suite, yes.**

Q.    But the public doesn't have access right up until the door of the legal office, does it, at Citizens?

A.    **I'm pulling back here about a decade, but my recollection is it was either the elevator -- yeah, I don't think so.  It was a private office suite.**

Q.    Right.  They couldn't get up to your private office unless they had some kind of an arrangement beforehand to go into that office.  Is that a fair statement?

A.    **Yes.  Unlike City Hall, I think there might have been actually security too.  City Hall doesn't have security because it's open to the public.**

Q.    Right.  And the entrance to the legal office, that's a public hallway, isn't it?

A.    **It's a hallway that people can -- at that time, it was not restricted, correct.**

Q.    Correct.  It's public.

And at some point, the legal office made attempts to restrict the public access to that office, correct?  They put up a rope and a sign that says authorized personnel only?

A.    **The rope and the sign are there now, yes.**

Q.    But that, obviously, wasn't there on January 22nd, 2021?

A.   **Correct.**

Q.   And that rope was put up there because of Ms. Ortolano, wasn't it?

MR. HILLIARD:  Objection.

THE COURT:  Narrow the question.

**BY MR. AIVALIKLES:**

Q.   Do you know specifically why that rope was put up there specifically?

MR. CULLEN:  Objection.  Side bar.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

MR. CULLEN:  Your Honor, my understanding the rope was put up there because of the July 22 incident between Ms. Ortolano and Attorney Bolton.  I'm afraid that if she answers this question, she's going to say that.

THE COURT:  All right.

MR. AIVALIKLES:  I wasn't aware of that.

THE COURT:  All right.  I had the impression from previous testimony it was because of this incident as well.

MR. AIVALIKLES:  Right.

THE COURT:  Ultimately, I think you need to move along.  I think the jury has heard the testimony, that this went up after the January 22nd incident so and --

MR. CULLEN:  And that it was in due, in part, to her.

THE COURT:  You can ask it that way and move on, so it

doesn't open the door.

MR. AIVALIKLES:  Definitely.

(Thereupon, the side-bar conference was concluded.)

BY MR. AIVALIKLES:

Q.   Did the installation of the rope have anything to do with the January 22nd, 2021, incident involving Ms. Ortolano?

A.   **You know, I don't know.**

Q.   Did the placing of the sign, authorized personnel only, did that have anything to do with the January 22nd, 2021, incident involving Mrs. Ortolano?

A.   **I don't think so, no.**

Q.   In this statement going back to the January 22nd, 2021, statement that you prepared after the police left, you indicate at the end, especially given recent violations -- I'm sorry -- especially given recent violent actions against government employees and Ms. Ortolano's vocal criticism of city staff, including me, at public meetings and in e-mails to various boards and government officials, you were concerned?

A.   **Yes.**

Q.   And according to the police officer's log note, you never made that statement to him when he was there on January 22nd, 2021, did you?

A.   **No.  I don't believe I did.**

Q.   And now you're referencing her criticism of you in e-mails and before governmental boards?

A.    **It says that, yes.**

Q.    And you had attended many meetings where Mrs. Ortolano was present and talked at the various boards, correct?

A.    **Yes.**

Q.    And that was between 2018 up until 2021, January 22nd, 2021; is that correct?

A.    **Yes.**

Q.    And, in fact, you would -- if you weren't at the meeting, for example, the Board of Alderman meeting, you would review those notes to make sure you knew what was going on, correct?

A.    **Not always, no.**

Q.    Would you speak to Mr. Bolton about what was going on at the Board of Alderman meetings when you didn't read the notes?

A.    **Generally, yes, I kept apprised of my client's business.**

Q.    And so what threatening e-mails did she send you that you equated with violence against government employees?

A.    **I'm sorry.  Where does it say I said she sent e-mails?**

Q.    Well, it says here, especially given recent violent actions against government employees and Mrs. Ortolano's vocal criticism of city staff, including me, at public meetings and in e-mails to various board and government officials.

So what were the e-mails that she sent to government officials and the various boards that concerned you?

A.    **That had -- I don't say they concerned me.  I'm saying that there was criticism in e-mails that she wrote.  I don't**

remember specifics at this time.  I obviously had something in mind then.  And I believe Ms. Ortolano actually testified in her testimony that she had -- she was critical of city officials, including me.  So I think we agree on that.

Q.   Definitely so.  But you can't recall, as you sit here today, what e-mails that she sent to these various boards that caused you to be concerned about maybe potential violence?

A.   I don't mean to be difficult.  I'm getting caught up on -- I don't understand your question.

Where did I say I was concerned?  And I could have; just please point it out.

Q.   (Complies.)

Well, were you concerned about her conduct there?

A.   Conduct where?

Q.   At the legal office on January 22nd, 2021?

A.   I was, yes.

Q.   And you're an attorney.  You're a member of the New Hampshire bar.  Are you a member of any other bar associations?

A.   Yes.  State of Massachusetts, and I think they consider the district court to be a separate bar, so that as well.

Q.   The federal district court?

A.   Yes.  Correct.

Q.   So you understand as a practicing attorney -- and you took constitutional law in law school, I take it?

A.   I did.

Q.   That Mrs. Ortolano has a First Amendment right to criticize her government and government employees?

A.   **I do understand that, yes.**

Q.   And you also understand she has a First Amendment right to criticize you?

A.   **Absolutely.**

Q.   And she has a First Amendment right to demand that you be fired for what she believes warrants such conduct, such action?

A.   **Yes.**

Q.   And I know you testified that you didn't -- her criticism didn't affect you, correct?

A.   **Correct.**

Q.   Hearing her telling the board of assessors, the Board of Alderman, your employer, your legal department, including your boss Attorney Bolton, that she wanted you fired, that didn't bother you?

A.   **No.  I guess I have a healthy dose of hubris.**

Q.   Can you explain that?

A.   **I'm confident in my job.  I was confident I was supported by my boss.  I was confident the mayor was concerned for my well-being.  And her e-mail didn't concern me.**

**She, as you stated, has a right to have that opinion. Her opinion didn't concern me.**

Q.   It didn't bother you that she was telling your colleagues what she thought of you?

A.    **Not at all.  What my colleagues think of me matters.**

Q.    You sent Kim Houghton this statement which is your statement dated January 22nd, 2021, at 2:55 p.m. on January 22nd, 2021; isn't that correct?

