**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-28-2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                 \*
LAURIE ORTOLANO                      \*
                                 \*  22-cv-326-LM
     v.                   \*  February 5, 2026
                                 \*
STEVEN BOLTON AND CELIA LEONARD   \*
                                 \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT EXCERPT OF JURY TRIAL TESTIMONY OF CELIA LEONARD
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

APPEARANCES:

For the Plaintiff:       William E. Aivalikles, Esq.
                         Aivalikles Law Office

For the Defendants:

(Steven Bolton)        Russell F. Hilliard, Esq.
                         Madeline K. Matulis, Esq.
                         Upton & Hatfield LLP

(Celia Leonard)        Brian J.S. Cullen, Esq.
                         Cullen Collimore Shirley PLLC

Court Reporter:        Susan M. Bateman, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

I N D E X

WITNESS:          Direct        Cross        Redirect        Recross

CELIA LEONARD:

By Mr. Cullen        3

P R O C E E D I N G S

CELIA LEONARD

having been duly sworn, testified as follows:

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Sure.  Celia Kathleen Leonard, L-E-O-N-A-R-D.

DIRECT EXAMINATION

BY MR. CULLEN:

Q.    Good afternoon, Ms. Leonard.

A.    Good afternoon.

Q.    I'm sorry.  I know I should call you Attorney Leonard.  I refer to him as Mr. Bolton, too.  So no offense intended, I assure you.

I'm going to give you a chance to introduce yourself in a second.  I already did a short introduction of you during the opening on Tuesday.

But I actually just want to jump for a second to a document that's been much talked about in this case.  It's Exhibit 56, which is a full exhibit in this case, and it's the exhibit that includes a series of records from the police regarding other calls for trespass in or around city hall.

Do you have that in mind?

A.    I do, yes.

Q.    Okay.  I'm not going to go through them one by one

with you.  I just have a couple quick questions.

Having reviewed them, is a single one of those something that you were involved in?

A.    The last one with Ms. Ortolano.

Q.    And that was the one that we're here to talk about today, right, or in theory?

A.    Yes.

Q.    All the prior ones over that entire seven year period, did a single one of those involve you?

A.    No.

Q.    Were you even aware of them?

A.    No.

Q.    Did you make any of the calls to the police?

A.    No.

Q.    Did you make any of the determinations or suggestions as to whether -- did you make any recommendations as to how those should be disposed of?

A.    No. They didn't involve me.

Q.    Were any of those in a private office of a city employee?

A.    No.

Q.    There was one that was in a public bathroom -- or I shouldn't say public.  There was one in a bathroom downstairs. They said the person locked themself in the bathroom.

Is that a public bathroom?

A.   If I understood where it was, outside of the rotunda, that is a public restroom, yeah, without a lock on the exterior door.  They may have locked themselves inside.

Q.   They could have locked themselves into a cubicle.

A.   Yes.

Q.   But the door itself is open?

A.   During -- yes.  When city hall is open, it's an open-to-the-public bathroom.

Q.   Okay.  I think I represented to the jury earlier that your family is from Idaho but you grew up in Rhode Island.  Did I get that right?

A.   Yes.  My mom and dad are both from Idaho, and we were the only ones who went east of the Mississippi.  I grew up in Rhode Island and then moved to New Hampshire in -- and after going to University of Colorado Boulder, came back for law school to the East Coast, and then I moved up to New Hampshire in 2000 after I graduated law school.

Q.   And after you graduated law school, what was your first job out of law school?

A.   I worked at the firm here in Concord, Gallagher, Callahan, and Gartrell, as an associate for a few years until I had my first child.  I took a little time off to be with her.

And then I came back into work as the general counsel of Citizens Bank New Hampshire, and I did banking law

for about ten years between Citizens Bank and being general counsel of the New Hampshire Banking Department.

