**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 5-28-2026**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*
                                            \*
LAURIE ORTOLANO                             \*
                                            \*   22-cv-326-LM
       v.                                   \*   February 6, 2026
                                            \*   1:10 p.m.
STEVEN BOLTON AND CELIA LEONARD             \*
                                            \*
                                            \*
                                            \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*


TRANSCRIPT EXCERPT OF JURY TRIAL TESTIMONY OF STEVEN BOLTON
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:


For the Plaintiff:          William E. Aivalikles, Esq.
                            Aivalikles Law Office


For the Defendants:

(Steven Bolton)             Russell F. Hilliard, Esq.
                            Madeline K. Matulis, Esq.
                            Upton & Hatfield LLP




(Celia Leonard)             Brian J.S. Cullen, Esq.
                            Cullen Collimore Shirley PLLC




Court Reporter:             Susan M. Bateman, RPR, CRR
                            Official Court Reporter
                            United States District Court
                            55 Pleasant Street
                            Concord, NH 03301
                            (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| STEVEN BOLTON: | | | | |
| By Mr. Hilliard | 3 | | | |
| By Mr. Aivalikles | | 12 | | |

P R O C E E D I N G S

THE CLERK:  This hearing is back in session.

THE COURT:  All right.  You may proceed.

CONTINUED DIRECT EXAMINATION OF STEVEN BOLTON

BY MR. HILLIARD:

Q.   Good afternoon.

Mr. Bolton, when did you learn about this incident that had taken place the morning of January 22?

A.   That's interesting.  Because I would have thought that I learned about it the same day, and I still think that's probably true, but from what people are remembering and have testified today, it now appears to me I probably got a call about it that morning or sometime that day and was told what had happened.

Q.   And did you in fact go to the office that day?

A.   I don't remember whether I went to the office that day.

The next time we were in the office I spoke to everyone about what had happened.

Q.   And you learned from them what had happened at least from their perspectives?

A.   Correct.

Q.   And what were your concerns?

A.   I was concerned -- I was likely concerned because they were concerned.  I got the sense that they were upset.

By they, I mean Celia Leonard, Mindy Lloyd, Jesse Neumann, who were involved.

MR. AIVALIKLES:  Objection, your Honor.  Hearsay.

THE COURT:  Overruled.

Q.    Go ahead.

A.    I was concerned because Celia, Mindy, and Jesse expressed to me how concerned they were, and they had recited everything that had happened.  An issue of safety came to mind.

Q.    And what, if anything, did you do in response to that concern?

A.    I know at some point I contacted Chief Carignan and asked that we be included in deciding what, if anything further, would be done.

Q.    All right.  And did that lead to a meeting of some sort?

A.    Yes.

Q.    What kind of a meeting was it and when was it, if you can tell us?

A.    If the 22nd was a Friday --

Q.    It was.

A.    -- it would have been sometime the following week. So I'm thinking the meeting was probably Wednesday, maybe Thursday, of the following week, and it was a Zoom meeting.

So we were in the conference room in the legal

department.  We being, myself and Celia and Mindy and Jesse.

And at the police station in their executive conference room would have been Chief Carignan, one or two of his two deputy chiefs, and some, probably not all, of the captains of the department.

Q.    All right.  And I'm going to have you just summarize the meeting, but how long would you say the meeting lasted by Zoom?

A.    Half an hour.

Q.    All right.  And who did most of the talking?

And just summarize what the discussion was, please.

A.    I think I did most of the talking, probably all of it, from the legal office's side.

And the only person I remember from the police department saying anything was the chief.

Q.    And what do you remember yourself saying?

A.    I remember saying that I think that all of the witnesses ought to be interviewed and that the police department should have a full understanding of everything that went on before making any decisions on what further action, if any, should be taken.

Q.    Now, various witnesses have described you as angry, vehement, raised voice.

What's your recollection?

A.    Well, apparently I have this unfortunate

characteristic that when I get excited, my voice raises in volume.  So I'm sure that happened.

I don't think I was angry.  I think I was disappointed in what I was getting of the attitude of the police department in regard to this matter.  I thought they regarded it as trivial and unworthy of any further time or attention.

Q.   And what did -- you said it was Chief Carignan doing the talking on the other side?

A.   Yes.  Chief Carignan would be talking to me and I would be talking to him.

Q.   And again, just in summary, what was the position he expressed to you?

A.   That basically they knew what they were going to do, and it was nothing, and I had no say in the matter.

Q.   Is that how the meeting ended?

A.   It was.

Q.   Two things, by the way, unrelated.

Jesse Neumann, someone has told us, had just recently started in your office when this happened.

A.   Correct.  He had started immediately prior to the new year, so December 29th or 28th, something like that, and so this would be three-and-a-half weeks into his relatively brief tenure.

Q.   I'll ask my question.  How brief was his tenure at

the end?

A.    He left us in August of '21.

Q.    So he was there less than a year?

A.    Yes.

Q.    Okay.  The other question I have is this.  You told us before lunch that there was a period in your career in the '90s, and some into the '2000s, when you were in private practice; is that right?

A.    That is correct.

Q.    You had your own law office?

A.    I did.

Q.    You had staff?

A.    Generally one person, yes.

Q.    And if this incident had happened in your private law office, would you have done anything differently?

A.    I would have done nothing differently.

Q.    All right.

A.    I would have been equally concerned of the safety of a person working for me, and I would have taken action to prevent it from happening again, up to and including trying to involve the police.

Q.    And Attorney Leonard described the conclusion of that Zoom meeting as a hard no from Chief Carignan.  Is that a fair characterization based on your memory?

A.    Yes.

Q.    All right.  And what, if anything, happened next with respect to police activity?

A.    Well, shortly thereafter, it's not impossible that it was the same day, but it might have been a day or two later, Chief Carignan called me and asked if it would be a good time to stop over, and I said yes.

And we met in the legal department's conference room, and basically he said that he didn't want to discuss it any further and a police officer would be interviewing the participants in the event.

