**\*\*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-6-2026**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                        \*
LAURIE ORTOLANO                  \*
                        \*  22-cv-326-LM
     v.               \*  February 4, 2026
                        \*  8:35 a.m.
STEVEN BOLTON AND CELIA LEONARD    \*
                        \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF JURY TRIAL
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

<u>APPEARANCES</u>:

<u>For the Plaintiff</u>:     William Aivalikles, Esq.
                      Aivalikles Law Office

<u>For the Defendants</u>:

(Steven Bolton)         Russell F. Hilliard, Esq.
                      Madeline K. Matulis, Esq.
                      Upton & Hatfield LLP

(Celia Leonard)         Brian J.S. Cullen, Esq.
                      Cullen Collimore Shirley PLLC

<u>Court Reporter</u>:      Susan M. Bateman, RPR, CRR
                      Official Court Reporter
                      United States District Court
                      55 Pleasant Street
                      Concord, NH 03301
                      (603) 225-1453

I N D E X

WITNESSES:           Direct      Cross       Redirect        Recross


LAURIE ORTOLANO


By Mr. Aivalikles     13

By Mr. Hilliard                   77




EXHIBITS                              FOR ID      ADMITTED


Plaintiff's Exhibit Nos. 64 and 65.                74

P R O C E E D I N G S

(IN COURT - NO JURY PRESENT)

THE CLERK:  This Court is in session and has for consideration a charging conference in 22-cv-326-LM, Laurie Ortolano versus Steven Bolton, et al.

THE COURT:  All right.  Any issues we need to talk about this morning?

MR. AIVALIKLES:  I don't have any, but I just wanted to alert the Court that I am withdrawing our request for the jury instruction on color of law and we'll go along with the Court's.

THE COURT:  Oh, you're going along with the Court's?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.  All right.

Any other good news?

MR. CULLEN:  We are prepared to address or at least highlight the areas of the jury instructions if you would like to.

THE COURT:  Great.  That would be great.

MR. CULLEN:  We did have one other issue which -- I think Russ was going to raise this, but since I'm standing, I will.

Exhibit 56 is the exhibit that deals with the trespass, the prior trespass calls.  Obviously, we have an

objection to it, and it appears that the Court is overruling our objection. Rather than doing that in front of the jury, it might make sense for the Court to just rule on it now.

THE COURT: I appreciate that. Anything that speeds up the jury process.

And so when you move for that to be a full exhibit, I'll note your objection but grant it.

How does that work?

MR. CULLEN: I think that makes sense, your Honor.

THE COURT: All right. And my ruling would be the same as that which I ruled previously. I haven't heard anything that would change my ruling.

MR. CULLEN: Understood. Thank you.

THE COURT: All right. Anything else? I know you've got jury instruction issues you can highlight for me.

MR. CULLEN: Yeah, I don't know that we necessarily have to argue them today. I take responsibility for us being here at 8:30 instead of 8:00, so I don't want to overly burden the Court, but I would just maybe flag a couple of things.

THE COURT: Yes.

MR. CULLEN: And we might as well take them in order. On page 7, burden of proof --

THE COURT: Let me get there.

All right. Tell me the line.

MR. CULLEN: Sure. Line 15.

THE COURT:  Okay.

MR. CULLEN:  You just have a note, I think to yourself, tilt or tip, and I think tilt is probably the more proper term.

THE COURT:  Either one.  Okay.  Obviously, I need to --

MR. CULLEN:  It doesn't matter that much to me.  It was in bold so I was alerted to it.

THE COURT:  Yes.  Thank you.

MR. CULLEN:  On page 10, your Honor.

THE COURT:  Yes.

MR. CULLEN:  The first element, conduct protected by the First Amendment, we're inclined to -- we're going to concede that those activities were protected.  So rather than having the last line "it's up to you to determine whether she's proven it," we're not disputing that those are -- that she engaged in those activities.

THE COURT:  Okay.

MR. CULLEN:  What we would ask is just that we include also in there that she doesn't have a First Amendment protected right to protest inside the legal department.  She's not claiming that here, but she has at various times said she was staging a protest.  I wouldn't want the jury to think that that's a protected First Amendment action.

THE COURT:  I'm not inclined to do that, but let me

think about that and I will ponder that.  I think that I would be drawing the jury's attention, first of all, to specific facts in this case, and I ultimately think that's going to be a factual question for the jury.  Unless you can give me some law or something I could hang that ruling on, I'm not inclined to give that.  So I'm just telling you off the top of my head, obviously we're here at 8:30, that's what I would need you to persuade me of.

Do you want to add anything to that while he's on this issue?  If you have nothing to add, don't worry.  I can hear you later.

MR. AIVALIKLES:  Okay, your Honor.  Why waste time.

THE COURT:  Okay.  Go ahead.

MR. CULLEN:  Thank you for alerting us to that then, your Honor.

On page 11 we do have an issue with the "but for" language on line 8.

THE COURT:  Okay.

MR. CULLEN:  I think "but for" is -- I think the Court needs to really think about proximate cause and not "but for" cause.

And this is brought up in a case called Rudnick v. Manchester.  It's a case out of this court, 95-cv-429.  It was a McAuliffe case, and he talks about how -- that case involves a retaliatory arrest -- or not a retaliatory arrest, a failure

to arrest somebody who has a mental illness and then goes out and hurts someone else, and the argument was, well, but for them not arresting, this wouldn't have happened.  And the Court mentions that, like, but for is really too amorphous, not his word, my word, but anything can be but for.  It needs to be a proximate cause, and I think that's a distinction that is lost by using the "but for" language.

The idea is true.  But for the officers not arresting that person that morning, he wouldn't have been able to stab the person later that day.  But it wasn't the proximate cause of the injury, and I think that's important here.

So, again, I'm not expecting a ruling on it.  I'm just flagging it for the future.

THE COURT:  Yeah.  All right.

Well, I will just say that normally the jury instructions on these issues divide this up into factual causation and legal causation and use terms like proximate cause.

Lay people do not understand those terms, and so ultimately I chose first component and second component.  I'm open to other ways to simplify it, but the idea is there is but for causation and proximate cause, and the proximate cause is the second component, the reasonable foreseeability component.

But that's just to let you know that I changed it. I removed any legal terminology that we are all familiar with so that the jury would better understand what it is they have to do, and I think there is also a way to further simplify this.

So I've got proximate cause in the second component, and the first component is sort of two different factual ways to get to this what's called factual causation.

So that's by way of clarifying what I've done with the instructions but that I'm open to suggestions to even simplify it further.

But I'm not understanding -- is it simply the way in which this is worded?  You don't want me to say but for this?

MR. CULLEN:  I'll take a further look at it, your Honor.  I do know we have some additional language in our own requests.

THE COURT:  Okay.  All right.  And this is really preliminary.  These are preliminary.

MR. CULLEN:  I'm just trying to flag issues.

THE COURT:  I appreciate that.

MR. HILLIARD:  And just for my thinking, your Honor, as between first component and second component, one is intended to deal with legal causation and one factual?

THE COURT:  Correct.

MR. HILLIARD:  And which is which?

THE COURT:  Facts are the first component and -- yes, as lawyers, that's something we understand the distinction of.  I was just worried about the jury wondering what's the difference between a factual cause and a legal cause.  Yes.

MR. CULLEN:  Thank you, your Honor.

THE COURT:  And make sure -- did everybody get the case you were relying on, the Judge McAuliffe case?

MR. CULLEN:  I'll read it again.  It's Rudnick, R-U-D-N-I-C-K versus Manchester.

THE COURT:  Okay.

MR. CULLEN:  The decision -- I didn't catch the date on it, but it's listed as 95-429.  So I don't know if that's the case number or the decision number, your Honor.

THE COURT:  Okay.  We can find it.

MR. CULLEN:  It was a ruling on a motion for summary judgment.

THE COURT:  Okay.  Thank you.

MR. CULLEN:  On page 13, your Honor, at line 3, you say constitutionally-protected conduct was a substantial or motivating factor, which I think is correct, but on line 10 you change that to a significant or motivating factor, which to me waters that down a little bit.

THE COURT:  Okay.  So just keep substantial.

MR. CULLEN:  That would be --

THE COURT:  Played a substantial or motivating part.

Well, that is legally correct, and you're just asking for consistency.

Any reason you have a problem with that?

MR. AIVALIKLES:  No.

THE COURT:  All right.  We'll make that change.

MR. CULLEN:  Thank you, your Honor.

I think I'll leave page 14 because you do have a blank at the end of that so it looks like that's a work in progress still.

THE COURT:  I think I have drafted this in a way that I'm comfortable with.  So if there's anything you want to draw my attention to --

MR. CULLEN:  I apologize.  It's not a blank.  It's a delineation for the footnote.  That was my error.  I saw it said, she only (blank), but it goes over to the next page.  My mistake there.

THE COURT:  All right.

MR. CULLEN:  On page 15 on the color of law, we would request that the Court use the language that's in West versus Atkins that I cited the other day that starts out with, traditionally, color of law is, and I don't see how the Court can go wrong with using the exact language from the Supreme

Court.  So that's what we would ask that the Court use for this color of law argument.

THE COURT:  What does that add that is not here?  Do you know off the top of your head?

MR. CULLEN:  I do have it, I think, your Honor.

I think the language there is just a little bit more specific, and it's on page 49 of that decision, which was 487 U.S. 42, and it says:  The traditional definition of acting under color of law requires that the defendant in a 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law," and that's quoting an earlier Supreme Court case as well.

I just think that's a clear, easy definition of color of law that I think is probably a little bit more -- to me it hits a little bit more on the point.

THE COURT:  Okay.  I will read that carefully.  I will come back and give you my thoughts on that.

Quoting, lifting from Supreme Court opinions and other opinions, particularly some in the First Circuit, it's not going to be comprehensible to lay people.  And so generally I wordsmith them to try to simplify them, but I'll look at that carefully and see if there's a way to work that language in and see if it adds something.

And let you respond, obviously.

MR. AIVALIKLES: Yeah. In that case, your Honor, then I would ask that you look at our proposed request for color of law because I think we're relying on cases that address that issue. It's a little bit different than yours, but ultimately we felt that yours was sufficient.

THE COURT: Okay. All right. I'll look at under color of state law again.

MR. CULLEN: The only other thing I have right now, your Honor, we will raise this again, I don't believe -- other than the qualified immunity defense, which I think your Honor is inclined to take under advisement, I don't believe we have any other affirmative defenses, but when we get to the end, we can strike any surplusage.

THE COURT: All right. Good.

Do you have anything you want to bring to my attention right now? Okay. You'll have plenty of time to do so.

MR. AIVALIKLES: Yeah, I didn't even consider them, your Honor, last night.

THE COURT: This is a preliminary discussion.

I do appreciate being alerted to some of these issues. I can look at them at breaks and get back to you.

So anything else? We will have our jury here shortly. I'm going to head back upstairs briefly and get things set up.

MR. CULLEN:  Thank you, your Honor.

THE COURT:  Thank you.

MR. AIVALIKLES:  Thank you, your Honor.

(RECESS)

(IN COURT - JURY PRESENT)

THE CLERK:  This Court is now in session and has for consideration jury trial day two in the matter of Laurie Ortolano versus Steven Bolton, et al., 22-cv-326-LM.

THE COURT:  Good morning.

I just want to confirm with you and ask you if you have been able to follow my instructions about not reading anything, speaking to anybody, researching anything, and about not speaking to each other about the facts.

Have you all been able to do that?

(Jurors nod affirmatively)

Thank you very much.

Everybody is nodding affirmatively, and so we will proceed with our evidence today.

Ms. Ortolano, if you would take the stand, and no need to swear you in again.  You are still under oath.

Go ahead.

MR. AIVALIKLES:  Yes.

Thank you, your Honor.

CONTINUED DIRECT EXAMINATION OF LAURIE ORTOLANO

BY MR. AIVALIKLES:

Q.    Laurie, I would like to draw your attention to a Right-to-Know e-mail concerning the Donchess timeline. That's, for identification only, Exhibit 12.

A.    Okay.

Q.    Which will be right in front of you.

A.    Getting there.

MR. HILLIARD:  Your Honor?

THE COURT:  Yes.

MR. HILLIARD:  Objection.

THE COURT:  All right.  Let me find my headphones.

Okay.  Let's speak on sidebar.

MR. HILLIARD:  Thank you.

(SIDEBAR)

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  Yes.  Go ahead.

MR. HILLIARD:  Okay.  This is the Donchess timeline that we've discussed.

THE COURT:  I can't hear you.

MR. HILLIARD:  I'm sorry.

THE COURT:  You literally have to get very close to the mic, and then if you're close, you can --

THE CLERK:  I'll turn down the microphone.

MR. HILLIARD:  Thank you.

Your Honor, we've discussed this several times and the Court has ruled this Donchess timeline issue is out of

bounds, and that's what they're starting to get into.

THE COURT:  Okay.  This deals with the mayor's taxes?

MR. HILLIARD:  Yes.

THE COURT:  Why are you talking about the mayor's taxes?

