**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 7-6-2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


* * * * * * * * * * * * * * * * * * *
                                    *
LAURIE ORTOLANO                     *
                                    *   22-cv-326-LM
        v.                          *   February 5, 2026
                                    *   1:10 p.m.
STEVEN BOLTON AND CELIA LEONARD     *
                                    *
* * * * * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
DAY THREE - AFTERNOON SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY


APPEARANCES:


For the Plaintiff:        William E. Aivalikles, Esq.
                          Aivalikles Law Office


For the Defendants:

(Steven Bolton)           Russell F. Hilliard, Esq.
                          Madeline K. Matulis, Esq.
                          Upton & Hatfield LLP




(Celia Leonard)           Brian J.S. Cullen, Esq.
                          Cullen Collimore Shirley PLLC




Court Reporter:           Susan M. Bateman, RPR, CRR
                          Official Court Reporter
                          United States District Court
                          55 Pleasant Street
                          Concord, NH 03301
                          (603) 225-1453

```
                        I N D E X


WITNESSES:              Direct      Cross      Redirect      Recross


RICHARD LEHMANN


By Mr. Aivalikles      3                        25
By Mr. Hilliard                    21
By Mr. Cullen                      23




MICHAEL ORTOLANO


By Mr. Aivalikles      26                       39
By Mr. Hilliard                    37
By Mr. Cullen                      38




MINDY LLOYD


By Mr. Hilliard        53                       90
By Mr. Cullen                      71                       91
By Mr. Aivalikles                  74                       93




CELIA LEONARD


(Previously transcribed under separate cover)
```

| EXHIBITS | FOR ID | ADMITTED |
|---|---|---|
| Defendant's Exhibit VV. | | 56 |

P R O C E E D I N G S

THE CLERK:  This hearing is back in session.

THE COURT:  Attorney Aivalikles, you may call your next witness.

MR. AIVALIKLES:  Attorney Lehmann.

I have to go out and get him, your Honor.

THE COURT:  I'm sorry?

MR. AIVALIKLES:  Attorney Lehmann is my next witness.

THE COURT:  Okay.

RICHARD LEHMANN

having been duly sworn, testified as follows:

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  My name is Richard Lehmann, L-E-H-M-A-N-N.

DIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.   Attorney Lehmann, are you a licensed New Hampshire attorney?

A.   Yes, I am.

Q.   And how long have you been a licensed New Hampshire attorney?

A.   Since 1992.

Q.   And where are you presently employed?

A.    I am a partner in my own firm, Lehmann, Major & List, here in Concord.

Q.    And do you also provide legal services for the New Hampshire Senate?

A.    I do.  I'm the legal counsel for the New Hampshire Senate.

Q.    And how long have you been their legal counsel?

A.    19 of the last 25 years.

Q.    And how long have you been practicing law?

A.    Since 1992 is 34 years.

Q.    And what does your practice entail?

A.    Areas of practice?

Q.    Yes.

A.    I'm involved in a lot of areas that involve people interacting with the government in various ways, whether it's through civil rights actions or representing highly regulated entities, and, as you said before, representing the State Senate.

Q.    Did you have an occasion to represent Laurie Ortolano?

A.    I did.

Q.    And what was the time frame for your representation of her?

A.    I believe that I started representing her in late 2019 and continued to represent her into 2021, I believe.

Q.    And in what capacity did you represent her?  Other than as an attorney, but what were the issues?

A.    Well, the issues mostly involved her attempts to obtain public records from the city of Nashua.  That expanded into representing her in a tax abatement appeal, as well.

Q.    Do you know the time frame for the tax abatement appeal?

A.    I believe it was her 2018 property taxes that were being appealed, and it was probably around 2020 that the abatement appeal happened.  It could have been 2021.

Q.    And you represented her before the board?

A.    Yes.

Q.    And what was the outcome?

A.    I believe we won.

Q.    Were you aware of the issue of the trespass in January of 2021?

A.    Yes.  It's my understanding the city issued a no trespass order against her.

Q.    And were you representing her during that time?

A.    I was.

Q.    And in what particular matter?

A.    I believe we were in a Right-to-Know litigation potentially in more than one case in superior court in Nashua.

Q.    Did you help her locate a criminal attorney?

A.    I believe I recommended a couple people to her.

Q.    After the arrest did you provide some statements to the press?

A.    Yeah, I spoke to the press on her behalf -- or I gave my impressions to the press, yes.

Q.    What statements did you make that were to the press?

MR. CULLEN:  Objection.

THE COURT:  Sustained.

Q.    Did you comment upon her arrest?

MR. HILLIARD:  Objection, your Honor.

Relevance.

THE COURT:  Sustained.

Q.    Did you comment upon your interaction with Attorney Bolton as it related to, for example, the Right-to-Know issues?

A.    Yes.

MR. HILLIARD:  Objection.

THE COURT:  Sustained.

MR. AIVALIKLES:  Your Honor, can we have a sidebar?

THE COURT:  Yes.

(SIDEBAR)

MR. AIVALIKLES:  Your Honor, this is for hearsay.
These are statements by Attorney Bolton.

MR. HILLIARD:  It's not hearsay.  It's relevance.

I'm sorry, your Honor, excuse me, I --

THE COURT: Can you give me the objection, and then I'll hear from you. Go ahead.

MR. HILLIARD: I'm sorry. I may have misheard. I thought he was asking the witness about his statements to the press.

THE COURT: That's what I thought, as well.

MR. HILLIARD: Okay. I'm sorry.

MR. AIVALIKLES: Yes. Again, he's --

THE COURT: Can you whisper?

MR. AIVALIKLES: Oh. Sorry.

Again, he's commenting upon what Attorney Bolton referenced or made statements to the press about.

THE COURT: Yeah, you're asking him about statements that he made.

MR. AIVALIKLES: Right.

THE COURT: That's hearsay, statements out of court that he made, and you're introducing them for the truth of the matter.

MR. AIVALIKLES: Okay.

THE COURT: All right.

(CONCLUSION OF SIDEBAR)

Q.    Did you have an occasion to receive an e-mail from Attorney Leonard concerning Laurie's request for her abatement file?

A.    Yes.

Q.    Did you ask Laurie to get her abatement file?

A.    Yes.   I asked her to get her abatement file so we would have all the documents to prosecute the abatement appeal.

Q.    And is that abatement file a public record?

A.    I believe it is, yes.

Q.    And was she able to get the record from the city?

A.    Well, I think ultimately the city produced it to me rather than giving it to her, but we ultimately were able to get the abatement file.

Q.    But they didn't give it to her directly; is that correct?

A.    That's right.

Q.    Let me show you -- let me, I guess, pull up Exhibit 33.

So there's a letter from Attorney Leonard to you. It's actually an e-mail dated January 15, 2020, and what did she indicate to you about the production of the public abatement file?

A.    She indicates that the city had scanned everything that was currently in its assessing department abatement file for Ms. Ortolano's property and that they would be sending the scanned documents along, and then she wrote a paragraph saying that -- suggesting there might be some additional legal department files related to that request that weren't being

produced under Right-to-Know law exemptions.

Q.    Would those legal documents be in the public abatement file?

A.    No.

MR. AIVALIKLES:  Go to the next page.

Q.    Were you aware that Laurie had sent a request for the abatement file to Louise Brown?

A.    I don't remember if I was exactly aware at this time.  Certainly this appears that I was made aware.

Q.    And that was in reference to getting a copy of the abatement file?

A.    Yes.  It seems to be.

Q.    Do you recall speaking to Laurie about whether she was able to get the abatement file?

A.    I don't have a present recollection of having that conversation, but I'm sure we did.  We spoke quite often.

Q.    Did she ask you to write a letter to the legal office concerning her request for the abatement file?

A.    I don't remember if she asked me to write the letter or if I proposed doing it, but I know that I wrote a letter.

Q.    Okay.  And, in fact, did you get the abatement file from the legal department?

A.    Ultimately, yes.

Q.    In the letter that you got from Attorney Leonard,

which is the previous, did she indicate to you that Laurie needed to make appointments to go to the legal department?

A.    Not in -- it doesn't appear that she does in this letter, no.

Q.    Okay.

MR. AIVALIKLES:  Can you bring up Exhibit 64?

Q.    Were you aware that Laurie was trying to get the training file from the city?

A.    Yes.

Q.    And do you recall -- was that a public document, the training manual?

A.    I believe it should have been a public document.  I don't know if the city of Nashua was treating it as a public document or not.  Generally -- my understanding is training materials are typically a public record.

MR. AIVALIKLES:  Can you go to the next page of that?

MR. CULLEN:  Can we make sure this is full versus ID?

MR. AIVALIKLES:  It's full.

MR. CULLEN:  65?

MR. AIVALIKLES:  That was done yesterday.

THE COURT:  I don't know what Exhibit 65 is, but we can talk about it at sidebar.

THE CLERK:  I have Exhibit 65 as a full exhibit.

MR. AIVALIKLES:  Thank you.

MR. CULLEN:  Sorry about that.

THE COURT:  It is full?

THE CLERK:  I have it as full.

MR. CULLEN:  I apologize.

Q.    So did you get a reply from Attorney Bolton dated July 5th, 2021?

A.    Yes.

Q.    And what did he indicate in the last sentence?

A.    "If Mrs. Ortolano appears at my office on Wednesday or any day, she risks arrest."

Q.    And did you make any reply to that to Attorney Bolton?

A.    Not that I remember.

I forwarded it to Laurie.

Q.    Have you had a lot of experience in handling Right-to-Know requests either for a citizen or in the capacity of a government entity?

A.    Yes.

Q.    And what was your experience dealing with Attorney Bolton as it related to Laurie Ortolano?

MR. HILLIARD:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Can you narrow the scope of the question?

MR. AIVALIKLES:  Sure.

Q.    When you were communicating with Attorney Bolton, do you remember the time frame that that was?

A.    Well, this exchange was July 5th of 2021.

Q.    That was after the arrest, but we're talking just in general.

A.    I believe it was from something that happened for months before this time.

Q.    And how much interaction did you have with Attorney Bolton during the time that you were representing Laurie for the Right-to-Know issues and the abatement file?

A.    I don't know how to answer that with any great specificity.  I feel like there was a substantial amount of back and forth between myself and sort of everyone at the legal department.

I guess I wouldn't say that I distinguish between the people at the legal department particularly.  I had a lot of communications with all of them, from my perspective.

Q.    Well, did you have a lot of communications with Attorney Bolton?

A.    I believe so, yes.

Q.    And what was your experience like in dealing with him?

MR. HILLIARD:  Objection, your Honor.  Relevance.

THE COURT:  Sustained.

Make the -- let's do sidebar so I can explain the

specifics.

(SIDEBAR)

THE COURT:  What was your experience like dealing with him?

MR. AIVALIKLES:  Right.

