*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 16, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                            \*

LAURIE ORTOLANO,                     \*
                                            \*

               Plaintiff,        \*

                                      \*   1:22-cv-326-LM

              v.                \*   February 9, 2026
                                         \*   8:58 a.m.

STEVEN BOLTON and CELIA LEONARD,     \*
                                            \*

              Defendants.       \*
                                            \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JURY TRIAL DAY 5
MORNING SESSION AND VERDICT
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

Appearances:

| | |
|---|---|
| For the Plaintiff: | William E. Aivalikles, Esq.<br>Aivalikles Law Office |
| For the Defendant,<br>Steven Bolton: | Russell F. Hilliard, Esq.<br>Madeline Kate Matulis, Esq.<br>Upton & Hatfield LLP |
| For the Defendant,<br>Celia Leonard: | Brian J.S. Cullen, Esq.<br>Cullen Collimore Shirley PLLC |
| Court Reporter: | Liza W. Dubois, RMR, CRR<br>Official Court Reporter<br>U.S. District Court<br>55 Pleasant Street<br>Concord, New Hampshire 03301<br>(603)225-1442 |

2

I N D E X

                                                                    Page

Closing Arguments

  By Mr. Hilliard                                                      3
  By Mr. Cullen                                                       10
  By Mr. Aivalikles                                                   22


Jury Instructions                                                    52

P R O C E E D I N G S

(Excerpt #1 filed under separate cover.)

(With the jury present.)

THE CLERK:  All rise for the jury.

Please be seated.

This court is now in session and has for consideration jury trial day five in the matter of Laurie Ortolano vs. Steven Bolton, et al, 22-cv-326-LM.

THE COURT:  All right.  Good morning, everybody. Just going to check in before we begin closing arguments. We've had a weekend since we last saw each other and I just want to confirm that over the weekend you were able to comply with all of my instructions.

And every single one of you is shaking your head affirmatively.  Thank you very much.

We will now begin closing arguments with Attorney Hilliard for Attorney Bolton.

MR. HILLIARD:  May it please the Court and members of the jury.

As I told you in my opening statement, I would return at the conclusion of this case and ask that you return a verdict in favor of my client, Steve Bolton, based on the evidence you've heard over the last few days.

Beyond the undisputed facts I highlighted at the beginning, the trespass, police arrest, and the plea of guilty,

the evidence has now fleshed out the open questions that I suggested you would have to consider.

But before I do that, let me talk for a minute or two about damages.

Respectfully, I suggest that you need never reach the question of damages and that you should find instead in favor of my client.  But in the event you do, I would be remiss if I didn't make a couple of comments.

There's not been any concrete proof of any damages suffered by Ms. Ortolano.  Her generalized testimony about distress and upset is belied by all the things she said and did in the months following the trespass and the arrest.  In fact, when you get a chance to look at all of the blog posts, emails, meeting minutes -- you'll find them between Exhibit G and MM in your exhibits -- you might conclude that she actually viewed this as a badge of honor.

Likewise, you will hear an instruction from the Court regarding punitive damages.  But like other damages, no such award is justified by the evidence.

It's undisputed that Steve Bolton had no participation in or knowledge of the other incidents in city hall that you heard about that did not result in an arrest for trespass.  His motivation was to deal appropriately for her quite unacceptable conduct that day, January 22, 2021.  Nothing more, nothing less.  Even if you found him liable, there is no

or very little damage to answer for.

Now let me review the incident in question.

You've heard a lot about what happened that day from a lot of different people.  Let me suggest to you that Exhibit 45, the complaint, Exhibit 46, the arrest warrant affidavit, and Exhibit 47, the compilation of Sergeant Roach's investigation, contain the most complete and reliable information for you to consider.  The testimony of Mindy Lloyd and Celia Leonard who were there that day is consistent with that investigative report and demonstrates that beyond any doubt, all of the elements of criminal trespass were present.

In fact, Ms. Ortolano conceded that the trespass complaint, Exhibit 45, that described her conduct that day was true, knowing she was not licensed or privileged to do so, knowingly entered and remained in Room 313 in defiance of an order not to enter or remain, which was personally communicated to her by authorized persons, Mindy Lloyd, Jesse Neumann, and Celia Leonard.  This is the offense to which she pled guilty.

Ms. Ortolano has always made much of Sergeant Roach's shorthand entry of his original narrative note.  I think it said no offenses alleged or apparent.  But you heard his explanation for these words and why they have no bearing on the later internal decision of the police department to investigate or consider prosecution.

You may also recall Ms. Ortolano's parting words to

Sergeant Roach that day.  I'll be back, she said.  That's in Exhibit 47 at page 5.

And to put it in context, nothing like this has ever happened before in the legal department.  And much as Ms. Ortolano may wish to minimize this, you had a chance to hear and see Mindy Lloyd describe this incident and how it impacted her.  This was no trivial matter.  Pulling or pushing the door from Mindy's hand, rushing past her after being told she needed an appointment, sitting, sprawling on the floor, berating a new low-level employee, Jesse Neumann.  And you'll find in the exhibits a few months later, just a few months later, she's telling the Budget Review Committee at a public hearing, talking about Jesse Neumann, to quote, fire his buns out of there.  It's Exhibit J.  Refusing to leave after being asked and told many times by three different people, such conduct in any professional office would raise concerns, hostility, and instability.

And in the face of all the questions you heard asked about, well, did you say hostile, did you say threatening, did you say erratic, did you say unstable, this is what they will face -- and, for the record, Exhibit TT -- sitting in Celia's door to the office, refusing to leave.

To now blame others and accept no responsibility herself for this situation demonstrates the complete irresponsibility of Ms. Ortolano in dealing with other people

if her various publications and statements didn't already demonstrate this.

Her entrance without permission, refusal to leave despite numerous requests, was, as you've heard from Steve Bolton, an affront to him and his office. His reaction to it is totally natural and reasonable. He did what any office manager, government or private, would have done.

I know you've heard a lot about Exhibit 56, but let me just spend a couple of minutes on it.

To add to her irresponsibility, Ms. Ortolano now claims that even though she pled guilty to the charge of trespassing, she was treated differently from other individuals who were trespassing at city hall and were not arrested. As you'll recall, we spent a lot of time looking at Exhibit 56 and the 10 other incidents that she claims demonstrate she was treated differently. All you'll need to do is look again at those in the jury deliberation room and you will see there's no comparison whatsoever to her conduct in entering an office not open to the public, knowing she was doing so without permission, refusing directions from three different people to leave, and sitting down and not leaving until the police finally have to be called and arrive.

It trivializes her conduct to suggest that she's no different from the intoxicated woman in the public bathroom off the main lobby of city hall or the highly intoxicated man

locked in a stall in the men's room there.  It's an affront to our senses to have her try to use this information to somehow excuse the responsibility she shouldered in choosing to trespass and pleading guilty to the charge.

Let me shift to the Nashua Police Department.  Did Steve Bolton cause the plaintiff's arrest?  The undisputed evidence now demonstrates that he did not.  His initial effort with Chief Carignan was completely unsuccessful.  And as you've heard from the former chief, it was later internal discussions at the police department based on additional information that had come to light which resulted in the assignment of Sergeant Roach to conduct an investigation.

This is not to say that Steve's desire that there be consequences for such an intrusion into the legal department and the upset of his staff on that Friday morning, that that desire was unfounded or unreasonable, but he ran into the absolute independent authority of the Nashua Police Department to review these situations and make these decisions.  He did not cause her arrest.  She caused her arrest by the police department.

Another part of the instructions will be retaliatory motive and we often say that there's no window to the human mind.  While this is true, we can certainly make judgments about intent, such as retaliation by a person's words or actions.  Here, the only expressed and understandable concern

of Steve Bolton with respect to this trespass by Ms. Ortolano was the safety of his staff.  This would be the same and be true in his private law office if it happened there.  Anyone would have been concerned, no matter who had had the temerity to enter the office without permission and obey direct instructions to leave by three members of the staff.

As the picture demonstrates, this picture, TT, they were in an impossible situation, and Ms. Ortolano put them there.  Steve's concern for his staff was not only reasonable but appropriate under the circumstances.  Ms. Ortolano's First Amendment activities were not the motivating factor.

You'll receive, as I think you already know, obviously, a set of instructions after the lawyers finish their remarks from Judge McCafferty.  And all of the instructions that she will give you are important, but there is one I would like to emphasize and that's the burden of proof.

One of the fundamental concepts of our justice system recognizes that if a person's going to bring a lawsuit against another, that person must bear the burden of proving by preponderance of the evidence that their claims are true.

And, in fact, this is also the reason why in the order of the closing arguments the plaintiff's attorney gets the last word, because she has the burden of proof.  The actual instruction you'll hear will provide more detail, but the important thing to remember is that unless Ms. Ortolano meets

that burden of proof, your verdict must be for the defendants.

Attorney Cullen will be speaking with you next on behalf of Celia Leonard.  I'm sure he'll be making some points that also apply to Steve Bolton and I ask you to consider those as well.

In conclusion, on behalf of my client, Steve Bolton, I appreciate the attention you've given to this serious matter. I only ask that you weigh the testimony and exhibits carefully. I'm confident you will conclude that Ms. Ortolano has not met the burden of proof and that your verdict should be in favor of my client.

Thank you very much.

THE COURT:  Thank you, Attorney Hilliard.

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  Attorney Cullen for Attorney Leonard.

MR. CULLEN:  Good morning, everybody.  I get to go second this time, but I'm still after Russ, which means that it's going to feel like I'm speaking really quickly and I probably am.

In my opening, I told you that I wanted to introduce you to my client, Celia Leonard, tell you a little bit about her, because I knew it was going to be a while before you had a chance to talk to her.  And I asked that you just listen to all the evidence going through.  And I think I speak for all the counsel and the Court when it seems evident that you've all

done that through the course of the trial.

