*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 16, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                             \*
LAURIE ORTOLANO,                    \*
                             \*
            Plaintiff,      \*
                            \*  1:22-cv-326-LM
          v.             \*  February 5, 2026
                            \*  8:38 a.m.
STEVEN BOLTON and CELIA LEONARD,  \*
                             \*
            Defendants.     \*
                             \*
                             \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JURY TRIAL DAY 3
MORNING SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

Appearances:

For the Plaintiff:         William E. Aivalikles, Esq.
                       Aivalikles Law Office

For the Defendant,        Russell F. Hilliard, Esq.
Steven Bolton:             Madeline Kate Matulis, Esq.
                       Upton & Hatfield LLP

For the Defendant,        Brian J.S. Cullen, Esq.
Celia Leonard:             Cullen Collimore Shirley PLLC

Court Reporter:          Liza W. Dubois, RMR, CRR
                       Official Court Reporter
                       U.S. District Court
                       55 Pleasant Street
                       Concord, New Hampshire 03301
                       (603)225-1442

2

I N D E X

                                                            Page

Charging Conference                                           3


| Witness:                | Direct | Cross | Redirect | Recross |
|-------------------------|--------|-------|----------|---------|
| Timothy Roach (Cont.)   |        |       |          |         |
| By Mr. Aivalikles       | 19     |       | 39       |         |
| By Mr. Cullen           |        | 27    |          | 41      |
| Michael Carignan        |        |       |          |         |
| By Mr. Aivalikles       | 43     |       | 113      |         |
| By Mr. Hilliard         |        | 89    |          | 129     |
| By Mr. Cullen           |        | 111   |          |         |

| Exhibits:     | For ID | In Evid. |
|---------------|--------|----------|
| None marked.  |        |          |

P R O C E E D I N G S

(Without the jury present.)

THE CLERK:  This court is in session and has for consideration a charging conference in 22-cv-326-LM, Ortolano vs. Bolton, et al.

THE COURT:  Okay.  Let me hear from counsel with respect to any issues that are -- what's going to happen today that I need to know about and that I can perhaps help resolve before we begin the day.

MR. HILLIARD:  I can start with one thing, your Honor.

I think the either third or fourth witness today will be Attorney Richard Lehmann and I just wanted to flag for the Court -- I think I flagged this in my objection to one of the exhibits -- that there's a couple problems with his -- what I anticipate his testimony to be.

Number one, that it might fall into the realm of expert testimony about the rules of professional conduct or other standards of care for attorneys and he's not been disclosed as an expert or provided any disclosure.

And, number two, there may well be aspects of his proposed testimony in terms of litigation he's handling for the plaintiff in interacting with the defendants that would be covered by the litigation privilege.  I don't know exactly what they propose to have him say, but I wanted to flag those

4

issues, your Honor.

THE COURT:  Okay.  And he's -- he was Ms. Ortolano's attorney, right?

MR. HILLIARD:  Right.

THE COURT:  Okay.  And --

MR. HILLIARD:  With respect to certain matters, yes.

THE COURT:  Okay.  And, of course, I'm not clear on the different matters, but who's asserting the litigation privilege --

MR. HILLIARD:  The defendants.

THE COURT:  -- under your scenario?

MR. HILLIARD:  The defendants.

THE COURT:  Okay.

MR. HILLIARD:  It's a privilege, the actions they take in litigation on behalf of their client, things they say and do.  So --

THE COURT:  All right.

MR. HILLIARD:  -- defendants are asserting that privilege.

THE COURT:  All right.  Okay.  All right.

MR. HILLIARD:  That's all I had, your Honor.

THE COURT:  Okay.  Thank you.

Richard Lehmann, is he going to be more fact-based; are you going to ask him fact questions, essentially?

MR. AIVALIKLES:  Yes.

5

THE COURT: Can you give me an offer of proof generally?

MR. AIVALIKLES: Yeah, basically fact questions. He wrote a letter -- he wrote a letter, he received letters from Attorney Bolton, one of them dealt with having my client arrested, and how he interacted with Attorney Bolton in terms of how the case was handled. That's about it.

THE COURT: And so it deals with the January 26 -- 22nd, 2021, and then February arrest.

MR. AIVALIKLES: Incidentally. I mean, not directly, your Honor, no.

THE COURT: Okay. So how would he be -- you may not end up calling him?

MR. AIVALIKLES: No.

THE COURT: Or he is a definite?

MR. AIVALIKLES: Yeah, he is a definite, your Honor. We actually have eliminated seven witnesses --

THE COURT: Okay.

MR. AIVALIKLES: -- and I informed counsel last evening. So we're only left with two, which would be Michael Ortolano and Attorney Lehmann.

THE COURT: That's it?

MR. AIVALIKLES: That's it --

THE COURT: Those two.

MR. AIVALIKLES: -- those two?

THE COURT: Okay. No Carignan?

MR. AIVALIKLES: Oh, I'm sorry. I thought -- yes, my mistake. Finishing up with Roach and Carignan.

THE COURT: Okay.

MR. AIVALIKLES: And then Michael Ortolano and Attorney Lehmann.

THE COURT: Okay. So just give me a sense of -- I'm not as familiar as you with these facts. Give me a sense of how he is relevant on anything in the case. Give me the -- give me more specifics, if you could.

MR. AIVALIKLES: Hold on a moment. I believe he also made comments about the incident and he can testify to what those comments were, your Honor. It was on the 27th of January.

Also, he's going to testify that, you know, his interaction with -- with Attorney Bolton in representing Mrs. Ortolano was somewhat strained; it seemed to be personal. And, again, that goes to Mr. -- Mr. Bolton's deposition, his feelings about my client, his attitude about my client.

THE COURT: Okay. I'm going to need to probably deal with that at the lunch break in more detail when I have a sense of -- of what it is --

MR. AIVALIKLES: That's fine, your Honor.

THE COURT: -- he might be relevant for.

Okay. And the litigation privilege, I'll need --

I'll need you to make that argument and assert that argument. I know it has come up, I think. Has it come up in this case already once?

MR. HILLIARD: It came up in this case already, some of the earlier --

THE COURT: Yes.

MR. HILLIARD: -- motion practice.

THE COURT: And it's -- it immunizes statements --

MR. HILLIARD: Yes.

THE COURT: -- made in the course of litigation. It's not an evidentiary privilege.

MR. HILLIARD: Right. But the immunity would be hollow if the statements or actions could be used against the defendant, your Honor.

THE COURT: All right. Well, we'll --

MR. HILLIARD: That's what's happening here.

THE COURT: We'll revisit that then.

MR. HILLIARD: Thank you.

THE COURT: All right.

Anything, Attorney Cullen?

MR. CULLEN: Just -- just on that, I think the comment that it's going to include how Mr. Bolton acted -- Attorney Bolton acted in a deposition really puts a point on this idea of, you know, your conduct during a deposition, how -- how lawyers treat people during a deposition may be

8

strategic or something like that.  And the idea of having a -- a different attorney come in and say, geez, Attorney Bolton's conduct in that deposition that he took of the plaintiff was, you know, tough.  That's --

THE COURT:  That would be the -- that's what he's going to testify to?

MR. AIVALIKLES:  No, no, your Honor.

THE COURT:  Okay.

MR. AIVALIKLES:  That is not it.

MR. CULLEN:  I just wanted to make sure.

THE COURT:  Okay.  All right.

MR. CULLEN:  The only other thing is -- I apologize to the Court.

Yesterday I cited a case I called it Rudland or Ruckland vs. Manchester.  It's actually *Rowland*, R-o-w-l-a-n-d.  So to the extent that you were searching all over for it, I apologize.

THE COURT:  That's correct.  We could not locate it, ultimately, so --

MR. CULLEN:  And it -- in my defense, I did give you the right case number.  But, again, my apologies to the Court, but especially to the clerks.  Sorry about that.

THE COURT:  Do you have a copy of that case and have you --

MR. CULLEN:  I do, yes.

THE COURT:  Okay.  Do you have a copy?  The Court could not locate it, so I want to make sure --

MR. AIVALIKLES:  I was able to find it online, but I did not print a copy.

THE COURT:  But you have it; you found it?

MR. CULLEN:  I'm sorry.  I'm sure that -- I know how frustrating that is.

THE COURT:  And what you were asking, as I recall, is a proximate cause.

MR. CULLEN:  Yeah, it had to do with but-for causation.

THE COURT:  Okay.  And --

MR. CULLEN:  It's probably not as convincing as I read it to be yesterday morning.

THE COURT:  Okay.  All right.  And what -- it's ironic, because I obviously changed the categories and the labels on causation to help a jury, laypeople, understand the concepts and I think what I did was confuse the lawyers because lawyers are used to saying proximate cause, factual cause, legal cause.

And so, ultimately, both are in my instructions, but the factual cause is the first component; legal cause or proximate cause is the second component.  I think it covers what you were asking for yesterday and, ultimately, if not, you'll have to -- you'll have to clarify for me what language,

line, page, you want me to wordsmith and I will consider it.

MR. CULLEN:  Thank you, your Honor.

THE COURT:  Any -- and you were also arguing about -- you wanted language from *West vs. Atkins*.  I -- go ahead.  You're standing up, so I'm sure you want to make another point.  So go ahead.

MR. CULLEN:  No, no, no, your Honor.  Why don't I listen to you first and then respond.

THE COURT:  Okay.  I think my instruction as it's written captures what I think the law -- the state of the law is on this.  I -- the language you want me to use is obviously lifted from this *West vs. Atkins* case.  It's just that it's not particularly easy to understand.  And so my effort has been to put under color of state law in terms that are legally correct but will make sense to a jury.  And I think this will -- we'll get questions from the jury about what does it mean to be clothed with the authority of, and made possible only because.

So -- and this case is so different from the facts of this -- the *West* case is so different from the facts of this case, but it is helpful in terms of drawing this line because I think the case law that followed from the Court's holding -- I'm forgetting the name of it, but the case wherein they held that public defenders are not state actors, circuit and district judges incorrectly concluded from that that just professionals are not state actors and the Court's clarifying

that that is not at all what the Court intended.  And it's --
it points out -- *Polk County* is the name of the case -- that
that is the only case in which this Court has determined that a
person who is employed by the state and who is sued under 1983
for abusing his position in the performance of his assigned
tasks was not acting under color of state law.

And, you know, I think I captured the rest of *West*,
ultimately.

MR. CULLEN:  Your Honor, if you're not inclined to
change the color of state law from the one that you gave us in
draft on Tuesday, that's fine.

THE COURT:  Okay.  All right.  And you're fine with
the way it's written --

MR. AIVALIKLES:  Yes, I am, your Honor.

THE COURT:  -- Attorney Aivalikles?  Okay.

MR. AIVALIKLES:  Thank you.

MR. CULLEN:  Thank you, though, for the
consideration.

THE COURT:  I considered that last night carefully.
So -- okay.

Any other issues with respect to jury instructions,
Attorney Aivalikles?

MR. AIVALIKLES:  Yes, your Honor.

Your instruction with regard to multiple defendants,
you indicate that if you find that Mrs. Ortolano has proven her

claim against one of the defendants, it does not automatically mean that she has proven her separate claim against the other defendant. We think you should also instruct them on the reverse. In other words, if they find that she hasn't proved it against one defendant, it doesn't mean that it is automatic that the -- she hasn't proven against the other defendant. It's just the reciprocal.

THE COURT: Okay. Any problem with that?

MR. CULLEN: I don't think so, your Honor. I think it would be clear on the jury verdict form in either case.

THE COURT: Okay. All right. Well, we'll try to come up with some language or you could give us that if you would like.

Go ahead.

MR. AIVALIKLES: Then with regard to the claims, I think the first claim that Mrs. Ortolano engaged in protected First Amendment speech, I think that's been admitted by the defendants.

THE COURT: Say that again.

MR. AIVALIKLES: I think the first instruction about the claims, that Ms. -- Ms. Ortolano engaged in conduct protected by the First Amendment, I believe the defendants have admitted that.

MR. CULLEN: We did indicate that we would -- we would plan to concede that. We -- we do still have that

question about the -- whether she has the right to be in a public space. But if you're not inclined to add that, the language in -- we're -- we would -- we'd concede as far as the language here, that, you know, public criticism, requesting access, bringing lawsuits, is all protected conduct. We don't concede that she has a right to publicly protest in -- in the areas.

So if that's something they're pushing, I guess we just deal with it in our closing by saying that we're not disputing those issues.

THE COURT: Okay. So I don't need then to have the last sentence -- look at page 10, lines 11 through 13 -- it is up to you to determine.

MR. AIVALIKLES: Yeah. I mean, I think -- I think that --

MR. CULLEN: I think that would be fine, your Honor.

THE COURT: Okay. So there's no question that this is protected conduct. So I will add that sentence and I believe that's present in, I think, the Ninth Circuit pattern instructions. But I'll --

MR. AIVALIKLES: Yes.

THE COURT: I'll add that and bring it to your attention before --

MR. CULLEN: Thank you.

THE COURT: -- we go further.

Okay.  Thank you.  Go ahead.

MR. AIVALIKLES:  Yes, your Honor.

And I think we're going to provide an instruction along the offense that offensive speech, even in public forum, is protected, what -- you know, what is not protected, if it is inciting a riot or something along those lines.  So we would submit something to the Court on that issue.

THE COURT:  Go ahead and submit that, yeah.

Ultimately, it's a factual question whether it was the protected conduct, which they concede, whether that was the cause, whether they were retaliating.

MR. AIVALIKLES:  Yes.

THE COURT:  That's ultimately the question.

MR. AIVALIKLES:  Correct.

THE COURT:  Okay.  And I'm wondering if we could do something to assist with the whisper technology because you have to -- you have to bend over.  Maybe if -- if, ultimately, you use that microphone if you --

MR. AIVALIKLES:  This one back here?

THE COURT:  This one right here on the podium.

MR. AIVALIKLES:  Oh, yes, I will.  I didn't realize I could use that for the whisper.

THE COURT:  I think any microphone you can use and come close.  Because you're closest to the jury.  You're the person having the problem.  And this is common, don't --

whispering.

MR. AIVALIKLES:  I'm trying to block my face like this.

THE COURT:  But your voice is low and it's something I'm worried the jury could hear.

MR. AIVALIKLES:  Yes.

THE COURT:  So that's the only reason I keep telling you to whisper.

MR. AIVALIKLES:  No, I understand, your Honor.  I --

THE COURT:  Okay.  But just get very close to the mic and whisper, if you could.  All right.

Anything else?

MR. AIVALIKLES:  I don't believe so.

MR. CULLEN:  No, your Honor.  Thank you.

THE COURT:  Okay.  All right.

And let's talk about timing.  It sounds like you've pared this down.  You're going to also be cross-examining the two defendants as opposed to calling them on direct, which is going to, for sure, speed things up.  And what I'm hoping is that we would get to the defense case by, at the latest, tomorrow before lunch.  Does that sound --

MR. AIVALIKLES:  Oh, oh, absolutely.

THE COURT:  Okay.  All right.  I was looking back at a rough draft of transcripts and the assurance that I got about what was remaining with Ms. Ortolano was way, way, way off in

terms of how much time you had left with her.  So I hope that -- I hope that this is -- is accurate.  So sounds -- sounds like you've really pared it down.  I appreciate that.

MR. AIVALIKLES:  Yes.  And I just want the Court to know that I'm not intentionally ignoring your suggestions about paring it down.  That's not my intent, your Honor.

THE COURT:  I know that.  I --

MR. AIVALIKLES:  Okay.

THE COURT:  I know there's nothing intentional whatsoever.  It's just that I need -- I have an obligation.  As you know, my obligation is to this group of people to keep the case moving.  And yesterday, ultimately, the way you were handling direct examination was ultimately difficult to follow, for one thing, but it also slowed everything down.

