*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JULY 16, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
* * *
LAURIE ORTOLANO,                        *
                                        *
              Plaintiff,                *
                                        *  1:22-cv-326-LM
          v.                            *  February 3, 2026
                                        *  1:26 p.m.
STEVEN BOLTON and CELIA LEONARD,        *
                                        *
              Defendants.               *
                                        *
                                        *
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

JURY TRIAL DAY 1
AFTERNOON SESSION
BEFORE THE HONORABLE LANDYA B. MCCAFFERTY

Appearances:

For the Plaintiff:          William E. Aivalikles, Esq.
                            Aivalikles Law Office


For the Defendant,          Russell F. Hilliard, Esq.
Steven Bolton:              Madeline Kate Matulis, Esq.
                            Upton & Hatfield LLP


For the Defendant,          Brian J.S. Cullen, Esq.
Celia Leonard:              Cullen Collimore Shirley PLLC



Court Reporter:             Liza W. Dubois, RMR, CRR
                            Official Court Reporter
                            U.S. District Court
                            55 Pleasant Street
                            Concord, New Hampshire 03301
                            (603)225-1442

2

I N D E X


                                                        Page

Opening Statements

  By Mr. Aivalikles                                       3
  By Mr. Hilliard                                        21
  By Mr. Cullen                                          30



Witness:                  Direct    Cross    Redirect    Recross


Laurie Ortolano

  By Mr. Aivalikles        39



Exhibits:                          For ID            In Evid.

Plaintiff's Exhibit 20                                   52

P R O C E E D I N G S

THE CLERK:  All rise for the jury.

Please be seated.

THE COURT:  Now we will begin with opening statements.

Attorney Aivalikles.

MR. AIVALIKLES:  Thank you, your Honor.

Judge McCafferty, members of the jury, Attorney Cullen, Attorney Hilliard, Attorney Matulis, good afternoon.

It is my honor to represent Laurie Ortolano in this important case involving First Amendment rights that are guaranteed by the United States Constitution.

Before I talk to you about the evidence that I anticipate will come into this case, I would like to thank you for your willingness to devote your time to hearing the case and to attentively paying attention to the evidence that's going to be offered.  And it's evidence that comes from the witness stand or the exhibits.

An opening statement is merely what the lawyers anticipate the evidence will be.  I've been doing this for a long time, and I can tell you that you cannot predict by a hundred percent accuracy what the ultimate evidence will be in the case.  This is what I anticipate the evidence will be.

You will be hearing the story of Laurie Ortolano, a mother, a wife, an involved citizen, a good person.  The day

she went to city hall, January 22nd, 2021, she was doing an admirable deed.  She volunteered to help two elderly people who owned mobile homes.  And they were challenging their tax bill.

The two seniors were relying on Laurie because they knew nothing about tax abatements.  They had mobility issues and they needed a representative.  Laurie filed two tax abatements and she filed them electronically through the city's email AssessHelp and they were filed on January 17th, 2021.

Her abatement forms were accurate, complete, and when Laurie didn't receive proof that -- of the filing, she wrote a letter to the chief assessor, an email, and she said, can you please let me know when the city received these abatements.  He replied, I'll look into it.

Didn't hear from him.  She sent him another email, asking what was going on.  And the reason that she needed the acknowledgment is because an abatement has to be filed by March 1st and if you don't file it, you're out of luck; you cannot contest the taxes.  She was aware and she told this to the assessor; last year, the city lost an abatement for one of these mobile home park -- one of these mobile homeowners, can you please be sure to give me the acknowledgment.

She went to city hall that day to get those abatements date-stamped.  She expected help from her government.  It was a simple request that would have taken less than 30 seconds to date-stamp those two applications.

She entered city hall at 9:38 a.m., she spoke to the greeter, a -- a Ms. Castro.  She explained to Ms. Castro that she was going to administrative services, that she needed the abatements date-stamped.  She was waved in.

She went to administrative services.  It was closed. She couldn't go to the assessing office because it was under renovation and it was closed.  She went to the mayor's office on the second floor.  No one was there.  This was during COVID, so there was limited times that city hall was even open.

She then headed to the legal department.  She knocked on the door.  The paralegal answered.  She said, I'd like to speak to Mr. Neumann, Attorney Neumann, who was an attorney in the office, about her tax abatements.

She walked in and she was talking to Cindy -- Mindy Lloyd.  And then Attorney Neumann walked out of his office and he said to her, you need to leave, you're trespassing.  Not even the courtesy of good morning, can I help you, what do you need; you need to leave, you're trespassing.

She tried to explain that she wanted the date stamp. He told Mindy Lloyd to call risk management, which she did. Then when Mindy Lloyd got off the phone, she called the police and she requested that the police come to city hall because of Laurie Ortolano wanting a date stamp and would not leave the office until she got a date stamp.

She was there for a legitimate issue, a legitimate

reason.  She was looking for help.  That's all she wanted.

While Mindy Lloyd was on the phone, Attorney Leonard shows up, walks in.  First thing she says to Laurie Ortolano, leave, you're trespassing.  She didn't even want to know why Laurie was there.  She didn't even want to know if she could help her.  Immediately it was confrontational; you need to leave, you're trespassing.

The police come to the office.  Officer Roach then talks to Laurie.  He's -- he finds Laurie to be calm, not causing a disturbance.  She explained why she was there; they won't answer my questions, they won't schedule appointments, I just want these date-stamped.

He goes and talks to Attorney Leonard.  Attorney Leonard says, I want her trespassed from city hall.  When you trespass someone from city hall, they can't come to city hall unless they have an appointment in this case.  It's not a criminal offense.  It's not any kind of criminal action.  You just can't show up to city hall.

There were three police officers there.  They were, I guess, there for assistance, but who knows.  They -- they indicated that Laurie had to leave, which she did.  And in New Hampshire -- or I shouldn't say in New Hampshire -- in Nashua, when the police arrive and you're told to leave for criminal trespass and you leave, there's no criminal charges brought against you.  That's their policy.

On the way out, Officer Roach reminded Laurie, don't come back unless you have an appointment or I'm going to have to arrest you or I might arrest you. She understood. She wasn't under arrest at that point and she went home. Sergeant Caron, who was there, spoke to Attorney Leonard and he confirmed that that's all she wanted was Laurie trespassed from city hall for a year.

According to the police report, this is a replica of Officer Roach's statement. He said Laurie sat down in the upstairs corridor of city hall, she was not causing a scene, and on arrival appeared calm. No allegations of any threats, but stated that Celia needed to leave now; that's -- I'm sorry -- Celia stated she needed to leave now. She wanted her trespassed but allowed at city hall if she had an appointment. She informed -- she was informed she is being trespassed for one year and is not allowed in city hall unless with an appointment.

Then he says, no offenses alleged or apparent. When he left city hall that day, the case was closed. There was no arrest. There was nothing further to be done. Laurie was told, don't show up at city hall unless you have an appointment.

What does Laurie do? She goes home. Six hours later, she sends this email. It's to the Board of Aldermen, the Board of Assessors, the mayor's office, the legal

department, and some city officials.  And the subject matter is Attorney Leonard should be fired.  And it's dated January 22nd at 3:57 p.m.

And then it says:  Attorney Leonard should be fired. I had a depressing experience today when I went to city hall to try to see if I could get some abatement applications stamped for receipt of records.  I headed to the third floor to the legal office to see if the new RTK, which is right-to-know, coordinator could help me with an abatement issue.  After looking around, he came out the back corner of the conference room.  He said I was trespassing and I had to leave.  Five armed officers showed up to ask me to leave the office.  Of course I said yes.  I wasn't looking for a hostile exchange.

Attorney Leonard showed up at the city while I was sitting on the floor and escalated the situation.  She then claimed that I was hostile, that she felt threatened, she kept repeating how threatened she felt, she then opened the windows because she did not know my COVID exposure.  She wanted me arrested and so many -- as so many of the city leaders in city hall wanted.

That -- that's what Laurie assumed.  She didn't know that Celia only wanted her trespassed.  But when she left, she thought she wanted her arrested.

The police explained that I had been trespassed and banned from city hall for one year.

By the way, the city website does not say you need an appointment to go into legal. I'm not some barbarian at the gate. I'm a citizen requesting help. It was never on my bucket list to be arrested. A pox to Attorney Neumann and attorney city Leonard (sic) and all those city leaders who violated our rights. No one in city hall responded to her, but the police have now told her that I will not be charged with trespassing. There will be no criminal investigation.

That's what her email was.

So on January 23rd, Kimberly Houghton, who is a reporter for the Union Leader, spoke to Attorney Leonard and she told Attorney Leonard that the police are not going to have any further criminal investigation; the case is concluded. And Attorney Leonard says: I find it troublesome, to say the least. My office will be speaking with the police further.

Those were her responses after this email hit city hall and after it was posted on social media.

So now she goes from I only want to trespass -- I -- she can't come to city hall for a year unless she has an appointment to now she wants her arrested.

Shortly after that, Attorney Bolton and Attorney Leonard contacted Chief Carignan. Attorney Leonard calls the police department and says she is calling on behalf of city hall and wishes to open an investigation into Laurie Ortolano concerning the January 22nd, 2021, incident. Attorney Leonard

provided the police and the press with photographs that she took of Laurie Leonard -- of Laurie Ortolano at city hall on that date. Attorney Neumann provided the police department with the email that was critical of Attorney Leonard and how she conducted herself at city hall.

So the chief goes over to the legal department. He meets with Attorney Bolton and Attorney Leonard. At the meeting, Attorney Bolton is directing the chief law enforcement officer of the city of Nashua to immediately arrest Laurie Ortolano. He demanded that she be arrested. He was angry. He raised his voice while he was talking to the chief.

Chief Carignan said, no, I will not arrest her. He held his ground.

Attorney Bolton was not satisfied with that answer. The next thing that we know happens is a Zoom meeting attended by the chief, two deputy chiefs, five captains, Attorney Bolton, and Attorney Leonard. There was certainly a lot of brass there for a criminal trespass case that the police do not prosecute when the person leaves.

On February 3rd, the police go over to city hall and interview Attorney Leonard, Attorney Neumann, Mindy Lloyd, and some other people.

On January 27th, Attorney Bolton is interviewed by a Union Leader reporter and this is what he tells the Union Leader reporter. This was reported -- this -- this circulation

appears statewide, especially Nashua and the local -- local towns.

He says:  This was an out --

MR. HILLIARD:  Your Honor -- your Honor, objection.

THE COURT:  All right.  Sidebar.

AT SIDEBAR

MR. HILLIARD:  I believe he's reading from an exhibit that is still for ID.

THE COURT:  He's telling them about what he thinks is going to come into evidence from the Union Leader article, I think.

MR. AIVALIKLES:  Yes.

THE COURT:  He's -- he's not -- he doesn't have a -- an exhibit up that he's showing them at this point.

MR. HILLIARD:  Okay.  All right.  I didn't -- I thought that it was only agreed-upon exhibits that would be --

THE COURT:  Oh, I understand it was that you were going to use demonstratives and that his demonstratives would only be full exhibits.

MR. HILLIARD:  Yeah.

THE COURT:  I think now he's talking about what he thinks the evidence will show, which is that your client told a Union Leader reporter X.

MR. HILLIARD:  Okay.

MR. AIVALIKLES:  That's correct, your Honor.

12

THE COURT:  Okay.

MR. HILLIARD:  For the record, there's a -- there's an objection pending to that exhibit, but I understand, your Honor.

THE COURT:  Okay.  All right.

MR. HILLIARD:  Thank you.

CONCLUSION OF SIDEBAR

THE COURT:  All right.  Go ahead, Attorney Aivalikles.

MR. AIVALIKLES:  Thank you, your Honor.

So Attorney Bolton tells the Union Leader:  This was an out-and-out invasion intended to disrupt government operations seemingly inspired by the events in Washington.

The events in Washington happened two weeks earlier, and we all know what that was.

Then he goes on to say:  In this case, happily, no one was injured or worse.

Or worse.  Those are his words.  This woman, who was calm, not causing a disturbance, by herself, was characterized as committing an out-and-out invasion.  And these are words from the city's top lawyer that carry a lot of weight.

Attorney Leonard, in an earlier article in the Union Leader, equated my client's conduct to the recent violent actions against government employees and she was concerned.

