** NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO AUGUST 29, 2026 **

UNITED STATES DISTRICT COURT
CONCORD, NEW HAMPSHIRE
CASE NO. **22-CV-00326-LM**

**LAURIE ORTOLANO,**
Plaintiff

vs. **February 4, 2026**

**STEVEN BOLTON AND CELIA LEONARD**
Defendants.

**TRIAL DAY 2 - AFTERNOON SESSION**

BEFORE THE HONORABLE **LANDYA B. McCAFFERTY**,

UNITED STATES DISTRICT COURT JUDGE

**A P P E A R A N C E S**

FOR THE PLAINTIFF: LAURIE ORTOLANO — **WILLIAM E. AIVALIKLES**, ESQ, Aivalikles Law Office

FOR THE DEFENDANT: STEVEN BOLTON — **RUSSELL F. HILLIARD**, ESQ, **MADELINE K. MATULIS, ESQ**, Upton & Hatfield LLP

FOR THE DEFENDANT: CELIA LEONARD — **BRIAN J.S. CULLEN**, ESQ, Cullen Collimore Shirley PLLC

REPORTED BY: **GIZELLA BAAN-PROULX**, FCRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, NH 03301
(603) 225-1454
Trialreporters@hush.com

Also present:
SAMSON RACIOPPI, Paralegal

# I N D E X


| Witness | Direct | Cross | Cross | Redirect |
|---|---|---|---|---|
| LAURIE ORTOLANO | | 7 | 63 | 17 |
| TIMOTHY JOHN ROACH | 71 | | | |

***PROCEEDINGS***

*(The following proceedings were held in open court.)*

**THE COURT:** Before the jury comes in a couple of issues. Okay. All right. The question of opening the door. I could not get my screen to go back to reread exactly what the question was, but I have got the rough draft of the question and answers. And there's just no question that on this one, the defense attorneys are correct. Now, let me read this to you. Okay?

Question: During the investigation that Officer Roach conducted, he, I think, actually came to your home to interview you, didn't he?

Answer: Yes.

Question: And you declined?

Answer: I had counsel. I had him on the phone, and he recommended I not speak to the police and talk to the police.

Question: I'm sorry. Did you then finish your answer?

Answer: Yes.

Question: So you did not take that opportunity to give Officer Roach your side of the story?

Answer: I felt I gave my side of the story when I was in City Hall, and he wrote it and said there would be no further charges. I thought my story was there.

Question: But he told you you might be arrested if you came back, right?

Answer: I didn't come back.

Question: Didn't you tell him you probably would be arrested because you would come back?

Answer: So the question was what about what you told him.

**MR. AIVALIKLES**: Right.

**THE COURT**: All right?

Answer: Well, I thought I -- you know, the City had threatened me with arrest, and, in fact, Attorney Bolton tried to arrest me in 2022, so being threatened with arrest is something I had --

Mr. Cullen: Objection, Your Honor.

Again, the question was about what you had told him in that moment. There is no way that question opened the door to the incident a year later, more then a year later. It does have -- it's certainly topical in that it was about an arrest, but there is no way that question opened the door other than the emotional reaction that Ms. Ortolano had.

So I told the jury right after, at your request, to disregard it. I am willing to explain that even more clearly to them. They are to disregard it. They are not to consider it. But I think it might draw too much attention to it, and so I'm going to ask defense counsel if they would like a

further instruction clarifying they may not use that in any way.

**MR. HILLIARD**: No, thank you.

**THE COURT**: Okay.

**MR. CULLEN**: Agreed.

**THE COURT**: So is that clear? And I just want to make sure especially that, Ms. Ortolano, I know it's emotional, it's hard, but just listen very carefully to the questions and limit yourself as best you can to the question being asked, especially now on cross because they know what they're asking and they're being very careful. They know that other incident is not coming in, per my previous orders. All right?

**MR. AIVALIKLES**: If I can just put on the record, Your Honor, my objection.

**THE COURT**: Very, very briefly. I just read you the whole thing. I don't know how and what your objection would be. You still think that opens the door to it?

**MR. AIVALIKLES**: I think based upon the question that was asked and with the impression that that leaves with the jury that she didn't care what the police order was; she was coming back. They could make that conclusion.

And by her explaining -- and she was about to explain when the objection came through when she was about to explain why she made that statement, that confirms that her

speculation was, in fact, the reality. And the jury needs to know that she wasn't speculating when she made that statement.

**THE COURT**: This concerns me a little bit because your client --

**MR. AIVALIKLES**: I'm sorry, Your Honor.

**THE COURT**: This concerns me a little bit because the line is clear. This answer to this question went too far. I understand the emotion involved. I am -- I do understand that.

But I am telling you the line has been drawn. And your client needs to understand that line so it doesn't happen again, because if it happens again, ultimately, I will look very carefully at the transcript, and I will give an instruction, a very clear instruction to the jury. I'll ask for a recess, and I will consider taking more drastic action because this is clearly a question about what she said in the moment.

I understand she can get carried away, but I'm telling you what the line is, and I want to make sure that your client understands that line as we go forward.

**MR. AIVALIKLES**: I'm just trying to put my objection on the record and preserve the issue. That's all I'm doing. I'm not trying to change your mind. I just want to try to preserve the record.

**THE COURT**: I think all the arguments you made earlier preserved it, and that's understood and overruled, and I am not going to give them any further limiting instruction. Okay?

Now we can bring the jury back, and you can go ahead and take the stand, Ms. Ortolano.

(Thereupon, the jury entered the courtroom.)

**THE COURTROOM DEPUTY**: Please be seated. Hearing is back in session.

**THE COURT**: All right. Attorney Hilliard, go ahead.

**MR. HILLIARD**: Thank you very much, Your Honor.

Thereupon,

**LAURIE ORTOLANO,**

having been duly sworn by the courtroom clerk, testified as follows:

***CROSS EXAMINATION***

**BY MR. HILLIARD:**

Q. This morning on direct testimony, Ms. Ortolano, you described a nomination by Governor Sununu to a state board; do you recall that?

A. **Yes.**

Q. That, in fact, happened in May of 2020; isn't that right?

A. **I'm sure -- what date did I give?**

Q. Well, I'm looking at -- I'm showing your attorney, Mr. Aivalikles.
A. **If you confirm that it's May of 2020, then it was just a mistake if I gave the wrong date. My apologies.**
Q. I'm just reading your discovery response. It says: In May 2020 I was nominated by Governor Sununo, et cetera, et cetera.
A. **That was my discovery. Okay. Thank you.**
Q. And then may we look at exhibit 45, please, Your Honor. It's a full exhibit.
This is the trespassing complaint, is it not, Ms. Ortolano?
A. **That's correct.**
Q. And I don't need to read it out loud nor do you, but you see the typing in there that begins knowing and ends Leonard?
A. **Correct.**
Q. What it says there is true, isn't it?
A. **That's correct.**
Q. Now, may we look at exhibit F, please.
Ms. Ortolano, I think you've seen this before. This is a January 23rd, 2021, Union Leader article, right?
A. **Correct.**
Q. Written by a Kimberly Houghton?
A. **Yes.**
Q. In it -- and you can see it twice on the first page --

she, Ms. Houghton, quotes you as saying that what was going on is you were peacefully protesting?
A. **Yes.**
Q. You said that, right?
A. **Yes, I wrote that.**
Q. Is it a fair characterization of what you were doing?
A. **Trying to get the abatement applications stamped and staying there, yes; not going there to do that.**
Q. And you called it a peaceful protest?
A. **When I stayed. When I elected to wait for the police, yes.**
Q. So this article is dated the 23rd, which would have been Saturday, the day after, right?
A. **Correct.**
Q. When did you -- or excuse me.
Did you contact Kimberly Houghton?
A. **I did. I know I talked to her on Friday. I can't recall the time, but I would say it was noon or earlier afternoon.**
Q. All right. Let me suggest to you that it was even in the morning that day. Is that possible?
A. **It's possible.**
Q. And you called her?
A. **I sent her an e-mail, and then I called her.**
Q. To tell her about what had happened on Friday morning?
A. **Yes.**

Q. And you continued to have a fair amount of contact with the press during that year about this incident, right?
A. **I think there were three articles that ran over a short period of time. I'm not certain how many more articles ran after the 22nd of February. I can't recall them.**
Q. But in the articles that did run, they included reports of the reporter talking with you, right?
A. **For those three articles -- I don't think the last article after the arrest had me -- that they spoke to me about that. I don't remember being in that article.**
**I mean, I remember being in the first article, and the other two aren't admitted. I just don't know -- she might have used statements from the first article, but I don't recall if she called me for statements on the second and third article.**
Q. But you've certainly spoken to her more than once?
A. **I had spoken to her -- she was the reporter covering Nashua government, so she was the reporter I spoke to from 2019 through COVID and after that incident. And she left. She left the Union Leader and went someplace else.**
Q. But in any event, even after the arrest on February 18th, and for the rest of the year of 2021, you continued to attend public hearings and meetings, correct?
A. **Through Zoom. You could do them from home.**
**So I just want to make it clear, attendance wasn't**

**my physical attendance in City Hall any longer because you had set up Zoom conferences, Zoom calls.**
Q. And so you called in to the meetings and hearings and appeared and spoke on Zoom?
A. **Correct.**
Q. And during -- let's put up exhibit C for ID, please.
Ms. Ortolano, I'm showing you exhibit C for ID. You've seen this before?
A. **Yes. You gave me -- yes, this was part of our exhibit.**
Q. And I just want to ask you a couple of general questions.
Is it fair to say that in 2021, that you gave public comments in approximately 50 city board or committee meetings?
A. **I think that's fair to say.**
Q. And those included the board of assessors, the board of public works, the budget review committee, finance committee, the board of alderman, and the personnel administrative affairs committee, right?
A. **Yes.**
Q. And is it also fair to say that in 2021 you submitted approximately 150 right-to-know requests with the city?
A. **I can't swear the number, but I know there was a lot submitted at the time.**
Q. 150 isn't a wild number, is it?
A. **No.**

Q. Is it also fair to say that you published more than 30 Granite Grok articles in 2021?
A. **I would agree with that.**
Q. Is it also fair to say that you had more than 30 Facebook posts on National Scoop in 2021?
A. **I don't know if I had that many, but I definitely had posts on National Scoop.**
Q. And what about the Good Gov blog articles, is 47 a fair number?
A. **I definitely posted on that regularly and my own personal blog.**
Q. And you certainly continued your criticism of city officials in 2021, correct?
A. **Certainly in my outside writing I did. In my board meetings, it was more limited. My outside writing is where I could be the most critical.**
Q. When you say outside writing, you mean on these --
A. **Yes.**
Q. Granite Grok and Good Gov?
A. **Yes.**
Q. And Nashua Scoop?
A. **Yes.**
Q. May we look at exhibit M -- it's a full exhibit -- please.
This is an e-mail from you -- well, to Steve Bolton

copied to the Board of Alderman, Attorney Lehmann, the mayor's office, Kimberly Houghton -- she's the Union Leader reporter?

A. **Correct.**

Q. Subject: Bolton has no ethics, right?

A. **Correct.**

Q. Exhibit T, please. This is the full exhibit. I just want you to agree with me, if you do, that it's a posting you made on the Good Gov site on May 11th, 2021?

A. **That's correct.**

Q. W, please. W is for ID.

This is a posting you made on June 24, 2021; is that right?

A. **Correct.**

Q. On your Granite Grok?

A. **Correct.**

Q. What do I call that, the Granite Grok blog?

A. **No, it's a digital newspaper.**

Q. So just say Granite Grok?

A. **Yes.**

Q. And you wrote and published this there, right?

A. **Correct.**

Q. And the headline -- I move to strike the ID, Your Honor.

**MR. AIVALIKLES:** Side bar.

(Thereupon, there was a side-bar conference outside

the presence and hearing of the jury.)

**MR. AIVALIKLES**: Your Honor, I believe it's irrelevant. It's post arrest. I don't see how it bears on the issue and certainly the arrest, the constitutional issues.

**MR. HILLIARD**: Can you hear me, Your Honor?

**THE COURT**: Yes, I can.

**MR. HILLIARD**: Your Honor, the remaining relevance or continuing relevance of this is to damage. She's claiming she was upset or distressed or having difficulty. Publication of these documents during this period of time are inconsistent with such a state of mind. So they're offered to show that -- on the issue of damages.

I will tell you, Your Honor, I don't know if you've noticed this, but in the plaintiff's objections to our exhibits, they said they were not making any claim that she was chill, but this remains relevant on the damages claims regarding distress and so forth.

**THE COURT**: I think it is marginally relevant on that, so I am going to allow it. Are you going to go beyond 2021?

**MR. HILLIARD**: No.

**THE COURT**: Okay. Overruled, and go ahead.

(Thereupon, the side-bar conference was concluded.)

**THE COURT**: And that exhibit is a full exhibit.

Exhibit W.

**MR. HILLIARD**: So the ID is stricken on W?

**THE COURT**: Yes.

**BY MR. HILLIARD**:

Q. I'll just call your attention to the title, Ms. Ortolano.

Nashua should be ashamed of its Attorney Bolton, right?

A. **Yes.**

Q. You wrote that, right?

A. **Yes.**

Q. MM, please. It's a full exhibit.

**MR. HILLIARD**: I apologize, Your Honor. This one is actually January of '22, but I think it's the only one. It's a full exhibit already.

**THE COURT**: Okay.

**MR. HILLIARD**: Thank you.

**BY MR. HILLIARD**:

Q. All I want to confirm, Ms. Ortolano, is you wrote this and published it on Granite Grok, right?

A. **Correct.**

Q. And the title that you wrote is Nashua City Attorney Steve Bolton is Unfit for Duty?

A. **Correct.**

**MR. HILLIARD**: May I look at a document for a moment, Your Honor? I'm just concerned I misspoke a second.

There were one or two others that were in '22, but I'll skip those.

**THE COURT**: Thank you.

**MR. HILLIARD**: I did want to, Your Honor, just for the record and for the jury are, exhibits G, H, I, and J are already full exhibits. They're various publications, but I don't need to take the time on those.

**THE COURT**: Okay. I do want to look at L, which is ID very briefly, please. And this is just in the same category, Your Honor, as exhibit W.

**MR. HILLIARD**: 4, 6, 9.

**THE COURT**: And you would like to move as a full exhibit?

**MR. HILLIARD**: Yes, Your Honor.

**THE COURT**: Do you have any objection to that, Mr. Aivalikles?

**MR. AIVALIKLES**: Let me explore my notes, Your Honor, if I may.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

**MR. AIVALIKLES**: Your Honor, I do object. I think it's irrelevant. I think it has hearsay information in it. Again, it doesn't go to the issue surrounding the arrest.

**THE COURT**: I'm going to allow it. It cuts both ways. And ultimately, I'd ask counsel to move along.

And we still have Attorney Cullen to cross-examine the witness, so I just urge counsel to move along.

**MR. HILLIARD:** Thank you.

**THE COURT:** So the objection is overruled.

(Thereupon, the side-bar conference was concluded.)

**THE COURT:** L is a full exhibit.

**MR. HILLIARD:** Let me just check my note, please, Your Honor. Try to follow your direction.

**BY MR. HILLIARD:**

Q. Ms. Ortolano, do you accept any responsibility for the fact that you were arrested in this trespass?

A. **No. I don't think I should have been arrested. I don't think the records and the practices supported the arrest in Nashua.**

Q. Thank you.

**MR. HILLIARD:** Thank you, Your Honor.

**THE COURT:** All right. Attorney Cullen?

**MR. CULLEN:** Thank you, Your Honor.

***CROSS EXAMINATION***

**BY MR. CULLEN:**

Q. Good afternoon, Ms. Ortolano.

A. **Good afternoon.**

Q. I'm going to do my best not to repeat too much of what

Mr. Hilliard asked you, so if I do that, I'll try to keep it short.

Like Attorney Hilliard, though, I do just want to start out with that claim that you made that you were unaware that when you arrived on January 22nd, 2021, at the legal department that appointments were required.

Is that your testimony? Is that what I recall?

A. **Yes.**

Q. And with respect to that, I want you to turn -- I'd like to just pull up exhibit 1, which is your e-mail that you sent out later that day.

Maddie, are you able to pull that up?

Looking at the section there, and I'm not sure -- Maddie, if you can bring that up a little bigger -- you wrote: I knocked on the door and a young woman answered, and I asked if Attorney Neumann was in. She would not answer and said I needed an appointment.

What is it that you then said?

A. **I told her I tried to get one, but he didn't respond.**

Q. So you acknowledge that you were trying to get appointments before that day?

A. **But he never answered. I never received any answer from the legal office or that day that they had gone to an appointment-only office. I did not know that. I thought it was singling me out, but not that there was a policy for**

**that.**

Q. So if it was singling you out, you still knew that you were supposed to have an appointment?

A. **He didn't tell me I needed an appointment. He just didn't respond at all.**

Q. So you said you were trying to get an appointment, but he wouldn't respond.

A. **He didn't respond.**

Q. And you said that you thought you were being singled out for not getting an appointment. You were asking for appointments up until this time. That's why you were there. You were frustrated with Jesse Neumann, right?

A. **No. He was brand new, and I actually -- and it wasn't really appointments. I believe, if I think back to my e-mails, I asked for a phone conversation. I asked if I could have a talk with him. It didn't have to be an appointment if I could talk to him on the phone. And twice I believe I asked.**

**He started maybe the middle of December. So he was only there maybe four weeks when this happened. So I had been trying, but he just didn't respond to the request at all.**

Q. So although you wrote here that the first thing you said to Mindy Lloyd was that you tried to get one, and you just told the jury that you think you were being singled out for

appointments, your testimony continues to be you did not realize and you did not see the sign on the door saying legal department was for appointments only?
A. **I did not.**
Q. And you do recall -- you mentioned that Jesse Neumann had just started three or four weeks ago?
A. **On month four, maybe five. He was pretty new to the office.**
Q. And he was new, and he was hired to handle to 91-A requests, right?
A. **He was.**
Q. He wasn't hired to handle abatements, was he?
A. **He was actually taking all the abatement e-mails. We're going through him, yes.**
Q. So he was responding to your abatement e-mails?
A. **He was getting back to myself and Ms. Calhoun. All of our abatement questions were going to Mr. Neumann.**
Q. We don't see any of those in evidence, do we?
A. **No. I didn't think I needed them.**
Q. Turning to exhibit 12, if we can, one of your complaints against --
**THE COURTROOM DEPUTY:** Is that for ID or an exhibit?
**MR. CULLEN:** Number 12 is -- it was entered -- it was allowed in on Ms. Ortolano's direct. Thank you. Sorry

about that.

**BY MR. CULLEN:**

Q. One of the complaints that you had about Celia Leonard's responsiveness to you on the 91-A, you were involved in the Donchess timeline. Do you recall testifying to that?

A. **Yes.**

Q. And you pointed out that you had sent her a request on October 12th for the Donchess timeline?

A. **That's correct.**

Q. And in fact, she had replied that she didn't feel that that was sufficiently identified for you to be able to find it?

A. **Yes.**

Q. And you followed up with her, right, on the 17th of October with a better description?

A. **It would be on or about that day, but, yeah.**

Q. And then she supplied the records to you the following week, right, on October 24th?

A. **Could I see what I responded to on the 17th?**

Q. Well, just tell me this -- well, sure.

A. **Is that --**

Q. If you can pull up exhibit 14. This is also full.

**MR. CULLEN:** I'll be very careful to say ID, but I'll remember to say full each time. Sorry about that.

**BY MR. CULLEN:**

Q. This was ID'd but entered as full. Is this the one that you wanted to look at to refresh your recollection?
A. **Yes.**
Q. And then the next --
A. **And it does change my answer. I just want you to know that.**
Q. Okay. Go ahead and change your answer.
A. **When you asked if I clarified, I don't believe I clarified. I said: Please ask Gary Turgiss to provide the Donchess timeline that outlined the history of the permit work done on his property. I was referring to the mayor.**

**I'm aware, speaking with staff members, that this was the Donchess timeline that Due Hamel (ph.) was asking for. The October 25th, 2018, date was given for the e-mail. Gary should be able to provide this to you without further explanation.**

**So I don't feel I provided clarification. The responsibility of an office is to conduct a reasonable search, and my initial request showed that Gary was asked to do this timeline.**

**What I expected the legal office to do is talk to Gary and find out. And so I don't feel this is a clarifying e-mail. Actually, I'm frustrated that I have to go back and say it. I just want that on the record.**
Q. October 17th you sent this e-mail indicating more --

giving more information about the Donchess timeline, and she responded to you on the 24th, which is one week later, five business days later, and she provides it to you?
A. **That is correct.**
Q. Now, you purchased the home in Nashua in 2013 or 2014?
A. **Yeah. It went on the books, I think, registered in January of 2004.**
Q. For about $750,000?
A. **Yes.**
Q. Probably worth about double that now, right?
A. **No. Actually, no.**
Q. In 2018 the property was reappraised?
A. **It was.**
Q. And you felt the appraisal was too high, right?
A. **I did.**
Q. And you know that the city has an assessing department that handles appraisals like that, right?
A. **I sure learned about it.**
Q. And you found out that your property was appraised by a Greg Turgiss, correct?
A. **No, it was Gary.**
Q. They're brothers, I think you mentioned, right?
A. **Yes.**
Q. And Greg was the one then who went back and did the subsequent appraisal of your property?

A. **He came back, and he came in 2018 in the fall when we questioned the new data by KRT, yes.**
Q. And you felt that he should not have been the person to do that, right?
A. **Correct.**
Q. And you felt that he didn't -- still didn't appraise it correctly, right?
A. **Correct.**
Q. And so you launched an investigation into him, didn't you?
A. **Not because of that.**
Q. Well, in March of 2019, you mentioned yesterday or earlier today of a report, an investigative report. That investigative report was a report that you commissioned, right?
A. **Correct, but it wasn't that reason, but yes.**
Q. You hired a private --
**MR. AIVALIKLES:** I think she was answering.
**MR. CULLEN:** I apologize. I heard the yes, and I thought that was the answer.
**THE COURT:** And that was the answer to the question, so ultimately go ahead.
**MR. CULLEN:** Thank you, Your Honor.
**BY MR. CULLEN:**
Q. In March of 2019 you hired a private investigation to

follow Mr. Turgiss around, right?
A. **I did.**
Q. A William Freyler?
A. **Yes.**
Q. And you provided Mr. Freyler with the assessing department employee's license plate and make and model of his car, right?
A. **I got that from another assessor or assessing staff person.**
Q. So you started asking around assessing about Turgiss and got the information from that person?
A. **No. The woman who worked there told me that she thought he was filing fraudulent mileage reports and knew where he parked in the garage and took a photograph of his car and sent it to me.**
Q. And so you gave that information to your private eye, right?
A. **Correct.**
Q. And you told Mr. Freyler about his work habits, right?
A. **Yes.**
Q. And the assessing department, by the way, that has a whiteboard that indicates where everyone is, right?
A. **It was in the public office area, your entry, your public space. The assessing office did have a space for the public to go into, so it was there.**

Q. And you would sit in that space and watch Mr. Turgiss leave and text your private eye when he left, right?
A. **No, that's not correct. One, you couldn't sit there. There were no chairs. The woman in the assessing office who took the photo of the car gave me information on when he left. It wasn't me.**
**MR. CULLEN:** May I approach, Your Honor?
**THE COURT:** Yes.
**BY MR. CULLEN:**
Q. Do you recognize this document, Ms. Ortolano?
A. **I do.**
Q. What do you recognize it to be?
A. **It's the Freyler investigative report dated April 26th of 2019.**
Q. Could you turn to page 3, please.
A. **Sure.**
Q. Do you see the entry at the bottom of that page for April 3rd, 2019?
A. **Let's see. Page 3, that starts on 4-2-2019?**
Q. Correct, the second paragraph?
A. **Yeah.**
Q. Starts 4-3-19?
A. **Yes.**
Q. Do you want to read that to yourself, the first four lines?

A. **No. It says that --**
Q. Just read it to yourself, the first four lines.
A. **Sure. (Complies.) Yes.**
Q. Does that refresh your recollection that you were actually standing or sitting in the assessor's office and texting your private eye whenever Mr. Turgiss left?
A. **No. I didn't do that all the time at all.**
Q. But you did some of the time, right?
A. **That was one instance, but the majority of the information came from the woman in the office because I wasn't there. I didn't go everyday to just camp out and watch him.**
Q. Well, you texted him on April 1, April 3rd, and April 9th, didn't you?
A. **Who? My --**
Q. Your private eye?
A. **It doesn't say each time that I saw him do this or I read the whiteboard. I'm just not certain what those dates say.**
Q. And you also, in fact, took pictures of the whiteboard and sent them to your investigator?
A. **The pictures?**
Q. Yeah.
A. **It doesn't say that I sent those pictures to -- I know I texted them to him --**
Q. I'm not asking you -- I apologize. I'm not asking you if

it says it. I'm asking you if you did it?
A. **No. The pictures came from the assessing staff lady, in part. I might have taken one, but she took the majority of them, again, she noted when he left, and she took the pictures of the board.**
Q. So at the end of this Freyler report, starting on the 22nd page of this document, there's about a 7 or 8-page section that you wrote yourself, right?
A. **Correct.**
Q. Including several pictures of the whiteboard?
A. **Yes. Yeah, but those weren't pictures I took. They were just pictures I used.**
Q. They were pictures that you obtained from someone else in there, and that you then sent onto your person. Is that your testimony?
A. **Yes.**
Q. And at the end of this report, you had this report sent to the city, right?
A. **Correct.**
Q. And you went to the Nashua Police Department and asked them to open a criminal investigation into Mr. Turgiss, didn't you?
A. **I did.**
Q. And you have a right to do that, don't you?
A. **I do.**

Q. Every citizen has a right to go to the police and ask them to investigate if they think a crime has been committed, right?
A. **Correct.**
Q. And that's something you did?
A. **Correct.**
Q. And they actually did open up an investigation, didn't they?
A. **They did.**
Q. Interviewed the entire assessing department, right?
A. **Correct.**
Q. And this is in the summer and fall of 2019, isn't it?
A. **The summer and fall of -- yes. It was May it came out. So I think they did the investigation maybe in June or July, they opened it up, so summer into the fall. Yes, that's correct.**
Q. And this is right around the time that you're also trying to have interviews with assessors yourself, right?
A. **I don't know -- yeah, that's -- I think that is the right time. I was doing -- and I wasn't doing interviews of assessors, so I disagree with that.**
Q. I'm sorry. You weren't doing what?
A. **Interviews with assessors. You're using an e-mail that was up where Ms. Kleiner said that I was trying to interview assessors, but I was not trying to interview assessors. That**

**is not correct.**
Q. So let's turn to exhibit 17, please, and this is a full exhibit, I apologize. I will get there eventually.
Could you bring up page two? Let's go back to the first page of the e-mail.
And again, this is something you discussed on your direct. I think you're complaining about Celia Leonard's response to you.
So this starts with you sending a note to Kim Kleiner and Celia Leonard with a series of requests, right?
A. **Correct.**
Q. And that's on July 12th?
A. **That's correct. Yes. July 12th.**
Q. While the Nashua police, at your behest, is investigating members of the assessing department?
A. **No. The only one I knew they were investigating was Greg Turgiss.**
Q. Well, you also asked them to investigate Kim Kleiner, didn't you?
A. **Yes. She was the director, and she was being looked at for interference in the investigation, but there weren't other assessors named in the office.**
**THE COURT:** It's just a question. Did you ask them to investigate Kim Kleiner?
A. **Yes.**

**THE COURT**: And the answer is yes. Go ahead.

**BY MR. CULLEN:**

Q. And turning to the second page, now, this lengthy e-mail that you sent, at the top of this -- see if we can get this right this time.