A.    **That sounds about right.  Like I said, it was afternoon; that was my testimony.  Yeah.**

Q.    I thought you said 1:00 o'clock, but I'm glad that you corrected it.  Thank you.  And why did you send her the statement?

A.    **Well, Ms. Ortolano had called the press, the press had reached out to the City.  I was the one to respond to Ms. Houghton, and I thought it would be useful for her story, so I sent it.**

Q.    So you knew it was going to be included in whatever story she wrote about the incident?

A.    **I didn't know.  I don't know how a reporter puts it together.  I thought it would be helpful to her story.**

Q.    You thought, also, it would be helpful to her story to include the pictures of Ms. Ortolano sitting down in the legal office?

A.    **I had told Ms. Houghton that there were photographs, and she requested them, and I sent them.**

Q.    And you took those photographs to document the fact that Ms. Ortolano was sitting in the legal office, right?

A.    **Correct, on the floor.**

Q.   And the article does appear in the newspaper, correct?

A.   **Yes.  There's an article on the 23rd, I think, yeah, next day.**

Q.   On the 23rd the next day?

A.   **Yeah.**

Q.   Did you have any conversations with the reporter after you had sent her the statement at 2:55 p.m.?

A.   **I did not speak with her.  I -- maybe there was like a clarifying e-mail, but I did not speak with her further on the phone, no.**

Q.   What was the next time you spoke to the Union Leader reporter?

A.   **I don't think ever.**

Q.   Can you bring up exhibit 51, I believe?

     This is the newspaper article by Kimberly Houghton dated January 23rd, 2021, which is exhibit 51.  Are you familiar with that article?

A.   **Yes.**

Q.   Can you go to, I think, the third page.  Yes, thank you.

     Do you see the paragraph that starts Ortolano said one of the officers told her.  Do you see that?

A.   **Yes.**

Q.   And you read that, and you said that he indicated there was no no-trespass order, correct?

A.   **Yeah.  You can read that.  That's what Sergeant Joseph**

**Rousseau says.**

Q.   You didn't state according to the article, at least, I find it troublesome to say the least; my office will be speaking with the police further?

        MR. HILLIARD:  Objection.

        MR. AIVALIKLES:  Well, I'll phrase.

        THE COURT:  Can you clarify what you're asking?

        MR. AIVALIKLES:  Yes.

BY MR. AIVALIKLES:

Q.   When the Union Leader reporter advised you that there was no no-trespass order, did you indicate to her at that time that you find it troublesome?

A.   **I did.  Yes.**

Q.   Well, the next paragraph after the no-trespass incident indicates there was no criminal investigation --

        THE COURT:  Can you clarify which paragraph you're talking about?

        MR. AIVALIKLES:  I'm sorry, Your Honor.

        THE COURT:  Is it the fourth, fifth?

        MR. AIVALIKLES:  Looks like it's the fourth paragraph.

        THE COURT:  I think that will be help focus.  It starts with the word there is no.

        MR. AIVALIKLES:  Right.

        THE COURT:  Okay.

BY MR. AIVALIKLES:

Q.   It says there is no criminal investigation into her at all. She was just asked to leave because they only accept appointments right now, Rousseau said.  Do you see that?

A.   **I do**.

Q.   And then that next paragraph is your response to that.  It says, I find it troublesome, to say the least, Leonard said of the incident.  My office will be speaking with police further. Did I read that correctly?

          **MR. CULLEN**:  Objection.

          **THE COURT**:  Yes.  Did he read that correctly?  You're objecting to that question?

          **MR. CULLEN**:  I am.

          (Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

          **MR. CULLEN**:  That was the last part of his question, but the introduction to the question suggested that these are things that happened in a series in a temporal side.  We have no idea whether the statement I find it troublesome is directly as he suggests to the statement that Rousseau made.

          **THE COURT**:  That is correct.  I understand the objection.  It is sustained.  And just rephrase the question so that it makes sense.  You're describing something in your own head and formulating the question, but ultimately, it's very hard to follow.  Okay?

          **MR. AIVALIKLES**:  Thank you, Your Honor.

(Thereupon, the side-bar conference was concluded.)

BY MR. AIVALIKLES:

Q.   So in the article, you indicate my office will be speaking with the police further.  What office were you referring to?

A.   **Well, the legal office.**

Q.   And when did you call the police after reading that article?

A.   **I didn't.**

Q.   Well, at some point you called the police?

A.   **I did not.**

Q.   Can you bring up exhibit 47?  It's a February 1st, 2022, entry.  February 1st.  There it is.

          **THE COURT:**  What page on exhibit 47?

          **MR. AIVALIKLES:**  Page 6, Your Honor.

BY MR. AIVALIKLES:

Q.   Do you see the entry by Officer Roach?

A.   **I do.**

Q.   Would you like to change your testimony whether or not you contacted the police?

A.   **No.**

Q.   Well, let me read the statement.  On February 1st, 2021, at approximately 900 hours, I was made aware by supervisors at City Hall through Attorney Celia Leonard had contacted the Nashua Police Department and wished to open an investigation into the incident that occurred on January 22nd, 2021,

involving Laurie Ortolano for her actions that day.  I will attend City Hall to arrange to speak with witnesses to this incident.  Did I read that correctly?

A.   **You did.**

Q.   And do you still maintain that you did not call City Hall? -- I'm sorry, that you did not call City Hall to ask them to investigate Laurie Ortolano?

THE COURT:  You didn't call City Hall.