Q.   Okay.  And with respect to the work you did at the private firm, Callahan -- Gallagher, Callahan and Gartrell?

A.   Correct.

Q.   Did you do any criminal law there?

A.   No.

Q.   What sort of work did you do?

A.   I was -- I mean, I was an associate so I did what I was told, but it did not involve criminal work.  It was researching zoning, dealing with timeshare issues, some municipal issues, which actually is how I weaved my way, and real estate, into my job with the city, and I started in April of 2013.

Q.   April of 2013 at the city?

A.   Yeah.  So coming on 13 years this April.

Q.   And you mentioned that you took some time off when you had your daughter.

Do you have any other children?

A.   I do.  I have a ten-year-old son, a fifth grader.

Q.   Okay.  So back in January of 2021 he would have been about five?

A.   Yeah.

Q.   That's the extent of my math skills.

When you got hired for Nashua, what was your

original position?

A.    I started as, I believe it was, associate attorney in the department, and then through the years I was promoted. I think there was another one that began with an A.  I actually don't remember.

But I have been for a number of years and I am a deputy corporation counsel, and I do say a deputy corporation counsel because my colleague Dorothy Clark is also a deputy corporation counsel.  So I'm not the deputy corporation counsel.

Q.    And Dorothy goes by Dori?

A.    She does, yeah.

Q.    Okay.  I thought I remembered that name.

With respect to your initial responsibilities, what were they when you arrived at the department and how have they changed over time?

A.    I think when I first arrived, it was very much focused on reviewing contracts for the city.  There's multiple contracts.  The city is a large corporation so there's vendor contracts.  There's real estate contracts.  There's a lot of contracts.

And then it just expanded to -- as I learned more and got to know our client more and became more involved in the city overall business understanding, I took on the varying roles that we do.  I can kind of go into that a little, I

guess.

Q. That's okay.

In general, tell me -- does the legal department advise the public, in general?

A. Oh, no. No. My client is the City of Nashua, the corporate body itself, as is embodied by individual directors, certain employees, the different boards, the Board of Aldermen, Planning Board, Board of Zoning, assessing board -- or Board of Assessors, it goes on, but the corporate body is my client.

Q. And we heard a little bit from Chief Carignan this morning about the separation between the police department and the city. I don't want to rehash that.

Was his testimony consistent with your understanding?

A. Yes.

Q. Okay. The legal department doesn't control the police department?

A. Not at all.

Q. Okay. You don't oversee the assessing department either, do you?

A. No. The legal department, we are in a position of advising and counseling our clients. We do not -- we cannot tell any of our clients what to do. We can simply advise them as to the law and our opinion of how things, facts, might

apply to that law and the best way to avoid any issue with the law.

We don't direct any -- I don't -- as you heard Ms. Lloyd, I don't even direct her.  I cannot direct an employee to do or not do anything.

Q.    It's fair to say that you're there to provide legal advice to the various departments and boards, but you can't direct them what to do?

A.    Yes.  That's correct.

Q.    And going back to the police just for a moment, does the legal department of the city have anything to do with the prosecution of cases by the police?

A.    No.  Nothing.

Q.    Does the legal department have anything to do with standard operating procedures or policies, sometimes called SOPs?

A.    No.  Nothing.

Q.    Okay.  We heard Chief Carignan testify earlier to sort of a philosophy that they have with respect to certain types of misdemeanor offenses.

Does the legal department have any oversight over their philosophies or approaches to cases?

A.    No.  None.

Q.    Are you even aware of those?

A.    No.

Q.   You heard some testimony from Chief Carignan that the department has sort of a philosophy that if somebody is trespassing but they leave when the police come, that they generally don't file charges against that person.  At least absent any request to do so.

Were you familiar with that philosophy at all?

A.   No.

Q.   Had you ever heard of it prior to this litigation?

A.   No.

Q.   I think we know the answer to this, but, in general, is the office open to the public?

A.   No.

Q.   You do have meetings occasionally with members of the public there or do you?

A.   Well, occasionally.  So I assist -- one of the many things I do is assist when the city has tax deedings.  So folks who haven't paid their taxes and whatnot and there's maybe an auction or a prior owner repurchases.  So they're technically a member of the public.  I do conduct those closings in the conference room, but they're by appointment. If someone comes in that isn't a member of the office, or a colleague, you know, say, from the mayor's office needs to bring up a contract for our review or something, it's by appointment.  It's in the conference room.