Q.    All right.  Do you have any idea what happened between the hard no and that visit?

A.    I didn't know then, and I really don't know now.  I know what has been testified to over the last few days.

Q.    Yeah, I meant other than that.  Okay.

So, Mr. Bolton, you've been corporation counsel since 2016?

A.    In this tenure, yes.

Q.    In this tenure.  You're exactly right.

Between 2016 and this event on January 22, 2021, has anyone else ever trespassed in the legal department?

A.    No.

Q.    No adversaries?

A.    No.

Q.    And I won't pull up the exhibit, but we've all had

several occasions to look at a compilation of some incidents in city hall where people were apparently trespassing and asked to leave.  You know what I'm talking about?

A.    Yes.

Q.    Did you have any involvement in those incidents or any knowledge of them before this trial?

A.    Well, in the run-up to the trial, but after the case was filed this material came to light.  But prior to that I had no involvement, no knowledge, nothing.

Q.    All right.  And I think Attorney Leonard mentioned this, but I want to be sure.

Ms. Ortolano was talking about tax abatement applications; is that right?

A.    Yes.  That's what I heard.

Q.    Yes.  Those have a due date under state law?

A.    March 1.

Q.    And the date is March 1?

A.    Correct.

Q.    Okay.  Thank you very much.

MR. HILLIARD:  No other questions.

THE COURT:  Thank you.

Attorney Cullen, go ahead.

MR. CULLEN:  I don't have any questions for the witness.

THE COURT:  Okay.  Attorney Aivalikles, go ahead.

MR. AIVALIKLES:  Thank you, your Honor.

(Attorney Aivalikles gives document to Attorney Hilliard and Attorney Cullen)

MR. HILLIARD:  Well, I guess we probably should do this at sidebar, your Honor.

(SIDEBAR)

MR. HILLIARD:  I've been handed a document which is a superior court order in I guess one of the right-to-know cases dated June 20, 2022.

So right from the start I question the relevance of this, your Honor.  It's 12 pages long.  I'm not sure what it all says.

THE COURT:  Attorney Cullen?

MR. CULLEN:  Yeah, apparently, based on page 2 -- this is a little bit further information on that right-to-know request.  It indicates on page 2 that the petitioner filed a right-to-know request on March 7, 2021, six weeks after our incident and at least three weeks after the plaintiff was arrested, and this -- I wasn't involved in the case, but this appears to be an order on a hearing that came out of a challenge to the answer.

So she was looking at -- she was looking at this and she was looking for the Richard Vincent e-mails that we've now seen as 38 through Exhibit 40M.

So this is a -- this seems to have to do with

litigation over the attempt post-arrest to obtain those e-mails. I don't see how it could be relevant to their retaliatory motive or any other element of this case.

And if the idea is to ask these people if they got sanctioned for something they did after she was arrested, again I don't see the relevance of that.

THE COURT: Okay.

Attorney Aivalikles, how is it relevant?

MR. AIVALIKLES: Your Honor, she was asked by me if Judge Temple ordered the production of the documents that my client asked for the right to know, and she said no, and that order says my client's request was granted.

That's the only reason I'm introducing it. Because it's contrary to what she testified to on cross-examination.

THE COURT: This is a different witness.

MR. AIVALIKLES: But he was part of the case. He was an attorney on this case.

THE COURT: Understood, but he hasn't testified about this, and I don't see how this is relevant to anything he testified to on direct.

It might be relevant to something you could have crossed her on, Attorney Leonard, but --

MR. AIVALIKLES: Well, to be honest, your Honor, I didn't expect she would state something contrary to what the Court had ordered.

THE COURT:  So the objection to this on relevance is sustained.

MR. HILLIARD:  Thank you.

(CONCLUSION OF SIDEBAR)

CROSS-EXAMINATION

BY MR. AIVALIKLES:

Q.    Attorney Bolton, were you part of the team that had to do with the right-to-know request in 306, docket 306 in the superior court, concerning the request that my client made for the right to know -- I'm sorry -- the e-mails and the abatements that she filed on behalf of those elderly people?

MR. HILLIARD:  Objection, your Honor.

THE COURT:  Sustained.  Same basis.

Q.    Attorney Bolton, you testified that you observed my client rifling through one of your assistant's desks.

Do you recall that?

A.    I don't recall the word rifling.  Did I say rifling?

Q.    Well, that's the way I characterized it.  If you have a different term, that's fine.

A.    I saw her leaning over Manuela -- one of the legal assistants, Manuela's desk looking at the papers and files on the desk apparently searching for something.

Q.    That's a really serious matter, isn't it?

A.    I took it seriously.

Q.   Probably more serious than someone committing criminal trespass?

MR. HILLIARD:  Objection, your Honor. Argumentative.

THE COURT:  I'll allow it.

A.   I would be hard-pressed to figure out what crime it was.  So I guess the answer is no.

Q.   Did you call the police and advise them that Laurie Ortolano was going through private legal documents in your office?

A.   I did not.

Q.   Did you make any kind of note that you observed her going through Manuela's desk looking through your legal documents?

A.   I certainly made a mental note.  I didn't commit anything to writing.

Q.   This mental note would have been made, what, five, six years ago from today, roughly?  It was 2020 that this happened?

A.   Yes.

Q.   Okay.  So you still remember six years ago?

A.   I do.

Q.   Okay.  And did you call her lawyer, Mr. Lehmann, and tell him that you observed his client looking through papers on my paralegal's desk and this cannot happen and

that's why she cannot come back to the office?  Did you call him?

A.    I don't believe I called him.  I think Attorney Leonard wrote him asking what it was he wanted from our office or words to that effect.

Q.    And I think you told this jury that it was your office policy that when you were dealing with Mrs. Ortolano, you put things in writing; is that correct?

A.    At some point we took to not speaking with her but doing everything in writing.  That was after the event that we've just been talking about.

MR. AIVALIKLES:  Can you bring up Exhibit 33?

Q.    If you need a moment to look at it, please take your time.

A.    Can you go to the next page?

MR. AIVALIKLES:  Next page.  Can you go to the next page, Sam?