MR. AIVALIKLES:  First of all, your Honor, the Court did not rule this was out of bounds as I recall.

Secondly, this was a Right-to-Know request handled by Attorney Leonard, and it shows -- how she treated the request has nothing to do or is not being offered concerning the mayor's real estate taxes.  It's how she handled it.

THE COURT:  Whisper.  Whisper.

MR. AIVALIKLES:  This was a document that was labeled the Donchess timeline by the city of Nashua, and the response that she got, Laurie got, was it was inadequately described, it was ambiguous, when it was their own characterization.

The issue is how Attorney Leonard reads her Right-to-Know requests.

THE COURT:  Okay.  I think she can talk generally about that.  We do not -- I did rule that I didn't want to hear anything about the mayor's taxes and that dispute other than as to her general approach to the element of protected conduct.  You had definitely established that.

I do not want to hear the details about the taxes. I ruled, and I so rule now, that introduction of those details creates a waste of time.  It's needless presentation of cumulative evidence.  They've already heard about her beefs with the mayor, and I'm thinking about considerations of delay as well.

I can see there's some relevance and you want to get into it, but I think I've made it clear that I'm not going to allow details about the mayor's taxes.

So that objection is sustained.

So move on.  Go ahead.

MR. AIVALIKLES:  Thank you.

Your Honor, just for the record --

THE CLERK:  Hold on.

Okay.  Go ahead.

THE COURT:  Go ahead.

MR. AIVALIKLES:  Just for the record, your Honor, Exhibit N, which was a full exhibit by the defendants, talks about the mayor's properties.

THE COURT:  And you can talk about it in your closing.  It's a full exhibit.  You can draw the jury's attention to it.  They already know about it.  We've talked about that exhibit.

So let's move along, okay?  Thank you.

MR. HILLIARD:  Thank you.

(CONCLUSION OF SIDEBAR)

Q.    So did you send a request, a Right-to-Know request to get a record for the Donchess timeline?

A.    Yes.  I sent it to Attorney Leonard on October 12th of 2019.

Q.    And where did the term the Donchess timeline come from?

A.    It came from a batch of records that Attorney Leonard sent me, email records from the assessing chief, and in those records was a single e-mail written between assessing staff that was called the Donchess timeline and an assessor was going to be assigned to look into that.

Q.    Okay.  So the term the Donchess timeline came from the city; is that correct?

A.    Correct.

Q.    And that's what you had requested; is that correct?

A.    I cited the specific batch, the time, the e-mail. I gave all the details.

Q.    And did Attorney Leonard respond to your request?

A.    Yes.

Q.    What did she say?

A.    She said it was overly broad and unreasonably described, and that there was -- that it wasn't a searchable record.

Q.    And did you follow up with that?

A.    I did.

Q.    And what did you tell her?

A.    I said go talk to the assessor who was named in there, Gary.  Go ask him if he did a search and produced a record called the Donchess timeline.

I believed he would remember.

Q.    And did you ultimately get the documents that satisfied your request?

A.    Yes.  Then a short time later she produced it and said they found the records.

MR. AIVALIKLES:  Your Honor, I move to introduce Exhibit 12.

THE COURT:  Objection?

MR. HILLIARD:  Yes.

THE COURT:  Objection sustained.

Q.    Let me direct your attention to full exhibit number 17.

MR. HILLIARD:  Excuse me.

I didn't quite hear you, Attorney Aivalikles.

MR. AIVALIKLES:  17.

MR. HILLIARD:  Thank you.

Q.    Can you tell the jury what that document is, Laurie?

A.    It was an e-mail I sent to the woman who had taken over the assessing office, Kim Kleiner, and copied Attorney

Leonard, and it asked for various pieces of information.

On the second page is where I made the request, on the very top: Could I meet -- Laura received a Right-to-Know report on permit data that did not have information she requested. We're struggling with communication with the assessing office and legal. Without a skilled chief, we are in a situation where the blind is leading the blind. Could I meet with Doug -- he was an assessor in the office -- could I meet with Doug and talk to him about how permits are captured and how the offices know that they are being captured?

THE COURT: I missed the date on that.

THE WITNESS: July 12th of 2019.

THE COURT: Okay. Thank you.

Q. And did you get a response?

MR. AIVALIKLES: Can you put up Exhibit 18?

A. Yes. She answered in various parts, but the answer to No. 3, which is the next page --

Q. Excuse me, Laurie. One second.

MR. AIVALIKLES: Can you bring up the page?

Q. And what did she indicate about you talking to Mr. Dame?

A. She said: Mr. Dame is not responsible for permit capture function in the assessing office. That is an administrative function --

(Court reporter asks witness to slow down)

I'm sorry.

Q.   Laurie, just listen to the question.

What did she decide about you talking to Mr. Dame?

A.   She denied it.

MR. AIVALIKLES:  Can you bring up Exhibit 19?

Q.   Laurie, what is Exhibit 19?  It's dated August 23, 2019.

A.   That was another request, that was an exhibit we looked at yesterday, and it was me -- it's not written, my request, there, but Kim Kleiner, the manager of the assessing office at that time, sent an e-mail to Attorney Leonard saying that I had come in to assessing and had a conversation with assessor Mike Mandile, and I wanted to get information on sales letters that were sent during the KRT re-evaluation.

Q.   And what was the response by Attorney Leonard on August 23, 2019?

THE COURT:  Hold that for just a moment, if you would.

Brief sidebar.

(SIDEBAR)

THE COURT:  I'm wondering if there's any way you could go through this more quickly by putting together -- she's very familiar with the exhibits -- and asking her, the jury is going to receive these full exhibits, Exhibits A through Z.  Do they document -- what are these?  Tell the jury

what these exhibits are.

They're my communications with the assessing office.

And the jury will have those. They can look at them. She can speak briefly about them and what they reveal, but to go through each one individually is going to take a long time, and it's going to, frankly, I think serve to really confuse the jury in terms of the details.

If there's specific things you want to pull out of specific exhibits, that's fine, but to have her read sections of these letters -- this is August 2019. It's years before the actual incident.

So I'm suggesting that I think you could do this in a package form. In other words, the jury is going to have those e-mails. You're going to be able to talk about them in closing. You'll be able to draw specific attention -- you'll be able to point out -- I haven't looked at these exhibits -- but point out her tone. Is she rude two years before the episode?

So that is my suggestion, and I'm making that suggestion under the -- really under my authority under Rule 611. Because I can foresee this taking till lunch.

So that's my -- that's what I'm asking you to do if you can accomplish this in a way that's more succinct, and that would be consistent with my earlier ruling. So I think

that's a way you could do the same thing and have her explain it but not read word for word.

MR. AIVALIKLES:  Your Honor, am I allowed to ask her leading questions that would move things along?

THE COURT:  To the extent you're asking her leading questions to truncate this and speed it along but you're not, like, suggesting or arguing something.

MR. AIVALIKLES:  Right.

THE COURT:  I'll leave that up to defense to object to particular leading questions, but I'm going to allow you to do that so that we can get this evidence in in a way that the jury I think is going to understand better, too.  So that's what I would strongly encourage you to do.  So go ahead.

(CONCLUSION OF SIDEBAR)

THE COURT:  Excuse me for that interruption.

Go ahead, Attorney Aivalikles.

Q.   Did Attorney Leonard grant you the request that you were looking for?

A.   No.

Q.   Did you ever request to get copies of the sanctions that were issued by the state of New Hampshire?

A.   Yes.

Q.   And was that request refused?

A.   Through the state of New Hampshire?

Q.   No, no.  Through the city.

A.    The city?  Yes.

Q.    And Attorney Leonard, was she the one that refused it?

A.    Yes.

Q.    And as a result of that, what did you do?

A.    I worked with the state assessing board to change the legislation to make those complaints against assessors public.  They were not considered public records.  The state board agreed that the public should be able to know when an assessor is sanctioned, and we went to the State House, campaigned, changed the law, and made them public.

Q.    Directing your attention to full Exhibit No. 23, that was a Right-to-Know request for the assessing staff meetings; is that correct?

A.    Yes.

Q.    And were those records produced?

A.    Yes.

MR. AIVALIKLES:  Can you pull up the assessing?

Q.    There's a meeting on April 1, 2019, item No. 3.

A.    Yes.

Q.    And did it direct the assessors, Mike, Gary, and Greg, not to speak with you?

A.    Yes.

Q.    There's another meeting on April 8th, item number 3.  Did they change the rules and indicate that the

assessors would not talk to residents with large, multiple requests for properties not owned by them?

A.    Yes.  That was a change.

Q.    And did you request multiple copies prior to this?

A.    Yes.  The city charter allowed it.

Q.    July 19, item number 2, did the assessors need to discuss information that they had and share it with legal?

A.    Now it was going to legal, yes.

Q.    Thank you.

MR. AIVALIKLES:  Exhibit 18, I think we discussed that.

If you could pull up Exhibit 24?

Q.    That's an e-mail that you wrote to I believe Attorney Leonard; is that correct?

A.    Yes.

Q.    And did you reiterate your understanding about the role of the legal department?

A.    I did regarding this document, Right-to-Know request.

Q.    Right.  And what did you indicate in this document was your understanding of their role?

A.    Well, they claimed they only handled documents --

Q.    Just answer the question.

Go to paragraph 4.  What did it indicate?  What did you indicate?

A.    "Any questions that they have from my office, Ms. Leonard --," is that the paragraph you're looking at, "If you're sitting on any questions?"

Q.    You said, when I took it to legal.  Do you see that?  What did you understand you would go to legal for?

A.    Wait a minute.  I'm just trying to find where that is.

Oh, yeah.  When I took it to legal, Ms. Leonard expressed that only document requests are handled by legal.  She wouldn't handle general questions brought to legal.

Q.    Now when you went on January 22nd for the abatement, did you consider that to be a request for documents?

A.    No.

Q.    Do you recall filing an abatement for your personal taxes in 2020?

A.    Yes.

Q.    And you filed those on November 18th; is that correct?

A.    I think it was November 13th.

Q.    November 13th.

And did you get a receipt for your taxes?

A.    I did.

Q.    When did you get a receipt?

A.    I first got a -- the actual receipt came from the

legal office on November 20th.

Q.   And did that letter from the legal office contain a receipt of when it was received, which was November 13th?

A.   Yes.

MR. AIVALIKLES:  Your Honor, may I approach?

THE COURT:  Yes.

Q.   Who sent the letter enclosing the receipt?

A.   The letter was sent by Manuela Perry of the legal office.

Q.   And what's the address?

A.   The address is manuelaperry@nashuanh.gov.

Q.   Is it from the legal department?

A.   Yes.  She's a clerk there, and she sent it with a stamped receipt to me.

Q.   And that was November 20th, 2020; is that correct?

A.   Yes.

Q.   Did that have any impact on your --

MR. HILLIARD:  Excuse me, your Honor.  We haven't seen this document.

MR. CULLEN:  I don't know what exhibit it is.

MR. AIVALIKLES:  It's not an exhibit, your Honor.

THE COURT:  It is an exhibit?

MR. AIVALIKLES:  No.  It is not an exhibit, your Honor.

THE COURT:  Okay.  And you're not trying to admit

it as an exhibit?

MR. AIVALIKLES:  Exactly.

THE COURT:  Okay.

MR. HILLIARD:  Well, we haven't seen it either, your Honor.

MR. AIVALIKLES:  Well, it's a city document.  I'll show it to you.

(Document given to Attorney Hilliard and Attorney Cullen)

Should I continue or should I wait until they've read it?

THE COURT:  Let them just read that, and then we'll continue.

(Attorney Cullen and Attorney Hilliard read document)

Are you ready to carry on?  Is everybody ready?

MR. CULLEN:  I'm ready, your Honor, but I would just ask that we be shown things before they're shown to the witness.

THE COURT:  I think that's fair.

MR. AIVALIKLES:  I agree.

Sorry, your Honor.

THE COURT:  I think, too, if you introduce it, you can talk about the exhibit with Ms. Ortolano before you bring it up and then show it to counsel.

MR. AIVALIKLES:  Yes, I will.

THE COURT:  All right.

MR. HILLIARD:  Your Honor, sidebar, please.

THE COURT:  Okay.

(SIDEBAR)

MR. HILLIARD:  If I'm reading this correctly, the date stamp is from the assessing office, and that's when it's dated, November 13, 2020.  It's not a date stamp.

THE COURT:  Okay.  That's a great cross.

MR. CULLEN:  It would be, your Honor, if we had this document.

THE COURT:  You've never seen this document?

MR. CULLEN:  We weren't supplied with it.  It's not marked for ID.

THE COURT:  Okay.

MR. CULLEN:  We at least need to have a copy of it so that we can do our cross.

THE COURT:  I agree.  I agree.

I'm just assuming these are documents that you've all seen.  So this is something you've never looked at, you haven't had a chance to review beforehand?

MR. HILLIARD:  And on its face it's not what it is represented to be.

THE COURT:  Okay.  All right.  I will allow you on cross to go into that obviously in great depth.

Are you asking for any other relief?