THE COURT:  That's very broad.  And how is his experience relevant to this case and any of the elements in the case?

You need to narrow the scope of the question, all right?

MR. HILLIARD:  Well, and I would say, your Honor, his personal experience with Attorney Bolton may be the same kind of experience Attorney Bolton has with other lawyers. There's no basis of comparison.  It's not a case where he's giving an opinion that Attorney Bolton acts in a particular way.  It's just so vague as not to be helpful to the jury or actually probative of anything.

THE COURT:  The questions are too broad.

However, the suggestion is being left that somehow Ms. Ortolano is the one who's bringing all this on, and this is corroborative if he has testimony that is limited to interactions in this time frame and dealing with Ms. Ortolano in this time frame that would support her or corroborate her version of events.  So to that limited extent I think it does and it is probative of a material question in the case, but

thus far the questions have been too broad and too vague, all right?

So the objection is sustained.

(CONCLUSION OF SIDEBAR)

THE COURT:  Can you rephrase the question?

MR. AIVALIKLES:  Yes.

Q.   Would you characterize your experience with Attorney Bolton as similar to experiences you've had in other matters concerning Right-to-Know requests?

MR. HILLIARD:  Objection, your Honor.

THE COURT:  Sustained.

The same reason.

Q.   Were you able to reach a conclusion whether or not Attorney Bolton liked Mrs. Ortolano?

MR. HILLIARD:  Objection, your Honor.

Relevance.  His opinion.

THE COURT:  Sustained.

Lay a foundation for this in terms of his awareness and interactions.

Q.   Well, did you have any conversations with Attorney Bolton that addressed Mrs. Ortolano and how he felt about her?

A.   I'm sure I had conversations with him.  And based on the nature of the e-mails that were exchanged and conversations that happened, it was clear to me that he didn't like her.

Q.    And did you have that opinion with other members of the legal department that you dealt with?

A.    I don't think any of them liked her.  I mean, my sense of it was that she didn't appreciate -- they didn't appreciate what she was doing in trying to access the public records.

MR. AIVALIKLES:  Thank you.

MR. HILLIARD:  Your Honor --

MR. AIVALIKLES:  Oh, I'm sorry.  I do have one more area.  I'm sorry.

THE COURT:  Do you have an objection?

MR. HILLIARD:  I've got an objection, and I would like a sidebar, please.

(SIDEBAR)

MR. HILLIARD:  Your Honor, I guess I would move to strike the last part of that answer that said his impression was that they didn't like -- I can't quite quote it, but that they didn't like the Right-to-Know requests she was making or something like that.

That's not personal knowledge, having a basis, an evidentiary basis for the jury to consider.

THE COURT:  I'm not seeing how his opinion is relevant in the case, asking him his opinion of whether other members of the office liked her pursuit of public records.

So you didn't make an objection at the time, but

he's objecting, and I'm going to give a limiting instruction or ask you to move along.

MR. AIVALIKLES:  I'll move along.

THE COURT:  Is there a limiting instruction you want me to give?

MR. CULLEN:  I would say, yes, your Honor.

You know, he added the based upon her 91-A.  That wasn't really part of the question.  So we didn't really have an opportunity to object before it came out.

I do think a limiting instruction just indicating that Attorney Lehmann's personal opinion about why he thought they felt, you know, a certain way about her is not relevant and should be stricken.

THE COURT:  I'm going to give a limiting instruction.

All right, sir.

MR. CULLEN:  Thank you.

(CONCLUSION OF SIDEBAR)

THE COURT:  All right.  Okay.

Members of the jury, I'm going to give you another limiting instruction order.

You just heard testimony about this witness's, Attorney Lehmann's opinion regarding whether members of the Nashua legal department liked Ms. Ortolano.

You are to disregard that testimony.  It's not

relevant to any issues in this case.

Go ahead, Attorney Aivalikles.

Q.    Did you have conversations with Attorney Leonard about her -- Mrs. Ortolano's ability to talk to them and discuss cases that she was handling on her own?

A.    Yes.

Q.    And what did you indicate to Attorney Leonard?

A.    I communicated to Attorney Leonard, and I believe the whole office, that any ethical restrictions on their ability to communicate with Mrs. Ortolano as somebody that they were in litigation with I would consider inapplicable to other things she was doing with the city.  So I encouraged them to communicate with her about subjects that weren't part of the litigation that we were involved in.

Q.    So, in other words, they could interact with her in matters that you were not representing her on?

A.    Yes.

Q.    Okay.  And was that permission in writing?

A.    Yes.  I wrote a letter.

Q.    And did they honor that position?

A.    I don't recall that they did.  There may have been instances in which somebody spoke to her, but not that I'm aware of.

Q.    Did you have an opportunity to write a letter to Attorney Neumann on February 19, 2021?

A.    Yes.

Q.    And what was the purpose of writing that letter?

MR. HILLIARD:  Excuse me.  I don't have that letter.  I don't know if other people have it.

MR. AIVALIKLES:  Well, I wasn't planning on --

MR. HILLIARD:  Well, if he's going to be asked questions about it, I would like to be able to see it.

THE COURT:  Yeah.

Can you get a copy of that so that he can see it?

(Document shown to Attorney Hilliard and Attorney Cullen)

MR. HILLIARD:  Your Honor, it's a four-page single spaced letter written to Attorney Neumann after the date of the arrest.

I didn't have an opportunity to absorb the entire document just now.  I've only seen it for the first time now.

THE COURT:  All right.  We're going to have to take a recess to allow them to look at this.

MR. AIVALIKLES:  Can we have a sidebar?

THE COURT:  Yeah.  Go ahead.

(SIDEBAR)

MR. AIVALIKLES:  Your Honor, it was not my intent to go through it line by line.  I was just going to ask him what the purpose was.

THE COURT:  I know, but they get to cross.

MR. AIVALIKLES:  Okay.

THE COURT:  And they need to know what's in the letter.

MR. AIVALIKLES:  That's fine.

THE COURT:  So either you can withdraw questions about the letter or move on.

MR. AIVALIKLES:  What is the purpose, though?  That would help me.  Again, it advised the legal department --

THE COURT:  Can you whisper?

MR. AIVALIKLES:  I'm trying.

She advised the legal department that they could talk to Laurie about matters where she was not represented by counsel.

MR. CULLEN:  Your Honor --

THE COURT:  His issue is an issue of law that gets into an area almost of being an expert witness, Mr. Aivalikles.

I think -- I'm not seeing where this is relevant, and, in fact, this is the second exhibit that you've brought up with a witness that you've called and they've never seen this exhibit or letter.

So my ruling is that you need to withdraw your questions about the letter and move on.

MR. CULLEN:  Your Honor, can I just add one thing?

This letter is dated February 19, 2021.  This is after the incident.

So Mr. Lehmann sending the letter after the fact to say that you can talk to my client doesn't have anything to do with this case.

THE COURT:  All the more reason -- they haven't seen it, but they've at least already spotted some problems in terms of relevance.

I could take a break right now and I could let them spend ten, fifteen minutes reading this letter that they should have had before you called this witness because you intend to use the letter.  That way they could see it, they could make objections, and they could cross the witness on it.

I'm not going to let you use the letter.  So let me be clear.  You're going to withdraw the letter and not ask him questions about the letter, all right?

MR. AIVALIKLES:  Can I make one more comment, your Honor?

THE COURT:  Yeah.  Of course.

Can you whisper?

MR. AIVALIKLES:  They are claiming that they would not talk to Laurie or they would not give her documents because she was represented by counsel.

THE COURT:  I know.  I know that.

MR. AIVALIKLES:  That's just the pretext.  Our position is that's a pretext for not talking to her when in fact they were advised that they could talk to her on

non-represented matters.

THE COURT:  I understand your argument.

MR. AIVALIKLES:  Okay.

THE COURT:  All right.  Thank you.

(CONCLUSION OF SIDEBAR)

THE COURT:  Move along, Attorney Aivalikles.

MR. AIVALIKLES:  Yes.  Thank you, your Honor.

I'm done with Attorney Lehmann.

CROSS-EXAMINATION

BY MR. HILLIARD:

Q.    Good afternoon, Attorney Lehmann.

A.    Good afternoon.

Q.    I've asked to have Exhibit 65 put back up there. You were looking at it during the direct examination.

Do you recall that?

A.    Yes.

Q.    And isn't it in fact true the sentence you read, "If Mrs. Ortolano appears at my office --", and my is Attorney Bolton, "-- on Wednesday or any day, she risks arrest."

Do you know what the situation was on July 5, 2021, about her criminal case?

A.    No.

Q.    So you don't know whether there were bail conditions or conditions of her case that prevented her from entering the legal department without -- from entering the

legal department?  Leave it at that.  You don't know?

A.    I don't.

Q.    So you don't know whether that second sentence is in fact true or not?

A.    I don't.

Q.    In the beginning of the e-mail Attorney Bolton said, "Please inform your client, Ms. Ortolano, that I cannot communicate with her on this matter.  You've been provided the material discussed in the deposition."

My question is, Attorney Lehmann, are you aware that the year before, 2020, that Ms. Ortolano filed an ethics complaint against Attorney Bolton for communicating with her on a matter in which she was represented by counsel?

A.    I think I -- yes, I was aware of that.

Q.    And her claim was that they were meeting about one matter and he ended up talking to her about another matter where she had counsel.  Are you familiar with the facts?

A.    That sounds familiar, yes.

Q.    And she claimed that he violated one of our ethics rules by talking to her about two different matters, one in which she was represented by counsel, and there is such a rule, isn't there?

A.    Yes, there's such a rule.

Q.    And I take it you're not familiar with the fact that she made the complaint to the ethics folks or what the

disposition was?

A.    I think I was familiar with the fact that she made the complaint, and I suggested that they record their interactions together to protect everybody from any complaints.

Q.    But she made a complaint to the ethics authorities before that, right?

A.    Yes.

Q.    Thank you.

THE COURT:  Attorney Cullen?

CROSS-EXAMINATION

BY MR. CULLEN:

Q.    Good afternoon, Attorney Lehmann.

How are you?

A.    Good, Attorney Cullen.  How are you?

Q.    I'm well.  Thanks.

It seems very formal, doesn't it?

I have two quick questions or maybe two points of questions, I guess.

You were just talking about making sure that they were advising people they should record what their interactions are to make sure that they were clear, right?

A.    Right.

Q.    And another way you do that is you make sure that you communicate with someone, especially somebody who's

adverse to you in litigation or potentially adverse to you in litigation, you sometimes have a person where you say I only want to communicate with this person in writing, right?

A.    You can.

Q.    So there's no confusion or misremembering or miscommunications?

A.    Make sure that there's a clear record.  As long as there's a clear record of what happened, it protects everybody.

Q.    Right.  And so sometimes it's better not to have live conversation with somebody if they're not going to be recorded in some way.  You've had clients like that or people like that you've dealt with on the other side, I'm sure, in your days?