I also suggested that you pay attention to this question about time stamps and whether the plaintiff came in that day to ask the legal department for time stamps.  And you saw a lot about this statement by Jesse Neumann saying, well, you know, she talked about time stamps and abatements.  I think if you look at that statement carefully, and it's part of Exhibit 47, you'll find that he says she's talking about it, not that she comes in and says I'm asking for one.

And I said that, you know, she's going to present this as she came in, you know, for this good purpose of defending or pursuing these abatements for a couple of elderly clients, a noble and admirable cause, I suggest that she'll say.  And I said in my opening, I said, look, that's commendable.

But I also pointed out, and you now have it before you, that she called a reporter immediately after getting back to her house and the reporter didn't say anything about I went there to get documents stamped.  And she wrote a lengthy email, she said she probably spent all day on it, the one that's now Exhibit 1 in the plaintiff's binder that you'll have.  That's the one that she sent at 3:57 that afternoon.  And nowhere in that rendition of her version of events does she say that I went in there to get something stamped.

But let's talk about a couple of things that are not

12

ambiguous.

First, there was no need for Ms. Ortolano to go to the legal department that day to get time stamps or any other purpose. Richard Vincent, who is the head of the assessing department, had been in contact with her that week. And on Wednesday, just before noon, he finally received the email that she'd sent to the wrong address previously and said, I'll look into it. This is the person who's actually in charge of abatements, not Jesse Neumann, who we now know was only there for three or four weeks before this and dealt with 91-A requests, right-to-know requests. This was Richard Vincent, the person in charge of this.

And when she didn't get a response within 24 hours, she sent him a follow-up letter and she copied the mayor, the Board of Assessors, and three different people from the state Department of Revenue Administration, essentially the state's IRS.

At 9:30 in the morning, not having received a response to that email, she did not need to go into the legal department for any reason. And you heard she came into city hall and she just went office to office to office to office. And she said that she wrote that earlier email to light a fire. And I think you can consider that she came in that day because she wanted to see if she'd lit a fire.

The second thing that we know, however, or that I

think is unambiguous from the evidence, is that Ms. Ortolano knew she wasn't supposed to go to the legal department with questions and she wasn't supposed to go without an appointment. How did she know that?  September 15th or September 11th of 2019, she sends an email to my client, Ms. Leonard, specifically saying, thank you for clearing things up; I understand now I'm not supposed to go to the legal department with general questions.

And Steve Bolton expressly tells her, you can't come back here.  And why does he do that?  He does that because the last time Ms. Ortolano was in the legal department speaking with legal counsel, she reported him to the Professional Conduct Committee or Attorney Discipline Committee saying that he had talked to her when he's not supposed to because she had another counsel.

And we know that in January -- you know that in January -- from the evidence that in January of 2022 -- '21, I apologize -- in January of 2021, she had counsel, she had Rick Lehmann, who was here.  And Attorney Lehmann even told you, there are some people with whom it is safer to only communicate with them in writing.  And Ms. Ortolano was one of those people.  And she knew that she wasn't supposed to be there.

And she talks about -- well, I mean, we have all of this -- this picture of the -- of the sign that keeps coming up

when it's been moved a year and a half later to the outside of the door. But there's really no question, I'd say, before you. There's a sign right on the door, right -- at this time, right next to the handle that she pulls open, that says, by appointment only. And she tells you, well, I -- I wasn't really reading the sign.

Okay. If she's not reading the sign, she certainly knew when Mindy Lloyd said, do you have an appointment, you can't be here without an appointment. And whether she rips the door open this way or pushes it this way, there was a lot of talk about push versus pull, what does it matter? What matters is that Mindy Lloyd said, you can't be here, and she brushed Mindy Lloyd aside, walked into that evidence -- office and said, where's Jesse Neumann, I want to talk to Jesse Neumann.

And what's the first thing we know Jesse Neumann says? You can't be here, you need to leave, you're trespassing. And he has to say it three different times.

And she doesn't leave. And they call risk management and the police are called and my client, Celia, arrives and -- my client arrives. And when she arrives, she says the same thing, look, you need to leave, you can't be here. With good reason, based on knowing, like Jesse Neumann knows, that talking to Ms. Ortolano can land you in trouble with the Attorney Discipline Office. Now, Attorney Bolton was exonerated, but that doesn't mean that he didn't have to go

through the process.

Now, the judge is going to instruct you on the elements of the plaintiff's claim.  And I know that Russ Hilliard talked about this a little bit, so I'm -- but I want to just go through them.  I'm going to characterize those elements.  The judge is going to give you the instructions, obviously.  If there's a difference, you should follow mine.  No, I'm kidding.  If there's a difference, you -- the judge's instructions are the last word on the law.

But I'm going to suggest to you that she's going to say there are five elements to Ms. Ortolano's claim, that she has to prove each element beyond -- not beyond -- each element by a preponderance of the evidence.  She has to show you that it's more likely than not each one of those.

So she's got five of them.  Well, the first one is fairly easy; did the plaintiff engage in First Amendment activity.  And you heard Mr. Bolton -- Attorney Bolton and Attorney Leonard both say, yeah, of course, she has a right to file 91-A requests.  She has a right to file an abatement.  That's -- that's conceded.  It's not contested.  She has a right to say -- to criticize the government and she -- and say horrible things, and she did say horrible things, but she has a right to do that.  She's allowed to do that.

I would suggest the evidence doesn't support the plaintiff's claim on any of the other four elements.

The second element is that the plaintiff has to show that each individual defendant was the cause of her arrest.

Well, what did Celia Leonard do?  She reported that day to the police that she was there.  She said that, you know, she had a problem with the police when the police said, hey, we're not going to even trespass her, there's not going to be an investigation.

But you heard from Sergeant Roach; did -- did Celia Leonard ever talk to you between then and when you interviewed her?  No.

You heard from Chief Carignan; did you ever talk to Celia Leonard about this case?  No.

There's no indication whatsoever.  Celia Leonard told you the same thing.  No witness has come in here and said that Celia Leonard, you know, went around somebody's back and -- and made this thing happen.

But there's also something called an intervening cause, and this is what Attorney Hilliard touched upon.  An intervening cause is when you do something, but the actual cause of the eventual, you know, harm or damage is something that's independent of you.  It's an intervening cause.  And I would suggest to you that the intervening cause here was delivered to you by Chief Carignan who told you that when Steve Bolton came to him and said that he wanted an investigation or demanded an arrest, depending whose memory of that is more

clear, he said no.  He said, as I characterized it in the opening, you're not the boss of me.  And he made clear -- he spent a lot of time talking about how the police are so independent, they have a police commission that's appointed by the governor, and that's something that the chief fought for and values.

The legal department doesn't control the police and he made that clear.  As Celia Leonard put it, they got a hard no when they asked for an investigation.  And Chief Carignan said that people below him then came up to him later and said, hey, we've seen a post on social media where she admits that she was there, that she refused -- was told to leave and she refused to leave, and those people in my department said, we think there should be an investigation.

And so the investigation request goes back from the chief to his various people, I think the chief to the deputy chief to the captain to the lieutenant -- I can't even remember the order, but it's about three or four people before it gets to Sergeant Roach.  Sergeant Roach isn't told, go arrest this person.  He tells you that.  He's tells you, I've been told to do an investigation.  So he goes and interviews the three people who were in the office and he gives Ms. Ortolano a chance to speak with him as well.

Now, obviously, she doesn't have to, and she didn't.  That's fine.  That's her Fifth Amendment right.  But she had an

opportunity to talk to him and she didn't.  And then he submitted a warrant to a judge, and the judge determined that there was probable cause, and that's when the charges came about.

So did the defendant -- did the plaintiff prove to you that Celia Leonard caused her arrest?  I would suggest the evidence is to the contrary.

But she also -- if you get past that, she also has to prove that Celia Leonard acted with a retaliatory -- with a retaliatory animus, some sort of hatred or motive to get to her, because of her First Amendment speech.  And what's the evidence of that?  Well, plaintiff keeps waving around this Exhibit 19, where Celia Leonard is asked a question by Kim Kleiner, hey, you know, the plaintiff wants to talk to this assessor, and she says, look, you don't have to do that, the law does not require that.  And it's uncontested that that -- that advice is accurate.

We don't have to like it.  You can say, listen, I feel the government should talk to citizens all the time.  That's fine.  But it's not the law.  And she's advising her client, you don't have to talk to that person and, I think you heard, with good reason.

Plaintiff had already been investigating -- had a private eye follow another assessor around, had the private eye follow the guy with a drone, was in the assessing office

calling out, saying -- texting, saying, hey, Greg Turgiss is leaving now.

There was good reason for that advice.  That's not retaliatory animus, I would suggest to you.

And as to the 3:57 p.m. email being sort of something that she was retaliating for, she had already written her statement and provided to the press saying that she thought she was hostile and threatening.  She didn't do anything beyond that after that.  She already had put her view of the case -- day in writing before that email even ever was sent.

The fourth element is this idea that she has to prove that she was treated differently than similarly situated people.  You've seen Exhibit 56.  Russ Hilliard already talked to you about this exhibit, 56.  If there's one exhibit you guys already know by number, it's probably Exhibit 56.

I'd just ask you to take a look at that.  When you review it yourself, you're going to see, I think, that not one of those people is similarly situated to the plaintiff.  Some of them aren't even in the building or on the property.  One, I think, is at the gyro market next door.  One, I think, is at the Telegraph, you'll find.  On many of them, it's not even clear that anybody even asked them to leave.  They were passed out or on the nod, I think was the expression the chief used.

Most importantly, I'd suggest none of them took place in the legal department and none of them involved Celia

Leonard or, for that matter, Steve Bolton.  Neither of them treated her differently than they treated anyone else because it had never happened before.  Each testified that they'd never had to call for the police to have somebody removed from the legal department because it just didn't happen.

And although the chief said, well, you know, we have a philosophy or an approach to these cases where if the person leaves, we don't arrest, that's not the legal department.  The legal department doesn't have control over the police department's approach to these cases.