So that's why I needed to -- I needed to speed you up.  But, no, I don't want you to worry about --

MR. AIVALIKLES:  Okay.

THE COURT:  -- me --

MR. AIVALIKLES:  Because --

THE COURT:  -- interpreting that as you somehow ignoring or violating my instructions.  I did not interpret it that way.

MR. AIVALIKLES:  And --

THE COURT:  Okay.

MR. AIVALIKLES:  And the cross-examination of Chief

Carignan may have some component to that, your Honor, but it's not a great deal of component about it, just pointing out inconsistencies. So --

THE COURT: Okay.

MR. AIVALIKLES: But I --

THE COURT: Just remember the jury needs -- it's the first time they're hearing from Chief Carignan. You know what he's going to say or generally. Same with Officer Roach.

MR. AIVALIKLES: Right.

THE COURT: First time they're ever hearing this. And to go from one exhibit to another, it's hard for them to have a coherent understanding of what in the world is going on. And, obviously, you're calling him as a witness.

MR. AIVALIKLES: Right.

THE COURT: He's part of your case. So you want the jury to learn something from these witnesses.

MR. AIVALIKLES: Right.

THE COURT: So, ultimately, if you can, you know, give them a sense of the story and then present some --

MR. AIVALIKLES: Right.

THE COURT: -- exhibits.

MR. AIVALIKLES: Right.

THE COURT: That would be very helpful, I think.

MR. AIVALIKLES: And he is a hostile witness, your Honor. That's been agreed. So there will be --

THE COURT:  That's correct.  He is a hostile witness.

MR. AIVALIKLES:  So there will be leading questions.

THE COURT:  And you've conceded he would be a hostile witness.

MR. CULLEN:  We did.  In fairness, we thought that would speed things up.

THE COURT:  Okay.  Well, we'll be back in ten minutes or so.

MR. AIVALIKLES:  Thank you, your Honor.

MR. CULLEN:  Thank you, your Honor.

THE CLERK:  All rise.

(Recess taken from 8:56 a.m. until 9:14 a.m.)

(With the jury present.)

THE CLERK:  Please remain standing for the jury.

Please be seated.

This court is in session and has for consideration jury trial day three in the matter of Ortolano vs. Bolton, et al, 22-cv-326-LM.

THE COURT:  Good morning, everyone.

I just want to ask you this morning on our third day if you have been able to comply with my instructions about your conduct outside of this courtroom.

And everybody is aggressively affirmatively shaking their head yes, so let the record reflect that.

And, Attorney Aivalikles, I believe Officer Roach was --

MR. AIVALIKLES:  Yes.

THE COURT:  -- on the stand and we will swear him in again and then you may continue.

MR. AIVALIKLES:  Thank you, your Honor.

THE COURT:  Officer Roach.  Sergeant Roach.

THE WITNESS:  Thank you.

THE CLERK:  Would you raise your right hand.

**TIMOTHY ROACH,** having been first duly sworn, testified as follows:

THE CLERK:  Thank you.  Please be seated.

Please state your full name for the record.

THE WITNESS:  My name is Timothy John Roach.  Last name is spelled R-o-a-c-h.

CONTINUED DIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.    Good morning, Sergeant Roach.

A.    Good morning.  How are you?

Q.    I'm doing fine.  How are you?

A.    Good.

Q.    Did Attorney Bolton ever call you and ask if you wanted to interview the victims of this offense?

A.    No.

Q.    When you received instructions from your supervisors

20

to go to city hall to talk to the witnesses, did you tell them that the case was closed?

A.    No.

Q.    If Laurie had an appointment and she went to the legal office and Attorney Leonard met with her and during the appointment Attorney Leonard said, you must leave, and she refused to leave, would that constitute a criminal trespass?

A.    Are we doing hypotheticals?

Q.    Yes.

A.    Then yes.

Q.    Okay.  In Attorney Leonard's handwritten statement, which was January 22nd, 2022, and Exhibit 47, did she ever indicate in that statement she wanted Laurie arrested?

A.    The typed statement, you mean?

Q.    Her statement of January 22.

A.    I'd have to refer to it exactly.

Q.    Okay.  Please do.  Do you have it in front of you?

A.    Yes.

THE COURT:  Are these the same documents that you had yesterday, Sergeant Roach?

THE WITNESS:  Yes, your Honor.

THE COURT:  Okay.  And so we confirmed that that set of documents is identical to Exhibit 47.

MR. AIVALIKLES:  47.  It's the handwritten note of Attorney Leonard --

21

THE COURT: Okay.

MR. AIVALIKLES: -- dated January 22nd.

THE WITNESS: Yeah, I think it's typed as well.

MR. AIVALIKLES: Oh, is it typed?

MR. CULLEN: I did prepare a clean copy of Exhibit 47 that's page-numbered, if that's helpful. I'd offer it to counsel.

THE COURT: Would that be helpful? And does Sergeant Roach have the same document with page numbers or --

MR. CULLEN: I was going to just suggest that perhaps the witness have the one that's the exhibit.

THE COURT: I think that would be excellent for the record as well.

Q. I'll give you Exhibit 47 and pull out the -- the January 22nd --

A. Thank you.

Q. -- statement by Attorney Leonard. It may make it easier for you.

A. So your question was?

Q. Does she indicate in that statement on January 22nd that she wanted Laurie Ortolano arrested?

A. It doesn't appear so.

Q. Thank you.

Can you bring up Exhibit 46 and the arrest warrant. Sorry, the affidavit.

22

Directing your attention to the affidavit, did you sign that under oath?

A.    I would have, yeah.  Can you go to the page?

Q.    I don't have those same page numbers that you do, but it would be your affidavit.

A.    Yeah, that's my signature.

Q.    And the purpose of that affidavit was to have the Court approve an arrest warrant; is that correct?

A.    Yes.

Q.    And so you set forth facts that you thought the judge should know to establish probable cause for the issuance of the arrest warrant; is that correct?

A.    Yes.

Q.    You didn't indicate in the arrest warrant that when you were there on January 22nd that you did not note any offense committed or apparent, is that correct, in your warrant?  I'm sorry, in your affidavit.

A.    No.

Q.    In the affidavit, did you tell the judge that the case was closed on January 22nd?

A.    No.  And could I just clarify?

When you say case is closed, it means at that point I was taking no further action because technically there wasn't a case opened on that initial day on the 22nd of January.

Q.    Right.  When you left, you were taking no further

23

action?

A.    Yes.  At that point, yes.

Q.    Okay.  And that wasn't disclosed in your affidavit, was it?

A.    No, it didn't need to be.

Q.    Okay.  Did you advise the judge in your affidavit that Attorney Leonard wanted Laurie Ortolano trespassed on January 2nd -- 22nd?

A.    I haven't reviewed this since 2021 and I don't have a copy of that here.

Q.    I'm sorry.

A.    And I'm only seeing one page.

Q.    Oh, go to the second page and the third page.  I'm sorry.  Please feel free to review it.

A.    Yeah, I --

THE COURT:  Is there a way to give him a hard copy of the complete -- is it part of what he has?

MR. AIVALIKLES:  Yes.

THE COURT:  All right.

THE WITNESS:  I'm sorry, your Honor.  I'm trying to find it in here.

THE COURT:  Take your time.

Q.    Let me give you the hard copy.

A.    Yeah, I don't have it in here, sir.

Q.    Let me give you the hard copy.

24

A.    Thanks.

Can I take a couple --

THE COURT:  Yes, you may.

THE WITNESS:  Thank you.

Okay.  Could you repeat the question again, sir?

Q.    Yes.  In your affidavit to the judge, did you tell the judge that Attorney Leonard told you on January 22nd, 2022, that she only wanted her trespassed?

A.    No.

Q.    Did you tell the judge in your affidavit that no one at city hall on January 22nd wanted her arrested?

A.    No.

Q.    Did you include the admission that the police department claimed resulted in the reopening in your affidavit? On the other hand, did you tell the judge that Laurie Ortolano admitted to committing the crime in your affidavit?

A.    No.

Q.    But you did tell the judge in paragraph 10 that Laurie Ortolano refused to talk to the police after January 22nd; is that correct?

A.    Yes.

Q.    You agree she has a constitutional right not to talk to the police?

A.    Absolutely.

Q.    And before you asked to talk to her, did you give

25

her her Miranda warnings?

A.    She wasn't in custody, so no.

Q.    Well, you were contemplating arresting her.

A.    I was still conducting an investigation.

Q.    Okay.  And the date of that contact with Laurie Ortolano?

A.    Was February 9th.

Q.    Okay.  Did you tell the judge in your affidavit that Laurie Ortolano is a vocal critic of the city, the staff, and herself, meaning Attorney Leonard, at public meetings, emails, and with city officials?  Did you tell that to the judge?

A.    No.

Q.    Then you got the arrest warrant and you charged her with a Class A misdemeanor; is that correct?

A.    That's correct.

Q.    And a Class A misdemeanor is a -- a potential one-year jail sentence?

A.    That's correct.

Q.    And you had the option of charging her with a Class B misdemeanor, correct?

A.    To my understanding, it's not defined by statute. So typically I would always charge with a Class A misdemeanor if it's not defined by statute, regardless of the -- what misdemeanor it is.

Q.    So are you telling this jury that you've never

26

charged any person for criminal trespass as a Class B misdemeanor?

A. Personally, I haven't, no.

Q. And you saw her on the day she turned herself in at the police station?

A. I didn't have any contact with her that day.

Q. No, I know, but did you see her at the police station?

A. I don't recall seeing her.

Q. Okay. So what was the last involvement you had with Laurie?

A. When I'd visited her address to see if she was willing to talk to me about the incident.

Q. February --

A. 9th.

Q. 9th. Sorry. Thank you.

A. Thank you.

MR. AIVALIKLES: Nothing further.

THE COURT: All right.

Attorney Cullen?

MR. CULLEN: It's okay if I start?

THE COURT: What's that?

MR. CULLEN: It's okay if I start?

THE COURT: Yes. Go ahead.

MR. CULLEN: We'll save Russ even having to get up.

<u>CROSS-EXAMINATION</u>

BY MR. CULLEN:

Q.    Good morning, Sergeant.  How are you today?

A.    Good, thank you.

Q.    You were just asked a question about Miranda warnings and what -- can you just tell the jury when you have to give Miranda warnings to somebody?

A.    Typically it would be if they're in custody, I would issue a Miranda warning or if there's an impression that they're in custody, I would issue a Miranda warning.  But because I visited Ms. Ortolano at her home and I wasn't intending on arresting her, I didn't issue any Miranda warning.

Q.    So there's no requirement that you do a Miranda warning when you just go up to somebody's house and ask to talk to them about a situation?

A.    No, there isn't.

Q.    Okay.  The nature of this call, you -- you were -- you were a patrol officer at this time, right?

A.    That's correct.

Q.    And do you recall just about where you were, were you in a car, were you walking a beat, what were you doing?

A.    I believe I was on patrol on Main Street in Nashua.

Q.    And when the call comes in -- we've seen the call notes, which are the first page of Exhibit 47.  But when this first call comes in, there are sort of -- it looks like there

28

are three entries from a Linda French.  And I take it she's a dispatcher?

A.    Linnea French, that's correct.

Q.    Thanks.

A.    She's an officer, but she was dispatching that day.

Q.    Thank you.  My eyes are getting older.

You don't read those in real time, do you?

A.    They were -- we'll be dispatched to a call and a call will pop up on our screen, but sometimes there is a delay between the call popping up on our MDT, our mobile data terminal, and what's being relayed verbally over the radio.

Q.    All right.  So are you primarily listening to the radio for --

A.    Exactly, yes.  Primarily, yes.

Q.    And what was your understanding of the nature of the call based on what you had observed or listened to?

A.    That there was a female refusing to leave city hall on the third floor.

Q.    So a fairly standard-sounding trespass case?

A.    Yes.

Q.    And you went into this knowing that it appeared to be a trespass issue?

A.    Yes.

Q.    And you're familiar with the trespass statute, I assume.

A.    Yes.

Q.    It's one of the things you studied when you took the -- took the -- went to the academy?

A.    Yes.  We review various statutes.

Q.    Okay.  And you were also in the legal bureau, right?

A.    I was for a short period of time, yes.

Q.    And just to be clear for the jury, we've been talking a lot about a legal department, which is part of city hall.  The legal bureau is different; is that right?

A.    We're a separate entity, yes.

Q.    Okay.  It's part of the police department?

A.    Yes.

Q.    Okay.  And did the call notes, which are pages 1 and 2 of Exhibit 47, include your synopsis of what happened?

A.    That's correct.

Q.    It's not everything that you remember from that day?

A.    No, it's just enough to clarify it for anyone reviewing the log of how I resulted that call.

Q.    And then when the investigation opened, you went back and re-created a more complete -- your more complete memory of the events and that's what's at page 5 of that exhibit, right?  That's the entry that sort of reflects on what -- expands on what happened.

A.    Yes.

Q.    Okay.  When you wrote at the bottom of the call log,

30

no offense alleged or apparent, what -- what did you mean?

A.    It's kind of a catchall, but how I use when I'm resulting calls.  It just means that at this point in time, there's no crime that I'm going to be investigating and as far as I'm concerned, this matter is closed.

Q.    Okay.  Because you know that under the statute, a person's guilty of criminal trespass if knowing he or she is not licensed or privileged to be there, they enter or remain in a place, right?

A.    Yes.

Q.    And that -- clearly you knew those things had happened on the day of the incident, right?

A.    Yes.

Q.    So when it reads, no offense alleged or apparent, you weren't suggesting to people that, in fact, there was no crime?

A.    No, a criminal trespass had occurred.  There was no additional crime.

Q.    And, again, the call log is something that is -- is a summary, really, for somebody else to look over and sort of see what happened to the case?

A.    Yes.

Q.    It doesn't include every piece of information you got that day?

A.    No.

Q.    And one of the things it doesn't include, it doesn't include Laurie Ortolano's statement to you that I'll probably get arrested because I'll come back, or words to those effect?

A.    No, it doesn't include that.

Q.    Okay.  But that is something she told you, right?

A.    Yes, she did.

Q.    Okay.  And because it's not on the call log, you know, a supervisor or somebody else looking that over later in time wouldn't realize that she had said that, right?

A.    I'm sorry.  Can you repeat that?

Q.    Yeah, it was poorly phrased.

A supervisor looking at the call log wouldn't know from looking at that that Laurie had actually expressly told you she'd probably be back?

A.    No.

Q.    Okay.  With respect to the -- when you went there that day, you spoke, is it fair to say, fairly briefly with Ms. Ortolano?

A.    Yes, I spoke fairly briefly with everybody.

Q.    Okay.  And was it your impression at that time that Celia Leonard just wanted Ms. Ortolano to leave so she could go back to business?

A.    Yes.

Q.    Okay.  And that's what you worked to accomplish, right?

32

A.    Yes.

Q.    Get the person out of the building and let them go back to their work?

A.    Exactly -- yes, exactly.

Q.    And for somebody to be -- to commit criminal trespass, they don't -- it doesn't require that that person be threatening, right?

A.    No.

Q.    And it doesn't require that they be loud or shouting or anything like that?

A.    No.

Q.    It doesn't require that they commit some further crime like criminal mischief or vandalism?

A.    No.

Q.    It's just sufficient that they're in a place they're not supposed to be and they refuse to leave?

A.    Yes.

Q.    Okay.  So that would be the same if they -- if somebody came to my office or my home or the jury's office or their home and somebody was there and they refused to leave, that would be a criminal trespass.