And this is what she was concerned about.

Mrs. Ortolano is a vocal critic of city staff, including me, meaning including Attorney Leonard, at public meetings and in emails, various boards, and government officials.

The chief ordered a further investigation and he claims he changed his position on whether to arrest Laurie or to investigate her because of the email that Laurie posted on social media.  And because of that email that was critical of Attorney Leonard's job performance, she was arrested.  She was charged with a Class A misdemeanor which carried a one-year jail sentence.

It doesn't end there.  There's a history here. Attorney Bolton told Laurie Ortolano in 2019, you insulted the mayor, you insulted me, it's personal.  And the insult that he claims Laurie made to the mayor was calling him a criminal, which Laurie did not call him a criminal, but that's what he felt.

And he said that the reason that she insulted the mayor had to do with raising to the public his real estate tax issues.  She was at a meeting Attorney Bolton attended, Attorney -- I'm sorry -- the mayor attended.  It was the end of November.  And she raised the issue of how the mayor's property was undertaxed and how he had a building permit for a hundred thousand dollar renovation which was never closed, which means the city for that five-year period did not charge him for the -- for the home improvements.  He said at the meeting that

was a slander.  That's how he took it.

At first the relationship that Laurie had with Attorney Bolton was really good.  It was cordial.  In fact, the first meeting she ever attended in September of 2018, she complimented Attorney Bolton; she said the city is lucky to have such a strong attorney.  But after the incident disclosing the mayor's taxes, things changed.

Laurie moved to Nashua in 2014 with her husband and in 2018, she began to raise issues in her mind about the assessment of her property, so she started looking at the records at the assessor's office to figure out what was going on.  And these were public records.  And while she was doing that she inadvertently came across the mayor's property.  That's how she discovered it.  It wasn't like she had targeted the mayor.

But the evidence clearly shows that as things went along, Laurie's relationship with the city, with Attorney Bolton, Attorney Leonard, was contentious.  And employees were instructed not to talk to her, not to talk to her, when she had questions.

And there is a -- there is an email, August 22nd, 2019.  Laurie says to Manuela in the legal office, Attorney Leonard, copies to various city officials, and she indicates that she had a conversation with two assessing staff and that she had come to the office and she wanted to talk to Doug in

the office who was an assessor and she wanted to know if it was okay to talk to her. So the -- Kleiner sent an email to Attorney Leonard asking whether it was okay.

So Attorney Leonard replies the next day: Kim, the law does not require that we speak with her. I'm not sure what is to be gained by doing so at this point. My advice is to decline such personal interviews with her and have the staff continue with their important work.

That was the deputy attorney for the city of Nashua, instructing the people in the assessing office, you don't have to talk to her, it's not required, there's nothing to be gained. Gained. That was the word she used.

The employees at city hall were monitoring her activities. Her right-to-know requests were funneled to the legal department. Attorney Leonard handled a lot of those. And you'll have the opportunity to hear some of what those consisted of.

The replies, though, that she got from Attorney Leonard were classic runarounds. The environment at city hall for Laurie was toxic, but Laurie was not deterred. She's a strong woman. She stood up to city hall by filing cases in the superior court, arguing in front of five judges of the New Hampshire Supreme Court. She's not trained -- she's not a trained lawyer. She's an engineer. She filed complaints with the state departments. Laurie won a lot of those lawsuits and

a lot of her complaints were -- were upheld.

The chief assessor's position that she complained about was eliminated by Nashua.  He was gone.  The city assessor, Greg Turgiss, was sanctioned for not -- for sleeping on the job and for some other ethical issues.  She won her tax abatement before the Banking Commission.

All of these sanctions that were imposed were a result of Laurie publicizing what was going on in the city of Nashua.  In fact, the Department of Revenue Administration ordered the city to conduct a total reevaluation of the property.  Needless to say, she was not welcomed at city hall.

On February 18th, Laurie was arrested for criminal trespass.  As I said, a Class A misdemeanor with a potential jail sentence at that time she was a model citizen.  She had no criminal record.  She didn't even have a speeding ticket.  And here she is being charged with a Class A misdemeanor with the potential of going to jail for one year that she knew Attorney Bolton and Attorney Leonard wanted to happen because they were the ones that were insisting that the investigation be reopened and that she be arrested.

And she went to city hall that day because she was helping two elderly people who had an unfair tax burden and she just wanted a date stamp, a simple date stamp that had they done so, we wouldn't be here.  This wouldn't have happened.

These senior citizens did win their abatement.

Laurie saved them $2,000 on their taxes over a two-year period. She charged them nothing. She did it because she wanted to help them. She's a good person. But she paid a hefty price for standing up to the city. As I said, there's a history here that preexisted January 22nd.

I just want to address one instance because I've probably gone on too long now, but she filed a right-to-know request in March of 2021, about two weeks after she was arrested, because she was convinced that she filed the abatement on January 17th and the city was just playing games with her. There's 13 emails going back and forth about do you have it, when was it filed, and they're complaining that the application wasn't complete, she didn't fill out this part, she didn't fill out that part. So she filed a right-to-know request. She said, city, please produce the email and the tax abatements that were filed through AssessHelp. And the city said, oh, we moved those to a backup tape; it's going to take too long for us to get those; you're not getting them.

So what does Laurie do? Typical Laurie, she files a suit in superior court asking the court to force the city to produce those tapes. We have a hearing -- that was filed in June 2021. They have a hearing January 2022 and the judge says to the city, you produce those emails, you produce the abatement.

Attorney Leonard wasn't happy with that outcome, so

it was appealed to the New Hampshire Supreme Court, this minor issue, important to Laurie but, really, in the scheme of things, pretty minor.

Attorney Leonard argues in front of Supreme Court. The Supreme Court says, City, you produce those emails, those abatements; they're public records; she's entitled to them.

So November 26, 2023, she gets a letter from Celia Leonard enclosing the abatements, enclosing the email, two and a half years later from her original request.

Lo and behold, the city documents that were produced confirmed that they were received by the city on January 17th, 2021, the day she said she filed them. So when she was at the city hall on January 22nd, the city already had those abatements four days earlier. They never told her they did. There's 13 emails going back and forth, you didn't do this, you didn't do that. Well, it turns out she did do this and she did do that and everything she filed was proper.

But this case -- that incident illustrates what she went through in dealing with the city. The evidence will show that she's not afraid of her government. She's not afraid to criticize her government. She's not afraid to point out the flaws in her government. That's what good citizens do. That's what she was. She wasn't afraid to criticize the powers that be, the lawyers, the mayor, the aldermen. From her perspective, if they did something wrong, it should come to

light.  It should see the light of day.  But what she was afraid of was going to jail.  That's what terrified her and she knew that was a possibility.

And so she didn't stand her ground.  She pled guilty to a violation, which is a noncriminal offense, but she was guaranteed not to go to jail.  And that -- because she pled guilty doesn't mean that she's not entitled to an award from this jury because, historically, the City of Nashua Police Department did not arrest people for criminal trespass who left when they were told to leave.  People in her situation who were not pursuing their constitutional rights were not arrested for criminal trespass when the police showed up and they were told to leave.

But Attorney Bolton and Attorney Leonard were able to convince the Nashua Police Department to change that philosophy for Laurie and it was embarrassing.  She's pretty well known in Nashua.  Her family's known in Nashua.  She's active at the church that she goes to.  But the arrest was humiliating.  It was embarrassing.  It affected her marriage. It affected her personal life because of the stress that she was dealing with, the reputational damages.  She had to pay attorney's fees to the -- to have herself defended.

And she's -- in addition to compensatory damages, she's seeking punitive damages because the evidence will show that the defendants were not confused with what the law is

about First Amendment rights. They're attorneys for the city. They understood what constitutional rights mean, the importance of the First Amendment, and the citizens' right to access. And she's asking for punitive damages in addition to compensatory damages.

In conclusion, the evidence will show that Laurie engaged in a protected conduct when she emailed the city officials on January 22nd, as well as other things that she did that were protected. She was subjected to an adverse action, that is, she was arrested for what she did, and the -- the defendants' decision to demand an arrest was substantially motivated by their desire to retaliate against her for her protected conduct.

That's what we believe the evidence will show. These two city attorneys demanded her arrest, set in motion the criminal process for the offense of criminal trespass that was not prosecuted in Nashua under these circumstances except for Laurie, who was exercising her constitutional rights. The case was closed. The police were satisfied no offense was committed.

But the evidence will show that what these two attorneys did was done under the color of law. They were calling for -- from -- on behalf of city hall to have her investigated and to have the matter pursued further. They were in a position to do this. They were the head corporate counsel

21

and the deputy corporate counsel of the City of Nashua.  When they talk, people listen.  And that's what happened in this case.  The police listened and Laurie was prosecuted for trying to do a good deed.

Thank you.

THE COURT:  Thank you, Attorney Aivalikles.

Attorney Hilliard.

MR. HILLIARD:  Thank you, your Honor.

THE COURT:  Yes, sir.  Go ahead.

MR. HILLIARD:  May it please the Court and members of the jury, good afternoon.  My name, again, is Russ Hilliard.  I represent Steven Bolton, along with my colleague Maddie Matulis.

Steve has been a lawyer in New Hampshire for more than 40 years, spending nearly his entire adult life in the city of Nashua.  He's served the City of Nashua as a -- in a number of capacities:  He's been on the Board of Aldermen, members of the Board of Education, and he's been the city attorney for about the last ten years.

As Judge McCafferty told you this morning, in Nashua, the city attorney is called corporation counsel and so that's a name you may hear from time to time referring to him.

But let me start with some undisputed facts.

First, Ms. Ortolano trespassed in the legal department of Nashua City Hall on January 22, 2021.

The second one is that the Nashua Police Department charged her with trespass. And I'm going to show you what is Exhibit 45, for the record.

This is the complaint, you'll hear from Officer Roach sometime later this week, dated February 18. It says the undersigned complains, and she's named there.

And here's what it says: Knowing she was not licensed or privileged to do so, knowingly entered and remained in Room 313, legal office, third floor city hall, located at 229 Main Street, in defiance of an order not to enter or remain which was personally communicated to her by authorized persons, to wit, Ms. Mindy Lloyd, Attorney Jesse Neumann, and Attorney Celia Leonard.

That's Exhibit 45 and that's the complaint charging her with trespass.

The third undisputed fact is that she pled guilty to that charge.

Well, there are going to be several witnesses, many exhibits. Let me suggest to you that there are three key points for you to consider in light of the evidence I expect you to hear and see.

First, did Steve Bolton cause her arrest? There will be undisputed evidence from the police department that he did not. The police refused his request that witnesses be interviewed and the case investigated. It was the plaintiff's

later -- plaintiff, Ms. Ortolano's -- later conduct in confirming her actions in the media that caused the police to investigate and decide to charge her.

Second, even if he did cause, cause, her arrest, did he have a retaliatory motive or was he motivated by the fact that someone had entered his office without permission? The legal department, you will -- you'll hear all about this from several witnesses -- is on the third floor of city hall. It's not an office open to the public. It's just an office for the city lawyers to work in.

Was he motivated by the fact that someone entered that office, upset his staff, and refused to leave when all of them asked or directed her to do so, and was her conduct at all similar -- you're going to hear about ten incidents in city hall over about a seven-year period where individuals who were in city hall were asked to leave, did leave, and weren't charged with trespass. We'll go over those with you and you will see that all of those involve public areas in city hall, restrooms, where an intoxicated person needs help leaving. You'll have to look at those and decide whether or not her conduct on January 22, 2021, bears any similarity to those other instances where people were not charged.

Third, you will hear undisputed evidence that the plaintiff, Ms. Ortolano, attended many public hearings and

meetings in Nashua, speaking her mind in sometimes insulting in vulgar terms, and also published regularly on various platforms, again sometimes in insulting and vulgar terms.  She did this both before and after her arrest.  Nothing changed in this regard from before to after the arrest.

Steve Bolton's job is to represent the City of Nashua, the city and its various departments and agencies and so forth in all kinds of matters involving many different individuals and businesses.

And for some time before the trespass, Ms. Ortolano had been active, as you heard, in the city, particularly with respect to assessing taxes and other issues.  As was certainly her right, she filed many what we've called right-to-know cases.  New Hampshire has a law that allows a citizen to ask the government for some records and there's a procedure you follow.  We call them right-to-know cases.  You'll hear a lot about them.