Looking at the highlighted paragraph, don't you write: Could I meet with Doug to talk to him about how permits are captured and how the office would know that they're all captured? I think his is the most experienced and intelligent. Did I read that right? It's a little garbled, I know.

A. **Yeah. It was my writing. Yes, that's fine.**

Q. And one of the things that Celia responds, again, your request was on the 12th?

A. **Yeah.**

Q. And she responds on the 19th. Again, one week?

A. **Correct.**

Q. Five business days?

A. **Correct.**

Q. Exactly what 91-A statute requires?

A. **My issue wasn't the response. Took away my right to interface with assessing staff.**

Q. Well, the assessing staff that you were having investigated?

A. **No.**

Q. And she writes your request to meet with Mr. Dame regarding this topic is denied. That was her response, right?

A. **She said he doesn't -- yes, she says that response, but additionally she said permit capture is an administrative function, which it was not.**

Q. She said it was denied, right?

A. **She denied it.**

Q. I think that was my question.

A. **Yes.**

Q. Can you turn to page 19, please -- exhibit 19. That is a full exhibit. If you can pull it up for me. I appreciate you helping me. Would you blow that part up for me, Maddie, if you can.

And again, from exhibit 19, one of the things that you -- that Ms. Kleiner was concerned about is that you had -- she attaches -- those are conversations that you had with two assessing staff, Mike Mandel (ph.) and Lynn Cameron.

Ms. Ortolano has come to the assessing department a few times today, wanting to be able to question each assessor on whether they had sent sales letters during the KRT evaluation. Do you see that?

A. **I don't agree with it. I don't agree with her writing on that.**

Q. And she continues that Doug was not in the office, but

Ms. Ortolano later called and asked to speak with him; is that right?

A. **I don't remember that.**

Q. I mean, essentially, even though legal counsel has told you you can't have an interview with Doug Dame, you're going around the back and trying to get interviews with them anyway?

A. **You're reading that out of sequence. Wasn't that e-mail sent before she came back with a response?**

Q. I believe this e-mail, if you look at the date --

A. **Yes. August 27th of 2019, and Ms. Leonard comes back on August 23rd of 2019, a day later and says --**

Q. I think if you look at exhibit 18, Ms. Ortolano, and we'll go back to that, which we just read Ms. Leonard's letter of July 19th, over a month earlier, she told you you can't meet with Doug Dame.

A. **That was on a permit-capture issue, specific to that issue. Now you're applying it to everything, which is exactly what went on in the assessing office, Attorney Cullen. They blocked me and boxed me out of everything.**

Q. Right. And that's why you decided to stay outside the assessing department and ambush them on lunch breaks, right?

A. **No. I did not ambush them on lunch breaks.**

**MR. AIVALIKLES:** Argumentative.

**THE COURT:** It is argumentative. Sustained.

**BY MR. CULLEN:**
Q. Was there a complaint made that you were approaching people at lunch break and trying to talk to them outside of the assessing office?
**MR. AIVALIKLES:** Objection, Your Honor, side bar.
**THE COURT:** Overruled. Go ahead.
A. **Yes.**
**BY MR. CULLEN:**
Q. And just going back, if we could, Maddie, I apologize -- to exhibit 19, which is a full exhibit.
And your response here is essentially that Doug Dame doesn't -- the law does not require them to speak with you, right?
A. **Correct.**
Q. And you know that that's actually true: 91-A does not require them to speak with you. It requires them to produce documents that are requested, right?
A. **But I am allowed to have a conversation with an assessor like every other person is. That wasn't a document request. It was whether or not they sent sales letters out.**
Q. So let me try that again. You understood that this was true. Law 91-A does not require them to talk to you, right?
A. **91-A requires they produce records.**
Q. Thank you. Now, in September of 2019, you came to the legal department and you spoke with Celia Leonard, right?

Do you remember that, the conversation you discussed about where she explained what the legal department does and the limits?
A. **It was after that BTLA hearing, yes.**
Q. Well, it was also after these requests where you were trying to meet with people also, right?
A. **Yes.**
Q. And Maddie, could you bring up exhibit A, which is a full exhibit for me, please.
And when you told -- you had a conversation with Ms. Leonard somewhere around the legal department, right?
A. **Correct. That was actually in the legal office. She was at the -- I believe the legal clerk's desk area.**
Q. And she explained to you the function of legal office, right?
A. **I wouldn't say it was an explanation. She just said we handle document requests.**
Q. You wrote: Thank you for taking time today to explain the function of the legal office in addressing my concerns. You made it very clear that legal is only there to address specific document requests, and I should not bring any other information or concerns regarding the city to the attention of the legal office, right?
A. **Correct.**
Q. And I know I changed the of to an or, but that was

correct?
A. **Close enough. And then I wanted to explain it was very confusing.**
Q. Sure. Up until that time, up until September 11th, 2019, it was very confusing?
A. **It was confusing after as well.**
Q. Well, it doesn't seem like it was confusing. At the very end of the second paragraph, you write: Steve did not make it clear that I should not have addressed him on any matters regarding assessing inquiries unless they were for specific document requests. Your role and my role has been clarified.
So it certainly sounds like you feel like it was clear.
A. **Not after that, no. They didn't stick to document requests.**
Q. And you also knew that there are ethical limitations on when an attorney can talk with someone who is in litigation with them, right?
A. **Correct.**
Q. And you were represented at this time by -- was it Robert Fojo?
A. **September of 2019. No, I don't think so anymore. I think Attorney Lehmann had come on -- no, he had not come on board yet. It might have been at the end of my representation with Fojo.**

Q. Because I'm looking at exhibit A, which is still on the screen. It looks like Robert Fojo was copied on that?

A. **He is. So that was at the end of my time with him.**

Q. And after him was Rick Lehmann? Was that the next person?

A. **Yes. He came in at the end of '19.**

Q. Essentially you went from Fojo to Lehmann, right?

A. **Well, Lehmann took the right-to-know lawsuit. Fojo was not involved with that.**

Q. And I know they're not here, but I apologize for just giving them surnames.

Maddie, will you please pull up exhibit 24, which is also a full exhibit.

Looking at the language that's highlighted here -- and this is just a few days after. So this is September 15th, 2019, four days after your e-mail to Celia saying that you understand.

Now you say in the last line: When I took to legal, Ms. Leonard expressed that only document requests are handled by legal, and there will be no general questions brought to legal.

A. **That's what I wrote, yes.**

Q. And then she asked -- apparently asked you to leave the office, right?

A. **I left.**

Q. So again, that's twice in September that you've reiterated you understand the limits of legal?
A. **But they changed the rules.**
Q. Did they send you an e-mail saying they changed the rules or announced that or posted it?
A. **They never ever did that. The rules would change when those staff agendas were discussed, and they needed to rule that three assessors would not be allowed to talk to Laurie. They never came to me and told me that was true. They never told me they had implemented that in April. So when they made these changes, I was never told.**
Q. Well, I think the jury has seen the evidence that you were told, but we'll move on.
Now let's go to January 2021. You're still represented by counsel at that point, right?
A. **January -- yes.**
Q. You were represented by Attorney Rick Lehmann?
A. **Correct.**
Q. And he represented you in ongoing litigation with the city?
A. **Yeah, two items.**
Q. Which was two items -- I'm sorry?
A. **Two items. He was handling litigation items.**
Q. And you also had an ongoing abatement action?
A. **He was handling that. I did one privately. Was it there**

**in 2019? What date --**

Q. 2021.

A. **Yes. I had one myself.**

Q. So Rick Lehmann had two actions, a 91-A request action and an abatement action, right?

A. **The 2018 abatement, and I had the 2019 abatement.**

Q. And you were going to City Hall, you claimed, to talk to Jessie Neumann about abatement issues, right? That's what you kept asking him to talk about?

A. **No. The very first, my entrance to City Hall, my clearance with the greeter, my e-mail I wrote about that.**

**My focus was on those abatement applications and getting a receipt for those.**

Q. And this is a time in which you already reported Steve Bolton to the ethics committee for having communications with you about a subject that you said you were represented by counsel on, right?

A. **That happened, yeah, right around that time, yes.**

Q. That happened before. That was, I think, we talked about --

A. **2020. Correct.**

Q. Right. And so by --

A. **I don't know when it was over with the committee, but maybe sometime in November of 2020. So here I was in January of 2021. It might have been a short time before that it was**

**over.**

Q. So six months before showing up at the legal department with no appointment and unannounced to talk to Jesse Neumann or whoever would be there about abatement issues, you had already reported one of their members to the Bar potentially for disbarment for talking to you?

A. **That, I don't feel is correct at all because I wasn't locked out of -- these were abatements for senior citizens. They weren't represented. They were the filing of abatements; they weren't appeals. I was involved in litigation appeal with Attorney Bolton on abatement. The filing of an abatement is not a legal action. Why were my abatement applications up illegal? I don't understand that.**

**So because you put everything through legal, all of my right-to-knows, you mixed me in -- the city did -- with attorneys who could then claim: We can't talk to her because she is in litigation. All of my stuff went up there, and it created a wall for me.**

Q. Well, a wall that you decided not to pay attention to, right? And you just went right through that wall, didn't you?

A. **That's not true.**

Q. Well, you went through the wall when you pushed the door open and forced your way past Mindy Lloyd into the office, right?

A. **I didn't push the door open. It opened out. I opened the door, and I walked in.**

Q. You walked in even though she told you you could only come in with an appointment, and you didn't have one?

A. **I didn't know that there was a rule for appointments. I've said that repeatedly.**

Q. But she told you you needed an appointment, and you knew you didn't have one, right?

A. **Right. And it wasn't an appointment issue.**

Q. And you knew that the -- you had already filed an ethics complaint against one member for talking to you at all?

A. **About an issue I was represented on. These were two applications, abatements for senior citizens that were not legal actions at all. You lumped everything --**

Q. Steve Bolton was exonerated on that, wasn't he?

A. **What was that?**

**MR. AIVALIKLES:** Objection, Your Honor.

**THE COURT:** The question -- just listen to the question carefully. I know it goes by fairly fast. But the question was: You knew that you had already filed a complaint against a member for talking to you at all.

That was the question, and the answer would presumably be, yes, based on what you said.

A. **Yes.**

**THE COURT:** But then you went on and -- Attorney

Aivalikles can get up on redirect and ask you further questions.

A. **Okay.**

**THE COURT:** Go ahead, Attorney Cullen, and that way it might help you not talk over each other.

**MR. AIVALIKLES:** There was a question that he followed up on that I was objecting to, Your Honor. That's why I stood up.

**MR. CULLEN:** I don't think she answered that question, so I can move on, Your Honor.

**THE COURT:** Okay. You're not asking me to strike a question?

**MR. AIVALIKLES:** Thank you.

**THE COURT:** Okay.

**BY MR. CULLEN:**

Q. I don't want to belabor the Richard Vincent e-mails, but you've introduced a series of e-mails with Richard Vincent.

I think Mr. Hilliard and you had a discussion about the fact that some of the original ones went to Mr. Vincent's prior e-mail. Do you need a second?

A. **I can hear you. I'm sorry. Apologies to the jury. Okay.**

Q. And on January 20th you had sent him a note saying that you still didn't have these time stamps, and you were concerned about it, and he responded that, yes, he'd get them

to you, right -- or he'd look into it?
A. **He would look into it.**
Q. And on Thursday night, January 21st, you still had not heard from him?
A. **No.**
Q. It had been over 24 hours since he said he'd look into it, right?
A. **Yes.**
Q. And so you sent -- and can we bring up 40-A, which is a full exhibit now.
Just look at the people on this list of people. You sent this to -- you sent this to Vincent himself, Mr. Richard Vincent?
A. **Correct.**
Q. But then you cc'd the mayor, three people have an @DRA.nh.gov. That's the Department of Revenue Administration?
A. **Yes.**
Q. Basically the state's IRS?
A. **Yes. They oversee assessing.**
Q. And the board of assessors?
A. **Correct.**
Q. And the board of alderman?
A. **Correct.**
Q. And your friend, Laura Colquhoun?

A. **Correct.**
Q. Now, the reason you cc'd all those people was essentially to try to light a fire under Mr. Vincent, right?
A. **Well, I think in there --**
Q. You can say no if the answer is no.
A. **It wasn't just to light a fire. It was trying to get an accounting of the abatements that were being filed.**
**I know in one of these or two of these e-mails, I request the log. He would log all of these abatements coming in, and I requested him to give me this log. And I wasn't able to get it, actually, from him. He didn't treat it like a right-to-know.**
**I wanted the DRA to know that our assessing office was closed. There was no assessing office at all. And I didn't know how these applications were being handled, and mine certainly wasn't.**
Q. So it wasn't just to light a fire under him. There were other reasons as well?
A. **Yes.**
Q. What part of it was to light a fire under him? Copy all of his bosses and the state's oversight board on an e-mail that you sent to him saying that you're frustrated and that you still need to get this information?
A. **I wanted them -- they had issued the letter. They had called the city into the hearing at this time. They were**

**doing quarterly reports with the city on the update on the assessments. And abatements were a part of the new numbers that were coming out, and because they were following up, I wanted them to know.**

**We didn't have, what I saw, a totally unfair abatement process.**

Q. So now having e-mailed this bomb to all these different people, you sat back to wait to see who would help you, right?

A. **I didn't expect the DRA to get back to me. They don't do that personally.**

Q. Instead you walked into the City Hall the very next day just after 9:00 a.m. to go to the assessing department?

A. **No. I think -- the assessing department didn't exist. The room was demolished. I met the greeter, and I asked her if I could go to administrative services where Director Kleiner kept an office. She was now in charge of assessing, and I was under the belief that an assessor would be in there.**

Q. I guess the thing is really here, you sent out this e-mail after the close of business on Thursday, and immediately on the open of business on Friday, without waiting for any response from this e-mail or any further response from Mr. Vincent, you walked into City Hall, right?

A. **Yeah. It had been four days.**

Q. And you were frustrated?

A. **Well, it had been enough time that I thought it would be lost or not handled. I mean, I filed an abatement in 2019 and brought it in. It was stamped in 60 seconds. The 2018 was 60 seconds. The 2019 was 60 seconds, and I gave you information that the one I did in November of 2020 was stamped in 9 minutes, even with the office closed. So this had been four days, and it seemed -- I was concerned.**

Q. This is a little out of order, but since we're in the 40s, can we bring up 40-C, please, Maddie.

So this is an e-mail on January 22nd, 2021, correct?

A. **Correct.**

Q. And it's from you to Richard Vincent?

A. **Correct.**

Q. And it's actually on the afternoon after which you had been told that you have to leave City Hall, right?

A. **Correct.**

Q. The afternoon that you're having trouble breathing and distressed, and you're not even telling your husband what happened?

**MR. AIVALIKLES:** Objection, Your Honor.

**THE COURT:** Side bar.

(Thereupon, there was a side-bar conference held outside the presence and hearing of the jury.)

**THE COURT**: I'm going to let you correct that. I can see the out of order. She talked about that after the arrest as opposed to after this incident on January 22nd.

(Thereupon, the side-bar conference was concluded.)

**THE COURT**: So the objection is sustained. Go ahead.

**BY MR. CULLEN**:

Q. Sorry. If I said that those things happened that day, I apologize.

This is the day that you were told you had to leave City Hall?

A. **Yes, in the morning.**

Q. And what you wrote to Mr. Vincent -- and this time you didn't cc anyone -- you said: The legal office invited me into City Hall for many hours at a time to review documents. If they are willing to allow me in, then you should be okay with this as well.

A. **I did write that.**

Q. So the very day that you know that City Hall has not -- that the legal office has not invited you in, you're representing to Mr. Vincent that they let you in regularly, and that's why he should too?

A. **That's not what I implied at all. When I wrote that the legal office invited me into City Hall for many hours at times to review documents --**

**THE COURT**: Slow down there.

A. **The legal office invited me into City Hall for many hours at a time to review documents. That happened when they produced the cache of documents, and I made an appointment in 2019.**

**In 2019 I made an appointment to go in to review boxes of right-to-know records they put together for me. It was reasonable. It was a voluminous request, and I did it. I also made an appointment to go up and mediate my abatement in 2019, so they made appointments. I mean, I was allowed to review documents.**

**What happened that day is no relevance of me writing that sentence. It was not my intention to connect me being told that I had to leave the legal office with me inferring to Rick Vincent that you should allow me into the assessing office.**

Q. You knew that Rick Vincent had just started about that week, right?

A. **He was decades experienced, yes.**

Q. But he had only started in Nashua --

A. **Not that week. I thought he came on in December. I don't know.**

Q. Really no longer than Jesse Neumann?

A. **I found out that was the case, yes.**

Q. And, in fact, so recently that you were using his wrong

e-mail address earlier that very week?
A. **No. What happened with that e-mail address is I went to the assessing standard board's meeting in Concord, and they put me on an e-mail list to receive their agendas and their newsletters.**
**That e-mail list had Mr. Vincent's e-mail address in it, so when I typed his name, it automatically pulled up Lebanon, and I clicked on it thinking that's who I was getting. It wasn't that I was using it; it was an address I had. My computer recognized that address from state e-mails that were sent to me.**
Q. You knew he was new?
A. **I believe he was newer, yes, for sure.**
Q. And you knew that legal office had not invited you into their office for at least a couple of years?
A. **Umm --**
Q. Didn't you think this was a little misleading to tell a brand new assessing leader that legal has just invited you in to review documents and that he should do the same?
A. **No. I didn't state that was --**
Q. -- now is all I need -- (cross-talking)
A. **No.**
Q. Can we pull up, please, exhibit 1. That's a full exhibit.
I think -- I don't know that we need to really look

at this.

You testified, I think, earlier this morning that after you were told to leave and after you actually did leave, finally leave the legal department, you called Kimberly Houghton?

A. **Yes.**

Q. And what you told Kimberly Houghton, as we've gone over, was that you were peacefully protesting?

A. **Yes, that's what she wrote.**

Q. That's what she wrote because that's what you told her, right? She literally quoted you?

A. **Yes.**

Q. And she writes: Ortolano has said she repeatedly called and e-mailed Jesse Neumann seeking assistance and clarification about how abatements are being handled, right?

A. **Yes, because the legal office was handling abatements.**

Q. So even though you had been told only to go there for document requests, you're calling Jesse Neumann, and you're basically looking for an appointment with him to talk about how abatements are being handled?

A. **That's a document request, in my mind.**

Q. But in any case, you're asking him for clarification -- this is what you told Kimberly Houghton. You've been seeking assistance and clarification about how abatements are being handled this year, right?

A. **Correct.**
Q. There's nothing in Kim Houghton's article that indicates that you went up there to the legal department to get them to date stamp something, is there?
A. **She didn't write it, but my letter certainly does.**
Q. Well, the letter that you wrote after you spoke with her?
A. **I don't know that that's the case.**
Q. Well, your letter -- I'm sorry to repeat this, but your letter is 3:57 p.m., and you told Attorney Hilliard you might have talked to her in the morning or certainly around lunchtime?
A. **Just because it went out at 3:57 doesn't mean it was written that instant.**
Q. Fair enough.
A. **That was a lengthy letter, and I'm sure I worked on it.**
Q. And you also told her that you were going to be treated with the dignity you deserve and you were going to sit there until someone gave you the time of day?
A. **Yes.**
Q. One of the other things that you mentioned that gave you the impression that Celia Leonard didn't like you was you said you overheard a conversation she had while you were in the legal department, right?
A. **Correct.**
Q. And if I recall correctly, you said she was in a meeting

with -- was it Doug Dame and Mr. Turgiss?

A. **Correct.**

Q. And Mr. Turgiss was somebody that you were having the police investigate?

A. **No. I think it was -- I don't know if it was Greg. I don't know if it was Greg or Gary.**

Q. Well, which one did you have investigated?

A. **Greg.**

Q. And which one did you have reported up to DRA for sanctions?

A. **Greg. But they didn't bring him to the presentation up at the BTLA on August 6th. They brought Doug Dame. I can't remember if Gary went or not. I know they didn't present Greg.**

Q. Doug Dame was a witness in the BTLA hearing?

A. **I don't know if he spoke. He attended. I don't know if he spoke at all.**

Q. And Ms. Leonard was meeting with a witness when you walked into that office, right?

A. **Well, he wasn't a witness. I don't think he was recognized as a witness.**

Q. Well, she was meeting with somebody from the assessing department in preparation for the BTLA hearing?

A. **No, it was over. It was after.**

Q. And you were evesdropping outside in the hallway?

A. **Incorrect.**
Q. And that's why the city council doesn't want you to be hanging around in a private space, right?
A. **That's incorrect.**
Q. With respect to -- now, you don't deny that the -- neither the investigation interview or your arrest stopped you from going to public meetings or attending them by Zoom, right?
A. **That's correct.**
Q. And I think you mentioned with Attorney Hilliard that you went to something like approximately 50 just in 2021?
A. **Correct. They were Zoom meetings.**
Q. And presumably, the vast majority of those were after your February of 2021 arrest?
A. **Correct.**
Q. And one of the -- you also published a lot of articles, right?
A. **Correct.**
Q. One of them has been exhibit L, which is now a full exhibit. We don't have to bring it up, but you wrote -- you called Celia "Lying Leonard" and Kleiner "Crooked Kleiner"?
A. **What was the date of that?**
Q. April 28th, 2021.
A. **After my arrest, yes.**
Q. And at this time, in that same article you noted that you

have another lawyer, Rick Gagliouso, who is filing a motion to compel or had filed one in December of 2020, right?
A. **He took over the right-to-know case from Rick Lehmann, yes. And are you talking about getting e-mails? Just so I understand what the motion to compel is because I don't know what you're referring to.**
Q. So I'm really just looking at your own, so I don't know. What you wrote was my attorney had to submit a motion to compel on December 11th, 2020. This is a right-to-know priority matter to be expedited by the Courts.
A. **Yes, that was for e-mails we were trying to get.**
Q. Another litigation that you had on the city?
A. **It was the same one. It was the right-to-know case represented by Attorney Lehmann and Attorney Gagliouso who stepped in and took over that case toward the end.**
Q. In any case, once again, you were represented by counsel at the time that you were trying to go into speak with Jesse Neumann.
A. **I was -- I had my right-to-know case on the assessing records.**
Q. Now, in August 26th, 2021, you attended a board of assessors hearing, didn't you?
A. **August 26th of 2021?**
Q. Yeah.
A. **Yes. Yes.**

**MR. CULLEN**: Your Honor, a brief side bar is in order.

**THE COURT**: I think it's also time we can take an afternoon break, so you don't have to sit through this. So we'll take 15 minutes.

(Thereupon, the jury exited the courtroom.)

**MR. HILLIARD**: I'm sorry. We were having a private side bar before we started the official side bar.

**MR. AIVALIKLES**: We were going to suggest talking to you.

**MR. CULLEN**: This is the board of assessors hearing which the plaintiff uses the C word. I would posit that based on her testimony so far, including her claims of reputational damage or claims of distress, that this has an additional two points of interest. One is she's speaking specifically of this day. It's not sort of a random thing where she's attacking Celia about her conduct with right-to-know requests or her conduct.

She's talking specifically at this meeting about what happened on the day that she was trespassed from City Hall.

So I think it's -- I think it's notable some of the things that she omits from this, and I think it's also notable of the conduct that she accuses her of, which is specifically: It was Celia Leonard who took this up a notch.

Very happily to do that. I think she's a despicable attorney. I think it was the "C"-est behavior I've ever seen out of somebody.

And I would argue that it's admissible to both because of, as I said, some of the things she doesn't say in here, but also to counter her claims that her reputation was damaged because of her arrest as opposed to her other behavior.

**THE COURT**: And I've already ruled that it's relevant on damages likely to be relevant. And now we're in the context of the trial and not inclined to change that ruling. So I'm inclined to allow it. And was that all you needed to ask?

**MR. CULLEN**: Yeah. I think we were pretty specifically told to be careful around there.

**THE COURT**: I appreciate that.

**MR. AIVALIKLES**: Can I be heard, Your Honor?

**THE COURT**: Yes.

**MR. AIVALIKLES**: So this statement was made approximately six months after the arrest. Originally the Court said that this could come in under damages because it involved subjective chilling.

I believe in my opening I clearly made it known to the jury that there was no subjective chilling of speech because I said she was knocked down, but she got up, and she

continued to criticize the town officials.

Her evidence is clear also that there is no chilling. There is abundance of evidence that she wrote articles, that she attended hearings. So there's no damage component to that particular term, Your Honor, none whatsoever.

That has no probative value other than to inflame the jury. That's all it's there for, because there are other instances where she was either at hearings or she wrote that they could use if they wanted to establish that point, although it's an irrelevant point because it's not being claimed by the plaintiff.

**THE COURT**: All right. I appreciate your argument. I have overruled it. Have you preserved everything you want to preserve?

**MR. AIVALIKLES**: Yes, one other issue. It seems that the statement that was made in August is not that much different than the issue that's raised by the February 2022 -- I'm sorry, the July 2022 incidents. They're very, very similar because it goes to damages for my client, it goes to punitive damages, it goes to how she was impacted by the arrest, and her fear of future arrest that ultimately happened.

So it seems like the Court is not treating those two issues the same. We're not trying to say, Your Honor,

that the July incident was a separate, distinct event that deserves recovery. We're saying that it goes to punitive damages, and it goes to what my client had to go through in dealing with the city.

**THE COURT**: I understood your argument and I think it is well preserved at this point, and it's overruled. And so you will be able to inquire when we get back from our brief recess now.

**MR. CULLEN**: And that's probably going to be the end of my cross as well.

**THE COURT**: All right. So you will be ready for redirect at that point?

(Thereupon, a brief recess was taken.)

(Thereupon, the jury entered the courtroom.)

**THE COURTROOM DEPUTY**: Please be seated. This hearing is back in session.

**THE COURT**: Attorney Cullen?

**BY MR. CULLEN**:

Q. Thank you, Your Honor.

Ms. Ortolano, I believe it was yesterday that you said that when you were sitting outside of Attorney Leonard's office, you did not know that was her office, right?

A. **Correct**.

Q. And you said that she came in wearing big black boots and pressed them up against your thighs and stood over you in a

threatening manner?
A. **No. I think I said that she put them up right to my thigh. She didn't press them into my thigh. I don't want to say that, and she definitely stood over me in a tall presence and looked down at me.**
Q. Now, that's not something that you relayed to the police that day, right?
A. **No.**
Q. It's not something you included in your statements to Ms. Houghton?
A. **I don't recall. It's possible I did. I just don't recall. I don't want to say.**
Q. It's not something that you put in your e-mail that afternoon to the board and the mayor?
A. **No. I covered the statements. I was more concerned about the threatening and hostile and erratic and unstable kind of statements.**
Q. It's not something that you raised actually ever in public before this trial, is it?
A. **I don't know if I raised it in any public session. I don't know. I know I talked to my friend about it, but whether I did it in a public meeting, I don't know.**
Q. You're certainly not bringing in any evidence here to say that that's anything other than something you made up yesterday on the stand, right?