BY MR. AIVALIKLES:

Q.   Sorry.  You did not call the police department to investigate the incident involving Laurie Ortolano?

A.   **I did not.**

Q.   So that entry is wrong by Officer Roach?

A.   **I wouldn't say that if he was told that.  That's what this says I was made aware by supervisors that City Hall through Attorney Celia Leonard had contacted.  It doesn't say call.**

**So he was made aware, his report is, but I don't know who made him aware of it.  I didn't call anybody.  I didn't contact anybody at the police department.  I did not -- so he might -- this might -- two things could be true at the same time.  He might have been told that, but I didn't call him.**

Q.   Were you part of the Zoom conference call that Mindy Lloyd talked about?

A.   **I was, yes.**

Q.   When did that happen?

A.    I don't know.  Sometime after the incident and before the arrest.  I don't know -- or before the investigation.  They opened -- they said no at the Zoom.  Hard no.  And then, kind of, next thing I knew that I was being called to have the formal investigation, so I again spoke with the police.  So anyway, no.

Q.    So let's backup.  I'm sorry.  Do you need to say anything further?

A.    No.

Q.    So let's back up.  So you attended this Zoom meeting, and I think you testified that you got a hard no?

A.    As former Chief Carignan had said, he told everyone on the Zoom that there would be no investigation and no arrest -- or no investigation at least.  You can't have an arrest without an investigation.  So that's what I mean by it was said at the Zoom, and I was paraphrasing that is a hard no.

Q.    And so the attendees at the Zoom were the chief; is that correct?

A.    The chief was on the Zoom, yes.

Q.    Two deputy chiefs?

A.    I don't know.  There was a lot of police officers on the Zoom screen.  I don't know any of the other ones.

Q.    A lot of brass, would you say?

A.    Sure.

Q.    Did you think it was unusual that all these people were

going to be doing a Zoom call to discuss a criminal trespass case against Laurie Ortolano?

A.    **I'm not sure I understand the question.**

Q.    I'll withdraw it.  That's okay.

So after the Zoom meeting, wasn't there another meeting with Chief Carignan?

A.    **Brian trained us to say it wrong.  I do recall that Chief Carignan came to say that they had decided -- the police had decided to go forward with this investigation.**

Q.    Maybe -- I'm confused; I don't know if anyone else is, but I thought Chief Carignan testified that he had a meeting at City Hall, at your offices, with you Attorney Bolton, and possibly Mindy Lloyd.  Was he wrong about that?

A.    **No.  I think that's what I'm referring to.  There was a Zoom meeting where there was -- Chief Carignan had said no investigation, and then at some point after that, before the investigation started, my recollection is at some point he came over and had said, yes, based on, you know, evidence we found, Ms. Ortolano's e-mail, we're going forward.  That's my memory.**

Q.    You heard Chief Carignan testify that Attorney Bolton was angry.  He had a raised voice.  And he was demanding that Mrs. Ortolano be arrested.

Did that happen at the Zoom meeting?  Is that your testimony?

MR. HILLIARD:  Objection, Your Honor.  He assumes that

the witness agrees with those.

THE COURT:  Break it up and ask the question separately.

BY MR. AIVALIKLES:

Q.   Did Attorney Bolton act in an angry manner during the Zoom conference?

A.   **I'd say he was vehement.**

Q.   But not angry?

A.   **No.  I wouldn't say he was angry, no.**

Q.   At the Zoom conference, did he demand Laurie Ortolano be arrested?

A.   **No.**

Q.   At the Zoom meeting, did he raise his voice?

A.   **Yes.**

Q.   You had a conference or an interview with Sergeant Roach on February 3rd; is that correct?

A.   **I remember I had one.  The report says February 3rd, so yes.**

Q.   Well, let's bring it up.  It's page 11 for exhibit 47.  You see it says Celia Leonard?

A.   **I do.**

Q.   And if you go down to the bottom -- you have to go back -- on the second page -- I'm sorry, on the first page of your statement, it says, Attorney Leonard confirmed to me that she does wish to pursue charges against Ortolano for criminal

trespass.  Did I read that correctly?

A.    **Oh, the last sentence?**

Q.    Yes.

A.    **Yes.**

Q.    And that is, I believe, part of the report of Officer Roach when he showed up on February 3rd to interview you, Attorney Neumann, and Mindy Lloyd; is that correct?

A.    **I'm sorry.  Can you repeat the question?**

Q.    This note, this information was provided to Officer Roach on February 3rd when he met at your offices with you, Attorney Lloyd -- I'm sorry, Mindy Lloyd, and Attorney Neumann?

A.    **Well, I understand this to be his report of when we met, yes.**

Q.    And that was February 3rd?

A.    **On or about, I guess.  This particular page doesn't have a date, so sure.**

Q.    It would have been around February 3rd?

A.    **Yes.**

Q.    And this report by Officer Roach about his interview of you was after the e-mail Attorney Leonard should be fired; is that correct?

A.    **Yes.**

Q.    And this was the first time in any of your reports, which is the incident report, your handwritten note of January 22nd, 2022 -- '21, sorry, and now this document of yours, the

statements, on or around February 3rd, where you first indicate you wanted charges against her, and you wanted them to investigate, is that correct, in the time sequence?

A.   **It's the first time it's noted in writing, but it wasn't the first time I thought that she should be investigated.**

THE COURT:  Can I ask you a quick question:  Are you going to continue asking questions about exhibit 47, the police file?  If so, I'd like her to have a full copy, hard copy of it, because, for instance, the February 3rd date you wanted is at the beginning of his report, and the sequence of interviews would have been a very easy way to confirm that.  But there's no way for her to do it because she's looking at a section of a statement that's three pages.

MR. AIVALIKLES:  I think we should have one that we use.  And I apologize, Your Honor, but this is my first electronic trial so...

THE COURT:  All right.  Well, we did it better in the old days.  So I have a full copy of that exhibit and I am now using the hard copies instead of the electronic.  It's much easier to follow.

MR. AIVALIKLES:  I agree.

(Complies.)

A.   **Thank you.  It is, however, smaller.**

BY MR. AIVALIKLES:

Q.   Can you go back to the beginning.  Do you see right before

Mindy Lloyd's statements, page 9?

A.   **I do, yes.**

Q.   Do you see where he says, on Wednesday, February 3rd, 2021, at 1300 hours, I attended City Hall to speak with three witnesses from this incident.  Do you see that?