Q.   And, in fact, people can reach that conference room

through the door in the outside area; is that right?

A.    Correct.  Sometimes I'll -- yeah, sometimes people come in that way.  If I'm already in the conference room, I'll simply open that, and the door to the rest of the offices will be closed so that they don't see the inner offices.

Q.    It provides an opportunity for you to have people into the conference room without marching them past Mindy Lloyd's desk or Manuela's desk?

A.    Correct.

Q.    When did you first become aware of Ms. Ortolano?

A.    I think it was around the fall of 2018.  Maybe sooner.

Q.    And do you remember how that was?

A.    I think it was various right-to-know requests that were coming to my client, and they were -- there was a lot of them volume-wise, and they also were sometimes complex, asking for a lot of documents, and my client wasn't used to getting that sort of thing and was just asking advice.

And I think maybe around that time, again there's a lot of dates here, but I can't remember if the plaintiff had filed the tax abatement appeal yet for her own property.

Q.    Let's talk for a second then about this public document request.  I think the jury has heard things called right to know.  They've heard 91-A.

Do you think you could just tie those together for

the jury and explain what the connection between those is?

A.    Sure.    In a nutshell, the right-to-know law has two main components.    One is access to governmental records and another is open meeting law.

So what we've been dealing with here today or for the past few days has been around -- when the right to know is being referenced, it's referring to right-to-know requests for governmental records.

So my client has an obligation when they get a request to respond at least within five business days.    If they have the document, to go ahead and send the document, or if for some reason there needs to be more review for redaction, birth dates, confidential information, or sometimes someone who might have that particular document is on vacation and they need a little more time or gets a request for 500 documents, so just in the orderly conducting of city business they might need a little more time.    So my client -- within five business days anyway.    It's very strict.    It's got to be within five business days.    So you need to track when those requests come in or else you risk violating the law by just simply not getting back to somebody in a timely manner.

Anyway, so you've got to go through it.    If you're going to exempt anything, there has to be a written explanation as to why something is exempted.    So that also will take time.    Sometimes it will take a few days, maybe a

week, maybe a month.  It depends on the volume.

Q.    So, Attorney Leonard, just very briefly, I want to run through one of those that's in this case already.

MR. CULLEN:  Could you bring up Exhibit 17, please?

Q.    While that's coming up, when we talk about RSA 91-A, is it fair to say that's the actual statute that sets this public records requirement, right?

A.    Correct.

Q.    So if somebody says a 91-A request, they're talking about a public records request made under that statute?

A.    Correct.  But can I be a lawyer for just a minute?

You don't have to actually reference RSA 91-A --

Q.    Right.

A.    -- for it to be a request.  Any request for a record is considered something that you have to respond to under RSA 91-A.  So even if someone doesn't say that, you still have to do it.

Q.    So if Laurie Ortolano or anyone else sends an e-mail to, we've heard the name Kim Kleiner, to Kim Kleiner or someone else saying, hey, can you get me this document, you guys, as the government, have to treat that as if it's a request under this statute and respond accordingly?

A.    Correct.

Q.    Okay.  And those don't have to be formal.  They can be e-mails.  They can be anything, right?

A.    Right.    The term record is broadly defined in the law.

Q.    Right.    But what I mean is the request itself can be in any form?

A.    Oh.    Correct.    Yes.    You cannot require someone to put it in writing.    It's very, very helpful when it is in writing because it provides clarity, but it can be verbal.    It can be somebody going to the city clerks asking for a copy of a birth certificate.

Q.    The record that's now up in front of you, Exhibit 17, this is the front page of an e-mail from Ms. Ortolano to Ms. Kleiner.    You're cc'd on it.