A.    I read it.

Q.    All set?  Thank you.

So the incident that you were talking about had to do with Mrs. Ortolano coming to your office to get her abatement file; is that correct?

A.    I don't know.

Q.    Okay.  Do you recall her coming to the office to get her private -- her abatement form for her own home?  Do

you recall that happening?

A. I don't know why she was there. I refused to speak with her after I observed her looking through the top of Manuela's desk. I told her she had to leave, I told her I wouldn't speak to her, and I told her she could not come back without a prior appointment.

Q. Well, didn't Manuela approach you to tell you that Mrs. Ortolano was in the office? Do you recall that?

A. It wasn't Manuela who told me she was in the office.

Q. Well, one of the legal assistants, did she go back and tell you that Laurie was in the office?

A. Mindy told me she was in the office.

Q. Right. And that's why you came out, correct?

A. Correct.

Q. And you told her to have her lawyer request her abatement file, didn't you, at that session?

A. I think I said anything that you or your lawyer needs from this office he should contact us and request it.

Q. Correct. And so if you look at the e-mail from Laurie that's on the second page, it's January 14th, 2020, and that's Laurie to Louise Brown. Who was Louise Brown?

A. Louise Brown was an employee of the Assessing Department. I don't remember her exact title, but she was in charge of the clerical staff. Not the professional assessors.

Q.    And so Laurie wrote to Louise asking for her abatement file for her litigation, correct?

A.    That's what this says.

Q.    Right.  And that abatement file is a public record; is it not?

A.    Generally speaking, it would be.

Q.    Right.  So she doesn't need her lawyer to get a public file from the city records, does she?

A.    She doesn't need it from the Assessing Department.

MR. AIVALIKLES:  Can you go to the next page?

Q.    This is an e-mail that was sent by Attorney Leonard dated January 15th, 2020, at 3:58 p.m.

MR. AIVALIKLES:  And I'm sorry, your Honor.  For the record, I'm looking at Exhibit 33.

Q.    Is that a letter that Attorney Leonard wrote?

A.    That's what it looks like.

Q.    And I think she enclosed -- or indicating that the abatement file was going to be sent to Attorney Lehmann from your office; is that correct?

A.    That's what it says.

Q.    There's nothing in this letter that Attorney Leonard wrote to Attorney Lehmann that indicates that his client, Laurie Ortolano, was going through documents on your legal assistant's desk, is there?

A.    There is not.

Q.    Right.  And you got a copy of this letter that Attorney Leonard wrote to Mr. Lehmann, right?  Correct?

A.    I am copied on it.

Q.    I take it you saw that letter when you got Attorney Leonard's e-mail?

A.    I assume so.

Q.    Did you approach Attorney Leonard and say, why didn't you put in there what I saw his client doing with regard to looking at the legal files?

A.    I have no recollection of doing so.

Q.    All right.  Okay.

When you met with the chief after the event on January 22, 2021, did you ever tell the chief what Laurie Ortolano did in your office looking at your legal files on your assistant's desk?

A.    I'm sure I told him that she had been told previously that she should not come to the office without an appointment.

Q.    That wasn't my question.

Did you tell him what you observed of my client going through your legal files on your assistant's desk?  Did you specifically tell him about that event?

A.    I don't think so.

Q.    Attorney Bolton, were you aware that Laurie had filed a right-to-know request requesting documents concerning

her visits to the legal office on January 22nd, 2021, and also for January 2020?  Are you aware of that request that she made?

MR. HILLIARD:  I'm sorry --

A.    Am I aware of her making requests on those dates or coming to the office on those dates?

Q.    No.  Are you aware that she made a request of your office to produce documents concerning the January 22, 2021, and January 2020 visit to your office?

A.    I may have been aware at some time.  I have no recollection of it currently.

Q.    Okay.  Now, as part of your private practice, you did criminal work, did you not?

A.    A smattering.

Q.    Well, you defended cases of assault on police officers?

A.    Not that I remember.  It's not impossible, but I don't remember as I'm sitting here.

Q.    Do you have your deposition in front of you?

A.    I do.

Q.    I think it's on page 8 and 9.

MR. HILLIARD:  Your Honor, may I just have a minute?  I gave him my copy.  I just need to pull it up on my computer.  I'll do it very quickly.

THE COURT:  No problem.  Take your time.

MR. AIVALIKLES:  And I'll ask him preliminary questions before I get to it, your Honor.

THE COURT:  Okay.

MR. HILLIARD:  Oh.  Thank you.

Go ahead.  I've got one now.

Q.    Do you recall your deposition being taken on May 13, 2024, Attorney Bolton?

A.    I do.

Q.    And you had a chance to review the transcript; is that correct?

A.    I did.

Q.    And after you reviewed the transcript, you had the opportunity to make any corrections?

A.    I did.

Q.    And you signed the deposition under oath; is that correct?

A.    That's correct.

Q.    And I believe you did make some corrections to the deposition.  Do you recall that?

A.    I do.  And I did make some corrections, yes.

Q.    And those corrections are on the back of your deposition, correct?  They're in front of you if you want to look at them.  Go to the very end.

A.    They are not.

Q.    They are not?

A.    The copy I have does not contain the errata sheet.

Q.    Then I will give you mine.

MR. AIVALIKLES:  Your Honor, may I approach?

THE COURT:  Yes.

Q.    Do you need to read that before we continue?

(Witness reads documents)

A.    All set.

Q.    Okay.  I don't have that.  So if I ask you a question about a certain page and if you note that there's a change to it that you made, please let me know, okay?

A.    I'll endeavor to do that, yes.

Q.    So if you could turn to page 8?

A.    8?  Page 8.

Q.    Did you find it?

A.    I'm on page 8.

Q.    Oh.  Okay.  Go to line 15.  Do you have that?

A.    I have line 15.

Q.    Okay.  The question was what type of criminal cases had you handled, and you answered:  I would say it was mostly lower level DWIs, assault, disturbing the peace, there was one embezzlement case, there was one DUI, but it was more than that.  It was reckless conduct associated with that.