MR. HILLIARD:  Well --

THE COURT: I mean, at this point?

MR. HILLIARD: Well, I probably would move to strike that testimony for now until we've had a chance to explore.

THE COURT: What's the harm? Tell me the harm. You're going to be able to cross-examine her on something. They just asserted it came from the legal department. The jury will remember that. This is going to actually help you on cross. Why is this harmful?

MR. HILLIARD: Well, it's put in there to leave the impression that the legal department has provided date stamps on abatement applications, and that's simply not the case and this document doesn't establish that. It's very prejudicial.

MR. AIVALIKLES: Your Honor, it was my intention to address that with my client about the date stamp. If I could continue, she'll explain what her thought process was.

THE COURT: I am not inclined at this point to ask them to strike the entire testimony. I could, however, ask him to clarify this.

You've had an opportunity to look at it. Are you asking that it be excluded completely? The jury hasn't seen it.

MR. HILLIARD: Right. I certainly don't think this is a relevant exhibit.

THE COURT: Right. Okay.

MR. HILLIARD:  And I guess, reserving my rights, she could clarify it, but I'm looking at a date stamp that is from the assessor's office, not from the legal department.

MR. AIVALIKLES:  Your Honor, that's not disputed. In fact, at that time the assessor's office was closed, and she's going to explain the significance of that in terms of this case and the relevancy to this case.

THE COURT:  Okay.  Well, I think it's important and incumbent on you to clarify the misleading impression that's been left.  And you understand what it is Attorney Hilliard is raising.  You can correct that.  The jury hasn't seen the exhibit, but you can correct the impression that was left.

MR. AIVALIKLES:  Your Honor, first of all, I didn't intend to leave that impression.  I have my questions that were going to be followed.  There was no intention to mislead or misrepresent anything.

THE COURT:  Okay.  The problem is they've never seen these exhibits.  That's a problem.  Number one, they've never seen it.  You didn't show it to them.  I'm assuming as the judge, these are exhibits and they know what you're talking about.  You're not moving that they be full exhibits, but the way you used them and showed them left a misleading impression.  So I would like you to cure that.

MR. AIVALIKLES:  Absolutely.

THE COURT:  And if you need to use some leading

questions to cure that, then I approve of that, but please do that right now.

MR. AIVALIKLES:  I am, your Honor.

THE COURT:  All right.  Go ahead.

(CONCLUSION OF SIDEBAR)

Q.    Laurie, after you received that document from legal, what did you conclude?

A.    That my abatement was up in the legal office.  It was sent through the legal office.

And as far as the stamp, I don't know who or where the stamp was put on because there was no assessing office at that time.  It had an assessing office stamp on it, but the office had been demolished.  And I don't know who was putting the stamp on it, but it did come back to me from the legal office.

Q.    And did you rely upon what you had received when you went to the legal office on January 22nd?

A.    That piece of information and the fact that all of my requests were being channeled through the legal office. Even requests for an abatement file was channeled through the abatement office.  So I knew they would have a date timestamp.

Q.    And that date stamp does not say legal department, does it?

A.    No.

Q.    What does it say?

A.   Assessing office.

Q.   Okay.

THE COURT:  Go ahead.

MR. AIVALIKLES:  Thank you, your Honor.

Q.   Calling your attention to Exhibit 25, did you make the request --

MR. AIVALIKLES:  I'm sorry.  I don't know if we addressed that yesterday.  It was Exhibit 25.

THE COURT:  I'm sorry.  I don't know what you're asking.

MR. AIVALIKLES:  Yeah.  Okay.

Q.   Did you send an e-mail to the legal department -- or the assessors, I'm sorry, about wanting to speak and meet with the assessors?  That would be Exhibit 25 I would ask you to look at.

A.   I don't see 25.  I see a city hall renovations memo.

Q.   That would be 25.

A.   Okay.  Now I see it, yes.

Q.   Okay.  Do you see that?

A.   Yes.

Q.   Did you get a reply to that?

A.   I did.

Q.   And what was the reply?

A.   Attorney Leonard ignored my request to speak with

an assessor or to have a meeting that was offered by the director.  It was just not responded to at all.  I was not allowed to speak to an assessor, that was in December of 2019, over data that I created that the office claimed was inconsistent and had mistakes and discrepancies.

MR. AIVALIKLES:  Exhibit 32.  That's a full exhibit.

Q.   Does this concern your abatement appeal?

A.   Yes.

Q.   And did you have an attorney representing you?

A.   Yes.

Q.   Who was that?

A.   Attorney Rick Lehmann.

Q.   And what were you asking for in that letter?

A.   He had contacted me and wanted a full copy of the abatement file so he could start working on it.  And to save money he said, go get it yourself, it's a public record.

Q.   That's a public record.  Go get it.

And did you get a response to that request?

A.   No.  I sent it late at night.  I waited until the next morning.

MR. AIVALIKLES:  Pull up Exhibit 33.

Q.   Did you actually get the documents yourself, your abatement file?

A.   No.  It was sent to my attorney.

I went to the legal office to try to get it because I was directed there by the assessor's office, and they wouldn't -- Attorney Bolton would not give it to me.

Q. Okay. Well, did you speak to Attorney Bolton that day?

A. Yes.

Q. Did you knock on the door?

A. Yes.

Q. Did someone tell you you needed an appointment?

A. No.

Q. What did Attorney Bolton tell you?

A. He said that I couldn't have the file. That I needed to have my attorney write a letter and request the file.

Q. What was his tone?

A. Angry. Very angry.

Q. Was he yelling?

A. Yes. He was loud. He was shouting.

And I argued back that it was a public record and I shouldn't have to have my lawyer pay -- I shouldn't have to pay him to get a copy of a public record. I left because he wouldn't give me the file.

Q. And what did Attorney Leonard indicate in her response to your attorney?

A. She indicated that it could be broadly construed

that I was attempting to gain confidential attorney-client communications or work product by going there to get the file.

Q.   But this was a public file, right?

A.   It was.

MR. AIVALIKLES:  Exhibit 34, please.

THE COURT:  Can we have a brief sidebar again, please?

(SIDEBAR)

THE COURT:  I just need to ask you again to ask your incredibly intelligent client general questions.  Ask her about what happened and go through this in a different way. I'm not going exhibit by exhibit and having her read exhibits out of context.

We were in November of 2020.  That's the document dispute we just had.  I'm thinking November 2020.  We're two months away from the incident.  We're almost there, and then suddenly we're going backwards with exhibits.

You have an intelligent client who can answer your open-ended, direct questions about these things and what happened.  You can use exhibits to supplement that testimony, but I'm not going to allow you to waste the jury's time going through exhibit by exhibit.

I am so ruling under Rule 6, 11, and 403.

Get through the story.  Get us to January of 2021, okay?

MR. AIVALIKLES:  Okay.

(CONCLUSION OF SIDEBAR)

Q.    Did any of the city postings about city hall hours during the 2020, 2021 years indicate openings and closings and appointment requirements?

A.    Yes.  When they -- yes.

Q.    Was there anything in those postings from legal indicating that an appointment was necessary?

A.    No.

MR. AIVALIKLES:  Let's bring up Exhibit 38.

Q.    Exhibit 38 is the documents that you received from the city after the supreme court ordered them produced; is that correct?

A.    Those e-mails I did get, yes.

Q.    Okay.  So can you tell the Court and the jury what happened from the moment you filed your abatement request on January 17th?

A.    It was at 7:21 in the evening on a Sunday I put the letter in.

THE COURT:  Slow it down.

What time are we?  I'm sorry.  I missed the date.

MR. AIVALIKLES:  January 17, 2021, your Honor.

THE COURT:  January 17, 2021?

MR. AIVALIKLES:  Right.

THE COURT:  Okay.  Go ahead.

A.    Okay.  And this is where the situation sort of started.

I filed -- I sent an e-mail in to AssessHelp, which is where you had to send your requests for abatements because city hall was under COVID restrictions.  I did so.  And I attached the applications for the two senior citizens that I had helped out.  Filled them out, attached them, and sent.

And I believe if you scroll through, the applications even say --

Q.    We don't need to.  The jury will see those.

A.    Okay.

Q.    Okay.  So did you get an acknowledgment back on January 17th?

A.    No.

Q.    Okay.  What did you then do?

A.    I waited a couple days.  And January I think it was 20th I sent an e-mail to AssessHelp again and the chief, Rick Vincent, and said, you know, I'm waiting for a response, and I would like a receipt back on those applications.

He wrote back to me I believe on the afternoon of the 20th and said I will look into those and get back to you.

Q.    Did he tell you when he would get back to you?

A.    No.

Q.    And did you follow up with a contact to Mr. Vincent after that?

A.   On the 21st, Thursday, I didn't hear back from him, and I followed up with I'm very concerned, abatements have been lost, this is just a quick thing of putting a stamp on them, I don't have it.

And he said he would follow up, but he didn't say I have them.  He didn't confirm I have these documents and I will get them to you.  It sounded like he didn't have them.

Q.   And then what did you do?

A.   On the 22nd I went to city hall with copies of my abatement applications and was hoping to go to administrative services.  I believed somebody from assessing would be in there.  The office was gone, and I couldn't get a date stamp.

Q.   And then what did you do?

A.   The lights were off.  I went to the second floor. I thought the mayor's office would have a stamp.  It was barricaded.  Lights were off.  Nobody was there.

Q.   What happened after that?

A.   I went to the third floor to the legal office.  It was not barricaded.  And I went to the door I usually go into and knocked on the door, and Mindy Lloyd came.

MR. AIVALIKLES:  Could you bring up UU?

Q.   So that is a picture of the third floor; is that correct?

A.   Yes.

Q.   The next picture?

THE COURT:  These are full exhibits?

MR. AIVALIKLES:  Yes, they are, your Honor.

A.    That's a picture of the third floor.

Q.    So you see that there's a sign on the wall, there's a rope, and then there's another sign.

Was that there on January 22nd, 2021?

A.    No.

MR. HILLIARD:  Objection, your Honor.

I think the question needs clarification as to what was there or not on January 22, '21.

THE COURT:  Sustained.

There are a bunch of signs there, and so there just needs to be some clarity as to what you're asking her about.

MR. AIVALIKLES:  Can you go to the next picture?

THE COURT:  Is there a way to zoom?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.

Q.    Do you recall the sign that has the 313 up there being there on January 22nd?

A.    No.  That wasn't there.

Q.    Do you recall that rope being there on January 22nd?

A.    That was not there.

MR. AIVALIKLES:  And can you zoom in on the sign, the white one next to the rope.

Q.    The sign says Authorized Personnel Only.

Was that sign there?

A.    No, that was not there.

Q.    And there's a door at the end of this hallway.

Do you know what that door is for?

A.    The straight-down door was to an AV office, and the door on the left is legal.

Q.    And, to your knowledge, was that hallway a public passage way?

A.    Yes.

Q.    And so then after you knocked on the door, what happened?

A.    Mindy Lloyd came and opened the door.  I could see her.  She could see me.  And I asked her if Attorney Neumann was in, and she wouldn't answer.

So the door opens out.  I just opened it the rest of the way and I came in.

Q.    Okay.  So that door then opened into the hallway; is that correct?

A.    Yes.

Q.    Okay.  And what happened then?

A.    I started calling for Attorney Neumann, and he stepped out, stepped to the door frame of the conference room.  He was in the legal office conference room, and he stepped to the doorway.

Q.    And what were his first words to you?

A.    You're trespassing.  You have to leave.

Q.    Did he say anything else?

A.    No.

Q.    Did you ask him -- did you tell him anything?

A.    Yes.  I explained why I was there.  I had the abatement applications in my hand.  I said I just wanted to get these date timestamped.  It had been a week.  I was concerned that my e-mail wasn't received, that it would be lost, and the offices I tried downstairs nobody was in.  I couldn't find anyone.

Q.    And did he tell you he was going to answer your questions?

A.    No.

Q.    Did he tell you that the legal office does not date stamp assessing records?

A.    No.

Q.    Did he offer to call to the person, the head of assessing, to find out if they had received it?

A.    No.

Q.    What happened next?

A.    I told him I was going to stay until somebody would stamp these applications or assist me, just help me, and I went into the lobby area, there were no chairs there, and I sat down against a wall.

42

And he went back into his office to work, she went to her desk, and he told her call risk management and let them know.

Q.    And what happened after -- when you said he told her to call, who is he referring to?

A.    Mindy Lloyd.

Q.    So after Mindy Lloyd got off the phone with risk management, what happened?

A.    She told him, I heard her say to him, I need to call the police.  They told me to call the police, risk management.

Q.    Did that happen?

A.    Yes.

Q.    And did you hear Mindy Lloyd's conversation with the police?

A.    Only part of it from one side.

Q.    What did you hear?

A.    I heard her say that there's a woman -- well, before she even said -- she said eventually there's a woman here in a purple jacket, we know her, we're familiar with her, she's involved in litigation issues with the city, and she won't leave.