A.    Yes.

Q.    And just briefly, on Exhibit 33 I think you -- I don't think you intended this so I just want to clear it up.

A.    Which is Exhibit 33?

Q.    Exhibit 33 was the request for the abatement file. I can show it to you, but it looks to me that -- I just remember you were asked if you got the things, if you got the records, if you got the abatement files, and I think you said, ultimately, yes, and I just want to clarify.

MR. CULLEN:  Can you go to the next page?

I'm not sure who's controlling it.

Q.   So Laurie Ortolano sent this to Louise Brown at 5:07 on January 14th, right?

A.   Right.

Q.   Is it fair to say that's after the close of business at city hall?

A.   (Nods affirmatively.)

Q.   And Ms. Leonard responded to you at 3:58 the next day?

MR. CULLEN:  Can you swap that up for me?

Q.   I know it's hard to see.  It says here at 3:58. Do you see?

A.   Yes.

Q.   Okay.  So when you say ultimately, I mean, she responded to you within 24 hours, right, and you got the file that day?

A.   Yes.

MR. CULLEN:  Thanks.

THE COURT:  Anything further, Attorney Aivalikles?

MR. AIVALIKLES:  Yes.

REDIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.   Laurie had a lot of Right-to-Know requests that were pending; is that correct?

A.   Yes.

Q.   And she wasn't represented by counsel in a lot of

those, was she?

A. In most of them.

Q. And also you had suggested that because there were issues about truthfulness that if there were any meetings, that they should be recorded. Do you recall that?

A. I suggested that, yes.

Q. That was your proposal?

A. It was.

MR. AIVALIKLES: Thank you.

THE COURT: All right.

Attorney Lehmann, you are excused. Thank you, sir.

THE WITNESS: Thank you, your Honor.

THE COURT: Attorney Aivalikles, you may call your next witness.

MR. AIVALIKLES: Michael Ortolano.

MICHAEL ORTOLANO

having been duly sworn, testified as follows:

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: Michael Charles Ortolano.

My last name is spelled O-R-T-O-L-A-N-O.

DIRECT EXAMINATION

BY MR. AIVALIKLES:

Q. And where do you reside?

A. 41 Berkeley Street, Nashua, New Hampshire.

Q.   Shall I call you Mike, Michael, or Mr.?

A.   You can call me Mike.

Q.   Mike, let me ask you some questions about your background.

Where did you grow up?

A.   I grew up in Nashua.

Q.   Where did you go to high school?

A.   I went to Nashua High School.

Q.   And after high school, did you go to college?

A.   Yes.  I went to Worcester Polytechnic Institute on a Navy ROTC scholarship.

Q.   What did you study?

A.   Mechanical engineering.

Q.   And is that where you met Laurie?

A.   Yes.

Q.   And did you receive your Navy commission when you graduated from the university?

A.   I did.

Q.   And where did you end up going?

A.   I reported to naval reactors just outside of Washington, D.C.

Q.   And what was your position there?

A.   I was a project engineer for the Navy nuclear program.

Q.   And was it in a specific department?

A.    Yeah.  It was in the nuclear components department.

Q.    And do you know who the head of that department was?

A.    Yeah, I do.  Jerry Prudum was the head of the department.

Q.    When did you move back to New Hampshire?

A.    I moved back to New Hampshire in 1989 when I got out of the Navy.  I served from 1984 to 1989.

Q.    Why did you move back to New Hampshire?

A.    My dad had started a business that needed some assistance.  So I came back to assist him with that business.

Q.    And did he ultimately end up selling that business?

A.    Yes, he did.

Q.    And did you start your own business?

A.    Eventually, I started my own business, but initially I took a position at another -- at a company inside the Massachusetts area.

Q.    What was the company?

A.    It was Automated Assemblies Corporation.

Q.    And what did they manufacture?

A.    They were an automation company.  They did robotic and automation projects for a manufacturing sector.

Q.    And then when did you start your own company?

A.    I started my own company in '2000.

Q.    And is that company still in existence?

A.    Yes, it is.

Q.    And what does that company do or produce?

A.    We are a value-added distributor for manufacturing machinery automation systems.

Q.    How long have you been married to Laurie?

A.    For 40 years.

Q.    Did you share her concern about your tax assessment in the city of Nashua?

A.    Yeah, of course.  It was very high.

Q.    And did you attend a meeting before the Board of Aldermen and raise the issue that you were having about your taxes?

A.    Yes, I did.

Q.    And what did you indicate to the board the issues were that you had with the taxes?

A.    Well, I mean, my main comment was that the taxes are pretty inconsistent with the properties around us.  That they had been immediately raised when we moved into the community, and it just didn't look like the basic concept of the property taxes was being handled, you know, equitably.  So I talked to that issue.

Q.    And was Attorney Bolton present?

A.    I don't know.

Q.    Was the mayor present?

A.    I really don't know.  The mayor was at some of the

meetings that I had attended, but I'm not sure if he was at that specific one.

Q.    Did the board members respond to the issues that you raised?

A.    No.  Generally, nobody responds to anything in the city.

Q.    And did you raise the issue of the mayor's assessment at that meeting?

A.    I don't know if I raised it at that meeting, but I had become somewhat agitated over the fact that the mayor kept referring to, you know, our property taxes, the Ortolanos' property taxes, in some of his commentary on property taxes in the city.

So I was at one meeting where I specifically spoke to the mayor as part of my comment.

Q.    Did you try to get the assessing department to correct the taxes?

A.    Yes, we did.  I mean, Laurie took the primary lead on that, but we worked together to analyze, you know, the neighboring properties and to look at the processes that are used by the city to figure that stuff out.

Q.    Were you successful?

A.    No.  We were ultimately successful when we appealed, but at the city level we were not successful.

Q.    Were you at the hearing that Laurie presented a

paper concerning the way the city was assessing properties?

A.    The one presented to the BTLA?

Q.    Yes.

A.    Up in Concord?

Q.    Yes.

A.    Yes, I was at that meeting.

Q.    And did you help her write that report?

A.    Yes, I did.

Q.    Were you aware whether or not the Board of Aldermen were frustrated with Laurie's work?

MR. HILLIARD:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.

Go ahead.

A.    The city generally would disregard most of the work that she would do with respect to, like, the assessing issues, and their reason for that, I don't know, but I do feel like they viewed her as more or less a nuisance that ultimately would go away.

Q.    How did you feel about Laurie participating in these public meetings?

A.    Well, initially, I didn't think it was too big a deal, but ultimately, you know, it seemed to get to a position where there was a lot of negativity in the way that the city communicated with her, and I became sort of concerned about it.

Q.    In what way were you concerned?

A.    Well, they seemed to -- rather than deal with the issues that she would bring to them with respect to the operating approaches, the integrity of some of the staff that was running, they would really sort of turn around and try to dismiss the cause.  You know, that she was just a little overzealous and, you know, these were minor issues she was pointing out, and she was wasting a lot of city time was the sense that I was picking up on.

Q.    When were you told about the January 22, 2021, incident?

A.    Probably a couple days later.

Q.    Did you have an opportunity to read the Union Leader article, which is Exhibit 51 in this case?

A.    Yes, I did.

Q.    And what was your reaction when you read the quotes that were in the newspaper by the --

MR. HILLIARD:  Objection.

Relevance, your Honor.

THE COURT:  Sustained.

Q.    Did you agree that -- strike that.

Have you ever seen Laurie be unstable?

A.    No.

Q.    Have you ever seen Laurie be dangerous?

A.    No.

Q.    Were you at home when the police came to the house in February of 2021?

A.    I believe I was at home, yes.

Q.    What do you recall happening?

A.    Well, they rang the doorbell, Laurie wasn't there at the time, and they asked to speak to her.  I told them that she wasn't there but that I would contact her and tell her that, you know, they were looking for her.

Q.    And did you in fact contact Laurie?

A.    Yes, I did.

Q.    And what did she do?  Did she come home or did she go to the police station?

A.    I think she called the police station and then she went to the police station.

Q.    Did you see the police parked outside of your home or your neighbor's home?

A.    Yeah, I did.  Two cruisers.

Q.    And when you saw those cruisers, what were you thinking?

A.    Well, I don't know.  I mean, there had been some back and forth.  There had been this article that was published in the paper that sort of, like, characterized her as a January 6th sort of insurrectionist thing, and I was concerned that, you know, there were representations of her that were taking place that would in the minds of some

justify, you know, her being prosecuted.

Q. Did you talk to Laurie about the articles that were in the newspaper?

A. I did.

Q. And what was her response?

A. She just thought it was absurd. You know, it's like they're positioning this stuff as way more than it was. I mean, she went -- if somebody had just stamped the two documents, right, and told her to get out of here, it would have been done.

MR. CULLEN: Objection. Hearsay.

THE COURT: Overruled.

Go ahead.

Q. Did you finish your answer?

A. Yes. Yeah.

Q. Did you go to the police station with her when she was going to turn herself in?

A. No.

Q. Why not?

A. I wasn't in town at the time.

Q. What happened after she had turned herself in? Do you recall? What was the next step?

A. Well, she ultimately told me about the whole process of getting, you know, handcuffed and put in a cell and getting photographed and all that stuff.

She sought advice of counsel on, you know, how to proceed.

Q.    How did she take being arrested, handcuffed, mugshot?

A.    Well, it was sort of devastating for her, and it was devastating for both of us.  I mean, who wants to hear about their wife or anybody else getting handcuffed and, you know, put in a jail cell for trying to help a couple elderly people get a rebate on their property taxes.  It's kind of, like, crazy, right?  It was dystopian.  It was sort of weird.

Q.    Did you notice any changes in Laurie's personality after she was arrested?

A.    Oh, yeah. She was -- you know, she was pretty distraught, and it caused her to have some difficulty sleeping.  It changed some of her normal life patterns.  Like walking the dog.  She was concerned that people, you know, reading these stories would view her as a different sort of type of person than she was and it would draw reaction.  There are, you know, a lot of things that evolved after that incident.

Q.    Did you have any concerns about, you know, the charges that they leveled against her and the potential consequences?

A.    I can tell you I was concerned for her safety.

I was also concerned for her being set up when she

went into city hall.

I did purchase a body cam for her which she wore for a period of time and then decided she wouldn't do that anymore.

I had also urged her that anytime she went into city hall to make sure she brought one of her friends with her that could serve as a witness of her interaction with the city.

Q.   Do you have any concerns about how your social network, church, third parties, were viewing Laurie?

A.   Well, I mean, there's all these -- some people believe what they read in the newspapers, and certainly there are some people that, you know, will view us differently or, you know, do view us differently in general.

The church, you know, was a good place for us.  It helped us sort of deal with most of this.