But both he and Sergeant Roach told you, yeah, if the victim, if the person who reports the crime, wants charges brought, then we'll go ahead and we'll investigate them.  So where is the evidence that she's treated differently than other people who were asked to leave, you know, your banquet hall or your place of business, or your office, or your school, or your teach -- your classroom.  Where is the evidence that she's treated differently than those people?  I would suggest to you that there's none.

And, finally, the plaintiff has to prove to you that Celia Leonard acted under the color of law, in other words, that she acted in a way that only -- that she could only do because of her position.  And Celia told you, I would have done the same thing if this had happened at my bank, when I worked at a bank, or anywhere else and I would have done it no matter

who was there.

Russ talked about damages first, so I'll talk about it last. This isn't a defamation claim. The plaintiff has to show some concrete damages, either some actual monetary costs that she suffered or emotional distress that she suffered. And, again, if you look at emotional distress, where she says I was too emotionally distressed to go out in public, the first thing she did when she got home that day was call Kimberly Houghton at the Union Leader and tell her what happened. You can ask yourself, is that what somebody does when they're emotionally distressed and depressed? She certainly didn't seem emotionally distressed when she called my client a despicable lawyer and worse in the Exhibit GG that you'll have in front of you.

And punitive damages, I suggest you're going to hear, are awarded only if she establishes that Celia Leonard acted with outrageous conduct, engaged in outrageous conduct or something that evidences evil motive or intent.

I would suggest whatever the plaintiff's purpose when she arrived, whether it was noble or admirable or commendable, her -- her conduct, not Celia Leonard's conduct, when -- after Mindy Lloyd opened that door to see who it was, that was the conduct that was outrageous. She was told not to come in. She pushed past Ms. Lloyd. She refused to leave, despite being told seven times to leave, and she sat down and

just wouldn't go until the police had to be called.

Now, I'm not suggesting she has an evil motive and, frankly, you don't have to find that. You don't have to find that she's a good person or a bad person. That's not the question. The question before you is simply are you satisfied that she has convinced you by a preponderance of the evidence on every one of these five elements.

Based on all of the evidence, I would ask you to come back and say, no, that she hasn't satisfied that burden and enter a judgment in favor of Attorney Leonard.

Thank you for your time.

THE COURT: Thank you, Attorney Cullen.

Attorney Aivalikles for Ms. Ortolano.

MR. AIVALIKLES: Judge McCafferty, members of the jury, Attorney Cullen, Attorney Hilliard, Attorney Matulis, good morning.

We've now come to the end of the case where you'll be hearing from the lawyers. I want to focus on what the significant evidence of this case means and point out to you what you should consider.

I'd like to thank you for your undivided attention. This has been a long case. There's been a lot of exhibits that have been referred to and your devotion to hearing this case is greatly appreciated, as Judge McCafferty has alluded to very eloquently.

23

In my opening, I told you that you would hear the story of Laurie Ortolano, a mother, a wife, an involved citizen, a defender of those who have no voice in Nashua city government, a well-respected person who was recognized by the Loeb Organization for her First Amendment issues, respected enough that the -- Governor Sununu appointed her or nominated her for the Assessing Fitness Board.

That's who Laurie Ortolano is.  And she dared to stand up to two very powerful lawyers that were well known to the police because they had represented the police in various matters, as Chief Carignan stated.

At the outset, I want you to focus in on the issue of credibility, because that's important.  Because you have to believe what the witnesses testified to on the witness stand.

And focus on what Attorney Leonard had to say about the order that was issued by the superior court concerning the senior abatement applications.  She said the judge denied that. That wasn't true.  The judge granted it and then it went up to the Supreme Court and the Supreme Court granted it.  And two and a half years later, the city finally produced them.  So if Attorney Leonard is going to misrepresent that issue, what other issues did she misrepresent on the witness stand?

Focus on the testimony of Attorney Bolton.  He told you that, his statement, it was an out-and-out assault or an invasion.  He admitted that.  But he would not admit that it

was seemingly inspired by the events in Washington, D.C. That, he would not admit to. But he did admit that, happily, it didn't cause any injuries or worse.

And what was his explanation as to why he would not accept the second, middle statement? Because it was a bad statement. It was the wrong statement for him to say. And what does he do on the witness stand? He said, oh, I was referring to an incident that happened 30 years ago where this lawyer was -- was gunned down. He wasn't referring to that. That simply was not true. He was referring to what happened in Washington, D.C. two weeks earlier.

And that statement was bad enough, but if he didn't make that statement, he had an obligation to contact the reporter and have her retract it for -- for Laurie's sake, because that statement was pretty bad. He never did that. He allowed that statement, whether he made it or not, to stand in the public record, broadcast or reported throughout the state of New Hampshire. And to anyone today that wants to access the Internet, they're going to see that statement by Attorney Bolton. So if he's not credible or honest with regard to that issue, then what else has he not been honest about when he testified?

It's important also to look what was said by the people that were at the office. Mindy Lloyd was not instructed to call 911 because of this invasion. She was told to call

risk assessment.  Hardly, hardly the response of someone that was in the middle of an invasion.

Attorney Leonard talks about the -- the incident and the incident report.  Never, ever, ever says, she was threatening us, she was hostile.  I'm not going to go through all the different iterations of her statements from the incident report to the January 22nd, 2021, internal report and then her report to the police on February 3rd, but there are differences that exist from report to report to report.  And what's significant is that the way that these reports changed depends upon what was happening with regard to this particular reporting of the incident.

At first she wants her trespassed, in the internal report she doesn't say she wants her arrested, and then this email hits at 3:57 and then things changed.  Now she wants her arrested.

And Attorney Cullen said there's nothing in this email that talks about the abatement stamp.  That's certainly not accurate.  Look at the first sentence:  I had a depressing experience today when I went to city hall to try to see if I could get some abatement applications stamped for receipt of records.

She said that in her email the very same day.  So to suggest that she never even raised that issue in her email is just not accurate.

Don't be fooled into believing that this legal office at city hall has some special status. It's like any other office in city hall. This legal office is no different than the tax collector's office. If a person, for example, went to the tax collector's office, was told to leave, they didn't leave, they would be arrested for criminal trespass.

Even if Laurie Ortolano had an appointment with the legal department that day, she could have been arrested. And I believe it was Officer Roach that verified that. Had she had an appointment, had Attorney Leonard not been happy with the way the appointment was going and told her to leave and she didn't leave, she could be arrested. So the appointment issue is a nonissue. The lack of a -- an appointment did not result in the criminal charges.

The Zoom meeting. We don't know when that Zoom meeting happened because no one in the police department made a report. We don't know the date. The only thing we know is that there -- the chief was present, there were a couple of deputy chiefs that may have been present, there were five captains that were present, and there was Attorney Bolton and Attorney Leonard.

The purpose of the meeting was to discuss this particular incident that happened at city hall, yet there's no note whatsoever of the meeting. Officer Roach, who was the lead investigator, wasn't even invited to this meeting. No

ordinary citizen would have been granted that kind of a meeting with all the police brass except for the two powerful attorneys, city attorneys, for Nashua. They received the royal treatment. They got to present their case. And even after they presented their case, they got a hard no because the brass at that point recognized that there was no crime that was committed, that the philosophy of the Nashua Police Department is not to arrest people if the police show up and they're told to leave. So they got a hard no.

And, then, this is another issue that I think you need to look at. Attorney Bolton told you that the chief called him and said, I'd like to meet with you to discuss this. Now, this is the chief that already gave him a hard no. Why would the chief be calling Attorney Bolton to schedule a meeting? It doesn't make sense. He already told him no. It was Attorney Bolton that called the chief. That's why the meeting came about. He wanted to see if he could convince the chief at this in-person meeting to arrest Laurie Ortolano.

Again, this in-person meeting has no police report, don't know the date, but, fortunately, we do know what Chief Carignan said happened at that meeting. Bolton talked to him in a raised voice. This is the chief law enforcement officer in Nashua. And Attorney Bolton says, oh, well, when I -- when I get excited, I talk in a loud voice. You can believe it if you want. But he was angry. He was angry at the police

because they did not arrest Laurie Ortolano.  He -- he is demanding that this decorated law enforcement official arrest her immediately.  That was his demand.  He wanted them to go arrest her and take her out in cuffs so that it could be a public display and it could humiliate, it could embarrass Laurie Ortolano.

The chief gave him a hard no again.  He was not going to arrest Laurie Ortolano because the chief knew what their philosophy was.  She was there, she was told to leave, she left, she doesn't get arrested.  It was unkind for Attorney Bolton to be verbally abusing this person because he was doing his job.  He was doing what was right.  And he wasn't going to be bullied by Attorney Bolton into arresting Laurie Ortolano.

Then what happens next?  This is a close case, according to Officer Roach.  The police on their own are now investigating and somehow they find this posting in social media that amounts to an admission.  Out of the blue?

These police officers have a tough job.  They're very busy.  And this is not like a murder cold case.  This is a criminal trespass case that's closed and all of a sudden they -- they come across this particular posting.

What we do know is on February 1st -- don't know when Attorney Leonard called, but there's an entry, again, by Officer Roach, a professional police officer who noted that the supervisors got a call from Celia Leonard on behalf of city

hall, and they want you to investigate this particular matter. So what does he do? Within 40 minutes, he's on his way to city hall for a criminal trespass case that has been closed, but his supervisors told him he had to go.

So what motivated the supervisors to change their position? You -- you can decide that. We don't have any concrete proof. We don't have the smoking gun because there's no police reports. So why are these supervisors now asking Officer Roach to go to city hall and investigate? Because Attorney Leonard told the police she wished to have the investigation reopened that involved Laurie Ortolano. You'll -- you can see that in Exhibit 47.

So, again, we don't know when Attorney Leonard called the police, but we do know that she informed the Union Leader reporter of what had happened on 2:55 p.m. on July 22nd. That we do know. We -- we do know that she was told that there was no criminal investigation into Laurie Ortolano.