A.    Yes.

Q.    And that person would have the ability to ask you at the time to do an investigation or to pursue charges?

A.    Yes.

Q. Or they could ask you at a subsequent time?

A. Yes.

Q. In fact, that's happened for you before, right? Maybe not in a criminal trespass, but there have been situations where people come to you later and said, look, I -- I want to press charges --

A. Yes.

Q. -- even if they don't make it apparent on the day.

A. Yes.

Q. Okay. But that's -- in this case, Celia Leonard never reached out to you directly in -- between January 22nd when you left and February 1st, you never heard from Celia Leonard.

A. No.

Q. In fact, you never heard from Steve Bolton either.

A. No.

Q. And just to hopefully save Russ a trip, have you ever spoken to Steve Bolton?

A. No.

Q. At any time?

A. No.

Q. Okay. And so not about Laurie Ortolano, not about anything?

A. No.

Q. Okay. Have you met him before?

A.   Nope.

Q.   Okay.  With respect to the investigation, once you opened the investigation, you went to city hall and you interviewed the three people who were present on the day?

A.   Yes.

Q.   Okay.  And Mindy told -- Mindy Lloyd was one of them?

A.   Yes.

Q.   And she told you that she had asked Laurie Ortolano twice to leave?

A.   Yes.

Q.   And Ms. Ortolano didn't leave.

A.   Yes.

Q.   That alone would be sufficient for criminal trespass, wouldn't it?

A.   Yes.

Q.   And then you interviewed Jesse Neumann, right?

A.   Yes.

Q.   And he told you that he asked her three times to leave.

A.   Yes.

Q.   And, again, she didn't leave, correct?

A.   That's correct.

Q.   And then you spoke to Celia Leonard and she also indicated that she had told her to leave and she didn't leave.

A.    Yes.

Q.    Okay.  And although you didn't put it in the warrant, you had the -- you had the after -- not on the day of, but after you interviewed Jesse Neumann, he supplied you with a copy of the email that she had sent later that day?

A.    Yes.

Q.    And in there, she says, they told me to leave and I refused to leave.

A.    Yes.

Q.    Okay.  There were a couple questions just about your affidavit.  Is -- is the possibility that Celia Leonard -- if Celia Leonard said, I want her trespassed, is that relevant to whether or not Laurie Ortolano committed a trespass?

A.    I -- I don't understand.

Q.    Yeah.  I don't know if I do either.

What's the purpose of when you're writing a warrant?  What are you trying to include in that warrant?  The affidavit, I apologize, not the warrant.

A.    Probable cause that someone -- with sufficient facts and circumstances someone committed an offense.

Q.    And a request by an individual, say, me at my office, to say I want Maddie trespassed, that doesn't have anything to do with actually whether she committed the offense or not, that's just my desire to have her out of the office, right?

36

A.    Yes.

Q.    That's not something you would think would have to be included in a warrant to go to, say, a judge to determine probable cause?

A.    No.

Q.    And although you didn't include in your warrant that the plaintiff had actually -- Ms. Ortolano had actually confessed to the crime, that would have only made your warrant stronger, right, not weaker?

A.    Yes.

Q.    And then once you sent -- once you do the warrant, you send that to a judge, right?

A.    That's correct.

Q.    And the judge can either accept the warrant and issue a warrant or they could say no?

A.    Yes.

Q.    Okay.  In this case, they determined there was probable cause?

A.    Yes.

Q.    Okay.  I skipped this part, but I think it's clear to the jury already.  Before you even did that warrant, you did give Ms. Ortolano another opportunity to speak to you in the sense that after the day of the incident on January 22nd you start an investigation.  And once you start the investigation, you did go to her house and give her a chance to speak to you.

37

A.    Yes.

Q.    Okay.  And she declined.

A.    Yes.

Q.    Okay.  And as Attorney Aivalikles says, that's fine, that's her right.

A.    Yes.

Q.    Okay.  Did you -- once you got the arrest warrant, did you go to her house and arrest her on the spot?

A.    No.

Q.    Didn't swoop in with police cars?

A.    No.

Q.    Didn't drag her from her house?

A.    No.

Q.    Did anybody at any point tell you when you started this investigation or at any other time, you need to arrest her?

A.    No.

Q.    Other than on January 22nd, the date of the incident, and/or February 1st when you interviewed Celia Leonard, did you have any other conversations with her about Laurie Ortolano?

A.    I believe I interviewed Ms. Leonard on the -- February 3rd.

Q.    I'm sorry.

A.    But, no, there was no other contact --

Q.   Okay.

A.   -- or conversations prior to that.

Q.   So she didn't follow up with you at any time and say, where are we on the investigation or anything along those lines?

A.   The only two times I've spoken with Ms. Leonard ever would be January 22nd and February 3rd.

Q.   Okay.  And on the date -- on January 22nd, you didn't specifically ask her, do you want me to arrest her?

A.   No.

Q.   Okay.  And, again, just to make sure I've covered this, you never talked to Steve Bolton at all?

A.   No.

MR. CULLEN:  One moment, your Honor.

Thank you, Officer -- Sergeant.  Appreciate your time.

THE WITNESS:  Thank you.

MR. CULLEN:  Don't get up quite yet, just in case.

THE WITNESS:  No.

THE COURT:  Anything else?

MR. HILLIARD:  No questions.

THE COURT:  Okay.  Anything else, Attorney Aivalikles?

MR. AIVALIKLES:  Yes.  I have just a few questions, your Honor.

39

THE COURT:  Go ahead.

REDIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.    You have spoken to Attorney Cullen before your testimony here today; is that correct?

A.    Yeah, Brian -- Brian Cullen, yes.  I'm sorry.

Q.    I'll call him Brian.

A.    Yes.

Q.    That's okay.

How many times did you meet with Brian?

A.    I met with him twice at the police department, once at his office, and then he was present when I spoke to yourself last week.

Q.    So four times?

A.    Well, three times, and then he was present when I spoke to you.

Q.    Oh, I see.  Okay.  And how long were those -- total were those sessions?

A.    I wasn't keeping track of time.  Probably half an hour on each occasion, maybe the last one was close to an hour.

Q.    Oh, okay.  All right.  So you went over your testimony with him?

A.    Yes.

Q.    And the questions he was going to ask you?

A.    Something like the questions, yes.

40

Q.   When you left on January 22nd, you had no intention of following up with a further investigation, did you?

A.   No.

Q.   And, in fact, it was when you were told that the supervisors got a call from Attorney Leonard on behalf of city hall that she wanted the -- the matter opened and investigated; is that correct?

A.   I wasn't aware how contact was made.  I was aware that there was contact through Celia Leonard that they wished the matter to be investigated and that was relayed to me by Sergeant Caron.

Q.   Okay.  So it was a call that Celia Leonard made requesting that it be reopened, the investigation?

A.   What was relayed was that they wanted it investigated and they were unsure as to why she wasn't arrested on the day.

Q.   Okay.  So if you didn't get that instruction to reinvestigate, this case would have never been reopened?

A.   No.

Q.   No?

A.   It wouldn't have been reopened, that's correct, yeah.

Q.   Now, one final question.  If someone described what happened at the city hall as an out-and-out invasion inspired by events in Washington and, happily, no one was injured or

worse, would you have expected some kind of disturbance?

A.   I'm sorry.  Are we -- is this something specifically mentioned somewhere?

Q.   That was a statement by Attorney Bolton.

A.   Okay.

Q.   So based on his description of what happened, would you have expected that Laurie Ortolano was causing a disturbance, making threats, physically confrontational?

A.   I -- it seems an odd question to ask, but I'm not aware of any --

MR. AIVALIKLES:  No problem.  Thank you.

I'll withdraw the question.

Thank you, Officer.

THE COURT:  Okay.

MR. CULLEN:  Your Honor, may I just redirect a moment?

THE COURT:  Yes.

MR. CULLEN:  Thank you.

RECROSS-EXAMINATION

BY MR. CULLEN:

Q.   Sergeant, when you met with Attorney Aivalikles on Friday, was I present during your meeting?

A.   You were present as in you were in the office, but we spoke with the attorney separately.

Q.   And you met with him privately in a conference room,

42

right?

A.    That's correct.

Q.    And he had an opportunity to ask you whatever questions he wanted?

A.    Yes.

Q.    And you answered all those truthfully?

A.    Yes.

Q.    And he gave you an idea of what questions he might ask you today, didn't he?

A.    Yes.

MR. CULLEN:  Thank you.

MR. AIVALIKLES:  No.

THE COURT:  Nothing further?

MR. AIVALIKLES:  Nothing further.

THE COURT:  All right.  Thank you, Sergeant Roach. You may step down, sir.

THE WITNESS:  Thank you, your Honor.

THE COURT:  And you may call your next witness.

(Witness excused.)

MR. AIVALIKLES:  Chief Carignan.

THE JUROR:  Your Honor, I need to use the restroom.

THE COURT:  Yes.  Why don't we take a morning break.

THE CLERK:  All rise for the jury.

(Recess taken from 9:43 a.m. until 9:58 a.m.)

(With the jury present.)

THE CLERK: Please be seated. This hearing is back in session.

THE COURT: All right. Attorney Aivalikles.

MR. AIVALIKLES: Yes, your Honor. Thank you.

Chief Carignan -- or I should say ex-Chief Carignan.

THE WITNESS: That's fine. Thank you.

MR. AIVALIKLES: Take the stand, please.

THE CLERK: Please stand and raise your right hand.

**MICHAEL CARIGNAN**, having been first duly sworn, testified as follows:

THE CLERK: Thank you. Please be seated.

THE WITNESS: Thank you.

THE CLERK: Please state your full name and spell your last name for the record.

THE WITNESS: My name is Michael Carignan, spelled C-a-r-i-g-n-a-n.

<u>DIRECT EXAMINATION</u>

<u>BY MR. AIVALIKLES:</u>

Q. Good morning.

A. Good morning.

Q. Nice to meet you again.

How long have -- how long were you in law enforcement?

A. I was a Nashua police officer for 28 years.

Q. And what was your first rank?

44

A.    The first rank is called first year special officer.

Q.    And you rose through the ranks to become the chief?

A.    That's correct.

Q.    And that was in, what, 2020?

A.    2019.

Q.    2019.  And I think you tendered your resignation in March of 2021?

A.    '21, correct.

Q.    And now you're employed with BAE; is that correct?

A.    That's correct.

Q.    And what is your position with BAE?

A.    I just transitioned to the position of sector lead investigator.

Q.    Okay.  And how long have you been at BAE?

A.    Four years since I retired.

Q.    Do you -- do you know Officer Roach, now Sergeant Roach, when you were the chief?

A.    I did.

Q.    Okay.  And did you consider him to be a competent police officer?

A.    Yes.

Q.    As part of your responsibility as the chief, were you required to have your budget approved by the Nashua Board of Aldermen?

A.    So the budget gets approved by the Nashua Police

Commission, but then it gets presented to the Board of Aldermen who approves it.

Q. Right. So the aldermen can actually reject it; is that correct?

A. That's correct.

Q. They have the -- I'm sorry. I didn't mean to interrupt you.

A. No, there was no -- I was done.

Q. Okay. So they have the final say, the Board of Aldermen have the final say, in what the budget is?

A. That's correct.

Q. And before you present a budget that involves the police department, is that reviewed by the mayor?

A. It's not reviewed by the mayor. Oftentimes it would be reviewed by corporate counsel.

Q. Corporate counsel, who would be, in this case, Attorney Bolton?

A. Yeah, so let me back up.

So for union negotiations, which are part of the different contracts that we would have within the budget, the corporate counsel would be present for those negotiations or a representative would be present for those negotiations. But when we presented a budget, it did not go in front of corporate counsel.

Q. Okay.

46

A.    So they were present during some of the meetings, which a lot of funding that would be put towards the budget were there to make sure we had the money.

Q.    And we'll get to that.  I'm just trying to give the jury some information about how the mayor is involved with the police budget.  Can you tell us that?

A.    So the mayor's not really involved in the police budget at all.

Q.    Okay.  So during the time that you were chief, you had an opportunity to work with the Nashua legal department, which is the one in city hall, not the one in the police department?

A.    Correct.

Q.    And I think you've already indicated that Attorney Bolton would advise you concerning collective bargaining negotiations when those were going on?

A.    Correct.

Q.    And he was there to make sure that you didn't commit to something that the city wouldn't approve; is that correct?

A.    Correct.

Q.    You also discussed legislation, pending legislation, with Attorney Bolton; is that correct?

A.    Generally, no.  I'm not sure I follow.  Like I'm not sure I understand the question.

Q.    Okay.

A.    Like we don't -- the police department doesn't create legislation.

Q.    No, no, I'm sorry.  I guess it was a bad question.

You discussed with Attorney Bolton legislation that may be pending before the legislature; is that correct?

A.    Generally, no, with the exception of the police commission issue.  We did not discuss legislation.

Q.    And what was the time frame that you discussed or you represented by Attorney Bolton concerning negotiations?  Do you have an idea of the time frame or was it just throughout your involvement -- position as the chief?

A.    Attorney Bolton was present and I don't -- there are five unions at the Nashua Police Department.  So sometimes he would be present, sometimes somebody else would be present.  So I don't know exactly which ones he was in.  It was the -- they were ongoing negotiations.  So that would have been while I was deputy chief, which would be 2016 to 2019 --

Q.    Okay.

A.    -- roughly.

Q.    And you had a professional relationship with Attorney Leonard on a few occasions?

A.    I did.

Q.    And the -- that office was used concerning any, like, right-to-know requests at some point, 91-A right-to-know requests?

48

A.    At some point, yes.

Q.    At some point was a directive issued to the police department by Attorney Bolton that all right-to-know requests had to go through their office?

A.    I believe it was all right-to-know requests originating from Ms. Ortolano.

Q.    Oh, okay.  And prior to that directive from Attorney Bolton as it related to Ms. Ortolano's right-to-knows, the city did have a right-to-know or a record manager that would handle those right-to-knows; is that correct?

A.    The city -- I would assume the city does.  I know the Nashua Police Department has our own.

Q.    Right.  Okay.  And that would be Dave Lavoie?

A.    Correct.  He was employed by the Nashua Police Department.

Q.    I believe that you were advised by the deputy chief that there was an incident at city hall on January 22nd.  Do you recall that?

A.    Are you referring to the arrest -- of what year?

Q.    The incident, 2021.

A.    Yes.

Q.    Okay.  And who was the person that advised you?

A.    So the way -- it would have been one of the two deputy chiefs or one of the captains for patrol.  So the way the Nashua Police Department works, the chief has two deputy

49

chiefs; one manages all strictly patrol, one manages detective services, legal bureau, all that stuff.

So there's a chain of command that the patrolman go to the sergeants, the sergeants go to lieutenants, lieutenants to captains, captains to deputy chiefs, deputy chief up to the chief.

So I would have been informed by either the uniformed deputy chief, who I believe was Kevin Rourke at the time, or possibly the first or second shift captain.

MR. AIVALIKES: Okay. Can you bring up Exhibit 56.

THE CLERK: For ID?

MR. AIVALIKLES: No, that's a full exhibit.

THE CLERK: I do not have that as a full exhibit.

MR. AIVALIKLES: Oh, I thought it was agreed.

MR. CULLEN: It is a full exhibit.

THE CLERK: It is? Okay. I just had a discussion with him this morning and when I told him it wasn't in yet, he said okay. So I'm just going --

MR. CULLEN: Sorry.

MR. HILLIARD: Well, this is the exhibit, your Honor, 56, we discussed yesterday. And we understand it's becoming a full exhibit, but the Court noted our objection.

MR. CULLEN: You mentioned, your Honor, that you don't have the exhibits memorized, which is not surprising, but this is the exhibit with prior trespass issues.

50

THE COURT:  Okay.

MR. CULLEN:  And you were going to allow it in over our objection.

THE COURT:  Thank you.

MR. CULLEN:  Sorry.

THE COURT:  Go ahead.