A number of these right-to-know cases that she brought ended up in the superior court.  And as corporation counsel, part of Steve Bolton's job was, and is, to defend the city in litigation brought against it by her or anyone else.

Now, in some of her litigation, Ms. Ortolano was what we call *pro se*, meaning she proceeds without an attorney representing her.  She brings -- handles the case herself, which is absolutely fine, but results in there being more

direct contact between her and, in this case, the city lawyers as opposed to other times when she had a lawyer representing her and then the communications went between her lawyer and the city lawyers.  The evidence will show that there were several years of such proceedings before her trespass in the legal department and while there was occasional friction, these matters proceeded to a resolution one way or the other.

However, on January 22, she came to the legal department, knowing it was not open to the public, knowing she didn't have an appointment, something she knew was required.

She later claimed she wanted to have some tax abatement forms date-stamped.  You will see the emails that were going back and forth between her and the city's assessor that week about getting these forms date-stamped.  And we are all reminded, because it's sometimes easy to forget now, early '21, we're still in the COVID pandemic, at least to some extent, and as was mentioned, some of the city offices were closed because of that.

But the legal department does not date-stamp tax assessment applications.  She knew that before appearing at the office on Friday morning, January 22.

Now, there may be some dispute as to exactly what occurred when she rang the bell of the legal department and how she managed without an appointment or permission to get past Mindy Lloyd, the legal assistant who opened the door to see who

was there, and how she entered the office. As I said, the legal department is not open to the public. There's no lobby, there's no waiting room, there's no counter. There's -- it's not there -- it's a place for the city lawyers to do their work. But there's no dispute that she entered and sat down on the floor, refusing to leave.

This is Exhibit TT for the record, your Honor.

That's a picture taken the morning of January 22, 2021. That's Ms. Ortolano. That is Celia Leonard's desk. That is the door into Celia Leonard's office. This'll be in evidence.

Ultimately, Mindy did call the police. They came and then Ms. Ortolano ended what she later called, several times, a, quote, peaceful protest, and left with the officers. She immediately published statements describing the incident and her admission to having trespassed in the legal department and that is what led the police department to decide to further investigate.

And they took, on February 3, formal statements. This is Officer Roach, who you'll hear from, from Mindy Lloyd, Jesse Neumann, and Celia Leonard. You will have their statements in evidence. They're part of the exhibit, part of Exhibit 47.

Steve Bolton was not there that morning. You will hear this anyway. He had had, I'm going to say, a minor stroke

in the middle of December 2020 and had returned to work upon discharge from the hospital on December 31, 2020. But on that Friday morning, he was at a PT or OT follow-up session. So he wasn't there when this transpired, but he sure heard about it when he got back to the office. And as head of that office, as corporation counsel, he strongly believed that that conduct, that conduct, was inappropriate and should not go without consequence.

As I said, Ms. Ortolano, because she pled guilty to trespass, she wants you to compare her conduct to that of those other incidents in city hall where people were asked to leave, all asked to leave public areas of city hall, and were not prosecuted for trespassing. And I submit when you have a chance to look at those, you will conclude that they're totally unalike, these circumstances, on January 22, 2021.

You will hear undisputed testimony that Steve Bolton and the legal department have no control whatsoever over the Nashua Police Department. Nashua is one of the few municipalities in the state that has a police commission that's separate from city government. He had no control over the Nashua Police Department. It makes its own decisions about whether to investigate and whether to prosecute.

Did he want this? Did he -- did Steve Bolton want this situation investigated and considered for prosecution? Of course he did. What she did was an affront to his office and

to his staff, particularly, that Friday morning.  During his time in city hall, no one, no one, has ever trespassed in the legal department.  And regardless of who trespassed in the legal department under those circumstances, consequences would be and are appropriate.

Ms. Ortolano claims that his actions, Steve's actions, were in retaliation for her exercise of First Amendment rights.  When you've heard all the testimony, I submit that you'll conclude that nothing could be further from the truth.  His actions were motivated by the conduct displayed in that photograph and the circumstances surrounding it that resulted in the police department deciding to charge and prosecute her.

Now, the undisputed evidence will also demonstrate that Ms. Ortolano's public activities continued after the incident and I want to just share with you a sample of some of those public statements.

And just for the record, your Honor, these are agreed-upon exhibits and I'll just flag the letters as I hit them.

G, a statement in the Nashua Scoop that you'll hear about on February 22, these are all in 2021:  The deception and unethical practices in the assessing office must stop now.

H, the Grok, G-r-o-k, Granite Grok, posting site, a post about Jesse Neumann:  His very underhanded and deceptive

maneuvers, his position should be eliminated.

I, again the Nashua Scoop on April 18: Unbelievable, the city is so corrupt.

J, a Budget Review Committee on April 26th: I'm a big proponent of firing out Jesse Neumann's position, so fire his buns out of there.

N, a post on a place called GoodGov entitled, on April 28, Story About a Crooked Mayor.

Nashua Scoop again, O, on April 29: Attorney Leonard is a lying officer of the court and must be removed from her position as deputy counsel of the Nashua legal office. She is a dirty lawyer who has to go.

T, GoodGov, May 11: Attorney Bolton continues to obstruct public information.

X, GoodGov again, on July 3: The broken Nashua court system.

Y, the Nashua Scoop, July 19, talking about Attorney Bolton: He's lost his professional integrity and given this, he should lose his job.

Z, July 22, GoodGov site: Deputy Attorney Leonard's misrepresentations.

DD, double D, same site, August 3: Bolton ignores court order to drive up legal fees.

EE, August 4: Report of the Finance Committee. You need to dump Attorney Bolton and find somebody who wants to do

that job.

FF, Budget Review Committee, August 23, 2021:  The city legal office is a disgrace.

LL, the Granite Grok, December 15, entitled Nashua's Thug Leadership.

And, finally, MM, Granite Grok again, January 18, 2022, Nashua City Attorney Steve Bolton is unfit for duty, with his picture.

You will have all of these articles and meeting minutes and posts and so forth in evidence to get an idea of what has been going on.

This is not a case about violation of First Amendment rights or any constitutional rights or any other rights.  It's about a trespass admitted to and resolved by a plea of guilty.  Ms. Ortolano has no one but herself to blame for this.

Thank you.  At the conclusion of the case, I'll be speaking to you again and asking you to return a verdict in favor of Steve Bolton.

Thank you, your Honor.

THE COURT:  Thank you.

Attorney Cullen.

MR. CULLEN:  Thank you, your Honor.

I know what you're all thinking.  You're thinking how did I get so lucky to get picked in a jury with three

lawyers?  I'm going to try to keep this fairly short.  I think you've heard a lot already about the case.

My name is Brian Cullen.  I'm here -- I represent Celia Leonard, who's sitting back with me.  She is the deputy legal counsel at the -- at the City of Nashua.

Plaintiff's counsel has already talked to you a lot about what he believes the evidence is going to be and it sounds like you'll hear a lot from Ms. Ortolano this afternoon and probably into tomorrow about her various campaigns and -- and suits and the other things she has brought against the City of Nashua over the years.  And Attorney Hilliard's already given you some information about some of the evidence that he thinks is going to come in.

So -- and you're going to hear, obviously, that Ms. Ortolano at some point was helping these two elderly people with their abatements and, you know, you're going to hear, and I don't think anybody's going to dispute, that that's commendable work.  But what you're also going to hear is that this notion of going into the legal department for timestamps is a fiction.  And what you're going to hear is that she may have gone to city hall in general to get those stamps, but that's not what she told people when she pushed her way into the legal department, that she just wants these things stamped. What she told people as she pushed into legal department is that she wanted to speak with Jesse Neumann about the abatement

process, something that she'd been trying to pursue with Jesse Neumann since he was hired about three weeks before, and she's frustrated that he hasn't met with her at this point. That's -- that's the evidence that you're going to hear.

And, in fact, you're going to see evidence that Ms. Ortolano didn't need to go that day because just on the Wednesday, two days earlier, Richard Vincent, who's the head of the assessors, had said, I'll get you your time stamps. And, in fact, on the night before, at about five o'clock at night or 5:50 at night, she sent an email blast not just to the Richard -- this Richard Vincent character, but also to the mayor, the Board of Aldermen, and all these other people, saying, hey, you know, say -- directed to Vincent, but with all these people cc'd, saying when am I going to get these things.

But the very next day, instead of waiting for a response, she comes into the city hall, as she can, and she goes to assessing -- she knows assessing is closed, they've mentioned that, and then she goes in and she goes up to legal, not to get something stamped. That, I think, you'll find is an after-the-fact assertion, I think is what you're going to hear.

You're going to hear from police officers, Officer Roach, who responded. He's going to explain to you why he wrote that line no offense alleged or apparent.

And you're going to hear from Chief Carignan. And Chief Carignan, as Russ Hilliard already mentioned, can explain

to you a little bit about how the City of Nashua's police department is really uniquely independent from the pressures of the mayor or even the legal counsel because it's run by a police commission that's appointed by the governor, not by the mayor. And Chief Carignan will tell you in no uncertain terms that Steve Bolton's not the boss of me. And when he -- if he tells me I want -- that he wants an investigation, that doesn't mean that I'm going to do an investigation.

And he's going to tell you that what prompted him to do an investigation was when Laurie Ortolano started publishing that she had actually committed the offense, when she actually put out there, confessed, gave an admission, that, yeah, I was told to leave and I refused because I'm not going to be kicked out of city hall, that that's what prompted him to say, okay, go ahead with the investigation, let's see where it lies.

And Officer Roach will tell you that's what he did. He did an investigation. He spoke with -- with Celia Leonard, he spoke with Jesse Neumann, he spoke with Mindy Lloyd. He gave the plaintiff an opportunity to speak with him, but she declined. And then he wrote up an affidavit for a warrant, sent it to a judge, a judge found that there was probable cause, and the judge issued the arrest warrant. And that's what Officer Roach will tell you.

So what I want to do just with a couple of minutes is just talk to you a little bit about my client. Because

you're going to hear lots of things about her, a lot of probably disparaging things, and she's not really going to have a chance to speak for herself until probably quite late in the case.  Russ Hilliard and I aren't in charge of the schedule here.  The plaintiff calls the witnesses first.  They call the witnesses that they want to and in the order that they want to.

You're going to hear from Celia, when she does get a chance to talk, that she -- you know, she's in an Idaho family, she grew up in Rhode Island, she moved to New Hampshire after taking the Bar Exam, worked at a firm, worked for a bank, worked at the Banking Department before landing in -- in Nashua at the legal department and that she became familiar with Ms. Ortolano through that process and that she strove to treat her with respect and yet to have clear boundaries with Ms. Ortolano.  And you'll hear some of the reasons why she felt those boundaries were important.

And it's not just that she felt this.  You'll see this from the plaintiff herself that she knew this because Celia Leonard met with her back in 2019 and said, look, this is what the legal department is for; we're here to advise the city, which is to say, the mayor, and its departments and its boards.  We're not here as a general advice to people.

Now, that may seem -- may seem harsh, but you're going to hear that, you know, lawyers can't just talk to everybody because they have clients.  Even the city has -- is

their client.  And they don't have to answer questions that come in from the public.  That's just not their role.

Ms. Ortolano, incidentally, you'll hear, already had her own legal counsel, including her counsel on the abatement. So this idea that she was going to see Jesse Neumann to ask questions about the abatement process, I think you're going to hear evidence that that's a hollow excuse, as was the timestamp excuse.

Celia will tell you that on the morning of this incident on January 22nd, she was off site on a Zoom meeting. She got the call from Mindy Lloyd saying that Ms. Ortolano was there and that she was concerned, in part because she knew that -- that Ms. Ortolano knew that that wasn't -- that she's not supposed to be there without an appointment and that they can't answer these legal questions.

And, as I said, you won't see that -- that's in Ms. Ortolano's own writing.  She sends the email.  And she says to -- to Celia:  Thank you for taking the time to explain the functions of the legal office -- I'm sorry, I'm going too fast, bad habit -- in addressing my concerns.  You have made it very clear that legal is only there to address specific document requests and I should not bring any other information or concerns regarding the city to the attention of the legal office.