A. **I did not make that up.**
Q. You did talk about the incident on -- at the board of assessors meeting on August 26th, 2021. Do you recall that?
A. **Yes.**
Q. And pulling up something that's marked for ID only GG. You've seen this document before, right?
A. **Correct.**
Q. And it consists of about three pages of your statement made at the board of assessors meeting?
A. **Yes. It was transcribed by, I think, the city or one of the offices for this trial.**
Q. And it's accurate, right?
A. **I believe so.**
**MR. CULLEN:** Your Honor, I would ask that the ID on this be stricken.
**THE COURT:** All right. Objection noted. It is a full exhibit.
**BY MR. CULLEN:**
Q. Would you mind going to page 3 of this, about roughly here -- and maybe we can just blow that piece up a little bit -- you're talking to this board of assessors about the date of the incident, right, the date that you were in that City Hall, in the legal department?
A. **In this e-mail in talking about -- that's one of the things I'm talking about, yes.**

Q. And in this portion -- I'm skipping over the front part -- it's not actually an e-mail, right, it's public testimony?
A. **It's public comment during a board of assessors meeting.**
Q. A board of assessors meeting that is open to the public?
A. **Correct.**
Q. Broadcast on TV?
A. **Correct.**
Q. And one of the things you said here was there is no appointment posting on the website. I'm looking about five or six lines down, so I came, and the woman let me in.
Mindy Lloyd didn't let you in, did she?
A. **You know, I was talking about the lady, I believe, I forget her name, the greeter, who let me in.**
Q. So that's actually a little higher up there, though. When you start -- go four lines down in the blown-up section, it says, and I was admitted without an appointment because the website obviously didn't say I needed an appointment. Do you see that?
A. **Yes.**
Q. That's the part where you're talking about coming into City Hall itself, right?
A. **And I was admitted without an appointment because the website obviously -- yes, I believe that's when I went into the greeters area.**
Q. And so later when you repeat so I came in, the woman let

me in, and then you say so when Celia Leonard says she knows we don't have statements, you're talking about Mindy Lloyd letting you in?
A. **Yes, I believe so.**
Q. And that's not technically true, right? She just opened the door enough to see who you were?
A. **Right. I mean, she opened the door, yes.**
Q. And again, nowhere in this statement do you say anything about these black boots or anything else that she did to you -- that Celia Leonard allegedly did that day, right?
A. **She did do it, and I just didn't address it.**
Q. So the answer is no, nowhere in this statement did you say that?
A. **No.**
Q. You did say some other things about her, though, didn't you?
A. **I did.**
Q. Can we just take that section and blow it up for me, please.
And really, it was Celia Leonard who took this up a notch, very happily to do so. I think she's a despicable attorney. Just reading to yourself the next line that you said out loud at this meeting, is that what you said?
A. **Yes.**
**MR. CULLEN:** I don't have any further questions.

**THE COURT**: All right. Time for redirect.

## ***REDIRECT EXAMINATION***

**BY MR. AIVALIKLES**:

Q. Why did you call Kimberly Houghton after you were arrested? What was the purpose of that?

A. **Just to let her know what happened at City Hall and she would look into it and find out what really went on with the police. I thought she would do research on it.**

Q. And I think there was a discussion about exhibit 38 that you already talked about. In exhibit 4B, there's a mention that the homeowner and the rep would have gotten involved with the filing, correct?

A. **In 40-B.**

Q. I think it's 40-B.

A. **Is it an e-mail that I wrote or an e-mail that they wrote; do you remember? I'm just trying to put it all in my head.**

Q. Yeah. Let me pull it out. Mr. Vincent indicated that there would have been a receipt, then, to the homeowner?

A. **Yes, he did, yes, on the 22nd. Yes, he said everything had been processed.**

Q. Did you address that with him?

A. **I think I did write to him and say I didn't get anything. I'm a representative. I'm representing these people. I'm**

**signed on it. And I certainly wasn't notified, and neither were they. I contacted them, and they had received no receipt.**

Q. And I think that it's contained in 40-C. Let's talk about AssessHelp and the e-mail to Mr. Vincent. What is AssessHelp?

A. **It's an e-mail address that goes -- that is monitored and read by a staff member of the assessing office.**

Q. Does that --

A. **That's just the City of Nashua's e-mail address.**

Q. So when you sent the application through AssessHelp and you also sent it to Mr. Vincent, did they -- would they both have gotten the e-mail?

A. **Definitely.**

Q. So on January 17th when you sent it, Nashua had it, correct?

A. **They should have, and AssessHelp is where I was supposed to send it according to the policy.**

Q. So even though you had the wrong address for Mr. Vincent, it still would have gone to AssessHelp because you sent it there?

A. **Correct.**

Q. Can we pull up exhibit A which is defendants' exhibit.

When you went to the legal department on January 22nd, were you going there to have documents produced?

A. **No.**

Q. Did the situation change with the legal department concerning what they would do for the public in terms of like answering questions and documents. Did that change at all from A?

A. **Well, I think it changed -- that e-mail from 2019 changed by 2022 -- by 2021 when we ended up with Covid in 2020, and we ended up with an assessing office that was closed.**

Q. And was legal still answering questions that you had?

A. **Yes. That was -- that e-mail said they only handled document concerns, but I was frustrated because if I would ask a question in City Hall, it would get docketed. It would go up to legal. It would be docketed. They would write a response, inform me that 91-A, the right-to-know law doesn't require us to answer questions. Sometimes they'd give an answer, many times they wouldn't. And they would create a file on it and put it on a list of all of my requests, and so questions were still being forwarded up there. Correspondence was still being forwarded up there. They weren't handling just document requests. They weren't following the rule they told me they followed.**

Q. Did every single question that you sent, did that turn out to be a right-to-know request?

A. **No. I mean, it's questions -- I mean, people walk in and ask questions all the time. It's a public service area of**

City Hall.
Q. The 150 right-to-know requests that they claimed that you had sent, did any of those have to do with questions that you asked --
A. **Well, I would have not had to file many at all if I could have talked to people, especially in the assessing office, the way everyone else did.**
**I literally watched hundreds of people walk in that office during the time when an assessment is done, go up to the counter and ask all kinds of questions to the people. They could get anything they wanted answered.**
**And from the very beginning in 2019, I could not. I had to file right-to-know requests. And at that time, my questions, unknown to me, were being logged and put in a database.**
Q. Now, let's talk about the private investigative report. What did the private investigator conclude?
A. **That Mr. Turgiss had been sleeping on the job, even though he had been signing on on this whiteboard, indicating that he was going to inspect properties.**
Q. And did you address that with Attorney Bolton?
A. **Yes.**
Q. And what was Attorney Bolton's response?
A. **He laughed. He thought it was comical. He said there's nothing in here that's really relevant. He gets flex hours.**

**His job description allows him to do this, and the city would find nothing wrong with this.**

Q. And did the police find any type of misconduct when they investigated it?

A. **No.**

Q. And then when you complained to the state, did the state -- was it the Department of Revenue Administration?

A. **Yes.**

Q. Did they find anything wrong with what he did?

A. **Yes. That's why they sanctioned him and decertified him. It was because of the report that went up there, and they read it and thought that the line about going to homes and failing to inspect properties and misleading people on the whiteboard was a violation; and that he had broken the trust of the public.**

Q. Now, when you filed the abatement request for the two senior citizens --

A. **Yes.**

Q. -- did you have an attorney involved in that?

A. **No. No.**

Q. If you can go to exhibit 47 and if you can go bring up Mr. Neumann's statement to the police.

Did he indicate to the police that you refused to leave, and you continued to talk about abatement stamp dates while degrading both he and Ms. Lloyd?

A. **Yes, in the middle of that second paragraph.**
Q. Yes. So according to this report, Mr. Neumann knew that you were there for abatement stamps; is that correct?
A. **Yes, he knew.**
Q. Were you evesdropping when you were in the legal office?
A. **No. That was the day after the BTLA hearing. I went up to get records, which was before this letter about documents, but I went up to get documents on sales data that had been issued, discussed up at this meeting, and I was standing at Mindy Lloyd's desk. The office to the conference room was open, and the statement made by Attorney Leonard: Don't speak that woman's name was said loudly. I just heard it.**
Q. When you were there, did anyone tell you you couldn't be there; you needed an appointment?
A. **No.**
Q. Did anyone tell you you have to leave; we have these private conversations going on?
A. **No.**
Q. Were you in the hallway, or were you in the actual legal office?
A. **I was actually in the center part where the two legal assistants sit right -- in the room right next to it was the conference room.**
Q. All right. Now, let's go to GG. Those are the minutes of the meeting that you attended; is that correct?

A. **Yeah. On August 26th of 2021 at the board of assessors meeting, yes.**

Q. And as Attorney Cullen said, it's three pages of your testimony. So how long did you speak for?

A. **Probably 12 minutes.**

Q. And what were you addressing before you made the comment of the concern, Attorney Leonard?

A. **I was addressing some history about what it had been like for me to get records, to use the AssessHelp line, to -- I discovered that e-mail address in 2019 from my friend Laura Calhoun, who alerted me as a general address to get information. And I found that when I used it, it didn't work for me. The legal office said they wouldn't answer questions off that line of my questions. I expressed that frustration. I talked about assessor Turgiss coming to our home to inspect it in 2018. And --**

Q. Did you talk about the events of January 21st -- 22nd?

A. **Yeah. And then I went in and talked about specifically what had happened when I went to the legal office and how the board of assessors themselves never set up a process for citizens to be able to get these applications stamped and given back in a clear manner. They didn't communicate.**

Q. And then you described Attorney Leonard's behavior, correct?

A. **I did.**

Q. And in retrospect, would you have used a different term?
A. **I mean, I was extraordinarily frustrated at what had happened. I had just been dispositioned out of my arrest, July 12th, my birthday. That was my celebration. And I was just so frustrated at how I had been treated. And I made the remark toward her conduct, not to her personally, and I wouldn't do it again, but that's what rolled out.**
**MR. AIVALIKLES:** Thank you.
**THE COURT:** All right. Thank you. Anything further? All right.
**MR. CULLEN:** No, Your Honor.
**THE COURT:** All right. Ms. Ortolano, you may step down. You may call your next witness.
Thereupon,

**TIMOTHY JOHN ROACH,**

having been duly sworn by the courtroom clerk, testified as follows:
A. **Yes.**
**THE COURTROOM DEPUTY:** Thank you. Please be seated. State your full name and spell your last name for the record.
A. **My name is Timothy John Roach. And my last name is spelled R-O-A-C-H.**

***DIRECT EXAMINATION***

**BY MR. AIVALIKLES:**

Q. Good afternoon, Officer Roach.

A. **Good afternoon.**

Q. How are you today?

A. **Fine. Thank you.**

Q. Would you like some water?

A. **No. I'm fine right now.**

Q. How long have you been employed with the Nashua Police Department?

A. **It will be 16 years in April.**

Q. And what is your present rank?

A. **I'm a sergeant in the Nashua Police Department.**

Q. Congratulations, because you were a patrolman back in 2021?

A. **Correct.**

Q. Prior to joining the Nashua Police Department, had you had any other law enforcement experience?

A. **Yes. I was a crime scene investigator in North Carolina and a police officer in the United Kingdom.**

Q. In order to be an officer in the United kingdom, did you have to go through something similar to the New Hampshire Police Academy?

A. **There's a police training that's required. That's correct.**

Q. So you went through that, and you also went through the New Hampshire Police Academy?
A. **Yes, I did.**
Q. And you received their certificate, correct?
A. **Yes.**
Q. And as part of your training up at the New Hampshire Police Academy, you're instructed on how to conduct an examination?
A. **Yes.**
Q. You were instructed how to prepare reports?
A. **Yes.**
Q. And the purpose of a report is prepared is to -- for you to document all the important factors that you observed so that you could refresh your memory if it goes to trial and if there's a record of it; is that correct?
A. **Yes.**
Q. And you followed what you learned at the police academy when you did the investigation into this January 22nd incident involving Ms. Ortolano; is that correct?
A. **Yes.**
Q. And the narrative report that you have is actually two reports. If you could bring up 47, page 1 and 2. So that is your report?
A. **No, that's not my report. That's the call log.**
Q. But it has --

A. **This is my report.**
Q. It has information that you obtained during the investigation, does it not?
A. **This is a record of what was taken from the incoming call to dispatch. At the end of it will show a brief synopsis. So it's gone. You keep moving around. Are we good?**
Q. See, that's information that you provided; is that correct?
A. **That's correct. Yeah.**
Q. Okay. What's your education, officer?
A. **I went to school in the United kingdom, graduated high school, all the equivalent in U.K., and I have a degree in economics and environmental issues.**
Q. So when you began your employment with the City of Nashua, you were ranked as a patrolman, correct?
A. **Yes.**
Q. And what were your responsibilities as a patrolman?
A. **At that time I was a uniformed patrol officer. I was on first shift, so I would respond to any call for service and primarily investigate misdemeanors, minor offenses, or some minor offenses.**
Q. Such as criminal trespass cases?
A. **Yes. Misdemeanor would be a criminal trespass, correct.**
Q. And did that change before January of 2022?
A. **What do you mean did it change?**

Q. Your responsibilities, your duties. Were you still --

A. **I had different roles in the police department since when I was hired. So my roles have changed slightly.**

Q. So what were your roles?

A. **I was a uniformed patrol officer initially, and then I was -- went to the detective division while I was a computer forensics exam officer, basically, detective. And then I went back to patrol, then I went to the legal division temporarily, then back to patrol, and now I'm promoted.**

Q. So on January 22nd, did you consider yourself an excellent investigator?

A. **I mean, I'm a competent investigator.**

Q. Okay. Do you consider yourself more than just competent?

A. **I've never thought of myself to actually label my investigative skills. I just know anything I do handle, I try do it to the best of my ability.**

Q. So exhibit 47, that's the entire police report; is that correct?

A. **What's exhibit 47?**

Q. I'm sorry. You can look through it.

A. **So this is the offense report, the investigation I completed.**

Q. Yes.

**THE COURT:** Do you have a hard copy of that you could show him?

A. **I do have that hard copy.**
**THE COURT:** You do? Okay.
**BY MR. AIVALIKLES:**
Q. So you can go through it. So the record is clear, that's the police file?
A. **This is my involvement. So anything I did, I would have wrote a supplemental report for it, and it would have been logged under this ROF number. It says 21-4609-OF. That was my involvement.**
Q. Then if you could turn to exhibit 46.
A. **That's an arrest warrant I completed.**
Q. And it also includes the affidavit behind it; is that correct?
A. **That's correct.**
Q. And then there's the -- and then did you appear in court when the case was disposed of?
A. **No.**
Q. Were you informed of that?
A. **No. I wasn't aware what happened to the case.**
Q. So on that date, what was the first information that you received from the dispatcher?
A. **Would I be able to refer back to the initial call?**
Q. Yes. Can you put up number 1?
A. **So what I was advised of would be what was actually typed in the log portion of that exhibit indicating that that --**

**the first floor next to auditorium, they were requesting police for a woman that had forced her way into the office and would not leave.**

Q. What else were you told?

A. **The individual's name. She was reported to be Laurie Ortolano wearing certain clothing, carrying a bag. She was there to review documents, had a lawsuit against the city, and was told to speak with the attorney, but they are appointment only, and she refused to leave.**

Q. Was this conveyed to you while you were en route or before you left the station?

A. **I was -- I believe I was on Main Street at the time when this was dispatched, and this would have been go to the location, and it would have been relayed as I was heading in that direction.**

Q. According to the dispatch, I think you arrived at City Hall at like 9:28?

A. **No. Dispatched at 9:29. It says actually en route at 9:29 and arrived at 9:30. And, again, this is based on times that the dispatch enter arrival.**

Q. So when you arrived at City Hall, you went to the legal department?

A. **I went up to the third floor where this was, yeah.**

Q. And who was the first person, that you talked to?

A. **I believe I first talked to -- it was a few people there.**

**I believe Attorney Leonard was there. Mindy Lloyd was there, Jesse Neumann, Laurie Ortolano. I believed I talked to Laurie Ortolano to find out what was going on.**
Q. So you think you talked to Laurie first?
A. **I believe so, yeah.**
Q. And does your note indicate what Laurie told you?
A. **So obviously there was a report completed later, and it's the explanation, brief synopsis of my activity that day. Which one would you like me to review?**
Q. The first one in time. So it would be --
A. **And again, this is just listed here to clarify. It's not necessarily in the order that it happened. It's just a note to say I went to this location, and this is what happened, and this is how I resulted the call. It says here I spoke to Celia from City Hall.**
Q. Can you move that down for us because I think there's more to that. You see -- you indicated that you talked to Laurie first, and I think that you make reference to that.
A. **Yeah. I believe I'm making a reference to that specifically in these call notes. I'm just documenting.**
Q. So what did you observe, and what did Laurie tell you?
A. **Laurie was sat down in the hallway, and that she was there to have paperwork, related paperwork stamped, and that she had been trying to get an appointment with City Hall, and they weren't assisting her. And she had gone in today to**

**find out what she could do, and she had been asked to leave.**
Q. You indicate initially that she was not causing a scene on arrival and appeared calm; is that correct?
A. **That's correct.**
Q. And she told you -- one of the first things she told you is that she was upset about getting paperwork stamped by City Hall; is that correct?
A. **Yes.**
Q. You can go to the next page.
**THE COURT:** Could I just ask a quick question and clarify for the record? Sergeant Roach has documents, I think, that he brought in that are with him; is that correct?
A. **Yes, Your Honor.**
**THE COURT:** Just clarify that those documents are matching an exhibit in the case.
**MR. AIVALIKLES:** Okay.
**BY MR. AIVALIKLES:**
Q. Can you tell us what documents you have in front of you?
A. **So I have a copy of the initial call log.**
Q. Which is?
A. **Which would be the document you're referring to now.**
Q. What else do you have?
A. **I have a copy of the offense report which was 21-4609-OF.**
Q. Which is?
A. **This investigation here. And I have a copy of the arrest**

**report.**

Q. Your arrest report?

A. **The arrest report from Officer Santiago, and then I also have copies of the exhibits.**

Q. So you don't have up there your statement -- I'm sorry, your report nor Celia Leonard's two reports nor Neumann nor Lloyd's statements to you?

A. **Did you say I don't or I do?**

Q. I said you don't.

A. **No. I have my report, and I have a copy of those statements.**

Q. Oh, you do have them up there?

A. **Yes.**

**THE COURT:** Can you just for the record, state what exhibits those would match?

**MR. AIVALIKLES:** Yeah. Well, it would be exhibit 47 -- they're all in exhibit 47.

**THE COURT:** So they're attached in exhibit 47 -- everything that Sergeant Roach has is in exhibit 47.

**MR. AIVALIKLES:** That's what it appears to be, yes, Your Honor.

**THE COURT:** Thank you.

A. **Thank you.**

**BY MR. AIVALIKLES:**

Q. So when you spoke to Attorney Leonard, you put down the

facts that you heard from her; is that correct?
A. **Yes.**
Q. And what did she tell you?
A. **Summarized. She said that ongoing issues with Laurie and that personnel from the Nashua Police Department were aware.**
Q. Did she tell you what those issues were?
A. **No, not in a way, no.**
Q. Were you aware of any issues with the Nashua Police Department and Laurie Ortolano?
A. **No. I didn't know who Ms. Ortolano was.**
Q. And what else did she indicate to you?
A. **It was established that no allegation of any threats were made, but that Attorney Leonard wanted Laurie to leave City Hall. And they wanted a trespass but allowed to attend City Hall if she had an appointment.**
Q. Is that something that she told you?
A. **Yes. That was established at the time.**
Q. So at no time, according to your report, did she tell you she wanted her arrested, did she?
A. **No.**
Q. At no time, according to the report, she told you she wanted her prosecuted, did she?
A. **No.**
Q. And when you trespass -- when you trespass someone, is that the same as a criminal charge?

A. **No.**
Q. Explain to the jury what that is.
A. **If you're criminally trespassed -- in terms of what regard?**
Q. What does it mean to be criminally trespassed?
A. **You're not allowed to go back to a certain location without permission from the owner or an authorized person. So if she was to go back -- can I just explain a bit more?**
Q. Please.
A. **Typically when we respond to criminal trespass calls, usually we'll arrive, and if someone refuses to leave -- well, I ask them to leave, and if they refuse to leave in our presence, they can be arrested for criminal trespass which is a misdemeanor.**
**If they leave, we'll ask the owner or authorized person do you want him trespassed, and if they say yes, then we'll trespass them usually for a period of a year, and that will be a local record in Nashua.**
**So if they return, we can see when you were trespassed and by what officer, and they can be arrested for that misdemeanor because it would be in our presence.**
Q. So Attorney Leonard asked you to trespass her, is that correct, according to your notes?
A. **Yes.**
Q. And you did do that, correct?

A. **Yes.**
Q. Did Attorney Leonard, according to the note that is up before the Court, did she indicate she felt threatened by Laurie Ortolano?
A. **At the time that -- no. At the time I don't have that information. What I reported was in the notes here.**
Q. So there was no indication in the notes that she told you she felt threatened by Laurie.
Did she tell you that she was behaving in a threatening manner, according to your notes?
A. **According to my notes, no.**
Q. Did she tell you that her behavior was hostile, according to your notes?
A. **According to my notes, no.**
Q. Did she tell that you that her behavior was erratic, according to your notes?
A. **Based on my notes, no.**
Q. Did she tell you that her behavior was unstable, according to your notes?
A. **No.**
Q. Did she tell you she was afraid of Laurie Ortolano, according to your notes?
A. **No.**
Q. Did she equate Laurie's conduct to the Washington insurrection that happened on January 6th?

A. **No.**
Q. Do your notes reflect that you wanted to -- strike that.
You indicate the no offense alleged or apparent; is that correct?
A. **Yes.**
Q. So when you left City Hall that day, you left with Laurie, didn't you?
A. **Yes.**
Q. Did you consider the case closed?
A. **At that time, yes.**
Q. You had no intention of continuing any investigation, did you, when you left on January 22nd, 2021?
A. **No.**
Q. So your conclusion of no offense alleged or apparent was based upon your conversation with Laurie, your conversation with Attorney Leonard; is that correct?
A. **Yes.**
Q. So according to your notes, again, we're talking the first note, you asked Laurie to leave, and she left?
A. **Yes.**
Q. And she did so willingly?
A. **Yes.**
Q. Did she tell you she was frustrated?
A. **Yes.**
Q. When she left, did she appear to be angry or anything

like that?

A. **No, but the demeanor appeared fine.**

Q. Fine. And when you advised her that she was under arrest, did she of --

A. **I'm sorry?**

Q. When you advised her -- my mistake. When you advised her she was under trespass, did she have any questions for you?

A. **No. She understood that she was trespassed.**

Q. In fact, you reminded her again on the way out, correct?

A. **Yes.**

Q. You told her, Laurie, you can't come back here. I don't want to have to arrest you. Isn't that what you told her?

A. **Yes.**

Q. Was she actually escorted out of City Hall?

A. **No.**

Q. When you left on January 22nd, there's an indication that the case was cleared; is that correct?

A. **Yes.**

Q. What does it mean when a case is cleared?

A. **There was going to be no further investigation.**

Q. In other words, it was closed?

A. **Yes.**

Q. Do you recall when you learned why she was there, what she was doing there, who she was doing there, did you have any -- did you characterize her motivation for being there, I

should say? When we met we talked about that.
A. **I didn't think much of it, to be honest with you. What are you trying to say?**
Q. Well, did you characterize it when we met on Friday when you became aware of all of the circumstances as to why she was there?
A. **I'm not aware of -- I wasn't aware of anything that Ms. Ortolano was engaged in. I wasn't aware of any issues with City Hall. From what she was reporting, she was trying to save residents money. That's a noble -- noble cause.**
Q. In fact, did you use the word admirable when we talked?
A. **Yes.**
Q. Thank you. So after you left, did you go back and talk to Attorney Leonard?
A. **No. Once I left, I left. I talked to Teddy Leonard another day.**
Q. Yes. We'll get to that. Was Sergeant Caron there also?
A. **Yes.**
Q. And do you know if he spoke to Attorney Leonard?
A. **He was present with me, so we both spoke, correct.**
Q. What other police officers were there?
A. **I believe Officer Yeomelakis, and I'm trying to recall if -- there was a number of officers dispatched. I'm not sure if the other two individuals arrived or not.**
Q. Would one of them be Officer Crossen (ph.), I believe?

A. **That's correct.**
**THE COURT:** Can you tell us when you're talking about?
**MR. AIVALIKLES:** January 22nd.
**THE COURT:** So the same day goes back.
**MR. AIVALIKLES:** Right.
**BY MR. AIVALIKLES:**
Q. So you're not sure if Officer Crossen was there?
A. **No, I don't remember.**
Q. But do you remember Yeomelakis, and you remember Sergeant Caron being there?
A. **Yes.**
Q. Can you bring up the next page. Is this the statement in your narrative report?
A. **That's my synopsis of my involvement that day.**
Q. Right. So this is more detailed than the incident report which was on page 1 to 2 of exhibit 47; is that correct?
A. **That's not -- yeah. That's not an instant report but prior. That's just call notes.**
Q. Call notes. But this is more detailed than your call notes?
A. **It's more detailed.**
Q. Now, when you prepared this report, was that based on your -- the notes you took that day?
A. **It was based on the notes and recollection.**

Q. So some of this wasn't in your notes. It was what you also recalled?

A. **Yes, correct.**

Q. And that's not unusual for police officers to do that, is it?

A. **No.**

Q. And in this particular narrative, which is -- looks like it's on page 5, did you put down all of the relevant matters that you had observed that particular day?

A. **It depends what you're referring to.**

Q. Well, all the important things that you observed when you was part of your response to the call?

A. **I wrote down what was appropriate for the call that I was responding to, being a criminal trespass.**

Q. But you haven't noted anything that was important to your activity, did you?

A. **No.**

Q. Can you pull up -- I think it's UU. Can you --

Is that Laurie that's sitting in the picture?

A. **I mean, the picture is poor quality.**

Q. Can you bring it --

A. **That's an individual sitting down, but I remember Ms. Ortolano being sat there.**

Q. Is her back up against the door?

A. **I can't tell what that is in the picture. It looks like**

**a ball.**
Q. Do you see the door there?
A. **Is that a door, or is that part of the wall?**
Q. No. The white thing on the -- do you see the door there now?
A. **I'm sorry. The door in the center of the picture? I see a door in the center of the picture.**
Q. Yes. Was her back up against the door?
A. **I can't. From that picture, no, I can't see her back against the door.**
Q. Thank you. Are you aware how that door opens? Does it open out or in?
A. **I don't recall.**
Q. It's okay if you don't recall.
A. **I don't recall.**
Q. Don't worry about that. Again, go back to his report.
So in your report, do you again reiterate that she was not causing a disturbance, she appeared calm. You asked her to stand; is that correct?
A. **Yes.**
Q. And she did that, didn't she?
A. **Yes.**
Q. You asked her for an ID, and she did that?
A. **Yes.**
Q. You asked her what the problem was and why she was at

City Hall, and according to your report, she told you why she was there, right?
A. **Correct.**
Q. And that had to do, again, with the date stamps and some abatement work that she was inquiring about?
A. **Yes.**
Q. So she was complying with all of your requests when you were talking to her and asking her for her ID, to stand, and things of that nature, correct?
A. **Yes.**
Q. She was even complying when you told her she had to leave?
A. **Yes.**
Q. She didn't argue with you or anything along those lines, correct?
A. **No.**
Q. So when you talked to Attorney Leonard, and you have your conversation with her, and some of them would be in your notes and others from memory, did Attorney Leonard say that she felt threatened by Laurie Ortolano, according to your narrative report?
A. **No.**
Q. Did she say that her behavior was threatening?
A. **No.**
Q. Did she say that her behavior was hostile?