A.   **Yes.**

Q.   Does that help you with your recollection in terms of when you gave the statement to Officer Roach that is on page 11 of exhibit 147?

Would you agree it was on February 3rd?

A.   **Yes.  I'll just note that there's more than three witnesses statements, but, yes, February 3rd.**

Q.   Yeah.  I think he spoke to someone, Ms. Castro, but I don't think that was February 3rd?

A.   **Yes.  It's just confusing because right after mine, it goes right into Diane Veino, and then it continues, but we'll go with February 3rd.**

Q.   Thank you.  Now, you say -- going back to your statement on February 3rd, I think it's page -- there it is.  I'm sorry.

THE COURT:  Bring that microphone over.

MR. AIVALIKLES:  That would help.  Thank you, Your Honor.

BY MR. AIVALIKLES:

Q.   Do you see where in the third paragraph at the bottom, Attorney Leonard told Ortolano that her behavior was

threatening and hostile.  Do you see that?

A.   **Yes.**

Q.   And Ortolano replied, quote, unquote, poor baby.  Do you see that?

A.   **Yes.**

Q.   That did not appear in the office's call log when he interviewed, is that correct, that term?

A.   **That's correct.**

Q.   That term didn't appear in your January 22nd, 2021, statement that you wrote after the event, did it?

A.   **No.**

Q.   You also indicated in the -- it's indicated -- I'm sorry -- in the narrative that you told the officer -- and I'm looking at, like, the four lines from the bottom, Attorney Leonard also advised.  Do you see that?

A.   **Is that in the last paragraph?**

Q.   Yes, in the last paragraph.

A.   **I do see that.**

Q.   It says, Attorney Leonard also advised that the legal department don't stamp assessor documents in that office.

          Did I read that correctly?

A.   **Yes.**

Q.   Why were you letting Officer Roach know that?

A.   **Perhaps he asked.**

Q.   And you said in that statement, she believes Ortolano was

fully aware.  Did I read that correctly?

A.  **Yes.**

Q.  So what is the basis of your belief that Laurie knew that the legal department did not stamp assessor documents?

A.  **First, based upon the very simple fact that the legal office is not the assessing office.  And I believe, given her involvement with the City, she's seen where the different offices in City Hall have date stamps that will say like assessors or legal office on them.**

**Also, because I had a conversation with her in the fall of 2019 about what the legal office did and didn't do.  And while it was not exhaustive to be sure, I certainly never indicated that our legal office would be the administrative date stamping form for another office, any office, including the assessors.**

Q.  But when you explained what the legal office does back in 2018, you didn't address date stamping of documents, did you?

A.  **No.  I didn't think it would be relevant -- well, not date stamping of any sort and certainly not date stamping for another office, not IT, not assessing, not any -- she didn't ask.**

Q.  Well, you're aware that Mrs. Ortolano received an e-mail from your office from Manuela Perry on November 2024 -- I'm sorry -- 2020, enclosing the abatement application she filed for her own property?  You're aware of that in the testimony

that came out?

A.   I saw that there was an application we forwarded that had an assessing date stamp on it.  It was probably in response to a right-to-know, since we don't process those.

Q.   No one is contesting that it was an assessor stamp.

A.   Okay.

Q.   So can you understand why she may have thought, however, when she got this letter from the legal department that the legal department could help her getting a date stamp for her abatement that she filed for these two elderly people?

A.   No.  I don't understand why she thought the legal department would put an assessing date stamp on an application for an abatement.

Q.   Well, at that time, the assessor's office was under construction; it was literally demolished, so they weren't in operation, were they?

A.   No.  They were operating; they just weren't in the office at that point.

Q.   And what generally happened prior to this renovation, people would go to the assessor's office, hand them the abatement application, and it would be stamped and then be on their way, correct?

A.   Are you asking me to testify about what the assessor office does?  I mean, that was -- I guess that's my understanding that's what they would have done.  I never did it.

Q.   And is there any question that no one at the legal office on January 22nd, 2021, told her that the legal office does not date stamp assessing documents?

A.   **I don't think that's a question because I don't think she ever asked anyone to do it.**

Q.   Did you follow Laurie on social media?

A.   **No.**

Q.   Do you recall being advised by Attorney Lehmann that -- this would have been in 2020 now -- that the legal department had permission to talk to Laurie Ortolano for matters that she was not represented?  Do you recall getting a letter from him?

A.   **I don't know if it was a letter, but I do know he said that, yes.**

Q.   And it's not against the ethic rules for you to talk to an individual that is not represented by an attorney; is that correct?

A.   **That's correct.**

Q.   And I know there was some belief in the legal department that my client doesn't tell the truth; is that correct?

A.   **There's a belief that it's best for everyone if things are in writing for both sides.**

Q.   Was there a belief in the legal office that my client does not tell the truth?

A.   **No.**

Q.   Was there a suggestion by Attorney Lehman that any

conferences between the legal office and Laurie Ortolano -- again, where she wasn't represented, be recorded?

MR. HILLIARD:  Objection, Your Honor.  Can we have a time frame on this, please?

THE COURT:  And maybe break it up because it's rambling and hard to follow.

MR. AIVALIKLES:  Thank you, Your Honor.

BY MR. AIVALIKLES:

Q.  Was there a suggestion by Attorney Lehman that meetings with Ms. Ortolano be recorded?

A.  **To me, in 2020?  Or here on the stand?**

Q.  Well, let's talk about 2020?

A.  **You know, I don't recall him saying that to me.  No.  No.**

Q.  How about in 2021?

A.  **No.**

Q.  Do you recall reading anything in the newspaper in 2021 in which he indicated that meetings should be recorded?

MR. CULLEN:  Objection, Your Honor, hearsay, and the time frame.

THE COURT:  Sustained.

BY MR. AIVALIKLES:

Q.  Now, you had indicated, I think, in looking at exhibit 18 -- let me just take a look at that.

So can you pull up Exhibit 18?  And that's a full exhibit.

And this was a right-to-know request that you had handled that Ms. Ortolano's filed on July 19th -- well, you filed it before July 19th, but you responded to it on July 19th, 2019; is that correct?