And if I'm flipping through, as could you perhaps for me, Attorney Matulis, it looks like it's three pages, maybe generously two if you consider the page cut-offs, three pages of requests -- or a three page e-mail from Ms. Ortolano, right?

A.    Yes.    That's what it is.

Q.    Okay.    And in it -- just looking at this first page, there's a series of questions on the third paragraph here.

This one here it appears that she's asking, you know, was the PDF file the yearly report Lynn generates, and then is the permit file sent available as a PDF.

I see in the first paragraph she asks if you could

expand the print.

Is this -- when you get requests like this, you have to read through this entire three-page document, find everything that could be a potential request, and then respond to it?

A.    Yes.

Q.    And in this one in particular, we talked about this earlier with Ms. Ortolano, but on page 2 she specifically asks Ms. Kleiner if she could meet with this assessor Douglas Dame.

Do you recall that?

A.    I do, yes.

Q.    And does 91-A require that you produce people to answer all these questions that Ms. Ortolano has in this?

A.    No.

Q.    It only speaks to the documents that you have to produce?

A.    91-A only speaks to the documents; that's correct.

Q.    Okay.  And I see on the next exhibit, 18, you submitted back a three-page letter identifying eleven different requests and responding to every one.

Do you recall that from the notes?

A.    Yes.

Q.    And you did that within the five business days that you were supposed to, it appears.  I'm looking at -- July 12th the e-mail comes to you, and it goes out on July 19th.  It's

five business days, right?

A.    Business days, right.  And, obviously, if there was a holiday, you don't count that, but yeah.

Q.    I just wanted to make sure that the jury understood how you respond.

And then in Exhibit 19 --

MR. CULLEN:  Could you bring this up?

Q.    I think this might have been blown up in the plaintiff's opening so I just want to spend a short time looking at it with you.

MR. CULLEN:  Maddie, can you just blow up the top of that?  I'm just trying to make it bigger.

Oh, no.  Sorry.  I misspoke.  I didn't know if you could just enlarge it a little bit.  Even on the screen it's hard -- that's perfect.  Thank you.  Even on the screen it's hard to read.

Q.    This is a -- the bottom of this is an e-mail from Ms. Kleiner to you?

A.    It is, yes.

Q.    Okay.  And we've been over this, but Ms. Kleiner, would you consider her your client?

A.    Yes.

Q.    She's the administrative services director it says at the bottom?

A.    Correct.  That was her role at that time.

Q.    Okay.  And she forwards this to you why?

A.    She wanted my advice.

Q.    And you provided the advice, right?

A.    Correct.

Q.    You wrote:  The law does not require that we speak with her.

That's correct, right?

A.    That was my view of the law, and I believe it is correct, yes.

Q.    Okay.  And you add:  I'm not sure what can be gained by doing so at this point.

You heard me talking with Attorney Lehmann, I think it was just after lunch, about there are certain people you try to do all your communications with in writing if you can.

Was Ms. Ortolano one of those?

A.    Yes.

Q.    And why was that?

A.    There are just times when it's best for everyone involved.  When there is a record of what is said, you can go back and make sure before you send it that you're being clear, that you're addressing all points.  It's just in the best interest of my client to make sure things are in writing.

Q.    And I think we heard Attorney Lehmann say that, you know, even he suggested that conversations be recorded to avoid -- does having a policy or a practice or a preference of

trying to communicate with someone in writing avoid having to record every conversation you have with them?

A.    It does.  It does, yes.

It also can short circuit some having to do memos to the file or the very common practice of having a conversation and then one party or the other having to follow up saying, you know, as we discussed, just wanting to memorialize this.  If you just send an e-mail, there it is, or a letter, it's done.

Q.    And shortly after this --

THE COURT:  Attorney Cullen, it's time to break. Is this a decent time?

MR. CULLEN:  A perfect time, your Honor.

THE COURT:  Okay.  Good.

We will send the jury home tonight with the same instructions, which I won't repeat again, but just ask you to continue to abide by those instructions, and we'll see you at 9:00 a.m. tomorrow.