Did I read that correctly?

A.    You did.  I think DUI or DWI you may have mixed up, but it's irrelevant.

Q.    Okay.  The next question.  Disobeying police --
it's not clear.

Was your answer:  Typical boilerplate stuff that
Nashua sometimes throws at defendants.

Was that your answer?

A.    It doesn't indicate it's my answer.  It indicates
it's part of the question.

Q.    Well, yeah.  Okay.

Then line 5 on page 9, question:  Disobeying
police, typical boilerplate stuff that Nashua sometimes throws
at defendants?  Answer --

A.    I'm sorry.  What line are you on?

Q.    Starting line 5 on page 9.

A.    Okay.  Yes, I see that.

Q.    Okay.  The question was:  Disobeying
police, typical boilerplate stuff that Nashua sometimes throws
at defendants?  And your answer was:  They had a -- sometimes
it was called the trinity or the three-pack, and it was very
often assaulting an officer, disturbing the peace, and -- and
then I interjected:  Resisting?  And you answered:  Some other
things.  Resisting, yes.  There were a few other things.

So did you handle cases involving assaulting police
officers?

A.    I seem to have remembered doing at least one when
you took the deposition.

Q.    Okay.  That's fine.  Thank you.

You also handled bankruptcy cases?

A.    I did.

Q.    You agree that your relationship with Laurie initially was cordial, courteous?

A.    Yes.

Q.    Okay.  In fact, there was an issue raised by the mayor at some coffee of Laurie taking too much of your time.

Do you remember that?

A.    I do remember.

Let me correct that.  I don't remember it being at some coffee event.  I think it was probably at a Board of Aldermen meeting, perhaps I'm wrong about that, but I do remember there was one time where I differed with the mayor on a suggestion that Ms. Ortolano was dominating my time.

Q.    Right.  In fact, you wrote an e-mail to the mayor and to various government people saying that she wasn't taking up a lot of your time, correct?

A.    Yeah.  I think I said we met two or three times for a total of a couple of hours.  I don't remember exactly, but it was something to that effect.

Q.    And you felt that those were productive meetings that you had with her, correct?

A.    I did, yeah.

Q.    And you met with her in your office, correct?

A.    Either in my personal office or in the conference room.

Q.    All right.  But it was at city hall in the legal department office, correct?

A.    Correct.  All of that would have been before the incident in January 2020.

Q.    Right.  That was in 2018.  We're discussing your initial relationship with her.

A.    Yes.

Q.    In fact, she told the Board of Aldermen I think at the September meeting that you attended that Nashua was lucky to have such a strong corporate counsel, didn't she?

A.    I remember her saying some complimentary things, yes.

Q.    Right.  Now, you had indicated -- strike that.

Did you call the police sometime after the arrest and ask them if they wanted victims' input concerning what happened?

A.    That may have -- well, I don't -- as I said, I contacted the police after I learned of the incident.  I contacted the chief.  I can't remember whether that was by e-mail or by telephone or exactly what method, but I may well have said don't you want to interview the witnesses or don't you want the victims' input.  I may well have said something of that nature.

Q.    Right.  So you considered yourself a victim also, correct?

A.    I wasn't there.  It's hard really to say I was a victim.

Q.    I understand that, but did you tell a judge in the district court that you were a victim of what happened?

A.    If I said those words, I probably should more correctly have said I was representing the victims.

Now sometimes, and I'm sure you've been in this situation, a lawyer will conflate themselves with their client.  So you might have said to someone in this case you're the plaintiff or you have the plaintiff.

So if I said that I was the victim -- I know I wasn't there.  I was representing the victims.  I was there -- and I remember the occasion.  I said I was there to speak for the victims, or at least that's what I was trying to say.

Q.    Okay.  Since you did criminal law, you've probably reviewed a lot of police reports?

A.    Some, yeah.

Q.    And, generally, don't the police in their reports identify who the victims are, who the witnesses are?

A.    There are sections in their basic form for that.  Whether they are always a hundred percent accurate making that determination, I would hesitate to endorse that.

Q.    What?  That the police reports wouldn't be accurate

or the police records wouldn't be accurate?

MR. HILLIARD:  Objection.

THE COURT:  Clarify what you're asking him.

MR. AIVALIKLES:  Well, I'm just responding to his last answer.

Q.    You said that --

THE COURT:  Just clarify what it is you're asking him.

MR. AIVALIKLES:  Right.

Q.    Do you have any doubt that the police report records would be accurate?

THE COURT:  In this case?  In any case?

MR. AIVALIKLES:  Well, let's talk about this case.

THE COURT:  Okay.  Then just add that so he knows you're asking that.

A.    I don't know of any inaccuracy in this case.

I do question whether in all cases all police reports are a hundred percent accurate.  I don't think they are.

Q.    I would agree.

MR. AIVALIKLES:  Can we bring up Exhibit 47?

Q.    Attorney Bolton, why don't I give you a copy of this.

MR. CULLEN:  I'm sorry.  I have a full --

MR. AIVALIKLES:  May I approach, your Honor?

THE COURT:  Yes.

That's Exhibit 47?

MR. AIVALIKLES:  Yes.  47 in full.

THE COURT:  Excellent.

Q.   So this document is the police report in this particular incident of January 22, 2021, and I think it's on the fourth page.

MR. AIVALIKLES:  Stop right there.

Q.   Do you have that?  Let me know when you have that.

A.   I have page 4.

Q.   Do you see how on that page Jasmine Castro is noted as a witness?  Do you see that?

A.   I see that.  I don't know who that person is.

Q.   Okay.  Mindy Lloyd is a witness?

A.   I see that.

Q.   Jesse Neumann is a witness?

A.   I see that.

Q.   Celia Leonard is a witness, correct?

A.   I see that.

Q.   Okay.  Thank you.

A.   Do you want this back now?

Q.   You can keep it in case there's more questions.

You agree that Laurie Ortolano had a right to question you and Attorney Leonard concerning your job performance?