Q.    Okay.  And was that the end of the conversation that you heard?

A.    No.  I mean, I heard her go on and tell her that

Attorney Leonard was in the office.  That she had come in. Because maybe a minute into the conversation Attorney Leonard came into the office.

Q.   And what was Attorney Leonard saying while Mindy was on the phone?  Do you recall?

A.   That I was threatening and hostile.  She repeatedly said that.

Q.   And did Mindy make those comments during the phone call after Attorney Leonard came in?

A.   Yes.  Attorney Leonard was saying it very loudly, and then at the end of the conversation I could hear Mindy Lloyd say that we find her threatening.

Q.   And did she indicate anything else about your conduct to the police at that point?

A.   Not that I recall.

Q.   Okay.  And then what happened?

A.   I waited.  Well, Attorney Leonard had come up to me right away when she came in and determined while I was sitting there that I was threatening and hostile, said repeatedly that I needed to leave, that I couldn't be looking in her office, I was a COVID threat.  There was just a lot of things being said, and I was worried.  I was worried about those statements.

Q.   Did you tell her why you were there?

A.   I can't recall if I told her, but I believe she

knew.  I do.

Q.    And did she indicate to you that legal doesn't date stamp documents for the assessors?

A.    No.

Q.    Did she answer any questions that you had of her?

A.    No.

Q.    Did she offer to help you?

A.    No.

Q.    How many times did she tell you you had to leave, you were trespassing?

A.    Oh, I'm going to say, like, three times.  Two or three times.

Q.    And did the police come?

A.    Yes.

Q.    And what happened when the police came?

A.    It was about -- they came in a little sequence.  I think three arrived, then one arrived, and then another arrived.

When they were first there, it was Officer Roach that was taking the lead, and he went and talked to Attorney Leonard.  I did not hear anything being said.  It was very quiet.  And then he -- he had a little notepad that he was taking notes.  Because he came over to talk to me and he closed his notepad and put it away.  He didn't write anything down that I said.  It appeared he took notes for her

conversation.

Q.   Okay.  What did you tell him?

A.   I told him why I was there.  I was just trying to get these applications stamped.  I was very frustrated.  The city wouldn't respond to me.  All my stuff was being shuttled into the legal office and delayed.  I had been trying to communicate with them, and I was concerned these abatements would be lost.

Q.   And what happened after that?

A.   He explained to me at one point I think while -- I know it was while I was in the office.  He said, oh, well, this is an appointment-only office.  I had no idea.  I said, what do you mean it's appointment only?  It's never been appointment only.  He said, well, apparently there's a sign when you come in that says appointment only.

So when he asked me to leave, which I did, I asked him if I could go out the way I came in.  I wanted to see the sign.  And he said, no, and he took me out another door that was on the side of the conference room, and I had to go that way.  So I couldn't verify.

Q.   So before you left, though, what did he tell you about what he was going to do?

A.   It wasn't clear at that point, but he said you need to make an appointment.  To come here, you need to make an appointment.  And he kept saying an appointment is required.

And I, not understanding, said it isn't.  I kind of said to him, I don't need an appointment for legal.  I've never needed an appointment for legal.

And that's when I learned about this sign.

Q.    Did you walk out with the police officer?

A.    I did.

Q.    Okay.  Did you have a conversation with the police officer once you were outside?

A.    I did.  I got in my car to leave, and I was concerned.  It really wasn't clear what was happening.  So I pulled my car over and I called the officer over and I said, exactly what am I supposed to do?  And he said, well, you're being trespassed, and he said, you need to make an appointment to come into city hall.  You have to make an appointment first.  Otherwise, you might be arrested.  And he said, I don't want to arrest you so just make an appointment.

At that point it wasn't clear to me that I couldn't be on the grounds.  I had to make an appointment to get into city hall, but I couldn't even be in the parking lot.  That wasn't clear to me.

Q.    Did any police officer tell you that you were under arrest?

A.    No.

Q.    So how did you feel once you left city hall?

A.    Pretty upset.  I mean, I was depressed.  I was

upset.  I left.  I didn't have those abatements stamped for those senior citizens.  You know, it was just -- I really questioned whether a sign was there.

When I was told I was, you know, trespassing, I thought it was me being targeted again.  Laurie, you can't be here, but anyone else can.  And I thought it was just directed to me.  Not that it was a general rule.

So I didn't have my stamped applications and, you know, I went home.

Q.    And did you speak to anyone once you got home about what happened?

A.    I did.  I talked to my neighbor, Kathleen, and I talked to Laura, my friend.

Q.    Did you speak to your husband?

A.    No.

Q.    Why not?

A.    Because I thought he would be just so upset.  He had watched what was going on and the difficulty I was having with getting information through city hall.  It was very stressful for him to see it, and I didn't want to create more stress.

Q.    So Exhibit 1, which is the e-mail Attorney Leonard should be fired, why did you write that?

A.    It says right at the beginning.  I had a depressing experience today when I went to city hall to see if I could

get some abatement applications stamped for receipt of records. I mean, I wrote it frustrated, depressed, all my difficulties for, you know, a year and a half with that assessing office, and with legal taking over everything was just, I felt like I couldn't get through it, I couldn't get the responses I deserved, and I felt like I wasn't being treated in a way a citizen should be treated.

Q. Did you brag in any way in that e-mail?

A. I don't think I did. I think I expressed my opinions, but I don't feel like I was bragging and boasting.

Q. What was the purpose that you sent it?

A. To let --

Q. Did you want Attorney Leonard fired?

A. Yeah, I felt that way.

Q. And did you ever get a response from the mayor or Attorney Bolton about her employment status or anything like that?

A. No.

Q. So after you went home, did you do any follow up with regard to getting the documents date stamped?

A. I did.

Q. What did you do?

A. The first thing I did was call the assessing office to leave a message that, you know, what happened to these applications, why haven't I heard.

Then I sent e-mails.  I sent a follow-up e-mail on the 22nd in the afternoon asking why I don't have a stamp.

Q.    Laurie, the jury is going to see these e-mails. They're 40A through M.

Can you just highlight the ones that you felt were important?

A.    Yes.  I'll do the best I can.

On the 22nd -- because it's a lot to put in my mind.  But on the 22nd after I e-mailed Rick Vincent, he e-mailed me back and he let me know that they had processed all the applications they had.  Everything had been processed, put on a spreadsheet, and was documented.

When I got that e-mail, I was shocked.  That meant he didn't have my applications.  And then I wrote back and said, how can that be?  I sent you this e-mail on the 17th and I attached the header and I attached the records.  How could you not have them?  I know abatements have been lost.  I know there's e-mail problems.

And so -- he then wrote back and said -- this was on the 22nd -- you did not sign the applications.  You didn't do them properly.  That was at the end of the day.

And I was, again, shocked by that.  So I e-mailed back and said, my apologies.  This was almost 5 o'clock.  I thought I was wrong.  I said, oh, my apologies.  I'm sorry.  I will get these to you.

After business closed, I think around 5:50 that day, I looked at those applications and they were signed. Everything was right about them.

So I took the original applications, I wrote a word on it, I put the cover page, and I rescanned them and I sent them.

I called in the morning, the next morning, and I said, just to let you know -- Monday morning I called. Because that was a Friday. I said, just to let you know, I sent you signed applications. They were done.

And I didn't hear anything back. Ten days later I followed up on February 2nd. I said, it's unbelievable to me that in ten days you have not given me these documents that took just a minute to do. I still don't have the receipts for these senior citizens.

And then he wrote back, followed up again, and said, oh, my apologies. I'm working on it. I'll get these to you.

And then he sent them on the 3rd and he sent them with a stamp.

Q.   What was the stamp that was on the documents that you received on the 3rd?

A.   The actual assessing office stamp was --

MR. AIVALIKLES:  Can you pull it up, please?

A.   It was February 3rd he sent those.

Yes.  You have it right there.  That's what I got.

Q.    Okay.

A.    And it has a stamp on the side, somewhat faded.  It was from the assessor's office.

MR. AIVALIKLES:  Could you zoom in?

A.    And it was stamped February 3rd at 8:33 in the morning, and then he crossed it out and he wrote January 22nd and he put his initials, Rick Vincent.

Q.    And January 22nd was the day you were at city hall?

A.    Yes.

Q.    But that wasn't the day you filed it with the city, was it, January 22nd?

A.    No.  I filed on the 17th, and I got them back the 3rd of February.

Q.    And how do you know that that is the exact abatements that you sent on January 17th?

A.    The very last page to this set of documents, right there, it has a title on it if you go above, I wrote in handwriting 28 Baltimore.  When I sent them on the 17th, I took the instruction page and I handwrote the address of each one.  18 Baltimore and 28.

When I resent them on that Friday because he said they weren't signed, I took that page and I wrote the word "rep" on it, and that's in the exhibit.  You're going to see I handwrote "rep" on that one, but that's not the one they sent

me back.  They sent me back the original one that I had filed.

Q.   So after you got this back, what did you do with regard to the abatement request?

A.   I thought I was done, but he e-mailed me again.

Q.   What did he say?

A.   He e-mailed me on the 5th and said I didn't attach the records right, which I believe I did.  I had them.  So he resent them.

And then he said you didn't get a letter from the property owners authorizing you to represent them.

MR. CULLEN:  Your Honor, objection.

May I be heard?

THE COURT:  Yes.

(SIDEBAR)

MR. CULLEN:  We've been talking for quite some time about e-mails between Mr. Vincent and Ms. Ortolano that postdate the incident.

I don't think there's any suggestion the legal department handled abatements or handled any of these e-mails. It doesn't look to me, looking at the one on the screen, that they're even copied on them.

I'm just not sure that this -- I don't see the relevance of her ongoing beef or timeline with Mr. Vincent as to what our clients did.  So I would object to this.

MR. AIVALIKLES:  Your Honor --

THE COURT:  Whisper in very close to the mic.

MR. AIVALIKLES:  I'm trying.

THE COURT:  You could use that one, I think, if it's easier.

MR. AIVALIKLES:  Sure.

Your Honor, the full exhibits that she's talking about -- the 40A through M that she's talking about are in those admitted exhibits.

THE COURT:  All right.  Can you hurry along?

MR. AIVALIKLES:  I'm trying.  I'm trying.

THE COURT:  Objection overruled, but I would like you to hurry along.

MR. AIVALIKLES:  I'm trying.

(CONCLUSION OF SIDEBAR)

Q.   The application that you received when you got the form, did it indicate that a letter from the owner was required?

A.   No.

Q.   Okay.  So did you get a letter from the owner?

A.   I did.  I went on the 7th and I got letters signed, I e-mailed those letters to the chief, and that was the end of it.

Q.   And why did you get the letters if they weren't required?

A.   Because I didn't want to fight anymore.  I didn't

want to argue.  I wanted these things processed.  It was now three weeks that I was trying to get these finalized, and I just wanted to move forward.

THE COURT:  We're going to take our morning break at this point.  People have coffee in the morning, I know, and can probably use a moment.  So we'll take a ten-minute break.

MR. AIVALIKLES:  Thank you, your Honor.

(IN COURT - NO JURY PRESENT)

THE COURT:  Do you need to go to the restroom?

THE WITNESS:  Yes.

THE COURT:  Feel free.

Two things.  Date stamp, that has been repeatedly said in this case, and there's a difference between a date stamp, as I understand a date stamp, and another -- and the assessor date stamp or legal's date stamp, and I think there's some confusion around that.

I think that counsel are very familiar with what you're referring to, but I think that -- she keeps saying I want a date stamp.  Is she asking for just a date to be placed on a document or is she asking for a legal department date stamp?  And, again, I think that that is -- there's confusion around that.  And that came up with respect to the exhibit that you did not introduce, nor did you show to counsel, and that ultimately is something that I am confused about as well when you refer to date stamps.

So I just ask you to clarify that.  Especially as you are objecting to evidence that I haven't seen.

At no point in this trial going forward will you approach -- ask to approach with a document that the other side hasn't seen yet.

MR. AIVALIKLES:  Yeah, I realize that was a mistake, your Honor, and I should know better.

THE COURT:  Okay.  And I assume that they've seen it, and I of course am allowing you to approach, but ultimately they start hearing testimony about something, they presume that it's an exhibit that they've seen, that's just not the way to handle a trial.  And ultimately with regard to cross-examination on that, they're going to have free rein.

Speaking of cross-examination, we were supposed to be at cross-examination and we have not heard any testimony at all on damages yet.  And I am going to rein you in because you need to get the evidence in and they need to have an opportunity to cross-examine, and we have witnesses coming in in the afternoon.  So ultimately I'm just going to ask you again to move along.

Let's everybody take a brief break, get to the restroom, and then we'll proceed.

Anything else?

You look like you wanted to say something, Attorney Hilliard.

MR. HILLIARD:  I do, your Honor, along the lines you just mentioned.

We're going to have an objection to the recently disclosed Exhibit 88 which are the plaintiff's checking account records that show checks to four different lawyers in 2021 and '22, and there's no --

THE COURT:  You haven't seen those?

MR. HILLIARD:  Oh, no, we've seen them.

THE COURT:  Okay.  All right.