Q.   What did you think about Laurie getting the Nackey Lobe First Amendment Award?

A.   I was very proud of her.  She did a good job. She's consistently worked towards, you know, responsible government and using information that should be freely available to all citizens to do the good work of a good citizen.  So, you know, I was very proud of her.

Q.   And, finally, do you think that Laurie was fairly portrayed in the newspaper articles about the arrest?

A.    I do not.

Q.    In what way?

A.    Well, I mean, they really, you know, positioned her as this person that could have caused injury to somebody.  You know, that's just sort of -- you know, I mean, in my view it was crazy.  It was crazy talk.

MR. AIVALIKLES:  Thank you.

You may inquire.

THE COURT:  Attorney Hilliard.

CROSS-EXAMINATION

BY MR. HILLIARD:

Q.    Good afternoon, Mr. Ortolano.

A.    Good afternoon.

Q.    My name is Russ Hilliard, and I represent Steve Bolton.

Just a couple of questions, sir.

Do you read the posts that your wife puts on Granite Grok and the Nashua Scoop, and I'm forgetting the name of the other one?

A.    Occasionally.

Q.    Occasionally?

A.    Yes.

Q.    Do you read the e-mails that she sends to the Board of Aldermen and other city boards and departments?

A.    Just occasionally.

Q.    She continued to do that in 2021 after the trespass and after her arrest, didn't she?

A.    Yes.

MR. HILLIARD:  Thank you.

CROSS-EXAMINATION

BY MR. CULLEN:

Q.    Good afternoon, Mr. Ortolano.

A.    Good afternoon.

Q.    You indicated that there was a lot of negativity from the city.

There was a fair amount of negativity coming from your wife towards the city, too; is that right?

A.    I would say that's right.

Q.    Because, yeah, you've read those articles that we were looking at the jury with yesterday, right?

A.    I'm sorry.  Could you say that again?

Q.    Yeah.  You've read the articles and looked at some of the statements and comments she's made at the assessing department and places like that, right?

A.    I have been here in the courtroom and listening to the testimony.

I'm not familiar with every exhibit or every piece of content that's been talked about here.  I'm not.

Q.    Obviously, there are big screens here.  You've been able to see some of the words that your wife has used to

describe people, people in this very courtroom?

A.    I've listened to the words.  I was sitting over there, and the closest screen to me was the one over there, I couldn't see it, but I've heard the words that have been said today and in the rest of the trial, yeah.

Q.    Said by her?

A.    Said by her, yes, and by everybody else.

Q.    You would agree that responsible government, also the corollary of that is responsible citizens, right?

A.    Yes.

Q.    Tell me a little bit about your work setup.  Where is your work?  Where's your office?

A.    I have an office based in Worcester, Massachusetts, and then another office based in Cleveland, Ohio, just outside of Cleveland, and then one in South Carolina.

Q.    Which one do you primarily work at?

A.    Primarily, the one in Worcester, Massachusetts.

Q.    And can anybody just walk in there and just stay if you tell them to leave?

A.    No.

MR. CULLEN:  Thank you.

THE COURT:  Attorney Aivalikles.

REDIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.    These articles that Laurie wrote that were just

referenced, those were written after the arrest, were they not?

A.    I'm sure a bunch of them were written after the arrest, but I'm not sure exactly which, you know, which ones, but yeah.

MR. AIVALIKLES:  Thank you.

THE COURT:  Mr. Ortolano, sir, thank you.  You may step down.

And you may call your next witness.

MR. AIVALIKLES:  We have no more witnesses, your Honor.

THE COURT:  I'm sorry?

MR. AIVALIKLES:  We have no more witnesses.

THE COURT:  So the plaintiff rests?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.  Let's take an afternoon recess for ten minutes.

(IN COURT - NO JURY PRESENT)

THE COURT:  We'll need an afternoon recess as well.

The plaintiff has rested.

MR. HILLIARD:  We need time to make a motion, your Honor.

THE COURT:  If you would like to do it now, go ahead.

MR. CULLEN:  Do you want me to start?

Thank you, your Honor.  We would move under Rule 50 for a directed verdict at this time.

The Court's well familiar with the standard as to whether a reasonable juror could find a sufficient evidentiary basis to find in favor of the plaintiff, and the evidence here is insufficient for a reasonable jury to find that evidentiary basis.

The Court has proposed in its instructions that there would be five elements to the plaintiff's claim.  The first is that she engaged in First Amendment activity.  That's not being challenged at this time.

The second is that the action of the defendants caused the arrest.  The action is apparently Mr. Bolton having a meeting with Mr. Carignan and asking him to arrest the plaintiff or investigate the plaintiff.

We know from the chief's testimony this morning that that did not cause her arrest.  In fact, he was very clear on both direct and cross that he refused that request completely and that the police made an independent evaluation after obtaining additional evidence, evidence that was published by the plaintiff herself, that led them to change their mind independently of anything.  There's no evidence in front of this Court to indicate that either Mr. Bolton or Ms. Leonard caused that arrest to happen.

We would also -- I would also argue on behalf of

Attorney Leonard that there's no evidence that Ms. Ortolano's First Amendment activities were a substantial motivating factor.

For Celia Leonard the only two things I can recall being said about her having any sort of retaliatory motive was that she provided her clients with legal advice that they did not have to speak to Ms. Ortolano.

That legal advice is correct. 91-A does not require that they do so. And as I think is apparent to this Court, and Attorney Lehmann for the plaintiff essentially conceded, there are times that you have people that you work with that you do not want to have live conversations with. That's not a First Amendment retaliatory motive. That's proper legal advice that she's giving to a client.

The only other thing that suggested any sort of retaliatory motive was when Ms. Ortolano apparently was standing outside the conference room door and alleges that she heard my client say don't say her name. That is -- when they say in the rule you have to have more than a scintilla of evidence, I would suggest that's not even a scintilla of evidence.

With respect to the fourth element of similarly situated persons, we've had this argument before, but you've now had an opportunity, I think, to look at Exhibit 56 in more detail, and you've heard testimony from Chief Carignan about

those, and it's now quite clear that none of those involved a person who's in any private area of that building.  Several of them, or a few of them anyway, are outside the building.  Some of them aren't even on city hall grounds.

The idea somehow that a person who's passed out in a public bathroom is a similarly situated person to Ms. Ortolano, I think even she would agree that they are not similarly situated.

Not one of those calls comes from the legal department.  Not one of those calls involves a person who's entered the office and refused to leave.  They're just not similarly situated, and I would argue that that's not enough.

The idea that the chief has a philosophy of not generally arresting, he explained very well to the Court and the jury why it is that they don't always make those arrests, and he and Sergeant Roach both testified that there are times when they make an arrest in a criminal trespass case if the person who controls the property is requesting.

Finally, there's no evidence certainly as to my client, but I don't think either, that either was acting under color of law when they took the action.  I don't even know yet -- I'm still not entirely clear what the action my client took was.  There was a call to 911 on the day of the incident, and then there's this idea that she requested an investigation.  There's no indication that she did those

44

things under color of law, and I'll leave it to Attorney Hilliard, but I see the same flaw in the case against Mr. Bolton.

Normally -- I rarely, frankly, move for a directed verdict.  I'm often in excessive force cases where it just doesn't come up, but here -- when I do move, I usually only have one element that I get to attack, but here there are at least three elements that aren't satisfied and don't have enough evidence to go to the jury.

And I would ask the Court at this time to direct a verdict in favor of my client, and I expect Russ is about to get up and ask for the same for his.

THE COURT:  Thank you, sir.

Go ahead.

MR. HILLIARD:  That's in fact the case, your Honor, on behalf of defendant Bolton as well, and I join in those remarks.

Am I close enough to the mic when I stand up?

THE COURT:  It is close enough for me to hear you.

MR. HILLIARD:  Okay.

The only thing I would add is that now that we have, well, Sergeant Roach's, but now today Chief Carignan's testimony, it has become abundantly clear what the sequence of events was, and there was an absolute no to the request from Attorney Bolton to proceed with some further action.  An

absolute no. And he described that the genesis of the discussions and the direction to then Officer Roach through the investigation came internally from the police department.

There's just not sufficient evidence for the jury to find that these defendants were the cause in all aspects of that word cause, your Honor.

Thank you.

THE COURT: Thank you.

Attorney Aivalikles.

MR. AIVALIKLES: Yes, your Honor.

It's our position that the jury based upon the evidence and the reasonable inferences can come to the conclusion that my client's First Amendment rights were violated.

First of all, the defendants have admitted that she was engaged in protected speech. The evidence I think clearly shows that the case was closed on January 22nd, and it was reopened because Attorney Leonard contacted the police and said she was calling for city hall, which I think is color of law, calling on behalf of city hall and that she wanted them to reopen the investigation.

I think what's significant also is that at that time she requested that my client be trespassed as opposed to arrested.

In terms of the motivating factor, I think the

facts are right now that on January 22nd when the police arrived, they did not arrest my client. Attorney Leonard did not demand that they arrest my client. My client then sends an e-mail, and then on January 23rd Attorney Leonard then begins to demand that my client be arrested.

So there's a time connection between the 22nd when she said I don't want her arrested, I want her trespassed, and we get the e-mail and then the e-mail hits, and then the next day or a couple days thereafter she is indicating that she now wants her arrested.

And then she tells the press -- when the press tells her that the police have closed the case, they're not going to pursue any further investigation, she says: I find that troublesome. My office will be hearing from me about that.

Again, referencing her office. Color of law.

So there is a substantial motivating factor for the claims that the arrest was motivated by my client's protected speech.

And if you look at Exhibit 56, your Honor, and you look at the responses, the responses are -- the police are responding to a criminal trespass. None of those people were arrested.

My client wasn't intoxicated. Does that mean it's not similar? No. These people were in city hall. They were

there without permission, which would amount to a criminal violation.  They were told to leave, they left, and there was no consequences.

None of those people were engaged in protected speech, your Honor.  The only one that's been arrested that was engaged in protected speech for a criminal trespass is my client, your Honor.

So I think that there is a disparity of treatment. There is enough evidence to support the claim that she was arrested because of her protected speech.

The situation does not have to be identical to what the police have dealt with in the past, but we do know what the philosophy is, according to Chief Carignan, and the philosophy is if they respond to a complaint for criminal trespass and the police arrive and they tell the person to leave and that person complies, there is no prosecution. There is no exception to that philosophy that if the office occupant wants an arrest, that they make an arrest.  He didn't testify to any exception to that.  And that's what happened in this case.  The police let her go, and there was no arrest and there was no investigation contemplated.  It only got reopened because of Attorney Leonard's call to the police department on behalf of city hall.