And then she says, I find it troublesome to say the least. My office, meaning her position in the attorney's office, will be speaking with the police further.

Sure enough, she did, because at some point these supervisors are now gearing up for Officer Roach to go investigate the matter further.

She got outraged when the reporter told her there's no further police criminal investigation and her outrage is

showed in the statement that she gave to the reporter that particular day. She was going to make it happen. She was determined that the police would reopen this investigation and she had the power to.

They say that the attorneys don't control the police department. Well, these are two powerful attorneys in the city of Nashua that were well known by the police. And it's obvious they could get Zoom meetings with the brass, you get second appointments with the chief, it's obvious that they had influence that they could exert to get the police to do something more than what happened right now.

Attorney Bolton and Attorney Leonard brought the weight of the Nashua Police Department on Laurie Ortolano. They are not ordinary citizens, but powerful attorneys, and it's clear that if Bolton -- Attorney Bolton and Attorney Leonard had not contacted the police that there would be no arrest because the case was closed. It was done. It was over. It was their efforts that influenced the police to prosecute her and to arrest her.

I suggest that Attorney Bolton was very angry following the in-person meeting that he had with the chief and he contacted the subordinates and urged them, probably repeatedly, that they needed to do something to Laurie Ortolano because it was simply unacceptable that she would not be prosecuted because she entered their office. There's no issue

that but for what Attorney Leonard did, but for what Attorney Bolton did, there would be no arrest.  The case would be over.

MR. HILLIARD:  Your Honor, sidebar.

AT SIDEBAR

MR. HILLIARD:  I'm sorry to interrupt, but there is no evidence to support that statement that was made that Attorney Bolton contacted subordinates in the Nashua Police Department to encourage an investigation and prosecution. There's just no evidence, your Honor.

THE COURT:  There is circumstantial evidence that there was contact and that is his whole theory of the case, that it went from absolute hard no to then investigating.  And his -- he's using inferences and argument to persuade the jury that something had to have happened here.

Would you like to add anything, Attorney Cullen?

MR. CULLEN:  No.

THE COURT:  Overruled.

MR. HILLIARD:  Thank you.

CONCLUSION OF SIDEBAR

THE COURT:  Go ahead, Attorney Aivalikles.

MR. AIVALIKLES:  Thank you very much, your Honor.

As I was saying, but for the actions of Attorney Bolton, the January 22, 2021, incident would never have been reopened.  Attorney Bolton demanded her arrest at the conference.  Attorneys Bolton and Leonard used their position

as attorneys to influence the police improperly to open the investigation.

As I said, Attorney Leonard acted on behalf of city hall when she contacted the police, when she said, you'll be hearing from my office. Attorney Bolton acted, because he was concerned about the safety, he said, of his staff even though there was no 911 call, even though there was no threats, even though there was nothing that would indicate that his staff was -- his staff safety was -- was in any way implicated.

Both lawyers knew that it was foreseeable that their conduct in influencing the police would cause the case to be reopened, a closed case, and their demanding Laurie Ortolano's arrest would, in fact, result in her arrest. They were clearly acting under the color of the law. They were using their position improperly to influence the police, to do something the police didn't even want to do.

Attorney Leonard and Bolton bypassed Officer Roach, the lead investigator, and directly -- and dealt directly with the upper brass. Again, it was the supervisors that instructed Officer Roach to go to city hall to do the investigation.

February 1st, he interviews Jasmine Castro. This is the greeter at city hall that asked the people why are you there, can I help you. She was there to help people. She asked -- she didn't ask Laurie if she had an appointment. Laurie caused her no concern. Laurie was pleasant. And the

officer asked her, do you know Laurie Ortolano, and she said, I only know -- knew her name in reference to the legal department. She already knew about Laurie in reference to the legal department.

Attorney Leonard tells Officer Roach, I just want her trespassed. She didn't say I want her arrested. I want her trespassed. That's not an arrest. But, again, something changed, and the thing that changed was the email that Laurie sent on that day demanding that Attorney Leonard be fired.

Officer Roach is a very respected, professional police officer. I'm sure he treats all the people he encounters in that same way. And on the way out, he's very respectful of Laurie. He tells her, please don't come back because I don't want to have to arrest you. That was his concern. He didn't want her arrested. He testified that he knew that her efforts to help these senior citizens was noble and admirable. That was his characterization. Officer Roach embodies the professionalism that you would want in your police officers.

However, did Laurie experience that same professionalism from Attorney Leonard when she entered that office and told her, you have to leave, you are trespassing? She was angry because her Zoom telephone call was interrupted because of Laurie Ortolano. She was the one that stormed into the office that day, telling Laurie, leave, you're trespassing,

never once offering any words of assistance, can I help you, why are you here, why are you sitting there, what can I do? And she had the power to do it.

The way she acted on that day was not professional, yet she told you on the witness stand that she always treated Laurie in a professional manner. And that simply is not true. Her conduct on January 22nd refutes that particular statement.

Attorney Leonard prepared this internal legal memo about the incident and what does she do? She sends it to the press. Now, you heard them criticizing Laurie because she sent this email to the press, but Attorney Leonard didn't do anything different. This is an internal memo. This was an email that was sent to everyone in the city government. Her memo was for internal use only and she provided that to the reporter.

And you'll notice that, again, her statements are changed as she goes -- goes along. She embellishes what happened; she was erratic, she was unstable, she was hostile and threatening. It goes on and on and on of how she characterized Laurie's conduct, which is not what the police officers saw.

And most of the information that comes from her internal memo, she wasn't even there. It came from Attorney Neumann and it came from Mindy Leonard (sic). She wasn't even there, and she's telling the press and she's telling the police

she was unstable, she was erratic, she was hostile, she was threatening.

Why was she doing that? There was a reason why she was doing that. She wanted the police to open their investigation and she wanted the public to know what Laurie Ortolano did. What she did, as she represented, was not truthful.

But what's really important, because this is what this case is all about, the first thing she puts in her internal memo, she says, Mrs. Ortolano's vocal criticism of city staff, including me, meaning Attorney Leonard, that she made to various boards and government officials, that's what was in her head, the criticism that Laurie gave her. That was in her head on January 22nd when she wrote that attorney -- when she wrote that internal memo because that's what she talked about. It was her criticism of Attorney Leonard that really motivated what she did. Talk about admissions, this is an admission of her mental state at that time. She was thinking of the criticism that Laurie talked about and that's the reason why she wanted an arrest, this email, the criticism that Laurie had given her before.

This is all protected speech. This is what we have as Americans. We can criticize our government. We can -- we can call out improper conduct of government officials. We have that right. That's what makes our government great, that we

have that right, and that's what Laurie was doing. And that was not acceptable to Attorney Leonard. And, again, she is now comparing Laurie, or what Laurie did, to the events of Washington, D.C. Same attack that Attorney Bolton used.

Attorney Bolton -- Laurie's actions were not an invasion. She was calm. No threats. She was inspired in the pursuit of the tax abatement for these two elderly people. And why did she have to be there on January 22nd? Why? You can ask yourself and Attorney Cullen raised that same issue. Attorney -- Mr. Vincent did not tell Laurie when he was going to get back to her. He said, I'll get back to you.

She knew the year before that she had lost an abatement application for one of the homeowners in the mobile home park. She was concerned. There's a March 1st deadline to file. If you don't file, you're out. That was her worry and she wasn't getting answers. And she went to city hall to see if she could get that date stamp.

And you'll have Exhibit 44-A through M and you'll see the correspondence between Laurie and Mr. Vincent and the runaround that she got. First he says, you didn't sign the rep page, which she did; then at the end he said, you didn't have a letter from the homeowner, which wasn't necessary. It's just one game after another in the series of emails.

The actions of both Attorney Bolton and Attorney Leonard were clearly motivating factors behind her arrest.

That's one of the -- the conditions that must be proven and it's clear from all the evidence that they were behind her arrest. There is evidence that the -- the demands for the arrest were retaliatory for her being critical.

Laurie made them feel uncomfortable. She called them out. And her husband Michael was so fearful of what they would do to her that he purchased her a body camera. Can you imagine walking around as an individual with a body camera?

And she went into city hall and this -- the frontline employees, as she said, were very uncomfortable with that. And what does she do? She stops wearing it because she didn't want to make them feel uncomfortable. Their job is hard enough dealing with the public.

Because Laurie said she'll be back, they want you to believe that Laurie intended to violate their trespass order. That's what they want you to believe. What Laurie was saying and what she meant, I know I'm going to be arrested again. That was her fear. That's why she made that statement.

And her fear of retaliation was validated because on July 5th, 2021, which is Exhibit 65, Attorney Bolton sends an email to Laurie's attorney stating if Mrs. Ortolano shows up at my office on Wednesday or any other time, she runs the risk of being arrested. That's what he told her attorney.

So, yeah, she was concerned and that's why she made that statement, because that shows the retaliatory intent that

Mr. Bolton had. Because, like he said, you've insulted the mayor, you've insulted me, and now it's personal. And it sure was personal because he caused her arrest. He made it happen. He was going to punish her. How dare she question him. He's the top city attorney. Who is she? Well, he found out who she was because she beat him in court, she beat him in the Supreme Court, she beat him at the state federal -- I'm sorry -- at the state departments.

And, yes, she did have a private investigator follow this city assessor who wasn't doing his job and, yes, the Department of Revenue Administration sanctioned him because of Laurie. That's why he was sanctioned, because of Laurie. She had the information to prove that he wasn't doing his job. And when she told Attorney Bolton about the report prior to going to the State, he laughed. He thought it was funny that this assessor was sleeping on the job. And they did nothing about it until she went to the State and the State did something about it.

You have Exhibit 66, a January 31st, 2022, letter by the city clerk to Laurie Ortolano. And she says, if you show up at the clerk's office without legitimate business and refuse to leave, you will immediately be reported to law enforcement.