Q.    Do you have it in front of you, Chief?

A.    I do, the memo to Laura Colquhoun.

Q.    Yes.

Can you go to the second page, Sam?

This was a -- the request made by Laura Colquhoun for the record of criminal trespass at city hall between January 1st, 2014, and January 31st, 2021; is that correct?

A.    Yes.

Q.    Do you see the first paragraph?

A.    Yes.

Q.    Okay.  And it indicates it was received by the police on March 15th, up top.

A.    Correct.

Q.    Okay.  And can you go back to the first page.

And the first page indicates that David Lavoie responded to the request on March 15th, the very same day?

A.    According to this, correct.

Q.    Was that request sent over to Attorney Bolton before it went out by Mr. Lavoie?

A.    I would have no idea.  I'm sorry.

Q.    Okay.  No, that's okay.  Don't worry about that.

THE COURT:  Would you do, I think, the jury a favor and just ask him what this collection of documents is --

MR. AIVALIKLES:  That's --

THE COURT:  -- and if he's seen it before, if he's familiar with it.

MR. AIVALIKLES:  Yeah, I was going -- that was my next question, your Honor, but thank you.

THE COURT:  Okay.

MR. AIVALIKLES:  So can we go through the -- scroll through that.

So that's -- that's the first page.  Go to the --

Q.    Have you had a chance to review it?

A.    I did see that -- I did see this form during trial prep, yes.

Q.    Okay.  So you've seen this form before or the document?

A.    If it's the same one, I believe so, yes.

Q.    Okay.

A.    I will assume that it is.

Q.    So that contains events that happened at city hall for that seven-year period that involve potential criminal trespass cases; is that correct?

A.    It appears -- well, for the most part, this one

52

here, 7 Star, that was not -- that wouldn't be considered city hall.  It's one street over.

Q.    Okay.  Do you know why that was included in the disclosure?

A.    Most likely because it's part of the intersection.

Q.    And so --

THE COURT:  We need to take a brief recess.  And while -- this is perfect timing, so we can talk about the mics and the jury hearing, all that, all that he's saying.

MR. AIVALIKLES:  Okay.

THE COURT:  So, go ahead.  We'll take a brief recess.  Five minutes.

(Jury excused.)

(Without the jury present.)

THE COURT:  Okay.  You have a very soft voice and so when you're speaking, if you could lean in to the mic --

THE WITNESS:  Apologies.

THE COURT:  -- that would be wonderful.  I think the jury can hear you because you're talking to them.  That's good. I'm having just a little trouble picking it up.  And then slow down for our court reporter to get every word.

And then let me back up a little bit.

I think that Chief Carignan came in with documents like, I think, Sergeant Roach and so I just want to clarify.

Are these documents an exhibit that we can

53

essentially mark for the record and find out what it is he's relying on, number one; number two, I think it's easier for the witness to see the sum total of an exhibit as opposed to just a page that's on the screen.  It's something you're so familiar with, but he may not have seen this in years.

MR. AIVALIKLES:  Sure.

THE COURT:  So can you clarify, number one, the documents that you brought, presumably records from the case, but --

THE WITNESS:  I do.  I have a copy of -- I have a copy of my deposition --

THE COURT:  Okay.

THE WITNESS:  -- which I was using for trial prep. I just didn't have a place to put it down there.

THE COURT:  All right.  That's okay.

So he has a copy of his deposition.  That's not an exhibit in the case?

MR. AIVALIKLES:  No, your Honor.

MR. CULLEN:  No, your Honor.

THE COURT:  Okay.  All right.  And --

THE WITNESS:  And --

THE COURT:  Is there a way to give him a copy -- oh, you have --

THE WITNESS:  I have two other documents, just my sworn -- my sworn affidavits.

54

THE COURT: You have your two sworn affidavits.

THE WITNESS: Sworn affidavit and just a copy of what is Plaintiff's Exhibit 1.

THE COURT: Okay. That's the email that Ms. Ortolano sent --

THE WITNESS: Right.

THE COURT: -- on January 22nd. All right.

So we know he's got a copy of his affidavit. Is that the affidavit you attached to the motion for summary judgment?

MR. AIVALIKLES: There were two affidavits.

MR. CULLEN: There's --

MR. AIVALIKLES: I have the --

MR. CULLEN: -- one for each -- one for his own -- I apologize.

He has an affidavit from, I believe, his own motion for summary judgment --

THE COURT: Yes.

MR. CULLEN: -- and then he also submitted one when Attorney Bolton submitted a summary judgment motion. So there -- he actually has submitted two affidavits in this court.

THE COURT: And are they different?

MR. AIVALIKLES: A little.

THE COURT: A little different. Okay. So we've at

least identified those two documents. And then --

THE WITNESS: I have one of them, one of the affidavits.

THE COURT: You have one of the affidavits. Does it have any marking? Do you know which affidavit -- do you know which documents he has?

MR. CULLEN: It probably says it right across the top. Does it have a --

THE WITNESS: 5/30/2024.

MR. AIVALIKLES: So you don't have the April --

THE COURT: Okay.

THE WITNESS: And then the other is just my work note --

MR. AIVALIKLES: There's an April one, too.

THE COURT: All right. Do you know which, in the record, which affidavit?

MR. CULLEN: I can help you with that, your Honor, if you just give me a second.

The -- the one dated 5 -- March 5th of 2024 is document number 71-17.

THE COURT: Okay. And that's the document, one of the documents, he has presently on the witness stand that he brought --

MR. CULLEN: It appears so.

THE COURT: -- to the witness stand.

Okay.  All right.  And then the other is -- I know he has his deposition, a copy of his deposition.  That's not -- not in the -- it is in the record, actually.  A copy is in the record, I believe.

MR. CULLEN:  Portions of it are likely in the record.  I don't think anybody ever submitted his entire deposition.

THE COURT:  I recall the full deposition.

MR. CULLEN:  It could be.  I don't --

THE COURT:  But in any event --

MR. CULLEN:  I don't recall, to be honest.

THE COURT:  I think that's enough of an identification for the appellate record.

MR. HILLIARD:  No one has offered his deposition or excerpts of it as an exhibit, your Honor, but it does remind me this is -- it's testimony in that deposition that was relied on in summary judgment that includes hearsay and I just flag that in case it comes up this morning.

THE COURT:  Okay.

MR. AIVALIKLES:  So --

THE COURT:  I'm just trying to clarify documents.

And, ultimately, it would be really helpful if the attorneys would clarify.  When a witness takes the stand and they bring documents, perfectly fine, so I don't want you -- but just identify what he has and then the jury knows what

documents he has and then the record reflects what document he has.

MR. AIVALIKLES:  Your Honor, I have Exhibit 56 I can give him and I have the two affidavits that I can give him, if he wants to review them.

THE COURT:  So they're marked and those are marked as exhibits in this case?

MR. AIVALIKLES:  56 is.

MR. HILLIARD:  No.

MR. AIVALIKLES:  Not the affidavits.

THE COURT:  Okay.  All right.  Well, I think he has his affidavits.  I just want to identify those or he has one of his affidavits.

MR. AIVALIKLES:  He only has one.

THE WITNESS:  I have one, yes.

THE COURT:  And you're going to give him the other one.

MR. AIVALIKLES:  Yes.

THE COURT:  Any objection to that?

MR. CULLEN:  No, your Honor.

THE COURT:  Okay.

MR. AIVALIKLES:  And then --

THE COURT:  And then give him the full exhibit of the prior similar incidences.  Is that -- that exhibit is exhibit --

MR. AIVALIKLES:  56.

MR. CULLEN:  56, your Honor.

THE COURT:  -- 56.  That way you have the whole --

THE WITNESS:  Is there a good place to leave these? I'd be happy to leave them by --

THE COURT:  That's all right.  That's all right. Don't worry about it.

Sidebar.

AT SIDEBAR

THE COURT:  This deals with an issue with a juror so I want to keep this under seal and just talk to the lawyers and -- about it.

It looks like the gentleman you'll recall from voir dire who has broken ribs, there was an issue brought to my attention about him being somewhat grumpy and unhappy about being here.  I asked him about that and he indicated, Judge, I have some broken ribs, so I'm in some pain.

So Jen Sackos Bartlett is going to inquire with him as to how he's doing to see if he is perhaps sick or unable -- if he's actually getting sick or if somehow something's wrong with him and -- and he's in too much pain.  So she's just going to find out how he is and I wanted to let you know that she's doing that right now.  Okay?

MR. AIVALIKLES:  Absolutely, your Honor.

CONCLUSION OF SIDEBAR

MR. AIVALIKLES:  You should ask the other side, too, but --

MR. CULLEN:  What's that?

MR. AIVALIKLES:  He wanted to know if he can write on them.

THE WITNESS:  I just didn't know if I can -- he asked me to take a look at it.  I was going to highlight some notes on it.

MR. CULLEN:  It doesn't matter to me.  It's just a copy.

THE WITNESS:  Okay.

MR. CULLEN:  Just make sure you wait for the questions.

THE COURT:  Just a quick sidebar so I can update you.

                    AT SIDEBAR

THE COURT:  Attorney Aivalikles, just a quick sidebar.

MR. AIVALIKLES:  Oh, I'm sorry, your Honor.

THE COURT:  He thinks he's going to be okay.  He wants to continue.  He thinks it was something he ate.  It does not deal with his ribs.

At this point, let's continue and if we need to take another sudden break, we'll deal with it.  And I will always consult with you about exactly how we handle this issue,

60

obviously.  Okay.

MR. AIVALIKLES:  Very well.

THE COURT:  Okay.

CONCLUSION OF SIDEBAR

(With the jury present.)

THE CLERK:  All rise for the jury.

Please be seated.  This hearing is back in session.

THE COURT:  All right.

MR. AIVALIKLES:  Thank you, your Honor.

THE COURT:  Attorney Aivalikles, go ahead.

Q.    Yes.  So you have the -- the right-to-know documents.  On the second page, which was the request that was made, is that part of it?

A.    Yes, sir.

Q.    Okay.  So what was requested of the police department was all criminal trespass where either a verbal, written, or arrest happened during January 1st, 2014, through January 31st, 2021; is that correct?

A.    Yes, sir.

Q.    That was the request.  And that was responded by Mr. Lavoie and you have the response, together with all of those incidents that he provided; is that correct?

A.    Yes, sir.  Correct.

Q.    Have you had a chance to look at the instances themselves?

61

A.    I did, briefly, as we were in recess, yes, sir.

Q.    Okay.  So they include calls for intoxication, undesirables, disorderly people, at city hall except for the one that had to do with the restaurant; is that correct?

A.    There's another one in here where the incident happened at the Nashua Telegraph building, which is at the other side of Main Street.  And they probably just stopped him at city hall, meaning he probably left that facility, walked up Main Street in Nashua, and the police located him there.

Q.    Okay.  None of those incidences resulted in an arrest, did they?

A.    It does not appear so, correct.

Q.    A lot of the individuals were issued a warning; is that correct?

A.    That's correct.  Yes, sir.

Q.    A lot of those individuals were trespassed from city hall for a period of time unless they had an appointment; is that correct?

A.    Correct.

Q.    So Laurie Ortolano was the only one that has been arrested at city hall for -- as a result of trespass at city hall between that time period; is that correct?

A.    Based on the documents I have, yes.

Q.    And on January 22nd, 2021, the police had a philosophy of not arresting people for criminal trespass if

62

they left when directed to do so by the police; is that correct?

A.   I would call it more of an approach than a philosophy.

Q.   Well, do you have your deposition in front of you, Chief?

A.   I do, yes, sir.

Q.   Okay.  Can you go to page 64, Chief.

A.   Uh-huh.

Q.   And do you see line 4, it says --

A.   Yes, sir.

Q.   You were asked:  Do you have a general philosophy about how criminal trespass situations should be handled by Nashua police officers?

And you indicated sure.

A.   I did.  That's correct.

Q.   You indicated in that deposition it was a philosophy, didn't you?

A.   I did, yup.

Q.   Okay.  And the person in control of the property has to be the one to issue an order to leave?

A.   Correct.

Q.   And can -- can any private citizen ask the police to come to city hall because they wanted an individual trespassed out of city hall?

63

A.   No.

Q.   Generally, when they issue a trespass, that has teeth, doesn't it, Chief?

A.   It does now, yes.

Q.   And the reason that it has teeth is because if the person violates that trespass order, the police can arrest them or her?

A.   That's correct.

Q.   So that's -- that's a tool that the police use as part of their law enforcement duties, correct?

A.   Yes.

Q.   And that's probably preferable to having someone arrested, correct?

A.   Yes.

Q.   Police officers in Nashua are given a great deal of discretion in terms of whether to arrest a person for a criminal trespass; is that correct?

A.   Correct.

Q.   And the decision to arrest is made on the spot, is it not?

A.   Correct.

Q.   And Laurie Ortolano was not arrested on the spot on January 22nd, 2021, was she?

A.   She was not.

Q.   And you understand, do you not, from the records

64

that when Officer Roach spoke to Attorney Leonard, she wanted Laurie Ortolano trespassed; is that correct?

A.    I believe so.  I was not there.

Q.    Okay.  When Sergeant Caron spoke with Attorney Leonard on January 22nd, Attorney Leonard indicated to him that she wanted Laurie Ortolano trespassed; is that correct?

A.    Again, I was not there.

Q.    Okay.  And isn't it proper procedure for the police to talk to the person that's in control of the -- the space that the criminal trespass is occurring?

A.    Yes.

Q.    Because that's part of the requirement in the statute, that it has to be communicated by the person in control to the individual to leave?

A.    Correct.

MR. AIVALIKLES:  Can you bring up Exhibit 47, page 2.

Q.    Chief, do you see the bottom where it says no offense alleged or apparent?

A.    I do.

Q.    Okay.  You were not aware of that conclusion until April 19th, 2024, when your deposition was taken; is that correct?

A.    Correct.

Q.    But for Attorney Leonard's call to the police

65

department around February -- early February, this investigation never would have been opened based upon what you're reading there; is that correct?

MR. CULLEN: Objection to form.

THE COURT: Sustained. Ask that in a different way, please.

Q. Based upon the report of Officer Roach, does it indicate that a further investigation is going to be conducted?

A. Based on this report, it does not -- based on this report, it does not.

Q. And Officer Roach testified that he was advised that a call was received from -- on behalf of city hall from Attorney Leonard, wishing to reopen an investigation into Laurie Ortolano. Do you recall that?

A. I do not.

Q. You weren't advised of that?

A. If I was -- if I was told at the time, maybe, but it's not something that I was involved in.

Do you mind shrinking this report down just a little bit so I can see the top page as well?

THE COURT: Also, instead of referring to the document as an exhibit with a number, perhaps ask him if he's seen it or does he know about it and what is it so that we know what the document is that you're asking him questions about. It's one that has been admitted as a full exhibit, but we don't

remember --

MR. AIVALIKLES:  I will.

THE COURT:  -- exhibit numbers.

MR. AIVALIKLES:  Thank you, your Honor.

THE COURT:  Thank you.

MR. AIVALIKLES:  I'll keep that in mind.  Thank you for your suggestion.

Q.  You know that Attorney Bolton had demanded that you arrest Laurie Ortolano?

A.  That's correct.  Yes, sir.

Q.  And when the -- Officer Roach left on January 22nd, he treated the case as cleared?

A.  That's correct.

Q.  What does that mean in police lingo or law enforcement lingo?

A.  It means he's not going to take any further action.

Q.  So when they -- when Officer Roach allowed Laurie to leave the city hall on January 22nd, he was merely performing -- or his activities were consistent with the philosophy of the police department not to arrest people that are charged with trespass if they leave when they're told to do so by the police?

A.  Correct.

Q.  Right.  So his actions that day were consistent with that policy?

MR. HILLIARD:  Objection.  What was the last word of the question?