Ms. Ortolano knew on January 22nd of 2021 that she

didn't have a proper purpose for being there.  And when you hear that, well, this could all have been solved in 30 seconds if she had -- if they had just stamped it, you'll hear that she didn't ask for timestamps.  She asked to see Jesse Neumann to talk about an abatement process and he didn't want to talk to her and he didn't have to talk to her.

And you know the 30 seconds that it could have been solved in?  It could have been solved in 30 seconds had Ms. Ortolano left when Mindy Lloyd told her to leave, when Jesse Neumann told her to leave, or when Celia Leonard told her to leave.  And you're going to hear that Celia will tell you that she -- she'd make that same demand of Ms. Ortolano if she came into her -- into her house, if she came into her law office when she practiced here in Concord, or if she came into the bank.  And some of you will probably have similar -- would probably have similar expectations that you can be at your office and that if you tell somebody to leave, they should leave.

And Celia will tell you that when the police came and they -- they -- they went to her and said, look, do you want her trespassed, and she said yes and that she understood that that would mean that Laurie would be charged with trespass as well as being told not to come back.

One aspect of the timeline that was missed in the plaintiff's opening -- and there's a lot here, so I don't -- I

don't mean to cast aspersions on it -- Ms. Ortolano called Kimberly Houghton at the Union Leader before she sent the email that you've been shown saying Celia Leonard should be fired. She called her and told her about the incident and then Celia Leonard was also responding to a call and spoke to her. There -- there was no change in plan based on her sending this letter saying Celia Leonard should be fired.

First of all, Celia will tell you that doesn't bother her.  She deals with people like Ms. Ortolano a lot. She's not going to get all ruffled over this.  But, in addition, just from a timestamp point, she had already said those words that you were quoted to about, like, I find this troublesome, my office will be doing something about it, before this went out.  So this wasn't -- there was no retaliation for this.  Ms. Leonard was clear from the get-go that she wanted and expected that there would be a criminal charge for coming into the office and refusing to leave.

And you'll also hear that -- from Celia that she was present when Chief Carignan told Steve Bolton in no uncertain terms that the police weren't planning to move ahead at that time and you'll hear from Celia that she did nothing after that point other than comply with the police request for an interview and there will be no other testimony to contradict that.

So like -- like Russ Hilliard, at the end of the

case, I'll have another chance, as will the plaintiff's counsel, to get before you and talk to you about what the evidence -- if the evidence came in the way we expected it to and what the evidence is.  And at that time I will be asking you, if the evidence supports it, to find in favor of my client and enter a verdict for the defense.

And I thank you for your time.

THE COURT:  Thank you, Attorney Cullen.

We'll take a brief recess and we'll come back for our first witness.

THE CLERK:  All rise.

THE COURT:  Please continue to follow my instructions about not talking about the case.

Thank you.

(Jury excused.)

(Without the jury present.)

THE COURT:  All right.  Back in ten minutes.

(Recess taken from 2:38 p.m. until 2:50 p.m.)

(With the jury present.)

THE CLERK:  All rise for the jury.

THE COURT:  Okay.  Plaintiff may call your first witness.

MR. AIVALIKLES:  Thank you, your Honor.

Laurie, I need you to go up there.

THE CLERK:  Step back to the witness box and raise

your right hand.

LAURIE ORTOLANO, having been first duly sworn, testified as follows:

THE CLERK:  Thank you.  Please state your name and spell your last name for the record.

THE WITNESS:  Laurie Ortolano, O-r-t-o-l-a-n-o.

DIRECT EXAMINATION

BY MR. AIVALIKLES:

Q.    Okay.  You can sit back, Laurie.

A.    Okay.  It seems so loud.

Q.    What is your address?

A.    41 Berkeley Street.

Q.    And is it okay if I call you Laurie?

A.    Yes.

Q.    How long have you lived at the Berkeley Street address?

A.    Since the -- January of 2014.

Q.    And prior to that, where did you live?

A.    In Litchfield for about 23 years.

Q.    Are you married?

A.    Yes.

Q.    Do you have children?

A.    Two sons, adult.

Q.    How old?  Not -- not you, your sons.

A.    The oldest is 34 and the second one is 30.

Q.    And do they live around here?

A.    No.  The oldest one is -- graduated college, is a language kid, lots of languages, and he lives in Amsterdam, does marketing work.  The youngest one went to NCC trade school for a machining degree and he works -- he worked at GE Aerospace, moved to South Carolina for four or five years, and just came back up here in the last two months.

Q.    Can you tell us your background, your education background?

A.    I grew up in Connecticut, a little town called Somers, and I went to high school there, went to college at Worcester Polytech, and I got my degree in mechanical engineering.

Met my husband my last year of college, Michael, and he's a Navy guy and had a commission down outside of Washington, D.C., so I got a job offer with -- worked to get a job offer from Westinghouse Defense Electronics in Baltimore and we went down there.

Q.    And what was your position at Westinghouse?

A.    I was an analytical engineer.

Q.    What is an analytical engineer?

A.    Did a lot of modeling at that -- at that time, there was all kinds of new technology coming out with finite analysis and creating models to predict how equipment would operate. And I had been involved with a space program, satellite

41

program, so it was modeling -- you know, gathering data and creating models on how a satellite would work.

Q.    And how long did you stay down in the Baltimore area?

A.    Five years.

Q.    Okay.  And where did you go after that?

A.    My husband's commission was up and his dad had started a company up in -- his parents lived in Nashua and started a company here.  And his father's company was struggling, so Michael wanted to come back up to assist his dad.  He grew up in Nashua.  He was a Nashua native.  So we came back to Nashua.

Q.    And what did you do when you came back to Nashua?

A.    Initially I started helping at his dad's company and then I got a job at Lockheed and I worked there for about a year.  There was a group of engineers in there that spun off into a startup company in Bedford called Spaceflight Systems. I went over there and did contract work for them and contract work with the Department -- Department of Defense down in Washington until I had my first son.

Q.    Did you have security clearance --

A.    Yes.

Q.    -- working in this position?

A.    Yes.

Q.    What kind of clearance?

42

A.    I had a top secret.

Q.    Can you explain what that is?

A.    Not really.  I mean, I -- I forget what the levels are.  It's been so long since I've had one.  I know there's one above it because I know my husband had it.  So I know I was a level down, but couldn't really talk about anything.  That's pretty much the way it went.

Q.    So after you had your child, did you return to the workforce?

A.    I started -- I did consulting, tech writing and manual writing, and I started a company called Computers and Kids and I got an office space in downtown Nashua.  At the time, this was in the early '90s, computers were really taking off, and the educational purpose of computers was -- was growing rapidly with software, so I taught these after-school and primarily summer courses for kids to come and improve reading, math, that kind of stuff.  And I did that until I had my second son and then I -- I became an at-home mom.

Q.    And did your children go to public school?

A.    No.  We homeschooled our two boys.

Q.    Were you active in public life or government while in Litchfield?

A.    I was.  I became active in my early 30s.  I ran for school board and I got elected and I was a school board member for maybe five years.  And then I switched over and served on

the budget committee for about two, two and a half years, and then I -- I stopped. I didn't run again. I simply had -- I had done like seven and a half, eight years, and I was tired. And my homeschooling, the age of my kids was picking up, there were a lot of demands, and so I just focused on the schooling.

Q.    At some point did you move from Litchfield?

A.    It was in -- well, we -- we rented for a little while in Nashua and then my husband had a company in Worcester and would commute to Worcester from Litchfield. It was a long commute across the bridge. So after we rented, I suggested we move to Nashua to cut his travel time down, try to give him less road miles as he got older.

Q.    What year was that, roughly?

A.    That was when we bought the house in 20 -- actually, oh, we came into Nashua I think around 2012, 2013. We rented maybe a year and a half, I'm guessing.

Q.    And then you bought in Nashua?

A.    Then we bought in Nashua at 41 Berkeley Street.

Q.    And what year was that?

A.    That was 2014.

Q.    Did you become involved with Nashua government at that time?

A.    Not at that time.

Q.    Did you become active in groups that support and advocate open government?

A.    Yes.  So in 2014 I wasn't active, but by 2018, because of our -- a new assessment data that came out and our tax bill, I became active.  I started going to board meetings and by 2019 I got involved with a group called Right to Know New Hampshire that is just a random group of citizens from all around the state that were concerned about -- had encountered difficulties with getting records or issues with their towns or cities and they had this common goal of trying to make access easier.

Q.    And at some point were you publicizing issues with the Nashua assessor's office and what was going on with the assessing?

A.    Well, actually, I wasn't so much publicizing.  At the time in -- at the end of 2018 is when I started going to meetings.  I went to my first Board of Assessors meeting -- I mean Board of Aldermen meeting in September of 2018 and the newspapers were covering the board meetings.  There was a press box in the aldermen room and they would come and cover meeting meetings.  So my concerns about assessing in 2018 and 2019 were picked up by the media because they were there.

2020, when COVID hit, press changed dramatically.  Press boxes closed.  Newspapers really struggled.  There was a lot of financial issues and there was very little covered.  And it was around the beginning of 2020 that I -- I started writing on my blog post called GoodGov that I had started and I started

posing on Facebook.  A lady in the assessing office told me that people were really interested in my work and I should look at responding -- there were lots of comments on Facebook and I should look at responding, so I began doing it.

Q.    At some point did the BTLA order the city -- or open an investigation into the City of Nashua's assessing practices?

A.    Yes, that was --

Q.    When was that?

A.    That happened in June of 2019.  The Board of Tax and Land Appeals, which oversees assessment issues, they were following newspaper articles by the Union Leader and Telegraph, reading them, and they also had addressed a couple's abatement appeal, a couple appealed their assessment and their, essentially, tax bill concern that when they moved into Nashua that their property wasn't treated fairly; they were senior citizens, and that sold homes were being treated differently than unsold homes in Nashua.  And the BTLA recognized that issue.  They didn't win their abatement, but they recognized the problem.  So --

MR. HILLIARD:  Your Honor, I'm sorry.  I'm sorry.

A.    The Board of Tax and Land Appeals, because of those two issues, having seen a problem in the past, plus looking at these newspaper articles, not so much taking them as credible but concerned about the process of fair assessing, they decided to call the city to a hearing.

MR. HILLIARD:  Objection, your Honor.  Almost all of that answer was hearsay.

THE COURT:  Overruled.  Go ahead.

MR. AIVALIKLES:  Yes.

Q.    So the articles that the BTLA was referencing, were those your quotes in the newspaper about what was going on?

A.    Yes.

MR. AIVALIKLES:  Can we bring up Exhibit 20 that's for identification only?

THE PARALEGAL:  Just as an admin note, I don't -- when I put something up, it goes on all the screens.  I was trying to fix that.

THE CLERK:  It's off.

THE PARALEGAL:  Okay.

Q.    Do you have that document in front of you?

A.    It looks like it's trying to get here.

Q.    Okay.

A.    Things are happening.

THE PARALEGAL:  Is that it?

THE WITNESS:  This Exhibit 20, you said, for ID?  Is that correct, Bill --

MR. AIVALIKLES:  I believe that's --

THE WITNESS:  -- Attorney Aivalikles?

MR. AIVALIKLES:  I believe that's it.

THE WITNESS:  Okay.

Q.    Can you identify that document?

A.    Sure.  It's an order from the Board of Tax and Land Appeals to order the City of Nashua to a hearing that was going to take place on August 6th of 2019.

Q.    And is there anything else about that exhibit that indicates the basis of their request?

MR. HILLIARD:  Your Honor, there's a relevancy objection to this exhibit.

THE COURT:  Okay.  Sidebar.

AT SIDEBAR

THE COURT:  Go ahead.

MR. HILLIARD:  Oh, I'm sorry.

Your Honor, Exhibits 20, 21 -- can you hear me all right?

THE COURT:  I can.

MR. HILLIARD:  Okay.  20, 21, and 22, as we outlined in our objection, have to do with actions of the BTLA in 2019. In addition to our own, quote, unquote, report, which is 21, as part of that group of exhibits, there's no suggestion that this activity was anything other than read them on reassessment with the City of Nashua and is not evidence to support any claim of retaliation by the defendants.

THE COURT:  Okay.  Why are you introducing it, what purpose?

MR. AIVALIKLES:  Your Honor, I believe it goes to

her activities in --

THE COURT: Whisper, whisper.

MR. AIVALIKLES: I'm trying.