A. **No.**
Q. Did she say that her behavior was erratic?
A. **No.**
Q. Did she say that her behavior was unstable?
A. **No.**
Q. Did she say that she was afraid of her?
A. **No.**
Q. She just wanted her to leave; isn't that correct?
A. **Yes.**
Q. And that's what happened?
A. **Yes.**
Q. Now, when Laurie interacted with people, was she courteous and respectful?
A. **Yes.**
Q. Does your report indicate Sergeant Caron's involvement in this?
A. **Indicates he was here, yeah.**
Q. Does it indicate he had a conversation with Celia Leonard?
A. **Yeah. He spoke with Celia Leonard. It doesn't indicate that specifically, but I know he was involved in speaking with her also.**
Q. Well, it says prior to leaving the building fully, Sergeant Caron had confirmed with Celia that Ortolano was to be trespassed from City Hall and only allowed in the building

with an approved appointment?
A. **Yeah. He spoke to Ms. Leonard.**
Q. So Sergeant Caron obviously talked to you about what he told Attorney Leonard, according to your report, correct?
A. **About what he told Celia Leonard?**
Q. Yes. About Laurie was going to be trespassed and not allowed to return?
A. **About what Attorney Leonard asked.**
Q. Oh, okay. What Attorney Leonard asked. I'm sorry. I didn't read it that way, but that's fine. So Attorney Leonard asked Sergeant Caron to trespass her?
A. **Yeah.**
Q. You also have a statement from Attorney Leonard that she prepared on January 22nd, is that correct, as part of your report?
A. **Well, I received a statement later on when I went back.**
Q. Exactly. I'm sorry. I didn't mean to suggest that you got it on that day.
But at some point when you went back, you were handed a statement that she had prepared with a date of January 22nd?
A. **Yes.**
**THE COURT:** Brief side bar. Brief side bar.
(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

**THE COURT**: There's no objection on the floor, but this is entirely leading, and he's not hostile. And he sounds as though he's got records in front of him, if you needed to refresh his memory or cross-examine or show him something, but why can't you just ask him what happened next? What did you do next? Was Officer Caron there? Did you talk to him? As opposed to cross-examining him on an exhibit. The jury is going to have the exhibit speak for itself. The officer is on the stand. Let him testify on direct. It's just going to take forever otherwise.

**MR. AIVALIKLES**: I'm sorry, Your Honor, but I can't expect the jury to understand the different nuances between the different reports, the contradictions, the omissions, and things of that nature. I have to point it out as Attorney Cullen --

**THE COURT**: Whisper. Whisper.

**MR. AIVALIKLES**: As Attorney Cullen did with my client and what was not --

**THE COURT**: This is your witness. You're on direct. You have asked nothing but cross-examination leading questions. He's not a hostile witness. I haven't declared him as a hostile witness. There's no objection, but this trial will take a month going at this speed, sir. He is a competent witness. He was there. You can ask him what happened. And then you've got exhibits to make the point

with the jury. That's how direct examination works. So I'm going to ask you to do a direct examination.

**MR. AIVALIKLES:** I will. I will.

(Thereupon, there was a side-bar conference outside the presence and hearing of the jury.)

**BY MR. AIVALIKLES:**

Q. So when you left City Hall, did you have an understanding what the city's position was concerning Ms. Ortolano?

A. **Yes.**

Q. What was that?

A. **That they didn't want her to return without an appointment.**

Q. And was the -- did the police follow the city's -- strike that.

Was she given any warning other than the no trespass?

A. **Well, she was warned by myself that if she was to return without an appointment, she could be arrested for criminal trespass.**

Q. So based upon what you learned in your investigation, did Mrs. Ortolano have permission to be at the legal office?

A. **No.**

Q. Based upon your investigation, did you learn whether the person in control of the office told her to leave?

A. **A number of people told her to leave.**

Q. But specifically a person in control of that office?
A. **Yes.**
Q. Did you learn that Mrs. Ortolano refused to leave after being told to?
A. **Yes.**
Q. And based upon those facts, there would have been enough to charge her with criminal trespass, is that correct, on that date?
A. **Yes.**
Q. Were you aware of the e-mail that Laurie sent on 3:57, which is exhibit 1. One of the questions -- well, you have it. Actually, that's in the police report.
A. **This e-mail was sent at 3:57 p.m.**
Q. You have that there?
A. **I have a copy, yes.**
Q. And how did you get a copy of that?
A. **I believe I was provided that by -- I'd have to refer to my report, but Attorney Neumann, I believe.**
Q. And when did you get that?
A. **Later on when he sent it to me. That would have been after I took a statement from him.**
Q. And did you read the e-mail?
A. **I reviewed it, yes.**
Q. Did you draw any conclusions about the contents of that e-mail?

A. **Would you mind if I refer to my report again?**
Q. Please. Please.
A. **(Complies.) So I didn't indicate, really, an e-mail prepared to address the incident on the 22nd when it was signed off with the name Laurie indicating it was written by her. Would you like me to --**
Q. No. I'm just inquiring whether you had the opportunity to read it.
A. **Yeah.**
Q. At some point during the investigation?
A. **Yes.**
Q. You interviewed Jasmine Castro, did you not?
A. **Yes.**
Q. And who was she?
A. **She was a greeter who worked on City Hall on the ground floor.**
Q. And you didn't prepare a narrative based upon your discussions with her?
A. **Yes.**
Q. Do you have that in front of you?
A. **Yes, I do.**
Q. What did she tell you?
A. **She told me that between sometime between 9:00 and 9:30 Ms. Ortolano arrived at City Hall requesting to speak with an employee called Kim Kleiner regarding obtaining stamps for**

**abatement documentation.**
Q. Did she tell you anything about Ms. Ortolano's disposition?
A. **Nothing that I recall writing down.**
Q. Well, it says Jasmine reported that Ortolano had been pleasant; is that correct?
A. **Yes. It should be in my report. One second.**
Q. Second paragraph, last sentence.
A. **There we go. Yeah. Pleasant.**
Q. And you asked her if she knew who she was?
A. **Yes.**
Q. And what did she say?
A. **She said she'd heard the name mentioned before in reference to the legal department but did not know what she looked like.**
Q. And after you interviewed Ms. Castro, did you interview anyone else?
A. **I arranged to speak with different individuals, interviewed them on a different day, I believe.**
Q. Actually, when did you learn that -- strike that.
When were you requested to go to City Hall after the event, after January 22nd?
A. **I wasn't requested to go to City Hall. I was asked to investigate this case further, and that would entail me obviously eventually going to City Hall.**

Q. Let's go to page 13 in exhibit 47, which is a February 7th entry.

**THE COURTROOM DEPUTY:** Did you say 13? Excuse me.

**MR. AIVALIKLES:** No. No. 47. But it's page 13.

**THE COURTROOM DEPUTY:** Thank you.

**BY MR. AIVALIKLES:**

Q. Do you see that? It says that at of 6:30 -- I'm sorry. That's the wrong entry.

A. **Were you looking for February 1st?**

Q. February 1st, yes.

A. **Yes. I was made aware by a supervisor that City Hall were looking to have this matter investigated.**

Q. Well, I think it said supervisors; is that correct? You used the plural, supervisors?

A. **Yes. I mean, I spoke with Sergeant Caron, so I'm assuming he spoke to somebody else.**

Q. So you spoke to Sergeant Caron, but you assume he spoke to someone else?

A. **Yes.**

Q. So that's why you used supervisors?

**MR. CULLEN:** Objection. Yes, Your Honor, just upcoming hearsay. Conversations that he had with his supervisors, I believe, is hearsay.

(Thereupon, there was a side-bar conference held outside the presence and hearing of the jury.)

**MR. AIVALIKLES**: It's in his report that he spoke with supervisors.

**THE COURT**: That doesn't mean it's not hearsay. What's the purpose of the introduction that's a non-hearsay purpose?

**MR. AIVALIKLES**: I wasn't going to ask him what he was told, Your Honor.

**THE COURT**: Okay. All right.

(Thereupon, the side-bar conference was concluded.)

**THE COURT**: Overruled.

**BY MR. AIVALIKLES**:

Q. As a result of that conversation, you were going to pursue a further investigation? I'm sorry.

A. **Yes.**

Q. Now, what does the note indicate Attorney Leonard said when she called the police department?

A. **Give me one second, please.**

**MR. HILLIARD**: Let's get the note on the screen.

A. **So I don't know how --**

**MR. AIVALIKLES**: No, that's not it. We're still on page 6.

**THE COURT**: We've got 10 minutes left until it's time to send the jury home. I'm not going to have to another side bar. I'd just like you to speed it up. I think if you ask him what happened next, then what happened, what did you

find out next, it would move along.

**MR. AIVALIKLES:** I'm trying, Your Honor.

**BY MR. AIVALIKLES:**

Q. Does it indicate that she was calling on behalf of City Hall, according to your note?

A. **I don't know whose calling. I didn't see calling. It said contacted.**

Q. Made aware?

A. **I was made aware by supervisors City Hall through Attorney Celia Leonard contacted the Nashua police department to open up an investigation.**

**THE COURT:** He's reading from exhibits. Okay? He's not testifying. I've asked you to just ask him to testify, as opposed to go exhibit by exhibit. So if you could just ask him to tell what he knows. Tell the jury the story, as opposed to pointing to exhibits. And then it's confusing because he doesn't know exactly which exhibit you're pointing to. So just ask him to testify. Go ahead.

**BY MR. AIVALIKLES:**

Q. So the call came in to you at 9:00 -- the request came in at 9:00, and at 9:40 you responded to City Hall?

**MR. CULLEN:** I'm sorry, Your Honor. Are we back on January 22nd now?

**MR. AIVALIKLES:** Yes.

**THE COURT:** I don't know. I don't know.

**BY MR. AIVALIKLES:**

Q. There's February 1st entry by you?

A. **Yeah.**

Q. And it indicates that at 9:40 you went to City Hall, correct?

A. **Yes, that's correct.**

Q. And that was 40 minutes after you received the message about the supervisors wanting you to go to City Hall, correct?

A. **Yes.**

Q. So what was the urgency that you had to be there so quickly?

A. **Well, it's a Monday morning. There's not much going on. I'm going to be investigating this, so I'd rather get on top of it and start investigating.**

Q. So let's go to Mindy Lloyd's statement.

**THE COURT:** We're going to go to another exhibit?

**MR. AIVALIKLES:** No. I'm sorry. It's still exhibit 47, but it's on page --

**THE COURT:** I just want him to testify and tell his version of events, and then you've got a lot of exhibits you can ask him about.

**BY MR. AIVALIKLES:**

Q. How long did you spend with Mindy Lloyd?

A. **I don't know how long exactly I spent with Mindy. Could**

**be 20, 30 minutes.**

Q. And was this report under her name, was that typed by you or was it typed by her?

A. **This was typed by me.**

Q. Have you listened to the audio tape of the initial call into the police from Mindy Lloyd?

A. **No.**

Q. Was this the 911 call initially?

A. **No.**

Q. Do you know if she was asked by the dispatcher whether or not they wanted her to stay on the line?

A. **I don't know.**

Q. Now, did she tell you that Laurie Ortolano pushed the door open?

A. **Yes. I believe she said words to the effect of I'm coming in and pushed the door open.**

Q. You don't know how the door opened, do you?

A. **I believe the door was an outward-opening door.**

Q. Right. So she couldn't push the -- Laurie Ortolano could not have pushed the door open?

A. **You can push a door open. You can push it open, or you can pull it open, so she pushed the door open.**

Q. But she was standing in the hallway. She'd have -- if she pushed it, it would be closing?

A. **If the door is ajar, you can push the door open.**

Q. You observed the door on the -- I'm sorry. You observed the sign on the door; is that correct?
A. **Yes. There was a sign on the door.**
Q. And it said by appointment only?
A. **As well as other writings.**
Q. It doesn't say visits by appointment only, did it?
A. **No.**
Q. It didn't say appointments that needed, did it?
A. **No.**
Q. Nowhere in your conversation with Mindy Lloyd does she say that she felt threatened by Laurie's presence?
A. **No.**
Q. Nowhere in -- did she tell that you Laurie was hostile?
A. **No.**
Q. Did she tell you her behavior was hostile and threatening?
A. **No. I didn't write it down.**
Q. Did she tell you her behavior was unstable?
A. **No.**
Q. Did she tell you her behavior was erratic?
A. **No.**
Q. Did she tell you her behavior was unusual?
A. **No.**
Q. Did she tell you she was concerned with her behavior?
A. **No.**

Q. Did she point Laurie's behavior to the J-6 incident in the statement that you took from her?
A. **No.**
Q. Did she tell you that Laurie invaded the legal department?
A. **No. I don't recall, used those words.**
Q. Did she tell you that it was fortunate that no one was injured or worse?
A. **No.**
Q. And then you also spoke to Attorney Neumann, correct?
A. **Yes.**
Q. And did he tell you that he refused to answer Laurie's questions at least three times that she had asked?
A. **He told her that he had no intention of discussing anything with her.**
Q. And in the statement, he also raised the issue that she wanted to discuss the stamping of the abatements, correct?
A. **Yes.**
Q. Now, is there anything in Mr. Neumann's report where he indicated that he told Laurie to maybe come back or that he would call down to assessing or anything of that nature?
A. **No.**
Q. Did he tell you that she made explicit threats?
A. **No.**
Q. Did he tell you he was concerned with her behavior? I'm

sorry. I think he did say that.
A. **He did say he was concerned by her behavior. Didn't know -- with recent events in Washington D.C., he was concerned, and that she appeared unstable.**
Q. And did he indicate to you that he wanted her arrested?
A. **He did. When I finished, he did say he would like to pursue charges against her.**
Q. Can you pull up the statement from Attorney Leonard dated -- this is the one that's dated January 22nd. Can you go to the last page of that.
Is that signed by Attorney Leonard?
A. **I've not witnessed Ms. Leonard sign anything, but the signature says Celia Leonard.**
Q. And that's dated January 22, 2021; is that correct?
A. **Yes.**
Q. Can you go back to the first page.
Now, Attorney Leonard wasn't there for the full time, was she?
A. **No.**
Q. When the event happened on the 22nd?
A. **No.**
Q. Did she tell you that Laurie yanked the door open?
A. **I don't recall, no.**
Q. Did she tell you that Laurie --
**MR. CULLEN:** Your Honor?

**THE COURT**: We're going to take our afternoon break and send the jury home. We will -- I send you home with the same instructions. You're all shaking your head, you know exactly what I mean.

There has been some testimony about blogs and various Facebook items. Please follow my instructions and don't go researching looking at things. You are also shaking your head. I think you get it. I'm going to send you home and I'll see you at 9:00 a.m. in the morning. Thank you very much.

(Thereupon, the jury exited the courtroom.)

**THE COURT**: Thank you, sergeant. You may step down, and we will see you in the morning and continue your testimony.

A. **Thank you.**

**THE COURT**: Thank you. All right. Before everybody goes, let's set our time for tomorrow. 8:30 still work for everybody just to touch base?

**MR. AIVALIKLES**: Yes, Your Honor.

**THE COURT**: We can revisit perhaps in more detail maybe some of the issues with the jury instructions but move through that fairly quickly as well. Anything else you need to bring to my attention?

**MR. AIVALIKLES**: No, I don't think so, Your Honor.

**THE COURT**: I need to bring to your attention a

concern that I have with time in terms of what I told the jury about the length of the trial.

And this witness is a witness who could be on and off, could be going home tonight had you done a direct examination of him, and then defense counsel could have crossed him.

You cross examined him for the entire hour of his testimony, 3:00 to 4:00, and as a result, what happens is the jury sees one exhibit after another instead of hearing a coherent story.

And the exhibits are scrolling in front of the witness and the jury and everyone else. And ultimately, your pinpointing one issue in a report, for instance. Just now we did the statement of Attorney Leonard. Why not just ask him: What is this? Have you seen this? Can you tell the jury what it is? Those kind of direct open-ended questions.

And then instead of just launching in: Did she tell you X? Because then he needs to take the time to read, to make sure and see if he can find in that whatever statement the words that you're specifically cross-examining him on as opposed to having topics of discussion.

He's not a hostile witness at this point. To the extent you need to show him things in his report, you have them. They are exhibits and you can bring them up to him.

We do not -- we will never get through witnesses if

you cross-examine them with their exhibits on direct. These are direct witnesses. He's not a hostile witness. It's one hour and ultimately, you know, asking him repeatedly if she didn't tell you he was threatened, she didn't tell you -- those are all leading questions. I understand. You're looking at me. And you're looking at me like -- I'm telling you the basics.

You need to be doing a direct exam of these witnesses, or we will not get through this trial. And I have a duty and obligation to control the order and presentation of witnesses so that there's not a delay, there's not cumulative evidence, there's not confusion.

And it's essential that when you call a witness, unless they are a hostile witness and declared a hostile witness, that you get their story out in a narrative form with open-ended questions.

For whatever reason, defense counsel's not objecting, but the time that this is going to take is something that I am sua sponte concerned about, and I'm bringing it to your attention.

So ultimately, I think, organizing your questions so that they conform to the rules of evidence, a witness that you call, that is direct examination with open-ended, narrative questions.

And then you can use exhibits to refresh memory, to

show him specific statements to draw his attention. But to literally start with exhibits -- and I don't even know the timing, the sequence of events, I'm assuming the jury is confused as well in terms of if he went there on January 22nd and then he ended up talking to other people after that, when, why, who did he talk to in the meantime? There have been not open-ended questions.

It's going to cause a time problem in the case, and that's the concern I have. So I'm going to ask you to comply with the rules of evidence. And when you call a witness, to ask them direct, open-ended questions, not cross-examining exhibits that are in the case. That is not proper and, unfortunately, it's taking -- it's taking too long, and it's confusing. It's a confusing presentation of a story that this gentleman could tell.

I don't know quite how to deal with this other than setting up some time limits with respect to how much more time you can have to put on this case. I'm going to contemplate that, but I would much prefer you on your own just speeding up the presentation of the case, and you can do that by complying with the rules of evidence. It would be much simpler; it would be faster, and so I am stepping in and I'm asking you to do that because I do not want to be having to say you only have until such and such a time get your entire case in. But that's where we may be headed because I

109 of 126

told the jury I overestimated where I was told by counsel because I do not want to keep them here longer than Tuesday. That means they need to be deliberating Tuesday. And right now, at this pace, your case won't begin by Monday. This is not going to -- it's too slow, and the reason it's the too slow is because of the manner in which the questions are being presented.

So I'm bringing that to your attention, and I'm going to contemplate how I deal with this if, in fact, there's continued cross-examination by exhibit as opposed to direct examination of your own witnesses. I know it's tiring. It's tiring. You've been doing this trial for days. It's tiring right now, but I'm going to have to rein the time in and speed up the presentation of the witnesses. And I'm not asking you to do anything but to comply with the rules of evidence, and that's what I'm asking you to do.

So we will reconvene at 9:30, and I will, at that point, check in with you about whether or not you think you can get this case in in a timely manner and whether or not you can conform your direct questioning to the rules of evidence.

Attorney Hilliard?

**MR. HILLIARD**: Thank you, Your Honor. It would help if we had some indication or confirmed indication of the order of witnesses after Sergeant Roach and Sergeant Caron

who was here today as well.

**THE COURT**: I think he said the order already. Has it changed?

**MR. CULLEN**: We just have two more. We know that Chief Carrignan, I think, and I think and David Lavoie we're still calling them are the next two after Sergeant --

**MR. HILLIARD**: Is the plaintiff going to rest then? Are we going to be ready to proceed?

**MR. AIVALIKLES**: I will get back to him and let him know, Your Honor. I can't answer that right how.

**THE COURT**: It's possible those two witnesses could be your last two witnesses?

**MR. AIVALIKLES**: No. I don't believe so.

**THE COURT**: You don't think that's possible?

**MR. AIVALIKLES**: No.

**THE COURT**: So it's Carrignan and another officer.

**MR. HILLIARD**: Caron.

**MR. CULLEN**: David Lavoie. He's the records manager, not that I know who he is.

**THE COURT**: And then beyond that?

**MR. AIVALIKLES**: I was going to suggest that maybe I won't call Attorney Bolton and Attorney Leonard and let defendants call them.

**THE COURT**: And then you cross-examine them?

**MR. AIVALIKLES**: Cross-examine them.

**THE COURT**: All right. That sounds reasonable. I'll let you make that call. And if you can -- with your remaining officers, unless they're hostile witnesses, just get the narrative out and then be ready to supplement with the exhibits.

**MR. AIVALIKLES**: We have agreed to Carrignan as a hostile witness, Your Honor.

**THE COURT**: And so if he's a hostile witness, you can right away start with cross-examination.

**MR. AIVALIKLES**: And Sergeant Caron is going to be a very quick witness.

**THE COURT**: Okay. Good. All right. Thank you, counsel. And we'll see you tomorrow at 8:30.

(Thereupon, the above portion of the trial was concluded.)

* * *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

05/21/2026

DATE COMPLETED

GIZELLA BAAN-PROULX, FCRR

## $

**$750,000** [1] - 23:8

## '

**'19** [1] - 37:6
**'22** [2] - 15:13, 16:1

## 0

**03301** [1] - 1:21
**05/14/2026** [1] - 112:8

## 1

**1** [7] - 18:10, 27:13, 49:23, 72:22, 75:23, 86:17, 94:11
**10** [1] - 98:22
**11th** [3] - 13:9, 36:4, 54:9
**12** [3] - 20:20, 20:24, 69:5
**12th** [5] - 21:8, 30:12, 30:13, 31:14, 70:4
**13** [3] - 97:1, 97:3, 97:4
**14** [1] - 21:22
**15** [1] - 55:5
**150** [3] - 11:21, 11:24, 66:2
**15th** [1] - 37:16
**16** [1] - 71:11
**17** [2] - 2:4, 30:2
**17th** [4] - 21:14, 21:19, 22:25, 64:15
**18** [1] - 33:13
**18th** [1] - 10:21
**19** [4] - 32:11, 32:15, 34:10
**19th** [2] - 31:16, 33:15
**1st** [3] - 97:9, 97:10, 100:2

## 2

**2** [2] - 72:22, 86:17
**20** [1] - 101:1
**2004** [1] - 23:7
**2013** [1] - 23:5
**2014** [1] - 23:5
**2018** [6] - 22:14, 23:12, 24:1, 39:6, 46:4, 69:16
**2019** [22] - 10:19, 24:12, 24:25, 26:14, 26:18, 29:12, 33:11, 33:12, 34:24, 36:4, 36:22, 37:16, 39:1, 39:6, 46:3, 46:5, 48:5, 48:6, 48:10, 65:6, 66:12, 69:10
**2020** [9] - 7:24, 8:3, 8:6, 39:21, 39:24, 46:6, 54:2, 54:9, 65:7
**2021** [26] - 8:21, 10:22, 11:11, 11:20, 12:2, 12:5, 12:13, 13:9, 13:12, 14:21, 18:5, 38:14, 39:2, 39:25, 46:11, 53:11, 53:14, 53:23, 54:21, 54:23, 60:3, 65:7, 69:1, 71:15, 83:12, 104:14
**2022** [5] - 4:12, 57:19, 65:7, 73:24
**2026** [1] - 1:4
**20th** [1] - 42:23
**21-4609-0F** [2] - 75:8, 78:23
**21st** [2] - 43:3, 69:17
**22** [1] - 104:14
**22-CV-00326-LM** [1] - 1:2
**225-1454** [1] - 1:21
**22nd** [21] - 10:5, 18:5, 28:7, 46:11, 47:3, 63:21, 64:25, 69:17, 72:18, 74:10, 83:12, 84:16, 86:4, 91:14, 91:21, 95:4, 96:22, 99:23, 104:9, 104:20, 108:4
**23rd** [3] - 8:21, 9:12, 33:12
**24** [3] - 13:12, 37:12, 43:6
**24th** [2] - 21:18, 23:2
**25th** [1] - 22:14
**26th** [5] - 26:13, 54:21, 54:23, 60:3, 69:1
**27th** [1] - 33:11
**28th** [1] - 53:23

## 3

**3** [3] - 26:15, 26:19, 60:19
**30** [3] - 12:1, 12:4, 101:1
**38** [1] - 63:10
**3:00** [1] - 106:8
**3:57** [4] - 51:9, 51:12, 94:10, 94:13
**3rd** [2] - 26:18, 27:13

## 4

**4** [3] - 1:4, 1:8, 16:11
**4-2-2019** [1] - 26:19
**4-3-19** [1] - 26:22
**40** [1] - 100:7
**40-A** [1] - 43:9
**40-B** [2] - 63:14, 63:15
**40-C** [2] - 46:10, 64:4
**40s** [1] - 46:10
**45** [1] - 8:9
**46** [1] - 75:10
**47** [13] - 12:8, 67:21, 72:22, 74:17, 74:19, 79:17, 79:18, 79:19, 86:17, 97:1, 97:4, 100:19
**4:00** [1] - 106:8
**4B** [1] - 63:11

## 5

**5** [1] - 87:8
**50** [2] - 11:12, 53:11
**55** [1] - 1:20

## 6

**6** [2] - 16:11, 98:21
**60** [3] - 46:4, 46:5
**603** [1] - 1:21
**63** [1] - 2:4
**6:30** [1] - 97:7
**6th** [2] - 52:12, 82:25

## 7

**7** [2] - 2:4, 28:7
**71** [1] - 2:5
**7th** [1] - 97:2

## 8

**8-page** [1] - 28:7
**8:30** [2] - 105:17, 111:13

## 9

**9** [2] - 16:11, 46:7
**91-A** [8] - 20:9, 21:4, 31:20, 34:15, 34:22, 34:23, 39:4, 65:14
**911** [1] - 101:8
**9:00** [5] - 45:13, 95:23, 99:20, 99:21, 105:9
**9:28** [1] - 76:17
**9:29** [2] - 76:18, 76:19
**9:30** [3] - 76:19, 95:23, 109:17
**9:40** [2] - 99:21, 100:4
**9th** [1] - 27:14

## A

**a.m** [2] - 45:13, 105:9
**abatement** [22] - 9:7, 20:13, 20:15, 20:17, 38:24, 39:5, 39:6, 39:8, 39:12, 40:4, 40:11, 40:12, 40:13, 45:6, 46:3, 48:9, 67:16, 67:24, 68:3, 89:5, 96:1
**abatements** [12] - 20:12, 40:8, 40:10, 41:13, 44:7, 44:9, 45:2, 50:15, 50:16, 50:20, 50:24, 103:17
**ability** [1] - 74:16
**able** [8] - 18:12, 21:11, 22:15, 32:20, 44:11, 58:7, 69:21, 75:22
**above-entitled** [1] - 112:4
**abundance** [1] - 57:3
**Academy** [3] - 71:23, 72:2, 72:7
**academy** [1] - 72:17
**accept** [1] - 17:10
**according** [19] - 64:18, 68:2, 76:16, 80:18, 80:21, 81:23, 82:2, 82:10, 82:11, 82:12, 82:14, 82:16, 82:19, 82:22, 83:18, 89:1, 89:20, 91:4, 99:5
**accounting** [1] - 44:7
**accurate** [2] - 60:12, 112:3
**accuses** [1] - 55:24
**acknowledge** [1] - 18:20
**action** [5] - 6:16, 38:24, 39:4, 39:5, 40:12
**actions** [2] - 39:4, 41:14
**activity** [2] - 77:8, 87:16
**actual** [1] - 68:19
**additional** [1] - 55:15
**additionally** [1] - 32:5
**address** [15] - 35:20, 49:1, 49:2, 49:6, 49:9, 49:10, 62:11, 63:23, 64:7, 64:10, 64:19, 66:21, 69:10, 69:11, 95:4
**addressed** [1] - 36:9
**addressing** [3] - 35:19, 69:6, 69:8
**Administration** [2] - 43:17, 67:7
**administrative** [3] - 11:17, 32:5, 45:16
**admirable** [1] - 85:11
**admissible** [1] - 56:4
**admitted** [3] - 10:12, 61:16, 61:22
**advised** [4] - 75:24, 84:3, 84:6
**affairs** [1] - 11:18
**affidavit** [1] - 75:12
**afraid** [2] - 82:21, 90:6
**AFTERNOON** [1] - 1:8
**afternoon** [10] - 9:18, 17:23, 17:24, 46:16, 46:19, 55:4, 59:14, 71:3, 71:4, 105:1
**agendas** [2] - 38:7, 49:4
**ago** [1] - 20:6
**agree** [4] - 12:3, 13:8, 32:23
**agreed** [2] - 5:5, 111:6
**ahead** [10] - 7:6, 7:11, 14:23, 22:7, 24:22, 31:1, 34:6, 42:4, 47:6, 99:18
**AIVALIKLES** [59] - 1:12, 4:8, 5:14, 5:19, 6:6, 6:22, 13:24, 14:2, 16:17, 16:21, 24:18, 33:24, 34:5, 41:17, 42:6, 42:13, 46:22, 55:9, 56:17, 56:19, 57:16, 63:4, 70:8, 71:2, 75:3, 78:16, 78:17, 79:16, 79:20, 79:24, 86:4, 86:6, 86:7, 92:11, 92:17, 93:3, 93:6, 97:4, 97:6, 98:1, 98:6, 98:11, 98:20, 99:2, 99:3, 99:19, 99:24, 100:1, 100:18, 100:23,