A.   **This is the letter from me to Ms. Ortolano regarding a right-to-know request received July 12th, and it's dated July 19th, 2019.  Yes.**

Q.   Can you bring up exhibit 17, which is the full exhibit?

Do you see that there was a letter to Kim Kleiner from Laurie Ortolano dated July 12th, 2019.

Do you see that there?

A.   **Yeah, at 10:03 p.m.?**

Q.   Yeah.

A.   **Yeah.**

Q.   Who is Kim Kleiner?

A.   **Kim Kleiner, at that time, was the director of administrative services, which oversaw one of our internal department's, IT, assessing, HR.  So she was a colleague of mine at that time.**

Q.   And Kim Kleiner sent you Mrs. Ortolano's right-to-know request on July 13th, 2019; is that correct?

A.   **Yes, at 4:03 a.m.**

Q.   And in her request, she requested permission to talk to Doug about permits captured and how they're handled in the office; is that correct?

That's on the next page, I'm sorry.  Can you go to the next page?  Do you see that?

A.    **I do.**

Q.    She wanted to talk to this individual, Doug, and that's Doug Dame?

A.    **Correct.  Ms. Ortolano was asking Ms. Kleiner to speak with Doug.**

Q.    And that's a very simple request; it's not complex, is it?

A.    **That particular one?**

Q.    Yes.

A.    **Yeah, no.**

Q.    It wouldn't require a lot of time or investigation or anything like that, correct?

A.    **I don't know.  It depends how long she wants to speak with him.**

Q.    Well, in other words, she would have to schedule an appointment to meet with him?

A.    **I don't know.  He didn't report to me.**

Q.    And now if you can go back to 18, on the second page, request three.

You say your request to meet with Mr. Dame regarding this topic is denied; is that correct?

A.    **Yes.**

Q.    Did you suggest that -- strike that.

You were advised that Mrs. Ortolano was petitioning

the Court for an annulment which would have meant her conviction would have been removed from the public records; is that correct?

A.   **At some point I became aware of it.  I don't think I was fully advised, if that makes sense, yeah.**

Q.   And you were opposed to that, correct?

A.   **Yes.**

Q.   And you felt that she had not been rehabilitated and shown sufficient remorse for what she did?

A.   **I don't recall that.  I just think that she did it, she pled guilty.  I don't see why it shouldn't be kept in the public record and be there for everybody to see.**

Q.   You never attended the sentencing, did you?

A.   **No, I didn't know when it was.  I wasn't told.**

Q.   I think -- do you recall when you were asked that question, you said you wanted to make sure you didn't spend anymore time that you needed to, and that's why you didn't appear?

        **MR. HILLIARD:**  Excuse me, Your Honor.  This is impeachment.  We should have page and line of the deposition.

        **THE COURT:**  Yeah.  Ultimately, can you rephrase the question in terms of cross-examination?

        **MR. AIVALIKLES:**  Yes.

BY MR. AIVALIKLES:

Q.   Did you not appear at the sentencing because you didn't want to waste anymore time than you needed to?

A.   **That could be part of it too**.

Q.   And did you not -- was it your understanding that that was a choice, that sort of freedom of speech, did you make that statement?

        MR. CULLEN:  Objection.

        THE COURT:  Sustained.

        Do you have a copy of your full deposition?

A.   **I'm sorry.  I can't hear you**.

        THE COURT:  Do you have a hard copy of your deposition, a hard copy?

A.   **I do**, **yes**.

        THE COURT:  So she has a hard copy of that.  In order to refer to that, there has to be something, obviously, to impeach.

BY MR. AIVALIKLES:

Q.   Can you go to page 28, and it is line -- starting with line 13.  This is part of your answer:  Did you contact the City prosecutor to find out what the sentence was going to be?

        Did I read that correctly?

        MR. CULLEN:  I'm sorry, Your Honor.  I just need a minute to get there.  Did you say her deposition page 8?

        MR. AIVALIKLES:  28.

        MR. CULLEN:  That explains why I can't find it.

BY MR. AIVALIKLES:

Q.   And let me go back first.  You participated in a deposition

in this case?

A.    Yes.

Q.    Do you recall that?  And that was on May 13th, 2024?

A.    Yes.

Q.    And you had an opportunity to review this document before you -- the transcript, you had an opportunity to review that?

A.    Yes.

Q.    And after you reviewed it, you had the opportunity to make any corrections that you wanted to this deposition, correct?

A.    Yes.

Q.    And you signed this deposition, correct?

A.    I'm sorry?

Q.    You signed this deposition?

A.    Yes.

Q.    And what you signed was the certification, I, Celia Leonard, hereby certify that I've read the foregoing transcript of my testimony and further certify that it is true and accurate record of same given on May 13th, 2024, with the exception of the corrections listed above.  Did I read that correctly?

A.    Yes.

Q.    And there were no exceptions that you noted above, correct?

A.    Correct.

Q.    So let me go back to my original question.

        You were asked, did you contact the City prosecutor to

find out what the sentence was going to be, right?

A.   **Correct.**

Q.   And you gave a lengthy answer.  And if you want, you can read it to the jury, or I can just direct you to the part that I'm going to be asking you a question about.

A.   **No.  I'm happy to read it.**

Q.   Go right ahead.

A.   **He said:  Did you contact the City prosecutor to find out what the sentence was going to be?**

THE COURT:  Slow down.

A.   **Sorry.**

THE COURT:  That's all right.

A.   **And I answered no.  I really wanted to make sure that I didn't spend more time than I needed to on the event, but I did feel -- I did feel strongly that I and my colleagues were a victim, and I wanted to see what I thought was justice, which is when she pled guilty, that there would be a consequence to it done.  That didn't mean that I wanted to take time out of my work or away from my family to be at court, hearings, et cetera.  That's my choice.  That's sort of my freedom of speech.**

MR. AIVALIKLES:  Thank you very much.  Oh -- again, I apologize, Your Honor.  I did have some notes during her testimony I wanted to question her about.  Is that okay?

THE COURT:  You have a few more questions?