Thank you.

(IN COURT - NO JURY PRESENT)

THE COURT:  All right.  Attorney Leonard, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Any issues we need to discuss before tomorrow?

MR. AIVALIKLES:  We're just discussing timing and whether or not Attorney Bolton is going to happen tomorrow or should we wait until Monday.  What does the Court have in mind?

THE COURT:  I'm sorry.  What was the question?

MR. AIVALIKLES:  We were just talking about sequence of events, whether or not we may have the ability to close tomorrow or whether it would flow over to Monday.  I don't know what the Court's thoughts are.

THE COURT:  If it's possible -- I will keep pushing the case to completion.  So ultimately if it's possible to do closings -- we'll wait until we see how much time we're talking about at the end of the day.

But one thing I will do is get you a copy of the jury instructions so that you have the final copy, and we can have a charging conference tomorrow morning.

MR. CULLEN:  I think that makes sense, your Honor.

THE COURT:  I think 8:30 is sufficient for that.

Does everybody agree?

MR. CULLEN:  That's fine, your Honor.

MR. AIVALIKLES:  Yes.

MR. HILLIARD:  Excuse me, your Honor.

We're working out the special verdict form, a pretty simple one, but we'll get that to you.

THE COURT:  Okay.  All right.  And I think I also

have one I can attach, as well.

MR. HILLIARD:  I don't think it's complicated.

THE COURT:  Yeah.  So I'll give you a fresh set. I'm not going to have the numbering, but you'll see a fresh set of jury instructions, and I'll be able to point out to you what I've changed since the last time we discussed them and then bring up any other issues you want to discuss about the jury instructions in the morning.

I'll ask you again.  If you need to bring anything up before I give my instructions, I will allow that, but let's see if we can't wrap it up tomorrow morning with regard to getting those finalized just in case we do get this done earlier than we thought.

MR. CULLEN:  I was going to say, at the risk of getting my third strike, it's not unforeseeable that we could have the testimony in by 2:00, which would probably give you enough time to charge and send them out.

THE COURT:  Okay.

MR. CULLEN:  Oh, we should probably do closings.

Do you think, guys?  I forgot about closings.

MR. AIVALIKLES:  Yeah.  Strike three.

MR. CULLEN:  I don't get to close now.

MR. HILLIARD:  That's my concern.  I would hate to have the jury get the case at 3:45 on a Friday.

THE COURT:  Right.  Well, we may do closings and

then save instructions until Monday morning.  I mean, I'll make that decision --

MR. CULLEN:  Thank you, your Honor.

THE COURT:  -- in consultation with you, but we'll make that decision closer in time.

But thank you for alerting me that we might be ready for those by 2:00.

Who are your witnesses tomorrow?

MR. CULLEN:  We'll finish with Attorney Leonard in the morning.  I guess that I have about 40 minutes left with her perhaps, and then obviously there will be cross-examination, and then I think it's Attorney Bolton.

MR. HILLIARD:  Right.

MR. CULLEN:  And I don't believe we're intending to bring anyone else in unless Russ tells me otherwise.

MR. HILLIARD:  No.  But you said 40 minutes maybe? I'm assuming the cross --

MR. CULLEN:  If I'm allowed to speak as fast as I like.

MR. HILLIARD:  I assume the cross will take a while.

MR. AIVALIKLES:  Yeah.

MR. HILLIARD:  And then an equal amount for Mr. Bolton.

THE COURT:  Okay.  Understood.  All right.  Then --

MR. CULLEN:  We'll see, I guess.

THE COURT:  We'll see you at 8:30.

MR. HILLIARD:  Thank you, your Honor.

MR. CULLEN:  Thank you, your Honor.

MR. AIVALIKLES:  Thank you, your Honor.

(Jury trial adjourned at 4:05 p.m.)

C E R T I F I C A T E


I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  2-27-26      /s/    Susan M. Bateman _____
                         SUSAN M. BATEMAN, RPR, CRR