A.   Yes.

Q.   And she did that when she attended the various public meetings of the Board of Aldermen and the Board of Assessors, correct?

A.   Yes.

Q.   And your relationship with her began to change after the meeting in November of '26 before the Board of Aldermen when she raised the issue of the mayor's taxes; is that correct?

A.   I don't think that's correct.

Q.   Okay.  You were there when she gave her presentation and the mayor spoke and said that he was slandered?  Do you recall that comment that he made?

A.   I don't know that I was there.  I think I heard that there was a dispute between the two of them.

MR. AIVALIKLES:  Your Honor, this is not a full exhibit.  I just want to show him who the attendees were to help his memory on that, if that's possible.

MR. HILLIARD:  I did not hear what he said, your Honor.

THE COURT:  Can you just pull the document out so that they can see it and verify what it is?

MR. AIVALIKLES:  Sure.

MR. HILLIARD:  Is it a marked exhibit?

MR. AIVALIKLES:  Okay.

(Document shown to Attorney Hilliard and Attorney Cullen)

THE COURT:  Any objection to just using that in the way that he indicated?

MR. HILLIARD:  Just to refresh his memory whether he was in attendance or not.

MR. AIVALIKLES:  So can we pull up Exhibit 9 for ID?

THE CLERK:  It's all set.  They're not going to see it.

MR. AIVALIKLES:  Okay.  Thank you.

Q.    Do you see that it has the people that were attending and you are listed as an attendee at that meeting?

A.    Yes, I see that.

Q.    Okay.  Does that refresh your memory that you did attend that meeting?

A.    I take this as accurate that I attended the Board of Aldermen's meeting on November 27, 2018.

What was said at that meeting, I don't remember.

Q.    Okay.  So you don't remember the mayor standing up and saying that he was slandered when Mrs. Ortolano discussed his taxes?

A.    I don't remember that.

Q.    Do you remember telling her, I believe it was in 2019, that you've insulted the mayor, you've insulted the president of the Board of Aldermen, and even me, and now it's

personal?  Do you remember making that statement to her?

A.    I don't remember those words, but I think I remember the occasion.  I would say that that occurred during a period of time when we still were on quite good terms.  And I think she was complaining to me about how she was being treated, and she thought she was being mistreated, and she says, why is everyone taking things so personal and making it personal about me.

And, as I said, I think we were on good terms, and I probably was even on a first name basis with her at the time.  So my recollection is I said something to the effect of, well, Laurie, you know, it's you that have made things personal.  You went out of your way to insult the mayor about something that happened well before he was mayor.  You also insult other people.  I think I may have used the president of the Board of Aldermen or the vice president of the Board of Aldermen as an example of that.  And maybe she had said something about me so I may have mentioned myself.  I don't remember saying anything about myself, but it's not impossible.

So I was -- basically, I thought I was suggesting that maybe instead of attacking people she attack what she thought was wrong in the way procedures and things were carried out.  So that's what I recall of an event where something of that nature was said.

Q. Do you recall filling out some interrogatories, which would be questions that were sent to you by Laurie's attorneys? Do you recall doing that?

A. I don't. I don't dispute it, but I don't remember it.

MR. AIVALIKLES: Do you have those?

MR. HILLIARD: Bolton's answers to interrogatories?

MR. AIVALIKLES: Yeah.

Your Honor, may I approach with the interrogatories?

THE COURT: And do you know what this is?

MR. HILLIARD: I do, and I have no objection.

THE COURT: Okay.

(Document given to the witness by Attorney Aivalikles)

Q. Do you recall -- take a look. Take your time.

A. Is there a particular question you want me to look at?

Q. Yes. Question 9. But before we get there, you prepared these answers to interrogatories; is that correct?

A. I don't know.

Q. Okay.

A. I don't dispute it, but I don't know yet.

Q. Take your time.

(Witness reviews document)

A. I don't have a No. 9.

Q.   You don't?  They're two-sided.  The document is two-sided.  So No. 9 is on page 6.

A.   I don't have page 6.

Q.   Okay.  Let me give you page 6.  You can have mine.

A.   Do you want all these back?

Q.   Take mine.

Did you sign these interrogatories under oath?

A.   You've taken that page away from me so I can't answer that.  I'm sorry.

I probably did, but I can't swear to it with --

MR. HILLIARD:  I'll stipulate that he did, your Honor, if that helps.

THE COURT:  All right.  Then we'll move along.

MR. AIVALIKLES:  Thank you, your Honor.

Q.   Interrogatory 9, do you have that in front of you?

A.   I do.

Q.   Okay.  Look at interrogatory 9(c) answer.  The question is:  If you recall a -- strike that.

Let me start with the question:  If you recall a conversation between you and Laurie Ortolano regarding Ortolano's perception that the Board of Aldermen, Chairman Wilshire, had expressed hostility toward Ortolano, please state in full detail.

Did I read that correctly?

A.   Yes.

Q.    Okay.  And your answer to -- 9(c):  The exact words used during the conversation.  If you do not recall the exact words, your best recollection of everything Ortolano said during such conversation.

And your answer was:  Mrs. Ortolano said something like, they make it all personal as to me.

Correct?  Did I read that correctly?

A.    It is correct.

Q.    And then (d), the exact words you used --

A.    May I stop you here?  I only have part of (d).  I have page 6.  I don't have page 7.

Q.    Okay.  I'll give you page 7.

A.    Thank you.

Q.    And then the next question was directed to you about what your exact words were.

A.    My best recollection of them, right.

Q.    Let me read it.  The exact words you used during the conversation --

A.    That's what I have to correct you on, sir.  This says for me to write the exact words or my best recollection of everything.  So these are not my exact words.  They're my recollection of things.

Q.    Okay.  That's fine.  Let's have you read to the jury what your answer was to 9(d).

A.    I replied --

Q.    The question was, so the jury knows:  The exact words you used during the conversation, or if you do not recall the exact words, your best recollection of everything you said during such conversation.