MR. HILLIARD:  Exhibit 88 was added at the same time 40A through M came in.

THE COURT:  Okay.

MR. HILLIARD:  But I'm just telling you that --

THE COURT:  You're going to object when those come up?

MR. HILLIARD:  They're being displayed right now. That's all we have on this subject.  There was nothing produced in initial disclosures or in discovery responses about these legal bills.

THE COURT:  Okay.  So you're going to be objecting on grounds of you haven't seen them, they weren't provided to you in a timely manner, on a Rule 26 objection or --

MR. HILLIARD:  In part, but more directly, and I'm sure the Court is familiar, we often have attorneys' fees as damages or components, and we always have something more than

cancelled checks in round numbers that appear to be retainers over a two-year period to four different attorneys.  There's no bills, there's no itemization for what was done, and the time frame -- as you recall, the arrest was in early '21 and resolved in the summer of '21.  We've got a couple of checks that postdate that significantly.

There's just not sufficient information to have this come into evidence.

THE COURT:  Okay.  Thank you for that.

MR. HILLIARD:  I wanted to alert you to that.

THE COURT:  All right.  Thank you.

I will hear you at the time.  I want to give everybody an opportunity to go to the restroom, and then we'll put Ms. Ortolano back on the stand.

MR. AIVALIKLES:  Your Honor, if you can give a little more time only to allow me to pare down the questions?

THE COURT:  Yes.  I'm asking you to speed along.

MR. AIVALIKLES:  Yeah.  And if I could just during this break have a few minutes to really go through it so I can really narrow it, that would be great, your Honor.

THE COURT:  All right.  Well, let's tell the jury we're going to give them ten more minutes.

All right.  We'll give you ten more minutes.

MR. AIVALIKLES:  Thank you, your Honor.

(RECESS)

THE CLERK:  This Court is back in session.

Q.    Laurie, you're still under oath.

A.    Okay.

Q.    When were you informed that you were going to be charged with the offense of criminal trespass?

A.    When my attorney called me on the 18th of February.

Q.    And was there an arrangement made with the police and your attorney that you would have a couple days before you turned yourself in?

A.    Yes.

Q.    And what did you do?

A.    Immediately went and turned myself in within probably a half hour.

Q.    And why was that?

A.    Because it was stressful, and staying home and waiting a couple days was just -- would have just eaten at my mind and made it much worse than what it was going to be.  I just wanted to get it behind me.

Q.    And describe your experience once you got to the police station.  What happened?

A.    I reported to the receptionist, and an officer came out and walked me in through a side door which I would call the booking area.  I was immediately handcuffed and taken to the photograph -- I was frisked, and then I was taken to the photograph and I would say the booking counter where they take

your belongings and take your picture and ask you -- make you answer a drug questionnaire and a mental fitness questionnaire.

Q.   Then what happened?

A.   I was taken to a jail cell because they needed the bail officer to come.  So they removed my handcuffs and put me in a cell probably for 20 minutes or so until a bail officer arrived to issue a bail statement to me.

Q.   And what happened after that?

A.   I paid $40, and I was given a piece of paper handwritten what my bail condition was.  That I had to stay off city property for a year and I couldn't go to city hall without an appointment.

Q.   What impact did the arrest have on you?

A.   It was huge.  I mean, I was pretty upset.  I mean, I didn't think it was justified.  I didn't think my actions warranted that.  I lost a lot of sleep.  I gained a lot of weight.  I developed a lot of respiratory and stomach problems.

MR. HILLIARD:  Objection, your Honor.

THE COURT:  Sidebar?

MR. HILLIARD:  Sidebar, yes.  I'm sorry.

(SIDEBAR)

MR. HILLIARD:  Your Honor, there's not going to be any medical or other expert testimony about respiratory

problems as a result of the arrest.

MR. AIVALIKLES: There's no medical expert that would testify to that. She could certainly testify what she experienced physically as a result of being arrested.

THE COURT: You're telling me that medical expert testimony is required for her to be able to testify personally as to her own -- the physical effects of the stress, et cetera?

MR. HILLIARD: Well, I don't have that issue with respect to general testimony about being distressed, but to link some alleged respiratory problem to this incident requires some kind of expertise.

THE COURT: Okay. I think I understand the objection. It's overruled.

Go ahead.

MR. HILLIARD: Thank you.

(CONCLUSION OF SIDEBAR)

Q. Can you tell the jury what else you experienced as a result of the arrest?

A. I was -- the newspaper articles were so damning in my opinion on my, you know, intent, my hostility, and my threatening nature, and comparing me to a J-6 person and being unstable, I worried about my own safety. I didn't walk my dog at night. I -- you know, I didn't go to -- I would go to city hall, but I would try and take a friend with me if I made an

appointment.

At that time I really didn't make appointments. I went in a couple times, but I avoided it altogether. I didn't make any appointments when I was trespassed until I was arrested, and I generally avoided it altogether. You know, it was very stressful.

Q. Did your husband buy you some sort of protective measures?

A. Yes. He bought a body cam for me. He wanted me to wear a body camera when I went into city hall and record everything and all interactions so I would have some protection.

Q. And what was the response from the city employees?

A. They did not like it at all, and I understood, especially entry-level employees that I felt were making very little money just trying to do service, and I ended up stopping wearing it. I wore it for a short time, and I took it off because I didn't want them to feel uncomfortable.

Q. What were your plans in terms of your involvement in the community had this arrest not occurred?

A. Well, you know, I had been involved with -- I had done a lot of tutoring when I homeschooled my kids. There were some schools very close to me. I wanted to tutor children again and go back to my math tutoring. I thought I could get into that. And I felt like that door closed. You

know, I had an arrest now, and I just -- I felt like my community involvement -- or being selected to serve on any kind of state board was now tarnished because of how I was portrayed, and I was portrayed pretty terribly at the time in January when I was compared to what was going on in the country. I didn't expect people to look at me as a favorable candidate for anything.

Q. But you did get the First Amendment Award by the Nackey Lobe Foundation, correct?

A. I did.

Q. Did you get nominated for any state board positions after the arrest?

A. I think it was after the arrest when they worked on the legislation -- actually, there was an open seat on the Assessing Standards Board, and the governor nominated me for that position.

Q. Who was the governor?

A. Governor Sununu.

Q. And what happened with your nomination?

A. It ended up being pulled. Because it was a split political Executive Council five-member board and I wasn't favored to be a candidate, it was never brought forward.

MR. HILLIARD: Excuse me, your Honor.

Sidebar, I guess. Thank you.

(SIDEBAR)

MR. HILLIARD:  I will check it, but I'm reasonably sure that the event she just described took place in 2020. Well before this incident.  I will need to go back and check the discovery responses to be sure.

THE COURT:  Okay.  This occurred before the arrest?

MR. AIVALIKLES:  I asked her when it occurred, and she said after.

THE COURT:  Okay.  All right.  Well, it's cross-examination.

So go ahead.

MR. AIVALIKLES:  Thank you, your Honor.

(CONCLUSION OF SIDEBAR)

Q.   Have you done any reflection upon the arrest itself and that impact?

A.   Can you kind of rephrase that?  I'm not certain what you're asking me.

Q.   How did you react to the fact that what you did was characterized as a crime?

A.   It made me feel terrible.  I mean, I was in city hall.  I left when the officers told me to leave.  They said there was -- you know, I wasn't going to be even investigated. There was no issue here.  One of the officers even stated it was ridiculous when they were called in.

And I ended up, you know, a month later being arrested.  And I was a criminal, and they wanted to put me in

jail for a year. I was really, really concerned about that. Especially knowing it was city lawyers who were making those claims.

Q. And after your arrest did you post a number of articles on social media?

A. I did. I posted the main one, and then I did -- after the arrest is when my writing became more prolific.

Q. And what was the purpose of writing those?

A. It was really helpful to me. I could go out to my own sites. I could express my opinion. I didn't think any of what was going on was right in city government. I was still focused on assessing records.

I wasn't getting the office to be very receptive on opening records. I didn't think my city leaders, namely my attorneys, my mayor, were open to criticism at all.

And so when I wrote in private pages, it was my outlet. And, honestly, it was almost therapy for me. It gave me a place to go where I shouldn't have been criticized for doing it.

Q. Before I forget, when you were requesting a date stamp, what were you asking for?

A. Just a receipt. Something that showed the assessing office -- or the document was received by the city. The assessing office policy was to stamp it in their machine and give that back to you because the application tells you to

make certain you have a receipt, and that was their policy. They put a stamp on it. I don't care who puts a stamp on it. I just needed the receipt for proof. That's all.

Q. Thank you.

Did you have to pay for an attorney to defend you in the criminal matter?

A. Yes.

Q. And what attorney did you first hire?

A. Attorney Sisti.

Q. And do you recall what you paid Attorney Sisti?

A. I think it was around $3,500.

MR. HILLIARD: Objection, your Honor.

THE COURT: Okay. Sidebar.

(SIDEBAR)

MR. HILLIARD: Your Honor, as I indicated before, there was no information about legal expense in the initial disclosures or even in response to discovery requests which asked for any documents with respect to claimed damages in the case. The only documents we received were some sort of counseling records.

THE COURT: Okay.

MR. HILLIARD: But those were withdrawn.

THE COURT: Okay.

MR. HILLIARD: And then we did receive what's Exhibit 88 just before the final pretrial conference, your

Honor.

THE COURT:  Okay.

MR. HILLIARD:  And all that is is some bank records showing a credit card charge and I think three or perhaps four checks to different attorneys.

THE COURT:  Okay.

Let me just ask you, Attorney Aivalikles.  You were asked in discovery to provide everything that was going to support your damages claim, and they're saying to me that you did not provide the itemized bills from the lawyers?

MR. AIVALIKLES:  Your Honor, unfortunately, I was not on the case at that time so I don't know what the documents were that were produced.

I can tell the Court she did not get any --

THE COURT:  Whisper.  Whisper.

MR. AIVALIKLES:  I'm sorry.

She did not get any itemized bills from any attorneys.  She paid them lump sums, and those checks indicate what she paid.  And she can certainly testify that she paid attorneys and how much she paid.

THE COURT:  So there were four attorneys that did not send her itemized bills?  That's what you're telling me?

MR. AIVALIKLES:  Yes, your Honor.

And one of the attorneys has some issues.

MR. CULLEN:  Frankly, that's a different attorney.

That's a different matter.

MR. AIVALIKLES:  Right.

THE COURT:  My concern is they asked for the evidence to support the claim of damages, and attorneys' fees would be a legitimate claim.  But to send them simply checks, how are they going to cross-examine her on this?  How are they going to have the evidence to cross-examine her about this money and what was done to bill her for that.

MR. AIVALIKLES:  Unfortunately, she can't force the attorneys to send them an itemized bill.  It was on a lump sum flat fee case.

THE COURT:  So you're telling me that she wrote -- there's no fee agreements?

MR. AIVALIKLES:  Not that I'm aware of.

There is an e-mail that she sent to Attorney Goulden I think acknowledging the check that was being paid.

THE COURT:  Okay.

Go ahead.

MR. HILLIARD:  What he's referring to there is Exhibit 77, which is an e-mail from her to Attorney Goulden, saying I'm sending you the whole $5,000, and there's some other stuff we can talk about later.

But the other aspect of this, your Honor, is all these '21 and '22 charges add up to in excess of $10,000, which is just another reason I question the submission.

THE COURT:  Let me ask you this.  Attorney Sisti, was that a flat fee, 3500?

MR. AIVALIKLES:  That's what she paid him, yes, your Honor, as far as I know.

MR. HILLIARD:  I'm hearing that for the first time.

THE COURT:  Go ahead, Attorney Cullen.

MR. CULLEN:  We know from a very recent order that just came out, and the plaintiff is well aware, that attorneys are supposed to provide backup for their bills.

It appears that she paid -- the checks suggest she paid Sisti $3,500 as a flat rate, which would not necessarily be outrageous for a criminal trespass, but then she turned around and paid $5,000 to Tim Goulden for presumably the same work.

We have no way of knowing whether Sisti got his money back because we don't know if she requested -- we just don't know anything about this, and we didn't have an opportunity to ask her at deposition because none of this stuff had been produced.

THE COURT:  Yeah, I'm not going to allow this. This is not how it works.  It's not remotely credible to me that there wasn't a way for you to somehow gather evidence to support the claim with respect to these damages.

I'm not clear on how they can even cross-examine her specifically on a check she wrote.  There's nothing that

they have to challenge that.

MR. AIVALIKLES:  I understand what the Court is saying, your Honor, but I think she can still testify she paid her criminal attorney 3500, she paid the second criminal attorney $5,000.  She has a right to testify to that.  Maybe it doesn't mean that the checks are proof and come in as evidence, but she can certainly testify about it.

MR. HILLIARD:  That doesn't get us anywhere in terms of evidence of an element of damage, your Honor.

Is it possible to display Exhibit 88?  It's for ID.  I want to make sure the Court --

THE COURT:  I think I got the gist.

MR. HILLIARD:  You got it.  Okay.