And then we know that Attorney Bolton demanded that the chief arrest her when they had the meeting.  Yes, the

chief claimed that he was not going to arrest her, and then she ultimately is arrested. And the chief claims, well, because she admitted to doing the offense. But like the chief said, your Honor, they have many cases that he's been involved with, investigations that result in a prosecution that don't have an admission. So that's not a necessary element in order for them to bring a charge that they need an admission. In fact, even if they presented the case, they still needed witnesses from the city to prove their case, your Honor.

So there is a connection, a "but for" connection, in the evidence that the jury could clearly find that the two lawyers were responsible for changing the mind of the police. Because until they got involved in advocating for the arrest, the case was done. It was over. It was closed.

So I think that there's sufficient evidence for the jury to find that the plaintiff has sustained her burden, your Honor.

THE COURT: Thank you.

MR. CULLEN: May I be heard on just one matter, your Honor?

THE COURT: Yes, you may.

MR. CULLEN: I won't address every single section again, but I do want to debunk this myth that there's evidence that my client retaliated based on this e-mail.

The e-mail was sent out at 3:57 p.m. There's no

evidence that my client even had it at that time. And, again, there's no evidence. That's the point. They have to produce the evidence that my client even saw this e-mail.

But the e-mail itself indicates -- and the plaintiff testified that she contacted Kim Houghton at the Union Leader. She testified that it might have been that morning, but certainly around noon. The e-mail itself also indicates that she already knew that Kim Houghton had talked to the police.

The fact that the article comes out the next day is not evidence that my client made any statements about her to Kim Houghton the next day. And the evidence -- if this case were to go on or had my client been called in the plaintiff's case, she would have testified that in fact she spoke to Kim Houghton prior to ever seeing this e-mail.

That's not a question of fact that we leave for the jury because it's currently not a question of fact in the case because neither Kim Houghton, who is on their list of witnesses, was called. Nor was my client called.

So this isn't a question where we can speculate that, well, maybe it took place here, maybe it took place there. They have the burden of proving by a preponderance of the evidence that this happened, and if that's the connection that they're raising, they don't have that in front of this Court.

I stand with all the other arguments I made as well, but I do want to make that clear.

THE COURT:  All right.  Go ahead.

MR. AIVALIKLES:  Your Honor --

MR. HILLIARD:  Can I just get my other two cents in?

MR. AIVALIKLES:  Oh, I'm sorry.  Go ahead.

MR. HILLIARD:  Just two quick things.

On this issue of similar incidents, Exhibit 56, there has got to be, almost as a matter of common sense, some similarity to justify the conclusion or presumption or whatever we're calling it that somehow this case was treated differently for improper reasons.

This case involves a space not open to the public that the plaintiff came in without permission, and three different people asked her to leave.  It puts those ten incidents in public areas of city hall just in such a different category.  It doesn't justify making the Nieves exception.

THE COURT:  All right.  I understand.

Go ahead.

MR. HILLIARD:  And, finally, I was going to say on this causation, given the state of the record, the best the plaintiff can say to this jury is please speculate about how this might have come about given the state of evidence, your

Honor, and that's not proper.

THE COURT:  All right.  I think I understand everyone's arguments.  I'm going to take it under advisement.

Let's take an afternoon recess.

When we come back, we'll go until 4:00, okay, and I will take the bench --

MR. AIVALIKLES:  Your Honor, I thought the Court was maybe going to issue a ruling, that's why I didn't respond, but I would like to say two things in response to what was just raised.

With regard to Attorney Leonard having the knowledge of the e-mail, the e-mail was sent to the legal office, and there is no evidence right now that the defense has offered that she did not have that e-mail before she made the comment to the reporter or when she called city hall to say that she wanted my client arrested.

So there is an inference that the jury can draw because of the timing right now that she had the e-mail because it was sent to her office and that motivated her to then change her position from I don't want her arrested to I want her arrested.

Secondly, with regard to the similarity of events, the similarity is very simple.  The people in Exhibit 56 were committing criminal trespass, which is what my client did.  When the police responded, the people left, which my client

did, and there were no charges.  That's the similarity.  I don't think the facts themselves have to be identical.

That's all I have to say, your Honor.

THE COURT:  Thank you very much.

All right.  I'll be back in ten minutes.

MR. CULLEN:  Thank you, your Honor.

(RECESS)

(IN COURT - NO JURY PRESENT)

THE COURT:  All right.  After considering the evidence in a light most favorable to Ms. Ortolano and construing all reasonable inferences in her favor without evaluating the credibility of any witness or the weight of the evidence, I find the evidence is legally sufficient for a reasonable jury to find in her favor on both claims, and we can bring the jury in.

(IN COURT - JURY PRESENT)

THE CLERK:  Please be seated.

This hearing is back in session.

THE COURT:  All right.  The plaintiff has rested, and now it is time for -- Attorney Hilliard, would you call your first witness?

MR. HILLIARD:  Thank you, your Honor.

Mindy Lloyd, please.

MINDY LLOYD

having been duly sworn, testified as follows:

THE CLERK:  Please state your full name and spell your last name for the record.

THE WITNESS:  Mindy Lloyd, L-L-O-Y-D.

DIRECT EXAMINATION

BY MR. HILLIARD:

Q.    And what town do you live in?

A.    I live in Milford, New Hampshire.

Q.    And how are you employed?

A.    I'm a legal assistant with the legal department for the city of Nashua.

Q.    And how long has that been true?

A.    I've been with them for approximately eight and a half years.

Q.    All right.  Can you give the jury just a little sense about your educational background and work history leading up to that employment?

A.    Sure.  I'm a graduate of the University of New Hampshire.  And I first started working for the city in the planning department, and I worked as the zoning coordinator for approximately four years, and then I obtained the position as legal assistant for the legal department.

So I've been working for the city for approximately twelve and a half years.

Q.    And as a legal assistant in the legal department, can you give us an idea of your job duties?

A.   Sure.   I perform various duties in support of the four attorneys in the office.

I maintain their calendars and set meetings, I open case files, I work on drafting various documents and legislation for the city, among various other duties in support of the office.

Q.   All right.

MR. HILLIARD:  I would like to look at Exhibit VV for ID, please.

MR. CULLEN:  I think we did make this full, Russ.

THE COURT:  It's a full exhibit, Attorney Aivalikles?

Which one?

THE CLERK:  V as in Victor?

MR. HILLIARD:  Yeah, VV.

THE CLERK:  I don't have that.

THE COURT:  VV, as in Victor?

THE CLERK:  V as in Victor?

MR. HILLIARD:  Right.

THE CLERK:  I don't have that as an admitted exhibit.

MR. HILLIARD:  I don't either, but I'm not sure --

MR. CULLEN:  I'm sorry.  I thought we e-mailed back and forth and said it was okay.

MR. AIVALIKLES:  Can we have a sidebar, your Honor?

THE COURT:  Sure.

(SIDEBAR)

MR. AIVALIKLES:  Your Honor, I told Brian in an e-mail that so long as the jury knows it's not to scale and they identify who produced it, I wouldn't object.

THE COURT:  Okay.  All right.

MR. HILLIARD:  Okay.  Well, she's the person who drew it.  I guess she can say that it's a fair representation, your Honor.  That's what I intended to ask her.

THE COURT:  Okay.  All right.  Go ahead.

(CONCLUSION OF SIDEBAR)

THE CLERK:  Can I publish it, your Honor?

THE COURT:  Not quite yet.  I haven't heard enough about it.

MR. HILLIARD:  Why don't I have her identify it.

THE COURT:  Go ahead.  You can pull it up for your witness, ask some questions, lay a foundation, and then ultimately I'll rule on it.

MR. HILLIARD:  Thank you, your Honor.

Q.    Ms. Lloyd, can you see VV?

A.    Yes.

Q.    What is that?

A.    It's a drawing of the legal department that I made. It's what our office looked like before, not now.

Q.    Is that drawing a fair representation of what the

office looked like, the layout, in January of 2021?

A.    Yes.

Q.    And is it reasonably to scale?

A.    I think so.  It's --

Q.    Did you pace it off to see whether the space is about twice as long as it is wide?

A.    Not at the time I made the drawing.

Q.    Have you done it since?

A.    Yes.

Q.    Is it?

A.    Yes.

Q.    Okay.

MR. HILLIARD:  Move to strike the ID, your Honor.

MR. AIVALIKLES:  That's fine, your Honor.

THE COURT:  All right.  Full exhibit.

MR. HILLIARD:  Thank you.

(Defendant's Exhibit VV Admitted)

Q.    Let's just keep this up for a minute, Ms. Lloyd, and just orient us generally on what we're looking at here.

A.    Okay.  So on the far -- the left side of the drawing it shows our main entrance door.  And when you walked in that door, there would be some filing cabinets on your left and a coat rack on your right, and then the entrance to Attorney Leonard's office.

And then if you keep walking down the hallway, it

leads to where my desk was and the desk of the other legal assistant, and it also had our copier and a couple book shelves.

And right across from my desk and the other legal assistant's desk was our conference room.

And if you continue walking down the hallway, it leads to Attorney Bolton's office and Attorney Clark's office.

Q. Okay. Attorney Clark is another lawyer in the office?

A. She is.

Q. And then in the conference room where it says "Jesse desk," is that the desk out of which Attorney Neumann was working at the time?

A. Yes.

Q. All right. And just a couple other questions for clarity for those who haven't been there.

Where it says vault in the upper left, I take it that is a wall between the hallway and the vault?

A. Yes.

Q. And you enter the vault through the conference room?

A. That's correct.

Q. And then the IT department -- there's no connection between the legal department and the IT department?

A. No. We share a wall with them, but there's no

connection or entrance or anything into that department from our office.

Q.    And the back door, if I can call it that, of the conference room opens up into a hallway area?

A.    Yes.  The third floor hallway.

Q.    All right.  Again, this is what it looked like on January 22, 2021?

A.    Yes.

Q.    Is there any lobby?

A.    No.

Q.    Any waiting room?

A.    No.

Q.    Any counter for someone who was coming in for some service?

A.    No.

Q.    In fact, at that time was the office open to the public?

A.    No.

Q.    Has it ever been while you've been there?

A.    No.

Q.    What kind of materials would one find in this office, just generally?

A.    Well, we have many filing cabinets that contain case files.  So various litigation that's been brought to the city.  There are also book shelves with various books, law

books, city ordinances, contracts, like copies of the union contracts. A lot of confidential materials.

Q. And this is materials that the lawyers would be working with?

A. Yes.

Q. Okay. Are there ever any members of the public that visit the office, the legal department?

A. No. Not normally.

Q. Would there be other city officials or employees that might visit the office?

A. Yes.

Q. Ms. Ortolano has been in that office more than once, right?

A. Yes.

Q. Do you remember an occasion that she was there in 2019 in a meeting in the conference room?

A. Yes.

Q. By the way, this layout that we have in Exhibit VV, that was basically the same in 2019, wasn't it?

A. Yes.

Q. And what do you recall about that meeting that she attended in the conference room? Anything?

A. The only thing I remember was hearing her raise her voice.

Q. Could you tell what she was saying?

A.    No.

Q.    Just raising her voice?

A.    Yes.

Q.    All right.  And then was she in there again in 2020?

A.    Yes.

Q.    And what do you remember about that incident?

A.    She had come to the office to drop off some interrogatory answers to our office, and so I took those from her and she left.