This is the city clerk who has the records telling a citizen that if -- if they show up and they don't leave, she's going to report them to law enforcement. Who does that? Who

in city government does that, threatens a citizen with arrest if they show up?  It's because it was Laurie Ortolano that they did that.  She was not treated like anyone else.  If someone else showed up at the clerk's office without business, they're not going to be calling the police.  They'd ask, can I help you, what can I do for you.

It's clear that legal office did not want her in city hall discovering documents that were critical of city departments, that were critical of the mayor, they were critical of the two attorneys.

She came to the legal department for assistance. And, no, she was not there for a meeting, because she knew she didn't have -- I'm sorry -- she knew that they only dealt with production of documents.  This wasn't a meeting.  It was just to say, can you please date-stamp these two abatements.  That's all I want.

And Neumann knew what she wanted.  They never told her, we don't date-stamp abatements, but let me see what we can do for you; let me see if we can find someone at city hall that can take care of this issue for you.  They didn't care.  It was Laurie, and they weren't going to do anything to help her. Just leave.  You're trespassing.

Attorney Neumann had only been there for three weeks and he already knew about Laurie.  He already prejudged her because of what they were saying in that legal office about

40

her.  And he didn't stay long, either, in that legal office.

You've witnessed Attorney Leonard's demeanor on the witness stand.  Very professional, smiling when she was discussing the case, calm.  Her -- her words were very measured.  But this was not the same Attorney Leonard that was at the law office on January 22nd confronting Laurie and demanding that she leave and telling the staff to open the windows.  That wasn't the same Attorney Leonard that was at the January 22nd meeting.  And I suggest to you if Attorney Leonard was like that on January 22nd as she was yesterday, we wouldn't be here today.  There would be no issue.

You also know how she felt about Laurie.  After the meeting up in Concord, she was there meeting with some assessors and Laurie happened to be there because she was picking up something, and she heard Leonard say, in a loud voice, don't ever say that woman's name.  That shows you the depth of how she felt about Laurie.  She didn't even want to hear her name.

You heard about the assessing manual that talks about treat your people like the Golden Rule, treat them like you wanted to be treated.  And what does Attorney Leonard tell the assessors when they wanted to speak -- when Laurie wanted to speak with them?  Denied.  Is that telling your client, the assessors, to live by the Golden Rule and how you treat people?

Another occasion she said, you don't have to talk to

41

her.  And it's true.  91-A doesn't require that they talk to people about questions.

There is nothing to be gained.  Those were her words.  What is to be gained?  What was she thinking about?  Instead, she's telling her clients to disregard the manual, to disregard the Golden Rule.  Don't talk to her.

And it didn't just stop with Attorney Leonard.  You'll see, I believe it's Exhibit 23, there's agenda minutes, April 1st.  None of three assessors, and they're named, shall talk to Laurie Ortolano.

And another agenda note, I think it was April 9th, anyone that has a request for multiple documents from the assessing department, you do not have to talk to them.  Laurie was the one that was making the requests for a number of documents because she was doing her -- her investigation or her research.  It was directed to Laurie.

And another one, entry, in July talked about if there's any questions about AssessHelp, call legal.

She was targeted.  She was deliberately isolated from city hall.

Now, you heard reference to these other incidences in Exhibit 56.  They don't have to be identical.  It's unlikely that you would ever get identical facts and circumstances.

But what is identical?  The people were committing criminal trespass, same as Laurie; these people were told to

42

leave, same as Laurie; the people left when they were told to leave by the police, same as Laurie.

But what is the difference between what they did, the intoxicated person, the -- the other people; what did they do that was so different that got Laurie arrested?

Laurie was exercising her right of free speech. That's what got her arrested. Because the other 10 or 11 weren't doing that. They were just sleeping it off or whatever they were doing in city hall. But Laurie got arrested because she was exercising her rights of free speech.

So when Attorney Hilliard says, well, there was probable cause and look at this complaint, she knowingly entered. Yes, but that doesn't end the inquiry that you are required to do now because it doesn't mean that she's not entitled to recover damages even though there may have been probable cause.

And they -- and they testified, both Attorney Leonard and Attorney Bolton, they would have done the same thing if it was anyone else. They would have handled it the same way. You don't have to believe that. You don't have to believe that, because the evidence really shows that they treated Laurie totally differently. They took actions against her that they would not have taken against other people. They wouldn't have sent internal memos to the press to demonize Laurie. They wouldn't have made those awful statements

43

characterizing her conduct.  They wouldn't have said that this other citizen here created an out-and-out invasion inspired by the events in Washington.  Happily, no one was injured or else -- and we know what the or else is now -- or worse, I should say.  We know what that or worse is.  That or worse is someone being killed.

That's what Attorney Bolton told you on the witness stand.  That's what he was implying to everyone in Nashua, everyone that read that Union Leader, that this person was a danger.  She's erratic, she's unstable.  That is not acceptable of a government attorney to do something like that.

They want you to believe that they would have done the same with any other person.  Look what Attorney Leonard's attitude was about the annulment.  An annulment is an expunging of that criminal conviction.  It's to give that person a clean slate.  It's available to anyone that qualifies for it.

What does she say?  I was opposed to it, I wanted it to be a public record, so that she could use it against her anytime she wanted to; you're -- you've been convicted of a crime.  I want that to be a public record.

And what else does she do?  She didn't go to the sentencing because, she said, I can't be bothered wasting any more time for Laurie Ortolano.  That's what she said.  I can't be wasted -- I can't be bothered.

And the shocking thing is she then says, I have a

First Amendment right not to be there. That's not the First Amendment. That may be free will, but it's not the First Amendment, and it just goes to show you what her view of the First Amendment was and why Laurie Ortolano was put through this retaliatory arrest based upon her exercising her freedom of speech. That is why her First Amendment rights were trampled upon, because Attorney Leonard doesn't even recognize what the First Amendment means.

They keep talking about Laurie needs to schedule an appointment. But we know that a -- Attorney Bolton told Judge Leary she will never have an appointment with the legal office. So what's the point of her requesting an appointment when we already know she's never going to get an appointment at the legal office?

The other thing that was really questionable was Attorney Bolton saying, well, she was in the office and she was going through my legal assistant's desk and, that was it, I -- that was the -- the -- the determining factor. We had to lock the doors. Yet he never calls the police to tell her -- tell them what Laurie did. This is worse than the criminal trespass, going through an attorney's legal files, far worse than a criminal trespass, and he doesn't even write a letter to her attorney to tell her -- tell the attorney what Laurie did, how she went through the -- the assistant's files. That should have been documented and I suggest the reason that it wasn't

documented is because it never happened.

Then they say, oh, well, we can't talk to Laurie because, you know, she reported Attorney Bolton to the Professional Conduct Committee.  Well, first of all -- and don't be confused by this, because there's an attempt here to conflate her representation with an attorney on other matters and the senior abatements.  There was no attorney representing Laurie for the senior abatements.  She was doing that on her own.  They had every right to talk to her.  They had a letter from Attorney Lehmann telling the legal department, so long as she's not represented by an attorney, you can talk to her.  They had that letter.  And now they're trying to tell you that because she was represented by an attorney for the senior abatements, they couldn't talk to her.  That just isn't true.  There was no legal representation.  That issue was used as an excuse not to talk to her.

Yes, she filed a complaint against Attorney Bolton.  It was a she said, he said.  That was it.  And she didn't carry her burden of proof to the satisfaction of the Professional Conduct Committee, but it doesn't mean it didn't happen.  Because the evidence was insufficient.

They could have taped her meetings.  The offer was made to tape her meetings if they had any kind of concern about what was said at the meetings.  They gave her the runaround on the right-to-knows.  It's clear.  The Donchess timeline, these

are the mayor's taxes. The city labeled it the Donchess timeline in their email and Attorney Leonard says, your description is not clear enough, it's ambiguous. She used the words of the city and she's being told its ambiguous.

The senior abatements, again, that's Exhibit 38, look at those. Everything that Laurie said was true. It was proven to be true and it took two and a half years to get that. Why? Why wait two and a half years? Because those documents prove that what Laurie was saying was the truth.

Even the police, if they got a right-to-know from Laurie, they had to go through legal. Even though they had a specific person identified to handle right-to-knows, legal told them, you've got to come to us. They probably were upset that Laurie found out about those 11 instances at city hall that didn't result in an arrest.

Laurie humiliated them and they didn't like her. That's the bottom line. And they were going to get back to her.

Damages. Laurie's not saying that what happened at city hall on January 22nd caused her anxiety, caused her emotional distress, as Attorney Cullen has suggested to you. It was the arrest that caused her the anxiety, that caused her the emotional upset. The arrest, the embarrassment that -- of it appearing in the newspaper, the humiliation that it caused her, having cuffs put on her, having her mugshot, having her

fingerprinted. This was the embarrassment. This was the humiliation, not January 22nd. That was what got her there. That's what got her arrested.

She couldn't sleep at night. Rightfully so. They wanted her in jail. They charged her with a Class A misdemeanor, which is a one year in jail. That's what she thought about.

She had to go into a jail cell until the bail commissioner came. How humiliating for a person that has no criminal record, not even a speeding ticket. What she must have felt hearing the clanging of the jail cell doors and sitting in there, thinking, how did I get here.

It wasn't her fault, how she got there. It was Attorney Bolton and Attorney Leonard's fault that she got there. Her injuries were caused by their conduct. Her stress was caused by their conduct. Her stomach issues, her respiratory issues, were a result of the stress that she experienced because of them. The fear that she experienced -- think about it. The fear of going to jail, that would be enough to set anyone over the edge.

The way they portrayed her in the press, totally damaging to her reputation, totally designed to damage her reputation, calling her an insurrectionist or suggesting that she was an insurrectionist, just devastating to a well-known citizen in Nashua that was calling out the city for their work.

That's compensatory.