THE COURT:  Policy.

MR. AIVALIKLES:  I'm sorry, philosophy.

Q.   His actions that day were consistent with the police department's philosophy; is that correct?

A.   Correct.

Q.   Do you recall the meeting that you had with Attorney Bolton and Attorney Leonard?

A.   I do.

Q.   Do you know when that occurred?

A.   I don't know the exact date.  I would -- I would assume it's within about a week of the incident at city hall.

Q.   And the request was made to meet with -- with you at the legal department?

A.   At the legal department at city hall, correct.

Q.   At city hall.  And at that meeting, who was present other than Attorney Bolton and Attorney Leonard, if you know?

A.   So Attorney Bolton was there, Attorney Leonard was there, there was a staff assistant that was there, I don't recall her name, and I think that was it.

Q.   Who did all the talking at the meeting?

A.   Well, it was talking back and forth between Steve Bolton and I.

Q.   At the meeting, did Attorney Bolton tell you that

she should be arrested immediately?

A.   He did.

Q.   Did he -- did he express his concern for his --

A.   If I could just correct that.  I don't know that he said immediately.  I don't recall.  He said he wanted her arrested.

Q.   Well, let me --

A.   And if it's in here, I'll -- that's fine.  I just don't remember him saying immediately right now.

Q.   Well, the jury needs to know that.

A.   Okay.

Q.   I believe it's on page 80.  Let me see if -- do you see where it says on line 11:  He felt that she should be arrested -- placed under arrest immediately.

MR. CULLEN:  Objection.

Q.   Do you see that?

MR. CULLEN:  Your Honor?

THE COURT:  Yes.

MR. CULLEN:  I don't think we need sidebar for this.

It might be helpful if the jury knows what he's looking at.

MR. AIVALIKLES:  It's not on the electronics, your Honor.

THE COURT:  I know, it just gives the jury an idea of what it is you're asking him to look at.  And we understand

it's not an exhibit, but it looks as though you're going to move through it fairly quickly with him.  But just so the jury understands what it is you're asking him.

MR. AIVALIKLES:  Okay.

Q.  So your deposition was taken on April, I think, 19th in 2024, correct?

A.  April 19th, 2024, correct.

Q.  All right.  And you were asked a series of questions that you were -- that you were required to respond to; is that correct?

A.  Correct.

Q.  And then after the deposition, a transcript was provided of your -- the questions and answers; is that correct?

A.  Correct.

Q.  And you had an opportunity to review that deposition, correct?

A.  I did.

Q.  And after you reviewed it, you had an opportunity to sign it under oath; is that correct?

A.  Correct.

Q.  And you also had an opportunity to make any corrections in the deposition that you disagreed with; is that correct?

A.  Correct.

Q.  Okay.  So after looking at page 80 of your

deposition, does it indicate that Attorney Bolton asked you to immediately arrest Laurie Ortolano? And that's at line 11.

A. He felt that she should have been placed under arrest immediately. Okay.

Q. And the question I asked you is did he express concern for his staff or their safety to you.

A. He did.

Q. And he indicated that he was concerned for their safety because of her unpredictable behavior; is that correct?

A. Correct.

Q. And then again he told you to arrest her, didn't he?

A. Yes.

Q. And when he told you to arrest her, you considered it a demand, correct?

A. Correct.

Q. And you told him you were not going to arrest her?

A. Correct.

Q. Did you understand that Attorney Bolton wasn't even in the office when Laurie Ortolano was there on January 22nd, 2021?

A. I did not realize that.

Q. And did you -- I mean, you know Laurie Ortolano --

A. I do.

Q. -- right?

Do you consider her a physical threat?

A.    I do not.

Q.    Did the police officers consider her a physical threat?

A.    I can't speak to them, but I believe not.

Q.    When Attorney Bolton was talking to you, was he angry?

A.    Yes.

Q.    Did he shout?

A.    Raised voice, yes.

Q.    Did Attorney Bolton tell you that Laurie Ortolano made any threats?

A.    I don't believe so.

Q.    Did you believe what the officers stated happened in their narrative and in the initial statements was accurate and truthful?

A.    Yes.

Q.    So when you told Steve Bolton that you were not going to have her arrested, was he satisfied with that decision?

A.    I believe --

MR. HILLIARD:  Objection, your Honor.

THE COURT:  Okay.  Rephrase the question. Sustained.

THE CLERK:  Your Honor, I'm going to let the jurors go out to the restroom.

72

THE COURT:  All right.

THE CLERK:  All rise.

THE COURT:  Let's take a recess.

(Jury excused.)

(Without the jury present.)

THE CLERK:  He motioned.

THE COURT:  Okay.

(Discussion between the judge and deputy clerk.)

THE COURT:  You can -- you can be seated.  This shouldn't take long.

THE WITNESS:  That's fine.

THE COURT:  Or you can stand.  I prefer to stand.

So I just need to talk to the attorneys.

AT SIDEBAR

THE COURT:  At this point, juror number 3 is fidgety, uncomfortable, and he is sick to his stomach and has had episodes and I think it's actually distracting other members of the jury.

And so I think what I am going to do is recommend that he be released to go home.  It seems he's sick and it seems as though the other jurors are a little concerned about him throwing up.

Do you have any objections to us releasing him?

MR. AIVALIKLES:  No, your Honor.

MR. HILLIARD:  No, your Honor.

MR. CULLEN:  No, your Honor.

THE COURT:  All right.  Then we'll get the -- we'll get the trial back on track.  All right?

I'm not going to bring him out here.  I'm just going to have Jen Bartlett release him.  Does that meet your approval, everybody?

MR. AIVALIKLES:  Yes, it does.

MR. CULLEN:  Yes.  That's fine, your Honor.

THE COURT:  And, Attorney Hilliard, you're okay with that as well?

MR. HILLIARD:  Yes, your Honor.  Thank you.

THE COURT:  Go ahead and excuse him.

                (With the jury present.)

THE CLERK:  All rise for the jury.

Please be seated.  This hearing is back in session.

THE COURT:  All that standing and sitting was good for my back.

Go ahead, Attorney Aivalikles.

MR. AIVALIKLES:  Thank you, your Honor.

Q.   After you told Attorney Bolton that you were not going to arrest her, did you tell him anything else?

A.   I don't believe so.  I can refresh my memory here.

Q.   Yeah, maybe if you want to go to page 83, line 12.

A.   My answer was:  My belief was that this matter was closed and we were not going to pursue further charges.

Q.   And what was Attorney Bolton's response to that?

A.   Steve Bolton said he was not satisfied.

Q.   Thank you.

A.   And I said yes.

Q.   When you returned to the police department, did you have any discussions with any of your command staff about what happened at the meeting?

A.   So it would have been very common for me to talk to my deputy chiefs about, hey, I was just at city hall, this meeting happened, and then go from there.

Q.   But you don't recall what was discussed, I take it?

A.   Correct.

Q.   Brian Kenney is a police officer; is that correct?

A.   He is.

Q.   And he is the prosecutor for the Nashua Police Department?

A.   At the time he was, correct.

Q.   And, typically, does Brian Kenney bring to you information about what he's doing with regard to prosecutions?

A.   So at the time he was a lieutenant, so he would not have been.  He would have reported to his captain, who would have reported either to the deputy chief to me or in the morning meeting where the captains are present, he would have reported it possibly then.

Q.   Okay.  So he would report it to the captains, the

captains would report it to the deputy, and then the deputy would report it to you; is that --

A.    Correct, correct.

Q.    -- the chain of command?

A.    Yes, sir.

Q.    Did you understand that Attorney Bolton was talking to Officer Kenney?

MR. HILLIARD:  Objection.

MR. CULLEN:  Objection.

MR. HILLIARD:  The answer would be based on hearsay, your Honor.

THE COURT:  Overruled.

Go ahead.

A.    I believe I was made aware that there were conversations about the investigation, but I don't recall what they were.

Q.    Do you know if Steve Bolton was advocating for the arrest or the opening of the investigation with Officer Kenney?

MR. HILLIARD:  Objection.

A.    I believe --

THE COURT:  Sidebar.

AT SIDEBAR

MR. HILLIARD:  Your Honor, this is the hearsay problem that I've been talking about.  This is totally --

THE COURT:  Talk about it again.  I haven't heard

you talking about it today.

MR. HILLIARD:  Oh, okay.

This is now totem pole hearsay with the Nashua Police Department about what somebody said to someone, said to someone, said to someone, said to Chief Carignan, and it's being offered for the truth of its contents.  There's no other purpose for the offer.  And it's classic hearsay.  And I will say to the Court, Attorney Cullen can verify this for us as an offer of proof, Kenney would say there were no such conversations.

THE COURT:  Right.  But he said under oath at his deposition in April 2024 that there were such conversations, that he heard about them, and ultimately he is a hostile witness.  He can bring it in for his credibility.

So, ultimately, if he denies it sitting here, it would -- it would go to his credibility.

MR. HILLIARD:  No, I'm not concerned about the witness's credibility, your Honor.  The statement, this hearsay statement, is being offered for the truth of its contents.  The only relevance would be if, in fact, there were conversations during this time period between Bolton and Kenney.  And for that purpose, is it not only hearsay, it's several layers of hearsay.

THE COURT:  What's the non-hearsay purpose?

MR. AIVALIKLES:  First of all, the purpose of the

hearsay rule is because there's an issue of reliability.  This has the indicia of authenticity because, as he testified, the only way he gets information from a subordinate is through the chain of command.  And I doubt very much that the statement from Mr. --

THE COURT:  Whisper, whisper.

MR. AIVALIKLES:  -- yeah, Mr. Kenney would be false because he's a subordinate.

And, secondly, this goes to his credibility because he testified in the deposition that he was aware that Attorney Bolton was talking to Officer Kenney.

THE COURT:  All right.  Let me back up.

There's been an objection to did you have conversations, did you learn of conversations.  There was no hearsay --

MR. AIVALIKLES:  Understood.

THE COURT:  -- at that point.

MR. AIVALIKLES:  Right.

THE COURT:  I overrule that objection.

The next question was about what he heard said.  And you can ask him a general question, I think, about did you hear that Bolton and Kenney had had conversations about the January 22nd incident.  And if he says no, then at that point he can introduce it for credibility and I can give a credibility limiting instruction.

MR. HILLIARD:  But we shouldn't even be going down that road, your Honor, because the only purpose is for the truth of the fact that there were alleged conversations between Bolton and Kenney.  It's not a question of this gentleman's credibility or memory; it's a question of hearsay supplied to him now being offered here.

And you denied my motion for summary judgment under this -- under the principle that it was hearsay.  But because it was offered in the summary judgment proceeding, that competent testimony, evidence about it, could be offered in trial.  Therefore, it could be considered by you for summary judgment purposes, but now we're here and the only competent evidence of the existence of those contacts would come from Kenney or Bolton or someone that heard those conversations.

MR. AIVALIKLES:  Your --

THE COURT:  I -- the presumption is that the witnesses, Chief Carignan and Kenney, are telling the truth. He has a right to suggest that this is not true.  He has a right to suggest that Chief Carignan said at time one these conversations, backchanneling conversations, were going on and since that deposition has changed his testimony.

MR. HILLIARD:  I --

THE COURT:  How is that not something that he can get into?  I understand that there is a hearsay objection and, technically, it is a statement out of court, but, ultimately,

the question is whether or not there is a non-hearsay purpose that allows this evidence.

MR. HILLIARD:  And the non-hearsay purpose is the witness's credibility.  I just don't understand how that justifies admitting substantively what's clearly a hearsay statement.  And not only hearsay, it's why I say totem pole hearsay, your Honor.  And it's a critical issue, as I said, because we will offer, whatever he is, Deputy Chief Kenney, whatever he is now, has confirmed again recently there were no such conversations.  And it's extremely unfair to our side, through some circuitous route, to allow the jury to hear that he heard thirdhand that there were such conversations.

And I don't think he's going to -- I have no idea what his answers will be on these questions, but he will certainly be confronted with his deposition testimony where he related this totem pole hearsay.  And I can't emphasize enough, your Honor, I tried in summary judgment to say this is hearsay and the Court ruled --

THE COURT:  And I remember that and I remember my ruling --

MR. HILLIARD:  Yes.

THE COURT:  -- and your argument was incorrect as a matter of law.  The standard is whether or not there's any way that the statements are admissible at a trial.

MR. HILLIARD:  Right.

THE COURT: And, ultimately, just because these are statements that are being presented does not mean I'm going to grant summary judgment. There are credibility issues here from Ms. Ortolano's perspective.

I know that you -- they're not your issues, but they're his issues. He is trying to prove to the jury that there was backchanneling going on and under oath this witness said there was, that he had heard that there were conversations.

MR. AIVALIKLES: They can just bring in Officer Kenney to testify and to refute it.

MR. HILLIARD: Well, in the first instance, the plaintiff should have brought Kenney if they truly believed he was going to provide any testimony to corroborate this hearsay statement. And to have the jury hear this from the retired chief --

THE COURT: I'm not sure it's been set up in such a way that they would have any idea that you're anticipating that he's going to deny a statement about Kenney or I'm not sure you've set this up in such a way that it would come in for his credibility as -- as of yet because the objections have been made.

So, ultimately, what I'm going to do is allow you to ask a few more questions. If you're able to establish the testimony you're attempting to elicit and he says, ultimately,

I thought that there were conversations, I'll give the jury a limiting instruction and indicate that this is only coming in -- it can't be considered as -- for the truth of the matter. It's only coming in as to the chief's credibility.

But, ultimately, we're not there yet. So go ahead and frame your questions -- back up because this has been a long -- a long recess. All right?

MR. AIVALIKLES: Thank you.

THE COURT: So the objection is overruled. I'm going to give you a few more opportunities to ask the question to get there and then I will give a limiting instruction.

MR. HILLIARD: Thank you.

MR. AIVALIKLES: Thank you, your Honor.

CONCLUSION OF SIDEBAR

Q. Did you hear that Attorney Bolton and Officer Kenney were communicating concerning this particular case?

A. I did.

MR. HILLIARD: Objection, hearsay. I understand, your Honor.

THE COURT: Objection noted. Overruled.

MR. AIVALIKLES: May I have a moment, your Honor?

Q. Now, do you claim that the investigation to Laurie Ortolano was reopened because of a social media post?

A. Correct.

Q. Did you actually see that post?

A.    I believe I saw the post.  I can't swear to it.  I don't have it in front of me and it was back in, what, '21, '22.

So I don't -- I believe I saw it, but, if not, we had the discussion about it, about what it said.

Q.    Well, do you remember what the post consisted of that you saw?

A.    Yes.

Q.    What was it?

A.    It was a post about admitting that she had been at city hall, hadn't left, and was going to do it again, I believe.

Q.    But you don't know the context in which she said she was going to do it again, do you?

A.    I do not.

Q.    And did she actually say she's going to do it again? Did you see that in the article or the posting?

A.    I don't recall if it was that posting or other -- there were several media outlets that it was released on.  So I don't remember which one it was.  I thought there was a Facebook, which is what I believe I was originally told about, but, again, it's been a while.

Q.    Who told you about the Facebook?

A.    It would have come up through my deputies.

Q.    You don't know which one told you?

A.    Correct.

MR. AIVALIKLES:  Can you bring up Exhibit 1.

Q.    Is that the posting that you're talking about?

A.    I don't -- I don't know if this was the actual one, but this is consistent with the information I was being presented with.  If that --

Q.    When you say the information you were being presented with, are you talking about what your subordinates told you the posting consisted of?

A.    Correct.

Q.    Okay.  And I think that you said that she was bragging in this posting.  Do you recall making that statement?

A.    I'm just going to review my notes.

Q.    Go right ahead.  Take your time.

You want to go to page 89, line 17.