THE COURT: It's okay.

MR. AIVALIKLES: It goes to her activities in raising issues about the assessing office and how her evidence, what about the involvement of the BTLA, and ultimately the city was ordered to do a total reassessment that was very upsetting to the mayor and to Attorney Bolton.

MR. HILLIARD: I don't --

THE COURT: Okay. All right. This -- you need to establish more of a foundation for this and lay the context and relevance. I'm a little lost myself in exactly what this document is tending to show in relation to the case, but I understand that this is context evidence and background evidence, at least that's what I understood it to be --

MR. AIVALIKLES: Right.

THE COURT: -- at our earlier hearings.

But, again, try to lay a foundation. Renew your objection if it's not clear.

But right now I'm going to -- I'm going to give him some leeway because he can lay a foundation to show that she was engaged in all kinds of protected conduct and activity that caused the City of Nashua and caused the defendants to want to retaliate against her for protected conduct.

So, again, I'm not seeing her specific role in this, so go ahead.

CONCLUSION OF SIDEBAR

Q.    Laurie, were you involved in the hearing up at the BTLA?

A.    Yes, I presented.

Q.    What did you actually present?

A.    A group of us citizens, like six or seven people, got together and I was a principal researcher.  And we wrote a 62-page technical paper looking at the deficiencies in the assessing office as far as data control and the creation of fair assessments.  And so it was a very technical paper that the data was gathered through a lot of right-to-know requests.

Q.    And was Attorney Bolton and Attorney Leonard present representing the city?

A.    Yes.

Q.    And what did the board decide?

A.    They decided in October, I believe, of 2019, that they would order a reassessment, that there had been enough evidence that -- that there were concerns, the concerns were justified, and that they would order the reassessment and they would monitor the city, along with the Department of Revenue Administration, requesting quarterly reports be submitted by the city in the next town -- citywide assessments that would be done, which were to be completed in 2022.

50

Q.    When was the last time there was a citywide assessment?

A.    It had been 30 years almost.

Q.    30?

A.    Right.

Q.    And did Attorney Bolton comment upon the order that was issued by the BTLA?

A.    He did at a board meeting approximately a week later.  Before the -- actually, he commented before the order was issued that he was hoping that they could avoid having the DRA and the BTLA involved because it might make it more costly.  And I don't think he saw it as justified.  That was essentially his comments at that meeting.

Q.    And what was the -- did the mayor comment?

A.    Yes, the mayor was also very concerned, felt that they would make -- the state would make things --

MR. CULLEN:  Objection.

THE COURT:  Overruled.  Oh, sidebar.  All right. Brief sidebar.

                         AT SIDEBAR

MR. CULLEN:  She's specifically testifying to what the mayor said.  The mayor's not here.  He's not a defendant. This is clear hearsay.

THE COURT:  I think it goes to her state of mind and it goes to the defendants' state of mind.  Let's get through

51

this, this is one episode.  I know there are several.

So overruled.

MR. HILLIARD:  May I just add something, your Honor?  Sorry.  May I just add something?

THE COURT:  Yes.

MR. HILLIARD:  She's talking about this document.  This document would reflect that the city agreed to do the reassessment and I think she's trying to leave the impression that the city was fighting this.  I heard, by her description --

THE COURT:  She's saying the city didn't like it.  It's something that she did that would fall into a bucket of protected activity.  She is testifying the city didn't like it.  This is one of many things that she's going to be describing.

I had asked Attorney Aivalikles to move through these with some amount of speed and not spend an inordinate amount of time on each one, but they are relevant, they provide context, they go to state of mind of Ms. Ortolano, and this -- both of the defendants in this case.

So overruled.  Go ahead.

                    CONCLUSION OF SIDEBAR

MR. AIVALIKLES:  Your Honor, I would move to admit Exhibit 20.

THE COURT:  I'm sorry?

MR. AIVALIKLES:  I would move to admit Exhibit 20.

THE COURT:  Full exhibit.

MR. AIVALIKLES:  Thank you, your Honor.

(Plaintiff's Exhibit 20 admitted.)

Q.    Were you also involved in contacting the state about individual assessors in the assessing office?

A.    Yes, in the winter of 2019.

Q.    And what did you do with respect to that issue?

A.    The Department of Revenue Administration, the DRA, was responsible for the oversight of assessors and their certifications and their training.  And they had a form you could file called the PA-71 that you could file a formal complaint against an assessor that you didn't think was handling the city's -- the records -- doing their job properly.

They had very specific job codes laid out by a group called the Assessing Standards Board that worked under the Department of Revenue Administration.  So looking at those job descriptions and what was happening in Nashua, I filed complaints.

Q.    And what happened?

MR. HILLIARD:  Objection, your Honor.  Relevance.

THE COURT:  Overruled.  Go ahead.

A.    What happened.  The Department of Revenue, it took almost a year and a half, and even a little longer, in June of 2020 and in the fall of 2020, they issued sanctions against three assessors, the -- the chief, John Duhamel, was sanctioned

for not conducting the 2018 assessment -- reassessment of all properties properly and the other supervisory assessor, Greg Turgiss, was sanctioned for violating his ethical codes in coming to our house and evaluating the work done by his brother who had assessed it.  So it was a brother assessing -- reviewing a brother's assessment.  So he got caught on an ethical violation with that and also he was found to have been sleeping on the job.  When he was signing out that he was going to do work on properties and driving to people's homes to assess them, he wasn't doing that.  He was sleeping on the job.  And they found him in violation for that and decertified him as a supervisor.

And then the assessor involved in Nashua who didn't work with Nashua, Rob Tozier, who was the vice-president of KRT Appraisal who conducted the assessments for our city in 2018, was found not to have complied with the contract to review all the sales data that built the model to determine the new values.  The sales data had not been properly verified and it had not been reported properly to the state.  He was decertified and not permitted to serve as an oversight assessor in any New Hampshire assessments for a year.

Q.   And what was --

MR. HILLIARD:  Objection.

THE COURT:  Brief sidebar.

AT SIDEBAR

54

THE COURT:  Let me just say something and then I'll hear your objection.

She is engaging in a lengthy narrative.  It is very detailed.  They do not need to hear every sanction and every person.  This is -- this is not skating above the surface.  This is going into great detail, granular detail, and that is not -- that is not relevant.

Go ahead, Attorney Hilliard.

MR. HILLIARD:  I was going to say that.

And in addition, your Honor, it didn't -- it just keeps going on without any foundation that connects it to the defendants, but gives the jury the impression that somehow they caused or contributed to cause the circumstances.

THE COURT:  You're going to be able to both get up and cross-examine her.  But this is different than the BLT -- BTLA order.  You moved to a totally different topic.  This is assessors.

Again, there needs to be some basic foundation.  I know she played some sort of role, but the jury does not know that.  And so, again, he is correct.  You need to tie the evidence to your client and then you need to rein the narrative in.

MR. AIVALIKLES:  Okay.

THE COURT:  All right?

MR. AIVALIKLES:  Sure.

THE COURT:  So to that extent, the objection's sustained.

                    CONCLUSION OF SIDEBAR

Q.   Laurie, the sanctions that were issued, was that -- were those related to complaints that you filed with the DRA?

A.   Yes.

Q.   Now, as part of your involvement with city government, have you been recognized for your right-to-know work?

A.   Yes.

MR. HILLIARD:  Objection.

THE COURT:  Overruled.

Go ahead.

Q.   And in what way?

A.   In 2022, I received the Nackey Loeb award from the Union Leader for my First Amendment and right-to-know work regarding these assessing emails and records that I had worked on.  Specifically they recognized that I had represented myself up at the Supreme Court and was able to get favorable rulings to get access to those records.  So -- and all of that recognition all stemmed from these assessing records.

Q.   Okay.  And --

MR. HILLIARD:  Your Honor, we raise a relevancy objection.

THE COURT:  All right.  Objection, sidebar.  All

56

right.

                              AT SIDEBAR

THE COURT:  I can't tell if you want to speak to me on the sidebar or not unless you tell me.

MR. HILLIARD:  Oh, okay.

THE COURT:  So I'm thinking that you're just preserving some objection that you've made already.

So just let me know that you want to further --

MR. HILLIARD:  I --

THE COURT:  -- speak about it.

Can I just make clear that -- let's -- let's have your client answer the direct, specific question.

MR. CULLEN:  Your Honor -- sorry, I'm not sure --

THE COURT:  And she was just testifying about an award and she was giving all of these reasons why.  I think an award that she received by the Union Leader for First Amendment is plenty and they don't need to hear every detail and every reason behind the award.  And I'm stopping you because this could go on forever.

So just try to lead her even, if that would help to lead her --

MR. AIVALIKLES:  Okay.

THE COURT:  -- to limit the testimony.

One of her claims is that she was -- her reputation was harmed.  She's testifying about an award and an honor and

are -- you were saying there's some relevance objection to this?

MR. HILLIARD: Well, in that sense, it's favorable to the defendants, but our concern and our objection, your Honor, was this is something that happened more than two years after the event in question and how it could show retaliation on the part of the defendants two years later.

THE COURT: It seems to me it's very favorable to the defense, but he's right. It is well after the incident and so I'm going to sustain the objection to the extent no more questions about this award.

MR. AIVALIKLES: Okay.

THE COURT: Okay? Move long.

MR. AIVALIKLES: Thank you.

CONCLUSION OF SIDEBAR

Q. Laurie, can you try to focus on my questions and answer the question specifically so that --

A. Sure.

Q. -- there's more direct answers to the questions.

A. Okay.

Q. Now, calling your attention to Exhibit 1, could you bring that up, please.

Can you identify that document?

A. It's an email I sent on January 22nd, 2021, at 3:57 to the Board of Aldermen and copied the Board of Assessors, the

mayor's office, the legal department, Donna Graham, who was a legislative assistant, and Rick Vincent, who was the chief of assessing.

Q. And that was sent from the day you went to city hall on January 22nd?

A. Yes.

Q. Why did you send that?

A. I was frustrated. I -- I left city hall without getting those applications stamped. I felt that my process was -- you know, to go there was reasonable. The legal office had always been open to me. I had been in the legal office probably ten times before this. I was unaware that they had changed to an appointment-only office.

I didn't plan to go to the legal office when I went there, and I wrote that in my letter. I came into city hall just to get those abatement applications stamped and thought I could go to the assessing -- the administrative services department.

Q. And did the city take any action with regard to your email?

A. Nobody responded to it.

Q. When you were at the legal office, did you make any threats of any kind?

A. No.

Q. And do you regret sending that email to the mayor,

59

to the legal department, to the Board of Aldermen, to the assessors?

A.   No, I don't regret it.

Q.   What -- why -- what is the basis for your claim that both Attorney Bolton and Attorney Leonard pushed for your arrest?

A.   Well, once we did the deposition of -- I was present for the deposition of Chief Carignan.

MR. HILLIARD:  Objection, your Honor.  The question calls for hearsay.

THE COURT:  Sidebar.

AT SIDEBAR

THE COURT:  Go ahead.

MR. HILLIARD:  She's -- at least it seems to me she's just leading into repeating what she says former Chief Carignan said at his deposition.

THE COURT:  All right.

MR. HILLIARD:  She can't do that.

THE COURT:  She said that -- what's the purpose of the question?  Why would you be asking her to tell you about Chief Carignan's deposition testimony?

MR. AIVALIKLES:  Well, I asked -- I asked her, your Honor --

THE COURT:  Keep your voice whispered.

MR. AIVALIKLES:  I asked her, your Honor, what the

basis was of her claim that Attorney Bolton and Attorney --

THE COURT:  I heard that question.

MR. AIVALIKLES:  Okay.

THE COURT:  Did you -- she's about to introduce statements of another party who's not here, not a party opponent.  What's the nonhearsay purpose?  Or maybe ask her something else.  Come at it a different way.

MR. AIVALIKLES:  Okay.

MR. HILLIARD:  Two things, your Honor.  Number one, this deposition was two years after the lawsuit was filed; and, number two, no, she's heading towards statements in his deposition that included hearsay themselves --

THE COURT:  All right.  She --

MR. HILLIARD:  -- of totem pole nature.

THE COURT:  I -- I'm going to sustain the objection just based on the deposition taking place two years after she filed the lawsuit --

MR. AIVALIKLES:  Okay.

THE COURT:  -- of how that could form the basis for her claim.