105:19, 105:24, 110:9, 110:13, 110:15, 110:21, 110:25, 111:6, 111:10
**Aivaliklses** [4] - 1:13, 8:2, 16:16, 42:1
**ajar** [1] - 101:25
**alderman** [2] - 11:17, 43:23
**Alderman** [1] - 13:1
**alerted** [1] - 69:11
**allegation** [1] - 80:12
**alleged** [2] - 83:3, 83:14
**allegedly** [1] - 62:10
**allow** [5] - 14:20, 16:24, 47:16, 48:15, 56:12
**allowed** [8] - 20:25, 34:18, 38:8, 48:10, 80:14, 81:6, 90:25, 91:7
**allows** [1] - 67:1
**ambush** [2] - 33:22, 33:23
**amount** [1] - 10:1
**AND** [1] - 1:5
**angry** [1] - 83:25
**announced** [1] - 38:5
**answer** [17] - 3:19, 6:8, 18:16, 18:22, 22:5, 22:7, 24:20, 24:21, 31:1, 41:22, 44:5, 62:12, 65:15, 65:16, 69:13, 103:12, 110:10
**Answer** [7] - 3:13, 3:15, 3:20, 3:23, 4:3, 4:6, 4:10
**answered** [4] - 18:15, 18:22, 42:9, 66:11
**answering** [3] - 24:18, 65:4, 65:9
**answers** [1] - 3:7
**anyway** [1] - 33:7
**apologies** [2] - 8:4, 42:21
**apologize** [7] - 15:12, 24:19, 27:25, 30:3, 34:9, 37:10, 47:9
**apparent** [2] - 83:3, 83:14
**appeal** [1] - 40:11
**appeals** [1] - 40:10
**appear** [2] - 75:15, 83:25
**appeared** [5] - 11:4, 78:3, 84:2, 88:18, 104:4
**application** [1] - 64:11
**applications** [6] - 9:7, 39:12, 40:13, 41:13, 44:15, 69:21
**applying** [1] - 33:18
**appointment** [28] - 18:17, 18:24, 19:3, 19:4, 19:6, 19:10, 19:17, 40:3, 41:4, 41:7, 41:9, 48:4, 48:6, 48:9, 50:19, 61:9, 61:16, 61:17, 61:22, 68:14, 76:9, 77:24, 80:15, 91:1, 93:12, 93:18, 102:4, 102:6
**appointment-only** [1] - 18:24
**appointments** [9] - 18:6, 18:21, 19:11, 19:14, 20:1, 20:3, 41:5, 48:10, 102:8
**appraisal** [2] - 23:14, 23:25
**appraisals** [1] - 23:17
**appraise** [1] - 24:6
**appraised** [1] - 23:19
**appreciate** [3] - 32:12, 56:16, 57:13
**approach** [1] - 26:7
**approaching** [1] - 34:2
**appropriate** [1] - 87:13
**approved** [1] - 91:1
**April** [8] - 26:13, 26:17, 27:13, 38:10, 53:23, 71:11
**area** [4] - 25:23, 35:13, 61:24, 65:25
**argue** [2] - 56:4, 89:14
**argument** [2] - 57:13, 58:5
**argumentative** [2] - 33:24, 33:25
**arguments** [1] - 7:1
**arranged** [1] - 96:18
**arrest** [25] - 4:11, 4:12, 4:19, 10:9, 10:21, 14:3, 14:4, 16:23, 17:13, 47:3, 53:6, 53:14, 53:24, 56:7, 56:20, 57:22, 70:3, 75:11, 78:25, 79:2, 79:3, 84:4, 84:12
**arrested** [10] - 4:1, 4:5, 17:11, 17:12, 63:6, 80:19, 81:13, 81:20, 93:18, 104:5
**arrival** [2] - 76:20, 78:3
**arrive** [1] - 81:11
**arrived** [6] - 18:5, 76:16, 76:19, 76:21, 85:24, 95:24
**article** [9] - 8:21, 9:12, 10:9, 10:10, 10:11, 10:13, 10:15, 51:2, 53:25
**articles** [8] - 10:3, 10:4, 10:6, 10:8, 12:2, 12:8, 53:16, 57:4
**ashamed** [1] - 15:6
**AssessHelp** [6] - 64:5, 64:6, 64:11, 64:17, 64:20, 69:9
**assessing** [33] - 23:16, 25:5, 25:8, 25:10, 25:21, 25:24, 26:4, 28:2, 29:10, 30:15, 31:22, 31:23, 32:18, 32:19, 33:19, 33:22, 34:4, 36:10, 43:20, 44:13, 44:14, 45:13, 45:14, 45:17, 48:16, 49:3, 49:18, 52:22, 54:19, 64:8, 65:8, 66:6, 103:21
**assessment** [1] - 66:9
**assessments** [1] - 45:2
**assessor** [5] - 25:8, 32:20, 34:18, 45:18, 69:15
**assessor's** [1] - 27:5
**assessors** [18] - 11:15, 29:18, 29:21, 29:23, 29:25, 30:22, 38:8, 43:21, 54:22, 55:11, 60:3, 60:9, 60:21, 61:3, 61:4, 69:1, 69:20
**assistance** [2] - 50:14, 50:24
**assistants** [1] - 68:22
**assisting** [1] - 77:25
**assume** [1] - 97:17
**assuming** [2] - 97:16, 108:3
**attached** [1] - 79:18
**attaches** [1] - 32:17
**attacking** [1] - 55:17
**attend** [2] - 10:22, 80:14
**attendance** [2] - 10:25, 11:1
**attended** [4] - 52:16, 54:21, 57:4, 68:25
**attending** [1] - 53:7
**attention** [9] - 4:24, 15:5, 35:22, 40:19, 105:23, 105:25, 107:20, 108:1, 109:8
**attorney** [11] - 7:10, 8:1, 17:17, 36:17, 54:8, 56:2, 58:17, 62:22, 67:19, 76:8, 109:22
**Attorney** [51] - 4:11, 13:1, 15:6, 15:21, 17:1, 18:3, 18:16, 33:19, 36:23, 38:17, 40:11, 41:25, 42:4, 51:9, 53:10, 54:14, 58:21, 66:21, 66:23, 68:11, 69:3, 69:7, 69:23, 77:1, 79:25, 80:13, 81:22, 82:2, 83:16, 85:14, 85:19, 89:17, 89:19, 91:4, 91:8, 91:9, 91:10, 91:13, 92:14, 92:17, 94:18, 98:15, 99:10, 103:10, 104:8, 104:11, 104:17, 106:14, 110:22
**attorneys** [2] - 3:8, 40:16
**audio** [1] - 101:5
**auditorium** [1] - 76:1
**August** [8] - 33:11, 33:12, 52:12, 54:21, 54:23, 57:17, 60:3, 69:1
**authorized** [2] - 81:7, 81:15
**automatically** [1] - 49:7
**aware** [13] - 22:12, 75:19, 80:5, 80:8, 85:5, 85:7, 85:8, 88:11, 94:10, 97:11, 99:8, 99:9

## B

**BAAN** [2] - 1:19, 112:9
**BAAN-PROULX** [2] - 1:19, 112:9
**bag** [1] - 76:6
**ball** [1] - 88:1
**bar** [19] - 13:24, 13:25, 14:24, 16:19, 17:5, 34:5, 46:23, 46:24, 47:4, 55:1, 55:8, 91:23, 91:24, 93:4, 97:24, 98:9, 98:24
**Bar** [1] - 40:5
**base** [1] - 105:18
**based** [12] - 5:19, 41:23, 55:13, 76:19, 82:17, 83:15, 86:23, 86:25, 93:20, 93:23, 94:6, 95:17
**basics** [1] - 107:7
**bears** [1] - 14:3
**became** [1] - 85:5
**BEFORE** [1] - 1:9
**began** [1] - 73:14
**begin** [1] - 109:4
**beginning** [1] - 66:12
**begins** [1] - 8:15
**behalf** [1] - 99:4
**behaving** [1] - 82:9
**behavior** [18] - 56:2, 56:8, 69:23, 82:12, 82:15, 82:18, 89:23, 89:25, 90:2, 90:4, 102:15, 102:18, 102:20, 102:22, 102:24, 103:1, 103:25, 104:2
**behest** [1] - 30:14
**behind** [1] - 75:12
**belabor** [1] - 42:16
**belief** [1] - 45:18
**best** [3] - 5:9, 17:25, 74:16
**better** [1] - 21:15
**between** [3] - 92:12, 95:23
**beyond** [2] - 14:20, 110:20
**big** [1] - 58:24
**bigger** [1] - 18:14
**birthday** [1] - 70:4
**bit** [4] - 6:4, 6:7, 60:21, 81:8
**black** [2] - 58:24, 62:9
**blocked** [1] - 33:20
**blog** [3] - 12:8, 12:11, 13:17
**blogs** [1] - 105:5
**blow** [3] - 32:13, 60:20, 62:18
**blown** [1] - 61:15
**blown-up** [1] - 61:15
**board** [21] - 7:21, 11:12, 11:15, 11:17, 12:14, 28:5, 36:24, 43:21, 43:23, 44:21, 54:21, 55:11, 59:14, 60:2, 60:9, 60:21, 61:3, 61:4, 69:1, 69:20
**Board** [1] - 13:1
**board's** [1] - 49:3
**BOLTON** [2] - 1:5, 1:14
**Bolton** [10] - 4:11, 12:25,

13:5, 15:6, 15:22, 39:15, 40:11, 41:15, 66:21, 110:22
**Bolton's** [1] - 66:23
**bomb** [1] - 45:7
**books** [1] - 23:6
**boots** [2] - 58:24, 62:9
**bosses** [1] - 44:21
**bottom** [1] - 26:17
**boxed** [1] - 33:20
**boxes** [1] - 48:7
**brand** [2] - 19:13, 49:18
**break** [3] - 34:3, 55:4, 105:1
**breaks** [2] - 33:22, 33:23
**breathing** [1] - 46:19
**BRIAN** [1] - 1:16
**brief** [7] - 55:1, 58:8, 58:13, 73:5, 77:8, 91:23
**briefly** [2] - 5:16, 16:9
**bring** [16] - 7:5, 18:14, 30:4, 35:8, 35:21, 43:9, 46:10, 52:11, 53:20, 67:21, 72:22, 86:13, 87:21, 105:23, 105:25, 106:24
**bringing** [3] - 59:23, 107:20, 109:8
**broadcast** [1] - 61:6
**broken** [1] - 67:14
**brothers** [1] - 23:22
**brought** [4] - 37:21, 46:4, 52:12, 78:12
**BTLA** [5] - 35:4, 52:12, 52:15, 52:23, 68:6
**budget** [1] - 11:16
**building** [2] - 90:23, 90:25
**business** [4] - 23:3, 31:18, 45:21, 45:22
**BY** [30] - 1:19, 7:19, 15:4, 15:17, 17:9, 17:22, 21:2, 21:25, 24:24, 26:9, 31:2, 34:1, 34:8, 42:15, 47:7, 58:18, 60:18, 63:4, 71:2, 75:3, 78:17, 79:24, 86:7, 93:6, 97:6, 98:11, 99:3, 99:19, 100:1, 100:23

## C

**C"-est** [1] - 56:2
**cache** [1] - 48:4
**Calhoun** [2] - 20:16, 69:11
**calm** [2] - 78:3, 88:18
**Cameron** [1] - 32:18
**camp** [1] - 27:11
**capture** [2] - 32:5, 33:17
**captured** [2] - 31:8, 31:9
**car** [3] - 25:7, 25:14, 26:5
**care** [1] - 5:21
**careful** [3] - 5:11, 21:23, 56:15
**carefully** [3] - 5:8, 6:14, 41:19
**Carolina** [1] - 71:19
**Caron** [11] - 85:17, 86:11, 90:24, 91:3, 91:11, 92:6, 97:15, 97:17, 109:25, 110:17, 111:10
**Caron's** [1] - 90:15
**carried** [1] - 6:19
**Carrignan** [3] - 110:5, 110:16, 111:6
**carrying** [1] - 76:6
**case** [22] - 48:24, 50:22, 51:7, 54:3, 54:13, 54:15, 54:16, 54:19, 75:16, 75:19, 78:15, 83:9, 84:17, 84:19, 96:24, 108:8, 108:12, 108:18, 108:20, 108:25, 109:4, 109:19
**CASE** [1] - 1:2
**cases** [1] - 73:22
**Castro** [1] - 95:12
**castro** [1] - 96:16
**category** [1] - 16:10
**causing** [2] - 78:2, 88:18
**cc** [1] - 47:14
**cc'd** [2] - 43:15, 44:2
**celebration** [1] - 70:4
**Celia** [21] - 21:3, 30:7, 30:10, 31:13, 34:25, 37:16, 51:21, 53:21, 55:17, 55:25, 62:1, 62:10, 62:20, 77:15, 79:6, 90:18, 90:20, 90:24, 91:5, 99:10, 104:13
**CELIA** [2] - 1:5, 1:16
**center** [3] - 68:21, 88:6, 88:7
**certain** [4] - 10:4, 27:18, 76:6, 81:6
**certainly** [11] - 4:18, 10:16, 12:12, 12:14, 14:4, 36:12, 44:16, 51:5, 51:10, 59:23, 64:1
**certificate** [1] - 72:4
**certify** [1] - 112:3
**cetera** [2] - 8:6, 8:7
**chairs** [1] - 26:4
**change** [9] - 6:24, 22:5, 22:7, 38:6, 56:11, 65:2, 65:4, 73:24, 73:25
**changed** [7] - 35:25, 38:3, 38:4, 65:6, 74:3, 110:3
**changes** [1] - 38:11
**characterization** [1] - 9:6
**characterize** [2] - 84:25, 85:4
**charge** [3] - 45:17, 80:25, 94:7
**charges** [2] - 3:25, 104:7
**check** [2] - 17:7, 109:18
**Chief** [1] - 110:5
**chill** [1] - 14:17
**chilling** [3] - 56:22, 56:24, 57:3
**circumstances** [1] - 85:5
**citizen** [1] - 29:1
**citizens** [4] - 40:8, 41:13, 67:17, 69:21
**city** [16] - 11:12, 11:21, 12:12, 23:16, 28:18, 35:22, 38:20, 40:15, 44:25, 45:1, 53:2, 54:12, 58:4, 60:10, 67:1, 76:7
**City** [46] - 3:24, 4:10, 11:1, 15:21, 39:7, 39:10, 45:12, 45:24, 46:17, 47:11, 47:15, 47:19, 47:24, 48:2, 55:20, 60:23, 61:21, 63:7, 64:10, 65:12, 66:1, 73:14, 76:16, 76:21, 77:15, 77:24, 78:6, 80:13, 80:14, 83:6, 84:14, 85:9, 89:1, 90:25, 93:7, 95:15, 95:24, 96:21, 96:23, 96:25, 97:11, 99:4, 99:9, 99:21, 100:4, 100:8
**city's** [2] - 93:8, 93:13
**claim** [3] - 14:16, 18:4, 40:16
**claimed** [3] - 39:7, 57:12, 66:2
**claiming** [1] - 14:9
**claims** [4] - 14:17, 55:13, 55:14, 56:6
**clarification** [4] - 22:17, 50:15, 50:22, 50:24
**clarified** [3] - 22:8, 22:9, 36:11
**clarify** [3] - 77:11, 78:11, 78:14
**clarifying** [2] - 5:1, 22:22
**clear** [10] - 5:6, 6:8, 6:15, 10:25, 35:20, 36:9, 36:13, 57:2, 69:22, 75:4
**clearance** [1] - 39:11
**cleared** [2] - 84:17, 84:19
**clearly** [3] - 4:22, 6:17, 56:23
**clerk** [2] - 7:15, 70:16
**clerk's** [1] - 35:13
**clicked** [1] - 49:8
**client** [6] - 6:5, 6:12, 6:21, 57:20, 58:3, 92:18
**close** [2] - 36:2, 45:21
**closed** [5] - 44:14, 46:7, 65:8, 83:9, 84:21
**closing** [1] - 101:24
**clothing** [1] - 76:6
**coherent** [1] - 106:10
**Collimore** [1] - 1:16
**Colquhoun** [1] - 43:25
**comical** [1] - 66:24
**coming** [7] - 5:12, 5:22, 44:9, 45:3, 61:20, 69:15, 101:16
**comment** [2] - 61:3, 69:6
**comments** [1] - 11:12
**commissioned** [1] - 24:14
**committed** [1] - 29:2
**committee** [6] - 11:12, 11:16, 11:18, 39:15, 39:23
**communicate** [1] - 69:22
**communications** [1] - 39:15
**compel** [3] - 54:2, 54:5, 54:9
**competent** [3] - 74:12, 74:13, 92:24
**complained** [1] - 67:6
**complaining** [1] - 30:7
**complaint** [4] - 8:11, 34:2, 41:11, 41:21
**complaints** [2] - 20:20, 21:3
**completed** [3] - 74:22, 75:11, 77:7
**COMPLETED** [1] - 112:9
**Complies** [2] - 27:3, 95:3
**comply** [2] - 108:9, 109:15
**complying** [3] - 89:7, 89:11, 108:21
**component** [1] - 57:5
**computer** [2] - 49:10, 74:6
**concern** [3] - 69:7, 106:1, 108:9
**concerned** [10] - 15:25, 32:16, 42:25, 46:8, 59:15, 102:24, 103:25, 104:2, 104:3, 107:19
**concerning** [2] - 65:3, 93:8
**concerns** [5] - 6:4, 6:7, 35:19, 35:22, 65:11
**conclude** [1] - 66:17
**concluded** [5] - 14:24, 17:5, 47:4, 98:9, 111:16
**conclusion** [2] - 5:22, 83:14
**conclusions** [1] - 94:24
**CONCORD** [1] - 1:1
**Concord** [2] - 1:21, 49:3
**conduct** [7] - 22:18, 55:17, 55:18, 55:24, 70:6, 72:7, 82:24
**conducted** [1] - 3:11
**conference** [12] - 13:25, 14:24, 16:19, 17:5, 46:24, 47:4, 68:10, 68:23, 91:24, 93:4, 97:24, 98:9
**conferences** [1] - 11:2
**confirm** [2] - 8:3, 15:18
**confirmed** [2] - 90:24, 109:24

**confirms** [1] - 5:25
**conform** [2] - 107:22, 109:20
**confused** [1] - 108:4
**confusing** [7] - 36:3, 36:5, 36:6, 36:7, 99:17, 108:14
**confusion** [1] - 107:12
**congratulations** [1] - 71:14
**connect** [1] - 48:13
**consider** [5] - 4:23, 6:16, 74:10, 74:13, 83:9
**consists** [1] - 60:8
**constitutional** [1] - 14:4
**contact** [2] - 9:16, 10:1
**contacted** [3] - 64:2, 99:7, 99:10
**contained** [1] - 64:4
**contemplate** [2] - 108:19, 109:9
**contents** [1] - 94:24
**context** [1] - 56:11
**continue** [1] - 105:13
**continued** [6] - 10:1, 10:22, 12:12, 57:1, 67:24, 109:10
**continues** [2] - 20:1, 32:25
**continuing** [2] - 14:9, 83:11
**contradictions** [1] - 92:13
**control** [3] - 93:24, 94:1, 107:10
**conversation** [11] - 19:15, 34:18, 35:1, 35:10, 51:22, 83:15, 89:18, 90:18, 98:12, 102:10
**conversations** [3] - 32:17, 68:17, 97:22
**conveyed** [1] - 76:10
**copied** [2] - 13:1, 37:2
**copies** [1] - 79:4
**copy** [9] - 44:20, 74:24, 75:1, 78:19, 78:23, 78:25, 79:10, 94:15, 94:16
**correct** [115] - 3:8, 8:13, 8:16, 8:18, 8:22, 9:14, 10:23, 11:5, 12:13, 13:4, 13:6, 13:10, 13:14, 13:16, 13:22, 15:20, 15:23, 21:9, 23:4, 23:20, 24:5, 24:8, 24:16, 25:18, 26:3, 26:20, 28:9, 28:19, 29:4, 29:6, 29:11, 29:16, 30:1, 30:11, 30:13, 31:17, 31:19, 34:14, 35:12, 35:24, 36:1, 36:19, 38:18, 39:21, 40:7, 43:14, 43:22, 43:24, 44:1, 46:12, 46:13, 46:15, 46:18, 47:1, 51:1, 51:24, 52:2, 53:9, 53:12, 53:15, 53:18, 58:23, 60:7, 61:5, 61:7, 63:13, 64:16, 64:22, 68:3, 68:25, 69:24, 71:16, 71:25, 72:4, 72:15, 72:19, 73:8, 73:9, 73:15, 73:23, 74:18, 75:13, 75:14, 78:3, 78:4, 78:7, 78:12, 80:1, 81:23, 81:25, 83:4, 83:16, 84:9, 84:17, 85:20, 86:1, 86:17, 87:3, 88:19, 89:3, 89:9, 89:15, 90:8, 91:4, 91:14, 94:7, 96:6, 97:13, 100:5, 100:6, 100:9, 102:2, 103:10, 103:17, 104:14
**correctly** [2] - 24:7, 51:25
**correspondence** [1] - 65:19
**council** [1] - 53:2
**counsel** [11] - 3:15, 4:25, 16:25, 17:2, 33:4, 38:15, 39:17, 54:16, 106:5, 109:1, 111:13
**counsel's** [1] - 107:17
**counter** [2] - 56:6, 66:10
**couple** [3] - 3:3, 11:10, 49:15
**COURT** [87] - 1:1, 1:10, 3:3, 4:9, 5:4, 5:6, 5:16, 6:4, 6:7, 7:1, 7:10, 14:7, 14:19, 14:23, 14:25, 15:3, 15:15, 16:3, 16:8, 16:12, 16:15, 16:24, 17:4, 17:6, 17:17, 24:21, 26:8, 30:23, 31:1, 33:25, 34:6, 41:18, 41:25, 42:4, 42:11, 42:14, 46:23, 47:1, 47:5, 48:1, 55:3, 56:9, 56:16, 56:18, 57:13, 58:5, 58:11, 58:17, 60:16, 63:1, 70:9, 70:12, 74:24, 75:2, 78:10, 78:14, 79:14, 79:18, 79:22, 86:2, 86:5, 91:23, 92:1, 92:16, 92:19, 98:3, 98:8, 98:10, 98:22, 99:12, 99:25, 100:17, 100:20, 105:1, 105:12, 105:16, 105:20, 105:25, 110:2, 110:11, 110:14, 110:16, 110:20, 110:24, 111:1, 111:8, 111:12
**Court** [5] - 1:19, 1:20, 56:21, 57:24, 82:3
**court** [2] - 3:2, 75:15
**courteous** [1] - 90:13
**courtroom** [6] - 7:7, 7:15, 55:6, 58:14, 70:16, 105:11
**COURTROOM** [6] - 7:8, 20:22, 58:15, 70:19, 97:3, 97:5
**Courts** [1] - 54:10
**covered** [1] - 59:15
**covering** [1] - 10:17
**Covid** [1] - 65:7
**COVID** [1] - 10:19
**create** [1] - 65:16
**created** [1] - 40:18
**crime** [2] - 29:2, 71:19
**criminal** [9] - 28:21, 73:22, 73:23, 80:25, 81:10, 81:13, 87:14, 93:18, 94:7
**criminally** [2] - 81:3, 81:5
**critical** [1] - 12:16
**criticism** [1] - 12:12
**criticize** [1] - 57:1
**Crooked** [1] - 53:21
**CROSS** [2] - 7:18, 17:21
**cross** [17] - 2:3, 5:10, 17:1, 49:21, 58:10, 92:4, 92:7, 92:20, 106:7, 106:20, 107:1, 108:11, 109:10, 110:24, 110:25, 111:9
**cross-examination** [3] - 92:20, 109:10, 111:9
**cross-examine** [5] - 17:1, 92:4, 107:1, 110:24, 110:25
**cross-examining** [3] - 92:7, 106:20, 108:11
**cross-talking** [1] - 49:21
**crossed** [1] - 106:6
**Crossen** [2] - 85:25, 86:8
**cullen** [1] - 4:14
**CULLEN** [33] - 1:16, 5:5, 17:18, 17:22, 20:24, 21:2, 21:23, 21:25, 24:19, 24:23, 24:24, 26:7, 26:9, 31:2, 34:1, 34:8, 42:9, 42:15, 47:7, 55:1, 55:11, 56:14, 58:9, 58:18, 60:14, 60:18, 62:25, 70:11, 97:21, 99:22, 104:25, 110:4, 110:18
**Cullen** [9] - 1:16, 17:1, 17:17, 33:20, 42:4, 58:17, 69:3, 92:15, 92:17
**cumulative** [1] - 107:12
**cuts** [1] - 16:24

## D

**D.C** [1] - 104:3
**damage** [3] - 14:9, 55:14, 57:4
**damaged** [1] - 56:7
**damages** [7] - 14:13, 14:17, 56:10, 56:21, 57:20, 57:21, 58:3
**Dame** [7] - 32:1, 33:5, 33:16, 34:12, 52:1, 52:12, 52:15
**data** [2] - 24:2, 68:8
**database** [1] - 66:15
**DATE** [1] - 112:9
**date** [13] - 7:25, 8:4, 22:14, 33:10, 39:1, 51:4, 53:22, 60:22, 75:20, 89:4, 91:20, 94:8
**dated** [5] - 9:12, 26:13, 104:9, 104:14
**dates** [2] - 27:18, 67:24
**David** [2] - 110:5, 110:18
**DAY** [1] - 1:8
**days** [7] - 23:3, 31:18, 37:15, 37:16, 45:25, 46:8, 109:12
**deal** [2] - 108:16, 109:9
**dealing** [1] - 58:4
**decades** [1] - 48:19
**December** [4] - 19:19, 48:21, 54:2, 54:9
**decertified** [1] - 67:10
**decided** [2] - 33:21, 40:19
**declared** [2] - 92:21, 107:14
**declined** [1] - 3:14
**DEFENDANT** [2] - 1:14, 1:16
**defendants** [2] - 1:6, 110:23
**defendants'** [1] - 64:23
**defense** [4] - 3:8, 4:25, 106:5, 107:17
**definitely** [4] - 12:6, 12:10, 59:4, 64:14
**degrading** [1] - 67:25
**degree** [1] - 73:12
**delay** [1] - 107:11
**deliberating** [1] - 109:3
**demeanor** [1] - 84:2
**demolished** [1] - 45:15
**denied** [3] - 32:2, 32:7, 32:8
**deny** [1] - 53:5
**department** [28] - 18:6, 20:3, 23:16, 25:6, 25:21, 29:10, 30:15, 32:19, 33:22, 34:25, 35:2, 35:11, 40:2, 45:13, 45:14, 50:4, 51:3, 51:23, 52:23, 60:23, 64:24, 65:2, 74:2, 76:22, 96:14, 98:16, 99:10, 103:5
**Department** [8] - 28:20, 43:16, 67:7, 71:10, 71:13, 71:17, 80:5, 80:9
**DEPUTY** [6] - 7:8, 20:22, 58:15, 70:19, 97:3, 97:5
**described** [2] - 7:21, 69:23
**description** [2] - 21:15, 67:1
**deserve** [1] - 51:17
**deserves** [1] - 58:2
**desk** [2] - 35:13, 68:10
**despicable** [2] - 56:1, 62:21
**detail** [1] - 105:20
**detailed** [3] - 86:16, 86:20, 86:22
**detective** [2] - 74:6, 74:7
**different** [8] - 45:7, 57:18, 70:1, 74:2, 92:12, 92:13, 96:18, 96:19