**MR. AIVALIKLES:** I do. It was some notes taken during her direct examination I had up here. A few.

**THE COURT:** A few more questions, go ahead.

**BY MR. AIVALIKLES:**

Q. You testified that you always treated Ms. Ortolano professionally. Do you remember that?

A. **Yes**.

Q. Do you think you treated her professionally on January 22nd, 2021, when you told her to leave; you're trespassing?

A. **I'd say it was appropriate. It was professional. There were other things, more harsh things, I could have said, and I did not.**

Q. Well, do you think you would have been probably more professional with Ms. Ortolano, can I help you? Do you think that would have been more professional than, leave, you're trespassing?

A. **No. I had my colleagues, and my job, and my responsibilities to get the government going, also, is my professional obligation.**

Q. Thank you.

**THE COURT:** Thank you.

**MR. HILLIARD:** I have no questions, Your Honor.

**THE COURT:** Mr. Cullen?

**MR. CULLEN:** Nothing Your Honor.

**THE COURT:** All right. Ms. Leonard, you may step

down.

MR. HILLIARD:  We call Steven Bolton, Your Honor.

Thereupon,

STEVEN BOLTON,

having been duly sworn by the courtroom clerk, testified as follows:

A.  I do.

THE COURTROOM CLERK:  Thank you.  Please be seated. Please state your full name and spell your last name for the record.

A.  Steven Bolton, B-O-L-T-O-N.


DIRECT EXAMINATION

BY MR. HILLIARD:

Q.  Good morning, Mr. Bolton.

Could you please introduce yourself for the jury and just give kind of a biographical sketch of your education and employment, please.

A.  Steven Bolton, currently the city corporation counsel for the City of Nashua.  I spent my childhood in Manchester, New Hampshire; graduated from Manchester West High School in 1972; attended Dartmouth College; studied economics and history there, graduating in 1976; worked in the jewelry industry in Rhode Island for a couple of years; and then attended law

school at Western New England College School of Law; graduated cum laude in 1981; took the New Hampshire Bar that year and was admitted to practice; and admitted to practice in the Commonwealth of Massachusetts the following year, 1982.

After being admitted to the bar, I practiced on my own for about a year and was hired thereafter in August 1982 to be the deputy corporation counsel in the City of Nashua.  And I did that job for a couple of years.

And then the City corporation counsel was appointed to a judgeship on the Nashua District Court, and the then-mayor, Maurice Arel, nominated me, and I was confirmed by the Board of Alderman to be the City corporation counsel.

And I served in that capacity for three years, leaving there in 1987; joined the Nashua law firm of then-called Prunier Nadeau and Leonard; sometime later it was called Prunier Leonard and Bolton; and then had some other names after I left.

From 1991 to 2016, I practiced out of my own office doing a variety of legal work, and then Jim Donchess, who had been mayor following Maurice Arel back in the 80s, decided to revive his political career after about a 20-year intermission and approached me, and after various conversations there was discussion about my going back to city employee again as the City corporation counsel.

When Mr. Donchess was elected mayor, he nominated me,

and the Board of Alderman confirmed me.  That was in March of 2016, and I've held that position ever since then.

Q.   And have you, during your professional career, also served on any boards of the City of Nashua?

A.   Yes.  From 1991 to 1995, I was elected and served on the Nashua Board of Education.  Then in 198 -- 1997, I served for another year to fill in an unexpired term of school board member who had resigned.

And then I ran for election to the Board of Alderman and was elected alderman at large in 1997 and served in that capacity until 2010.  So during those approximately 12 years, I was an alderman at large in the City of Nashua.

I'm also the governmental board I've served on.  Part of that I was on the trustee of the trust funds for a number of years and the Board of Library Trustees as well.  That was co-terminus with my service on the Board of Alderman.

Q.   I'm not looking for a long answer here, but I just would like to have you, since you are corporation counsel, just describe to the jury briefly what that job entails?

A.   In Nashua that position is called corporation counsel.  In other municipalities, it might be called city solicitor or city attorney.

In Nashua, we primarily deal with what would be called the civil law issues of municipal government, so we don't do the prosecuting of criminal acts.

Our role with regard to criminal prosecutions or the police department is virtually non-existent in that field.

We do represent the police department similar to the fire department, public works department, in terms of if they're contracting to purchase copy machines or doing negotiations with labor unions.

Sometimes if there are employee disputes, human resource issues, we may be advising on those things.  So if someone is accusing someone else of harassment or sexual discrimination or something, we may have a role in explaining the law or what might be appropriate or inappropriate conduct in those circumstances.

And this we do for all departments, the fire public works, the library, the treatment plant, the landfill, every aspect of municipal government.

We write legislation for the Board of Alderman; help through that process, if there are going to be stop signs put up, pretty much a boilerplate way that we authorize the erection of a stop sign in a certain intersection and parking on the street.  Those things are sort of routine and mundane.

We advise on any legal question that comes up, so you've heard a lot about right-to-know issues.  Right to know, as you've heard before, comes out of a chapter in the state statutes which is known as RSA 91-A.  Essentially it provides that citizens have a right to request documents, public records

from municipalities and other government agencies, but in our case we're concerned with the City of Nashua, so municipality.

And while generally speaking, the general rule is public records are available and will be provided. I should say public records, which are available, will be provided, but there are a number of exceptions. There's exceptions for attorney/client privilege documents. There's an exception for documents in the process of a competitive bidding situation. There are exceptions for draft documents that have not reached their final form. There are exceptions for confidential personal information that could constitute an invasion of someone's privacy.

So perfect example of that are things like health records that someone is out on an extended leave for a health reason, the details of that, well, it might be contained in the employee's personnel file, that is not open to the public.

Q.   I don't mean to interrupt you, but you're getting a little too granular for what I intended, but thank you.

A.   I'm sorry.

Q.   That's all right.

A.   I could go on for three or four or five --

Q.   That's why I interrupted you.

Just quickly, in that capacity, corporation counsel, do you have occasion to regularly attend board or committee meetings of the City?