Now, before you answered that, did you indicate in your answer, this is to the best of my recollection?  Did you indicate that in your answer?

A.    I can read you the exact answer that I gave.

Is that what you want me to do?

Q.    I do, but before you read the -- read the entire answer that you gave.

A.    Well, I may have said that on different pages, but I can give you the answer that's right here.

Q.    Right.  That's what I want, please.

A.    Okay.  I replied:  Mrs. Ortolano, you have made it all personal.  You have personally insulted the mayor, the president of the board, and even me.

Q.    You didn't put anything in there about what you had testified earlier in response to that question, do you recall, or you added additional language?

MR. HILLIARD:  Your Honor, I object.  I don't think that's a fair question.

THE COURT:  Sustained.

MR. AIVALIKLES:  I'll withdraw it.

THE COURT:  Sustained.  Move along.

Q.   Do you recall being asked the question:  How did she make it personal -- strike that.  How did she insult the mayor?  And you indicated:  She called him a criminal.

Do you recall that testimony?

A.   No.  When did I --

Q.   During your deposition --

THE COURT:  You know what?  I'm going to stop this because there's no -- you're not giving any time frame to it, and he doesn't have the complete copy of the interrogatories.

MR. AIVALIKLES:  This has to do with his deposition testimony, your Honor.

THE COURT:  Okay.  Well, ultimately, he doesn't know that's what you're asking him about.  So, again, just set the stage for what it is you're asking about, and in your question make it very specific and clear to him what it is you're trying to elicit.

MR. HILLIARD:  Excuse me, your Honor.

What should be done is the question should be asked, and if he gives a different answer in his deposition, then he can be shown the deposition.

THE COURT:  That's correct.  That's correct.

Go ahead.

MR. AIVALIKLES:  Yeah.  Fine.

Q.   Do you recall indicating that Mrs. Ortolano insulted the mayor because she called him a criminal?  Do you

recall that?

A.    I don't recall her using those words.  I recall that there was an implication that he somehow used improper influence to get his tax bill lower than it should have been.

Q.    So she didn't use the exact word.  It was an implication that she gave?

A.    I don't recall her using that word.  She may have.  I don't recall.

Q.    Do you know if Attorney Leonard contacted Chief Carignan after the January 22 incident?

A.    I don't believe she did.

Q.    And were you aware that on January 22, 2021, the police had closed the investigation?

A.    I was told that they had been there and they left.  That's about all I knew.

Q.    Were you aware that they told Attorney Leonard that they were going to issue a trespass order against Laurie Ortolano?

A.    I think that was reported to me probably from Attorney Leonard.

Q.    And are you aware that it was Attorney Leonard that asked for that trespass order?

A.    She may have told me that.  As I sit here, I don't remember being aware of that at that time.

Q.    So just so it's clear, the first meeting you had

with the chief and all the higher officers was a Zoom meeting; is that correct?

A.    The first meeting with the chief and some of the other officers was a Zoom.

Q.    A Zoom.  And then do you remember when that Zoom meeting was?

A.    Certainly within a week of the event.

Q.    And then do you remember when the meeting with the chief was at your office?  How soon after the Zoom meeting?

A.    A day, two days, three days.  A fairly short time period.

Q.    You were present when the chief testified; is that correct?

A.    I was.

Q.    And you probably agree with him that you were angry at that meeting that you had at your office at city hall?

A.    I certainly was disappointed.  I've mentioned before that I am aware that when I get excited, my voice raises in volume.  I probably have other negative characteristics, as well.  I should try and modulate that more than I do, and I admit that.  So he may have gotten a perception that I was angry.  I don't doubt that he truly feels that way and testified truthfully in that regard.

I would say disappointed is more what I felt.

Q.    Well, you had asked him to immediately arrest

Laurie Ortolano, correct?

A.    No.

Q.    Did you ask him to arrest Laurie Ortolano?

A.    No.

Q.    So his testimony on those two issues was incorrect?

A.    I think he probably believes -- and maybe he interpreted what I said that way, but I'm sure I said that I think more needs to be done, I think the witnesses and those persons present should be interviewed, and I think consideration should be given to what further steps are necessary.

Q.    Did you hear the chief testify that at that meeting you demanded that she be arrested?

A.    I heard him say that.  I think he believes he's telling the truth.  My recollection is greatly different.

Q.    After the meeting with the chief at your office, he made it clear that he was not going to arrest Laurie Ortolano, didn't he?

A.    He made it clear that at that point in time they did not intend to take any further action, and he made it pretty clear that I had no say in the matter and he wasn't listening to me further.

Q.    And after the meeting with the chief, did you have any contact with any of the lower-ranked police officers?

A.    During what time period?

Q.    After the meeting with the chief at your office.

THE COURT:  Can you help me by describing it as the Zoom meeting or the in-person meeting?

MR. AIVALIKLES:  Okay.  I'll distinguish.

THE COURT:  I think that's how it was described.

MR. AIVALIKLES:  Okay.

THE COURT:  And I'm getting confused as to which meeting you're asking him about.

MR. AIVALIKLES:  Thank you, your Honor.

MR. HILLIARD:  Your Honor, is the question directed through the time of the arrest or all time?

THE COURT:  And narrow the time and scope.  So if you could just back up to which meeting he's being asked about.

MR. AIVALIKLES:  Yes.

Q.    Following the in-person meeting with the chief, did you contact any of the lower-ranking police officers after that meeting?

A.    On this subject?

Q.    Yes.  On Laurie Ortolano, yes.

A.    No, I did not.  No.

Q.    Do you know how they went from there's not going to be an arrest, there's not going to be a further investigation, to we're going to now open the investigation?

Do you know what prompted them to do that?

A.    I only know what the chief testified in this trial. Other than that, I have no awares.

Q.    Right.  And do you know how he got that social posting that he claimed was the origin of the reopening?

A.    I don't know.

Q.    You didn't send it to him?

A.    I certainly don't remember sending it to him.

Q.    And I think the document he was talking about had to do -- was the e-mail that Laurie had sent on January 22nd at 3:57 p.m.; is that correct?