THE COURT:  Clearly this is admissible testimony if there had been proper discovery and proper disclosures, and I understand you're saying you were not part of the initial process, but ultimately they could have asked her all kinds of questions at the deposition had they had these checks before the deposition, but they didn't even have the checks before the deposition.

So at this point it's really, frankly, a matter of a discovery violation more than irrelevance or prejudice because it's clearly something that I would allow her normally to testify about, but I've got to obviously give them an opportunity to cross-examine her on the basis for that number.

She paid it, but ultimately they have a right to cross-examine her to establish that that was not really earned, et cetera.

So at this point I am going to disallow it.

The objection is sustained.

MR. HILLIARD:  Thank you.

(CONCLUSION OF SIDEBAR)

Q.   So, Laurie, the articles that you wrote that are full exhibits -- that have been made full exhibits by the city --

THE COURT:  Can you move that microphone closer to you?

MR. AIVALIKLES:  Sure, your Honor.

THE COURT:  Go ahead.

MR. AIVALIKLES:  Thank you, your Honor.

Q.   And those would be LL, DD, Z, and there's others.

Were those truthful?

A.   Yes.

MR. AIVALIKLES:  Can you bring up Exhibit 64?

That's for identification.

THE CLERK:  Hold on.

That's for ID, correct?

MR. AIVALIKLES:  Yes, for ID.

Q.   Do you recall getting a letter from Celia Leonard with a copy to Attorney Bolton about a training manual?

A.   Yes.

MR. HILLIARD:  Your Honor, objection.

Your Honor, sidebar.

(SIDEBAR)

MR. HILLIARD:  Your Honor, a couple of things about this that are objectionable.

Number one, it's about six months after the incident in question.  And, number two, this is in the -- well, this has to do with the plaintiff's Right-to-Know requests.

But predominantly, your Honor, with respect to 64 and 65, my objection is that this is well after the incident in question, and, therefore, it doesn't bear on any of the issues in the case.

THE COURT:  Go ahead.  Tell me why you're introducing -- whisper really close to the mic.

MR. AIVALIKLES:  I'll try, your Honor.

It had been right around the time that her case was disposed of.

And the next exhibit is --

THE COURT:  Her case?

MR. AIVALIKLES:  Her criminal case, yes.

THE COURT:  Okay.

MR. AIVALIKLES:  And the next exhibit, your Honor, is an e-mail by Attorney Bolton threatening to arrest her if she showed up at his office.  The e-mail, it's tied to Exhibit

64.

MR. CULLEN:  Your Honor, you already ruled on this and determined that the defendant's actions towards her after she was arrested and after she published all these other things about her were not relevant to either her conduct beforehand that might have triggered them to act in some way to cause her arrest or to her damages.

I don't see how -- this seems like a sideways way around that to try to establish somehow that they have some animosity.

And granted, you know, she had written an awful lot of further things after the arrest, and I think that's why you kept these out in the first place.

THE COURT:  All right.  He's not going into this July 22nd incident or encounter.  That I did prohibit.  He is telling me that this is concurrent with the disposition of the criminal case.

Isn't that accurate, the time frame?

MR. HILLIARD:  I don't have any reason to dispute that, your Honor.

THE COURT:  Okay.  All right.  I'm going to allow this on a limited basis, but go ahead.

MR. AIVALIKLES:  Thank you.

THE COURT:  The exhibits will be full exhibits.

MR. HILLIARD:  And, your Honor -- oh.

Excuse me, your Honor.  Your Honor, just one more.

I'm sorry.  When you say on a limited basis, are you going to instruct the jury in that regard?

THE COURT:  I'm letting Attorney Aivalikles know I want him to quickly move through this and that it's a limited line of examination.

MR. HILLIARD:  Thank you.

MR. AIVALIKLES:  Thank you, your Honor.

(CONCLUSION OF SIDEBAR)

MR. AIVALIKLES:  64.

THE CLERK:  You're admitting that, right?

MR. AIVALIKLES:  Yes.  That's a full exhibit.

Correct, your Honor?

I'm sorry, your Honor.  The issue from the clerk is is this a full exhibit.

THE CLERK:  It's showing.

THE COURT:  Let me just explain to the jury so you know this process and the language we're using.

Marked for ID means that I've got to make some legal rulings before you get to see it.  I'm the gatekeeper as the judge.  You are the fact finders, but I am the gatekeeper with respect to the legal issues.

So marked for ID just means it's not going to -- you're not going to see it on the screen.  The witness can see it because the witness is going to testify about it, and then

I decide whether ultimately it becomes an exhibit.  That's the different language, and that is how that works.

The other thing in terms of language is we say sidebar because ultimately in the old days lawyers used to come to sidebar, as I explained to you earlier in the case, and it took a long time to do that.  So every time you hear the word sidebar and hear us do this, be relieved that they're not coming up to sidebar and taking that extra amount of time.

That's my positive spin for the day.

So full exhibit.  The jury gets to see it.

Go ahead, Attorney Aivalikles.

MR. AIVALIKLES:  And, your Honor, I believe you said 65 was going to be a full exhibit.

THE COURT:  Both of these exhibits, yes.

MR. AIVALIKLES:  Okay.  Can you bring up 65, please?

(Plaintiff's Exhibit Nos. 64 and 65 Admitted)

Q.    The response you got was from Attorney Bolton to your request; is that correct?

A.    Yes.  It was sent to -- I sent the request to Attorney Bolton and Leonard, I believe, and he responded back to my attorney.

Q.    And what did he respond on July 5, 2025?

A.    He said that if I appeared at his office on Wednesday or any day, she risks arrest.

And my request was to just view records in the city clerk's office, the public area.  I just wanted to go to the clerk's office to review a manual.

And the response was:  If Mrs. Ortolano appears at my office on Wednesday or any day, she risks arrest.

Q.    Thank you.

MR. AIVALIKLES:  If you can pull up Exhibit 66?

THE COURT:  66 is ID at this point?

I'm sorry.  Are you pulling up an exhibit for ID or --

MR. HILLIARD:  It's a full exhibit, your Honor.

THE COURT:  It's a full exhibit.  Okay.

Q.    So is 66 a letter you got from a Sue Lovering?

A.    She was the head of the clerk's office.

Q.    Okay.  And were you requesting information from the clerk's office?

A.    I went there, yes, to try and get records.

Q.    And were those records held by the clerk's office?

A.    Yes.  I believe so.

MR. AIVALIKLES:  And can you go to the end?

THE COURT:  Can I just ask a quick question?  We're going back in time.  Was that --

MR. AIVALIKLES:  No.  This was February --

THE COURT:  Can you start with maybe the dates of these things and just orient us?

MR. AIVALIKLES:  I can because they're up there.

THE COURT:  Okay.

Go ahead.

A.    It was on February 2nd of 2022 that I went to the clerk's office to try and get public records, and she wrote me a letter back and sent it to the legal department.

MR. AIVALIKLES:  And could we go to the last page?

Q.    And what did she indicate in the last sentence?

A.    She made it sound like I wasn't there for legitimate business.  She said, we won't engage with any person and further subject themselves -- they wouldn't subject themselves to abusive behavior.  Appropriate steps may be taken by employees to disengage from abusive behavior.  If you're not present in a clerk's office to conduct any legitimate business and you refuse to leave, your conduct will be immediately reported to law enforcement.

Q.    And did a copy of that go to the legal department?

A.    Yes.

Q.    And were you abusive at all to the employees in that office?

A.    No.

Q.    Just one final question, Laurie.

If you had been offered assistance when you went to the legal office on the 22nd rather than being told, leave, you're trespassing, what would you have done?

A.   If I hadn't gone there, I would have had my application stamped.  Hopefully, you know, I wouldn't have had to go there.  I would have had a stamped application.  I wouldn't have been, you know, trespassed, subsequently arrested, put in handcuffs, processed out as a criminal, you know, watched those terrible articles appear in the newspaper, three of them, and I would have not had any of these problems that resulted into a lot of additional legal issues with me and threats of potential arrests for my conduct.

MR. AIVALIKLES:  Thank you.

Your Honor, I have nothing further.

THE COURT:  All right.  Thank you, sir.

All right.  Now it is time for cross-examination.

Attorney Hilliard.

MR. HILLIARD:  Thank you, your Honor.

May I just have a moment to get organized?

THE COURT:  You may.

(Pause)

MR. HILLIARD:  I think I'm ready, your Honor.

THE COURT:  Go ahead.

CROSS-EXAMINATION

BY MR. HILLIARD:

Q.   Good morning, Ms. Ortolano.

A.   Good morning.

Q.   I'm going to go out of order, if you'll bear with

me for a moment.

MR. HILLIARD:  Can we look at Exhibit UU5, please?

Am I close enough to that mic, your Honor?

THE COURT:  You could be closer.

MR. HILLIARD:  It doesn't pull out much further.

THE COURT:  Can everybody hear?  It's important the jury be able to hear and all counsel.

MR. HILLIARD:  The fifth picture near you.  The next one.  That one.

Q.   We were looking at this just a little bit ago this morning, Ms. Ortolano?

A.   Yes.

Q.   And your testimony was that the sign that says 313 legal department by appointment only with the phone number was not there on January 22, 2021; is that right?

A.   Correct.

MR. HILLIARD:  May I have Exhibit B, please?

This is a full exhibit, your Honor.

Q.   You've seen this exhibit, Ms. Ortolano?

A.   Yes.  It was a Right-to-Know request I put in for.

Q.   Oh.  So you've had it for sometime?

A.   No.  I actually put it in in 2024, and the city responded and gave me that record.

Q.   Well, now it's a defendant's exhibit in the trial, right?

A.    Yes.

Q.    Exhibit B.  And it's an invoice from a sign company, correct?

A.    Correct.

Q.    And it's dated July 10, 2020, correct?

A.    Yes.

Q.    And there's one, two, three signs that were purchased there, and one of them said legal department by appointment only with a phone number, correct?

A.    Yes.

Q.    And that was more than six months before January 22, 2021, correct?

A.    Correct.

MR. HILLIARD:  And then may I have Exhibit 47, please, at page 9?

47 is a full exhibit, your Honor.

Q.    Showing you page 9 of Exhibit 47.

And this is Officer Roach's investigative report; is it not?

A.    Correct.  On February 3rd.

Q.    Right.  And he talks about that sign and observing it when he was there to interview Mindy Lloyd, correct?

A.    Correct.

Q.    "It should be noted I did observe on the entrance to the legal department signage which read 313 legal

department by appointment only and the phone number."

Correct?

A.    Correct.

Q.    And that's exactly what the sign reflects that was in the photograph we looked at a minute ago?

A.    But that sign wasn't mounted on that wall.  It was mounted, if you read the description here, at the door.  It was in the hallway when you went down.  They moved that sign in 2024 to the wall.

Q.    But it was there at the door that's the entrance to the legal department on January 22, 2021, wasn't it?

A.    Well, you put up a picture -- just to be clear, your picture was the hallway blocked off with a rope with a sign on the left and a sign on the right.

MR. HILLIARD:  Let's go back to UU5, please.

A.    Just -- I want to be clear.

MR. AIVALIKLES:  Your Honor, could we have a -- can she be allowed to finish answering the question?

MR. HILLIARD:  I didn't intend to interrupt her, your Honor.

THE COURT:  I don't think he intended to interrupt.

Go ahead and finish.  I think you finished.

A.    If you can bring that picture back up, just that one picture, just so I'm clear with you.

That sign right there on the wall was not there in

2021.

Q.    But it was on the wall next to the door down the hall?

A.    Down the hallway next to the door.

There was no doorbell.  There were no baskets either at that time.

Q.    But it was right where you were standing when you knocked on the door?

A.    No.  I mean, I didn't see the sign or notice that the sign had been changed.  Because the sign before that time said legal department room 313.

You're right.  I learned in 2024 that the sign was changed, but I did not see that sign.

Q.    Even though it was right next to the door you were standing in front of?

A.    Because the door had a big, red sign on it.  The door has a big, colored-red piece of paper.  So when you go down that hallway -- and, mind you, a sign is against -- flush to the wall.  So it's not like you're walking down the hallway and you see the sign looking at you.  It's flush to the wall.

When you come to the door, there's a big, red piece of paper taped on the door that says, it's a caution, beware, the door opens out.

The thing you really look at is the door opens out and you're going to get hit by it.  That's what I noticed.

And, quite frankly, I knew that sign was there in 2018 when I went to the legal office because I didn't know the building well.  Signs help you figure out where an office is. When I was told by somebody in assessing go up and talk to legal, and I went up and I had to find 313, I looked at the sign that day and I knew I was at legal.

Any other time I went to legal, the other eight or ten times, I never looked at the sign again.  I knew where it was.  So I didn't notice.  I had no idea you changed the sign. I did not anticipate that.

Q.    The very first thing Mindy Lloyd said to you was, do you have an appointment.

A.    She didn't say it's by appointment only.

Q.    Did she ask you if you had an appointment?

A.    I don't know if she said that immediately or until I was in the hallway.  Whatever she said she said is fine, but she didn't say our sign on the door says appointment only.  I learned that from the police as I was being led out, and I wanted to go out that way.