And then very shortly after that she came back to the office and asked to see her abatement file, and I was confused by that request because abatement files are held in our assessing department.  We didn't have them.  So I went to get Attorney Bolton and asked him to speak to her about it.

Q.    And was that the end of your participation in that visit?

A.    Yes.

Q.    All right.  At some point did the office become locked?

A.    Yes.

Q.    When was that, if you remember?

A.    I don't remember exactly when.  I know it was sometime after that incident because at that time we weren't locking the door.  So I know it was sometime after that, but I

don't remember exactly when.

Q. In the 2020 incident had she come in without being greeted or invited in?

A. In? I'm sorry.

Q. In 2020?

If you don't remember, just say so. That's fine.

A. I'm just mixing up my years I think.

Q. Okay.

A. When she came in to drop off the interrogatories you mean?

Q. Right.

A. She had just walked in.

Q. But sometime after that the door became locked?

A. Yes.

Q. All right.

MR. HILLIARD: Can we look at Exhibit UU?

It's a full exhibit, your Honor.

The fifth photograph in UU.

Q. This is Exhibit -- part of Exhibit UU, the fifth photograph. Do you recognize what we're looking at?

A. Yes.

Q. And what is that?

A. This is the hallway that leads to our main door to the legal department.

Q. Is that the way it looks now?

A.    Yes.

Q.    We've heard testimony that in January of 2021 the sign that says "313 legal department - by appointment only" and a phone number was in fact next to the door down the hallway; is that right?

MR. AIVALIKLES:  Your Honor, can I object?

Leading.

THE COURT:  Let's go to sidebar.

(SIDEBAR)

THE COURT:  There was testimony I think that Ms. Ortolano thought that the sign was down closer to the door.

MR. HILLIARD:  And I didn't mean to lead the witness, your Honor.  I just wanted her to confirm that, but I can rephrase it.

THE COURT:  Was your objection that it was leading?

MR. AIVALIKLES:  Yes.

(CONCLUSION OF SIDEBAR)

THE COURT:  Go ahead and rephrase.

Q.    The sign that says "by appointment only" shown in Exhibit UU, number five, where was that sign in January of 2021?

A.    It was next to the door.

Q.    So, in other words, down the hallway we're looking at?

A.    Yes.  Looking down that hallway, the door would be

on the left-hand side.  It's not the door that's straight ahead there in the picture.

Q.    And at that time, January of 2021 -- or strike that.

Are there other differences between the setup we're seeing in this photo and what was there in January of '21?

A.    Yes.

Q.    What are the other differences?

A.    In January 2021 we didn't have it roped off and we didn't have the sign there that said "authorized personnel only."

And we also didn't have -- you can kind of see it protruding on the side of the door there.  That's a doorbell camera.  We didn't have that at the time.

Q.    And what we're seeing there is a doorbell camera setup?

A.    Yes.

Q.    Which was not there in January of '21?

A.    It was not there.

Q.    So let's talk about January 22, 2021.

What's the first thing in terms of this incident you recall?

A.    Well, it was just myself and Attorney Neumann at the office that morning.

MR. HILLIARD:  Excuse me just a minute.

May we put Exhibit VV up again, please?

Thank you.

Q.    Go ahead.

A.    I was sitting at my desk, and I heard a knock on our door around 9 o'clock.  So I got up to see who it was.  And I opened the door just a crack and I had my hand on the door, and I saw Ms. Ortolano standing there, and she asked to meet with Attorney Neumann.  And I asked her if she had an appointment, and she said no, and I said he wasn't available and that she wouldn't be able to come into the office without an appointment.  And she asked again if he was in the office and if she could see him, and I said again, no, she didn't have an appointment and he wasn't available.

And at that point she said something to the effect of, well, I'm coming in, and she pulled the door away from my hand, pulled the door open, and then walked in, and I kind of moved out of the way a little bit so she wouldn't hit my shoulder.

And so she walked down the short hallway --

Q.    Okay.  So now we can look at VV.  So she's come in through that door and is going down that hallway?

A.    Yes.

Q.    Go ahead.

A.    She walked down the hallway past the filing cabinets and past Attorney Leonard's office, and she stopped

where my desk and the other legal assistant's desk was, and I again told her that she needed to leave.

And at that point Attorney Neumann who was in the conference room at his desk, he heard what was going on and he got up and came out of the conference room and he also asked her to leave.

And at that point Attorney Neumann and I decided we were going to call the risk department to see if they could assist us.

Q.   All right.  So up to this point -- she's come in. How many times did you tell her she had to leave?

A.   I told her at least once.  When she had entered the office, I told her at least once that she needed to leave.

Q.   Okay.  And now you're down by the conference room door where Attorney Neumann's desk is?

A.   Yes.

Q.   Okay.  And he came out, and what did he say?

A.   He also told her that she shouldn't be there and she needed to leave.

Q.   What happened -- I think, I'm sorry, I interrupted you.  I think you talked about him indicating to call the risk department?

A.   Yes.

Q.   What's the risk department?

A.   They are the city's insurance risk department.  So

I just -- I don't know exactly what their duties are.

Q. That's fine if you don't. I just wanted -- you said it, and I wanted us to all have some sense of who it was he was suggesting you call.

A. They were located on the first floor of city hall, and I just thought that they might be able to assist us.

Q. And where was Ms. Ortolano at this point?

A. When I called the risk department, I think she was still standing in that same area sort of outside of the conference room door where Jesse was also standing.

Q. Okay. And did she move from there?

A. Yes.

Q. Where did she move?

A. She eventually sat down in front of the doorway to Attorney Leonard's office.

Q. I'm going to show you the first page of Exhibit TT, Ms. Lloyd. We've seen this before. Others have seen it before.

Can you describe to the jury what we're seeing here?

A. That's Ms. Ortolano sitting in front of the doorway that leads to Attorney Leonard's office, and so this view would be from -- you're standing in the conference room doorway.

Q. Why don't you show -- describe on Exhibit VV where

the person who took this photo would be standing.

A.    So it would be the sort of dark rectangle indicating the conference room door.  So to the left of Jesse's desk.

Q.    And then looking toward the door to Attorney Leonard's office?

A.    Correct.

Q.    Okay.  So that's where she was when you called risk?

A.    Yes.

Q.    And what happened as a result of you calling risk?

A.    At first they told me that they would send someone up to assist us, and so I walked through the conference room and I walked out of the other conference room door that leads to the third floor hallway.

Q.    At the top of this VV, right?

A.    At the top, yeah.

Q.    All right.

A.    And I stood there waiting for someone to come upstairs, but very shortly after that the risk department called our office again, and I think Attorney Neumann took the call at his desk, and said that they wanted to speak with me. So I went over and answered the phone at Attorney Neumann's desk, it was someone from our risk department, and she said you need to just call the police.

Q.    All right.  And during this time period is Ms. Ortolano still sitting in Attorney Leonard's door?

A.    Yes.

Q.    Okay.  So what did you do?

A.    So I went back to my desk and I called the Nashua Police Department.

Q.    Okay.  Did you reach them?

A.    I did.

Q.    And what did you tell them?

A.    I told them that someone had trespassed into our office and was refusing to leave.

Q.    All right.  What did whoever you spoke with say?

A.    They asked me if I knew who the person was, and I said yes, and they asked me to describe her, describe what she was wearing, and they asked who was in the office, and I think they asked also if she was threatening us.

Q.    Okay.  And you answered their questions?

A.    I did.

Q.    All right.  And what happened next, if you recall?

A.    While I was on the phone with the police department, Attorney Leonard arrived at the office.

Q.    Okay.  I'm sorry.  While you were on the phone with the police, Attorney Leonard arrived?

A.    Yes.

Q.    All right.  Where did she come in?

A.    She came in I believe through the conference room door that leads out to the third floor hallway.  So, again, that doorway that's at the top of the drawing there.

Q.    The door at the top, the back door of the conference room leading to the hallway, I take it that the staff people, legal department, are able to come in and out of that door?

A.    Yes.

Q.    Is it locked?

A.    It is locked.

Q.    All right.  But Attorney Leonard came in through that door?

A.    I believe so.  That's my memory.

Q.    And just keep going, please.

What happened next, as you recall it?

A.    So Attorney Leonard arrived and she also asked Ms. Ortolano to leave and told her she wasn't supposed to be there, and Ms. Ortolano said something to the effect of she wouldn't leave unless the police made her leave.

And then during that time she also stood up, Ms. Ortolano stood up and then moved toward the main entrance of the legal department where she had come in, and she sat down there.

Q.    So you're referring to -- did she sit down against the wall behind which is the vault?

A.    Yes.

Q.    Right at the door?

A.    Right next to the door.

MR. HILLIARD:  Can I have, please, Exhibit TT, the second photo, please?

Is it possible to rotate it?  Oh, thank you.

Q.    It's not the greatest photo, Ms. Lloyd, but can you see what this is depicting?

A.    Yes.  This shows where Ms. Ortolano was sitting, in front of the main entrance door.

Q.    Okay.  And what happened next?

A.    After I hung up the phone with the police department, it was shortly after that that I believe it was four police officers arrived at the office.  They spoke with Ms. Ortolano for a few minutes, and then they all left together.

Q.    Okay.

MR. HILLIARD:  Can we go back to VV, I'm sorry, one more time, the sketch?

Thank you.

Q.    So when the police arrived, was Ms. Ortolano still out on the floor near the entrance?

A.    Yes.

Q.    All right.  Did the police come in through that door?

A.    I believe so.

Q.    All right.  And at some point they all left?

A.    Yes.

Q.    Do you recall which way they exited the legal department?

A.    I believe it was through that main entrance door.

Q.    Okay.  Have you had any other trespass incidents in the legal department while you were there?

A.    No.

Q.    Did Ms. Ortolano at any time ask you or tell you that she needed date stamps on tax abatement applications?

A.    No.

Q.    I'm not looking for a long answer, but if you can recall, how did you feel after this, after the police led her away?

A.    Well, I felt relief after she left, but in the moment while she was there I was feeling very panicked.  I had never really been in a situation like that before, and I just felt unsafe.

MR. HILLIARD:  Thank you.

THE COURT:  Attorney Cullen, do you have any questions?

MR. CULLEN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q.    Looking, Ms. Lloyd, at -- I believe this is TT-1. This is where she's outside of the conference room or outside of Ms. Leonard's office, Attorney Leonard's office?