Then you're going to get to punitive damages. And this, I suggest to you, should be significant because punitive damages are meant to send a message to people that have -- in the authority, like the two attorneys. You can't do this to people. You are going to be punished for doing this to people. You can't use the criminal process to punish people you don't like. You can't demand that they be arrested because you don't like what they say about you, because they've humiliated you before state boards, before the Court.

That's why punitive damages are there, to send a message, to send a message to the next city attorney, you can't do that to people. You have a responsible position. You treat people with fairness, you treat them with professional dignity. You don't threaten to arrest them. It's not acceptable to do that. That's why we have punitive damages.

And there's two letters that indicate where their mindset is when they tell her attorney, if she shows up on Wednesday or any other day, she runs the risk of arrest. That needs to stop. She needs to be able to go to city hall to look at records and to point out any bad things that the mayor or anyone else is doing. She has that right. And punitive damages are going to stop this nonsense that she had to deal with. No one is saying that her speech was chilled. No one. She's not saying that. I'm not saying that. Her writings were

49

her safe place after her arrest, where she could write and say what she wanted without fear of being arrested.

So, yeah, you'll see these articles.  Some of them are funny.  Some of them are really biting.  But it's her voice that she wanted heard.

These city attorneys were using their awesome power and their position as attorneys to punish her.

I'm at an end.  I know it's been long.  But you've heard the story of Laurie Ortolano.  You've heard this story.  You are going to be able to write the conclusion to the story. You will be the authors of the last chapter of Laurie Ortolano versus Attorney Bolton and Attorney Leonard.  That ending should be just, noble, and admirable.

Thank you.

THE COURT:  Thank you, Attorney Aivalikles.

We're going to take one more recess and so my instructions still stand during this recess.  I need to get my jury instructions ready to give them to you and I will be doing that in this recess.  And then you'll come back in, hear my instructions, and then after that you'll be able to discuss the case and you'll begin your deliberations.

So, please, during this recess, continue to abide by those instructions and we'll see you shortly.

THE CLERK:  All rise for the jury.

(Jury excused.)

(Without the jury present

MR. CULLEN:  Your Honor, I'm sorry to catch you just as you walk out the door.  I'd just like to raise one thing.

In the closing, plaintiff's counsel argued for reputational damages.  I think this Court made it clear that reputational damages are not part of compensatory damages.  They were clearly linked.  I'm not -- no -- no -- I don't have a problem with the argument.  I think we need an instruction on the damages to be clear that reputational damages are not part of the harm.

This wasn't a defamation case.  She did bring defamation counts against other defendants earlier in this case that were dismissed by the Court.  I would like to ask that the Court supplement its damages instruction just to be clear on that point now that it's been argued, particularly where it's been argued based on statements that were made after the incident that's at issue in this case.

So that's my request to the Court.

MR. AIVALIKLES:  I believe damage her reputation aside from a slander or liable suit is compensable in these situations.  They made all these awful statements about an out-and-out invasion that -- inspired by the events of -- recent events in Washington, D.C.  I think this is all part of the damage component and the injuries that she suffered.

THE COURT:  All right.  You're going to have to give

me a proposed instruction and you'll have time to draft that and let me have it.

But, ultimately, the argument is that some of her pain and suffering from this episode came from those negative statements about her. And as I recollect, she was worried even just about how the public would perceive her and felt unsafe.

So you'll have to help me with that instruction and draft what it is you think I should -- I should say. And you have the most recent copy of my proposed instructions, so you can tell me exactly which page and line --

MR. CULLEN: Thank you, your Honor.

THE COURT: -- you want that instruction.

Thank you.

MR. AIVALIKLES: Thank you.

THE COURT: Probably 15 minutes.

MR. CULLEN: Thank you.

(Recess taken from 10:40 a.m. until 11:05 a.m.)

(Without the jury present.)

THE COURT: Just going to put on the record there's no request for a reputational damages limiting instruction.

MR. CULLEN: That's fine, your Honor. Thank you. Thanks for considering it.

THE COURT: Okay. All right.

(With the jury present.)

THE CLERK: Please remain standing for the jury.

Please be seated.  This hearing is back in session.

THE COURT:  Members of the jury, you have now heard all of the evidence in this case and argument by the lawyers. It is my duty at this point in the trial to instruct you on the law that you must apply in reaching your verdict.  It is your duty to follow and apply the law as I give it to you.  But you alone are the judges of the facts.  Please do not consider any statement that I have made in the course of the trial or make in these instructions as any indication that I have any opinion about the facts of this case or what the verdict should be. The verdict in this case is your responsibility and yours alone.

You are the sole and exclusive judges of the facts. You must weigh the evidence that has been presented impartially, without bias, without prejudice, and without sympathy.  You must make a determination as to what the facts are and what the truth is based upon the evidence presented in this case.  You must then decide the case by applying the law to the facts as you find them to be from the evidence.  I will give you the law in these instructions.

The mere fact that an individual has brought a lawsuit is not in and of itself a reason to render a verdict for that individual.  Bringing a lawsuit is merely the formal means of introducing the matter of controversy into court. Your verdict must be based solely on the evidence and the law.

53

You must apply the law regardless of any opinion you may have as to what the law ought to be.  It would be a violation of your sworn duty if you were to base your verdict upon any view of the law other than that reflected in these instructions, just as it would be a violation of your sworn duty as judges of the facts to base a verdict upon anything but the evidence presented in this case.

Your findings of fact must be based exclusively on the evidence.  There are two types of evidence that you may properly consider in deciding this case, direct and circumstantial.

Direct evidence is the testimony given by a witness about what that witness has seen, heard, or observed, or what that witness knows based on personal knowledge.  Finally, direct evidence also includes any exhibits that have been marked.

Evidence may also be used to prove a fact by implication and such evidence is often called circumstantial evidence.  The circumstances suggest that a certain fact is true.  You may give circumstantial evidence the same weight as direct evidence.

The evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, and all the exhibits received in evidence, regardless of who may have produced them.

54

Certain things are not evidence and you cannot consider them as evidence:

First, arguments, statements, and questions by the lawyers are not evidence. What they have said in their opening statements, closing arguments, questions to the witnesses, and at other times during the trial is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from what the lawyers have said about those facts, your memory controls.

Second, objections raised by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper under the rules of evidence. I must rule on objections and I've not intended to indicate in any way by my rulings what the verdict should being in this case. You should not be influenced by the lawyers' objections or by my rulings on those objections.

Third, anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at trial.

In determining what the facts are and what the truth is, you must necessarily assess the credibility of each witness and determine what weight you will give to each witness's testimony. By credibility, I mean the believability or truthfulness of a witness.

You should carefully scrutinize all the testimony

given, the circumstances under which each witness has testified, and every matter in evidence which tends to show whether a witness is worthy of belief or not worthy of belief.

For example:  Consider each witness's intelligence, motive, state of mind, demeanor and manner while testifying.

Consider the witness's ability to observe or to know the matters about which that witness has testified and whether the witness impresses you as having an accurate recollection of those matters.

Consider whether the witness had any reason for telling the truth or not telling the truth, whether the witness had an interest in the outcome of the case, whether the witness had anything to gain or lose as a result of his or her testimony, whether the witness had any friendship, relationship, or animosity towards other individuals involved in the case, whether the witness's testimony was consistent or inconsistent with itself or with the testimony of other witnesses.

Consider the extent, if any, to which the testimony of each witness is either supported or contradicted by other evidence in the case.

The testimony of a witness may be discredited or, as we sometimes say, impeached, by showing that the witness previously made statements that are different than or inconsistent with his or her testimony here in court.

Inconsistent or contradictory statements that are made by a witness outside of court may be considered only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier out-of-court statements.

You must decide what weight, if any, should be given the testimony of a witness who has made prior inconsistent or contradictory statements.  In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact or whether it had to do with only a small detail; whether the witness had an explanation for the inconsistency and whether that explanation appealed to your common sense.

You should give the testimony of each witness both on direct and cross-examination the weight you think it deserves.  You are not required to believe the testimony of any witness simply because that witness was under oath.  You may believe or disbelieve all or part of the testimony of any witness.  It is within your province to determine what testimony is worthy of belief and what testimony may not be worthy of belief.

After assessing the credibility of each witness, you will assign as much weight to his or her testimony as you deem proper.  You are not required to believe the testimony of any witness simply because that witness was under oath.  You may

believe or disbelieve all or part of the testimony of any witness.  You determine what testimony is worthy of belief and what testimony may not be worthy of belief.  The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

The weight of the evidence is not necessarily determined by the number of witnesses testifying on either side.  You should consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of belief.  In reviewing the evidence, you should consider the quality of the evidence and not the quantity.  It is not the number of witnesses or the quantity of testimony that is important, but the quality of the evidence that has been produced that is important.  You must consider all the evidence no matter which side produced or elicited it.

At certain points in these instructions, I will tell you that one of the parties has the burden of proving something to you by a preponderance of the evidence.  A preponderance of the evidence simply means that quantity and quality of evidence necessary to persuade you that a party's claim is more likely true than not true.  So if Ms. Ortolano has the burden of proving X by a preponderance of the evidence, that simply means that Mrs. Ortolano must produce sufficient evidence to persuade

you that X is more likely true than not true.

What does it mean for Mrs. Ortolano to prove that something is more likely true than not true?  Think of a set of scales.  At the beginning of the trial, they're perfectly balanced and even.  At the end of the trial, if they've been tilted by the evidence ever so slightly toward the plaintiff, then Ms. -- Mrs. Ortolano has met her burden.  If, on the other hand, the scales remain even or if they tilt ever so slightly in the defendants' favor, then Mrs. Ortolano has not met her burden.

In deciding whether any fact has been proven by a preponderance of the evidence, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

In this case, Mrs. Ortolano has the burden of proving certain things to you by a preponderance of the evidence and the defendants have the burden of proving other things to you by a preponderance of the evidence.  I will explain these matters to you shortly.