A.    I was advised by deputies that they wanted to open an investigation to relook at the case because of a social media post that Ms. Ortolano had posted, but if I remember right, she was bragging about refusing to leave and not obeying the commands of what the person who had control of the property did, meaning the legal department.

Q.    So that was another basis for reopening the investigation, was the conclusion or the characterization that she was bragging in this posting, correct?

A.    I believe the decision to reopen, which was their

decision to make, not my decision to make, it was made by the officers, was based on the admission to the crime.

Q. But they told you that she was bragging in this posting.

A. That's if I -- yeah, that's what I would have remembered at the time.

Q. Okay. So can we go to the very beginning of this?

Do you see where it says, I had a very depressing experience today when I went to city hall to try to see if I could get some abatement applications stamped?

A. Yes, sir, I do.

Q. Yeah. So that wouldn't be bragging, would it?

A. No, sir.

Q. Can you point out to me -- that's okay. I'll rephrase that.

Chief, you have been a police officer in law enforcement for a number of years, correct?

A. Yes, sir.

Q. You've been involved in hundreds of investigations that resulted in prosecutions?

A. Correct.

Q. So are you telling this jury that in every case that you were involved in that went to prosecution, it had an admission by the defendant?

A. I'm sorry. Can you state that question again,

please?

Q.   Sure.  Every case that you were involved in that resulted in charges being brought, did you always have an admission from the defendant?

A.   We did not.

Q.   But just in general, I'm not saying in this case.

A.   Correct, we did not always have an admission.

Q.   Right.  So that doesn't prevent you from filing -- bringing a lawsuit, correct?  I'm sorry, bringing a charge against the defendant because you don't have an admission.

A.   Correct.

Q.   And you weren't here, but -- and I'll represent to you that Sergeant Roach testified that based upon what he learned on January 22nd, 2021, he had probable cause to arrest her at that time for criminal trespass.  Were you aware of that?

A.   I don't -- I am not aware of it.

Q.   You understand that Laurie has a First Amendment right to talk about that arrest and what she experienced --

A.   I do.

Q.   -- on social media, right?

A.   Yes.

Q.   You understand that she had a right to post something that may be offensive?

A.   Yes, I do.

86

Q.   And, you know, as a law enforcement official, you are very respective of citizens' First Amendment rights, aren't you?

A.   Yes.

Q.   You have your affidavits in front of you?

A.   I have one of the affidavits, yes, sir.

Q.   Oh, I thought we gave you both.  I'm sorry.  There should be an April --

A.   Oh, yes, I do.  Yup.

Q.   So if you can go to the April 1st.

A.   I have it.

Q.   Do you have that?

A.   Uh-huh.  Yes, sir.

Q.   In paragraph 4, it said that you were informed that the legal -- the legal department was, I guess, looking into her further investigation; is that correct?

Let me rephrase -- let reread it directly:

At this time, the officers reportedly informed Ms. Ortolano that she was being directed by the legal department not to return and that she could be subject to arrest for trespass if she violated the direction.

Did I read that correctly?

A.   You did.

Q.   Okay.  And that means she was trespassing?

A.   Correct.

87

Q.    And then the following day, the Union Leader published statements from Mrs. Ortolano acknowledging that she had been asked by legal counsel to leave and refused to do so, correct?

A.    Correct.

Q.    Did you read that article that they were talking to you about?

A.    I don't believe I saw it the next day.  I may have seen it.  Again, I'm not sure.  There were several media outlets that we monitored and reviewed, so --

MR. AIVALIKLES:  Can you bring up Exhibit 51.

THE WITNESS:  Can you just scroll down, please.

Q.    The -- do you recognize -- do you recognize that newspaper article?

A.    That's November 9th of 2022.  I don't --

Q.    No, no, it was -- it's not November 9th.  I believe it's January 23rd.

A.    Oh, January 23rd, 2021.  I don't recognize -- I mean, I recognize what it is, taking it at face value, but I don't remember seeing it.

Q.    But that was the day after that article?

A.    Correct, correct.

Q.    Does that help you?

A.    Correct.

Q.    Does that help you refresh your memory that that may

88

have been the article that you were referring to in your affidavit?

A.    Yes.

Q.    Now, in your second affidavit, which is signed by you -- oh, actually, it's not dated -- you indicated in paragraph 7 that:  Although originally the responding officers had considered the matter closed, it later came to my attention that Ms. Ortolano had admitted on social media both that she had been asked to leave and that she refused to leave.

A.    That's correct.

Q.    And was that the basis for reopening, was -- based on that admission?

A.    Yes.

Q.    You indicated that you thought that because she was vocal about it that there was a concern that she would be like a repeat offender, she would go back there, and that was one of the reasons that you wanted to charge her with this crime.  Is that correct?

A.    That's correct.

Q.    But you didn't need that charge to arrest her if she went back to city hall, did you?

A.    No.

Q.    Because you or the police department had trespassed her --

A.    Correct.

Q.   -- and specifically told her that if she returned to city hall without an appointment, she would be arrested?

A.   That's correct.

Q.   So you didn't need the arrest to prevent her from going back to city hall, did you?

A.   Correct.

Q.   Did you have a Zoom meeting with Attorney Bolton and some of your staff?

A.   I don't know.  That was -- it was right around COVID time or post-COVID, so it was -- there were a lot of meetings with city hall.  So you'd have to narrow it down.

Q.   Yeah.  Well, do you recall a meeting in which you attended, two of your deputies attended, and five captains attended?

A.   I don't.

MR. AIVALIKLES:  Okay.  I think that's all I have, your Honor.

THE COURT:  All right.  Attorney Hilliard, Attorney --

MR. HILLIARD:  Yes, thank you, your Honor.

THE COURT:  -- Cullen?

MR. HILLIARD:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. HILLIARD:

Q.   Chief Carignan --

A.    Yes.

Q.    -- right?  My name is Russ Hilliard and I represent Steve Bolton.  I don't think we've met before.

A.    We have not.

Q.    Okay.  Thank you.

Let me jump to one thing first and then go back to where I really want to be.

May we look at Exhibit 56, please.  That's a full -- that's a full exhibit.

MR. AIVALIKLES:  You have it in front of you if you want to --

MR. HILLIARD:  It's coming -- it's coming up on the screen.

THE COURT:  I remember that exhibit.

MR. HILLIARD:  That's not a good sign.

Q.    Chief, Exhibit 56 is a multipage document.  You looked at it a little bit with Attorney Aivalikles, but it's the department's response to a right-to-know request received from a Laura Colquhoun of Nashua and you can see that on the first page.

Then if we can go to the second page, please.

And that's, in fact, the request the letter is responding to and you -- your attention was called to the highlighted sentence about what information was asked -- was asked for.

And then if we can go two more pages along, these are the actual incidents that the department produced in response to the right-to-know request and I just want to look at each of them very briefly with you, sir.

If you look at the first one, if you get down to the narrative, it says:  Intoxicated female, passed out in the first floor bathroom.

Do you see that?

A.   Yes.

Q.   And that's the first floor bathroom in the lobby of city hall?

A.   Correct.

Q.   All right.  The next one really doesn't tell us much in the narrative, does it?

A.   It does not.

Q.   Yeah.  It says, initiated and checked conditions, but can you discern anything else from that about what the circumstances were?

A.   So I'm looking at a -- basically a very brief report of what the call for service was and typically it will tell you what a disposition is.

This one, dated 8/12/2015, indicates that it was a follow-up, which tells me the officer went back there for an incident that had happened at a previous time and was -- could be asking somebody questions, could be asking any number of

92

investigative things.  It's a check conditions call.

If I had to look at this, a common occurrence would be that there may be some homeless people by city hall, what can we do -- excuse me -- what can we do about it.  So --

Q.    Okay.

A.    -- that's a possibility.

Q.    You're very helpful.  Thank you.

The third one, the narrative says:  Eric was trespassed from 7 Star and Main Street Gyro.

Is that a business in Nashua?

A.    Those are two different businesses.

Q.    Okay.

On behalf of management due to his disorderly behavior.

Now, why is that -- if you can tell me, I understand you didn't collect this information or review it before quite recently, what's the connection to trespass in city hall with that -- with that incident?

A.    City hall in Nashua is located at the intersection of Main Street at West Hollis Street.  On the south side of West Hollis Street --

Q.    Keep your voice up, please, Chief.

A.    Sorry.  I apologize.  City hall and Main Street runs at the intersection of Main Street at West Hollis Street.  West Hollis Street, on the south side, is 7 Star Pizza.  Nashua gyro

93

is on the north side, maybe a business or two down on the north.

So, reading this, it would indicate that the officers located the subject in front of city hall at some point between the two locations, would have identified him and warned him for criminal trespass from the two locations, not city hall.

Q.   Okay.   Thank you.

And then the fourth one begins on that page, but I think we have to move to the next page to see what it was about.

And do you see that on the top of this page and it says, male and female going through trash and taking cardboard, and then their names and description.

This was in front of city hall?  Can you tell from the narrative?

A.   It doesn't say in the narrative, but there really are no trash receptacles in front of city hall.  There may have been some on the south side of city hall in the alleyway going to the back parking lot, but I'm not sure about that, or could have also been on the north side, an area that goes behind it.

Q.   Outside of the physical city hall?

A.   Correct.

Q.   Okay. All right.  The next one, it's got a little longer narrative there, but it says:  On the main floor in the

rotunda next to motor vehicles.

Q.    So in the lobby of city hall, there's a rotunda --

A.    Uh-huh.

Q.    -- right?

A.    Yes.

Q.    And the motor vehicle department is off that lobby?

A.    Correct.

Q.    So the description is male in the men's room in a stall with the door locked, highly intoxicated, will not come out.

Did I read that correctly?

A.    Yes, sir.

Q.    Okay.  And then there's a further narrative as to how it was handled, right?

A.    Yes.

Q.    Okay.  Then the next one, Chief, begins, Corey was, quote, on the nod, sitting on the benches next to city hall.

These are benches outside city hall?

A.    That's correct.

Q.    Does on the nod mean asleep to you?

A.    The -- on the nod in quotations would indicate that -- maybe some substance misuse.

Q.    Oh, okay. Okay.  The next one, please.  Again, I think it begins at the bottom of that page and we need to turn over to see what it was about.

In the city clerk's office, mail that was just removed from transit is not in the office -- maybe that should say is now in the office -- yelling at employees about being trespassed from the transit center.

So do you know what the transit center is?

A.    I believe it's the building off to the northwest corner, so the back corner of the building.

Q.    Is it --

A.    Basically the bus station.

Q.    Bus station?

A.    Correct.

Q.    Okay.  Not city hall?

A.    Correct.

Q.    Okay. All right.  The next one, please, this will be number 8.

Community development offices on second floor, so this is in city hall?

A.    Correct.

Q.    Subject refusing to leave.

And it said -- C-O-M-P-L, period, is that complainant or --

A.    Yes, sir.

Q.    So complainant advised she had left and would like to cancel the call, right?

A.    Correct.

96

Q.    All right.  The next one, please.

Johnny and Eric were hanging out behind city hall.

Is this the same Eric again we had earlier, do you know?

A.    Eric Colcord, I'm not sure.

Q.    Okay.  Stated they were leaving.

So these gentlemen were -- had been trespassed from the Nashua Telegraph, I think you mentioned that earlier, but they were outside of city hall.

A.    Correct.

Q.    Okay.  All right, the last one, again, begins at the bottom of that page and carries over to the next.  And the first narrative says:  Complainant states someone snuck into the building, acting disorderly right now.

And then:  Gregory was upset that he'd been trespassed from the garage, so he went to city hall.

Do you know what the garage is in that context?

A.    There's a parking garage, a multilevel parking garage, on the northwest corner, which is the back rear corner of city hall.

Q.    Okay.  And he'd been trespassed from that, apparently?

A.    Correct.

Q.    Okay.  Okay.  Thank you, Chief.  We're done with 56.

A couple of questions about the police department

and structure before I get into the incident that you alluded to.

Am I correct in understanding that the police department doesn't answer to the legal department?

A.   That is correct.

Q.   And you don't take orders from the legal department?

A.   That's correct.

THE COURT:  Can I have a quick sidebar with counsel?

AT SIDEBAR

THE COURT:  I'm going back to your objection -- hearsay objection for a second before you get into that testimony.

MR. AIVALIKLES:  I'm sorry, your Honor.  I'm -- my -- my mic wasn't on or my hearing wasn't on, so I didn't hear your introduction.

THE COURT:  Okay.  I'm just -- as I'm -- I want to -- before Attorney Hilliard revisits anything regarding the hearsay objection, I want to -- I want to go back to that for a moment.

Let me ask you, Attorney Hilliard, and I'll allow you to respond, has there been any testimony prior to this moment that Attorney Bolton has had conversations with any other police officers between the incident and her arrest?  Is there any other evidence of that?

MR. HILLIARD:  Well, the only -- the only evidence

there would be, your Honor, is this witness's description of a meeting that they all had.

THE COURT: Okay. So that's it --

MR. HILLIARD: That's it.

THE COURT: -- his conversation at that table.

MR. HILLIARD: Yes.

THE COURT: Okay. All right.

The suggestion in the testimony that Chief Carignan had heard that both had spoken with Lieutenant Kenney, had conversations with Lieutenant Kenney, came in for the truth of those conversations, you were correct. And what I am going to do, what I am going to suggest that I do, is instruct the jury at the end of his testimony, perhaps -- please give me a suggestion on this -- but instruct the jury they heard testimony about a conversation the chief -- that the chief thought he had heard about conversations between Attorney Bolton and a lieutenant and that that evidence is to be disregarded; you are not to consider it for any purpose. That's what I'm going to do. I'm revisiting that ruling.

MR. HILLIARD: That's fine with me, your Honor.

THE COURT: Okay. Attorney Aivalikles?

MR. HILLIARD: I don't intend to ask him any questions going --

THE COURT: About that. Okay. All right.

Attorney Aivalikles, that is -- even though you

didn't ask for precise statements, that suggestion left in the jury's mind, the effect there's no other evidence, is coming in for the truth. So, ultimately, that hearsay objection should have been sustained and is now being sustained. I'm revisiting it and I am going to correct the mistake that I made. I'm going to instruct the jury that they may not consider that at the end of his testimony.

MR. AIVALIKLES: I mean --

THE COURT: All right?

MR. AIVALIKLES: You -- I mean, if that's what the Court's going to do --

THE COURT: Okay.

MR. AIVALIKLES: -- I'm not going to try to convince you otherwise.

THE COURT: Okay. All right. Thank you.

CONCLUSION OF SIDEBAR

THE COURT: Go ahead, Attorney Hilliard.

MR. HILLIARD: Thank you, your Honor.

Q. I think I had one more question along that line, Chief Carignan.

The Nashua Police Department doesn't answer to the mayor either, do they?

A. That's correct.

Q. Or the Board of Aldermen?

A. Correct.

Q.    Can you just describe for the jury -- they've, I think, heard me allude to it the other day -- how the police department in Nashua is governed?  And please just explain it to the jury.

A.    So the Nashua Police Department is a little bit unique compared to other places.  We answer to a board of police commissioners.  Think of it in terms of a board of directors and a CEO.  The chief of police is the CEO of the business, the police department, which was me, make decisions on day-to-day operations, personnel matters, stuff like that.  So the chief of police makes day-to-day decisions in the police department as far as how to allocate resources, maybe different directions you want to go for if you want to increase, like, community policing, stuff like that.  So the police chief runs the business, the department.

The police commissioners are who I would answer to as chief of police.  So that is -- there are three members on the Nashua Police Board of Commissioners.  They are appointed by the governor of the state of New Hampshire, which is fairly unique.  Oftentimes the local politicians will appoint the chief or they'll have a say in the matter.