So that's -- that objection's sustained.

Go ahead.

MR. HILLIARD:  Thank you.

CONCLUSION OF SIDEBAR

Q.   Was the -- was the article that you sent, was that

addressed in the Union Leader article that's Exhibit 51?

A.    The email that I sent?

Q.    Yes.

A.    Not to my knowledge.

Q.    Okay.  Did you read Attorney Leonard's statement in Exhibit 51?

A.    Yes.

Q.    When did you read it?

A.    When the -- when it published that Saturday night. It came out it was a Saturday night exhibit (sic) and then Sunday, I believe.

Q.    And when you read that newspaper article, what did you think?

A.    Well, the police officer said there was no investigation.  There really wasn't even a trespass order.  I just needed to make an appointment.  And there were a couple things that I thought.  One, she was not happy with that and was going to be talking to the police; and, two, she equated my actions to being similar to the J-6 people in Washington, which was extremely upsetting to me, and described my behavior as erratic, I believe, and unstable, and I was just very, very upset about that.

Q.    Was your behavior erratic or unstable?

A.    No.

Q.    And when she indicated in the article that she found

it troublesome that the police were not going to investigate and they were going to be hearing from her office, what did you think?

A.   Well, I wondered if they would, but I -- I didn't know what was going to happen.  I hoped it was over.  Wasn't certain whether that was good or bad, but I sort of took the officer's words for face value and thought it was over.

Q.   What did the police say to you when you left city hall that day?

A.   They just --

MR. HILLIARD:  I'm sorry.  I -- excuse me.  I'm -- I just didn't hear the question.  I'm sorry.

THE COURT:  Go ahead.

Q.   What did the police say when you left city hall that day?

A.   It was when I was getting in my car, I was pulled over.  I talked to Officer Roach and he said, you know, you're being trespassed, you need to make an appointment to come to city hall or you might be arrested.  He didn't say directly.  But also said, please just make an appointment.  You know, he didn't want to arrest me.

Q.   And prior to January 22nd, 2021, do you have an opinion whether Attorney Leonard had harbored any ill will toward you?

A.   I do, and I do believe she did.

Q. And what was the basis of that?

A. My -- my assessing work. After we had our BTLA hearing on August 6th, the very next day I went up to legal to get a record and when I walked into the office, I went to Mindy Lloyd's desk. And when I passed by the conference room, she was in there, meeting with Greg Turgiss and Doug Dame, going over information from that hearing the day before. And I heard Assessor Dame say, bring up Laurie said this in the hearing. And Attorney Leonard said, don't speak that woman's name. And when she said it, it was not friendly. It was angry. It was audible to me standing in the entry area, the clerk's area, and it seemed very personal.

Q. Is there anything else?

A. I know there are. My -- my right-to-know requests that were put in were -- you know, I thought she found those irritating. She dodged them. She wasn't responsive. It was causing me to go back and file more and clarify and I don't think she thought well of me for that. You know, I was challenging my property assessment and she was the lawyer attending the Board of Assessors' meetings while those challenges were going on.

So those are things that come to my head right now.

Q. Do you have an opinion why you were arrested for criminal trespass?

A. I think my email when I put out my opinion, that was

64

so critical of her, they jumped -- they didn't like my writing.

Q.    Do you have an opinion why Attorney Bolton may have been pushing for your arrest?

A.    I didn't have a good relationship with him either. And, you know, all my work in the assessing office and seeing employees sanctioned and the chief fired and all the things that went on, the state intervening, he was often offended by me.  He made comments about that.  And, you know, the newspaper article that ran four or five days later with his quotes just showed me even though he wasn't present when I went in the legal office, his description was very much like Celia Leonard, that I was a -- acting like a J-6er and invading the office. And it was just so harsh.

Q.    Why did you go to the legal office that day?

A.    I didn't intend to.  I came in to city hall, I met the door greeter.  I was carrying my abatement applications in my hand and I told her I wanted to get them stamped, go to administrative services, and she flagged me in.  And the only reason, the assessing office had literally been demolished and was under construction.  And it went under construction on September -- early September, the first week of September.  The plan was it would be finished in a matter of weeks, five or six weeks.  It ended up taking five months.  So when abatements could be filed, there was no office.  There was no place to get it stamped.

65

So I went to the administrative services office because I heard somebody, and I don't remember who, say that assessors were rotating out of that office working there; one would go in and work in the office and they'd cover shifts. So I asked to go there because I thought I could get the stamp put on the application. And when it was not there, I proceeded on.

Q. Did you ultimately go to the mayor's office?

A. I did. And when I got up to that hallway, it was pitch dark and the mayor's office, as I recall, actually had like barricades up, tables and things that blocked it. And it was pitch dark. So there -- clearly nobody was in there. It had a big glass door. And that -- I thought they would have a date -- I was trying to think of what office would have a date-time stamp that could just stamp them.

Q. And you ultimately went to the legal department?

A. Because I knew they'd have a stamp. If they didn't have the assessing stamp -- they could have even had the assessing stamp up there -- they had a stamp.

Q. Were you ever told that the legal department doesn't date-stamp documents for the assessing department?

A. No. I mean, I was not directly told that at all. And at the time of COVID with the office being closed, I was not told that.

Q. When you were at the office, did Mindy Lloyd -- strike that.

Did you tell Mindy Lloyd why you were there?

A.    I told Jesse Neumann and Mindy Lloyd together when he stepped out of the office that I just wanted some help in getting these applications stamped, that I had tried downstairs and I couldn't find anyone to help me, and that I had been waiting five days.  I put them in on Sunday night and I still didn't have the receipt for these people I was representing.

Q.    Did either Mindy Lloyd or Attorney Neumann tell you that the legal department doesn't date-stamp?

A.    No.

Q.    Did they offer to help you in some way by calling someone in city hall that may have the answers for you?

A.    No.

Q.    What did they tell you?

A.    Immediately it was Attorney Neumann, you're trespassing, you have to leave.  It was very simple.

Q.    And what did you say?

A.    I said, I can't -- I don't think I'm trespassing; I just want a date stamp.  I just want a date stamp.  I -- I think I have a right to be here to try and get it.  I'm just looking for help.  I just want somebody to assist me.

So at that point, I said, I'm going to go sit in the lobby area, the entry area, of the legal office.  There was an entry hall -- entry area.  And I went over there and I sat on the floor and I said, I'm just going to wait for somebody to

help me.

Q.    What happened after that, after you sat down?

A.    I heard Mindy Lloyd call, and she called risk management.  And then I heard her say to Jesse Neumann, who was in this conference room, she told me to call the police.

So she called the police.  And, of course, I could only hear, like, her giving a little bit of information.  And when she was talking to the police, within a couple of minutes Attorney Leonard came in.

Q.    And what happened when Attorney Leonard came in?

A.    I felt the situation escalated immediately.

Q.    In what way?

A.    She walked right up to me.  She had these big black boots on and she practically put them against my thigh and she looked down at me and she said, you're hostile, I find you threatening, you need to leave, you're trespassing.  It was just an instant -- you know, she never offered to help at all.

And she then proceeded to walk around the office space that I couldn't see where the -- the office, the paraprofessionals -- I don't think they're paralegals, the legal assistants, work.  And they kept saying, you know, I find her very threatening, this is very threatening, she's very hostile, this is, you know, bad, and we don't know her COVID status, she might have COVID, I was -- it was -- open a window, we've got to open the windows.  It was just an escalation.

Q.    Did you know you were sitting in her -- in front of her office?

A.    No.  I had been up in legal eight or ten times prior to that.  I had actually been invited into Attorney Bolton's office.  I had been in his office, which is -- was at the end of the hallway.  So I had gone into that office.  And when you go down the hallway, there's other doors and I -- I just assumed all the legal offices were down there.  I had been in the conference room and so I was familiar with the conference room, but I did not know Celia Leonard's office was located in that entry hallway.  I had no idea.

Q.    And after she told you that you were sitting in front of her office, what did you do?

A.    She was angry.  She was like, you're blocking my office, don't look in my office.  The door was open.  And I said, I'm sorry, I don't want to block your office; I had no idea it was your office.  And I got up and I moved to the front door of that entryway so I could not be near her office.  I didn't want to interrupt her work.  At that point I was just waiting for the police to come.

Q.    Why didn't you leave when they told you to leave?

A.    Because once the police were called and Attorney Leonard came in and said I was hostile and threatening, I wasn't certain what they were going to tell the police if I wasn't there.  I was afraid that they would say I broke

something, I did something terrible, I was yelling at them. I felt like I needed to stay there to give my story, to give my side.

I thought of leaving a couple of times, but she kept repeating how hostile and threatening I was and I was afraid if I left, I would -- if I left, they'd all -- the police would come to my house immediately. So I just stayed and waited for them.

Q. You heard Attorney Cullen say that you never told anyone in the office that you were there to have your abatements date-stamped. Do you recall him making that statement in opening?

A. Yes.

Q. Is that accurate?

A. No.

MR. AIVALIKLES: Let me ask you to bring up Exhibit 47 and page 10, which is the statement that Jesse Neumann gave to the police.

THE PARALEGAL: 47.

MR. AIVALIKLES: 47, page 10. Correct. If you could find page 10. It's --

THE COURT: Is this a full exhibit?

MR. AIVALIKLES: It is, your Honor. It is a full exhibit.

THE COURT: Okay.

70

Q.    And that's the statement.  Do you see that up there?

A.    Yes.

Q.    Does Jesse Neumann in his statement to the police address the issue of the -- your presence there for a date stamp?

A.    Let me see.

Q.    It's sort of in the first paragraph.

A.    He said that Ortolano refused to leave, continued to talk about abatement date stamps while also berating both he and Ms. Lloyd.

Q.    Did he tell you that they don't do date stamps?

A.    No.

Q.    Did you tell Attorney Leonard why you were there?

A.    I don't recall.

Q.    Did you force your way into the office?

A.    No.

Q.    How did you get in?

A.    Mindy Lloyd came to the door when I knocked.  And there was no doorbell.  It was just -- the doorbell wasn't up then.  I just knocked.  And the door opens out and she opened the door enough that I could see all of her and she can see me and when I asked her if Jesse Neumann was in, she wouldn't answer me.  So I just opened the door all the way.  I pulled it the rest of the way out and I walked in.

Q.    And how long were you there for total?

71

A.    I'm going to guess -- by the time the police came, I'm going to guess it took the police a little time to come, 15, 20 minutes.

Q.    Did you make any threatening statements while you were there?

A.    No.

Q.    Were you wearing a mask?

A.    Yes.

Q.    Did Attorney Leonard comment upon your being close to her office?

A.    Yes.  She -- she was angry.  And I apologized.  I didn't know it was her office.  So I got up and moved to the front -- front, right where the front door was on the sidewall, so I could be away from her.

Q.    Do you know if Attorney Leonard or Attorney Bolton became aware of that email that you sent, Attorney Leonard should be fired?

A.    I sent it to legal, so when it goes to legal, it goes to all of them.

Q.    And do you know if the mayor became aware of that email?

A.    I believe I sent it to him as well.

Q.    Did you send the email to the police department?

A.    No.

Q.    Do you know how it ended up in the police report?

72

A.    I think Attorney Neumann gave them a copy in maybe that exhibit you have up.

Q.    Can you find --

A.    Yes, it's in there.  It was in that exhibit.

Q.    It's on page 23?

A.    Oh, it's also on page -- the page 10.  I just saw it.

THE PARALEGAL:  Exhibit 23.

THE WITNESS:  Oh, it's in the report on page 23.

Q.    Correct.

A.    But it's in Attorney Neumann's --

Q.    Excuse me.

A.    Right on page 10.

MR. AIVALIKLES:  Excuse me.  That's Exhibit 47 and it's page 10.  And that's -- that's the bottom part of it.

Q.    Is that the email that you sent on January 22nd?

A.    Yes, that's a page of it.

Q.    At -- I'm sorry.  I didn't quite understand your answer.

Do you know how it got into the police report?

A.    Attorney Neumann gave them a copy.

Q.    Do you know when he gave them a copy?

A.    I think when they -- the police officer went to conduct the investigation around February 3rd.

Q.    And do you know if you posted that on any of your

social media?