**difficulty** [1] - 14:10
**digital** [1] - 13:18
**dignity** [1] - 51:17
**direct** [17] - 2:3, 7:20, 20:25, 30:7, 92:9, 92:20, 93:1, 93:2, 106:4, 106:16, 107:1, 107:2, 107:8, 107:23, 108:11, 109:11, 109:20
**DIRECT** [1] - 71:1
**direction** [2] - 17:8, 76:15
**director** [1] - 30:20
**Director** [1] - 45:16
**disagree** [1] - 29:21
**disbarment** [1] - 40:6
**discovered** [1] - 69:10
**discovery** [2] - 8:5, 8:8
**discuss** [1] - 103:17
**discussed** [4] - 30:6, 35:2, 38:7, 68:9
**discussing** [1] - 103:14
**discussion** [3] - 42:18, 63:10, 106:21
**discussions** [1] - 95:18
**dispatch** [3] - 73:5, 76:16, 76:20
**dispatched** [3] - 76:13, 76:18, 85:23
**dispatcher** [2] - 75:21, 101:10
**disposed** [1] - 75:16
**disposition** [1] - 96:3
**dispositioned** [1] - 70:3
**disregard** [2] - 4:22, 4:23
**distinct** [1] - 58:1
**distress** [2] - 14:18, 55:14
**distressed** [2] - 14:10, 46:20
**District** [1] - 1:20
**DISTRICT** [2] - 1:1, 1:10
**disturbance** [1] - 88:18
**division** [2] - 74:6, 74:8
**docketed** [2] - 65:12, 65:13
**document** [16] - 15:24, 26:10, 28:7, 34:19, 35:17, 35:21, 36:11, 36:14, 37:19, 50:18, 50:21, 60:6, 65:11, 65:20, 72:13, 78:21
**documentation** [1] - 96:1
**documenting** [1] - 77:20
**documents** [16] - 14:11, 34:17, 47:15, 47:25, 48:3, 48:4, 48:11, 49:19, 64:25, 65:4, 68:7, 68:8, 76:7, 78:11, 78:14, 78:18
**Donchess** [5] - 21:5, 21:8, 22:10, 22:13, 23:1
**done** [3] - 22:11, 66:9, 106:4
**door** [34] - 3:4, 4:17, 4:19, 5:18, 18:15, 20:2, 40:23, 41:1, 41:2, 62:6, 62:7, 87:24, 88:2, 88:3, 88:4, 88:6, 88:7, 88:8, 88:10, 88:11, 101:14, 101:16, 101:17, 101:18, 101:20, 101:21, 101:22, 101:25, 102:1, 102:2, 102:3, 104:22
**double** [1] - 23:10
**Doug** [8] - 31:7, 32:25, 33:5, 33:16, 34:11, 52:1, 52:12, 52:15
**down** [16] - 48:1, 56:25, 59:5, 61:10, 61:15, 70:13, 77:16, 77:22, 79:25, 87:8, 87:13, 87:22, 96:4, 102:17, 103:21, 105:13
**DRA** [3] - 44:13, 45:10, 52:9
**DRA.nh.gov** [1] - 43:16
**draft** [1] - 3:6
**drastic** [1] - 6:16
**draw** [3] - 4:24, 94:24, 108:1
**drawn** [1] - 6:11
**Due** [1] - 22:13
**duly** [2] - 7:15, 70:16
**during** [9] - 3:10, 10:2, 11:6, 14:11, 32:21, 61:3, 66:9, 73:2, 95:10
**duties** [1] - 74:1
**duty** [1] - 107:10
**Duty** [1] - 15:22

## E

**e-mail** [41] - 9:23, 12:25, 18:10, 22:14, 22:23, 22:25, 29:23, 30:5, 31:3, 33:8, 33:10, 37:16, 38:4, 39:11, 42:20, 44:21, 45:21, 45:23, 46:11, 49:1, 49:2, 49:4, 49:6, 59:13, 60:24, 61:2, 63:16, 64:5, 64:7, 64:10, 64:13, 65:6, 65:10, 69:10, 94:10, 94:13, 94:22, 94:25, 95:3
**e-mailed** [2] - 45:7, 50:14
**e-mails** [9] - 19:15, 20:13, 20:15, 42:16, 42:17, 44:8, 49:10, 54:4, 54:11
**economics** [1] - 73:13
**education** [1] - 73:10
**effect** [1] - 101:15
**either** [1] - 57:9
**elected** [1] - 9:10
**emotion** [1] - 6:9
**emotional** [2] - 4:20, 5:8
**employed** [1] - 71:9
**employee** [1] - 95:25
**employee's** [1] - 25:6
**employment** [1] - 73:14
**en** [2] - 76:10, 76:18
**end** [9] - 28:6, 28:17, 36:8, 36:24, 37:3, 37:6, 54:15, 58:10, 73:5
**ended** [8] - 65:7, 65:8, 106:16, 107:16, 107:23, 108:5, 108:7, 108:11
**ends** [1] - 8:15
**enforcement** [1] - 71:18
**engaged** [1] - 85:8
**entail** [1] - 96:24
**enter** [1] - 76:20
**entered** [4] - 7:7, 20:24, 22:1, 58:14
**entire** [4] - 29:10, 74:17, 106:7, 108:25
**entirely** [1] - 92:2
**entitled** [1] - 112:4
**entrance** [1] - 39:10
**entry** [5] - 25:23, 26:17, 97:2, 97:8, 100:2
**environmental** [1] - 73:13
**equate** [1] - 82:24
**equivalent** [1] - 73:12
**erratic** [4] - 59:16, 82:15, 90:2, 102:20
**escorted** [1] - 84:14
**especially** [3] - 5:7, 5:10, 66:6
**ESQ** [4] - 1:12, 1:14, 1:14, 1:16
**essential** [1] - 107:13
**essentially** [4] - 33:4, 34:11, 37:7, 44:2
**establish** [1] - 57:10
**established** [2] - 80:12, 80:17
**et** [2] - 8:6
**ethical** [1] - 36:16
**ethics** [3] - 13:5, 39:15, 41:10
**evaluation** [1] - 32:22
**event** [4] - 10:21, 58:1, 96:22, 104:20
**events** [4] - 69:17, 100:21, 104:3, 108:3
**eventually** [2] - 30:3, 96:25
**everyday** [1] - 27:11
**evesdropping** [2] - 52:25, 68:5
**evidence** [11] - 20:18, 38:12, 57:2, 57:3, 59:23, 107:12, 107:22, 108:10, 108:21, 109:16, 109:21
**exactly** [7] - 3:5, 31:20, 33:19, 91:17, 99:17, 100:25, 105:4
**exam** [2] - 74:7, 107:8
**examination** [9] - 72:8, 92:20, 93:1, 93:2, 106:5, 107:23, 109:10, 109:11, 111:9
**EXAMINATION** [4] - 7:18, 17:21, 63:3, 71:1
**examine** [5] - 17:1, 92:4, 107:1, 110:24, 110:25
**examined** [1] - 106:7
**examining** [3] - 92:7, 106:20, 108:11
**excellent** [1] - 74:11
**excuse** [2] - 9:15, 97:3
**exhibit** [67] - 8:9, 8:10, 8:19, 11:6, 11:7, 11:9, 12:23, 13:7, 14:25, 15:1, 15:11, 15:14, 16:10, 16:13, 17:6, 18:10, 20:20, 20:23, 21:22, 30:2, 30:3, 32:11, 32:12, 32:15, 33:13, 34:10, 35:8, 35:9, 37:1, 37:12, 37:13, 43:10, 49:23, 49:24, 53:19, 53:20, 60:17, 63:10, 63:11, 64:23, 67:21, 74:17, 74:19, 75:10, 75:25, 78:15, 79:16, 79:17, 79:18, 79:19, 86:17, 92:7, 92:8, 94:11, 97:1, 99:14, 99:17, 100:17, 100:19, 106:9, 109:10
**exhibits** [16] - 14:16, 16:5, 16:6, 79:4, 79:15, 92:25, 99:12, 99:16, 100:21, 106:11, 106:24, 107:1, 107:25, 108:2, 108:12, 111:5
**exist** [1] - 45:14
**exited** [2] - 55:6, 105:11
**exonerated** [1] - 41:15
**expect** [2] - 45:10, 92:12
**expected** [1] - 22:21
**expedited** [1] - 54:10
**experience** [1] - 71:18
**experienced** [2] - 31:9, 48:19
**explain** [7] - 4:22, 5:24, 5:25, 35:18, 36:2, 81:2, 81:8
**explained** [2] - 35:2, 35:14
**explaining** [1] - 5:23
**explanation** [3] - 22:16, 35:16, 77:8
**explicit** [1] - 103:23
**explore** [1] - 16:17
**expressed** [2] - 37:19, 69:14
**extent** [1] - 106:23
**extraordinarily** [1] - 70:2
**eye** [4] - 25:16, 26:2, 27:6, 27:16

## F

**Facebook** [2] - 12:4, 105:6
**fact** [11] - 4:11, 6:1, 7:24, 17:11, 21:10, 27:19, 42:19,

48:25, 84:9, 85:11, 109:9
**factors** [1] - 72:13
**facts** [2] - 80:1, 94:6
**failing** [1] - 67:13
**fair** [9] - 9:6, 10:1, 11:11, 11:14, 11:20, 12:1, 12:4, 12:8, 51:14
**fairly** [2] - 41:19, 105:22
**fall** [4] - 24:1, 29:12, 29:13, 29:15
**far** [2] - 6:9, 55:13
**fast** [1] - 41:19
**faster** [1] - 108:22
**FCRR** [2] - 1:19, 112:9
**fear** [1] - 57:22
**February** [9] - 1:4, 10:5, 10:21, 53:14, 57:18, 97:1, 97:9, 97:10, 100:2
**felt** [8] - 3:23, 23:14, 24:3, 24:6, 82:3, 82:8, 89:20, 102:11
**few** [3] - 32:20, 37:15, 76:25
**file** [4] - 65:17, 66:5, 66:13, 75:5
**filed** [6] - 41:10, 41:20, 44:7, 46:3, 54:2, 67:16
**filing** [5] - 25:13, 40:9, 40:12, 54:1, 63:13
**finally** [1] - 50:4
**finance** [1] - 11:16
**fine** [6] - 31:12, 71:6, 71:8, 84:2, 84:3, 91:10
**finish** [1] - 3:18
**finished** [1] - 104:6
**fire** [4] - 44:3, 44:6, 44:17, 44:20
**first** [19] - 8:25, 10:11, 10:13, 19:23, 26:24, 27:2, 30:5, 39:10, 73:19, 75:20, 76:1, 76:24, 76:25, 77:4, 77:10, 77:18, 78:5, 83:19, 104:16
**five** [4] - 20:7, 23:2, 31:18, 61:9
**flex** [1] - 66:25
**floor** [4] - 76:1, 76:23, 92:1, 95:16
**focus** [1] - 39:12
**Fojo** [4] - 36:21, 36:25, 37:2, 37:7
**fojo** [1] - 37:8
**follow** [4] - 17:8, 25:1, 93:13, 105:6
**followed** [4] - 21:14, 42:7, 65:21, 72:17
**following** [4] - 3:2, 21:17, 45:3, 65:21
**follows** [2] - 7:16, 70:17
**FOR** [3] - 1:12, 1:14, 1:16
**forced** [2] - 40:24, 76:2
**foregoing** [1] - 112:3
**forensics** [1] - 74:7
**forever** [1] - 92:10
**forget** [1] - 61:13
**form** [1] - 107:15
**forth** [1] - 14:18
**fortunate** [1] - 103:7
**forward** [1] - 6:21
**forwarded** [2] - 65:18, 65:19
**four** [9] - 19:20, 20:6, 20:7, 26:24, 27:2, 37:16, 45:25, 46:8, 61:15
**fraudulent** [1] - 25:13
**Freyler** [5] - 25:3, 25:5, 25:19, 26:13, 28:6
**Friday** [4] - 9:17, 9:24, 45:22, 85:4
**friend** [3] - 43:25, 59:21, 69:10
**front** [5] - 61:1, 78:18, 92:3, 95:20, 106:11
**frustrated** [8] - 19:12, 22:23, 44:22, 46:1, 65:11, 70:2, 70:5, 83:23
**frustration** [1] - 69:14
**full** [23] - 8:10, 12:23, 13:7, 14:25, 15:11, 15:14, 16:6, 16:12, 17:6, 21:22, 21:24, 22:1, 30:2, 32:12, 34:10, 35:8, 37:13, 43:10, 49:23, 53:19, 60:17, 70:20, 104:17
**fully** [1] - 90:23
**function** [3] - 32:6, 35:14, 35:19
**future** [1] - 57:22


## G


**Gagliouso** [2] - 54:1, 54:14
**garage** [1] - 25:14
**garbled** [1] - 31:11
**Gary** [7] - 22:9, 22:15, 22:19, 22:22, 23:21, 52:6, 52:13
**general** [3] - 11:10, 37:20, 69:11
**gentleman** [1] - 108:15
**GG** [2] - 60:5, 68:24
**given** [3] - 22:14, 69:22, 93:15
**GIZELLA** [2] - 1:19, 112:9
**Gov** [3] - 12:8, 12:19, 13:9
**government** [1] - 10:18
**Governor** [2] - 7:21, 8:6
**graduated** [1] - 73:11
**Granite** [6] - 12:2, 12:19, 13:15, 13:17, 13:19, 15:19
**greeter** [4] - 39:11, 45:15, 61:13, 95:15
**greeters** [1] - 61:24
**Greg** [8] - 23:20, 23:24, 30:16, 52:5, 52:6, 52:8, 52:11, 52:14
**Grok** [6] - 12:2, 12:19, 13:15, 13:17, 13:19, 15:19
**ground** [1] - 95:15
**guess** [1] - 45:20


## H


**habits** [1] - 25:19
**Hall** [42] - 3:24, 11:1, 39:7, 39:10, 45:12, 45:24, 46:17, 47:11, 47:15, 47:19, 47:24, 48:2, 55:21, 60:23, 61:21, 63:7, 65:12, 66:1, 76:17, 76:21, 77:15, 77:24, 78:7, 80:14, 80:15, 83:6, 84:14, 85:9, 89:1, 90:25, 93:7, 95:15, 95:24, 96:21, 96:23, 96:25, 97:11, 99:5, 99:9, 99:21, 100:4, 100:8
**hallway** [4] - 52:25, 68:19, 77:22, 101:23
**Hamel** [1] - 22:13
**HAMPSHIRE** [1] - 1:1
**Hampshire** [3] - 71:22, 72:2, 72:6
**handed** [1] - 91:20
**handle** [4] - 20:9, 20:12, 35:17, 74:15
**handled** [7] - 37:20, 44:15, 46:3, 50:15, 50:20, 50:25, 65:10
**handles** [1] - 23:17
**handling** [4] - 38:23, 38:25, 50:16, 65:20
**hanging** [1] - 53:3
**happily** [2] - 56:1, 62:21
**hard** [3] - 5:8, 74:24, 75:1
**Hatfield** [1] - 1:15
**head** [3] - 63:18, 105:3, 105:8
**headed** [1] - 108:25
**heading** [1] - 76:14
**headline** [1] - 13:23
**hear** [2] - 14:6, 42:21
**heard** [6] - 24:19, 43:4, 56:17, 68:12, 80:1, 96:13
**hearing** [16] - 7:8, 14:1, 16:20, 35:4, 44:25, 46:25, 52:15, 52:23, 54:22, 55:11, 58:16, 68:6, 91:25, 93:5, 97:25, 106:9
**hearings** [4] - 10:23, 11:3, 57:4, 57:9
**hearsay** [5] - 16:22, 97:22, 97:23, 98:3, 98:4
**held** [3] - 3:2, 46:24, 97:24
**help** [3] - 42:5, 45:8, 109:24
**helping** [1] - 32:13
**hereby** [1] - 112:3
**high** [2] - 23:14, 73:11
**higher** [1] - 61:14
**highlighted** [2] - 31:6, 37:14
**Hilliard** [7] - 7:10, 18:1, 18:3, 42:18, 51:9, 53:10, 109:22
**HILLIARD** [25] - 1:14, 5:3, 7:12, 7:19, 14:6, 14:8, 14:22, 15:2, 15:4, 15:12, 15:16, 15:17, 15:24, 16:4, 16:11, 16:14, 17:3, 17:7, 17:9, 17:16, 55:7, 98:18, 109:23, 110:7, 110:17
**himself** [1] - 43:12
**hired** [5] - 20:9, 20:12, 24:17, 24:25, 74:3
**history** [2] - 22:10, 69:8
**home** [9] - 3:11, 10:24, 23:5, 69:15, 98:23, 105:2, 105:8, 106:4
**homeowner** [2] - 63:12, 63:20
**homes** [1] - 67:12
**honest** [1] - 85:2
**Honor** [47] - 4:14, 5:15, 6:6, 7:12, 8:9, 13:23, 14:2, 14:6, 14:8, 14:14, 15:12, 15:25, 16:4, 16:10, 16:14, 16:18, 16:21, 17:8, 17:16, 17:18, 24:23, 26:7, 34:5, 41:17, 42:7, 42:10, 46:22, 55:1, 56:17, 57:5, 57:25, 58:19, 60:14, 70:11, 78:13, 79:21, 92:11, 97:21, 98:7, 99:2, 99:22, 104:25, 105:19, 105:24, 109:23, 110:10, 111:7
**HONORABLE** [1] - 1:9
**hostile** [15] - 59:16, 82:12, 89:25, 92:2, 92:21, 92:22, 102:13, 102:15, 106:22, 107:2, 107:14, 111:3, 111:7, 111:8
**Houghton** [9] - 8:23, 9:1, 9:16, 13:2, 50:5, 50:7, 50:23, 59:10, 63:5
**Houghton's** [1] - 51:2
**hour** [2] - 106:7, 107:3
**hours** [5] - 43:6, 47:15, 47:24, 48:2, 66:25
**hundreds** [1] - 66:8
**husband** [1] - 46:20

# I

**ID** [12] - 11:6, 11:7, 13:11, 13:23, 15:2, 16:9, 20:22, 21:23, 60:5, 60:14, 88:23, 89:8
**ID'd** [1] - 22:1
**identified** [1] - 21:11
**illegal** [1] - 40:13
**immediately** [1] - 45:22
**impacted** [1] - 57:21
**implemented** [1] - 38:10
**implied** [1] - 47:23
**important** [3] - 72:13, 87:11, 87:15
**impression** [2] - 5:20, 51:21
**incident** [12] - 4:17, 5:12, 10:2, 10:19, 47:3, 58:1, 60:2, 60:22, 72:19, 86:16, 95:4, 103:1
**incidents** [1] - 57:19
**inclined** [2] - 56:11, 56:12
**included** [3] - 10:6, 11:15, 59:9
**includes** [1] - 75:12
**including** [2] - 28:10, 55:13
**incoming** [1] - 73:4
**inconsistent** [1] - 14:12
**incorrect** [2] - 53:1, 53:4
**indicate** [13] - 67:23, 77:6, 78:2, 80:11, 82:3, 83:3, 90:15, 90:18, 90:20, 95:3, 98:15, 99:4, 104:5
**indicated** [3] - 63:19, 77:17, 103:20
**indicates** [4] - 25:22, 51:2, 90:17, 100:4
**indicating** [4] - 22:25, 66:19, 75:25, 95:5
**indication** [4] - 82:7, 84:16, 109:24
**individual** [1] - 87:22
**individual's** [1] - 76:5
**individuals** [2] - 85:24, 96:18
**inferring** [1] - 48:15
**inflame** [1] - 57:7
**inform** [1] - 65:14
**information** [14] - 16:22, 23:1, 25:11, 25:16, 26:5, 27:10, 35:22, 44:23, 46:6, 69:12, 73:2, 73:7, 75:20, 82:6
**informed** [1] - 75:18
**initial** [4] - 22:19, 75:22, 78:19, 101:5
**injured** [1] - 103:8
**inquire** [1] - 58:7
**inquiries** [1] - 36:10
**inquiring** [2] - 89:5, 95:7
**inspect** [3] - 66:20, 67:13, 69:15
**instance** [2] - 27:9, 106:13
**instances** [1] - 57:9
**instant** [2] - 51:13, 86:18
**instead** [3] - 45:12, 106:9, 106:17
**instructed** [2] - 72:7, 72:10
**instruction** [4] - 5:1, 6:15, 7:4
**instructions** [3] - 105:3, 105:6, 105:21
**insurrection** [1] - 82:25
**intelligent** [1] - 31:10
**intention** [3] - 48:13, 83:11, 103:14
**interacted** [1] - 90:12
**interest** [1] - 55:15
**interface** [1] - 31:22
**interference** [1] - 30:21
**interview** [6] - 3:12, 29:24, 29:25, 33:5, 53:6, 96:16
**interviewed** [4] - 29:10, 95:12, 96:16, 96:19
**interviews** [4] - 29:18, 29:20, 29:23, 33:6
**introduced** [1] - 42:17
**introduction** [1] - 98:4
**invaded** [1] - 103:4
**investigate** [6] - 29:2, 30:18, 30:24, 52:4, 73:20, 96:24
**investigated** [4] - 31:24, 52:7, 67:4, 97:12
**investigating** [4] - 30:14, 30:16, 100:14, 100:15
**investigation** [19] - 3:10, 24:9, 24:25, 28:21, 29:7, 29:14, 30:21, 53:6, 72:18, 73:3, 74:21, 78:25, 83:11, 84:20, 93:20, 93:23, 95:10, 98:13, 99:11
**investigative** [5] - 24:13, 24:14, 26:13, 66:16, 74:15
**investigator** [5] - 27:20, 66:17, 71:19, 74:11, 74:12
**invited** [6] - 47:14, 47:20, 47:24, 48:2, 49:14, 49:18
**involved** [8] - 6:9, 21:4, 37:9, 40:10, 56:22, 63:12, 67:19, 90:21
**involvement** [4] - 75:6, 75:9, 86:15, 90:15
**involving** [1] - 72:19
**irrelevant** [3] - 14:3, 16:22, 57:11
**IRS** [1] - 43:19
**issue** [13] - 6:23, 14:4, 14:13, 16:23, 31:21, 33:17, 33:18, 41:9, 41:12, 57:16, 57:18, 103:16, 106:13
**issued** [2] - 44:24, 68:9
**issues** [11] - 3:4, 14:5, 39:8, 40:4, 57:25, 73:13, 80:4, 80:6, 80:8, 85:8, 105:21
**items** [5] - 38:21, 38:22, 38:23, 105:6
**itself** [2] - 61:21, 92:8

# J

**J-6** [1] - 103:1
**J.S** [1] - 1:16
**January** [28] - 8:21, 15:13, 18:5, 23:7, 38:14, 38:16, 39:24, 42:23, 43:3, 46:11, 47:3, 64:15, 64:24, 69:17, 72:18, 73:24, 74:10, 82:25, 83:12, 84:16, 86:4, 91:14, 91:21, 96:22, 99:23, 104:9, 104:14, 108:4
**Jasmine** [2] - 95:12, 96:5
**Jesse** [8] - 19:12, 20:5, 40:3, 48:23, 50:14, 50:18, 54:17, 77:2
**Jessie** [1] - 39:8
**job** [2] - 66:18, 67:1
**John** [1] - 70:22
**JOHN** [2] - 2:5, 70:15
**joining** [1] - 71:17
**JUDGE** [1] - 1:10
**July** [7] - 29:14, 30:12, 30:13, 33:15, 57:19, 58:1, 70:4
**June** [2] - 13:12, 29:14
**jury** [36] - 3:3, 4:21, 5:21, 6:1, 6:15, 7:5, 7:7, 14:1, 16:5, 16:20, 19:25, 38:12, 42:21, 46:25, 55:6, 56:24, 57:8, 58:14, 81:2, 91:25, 92:8, 92:12, 93:1, 93:5, 97:25, 98:23, 99:15, 105:2, 105:11, 105:21, 106:2, 106:9, 106:12, 106:15, 108:3, 109:1

# K

**keep** [3] - 18:1, 73:6, 109:2
**kept** [2] - 39:9, 45:17
**Kim** [5] - 30:9, 30:18, 30:24, 51:2, 95:25
**Kimberly** [7] - 8:23, 9:16, 13:2, 50:5, 50:7, 50:23, 63:5
**kind** [2] - 59:17, 106:16
**kinds** [1] - 66:10
**Kingdom** [1] - 71:20
**kingdom** [2] - 71:21, 73:11
**Kleiner** [9] - 29:24, 30:10, 30:18, 30:24, 32:16, 45:17, 53:21, 95:25
**knocked** [2] - 18:15, 56:25
**knowing** [1] - 8:15
**known** [1] - 56:23
**knows** [3] - 40:15, 62:1, 99:15
**KRT** [2] - 24:2, 32:21

# L

**label** [1] - 74:14
**lady** [2] - 28:2, 61:12
**LANDYA** [1] - 1:9
**language** [1] - 37:14
**last** [7] - 10:8, 37:18, 70:20, 70:22, 96:8, 104:10, 110:12
**laughed** [1] - 66:24
**launched** [1] - 24:9
**launching** [1] - 106:17
**Laura** [2] - 43:25, 69:10
**Laurie** [32] - 38:8, 76:5, 77:2, 77:3, 77:4, 77:6, 77:18, 77:21, 77:22, 80:4, 80:9, 80:13, 82:4, 82:8, 82:21, 83:7, 83:15, 83:19, 84:11, 87:19, 89:20, 90:12, 91:6, 94:10, 95:5, 101:13, 101:19, 102:13, 103:4, 103:20, 104:22, 104:24
**LAURIE** [4] - 1:3, 1:13, 2:4, 7:14
**Laurie's** [4] - 82:24, 102:11, 103:1, 103:12
**Lavoie** [2] - 110:5, 110:18
**Law** [1] - 1:13
**law** [4] - 34:12, 34:22, 65:14, 71:18
**lawsuit** [2] - 37:8, 76:7
**lawyer** [1] - 54:1
**Leader** [3] - 8:21, 10:20, 13:2
**leader** [1] - 49:18
**leading** [3] - 92:2, 92:20, 107:5
**learn** [3] - 93:23, 94:3, 96:20
**learned** [4] - 23:18, 72:17, 84:23, 93:20
**least** [2] - 49:15, 103:13
**leave** [24] - 26:2, 37:23, 46:17, 47:10, 48:14, 50:3, 50:4, 67:24, 68:16, 76:3, 76:9, 78:1, 80:13, 81:11, 81:12, 81:15, 83:19, 89:12, 90:8, 93:24, 93:25, 94:3
**leaves** [1] - 5:20
**leaving** [1] - 90:23
**Lebanon** [1] - 49:8
**left** [19] - 10:19, 10:20, 26:2, 26:6, 27:6, 28:4, 37:25,