A.    Yes.

Q.    And just briefly, what's the typical boards that you attend?

A.    I attend the twice-a-month, regular meetings of the Board of Alderman.  The Board of Alderman has various sub-committees, legislation that's proposed to the Board of Alderman typically will get directed to one of its sub-committees.

        If there are legal issues that the board members have questions about, I will attend the sub-committee meetings as well.

        When requested, I attend board of education meetings, board of public works meetings, board of library trustee meetings, board of fire commissioner meetings, board of public works, planning board, zoning board, any of those.

Q.    May I have exhibit VV, a full exhibit, pulled up?

        We're showing you, Mr. Bolton, exhibit VV.  It was now a full exhibit.  My only question is, is this a fair layout of your office as it existed in 2021?

A.    Yes.

Q.    Is there any lobby or waiting area or counter service available in the legal department?

A.    There wasn't then, and there isn't now.

Q.    Has this office ever been open to the public -- during your tenure, I'll say?

A.    Well, not as such.  There were times when the doors were

not locked and people could, if they opened an unlocked door, they could walk in, and they would be typically addressed as, you know, could something be done to help you. That was fairly uncommon even when the door was unlocked. It was mostly accessed by people who were city employees, colleagues of ours, who had reasons to seek out assistance on legal issues.

Q. And by 2021, January, the door was locked?

A. Yes.

Q. Maybe you addressed this, but were there occasions prior to 2021, January, where Ms. Ortolano was invited to visit the office?

A. Yes.

Q. And approximately how many times?

A. By invitation, three.

Q. And can you just briefly tell us the time frame and the purpose of the visits?

A. Well, in time frame beginning in 2018 would have continued to early 2020. I don't think there were occasions after that. But if there -- there were also times when she visited on her own initiative, and I was willing to speak with her. That changed after a while.

Q. All right. On those other occasions when you were willing to speak with her, what were the topic of the conversations?

A. Initially there were questions, usually about assessing, but more generally how city government functioned.

So a lot of questions about assessing centered on, you know, how was the number determined and who determined it, and basically I would explain to her, well, we're looking to get the value of the property.  And periodically all of the property in the City would be revalued, and that value would carry on for a number of years until the next citywide reevaluation.  So we would talk in general terms about that process.

Sometimes it would stray into other matters of, well, what can the Board of Alderman do, or what can the Board of Alderman not do, and those sorts of general questions about the municipal government in New Hampshire.

Q.   And we heard earlier testimony in the week that at some point the City was to undergo -- let me get the right term correct -- the citywide reassessment?

A.   There was a citywide revaluation or reassessment scheduled for 2018.

Q.   And did you oppose that?

A.   No.

Q.   The City agreed to do that?

A.   Well, the City contracted to do it.  We were -- at that point in time, the City was required by law to do one every five years, and we were at the five-year mark.  So it was -- I don't think there was a lot of dispute about whether it was going to happen or not.

Q.   And then did there come a time when Ms. Ortolano appealed her own tax assessment on her home?

A.   **On her Berkley Street property she appealed that assessment, the assessment of 2018.  I believe that same number which would have been typically of most of the properties which were virtually all the property the same number that was determined for 2018 was carried over for 2019 and Ms. Ortolano appealed that year as well.**

Q.   And was she representing herself and both of those tax year appeals?

A.   **No.  She was represented by counsel in the 2018 year.**

Q.   And was representing herself in the 2019 one?

A.   **Correct.**

Q.   Calling your attention to 2019, did you have a meeting, by invitation, with her in the legal department?

A.   **In 2019?**

Q.   Yes.  And speaking about the meeting with Ms. Kleiner?

A.   **Oh, yes.  Yes.  This was not -- this was not concerning her own abatements.**

Q.   I'm sorry.  I switched gears.  That's right.

A.   **Yes.  There was, I believe -- I wasn't there for all of them, but what I understood is that Mrs. Ortolano had requested to meet with Kim Kleiner, who was then either director or acting director of the administrative services division, and they had scheduled something, but Mrs. Kleiner was reluctant**

for some reason.

MR. AIVALIKLES:  Objection, Your Honor.

A.    -- to speak --

MR. HILLIARD:  Wait.  Wait.  There's an objection.

MR. AIVALIKLES:  Hearsay.

MR. HILLIARD:  The truth of its contents.

THE COURT:  I'll allow it.  Go ahead.

BY MR. HILLIARD:

Q.    You can proceed.

A.    Thank you.  So I was asked did I get on well with Mrs. Ortolano, and would I be willing to attend that meeting to try and facilitate things.  And frankly I did have some knowledge about how the assessment process was done.  I understood there was going to be some questions about how it interacted with people who did renovations and additions and so forth to their property and how the building permit process intersected with the assessing process.  And I did have some knowledge of that, so I was willing to attend that meeting.  I attended that meeting, the meeting occurred.  Shall I go on?

Q.    Quickly summarize what the discussion was and how the meeting ended?

A.    Okay.  Well, first thing, you know, I'm waiting.  It was -- the meeting occurred in the legal department conference room right here.

Q.    You're pointing to --

A.    And Mrs. Ortolano came in through the door that exits out to the third floor lobby and stairway.  And I was sitting in the room, and I thought it necessary to explain to Mrs. Ortolano that I knew she didn't expect me to be at the meeting and if she was at all uncomfortable with that, that we could reschedule, postpone to a date when she was more comfortable, if she wanted to bring anyone with her, her lawyer, or anyone, I was willing to accommodate that, but, I could not talk to her at all about her own abatement that was then pending, which she was represented by a lawyer, nor any other matter in which she was represented by a lawyer.

Q.    All right.  We have heard -- I'm sorry.  Finish your answer.

A.    I could only talk to her about general questions about the assessing process.

Q.    And is that what happened?

A.    Well, not exactly.  We started off.  Ms. Ortolano had a series of examples of properties that had undergone some construction work, additions, renovations, et cetera, that had finished the work after April 1st of a given year.

And Mrs. Ortolano was under the impression that if the assessing personnel had gone out and inspected that property and revalued that property as newly constructed, that their assessment could immediately be increased, and then they'd get a higher bill in July or a higher bill in November for the

those two payments that would be made later that year.