A.    I don't know if it's correct or not.

Q.    Okay.  Did you ever describe Laurie Ortolano's conduct as an out-and-out invasion?

A.    I was reported in the press as having characterized it that way.  I think I probably did.

Q.    You did.

And did you also indicate to the reporter that it came about because of the January 6th incident in Washington, D.C.?

A.    I don't think I said that, and I can explain that further, if you wish.

Q.    Let me get the document.

MR. HILLIARD:  Well, at some point, your Honor, the witness should be able to give his explanation.

MR. AIVALIKLES:  I'm sorry.  I didn't hear that.

MR. HILLIARD:  Go ahead.

Q.   After you stated that this was an out-and-out invasion, did you then say, intended to disrupt government operations seemingly inspired by the events in Washington?

Do you remember making that statement?

A.   I am virtually certain that I never said that.

Q.   Well, did you read the article in the newspaper?

A.   I did.

Q.   Did you contact the reporter and ask her to correct that statement that she was reporting?

A.   No.

Q.   Did you also indicate:  In this case, happily, no one was injured or worse.

A.   I may have said that.  I was happy no one was hurt.

Q.   Well, what was the or worse?  What were you thinking when you said or worse?

A.   Worse than being injured?

Q.   Yeah.  What's worse than being injured?

A.   Death.

Q.   Okay.

A.   Would you like me to explain what was in my mind when I said that?

Q.   Go ahead.

A.   Some years ago up in Colebrook a man named Carl Drega walked into a lawyer's office.  The lawyer's name was

Vickie Bunnell. She happened to be the selectperson, assessor, in the neighboring town of Clarksville.

Mr. Drega was unhappy with the tax assessment on his property, and he had a dispute with the town and its board of selectpersons over that.

Mr. Drega walked into Attorney Bunnell's office, shot and killed her, and killed a person, I believe his name was Dennis Jolicoeur (sic), in the neighboring office.

These things do happen. I was very happy that nothing like that happened in my office.

Q. You didn't tell the reporter, however, that you were referencing that particular incident when you were talking about your concern with what Laurie Ortolano did. You were referencing the Washington insurrection, weren't you?

A. No, I was not.

Q. Well, you didn't indicate that: It was intended to disrupt government operations seemingly inspired by events in Washington.

You did not make that statement?

A. I did not. I can tell you what I did say.

Q. Your attorney can follow up on that.

And you were aware when you made that statement to the press that your employees said that there were no threats that were made by Laurie Ortolano when she was there. You're aware of that?

A.    I don't know that they said that to me.  I knew of no threats.

Q.    When you got back to the office, you questioned Mindy Lloyd, didn't you?

A.    I did.

Q.    And did you see her report initially to the police, the incident report?

A.    I'm sure I saw it at some point.

Q.    Right.  She doesn't say that Mrs. Ortolano threatened her, did she?

A.    No, she did not.

Q.    There was an indication that Mrs. Ortolano was not armed with a weapon?

A.    I don't know whether she was or not.

Q.    You don't think the police made that determination? You don't recall seeing that?

A.    I don't know whether they did or not.

Q.    And when the police officer came, Mrs. Ortolano was calm.  Do you recall seeing that in the report?

A.    During this trial I've seen it.  Maybe I saw it in the run-up to the trial.  During the time I was talking to that reporter I had never seen the police reports.

Q.    So the article with the reporter was on -- I think it was, like, six days after this event, on the 27th of January.  So between January 22nd and January 27th you spoke

to Mindy Lloyd, didn't you?

A.    Oh, yes.  I've said that.

Q.    Right.  And Mindy Lloyd never told you that Mrs. Ortolano threatened her, did she?

A.    We just went over this, sir.  No, she didn't.

MR. AIVALIKLES:  Can I borrow that picture again?

MR. HILLIARD:  Sure.

MR. AIVALIKLES:  Excuse me, your Honor.

(Pause)

Q.    What generally happens in your office if a person comes knocking on the door and is let in without an appointment?  Do you tell them that if they don't have an appointment, schedule an appointment, or anything like that?

A.    Are you talking now or are you talking at that time?

Q.    We're talking at that time.  January 22nd.

A.    At that time if a person didn't have an appointment, they were not supposed to be admitted.

Q.    And when that person came in, were they told that?

A.    Yes.

Q.    Were they immediately told to leave?

A.    Yes.

Q.    And they were going to be trespassed?

A.    That was the protocol.  They would be immediately told to leave.  I don't know about trespass if they did

immediately leave.  They left.

Q.    Can you think of any situation that that happened when you were there where a person came in and --

A.    Mrs. Ortolano is the only time this has happened.

Q.    The only time anyone from the public has walked into your office without an appointment at around the January 22nd time frame?

A.    The only time in history as far as I'm aware.

Q.    Is there any e-mail that was sent to Mrs. Ortolano saying that she needs to make an appointment before your office will talk to her?

A.    I know of no e-mail.  I know there was a sign outside the door.  I know I had personally said that to her.

Q.    Are you certain that the sign was outside the door or was it out in the hallway?

A.    I'm virtually certain it was immediately beside the door.

Q.    Do you remember telling Judge Leary that Mrs. Ortolano will never get an appointment with the legal office?

MR. HILLIARD:  Objection, your Honor.

MR. AIVALIKLES:  It was after --

THE COURT:  Can you give the time frame for this?

MR. AIVALIKLES:  Yes.

Q.    On December 15, 2021, you appeared in front of --

MR. HILLIARD:  Objection, your Honor.  Relevance.

MR. AIVALIKLES:  It has to do with appointments.

MR. HILLIARD:  After the fact.

THE COURT:  Sustained.

Q.    Were you aware of the abatement requests that she had filed for those mobile home owners?  Were you aware of that?

A.    One, I wasn't aware of it, and, two, I don't think they were mobile homes.

Q.    How do you know that?

A.    I'm familiar with the address.

Q.    When was the roping installed in front of the hallway?

MR. HILLIARD:  Objection, your Honor.  Relevance.