And, by the way, your invoice might be in July, or June, but it doesn't tell me when they put it on the door. The officer went on the 3rd and got a statement.  I don't even know if that was the sign mounted there.

Q.    You said there was a sign mounted by the door on January 22.

A.    I didn't see the sign, but that's where the sign would have been.  That's where -- I didn't notice the sign. Because once I figured out how to get to the legal office two years earlier, I didn't read the sign.

Q.    Ms. Ortolano, I've got a few questions about the period of time before January 22.

A.    Sure.

Q.    You in fact did file many Right-to-Know requests with the city of Nashua and its various departments?

A.    Mostly focused on assessing, yes.

Q.    But many of them?

A.    Yes.

Q.    And we've already heard -- and, excuse me, some of those turned into lawsuits in the superior court?

A.    At the time of this arrest there was one Right-to-Know lawsuit and there was one abatement represented by an attorney.  That was it.

Q.    And you already got my next question.

      You had your tax abatement case about your own property?

A.    Yes.

Q.    And you had tax abatement cases for others?

A.    Those were not represented by anyone, by myself, and they were not -- they were just abatements.  They weren't appeals.  Yes, they were abatements, but those were

represented by me, not by a lawyer.

Q. Yeah. And you already indicated yesterday that early on you and Mr. Bolton apparently got along all right?

A. At the very beginning.

Q. And then you had some meetings in the legal department back in that time frame, '18, '19, '20 maybe?

A. Well, I went up there -- I think I detailed it out. Initially, I went up and had meetings with him in his office and in the conference room, and then I was less frequent but I would go up to try to get records or ask them about a document request, yeah.

The last visit I had was an exhibit shown when I tried to get my abatement file in January of 2020. I believe that was the last time I had gone up to legal until January 22nd of 2021 because COVID hit by March and we were on a whole different protocol, and I wasn't going in much.

MR. HILLIARD: Can we go back to Exhibit 34, please?

Q. This is the exhibit from your visit there in January of 2020. It's a full exhibit. We looked at that a few minutes ago, didn't we?

A. This was to Mayor Donchess, yes.

Q. Yeah. And that was the last time you were in the office, legal department office --

A. Well, that's what I recall.

Q.    -- before January 22, 2021, correct?

A.    I believe so.

Q.    And at that time you were told to leave, correct?

A.    No.  He actually helped me.  I mean, he assisted me and told me I couldn't have my file and that I had to have my attorney contact the legal office to get the public file, and I left.  I mean, I wasn't -- he wasn't going to give me the records I wanted so I was able to talk about the records I wanted, and I left.

Q.    And the matter you were talking about was one in which you were represented by a lawyer?

A.    But it was the public file.  The lawyer --

Q.    I'm sorry.  Finish your answer.

A.    It was just -- it wasn't the appeal file.  I just wanted the public abatement file.  That's why my lawyer said go get it so he didn't have to charge me.

Q.    Your lawyer in the abatement case?

A.    Yes.

Q.    A prior year, 2019, you had a meeting in the legal department that involved Ms. Kleiner and Attorney Bolton, correct?

A.    Yes.

Q.    And there you were discussing some general assessment issues, correct?

A.    Yes and no.  It wasn't the meeting that I believed

I was going to have.  I was supposed to meet with assessors down in the legal office.  And when I came -- it was set up that way.  And when I came to city hall, Director Kleiner changed the meeting, told me I was going to be in a different office, escorted me up two flights of stairs.  I ended up at a back door unknown to me in the legal office.  I did not know at the time I was even in the legal office.

Q.    But in any event, out of that meeting you filed an ethics complaint against Mr. Bolton?

A.    I did.

MR. AIVALIKLES:  Objection, your Honor.

THE COURT:  Sidebar.

(SIDEBAR)

MR. AIVALIKLES:  I guess I'm going to withdraw my objection.

THE COURT:  Thank you.

(CONCLUSION OF SIDEBAR)

THE COURT:  Go ahead, Attorney Hilliard.

Q.    In your complaint, Ms. Ortolano, was that he had undertaken to discuss with you without your lawyer present some aspects about your individual case?

A.    Well, no.  I mean, what individual case?  Can you clarify what you're talking about?

Q.    One in which you were represented by counsel.

A.    Well, it wasn't really a case.  It was the assessor

who was sleeping on the job.  A report had been produced by a private investigator who researched what that assessor was doing.  That report was given to the mayor in the legal office, and it was sent in by an attorney that I contacted who sent it to the mayor and the legal department.  So in that instance it wasn't Attorney Lehmann.  It wasn't assessing.  It wasn't my abatement.  It wasn't a lawsuit issue.  It was just a letter sent in by a lawyer.

Q.    Well, I don't want to quibble with you, but you made a complaint about him with the ethics authorities for discussing with you a matter in which you were represented by counsel?

A.    That's absolutely true.  Because I felt he should be going through the attorney who sent it to him to raise issues about that report.

Q.    And that occurred -- that complaint you made occurred in the summer of 2020, correct?

A.    After I had a deposition with Attorney Bolton, yes.

Q.    All right.  Now, as of January 22, 2021 --

A.    As of January 22.  Okay.

Q.    The date of the incident.

A.    Okay.

Q.    You knew the legal department was locked?

A.    As of that day?

Q.    Right.

A.    That day, yes.

Q.    But you're now telling us you didn't know that an appointment was needed?

A.    I absolutely had no idea.  It wasn't posted on any of the COVID records -- the notifications for going to city hall.

Q.    You acknowledge there was a sign there by the door but that you didn't see it?

A.    Didn't read it.

Q.    Didn't read it.

You submitted, and I think you referred to briefly, Exhibit 36.  Well, I guess you can just call it 36-1.

A.    Yes.

Q.    And you submitted this exhibit --

MR. HILLIARD:  And I believe it's a full exhibit, isn't it?

THE CLERK:  I have it as a full exhibit on the list.

MR. HILLIARD:  Yes.  The seal says ID, but it's a full exhibit.

THE COURT:  All right.  So 36 marked for ID is actually a full exhibit.  So the jury can see it and decide what it is.

Go ahead.

MR. HILLIARD:  I believe that's true of 35, 36, and

37.

THE COURT:  Is that right?

THE CLERK:  Yes.  That's what I have on the list.

THE COURT:  Okay.

MR. HILLIARD:  Anyway, let's just scroll fairly quickly, please, through Exhibit 36.  I think it's four pages long.

Q.  And what you will see here, it's sideways, but it lists various offices in city hall?

A.  Correct.

Q.  Clerk, administrative services.

MR. HILLIARD:  Can you go to the next page and the next page?

Q.  And I think what you told us and what you're implying is that there's nothing on this that says what the hours are or the rules are for the legal department?

A.  It's not a good representative exhibit of that, unfortunately.  I took those screenshots myself, and I didn't go to the legal page and take a screenshot.  I wished I had, but I had overlooked it.

So really the letters that were sent in, whatever the exhibit is, before and after by the city itself are more representative of what the city said was open.

MR. HILLIARD:  Well, let's go to 35 then, please.

A.  That's just the assessing office.

And 37 is the reopening of city hall.

Q.    All right.

MR. HILLIARD:  37, please.

A.    And I didn't see anywhere in this document where it addressed the legal office.

Q.    And isn't that probably because the legal office was not open to the public?

A.    Not in my mind.  Because I went up there.  I had been up in that legal office eight or ten times.  It was the assessing clerk that said you could go up there.

I didn't view it as a non-public office, and I was never told for a year and a half or two years that you can't be here, you're the public.

Q.    Well, you were told that by three people on January 22 of 2021, weren't you?

A.    Eventually, yes.

Q.    And you weren't leaving until the police came?

A.    After Attorney Leonard made the statements of how threatening and hostile I was, I was fearful to go, and I'm glad I didn't given the articles that came out in the paper.

Q.    Afterwards?

A.    When I saw the articles that I was being equated to a January 6th insurrectionist, and that was her take on my conduct, both her and Attorney Bolton, I'm glad I stayed so that the police could see me and they could make an assessment

on my conduct and my tone and my communication with them.

Q.   But that morning you weren't leaving until the police came?

A.   That's true.

Q.   And there's no service counter in the legal department, is there?

A.   There's no service counter in any departments that are open to the public.  That's true.  There's no service counter in human resources or contracts or financial reports. Those were all public spaces.  There's all kinds of offices in city hall that have no service counter that are public.

MR. HILLIARD:  Your Honor -- well, never mind.

Q.   There's no waiting area -- there's no lobby in the legal department, right?

A.   There's the entry hallway.  And, you know, to me, having been in there a bunch of times, your lobby area is where your two legal assistants are.  It's a very big, open space.

MR. HILLIARD:  Might we look at Exhibit TT, the second page, please?

This is the second page of TT we're looking at. It's a full exhibit.

Q.   That's you down by the entrance door sitting on the floor, right?

A.   After I moved, yes.

Q.    You moved from the doorway to Attorney Leonard's office?

A.    To clear out of the way, yes.

Q.    And you referred to that in your earlier testimony as the lobby, didn't you?

A.    The entry.  I think I called it the entry.

Q.    I think -- you don't think you called it the lobby more than once?

A.    If you want it to be the lobby, I'll say it was the lobby.  I call it the entry, the lobby.  It's kind of where you come in.

The building has so many offices without formally designed lobbies that where you go in is their lobby.  It's a very old building.

Q.    So you were waiting there in the lobby for the police to come?

A.    Yes.

Q.    You had never had anything date stamped at the legal department before, had you?

A.    No.  Except I received the e-mail for my application two months earlier that came down from the legal office.

Q.    And that was in response to a Right-to-Know request you had made, correct?

A.    No, no.  That was just in response to -- that was

just me when I submitted my application for 2020 in November. Two months before this happened. I just submitted it like I would normally. Except the assessing office was under construction. I sent it to AssessHelp, what the instructions told us to do, and within two days Attorney Kleiner said she had the document.

And I just wanted the receipt because that's what I'm supposed to get. According to the paperwork, get your receipt. So I wanted the stamp on it to say it was official.

And I asked for that on a Thursday, and on November 20th, on the Friday, the legal office sent me down the receipt as the cover page.

Q. And it was a receipt from the assessing department?

A. Well, it said -- there's no assessing department anymore. So it said assessing office on it, but I don't know where it came from.

Q. We'll look at another one.

You talked about some e-mail exchanges you had with a Mr. Vincent that week of the incident, correct?

A. Yes. On the 22nd. I think the e-mails stopped the day I left city hall.

And then it went to February 2nd. I waited ten more days, and then I e-mailed back again to find out what was going on.

MR. HILLIARD: May we look at Exhibit 38, please?

These are all full exhibits, your Honor, 38 through 42.

THE COURT:  Thank you.

Q.  This is your initial e-mail to Mr. Vincent, correct?

A.  Yes.

Q.  And just for all of our benefits, who was Mr. Vincent?

A.  He was hired as the assessing chief.

Ms. Kleiner was serving as the chief for a while, and then they brought in this guy who was actually an assessing chief from another town and had a lot of experience.

Q.  And you learned later, did you not, that you used the wrong e-mail address for Mr. Vincent in this e-mail?

A.  That was just a secondary copy, yes.

Q.  Is the answer yes?

A.  It was sent to AssessHelp and Mr. Vincent, and Mr. Vincent's e-mail was Lebanon.  So that was the wrong address.

Q.  The wrong address for Mr. Vincent, right?

A.  Yes.

Q.  And this was the e-mail with the two abatement applications for the two Baltimore Road addresses, correct?

A.  Correct.

MR. HILLIARD:  Exhibit 39, please.

Q.  It was Sunday night, the one with Mr. Vincent's

wrong e-mail address.

We're now Wednesday morning the 20th, right?

A.    Correct.

Q.    And you tell him:  I still do not have the stamped time dated receipt?

A.    Correct.

Q.    But now his address is correct?

A.    And AssessHelp was always correct, where I had to send it.

Q.    My question is about Mr. Vincent, Ms. Ortolano.

A.    I said correct.

Q.    And your message to him was at 10:41 on Wednesday the 20th, correct?

A.    Correct.

MR. HILLIARD:  Let's look at Exhibit 40, please.

Q.    You got a response back from him, what, about a half hour later?

A.    Correct.

Q.    Thanking you for the information and he's going to look into it, and there's a question about the owner of one of the properties, correct?

A.    Correct.

Q.    All right.  Now, we now have a series of e-mails between you and Mr. Vincent that are labeled 40A through 40M.

MR. HILLIARD:  Your Honor, I just want to try to do

this as rapidly as possible.

THE COURT:  I appreciate it.

MR. HILLIARD:  May we look at 40A, please?

These are all full exhibits.  So the jury will have all of them, your Honor.

Q.  So now you're e-mailing back and forth with him the following day at 5:49?

A.  Correct.

Q.  Right?

A.  Correct.

Q.  And now the subject line is changed to Totally Unfair Abatement Process, right?

A.  Correct.

Q.  And there's a lot of people cc'd on that e-mail, correct?

A.  Correct.

Q.  All right.

MR. HILLIARD:  We can go to 40B, please.