A.    Yes.  She's sitting in the doorway of Attorney Leonard's office.

MR. CULLEN:  Can you bring it up on the screen, the other picture, TT-2.  I think that's the same one I have.  I was looking for the next one.

Thank you.  Are you able to rotate that?

Mad skills.  Thank you.

Q.    Your desk -- is your desk pictured in this?  As I see it, Ms. Ortolano is at the end now near the entrance that she came in.  The conference room door I think would be this one?

A.    That's correct.

Q.    Okay.  Is one of these two desks yours?

A.    Yes.  So mine -- I think you can only see a little piece of it.  The more visible desk where you can see the cork board in the back there with some photographs, that's the desk of the other legal assistant.

Q.    Was that Manuela Perry at the time or was it someone else?

A.    Yes.

Q.    Okay.  And your desk is in the foreground maybe with the 3-ring binder or a book open or something on the

front?

A.    I think that little in-basket there was on a table that was next to my desk, and then that little piece on the lower left-hand side of the photo, that would be my desk, or part of it.

Q.    And, forgive me, your position at this time was -- were you the litigation paralegal or the city counsel paralegal?

A.    Legal assistant.

Q.    Legal assistant.

And is it fair to say your desk had a good number of confidential documents on it?

A.    Yes.

Q.    Would that be true of Ms. Perry, as well?

A.    Yes.

Q.    I don't see -- though the picture is a little dark, there doesn't appear to be any wall between the files on the right-hand side of the picture and the desks on the left-hand side, right?

A.    That's correct.

Q.    So when Ms. Ortolano is at the door to the conference room and speaking with Jesse Neumann, there's nothing blocking her vision of the confidential documents on your desk either, right?

A.    That's correct.

MR. CULLEN:  Thank you.  I don't have anything further.

THE COURT:  Attorney Aivalikles?

MR. AIVALIKLES:  Yes.  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. AIVALIKLES:

Q.   Good afternoon.

A.   Good afternoon.

Q.   I'm going to be asking you a few questions about what you recall happening.

Before you testified here today, what documents had you reviewed?

A.   I looked at my police interview, and I also looked at just a memo I had written for myself sort of detailing what had happened.

Q.   Are those handwritten notes?

A.   No.  They're typed.

Q.   Oh.  Is that the same one you gave to the police?

MR. AIVALIKLES:  Can you pull up 47, Mindy Lloyd's statement?

Q.   I just want to make sure we're talking about the same thing.

Is that the statement you gave to the police?

A.   That is, yes.

Q.   And you typed that up?

A.    No.  I had my own written notes.

Q.    Do you have those notes still?

A.    Not with me.

Q.    What did you do with those notes?

A.    I have them saved on my computer.

Q.    And you reviewed those notes prior to testifying here today?

A.    Yes.

MR. AIVALIKLES:  Your Honor, could we have a sidebar?

(SIDEBAR)

MR. AIVALIKLES:  Your Honor, she's testified that she reviewed those notes before she testified today.  I believe I'm entitled to see those notes that she reviewed.

THE COURT:  When did you request those?

MR. HILLIARD:  I have no objection, your Honor.

THE COURT:  Okay.  Obviously, they're not here.  So is there a way to get those?

You don't have any objection.

Do you have an objection, Attorney Cullen?

MR. CULLEN:  No, your Honor.

THE COURT:  Is there a way to get those notes?

MR. HILLIARD:  I have them.

THE COURT:  Oh, you have them?

MR. HILLIARD:  Yeah.

THE COURT:  Okay.  Great.

MR. AIVALIKLES:  Can we have, like, a five minute recess, your Honor?

THE COURT:  Do you need five minutes?  How long is that?  It looks like it's a half a page.

MR. AIVALIKLES:  Okay.  Just a couple minutes then?

THE COURT:  A couple minutes.  All right.

(CONCLUSION OF SIDEBAR)

THE COURT:  We're just going to take a couple of minutes, we're not going to take a recess, just a couple of minutes to let him look at the document.

Q.   Do you have your notes up there?

A.   I don't.

MR. AIVALIKLES:  Your Honor, may I give her her notes?

THE COURT:  Yes, you may.

MR. AIVALIKLES:  Thank you.

(Attorney Aivalikles gives notes to the witness)

Q.   I read them very quickly so I may be wrong.  The question that I can ask you is, is there anything in that note that indicated that Ms. Ortolano pushed the door open?

A.   These notes say she pulled the door open.

Q.   They say she pulled the door open.  And that's not possible, is it?  You can't pull that door open because the door opens into the hallway?

A.    If she had had her hand on the outside door handle, she could have pulled it open.

Q.    She could have pulled it open?

A.    Or she could have used her --

Q.    I think you said pushed, though.

A.    Yeah, I don't have a clear recollection of whether she pulled or pushed the door open.

Q.    Well, she couldn't push the door open.  If she pushed it, she would be closing it; is that correct?

A.    If she had put her hand on the inside of the door and then pushed it open, kind of where my hand was sitting.

Q.    Did she do that?  Do you recall?

A.    I can't remember.

Q.    Okay.  Now, Attorney Bolton is your boss; is that correct?

A.    Yes.

Q.    Did he hire you?

A.    Yes.

Q.    And Attorney Leonard is also your boss?

A.    Yes.  Well, he -- Steve is my boss, I would say, yes.  I work for Attorney Leonard, but Steve is my boss. Steve is the one that approves my timecard and things like that.  So I would say Steve is my boss.

Q.    Now, you testified that no one from the public had ever entered that office.  Do you want to stand by that

testimony?

A. I mean, it wasn't a usual thing that happened.

Q. I understand that, but you used the word never. So that's important.

MR. HILLIARD: Your Honor, I'm not sure that correctly states the testimony, but the witness can respond certainly.

A. I don't recall saying that no one, you know, from the public ever entered the office but --

Q. So members of the public did enter that office?

A. Prior to locking the door there were occasions when there were, like, folks in city hall who were lost who might come in, you know, looking for the city clerk's department or something like that, and we would redirect them. Instances like that may have happened, but other than that, I don't recall anything.

Q. You testified that Mrs. Ortolano dropped off some interrogatories in 1919 (sic)?

A. In 2019?

Q. Or was that in 2020?

A. Or 2020. I can't recall which year it was.

Q. 2020 I think you said. I'm sorry.

Did she have an appointment at that time when she came in to drop off those interrogatories?

A. No.

Q.    Prior to January 21st, 2022, had Mrs. Ortolano entered that office without an appointment prior to the 2021 incident?

THE COURT:  Just restate those dates again.  I think you said 2022.

MR. AIVALIKLES:  Okay.

THE COURT:  Start from scratch.  Go ahead.

Q.    Prior to January 22, 2021, had Mrs. Ortolano entered that office without an appointment?

A.    I just recall when she came to drop off the interrogatories.

Q.    There was a photograph that showed a rope.

Do you recall that photograph?

A.    Yes.

Q.    That wasn't there on January 22nd of 2021.

Why was that rope put up?

MR. HILLIARD:  Objection, your Honor.  Irrelevant.

THE COURT:  Overruled.  Go ahead.

A.    I don't really know.

Q.    Did it have anything to do with Mrs. Ortolano?

A.    I don't know.

Q.    And do you know why the sign was put up that said "authorized personnel only"?

A.    I don't know.

Q.    Did that have anything to do with Mrs. Ortolano?

A.    I don't know.  I wasn't part of the decision-making with the rope and the sign.  So I'm not sure.

Q.    Okay.  The hallway that that rope is at, that is a public hallway; is that correct?

A.    I don't know.

Q.    Well, isn't there a door for a city department at the end of that hallway?

A.    Yes, but that's a locked door.

Q.    I understand that, but if someone wanted to go through that locked door, they would have to walk down that hallway to enter that office; is that correct?

A.    Yes, but the only people that would enter that door would be personnel, city personnel.

Q.    So you mean no one from the public would ever go to that door?

A.    No.

Q.    Did you indicate in your report that Mrs. Ortolano stormed past you as she entered the office?

A.    I indicated that I had to move out of the way so that she wouldn't hit my shoulder.

Q.    Just answer the question.  I asked you if you indicated in your report that she stormed past you?

A.    Are you talking about in my memo or in the police interview?

Q.    Well, let's take the memo first.

Is there anything in there where you use the words she stormed past you?

A.    I said she brushed past me.

Q.    Right.  And is there anything in your report that was typed up that indicates she stormed past you?

A.    No.

Q.    Are you sure that you decided to -- strike that.

Did you decide to contact risk management or were you instructed to contact risk management?

A.    I remember discussing it with Attorney Neumann, and he thought it was a good idea.

Q.    And you indicated that Ms. Ortolano didn't tell you that she was there for a date stamp for some abatements; is that correct?

A.    That's correct.

Q.    But you do know that she told that to Attorney Neumann while she was in there, don't you?

A.    I don't recall that.

Q.    Did you look at Attorney Neumann's report?

A.    No, not recently.

Q.    Have you reviewed it?

A.    I have reviewed it.

MR. AIVALIKLES:  Can we pull that up?

Q.    In the first paragraph starting at he says:  He informed Ortolano that he was not going to discuss anything

with her and that she was trespassing and needed to leave immediately.  He said that -- he repeated these words at least three times and had no intention of discussing anything with her.  He said Ortolano refused to leave.  She continued to talk about abatement stamps while berating you.

You don't recall reading that statement from Attorney Neumann that she repeatedly brought up the issue of date stamps?

A.    I may have read this around the time that it came out, but I don't have any memory of her speaking of abatement date stamps.

Q.    In your statements -- going back to your statements -- in your notes, we can talk about those first, did you indicate that Ms. Ortolano's behavior was erratic?

A.    I didn't use that word.

Q.    Did you indicate in your handwritten notes that she was hostile?

A.    I didn't use that word in my notes.

Q.    Did you indicate in your notes that she was unstable?

A.    No.  These are really just to sort of recall the factual, you know, what had happened.  I didn't go into the emotional aspect of it.

Q.    Well, these statements would be important, would they not?  If she was unstable, if she was erratic, wouldn't

they be important to include in your handwritten notes?

A.    This was just for me to remember the sequence of events.

Q.    I understand that, but wouldn't those factors be important to put in your handwritten notes?  This was an event you said that you felt you were unsafe?

MR. HILLIARD:  Your Honor, there are two questions there.

MR. AIVALIKLES:  Okay.  I'm sorry.  I'll back up.

Q.    You testified that this was an event that you felt unsafe, correct?

A.    Yes.

Q.    But yet there's nothing in your handwritten notes that indicated that her behavior was unstable, threatening, hostile, is there?

A.    I knew I wouldn't forget how I felt on this day.  I thought maybe I would forget the sequence of events, which is why I wrote these notes.