If the party with the burden of proving a fact establishes that fact by a preponderance of the evidence, you should find in favor of the party with the burden of proof.

If, on the other hand, you find that the party with the burden of proving a fact has not proven that fact by a

preponderance of the evidence, you should find in favor of the other party.

Mrs. Ortolano has brought one claim against Attorney Bolton and one claim against Attorney Leonard. I will explain Mrs. Ortolano's claims in a moment. Before I do so, however, it's important to remember that the claims against each defendant are separate. If you find that Mrs. Ortolano has proven her claim against one of the defendants, it does not automatically mean that she's proven her separate claim against the other defendant. Likewise, if you find that Mrs. Ortolano has not proven her claim against one defendant, it does not automatically mean that she's failed to prove her claim against the other defendant. The parties are entitled to fair, separate, and individual consideration of the evidence. The instructions I'm about to give you apply to Mrs. Ortolano's claim against each defendant.

I will now explain Mrs. Ortolano's claims in greater detail.

Mrs. Ortolano has brought one claim for retaliatory arrest against Attorney Bolton and one claim for retaliatory arrest against Attorney Leonard. To prove a claim of retaliatory arrest, Mrs. Ortolano must prove each of the following things by a preponderance of the evidence:

First, that Mrs. Ortolano engaged in conduct protected by the First Amendment;

60

Second, that the defendants' actions caused Mrs. Ortolano's arrest;

Third, that Mrs. Ortolano's constitutionally protected conduct was a substantial or motivating factor behind the defendants' actions;

Fourth, that Mrs. Ortolano was arrested in circumstances where other similarly situated people who had not engaged in the same sort of constitutionally protected conduct would not be arrested; and

Fifth, that the defendant acted under color of state law.

I will now explain each element in greater detail.

With respect to the first element, you are instructed that the following activities are protected by the First Amendment:  Expressing public criticism of government officials or employees; requesting access to public records; and bringing lawsuits against the government for access to public records.  The defendants do not dispute that Mrs. Ortolano engaged in these activities.

To satisfy the second element, Mrs. Ortolano must prove by a preponderance of the evidence that the defendants' actions caused her arrest.  Causation has two components. Ms. Ortolano must prove both components by a preponderance of the evidence.

Now I'm going to explain each component separately.

All right.  There are two ways to establish the first component of causation.  One way is to show by a preponderance of the evidence that but for the defendants' actions, Mrs. Ortolano would not have been arrested.  The other way is to show by a preponderance of the evidence that the arrest was brought about by the defendants' actions and also by another person's unrelated actions, each of which would have been sufficient by itself to cause the arrest.  If Mrs. Ortolano makes either showing by a preponderance of the evidence, she has satisfied the first component of causation.

To satisfy the second component of causation, Mrs. Ortolano must prove by a preponderance of the evidence that her arrest was a reasonably foreseeable consequence of the defendants' actions.  However, Ms. Ortolano's arrest was not a reasonably foreseeable consequence of the defendants' actions if the arrest was brought about by an intervening cause.  An intervening cause is an independent event, not reasonably foreseeable, that breaks the connection between the defendants' conduct and the plaintiff's injury.

The third element Mrs. Ortolano must prove by a preponderance of the evidence is that her constitutionally protected conduct was a substantial or motivating factor behind the defendants' actions.  To do so, she must prove by a preponderance of the evidence that in causing her arrest, the defendant was motivated by an intent to retaliate against

Mrs. Ortolano for engaging in constitutionally protected conduct.  However, Mrs. Ortolano is not required to prove that an intent to retaliate was the sole motivation or even the primary motivation behind the defendants' actions. Mrs. Ortolano only needs to prove that an intent to retaliate played a substantial or motivating part in the defendants' decision, even though other factors may have also motivated the defendant.

The fourth element Mrs. Ortolano must prove by a preponderance of the evidence is that she was arrested in circumstances where other similarly situated people who had not engaged in constitutionally protected conduct would not be arrested.

Here is an example to illustrate what I mean. Jaywalking is common at many intersections.  Suppose an individual who's been vocally complaining about police conduct is arrested for jaywalking at an intersection where jaywalking is common but arrests are rare.  If the individual who was arrested can show that those other jaywalkers who were not arrested had not engaged in the same sort of public criticism, she will have proven this element of a retaliatory arrest claim.

Mrs. Ortolano must show that she is similarly situated to individuals who were not arrested for trespass. However, she need not show that other individuals who were not

arrested trespassed in the exact same manner she did.  She only needs to show that other people in similar circumstances were not arrested.  It is up to you to determine whether Ms. Ortolano has proven she is similarly situated to person who trespassed but were not arrested.

The fifth element that Mrs. Ortolano must prove by a preponderance of the evidence is that the defendant acted under color of state law.  A government official or employee acts under color of state law when he or she acts or purports to act in furtherance of their official duties.  By contrast, when a government official or employee takes an action that has nothing to do with their position or official responsibilities, the official or employee has not acted under color of state law.  The action must be of such a nature and committed under such circumstances that the person would not have acted if he or she was not a government official or employee.

If you find that Mrs. Ortolano failed to prove one or more of these elements by a preponderance of the evidence with respect to a particular defendant, then your verdict must be for that defendant.

However, if you find that Mrs. Ortolano has proven all five of these elements as to a particular defendant, the burden of proof shifts to that defendant to prove by a preponderance of the evidence that he or she would have taken the same action even in the absence of any motive to retaliate

64

against Mrs. Ortolano for engaging in protected conduct. In other words, if the defendant proves that he or she would have treated Mrs. Ortolano the same, regardless of any intent to retaliate against her for her constitutionally protected conduct, then your verdict must be for the defendant. If the defendant fails to make that showing, your verdict must be for Mrs. Ortolano.

You should consider all of the evidence that has been presented to you and determine whether one or more defendant is liable to Mrs. Ortolano on a retaliatory arrest claim.

In order for a defendant to be liable to Mrs. Ortolano, you must make two findings. First, you must find that Mrs. Ortolano proved by a preponderance of the evidence all five of the elements of her retaliatory arrest claim against that defendant; second, you must find that the defendant failed to prove by a preponderance of the evidence that his or her affirmative defense applies.

If you find that one or more defendants is liable to Mrs. Ortolano, you will go on to consider the proper measure of damages for those claims on which you have found a defendant liable. If, on the other hand, you find that neither defendant is liable to Mrs. Ortolano, then you will conclude your deliberations and return a verdict for the defendants.

I will now instruct you on the law regarding

damages.  You should not consider the fact that I am instructing you on the law of damages as indicating in any way that the plaintiff is entitled to damages.

The principal or paramount rule in awarding damages is that every person unjustly deprived of his or her rights is fully and fairly compensated for the injuries sustained.  The general object of damages is to compensate the person injured for the actual loss that person sustained.  The law requires that the compensation be equivalent to the injury.

If you find that Mrs. Ortolano is entitled to damages in accordance with these instructions, then you should award her that sum of money that will fairly, justly, and reasonably compensate her for all the damage suffered as a direct result of the defendants' wrongful conduct.  A plaintiff is entitled to full, fair, and adequate compensation for the injuries and the results of the injuries she has sustained -- no more and no less.

Ms. Ortolano has the burden of proving that it is more probable than not that the damages for which she seeks compensation were caused as a direct result of the conduct of the defendant.  Additionally, a person seeking damages must show the nature, extent, and amount of those damages.

So the burden is on Mrs. Ortolano to prove by a preponderance of the evidence each item of damage she says she suffered and to prove that each item was caused by the wrongful

66

conduct of the defendant from whom she seeks damages. Mrs. Ortolano is not required to prove the exact amount of her damages, but she must introduce sufficient evidence to permit you to make a reasonable estimate of each item.  If Mrs. Ortolano fails to do so, then she cannot recover for that item.

If you return a verdict for Mrs. Ortolano on either of her claims, you must first determine whether she has proved that she is entitled to compensatory damages.  Regardless of whether you find that Ms. Ortolano is entitled compensatory damages, you may then consider whether Ms. Ortolano has proved that she is entitled to a award of punitive damages.

I will instruct you on each of these categories of damages separately.

First, compensatory damages.  The general purpose of awarding compensatory damages to a plaintiff is to give a sum of money which, as nearly as possible, will restore the plaintiff to the position she would be in if the wrong had not been committed.  A plaintiff who seeks compensatory damages has the burden of proving it is more probable than not that the damages were caused by the defendants' wrongful conduct. Additionally, a plaintiff seeking damages must show the nature, extent, and amount of those damages.

To demonstrate that the damages were caused by the defendants' wrongful conduct, Mrs. Ortolano must prove by a

preponderance of the evidence that the damages, one, would not have occurred but for the defendants' wrongful conduct; and, two, were a reasonably foreseeable consequence of the defendants' wrongful conduct.

If you decide that Mrs. Ortolano has proven that it is more probable than not that the defendants caused the damages she claims, you must then decide the amount to award as compensation.

In determining the amount of damages, if any, to allow Mrs. Ortolano, you may draw such inferences from the evidence concerning the nature of the injuries and the results thereof as are justified by your common experiences.  Damages are not to be awarded on the basis of guesswork or speculation or on the basis of passion, prejudice, or sympathy.  Nor may compensatory damages be awarded as a punishment, and they may not be imposed or increased to penalize a defendant.  Instead, they must be awarded, if at all, based upon your assessment of what full and fair compensation should be.  The law does not require mathematical certainty in computing damages.  However, your computation of the damage award must be supported by the evidence.  It cannot be based on speculation.

You may award compensatory damages against a defendant only for injuries that the plaintiff has proved or caused by that defendant's wrongful conduct.  Nor should be you award compensatory damages for speculative injuries.  They may

be awarded only for those injuries that the plaintiff has actually suffered or that she is reasonably likely to suffer in the future as a consequence of a defendant's unlawful conduct.