Back in the, I believe, late 1800s, the Nashua Police were structured in such a way that the governor would appoint the police commissioners because they wanted to keep local politics out of it.  So they didn't want the mayor to

have the ability to influence decisions on the police department -- for example, hire someone's nephew or, hey, I play poker with this guy, can you hire his son no matter what.

So that influence was designed or the commission is set up in a way so that it does not influence the decisions made by the police department, which helps keep it impartial and fair to the public.

Q.   Thank you, Chief.

Is it fair to say that in your tenure in Nashua, you fought to maintain that independence?

A.   I did.

Q.   Can you explain to the jury?

A.   So toward the end of my tenure as the chief of police, Mayor Jim Donchess, who was mayor at the time, he wanted to take control of the police department.  So he tried to enact legislation that he would be the one that would appoint the police commissioners to -- to the -- or the people to the commission so he would have complete say for it.

I disagreed.  It was an historical issue and I felt very strongly that the mayor, regardless of who was in the seat at the time, should not have the influence over the police department to be able to dictate decision-making.  So, for example, if the mayor's husband was involved in some crime, we didn't want the mayor to say, hey, kill this investigation.  So it's a level of integrity for the police department.

102

So the mayor tried to enact legislation to get control of it.  I fought very hard for it.  He --

Q.   Fought very hard against it?

A.   I mean, I'm sorry, yeah.  I mean to prevent it.  I wanted to maintain what we had.

He went to the aldermen and he had it put on the ballot for a vote to be taken at the next election.  It was presented at the election.  I forget which year it was.  Ultimately, we prevailed.  The police department prevailed.  We were able to keep the police commission under the governor.

So the governor appoints a police commission and an executive council or, I'm sorry, the governor nominates and the executive council appoints that person.

So we were able to win that battle, which was quite a dramatic last couple of months of my career.

Q.   And maintained your independence from the city?

A.   That's correct.

Q.   All right.  Thank you, Chief.

You mentioned very briefly, I think you said approach, Attorney Aivalikles said philosophy, but about if someone obeys a command to leave that you don't prosecute for arrest.

A.   That's correct.  In my deposition, I said philosophy.  I think approach is a more appropriate word.  Philosophy would indicate it's a deep-rooted, more overarching,

you know, direction that the police department goes.  So this is more an approach to criminal trespass charges in general.

Q.    Now, isn't it correct to say that one of your officers coming upon a criminal trespass needs to get a warrant anyway to arrest for a misdemeanor, right?

A.    Unless it happens in their presence.

Q.    Unless it happens in their presence, exactly.  So is this philosophy, is it based in part on the practical consideration of having the person in control of the property have to show up in court?

A.    Correct.

Q.    Can you explain that to the jury?

A.    Sure.  So when you charge somebody with a misdemeanor that doesn't happen in your presence, meaning the owner of a business asks somebody to leave several times, they refuse to do so and we go, if we ask them to leave and they don't, that's a misdemeanor that happens in our presence.  We can arrest them on the spot.

If they do leave, then it doesn't mean the crime wasn't committed, but it means if we wanted to arrest that person, we would have to go type up a warrant, affidavit, and complaint, which is basically all the facts and circumstances, present it to a judge, the judge would review it, sign it, and then it goes into effect and then the person would be arrested.

Q.    So this philosophy or approach is not documented in

104

any standard operating procedures of the Nashua Police Department; is that right?

A.    That's correct.

Q.    And even those policies and procedures are not reviewed or approved by the legal department, are they?

A.    No.

Q.    Have there been occasions when the department, the police department, did not intend to prosecute someone but the victim requested you do so?

MR. AIVALIKLES:  Well, objection, your Honor.

THE COURT:  Overruled.  Go ahead.

A.    I can't tell you a specific time when that would happen, but it's certainly something that would be very common. Or not -- I'm sorry, not common, but it would happen and I wouldn't be -- you wouldn't be surprised for it.

Police work is very unique.  There are a lot of different -- every situation is different.  So you have to allow for that to happen and really look at it holistically to be able to make a decision.

Q.    Okay.  You described in your testimony in response to questions of Attorney Aivalikles this meeting that you and Steve Bolton attended.  And before I ask my questions, just so that we're all clear, are you telling us that was an in-person meeting or a Zoom meeting?

A.    The meeting with Steve Bolton was an in-person

105

meeting.

Q. All right. All right. Let me just suggest to you that there's going to be some witnesses who will testify that first there was a Zoom meeting with you and a number of your command staff at the department and the legal department staff at their office by Zoom and that it was followed by a meeting at the legal department where you went over. Does that -- does that ring any bells with you?

A. It does not. We were using Zoom quite a bit, but that does not ring a bell.

Q. All right. Fair enough. I just wanted to make sure.

It sounds like you and Steve Bolton had quite a conversation --

A. We did.

Q. -- at that meeting.

Fair for me to say you two are not the best of friends or whatever you want to call it?

A. I don't think that's a fair assessment. There are times when I would stand up for the police -- times where I would stand up for the police department and he would stand up for his position. We didn't always agree, certainly didn't often agree towards the end of my tenure --

Q. Okay.

A. -- but it was -- it was not -- we're not friendly or

not friendly.

Q.    But you did both take and maintain strong positions and sometimes opposed each other?

A.    Correct.

Q.    All right.  I think this was brought out, but in terms of his -- his, Bolton's, comments about the arrest or wanting an arrest, he was concerned for the safety of his staff?

A.    That's correct.

Q.    He didn't say arrest her because I don't like her?

A.    Correct.

Q.    He didn't say arrest her because she's a nuisance around the office?

A.    Correct.

Q.    He didn't say arrest her because she files too many lawsuits against the city?

A.    Correct.

Q.    Excuse me.  Sorry.  Sorry, your Honor.  I didn't want to overlook it.

You had a back-and-forth with Attorney Aivalikles about your testimony that he said I want her arrested immediately and I want to call your attention to your deposition, Chief Carignan.  And it's on page 83 and it begins at line 17.

And would you just read that to yourself for a

moment, beginning at line 17 on page 83 and carrying over to line 2 on page 84.

A. Okay.

Q. Did you have a chance to -- there to correct your earlier statement about the use of the word immediately?

A. Correct. So the question was: So I wrote down Steve Bolton said he was not satisfied; is that accurate?

Yes.

Question: And then he demanded -- I believe you used the word he told you to arrest her immediately?

My answer was: That's correct.

And then the question was: Go ahead.

My answer was: He didn't say immediately, paraphrased the -- paraphrased the conversation, he said that we should arrest her or you should be able to arrest her.

Q. Thank you.

Is there anything improper about the victim of a crime asking you, your department, to do an investigation?

MR. AIVALIKLES: Objection, your Honor.

THE COURT: Overruled.

MR. AIVALIKLES: Can we have a sidebar, your Honor?

THE COURT: Uh-huh.

AT SIDEBAR

MR. AIVALIKLES: So, Attorney Bolton wasn't even there when this happened. I don't know how he could be a

victim.

THE COURT:  Right.  You can cross -- you can redirect on that.

CONCLUSION OF SIDEBAR

THE COURT:  Go ahead, Attorney Hilliard.

MR. HILLIARD:  Thank you, your Honor.

MR. AIVALIKLES:  I can't recall whether the witness had a chance to answer the question or not.

THE COURT:  I don't believe so.  Go ahead.

Q.    Do you have the question in mind?

A.    No.  Could you reask the question, please.

Q.    Sure.  Anything improper about a victim of a crime asking your department to investigate it?

A.    No.

Q.    It happens fairly regularly, I assume?

A.    Correct.

Q.    All right.  But, in any event, in the meeting that you recall with Attorney Bolton, you said no in no uncertain terms?

A.    Correct.

Q.    All right.  And had no further conversations with him about the subject?

A.    I believe that's correct.

MR. HILLIARD:  All right.  I'm trying just not to cover ground again the direct covered, your Honor.

109

Q. So, actually, it wasn't your personal decision to begin an investigation; it was people in your department?

A. Correct.

Q. And it certainly wasn't Attorney Bolton's authority to order you to investigate?

A. Correct.

Q. All right. And I think it was brought out the other concern that had come to your attention was that she would go back to the legal department and do it again.

A. Correct.

Q. I think you told us that Officer -- or, excuse me, now Sergeant Roach is a competent investigator?

A. He was.

Q. And you've had a chance to maybe as a result of this case review the work he did?

A. I don't believe I reviewed his reports in this investigation.

Q. Has anything come to your attention to call the integrity or completeness of that investigation into question?

A. No, not at all.

Q. I think you indicated that before this incident you knew Ms. Ortolano.

A. That's correct.

Q. And what -- what -- by virtue of what activity or what occurrence?

110

A.    So Ms. Ortolano is very active at city hall.  She had some concerns about some tax issues that she was in -- as a citizen trying to get information on.  Her approach was consistent, I guess, is the best word to -- to phrase it.  She was consistently going over there.  When she didn't get it, the information that she wanted, she would be very vocal about it publicly in city hall.

I had been aware that Ms. Ortolano had lived in Litchfield, New Hampshire, prior to coming to Nashua and had been aware of this persistency.

So that was in -- that was some of the experiences that I had heard about within -- in an investigation at city hall in addition to just she was active in the community in the city of Nashua.  We were active in community policing, so we would often see each other at city hall meetings and community meetings and the like.

Q.    And she actually, I think we heard about already, asked the police to open an investigation of the assessing department?

A.    She did.

Q.    Yeah.  Which she's got a right to do?

A.    Yes, she does.

MR. HILLIARD:  All right.  That's all I have, your Honor.  Thank you.

THE COURT:  All right.  Attorney Cullen?

111

MR. CULLEN:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CULLEN:

Q.    Good morning, Chief.

A.    Good morning.

Q.    So we both speak pretty quickly, so let's -- we probably should try not to make this a race.

I hate to call you out on something, but you actually started BAE, you said, four years ago, right?

A.    Correct.

Q.    So you left the department in '22, not '21, right?

A.    So --

Q.    Just -- the only reason I say this, you had indicated, I think, to the jury that you retired March of 2021, which was immediately after this incident, but your actual retirement was March of '22, correct?

A.    Correct.  Based on the time I had on the job, there was a period of time where you have what's called terminal leave, where you have a bunch of vacation that you have to use. So for the past -- you know, for the last two months of your tenure, you're not there.  You're not serving in any capacity as chief.  You're just burning off your time.

So I had started at BAE on January 1st of this year. So there was an overlap there.

Q.    Of '22?

112

A.    Correct.

Q.    Yeah.

A.    Sorry.

Q.    No, that's okay.  I just -- I didn't want the jury to think that maybe you left right when this happened.

And you indicated, I think, to Attorney Hilliard that even if -- that you can't make a misdemeanor arrest unless the crime happens in your -- in your presence.

A.    Correct.

Q.    Okay.  I take it you never reviewed the call log that you were shown, which is page -- the first page of Exhibit 47.  That's not something you would have reviewed at any time?

A.    No.

Q.    And with respect to Attorney Bolton speaking to you about this even though he wasn't present, the manager of, say, at Dunks, if he or she comes to you and says, look, I want somebody charged that they trespassed, you know, in Dunks this weekend, it wouldn't matter if that person wasn't there because you're going to do an investigation, right?

A.    That's correct.

Q.    So the -- a manager can advocate on behalf of his or her staff?

A.    Yes.

Q.    Okay.

A.    Which would be quite frequent the owner of the

113

facility would do that.

Q.    When you met with people from the legal department, did Celia Leonard speak at all at that?

A.    The conversation I remember was between Steve Bolton and I and only us two.

Q.    Did Celia Leonard ever approach you and say she wants an investigation done?

A.    No.

Q.    She didn't email or text you or anything like that to communicate to you she wants an investigation?

A.    No.

MR. CULLEN:  Okay.  May I just have one moment, your Honor?

I have no further questions.  Thank you.

THE COURT:  All right.  Attorney Aivalikles?

REDIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.    You probably thought you were done.

Chief, was Attorney Leonard at the meeting in which Bolton demanded Laurie Ortolano's arrest?

A.    Yes, she was.

Q.    Did she indicate that she was opposed to your arresting Laurie Ortolano?

A.    No.  The conversation it was between Mr. Bolton and myself.

114

Q.    Did she indicate anything, any disagreement, with what Attorney Bolton was saying?

A.    I don't believe so, no.

Q.    With regard to an arrest, if Officer Roach had asked Laurie Ortolano to leave and she didn't, he could arrest her right there, right?

A.    That's correct.

Q.    He didn't need an arrest warrant or an affidavit, did he?

A.    No.

Q.    If Attorney Leonard had told Officer Roach that she wanted Laurie arrested on January 22nd, 2021, this was nine o'clock in the morning, he could have filed an affidavit with an arrest warrant request --

A.    Correct.

Q.    -- after he left, right?

A.    Correct.

Q.    And it may have been processed in a couple of days, correct?

A.    Correct.

Q.    And then he could have come back or he could have gone to Mrs. Ortolano's house and arrested her?

A.    That's correct.

Q.    Let me talk about your deposition testimony and the issue about the immediate arrest.

A.    Okay.

Q.    Can you turn to page 80 and look at page -- line 12. Do you have that in front of you?

A.    I do, yes, sir.

Q.    Okay.  So this is the question you were asked:  So what did Steve Bolton say?

So this was sort of in the beginning of your meeting, correct, when you were asked that question, what did Attorney Bolton say?

A.    Paraphrasing the conversation, he was not --

Q.    No, was this asked of you in the context of the start of your meeting with Attorney Bolton and Attorney Leonard?  I know it's in the deposition, but is that what you were answering?

A.    I -- I apologize.  Are you asking me what was said in the deposition or --

Q.    Yeah, I'm sorry.  I'm just trying to get the time frame in the deposition when you addressed the issue of the immediate arrest.  And was that when you were discussing the events -- I'm sorry -- what Steven Bolton was telling you?

A.    I just want to make sure I answer this question.

Q.    Yeah.

A.    It's an awkward question, so, please, just give me a minute to --

Q.    It's probably a bad question.  Let me rephrase it.

116

Okay?

Okay.  So on page 80 --

A.    Uh-huh.

Q.    -- you responded to a question:  So what did Steve Bolton say?

And you indicated:  He was not satisfied with the outcome of the investigation.  He felt that he should have been placed under arrest immediately and then he expressed concern for his staff.

Did I read that correctly?

A.    Paraphrasing that conversation, right.

Q.    Well, I'm not paraphrasing it.  I read the words directly, didn't I?

A.    Correct.

MR. HILLIARD:  But those were his words.

MR. AIVALIKLES:  Exactly.

THE WITNESS:  Those were my words.

MR. AIVALIKLES:  In the deposition.

THE COURT:  All right.  Just to make it easier, you could read the question, ask him, did I read that correctly.

MR. AIVALIKLES:  I thought that's what I asked him, your Honor.

THE COURT:  Go ahead.

Q.    So you had an opportunity, you told this jury, to read your deposition transcript, to make any corrections, and

then to sign it under oath; is that correct?

A.    Correct.

Q.    You didn't correct that part of your testimony, did you?

A.    I did not.

Q.    And then if we jump over to page 83, and this is what I believe Attorney Hilliard was referencing, do you see that?

A.    I have page 83, yes, sir.

Q.    Okay.  So the question was asked:  Now, you said that you were not going to immediate (sic) arrest Mrs. Ortolano.  Did you say anything else in terms of an investigation that might follow?

And there was an objection and then you answered:  I don't know the specific words, so did I say immediate?  To answer your question, I don't know.  My belief was that this matter was closed and we were not going to be -- we were not going to pursue the matter -- further charges.

Did I read that correctly?

A.    Yes, sir.

Q.    Okay.  So the issue of whether you said immediate arrest or arrest was in two different times during the conversation you had with Attorney Bolton; is that fair?  Because there seems to be a conflict between page 80 in which you said immediate arrest and now on page 83.

A.   So it's my understanding that during the part of the deposition, these conversations had happened several years prior --

Q.   Right?

A.   -- right?  And for me, and my role at the time, is one of many conversations having throughout the day with many different people.

So for the deposition, when the question's asked, the indication that it was paraphrasing was because I don't remember exact specifics of a conversation.

So the question's asked, you asked -- I would answer it, and then say, okay, well, it was paraphrasing.  Like it's not a quote from Mr. Bolton.  It's what I recall our conversation to be.

Q.   Okay.  Yeah, we're not going to belabor that point.

If Mr. Bolton had told you, I want you to arrest Laurie Ortolano because she's a nuisance, she has too many lawsuits, would you have laughed at him?

A.   I would not have laughed at him, but I would have not -- I would not have agreed with him.

Q.   And if he said to you, I want you to arrest her because I don't like her, would you have laughed at him?

A.   I would not have laughed at him, but I would have said no.

Q.   Right.  Police don't arrest people because someone

119

doesn't like them, correct, like an attorney that works for the city?

A.    That's correct.

Q.    The police aren't going to arrest someone who's a nuisance because the attorney of the city wants the police to?

A.    That's correct.

Q.    Does the legal department need to approve the philosophy that the police use with regard to effectuating an arrest?

A.    So please clarify which legal department, sir.

Q.    I'm sorry, the city's legal department.

A.    Okay.  No, they do not.

Q.    They don't need -- you don't need their approval, do you?

A.    Correct.

Q.    Because you're in charge of how the police department is run.

A.    That's correct.

Q.    And you're in charge of the philosophy that these police officers are going to follow under your leadership, right?

A.    Correct.

Q.    And that's exactly what Sergeant Roach did at the time:  He went to city hall, he asked Mrs. Ortolano to leave, she left, there was no arrest.  Correct?

120

A.    That's correct.

Q.    That was consistent with your policy?

A.    Yes.  Well, not a policy --

Q.    Not policy, philosophy.

A.    Correct.

Q.    Sorry.  I think you testified that because Laurie Ortolano admitted to the events amounting to criminal trespass that you did not need any other witnesses other than the police officers; is that correct?

A.    Well, if we went back into the testimony, I believe the testimony in my deposition was it was a discussion with my deputies about, okay, the officers want to reopen the investigation because of this.  Okay.  So there's back-and-forth, well, what does that look like, can we do it.  When -- when you're the chief, you rely on your deputies for kind of the conversation, okay, what does that look like, right?

In that room on that day, it would have been a -- part of that conversation would be we're opening up a can of worms with Ms. Ortolano knowing that if we arrest her for this, she's going to be very vociferous about it, she's going to be very -- quite frankly, no offense, she's going to be a big pain in our neck, which we had been trying to avoid by supporting her with whatever request she gave us.

So to answer your question, we would have --

121

there's no decisions being made in that room. It was more of a discussion about, okay, this is what they want to do; okay, what does that look like and how is that going to affect us as an agency would have been my level of the conversation.

Q. You never testified to that at your deposition when you were asked why she was arrested after the initial decision was made not to arrest?

A. Well, I believe I was talking about the back-and-forth and I'm elaborating on what that would look like.

Q. But you were asked in the deposition why did the police change their mind and arrest her. You never told -- you never stated in the deposition that it had to do with the -- the implications of the police arresting her and the political fallout or whatever.

A. That decision was not mine, nor was it my deputies', and I indicated that in my deposition, that that decision was made by the officers and their supervisors.

Q. But you never told the officers that you wanted her arrested, did you?

A. Correct.

Q. Let's go back to Exhibit 6 -- 56, I'm sorry. That's the Dave Lavoie -- can you bring that up?

Do you have it in front of you?

A. I do, yeah.

122

Q.    Do you have that, Chief?

A.    I do.  I have it right in front of me.

Q.    So the first incident happened in the entry December 4th, 2014, and that had to do with an intoxicated person, correct?

A.    According to the notes, yeah, that's correct.

Q.    At city hall?

A.    In the first floor bathroom, passed out in the first floor bathroom.

Q.    Is there anything in the note that indicates that those people were exercising their -- their rights of free speech when they were there?

A.    No.

Q.    Then you have the next entry, which is 8/12/2015, and it -- it refers to a criminal trespass.  Does that mean a charge was lodged against the individual?

A.    Well, again, all I have is what's in front of me from 2015 as a follow-up, so it could have been any number of scenarios.  It gave a possible scenario.  It doesn't mean that that was the one, but that would be something that it could be.

Q.    Does it indicate an arrest?

A.    No, it does not.

Q.    The next entry was April 17th, 2017.  Do you see that?

A.    I do, yes, sir.

Q.    And in that instance, the -- it then had to do with the 7 Star, Main Street Gyro, but somehow it spilled over into a city hall reporting.

A.    Yeah.  City hall's right in between the two, so I would imagine he would be stopped right there.

Q.    And in that situation, the person was warned and not arrested; is that correct?

A.    Correct.

Q.    And then the next entry is August 23rd, 2017.  Do you see that?

A.    Yes, sir.  Yes, sir.

Q.    And it indicates the -- an employee from city hall was the one that contacted the police; is that correct?

A.    Correct.

Q.    And it indicates that Eric and Amber were trespassed and both left upon request.

A.    Correct.

Q.    So there was no arrest there either, was it?

A.    No, there was not.

Q.    They were just trespassed, which means they couldn't come back to city hall, correct?

A.    Correct.

Q.    Then you have May 2nd.  That's listed as an undesirable and the call came in from city hall?

A.    Yes.  Sorry.  Yes, sir.

124

Q.    Okay.  And, again, this was a situation involving a bathroom and there was an intoxicated person there, correct?

A.    Yes, sir.

Q.    And that didn't result in arrest?

A.    No.

Q.    And that person wasn't exercising their rights of free speech at that time, were they?

A.    No.

Q.    Okay.  And let's just go back, because I -- I didn't ask you, but on August 23rd, 2017, was that person exercising their rights to free speech?

A.    Not to my knowledge, no.

Q.    On April 17th, 2017, was that person exercising their right of free speech?

A.    Not to my knowledge.

Q.    On December 4th, 2014, was that person exercising their rights to free speech?

A.    Not to my knowledge.

Q.    The next one is May 29th, 2018.  And this had to do with sitting on a bench but is on city hall property; is that correct?

A.    Correct.

Q.    And the person was warned; is that correct?

A.    Correct.

Q.    And there was no arrest, was there?

A.    There was not.

Q.    And was that person exercising his rights of free speech?

A.    Not to my knowledge.

Q.    Then you have July 23rd, 2018, and the call came in from city hall, an employee from city hall; is that correct? If you go to the next page, it says the clerk's office --

A.    Yeah.  I'm sorry.  I'm just trying to find the name. Patricia, yes.

Q.    Right.  It was on the next page.  Did you find it?

A.    Yes, sir, I did.  And it is an employee.

Q.    And that person was trespassed from transit, it said.  And was the person arrested as a result of his involvement at city hall?

A.    No.

Q.    He was -- it indicates he was advised to leave the area, and he did, correct?

A.    Correct.

Q.    Okay.  Then we have August 29th, this is at the community development office on the second floor, subject refused to leave.

That's on -- that's in city hall; is that correct?

A.    Correct.

Q.    And then the call was canceled because the person left.

A.    Correct.

Q.    Then we have May 12th, 2020, and the call came in from city hall.  Does that indicate the call came in from city hall?

A.    The location of the incident is city hall.  I'm not familiar with Eric Colcord.

Q.    It says they were hanging behind city hall.  Do you see that?

A.    No, that's correct.  The call came in at -- the call came in that the subject was stopped at city hall.  I don't believe it was a call from city hall.  I believe the call that you're referring to now would have been somebody from the Telegraph.

Hold on.  Let me see.

Oh, they were hanging out the back -- yeah, correct.

So someone at city hall called, said they were hanging out behind city hall.  Police arrived.  When they made contact, what this would tell me is that they knew that they had -- they were trying to locate them to criminally trespass from the Telegraph, per Heather Henline, who was an employee of the Telegraph.

Q.    But that had nothing to do with city hall in terms of the Nashua Telegraph.  That's the newspaper.

A.    The Nashua Telegraph portion did not, but the original call that they were hanging out behind city hall was

127

relating to city hall.

Q.    All right.  And they weren't arrested for their hanging out at city hall?

A.    Correct.

Q.    Okay.  And that didn't have anything to do with their making speeches under the First Amendment or anything like that, did it?

A.    I don't believe so.

Q.    And then you have December 28, 2020, and there was a person that was demanding to see the mayor.  He was very unhappy.  He was told city hall was closed, and he refused to listen, but he was -- he was warned not to enter city hall unless he made an appointment, correct?

A.    Correct.

Q.    So he wasn't arrested either?

A.    He was not arrested.

Q.    Okay.  And then the next one you had was Laurie Ortolano?

A.    That's correct.

Q.    All right.  So prior to testifying here today, did you have conferences with Attorney Hilliard?

A.    With Attorney -- no, I did not.

Q.    Did you have conferences with Brian?

A.    I did, Attorney -- yes, Attorney Cullen.

Q.    And how many did you have?

128

A.   We had a -- we had a deposition and I believe we had --

Q.   I'm sorry.  That was a bad question then.  I meant before your testimony here today, not for your deposition.

A.   So between the deposition and between the testimony today?

Q.   Yes, yes.

A.   We met -- the trial was canceled three times for other issues, so before each one, so two or three.

Q.   Two or three?

A.   Yeah.

Q.   And how long did you meet?

A.   Half-hour, 45 minutes.

Q.   And you went over your testimony?

A.   Correct.

Q.   And we never met?

A.   We have not met.

MR. AIVALIKLES:  One moment, your Honor.

Q.   I'm sorry.  I forgot if I asked you this.

But if you prosecuted Laurie Ortolano, would either Attorney Leonard or Attorney Neumann have to show up in court to testify even though you had this admission?

A.   So, again, it wasn't my investigation, but in a what-if scenario, the attempt would have been made to get them because they were pressing for the offense, so they would have

been witnesses.  But if they didn't show up, we still could have proceeded with the arrest based on the statements.

Q.   Without their testimony, you could present this case against Laurie Ortolano?

A.   Part of the investigation, yes.

Q.   Don't you have to prove under the statute that the person in control of the property told her to leave?

A.   We did.  That was all part of the statements that were taken as part of the investigation.

Q.   Right.  But you'd have to have Attorney Leonard testify to that, that she was in control of the office and she told her to leave.  You needed that as proof in order to prove your case in front of a judge?

A.   Correct.  Yes, yes, I'm sorry.  I misunderstood what you were asking.  Yes.

Q.   So you would have had to have called either Attorney Leonard or Attorney Neumann even though you had this admission?

A.   Correct.

MR. AIVALIKLES:  Okay.  Thank you.

THE COURT:  Anything further?  Briefly?

MR. HILLIARD:  May I?

THE COURT:  Yes.

RECROSS-EXAMINATION

BY MR. HILLIARD:

Q.   I just want to confirm, Chief Carignan, the reason

130

that your department would arrest somebody is because you determined there was probable cause they committed a crime.

A.    That's correct.

MR. HILLIARD:  Thank you.

THE COURT:  Attorney Cullen?

MR. CULLEN:  Nothing, your Honor.  Thank you.

THE COURT:  All right.  We're going to take our lunch break.  And remember at the beginning of this case I told you there may be times when I would give you a limiting instruction.  I'm going to do so now.

You heard Chief Carignan testify on direct that he understood that Attorney Bolton was having conversations with a Lieutenant Kenney at Nashua Police Department after the January 2021 trespassing incident.  You are to disregard that testimony.  You may not consider it for any purpose whatsoever.

Now you're going to go to lunch.  You've -- we're in day three.  You've heard a lot of testimony.  So it's very important that you wait until you have heard all the testimony before you begin to talk to each other about this case.

And so I know it's counterintuitive, but I want to remind you again that that is an order of the Court and remind you again not -- not to talk about the case with each other and of course you know not to talk about it with anyone else outside the courtroom.

Thank you.  We'll go to lunch.  We'll be back in an

hour.

THE CLERK:  All rise for the jury.

(Jury excused.)

(Without the jury present.)

THE COURT:  Okay.  You may step down, sir, and I'll just check in with our lawyers about the afternoon.

(Witness excused.)

MR. HILLIARD:  This is not about the afternoon, your Honor, but -- and I had resolved to say this before you revisited that ruling.

I just wanted the Court -- I think you know me well enough to know I didn't -- sometimes in these whispering devices you can -- you can get pretty -- I don't know what the right word is, but --

THE COURT:  Yeah.  No, no, no.

MR. HILLIARD:  I didn't mean any disrespect --

THE COURT:  No.  And I --

MR. HILLIARD:  -- on the ruling you had made.

THE COURT:  I think that lawyers presume that I know all of the facts at all times and I think sometimes even more clarity is helpful.  And I would encourage you, especially in the moment, to make very clear to me what your objections are.

I had Exhibit 56 that Attorney Aivalikles spent a fair amount of time on that didn't require a lot of my attention.  I was able to think through the issue and correct

it.  But, no, I didn't -- I did not interpret that in any way.

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  So --

MR. AIVALIKLES:  Okay.  So we can discuss it now.

Your Honor, there's now three times that defendant's counsel has brought out the statement by my client that I'll be back, I'll probably be arrested again, along those lines, three times now they've elicited that.

It is totally unfair that my client does not have the opportunity to testify what she meant by that statement because now the jury has a totally different impression.  And I think we should be able to on a limited basis ask her what she meant by that because, otherwise, it's extremely prejudicial because the jury doesn't have her testimony as to what she meant.  It only has what -- how the police interpreted that statement.

THE COURT:  Can you remind me what -- or give me an offer of proof, what would she say she meant by that?

MR. AIVALIKLES:  She would say that she made that statement because she knew the city wanted her arrested and that's why she made that statement.  And that, in fact, it happened.  It happened in July 2022.  She was -- the police showed up and Attorney Bolton demanded that she be arrested.

THE COURT:  Well --

MR. AIVALIKLES:  So what she -- what she said and

why she said it was validated by that subsequent conduct.

THE COURT: Yeah. I understand the argument. You're trying again to argue that the door has somehow been opened to the evidence and I don't think that that has happened. I think if Attorney Bolton were to get up and say, I have always been polite to Ms. Ortolano, or in some way suggest he doesn't -- hasn't, you know, at times said things to her that she might interpret as rude, then I think, ultimately, it would come in on credibility because she claims from that incident -- and, again, I don't know these facts, but I know that her claim is that Attorney Bolton yelled at her, et cetera.

So that's the only way in which they would open the door to this incident. If that comes in and there are more police involved, for the same reasons I've been telling you all along, that would open the door to a whole trial within a trial and, you know, I am not going to allow it for the same reasons I have denied it, I think, about five or six times thus far. But I -- I appreciate the effort.

MR. AIVALIKLES: I mean, you know, questioning Attorney Bolton whether he was rude or not doesn't explain why she made that statement and what she meant by that statement.

THE COURT: All right. And I --

MR. AIVALIKLES: It just doesn't do it.

THE COURT: Right. And I think that she did testify

about that in her direct.  She made the statement and she explained why she made the statement.  So, ultimately, I'm not persuaded to do that, but ...

So we will take an hour for lunch.

Anything else, Attorney Aivalikles?

MR. AIVALIKLES:  No, your Honor.

THE COURT:  Anything else?  All right.

THE CLERK:  All rise.

(Lunch recess taken at 12:14 p.m.)

135

C E R T I F I C A T E


          I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 4/17/26          */s/  Liza W. Dubois*
                            LIZA W. DUBOIS, RMR, CRR