A.    It did.  It went up on the Nashua Scoop.

Q.    When was that?

A.    The day I wrote it.  I don't know the exact time because it doesn't record the time on the posting.  But that day, after I wrote it.

Q.    Can you look at Attorney Leonard's statement to the police.

Can you bring that up?

Does she make a comment about your postings about your criticism of the city employees?

A.    Yes, at the bottom of the page.

Q.    What does she -- what does she say in her statement to the police?

A.    In her -- this -- just to be clear, am I looking at the typed-up one from the police department --

Q.    Yes.

A.    -- the typed statement?

Okay.  So this is -- on the bottom, it says: Attorney Leonard also advised -- oh.

This is -- oh, wait a minute.  I think, you know, this is the page.  Hang on.  I just don't see it in here.

Q.    Maybe you're looking at the wrong report.  There's two reports by Leonard.  So if you can go to 14, page 14.

THE COURT:  She's looking at something that's being

shown to her?

MR. AIVALIKLES:  It's a full exhibit, your Honor.

THE COURT:  It's a full exhibit, but I just want the record to reflect whatever it is is being shown to her.

MR. AIVALIKLES:  Yes.

THE COURT:  Is the jury also seeing what's being shown to her?

MR. AIVALIKLES:  Yes.

THE COURT:  Okay.  So the jury is seeing the scrolling.

All right.  I would ask you to essentially help the jury understand --

MR. AIVALIKLES:  Sure.

THE COURT:  -- where we are with the exhibits and then ask a specific question --

MR. AIVALIKLES:  Sure.

THE COURT:  -- about it just so they know what it is they're looking at.  Even though it's a full exhibit, I think it would help them to understand it.

MR. AIVALIKLES:  Yeah.

THE COURT:  It certainly would help me.

Q.    So in Exhibit 47, which is the police report, there are two statements by Attorney Leonard.  The statement I want to direct your attention to is the one that's dated January 22nd, 2021, that is signed by Attorney Leonard.  Do you see

that?

A.    I do.  It says at approximately 9:20 a.m.

Is that the one that it starts with?

Q.    Yes.  And --

A.    I do see that.

Q.    And does Attorney Leonard indicate anything in that statement about criticisms that you've made to Nashua --

A.    Yes.

Q.    -- employees?  What does she say?

A.    At the very bottom three lines:  Especially given recent violent actions against government employees and Mrs. Ortolano's vocal criticism of city staff, including me, at public meetings and in emails to various board and government officials.

Q.    And what she said is true in terms of you have been critical of her and government officials at public meetings, in emails, and at board meetings; is that correct?

A.    Yes.

Q.    Now, when was the first time you attended a Board of Aldermen's meeting at city hall?

A.    In September of 2018.

Q.    And let me direct your attention to full Exhibit Number 5, which is the minutes of the September 12, 2018, Board of Aldermen meeting.

Can you bring that up, please.  That's Exhibit 5?

Now, in Exhibit 5, do the minutes reflect that you commented upon Attorney Bolton's performance as the city attorney?

A.    They do, on page 13 at the very bottom.

MR. AIVALIKLES:  Can you find that, page 13.

Q.    And what did you indicate about Attorney Bolton?

A.    That he had been willing to speak to me, that I had spoken to him and he was being wonderfully receptive and I very much appreciated it and you should be thankful that you have strong legal counsel and I -- I am, too, that helps me with the management of our city.

Q.    And did your relationship with Attorney Bolton remain cordial?

A.    No.

Q.    When did it change and what happened?

A.    It -- it changed by the end of that year and into early 2019, you know, one of the very last meetings I had where I went up to the office in legal to talk to him specifically at his office was -- which was the end of February of 2019.  When I left, he said to me, you offended the mayor, you offended me, and you offended Lori Wilshire.

And I was -- he walked me to the door of the legal office and he -- I went to go out and he made that statement and I was very surprised.  I felt like I should be offended -- we had all these problems with our assessment and we couldn't

get it fixed -- but he was offended.

Q. Okay.

A. And, yes, so I knew the relationship had shifted. I had gone to a Board of Assessors' meeting right after that. He was angry with me for questioning him and it resulted in an altercation at the end of the meeting where he stated, I don't like people questioning me in a meeting, don't question me. He was definitely being very pointed, hostile, I felt. I was shocked at the way he talked to me after the board meeting.

Q. Again, what was the date of that board meeting?

A. It was in March of 2019.

Q. Prior to the 2020 encounter with Attorney Bolton or 2019, did you attend a meeting at the Board of Aldermen that -- in which you addressed the mayor's property taxes?

A. I did.

Q. When was that?

A. It was the end of November of 2018, after I had done research in the office.

Q. And was the mayor present?

A. Yes.

Q. Was Attorney Bolton present?

A. Yes.

Q. And what did you indicate about the mayor's property taxes?

A. I -- I had sent emails about it, so my comments were

brief.  But I just made mention that the mayor should understand based on his property how these permit issues weren't being handled correctly because his property got overlooked and our property got hit hard.

Q.    What was the issue with his building permit?

A.    That he had done a major renovation on his home, stripped it down to the studs in 2012, and the process for a permit is assessors are supposed to go out every year, April 1st, do an evaluation on what that permit work was worth, and there was nobody going out to really look at that permit.  It took five years to close it and it was never fully closed. They were supposed to go back in, I think, 2013 and they -- '12 or '13 -- and they never went back for the final review.

Q.    So what was the net effect of that building permit staying open?

MR. HILLIARD:  Your Honor, sidebar, please.

THE COURT:  Yes.

AT SIDEBAR

MR. HILLIARD:  Your Honor, we're headed down a road that implicates Exhibits 8 through 15 that you have previously ruled upon, that is, involving the mayor's tax assessment.

MR. AIVALIKLES:  Your Honor --

THE COURT:  I think you can move along.

MR. AIVALIKLES:  If you're --

THE COURT:  At this point I don't want to hear

anything more about the mayor's tax assessment.  You've established that she made statements.  She's admitted the end of November 2018, they were directed right at the mayor involving his tax assessment.  Attorney Bolton obviously works in -- for the mayor and she is talking about how this is one of another of her activities that frustrated city -- the City. And I think we've heard enough about it.  I don't know why we need one more detail.

MR. AIVALIKLES:  Well, your Honor, I do have one more question on that, but just to --

THE COURT:  Tell me why we -- make an offer of proof.

MR. AIVALIKLES:  Well, first of all, Exhibit N, which is a full exhibit in this case, talks about the mayor's property.  That's in the case.  So I have --

THE COURT:  Well, the issue is -- is the -- the jury understands that -- the jury gets the fact that she has been bringing these issues up.  They don't need to hear any details about his property assessment and how that worked, just that she was pointing out problems.  I think it's sufficient.

Okay.

MR. AIVALIKLES:  Yes.

THE COURT:  All right.  Sustained then to that.

CONCLUSION OF SIDEBAR

Q.   Laurie, he made a comment at that meeting?

A.    Yes.

Q.    What did he say?

A.    He said my -- he commented right away after I finished my comment and he said my -- like I can't quote it exactly, but it bordered or they -- my complaints were slanderous.

Q.    Okay.  Did you attend the mayor's coffees that he hosted?

A.    Yes, I attended two.  I learned about them and I went to them in the fall of 2018.

Q.    And who -- when you went to that coffee, did the mayor comment upon your activities in city hall?

A.    Yes, because I asked a question about our assessment and how it was handled.  It was an open Q-and-A for the public to come out and ask questions, so at the end I asked a question.

Q.    And what was his comment?

A.    He did not think I was being truthful.  He said what I explained would have never happened.  I had a letter to prove it.  He said I wasting -- I was wasting a lot of city officials' times, including Attorney Bolton's, and that I had wasted a lot of his time.

Q.    Why were you reviewing the assessing records in the assessor's office back in 2018, 2019?

A.    Because they had just finished a full citywide

update of all the numbers and when we moved into our property in 2014, our taxes jumped 50 percent. Our assessment changed by over 250,000. And it didn't make sense back then. I tried to address it. I didn't push it. I didn't get a good answer. By 2017, our tax bill had crossed 18,000 and I thought it was totally out of control.

So 2019, new numbers come out, we get a real heavy data dump from the city, from the analytical company they hired. They produced a spreadsheet of 33,000 numbers. And being an engineer, I -- what my husband and I do, we took that data, we analyzed it, and we felt we had been treated very unfairly.

Q. And you filed for an abatement?

A. I did.

Q. Okay. And who was the assessing chief at that time in 2018?

A. His name was John Duhamel.

Q. And what was your relationship with him?

A. Poor. Very poor. It -- he did not like me in the office. The only way you could do the research was in the assessing office because home computers, you couldn't access any of the data. They had these three old terminals in a public service area and you had to go in there and stand and do the work. There wasn't even a chair. You just had to stand there and work.

82

And he did not appreciate my time in there.  He thought I was wasting time, wasting staff time, and he wouldn't respond to my requests for records.

MR. HILLIARD:  Your Honor, objection, relevance.

THE COURT:  Move along.

MR. AIVALIKLES:  Yes, your Honor.  Thank you.  I will.

Q.    Did you publish on social media an article called There was a Crooked Mayor --

A.    Yes.

Q.    -- on April 28th, 2021 --

A.    After --

Q.    -- which was --

A.    -- after my arrest.

Q.    That's Exhibit --

A.    Yes.

Q.    -- full N.

A.    I published that story on my GoodGov site.

Q.    And what were you claiming in that article?

A.    That the mayor knew that he had gotten a very great -- good deal on not having his permit assessed.  And that was the -- the issue with older homes that weren't sold being treated differently than sold homes; that we had moved in and we bought a home that had been sold, we were being treated differently from this home.

And it laid out the details of the assessor who went to the home, the extent of the permit, that the house was stripped down to the studs, that a new bathroom was added, that it was very extensive.

Q.   Okay.  And was this in the newspapers in the Nashua area about the mayor's property?

A.   They -- after it got raised in that board meeting in November, they did run an article in the newspaper about it.

Q.   I don't know if we fully addressed your change in relationship with Attorney Bolton other than the comment that he made.  Were there any other instances that involved Attorney Bolton that affected your relationship with him?

A.   Yes.  I mean, yeah, there were instances.

THE COURT:  Can you give a time limit?

MR. AIVALIKLES:  Yes.

Q.   Directing your attention to March of 2019, do you recall any statements that you made about Attorney Bolton?

A.   Well, that would have been, I think, in the Board of Assessors meeting where I raised issues.  The board allowed me to talk.  There was public comment.  I gave comment.  Attorney Bolton interjected and started asking me questions.  When he asked me questions, I decided to ask him questions.  And when it ended, he ended up very angry with me and came up to me at the end of the meeting and said, don't -- he came so close to my face I could feel his breath on my cheek.  He said, don't

question me.

Q.   Did you say anything derogatory about Attorney Bolton?

A.   No.   No, I was just talking about data and the Board of Assessors, the three members, did not, you know, tell me to stop or make any comment that I was inappropriate.   I was just talking about the data and he didn't like it.

Q.   Directing your attention to Exhibit -- full Exhibit 16, which is the assessor's manual and the section that deals with public relations, do you have that in front of you?

A.   Yes.

Q.   The first -- second paragraph, what does it say?

A.   It says:   It is important that the assessor demonstrate the fairness and equity of the assessment process. A good public relations program reduces taxpayers' anxiety, anger, and confusion and develops a spirit of cooperation and understanding.

Q.   And then the fourth paragraph.

A.   The Golden Rule.   It talks about the Golden Rule: Treat the public as you would like to be treated.

Q.   And were you treated according to the Golden Rule when you were dealing with assessors?

A.   No.

Q.   Do you recall -- let me direct your attention to Exhibit 19, which is a full exhibit.

Do you see that?

A.    I do.

Q.    Okay.  Did you send an email or a request to Kim Kleiner to talk to an assessor?

A.    Yes.  That was August 22nd of 2019, so that was after that BTLA hearing.  And I actually -- there were notes, notes written down by Mike Mandile, not by email, and I had gone to assessing.  I ran into that assessor, Mike Mandile, caught him coming out to the copy machine, asked him about some sales data, whether letters had been sent to buyers and sellers for properties, and he said no.  And I asked him did the other assessors send letters and could he check for me.  That's what I asked.  And that was the end of it.

So she wrote this email --

Q.    Who is she?

A.    Attorney -- Director Kleiner, who had taken over assessing when John Duhamel was removed from the department, the assessing chief.  She took over.  And she said, Mrs. Ortolano is coming to the assessing department, wanted to be able to ask questions to each assessor on whether they had sent sales letters during the KRT evaluation.

Q.    And who did she send that email to?

A.    She sent it to Attorney Leonard.

Q.    Okay.  And did Attorney Leonard respond?

A.    She did.

Q.    When did she respond?

A.    She responded a day later, roughly.  Well, you know, the next morning.

Q.    And did you get a copy of the -- her email response?

A.    No.

Q.    How did you get this?

A.    Through a right-to-know.

Q.    Okay.  And what did Attorney Leonard say?

A.    She said:  The law does not require that we speak with her.  I'm not sure what is to be gained by doing so at this point.  My advice is to decline such personal interviews with her and have the staff continue their important other work.

Q.    Were you requesting a meeting with the assessors?

A.    No.  Actually, I had asked Mike Mandile just to check with them himself, go back and ask them and let me know, send me an email, whatever.

Q.    And what did you think when you read her email?

A.    I -- I thought it was terrible.  It didn't live up to the public relations portion of the assessing manual that you talk to them, you -- you treat each individual's questions with respect, you tailor your communication based on their knowledge.

I was being shut out and this gain thing really bothered me because what I gained by being able to communicate

87

with assessors is trust that the process works.  I -- that was my way of trusting them.  She set the bar very low and said, we're not even going to allow that.

Q.    Did the manual talk about accessibility or availability of the assessors?

A.    Yes.

Q.    What does it say?

A.    It says, you know, nothing's more frustrating than not being able to get an assessor to respond to your questions or get back to you, which is true.

Q.    And did it talk about how the assessors should conduct themselves?

A.    You know, as professionals, tailoring their communications based on your education level or your questions; you know, responding, yeah, it was -- it was all -- I call it common sense.

Q.    Does it address the importance of meeting and communicating with the taxpayer?

A.    Very much so.

Q.    What does it say?

A.    I don't have it up, so --

Q.    Oh, okay.

A.    It says:  Nothing is more frustrating to the taxpayer with a good -- a question than to be unable to reach the assessor.  Good intentions, assessment knowledge, and

public relation techniques will be of little use if the public cannot reach the assessor.

Q.    Did your request for right-to-knows in your other activities, were those forwarded to the legal department at some point?

A.    By June of 2019, they were really all being channeled up to the legal department and Attorney Leonard was responding to them.

Q.    Okay.  What was the practice before then with regard to your right-to-know requests?

A.    Initially I was focused on the assessing office, so they would go in to Chief Duhamel.  I sent some requests in, he had ignored them.  He didn't answer them.  So I didn't get information from him.

Then when Kim Kleiner took over, she was responding. So she came in in April or March.  So I would say April to the beginning of June she responded and then Attorney Leonard took over.

THE COURT:  This is a good time to break --

MR. AIVALIKLES:  Yes.

THE COURT:  -- break for the day.  That's actually a little fast in terms of time.

And so what we're going to do is we're going to send you home now at 4:00, as promised, and ask you to come back tomorrow morning at 9:00 a.m.  Ms. Ortolano will continue

testimony and you'll hear from other witnesses as well tomorrow.

You've heard me say at least twice today to not talk to anyone and even not talk among yourselves and not look at news and -- so do your duty and obligation to follow my orders. They're very important that you follow them.  Again, feel free to blame it on the judge, but you can't talk about the case, any witnesses, any evidence.  Everything that you hear, you're going to hear in this courtroom.  Everything you hear that you can hear is going to be heard here.

So I'll check with you in the morning when you come in about whether you've been able to abide by that instruction. It's very important.

So drive home carefully and we will see you at 9:00 a.m. tomorrow.  Thank you very much.

THE CLERK:  All rise.

(Jury excused.)

THE COURT:  You can step down --

THE WITNESS:  Okay.

THE COURT:  -- for the day.

(Witness excused.)

THE COURT:  All right.  Let's touch base, if we could.

Do you need a break?

MR. HILLIARD:  No.

THE COURT:  Okay.

MR. HILLIARD:  I had two things, your Honor.

THE COURT:  Go ahead.

MR. HILLIARD:  Number one, are we able to leave some of our materials in that anteroom overnight?

THE COURT:  I hope so.  Let's find out.  Vinny is going to have to answer that for me.

MR. HILLIARD:  Okay.

THE COURT:  I would say yes, but then they'll tell me later I'm violating some protocol, so I want to wait and hear.

MR. HILLIARD:  Well, I was saying that as opposed to leaving them in here, but do you --

THE COURT:  Can they leave everything in here, Vinny?

THE CLERK:  Yeah.  Yeah.

THE COURT:  Okay.

MR. HILLIARD:  Oh, perfect.

THE COURT:  We're going to leave everything in here then.  All right.

MR. HILLIARD:  Number two --

THE COURT:  And does the courtroom get locked?

THE CLERK:  Yes.  Yes.

THE COURT:  Okay.

MR. HILLIARD:  Number two, when the witnesses were

read off to the prospective jury this morning, there were several designated by the plaintiff that are going to be an issue if they're really called.  And I just wanted to --

THE COURT:  Okay.

MR. HILLIARD:  I think the Court is already aware of that.

THE COURT:  Okay.  You're going to have to remind me of specifics and remind me of names, but is that something we can -- a bridge we can cross when we're closer in time and maybe at that point you decide you don't necessarily need to call them?

MR. AIVALIKLES:  Right.

MR. HILLIARD:  I think we can.

THE COURT:  You think you can?

MR. HILLIARD:  Yes.

THE COURT:  Okay.  What about tomorrow?  Ms. Ortolano will continue testifying, cross-examination, redirect, and then I think you had a list of four other witnesses you intended to call after Ms. Ortolano.

MR. AIVALIKLES:  Yeah.  Brian's kind enough to be the liaison with the police, so tomorrow I anticipate Officer Roach, Officer Caron, and Chief Carignan.  I'm not sure if we can do more than that, but I have some people we might be able to fill in.

THE COURT:  Okay.  So those three after

Ms. Ortolano --

MR. AIVALIKLES:  Right.

THE COURT:  -- and then you have some others you can call to fill in --

MR. AIVALIKLES:  Yes.

THE COURT:  -- if it doesn't take the whole day.

MR. AIVALIKLES:  Right.

THE COURT:  Okay.  Go ahead, Attorney Cullen.

MR. CULLEN:  Yeah, that's fine.  I just -- if I can get a general sense.  Obviously the -- the police officers are all subpoenaed here as well as David Lavoie for 8:30 tomorrow.  That certainly seems unlikely.

THE COURT:  I think so.

MR. AIVALIKLES:  Yeah.

MR. CULLEN:  So I guess if we can get a sense of how long we think it's going to go, my preference would be to have maybe Roach and Caron come at 11:30.  I think it would be unlikely that we'll be wrapped up, but nobody wants to have the Court not have a witness ready.

So --

THE COURT:  I know.  That's my top priority.

MR. CULLEN:  -- I can have them here at 11:00, if you think that's realistic, and let them know to wait and I would think that maybe keep the chief on hold until after lunch, but --

THE COURT:  I'm going to let you make that decision. I -- it's -- you're moving through these incidents.  It sounds like it's coming close to the end in terms of the history.

MR. AIVALIKLES:  A ways to go, your Honor, but I'm going to pare down tonight --

THE COURT:  Okay.

MR. AIVALIKLES:  -- knowing that the Court's --

THE COURT:  And they've heard about the incident --

MR. AIVALIKLES:  Right.

THE COURT:  -- they've heard about the history of her protected conduct --

MR. AIVALIKLES:  Uh-huh.

THE COURT:  -- and obviously she's got more to say and more to talk about in terms of the claim, but would you say an hour more of testimony or less?

MR. AIVALIKLES:  Probably an hour, your Honor, but, again, I'll know better tonight when I go through this --

THE COURT:  Okay.

MR. AIVALIKLES:  -- because I've only gotten through a third of what I was going to ask in terms of paper.  So I'm going to work on that tonight.

THE COURT:  Okay.  Some of these are full exhibits, so --

MR. AIVALIKLES:  Right.

THE COURT:  -- some of them, ultimately, you can

talk about to your heart's content in closing and bring --

MR. AIVALIKLES:  Right.

THE COURT:  -- attention to certain lines and quotes.

MR. AIVALIKLES:  Right.

THE COURT:  And Ms. Ortolano wouldn't have to necessarily point out every quote that you want to bring to the jury's attention if it's a full exhibit.

MR. AIVALIKLES:  Yeah, I understand that, your Honor.

THE COURT:  Okay.  I'm sure do you.

MR. AIVALIKLES:  No, but you know how lawyers are. It's overkill.

THE COURT:  So I'm hoping that you can do it within an hour so that we start at 9:00, we go to 10:00.

Cross?

MR. HILLIARD:  I'd say an hour, your Honor, for me.

MR. CULLEN:  40 minutes.

THE COURT:  Okay.

MR. AIVALIKLES:  That's lunchtime.

THE COURT:  Okay.  So that seems to answer some of the question you have about the order.  So I'll let you figure that out.  And it looks like we'll have officers after lunch.

And you'll have time tonight to review the jury instructions more carefully.  We'll meet at 8:00 a.m. to go

over objections that you have to jury instructions unless you can tell me that we don't need that meeting and you can -- could they email you?  Counsel knows how to reach you.

THE CLERK:  Uh-huh, yeah.

THE COURT:  Now, Jen Bartlett is going to be coming in for Vinny, but if you could let Jen know --

THE CLERK:  Uh-huh.

THE COURT:  -- we can cancel the meeting at 8:00 if there's no issue because we're going to continue with Ms. Ortolano and then, obviously, have a lunch break.  So --

MR. CULLEN:  Your Honor, I would -- if I may, I -- we've been over the jury instructions.  I think a lot of it's just going to be preserving objections.

THE COURT:  Okay.

MR. CULLEN:  So my guess is that 8:30 would give us plenty of time to do that.  I'm happy to be here at 8:00 if that --

THE COURT:  No, 8:30 works better -- works well for me.  And if you want to even delay a more detailed discussion --

MR. AIVALIKLES:  Yeah.

THE COURT:  -- of jury instructions until later --

MR. AIVALIKLES:  I think --

THE COURT:  -- I'm fine with that.

MR. AIVALIKLES:  I think that makes more sense, your

Honor.

MR. HILLIARD:  I think that would be -- we got it this morning but haven't really had a chance to look at it yet, your Honor.

THE COURT:  I never got a draft of jury instructions from any judge I ever tried a case in front of and I tried cases for --

MR. HILLIARD:  You've spoiled us.

THE COURT:  -- more than a decade.  So I am spoiling you.  I want to get this right.

Okay.  Any other issues that I need to talk with you about?  We're moving this case and I appreciate that.

MR. AIVALIKLES:  Yeah.  I don't think so, your Honor.  We did file an instruction for color of law.

THE COURT:  For what?

MR. AIVALIKLES:  Color of law.  State action.

THE COURT:  Oh, you filed a new proposed instruction?

MR. AIVALIKLES:  Yes.

MR. HILLIARD:  It -- midday, your Honor.

THE COURT:  Okay.  All right.  Well --

MR. AIVALIKLES:  I just -- to alert everyone.

THE COURT:  I have an instruction in the draft.  So obviously look at that and what we'll do is we'll obviously have charging instruction.  We'll have a charging meeting.  So

maybe we'll start to go over that at 8:30 tomorrow.

MR. CULLEN:  Thank you, your Honor.

THE COURT:  And any other issues that you see we'll talk about at 8:30 and then we'll have Ms. Ortolano start right at 9:00 a.m., assuming everybody's here.

MR. AIVALIKLES:  So 8:30?

THE COURT:  8:30.

MR. HILLIARD:  Thank you.

THE COURT:  All right.  Thank you.

(Proceedings adjourned at 4:17 p.m.)

98

C E R T I F I C A T E


I, Liza W. Dubois, do hereby certify that
the foregoing transcript is a true and accurate transcription
of the within proceedings, to the best of my knowledge, skill,
ability and belief.


Submitted: 4/17/26        /s/  Liza W. Dubois
                          LIZA W. DUBOIS, RMR, CRR