76:11, 83:6, 83:12, 83:19, 83:25, 84:16, 85:13, 85:15, 93:7, 98:22
**legal** [48] - 18:5, 18:23, 20:2, 22:21, 33:4, 34:25, 35:2, 35:11, 35:12, 35:13, 35:14, 35:19, 35:20, 35:23, 37:19, 37:20, 37:21, 38:2, 40:2, 40:12, 40:14, 41:14, 47:14, 47:20, 47:24, 48:2, 48:14, 49:14, 49:18, 50:4, 50:16, 51:3, 51:23, 60:23, 64:24, 65:2, 65:9, 65:13, 68:5, 68:19, 68:21, 69:13, 69:19, 74:8, 76:21, 93:21, 96:14, 103:4
**Lehmann** [9] - 13:1, 36:23, 37:4, 37:7, 37:8, 38:17, 39:4, 54:3, 54:14
**length** [1] - 106:2
**lengthy** [2] - 31:3, 51:15
**Leonard** [44] - 8:15, 30:10, 33:11, 34:25, 35:11, 37:19, 51:21, 52:18, 53:21, 55:25, 62:1, 62:10, 62:20, 68:11, 69:7, 77:1, 79:25, 80:13, 81:22, 82:2, 83:16, 85:14, 85:15, 85:19, 89:17, 89:19, 90:19, 90:20, 91:2, 91:4, 91:5, 91:8, 91:9, 91:11, 91:13, 98:15, 99:10, 104:8, 104:11, 104:12, 104:13, 104:17, 106:14, 110:22
**LEONARD** [2] - 1:5, 1:16
**Leonard's** [6] - 21:3, 30:7, 33:14, 58:21, 69:23, 79:6
**letter** [8] - 33:15, 44:24, 51:5, 51:6, 51:8, 51:9, 51:15, 68:7
**letters** [2] - 32:21, 34:20
**letting** [1] - 62:3
**license** [1] - 25:6
**light** [4] - 44:3, 44:6, 44:17, 44:20
**likely** [1] - 56:10
**limit** [1] - 5:9
**limitations** [1] - 36:16
**limited** [1] - 12:15
**limiting** [1] - 7:3
**limits** [3] - 35:3, 38:2, 108:17
**line** [11] - 6:8, 6:11, 6:12, 6:20, 6:21, 37:18, 62:22, 67:12, 69:9, 69:14, 101:11
**lines** [5] - 26:25, 27:2, 61:10, 61:15, 89:14
**list** [4] - 43:11, 49:4, 49:6, 65:17
**listed** [1] - 77:11
**listen** [2] - 5:8, 41:18
**listened** [1] - 101:5
**literally** [3] - 50:11, 66:8, 108:2
**litigation** [6] - 36:17, 38:19, 38:23, 40:11, 40:17, 54:12
**Lloyd** [9] - 19:24, 40:24, 61:11, 62:2, 67:25, 77:1, 100:24, 101:6, 102:10
**Lloyd's** [3] - 68:10, 79:7, 100:16
**LLP** [1] - 1:15
**local** [1] - 81:18
**location** [3] - 76:14, 77:13, 81:6
**locked** [1] - 40:8
**log** [6] - 44:9, 44:10, 72:24, 75:25, 78:19
**logged** [2] - 66:14, 75:8
**look** [16] - 6:14, 8:9, 8:19, 12:23, 15:24, 16:8, 22:2, 33:10, 33:13, 43:1, 43:2, 43:6, 43:11, 49:25, 63:8, 74:20
**looked** [3] - 30:20, 59:5, 96:15
**looking** [13] - 8:1, 18:13, 31:6, 37:1, 37:14, 50:19, 54:7, 61:9, 97:9, 97:12, 105:7, 107:6
**looks** [3] - 37:2, 87:7, 87:25
**lost** [1] - 46:3
**loud** [2] - 8:14, 62:23
**loudly** [1] - 68:12
**lumped** [1] - 41:14
**lunch** [3] - 33:22, 33:23, 34:3
**lunchtime** [1] - 51:11
**Lying** [1] - 53:21
**Lynn** [1] - 32:18

## M

**Maddie** [7] - 18:12, 18:14, 32:13, 34:9, 35:8, 37:12, 46:10
**MADELINE** [1] - 1:14
**mail** [41] - 9:23, 12:25, 18:10, 22:14, 22:23, 22:25, 29:23, 30:5, 31:3, 33:8, 33:10, 37:16, 38:4, 39:11, 42:20, 44:21, 45:21, 45:23, 46:11, 49:1, 49:2, 49:4, 49:6, 59:13, 60:24, 61:2, 63:16, 64:5, 64:7, 64:10, 64:13, 65:6, 65:10, 69:10, 94:10, 94:13, 94:22, 94:25, 95:3
**mailed** [2] - 45:7, 50:14
**mails** [9] - 19:15, 20:13, 20:15, 42:16, 42:17, 44:8, 49:10, 54:4, 54:11
**Main** [1] - 76:12
**majority** [3] - 27:9, 28:3, 53:13
**manager** [1] - 110:19
**Mandel** [1] - 32:18
**manner** [5] - 59:1, 69:22, 82:10, 109:6, 109:19
**March** [2] - 24:12, 24:25
**marginally** [1] - 14:19
**marked** [1] - 60:5
**match** [1] - 79:15
**matching** [1] - 78:15
**matter** [3] - 54:10, 97:12, 112:5
**matters** [2] - 36:9, 87:8
**MATULIS** [1] - 1:14
**mayor** [3] - 22:11, 43:15, 59:14
**mayor's** [1] - 13:2
**McCAFFERTY** [1] - 1:9
**mean** [19] - 10:11, 12:17, 33:4, 46:3, 48:10, 51:12, 62:7, 65:24, 70:2, 73:25, 74:12, 81:5, 84:19, 87:20, 91:17, 97:15, 98:3, 105:4
**means** [1] - 109:3
**meantime** [1] - 108:6
**mediate** [1] - 48:9
**meet** [4] - 31:7, 32:1, 33:16, 35:6
**meeting** [14] - 49:3, 51:25, 52:18, 52:22, 55:19, 59:22, 60:3, 60:9, 61:3, 61:4, 62:23, 68:9, 68:25, 69:2
**meetings** [6] - 10:23, 11:3, 11:13, 12:15, 53:7, 53:12
**member** [3] - 41:11, 41:21, 64:8
**members** [3] - 22:12, 30:15, 40:5
**memory** [4] - 72:14, 89:19, 92:4, 107:25
**mention** [1] - 63:11
**mentioned** [6] - 20:5, 23:22, 24:12, 51:20, 53:10, 96:13
**message** [1] - 100:7
**met** [3] - 45:15, 85:1, 85:4
**middle** [2] - 19:19, 68:1
**might** [8] - 4:1, 4:24, 10:13, 28:3, 36:24, 39:25, 42:5, 51:9
**Mike** [1] - 32:18
**mileage** [1] - 25:13
**mind** [5] - 6:24, 14:12, 50:21, 60:19, 95:1
**Mindy** [11] - 19:24, 40:24, 61:11, 62:2, 68:10, 77:1, 100:16, 100:24, 100:25, 101:6, 102:10
**mine** [1] - 44:16
**minor** [2] - 73:20, 73:21
**minutes** [7] - 46:7, 55:5, 68:24, 69:5, 98:22, 100:7, 101:1
**misconduct** [1] - 67:3
**misdemeanor** [3] - 73:23, 81:14, 81:21
**misdemeanors** [1] - 73:20
**misleading** [2] - 49:17, 67:13
**misspoke** [1] - 15:25
**mistake** [2] - 8:4, 84:6
**mixed** [1] - 40:15
**MM** [1] - 15:11
**model** [1] - 25:6
**moment** [3] - 4:16, 6:18, 15:25
**Monday** [2] - 100:13, 109:4
**money** [1] - 85:10
**monitored** [1] - 64:7
**month** [3] - 20:7, 33:15, 92:23
**months** [2] - 40:2, 56:20
**morning** [9] - 7:20, 9:20, 9:24, 47:12, 50:2, 51:10, 100:13, 105:9, 105:13
**most** [2] - 12:16, 31:9
**motion** [3] - 54:1, 54:5, 54:8
**motivation** [1] - 84:25
**move** [9] - 13:23, 16:12, 16:25, 17:2, 38:13, 42:10, 77:16, 99:1, 105:21
**moving** [1] - 73:6
**MR** [114] - 4:8, 5:3, 5:5, 5:14, 5:19, 6:6, 6:22, 7:12, 7:19, 13:24, 14:2, 14:6, 14:8, 14:22, 15:2, 15:4, 15:12, 15:16, 15:17, 15:24, 16:4, 16:11, 16:14, 16:17, 16:21, 17:3, 17:7, 17:9, 17:16, 17:18, 17:22, 20:24, 21:2, 21:23, 21:25, 24:18, 24:19, 24:23, 24:24, 26:7, 26:9, 31:2, 33:24, 34:1, 34:5, 34:8, 41:17, 42:6, 42:9, 42:13, 42:15, 46:22, 47:7, 55:1, 55:7, 55:9, 55:11, 56:14, 56:17, 56:19, 57:16, 58:9, 58:18, 60:14, 60:18, 62:25, 63:4, 70:8, 70:11, 71:2, 75:3, 78:16, 78:17, 79:16, 79:20, 79:24, 86:4, 86:6, 86:7, 92:11, 92:17, 93:3, 93:6, 97:4, 97:6, 97:21, 98:1, 98:6, 98:11, 98:18, 98:20, 99:2, 99:3, 99:19, 99:22, 99:24, 100:1, 100:18, 100:23, 104:25, 105:19, 105:24,

109:23, 110:4, 110:7, 110:9, 110:13, 110:15, 110:17, 110:18, 110:21, 110:25, 111:6, 111:10

**N**

**name** [11] - 49:7, 61:13, 68:12, 70:20, 70:22, 76:5, 95:5, 96:13, 101:2
**named** [1] - 30:22
**narrative** [8] - 72:21, 86:14, 87:7, 89:21, 95:17, 107:15, 107:24, 111:4
**Nashua** [18] - 10:18, 12:21, 15:6, 15:21, 17:14, 23:5, 28:20, 30:14, 48:20, 64:15, 71:9, 71:13, 71:17, 73:15, 80:5, 80:8, 81:18, 99:10
**Nashua's** [1] - 64:10
**National** [2] - 12:5, 12:7
**nature** [3] - 89:9, 92:14, 103:21
**necessarily** [1] - 77:12
**need** [11] - 8:14, 16:7, 42:20, 44:23, 49:21, 49:25, 105:22, 105:25, 106:23, 107:8, 109:3
**needed** [10] - 18:17, 19:4, 20:19, 38:7, 41:7, 56:13, 61:17, 68:14, 92:4, 102:8
**needs** [3] - 6:1, 6:12, 106:18
**Neumann** [15] - 18:16, 19:12, 20:5, 20:17, 39:8, 40:3, 48:23, 50:14, 50:18, 54:18, 68:2, 77:2, 79:6, 94:18, 103:10
**Neumann's** [1] - 67:22
**neumann's** [1] - 103:19
**never** [9] - 18:22, 38:6, 38:9, 38:11, 69:20, 74:14, 106:25
**NEW** [1] - 1:1
**New** [3] - 71:22, 72:2, 72:6
**new** [7] - 19:13, 20:7, 20:9, 24:2, 45:2, 49:12, 49:18
**newer** [1] - 49:13
**newsletters** [1] - 49:5
**newspaper** [1] - 13:18
**next** [14] - 22:4, 37:4, 45:12, 62:22, 68:22, 70:13, 76:1, 78:9, 86:13, 92:5, 92:6, 98:25, 99:1, 110:6
**NH** [1] - 1:21
**night** [1] - 43:3
**NO** [1] - 1:2
**noble** [2] - 85:10
**nominated** [1] - 8:6
**nomination** [1] - 7:21
**non** [1] - 98:4
**non-hearsay** [1] - 98:4
**none** [1] - 57:5
**noon** [1] - 9:18
**North** [1] - 71:19
**notable** [2] - 55:22, 55:24
**notch** [2] - 55:25, 62:21
**note** [10] - 17:7, 30:9, 42:23, 77:6, 77:12, 82:2, 83:19, 98:15, 98:18, 99:5
**noted** [4] - 28:4, 53:25, 60:16, 87:15
**notes** [22] - 16:17, 77:20, 81:23, 82:6, 82:7, 82:10, 82:11, 82:13, 82:14, 82:16, 82:17, 82:19, 82:22, 83:2, 83:18, 86:19, 86:20, 86:21, 86:24, 86:25, 87:1, 89:19
**nothing** [5] - 51:2, 66:25, 67:2, 92:20, 96:4
**noticed** [1] - 14:15
**notified** [1] - 64:1
**November** [2] - 39:24, 46:6
**nowhere** [4] - 62:8, 62:12, 102:10, 102:13
**nuances** [1] - 92:12
**number** [8] - 11:22, 11:24, 12:9, 20:24, 75:8, 75:23, 85:23, 93:25
**numbers** [1] - 45:2

**O**

**object** [1] - 16:21
**objecting** [2] - 42:7, 107:18
**objection** [15] - 4:14, 5:15, 5:17, 5:24, 6:23, 16:15, 17:4, 34:5, 41:17, 46:22, 47:5, 60:16, 92:1, 92:22, 97:21
**objections** [1] - 14:15
**obligation** [1] - 107:10
**observe** [1] - 77:21
**observed** [5] - 72:13, 87:9, 87:11, 102:1
**obtained** [2] - 28:13, 73:2
**obtaining** [1] - 95:25
**obviously** [5] - 61:17, 61:23, 77:7, 91:3, 96:25
**October** [5] - 21:8, 21:15, 21:18, 22:14, 22:25
**offense** [4] - 74:21, 78:23, 83:3, 83:14
**offenses** [2] - 73:20, 73:21
**offered** [1] - 14:12
**office** [51] - 13:2, 18:23, 18:24, 20:8, 22:18, 22:21, 25:23, 25:24, 26:4, 27:5, 27:10, 30:22, 31:8, 32:25, 33:19, 34:4, 35:12, 35:14, 35:19, 35:23, 37:24, 40:24, 44:13, 44:14, 45:17, 46:7, 47:14, 47:20, 47:24, 48:2, 48:14, 48:16, 49:14, 49:15, 50:16, 52:19, 58:22, 64:8, 65:8, 66:6, 66:9, 68:5, 68:10, 68:20, 69:13, 69:19, 76:2, 93:21, 93:24, 94:1
**Office** [1] - 1:13
**officer** [9] - 71:20, 71:21, 73:10, 73:18, 74:5, 74:7, 81:20, 92:9, 110:16
**Officer** [8] - 3:10, 3:22, 71:3, 79:3, 85:22, 85:25, 86:8, 92:6
**officers** [4] - 85:21, 85:23, 87:4, 111:3
**offices** [1] - 60:11
**Official** [1] - 1:19
**official** [1] - 55:8
**officials** [2] - 12:13, 57:1
**omissions** [1] - 92:13
**omits** [1] - 55:23
**once** [3] - 10:16, 54:16, 85:15
**one** [50] - 3:8, 15:12, 15:13, 16:1, 18:19, 19:24, 20:20, 21:3, 22:1, 23:2, 23:24, 26:3, 27:9, 28:3, 30:16, 31:13, 31:16, 32:15, 38:25, 39:3, 40:5, 41:4, 41:8, 41:11, 44:8, 46:6, 51:20, 52:7, 52:9, 53:16, 53:19, 54:2, 54:13, 55:15, 57:16, 60:10, 60:24, 61:8, 77:9, 77:10, 78:5, 85:25, 94:11, 96:7, 98:17, 103:7, 104:9, 106:9, 106:13, 107:2
**ones** [1] - 42:19
**ongoing** [3] - 38:19, 38:24, 80:4
**open** [24] - 3:2, 28:21, 29:7, 40:24, 41:1, 45:22, 61:4, 68:11, 88:12, 99:11, 101:14, 101:16, 101:20, 101:21, 101:22, 101:25, 104:22, 106:16, 107:16, 107:23, 108:7, 108:11
**open-ended** [5] - 106:16, 107:16, 107:23, 108:7, 108:11
**opened** [8] - 4:16, 4:19, 29:15, 41:1, 62:5, 62:7, 101:17
**opening** [3] - 3:4, 56:23, 101:18
**opens** [2] - 5:18, 88:11
**opportunity** [2] - 3:21, 95:7
**opposed** [7] - 47:3, 56:7, 92:7, 99:14, 99:16, 106:21, 109:10
**order** [9] - 5:21, 46:9, 47:2, 55:2, 71:21, 77:12, 107:10, 109:25, 110:2
**orders** [1] - 5:12
**organizing** [1] - 107:21
**original** [1] - 42:19
**originally** [1] - 56:20
**ORTOLANO** [4] - 1:3, 1:13, 2:4, 7:14
**Ortolano** [36] - 4:20, 5:7, 7:6, 7:20, 8:12, 8:20, 11:7, 15:5, 15:18, 17:10, 17:23, 26:10, 32:19, 33:1, 33:13, 50:13, 58:20, 70:12, 72:19, 76:6, 77:2, 77:3, 80:9, 80:10, 82:4, 82:21, 87:23, 89:20, 90:24, 93:8, 93:21, 94:3, 95:24, 96:5, 101:13, 101:19
**ortolano** [1] - 85:8
**Ortolano's** [2] - 20:25, 96:2
**otherwise** [1] - 92:10
**outlined** [1] - 22:10
**outside** [13] - 12:14, 12:15, 12:17, 13:25, 16:19, 33:21, 34:3, 46:24, 52:25, 58:21, 91:24, 93:4, 97:25
**outward** [1] - 101:18
**outward-opening** [1] - 101:18
**overestimated** [1] - 109:1
**overheard** [1] - 51:22
**overruled** [7] - 7:2, 14:23, 17:4, 34:6, 57:14, 58:6, 98:10
**oversee** [1] - 43:20
**oversight** [1] - 44:21
**own** [4] - 12:10, 54:7, 108:19, 109:11
**owner** [2] - 81:7, 81:15

**P**

**p.m** [2] - 51:9, 94:13
**pace** [1] - 109:4
**page** [21] - 8:25, 26:15, 26:17, 26:19, 28:7, 30:4, 30:5, 31:3, 32:11, 60:19, 72:22, 78:9, 86:13, 86:17, 87:8, 97:1, 97:4, 98:21, 100:19, 104:10, 104:16
**pages** [2] - 60:8, 69:3
**paperwork** [3] - 77:23, 78:6
**paragraph** [5] - 26:20, 31:6, 36:8, 68:1, 96:8
**Paralegal** [1] - 1:23
**parked** [1] - 25:14
**part** [12] - 11:9, 28:3, 32:13, 44:20, 45:2, 61:1, 61:20, 68:21, 72:6, 87:12, 88:3, 91:14

**particular** [3] - 57:5, 87:7, 87:9
**past** [1] - 40:24
**patrol** [4] - 73:18, 74:5, 74:8, 74:9
**patrolman** [3] - 71:14, 73:15, 73:17
**pay** [1] - 40:19
**peaceful** [1] - 9:9
**peacefully** [2] - 9:2, 50:8
**people** [17] - 34:3, 35:6, 43:11, 43:15, 44:2, 45:8, 63:25, 65:24, 66:6, 66:8, 66:10, 67:13, 76:25, 90:12, 93:25, 108:5
**per** [1] - 5:12
**perhaps** [1] - 105:20
**period** [3] - 10:4, 14:11, 81:17
**permission** [2] - 81:7, 93:21
**permit** [3] - 22:10, 32:5, 33:17
**permit-capture** [1] - 33:17
**permits** [1] - 31:8
**person** [11] - 24:3, 25:9, 25:11, 28:14, 34:19, 37:5, 76:24, 81:7, 81:16, 93:24, 94:1
**personal** [1] - 12:10
**personally** [2] - 45:11, 70:6
**personnel** [2] - 11:17, 80:5
**ph** [3] - 22:13, 32:18, 85:25
**phone** [3] - 3:15, 19:15, 19:17
**photo** [1] - 26:5
**photograph** [1] - 25:14
**physical** [1] - 11:1
**picture** [6] - 87:19, 87:20, 87:25, 88:6, 88:7, 88:9
**pictures** [9] - 27:19, 27:21, 27:23, 28:2, 28:5, 28:10, 28:11, 28:12, 28:13
**piece** [1] - 60:20
**pinpointing** [1] - 106:13
**plaintiff** [4] - 1:4, 55:12, 57:12, 110:7
**PLAINTIFF** [1] - 1:12
**plaintiff's** [1] - 14:15
**plate** [1] - 25:6
**Pleasant** [1] - 1:20
**pleasant** [2] - 96:6, 96:9
**PLLC** [1] - 1:16
**plural** [1] - 97:14
**point** [12] - 38:15, 57:10, 57:11, 58:6, 58:12, 91:19, 92:14, 92:25, 95:10, 103:1, 106:22, 109:18
**pointed** [1] - 21:7
**pointing** [2] - 99:16, 99:18
**points** [1] - 55:15
**Police** [9] - 28:20, 71:9, 71:13, 71:17, 71:23, 72:2, 72:7, 80:5, 80:8
**police** [26] - 3:16, 3:17, 5:21, 9:10, 29:1, 30:14, 52:4, 59:6, 63:9, 67:3, 67:22, 67:23, 71:20, 71:24, 72:17, 74:2, 74:17, 75:5, 76:2, 85:21, 87:4, 93:13, 94:12, 98:16, 99:10, 101:6
**policy** [2] - 18:25, 64:18
**poor** [1] - 87:20
**portion** [3] - 61:1, 75:25, 111:16
**posit** [1] - 55:12
**position** [1] - 93:8
**possible** [5] - 9:20, 9:21, 59:11, 110:11, 110:14
**post** [1] - 14:3
**posted** [2] - 12:10, 38:5
**posting** [3] - 13:8, 13:12, 61:9
**posts** [2] - 12:5, 12:7
**potentially** [1] - 40:5
**practices** [1] - 17:13
**prefer** [1] - 108:19
**preparation** [1] - 52:23
**prepare** [2] - 72:10, 95:17
**prepared** [5] - 72:12, 86:23, 91:14, 91:20, 95:4
**presence** [10] - 14:1, 16:20, 46:25, 59:4, 81:13, 81:21, 91:25, 93:5, 97:25, 102:11
**present** [4] - 1:23, 52:13, 71:12, 85:20
**presentation** [5] - 52:11, 107:10, 108:14, 108:20, 109:14
**presented** [1] - 109:7
**preserve** [3] - 6:23, 6:25, 57:15
**preserved** [3] - 7:2, 57:14, 58:6
**press** [2] - 10:2, 59:3
**pressed** [1] - 58:25
**presumably** [2] - 41:23, 53:13
**pretty** [2] - 20:7, 56:14
**previous** [1] - 5:12
**primarily** [1] - 73:20
**priority** [1] - 54:10
**private** [11] - 24:17, 24:25, 25:16, 26:2, 27:6, 27:16, 53:3, 55:7, 66:16, 66:17, 68:17
**privately** [1] - 38:25
**probative** [1] - 57:7
**problem** [2] - 88:25, 108:8
**proceed** [1] - 110:8
**proceedings** [2] - 3:2, 112:4
**process** [2] - 45:6, 69:20
**processed** [1] - 63:22
**produce** [2] - 34:16, 34:23
**produced** [2] - 48:4, 64:25
**promoted** [1] - 74:9
**proper** [1] - 108:12
**properties** [2] - 66:20, 67:13
**property** [4] - 22:11, 23:12, 23:19, 23:25
**prosecuted** [1] - 80:22
**protest** [1] - 9:9
**protesting** [2] - 9:2, 50:8
**PROULX** [2] - 1:19, 112:9
**provide** [2] - 22:9, 22:15
**provided** [4] - 22:17, 25:5, 73:7, 94:17
**provides** [1] - 23:3
**public** [16] - 10:23, 11:12, 11:16, 25:23, 25:24, 53:7, 59:19, 59:20, 59:22, 61:2, 61:3, 61:4, 65:3, 65:25, 67:15
**publication** [1] - 14:11
**publications** [1] - 16:6
**published** [4] - 12:1, 13:21, 15:19, 53:16
**pull** [11] - 18:10, 18:12, 21:22, 32:12, 37:12, 49:23, 63:19, 64:23, 87:18, 101:22, 104:8
**pulled** [1] - 49:7
**pulling** [1] - 60:5
**punitive** [2] - 57:21, 58:2
**purchased** [1] - 23:5
**purpose** [4] - 63:6, 72:12, 98:4, 98:5
**pursue** [2] - 98:13, 104:7
**push** [5] - 41:1, 101:19, 101:21, 101:25
**pushed** [6] - 40:23, 101:13, 101:16, 101:20, 101:22, 101:24
**put** [15] - 5:14, 6:22, 11:6, 40:14, 48:7, 49:4, 59:2, 59:13, 63:17, 65:17, 66:14, 75:23, 79:25, 87:8, 108:18

## Q

**quality** [1] - 87:20
**quarterly** [1] - 45:1
**questioned** [1] - 24:2
**questioning** [1] - 109:20
**questions** [29] - 5:9, 11:10, 20:17, 37:20, 42:2, 62:25, 65:4, 65:9, 65:15, 65:18, 65:24, 65:25, 66:3, 66:10, 66:14, 69:13, 69:14, 84:7, 92:21, 94:11, 103:13, 106:16, 107:5, 107:16, 107:21, 107:24, 108:7, 108:11, 109:6
**quick** [2] - 78:10, 111:11
**quickly** [2] - 100:12, 105:22
**quite** [1] - 108:16
**quoted** [1] - 50:11
**quotes** [1] - 9:1

## R

**R-O-A-C-H** [1] - 70:23
**RACIOPPI** [1] - 1:23
**raised** [4] - 57:18, 59:18, 59:20, 103:16
**ran** [2] - 10:3, 10:4
**random** [1] - 55:16
**rank** [1] - 71:12
**ranked** [1] - 73:15
**rather** [1] - 100:14
**reaction** [1] - 4:20
**read** [14] - 3:9, 5:16, 8:14, 26:24, 27:2, 27:17, 31:10, 33:14, 64:8, 67:12, 91:10, 94:22, 95:8, 106:18
**reading** [4] - 8:5, 33:8, 62:22, 99:12
**ready** [3] - 58:11, 110:8, 111:4
**reality** [1] - 6:1
**realize** [1] - 20:2
**really** [9] - 19:14, 45:20, 48:23, 49:25, 54:7, 62:20, 63:8, 66:25, 95:3
**reappraised** [1] - 23:12
**reason** [4] - 24:16, 44:2, 107:17, 109:5
**reasonable** [3] - 22:18, 48:8, 111:1
**reasons** [1] - 44:18
**recalled** [1] - 87:2
**receipt** [3] - 39:13, 63:20, 64:3
**receive** [1] - 49:4
**received** [6] - 18:22, 64:2, 72:4, 75:21, 91:16, 100:7
**recent** [1] - 104:3
**recently** [1] - 48:25
**recess** [3] - 6:16, 58:8, 58:13
**recognize** [2] - 26:10, 26:12
**recognized** [2] - 49:10, 52:21
**recollection** [3] - 22:2, 27:4, 86:25
**recommended** [1] - 3:16
**reconvene** [1] - 109:17
**record** [12] - 5:14, 6:23,

6:25, 16:5, 22:24, 70:21, 72:15, 73:4, 75:4, 78:11, 79:14, 81:18
**records** [9] - 17:13, 21:17, 34:23, 48:7, 54:20, 68:7, 69:9, 92:3, 110:18
**recovery** [1] - 58:2
**Redirect** [1] - 2:3
**REDIRECT** [1] - 63:3
**redirect** [3] - 42:1, 58:12, 63:1
**refer** [3] - 75:22, 94:17, 95:1
**reference** [3] - 77:18, 77:19, 96:14
**referring** [4] - 22:11, 54:6, 78:21, 87:10
**reflect** [1] - 83:2
**refresh** [5] - 22:2, 27:4, 72:14, 92:4, 107:25
**refuse** [1] - 81:12
**refused** [4] - 67:23, 76:9, 94:3, 103:12
**refuses** [1] - 81:11
**regard** [1] - 81:4
**regarding** [5] - 14:18, 32:2, 35:22, 36:10, 95:25
**registered** [1] - 23:6
**regularly** [2] - 12:10, 47:21
**rein** [1] - 109:13
**reiterate** [1] - 88:17
**reiterated** [1] - 38:2
**related** [1] - 77:23
**relayed** [2] - 59:6, 76:14
**relevance** [3] - 14:8, 14:9, 48:12
**relevant** [6] - 14:17, 14:19, 56:10, 66:25, 87:8
**remaining** [2] - 14:8, 111:3
**remains** [1] - 14:17
**remark** [1] - 70:6
**remember** [11] - 10:10, 10:11, 21:24, 33:3, 35:1, 52:13, 63:17, 86:9, 86:10, 87:22
**reminded** [1] - 84:9
**rep** [1] - 63:12
**repeat** [3] - 17:25, 51:8, 61:25
**repeatedly** [3] - 41:6, 50:13, 107:3
**replied** [1] - 21:10
**report** [48] - 24:13, 24:14, 26:13, 28:6, 28:17, 66:16, 67:11, 68:2, 72:12, 72:21, 72:23, 72:24, 73:1, 74:17, 74:21, 75:7, 77:7, 78:23, 79:1, 79:2, 79:3, 79:6, 79:10, 80:18, 80:21, 86:14, 86:16, 86:18, 86:23, 88:16, 88:17, 89:1, 89:21, 90:15, 91:4, 91:15, 94:12, 94:18, 95:1, 96:7, 98:1, 101:2, 103:19, 106:13, 106:23
**reported** [6] - 39:14, 40:5, 52:9, 76:5, 82:6, 96:5
**REPORTED** [1] - 1:19
**Reporter** [1] - 1:19
**reporter** [4] - 10:7, 10:17, 10:18, 13:3
**reporting** [1] - 85:9
**reports** [7] - 10:6, 25:13, 45:1, 72:10, 72:22, 79:6, 92:13
**representation** [1] - 36:25
**representative** [1] - 63:25
**represented** [9] - 36:20, 38:15, 38:17, 38:19, 39:16, 40:9, 41:12, 54:14, 54:16
**representing** [2] - 47:21, 63:25
**reputation** [1] - 56:6
**reputational** [1] - 55:14
**request** [14] - 4:21, 19:21, 21:7, 22:19, 31:14, 32:1, 34:19, 39:4, 44:9, 48:8, 50:21, 65:23, 67:16, 99:20
**requested** [4] - 34:17, 44:10, 96:21, 96:23
**requesting** [2] - 76:1, 95:24
**requests** [16] - 11:21, 20:10, 30:10, 35:5, 35:17, 35:21, 36:11, 36:15, 37:19, 50:18, 55:18, 65:17, 65:20, 66:2, 66:13, 89:7
**require** [4] - 34:12, 34:16, 34:22, 65:15
**required** [2] - 18:6, 71:24
**requires** [3] - 31:20, 34:16, 34:23
**reread** [1] - 3:5
**research** [1] - 63:9
**researching** [1] - 105:7
**residents** [1] - 85:10
**respect** [3] - 18:9, 53:5, 108:17
**respectful** [1] - 90:13
**respond** [7] - 18:19, 19:5, 19:7, 19:8, 19:21, 73:19, 81:10
**responded** [4] - 21:19, 23:2, 42:25, 99:21
**responding** [2] - 20:15, 87:14
**responds** [2] - 31:13, 31:16
**response** [12] - 8:5, 30:8, 31:21, 32:2, 32:4, 33:9, 34:11, 45:23, 45:24, 65:14, 66:23, 87:12
**responsibilities** [2] - 73:17, 74:1
**responsibility** [2] - 17:10, 22:18
**responsiveness** [1] - 21:4
**rest** [2] - 10:22, 110:7
**result** [2] - 98:12, 106:8
**resulted** [1] - 77:14
**retrospect** [1] - 70:1
**return** [4] - 81:19, 91:7, 93:11, 93:17
**Revenue** [2] - 43:16, 67:7
**review** [9] - 11:16, 47:15, 47:25, 48:3, 48:6, 48:11, 49:19, 76:7, 77:9
**reviewed** [1] - 94:23
**revisit** [1] - 105:20
**Richard** [4] - 42:16, 42:17, 43:13, 46:14
**Rick** [7] - 37:4, 38:17, 39:4, 48:15, 48:17, 54:1, 54:3
**right-to-know** [13] - 11:21, 37:8, 44:12, 48:7, 54:3, 54:9, 54:13, 54:19, 55:18, 65:14, 65:23, 66:2, 66:13
**right-to-knows** [1] - 40:15
**ROACH** [2] - 2:6, 70:15
**Roach** [7] - 3:11, 3:22, 70:22, 71:3, 78:11, 79:19, 109:25
**Robert** [2] - 36:20, 37:2
**ROF** [1] - 75:8
**role** [2] - 36:11
**roles** [3] - 74:2, 74:3, 74:4
**rolled** [1] - 70:7
**room** [4] - 45:15, 68:10, 68:22, 68:23
**rough** [1] - 3:6
**roughly** [1] - 60:19
**route** [2] - 76:10, 76:18
**rule** [3] - 38:7, 41:5, 65:21
**ruled** [1] - 56:9
**rules** [8] - 38:3, 38:4, 38:6, 107:22, 108:10, 108:21, 109:15, 109:20
**ruling** [1] - 56:12
**run** [1] - 10:6
**RUSSELL** [1] - 1:14

## S

**sales** [3] - 32:21, 34:20, 68:8
**SAMSON** [1] - 1:23
**sanctioned** [1] - 67:10
**sanctions** [1] - 52:10
**Santiago** [1] - 79:3
**sat** [3] - 45:8, 77:22, 87:23
**Saturday** [1] - 9:13
**save** [1] - 85:10
**saw** [2] - 27:17, 45:5
**scene** [2] - 71:19, 78:2
**school** [2] - 73:11, 73:12
**Scoop** [3] - 12:5, 12:7, 12:21
**screen** [3] - 3:5, 37:2, 98:18
**scrolling** [1] - 106:11
**search** [1] - 22:19
**seated** [3] - 7:8, 58:15, 70:20
**second** [10] - 10:14, 15:25, 26:20, 31:3, 36:8, 42:20, 68:1, 96:7, 96:8, 98:17
**seconds** [3] - 46:4, 46:5
**section** [4] - 18:13, 28:8, 61:15, 62:18
**see** [27] - 8:15, 8:25, 14:3, 20:2, 20:18, 21:19, 26:17, 26:19, 31:4, 32:22, 45:8, 47:2, 61:18, 62:6, 73:7, 77:17, 81:19, 88:2, 88:4, 88:6, 88:9, 97:7, 99:6, 105:9, 105:13, 106:19, 111:13
**seeking** [2] - 50:14, 50:23
**seem** [1] - 36:7
**sees** [1] - 106:9
**send** [6] - 38:4, 64:18, 98:23, 105:2, 105:8
**sending** [1] - 30:9
**senior** [3] - 40:8, 41:13, 67:17
**sent** [29] - 9:23, 18:10, 21:7, 22:25, 25:15, 27:20, 27:23, 28:14, 28:17, 31:4, 32:21, 33:9, 34:20, 42:23, 43:9, 43:12, 44:22, 45:20, 49:11, 64:11, 64:12, 64:15, 64:20, 65:22, 66:3, 94:10, 94:13, 94:20
**sentence** [2] - 48:13, 96:8
**separate** [1] - 58:1
**September** [5] - 34:24, 36:4, 36:22, 37:15, 38:1
**sequence** [2] - 33:8, 108:3
**Sergeant** [13] - 79:19, 85:17, 86:10, 90:15, 90:24, 91:3, 91:11, 97:15, 97:17, 109:25, 110:6, 111:10
**sergeant** [3] - 71:13, 78:11, 105:12
**series** [2] - 30:10, 42:17
**service** [2] - 65:25, 73:19
**services** [1] - 45:16
**session** [3] - 7:9, 58:16, 59:20
**SESSION** [1] - 1:8
**set** [3] - 11:2, 69:20, 105:17
**setting** [1] - 108:17
**several** [1] - 28:10
**shaking** [2] - 105:3, 105:7
**shift** [1] - 73:19

**Shirley** [1] - 1:16
**short** [3] - 10:3, 18:2, 39:25
**show** [6] - 14:13, 73:5, 74:25, 92:4, 106:23, 108:1
**showed** [1] - 22:19
**showing** [3] - 8:1, 11:7, 40:2
**side** [21] - 3:22, 3:23, 13:24, 13:25, 14:24, 16:19, 17:5, 34:5, 46:23, 46:24, 47:4, 55:1, 55:8, 91:23, 91:24, 93:4, 97:24, 98:9, 98:24
**side-bar** [10] - 13:25, 14:24, 16:19, 17:5, 46:24, 47:4, 91:24, 93:4, 97:24, 98:9
**sign** [4] - 20:2, 102:2, 102:3, 104:12
**signature** [1] - 104:13
**signed** [3] - 64:1, 95:5, 104:11
**signing** [1] - 66:19
**similar** [2] - 57:20, 71:22
**simpler** [1] - 108:22
**single** [1] - 65:22
**singled** [2] - 19:9, 19:25
**singling** [2] - 18:25, 19:2
**sit** [5] - 26:1, 26:3, 51:17, 55:4, 68:22
**site** [1] - 13:9
**sitting** [4] - 27:5, 58:21, 87:19, 87:22
**situation** [1] - 65:2
**six** [3] - 40:2, 56:20, 61:10
**skills** [1] - 74:15
**skip** [1] - 16:2
**skipping** [1] - 61:1
**sleeping** [1] - 66:18
**slightly** [1] - 74:3
**slow** [3] - 48:1, 109:5, 109:6
**someone** [6] - 28:13, 36:17, 51:18, 80:24, 81:11, 97:18
**someplace** [1] - 10:20
**sometime** [2] - 39:24, 95:23
**sometimes** [1] - 65:15
**somewhere** [1] - 35:11
**sorry** [24] - 3:18, 6:6, 20:25, 21:24, 29:22, 38:22, 42:21, 47:8, 51:8, 55:7, 57:19, 74:20, 79:5, 84:5, 88:6, 91:9, 91:17, 92:11, 97:7, 98:13, 99:22, 100:18, 102:1, 104:1
**sort** [1] - 55:16
**sounds** [3] - 36:12, 92:3, 111:1
**space** [4] - 25:24, 26:1, 53:3
**speaking** [3] - 22:12, 55:15, 90:21
**specific** [4] - 33:17, 35:21, 36:10, 108:1
**specifically** [9] - 55:16, 55:19, 55:25, 56:15, 69:18, 77:20, 90:21, 94:1, 106:20
**speculating** [1] - 6:2
**speculation** [1] - 6:1
**speech** [1] - 56:24
**speed** [3] - 92:23, 98:24, 109:14
**speeding** [1] - 108:20
**spell** [1] - 70:20
**spelled** [1] - 70:23
**spend** [1] - 100:24
**spent** [1] - 100:25
**spoken** [2] - 10:16, 10:17
**sponte** [1] - 107:19
**staff** [8] - 22:12, 25:8, 28:2, 31:22, 31:23, 32:18, 38:7, 64:8
**stamp** [2] - 51:4, 67:24
**stamped** [6] - 9:7, 46:4, 46:7, 69:21, 77:23, 78:6
**stamping** [1] - 103:17
**stamps** [4] - 42:24, 68:3, 89:4, 95:25
**stand** [5] - 7:6, 59:25, 88:19, 89:8, 92:9
**standard** [1] - 49:3
**standing** [3] - 27:5, 68:9, 101:23
**start** [5] - 18:4, 61:15, 100:15, 108:2, 111:9
**started** [6] - 19:19, 20:6, 25:10, 48:17, 48:20, 55:8
**starting** [1] - 28:6
**starts** [3] - 26:19, 26:22, 30:9
**state** [8] - 7:21, 14:12, 49:10, 49:20, 67:6, 70:20, 79:14
**state's** [2] - 43:19, 44:21
**statement** [21] - 5:25, 6:3, 56:19, 57:17, 60:8, 62:8, 62:12, 67:22, 68:11, 79:5, 86:13, 91:13, 91:16, 91:20, 94:21, 100:16, 103:2, 103:16, 104:8, 106:14, 106:20
**statements** [9] - 10:13, 10:14, 59:9, 59:15, 59:17, 62:2, 79:7, 79:11, 108:1
**States** [1] - 1:20
**STATES** [2] - 1:1, 1:10
**station** [1] - 76:11
**statute** [1] - 31:20
**stay** [2] - 33:21, 101:11
**stayed** [1] - 9:10
**staying** [1] - 9:8
**step** [2] - 70:12, 105:12
**stepped** [1] - 54:15
**stepping** [1] - 108:22
**Steve** [5] - 12:25, 15:22, 36:8, 39:14, 41:15
**STEVEN** [2] - 1:5, 1:14
**stick** [1] - 36:14
**still** [18] - 5:18, 17:1, 19:2, 24:6, 37:1, 38:14, 42:24, 43:3, 44:23, 64:20, 65:9, 65:18, 65:19, 74:1, 98:20, 100:18, 105:17, 110:6
**stood** [3] - 42:8, 58:25, 59:4
**stopped** [1] - 53:6
**story** [7] - 3:22, 3:23, 3:25, 99:16, 106:10, 107:15, 108:14
**Street** [2] - 1:20, 76:12
**stricken** [2] - 15:2, 60:15
**strike** [5] - 13:23, 42:11, 83:2, 93:13, 96:20
**stuff** [1] - 40:17
**sua** [1] - 107:19
**subject** [2] - 13:5, 39:16
**subjective** [2] - 56:22, 56:24
**submit** [1] - 54:8
**submitted** [2] - 11:20, 11:23
**subsequent** [1] - 23:25
**sufficiently** [1] - 21:11
**suggest** [4] - 9:19, 55:9, 91:17, 110:21
**summarized** [1] - 80:4
**summer** [3] - 29:12, 29:13, 29:15
**Sununo** [1] - 8:6
**Sununu** [1] - 7:21
**supervisor** [1] - 97:11
**supervisors** [7] - 97:13, 97:14, 97:20, 97:23, 98:2, 99:9, 100:8
**supplement** [1] - 111:4
**supplemental** [1] - 75:7
**supplied** [1] - 21:17
**supported** [1] - 17:13
**supposed** [2] - 19:3, 64:17
**surnames** [1] - 37:11
**surrounding** [1] - 16:23
**sustained** [2] - 33:25, 47:5
**swear** [1] - 11:22
**sworn** [2] - 7:15, 70:16
**synopsis** [3] - 73:5, 77:8, 86:15

## T

**tall** [1] - 59:4
**tape** [1] - 101:5
**technically** [1] - 62:5
**Teddy** [1] - 85:15
**temporarily** [1] - 74:9
**term** [2] - 57:5, 70:1
**terms** [4] - 65:3, 81:3, 106:1, 108:4
**testified** [3] - 7:15, 50:2, 70:16
**testify** [4] - 92:9, 99:14, 99:18, 100:20
**testifying** [2] - 21:5, 99:13
**testimony** [10] - 7:20, 18:7, 20:1, 28:15, 55:13, 61:2, 69:4, 105:5, 105:14, 106:8
**text** [1] - 26:2
**texted** [2] - 27:13, 27:24
**texting** [1] - 27:6
**THE** [95] - 1:9, 1:12, 1:14, 1:16, 3:3, 4:9, 5:4, 5:6, 5:16, 6:4, 6:7, 7:1, 7:8, 7:10, 14:7, 14:19, 14:23, 14:25, 15:3, 15:15, 16:3, 16:8, 16:12, 16:15, 16:24, 17:4, 17:6, 17:17, 20:22, 24:21, 26:8, 30:23, 31:1, 33:25, 34:6, 41:18, 41:25, 42:4, 42:11, 42:14, 46:23, 47:1, 47:5, 48:1, 55:3, 56:9, 56:16, 56:18, 57:13, 58:5, 58:11, 58:15, 58:17, 60:16, 63:1, 70:9, 70:12, 70:19, 74:24, 75:2, 78:10, 78:14, 79:14, 79:18, 79:22, 86:2, 86:5, 91:23, 92:1, 92:16, 92:19, 97:3, 97:5, 98:3, 98:8, 98:10, 98:22, 99:12, 99:25, 100:17, 100:20, 105:1, 105:12, 105:16, 105:20, 105:25, 110:2, 110:11, 110:14, 110:16, 110:20, 110:24, 111:1, 111:8, 111:12
**themselves** [1] - 69:20
**Thereupon** [18] - 7:7, 7:13, 13:25, 14:24, 16:19, 17:5, 46:24, 47:4, 55:6, 58:13, 58:14, 70:14, 91:24, 93:4, 97:24, 98:9, 105:11, 111:16
**thigh** [2] - 59:3
**thighs** [1] - 58:25
**thinking** [1] - 49:8
**third** [2] - 10:15, 76:23
**threatened** [7] - 4:11, 4:12, 82:3, 82:8, 89:20, 102:11, 107:4
**threatening** [5] - 59:1, 59:16, 82:10, 89:23, 102:16
**threats** [2] - 80:12, 103:23
**three** [8] - 10:3, 10:8, 20:6, 38:8, 43:15, 60:8, 69:3, 103:13
**Thursday** [2] - 43:3, 45:21
**timeline** [6] - 21:5, 21:8, 22:10, 22:13, 22:20, 23:1

**timely** [1] - 109:19
**timing** [1] - 108:3
**Timothy** [1] - 70:22
**TIMOTHY** [2] - 2:5, 70:15
**tiring** [3] - 109:12, 109:13
**title** [2] - 15:5, 15:21
**today** [6] - 24:13, 32:20, 35:18, 71:5, 77:25, 110:1
**together** [1] - 48:7
**tomorrow** [2] - 105:17, 111:13
**tonight** [1] - 106:4
**took** [16] - 25:14, 26:5, 27:19, 28:3, 28:4, 28:11, 31:21, 37:8, 37:18, 54:3, 54:15, 55:25, 62:20, 86:24, 94:21, 103:2
**top** [2] - 31:4, 100:14
**topic** [1] - 32:2
**topical** [1] - 4:18
**topics** [1] - 106:21
**totally** [1] - 45:5
**touch** [1] - 105:18
**toward** [2] - 54:15, 70:6
**town** [1] - 57:1
**training** [2] - 71:24, 72:6
**transcribed** [1] - 60:10
**transcript** [1] - 6:14
**transcription** [1] - 112:4
**treat** [1] - 44:11
**treated** [2] - 51:16, 70:5
**treating** [1] - 57:24
**trespass** [16] - 17:11, 73:22, 73:23, 80:14, 80:24, 81:10, 81:13, 81:17, 81:22, 84:7, 87:14, 91:11, 93:16, 93:19, 94:7
**trespassed** [8] - 55:20, 81:3, 81:5, 81:16, 81:20, 84:8, 90:25, 91:6
**trespassing** [1] - 8:11
**TRIAL** [1] - 1:8
**trial** [9] - 56:11, 59:19, 60:11, 72:14, 92:23, 106:2, 107:9, 109:12, 111:16
**trialreporters@hush.com** [1] - 1:22
**tried** [3] - 4:12, 18:19, 19:24
**trouble** [1] - 46:19
**true** [6] - 8:17, 34:15, 34:22, 38:9, 40:22, 62:5
**trust** [1] - 67:14
**try** [6] - 6:25, 17:8, 18:1, 34:21, 44:3, 74:16
**trying** [22] - 6:22, 6:24, 9:7, 18:20, 19:6, 19:21, 29:17, 29:24, 29:25, 33:6, 34:3, 35:6, 44:6, 54:11, 54:17, 57:25, 63:17, 77:24, 85:3, 85:9, 85:22, 99:2
**Tuesday** [2] - 109:2, 109:3
**Turgiss** [12] - 22:9, 23:20, 25:1, 25:10, 26:1, 27:6, 28:21, 30:17, 52:1, 52:3, 66:18, 69:15
**turn** [6] - 18:9, 26:15, 30:2, 32:11, 65:22, 75:10
**turning** [2] - 20:20, 31:3
**TV** [1] - 61:6
**twice** [3] - 8:25, 19:17, 38:1
**two** [21] - 10:12, 16:1, 30:4, 32:18, 38:21, 38:22, 38:23, 39:4, 41:12, 44:8, 55:15, 57:25, 67:16, 68:21, 72:21, 79:6, 85:24, 110:4, 110:6, 110:11, 110:12
**type** [1] - 67:3
**typed** [5] - 49:7, 75:24, 101:2, 101:3, 101:4
**typically** [1] - 81:10
**typing** [1] - 8:15

## U

**U.K** [1] - 73:12
**ultimately** [7] - 6:13, 16:25, 24:22, 57:22, 106:12, 107:3, 107:21
**umm** [1] - 49:16
**unannounced** [1] - 40:3
**unaware** [1] - 18:4
**under** [9] - 44:3, 44:17, 44:20, 45:18, 56:21, 75:8, 84:3, 84:7, 101:2
**understood** [4] - 7:2, 34:21, 58:5, 84:8
**unfair** [1] - 45:5
**Unfit** [1] - 15:22
**unfortunately** [1] - 108:13
**uniformed** [2] - 73:18, 74:5
**Union** [3] - 8:21, 10:20, 13:2
**UNITED** [2] - 1:1, 1:10
**United** [4] - 1:20, 71:20, 71:21, 73:11
**unknown** [1] - 66:14
**unless** [3] - 36:10, 107:14, 111:3
**unstable** [5] - 59:16, 82:18, 90:4, 102:18, 104:4
**unusual** [2] - 87:4, 102:22
**up** [78] - 11:2, 11:6, 18:10, 18:12, 18:14, 19:11, 21:14, 21:22, 29:7, 29:15, 29:24, 30:4, 32:12, 32:13, 35:8, 36:4, 37:12, 40:2, 40:13, 40:17, 42:1, 42:7, 42:8, 43:9, 45:3, 46:10, 48:9, 49:7, 49:23, 51:3, 52:9, 52:11, 53:20, 55:25, 56:25, 58:25, 59:2, 59:24, 60:1, 60:5, 60:20, 61:14, 61:15, 62:18, 62:20, 64:23, 65:7, 65:8, 65:13, 65:18, 65:19, 66:9, 67:11, 67:21, 68:6, 68:8, 68:9, 69:20, 72:6, 72:22, 75:23, 76:23, 79:5, 79:12, 82:2, 86:13, 87:18, 87:24, 88:8, 98:24, 99:11, 104:8, 106:24, 108:5, 108:17, 108:20, 109:14
**upcoming** [1] - 97:22
**update** [1] - 45:1
**upset** [2] - 14:10, 78:6
**Upton** [1] - 1:15
**urge** [1] - 17:2
**urgency** [1] - 100:11
**uses** [1] - 55:12
**UU** [1] - 87:18

## V

**value** [1] - 57:7
**various** [2] - 16:6, 105:6
**vast** [1] - 53:13
**version** [1] - 100:21
**Vincent** [15] - 42:16, 42:17, 43:12, 43:13, 44:3, 45:24, 46:14, 47:13, 47:21, 48:15, 48:17, 63:19, 64:5, 64:12, 64:19
**Vincent's** [2] - 42:19, 49:6
**violation** [1] - 67:14
**visits** [1] - 102:6
**voluminous** [1] - 48:8
**vs** [1] - 1:4

## W

**wait** [2] - 9:10, 45:8
**waiting** [1] - 45:23
**walk** [2] - 65:24, 66:8
**walked** [5] - 41:2, 41:3, 45:12, 45:24, 52:19
**wall** [5] - 40:18, 40:19, 40:20, 40:23, 88:3
**warned** [1] - 93:17
**warning** [1] - 93:15
**warrant** [1] - 75:11
**Washington** [2] - 82:24, 104:3
**watch** [2] - 26:1, 27:12
**watched** [1] - 66:8
**water** [1] - 71:7
**ways** [1] - 16:25
**wearing** [2] - 58:24, 76:6
**website** [3] - 61:9, 61:17, 61:23
**week** [6] - 21:18, 23:2, 31:16, 48:18, 48:21, 49:1
**weeks** [2] - 19:20, 20:6
**whatsoever** [1] - 57:6
**whisper** [2] - 92:16
**white** [1] - 88:4
**whiteboard** [6] - 25:22, 27:18, 27:19, 28:10, 66:19, 67:14
**whole** [1] - 5:17
**wild** [1] - 11:24
**WILLIAM** [1] - 1:12
**William** [1] - 25:3
**willing** [2] - 4:22, 47:16
**willingly** [1] - 83:21
**Witness** [1] - 2:3
**witness** [23] - 17:2, 52:15, 52:18, 52:20, 52:21, 70:13, 92:19, 92:21, 92:22, 92:24, 106:3, 106:12, 106:22, 107:2, 107:13, 107:14, 107:15, 107:22, 108:10, 111:7, 111:8, 111:11
**witnessed** [1] - 104:12
**witnesses** [10] - 106:25, 107:2, 107:9, 107:11, 109:11, 109:14, 109:25, 110:11, 110:12, 111:3
**woman** [7] - 18:15, 25:12, 26:4, 27:10, 61:10, 61:25, 76:2
**woman's** [1] - 68:12
**word** [2] - 55:12, 85:11
**words** [4] - 84:21, 101:15, 103:6, 106:20
**works** [2] - 11:16, 93:1
**worry** [1] - 88:16
**worse** [1] - 103:8
**worth** [1] - 23:10
**write** [7] - 31:7, 36:8, 47:18, 51:5, 63:24, 65:13, 102:17
**writes** [2] - 32:1, 50:13
**writing** [7] - 12:14, 12:15, 12:17, 31:12, 32:23, 48:13, 96:4
**writings** [1] - 102:5
**written** [3] - 8:23, 51:13, 95:5
**wrote** [25] - 3:24, 9:5, 13:21, 15:9, 15:18, 15:21, 18:15, 19:23, 28:8, 35:18, 37:22, 39:11, 47:13, 47:23, 50:9, 50:10, 51:6, 53:20, 54:8, 57:3, 57:9, 63:16, 63:17, 75:7, 87:13

## Y

**yanked** [1] - 104:22
**year** [6] - 4:17, 10:2, 10:22, 50:25, 81:17
**years** [2] - 49:15, 71:11
**Yeomelakis** [2] - 85:22,

86:10
**yesterday** [3] - 24:12, 58:20, 59:25
**young** [1] - 18:15
**yourself** [8] - 5:9, 26:24, 27:2, 28:8, 29:18, 62:22, 74:10, 74:13

**Z**

**Zoom** [6] - 10:24, 11:2, 11:4, 53:7, 53:12