And I had to explain to her that it was only what the property was worth on April 1 of any given year.  The first payment is sort of a prepayment of the total, and then the yearly bill is totalled up, subtracted out from whatever was billed in the early July payment, and that was the final reconciliation when the bill that was due in December came out.  So everything had to be what the property looked like or what it was worth on April 1st.

So that was not something that Ms. Ortolano was aware of previously.  She had done a lot of work putting together all her examples of property when the construction happened after April 1st.  So it was sort of unfortunate, and I think she was disappointed that she had done all that work under that mis-impression, and she was not going to be satisfied with the outcome from me.

She then started to question me about the situation where one of the assessors was alleged to be goofing off and sleeping or going on joy rides or something, when he was supposed to be out looking at property.

And she had had a private detective follow him around for a while and she, herself, had followed him around for a while, and she had asked me if I had seen the report on that?  And that report had come in like the day before.  I think it went to the mayor, and the mayor had asked me questions about

it and provided me with a copy.  I said I couldn't talk to her about that, and that frustrated her further.

Q.   Why was that?

A.   Because she had an attorney who had helped her with the report or had some involvement with it, and he's the one who sent the report to the mayor.  And knowing that, that fell under the heading of I couldn't talk to her on matters which she was represented by counsel.  This seems to frustrate her further.  She got angry and loud.  She used some very course and vulgar language in complaining about me and about the City in general and how she was treated by everyone.

And she said she thought she and I were on good terms, but I had proven myself to be as much of a such-and-such as everybody else, so I asked her to leave because it was clear we weren't going to be able to continue on in a civil manner.

Q.   And was there any further consequence flowing from that discussion at that meeting?

A.   A year later, maybe more than a year later, approximately a year later, she filed a complaint with the attorney discipline office of the New Hampshire bar and asserted that I had raised these issues, upon which she was represented by other counsel and made that complaint and sought disciplinary action be imposed on me.

Q.   And what was the outcome of that?

A.   I was exonerated.

Q.    Was there another occasion in 2020 before the ethics complaint was filed that she was in the legal department office?

A.    **Yeah.   I believe at this point it was in January of 2020.**

Q.    Okay.   Just briefly tell us what happened, that you observed?

A.    **I'm in my office.   It says Steve's office on the sketch. And Mindy Lloyd came down the hall and told me that Mrs. Ortolano had come in and had questions about something and wanted to speak with me.   So I proceeded from my office down the hallway and saw Mrs. Ortolano bending over Manuela's desk and going through the files and paperwork on Manuela's desk.   I was upset.**

**I was quite firm, and I told Mrs. Ortolano, in no uncertain terms, that she could not be looking at our confidential materials; she shouldn't be looking at anyone's desk without our permission.   And, in fact, we were going to put a stop to this, and we were going to require her to seek an appointment before she came to this office.**

**So she started asking me about her own abatement.   I can't talk to you about that; you have to leave; that's something I can't talk to you about; make an appointment; and we'll see what we can do.   If your lawyer needs material that we have, he should be the one dealing with this office; but here on out, don't just show up here without an appointment.**

That's what happened.

Q.    And later after that incident, the by-appointment-only sign went up?

A.    Yes.

Q.    And the door was then kept locked?

A.    We kept the door locked thereafter, and I should say, it was not only because of Mrs. Ortolano or this experience that day, although that was the trigger, in my mind, to realize that we were too lax.  We should not have had an unlocked door.  We should not have documents out on the desk, if there was any chance that a person from the public could see that.  We had more of an obligation to protect our clients from that eventuality.  So we were then going to require everybody to have an appointment.

Now, if the mayor wanted to see me, obviously I'm going to see him, and I'm going to see him right away, and I may even go to his office.  And if the director of public works wanted to see me, she'd get an immediate appointment, and like that.  And most of our day-to-day duties involve interaction with other city officials.

So I did not think the appointment requirement was going to cause too much interfere with our normal business, but I thought it was important that the public not just be allowed to wander in.  So that's the way we operated from then on.

MR. HILLIARD:  May I get in a couple more questions

before the lunch break, Your Honor?

THE COURT:  A couple?

MR. HILLIARD:  Couple.

THE COURT:  Go ahead.

BY MR. HILLIARD:

Q.   Just take us through April 2020.  You had a personal incident in December of 2020, right?

A.   Oh, yes.

Q.   What was that, just briefly?

A.   I had a stroke.  I was hospitalized for about three weeks.

Q.   And when did you get out of the hospital?

A.   December 31st.

Q.   2020?

A.   2020.

Q.   And what did you do when you got out?

A.   I went to the office.

Q.   And you were not there the morning of January 22, 2021, right?

A.   I was not.

Q.   And why was that?

A.   Well, I don't really remember, but the best I can think of is I probably had a follow-up medical appointment or physical or occupational therapy or something because, for the weeks following, I was still regaining some mobility.

I had a little issue with my left side.  All recovered

now thankfully; I'm grateful for that, but my left arm was weak and not as dextrous as it had been, and I was limping a little bill on my left side, so I was getting physical therapy, and I had some follow-up appointments with the neurologist, and cardiologist, and what have you.  So it's likely that it was one of those kind of appointments that I wouldn't have been there on that day.

MR. HILLIARD:  Thank you.

THE COURT:  Good time to break for lunch.  Remember my instructions, and we'll see you in an hour.

(Thereupon, the jury exited the courtroom.)

THE COURT:  Need me for anything?

MR. HILLIARD:  Your Honor, I would say just for other people's planning, I probably have another half an hour with Attorney Bolton.

THE COURT:  Will you have any questions?

MR. CULLEN:  No, Your Honor.

THE COURT:  And then you will have?

MR. AIVALIKLES:  Yes, Your Honor.

THE COURT:  Okay.

MR. HILLIARD:  Great.  Thank you.


(Thereupon, the above portion of the trial was concluded.)


                    *         *         *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

02/18/2026

DATE COMPLETED          GIZELLA BAAN-PROULX, FCRR