MR. AIVALIKLES:  Well, I asked Attorney Leonard what the rope --

THE COURT:  Can we do a sidebar, please?

(SIDEBAR)

THE COURT:  I think the objection is going to go to the possibility that this could open the door to the July 2022 episode.

You're willing to move along?

MR. AIVALIKLES:  Yes.

THE COURT:  How much more do you have?

MR. AIVALIKLES:  No more than a half hour, your Honor.

THE COURT:  Okay.

(CONCLUSION OF SIDEBAR)

Q.    You're aware that sometimes when the police are called to an incident at city hall, that they don't necessarily arrest people as part of their philosophy?

MR. HILLIARD:  Excuse me, your Honor.

Do you mean back in 2021?

MR. AIVALIKLES:  Before.  2021 or before.

THE COURT:  Rephrase the question.

MR. AIVALIKLES:  Yes.

THE COURT:  And give it a time frame.

MR. AIVALIKLES:  Sure.

Q.    Do you recall an incident in which you were involved with a Fred Teeboom when you were president of the Board of Aldermen in which he was disorderly and the police were called?

A.    Yes.

MR. HILLIARD:  Objection, your Honor.

Sidebar, I think.

(SIDEBAR)

MR. HILLIARD:  I don't know what incident he's asking about, but if they're trying to inject some other comparator into the analysis --

THE COURT:  Of course I have no idea what this is.

So perhaps you can make an offer of proof.

MR. AIVALIKLES:  Yeah.  It's my understanding that when Attorney Bolton was the president of the Board of Aldermen, that Mr. Teeboom was --

THE COURT:  Whisper.  Quiet.  Whisper.

MR. AIVALIKLES:  -- talking when he shouldn't have been talking, and the police were called.  They had Mr. Teeboom removed, and there were no criminal charges.

THE COURT:  No.  That's not relevant.

Sustained.

(CONCLUSION OF SIDEBAR)

MR. AIVALIKLES:  I'm trying to go through my notes quickly, your Honor.

THE COURT:  I'm sorry?

MR. AIVALIKLES:  I'm trying to go through my notes.

THE COURT:  We can take an afternoon recess.

MR. AIVALIKLES:  That would be great.

(RECESS)

THE CLERK:  This hearing is back in session.

THE COURT:  You can continue.

MR. AIVALIKLES:  Thank you, your Honor.

I just have a few more questions.

Q.    Attorney Bolton, you were present when Chief Carignan testified about the police budget.

Do you remember that testimony?

A.    I was here for the entire proceeding.  I don't know

that I remember it word for word.

Q.   Isn't the budget prepared by the mayor in the first instance?

A.   No.

Q.   Okay.  Who prepares it in the first instance?

A.   For the police department?

Q.   Yes.

A.   I believe it's probably someone in their finance office, but certainly it goes up through the chief.  It probably goes to the police commission as well, but I have no involvement in that.

MR. HILLIARD:  Your Honor, I think we need a sidebar, please.

(SIDEBAR)

MR. HILLIARD:  We've been handed some documents.

This is the Nashua city charter?

MR. AIVALIKLES:  Yes.

MR. HILLIARD:  And a letter from the mayor.

I guess I would just like an offer of proof.  I just don't see the relevance at this point.

MR. AIVALIKLES:  Oh, it just clarifies Chief Carignan's testimony that the police prepare their budget and then ultimately the Board of Aldermen approve it.  That's all.

THE COURT:  I don't see why you would be asking him about that when Chief Carignan testified about that.

MR. AIVALIKLES:  Well, he's corporate counsel.  So he probably would know better than Chief Carignan.

That's fine, your Honor.

THE COURT:  You're willing to skip that line of questions?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.

MR. HILLIARD:  Thank you.

(CONCLUSION OF SIDEBAR)

Q.   Attorney Bolton, you studied constitutional law in law school?

A.   It was required.

Q.   And you were a history major at Dartmouth?

A.   I took many history courses.  I was actually an economics major.

Q.   Okay.  And the history courses dealt with the Constitution, the Revolutionary War, and the enactment of the Constitution?

A.   I don't think I had a course on American revolutionary history, but I think I know as much about that period in our history as the average person.

Q.   But you would agree, based upon your law school training and whatever you learned in your history classes, that Laurie has a First Amendment right to criticize you, Attorney Leonard, and the mayor, correct?

MR. HILLIARD:  Objection, your Honor.

Asked and answered.

THE COURT:  I'll allow it.  Go ahead.

MR. AIVALIKLES:  I'm finishing up, your Honor.

THE COURT:  Okay.  I'll allow it.

Q.    You would also agree that you and Attorney Leonard could not retaliate against her because of her protected speech, correct?

MR. HILLIARD:  Objection, your Honor.

That's argumentative.

THE COURT:  Sustained.

Q.    But would you agree that you cannot do anything as a government employee to interfere with her First Amendment rights?

MR. HILLIARD:  Objection, your Honor.

Relevancy.

THE COURT:  Sustained.

Q.    Do you agree that a public figure cannot penalize a citizen because of their protected speech rights?

MR. HILLIARD:  Your Honor, objection.

These are calling for conclusions of law for the Court to draw.

MR. AIVALIKLES:  I'm just inquiring into his knowledge of the Constitution and his education as a lawyer, your Honor.

THE COURT:  Yeah.  I'm going to give instructions on the law.  So the objection is sustained.

MR. AIVALIKLES:  Okay.  Thank you, your Honor.

I have nothing further.

THE COURT:  That's it?

MR. AIVALIKLES:  That's it.

THE COURT:  Okay.

Attorney Hilliard.

MR. HILLIARD:  No redirect, your Honor.

THE COURT:  No redirect.

Anything, Attorney Cullen?

MR. CULLEN:  No, your Honor.  Thank you.

(Conclusion of requested testimony of Steven Bolton)

C E R T I F I C A T E


I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  2-27-26      /s/    Susan M. Bateman _____
                         SUSAN M. BATEMAN, RPR, CRR