Q.  And he responds the next day, correct?

A.  He does.  And he says --

Q.  12:49 p.m.?

A.  He does, but he says they're all logged. Everything he has is logged.

Q.  Yeah.

A.  But mine weren't there.

Q. He says: Those that have requests for confirmation of receipt have had a copy of the date stamped application e-mailed to the property owner.

Correct?

A. They were not e-mailed and I was not e-mailed.

Q. Would you just confirm for me that that's what his statement said, please?

A. Yes.

Q. Thank you.

MR. HILLIARD: Exhibit 40C, please.

Q. And this is your response to him, correct?

A. Correct.

MR. HILLIARD: And 40D.

Q. He tells you you didn't fill out the tax rep section or sign the applications.

That's what he says, right?

A. That's what he says.

Q. All right.

MR. HILLIARD: And then 40E, please.

Q. And then you tell him: My apologies. I must have scanned them before I signed.

That's what you told him, right?

A. Within five minutes, yes.

Q. I'm sorry?

A. Within five minutes I responded back.

Yes, that is what I said.

MR. HILLIARD:  40F, please.

Q.    You sent him the signed ones?

A.    Yep.

MR. HILLIARD:  40G, please.

Q.    You sent them on February 2.  All right.  And then --

A.    I let him know that on the 17th I had signed as a rep, and I gave him the header.

MR. HILLIARD:  Let's go back to 40G for a minute, please.

Q.    We now know that, you can see it there on 40G in the middle of the page next to Vincent, that's his Lebanon address, right?

A.    But it's sent to AssessHelp.

Yes, it's his Lebanon, but it's sent to the place it was supposed to go, AssessHelp.

Q.    I understand.

MR. HILLIARD:  40H, please.

Q.    All right.  And this is you writing to Mr. Vincent again, correct?

A.    Yes.

Q.    February 2?

A.    Yes.

MR. HILLIARD:  And 40I, please.

Q.   And he responds to you that day apologizing for the delayed return, correct?

A.   Yes.

MR. HILLIARD:  40 -- is it J?  40J.

Q.   And this is you responding to him, and you think it's taking too long, right?

A.   17 days, yes.

MR. HILLIARD:  40K, an e-mail from him February 3.

40L, please.  I think we looked at this earlier maybe.

40M, please.

And then, just to round it out, 41, please.

Q.   And this we looked at earlier.  It had to do with the letter authorization to be a representative, right?

A.   Correct.

MR. HILLIARD:  And then 42, please.

Q.   So all during the week of, the week that ended on Friday the 22nd of January '21, you were corresponding by e-mail with Mr. Vincent?

A.   There were, yeah, a few.

Q.   All right.  Let's move then to the morning of the 22nd.  Now, you didn't have an appointment?

A.   No.

Q.   You either rang the bell or knocked on the door? What did you do?

A.    There was no bell there at that time.  I knocked on the door.

Q.    There is one now?

A.    Correct.

Q.    And Mindy Lloyd opened the door?

A.    Correct.

Q.    Partly?

A.    Say that again.

Q.    Opened the door partly, enough to see who you were and you to see who she was?

A.    Yes.

Q.    She didn't invite you in?

A.    She didn't answer.  She didn't invite me out.  She didn't answer my question.  No.

Q.    You've seen the arrest affidavit from Officer Roach, have you not, Exhibit 46?

A.    Yes.

Q.    And you note in there that he in his investigation summarized what he found had occurred and referenced that you pushed the door open to enter?

A.    Right.  But that's not correct.

Q.    What is correct?

A.    You can't push the door open.  It opens out.

Q.    You pulled the door open?

A.    It opens out, yes.  You have to pull it open.

Q.   So you did that?

A.   Yes.

Q.   Mindy Lloyd hadn't opened it far enough for you to go in, had she?

A.   No.

Q.   She asked you to leave, she Mindy Lloyd, two times?

A.   I don't recall her being the one asking me to leave.  I believe it was Attorney Neumann.  She was a clerk, and I don't recall her saying you have to leave.  It was Jesse Neumann who came to the threshold and said that.

Q.   You've reviewed Officer Roach's arrest affidavit, I assume?

A.   Yes, I have, but I just don't know every word in it, but I have, yes.

Q.   Certainly Jesse Neumann asked you to leave several times?

A.   That's true, yes.

Q.   And you didn't?

A.   Correct.

Q.   Celia Leonard asked you to leave several times?

A.   Correct.

Q.   And you didn't?

A.   Correct.

Q.   By the time she arrives, Celia Leonard, you were already sitting down in the entrance to her door?

A.    Yes.   It was about five minutes I was there and she came.

Q.    During the investigation that Officer Roach conducted -- he I think actually came to your home to interview you, didn't he?

A.    Yes.

Q.    And you declined?

A.    I had counsel, I had him on the phone, and he recommended I not speak to the police and talk to the police.

Q.    I'm sorry.  Did you finish your answer?

A.    Yes.

Q.    So you did not take that opportunity to give Officer Roach your side of the story?

A.    I felt I gave my side of the story when I was in city hall, and he wrote it and said there would be no further charges.  I thought my story was there and done.

Q.    But he told you you might be arrested if you came back, right?

A.    I didn't come back.

Q.    Didn't you tell him you probably would be arrested because you would come back?

A.    Well, I thought I -- you know, the city had threatened me with arrest, and in fact Attorney Bolton tried to arrest me in 2022.  So being threatened with arrest was something I had --

MR. CULLEN:  Objection, your Honor.

(SIDEBAR)

MR. CULLEN:  Your Honor, this witness knows full well that you have blocked that testimony, and the fact that she tried to sneak it in on that answer is outrageous.  It should be stricken, but I don't think that's enough of a sanction.

MR. AIVALIKLES:  She's responding to the question, your Honor, about her saying she was going to be back and be arrested.  That's a response from her, that's why she made that statement, and she used that as an example.  The door was opened.

THE COURT:  The question was about her state of mind on the date.

There's clarity in my ruling with respect to that episode.  So I'm going to ask the jury to disregard the mention of anything on -- did she use a date?

MR. CULLEN:  Your Honor, I believe she did.  That's why I noticed it.  She said 2022.

THE COURT:  All right.  I don't think the cross-examination opened the door to that evidence.  So I am going to strike it and overrule your objection to that.

(CONCLUSION OF SIDEBAR)

THE COURT:  Okay.  You just heard testimony about an incident in I believe July 2022, and you are to disregard

references to that incident.

MR. HILLIARD:  Thank you, your Honor.

May we have Exhibit 47 at page 5, please?

Q.    Ms. Ortolano, this is a page from Officer Roach's investigation reporting what happened on the day in question.

You've seen this, haven't you?

A.    Yes.

Q.    And if you look near the end, the last full paragraph that begins "I returned and spoke," toward the end of it he reports that you expressed your frustration with this and also commented that she probably would be arrested and she would be back.

Did you tell him that?

A.    I did.

MR. HILLIARD:  I would like to look at Exhibit 56 for a couple minutes, your Honor, but in accordance with our previous discussions, our objection to this exhibit is preserved.

THE COURT:  I'm sorry.  I don't know what --

MR. CULLEN:  Could we have a sidebar?

THE COURT:  You know what Exhibit 56 is.

MR. CULLEN:  Could we have a sidebar?

THE COURT:  The lawyers do, but I do not know that off the top of my head.

Let me just say this.  We're very close to a lunch

break.  So we're going to take our lunch break now and be back at 1 o'clock.

(IN COURT - NO JURY PRESENT)

You can step down.

MR. HILLIARD:  Excuse me, your Honor, for a moment, please.

THE COURT:  You just need a second?  That's fine.

(Attorney Hilliard confers with Attorney Cullen)

MR. CULLEN:  That was worthwhile, your Honor.

Mr. Hilliard corrected me.

MR. HILLIARD:  Your Honor, Exhibit 56 is the police department recounting of the ten allegedly similar incidents --

THE COURT:  Oh.  Okay.

MR. HILLIARD:  -- that someone was trespassing city hall but not arrested.

THE COURT:  All right.  I know of what you speak.

MR. HILLIARD:  Okay.

THE COURT:  But I don't know a number.  I honestly have not absorbed it to that level.

MR. HILLIARD:  I appreciate that, and I apologize.

The only reason I hesitated is that you had indicated this was going to be a full exhibit, and we appreciate that, but it was not addressed during direct examination.  So I wanted to be sure that by my starting to

use it, because I understand it's to be a full exhibit, I haven't waived anything.

THE COURT:  I understand where you're coming from, and I appreciate the courtesy you were trying to show me there.

So now I know what you're talking about, and those are full exhibits.  So you're going to begin crossing her on those when we get back from lunch, and your objection to those being admitted is preserved.  You've made that objection.  I've overruled it.  Those are relevant on one of the elements of the claim.

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  And you're not objecting on foundation or authentication.  Just on relevance.  So, yeah, I have overruled that.

So those will begin.  And I'll know of what you are speaking, Attorney Hilliard, if you start there.

MR. HILLIARD:  Okay.

THE COURT:  And hopefully I'll remember Exhibit 56, as well.

MR. HILLIARD:  It's emblazoned in our minds for better or worse.

THE COURT:  I'm impressed the plaintiff knows all the numbers of each exhibit.

So is there anything else?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.  Go ahead.

MR. AIVALIKLES:  Your Honor, the Court ruled concerning the response of my client to Attorney Hilliard's question, did you tell the police that you were going to be arrested, you were going to return, that's out there.  The jury has heard that.

I should have a right on cross-examination to question my client about that particular comment because she's going to testify, I presume, that she was afraid she was going to be arrested and her fears came true because Attorney Bolton tried to have her arrested in July of 2022.  I should have a right to cross-examine her so the jury knows the full story.  Right now they're not going to get the full story.

THE COURT:  I understand your argument.

I will do this.  At my lunch break I will look at the transcript, at the question of whether that question Attorney Hilliard asked could have possibly opened the door to that, but that was clearly something that was not coming in.  It was going to introduce a whole new dispute and a trial within a trial, and that was clear.  And so ultimately to interject that into the case is a problem in light of my prior order.

I will look at this at lunch, but I've ruled on it.  I understand you to be filing a motion to reconsider orally.

I will reconsider that and bring that back after lunch, but at this point I think I've made myself very clear before the hearing, before the trial, and so I think Attorney Cullen's point that this was clearly an area that was not going to be admitted -- I agree there can be a way in which a door is opened, and I said that when I made that ruling, but what I heard did not open that door.  I will look at that at lunch, and I think we probably need to get to lunch so that I can do that.

MR. AIVALIKLES:  Yes.

THE COURT:  Let me make sure.  What are the other issues that I need to think about at lunch?  Anything else?

Anything else, Attorney Cullen?

MR. CULLEN:  I just think perhaps things like that wouldn't happen if the witness would just answer the questions.  She's taking the opportunity to move into everything, even if it's just, is that Mr. Vincent's e-mail address?  Well, yeah, but I also sent it to --

THE COURT:  She's not going on and on and on, though.  I've had witnesses who -- she's answering the questions.  She's supplying a little extra.  Therefore, he doesn't have to get on redirect and ask her what is so obvious on the document, on the face of the document.  If she were going on and on, I would have a problem with it, but ultimately she's answering his question.  Technically, she

could stop there and I could sustain that objection, but at this point I have not seen her go beyond the question.

MR. CULLEN:  I understand your position, your Honor, and I take it as a ruling.  I just -- I think that was an example of how we don't have an opportunity to object if she's going to go beyond the questions, and then it's out and then we have a sidebar, and then we have to instruct the jury to strike.  It would just be easier I think for everybody, but I take your position.  And if it comes up again, we'll address it then.

THE COURT:  Okay.  And I will say that ultimately -- and I do not find her testimony at this point to be beyond the pale in that way, but I will say that if there is a direct question and he asks you a question about did you agree to do this and you say, correct, I did, you've answered the question, and then it's Attorney Aivalikles' job on redirect to get up and find that exhibit and give you an opportunity to explain, but ultimately that would take us forever to go through each exhibit and have Attorney Aivalikles have to do that.

At this point I am not finding a reason to sustain any objection, but you can obviously move for that at the time and I can remind Ms. Ortolano that ultimately on cross she needs to answer the direct question.

But thus far she's answered the direct question

with respect to an e-mail you're showing her that clearly also has other relevant evidence in response to your question.

So that's how I have seen it thus far. So I would just say make the objection at the time or just simply ask the Court to instruct her accordingly. Because you're the one who's asking the question. So it's hard to object.

Okay. Anything else?

MR. AIVALIKLES: No, your Honor.

THE COURT: Anything else?

MR. HILLIARD: No.

MR. CULLEN: No, your Honor. Thank you.

THE COURT: Okay. Well, let's go have our lunch and then come back.

(RECESS)

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.

Submitted:  3-6-26          /s/    Susan M. Bateman _____
                            SUSAN M. BATEMAN, RPR, CRR