Q.    Can you just please answer the question?

Is there anything in your notes that indicates she was hostile or her behavior was unstable?  Is there anything like that in your notes?

It's just a yes or no answer.

A.    No.

Q.    Okay.  And when you gave your statement for the

police, you wanted to make sure that the police were informed of everything that you had observed, correct?

A.    Yes.

Q.    And you did that, correct?

A.    Yes.

Q.    And you knew that when the police were talking to you it was a pretty important event, correct?

A.    Yes.

Q.    So you wanted to be accurate?

A.    Correct.

Q.    So looking at your report that was given to the police on February 3rd, or the police narrative of your statement, is there anything in there that indicates that Mrs. Ortolano was hostile?

A.    I mean, I think that -- you know, the end of the first paragraph where she pushes open the door and I have to step out of the way to avoid physical contact, I mean, just the act itself was hostile.

Q.    I'll ask you the question again.

Is there anything in the report that says that she was hostile?  Did you use that word?

A.    That word is not used in the report, no.

Q.    Did you use the words her behavior was unstable in the report to the police?

A.    No.

Q.   Did you use the words that you were concerned about her behavior?  Are those words used in your report to the police?

A.   No.

Q.   Did you use the words she was hostile and threatening in the report to the police?

A.   No.

Q.   Did you use the word that her behavior was erratic in your report to the police?

A.   No.

MR. AIVALIKLES:  Can you pull up 51, the article, the picture?

Q.   Did you ever tell the police either in your report or in your notes that you felt when Mrs. Ortolano came into the office it was an out-and-out invasion?

A.   No.

Q.   Did you tell -- I'm sorry.  Did you indicate in either the report or your notes that you felt that her activities were influenced by the events of Washington, D.C., on January 6th?

A.   No.

Q.   Did you tell the police officer in the report or in your notes that it was fortunate that no one was hurt or worse?  Did you make a statement like that?

A.   I don't think so.

Q.   In this particular picture does it appear that Mrs. Ortolano is doing anything that would indicate hostility?

A.   No.

Q.   In fact, Mrs. Ortolano was calm throughout the whole process, wasn't she?

A.   I wouldn't say calm.

Q.   Well, when the police arrived, they indicated she was calm.  Would you agree with that?

A.   Perhaps.  At that point I was sitting at my desk and she was sitting at the main entrance of the office.  So I wasn't really interacting with her at that point.

Q.   But you said you were concerned by the fact that she was there, but you weren't paying attention to what was going on?

A.   I was in a situation I had never been in before, and I was panicking.

Q.   Did you indicate in the report to the police officer that you were panicking while this situation was going on?  Did you use those words?

A.   It's not in the report.

Q.   Prior to January 22, 2021, did you hear any comments made by Attorney Bolton about Mrs. Ortolano?

A.   No, other than if we spoke about her in terms of, you know, her cases or litigation against the city.

Q.   That was the only conversations that you heard,

about the litigation?

A.   I don't recall anything else.

Q.   Did you hear any conversations or did you have any conversations from Attorney Leonard concerning Mrs. Ortolano prior to January 22nd?

A.   I don't recall any specific conversations.  It was a long time ago but --

Q.   Yeah, granted.

Did you hear any conversations after January 22nd from Attorney Bolton that he wanted Mrs. Ortolano arrested?

MR. CULLEN:  Objection.  Can we have a more specific time frame on that?

MR. AIVALIKLES:  I said it was after.

MR. CULLEN:  But after is, like, till today.

MR. AIVALIKLES:  Okay.  Fair enough.

Q.   Between January 22nd, 2021, and February 18th, 2021, did you hear any comments by Attorney Bolton that Mrs. Ortolano should be arrested for what happened at the office?

A.   I don't have a clear memory of him saying that.

Q.   Did you hear Attorney Leonard between January 22, 2021, and February 18, 2021, stating that Mrs. Ortolano should be arrested as regard to what happened at the office?

A.   Again, I don't have a distinct memory of any one of them saying those things.

Q.   Did you attend any of the meetings with Attorney

Bolton, Attorney Leonard, and Chief Carignan at city hall?

A.    Yes.  I sat in on a Zoom meeting with the police department on the day that this happened.

Q.    I'm sorry.  There was a Zoom meeting with the police department the day that this happened?  Is that your testimony?

A.    Yes.  That's my memory.  I believe it was on the same day.

Q.    Who was at the meeting?

A.    I believe it was myself, Attorney Leonard, Attorney Bolton, and Attorney Neumann from our office, and then there were several police officers.

Q.    I'm sorry.  There were several police officers?

A.    Several.

Q.    Did these police officers have a lot of -- wearing a lot of brass on their uniforms?

A.    I don't remember.

Q.    You don't remember who the police officers were?

A.    No.

Q.    And what was discussed at that meeting, that Zoom meeting?

A.    I don't really have a clear memory of it.

Q.    Did you hear Attorney Bolton say that he wanted Mrs. Ortolano arrested?  Do you have any recollection of that?

A.    No.

Q.    Do you have any recollection that Attorney Leonard indicated that Mrs. Ortolano should be arrested?

A.    No.

Q.    But you participated in the meeting.  When I say participated, you were there throughout the whole meeting, correct?

A.    I was in the meeting and I sat in on the meeting.

Q.    Did you say anything in the meeting?

A.    No.

Q.    How long did the meeting last?

A.    I don't remember.

Q.    Do you remember what the result was following the ending of the meeting?

A.    No.

Q.    Did you attend a meeting with the chief, Attorney Bolton, and Attorney Leonard at the legal office?

A.    Yes.

Q.    You were.  Okay.

Did you hear Attorney Bolton demand that the chief arrest Mrs. Ortolano?

A.    No.  I don't have a clear recollection of what was said at that meeting.

Q.    Okay.  Do you have a recollection that Attorney Bolton wanted the chief to reopen the investigation?

A.    I don't have a clear recollection.

Q.    The chief indicated that Attorney Bolton was angry during that meeting.

Do you have a recollection of whether he was angry at that meeting?

A.    No.

Q.    No recollection?

A.    No.

Q.    Do you have a -- the chief indicated that Attorney Bolton raised his voice during that meeting.

Do you have a recollection of Attorney Bolton raising his voice?

A.    I don't.  The only thing I remember from that meeting was Chief Carignan speaking, and he sort of just said that he was taking it seriously.  He was taking the situation seriously.  That's really the only detail that I remember.

Q.    Do you recall Chief Carignan telling Attorney Bolton and Attorney Leonard that he was not going to arrest Laurie Ortolano at that meeting?

A.    No.  I don't have any recollection of that.

MR. AIVALIKLES:  Thank you.

Nothing further.

THE COURT:  Attorney Hilliard?  Attorney Cullen?

MR. HILLIARD:  Just one thing.

May I have Exhibit 47, page number 10, please?

REDIRECT EXAMINATION

BY MR. HILLIARD:

Q.   You were looking at this, Ms. Lloyd, with Attorney Aivalikles, and he was in the middle of that big paragraph, the second paragraph, and I want to call your attention -- now, this is Attorney Neumann's statement to the police.  I want to call your attention to the middle of that paragraph.

The sentence says:  He said that Ortolano refused to leave.

He meaning Neumann.

Continued to talk about abatement stamp dates while also berating both he and Ms. Lloyd.

Do you recall that?

A.   No.  I just remember -- I remember perhaps Ms. Ortolano berating Attorney Neumann, but I think at that time maybe I was on my way to call the risk department.  I can't quite remember.

MR. HILLIARD:  All right.  Thank you.

RECROSS-EXAMINATION

BY MR. CULLEN:

Q.   Ms. Lloyd, you were shown a statement from a police report bearing your name at the top of it.

MR. CULLEN:  Can we pull that up?  It's Exhibit 47, page 9.

Q.   There were some suggestions -- or I think at times it was represented a little unclearly, but this isn't a

statement that you wrote.  This is a summary of an interview you gave that was written by the officer who interviewed you, right?

A.    That's correct.

Q.    So if the word is hostile or something like that, this isn't your writing?

A.    Correct.

Q.    And with respect to your own notes, I think you indicated that you wanted to write your notes to remember the sequence?

A.    Correct.

Q.    But you said that you didn't need to write notes about how you felt because you wouldn't ever forget that?

A.    That's correct.

Q.    Has anything like this happened to you ever before?

A.    No.

Q.    Has anyone else come in and pushed past you and into the legal department and started berating Attorney Neumann?

A.    No.

Q.    Has anybody ever gone into the legal department and refused to leave when you told them to leave?

A.    No.

Q.    Has there ever been a time that you stamped municipal abatement applications on behalf of the city?

A.    No.

MR. CULLEN:  Thank you.

RECROSS-EXAMINATION

BY MR. AIVALIKLES:

Q.    Does the legal office have a date stamp that they use?

A.    Yes.

Q.    And at any time did Attorney Neumann tell you that Mrs. Ortolano was looking for a date stamp?

A.    No.

Q.    At any time when Attorney Neumann first came out, do you recall him saying hello to Mrs. Ortolano?

A.    No.  He just told her that she needed to leave.

Q.    Did he ask her if he could help her?

A.    No.

Q.    Did he offer any assistance?

A.    No.

Q.    He refused to answer her questions, correct?

A.    I just remember he told her that she needed to leave.

Q.    And when Attorney Leonard came in, did she say hello to Mrs. Ortolano?

A.    No.  I don't think so.  I was on the phone with the police when she came in, but I only recall her asking Ms. Ortolano to leave.

Q.    That's the only thing you recall her telling Mrs. Ortolano.

How many times did she tell her to leave?

A.    How many times did Attorney Leonard tell Ms. Ortolano to leave?

Q.    Yes.

A.    I only heard one instance of it, but I was also on the phone with the police at the time so I was only hearing, you know, a little bit of what was going on.

Q.    So you talked to the police, correct, and this is what this statement is in Exhibit 47.

Do you think that if you told the police officer that Mrs. Ortolano was hostile, erratic, unstable, that that would have been noted by the police officer in his narrative?

A.    I don't know.

MR. AIVALIKLES:  Thank you.

THE COURT:  All right.  Ms. Lloyd, you may step down.  Thank you.

And you may call your next witness.

You have 20 minutes.

MR. CULLEN:  The defendants are going to call Celia Leonard.

I'm sorry.  Did you say 40 minutes or 20 minutes, your Honor?

THE COURT:  20.  That's five minutes fast.

(Testimony of Celia Leonard previously transcribed under separate cover)

(Jury trial adjourned at 4:05 p.m.)

C E R T I F I C A T E


        I, Susan M. Bateman, do hereby certify that the

foregoing transcript is a true and accurate transcription of

the within proceedings to the best of my knowledge, skill,

ability and belief.


Submitted:  4-6-26        /s/    Susan M. Bateman _____
                          SUSAN M. BATEMAN, RPR, CRR