As an element of compensatory damages, you may award reasonable compensation for pain, suffering, and mental anguish which you find from a preponderance of the evidence was caused by a defendant and which the plaintiff has experienced to date and any such pain and suffering and mental anguish which you find from a preponderance of the evidence she will probably experience in the future.  There is no standard prescribed by law by which to fix reasonable compensation for pain, suffering, and mental anguish.  In making an award for this element, you should exercise your reasonable judgment and determine damages that are full, fair, and adequate in light of the evidence.  Plaintiff may not recover for any pain, suffering, or mental anguish which she suffered as a result of factors other than a defendant's allegedly unlawful contact with her.

As I've told you, compensatory damages may be awarded for each of Mrs. Ortolano's claims.  Importantly, however, she may only recover once for injuries she may have sustained.  So if you decide to award the plaintiff compensatory damages, the total amount of damages you award to her, regardless of whether they were assessed against Attorney Bolton, Attorney Leonard, or both, must provide full and fair

compensation for her injuries, but no more than that.

Regardless of whether you award Ms. Ortolano compensatory damages, you may, but are not required to, award punitive damages.

The purpose of punitive damages is to punish a defendant for his or her outrageous conduct and to deter others from similar conduct in the future. Mrs. Ortolano has the burden of proving by a preponderance of the evidence that punitive damages should be awarded and the amount, if any, that should be awarded. You may award punitive damages if Mrs. Ortolano proved by a preponderance of the evidence that the defendant's conduct was motivated by evil motive or intent, or involved reckless or callous indifference to constitutional rights. A retaliatory arrest is in reckless or callous disregard of a plaintiff's rights if, under the circumstances, the defendants' conduct is outrageous and in obvious violation of the plaintiff's First Amendment rights.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be sufficient in an amount fulfill their purposes, but should not reflect bias, prejudice, or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the defendants' conduct and the relationship of any award of punitive damage to any actual harm inflicted on the plaintiff.

Punitive damages may be awarded even if you award the plaintiff no compensatory damages.

When you retire to the jury room to deliberate, you may take with you this charge and the exhibits admitted into evidence. You will be able to view the documentary exhibits in this case through an electronic system calls JERS. J-E-R-S stands for Jury Evidence Recording System. In your deliberation room is a large television screen. You'll be able to view the exhibits from that screen using a mouse. The courtroom deputy will show you a brief tutorial.

You should understand that you will also have all documentary exhibits in paper copy to examine as well. The JERS system is simply another way for you to view the exhibits. The advantage is that you can all see the exhibit on the screen and discuss that exhibit while seeing it displayed on the screen. You may consider any and all exhibits in the JERS system. You can also use the JERS system to zoom in to an exhibit so that all jurors can see an exhibit up close.

It is easy to use, especially after you see the tutorial. But if you have a question about JERS, as with any other question you might have, you must put it in writing. Even if you need some sort of technical assistance with JERS, you will need to put your request in writing so that the Court security officer can present it to me. Before resolving any of your questions, I show your written question to the lawyers.

The principles of law set forth in these instructions are intended to guide you in reaching a fair and just result in this case, which is important to all the parties. You are to exercise your judgment and common sense without prejudice and without sympathy, but with honesty and understanding. You should be conscientious in your deliberations and seek to reach a just result in this case because that is your highest duty as judges of the facts and as officers of this court.

When you retire, you should elect one member of the jury as your foreperson. That individual will act very much like the chairperson of a committee, seeing to it that the deliberations are conducted in an orderly fashion and that each juror has a full and fair opportunity to express his or her views, positions, and arguments on the evidence and on the law.

The verdict on each claim must represent the considered judgment of each juror. In order to return a verdict, each juror must agree to it. That is to say, your verdict, regardless of whether it is in favor of the plaintiff or one or more of the defendants, must be unanimous.

Throughout your deliberations, you may discuss with each other the evidence and the law that has been presented in this case, but you must not communicate with anyone else by any means about the case. You also cannot learn from outside sources about the case, the matters in the case, the legal

issues in the case, or individuals or other entities involved in this case. This means you may not use any electronic device or media, such as phone, a computer, or a tablet, the Internet, any text or instant messaging service or any social media apps such as Twitter or X, Facebook, Instagram, LinkedIn, YouTube, WhatsApp and Snapchat, to research or communicate about what you've seen and heard in this courtroom.

These restrictions continue during deliberations because it is essential, under our Constitution, that you decide this case based solely on the evidence and the law presented in this courtroom.

You are permitted to discuss the case with only your fellow jurors during deliberations because they have seen and heard the same evidence and instructions on the law that you have and it is important that you decide this case solely on the evidence presented during the trial without undue influence by anything or anyone outside of the courtroom. For this reason, I expect you to inform me at the earliest opportunity should you learn about or share any information about this case outside of this courtroom or the jury room or learn that another juror has done so.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after

an impartial consideration of the evidence in the case with the other jurors.  In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of the evidence solely based on the opinion of the other jurors or merely for the purpose of returning a verdict.  Remember at all times that you are not partisans.  You are judges, judges of the facts.  Your only interest is to seek the truth from the evidence in the case.

If during your deliberations it becomes necessary to communicate with me, please give a written message to the court security officer, who will bring it to me.  I will then respond as promptly as possible, either in writing or by meeting with you in the courtroom.  I will always first show the attorneys your question and my response before I answer your question.

You must never disclose to anyone, including the Court, how the jury stands, numerically or otherwise, on the matters you are deciding, until after you have reached a unanimous verdict or have been discharged.  In other words, if the jury is split, say, five to three on some issue or I should say five to two on some issue, the existence of that split or the number on one side or the other must not be disclosed to anyone, including me.

If we recess during your deliberations, you must

follow all of the instructions I have given you concerning your conduct during the trial.  In particular, do not discuss the case with anyone other than your fellow jurors in the jury room when everyone is present.

You were permitted to take notes during this trial and I want to remind you of the instructions I gave you about your notes.  Do not use your notes as authority to persuade other jurors.  Your notes should be used only as aids to your own memory and must not be used as authority to persuade the other jurors of what the evidence was during the trial.  In the end, each juror must rely on his or her own recollection or impression as to what the evidence was.

You are each going to have a paper copy of my jury instructions to take with you into the jury room.  Attached to your individual copy of the jury instructions is a copy of what's called the verdict form.  The verdict form is self-explanatory and contains all the questions you need to answer as well as step-by-step instructions.  Read that verdict form carefully and follow the instructions on it.  The verdict form is consistent with the instructions I have given to you. Feel free to consult the paper copy of the jury instructions as you deliberate.  After you have reached your unanimous verdict, your foreperson must complete, sign, and date the official verdict form.  The official verdict form will be given to you with an envelope and will be marked with the word original at

the top of the form.  After you have reached a verdict, you are not required to talk to anyone about the case unless I direct you to do so.

At the risk of being repetitive, let me once again tell you that nothing said in these instructions is intended in any -- is intended to suggest in any way what your verdict should be.  The verdict is the exclusive responsibility of the jury, not the judge.

When you have arrived at a verdict, notify the court security officer and you will be brought back into the courtroom.

Any reason to approach?

MR. AIVALIKLES:  No, your Honor.

MR. CULLEN:  No, your Honor.

MR. HILLIARD:  (Shakes head.)

THE COURT:  All right.  The courtroom deputy, please swear in our court security officer.

(Court security officer sworn by the deputy clerk.)

THE CLERK:  All rise for the jury.

(Jury excused.)

MR. CULLEN:  Thank you, your Honor.

(Recess taken at 11:52 a.m.)

(Excerpt #2 filed under separate cover.)

(Proceedings reconvened for verdict at 2:52 p.m.)

THE CLERK:  Please remain standing for the jury.

76

Could you please let the jury in?

(With the jury present.)

THE CLERK:  Please be seated.

The Court understands that the jury has reached a verdict.  Could you please hand the envelope to the court security officer.

THE COURT:  And, Mr. Foreperson, let me ask you:  Has the jury reached a unanimous verdict?

THE JUROR:  We have.

THE COURT:  All right.

All right.  Your verdict will now be read aloud by our courtroom deputy.

Please listen carefully because after the verdict is read aloud, the lawyers may ask to poll the jury, which means that the courtroom deputy would ask each one of you individually if the verdict as read aloud is your individual verdict.

THE CLERK:  United States District Court for the District of New Hampshire, Laurie Ortolano vs. Steven Bolton and Celia Leonard, civil number 22-cv-326-LM, verdict form.

Question one:  Has the plaintiff proved her retaliatory arrest claim against Attorney Bolton by a preponderance of the evidence?

Answer:  No.

Question two:  Has the plaintiff proved her

retaliatory arrest claim against Attorney Leonard by a preponderance of the evidence?

Answer:  No.

Signed, the foreperson, February 9th, 2026.

THE COURT:  Would counsel like to poll the jury?

MR. AIVALIKLES:  No, your Honor.

THE COURT:  Okay.

All right.  Your jury service has come to an end.  I want to thank you on behalf of everybody for your service.  It was obvious to everybody involved that you paid close attention for this entire time.  I know you also were careful about following -- listening to and then following all my instructions.

I would like if you would be so kind as just to wait so that I can come thank you in person before you leave, and I'll be in there very shortly.

Thank you for your service.

THE CLERK:  All rise for the jury.

(Jury excused.)

THE CLERK:  Please be seated.

THE COURT:  Okay.  I can issue an endorsed order just setting a deadline for posttrial motions to the extent there are any.

Is there anything else I need to do before I adjourn and go just personally thank the jury?  Anything else?

78

MR. AIVALIKLES:  No, your Honor.

MR. HILLIARD:  No.

MR. CULLEN:  No, your Honor.

MR. HILLIARD:  No, your Honor.

THE COURT:  All right.  Thank you, counsel.

MR. AIVALIKLES:  Thank you.

THE COURT:  Court is adjourned.

THE CLERK:  All rise.

(Proceedings concluded at 2:56 p.m.)

79

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.


Submitted: 4/17/26          */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR